**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     :

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. | : Master File No. 09 MDL 2058 (DC) |
| SECURITIES, DERIVATIVE, AND | : |
| EMPLOYMENT RETIREMENT INCOME | : **CONSOLIDATED AMENDED** |
| SECURITY ACT (ERISA) LITIGATION | : **CLASS ACTION COMPLAINT** |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                     : **JURY TRIAL DEMANDED**

| | |
|---|---|
| THIS DOCUMENT RELATES TO: | : **ECF CASE** |
| | : |
| All Securities Actions | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 2

II. JURISDICTION AND VENUE .............................................. 11

III. PARTIES ........................................................................ 11

    A.    Plaintiffs ................................................................. 11

    B.    Defendants .............................................................. 13

          1.    Corporate Defendants .......................................... 13

          2.    Officer Defendants .............................................. 14

          3.    BoA Board Defendants ........................................ 16

          4.    The Underwriter Defendants ................................. 19

IV. OVERVIEW .................................................................... 19

    A.    BoA Hastily Seizes The Opportunity To Acquire Merrill, Paying A Significant Premium Without Performing Adequate Due Diligence .................. 19

    B.    BoA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End ................................ 22

    C.    Lewis Presents The Merger To Investors While Concealing The Bonus Agreement And Assuaging Investor Concern Over BoA's Due Diligence .......... 25

    D.    During October And November 2008, Merrill's Losses Grow To At Least $15.3 Billion Before The Shareholder Vote ........................................................ 28

    E.    BoA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote, And Debated Terminating The Merger Because Of Them ................................................. 30

    F.    While Merrill And BoA Deteriorate, The Billions In Merrill Bonuses Are Finalized .................................................. 34

    G.    BoA And Merrill Issue The Materially False And Misleading Proxy ................ 35

    H.    Almost Immediately After Shareholders Approve The Merger, Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him ................................................ 37

    I.    With BoA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout .................................................. 44

    J.    On The Day The Merger Closes, Defendants Misrepresent The Deal While Continuing To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout ........................................ 47

    K.    The Price Of BoA Shares Plummets As The Truth Emerges ............................... 47

L.     Post-Class Period Events ........................................................ 54

V.     FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS .......... 59

    A.     The Announcement Of The Merger On September 15, 2008 .............. 59

    B.     The Merger Agreement Is Filed On September 18, 2008 ..................... 66

    C.     The Secondary Offering Documents ..................................... 68

    D.     Merrill's October 16, 2008 Press Release .............................. 69

    E.     The Proxy .............................................................. 70

    F.     The Proxy Supplements ................................................. 74

    G.     The December 5, 2008 Shareholder Vote And Press Release ............. 76

    H.     Defendants' Failure To Disclose Highly Material Information Prior To
The Close Of The Merger ............................................... 77

VI.     SUMMARY OF SCIENTER ALLEGATIONS ................................... 79

    A.     Additional Evidence Of Lewis's Scienter ............................... 81

    B.     Additional Evidence Of Price's Scienter ............................... 87

    C.     Additional Evidence Of Thain's Scienter ............................... 88

    D.     Additional Evidence Of Cotty's Scienter ............................... 89

VII.     LOSS CAUSATION – EXCHANGE ACT CLAIMS .............................. 89

VIII.     RELIANCE: APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE
FOR EXCHANGE ACT CLAIMS ........................................... 92

IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE ......................................... 94

X.     CLASS ACTION ALLEGATIONS ........................................... 95

XI.     CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE
EXCHANGE ACT ........................................................ 97

    COUNT I ................................................................ 97

    For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
        (Against Defendants BoA, Lewis, Price, And Cotty)

    COUNT II ............................................................... 102

    For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
        (Against Defendants Merrill And Thain)

    COUNT III .............................................................. 106

    For Violations Of Section 20(a) Of The Exchange Act
        (Against Defendants Lewis, Price, And The BoA Board)

COUNT IV .................................................................................................................. 108

        For Violations Of Section 20(a) Of The Exchange Act
        (Against Thain)

XII.     CLAIMS UNDER SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT ........... 110

COUNT V .................................................................................................................... 117

        For Violations of Section 14(a) Of The Exchange Act
        (Against Defendants BoA, Merrill, Lewis, Thain, Price,
        Cotty, And The BoA Board)

COUNT VI .................................................................................................................. 119

        For Violations Of Section 20(a) Of The Exchange Act
        In Connection With The Proxy Claims
        (Against Defendants Lewis, Thain, Price, And The BoA Board)

XIII.    CLAIMS UNDER THE SECURITIES ACT ............................................................ 122

COUNT VII ................................................................................................................. 125

        For Violations Of Section 11 Of The Securities Act
        (Against BoA, Lewis, Price, Cotty, The BoA Board,
        And The Underwriter Defendants)

COUNT VIII ............................................................................................................... 127

        For Violations Of Section 12(a)(2) Of The Securities Act
        (Against BoA And The Underwriter Defendants)

COUNT IX .................................................................................................................. 128

        For Violations Of Section 15 Of The Securities Act
        (Against Defendants Lewis, Price And The BoA Board)

1.      Court-appointed Lead Plaintiffs, the State Teachers Retirement System of Ohio; the Ohio Public Employees Retirement System; the Teacher Retirement System of Texas; Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V.; and Fjärde AP-Fonden (collectively, "Lead Plaintiffs"), bring this action individually and on behalf of all persons and entities who (i) purchased or otherwise acquired the common stock or preferred securities as described in Appendix A attached hereto (the "Preferred Securities") of Bank of America Corporation ("BoA" or the "Company") between September 15, 2008 and January 21, 2009, inclusive (the "Class Period"), excluding any shares of BoA common stock acquired by exchanging the stock of Merrill Lynch & Co., Inc. ("Merrill" or "Merrill Lynch") for BoA stock through the merger between the two companies consummated on January 1, 2009; (ii) held BoA common stock or 7% Cumulative Redeemable Preferred Stock, Series B ("Series B Preferred Stock") as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill; or (iii) purchased BoA common stock issued under the Registration Statement and Prospectus for the $10 billion offering of BoA common stock that occurred on or about October 7, 2008, and were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants (as defined herein), present or former executive officers of BoA and Merrill, the members of Merrill's Board of Directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP; Kaplan Fox & Kilsheimer LLP; and Barroway Topaz Kessler Meltzer & Check, LLP.  This investigation included, but was not

limited to, a review and analysis of: (i) public filings with the Securities and Exchange Commission ("SEC") by BoA and Merrill; (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by BoA and Merrill; (v) press releases and media reports; (vi) economic analyses of securities movement and pricing data; (vii) publicly available legal actions involving both companies; and (viii) public material obtained in connection with continuing investigations by the United States Congress, the New York Attorney General, and the SEC. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. __INTRODUCTION__

3. This action involves a series of materially false and misleading statements and omissions by Defendants in connection with BoA's $50 billion acquisition of Merrill Lynch, which was announced on September 15, 2008, voted on by BoA's shareholders on December 5, 2008, and consummated on January 1, 2009.

4. On the morning of Saturday, September 13, 2008, John A. Thain ("Thain"), Merrill's Chief Executive Officer, called Kenneth D. Lewis ("Lewis"), BoA's Chief Executive Officer, to propose a "strategic arrangement" between the two companies. As Thain knew, the impending bankruptcy of Lehman Brothers Holdings Inc. ("Lehman") and the ensuing dislocations in the financial markets would cause severe liquidity issues for Merrill "beginning Monday morning," September 15, 2008. Indeed, as subsequently reported by *PBS Frontline*, Thain, along with the heads of most major investment banking firms, had attended a meeting on September 12 called for and presided over by Henry M. Paulson, the then-Secretary of the

United States Treasury ("Secretary Paulson"), during which the discussions focused on attempts to find a buyer to avert Lehman's impending bankruptcy and the likelihood that Merrill – because of its own exposure to toxic assets – would be the next investment bank to fail.

5.      Lewis, who had long coveted Merrill, readily accepted Thain's invitation and flew to New York City to meet with him that Saturday afternoon.  By September 14, 2008, one day later, Lewis and BoA had agreed to acquire Merrill in one of the largest mergers in Wall Street history.  Pursuant to the terms of the Merger Agreement, BoA agreed to pay $29 per share in stock to acquire Merrill – a total of $50 billion – a price that represented a substantial 70% premium over the price at which Merrill stock closed on September 12.

6.      During the abbreviated merger negotiations, BoA and Merrill spent considerable time negotiating the discretionary year-end bonuses that Merrill executives and employees would receive for 2008.  The bonus discussions lasted until 2 a.m. on September 15, and ultimately BoA agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses – an amount which represented 12% of the merger price, and more than 75% of the "record" $7.5 billion profit Merrill had reported in 2006 (the last year it would ever report a profit).  BoA, Thain, and Lewis also agreed to allow Merrill to accelerate payment of these bonuses so that Merrill could pay them in December 2008, before the merger closed, rather than in January, when bonuses were supposed to be paid at Merrill, to ensure that Merrill would be able to exercise significant control over the bonus amounts and the recipients of the bonuses.

7.      Throughout October and November 2008 – the two months immediately preceding the December 5, 2008 shareholder vote on the merger – Merrill and BoA suffered highly material undisclosed losses that greatly jeopardized the solvency of Merrill and the combined company.  In October 2008 alone, Merrill lost a staggering $7 billion.  In November

2008, Merrill lost an additional $6.3 billion, and also suffered a goodwill impairment of another $2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender. Thus, by the date of the merger vote, <u>Merrill had lost at least $15.3 billion in just two months</u> – and Merrill was internally projecting billions of dollars of additional losses in December. The losses were large enough to bankrupt Merrill, and in the weeks preceding the shareholder vote, senior BoA executives repeatedly discussed terminating the merger by invoking the "material adverse effect" clause in the merger agreement (commonly known as a "material adverse change" clause or "MAC").

8.     Notwithstanding these highly material facts, neither Merrill nor BoA disclosed any information relating to Merrill's enormous pre-merger losses, or the fact that BoA had agreed to allow Merrill to pay billions of dollars in bonuses regardless of those losses, prior to the shareholder vote. Instead, on November 3, 2008, BoA and Merrill filed with the SEC a Joint Definitive Proxy Statement soliciting approval of the merger from the shareholders of both companies, which materially misstated Merrill's financial condition and the strength of the combined company, and failed to disclose the agreement allowing Merrill to pay billions of dollars of bonuses before the merger closed (as defined further below, the "Proxy"). Indeed, the Proxy specifically highlighted the purported "strong capital position" of the combined company, and falsely represented that there had been no "material adverse changes" to Merrill's financial condition. Further, rather than disclosing the fact that BoA had already agreed to allow Merrill to pay up to $5.8 billion in bonuses, the Proxy represented that Merrill had agreed <u>not</u> to pay year-end performance bonuses or other discretionary incentive compensation prior to the closing of the merger without BoA's consent.

9.     Documents, sworn testimony, and acknowledgements by Defendants cited herein establish that both Merrill and BoA senior executives, including Defendants Thain and Lewis, were fully aware of both BoA's agreement to allow Merrill to pay the bonuses and the massive losses Merrill was experiencing.  Executives at BoA, including Defendant Lewis, expressly approved the Merrill bonuses, and were kept fully informed about Merrill's deteriorating financial condition from the time the merger was announced.  As Defendant Thain testified under oath, "Bank of America had daily access to the exact same financial information that I had," and "was totally up to speed as to what was happening."  Defendant Lewis also admitted before Congress that BoA received "detailed financial reports every week" from Merrill and that Merrill's losses were "clear" before the shareholder vote.

10.     On December 5, 2008, shareholders of BoA, oblivious to the fact that Merrill had lost at least $15.3 billion in the first two months of the fourth quarter, and that BoA and Merrill had agreed to pay billions of dollars in bonuses to Merrill's executives notwithstanding these crippling losses, approved the merger.  The closing date was set for January 1, 2009.

11.     Following the shareholder vote, Defendants continued to conceal highly material information from investors. Within days of the shareholder vote, Defendant Lewis internally acknowledged that Merrill's losses were so significant that BoA could not absorb them and remain solvent.  On or about December 17, 2008, Defendant Lewis called Secretary Paulson to inform him that Merrill's losses were so severe that BoA was going to terminate the merger by invoking the MAC.  Summoned almost immediately to a meeting in Washington, D.C., Lewis falsely claimed to Secretary Paulson and Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve ("Chairman Bernanke"), that Merrill's losses only recently materialized in mid-December, and that he had been unaware of them until then.

12.     After reviewing Merrill's and BoA's financial data, senior officials of the U.S. Federal Reserve System (the "Federal Reserve") concluded that Lewis's claims of surprise were "<u>not credible</u>," and that Merrill's financial deterioration had been "<u>observably under way over the entire quarter</u>."[1]  Indeed, documents and other evidence establish that Merrill's losses were far greater in October and November 2008 than in December 2008, and that BoA, which had appointed its Chief Accounting Officer, Neil A. Cotty ("Cotty"), to be Merrill's acting CFO when the merger was announced, knew of these losses as they occurred.  Accordingly, Secretary Paulson and Chairman Bernanke told Lewis that invoking the MAC "after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition" would reveal the falsity of those statements, and "cast doubt in the minds of financial market participants . . . about the due diligence and analysis done by the company, its capability to consummate significant acquisitions, its overall risk management processes, and the judgment of its management."  As Secretary Paulson later testified to Congress, he also told Lewis that, if Lewis invoked the MAC, Lewis, BoA's senior management, and BoA's Board of Directors (the "BoA Board") would be terminated.

13.     After this threat, Defendant Lewis agreed not to invoke the MAC, and to proceed with the merger.  However, in order to prevent BoA's collapse from the weight of Merrill's losses – which by that point were approaching $20 billion for the quarter – Lewis asked for and obtained a commitment that BoA would receive a $138 billion taxpayer bailout, consisting of a highly dilutive $20 billion capital infusion and an asset guarantee of $118 billion.  Recognizing that disclosure of these facts would lead to a shareholder revolt and almost certainly prevent the merger from closing – and thus cost him his job – Defendant Lewis actively concealed the Government's commitment from his shareholders.  In a December 22, 2008 email to the BoA

---

[1] Throughout this Complaint, all emphasis is added unless otherwise noted.

Board, Lewis wrote, "I just talked with Hank Paulson.  He said there is no way the Federal Reserve and the Treasury could send us a letter of any substance [documenting the bailout] without public disclosure <u>which, of course, we do not want</u>."

14.     The merger closed on January 1, 2009, with BoA shareholders and investors still unaware that (i) Merrill had lost more than $21 billion in the fourth quarter of 2008; (ii) as a result of these massive losses, Lewis and BoA had determined that a MAC had occurred and that BoA should not proceed with the merger; (iii) BoA had agreed to proceed with the merger only after Secretary Paulson told Lewis that he, senior management, and the Board would be fired if they refused to proceed; (iv) as a result of that ultimatum, BoA's officers and directors faced a clear, irreconcilable conflict of interest in agreeing to proceed with the merger; (v) BoA could not absorb Merrill's losses without receiving a $138 billion taxpayer bailout; and (vi) notwithstanding Merrill's losses, Merrill had paid its executives and employees $3.6 billion in bonuses prior to the close of the merger, further depleting Merrill's resources.  Instead, BoA issued a press release that day falsely claiming that the merger "creat[ed] a premier financial services franchise."  In the press release, Lewis falsely represented that "[w]e are now uniquely positioned to win market share and expand our leadership position in markets around the world."

15.     News about these materially adverse facts did not begin to enter the market until mid-January 2009.  On the morning of January 12, 2009, a Citigroup analyst wrote, based on information leaked to the market, that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share.  On January 15, 2009, *The Wall Street Journal* reported that BoA was "to get billions in U.S. aid . . . because of Merrill's larger-than-expected losses in the fourth quarter."  In response, BoA moved its earnings conference call from January 20 to January 16, 2009.  On January 16, BoA announced that Merrill had suffered more

than $21 billion of losses during the fourth quarter, and that BoA had suffered an additional $1.8 billion loss. BoA also announced that the U.S. Government was extending a $138 billion taxpayer bailout to BoA, and that the Company was slashing its dividend from $0.32 to $0.01 per share to preserve capital.

16.     The news stunned the investment community. J.P. Morgan analysts reported that Merrill's losses were "enormous" and "much worse" than expected, and *The New York Times* reported that Merrill's losses were "devastating." After the close of the market, it was reported that Moody's Corp. ("Moody's") had downgraded BoA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch Ratings, Inc. ("Fitch") had downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

17.     In direct response to these disclosures, BoA shares lost more than half of their value, falling from $12.99 on January 9 (the trading day immediately prior to the January 12 disclosure) to $5.10 on January 20 – a market capitalization loss of approximately $50 billion. *The New York Times* described the loss as "one of the greatest destructions of shareholder value in financial history." Yet, these shares were still inflated, as BoA continued to conceal the materially adverse fact that, despite Merrill's gargantuan losses, BoA had allowed Merrill to pay billions of dollars in bonuses to its executives and employees before the merger closed.

18.     On the night of January 21, 2009, the *Financial Times* reported that, in late December, immediately prior to the closing date, Merrill had paid $3-4 billion in bonuses despite its massive fourth quarter losses. In response to the belated disclosure of billions of dollars in secret bonus payments, BoA stock fell an additional 15% on January 22, 2009. Within hours of

this disclosure, with shareholders in an uproar, Lewis was on his way to New York, where he fired Thain.

19.     The events surrounding the Merrill acquisition have continued to have a substantial negative effect on the Company.  In late January 2009, the New York Attorney General, Andrew M. Cuomo, initiated an investigation into Merrill's accelerated bonus payments.  On September 8, 2009, the New York Attorney General's office released a letter in which it stated that its ongoing investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders" – including Merrill's losses, the accelerated bonus payments, undisclosed goodwill write-downs, and the decision to invoke the MAC – and that "the facts of Bank of America's senior executives' knowledge of these events are straightforward."  In April 2009, BoA shareholders – expressing their fury over Lewis's conduct in connection with the merger – voted to strip Lewis of his position as Chairman of the BoA Board.  *BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties."  Ten members of the BoA Board have resigned since the merger closed.  In May 2009, Congress initiated an investigation into the circumstances surrounding the merger, including BoA's refusal to disclose Merrill's losses, and has to date held hearings during which Lewis, Secretary Paulson, and Chairman Bernanke have testified.

20.     In August 2009, the SEC sued BoA for violating Section 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that "Bank of America's failure to disclose the fact that it had agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses before the merger closed" violated the federal securities laws because "this

omission made statements in Bank of America's proxy materials materially false and misleading." On the same day that the SEC filed its complaint, it announced that BoA had agreed to settle the action and pay a $33 million fine. On September 14, 2009, the United States District Court for the Southern District of New York rejected that settlement, holding that, given the strength of the allegations and the fact that no individual was either named as a defendant or contributing to the settlement, the proposed settlement was "neither fair, nor reasonable, nor adequate."

21.     On September 18, 2009, the *Charlotte Observer* reported that, for the past six months, the F.B.I. and the U.S. Department of Justice had been conducting an extensive "criminal investigation" of BoA in connection with the merger, during which the agencies had interviewed numerous executives and reviewed hundreds of thousands of documents.

22.     Based on the facts alleged herein, Lead Plaintiffs assert claims under (i) Section 10(b) of the Exchange Act against Defendants BoA, Merrill, Lewis, Thain, BoA's Chief Financial Officer Joe L. Price ("Price"), and Cotty; (ii) Section 20(a) of the Exchange Act against Defendants Lewis, Thain, Price, and the BoA Board; (iii) Section 14(a) of the Exchange Act against Defendants BoA, Merrill, Lewis, Thain, Price, Cotty, and the BoA Board; (iv) Section 11 of the Securities Act of 1933 (the "Securities Act") against BoA, Lewis, Price, Cotty, the BoA Board, and the underwriters of BoA's $10 billion offering of common stock on or about October 7, 2008 (the "Secondary Offering"), Banc of America Securities LLC ("Banc of America") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"); (v) Section 12(a)(2) of the Securities Act against BoA, Banc of America, and MLPFS related to the Secondary Offering; and (vi) Section 15 of the Securities Act against Lewis, Price, and the BoA Board related to the Secondary Offering.

## II.    **JURISDICTION AND VENUE**

23.    The claims asserted herein arise under (i) Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"); and (ii) Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

24.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

25.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

26.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.    **PARTIES**

### A.    **Plaintiffs**

27.    Lead Plaintiff, the State Teachers Retirement System of Ohio ("STRS Ohio"), is a public pension fund organized for the benefit of current and retired educators in Ohio.  As of June 30, 2008, STRS Ohio managed approximately $72.6 billion.  STRS Ohio serves

approximately 458,000 active, inactive, and retired Ohio public educators. STRS Ohio held 8,314,063 shares of BoA common stock as of October 10, 2008, the Record Date for voting in the merger, which were eligible to vote. STRS Ohio also purchased 178,000 shares of BoA common stock in the Secondary Offering. On June 30, 2009, this Court appointed STRS Ohio as a Lead Plaintiff for this litigation.

28. Lead Plaintiff, the Ohio Public Employees Retirement System ("Ohio PERS"), is a public pension fund organized for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement system. As of December 31, 2008, Ohio PERS managed approximately $59.2 billion. Ohio PERS serves approximately 936,000 members. Ohio PERS held 10,090,511 shares of BoA common stock as of the Record Date, which were eligible to vote. Ohio PERS also purchased 150,000 shares of common stock in the Secondary Offering. On June 30, 2009, this Court appointed Ohio PERS as a Lead Plaintiff for this litigation.

29. Lead Plaintiff, the Teacher Retirement System of Texas ("Texas Teachers"), is a public pension fund organized for the benefit of all employees of public education institutions throughout the State of Texas. As of October 2008, Texas Teachers managed approximately $82 billion. Texas Teachers serves more than 1.2 million members. Texas Teachers held 9,017,666 shares of BoA common stock as of the Record Date, of which 6,110,585 were eligible to vote. On June 30, 2009, this Court appointed Texas Teachers as a Lead Plaintiff for this litigation.

30. Lead Plaintiff, Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V. ("PGGM"), is the public pension fund for the healthcare and welfare sector in the Netherlands, and the second largest pension fund in Europe. The pension fund serves more than 2 million members. PGGM, acting for Stichting Pensioenfonds Zorg en

Welzijn, currently has approximately $115.3 billion in assets under management for Stichting Pensioenfonds Zorg en Welzijn. PGGM held 4,369,367 shares of BoA common stock for Stichting Pensioenfonds Zorg en Welzijn as of the Record Date, which were eligible to vote. On June 30, 2009, this Court appointed PGGM as a Lead Plaintiff for this litigation.

31. Lead Plaintiff Fjärde AP-Fonden ("AP-4") is a public pension fund in Sweden. AP-4 is part of the Swedish National Pension Fund System. With over four million members and approximately $32 billion in assets under management, AP-4 is one of the largest pension funds in Scandinavia. AP-4 held 2,604,640 shares of BoA common stock as of the Record Date, of which 2,163,226 were eligible to vote. On June 30, 2009, this Court appointed AP-4 as a Lead Plaintiff for this litigation.

32. Lead Plaintiffs purchased BoA common stock during the Class Period on the New York Stock Exchange ("NYSE") as detailed in the certifications attached hereto as Appendix B and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

**1. Corporate Defendants**

33. Defendant BoA is a Delaware corporation headquartered at 100 N. Tryon Street, Charlotte, North Carolina 28255. BoA is one of the country's largest financial institutions, providing a range of banking and non-banking financial services and products domestically and internationally. BoA securities actively trade on the NYSE under the ticker symbol BAC and, as of April 30, 2009, there were 6,402,966,457 shares of its common stock outstanding. On or about October 7, 2008, BoA issued 455,000,000 shares of BoA common stock, with an underwriter option to issue an additional 68,250,000 shares of common stock, in the Secondary Offering. The Secondary Offering was conducted pursuant to BoA's Shelf Registration Statement dated May 5, 2006 and filed with the SEC on Form S-3ASR (the "Secondary Offering

Registration Statement"), and a Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (the "Prospectus Supplement") (collectively, the "Offering Documents").

34. Defendant Merrill is a Delaware corporation headquartered at 4 World Financial Center, New York, New York 10080. Merrill is a global financial services company, providing investment banking, wealth management, and research services. From the start of the Class Period through December 31, 2008, Merrill stock was actively traded on the NYSE under the ticker symbol MER. As of January 1, 2009, Merrill became a direct subsidiary of BoA.

## 2. **Officer Defendants**

35. Defendant Lewis was BoA's Chief Executive Officer ("CEO"), President, and Chairman of the Board during the Class Period. Lewis signed the Agreement and Plan of Merger between BoA and Merrill dated September 15, 2008 (the "Merger Agreement"). Lewis also signed BoA's Registration Statement on Form S-4, which was filed with the SEC on October 2, 2008, as amended on October 22 and October 29, 2008 on Form S-4/A (collectively, the "Proxy Registration Statement"). The Proxy Registration Statement included a preliminary version of the Joint Proxy Statement for the merger, as required by Rule 14a-3(a), which was identical in all relevant respects to the materially false and misleading Definitive Joint Proxy Statement, and a copy of the Merger Agreement. Lewis also signed a cover letter for BoA's and Merrill's Definitive Joint Proxy Statement, which was dated October 31, 2008 and filed with the SEC on November 3, 2008 on Form DEFM14A and as a prospectus supplement on Form 424(b)(3) (together with the Proxy Registration Statement, the "Proxy"). Lewis made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a BoA press release of the same date.

Lewis further solicited approval of the merger through his recommendation as a member of BoA's Board of Directors to vote in favor of the merger, which repeatedly appeared throughout the Proxy. In addition, Lewis signed BoA's false November 26, 2008 Proxy Supplement, which was filed with the SEC pursuant to Rule 14a-b(6). Lewis was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and was a signatory of BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement. Because of his senior position with the Company, Lewis possessed the power and authority to control the contents of the Merger Agreement, Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.

36.     Defendant Price was BoA's Chief Financial Officer ("CFO") during the Class Period. Price signed the Proxy Registration Statement and made numerous other false and misleading statements and solicitations throughout the Class Period as set forth below. Additionally, Price was a signatory of the Secondary Offering Registration Statement by virtue of his having signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement. Because of his senior position with the Company, Price possessed the power and authority to control the contents of the Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.

37.     Defendant Cotty was BoA's Chief Accounting Officer ("CAO") before the announcement of the merger. Following the announcement of the merger, Cotty was appointed as Merrill's interim CFO, and acted as a direct liaison between BoA, including Lewis and Price,

and Merrill.  Cotty simultaneously continued in his capacity as BoA's CAO.  Cotty signed the Proxy Registration Statement.  Cotty was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.

38.    Defendant Thain was Merrill's CEO and Chairman of the Board from the beginning of the Class Period through December 31, 2008.  From January 1, 2009 through the end of the Class Period, Thain was the President of Global Banking, Securities and Wealth Management at BoA.  Thain signed the Merger Agreement on behalf of Merrill.  Thain also personally signed a cover letter for the materially false and misleading Proxy.  Thain made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a BoA press release of the same date.  Because of his senior position with Merrill, Thain possessed the power and authority to control the contents of the Merger Agreement, Proxy and Merrill's press releases, investor and media presentations, and other SEC filings.  Defendant Lewis terminated Defendant Thain's employment with BoA on January 22, 2009.

**3.  BoA Board Defendants**

39.    Defendant William Barnet III ("Barnet") was a Director of BoA during the Class Period.  Defendant Barnet resigned from the BoA Board on July 31, 2009.

40.    Defendant Frank P. Bramble, Sr. ("Bramble") was a Director of BoA during the Class Period.

41.     Defendant John T. Collins ("Collins") was a Director of BoA during the Class Period.  Defendant Collins resigned from the BoA Board on July 29, 2009.

42.     Defendant Gary L. Countryman ("Countryman") was a Director of BoA during the Class Period.  Defendant Countryman resigned from the BoA Board on July 31, 2009.

43.     Defendant Tommy R. Franks ("Franks") was a Director of BoA during the Class Period.  Defendant Franks resigned from the BoA Board on June 17, 2009.

44.     Defendant Charles K. Gifford ("Gifford") was a Director of BoA during the Class Period.

45.     Defendant Monica C. Lozano ("Lozano") was a Director of BoA during the Class Period.

46.     Defendant Walter E. Massey ("Massey") was a Director of BoA during the Class Period.

47.     Defendant Thomas J. May ("May") was a Director of BoA during the Class Period.

48.     Defendant Patricia E. Mitchell ("Mitchell") was a Director of BoA during the Class Period.  Defendant Mitchell resigned from the BoA Board on June 3, 2009.

49.     Defendant Thomas M. Ryan ("Ryan") was a Director of BoA during the Class Period.

50.     Defendant O. Temple Sloan, Jr. ("Sloan") was a Director of BoA during the Class Period.  Defendant Sloan resigned from the BoA Board on May 26, 2009.

51.     Defendant Meredith R. Spangler ("Spangler") was a Director of BoA during the Class Period.  Defendant Spangler resigned in April 2009 from the BoA Board when she reached the age limit for board members.

52.     Defendant Robert L. Tillman ("Tillman") was a Director of BoA during the Class Period.  Defendant Tillman resigned from the BoA Board on May 29, 2009.

53.     Defendant Jackie M. Ward ("Ward") was a Director of BoA during the Class Period.  Defendant Ward resigned from the BoA Board on June 3, 2009.

54.     Defendants Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward are collectively referred to as the "BoA Board" or the "BoA Board Defendants."

55.     The BoA Board Defendants participated in BoA Board meetings and conference calls, voted to approve the merger, including Merrill's bonuses, signed the Proxy Registration Statement, and solicited approval of the merger through the BoA Board's recommendation to vote in favor of the merger, which repeatedly appeared throughout the Proxy.  The BoA Board Defendants also signed the Secondary Offering Registration Statement at the time it was filed with the SEC on Form S-3ASR in 2006, signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement, and were directors of the Company at the time of the filing of the Prospectus Supplement.  In their capacities as signatories of the documents set forth above, as well as by virtue of their authority to approve the merger and Merrill's bonuses and formally recommend in the Proxy that BoA's shareholders approve the merger, the BoA Board Defendants possessed the power and authority to control the contents of the Proxy, as well as BoA's press releases, investor and media presentations, and other SEC filings.

**4.  The Underwriter Defendants**

56.     Defendant Banc of America, a wholly owned subsidiary of BoA, was an underwriter for the Secondary Offering, selling 227,500,000 shares of common stock in the Secondary Offering.

57.     Defendant MLPFS, a wholly owned subsidiary of Merrill, was an underwriter for the Secondary Offering, selling 227,500,000 shares of common stock in the Secondary Offering.

58.     Defendants Banc of America and MLPFS are collectively referred to as the "Underwriter Defendants."

**IV.     OVERVIEW**

**A.  BoA Hastily Seizes The Opportunity To Acquire Merrill, Paying A Significant Premium Without Performing Adequate Due Diligence**

59.     As *The Wall Street Journal* reported on September 15, 2008, Ken Lewis had "long coveted" Merrill.  Indeed, Merrill, a 94-year old pillar of Wall Street, possessed significant prestige and respect for which Lewis and the Charlotte-based BoA had "long clamored," and its acquisition was "the final piece" of Lewis's plan to make BoA the country's biggest bank by assets and arguably its most powerful financial institution, as Lewis himself acknowledged during an October 19, 2008 interview on *60 Minutes*:

| | |
|---|---|
| Question: | You always wanted Merrill Lynch. |
| Lewis: | We've always thought that was the best fit for us. |
| Question: | You were drooling for Merrill Lynch. |
| Lewis: | We have always thought it was . . . .  Yep. |

60.     As the financial markets collapsed in 2008, Defendant Lewis got the chance to acquire the company he coveted.  On Sunday, September 7, 2008, the U.S. Government seized the country's two largest mortgage companies, known as Fannie Mae and Freddie Mac, placed

them into conservatorships, and agreed to inject as much as $100 billion into each institution to remedy its capital shortfall.  Days later, on September 11, 2008, American International Group, Inc. ("AIG") saw its stock price plummet 31% in the face of looming rating agency downgrades and resulting collateral calls, and immediately began negotiating a deal to, in effect, sell itself to the U.S. Government for $85 billion to avert imminent bankruptcy.

61.     The next day, Friday, September 12, 2008, it became clear that Lehman, one of Wall Street's most venerable institutions, would have to find a buyer or be forced to file for bankruptcy by September 15.  Lehman's bankruptcy – the largest in U.S. history – was certain to further destabilize the financial markets by causing lenders to halt crucial daily funding to other financial companies with large exposure to similar mortgage-linked assets, leaving those companies vulnerable to collapse.

62.     As Merrill CEO John Thain realized, Lehman's bankruptcy would almost certainly trigger Merrill's own collapse.  Indeed, in a February 19, 2009 deposition taken by the New York Attorney General's office, Thain testified that he knew that Lehman's failure would likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008.  As Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill.   Accordingly, Thain immediately began searching for a buyer for Merrill.

63.     As Thain later stated, he knew that Lewis "always wanted" to acquire Merrill. Thus, on the morning of Saturday, September 13, Thain called Lewis at his North Carolina home and said, "Ken, I think we should talk about a strategic arrangement."  Lewis, who had been

rebuffed in several previous attempts to acquire Merrill, jumped at the opportunity, telling Thain he could meet him in New York that afternoon.

64.     By 2:30 p.m. that day, Thain and Lewis were sitting alone and face-to-face in BoA's corporate apartment in the Time Warner Center in New York.  Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America."  Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here.  I want to buy the whole company, not invest 9 to 10 percent."  Thain ultimately agreed to sell all of Merrill to BoA that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

65.     As Federal regulators got wind of the deal, they exerted significant pressure on the parties to finalize the transaction before the markets opened on Monday morning, in order to prevent Merrill's collapse and the effect such a collapse would have on the markets.  As *PBS Frontline* reported in a program titled "Breaking the Bank," which initially aired on June 16, 2009 ("*PBS Frontline*"), "Paulson was adamant the deal had to be done by Monday morning." According to Thain, in a personal meeting in New York City on Sunday, September 14, Federal regulators exerted "very strong[]" pressure to finalize the proposed merger immediately:

Thain:       Hank [Paulson] in particular was very strongly encouraging me to make sure that I got a transaction done prior to the opening on Monday.  And so they were very concerned that if Lehman were to go bankrupt what the implications might be for Merrill.  And so they very much wanted us to get a transaction done.

Question:   What form does that "strongly encouraging" take? How strongly?

Thain:       You know, in a meeting, it is, "John, you'd better make sure this happens."

Question:   That straightforward?

Thain:       Mm-hmm.

66.     Accordingly, on September 14, 2008, only one day after Defendant Thain had first contacted Defendant Lewis to discuss a strategic investment, Defendant Lewis agreed on BoA's behalf to pay $50 billion for Merrill in an all-stock transaction whereby each share of Merrill would be exchanged for 0.8595 shares of BoA.  The agreement valued Merrill stock at $29 per share – a 70% premium to Merrill's $17 per share closing price on September 12.

**B.  BoA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End**

67.     Unbeknownst to shareholders and investors, BoA's and Merrill's senior officers spent a large portion of their limited time during the merger discussions negotiating the bonuses that Merrill's senior officers and employees would receive as part of the deal.  In fact, Defendant Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC.  Defendants Lewis and Thain were involved in and kept continually apprised of these bonus negotiations.  Lewis negotiated the bonus agreement through Greg Curl, BoA's Global Corporate Strategic Development and Planning executive.  According to Thain's deposition testimony, he was kept informed of the negotiations, and all the terms of the agreement, through Greg Fleming, Merrill's President and Chief Operating Officer.

68.     According to a February 8, 2009 article in *The New York Times*, during these bonus negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone."  Subsequent media reports revealed that the list also provided for $30 million for Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai, President of Global Wealth Management Robert McCann, and General Counsel Rosemary

Berkery.  In total, Merrill sought the right to pay up to $5.8 billion in discretionary year-end and other bonuses to its executives and employees.

69.     Significantly, during these discussions, Merrill's senior executives also insisted that BoA agree to allow Merrill to <u>accelerate</u> payment of these bonuses so that they could be paid in December 2008 – before the merger was scheduled to close on January 1, 2009, and before Merrill's financial results for the fourth quarter became public.  This accelerated schedule deviated from Merrill's compensation practices and regular bonus schedule, under which annual bonuses were not even calculated, let alone paid, until January – <u>after</u> the close of the fiscal year.

70.     Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the merger Proxy, "pay for performance" was "the core of [Merrill's] compensation policy," and executive bonuses were "paid in January for performance in the prior fiscal year."  The March 2008 Proxy also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations."

71.     The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy – bringing Merrill to the precipice of collapse.

72.     Ultimately, BoA agreed to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger.  This highly material amount was

equal to <u>12% of the value of the merger</u>, and was in fact 26% <u>more</u> than BoA had earned during the first two quarters of 2008. It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

73.     The $5.8 billion in bonuses that BoA agreed to allow Merrill to pay was actually materially <u>greater</u> than the bonuses that Merrill itself had internally planned to pay prior to the collapse of the financial industry that occurred in the second half of 2008. Prior to the merger negotiations, Merrill had <u>reduced</u> its internally-projected bonus pool from $5.8 billion to $5.1 billion, or by 16.5%. Thus, the agreement with BoA permitted Merrill to pay bonuses that were at least $700 million greater than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

74.     BoA also permitted Merrill to pay these bonuses before the merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule. As Thain testified in his February 19, 2009 deposition: "The timing . . . was determined when we signed the merger agreement. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

75.     The acceleration of the bonuses was material to BoA shareholders for several reasons. First, paying the bonuses in December meant that Merrill executives would be able to reap gigantic bonuses despite Merrill's 2008 financial performance.

76.     Second, the accelerated schedule eliminated any chance that BoA might reduce or eliminate Merrill's bonus payments once BoA assumed control of Merrill after the merger closed. As the Associated Press reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later." As Merrill's

executives knew, BoA's compensation policies were substantially less generous than Merrill's, making it likely that BoA would severely curtail Merrill's bonuses – especially if Merrill suffered large losses during the fourth quarter – unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated the other merger terms. This was confirmed by BoA's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and BoA's – so big, in fact, that Smith gave "an example of someone in a role at Merrill that got paid three dollars, and that same role in Bank of America would have gotten paid one dollar."

77. Third, paying billions of dollars in bonuses before the merger closed meant that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

78. On *PBS Frontline*, Lewis stated that the bonuses were so large that they ruined the celebratory toast he had hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [of the merger process]. And frankly, it extends things to the point that I have never really been real happy by the time that champagne pours. Usually, you're mad at each other by then and you drink it politely and then leave. . . . And that was about how I felt with this one."

### C. Lewis Presents The Merger To Investors While Concealing The Bonus Agreement And Assuaging Investor Concern Over BoA's Due Diligence

79. On the morning of Monday, September 15, 2008, the first day of the Class Period, BoA and Merrill issued a joint press release in which they announced that BoA had agreed to acquire Merrill for $50 billion in stock in a deal that created an "unrivalled" financial services company and was scheduled to close on January 1, 2009. In an investor conference call and press conference that day, Defendants Lewis, Thain, and Price rebutted any suggestion that BoA

had made a hasty or precipitous decision to acquire Merrill, and made a series of false statements designed to assure investors that BoA had conducted comprehensive due diligence of Merrill, that there had been no regulatory pressure to finalize the transaction on an expedited basis, and that the large premium was justified because Merrill was financially stable.

80.     For example, when asked about the due diligence BoA conducted, Lewis falsely stated that it was "very, very extensive," included a "comprehensive[]" analysis of Merrill's financial condition, and had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much lower risk profile" than it previously possessed.  In order to emphasize how familiar BoA was with Merrill's financial condition with respect to any asset valuation issues, Lewis added that "we have very similar methodology valuations and we have very similar marks.  The structures – we're dealing with the same counterparties on things.  So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

81.     Further, when asked whether there was "any pressure on the part of regulators" to consummate the deal so quickly, Lewis falsely stated: "First of all, there was no pressure from regulators . . . absolutely no pressure," adding that the substantial premium was justified because "Merrill Lynch would have seen this [financial meltdown] through if they had been independent."

82.     On September 18, 2008, BoA and Merrill each filed copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms.  The Merger Agreement did not say a word about the $5.8 billion in bonuses that BoA had agreed to let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the merger closed.

To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not, without the prior written consent of BoA:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

83.     Thereafter, between September 18 and November 3, 2008, when the definitive Proxy was filed with the SEC on Forms DEFM14A and 424(b)(3) and mailed to shareholders, BoA and Merrill continued to make numerous positive statements reassuring investors about their financial condition, the merger, and the combined company. For example, on October 7, 2008, BoA conducted the Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion. In the press release announcing the offering, Lewis underscored BoA's "strength and stability," and falsely stated that the merger "should significantly enhance our earnings." On a related investor and analyst conference call, Defendant Price, responding specifically to a question regarding any need for additional capital in connection with the merger, affirmatively stated that no new capital would be necessary.

84.     On October 16, 2008, Merrill issued a press release in which Thain misleadingly stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal," and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent . . . earnings power."

85.     On October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to the "Troubled Asset Relief Program," or TARP. On October 19, 2008, Lewis appeared on *60 Minutes* and assured investors that BoA had actually benefited from

the financial crisis because, in contrast to other banks, consumers were attracted to BoA's stability and thus were making deposits at a record pace, enhancing BoA's capital position. Lewis represented that the Merrill transaction proved that BoA's capital strength had enabled it to defeat and absorb weaker banks, and that BoA had "won" its competition with "Wall Street."

86.     Lewis further stated that BoA did not need the TARP funding it had recently received, but that Secretary Paulson had forced Lewis to accept it with "no negotiations." Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and [] the right thing for America." In contrast to institutions that needed TARP funds to repair their capital bases, Lewis stated that BoA would "use [the TARP funds] to grow loans and to make more net income."

## D. During October And November 2008, Merrill's Losses Grow To At Least $15.3 Billion Before The Shareholder Vote

87.     Unbeknownst to BoA's shareholders and investors, throughout October and November 2008 – while BoA and Merrill were soliciting shareholder approval of the merger – Merrill was suffering undisclosed losses that were so large that they threatened the viability of the combined company if the merger was approved.

88.     In October 2008, the first full month after the merger was announced, Merrill suffered losses of approximately $7 billion. As Thain admitted in his interview with *PBS Frontline*:

> If you look at what actually happened in the fourth quarter, <u>October was the worst month</u>, which is not surprising, because it comes right after the Lehman bankruptcy. <u>We lost about $7 billion in the month of October</u>.... October was by far the worst.

89.     In November 2008, Merrill continued to suffer billions of dollars in losses. According to an expert analysis of Merrill's weekly loss data for the fourth quarter – which was

prepared by Congress to determine "what loss trends could reasonably be deduced from the loss data available to [BoA's] decision makers" at the time – by November 14, Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

90.     By the end of November 2008, Merrill's losses for October and November exceeded $15 billion – an amount that was substantially more than the record $12.8 billion pre-tax loss Merrill reported for the entire 2007 fiscal year.  As *The Wall Street Journal* reported on February 5, 2009, after reviewing an "internal document" which reported the losses, "<u>internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and December was looking even worse</u>."

91.     In addition to these highly material losses, according to a September 8, 2009 letter from the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans."  This impairment would be charged against Merrill's income.  Including this $2 billion goodwill impairment, Merrill's total losses and impairments by the end of November 2008 totaled <u>$15.3 billion</u>.

92.     Judged by any measure, Merrill's undisclosed losses were highly material to BoA shareholders and investors.  The undisclosed losses were large enough to bankrupt Merrill, and so large that BoA did not have the capital to absorb them.  Indeed, Merrill's losses were substantially greater than the $5.8 billion BoA had earned through the first nine months of 2008.  Further, these losses were entirely unexpected by the investment community.  After Merrill highlighted the "significant progress in balance sheet and risk reduction" it had supposedly

achieved in its October 16, 2008 press release, discussed above in ¶84, analysts' consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter <u>profit of $0.44 per share</u>.

### E. BoA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote, And Debated Terminating The Merger Because Of Them

93.     Defendants Lewis, Thain, Price, and Cotty knew of Merrill's losses as they occurred.  Indeed, Cotty became acting CFO of Merrill immediately after the merger was announced, and acted as a direct liaison between Merrill and Defendants Lewis and Price.  In addition, according to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team," to continuously monitor Merrill's financial condition.  As Thain wrote in a January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America.  They learned about these losses when we did.  The acting CFO of my businesses was Bank of America's former Chief Accounting Officer.  They had daily access to our p&l [profit and loss statements], our positions and our marks.

94.     Moreover, Thain testified in his deposition that BoA executives not only had access to this detailed financial information, but personally received regular updates as the fourth quarter progressed.  Thain testified that Merrill held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what was happening" throughout the fourth quarter.

95.     During Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, all received daily, "step-by-step" updates on Merrill's financial condition:

> Question:     And was Bank of America inside your books? . . .  Would they have known what was happening, what the projections were, how

|          | bad things actually were because of the Lehman collapse and what else had happened in the market? |
| Thain:   | <u>Yes, absolutely</u>. I believe in being totally transparent. They had acquired us. <u>We were completely transparent with them</u>. They had inserted the person who had been their chief accounting officer – he became the acting chief financial officer for the Merrill businesses. <u>We generate a daily profit and loss statement. They were getting that daily profit and loss statement, so they knew about the losses at the same time we did</u>. |
| Question: | Which was when? |
| Thain:   | <u>We get an update every day</u>. |
| Question: | <u>So they would have known all the way along</u>? |
| Thain:   | <u>All the way along</u>. |
| Question: | <u>Step by step</u>? |
| Thain:   | <u>Yes</u>. |

96.     Indeed, BoA has admitted that it was aware of Merrill's financial condition.  As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said that '<u>we have not disputed that we were kept informed about the financial condition of the company</u>.'"

97.     As set forth below at ¶¶115-119, although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware at the time of the losses that occurred during October and November 2008.  Lewis was asked by one Representative whether BoA received "<u>detailed financial reports every week</u> from Merrill Lynch after signing the merger agreement on September 15th?"  Lewis replied, "<u>That is true</u>."  The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . . ?  Isn't that true?"  Again, Lewis replied, "<u>It is true</u>."  At a later point in Lewis's testimony, another Representative asked whether any of the 200

financial analysts that BoA stationed at Merrill immediately after the merger announcement reported Merrill's losses to Lewis before the shareholder vote. Lewis responded, "I apologize if I haven't been clear. The – we did have people there, and we did know that there were losses. And that was clear both at our company and theirs."

98.     Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections. I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

99.     In fact, Lewis led weekly calls during which he and Defendant Price actively discussed Merrill's growing losses with the BoA Board. As *The Wall Street Journal* reported on September 17, 2009, "Before the shareholder vote, directors participated in weekly conference calls led by Mr. Lewis that included updates from the bank's chief financial officer, Joe Price, on Merrill's estimated fourth-quarter losses, said one person familiar with the calls."

100.    Merrill's losses in October and November 2008 were so significant that, in the days and weeks leading up to the shareholder vote, senior BoA executives discussed terminating the deal on several occasions. According to a February 5, 2009 article in *The Wall Street Journal*, "shortly before Thanksgiving," BoA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in its merger agreement." The debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

101.    The New York Attorney General's investigation confirms these facts. According to the New York Attorney General's September 8, 2009 letter, "prior to the shareholder vote,"

Merrill had suffered "more than $14 billion" of losses, which were "so great that Bank of America officers sought guidance – <u>before Bank of America shareholders approved the merger</u> – about the applicability of the material adverse change ('MAC') clause. . . . Yet Bank of America failed to disclose those large and increasing losses to its shareholders prior to the December 5, 2008 vote." (Emphasis in original). Indeed, according to the New York Attorney General, BoA's senior executives, including Defendant Price, discussed "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" on three separate occasions in the weeks before the vote, namely, on November 20, December 1, and December 3, 2008. On each occasion, BoA's senior officers, including Defendant Price, made a "decision not to disclose these escalating losses."

102.    Certain BoA executives insisted that if the Company was not going to terminate the merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts. According to the February 5, 2009 *Wall Street Journal* article quoted above, "[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses," and this disagreement continued right up until "the night before the vote." As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, <u>that investors should know about this before they vote</u>."

103.    At the same time that Merrill was collapsing, unbeknownst to investors, BoA's own financial condition was materially deteriorating to the point where BoA would be unable to absorb the losses suffered by Merrill. As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the merger, BoA had incurred a loss of almost $800 million, and was

projecting a total fourth quarter loss of $1.4 billion – <u>the first quarterly loss in BoA's history</u>. In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted BoA's own financial deterioration, writing that, "[a]s they [BoA senior executives] themselves noted the other night at our meeting, even on a stand alone basis, the firm is very thinly capitalized," BoA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

   **F.   <u>While Merrill And BoA Deteriorate, The Billions In Merrill Bonuses Are Finalized</u>**

   104.   While the financial condition of both Merrill and BoA deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees. According to Thain's deposition testimony, in early November 2008, he and BoA's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion. On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review. Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses on December 22; and employees would receive their cash awards by December 31. On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

   105.   Throughout this process, BoA's senior executives knew of the size and timing of the bonus payments. As Thain stated to *PBS Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

### G. BoA And Merrill Issue The Materially False And Misleading Proxy

106.    Notwithstanding the facts set forth above, the Proxy failed to disclose at any time before the shareholder vote on the merger <u>any</u> information about the billions of dollars in losses that had been suffered by either Merrill or BoA during October and November.  The Proxy also failed to disclose that Merrill would pay billions of dollars of bonuses before the merger's scheduled closing date, the payment of which further weakened Merrill's financial condition; that BoA's due diligence of Merrill was completely inadequate; and that regulators had exerted intense pressure on the parties to sign the Merger Agreement within 36 hours.

107.    On November 3, 2008, the Proxy was filed with the SEC on Forms DEFM14 and 424(b)(3) and mailed to shareholders.  The Proxy made no mention of the $7 billion in fourth quarter losses that Merrill had suffered by this date.  Instead, the Proxy falsely represented that there was an "<u>absence of material adverse changes</u>" to Merrill's financial condition, the merger was "fair" to BoA shareholders, and the "strong capital position" of the "combined company" was a "material factor" favoring the merger.

108.    The Proxy also affirmatively misrepresented that Merrill would <u>not</u> make any discretionary bonus payments before the merger closed on January 1, 2009.  Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch <u>will not</u>" pay any compensation that was "not required."  In addition, the Merger Agreement, which was attached to the Proxy as Appendix A, repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K, described above at ¶82.  Moreover, by incorporating Merrill's prior SEC filings, including the March 2008 Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance," as set forth above at ¶70.

109.     Significantly, in the weeks after the Proxy was mailed to shareholders, BoA and Merrill updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or BoA, or the accelerated bonus payments.  Rule 14a-9 specifically required BoA to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events.  Both Proxy supplements violated this rule.

110.     Specifically, on November 21, 2008, BoA and Merrill each filed a Form 8-K pursuant to SEC Rule 425, updating the Proxy to disclose that they had settled certain derivative litigation relating to the merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the merger – without disclosing any information concerning Merrill's losses, the secret bonus agreement, or BoA's own deteriorating financial condition.

111.     Then, on November 26, 2008, with the vote less than ten days away, BoA again supplemented the Proxy with the stated purpose of bolstering BoA's stock price, by filing a letter from Lewis to shareholders pursuant to Rule 14a-6(b) that falsely assured shareholders that BoA's financial condition remained extremely strong despite the upheaval in the market.  In that letter, which was written specifically to address investors' "deep concerns about . . . whether financial institutions have enough capital," Lewis falsely represented that BoA was "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world."  Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above.

**H. Almost Immediately After Shareholders Approve The Merger, Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him**

112. On December 5, 2008, BoA shareholders convened in Charlotte, North Carolina to vote on the merger, while Merrill shareholders convened in New York. BoA and Merrill shareholders voted in favor of the merger. Lewis represented that the merger was the crowning event in BoA's corporate history, noting that, "it puts us in a completely different league." BoA also issued a press release in which Lewis again falsely stated that the merger would create the "premier financial services franchise" in the world.

113. On Tuesday, December 9, 2008, the second business day following the shareholder vote, Defendants Lewis and Price met with the BoA Board to discuss Merrill's deteriorating financial condition. At the meeting, Defendant Price, relying on loss figures known to him and BoA, Merrill, Thain, Lewis, and Cotty and calculated before the shareholder vote, acknowledged that the massive projected fourth quarter losses at Merrill were material to investors. According to an August 6, 2009 *Wall Street Journal* article, Price "used the $9 billion [after tax] net loss estimate [circulated amongst management on December 3, 2008 in advance of the shareholder vote] in a presentation to Bank of America's Board. The 'magnitude' of the losses 'is quite significant,' he said . . . ." Merrill's losses were so severe that, according to the February 5, 2009 *Wall Street Journal* article, by no later than December 14, 2008, "Lewis [had] told Bank of America directors in a conference call that the bank might abandon the acquisition which was supposed to close in two weeks."

114. Having acknowledged that Merrill's losses were so massive that they threatened BoA's solvency, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that BoA had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis's deposition testimony. Secretary Paulson

immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal Reserve.

115.    On the evening of December 17, 2008, Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and other Treasury and Federal Reserve officials.  Lewis began the discussion by reporting the dire financial condition of the combined company.  Lewis stated that BoA was projected to lose $1.4 billion in the fourth quarter – the Company's first quarterly loss in its history.  Lewis then reported that Merrill's massive fourth quarter losses were so large that they would devastate BoA's tangible common equity and Tier 1 capital ratios, bringing the Company to the brink of insolvency.  Defendant Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes.  Lewis stated that BoA had concluded that a material adverse change had occurred in Merrill's financial condition, and that it would terminate the merger pursuant to the MAC.  In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

116.    Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for BoA and Merrill.  In response, Lewis raised the idea of BoA receiving a taxpayer bailout – including a "Citi-type" guarantee on $50 billion of assets – to proceed with the transaction, according to Price's handwritten notes.  Secretary Paulson asked for time to allow the Treasury and Federal Reserve to analyze the situation.  Lewis agreed to supply the Federal Reserve with information on

Merrill's and BoA's fourth quarter performance and risk exposures, and to wait to hear back from the regulators before taking further action.

117.    After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses.  As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email: "<u>This claim is not credible</u>."   On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise[]" was dubious:

> <u>General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter</u> – albeit picking up significant[ly] around mid-November and carrying into December – <u>Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect</u>.   <u>At a minimum, it calls into question the adequacy of the due diligence process [BoA] has been doing in preparation for the takeover</u>.

118.    As the above email provides, after reviewing BoA's internal data and Merrill's losses, numerous senior Federal Reserve officials concluded that, in contrast to BoA's public statements, the due diligence that BoA had conducted on Merrill had been grossly "deficient." For example, on December 20, 2008, Deborah Bailey, deputy director of the Banking Supervision and Regulation Division at the Federal Reserve, sent an email stating that, "I always had my doubts about the quality of the due diligence they did on the [Merrill] deal.  Don't forget they paid a premium.  How do you pay a premium and now ask for help?  This will not go over well at all."

119.    Senior Federal Reserve officials repeated these conclusions in the Federal Reserve Merger Analysis, which stated:

While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, [BoA] <u>management's contention that the severity of [Merrill's] losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition</u>.

120.     According to the Federal Reserve Merger Analysis, BoA had failed to adequately consider or assess Merrill's largest risk exposures.  As that Analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "large losses stemming from exposures to financial guarantors."  These exposures and losses, Federal Reserve officials concluded, "<u>were clearly shown in Merrill Lynch's internal risk management reports that [BoA] reviewed</u> during their due diligence."  In addition, Federal Reserve officials concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BoA] itself is also active in [] these products."

121.     The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BoA] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

122.     Defendant Lewis himself acknowledged to Federal Reserve officials that BoA had not conducted adequate due diligence.  In a December 23, 2008 internal Federal Reserve email, Federal Reserve Senior Vice President Mac Alfriend reported that Lewis "is worried about stockholder lawsuits; <u>knows they did not do a good job of due diligence</u> and the issues facing the company are finally hitting home and he [Lewis] <u>is worried about his own job</u> after cutting loose lots of very good people."

123.     As noted above, evidence emerging as a result of federal and state investigations of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-

December 2008.  Among other things, as noted above, the New York Attorney General has stated that evidence uncovered during its investigation established that, before the shareholder vote, BoA's executives (i) were fully aware of at least $14 billion of losses at Merrill and $2 billion in goodwill impairments; (ii) were so concerned with the magnitude of these combined losses that they repeatedly discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were not credible in claiming that Merrill's losses and goodwill impairments were "surprising."

124.    On December 19, 2008, Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Federal Reserve officials.  According to Defendant Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses in excess of $21 billion pre-tax, and that BoA would likely invoke the MAC.  Secretary Paulson asked Lewis what needed to be done to have the deal proceed.  Lewis raised two possibilities: the government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BoA.

125.    Price's handwritten notes show that Federal Reserve officials unequivocally told Lewis that a decision by BoA to invoke the MAC would reveal that BoA's prior statements about the merger and its due diligence were false, and would further cause the market to seriously question BoA's financial condition and the judgment of its management.  Chairman Bernanke testified before Congress that he told Lewis that "an attempt [by BoA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due

diligence and analysis done by the company, its capacity to consummate significant acquisitions, its overall risk management processes and the judgment of its management."

126.    On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further. Secretary Paulson bluntly told Lewis that the Federal Reserve would remove BoA's board and management if it tried to terminate the transaction. According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America. I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

127.    The threat to fire Lewis, BoA senior management, and the BoA Board had its intended effect. Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [BoA] were going to call the MAC." After receiving this threat, Lewis reversed course. As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

128.    That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BoA would proceed with the merger and would work with federal regulators on designing a bailout package. Lewis made the decision to proceed with the merger even though he knew that the impact of Merrill's losses would harm BoA shareholders. Specifically, at his deposition, Lewis was asked whether BoA's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them. He responded that BoA's investors were harmed over the "short term," which he defined as "[t]wo to three years."

129.     Recognizing that his conduct would likely result in legal liability for misleading shareholders, Lewis next took the extraordinary step of trying to obtain protection from the Government against shareholder suits.  According to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]."  Thus, Lewis had asked Bernanke "whether he could use as a defense that the [Government] ordered him to proceed for systemic reasons."  Bernanke told Lewis "no."

130.     Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors could formally advise Lewis that invoking the MAC was not in the best interests of BoA, and whether Lewis could use such a letter as a defense from suit.  Alvarez responded that such a letter was not "appropriate."  Alvarez also underscored that Lewis faced liability for BoA's lack of disclosures to shareholders in advance of the shareholder vote.  Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is material to investors.  There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . .  His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BoA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.

131.     In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise.  That could cause other problems for him around the disclosures [BoA] made for the shareholder vote.

**I.    With BoA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout**

132.    Ultimately, in order to proceed with the merger, Lewis requested and obtained a $138 billion taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of preferred stock, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill.  In a BoA Board meeting on December 22, 2008, Lewis told the BoA Board that he and Government officials had agreed to this bailout package. According to the meeting minutes, Lewis informed the BoA Board that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets;" that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation;" and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

133.    Lewis also made clear that management's recommendation to proceed with the merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

134.     Recognizing the material risk that shareholders would demand that the merger be terminated if BoA disclosed the Government bailout before the merger closed – and knowing that, if the merger failed, he, senior management, and the Board would be fired – Lewis concealed the bailout from investors.  Specifically, when Lewis learned that the Government would have to disclose that it was providing TARP funding to BoA if the Government's commitment was reduced to writing, Lewis immediately advised the BoA Board that the Company would not enter into a written agreement because it did not want this information to be disclosed in advance of the merger's close.  On December 22, 2008, Lewis sent the following email to the Board:

> I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, of course, we do not want.

135.     On December 30, 2008, Lewis met with the BoA Board to update them concerning the U.S. Government's commitment of TARP funds, and further underscored that the deal with the U.S. Government was firm and detailed.  According to the minutes of this meeting, "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators."  Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation."  Lewis added that:

> management of the Corporation had clearly explained to the federal regulators the terms and conditions required by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009.  In return, he reported, management has received strong assurances from all relevant federal regulators and policy makers that the Corporation will receive adequate and appropriate assets to neutralize the

impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009.

136.     Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize the impact . . . resulting from the Corporation's acquisition of Merrill Lynch," Lewis and the BoA Board again determined to withhold this information from BoA shareholders and investors.  According to the minutes of the BoA Board's December 30, 2008 meeting: "Mr. Lewis explained that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, which formal action would require public disclosure."  According to the meeting minutes, rather than disclose information about the Government bailout at that time, BoA determined to announce it "in conjunction with [BoA's] earning release on January 20, 2009."

137.     The New York Attorney General's investigation has further confirmed that, following the shareholder vote, Defendants concealed numerous, highly material facts. According to the New York Attorney General's September 8, 2009 letter:

> Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses.  Indeed, Bank of America only decided against seeking to terminate the merger when the jobs of its officers and directors were threatened by senior federal regulators.  Yet it took Bank of America more than a month to make public disclosure of its dire financial situation – a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information.  Bank of America further failed to disclose that its officers faced a conflict of interest in responding to the federal government's threat, or that it had received the government's oral commitment to support the merger with taxpayer funds.

138.     By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter.  On that day – its last as an independent company – it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to BoA shareholders.

**J. On The Day The Merger Closes, Defendants Misrepresent The Deal While Continuing To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout**

139.    On January 1, 2009, BoA closed its purchase of Merrill.  Even though (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) BoA had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the Company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse, BoA issued a press release that day falsely representing the merger as "creating a premier financial services franchise" and hailing the "$7 billion in pre-tax expense savings" BoA expected to achieve from the transaction.

140.    Based on BoA's false representations to the market as of that date, analysts had previously estimated that BoA would independently report earnings of $0.08 per share for the fourth quarter of 2008.  A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy.  Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told.  Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

**K. The Price Of BoA Shares Plummets As The Truth Emerges**

141.    News that BoA would report much higher losses than expected began to leak into the market by no later than January 12, 2009, when a Citigroup analyst wrote that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per

share.  In response, shares of BoA stock fell from $12.99 at the close of the market on the prior trading day to $11.43 – a 12% drop.

142.    According to a June 1, 2009 article in the *Sydney Morning Herald*, on January 14, 2009 in Sydney, which was January 13 in New York, Merrill executives in Australia had informed Australian bond traders that Merrill was going to report "awful" news that was going to cause the market to "plummet" on January 15, 2009.  One trader reported that he was told that the "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night," and that the news would "start to leak out."  BoA shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009, and fell further to close at $10.20 on January 14, 2009, all on heavy volume – a decline of approximately 11%.

143.    On the morning of January 15, 2009, *The Wall Street Journal* shocked investors with news that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to the Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co.," citing larger-than-expected but unquantified fourth quarter losses at Merrill.  In response, BoA announced that it was moving its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned.  The price of BoA stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009, on extremely heavy trading volume – an 18% drop which left BoA's share price at an 18-year low.

144.    On the morning of January 16, 2009, the Treasury Department issued a press release disclosing the Government bailout.  Later that morning, *The Wall Street Journal* published an article entitled "Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury to Inject $20 Billion More: Stock at 1991 Level," in which it speculated that Merrill's losses "could total in excess of $10 billion," and further reported that:

Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan.  Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991 . . . .  Thursday's 18% stock-market drop gives the Charlotte, N.C. bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill.  Its shares have lost over 40% of their value in the past seven trading sessions.  The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement.  Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

145.    Later that morning, BoA disclosed that (i) Merrill had suffered a fourth quarter after-tax net loss of $15.31 billion, or more than $21 billion before taxes, which accounted for more than 55% of Merrill's full year after-tax loss of $27 billion; (ii) BoA had suffered its own net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government was injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional preferred stock. With the fourth quarter losses, Merrill had lost $24.44 per share for the year, and $9.62 per share for the quarter, far above what the market had been expecting.  Similarly, BoA's own losses meant that it had lost $0.48 per diluted share, a far cry from the $0.08 per share profit that analysts expected.  In addition, BoA announced that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per share.

146.    The $24 billion of preferred shares that BoA was required to sell to the U.S. Government under the terms of the bailout carried an 8% dividend rate, which would require BoA to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BoA common stock by approximately thirty cents per share for 2009.  Further, BoA was required to pay the U.S. Government $236

million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee – all of which further reduced its future earnings and diluted the value of its common stock. In addition, BoA's acceptance of this additional Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a status that was so unique that, apart from BoA, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected BoA to additional Government oversight and restrictions.

147.     On the January 16, 2009 conference call to discuss these results, Lewis admitted that BoA was unable to absorb Merrill's losses without the taxpayer bailout:

> We went to our regulators and told them that we would not – that we could not close the deal without their assistance. As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

148.     Analysts and the financial press reacted with astonishment. On January 16, Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [Government] involvement."

149.     As Lewis admitted on *PBS Frontline*, "The magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."

150.     After the close of markets on January 16, 2009, it was reported that Moody's had downgraded BoA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch had downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

151.     On Saturday, January 17, 2009, *The New York Times* published a lengthy article describing Merrill's massive losses as "devastating" and revealing that BoA's management had contemplated exercising the MAC after the vote but prior to the closing of the merger, and was dissuaded by the Government from doing so.  In addition, *The Wall Street Journal* reported that BoA's own weakened financial condition contributed to the need for Government aid.

152.     The next trading day, Tuesday, January 20, 2009 (following the weekend and the Martin Luther King, Jr. holiday), J.P. Morgan reported that BoA's fourth quarter losses were "enormous," adding:

> [BoA] announced a major agreement with the U.S. government that reflected primarily the <u>poor acquisition of [Merrill] done without due diligence</u> as well as some assets from its own weakening portfolio. [Merrill] over-represented its value <u>given its large amount of high risk assets and the level of permanent dilution for [BoA]</u> from the acquisition will likely be higher.

153.     In direct response to these disclosures, BoA shares fell from $8.32 per share, their opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 – a drop of 38.7% on extremely heavy volume over two days of trading.

154.     In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about this materially adverse information, BoA stock plummeted from $12.99 to $5.10 – a decline of 60% – causing a market capitalization loss of <u>over $50 billion</u>. Even at this price, BoA stock remained artificially inflated because news of the massive bonuses had yet to be disclosed.

155.     Then, on January 21, 2009, just before midnight, the *Financial Times* broke the story of Merrill's accelerated bonus payments, reporting that Merrill had taken "the unusual step of accelerating bonus payments by a month last year."  Although the amount of the bonuses was not public, the *Financial Times* further reported that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December," before the merger closed.

According to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as "ridiculous," especially in light of Merrill's losses.

156.    After the *Financial Times* broke the news of Merrill's bonus payments, on the morning of January 22, 2009, Defendant Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job. According to Thain's *PBS Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

157.    On January 22, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

158.    The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments – as well as the fact that they were paid amidst historically large losses – was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitated in part by "[v]itriol . . . over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated." Similarly, the *Charlotte Observer* reported that "Thain's departure follows a raft of damaging revelations in recent days, including bigger-than-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed." The *Los Angeles Times* reported

on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the Associated Press reported that "on Thursday came the news that [Lewis] didn't block Merrill management's decision to dole out billions of dollars in early bonuses even as [Lewis] was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

159. Even after the *Financial Times* report, BoA and Merrill steadfastly refused to disclose or confirm the size of the bonuses. As the *Charlotte Observer* reported on January 23, 2009, BoA still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

160. The news of Merrill's bonus payments immediately triggered an investigation by the New York Attorney General. On January 23, 2009, *The New York Times* reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized . . . as 'large, secret last-minute bonuses.'" In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.

> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

161. In response to the disclosure of Merrill's enormous, accelerated bonus payments, BoA stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009. All told, BoA common

stock fell 56% – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 – in response to these belated disclosures, destroying tens of billions of dollars in shareholder value.  Similarly, the price of BoA's Preferred Securities fell by over 30% in the aggregate during this same time period.

**L.  Post-Class Period Events**

162.    The fallout from the revelations described above continues to be immense, resulting in additional civil and criminal investigations at both the federal and state levels.  In addition to the New York Attorney General's ongoing investigation, a similar investigation was initiated by the Attorney General of North Carolina to determine whether, among other things, Merrill and BoA had violated that state's laws against fraudulent transfers and civil racketeering.  Neil Barofsky, the TARP Inspector General, also opened a probe.

163.    Additionally, in January 2009, although it would not be disclosed to shareholders until mid-July 2009, the Federal Reserve and the Office of the Comptroller of the Currency downgraded the overall rating of BoA from "fair" to "satisfactory."  A letter sent by Federal Reserve officials explaining the action criticized BoA's management and directors for being "overly optimistic" about risk and capital.  As the letter explained, "Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future."  As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on BoA that, among other things, required it to address its problems with liquidity and risk management.

164.    On February 10, 2009, the New York Attorney General wrote a letter to Congress providing details on Merrill's accelerated bonus payments.  The letter detailed how Merrill's accelerated bonus schedule had allowed it to disproportionately reward its top executives despite

its massive losses – actions which the New York Attorney General described as "nothing short of staggering."  In particular, the New York Attorney General stated that:

> While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals.  Indeed, Merrill chose to make millionaires out of a select group of 700 employees.  Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group of <u>top executives what can only be described as gigantic bonuses</u>.

165.    Among the statistics that the New York Attorney General set forth were that (i) "[t]he top four bonus recipients received a combined $121 million;" (ii) "[t]he next four bonus recipients received a combined $62 million;" (iii) "[f]ourteen individuals received bonuses of $10 million or more and combined they received more than $250 million;" and (iv) "[o]verall, the top 149 bonus recipients received a combined $858 million."

166.    On April 29, 2009, at the Company's annual meeting, BoA shareholders voted to strip Lewis of his position as Chairman of the BoA Board in a vote that analysts deemed a rebuke to Lewis's conduct in connection with the merger.  *BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties."  At the shareholder meeting, Lewis conceded that BoA's shareholders "have carried a heavy burden" as a result of the Merrill acquisition.

167.    On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Federal Reserve.  BoA was deemed to need an additional $33.9 billion of Tier 1 common capital – far more than any other of the 19 banks tested.

168.    Beginning in May 2009, several members of BoA's Board of Directors resigned, including its lead independent director, O. Temple Sloan Jr., and Jackie Ward, chairman of the Board's asset quality committee.  Other departures included Chief Risk Officer Amy Woods Brinkley, and J. Chandler Martin, an enterprise credit and market risk executive.

169.    In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearings on the merger, with a particular focus on Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout.  During Lewis's testimony on June 11, 2009, Representative Dennis Kucinich told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008."  Representatives Peter Welch and Elijah Cummins both repeatedly pressed Lewis on the lack of disclosure to shareholders.  As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

170.    On August 3, 2009, the SEC filed a complaint against BoA in the United States District Court for the Southern District of New York, alleging that BoA had violated Section 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement.  That same day, the SEC announced that BoA had agreed to settle the action and pay a $33 million fine.

171.    As the SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without BoA's consent, in fact, BoA had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the

56

contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

172.     During the SEC's investigation, Merrill's most senior human resources executive, Peter Stingi ("Stingi"), whose responsibilities included monitoring the annual bonus pay of Merrill's competitors, acknowledged that the compensation expense set forth in Merrill's financial statements did not disclose Merrill's bonus plans.  Specifically, Stingi testified under oath that:

> We would not be able to see what our competitors' quarterly [bonus] accruals were because they like us would report their compensation and benefits expense [as an aggregate] . . . .  [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense.

173.     The day after the SEC filed its complaint, Representative Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch."  Representative Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that "our investigation has revealed . . . [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violations for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote."

174.     On September 8, 2009, the New York Attorney General sent a letter to BoA's outside counsel, which summarized the results of the New York Attorney General's investigation

and stated that it was in the process of "making charging decisions with respect to Bank of America and its executives." The letter provided that, "<u>The facts of [Merrill's] cascading losses and bonus payments – and the facts of Bank of America's senior executives' knowledge of these events – are straightforward</u>." The letter further provided that, "Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew;" (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly 'surprising'" losses after the shareholder vote; (iii) Bank of America's determination, "eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators;" and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

175.    On September 14, 2009, the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, rejected the proposed $33 million settlement of the suit filed by the SEC against BoA. The Court held that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior BoA executives were sued or contributed to the settlement. The Court found that the settlement violated the SEC's "normal policy in such situations [] to go after the company executives who were responsible for the lie," and rejected the SEC's contention that it did not have grounds for bringing claims against senior BoA

officials, remarking, "How can such knowledge [of the falsity of the statements in the Proxy] be lacking when, as the Complaint in effect alleges, executives at the Bank expressly approved making year-end bonuses before they issued the proxy statement denying such approval?" A trial date in the SEC action has been set for March 1, 2010.

176. On September 18, 2009, the *Charlotte Observer* reported that, for the past six months, the F.B.I. and the U.S. Department of Justice have been conducting an extensive "criminal investigation" of BoA in connection with the merger. As part of this wide-ranging investigation, BoA "has provided hundreds of thousands of documents and dozens of hours of executive time" to answer questions.

177. That same day, *Bloomberg* reported that, on September 17, 2009, Defendant Thain gave a speech at the Wharton School of the University of Pennsylvania, during which he made clear that BoA's claim that it lacked control over the bonuses paid to Merrill executives and employees was not true:

> [W]hen [BoA] said, "John Thain secretly accelerated these bonuses," they were lying and that has now trapped them into a lot of trouble because there is a piece of paper, there's a document that says, yes, they in fact agreed to this in September. So one take away for all of you is it's really always better to just tell the truth.

## V.     FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

### A.   The Announcement Of The Merger On September 15, 2008

178. On September 15, 2008, BoA announced that it had agreed to acquire Merrill for $50 billion in an all stock transaction that valued Merrill at $29 per share – a 70% premium to its closing price on September 12. As part of this announcement, BoA held a conference call for analysts and investors in which Lewis, Thain, and Price participated (the "Investor Call"), conducted a press conference in which Lewis and Thain participated (the "Press Conference"),

and issued a press release. In each instance, BoA, Merrill, Thain, Lewis, and Price made materially false and misleading statements about the circumstances surrounding the merger.

179. For example, during the Investor Call, several analysts questioned the adequacy of BoA's due diligence given the extremely abbreviated time frame in which the deal came together. In response to these queries, Defendant Price assured investors that the due diligence performed by BoA and its financial advisor, J.C. Flowers, had been "extensive":

> [F]rom a risk or due diligence perspective . . . we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. We sent in a large team to review areas such as asset valuations, trading positions, and the like. We were also joined by a team from J.C. Flowers that had done extensive due diligence over some time in reviewing other potential transactions [involving Merrill], so they were very familiar with Merrill Lynch's books.

180. During the Press Conference, Lewis also emphasized that BoA's due diligence was more than sufficient, and had established that Merrill's risk profile had been "dramatically" reduced in recent months:

> [H]e and his firm [Chris Flowers and J.C. Flowers] had done quite an amount of due diligence on Merrill Lynch fairly recently, and <u>it was very, very extensive</u>. <u>They had looked at the marks very comprehensively</u>, so this allowed us to have him and [his] team as an advisor, and just update the information they already had. So that was one of the key ingredients to being able to do this as quickly as we did.

> I will say that Chris's comment was it's <u>night and day from the time we first looked at it to now</u>. He was very complimentary of what John and his team had done in terms of <u>dramatically reducing the marks</u>, in many cases not only – not reducing the marks but getting rid of the assets, which is the best thing to do, so a <u>much lower risk profile</u> than he'd seen earlier on.

181. Lewis further stated that: "The J.C. Flowers piece is key because they were renewing an effort that had already gone on and had been very, very extensive." Lewis likewise assured BoA shareholders that BoA was very familiar with Merrill's risk profile because BoA and Merrill shared "very similar methodology valuations" and "very similar marks." He noted:

"The structures – we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

182.    These statements were false because (i) BoA had not "comprehensively" analyzed Merrill's financial condition, and thus (ii) Defendants had no reasonable basis to make any representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved. Indeed, after reviewing thousands of Merrill's internal documents which were made available by Merrill to BoA during the due diligence process, federal regulators determined that BoA's due diligence had been grossly deficient because, among other things, it failed to appropriately consider Merrill's risk profile. For example, in the Federal Reserve Merger Analysis, federal regulators concluded that Merrill's "single largest area of risk exposure and driver of recent losses . . . <u>were clearly shown in Merrill Lynch's internal risk management reports that [BoA] reviewed during their due diligence</u>." Further, after Lewis threatened to invoke the MAC due to Merrill's mounting losses, senior officials from the Federal Reserve concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BoA] itself is also active in [] these products." Thus, these officials concluded that BoA's failure to accurately understand Merrill's exposures at the time of the merger announcement "implies <u>substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition</u>."

183.    Lewis himself acknowledged that BoA's due diligence was grossly inadequate. When Lewis originally approached Federal Reserve officials for a bailout on December 17, 2008, Chairman Bernanke informed him that, if he were to terminate the merger, it would immediately reveal the falsity of his claims regarding "adequate due diligence." In a December

23, 2008 email, Mac Alfriend, a Senior Vice President at the Federal Reserve ("Alfriend"), wrote to other senior Federal Reserve officials that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose lots of very good people."

184.    As a direct result of BoA's inadequate due diligence, Defendants' statements about Merrill's "dramatically" lower risk profile were made without any reasonable basis. Indeed, mere weeks after Defendants made these statements, in October 2008, Merrill experienced the worst month in its history, incurring $7 billion of losses on high-risk assets that Thain acknowledged "were incurred almost entirely on legacy positions" that Merrill held as of September 15, 2008. As Thain further articulated in his September 17, 2009 speech, Lehman's bankruptcy filing on September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets," and that was precisely "why we sold the company." Moreover, contrary to BoA's Class Period representation that Merrill had "dramatically" reduced its risk profile, in its internal Federal Reserve Merger Analysis, Federal Reserve officials concluded that Merrill maintained several "large[] risk exposures" and "vulnerabilities" which exposed it to losses of between $13.4 billion and $23.2 billion. These exposures were so material that Alfriend wrote in an email that "Merrill is really scary and ugly."

185.    Defendant Lewis also made false statements about Merrill's liquidity and its ability to survive as an independent entity. For example, in response to questions asked during the Investor Call as to why BoA had agreed to pay such a substantial premium for Merrill, Lewis stated:

One, probably the more likely is that <u>Merrill had the liquidity and capacity to see this through</u>. It's not necessarily easy because of just the times. But more likely than not, they would have seen this through and come out on the other side.

186.    This statement was false because, as Thain admitted, Merrill did not have the liquidity or capacity to survive as a stand-alone entity. In fact, Thain admitted in sworn deposition testimony before the New York Attorney General that, without a deal, Merrill would have become effectively insolvent "beginning Monday morning," September 15, 2008. As noted above, Thain also subsequently stated that Lehman's bankruptcy filing on September 15 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets," and that Merrill's impending insolvency was "why we sold the company." Furthermore, Thain has publicly acknowledged that he attended a meeting on Friday, September 12, 2008 with the heads of the major investment houses, wherein it was discussed that Merrill's failure was imminent in light of the Lehman bankruptcy.

187.    Defendants also falsely represented that they were under no pressure from Federal regulators to complete the deal quickly. For example, in response to questions from analysts during the Press Conference about whether federal regulators had pressured the parties to get the deal done quickly, Defendant Lewis stated that:

First of all, <u>there was no pressure from regulators</u>. I'm sure, after the fact, that having this not be an issue is obviously very positive to them, but <u>absolutely no pressure</u>.

188.    This statement was false because, during the merger negotiations, Secretary Paulson had issued an ultimatum that BoA and Merrill finalize the transaction by Monday morning, September 15, 2008. As *PBS Frontline* reported, "Paulson was adamant the deal had to be done by Monday morning." In fact, Thain has subsequently admitted that Paulson demanded that the parties finalize the transaction by September 15, as set forth above at ¶65.

189.     In response to a question concerning whether Lewis and Thain had discussed Thain's position in the combined company, Thain stated that they had not, and Lewis emphasized that Thain had not sought to enrich himself or otherwise pursue his own self-interest while negotiating the merger.  Lewis stated: "That's a credit to John.  It usually doesn't happen that way and he never – <u>it was never about him; it was always about the deal</u>."

190.     This statement was false because, in reality, the merger negotiations were very much about Thain's ability to pay himself (and his associates) tens of millions of dollars.  As was subsequently revealed, Thain had demanded that Lewis pay him a $40 million bonus in connection with the merger, as well as $100 million in bonuses for his top lieutenants and former business associates from Goldman Sachs, as part of the total $5.8 billion in discretionary bonuses to Merrill executives and employees.  In fact, rather than focusing on "the deal," Thain stated that Merrill's bonuses were one of the three "main things" he focused on, and he used the merger as an opportunity to materially <u>increase</u> the amount of bonus compensation Merrill was planning to pay him and other executives.  Indeed, Thain was so focused on the question of personal compensation that, although the other terms of the agreement had been settled by the night of Sunday, September 14, negotiations concerning the Merrill bonuses continued until the early morning hours of Monday, September 15.

191.     Defendants BoA, Merrill, Thain, and Lewis also made false and misleading statements about the purported benefits of the merger.  For example, during the Investor Call, Lewis emphasized his favorable view of the merger, stating that the merger would "creat[e] more value for shareholders," and that the combined companies would be "just an incredible combination."  Similarly, Thain stated: "This is a transaction that makes tremendous strategic sense. We think it gives us great opportunities, both on the Bank of America side and on the

Merrill Lynch side" and "I think this is going to be a very attractive transaction from a shareholder point of view[.]"  During the Press Conference, Lewis told investors that the merger was "just a major grand slam home run" and "this was the strategic opportunity of a lifetime . . . . So we are very, very pleased with this."

192.    Defendants BoA, Merrill, Thain, and Lewis also praised the merger in the press release they issued that day, which was filed with the SEC as an exhibit to a Form 8-K, stating:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a <u>company unrivalled in its breadth of financial services and global reach</u>.
>
> "Acquiring one of the premier wealth management, capital markets, and advisory companies is a <u>great opportunity for our shareholders</u>," Bank of America Chairman and Chief Executive Officer Ken Lewis said.   "<u>Together, our companies are more valuable</u> because of the synergies in our businesses."
>
> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management to create what will be <u>the leading financial institution in the world with the combination of these two firms</u>," said John Thain . . . .
>
> *        *        *
>
> Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States.

193.    These statements praising the benefits of the merger were false and misleading, and made without a reasonable basis.  As noted above, BoA's due diligence of Merrill was grossly inadequate, and the amount of toxic assets on Merrill's balance sheet was so substantial that BoA would not have been able to absorb them had the Government not agreed to a $138 billion bailout.

194.    All of the above statements made on September 15 were highly material to investors.  Given Merrill's recent losses, the 70% premium BoA was paying, and the fact that the collapsing housing market was causing turmoil at other financial institutions, the market was

concerned over whether BoA had adequately investigated Merrill's exposure to potentially toxic assets, whether Merrill's financial condition was fundamentally sound, and whether regulators had pressured the parties to hastily agree to a deal that was not in BoA's best interests. The market was also concerned about whether Merrill executives had attempted to enrich themselves at the expense of BoA shareholders by draining Merrill of value before the transaction closed.

195.    In response to these statements, on September 15, 2008, Ladenburg Thalman reported that "the fact that Bank of America paid a high premium for Merrill and would not buy Lehman indicates that the due diligence done on both companies suggests that Merrill may be in stronger condition than thought."  On September 16, 2008, *The Daily Telegraph* of London reported that, "Bank of America was able to carry out due diligence on Merrill's books so swiftly because of work previously carried out by JC Flowers . . . which has been studying Merrill closely for months."  Likewise, *Investment Dealers' Digest* quoted the managing director at research and advisory firm TowerGroup as concluding, "Don't let them fool you into thinking they haven't been looking at each other for a long time. . . .  This was not a deal that was drummed up in the shower on Saturday morning and completed on Sunday night. These two firms are very familiar with each other."

**B.  The Merger Agreement Is Filed On September 18, 2008**

196.    On September 18, 2008, three days after Defendants announced the proposed merger, BoA and Merrill filed a Form 8-K with the SEC attaching the Merger Agreement.  The Merger Agreement assured BoA shareholders and investors that Merrill would not pay discretionary bonuses before the merger closed.  Specifically, in a section titled "Company Forbearances," the Merger Agreement provided that, "except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement," from September 15, 2008 through January 1, 2009, Merrill "shall not, and shall not

permit any of its Subsidiaries to, without the prior written consent of [BoA]," undertake any of 18 enumerated actions, including:

> increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, 'Employees'), [or] pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

197.    This statement was materially misleading.  First, the statement set forth above represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before the merger closed.  Second, the statement set forth above falsely reassured investors that BoA had not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA had already granted its consent with respect to the payment of $5.8 billion of bonuses.  As set forth above at ¶¶72-77, the undisclosed bonus agreement was highly material because, among other reasons, (i) the amount set aside to pay bonuses constituted 12% of the entire merger price and 30% of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses despite the fact that it lost more than $21 billion in the fourth quarter; and (iv) the payment of these bonuses before the merger closed ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

198.    The agreement allowing Merrill to pay $5.8 billion of bonuses pursuant to Merrill's VICP before the merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule."  While the Merger Agreement made a generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders.  Defendants' failure

to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because they violated Item 601(b)(2) of Regulation S-K. Item 601(b)(2) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement." In addition, Item 601(b)(2) further provides that any plan of acquisition "shall contain a list briefly identifying the contents of all omitted schedules, together with an agreement to furnish supplementally a copy of any omitted schedule to the Commission upon request." Accordingly, Defendants' failure to publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement also rendered the September 18, 2008 Forms 8-K materially false and misleading.

### C.  **The Secondary Offering Documents**

199.    On October 6, 2008, BoA announced that it was conducting the Secondary Offering for approximately $10 billion. During a conference call that day, Defendant Price told investors that the Secondary Offering was sufficient to cover BoA's capital needs required by the Merrill transaction, stating that BoA had "considered the Merrill deal" in assessing its capital position, and that the offering "covered our anticipated needs from a Merrill standpoint."

200.    The Secondary Offering was conducted pursuant to BoA's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

201.    The Offering Documents expressly incorporated by reference BoA's Form 8-K filed with the SEC on September 15, 2008, and Form 8-K filed with the SEC on September 18, 2008. As set forth above at ¶¶192-198, these documents contained untrue statements of material

facts and omitted to state material facts, thereby rendering the Offering Documents materially false and misleading.

**D.** **Merrill's October 16, 2008 Press Release**

202.    On October 16, 2008, Merrill issued a press release announcing its financial results for the third quarter, including a net loss of $5.2 billion.  Significantly, in the press release, Merrill explained that this $5.2 billion loss was a positive development, and highlighted that the loss was caused by the aggressive selling of risky assets in order to strengthen Merrill's balance sheet before the merger with BoA.  Thain misleadingly proclaimed that Merrill "continue[d] to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal," and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent . . . earnings power."

203.    In response to Merrill's announcement, analysts concluded that Merrill had significantly improved its financial condition in preparation for the merger with BoA, and believed that Merrill would make a profit in the fourth quarter.  For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse noted: "The strongest positive in the quarter was the progress made on working down the investment bank's 'high risk' inventory. . . .  With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%."  That same day, Deutsche Bank reported, "Merrill's quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America."  The report forecasted earnings of $0.54 per share for the fourth quarter.   On October 17, 2008, Buckingham Research Group reported that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter.  Indeed, on October 17, Thomson First Call consensus estimates stated that Merrill would have positive earnings of $0.44 per share in

the fourth quarter.  Likewise, on October 19, 2008, Oppenheimer concluded that Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet . . . ahead of the pending merger with Bank of America."

204.    However, the statements in Merrill's October 16, 2008 press release were materially false and misleading.  The statement that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" was materially false and misleading because, notwithstanding its purported efforts to "reduce exposures" and "de-leverage the balance sheet," Merrill retained large amounts of toxic assets on its balance sheet that caused $7 billion of losses in October alone and losses of more than $21 billion in the fourth quarter.

**E.  The Proxy**

205.    On October 2, 2008, BoA filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed two amendments on Forms S-4/A on October 22 and October 29, 2008.  On November 3, 2008, BoA and Merrill filed the definitive Proxy, including the attached Merger Agreement, with the SEC on Form DEFM14A and as a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3), and mailed it to shareholders.

206.    The Proxy, which included a cover letter signed by Defendants Lewis and Thain, explained the terms and conditions of the merger to shareholders, informed them about the background of the merger, and set forth the reasons why the BoA and Merrill Boards recommended that shareholders vote in favor of the merger.  The Proxy also informed BoA and Merrill shareholders that the shareholder vote on the merger would occur on December 5, 2008.

207.    The Proxy was materially false and misleading at the time it was filed because it failed to disclose any information whatsoever about Merrill's October 2008 losses.  At the time the Proxy was filed on November 3, 2008, Merrill had sustained more than $7 billion in losses in October alone – a highly material amount which Defendants were required to disclose.

208.     Moreover, as Merrill's losses increased, Defendants were under a duty to update the Proxy to correct any of the false and misleading statements or omissions they had previously made, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Defendants also had a duty to correct and/or update the Proxy as a result of intervening events, as well as a duty to correct and/or update under Rule 14a-9, which required Defendants to update in proxy supplements "any statement in any earlier communication with respect to the solicitation of a proxy . . . which has become materially false or misleading."

209.     As set forth more fully above, by mid-November 2008, Merrill's losses had increased to at least $9 billion and were rapidly accelerating.  By the end of November, Merrill had suffered another $4 billion in losses as well as a goodwill impairment of more than $2 billion.  Thus, by the beginning of December 2008 – just days before the shareholder vote on the merger – Merrill had already suffered an astounding $15.3 billion in total losses and impairments in October and November 2008, with billions of dollars of additional losses projected for December.

210.     In violation of their duty to update and/or correct the Proxy and their earlier statements soliciting shareholder approval of the merger, Defendants never disclosed Merrill's massive losses at any time before the shareholder vote.  These losses were highly material. Specifically, Merrill's $15.3 billion pretax loss for October and November 2008 substantially exceeded Merrill's pretax loss from continuing operations of $12.8 billion for all of 2007 – the worst year in its history.  In fact, these losses were so material that, beginning on November 20 – weeks before the vote – BoA executives debated internally about terminating the merger by

invoking the MAC. The failure to disclose the losses Merrill suffered in October and November 2008 prior to the shareholder vote rendered the Proxy materially false and misleading.

211. In addition, the failure to disclose Merrill's losses rendered several statements in the Proxy materially false and misleading. For instance, the Proxy stated that there was an "absence of material adverse changes" in Merrill's financial condition. Similarly, the Merger Agreement, which was attached to the Proxy as Appendix A, made the same representation until the close of the merger. These statements were materially false and misleading because, contrary to these assurances, Merrill had suffered material adverse changes to its financial condition. As noted above, Merrill had suffered more than $15 billion of losses before the vote, with billions of dollars of additional losses projected for December. Senior BoA executives, including Lewis and Price, repeatedly debated terminating the merger by invoking the MAC before the vote and, immediately following the vote, Defendant Lewis acknowledged that a material adverse change in Merrill's financial condition had occurred and that BoA planned to invoke the MAC.

212. Similarly, the Proxy falsely represented that no "material adverse change" had occurred in BoA's financial condition and that BoA had a "strong capital position, funding capabilities and liquidity." In reality, however, by the end of November, BoA was projecting its own quarterly loss of at least $1.4 billion – the first quarterly loss in its history and a material fact. Further, in December 2008, senior Federal Reserve officials, who had closely examined and analyzed BoA's capital position, concluded that BoA's own capital levels were "very thin[]" and that BoA was "clearly" not able to withstand further deterioration, which would result directly from the Merrill transaction.

213. Further, despite these undisclosed, mounting losses at both firms, the Proxy falsely portrayed the financial condition of the combined company as strong. Specifically, the

Proxy falsely stated that one of the principal reasons for the merger was the "strong capital position, funding capabilities and liquidity" the combined company would have. The representation about the combined company's "strong" financial condition was materially false and misleading for the reasons set forth above in ¶¶207-212.

214.    The Proxy was also materially false and misleading because it failed to disclose that BoA had agreed to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed. As noted above, this secret bonus agreement was highly material. Indeed, as Merrill's losses increased to $15.3 billion before the shareholder vote, the undisclosed bonus agreement became even more material because it permitted the payment of billions of dollars in bonuses to Merrill's executives and employees despite the fact that Merrill's losses, and their impact on BoA, were catastrophic.

215.    In fact, rather than disclose this secret agreement, the Proxy falsely represented to investors that, as part of the merger, Merrill "will not" pay any discretionary bonuses. Specifically, the Proxy stated that, subject to "certain exceptions" which were unspecified, or unless it had BoA's "prior written consent," Merrill "will not . . . undertake the following [18] extraordinary actions," including:

> (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements; (iii) become a party to, establish, adjust, or terminate any employee benefit or compensation plan or agreement. . . .

216.    The Proxy further stated that BoA's "written consent" "will not be unreasonably withheld or delayed," falsely indicating that no such consent had been given.

217.    Similarly, the Merger Agreement attached to the Proxy assured investors that Merrill "shall not" make any discretionary bonus payments in language identical to that set forth in the agreement attached to the September 18, 2008 Form 8-K, reproduced above at ¶196.

218.  The statements in the Proxy and the Merger Agreement set forth in ¶¶214-217 above were materially false and misleading for the reasons set forth above at ¶¶197-198.

219.  In addition, the Proxy incorporated Merrill's March 2008 Proxy, which made other false statements about the bonus awards, including that (i) Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year;" (ii) "[t]he goal of our compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders;" (iii) Merrill's bonus policy "provide[s] a strong incentive to increase financial performance and enhance returns to shareholders;" (iv) Merrill's "pay for performance" policy "fosters an ownership culture that increases executive focus on Company-wide returns across economic and business cycles;" and (v) Merrill's "pay for performance" policy focused on "the performance of the Company as a whole," and was emphasized as "the core of our compensation policy."

220.  The statements set forth above in ¶219 were false.  Directly contrary to the statement that Merrill paid bonuses "in January for performance in the prior fiscal year," Merrill, BoA, Thain, and Lewis had already agreed to allow Merrill to pay up to $5.8 billion of bonuses in December, before the merger closed.  Moreover, directly contrary to the statements that Merrill's bonus practice and policy was to "pay for performance" in order to "enhance returns to shareholders," the secret bonus agreement, including the accelerated schedule, allowed Merrill to pay billions of dollars in bonuses regardless of Merrill's massive fourth quarter and year-end losses and their effect on shareholders.

### F.  The Proxy Supplements

221.  As noted above, Defendants were under a continuing duty to update and correct the Proxy to disclose the material adverse facts set forth above, including the secret bonus

agreement and Merrill's massive losses.  On November 21, 2008, BoA and Merrill filed a Proxy Supplement without disclosing any of these facts, and without correcting or updating any of their prior false and misleading statements.  Similarly, on November 26, 2008, as BoA executives were debating invoking the MAC, BoA filed another Proxy Supplement, attaching a letter from Lewis, which also failed to disclose any of these facts and did not correct or update any of BoA's or Lewis's false and misleading statements.  By failing to do so, these Proxy Supplements falsely affirmed that nothing in BoA's earlier proxy solicitations was, or had become, materially false or misleading.

222.    In addition to being materially false and misleading due to the failure to correct and/or update Defendants' prior proxy solicitations, the November 26, 2008 Proxy Supplement contained materially false statements.  Indeed, BoA's November 26, 2008 Proxy Supplement consisted of a letter signed by Defendant Lewis titled "Despite Stock Price Volatility, Bank of America Remains Strong."  In this letter, Lewis recognized that investors were "concerned, among other things, about whether financial institutions have enough capital."  To assuage this concern, and with the specific stated purpose of bolstering BoA's stock price, Lewis highlighted BoA's purported financial strength:

> I usually don't comment on our stock price. . . .  But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how Bank of America is positioned to ride out this severe economic storm.
>
> *      *      *
>
> Bank of America continues to be a strong, active player in the financial markets. We are generating strong deposit growth and attracting new customer and client relationships throughout our company. We continue to make loans to consumers and businesses to <u>boost shareholder value</u> and to do what we can to support economic activity.
>
> <u>We are one of the most liquid banks in the world. We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements</u>

and our own target. In short, we believe we are one of the strongest and most stable major banks in the world.

Regarding the federal capital injection, these were funds that we did not need and did not seek. At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, had more than adequate capital. We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally . . . .

223.    The statements that BoA was "one of the strongest and most stable major banks in the world" and possessed "more than adequate capital" and that BoA "did not need" the federal funds were materially false and misleading because, in reality, as senior Federal Reserve officials concluded, (i) BoA was "very thinly capitalized," and was "clearly not [] well prepared for any further deterioration;" and (ii) by the end of November 2008, BoA had suffered almost $800 million in losses, and was expecting to lose at least $1.4 billion for the quarter – the first quarterly loss in its history – thus further eroding its capital levels, as set forth above at ¶103.

224.    Further, the statements in the November 26, 2008 Proxy Supplement were materially false and misleading because the imminent acquisition of Merrill would devastate BoA's Tier 1 capital levels and liquidity position. Indeed, as BoA knew, Merrill had already suffered approximately $15.3 billion in total losses and, as Congress's expert analysis concluded, Merrill's internal loss data provided strong evidence that these losses were significantly accelerating. Defendant Lewis acknowledged that these losses were enough to bring BoA to the brink of insolvency when he determined to invoke the MAC mere weeks after issuing the November 26, 2008 Proxy supplement, and conceded that BoA could not absorb these losses without massive taxpayer assistance.

**G.  The December 5, 2008 Shareholder Vote And Press Release**

225.    On December 5, 2008, BoA shareholders convened in Charlotte, North Carolina and voted to approve the merger. Rather than disclosing any of the material facts regarding

Merrill's or BoA's losses, or the bonuses to be paid to Merrill's executives and employees, Lewis stated that the merger "puts us in a completely different league."

226.    Later that day, BoA issued a press release that quoted Lewis as stating: "When this transaction closes, Bank of America will have the premier financial services franchise anchored by the cornerstone relationship products and services of deposits, credit and debit cards, mortgages and wealth management."

227.    This press release and Lewis's remarks at the shareholder meeting were materially false and misleading because they did not disclose any of the material adverse facts set forth above, including that: (i) Merrill had already suffered at least $15.3 billion in losses and impairments in October and November, with billions more expected in December; (ii) BoA had already suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss; (iii) BoA, as senior Federal Reserve officials determined, was "very thinly capitalized," and was "clearly not [] well prepared" for further deterioration; and (iv) BoA lacked the capital to absorb Merrill's losses without massive amounts of Government aid.    Indeed, Defendant Lewis acknowledged that BoA lacked the capital to absorb Merrill's losses when, mere days after issuing the statements set forth above, he decided to terminate the merger or, alternatively, seek a $138 billion taxpayer bailout to rescue BoA from collapse.    Similarly, the statement that the merger would create "the premier financial services franchise" was materially false and misleading for the same reasons.

**H. Defendants' Failure To Disclose Highly Material Information Prior To The Close Of The Merger**

228.    As alleged above, following the December 5, 2008 shareholder vote and prior to the close of the merger on January 1, 2009, numerous highly material events occurred that BoA failed to disclose:

- Days after the shareholder vote, Lewis determined – and informed Secretary Paulson and Chairman Bernanke – that Merrill's losses were so large that BoA could not absorb them, and that, as a result, BoA had determined to terminate the merger by invoking the MAC.

- Secretary Paulson threatened to fire Lewis, BoA's senior management, and the BoA Board if they refused to complete the merger, and as a result Lewis and BoA's officers faced an irreconcilable conflict of interest in agreeing to proceed with the merger.

- BoA requested and received a highly dilutive $138 billion taxpayer bailout in order to enable BoA to absorb Merrill's losses.

- BoA suffered a loss of $1.8 billion for the quarter, the first loss in its history.

- On December 31, as Merrill's losses for the fourth quarter reached $21.5 billion, Merrill paid out the cash component of the $3.6 billion in bonuses, with BoA's knowledge and approval.

229.    None of these facts were disclosed in advance of the merger closing date.  Instead, on the day the merger closed, BoA issued a press release announcing that "Bank of America Corporation today completed its purchase of Merrill Lynch & Co. Inc. creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities."  The press release quoted Defendant Lewis as stating, "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."  This press release was materially false and misleading because it omitted to disclose any of the critical developments set forth above, and instead represented that the combined company was a "premier financial services franchise."

# VI. SUMMARY OF SCIENTER ALLEGATIONS

230.    As alleged above, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants BoA, Merrill, Lewis, Thain, Price, and Cotty knew or recklessly disregarded that their statements set forth above were materially false and misleading when made.

231.    *First*, the senior executives of both BoA and Merrill possessed direct knowledge of Merrill's losses as they occurred, yet failed to disclose them.  As noted above at ¶93, immediately after the merger was announced, BoA installed 200 people at Merrill, including a large financial team, to monitor Merrill's financial condition and installed Defendant Cotty to act as Merrill's CFO.  Further, as set forth more fully above at ¶93, Thain issued a memo on January 26, 2009 stating that Merrill's senior executives tracked Merrill's losses on a daily basis, and provided senior BoA executives with this information, also on a daily basis.  In particular, Thain stated that BoA's senior executives had "daily access to our p&l [profit and loss statements], our positions and our marks."  Moreover, during Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, received daily, "step-by-step" updates on Merrill's financial condition (*see* ¶95).

232.    Given the facts set forth above, a BoA spokesperson told *The New York Times* that "we have not disputed that we were kept informed about the financial condition of the company." Indeed, knowledge of Merrill's losses was so well-known among BoA's senior executives that – as newspaper reports and the New York Attorney General's investigation have established – between November 20 and December 3, 2008, BoA's senior executives repeatedly discussed terminating the merger pursuant to the MAC and informing shareholders of Merrill's mounting losses, as described more fully above at ¶¶99-102.

233.    *Second*, BoA's and Merrill's senior executives also knew of the $2 billion goodwill impairment by November 2008 – yet represented to regulators that it arose suddenly after the shareholder vote.  As the New York Attorney General wrote in his September 8, 2009 letter, "Even though it was known of by November, this write-down became part of the purportedly 'surprising' losses that were included in Merrill's financials more than a month after the December 5 shareholder vote."  These Defendants' knowledge of this write-down before the shareholder vote – and their false claims of "surprise" as to its existence – further supports an inference of scienter.

234.    *Third*, these Defendants knew or were reckless in not knowing that BoA did not "comprehensively" analyze Merrill's financial condition, providing them with no reasonable basis to represent that Merrill's risk profile had improved without also disclosing that it remained dangerously high, or to make related representations about the expected benefits of the merger. For example, after reviewing thousands of Merrill's internal documents which were made available to BoA during the due diligence process, Federal Reserve officials concluded that BoA's investigation was grossly inadequate, and not performed "comprehensively" as Lewis and Price represented to investors.

235.    *Fourth*, directly contrary to the statement that BoA had a "strong capital position, funding capabilities, and liquidity," these Defendants knew that, even on a stand-alone basis, BoA's own capital position was extremely weak.  In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, wrote that, "<u>as they [BoA senior executives] themselves noted</u> the other night at our meeting, <u>even on a stand alone basis, the firm is very thinly capitalized</u>."

236.     *Fifth*, as set forth above, these Defendants were clearly aware of the secret bonus agreement because (i) it was the focus of intense discussions during the merger negotiations and was one of the three "main" terms of the merger agreement; (ii) Defendants Lewis and Thain, who negotiated the bonus agreement through high-ranking intermediaries, have admitted their knowledge of the bonus agreement; and (iii) executives at each company played an active role in determining and/or approving the ultimate bonus amounts and specific payment dates at various points throughout the fourth quarter.  Moreover, these Defendants were clearly aware that the bonus agreement had not been disclosed because the bonus agreement was set forth in a separate document that was meant to be, and in fact was, withheld from the investing public.

237.     Additional facts summarized below further establish the individual scienter of Defendants Lewis, Thain, Price, and Cotty, and, in turn, the corporate scienter of BoA and Merrill.

**A.    <u>Additional Evidence Of Lewis's Scienter</u>**

238.     Lewis has admitted in sworn testimony before Congress and the New York Attorney General's office that he received regular updates on the financial condition of both BoA and Merrill throughout the Class Period and knew of the companies' escalating, unprecedented losses before the merger vote.  As described more fully above at ¶¶97-98, Lewis admitted that BoA in general, and he in particular, received "detailed financial reports every week" from Merrill, and that he received profit and loss statements for BoA and regular projections of Merrill's losses.  Indeed, during his congressional testimony, when asked whether any of the 200 financial analysts that BoA stationed at Merrill reported Merrill's losses to Lewis before the shareholder vote, Lewis responded:  "The – <u>we did have people there, and we did know that there were losses.  And that was clear both at our company and theirs</u>."  Similarly, as noted

above in ¶95, during Thain's *PBS Frontline* interview, he stated that senior executives at both companies "<u>knew about the losses at the same time we did</u>."

239.    Before the shareholder vote, Lewis led weekly conference calls during which he and Defendant Price discussed Merrill's growing losses with the BoA Board, as set forth above in ¶99.

240.    In his capacity as CEO and Chairman of the BoA Board, Lewis led the Board meetings on December 9, December 22, and December 30, 2008, during which the BoA Board discussed Merrill's losses and decided – even though BoA senior management (including Lewis) believed that a material adverse change had occurred in Merrill's financial condition – to nevertheless consummate the merger and accept a $138 billion taxpayer bailout to avoid the threatened insolvency of the combined company, without disclosing any of these critical facts. Lewis was also personally involved in the discussions with Secretary Paulson, Chairman Bernanke, and other regulators regarding all of those subjects, as described more fully above at ¶¶132-136.

241.    Further, as explained more fully above at ¶¶126-128, Lewis, as well as other BoA senior management, was highly motivated to conceal material facts from shareholders because he knew that if these facts were disclosed prior to the close of the merger, he would be terminated.  Lewis admitted to this motivation in sworn testimony before the New York Attorney General's office.  As the New York Attorney General concluded in his April 23, 2009 letter to Congress, "Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, '<u>that makes it simple. Let's deescalate.' Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal</u>."

242.    Lewis was also motivated to conceal material facts from shareholders, and thus ensure that the merger was consummated, because Lewis knew that if investors learned the truth about Merrill's financial condition it would reveal that the statements he had made over the previous two months regarding the purported benefits of the merger and BoA's due diligence were false, and call into question his judgment and competence in agreeing to pay a substantial premium for Merrill in such a precipitous manner.  Indeed, as described more fully above at ¶125, Chairman Bernanke expressly told Lewis that if Lewis invoked the MAC after Lewis had praised the merger and extolled for months BoA's due diligence, it would "cast doubt" on the truthfulness of Lewis's statements and his judgment.  In addition to those admonitions, a set of "Talking points for [BoA] Discussion," prepared by Federal Reserve officials in advance of their conversation with Lewis on December 21, 2008, provided that regulators also told Lewis that, if he were to invoke the MAC, it "would expose the weaknesses in [BoA]'s capital and asset quality," and "[t]he market would conclude that [BoA] was too weak to address the problems at [Merrill]."

243.    Consistent with these motivations, Lewis made the conscious decision to conceal numerous highly material facts from BoA's shareholders and investors.  In Lewis's congressional testimony, he admitted that Merrill's losses, his and BoA's conclusion that a material adverse change had occurred, and the bailout were facts "of enormous magnitude and consequence to the company and the shareholders."  Nonetheless, Lewis knowingly withheld this highly material information from shareholders, writing in an email that "of course[] we do not want" "public disclosure" of them.

244.    Lewis was so conscious of his liability to shareholders for proceeding with the merger without disclosing Merrill's losses, the violation of the MAC, or the taxpayer bailout that,

in an attempt to immunize himself from lawsuits, he explicitly sought a letter from Chairman Bernanke stating that the merger was forced upon Lewis. Federal Reserve officials refused.

245. Moreover, Lewis's repeated inconsistencies in his statements to regulators and sworn testimony to Congress and the New York Attorney General, and in his public statements to BoA shareholders, are strong circumstantial evidence of Lewis's scienter. For example, on December 17, 2008, Lewis told federal regulators that he only became aware of Merrill's losses in mid-December, after the shareholder vote, because they purportedly "accelerated" at that time. Likewise, during the January 16, 2009 conference call to discuss Merrill's losses, Lewis told investors that the "loss materialized late in the quarter in December." As set forth above, numerous facts establish that these statements were false, and amounted to nothing more than an attempt to cover up the fact that Lewis and his senior officers had personal knowledge of or reckless disregard for Merrill's severe and accelerating losses throughout the entire fourth quarter. For example, on *PBS Frontline*, Thain – who, as Merrill's CEO, had personal knowledge of the pace and timing of Merrill's losses – stated that Lewis's version of the facts was exactly the opposite of "what actually happened":

| Question: | Ken Lewis tells us that in the time between the Dec. 5 stockholders' meeting and his going to Washington and asking for the get-out-of-jail clause, something substantial changed. What would it have been, do you think? |
|---|---|
| Thain: | I don't know what he's referring to. If you look at what actually happened in the fourth quarter, October was the worst month, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . October was by far the worst. |

246. Corroborating Thain's first-hand account, at the request of Congress, an impartial expert reviewed Merrill's internal loss data and independently concluded that any acceleration in Merrill's losses was clear by mid-November at the latest. Indeed, according to Congress's expert

analysis of Merrill's weekly internal loss data, "the evidence for a constantly deteriorating [] trend [in Merrill's losses] is much stronger on November 14 than it is on December 12." Moreover, even without the benefit of this evidence, the country's most senior banking regulators, after reviewing Merrill's loss data, concluded that Lewis's claim of mid-December "surprise" was "not credible," as set forth above at ¶¶117-119.

247.    Further corroborating the conclusion that Lewis's claim of surprise was false, the New York Attorney General's investigation has revealed that BoA's senior executives knew of at least $14 billion in Merrill losses before the shareholder vote (with the potential for billions of dollars more), plus another $2 billion in Merrill goodwill impairments.  Indeed, as early as November 20, 2008, senior BoA executives debated whether to disclose these losses, and on December 1 and 3, 2008, senior BoA executives debated "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" – facts that the New York Attorney General wrote were "of tremendous significance because [they are] at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote."

248.    As another example of Lewis's knowing and/or recklessly false and inconsistent statements, during Lewis's June 11, 2009 Congressional testimony, he initially stated that he "did not recall" asking Chairman Bernanke for a letter immunizing Lewis from shareholder suits – even though this request was highly unique and Lewis had made it just months earlier during a personal conversation between him and his chief regulator:

| Rep. Kucinich: | You requested a letter from the government saying that the government ordered you to close the deal to acquire Merrill. Wasn't there such a letter? |
| --- | --- |
| Lewis: | I don't recall such a letter. |
| Rep. Kucinich: | You're under oath. But your answer is you do not recall? |
| Lewis: | I do not recall a letter. |

| Rep. Kucinich: | Isn't it true that your request of that letter was motivated by your desire to protect yourself from your shareholders? |
|---|---|
| Lewis: | Well, sir, if I can't recall it, I can't answer the second question. |

Lewis only acknowledged his request after Congress confronted him with the email from Chairman Bernanke documenting this exact request.

249.    Likewise, during Lewis's sworn deposition taken by the New York Attorney General's office in February 2009, he specifically testified that, after he approached the U.S Government for a bailout in mid-December, Secretary Paulson "instructed" him not to disclose: (i) Merrill's losses, (ii) BoA's resulting need for taxpayer assistance, or (iii) the Government bailout.  When Lewis testified before Congress in June 2009, however, he changed his story, stating, "I never heard from him [Paulson] on the issue of us not disclosing something."  Noting this reversal, Representative Watson cautioned Lewis, "Okay.  Remember you're under oath."

250.    Lewis also made false statements to Congress regarding his involvement in approving Merrill's bonuses.  Lewis portrayed his involvement in approving the bonuses as "very limited," stating that Merrill was "a public company until the first of the year.  They had a separate board, separate compensation committee and we had no authority to tell them what to do, just urged them what to do."  In reality, as set forth above at ¶¶67-69, 71-72, and 74, Lewis was directly involved in Merrill's bonus payments because he specifically authorized Merrill to pay up to $5.8 billion of bonuses on an accelerated basis at the time he negotiated the Merger Agreement.  This was a key term of the merger, which Lewis approved.  Thain himself has stated that Lewis was "lying" when he sought to minimize his involvement in the bonuses.

251.    In addition – as federal regulators have independently confirmed after reviewing BoA's due diligence and speaking directly with Lewis – Lewis knew that BoA's due diligence of Merrill was grossly inadequate.  As set forth above at ¶¶120, 122, after reviewing BoA's due

diligence and discussing it with Lewis, senior Federal Reserve officials concluded that Lewis "is worried about stockholder lawsuits; <u>knows they did not do a good job of due diligence</u> and the issues facing the company are finally hitting home and <u>he [Lewis] is worried about his own job</u> after cutting loose lots of very good people."

**B. <u>Additional Evidence Of Price's Scienter</u>**

252. As the Company's CFO, Price received the daily, "step-by-step" updates on Merrill's financial condition that Thain described above. Indeed, according to the New York Attorney General's September 8, 2009 letter, Defendant Price kept close watch on Merrill's losses and impairments throughout the entire fourth quarter, repeatedly discussed with other BoA executives whether to invoke the MAC or otherwise disclose Merrill's deteriorating financial condition, and made the conscious decision to not disclose these facts, as set forth above at ¶¶99-101.

253. Each week before the shareholder vote, Defendant Price discussed Merrill's growing losses with the BoA Board during conference calls led by Defendant Lewis, as set forth above in ¶99. Based on his personal knowledge of Merrill's losses, Price (along with Lewis) also reported Merrill's mounting losses to the BoA Board on December 9, 22, and 30, 2008.

254. In addition, Price personally participated in meetings with Lewis, Secretary Paulson, Chairman Bernanke, and other regulators regarding the existence of a material adverse change in Merrill's financial condition and BoA's resulting need for an enormous taxpayer bailout. Specifically, Price attended such meetings on December 17, 19, and 21, 2008, where he took handwritten notes memorializing the discussions. Lewis also reported to the BoA Board on December 30, 2008 that Price had been intimately involved in negotiations with the federal government for additional TARP funding. Accordingly, Price knowingly or recklessly made false and misleading statements and material omissions.

C. **Additional Evidence Of Thain's Scienter**

255.    Defendant Thain has admitted his knowledge of Merrill's mounting daily losses. As set forth above, Thain stated that Merrill generated daily profit and loss statements; that Merrill's and BoA's senior executives, including himself, received this information as it was generated; and that October was the worst month of the fourth quarter.  In addition to the numerous statements recited above at ¶¶88, 93-95, in Thain's deposition before the New York Attorney General's office, Thain testified, "Bank of America had daily access to the exact same financial information I had."

256.    In addition, Thain has admitted in sworn testimony that he had personal knowledge of the secret bonus agreement at the time it was being negotiated during the September 13-14, 2008 weekend.  In his deposition, Thain testified that "I was aware that [the bonus agreement] was being negotiated."  Thain further testified that he was kept apprised of all the salient terms of the agreement "[t]hrough discussions with, primarily, Greg Fleming," including the terms allowing "us, Merrill Lynch, to be able to pay bonuses to our employees prior to the deal closing," as well as the "cap on the amount that we could pay out."

257.    Moreover, Thain was intimately involved in finalizing the accelerated Merrill bonuses throughout the fourth quarter of 2008.  In early November 2008, he and Alphin, BoA's Chief Administrative Officer, determined the final size of the bonus pool; on November 11, 2008, Thain presented the final bonus figures and the accelerated payment schedule to Merrill's Compensation Committee, which approved the accelerated schedule; and on November 12, 2008, Thain informed Alphin of this schedule.

258.    Thain has also admitted his personal knowledge of facts directly contradicting numerous other statements he made during the Class Period, including that (i) he knew that, without the merger, Merrill would become effectively insolvent "beginning Monday morning,"

September 15, 2008, and (ii) Secretary Paulson exerted intense pressure on the parties to finalize the transaction, and personally told him, "John, you'd better make sure this happens."

**D.** **Additional Evidence Of Cotty's Scienter**

259.     Numerous facts establish that Defendant Cotty had personal knowledge of Merrill's undisclosed losses throughout the fourth quarter of 2008.  Before and after the merger was announced, Cotty served as BoA's Chief Accounting Officer.  As noted above, immediately after the merger was announced on September 15, 2008, Cotty was also appointed as Merrill's interim CFO, and acted as a direct liaison for relaying financial information between Merrill and BoA, including to Lewis and Price.  Thus, as Thain specifically stated, Cotty was provided with Merrill's daily profit and loss statements and received unfettered access to Merrill's positions and accounting marks.

260.     Moreover, Thain testified under oath that Cotty was not merely provided with this information, but that he actively discussed it during Merrill's weekly meetings.  Specifically, Thain was asked what was "happening in terms of you updating them [*i.e.*, BoA senior officers] on how things were going," and Thain testified that, "The acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed as to what was happening" throughout the fourth quarter.  Nevertheless, despite Cotty's actual knowledge as to Merrill's escalating losses in October and November 2008, he signed the false and misleading Proxy Registration Statement and otherwise failed to disclose any of this highly material information to shareholders.

**VII.**     **LOSS CAUSATION – EXCHANGE ACT CLAIMS**

261.     For purposes of the Exchange Act claims alleged herein, Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plaintiffs and the Class.  Throughout the Class Period, the prices of BoA common stock and Preferred Securities were

artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. The true facts became known by investors and the market through a series of partial corrective disclosures. By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in BoA common stock and Preferred Securities throughout the Class Period.

262. As the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of BoA common stock and the Preferred Securities declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Lead Plaintiffs and the members of the Class.

263. On January 12, 2009, a Citigroup analyst wrote that BoA might post a $3.6 billion fourth quarter loss and slash its quarterly dividend from $0.32 to $0.05 cents per share. After the report, shares of Bank of America stock fell 12% on heavy volume, falling from $12.99 at the close of market the prior trading day to $11.43.

264. On January 14, 2009 in Australia, which was January 13 in New York, Merrill executives in Australia warned a bond trader of imminent "awful" news, and admitted that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night." BoA shares dropped 11% from a close of $11.43 on January 12 to a close of $10.20 on January 14, on heavy volume.

265. Further disclosures occurred on January 15, 2009, when *The Wall Street Journal* reported on BoA's imminent TARP injection, prompting BoA shares to drop 18% on extremely heavy volume of 552,669,186 shares, leaving BoA shares to close at $8.32, an 18-year low. And

on January 16, 2009, BoA announced its terrible fourth quarter results, revealing, among other things, the $21.5 billion losses at Merrill and the fact that TARP funding had been necessary to complete the merger. These disclosures caused BoA stock to drop an additional 13% on January 16 on extremely heavy volume.

266.    After the close of the markets on January 16, 2009, it was reported that Moody's had downgraded BoA's credit rating due to "the disclosure of substantial losses of Merrill Lynch" and Fitch had downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive absent assistance provided by the U.S. Treasury."

267.    On Saturday, January 17, 2009, *The New York Times* reported that, given Merrill's "devastating" losses, BoA's management had sought to exercise the MAC after the vote but before the closing of the merger, and was dissuaded from doing so by the Government. *The Wall Street Journal* also reported on January 17 that BoA had sought the bailout not only because of Merrill's losses, but also because of BoA's own precarious financial condition. According to an analyst quoted in *The Wall Street Journal* article, Lewis "has very little credibility with the investor public right now." On Tuesday, January 20, the next trading day, BoA's stock fell an additional 29%, also on extremely heavy volume, as a result of these disclosures.

268.    Finally, BoA stock dropped another 15% on January 22, 2009, the trading day immediately following the *Financial Times* story revealing the accelerated bonus payments.

269.    From January 12, 2008 through January 22, 2008, the corrective disclosures set forth above had a similarly negative effect on the price of the Preferred Securities. The price of the Preferred Securities fell, on average, 32% over this period. Their cumulative negative returns from January 12, 2008 through and including January 22, 2008 are set forth in Appendix A.

270.     Each of the above referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

271.     For the purposes of the Exchange Act claims, it was entirely foreseeable to BoA, Merrill, Lewis, Thain, Price, Cotty, and the BoA Board that concealing from investors (i) the circumstances surrounding the merger negotiations (including the lack of due diligence and the pressure from federal regulators), (ii) Merrill's losses, (iii) BoA's debating of and decision to invoke the MAC, (iv) BoA's own deteriorating financial condition, (v) the taxpayer bailout, and (vi) the secret agreement allowing Merrill to pay up to $5.8 billion in bonuses before the merger closed, would artificially inflate the price of BoA common stock and the Preferred Securities.  It was similarly foreseeable that the ultimate disclosure of this information and, in particular, the truth about Merrill's financial condition, BoA's financial condition, the bonus payments, and circumstances surrounding the merger negotiations, would cause the price of BoA's securities to drop significantly as the inflation caused by their earlier misstatements was removed from the stock by the corrective disclosures set forth herein.

272.     Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Lead Plaintiffs and members of the Class.

## VIII.    RELIANCE: APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE FOR EXCHANGE ACT CLAIMS

273.     At all relevant times, the market for BoA's common stock and Preferred Securities was an efficient market for the following reasons, among others:

> a.      The Company's common stock and Preferred Securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b. The average weekly trading volume for BoA common stock, as a percentage of BoA's outstanding shares, was 13.1% shares during the Class Period, and the average weekly trading volume for the Preferred Securities during the Class Period was 3.53%;

c. BoA's securities, including its Preferred Securities, were rated by Moody's and Fitch Ratings;

d. BoA was extensively followed by numerous securities analysts employed by firms including J.P. Morgan, Citigroup, Deutsche Bank, Ladenburg Thalman, Oppenheimer, and NAB Research, among others, who wrote reports about the Company and the value of its securities that entered the public marketplace;

e. BoA met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Secondary Offering, among other SEC filings, as set forth in ¶33;

f. As a regulated issuer, the Company filed periodic public reports with the SEC; and

g. BoA communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the *Business Wire* news service, and conference calls with analysts and investors.

274. As a result, the market for BoA's common stock and Preferred Securities promptly digested current information with respect to BoA from all publicly-available sources and reflected such information in the price of the Company's common stock and Preferred Securities. Under these circumstances, all purchasers of the Company's publicly-traded common stock and Preferred Securities during the Class Period suffered similar injury through their purchase of the publicly-traded common stock and Preferred Securities of BoA at artificially inflated prices, and a presumption of reliance applies.

IX.     **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE**

275.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

276.    None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the due diligence performed in connection with the merger, the pressure exerted by federal regulators, Merrill's and BoA's then-existing financial condition, and the payment of accelerated, discretionary bonuses to Merrill's executives and employees.

277.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the due diligence performed in connection with the merger, the pressure exerted by federal regulators, Merrill's and BoA's financial condition, and the payments of accelerated, discretionary bonuses to Merrill's executives and employees.  Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by BoA or Merrill were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

278.    To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement

was false, or the statement was authorized and/or approved by an executive officer of BoA who actually knew that the statement was false.

## X.    CLASS ACTION ALLEGATIONS

279.    Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who (i) purchased or otherwise acquired the common stock or Preferred Securities (as described in Appendix A) of BoA between September 15, 2008 and January 21, 2009, inclusive (defined above as the "Class Period"), excluding any shares of BoA common stock acquired by exchanging the stock of Merrill for BoA stock through the merger between the two companies consummated on January 1, 2009; (ii) held BoA common stock or Series B Preferred Stock as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill; or (iii) purchased BoA common stock issued under the Registration Statement and Prospectus for the $10 billion offering of BoA common stock that occurred on or about October 7, 2008, and were damaged thereby (defined above collectively as the "Class"). Excluded from the Class are Defendants (as defined herein), present or former executive officers of BoA and Merrill, the members of Merrill's Board of Directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

280.    The members of the Class are so numerous that joinder of all members is impracticable.  For example, as of December 31, 2008, BoA had 5,017,435,592 shares of common stock outstanding.  Throughout the Class Period, BoA common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believes that Class members number in the thousands, if not millions.

281.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs and the other members of the Class purchased or otherwise acquired BoA

common stock and/or Preferred Securities in the market during the Class Period, were entitled to vote in the merger, or purchased BoA common stock in the Secondary Offering and sustained damages as a result of Defendants' conduct complained of herein.

282.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

283.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

284.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.      whether the federal securities laws were violated by Defendants' conduct as alleged herein;

      b.      whether the Proxy and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

      c.      whether and to what extent the market prices of BoA common stock and/or Preferred Securities were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

      d.      whether, solely with respect to the claims under Section 10(b) of the Exchange Act, Defendants acted with scienter;

      e.      whether, solely with respect to the claims under Section 10(b) of the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

    f.  whether the members of the Class have sustained damages
       as a result of the conduct complained of herein, and if so,
       the proper measure of damages.

285. The names and addresses of those persons and entities who purchased or otherwise acquired BoA common stock and/or Preferred Securities during the Class Period, or who voted in connection with the Proxy Claims are available from the Company's transfer agent(s). Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XI. CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT

### COUNT I

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 (Against Defendants BoA, Lewis, Price, And Cotty)

286. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

287. During the Class Period, BoA, Lewis, Price, and Cotty disseminated or approved the false statements and omissions set forth above and summarized below, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

288. These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and members of the Class in connection with their purchases or acquisitions of BoA common

stock or Preferred Securities during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding Merrill's and BoA's financial condition and losses, the agreement authorizing Merrill to pay up to $5.8 billion in bonuses before the merger closed, the degree of due diligence performed in advance of the merger, and the reasons for the merger.

289.     These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and members of the Class, regarding, among other things, the events that had materially adverse effects on Merrill's and BoA's financial condition and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate and maintain the market price of BoA common stock and Preferred Securities; and (iii) cause Lead Plaintiffs and members of the Class to purchase BoA common stock and Preferred Securities at artificially inflated prices.

290.     As described above, these Defendants had a duty to disclose Merrill's highly material losses and the secret bonus agreement when the Proxy was filed, before the shareholder

vote, and before the merger closed.  These Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

291.    These Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and omissions.  For example, Defendants repeatedly misrepresented that the merger would be beneficial to BoA shareholders, and misrepresented in the Proxy and the attached Merger Agreement that no material adverse events had occurred.  Defendants remained under a duty to update and correct these and their other misrepresentations.  Further, by continuing to speak about the merger in supplements to the Proxy, Defendants were under a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the merger. Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Proxy, and in supplements to the Proxy, including the losses at both BoA and Merrill. Defendants were also under a duty to disclose infrequent or unusual changes and events affecting income in the Proxy and in supplements to the Proxy.

292.    Similarly, these Defendants were also required to disclose, before the merger closed on January 1, 2009, the events which occurred in December 2008, as set forth above in ¶228, because such facts were highly material information and because they were under a continuing obligation and duty to correct and/or update their prior statements concerning the merger, including the statements made on September 15, 2008 and in the Proxy, each of which had clearly been rendered materially misleading by the events that occurred in December 2008.

293.    Defendants BoA and Lewis are liable for all materially false and misleading statements made during the Class Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in (i) the

September 15, 2008 Press Release, Investor Call, and Press Conference; (ii) BoA's September 18, 2008 Form 8-K; (iii) BoA's October 6, 2008 conference call; (iv) the Proxy; (v) BoA's November 21, 2008 Form 8-K, which supplemented the Proxy; (vi) BoA's November 26, 2008 Proxy Supplement; (vii) Lewis's December 5, 2008 statement; (viii) BoA's December 5, 2008 Press Release; and (ix) BoA's January 1, 2009 Press Release. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial conditions of Merrill and BoA, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

294. Defendant Price is also liable for the false and misleading statements set forth above, including, without limitation, the statements in: (i) the September 15, 2008 Investor Call; (ii) BoA's October 6, 2008 conference call; and (iii) the Proxy. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial conditions of Merrill and BoA, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

295. Defendant Cotty is also liable for the false and misleading statements set forth above including, without limitation, statements in the Proxy. These statements were materially false and misleading because, among other things, they misrepresented the terms of the Merger Agreement, and the financial conditions of Merrill and BoA, failed to disclose Merrill's losses

and the secret bonus agreement.  They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

296.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  Specifically, these Defendants knew or should have known, *inter alia*, that government officials had pressured the parties into announcing a Merger Agreement on September 15, 2008; that the financial conditions of BoA and Merrill were severely deteriorating throughout the fourth quarter of 2008; that the Merger Agreement had been reached without adequate due diligence; and that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.

297.    These Defendants engaged in this scheme in order to maintain and/or inflate the prices of BoA common stock and Preferred Securities and induce BoA's shareholders to support the merger.

298.    Lead Plaintiffs and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BoA common stock and/or Preferred Securities.  Lead Plaintiffs and the Class would not have purchased or otherwise acquired BoA common stock and/or Preferred Securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material facts.

299.     As a direct and proximate result of these Defendants' wrongful conduct, Lead

Plaintiffs and other members of the Class suffered damages in connection with their purchases or

acquisitions of BoA common stock and/or Preferred Securities during the Class Period.

## COUNT II

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against Defendants Merrill And Thain)

300.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as

if fully set forth herein.

301.     During the Class Period, Defendants Merrill and Thain disseminated or approved

the false statements specified herein, which they knew or recklessly disregarded were false and

misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

302.     These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in

that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in

acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs

and members of the Class in connection with their purchases or acquisitions of BoA common

stock and/or Preferred Securities during the Class Period.     As detailed herein, the

misrepresentations contained in, or the material facts omitted from, Defendants' public

statements included, but were not limited to, false and misleading representations and omissions

regarding Merrill's financial condition and losses, the agreement authorizing Merrill to pay up to

$5.8 billion in bonuses before the merger closed, the degree of due diligence performed in advance of the merger, and the reasons for the merger.

303.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and members of the Class, regarding, among other things, the events that had materially adverse effects on Merrill's and BoA's financial condition and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate and maintain the market price of BoA common stock and Preferred Securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase BoA common stock and Preferred Securities at artificially inflated prices.

304.    As described above, these Defendants had a duty to disclose Merrill's highly material losses and the secret bonus agreement, when the Proxy was filed, before the shareholder vote, and before the merger closed.  These Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

305.    These Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and omissions.  For example,

Defendants repeatedly misrepresented that the merger would be beneficial to BoA shareholders, and misrepresented in the Proxy and the attached Merger Agreement that no material adverse events had occurred. Defendants remained under a duty to update and correct these and their other misrepresentations. Further, by continuing to speak about the merger in supplements to the Proxy, Defendants were under a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the merger. Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Proxy and in supplements to the Proxy, including the losses at Merrill. Defendants were also under a duty to disclose infrequent or unusual changes and events affecting income in the Proxy and in supplements to the Proxy.

306. Defendants Merrill and Thain are liable for all materially false and misleading statements made during the Class Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in: (i) the September 15, 2008 Press Release, Investor Call, and Press Conference; (ii) Merrill's September 18, 2008 Form 8-K; (iii) Merrill's October 16, 2008 Press Release; (iv) the Proxy; and (v) Merrill's November 21, 2008 Proxy Supplement. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial condition of Merrill, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

307. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or should have known, *inter alia*, that government officials had pressured the parties into announcing a Merger Agreement on September 15, 2008; that the financial conditions of Merrill and BoA were severely deteriorating throughout the fourth quarter of 2008; that the Merger Agreement had been reached without adequate due diligence; and that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.

308.    These Defendants engaged in this scheme in order to maintain and/or inflate the prices of BoA common stock and Preferred Securities and induce BoA's shareholders to support the merger.

309.    Lead Plaintiffs and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BoA common stock and/or Preferred Securities. Lead Plaintiffs and members of the Class would not have purchased or otherwise acquired BoA common stock and/or Preferred Securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material facts.

310.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of BoA common stock and/or Preferred Securities during the Class Period.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Lewis, Price, And The BoA Board)

311.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

312.    This Count is asserted against Defendants Lewis, Price, and the BoA Board for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of members of the Class.

313.    During their tenures as officers and/or directors of BoA, each of these Defendants was a controlling person of BoA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of BoA, these Defendants had the power and authority to cause BoA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by BoA during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

314.    The BoA Board Defendants participated in BoA Board meetings and conference calls, reviewed the Merger Agreement and voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through the BoA Board's recommendation to vote in favor of the merger, which appeared throughout the Proxy.  The BoA Board Defendants also signed the Secondary Offering Registration Statement at the time it was filed with the SEC on Form S-3ASR in 2006, signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the

Secondary Offering Registration Statement, and were directors of the Company at the time of the filing of the Prospectus Supplement.

315.     In their capacities as senior corporate officers and/or directors of BoA, and as more fully described above, these Defendants were made aware of the circumstances surrounding the merger, including the terms of the merger, the bonus agreement, the due diligence that had and had not been performed, and the financial conditions of both Merrill and BoA.  According to a September 17, 2009 *Wall Street Journal* article, prior to the shareholder vote on the merger, the BoA Board "participated in weekly conference calls led by Mr. Lewis that included updates from the bank's finance chief, Joe Price, on Merrill's estimated fourth-quarter losses."  In addition, the BoA Board was further apprised of BoA's and Merrill's financial condition at subsequent Board meetings as set forth above.

316.     In addition to their knowledge of the bonus agreement with Merrill and the mounting Merrill losses, the BoA Board Defendants were also aware of the undisclosed events of December 2008 discussed above and the decision not to disclose those material events.  For example, at the December 22, 2008 Board meeting, which was called specially to discuss Lewis's conversations with Secretary Paulson, Lewis informed the BoA Board that if BoA invoked the MAC, "the Treasury and Fed would remove the Board and management of the Corporation."

317.     Further, the BoA Board Defendants monitored the negotiations with the Federal Government for BoA's bailout.  Specifically, at Board meetings on December 22 and 30, 2008, the BoA Board was fully informed of the Government's "commitment," and approved the decision to proceed with the merger.  Moreover, the BoA Board was fully informed about and approved BoA's decision not to disclose the taxpayer bailout.  In an email dated December 22,

2008, Lewis told the BoA Board of this nondisclosure decision and, at the December 30, 2008 meeting, the Board approved this decision.

318.    As a result of the foregoing, Lewis, Price and the BoA Board Defendants, as a group and individually, were control persons of BoA within the meaning of Section 20(a) of the Exchange Act.

319.    As set forth above, BoA violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of BoA and, as a result of their own aforementioned conduct, Lewis, Price and the BoA Board Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BoA is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired BoA common stock and/or Preferred Securities.   Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of BoA, each of these Defendants is responsible for the material misstatements and omissions made by BoA.

320.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of BoA common stock and/or Preferred Securities.

## COUNT IV

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Thain)

321.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

322.     This Count is asserted against Defendant Thain for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of members of the Class.

323.     During his tenure as Merrill's CEO and Chairman, Defendant Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.  By reason of his positions of control and authority as Merrill's CEO and Chairman, Defendant Thain had the power and authority to cause Merrill to engage in the wrongful conduct complained of herein.  Defendant Thain was able to and did control, directly and indirectly, the content of the public statements made by Merrill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

324.     In his capacity as Merrill's CEO and Chairman, and as more fully described above, Defendant Thain was made aware of the circumstances surrounding the merger, including the terms of the merger, the due diligence that had and had not been performed, and analyses of the financial conditions of Merrill and the bonus agreement.  As a result of the foregoing, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.

325.     As set forth above, Merrill violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person of Merrill and, as a result of his own aforementioned conduct, Thain is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Merrill is liable under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired BoA common stock and/or Preferred Securities.  Moreover, as detailed above, during the respective times that Thain served as Merrill's CEO and Chairman, he was responsible for the material misstatements and omissions made by Merrill.

326.    As a direct and proximate result of Defendant Thain's conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of BoA common stock and/or Preferred Securities.

## XII.    CLAIMS UNDER SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

327.    The claims in Counts V and VI below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors who held BoA common stock or 7% Cumulative Redeemable Preferred Stock, Series B (defined above as "Series B Preferred Stock") on the Record Date of October 10, 2008 and were entitled to vote on the merger between BoA and Merrill.  The Proxy Claims are based solely on negligence.  They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

328.    The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger, including the Proxy, the documents incorporated into the Proxy, the later-filed Proxy Supplements and statements made by Defendants on conference calls discussing the merger, contained misstatements of material facts and omissions of material facts. Further, Defendants' later-filed Proxy Supplements did not, as required by law, update and correct their previously-made misstatements, and themselves contained material misstatements and omissions.  Nor did Defendants, as required by law, update their previously-made statements expressing their optimistic opinions about the strength of the merger and its value to BoA shareholders when Defendants experienced a "change of heart" about the merits of the transaction.

329. Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage BoA shareholders to vote in favor of the merger. These statements included the following (collectively referred to as the "Proxy Solicitations"):

(a) The September 15, 2008 Investor Call, Press Conference, and Press Release, set forth above at ¶¶178-181, 185, 187, 189, 191-192;

(b) Merrill's September 18, 2008 Form 8-K, set forth above at ¶196;

(c) BoA's October 6, 2008, conference call, set forth above at ¶199;

(d) Merrill's October 16, 2008 Press Release, set forth above at ¶202;

(e) The Proxy and attached Merger Agreement, set forth above at ¶¶196, 205-206, 211-217, 219;

(f) BoA's and Merrill's November 21, 2008 Proxy Supplement, set forth above at ¶221; and

(g) BoA's November 26, 2008 Proxy Supplement, set forth above at ¶¶221-222.

330. All of the Proxy Solicitations were materially false and misleading.

331. Specifically, the Proxy failed to disclose the following highly material information prior to the shareholder vote on December 5, 2008:

(a) BoA had agreed to allow Merrill to pay up to $5.8 billion in bonuses on an accelerated basis, before the merger closed. This agreement, which was set forth in a Disclosure Schedule that was never publicly filed or otherwise disclosed to shareholders before the vote on the merger, was highly material to investors because, among other reasons, it: (i) represented 12% of the merger price; (ii) constituted 30% of Merrill's stockholders' equity as of December 26,

2008; and (iii) ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

(b)     Before the shareholder vote, Merrill had already suffered approximately $15 billion in pre-tax losses and impairments – losses which precipitated internal discussions about invoking the MAC and terminating the merger – and was projecting billions of dollars of additional losses for December.

(c)     BoA did not have the ability to absorb Merrill's losses at its existing capital levels as of the end of November 2008.  Indeed, as set forth in the Federal Reserve Merger Analysis, BoA had suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss – the first quarterly loss in its history – thus further eroding its capital levels.

(d)     As a consequence of the massive losses at Merrill and BoA's own deteriorating financial condition, BoA's senior executives debated invoking the MAC before the shareholder vote.

332.     Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made, which are summarized below.  In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote.  Significantly, Defendants updated the Proxy twice, on November 21 and November 26, 2008, without disclosing any of the material facts originally omitted.

333.     In addition to the failure to disclose this highly material information, the Proxy Solicitations contained numerous statements which were materially false and misleading at the time they were made <u>or</u> were rendered false and misleading by subsequent events, giving rise to

a duty on the part of the Defendants to correct and/or update these statements. These materially false and misleading statements included the following:

(a)   Misstatements on September 15, 2008 about BoA's "very, very extensive" due diligence of Merrill, which included a "comprehensive[]" analysis of Merrill's financial condition, set forth more fully above at ¶¶179-181. These statements were materially false and misleading when made because, contrary to Defendants' statements, BoA's due diligence was inadequate, a fact that has been confirmed by Lewis as well as by federal regulators who reviewed BoA's due diligence efforts.

(b)   Misstatements on September 15, 2008 about Merrill's "dramatically" reduced "risk profile," set forth more fully above at ¶¶180-181. Given the inadequacy of BoA's due diligence, these statements were made without reasonable basis and were untrue, as demonstrated by the following facts: (i) mere weeks after Defendants made these statements, in October 2008, Merrill experienced the worst month in its history by incurring $7 billion of losses on high-risk assets that existed as of September 15, 2008; (ii) Merrill's massive fourth quarter losses, as reported by Thain, "were incurred almost entirely on legacy positions" that Merrill held as of September 15, 2008; (iii) Thain stated that Lehman's bankruptcy on September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets;" and (iv) in mid-December 2008, Federal Reserve officials reviewed Merrill's assets and financial condition, and concluded that Merrill had retained tens of billions of dollars of high-risk exposures.

(c)   Misstatements on September 15, 2008 that "Merrill had the liquidity and capacity" to survive the market turmoil as an independent entity, set forth more fully above at ¶185, which, according to Defendants, supported the substantial premium that BoA had agreed to

pay for Merrill.  In fact, contrary to these assurances, as Thain subsequently admitted: (i) Merrill would have become insolvent as early as the morning of September 15, 2008; and (ii) Lehman's bankruptcy "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets."  In addition, on the Friday before the deal was negotiated, the heads of the major investment banks had uniformly acknowledged the likelihood of Merrill's imminent collapse given Lehman's bankruptcy.

(d)     The statement on September 15, 2008 that BoA and Merrill faced "absolutely no pressure" from federal regulators to finalize the merger, set forth above at ¶187.  In fact, as Thain has stated, given Merrill's disastrous financial condition and severe liquidity constraints, Secretary Paulson issued a "very strong" ultimatum to finalize the proposed deal by September 15, 2008.  In fact, *PBS Frontline* reported that Secretary Paulson was "adamant" that the parties finalize the transaction before the markets opened on September 15.

(e)     The assurance on September 15, 2008 that Thain had not sought to pursue his own self-interests in negotiating the merger because "it was never about him; it was always about the deal," set forth more fully above at ¶189.  In fact, Thain delayed the signing of the Merger agreement for hours because he insisted on receiving tens of millions of dollars in personal compensation in connection with the merger, and sought to pay hundreds of millions of dollars in bonuses to his top lieutenants and former business associates from Goldman Sachs, as part of the total $5.8 billion in discretionary bonuses to Merrill executives and employees. Moreover, as set forth more fully above at ¶73, Thain used the merger negotiations as an opportunity to materially increase the bonuses that Merrill was planning to pay.

(f)     The statements on September 15, 2008 concerning the benefits of the merger to BoA's shareholders, including that the merger was "a great opportunity for our

shareholders," made BoA more "valuable," and created "the leading financial institution in the world," set forth more fully above at ¶¶191-192. As noted above, Defendants had no reasonable factual basis to make these statements given that they had failed to adequately consider the risks presented by Merrill's enormous portfolio of toxic assets. Moreover, before the shareholder vote, Defendants determined that Merrill's enormous losses threatened to materially impact BoA's financial condition, but failed to update their prior statements to reflect their changed assessment of the strengths and benefits of the merger.

(g)     Defendant Price's statement on October 6, 2008 that the $10 billion Secondary Offering "covered [BoA's] anticipated [capital] needs from a Merrill standpoint," set forth more fully above at ¶199. By late November 2008, as a consequence of Merrill's mounting losses, which were approximately $15 billion and growing, and BoA's own deteriorating financial condition, BoA's capital needs in connection with the merger had exceeded the capital it raised in the Secondary Offering, and this statement had become materially misleading. Consequently, Defendants had a duty to update this statement prior to the date of the vote, which they negligently failed to do.

(h)     The statement by Defendant Thain on October 16, 2008 that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" prior to the merger's close, set forth more fully above at ¶202. This statement was materially misleading because (i) Merrill had suffered $7 billion of losses in October alone precisely because it had retained large amounts of toxic assets on its balance sheet; (ii) Thain acknowledged that almost all of Merrill's massive fourth quarter losses arose from "legacy" positions that Merrill had retained; and (iii) federal regulators, after examining Merrill's financial condition, concluded that it retained a dangerously high risk profile as of October 2008.

(i)     The misstatements in the Merger Agreement and Proxy that Merrill "shall not" and "will not," respectively, pay any discretionary bonuses before the merger closed without BoA's prior written consent, set forth more fully above at ¶¶196, 215, 217-219.  In fact, BoA had already approved both the payment of up to $5.8 billion in bonus compensation for Merrill's employees and an accelerated schedule to pay the bonuses in December, before the merger closed.

(j)     The misstatements in the Proxy that Merrill's bonuses were "paid in January for performance in the prior fiscal year," set forth more fully above at ¶219.  In reality, the bonuses were determined prior to the close of the fourth quarter and fiscal year, and were paid despite Merrill's losses.

(k)     The misstatements in the Proxy and November 26, 2008 Proxy Supplement, including that there was an "absence of material adverse changes" in Merrill's financial condition that was "disproportionately adverse" to its peer institutions; that BoA and the combined company had a "strong capital position, funding capabilities, and liquidity;" and that BoA was one of the "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world," set forth above at ¶¶211-213, 221-222.  Contrary to these statements, a material adverse change had occurred in Merrill's financial condition before the vote, and the imminent merger would materially impact BoA's financial condition because: (i) at the time the Proxy was filed on November 3, 2008, Merrill had already suffered $7 billion in losses, which was almost equal to BoA's pre-tax income for the first three quarters; (ii) as of the date of the shareholder vote, Merrill's pre-tax losses had ballooned to $15.3 billion and had triggered debate within BoA as to whether to invoke the Merger Agreement's MAC; (iii) after reviewing BoA's own capital position, federal regulators concluded that BoA's capital levels were "very thin[]" and that BoA was unprepared for further deterioration, which would occur once it

absorbed Merrill; and (iv) just days after the vote, Defendant Lewis decided to invoke the MAC because of BoA's inability to absorb Merrill's losses, and requested and accepted a $138 billion bailout.

334. The false statements and omissions as set forth above proximately caused foreseeable losses to Lead Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures, causing BoA stock to fall from $12.99 on January 9, 2009 to a Class Period low of $5.10 on January 20, and to fall again on January 22, 2009, as set forth more fully above at ¶¶261-271.

## COUNT V

### For Violations of Section 14(a) Of The Exchange Act
### (Against Defendants BoA, Merrill, Lewis, Thain, Price, Cotty, And The BoA Board)

335. Lead Plaintiffs repeat and reallege the allegations in ¶¶23-55, 327-334 as if set forth fully herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

336. The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

337. Defendants did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on December 5, 2008.

338.     Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy.

339.     BoA and Merrill are issuers of the Proxy.

340.     BoA and Merrill permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that neither company had experienced material adverse effects, and that Merrill would not pay discretionary bonus compensation.

341.     Defendant Lewis signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy and otherwise permitted the use of his name in the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Call, Press Conference, and press release.

342.     Defendant Thain signed the cover letter for the Proxy and otherwise permitted the use of his name in the Proxy.  Defendant Thain also solicited the votes of shareholders in the September 15, 2008 Investor Call, Press Conference, and press release, and the October 16, 2008 press release.

343.     Defendant Price signed the Proxy Registration Statement and subsequent amendments, and solicited the votes of shareholders in the September 15, 2008 Investor Call and the October 6, 2008 conference call.

344.     Defendant Cotty signed the Proxy Registration Statement and subsequent amendments.

345.     The BoA Board Defendants signed the Proxy Registration Statement and subsequent amendments, and permitted the use of their names by, among other things, allowing the Proxy to represent that they recommended the merger.

346.     By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants sought to secure Lead Plaintiffs' and other Class members' approval of the merger, and solicited proxies from Lead Plaintiffs and other members of the Class.

347.     Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by material information which arose after the dissemination of the these statements and before the December 5, 2008 shareholder vote.

348.     The solicitations described herein were essential links in the accomplishment of the merger.  As a result of these solicitations, the BoA shareholders approved the merger.

349.     Lead Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

350.     This claim is brought within the applicable statute of limitations.

351.     By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

## COUNT VI

### For Violations Of Section 20(a) Of The Exchange Act
### In Connection With The Proxy Claims
### (Against Defendants Lewis, Thain, Price, And The BoA Board)

352.     Lead Plaintiffs repeat and reallege the allegations in ¶¶23-55, 327-351 as if set forth fully herein.

353.     During their tenures as officers and/or directors of BoA, each of Defendants Lewis, Price, and the BoA Board was a controlling person of BoA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of BoA, these Defendants had the power and authority to cause BoA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the Proxy and the other solicitations described herein made by BoA during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

354.     The BoA Board Defendants participated in BoA Board meetings and conference calls, reviewed the Merger Agreement and voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through the BoA Board's recommendation to vote in favor of the merger, which repeatedly appeared throughout the Proxy. The BoA Board Defendants also signed numerous other filings with the SEC.

355.     In their capacities as senior corporate officers and/or directors of BoA, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above.  Indeed, these Defendants had access to information regarding the circumstances surrounding the merger, including the terms of the merger, the due diligence that had and had not been performed, and analyses of the financial conditions of both Merrill and BoA.  As a result of the foregoing, Lewis, Price, and the BoA Board Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

356.     During his tenure as an officer and Chairman of the Board of Merrill, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.  By reason of his position of control and authority as an officer and Chairman of Merrill, Thain had

the power and authority to cause Merrill to engage in the wrongful conduct complained of herein. Thain was able to and did control, directly and indirectly, the contents of the Proxy and the other solicitations described herein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

357. In his capacity as a senior corporate officer and Chairman of the Board of Merrill, and as more fully described above, Thain had access to information regarding the circumstances surrounding the merger, including the terms of the merger, the due diligence that had and had not been performed, as well as the financial condition of Merrill. As a result of the foregoing, Thain was a control person within the meaning of Section 20(a) of the Exchange Act.

358. As set forth above, BoA and Merrill violated Section 14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of BoA and Merrill, and as a result of their own aforementioned conduct, Lewis, Price, Thain, and the BoA Board are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BoA and Merrill are liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of BoA or Merrill, each of these Defendants is responsible for the material misstatements and omissions made by BoA or Merrill.

359. Lead Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

360. This claim is brought within the applicable statute of limitations.

361. By reason of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## XIII. CLAIMS UNDER THE SECURITIES ACT

362. The claims in Counts VII-IX are brought under Sections 11, 12 and 15 of the Securities Act. The Securities Act claims are brought on behalf of persons or entities who purchased BoA common stock issued under the Secondary Offering Registration Statement in connection with BoA's Secondary Offering. The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of the Defendants – *i.e.*, they do not allege, and do not sound in, fraud – and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

363. On October 7, 2008, the Company announced its intention to raise $10 billion in the Secondary Offering through the sale of 455,000,000 shares of common stock at $22 per share. As set forth above at ¶¶56-58, Banc of America and MLPFS acted as underwriters of the Secondary Offering.

364. The Secondary Offering was conducted pursuant to the Secondary Offering Registration Statement, which incorporated the Prospectus Supplement (defined collectively above as the "Offering Documents"). The Offering Documents contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading with respect to: (i) BoA's pre-existing agreement allowing Merrill to pay up to $5.8 billion of discretionary bonuses before the merger closed, and (ii) the benefits of the merger and the merger's impact on BoA.

365. Specifically, the Offering Documents incorporated by reference BoA's Form 8-K filed with the SEC on September 18, 2008, which attached a copy of the Merger Agreement. In a section titled "Company Forbearances," the Merger Agreement provided that, from September

15, 2008 through January 1, 2009, Merrill "<u>shall not</u> . . . without the prior written consent of [BoA]" pay discretionary bonus compensation.

366.    This statement was untrue, and omitted material facts because (i) it represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before the merger closed; and (ii) it created the impression that BoA had not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA had already agreed to the payment of $5.8 billion of bonuses.

367.    Defendants' undisclosed agreement allowing Merrill to pay these bonuses was highly material because, among other reasons, (i) the size of the bonuses constituted 12% of the entire merger price and 30% of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule and allowed Merrill to award billions of dollars in bonuses prior to the close of the merger; (iii) it allowed Merrill to pay billions of dollars in bonuses despite the massive losses Merrill suffered in 2008; and (iv) the payment of these bonuses before the merger closed ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

368.    While the Merger Agreement made a generalized reference to the Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders either in the Offering Documents or otherwise. Defendants' failure to either publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement rendered BoA's September 18, 2008 Form 8-K materially false and misleading because it violated Item 601(b)(2) of Regulation S-K.  Item 601(b)(2) requires that

(i) schedules to a plan of acquisition must be filed with the SEC if they contain material information that is not otherwise disclosed, and (ii) a plan of acquisition must contain a list describing the contents of omitted schedules, along with an agreement to provide the schedule to the SEC upon request.

369. The Secondary Offering Registration Statement also incorporated by reference BoA's September 15, 2008 Form 8-K, which attached the press release announcing the merger. The press release stated that the merger "creates a company unrivalled in its breadth of financial services and global reach" and "both enhances current strengths at Bank of America and creates new ones;" quoted Defendant Lewis as stating that the merger was a "great opportunity for our shareholders" and made BoA "more valuable;" and quoted Thain as stating that the merger created "the leading financial institution in the world."

370. These statements were material to investors because they created the impression that BoA had adequately investigated Merrill's exposure to potentially toxic assets, determined that Merrill's financial condition was fundamentally sound, and therefore the merger would benefit BoA.

371. These statements set forth in the September 15, 2008 press release were untrue and omitted to disclose material facts because BoA's due diligence of Merrill was inadequate and, thus, Defendants had no basis to represent that the merger's impact on BoA would be beneficial. In fact, rather than benefitting BoA, the merger posed a material threat to BoA's own solvency because Merrill's risk profile was dangerously high, as established by the following facts: (i) in October 2008, the same month that the Secondary Offering was announced, Merrill experienced the worst month in its history by incurring $7 billion of losses on high-risk assets that existed as of September 15, 2008; (ii) Merrill's massive fourth quarter losses were,

according to Thain, "incurred almost entirely on legacy positions" that Merrill held prior to the Secondary Offering; (iii) Merrill's financial condition was so poor that, according to Thain, Merrill would have become insolvent as early as Monday morning, September 15; and (iv) Merrill had retained such "large[] risk exposures" and "vulnerabilities" that, according to an analysis of Merrill's financial data performed by the Federal Reserve, Merrill had a loss exposure of between $13.4 billion and $23.2 billion.

## COUNT VII

### For Violations Of Section 11 Of The Securities Act
### (Against BoA, Lewis, Price, Cotty, The BoA Board, And The Underwriter Defendants)

372.    Lead Plaintiffs repeat and reallege the allegations above at ¶¶23-58, 362-371, as if fully set forth herein.  For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence and/or strict liability.

373.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who purchased BoA common stock in the Secondary Offering against the Company, Lewis, Price, Cotty, the BoA Board, Banc of America and MLPFS.

374.    The Secondary Offering Registration Statement contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

375.    BoA is the issuer of the common stock pursuant to the Secondary Offering Registration Statement.  As the issuer of the common stock, BoA is strictly liable to the members of the Class who purchased the common stock in the Secondary Offering for the materially untrue statements and omissions alleged herein that appeared in or were omitted from the Registration Statement.

376.    Defendant Lewis and the other members of the BoA Board were directors of BoA at the time of the filing of the false and misleading Prospectus Supplement and were signatories of the Secondary Offering Registration Statement both by virtue of having signed the Secondary Offering Registration Statement at the time it was initially filed in 2006 and by having signed BoA's Form 10-K filed with the SEC on February 28, 2008.  Defendant Price was a signatory of the Secondary Offering Registration Statement by virtue of having signed BoA's Form 10-K filed with the SEC on February 28, 2008.  Defendant Cotty was a signatory of the Secondary Offering Registration Statement and signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.  These Defendants named in this Count acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offering.

377.    Banc of America and MLPFS were underwriters of the Secondary Offering.  The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offering.

378.    Lead Plaintiffs and other members of the Class purchased the common stock issued pursuant to the Secondary Offering Registration Statement.

379.    Lead Plaintiffs and other members of the Class purchased BoA common stock in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

380.    Lead Plaintiffs and the other members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement suffered substantial damages as

a result of the untrue statements and omissions of material facts in the Secondary Offering Registration Statement, as they either sold these shares at prices below the Offering price of $22 per share or still held shares as of the date of the initial complaint containing claims under the Securities Act when the price of BoA common stock was below the Offering price of $22 per share.

381. This claim is brought within the applicable statute of limitations.

382. By reason of the foregoing, the Defendants named in this count have violated Section 11 of the Securities Act.

## COUNT VIII

### For Violations Of Section 12(a)(2) Of The Securities Act
### (Against BoA And The Underwriter Defendants)

383. Lead Plaintiffs repeat and reallege the allegations above at ¶¶23-58, 362-382, as if fully set forth herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

384. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased BoA common stock in the Secondary Offering, against the Company and the Underwriter Defendants.

385. BoA was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Secondary Offering Registration Statement, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

386. The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the common stock offered pursuant to the Secondary Offering Registration Statement, which

contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

387. Lead Plaintiffs and other members of the Class purchased BoA common stock in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

388. Members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement and still hold that stock have sustained substantial damages as a result of the untrue statements of material facts and omissions in the Secondary Offering Registration Statement, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this count in return for the consideration paid with interest. Those members of the Class who have already sold their stock acquired in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement issued in connection with the Secondary Offering are entitled to rescissory damages from Defendants.

389. This claim is brought within the applicable statute of limitations.

390. By virtue of the foregoing, the Defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT IX

### For Violations Of Section 15 Of The Securities Act
### (Against Defendants Lewis, Price, And The BoA Board)

391. Lead Plaintiffs repeat and reallege the allegations above at ¶¶23-58, 362-390 as if fully set forth herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim

any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

392. This Count is asserted against Defendants Lewis, Price, and the BoA Board for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Class who purchased the common stock issued pursuant to the Secondary Offering Registration Statement.

393. At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Defendant Lewis, at the time of the filing of the Prospectus Supplement, served as Chairman of the Board of Directors, Chief Executive Officer and President of BoA. Lewis negotiated the terms of the Merger Agreement and was involved in the agreement to permit Merrill to pay up to $5.8 billion in discretionary bonuses. Defendant Price was CFO of BoA at the time of the filing of the Prospectus Supplement. Each BoA Board Defendant reviewed and approved the Merger Agreement.

394. Defendants Lewis, Price, and the BoA Board, prior to and at the time of the Secondary Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of BoA's business affairs, including the proposed merger. As officers and/or directors of a publicly owned company, Lewis, Price, and the BoA Board had a duty to disseminate accurate and truthful information with respect to BoA's business, financial condition and results of operations, including its proposed merger with Merrill. Defendants Lewis, Price, and the BoA Board participated in the preparation and dissemination of the Prospectus Supplement, and otherwise participated in the process necessary to conduct the Secondary Offering. Because of their positions of control and authority as senior officers and/or directors of BoA, Lewis, Price, and the BoA Board were able

to, and did, control the contents of the Prospectus Supplement and, hence, the Secondary Offering Registration Statement, which contained materially untrue information.

395.     By reason of the aforementioned conduct, Defendants Lewis, Price, and the BoA Board are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as BoA is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiffs and members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

a.     Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.     Awarding all damages and other remedies set forth in the Exchange Act and Securities Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a jury trial.

Dated: September 25, 2009
New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By: _____
    Robert N. Kaplan
    Frederic S. Fox
    Joel B. Strauss
    Donald R. Hall
    Hae Sung Nam
    Melinda Rodon

850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: _____
    Max W. Berger
    Steven B. Singer
    Gerald H. Silk
    Hannah G. Ross
    Boaz A. Weinstein
    Ann Lipton
    John J. Rizio-Hamilton
    Katherine M. Sinderson

1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP**

By: _____
    Gregory M. Castaldo
    David Kessler
    Sean M. Handler
    Darren J. Check
    Sharan Nirmul
    Jennifer L. Joost
    Richard A. Russo, Jr.

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Court-Appointed Co-Lead Counsel for the Class*

**FLANAGAN LIEBERMAN
HOFFMAN & SWAIM**
Dennis Alan Lieberman
15 W. Fourth Street
Suite 100
Dayton, OH 45202
Tel:  937-223-5200

*Ohio Counsel*

# APPENDIX A

## APPENDIX A –Preferred Securities

|    | CUSIP     | Issue Date | Cumulative Return 1/12 - 1/22 |
|----|-----------|------------|-------------------------------|
| 1  | 060505682 | 1/29/08    | -37.41%                       |
| 2  | 22238E206 | 4/11/03    | -24.67%                       |
| 3  | 060505740 | 9/26/07    | -38.46%                       |
| 4  | 060505815 | 11/6/06    | -29.07%                       |
| 5  | 222388209 | 11/8/06    | -28.78%                       |
| 6  | 060505765 | 5/20/08    | -39.27%                       |
| 7  | 060505831 | 9/14/06    | -38.06%                       |
| 8  | 05518E202 | 8/9/02     | -27.33%                       |
| 9  | 060505724 | 11/20/07   | -45.43%                       |
| 10 | 055188205 | 1/31/02    | -33.51%                       |
| 11 | 055185201 | 4/30/03    | -29.75%                       |
| 12 | 05633T209 | 8/2/06     | -23.21%                       |
| 13 | 055187207 | 12/14/01   | -27.48%                       |
| 14 | 055189203 | 3/28/06    | -37.38%                       |
| 15 | 55270B201 | 11/27/02   | -32.09%                       |
| 16 | 05518T209 | 8/25/05    | -29.77%                       |
| 17 | 55266J200 | 6/27/02    | -31.76%                       |
| 18 | 33889X203 | 3/8/02     | -32.67%                       |
| 19 | 055184204 | 11/3/04    | -31.75%                       |
| 20 | 33889Y201 | 7/31/03    | -24.55%                       |

# APPENDIX B

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

I, William J. Neville, on behalf of Lead Plaintiff State Teachers Retirement System of Ohio ("Ohio STRS"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.     Ohio STRS did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.     Ohio STRS is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.     Ohio STRS has reviewed the Complaint and authorizes its filing.

4.     Attached in Schedule A are Ohio STRS' transactions during the Class Period in the securities that are the subject of this Complaint.

5.     Ohio STRS has full power and authority to bring suit to recover for its investment losses.

6.     I am authorized to make legal decisions on behalf of Ohio STRS with regard to this action.

7.     Ohio STRS intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firms of Kaplan Fox & Kilsheimer LLP and Berstein Litowtiz Berger & Grossman LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.     Ohio STRS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*Bakshi v. Samueli, No. 06-cv-5036 (C.D. Cal.)*
*Freudenberg v. E\*Trade Financial Corp., et al., No. 07-cv-8538 (S.D.N.Y.)*
*In re Citigroup Inc. Sec. Litig., No. 07-cv-09901 (S.D.N.Y.)*

9.     Ohio STRS has sought to serve and was appointed as lead plaintiff and

representative party on behalf of a class in the following actions under the federal securities laws

filed during the three-year period preceding the date of this Certification:

> *Zuckerman v. Scottish Re Group LTD, et al., No. 06-cv-5853 (S.D.N.Y.)*
> *In re Merrill Lynch & Co. Sec., Derivative and ERISA Litig., No. 07-cv-9633 (S.D.N.Y.)*

10.     Plaintiff will not accept any payment for serving as a representative party on behalf

of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and

expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is

true and correct to the best of my knowledge and belief.

Executed this $\underline{25^{th}}$ day of September, 2009.

By:     _____

William J. Neville
General Counsel
*State Teachers Retirement System of Ohio*

## SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|---|---|---|---|---|
| Common Stock | Purchase | 10/7/2008 | 78,000 | $22.0000 |
| Common Stock | Purchase | 10/7/2008 | 100,000 | $22.0000 |
| Common Stock | Purchase | 10/7/2008 | 50,000 | $25.1340 |
| Common Stock | Purchase | 10/8/2008 | 100,000 | $21.2516 |
| Common Stock | Purchase | 10/31/2008 | 486,600 | $24.1700 |
| Common Stock | Purchase | 11/5/2008 | 22 | $23.8595 |
| Common Stock | Purchase | 11/5/2008 | 23 | $23.8200 |
| Common Stock | Purchase | 11/5/2008 | 19,135 | $24.0530 |
| Common Stock | Purchase | 11/5/2008 | 17,600 | $24.0437 |
| Common Stock | Purchase | 11/5/2008 | 42,002 | $24.2500 |
| Common Stock | Purchase | 11/7/2008 | 12,674 | $20.2859 |
| Common Stock | Purchase | 11/17/2008 | 12,157 | $15.5245 |
| Common Stock | Purchase | 12/4/2008 | 13,290 | $14.7208 |
| Common Stock | Purchase | 12/22/2008 | 16,256 | $13.6528 |
| Common Stock | Purchase | 1/2/2009 | 32,000 | $14.2475 |
| Common Stock | Purchase | 1/12/2009 | 25,721 | $11.9409 |
| Common Stock | Sale | 9/16/2008 | (45,208) | $28.0245 |
| Common Stock | Sale | 9/16/2008 | (51,000) | $25.8603 |
| Common Stock | Sale | 9/19/2008 | (50,000) | $37.0094 |
| Common Stock | Sale | 9/26/2008 | (60,000) | $36.9973 |
| Common Stock | Sale | 10/8/2008 | (5,931) | $22.2007 |
| Common Stock | Sale | 10/16/2008 | (3,324) | $23.2553 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

I, Julie Becker, on behalf of Lead Plaintiff, Ohio Public Employees Retirement System ("Ohio PERS"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.      Ohio PERS did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Ohio PERS is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Ohio PERS has reviewed the Complaint and authorizes its filing.

4.      Attached in Schedule A are Ohio PERS's transactions during the Class Period in the securities that are the subject of this Complaint.

5.      Ohio PERS has full power and authority to bring suit to recover for its investment losses.

6.      I am authorized to make legal decisions on behalf of Ohio PERS with regard to this action.

7.      Ohio PERS intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firms of Kaplan Fox & Kilsheimer LLP and Berstein Litowtiz Berger & Grossman LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      Other than in this action, Ohio PERS has not served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification, except:

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp., et al.,*
  *No. 08-cv-00160 (N.D. Ohio)*

9.      Plaintiff will not accept any payment for serving as a representative party on

behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs

and expenses directly relating to the representation of the class as ordered or approved by the

Court.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is

true and correct.

Executed this 24th day of September, 2009.


By:  *Julie Becker*
         Julie Becker
         General Counsel
         *Ohio Public Employees Retirement System*

## SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 9/17/2008 | 2,700 | $28.8500 |
| Common Stock | Purchase | 9/18/2008 | 1,400 | $30.0100 |
| Common Stock | Purchase | 10/1/2008 | 115,000 | $37.5800 |
| Common Stock | Purchase | 10/7/2008 | 150,000 | $22.0000 |
| Common Stock | Purchase | 10/14/2008 | 1,110 | $26.6100 |
| Common Stock | Purchase | 10/30/2008 | 211,074 | $22.6100 |
| Common Stock | Purchase | 10/31/2008 | 385,691 | $23.6300 |
| Common Stock | Purchase | 11/3/2008 | 4,300 | $23.8300 |
| Common Stock | Purchase | 11/4/2008 | 38,962 | $24.3700 |
| Common Stock | Purchase | 11/4/2008 | 61,306 | $24.1100 |
| Common Stock | Purchase | 11/13/2008 | 4,500 | $16.3500 |
| Common Stock | Purchase | 11/19/2008 | 47,895 | $13.6900 |
| Common Stock | Purchase | 11/21/2008 | 5,364 | $10.7300 |
| Common Stock | Purchase | 11/21/2008 | 1,670 | $10.7600 |
| Common Stock | Purchase | 11/26/2008 | 1,190 | $14.4100 |
| Common Stock | Purchase | 11/28/2008 | 18,407 | $15.8300 |
| Common Stock | Purchase | 12/5/2008 | 27,230 | $15.2400 |
| Common Stock | Purchase | 12/8/2008 | 10,407 | $17.1400 |
| Common Stock | Purchase | 12/10/2008 | 1,382 | $16.5600 |
| Common Stock | Purchase | 12/12/2008 | 1,210 | $14.6400 |
| Common Stock | Purchase | 12/15/2008 | 1,149 | $14.1900 |
| Common Stock | Purchase | 12/22/2008 | 1,337 | $13.6200 |
| Common Stock | Purchase | 12/24/2008 | 24,424 | $13.1600 |
| Common Stock | Purchase | 12/30/2008 | 41,804 | $12.8200 |
| Common Stock | Purchase | 12/30/2008 | 460,000 | $12.8500 |
| Common Stock | Purchase | 1/6/2009 | 88,546 | $14.4300 |
| Common Stock | Purchase | 1/7/2009 | 17,192 | $13.9700 |
| Common Stock | Purchase | 1/9/2009 | 6,600 | $13.1600 |
| Common Stock | Purchase | 1/16/2009 | 10,658 | $7.3800 |
| Common Stock | Purchase | 1/20/2009 | 19,176 | $5.7200 |
| Common Stock | Purchase | 1/21/2009 | 19,832 | $5.9000 |
| Common Stock | Sale | 9/18/2008 | (100,000) | $28.3900 |
| Common Stock | Sale | 9/22/2008 | (667) | $35.0100 |
| Common Stock | Sale | 10/2/2008 | (5,005) | $37.4400 |
| Common Stock | Sale | 10/6/2008 | (600) | $32.5500 |
| Common Stock | Sale | 10/8/2008 | (6,172) | $22.3200 |
| Common Stock | Sale | 10/24/2008 | (154,600) | $21.3600 |
| Common Stock | Sale | 11/19/2008 | (1,960) | $13.4400 |
| Common Stock | Sale | 11/21/2008 | (150,000) | $11.5700 |
| Common Stock | Sale | 12/1/2008 | (1,210) | $14.1100 |
| Common Stock | Sale | 12/12/2008 | (400,000) | $14.7100 |

## SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Sale | 1/12/2009 | (6,800) | $11.8900 |
| Common Stock | Sale | 1/13/1990 | (0.33) | $14.4300 |
| Common Stock | Sale | 1/13/2009 | (0.91) | $14.3600 |
| Common Stock | Sale | 1/13/2009 | (0.01) | $14.0000 |
| Common Stock | Sale | 1/13/2009 | (0.30) | $14.4300 |
| Common Stock | Sale | 1/13/2009 | (7,160) | $10.9300 |
| Common Stock | Sale | 1/13/2009 | (0.10) | $14.4000 |
| Common Stock | Sale | 1/15/2009 | (200,000) | $7.5300 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Teacher Retirement System of Texas (hereinafter, "Texas Teachers" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.    Texas Teachers did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.    Texas Teachers is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.    Texas Teachers has reviewed the Complaint and authorizes its filing.

4.    Attached in Schedule A are Texas Teachers' transactions during the Class Period in the securities that are the subject of this Complaint.

5.    Texas Teachers has full power and authority to bring suit to recover for its investment losses.

6.    I, Ronnie Jung, Executive Director of Texas Teachers, am authorized to make legal decisions on behalf of Texas Teachers with regard to this action.

7.    Texas Teachers intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Bernstein Litowitz Berger & Grossmann LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.    Other than in this action, Texas Teachers has not served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9.     Other than in this action, Texas Teachers has not sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of September, 2009.

**Teacher Retirement System of Texas**

By: _Ronnie Jung_

Ronnie Jung
*Executive Director*

# SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 09/15/2008 | 4,000 | $28.1734 |
| Common Stock | Purchase | 09/22/2008 | 6,000 | $34.9089 |
| Common Stock | Purchase | 09/29/2008 | 2,000 | $33.5426 |
| Common Stock | Purchase | 10/06/2008 | 2,000 | $32.1999 |
| Common Stock | Purchase | 10/16/2008 | 840,700 | $23.9793 |
| Common Stock | Purchase | 10/31/2008 | 819,000 | $23.0343 |
| Common Stock | Purchase | 11/03/2008 | 10,000 | $23.5934 |
| Common Stock | Purchase | 12/22/2008 | 168,000 | $13.7118 |
| Common Stock | Purchase | 12/23/2008 | 138,000 | $13.1194 |
| Common Stock | Purchase | 01/08/2009 | 8,754 | $13.4330 |
| Common Stock | Purchase | 01/12/2009 | 27,800 | $11.4300 |
| Common Stock | Sale | 09/30/2008 | -559,400 | $33.7135 |
| Common Stock | Sale | 10/03/2008 | -86,000 | $35.4627 |
| Common Stock | Sale | 10/07/2008 | -8,900 | $26.3396 |
| Common Stock | Sale | 10/08/2008 | -11,982 | $20.0890 |
| Common Stock | Sale | 10/20/2008 | -17,000 | $23.8710 |
| Common Stock | Sale | 12/08/2008 | -17,000 | $17.2417 |
| Common Stock | Sale | 12/15/2008 | -6,000 | $14.2049 |
| Common Stock | Sale | 01/06/2009 | -0.150 | $14.2667 |
| Common Stock | Sale | 01/08/2009 | -0.034 | $10.2941 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Stichting Pensioenfonds Zorg en Welzijn, duly represented by PGGM Vermogensbeheer B.V. (hereinafter, "PGGM" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1. PGGM did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2. PGGM is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3. PGGM has reviewed the Complaint and authorizes its filing.

4. Attached in Schedule A are PGGM's transactions during the Class Period in the securities that are the subject of this Complaint.

5. PGGM has full power and authority to bring suit to recover for its investment losses.

6. I, Femke van 't Groenewout, Senior Advisor Responsible Investment at PGGM, am authorized to make legal decisions on behalf of PGGM with regard to this action.

7. PGGM intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.     Other than in this action, PGGM has not served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9.     PGGM has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re American International Group, Inc. 2008 Securities Litigation*, No. 08-4772 (S.D.N.Y.).

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24ᵗʰ day of September, 2009.

**Stichting Pensioenfonds Zorg en Welzijn,**
**duly represented by PGGM Vermogensbeheer B.V.**

By: _____
Femke van 't Groenewout
*Senior Advisor Responsible Investment*

# SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 9/19/2008 | 20,101 | $37.4825 |
| Common Stock | Purchase | 9/22/2008 | 830 | $35.0224 |
| Common Stock | Purchase | 10/1/2008 | 11,455 | $36.4424 |
| Common Stock | Purchase | 10/8/2008 | 375,766 | $22.0500 |
| Common Stock | Purchase | 10/9/2008 | 22,010 | $22.3907 |
| Common Stock | Purchase | 11/18/2008 | 24,888 | $15.1755 |
| Common Stock | Purchase | 11/28/2008 | 4,072,074 | $15.8240 |
| Common Stock | Purchase | 12/2/2008 | 450 | $14.4336 |
| Common Stock | Purchase | 12/2/2008 | 18,370 | $14.3800 |
| Common Stock | Purchase | 12/8/2008 | 5,686 | $17.1158 |
| Common Stock | Purchase | 12/11/2008 | 4,055 | $15.9675 |
| Common Stock | Purchase | 12/16/2008 | 1,400 | $14.4428 |
| Common Stock | Purchase | 12/16/2008 | 3,100 | $14.4428 |
| Common Stock | Purchase | 12/16/2008 | 26,100 | $14.4428 |
| Common Stock | Purchase | 12/29/2008 | 287,870 | $12.9425 |
| Common Stock | Purchase | 12/30/2008 | 1,910 | $12.8079 |
| Common Stock | Purchase | 12/30/2008 | 3,154 | $12.7868 |
| Common Stock | Purchase | 12/31/2008 | 302,923 | $14.0825 |
| Common Stock | Purchase | 1/7/2009 | 156,600 | $14.0505 |
| Common Stock | Sale | 9/30/2008 | (240,286) | $34.9823 |
| Common Stock | Sale | 10/14/2008 | (1,870) | $25.7342 |
| Common Stock | Sale | 10/31/2008 | (270,770) | $24.1674 |
| Common Stock | Sale | 11/17/2008 | (400) | $15.4511 |
| Common Stock | Sale | 11/21/2008 | (764,813) | $10.7992 |
| Common Stock | Sale | 11/21/2008 | (764,812) | $10.9320 |
| Common Stock | Sale | 12/19/2008 | (1,400) | $13.7974 |
| Common Stock | Sale | 12/19/2008 | (3,100) | $13.7974 |
| Common Stock | Sale | 12/19/2008 | (5,220) | $13.7974 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Fjärde AP-Fonden ("AP4" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.      AP4 did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      AP4 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      AP4 has reviewed the Complaint and authorizes its filing.

4.      Attached in Schedule A are AP4's transactions during the Class Period in the securities that are the subject of this Complaint.

5.      AP4 has full power and authority to bring suit to recover for its investment losses.

6.      I, Agneta Wilhelmson Kåremar, Administrative Director of AP4, am authorized to make legal decisions on behalf of AP4 with regard to this action.

7.      AP4 intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      In addition to this action, Plaintiff is currently serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Stratte-McClure v. Lynch*, No. 09-2017 (S.D.N.Y.).

9. AP4 has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Minneapolis Firefighters' Relief Association v. Medtronic Inc.*, No. 08-6324 (D. Minn.); *In re Wachovia Equity Securities Litigation*, No. 08-6171 (S.D.N.Y.); and *In re Citigroup Inc. Securities Litigation*, No. 07-9901 (S.D.N.Y.).

10. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24 day of September, 2009.

Fjärde AP-Fonden

By: _____
Agneta Wilhelmson Kåremar
*Administrative Director*

**SCHEDULE A**

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 9/26/2008 | 652,976 | $36.7000 |
| Common Stock | Purchase | 10/7/2008 | 60,000 | $24.5200 |
| Common Stock | Purchase | 10/7/2008 | 54,510 | $24.2641 |
| Common Stock | Purchase | 10/8/2008 | 107,100 | $22.0500 |
| Common Stock | Purchase | 10/9/2008 | 308,613 | $22.3917 |
| Common Stock | Purchase | 10/9/2008 | 25,701 | $23.6600 |
| Common Stock | Purchase | 1/15/2009 | 144,000 | $8.5325 |
| Common Stock | Sale | 7/31/2008 | (0.08) | $32.9800 |
| Common Stock | Sale | 11/24/2008 | (132,800) | $13.6349 |
| Common Stock | Sale | 11/25/2008 | (132,800) | $14.5758 |