UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No.  09 MDL 2058 (DC) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ERISA ACTIONS | **CONSOLIDATED AMENDED COMPLAINT FOR BREACHES OF DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**<br><br>**ECF CASE** |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................8

III.    PARTIES ...............................................................................................................9

        A.      Plaintiffs ....................................................................................................9

        B.      Defendants ...............................................................................................10

IV.     The BANK OF AMERICA 401(k) Plan...........................................................21

        A.      Background...............................................................................................21

        B.      Investment Options in the 401(k) Plan, including the BAC Common Stock Fund22

        C.      Administration of the 401(k) Plan ..........................................................23

        D.      Participant and Employer Contributions to the 401(k) Plan...................26

V.      THE BANK OF AMERICA 401(K) PLAN FOR LEGACY COMPANIES...................27

VI.     THE COUNTRYWIDE FINANCIAL CORPORATION 401(K)  SAVINGS AND
        INVESTMENT PLAN.........................................................................................30

        A.      Background and Operation of the Plan....................................................30

        B.      Losses to the Countrywide 401(k) Plan..................................................32

VII.    THE BANK OF AMERICA PENSION PLAN.................................................33

VIII.   THE PLANS INCORPORATED THE COMPANY'S SEC FILINGS ............................36

IX.     DEFENDANTS' FIDUCIARY STATUS .........................................................38

        A.      The Nature of Fiduciary Status...............................................................38

        B.      Bank of America's Fiduciary Status........................................................39

        C.      Defendant Lewis's Fiduciary Status .......................................................41

        D.      Benefit Committee Defendants' Fiduciary Status ..................................42

                1.      The 401(k) Plan..........................................................................42

                2.      The Pension Plan.........................................................................45

                3.      The Legacy 401(k) Plan..............................................................46

                4.      The Countrywide 401(k) Plan.....................................................47

|       | E.  | The Compensation and Benefits Committee Defendants' Fiduciary Status..........48 |
|       | F.  | Board of Directors' Fiduciary Status.....................................................................49 |
| X.    |     | PLAINTIFFS' CLASS ACTION ALLEGATIONS............................................................50 |
| XI.   |     | SUBSTANTIVE ALLEGATIONS ..................................................................................54 |
|       | A.  | Relevant Background............................................................................................54 |
|       |     | 1.  The Deteriorating Credit and Housing Markets Weakened Bank of America....................................................................................................54 |
|       |     | 2.  As the Credit Crisis Began to Impede the Company's Earnings, Bank of America Increased its Risk Exposure by Acquiring Failed Banks and Toxic Assets.............................................................................................56 |
|       |     | 3.  Prior to the Class Period, Bank of America Masked Its Mounting Weaknesses and Claimed to be Weathering the Financial Crisis Well .....63 |
|       | B.  | The Company's Ill-Conceived Acquisition of Countrywide.................................64 |
|       |     | 1.  The Company Makes a Bad Investment in Countrywide ..........................64 |
|       |     | 2.  The Company Commits to the Acquisition of Countrywide .....................64 |
|       |     | 3.  Countrywide's Primary Business Segments .............................................66 |
|       |     | 4.  The High-Risk Loans at the Heart of Countrywide's Business Made Countrywide a House of Cards .................................................................67 |
|       |     | 5.  Countrywide's Questionable Accounting Masked the Extent of Its Problems, and the Risk the Countrywide Acquisition Posed to Bank of America Stock.............................................................................................74 |
|       |     |     a.  Countrywide failed to properly account for the declining quality of "held for investment" loans, and shifted loans from "trading" to "held for investment" to avoid accounting for losses ...................74 |
|       |     |     b.  The questionable recognition of interest income from "Negative Amortization" loans......................................................................77 |
|       |     |     c.  Countrywide's reliance on "Gain on Sale" accounting .................77 |
|       |     |     d.  Countrywide's questionable valuation of mortgage servicing rights79 |
|       |     | 6.  Countrywide Was on the Brink of Collapse at the Time Bank of America Committed to the Acquisition....................................................................80 |
|       |     | 7.  Countrywide's Predatory Lending, Abandonment of Its Stated Underwriting Standards, and Other Questionable Conduct Exposed Bank of America to Massive Liability ...............................................................82 |

        8.     After the Countrywide Deal was Announced, The Financial Condition of Both Bank of America and Countrywide Continued to Deteriorate..........83

        9.     Bank of America and Defendant Lewis made Misleading Statements about the Countrywide Transaction to Plan Participants in a Fiduciary Capacity87

        10.   After the Countrywide Acquisition Closed, Bank of America's Problems Continued to Mount ..................................................................................90

   C.    The Company Commits to the Acquisition of Merrill Lynch...............................91

        1.     Merrill Lynch's October 16, 2008 Press Release Announcing Third Quarter 2008 Financial Results....................................................................98

        2.     Merrill Lynch's Third Quarter 2008 Form 10-Q ......................................99

   D.    The Misleading Proxy Statement.......................................................................100

   E.    As The Truth about The Countrywide and Merrill Acquisitions Begins to Come Out, the Plans Are Hit Hard ..............................................................................106

   F.    After the Announcement of the Proposed Merrill Acquisition, Defendants Remained Positive about the Acquisition in Statements to the Market and to Employee-Plan Participants ................................................................................108

        1.     BOA's Senior Officers Were Aware of Merrill's Staggering 4th-Quarter Losses before the Shareholder Vote, and Even Debated Whether to Pull Out of the Merger Via the MAC ...............................................................112

        2.     BOA, Lewis and the BOA Board Knew About Merrill's Intention to Award Bonuses to Its Senior Managers and Employees Prior to the Consummation of the Merger ...................................................................114

   G.    Leading Up to and Following the Merrill Acquisition, Revelations About Countrywide and Merrill Continued to Bring Bank of America's Stock Price Down...................................................................................................................116

XII.   THE LAW UNDER ERISA .........................................................................................124

XIII.  ERISA § 404(c) DEFENSE INAPPLICABLE...............................................................126

XIV.  CLAIMS FOR RELIEF ................................................................................................128

   Count I: Failure to Prudently and Loyally Manage the 401(k) Plans and Their Assets.128

   Count II: Failure to Monitor the 401(k) Plans' Fiduciaries ...........................................135

   Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the 401(k) Plans' Participants and Beneficiaries .........................137

   Count IV: Co-Fiduciary Liability for Breaches with Respect to the 401(k) Plans and Their Participants and Beneficiaries ...................................................................140

   Count V: Failure to Insure Prudent Investment Measures in Pension Plan....................142

Count VI:  Failure to Monitor Pension Plan Fiduciaries ..................................................149

Count VII: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate
Information to the 401(k) Plan's Participants and Beneficiaries .........................151

Count VIII: Co-Fiduciary Liability for Breaches with Respect to the Pension Plan and Its
Participants and Beneficiaries .............................................................................154

XV.    REMEDY FOR BREACHES OF FIDUCIARY DUTY ..................................................157

Plaintiffs Mark Adams, Elizbeth Eagen, Vernon C. Dailey, Richard L. Adame, Rhonda Wilson, Arlene Kahn, Deborah Foreman, and Petra Chatman ("Plaintiffs"), participants in the Bank of America 401(k) Plan ("the 401(k) Plan"), or the Bank of America 401(k) Plan for Legacy Companies (formerly the Bank of America 401(k) Plan for Legacy Fleet and MBNA) (the " Legacy 401(k) Plan"), or the Countrywide Financial Corporation 401(k) Plan (the "Countrywide 401(k) Plan") (collectively the "401(k) Plans") and/or the Bank of America Pension Plan (the "Pension Plan") (collectively with the 401(k) Plans, the "Plans"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the following material: (a) Form 5500 filings with the Department of Labor ("DOL"); (b) Form 11-k filings with the Securities and Exchange Commission ("SEC"); (c) other filings with the SEC; (d) press releases, news reports, transcripts of conference calls with securities analysts; (e) other publicly available news reports; (f) testimony before regulatory authorities and government panels; and (g) a review of available documents governing the operations of the Plans. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Securities Act ("ERISA), 29 U.S.C. § 1132, against the Plans' fiduciaries, on behalf of participants in and beneficiaries of the Plans.

2.      The Bank of America 401(k) Plan and Legacy 401(k) Plan are defined contribution plans sponsored by The Bank of America Corporation (the "Company," "BOA," or "Bank of America").

3.      The Countrywide 401(k) Plan was a defined contribution plan sponsored by the Countrywide Financial Corporation, a wholly-owned subsidiary of BOA as of July 1, 2008.

4.      The Pension Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 10001(35).

5.      Throughout the Class Period (January 11, 2008, through January 21, 2009), the 401(k) Plans held substantial interests in Bank of America stock. Plaintiffs and the 401(k) Plan classes held shares of Bank of America stock in their 401(k) Plan accounts during the Class Period. Throughout this same period, the Pension Plan offered Bank of America stock as an "Investment Measure" for Pension Plan participants' pre-January 1, 2008 benefits in the Company's cash-balance Pension Plan. Plaintiffs and the Pension Plan class tied their Pension Plan benefits to the performance of Bank of America stock.

6.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period, as is required by ERISA.

7.      Plaintiffs allege that Defendants allowed the imprudent investment of the 401(k) Plans' assets in Company Stock, and offered Company Stock as an "Investment Measure" for Pension Plan participants' pre-January 1, 2008 pension benefits, throughout the Class Period despite the facts that: (i) prior to the Class Period, BOA engaged in an ill-conceived acquisition spree that severely compromised the Company by the start of the Class Period; (ii) in acts of

serious mismanagement that caused Bank of America stock to be an imprudent investment for the Plans, Bank of America acquired two massive, debt-ridden companies that were on the brink of collapse: first, Countrywide Financial Corporation ("Countrywide") and then Merrill Lynch & Co., Inc. ("Merrill Lynch"); (iii) after the announcement of the acquisitions, Defendant Kenneth D. Lewis ("Lewis") and others repeatedly disseminated material misstatements concerning the state of Bank of America, the state of Countrywide, and the state of Merrill Lynch, to employees who participated in the Plans; (iv) after the announcement of the acquisitions, Defendant Lewis and the other Defendants failed to disclose the disastrous state of the financial condition of Countrywide and Merrill Lynch and did not disclose the significant risks and liabilities that Bank of America and its shareholders would be assuming by acquiring first Countrywide and then Merrill Lynch; (v) Defendants failed to disclose that the Company had considered withdrawing from the Merrill Lynch acquisition prior to closing and only agreed to consummate the acquisition when the federal government agreed to provide assistance to Bank of America; (vi) when the facts regarding the true financial condition of Countrywide and Merrill Lynch and their devastating impacts on Bank of America emerged, Bank of America stock plunged from a closing price of $39.30 per share on January 10, 2008 (the day before the Countrywide deal was announced) to a closing price of $6.68 per share on January 21, 2009. During the Class Period, Bank of America stock dropped by over 80%, causing hundreds of millions of dollars in losses to the 401(k) Plans and their participants, and devastating the pension benefits of Plaintiffs and the proposed Pension Plan Class.

8.     Bank of America's ill-conceived and worse-timed expansion radically altered the character of the Company's stock from a relatively staid and safe investment to an extremely risky gamble, as the Company topped off a wild acquisition spree by attempting to digest two of

the largest collections of toxic assets ever assembled. In the end, only government aid saved the Company from total collapse.

9.     Plaintiffs allege in Count I that the Defendants, with responsibility for managing the 401(k) Plans' assets, breached their fiduciary duties to the 401(k) Plans' participants in violation of ERISA by failing to prudently and loyally manage the 401(k) Plans' investment in Bank of America stock. In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the 401(k) Plans' other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance were inadequate. In Count III, Plaintiffs allege that Defendants, who communicated with participants regarding the 401(k) Plans' assets, or had a duty to do so, failed to provide participants with complete and accurate information regarding Bank of America stock sufficient to advise participants of the true risks of investing their retirement savings in the stock. In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries for the 401(k) Plan Classes by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring. In Counts V through VIII, Plaintiffs and the Pension Plan Class bring similar claims based on the continued and imprudent allowance of Company Stock as an Investment Measure for Pension Plan participants' pre-January 1, 2008 benefits.

10.     As Bank of America, Defendant Lewis, and the other fiduciaries knew or should have known, the acquisitions of Countrywide and Merrill Lynch were far riskier than the Plans' participants could have known.

11.     Even prior to the Countrywide and Merrill Lynch acquisitions, Bank of America was severely compromised, in large part as the result of a several-year acquisition spree

spearheaded by Defendant Lewis. This acquisition spree left BOA with a collection of troubled assets and mounting liquidity issues, among other problems. Moreover, the Company had exposure to Collateral Derivative Obligations ("CDOs"), which are investment products often backed by subprime loans, and hence experienced $5 billion in write-downs in the value of its CDOs in the last quarter of 2007.

12.    Nonetheless, prior to the Countrywide acquisition, Bank of America presented a falsely rosy picture of itself as a company that had weathered the subprime and credit crisis reasonably well in comparison with other banks – largely because, according to its own public statements, Bank of America had exited the subprime market years earlier and therefore suffered no "direct" losses from its own subprime lending. The continued prudence of investing retirement plan assets in BOA stock during the Class Period must be viewed against the backdrop of the Company's decisions to layer the failing Countrywide and Merrill Lynch companies upon BOA's existing businesses which were already exhibiting the adverse effects of exposure to weakening credit and capital markets.

13.    In fact, as BOA must have known through its due diligence, Countrywide was on the brink of collapse at the time BOA made the decision to acquire it. Countrywide has rightfully become synonymous with the reckless and illegal lending practices which have wreaked so much havoc on the world economy – and the Countrywide "assets" acquired by BOA are exceedingly toxic.

14.    As more information about Countrywide became public in the first and second quarters of 2008, analysts and commentators urged Bank of America to scuttle the deal; undeterred, Defendants forged ahead with the deal, and continued to rave about its supposed

benefits in SEC filings that were incorporated by reference into fiduciary statements to the Plans' participants.

15. In acquiring Countrywide, BOA dove directly into the heart of the subprime crisis. It acquired debt, litigation liability, and harm to its reputation –all of which caused BOA's share price to plummet and the Plans' retirement assets to greatly diminish.

16. Notwithstanding a barrage of positive and materially misleading statements that the Company and Defendant Lewis issued throughout the Class Period, the true facts about BOA's vulnerability to the credit crisis unfolding throughout late 2007 and 2008 and the true facts about Countrywide and Merrill Lynch and the severity of their negative impact on Bank of America only became known to the market and to employee Plan participants later, and they were devastating.

17. Indeed, as the facts about BOA, Countrywide and Merrill Lynch trickled out to the market in the fall of 2008, the price of BOA stock steadily dropped. While BOA stock traded at above $38 dollars on the day before the announcement of the Countrywide acquisition, it closed at $26.55 on September 15, 2008 – the day the Merrill Lynch acquisition was announced. The stock continued to drop in October, November, and December as investors learned more about Merrill Lynch's problems – but the Defendants knew that Merrill Lynch's problems were far worse than the market or the Plans' participants could ever have suspected.

18. On January 16, 2009, investors learned that BOA would receive a $20 billion dilutive investment in preferred stock from the federal government and a guarantee against future losses on $118 billion in toxic assets, mostly coming from Merrill Lynch. On the same day, the Company announced fourth quarter losses of $1.79 billion, and a shocking $15.31 billion fourth quarter net loss at Merrill Lynch. As a result, analysts suggested that Bank of America would

need to raise an additional $80 billion to restore adequate liquidity. These revelations caused a dramatic 50% drop in the value of Company stock during the week of January 14, 2009 to January 20, 2009, and were a direct result of the ill-conceived Merrill Lynch acquisition. At the same time, BOA announced that its quarterly dividend – which had been 64 cents per share at the start of the Class Period – would be cut to a penny per share as the result of the Company's now dire shortage of capital.

19.     Only government intervention saved the Company from total collapse.

20.     This action is brought on behalf of the Plans and their participants and seeks to recover on behalf of participants the losses to the 401(k) Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, the recalculation of Pension Plan benefits that were imprudently tied to the performance of Bank of America stock, other injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

21.     As a result of Defendants' fiduciary breaches, as enumerated and described herein, the 401(k) Plans suffered substantial losses, resulting in the depletion of hundreds of millions of dollars of the retirement savings of the 401(k) Plans' participants. In addition, many Pension Plan participants took a double hit, as their pre-January 1, 2008 Pension Plan benefits were tied to the performance of Bank of America stock. Under ERISA, the breaching fiduciaries are obligated to restore to the 401(k) Plans the losses resulting from their fiduciary breaches, and to recalculate the Pension Plan participants' benefits as if they had been tied to the performance of a prudent Investment Measure.

22.    Because Plaintiffs' claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiffs to sue for plan-wide relief for breach of fiduciary duty, Plaintiffs bring this as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period.  Plaintiffs also bring this action as participants seeking plan-wide relief for breach of fiduciary duty on behalf of each of the Plans.

23.    Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct additional discovery, Plaintiffs will, to the extent necessary and appropriate, amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the Counts alleged herein.

## II.    JURISDICTION AND VENUE

24.    **Subject-Matter Jurisdiction.**  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject-matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject-matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the … laws … of the United States."  28 U.S.C. § 1331.

25.    **Personal Jurisdiction.**  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.

26.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because Defendant Bank of America is found in this district.

## III.    PARTIES

### A.    Plaintiffs

27.    Plaintiff Mark Adams is a "participant" in the 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). He continues to hold shares of Company stock in his retirement account in the 401(k) Plan and did so throughout the Class Period. Mr. Adams is also a participant in the Bank of America Pension Plan, and throughout the Class Period he selected Bank of America stock as an Investment Measure for his Pension Plan benefits.

28.    Plaintiff Elizabeth Eagen is a "participant" in the 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). She continues to hold shares of Company stock in her retirement account in the 401(k) Plan and did so throughout the Class Period.

29.    Plaintiff Rhonda Wilson is a "participant" in the 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). She continues to hold shares of Company stock in her retirement account in the 401(k) Plan and did so throughout the Class Period. Ms. Wilson is also a participant in the Bank of America Pension Plan, and throughout the Class Period, she selected Bank of America stock as an Investment Measure for her Pension Plan benefits.

30.    Plaintiff Vernon C. Dailey is a "participant" in the 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). He continues to hold shares of Company stock in his retirement account in the 401(k) Plan and did so throughout the Class Period.

31.    Plaintiff Richard Adame is a "participant" in the 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). He continues to hold shares of Company stock in his retirement account in the 401(k) Plan and did so throughout the Class Period.

32.    Plaintiff Arlene Kahn is a "participant" in the Legacy 401(k) Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). She continues to hold shares of Company

stock in her retirement account in the Legacy 401(k) Plan and did so throughout the Class
Period.

33.    Plaintiff Petra Chatman is a "participant" in the Countrywide 401(k) Plan within
the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7). She continues to hold shares of Bank of
America stock in her retirement account in the Countrywide 401(k) Plan and did so throughout
the Class Period.

**B.    Defendants**

34.    The Defendants are identified below. All of the Defendants are fiduciaries of the
Plans within the meaning of ERISA, as is explained below in Section IX ("Defendants'
Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained
in Section XIV ("Claims for Relief").

**_Bank of America_**

35.    Defendant **Bank of America** is a Delaware corporation that is headquartered at
401 N. Tryon Street, Charlotte, NC 28255. The Company provides a diverse range of banking
and non-banking financial services and products domestically and internationally. Bank of
America's common stock is listed on the New York Stock Exchange and trades under the ticker
symbol "BAC." As described more fully below, the Company was a fiduciary for the Plans.

**_Bank of America Corporation Corporate Benefits Committee Defendants_**

36.    **Bank of America Corporation Corporate Benefits Committee (the "Benefits
Committee" or "Committee") Defendants**. According to the most recently filed annual reports
filed with the SEC for each of the 401(k) Plans and according to the Pension Plan document, the
Benefits Committee is the administrator for each of the Plans.[1] As plan administrator, the

---

[1] *See* The Bank of America 401(k) Plan, Annual Report (Form 11-K) for the Year Ended
December 31, 2008 (June 26, 2009) (hereinafter the "2008 Form 11-K 401(k) Plan"); The Bank

Benefits Committee has overall responsibility for the operation and administration of the Plans. The Benefits Committee members are therefore fiduciaries of the Plans. The Defendants, who are or were members of the Benefits Committee, are sometimes referred to as the "Benefits Committee Defendants" or the "Committee Defendants."

37.     Plaintiffs rely on Defense Counsel's representations, and must do so before discovery, to identify the individual defendants below who are or were members of the Benefits Committee during the Class Period:

38.     **J. Steele Alphin** ("Alphin") was a member of the Benefits Committee. Alphin joined Bank of America in 1977 and has been Chief Administrative Officer of the Company since 2006. Alphin is a member of the Company's senior management team, and responsible for the Company's Global Human Resources and Global Marketing & Corporate Affairs. As a result of his history and position at the Company, Defendant Alphin was privy to information concerning Bank of America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which he knew or should have known that BOA stock was not a prudent investment for the Plans' participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

39.     **Amy Woods Brinkley** ("Brinkley") was a member of the Benefits Committee. Defendant Brinkley was the Company's Chief Risk Officer from April 2002 until she was ousted in June of 2009. As head of the Company's risk department, it was Brinkley's job to protect the Company from all kinds of risk, ranging from human resources-related factors to interest rate fluctuations and credit risk. She also became the point person between the Company and the

of America 401(k) Plan for Legacy Companies, Annual Report (Form 11-K) for the Year Ended December 31, 2008 (June 26, 2009) (hereinafter the "2008 Form 11-K Legacy 401(k) Plan"); The Countrywide Financial Corporation 401(k) Savings and Investment Plan, Annual Report (Form 11-K) for the Year ended December 31, 2008 (June 26, 2009) (hereinafter the "2008 Form 11-K Countrywide 401(k) Plan").

regulators during the 2009 "stress tests."  According to a June 2009 article in *The New York Times*,  Defendant Brinkley "was at Mr. Lewis's side as the bank rapidly expanded its credit card and home equity lending, businesses that were causing charge-offs for the bank.  Defendant Brinkley spent the bulk of her career at BOA, rising from the front lines of corporate lending. Brinkley became an officer of the Company in 1979 and served as Executive Vice President and Senior Consumer Credit Policy Executive until 1990.  Brinkley established a Consumer Credit Policy function in 1987 to oversee the credit issues in Bank of America's consumer portfolio, including credit card, residential mortgages, and direct and indirect consumer loans.  She also served as a Chairman of Bank of America from July 2001 to April 2002.  Defendant Brinkley has also served as a director at Merrill Lynch.  As a result of her history and position at the Company, Brinkley was privy to information concerning Bank of America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which she knew or should have known that BOA stock was not a prudent investment for the Plans' participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

40.    **Barbara J. Desoer** ("Desoer") was a member of the Benefits Committee. Desoer's long history with the Company began in 1977 and she first became an officer of the Company in 1998.  Desoer has been President of Home Loans and Insurance of Bank of America since July 2008.  Desoer oversees a home loans business that accounts for about 20 percent of the U.S. mortgage origination market, with a $2 trillion servicing portfolio serving nearly 14 million customers. She also manages the bank's home equity business and oversees an insurance services organization that is the world's largest provider of loan protection products.  Desoer's other positions have included President of Consumer Products of Bank of America, President of

the Consumer Real Estate Operations at Countrywide Financial Corporation after the

Countrywide acquisition, and President of Consumer Real Estate Operations at Bank of America.

As a result of her history and positions at the Company, Desoer was privy to information

concerning Bank of America, its businesses, financial statements and condition, and the risks that

threatened the value of the Company's stock, based on which she knew or should have known

that BOA stock was not a prudent investment for the Plans' participants during the Class Period

and knew the risk posed to the Plans' investments in Bank of America stock.

41.     **Liam E. McGee** ("McGee") was a member of the Benefits Committee. McGee

joined Bank of America in 1990. McGee also served as President of Consumer and Small

Business Banking at the Company before leaving in August of 2009. As a result of his history

and positions at the Company, McGee was privy to information concerning Bank of America, its

businesses, financial statements and condition, and the risks that threatened the value of the

Company's stock, based on which he knew or should have known that BOA stock was not a

prudent investment for the Plans' participants during the Class Period and knew the risk posed to

the Plans' investments in Bank of America stock.

42.     **Timothy J. Mayopoulos** ("Mayopoulos") was a member of the Benefit

Committee. Mayopoulos served as Bank of America's General Counsel for five years until he

was mysteriously fired in December 2008 – just four days after shareholders approved the ill-

fated Merrill Lynch acquisition and the same day that Bank of America informed the Board of

Directors that Merrill Lynch was bleeding money at an alarming and unexpected rate. As

General Counsel, Mayopoulos was responsible for advising the bank on its disclosure decisions.

Mayopoulos was also an Executive Vice President of Bank of America. As a result of his history

and positions at the Company, Mayopoulos was privy to information concerning Bank of

America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which he knew or should have known that BOA stock was not a prudent investment for plan participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

43.   **Brian T. Moynihan** ("Moynihan") was a Benefits Committee member. Moynihan started at Bank of America in April 2004. He is currently President of Global Banking and Wealth Management and has been since January 2009. Moynihan also served as President, Global Banking and Wealth Management from April 2004 through October 2007 before becoming President, Global Corporate and Investment Banking. From December 2008 through January 2009, Moynihan served as General Counsel, before returning to the position he holds to this day as President, Global Wealth and Banking. Moynihan also currently serves as a director of Bank of America, N.A., FIA Card Services, N.A. and Countrywide Bank, FSB and as Chief Executive Officer of Merrill Lynch & Co., Inc. As a result of his history and positions at the Company, Moynihan was privy to information concerning Bank of America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which he knew or should have known that BOA stock was not a prudent investment for the Plans' participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

44.   **Bruce L. Hammonds** ("Hammonds") was a Benefits Committee member who was President of Bank of America's Global Card Services before retiring at the end of 2008. In that position, Hammonds oversaw the largest credit card portfolio in the world, serving more than 70 million customers. Hammonds was also responsible for the Company's unsecured lending and international card businesses. In total, he was responsible for more than $230 billion

in managed loans around the world. Hammonds was a founding member of the management team that established MBNA in 1982. Hammonds joined Bank of America in January 2006 when the Company acquired MBNA; Hammonds had previously served as President and Chief Executive Officer of the MBNA Corporation. As a result of his history and positions at the Company, Hammonds was privy to information concerning Bank of America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which he knew or should have known that BOA stock was not a prudent investment for the Plans' participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

45.     **Richard K. Struthers** ("Struthers") was a Benefits Committee member. Struthers was a Consumer Credit Risk executive before succeeding Defendant Hammonds as President of Bank of America's Global Card Services on January 1, 2009. From May 2008 to January 2009, Struthers served as Consumer Credit Risk Executive; from June 2007 to May 2008, he served as North America Card Services Executive; from December 2006 to June 2007, he served as Credit and Operations Executive, and from January 2006 to December 2006, he served as Card Operations Executive. Prior to Bank of America's acquisition of MBNA in January 2006, Struthers was Executive Vice Chairman of MBNA Bank, N.A. from January 2002 to January 2006. Struthers currently also serves as a director of Bank of America, N.A., FIA Card Services, N.A., and Countrywide Bank, FSB. As a result of his history and positions at the Company, Struthers was privy to information concerning Bank of America, its businesses, financial statements and condition, and the risks that threatened the value of the Company's stock, based on which he knew or should have known that BOA stock was not a prudent

investment for the Plans' participants during the Class Period and knew the risk posed to the
Plans' investments in Bank of America stock.

## *Bank of America Compensation and Benefits Committee Defendants*

46.     **Bank of America Compensation and Benefits Committee (the "C&B**

**Committee") Defendants.** The C&B Committee is a committee composed of members of the
Company's Board of Directors. The C&B Committee members are nominated by the Corporate
Governance Committee and appointed by the Board of Directors. *See* Bank of America 2009
Proxy Statement.

47.     According to its Charter, the C&B Committee has the purpose of "provid[ing]
overall guidance with respect to the establishment, maintenance and administration of [the
Company's] compensation programs and employee benefit plans."

48.     The C&B Committee in general is charged with the duty of overseeing the
establishment, maintenance, and administration of the Company's compensation and benefits
programs and reviewing, approving and making recommendations for executive compensation.
*See* Bank of America 2009 Proxy Statement at 8, available at http://investor.bankofamerica.com.

49.     The C&B Committee also may delegate to management certain of its duties and
responsibilities granted to it to perform in its discretion under the Plan with respect to the
adoption, amendment, modification or termination of benefit plans. *Id.* at 9; *see also*, *e.g.*,
401(k) Plan § 13.1 ("Amendment of Plan").

50.     The C&B Committee members are therefore fiduciaries of the Plans.

51.     During the Class Period, the Compensation and Benefits Committee Defendants
included Director Defendants:

C:\DOCUMENTS AND SETTINGS\ANDREW\DESKTOP\FINAL BOA COMPLAINT.DOC - 16 -

a)      **O. Temple Sloan, Jr**. ("Sloan") was a director of the Company from 1996 until he resigned in May 2009. Defendant Sloan was the Company's independent lead director throughout the Class Period, Chairman of the C&B Committee and Executive Committee and a member of the Corporate Governance Committee.

b)      **Thomas M. Ryan** ("Ryan") has been a director of the Company since April 2004 and is currently, and was throughout the Class Period, a member of C&B Committee and also Chairman of the Corporate Governance Committee.

c)      **Patricia Mitchell** ("Mitchell") was a director of the Company since 2001 until she resigned June 2009. Throughout the Class Period, Defendant Mitchell was a member of the C&B Committee.

d)      **Meredith R. Spangler** ("Spangler") was a director from 1988 until she resigned in April 2009. Throughout the Class Period, Defendant Spangler was a member of the C&B Committee.

### *Director Defendants*

52.     **Board of Directors ("Board") Defendants.** As explained in more detail below, the Company's Board of Directors had certain responsibilities with respect to the Plans, including appointment and oversight responsibilities. The Board and its members (the "Director Defendants") were therefore fiduciaries of the Plans.

53.     The Board's "basic responsibility ... is to oversee the businesses and affairs of Bank of America." 2009 Proxy Statement at 4. The Board's "Key responsibilities" include among other things:  monitoring the performance of the CEO, executive compensation, and approving the Company's annual and strategic business plans. *Id.*

54.     Charged with these basic and specific duties, the director Defendants described below and the members of the C&B Committee already described, were each and all privy to information concerning Bank of America and its business, operations, products, financial statements, financial condition, based on which they knew or should have known that BOA stock was not a prudent investment for the Plans' participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

55.     The Director Defendants who did not serve on the C&B Committee during the Class Period but who had fiduciary duties in connection with the Plans included:

**a)     Defendant Kenneth D. Lewis ("Lewis")** was Chairman of the Board of Directors from February 2005 until Defendant Massey was elected Chairman in 2009, has been President of the Company since July 2004 and Chief Executive Officer ("CEO") since April 2001. On September 30, 2009, Lewis announced that he would resign from the Company at the end of the year. Lewis is currently, and was throughout the Class Period, a member of the Executive Committee. As is explained in more detail below, in addition to his monitoring obligations as a member of the Board of Directors, Defendant Lewis engaged in acts of Plan administration by communicating extensively with employees regarding the Company and Company stock, the single largest asset of the 401(k) Plans and a major hypothetical investment vehicle for the Pension Plan.

**b)     Jackie M. Ward** ("Ward") was a director until she resigned June 2009 and was Chairman of the Asset Quality Committee during the Class Period. As Chairman and member of the Asset Quality Committee, Defendant Ward's duties included: reviewing asset quality trends and performance; monitoring management's adherence to prudent and sound credit policies and practices; reviewing credit concentrations, credit risk inherent in selected products and

businesses, country risk and loan loss reserves; reviewing adequacy of the allowance for loan and lease losses and related written policies and procedures; reviewing market risk reports; and approving credit risk policies and management disciplines as required by regulations.

    c)    **Thomas May** ("May") has been a director since April 2004 and is currently and was throughout the Class Period, Chairman of the Audit Committee. As a member of the Audit Committee, May's duties generally are to annually review the scope of the proposed internal audit, external audit, and credit review activities, and review the actual coverage of those activities.

    d)    **Walter E. Massey** ("Massey") has been a director of the Company since 1998, was elected Chairman of the Company in April 2009, and is currently and was throughout the Class Period, a member of the Audit Committee. As a member of the Audit Committee, Massey's duties generally are to annually review the scope of the proposed internal audit, external audit, and credit review activities, and review the actual coverage of those activities.

    e)    **Charles Gifford** ("Gifford") was Chairman of Bank of America from April 2004 until January 2005. He has been a director of the Company since 2004 and is currently, and was throughout the Class Period, a member of the Executive Committee. Gifford has also served as a member of the Asset Quality Committee since January 28, 2009.

    f)    **William Barnet III** ("Barnet") became a director of the Company in April 2004 and was a member of the Audit Committee during the Class Period. Barnet resigned from his BOA directorship on July 31, 2009. Barnet has served as Chairman, President, and CEO of The Barnet Company Inc. since 2001 and Barnet Development Corporation since 1990. Both companies are real estate and investment firms.

**g)** **John Collins** ("Collins") became a director of the Company since April 2004 and was a member of the Audit Committee throughout the Class Period. Ms. Collins resigned from her BOA directorship on July 31, 2009, reportedly in response to government pressure.

**h)** **Robert Tillman** ("Tillman") was a director from April 2005 until he resigned in May 2009. Throughout the Class period, Tillman was a member of the Asset Quality Committee. He was also a member of the Executive Committee as of January 29, 2009 until his resignation.

**i)** **Frank Bramble, Sr.** ("Bramble") has been a director since January 2006 and is currently, and was throughout the Class Period, a member of the Asset Quality Committee. He is also a former Executive Officer of the MBNA Corporation.

**j)** **Monica Lozano ("Lozano")** has been a director of the Company since April 2006 and is currently, and was throughout the Class Period, a member of the Asset Quality Committee.

**k)** **Tommy Franks ("Franks")** was a director from January 2006 until his resignation June 17, 2009. Franks is a retired army general and throughout the Class Period was a member of the Audit Committee.

**l)** **Gary Countryman ("Countryman")** had been a director since April 2004 until he resigned on July 31, 2009. Throughout the Class Period, Countryman was a member of the Executive Committee.

56.     **Defendants Ward, Gifford, Tillman, Bramble, and Lozano,** as members of the Asset Quality Committee, had duties including: reviewing asset quality trends and performance; monitoring management's adherence to prudent and sound credit policies and practices; reviewing credit concentrations, credit risk inherent in selected products and businesses, country

risk and loan loss reserves; reviewing adequacy of the allowance for loan and lease losses and related written policies and procedures; reviewing market risk reports; and approving credit risk policies and management. The Asset Quality Committee met six times in 2008. As a result of the foregoing duties each and every member of the Asset Quality Committee was privy to information concerning Bank of America and its business, operations, products, financial statements and financial condition, based on which they knew or should have known that BOA stock was not a prudent investment for the Plan's participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

57.     **Defendants Sloan, Lewis, Countryman, Gifford, and Tillman**, as members of the Executive Committee, had the power to direct and transact all business that would come before the Board. *See* Bank of America Executive Committee Charter *available* at http://media.corporateir.net/media_files/irol/71/71595/corpgov/Executive_Committee_Charter_1 _07.pdf. The Executive Committee met six times in 2008. 2009 Proxy Statement at 10. Further, the Executive Committee reports its actions to the full Board at the next regular meeting. *Id.* As a result of the foregoing duties each and every member of the Executive Committee was privy to information concerning Bank of America and its business, operations, products, financial statements and financial condition, based on which they knew or should have known that BOA stock was not a prudent investment for the Plan's participants during the Class Period and knew the risk posed to the Plans' investments in Bank of America stock.

## IV.     THE BANK OF AMERICA 401(K) PLAN

### A.     Background

58.     The Bank of America 401(k) Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and, further, is a "defined contribution plan" within the meaning of § 3(34) of ERISA, 29 U.S.C. § 1002(34).

59.     The 401(k) Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29
U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the 401(k) Plan
is neither a defendant nor a plaintiff. Rather, pursuant to ERISA §409, 29 U.S.C. § 1109, and the
law interpreting it, the relief requested in this action is for the benefit of the 401(k) Plan and its
participants and beneficiaries.

60.     The assets of an employee benefit plan, such as the 401(k) Plan here, must be
"held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class
Period, the assets of the 401(k) Plan were held in a trust fund administered by Bank of America,
N.A.

61.     The purpose of the 401(k) Plan as stated in its governing documents is "to provide
a program through which Participants may achieve additional financial security during their
working years and in retirement and participate in the growth of the Participating Employers
through ownership of Common Stock" in the Company. *See* The Bank of America 401(k) Plan
(the "401(k) Plan") (as amended effective Jan. 1, 2006) at 1.

62.     "Participating Employers" include the Company and its Subsidiaries, and
"Covered Employees" include any U.S.-based person who is identified as an Employee in the
personnel records of his or her Participating Employer.

**B.     Investment Options in the 401(k) Plan, including the BAC Common Stock Fund**

63.     The 401(k) Plan purports to consist of two components:  the Employee Stock
Ownership Plan (the so-called "ESOP") portion, and the "Profit-sharing portion."  The ESOP
consists of the Common Stock Fund, and purports to qualify as an ESOP within the meaning of
ERISA § 407(d)(6).  The "Profit-sharing portion" is defined as "the portion of the Plan that is not
the ESOP."

64.     The 401(k) Plan provides that the "ESOP assets shall include the Common Stock Fund …."

65.     While the 401(k) Plan defines the Common Stock Fund in the Plan as a "Fund that invests primarily in Common Stock," 401(k) Plan at 2.1(c)(15) at 6, the Plan reserves to the fiduciaries the discretion to invest ESOP assets in cash or cash equivalents: "ESOP assets may also be invested, directly or indirectly, in cash or cash equivalent investments and other types of investments pending use to purchase Common Stock." 401(k) Plan § 11.2(a).

66.     As of January 1, 2008, the 401(k) Plan offered a total of 26 investment alternatives to participants. Those investments included: the Bank of America Common Stock Fund (the "BAC Common Stock Fund"), Stable Capital Fund and 14 mutual funds. *See* 2008 Form 11-K 401(k) Plan at 4-5.

67.     On information and belief, and at all relevant times, the BAC Common Stock Fund has been an available investment vehicle for the 401(k) Plan and the fiduciaries have always chosen to invest all or nearly all of that Fund's assets in BAC stock throughout the Class Period despite the imprudence of investing in BAC stock during the Class Period.

## C.     Administration of the 401(k) Plan

68.     Even if the ESOP component of the 401(k) Plan satisfies all the statutory and regulatory mandates and hence qualifies as an ESOP, fiduciaries of an ESOP remain bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

69.     Accordingly, if the fiduciaries knew or an adequate investigation would have revealed that BAC stock was no longer a prudent investment for the 401(k) Plan, the fiduciaries were required to disregard plan direction to maintain investment in BAC stock and to protect the 401(k) Plan's assets by investing those assets in other, suitable investments.

70.    Recognizing that the fiduciaries could be required to limit or eliminate the amount of BAC stock in the Common Stock Fund, the Summary Plan Description in 2006 informed participants that the BAC Common Stock Fund "[*u]nder normal circumstances* … invests primarily in the common stock of Bank of America Corporation, and also invests in short-term investments." *See* Bank of America Retirement Plans Supplement ("SPD") as of January 1, 2006, at 27 (emphasis added).

71.    Pursuant to the 401(k) Plan, the Benefits Committee has "complete responsibility for the operation and administration of the Plan … excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors." 401(k) Plan § 8.2(a) at 52.

72.    In addition to its general "powers necessary to enable it properly to carry out its duties under the Plan and Trust," the Benefits Committee had the specific powers and duties, among others, to:

(i)    construe and interpret the Plan and to determine all questions that arise thereunder;

(ii)    decide all questions relating to the eligibility of employees to participate in the Plan as well as to receive benefits under the Plan;

(iii)    establish rules and procedures relating to Participant elections under the Plan, including Compensation reduction elections under Article IV, Distribution elections under Article VII and investment elections under Article XII, and the Committee in its discretion may employ one or more persons or entities to provide advice or other assistance to Participants in making their said investment elections;

\*        \*        \*

(v)     authorize all disbursements by the Trustee except for the ordinary

expenses of administration of the Trust;

\*      \*      \*

(ix)    modify or supplement any Plan accounting method, practice or procedure,

make any adjustments to Accounts or modify or supplement any other aspect of the operation or

administration of the Plan in such manner and to such extent consistent with and permitted by

[ERISA] and the [Tax] Code that the Committee deems necessary or appropriate to correct errors

and mistakes, to effect proper and equitable Account adjustments or otherwise to ensure the

proper and appropriate administration and operation of the Plan; and

(x)     carry out such other and further specific duties, and exercise such other

and further specific powers, authority and discretion, as are elsewhere in the Plan or the Trust

either expressly or by necessary implication conferred upon it.  [401(k) Plan § 9.3, at 55-56.]

73.     The 401(k) Plan also requires that the Benefits Committee "prescribe the rules

and procedures that Participants must following [sic] in making their investment elections and

may from time to time amend, modify or change those rules and procedures in such manner as

the Committee in its discretion deems appropriate."  401(k) Plan § 12.1(b). This discretion

includes the discretion to:

> Prescribe restrictions as to the time, frequency and amount of
> permitted investment changes. Such restrictions may include,
> without limitation, rules that limit or otherwise restrict transfers to
> or from some or all of the Funds to particular Valuation Date(s)
> during particular period(s) of time, including rules that in the
> Committee's judgment are appropriate to deter, restrict or
> eliminate transfers to, from or among Funds by Participants that
> because of frequency, timing or amount may be to the direct or
> indirect detriment of other Participants or the Plan, and such rules
> may include the imposition of redemption or similar fees on
> transfers from particular Fund. Such restrictions may include,
> without limitation, restrictions regarding transfers to or from a
> Fund whose investments are not highly liquid.

401(k) Plan § 12.1(b)(v).

## D.    Participant and Employer Contributions to the 401(k) Plan

74.    Individual accounts are maintained for each 401(k) Plan participant. Participants' accounts are credited with Employer and Participant-directed contributions and earnings, expenses, gains and losses.

75.    According to the SPD, all Covered Employees are eligible to make pre-tax contributions as soon as they are employed by a Participating Employer.

76.    Throughout the Class Period, participants in the 401(k) Plan were permitted to defer a percentage of their base compensation for investment in the 401(k) Plan. Effective January 1, 2006, 401(k) Plan participants were allowed to contribute between 1% and 30% of their compensation, up to the annual maximum permissible under the Internal Revenue Code.

77.    The Company provides a Matching Contribution for all employees who have completed 12 months of service. Any pre-tax employee contributions made prior to completing 12 months of employment are not eligible for the Matching Contribution.

78.    Effective January 1, 2006, the Company Match was calculated in each payroll period as *the lesser of* (A) the full amount of the participant's pre-tax Employee Contribution for the payroll period *or* (B) five percent of the Participants' compensation for the payroll period. An annual "true-up" Matching Contribution was available under certain circumstances to ensure that Participants received the lesser of (A) the full amount of their pre-tax contributions for the year or (b) five percent of their annual compensation.

79.    401(k) Plan participants are authorized to direct the investment of their contributions and the Company Matching Contributions among the various investment options in the 401(k) Plan.

80.     If a participant does not initially direct his or her investment, the participant's contribution will be invested in the Stable Capital Fund or if not in existence, a fund the Committee determines to pose the least risk to principal.

**E.     Losses to the 401(k) Plan**

81.     The 401(k) Plan incurred substantial losses as a result of the 401(k) Plan's investment in BAC common stock. As of December 31, 2007, the 401(k) Plan held about 75 million shares of BAC common stock, then having a market value of approximately $3 billion or 31.5% of the total assets of the 401(k) Plan. *See* The Bank of America 401(k) Plan, Annual Report (Form 11-K) for the Year Ended December 31, 1007 (June 6, 2008) (hereinafter the "2007 Form 11-K 401(k) Plan"). As of December 31, 2008 – the most recent date for which there is publicly available information – the 401(k) Plan held 81,379,468 shares of BAC stock then having a market value of $1,145,822,909.00 and was approximately 19.0% of the total assets of the 401(k) Plan.

82.     The price of BOA stock dropped from over $38 at the beginning of the Class Period to $6.68 on January 21, 2009, and the 401(k) Plan lost hundreds of millions of dollars. These staggering losses could have been avoided in whole or in large part had the 401(k) Plan fiduciaries acted prudently, loyally and in the best interest of 401(k) Plan participants as required by ERISA.

# V.     THE BANK OF AMERICA 401(K) PLAN FOR LEGACY COMPANIES

**A.     Background**

83.     The Legacy 401(k) Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and further is a "defined contribution plan" within the meaning of ERISA § 3(34) of ERISA, 29 U.S.C. § 1002(34). The Legacy 401(k) Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a

breach of fiduciary duty action such as this, the Legacy 401(k) Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Legacy 401(k) Plan and its participants and beneficiaries.

84.     The assets of an employee benefit plan such as the Legacy 401(k) Plan here must be held in trust by one or more trustees. ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Legacy 401(k) Plan were held in a trust fund administered by Bank of America, N.A.

85.     The Legacy 401(k) Plan participating employers include Bank of America and its principal subsidiaries.

86.     Upon information and belief, participants in the Legacy 401(k) Plan include current and former employees of acquired companies MBNA, Fleet and other acquired companies who participated in plans that have been merged into the Legacy 401(k) Plan.

87.     Employees covered by the Legacy 401(k) Plan are eligible to make pre-tax contributions after employment commences up to 30% of their pre-tax compensation. Company matching contributions are calculated and allocated to each participant's account on a pay period basis. "The company matching contribution is equal to the first 5% of plan-eligible compensation contributed by the participant for the pay period. Company matching contributions are made in cash and are directed to the same investment choices as the pre-tax contributions. An end of year 'true-up' matching contribution is also provided." 2008 Form 11-K for the Legacy 401(k) Plan.

88.     Effective January 1, 2008, the Legacy 401(k) Plan provided participants with a total of 26 investment alternatives and included in these alternatives was the BAC Common Stock Fund and 14 mutual funds. *See* 2008 Form 11-K Legacy 401(k) Plan.

89.     According to a notice sent to participants from the MBNA plan,[2] the Legacy 401(k) Plan "has the same important features and benefits as the Bank of America 401(k) Plan and is used for all transition related accounts." The Summary Plan Description provided to participants also states that the Legacy 401(k) Plan shares the same features as the 401(k) Plan. But the "features and benefits" are not described in the SPD.

## B.     Losses to the Legacy 401(k) Plan

90.     The Legacy 401(k) Plan has incurred substantial losses as a result of the Legacy 401(k) Plan's investment in Bank of America stock. As of December 31, 2007, the Legacy 401(k) Plan held over 20 million shares of BAC common stock, then having a market value of approximately \$844,779,315.00 or 18% of the Legacy 401(k) Plan's total assets. *See* the Bank of America 401(k) Plan for Legacy Fleet and MBNA, Annual Report (Form 11-K), for the Year Ended December 31, 2007 (June 6, 2008) (hereinafter the "2007 Legacy 401(k) Form 11-K"). As of December 31, 2008, the most recent date for which there is publicly available information, the Legacy 401(k) Plan held 24,952,515 shares of BAC stock then having a market value of \$351,331,411.00 or 10% of the Legacy 401(k) Plans' total assets.

91.     The BAC stock in the Legacy 401(k) Plan shed the great majority of its value. Indeed, the price of Bank of America stock dropped from over \$38 at the beginning of the Class Period to \$6.68 on January 21, 2009, and the Legacy 401(k) Plan lost hundreds of millions of dollars. These staggering losses could have been avoided, in whole or in large part, had the

---

[2] At the time the Legacy 401(k) Plan was referred to as the Fleet/MBNA 401(k) Plan.

Legacy 401(k) Plan fiduciaries acted prudently, loyally and in the best interests of the Legacy 401(k) Plan participants as required by ERISA.

## VI.   THE COUNTRYWIDE FINANCIAL CORPORATION 401(K) SAVINGS AND INVESTMENT PLAN[3]

### A.   Background and Operation of the Plan

92.   Countrywide Financial Corporation ("Countrywide") merged with and became a wholly owned subsidiary of Bank of America on July 1, 2008. *See* 2008 Form 11-K Countrywide 401(k) Plan. Countrywide is the named Sponsor of the Countrywide 401(k) Plan.

93.   The Countrywide 401(k) Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and further is a "defined contribution plan" within the meaning of ERISA § 3(34) of ERISA, 29 U.S.C. § 1002(34). The Countrywide 401(k) Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Countrywide 401(k) Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Countrywide 401(k) Plan and its participants and beneficiaries.

94.   The assets of an employee benefit plan such as the Countrywide 401(k) Plan must "be held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Countrywide 401(k) Plan were held in a trust fund administered by Fidelity Management Trust Company.

---

[3] As of April 2009, the Countrywide 401(k) Plan has merged with the Legacy Plan. Because this event is outside the Class Period, the Complaint treats the Countrywide 401(k) Plan as a separate entity.

95. The Countrywide 401(k) Plan covered employees of the Countrywide Financial Corporation, a subsidiary of Bank of America as of July 1, 2008, who were eligible to participate in the Plan immediately upon their hire date if they were age 21 or older.

96. On July 1, 2008, all common stock of Countrywide Financial was converted into Bank of America Corporation shares at a rate of 0.1822 shares of Bank of America Corporation common stock for every share of Countrywide Financial Corporation common stock. Countrywide Financial Corporation continues as a surviving Bank of America Corporation subsidiary.

97. According to the 2008 Form 11-K for the Countrywide 401(k) Plan, the Countrywide 401(k) Plan's investment options included 19 mutual funds, a money market mutual fund and an employer common stock fund as investment options for participants.

98. In general, an eligible employee participating in the Countrywide 401(k) plan could contribute up to 40% of his or her pretax annual compensation.

99. Countrywide made quarterly, discretionary matching contributions equal to 50 percent of the first six percent of eligible earnings that the participant contributes. Effective with the discretionary matching contribution for the calendar quarter beginning April 1, 2008, the Corporation's discretionary matching contributions were made in cash and were directed to the same investment choices as their pre-tax contributions. Prior to this change, the Corporation's discretionary matching contributions were made entirely in Countrywide Financial Corporation common stock and participants had the option to re-direct the discretionary matching contribution once the common stock had been allocated to the participant accounts. The value of the common stock that was contributed for the discretionary match was based on the closing price for the last business day of the quarter for which the contributions were made.

100.    Each participant's account was credited with the participant's contribution,

discretionary matching contribution, Limited Profit Sharing contribution (if eligible), and an

allocation of earnings or losses. Allocations of Countrywide 401(k) Plan earnings or losses were

based on account balances. The benefit to which a participant was entitled was the benefit that

could be provided from the participant's vested account.

101.    Participants were immediately vested in their voluntary contributions plus actual

earnings or losses thereon. Participants began vesting in Countrywide contributions after one

year of service under a graduated vesting schedule and were fully vested after five years of

service.

**B.    Losses to the Countrywide 401(k) Plan**

102.    The Countrywide 401(k) Plan incurred substantial losses as a result of the

Countrywide 401(k) Plan's investment in Bank of America stock. As of December 31, 2007, the

Countrywide 401(k) Plan held shares of Countrywide common stock then having a market value

of approximately $83,425,898 and was 9% of the Countrywide's 401(k) Plan's total assets. The

Plan's shares of Countrywide common stock were then converted into BAC common stock on

July 1, 2008. *See* Countrywide 401(k) Plan 2008 11-K. As of December 31, 2008, the most

recent date for which there is publicly available information, the Countrywide 401(k) Plan held

shares of BAC stock then having a market value of $40,374,235 or 7% of the Countrywide

401(k) Plans' total assets.

103.    The BAC stock in the Countrywide 401(k) Plan shed most of its value during the

Class Period. The price of Bank of America stock dropped from $23.81 at the beginning of the

Countrywide 401(k) Plan Class Period on July 1, 2008 to $6.68 on January 21, 2009, and the

Countrywide 401(k) Plan lost tens of millions of dollars. These losses could have been avoided

in whole or in large part had the Countrywide 401(k) Plan fiduciaries acted prudently, loyally and in the best interests of the Countrywide 401(k) Plan participants as required by ERISA.

## VII.    THE BANK OF AMERICA PENSION PLAN

104.    The Pension Plan is a cash balance "defined benefit" plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Pension Plan is the successor to the NationsBank Cash Balance Plan, which was converted into a "cash balance" defined benefit plan as of July 1, 1998.

105.    As a "cash balance" defined benefit plan, the Bank of America Pension Plan maintains a hypothetical account in each participant's name. These accounts are credited with Compensation Credits after the end of each pay period in an amount equal to 2-8% of each participant's pay. (The percentages vary depending upon the years of service of the particular employee.)

106.    As of January 1, 2008, a participant is 100% vested after 36 months of vesting service.

107.    Up until December 31, 2007, the Pension Plan required participants to direct the hypothetical investment of their account balances in a number of "Investment Measures" offered under the Pension Plan, which generally mirrored the actual investment options provided in the 401(k) Plan. (For all Compensation Credits earned January 1, 2008 or later, interest is calculated based on the yield of the 10-year U.S. Treasury Note.)

108.    Each participant account is regularly adjusted by "Investment Credits" that reflect, (i) the return on the investments in which the account is hypothetically invested for pre-January 1, 2008 Compensation Credits plus, and (ii) the interest calculated based on the yield of the 10-year treasury note for post January 1, 2008 Compensation Credits. (The Pension Plan

guarantees that the amount of a participant's Compensation Credits plus the value of certain pay credits and asset transfers is not subject to reduction.)

109.    Unlike in a 401(k) Plan, the participant "investments" under the Pension Plan are only *hypothetical*; that is because participants in the Pension Plan do not have the authority to instruct the Trustee of the Pension Plan how the Trustee must actually invest assets of the Plan, and, in fact, the Trustee (or other Plan fiduciaries) are obligated to make their own independent judgment as to how to best invest Plan assets. The hypothetical "Investment Measures" are merely the method by which the "Investment Credits" made for each participant's pre-January 1, 2008 account balance are determined.

110.    As stated in the Summary Plan Description for 2006, still available on Bank of America's employee benefits website to this day:

> The Bank of America Pension Plan differs from typical pension plans, which do not give choices that affect how your benefit will grow. The Bank of America Pension Plan gives you the opportunity to 'invest' the funds in your account. You can select the investment choices as to which your account is tied. You can select from the same investment choices as you do in the 401(k) Plan. Your Pension Plan account is not actually invested in those investment choices, but the amount you direct to each investment choice is credited with the same return that would be received if your account were actually invested in that investment choice in the 401(k) Plan.

111.    As Pension Plan participants were informed in November of 2007:

> In response to recent legislative and regulatory requirements, beginning January 1, 2008, any compensation credits that you receive will earn interest credits based on the yield of the 10-year U.S. Treasury Note. Over the past five years, this yield has averaged between 4 and 5 percent. Under the previous plan design, in which participants could direct the investment of their compensation credits, it was possible to obtain returns that were higher or lower than the yield of the 10-year U.S. Treasury Note.
>
> This change does not affect your account balance as of December 31, 2007. Your account balance as of that date will continue to reflect daily gains and losses based on the returns of the investment choices you select. You can direct the investment of the pre-2008 portion of your account among the same investment choices

> available in the 401(k) plan.... You can change the investments of
> your pre-2008 portion of your pension plan account in the same
> way you change investments in you 401(k) plan account.

112.    Hence, as of January 1, 2008, the "Investment Credits" component of Pension

Plan accounts were split into two parts: (1) the "Investment Credits" balance through December

31, 2007 continued to be credited with returns based on investment choices the participant

selected; and (2) the Investment Credits beginning January 1, 2008, receive interest credits based

on the yield of the yield of the 10-year U.S. Treasury Note.

113.    Up until January 1, 2008, Bank of America stock was always one of the

Investment Measures to which the Pension Plan participants could tie their Investment Credits

and continues to be for the cash-balance account credits through December 31, 2007.

114.    The Pension Plan is funded by Bank of America contributions.

115.    To the extent that the actual investment return on Pension Plan assets exceeds the

return on the Investment Measures selected by participants, the difference is an arbitrage gain for

Bank of America.  Arbitrage gains are used to offset contributions Bank of America would

otherwise be required to make to the Pension Plan to fund benefit payments.  The gains thereby

reduce the Bank's pension costs, and in some cases resulted in pension income for Bank of

America.

116.    Accordingly, to the extent Bank of America stock underperformed the vehicles in

which Pension Plan assets were *actually* invested, Bank of America benefits.  This inherent

conflict of interest imposed on the Defendant-fiduciaries a heightened duty to insure that the

Pension Plan offered prudent Investment Measures and eliminate imprudent Investment

Measures, and that Pension Plan participants and beneficiaries received complete and accurate

information about the hypothetical Investment Measures.

## VIII.  THE PLANS INCORPORATED THE COMPANY'S SEC FILINGS

117.  The 2006 SPD for the 401(k) Plan, the Legacy 401(k) Plan and the Pension Plan

incorporates by reference certain SEC filings for the Company.

118.  The 2006 SPD is still available on the Company's benefits website.

119.  Specifically, the 2006 SPD provides:

> The SEC allows Bank of America Corporation to *incorporate by reference* certain information filed with the SEC, which means that Bank of America Corporation can disclose important information to you by referring to those documents. The information incorporated by reference is considered to be part of this prospectus, and such later information filed with the SEC will update and supersede this prospectus. Bank of America Corporation is incorporating by reference the documents listed below and any future filings made by Bank of America Corporation, the Bank of America 401(k) Plan or the Bank of America 401(k) Plan for Legacy Fleet, as applicable, under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (the Exchange Act):
>
> • Bank of America Corporation's most recent Annual Report on Form 10-K and the Bank of America401(k) Plan's most recent Annual Report on Form 11-K
>
> • Any Quarterly Reports on Form 10-Q filed since Bank of America Corporation's most recent Annual Report on Form 10-K
>
> • Any current reports on Form 8-K filed since the end of the fiscal year covered by Bank of America Corporation's most recent Annual Report on Form 10-K
>
> • Description of Bank of America Corporation's common stock contained in its registration statement filed under Section 12 of the Exchange Act, including any amendment or report filed for the purpose of updating that description
>
> At your written or oral request, Bank of America Corporation will provide to you, without charge, a copy of any document incorporated by reference in the registration statement and in the prospectus (other than exhibits to such documents that are not specifically incorporated by reference in such documents) and a copy of any document that forms a part of the prospectus. Requests should be made to: Bank of America Corporation, Personnel Center, PO Box 436, Little Falls, NJ 07424-0436; or call 1.800.556.6044.
>
> This prospectus document may be updated by furnishing an appendix or supplement, which will be identified as part of the

prospectus, containing new information. You should retain this
prospectus document and any appendices or supplements for future
reference.

120.    The Countrywide 401(k) Plan also incorporates by reference certain SEC filings.

See Bank of America, Post-Effective Amendment No. 1 on Form S-8, for Countrywide 401(k)

Plan ("Form S-8") (July 1, 2008). Specifically the Form S-8 provides:

The following documents filed by Bank of America with the Securities and Exchange

Commission (the "SEC") pursuant to the Securities Exchange Act of 1934, as amended (the

"Exchange Act"), are incorporated by reference herein and in the Prospectus constituting a part

of this Registration Statement:

> (a) The Registrant's Annual Report on Form 10-K for the year
> ended December 31, 2007;
>
> (b) The Registrant's Quarterly Report on Form 10-Q for the
> quarter ended March 31, 2008;
>
> (c) The Registrant's Current Reports on Form 8-K filed
> January 11, 2008, January 22, 2008, January 29, 2008, January 30,
> 2008, April 15, 2008, April 21, 2008, May 1, 2008, May 23, 2008,
> May 29, 2008 and July 1, 2008 (in each case, other than
> information that is furnished but that is deemed not to have been
> filed); and
>
> (d) The description of the Registrant's Common Stock that is
> contained in the Registrant's registration statement filed pursuant
> to Section 12 of the Exchange Act, as modified by the Registrant's
> Current Reports on Form 8-K filed March 7, 2007, September 26,
> 2007, November 20, 2007, January 29, 2008, January 30, 2008,
> May 1, 2008 and May 23, 2008 and any other amendment or report
> filed for the purpose of updating such description.
>
> In addition, the Annual Report on Form 11-K for the fiscal year
> ended December 31, 2007, as filed by the Countrywide Financial
> Corporation 401(k) Savings and Investment Plan with the SEC, is
> incorporated by reference in this Registration Statement and made
> a part hereof.
>
> All documents filed by the Registrant or the Countrywide
> Financial Corporation 401(k) Savings and Investment Plan with
> the SEC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the
> Exchange Act (other than any information that is furnished but that
> is deemed not to have been filed) prior to the filing of a post-
> effective amendment hereto that either indicates that all securities

offered hereby have been sold or deregisters all securities then remaining unsold shall be deemed to be incorporated by reference in this Registration Statement and the Prospectus and to be a part hereof from the date of filing of such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement and the Prospectus to the extent that a statement contained herein or in any other subsequently filed document that also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Registration Statement.

## IX. DEFENDANTS' FIDUCIARY STATUS

### A. The Nature of Fiduciary Status

121. **Named Fiduciaries**. Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

122. **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

123. Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the participants and beneficiaries of the Plans under ERISA in

the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

124. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

125. Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

126. Instead of delegating all fiduciary responsibility for the Plans to external service providers, Bank of America chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein. These persons and entities in turn selected Bank of America employees, officers, and agents to perform most fiduciary functions.

127. ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

## B.    Bank of America's Fiduciary Status

128. Bank of America had the responsibility to appoint, and hence to monitor and remove, the Trustee, and, on information and belief, to execute the Trust documents with the Trustee to provide for the investment, management, and control of the assets of the Plans.

129. On information and belief, the Company exercised *de facto* authority and control
with respect to the *de jure* responsibilities of the Committee Defendants, making itself fully
responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the
governing plan documents to those Defendants, without relieving them of any such
responsibility.

130. On information and belief, in order to comply with ERISA, the Company and the
Committee exercised responsibility for communicating with participants regarding the Plans in a
uniform, mandatory manner by providing participants with information and materials required by
ERISA. *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator
to furnish to each participant covered under the plan and to each beneficiary who is receiving
benefits under the plan a summary plan description or "SPD"). In this regard, the Company and
the Committee disseminated the Plans' documents and related materials which, among other
things, incorporated by reference Bank of America's misleading SEC filings, thus converting
such materials into fiduciary communications.

131. Moreover, Bank of America, at all applicable times, on information and belief,
has exercised control over the activities of its employees and directors that performed fiduciary
functions with respect to the Plans, including the Committee Defendants, and, on information
and belief, can hire or appoint, terminate, and replace such employees at will. Bank of America
is, thus, responsible for the activities of its employees through traditional principles of agency
and *respondeat superior* liability.

132. Finally, under basic tenets of corporate law, Bank of America is imputed with the
knowledge that the other Defendants had regarding the misconduct alleged herein, and, hence,

like the fiduciaries who acted on its behalf, had knowledge of the imprudent actions alleged
herein.

133.   Consequently, in light of the foregoing duties, responsibilities, and actions, Bank
of America was a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C.
§ 1002(21), during the Class Period in that it exercised discretionary authority or discretionary
control respecting management of the Plans, exercised authority or control respecting
management or disposition of the Plans' assets, and/or had discretionary authority or
discretionary responsibility in the administration of the Plans.

## C.   Defendant Lewis's Fiduciary Status

134.   According to the 2007 Form 11-K for the 401(k) Plan, the Board appointed the
members of the Committee. Thus, the Board had a duty to monitor the activities of the
Committee, and as such under ERISA was required to ensure that the Committee was fully
informed of critical information that it needed to faithfully discharge its duties under ERISA. As
a member of the Board, Defendant Lewis had and exercised this authority.

135.   In addition, throughout the Class Period, Defendant Lewis made numerous
statements, many of which were incomplete and inaccurate, to employee Plan participants
regarding the Company, and future prospects of the Company specifically with regard to the risk,
or purported lack thereof, faced by the Company as a result, *inter alia,* of the acquisitions of
Countrywide and Merrill Lynch. One method for disseminating these statements was via
internal "talking points" disseminated to employee Plan participants. These statements were
made in an ERISA fiduciary capacity because they contained information about the likely future
of the Plans' benefits, in particular the value and prudence of the 401(k) Plans' largest single
investment, Bank of America stock (which was also a hypothetical investment vehicle that would
control what Pension Plan participants will receive when they retire), thus were acts of Plan

administration under controlling legal precedent. Lewis made these statements knowing that, due to his position as CEO, employees would view him as a fully informed, knowledgeable, and trustworthy source of information regarding Bank of America's financial condition and future prospects.

136.    Consequently, in light of the foregoing duties, responsibilities and actions as a member of the Board, and as a result of his communications with the Plans/ participants which constitute acts of Plan administration, Defendant Lewis was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## D.    Benefit Committee Defendants' Fiduciary Status

### 1.    The 401(k) Plan

137.    The 401(k) Plan names the Benefits Committee to act as the Plan "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). The Committee and its members are therefore named fiduciaries.

138.    According to the 401(k) Plan, the Benefits Committee has "complete responsibility for the operation and administration of the Plan … excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors."

139.    In addition to its general "powers necessary to enable it properly to carry out its duties under the Plan and Trust," the Benefits Committee had the specific powers and duties, among others, to:

(i)     construe and interpret the Plan and to determine all questions that arise
thereunder;

(ii)    decide all questions relating to the eligibility of Employees to participate
in the Plan as well as to receive benefits under the Plan;

(iii)   establish rules and procedures relating to Participant elections under the
Plan, including Compensation reduction elections under Article IV, Distribution elections under
Article VII and investment elections under Article XII, and the Committee in its discretion may
employ one or more persons or entities to provide advice or other assistance to Participants in
making their said investment elections;

\*       \*       \*

(v)     authorize all disbursements by the Trustee except for the ordinary
expenses of administration of the Trust;

\*       \*       \*

(ix)    modify or supplement any Plan accounting method, practice or procedure,
make any adjustments to Accounts, authorize special contributions, or modify or supplement any
other aspect of the operation or administration of the Plan in such manner and to such extent
consistent with and permitted by [ERISA] and the [Tax] Code that the Committee deems
necessary or appropriate to correct errors and mistakes, to effect proper and equitable Account
adjustments or otherwise to ensure the proper and appropriate administration and operation of
the Plan; and

(x)     carry out such other and further specific duties, and exercise such other
and further specific powers, authority and discretion, as are elsewhere in the Plan or the Trust
either expressly or by necessary implication conferred upon it.

140.    The 401(k) Plan also requires that the Benefits Committee "prescribe the rules

and procedures that Participants must following [sic] in making their investment elections and

may from time to time amend, modify or change those rules and procedures in such manner as

the Committee in its discretion deems appropriate." 401(k) Plan § 12.1(b). This discretion

includes:

> Prescrib[ing] restrictions as to the time, frequency and amount of
> permitted investment changes. Such restrictions may include,
> without limitation, rules that limit or otherwise restrict transfers to
> or from some or all of the Funds to particular Valuation Date(s)
> during particular period(s) of time, including rules that in the
> Committee's judgment are appropriate to deter, restrict or
> eliminate transfers to, from or among Funds by Participants that
> because of frequency, timing or amount may be to the direct or
> indirect detriment of other Participants or the Plan, and such rules
> may include the imposition of redemption or similar fees on
> transfers from particular Fund. Such restrictions may include,
> without limitation, restrictions regarding transfers to or from a
> Fund whose investments are not highly liquid.

401(k) Plan § 12.1(b)(v).

141.    The Benefits Committee also had the power and authority under the 401(k) Plan

and exercised responsibility for communicating with participants regarding the 401(k) Plan and

providing participants with information and materials required by ERISA. In this regard, on

behalf of Bank of America and the Board of Directors, the Benefits Committee disseminated the

401(k) Plan's documents and materials. See 401(k) Plan 14.3(a)(b).

142.    Accordingly, if the fiduciaries knew or an adequate investigation would have

revealed that BAC stock was no longer a prudent investment for the Plans, the fiduciaries were

required to disregard plan direction to maintain investment in BAC stock and to protect the

401(k) Plan's assets by investing those assets in other, suitable investments.

143.    Consequently, in light of the foregoing duties, responsibilities, and actions, the

Committee Defendants were both named fiduciaries of the 401(k) Plan pursuant to ERISA

§ 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA

§ 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the 401(k) Plan, exercised authority or control respecting management or disposition of the 401(k) Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the 401(k) Plan.

## 2.    The Pension Plan

144.    The Pension Plan names the Corporate Benefits Committee (the "Committee") as the "general administrator" of the Pension Plan.  The Committee and its members are therefore named fiduciaries of the Pension Plan.

145.    According to the Pension Plan, the Committee has "complete responsibility for the operation and administration of the Plan … excluding those areas specifically or by necessary implication allocated in the Plan to the Compensation Committee, the Trustee or the Board of Directors."

146.    In addition to its general "powers necessary to enable it properly to carry out its duties under the Plan and Trust," the Committee had the specific powers and duties, among others, to:

(i)    construe and interpret the Plan and to determine all questions that arise thereunder;

(ii)    decide all questions relating to the eligibility of Employees to participate in the Plan as well as to receive benefits under the Plan;

(iii)    establish rules and procedures relating to Participant elections under the Plan, including Compensation reduction elections under Article IV, Distribution elections under Article VII and investment elections under Article XII, and the Committee in its discretion may employ one or more persons or entities to provide advice or other assistance to Participants in making their said investment elections;

\*        \*        \*

(v)        authorize all disbursements by the Trustee except for the ordinary expenses of administration of the Trust;

\*        \*        \*

(ix)        modify or supplement any Plan accounting method, practice or procedure, make any adjustments to Accounts or modify or supplement any other aspect of the operation or administration of the Plan in such manner and to such extent consistent with and permitted by [ERISA] and the [Tax] Code that the Committee deems necessary or appropriate to correct errors and mistakes, to effect proper and equitable Account adjustments or otherwise to ensure the proper and appropriate administration and operation of the Plan; and

(x)        carry out such other and further specific duties, and exercise such other and further specific powers, authority and discretion, as are elsewhere in the Plan or the Trust either expressly or by necessary implication conferred upon it.

147.        Consequently, in light of the foregoing duties, responsibilities, and actions, the Committee Defendants were both named fiduciaries of the Pension Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Pension Plan, exercised authority or control respecting management or disposition of the Pension Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Pension Plan.

### 3.        The Legacy 401(k) Plan

148.        The Legacy 401(k) Plan names the Benefits Committee to act as the Plan "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). *See* 2008

Form 11-K Legacy 401(k) Plan. The Committee and its members are therefore named fiduciaries.

149.    Upon information and belief, the Benefits Committee Defendants have the same or similar discretionary power and authority under the Legacy 401(k) Plan as provided to them under the 401(k) Plan.

150.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Benefits Committee Defendants were both named fiduciaries of the Legacy 401(k) Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Countrywide 401(k) Plan, exercised authority or control respecting management or disposition of the Countrywide 401(k) Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the 401(k) Plans.

### 4.    The Countrywide 401(k) Plan

151.    The Countrywide 401(k) Plan names the Benefits Committee to act as the Plan "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). *See* 2008 Form 11-K Countrywide 401(k) Plan ("Effective July 1, 2008, the Plan is administered by the Bank of America Corporation Corporate Benefits Committee (the Corporate Benefits Committee). Prior to July 1, 2008 the Plan was administered by the Countrywide Financial Corporation Administrative Committee for Employee Benefits Plan.") The Committee and its members are therefore named fiduciaries of the Countrywide 401(k) Plan.

152.    Moreover, "the Corporate Benefits Committee has overall responsibility for the operation and administration of the Countrywide 401(k) Plan including the power to construe

and interpret the Plan, decide all questions that arise thereunder, and to delegate responsibilities."
2008 Form 11-K Countrywide 401(k) Plan.

153.    Consequently, in light of the foregoing duties, responsibilities, and actions, the
Committee Defendants were both named fiduciaries of the Countrywide 401(k) Plan pursuant to
ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of
ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or
discretionary control respecting management of the Countrywide 401(k) Plan, exercised
authority or control respecting management or disposition of the Countrywide 401(k) Plan's
assets, and/or had discretionary authority or discretionary responsibility in the administration of
the Countrywide 401(k) Plan.

## E.    The Compensation and Benefits Committee Defendants' Fiduciary Status

154.    The Compensation and Benefits Committee ("C&B Committee") is charged with
the duty to oversee the establishment, maintenance, and administration of the Company's
compensation and benefits programs. Specifically, the C&B Committee "has responsibility for
substantially all of [the Company's] employee benefit plans." 2009 Bank of America Proxy
Statement at 9.

155.    The C&B Committee may also create subcommittees with authority to act on its
behalf. *Id*. at 8. It may also delegate its authority and power to the extent permitted by
applicable law. Indeed, "the [C&B] Committee may delegate to management certain of its duties
and responsibilities, including with respect to the adoption, amendment, modification or
termination of benefit plans and with respect to the awards of stock options." *See* Compensation
and Benefits Committee Charter at 3.

156.    Consequently, in light of the foregoing duties, responsibilities, and actions, the
C&B Committee Defendants were and *de facto* fiduciaries of the Plans within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21) in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## F.     Board of Directors' Fiduciary Status

157.    Bank of America, as a corporation, cannot act except through its human counterparts. Bank of America's Board of Directors served as a human arm of the corporation. Hence, the Director Defendants share the same role and responsibilities to the Plans as the Company with regard to appointing the Plans fiduciaries, selecting the Plans' investment alternatives, and monitoring the Plans' investments.

158.    As such the Director Defendants were fiduciaries of the 401(k) Plan, the Legacy 401(k) Plan, the Countrywide 401(k) Plan and the Pension Plan within the meaning of ERISA §3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting the management of the Plans, exercised authority or control respecting the management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

159.    According to the 2007 Forms 11-K for the 401(k) Plan and the Legacy 401(k) Plan, and the 2008 Form 11-K for the Countrywide 401(k) Plan, the Board of Directors "has the right at any time to remove any member of the [Benefits] Committee." The Board of Directors also appoints the members of the Benefits Committee and the C&B Committee.

160.    Accordingly, the Board of Directors had a duty to monitor the members of both Committees, 29 C.F.R. § 2509.75-8 at FR-17 ("At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary ...."), and exercised a fiduciary function under ERISA, 29 C.F.R. § 2509.75-8 (D-4).

161.    Consequently, in light of the foregoing duties, responsibilities, and actions, the

Board of Director Defendants were *de facto* fiduciaries of the Plans within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised

discretionary authority or discretionary control respecting management of the Plans, exercised

authority or control respecting management or disposition of the Plans' assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plans.

## X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

162.    Plaintiffs bring Counts I through IV of this action as a class action pursuant to

Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

themselves and the following classes of persons similarly situated (the "401(k) Plan Classes"):

> All persons who were participants in or beneficiaries of the Bank
> of America 401(k) Plan (the "401(k) Plan"), the Bank of America
> 401(k) Plan for Legacy Companies (Formerly Bank of America
> 401(k) Plan for Legacy Fleet and MBNA) (the "Legacy 401(k)
> Plan") at any time between January 11, 2008, and January 21, 2009
> (the "Class Period") and whose Plan account included investments
> in Company stock, bringing claims for breach of fiduciary duty
> under ERISA and  all persons who were participants in or
> beneficiaries of the Countrywide Financial Corporation 401(k)
> Plan (the "Countrywide 401(k) Plan") at any time between July 1,
> 2008, and January 21, 2009 (the "Class Period") and whose Plan
> account included investments in Company stock, bringing claims
> for breach of fiduciary duty under ERISA.

Excluded from the 401(k) Plan Classes are Defendants, the officers and directors of the

Company at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a

controlling interest.

163.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the

401(k) Plan Classes.

164.    The members of the 401(k) Plan Classes are so numerous that joinder of all

members is impracticable.  While the exact number of 401(k) Plan Class members is unknown to

Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs
believe there are tens of thousands of members of the Classes who participated in, or were
beneficiaries of, the Plans during the Class Period. According to the 401(k) Plans' Forms 5500
for 2007, there were over 200,000 Plan Participants in the 401(k) Plan, over 55,000 participants
in the Legacy 401(k) Plan, and over 53,000 participants in the Countrywide 401(k) Plan as of the
beginning of that year.

165.    Common questions of law and fact exist as to all members of the 401(k) Plan
Classes and predominate over any questions affecting solely individual members of the Classes.
Among the questions of law and fact common to the 401(k) Plan Classes are:

      (a)    whether Defendants acted as fiduciaries;

      (b)    whether Defendants breached their fiduciary duties to the 401(k) Plans,
Plaintiffs and members of the Classes by failing to act prudently and solely in the interests of the
Plan, and the Plan's participants and beneficiaries;

      (c)    whether Defendants violated ERISA; and

      (d)    whether the 401(k) Plans and, therefore, members of the Classes have
sustained damages and, if so, what is the proper measure of damages.

166.    Plaintiffs' claims are typical of the claims of the members of the 401(k) Plan
Classes because each of the Plans, as well as the Plaintiffs and the other members of the 401(k)
Plan Classes, sustained damages arising out of the Defendants' wrongful conduct in violation of
federal law as complained of herein.

167.    Plaintiffs will fairly and adequately protect the interests of the members of the
401(k) Plan Classes and have retained counsel competent and experienced in class action,

complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the 401(k) Plan Classes.

168.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the 401(k) Plan Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

169.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the 401(k) Plan Classes would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Classes predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

170.    Plaintiffs bring Counts V throughVIII of this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Pension Plan Class"):

> All persons who were participants in or beneficiaries of the Pension Plan and whose Plan investment credits used Company stock as an investment measure at any time between January 11, 2008, and January 21, 2009 (the "Class Period").

Excluded from the Pension Plan Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

171.    The members of the Pension Plan Class are so numerous that joinder of all
members is impracticable. While the exact number of Pension Plan Class members is unknown
to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs
believe there are tens of thousands of members of the Class who participated in, or were
beneficiaries of, the Plan during the Class Period. Indeed, according to the Pension Plan's Form
5500 for 2007, there were over 200,000 Plan Participants as of the beginning of that year, and
many of them had their benefits tied to the performance of Company Stock.

172.    Common questions of law and fact exist as to all members of the Pension Plan
Class and predominate over any questions affecting solely individual members of the Class.
Among the questions of law and fact common to the Pension Plan Class are:

      (a)    whether Defendants acted as fiduciaries;

      (b)    whether Defendants breached their fiduciary duties to the Plaintiffs and
members of the Pension Plan Class by failing to act prudently and solely in the interests of the
Plan's participants and beneficiaries in maintaining Company stock as an available investment
measure;

      (c)    whether Defendants violated ERISA; and

      (d)    whether members of the Class have been injured, whether recalculation of
Class members' hypothetical account balances is appropriate relief, and, if so, what is the
appropriate measure of that relief.

173.    Plaintiffs' claims are typical of the claims of the members of the Pension Plan
Class because the Plaintiffs and the other members of the Pension Plan Class each sustained
inury arising out of the Defendants' wrongful conduct in violation of federal law as complained
of herein.

174.     Plaintiffs will fairly and adequately protect the interests of the members of the
Pension Plan Class and have retained counsel competent and experienced in class action,
complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with
those of the Pension Plan Class.

175.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B)
because prosecution of separate actions by the members of the Pension Plan Class would create a
risk of adjudications with respect to individual members of the Class which would, as a practical
matter, be dispositive of the interests of the other members not parties to the actions, or
substantially impair or impede their ability to protect their interests.

176.     Class action status is also warranted under the other subsections of Rule 23(b)
because: (i) prosecution of separate actions by the members of the Pension Plan Class would
create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants
have acted or refused to act on grounds generally applicable to the Pension Plan Class, thereby
making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect
to the Class as a whole; and (iii) questions of law or fact common to members of the Class
predominate over any questions affecting only individual members and a class action is superior
to the other available methods for the fair and efficient adjudication of this controversy.

## XI.     SUBSTANTIVE ALLEGATIONS

### A.     Relevant Background

#### 1.     The Deteriorating Credit and Housing Markets Weakened Bank of America

177.     By the end of 2007, as a result of several ill- timed acquisitions, Bank of America
found itself with a heavy and dangerous exposure to the quickly deteriorating consumer and
housing credit markets which was demonstrably adversely affecting BOA's earnings, capital
position, shareholders' equity and stock price.

178.    In 2005, BOA acquired MBNA, which was then the country's largest credit card issuer, for $34 billion in stock and cash.  Prior to the takeover, MBNA engaged in intensive marketing efforts to grow its sales volume by issuing cards with low introductory rates. By the end of 2004, it already had $143 billion in outstanding card balances, an amount that increased after the aforesaid marketing effort.

179.    After the MBNA merger, BOA's consumer and small business division would account for 48% of BOA's net income in 2005, up from 43% before the merger.  Looking at the combined companies in mid-2006, one stock analyst from Sandler O'Neill & Partners, LP commented: "They're more levered than ever to the U.S. consumer, . . . it's hard to see that part of the economy getting any incremental growth."

180.    On October 1, 2007, Bank of America paid $21 billion in cash to purchase LaSalle Bank ("LaSalle"), a Midwestern commercial bank.  LaSalle, like Bank of America, was heavily invested in the consumer credit and housing credit markets.   Unfortunately, LaSalle was not  well insulated against the rising default rates.  In 2006, LaSalle reported a higher ratio of nonperforming to total loans than the national aggregate average for commercial banks, reflecting problems in the subprime mortgage lender's business.  *Id.*

181.    The credit crisis unfolded slowly enough that industry insiders, such as Defendants herein, had ample notice of the imminent and severe decline and losses.

182.    Several major mortgage lenders disclosed extraordinary loan default rates, triggering inquiries from the SEC and the FDIC, and resulting in several bankruptcy filings. Between April 2007 and January 2008, the following subprime lenders failed or were on the verge of collapse: New Century Financial Corp. (the largest subprime lender at the time) failed on April 2, 2007; American Home Mortgage filed for Chapter 11 bankruptcy in August 2007;

Countrywide narrowly avoided bankruptcy with $13 billion in emergency loans, and Ameriquest (the largest subprime lender in 2005) announced that it was going out of business. One of Countrywide's "rescuers" in 2007 was BOA, which invested $2 billion in Countrywide.

183.    In September 2007, the Congressional Research Service reported that "surveys of mortgages originated in 2005 suggest that defaults and foreclosures will rise even higher in late 2007 and the first half of 2008." Getter et al., *CRS: Financial Crisis?*, at 4.

184.    Mortgage securities' values, tied as they were to perceptions of their creditworthiness, plunged from the third quarter of 2007 through mid-2008 as both Moody's and Standard & Poor's downgraded $85 billion in mortgage securities in the third quarter of 2007, $237 billion in the fourth quarter of 2007, $739 billion in the first quarter of 2008 and $841 billion in the second quarter of 2008.

185.    According to the Company's September 30, 2007 10-Q, filed with the SEC on November 9, 2007 (hereinafter "Sept. 30, 2007 10-Q"), Bank of America had exposure to over $12.1 billion in credit derivative obligations ("CDOs") backed by subprime residential mortgages.

## 2.    As the Credit Crisis Began to Impede the Company's Earnings, Bank of America Increased its Risk Exposure by Acquiring Failed Banks and Toxic Assets

186.    By the end of the Third Quarter in 2007, Bank of America was beginning to feel the effects of the declining economy. This was even before it merged LaSalle's operations, and problems, into its own.

187.    On September 17, 2007, BOA's Chief Financial Officer Joe Price informed attendees at BOA's 37th annual investment conference that the Company "expect[ed] a meaningful impact on global corporate and investment banking's ["GCIB's"] third quarter

results." Mark Calvey, "BofA Warns Credit Crunch To Hurt Investment Bank's Third Quarter,"
*San Francisco Business Times* (September 18, 2007).

188.    On October 18, 2007, the Company issued a press release announcing its Third
Quarter results: "Bank of America Third Quarter Earnings Per Share Decline 31% to 82 cents;
Capital Markets Losses Offset Solid Revenue Growth in Most Businesses" (hereinafter Oct. 18
Press Release) (available at http://newsroom.bankofamerica.com/index.php?s=43&item=7896).
According to the Oct. 18 Press Release, which was incorporated in a Form 8-K filing, GCIB's
net income fell 93 percent compared to third quarter 2006, with one division posting a $717
million net loss compared to a $298 net income a year earlier.

189.    The Company also reported that the weak housing market had forced Bank of
America to increase its provision for credit losses by $192 million over the course of the year
while its ratio of nonperforming assets increased from .32 to .43 percent of total loans from
quarter to quarter. *Id.* at 4. Also according to the Oct. 18 Press Release, as of September 30,
2007, Bank of America's Tier 1 capital ratio was down 3.5 percent from June 30, 2007.

190.    On November 13, 2007, Bank of America filed a Form 8-K with the SEC, and
attached to it CFO Joe Price's address to the Merrill Lynch Financial Services Conference. In
his address, Price touted the Company's position in the home equity market:

> Home Equity. We have grown home equity at above industry
> growth rates not because of taking outsized risk but because it was
> a focused relationship product where we innovated product
> enhancements and shortened fulfillment times for customers.
>
> Our originations average a FICO score of well above 750 and our
> current portion on a refreshed basis carries and [sic] average FICO
> of 721. Loan-to-value ratios are most important in determining
> losses. More than 80% of our outstanding have a [current-loan-to-
> value] below 90%. *We have not been heavily involved in third
> party originated paper and, in fact, 95% of our outstandings have
> come from our branch originated strategy.*

*    *    *

> Driven by the significant declines in housing values in the third
> quarter we increased reserves last quarter anticipating a loss rate of
> 40 basis points. We continue to monitor and will adjust if housing
> markets continue to weaken beyond our assumptions.  [Emphasis
> added.]

191.    Price also noted in his address that with the Company's significant cash flow

generated through its earning capacity, Bank of America typically had the option of repurchasing

shares "to send excess capital back to shareholders."  In fact, according to annual reports filed

with the SEC for the preceding 5 years, Bank of America had repurchased more than 100 million

shares each year, and over 290 million in 2006 alone.  According to Price, however, the LaSalle

acquisition had impeded the Company's ability to repurchase shares:

> In the wake of the LaSalle cash acquisition, we have curtailed
> buybacks in order to rebuild Tier 1 to our targeted 8% level.  We
> currently expect to resume buybacks no sooner than the second
> half of next year.

192.    The lasting impact of the LaSalle acquisition and the continued decline of the

housing market became more apparent as the months passed.  On January 22, 2008, the

Company issued a press release titled "Bank of America Earns $15 Billion, or $3.30 Per Share,

in 2007; Fourth Quarter Earnings Fall to $268 Million, or $0.05 Per Share" (hereinafter "Jan. 22

Press Release"), and reported that Bank of America's net income for 2007 declined 29 percent to

$14.98 billion from $21.13 billion and that diluted earnings per share dropped 28 percent to

$3.30.  The fourth quarter included results from LaSalle.

193.    The Jan. 22 Press Release attributed the reduced fourth quarter earnings primarily

to trading account losses of $5.44 billion compared to profits of $460 million  in 2006, and

provision expenses increasing $1.74 billion primarily due to a $1.33 billion addition to credit loss

reserves.  The 65 percent decrease in noninterest income, from $9.89 billion to $3.51 billion, was

attributed to "significant trading account losses, lower equity investment income, and losses

relating to the support of certain cash funds and subsequent writedowns related to securities
original purchased from the funds at fair value." Jan. 22 Press Release at 4.

194. Weakness in the housing and financial markets caused net charge-offs of $1.99
billion, up 14 percent quarter to quarter. *Id.* Nonperforming assets totaled $5.95 billion, $1.21
billion of which was contributed to LaSalle.

195. Also partially attributed to LaSalle was the decrease in net income from by 28
percent to $1.87 billion, the increase in credit losses by 55 percent, and the increase in expenses
by 15 percent. *Id* at 9.

196. GCIB especially suffered in the fourth quarter of 2007 with net revenue declining
37 percent and net income falling 91 percent on CDO-related writedowns and weaker trading
results. *Id.* at 10.

197. By December 31, 2007, Bank of America's Tier 1 risk-based capital ratio was
down 20 percent from 2006.

198. Along with the Jan. 22 Press Release, Defendant Lewis and CFO Price filed a
script for use during the Company's 4th Quarter 2007 Earnings Review (hereinafter "4Q
Review"). In addition to analyzing the Company's fourth quarter performance, Defendant Lewis
also sought to convey his thoughts on the future of Bank of America, and the Company's outlook
for 2008.

199. In the 4Q Review, Defendant Lewis touted the Company's performance in the
Company's Global Consumer and Small Business Banking division, noting that "[Bank of
America] attained a longstanding goal of the leading position in the origination of direct-to-
consumer real estate loans" and that "[the Company's] efforts in expanding Small Business
continued to produce results with revenue grown of 13 percent, average loan growth of 27

percent and growth in active accounts online of 16 percent." In spite of the good news, however,

the Company was still forced to increase the allowance for loan losses by around $2 billion due

primarily to the weakness in the housing market. 4Q Review at 2.

200. As far as GCIB was concerned, the news was not so positive. One department,

Capital Markets and Advisory Services, lost $3.4 billion versus earning $1.7 billion in 2006. *Id.*

201. In addressing the LaSalle acquisition, Defendant Lewis said the following:

> At the time of the LaSalle announcement we had estimated a Tier 1
> capital ratio (our most constraining measure) of approximately 7.5
> percent. Our current capital position is not at our 8% Tier 1 target,
> *principally due to the combination of the LaSalle acquisition* as
> well as lower earnings. Our goal continues to be getting back to
> that target and we will do that through earnings generation, capital
> raising and *no net share repurchases*.

4Q Review at 4 (emphasis added).

202. CFO Price addressed more of the troublesome aspects of the Company's fourth

quarter earnings, noting the negative CDO and subprime related charges of $5.3 billion during

the quarter, the increase in reserves of $1.3 billion, and approximately $800 million more in

charge-offs and writedowns.

203. According to Price, LaSalle added $63 billion in loans to the Company's balance

sheet, and represented 48 percent ($1.2 billion) and 78 percent ($5.2 billion) of the Company's

increase in exposure to Nonperforming Assets and criticized exposure, respectively. 4Q Review

at 11.

204. On the CDO side, Price again noted the $5.1 billion in losses during the fourth

quarter, and pointed out that the Company's uninsured subprime exposure where subprime

consumer real estate loans made up at least 35% of the ultimate underlying collateral totaled

$12.2 billion before writedowns. *Id.* at 12.

205.     In discussing credit quality, CFO Price remarked that net charge-offs increased 11 basis points to 91 or $2.0 billion on a held basis while 30 day-plus delinquencies increased 21 basis points to 5.45 percent. *Id.* at 14. Breaking it down further, Price disclosed that in California, Florida, Arizona and Nevada, a group that comprised nearly 25 percent of the Company's domestic consumer card book, the rate of increase in 30 day-plus delinquencies was over five times the pace of the rest of the portfolio. *Id.* at 15. These losses combined with the continued weakness in the economy foretold a 5 to 5.5 percent range for consumer card losses in 2008, compared to 4.75 percent in the fourth quarter of 2007. *Id.*

206.     Home equity reported an increase in net charge-offs of 63 basis points to $179 million, up a whopping 20 basis points from the end of September, 4Q Review at 15, and 90 percent plus current-loan-to-value increased nearly 25% from quarter to quarter. *Id.* With the problems in the market, Price noted that the Company "wouldn't be surprised to see losses cross the 100 basis point mark by the middle of [2008] as [it] work[ed] through higher CLTV [combined loan-to-value] vintages." *Id.*

207.     A disproportionate amount of Bank of America's loans were issued in Florida and California – two areas with particularly sharp declines in house prices in 2007-08. According to the Case-Shiller Home Price Index, as of September 2008, house prices in Florida and California had dropped about 29% off their peak, as compared the national average of 19%.

208.     Some 41% of Bank of America's residential mortgage and home equity loans were in California and Florida – for a total of $356.9 billion in outstanding loans as of the second quarter of 2008.

209.     Commercial portfolios reported an increase in net charge-offs of 5 basis points to $381 billion, with small business losses up $40 million quarter to quarter, and other commercial

net-charge offs up $70 million. *Id.* Criticized exposure rose 63 percent to $17.6 billion due to the addition of LaSalle, which accounted for $5.2 billion, and an additional $1.5 billion at legacy Bank of America. *Id.* at 17. Nonperforming assets rose $2.6 billion with LaSalle representing $1.2 billion of the increase and legacy BOA accounting for $1.4 billion. *Id.*

210.    In further analysis of LaSalle's effects on the Company, Price noted that "Tier 1 capital…was 6.87 percent, down from 8.22 at September 30th *due mainly to the acquisition of LaSalle which closed on October 1*...." *Id.* at 19 (emphasis added).

211.    Finally, in addressing the Company's 2008 prospects, Price admitted considerable uncertainty given the economic environment but avoided admitting that the country was in a recession despite the apparently distressed state of the homebuilders' industry. *Id.* at 21. Bank of America expected that total revenue would be impacted by the bounceback from trading losses as well as lower equity investment gains which would be dependant on liquidity events with customers and dividends from the Company's strategic investments. Price noted that:

> Given our economic assumptions we could see provision expense
> up 20 percent compared to reported 2007 levels. Obviously
> continued deterioration, including a recession, could take this
> number higher. However, *our strong market position, attractive
> risk adjusted margins and substantial distribution advantages*
> position us well versus the competition.

212.    The 4Q Review came just days after Bank of America's January 11, 2008 announcement that it would acquire Countrywide in a stock deal that was then valued at $4.1 billion dollars. No mention was made regarding Countrywide, or the possible effects the acquisition would have on the Company's earnings, in spite of the fact that just a day before news of the acquisition became public, Countrywide disclosed that 7.2 percent of the loans in its servicing portfolio were delinquent in December of 2008, up from 4 percent in December of 2006, and foreclosures had more than doubled during that same time period.

213. Overall, Bank of America suffered \$5.6 billion in write-downs in 2007, primarily

due to the LaSalle acquisition, BOA's exposure to CDOs, and to a lesser extent structured

investment vehicles (or "SIVs"), backed by subprime and other high-risk loans. Bank of

America 2007 Annual Report, filed with the SEC on February 28, 2008 (hereinafter 2007 10-k)

(available at http://media.corporate-ir.net/media_files/irol/71/71595/reports/2007_AR.pdf).

### 3. Prior to the Class Period, Bank of America Masked its Mounting Weaknesses and Claimed to be Weathering the Financial Crisis Well

214. As discussed above, even before the ill-fated decision to acquire Countrywide at

the start of the Class Period, Bank of America was severely compromised, largely as a result of

an ill-advised acquisition-spree.

215. Nonetheless, prior to the Class Period, Bank of America and certain of the

individual Defendants painted a misleadingly rosy picture of the Company, its condition and its

prospects.

216. According to Defendant Lewis in his introduction to the Company's Annual

Report for 2007 ("2007 Annual Report"), it appeared that the Company's "diversity of income,

tremendous scale and efficiency will help us weather this storm better than most …."

217. Lewis further crowed in the 2007 Annual Report, "We escaped direct losses from

subprime lending, which we had exited years ago."

218. As Lewis further noted in the 2007 Annual Report:

> The good news is that our core businesses continue to execute their
> growth strategies in the marketplace with precision and discipline.
> In Global Consumer & Small Business Banking, revenue rose 6
> percent for the year, and noninterest income rose 13 percent. We
> added more than two million net new retail checking accounts for
> the second year in a row, opened nearly 14 million new Card
> Services accounts, became a leading direct-to-consumer mortgage
> and home equity originator and extended our leadership in online
> banking and bill-pay business to lead the industry in mobile
> banking, with more than 600,000 active new accounts.

219.    Toeing the Company line, on December 19, 2007, the *Wall Street Journal*

reported that Bank of America had the highest net income of any commercial bank in 2007 and

called Bank of America a "stalwart" among financial institutions. The *Journal* credited this

success to the Company's decision in 2001 to get out of the business of issuing subprime

mortgages. As a result, according to the *Journal,* Bank of America was a "healthy bank" with

"plenty of time to absorb" new lessons regarding lending standards.

220.    At that time, Bank of America stock was trading at approximately $41 per share.

## B.    The Company's Ill-Conceived Acquisition of Countrywide

### 1.    The Company Makes a Bad Investment in Countrywide

221.    Prior to its decision to acquire Countrywide, Bank of America made a large

investment in Countrywide.

222.    On August 21, 2007, Bank of America invested $2 billion dollars in Countrywide,

and acquired nonvoting, convertible preferred stock which could be converted into common

shares of Countrywide at $18 per share.

223.    It soon became apparent that this was a bad investment, as Countrywide stock

plummeted in the fall of 2007.

224.    By the time the news of the Company's acquisition of Countrywide began leaking

on January 10, 2007, Countrywide's stock was trading in the range of $5 a share, and Bank of

America's investment had lost $1.3 billion.

### 2.    The Company Commits to the Acquisition of Countrywide

225.    On January 11, 2008, Bank of America announced that it would acquire

Countrywide in a stock deal that was then valued at $4.1 billion dollars.

226.    Just a day before news of the Countrywide acquisition became public,

Countrywide disclosed that 7.2 percent of the loans in its servicing portfolio were delinquent in

December of 2008, up from 4 percent in December of 2006. Foreclosures more than doubled during that same time period.

227. By the time Bank of America conducted its due diligence on the Countrywide acquisition, Countrywide was facing bankruptcy as a result of serious mismanagement, the bursting of the housing bubble, and securities fraud, as detailed in part herein.

228. At the time of the acquisition, Defendant Lewis claimed, remarkably, that that the "challenges" in the nation's housing market were only "near term."

229. In fact, the Countrywide acquisition greatly increased Bank of America's sensitivity to what Bank of America should have known would be a prolonged housing market downturn.

230. Although Bank of America exited the subprime mortgage origination business in 2001, it continued to issue risky prime loans during the 2000's.

231. A disproportionate amount of Bank of America's loans were issued in Florida and California – two areas with particularly sharp declines in house prices in 2007-08. According to the Case-Shiller Home Price Index, as of September 2008, house prices in Florida and California had dropped about 29% off their peak, as compared the national average of 19%.

232. Some 41% of Bank of America's residential mortgage and home equity loans were in California and Florida – for a total of $356.9 billion in outstanding loans as of the second quarter of 2008 (the last quarter prior to the completion of the Countrywide acquisition).

233. The Countrywide acquisition exacerbated this situation because 58% of Countrywide's residential mortgage portfolio derived from California and Florida properties, as did 36% of Countrywide's home equity portfolio.

234.    In the second quarter of 2008, Bank of America's loan losses were 3.09% of its

loan book value – much higher than its 1.71% in the first quarter and the 1.75% industry average

at that time.

235.    After the Countrywide acquisition was announced, Bank of America's exposure

to the mortgage meltdown increased dramatically – and its stock price suffered dramatically.

The Company that had been perceived as a "financial stalwart," with diverse and safe income

streams, was now a repository for some of the most toxic assets ever assembled. This would

have a devastating impact on Bank of America stock – and especially on Plan participants with

large amounts of their retirement assets invested in and/or tied to the performance of Bank of

America stock.

## 3.    Countrywide's Primary Business Segments

236.    Countrywide was the nation's largest mortgage lender and home loan service

provider in the United States. During the year 2006, Countrywide originated or serviced

approximately 17% of all residential mortgages nationwide.

237.    The great majority of Countrywide's profits came from three of its five business

segments: (1) Mortgage Banking, which originated, purchased, sold and serviced non-

commercial mortgage loans nationwide, and accounted for 49% of Countrywide's pre-tax

earnings for 2006; (2) Banking, through which Countrywide Bank, N.A., took deposits and

invested in mortgage loans and home equity lines of credit ("HELOCs"), most but not all of

which originated from Countrywide's Mortgage Banking segment; and (3) Capital Markets,

which primarily specialized in trading and underwriting mortgage-backed securities.

238.    Countrywide's Mortgage Banking, Banking, and Capital Markets businesses

combined to produce 93% of Countrywide's pre-tax earnings for 2006, and the three divisions

were interrelated. Countrywide originated home loans through its Mortgage Banking division,

retained a portion of those loans as investments (mostly through the Banking division), and

securitized and sold off the remainder of the mortgages (or the rights and obligations incident to

mortgages) to third parties through the Capital Markets Division.

239.    In order to fuel its business, then, Countrywide needed to issue a massive number

of loans, regardless of the borrower's ability to repay the loans. As detailed in part below, this

led to a massive pool of very poor-quality loans – right at the very heart of the business acquired

by Bank of America.

## 4.    The High-Risk Loans at the Heart of Countrywide's Business Made Countrywide a House of Cards

240.    Traditionally, lenders such as Countrywide typically retained ownership of the

loan and mortgage for the life of the loan. Hence, their primary interest was in ensuring that a

borrower would be able to repay a loan, and that the loan was adequately collateralized in the

case of default by the borrower.

241.    This model changed in the early 2000's, as lenders such as Countrywide started to

sell off the majority of their mortgage loans to investment banks, trusts or government sponsored

enterprises such as the Federal National Mortgage Association ("Fannie Mae") or the Federal

Home Loan Mortgage Corporation ("Freddie Mac"). The loans were pooled together,

securitized, and sold as mortgage-backed securities, allowing lenders such as Countrywide to

profit from the volume and value of loans procured, as well as from the retention of rights such

as Mortgage Servicing Rights ("MSRs") and pre-payment penalties. In addition, lenders often

retained a portion of the earnings streams from the pools.

242.    Until 2003, Countrywide primarily made traditional first-lien home loans to

individuals with strong credit histories. These loans were "conforming" loans that could be sold

to Fannie Mae and Freddie Mac, the government-sponsored entities ("GSEs") that provided

liquidity to the home mortgage market. (The loans "conformed" to GSE guidelines concerning

maximum loan amounts, debt-to-income ratio limits, and documentation requirements.)

243.    In 2004, as interest rates began to climb, the pool of potential prime borrowers

looking to refinance began to dry up and lenders like Countrywide began extending loans to

subprime borrowers with troubled credit histories in an effort to maintain or grow market share

in a declining origination environment, and also set out to entice prime borrowers to take out

ever-larger mortgage loans. Lenders did this in order to profit from the heavy demand for

mortgage loans that could be securitized and sold by Wall Street to institutional investors.

(Countrywide did this through its three primary business segments, as discussed above.)

244.    To take advantage of the lucrative secondary market for mortgages, market

lenders, led by Countrywide, weakened their underwriting standards by, among other things:

> a.    reducing the minimum credit score borrowers need to qualify for
>       certain loans;
>
> b.    allowing borrowers to finance a greater percentage of a home's
>       value or to carry a higher debt load;
>
> c.    introducing new products designed to lower borrowers' monthly
>       payments for an initial period; and
>
> d.    allowing borrowers to take out loans with little, if any,
>       documentation of income and assets.

*See* Simon, Ruth "Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks

Keep Relaxing Credit-Score, Income and Debt-Load Rules," *Wall Street Journal* (July 26, 2005).

245.    Whereas in 2002 only 25% of the total loans originated by Countrywide were

nonconforming, by 2006 this figure was 45.2%.

246.    As lenders such as Countrywide sold more and more of the loans they originated

in a lucrative secondary market, the lenders lost their incentives to protect their assets through

vigorous underwriting standards and accurate property appraisals.

247.    In addition to lowering underwriting standards, lenders, led by Countrywide, introduced and/or accelerated the use of an array of non-traditional mortgage loan products, which enticed borrowers to take out large mortgage loans, but also put them at greater risk of default. These mortgage loan products are explained, in part, in the following paragraphs.

248.    **Interest-Only Mortgages**: These mortgage loans allowed borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

249.    **"Stated-income," "No-Documentation" or "Low-Documentation" Loans (also known as "Liar Loans")**: The practice of making loans based on "stated income" or requiring little or no documentation from borrowers became pervasive; such loans constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. *See* Morgenson, Gretchen, "Crisis Looms In Mortgages," *The New York Times* (Mar. 11, 2007). These loans usually carried higher interest rates than fully documented loans. Low-documentation mortgages were originally designed for professionals and business owners with very high credit scores. However, Countrywide routinely extended these "liar loans" to borrowers with weak credit knowing that they were likely to contain misinformation from the borrowers that would result in increased default rates.

250.    **"PiggyBack" Loans**: This type of loan combines a mortgage with a HELOC, allowing borrowers to finance more than 80% of the home's value without paying for private mortgage insurance. As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82% of the underlying value of their property, markedly up from 48% in 2000. *See id.*; *see also* Hagerty, James R., & Simon, Ruth, "Home Lenders Pare

Risky Loans – More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer," *Wall Street Journal* (Feb. 14, 2007). The first loan typically covered 80% of the mortgaged home's appraised value, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%. Thus the HELOC and the first loan together often encumbered 100% or more of a home's appraised value. Because Countrywide offered HELOCs as piggybacks to Option ARMs and "2/28" ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest only payments or allowed for negative amortization. As noted by the *The Wall Street Journal* in December 2007, HELOCs are "high risk" loans that are "potentially worthless in a default because the first-lien holder gets first dibs on the home."

251.    **Adjustable-Rate Mortgages ("ARMs")**:  ARMs are typically marketed with promotional or "teaser" rates during the loan's introductory period that later balloon to much higher rates once the introductory period has ended. ARMs accounted for between one-half and one-third of subprime mortgages. *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, Mortgage Markets, Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm. A significant portion of the ARMs issued by Countrywide were so-called "2/28" ARMs. A 2/28 ARM offered a low, fixed interest rate for the first three years (the "2" in "2/28"). Thus, the borrower faced payment shock when the "teaser" period ended, as well as the potential for steadily increasing payments. The risk of nonpayment was further exacerbated by the fact the "2/28" and other ARM loans were available to subprime borrowers.

252.    **"Option ARMs" (also known as "Pay Option ARMs")**: Countrywide was also

aggressive in the origination of "Option ARMs." Option ARMs enticed borrowers by offering a

very low "teaser" rate of as low as 1% for an introductory period of one to three months, after

which the interest would spike dramatically. When the teaser rate expired, Option ARMs

became adjustable rate loans in which the rate could fluctuate monthly based on changes to a rate

index. Each month the borrower could choose one of four options for payment: (1) minimum

payments; (2) interest only payments; (3) full principal and interest; or (4) accelerated principal

and interest. Borrowers who chose to make minimum payments saw the amount owed on their

loans *increase*. On November 29, 2005, the *Wall Street Journal* reported that roughly 70% of

Option ARM borrowers were making minimum payments; hence their principle amounts were

*increasing* during the life of their loan. These "negative amortization" loans were ticking time

bombs, as they had negative amortization caps, in the range of 120% of the original principal of

the loan. Once the balance hit the cap, the monthly payment immediately increased to the fully

amortizing level (*i.e.*, monthly payments after the date the cap was reached had to be sufficient to

pay off the new balance over the remaining life of the loan). When this happened, the borrower

experienced significant payment shock.

253.    According to an October 27, 2007 *Wall Street Journal* article, Countrywide

secretly encouraged employees to sell Option Arms to borrowers who did not even understand

the loan terms:

> In one California branch office, employees could win prizes, such
> as a trip to Hawaii, for selling the most option ARMs, says Cindy
> Lau, who worked for the company for more than six years. Only a
> small portion of borrowers "understood the loan and knew what
> they were getting themselves into," Ms. Lau adds.

254.    By 2005, Countrywide had originated approximately $93 billion worth of Option

ARMs. According to a UBS AG analysis conducted for the *Wall Street Journal* in October of

2007, Countrywide ratcheted up its generation of Option Arms by "giving these loans to riskier and riskier borrowers."

255.    Option Arm loans are high risk even for credit-worthy borrowers. Issuing such loans to borrowers of unknown creditworthiness is simply reckless. Yet according to Countrywide's Form 10Q report filed on November 9, 2007, a shocking 81% of the Option ARM loans Countrywide held for investment were loans with low or no income documentation.

256.    As another method of increasing its issuance of Option ARM loans, Countrywide allowed borrowers to obtain the high-risk loans with very small down-payments. According to the October 2007 UBS study reported in the *Wall Street Journal*:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value ["LTV"] of 90% or more, up from just 15% in 2004, according to UBS.

257.    While it increased its origination of Option ARMs, Countrywide also increased the amount of Option ARMs it held for investment. As of December 31, 2006, Option ARMs constituted 46% of Countrywide's mortgage loans held for investment, having grown from approximately $4.7 billion in 2004, to more than $26 billion in 2005, to more than $32 billion in 2006.

258.    In addition, lenders such as Countrywide incentivized employees and executives to generate as many subprime loans and Option ARM loans as possible. That is because bank profits now correlated more strongly to the volume and value of loans generated than to the likelihood that a loan would be repaid.

259.    Subprime loans were more valuable to lenders than traditional loans – ***provided*** that the less-creditworthy borrowers who took them were able to pay the high interest rates.

260.    Option ARM loans were also attractive fodder for mortgage-backed securities, and – in general and as long as it could – Countrywide off-loaded many of these high-risk loans.

261.    Lenders such as Countrywide were able to obtain higher returns on both subprime loans and Option ARMs that were bundled and sold to investors as mortgage-backed securities. That is because subprime loans carried higher (and often increasing) interest rates, and tended to carry harsh prepayment penalties, making it less likely that they would be paid off in the near future (and therefore making it more likely that monthly payments would continue). Subprime and ARM loans (whether subprime or not) were ideal for securitization because an increase in market rates would make the loans more profitable, yet a drop in market interest rates would not lessen the return (and concomitantly the value) of the associated mortgage-backed security.

262.    However, for reasons discussed in part *infra,* even after lenders such as Countrywide had sold subprime and Option ARM loans, they retained a devastating exposure to the subsequent impairment of those loans. Bank of America knew of this exposure, but failed to in any meaningful way manage the risk it presented to Bank of America and to the Plans' huge exposure to Company stock.

263.    As Bank of America must have been aware at the time it acquired Countrywide, Countrywide's aggressively pursued and rapidly developed subprime mortgage business and Option ARM mortgage business ultimately was doomed by one simple fact: the subprime loans and the Option ARM loans at the heart of the business were inherently low quality and faced inevitable and devastating impairments over time – and those impairments dragged Bank of America right into the maelstrom of the economic meltdown in the second half of 2008 and the beginning of 2009.

### 5.    Countrywide's Questionable Accounting Masked the Extent of Its Problems, and the Risk the Countrywide Acquisition Posed to Bank of America Stock

264.    By the end of 2007 – prior to Bank of America's ill-fated decision to acquire

Countrywide – sophisticated observers and analysts openly questioned various aspects of the

accounting practices used by Countrywide to overstate its earnings and mask its crippling

liabilities. As a result of its due diligence in connection with the Countrywide acquisition, Bank

of America must have been aware of these very serious issues, which are discussed in the

successive paragraphs of this Complaint.

### a.    Countrywide failed to properly account for the declining quality of "held for investment" loans, and shifted loans from "trading" to "held for investment" to avoid accounting for losses

265.    Generally Accepted Accounting Principles ("GAAP") are the conventions, rules

and procedures recognized by the accounting profession as necessary to define accepted

accounting practices at a particular time. The SEC has the statutory authority to promulgate

GAAP for public companies and has delegated that authority to the Financial Accounting

Standards Board (the "FASB"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that

financial statements filed with the SEC which are not presented in accordance with GAAP will

be presumed to be misleading, despite footnotes or other disclosures.

266.    Pursuant to Statement of Financial Accounting Standards (FAS) 65: "Accounting

for Certain Mortgage Banking Activities," a loan held for investment is considered "impaired"

only when the holder determines in its discretion that the impairment is "other than temporary."

267.    According to Statement of Financial Accounting Standards (FAS) 115:

"Accounting for Debt and Equity Securities," investments (including debt securities such as

mortgages) must be placed in one of three categories at the time of acquisition, depending on the

company's intentions with regard to holding the investment:

(i).     Securities held to maturity: This category includes mortgages that the company intends to hold to maturity. Under FAS 115, unrealized losses on mortgages held to maturity are only reflected in financial statements if they are considered to be permanent in nature. Because this determination is made at the discretion of management, classifying a loan in this category gives the Company the ability to hide losses.

(ii).    Trading securities: This category includes debt and equity securities that are held with the short-term objective of generating profits from short-term differences in price. Mortgage loans held for sale are treated as trading securities, and unrealized gains and losses form trading securities are included in the determination of net income.

(iii).   Securities available for sale. All other mortgage loans are included in this category. Unrealized gains and losses are excluded from the determination of net income, except in cases of permanent impairment, which is, again, subject to management discretion.

268.    Despite mounting evidence of significant impairments to Countrywide's held-for-investment portfolio, Countrywide failed to adequately increase its loan loss reserves to account for the declining quality of its loans.

269.    Option ARMs played a significant role in decreasing the quality of Countrywide's held-for-investment portfolio. In the third quarter of 2007, Countrywide carried an average of $27.8 billion in Option ARMs. These loans are highly risky given that: (i) when they reset at higher rates, the borrower's payments will often dramatically increase; and (ii) it is all but impossible for many borrowers to refinance at favorable terms, if at all (and has been since the summer of 2007).

270.    In the first nine months of 2007, the dollar amount of nonperforming loans held by Countrywide tripled to $1.74 billion as of September 30, 2007. The dollar amount of nonperforming loans continued to increase dramatically, suggesting that the value of Countrywide's held-for-investment loans was badly misstated, even *after* Countrywide increased its reserves for loan losses by a factor of 10 during the first nine months of 2007.

271.    Pursuant to Statement of Financial Accounting Standards (FAS) 65: "Accounting for Certain Mortgage Banking Activities," a bank's balance sheet must distinguish between a loan held for sale and a loan held for investment.

272.    According to paragraph 6 of FAS 65, a loan held for investment is one that the holder has both the ability and the intent to hold "for the foreseeable future or until maturity." Similarly, under FAS 115, "*Securities held to maturity*" includes mortgages that the holder intends to hold to maturity.

273.    During the third quarter of 2007, Countrywide shifted approximately $12 billion dollars worth of loans to its "held-for-investment" portfolio, totaling approximately 14.4% of the ending balance of held-for-investment loans.

274.    Presumably, these were questionable loans that Countrywide could not sell due to adverse market conditions.

275.    However, Countrywide did *not* disclose the extent to which the value of these loans was written down at the time of reclassification to "held for investment."

276.    Moreover, by changing the classification of these loans, Countrywide avoided accounting for a much larger impairment. That is because, pursuant to both FAS 65 and FAS 115, a loan held for investment is considered to be impaired only when management determines the impairment to be permanent.

277.    Regardless of whether Countrywide's $12 billion transfer into the "held-for-investment" category was proper, the extent of Countrywide's undisclosed mark-down of the value of the loans was likely understated, and thereby served to mask from the market the poor quality of the debt that Bank of America would acquire in the Countrywide acquisition.

### b. The questionable recognition of interest income from "Negative Amortization" loans

278. A "negative amortization" loan is one in which the balance owed on the loan actually *increases* over time. That is because the borrower's monthly payments do not even cover the monthly interest, and the unpaid interest amounts are added to the loan balance.

279. Option ARMs can be negative amortization loans at the discretion of the borrower who chooses to make a minimum monthly payment.

280. Negative amortization loans carry a high risk of delinquency and default. Indeed, many (or most) borrowers postponing their interest payments did so because they could not afford to pay them.

281. Nonetheless, Countrywide recognized interest income when borrowers postponed their interest payments, even though Countrywide received no cash.

282. As of June 30, 2007, $942 million of the total Option ARMs on Countrywide's books represented unpaid principle; this implies that Countrywide reported $288 million in interest from negative amortization during the first half of 2007, equaling about 31.3% of Countrywide's consolidated income for the first six months of that year.

283. Countrywide's reliance on low-quality negative amortization income, and its failure to adequately account for impairments to that income, was yet another red flag as to the high risk to Bank of America and the Plans' participants posed by the Countrywide acquisition.

### c. Countrywide's reliance on "Gain on Sale" accounting

284. FAS 140, "Accounting for the Transfer and Servicing of Financial Assets and Extinguishments of Liabilities," sets out the accounting treatment for mortgages that are transferred to a third party. A major purpose of FAS 140 is to proscribe when the securitization of a debt (such as a mortgage) may be deemed a "sale" for accounting purposes.

285.    When a securitization is deemed a "sale," a gain on sale is realized and that loan is shifted off the bank's books.

286.    However, if a securitization is deemed a collateralization of assets in support of a financing, no gain is realized and the asset (as well as the related borrowings) remains on the bank's balance sheet.

287.    Under FAS 140, the securitization of a debt security can be considered a "sale" if (i) the debt security has been properly isolated in a qualifying special purpose entity ("QSPE") and (ii) control over the security has been transferred to the securitization trust.

288.    After the "sale" of a mortgage debt via securitization to a secondary entity such as a trust or a QSPE, the secondary entity sells bonds that represent claims on the principal and some of the interest that will come in from the mortgage debt.

289.    After such a "sale," the primary enterprise (here, Countrywide) retained the right to certain interests in the mortgage – such as the servicing rights and possibly other elements such as the right to collect prepayment penalties. To calculate the profits that (theoretically) are still to come, the primary enterprise makes estimates about future losses from nonperforming loans and how long the average account will stay on the books generating interest. The hypothetical earnings, discounted to current value, are then reported as a "gain on sale."

290.    During the years 2005-2007, Countrywide was first among major lenders in its reliance on "gain on sale" income. During this time period, gain on sale income accounted for a stunning 48.4% of Countrywide's operating income.

291.    Though securitization income declined as the secondary market for subprime mortgages evaporated, Countrywide's prior aggressive use of gain on sale accounting left it (and

hence Bank of America) highly vulnerable to later write-downs of Countrywide's retained interests.

## d.    Countrywide's questionable valuation of mortgage servicing rights

292.    One of the assets Countrywide typically retained after the "sale" of a mortgage was the mortgage servicing rights, or "MSR." Mortgage servicing is the activity of keeping a mortgage loan current, including collecting monthly mortgage payments, forwarding principal and interest payments to the current mortgage holder (if the loan has been sold), maintaining escrow accounts, paying taxes and insurance premiums, and taking steps to collect overdue payments. An MSR is the right to perform these services in exchange for a fee.

293.    Significantly, Countrywide voluntarily adopted FAS 156, "Accounting for Servicing of Financial Assets, an Amendment of FASB Statement No. 140." This standard was optional, and, by adopting it, Countrywide obtained the ability to revalue servicing assets, such as MSRs, on a quarterly basis.

294.    Under FAS 156 and FAS 157, companies are required to report various assets at "fair value" – including MSRs.

295.    In order to determine the "fair value" of an asset, a company must consider three "levels" of information. When available, a company must use "Level 1" values, which come from quoted prices in active markets. When Level 1 values are unavailable, a company must next look to "Level 2" evidence; Level 2 values are based on "observable inputs" such as market prices for similar assets. When Level 2 values are unavailable, the company must rely on "Level 3" values.

296.    Level 3 valuations are based on "unobservable inputs." They are therefore the lowest quality, inherently subjective and most highly suspect valuations.

297.    According to Countrywide's 10-Q for the second quarter of 2007, in the first six months of that year Countrywide recognized $1.51 billion in Level 3 gains on its MSRs. Then, during the third quarter of 2007, Countrywide recorded a valuation loss of $830.9 million in its MSRs.

298.    Even after the $830.9 million valuation loss in the third quarter of 2007, Countrywide had increased its valuation of MSRs by $942.7 million over the course of the seven quarters since it adopted FAS 156 in the beginning of 2006. As Bank of America's due diligence should have revealed, this amount was materially overstated given that these gains were reported during a period in which default and delinquency rates were rising, and, therefore, Countrywide's earning were materially overstated during this time period.

299.    Nonetheless, Bank of America publicly suggested that the MSRs were extremely valuable, and cited this alleged value as a major benefit of the Countrywide acquisition.

300.    In the third quarter of 2008, after the Countrywide acquisition was consummated, Bank of America booked $21 billion in MSRs based on Level 3 valuations.

## 6.    Countrywide Was on the Brink of Collapse at the Time Bank of America Committed to the Acquisition

301.    In 2007, the engines of Countrywide, fueled by loose underwriting standards, lackadaisical or non-existent risk management, and the sale of toxic mortgages, began to sputter. Ira Rheingold, executive director of the National Association of Consumer Advocates said, "In terms of being unresponsive to what was happening, to sticking it out the longest, and continuing to justify the garbage they were selling, Countrywide was the worst lender." Morgenson, Gretchen, "Inside the Countrywide Lending Spree," *The New York Times* (August 26, 2007).

302.    In August of 2007, Countrywide was forced to draw down all of its $11.5 billion credit line.

303.    Indeed, during 2007, as home prices dropped, borrower defaults soared and

Countrywide's dubious lending practices came under the spotlight of legislators and regulators,

Countrywide's stock dropped by 80 percent.

304.    Countrywide reported losses in the third quarter of 2007 of $1.2 billion, and

fourth quarter losses of $422 million.

305.    As *The New York Times* reported upon the announcement of Bank of America's

acquisition of Countrywide:

> [T]he risks to Bank of America far outweigh what the company is
> paying.  Mr. Lewis must overcome many challenges that could
> tarnish the Bank of America brand….
>
> Mr. Lewis must … integrate two vastly different cultures, prevent
> or at least hedge against further declines in the value of
> Countrywide's assets and soothe anxious investors – all as the
> housing market weakens and the economy teeters on the edge of
> recession….
>
> The aggressive business practices of Countrywide, where
> employees were encouraged to push borrowers into shaky loans to
> rake in high fees, stand in sharp relief to the friendly, welcoming
> image that Bank of America has worked hard to project.…
>
> "The cultural differences at these companies are staggering," said
> John Kanas, who headed North Fork Bank for 35 years, before
> overseeing its acquisition by Capital One; he left Capital One last
> year.  "Overcoming all of the trauma of Countrywide employees,
> and convincing angry Countrywide customers that this company is
> now kind and benevolent is going to be no small feat," he said.
>
> For instance, Mr. Lewis' Bank of America will have to reach out to
> distressed Countrywide borrowers whose credit profiles would
> have qualified them for low-cost loans but were steered into
> expensive mortgages.
>
> *            *            *
>
> But Mr. Lewis has to some degree placed his own bank at risk.  He
> must fix Countrywide while simultaneously absorbing the
> Company's employees, seeking to cut costs and managing its still-
> hefty exposure to the troubled mortgage market.

Duhigg, Charles, "A Balancing Act," *The New York Times* (Jan. 12, 2008).

**7.     Countrywide's predatory lending, abandonment of its stated underwriting standards, and other questionable conduct exposed Bank of America to massive liability**

306.    As Bank of America should have known when it made the decision to acquire

Countrywide, the culture at Countrywide was to sell as many loans as possible – regardless of

whether the borrower had the ability to repay the loan, regardless of whether the borrower even

understood the terms of the loan, and often in direct contravention of its own stated underwriting

standards.  Thus, in addition to the losses that Bank of America would incur on defaulting loans,

in purchasing Countrywide BOA, was also purchasing massive litigation liability for

Countrywide's many transgressions.

307.    As *The New York Times* reported in August of 2007, at Countrywide:

> [P]otential borrowers were often led to high-cost and sometimes
> unfavorable loans that resulted in richer commissions for
> Countrywide's smooth-talking sales force, outsize fees to company
> affiliates providing services on the loans, and a roaring stock price
> that made Countrywide executives among the highest paid in
> America.
>
> Countrywide's entire operation, from its computer system to its
> incentive pay structure and financing arrangements, is intended to
> wring maximum profits out of the mortgage lending boom no
> matter what it costs borrowers, according to interviews with former
> employees and brokers who worked in different units of the
> company and internal documents they provided. One document,
> for instance, shows that until last September the computer system
> in the company's subprime unit excluded borrowers' cash reserves,
> which had the effect of steering them away from lower-cost loans
> to those that were more expensive to homeowners and more
> profitable to Countrywide.

Morgenson, Gretchen, "*Inside the Countrywide Lending Spree*," *The New York Times* (Aug. 26,

2007).

308.    As California Attorney General Brown later stated, "Countrywide's lending

practices turned the American dream into a nightmare for tens of thousands of families by

putting them into loans they couldn't understand and ultimately couldn't afford."

8.    **After the Countrywide Deal was Announced, the Financial Condition of Both Bank of America and Countrywide Continued to Deteriorate**

309.    From the time the acquisition was announced on January 11 until the time it was

consummated in July of 2008, the news from Countrywide and Bank of America grew worse.

310.    As noted in a February 29, 2008 UBS Investment Research report, Bank of

America's 2008 10-K revealed that Bank of America's credit was "worse than expected." As the

report continued:

> BAC noted that the downturn in housing will likely impact other
> areas of its consumer loan portfolio – which we believe implies
> more deterioration in credit card, auto and RV/marine lending than
> mgmt assumed in Dec./Jan.

311.    The February 29 UBS report also predicted additional Bank of America

writedowns of $2 billion in the first quarter of 2008, one billion of which would be in the Bank's

CDO portfolio. At this time, Bank of America still had $12.5 billion in exposure to CDOs

backed by subprime mortgages.

312.    A March 11, 2008 Deutsche Bank report focused on the generally deteriorating

conditions at Bank of America:

> We expect Bank of America to have capital markets write downs
> and provisions for reserve builds of $6B in 1Q08 due to weaker
> capital markets … and likely expected higher loan losses (esp.
> home equity) ….

The report further noted that:

> Bank of America has significant exposures in leveraged loans of
> $18B (indices are down 5% year-to-date) CMBS [Commercial
> Mortgage Backed Securities] of $16B (down about 5%) and
> especially subprime/CDOs of $9B (down 20% -40% plus on
> several indices). Exposures likely necessitating higher loan loss
> provisions incl. $115B home equity and $174B in cards ….

313.    A March 12, 2008 Credit Suisse report on Bank of America, captioned

"Headwinds Mounting; Taking Down Estimates," essentially concurred with the Deutsche Bank

report of the previous day, stating: "As the turmoil in the capital markets and the news on the

housing front continues to get incrementally worse, we are reducing our earnings expectations

for Bank of America."

314.    An April 23, 2008, Citi Investment Research report on Bank of America

commented on Bank of America's 10-Q for the first quarter of 2008.  As the report noted, "Bank

of America reported 1Q EPS of $0.23 vs. our estimate of $0.57 and consensus of $0.41."  The

report went on to state that:

> Going into 1Q, we were concerned about Bank of America's home
> equity and small business portfolios, but the actual performance of
> the home equity portfolio was much worse than we expected....
> [O]ne of the reasons why Bank of America saw more deterioration
> than other banks in 1Q was we believe due to a higher % of 06 and
> 07 vintages, and now the portfolio is beginning to season.... The
> 54% of the home equity portfolio in 2006-07 vintages generated
> 77% of home equity losses in 1Q08.... The >90% LTV loans
> drove 82% of losses in 1Q[08].... CA and FL were 40% of the
> home equity portfolio, but drove 51% of 1Q losses.

315.    The April 23, 2008 Citi Investment Research report also commented on

"weakness" in Bank of America's Global Corporate and Investment Bank ("GCIB"), noting that

"GCIB weakness was driven by another round of mark to market writedowns, and a $255 mil

increase in [loss] provision."  In particular:

> GCIB results included $2.37 bil in net mark to market valuation
> losses ($1.465 bil for CDOs and subprime, $429 mil for leveraged
> loans, $272 for counterparty writedowns, and $191 mil net losses
> on CMBS).  Total marks were ~20% higher than our $1.96 bil
> forecast, with greater than expected impact from CDOs....

316.    On or about April 29, 2008, Countrywide announced first quarter losses of $893

million.  The losses reflected over $3 billion in credit-related charges, including $1.5 billion to

cover losses on mortgage loans – a massive increase from the $158 million in such charges in the

first quarter of 2007.  Charge-offs, or loans written off as not being repaid, totaled more than

$606 million during the quarter – a fifteen-fold increase from the $39 million in charge-offs in

the first quarter of 2007.

317.    Delinquencies in Countrywide's mortgage servicing portfolio nearly doubled in the first quarter of 2007 and the first quarter of 2008 – and reached 9.3 percent. Nearly 39 percent of Countrywide's subprime loans were delinquent in the first quarter of 2008.

318.    In late April of 2008, Bank of America stated it was examining its options with respect to Countrywide's debt, which was then estimated at about $40 billion. Bank of America stated that there was no assurance that it would redeem, assume or guarantee the debt.

319.    On May 2, 2008, Stand and Poor's cut Countrywide's credit rating to junk status based on concerns that Bank of America might not back Countrywide's debt after the completion of the takeover. (As Countrywide stated in a February 2008 filing, a loss of its investment grade rating would result in the acceleration of some secured debt obligations and hurt Countrywide's ability to manage and hedge its inventory of loans; in addition, up to $4.2 billion in custodial deposits could be transferred to another bank.)

320.    In fact, by May of 2008, Countrywide had deteriorated to the point where the acquisition itself was in doubt. As reported in a May 6, 2008 article in *The New York Times*:

> Countrywide's share price sank 10.4 percent [on May 5] in a torrent of heavy selling … touched off by an analyst report urging Bank of America to abandon the acquisition because of growing problems at Countrywide….
>
> [S]ince Mr. Lewis announced the acquisition, the problems at Countrywide have intensified. Countrywide's losses on mortgages and home equity loans have ballooned, federal and state agencies have investigated its business practices, and the company is bracing for a wave of lawsuits from angry customers and investors.
>
> *        *        *
>
> The troubles have grown so acute that two longtime analysts denounced Mr. Lewis' deal on Monday. "Bank of America should completely walk away from the Countrywide deal, as Countrywide's loan portfolio will prove to be a drag on earnings and force Bank of America to raise additional capital," Paul J. Miller Jr., a mortgage industry analyst at Friedman, Billings, Ramsey & Company, wrote in a report. He downgraded Countrywide's rating to underperform ….

\*        \*        \*

Even before those warnings, Bank of America itself had prompted
speculation it might pull back from the deal....

"They should walk away, but they will not," Mr. Miller said,
adding that it would tough for "empire builders" like Mr. Lewis
and his team to tolerate the damage to their reputation that would
be caused by abandoning the deal.

\*        \*        \*

Indeed, Countrywide's losses have risen sharply since Bank of
America made its initial \$2 billion investment last summer. Last
fall, Mr. Peabody estimated that Countrywide's losses might total
\$9 billion or \$ 10 billion. Now, as housing values continue to
plummet, they may reach \$16 billion or more.

321.    Ignoring the many red flags surrounding the Countrywide acquisition, Defendant

Lewis reaffirmed his commitment to the deal, which he called "compelling," with a "pretty nice

upside." Morgenson, Gretchen, "Countrywide's Buyer Isn't Blinking," *The New York Times*

(June 8, 2008).

322.    Later in June of 2008, Illinois Attorney General Lisa Madigan announced that the

State was suing Countrywide, alleging that Countrywide and its executives defrauded borrowers

by making costly loans with lax underwriting standards, risky features, and hidden fees. As a

result of Countrywide's deceptive and predatory tactics, Ms. Madigan asserted, "[p]eople were

put into loans they did not understand, could not afford, and could not get out of." By August of

2008, Connecticut, California, and Florida had filed similar suits, and Washington State had

separately announced plans to fine Countrywide and possibly revoke its lending license.

323.    Also in June of 2008, equity analysts at Standard and Poors slashed their rating of

Bank of America stock to "sell" on fears that BOA underestimated the impact of rising consumer

defaults and delinquencies at Countrywide, especially with respect to Option ARM loans.

324.    On June 24, 2008, Countrywide shareholders approved the deal, and the deal

closed on or about July 1, 2008.

325.    A July 1, 2008 Credit Suisse report on Bank of America stated that "[p]ersistent

weakness in consumer/construction portfolios continue to drive higher loss expectations." As

the report continued:

> Although BAC's consumer portfolio has held up relatively well,
> we are becoming increasingly more cautious given the relative
> outsized exposure to CA/FL. Of particular concern are the $118B
> of home equity…, $184B of managed credit cards, and $21B of
> total binding homebuilder exposure….
>
> While BAC has made constructive, wholesale changes in the
> Global Investment Bank, earnings and capital headwinds continue
> to mount – and the July CFC acquisition only adds to the
> uncertainty.

9.    **Bank of America and Defendant Lewis made Misleading Statements about
the Countrywide Transaction to Plan Participants in a fiduciary capacity**

326.    The Summary Plan Description ("SPD") provided to Bank of America employees

incorporates certain information filed with the Securities and Exchange Commission by

reference. Some of the documents the Company's Associate Handbook Retirement Plans

Supplement incorporates include the Annual Report on Form 10-K, the quarterly reports on

Form 10-Q, and current reports on Form 8-K. Thus, the statements made in these documents

were made in a fiduciary capacity.

327.    Although the Company chose to incorporate these filings in SPDs and Form S-8s,

the actual statements included in these documents failed to set forth the true circumstances of the

Company and thereby failed to provide the Plans' participants with an accurate picture of the

health of Bank of America's stock.

328.    Despite the precarious state of Countrywide's assets, and the evidence concerning

Countrywide's unethical and improper practices of which Bank of America must have been

aware as a result of its due diligence, Bank of America purchased the biggest seller of toxic and

risky mortgage products and raved about the benefits of the acquisition.

329.    Without disclosing the significant and actual risks that Countrywide posed to

BOA, Defendant Lewis said, "Countrywide presents a rare opportunity for Bank of America to

add what we believe is the best domestic mortgage platform at an attractive price and to affirm

our position as the nation's premier lender to consumers … home ownership is a fundamental

pillar of the U.S. economy and over time it will be a key area of growth for Bank of America."

Form 8-K, Jan. 11, 2008, at 2. He continued to affirm the benefits of the acquisition to Bank of

America:

> "One of the largest differentiators for Bank of America is our
> unique leadership positions in the cornerstone products of a
> consumer's financial relationship: deposits, debit and credit card,
> and home lending," Lewis said. "These are also the largest revenue
> and profit opportunities in U.S. financial services. We are the
> market share leader in deposits. We have the leading U.S. market
> share in the most important payment devices, credit card and debit
> card. The Countrywide acquisition will create a leading position in
> home financing."
>
> "We have the best opportunity in banking to grow those businesses
> based on our advantages of scale, convenience, financial strength
> and innovation. We also have the most recognized financial brand
> in retail banking." [Id.]

330.    Moreover, although the Countrywide brand was becoming synonymous with the

cause of the mortgage crisis, and Countrywide was even awarded the Consumerists' 'Worst

Company in America' award,[4] Mr. Lewis touted the strength of the Countrywide brand name,

which Bank of America then planned to use. Form 8-K, Jan. 11, 2008.

331.    Although Bank of America praised the Countrywide merger, the market met Bank

of America's decision with skepticism. Bank of America's net income declined substantially

from $5.26 billion in the first quarter of 2007 to just $1.21 billion in 2008's first quarter. Form

---

[4] Consumerist.com, Countrywide Home Loans Wins Consumerist's Worst Company in
America Contest, Jul. 28, 2008.

8-K, Apr. 21, 2008, at 1. Despite the substantial drop in income, Lewis promised that Bank of America was in a "strong position to withstand the jolts to the system." *Id.* at 2.

332.    Rather than inform Plan participants of the massive risks associated with BAC stock given that BOA now held a massive amount of toxic assets, Lewis said, "Our earnings power from our core business activities is strong and growing." Lewis added, "We are bringing innovative new products to market, taking market share and expanding customer relationships across the company." *Id.*

333.    Bank of America's earnings continued to fall. In the second quarter of 2008, noninterest income declined 14 percent from a year prior while noninterest expense increased 4 percent. Form 8-K, July 21, 2008, at 3. Net income fell 66 percent from 2007. *Id.* at 5. Particularly as a result of the housing crisis, generated in large part by Countrywide's careless and unlawful lending practices, Bank of America's credit quality weakened substantially. *Id.* at 3. Primarily due to portfolios tied to housing, home equity, residential mortgages, and homebuilders (also largely due to Countrywide's haphazard practices), provision expenses rose more than a billion dollars. *Id.* at 3. Despite these dismal numbers and the lack of any meaningful sign of improvement, Defendant Lewis assured the Plans' Participants that Bank of America was "pleased with these solid results" and promised that the results demonstrated "the advantages of our company's diversity and scale." Form 8-K, July 21, 2008, at 1.

334.    By July of 2008, BAC stock had already suffered significantly from Countrywide's negative image. Nonetheless, Defendant Lewis informed Plan participants, "Mortgages are one of the three main cornerstone consumer financial products along with deposits and credit cards … [t]his purchase significantly increases Bank of America's market share in consumer real estate, and as [Countrywide and Bank of America] combine, we believe

Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs."

335.    On information and belief, throughout this time period, Mr. Lewis also directed statements directly to employee-Plan participants pumping up the Company and its prospects, and suggesting that the Company's stock was undervalued.

## 10.    After the Countrywide Acquisition Closed, Bank of America's Problems Continued to Mount

336.    In early July of 2008, shortly after the Countrywide acquisition closed, Bank of America agreed to assume $16.5 billion of Countrywide's debt.

337.    A July 22, 2008 Citi Investment Research report on Bank of America reiterated that "[t]he key issue for BAC shares remains capital adequacy, especially in light of the potential costs for CFC." In this regard, the report noted, "Refreshed LTVs indicated 48% of loans have LTV greater than 90%.... This is up from about 19% in 3Q07, showing the dramatic shift in LTVs given about 50% of the portfolio is in CA and Fl."

338.    A September 1, 2008 Goldman Sachs report on Bank of America again stated that the "[k]ey risk is an equity raise resulting from credit costs and Countrywide risk." According to the report:

> Cumulative losses on Countrywide's loan book of 19%, higher than management's assumption of 17%. As a result, we are assuming that ~5.0 billion of Countrywide credit costs will eventually hit the provision line item, even above and beyond the write-downs taken at deal closing. Even when taking into account that 12.5% of all of CFC's loans are delinquent or non-performing, half of the book is California, and half have a mark to market LTV of greater than 90%, these are remarkably high loss rates…..
>
> \*    \*    \*
>
> Credit quality remains our key concern as the Countrywide acquisition increased BAC's sensitivity to a prolonged housing market downturn.

## C.    The Company Commits to the Acquisition of Merrill Lynch

339.    All of these disturbing facts about Countrywide were known to Defendants at the
time they were contemplating the acquisition of Merrill Lynch in mid-September 2008. Despite
the rising tide of losses at Countrywide, BOA decided after only 48 hours of due diligence over a
weekend to purchase Merrill Lynch, which itself was weighed down by similarly toxic assets.

340.    Merrill Lynch described itself as "one of the world's leading capital markets,
advisory and wealth management companies with offices in 40 countries and territories and total
client assets of approximately $1.5 trillion at September 26, 2008. As an investment bank, we
are a leading global trader and underwriter of securities and derivatives across a broad range of
asset classes, and we serve as a strategic advisor to corporations, governments, institutions and
individuals worldwide."

341.    Over the course of its last eighteen months as an independent entity, Merrill
Lynch reported net losses over six consecutive quarters. These losses were substantially
attributable to declining values of trading assets held by Merrill Lynch as a principal in those
transactions. The troubled assets included certain categories of asset-backed securities, including
mortgage-backed securities, collateralized debt obligations ("CDOs") and related derivative
positions used as either hedges or investments in their own right.

342.    Other investment banks had experienced similar difficulties amidst illiquid market
conditions and declining asset values. Most notably, in March 2008, Bear Stearns became
effectively insolvent and was purchased by JPMorganChase in a deal arranged and backed by the
U.S. Treasury Department and the Federal Reserve.

343.    During the week of September 8, 2008, the stock prices of many major financial
services companies declined significantly as reports circulated regarding financial difficulties at
Lehman Brothers Holdings, Inc. ("Lehman").

344.    On September 10, 2008, Lehman pre-announced a $3.9 billion net loss for its third quarter of 2008, as well as a number of initiatives to bolster its financial viability. Lehman's troubles were primarily associated with illiquid mortgage and real estate related securities. Despite Lehman's efforts to prevent insolvency, by September 12, 2008, it became clear that Lehman was running out of options and would likely file for bankruptcy.

345.    Given investors' perceptions of similar risks associated with Merrill Lynch's balance sheet, over the course of the week ending on September 12, 2008, Merrill Lynch's common stock price declined by $3.91 per share, or approximately 24 percent, to close at $12.59 per share on Friday, September 12, 2008.

346.    The Proxy Statement concerning BOA's acquisition of Merrill Lynch disclosed that on the morning of Friday, September 12, 2008, the Merrill Lynch board of directors held an informational conference call during which senior management updated directors on recent market conditions, Lehman's waning financial viability, the status of Merrill Lynch's capital, liquidity and business results, Merrill Lynch's recent stock performance, and potential rating agency actions.

347.    During that conference call, the Merrill Lynch board urged management to continue to evaluate the potential impact of market developments on Merrill Lynch and the possible courses of action Merrill Lynch might pursue in response to various possible scenarios. The Merrill Lynch board of directors stressed the need for Merrill Lynch to be prepared to act quickly as events unfolded.

348.    On Saturday, September 13, 2008, Merrill Lynch Chief Executive Officer John A. Thain contacted Defendant Lewis at his North Carolina home, and invited him to come to New York to "discuss some strategic options."

349.    Defendant Lewis immediately flew to New York, where Thain informed him that he would like to initiate discussions of the possible sale to BOA of a 9.9% stake in Merrill Lynch.

350.    Defendant Lewis informed Thain that he was not interested in a 9.9% stake in Merrill Lynch. Instead, he wished to purchase the failing company. Thain responded that he had no intention of selling Merrill Lynch.

351.    Nonetheless, teams were immediately assembled to assess both options – the 9.9% stake and the takeover.

352.    The very next day – Sunday, September 14 – Thain learned that Goldman Sachs was amenable to purchasing a 9.9% stake in Merrill Lynch and providing a $10 billion line of credit – the very deal Thain had been seeking. Thain was eager to consummate a deal with Goldman.

353.    However, before Merrill's team could be dispatched to meet with the Goldman Sachs team, Bank of America proposed purchasing Merrill Lynch for an astounding $29 per share. Thain immediately turned his focus to consummating the Bank of America deal.

354.    On Sunday, September 14, 2008, only one day after the process began, Merrill Lynch and Bank of America agreed on the principal terms of the deal, providing for a stock-for-stock acquisition of Merrill Lynch at an exchange ratio of 0.895 shares of Bank of America for each Merrill Lynch share. As of September 14, 2008, the implied value of the consideration to Merrill Lynch shareholders was $29 per share and Merrill Lynch shareholders would own approximately 23% of the combined company. This represented a massive premium over the price at which Merrill Lynch stock was then trading, which was extraordinary given the volatile state of the financial markets and the severely compromised state of Merrill Lynch.

355. Thus, on September 15, 2008, Bank of America announced that it had agreed to

acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that, according to BOA,

"creates a company unrivaled in its breadth of financial services and global reach." According to

the BOA press release, incorporated in a Form 8-K filing:

> Bank of America Corporation today announced it has agreed to
> acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock
> transaction that creates a company unrivalled in its breadth of
> financial services and global reach.
>
> "Acquiring one of the premier wealth management, capital
> markets, and advisory companies is a great opportunity for our
> shareholders," Bank of America Chairman and Chief Executive
> Officer Ken Lewis said. "Together, our companies are more
> valuable because of the synergies in our businesses."

356. During a conference call on September 15, 2008, Joe L. Price, Bank of America's

CFO stated, "[t]he price represents roughly 1.8x stated tangible book value. It's roughly 12x

Merrill Lynch's 2009 projected earnings based on First Call consensus estimates … we used

First Call consensus estimates as a base for modeling the transaction."

357. Analysts on the call questioned the rationale for the deal price and suggested that

BOA was overpaying for Merrill. Matthew O'Connor, an analyst at UBS, pointed out "there's a

lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off

today and this week if the deal hadn't been announced. I guess the question is why pay $29 at

this point?"

358. Defendant Lewis attempted to quell concerns by stating "the long term benefits

were so overwhelming, it was such a strategic opportunity … we thought we had a compelling

situation for the shareholders over the long-term."

359. When another analyst asked about the necessary write-downs on Merrill's assets

and if the numbers presented with the announcement included any mark-to-market write-downs,

Defendant Lewis answered, "The numbers that we presented today we have considered marks on

the assets ... I would tell you that, again, going back to the point of things such as CDOs, we

have very similar methodology valuations and we have very similar marks to structures. We are

dealing with the same counterparties on things so again, we're pretty familiar with the types of

assets and feel pretty good about the progress that Merrill Lynch has made."

360.    Analysts who studied the transaction also predicted that Merrill Lynch could

experience further asset write-downs and losses that would impair the value of the merger. A

Deutsche Bank analyst report, dated September 16, 2008, identified the potential risk of further

write-downs at Merrill Lynch:

> The big question surrounding capital market businesses is, "how
> much more in write-downs are likely ahead?" In particular, a new
> weakness at AIG has the potential to hurt Merrill's capital via any
> potential insurance on its ABS CDO. Alternatively, additional
> selling of risky commercial or residential real estate assets could
> impact Merrill's commercial real estate securities ($18B), other
> risky mortgage assets ($31B; includes $10B alt-A, subprime and
> non-US residential), and leveraged finance ($8B), not withstanding
> declines in these amounts since the end of 2Q08. In addition to the
> "risky" assets, Merrill also has $33.7B in US prime mortgages on
> balance sheet... Moreover, it seems as though BAC had only 36
> hours of due diligence, which does not give extra comfort in an
> environment when loss estimates seem to increase quarter after
> quarter. Indeed, several details were not included in the
> presentation, such as pro forma management, location, timeline
> (besides deal close in early 1Q09 and conversions sometime in
> 2010), etc. This by itself is less the issue (we have confidence that
> BAC can work this out in a reasonable manner given proven
> success in previous integrations) vs. the bigger issues of comfort
> with the level of marks on MER's books. One way to think about
> the margin of safety for BAC is that its purchase price seems to
> give it room to incur $12 bil. of additional marks before the price is
> above MER' s adjusted book value.

361.    In light of all the foregoing, in preparing the Proxy Statement, and the materials

incorporated therein by reference, the Defendants were well aware of the severe, acute risks

associated with the types of now illiquid assets accumulated by investment banks generally, and

Merrill Lynch in particular, and had a due diligence obligation to ensure that disclosures to BOA

shareholders and the Plans' participants with respect to Merrill Lynch's financial condition were accurate and complete.

362.    The Company's timing was odd for many reasons. Indeed, just nine months earlier, on January 15, 2008, the Company announced that it was *scaling back* its investment banking operations and shedding 650 jobs after suffering heavy losses from bad mortgage investments. Under Defendant Lewis' direction, the Company had spent more than $625 million to expand into investment banking, only to see its trading businesses suffer heavy losses. At a conference several months prior to the announcement of the Merrill acquisition, Defendant Lewis said he would not spend even "petty cash" for an investment bank.

363.    As reported in a September 16, 2008 article in *The New York Times*, "investors responded unenthusiastically to the hurried" Merrill Lynch acquisition, as Bank of America stock "dropped 21.3 percent on the news." As the *Times* further reported, "some analysts said that [the Merrill Lynch acquisition] shared similarities with the shotgun marriage Bank of America consummated with the Countrywide Financial Corporation …."

364.    According to Defendant Lewis, "regulators had not pushed him to acquire Merrill. He said the reason he had moved forward so quickly – and offered to pay a premium for a company with potentially toxic assets sagging under financial distress – was that he had not wanted to risk another buyer swooping in ahead of him."

365.    As later revealed by Thain in a program titled "Breaking the Bank" on PBS's Frontline, which originally aired on June 16, 2009 ("PBS Frontline"), "[Secretary of the U.S. Treasury] Paulson was adamant the deal had to be done by Monday morning," in order to prevent Merrill's collapse and the effect such collapse would have on world markets. Mr. Lewis's repeated refusal to acknowledge pressure from the government is understandable

because by doing so he would impliedly be admitting that BOA's due diligence of the

transaction was a fiction. Indeed, Secretary Paulson and Chairman Bernanke told Lewis that

invoking the material adverse change clause (the "MAC") "after three months of review,

preparation and public remarks by the management of Bank of America about the benefits of the

acquisition" would reveal the falsity of those statements, and "cast doubt in the minds of

financial participants … about the due diligence and analysis done by the company, its capability

to consummate significant acquisitions, its overall risk management processes, and the judgment

of its management." Secretary Paulson's testimony to Congress also revealed that he told Lewis

that if Lewis invoked the MAC, Lewis and the rest of BOA's senior management and BOA's

Board would be terminated.

366.    As the September 16, 2008 article in *The New York Times* further stated:

> The stock market is … hesitant, concerned that Mr. Lewis may
> have moved so quickly that he could eventually find himself
> exposed to more troubled Merrill assets than he bargained for – in
> addition to the risky mortgage portfolio he inherited from
> Countrywide.

367.    On September 18, 2008, Bank of America attached the Agreement and Plan of

Merger (the "Agreement") to a Form 8-K the Company filed with the SEC.

368.    Under the Agreement, Merrill Lynch was required to fully cooperate with

Defendants and provide any information necessary in order to prepare the Proxy Statement:

> Each of Parent and Company shall, upon request, furnish to the
> other all information concerning itself, its Subsidiaries, directors,
> officers and stockholders and such other matters as may be
> reasonably necessary or advisable in connection with the Joint
> Proxy Statement, the Form S-4, or any other statement, filing,
> notice or application made by or on behalf of parent, Company or
> any of their respective Subsidiaries to any Governmental Entity in
> connection with the Merger and the other transactions
> contemplated by this Agreement.

369.    Section 6.2 of the Agreement further provided Defendants with full and complete

access to Merrill Lynch's books and records.

1.    **Merrill Lynch's October 16, 2008 Press Release Announcing Third Quarter 2008 Financial Results**

370.    The Proxy Statement incorporated by reference several documents, including

Merrill Lynch's filing on Form 8-K dated October 16, 2008.  That filing included as Exhibits

99.1 and 99.2, respectively, Merrill Lynch's press release announcing its results for the Third

Quarter of 2008 and a Preliminary Unaudited Earnings Summary for the Third Quarter.  The

press release stated that Merrill Lynch reported:

> [A] net loss from continuing operations for the third quarter of
> 2008 of $5.1 billion, or $5.56 per diluted share, compared with a
> net loss from continuing operations of $2.4 billion, or $2.99 per
> diluted share, for the third quarter of 2007. Merrill Lynch's net loss
> for the third quarter of 2008 was $5.2 billion, or $5.58 per diluted
> share, compared with a net loss of $2.2 billion, or $2.82 per diluted
> share, for the year-ago quarter.

371.    In its financial results, Merrill Lynch broke out its revenue among several

categories, including "principal transactions."  In its November 4, 2008 Form 10-Q (discussed

below), Merrill Lynch described "principal transactions":

> Principal transactions revenues include both realized and
> unrealized gains and losses on trading assets and trading liabilities,
> investment securities classified as trading investments and fair
> value changes associated with structured debt. These instruments
> are recorded at fair value. Fair value is the price that would be
> received to sell an asset or paid to transfer a liability in an orderly
> transaction between marketplace participants. Gains and losses are
> recognized on a trade date basis.

372.    In its third quarter 2008 press release, Merrill Lynch reported negative $6.5

billion in principal transactions revenue, indicating a net loss due to realized or unrealized losses

(either asset impairment write-downs or declines in mark-to-market valuations) in the securities

held on its balance sheet.

373.    Among the "significant items" driving third quarter revenues identified in the

October 16, 2008 press release were write-downs and asset losses totaling $12.1 billion:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super-senior ABS CDOs and the termination and potential settlement of related hedges with monoline guarantor counterparties.

                        *        *        *

- Net write-downs of $3.8 billion, principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government-sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer.

                        *        *        *

- Net losses of $2.6 billion, resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures.

374.    In conjunction with its Third Quarter release, Merrill Lynch noted "Third Quarter

and First Nine Months of 2008 Highlights," including, among others:

> - Significant progress in balance sheet and risk reduction; RWA declined by approximately 15 percent over the quarter; and
>
> - Reductions of 98 percent of U.S. Alt-A residential mortgage net exposures. Including planned sales, reductions of 56 percent in non-U.S. residential mortgages and 25 percent in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio.

375.    The October 16, 2008 Press Release, included a quote from Merrill CEO Thain

where he stated that, "[w]e continue to reduce exposures and de-leverage the balance sheet prior

to the closing of the Bank of America deal. As the landscape for financial services firms

continues to change and our transition teams make good progress, we believe even more that the

transaction will create an unparalleled global company with pre-eminent scale, earnings power

and breadth."

## 2.    Merrill Lynch's Third Quarter 2008 Form 10-Q

376.    On November 4, 2008, Merrill Lynch filed its quarterly report on Form 10-Q for

the third quarter of 2008 (ended September 26, 2008) with the SEC. The Proxy Statement, at

124, specifically incorporated by reference "additional documents that either company files with the SEC" including "Quarterly Reports on Form 10-Q and Current Reports on Form 8-K."

377. Merrill Lynch's November 4, 2008 Form 10-Q substantially incorporated the financial results and financial information quoted above from the October 16, 2006 8-K/Press Release and represented that the financial disclosures in the 10-Q complied with generally accepted accounting principles (GAAP).

378. The Form 10-Q disclosed that Merrill Lynch had total assets of $875.8 billion, which included the following asset categories, totaling $ 261.5 billion, that were substantially subject to the losses and write-downs announced in the fourth-quarter of 2008 (discussed below):

| Asset Category | | Value in Millions, as of September 26, 2008 |
|---|---|---|
| **Trading assets**, at fair value (includes securities pledged as collateral that can be sold or repledged of $27,074 in 2008), including: | | 189,358 |
| Derivative contracts | 74,106 | |
| Equities and convertible debentures | 34,311 | |
| Corporate debt and preferred stock | 38,998 | |
| Mortgages, mortgage-backed, and asset-backed | 19,130 | |
| Non-U.S. governments and agencies | 8,998 | |
| U.S. Government and agencies | 6,903 | |
| Municipals, money markets and physical commodities | 6,912 | |
| Investment Securities (includes $4,045 in 2008 and $4,685 in 2007 measured at fair value in accordance with SFAS No. 159) (includes securities pledged as collateral that can be sold or repledged of $7,152 in 2008 and $16,124 in 2007) | | 72,182 |
| **Total** | | **$261,540** |

## D. The Misleading Proxy Statement

379. The terms of the acquisition were detailed in a Proxy Statement filed with the SEC on November 3, 2008, and mailed to all shareholders of record of Bank of America including Plan participants. As detailed below, the Proxy Statement misstated and failed to inform BOA shareholders of material facts concerning Merrill Lynch's business, true financial

condition and the substantial risks associated with Merrill Lynch's assets. The cover letter

enclosing the Proxy Statement was signed by Defendant Lewis. The Proxy Statement urged all

Bank of America shareholders including Plan participants to vote in favor of the acquisition:

> The Bank of America board of directors believes that the merger is
> in the best interest of Bank of America and its stockholders and has
> unanimously approved the merger and the merger agreement. The
> Bank of America board of directors unanimously recommend that
> Bank of America shareholders vote "FOR" the proposal to issue
> shares of Bank of America common stock in the merger.

380. Under the terms of the agreement, Bank of America would exchange .8595 shares

of Bank of America common stock for each Merrill Lynch common share.

381. The Proxy Statement identified twelve distinct "Risk Factors," at pages 23

through 26, and stated that "stockholders should consider the matters described below in

determining whether to adopt the merger agreement." None of the Risk Factors identified

provided disclosure concerning the specific risk that Merrill Lynch's assets were too complex

and illiquid to value with any degree of specificity and that there was a substantial risk that the

true value of those assets were substantially less than the stated value, impairing the value of the

Merrill Lynch acquisition to BOA shareholders, including participants in the Plans.

382. Under the heading "Recent Developments" the Proxy Statement disclosed that

BOA had agreed to sell $15 billion in preferred stock to the U.S. Treasury pursuant to the Capital

Purchase Program ("CPP") that was effectuated after Congress passed the Emergency Economic

Stabilization Act of 2008:

> On October 3, 2008, President Bush signed into law the
> Emergency Economic Stabilization Act of 2008 (the "EESA").
> Pursuant to the EESA, the U.S. Treasury has the authority to,
> among other things, invest in financial institutions and purchase
> mortgages, mortgage-backed securities and certain other financial
> instruments from financial institutions, in an aggregate amount up
> to $700 billion, for the purpose of stabilizing and providing
> liquidity to the U.S. financial markets. On October 14, 2008, the
> U.S. Treasury announced a plan, referred to as the Capital
> Purchase Program, or the CPP, to invest up to $250 billion of this

$700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate. In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28,2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under "Merrill Lynch & Co Developments - Unaudited - Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

383.   The Proxy Statement similarly disclosed that at the present time Merrill Lynch

would not participate in the CPP, pending the outcome of the merger:

After discussions with Treasury and Bank of America, Merrill Lynch has determined that, in view of the pending merger with Bank of America, it will not sell securities to the U.S. Treasury under the CPP at this time, but may do so in the future under certain circumstances. As a result, Merrill Lynch has entered into a purchase agreement that provides for delayed settlement for a sale of $10 billion of a new series of Merrill Lynch preferred stock and warrants to purchase 64,991,334 shares of Merrill Lynch Common Stock at an exercise price of $23.08 per share. The agreement provides that the closing will take place on the earlier of (i) the second business day following termination of the Merger Agreement with Bank of America and (ii) a date during the period beginning on January 2, 2009 and ending on January 31, 2009 if the Merger Agreement is still in effect but the merger has not been completed by the specified date, but, in the case of either (i) or (ii), in no event later than January 31, 2009. In addition, prior to January 2, 2009, if the Merger Agreement is still in effect but the merger is not been completed, Merrill Lynch has the right, after consultation with the Federal Reserve and Bank of America, to request that the U.S. Treasury consummate the CPP investment on or prior to January 1, 2009. The Purchase Agreement will

terminate at 12:01 am on February 1, 2009 if the investment has
not been made by that date.

Completion of the CPP investment prior to the termination of the
Merger Agreement is subject to Bank of America's approval. Bank
of America has agreed it will not unreasonably withhold or delay
its consent. After January 1, 2009, Bank of America may not
withhold its consent if, after consulting with Bank of America,
Merrill Lynch reasonably determines that the failure to obtain the
CPP investment would have a material adverse impact on Merrill
Lynch. After January 30, 2009 until 12:01 a.m. on February 1,
2009, Merrill Lynch will have the unilateral right to obtain the CPP
investment and Bank of America has consented in advance to the
investment at such time if the merger has not been completed at
that date.

*   *   *

On October 29, 2008, Merrill Lynch and Bank of America, N.A., a
wholly owned subsidiary of Bank of America, entered into a $10
billion committed unsecured bank revolving credit facility with
borrowings guaranteed under the Temporary Liquidity Guarantee
Program. This facility will be available to Merrill Lynch until
January 3 0, 2009 but may expire at an earlier date if the merger
with Bank of America is terminated or consummated prior to
January 30, 2009 or Merrill Lynch elects to participate in the CPP.
If Merrill Lynch participates in the CPP, the proceeds received
from the U.S. Treasury will be used to repay in full any
outstanding amounts owed under this facility.

384.    The Proxy Statement contained statements from both companies highlighting the

potential benefits of the merger. BOA articulated numerous "Reasons for the Merger" and

included the "Recommendation of the Bank of America Board of Directors," which stated the

following at 54-55:

### Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors

The Bank of America board of directors consulted with Bank of
America management as well as financial and legal advisors and
determined that the merger is in the best interests of Bank of
America and Bank of America stockholders. In reaching its
conclusion to approve the merger agreement, the Bank of America
board considered a number of factors, including the following
material factors:

• its understanding of Bank of America's business, operations,
financial condition, earnings and prospects and of Merrill Lynch's
business, operations, financial condition, earnings and prospects;

*        *        *

• the fact that application of such potential expense savings
and other transaction-related assumptions and adjustments to the
combined net income forecasts for Bank of America and Merrill
Lynch made by various third-party brokerage firms and published
as consensus estimates by First Call would result in the
combination being 3.0% dilutive in 2009 and breakeven in 2010;

• the reports of Bank of America management and the financial
presentation by J.C. Flowers and FPK to Bank of America's board
of directors concerning the operations, financial condition and
prospects of Merrill Lynch and the expected financial impact of the
merger on the combined company;

• the opinions delivered to the Bank of America board of directors
by each of J.C. Flowers and FPK to the effect that, as of the date of
the opinion and based upon and subject to the assumptions made,
methodologies used, factors considered and limitations upon its
review described in its opinion and such other matters as J.C.
Flowers and FPK considered relevant, the exchange ratio to be
paid by Bank of America was fair, from a financial point of view,
to Bank of America.

385.    In describing the Representations and Warranties made by Merrill Lynch and

BOA, the Proxy Statement assured investors that these included determinations that no "material

adverse effect" has occurred between the date of the Merger Agreement and the date of the

closing of the merger:

> The merger agreement contains customary representations and
> warranties of Merrill Lynch and Bank of America relating to their
> respective businesses. With the exception of certain representations
> that must be true and correct in all material respects (or, in the case
> of specific representations and warranties regarding the
> capitalization of Merrill Lynch, true and correct except to a de
> minimis extent), no representation or warranty will be deemed
> untrue, inaccurate or incorrect as a consequence of the existence or
> absence of any fact, circumstance or event unless that fact,
> circumstance or event, individually or when taken together with all
> other facts, circumstances or events, has had or would reasonably
> be expected to have a material adverse effect on the company
> making the representation.

*        *        *

> Each of Bank of America and Merrill Lynch has made
> representations and warranties to the other regarding, among other
> things:

*     *     *

• capitalization;

*     *     *

• financial statements, internal controls and accounting or auditing practices;

*     *     *

• the absence of material adverse changes;

*     *     *

In addition, Merrill Lynch has made other representations and warranties about itself to Bank of America as to:

investment securities and commodities ….

386. The Merger Agreement, annexed to the Proxy Statement as Appendix A, included

the following language in paragraph 3.8, the definition of "Material Adverse Effect," the

occurrence of which would allow for the termination of the merger:

> 3.8 Absence of Certain Changes or Events. (a) Since June 27,
> 2008, no event or events have occurred that have had or would
> reasonably be expected to have, either individually or in the
> aggregate, a Material Adverse Effect on Company. As used in this
> Agreement, the term" Material Adverse Effect" means, with
> respect to Parent or Company, as the case may be, a material
> adverse effect on (i) the financial condition, results of operations or
> business of such party and its Subsidiaries taken as a whole
> (provided, however, that, with respect to clause (i), a "Material
> Adverse Effect" shall not be deemed to include effects to the
> extent resulting from (A) changes, after the date hereof, in GAAP
> or regulatory accounting requirements applicable generally to
> companies in the industries in which such party and its
> Subsidiaries operate, (B) changes, after the date hereof, in laws,
> rules, regulations or the interpretation of laws, rules or regulations
> by Governmental Authorities of general applicability to companies
> in the industries in which such party and its Subsidiaries operate,
> (C) actions or omissions taken with the prior written consent of the
> other party or expressly required by this Agreement, (D) changes
> in global, national or regional political conditions (including acts
> of terrorism or war) or general business, economic or market
> conditions, including changes generally in prevailing interest rates,
> currency exchange rates, credit markets and price levels or trading
> volumes in the United States or foreign securities markets, in each
> case generally affecting the industries in which such party or its
> Subsidiaries operate and including changes to any previously
> correctly applied asset marks resulting therefrom, (E) the execution

of this Agreement or the public disclosure of this Agreement or the transactions contemplated hereby, including acts of competitors or losses of employees to the extent resulting therefrom, (F) failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof or (G) changes in the trading price of a party's common stock, in and of itself, but not including any underlying causes, except, with respect to clauses (A), (B) and (D), to the extent that the effects of such change are disproportionately adverse to the financial condition, results of operations or business of such party and its Subsidiaries, taken as a whole, as compared to other companies in the industry in which such party and its Subsidiaries operate) or (ii) the ability of such party to timely consummate the transactions contemplated by this Agreement.

## E.  As the Truth About the Countrywide and Merrill Acquisitions Begins to Come Out, the Plans Are Hit Hard

387.  On October 6, 2008, Bank of America announced a settlement of predatory lending claims against Countrywide brought by the states of California, Illinois, Arizona, Connecticut, Florida, Iowa, Michigan, North Carolina, Ohio, Texas, and Washington. According to *The New York Times,* in the settlement, Countrywide agreed to "provide $8.4 billion in direct loan relief … while waiving certain fees and setting aside additional funds to help people in foreclosure and relocating." Morgenson, Gretchen, "Countrywide to Set Aside $8.4 Billion In Loan Aid," *The New York Times* (Oct. 6, 2008).

388.  The $8.4 billion settlement in turn led to additional litigation, as investors in mortgage-backed securities demanded that Countrywide compensate them if the lender changes the terms of the loans backing their securities. *See* Bajaj, Vikas, "Fund Investors Sue Countrywide Over Loan Modifications," *The New York Times* (Dec. 2, 2008).

389.  After the close of the market on October 6, 2008, Bank of America released its results for the third quarter of 2008 – and the news was not good. In an effort to shore up its depleted capital reserves and to fund the Merrill Lynch acquisition, Bank of America cut its quarterly dividend from $.64 to $.32, and announced plans to raise $10 billion in new capital. Defendant Lewis reportedly stated, "It's a damn disaster." *See* "BofA Cuts Dividend, Posts

Lower Profit – Banking Woes Hit Consumer Giant; Stock Sale Planned," *The Wall Street Journal* (Oct. 7, 2008). As the *Journal* reported: "Bank of America's many recent acquisitions – the latest being a $44 billion purchase of Merrill Lynch & Co. – have put pressure on its capital base." *Id.*

390. As of the end of Q3 of 2008, Bank of America's nonperforming assets had reached $13.3 billion, 1.42 percent of the Company's total loans, leases and foreclosed properties. The Company's provision for credit card losses was $6.45 billion.

391. After the announcements of the $8.4 billion Countrywide settlement and Bank of America's "disastrous" results for Q3 of 2008, on October 7, 2008, Bank of America's shares fell 26% in a single day, closing at $23.77.

392. On November 5, 2008, BAC stock closed at $21.27.

393. On November 6, 2008, Merrill Lynch announced its results for Q3 2008. Merrill reported substantial mark downs in its assets and a resultant loss of over $5 billion.

394. As reported in a *Wall Street Journal* article dated November 17, 2008, "[a]n additional $10 billion in capital [to be paid from the U.S. Treasury under the Troubled Asset Relief Program] has been set aside for Merrill Lynch & Co. in a transaction to be settled after its acquisition by Bank of America."

395. As the month of November continued, the market became increasingly concerned about Merrill Lynch's potential exposure to commercial mortgage-backed securities, and BAC stock dropped accordingly. As *The New York Times* reported in a November 28, 2008 article:

> ... Bank of America's bargain looks expensive. Shares of its main banking rivals – Wells Fargo, U.S. Bancorp and JPMorgan – are down 16 percent, 22 percent and 26 percent, respectively, an average decline of 21 percent [from the day before the Merrill Lynch acquisition was announced]. Bank of America's stock has shed a stunning 54 percent of its value since the day before the Merrill deal.

> That decline of 33 percentage points beyond the losses seen by
> Bank of America's peers equates to more than $50 billion of its
> market cap that has evaporated.
>
> Not all of that decline is attributable to Merrill. Bank of America
> also acquired Countrywide Financial, one of the biggest mortgage
> banks during the go-go years but one that is now in distress.

396.    By December 1, 2008, BAC stock had dropped to $12.85 per share.

## F.    After the Announcement of the Proposed Merrill Acquisition, Defendants Remained Positive About the Acquisition in Statements to the Market and to Employee-Plan Participants

397.    From the time of the announcement of the Merrill acquisition until after its

consummation and beyond, Defendants never publicly deviated from their positive assessment of

the acquisition and its impact on the largest single asset of the Plans, BAC stock. That is the

case even though, as Defendants knew or should have known, Merrill Lynch's condition was far

worse than represented in the Proxy Statement or known to employee-Plan participants at Bank

of America, and was continuing to deteriorate.

398.    In the Company's conference call discussing its own results for Q3 2008, when an

analyst asked whether "the $10 billion you're raising today, should we expect that to be that and

then done or look for additional capital once the Merrill deal is closed?," CFO Price responded:

"We have considered the Merrill deal in our intentions here so the numbers we were talking

about, as I mentioned in the prepared remarks, covered our anticipated needs from a Merrill

standpoint."

399.    On information and belief, Defendant Lewis continued, in his internal talking

points to employee-Plan participants, to tout the strength of the Company and its stock.

400.    In a November 26, 2008 letter to employee-Plan participants captioned "Despite

stock price volatility, Bank of America remains strong, Defendant Lewis stated, in part:

> I usually don't comment on our stock price …. But in this
> environment, I think it is important to share my perspective with

> associates [BOA employees] regarding our stock's volatility, and
> how Bank of America is positioned to ride out this severe
> economic storm.
>
> *       *       *
>
> Bank of America continues to be a strong, active player in the
> financial markets. We are generating strong deposit growth and
> attracting new customer and client relationships throughout our
> company. We continue to make loans to consumers and
> businesses to boost shareholder value and to do what we can to
> support economic activity.
>
> We are one of the most liquid banks in the world. We successfully
> raised capital in October and now have Tier I capital that exceeds
> both regulatory requirements and our own target. In short, we
> believe we are one of the strongest and most stable banks in the
> world.
>
> I have gotten questions from associates and investors in recent
> weeks on two specific topics: the government capital injections
> into banks, and our decision to increase our investment in China
> Construction Bank (CCB).
>
> Regarding the federal capital injection, that was funds we did not
> need and did not seek. At the time the government asked the major
> banks to accept the injections, we had just completed our own $10
> billion capital raise in the market and, as I mentioned above, had
> more than adequate capital. We accepted the funds from the
> government as part of a broad plan to stabilize the financial
> markets generally, and will pay interest to government on the
> funds until the interest is paid back.
>
> *       *       *
>
> I am confident that, after this storm passes, investors will see the
> value in our franchise, the power of our brand, and especially our
> associates' ability to create broad, deep and long lasting financial
> relationships....

401.    According to a February 2008 *Wall Street Journal* article titled, "In Merrill Deal,

U.S. Played Hardball," by the time of Lewis' November 26 letter, Bank of America and

Defendant Lewis were aware that Merrill Lynch's quarterly losses were already approaching $9

billion – with more than a month to go until the end of the quarter. Lewis did not disclose this

fact in his November 26 letter.

402.     In fact, neither the Proxy Statement, nor any statements made to employee-Plan participants from the time of the Agreement onward, disclosed the catastrophic state of Merrill Lynch's assets or the inevitability of stunning losses in the 4th quarter as a result.

403.     Despite the fact that BOA shareholders did not vote on the merger until December 5, 2008, after over two-thirds of the fourth quarter had passed, the Proxy Statement was not updated, corrected, amended or supplemented with any information concerning the actual losses incurred by Merrill Lynch during the fourth quarter of 2008, or the risk that such losses could occur and would materially effect the value of BOA if the merger were consummated, given the nature of the assets and the lack of or inability of BOA to perform adequate due diligence to value the assets. Nor was the Proxy Statement updated or corrected to reflect that owing to losses incurred by Merrill Lynch during the fourth quarter of 2008, BOA would be required to seek additional funding from the United States Treasury Department.

404.     The February *Wall Street Journal* article titled, "In Merrill Deal, U.S. Played Hardball," further reported that, prior to the December 5, 2008 shareholder vote on the acquisition, Bank of America, Defendant Lewis and other Bank of America executives were aware that Merrill Lynch's quarterly losses had reached \$13.3 billion. Stunningly, Bank of America decided to go ahead with the December 5th vote – *and made no disclosures about the dramatic deterioration at Merrill Lynch to either Plan participants or to shareholders in general.*

405.     At the December 5, 2008 special meeting, 82% of Bank of America shareholders who voted approved the acquisition and issuance of additional shares by the Company that it would use to consummate the acquisition.

406.    The foregoing statements contained in or incorporated by reference into the Proxy
Statement and disseminated to the Plans' participants:

(a)     misstated Merrill Lynch's financial results and financial position,
including by overstating the assets recorded on Merrill Lynch's balance sheet as of the third
quarter of 2008;

(b)     misstated the benefits of the merger, including the value of the assets to be
acquired from Merrill Lynch;

(c)     misstated, in John Thain's statements in the October 16, 2008 press
release, that Merrill Lynch continued to "reduce exposures and de-leverage the
balance sheet";

(d)     omitted to disclose that Merrill Lynch's financial results, and losses on
principal transactions during the fourth quarter of 2008, were potentially sufficient to trigger the
termination of the merger due to the occurrence of a material adverse change;

(e)     omitted information about the magnitude and impact of losses incurred by
Merrill Lynch during the fourth quarter of 2008; and

(f)     misstated and omitted to disclose information concerning the potential
risks of acquiring Merrill Lynch and the potential for further material write-downs, impairments
and losses on assets held by Merrill Lynch.

407.    Defendants knew or should have known that, given the above misstatements
and/or omissions, coupled with the disastrous result of the Countrywide acquisition, BOA Stock
was an imprudent Plan investment. During the Class Period, as Directors and members of
committees entrusted with the stewardship of the Plan, Defendants ignored several serious,

non-public red flags that should have alerted them to the fact that BOA Stock was not a prudent

investment for the Plan.

408.    The Plan fiduciaries also knew or should have known that the above material

misstatements and omissions caused BOA common stock to trade at artificially inflated levels

during the Class Period.

### 1.    BOA's Senior Officers Were Aware of Merrill's Staggering 4th-Quarter Losses Before the Shareholder Vote, and Even Debated Whether to Pull Out of the Merger Via the MAC

409.    Defendant Lewis and other senior officers of BOA knew of Merrill's losses as

they occurred.  Indeed, BOA went so far as to appoint its Chief Accounting Officer, Neil A.

Cotty, as Merrill's acting CFO immediately after the merger was announced.  Cotty acted as a

direct liaison between Merrill and Lewis and other BOA senior officers.  In addition to Cotty,

according to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal

was announced, quickly put 200 people at the investment bank, including a large financial team,"

to allow BOA to closely monitor Merrill's financial condition.

410.    Merrill's Thain has since corroborated this fact when he testified at his deposition

that BOA executives personally received regular updates concerning Merrill's financial health as

the fourth quarter progressed.  Thain wrote in a January 26, 2009 memo to Merrill employees:

> We were completely transparent with Bank of America.  They
> learned about these losses when we did.  The acting CFO of my
> businesses was Bank of America's former Chief Accounting
> Officer.  They had daily access to our p&l [profit and loss
> statements], our positions and our marks.

411.    Thain further testified in his deposition that Merrill held meetings each Monday to

discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat

in meetings and discussions and was totally up-to-speed on what was happening" throughout the

fourth quarter.

412.    Bank of America has also since admitted its awareness of Merrill's financial condition. A February 8, 2009 *New York Times* article responded that "a Bank of America spokesman said that 'we have not disputed that we were kept informed about the financial condition of the company.'"

413.    Lewis himself has since admitted in both his testimony to Congress and his deposition testimony taken by the New York Attorney General's Office that BOA received detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 15th and that BOA "did have people [at Merrill], and we did know that there were losses. And that was clear both at our company and theirs."

414.    Indeed, Lewis' and the BOA Board's awareness of Merrill's deterioration between the announcement of the merger and the shareholder vote cannot be seriously doubted. According to a September 17, 2009 *Wall Street Journal* article, "Before the shareholder vote, directors participated in weekly conference calls led by Mr. Lewis that included updates from the bank's chief financial officer, Joe Price, on Merrill's estimated fourth-quarter losses, said one person familiar with the calls."

415.    Merrill's losses in October and November 2008 were so significant that senior BOA executives discussed terminating the merger on several occasions. The *Wall Street Journal* reported in a February 5, 2009 article that "shortly before Thanksgiving," BOA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in the merger agreement." This debate among BOA's executives about the applicability of the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote." The New York Attorney

General has since confirmed that these debates concerning the MAC occurred on at least three separate occasions prior to the vote: November 20, December 1, and December 3, 2008.

416.    According to a February 5, 2009 article in the *Wall Street Journal*, the debate about the MAC also included "disagreement inside the bank about whether to tell shareholders about Merrill's losses." The *Wall Street Journal* reporter later explained on *PBS Frontline* that "there were people inside Bank of America who felt like the number was big enough to disclose, that investors should know about this before they vote."

## 2.    BOA, Lewis and the BOA Board Knew About Merrill's Intention To Award Bonuses to Its Senior Managers And Employees Prior to the Consummation of the Merger

417.    Unbeknownst to shareholders and investors, BOA's and Merrill's senior officers spent a large portion of their limited time during the merger discussions negotiating the bonuses that Merrill's senior officers and employees would receive as part of the deal. In fact, Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC. Defendant Lewis was kept apprised of these bonus negotiations through Greg Curl, BOA's Global Corporate Strategic Development and Planning Executive.

418.    *The New York Times* reported in a February 8, 2009 article that during the bonus negotiations "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone." In total, Merrill demanded the right to pay up to $5.8 billion in discretionary year-end and other bonuses to its executives and employees.

419.    Merrill's negotiators also insisted that these bonuses be accelerated in terms of payment such that they would be paid prior to the closing of the merger on January 1, 2009 – after which such bonuses would be subject to BOA management's discretion and less than those

that would be approved by Merrill – and before Merrill's fourth quarter results would become public. This accelerated payment schedule deviated from Merrill's and the rest of Wall Street's common compensation practices and bonus schedules under which bonuses are not even calculated until January – after the close of the fiscal year.

420.    Merrill's 2008 Definitive Proxy bears out this common practice explaining that "pay for performance" was "the core of [Merrill's] compensation policy," and that bonuses were "paid in January for performance in the prior fiscal year."

421.    Ultimately, BOA agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger pursuant to Merrill's Variable Incentive Compensation Program ("VICP"). This staggering amount was equal to 12% of the value of the merger and was actually 26% more than BOA had earned during the first two quarters of 2008. It also equated to 77% of Merrill's record earnings of $7.5 billion for all of 2006; almost 30% of Merrill's total stockholders equity as of December 26, 2008; and over 8% of Merrill's total case as of December 26, 2008. To say it was a material amount is an under-statement.

422.    This amount was even greater than the $5.1 billion Merrill had internally planned to pay prior to the collapse of the financial industry in the fall of 2008.

423.    The acceleration of the bonuses was material to BOA's shareholders because (1) paying bonuses in December meant Merrill executives would be able to collect bonuses regardless of the financial performance of Merrill in 2008; (2) it took away from BOA the ability to reduce or eliminate such bonuses in light of Merrill's horrendous financial performance in 2008; and (3) the payment of such bonuses materially reduced the value shareholders received

incident to the merger insofar as BOA shareholders would be purchasing an asset worth billions less than they thought they had bargained for.

424.    Even while the financial condition of both Merrill and BOA deteriorated subsequently during the tumultuous months of October and November 2008, executives at both companies found time to finalize the billions in bonuses to be paid before the consummation of the merger. According to Thain's deposition testimony, in early November 2008, he and BOA's Chief Administration Officer, Defendant Alphin, jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion. On November 11, 2008, Thain presented the final bonus numbers and accelerated schedule to Merrill's Compensation Committee for review. On November 12, 2008, Thain informed Alphin of the precise dates involved in the accelerated schedule.

425.    Throughout the process, BOA's senior executives knew of the size and timing of the bonus payments. As Thain stated to *PBS Frontline*, "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

## G.    Leading Up to and Following the Merrill Acquisition, Revelations about Countrywide and Merrill Continued to Bring Bank of America's Stock Price Down

426.    A December 2, 2008 Citi Investment Research report on Bank of America stated that "Combined BAC and MER held $56 bil of 'high risk' assets as of 9/30/08. We see $1.5 bil in BAC-stand alone marks and another $3.6 bil in fair value losses on on MER's risk positions, given the swift decline in capital markets during 4Q[08]." The report further noted that Bank of America listed "level 3 assets of $60 billion – including $17 bill in Countrywide mortgage servicing rights." Citi rated Bank of America stock as "'High Risk,' largely because of … its

exposure to high-risk' businesses." As the report continued under the caption "Merrill

Lynch/Countrywide integration and litigation risk":

> The Countrywide acquisition closed in 2Q08. This transaction
> presents integration risks given the volatile state of the mortgage
> market. In addition, there is litigation risk attached to Countrywide
> related to mortgage lending practices. Merrill Lynch is expected to
> close by the end of 2008. Like any large scale transaction, this
> deal presents execution risk.

427.    UBS Investment Research's December 4, 2008 estimated zero profit for Bank of

America in 4Q08 based in "our estimate of nearly $9 billion of hits at BAC stand alone related to

credit ($7b provision expense) and mark to market hits ($1.5b-2b)." UBS also believed that

"another dividend cut is possible."

428.    On December 15, 2008, with Bank of America stock trading at $14.93, Friedman,

Billings, Ramsey & Co. ("FBR") issued a report on the Company. FBR "recommend[ed] that

investors stay away from this stock," citing, among other things, concerns that the Company was

undercapitalized and over-leveraged, and the fact that "[o]ver the past four quarters, Merrill

Lynch, Countrywide, and Bank of America lost approximately $23 billion combined." FBR did

"not consider the marks Bank of America took on Countrywide's loan portfolio adequate, and

we suspect that Bank of America's brief due diligence on Merrill Lynch was insufficient to

understand the risk exposures embedded in the balance sheet."

429.    Despite his knowledge of Merrill Lynch's staggering losses, and without

revealing them to shareholders or employee-Plan participants, Lewis forged ahead with the deal.

On January 1, 2009, BOA completed its purchase of Merrill Lynch. Defendant Lewis was still

positive on the closing of the merger, stating, "We are now uniquely positioned to win market

share and expand our leadership position in new markets around the world."

430.     Deutsche Bank's January 5, 2009 report lowered its earnings estimates for Bank

of America in 2009, "reflecting higher loss rates and lower revenues than previously expected."

As the report continued:

> Company-wide specific downside risks include merger integration
> issues (with both Countrywide and Merrill Lynch acquisitions),
> credit risk (consumer credit, commercial credit, and country risk;
> both positive and negative trends), market and interest-rate risk
> (which materially impact assets and liabilities, such as mortgage
> servicing assets), and operational risks (processing,
> compliance/legal etc.).

With respect to "Valuation," the Deutsch Bank analyst stated:

> We believe the valuation of Bank of America reflects merger
> integration risks associated with the recently closed Merrill Lynch
> acquisition (closed on Dec. 31, 2008) and the recently completed
> Countrywide deal (closed July 1, 2008) along with macroeconomic
> and industry headwinds, such as a slowing U.S. economy, higher
> unemployment, ongoing declines in U.S. home values, and
> potential ongoing disruptions in global capital markets esp. in U.S.
> fixed income.

With respect to "Risks," the report stated:

> Company-specific downside risks include merger related
> integration risks associated with the Merrill Lynch acquisition
> (close Dec. '08) and Countrywide (close July '08), credit risk
> (consumer credit, commercial credit, and country risk), market and
> interest-rate risks (which adds to mortgage servicing rights
> volatility), and operational risks (besides integration issues, BofA
> has large securities and payments processing businesses).

431.     On January 15, 2009, after widespread reporting of an impending bailout of Bank

of America necessitated by the Merrill Lynch acquisition, Bank of America announced that it

would move up its quarterly earnings report.

432.     On January 16, 2009, Bank of America announced a fourth-quarter loss of $1.7

billion, and revealed that Merrill Lynch had $15.31 billion in losses for the quarter. This was

BOA's first quarterly loss since 1991.

433.   As a result of these losses and a desperate need for capital, the Company

announced that it would cut its quarterly dividend from 32 cents per share to a *de minimis*

amount of one cent per share.

434.   As Stuart Plesser, equity analyst at Standard & Poor's Corp. put it, "From day one

of the Merrill deal, their capital levels were thin.  Ken Lewis wanted it so badly, he put any

concerns aside."

435.   The January 16 press release further announced that:

> In view of the continuing severe conditions in the markets and
> economy, the U.S. government agreed to assist in the Merrill
> acquisition by making a further investment in Bank of America of
> $20 billion in preferred stock carrying an 8 percent dividend rate.
>
> In addition, the government has agreed to provide protection
> against further losses on $118 billion in selected capital markets
> exposure, primarily from the former Merrill Lynch portfolio.
> Under the agreement, Bank of America would cover the first $10
> billion in losses and the government would cover 90 percent of any
> subsequent losses.  Bank of America would pay a premium of 3.4
> percent of those assets for this program.

436.   Among Merrill Lynch's fourth-quarter losses and write-downs that Bank of

America reported in its January 16 press release were the following:  (i) $1.92 billion in

leveraged loan write-downs; (ii) $2.31 billion in impairment to goodwill; (iii) $3.22 billion in

credit valuation adjustments resulting from monoline financial guarantor exposures; (iv) $1.16

billion in write-downs to its U.S. Bank Investments Securities Portfolio; and (v) $1.1 billion in

commercial real estate write-downs.

437.   As *The New York Times* reported in a January 18, 2009 article titled "The End of

Banking as We Know It," "Bank of America – another serial acquirer of troubled financial

institutions – Merrill Lynch and Countrywide Financial most recently – fessed up that its deals

now need taxpayer backing.  The United States government invested an additional $20 billion in

Bank of America (after $25 billion last fall) and agreed to guarantee more than $100 billion of

imperiled assets."

438.    In a January 16, 2009 conference call with analysts discussing the Company's

fourth quarter and yearly earnings for 2008, Defendant Lewis revealed for the first time that the

deteriorating conditions at Merrill Lynch had led him to consider scrapping the deal. Defendant

Lewis also disclosed for the first time that he informed the federal government in mid-December

that, without billions in additional aid, Bank of America would be unable to consummate the

acquisition.

439.    In a January 16, 2009 Comment captioned, "First Take: Self-inflicted wounds,"

Goldman Sachs reported as follows:

> Merrill Lynch has significantly weakened the already-tight capital
> position of Bank of America. As a result, BAC is receiving a loss-
> sharing agreement from the government, receiving another capital
> injection, and cutting the dividend to a penny. Specifically:
>
> (1) BAC standalone was pretty bad, but not horrendous – BAC
> lost $0.48 vs. consensus of an $0.08 gain due to $4.6 bn of write-
> downs and $8.4 billion of provisions....
>
> (2) Merrill was much, much worse than expected – Merrill lost
> $15 bn. 3X worse than last quarter. To put $15 bn after-tax in
> perspective, 60% of the common equity base of the company was
> lost in one quarter.
>
> (3) As a result, Bank of America's pro forma capital position
> became very thin (2.6% tangible common post Merrill).
>
> (4) This necessitated another round of government money. BAC
> gets another $20 bn of preferred and loss sharing on $118 bn of
> assets (BAC takes the first $10 bn of losses, after that 90% of
> losses taken by the government).

440.    The January 17, 2009 *Wall Street Journal* article captioned "Crisis on Wall Street:

Bank of America Goes on Offense – Stock Tanks on Quarterly Loss, Details of Latest Bailout;

Employees Angry," reported that "[i]nvestors sent the stock down 14% on Friday, to $7.18," and

quoted an investment analyst as stating that Defendant Lewis "has very little credibility with the investor public right now."

441.    Other analysts and investment managers concurred. Jon Fisher, who managed a $1.5 billion portfolio at Fifth Third Asset Management, stated that Mr. Lewis had "made so many just grossly wrong projections or statements in the public press over the last 18 months." Independent bank analyst Nancy Bush expressed disappointment that "Ken Lewis didn't take responsibility for what has happened with Merrill Lynch and Countrywide." *See* "Lewis's Merrill, Countrywide Buys May Hurt Him, Bank of America," *Bloomberg.com* (Jan. 17, 2008).

442.    The Board of Directors came under fire for not evaluating the risks of the Countrywide and Merrill Lynch acquisitions. According to Richard Ferlauto, director of corporate governance and pension investment at the American Federation of State, County and Municipal Employees, "The board has got to be the brake on the CEO. [The Merrill Lynch acquisition] was a bad deal. After the Countrywide transaction, we thought that Bank of America was in no position to take on more troubled assets." *See id.*

443.    According to a January 17, 2009 article in the *Wall Street Journal* captioned "Crisis on Wall Street: Bank of America Goes on Offense – Stock Tanks on Quarterly Loss, Details of Latest Bailout; Employees Angry," *even after* the truth about the disastrous state of Merrill Lynch began to come out, the Company issued a memo to employee-Participants on January 15, 2009 titled "Bank of America Remains Strong."

444.    In the January 15 memo, Defendant Lewis told employee-Plan participants that, among other things: "The core of our company, Bank of America, remains strong. We are one of the world's leading financial institutions with broad earnings diversity and a large growing deposit base." As reasons for optimism, Defendant Lewis cited increases in retail and

commercial deposits, as well as the claim that Bank of America serves "one out of every two American households, helping them navigate these challenging times." Further, Defendant Lewis stated, "We remain focused on providing associates with a great work environment, opportunities and world-class benefits. And we remain focused on delivering strong results, as we have in past decades and will in the future."

445.    Hence, even as he sat poised to deliver the news that would send BAC stock – and the Plan participants' massive holdings of the stock – into a tailspin, Defendant Lewis assured employee-Plan participants that all was well.

446.    On January 20, 2009, based on the new information revealed by Bank of America in connection with the Merrill Lynch transaction, analysts opined that Bank of America would need to raise an additional $80 billion to restore its capitalization to adequate levels.

447.    These stunning revelations caused the price of the Plans' largest holding, BAC stock, to plunge from a closing price of $10.20 per share on January 14, 2009 to a closing price of $5.10 per share on January 20, 2009 – a decline of 50% in a single week.

448.    A January 23, 2009 article in the *Wall Street Journal* captioned "Thain Ousted in Clash at Bank of America: Surprise Losses at Merrill Unit Led to Former Chief's Fall; Pressure is Seen Mounting on CEO Lewis Over Soured Deals" reported that former Merrill Lynch CEO John Thain (who had initially been retained by Bank of America to stay on after the acquisition) was ousted because of his handling of the fourth quarter losses and questions swirling about the massive bonuses he and other Merrill Lynch executives received at the end of 2008. The article further reported that: "Investors and analysts are angry that Bank of America failed to disclose Merrill's problems before the acquisition was completed on January 1. The stock is down 83% since the Merrill deal was announced."

449.    A January 27, 2009 *Wall Street Journal* article captioned "Thain Fires Back at Bank of America" reported Mr. Thain's assertions that Bank of America learned about the fourth-quarter losses at the same time Merrill Lynch did, and that there was complete transparency between Merrill Lynch and Bank of America in the months leading up to the consummation of the acquisition.

450.    A January 27, 2009 *New York Times* article captioned "Breakingviews.com" reported that "Deal making by the chief executive, Ken Lewis, has made [Bank of America] a de facto repository for all manner of toxic assets.... The bank has not merely had to ask for a second, dilutive helping of the Treasury's Trouble Asset Relief Program and suspend its dividend. It has led to one of the greatest destructions of shareholder value in financial history."

451.    According to a January 29, 2009 *Wall Street Journal* article captioned "Merrill Bonus Cases Widens as Deal Struggles," "New York Attorney General Andrew Cuomo is expanding the scope of his investigation into bonuses paid by Merrill Lynch .... Mr. Cuomo wants to know why [Bank of America] didn't publicly disclose that Merrill's condition was deteriorating." The article continued:

> "We plan to look at the fiduciary duty of these two men [Lewis and Thain] and others at various points in this saga," the person familiar with the investigation said Wednesday. "Looking at Bank of America, if they did a bad deal and didn't tell anyone, it not only hurt shareholders, it hurt taxpayers because of the government funding that has been extended to the bank."

452.    Defendants' fiduciary breaches have also caused the Plans and their participants to suffer hundreds of millions of dollars in losses.

453.    In early February of 2009, Friedman, Billing, Ramsey & Co. analyst Paul Miller told *The New York Post* that Bank of America could end up reporting losses of as much as $33 billion as a result of the Countrywide acquisition.

454.    A March 2, 2009 report by Citigroup Global Markets, Inc., estimated that Bank of

America would suffer an astounding $165 billion in cumulative losses through the year 2010.

## XII.    THE LAW UNDER ERISA

455.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

456.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part:

> [A]ny person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties imposed
> upon fiduciaries by this subchapter shall be personally liable to
> make good to such plan any losses to the plan resulting from each
> such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan
> by the fiduciary, and shall be subject to such other equitable or
> remedial relief as the court may deem appropriate, including
> removal of such fiduciary.

457.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to

seek equitable relief from Defendants, including, without limitation, injunctive relief and, as

available under applicable law, constructive trust, restitution, and other monetary relief.

458.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

459.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Chao*

*v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002).  They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and

continually to monitor, the merits of all the investment alternatives of a plan, including in this

instance the Common Stock Fund which invested in BAC stock, to ensure that each investment

is a suitable option for the Plans;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when

they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan

sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty

not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know

that silence might be harmful; and (3) a duty to convey complete and accurate information

material to the circumstances of participants and beneficiaries.

460.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (1) if
> he participates knowingly in, or knowingly undertakes to conceal,
> an act or omission of such other fiduciary, knowing such act or
> omission is a breach; (2) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (3) if he
> has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the
> breach.

461.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be,

as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company

stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The

result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely

knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has
> committed a breach, and the first fiduciary knows that this is a
> breach, the first fiduciary must take reasonable steps under the
> circumstances to remedy the breach. … [T]he most appropriate
> steps in the circumstances may be to notify the plan sponsor of the
> breach, or to proceed to an appropriate Federal court for
> instructions, or bring the matter to the attention of the Secretary of
> Labor. The proper remedy is to be determined by the facts and
> circumstances of the particular case, and it may be affected by the
> relationship of the fiduciary to the plan and to the co-fiduciary, the
> duties and responsibilities of the fiduciary in question, and the
> nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

462.   Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for

plan-wide relief under ERISA § 409(a) to recover losses sustained by the 401(k) Plans arising

out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1)

and ERISA § 405(a), and to restore the Pension Plan benefits that were wiped out because of the

same fiduciary breaches.

## XIII.   ERISA § 404(C) DEFENSE INAPPLICABLE

463.   ERISA § 404(c) is an affirmative defense that provides a limited exception to

fiduciary liability for losses that result from participants' exercise of control over investment

decisions in 401(k) plans. In order for § 404(c) to apply, participants must in fact exercise

"independent control" over investment decisions, and the fiduciaries must otherwise satisfy the

numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and

the regulations promulgated under it.

464.    ERISA § 404(c) does not apply here for multiple reasons.

465.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to continue offering BAC stock as an investment option in the 401(k) Plans as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at \*46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

466.    Secondly, even as to participant-directed investment in BAC stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding BAC stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the 401(k) Plans' assets that were invested in BAC stock as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

467.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the 401(k) Plans, the Plaintiffs and the Class for losses caused by the Plans' investment in BAC stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## XIV.  CLAIMS FOR RELIEF

### Count I:  Failure to Prudently and Loyally Manage the 401(k) Plans and Their Assets

468.    Plaintiffs incorporate by this reference the paragraphs above.

469.    This Count alleges fiduciary breach against the following Defendants:  BOA and the Benefits Committee Defendants (the "Prudence Defendants").

470.    This Count is brought on behalf of the 401(k) Plan Classes, which includes participants and beneficiaries of (i) the Bank of America 401(k) Plan; (ii) the Legacy 401(k) Plan and (iii) the Countrywide 401(k) Plan (collectively, the "401(k) Plans").

471.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

472.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the 401(k) Plans for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  As such, the Prudence Defendants were directly responsible for, among other things, selecting prudent investment options and eliminating imprudent options.  They were also responsible for overseeing the management of the Plan's trust fund and periodically reviewing the performance of the funds and investment managers.  As alleged previously, Defendant BOA exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other Prudence Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing documents to the other Prudence Defendants, without relieving them of any such responsibility.  In carrying out

their responsibilities, the Prudence Defendants were required to evaluate the merits of the Plans'
investments on an ongoing basis and take all necessary steps to ensure that the Plans' assets were
invested prudently.

473. Yet, contrary to their duties and obligations under ERISA, the Prudence
Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, during
the Class Period, these Defendants knew or should have known that BAC common stock no
longer was a suitable and appropriate investment for the Plans, but was, instead, a highly
speculative and risky investment in light of the Company's financial problems and lack of
liquidity, its serious mismanagement in committing to the Countrywide and Merrill Lynch
acquisitions, the Company's resultant dire financial circumstances, and the imminent risk of
collapse of BAC stock as a result thereof. Nonetheless, during the Class Period, these
Defendants continued to offer BAC stock as an investment option for participant contributions.
They did so despite mounting evidence that the Company's acquisitions of Countrywide and
Merrill Lynch, together with its other mounting financial problems, were disastrous and would
lead to overexposure to high-risk mortgage-backed securities, write-downs of commercial
property and leveraged loans, and losses tied to credit bets, and that (from at least the time of the
announcement of the proposed Countrywide acquisition) the price of BAC stock was artificially
inflated as a result of the failure of the Defendants to provide complete and accurate information
to Plan participants and the market generally.

474. The Prudence Defendants were obliged to prudently and loyally manage all of the
Plans' assets. However, their duties of prudence and loyalty were especially significant with
respect to Company stock because: (a) company stock is a particularly risky and volatile
investment, even in the absence of company misconduct; (b) participants tend to underestimate

the likely risk and overestimate the likely return of investment in company stock; and (c) Company stock was the largest holding of the 401(k) Plans. In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

475. Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in BAC stock even in light of the losses, the Company's, Countrywide's, and Merrill Lynch's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plans. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in BAC stock under these circumstances.

476. The Prudence Defendants' decisions respecting the Plans' investment in BAC stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in BAC stock was in keeping with the Plan settlors' expectations of how a prudent fiduciary would operate.

477. The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

478.    According to DOL regulations and case law interpreting this statutory provision, a
fiduciary's investment or investment course of action is prudent if (a) he has given appropriate
consideration to those facts and circumstances that, given the scope of such fiduciary's
investment duties, the fiduciary knows or should know are relevant to the particular investment
or investment course of action involved, including the role the investment or investment course
of action plays in that portion of the plan's investment portfolio with respect to which the
fiduciary has investment duties; and (b) he has acted accordingly.

479.    Again, according to DOL regulations, "appropriate consideration" in this context
includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment
  course of action is reasonably designed, as part of the portfolio (or, where
  applicable, that portion of the plan portfolio with respect to which the fiduciary
  has investment duties), to further the purposes of the plan, taking into
  consideration the risk of loss and the opportunity for gain (or other return)
  associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the
  portfolio:

  o The composition of the portfolio with regard to diversification;

  o The liquidity and current return of the portfolio relative to the anticipated
    cash flow requirements of the plan; and

  o The projected return of the portfolio relative to the funding objectives of
    the plan.

480.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in BAC stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made Company stock an extremely risky and imprudent investment for the Plan:  (a) the Company's pre-Class Period acquisition spree, which severely compromised the Company by the start of the Class Period; (b) the Company's ill-conceived decision to acquire Countrywide, which consisted of a massive collection of toxic assets and unlimited liability; (c) the Company's ill-conceived decision to acquire Merrill Lynch (after already diving head first into the subprime crisis by purchasing Countrywide); (d) the Company's knowledge of the undisclosed and vast magnitude of Merrill Lynch's financial problems; and (e) the Company's failure to disclose the massive losses it would take on by acquiring Countrywide and Merrill Lynch;

- The risk associated with the investment in BAC stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plans' participants did not
  know it, the Prudence Defendants had a duty to avoid permitting the Plans or any
  participant from investing the Plans' assets in BAC stock; and

- Further, knowing that the Plans were not diversified portfolios, but were
  significantly invested in Company stock, the Prudence Defendants had a
  heightened responsibility to divest the Plans of Company stock if it became
  imprudent.

481.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts
of interest and to resolve them promptly when they occur. A fiduciary must always administer a
plan with single-minded devotion to the interests of the participants and beneficiaries, regardless
of the interests of the fiduciaries themselves or the plan sponsor. Upon information and belief,
the compensation and tenure of the Prudence Defendants was tied to the performance of BAC
stock and/or the publicly reported financial performance of BOA. Fiduciaries laboring under
such conflicts must, in order to comply with the duty of loyalty, make special efforts to assure
that their decision-making process is untainted by the conflict and made in a disinterested
fashion, typically by seeking independent financial and legal advice obtained on behalf of the
plan.

482.    The Prudence Defendants breached their duty to avoid conflicts of interest and to
promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could
make independent judgments concerning the Plans' investment in BAC; failing to notify
appropriate federal agencies, including the DOL, of the facts and circumstances that made BAC
stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to
ensure that participants' interests were loyally and prudently served; with respect to each of these

above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to BOA's inappropriate practices; and by otherwise placing their own and BOA's interests above the interests of the participants with respect to the Plans' investment in BAC stock.

483.    These Defendants breached their duty of prudence by knowing of, and in some instances participating in, the imprudent acts, and illegal business practices described above while continuing to hold and purchase artificially inflated BAC stock for the Plans.

484.    Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

485.    Thus, even to the extent that the Plans required the fiduciaries to offer BAC stock as an investment option, the Prudence Defendants breached their duty of prudence by continuing to offer BAC stock as an investment option for participant contributions in the Plans, when the Prudence Defendants knew or should have known that BAC stock no longer was a prudent investment for participants' retirement savings.

486.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the

breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

487.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Count II: Failure to Monitor the 401(k) Plans' Fiduciaries

488.    Plaintiffs incorporate by this reference the allegations above.

489.    This Count alleges fiduciary breach against the following Defendants: BOA, the C&B Committee Defendants and the Director Defendants (the "Monitoring Defendants").

490.    This Count is brought on behalf of the 401(k) Plan Classes, which includes participants and beneficiaries of (i) the Bank of America 401(k) Plan; (ii) the Legacy 401(k) Plan and (iii) the Countrywide 401(k) Plan (collectively, the "401(k) Plans").

491.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

492.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries; in particular, BOA, the C&B Committee Defendants and the Director Defendants had this responsibility with respect to the Benefits Committee Defendants, and BOA and the Director Defendants had this responsibility with respect to the C&B Committee Defendants.

493. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

494. The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

495. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

496. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of BOA's highly risky and inappropriate

business practices, and the likely impact of the acquisitions of Countrywide and Merrill Lynch on the value of the Plans' investment in BAC stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in BAC stock despite their knowledge of practices that rendered BAC stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

497.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

498.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the 401(k) Plans' Participants and Beneficiaries

499.    Plaintiffs incorporate by this reference the allegations above.

500.    This Count alleges fiduciary breach against: BOA, the Benefits Committee Defendants, and Defendant Lewis (the "Communications Defendants").

501.    This Count is brought on behalf of the 401(k) Plan Classes, which includes

participants and beneficiaries of (i) the Bank of America 401(k) Plan; (ii) the Legacy 401(k) Plan

and (iii) the Countrywide 401(k) Plan (collectively, the "401(k) Plans").

502.    At all relevant times, as alleged above, Defendants listed in this Count were

fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were

bound by the duties of loyalty, exclusive purpose, and prudence.

503.    At all relevant times, the scope of the fiduciary responsibility of BOA and the

Benefits Committee included the communications and material disclosures to the Plans'

participants and beneficiaries. In addition, Defendant Lewis acted as a *de facto* communicating

fiduciary as a result of his extensive communications directly with employees/Plan participants

regarding the Company and its likely future prospects. Defendant Lewis knew that the

employees' retirement savings were invested significantly in BAC stock in the Plans, his

communications concerned this investment, and, thus, concerned Plan benefits, and constituted

acts of plan administration under ERISA.

504.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

participants, not to mislead them regarding the plan or plan assets, and to disclose information

that participants need in order to exercise their rights and interests under the plan. This duty to

inform participants includes an obligation to provide participants and beneficiaries of the plan

with complete and accurate information, and to refrain from providing false information or

concealing material information, regarding plan investment options so that participants can make

informed decisions with regard to the prudence of investing in such options made available under

the plan. This duty applied to all of the Plans' investment options, including investment in BAC

stock.

505.    Because investments in the Plans were not diversified (*i.e.*, the Defendants allowed the Plans' assets to be invested heavily in BAC stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to BAC stock.

506.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding BOA's serious mismanagement and improper business practices and public misrepresentations, the truly dire situation at Merrill Lynch and Countrywide, and the consequential artificial inflation of the value of BAC stock, and, generally, by conveying incomplete information regarding the soundness of BAC stock and the prudence of investing and holding retirement contributions in BAC equity. These failures were particularly devastating to the Plans and their participants; a large percentage of the Plans' assets were invested in BAC stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

507.    Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plans' investment in BAC stock.

508.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plans' participants.

509.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

510.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,

the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a

significant portion of their retirement investment.

511.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29

U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by

their breaches of fiduciary duties alleged in this Count.

### Count IV:  Co-Fiduciary Liability for Breaches with Respect to the 401(k) Plans and Their Participants and Beneficiaries

512.    Plaintiffs incorporate by this reference the allegations above.

513.    This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary

Defendants").

514.    This Count is brought on behalf of the 401(k) Plan Classes, which includes

participants and beneficiaries of (i) the Bank of America 401(k) Plan; (ii) the Legacy 401(k) Plan

and (iii) the Countrywide 401(k) Plan (collectively, the "401(k) Plans").

515.    As alleged above, during the Class Period, the Co-Fiduciary Defendants were

named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were

bound by the duties of loyalty, exclusive purpose, and prudence.

516.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

fiduciary, in addition to any liability which he may have under any other provision, for a breach

of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a

breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-

Fiduciary Defendants breached all three provisions.

517.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C.

§ 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary

if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts

under the circumstances to remedy the breach. Each Defendant knew of the breaches by the

other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In

particular, they did not communicate their knowledge of the Company's illegal and reckless

activity to the other fiduciaries.

518.    BOA, through its officers and employees, engaged in highly risky and

inappropriate business practices including highly suspect acquisitions, withheld material

information from the market, and profited from such practices, and, thus, knowledge of such

practices is imputed to BOA as a matter of law.

519.    Because Defendants knew of the Company's failures and inappropriate business

practices, they also knew that the Prudence Defendants were breaching their duties by continuing

to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches.

Instead, they compounded them by downplaying the significance of BOA's failed and

inappropriate business practices, and obfuscating the risk that the practices posed to the

Company, and, thus, to the 401(k) Plans.

520.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1),

imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with

respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an

act or omission of such other fiduciary, knowing such act or omission is a breach. BOA

knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited

from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan

participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered BAC stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

521.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

522.    The Monitoring Defendants' failure to monitor the Benefits Committee Defendants and/or the C&B Committee Defendants enabled those Defendants to breach their duties. Defendant BOA's and Defendant Lewis's failure to provide critical information regarding the true risks faced by BOA likewise enabled the C&B Committee Defendants and the Benefits Committee Defendants to breach their duties.

523.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost hundreds of millions of dollars of retirement savings.

524.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Count V: Failure to Insure Prudent Investment Measures in Pension Plan

525.    Plaintiffs incorporate by this reference the paragraphs above.

526.    This Count alleges fiduciary breach against the following Defendants:  BOA and the Benefits Committee Defendants (the "Prudence Defendants").

527.    This Count is brought on behalf of the participants and beneficiaries of the Bank of America Pension Plan.

528.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

529.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. As such, the Prudence Defendants were directly responsible for, among other things, selecting prudent Investment Measures and eliminating imprudent Investment Measures for Plan participants' pre-January 1, 2008 Compensation Credits. As alleged previously, Defendant BOA exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other Prudence Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing documents to the other Prudence Defendants, without relieving them of any such responsibility. In carrying out their responsibilities, the Prudence Defendants were required to evaluate the merits of the Plan's Investment Measures on an ongoing basis and take all necessary steps to ensure that all such measures were prudent.

530.    Yet, contrary to their duties and obligations under ERISA and the Pension Plan, the Prudence Defendants failed to loyally and prudently monitor the available Investment Measures under the Pension Plan. Specifically, during the Class Period, these Defendants knew or should have known that BAC common stock no longer was a suitable and appropriate Investment Measure for Pension Plan participants, but was, instead, a highly speculative and

risky investment in light of the Company's serious mismanagement in, among other things, committing to the Countrywide and Merrill Lynch acquisitions, the Company's resultant dire financial circumstances, and the imminent risk of collapse of BAC stock as a result thereof. Nonetheless, during the Class Period, these Defendants continued to allow BAC stock as an Investment Measure for participants' pre-January 1, 2008 Compensation credits. They did so despite mounting evidence that the Company's acquisitions of Countrywide and Merrill Lynch were disastrous and, together with the Company's other serious financial issues, would lead to overexposure to high-risk mortgage-backed securities, write-downs of commercial property and leveraged loans, and losses tied to credit bets, and that (from the time of the announcement of the proposed Countrywide acquisition) the price of BAC stock was artificially inflated as a result of the failure of the Defendants to provide complete and accurate information to Plan participants and the market generally.

531.    The Prudence Defendants were obliged to prudently and loyally monitor all of the Plan's available Investment Measures. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock; (c) on information and belief Company stock was a widely used Investment Measure by Plan participants; and (d) there was an inherent conflict of interest, in that the Company could actually benefit from the poor performance of Company stock. In view of this, and according to the Pension Plan, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the on-going prudence of Company stock as an Investment Measure for participants' pre-January 1, 2008 Compensation Credits.

532.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of the continued use of BAC stock as an Investment Measure even in light of the losses, the Company's, Countrywide's, and Merrill Lynch's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Pension Plan participants. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to allow BAC stock as an Investment Measure under these circumstances.

533.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

534.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if; (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

535.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary

has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

536. Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to allow the hypothetical investment of Plan participant's assets in BAC stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent Investment Measure for Plan participants: (a) the Company's pre-Class Period acquisition spree, which severely compromised the Company by the start of the Class Period; (b) the Company's ill-conceived decision to acquire Countrywide, which consisted of a massive collection of toxic assets and unlimited liability; (c) the Company's ill-conceived decision to acquire Merrill Lynch (after already diving head first into the subprime crisis by purchasing Countrywide); (d) the Company's knowledge of the undisclosed and vast magnitude of Merrill Lynch's financial problems; and (e) the Company's

failure to disclose the massive losses it would take on by acquiring Countrywide
and Merrill Lynch;

- The risk associated with the investment in BAC stock during the Class Period was
  far above and beyond the normal, acceptable risk associated with investment in
  company stock;

- This abnormal investment risk could not have been known by the Plan's
  participants, and the Prudence Defendants knew that it was unknown to them (as
  it was to the market generally), because the fiduciaries never disclosed it;

Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the
Prudence Defendants had a duty to prevent Plan participants from using BAC stock as an
Investment Measure.

537.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts
of interest and to resolve them promptly when they occur. A fiduciary must always administer a
plan with single-minded devotion to the interests of the participants and beneficiaries, regardless
of the interests of the fiduciaries themselves or the plan sponsor. As detailed above, the
Company would actually benefit to the extent that the actual Pension Plan investment vehicles
generated higher returns than the hypothetical Investment Measures chosen by Plan participants.
Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make
special efforts to assure that their decision-making process is untainted by the conflict and made
in a disinterested fashion, typically by seeking independent financial and legal advice obtained
only on behalf of the plan.

538.   The Prudence Defendants breached their duty to avoid conflicts of interest and to
promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could

make independent judgments concerning Plan participants' use of BAC stock as an Investment Measure; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made BAC stock an unsuitable Investment Measure for Plan participants; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by otherwise placing their own and BOA's interests above the interests of the participants with respect to the Plan's use of BAC stock as an Investment Measure.

539.    These Defendants breached their duty of prudence by knowing of, and in some instances participating in, the imprudent acts, and illegal business practices described above while continuing to allow the use of BAC stock as an Investment Measure for Plan participants' accounts.

540.    Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

541.    Thus, even to the extent that the Plan required the fiduciaries to offer BAC stock as an Investment Measure, the Prudence Defendants breached their duty of prudence by continuing to offer BAC stock as an Investment Measure for participants' Plan accounts, when the Prudence Defendants knew or should have known that BAC stock no longer was a prudent Investment Measure for participants' retirement funds.

542.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, Plaintiffs and Class Members have been greatly harmed; their Pension Plan benefits will be lower because of the imprudent use of BAC stock as an Investment Measure.  If the Prudence Defendants had discharged their fiduciary duties, Plaintiffs' and Class Members' Pension Plan benefits would have been tied to a prudent Investment Measure.

543.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to remedy the harm caused to Pension Plan participants whose accounts used BAC stock as an Investment Measure by recalculating the Pension Plan benefits as though they were at all times tied to a prudent Investment Measure.

### Count VI:  Failure to Monitor Pension Plan Fiduciaries

544.    Plaintiffs incorporate by this reference the allegations above.

545.    This Count alleges fiduciary breach against the following Defendants:  BOA, the C&B Committee Defendants, and the Director Defendants (the "Monitoring Defendants").

546.    This Count is brought on behalf of the participants and beneficiaries of the Bank of America Pension Plan.

547.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

548.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries; in particular, BOA, the C&B Committee Defendants and the Director Defendants had this responsibility with respect to the Benefits Committee Defendants,

and BOA and the Director Defendants had this responsibility with respect to the C&B
Committee Defendants.

549.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries
are performing their fiduciary obligations, including those with respect to the investment and
holding of plan assets, and must take prompt and effective action to protect the plan and
participants when they are not.

550.     The monitoring duty further requires that appointing fiduciaries have procedures
in place so that on an ongoing basis they may review and evaluate whether the "hands-on"
fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work
and the plan's performance, and by ensuring that they have a prudent process for obtaining the
information and resources they need). In the absence of a sensible process for monitoring their
appointees, the appointing fiduciaries would have no basis for prudently concluding that their
appointees were faithfully and effectively performing their obligations to plan participants or for
deciding whether to retain or remove them.

551.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with
complete and accurate information in their possession that they know or reasonably should know
that the monitored fiduciaries must have in order to prudently manage the plan and the plan
assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions
regarding the plan.

552.     The Monitoring Defendants breached their fiduciary monitoring duties by, among
other things: (a) failing, at least with respect to the Pension Plan's allowance of Company stock
as an Investment Measure, to monitor their appointees, to evaluate their performance, or to have
any system in place for doing so, and standing idly by as the Pension Plan Participants suffered

enormous losses as a result of their appointees' imprudent actions and inaction with respect to

Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of

BOA's highly risky and inappropriate business practices, and the likely impact of the

acquisitions of Countrywide and Merrill Lynch on the value of the Plan participants'

hypothetical investment in BAC stock; (c) to the extent any appointee lacked such information,

failing to provide complete and accurate information to all of their appointees such that they

could make sufficiently informed fiduciary decisions with respect to the Plan's available

Investment Measures; and (d) failing to remove appointees whose performance was inadequate

in that they continued to offer BAC stock as an Investment Measure despite their knowledge of

practices that rendered BAC stock an imprudent Investment  Measure during the Class Period for

participants' Pension Plan accounts, and who breached their fiduciary duties under ERISA.

553.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty,

Plaintiffs and the Class have been greatly harmed; their Pension Plan benefits will be lower

because of the imprudent use of BAC stock as an Investment Measure.  If the Monitoring

Defendants had discharged their fiduciary monitoring duties as described above, the harm to Plan

participants' pension benefits would have been minimized or avoided.

554.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

& (a)(3), the Monitoring Defendants are liable to remedy the harm caused to Pension Plan

participants whose accounts used BAC stock as an Investment Measure by recalculating the

Pension Plan benefits as though they were at all times tied to a prudent Investment Measure.

### Count VII: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the 401(k) Plan's Participants and Beneficiaries

555.    Plaintiffs incorporate by this reference the allegations above.

556.    This Count alleges fiduciary breach against: BOA, the Benefits Committee Defendants, and Defendant Lewis (the "Communications Defendants").

557.    This Count is brought on behalf of the participants and beneficiaries of the Bank of America Pension Plan.

558.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

559.    At all relevant times, the scope of the fiduciary responsibility of BOA and the Benefits Committee included the communications and material disclosures to the Pension Plan's participants and beneficiaries. In addition, Defendant Lewis acted as a *de facto* communicating fiduciary as a result of his extensive communications directly with employees/Plan participants regarding the Company and its likely future prospects. Defendant Lewis knew that the employees' Pension Plan benefits were significantly linked with the performance of BAC stock as an Investment Measure, his communications concerned BAC stock, and, thus, concerned Plan benefits, and constituted acts of Plan administration under ERISA.

560.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan benefits, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants included an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan Investment Measures so that participants can make informed decisions with regard to the prudence of using such Investment Measures as were

made available under the Pension Plan. This duty applies to all of the Plan's Investment Measures, including BAC stock.

561.    Because the Investment Measures in the Pension Plan were not diversified (*i.e.* the Defendants allowed the Plan Participants' benefits to be tied heavily to the performance of BAC stock), the use of such Investment Measure carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to BAC stock.

562.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding BOA's serious mismanagement and improper business practices and public misrepresentations, the truly dire condition of the Countrywide and Merrill Lynch assets that BOA was acquiring, the consequential artificial inflation of the value of BAC stock, and, generally, by conveying incomplete information regarding the soundness of BAC stock and the prudence of tying retirement funds to the performance of BAC equity. These failures were particularly devastating to the Plan and its participants; a large percentage of the Plan participants' benefits were tied to the performance of BAC stock during the Class Period and, thus, the decline of BAC stock had a significant impact on the value of participants' retirement assets.

563.    Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by using BAC stock as an Investment Measure.

564.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plan's participants.

565.    As a consequence of the Defendants' breaches of fiduciary duty, Plaintiffs and the

Class have been greatly harmed. Plaintiffs and Class Members' Pension Plan benefits will be

lower because of the imprudent use of BAC stock as an Investment Measure. If the Defendants

had discharged their fiduciary monitoring duties as described above, the harm to Plan

participants' pension benefits would have been minimized or avoided.

566.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

& (a)(3), the Defendants are liable to remedy the harm caused to Pension Plan participants whose

accounts used BAC stock as an Investment Measure by recalculating the Pension Plan benefits as

though they were at all times tied to a prudent Investment Measure.

## Count VIII:   Co-Fiduciary Liability for Breaches with Respect to the Pension Plan
## And Its Participants and Beneficiaries

567.    Plaintiffs incorporate by this reference the allegations above.

568.    This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary

Defendants").

569.    This Count is brought on behalf of the participants and beneficiaries of the Bank

of America Pension Plan.

570.    As alleged above, during the Class Period the Co-Fiduciary Defendants were

named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were

bound by the duties of loyalty, exclusive purpose, and prudence.

571.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

fiduciary, in addition to any liability which he may have under any other provision, for a breach

of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a

breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

572. **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

573. BOA, through its officers and employees, engaged in highly risky and inappropriate business practices including the consummation of highly suspect acquisitions, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to BOA as a matter of law.

574. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to offer Company stock as an Investment Measure for the Pension Plan. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of BOA's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

575. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. BOA

knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the losses suffered by Pension Plan participants who tied their benefits to the performance of Company stock.  Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered BAC stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.

576.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

577.    The Monitoring Defendants' failure to monitor the Benefits Committee Defendants and/or the C&B Committee Defendants enabled those Defendants to breach their duties.  Defendant BOA's and Defendant Lewis's failure to provide critical information regarding the true risks faced by BOA likewise enabled the Benefits Committee Defendants to breach their duties.

578.    As a consequence of the Defendants' breaches of co-fiduciary duty, Plaintiffs and the Class have been greatly harmed in that their Pension Plan benefits will be lower because of the imprudent use of BAC stock as an Investment Measure.  If the Defendants had discharged their co-fiduciary duties as described above, the harm to Plan participants' pension benefits would have been minimized or avoided.

579.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Defendants are liable to remedy the harm caused to Pension Plan participants whose

accounts used BAC stock as an Investment Measure by recalculating the Pension Plan benefits as though they were at all times tied to a prudent Investment Measure.

## XV. REMEDY FOR BREACHES OF FIDUCIARY DUTY

580. The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the 401(k) Plans' assets should not have been invested in BAC stock during the Class Period, and the Pension Plan participants' benefits should not have been tied to the performance of BAC stock.

581. As a consequence of the Defendants' breaches, the Plans and their participants suffered significant losses.

582. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan …." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

583. ERISA § 503(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a plan participant to bring a civil action to enjoin any act or practice which violates any portion of ERISA or to obtain other appropriate equitable relief to remedy such violation or to enforce any portion of ERISA.

584. With respect to calculation of the losses to the 401(k) Plans and the harm to the Pension Plan participants, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the 401(k) Plan would not have made or maintained its investments in the challenged investment and the Pension Plan participants would not have tied their benefits to the performance of BAC stock. In this way, the remedies will restore the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

585.    Plaintiffs and the 401(k) Classes are therefore entitled to relief from the

Defendants in the form of:  (a) a monetary payment to the Plans to make good to the 401(k) Plan

the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount

to be proven at trial, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and

other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA

§§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other

appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing

participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses,

as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other

applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such

other legal or equitable relief as may be just and proper.

586.    Plaintiffs and the Pension Plan Class are entitled to relief in the form of an order

pursuance to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), compelling Defendants to recalculate

the Pension Plan benefits of Plaintiffs and Class Members whose Pension Plan benefits were tied

to the performance of Bank of America as an Investment Measure though those benefits had

been tied to a prudent Investment Measure.

587.    Under ERISA, each Defendant is jointly and severally liable for the losses and the

harm suffered by the Plans in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA

fiduciary duties to the Plans' participants and beneficiaries;

B.    A Declaration that the Defendants, and each of them, are not entitled to the

protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the 401(k) Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the 401(k) Plans' investment in BAC stock;

E.     Actual damages in the amount of any losses the 401(k) Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order compelling Defendants to recalculate the Pension Plan benefits of Plaintiffs and Class Members whose Pension Plan benefits were tied to the performance of Bank of America as an Investment Measure though those benefits had been tied to a prudent Investment Measure.

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: October 9, 2009

HARWOOD FEFFER LLP

By: ~~Robert I. Harwood~~

Robert I. Harwood
Peter W. Overs, Jr.
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
Andrew M. Volk (*pro hac vice*)
Nick Styant-Browne (*pro hac vice*)
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Lee Squitieri
Caitlin Duffy
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 241-6553

*Interim Co-Lead Attorneys for Plaintiffs and the
Proposed Class*

Major Kahn
MAJOR KHAN LLC
20 Bellevue Street
Weehawken , NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

Christopher Lometti
COHEN MILSTEIN SELLERS & TOLL PLLC
150 East 52nd Street, 30th Floor
New York, NY 10019
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven E. Fineman (SF 8481)
Rachel Geman (RG 0998)
LIEFF CABRASER HEIMANN &

BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Jeffrey G. Lewis
Teresa Renaker
Margaret Hasselman
LEWIS, FEINBERG, LEE,
RENAKER & JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, CA 94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839

Geraldine Sumter
C. Margaret Errington
FERGUSON, STEIN, CHAMBERS
GRESHAM & SUMTER, P.A.
741 Kenilworth Avenue, Suite 300
Charlotte NC 28204
Telephone: (704) 375-8461
Facsimile: (704) 334-5654

Jack A. Raisner (JR 6171)
OUTTEN & GOLDEN, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

Edwin J. Mills (EM 7117)
Michael J. Klein (MK 8187)
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Facsimile: (212) 490-2022

Athanasios Basdekis (AB 2574)
Brian A. Glasser
Michael L. Murphy
BAILEY AND GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

Gregory A. Porter
BAILEY AND GLASSER LLP
601 Pennsylvania Ave. NW
Washington, DC 20002
Telephone: (202) 543-0226
Facsimile: (202) 434-8252

Todd M. Schneider
Mark T. Johnson
SCHNEIDER, WALLACE, COTTRELL,
BRAYTON, KONECKY, LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Garrett W. Wotkyns
SCHNEIDER, WALLACE, COTTRELL,
BRAYTON, KONECKY, LLP
7702 E. Doubletree Ranch Rd., Suite 300
Scottsdale, AZ 85258
Telephone: (480) 607-4368
Facsimile: (480) 348-3999

Brian P. Murray (BM 9954)
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, Suite 801
New York, New York 10016-1101
Telephone: (212) 681-1818
Facsimile: (212) 682-1892

Francis A. Bottini, Jr.
Frank J. Johnson
Brett M. Weaver
JOHNSON BOTTINI, LLP
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535

Thomas J. McKenna
GAINEY & McKENNA
295 Madison Avenue, 4th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383

*Additional Counsel for the Proposed Class*