**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE BANK OF AMERICA CORP. |
| SECURITIES, DERIVATIVE AND |
| EMPLOYMENT RETIREMENT INCOME |
| SECURITY ACT (ERISA) LITIGATION |

Master File No. 09 MDL 2058 (DC)

Related File No. 09-CV-5411 (DC)

This document relates to:

All Securities Actions

**PLAINTIFF MICHAEL BAHNMAIER'S INDIVIDUAL**
**AMENDED COMPLAINT FOR VIOLATIONS OF SECURITIES LAW**

Plaintiff Michael R. Bahnmaier ("Plaintiff" or "Bahnmaier") brings this individual securities complaint against Bank of America Corp. ("Bank of America" or the "Company"), Kenneth D. Lewis ("Lewis"), Joe L. Price ("Price"), and Jonathan A. Thain ("Thain"), collectively ("Defendants").[1]  Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bank of America, securities analysts' reports, and advisories about the Company, news articles, publicly available information regarding legal actions and investigations, and information readily available on the internet.  Many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control.  Plaintiff believes that substantial

---

[1] This individual action, No. 09-Civ-5411, has been consolidated with the securities class actions against Bank of America for pretrial proceedings only pursuant to 28 U.S.C. § 1407(a) and Fed. R. Civ. P. 42(a).

1

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. INTRODUCTION

*"What idiots, what kind of idiots are running that bank?"*[2]

1.     This is a securities complaint against Bank of America and certain current and former executive officers of Bank of America and Merrill Lynch.  The claims arise from material misrepresentations and omissions in the Company's proxy statements and other public declarations, regarding, among other things, Bank of America's acquisitions of Countrywide Financial Corporation ("Countrywide") and Merrill Lynch & Co., Inc. ("Merrill Lynch"), made from January 11, 2008 through February 25, 2009 (the "Relevant Period").  This action asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC, which claims seek redress on the basis of negligence and do not sound in fraud.  This action also asserts separate claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder by the SEC, which claims do sound in fraud.  Finally, this action also asserts separate claims under Section 20(a) of the Exchange Act.

2.     During the Relevant Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results.  Defendants failed to expose the potential for litigation resulting from Countrywide's predatory lending practices that would eventually lead to an $8.7 billion settlement.  Defendants hid the fact that Countrywide would put Bank of America's capital levels at risk by adding $30 billion in loan losses to the

---

[2] Peter Cohan, <u>Bank of America heiress says 'idiots' are running the bank</u>, DailyFinance.com, February 26, 2009, quoting Virginia Hammerness, granddaughter of Bank of America founder, A.P. Giannini.

Company's balance sheet.  Defendants also hid Bank of America's failure to engage in proper due diligence in advance of its proposed merger with Merrill Lynch.  Defendants further concealed Bank of America's failure to appropriately value or conduct due diligence on Merrill Lynch's mortgage-related assets, including its "toxic" holdings.  Subsequently, losses reported by Merrill Lynch totaled $36.3 billion in 2007 and 2008, enough to wipe out eleven (11) years of earnings previously reported by the company. Because of Defendants' materially false and misleading statements, Bank of America's stock traded at artificially inflated prices throughout the Relevant Period, reaching $38.13 per share on October 1, 2008, and remaining in the $22-$25 per share range even as the stock market collapsed in early October 2008.  During this time, Bank of America sold 455 million shares of its common stock to the public at $22 per share in a secondary common stock offering on October 10, 2008 (the "Offering"), which raised approximately $10 billion.

3.      As the real estate and credit markets continued to crumble in early 2008, Bank of America announced a merger agreement with Countrywide that would make Bank of America the nation's largest mortgage lender and servicer.  Defendant Lewis praised the agreement as a "rare opportunity" and lauded Countrywide as the industry's "best domestic mortgage platform." Bank of America would acquire Countrywide in an all stock transaction worth approximately $4 billion.

4.      Defendants repeatedly assured Bank of America shareholders that the Company had taken appropriate steps to reduce its exposure to subprime mortgages.  In June 2008, Bank of America's stock price began to decline as investors remained concerned that Bank of America would be required to take major write-offs due to its subprime exposure, much of which came as a result of the merger with Countrywide.

5.     On June 25, 2008, Illinois State Attorney General, Lisa Madigan, and California State Attorney General Jerry Brown, filed lawsuits against Countrywide.  The suits sought to recover damages from Countrywide for unfair and deceptive practices, violation of false advertising laws, and unfair business practices.  On July 1, 2008, Florida Attorney General Bill McCollum filed a similar lawsuit.

6.     On July 1, 2008, Bank of America's deal to acquire Countrywide closed, despite the fact there were numerous state investigations and these lawsuits had been filed against Countrywide.

7.     On July 21, 2008, Bank of America announced better-than-expected second quarter 2008 results, beating analysts' estimates.  In a conference call held to discuss these results, Defendant Price stated, "We think the worst is behind us on value declines, as evidenced in our results for the quarter."  Almost immediately, Bank of America's stock began to trade higher.

8.     On August 6, 2008, Connecticut Attorney General, Richard Blumenthal, filed suit against Countrywide seeking restitution for homeowners who were damaged by the company's deceptive lending practices.  Later that month, West Virginia Attorney General Darrell McGraw and Indiana Attorney General Steve Carter brought similar suits against Countrywide.

9.     On September 12, 2008, with Lehman Brothers Holdings, Inc. ("Lehman"), on the verge of bankruptcy, investors became ever more concerned that Merrill Lynch would be the next company to run short of capital.  As a result, Defendant Thain, Chief Executive Officer of Merrill Lynch, contacted executives at Bank of America to propose a merger between the two companies.  Over the course of the next couple of days, an agreement was put together calling

for Bank of America to acquire Merrill Lynch in an all stock transaction valued at $50 billion (the "Merrill Acquisition").

10.    On September 15, 2008, Bank of America announced that it had entered into a Merger Agreement with Merrill Lynch. Investors questioned the hastiness of the deal and the transaction price, but Defendants confidently assured investors of the fairness of the price, including strong assurances to investors that Bank of America had conducted appropriate due diligence in determining the fairness and safety of the transaction. Defendants further represented that despite Merrill Lynch's noteworthy exposure to risky investments, the company had recently taken actions that substantially reduced its risk and the amount of toxic assets on its balance sheet.

11.    On October 6, 2008, Bank of America entered into a settlement agreement with the eleven state regulators who had brought suit against Countrywide. The settlement agreement required Bank of America to alter mortgages on approximately 400,000 homes in an effort to make the mortgages more affordable for homeowners. The Company agreed to drop mortgage rates as low as 2.5 percent. When news of the settlement broke, Bank of America's stock price fell 37 percent, or $8.45, in one day.

12.    On October 7, 2008, Bank of America completed a secondary offering of $10 billion worth of common stock. Further, in October 2008, Bank of America received a $25 billion investment from the U.S. Government (with Merrill Lynch receiving $10 billion in funding). Bank of America confidently insisted that it "did not need and did not seek" the capital injection, especially in light of its recent stock offering.

13.     Relying on Defendants' misrepresentations, shareholders of Bank of America overwhelmingly approved the merger with Merrill Lynch on December 5, 2008, with 82% of the vote in support.

14.     By the time of the shareholder vote, but undisclosed to the public, Merrill Lynch had suffered monstrous losses for the fourth quarter of 2008. On December 17, 2008, Defendant Lewis met with government officials and advised them that Bank of America would be unable to complete the deal with Merrill Lynch without considerable assistance from the government. The government strongly encouraged Bank of America to continue with its acquisition of Merrill Lynch and agreed to provide additional funding and financial guarantees to protect against future potential losses. Although this additional government funding would substantially dilute the interests of Bank of America's common shareholders, they were not made privy to this information prior to the December 5, 2008 vote nor were they made aware of this prior to the merger's closing.

15.     The merger closed on January 1, 2009. In press releases and filings following the close of the transaction, Bank of America emphasized the success and joint potential of the newly merged companies.

16.     On January 14, 2009, investors were stunned to learn that Bank of America would be the recipient of another multi-billion investment from the U.S. government due to significant losses suffered by Merrill Lynch in the fourth quarter of 2008.

17.     On January 16, 2009, Bank of America announced a $1.8 billion loss for the fourth quarter of 2008, citing deeper trading and loan losses. It was the Company's first reported loss in 17 years. The Company cut its dividend from $0.32 to a penny per share per quarter. In addition to its own losses, Bank of America reported that Merrill Lynch's preliminary results for

the fourth quarter of 2008 indicated a net loss of $15.31 billion. This loss was separate from the $1.8 billion loss Bank of America had sustained in the quarter. Bank of America further confirmed that it would receive an additional $20 billion in assistance from the U.S. government and that the government had agreed to provide guarantees against further Merrill Lynch losses of $118 billion, with Bank of America covering the first $10 billion.

18.     Over the course of the next several days, details began to emerge concerning the truth behind Bank of America's deal with Merrill Lynch, including the fact that Bank of America had learned of Merrill Lynch's substantial fourth quarter losses prior to completing its acquisition of Merrill Lynch. Analysts believed that Bank of America would need to raise another $80 billion to maintain adequate capital.

19.     As news of Bank of America's precarious financial position came to light, Bank of America's stock lost a dramatic 50% of its value.  It declined from $10.20 per share on January 14, 2009 to close at $5.10 per share on January 20, 2009.

20.     On January 22, 2009, Defendant Thain, former CEO of Merrill Lynch, was relieved of his duties at Bank of America.  This action was taken after another financial scandal was disclosed at Merrill Lynch, including lavish spending of shareholder money by Defendant Thain.

21.     On January 27, 2009, New York State Attorney General Andrew Cuomo ("Cuomo") announced that a subpoena had been issued to Defendant Thain in connection with an investigation into $3.6 billion in end of the year bonuses paid by Merrill Lynch to its executives.

22.     On February 20, 2009, Cuomo announced that a subpoena had been issued to Defendant Lewis in connection to allegations that Bank of America had withheld pertinent information from shareholders.

23.     On February 23, 2009, it was reported by *CNNMoney.com* that a New York state judge had ordered Defendant Thain to provide further testimony about billions of dollars in bonuses handed out by Merrill Lynch on the eve of the investment bank's merger with Bank of America.  In a document filed with the New York state court that same day, Cuomo said Thain refused to answer questions about the "determination and amount of individual bonuses awards for all, but five employees at Merrill Lynch."   According to the documents filed by Cuomo, Thain refused to answer the questions because he was instructed not to by Bank of America.

24.     On February 25, 2009, it was revealed that Merrill Lynch's fourth-quarter losses were $500 million more than Bank of America had previously estimated, bringing the total fourth-quarter loss to $15.84 billion.

25.     The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

a.  The Company was failing to sufficiently reserve for mortgage-related exposure, causing its balance sheet and financial results to be overstated;

b.  The Company failed to engage in proper due diligence in assessing the fairness of the deals with Countrywide and Merrill Lynch;

c.  The Company's acquisitions of Countrywide and Merrill Lynch would have catastrophic consequences on the Company's capital position and overall operations;

d.  The acquisition of Countrywide would saddle Bank of America with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to $8.7 billion in losses related to litigation for predatory lending;

    e.   Merrill Lynch had not substantially decreased its risk exposure to troubled mortgage-related assets;

    f.   The significant and continuing deterioration of Merrill Lynch's financial position, including its substantial fourth quarter 2008 loss, was sufficient to trigger termination of the merger;

    g.   That the Company either knew it did not have a firm grasp on the aggregate amount of Merrill Lynch's losses and deteriorating positions or knew such information and withheld it from the public;

    h.   The Company had agreed to permit up to $5.8 billion in discretionary bonuses to Merrill.

    i.   The Company had to approach the U.S. government for additional funding and financial guarantees in December 2008 in order to complete its acquisition of Merrill Lynch; and

    j.   The Company's capital base was not adequate to withstand the significant deterioration in the subprime market and, as a result, Bank of America would be forced to seek government funding in order to raise significant amounts of additional capital.

26.    As a result of Defendants' false and misleading statements, Bank of America's stock traded at artificially inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the Company's share price was hammered by massive sales, sending it down more than 86% from its price before these disclosures.

## II. JURISDICTION AND VENUE

27.    Part of the claims in this action arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. § §78j(b), 78n(a), and 78t(a) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 and Rule 14a-9, 17 C.F.R. § 240.10b-5 240.14a-9, promulgated thereunder by the SEC.

28.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

29.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions by the Defendants giving rise to the violations of law complained of herein occurred in this district.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

### III. PARTIES

**A.    <u>Plaintiff</u>**

31.     Plaintiff Bahnmaier purchased 70,000 shares of Bank of America common stock at a total cost of $2,140,000.00.  Plaintiff made purchases of 50,000 shares at a price of $37.00 per share on April 11, 2008, and 20,000 shares at a price of $14.50 per share on November 19, 2008.  Plaintiff was an owner of Bank of America common stock at times relevant to the claims in this Complaint.

**B.    <u>Defendants</u>**

32.     Defendant Bank of America, a Delaware corporation, with its headquarters located at 100 N. Tyron Street, Charlotte, North Carolina 28255.  Bank of America is a financial holding company, providing a range of banking and non-banking financial services and products in the United States and internationally.

34.     Defendant Lewis was at all relevant times, the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Bank of America.  Lewis solicited approval of the Merrill Acquisition through his recommendation as a member of the Company's board of directors (the "Board") appearing in the Proxy Statement for shareholders to vote in favor of the

Merrill Acquisition.  Lewis signed the Agreement and Plan of Merger between Bank of America and Merrill dated September 15, 2008 (the "Merger Agreement").  Lewis also signed Bank of America's Registration Statement on Form S-4, which was filed with the SEC on October 2, 2008, as amended on October 22 and October 29, 2008 on Form S-4/A (collectively, the "Proxy Registration Statement").  The Proxy Registration Statement included a preliminary version of the Joint Proxy Statement for the merger, as required by Rule 14a-3(a), which was identical in all relevant respects to the materially false and misleading Definitive Joint Proxy Statement, and a copy of the Merger Agreement.  Lewis also signed a cover letter for Bank of America's and Merrill's Definitive Joint Proxy Statement, which was dated October 31, 2008 and filed with the SEC on November 3, 2008 on Form DEFM14A and as a prospectus supplement on Form 424(b)(3) (together with the Proxy Registration Statement, the "Proxy"). Lewis made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a Bank of America press release of the same date. Lewis further solicited approval of the merger through his recommendation as a member of Bank of America's Board of Directors to vote in favor of the merger, which repeatedly appeared throughout the Proxy. In addition, Lewis signed Bank of America's false November 26, 2008 Proxy Supplement, which was filed with the SEC pursuant to Rule 14a-b(6).  Lewis was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and was a signatory of Bank of America's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement. Because of his senior position with the Company, Lewis possessed the power and authority to control the contents of the

Merger Agreement, Proxy, Proxy Supplements, Secondary Offering Registration Statement, Bank of America's press releases, investor and media presentations, and other SEC filings.

33.      Defendant Price was at all relevant times Chief Financial Officer ("CFO") of Bank of America.  Price signed the Proxy Registration Statement and made numerous other false and misleading statements and solicitations throughout the Relevant Period as set forth below.  Additionally, Price was a signatory of the Secondary Offering Registration Statement by virtue of his having signed Bank of America's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.  Because of his senior position with the Company, Price possessed the power and authority to control the contents of the Proxy, Proxy Supplements, Secondary Offering Registration Statement, Bank of America's press releases, investor and media presentations, and other SEC filings.

34.      Defendant Thain was at all relevant times the CEO and Chairman of the Bank of America of Merrill Lynch and, in that capacity, he signed the Merger Agreement on behalf of Merrill and the Proxy Statement soliciting the votes of Bank of America shareholders in favor of the Merrill Acquisition.  Thain made numerous other false and misleading statements and solicitations, and/or failed to correct false and misleading statements and solicitations made in his presence, including during an analyst conference call and a press conference held on September 15, 2008 and in a Bank of America press release of the same date.  Because of his senior position with Merrill, Thain possessed the power and authority to control the contents of the Merger Agreement, Proxy and Merrill's press releases, investor and media presentations, and other SEC filings.  Thain assumed a senior executive position managing Merrill Lynch's operations following the Merrill Acquisition.  He remained in this position until he resigned or

Defendant Lewis terminated his employment on January 22, 2009.

35.    The Defendants referenced in ¶¶33-35 are collectively referred to in the Amended Complaint as the "Individual Defendants."

## IV. SUBSTANTIVE ALLEGATIONS SUPPORTING CLAIMS UNDER SECTION 14(a) AND OTHER CLAIMS

### A.    The Acquisition of Merrill Lynch

      i.    Events Leading Up to the Merger.

36.    Bank of America is one of the world's largest financial institutions.  It operates as a bank and financial holding company under U.S. law.  The Company provides a full range of banking, investing, asset management and other financial and risk-management products and services to individual consumers, small and middle market businesses and large corporations. Bank of America's operational strength and profitability came primarily from providing unmatched convenience in the United States, serving more than 59 million consumers and small business relationships with more than 6,000 retail banking offices, more than 18,000 ATMs and award winning online banking with nearly 24 million active users.

37.    These advantages were magnified by increasing defaults on sub-prime mortgage loans and related mortgage-backed securities issued and/or held by other banks.  Bank of America claimed to have judiciously avoided significant exposure to such toxic assets leaving it in an extremely strong competitive position within the financial services industry.  Bank of America presented itself as having an impregnable balance sheet that would enable the Company to weather the crisis running roughshod over the financial world.

61.    The financial crisis in 2008 provided the opportunity for Bank of America to acquire Merrill Lynch.  On September 7, 2008, the United States Government seized Fannie Mae and Freddie Mac, placed them into conservatorships, and agreed to inject billions of dollars into

each institution. Then after American International Group, Inc. ("AIG") saw its stock price plummet 31% on September 11, 2008, it began negotiating a deal to, in effect, sell itself to the U.S. Government for $85 billion to avert imminent bankruptcy. The next day, it became clear that Lehman would have to find a buyer or be forced to file for bankruptcy by September 15. Lehman's bankruptcy was certain to further destabilize the financial markets by causing lenders to halt crucial daily funding to other financial companies with large exposure to similar mortgage-linked assets, leaving those companies vulnerable to collapse.

38.     With the potential for Merrill's collapse before him, Thain immediately began searching for a buyer for Merrill. In a February 19, 2009 deposition taken by the New York Attorney General's office, Thain testified that he knew that Lehman's failure would likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008. As Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill.

39.     On September 13, 2008, Defendant Thain initiated the whirl-wind transaction when he called Defendant Lewis to explore the possibility of a merger. By 2:30 p.m. that day, Thain and Lewis were sitting alone and face-to-face in Bank of America's corporate apartment in the Time Warner Center in New York. Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America." Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here. I want to buy the whole company, not invest 9 to 10 percent." Thain ultimately agreed to sell all of Merrill to Bank of America that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

40.     As Federal regulators got wind of the deal, they exerted significant pressure on the parties to finalize the transaction before the markets opened on Monday morning, in order to prevent Merrill's collapse and the effect such a collapse would have on the markets. As *PBS Frontline* reported in a program titled "Breaking the Bank," which initially aired on June 16, 2009 ("*PBS Frontline*"), "Paulson was adamant the deal had to be done by Monday morning." According to Thain, in a personal meeting in New York City on Sunday, September 14, Federal regulators exerted "very strong[]" pressure to finalize the proposed merger immediately:

| | |
|---|---|
| Thain: | Hank [Paulson] in particular was very strongly encouraging me to make sure that I got a transaction done prior to the opening on Monday. And so they were very concerned that if Lehman were to go bankrupt what the implications might be for Merrill. And so they very much wanted us to get a transaction done. |
| Question: | What form does that "strongly encouraging" take? How strongly? |
| Thain: | You know, in a meeting, it is, "John, you'd better make sure this happens." |
| Question: | That straightforward? |
| Thain: | Mm-hmm. |

41.     On September 14, 2008, only one day after Defendant Thain had first contacted Defendant Lewis to discuss a strategic investment, Defendant Lewis agreed on Bank of America's behalf to pay $50 billion for Merrill in an all-stock transaction whereby each share of Merrill would be exchanged for 0.8595 shares of Bank of America. The agreement valued Merrill stock at $29 per share – a 70% premium to Merrill's $17 per share closing price on September 12, 2008.

        ii.     Bank of America's Approval of Enormous Merrill Bonuses.

42.     Unbeknownst to shareholders and investors, Bank of America's and Merrill's senior officers spent a large portion of their limited time during the merger discussions

negotiating the bonuses that Merrill's senior officers and employees would receive as part of the deal. In fact, Defendant Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC. Defendants Lewis and Thain were involved in and kept continually apprised of these bonus negotiations. Lewis negotiated the bonus agreement through Greg Curl, Bank of America's Global Corporate Strategic Development and Planning executive. According to Thain's deposition testimony, he was kept informed of the negotiations, and all the terms of the agreement, through Greg Fleming, Merrill's President and Chief Operating Officer.

43. According to a February 8, 2009 article in *The New York Times*, during these bonus negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone." Subsequent media reports revealed that the list also provided for $30 million for Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai, President of Global Wealth Management Robert McCann, and General Counsel Rosemary Berkery. In total, Merrill sought the right to pay up to $5.8 billion in discretionary year-end and other bonuses to its executives and employees.

44. Significantly, during these discussions, Merrill's senior executives also insisted that Bank of America agree to allow Merrill to **accelerate** payment of these bonuses so that they could be paid in December 2008 – before the merger was scheduled to close on January 1, 2009, and before Merrill's financial results for the fourth quarter became public. This accelerated schedule deviated from Merrill's compensation practices and regular bonus schedule, under which annual bonuses were not even calculated, let alone paid, until January – **after** the close of the fiscal year.

45.     Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the merger Proxy, "pay for performance" was "the core of [Merrill's] compensation policy," and executive bonuses were "paid in January for performance in the prior fiscal year." The March 2008 Proxy also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations."

46.     The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy – bringing Merrill to the precipice of collapse.

47.     Ultimately, Bank of America agreed to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger. This highly material amount was equal to *12% of the value of the merger*, and was in fact 26% *more* than Bank of America had earned during the first two quarters of 2008. It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

48.     The $5.8 billion in bonuses that Bank of America agreed to allow Merrill to pay was actually materially *greater* than the bonuses that Merrill itself had internally planned to pay prior to the collapse of the financial industry that occurred in the second half of 2008. Prior to the merger negotiations, Merrill had *reduced* its internally-projected bonus pool from $5.8 billion

to $5.1 billion, or by 16.5%. Thus, the agreement with Bank of America permitted Merrill to pay bonuses that were at least $700 million greater than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

49.     Bank of America also permitted Merrill to pay these bonuses before the merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule. As Thain testified in his February 19, 2009 deposition: "The timing . . . was determined when we signed the merger agreement. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

50.     The acceleration of the bonuses was material to Bank of America shareholders for several reasons. First, paying the bonuses in December meant that Merrill executives would be able to reap gigantic bonuses despite Merrill's 2008 financial performance.

51.     Second, the accelerated schedule eliminated any chance that Bank of America might reduce or eliminate Merrill's bonus payments once Bank of America assumed control of Merrill after the merger closed. As the Associated Press reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later." As Merrill's executives knew, Bank of America's compensation policies were substantially less generous than Merrill's, making it likely that Bank of America would severely curtail Merrill's bonuses – especially if Merrill suffered large losses during the fourth quarter – unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated the other merger terms. This was confirmed by Bank of America's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and Bank of America's – so big, in fact, that Smith gave "an example of someone in a role at Merrill that

got paid three dollars, and that same role in Bank of America would have gotten paid one dollar."

52.    Third, paying billions of dollars in bonuses before the merger closed meant that Bank of America shareholders would receive an asset worth billions of dollars less than contemplated.

53.    On *PBS Frontline*, Lewis stated that the bonuses were so large that they ruined the celebratory toast he had hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [of the merger process]. And frankly, it extends things to the point that I have never really been real happy by the time that champagne pours. Usually, you're mad at each other by then and you drink it politely and then leave. . . . And that was about how I felt with this one."

            iii.    <u>Defendants Proxy Solicitations and Proxy Statement Contained Material Misstatements and Omissions</u>.

54.    Defendants' proxy solicitations included all of the statements which affected the market's and Bank of America shareholders' view of the deal.  On September 15, 2008, Bank of America announced that it had agreed to acquire Merrill for $50 billion in an all stock transaction that valued Merrill at $29 per share – a 70% premium to its closing price on September 12.  Bank of America held a conference call for analysts and investors in which Defendants Thain, and Price participated (the "Investor Call"), conducted a press conference in which Lewis and Thain participated (the "Press Conference"), and issued a press release (attached to a Form 8-K filed with the SEC that same day).  In each instance, Bank of America, Merrill, Thain, Lewis, and Price made materially false and misleading statements about the circumstances surrounding the merger.

55.    The press release stated in relevant part:

Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled in its breadth of financial services and global reach.

***"Acquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders,"*** Bank of America Chairman and Chief Executive Officer Ken Lewis said. ***"Together, our companies are more valuable because of the synergies in our businesses."***

"Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management teams to create what will be the leading financial institution in the world with the combination of these two firms," said John Thain, chairman and CEO of Merrill Lynch.

Under terms of the transaction, Bank of America would exchange .8595 shares of Bank of America common stock for each Merrill Lynch common share. The price is 1.8 times stated tangible book value.

Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. The acquisition is expected to be accretive to earnings by 2010.

The transaction is expected to close in the first quarter of 2009. It has been approved by directors of both companies and is subject to shareholder votes at both companies and standard regulatory approvals.

* * *

***Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States.*** Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

(Emphasis added.  Throughout the rest of this Amended Complaint, all emphasis is added unless otherwise noted.)

56.    These statements praising the benefits of the merger were false and misleading, and made without a reasonable basis.  Bank of America's due diligence of Merrill was grossly inadequate, and the amount of toxic assets on Merrill's balance sheet was so substantial that Bank of America would not have been able to absorb them had the Government not agreed to a $138 billion bailout.

57.    Defendant Lewis made it his goal to reassure the investing public that the Company had done appropriate due diligence to understand the risks and the quality of assets it

would be taking on through the Merrill Acquisition.  During the Investor Call, Lewis endorsed the comments of Defendant Price, Bank of America's CFO, that Bank of America was well aware of Merrill Lynch's credit and assets because of its presence as a competitor in the marketplace and even though the due diligence period had been short, it had been thorough and sufficient.  Defendant Price specifically stated:

> Clearly we've had a tremendous amount of historical knowledge both as a competitor with Merrill Lynch but also have reviewed and analyzed the company over the years. As Ken referenced, we did have several advisors, among them J.C. Flowers with pretty extensive knowledge of the company.
>
> While none of us like the market turmoil we've been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset classes. So it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic. In addition, as you would expect we deployed the team that we would ordinarily deploy in these types of situations which had well over 45 people from our team on site as well as others off site, outside counsel and the like. ***So collectively with that group and quite frankly the progress that Merrill Lynch had made in reducing the risk exposures and analyzing them and having all that laid out given the efforts that the management team has made over the last period made it possible for us.***

58.    Defendant Lewis added to Price's analysis:

> Just to touch on a few other things of importance in the transaction before taking questions, from a risk or due diligence perspective as you heard Ken say we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. ***We sent in a large team to review areas such as asset valuations, trading positions and the like. We also were joined by a team from J.C. Flowers that had done extensive due diligence over some time in reviewing other potential transactions, so they were very familiar with Merrill Lynch's books.***

59.    Defendant Lewis went on to brag to investors that Bank of America did not need government funds.  He stated, ***"I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private.  But we have asked for no relief, no capital relief on this deal."***

179.    During the Press Conference, Lewis emphasized that Bank of America's due diligence was more than sufficient, and had established that Merrill's risk profile had been "dramatically" reduced in recent months.  Lewis further stated that: "The J.C. Flowers piece is key because they were renewing an effort that had already gone on and had been very, very extensive." Lewis likewise assured Bank of America shareholders that Bank of America was very familiar with Merrill's risk profile because Bank of America and Merrill shared "very similar methodology valuations" and "very similar marks." He noted: "The structures – we're dealing with the same counterparties on things.  So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

60.    These statements were false because (i) Bank of America had not "comprehensively" analyzed Merrill's financial condition, and thus (ii) Defendants had no reasonable basis to make any representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved. Indeed, after reviewing thousands of Merrill's internal documents which were made available by Merrill to Bank of America during the due diligence process, federal regulators determined that Bank of America's due diligence had been grossly deficient because, among other things, it failed to appropriately consider Merrill's risk profile. For example, in the Federal Reserve Merger Analysis, federal regulators concluded that Merrill's "single largest area of risk exposure and driver of recent losses . . . ***were clearly shown in Merrill Lynch's internal risk management reports that [Bank of America] reviewed during their due diligence.''*** Further, after Lewis threatened to invoke the MAC due to Merrill's mounting losses, senior officials from the Federal Reserve concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood,

particularly as [Bank of America] itself is also active in [] these products." Thus, these officials concluded that Bank of America's failure to accurately understand Merrill's exposures at the time of the merger announcement "implies **substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition."**

61.     The truth is that the Company's rank and file were filled with trepidation at the Merrill Acquisition, especially in light of the fact that Merrill Lynch competitor Lehman Brothers was collapsing over the same weekend the Merrill Acquisition agreement was forged. According to *Businessweek*, one Bank of America derivatives expert told of being called to a law office at 2:00 in the morning following a fourteen-hour work day.  He was asked to check Merrill Lynch's books and come to a decision within 24 hours.  Another Bank of America employee who works closely with management was quoted as saying, ***"It would take much more time than we were given to value [Merrill's illiquid] assets."***

182.    Even Lewis acknowledged that Bank of America's due diligence was grossly inadequate.  When Lewis originally approached Federal Reserve officials for a bailout on December 17, 2008, Chairman Bernanke informed him that, if he were to terminate the merger, it would immediately reveal the falsity of his claims regarding "adequate due diligence." In a December 23, 2008 email, Mac Alfriend, a Senior Vice President at the Federal Reserve ("Alfriend"), wrote to other senior Federal Reserve officials that Lewis "is worried about stockholder lawsuits; ***knows they did not do a good job of due diligence*** and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose lots of very good people."

62.     Defendants' statements about Merrill's "dramatically" lower risk profile were made without any reasonable basis. Indeed, mere weeks after Defendants made these

statements, in October 2008, Merrill experienced the worst month in its history, incurring $7 billion of losses on high-risk assets that Thain acknowledged "were incurred almost entirely on legacy positions" that Merrill held as of September 15, 2008. As Thain further articulated in his September 17, 2009 speech, Lehman's bankruptcy filing on September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets," and that was precisely "why we sold the company." Moreover, contrary to Bank of America's Relevant Period representation that Merrill had "dramatically" reduced its risk profile, in its internal Federal Reserve Merger Analysis, Federal Reserve officials concluded that Merrill maintained several "large[] risk exposures" and "vulnerabilities" which exposed it to losses of between $13.4 billion and $23.2 billion. These exposures were so material that Alfriend wrote in an email that "Merrill is really scary and ugly."

63.     Defendant Lewis also made false statements about Merrill's liquidity and its ability to survive as an independent entity. For example, in response to questions asked during the Investor Call as to why Bank of America had agreed to pay such a substantial premium for Merrill, Lewis stated:

> One, probably the more likely is that ***Merrill had the liquidity and capacity to see this through***.  It's not necessarily easy because of just the times. But more likely than not, they would have seen this through and come out on the other side.

64.     This statement was false because, as Thain admitted, Merrill did not have the liquidity or capacity to survive as a stand-alone entity. In fact, Thain admitted in sworn deposition testimony before the New York Attorney General that, without a deal, Merrill would have become effectively insolvent "beginning Monday morning," September 15, 2008. As noted above, Thain also subsequently stated that Lehman's bankruptcy filing on September 15 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets,"

and that Merrill's impending insolvency was "why we sold the company." Furthermore, Thain has publicly acknowledged that he attended a meeting on Friday, September 12, 2008 with the heads of the major investment houses, wherein it was discussed that Merrill's failure was imminent in light of the Lehman bankruptcy.

65.    Defendants also falsely represented that they were under no pressure from Federal regulators to complete the deal quickly. For example, in response to questions from analysts during the Press Conference about whether federal regulators had pressured the parties to get the deal done quickly, Defendant Lewis stated that:  "First of all, ***there was no pressure from regulators***.  I'm sure, after the fact, that having this not be an issue is obviously very positive to them, but ***absolutely no pressure***."  This statement was false because, during the merger negotiations, Secretary Paulson had issued an ultimatum that Bank of America and Merrill finalize the transaction by Monday morning, September 15, 2008. As *PBS Frontline* reported, "Paulson was adamant the deal had to be done by Monday morning." In fact, Thain has subsequently admitted that Paulson demanded that the parties finalize the transaction by September 15.

66.    In response to a question concerning whether Lewis and Thain had discussed Thain's position in the combined company, Thain stated that they had not, and Lewis emphasized that Thain had not sought to enrich himself or otherwise pursue his own self-interest while negotiating the merger. Lewis stated: "That's a credit to John. It usually doesn't happen that way and he never – it was never about him; it was always about the deal."

67.    This statement was false because, in reality, the merger negotiations were very much about Thain's ability to pay himself (and his associates) tens of millions of dollars. As was subsequently revealed, Thain had demanded that Lewis pay him a $40 million bonus in

connection with the merger, as well as $100 million in bonuses for his top lieutenants and former business associates from Goldman Sachs, as part of the total $5.8 billion in discretionary bonuses to Merrill executives and employees. In fact, rather than focusing on "the deal," Thain stated that Merrill's bonuses were one of the three "main things" he focused on, and he used the merger as an opportunity to materially ***increase*** the amount of bonus compensation Merrill was planning to pay him and other executives. Indeed, Thain was so focused on the question of personal compensation that, although the other terms of the agreement had been settled by the night of Sunday, September 14, negotiations concerning the Merrill bonuses continued until the early morning hours of Monday, September 15.

68.     All of the above statements made on September 15 were highly material to investors. Given Merrill's recent losses, the 70% premium Bank of America was paying, and the fact that the collapsing housing market was causing turmoil at other financial institutions, the market was concerned over whether Bank of America had adequately investigated Merrill's exposure to potentially toxic assets, whether Merrill's financial condition was fundamentally sound, and whether regulators had pressured the parties to hastily agree to a deal that was not in Bank of America's best interests.  The market was also concerned about whether Merrill executives had attempted to enrich themselves at the expense of Bank of America shareholders by draining Merrill of value before the transaction closed.

69.     In response to these statements, on September 15, 2008, Ladenburg Thalman reported that "the fact that Bank of America paid a high premium for Merrill and would not buy Lehman indicates that the due diligence done on both companies suggests that Merrill may be in stronger condition than thought." On September 16, 2008, *The Daily Telegraph* of London reported that, "Bank of America was able to carry out due diligence on Merrill's books so swiftly

because of work previously carried out by JC Flowers . . . which has been studying Merrill closely for months." Likewise, *Investment Dealers' Digest* quoted the managing director at research and advisory firm TowerGroup as concluding, "Don't let them fool you into thinking they haven't been looking at each other for a long time. . . . This was not a deal that was drummed up in the shower on Saturday morning and completed on Sunday night. These two firms are very familiar with each other."

        iv.    <u>Bank of America/Merrill Lynch Form 8-K Filed on September 18, 2008</u>.

70.    Bank of America and Merrill filed a Form 8-K with the SEC on September 18, 2008.  The filing described the terms of the Merrill Acquisition and attached as Exhibit 2.1 an Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America Corporation (the "Merger Agreement").  Defendants Lewis and Thain had signed the Agreement on behalf of Bank of America and Merrill Lynch respectively. The merger was the capstone on a string of acquisitions by Bank of America in which the Company, at Defendant Lewis's behest, had also added subprime lender Countrywide Financial and LaSalle Bank, along with their toxic balance sheets, at a cost of $75.2 billion.

71.    On September 18, 2008, three days after Defendants announced the proposed merger, Bank of America and Merrill filed a Form 8-K with the SEC attaching the Merger Agreement. The Merger Agreement assured Bank of America shareholders and investors that Merrill ***would not*** pay discretionary bonuses before the merger closed. Specifically, in a section titled "Company Forbearances," the Merger Agreement provided that, "except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement," from September 15, 2008 through January 1,

2009, Merrill "***shall not***, and shall not permit any of its Subsidiaries to, without the prior written consent of [Bank of America]," undertake any of 18 enumerated actions, including:

> increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, 'Employees'), [or] pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

72.     This statement was materially misleading. First, the statement set forth above represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, Bank of America had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before the merger closed. Second, the statement set forth above falsely reassured investors that Bank of America had not consented to Merrill's payment of any bonuses before the merger closed when, in fact, Bank of America had already granted its consent with respect to the payment of $5.8 billion of bonuses. As set forth above, the undisclosed bonus agreement was highly material because, among other reasons, (i) the amount set aside to pay bonuses constituted 12% of the entire merger price and 30% of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses despite the fact that it lost more than $21 billion in the fourth quarter; and (iv) the payment of these bonuses before the merger closed ensured that Bank of America shareholders would receive an asset worth billions of dollars less than contemplated.

73.     The agreement allowing Merrill to pay $5.8 billion of bonuses pursuant to Merrill's VICP before the merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule." While the Merger Agreement made a generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger

Agreement, and its contents were never publicly disclosed to shareholders. Defendants' failure to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because they violated Item 601(b)(2) of Regulation S-K. Item 601(b)(2) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement." In addition, Item 601(b)(2) further provides that any plan of acquisition "shall contain a list briefly identifying the contents of all omitted schedules, together with an agreement to furnish supplementally a copy of any omitted schedule to the Commission upon request." Accordingly, Defendants' failure to publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement also rendered the September 18, 2008 Forms 8- K materially false and misleading.

74. On October 7, 2008, Bank of America conducted the Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion. In the press release announcing the offering, Lewis underscored Bank of America's "strength and stability," and falsely stated that the merger "should significantly enhance our earnings." On a related investor and analyst conference call, Defendant Price, responding specifically to a question regarding any need for additional capital in connection with the merger, affirmatively stated that no new capital would be necessary.

75. On October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to the "Troubled Asset Relief Program," or TARP. On October 19, 2008, Lewis appeared on *60 Minutes* and assured investors that Bank of America had actually benefited from the financial crisis because, in contrast to other banks, consumers were

attracted to Bank of America's stability and thus were making deposits at a record pace, enhancing Bank of America's capital position. Lewis represented that the Merrill transaction proved that Bank of America's capital strength had enabled it to defeat and absorb weaker banks, and that Bank of America had "won" its competition with "Wall Street."

76.     Lewis further stated that Bank of America did not need the TARP funding it had recently received, but that Secretary Paulson had forced Lewis to accept it with "no negotiations." Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and [] the right thing for America." In contrast to institutions that needed TARP funds to repair their capital bases, Lewis stated that Bank of America would "use [the TARP funds] to grow loans and to make more net income."

77.     On October 16, 2008, Merrill issued a press release announcing its financial results for the third quarter, including a net loss of $5.2 billion.  Significantly, in the press release, Merrill explained that this $5.2 billion loss was a positive development, and highlighted that the loss was caused by the aggressive selling of risky assets in order to strengthen Merrill's balance sheet before the merger with Bank of America.  Thain misleadingly stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal," and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent . . . earnings power."

202.     In response to Merrill's announcement, analysts concluded that Merrill had significantly improved its financial condition in preparation for the merger with Bank of America, and believed that Merrill would make a profit in the fourth quarter.  For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse noted: "The strongest positive in the

quarter was the progress made on working down the investment bank's 'high risk' inventory. . . . With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%." That same day, Deutsche Bank reported, "Merrill's quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America." The report forecasted earnings of $0.54 per share for the fourth quarter. On October 17, 2008, Buckingham Research Group reported that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter. Indeed, on October 17, Thomson First Call consensus estimates stated that Merrill would have positive earnings of $0.44 per share in the fourth quarter. Likewise, on October 19, 2008, Oppenheimer concluded that Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet . . . ahead of the pending merger with Bank of America,

78.     However, the statements in Merrill's October 16, 2008 press release were materially false and misleading. The statement that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" was materially false and misleading because, notwithstanding its purported efforts to "reduce exposures" and "de-leverage the balance sheet," Merrill retained large amounts of toxic assets on its balance sheet that caused $7 billion of losses in October alone and losses of more than $21 billion in the fourth quarter. Unbeknownst to Bank of America's shareholders and investors, throughout October and November 2008 – while Bank of America and Merrill were soliciting shareholder approval of the merger – Merrill was suffering undisclosed losses that were so large that they threatened the viability of the combined company if the merger was approved.

79.     In October 2008, the first full month after the merger was announced, Merrill suffered losses of approximately $7 billion. As Thain admitted in his interview with *PBS*

*Frontline*:

> If you look at what actually happened in the fourth quarter, October was the worst month, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . October was by far the worst.

80.     In November 2008, Merrill continued to suffer billions of dollars in losses. According to an expert analysis of Merrill's weekly loss data for the fourth quarter – which was prepared by Congress to determine "what loss trends could reasonably be deduced from the loss data available to [Bank of America's] decision makers" at the time – by November 14, Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

81.     In addition to these highly material losses, according to a September 8, 2009 letter from the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans." This impairment would be charged against Merrill's income. Including this $2 billion goodwill impairment, Merrill's total losses and impairments by the end of November 2008 totaled ***$15.3 billion***.

82.     Merrill's undisclosed losses were highly material to Bank of America shareholders and investors.  The undisclosed losses were large enough to bankrupt Merrill, and so large that Bank of America did not have the capital to absorb them.  In fact, Merrill's losses were substantially greater than the $5.8 billion Bank of America had earned through the first nine months of 2008.  Further, these losses were entirely unexpected by the investment community. After Merrill highlighted the "significant progress in balance sheet and risk reduction" it had supposedly achieved in its October 16, 2008 press release, discussed above, analysts'

consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter profit of $0.44 per share.

83.     Defendants Lewis, Thain, and Price knew of Merrill's losses as they occurred. According to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team," to continuously monitor Merrill's financial condition.  As Thain wrote in a January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to our p&l [profit and loss statements], our positions and our marks.

84.     Moreover, Thain testified in his deposition that Bank of America executives not only had access to this detailed financial information, but personally received regular updates as the fourth quarter progressed. Thain testified that Merrill held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty ("Cotty"), sat in meetings and discussions and was totally up-to-speed on what was happening" throughout the fourth quarter.

85.     During Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as Bank of America and its senior executives, all received daily, "step-by-step" updates on Merrill's financial condition:

> Question:    And was Bank of America inside your books? . . . Would they have known what was happening, what the projections were, how bad things actually were because of the Lehman collapse and what else had happened in the market?
>
> Thain:    Yes, absolutely.  I believe in being totally transparent.  They had acquired us.  We were completely transparent with them. They had inserted the person who had been their chief accounting officer – he became the acting chief financial officer for the Merrill businesses. We generate a daily profit and loss statement. They

|          | were getting that daily profit and loss statement, so they knew about the losses at the same time we did. |
|----------|------------|
| Question: | Which was when? |
| Thain: | We get an update every day. |
| Question: | So they would have known all the way along? |
| Thain: | All the way along. |
| Question: | Step by step? |
| Thain: | Yes. |

86.      Indeed, Bank of America has admitted that it was aware of Merrill's financial condition. As reported in the February 8, 2009 New York Times article, "a Bank of America spokesman said that 'we have not disputed that we were kept informed about the financial condition of the company.'"

      vi.    The Proxy Statement.

87.      Despite these facts, Defendants filed and mailed a Proxy Statement on November 3, 2008, that made no mention of the $7 billion in fourth quarter losses that Merrill had suffered by this date.  The Proxy Statement, which included a cover letter signed by Defendants Lewis and Thain, urged all of Bank of America's shareholders to vote in favor of the Merrill Acquisition and recommended the Merrill Acquisition as being fair and in the best interests of Bank of America shareholders.  The Proxy Statement specifically stated:

> The Bank of America board of directors believes that the merger is in the best interests of Bank of America and its stockholders and has unanimously approved the merger and the merger agreement.  The Bank of America board of directors unanimously recommends that Bank of America stockholders vote "FOR" the proposal to issue shares of Bank of America common stock in the merger.

88.      The Proxy Statement also included detailed reported results with respect to Merrill Lynch's operations for the fiscal quarter ended June 30, 2008 and under a heading titled "Recent Developments" also discussed Merrill Lynch's more recent financial results.  The Proxy falsely represented that there was an ***"absence of material adverse changes"*** to Merrill's

financial condition, the merger was "fair" to Bank of America shareholders, and the "strong capital position" of the "combined company" was a "material factor" favoring the merger.

89.     The Proxy also affirmatively misrepresented that Merrill would ***not*** make any discretionary bonus payments before the merger closed on January 1, 2009. Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch ***will not***" pay any compensation that was "not required." In addition, the Merger Agreement, which was attached to the Proxy as Appendix A, repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K described above.  Moreover, by incorporating Merrill's prior SEC filings, including the March 2008 Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance," as set forth above.

90.     The Proxy Statement contained material misstatements and omissions because it did not disclose material facts to Bank of America shareholders necessary for them to cast fully informed votes with respect to the Merrill Acquisition.  The Proxy Statement significantly overvalued Merrill Lynch's assets and otherwise did not accurately disclose Merrill Lynch's financial condition to Bank of America shareholders.  The Proxy Statement did not inform Bank of America shareholders of the significant risks and liabilities that Bank of America and its shareholders would be acquiring in the event the Merrill Acquisition closed.  Further, the Proxy Statement did not reveal that Bank of America and its advisors had conducted inadequate due diligence on Merrill Lynch and that the recommendation in the Proxy Statement in favor of the vote and the other positive statements concerning the vote were made without an adequate basis.

91.     On November 6, 2008, Merrill Lynch reported financial results for the fiscal quarter ended September 30, 2008.  Those results included substantial mark downs in Merrill Lynch's assets and resulted in a reported net loss of over $5 billion.

92.     Then, in the weeks after the Proxy was mailed to shareholders, Bank of America and Merrill updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or Bank of America, or the accelerated bonus payments. Rule 14a-9 specifically required Bank of America to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events.  Both Proxy supplements violated this rule.

93.     Specifically, on November 21, 2008, Bank of America and Merrill each filed a Form 8-K pursuant to SEC Rule 425, updating the Proxy to disclose that they had settled certain derivative litigation relating to the merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the merger – without disclosing any information concerning Merrill's losses, the secret bonus agreement, or Bank of America's own deteriorating financial condition.

94.     Then, on November 26, 2008, with the vote less than ten days away, Bank of America again supplemented the Proxy with the stated purpose of bolstering Bank of America's stock price, by filing a letter from Lewis to shareholders pursuant to Rule 14a-6(b) that falsely assured shareholders that Bank of America's financial condition remained extremely strong despite the upheaval in the market. In that letter, which was written specifically to address investors' "deep concerns about . . . whether financial institutions have enough capital," Lewis falsely represented that Bank of America was "one of the strongest and most stable major banks

in the world," as well as "one of the most liquid banks in the world." Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above.

95.    The statements in the November 26, 2008 Proxy Supplement were materially false and misleading because the imminent acquisition of Merrill would devastate Bank of America's Tier 1 capital levels and liquidity position. Indeed, as Bank of America knew, Merrill had already suffered approximately $15.3 billion in total losses and, as Congress's expert analysis concluded, Merrill's internal loss data provided strong evidence that these losses were significantly accelerating. Defendant Lewis acknowledged that these losses were enough to bring Bank of America to the brink of insolvency when he determined to invoke the MAC mere weeks after issuing the November 26, 2008 Proxy supplement, and conceded that Bank of America could not absorb these losses without massive taxpayer assistance.

96.    On November 26, 2008, the Federal Reserve Bank of America approved the proposed Merrill Acquisition.

97.    While the financial condition of both Merrill and Bank of America deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees. According to Thain's deposition testimony, in early November 2008, he and Bank of America's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion. On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review. Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses

on December 22; and employees would receive their cash awards by December 31. On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

98.    Throughout this process, Bank of America's senior executives knew of the size and timing of the bonus payments. As Thain stated to *PBS Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

99.    Merrill's losses in October and November 2008 were so significant that, in the days and weeks leading up to the shareholder vote, senior Bank of America executives discussed terminating the deal on several occasions. According to a February 5, 2009 article in *The Wall Street Journal*, "shortly before Thanksgiving," Bank of America's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in its merger agreement." The debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

100.    The New York Attorney General's investigation confirms these facts. According to the New York Attorney General's September 8, 2009 letter, "prior to the shareholder vote,"

101.    Merrill had suffered "more than $14 billion" of losses, which were "so great that Bank of America officers sought guidance – ***before Bank of America shareholders approved the merger*** – about the applicability of the material adverse change ('MAC') clause. . . . Yet Bank of America failed to disclose those large and increasing losses to its shareholders prior to the December 5, 2008 vote." (Emphasis in original).  Indeed, according to the New York

Attorney General, Bank of America's senior executives, including Defendant Price, discussed "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" on three separate occasions in the weeks before the vote, namely, on November 20, December 1, and December 3, 2008.  On each occasion, Bank of America's senior officers, including Defendant Price, made a "decision not to disclose these escalating losses."

102.     Certain Bank of America executives insisted that if the Company was not going to terminate the merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts. According to the February 5, 2009 *Wall Street Journal* article quoted above, "[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses," and this disagreement continued right up until "the night before the vote." As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, that investors should know about this before they vote."

103.     At the same time that Merrill was collapsing, unbeknownst to investors, Bank of America's own financial condition was materially deteriorating to the point where Bank of America would be unable to absorb the losses suffered by Merrill.  As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the merger, Bank of America had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion – *the first quarterly loss in Bank of America's history.*  In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted Bank of America's own financial deterioration, writing that, "[a]s they [Bank of America senior executives] themselves noted the other night at our meeting, even on a stand alone basis, the firm is very thinly capitalized,"

Bank of America had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

       vii.    <u>The Shareholder Vote</u>.

104.    On December 5, 2008, Bank of America held a special meeting of shareholders to vote on the Merrill Acquisition. In advance of this vote, Defendants failed in their duty to update and correct the material misstatements and omissions in the Proxy Statement and Proxy solicitations. Not only did Defendants not correct these material misstatements and omissions, but Defendants did not update investors concerning the continued deterioration of Merrill Lynch's financial condition after the Proxy Statement was issued but before investors actually cast their votes on December 5, 2008. During that period, Merrill Lynch had suffered additional losses in their investments and securities, amounting to billions of dollars in further losses and a significant increase in the risk that Bank of America would take on if the Merrill Acquisition were consummated. In addition, Defendant Thain paid out a reported $5 billion in bonuses to Merrill Lynch executives between the time of the Merrill Acquisition agreement and the shareholder vote. These bonuses were known to Bank of America and Defendant Lewis, but they failed to disclose this information to shareholders before the vote. This information, which was highly material to Bank of America shareholders and their decision concerning the vote on the Merrill Acquisition, was never provided to shareholders prior to the December 5, 2008 vote.

105.    Later that day, Bank of America issued a press release that quoted Lewis as stating: "When this transaction closes, Bank of America will have the ***premier financial services franchise*** anchored by the cornerstone relationship products and services of deposits, credit and debit cards, mortgages and wealth management."

106.     This press release and Lewis's remarks at the shareholder meeting were materially false and misleading because they did not disclose any of the material adverse facts set forth above, including that: (i) Merrill had already suffered at least $15.3 billion in losses and impairments in October and November, with billions more expected in December; (ii) Bank of America had already suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss; (iii) Bank of America, as senior Federal Reserve officials determined, was "very thinly capitalized," and was "clearly not [] well prepared" for further deterioration; and (iv) Bank of America lacked the capital to absorb Merrill's losses without massive amounts of Government aid. Indeed, Defendant Lewis acknowledged that Bank of America lacked the capital to absorb Merrill's losses when, mere days after issuing the statements set forth above, he decided to terminate the merger or, alternatively, seek a $138 billion taxpayer bailout to rescue Bank of America from collapse. Similarly, the statement that the merger would create "the premier financial services franchise" was materially false and misleading for the same reasons.

107.     As Heidi Moore of *The Wall Street Journal* stated in a 2009 report, ***"Lewis's optimistic statements on the deal throughout left investors ill-prepared to expect potential losses so severe that the U.S. Treasury would have to step in with additional funds."*** She went on to call Bank of America's course of conduct ***"an object lesson in 'How Not To Communicate With Shareholders.'"***

108.     Lacking the material facts necessary to fully appreciate the impact of the Merrill Acquisition, at the December 5, 2008 special meeting, 82% of Bank of America shareholders who voted approved the Merrill Acquisition and the related issuance of additional shares by the

Company necessary to consummate the Merrill Acquisition.  Bank of America promptly issued a press release announcing that its shareholders had approved the Merrill Acquisition.

viii.    <u>Lewis Decides to Invoke the MAC and Terminate the Deal</u>.

109.    On Tuesday, December 9, 2008, the second business day following the shareholder vote, Defendants Lewis and Price met with the Bank of America to discuss Merrill's deteriorating financial condition. At the meeting, Defendant Price, relying on loss figures known to him and Bank of America, Merrill, Thain, and Lewis, and calculated before the shareholder vote, acknowledged that the massive projected fourth quarter losses at Merrill were material to investors. According to an August 6, 2009 *Wall Street Journal* article, Price "used the $9 billion [after tax] net loss estimate [circulated amongst management on December 3, 2008 in advance of the shareholder vote] in a presentation to Bank of America's Board. The 'magnitude' of the losses 'is ***quite significant***,' he said . . . ." Merrill's losses were so severe that, according to the February 5, 2009 *Wall Street Journal* article, by no later than December 14, 2008, "Lewis [had] told Bank of America directors in a conference call that the bank might abandon the acquisition which was supposed to close in two weeks."

110.    Having acknowledged that Merrill's losses were so massive that they threatened Bank of America's solvency, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that Bank of America had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis's deposition testimony.  Secretary Paulson immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal Reserve,

111.    On the evening of December 17, 2008, Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and

42

other Treasury and Federal Reserve officials. Lewis began the discussion by reporting the dire financial condition of the combined company. Lewis stated that Bank of America was projected to lose $1.4 billion in the fourth quarter – the Company's first quarterly loss in its history. Lewis then reported that Merrill's massive fourth quarter losses were so large that they would devastate Bank of America's tangible common equity and Tier 1 capital ratios, bringing the Company to the brink of insolvency. Defendant Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes. Lewis stated that Bank of America had concluded that a material adverse change had occurred in Merrill's financial condition, and that it would terminate the merger pursuant to the MAC. In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

112.    Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for Bank of America and Merrill. In response, Lewis raised the idea of Bank of America receiving a taxpayer bailout – including a "Citi-type" guarantee on $50 billion of assets – to proceed with the transaction, according to Price's handwritten notes. Secretary Paulson asked for time to allow the Treasury and Federal Reserve to analyze the situation. Lewis agreed to supply the Federal Reserve with information on Merrill's and Bank of America's fourth quarter performance and risk exposures, and to wait to hear back from the regulators before taking further action.

113.    After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's

losses. As Kevin Warsh, a member of the Bank of America of Governors of the Federal Reserve, flatly stated in one email: *"This claim is not credible."* On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise[]" was dubious:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter – albeit picking up significant[ly] around mid-November and carrying into December – Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum, it calls into question the adequacy of the due diligence process [Bank of America] has been doing in preparation for the takeover.

114.     As the above email provides, after reviewing Bank of America's internal data and Merrill's losses, numerous senior Federal Reserve officials concluded that, in contrast to Bank of America's public statements, the due diligence that Bank of America had conducted on Merrill had been grossly "deficient." For example, on December 20, 2008, Deborah Bailey, deputy director of the Banking Supervision and Regulation Division at the Federal Reserve, sent an email stating that, "I always had my doubts about the quality of the due diligence they did on the [Merrill] deal. Don't forget they paid a premium. How do you pay a premium and now ask for help? This will not go over well at all."

115.     Senior Federal Reserve officials repeated these conclusions in the Federal Reserve Merger Analysis, which stated:

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, [Bank of America] management's contention that  the severity of [Merrill's] losses only came to light in recent days is problematic  and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.

116.     According to the Federal Reserve Merger Analysis, Bank of America had failed to adequately consider or assess Merrill's largest risk exposures. As that Analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "large losses stemming from exposures to financial guarantors." These exposures and losses, Federal Reserve officials concluded, "were clearly shown in Merrill Lynch's internal risk management reports that [Bank of America] reviewed during their due diligence." In addition, Federal Reserve officials concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [Bank of America] itself is also active in [] these products."

117.     The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [Bank of America] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

118.     Defendant Lewis himself acknowledged to Federal Reserve officials that Bank of America had not conducted adequate due diligence.  In a December 23, 2008 internal Federal Reserve email, Federal Reserve Senior Vice President Mac Alfrined reported that Lewis "is worried about stockholder lawsuits; ***knows they did not do a good job of due diligence*** and the issues facing the company are finally hitting home and he [Lewis] ***is worried about his own job*** after cutting loose lots of very good people.

119.     As noted above, evidence emerging as a result of federal and state investigations of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-December 2008. Among other things, as noted above, the New York Attorney General has

stated that evidence uncovered during its investigation established that, before the shareholder vote, Bank of America's executives (i) were fully aware of at least $14 billion of losses at Merrill and $2 billion in goodwill impairments; (ii) were so concerned with the magnitude of these combined losses that they repeatedly discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were not credible in claiming that Merrill's losses and goodwill impairments were "surprising."

120.    On December 19, 2008, Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Federal Reserve officials. According to Defendant Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses in excess of $21 billion pre-tax, and that Bank of America would likely invoke the MAC. Secretary Paulson asked Lewis what needed to be done to have the deal proceed. Lewis raised two possibilities: the government could purchase Merrill's toxic assets directly, or provide an asset guarantee to Bank of America.

121.    Price's handwritten notes show that Federal Reserve officials unequivocally told Lewis that a decision by Bank of America to invoke the MAC would reveal that Bank of America's prior statements about the merger and its due diligence were false, and would further cause the market to seriously question Bank of America's financial condition and the judgment of its management. Chairman Bernanke testified before Congress that he told Lewis that "an attempt [by Bank of America] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the

company, its capacity to consummate significant acquisitions, its overall risk management processes and the judgment of its management."

122.    On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further. Secretary Paulson bluntly told Lewis that the Federal Reserve would remove Bank of America's Bank of America and management if it tried to terminate the transaction. According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the Bank of America of Bank of America. I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

123.    The threat to fire Lewis, Bank of America senior management, and the Bank of America had its intended effect.  Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [Bank of America] were going to call the MAC." After receiving this threat, Lewis reversed course. As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Bank of America could be removed, Lewis replied, "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

124.    That day, Lewis told Secretary Paulson and Chairman Bernanke separately that Bank of America would proceed with the merger and would work with federal regulators on designing a bailout package. Lewis made the decision to proceed with the merger even though he knew that the impact of Merrill's losses would harm Bank of America shareholders. Specifically, at his deposition, Lewis was asked whether Bank of America's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them. He

responded that Bank of America's investors were harmed over the "short term," which he defined as "[t]wo to three years."

125.    Recognizing that his conduct would likely result in legal liability for misleading shareholders, Lewis next took the extraordinary step of trying to obtain protection from the Government against shareholder suits.  According to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]." Thus, Lewis had asked Bernanke "whether he could use as a defense that the [Government] ordered him to proceed for systemic reasons." Bernanke told Lewis "no."

126.    Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors could formally advise Lewis that invoking the MAC was not in the best interests of Bank of America, and whether Lewis could use such a letter as a defense from suit. Alvarez responded that such a letter was not "appropriate." Alvarez also underscored that Lewis faced liability for Bank of America's lack of disclosures to shareholders in advance of the shareholder vote. Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is material to investors. There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [Bank of America] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.

127.    In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the shareholder vote caused "problems" for Lewis under the securities laws:

[O]nce we're in the litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [Bank of America] made for the shareholder vote.

### C.    The Truth Begins to Come Out.

128.    On December 6, 2008, the day following the shareholder vote, Citigroup analysts warned investors to look for, "mark to market losses on high risk assets – Combined [Bank of America] and [Merrill Lynch] held $56 billion of 'high-risk' assets as of 9/30/08. Given swift declines in the equity and structured product markets, we estimate BAC will see over $1.5 billion in marks during 4Q, assuming market conditions don't improve, while MER positions could see $3.6 billion in losses."

129.    By January 1, 2009, analysts were openly skeptical about the Merrill Acquisition. Sanford C. Bernstein analyst Brad Hintz opined that:

> From BAC's point of view Merrill Lynch may look less attractive as Mr. Lewis's management team realizes that they have purchased a massive portfolio of troubled asset classes (residential and commercial mortgages, RMBS, CMBS, leveraged loans and CDOs) and significant CDO underwriter's liability claims. Certainly there is concern that Merrill's troubled assets and counterparty exposure could continue to drive new writedowns for Bank of America after the MER acquisition closes and that unhappy purchasers of MER's 2005-2006 CDOs will likely bring substantial claims against BAC under sections 11 and 12(2) of the Securities Act of 1933.

130.    On January 14, 2009, Sandler O'Neill analyst Jeff Harte stated that the Merrill Lynch acquisition "significantly increases [Bank of America's] exposure to currently depressed capital markets related revenues." He went on to cut his estimates for Bank of America's earnings accordingly.

131.    Also on January 14, 2009, following the stock market's close, *The Wall Street Journal* reported that Bank of America was near an agreement with U.S. officials that would

provide it with billions of dollars in financial assistance from the federal government, likely to include an infusion of fresh capital and the backstopping of billions of dollars of Bank of America's assets, according to the report. The news came after Bank of America's shares gyrated wildly during the day, as investors reacted to earlier reports that the firm would need more government funds to stay afloat.

132.    On January 15, 2009, multiple news services carried the story of an impending government bailout of Bank of America relating to its purchase of Merrill Lynch. In reaction to these reports, Bank of America announced that it would move up its reporting of quarterly earnings.

**D.    The Truth is Finally Revealed.**

133.    On January 16, 2009, *The Wall Street Journal* carried a story with a headline of "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level." The article states, among other things that:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan. Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991 . . . . Thursday's 18% stock-market drop gives the Charlotte, N.C. bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill. Its shares have lost over 40% of their value in the past seven trading sessions. The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

134.    The January 16, 2009 *Wall Street Journal* article also quoted Bradley Dorman, managing partner of Whiterock Point Partners, L.P., an investment advisor with 315,000 shares

of Bank of America common stock stating that: *"**Bank of America didn't do proper due diligence.**"*

135.    Also on January 16, 2009, Evan Newmark of *The Wall Street Journal* provided his analysis of the Merrill Acquisition.  In his article he noted that Defendant Lewis had purchased "Merrill Lynch, a business that may have been worth nothing."  He went on to state that Merrill Lynch had "snookered" Lewis and noted that even at the time, the price Bank of America paid for Merrill Lynch was "baffling."  The article continued:

> Before the Merrill deal, a share of Bank of America traded at about $34. Today, a share trades at a little more than $7, that is a decline of almost 80%.

> Of course, the Merrill deal alone isn't to blame for the mess at Bank of America. All of the world's banks are suffering. And CEOs overpay for acquisitions all the time.

> *But the Merrill deal is an outlier–an awful deal at inception that just keeps on getting worse.*

> The optics of Merrill executives, Tom Montag and Peter Kraus pocketing tens of millions of dollars in payouts were bad. That little tussle over Thain's bonus was unseemly. But nothing is as bad as Merrill posting a staggering $15 billion loss in the fourth quarter.

> *To uncover that two-thirds of these losses arose after the Dec. 5 shareholder vote is not only inexplicable, it is inexcusable.* By November and December, everyone on Wall Street assumed the worst. Except, apparently, Ken Lewis and his team at Bank of America.

> *BofA claims it conducted an excruciating level of due diligence on Merrill Lynch. But given Lewis's surprise over Merrill's losses in December how can that be?*

136.    Later that morning of January 16, 2009, Bank of America disclosed that (i) Merrill had suffered a fourth quarter after-tax net loss of $15.31 billion, or more than $21 billion before taxes, which accounted for more than 55% of Merrill's full year after-tax loss of $27 billion; (ii) Bank of America had suffered its own net loss of $1.8 billion in the fourth

quarter; and (iii) the U.S. Government was injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional preferred stock. With the fourth quarter losses, Merrill had lost $24.44 per share for the year, and $9.62 per share for the quarter, far above what the market had been expecting.  Similarly, Bank of America's own losses meant that it had lost $0.48 per diluted share, a far cry from the $0.08 per share profit that analysts expected. In addition, Bank of America announced that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per share.

137.     The $24 billion of preferred shares that Bank of America was required to sell to the U.S. Government under the terms of the bailout carried an 8% dividend rate, which would require Bank of America to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of Bank of America common stock by approximately thirty cents per share for 2009. Further, Bank of America was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee – all of which further reduced its future earnings and diluted the value of its common stock. In addition, Bank of America's acceptance of this additional Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a status that was so unique that, apart from Bank of America, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected Bank of America to additional Government oversight and restrictions.

138.    Significant negative fourth-quarter items for Merrill Lynch were reported in the January 16 press release, including:

a.    Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion;

b.    Goodwill impairments of $2.31 billion;

c.    Leveraged loan write downs of $1.92 billion;

d.    $1.16 billion in the U.S. Bank Investment Securities Portfolio write downs; and

e.    Commercial real estate writedowns of $1.13 billion.

139.    On the January 16, 2009 conference call to discuss these results, Lewis admitted that Bank of America was unable to absorb Merrill's losses without the taxpayer bailout:

We went to our regulators and told them that we would not – that we could not close the deal without their assistance. As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

140.    Analysts and the financial press reacted with astonishment. On January 16, Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [Government] involvement."

141.    As Lewis admitted on *PBS Frontline*, "The magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."

142.    After the close of markets on January 16, 2009, it was reported that Moody's had downgraded Bank of America's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch had downgraded Merrill's individual rating to "F" – well below junk

status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

143.    On January 17, 2009, *The Wall Street Journal* carried a story with the headline of "Bank of America Goes on Offensive: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry."   The story quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group Inc., as stating that Defendant Lewis "has very little credibility with the investor public right now."   *The Wall Street Journal* further reported that Bank of America's own weakened financial condition contributed to the need for Government aid.   In addition, , *The New York Times* published a lengthy article describing Merrill's massive losses as "devastating" and revealing that Bank of America's management had contemplated exercising the MAC after the vote but prior to the closing of the merger, and was dissuaded by the Government from doing so.

144.    The next trading day, Tuesday, January 20, 2009 (following the weekend and the Martin Luther King, Jr. holiday), based on the new information revealed in the previous days by Bank of America, analysts opined that Bank of America would need to raise an additional $80 billion to restore its capital to adequate levels.   J.P. Morgan reported that Bank of America's fourth quarter losses were "enormous," adding:

> [Bank of America] announced a major agreement with the U.S. government that reflected primarily the poor acquisition of [Merrill] done without due diligence as well as some assets from its own weakening portfolio. [Merrill] over-represented its value given its large amount of high risk assets and the level of permanent dilution for [Bank of America] from the acquisition will likely be higher.

145.    In direct response to these disclosures, Bank of America shares fell from $8.32 per share, their opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 – a drop of 38.7% on extremely heavy volume over two days of trading.

146.     In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about this materially adverse information, Bank of America stock plummeted from $12.99 to $5.10 – a decline of 60% – causing a market capitalization loss of over *$50 billion*.   Even at this price, Bank of America stock remained artificially inflated because news of the massive bonuses had yet to be disclosed.

147.     Then, on January 21, 2009, the *Financial Times* broke the story of Merrill's accelerated bonus payments, reporting that Merrill had taken "the unusual step of accelerating bonus payments by a month last year." Although the amount of the bonuses was not public, the *Financial Times* further reported that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December," before the merger closed.  According to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as "ridiculous," especially in light of Merrill's losses.

148.     On the following morning, Defendant Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job. According to Thain's *PBS Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

149.     On January 22, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

150.    The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments – as well as the fact that they were paid amidst historically large losses – was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitated in part by "[v]itriol . . . over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated." Similarly, the *Charlotte Observer* reported that "Thain's departure follows a raft of damaging revelations in recent days, including bigger than-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed." The *Los Angeles Times* reported on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the Associated Press reported that "on Thursday came the news that [Lewis] didn't block Merrill management's decision to dole out billions of dollars in early bonuses even as [Lewis] was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

151.    Even after the *Financial Times* report, Bank of America and Merrill steadfastly refused to disclose or confirm the size of the bonuses. As the *Charlotte Observer* reported on January 23, 2009, Bank of America still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

152.    The news of Merrill's bonus payments immediately triggered an investigation by the New York Attorney General. On January 23, 2009, *The New York Times* reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized . . . as 'large, secret last-minute bonuses.'" In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.
> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

159.    In response to the disclosure of Merrill's enormous, accelerated bonus payments, Bank of America stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009.  All told, Bank of America common stock fell 56% – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 – in response to these belated disclosures, destroying tens of billions of dollars in shareholder value.  Similarly, the price of Bank of America's Preferred Securities fell by over 30% in the aggregate during this same time period.

153.    Thain issued a memo upon his departure which was reported in *The Wall Street Journal* on January 26, 2009. The memo provided in part:

> It has been an honor to lead this company over the last very difficult year.

> The decisions that I made were always with the best interests of our shareholders and employees above all. I believe that the decision to sell to Bank of America was the right one for our company and our clients. While the execution has been difficult, I still believe in the strategic rationale of the transaction and I wish you all the best for the future of the combined companies.

> I want to address several topics that have been inaccurately reported in the press.

* * *

The second topic is the losses in the fourth quarter, which were very large and unfortunate. However, they were incurred almost entirely on legacy positions and were due to market movements. We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to our p&l [Deal Journal translator: that means "profit and loss," or the statement of the bank's accounts], our positions and our marks.

Our year end balance sheet target (which we more than met) was given to us by Bank of America's CFO.

154.     On January 27, 2009, New York State Attorney General Cuomo announced that a subpoena had been issued to Defendant Thain in connection with an investigation into billions of dollars in end of the year bonuses paid by Merrill Lynch to its executives.  The *New York Times* revealed on February 8, 2009 that Bank of America knew about the bonuses, but this information was not revealed to shareholders until the New York attorney general made his announcement.

155.     On February 20, 2009, New York State Attorney General Cuomo announced that a subpoena had been issued to Defendant Lewis as part of an investigation into whether or not Bank of America had withheld information from investors in violation of New York State Law. The investigation centers on whether investors were misled about the depth of Merrill's losses and whether bonuses paid to Merrill Lynch employees before the deal closed violated New York law.

156.     On February 23, 2009, a New York state judge ordered Defendant Thain to provide further testimony on the bonuses paid by Merrill Lynch to its executives.  According to documents filed by Cuomo, Thain had refused to answer questions about bonuses paid to all but five Merrill Lynch executives.  The documents went on to state that Thain had refused to testify because he was instructed not to by Bank of America.  The five executives Thain did testify about had all foregone their bonuses and were irrelevant to Cuomo's investigation.

58

157.    On February 25, 2009, *The Wall Street Journal* reported that Merrill Lynch's losses were even greater than the $15.31 billion that had been reported on January 16, 2009. Fourth-quarter losses had actually totaled $15.84 billion, more than $500 million higher than the prior estimate.

158.    Investors were shocked by these developments and quickly pushed down the price of Bank of America common stock in active trading from its closing price of $10.20 per share on January 14, 2009 to close at $5.61 per share on February 25, 2009, a decline of 45%.

## V. CLAIMS FOR RELIEF UNDER SECTION 14(a) - "PROXY CLAIMS"

159.    The claims set forth herein pursuant to Section 14(a) and Rule 14a-9 ("Proxy Claims") are based solely on negligence and are not based on any allegations of knowing or reckless misconduct by any Defendant.  These claims do not allege, and do not sound in fraud, but rather in negligence, and Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under Section 14(a) and Rule 14a-9.

160.    The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger, including the Proxy, the documents incorporated into the Proxy, the later-filed Proxy Supplements and statements made by Defendants on conference calls discussing the merger, contained misstatements of material facts and omissions of material facts. Further, Defendants' later-filed Proxy Supplements did not, as required by law, update and correct their previously-made misstatements, and themselves contained material misstatements and omissions. Nor did Defendants, as required by law, update their previously-made statements expressing their optimistic opinions about the strength of the merger and its value to Bank of America shareholders when Defendants experienced a "change of heart" about the merits of the transaction

A.    <u>**Summary of Proxy Misrepresentations and Omissions.**</u>

161.   Defendants' proxy solicitations included all of the statements which affected the market's and Bank of America shareholders' view of the deal. These statements, collectively referred to as the "Proxy Solicitations," include:

    a.  The September 15, 2008 Investor Call, Press Conference, and Press Release;
    b.  Bank of America's and Merrill's September 18, 2008 Form 8-K;
    c.  Bank of America's October 6, 2008, conference call;
    d.  Merrill's October 16, 2008 Press Release;
    e.  The Proxy and attached Merger Agreement;
    f.  Bank of America's and Merrill's November 21, 2008 Proxy Supplement; and
    g.  Bank of America's November 26, 2008 Proxy Supplement.

162.   All of the Proxy Solicitations contained misstatements and omissions that were material, as described more fully above. Specifically, the Proxy failed to disclose the following highly material information prior to the shareholder vote on December 5, 2008:

(a)    Bank of America had agreed to allow Merrill to pay up to $5.8 billion in bonuses on an accelerated basis, before the merger closed. This agreement, which was set forth in a Disclosure Schedule that was never publicly filed or otherwise disclosed to shareholders before the vote on the merger, was highly material to investors because, among other reasons, it: (i) represented 12% of the merger price; (ii) constituted 30% of Merrill's stockholders' equity as of December 26, 2008; and (iii) ensured that Bank of America shareholders would receive an asset worth billions of dollars less than contemplated.

(b)    Before the shareholder vote, Merrill had already suffered approximately $15 billion in pre-tax losses and impairments – losses which precipitated internal discussions about invoking the MAC and terminating the merger – and was projecting billions of dollars of additional losses for December.

(c)    Bank of America did not have the ability to absorb Merrill's losses at its

existing capital levels as of the end of November 2008. Indeed, as set forth in the Federal Reserve Merger Analysis, Bank of America had suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss – the first quarterly loss in its history – thus further eroding its capital levels.

(d)    As a consequence of the massive losses at Merrill and Bank of America's own deteriorating financial condition, Bank of America's senior executives debated invoking the MAC before the shareholder vote.

163.    Furthermore, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made, which are summarized below. In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote. Significantly, Defendants updated the Proxy twice, on November 21 and November 26, 2008, without disclosing any of the material facts originally omitted

164.    In addition to the failure to disclose this highly material information, the Proxy Solicitations contained numerous statements which were materially false and misleading at the time they were made or were rendered false and misleading by subsequent events, giving rise to a duty on the part of the Defendants to correct and/or update these statements. These materially false and misleading statements included the following:

(a)    Misstatements on September 15, 2008 about Bank of America's "very, very extensive" due diligence of Merrill, which included a "comprehensive[]" analysis of Merrill's financial condition.  These statements were materially false and misleading when made because, contrary to Defendants' statements, Bank of America's due diligence was inadequate, a fact that has been confirmed by Lewis as well as by federal regulators who reviewed Bank of

61

America's due diligence efforts.

(b)     Misstatements on September 15, 2008 about Merrill's "dramatically" reduced "risk profile."   Given the inadequacy of Bank of America's due diligence, these statements were made without reasonable basis and were untrue, as demonstrated by the following facts: (i) mere weeks after Defendants made these statements, in October 2008, Merrill experienced the worst month in its history by incurring $7 billion of losses on high-risk assets that existed as of September 15, 2008; (ii) Merrill's massive fourth quarter losses, as reported by Thain, "were incurred almost entirely on legacy positions" that Merrill held as of September 15, 2008; (iii) Thain stated that Lehman's bankruptcy on September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets;" and (iv) in mid-December 2008, Federal Reserve officials reviewed Merrill's assets and financial condition, and concluded that Merrill had retained tens of billions of dollars of high-risk exposures.

(c)     Misstatements on September 15, 2008 that "Merrill had the liquidity and capacity" to survive the market turmoil as an independent entity, which, according to Defendants, supported the substantial premium that Bank of America had agreed to pay for Merrill. In fact, contrary to these assurances, as Thain subsequently admitted: (i) Merrill would have become insolvent as early as the morning of September 15, 2008; and (ii) Lehman's bankruptcy "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets." In addition, on the Friday before the deal was negotiated, the heads of the major investment banks had uniformly acknowledged the likelihood of Merrill's imminent collapse given Lehman's bankruptcy.

(d)     The statement on September 15, 2008 that Bank of America and Merrill faced "absolutely no pressure" from federal regulators to finalize the merger.  In fact, as

Thain has stated, given Merrill's disastrous financial condition and severe liquidity constraints, Secretary Paulson issued a "very strong" ultimatum to finalize the proposed deal by September 15, 2008. In fact, *PBS Frontline* reported that Secretary Paulson was "adamant" that the parties finalize the transaction before the markets opened on September 15.

(e)     The assurance on September 15, 2008 that Thain had not sought to pursue his own self-interests in negotiating the merger because "it was never about him; it was always about the deal."   In fact, Thain delayed the signing of the Merger agreement for hours because he insisted on receiving tens of millions of dollars in personal compensation in connection with the merger, and sought to pay hundreds of millions of dollars in bonuses to his top lieutenants and former business associates from Goldman Sachs, as part of the total $5.8 billion in discretionary bonuses to Merrill executives and employees. Moreover, Thain used the merger negotiations as an opportunity to materially increase the bonuses that Merrill was planning to pay.

(f)     The statements on September 15, 2008 concerning the benefits of the merger to Bank of America's shareholders, including that the merger was "a great opportunity for our shareholders," made Bank of America more "valuable," and created "the leading financial institution in the world."   As discussed above, Defendants had no reasonable factual basis to make these statements given that they had failed to adequately consider the risks presented by Merrill's enormous portfolio of toxic assets. Moreover, before the shareholder vote, Defendants determined that Merrill's enormous losses threatened to materially impact Bank of America's financial condition, but failed to update their prior statements to reflect their changed assessment of the strengths and benefits of the merger.

(g)     Defendant Price's statement on October 6, 2008 that the $10 billion

Secondary Offering "covered [Bank of America's] anticipated [capital] needs from a Merrill standpoint."  By late November 2008, as a consequence of Merrill's mounting losses, which were approximately $15 billion and growing, and Bank of America's own deteriorating financial condition, Bank of America's capital needs in connection with the merger had exceeded the capital it raised in the Secondary Offering, and this statement had become materially misleading. Consequently, Defendants had a duty to update this statement prior to the date of the vote, which they negligently failed to do.

(h)    The statement by Defendant Thain on October 16, 2008 that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" prior to the merger's close. This statement was materially misleading because (i) Merrill had suffered $7 billion of losses in October alone precisely because it had retained large amounts of toxic assets on its balance sheet; (ii) Thain acknowledged that almost all of Merrill's massive fourth quarter losses arose from "legacy" positions that Merrill had retained; and (iii) federal regulators, after examining Merrill's financial condition, concluded that it retained a dangerously high risk profile as of October 2008.

(i)    The misstatements in the Merger Agreement and Proxy that Merrill "shall not" and "will not," respectively, pay any discretionary bonuses before the merger closed without Bank of America's prior written consent.  In fact, Bank of America had already approved both the payment of up to $5.8 billion in bonus compensation for Merrill's employees and an accelerated schedule to pay the bonuses in December, before the merger closed.

(j)    The misstatements in the Proxy that Merrill's bonuses were "paid in January for performance in the prior fiscal year."  In reality, the bonuses were determined prior to the close of the fourth quarter and fiscal year, and were paid despite Merrill's losses.

(k)     The misstatements in the Proxy and November 26, 2008 Proxy Supplement, including that there was an "absence of material adverse changes" in Merrill's financial condition that was "disproportionately adverse" to its peer institutions; that Bank of America and the combined company had a "strong capital position, funding capabilities, and liquidity;" and that Bank of America was one of the "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world."  Contrary to these statements, a material adverse change had occurred in Merrill's financial condition before the vote, and the imminent merger would materially impact Bank of America's financial condition because: (i) at the time the Proxy was filed on November 3, 2008, Merrill had already suffered $7 billion in losses, which was almost equal to Bank of America's pre-tax income for the first three quarters; (ii) as of the date of the shareholder vote, Merrill's pre-tax losses had ballooned to $15.3 billion and had triggered debate within Bank of America as to whether to invoke the Merger Agreement's MAC; (iii) after reviewing Bank of America's own capital position, federal regulators concluded that Bank of America's capital levels were "very thin[]" and that Bank of America was unprepared for further deterioration, which would occur once it absorbed Merrill; and (iv) just days after the vote, Defendant Lewis decided to invoke the MAC because of Bank of America's inability to absorb Merrill's losses, and requested and accepted a $138 billion bailout.

165.   The false statements and omissions as set forth above proximately caused foreseeable losses to Plaintiff, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures, causing Bank of America stock to fall from $12.99 on January 9, 2009 to a low of $5.10 on January 20, and to fall again on January 22, 2009.

**COUNT I - VIOLATION OF SECTION 14(A)**
**OF THE EXCHANGE ACT AND SEC RULE 14A-9**

166.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

167.    This claim for relief is brought by Plaintiff against all of the Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC, which prohibits making material misstatements and omissions in a proxy statement.

168.    The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above ("Proxy Solicitations"), contained misstatements and omissions that were material.  The Defendants made, or were responsible for making, the misstatements and omissions.  Through their negligence in issuing the Proxy Statement and Proxy Solicitations containing material misstatements and omissions, the Proxy Defendants failed to disclose to Bank of America shareholders all material facts necessary for Bank of America shareholders to cast a fully informed vote with respect to the Merrill Acquisition, as alleged above.  Defendants did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on December 5, 2008.

169.    Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy.

170.    Bank of America and Merrill permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that neither company had experienced material adverse effects, and that Merrill would not pay discretionary bonus compensation.

171.    Defendant Lewis signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy and otherwise permitted the use of his name in

the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Call, Press Conference, and press release.

172.    Defendant Thain signed the cover letter for the Proxy and otherwise permitted the use of his name in the Proxy. Defendant Thain also solicited the votes of shareholders in the September 15, 2008 Investor Call, Press Conference, and press release, and the October 16, 2008 press release.

173.    Defendant Price signed the Proxy Registration Statement and subsequent amendments, and solicited the votes of shareholders in the September 15, 2008 Investor Call and the October 6, 2008 conference call.

174.    By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants sought to secure Plaintiff's and other shareholders' approval of the merger, and solicited proxies from them.

175.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by material information which arose after the dissemination of the these statements and before the December 5, 2008 shareholder vote.

176.    The solicitations described herein were essential links in the accomplishment of the merger.  As a result of these solicitations, the Bank of America shareholders approved the merger.

177.    Plaintiff has been injured by the material misstatements and omissions contained in the Proxy Statement, and Plaintiff is entitled to recover damages to compensate him for all

damages resulting from the acts and omissions of the Defendants in violation of Section 14(a) of the Exchange Act.

178.    Less than two years have elapsed from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time this Complaint was filed.

## IV.    ADDITIONAL SUBSTANTIVE ALLEGATIONS IN SUPPORT OF CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT

179.    The claims herein under Section 10(b) and SEC Rule 10b-5 incorporate by reference each and every allegation set forth above as if set forth fully herein.

### A.    The Acquisition of Countrywide.

180.    On January 11, 2008, Bank of America and Countrywide announced they had entered into a merger agreement whereby Bank of America would acquire Countrywide in an all stock transaction valued at $4.1 billion.  In a press release announcing the merger, which was also filed in a Form 425 prospectus with the SEC, Defendant Lewis praised the addition of Countrywide to the Bank of America family:

> Countrywide presents a rare opportunity for Bank of America to add what we believe is *the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier lender to consumers*.
>
> * * *
>
> We are aware of the issues within the housing and mortgage industries.  The transaction reflects those challenges. Mortgages will continue to be an important relationship product, and *we now will have an opportunity to better serve our customers and to enhance future profitability*.

181.    The press release went on to tout Countrywide's subprime initiatives, stating in relevant part:

- Both Bank of America and Countrywide continue to work with public officials and community groups to explore new initiatives to help homebuyers and communities affected by the subprime issue.

- Bank of America and Countrywide both support efforts to fight predatory lending practices.

- Bank of America and Countrywide are active participants in the Hope Now Alliance, which has launched a letter campaign to delinquent borrowers, created a counseling hotline and facilitates the sharing of best servicing practices. Bank of America also will continue Countrywide's commitment to participate in the American Securitization Forum's December 2007 reset freeze framework for 2/28 and 3/27 adjustable rate mortgages (ARMs).

- Bank of America will continue Countrywide's commitment to participate in California Governor Arnold Schwarzenegger's November 2007 subprime ARM program.

- Bank of America plans to expand the capacity and marketing of credit counseling programs and internal capacity and flexibility for loan modifications for loan workout teams following the purchase of Countrywide.

- Countrywide also has a number of programs in place designed to minimize foreclosures where feasible.

- On October 23, 2007, Countrywide announced a major expansion of its foreclosure prevention efforts by starting a $16 billion home preservation program to assist as many as 82,000 subprime hybrid [adjustable rate mortgage] customers facing [adjustable rate mortgage] resets through the end of 2008.

- On October 24, 2007, Countrywide entered into a groundbreaking partnership with the Neighborhood Assistance Corporation of America (NACA) to leverage Countrywide's market leading home retention programs and NACA's unique model for counseling borrowers.

- On December 21, 2007, Countrywide announced work on an agreement with the Association of Community Organizations for Reform Now (ACORN) to serve as a blueprint for home retention and foreclosure prevention initiatives in the mortgage industry, with a particular focus on subprime borrowers.

182. The statements above were false and/or misleading because Countrywide was under investigation in several states, including Arizona, Connecticut, Florida, Iowa, Michigan, North Carolina, Ohio, Texas and Washington for predatory lending practices. Further, the Defendants did not reveal to investors that the merger would saddle Bank of America with $30 billion in loan losses and seriously threaten the adequacy of the Company's capitalization. This

material information was knowingly or recklessly disregarded by Defendants and the failure to disclose this information constituted a violation of Section 10(b) and Rule 10b-5.

183.    The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

a.    The Company's acquisition of Countrywide would have catastrophic consequences on the Company's capital position and overall operations;

b.    The acquisition of Countrywide would saddle Bank of America with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to billions in losses related to Countrywide's predatory lending practices;

c.    The Company's capital base was not adequate to withstand the toxic assets and legal issues brought to the merger by Countrywide.

184.    On January 18, 2008, Bank of America held a teleconference to discuss its acquisition of Countrywide. Defendant Lewis spoke to analysts and investors:

We have asked you to join us today to talk about the acquisition of Countrywide.
* * *
Today's announcement presents a unique opportunity to acquire the mortgage capabilities and scale that are critical to our customer relationships at a time when valuations are, in fact, very compelling. Our extensive due diligence supports our overall valuation and pricing of the transaction.
* * *
We now move to the top of both originating and servicing, with a 25% share of the origination market and a 17% share of the servicing market. While we are regarded as one of the most efficient mortgage shops, Countrywide has product expertise and a sales culture that tops our capabilities. By utilizing their skill sets, we can offer more mortgage capabilities to our vast customer base.
* * *
When we marry the best practices of sales capabilities and efficient operations, we can dramatically improve the profitability of the Company.
* * *
So we view this as a one time opportunity to acquire the best mortgage platform in the business at a time when the value is very attractive.
* * *
Let me tell you just a few things that make Countrywide an important product. As I said, they are America's largest overall originator of mortgages, with leadership positions across all sales channels and retail, wholesale, and

correspondent lending.  With a $1.5 trillion dollar servicing portfolio, they service more than 9 million loans.

They have locations – either loan offices, 700-plus or banking centers, 200-plus – in nearly every state in the U.S.  These offices are focused on the most heavily-populated United States of California, Florida, and Texas, to name a few, and staffed with 15,000 mortgage sales associates.

These associates are led by a long-tenured management team that has built an incredible company with areas of operational expertise that has weathered many past cycles.  Their balance sheet has more than $200 billion in assets and roughly $55 billion in deposits.

As you are all aware, this year has been tough for them, as their model was severely impacted by market liquidity concerns and the ability to fund asset growth.  These problems play into our strengths as we have the funding with our deposit book and access to the markets to continue to grow the business.

* * *

We expect to close the deal in the third quarter after customary approvals from regulatory bodies as well as Countrywide shareholders.  We have completed due diligence and received both Bank of America's approvals.

Now as Ken said, the due diligence on this deal was extensive.  We had more than sixty people on the ground for the better part of the last thirty days, with more focus picking up through the holidays.  The focus of the due diligence, as you would expect was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas.  The results of our due diligence support our overall valuation and pricing of the transaction.

185.    Defendant Price also spoke at the conference and took questions from analysts:

**RONALD TEMPLE:**  Okay, that helps.  Two other quick ones.  Do you have any protection from legal ramifications?  Obviously, Countrywide has been involved in some litigation thus far, how should we think about that?  I think Ron Mandle kind of referenced that implicitly as well.

**JOE PRICE:** Go back to the comment made earlier.  Again, our being clearly focused on those areas in due diligence both from a kind of corporate as well as particular product aspect, and incorporated that in the economic evaluation in arriving at our pricing or validating our pricing.

* * *

**LORI APPELBAUM, ANALYST, GOLDMAN SACHS:**  My questions were largely asked by Ron and Ron, but I will try again anyway. Joe, you mentioned that much of the due diligence was spent on the MSR credit and legal; and that

was a factor in how you set the exchange ratio. If you could provide any key assumptions across those three measures at all in coming to the exchange ratio.

**JOE PRICE:** No, not really. Let me clarify, Lori. What we did is we did our due diligence; and obviously our exchange ratio was established based on market pricing and all the other attributes that you would consider in that.

What I was meaning is that our due diligence findings were supported or fully encompassed in when we set that exchange ratio, so.

But no, I am not prepared to provide any details specific as to specific estimates on particular items. Obviously, that will change up through the date of application of purchase accounting once the deal is approved in early third quarter period.

186.    Defendant Lewis also spoke to analysts at the conference:

**JEFF HARTE, ANALYST, SANDLER O'NEILL:**  Good morning, guys. Most of my questions have been hit. I have two left. One, I understand the due diligence process from the credits and what is in the portfolio standpoint. Can you talk a little bit more about how you got comfort on the litigation and potential regulatory site? Because we are looking at one of the biggest subprime issuers out that. With subprime having a lot of problems, and government kind of entities looking into it, and lawsuits potentially looming, how do you get comfortable with your potential exposures on those two fronts?

**KEN LEWIS:**        Well, all I can say is we had a lot of advice from both our internal group and also from two other entities that put some parameters around it.

187.    Despite these repeated specific questions on potential legal issues facing Countrywide, Defendants Price and Lewis refused to inform investors about the state investigations surrounding Countrywide's predatory lending practices.

188.    On April 11, 2008, Plaintiff purchased on the open market 50,000 Bank of America shares at $37.00 per share.

189.    On April 29, 2008, Countrywide reported a shocking first quarter loss of $893 million, reflecting $3 billion in credit-related charges. Countrywide wrote off $1.5 billion in losses on its residential loan portfolio alone, ten times the amount written off the previous year.

The news led to Standard & Poor's decision to downgrade Countrywide debt to junk-bond status. Countrywide shares dropped a precipitous 10 percent in one day.

190.    Over the next week, it became apparent that the merger was going forward despite the fact that Countrywide was clearly a dying company. Further, instead of buying Countrywide at a discount as the merger agreement anticipated, Bank of America would be paying a 20 percent premium. An analyst for Friedman Billings Ramsey suggested that a fair price would be $2.00 per share as opposed to the $7.00 per share price that Bank of America was preparing to pay. The analyst went on to write that, "Many investors believe that Bank of America does not want the negative publicity from renegotiation to ruin a solid reputation. ***This thesis ignores the marks that Bank of America will have to take if it closes the deal as is, and it could put Bank of America's well-capitalized levels at risk***." As the realization of what Bank of America was acquiring crept into the market, share prices began to descend, dropping 11 percent between May 1 and May 7, 2008.

191.    On June 25, 2008, Illinois Attorney General, Lisa Madigan, filed a lawsuit against Countrywide alleging the company had engaged in unfair and deceptive practices in an effort to induce homeowners to apply for risky mortgages beyond their means. California Attorney General, Jerry Brown, filed a similar lawsuit on the same date alleging Countrywide had broken the state's false advertising and unfair business practices laws. On July 1, 2008, Florida Attorney General Bill McCollum filed a lawsuit against Countrywide making similar allegations.

192.    Bank of America completed the purchase of Countrywide on July 1, 2008. Defendant Lewis was quoted in a press release as stating:

> Mortgages are one of the three main cornerstone consumer financial products along with deposits and credit cards. This purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a

broad distribution network that will offer more ways to meet our customers' credit needs.

193.    On July 21, 2008, Bank of America announced better-than-expected second quarter 2008 results, beating analysts' estimates.  In a conference call held to discuss these results, Defendant Price stated, "We think the worst is behind us on value declines, as evidenced in our results for the quarter."  Almost immediately, Bank of America's stock began to trade higher.

194.    On August 6, 2008, Connecticut State Attorney General, Richard Blumenthal ("Blumenthal"), filed suit against Countrywide seeking to recover damages for violations of state consumer protection and banking laws.  Blumenthal stated in relevant part:

> ***Countrywide conned customers into loans that were clearly unaffordable and unsustainable, turning the American Dream of homeownership into a nightmare.*** When consumers defaulted, the company bullied them into workouts doomed to fail. Countrywide crammed unconscionable legal fees into renegotiated loans, digging consumers deeper into debt. ***The company broke promises that homeowners could refinance, condemning them to hopelessly unaffordable loans.***

> Countrywide was at their side -- as an insolvency enabler. Countrywide inflated homeowner incomes to qualify them for loans they couldn't pay back and misled consumers about loan terms.

> Countrywide stacked the deck and the deal against its customers: Our goal is to un-stack the deck -- and undo the deals -- restoring fairness and fiscal sense to mortgages. I will fight for restitution -- money back to homeowners used and abused by Countrywide -- as well as fines and forfeitures to the state. Our lawsuit seeks to invalidate loans that violate state law, allowing consumers to shed illegal, unreasonable fees and conditions that leave them at the precipice of foreclosure. We must vigorously fight predatory lending practices that trap consumers on a debt treadmill.

195.    On August 12, 2008, West Virginia Attorney General Darrell McGraw brought similar claims against Countrywide.  On August 24, 2008, Indiana Attorney General Steve Carter filed a similar lawsuit, making it the sixth state to file suit against Countrywide

196.    Bank of America sought a solution to Countrywide's legal issues, and on October 6, 2008, the Company entered into and announced a historic settlement agreement with eleven state regulators who had brought suit against Countrywide.  The settlement required Bank of America to restructure approximately 400,000 residential mortgages, dropping interest rates to as low as 2.5 percent.  News of the settlement hit the market like a tidal wave.  Bank of America shares were pounded based on the Company's disappointing news, falling 27 percent or $8.45 by the close of trading on October 7. For California alone, the settlement was valued at $3.5 billion while Illinois home owners received $190 million in relief.  Bank of America agreed to waive $79 million in late fees and $56 million in prepayment penalties.  Bank of America spokesman, James M. Mahoney, admitted that the Company had prepared for such a loss when they acquired Countrywide, but investors were not informed of the potential litigation until the suits were filed. All told, Bank of America was forced to set aside $8.7 billion to meet the terms of the settlement agreement.  The Company also announced disappointing earnings and cut its dividend as part of an effort to raise more capital.  These announcements could not have come at a worse time as Bank of America was preparing to close on a stock offering in an effort to raise approximately $10 billion to shore up its capital levels.

197.    Bank of America's massive settlement later included numerous other states, totaling 39 different states.

**B.      The Stock Offering.**

198.    On October 7, 2008, Bank of America issued a press release announcing that it was conducting a Secondary Offering.  The press release stated in part:

> Bank of America Corporation today announced the pricing of its offering of $10 billion, or 455 million shares, of common stock.  The transaction includes an option to the underwriters to purchase up to 68.25 million additional shares of

common stock.  Bank of America expects to deliver the shares of common stock on October 10, 2008.

Banc of America Securities LLC and Merrill Lynch & Co. are serving as joint book runners.  The offering is being made under Bank of America's existing shelf registration statement filed with the Securities and Exchange Commission (Reg. No. 333-133852).

199.    During a conference call that day, Defendant Price told investors that the Secondary Offering was sufficient to cover Bank of America's capital needs required by the Merrill transaction, stating that Bank of America had "considered the Merrill deal" in assessing its capital position, and that the offering "covered our anticipated needs from a Merrill standpoint.

200.    The Secondary Offering was conducted pursuant to Bank of America's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

201.    The Offering Documents incorporated by reference Bank of America's Form 10-K for the year ending December 31, 2007 and its Form 10-Q for the three months and six months ending June 30, 2008.  The Offering Documents further incorporated by reference certain of the Company's Form 8-Ks filed with the SEC, including the Company's 8-K filed on September 15, 2008, which contained Bank of America's September 15, 2008 press release, the Company's 8-K filed on October 3, 2008, and the Company's 8-K filed on October 6, 2008, which contained Bank of America's October 6, 2008 press release and additional risk factors facing the Company.

202.    These documents contained untrue statements of material facts and omitted to state material facts, thereby rendering the Offering Documents materially false and misleading. They omitted important information about Bank of America's exposure to the credit markets and

how the changes in the market were affecting Bank of America by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base. The Offering Documents further misstated the effect the Merrill Acquisition would have on the Company's capital position and overall operations.

203.    The Offering Documents contained untrue statements of material fact or omitted to state other material facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.

204.    The statements above were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on both Bank of America's and Merrill Lynch's business, which significantly increased the risk of investing in Bank of America stock.

205.    At least 455 million shares of Bank of America common stock were sold to the public at $22.00 per share in the secondary offering, which raised over $10 billion.

**C.    Fraudulent Statements Made About the Acquisition of Merrill Lynch.**

206.    As detailed above in Section IV, Defendants made numerous material misrepresentations and omissions of fact regarding the acquisition of Merrill Lynch, the due diligence performed, the regulators' involvement, and the Merrill bonuses.

207.    In the Investor Call and Press Conference on September 15, 2008, Defendants Lewis, Thain, and Price rebutted any suggestion that Bank of America had made a hasty or precipitous decision to acquire Merrill, and made a series of false statements designed to assure investors that Bank of America had conducted comprehensive due diligence of Merrill, that there had been no regulatory pressure to finalize the transaction on an expedited basis, and that the large premium was justified because Merrill was financially stable.

208.    For example, when asked about the due diligence Bank of America conducted, Lewis falsely stated that it was "very, very extensive," included a "comprehensive[]" analysis of Merrill's financial condition, and had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much lower risk profile" than it previously possessed. In order to emphasize how familiar Bank of America was with Merrill's financial condition with respect to any asset valuation issues, Lewis added that "we have very similar methodology valuations and we have very similar marks. The structures – we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

209.    Further, when asked whether there was "any pressure on the part of regulators" to consummate the deal so quickly, Lewis falsely stated: "First of all, there was no pressure from regulators . . . absolutely no pressure," adding that the substantial premium was justified because "Merrill Lynch would have seen this [financial meltdown] through if they had been independent."

210.    On September 18, 2008, Bank of America and Merrill each filed copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms. The Merger Agreement did not say a word about the $5.8 billion in bonuses that Bank of America had agreed to let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the merger closed.  To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not, without the prior written consent of Bank of America:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries

(collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

211.    Although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware at the time of the losses that occurred during October and November 2008.  Lewis was asked by one Representative whether Bank of America received "detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 15th?" Lewis replied, "That is true." The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . . ? Isn't that true?" Again, Lewis replied, "It is true." At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that Bank of America stationed at Merrill immediately after the merger announcement reported Merrill's losses to Lewis before the shareholder vote. Lewis responded, "I apologize if I haven't been clear. The – *we did have people there, and we did know that there were losses. And that was clear both at our company and theirs."*

212.    Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections. I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

213.    In fact, Lewis led weekly calls during which he and Defendant Price actively discussed Merrill's growing losses with the Bank of America.  As *The Wall Street Journal* reported on September 17, 2009, "Before the shareholder vote, directors participated in weekly

conference calls led by Mr. Lewis that included updates from the bank's chief financial officer, Joe

Price, on Merrill's estimated fourth-quarter losses, said one person familiar with the calls."

214.    October 10, 2008 was the record date for determining the holders of the

Company's common stock entitled to vote on the Merrill Acquisition.

215.    On October 30, 2008, Bank of America filed a Form 8-K with the SEC which

stated in part:

> On October 26, 2008, Bank of America Corporation (the "Registrant") entered
> into a Letter Agreement (the "Purchase Agreement") with the United States
> Department of the Treasury ("Treasury"), pursuant to which the Registrant agreed
> to issue and sell (i) 600,000 shares of the Registrant's Fixed Rate Cumulative
> Perpetual Preferred Stock, Series N (the "Series N Preferred Stock") and (ii) a
> warrant (the "Warrant") to purchase 73,075,674 shares of the Registrant's
> common stock, par value $0.01 per share (the "Common Stock"), for an aggregate
> purchase price of $15,000,000,000 in cash.
>
> * * *
>
> Simultaneously with the Registrant's entry into the Purchase Agreement, Merrill
> Lynch & Co., Inc. ("Merrill Lynch") entered into an agreement with Treasury (the
> "Merrill Agreement") which would have allowed Merrill Lynch to sell preferred
> stock and warrants to Treasury for a purchase price of $10,000,000,000 prior to
> January 31, 2009, under certain circumstances. Treasury agreed with the
> Registrant that if the closing of the transactions contemplated by the Agreement
> and Plan of Merger dated as of September 15, 2008 by and between Merrill
> Lynch and the Registrant occurred prior to the closing of the issuance and sale of
> Merrill Lynch preferred stock and warrants to Treasury as contemplated by the
> Merrill Agreement, then the Merrill Agreement would be terminated and Treasury
> would purchase and the Registrant would issue (i) 400,000 additional shares of
> the Registrant's preferred stock with substantially identical terms as the Series N
> Preferred Stock and (ii) warrants to purchase 48,717,116 additional shares of
> Common Stock with an exercise price of $30.79 and substantially identical terms
> to the prior warrants, for an aggregate purchase price of $10,000,000,000.

216.    On November 3, 2008, Bank of America filed its Merger Proxy Statement, dated

October 31, 2008, with the SEC.    The Merger Proxy Statement contained the following

statements:

**Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors consulted with Bank of America management as well as financial and legal advisors and determined that the merger is in the best interests of Bank of America and Bank of America stockholders. In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following material factors:

- its understanding of Bank of America's business, operations, financial condition, earnings and prospects and of Merrill Lynch's business, operations, financial condition, earnings and prospects;

- its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market conditions, the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;

- the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;

- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;

- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;

- the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;

- the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- the likelihood that the regulatory and stockholder approvals needed to complete the transaction will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;
- the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK;  the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of
- the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;
- the potential impact of the transaction on the capital levels and credit rating of Bank of America; and the need and ability to retain key Merrill Lynch personnel.

The Bank of America board of directors considered all of these factors as a whole and, on balance, concluded that they supported a favorable determination to enter into the merger agreement.

The foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, but includes all material factors considered by the Bank of America board of directors. In view of the wide variety of factors considered by the Bank of America board of directors in connection with its evaluation of the merger and the complexity of these matters, the Bank of America board of directors did not consider it practical to, nor did it attempt to, quantify, rank or otherwise assign relative weights to the specific factors that it considered in reaching its decision. The Bank of America board of directors evaluated the factors described above and reached a consensus that the merger was advisable and in the best interests of Bank of America and its stockholders. In considering the factors described above, individual members of the Bank of America board of directors may have given different weights to different factors.

The Bank of America board of directors determined that the transaction was in the best interests of Bank of America and its stockholders, and the board voted unanimously to approve the merger agreement and recommends that Bank of America stockholders vote "FOR" the issuance of Bank of America common stock in the merger.

217.    The Merger Proxy Statement incorporated by reference Bank of America's Form 10-K for the year ending December 31, 2007 and its Forms 10-Q for the quarters ending March 30, 2008 and June 30, 2008, and Merrill Lynch's Form 10-K for the year ending December 28, 2007 and its Forms 10-Q for the quarters ending March 28, 2008 and June 27, 2008.

Additionally, the Merger Proxy Statement incorporated by reference certain of the Company's Forms 8-K filed with the SEC, including the Company's Forms 8-K filed on July 21, 2008, July 23, 2008, July 25, 2008, September 15, 2008 (2 filings), October 2, 2008, October 3, 2008, October 6, 2008, October 7, 2008, and October 26, 2008.

218.    On November 6, 2008, Bank of America filed its Form 10-Q for the third quarter of 2008, which included the same financial results previously reported on October 6, 2008.

219.    On November 19, 2008, Plaintiff purchased on the open market 20,000 Bank of America shares at $14.50 per share.

220.    On November 26, 2008, Bank of America filed a Form 425 with the SEC, which contained a letter by Defendant Lewis, which stated:

> To my teammates:
>
> I usually don't comment on our stock price – it is investors' job to price our stock based on their appraisal of our performance and our prospects, and my job to lead the company. But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how Bank of America is positioned to ride out this severe economic storm.
>
> Investors have deep concerns about how long and deep the recession will be, how high unemployment will go, when housing prices will stabilize and what will be the catalyst to bring us out of the recession. On banks in particular, they are concerned, among other things, about whether financial institutions have enough capital. These factors are putting tremendous pressure on the markets in general, and financial stocks in particular.
>
> Given this environment, Bank of America continues to be a strong, active player in the financial markets. We are generating strong deposit growth and attracting new customer and client relationships throughout our company. We continue to make loans to consumers and businesses to boost shareholder value and to do what we can to support economic activity.
>
> **We are one of the most liquid banks in the world. We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements and our own target. In short, we believe we are one of the strongest and most stable major banks in the world.**
>
> I have gotten questions from associates and investors in recent weeks on two specific topics: the government capital injections into banks, and our decision to increase our investment in China Construction Bank (CCB).
>
> **Regarding the federal capital injection, these were funds that we did not need and did not seek.** At the time the government asked the major banks to accept the

injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, had more than adequate capital. We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.

In the meantime, we are managing the company, and making decisions about strategic investments and other matters in the best interests of shareholders and the company, just as we would have given the economic environment and our competitive position.

Our decision to invest in China Construction Bank is a good example. We have known since we made our initial investment in CCB several years ago that we would have an opportunity to increase our stake at attractive terms. We made the decision based on our judgment about the prospective return for shareholders, as we always do.

While we cannot directly control or predict our stock price, there are some things we all can do to help push our business, the broader economy and, in an indirect sense, our stock price, in the right direction.

We can continue to work hard to serve customers, attract new relationships and expand existing ones. We can keep our focus on providing the highest quality service and flawless execution, giving customers and clients every reason to choose Bank of America in today's tough environment, and in better days to come. We can be the people who help customers think beyond the anxiety in today's markets, and see the opportunities we all have to build financial strength for the future.

If we do these things, I am confident that after this storm passes, investors will see the value in our franchise, the power of our brand, and especially, our associates' ability to create broad, deep and long-lasting financial relationships. Thank you again for all you are doing every day for our customers and our company.

221.    The statements that Bank of America was "one of the strongest and most stable major banks in the world" and possessed "more than adequate capital" and that Bank of America "did not need" the federal funds were materially false and misleading because, in reality, as senior Federal Reserve officials concluded, (i) Bank of America was "very thinly capitalized," and was "clearly not [] well prepared for any further deterioration;" and (ii) by the end of November 2008, Bank of America had suffered almost $800 million in losses, and was expecting to lose at least $1.4 billion for the quarter – the first quarterly loss in its history – thus further eroding its capital levels.

222.    On November 26, 2008, Bank of America announced it had received Federal Reserve approval for the Merrill Acquisition.

223.    On December 5, 2008, Bank of America issued a press release announcing that Bank of America shareholders had approved the Merrill Acquisition.

224.    On or about December 8, 2008, Merrill Lynch held its last Bank of America meeting in which its mounting losses and worsening financial condition were discussed. According to a January 20, 2009 *The Wall Street Journal* article, attendees at the meeting were told about Merrill Lynch's continued losses, principally arising from legacy positions rather than new trades.  In connection with these growing losses, Defendant Thain described November as "one of the worst months on Wall Street in history."  Merrill Lynch had been experiencing material client withdrawals during the fourth quarter, amounting to approximately $10 billion in withdrawals by the end of the quarter – which represented a more than threefold increase in withdrawals over the third quarter.  This material information was not disclosed to the investing public.

225.    As more fully setout above, Lewis wanted to invoke the MAC but was pressured by Paulson and Bernanke to close the deal.  Shortly thereafter, Defendant Lewis turned his attention to seeking federal assistance to deal with the significant (though never disclosed to shareholders) losses at Merrill Lynch.

226.    Ultimately, in order to proceed with the merger, Lewis requested and obtained a $138 billion taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of preferred stock, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill. In a Bank of America board meeting on December 22, 2008, Lewis told the Bank of America Board that he and Government officials had

agreed to this bailout package. According to the meeting minutes, Lewis informed the Bank of America Board that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets;" that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation;" and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

227.    Lewis also made clear that management's recommendation to proceed with the merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

228.    Recognizing the material risk that shareholders would demand that the merger be terminated if Bank of America disclosed the Government bailout before the merger closed – and knowing that, if the merger failed, he, senior management, and the Bank of America would be fired – Lewis concealed the bailout from investors. Specifically, when Lewis learned that the Government would have to disclose that it was providing TARP funding to Bank of America if the Government's commitment was reduced to writing, Lewis immediately advised the Bank of America Board that the Company would not enter into a

written agreement because it did not want this information to be disclosed in advance of the merger's close. On December 22, 2008, Lewis sent the following email to the Bank of America:

> I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, of course, we do not want.

229.    On December 30, 2008, Lewis met with the Bank of America Board to update them concerning the U.S. Government's commitment of TARP funds, and further underscored that the deal with the U.S. Government was firm and detailed. According to the minutes of this meeting, "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators." Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation." Lewis added that:

> management of the Corporation had clearly explained to the federal regulators the terms and conditions required by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009. In return, he reported, management has received strong assurances from all relevant federal regulators and policy makers that the Corporation will receive adequate and appropriate assets to neutralize the impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009.

230.    Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize the impact . . . resulting from the Corporation's acquisition of Merrill Lynch," Lewis and the Bank of America Board again determined to withhold this information from Bank of America shareholders and investors. According to the minutes of the Bank of America

Board's December 30, 2008 meeting: "Mr. Lewis explained that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, which formal action would require public disclosure." According to the meeting minutes, rather than disclose information about the Government bailout at that time, Bank of America determined to announce it "in conjunction with [Bank of America's] earning release on January 20, 2009."

231.    The New York Attorney General's investigation has further confirmed that, following the shareholder vote, Defendants concealed numerous, highly material facts. According to the New York Attorney General's September 8, 2009 letter:

> Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses.  Indeed, Bank of America only decided against seeking to terminate the merger when the jobs of its officers and directors were threatened by senior federal regulators.  Yet it took Bank of America more than a month to make public disclosure of its dire financial situation – a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information.  Bank of America further failed to disclose that its officers faced a conflict of interest in responding to the federal government's threat, or that it had received the government's oral commitment to support the merger with taxpayer funds.

232.    By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter. On that day – its last as an independent company – it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to Bank of America shareholders.

233.    As alleged above, following the December 5, 2008 shareholder vote and prior to the close of the merger on January 1, 2009, numerous highly material events occurred that Bank of America failed to disclose:

> • Days after the shareholder vote, Lewis determined – and informed Secretary Paulson and Chairman Bernanke – that Merrill's losses were so large that Bank of

America could not absorb them, and that, as a result, Bank of America had determined to terminate the merger by invoking the MAC.

- Secretary Paulson threatened to fire Lewis, Bank of America's senior management, and the Bank of America Board if they refused to complete the merger, and as a result Lewis and Bank of America's officers faced an irreconcilable conflict of interest in agreeing to proceed with the merger.

- Bank of America requested and received a highly dilutive $138 billion taxpayer bailout in order to enable Bank of America to absorb Merrill's losses.

- Bank of America suffered a loss of $1.8 billion for the quarter, the first loss in its history.

- Merrill paid out the cash component of $3.6 billion in bonuses despite losses of over $21 billion.

234.    On January 1, 2009, Bank of America announced that the Merrill Acquisition had been completed.  Even though (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) Bank of America had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the Company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse, Bank of America issued a press release that day falsely representing the merger as "creating a premier financial services franchise" and hailing the "$7 billion in pre-tax expense savings" Bank of America expected to achieve from the transaction.  The press release quoted Defendant Lewis as stating, "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."  This press release was materially false and misleading because it omitted to disclose any of the critical developments set forth above.

235.    Based on Bank of America's false representations to the market as of that date, analysts had previously estimated that Bank of America would independently report earnings of $0.08 per share for the fourth quarter of 2008. A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception

for Bank of America Corporation" underscored the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy. Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told. Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

236.    The fallout from the revelations described above continues to be immense, resulting in additional civil and criminal investigations at both the federal and state levels. In addition to the New York Attorney General's ongoing investigation, a similar investigation was initiated by the Attorney General of North Carolina to determine whether, among other things, Merrill and Bank of America had violated that state's laws against fraudulent transfers and civil racketeering. Neil Barofsky, the TARP Inspector General, also opened a probe.

237.    Additionally, in January 2009, although it would not be disclosed to shareholders until mid-July 2009, the Federal Reserve and the Office of the Comptroller of the Currency downgraded the overall rating of Bank of America from "fair" to "satisfactory." A letter sent by Federal Reserve officials explaining the action criticized Bank of America's management and directors for being "overly optimistic" about risk and capital. As the letter explained, "Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future." As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on Bank of America that, among other things, required it to address its problems with liquidity and risk management.

238.　　On February 10, 2009, the New York Attorney General wrote a letter to Congress providing details on Merrill's accelerated bonus payments. The letter detailed how Merrill's accelerated bonus schedule had allowed it to disproportionately reward its top executives despite its massive losses – actions which the New York Attorney General described as "nothing short of staggering." In particular, the New York Attorney General stated that:

> While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals. Indeed, Merrill chose to make millionaires out of a select group of 700 employees. Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group of **top executives what can only be described as gigantic bonuses.**

239.　　Among the statistics that the New York Attorney General set forth were that (i) "[t]he top four bonus recipients received a combined $121 million;" (ii) "[t]he next four bonus recipients received a combined $62 million;" (iii) "[f]ourteen individuals received bonuses of $10 million or more and combined they received more than $250 million;" and (iv) "[o]verall, the top 149 bonus recipients received a combined $858 million."

240.　　On April 29, 2009, at the Company's annual meeting, Bank of America shareholders voted to strip Lewis of his position as Chairman of the Bank of America Board in a vote that analysts deemed a rebuke to Lewis's conduct in connection with the merger. *Business Week* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties." At the shareholder meeting, Lewis conceded that Bank of America's shareholders "have carried a heavy burden" as a result of the Merrill acquisition.

241.　　On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Federal Reserve. Bank of America was deemed to need an

additional $33.9 billion of Tier 1 common capital – far more than any other of the 19 banks tested.

242.     Beginning in May 2009, several members of Bank of America's Board of Directors resigned, including its lead independent director, O. Temple Sloan Jr., and Jackie Ward, chairman of the Bank of America's asset quality committee. Other departures included Chief Risk Officer Amy Woods Brinkley, and J. Chandler Martin, an enterprise credit and market risk executive.

243.     In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearings on the merger, with a particular focus on Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout. During Lewis's testimony on June 11, 2009, Representative Dennis Kucinich told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008." Representatives Peter Welch and Elijah Cummins both repeatedly pressed Lewis on the lack of disclosure to shareholders. As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

244.     On August 3, 2009, the SEC filed a complaint against Bank of America in the United States District Court for the Southern District of New York, alleging that Bank of America had violated Section 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement. That same day, the SEC announced that Bank of America had agreed to settle the action and pay a $33 million fine.

245.    As the SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without Bank of America's consent, in fact, Bank of America had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

246.    During the SEC's investigation, Merrill's most senior human resources executive, Peter Stingi ("Stingi"), whose responsibilities included monitoring the annual bonus pay of Merrill's competitors, acknowledged that the compensation expense set forth in Merrill's financial statements did not disclose Merrill's bonus plans. Specifically, Stingi testified under oath that:

> We would not be able to see what our competitors' quarterly [bonus] accruals were because they like us would report their compensation and benefits expense [as an aggregate] . . . . [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense.

247.    The day after the SEC filed its complaint, Representative Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch." Representative Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that "our investigation has revealed . . . [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill

Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violations for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote."

248.    On September 8, 2009, the New York Attorney General sent a letter to Bank of America's outside counsel, which summarized the results of the New York Attorney General's investigation and stated that it was in the process of "making charging decisions with respect to Bank of America and its executives." The letter provided that, ***"The facts of [Merrill's] cascading losses  and bonus payments – and the facts of Bank of America's senior executives' knowledge of these  events – are straightforward."*** The letter further provided that, "Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew;" (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly 'surprising'" losses after the shareholder vote; (iii) Bank of America's determination, "eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators;" and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

249.     On September 14, 2009, the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, rejected the proposed $33 million settlement of the suit filed by the SEC against Bank of America. The Court held that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior Bank of America executives were sued or contributed to the settlement. The Court found that the settlement violated the SEC's "normal policy in such situations [] to go after the company executives who were responsible for the lie," and rejected the SEC's contention that it did not have grounds for bringing claims against senior Bank of America officials, remarking, "How can such knowledge [of the falsity of the statements in the Proxy] be lacking when, as the Complaint in effect alleges, executives at the Bank expressly approved making year-end bonuses before they issued the proxy statement denying such approval?" A trial date in the SEC action has been set for March 1, 2010.

250.     On September 18, 2009, the *Charlotte Observer* reported that, for the past six months, the F.B.I. and the U.S. Department of Justice have been conducting an extensive "criminal investigation" of Bank of America in connection with the merger. As part of this wide-ranging investigation, Bank of America "has provided hundreds of thousands of documents and dozens of hours of executive time" to answer questions.

251.     That same day, *Bloomberg* reported that, on September 17, 2009, Defendant Thain gave a speech at the Wharton School of the University of Pennsylvania, during which he made clear that Bank of America's claim that it lacked control over the bonuses paid to Merrill executives and employees was not true:

> [W]hen [Bank of America] said, "John Thain secretly accelerated these bonuses," they were lying and that has now trapped them into a lot of trouble because there is a piece of paper, there's a document that says, yes, they in

fact agreed to this in September. So one take away for all of you is it's really always better to just tell the truth.

252.    The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

a.  The Company was failing to sufficiently reserve for mortgage-related exposure, causing its balance sheet and financial results to be overstated;

b.  The Company's acquisition of Countrywide would have catastrophic consequences on the Company's capital position and overall operations;

c.  The acquisition of Countrywide would saddle Bank of America with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to billions in losses related to Countrywide's predatory lending practices;

d.  The Company's capital base was not adequate to withstand the toxic assets and legal issues brought to the merger by Countrywide.

e.  The Company failed to engage in proper due diligence in assessing the fairness of the deal with Merrill Lynch;

f.  The Company's acquisition of Merrill Lynch would have catastrophic consequences on the Company's capital position and overall operations;

g.  Merrill Lynch had not substantially decreased its risk exposure to troubled mortgage-related assets;

h.  The Company's approval of $5.8 billion in discretionary bonuses to Merrill executives and employees;

i.  The significant and continuing deterioration of Merrill Lynch's financial position, including its substantial fourth quarter 2008 loss, and the fact that it was sufficient to trigger termination of the merger;

j.  That the Company either knew it did not have a firm grasp on the aggregate amount of Merrill Lynch's losses and deteriorating positions or knew such information and withheld it from the public;

k.  The Company's capital base was not adequate to withstand the significant deterioration in the subprime market and, as a result, Bank of America would be forced to seek government funding in order to raise significant amounts of additional capital.

253.     As a result of Defendants' false and/or misleading statements, Bank of America's stock traded at artificially inflated levels during the Relevant Period.

**D.     Summary of Scienter Allegations.**

254.     As specifically described above, numerous facts give rise to the strong inference that, throughout the Relevant Period, Defendants Bank of America, Merrill, Lewis, Thain, and Price knew or recklessly disregarded that their statements set forth above were materially false and misleading when made.

255.     First, the senior executives of both Bank of America and Merrill possessed direct knowledge of Merrill's losses as they occurred, yet failed to disclose them. As noted above, immediately after the merger was announced, Bank of America installed 200 people at Merrill, including a large financial team, to monitor Merrill's financial condition and installed Cotty to act as Merrill's CFO. Further, Thain issued a memo on January 26, 2009 stating that Merrill's senior executives tracked Merrill's losses on a daily basis, and provided senior Bank of America executives with this information, also on a daily basis. In particular, Thain stated that Bank of America's senior executives had "daily access to our p&l [profit and loss statements], our positions and our marks." Moreover, during Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as Bank of America and its senior executives, received daily, "step-by-step" updates on Merrill's financial condition.

256.     Given the facts set forth above, a Bank of America spokesperson told *The New York Times* that "we have not disputed that we were kept informed about the financial condition of the company." Indeed, knowledge of Merrill's losses was so well-known among Bank of America's senior executives that – as newspaper reports and the New York Attorney General's investigation have established – between November 20 and December 3, 2008, Bank of

America's senior executives repeatedly discussed terminating the merger pursuant to the MAC and informing shareholders of Merrill's mounting losses.

257.    Second, Bank of America's and Merrill's senior executives also knew of the $2 billion goodwill impairment by November 2008 – yet represented to regulators that it arose suddenly after the shareholder vote. As the New York Attorney General wrote in his September 8, 2009 letter, "Even though it was known of by November, this write-down became part of the purportedly 'surprising' losses that were included in Merrill's financials more than a month after the December 5 shareholder vote." These Defendants' knowledge of this write-down before the shareholder vote – and their false claims of "surprise" as to its existence – further supports an inference of scienter.

258.    Third, these Defendants knew or were reckless in not knowing that Bank of America did not "comprehensively" analyze Merrill's financial condition, providing them with no reasonable basis to represent that Merrill's risk profile had improved without also disclosing that it remained dangerously high, or to make related representations about the expected benefits of the merger. For example, after reviewing thousands of Merrill's internal documents which were made available to Bank of America during the due diligence process, Federal Reserve officials concluded that Bank of America's investigation was grossly inadequate, and not performed "comprehensively" as Lewis and Price represented to investors.

259.    Fourth, directly contrary to the statement that Bank of America had a "strong capital position, funding capabilities, and liquidity," these Defendants knew that, even on a stand-alone basis, Bank of America's own capital position was extremely weak. In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, wrote that, "***as they [Bank***

*of America senior executives] themselves  noted the other night at our meeting, even on a stand alone basis, the firm is very thinly capitalized*."

260.    Fifth, as set forth above, the Defendants were clearly aware of the secret bonus agreement because (i) it was the focus of intense discussions during the merger negotiations and was one of the three "main" terms of the merger agreement; (ii) Defendants Lewis and Thain, who negotiated the bonus agreement through high-ranking intermediaries, have admitted their knowledge of the bonus agreement; and (iii) executives at each company played an active role in determining and/or approving the ultimate bonus amounts and specific payment dates at various points throughout the fourth quarter.  Moreover, these Defendants were clearly aware that the bonus agreement had not been disclosed because the bonus agreement was set forth in a separate document that was meant to be, and in fact was, withheld from the investing public

261.    Additional facts summarized below further establish the individual scienter of Defendants Lewis, Thain, and Price, and, in turn, the corporate scienter of Bank of America.

i.    Additional Evidence of Lewis's Scienter.

262.    Lewis has admitted in sworn testimony before Congress and the New York Attorney General's office that he received regular updates on the financial condition of both Bank of America and Merrill throughout the Relevant Period and knew of the companies' escalating, unprecedented losses before the merger vote. As described more fully above, Lewis admitted that Bank of America in general, and he in particular, received "detailed financial reports every week" from Merrill, and that he received profit and loss statements for Bank of America and regular projections of Merrill's losses. Indeed, during his congressional testimony, when asked whether any of the 200 financial analysts that Bank of America stationed at Merrill reported Merrill's losses to Lewis before the shareholder vote, Lewis responded: "The – *we*

*did have people there, and we did know that there were losses. And that was clear both at our company and theirs*." Similarly, as noted above, during Thain's *PBS Frontline* interview, he stated that senior executives at both companies "knew about the losses at the same time we did."

263.    Before the shareholder vote, Lewis led weekly conference calls during which he and Defendant Price discussed Merrill's growing losses with the Bank of America Board.

264.    In his capacity as CEO and Chairman of the Bank of America Board, Lewis led the Bank of America meetings on December 9, December 22, and December 30, 2008, during which the Bank of America Board discussed Merrill's losses and decided – even though Bank of America senior management (including Lewis) believed that a material adverse change had occurred in Merrill's financial condition – to nevertheless consummate the merger and accept a $138 billion taxpayer bailout to avoid the threatened insolvency of the combined company, without disclosing any of these critical facts. Lewis was also personally involved in the discussions with Secretary Paulson, Chairman Bernanke, and other regulators regarding all of those subjects.

265.    Lewis, as well as other Bank of America senior management, was highly motivated to conceal material facts from shareholders because he knew that if these facts were disclosed prior to the close of the merger, he would be terminated. Lewis admitted to this motivation in sworn testimony before the New York Attorney General's office. As the New York Attorney General concluded in his April 23, 2009 letter to Congress, "Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Bank of America could be removed, Lewis replied, 'that makes it simple. Let's deescalate.' Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause

and terminating the deal."

266.     Lewis was also motivated to conceal material facts from shareholders, and thus ensure that the merger was consummated, because Lewis knew that if investors learned the truth about Merrill's financial condition it would reveal that the statements he had made over the previous two months regarding the purported benefits of the merger and Bank of America's due diligence were false, and call into question his judgment and competence in agreeing to pay a substantial premium for Merrill in such a precipitous manner. Indeed, Chairman Bernanke expressly told Lewis that if Lewis invoked the MAC after Lewis had praised the merger and extolled for months Bank of America's due diligence, it would "cast doubt" on the truthfulness of Lewis's statements and his judgment. In addition to those admonitions, a set of "Talking points for [Bank of America] Discussion," prepared by Federal Reserve officials in advance of their conversation with Lewis on December 21, 2008, provided that regulators also told Lewis that, if he were to invoke the MAC, it "would expose the weaknesses in [Bank of America]'s capital and asset quality," and "[t]he market would conclude that [Bank of America] was too weak to address the problems at [Merrill]."

267.     Consistent with these motivations, Lewis made the conscious decision to conceal numerous highly material facts from Bank of America's shareholders and investors. In Lewis's congressional testimony, he admitted that Merrill's losses, his and Bank of America's conclusion that a material adverse change had occurred, and the bailout were facts "of enormous magnitude and consequence to the company and the shareholders." Nonetheless, Lewis knowingly withheld this highly material information from shareholders, writing in an email that "of course[] we do not want" "public disclosure" of them.

268.     Lewis was so conscious of his liability to shareholders for proceeding with the

merger without disclosing Merrill's losses, the violation of the MAC, or the taxpayer bailout that, in an attempt to immunize himself from lawsuits, he explicitly sought a letter from Chairman Bernanke stating that the merger was forced upon Lewis. Federal Reserve officials refused.

269.     Moreover, Lewis's repeated inconsistencies in his statements to regulators and sworn testimony to Congress and the New York Attorney General, and in his public statements to Bank of America shareholders, are strong circumstantial evidence of Lewis's scienter. For example, on December 17, 2008, Lewis told federal regulators that he only became aware of Merrill's losses in mid-December, after the shareholder vote, because they purportedly "accelerated" at that time. Likewise, during the January 16, 2009 conference call to discuss Merrill's losses, Lewis told investors that the "loss materialized late in the quarter in December." As set forth above, numerous facts establish that these statements were false, and amounted to nothing more than an attempt to cover up the fact that Lewis and his senior officers had personal knowledge of or reckless disregard for Merrill's severe and accelerating losses throughout the entire fourth quarter. For example, on *PBS Frontline*, Thain – who, as Merrill's CEO, had personal knowledge of the pace and timing of Merrill's losses – stated that Lewis's version of the facts was exactly the opposite of "what actually happened":

| Question: | Ken Lewis tells us that in the time between the Dec. 5 stockholders' meeting and his going to Washington and asking for the get-out-of-jail clause, something substantial changed. What would it have been, do you think? |
| Thain: | I don't know what he's referring to. If you look at what actually happened in the fourth quarter, October was the worst month, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . October was by far the worst. |

270.     Corroborating Thain's first-hand account, at the request of Congress, an impartial expert reviewed Merrill's internal loss data and independently concluded that any acceleration in

Merrill's losses was clear by mid-November at the latest. Indeed, according to Congress's expert analysis of Merrill's weekly internal loss data, "the evidence for a constantly deteriorating [] trend [in Merrill's losses] is much stronger on November 14 than it is on December 12." Moreover, even without the benefit of this evidence, the country's most senior banking regulators, after reviewing Merrill's loss data, concluded that Lewis's claim of mid-December "surprise" was "not credible."

271. Further corroborating the conclusion that Lewis's claim of surprise was false, the New York Attorney General's investigation has revealed that Bank of America's senior executives knew of at least $14 billion in Merrill losses before the shareholder vote (with the potential for billions of dollars more), plus another $2 billion in Merrill goodwill impairments. Indeed, as early as November 20, 2008, senior Bank of America executives debated whether to disclose these losses, and on December 1 and 3, 2008, senior Bank of America executives debated "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" – facts that the New York Attorney General wrote were "of tremendous significance because [they are] at odds with Bank of America's  position that it only became concerned with mounting losses after the shareholder vote."

272. As another example of Lewis's knowing and/or recklessly false and inconsistent statements, during Lewis's June 11, 2009 Congressional testimony, he initially stated that he "did not recall" asking Chairman Bernanke for a letter immunizing Lewis from shareholder suits – even though this request was highly unique and Lewis had made it just months earlier during a personal conversation between him and his chief regulator:

| | |
|---|---|
| Rep. Kucinich: | You requested a letter from the government saying that the government ordered you to close the deal to acquire Merrill. Wasn't there such a letter? |
| Lewis: | I don't recall such a letter. |

| | |
|---|---|
| Rep. Kucinich: | You're under oath. But your answer is you do not recall? |
| Lewis: | I do not recall a letter. |
| Rep. Kucinich: | Isn't it true that your request of that letter was motivated by your desire to protect yourself from your shareholders? |
| Lewis: | Well, sir, if I can't recall it, I can't answer the second question. |

Lewis only acknowledged his request after Congress confronted him with the email from Chairman Bernanke documenting this exact request.

273.    Likewise, during Lewis's sworn deposition taken by the New York Attorney General's office in February 2009, he specifically testified that, after he approached the U.S Government for a bailout in mid-December, Secretary Paulson "instructed" him not to disclose: (i) Merrill's losses, (ii) Bank of America's resulting need for taxpayer assistance, or (iii) the Government bailout. When Lewis testified before Congress in June 2009, however, he changed his story, stating, "I never heard from him [Paulson] on the issue of us not disclosing something." Noting this reversal, Representative Watson cautioned Lewis, "Okay. Remember you're under oath."

274.    Lewis also made false statements to Congress regarding his involvement in approving Merrill's bonuses. Lewis portrayed his involvement in approving the bonuses as "very limited," stating that Merrill was "a public company until the first of the year. They had a separate Bank of America, separate compensation committee and we had no authority to tell them what to do, just urged them what to do." In reality, as set forth above, Lewis was directly involved in Merrill's bonus payments because he specifically authorized Merrill to pay up to $5.8 billion of bonuses on an accelerated basis at the time he negotiated the Merger Agreement. This was a key term of the merger, which Lewis approved. Thain himself has stated that Lewis was "lying" when he sought to minimize his involvement in the bonuses.

275.    In addition – as federal regulators have independently confirmed after reviewing

104

Bank of America's due diligence and speaking directly with Lewis – Lewis knew that Bank of America's due diligence of Merrill was grossly inadequate. As set forth above, after reviewing Bank of America's due diligence and discussing it with Lewis, senior Federal Reserve officials concluded that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose lots of very good people."

ii.    Additional Evidence of Price's Scienter.

276.    As the Company's CFO, Price received the daily, "step-by-step" updates on Merrill's financial condition that Thain described above. Indeed, according to the New York Attorney General's September 8, 2009 letter, Defendant Price kept close watch on Merrill's losses and impairments throughout the entire fourth quarter, repeatedly discussed with other Bank of America executives whether to invoke the MAC or otherwise disclose Merrill's deteriorating financial condition, and made the conscious decision to not disclose these facts.

277.    Each week before the shareholder vote, Defendant Price discussed Merrill's growing losses with the Bank of America Board during conference calls led by Defendant Lewis, as set forth above.  Based on his personal knowledge of Merrill's losses, Price (along with Lewis) also reported Merrill's mounting losses to the Bank of America Board on December 9, 22, and 30, 2008.

278.    In addition, Price personally participated in meetings with Lewis, Secretary Paulson, Chairman Bernanke, and other regulators regarding the existence of a material adverse change in Merrill's financial condition and Bank of America's resulting need for an enormous taxpayer bailout. Specifically, Price attended such meetings on December 17, 19, and 21, 2008, where he took handwritten notes memorializing the discussions. Lewis also reported to the Bank

of America Board on December 30, 2008 that Price had been intimately involved in negotiations with the federal government for additional TARP funding. Accordingly, Price knowingly or recklessly made false and misleading statements and material omissions.

iii.    Additional Evidence of Thain's Scienter.

279.    Defendant Thain has admitted his knowledge of Merrill's mounting daily losses. As set forth above, Thain stated that Merrill generated daily profit and loss statements; that Merrill's and Bank of America's senior executives, including himself, received this information as it was generated; and that October was the worst month of the fourth quarter. In addition to the numerous statements recited above, in Thain's deposition before the New York Attorney General's office, Thain testified, "Bank of America had daily access to the exact same financial information I had."

280.    In addition, Thain has admitted in sworn testimony that he had personal knowledge of the secret bonus agreement at the time it was being negotiated during the September 13-14, 2008 weekend. In his deposition, Thain testified that "I was aware that [the bonus agreement] was being negotiated." Thain further testified that he was kept apprised of all the salient terms of the agreement "[t]hrough discussions with, primarily, Greg Fleming," including the terms allowing "us, Merrill Lynch, to be able to pay bonuses to our employees prior to the deal closing," as well as the "cap on the amount that we could pay out."

281.    Moreover, Thain was intimately involved in finalizing the accelerated Merrill bonuses throughout the fourth quarter of 2008. In early November 2008, he and Alphin, Bank of America's Chief Administrative Officer, determined the final size of the bonus pool; on November 11, 2008, Thain presented the final bonus figures and the accelerated payment schedule to Merrill's Compensation Committee, which approved the accelerated schedule; and

on November 12, 2008, Thain informed Alphin of this schedule.

282.    Thain has also admitted his personal knowledge of facts directly contradicting numerous other statements he made during the Relevant Period, including that (i) he knew that, without the merger, Merrill would become effectively insolvent "beginning Monday morning," September 15, 2008, and (ii) Secretary Paulson exerted intense pressure on the parties to finalize the transaction, and personally told him, "John, you'd better make sure this happens."

## VII.  CLAIMS UNDER SECTION 10(b) AND RULE 10b-5: FRAUD CLAIMS

283.    The claims set forth herein pursuant to Section 10(b) and Rule 10b-5 sound in fraud and are based on knowing or reckless misconduct by the Defendants.  These claims are independent of any other claims asserted herein and the allegations of fraud pertaining to the claims under Section 10(b) and Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

### COUNT II - VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

284.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

285.    This claim for relief is brought against Defendants Bank of America, Lewis, Thain, and Price.

286.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiff against the Defendants.

287.    Throughout the Relevant Period, the Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and facilities of national securities exchange, employed devices, schemes and artifices to

defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and engaged in acts, practices, and a course of business which operated a fraud and deceit upon shareholders, in violation of Section 10(b) or the Exchange Act and Rule 10b-5 promulgated thereunder.

288.    As more fully described above, the Defendants made the false statements and omissions knowingly, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other shareholders who purchased Bank of America securities during the Relevant Period.   Throughout the Relevant Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.

289.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities by Plaintiff.

290.     Defendants Bank of America and Lewis are liable for all materially false and misleading statements made during the Relevant Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in (i) the September 15, 2008 Press Release, Investor Call, and Press Conference; (ii) Bank of America's September 18, 2008 Form 8-K; (iii) Bank of America's October 6, 2008 conference call; (iv) the Proxy; (v) Bank of America's November 21, 2008 Form 8-K, which supplemented the Proxy; (vi) Bank of America's November 26, 2008 Proxy Supplement; (vii) Lewis's December 5, 2008 statement; (viii) Bank of America's December 5, 2008 Press Release; and (ix) Bank of America's January 1, 2009 Press Release. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement,

and the financial conditions of Merrill and Bank of America, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

291.     Defendant Price is also liable for the false and misleading statements set forth above, including, without limitation, the statements in: (i) the September 15, 2008 Investor Call; (ii) Bank of America's October 6, 2008 conference call; and (iii) the Proxy. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial conditions of Merrill and Bank of America, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

292.     Defendant Thain is liable for all materially false and misleading statements made during the Relevant Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in: (i) the September 15, 2008 Press Release, Investor Call, and Press Conference; (ii) Merrill's September 18, 2008 Form 8-K; (iii) Merrill's October 16, 2008 Press Release; (iv) the Proxy; and (v) Merrill's November 21, 2008 Proxy Supplement. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial condition of Merrill, and he failed to disclose Merrill's losses and the secret bonus agreement. He also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

293.     The Defendants' false and misleading statements and omissions were made with scienter and were intended to, and did, as alleged herein, (i) deceive the investing public,

including Plaintiff; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and other shareholders to purchase Bank of America securities at inflated prices.

294.    The Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents and/or other public statements containing untrue statements of material fact and/or omitting facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

295.    In ignorance of the false and misleading nature of the Defendants' statements and/or in reliance upon the integrity of the market price for Bank of America securities, Plaintiff and other shareholders purchased the Company's securities at artificially inflated prices during the Relevant Period.  But for the fraud, Plaintiff would not have purchased the Company's securities at artificially inflated prices.

296.    The market price for Bank of America securities declined materially upon the public disclosures of the facts that had previously been misrepresented or omitted by the Defendants as described above.

297.    Plaintiff was substantially damaged as a direct and proximate result of his purchases of Bank of America securities at artificially inflated prices and the subsequent decline in the price of those securities when the true state of affairs was revealed.

298.    This claim was brought within two years of the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

299.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff who has been damaged as a result of such violation.

A.    **Fraud on the Market**

300.    The market for Bank of America's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose, as set forth above, Bank of America's common stock traded at artificially inflated prices during the Relevant Period.  Plaintiff purchased or otherwise acquired Bank of America's common stock relying upon the integrity of the market price of Bank of America's common stock and market information relating to Bank of America, and has been damaged thereby.

301.    During the Relevant Period, Defendants materially misled the investing public, thereby inflating the price of Bank of America common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Bank of America, its business and operations.

302.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff.

303.    As described above, during the Relevant Period, Defendants made or caused to be made a series of materially false or misleading statements about Bank of America's business, and financial condition.  These material misstatements and omissions had the cause and effect of

creating in the market an unrealistically positive assessment of Bank of America and its business and operations, thus causing its common stock to be overvalued and artificially inflated at all relevant times.

304.    Defendants' materially false and misleading statements during the Relevant Period resulted in Plaintiff purchasing Bank of America's common stock at artificially inflated prices, thus causing the damages complained of herein.

**B.**    **Inapplicability of the Statutory Safe Harbor and Bespeaks Caution Doctrine.**

305.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Amended Complaint.

306.    None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the due diligence performed in connection with the acquisitions, the pressure exerted by federal regulators, Countrywide's, Merrill's and Bank of America's then-existing financial condition, and the payment of accelerated, discretionary bonuses to Merrill's executives and employees.

307.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the due diligence performed in connection with the Merrill Acquisition, the pressure exerted by federal regulators, Countrywide's, Merrill's and Bank of America's financial condition, and the payments of accelerated, discretionary bonuses to Merrill's executives and

employees. Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Bank of America were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

308.     To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of Bank of America who actually knew that the statement was false.

## VIII.  COUNT III - VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT

309.     Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

310.     This claim for relief is brought against the Individual Defendants.

311.     As alleged herein, the Defendants are liable to Plaintiff who purchased Bank of America's securities based on the materially false statements and omissions set forth above, pursuant to Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder.

312.     Throughout the Relevant Period, by reason of their positions of control and authority as officers of Bank of America, these Defendants had the power and authority to cause Bank of America to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the Proxy and the other solicitations described herein made by Bank of America during the Relevant Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

113

313.     In their capacities as senior corporate officers of Bank of America and Merrill, and as more fully described above, the Individual Defendants participated in the misstatements and omissions set forth above. Indeed, these Defendants had access to information regarding the circumstances surrounding the Countrywide and Merrill Acquisitions, including the terms of the merger, the due diligence that had and had not been performed, and analyses of the financial conditions of Merrill, Countrywide, and Bank of America.  As a result of the foregoing, the Individual Defendants, together and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

314.     This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

315.     By virtue of the forgoing, the Individual Defendants are liable to Plaintiff, who has been damaged as a result of Bank of America's underlying violations.

## IX.  LOSS CAUSATION AS TO ALL EXCHANGE ACT CLAIMS

316.     By misrepresenting Bank of America's, Countrywide's and Merrill Lynch's financial positions, the Defendants presented a misleading picture of the Company's businesses and prospects, including Bank of America's business and prospects if it were able to consummate the acquisitions.   Instead of truthfully disclosing that Bank of America's, Countrywide's and Merrill Lynch's businesses were not as healthy as represented, Bank of America concealed the extent of its exposure to risky real estate investments and further concealed the extent of the problems with Countrywide and Merrill Lynch.  The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.

317.    Defendants' false and misleading statements caused and maintained the artificial inflation of Bank of America's stock price throughout the Relevant Period until the truth about its financial condition and business prospects were revealed to the market.

318.    Defendants' false and misleading statements had the intended effect and caused Bank of America's stock to trade at artificially inflated levels throughout the Relevant Period, reaching as high as $38.13 per share in October 2008.  The true facts became known by investors and the market through a series of partial corrective disclosures. By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in Bank of America common stock throughout the Relevant Period.

319.    As set forth above, corrective disclosures taking place between January 11, 2008 and February 20, 2009 revealed previously undisclosed material information concerning, *inter alia*, the true extent of Countrywide's toxic assets, the billions of dollars in exposure Countrywide carried due to predatory lending practices, Merrill Lynch's deteriorated financial state, and Bank of America's need for federal financial assistance in order to survive the Merrill Acquisition and successfully absorb Merrill Lynch.   These corrective disclosures shocked investors and pushed down the price of Bank of America common stock in active trading from its closing price of $39.30 per share on January 11, 2008 to close at $3.79 per share on February 20, 2009, a decline of 90%.

320.    On January 12, 2009, a Citigroup analyst wrote that Bank of America might post a $3.6 billion fourth quarter loss and slash its quarterly dividend from $0.32 to $0.05 cents per share.  After the report, shares of Bank of America stock fell 12% on heavy volume, falling from $12.99 at the close of market the prior trading day to $11.43.

321.    On January 14, 2009 in Australia, which was January 13 in New York, Merrill executives in Australia warned a bond trader of imminent "awful" news, and admitted that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night." Bank of America shares dropped 11% from a close of $11.43 on January 12 to a close of $10.20 on January 14, on heavy volume.

322.    Further disclosures occurred on January 15, 2009, when *The Wall Street Journal* reported on Bank of America's imminent TARP injection, prompting Bank of America shares to drop 18% on extremely heavy volume of 552,669,186 shares, leaving Bank of America shares to close at $8.32, an 18-year low. And on January 16, 2009, Bank of America announced its terrible fourth quarter results, revealing, among other things, the $21.5 billion losses at Merrill and the fact that TARP funding had been necessary to complete the merger. These disclosures caused Bank of America stock to drop an additional 13% on January 16 on extremely heavy volume.

323.    After the close of the markets on January 16, 2009, it was reported that Moody's had downgraded Bank of America's credit rating due to "the disclosure of substantial losses of Merrill Lynch" and Fitch had downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive absent assistance provided by the U.S. Treasury."

324.    On Saturday, January 17, 2009, *The New York Times* reported that, given Merrill's "devastating" losses, Bank of America's management had sought to exercise the MAC after the vote but before the closing of the merger, and was dissuaded from doing so by the Government. *The Wall Street Journal* also reported on January 17 that Bank of America had sought the bailout not only because of Merrill's losses, but also because of Bank of America's

own precarious financial condition. According to an analyst quoted in *The Wall Street Journal* article, Lewis "has very little credibility with the investor public right now." On Tuesday, January 20, the next trading day, Bank of America's stock fell an additional 29%, also on extremely heavy volume, as a result of these disclosures.

325.    Finally, Bank of America stock dropped another 15% on January 22, 2009, the trading day immediately following the *Financial Times* story revealing the accelerated bonus payments.

326.    Each of the above referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

327.    It was entirely foreseeable to Bank of America, Merrill, Lewis, Thain and Price that concealing from investors (i) the circumstances surrounding the merger negotiations (including the lack of due diligence and the pressure from federal regulators), (ii) Merrill's losses, (iii) Bank of America's debating of and decision to invoke the MAC, (iv) Bank of America's own deteriorating financial condition, (v) the taxpayer bailout, and (vi) the secret agreement allowing Merrill to pay up to $5.8 billion in bonuses before the merger closed, would artificially inflate the price of Bank of America common stock and the Preferred Securities. It was similarly foreseeable that the ultimate disclosure of this information and, in particular, the truth about Merrill's financial condition, Bank of America's financial condition, the bonus payments, and circumstances surrounding the merger negotiations, would cause the price of Bank of America's securities to drop significantly as the inflation caused by their earlier misstatements was removed from the stock by the corrective disclosures set forth herein.

328.    Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Plaintiff.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a.    Awarding Plaintiff all compensatory damages and remedies set forth in the Exchange Act;

b.    Awarding Plaintiff pre-judgment and post judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

c.    Awarding such other relief as this Court may deem just and proper.

## XI.  DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all claims on which a jury trial is available.

Dated: Friday, October 09, 2009

_____

William B. Federman, Esq., WF 9124
FEDERMAN & SHERWOOD
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Fax:  (405) 239-2112
wbf@federmanlaw.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
---

|   |   |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MDL 2058 (DC) |
| | Related File No. 09-CV-5411 (DC) |
| This document relates to: | **ECF CASE** |
| All Securities Actions | |

## <u>CERTIFICATE OF SERVICE</u>

I, William B. Federman, hereby certify that a true and correct copy of the foregoing Plaintiff Michael Bahnmaier's Individual Amended Complaint for Violations of Securities Law is being filed with the Clerk of Court and served on this date upon all involved parties by sending a copy of the same to all counsel listed on the attached service list by electronic mail.

Dated: October 9, 2009

  /s/ William B. Federman       
       William B. Federman

## SERVICE LIST

**Max Wallace Berger**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
MWB@blbglaw.com

**Gregory M. Castaldo**
Barroway Topaz Kessler Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, PA 19087
gcastaldo@btkmc.com

**Caitlin Duffy**
Squitieri & Fearon LLP
32 East 57th Street, 12th Floor
New York, NY 10022
caitlin@sfclasslaw.com

**Jay W. Eisenhofer**
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York, NY 10017
jeisenhofer@gelaw.com

**Stephen John Fearon, Jr**
Squitieri & Fearon LLP
32 East 57th Street, 12th Floor
New York, NY 10022
stephen@sfclasslaw.com

**Steven E. Fineman**
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
8th Floor
New York, NY 10013-1413
sfineman@lchb.com

**Frederic Scott Fox, Sr**
Kaplan Fox & Kilsheimer LLP (NYC)

2

850 Third Avenue
14th Floor
New York, NY 10022
ffox@kaplanfox.com

**Joseph Peter Guglielmo**
Scott + Scott, LLP( NYC)
29th West 57th Street PH
New York, NY 10019
jguglielmo@scott-scott.com

**Donald R. Hall, Jr**
Kaplan Fox & Kilsheimer LLP (NYC)
850 Third Avenue, 14th Floor
New York, NY 10022
dhall@kaplanfox.com

**James Abram Harrod, III**
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
jharrod@wolfpopper.com

**Peter C Hein**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
PCHein@wlrk.com

**David Scott Hoffner**
Dechert, LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
david.hoffner@dechert.com

**Geoffrey Coyle Jarvis**
Grant & Eisenhofer, PA (DE)
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
gjarvis@gelaw.com

3

**Jennifer L. Joost**
Barroway Topaz Kessler Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, PA 19087
jjoost@btkmc.com


**Robert N. Kaplan**
Kaplan Fox & Kilsheimer LLP (NYC)
850 Third Avenue
14th Floor
New York, NY 10022
rkaplan@kaplanfox.com

**Jennie Boehm Krasner**
Dechert, LLP (NJ)
902 Carnegie Center
Princeton, NJ 08540
jennie.krasner@dechert.com

**Andrew J. Levander**
Dechert, LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
andrew.levander@dechert.com

**Natalie Marie MacKiel**
Wolf Popper LLP
845 Third Avenue
New York, NY 10022
nmackiel@wolfpopper.com


**Albert Morris Myers, III**
Kahn Gauthier Swick, LLC
650 Poydras Street
New Orleans, LA 70130
albert.myers@kgscounsel.com


**Sharan Nirmul**
Barroway Topaz Kessler Meltzer & Check,LLP
280 King of Prussia Road
Radnor, PA 19087
snirmul@btkmc.com

4

**John James Rizio-Hamilton**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
johnr@blbglaw.com

**Melinda D. Rodon**
Kaplan Fox & Kilsheimer LLP (NYC)
850 Third Avenue
14th Floor
New York, NY 10022
mrodon@kaplanfox.co

**David Avi Rosenfeld**
Coughlin Stoia Geller Rudman & Robbins, LLP (LI)
58 South Service Road
Suite 200
Melville, NY 11747
drosenfeld@csgrr.com

**Richard A Russo, Jr**
Barroway Topaz Kessler Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, PA 19087
rrusso@btkmc.com

**Katherine Mccracken Sinderson**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
katherine@blbglaw.com

**Steven B. Singer**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
steven@blbglaw.com

**Garry Thomas Stevens, Jr.,**
Squitieri & Fearon LLP
32 East 57th Street, 12th Floor

5

New York, NY 10022
garry@sfclasslaw.com

**Stephen D. Susman**
Susman Godfrey LLP (TX)
1000 Louisiana Street, Suite 5100
Houston, TX 77002
ssusman@susmangodfrey.com

**Boaz Aharon Weinstein**
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
boaz@blbglaw.com