**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MD 2058 (DC) |
| This document relates to:<br><br>All Derivative Actions | Related File No. 09 CV 808 (DC) |

**CONSOLIDATED SHAREHOLDER**
**DERIVATIVE AND CLASS ACTION COMPLAINT**
**FOR BREACH OF FIDUCIARY DUTIES, AIDING AND**
**ABETTING,  UNJUST ENRICHMENT, CONTRIBUTION, AND**
**VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT**

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................1

JURISDICTION AND VENUE................................................................................21

THE PARTIES..........................................................................................................22

    Plaintiffs.........................................................................................................22

    Nominal Defendant .......................................................................................22

    The BofA Defendants....................................................................................23

    The Merrill Defendants ................................................................................30

    The Advisor Defendants...............................................................................33

    Other Related Persons not Named as Defendants ......................................33

    Definitions of Groups....................................................................................35

I.     IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND
      GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND
      CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."...................35

      A.    In Breach of their Duties of Loyalty and Good Faith, the BofA
            Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that
            it is Essentially Worthless in the Absence of Any Deal, and to Secretly
            Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of
            Actual Performance.......................................................................................36

      B.    The BofA Defendants, Aided and Abetted by the Merrill Defendants
            and the Advisor Defendants, Conduct A Designedly Cursory "Due
            Diligence" of Merrill, in Further Gross Breach of Their Duties of
            Loyalty and Good Faith to BofA..................................................................38

      C.    The BofA Defendants, Aided and Abetted by the Merrill Defendants
            and the Advisor Defendants, Secretly Approve $5.8 Billion in
            Unwarranted Bonuses for Merrill Executives as Part of the Merger
            and Secretly Cause these Bonuses to be Paid on an Accelerated Basis
            *Before* the Merger Closes................................................................................45

      D.    In Violation of Their Duties of Candor, Good Faith, and Loyalty, the
            BofA Defendants, Aided and Abetted by the Merrill Defendants and
            the Advisor Defendants, Cause BofA to Issue a Proxy Statement That
            Conceals Crucial Facts About Losses at Merrill and the Bonuses to be

Paid to Merrill Executives and is Otherwise Materially False and Misleading................................................................................. 46

    1.    The Proxy Statement Falsely Omits Information Concerning Bonuses, For Which the BofA Defendants Later Try to Deflect Blame onto BofA's External and Internal Legal Counsel................................................. 47

    2.    The Proxy Statement Falsely Describes Losses and Liabilities of Merrill. ....................................................... 50

    3.    The Proxy Statement Falsely Sets Forth "Fairness" Opinions by the Advisor Defendants............................... 54

    4.    The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger.................................. 58

    5.    The Proxy Statement Falsely States that Merrill Executives Will Not Receive Discretionary Bonuses for 2008 and Conceals the Fact that Defendants Had Agreed to Guarantee $5.8 Billion in Bonuses to Merrill Executives and Accelerate the Payment Thereof to December 2008, Before the Merger Was Set to Close. ............. 59

    6.    The Proxy Statement Falsely Recommends Approval of he Merger...................................................................... 62

E.    The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity........................................................ 63

F.    BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants. ........................................................................... 70

G.    The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact................................................ 70

H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders............................................................. 75

I.      Liability of BofA Defendants for the Above Misconduct. ................................79

J.      In an Act of Corporate Waste, and in Further Breach of Their Duties
        of Loyalty and Good Faith, the BofA Defendants Secretly Allow the
        Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before
        the Merger Closes ..................................................................................................83

II.     THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY
        DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN
        VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA
        DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH. ..........89

        A.      False and Misleading Statements and Omissions in the Proxy
                Statement. ....................................................................................................89

        B.      False and Misleading Supplementary Statements. ................................94

        C.      False and Misleading Proxy *Supplements* ..............................................96

III.    AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET
        CAPITALIZATION IS PUNISHED, DEFENDANTS ARE
        INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS,
        AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS
        DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR
        THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY
        WITH THE COST OF SEC PENALTIES. .............................................................97

        A.      The Truth Emerges Concerning Merrill's Devastation and
                Defendants' Wrongdoing. ..........................................................................97

        B.      The SEC, FBI, DOJ, New York Attorney General, and
                Congress Conduct Investigations of Defendants ................................102

IV.     THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF
        INTEREST AND CIRCUMSTANCES GIVING RISE TO A
        SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS
        CREATING A REASONABLE DOUBT THAT THE BOARD COULD
        IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS
        AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE. ..........................106

V.      DUTIES OF THE BofA DEFENDANTS. ............................................................120

VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ........126

VII.    DERIVATIVE ALLEGATIONS. ..........................................................................128

VIII.   CLASS ACTION ALLEGATIONS. ......................................................................129

**CLAIMS FOR RELIEF**......................................................................................**131**

    **COUNT I:  Derivatively Against the BofA Defendants for Breach of
Fiduciary Duty**.............................................................................................**131**

    **COUNT II:  Derivatively Against the Advisor Defendants for Breach of
Fiduciary Duty**.............................................................................................**132**

    **COUNT III:  Derivatively Against the Advisor Defendants for Professional
Negligence**....................................................................................................**133**

    **COUNT IV:  Derivatively Against the BofA Officer Defendants, Montag, and
Kraus for Unjust Enrichment and Return of Unearned Compensation**...............**133**

    **COUNT V:  Derivatively Against the BofA Defendants for Contribution**...............**135**

    **COUNT VI:  Derivatively Against the BofA Defendants for Breach of the
Duties of Full Disclosure and Complete Candor**.................................................**135**

    **COUNT VII:  Derivatively Against the Merrill Defendants and the Advisor
Defendants for Aiding and Abetting the BofA Defendants' Breach of
Fiduciary Duties**.............................................................................................**136**

    **COUNT VIII:  Derivatively Against the BofA Defendants, the Merrill
Defendants, and the Advisor Defendants for Violation of Section 14(a) of the
Exchange Act and Rule 14a-9**.........................................................................**137**

    **COUNT IX:  Directly Against the BofA Defendants for Breach of the Duties
of Full Disclosure and Complete Candor**........................................................**140**

**REQUEST FOR RELIEF**...................................................................................**141**

**JURY DEMAND**.................................................................................................**144**

Plaintiffs Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System (collectively, "Plaintiffs") bring this action derivatively on behalf of nominal defendant Bank of America Corporation ("BofA" or the "Company"), and directly on behalf of a Class of BofA shareholders (as defined herein), against certain directors and officers of BofA named herein (the "BofA Defendants") and other defendants (collectively, "Defendants"). Plaintiffs base their allegations on actual knowledge as to their own acts and on information and belief as to all other allegations after due investigation.

## NATURE AND SUMMARY OF THE ACTION

1.      This action arises from Defendants' wrongdoing in causing BofA to acquire Merrill Lynch & Co., Inc. ("Merrill") in a $50-billion merger transaction (the "Merger") agreed to on September 14, 2008, approved by BofA shareholders on December 5, 2008 (the "Shareholder Vote"), and consummated on January 1, 2009 (the "Closing"). The BofA Defendants recklessly and in bad faith caused the Company to commit to paying $50 billion for a company that was in the grips of a liquidity crisis placing it only days or, at most, weeks away from insolvency, and they did so in the course of only *a single day* (from the afternoon of Saturday, September 13, 2008 to the afternoon of Sunday, September 14, 2008).

2.      Bad faith, deliberate or reckless misconduct, and even outright disloyalty suffused the entire process by which the Merrill Merger was agreed to, presented to BofA's shareholders for approval, and consummated. Such wrongdoing was engaged in not only by the BofA Defendants, but also by other wrongdoers who either were bound by similar fiduciary duties to the Company and its shareholders, had similar obligations under the federal securities laws, or otherwise aided and abetted the BofA Defendants in their misconduct. These include officers and directors of Merrill

(sued herein as the Merrill Defendants), and BofA's investment bankers on the Merrill Merger (sued herein as the Advisor Defendants).

3.     The Merger was **agreed to**, with the unanimous approval of both companies' Boards of Directors, through a breach of the BofA Defendants' fiduciary duties (including the duties of loyalty, candor, and good faith), aided and abetted by the Company's investment bankers, as well as the officers and directors of Merrill, both named as defendants herein.  Indeed, the Merger Agreement was executed based on an entirely perfunctory "due diligence" process that lasted only **10 hours** and was purposefully designed to give a green light to the Merger, and based on "fairness opinions" from the Company's investment bankers which, too, were merely post hoc rationalizations of a foreordained decision and which, in fact, deliberately disregarded Merrill's most recent financial projections and the impact of liquidity crises at other Wall Street firms—even though Merrill's viability was directly linked to the liquidity of those firms and even though those firms were themselves paying BofA's investment bankers for advice at the very same point in time.  Officials at the Board of Governors of the Federal Reserve System (the "Federal Reserve" or the "Fed") have concluded that the BofA Defendants' due diligence was inadequate, and that the BofA Defendants knew it at the time.

4.     The Merger was **approved** by BofA's shareholders based on a false and misleading proxy statement (the "Proxy Statement") issued by the Board of Directors of BofA and other defendants, in violation of Section 14(a) of the Securities Exchange Act of 1934 and in breach of the duties of candor, loyalty, and good faith owed to the shareholders.  These defendants, acting recklessly, in bad faith, and in conscious or reckless disregard of their duties, caused BofA to issue a Proxy Statement that was materially false and misleading in that, among other things, it:

- overvalued Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders;

- omitted the known fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value;

- omitted that the "fairness" opinions were based on incomplete information and were not actual opinions as to the Merger's fairness at all, but rather post hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action;

- misrepresented that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time;

- misrepresented that BofA would need no more than $25 million in financial assistance (which already had been received) to complete the Merger; and

- misrepresented Merrill's ability and intention to pay up to $5.8 billion in discretionary bonuses for 2008, before the Merger closed.

5.      The Proxy Statement not only was false and misleading when it was issued on October 16, 2008, but also was false and misleading by virtue of the fact that, while it was still effective and until the Shareholder Vote on December 5, 2008, Defendants deliberately, disloyally, and in bad faith took steps to assure that it was never corrected, amended, or updated to disclose the following highly material information:

- the fact that billions of dollars in additional losses were being incurred by Merrill in the fourth quarter of 2008, that these losses were accelerating, and that the losses reached approximately *$14 billion* two days before the Shareholder Vote;

- the fact that Merrill's financial results and losses on principal transactions during the fourth quarter of 2008 were sufficient, in the opinion of BofA's inside and outside legal counsel, to trigger the termination of the Merger due to the occurrence of a "material adverse event" pursuant to the merger agreement;

- the fact that BofA's Board of Directors had, in fact, decided to declare a "material adverse event" and terminate the Merger, but then quickly recanted

their decision once faced with perceived pressures by government officials to remove them from their jobs if BofA was caused to back out of the deal; and

- the fact that BofA had sought and obtained $20 billion in direct aid (coupled with over $118 billion in "backstop" guarantees) from the federal government to allow it to complete the Merger, and that the Company would not have been able to do so without such assistance.

6.      The Merger was *consummated* through further gross breaches of fiduciary duty (including the duties of loyalty, candor, and good faith) by the BofA Defendants, aided and abetted by other defendants.  Based on the cascading losses at Merrill and advised by legal counsel, BofA's Board of Directors determined in mid-December 2008 to terminate the Merger on the basis of the fact that Merrill had suffered a "material adverse event" allowing BofA to rescind the merger agreement pursuant to its terms.  However, in bad-faith disregard of their duty to act in the best interests of the Company by then acting on that decision, the BofA Directors immediately and loudly rescinded it and recklessly failed to pursue any alternatives, such as renegotiating the timing or price of the Merger using the "material adverse event" clause of the merger agreement (referred to herein as the "MAC clause") as leverage, consciously electing thereby to place their own  personal financial interests above the Company's.  Specifically, in mid-December 2008, the Board was informed (through Defendant Kenneth D. Lewis, Chief Executive Officer and Board Chairman) that Secretary of the Treasury Henry Paulson wished the Merger to be consummated regardless of Merrill's condition, and also that Mr. Paulson was threatening to try to have the entire Board removed from office if they did not comply.  However, rather than abide by their decision and face the consequences (or even resign in protest), the BofA Board members instead instantly retracted their

decision, causing Mr. Paulson to be notified of their decision even before the Board as a whole had been canvassed.[1]

7.     Having thus committed a textbook example of disloyalty, the BofA Defendants then compounded their wrongdoing by hiding from shareholders both the Board's "material adverse event" determination and its decision to reverse it under perceived pressure from Mr. Paulson—and even the fact that the Company had sought and obtained over $138 billion in direct aid and other assistance from the federal government solely to enable it to consummate the Merger.  To the contrary, the BofA Defendants expressly treated **withholding such information** as one of the key **goals** of the process by which the Merger was consummated.  These acts and omissions constituted further deliberate breaches of the BofA Defendants' fiduciary duties of loyalty and good faith, amounting to a vain attempt to "cover up" their own acts of wrongdoing, which were highly material to shareholders.

---

[1] In so doing, the BofA Board gave no consideration to the dubiousness of Mr. Paulson's threat—or to ways in which the MAC clause could have been used to BofA's advantage short of actually rescinding the Merger.  One senior Wall Street executive, upon learning of the Board's, was incredulous, telling an *Atlantic* reporter, "There is no question what I would have done if I were in his shoes . . . .  "*I would have told [Bernanke and Paulson] I was calling the MAC, was releasing the decision publicly, and dared them to fire me and the board—and that never would have happened, trust me*."  Similarly, a former Merrill executive, who was involved in Merger, told the *Atlantic* reporter: "He could have used the MAC clause a pretext to renegotiate the deal. . . .  "That would have been a prudent thing to do."

**After a Designedly Perfunctory "Due Diligence" Review, Defendants Violate Their Duties of Good Faith and Loyalty to BofA by Agreeing to Pay $50 Billion for a Virtually Bankrupt Company, While *Guaranteeing* $6 Billion in Bonuses to Company Executives**

8.       By the late summer of 2008, Merrill, with a large and perilous exposure to subprime-related securities, faced liquidity problems that jeopardized its very existence as a going concern.  As a consequence, the Board of Directors of Merrill and others at Merrill (sued herein as the "Merrill Defendants") were forced to put the entire company up for sale to an outside party.

9.       BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable disasters as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.  Over the weekend of September 13-14, 2008, representatives of the two companies gathered on orders from their Chairman-CEOs to negotiate a merger.  The deal—a stock-for-stock transaction in which Merrill would become a wholly-owned subsidiary of BofA—was peremptorily negotiated in the space of a single afternoon, Saturday, September 13, 2008, between Defendant Lewis, BofA's then-Chairman and CEO, and Defendant John A. Thain, the Chairman and CEO of Merrill.

10.       Rather than being properly focused on Merrill's deteriorating liquidity and inevitable bankruptcy as the only alternative to the Merger—and the correspondingly modest, if not fire-sale, price that BofA should pay—the negotiations under Defendant Lewis and the BofA Defendants instead were, from inception, pegged to the number of billions of dollars in ***bonuses*** that should be ***guaranteed*** to Merrill executives pursuant to the Merger, and to the amount of ***premium*** over Merrill's current share price BofA should pay.  Thus, the Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses

should be paid on an accelerated basis before the Merger closed on December 31, 2008. Similarly, the BofA Defendants, in a further act of disloyalty and bad faith, simply acceded to the Merrill team's demand that BofA pay an astonishing *70 percent premium* for Merrill's common stock based on the value of such stock at the time. With these deal terms in place, Defendants, in yet further acts of disloyalty and bad faith, then proceeded to conduct an ad hoc "due diligence" review of Merrill whose favorable result was foreordained by Defendants.

11.     According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, *10 hours*, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning. Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within days but for the transaction itself. The process was especially inadequate given Merrill's exposure to metastasizing losses in the market for auction rate securities ("ARS"), mortgage-backed securities ("MBS"), collateralized debt obligations ("CDOs"), and other toxic, highly-leveraged derivatives that made headlines throughout the nation's economy in the summer and fall of 2008.

12.     In recklessly agreeing to these terms, the BofA Director Defendants did not consider the scope, potential amount, or any other aspect of the liabilities that they were causing BofA to assume—including whether the assumption of such liabilities might cause serious or even fatal harm to BofA. The assumption of such liabilities without quantification or other consideration constituted a breach of these defendants' duties of loyalty, candor, and good faith, since the decision to do so could not have been taken in good faith or as the result of those defendants' informed business

judgment.  Indeed, in a move which shocked shareholders—who had, through Defendants' reckless, disloyal, and bad-faith misconduct, been kept in the dark throughout this process—on or about January 16, 2009, BofA announced that it had been required to obtain an ***additional*** $118 billion in aid and "backstop" liquidity guarantees from the government (on top of approximately $25 billion in aid already received) under the federal Troubled Asset Relief Program ("TARP"), just to stay afloat.

13.     In breach of their duties of good faith, loyalty, and candor, the Boards of Directors of both Merrill and BofA unanimously approved the Merger in great haste in separate afternoon meetings held on Sunday, September 14, 2008.  The transaction was first announced to BofA shareholders and the public on the morning of Monday, September 15, 2008.  The Shareholder Vote on the Merger was scheduled for December 5, 2008.

**Defendants Issue a False and Misleading Proxy Statement and Knowingly Deceive Shareholders With Respect to Billions of Dollars in Secret Bonuses to Merrill Executives**

14.     As became obvious practically the moment it closed on January 1, 2009, following a favorable vote on December 5, 2008, the Merger was approved by BofA's shareholders based on inaccurate and misleading information furnished to them by certain of the Defendants.  The BofA Director Defendants sought shareholder consent to the Merger in a Schedule 14A Proxy Statement (the "Proxy Statement") issued on November 3, 2008—one month before the Shareholder Vote. The Proxy Statement contained statements concerning Merrill that were false and that omitted material information necessary to make the statements that were made not misleading, in violation of the federal securities laws and in breach of these defendants' duty of candor to shareholders. Among other things, these defendants failed to disclose, either in the Proxy Statement or subsequently, the unprecedented, and rapidly accelerating, losses at Merrill caused by its exposure to the various derivative securities—losses which quickly reached over $15 billion in the fourth quarter alone.

15.     That information, however, was already known or readily available to the BofA Defendants and their financial and legal advisors, as the BofA Defendants had obtained unfettered access to the entirety of Merrill's financial and accounting records immediately upon signing the Merger Agreement.  Moreover, Merrill's collapsing financial results, as well as the authorization to pay up to $5.8 billion in bonuses to Merrill executives, which together totaled in the tens of billions of dollars, were manifestly material to BofA shareholders in deciding how to vote on the Merger. By omitting to disclose this information, either in the Proxy Statement itself or in a corrective or updated disclosure, and by dwelling almost exclusively on the supposedly positive contribution Merrill would make to BofA, the BofA Director Defendants and their financial and legal advisors drafted, signed, and published the false and misleading Proxy Statement, violating Section 14(a) and Rule 14a-9 promulgated thereunder.  These actions also constituted a knowing, reckless, or grossly negligent violation of these defendants' duties of candor and full disclosure in the context of an action requiring shareholder approval—a violation which harmed not only the Company but also each shareholder directly who was asked to vote on the Merger.

16.     Recently, Rep. Dennis Kucinich, in his opening statement to the House of Representatives' Joint Full Committee-Subcommittee Hearing on the Government's Rescue of the Bank of America-Merrill Lynch Merger, summarized the findings of the hearings thus far:

> This Committee's investigation and two previous hearings have revealed that the *Government had concluded that Mr. Lewis's management of Bank of America was seriously deficient and possibly in legal jeopardy*.  Top staff at the Fed and Treasury had determined that *Mr. Lewis knew about accelerating losses at Merrill Lynch before the shareholder vote to ratify the merger, but he did not provide that information to shareholders.*  The top lawyer at the Fed had determined that Mr. Lewis and his management team were possibly *in violation of securities laws for withholding material information from shareholders. Top professional staff at the Fed had determined that Mr. Lewis and his management team had failed to do due diligence in acquiring Merrill Lynch* and were not up to the task of identifying and solving the problems in which they found themselves in late 2008.  [Emphases added.]

17.     In an even more flagrant violation of their duties of candor, loyalty, and good faith, the BofA Defendants took steps to *actively conceal* the fact that they had authorized Merrill to accelerate the payment of bonuses for 2008 from early January 2009 (when they otherwise would, by custom, occur) to December 2008, before the Merger was set to close, and that these bonuses would total up to *$5.8 billion* in discretionary bonuses—knowingly deceiving shareholders into believing that the exact opposite was true, *viz.*, that *no* discretionary bonuses would be paid at Merrill for 2008.  Specifically, the bonuses were memorialized by the parties in a so-called "disclosure schedule" to the Merger Agreement.  That "disclosure schedule" was appended by the BofA Defendants to the Merger Agreement and was *not* contained in the body of the Agreement.  It therefore was *not disclosed to shareholders* in the Proxy Statement, which, as prepared by the BofA Defendants, attached the body of the Agreement *but not any of its appendices*.

18.     The bloated and undeserved bonuses that the BofA Defendants, aided and abetted by the Advisor Defendants and the Merrill Defendants (the latter of whom were motivated by their own self-interest to ensure that the bonuses not come to the attention of BofA shareholders, lest the Merger be voted down) caused to be secretly paid to Merrill executives did not come to light until well after the Merger closed on January 5, 2009.  Once disclosed, however, these bonuses became the subject of multiple regulatory and law enforcement proceedings.  In that regard, the New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses.  A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating the payment of bonuses to the BofA Defendants for 2008.  In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses.  On August 3, 2009, the SEC filed a complaint relating to the bonuses in the United States District Court for the Southern District of

New York against BofA under Section 14(a). The United States Securities and Exchange Commission ("SEC") has indicated that it will *try that case and not attempt to settle it*.

**After the Proxy Statement is Issued, Defendants**
**<u>Commit Further Knowing Deception of BofA Shareholders</u>**

19.     The Shareholder Vote to approve the acquisition of Merrill was held on December 5, 2008, with 82 percent of BofA shareholders voting in favor. Little did shareholders know, however, that Defendants Lewis, Price, Cotty, and Curl—with the full knowledge and complicity of the BofA Board—had already secretly determined (and were deliberately withholding from shareholders) that, immediately after the vote (and assuming it was in favor of the Merger), BofA must turn to the United States Government for over one hundred billion dollars in additional assistance and "guarantees"—on top of the $25 billion BofA had already received—to enable BofA to complete the Merger.

20.     This was because, throughout the fall of 2008, Merrill suffered highly material undisclosed losses that greatly jeopardized the solvency of the combined company—a fact that was well known (or recklessly or negligently disregarded) by all Defendants. Indeed, as Defendant Thain stated upon his forced departure from Merrill after the Closing, weekly profit-and-loss reports concerning Merrill were sent to Lewis, Price, and other BofA Defendants that made Merrill's rapidly deteriorating condition unmistakably clear. These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings. In October 2008 alone, Merrill lost another $7 billion. In November 2008, Merrill lost an additional $6.3 billion and also suffered a goodwill impairment of $2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender. Thus, by the eve of the shareholder vote on December 5, 2008, Merrill—undisclosed to BofA shareholders—had lost a staggering $15.3 billion so far in the fourth quarter of 2008.

**Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Rescission of the Merger, but Conceal this Fact from Shareholders and Then, in yet Further Acts of Disloyalty and Bad Faith, Retract this Decision so as to Keep Their own Positions and Compensation and Withhold that Fact, too, from Shareholders**

21.     On December 17, 2008, after the vote but before the Merger closed, Defendant Lewis informed Mr. Henry Paulson that the BofA Defendants considered Merrill's losses to constitute a "material adverse event" entitling BofA to cancel the Merger. Defendant Lewis also falsely claimed, both to Mr. Paulson and Federal Reserve Chairman Ben Bernanke, that Merrill's enormous losses had only recently materialized—claims which Federal Reserve officials soon derided as "not credible." After further meetings with Treasury and Fed officials—and as additional data concerning Merrill's losses became available—Defendant Lewis and the BofA Board concluded that Merrill's losses did, in fact, constitute a "material adverse event" justifying rescission of the Merger. However, when Lewis informed Mr. Paulson of that determination, he was told by Mr. Paulson that he, Mr. Paulson, would try to get the entire Board and senior management, including Lewis, ousted from office if BofA was caused to back out of the Merger—a threat to which Defendant Lewis and the other BofA Defendants responded by hastening to assure Messrs. Paulson and Bernanke, in effect, that they would never dream of invoking the MAC clause. Lewis and the BofA Director Defendants thus secured a promise of $20 billion in direct assistance to complete the Merger, as well as protections against $118 billion in additional exposure from Merrill. These developments were deliberately held secret from BofA shareholders until after the Merger closed on January 1, 2009. As evidence of this deliberate, reckless, disloyal and bad-faith misconduct, in a December 22, 2008 email to the BofA Board, Defendant Lewis wrote: "I just talked with Hank Paulson. He said there is no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure *which, of course, we do not want.*"

22.     The BofA Director Defendants' actions in determining that the Merger should be cancelled under the MAC clause based on advice from legal counsel, reversing that decision the moment they perceived their lucrative and prestigious positions to be at risk, and secretly securing $138 billion in federal assistance as the only means to consummate the Merger, yet acting deliberately to cover up these facts from shareholders, constituted further breaches of these defendants' fiduciary duties of candor, loyalty, and good faith, as well as violations of the federal securities laws.  If Merrill's exposure precluded BofA from being able to consummate the transaction, the BofA Defendants had a number of options by which they could have discharged their duties to shareholders, including rescinding the Merger under the MAC clause or at least trying to renegotiate the terms of the Merger, including the purchase price, with Merrill, perhaps using the MAC clause as leverage.

23.     All of these options, however, were knowingly rejected by the BofA Defendants, lest they be perceived with disfavor by a government bureaucracy that purported to hold their jobs in its hands.  All of these options, too, were withheld from shareholders, who also were willfully deprived by these defendants of any information concerning Merrill's losses, the Board's decision to invoke the MAC clause, the Board's reversal of that decision, or the $138 billion in additional financing BofA needed and obtained to complete the Merger.  The BofA Director Defendants simply determined to abdicate their own business judgment as to the best interests of the Company and its shareholders, defer to perceived pressure from government officials, and in the process keep their prestigious and lucrative positions at all costs.  This included the following 2007-2008 compensation to BofA Board members:   Lewis—$34.8 million; Gifford—$3.5 million; Sloan—$580,000; Barnet—$480,000; May—$398,000; Ward—$377,000; Collins—$381,000; Mitchell and Ryan—$378,000; and Bramble, Countryman, Franks, Lozano, Massey, Spangler, and Tillman—$338,000.

24.     As a respected commentator for the *New York Times*'s "DealBook" weblog, Steven

M. Davidoff, a professor at the University of Connecticut School of Law, has noted (February 9,

2009):

> *Ultimately, the . . . story is one of a bank that was being pushed hard by the federal government to do a deal without a whit of care about the effect on its shareholders.* The government implicitly threatened Ken Lewis's job, stated explicitly what BofA's legal options were, and offered a carrot if Bank of America completed the deal. Meanwhile, *despite the internal debate at BofA about whether or not to disclose the Merrill losses before the Bank of America vote, it again appears that shareholders were not in Bank of America's calculus.* Instead, the shareholder meeting was treated as an expiring option. Let's get it done so we can proceed to the deal. *The failure to disclose before the meeting is particularly galling because, if BofA had concluded there was no MAC before the meeting, its only out was through the shareholder vote. By not disclosing, BofA ensured that the deal would go through.*
>
> Both of these stories cast a harsh light on everyone: the government, Bank of America and Merrill. . . . But the wreckage is apparent. *I'm particularly troubled by the self-inflicted wounds Bank of America management appears to have imposed upon the company through their desire to proceed with the shareholder vote without disclosure of Merrill's losses.* The latter issue will now be settled in litigation and the shareholder process. [Emphases added.]

**"The $50 Billion Deal from Hell":**
**As the Truth Belatedly Emerges, BofA's Market**
**Capitalization is Punished; Defendants are Investigated by the**
**NYAG, SEC, FBI, DOJ, and Congress; and the BofA Defendants Commit**
**Still Further Acts Disloyalty and Bad Faith by Evading Responsibility for their**
**Actions and Even Trying to Saddle the Company with the Cost of SEC Penalties**

25.     It was not until January 14, 2009 that news first began to circulate concerning the

true size ($21 billion) of Merrill's theretofore-undisclosed fourth-quarter losses, the receipt of

massive federal assistance as the only way for BofA to be able to complete the Merger, and the fact

that the BofA Defendants had agreed to proceed with the Merger only after perceiving their

continuation in office to be called into question—thus creating an irreconcilable conflict of interest

that tainted all of their subsequent decision-making. Immediately thereafter, on January 16, 2009,

BofA shocked the market in announcing a fourth-quarter loss of $1.79 billion—a figure which would have been billions in *profits* but for the losses attributable to Merrill.  Accordingly, between January 14, 2009 and January 20, 2009, BofA's stock price dropped by 50 percent in only three trading days. BofA's stock price dropped an additional 15 percent on January 22, 2009, when news became available about Merrill's payment, with the BofA Defendants' express approval, of billions of dollars in unearned bonuses.  Defendant Thain, who had briefly run Merrill as a division of BofA, was fired amidst reports that he spent the latter part of December on a ski vacation in Vail, Colorado and spent $1.2 million refurbishing his private office at Merrill while the company itself lost $27 billion in 2008.

26.     The impact upon BofA from Defendants' conscious, reckless, and bad-faith misconduct has been profound.  When the Merger was first announced on September 15, 2008, it was valued at $50 billion, based on the then-current trading price of BofA's common stock.  By the eve of Closing, BofA's stock price had been driven so far down that the deal was worth only $19.4 billion.

27.     Merrill's losses of $27 billion for 2008—including $15 billion in losses for the fourth quarter that were unfolding right before the BofA Defendants' eyes throughout the October-December timeframe—contributed to the further collapse in BofA's market capitalization after the Merger closed on January 1, 2009.  Between December 31, 2008 and March 6, 2009—as news of Merrill's undisclosed losses and the Defendants' misconduct became widely reported in the press—BofA's share price dropped from $14.08 to $3.14—representing another $11 billion in wealth destruction.  All told, as a direct consequence of Defendants' bad faith and disloyalty, at least $136 billion in shareholder wealth was wiped out between September 15, 2008 and March 6, 2009.

28.     The damages to BofA do not end with the destruction of its shareholder base.  As a consequence of acquiring Merrill, BofA has suffered permanent damage to its reputation as a sound, well-managed financial institution.  Defendant Lewis was stripped of his position as Chairman of the Company's Board of Directors at the Company's annual shareholder meeting on April 29, 2009.  As the uproar over the BofA Defendants' brazen acts of self-interest continued, and more and more damaged information has emerged from the investigations by various government agencies pointing toward their deceitfulness and complicity in the misconduct, Defendant Lewis was forced to resign his CEO position on September 30, 2009, stating that he would leave the Company by the end of the year.  In addition, several other members of the Board who, with Lewis, helped engineer the bad-faith acquisition of Merrill, were only narrowly re-elected.  Many have since resigned or been forced out.  The Company has been obliged to defend multiple regulatory and law enforcement proceedings—including by the SEC, the New York Attorney General, and even the United States Congress.  The Federal Bureau of Investigation ("FBI") and United States Department of Justice ("DOJ") are conducting criminal probes.  The SEC recently filed a civil enforcement proceeding against BofA related to the BofA Defendants' failures to disclose the payment of some $5.8 billion in bonuses to Merrill employees before the Merger closed, in spite of Merrill's deteriorating condition.

29.     In addition, the New York Attorney General stated that its investigation has "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*"  (Emphasis added.)  These instances comprised:  (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote

losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

30. The BofA Defendants, further evidencing their bad faith and disloyalty to BofA, have consistently sought to evade any responsibility for their actions. Defendant Lewis, for example, testified to both the New York Attorney General and the House Committee on Oversight and Government Reform that the BofA Defendants were completely unaware of the devastating losses until December 9, 2008 and did not consider invoking the MAC clause until December 17, 2008. However, documentary and testimonial evidence obtained by the Attorney General and the Committee from other sources belies those assertions. Specifically, as early as mid-November 2008, Merrill faced fourth-quarter losses of $9 billion, or nearly *double* its third-quarter losses, and discussions of the MAC clause among the BofA Defendants and the Company's legal counsel were under way well before the Shareholder Vote on December 5, 2008.

31. Even recently, in what would otherwise be considered the aftermath of Defendants' misconduct, the BofA Defendants are continuing to try to deny their acts of bad faith and disloyalty to the Company. In early August 2009, the BofA Defendants caused the Company to try to enter into a settlement and consent judgment with the SEC over the Merrill bonus charges. In particular, these defendants executed a settlement of the charges which would have involved *BofA*—not any individual officers or directors—agreeing to a permanent injunction and the payment of a $33 million fine.

32. The proposed consent judgment was presented to this Court, the Honorable Jed S. Rakoff presiding, for approval. After a hearing and two rounds of briefing, Judge Rakoff issued an Order on September 14, 2009 *rejecting the settlement*. The Court found that the proposed settlement was "*neither fair, nor reasonable, nor adequate*"—among other reasons, because it attempted to have the Company itself, rather than individual officers, accept blame and pay the

penalty, thereby effectively requiring BofA shareholders to be victimized twice.[2]  Finally, the Court

found that the BofA Defendants' vigorous protestations of innocence rendered unclear what point, if

any, would be served by an decree of permanent injunctive relief.  Wrote the Court:

> *[T]he parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry—all at the expense of the sole alleged victims, the shareholders.*  Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

> Oscar Wilde once famously said that a cynic is "someone who knows the price of everything and the value of nothing."  *Lady Windermere's Fan* (1892).  The proposed Consent Judgment in this case suggests a rather cynical relationship between the parties:  the S.E.C. gets to claim that it is exposing wrongdoing on the part of Bank of America in a high-profile merger; the Bank's management gets to claim that they have been coerced into an onerous settlement by overzealous regulators.  And *all of this is done at the expense, not only of the shareholders, but also of the truth.*  [Emphases added.]

33.     Robert Bruner, dean of the Darden School of Business at the University of Virginia,

is an expert in the subject of failed business combinations.  His book, *Deals From Hell: M&A*

*Lessons That Rise Above the Ashes*, sets forth various criteria for failures.  The criteria include

destruction of market value, financial instability, impaired strategic position, organizational

weakness, damaged reputation, and violation of ethical standards and laws.

34.     Heidi N. Moore, a *Wall Street Journal* reporter writing on that newspaper's "Deal

Journal" weblog on January 22, 2009, applied Mr. Bruner's criteria to the Merrill Merger.  Her

conclusion:  "Check, check, check, check, check and mate."  Wrote Ms. Moore:

---

[2] In addition, the Court found that the SEC had too quickly credited the BofA Defendants' claims **both** that they had relied upon the advice of counsel in connection with the Company's disclosures of the Merrill bonuses **and** that the attorney-client privilege protected their communications with counsel and precluded charges against individual actors.

### Bank of America-Merrill Lynch: A $50 Billion Deal From Hell

*Mergers often prove troublesome, but few have set the land-speed record for disaster as fast as Bank of America's $50 billion acquisition of Merrill Lynch.*

Let us detail the ways.  Only three weeks after the deal closed on Jan. 1, there has been the departure of several high-level executives including the president, chief executive and head of wealth management of Merrill Lynch; an additional $20 billion in Treasury support; $118 billion of government backstops; a $15 billion loss at Merrill that came after repeated assurances from both sides that due diligence was solid; the massacre in Bank of America shares, which have fallen 78% since the bank agreed to acquire Merrill on Sept. 15; lawsuits surrounding the surprise announcement of the Merrill Lynch loss; the revelation that BofA CEO Kenneth Lewis himself contemplated calling the whole thing off in December; and widespread fears of even steeper losses on Merrill's troubled assets.  That doesn't even count the loss of market value.  Bank of America closed at $33.74 on the Friday before the deal was closed.  At Wednesday's close of $6.68, the company's market cap was $42.7 billion.  The stock was at a 52-week low of $5.50 recently.  *BofA's low trading price represents a complete wipeout of Merrill Lynch's $17 trading price before the deal and the $29 price at which Merrill was acquired.*

\*   \*   \*   \*

*It is official.  Bank of America's acquisition of Merrill Lynch is a candidate for the title of "A Deal from Hell."*

### Pre-Suit Demand is Futile and Excused

35.       Plaintiffs have not made a demand on the BofA Board to institute this suit in the Company's name because doing so would be futile and useless gesture.  The Board, in determining to accede to perceived pressure from Mr. Paulson to go through with the Merger at all costs—purportedly on pain of losing their lucrative and prestigious positions—*have already demonstrated that their loyalty lies in preserving their own positions and self-interest rather than in serving the best interests of BofA and its shareholders*.  Moreover, Board members face a substantial likelihood of liability herein under Section 14(a) for making false and misleading statements in the Proxy Statement—and for their acts of bad faith, disloyalty, and other breaches of their fiduciary duties to BofA detailed herein, none of which are exculpated under Delaware Code Section 102(b)(7) and

each of which therefore give rise to a substantial potential for liability, rendering demand futile. Further, Board members face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.

36.     In addition, various individual Board members are conflicted from objectively considering a pre-suit demand based on their insider status, substantial compensation, lack of banking industry experience, presence on interlocking public company Boards of Directors, excessive outside Board commitments, and other conflicts. *See infra*, part IV. These include but are not limited to:

- **Lewis** and **Gifford** are corporate insiders of BofA who received $10 million and $1.6 million in compensation, respectively, from BofA, and the Board itself has *admitted* that they are "*categorically*" not independent.

- **Bramble** was CEO of MBNA and received an opulent buyout package and a seat on the BofA Board when BofA acquired MBNA; he recently retired from Allfirst Financial Inc. after it was discovered that Allfirst had lost $691.2 million in a foreign currency trading scandal.

- **Barnet, Collins, Countryman, May, Gifford,** and **Ryan** are legacies of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others; when BofA acquired FleetBoston, these defendants receive lucrative buyouts and seats on the BofA Board. These same directors are designated as "Problem Directors" by The Corporate Library, an independent research organization, for approving bloated executive compensation to FleetBoston insiders while it was under investigation. These six directors tend to act together, are beholden to one another, and dominate the Board. Indeed, four of them, **May, Barnet,** and **Collins**, constitute a majority of the Audit Committee, with **May** serving as its Chair.

- **Lewis, Gifford, Spangler, Ward, and Massey** have received, over the last two years, far greater than ordinary director compensation ($34.8 million, $3.5 million, $580,000, $480,000, and $398,000, respectively), rendering them dependent on BofA for their livelihood and incapable of acting independently from other Board members who control these payouts.

- Nine directors, **Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman,** and **Ward** (more than half the Board) have no career experience in the banking, investment banking, securities brokerage, or any other financial services industry. Their experience lies, rather, in such areas as software, armed forces,

publishing, academia, non-profit, pharmaceuticals, auto parts, home improvement, and construction.

- **Gifford, Countryman,** and **May**, besides being legacies of the FleetBoston Board, each serve with the others as trustees of NSTAR and members of the Board of CBS Corporation. Given these interlocking directorships, Countryman and May are beholden to Gifford, a corporate insider of BofA and a "*categorically*" non-independent director.

- Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis, Gifford, Countryman,** and **Sloan**, chaired by **Sloan**, whose experience lies in auto parts, not banking.

## JURISDICTION AND VENUE

37.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

38.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiffs

40.     Plaintiff Louisiana Municipal Police Employees Retirement System ("MPERS") is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana.  MPERS has been a continuous owner of BofA stock since at least September 1, 2008.  The Retirement System is an instrumentality of the State of Louisiana and a citizen thereof.

41.     Plaintiff Hollywood Police Officers' Retirement System ("HPORS") is a Florida municipal pension fund organized for the benefit of Hollywood's police officers.  HPORS has been a continuous owner of BofA stock since at least September 1, 2008.

### Nominal Defendant

42.     Nominal defendant BofA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management, and other financial and risk-management products and services.  As of March 4, 2009, BofA had issued and outstanding more than 6.4 billion shares of common stock.  BofA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.

**The BofA Defendants**

43.     Defendant Kenneth D. Lewis ("Lewis") is the Chief Executive Officer and President of BofA, and served as Chairman of the Board of Directors until his unscheduled termination from that position on April 29, 2009.  Defendant Lewis has been a director since 1999, became Chief Executive Officer in 2001, President in 2004, and has served continuously in those positions since. Lewis also became Chairman in 2005 and served continuously in that position until he was removed from this position by shareholders on April 29, 2009.  On September 30, 2009, Lewis notified the BofA Board of his intention to resign from the CEO position by the end of 2009.  He is also a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BofA, Lewis was paid $24.8 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $10.0 million in 2008.   Lewis is a citizen of North Carolina.

44.     Defendant Charles K. Gifford ("Gifford") has been a member of the Board since 2004, when Bank of America acquired FleetBoston, of which Gifford was CEO.  He is a member of the Executive Committee of the Board and was the Chairman of the Board until replaced by Lewis. Defendant Gifford serves with defendant Countryman and defendant May as both a trustee of NSTAR (an energy utility company) and a member of the Board of Directors of CBS Corporation. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Gifford was paid $1.4 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $1.9 million in 2007, and $1,631,396 in 2008.  Defendant Gifford is a citizen of North Carolina.

45.     Defendant William Barnet, III ("Barnet") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Audit Committee of the Board during the events complained of herein.  In exchange for his

purported trust, loyalty, and fidelity to BofA, Defendant Barnet was paid $397,847 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, $240,000 in 2008.  Defendant Barnet is a citizen of South Carolina.

46.    Defendant Frank P. Bramble, Sr. ("Bramble") has been a member of the Board since 2006, when BofA acquired MBNA.  He is a member of the Asset Quality Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Bramble was paid $324,861 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Bramble is a citizen of Delaware.

47.    Defendant John T. Collins ("Collins") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 29, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Collins was paid $244,500 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, and $141,118 in 2008. Defendant Collins is a citizen of Massachusetts.

48.    Defendant Gary L. Countryman ("Countryman") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Executive Committee of the Board during the events complained of.  Defendant Countryman serves with Defendant Gifford and Defendant May as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Countryman was paid $403,145 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008. Defendant Countryman is a citizen of Massachusetts.

49.     Defendant Tommy R. Franks ("Franks") was a member of the Board from 2006 until his resignation on June 17, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  Defendant Franks is a retired general in the United States Army.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Franks was paid $318,984 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Franks is a citizen of Oklahoma.

50.     Defendant Monica C. Lozano ("Lozano") has been a member of the Board since 2006.  She is a member of the Asset Quality Committee of the Board.  Defendant Lozano publishes *La Opinion*, one of the largest Spanish-language newspapers in the United States.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Lozano was paid $263,486 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Lozano is a citizen of California.

51.     Defendant Walter E. Massey ("Massey") has been a member of the Board since 1998, and has been the Chairman of the Board since April 29, 2009.  Defendant Massey is President Emeritus of Morehouse College and a member of the Board of Directors of McDonald's Corporation.  He is a member of the Audit Committee of the Board.  Defendant Massey has long, close ties to Lewis; among other things, Lewis was co-chairman of a Morehouse College capital campaign when Massey was president of the college in the last several years.  Moreover, it was Lewis and Sloan who worked behind the scenes to elevate Massey to the Chairmanship of the Board when it became evident that shareholders might vote to unseat Lewis, which they did.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Massey was paid $649,692 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Massey is a citizen of Georgia.

52.     Defendant Thomas J. May ("May") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is the Chair of the Audit Committee of the Board. Defendant May serves with defendant Gifford and defendant Countryman as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation. He is the current Chairman and CEO of NSTAR. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant May was paid $469,117 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,517 in 2007, and $157,376 in 2008. Defendant May is a citizen of Massachusetts.

53.     Defendant Patricia E. Mitchell ("Mitchell") was a member of the Board from 2001 until she resigned on June 3, 2009. She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of. Defendant Mitchell is the President of the Paley Center for Media, a non-profit organization "dedicated to advancing understanding of the media," and a former President of Public Broadcasting Service. In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Mitchell was paid $415,558 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008. Defendant Mitchell is a citizen of New York.

54.     Defendant Thomas M. Ryan ("Ryan") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is a member of the Compensation and Benefits Committee and the Chair of the Corporate Governance Committee of the Board. Defendant Ryan is the Chairman and CEO of CVS/Caremark Corporation, a provider of pharmacy and related healthcare services. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Ryan was paid $432,890 in salaries, bonuses, fees, stock options, stock awards, and other

compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ryan is a citizen of Rhode Island.

55.     Defendant O. Temple Sloan ("Sloan") was a member of the Board from 1996 until May 26, 2009, when he resigned.  During the events complained of, he was the "Lead Director" of the Board, Chair of the Compensation and Benefits Committee, a member of the Corporate Governance Committee, and Chair of the Executive Committee of the Board.  Defendant Sloan is the Chairman of General Parts International, Inc., a distributor of automotive replacement parts.  He serves on the Board of Directors of Lowe's Companies, Inc., a home improvement retailer, which defendant Tillman formerly served as Chairman and CEO.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Sloan was paid $318,125 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $290,000 in 2007, and $290,000 in 2008. Defendant Sloan is a citizen of North Carolina.

56.     Defendant Meredith R. Spangler ("Spangler") was a member of the Board from 1988 until she retired from Board service on April 29, 2009.  She and her family own over 32,000,000 shares of BofA common stock—approximately eight times as much as Lewis and 16 times as much as any other Board member.  She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of. In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Spangler was paid $942,774 in salaries, bonuses, fees, stock options, stock awards, and other compensation for 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Spangler is a citizen of North Carolina.

57.     Defendant Robert L. Tillman ("Tillman") was a member of the Board from 2005 until May 29, 2009, when he resigned.  He was a member of the Asset Quality Committee of the Board during the events complained of.  Defendant Tillman is the former Chairman and CEO of

Lowe's Companies, Inc., a home improvement retailer.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Tillman was paid $317,479 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Tillman is a citizen of North Carolina.

58.     Defendant Jackie M. Ward ("Ward") was a member of the Board from 1994, until her resignation on June 3, 2009.  She was Chair of the Asset Quality Committee of the Board during the events complained of.  Defendant Ward is the retired Chairman and CEO of Computer Generation, Inc., a telecommunications software company.  She is also a member of the Boards of Directors of Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation, and Wellpoint, Inc., all of which are public companies.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Ward was paid $982,528 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ward also serves as a director of at least five other corporations: Equifax, Inc., Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation and Wellpoint, Inc.  Defendant Ward is a citizen of Georgia.

59.     Defendant Gregory Curl ("Curl") has been the Chief Risk Officer of BofA since June 30, 2009.  Previously, he was the Vice Chairman for Corporate Planning and Strategy at BofA.  Defendant Curl was one of BofA's principal negotiators on the Merrill Lynch acquisition.  Defendant Curl is a citizen of North Carolina.

60.     Defendant J. Steele Alphin ("Alphin") is the Chief Administrative Officer of BofA.  Defendant Alphin is a citizen of North Carolina.

61.     Defendant Joe L. Price ("Price") is the Chief Financial Officer of BofA.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Price was paid $6.5 million

in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $4.0 million in 2008.  Defendant Price is a citizen of North Carolina.

62.     Defendant Amy Woods Brinkley ("Brinkley") was the Global Risk Executive of BofA until June 30, 2009, in charge of controlling the Company's credit, market, and operational risks.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Brinkley was paid $9.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Brinkley is a citizen of North Carolina.

63.     Defendant Brian T. Moynihan ("Moynihan") was, until August 10, 2009, the head of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA.  Defendant Moynihan replaced Defendant Thain in this position when Thain resigned on January 22, 2009.  Previously, Defendant Moynihan was the President of Global Corporate and Investment Banking of BofA, and also served as its General Counsel from December 10, 2008 until August 10, 2009.  He is a former high-ranking officer of FleetBoston, which BofA acquired in 2004.  Defendant Moynihan is a director of Black Rock, Incorporated.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Moynihan was paid $10.1 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Moynihan is a citizen of North Carolina.

64.     Defendant Neil A. Cotty ("Cotty") has been the Chief Financial Officer of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA, since January 2009.  Defendant Cotty was a key member of the BofA-Merrill liaison team before the deal closed.  From April 2004 until December 2008, he was the Chief Accounting Officer of BofA.  Defendant Cotty is a citizen of North Carolina.

65.     Defendant Keith T. Banks ("Banks") is the President, Global Wealth and Investment Management of BofA.  He was a high-ranking officer of FleetBoston, which BofA acquired in 2004. Defendant Banks is a citizen of North Carolina.

66.     Defendant Timothy Mayopolous ("Mayopolous") was the General Counsel of BofA until December 10, 2008, when he was terminated and replaced by Defendant Moynihan. Mayopolous is a citizen of New York.

67.     Defendant Teresa Brenner ("Brenner") is an Associate General Counsel of BofA. Defendant Brenner is a citizen of New York.

**The Merrill Defendants**

68.     Defendant John A. Thain ("Thain") was the Chief Executive Officer of Merrill and Chairman of the Merrill Board from 2007 to January 1, 2009.  Defendant Thain became the President of Global Banking, Securities and Wealth Management of BofA on January 1, 2009 but resigned in scandal on January 22, 2009, following reports of massive losses and wasteful practices at Merrill.  In 2007, Defendant Thain was paid over $17.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation.  Defendant Thain is a citizen of New York.

69.     Defendant Carol T. Christ ("Christ") was a member of the Merrill Board from 2007 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee of the Board.  In 2007, Defendant Christ was paid over $191,000 in fees, stock awards, and other compensation.  Defendant Christ is a citizen of Massachusetts.

70.     Defendant Armando M. Codina ("Codina") was a member of the Merrill Board from 2005 until January 1, 2009.  He was Chair of the Nominating and Corporate Governance Committee of the Board, and a member of the Management Development and Compensation Committee.  In

2007, Defendant Codina was paid over $270,000 in fees, stock awards, and other compensation. Defendant Codina is a citizen of Florida.

71.     Defendant Judith Mayhew Jonas ("Jonas") was a member of the Merrill Board from 2006 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Audit Committee of the Board.  In 2007, Defendant Jonas was paid over $275,000 in fees, stock awards, and other compensation.  Defendant Jonas is a citizen of the United Kingdom.

72.     Defendant Virgis W. Colbert ("Colbert") was a member of the Merrill Board from 2006 until January 1, 2009.  He was a member of the Public Policy and Responsibility Committee, the Nominating and Corporate Governance Committee, and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Colbert was paid over $261,000 in fees, stock awards, and other compensation.  Defendant Colbert is a citizen of Wisconsin.

73.     Defendant Aulana L. Peters ("Peters") was a member of the Merrill Board from 1994 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Peters was paid over $270,000 in fees, stock awards, and other compensation.  Defendant Peters is a citizen of California.

74.     Defendant Charles O. Rossotti ("Rossotti") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chairman of the Finance Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Rossotti was paid over $274,000 in fees, stock awards, and other compensation.  Defendant Rossotti is a citizen of Maryland.

75.     Defendant John D. Finnegan ("Finnegan") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chair of the Management Development and Compensation Committee, and a member of the Finance Committee and the Nominating and Corporate Governance

Committee of the Board.  In 2007, Defendant Finnegan was paid over $282,000 in fees, stock awards, and other compensation.  Defendant Finnegan is a citizen of New Jersey.

76.      Defendant Joseph W. Prueher ("Prueher") was a member of the Merrill Board from 2001 until January 1, 2009.  He was Chair of the Public Policy and Responsibility Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Prueher was paid over $278,000 in fees, stock awards, and other compensation.  Defendant Prueher is a citizen of Virginia.

77.      Defendant Ann N. Reese ("Reese") was a member of the Merrill Board from 2004 until January 1, 2009.  She was Chair of the Audit Committee and a member of the Finance Committee of the Board.  In 2007, Defendant Reese was paid over $277,000 in fees, stock awards, and other compensation.  Defendant Reese is a citizen of New York.

78.      Defendant Nelson Chai ("Chai") was the Executive Vice President and Chief Financial Officer of Merrill at all relevant times.  Defendant Chai is a citizen of New York.

79.      Defendant Gregory Fleming ("Fleming") was the President and Chief Operating Officer of Merrill during and for a period after the Merger negotiations.  Defendant Fleming was one of Merrill's principal negotiators on the merger with BofA.  Defendant Fleming is a citizen of New York.

80.      Defendant Peter Kraus was the Executive Vice President for Business Strategy and Investments at Merrill.  Defendant Kraus is a citizen of New York.

81.      Defendant Peter Stingi was the Global Head of Human Resources at Merrill.  Defendant Stingi  is a citizen of New York.

82.      Defendant Michael Ross was the Head of Global Compensation and Benefits at Merrill.  Defendant Ross is a citizen of New York.

**The Advisor Defendants**

83.      Defendant J.C. Flowers & Co. LLC ("J.C. Flowers") is a principal investment firm specializing in buyouts which also serves as a financial advisor to companies in the banking and financial services industries.  J.C. Flowers was founded, and is owned in part, by J. Christopher Flowers, who serves as its managing partner.  J.C. Flowers is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  J.C. Flowers purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

84.      Defendant Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK") is a leading global specialist investment bank focused on the financial services industry.  FPK is owned in part by J. Christopher Flowers, who also owns Defendant J.C. Flowers.  FPK is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  FPK purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

**Other Related Persons not Named as Defendants**

85.      Merrill, until it was acquired by BofA, Merrill was one of the oldest and biggest brokerage houses in the world, whose "thundering herd" of brokers served millions of institutional and private clients around the world, with well-regarded investment banking and trading operations. The company continues as a unit of BofA, including its brokerage operations.

86.      Deloitte & Touche LLP ("Deloitte") is an independent registered public accounting firm that advises Merrill on a regular basis.  Deloitte is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principal place of business in New York,

New York. Deloitte purported to advise the Merrill Defendants with respect to the Merger and prepared and approved Merrill's audited financial statements in connection with the Merger.

87.     Wachtell Lipton Rosen & Katz ("Wachtell") is a partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York. Wachtell purported to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

88.     Edward D. Herlihy ("Herlihy") is a partner at Wachtell. Herlihy was the managing partner for Wachtell on the Merrill Merger engagement for BofA.

89.     Nicholas G. Demmo ("Demmo"), Jeannemarie O'Brien ("O'Brien"), and Matthew M. Guest ("Guest") are partners at Wachtell. Together with Herlihy, they played key roles in purporting to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

90.     Shearman and Sterling LLP ("Shearman") is a limited liability partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York. Shearman purported to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

91.     John Madden ("Madden") is a partner at Shearman. Madden was the managing partner for Shearman on the BofA Merger engagement for Merrill.

92.     John Marzulli ("Marzulli"), Scott Petelpiece ("Petelpiece"), and Linda Rappaport ("Rappaport") are partners at Shearman. Together with Madden, they played key roles in purporting to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

### Definitions of Groups

93.     The "BofA Defendants" comprise those defendants named in paragraphs 43-67 hereof.

94.     The "BofA Director Defendants" (sometimes referred to herein as the "BofA Board" or the "Board") comprise those persons who served on the BofA Board during the events complained of and named in paragraphs 43-58 above.

95.     The "BofA Officer Defendants" comprise those defendants who served as officers of BofA during the events complained of named in paragraphs 43 and 59-67 above.

96.     The "Merrill Defendants" comprise those defendants named in paragraphs 68-82 above.

97.     The "Advisor Defendants" comprise those defendants named in paragraphs 83-84 above.

## I.     IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."

98.     On Friday, September 12, 2008—in the wake of unprecedented liquidity demands arising from price declines in its investments in ARS, CDOs, MBS, and other highly-leveraged derivative securities—Merrill was at risk of failing.  With Merrill's share price down 36 percent that week alone and its access to credit markets in jeopardy—and with Lehman Brothers, Inc. teetering on the brink of bankruptcy as a result of its own liquidity emergency arising from similar toxic securities (it would file a petition for relief the following Monday)—Wall Street eyed Merrill as the next to succumb.  Knowing that Lehman's bankruptcy would cause Merrill, too, to collapse, Merrill's then-Chairman and CEO, Defendant Thain, frantically canvassed Wall Street for a business combination or other transaction which would generate enough cash to allow Merrill to survive.

99.     BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable catastrophes as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.

**A.      In Breach of their Duties of Loyalty and Good Faith, the BofA Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that it is Essentially Worthless in the Absence of Any Deal, and to Secretly Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of Actual Performance.**

100.     Before approaching BofA, Merrill's then-President and Chief Operating Officer, defendant Fleming, placed an initial call to Herlihy, a partner and Co-Chairman of the Executive Committee at the Wachtell law firm, who had a close relationship with senior management at BofA. The following afternoon, Saturday, September 13, 2008, at Herlihy's suggestion, Defendant Thain met with BofA's then-Chairman and CEO, Defendant Lewis, to discuss a proposed business combination.  Thain initially proposed selling BofA only a 9.9 percent interest in Merrill.  Lewis responded that BofA was interested in a transaction, but only if it involved acquiring Merrill outright.  Thain agreed, and, later that same day, teams from both firms began conducting due diligence and negotiating the terms of a possible merger.

101.     The principal terms of the Merger were negotiated in the space of a single day—from late afternoon on Saturday, September 13, 2008 to late afternoon on Sunday, September 14, 2008— by teams headed by defendant Fleming for Merrill and by defendant Curl, Vice Chairman for Corporate Planning and Strategy for BofA.  According to testimony later given by Fleming and Curl to the SEC, *the negotiations were limited to just five issues, most of them addressing the compensation and perquisites various people affiliated with Merrill would gain from the deal.* The issues were:  the price BofA would pay; the payment of "retention" bonuses to Merrill's financial advisers; the scope of the MAC clause in the merger agreement; the number of Merrill

directors who would join the Board of Directors of BofA; and Merrill's ability pay year-end bonuses to its executives and employees pursuant to its Variable Incentive Compensation Program ("VICP"). The Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses should be paid on an ***accelerated basis*** before the Merger closed on December 31, 2008.

102.   Negotiation of the five issues involved only a perfunctory review of Merrill, and a deal was struck in a matter or ***hours***, with the execution of the Merger Agreement at approximately 2 a.m. on the morning of Sunday, September 14, 2008.   The BofA Defendants, in a further act of disloyalty and bad faith, acceded to the Merrill team's demand that BofA pay an astonishing ***70 percent premium*** for Merrill's common stock based on the value of such stock at the time—in spite of the fact that Merrill, in the absence of a deal, would fail outright and probably be available for just "pennies" on the dollar in very short order, as noted investor Warren Buffett later recalled.   The deal subsequently received the approval of the Boards of BofA and Merrill, which met in separate sessions later that same afternoon.   Under the terms of the deal, BofA would pay 0.8595 of one BofA share for every share of Merrill—an arrangement valued at the time at $29 per Merrill share, for a total of $50 billion.   To memorialize their contract, the parties entered into a written agreement (the "Merger Agreement" or the "Agreement") whereby Merrill would become a wholly-owned subsidiary of BofA.   The Merger was first announced to the shareholders of both companies on the morning of September 15, 2008.

103.   The Merger was an immense financial undertaking for BofA which substantially diluted BofA shareholders.   Based on the Company's market capitalization on the day before the Merger was announced, the cost of the Merrill acquisition was 27 percent of BofA's market

capitalization.  In connection with the Merger—and subject to a vote of BofA shareholders—BofA committed to issue approximately 1.710 billion new shares of its common stock, and 359,100 shares of preferred stock.

> **B.** **The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Conduct A Designedly Cursory "Due Diligence" of Merrill, in Further Gross Breach of Their Duties of Loyalty and Good Faith to BofA.**

104.    Based on the BofA Defendants' own description of the decision to acquire Merrill for BofA, the BofA Defendants, aided and abetted by the other defendants, in negotiating and then approving the Merger, devoted insufficient process, relied upon insufficient due diligence, and conducted insufficient deliberation to the task at hand.

105.    According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, ***10 hours***, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning.  Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within a matter of days but for the transaction itself.

106.    Moreover, according to the Schedule 14A Proxy Statement dated October 31, 2008 which the BofA Director Defendants filed with the SEC and made publicly available on November 3, 2008, the BofA Board itself—in further breach of their duties of good faith, loyalty, and candor—considered, and approved, the Merger in the space of ***just a single afternoon*** (Sunday, September 14, 2008).

107.     The BofA Director Defendants' own statements to shareholders reveal their disloyalty and bad faith in approving the Merger based on such insufficient process.  In their own words, the BofA Defendants offered the following as the sum total of the deliberation they gave to the Merger:

> In the late afternoon on Sunday [September 14, 2008], the Bank of America board of directors met with members of Bank of America senior management and its outside advisors.  Bank of America senior management reviewed with the Bank of America board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction.  Bank of America senior management and the company's financial advisors, J.C. Flowers and FPK, presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction as more fully described below under the heading "— Opinion of Bank of America's Financial Advisors".  Each of J.C. Flowers and FPK orally advised the Bank of America board of directors, and indicated that it was prepared to render a written opinion to the same effect, that, as of such date and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon their review as described in their respective opinions and other matters as J.C. Flowers and FPK considered relevant, the proposed exchange ratio to be paid by Bank of America in the merger was fair, from a financial point of view, to Bank of America.  Bank of America's general counsel and Wachtell, Lipton, Rosen & Katz, counsel to Bank of America, discussed with the Bank of America board of directors the legal standards applicable to its decisions and actions with respect to the proposed transaction and reviewed the legal terms of the proposed merger.  Following review and discussion among the members of the Bank of America board of directors, including consideration of the factors described under "— Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Bank of America board of directors unanimously determined that the transaction was in the best interests of Bank of America and its stockholders and voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

108.     In the section of the Proxy Statement entitled "Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the BofA Board provided an exhaustive list of the 13 "material factors" that they had considered in approving the Merger:

- Its [the BofA Board's] understanding of Bank of America's business, operations, financial condition, earnings and prospects and of *Merrill Lynch's business,* operations, financial condition, earnings and prospects;

- *its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market*

***conditions,*** the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;

- ***the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement***, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;

- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;

- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;

- ***the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings***, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;

- ***the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch*** made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- ***the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors*** concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- ***the likelihood that the regulatory and stockholder approvals needed to complete the transaction*** will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- ***the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK***;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in *its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America*;

- *the potential impact of the transaction on the capital levels and credit rating of Bank of America*; and

- the need and ability to retain key Merrill Lynch personnel.

(Emphases added.)

109.    As set forth above, the BofA Defendants listed Merrill's future "prospects" as among the most important factors they used in justifying the decision to acquire Merrill at the bloated price they did.  In so doing, these Defendants caused the Proxy Statement to misrepresent the benefits of the Merger, including the value of the assets to be acquired by BofA, by, among other things, omitting to disclose any information concerning the tens of billions of dollars in additional losses being incurred by Merrill in the third and fourth quarters of 2008—losses which were well known to the BofA Defendants before shareholders voted and while the Proxy Statement was still effective amounts and which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

110.    Moreover, in announcing this 13-factor list, the BofA Defendants emphasized that "[t]he foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, *but includes all material factors considered by the Bank of America board of directors*."  (Emphasis added.)  The BofA Defendants thus admit that they did not give significant consideration to the massive losses and write-downs to which Merrill was then exposed. Moreover, the omission of such losses and write-downs from the list further demonstrates that, while

known or recklessly or negligently disregarded by Defendants, these losses were *not*—as certain BofA Defendants would later claim—disclosed to shareholders prior to the vote.

111.    The Proxy Statement states that the due diligence investigation the BofA Defendants made of Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was concluded by "[e]arly in the morning of Sunday, September 14, 2008," when "Messrs. Thain and Lewis met in New York City [and] discussed the results of the due diligence investigations conducted by their companies' respective representatives." The Merger Agreement was actually signed at 2 a.m. on Sunday, September 14, 2008. Thus, the entire due diligence investigation could have occupied no more than *10 hours* and, on its face, was woefully incomplete, and inadequate for a proposed $50 billion acquisition of a company, Merrill, with dire liquidity problems and complex liabilities. The BofA Director Defendants' decision to approve the Merger based on such due diligence, and in a single Board meeting late in the afternoon of September 14, 2008, could not have been the product of informed business judgment.

112.    Similarly, the Proxy Statement states that, supposedly due to the "complexity" of the 13 "material" factors, the BofA Defendants "did not consider it practical to, nor did [they] attempt to, quantify, rank or otherwise assign relative weights to the specific factors that [they] considered in reaching [their] decision." Again, such a process could not have been an exercise of informed business judgment. The more "complex" individual factors are, the *greater* is the need to weigh, quantify, compare, and contrast them. The above statement is just an unintended admission of the fact that the BofA Director Defendants gave their approval hurriedly, with little analysis, and without consideration, or with reckless or negligent disregard, of the crucial "factor" of whether inheriting Merrill's losses and liabilities could harm BofA—and the anticipated impact of such harms.

113.    According to the Proxy Statement, in approving the Merger, the BofA Director Defendants placed substantial reliance on the opinion of BofA's investment bankers on the transaction, Defendants FPK and J.C. Flowers.  However,

> [i]n arriving at their respective opinions [deeming the Merger fair to BofA], neither FPK nor J.C. Flowers ascribed a specific range of value to Bank of America or Merrill Lynch, but rather each of FPK and J.C. Flowers made its determination as to the fairness, from a financial point of view, to Bank of America of the exchange ratio to be paid by Bank of America in the merger on the basis of such financial, comparative and other analyses as of the date of such opinions.

114.    In other words, FPK and J.C. Flowers simply took the price BofA proposed to pay for Merrill (expressed as an exchange ratio of BofA shares for Merrill shares) *as a given* and then labored to justify that price.  While touting their results as "fairness" opinions, these advisors never considered whether the pre-ordained price that BofA was to pay for Merrill was within an appropriate range of values to begin with.  As such, those "fairness" opinions were incomplete and untrustworthy, and the BofA Director Defendants' reliance on them was not the product of proper business judgment.  From start to finish, the "fairness" opinions were meant merely to provide cover for the BofA Defendants' existing decision to acquire Merrill.  As such, FPK and J.C. Flowers merely aided and abetted the BofA Defendants' breaches of fiduciary duty.[3]

115.    The patent inadequacy of this process has been widely and consistently noted— including by senior officials of the Federal Reserve.  For example, in a December 19, 2008, e-mail to colleagues concerning Merrill's financial condition and BofA's ability to complete the Merger, Fed official Tim P. Clark wrote as follows:

> *General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we*

---

[3] J.C. Flowers and FPK were paid $20 million for their 12-15 hours of investment banking work which purportedly enabled both bankers to opine that the proposed $50 billion merger transaction was fair to BofA and its shareholders.

**have that _the deterioration at ML has been observably under way for the entire quarter—Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum it calls into question the adequacy of the due diligence process BAC has been doing in preparation for the takeover._** [Emphases added.]

116.     Similarly, an analysis of the status of the Merger, prepared by PIMCO for the Federal Reserve on December 21, 2008, stated:

> _While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, BAC management's contention that the severity of MER's losses only came to light in recent days is problematic **and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition**._

> • In the Proxy Statement and investor presentations the firm explicitly asserts that it has an understanding of MER's business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions.

> • _Staff at the Federal Reserve has been aware of the firm's potentially large losses stemming from exposures to financial guarantors, which is the single largest area of risk exposure and driver of recent losses that have been identified by management.  These were clearly shown in Merrill Lynch's internal risk management reports that BAC reviewed during their due diligence._

> • The potential for losses from other risk exposures cited by management, including those coming from leveraged loans and trading in complex structured credit derivatives products ('correlation trading') should also have been reasonably well understood, _**particularly as BAC itself is also active in both these products.**_  [Emphases added.]

117.     Fed General Counsel Scott Alvarez similarly wrote to Chairman Bernanke on December 23, 2008:  "_**Lewis should have been aware of the problems at ML earlier (perhaps as early as mid-November) and not caught by surprise.**_  That could cause other problems for him around the disclosures BA made for the shareholder vote."  (Emphasis added.)

118.     In sum, the due diligence conducted by the BofA Defendants—aided and abetted by other defendants—had its intended effect, which was to give an air of legitimacy to their decision to

cause BofA to pay $50 billion for a company that was on the verge of bankruptcy. This constituted a gross breach of these defendants' duties of good faith and loyalty to BofA and its shareholders.

> ### C. The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Secretly Approve $5.8 Billion in Unwarranted Bonuses for Merrill Executives as Part of the Merger and Secretly Cause these Bonuses to be Paid on an Accelerated Basis *Before* the Merger Closes.

119.    As noted above, bonuses for Merrill executives occupied a front-and-center position during the negotiations leading up to the Merger and dominated the Merger negotiation topics discussed by the parties.

120.    On the issue of VICP bonuses, a term sheet prepared on Saturday, September 14, 2008 reflected that BofA had agreed in principle that Merrill would be authorized to pay a bonus pool that would, at most, be "flat to last year"—i.e., would not exceed the amount of bonuses Merrill paid in 2007, taking into account fluctuations in headcount—with a maximum recorded expense of $4.5 billion.[4]

121.    Negotiators for BofA and Merrill agreed that 60 percent of Merrill's year-end bonuses would be paid in cash and 40 percent in stock, the same cash-stock division Merrill used in 2007, and that bonus allocations would be made in consultation with BofA. Throughout the course of the weekend, defendants Curl and Fleming reported to defendants Lewis and Thain, respectively, on the status of this and other aspects of the negotiations.

122.    The bonus pool that the BofA Defendants approved that was "flat" to 2007, taking headcount changes into consideration, amounted to $5.8 billion. Incredibly, this amount was *greater* than the pool Merrill itself was projecting for 2008. Indeed, earlier in 2008, members of Merrill's

---

[4] The annual financial statement expense for the bonuses reflected the cash portion of the total bonus pool and any stock grants awarded to employees in the same year in which the cash bonuses were paid.

Compensation Committee had determined to *reduce* the anticipated bonus pool compared to 2007 by 16.5 percent, due to losses at Merrill in the first half of 2008. Thus, prior to negotiations, Merrill had projected a total VICP pool of, at most, only $5.1 billion with a recorded expense of $3.5 billion. The BofA Defendants thus permitted Merrill to pay a bonus pool that was greater than the amount Merrill previously had projected by up to $700 million and that carried a recorded expense that was larger by $1 billion.

123.     During these discussions, Defendant Fleming also insisted that BofA agree to allow Merrill to accelerate the bonuses so that they would be paid *before the Merger closed*—on December 31, 2008, which was *well ahead of the normal mid-January payment date for the bonuses, and well ahead of the disclosure date for Merrill's fourth-quarter results*.

**D.     In Violation of Their Duties of Candor, Good Faith, and Loyalty, the BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Cause BofA to Issue a Proxy Statement That Conceals Crucial Facts About Losses at Merrill and the Bonuses to be Paid to Merrill Executives and is Otherwise Materially False and Misleading.**

124.     Defendants harmed BofA by causing BofA shareholders to approve BofA's acquisition of Merrill through the means of a false and misleading proxy statement. As a consequence, BofA acquired a company whose losses and liabilities have already begun to overwhelm BofA, transforming what was supposed to be an accretive acquisition into one that represents an immense *destruction* of BofA shareholder wealth—and that, for a while, effectively transformed BofA into a ward of the federal government.

125.     The terms of the Merger were set forth in the Proxy Statement, dated October 31, 2008, which was filed with the SEC on November 3, 2008, and mailed to all shareholders of record of BofA and Merrill Lynch (including Plaintiffs) as of the record date of October 10, 2008. The Proxy Statement—which spanned 125 pages and an additional 100 pages in exhibits—solicited

proxies from shareholders on behalf of BofA and the BofA Board to vote in favor of the Merger at a special meeting of shareholders on December 5, 2008.

> **1.    The Proxy Statement Falsely Omits
> Information Concerning Bonuses, For
> Which the BofA Defendants Later Try to
> <u>Deflect Blame onto BofA's External and Internal Legal Counsel.</u>**

126.    In the days following the announcement of the Merger, the BofA Defendants and the Merrill Defendants, together with their companies' respective legal counsel, prepared the transactional and disclosure documents relating to the Merger.  BofA was represented by the Wachtell law firm, including Herlihy, Demmo, O'Brien, and Guest.  Merrill was represented by the Shearman law firm, including Madden, Marzulli, Petelpiece, and Rappaport.

127.    The agreement that the negotiating teams led by Defendants Fleming and Curl had reached during the weekend negotiations concerning the payment of VICP bonuses by Merrill was memorialized by Wachtell and Shearman in a so-called "disclosure schedule" to the Merger Agreement.  This "disclosure schedule" was appended to the Merger Agreement and was ***not*** contained in the body of the Agreement.  It therefore was ***not disclosed to shareholders*** in the Proxy Statement, which attached the body of the Agreement ***but not any of its appendices***.

128.    The relevant provision of the "disclosure schedule" provided that VCIP bonuses for 2008 "may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion."  In addition, "[t]he allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America]."

129.    The SEC, in connection with its investigation of the bonus payments, later questioned Defendants Lewis, Thain, and Fleming.  Asked why, each stated that he did not know why this information was set forth in a disclosure schedule as opposed to the text of the Merger Agreement

itself.   Defendants Lewis, Thain, Fleming, and Stingi told the SEC that that issue had been

determined by lawyers at Wachtell and Shearman, and one or more of BofA's in-house lawyers,

including Defendant Mayopolous, BofA's then-General Counsel, and Defendant Brenner.

130.   This was also confirmed during an August 10, 2009, before the Honorable Jed S.

Rakoff, in which counsel for BofA and the SEC unsuccessfully tried to get the Court to approve an

illusory settlement agreement of the SEC's fraud complaint against BofA filed that same day.   (*See*

*infra*, ¶¶ 226-230.)   At that hearing, the following exchanges occurred:

| | |
|---|---|
| Court: | What you are saying, if I understand it, is that Bank of America and Merrill effectively lied to their shareholders about a highly material matter. |
| [SEC Counsel]: | What we are saying— |
| Court: | Is that right? |
| [SEC Counsel]: | That is essentially correct.   We are saying they made representations— |
| Court: | So who at Bank of America and Merrill was responsible for that? |
| [SEC Counsel]: | We have not alleged any individual misconduct. |
| Court: | Did this happen, was this some sort of government that performed these actions or were there human beings that wrote these documents? |
| [SEC Counsel]: | There were indeed human rogues [sic] who wrote these documents. |
| Court: | Were there human beings who made the decision. |
| [SEC Counsel]: | Yes, there were human beings to [sic] made the decision. |
| Court: | So who were they? |
| [SEC Counsel]: | As we point out in paragraph 12 of the complaint *the documents were drafted by lawyers of the company*. |
| Court: | Who made the decision not to disclose what had, according to your allegations, been an agreement already reached to pay bonuses up to in excess of five billion dollars. |
| [SEC Counsel]: | We have not made any allegations, your Honor— |
| Court: | Well, you could not have made the allegations you have made without having conducted an investigation; true? |
| [SEC Counsel]: | That's correct, we conducted an investigation. |
| Court: | And you must have determined, must not, then, who at least physically did the various acts that are alleged; yes? |
| [SEC Counsel]: | *We have determined to the extent that we were able to determine that lawyers crafted these documents for the company*. |
| Court: | *And who were the lawyers?* |
| [SEC Counsel]: | *I, I believe the lawyers were Wachtell—* |

| | |
|---|---|
| [BofA Counsel]: | ***Your Honor, the lawyers on both sides, if I may, the Bank of America side, Bank of America was represented by the law firm Wachtell, Lipton and on the Merrill Lynch was represented by the law firm Shearman & Sterling.*** |
| Court: | And were those lawyers aware when they drafted the proxy of the prior agreement to approve the bonuses? |
| [SEC Counsel]: | We have made no allegations with respect to what the lawyers did. |
| Court: | You are not going to be particularly effective with this court by telling me what I already know, namely, that you filed a rather uninformative bare bones complaint. |

*   *   *   *

| | |
|---|---|
| Court: | So if you are correct that this proxy statement was materially misleading in failing to disclose these arrangements, then at a minimum Mr. [Thain] or Mr. Lewis and I— |
| [SEC Counsel]: | Again, your Honor, we have not made any allegations with respect to Mr. [Thain] or Mr. Lewis and I— |
| Court: | Well, have you talked to them about it? |
| [SEC Counsel]: | We have spoken with relevant individuals. |
| Court: | And by relevant individuals, you mean Mr. Thain and Mr. Lewis? |
| [SEC Counsel]: | That's correct. |
| Court: | ***And what do they say.*** |
| [SEC Counsel]: | ***They were not aware, they relied on the lawyers' advice and they didn't what was in the disclosure schedule versus what was in the proxy statement that was distributed to shareholders, as to this issue, I should say.*** |
| Court: | Right.  Was that because they didn't read the proxy statement? |
| [SEC Counsel]: | I'm not— |
| Court: | That they signed off on? |
| [SEC Counsel]: | I don't, I don't think there is anything in the record about that. They obviously signed off on the proxy statement, but I'm not sure if they were asked specifically about— |
| Court: | You didn't ask them if they read the proxy statement that they signed? |
| [SEC Counsel]: | They were asked about their knowledge with respect to the specific transactions here, but, you know, they said that they were not aware of that on that [sic]. |
| Court: | This whole issue of bonuses wasn't, like, something that was not in the public eye or was an obscure issue at the time, was it? |
| [SEC Counsel]: | I don't know about at that time, your Honor.  It has since been public knowledge. |
| Court: | ***And did you attempt to find out whether the lawyers who prepared this and who apparently—Mr. Thain and Mr. Lewis*** |

-49-

> *relied on, according to what they told you, what they have to
> say about what they told Mr. Thain and Mr. Lewis or anyone
> else?*

[SEC Counsel]:    There has been no waiver of the attorney-client privilege and
we have not probed communications.

Court:    ***Have you asked them to testify and they asserted the
privilege?***

[SEC Counsel]:    ***No, we didn't.***

Court:    ***You didn't even ask them to testify?***

[SEC Counsel]:    ***No, your Honor, we have not.***

*    *    *    *

[BofA Counsel]:    [T]here were some statements that were made by my adversary
that I just wanted to maybe put in the correct order or clear up.
I mentioned that and proffered that ***there would be evidence
that the lawyers negotiated the merger agreement, disclosure
schedule and the proxy statement.***

I don't believe that there is any evidence—with respect to
Mr. Curl and Mr. Fleming, I believe what the evidence would
show is that those two individuals negotiated the essential
business terms of the transaction, which included that VICP,
that's the incentive compensation, would remain flat to last
year.

That was what was negotiated over the weekend of
September 15. ***The details of the disclosure schedule were
worked out over the ensuing month or so among the lawyers.***
I don't think there is any evidence in the record—

Court:    Those evil lawyers are at it again. But, OK, I understand your
point.

[BofA Counsel]:    Your Honor, I don't believe that there is any evidence that Mr.
Lewis or Mr. Thain were aware of the specific terms of the
disclosure schedules. Again without waiving the privilege, the
question is was the subject of the VICP or the disclosure
schedules discussed by the lawyers with Mr. Lewis. Just as to
the subject without getting into the content, I would proffer that
there would be no evidence that that subject was discussed.
[Emphases added.]

### 2.    The Proxy Statement Falsely Describes Losses and Liabilities of Merrill.

131.    The Proxy Statement incorporated by reference several documents, including

Merrill's Form 8-K filing dated October 16, 2008. That Form 8-K, in turn, included Merrill's press

release announcing results for the third quarter, ending September 30, 2008, as well as a preliminary

unaudited earnings summary for the quarter. These results indicated a net loss from continuing operations of $5.1 billion, and an overall net loss of $5.2 billion.

132.    The October 16, 2008, Form 8-K reported that Merrill had experienced negative $6.5 billion "principal transactions revenues," indicating a net loss due to realized and unrealized losses (including trading losses, asset impairments and write-downs, and declines in mark-to-market valuations) in the securities held on its balance sheet.[5]

133.    Among the "significant items" causing such large negative revenues were $12.1 billion in purported asset losses and write-downs described as follows:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super senior ABS CDOs[1] and the termination and potential settlement of related hedges with monoline guarantor counterparties

                              *   *   *   *

- Net write-downs of $3.8 billion principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer

                              *   *   *   *

- Net losses of $2.6 billion resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures

134.    Moreover, the Form 8-K emphasized the positive **developments at Merrill in reducing balance sheet exposure**, including a highly positive comment from Defendant Thain regarding improvements in that area:

### Third Quarter and First Nine Months of 2008 Highlights

- Bank of America Corporation agreed to acquire Merrill Lynch & Co. in an all-stock transaction

---

[5] "Principal transactions revenues" are described by Merrill as including "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt. These investments are recorded at fair value. . . . Gains and losses are recognized on a trade date basis."

- Record year-to-date and third highest quarterly revenues in Rates and Currencies, up 27% from prior year-to-date

- Global Equity Linked Products (Derivatives) net revenue growth of 23% sequentially and 14% year-on-year

- Advisory revenues outperformed the market, increasing 12% sequentially; Merrill Lynch also ranked #2 in global announced M&A for the quarter

- Solid performance in Global Wealth Management despite challenging market environment; FA headcount increased by 240 from a year ago; Net new annuitized assets are up $21 billion year-to-date

- ***Significant progress in balance sheet and risk reduction***; RWA declined by approximately 15% over the quarter

- ***Substantial sale of $30.6 billion of gross notional amount of U.S. super senior ABS CDOs***

- ***Reductions of 98% of U.S. Alt-A residential mortgage net exposures***.  Including planned sales, reductions of 56% in non-U.S. residential mortgages and 25% in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio

- ***Enhanced capital base*** through a $9.8 billion common stock offering and the $4.425 billion sale of the Bloomberg stake

- Subsequent to the third quarter, and as part of Bank of America's $25 billion participation in the TARP Capital Purchase Program, Merrill Lynch agreed and expects to issue $10 billion of non-voting preferred stock and related warrants to the U.S. Treasury pursuant to the program.

    "***We continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal,***" said John A. Thain, chairman and CEO of Merrill Lynch.  "As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth."  [Emphases added; footnote omitted.]

135.    These statements were materially false and misleading because, in spite of any efforts to "reduce exposure" or "de-leverage," Merrill, in fact, retained toxic amounts of bad securities on its balance sheet that, in the first half of October 2008 alone, were causing billions of dollars in new losses.

136.    The Proxy Statement also specifically incorporated by reference future documents to be filed with the SEC and made publicly available:

In addition, Bank of America and Merrill Lynch also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Merrill Lynch special meeting. These documents include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

137.     The Proxy Statement also incorporated by reference Merrill's filings on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, and September 30, 2008.   Each of these filings contained a certification by Deloitte, Merrill's independent registered public accounting firm, that no "material modifications" were necessary in Merrill's financial statement to make them accurate.  Deloitte's certification in the Form 10-Q for the third quarter 2008, for example, provided that:

We have reviewed the accompanying condensed consolidated balance sheet of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of September 26, 2008, and the related condensed consolidated statements of (loss)/earnings and comprehensive (loss)/income for the three-month and nine-month periods ended September 26, 2008 and September 28, 2007, and the related condensed consolidated statements of cash flows for the nine-month periods ended September 26, 2008 and September 28, 2007. These interim financial statements are the responsibility of Merrill Lynch's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

***Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***  [Emphasis added.]

138.     Similarly, the Proxy Statement incorporated by reference Merrill's filing on Form 10-K for the year ended December 31, 2007.  That form 10-K contained Deloitte's certification that:

We have audited the consolidated financial statements of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of December 28, 2007 and December 29, 2006, and for each of the three years in the period ended December 28, 2007, and the effectiveness of Merrill Lynch's internal control over financial reporting as of December 28, 2007, and have issued our reports thereon dated February 25, 2008 (which reports express unqualified opinions . . .).

We have also previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Merrill Lynch as of December 30, 2005, December 31, 2004, and December 26, 2003, the related consolidated statements of earnings, changes in stockholders' equity, comprehensive income, and cash flows for the years ended December 31, 2004, and December 26, 2003 (none of which are presented herein); *and we expressed unqualified opinions on those consolidated financial statements. . . .*

*In our opinion, the information set forth in the "Selected Financial Data" table under the captions "Results of Operations," "Financial Position" and "Common Share Data," for each of the five years appearing on page 19, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.* [Emphasis added.]

139.    Moreover, the Proxy Statement, under the heading of "Experts," stated that Deloitte's opinion formed an integral part of the Proxy Statement:

The consolidated financial statements and the related financial statement schedule incorporated by reference in this registration statement [sic] from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 28, 2007, and the effectiveness of Merrill Lynch & Co., Inc. and subsidiaries' internal control over financial reporting have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, incorporated herein by reference (*which report on the consolidated financial statements expresses an unqualified opinion . . .*). Such consolidated financial statements have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.  [Emphasis added.]

### 3.    The Proxy Statement Falsely Sets Forth <u>"Fairness" Opinions by the Advisor Defendants.</u>

140.    J.C. Flowers and FBK each provided a "fairness" opinion in the Proxy Statement concluding that the proposed purchase price of Merrill was "fair, from a financial point of view, to Bank of America."  These "fairness" opinions were dated September 14, 2008, the same day that

principal negotiations concerning the Merger had taken place.  The opinions were included in the Proxy Statement sent to BofA shareholders.

141.    In the Proxy Statement, Defendants FPK and J.C. Flowers provided "fairness" opinions to BofA shareholders stating that, in those Advisor Defendants' opinion, the Merger was fair, from a financial point of view, to BofA. The FPK "fairness" opinion stated, in part:

> You have requested our opinion as to the fairness, from a financial point of view, to Bank of America Corporation (the "Company") of the Exchange Ratio (as defined below) to be paid by the Company pursuant to the terms of, and subject to the conditions set forth in, the Agreement and Plan of Merger to be dated as of September 15, 2008 (the "Merger Agreement") by and between the Company and Merrill Lynch & Co., Inc. ("Merrill Lynch").

> \* \* \* \*

> In connection with our review of the proposed Merger and the preparation of our opinion herein, we have examined: (a) the financial terms and conditions of a preliminary draft of the Merger Agreement; (b) certain audited historical financial statements of the Company and of Merrill Lynch for the five years ended December 31, 2007; (c) information regarding the strategic, financial and operational benefits anticipated from the Merger and the prospects of the Company (with and without the Merger); (d) the pro forma impact of the Merger on the earnings per share of the Company (before and after taking into consideration any goodwill created as a result of the Merger) based on certain pro forma financial information prepared by the senior management of the Company; (e) information regarding the amount and timing of potential cost savings and related expenses and synergies which senior management of the Company expects will result from the Merger, as well as certain estimated restructuring charges and negative revenue adjustments which senior management of the Company expects to result from the Merger (the "Expected Synergies"); (f) information regarding publicly available financial terms of certain recently-completed transactions in the investment banking industry; (g) current and historical market prices and trading volumes of the common stock of the Company and Merrill Lynch; and (h) certain other publicly available information on the Company and Merrill Lynch.

> \* \* \* \*

> In rendering our opinion, we have assumed and relied, without independent verification, upon the accuracy and completeness of all the information examined by, or otherwise reviewed or discussed with, us for purposes of this opinion. We have not made or obtained an independent valuation or appraisal of the assets, liabilities (contingent, derivative, off-balance sheet or otherwise) or solvency of the Company

or Merrill Lynch, including particularly any mark-to-market balance sheet adjustments resulting from the Merger, market conditions or otherwise. We relied solely upon information provided to us by the Company and other publicly available information with respect to Merrill Lynch's financial condition, results of operations and prospects.

*    *    *    *

**Based upon and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Ratio to be paid by the Company in the Merger is fair, from a financial point of view, to the Company. This opinion has been approved by our fairness committee.** [Emphasis added.]

142.    The FPK "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

143.    The J.C. Flowers "fairness" opinion stated, in part:

You have requested our opinion as of the date hereof as to the fairness, from a financial point of view, to Acquiror of the Exchange Ratio. In connection with this opinion, we have: (i) reviewed the financial terms and conditions of the Merger; (ii) analyzed certain historical and prospective business and financial information relating to the Company and Acquiror; (iii) held discussions with members of the senior managements of the Company and Acquiror with respect to the businesses and prospects of the Company; (iv) reviewed public information with respect to certain other companies we believed to be relevant; (v) reviewed the financial terms of certain business combinations involving companies we believed to be relevant; (vi) reviewed historical stock prices and trading volumes of the Company common stock and Acquiror common stock; and (vii) conducted such other financial studies, analyses and investigations as we deemed appropriate.

*    *    *    *

**Based on and subject to the foregoing, we are of the opinion that as of the date hereof the Exchange Ratio is fair, from a financial point of view, to Acquiror.** [Emphasis added.]

144.    The J.C. Flowers "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

145.    In addition, the Proxy Statement stated that the two "fairness" opinions had been based in substantial part on forward-looking information concerning Merrill and its effect on BofA, including:

- "financial and operating information with respect to the business, operations and *prospects* of Merrill Lynch furnished to FPK and J.C. Flowers by Bank of America"; and

- "discussions with members of senior management of Merrill Lynch with respect to the businesses and *prospects* of Merrill Lynch".

(Emphases added.)

146.    All of the above statements were false and misleading, in that, at the time they were issued and subsequently, FPK and J.C. Flowers lacked any reasonable basis to conclude that the Merger was fair to BofA—and the BofA Defendants knew or recklessly or negligently disregarded that fact.  Throughout their misconduct, FPK and J.C. Flowers not only violated Section 14(a) but also facilitated the BofA Defendants' violations of that statute—as well as aiding and abetting the BofA Defendants in their breaches of candor and other fiduciary duties to the Company and its shareholders.  In particular, the "fairness" opinions were false and misleading in that, among other things, they:

(a)    disregarded the financial condition of Merrill (including illiquidity and insolvency)—or the resulting price at which Merrill could be acquired—in the absence of BofA's precipitate $50 billion bid;

(b)    were based on older, no-longer-reliable projections of future losses and write-downs and did not take into account current projections of losses and write-downs, much less critically evaluate the assumptions behind such projections;

(c)    made no attempt to relate the current liquidity crisis at Merrill to the company's likely future results or its value to BofA;

(d)      made no attempt to compare Merrill's financial condition and likelihood of remaining a going concern to those of Lehman Brothers, whose financial and accounting records had been reviewed for BofA by J. Christopher Flowers earlier that same week in connection with a possible acquisition of Lehman Brothers, and which was widely known to face immediate bankruptcy in the absence of an acquisition; and

(e)      made no attempt to quantify the impact on Merrill's losses, cash flow, liquidity, and solvency from the severe liquidity problems also being experienced at the time by American International Group, Inc. ("AIG"), which provided tens of billions of dollars of credit default swap protection on Merrill's holdings of CDOs and whose financial and accounting records were being examined by J. Christopher Flowers at the request of AIG simultaneously with his engagement by BofA on the Merrill Merger.

### 4. The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger.

147.    Under the heading "Recent Developments," the Proxy Statement disclosed that BofA had agreed to sell $25 billion in preferred stock to the United States Government pursuant to the Capital Purchase Program ("CPP") effectuated by Congress in the Emergency Economic Stabilization Act of 2008.  This amount included $10 billion of preferred stock related to the acquisition of Merrill if the Merger were consummated:

> On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury has the authority to, among other things, invest in financial institutions and purchase mortgages, mortgage-backed securities and certain other financial instruments from financial institutions, in an aggregate amount up to $700 billion, for the purpose of stabilizing and providing liquidity to the U.S. financial markets. On October 14, 2008, the U.S. Treasury announced a plan, referred to as the Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate.

In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28, 2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under "— Merrill Lynch & Co Developments — Unaudited — Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

148.   The Proxy Statement disclosed that Merrill would *not* participate in the CPP with the federal government, pending the outcome of the Merger.   This statement became false and misleading when the Proxy Statement was never updated to include information concerning Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

**5.      The Proxy Statement Falsely States
that Merrill Executives Will Not Receive
Discretionary Bonuses for 2008 and Conceals
the Fact that Defendants Had Agreed to Guarantee $5.8 Billion
in Bonuses to Merrill Executives and Accelerate the Payment
<u>Thereof to December 2008, Before the Merger Was Set to Close.</u>**

149.   The Proxy Statement included, as an attachment, the full text of the Merger Agreement, ***but it omitted the "disclosure schedule" setting forth the agreement about Merrill's***

*payment of VICP bonuses*.  Neither the "disclosure schedule" nor anything about its contents was

publicly disclosed at any time prior to the December 5, 2008, shareholder meetings. [6]

150.    The "disclosure schedule," which was omitted from the Proxy Statement, provided:

5.2(b)(iii),  5.2(c)(i),  and  5.2(c)(ii)—Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion. . . . Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards.  The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] . . . .  The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

151.    Not only did the proxy materials fail to disclose that the BofA Defendants had caused

BofA to authorize Merrill to pay up to $5.8 billion in discretionary and other year-end bonuses, but a

provision *from the Merrill Agreement, which was disclosed, indicated the opposite*—i.e., that

Merrill *had no authority to, and would not, pay discretionary bonuses to employees without*

*BofA's prior consent*.  Rather than set forth the truth about these bonuses, the pertinent provision

stated only:

5.2    Company Forbearances.  During the period from the date of this Agreement to the Effective Time [the closing of the Merger], except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, [Merrill] shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of [BofA]:

*    *    *    *

(c)   except as required under applicable law or the terms of any [Merrill] Benefit Plan existing as of the date hereof, (i) increase in

---

[6] It was not until January 16, 2009, with the pre-release of BofA's fourth quarter 2008 earnings that this information was finally disclosed.

> any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees") [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business) . . . .

152.    Subparagraph (c) to Section 5.2 of the Merger Agreement quoted above described one of approximately 18 enumerated actions that, as recited in the forbearance provision, Merrill purportedly agreed to refrain from taking prior to the closing of the Merger.   Although the forbearance provision as a whole refers generically to exceptions in the disclosure schedule, *there is no disclosure at all of what those exceptions were or the contents of the schedule anywhere in the Merger Agreement.*   Neither the "disclosure schedule" nor its contents were publicly disclosed at any time prior to the December 5, 2008, shareholder meetings.   Thus, there was no way to tell to what extent, if any, the unspecified exception applied to any particular action that Merrill was prohibited from taking.   Shareholders could not have known that BofA had *already* agreed to allow Merrill to pay Merrill executives up to $5.8 billion in discretionary bonuses—payments "not required by any current plan or agreement."

153.    Moreover, the text of the Proxy Statement, in a section describing the principal terms of the Merger Agreement, paraphrased the forbearance provision of Section 5.2 and listed the 18 "extraordinary" actions that Merrill had agreed not to take prior to closing—including the payment of discretionary compensation.   The relevant passage in the proxy statement qualified the discussion of the forbearance provision only by referring to "certain exceptions," which were left unspecified, and by stating that Merrill was prohibited from taking the "extraordinary" actions without "Bank of America's prior written consent," as follows:

> Merrill Lynch further agreed that, with certain exceptions or except with Bank of America's prior written consent . . . , Merrill Lynch will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions . . . except as required under applicable law or the terms of any Merrill Lynch

benefit plan (i) increase the compensation or benefits of any current or former directors, officers or employees [or] (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements . . . .

154.    The bonus information omitted from the Proxy Statement was highly material to BofA shareholders.  First, the bonuses meant that the asset to be acquired, Merrill, was worth $5.8 billion less than its purchase price—which, by the time of the Proxy Statement, based on BofA's share price, was well over 10 percent of the total cost.  Second, accelerating the bonus schedule meant that Merrill executives would, purely as a result of the Merger, reap gigantic windfalls, despite Merrill's abysmal financial performance in 2008.  Third, the acceleration of the bonuses as part of the Merger Agreement itself eliminated any opportunity for BofA to reduce or eliminate the bonus payments once the transaction closed.

### 6.    The Proxy Statement Falsely Recommends Approval of the Merger.

155.    Based on the extremely limited analysis recited above, the BofA Director Defendants unequivocally recommended that BofA's shareholders approve the Merger, as follows:

**Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors has unanimously approved and adopted the merger agreement and the transactions it contemplates, including the merger. *The Bank of America board of directors determined that the **merger, merger agreement and the transactions contemplated by the merger agreement** are advisable and in the best interests of Bank of America and its stockholders and unanimously recommends that you vote "FOR" approval of the issuance of shares of Bank of America common stock in the merger.*  [Emphases added.]

156.    The Proxy Statement indicated that the Merger would be "3.0% dilutive in 2009 and breakeven in 2010."  The Proxy Statement also included detailed reported results with respect to Merrill's operations for the quarter ending June 30, 2008 and, under a heading titled "Recent Developments," also discussed more recent financial results of Merrill.  These recommendations were based on the BofA Defendants' bad faith and disloyalty in desiring to acquire Merrill no matter

what the price tag or future liabilities, not on any reasoned determination that the transaction was in the best interests of BofA or its shareholders.

### E. The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity.

157. At the time of the issuance of the Proxy Statement and afterwards, each of the Defendants knew or were reckless or negligent in now knowing that Merrill's financial condition was dramatically deteriorating, and that the Proxy Statement contained the misstatements and omissions set forth herein, in violation of the federal securities laws and in violation of the BofA Defendants' duty of complete candor. In spite of this knowledge or reckless or negligent disregard, each of the Defendants caused or allowed the Proxy Statement to set forth the misstatements and omissions, and each failed to cause a corrected, updated, or revised proxy statement to be issued before the Shareholder Vote.

158. When the Merger was first announced on September 15, 2008, questions were raised by securities analysts concerning the valuation of Merrill at $29 per share, given Merrill's accumulating losses and uncertain future. At that time, Defendants stated unequivocally that they knew and understood the value of Merrill's assets.

159. During a conference call with analysts on September 15, 2008, Matthew O'Connor, an analyst at UBS, pointed out that "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced. I guess the question is why pay $29 at this point?" Another analyst raised the issue of the necessity of large write-downs on Merrill's assets, and asked whether the financial numbers presented with the

announcement included any mark-to-market write-downs.  Defendant Lewis quelled such concerns, stating:

> ***The numbers that we presented today we have considered marks on the assets . . . .*** I would tell you that, again, going back to the point of things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures. We are dealing with the same counterparties on things so again, ***we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch has made.***  [Emphases added.]

160.    In addition, prior to the Closing of the Merger, other analysts alerted Defendants to the need for Merrill to take further write-downs.  For example, once they digested the news of the Merger and took a close look at Merrill, other analysts noted the necessity of further asset write-downs at Merrill that would drastically impair the value of the Merger to BofA.  A Deutsche Bank analyst report, dated September 16, 2008, stated:

> The big question surrounding capital market businesses [such as Merrill's] is, "how much more in write-downs are likely ahead?"  In particular, a new weakness at AIG has the potential to hurt Merrill's capital via any potential insurance on its ABS CDO.  Alternatively, additional selling of risky commercial or residential real estate assets could impact Merrill's commercial real estate securities ($18B), other risky mortgage assets ($31B; includes $10B alt-A, subprime and non-US residential), and leveraged finance ($8B), not withstanding declines in these amounts since the end of 2Q08.  In additions to the "risky" assets, Merrill also has $33.7B in US prime mortgages on balance sheet.

161.    In addition to these analysts' warnings, the recent large partial write-downs of Merrill's assets should have placed (and did place) Defendants on notice of the impaired condition of that company prior to the Merger.  In fact, on November 6, 2008, Merrill reported financial results for the quarter ending September 30, 2008, that included substantial write-downs in Merrill's assets and resulted in Merrill reporting a net loss of over $5 billion.  Similarly, in a *Wall Street Journal* article on November 8, 2008, it was revealed that Merrill Lynch was "planning to sell roughly $4 billion of distressed debt securities, including mortgages and complex investments, in a bid to cut its exposure to risky assets."  An article in the *Journal* dated November 17, 2008, indicated that the

United States Treasury would provide $10 billion to Merrill under the Troubled Asset Relief Program after the Merger was completed.

162.    Of course, the BofA Defendants did not need analysts, or even Merrill's publicly announced results, to uncover the truth about Merrill.  These defendants (together with the Merrill Defendants) had complete and unfettered access to Merrill's financial and accounting records beginning no later than September 15, 2008, the day the Merger was announced.

163.    Under the terms of the Merger Agreement, paragraph 6.1, Merrill was obligated to fully cooperate with BofA and the BofA Defendants in providing any information necessary in connection with the Proxy Statement.  Similarly, under paragraph 6.2, the BofA Defendants enjoyed full access to Merrill's financial and accounting records:

> Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, *each of Company and Company shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors, agents and other representatives of the other party, reasonable access, during normal business hours during the period prior to the [Merger's closing], to<u>all its properties, books, contracts, commitments and records,</u>* and, during such period, such party shall, and shall cause its Subsidiaries to, make available to the other party . . . all . . . information concerning its business, properties and personnel as the other party may reasonably request . . . .  [Emphases added.]

164.    Such access included access to Merrill's profit and loss ("P&L") reports, which showed the facts of Merrill's deteriorating positions.  Indeed, in a memo to Merrill employees following his termination, Defendant Thain stated:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.  However, they were incurred almost entirely on legacy positions and were due to market movements.  *We were completely transparent with Bank of America.  They learned about these losses when we did.  The acting CFO of my businesses was Bank of America's former Chief Accounting Officer.  They had daily access to our P & L, our positions and our marks.*  [Emphasis added.]

165.    Moreover, Defendants Lewis, Price and other senior executives among the BofA Defendants received weekly reports concerning Merrill's financial condition *beginning immediately*

***after the Merger Agreement was executed.***  Defendant Lewis, for example, testified before the New York Attorney General on April 23, 2009 as follows:

> ***We were getting projections [concerning Merrill].  I was getting a P & L at Bank of America, but we were getting projections.  I don't recall getting them every day, but I was either hearing about them and in some cases I saw them.***  [Emphasis added.]

166.    Defendant Lewis similarly admitted to the House Committee on Government Oversight and Reform on June 11, 2009, that, beginning on September 15, 2008, he received weekly reports concerning Merrill's financial condition:

> Q.    Isn't it true that Bank of America examined Merrill Lynch's book of business before signing the merger agreement and then received detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 5th?
>
> A.    That is true.

167.    By November 2008, the losses at Merrill became so severe that, according to Defendant Price in testimony to the New York Attorney General earlier this year, he sought the advice of both inside legal counsel (specifically, Defendant Mayopolous) and outside legal counsel (specifically, the Wachtell law firm) as to whether BofA should disclose Merrill's expected fourth quarter losses to BofA shareholders.  Price further testified that BofA's decision not to disclose those losses was made after receiving such advice.  Price testified, in particular, that the BofA Defendants decided not to disclose such losses following a telephone call on November 20, 2008 with the Wachtell law firm.

168.    As Defendant Thain stated upon his forced departure from Merrill after the Closing, the weekly reports concerning Merrill that were sent to Lewis, Price, and other BofA Defendants were unmistakably clear about Merrill's rapidly deteriorating condition.  These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings.  In the first week of October, the reports showed, Merrill lost $1.3 billion, lost

$257 million the next week, lost $702 million the week after that, and then lost $2.2 billion in the week after that—for a total of $4.4 billion in October alone.  During the week of November 10, 2008, Merrill lost *another* $4.4 billion.

169.   At Kucinich's request, Pierre Sprey, a longtime Defense Department official who helped design the F-16 fighter, performed a statistical analysis of the Merrill losses and concluded "the evidence for a constantly deteriorating . . . trend is ***much stronger on November 14 than it is on December 12.***"  (Emphasis added.)[7]  This conclusion was contrary to the BofA Defendants' repeated statements that they did not learn of the losses, nor could they have known about them, until *after* the Shareholder Vote on December 5, 2008.

170.   Further, according to the *New York Times* (February 9, 2009), shortly after the Merger was announced, BofA "quickly put 200 people at [Merrill], including a large financial team. A Bank of America executive [Chief Accounting Officer Neil Cotty] was sent to New York from Charlotte to act as an interim chief financial officer ***and had daily access to Merrill's profit-and-loss statements***."  (Emphasis added.)  The information available to BofA's 200-person transition team was the same information available to the senior management of Merrill, including Defendant Thain. Thus, no aspect of Merrill's losses was or should have been opaque to the BofA Defendants.  Team leader Cotty reported directly to Defendant Lewis.  The BofA Director Defendants, who conducted weekly conference calls every Friday starting in September 2008 and continuing through December 2008, could not and should not have been unaware of Merrill's accelerating losses throughout the fourth quarter.

171.   According to the *Wall Street Journal* (February 6, 2009):

---

[7] Mr. Sprey's analysis was also put into the public record at the Lewis hearing.

*By the end of November, two months into the fourth quarter, Merrill had accumulated $13.34 billion in pretax quarterly losses, according to an internal document reviewed by The Wall Street Journal.* Some Bank of America executives expressed concern about proceeding with the takeover, people close to the bank say. . . . *[T]he bank decided to go ahead with Dec. 5 shareholder votes on the deal.* Shareholders of both Merrill and Bank of America gave their approval.

\* \* \*

Bank of America executives remained confident about the deal [in October].*Doubts began to creep in shortly before Thanksgiving. With more than a month to go until the end of the fourth quarter, the pretax quarterly losses at Merrill were approaching $9 billion*, according to people familiar with the figures. *By month's end, the figure had exceeded $13 billion*, or $9.29 billion after taxes.

Most of the losses were coming from the securities firm's sales and trading department. But business was even suffering in Merrill's lucrative wealth-management unit, which saw its revenue drop to $797 million in December, from $1.08 billion in October. Still, not all the losses, which included expected write-downs on assets such as Merrill's investment in rental-car company Hertz Global Holdings Inc., should have come as a surprise to Bank of America.

\* \* \* \*

*At Bank of America, executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the "material adverse effect" clause in its merger agreement.* Merger agreements typically specify certain "adverse" conditions that give an acquirer the right to abandon a deal.

\* \* \* \*

*The deliberations continued up until a few days before shareholders of Merrill and Bank of America were scheduled to vote*, one of these people says. Senior Bank of America executives had "mixed emotions," this person says, but "everyone wanted to see the deal go through." [Emphases added.]

172.    Defendant Lewis has stated publicly that internal BofA forecasts projected a $9 billion fourth-quarter loss (after taxes) for Merrill on December 5, 2008—a date which conveniently coincided in his memory with the date of the Shareholder Vote that was already underway that day. In actuality, however, Lewis was aware or should have been aware of the $9 billion *no later than the evening of December 3, 2008*, when he received the latest weekly BofA internal report on Merrill. On this occasion, Defendant Rosato, BofA's Chief Accounting Officer, sent an e-mail

stating: "*4Q revenues [at Merrill] need to be adjusted down by $3B.*"  The existence and contents of Rosato's e-mail were immediately made known to Defendants Lewis and Price and the BofA Board.  That revision changed the estimated fourth-quarter net loss to $8.98 billion, worse than the previous Merrill forecast of $7.06 billion, which had been sent to Lewis and other executives only that same day.  The December 5, 2009, projection was shared with the BofA Board no later than at its meeting on December 9, 2008.

173.     Moreover, the New York Attorney General has discovered that:

> *By December 3, 2008, Bank of America learned that Merrill's forecasted losses had risen to more than $11 billion [before taxes], and with the addition of a $3 billion "contingency" they rose to more than $14 billion [before taxes]*.  Mr. Price testified that the decision not to disclose these escalating losses was not made until after conversations with Mr. Mayopolous.  Mr. Mayopolous in turn testified that he spoke with outside counsel [the Wachtell law firm] to request legal advice regarding the additional losses.  [Emphasis added.]

174.     In addition, as Defendant Lewis testified to the NYAG on April 23, 2009, by December 14, 2008, the projected loss had increased to $12 billion (after taxes).  This represented, in Lewis's words (according to his testimony to the New York Attorney General) a "staggering amount of deterioration."

175.     Despite the BofA Director Defendants' awareness of, or ready access to, that information, neither the Proxy Statement nor any supplements thereto, were ever updated or corrected to disclose the dramatic decreases in the value of Merrill's assets or the company's increasing losses.  The BofA Defendants, aided and abetted by Merrill Defendants and the Advisor Defendants, breached their duty to update and correct the material misstatements and omissions in the Proxy Statement, in violation of the federal securities laws and/or the duty of candor to BofA shareholders.

**F.      BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants.**

176.     BofA's shareholders approved the Merger in a special meeting held on December 5, 2008.  Lacking the material facts necessary to make an informed decision on whether to approve BofA's acquisition of Merrill, 82 percent of BofA's shareholders voted to approve the Merger and the issuance of additional BofA shares necessary to complete it.  The BofA Defendants promptly issued a press release announcing that the shareholders had approved the Merger.

177.     Pursuant to their undisclosed agreement not to invoke the MAC clause and play along with Messrs. Paulson and Bernanke's desires (in the bargain, keeping their lucrative positions as officers and directors and receiving billions of dollars in federal assistance), almost immediately after the votes were tallied, the BofA Defendants went to the federal government to seek additional assistance (on top of the $25 billion already received in that fall).  BofA Chairman Lewis expressly advised the Treasury that BofA would not be able to close the deal without billions more in assistance, due to Merrill's substantially deteriorated financial condition.  Thereafter, Lewis secured a promise of $20 billion in direct additional assistance to complete the Merger, as well as guarantees and indemnifications for $118 billion in additional exposure.  Of this amount, fully 75 percent – or $88.5 billion – arose from Merrill losses and liabilities.  The Merger was consummated on January 1, 2009.

**G.      The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact.**

178.     The BofA Defendants further breached their fiduciary duties to BofA and its shareholders by proceeding with the acquisition of Merrill after September 15, 2008, despite their knowledge of, and/or ready access to, information concerning Merrill's severely worsening financial condition and the immensely dilutive and destructive effect Merrill would have on BofA as a

consequence.  As set forth above, the BofA Defendants knew of, or recklessly or with gross negligence disregarded, Merrill's losses and liabilities, and the effect they would have on BofA, yet deceived shareholders by not revealing the extent of the losses before the Merger closed on January 1, 2009—thereby foregoing steps that could have spared BofA the damage complained of herein.

179.    In fact, pursuant to the Merger Agreement, the BofA Defendants could have terminated the Merger and been held harmless, upon uncovering events or circumstances evidencing a material adverse effect of precisely this nature.  The Merger Agreement included the following language in paragraph 3.8, defining a "Material Adverse Effect," the occurrence of which would allow the BofA Defendants to terminate the Merger prior to the scheduled closing on January 1, 2009:

> 3.8    <u>Absence of Certain Changes or Events</u>.  (a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term "<u>Material Adverse Effect</u>" means, with respect to Company or Company, as the case may be, *a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole . . . .* [Emphasis added.]

180.    Certain items were excluded from the definition of "Material Adverse Effect," such as changes in accounting rules, rules and regulations, political conditions, general business conditions, and the like.  These exclusions, however, were not intended to apply if Merrill's financial and operational conditions took a sharp turn for the worse beyond plan, as they did.  For example, one exclusion was for "failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof"—indicating that the underlying causes of Merrill's results, such as asset impairments and write-downs, were to be ***included***.

181.    As Merrill's condition worsened in November and December 2008, Defendants Lewis became increasingly concerned about BofA's ability to complete the Merger.  Lewis

conferred with internal legal counsel to determine whether BofA had grounds to rescind the Merger under the MAC clause.  Indeed, prior to the Shareholder Vote, Defendants Lewis, Price, Curl, and the BofA Board were well aware that the significant deterioration in Merrill's asset values, and its ballooning losses, justified invoking the MAC clause, yet deceptively and in bad faith took pains to conceal these facts, in breach of their duties of loyalty, good faith, and candor.

182.    The New York Attorney General, in connection with its investigation of the Merger, has uncovered at least some of Defendants' bad faith and deceptive conduct and (in a letter to BofA's outside counsel, Lewis Liman, requesting greater cooperation) has made public evidence that:

> ***four days before the shareholder vote on whether to approve the merger, Mr. Price and Gregory Curl, Bank of America's then Vice Chairman of Corporate Development, sought legal advice regarding the MAC clause.  This fact is of tremendous significance because it is at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote.***  In particular, on December 1, 2008, Mr. Price and Mr. Curl requested legal advice from Mr. Mayopolous regarding whether Bank of America had a MAC in light of Merrill's deteriorating financial condition.  Mr. Mayopolous testified about the December 1, 2008 meeting:
>
> | Question: | Did you give advice about whether there was a [MAC] clause or not? |
> |---|---|
> | Mayopolous: | Did I give advice about whether I thought there was a material adverse [e]ffect or not? |
> | Question: | Yes. |
> | Mayopolous: | Yes. |

(Emphases added.)

183.    By Sunday, December 14, 2008, Merrill's condition had deteriorated so drastically that Defendant Price called Defendant Lewis on a Sunday to inform him of the developments. Attention among the BofA Defendants turned again to the MAC clause, and the Wachtell law firm opined that grounds existed to invoke that clause to terminate the Merger.

184.    Thereafter, on Tuesday, December 16, 2008, Herlihy placed a call to Treasury official Ken Wilson, a deputy to Mr. Paulson.  Herlihy informed Wilson on BofA's behalf that, with Merrill's losses having mushroomed to almost $21 billion, BofA's legal counsel, the Wachtell law firm, had opined that BofA could terminate the Merger Agreement pursuant to the MAC clause. Mr. Wilson told Herlihy to "get Mr. Lewis to call Mr. Paulson."

185.    Then, on December 17, 2008, Lewis, on Herlihy's recommendation, called Mr. Paulson to inform him that, given the amount of losses and write-downs at Merrill, BofA lacked the capital to close the Merger.  Lewis informed Mr. Paulson for the first time that the BofA Defendants were "strongly considering" invoking the MAC to terminate the Merger, on the grounds that Merrill Lynch had suffered a "Material Adverse Effect."

186.    Mr. Paulson summoned Defendant Lewis to the Federal Reserve for a meeting that very evening.  Defendants Lewis, Price, and Moynihan flew to Washington for the meeting, which was also attended by Messrs. Paulson, Bernanke, and others.  Defendants Lewis and Price began the meeting by informing the participants of Merrill's projected losses.  Messrs. Bernanke and Paulson implored Lewis not to invoke the MAC clause to terminate the Merger, even venturing the unsolicited opinion that any attempt to do so would be legally infirm.  Messrs. Bernanke and Paulson also claimed that, if the deal were terminated, it would reflect poorly on Defendant Lewis and the BofA Director Defendants and suggest that they had not done adequate due diligence of Merrill.

187.    Thereafter, between December 17 and December 21, Defendant Lewis and other BofA Defendants participated in telephone conferences with Treasury and Fed officials, including Messrs. Paulson and Bernanke.  During these meetings, Lewis and the other BofA Defendants were repeatedly urged not to invoke the MAC clause on various grounds, including that it wouldn't work, it would be bad for the economy, and it would be bad for their reputations.  Defendants Price and

Brinkley were unambiguous in their steadfast opinion, as memorialized in an e-mail by one Fed official, that the MAC clause should have been invoked at the time:

> Spoke with Joe and Amy finally about 30 minutes ago. They still feel comfortable that they would [win any] MAC lawsuit. Also feel they have good liquidity (300 billion at window). Also feel that while it will have very broad market implications that the equity markets will react positively to them (not sure I totally agree). They said they want the transaction to go through but have to protect their shareholders and that is why they contacted us . . . .

188.    Meanwhile, Merrill Lynch's condition continued to deteriorate. By December 21, 2008, the BofA Board determined that going through with the Merger would jeopardize BofA's existence as a going concern and that—despite the urgings of Fed officials—*it was in the Company's best interests to invoke the MAC clause and terminate the Merger.* Accordingly, on that day, Defendant Lewis reached Mr. Paulson by telephone to inform of the Board's decision. According to Defendant Lewis, Mr. Paulson then told Defendant Lewis that, if BofA invoked the MAC clause, he, Mr. Paulson, would remove BofA's management and Board from their offices.[8]

189.    To further induce Defendant Lewis and the BofA Board to preserve their lucrative positions and abandon their shareholders' interests in favor of their own, Mr. Paulson also told Defendant Lewis that, if the BofA Defendants caused BofA to go through with the Merger, the federal government would provide an additional cash infusion, through the government's purchase of shares of BofA preferred stock, and a guarantee against the losses which BofA would suffer in acquiring Merrill. As known to Defendants, however, the proposed purchase of additional shares by the federal government would necessarily have a dilutive effect on existing BofA shareholders and

----

[8] Mr. Paulson later testified to the New York Attorney General that if he made a threat to remove the Board, it was at the request of Fed Chairman Bernanke. Bernanke, in testimony before the House Committee, denied this, stating, "I did not tell Bank of America's management that the Federal Reserve would take action against the Board or management." A spokesman for Paulson later said that Paulson's admonitions to Lewis were "his own" and not made at the behest of Bernanke.

cause them harm thereby, as Defendant Lewis later admitted in his testimony to the New York Attorney General.

190.    In their telephone call, Mr. Paulson further pressured Defendant Lewis to act deceptively and in bad faith and to continue to violate the BofA Defendants' duty of candor to shareholders, and not to make any disclosure of their conversation—including the government's proposal to make a cash infusion.  Mr. Paulson indicated to Defendant Lewis that, because BofA's fourth-quarter earnings were not set to be announced until January 20, 2009, the terms of the government's cash infusion could be worked out well ahead of that date, with no disclosure to shareholders or the public before that required disclosure, or the Closing on January 1, 2009.

191.    Defendant Lewis did not give a definite response to Mr. Paulson, stating only "Hank, let's deescalate this for a while.  Let me talk to our Board."  Lewis called a Board meeting for 4:00 p.m. the next day, December 22, 2008, to report on his conversation with Mr. Paulson and obtain the Board's complicity in yielding to Mr. Paulson's inducements and threats.

192.    At no time before the Merger closed did the BofA Defendants make disclosure to BofA shareholders of any of the above highly material information.

**H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders.**

193.    Even before he hung up the telephone with Mr. Paulson on December 21, 2008, Defendant Lewis had determined to cause BofA to capitulate to Mr. Paulson's threat.  Throughout the evening, Defendant Lewis canvassed fellow Board members informally to determine whether the Board would opt to preserve their jobs and support management's recommendation not to invoke the MAC solely on the basis of Mr. Paulson's inducements and promises.  Defendant Lewis also had a

series of telephone calls with Fed and Treasury officials in which he assured them that BofA would play along with Mr. Paulson's desires.

194.    As evidence that Defendant Lewis and the Board decided to act deceptively to preserve their own lucrative positions, and in bad faith, failed to invoke the MAC clause, the next morning, a senior Fed official close to both Mr. Paulson and Mr. Bernanke, Arthur Angulo, memorialized the events as follows:

> *Yesterday [December 21, 2008], Ken Lewis gave separate assurances to Sec. Paulson and Chm. Bernanke that BAC will consummate the acquisition of MER as planned on 1/1/09.*  HMP and BSB will speak together with Lewis today, and they will express their commitment to work with BAC to come up with the "right response" to BAC's situation.  The timeframe for doing so is before 1/20/09, which is when BAC is tentatively scheduled to publicly release its 4Q 2008 earnings. [Emphasis added.]

195.    Moreover, even before the Board meeting on December 22, 2008, Defendant Lewis telephoned Mr. Bernanke directly to report that the BofA Board would breach their duties of loyalty, good faith, and candor and acquiesce to the demand to proceed with the Merger.  Mr. Bernanke documented the conversation in an e-mail to Scott Alvarez, the Fed's general counsel, as well as other Fed officials: "Had a good conversation with Lewis just now.  He confirms his willingness to drop the MAC and to work with the government to develop whatever support package might be needed for earnings announcement dates around Jan. 20."

196.    The Board meeting on December 22, 2008 was attended by Director Defendants Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lewis, Massey, May, Ryan, Sloan, Tillman, Lozano, and Spangler.  Also present were defendants Curl, Moynihan, Banks, Alphin, and Price.  At the meeting, Lewis formally sought the Board's concurrence with management's decision not to invoke the MAC clause.  Lewis had been able to reach "most" of the Board members before the meeting, and they had indicated their support for Lewis's plan to give in to Mr. Paulson's demand.

There was no dissent from this consensus view at the meeting itself.  Thus, the Board, having already determined that BofA's best interests lay in *invoking* the MAC clause, now determined—*based solely on Mr. Paulson's threat to remove them from office—not to do so*.  As Lewis later testified to the New York Attorney General:  "*Until we had that heated—I guess you would call it—from Paulson, we were still in the mode that the MAC was the best . . . .*"  (Emphasis added.)

197.    Following the Board meeting, Defendant Lewis telephoned Mr. Paulson again to report on the Board's action and his conversation with Mr. Bernanke.  Defendant Lewis also belatedly asked Mr. Paulson whether BofA could have the federal government's promise of assistance put into writing.  Mr. Paulson refused, on the grounds that doing so would require public disclosure.  The BofA Board, by then committed to its deceptive and self-serving scheme, again acquiesced in not disclosing these events.

198.    Defendant Lewis did not persist on this point.  Instead, Defendant Lewis sent an e-mail to the Board and various BofA officers stating:  "I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure *which, of course, we do not want*."  (Emphasis added.)

199.    One point on which Lewis did persist was seeking to enlist the government's help in protecting himself from being held accountable to shareholders for his actions.  In their telephone call before the December 22 Board meeting, Lewis told Bernanke that (as set forth in an e-mail from Mr. Bernanke to Mr. Alvarez) "he [Lewis] now fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at ML. . . . [H]e still asked whether he could use as a defense that the govt ordered him to proceed for systemic reasons.  I said no."  Mr. Alvarez also told Mr. Bernanke that it was neither "necessary [n]or appropriate" to give Lewis a letter purporting to mitigate his or the Board's responsibility for not invoking the MAC clause, or for not disclosing that

the Board had considered invoking the MAC clause but had decided not to based on Mr. Paulson's threat.

200.    In his response, however, Mr. Alvarez did specifically note that Defendant Lewis, and by implication, others at BofA, faced legal consequences if they did not, in fact, make adequate disclosures to shareholders regarding Merrill's deteriorating condition.  As evidence of this, Mr. Alvarez wrote:

> A different question that ***doesn't seem to be the one Lewis is focused on is related to*** **disclosure.  *Management may be exposed if it doesn't properly disclose information that is material to investors.*** There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial records. ***Lewis should be able to comply with all those reporting and certification requirements while also completing this deal.*** His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the ML losses when BA made its disclosures to get the shareholder vote on the ML deal in early December.  I'm sure his lawyers were much involved in that set of disclosures and Lewis was clear to us that he didn't hear about the increase in losses till recently. [Emphases added.]

201.    Following Mr. Paulson's purported threat on December 21, 2008, and the Board's acquiescence on December 22, 2008, discussions between BofA and the government turned to the terms of the promised governmental assistance to BofA.  Thus, another Board meeting was held on December 30, 2008.  At that meeting, the Board chiefly concerned itself with the timing, amounts, and documentation of the governmental assistance to be received.  The Board determined not to require written documentation from the government prior to the Closing on January 1, 2009—***and not to make any disclosure to BofA shareholders***.  Indeed, in determining not to require written documentation prior to Closing, the Board expressly credited Defendant Lewis's explanation (based on his conversation with Paulson) "that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, ***which formal action would require public disclosure***."  (Emphasis added.)

202.   The December 30 Board meeting minutes further reflect that the Board was specifically trying to conceal its disclosure of Merrill Lynch's losses until the announcement of BofA's fourth-quarter earnings in January, and until they received additional TARP funds.  As set forth in the meeting minutes, "Mr. Lewis concluded his remarks by stating that management will continue to work with federal regulators to transform the principles that have been discussed into an appropriately documented commitment to be codified and implemented in conjunction with the Corporation's earning release on January 20, 2009."

203.   Thereafter, without disclosing the need for additional capital or their capitulation in not invoking the MAC to save their positions, the BofA Defendants caused BofA to issue a press release on January 1, 2009, announcing the closing of the Merger.  This release said nothing about the grave losses at Merrill, BofA's inability to close without governmental assistance, the Board's decision to invoke the MAC clause, the negotiations with the government over assistance, the Board's retraction of its decision, and the purported threats to remove the Board and management. Nor had any aspect of the deal been renegotiated.

**I.      Liability of BofA Defendants for the Above Misconduct.**

204.   It was not until January 16, 2009, when the BofA Defendants caused BofA to pre-announce its fourth quarter earnings, that shareholders began to learn the truth about all of these events.  However, in acceding to Mr. Paulson's threat, the BofA Defendants deliberately and continuously withheld crucial information from shareholders, in breach of their duties of care, candor, loyalty, and good faith, and in violation of the federal securities laws.

205.   Despite the fact that BofA had determined that Merrill Lynch's financial condition was so grave that it justified termination of the Merger pursuant to the MAC clause, at no time prior to the Closing did the BofA Defendants publicly disclose Merrill Lynch's devastating losses or the

impact it would have on BofA.  Nor did these defendants disclose that the Board had decided to invoke the MAC clause and would have done so but for their self-interested capitulation to Mr. Paulson's threat to try to get them removed from office if they had.  Nor did these defendants disclose that the Board had determined to seek and obtain $138 billion in additional federal TARP money to allow BofA to close the Merger.  Yet, if Merrill's losses (which Lewis deemed "staggering") were grave enough to cause Lewis and the Board to decide to terminate the Merger, then obviously those losses were material to shareholders.

206.    To the contrary, *withholding information* was expressly treated as one of the key *goals* of the process, and was expressly used to justify proceeding as Mr. Paulson wished even in the absence of written documentation of Mr. Paulson's promises.  The BofA Defendants thus not only *failed* to observe their duties of complete candor and transparency, they *deliberately, knowingly, recklessly, and with gross negligence acted consistently to disregard them, acting in bad faith to promote their own self-interest and then to cover up these facts*.

207.    In his testimony to the New York Attorney General in April 2009, Defendant Lewis belatedly attempted to justify his and the Board's bad-faith misconduct by suggesting that the question of disclosure was not up to anyone at BofA and that the decision not to disclose was based on direction from Paulson and Bernanke:  "I was instructed that 'We do not want a public disclosure.'"  Paulson, however, has testified to the House Committee on Oversight and Government Reform that his discussions with Lewis regarding disclosure concerned the *Treasury Department's public disclosures, not BofA's*.  Moreover, Lewis clarified in his own testimony to the House Committee in June 2009 that "[n]either Secretary Paulson nor the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something that we publicly—that we felt should be publicly disclosed."  In equally clear terms, Lewis told the House Committee:  "[d]uring all of that

time there was never, ever a time that the Federal Reserve or the Treasury Department told me that we should not disclose something that we thought would be a disclosable event." Similarly, in response to a question from Rep. Elijah Cummings as to whether Mr. Bernanke had ever advised Lewis against disclosure, Lewis testified: "No, sir. Well, the—he never said we should not disclose anything that was disclosable. *That would be our decision*, and I never heard from him on the issue of us not disclosing anything. (Emphasis added.)

208. Bernanke, in his testimony to the House Committee, similarly stated:

*As I wrote in a letter to this Committee, neither I nor any member of the Federal Reserve ever directed, instructed, or advised Bank of America to withhold from public disclosure any information relating to Merrill Lynch, including its losses, compensation packages or bonuses, or any other related matter.* These disclosure obligations belong squarely with the company, and the Federal Reserve did not interfere in the company's disclosure decisions.

The Federal Reserve had a legitimate interest in knowing when Bank of America or Merrill Lynch intended to disclose the losses at Merrill Lynch. Given the fragility of the financial markets at that time, we were concerned about the potential for a strong, adverse market reaction to the reports of significant losses at Merrill Lynch. If federal assistance to stabilize these companies were to be effective, the necessary facilities would have to be in place as of the disclosure date. Thus, our planning was importantly influenced by the companies' planned disclosure schedule. *But the decisions and responsibilities regarding public disclosure always remained, as it should, with the companies themselves.* [Emphases added.]

209. Thus, instead of determining to stop the Merger, renegotiate its price (perhaps using the MAC clause as leverage)—or, at the very least, inform shareholders of Merrill's devastating losses and seek a new shareholder vote—the BofA Defendants forged ahead with their intentional, reckless, or grossly negligent breach of their duties of care, loyalty, good faith, and candor and failed to express a word of any concern to shareholders. Asked why the BofA Defendants had chosen this course of action, Lewis later commented that "we did think we were doing the right thing for the country." The mantle of patriotism, however, does not obviate the fact that BofA shareholders were

never informed of the proposed course of action, which was theirs to approve when approving the

Merger.

210.    According to William D. Cohan, in "The Final Days of Merrill Lynch," *Atlantic*,

September 2009:

> Lewis "**had an easy out before the shareholder vote,"** a senior Wall Street mergers-
> and-acquisitions banker, who was also trained as a Wall Street lawyer, told me.
> "**He could easily have disclosed to shareholders** that 'We have done two months of
> due diligence now, and look at the 600 things we've found.'  I've always wondered
> how could it be that they did not disclose to the world what they knew before
> December 5."
>
> . . .  "**He committed classic securities fraud**," the senior Wall Street mergers banker
> says flatly.  "**He had a material knowledge of a material event in the middle of a
> shareholder vote.**"
>
> *   *   *   *
>
> One senior Wall Street executive, upon learning of Lewis's actions, was incredulous.
> "There is no question what I would have done if I were in his shoes," he told me.  "***I
> would have told [Bernanke and Paulson] I was calling the MAC, was releasing the
> decision publicly, and dared them to fire me and the board—and that never would
> have happened, trust me***."  Even a former Merrill Lynch executive, who was
> involved in the sale of the company to Bank of America and was familiar with the
> MAC language in the contract, said ***Lewis should have used Merrill's fourth-
> quarter losses and the threat of calling a MAC as leverage to renegotiate
> downward the absurd price of the Merrill deal***.  "He could have used the MAC
> clause a pretext to renegotiate the deal," he said.  "That would have been a prudent
> thing to do."  [Emphases added.]

211.    Similarly, James Cox, a professor of corporate and securities law at Duke University,

has opined that it was "highly likely" that the $2 billion increase in Merrill's projected losses that

occurred on December 3, 2008, and was shared with Lewis, "would be material, but it is even more

likely to be material if this was indicative of conditions at Merrill that were deteriorating"—as, in

fact, was the case.

212.    Similarly, as noted by Jonathan Macey, Yale Law School deputy dean and Sam

Harris Professor of Corporate Law (*Deal Journal*, April 23, 2009):

Whatever [Defendant Lewis] was told by [Bernanke and Paulson] should not or does not in any shape or form get him off the hook. . . .  Regulators are supposed to tell you to obey the law, not to disobey the law.  *If you're the CEO, your first responsibility is not to your regulator, it's to your institution and shareholders*. . . . [Defendant Lewis] is the CEO of this massive company.  He's not a clerk.  *He's supposed to be able to stand up for the people whose interest he's hired to protect. He's basically saying that Bernanke's and Paulson's short-term political interests are more important than my shareholders.*

213.    Ironically, in the end, not even all of Mr. Paulson's staff thought that going through with the Merger was in BofA's best interests.  Indeed, on December 21, 2008, one Federal Reserve official, Adam Ashcraft, wrote in an e-mail to several colleagues working on the issue:  "*I think it is equally possible that the market looks at Merrill's 2008 q4 earnings release and sees BOA making a smart move by walking away from a black hole into which large amounts of time, effort, and money would have been going, potentially overwhelming the firm and inviting further dilution through future capital injections*."  (Emphasis added.)

### J.    In an Act of Corporate Waste, and in Further Breach of Their Duties of Loyalty and Good Faith, the BofA Defendants Secretly Allow the Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before the Merger Closes.

214.    Before the Merger with BofA closed on January 1, 2009, the Merrill Defendants— with the approval of the BofA Defendants—paid themselves and fellow Merrill executives $3.6 billion in bonuses.  These bonuses were paid well ahead of Merrill's disastrous earnings announcement for the fourth quarter—and further lowered the value of what BofA was acquiring in the Merger at an unconscionable and grossly unfair price.  The bonuses were specifically approved by the BofA Defendants and, in fact, had been at the top of the list of key deal terms when the Merger was negotiated on September 13-14, 2008.  Moreover, as set forth above, the fact and scope of the bonuses were entirely *omitted* in BofA's disclosures to shareholders seeking their approval of the Merger.

215.     Pursuant to longstanding company policy, Merrill paid year-end bonuses to its executives and employees pursuant to its VICP only in late January or early February of the following year.  That policy was secretly abandoned in 2008 so that Merrill executives could receive their bonuses prior to the Merger's close.

216.     Indeed, shortly after announcing the Merger, defendants Kraus, Stingi, and Ross began putting together an accelerated VCIP bonus schedule for 2008.  By the end of September 2008, these defendants had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses.  The Compensation Committee of the Merrill Board was scheduled to approve the final bonus pool in early December, more than three weeks *before* the end of the year for which the bonuses were to be paid and *before* the closing of the Merger.

217.     On November 11, 2008, defendants Thain, Stingi, Ross, and other Merrill Defendants held a conference call with the Merrill Compensation Committee.  During the call, Thain recommended that the Committee adopt the accelerated schedule, which contemplated approving the bonus pool on December 8, 2008, informing employees about their bonuses on December 22, 2008, and paying the cash awards on December 31, 2008.  Stock awards were to be made in early 2009, after the anticipated closing of the Merger.

218.     Merrill's Compensation Committee approved the accelerated schedule, and on the following day, November 12, 2008, Thain informed defendant Alphin at BofA of the bonus schedule, who then informed other BofA Defendants.

219.     Throughout the fall of 2008, the size of Merrill's proposed bonus pool was gradually reduced due to various factors, as were the bonuses planned for Merrill's top five executives.  By late November, Merrill's VCIP bonus pool was reduced to approximately $3.6 billion, with an expected current expense of $3 billion.  Incredibly, concerned that BofA might not have enough

stock to satisfy Merrill's stock awards, the BofA Defendants asked their counterparts at Merrill to pay 70 percent of the bonuses in cash and 30 percent in stock, instead of the 60-40 cash-stock split set forth in the Merger Agreement. The Merrill Defendants complied with the request, increasing the recorded current period expense of the bonuses to $3.2 billion.

220.   The shareholder meetings for BofA and Merrill took place, as scheduled, on December 5, 2008. The shareholders of both companies voted to approve the Merger. The BofA Defendants did not make any disclosures to their shareholders prior to the shareholder meetings concerning Defendants' agreements that Merrill could pay up to $5.8 billion, or the revised plans to pay $3.6 billion, in discretionary year-end bonuses before the Merger closed.[9]

221.   On December 8, 2008, Merrill's Compensation Committee, headed by defendant Finnegan, approved a final VCIP pool of $3.6 billion. Of this amount, only $700 million was for bonuses that had been contractually guaranteed earlier in 2008; the rest—$2.9 billion—was entirely discretionary.

222.   Merrill's employees were notified about their 2008 VCIP bonus on December 19, 2008, and received cash payments on December 31, 2008—*one day before the Merger closed*. VICP stock awards were made to Merrill employees in early 2009.

223.   The top four bonus recipients received $121 million. One of these was defendant Thomas Montag, who also had been given a contract worth $39 million when he moved to Merrill from Goldman Sachs earlier in 2008. Another was defendant Peter S. Kraus, who, in addition, had received $25 million just to join Merrill. All told, 20 Merrill executives were paid more than $8 million apiece. A total of 53 executives received more than $5 million each. Nearly 700 executives,

---

[9] In fact, this was contrary to the disclosures regarding the payment of any bonuses to Merrill employees.

in total, received $1 million or more.  All of these bonuses were paid despite Merrill's losses of over $27 billion for 2008.

224.     The planned payment of the bonuses were known to Lewis, Price, Alphin, and other BofA Defendants, including the members of the Compensation Committee of BofA's Board of Directors, and were specifically approved by those defendants, who deceptively acted to cover up these bonuses and also took no steps to stop them or recalculate them, even as BofA was deep into discussions with the government over what TARP monetary and other assistance BofA could receive in exchange for going through with the Merger despite Merrill's devastated condition.

225.     The New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses.  A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating BofA's payment to its own executives of bonuses for 2008.  In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses.

226.     On August 3, 2009, the SEC filed a complaint in the United States District Court for the Southern District of New York against BofA under Section 14(a).  *See SEC v. Bank of America Corporation*, No. 09 Civ. 6829 (S.D.N.Y. filed Aug. 3, 2009).  Simultaneously with the filing of that complaint, the SEC also purported to settle the complaint, with BofA agreeing to pay a $33 million penalty and consented to the entry of an injunction permanently enjoining the Company from committing Section 14(a) violations.  The SEC did not initially file charges against any individual defendant at BofA.

227.     The SEC action was assigned to the Honorable Jed S. Rakoff.  When the settlement was presented to the Court for approval on August 10, 2009, the Court **refused to approve it**. Among other reasons, Judge Rakoff questioned the propriety of not bringing charges against any

individual defendants, thus requiring BofA to satisfy the amount of any penalty and thereby *further* injuring shareholders who already had suffered as result of the misstatements at issue.  In addition, Judge Rakoff questioned the amount of the penalty, $33 million, compared to the amount of the omitted bonus payments, $5.8 billion.  Finally, Judge Rakoff questioned why BofA should be willing to agree to any penalty if, as its lawyers claimed, BofA made no misstatements in the Proxy Statement—and why, if key BofA decision makers allegedly relied entirely on the advice of counsel in not disclosing the bonuses, BofA was trying to assert the attorney-client privilege with respect to the advice it did receive.  Judge Rakoff ordered additional briefing by both the SEC and BofA.

228.    In the SEC proceedings, both BofA and the SEC have represented to the Court that the disclosures in the Proxy Statement concerning bonuses were prepared entirely by the law firms— Wachtell and Shearman, respectively—that advised BofA and Merrill in the Merger.  In particular, the decision to set forth the actual size of the allowed bonuses in a "disclosure schedule" to the Proxy Statement (a "schedule" that was never disseminated to shareholders) allegedly was made by lawyers at Wachtell and Shearman and Defendants Mayopolous and Brenner at BofA.

229.    After reviewing the parties' additional submissions, Judge Rakoff, on September 14, 2009, denied the proposed settlement and instructed the parties to proceed to litigation and be ready for trial in the spring of 2010.  The Court rejected the settlement on the basis of the fact that it proposed to rectify the wrongdoing of BofA's management in concealing the bonuses by having "the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct," rather than being paid by individual wrongdoers.  The Court also refused to credit the SEC's claim it would have been impossible to charge the individual wrongdoers, given that "lawyers drafted the documents at issue and made the relevant decisions concerning disclosure":

But if that is the case, *why are the penalties not then sought from the lawyers?* And *why, in any event, does that justify imposing penalties on the victims of the lie, the shareholders?*

\* \* \* \*

Moreover, it is noteworthy that, in all its voluminous papers protesting its innocence, Bank of America never actually provides the Court with the particularized facts that the Court requested, such as precisely how the proxy statement came to be prepared, exactly who made the relevant decisions as to what to include and not include so far as the Merrill bonuses were concerned, etc.

\* \* \* \*

Overall, . . . *the parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry*—all at the expense of the sole alleged victims, the shareholders. Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

*Nor is the proposed Consent Judgment reasonable. . . .*

For example, the Consent Judgment would effectively close the case without the S.E.C. adequately accounting for why, in contravention of its own policy, . . . it did not pursue charges against either Bank management or the lawyers who allegedly were responsible for the false and misleading proxy statements. The S.E.C. says this is because charges against individuals for making false proxy statements require, at a minimum, proof that they participated in the making of the false statements knowing the statements were false or recklessly disregarding the high probability the statements were false. But *how can such knowledge be lacking when, as the complaint in effect alleges, executives at the Bank expressly approved Merrill's making year-end bonuses before they issued the proxy statement denying such approval? The S.E.C. states, as noted, that culpable intent was nonetheless lacking because the lawyers made all the relevant decisions. But, if so, then how can the lawyers be said to lack intent?* [Footnote omitted.] [Emphases added.]

230.   The SEC has indicated that it will not appeal the Court's decision and that, instead, it will "vigorously pursue" charges against BofA—including possibly bringing charges against individual officers or directors of the Company. In addition, the Commission stated that it will use the discovery available in the proceedings possibly to broaden its case against BofA beyond misstatements relating to the Merrill bonuses.

## II.  THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH.

231.    The Proxy Statement (including the SEC filings and other documents incorporated by reference therein), as well as Proxy Supplements and other supplementary statements by Defendants, contained material misstatements and omissions in violation of the federal securities laws and in violation of the BofA Defendants' duty of candor and other fiduciary duties to shareholders, the effect of which was to harm the Company *and* to deprive each shareholder who voted on the Merger of the right to cast an informed vote.

### A.    False and Misleading Statements and Omissions in the Proxy Statement.

232.    Among other material misrepresentations and omissions were the following:

(a)    Defendants caused the Proxy Statement to significantly overvalue Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders.  At the time the Proxy Statement was filed on November 3, 2008, information concerning Merrill's $7 billion in losses so far in the fourth quarter (a highly material amount) were known or readily available to Defendants.

(b)    Defendants caused the Proxy Statement not to disclose that the "fairness" opinions provided by the Advisor Defendants were based on inadequate information and were not actual opinions as to the Merger's fairness at all, but rather ad hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action in furtherance of their own personal agendas at the expense of BofA and its shareholders;

(c)    While Defendants caused the Proxy Statement to purport to identify twelve "Risk Factors" from the Merger, none of these purported "Risk Factors" disclosed the known

fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value, impairing the value of the Merger to BofA shareholders;

(d)     Defendants caused the Proxy Statement to misrepresent that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time, when in fact Merrill was experiencing over $10 billion in new losses which *worsened* its exposures, leverage, and liquidity;

(e)     Defendants caused the Proxy Statement to omit to disclose that Merrill's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse event, and that management had received advice from Company legal counsel that the circumstances justifying terminating the Merger on that basis.

(f)     The Proxy Statement, while touting Merrill's favorable "prospects" as a material factor justifying the BofA Defendants' recommendation, was caused by Defendants to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008—amounts which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

(g)     Defendants caused the Proxy Statement to misrepresent Merrill's ability pay up to $5.8 billion in discretionary bonuses.  Specifically, Defendants caused the statements therein to constitute a misrepresentation that, under the terms of the Merger Agreement,

Merrill was only permitted to make "required" payments to its employees, such as salary and benefits, and was prohibited from paying discretionary year-end bonuses when, in fact, BofA had expressly authorized Merrill, as set forth in an *undisclosed* schedule, to pay up to $5.8 billion in discretionary year-end bonuses—a fact that a shareholder could not have known from reading the Proxy Statement or any other public source;

(h)    Defendants caused the Proxy Statement to falsely imply that BofA had not given its written consent to the payment of discretionary year-end bonuses at Merrill—which the Proxy Statement indicated "*will* not be unreasonably withheld or delayed" (emphasis added)—when, in fact, by the time the Proxy Statement was prepared and distributed to shareholders by Defendants, BofA *already* had given its written consent, as set forth in the undisclosed schedule, that Merrill could pay up to $5.8 billion in discretionary bonuses;

(i)    Defendants caused the Proxy Statement to omit that the $5.8 billion in discretionary bonuses that BofA authorized Merrill to pay constituted approximately 12 percent of the $50 billion price that BofA had agreed to pay to acquire Merrill, nearly 30 percent of Merrill's total shareholder equity, and over eight percent of Merrill's total cash and cash equivalents on hand as of December 31, 2008, and thus were highly material;

(j)    The Proxy Statement, in incorporating Merrill's 2008 Proxy Statement, was caused by Defendants to make additional false and misleading statements with respect to the Merrill bonuses. Specifically, whereas Merrill's 2008 Proxy stated that Merrill's bonuses were "paid in January for performance in the prior fiscal year," designed to link pay and performance so as to align employees' interests with shareholders', designed to provide a "strong incentive" to increase performance and enhance shareholder returns, and focused on "the performance of the Company as a whole," these statements were rendered false by the

Defendants' secret agreement to pay $5.8 billion in discretionary bonuses on an accelerated schedule regardless of Merrill's actual results in the remainder of 2008;

(k)    Defendants caused the Proxy Statement to state that the BofA Defendants' recommendation was based primarily on the "fairness" opinions received by FPK and J.C. Flowers (which opinions, in turn, were materially based on financial records and meetings with Merrill management concerning the "business, operations, and prospects" of Merrill) but caused it to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008 set forth herein.

(*l*)    The Proxy Statement was never updated to update or correct Defendants' statement that BofA would not need CPP funds to complete the Merger based on Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by the end of October and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

233.    In addition to the other material misstatements and omissions in the Proxy Statement, in violation of federal securities laws as well as the BofA Defendants' duty of complete candor in the context of a shareholder vote, Defendants also failed to update the Proxy Statement prior to the Shareholder Vote.  In fact, despite the fact that BofA shareholders did not vote on the Merger until December 5, 2008, *over two-thirds of the way into the fourth quarter*, the Proxy Statement was not updated, corrected, amended, or supplemented by Defendants with any information concerning:

(a)    Actual losses, impairments, and write-downs being incurred by Merrill during the fourth quarter of 2008, or the risk that such losses would materially affect the value of the deal to BofA if the Merger were consummated, including the fact that by the end of

November, Merrill's losses had increased to $15.3 billion (pretax) thus far in the fourth quarter—a highly material amount;

(b)      The Proxy Statement's (and Merger Agreement's, which was attached as an exhibit to the Proxy Statement) statement that there was an "absence of material adverse changes" in Merrill's financial condition—a representation that became diametrically opposite to the truth with each passing day;

(c)      The Proxy Statement's statements that no "material adverse change" had occurred in BofA's financial condition, that BofA was in a "strong capital position, funding capabilities and liquidity," and that the **combined** BofA-Merrill would have a "strong capital position, funding capabilities and liquidity:; these statements also became diametrically untrue over time given the accumulating losses at Merrill, given the fact that BofA was projecting its own quarterly loss of at least $1.4 billion by the end of November 2008—and given the fact that BofA required, and in fact Defendants had obtained, the promise of additional funding in the amount of $20 billion (as well as $118 million in financial "guarantees") from the federal government specifically to complete the Merger;

(c)      the fact that the losses at Merrill were so grave that the BofA Defendants determined that it was in BofA's best interests to invoke the MAC clause and rescind the Merger Agreement, that this determination was shared with government officials, including Secretary of Treasury Paulson and Fed Chairman Bernanke, and that the BofA Defendants did not invoke the MAC clause *solely* because of the Mr. Paulson's threat to replace Defendant Lewis, the Board, and senior management if they tried to protect the Company's

and shareholders' interests—a threat also not disclosed to shareholders and one of dubious factual and legal basis;[10] or

(d)     the fact that, in exchange for the government guarantee, BofA was required to issue an additional $4 billion in preferred stock to the Treasury and forego all future dividend payments in excess of $.01 per share per quarter for three years without government consent, which further diluted BofA's shareholders and eliminated that part of the value of their shares derived from expected dividends.

## B.    False and Misleading Supplementary Statements.

234.    The Proxy Statement was rendered further false and misleading, in violation of the federal securities laws and/or the fiduciary duty of complete candor, by the BofA Defendants and the Merrill Defendants in their public statements communicated to shareholders after the deal was announced and before the Shareholder Vote.  For example, at a press conference on September 15, 2008, the day the Merger was announced, Defendant Lewis was asked about BofA's due diligence on the acquisition, given that it was completed over a single weekend.  Fielding the question for Defendant Lewis, Defendant Price, BofA's CFO, replied with lavish assurances that the BofA Defendants had done their homework:

> ***We have had a tremendous amount of historical knowledge, both as a competitor with Merrill Lynch, but also have reviewed and analyzed the company over the years.***
>
> As Ken [Lewis] referenced, we did have an adviser several among them, ***JC Flowers with pretty extensive knowledge of the company.*** And while none of us like ***the market turmoil we have been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset***

---

[10] Defendant Lewis, for example, testified to the House Oversight Committee on June 11, 2009, that he did not think that the Secretary of the Treasury had the power to remove him or any other Board member from office.

*classes,* so it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic.

In addition, as you would expect, we deployed the team that we would ordinarily deploy in these types of situations, which had well over 45 people from our team on site as well as others off site, outside counsel, and the like. So collectively with that group *and quite frankly, the progress that Merrill Lynch had made in reducing the risk exposures such, and analyzing them and having all of that laid out,* given the efforts that the management team has made over the last period, made it possible for us. [Emphases added.]

235.    At the press conference, Lewis also bragged about not needing government funds for the Merger: "Well, first of all, I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private. But we have asked for no relief, no capital relief on this deal."

236.    Similarly, Defendant Lewis reassured investors about Merrill's overall viability, based on the review by J.C. Flowers:

*Chris [Flowers'] comment was "it's night and day from the time we first looked at it to now." He was very complimentary of what John [Thain] and his team had done in terms of dramatically reducing the marks, in many cases not only — not reducing the marks but getting rid of the assets, which is the best thing to do, so a much lower risk profile than he'd seen earlier on.* [Emphasis added.]

237.    On BofA's third-quarter earnings call with analysts, broadcast on October 6, 2008, just after BofA had raised $10 billion in the market, an analyst asked Defendants whether BofA would need more money to cover the Merrill acquisition. Defendant Price again assured analysts that it would not: "We have considered the Merrill deal in our [intentions] here so that the numbers we were talking about as I've mentioned in the prepared remarks covered our anticipated needs from a Merrill standpoint."

238.    All of these statements were false and misleading because neither the BofA Defendants nor the Advisor Defendants, including FPK and J.C. Flowers, had performed any kind of comprehensive analysis of BofA and, consequently, had no reasonable basis to make any positive

representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved.

### C.    **False and Misleading Proxy *Supplements*.**

239.    The BofA Defendants filed two Proxy Supplements—one on November 21, 2008 and the other on November 26, 2008—that purported to update the Proxy Statement and provide further material information to shareholders concerning the Merger.  In actuality, however, these Proxy Supplements further misled shareholders—both by omitting to disclose the highly material information that had emerged since September 15, 2008 and discussed herein ***and by making new affirmative misrepresentations***.  Specifically, the November 26, 2008 Proxy Supplement contained the following false and misleading statement made by Defendant Lewis:

> I usually don't comment on our stock price—it is investors' job to price our stock based on their appraisal of our performance and our prospects, and my job to lead the company.  But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how ***Bank of America is positioned to ride out this severe economic storm***.

> Investors have deep concerns about how long and deep the recession will be, how high unemployment will go, when housing prices will stabilize and what will be the catalyst to bring us out of the recession.  On banks in particular, they are concerned, among other things, about whether financial institutions have enough capital. These factors are putting tremendous pressure on the markets in general, and financial stocks in particular.

> Given this environment, ***Bank of America continues to be a strong, active player in the financial markets.  We are generating strong deposit growth and attracting new customer and client relationships throughout our company.  We continue to make loans to consumers and businesses to boost shareholder value*** and to do what we can to support economic activity.

> ***We are one of the most liquid banks in the world.  We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements and our own target.  In short, we believe we are one of the strongest and most stable major banks in the world.***

> I have gotten questions from associates and investors in recent weeks on two specific topics [including] the government capital injections into banks [TARP] . . . .

Regarding the federal capital injection, ***these were funds that we did not need and did not seek***.  At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, ***had more than adequate capital***.  We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.  [Emphases added.]

240.     These statements by Defendant Lewis were materially false and misleading because, at the time they were made, it was well known to Lewis and the BofA Defendants that Merrill's losses would be far north of $10 billion for the fourth quarter of 2008 and that BofA itself was projecting billion-dollar losses as a result, directly threatening its "strong capital position" and liquidity.  Moreover, in boasting that BofA "did not need and did not seek" federal TARP funds, Lewis misrepresented the scope of Merrill's and BofA's fourth quarter losses which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

### III.  AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET CAPITALIZATION IS PUNISHED, DEFENDANTS ARE INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS, AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY WITH THE COST OF SEC PENALTIES.

#### A.     The Truth Emerges Concerning Merrill's Devastation and Defendants' Wrongdoing.

241.     On January 14, 2009, after the stock market closed for the day, the *Wall Street Journal* reported that the BofA Defendants were near an agreement with federal officials that would provide BofA with massive financial assistance from the government, including an infusion of fresh capital and the "backstopping" of tens of billions of dollars in toxic assets to help it close the acquisition of Merrill.  The *Journal* further reported that the additional funding had been sought earlier in December by defendant Lewis under the CPP:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion committed federal rescue funds, said it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

242.    On January 15, 2009, multiple news services carried the story of an impending government bailout, or even nationalization, of BofA relating to its acquisition of Merrill. The *New York Times* reported that day that Defendant Lewis, no later than early December 2008, had specifically instructed BofA lawyers, including the Wachtell law firm and defendants Mayopoulos and Brenner, to explore BofA's ability to terminate the Merger under the MAC clause. In reaction to this and similar news reports, the BofA Defendants announced that they would move up their announcement of BofA's fourth quarter earnings to the next day. The price of BofA common stock plummeted 18 percent from $10.20 to $8.32 that day.

243.    On January 16, 2009, Defendants had caused BofA to disclose its disastrous fourth-quarter results. The Company had a net loss of $1.79 billion. Tucked into the press release was the news that Merrill had lost a staggering $15.3 billion in the fourth quarter. In the same press release was the first public announcement of the BofA Defendants' secret deal with Messrs. Paulson and Bernanke: BofA would be caused to obtain $20 billion aid from the federal government to help it absorb Merrill's toxic securities, and that the government would provide protection against losses on $118 billion in selected capital markets exposure. The results included at least $8.75 billion in additional write downs related to Merrill.

244.    The *Wall Street Journal* reported that day, in an article entitled "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level," that ***the current market value of the***

*combined BofA/Merrill was less than BofA's stand-alone market value prior to the announcement of the Merger, implying that the market viewed Merrill as having negative value*.

245.    The *Wall Street Journal* further reported:  "[t]he development angered some Bank of America shareholders who began to question why . . . Lewis didn't discover the problems prior to the Sept. 15 deal announcement.  Many also wanted to know why he didn't disclose the losses prior to the vote on the Merrill deal on Dec. 5 or before closing the deal on Jan. 1."  The article quoted Bradley Dorman, managing partner of White Rock Point Partners, an investment adviser which held 315,000 shares of BofA, as stating that: "*Bank of America didn't do proper due diligence*."  (Emphasis added.)  The price of BofA common stock declined another 14 percent, from $8.32 to $7.18 that day.

246.    On January 17, 2009, an article entitled "Bank of America Goes on Offense: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry" in the *Wall Street Journal* quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group, as stating that Lewis "has very little credibility with the investor public right now."  Thereafter, on January 20, 2009, analysts opined that, based on the new information made available, BofA would need to raise at least $80 billion to restore its capital to adequate levels for a bank of its size and scope.  The price of BofA common stock again dropped, this time a whopping 29 percent, from $7.18 to $5.10 that day.

247.    All told, between January 14, 2009, and January 20, 2009, the price of BofA's stock declined from $10.20 to $5.10, a decline of a massive *50 percent in just three trading days*.  With 6 billion shares outstanding, this represented a loss in market capitalization of *$32.7 billion*.  The stock continued to plummet in succeeding weeks, falling to $3.14 per share on March 6, 2009—for a total loss in market capitalization of *$45.2 billion*.

248.     The harm to the Company and its shareholders from Defendants' misconduct has been, and remains, profound.  From the start, the decision to acquire Merrill with tens of billions of dollars of valuable BofA common stock was rash, not predicated upon proper due diligence, and profoundly wasteful.   On September 12, 2008, Lehman Brothers was one day away from bankruptcy—i.e., worthlessness.  At the time, it was widely recognized that Merrill—which had an equivalent exposure to toxic securities as Lehman Brothers—was not far behind.

249.     Warren Buffett, one of the world's most respected investors, ably summarized the folly of the BofA Defendants' decision to pay $50 billion for Merrill, in an address to a conference sponsored by *Fortune* and recounted in an article posted on that magazine's website on September 15, 2009:

> If the Merrill deal solved one imminent crisis for policymakers, it only intensified the criticism of Lewis as an empire builder who hurt shareholders by turning BofA into a risk-laden colossus.
>
> Buffett alluded to that view in his comments Tuesday.  As regulators pressured Wall Street leaders over the weekend of Sept. 13-14 to find a private sector solution for Lehman's insolvency, Lewis was rushing to cinch a takeover that would give him control of Merrill's top-notch wealth management and investment banking franchises.
>
> And even though it was understood that Merrill Lynch would have trouble surviving once Lehman went down, Buffett noted that ***Lewis seemed to have inexplicably adopted the view that price was no object.***
>
> ***"Why pay X for Merrill Sunday when you could have had it for pennies on Monday?" Buffett said. "When Lehman failed, Merrill would have gone about five seconds later."***  [Emphasis added.]

250.     Moreover, aside from the loss of $45.2 billion in shareholder wealth, the Company's acceptance of additional TARP money to complete the Merrill deal, in exchange for preferred shares, has further substantially diluted shareholders' equity—just as the absorption of Merrill's $27 billion in losses for 2008 has decimated the Company's capital base and shareholder equity.  Moreover, the Company also has been required to absorb Merrill's liabilities in connection with its

subprime and ARS-related exposure, draining yet further billions of dollars unnecessarily from BofA.

251.    In addition, the Company has had to expend many hundreds of millions in attorneys' fees and lost productivity on the part of senior executives in defending multiple investigations concerning the Merger, not only by law enforcement agencies such as the New York Attorney General and the SEC, but also by the United States Congress—including the House Committee on Oversight and Government Reform, led by Rep. Dennis Kucinich and Rep. Edolphus Towns.

252.    The Merrill Merger was promised to shareholders as being immediately accretive to wealth and earnings.  For example, in BofA's press release on September 15, 2008, Defendant Lewis stated that "[a]cquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders. . . .  Together, our companies are *more valuable* because of the synergies of our businesses."  (Emphasis added.)

253.    Defendant Lewis himself, however, has admitted that the BofA Defendants' decision to proceed with the Merger ultimately harmed any shareholder with less than a two or three year time horizon.  Lewis testified to the New York Attorney General as follows:

Q.    Wasn't Mr. Paulson, by his instruction, really asking Bank of America shareholders to take a good part of the hit of the Merrill losses?

A.    What he was doing was trying to stem a financial disaster in the financial markets, from his perspective.

Q.    From your perspective, wasn't that one of the effects of what he was doing?

A.    Over the short term, yes, but we still thought we had an entity that filled two big strategic holes for us and over long term would still be an interest to the shareholders.

Q.    What do you mean by "short-term"?

A.    Two to three years.

B.    **The SEC, FBI, DOJ, New York Attorney
General, and Congress Conduct Investigations of Defendants.**

254.    Investigations against BofA and the BofA Defendants have been commenced by several law enforcements authorities, as well as various committees of the United States Congress.

255.    As noted above, the SEC filed civil proceedings against BofA on August 3, 2009. Although the Commission attempted simultaneously to enter into a settlement and consent decree with the Company, in exchange for a $33 million penalty, Judge Rakoff rejected the settlement and ordered the parties to trial. The SEC has indicated that it will "vigorously pursue" the charges— including possibly bringing charges against individual officers and directors of BofA.

256.    The New York Attorney General, which has commenced its own investigation into the Merrill bonuses, intensified its law enforcement efforts in the wake of Judge Rakoff's questioning of the SEC settlement and BofA's attempt to invoke both the attorney-client privilege and the defense of reliance upon the advice of counsel. On September 8, 2009, the Attorney General—before whom various BofA witnesses also had attempt to invoke both the attorney-client privilege and the reliance-of-counsel defense—sent a letter to counsel for BofA demanding that BofA waive the privilege in light of the proffered defense.

257.    In addition, the New York Attorney General stated that its investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*" (Emphasis added.) These instances comprised: (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

258.     After summarizing the instances of material nondisclosures (and the BofA witnesses' refusal to provide information based on the attorney-client privilege), the New York Attorney General further wrote:

> . . . [W]e cannot simply accept Bank of America's officers' bald assertions that their decisions to keep each of these material events from Bank of America's shareholders were based on a full review of all the relevant information by their inside and outside counsel.  The law is clear that Bank of America and its officers cannot assert an advice of counsel defense for their decisions, and at the same time persist in refusing to disclose the substance of the conversations with counsel. According, **we request that Bank of America reconsider its decision to prevent this Office from adequately probing these crucial issues.  We provide you with this final opportunity to reconsider.  Otherwise, we will proceed with our charging decisions without giving credit to the advice of counsel defense that Bank of America has not permitted us to test.**
>
> **Please provide us with Bank of America's decision by Monday, September 14, 2009. . . .**  [Emphasis added.]

259.     In response to the New York Attorney General's letter, the BofA Defendants caused BofA's counsel to send a reply letter that very same day.  In the reply, counsel on behalf of BofA, Lewis Liman, declined to waive the attorney-client privilege, as the Attorney General had requested. Counsel also purported to deny that the Company had even relied on an advice of counsel defense. In the wake of BofA's counsel's response, the Attorney General's office has stated that it will bring charges directly against officers and directors of BofA related to the four instances of nondisclosure identified in the Attorney General's letter.  In addition, on September 17, 2009, the Attorney General issued subpoenas for the testimony of five members of the BofA Board's Audit Committee— Defendants Barnet, Collins, Franks, Massey, and May.  Spokespersons for the Attorney General's Office have stated that the Audit Committee members are among the Board members most likely to have insight as to the Board's knowledge and involvement in the Merrill losses and the MAC clause discussions, and that, based on existing evidence, the Board will be shown to have had knowledge of

the losses and the MAC clause issue before the Shareholder Vote. In addition, the Attorney General will subpoena the remaining Board members on a future date.

260.     As set forth above, the Committee on Oversight and Government Reform of the House of Representatives also has been conducting an investigation of the BofA Defendants' disclosures to shareholders and other conduct in the context of the losses at Merrill. The Committee conducted hearings in the spring of 2009 and—like the New York Attorney General—began devoting renewed efforts to its investigation once the BofA Defendants' positions regarding the attorney-client privilege and the advice-of-counsel defense became public in the course of the SEC proceedings.

261.     On August 6, 2009, the Committee issued document requests to BofA concerning Merrill's fourth-quarter financial losses, BofA's receipt of financial assistance from the federal government, legal advice regarding disclosure of either issue, legal advice on the MAC clause, and Board meetings. The BofA Defendants caused the Company counsel to send a letter to the Committee objecting to certain of the requests on the basis of attorney-client privilege and asking the Committee to "withdraw its requests" for privilege documents. In addition, BofA was caused to produce 1,800 pages of documents, many of which were clearly irrelevant to the Committee's requests.

262.     The BofA Defendants' response prompted Rep. Edolphus Towns, Chairman of the Committee, to send a follow-up letter to Defendant Lewis on September 18, 2009 reiterating the request for responsive documents and giving BofA until noon on Monday, September 21, 2009 to respond. In addition, Rep. Towns wrote:

> I am deeply disappointed to learn from your attorneys that you are refusing to provide the Committee with key documents I requested in my letter of August 6, 2009. In plain terms, your refusal to provide the Committee with these documents,

without even providing a justification in some cases, leaves the impression that Bank of America is hiding information.

*   *   *   *

Beyond the issue of producing documents containing legal advice, I am disappointed in your overall response to the Committee's request. The documents produced so far include a number of pages that are either partly or wholly redacted. These redactions are unexplained and are unacceptable.

In addition, many of the documents produced so far are clearly irrelevant to the Committee's investigation. . . .

For example, you sent copies of numerous emails you received from your own employees expressing admiration for your "awesome" performance on *60 Minutes*. You also included copies of emails alerting Bank of America employees to discounts at Wal-Mart, Target, and Costco; an announcement of the "Annual Pecan Sale," featuring "This Year's Crop of Mammoth Pecan Halves"; and an invitation to attend a conference on investment in East Asia, written in Chinese. There were numerous other pages of obviously irrelevant material.

Moreover, while your attorneys have evidently been enthusiastic about redacting information pertaining to issues that are the subject of the Committee's investigation, as well as personal information about Bank of America executives, they have been less thorough about redacting sensitive information belonging to your bank's customers. Documents produced so far include letters from Bank of America customers containing their credit card numbers, checking account numbers, and other personal information. None of the latter are relevant to our investigation.

While I am aware that some lawyers seem to believe it is traditional to pad the record with thousands of pages of irrelevant material, in my view this indicates that Bank of America does not take seriously the Committee's investigation. While we neither expect nor wish Bank of America to decide which documents among all relevant records we might be interested in, we do expect you to provide all *relevant* records, rather than just *any* records.

263.    Incredibly, even in response to Rep. Towns's follow-up letter, the BofA Defendants still caused Company to counsel to respond by, ***once again, asking the House Committee to withdraw its requests concerning legal advice***. Moreover, they caused the Company ***to fail to meet the Monday, September 21, 2009, deadline***.

264.    In response, Rep. Towns issued a press release stating in pertinent part:

"I am deeply troubled by Bank of America's refusal to give this Committee the records it needs to rightfully determine how and why a private deal became a public

-105-

bailout," said Chairman Towns. "The taxpayers are now on the hook for billions of dollars and they have a right to know how that happened."

A hearing was scheduled for September 30, 2009.

265.    In addition to the above, the *Charlotte Observer* reported on September 21, 2009

that, since March 2009, both the FBI and the DOJ have been conducting a criminal probe into

BofA's Merger with Merrill.

## IV.    THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF INTEREST AND CIRCUMSTANCES GIVING RISE TO A SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS CREATING A REASONABLE DOUBT THAT THE BOARD COULD IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE.

266.    With respect to the derivative counts in this complaint, demand upon the BofA Board

to institute this action in the Company's name, for both wrongs committed against its wholly-owned

subsidiary Merrill and wrongs committed directly against BofA also would be entirely futile, and is

excused.

267.    The BofA Board consists of sixteen (16) individuals (referred to here as the BofA

Director Defendants):  Lewis, Gifford, Barnet, Bramble, Collins, Countryman, Franks, Lozano,

Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward.  For the reasons stated in this

section and throughout this Complaint, none of these individuals is disinterested and independent

with respect to the acts and omissions alleged herein, and therefore demand would be entirely futile.

268.    First, the BofA Director Defendants face a substantial likelihood of liability herein for

making false and misleading statements in the Proxy Statement.  Claims under Section 14(a) do not

require proof of scienter, and the allegations concerning BofA Director Defendants' access to the

facts concerning Merrill's rapidly deteriorating financial condition in the fourth quarter of 2008 are

strong.  Similarly strong are the allegations that the BofA Director Defendants breached their

fiduciary duties in approving the Merger with Merrill based upon inadequate due diligence; failing to

terminate the transaction or at least provide corrected and updated information to shareholders concerning Merrill's financial condition before the December 5, 2008, Shareholder Vote; and failing to terminate the transaction or provide further information after the Shareholder Vote, even while Lewis sought and obtained over $100 billion in federal assistance directly tied to helping the deal go through.  The failure to make such adequate disclosures also constituted a breach of the duty of complete candor in the context of a Shareholder Vote.

269.    Second, the BofA Director Defendants will not knowingly sue Lewis and other members of the BofA Board of Directors for proceeding with the Merger in violation of their fiduciary duties, given that the these defendants reportedly received pressure from the federal government, including both the Department of the Treasury and the Federal Reserve System, to complete the Merger in spite of any difficulties—*and risked losing their prestigious positions and corresponding reputations if they did not comply*.  In their decision to accept the Fed's Faustian bargain, the BofA Defendants, and each of them, have already demonstrated that their loyalty lies to preserving their own positions and perquisites over and above serving the best interests of BofA and its shareholders.

270.    Third, the BofA Director Defendants face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.   To defend the fiduciary claims, the BofA Director Defendants will be concerned to emphasize the extent of the due diligence performed on Merrill and the breadth and scope of their knowledge of Merrill's condition; yet that position will only tend to prove a key element of the Section 14(a) claims and breach of the duty of candor claims that they should have known the true facts about Merrill and disclosed them in the Proxy Statement.

271.    Fourth, the BofA Director Defendants are unable to objectively consider pursuing these claims because, among other reasons:

(a)    **Lewis** is a high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Indeed, The Corporate Library, an independent investment research firm, rated BofA as a "Very High Concern" as a result of Lewis's high pay of almost $30,000,000, and the SEC has written to the Company for clarifications in regard to executive compensation levels, including that of CEO Lewis.

(b)    **Gifford** is a recent, former, high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Moreover, Gifford has entered into a highly-paid consulting agreement with BofA that requires the Company not only to pay him a retainer, but also to pay for office space, support staff, and a private jet.  For 2008, the value of those benefits equaled the following: (i) $50,000 in consulting fees; (ii) $947,682 in aircraft usage (which was the amount paid to a third party vendor); and (iii) $225,031 in office and administrative support.  In addition, the Company paid Gifford a tax gross-up in the amount of $281,307 related to his use of Company-provided aircraft.  Moreover, Gifford also served as the Chairman and Chief Executive Officer of FleetBoston where he, as a member of the FleetBoston Board, approved his own and other executive rewards while FleetBoston was under investigation by regulators for improper trading activities that favored some investors

over others.  Gifford also was an executive at FleetBoston when FleetBoston, in the wake of its own trading scandal, was acquired by BofA.

(c)     **Bramble** served as a Chief Executive Officer of MBNA and when MBNA was acquired by BofA in 2006.  Bramble recently retired from Allfirst Financial Inc. after it was discovered that Allfirst lost $691.2 million in a foreign currency trading scandal, and returned to work only after lucrative offers from MBNA, which BofA continued on his behalf after it acquired MBNA.  In connection with the MBNA acquisition, Bramble received an opulent buyout package and a seat on the BofA Board.

(d)     BofA Directors **Barnet, Collins, Countryman, May, and Ryan,** were, like Director **Gifford**, members of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others.  When FleetBoston was acquired by BofA in April 2004, these defendants received lucrative buyouts and other compensation and were presented with seats on the BofA Board.

(e)     Each of the BofA Director Defendants has received compensation far in excess of an amount that would render them independent under accepted standards.  The NYSE listing standards, for example, provide that "[a] director who receives . . . more than $100,000 per year in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation[,] is not independent." Despite these standards, each of the directors received over $100,000 in stock awards alone in both 2006 and 2007.  Average compensation over the last two years for several directors has been egregiously disqualifying:  **Lewis** (over $25 million), **Gifford** ($1,616,990) **Spangler** ($576,646), **Ward** ($606,523), and **Massey** ($430,105).

(f)      At 16 directors, the BofA Board of Directors is large and unwieldy such that it can be and is dominated by **Lewis**, who serves as both the CEO and Chairman and has hand picked the majority of the BofA Board.  The Board's size contributes to the Company's being rated "High Governance Risk Assessment" by The Corporate Library, an independent investment research firm.

(g)      Six directors, **May, Ryan, Barnet, Collins, Countryman, and Gifford**, are designated as "Problem Directors" by The Corporate Library, in part due to their involvement with the FleetBoston Board of Directors, which approved substantial executive rewards even as FleetBoston was under regulatory investigations for multiple instances of improper activity.  Significantly, three of these "Problem Directors"—**May, Barnet, and Collins**—constitute a *majority* of the five-member Audit Committee, with **May** serving as its Chair.  Moreover, **Ryan** is Chair of Corporate Governance Committee.

(h)      Nine directors (more than half of the Board)—**Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward**—have no career experience in banking, investment banking, securities brokerage, or any other financial services industry.  Yet **Ward** (software) chairs the Asset Quality Committee; **Franks** (Army) serves on the Audit Committee, **Lozano** (publishing) serves on the Asset Quality Committee; **Massey** (college president) serves on the Audit Committee; **Mitchell** (media non-profit) serves on the Compensation and Benefits Committee and the Corporate Governance Committee; **Ryan** (pharmacy) chairs the Corporate Governance Committee and serves on the Compensation and Benefits Committee; **Sloan** (auto parts) is the "Lead Director," chairs the Executive Committee and the Compensation and Benefits Committee, and serves on the Corporate Governance Committee; **Spangler** (construction company) serves on the Compensation and

Benefits Committee and the Corporate Governance Committee; and **Tillman** (home improvement) serves on the Asset Quality Committee.  These directors rely heavily on the expertise and advice of other Board members who do have experience in banking or financial services and are not meaningfully independent of them with respect to BofA's acquisition of Merrill.  Moreover, the director compensation received by several of these directors—**Massey** (retired college president), **Franks** (retired Army officer), and **Mitchell** (media non-profit)—constituted a substantial portion of their annual earnings, making them dependent on BofA for their livelihood and further compromising their independence.

(i)     Three directors, **Gifford, Countryman, and May**, each serve as both a trustee of NSTAR, the energy utility company, and a member of the Board of Directors of CBS Corporation.  In addition, May is the Chairman and CEO of NSTAR.  These three directors therefore serve on interlocking Boards and are not meaningfully independent of one another.  In particular, Countryman and May are beholden to Gifford, an admittedly non-independent director, and will not act independently of his wishes.  Similarly, **Sloan and Tillman** serve together on the Board of Directors of Lowe's Companies, Inc. and are not meaningfully independent of one another.

(j)     There is a *100 percent overlap* among two supposedly separate and independent committees of the BofA Board – the Compensation and Benefits Committee and the Corporate Governance Committee.  These two committees comprise *exactly the same directors*: **Mitchell, Ryan, Sloan, and Spangler**.  These committees have no meaningful distinction from the full BofA Board and exist simply to ratify the positions of the full BofA Board, which is dominated by Lewis, Gifford, and the FleetBoston and MBNA nominees.

(k)    **Countryman, Ryan, Lozano, Franks, Gifford, Massey, Sloan, and Ward**
also served on the Boards of companies, other than BofA, that received a "D" rating by the
Corporate Library, including the following:

| | |
|---|---|
| Charles Gifford | CBS Corporation (CBS)<br>Chairman of the CBS Nomination Committee |
| Thomas Ryan | Yum! Brands (YUM)<br>On the Yum! Brands executive pay and nomination committees |
| Thomas Ryan | CVS Caremark Corporation (CVS)<br>Served as CVS CEO and Chairman |
| Walter Massey | McDonald's (MCD) |
| Jacquelyn Ward | Sanmina-SCI Corporation (SANM) |
| Jacquelyn Ward | WellPoint (WLP) |
| Monica Lozano | Walt Disney (DIS) |
| Tommy Franks | CEC Entertainment (CEC) |

(*l*)    **Gifford, Ward and Mitchell** were the beneficiaries of the full BofA Board's
decision to accelerate the vesting of stock options held by these defendants in order to avoid
recognizing the related expense.

(m)    **Ward** served on the boards of six public companies, three more than would
make her a disinterested and independent director under current standards.

(n)    The BofA Board farmed out its "Lead Director" position to **Sloan**, who is the
current Chairman and Chief Executive Officer of General Parts International, Inc., a North
Carolina-based distributor of automobile replacement parts.  Sloan cannot, and does not,
exercise any independent judgment or control as the Lead Director, as a member of the BofA
Board, as Chair of its Executive Committee, or as Chair of the Company's Compensation
and Benefits Committee.  Rather, he is dominated and controlled by Lewis, Gifford, and

their cohorts from the FleetBoston and MBNA acquisitions (Barnet, Bramble, Collins, Countryman, May, and Ryan).

(o)      Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis**, **Gifford**, **Countryman**, and **Sloan**, chaired by Sloan, whose experience lies in auto parts, not banking.

272.    Each of the BofA Director Defendants was a member of one or more committees of the BofA Board at various times during the relevant period and in connection with the Merger. As members of these Committees, these BofA Directors had specific oversight responsibilities for various aspects of BofA's operations, and each Committee was tasked with reporting back to the full Board.

273.    Each of the BofA Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's business units and capital position, and each of the BofA Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio of assets and business units: (a) **May (Chair), Barnet, Collins, Franks,** and **Massey** (Audit Committee); (b) **Ward (Chair),**

**Bramble, Lozano,** and **Tillman** (Asset Quality Committee); (c) **Sloan (Chair), Mitchell, Ryan,** and **Spangler** (Compensation and Benefits Committee); (d) **Ryan (Chair), Mitchell, Sloan,** and **Spangler** (Corporate Governance Committee); and (e) **Sloan (Chair) Countryman, Gifford,** and **Lewis** (Executive Committee). Each of these Committees did, in fact, actively direct and control the Company's affairs during the relevant period. In 2008, the full Board met 13 times, the Audit Committee met 10 times, the Asset Quality Committee met 6 times, the Compensation and Benefits Committee met 5 times, the Corporate Governance Committee met 4 times, and the Executive Committee met 6 times.

274. As members of the Audit Committee of the BofA Board, **May (Chair), Barnet, Collins, Franks,** and **Massey** had the ultimate responsibility at BofA for both "the effectiveness of the Corporation's system of internal controls" and "the compliance by the Corporation with legal and regulatory requirements." This mission was encapsulated in the following duties, among others:

- "*Review the scope and content of examinations of the Corporation performed by* the examination forces of the Federal Reserve Board, Comptroller of the Currency, and *other regulatory agencies and report their conclusions to the Board of Directors, including comments as to the suitability of necessary correction action taken, and to the response made to the regulators*";

- *Review with management, the Independent Registered Accounting Firm and the General Auditor any correspondence with regulators or government agencies* and any employee ("Whistleblower") complaints of published reports, *which raise significant issues regarding the Corporation's financial statements or accounting policies, procedures, or controls in accordance with the Committee's established procedures*";

- "Quarterly receive a report on *any significant deficiency or material weakness in the Corporation's internal controls* or any fraud involving an employee associated with internal controls";

- "Annually *review the Corporation's disclosure controls and procedures, including the Corporation's internal controls*"; and

- "Periodically *review with management and the Corporation's General Counsel the nature and status of significant legal matters*."

(All emphases added.)

275.    The BofA Audit Committee met 12 times during 2007.  The BofA Audit Committee met a similar number of times in 2008.  However, when it came time to consider one of the most important transactions in BofA's history, *viz.*, the acquisition of Merrill, the Audit Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

276.    As members of the Asset Quality Committee of the BofA Board, **Ward (Chair), Bramble, Lozano, and Tillman** had the ultimate responsibility at BofA for "oversight of credit risks to the company's assets and related earnings."  This mission was encapsulated in the following duties, among others:

- "*review the asset quality trends and performance* of the Corporation and its subsidiaries";

- "*monitor management's adherence to prudent and sound credit policies and practices*"

- "*review credit concentrations, credit risk inherent in selected products and businesses,* and country risk";

- "review the adequacy of the allowance for loan and lease losses and related written policies and procedures"; and

- "*approve credit risk policies and management disciplines* as required by the Basel II accord or other regulatory requirements."

(All emphases added.)

277.    The BofA Asset Quality Committee met six times during 2007.  the BofA Asset Quality Committee met a similar number of times in 2008.  However, with respect to the Merger, the Asset Quality Committee held no separate meetings and/or failed to ensure that the value of the

losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

278.    As members of the Compensation and Benefits Committee of the BofA Board, **Sloan (Chair), Mitchell, Ryan, and Spangler** had the ultimate responsibility at BofA for "overall guidance with respect to the establishment, maintenance and administration of Bank of America Corporation's compensation programs and employee benefit plans."  This mission was encapsulated in the following duties, among others:

- "Determine and approve the compensation, including salary, incentive compensation and equity based awards, for the Chief Executive Officer and Bank of America Corporation's other executive officers";

- "Review and discuss with management the Compensation Discussion and Analysis section of Bank of America Corporation's annual proxy statement and produce the compensation committee report for inclusion in Bank of America Corporation's annual proxy statement"; and

- "Periodically review and make recommendations to the Board as to the form and amount of compensation for Bank of America Corporation's directors."

279.    The BofA Compensation and Benefits Committee met five times during 2007.  the BofA Compensation and Benefits Committee met a similar number of times in 2008.  However, with respect to the Merger, the Compensation and Benefits Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

280.    As members of the Corporate Governance Committee of the BofA Board, **Ryan (Chair), Mitchell, Sloan, and Spangler** had the ultimate responsibility at BofA for "matters of

corporate governance (defined for this purpose as the relationship of the board, the stockholders and management in determining the direction and performance of the company)" and for "recommend[ing] the corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies applicable to the company." This mission was encapsulated in the following duties, among others:

- "solicit and review comments from all directors and report annually to the board with an assessment of the board's performance";

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval"

- "recommend appointments to board committees"; and

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval."

281.   The BofA Corporate Governance Committee met four times during 2007. the BofA Corporate Governance Committee met a similar number of times in 2008. However, with respect to the Merger, the Corporate Governance Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board. Thus, these individuals will take no action against Defendants.

282.   In addition, while BofA and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as

severance payments, stock grants, and stock awards as a result of their incompetent performance and deceptive activities.

283.    Each and every member of the Board of Directors held on to his or her position as a director and/or senior officer of the Company only because he or she was willing to violate his or her fiduciary duties or the federal securities laws and also sought to entrench themselves as a director for the reasons stated herein.  Specifically, where duty called for disclosure of Merrill's deteriorating condition in the fourth quarter of 2008, invocation of the MAC clause and/or renegotiation or termination of the Merger, and the disclosure of the BofA's communications with federal regulators on both these issues, the BofA Defendants, when told that faithfully discharging these duties would mean risking the loss of their positions at BofA by the actions of the Federal Reserve and/or the United States Treasury, willfully and knowingly abdicated these duties in favor of keeping their positions.

284.    The BofA Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of BofA or its shareholders.  The present Board of Directors of BofA has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including Lewis and Gifford are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the BofA Board are all personally named as defendants in the consolidated securities class action filed under this docket, which alleges that they committed fraud with respect to the merger.  This places Defendants in an irreconcilable conflict of interest regarding the prosecution of this action, and precludes them from exercising the independence necessary to make a good faith business judgment.

(f)     The members of the BofA Board, including each of the defendants herein, received substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of BofA.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(g)     The BofA directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

## V.      DUTIES OF THE BofA DEFENDANTS.

285.     By reason of their positions as officers, directors, and/or fiduciaries of BofA, and because of their ability to control the business and corporate affairs of the Company, the BofA Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, disclosure, oversight, and due care, and were and are required to use their utmost ability to control and manage BofA in a fair, just, honest and equitable manner.  The BofA Defendants were and are required to act in furtherance of the best interests of BofA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

286.     Each of the BofA Defendants had a duty to disclose fully and fairly to shareholders all material information within his or her control when seeking shareholder action such as a vote on whether or not to proceed with the Merger.  An item of information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote and/or that item would have assumed actual significance in the deliberations of a reasonable shareholder.

287.    Whenever directors or officers of a public corporation communicate with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith, and loyalty. The *sine qua non* of all such communications to shareholders is honesty.  Moreover, a fiduciary who learns that his or her earlier communications to his or her beneficiaries were false or misleading, and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements, also breaches his or her duty of loyalty and of full and fair disclosure.

288.    In addition to the duties of full disclosure imposed on the BofA Defendants as a result of their making affirmative statements and reports, each of these defendants had a duty to disseminate truthful information promptly that would be material to a reasonable investor in compliance with the integrated disclosure provisions of the SEC regulatory regime, including accurate and truthful information with respect to BofA's business, so that the market prices of the Company's public traded securities would be based on accurate, truthful, and complete information.

289.    Each director and officer of BofA owes to the Company and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the BofA Defendants had a duty to promptly disseminate accurate and truthful information with regard to their company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

290.    The BofA Defendants, because of their positions of control and authority as directors and/or officers of BofA, were able to, and did, exercise control over the wrongful acts

complained of herein and over the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the BofA Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the Company.

291.    To discharge their duties, the officers and directors of BofA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, these individuals were required to, among other things:

(i)    refrain from acting in any manner so as to favor the personal interest of the directors or officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    disclose all information to shareholders concerning Merrill or the impact of the Merrill Merger on BofA fully and fairly as that information became available, both before and after the Shareholder Vote on the Merger;

(iv)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(v)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an

adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(vi)     remain informed as to how the Company conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(vii)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(viii)   ensure that no inaccurate financial information about the Company was released to the public that would tend to artificially inflate the Company's stock price, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(ix)     ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company.

292.    Each of the BofA Defendants, by virtue of his or her position as a director and/or officer of BofA, owed the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the BofA Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

293.    In addition, the BofA Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, this required these defendants to:   (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

294.    The BofA Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.   The conduct of the BofA Officer Defendants was ratified by the BofA Director Defendants during the relevant period.

295.    The BofA Defendants also had specific duties imposed on them by the Company.

296.    BofA adopted "Corporate Governance Guidelines" in 2007 to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.   Among other things, the Corporate Governance Guidelines provided that the BofA Director Defendants had "complete and open access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Secretary or directly by the director." The Guidelines stressed:

> Bank of America's goal in everything we do is reaching for higher
> standards - for our customers, our shareholders, our associates and

our communities, upon which the future prosperity of our company rests. These Guidelines reflect the way we are striving for higher standards in corporate governance.

297.    BofA also had a "Code of Ethics" applicable to the entire Company, including

Defendants, which states in part:

### 1.2 Accounting

To ensure the integrity of its consolidated financial statements, Bank of America has established internal accounting and operating controls and procedures, including disclosure controls and procedures, and a Disclosure Committee.

All associates responsible for the preparation of the corporation's financial statements, or who provide information as part of that process, must maintain and adhere to these controls so that all underlying transactions, both within Bank of America and with third parties, are properly documented, recorded and reported.

In addition, all associates have the responsibility to promote full, fair, accurate, timely and understandable disclosure in reports and documents that Bank of America files with or submits to the Securities and Exchange Commission and in other public communications made by the corporation.

\*        \*        \*

Section 6: Compliance with Law

You must not take any action, either personally or on behalf of Bank of America, which violates any law, regulation or internal policy affecting Bank of America business.

\*        \*        \*

### 7.1 Restrictions on trading in Bank of America securities

You must not buy, sell, recommend or trade in Bank of America securities--either personally or on behalf of someone else--while in possession of material, nonpublic information relating to the corporation, except through trading programs pre-approved by the Legal Department. In addition, you must not communicate or disclose such information to others who may trade in Bank of America securities. Doing so may not only be a violation of your duty to keep

such information confidential, but also may be a violation of federal and state laws, and the laws of many countries.

If you are a Bank of America Corporation director or have been designated as an "insider" by the corporation, you must obtain special approvals before trading in Bank of America securities.

298.   In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.  These duties are highlighted *supra*.

## VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

299.   At all relevant times, as a result of their membership on the Board of Directors, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, each of the BofA Defendants had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.  Similar access was enjoyed by the Merrill Defendants with respect to Merrill's internal affairs.  Moreover, after the Merger was announced, the BofA Director Defendants had complete access to similar information concerning Merrill.

300.   At all relevant times, the BofA Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) preserve and enhance the BofA Defendants' directorial and managerial positions at BofA, as well as the power and prestige accruing to the BofA Defendants as a result of holding those positions; (b) transfer exorbitant unearned and wasteful sums of money to themselves; (c) deceive the investing public, including BofA's own shareholders, as to the Merrill Defendants' management of Merrill's operations, the company's financial health, stability, the accuracy and integrity of its accounting policies and other internal

controls, and its business prospects; and (d) purchase Merrill for BofA without adequate due diligence, and through the mechanism of a false and misleading Proxy Statement.

301.     In committing the wrongful acts alleged herein, the BofA Defendants, the Merrill Defendants, and the Advisor Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the BofA Defendants and the Merrill Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.  The Merrill Defendants aided and abetted the BofA Defendants in their breaches of duty with respect to the Merger and their filing of a false and misleading Proxy Statement.

302.     At all relevant times, each of the BofA Defendants was the agent of each of the other BofA Defendants, and was at all times acting within the course and scope of such agency.  At all relevant times, the BofA Director Defendants, the Merrill Defendants, and the Advisor Defendants was the agent of each of the others, and was at all times acting within the course and scope of such agency.

303.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

304.     The Merrill Defendants engaged in a conspiracy, common enterprise and/or common course of conduct to make improper statements about Merrill's financial performance, and its future business prospects, and to breach their duty of complete candor in the context of the

Shareholder Vote on the Merrill acquisition.  The BofA Defendants and the Advisor Defendants joined in and supported the Merrill Defendants' conspiracy and common enterprise with respect to the Merger.

305.    The purpose and effect of the BofA Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the BofA Defendants' violations of federal and state law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of BofA common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## VII.    DERIVATIVE ALLEGATIONS.

306.    Plaintiffs bring their "derivative" claims derivatively in the right and for the benefit of BofA to redress injuries suffered by it as a direct result of the breaches of fiduciary duty, dissemination of a false and misleading Proxy Statement, and other wrongs committed by the BofA Defendants.  BofA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

307.    Plaintiffs will adequately and fairly represent the interests of BofA in enforcing and prosecuting its rights.

308.    Plaintiffs were holders of BofA common stock during the wrongs complained of and remain so now.

309.    Prosecution of this action, independent of the BofA Board, is in the best interests of BofA.

## VIII.   CLASS ACTION ALLEGATIONS.

310.    Plaintiffs' "direct" claims are brought as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other persons who owned shares of BofA common stock as of October 10, 2008, the record date for the vote on approval of the proposed Merger, and were damaged thereby.  Excluded from the Class are the Defendants, affiliates of the Defendants, and the immediate family members of the Individual Defendants.

311.    The direct claims are properly maintainable as class claims for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2008, BofA had outstanding 5,017,579,321 shares of its common stock, held by individuals and institutions too numerous to bring separate actions.  Moreover, it is reasonable to assume that holders of BofA common stock are geographically dispersed throughout the United States and the world.

(b)    Plaintiffs will fairly and adequately protect the interests of the members of the Class, inasmuch as they are members of the Class and their claims are typical of the claims of all Class members.  Plaintiffs have retained competent counsel experienced in securities class action litigation.  Plaintiffs' interests are to obtain appropriate relief for themselves and for the Class for the harms arising out of the misconduct set forth herein.

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include:

(i)    Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning

Merrill's deteriorating condition in the fourth quarter of 2008 and the impact it would have on BofA;

(ii)     Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning their determination that BofA was entitled to invoke the MAC clause to terminate the Merrill Merger, Messrs. Paulson and Bernanke's efforts to persuade them not to invoke the MAC clause, and their decision to accede to those demands;; and

(iii)    Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning BofA's need for, seeking of, and obtaining of, $20 billion in additional federal assistance to complete the Merrill acquisition, coupled with over $100 billion in federal "backstop" guarantees in connection with that transaction.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' direct claims.  It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims.  In addition, the bringing of separate actions would put a substantial and unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

(e)     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them.  No unusual difficulties are likely to be encountered in the management of the class claims.

(f)     The BofA Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

(g)     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the BofA Defendants, and/or adjudications which as a practical matter might be dispositive of the interests of other members of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**Derivatively Against the BofA Defendants for Breach of Fiduciary Duty**

312.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

313.   The BofA Defendants owed and owe BofA fiduciary obligations.  By reason of their fiduciary relationships, the BofA Officer Defendants and the BofA Director Defendants owed and owe BofA the highest obligation of good faith, fair dealing, loyalty, candor, oversight, and due care.

314.   The BofA Defendants, and each of them, breached their duties to BofA and its shareholders by, among other things:  (a) agreeing to acquire Merrill after only 10 hours of due diligence, based on incomplete information and insufficient analysis; (b) agreeing to pay tens of billions of dollars in valuable BofA common stock for Merrill, at a time when Merrill was in a liquidity turmoil, faced imminent bankruptcy filing, and could otherwise have been acquired for mere "pennies" on the dollar; (c) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from

Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; (d) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives; and (e) failing to invoke the MAC clause or otherwise terminate or renegotiate the Merger even though they knew and had determined that it was in BofA's best interests to do so.  Such conduct was not, and could not have been, the result of rational business judgment, but rather constituted a pattern of bad faith and disloyalty to BofA and its shareholders.

315.    As a direct and proximate result of the BofA Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the BofA Defendants is liable to the Company.

## COUNT II

### Derivatively Against the Advisor Defendants for Breach of Fiduciary Duty

316.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

317.    Each of the Advisor Defendants owed BofA and its shareholders the duty to perform due diligence necessary to accurately and reliably determine whether the terms of the proposed Merger and exchange ratio were fair from a financial point of view to BofA and continued to be fair.

318.    The Advisor Defendants issued so-called "fairness" opinions, or otherwise counseled BofA as to the fairness of the proposed Merger, advising BofA that the Merger and exchange ratio were fair to BofA from a financial point of view.

319.    The Advisor Defendants failed to perform the due diligence necessary under the circumstances.  The "fairness" opinions or other advice to BofA therefore had no reasonable basis in

fact, were false and misleading, and breached the Advisor Defendants' duties to BofA and its shareholders.

320.     As a direct and proximate result of the Advisor Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT III

### Derivatively Against the Advisor Defendants for Professional Negligence

321.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

322.     As set forth herein, the Advisor Defendants, in issuing their "fairness" opinions or otherwise advising BofA on the fairness of the proposed Merger. failed to exercise the care that a professional employed to render such advice to BofA reasonably would have employed in the circumstances.

323.     The "fairness" opinions or other advice to BofA of the Advisor Defendants therefore had no reasonable basis in fact, were false and misleading, and constituted professional negligence on the part of the Advisor Defendants.

324.     As a direct and proximate result of the Advisor Defendants' firm' negligence, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT IV

### Derivatively Against the BofA Officer Defendants, Montag,
### and Kraus for Unjust Enrichment and Return of Unearned Compensation

325.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

326.    The BofA Officer Defendants were eligible for incentive compensation premised upon their achievement of BofA's business and financial goals in a legitimate and lawful manner. Each of the BofA Officer Defendants received substantial incentive compensation payments.

327.    By reason of their positions as officers of BofA, the BofA Officer Defendants owed fiduciary duties to the Company and its shareholders in connection with the operation, management, and direction of the Company.

328.    Defendants Montag and Kraus were eligible for incentive compensation premised upon their achievement of Merrill's business and financial goals in a legitimate and lawful manner. Each of these Defendants received substantial incentive compensation payments.

329.    By reason of their positions as officers of Merrill, Defendants Montag and Kraus owed fiduciary duties to Merrill in connection with the operation, management, and direction of Merrill.

330.    The BofA Officer Defendants failed to achieve BofA's business and financial goals except in an illegitimate and unlawful manner.  Accordingly, the compensation payments to the BofA Officer Defendants were not properly awarded for the work performed and results achieved. Since these defendants did not obtain the business results expected, they have been unjustly enriched and must return to the Company the incentive compensation that was awarded to them.

331.    Defendants Montag and Kraus failed to achieve Merrill's business and financial goals except in an illegitimate and unlawful manner.  Accordingly, the compensation payments to these Defendants were not properly awarded for the work performed and results achieved.  Since these Defendants did not obtain the business results expected, they have been unjustly enriched and must return to the BofA, Merrill's new parent, the incentive compensation that was awarded to them.

## COUNT V

### Derivatively Against the BofA Defendants for Contribution

332.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333.     The conduct of the BofA Defendants has exposed BofA to significant liability under various federal and state laws.

334.     By reason of the foregoing, the BofA Defendants have caused BofA to suffer substantial harm.

335.     If BofA is held liable under federal or state laws for damages, civil penalties, restitution, or other relief, the BofA Defendants are liable to BofA for contribution.

## COUNT VI

### Derivatively Against the BofA Defendants for
### Breach of the Duties of Full Disclosure and Complete Candor

336.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

337.     The BofA Defendants, and each of them, violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

338.     As a direct and proximate result of the BofA Defendants' breaches of their duties of full disclosure and complete candor, BofA sustained significant damages arising out of the material misstatements to shareholders, and the BofA Defendants are liable to the Company.

## COUNT VII

**Derivatively Against the Merrill Defendants and the Advisor Defendants for Aiding and Abetting the BofA Defendants' Breach of Fiduciary Duties**

339.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

340.     The BofA Defendants owed BofA fiduciary obligations.  By reason of their fiduciary relationships, the BofA Defendants owed BofA the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.  That the BofA Defendants owed these duties to BofA was well known to the Merrill Defendants and the Advisor Defendants.

341.     As is detailed in the preceding paragraphs, the BofA Defendants have breached their fiduciary duties to BofA.

342.     The Merrill Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.  The Merrill Defendants actively and knowingly induced the BofA Director Defendants to breach their fiduciary duties by offering a Merger transaction to BofA which would cause BofA to indemnify the Merrill Defendants and to assume billions of dollars in undisclosed losses and liabilities, to the detriment of BofA and its shareholders.

343.     Moreover, the Merrill Defendants concealed the fact of Merrill's growing losses and liabilities from the BofA Defendants and actively worked to prevent them from discovering the true facts.  Among other things, the Merrill Defendants convinced the BofA Defendants that Merrill's growing losses were "market related" and "in line" with other Wall Street firms, and they told the BofA Director Defendants that Merrill's exposure was the result of "legacy" trading positions and

not new positions that had been put on by defendant Montag since the deal was announced on September 15, 2008.

344.     The Advisor Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.  The Advisor Defendants knew that the BofA Defendants were breaching their fiduciary duties to BofA by issuing false and misleading statements in the Proxy Statement and otherwise in connection with the Merger, and the Advisor Defendants gave substantial assistance to the BofA Defendants by permitting their name and their "fairness" opinions to be used as indications of the fairness of the Merger to BofA.  FPK and J.C. Flowers received $20 million for their services to BofA.

345.     BofA was harmed as a direct and foreseeable consequence of these Defendants' misconduct.  As a result of the misconduct alleged herein, each of these Defendants is liable to BofA.

## COUNT VIII

### Derivatively Against the BofA Defendants,
### the Merrill Defendants, and the Advisor Defendants
### for Violation of Section 14(a) of the Exchange Act and Rule 14a-9

346.     This claim for relief, Count VIII, is not based on any allegations of knowing or reckless conduct by any defendant.  This claim does not allege, and does not sound in, fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

347.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this tile [15 U.S.C. § 78l]."

349.    SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

350.    In the Proxy Statement, Plaintiff and all other BofA shareholders were solicited to vote to approve the Merger between BofA and Merrill.  A shareholder vote was required to approve this proposal.  Thus, the Proxy Statement was an essential causal link in the accomplishment of this proposal.

351.    The BofA Defendants, the Merrill Defendants, and the Advisor Defendants provided information which was contained in the Proxy Statement, allowed their names to be used in connection with the Proxy Statement and the solicitation of shareholder votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Statement, would have a continuing material relationship with BofA following the vote on the Merger and other issues presented in the Proxy Statement, solicited votes under the Proxy Statement, and caused the Proxy Statement to be disseminated to BofA's shareholders through the use of the United States mails and the means and instrumentalities of interstate commerce.

352.     The BofA Defendants, the Merrill Defendants, and the Advisor Defendants solicited proxies from the Plaintiff and other BofA shareholders by means of a proxy statement which contained false and misleading statements concerning the Merger, its benefits to shareholders, and other issues, and which omitted to state material facts that were necessary to make the statement contained therein not false and misleading.

353.     The Proxy Statement dated October 31, 2008, jointly issued by BofA and Merrill, and the supplemental filings and disseminations made by the defendants named herein in advance of the Shareholder Vote on the Merger on December 5, 2008, were false and misleading in light of the true financial condition of Merrill, and the combined BofA/Merrill, including in particular the existence of substantial losses that were first disclosed only on January 16, 2009, long after the Merger had closed.  These defendants in the exercise of reasonable care should have known the truth about Merrill's deteriorating financial condition and the existence of the losses by at least December 5, 2009, but failed to disclose such information, by supplementing the Proxy Statement or otherwise, before shareholders voted.

354.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood that a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Proxy Statement or a material part of the mix of information available to shareholders in deciding how to exercise their voting rights.  Thus, shareholders were denied the opportunity to make an informed decision in voting on the Merger.

355.     None of the materially false and misleading statements contained in the Proxy Statement, or material facts omitted therefrom, were known to Plaintiff or other BofA shareholders when they voted on the matters presented to them in the Proxy Statement on December 5, 2008.

356.     BofA was harmed and suffered damages as a result of the Merger which was approved through the use of a proxy statement in violation of Section 14(a) and Rule 14a-9.

## COUNT IX

### Directly Against the BofA Defendants for
### Breach of the Duties of Full Disclosure and Complete Candor

357.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

358.     The BofA Defendants violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

359.     As a direct and proximate result of these Defendants' breaches of their duties of full disclosure and complete candor, Plaintiffs and the Class were deprived of their right to cast an informed vote at the Shareholder Vote on the Merger on December 5, 2008.

360.     Plaintiffs and the Class have sustained significant damages arising out of the defects in the Proxy Statement which deprived them of the opportunity to cast an informed vote.  These damages, which are separate from the damages to BofA from similar acts misconduct which harmed BofA, include the amounts which BofA spent to negotiate the transaction and prepare the Proxy Statement, including $20 million in fees to the Advisor Defendants, over $100 million in fees to the Wachtell law firm, and tens of millions of dollars in printing and disseminating the Proxy Statement, tallying votes, and otherwise implementing the solicitation of shareholders.  Through the BofA

Defendants' breaches of the duty of candor, Plaintiffs and the Class were deprived of the value of the honest services of the parties providing those services.

361.    The BofA Defendants are liable to Plaintiffs and the Class for these damages.

## REQUEST FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.    Against all the BofA Defendants and the Advisor Defendants and in favor of BofA for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, unjust enrichment, professional negligence, aiding and abetting breach of fiduciary duties, contribution, and violations of the federal securities laws;

B.    Against all of the BofA Defendants and in favor of the Class for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, including the duty of full disclosure and complete candor.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the BofA Defendants' assets until BofA can recoup all of the monies improperly transferred to the BofA Defendants;

D.    Declaring that the BofA Defendants' improper payments to themselves through BofA's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers—as well as any assets or property acquired with such payments— be held in constructive trust for the benefit of BofA;

E.    Awarding to BofA restitution from the BofA Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other monies obtained by the BofA Defendants;

F.      Directing BofA to take all necessary actions to reform and improve its corporate governance and internal procedures, so as to comply with applicable laws and to protect BofA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

(i)     strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)    controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

(iii)   permitting shareholders to nominate at least three additional candidates for election to the Board; and

(iv)    appropriately testing and then strengthening the internal audit and control functions demanded herein;

G.      Directing BofA to take all necessary actions to reform and improve their corporate governance and internal procedures regarding acquisitions, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following actions and policies:

(i)     providing that all material information concerning any mergers or acquisitions, including any such information calling into question the appropriateness

of proceeding with any such transaction, will be communicated to shareholders as soon as it is received, regardless of whether a shareholder vote has been completed;

(ii)      providing that no merger or other acquisition can be approved by the Board of Directors for recommendation to shareholders until the earlier of (x) the passage of five business days from the first communication of a potential transaction made to or received from a potential merger or acquisition partner, or (y) the Board's receipt of an opinion of outside, independent legal counsel, specifically retained for that purpose, that, in the circumstances presented, the time and scope of the due diligence performed by the Company and presented to the Board was adequate to make an informed decision to recommend approval of the transaction;

(iii)      providing that, with respect to any substantial merger or acquisition, an outside, independent legal counsel, specifically retained for that purpose, be appointed to represent shareholders to monitor the progress of the transaction from the date of recommendation of shareholder approval by the Board to the closing date; and

(iv)      terminating the employment of Lewis for cause and without the normal benefits of "severance" or "retirement" applicable to a "for good reason" resignation or a "without cause" termination.

H.      Requiring the BofA Defendants to remit to BofA all of the salaries, fees, bonuses, stock awards, and other compensation received for 2008;

I.      Requiring the BofA Director Defendants to take all necessary steps for restitution of all bonuses paid by Montag and Kraus in December 2008;

J.      Requiring the Advisor Defendants to remit to BofA all the fees paid to them for the "fairness" opinion and work performed in connection therewith;

K.      A judgment declaring the Proxy Statement to be materially false and misleading in violation of Section 14(a) of the Exchange Act;

L.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

M.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  October 9, 2009

LAW OFFICES OF CURTIS V. TRINKO, LLP

By:_____
Curtis V. Trinko
ctrinko@trinko.com
Kinny Wai Chan
Kchan@trinko.com
16 West 46th Street, 7th Floor
New York, New York 10036
Telephone: (212) 490-9550
Fax: (212) 986-0158

*Interim Liaison Counsel for Plaintiffs the Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System*

KAHN SWICK & FOTI LLC

Lewis S. Kahn
*lewis.kahn@ksfcounsel.com*
Michael A. Swick (a member of the bar of this Court)
*michael.swick@ksfcounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@ksfcounsel.com*
Kevin Oufnac
*kevin.oufnac@ksfcounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax:  (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Fax:  (504) 455-1498

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*the Louisiana Municipal Police Employees*
*Retirement System*

-and-

SAXENA WHITE P.A.

Maya Saxena
*msaxena@saxenawhite.com*
Joseph E. White, III
*jwhite@saxenawhite.com*
Christopher S. Jones (a member of the bar of this
Court)
*cjones@saxenawhite.com*
Lester R. Hooker
*lhooker@saxenawhite.com*
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone:  (561) 394-3399
Facsimile:  (561) 394-3082

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*Hollywood Police Officers' Retirement System*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MD 2058 (DC) |
| This document relates to: All Derivative Actions | Related File No. 09 CV 808 (DC) |

**CONSOLIDATED SHAREHOLDER**
**DERIVATIVE AND CLASS ACTION COMPLAINT**
**FOR BREACH OF FIDUCIARY DUTIES, AIDING AND**
**ABETTING,  UNJUST ENRICHMENT, CONTRIBUTION, AND**
**VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT**

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................1

JURISDICTION AND VENUE...........................................................................21

THE PARTIES................................................................................................22

    Plaintiffs................................................................................................22

    Nominal Defendant ...............................................................................22

    The BofA Defendants...........................................................................23

    The Merrill Defendants ........................................................................30

    The Advisor Defendants........................................................................33

    Other Related Persons not Named as Defendants ...................................33

    Definitions of Groups............................................................................35

I.      IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND
        GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND
        CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."................35

      A.     In Breach of their Duties of Loyalty and Good Faith, the BofA
              Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that
              it is Essentially Worthless in the Absence of Any Deal, and to Secretly
              Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of
              Actual Performance............................................................................36

      B.     The BofA Defendants, Aided and Abetted by the Merrill Defendants
              and the Advisor Defendants, Conduct A Designedly Cursory "Due
              Diligence" of Merrill, in Further Gross Breach of Their Duties of
              Loyalty and Good Faith to BofA.........................................................38

      C.     The BofA Defendants, Aided and Abetted by the Merrill Defendants
              and the Advisor Defendants, Secretly Approve $5.8 Billion in
              Unwarranted Bonuses for Merrill Executives as Part of the Merger
              and Secretly Cause these Bonuses to be Paid on an Accelerated Basis
              *Before* the Merger Closes......................................................................45

      D.     In Violation of Their Duties of Candor, Good Faith, and Loyalty, the
              BofA Defendants, Aided and Abetted by the Merrill Defendants and
              the Advisor Defendants, Cause BofA to Issue a Proxy Statement That
              Conceals Crucial Facts About Losses at Merrill and the Bonuses to be

Paid to Merrill Executives and is Otherwise Materially False and Misleading..................................................................................46

1.    The Proxy Statement Falsely Omits Information Concerning Bonuses, For Which the BofA Defendants Later Try to Deflect Blame onto BofA's External and Internal Legal Counsel...............................................47

2.    The Proxy Statement Falsely Describes Losses and Liabilities of Merrill. ........................................................50

3.    The Proxy Statement Falsely Sets Forth "Fairness" Opinions by the Advisor Defendants............................54

4.    The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger...............................58

5.    The Proxy Statement Falsely States that Merrill Executives Will Not Receive Discretionary Bonuses for 2008 and Conceals the Fact that Defendants Had Agreed to Guarantee $5.8 Billion in Bonuses to Merrill Executives and Accelerate the Payment Thereof to December 2008, Before the Merger Was Set to Close. .............59

6.    The Proxy Statement Falsely Recommends Approval of he Merger...................................................................62

E.    The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity...........................................63

F.    BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants. ...........................................................................70

G.    The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact.................................................70

H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders...........................................................75

I.       Liability of BofA Defendants for the Above Misconduct. ..................................79

J.       In an Act of Corporate Waste, and in Further Breach of Their Duties of Loyalty and Good Faith, the BofA Defendants Secretly Allow the Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before the Merger Closes ................................................................................................83

II.    THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH. ..........89

A.       False and Misleading Statements and Omissions in the Proxy Statement. ............................................................................................89

B.       False and Misleading Supplementary Statements..................................94

C.       False and Misleading Proxy *Supplements* ...............................................96

III.   AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET CAPITALIZATION IS PUNISHED, DEFENDANTS ARE INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS, AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY WITH THE COST OF SEC PENALTIES. ....................................................97

A.       The Truth Emerges Concerning Merrill's Devastation and Defendants' Wrongdoing..................................................................................97

B.       The SEC, FBI, DOJ, New York Attorney General, and Congress Conduct Investigations of Defendants...............................102

IV.   THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF INTEREST AND CIRCUMSTANCES GIVING RISE TO A SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS CREATING A REASONABLE DOUBT THAT THE BOARD COULD IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE. ...........................106

V.    DUTIES OF THE BofA DEFENDANTS. .......................................................120

VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ........126

VII.  DERIVATIVE ALLEGATIONS..........................................................................128

VIII. CLASS ACTION ALLEGATIONS. ...................................................................129

**CLAIMS FOR RELIEF**..................................................................................**131**

    **COUNT I:  Derivatively Against the BofA Defendants for Breach of
Fiduciary Duty**.................................................................................**131**

    **COUNT II:  Derivatively Against the Advisor Defendants for Breach of
Fiduciary Duty**.................................................................................**132**

    **COUNT III:  Derivatively Against the Advisor Defendants for Professional
Negligence**.......................................................................................**133**

    **COUNT IV:  Derivatively Against the BofA Officer Defendants, Montag, and
Kraus for Unjust Enrichment and Return of Unearned Compensation**..................**133**

    **COUNT V:  Derivatively Against the BofA Defendants for Contribution**..............**135**

    **COUNT VI:  Derivatively Against the BofA Defendants for Breach of the
Duties of Full Disclosure and Complete Candor**.........................................**135**

    **COUNT VII:  Derivatively Against the Merrill Defendants and the Advisor
Defendants for Aiding and Abetting the BofA Defendants' Breach of
Fiduciary Duties**..............................................................................**136**

    **COUNT VIII:  Derivatively Against the BofA Defendants, the Merrill
Defendants, and the Advisor Defendants for Violation of Section 14(a) of the
Exchange Act and Rule 14a-9**..............................................................**137**

    **COUNT IX:  Directly Against the BofA Defendants for Breach of the Duties
of Full Disclosure and Complete Candor**.................................................**140**

**REQUEST FOR RELIEF**...............................................................................**141**

**JURY DEMAND**.........................................................................................**144**

Plaintiffs Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System (collectively, "Plaintiffs") bring this action derivatively on behalf of nominal defendant Bank of America Corporation ("BofA" or the "Company"), and directly on behalf of a Class of BofA shareholders (as defined herein), against certain directors and officers of BofA named herein (the "BofA Defendants") and other defendants (collectively, "Defendants"). Plaintiffs base their allegations on actual knowledge as to their own acts and on information and belief as to all other allegations after due investigation.

## NATURE AND SUMMARY OF THE ACTION

1.      This action arises from Defendants' wrongdoing in causing BofA to acquire Merrill Lynch & Co., Inc. ("Merrill") in a $50-billion merger transaction (the "Merger") agreed to on September 14, 2008, approved by BofA shareholders on December 5, 2008 (the "Shareholder Vote"), and consummated on January 1, 2009 (the "Closing"). The BofA Defendants recklessly and in bad faith caused the Company to commit to paying $50 billion for a company that was in the grips of a liquidity crisis placing it only days or, at most, weeks away from insolvency, and they did so in the course of only *a single day* (from the afternoon of Saturday, September 13, 2008 to the afternoon of Sunday, September 14, 2008).

2.      Bad faith, deliberate or reckless misconduct, and even outright disloyalty suffused the entire process by which the Merrill Merger was agreed to, presented to BofA's shareholders for approval, and consummated. Such wrongdoing was engaged in not only by the BofA Defendants, but also by other wrongdoers who either were bound by similar fiduciary duties to the Company and its shareholders, had similar obligations under the federal securities laws, or otherwise aided and abetted the BofA Defendants in their misconduct. These include officers and directors of Merrill

(sued herein as the Merrill Defendants), and BofA's investment bankers on the Merrill Merger (sued herein as the Advisor Defendants).

3.    The Merger was *agreed to*, with the unanimous approval of both companies' Boards of Directors, through a breach of the BofA Defendants' fiduciary duties (including the duties of loyalty, candor, and good faith), aided and abetted by the Company's investment bankers, as well as the officers and directors of Merrill, both named as defendants herein.  Indeed, the Merger Agreement was executed based on an entirely perfunctory "due diligence" process that lasted only *10 hours* and was purposefully designed to give a green light to the Merger, and based on "fairness opinions" from the Company's investment bankers which, too, were merely post hoc rationalizations of a foreordained decision and which, in fact, deliberately disregarded Merrill's most recent financial projections and the impact of liquidity crises at other Wall Street firms—even though Merrill's viability was directly linked to the liquidity of those firms and even though those firms were themselves paying BofA's investment bankers for advice at the very same point in time.  Officials at the Board of Governors of the Federal Reserve System (the "Federal Reserve" or the "Fed") have concluded that the BofA Defendants' due diligence was inadequate, and that the BofA Defendants knew it at the time.

4.    The Merger was *approved* by BofA's shareholders based on a false and misleading proxy statement (the "Proxy Statement") issued by the Board of Directors of BofA and other defendants, in violation of Section 14(a) of the Securities Exchange Act of 1934 and in breach of the duties of candor, loyalty, and good faith owed to the shareholders.  These defendants, acting recklessly, in bad faith, and in conscious or reckless disregard of their duties, caused BofA to issue a Proxy Statement that was materially false and misleading in that, among other things, it:

- overvalued Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders;

- omitted the known fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value;

- omitted that the "fairness" opinions were based on incomplete information and were not actual opinions as to the Merger's fairness at all, but rather post hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action;

- misrepresented that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time;

- misrepresented that BofA would need no more than $25 million in financial assistance (which already had been received) to complete the Merger; and

- misrepresented Merrill's ability and intention to pay up to $5.8 billion in discretionary bonuses for 2008, before the Merger closed.

5.      The Proxy Statement not only was false and misleading when it was issued on October 16, 2008, but also was false and misleading by virtue of the fact that, while it was still effective and until the Shareholder Vote on December 5, 2008, Defendants deliberately, disloyally, and in bad faith took steps to assure that it was never corrected, amended, or updated to disclose the following highly material information:

- the fact that billions of dollars in additional losses were being incurred by Merrill in the fourth quarter of 2008, that these losses were accelerating, and that the losses reached approximately *$14 billion* two days before the Shareholder Vote;

- the fact that Merrill's financial results and losses on principal transactions during the fourth quarter of 2008 were sufficient, in the opinion of BofA's inside and outside legal counsel, to trigger the termination of the Merger due to the occurrence of a "material adverse event" pursuant to the merger agreement;

- the fact that BofA's Board of Directors had, in fact, decided to declare a "material adverse event" and terminate the Merger, but then quickly recanted

their decision once faced with perceived pressures by government officials to remove them from their jobs if BofA was caused to back out of the deal; and

- the fact that BofA had sought and obtained $20 billion in direct aid (coupled with over $118 billion in "backstop" guarantees) from the federal government to allow it to complete the Merger, and that the Company would not have been able to do so without such assistance.

6.     The Merger was **consummated** through further gross breaches of fiduciary duty (including the duties of loyalty, candor, and good faith) by the BofA Defendants, aided and abetted by other defendants.  Based on the cascading losses at Merrill and advised by legal counsel, BofA's Board of Directors determined in mid-December 2008 to terminate the Merger on the basis of the fact that Merrill had suffered a "material adverse event" allowing BofA to rescind the merger agreement pursuant to its terms.  However, in bad-faith disregard of their duty to act in the best interests of the Company by then acting on that decision, the BofA Directors immediately and loudly rescinded it and recklessly failed to pursue any alternatives, such as renegotiating the timing or price of the Merger using the "material adverse event" clause of the merger agreement (referred to herein as the "MAC clause") as leverage, consciously electing thereby to place their own  personal financial interests above the Company's.  Specifically, in mid-December 2008, the Board was informed (through Defendant Kenneth D. Lewis, Chief Executive Officer and Board Chairman) that Secretary of the Treasury Henry Paulson wished the Merger to be consummated regardless of Merrill's condition, and also that Mr. Paulson was threatening to try to have the entire Board removed from office if they did not comply.  However, rather than abide by their decision and face the consequences (or even resign in protest), the BofA Board members instead instantly retracted their

decision, causing Mr. Paulson to be notified of their decision even before the Board as a whole had been canvassed.[1]

7.      Having thus committed a textbook example of disloyalty, the BofA Defendants then compounded their wrongdoing by hiding from shareholders both the Board's "material adverse event" determination and its decision to reverse it under perceived pressure from Mr. Paulson—and even the fact that the Company had sought and obtained over $138 billion in direct aid and other assistance from the federal government solely to enable it to consummate the Merger.   To the contrary, the BofA Defendants expressly treated **withholding such information** as one of the key **goals** of the process by which the Merger was consummated.   These acts and omissions constituted further deliberate breaches of the BofA Defendants' fiduciary duties of loyalty and good faith, amounting to a vain attempt to "cover up" their own acts of wrongdoing, which were highly material to shareholders.

---

[1] In so doing, the BofA Board gave no consideration to the dubiousness of Mr. Paulson's threat—or to ways in which the MAC clause could have been used to BofA's advantage short of actually rescinding the Merger.   One senior Wall Street executive, upon learning of the Board's, was incredulous, telling an *Atlantic* reporter, "There is no question what I would have done if I were in his shoes . . . . "***I would have told [Bernanke and Paulson] I was calling the MAC, was releasing the decision publicly, and dared them to fire me and the board—and that never would have happened, trust me***."   Similarly, a former Merrill executive, who was involved in Merger, told the *Atlantic* reporter: "He could have used the MAC clause a pretext to renegotiate the deal. . . .  "That would have been a prudent thing to do."

**After a Designedly Perfunctory "Due Diligence" Review, Defendants Violate Their
Duties of Good Faith and Loyalty to BofA by Agreeing to Pay $50 Billion for a Virtually
Bankrupt Company, While *Guaranteeing* $6 Billion in Bonuses to Company Executives**

8.       By the late summer of 2008, Merrill, with a large and perilous exposure to subprime-related securities, faced liquidity problems that jeopardized its very existence as a going concern.  As a consequence, the Board of Directors of Merrill and others at Merrill (sued herein as the "Merrill Defendants") were forced to put the entire company up for sale to an outside party.

9.       BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable disasters as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.  Over the weekend of September 13-14, 2008, representatives of the two companies gathered on orders from their Chairman-CEOs to negotiate a merger.  The deal—a stock-for-stock transaction in which Merrill would become a wholly-owned subsidiary of BofA—was peremptorily negotiated in the space of a single afternoon, Saturday, September 13, 2008, between Defendant Lewis, BofA's then-Chairman and CEO, and Defendant John A. Thain, the Chairman and CEO of Merrill.

10.      Rather than being properly focused on Merrill's deteriorating liquidity and inevitable bankruptcy as the only alternative to the Merger—and the correspondingly modest, if not fire-sale, price that BofA should pay—the negotiations under Defendant Lewis and the BofA Defendants instead were, from inception, pegged to the number of billions of dollars in *bonuses* that should be *guaranteed* to Merrill executives pursuant to the Merger, and to the amount of *premium* over Merrill's current share price BofA should pay.  Thus, the Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses

should be paid on an accelerated basis before the Merger closed on December 31, 2008. Similarly, the BofA Defendants, in a further act of disloyalty and bad faith, simply acceded to the Merrill team's demand that BofA pay an astonishing *70 percent premium* for Merrill's common stock based on the value of such stock at the time. With these deal terms in place, Defendants, in yet further acts of disloyalty and bad faith, then proceeded to conduct an ad hoc "due diligence" review of Merrill whose favorable result was foreordained by Defendants.

11.     According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, *10 hours*, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning. Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within days but for the transaction itself. The process was especially inadequate given Merrill's exposure to metastasizing losses in the market for auction rate securities ("ARS"), mortgage-backed securities ("MBS"), collateralized debt obligations ("CDOs"), and other toxic, highly-leveraged derivatives that made headlines throughout the nation's economy in the summer and fall of 2008.

12.     In recklessly agreeing to these terms, the BofA Director Defendants did not consider the scope, potential amount, or any other aspect of the liabilities that they were causing BofA to assume—including whether the assumption of such liabilities might cause serious or even fatal harm to BofA. The assumption of such liabilities without quantification or other consideration constituted a breach of these defendants' duties of loyalty, candor, and good faith, since the decision to do so could not have been taken in good faith or as the result of those defendants' informed business

judgment.  Indeed, in a move which shocked shareholders—who had, through Defendants' reckless, disloyal, and bad-faith misconduct, been kept in the dark throughout this process—on or about January 16, 2009, BofA announced that it had been required to obtain an **additional** $118 billion in aid and "backstop" liquidity guarantees from the government (on top of approximately $25 billion in aid already received) under the federal Troubled Asset Relief Program ("TARP"), just to stay afloat.

13.    In breach of their duties of good faith, loyalty, and candor, the Boards of Directors of both Merrill and BofA unanimously approved the Merger in great haste in separate afternoon meetings held on Sunday, September 14, 2008.  The transaction was first announced to BofA shareholders and the public on the morning of Monday, September 15, 2008.  The Shareholder Vote on the Merger was scheduled for December 5, 2008.

### Defendants Issue a False and Misleading Proxy Statement and Knowingly Deceive Shareholders With Respect to Billions of Dollars in Secret Bonuses to Merrill Executives

14.    As became obvious practically the moment it closed on January 1, 2009, following a favorable vote on December 5, 2008, the Merger was approved by BofA's shareholders based on inaccurate and misleading information furnished to them by certain of the Defendants.  The BofA Director Defendants sought shareholder consent to the Merger in a Schedule 14A Proxy Statement (the "Proxy Statement") issued on November 3, 2008—one month before the Shareholder Vote. The Proxy Statement contained statements concerning Merrill that were false and that omitted material information necessary to make the statements that were made not misleading, in violation of the federal securities laws and in breach of these defendants' duty of candor to shareholders. Among other things, these defendants failed to disclose, either in the Proxy Statement or subsequently, the unprecedented, and rapidly accelerating, losses at Merrill caused by its exposure to the various derivative securities—losses which quickly reached over $15 billion in the fourth quarter alone.

15.     That information, however, was already known or readily available to the BofA Defendants and their financial and legal advisors, as the BofA Defendants had obtained unfettered access to the entirety of Merrill's financial and accounting records immediately upon signing the Merger Agreement.  Moreover, Merrill's collapsing financial results, as well as the authorization to pay up to $5.8 billion in bonuses to Merrill executives, which together totaled in the tens of billions of dollars, were manifestly material to BofA shareholders in deciding how to vote on the Merger. By omitting to disclose this information, either in the Proxy Statement itself or in a corrective or updated disclosure, and by dwelling almost exclusively on the supposedly positive contribution Merrill would make to BofA, the BofA Director Defendants and their financial and legal advisors drafted, signed, and published the false and misleading Proxy Statement, violating Section 14(a) and Rule 14a-9 promulgated thereunder.  These actions also constituted a knowing, reckless, or grossly negligent violation of these defendants' duties of candor and full disclosure in the context of an action requiring shareholder approval—a violation which harmed not only the Company but also each shareholder directly who was asked to vote on the Merger.

16.     Recently, Rep. Dennis Kucinich, in his opening statement to the House of Representatives' Joint Full Committee-Subcommittee Hearing on the Government's Rescue of the Bank of America-Merrill Lynch Merger, summarized the findings of the hearings thus far:

> This Committee's investigation and two previous hearings have revealed that the **_Government had concluded that Mr. Lewis's management of Bank of America was seriously deficient and possibly in legal jeopardy_**.  Top staff at the Fed and Treasury had determined that **_Mr. Lewis knew about accelerating losses at Merrill Lynch before the shareholder vote to ratify the merger, but he did not provide that information to shareholders._**  The top lawyer at the Fed had determined that Mr. Lewis and his management team were possibly **_in violation of securities laws for withholding material information from shareholders. Top professional staff at the Fed had determined that Mr. Lewis and his management team had failed to do due diligence in acquiring Merrill Lynch_** and were not up to the task of identifying and solving the problems in which they found themselves in late 2008.  [Emphases added.]

17.     In an even more flagrant violation of their duties of candor, loyalty, and good faith, the BofA Defendants took steps to *actively conceal* the fact that they had authorized Merrill to accelerate the payment of bonuses for 2008 from early January 2009 (when they otherwise would, by custom, occur) to December 2008, before the Merger was set to close, and that these bonuses would total up to *$5.8 billion* in discretionary bonuses—knowingly deceiving shareholders into believing that the exact opposite was true, *viz.*, that *no* discretionary bonuses would be paid at Merrill for 2008.  Specifically, the bonuses were memorialized by the parties in a so-called "disclosure schedule" to the Merger Agreement.  That "disclosure schedule" was appended by the BofA Defendants to the Merger Agreement and was *not* contained in the body of the Agreement.  It therefore was *not disclosed to shareholders* in the Proxy Statement, which, as prepared by the BofA Defendants, attached the body of the Agreement *but not any of its appendices*.

18.     The bloated and undeserved bonuses that the BofA Defendants, aided and abetted by the Advisor Defendants and the Merrill Defendants (the latter of whom were motivated by their own self-interest to ensure that the bonuses not come to the attention of BofA shareholders, lest the Merger be voted down) caused to be secretly paid to Merrill executives did not come to light until well after the Merger closed on January 5, 2009.  Once disclosed, however, these bonuses became the subject of multiple regulatory and law enforcement proceedings.  In that regard, the New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses.  A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating the payment of bonuses to the BofA Defendants for 2008.  In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses.  On August 3, 2009, the SEC filed a complaint relating to the bonuses in the United States District Court for the Southern District of

New York against BofA under Section 14(a).  The United States Securities and Exchange Commission ("SEC") has indicated that it will *try that case and not attempt to settle it*.

### After the Proxy Statement is Issued, Defendants
### Commit Further Knowing Deception of BofA Shareholders

19.     The Shareholder Vote to approve the acquisition of Merrill was held on December 5, 2008, with 82 percent of BofA shareholders voting in favor.  Little did shareholders know, however, that Defendants Lewis, Price, Cotty, and Curl—with the full knowledge and complicity of the BofA Board—had already secretly determined (and were deliberately withholding from shareholders) that, immediately after the vote (and assuming it was in favor of the Merger), BofA must turn to the United States Government for over one hundred billion dollars in additional assistance and "guarantees"—on top of the $25 billion BofA had already received—to enable BofA to complete the Merger.

20.     This was because, throughout the fall of 2008, Merrill suffered highly material undisclosed losses that greatly jeopardized the solvency of the combined company—a fact that was well known (or recklessly or negligently disregarded) by all Defendants.  Indeed, as Defendant Thain stated upon his forced departure from Merrill after the Closing, weekly profit-and-loss reports concerning Merrill were sent to Lewis, Price, and other BofA Defendants that made Merrill's rapidly deteriorating condition unmistakably clear.  These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings.  In October 2008 alone, Merrill lost another $7 billion.  In November 2008, Merrill lost an additional $6.3 billion and also suffered a goodwill impairment of $2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender.  Thus, by the eve of the shareholder vote on December 5, 2008, Merrill—undisclosed to BofA shareholders—had lost a staggering $15.3 billion so far in the fourth quarter of 2008.

**Defendants Determine that a "Material Adverse Event" has Occurred, Justifying
Rescission of the Merger, but Conceal this Fact from Shareholders and Then, in yet
Further Acts of Disloyalty and Bad Faith, Retract this Decision so as to Keep
Their own Positions and Compensation and Withhold that Fact, too, from Shareholders**

21.     On December 17, 2008, after the vote but before the Merger closed, Defendant
Lewis informed Mr. Henry Paulson that the BofA Defendants considered Merrill's losses to
constitute a "material adverse event" entitling BofA to cancel the Merger.  Defendant Lewis also
falsely claimed, both to Mr. Paulson and Federal Reserve Chairman Ben Bernanke, that Merrill's
enormous losses had only recently materialized—claims which Federal Reserve officials soon
derided as "not credible."   After further meetings with Treasury and Fed officials—and as
additional data concerning Merrill's losses became available—Defendant Lewis and the BofA
Board concluded that Merrill's losses did, in fact, constitute a "material adverse event" justifying
rescission of the Merger.  However, when Lewis informed Mr. Paulson of that determination, he
was told by Mr. Paulson that he, Mr. Paulson, would try to get the entire Board and senior
management, including Lewis, ousted from office if BofA was caused to back out of the Merger—a
threat to which Defendant Lewis and the other BofA Defendants responded by hastening to assure
Messrs. Paulson and Bernanke, in effect, that they would never dream of invoking the MAC clause.
Lewis and the BofA Director Defendants thus secured a promise of $20 billion in direct assistance
to complete the Merger, as well as protections against $118 billion in additional exposure from
Merrill.  These developments were deliberately held secret from BofA shareholders until after the
Merger closed on January 1, 2009.  As evidence of this deliberate, reckless, disloyal and bad-faith
misconduct, in a December 22, 2008 email to the BofA Board, Defendant Lewis wrote:  "I just
talked with Hank Paulson.  He said there is no way the Federal Reserve and the Treasury could
send us a letter of any substance without public disclosure *which, of course, we do not want.*"

22.     The BofA Director Defendants' actions in determining that the Merger should be cancelled under the MAC clause based on advice from legal counsel, reversing that decision the moment they perceived their lucrative and prestigious positions to be at risk, and secretly securing $138 billion in federal assistance as the only means to consummate the Merger, yet acting deliberately to cover up these facts from shareholders, constituted further breaches of these defendants' fiduciary duties of candor, loyalty, and good faith, as well as violations of the federal securities laws.  If Merrill's exposure precluded BofA from being able to consummate the transaction, the BofA Defendants had a number of options by which they could have discharged their duties to shareholders, including rescinding the Merger under the MAC clause or at least trying to renegotiate the terms of the Merger, including the purchase price, with Merrill, perhaps using the MAC clause as leverage.

23.     All of these options, however, were knowingly rejected by the BofA Defendants, lest they be perceived with disfavor by a government bureaucracy that purported to hold their jobs in its hands.  All of these options, too, were withheld from shareholders, who also were willfully deprived by these defendants of any information concerning Merrill's losses, the Board's decision to invoke the MAC clause, the Board's reversal of that decision, or the $138 billion in additional financing BofA needed and obtained to complete the Merger.  The BofA Director Defendants simply determined to abdicate their own business judgment as to the best interests of the Company and its shareholders, defer to perceived pressure from government officials, and in the process keep their prestigious and lucrative positions at all costs.  This included the following 2007-2008 compensation to BofA Board members:  Lewis—$34.8 million; Gifford—$3.5 million; Sloan—$580,000; Barnet—$480,000; May—$398,000; Ward—$377,000; Collins—$381,000; Mitchell and Ryan—$378,000; and Bramble, Countryman, Franks, Lozano, Massey, Spangler, and Tillman—$338,000.

24.     As a respected commentator for the *New York Times*'s "DealBook" weblog, Steven

M. Davidoff, a professor at the University of Connecticut School of Law, has noted (February 9,

2009):

> *Ultimately, the . . . story is one of a bank that was being pushed hard by the federal government to do a deal without a whit of care about the effect on its shareholders.* The government implicitly threatened Ken Lewis's job, stated explicitly what BofA's legal options were, and offered a carrot if Bank of America completed the deal. Meanwhile, *despite the internal debate at BofA about whether or not to disclose the Merrill losses before the Bank of America vote, it again appears that shareholders were not in Bank of America's calculus.* Instead, the shareholder meeting was treated as an expiring option. Let's get it done so we can proceed to the deal. *The failure to disclose before the meeting is particularly galling because, if BofA had concluded there was no MAC before the meeting, its only out was through the shareholder vote. By not disclosing, BofA ensured that the deal would go through.*
>
> Both of these stories cast a harsh light on everyone: the government, Bank of America and Merrill. . . . But the wreckage is apparent. *I'm particularly troubled by the self-inflicted wounds Bank of America management appears to have imposed upon the company through their desire to proceed with the shareholder vote without disclosure of Merrill's losses.* The latter issue will now be settled in litigation and the shareholder process. [Emphases added.]

### "The $50 Billion Deal from Hell": As the Truth Belatedly Emerges, BofA's Market Capitalization is Punished; Defendants are Investigated by the NYAG, SEC, FBI, DOJ, and Congress; and the BofA Defendants Commit Still Further Acts Disloyalty and Bad Faith by Evading Responsibility for their Actions and Even Trying to Saddle the Company with the Cost of SEC Penalties

25.     It was not until January 14, 2009 that news first began to circulate concerning the

true size ($21 billion) of Merrill's theretofore-undisclosed fourth-quarter losses, the receipt of

massive federal assistance as the only way for BofA to be able to complete the Merger, and the fact

that the BofA Defendants had agreed to proceed with the Merger only after perceiving their

continuation in office to be called into question—thus creating an irreconcilable conflict of interest

that tainted all of their subsequent decision-making. Immediately thereafter, on January 16, 2009,

BofA shocked the market in announcing a fourth-quarter loss of $1.79 billion—a figure which would have been billions in *profits* but for the losses attributable to Merrill.  Accordingly, between January 14, 2009 and January 20, 2009, BofA's stock price dropped by 50 percent in only three trading days. BofA's stock price dropped an additional 15 percent on January 22, 2009, when news became available about Merrill's payment, with the BofA Defendants' express approval, of billions of dollars in unearned bonuses.  Defendant Thain, who had briefly run Merrill as a division of BofA, was fired amidst reports that he spent the latter part of December on a ski vacation in Vail, Colorado and spent $1.2 million refurbishing his private office at Merrill while the company itself lost $27 billion in 2008.

26.     The impact upon BofA from Defendants' conscious, reckless, and bad-faith misconduct has been profound.  When the Merger was first announced on September 15, 2008, it was valued at $50 billion, based on the then-current trading price of BofA's common stock.  By the eve of Closing, BofA's stock price had been driven so far down that the deal was worth only $19.4 billion.

27.     Merrill's losses of $27 billion for 2008—including $15 billion in losses for the fourth quarter that were unfolding right before the BofA Defendants' eyes throughout the October-December timeframe—contributed to the further collapse in BofA's market capitalization after the Merger closed on January 1, 2009.  Between December 31, 2008 and March 6, 2009—as news of Merrill's undisclosed losses and the Defendants' misconduct became widely reported in the press— BofA's share price dropped from $14.08 to $3.14—representing another $11 billion in wealth destruction.  All told, as a direct consequence of Defendants' bad faith and disloyalty, at least $136 billion in shareholder wealth was wiped out between September 15, 2008 and March 6, 2009.

28.     The damages to BofA do not end with the destruction of its shareholder base.  As a consequence of acquiring Merrill, BofA has suffered permanent damage to its reputation as a sound, well-managed financial institution.  Defendant Lewis was stripped of his position as Chairman of the Company's Board of Directors at the Company's annual shareholder meeting on April 29, 2009.  As the uproar over the BofA Defendants' brazen acts of self-interest continued, and more and more damaged information has emerged from the investigations by various government agencies pointing toward their deceitfulness and complicity in the misconduct, Defendant Lewis was forced to resign his CEO position on September 30, 2009, stating that he would leave the Company by the end of the year.  In addition, several other members of the Board who, with Lewis, helped engineer the bad-faith acquisition of Merrill, were only narrowly re-elected.  Many have since resigned or been forced out.  The Company has been obliged to defend multiple regulatory and law enforcement proceedings—including by the SEC, the New York Attorney General, and even the United States Congress.  The Federal Bureau of Investigation ("FBI") and United States Department of Justice ("DOJ") are conducting criminal probes.  The SEC recently filed a civil enforcement proceeding against BofA related to the BofA Defendants' failures to disclose the payment of some $5.8 billion in bonuses to Merrill employees before the Merger closed, in spite of Merrill's deteriorating condition.

29.     In addition, the New York Attorney General stated that its investigation has "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*"  (Emphasis added.)  These instances comprised:  (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote

losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

30.     The BofA Defendants, further evidencing their bad faith and disloyalty to BofA, have consistently sought to evade any responsibility for their actions.  Defendant Lewis, for example, testified to both the New York Attorney General and the House Committee on Oversight and Government Reform that the BofA Defendants were completely unaware of the devastating losses until December 9, 2008 and did not consider invoking the MAC clause until December 17, 2008.  However, documentary and testimonial evidence obtained by the Attorney General and the Committee from other sources belies those assertions.  Specifically, as early as mid-November 2008, Merrill faced fourth-quarter losses of $9 billion, or nearly **double** its third-quarter losses, and discussions of the MAC clause among the BofA Defendants and the Company's legal counsel were under way well before the Shareholder Vote on December 5, 2008.

31.     Even recently, in what would otherwise be considered the aftermath of Defendants' misconduct, the BofA Defendants are continuing to try to deny their acts of bad faith and disloyalty to the Company.  In early August 2009, the BofA Defendants caused the Company to try to enter into a settlement and consent judgment with the SEC over the Merrill bonus charges.  In particular, these defendants executed a settlement of the charges which would have involved **BofA**—not any individual officers or directors—agreeing to a permanent injunction and the payment of a $33 million fine.

32.     The proposed consent judgment was presented to this Court, the Honorable Jed S. Rakoff presiding, for approval.  After a hearing and two rounds of briefing, Judge Rakoff issued an Order on September 14, 2009 **rejecting the settlement**.  The Court found that the proposed settlement was "**neither fair, nor reasonable, nor adequate**"—among other reasons, because it attempted to have the Company itself, rather than individual officers, accept blame and pay the

penalty, thereby effectively requiring BofA shareholders to be victimized twice.[2] Finally, the Court found that the BofA Defendants' vigorous protestations of innocence rendered unclear what point, if any, would be served by an decree of permanent injunctive relief. Wrote the Court:

> ***[T]he parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry—all at the expense of the sole alleged victims, the shareholders.*** Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

> Oscar Wilde once famously said that a cynic is "someone who knows the price of everything and the value of nothing." *Lady Windermere's Fan* (1892). The proposed Consent Judgment in this case suggests a rather cynical relationship between the parties: the S.E.C. gets to claim that it is exposing wrongdoing on the part of Bank of America in a high-profile merger; the Bank's management gets to claim that they have been coerced into an onerous settlement by overzealous regulators. And ***all of this is done at the expense, not only of the shareholders, but also of the truth.*** [Emphases added.]

33.    Robert Bruner, dean of the Darden School of Business at the University of Virginia, is an expert in the subject of failed business combinations. His book, *Deals From Hell: M&A Lessons That Rise Above the Ashes*, sets forth various criteria for failures. The criteria include destruction of market value, financial instability, impaired strategic position, organizational weakness, damaged reputation, and violation of ethical standards and laws.

34.    Heidi N. Moore, a *Wall Street Journal* reporter writing on that newspaper's "Deal Journal" weblog on January 22, 2009, applied Mr. Bruner's criteria to the Merrill Merger. Her conclusion: "Check, check, check, check, check and mate." Wrote Ms. Moore:

---

[2] In addition, the Court found that the SEC had too quickly credited the BofA Defendants' claims **both** that they had relied upon the advice of counsel in connection with the Company's disclosures of the Merrill bonuses **and** that the attorney-client privilege protected their communications with counsel and precluded charges against individual actors.

### Bank of America-Merrill Lynch: A $50 Billion Deal From Hell

*Mergers often prove troublesome, but few have set the land-speed record for disaster as fast as Bank of America's $50 billion acquisition of Merrill Lynch.*

Let us detail the ways.  Only three weeks after the deal closed on Jan. 1, there has been the departure of several high-level executives including the president, chief executive and head of wealth management of Merrill Lynch; an additional $20 billion in Treasury support; $118 billion of government backstops; a $15 billion loss at Merrill that came after repeated assurances from both sides that due diligence was solid; the massacre in Bank of America shares, which have fallen 78% since the bank agreed to acquire Merrill on Sept. 15; lawsuits surrounding the surprise announcement of the Merrill Lynch loss; the revelation that BofA CEO Kenneth Lewis himself contemplated calling the whole thing off in December; and widespread fears of even steeper losses on Merrill's troubled assets.  That doesn't even count the loss of market value. Bank of America closed at $33.74 on the Friday before the deal was closed.  At Wednesday's close of $6.68, the company's market cap was $42.7 billion.  The stock was at a 52-week low of $5.50 recently.  *BofA's low trading price represents a complete wipeout of Merrill Lynch's $17 trading price before the deal and the $29 price at which Merrill was acquired.*

\*   \*   \*   \*

*It is official.  Bank of America's acquisition of Merrill Lynch is a candidate for the title of "A Deal from Hell."*

### Pre-Suit Demand is Futile and Excused

35.     Plaintiffs have not made a demand on the BofA Board to institute this suit in the Company's name because doing so would be futile and useless gesture.  The Board, in determining to accede to perceived pressure from Mr. Paulson to go through with the Merger at all costs— purportedly on pain of losing their lucrative and prestigious positions—*have already demonstrated that their loyalty lies in preserving their own positions and self-interest rather than in serving the best interests of BofA and its shareholders*.  Moreover, Board members face a substantial likelihood of liability herein under Section 14(a) for making false and misleading statements in the Proxy Statement—and for their acts of bad faith, disloyalty, and other breaches of their fiduciary duties to BofA detailed herein, none of which are exculpated under Delaware Code Section 102(b)(7) and

each of which therefore give rise to a substantial potential for liability, rendering demand futile. Further, Board members face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.

36.     In addition, various individual Board members are conflicted from objectively considering a pre-suit demand based on their insider status, substantial compensation, lack of banking industry experience, presence on interlocking public company Boards of Directors, excessive outside Board commitments, and other conflicts. *See infra*, part IV. These include but are not limited to:

- **Lewis** and **Gifford** are corporate insiders of BofA who received $10 million and $1.6 million in compensation, respectively, from BofA, and the Board itself has *admitted* that they are "*categorically*" not independent.

- **Bramble** was CEO of MBNA and received an opulent buyout package and a seat on the BofA Board when BofA acquired MBNA; he recently retired from Allfirst Financial Inc. after it was discovered that Allfirst had lost $691.2 million in a foreign currency trading scandal.

- **Barnet, Collins, Countryman, May, Gifford,** and **Ryan** are legacies of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others; when BofA acquired FleetBoston, these defendants receive lucrative buyouts and seats on the BofA Board. These same directors are designated as "Problem Directors" by The Corporate Library, an independent research organization, for approving bloated executive compensation to FleetBoston insiders while it was under investigation. These six directors tend to act together, are beholden to one another, and dominate the Board. Indeed, four of them, **May, Barnet,** and **Collins**, constitute a majority of the Audit Committee, with **May** serving as its Chair.

- **Lewis, Gifford, Spangler, Ward, and Massey** have received, over the last two years, far greater than ordinary director compensation ($34.8 million, $3.5 million, $580,000, $480,000, and $398,000, respectively), rendering them dependent on BofA for their livelihood and incapable of acting independently from other Board members who control these payouts.

- Nine directors, **Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman,** and **Ward** (more than half the Board) have no career experience in the banking, investment banking, securities brokerage, or any other financial services industry. Their experience lies, rather, in such areas as software, armed forces,

publishing, academia, non-profit, pharmaceuticals, auto parts, home improvement, and construction.

- **Gifford, Countryman,** and **May**, besides being legacies of the FleetBoston Board, each serve with the others as trustees of NSTAR and members of the Board of CBS Corporation. Given these interlocking directorships, Countryman and May are beholden to Gifford, a corporate insider of BofA and a "*categorically*" non-independent director.

- Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis, Gifford, Countryman,** and **Sloan**, chaired by **Sloan**, whose experience lies in auto parts, not banking.

## JURISDICTION AND VENUE

37.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

38.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiffs

40.     Plaintiff Louisiana Municipal Police Employees Retirement System ("MPERS") is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana. MPERS has been a continuous owner of BofA stock since at least September 1, 2008. The Retirement System is an instrumentality of the State of Louisiana and a citizen thereof.

41.     Plaintiff Hollywood Police Officers' Retirement System ("HPORS") is a Florida municipal pension fund organized for the benefit of Hollywood's police officers. HPORS has been a continuous owner of BofA stock since at least September 1, 2008.

### Nominal Defendant

42.     Nominal defendant BofA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management, and other financial and risk-management products and services. As of March 4, 2009, BofA had issued and outstanding more than 6.4 billion shares of common stock. BofA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.

**The BofA Defendants**

43.     Defendant Kenneth D. Lewis ("Lewis") is the Chief Executive Officer and President of BofA, and served as Chairman of the Board of Directors until his unscheduled termination from that position on April 29, 2009.  Defendant Lewis has been a director since 1999, became Chief Executive Officer in 2001, President in 2004, and has served continuously in those positions since.  Lewis also became Chairman in 2005 and served continuously in that position until he was removed from this position by shareholders on April 29, 2009.  On September 30, 2009, Lewis notified the BofA Board of his intention to resign from the CEO position by the end of 2009.  He is also a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BofA, Lewis was paid $24.8 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $10.0 million in 2008.   Lewis is a citizen of North Carolina.

44.     Defendant Charles K. Gifford ("Gifford") has been a member of the Board since 2004, when Bank of America acquired FleetBoston, of which Gifford was CEO.  He is a member of the Executive Committee of the Board and was the Chairman of the Board until replaced by Lewis.  Defendant Gifford serves with defendant Countryman and defendant May as both a trustee of NSTAR (an energy utility company) and a member of the Board of Directors of CBS Corporation.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Gifford was paid $1.4 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $1.9 million in 2007, and $1,631,396 in 2008.  Defendant Gifford is a citizen of North Carolina.

45.     Defendant William Barnet, III ("Barnet") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Audit Committee of the Board during the events complained of herein.  In exchange for his

purported trust, loyalty, and fidelity to BofA, Defendant Barnet was paid $397,847 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, $240,000 in 2008.  Defendant Barnet is a citizen of South Carolina.

46.     Defendant Frank P. Bramble, Sr. ("Bramble") has been a member of the Board since 2006, when BofA acquired MBNA.  He is a member of the Asset Quality Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Bramble was paid $324,861 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Bramble is a citizen of Delaware.

47.     Defendant John T. Collins ("Collins") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 29, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Collins was paid $244,500 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, and $141,118 in 2008. Defendant Collins is a citizen of Massachusetts.

48.     Defendant Gary L. Countryman ("Countryman") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Executive Committee of the Board during the events complained of.  Defendant Countryman serves with Defendant Gifford and Defendant May as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Countryman was paid $403,145 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008. Defendant Countryman is a citizen of Massachusetts.

49.     Defendant Tommy R. Franks ("Franks") was a member of the Board from 2006 until his resignation on June 17, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  Defendant Franks is a retired general in the United States Army.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Franks was paid $318,984 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Franks is a citizen of Oklahoma.

50.     Defendant Monica C. Lozano ("Lozano") has been a member of the Board since 2006.  She is a member of the Asset Quality Committee of the Board.  Defendant Lozano publishes *La Opinion*, one of the largest Spanish-language newspapers in the United States.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Lozano was paid $263,486 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Lozano is a citizen of California.

51.     Defendant Walter E. Massey ("Massey") has been a member of the Board since 1998, and has been the Chairman of the Board since April 29, 2009.  Defendant Massey is President Emeritus of Morehouse College and a member of the Board of Directors of McDonald's Corporation.  He is a member of the Audit Committee of the Board.  Defendant Massey has long, close ties to Lewis; among other things, Lewis was co-chairman of a Morehouse College capital campaign when Massey was president of the college in the last several years.  Moreover, it was Lewis and Sloan who worked behind the scenes to elevate Massey to the Chairmanship of the Board when it became evident that shareholders might vote to unseat Lewis, which they did.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Massey was paid $649,692 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Massey is a citizen of Georgia.

52.     Defendant Thomas J. May ("May") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is the Chair of the Audit Committee of the Board. Defendant May serves with defendant Gifford and defendant Countryman as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation. He is the current Chairman and CEO of NSTAR. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant May was paid $469,117 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,517 in 2007, and $157,376 in 2008. Defendant May is a citizen of Massachusetts.

53.     Defendant Patricia E. Mitchell ("Mitchell") was a member of the Board from 2001 until she resigned on June 3, 2009. She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of. Defendant Mitchell is the President of the Paley Center for Media, a non-profit organization "dedicated to advancing understanding of the media," and a former President of Public Broadcasting Service. In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Mitchell was paid $415,558 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008. Defendant Mitchell is a citizen of New York.

54.     Defendant Thomas M. Ryan ("Ryan") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is a member of the Compensation and Benefits Committee and the Chair of the Corporate Governance Committee of the Board. Defendant Ryan is the Chairman and CEO of CVS/Caremark Corporation, a provider of pharmacy and related healthcare services. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Ryan was paid $432,890 in salaries, bonuses, fees, stock options, stock awards, and other

compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ryan is a citizen of Rhode Island.

55.      Defendant O. Temple Sloan ("Sloan") was a member of the Board from 1996 until May 26, 2009, when he resigned.  During the events complained of, he was the "Lead Director" of the Board, Chair of the Compensation and Benefits Committee, a member of the Corporate Governance Committee, and Chair of the Executive Committee of the Board.  Defendant Sloan is the Chairman of General Parts International, Inc., a distributor of automotive replacement parts.  He serves on the Board of Directors of Lowe's Companies, Inc., a home improvement retailer, which defendant Tillman formerly served as Chairman and CEO.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Sloan was paid $318,125 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $290,000 in 2007, and $290,000 in 2008. Defendant Sloan is a citizen of North Carolina.

56.      Defendant Meredith R. Spangler ("Spangler") was a member of the Board from 1988 until she retired from Board service on April 29, 2009.  She and her family own over 32,000,000 shares of BofA common stock—approximately eight times as much as Lewis and 16 times as much as any other Board member.  She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of. In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Spangler was paid $942,774 in salaries, bonuses, fees, stock options, stock awards, and other compensation for 2006, $210,517 in 2007, and $127,376 in 2008.   Defendant Spangler is a citizen of North Carolina.

57.      Defendant Robert L. Tillman ("Tillman") was a member of the Board from 2005 until May 29, 2009, when he resigned.  He was a member of the Asset Quality Committee of the Board during the events complained of.  Defendant Tillman is the former Chairman and CEO of

Lowe's Companies, Inc., a home improvement retailer.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Tillman was paid $317,479 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Tillman is a citizen of North Carolina.

58.    Defendant Jackie M. Ward ("Ward") was a member of the Board from 1994, until her resignation on June 3, 2009.  She was Chair of the Asset Quality Committee of the Board during the events complained of.  Defendant Ward is the retired Chairman and CEO of Computer Generation, Inc., a telecommunications software company.  She is also a member of the Boards of Directors of Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation, and Wellpoint, Inc., all of which are public companies.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Ward was paid $982,528 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ward also serves as a director of at least five other corporations: Equifax, Inc., Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation and Wellpoint, Inc.  Defendant Ward is a citizen of Georgia.

59.    Defendant Gregory Curl ("Curl") has been the Chief Risk Officer of BofA since June 30, 2009.  Previously, he was the Vice Chairman for Corporate Planning and Strategy at BofA. Defendant Curl was one of BofA's principal negotiators on the Merrill Lynch acquisition. Defendant Curl is a citizen of North Carolina.

60.    Defendant J. Steele Alphin ("Alphin") is the Chief Administrative Officer of BofA. Defendant Alphin is a citizen of North Carolina.

61.    Defendant Joe L. Price ("Price") is the Chief Financial Officer of BofA.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Price was paid $6.5 million

in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $4.0 million in 2008.  Defendant Price is a citizen of North Carolina.

62.     Defendant Amy Woods Brinkley ("Brinkley") was the Global Risk Executive of BofA until June 30, 2009, in charge of controlling the Company's credit, market, and operational risks.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Brinkley was paid $9.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Brinkley is a citizen of North Carolina.

63.     Defendant Brian T. Moynihan ("Moynihan") was, until August 10, 2009, the head of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA.  Defendant Moynihan replaced Defendant Thain in this position when Thain resigned on January 22, 2009.  Previously, Defendant Moynihan was the President of Global Corporate and Investment Banking of BofA, and also served as its General Counsel from December 10, 2008 until August 10, 2009.  He is a former high-ranking officer of FleetBoston, which BofA acquired in 2004.  Defendant Moynihan is a director of Black Rock, Incorporated.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Moynihan was paid $10.1 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Moynihan is a citizen of North Carolina.

64.     Defendant Neil A. Cotty ("Cotty") has been the Chief Financial Officer of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA, since January 2009.  Defendant Cotty was a key member of the BofA-Merrill liaison team before the deal closed.  From April 2004 until December 2008, he was the Chief Accounting Officer of BofA.  Defendant Cotty is a citizen of North Carolina.

65.     Defendant Keith T. Banks ("Banks") is the President, Global Wealth and Investment Management of BofA.  He was a high-ranking officer of FleetBoston, which BofA acquired in 2004. Defendant Banks is a citizen of North Carolina.

66.     Defendant Timothy Mayopolous ("Mayopolous") was the General Counsel of BofA until December 10, 2008, when he was terminated and replaced by Defendant Moynihan. Mayopolous is a citizen of New York.

67.     Defendant Teresa Brenner ("Brenner") is an Associate General Counsel of BofA. Defendant Brenner is a citizen of New York.

**The Merrill Defendants**

68.     Defendant John A. Thain ("Thain") was the Chief Executive Officer of Merrill and Chairman of the Merrill Board from 2007 to January 1, 2009.  Defendant Thain became the President of Global Banking, Securities and Wealth Management of BofA on January 1, 2009 but resigned in scandal on January 22, 2009, following reports of massive losses and wasteful practices at Merrill.  In 2007, Defendant Thain was paid over $17.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation.  Defendant Thain is a citizen of New York.

69.     Defendant Carol T. Christ ("Christ") was a member of the Merrill Board from 2007 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee of the Board.  In 2007, Defendant Christ was paid over $191,000 in fees, stock awards, and other compensation.  Defendant Christ is a citizen of Massachusetts.

70.     Defendant Armando M. Codina ("Codina") was a member of the Merrill Board from 2005 until January 1, 2009.  He was Chair of the Nominating and Corporate Governance Committee of the Board, and a member of the Management Development and Compensation Committee.  In

2007, Defendant Codina was paid over $270,000 in fees, stock awards, and other compensation. Defendant Codina is a citizen of Florida.

71.     Defendant Judith Mayhew Jonas ("Jonas") was a member of the Merrill Board from 2006 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Audit Committee of the Board.  In 2007, Defendant Jonas was paid over $275,000 in fees, stock awards, and other compensation.  Defendant Jonas is a citizen of the United Kingdom.

72.     Defendant Virgis W. Colbert ("Colbert") was a member of the Merrill Board from 2006 until January 1, 2009.  He was a member of the Public Policy and Responsibility Committee, the Nominating and Corporate Governance Committee, and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Colbert was paid over $261,000 in fees, stock awards, and other compensation.  Defendant Colbert is a citizen of Wisconsin.

73.     Defendant Aulana L. Peters ("Peters") was a member of the Merrill Board from 1994 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Peters was paid over $270,000 in fees, stock awards, and other compensation.  Defendant Peters is a citizen of California.

74.     Defendant Charles O. Rossotti ("Rossotti") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chairman of the Finance Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Rossotti was paid over $274,000 in fees, stock awards, and other compensation.  Defendant Rossotti is a citizen of Maryland.

75.     Defendant John D. Finnegan ("Finnegan") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chair of the Management Development and Compensation Committee, and a member of the Finance Committee and the Nominating and Corporate Governance

Committee of the Board.  In 2007, Defendant Finnegan was paid over $282,000 in fees, stock awards, and other compensation.  Defendant Finnegan is a citizen of New Jersey.

76.     Defendant Joseph W. Prueher ("Prueher") was a member of the Merrill Board from 2001 until January 1, 2009.  He was Chair of the Public Policy and Responsibility Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Prueher was paid over $278,000 in fees, stock awards, and other compensation.  Defendant Prueher is a citizen of Virginia.

77.     Defendant Ann N. Reese ("Reese") was a member of the Merrill Board from 2004 until January 1, 2009.  She was Chair of the Audit Committee and a member of the Finance Committee of the Board.  In 2007, Defendant Reese was paid over $277,000 in fees, stock awards, and other compensation.  Defendant Reese is a citizen of New York.

78.     Defendant Nelson Chai ("Chai") was the Executive Vice President and Chief Financial Officer of Merrill at all relevant times.  Defendant Chai is a citizen of New York.

79.     Defendant Gregory Fleming ("Fleming") was the President and Chief Operating Officer of Merrill during and for a period after the Merger negotiations.  Defendant Fleming was one of Merrill's principal negotiators on the merger with BofA.  Defendant Fleming is a citizen of New York.

80.     Defendant Peter Kraus was the Executive Vice President for Business Strategy and Investments at Merrill.  Defendant Kraus is a citizen of New York.

81.     Defendant Peter Stingi was the Global Head of Human Resources at Merrill.  Defendant Stingi  is a citizen of New York.

82.     Defendant Michael Ross was the Head of Global Compensation and Benefits at Merrill.  Defendant Ross is a citizen of New York.

**The Advisor Defendants**

83.     Defendant J.C. Flowers & Co. LLC ("J.C. Flowers") is a principal investment firm specializing in buyouts which also serves as a financial advisor to companies in the banking and financial services industries.  J.C. Flowers was founded, and is owned in part, by J. Christopher Flowers, who serves as its managing partner.  J.C. Flowers is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  J.C. Flowers purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

84.     Defendant Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK") is a leading global specialist investment bank focused on the financial services industry.  FPK is owned in part by J. Christopher Flowers, who also owns Defendant J.C. Flowers.  FPK is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  FPK purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

**Other Related Persons not Named as Defendants**

85.     Merrill, until it was acquired by BofA, Merrill was one of the oldest and biggest brokerage houses in the world, whose "thundering herd" of brokers served millions of institutional and private clients around the world, with well-regarded investment banking and trading operations. The company continues as a unit of BofA, including its brokerage operations.

86.     Deloitte & Touche LLP ("Deloitte") is an independent registered public accounting firm that advises Merrill on a regular basis.  Deloitte is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principal place of business in New York,

New York. Deloitte purported to advise the Merrill Defendants with respect to the Merger and prepared and approved Merrill's audited financial statements in connection with the Merger.

87.     Wachtell Lipton Rosen & Katz ("Wachtell") is a partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York. Wachtell purported to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

88.     Edward D. Herlihy ("Herlihy") is a partner at Wachtell. Herlihy was the managing partner for Wachtell on the Merrill Merger engagement for BofA.

89.     Nicholas G. Demmo ("Demmo"), Jeannemarie O'Brien ("O'Brien"), and Matthew M. Guest ("Guest") are partners at Wachtell. Together with Herlihy, they played key roles in purporting to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

90.     Shearman and Sterling LLP ("Shearman") is a limited liability partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York. Shearman purported to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

91.     John Madden ("Madden") is a partner at Shearman. Madden was the managing partner for Shearman on the BofA Merger engagement for Merrill.

92.     John Marzulli ("Marzulli"), Scott Petelpiece ("Petelpiece"), and Linda Rappaport ("Rappaport") are partners at Shearman. Together with Madden, they played key roles in purporting to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

## Definitions of Groups

93.     The "BofA Defendants" comprise those defendants named in paragraphs 43-67 hereof.

94.     The "BofA Director Defendants" (sometimes referred to herein as the "BofA Board" or the "Board") comprise those persons who served on the BofA Board during the events complained of and named in paragraphs 43-58 above.

95.     The "BofA Officer Defendants" comprise those defendants who served as officers of BofA during the events complained of named in paragraphs 43 and 59-67 above.

96.     The "Merrill Defendants" comprise those defendants named in paragraphs 68-82 above.

97.     The "Advisor Defendants" comprise those defendants named in paragraphs 83-84 above.

## I.     IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."

98.     On Friday, September 12, 2008—in the wake of unprecedented liquidity demands arising from price declines in its investments in ARS, CDOs, MBS, and other highly-leveraged derivative securities—Merrill was at risk of failing.  With Merrill's share price down 36 percent that week alone and its access to credit markets in jeopardy—and with Lehman Brothers, Inc. teetering on the brink of bankruptcy as a result of its own liquidity emergency arising from similar toxic securities (it would file a petition for relief the following Monday)—Wall Street eyed Merrill as the next to succumb.  Knowing that Lehman's bankruptcy would cause Merrill, too, to collapse, Merrill's then-Chairman and CEO, Defendant Thain, frantically canvassed Wall Street for a business combination or other transaction which would generate enough cash to allow Merrill to survive.

99.     BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable catastrophes as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.

    **A.**    **In Breach of their Duties of Loyalty and Good Faith, the BofA Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that it is Essentially Worthless in the Absence of Any Deal, and to Secretly Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of Actual Performance.**

100.    Before approaching BofA, Merrill's then-President and Chief Operating Officer, defendant Fleming, placed an initial call to Herlihy, a partner and Co-Chairman of the Executive Committee at the Wachtell law firm, who had a close relationship with senior management at BofA. The following afternoon, Saturday, September 13, 2008, at Herlihy's suggestion, Defendant Thain met with BofA's then-Chairman and CEO, Defendant Lewis, to discuss a proposed business combination.  Thain initially proposed selling BofA only a 9.9 percent interest in Merrill.  Lewis responded that BofA was interested in a transaction, but only if it involved acquiring Merrill outright.  Thain agreed, and, later that same day, teams from both firms began conducting due diligence and negotiating the terms of a possible merger.

101.    The principal terms of the Merger were negotiated in the space of a single day—from late afternoon on Saturday, September 13, 2008 to late afternoon on Sunday, September 14, 2008— by teams headed by defendant Fleming for Merrill and by defendant Curl, Vice Chairman for Corporate Planning and Strategy for BofA.  According to testimony later given by Fleming and Curl to the SEC, *the negotiations were limited to just five issues, most of them addressing the compensation and perquisites various people affiliated with Merrill would gain from the deal.* The issues were:  the price BofA would pay; the payment of "retention" bonuses to Merrill's financial advisers; the scope of the MAC clause in the merger agreement; the number of Merrill

directors who would join the Board of Directors of BofA; and Merrill's ability pay year-end bonuses to its executives and employees pursuant to its Variable Incentive Compensation Program ("VICP"). The Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses should be paid on an *accelerated basis* before the Merger closed on December 31, 2008.

102.    Negotiation of the five issues involved only a perfunctory review of Merrill, and a deal was struck in a matter or *hours*, with the execution of the Merger Agreement at approximately 2 a.m. on the morning of Sunday, September 14, 2008.  The BofA Defendants, in a further act of disloyalty and bad faith, acceded to the Merrill team's demand that BofA pay an astonishing *70 percent premium* for Merrill's common stock based on the value of such stock at the time—in spite of the fact that Merrill, in the absence of a deal, would fail outright and probably be available for just "pennies" on the dollar in very short order, as noted investor Warren Buffett later recalled.  The deal subsequently received the approval of the Boards of BofA and Merrill, which met in separate sessions later that same afternoon.  Under the terms of the deal, BofA would pay 0.8595 of one BofA share for every share of Merrill—an arrangement valued at the time at $29 per Merrill share, for a total of $50 billion.  To memorialize their contract, the parties entered into a written agreement (the "Merger Agreement" or the "Agreement") whereby Merrill would become a wholly-owned subsidiary of BofA.  The Merger was first announced to the shareholders of both companies on the morning of September 15, 2008.

103.    The Merger was an immense financial undertaking for BofA which substantially diluted BofA shareholders.  Based on the Company's market capitalization on the day before the Merger was announced, the cost of the Merrill acquisition was 27 percent of BofA's market

capitalization.  In connection with the Merger—and subject to a vote of BofA shareholders—BofA committed to issue approximately 1.710 billion new shares of its common stock, and 359,100 shares of preferred stock.

> **B.    The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Conduct A Designedly Cursory "Due Diligence" of Merrill, in Further Gross Breach of Their Duties of Loyalty and Good Faith to BofA.**

104.    Based on the BofA Defendants' own description of the decision to acquire Merrill for BofA, the BofA Defendants, aided and abetted by the other defendants, in negotiating and then approving the Merger, devoted insufficient process, relied upon insufficient due diligence, and conducted insufficient deliberation to the task at hand.

105.    According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, ***10 hours***, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning.  Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within a matter of days but for the transaction itself.

106.    Moreover, according to the Schedule 14A Proxy Statement dated October 31, 2008 which the BofA Director Defendants filed with the SEC and made publicly available on November 3, 2008, the BofA Board itself—in further breach of their duties of good faith, loyalty, and candor—considered, and approved, the Merger in the space of ***just a single afternoon*** (Sunday, September 14, 2008).

107.    The BofA Director Defendants' own statements to shareholders reveal their disloyalty and bad faith in approving the Merger based on such insufficient process.  In their own words, the BofA Defendants offered the following as the sum total of the deliberation they gave to the Merger:

> In the late afternoon on Sunday [September 14, 2008], the Bank of America board of directors met with members of Bank of America senior management and its outside advisors.  Bank of America senior management reviewed with the Bank of America board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction.  Bank of America senior management and the company's financial advisors, J.C. Flowers and FPK, presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction as more fully described below under the heading "— Opinion of Bank of America's Financial Advisors".  Each of J.C. Flowers and FPK orally advised the Bank of America board of directors, and indicated that it was prepared to render a written opinion to the same effect, that, as of such date and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon their review as described in their respective opinions and other matters as J.C. Flowers and FPK considered relevant, the proposed exchange ratio to be paid by Bank of America in the merger was fair, from a financial point of view, to Bank of America.  Bank of America's general counsel and Wachtell, Lipton, Rosen & Katz, counsel to Bank of America, discussed with the Bank of America board of directors the legal standards applicable to its decisions and actions with respect to the proposed transaction and reviewed the legal terms of the proposed merger.  Following review and discussion among the members of the Bank of America board of directors, including consideration of the factors described under "— Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Bank of America board of directors unanimously determined that the transaction was in the best interests of Bank of America and its stockholders and voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

108.    In the section of the Proxy Statement entitled "Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the BofA Board provided an exhaustive list of the 13 "material factors" that they had considered in approving the Merger:

- Its [the BofA Board's] understanding of Bank of America's business, operations, financial condition, earnings and prospects and of **Merrill Lynch's business,** operations, financial condition, earnings and prospects;

- **its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market**

***conditions,*** the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;

- ***the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement***, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;

- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;

- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;

- ***the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings***, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;

- ***the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch*** made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- ***the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors*** concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- ***the likelihood that the regulatory and stockholder approvals needed to complete the transaction*** will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- ***the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK***;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in *its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America*;

- *the potential impact of the transaction on the capital levels and credit rating of Bank of America*; and

- the need and ability to retain key Merrill Lynch personnel.

(Emphases added.)

109.     As set forth above, the BofA Defendants listed Merrill's future "prospects" as among the most important factors they used in justifying the decision to acquire Merrill at the bloated price they did.  In so doing, these Defendants caused the Proxy Statement to misrepresent the benefits of the Merger, including the value of the assets to be acquired by BofA, by, among other things, omitting to disclose any information concerning the tens of billions of dollars in additional losses being incurred by Merrill in the third and fourth quarters of 2008—losses which were well known to the BofA Defendants before shareholders voted and while the Proxy Statement was still effective amounts and which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

110.     Moreover, in announcing this 13-factor list, the BofA Defendants emphasized that "[t]he foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, *but includes all material factors considered by the Bank of America board of directors*."  (Emphasis added.)  The BofA Defendants thus admit that they did not give significant consideration to the massive losses and write-downs to which Merrill was then exposed. Moreover, the omission of such losses and write-downs from the list further demonstrates that, while

known or recklessly or negligently disregarded by Defendants, these losses were *not*—as certain BofA Defendants would later claim—disclosed to shareholders prior to the vote.

111.    The Proxy Statement states that the due diligence investigation the BofA Defendants made of Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was concluded by "[e]arly in the morning of Sunday, September 14, 2008," when "Messrs. Thain and Lewis met in New York City [and] discussed the results of the due diligence investigations conducted by their companies' respective representatives."  The Merger Agreement was actually signed at 2 a.m. on Sunday, September 14, 2008.  Thus, the entire due diligence investigation could have occupied no more than *10 hours* and, on its face, was woefully incomplete, and inadequate for a proposed $50 billion acquisition of a company, Merrill, with dire liquidity problems and complex liabilities.  The BofA Director Defendants' decision to approve the Merger based on such due diligence, and in a single Board meeting late in the afternoon of September 14, 2008, could not have been the product of informed business judgment.

112.    Similarly, the Proxy Statement states that, supposedly due to the "complexity" of the 13 "material" factors, the BofA Defendants "did not consider it practical to, nor did [they] attempt to, quantify, rank or otherwise assign relative weights to the specific factors that [they] considered in reaching [their] decision."  Again, such a process could not have been an exercise of informed business judgment.  The more "complex" individual factors are, the *greater* is the need to weigh, quantify, compare, and contrast them.  The above statement is just an unintended admission of the fact that the BofA Director Defendants gave their approval hurriedly, with little analysis, and without consideration, or with reckless or negligent disregard, of the crucial "factor" of whether inheriting Merrill's losses and liabilities could harm BofA—and the anticipated impact of such harms.

113.    According to the Proxy Statement, in approving the Merger, the BofA Director Defendants placed substantial reliance on the opinion of BofA's investment bankers on the transaction, Defendants FPK and J.C. Flowers.  However,

> [i]n arriving at their respective opinions [deeming the Merger fair to BofA], neither FPK nor J.C. Flowers ascribed a specific range of value to Bank of America or Merrill Lynch, but rather each of FPK and J.C. Flowers made its determination as to the fairness, from a financial point of view, to Bank of America of the exchange ratio to be paid by Bank of America in the merger on the basis of such financial, comparative and other analyses as of the date of such opinions.

114.    In other words, FPK and J.C. Flowers simply took the price BofA proposed to pay for Merrill (expressed as an exchange ratio of BofA shares for Merrill shares) *as a given* and then labored to justify that price.  While touting their results as "fairness" opinions, these advisors never considered whether the pre-ordained price that BofA was to pay for Merrill was within an appropriate range of values to begin with.  As such, those "fairness" opinions were incomplete and untrustworthy, and the BofA Director Defendants' reliance on them was not the product of proper business judgment.  From start to finish, the "fairness" opinions were meant merely to provide cover for the BofA Defendants' existing decision to acquire Merrill.  As such, FPK and J.C. Flowers merely aided and abetted the BofA Defendants' breaches of fiduciary duty.[3]

115.    The patent inadequacy of this process has been widely and consistently noted— including by senior officials of the Federal Reserve.  For example, in a December 19, 2008, e-mail to colleagues concerning Merrill's financial condition and BofA's ability to complete the Merger, Fed official Tim P. Clark wrote as follows:

> *General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we*

---

[3] J.C. Flowers and FPK were paid $20 million for their 12-15 hours of investment banking work which purportedly enabled both bankers to opine that the proposed $50 billion merger transaction was fair to BofA and its shareholders.

have that **the deterioration at ML has been observably under way for the entire quarter—Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect.  At a minimum it calls into question the adequacy of the due diligence process BAC has been doing in preparation for the takeover.** [Emphases added.]

116.     Similarly, an analysis of the status of the Merger, prepared by PIMCO for the Federal Reserve on December 21, 2008, stated:

> *While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, BAC management's contention that the severity of MER's losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.*
>
> - In the Proxy Statement and investor presentations the firm explicitly asserts that it has an understanding of MER's business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions.
>
> - *Staff at the Federal Reserve has been aware of the firm's potentially large losses stemming from exposures to financial guarantors, which is the single largest area of risk exposure and driver of recent losses that have been identified by management.  These were clearly shown in Merrill Lynch's internal risk management reports that BAC reviewed during their due diligence.*
>
> - The potential for losses from other risk exposures cited by management, including those coming from leveraged loans and trading in complex structured credit derivatives products ('correlation trading') should also have been reasonably well understood, *particularly as BAC itself is also active in both these products.*  [Emphases added.]

117.     Fed General Counsel Scott Alvarez similarly wrote to Chairman Bernanke on December 23, 2008:  "*Lewis should have been aware of the problems at ML earlier (perhaps as early as mid-November) and not caught by surprise.*  That could cause other problems for him around the disclosures BA made for the shareholder vote."  (Emphasis added.)

118.     In sum, the due diligence conducted by the BofA Defendants—aided and abetted by other defendants—had its intended effect, which was to give an air of legitimacy to their decision to

cause BofA to pay $50 billion for a company that was on the verge of bankruptcy. This constituted a gross breach of these defendants' duties of good faith and loyalty to BofA and its shareholders.

  **C.**  **The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Secretly Approve $5.8 Billion in Unwarranted Bonuses for Merrill Executives as Part of the Merger and Secretly Cause these Bonuses to be Paid on an Accelerated Basis *Before* the Merger Closes.**

  119. As noted above, bonuses for Merrill executives occupied a front-and-center position during the negotiations leading up to the Merger and dominated the Merger negotiation topics discussed by the parties.

  120. On the issue of VICP bonuses, a term sheet prepared on Saturday, September 14, 2008 reflected that BofA had agreed in principle that Merrill would be authorized to pay a bonus pool that would, at most, be "flat to last year"—i.e., would not exceed the amount of bonuses Merrill paid in 2007, taking into account fluctuations in headcount—with a maximum recorded expense of $4.5 billion.[4]

  121. Negotiators for BofA and Merrill agreed that 60 percent of Merrill's year-end bonuses would be paid in cash and 40 percent in stock, the same cash-stock division Merrill used in 2007, and that bonus allocations would be made in consultation with BofA. Throughout the course of the weekend, defendants Curl and Fleming reported to defendants Lewis and Thain, respectively, on the status of this and other aspects of the negotiations.

  122. The bonus pool that the BofA Defendants approved that was "flat" to 2007, taking headcount changes into consideration, amounted to $5.8 billion. Incredibly, this amount was ***greater*** than the pool Merrill itself was projecting for 2008. Indeed, earlier in 2008, members of Merrill's

---

[4] The annual financial statement expense for the bonuses reflected the cash portion of the total bonus pool and any stock grants awarded to employees in the same year in which the cash bonuses were paid.

Compensation Committee had determined to **reduce** the anticipated bonus pool compared to 2007 by 16.5 percent, due to losses at Merrill in the first half of 2008. Thus, prior to negotiations, Merrill had projected a total VICP pool of, at most, only $5.1 billion with a recorded expense of $3.5 billion. The BofA Defendants thus permitted Merrill to pay a bonus pool that was greater than the amount Merrill previously had projected by up to $700 million and that carried a recorded expense that was larger by $1 billion.

123.     During these discussions, Defendant Fleming also insisted that BofA agree to allow Merrill to accelerate the bonuses so that they would be paid **before the Merger closed**—on December 31, 2008, which was **well ahead of the normal mid-January payment date for the bonuses, and well ahead of the disclosure date for Merrill's fourth-quarter results**.

> **D.     In Violation of Their Duties of Candor, Good Faith, and Loyalty, the BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Cause BofA to Issue a Proxy Statement That Conceals Crucial Facts About Losses at Merrill and the Bonuses to be Paid to Merrill Executives and is Otherwise Materially False and Misleading.**

124.     Defendants harmed BofA by causing BofA shareholders to approve BofA's acquisition of Merrill through the means of a false and misleading proxy statement. As a consequence, BofA acquired a company whose losses and liabilities have already begun to overwhelm BofA, transforming what was supposed to be an accretive acquisition into one that represents an immense **destruction** of BofA shareholder wealth—and that, for a while, effectively transformed BofA into a ward of the federal government.

125.     The terms of the Merger were set forth in the Proxy Statement, dated October 31, 2008, which was filed with the SEC on November 3, 2008, and mailed to all shareholders of record of BofA and Merrill Lynch (including Plaintiffs) as of the record date of October 10, 2008. The Proxy Statement—which spanned 125 pages and an additional 100 pages in exhibits—solicited

proxies from shareholders on behalf of BofA and the BofA Board to vote in favor of the Merger at a special meeting of shareholders on December 5, 2008.

>    **1.    The Proxy Statement Falsely Omits Information Concerning Bonuses, For Which the BofA Defendants Later Try to <u>Deflect Blame onto BofA's External and Internal Legal Counsel.</u>**

126.    In the days following the announcement of the Merger, the BofA Defendants and the Merrill Defendants, together with their companies' respective legal counsel, prepared the transactional and disclosure documents relating to the Merger.  BofA was represented by the Wachtell law firm, including Herlihy, Demmo, O'Brien, and Guest.  Merrill was represented by the Shearman law firm, including Madden, Marzulli, Petelpiece, and Rappaport.

127.    The agreement that the negotiating teams led by Defendants Fleming and Curl had reached during the weekend negotiations concerning the payment of VICP bonuses by Merrill was memorialized by Wachtell and Shearman in a so-called "disclosure schedule" to the Merger Agreement.  This "disclosure schedule" was appended to the Merger Agreement and was ***not*** contained in the body of the Agreement.  It therefore was ***not disclosed to shareholders*** in the Proxy Statement, which attached the body of the Agreement ***but not any of its appendices***.

128.    The relevant provision of the "disclosure schedule" provided that VCIP bonuses for 2008 "may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion."  In addition, "[t]he allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America]."

129.    The SEC, in connection with its investigation of the bonus payments, later questioned Defendants Lewis, Thain, and Fleming.  Asked why, each stated that he did not know why this information was set forth in a disclosure schedule as opposed to the text of the Merger Agreement

itself.   Defendants Lewis, Thain, Fleming, and Stingi told the SEC that that issue had been

determined by lawyers at Wachtell and Shearman, and one or more of BofA's in-house lawyers,

including Defendant Mayopolous, BofA's then-General Counsel, and Defendant Brenner.

130.   This was also confirmed during an August 10, 2009, before the Honorable Jed S.

Rakoff, in which counsel for BofA and the SEC unsuccessfully tried to get the Court to approve an

illusory settlement agreement of the SEC's fraud complaint against BofA filed that same day.  (*See*

*infra*, ¶¶ 226-230.)  At that hearing, the following exchanges occurred:

| | |
|---|---|
| Court: | What you are saying, if I understand it, is that Bank of America and Merrill effectively lied to their shareholders about a highly material matter. |
| [SEC Counsel]: | What we are saying— |
| Court: | Is that right? |
| [SEC Counsel]: | That is essentially correct.   We are saying they made representations— |
| Court: | So who at Bank of America and Merrill was responsible for that? |
| [SEC Counsel]: | We have not alleged any individual misconduct. |
| Court: | Did this happen, was this some sort of government that performed these actions or were there human beings that wrote these documents? |
| [SEC Counsel]: | There were indeed human rogues [sic] who wrote these documents. |
| Court: | Were there human beings who made the decision. |
| [SEC Counsel]: | Yes, there were human beings to [sic] made the decision. |
| Court: | So who were they? |
| [SEC Counsel]: | As we point out in paragraph 12 of the complaint *the documents were drafted by lawyers of the company*. |
| Court: | Who made the decision not to disclose what had, according to your allegations, been an agreement already reached to pay bonuses up to in excess of five billion dollars. |
| [SEC Counsel]: | We have not made any allegations, your Honor— |
| Court: | Well, you could not have made the allegations you have made without having conducted an investigation; true? |
| [SEC Counsel]: | That's correct, we conducted an investigation. |
| Court: | And you must have determined, must not, then, who at least physically did the various acts that are alleged; yes? |
| [SEC Counsel]: | *We have determined to the extent that we were able to determine that lawyers crafted these documents for the company*. |
| Court: | *And who were the lawyers?* |
| [SEC Counsel]: | *I, I believe the lawyers were Wachtell—* |

| | |
|---|---|
| [BofA Counsel]: | ***Your Honor, the lawyers on both sides, if I may, the Bank of America side, Bank of America was represented by the law firm Wachtell, Lipton and on the Merrill Lynch was represented by the law firm Shearman & Sterling.*** |
| Court: | And were those lawyers aware when they drafted the proxy of the prior agreement to approve the bonuses? |
| [SEC Counsel]: | We have made no allegations with respect to what the lawyers did. |
| Court: | You are not going to be particularly effective with this court by telling me what I already know, namely, that you filed a rather uninformative bare bones complaint. |

*   *   *   *

| | |
|---|---|
| Court: | So if you are correct that this proxy statement was materially misleading in failing to disclose these arrangements, then at a minimum Mr. [Thain] or Mr. Lewis and I— |
| [SEC Counsel]: | Again, your Honor, we have not made any allegations with respect to Mr. [Thain] or Mr. Lewis and I— |
| Court: | Well, have you talked to them about it? |
| [SEC Counsel]: | We have spoken with relevant individuals. |
| Court: | And by relevant individuals, you mean Mr. Thain and Mr. Lewis? |
| [SEC Counsel]: | That's correct. |
| Court: | ***And what do they say.*** |
| [SEC Counsel]: | ***They were not aware, they relied on the lawyers' advice and they didn't what was in the disclosure schedule versus what was in the proxy statement that was distributed to shareholders, as to this issue, I should say.*** |
| Court: | Right.  Was that because they didn't read the proxy statement? |
| [SEC Counsel]: | I'm not— |
| Court: | That they signed off on? |
| [SEC Counsel]: | I don't, I don't think there is anything in the record about that.  They obviously signed off on the proxy statement, but I'm not sure if they were asked specifically about— |
| Court: | You didn't ask them if they read the proxy statement that they signed? |
| [SEC Counsel]: | They were asked about their knowledge with respect to the specific transactions here, but, you know, they said that they were not aware of that on that [sic]. |
| Court: | This whole issue of bonuses wasn't, like, something that was not in the public eye or was an obscure issue at the time, was it? |
| [SEC Counsel]: | I don't know about at that time, your Honor.  It has since been public knowledge. |
| Court: | ***And did you attempt to find out whether the lawyers who prepared this and who apparently—Mr. Thain and Mr. Lewis*** |

-49-

> *relied on, according to what they told you, what they have to say about what they told Mr. Thain and Mr. Lewis or anyone else?*

[SEC Counsel]:   There has been no waiver of the attorney-client privilege and we have not probed communications.

Court:   ***Have you asked them to testify and they asserted the privilege?***

[SEC Counsel]:   ***No, we didn't.***

Court:   ***You didn't even ask them to testify?***

[SEC Counsel]:   ***No, your Honor, we have not.***

*   *   *   *

[BofA Counsel]:   [T]here were some statements that were made by my adversary that I just wanted to maybe put in the correct order or clear up. I mentioned that and proffered that ***there would be evidence that the lawyers negotiated the merger agreement, disclosure schedule and the proxy statement.***

　　　I don't believe that there is any evidence—with respect to Mr. Curl and Mr. Fleming, I believe what the evidence would show is that those two individuals negotiated the essential business terms of the transaction, which included that VICP, that's the incentive compensation, would remain flat to last year.

　　　That was what was negotiated over the weekend of September 15. ***The details of the disclosure schedule were worked out over the ensuing month or so among the lawyers.*** I don't think there is any evidence in the record—

Court:   Those evil lawyers are at it again.  But, OK, I understand your point.

[BofA Counsel]:   Your Honor, I don't believe that there is any evidence that Mr. Lewis or Mr. Thain were aware of the specific terms of the disclosure schedules.  Again without waiving the privilege, the question is was the subject of the VICP or the disclosure schedules discussed by the lawyers with Mr. Lewis.  Just as to the subject without getting into the content, I would proffer that there would be no evidence that that subject was discussed. [Emphases added.]

## 2.        The Proxy Statement Falsely Describes Losses and Liabilities of Merrill.

131.    The Proxy Statement incorporated by reference several documents, including Merrill's Form 8-K filing dated October 16, 2008.  That Form 8-K, in turn, included Merrill's press release announcing results for the third quarter, ending September 30, 2008, as well as a preliminary

unaudited earnings summary for the quarter.  These results indicated a net loss from continuing operations of $5.1 billion, and an overall net loss of $5.2 billion.

132.    The October 16, 2008, Form 8-K reported that Merrill had experienced negative $6.5 billion "principal transactions revenues," indicating a net loss due to realized and unrealized losses (including trading losses, asset impairments and write-downs, and declines in mark-to-market valuations) in the securities held on its balance sheet.[5]

133.    Among the "significant items" causing such large negative revenues were $12.1 billion in purported asset losses and write-downs described as follows:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super senior ABS CDOs[1] and the termination and potential settlement of related hedges with monoline guarantor counterparties

                    *    *    *    *

- Net write-downs of $3.8 billion principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer

                    *    *    *    *

- Net losses of $2.6 billion resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures

134.    Moreover, the Form 8-K emphasized the positive **developments at Merrill in reducing balance sheet exposure**, including a highly positive comment from Defendant Thain regarding improvements in that area:

### Third Quarter and First Nine Months of 2008 Highlights

- Bank of America Corporation agreed to acquire Merrill Lynch & Co. in an all-stock transaction

---

[5] "Principal transactions revenues" are described by Merrill as including "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt.  These investments are recorded at fair value. . . .  Gains and losses are recognized on a trade date basis."

- Record year-to-date and third highest quarterly revenues in Rates and Currencies, up 27% from prior year-to-date

- Global Equity Linked Products (Derivatives) net revenue growth of 23% sequentially and 14% year-on-year

- Advisory revenues outperformed the market, increasing 12% sequentially; Merrill Lynch also ranked #2 in global announced M&A for the quarter

- Solid performance in Global Wealth Management despite challenging market environment; FA headcount increased by 240 from a year ago; Net new annuitized assets are up $21 billion year-to-date

- ***Significant progress in balance sheet and risk reduction***; RWA declined by approximately 15% over the quarter

- ***Substantial sale of $30.6 billion of gross notional amount of U.S. super senior ABS CDOs***

- ***Reductions of 98% of U.S. Alt-A residential mortgage net exposures***. Including planned sales, reductions of 56% in non-U.S. residential mortgages and 25% in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio

- ***Enhanced capital base*** through a $9.8 billion common stock offering and the $4.425 billion sale of the Bloomberg stake

- Subsequent to the third quarter, and as part of Bank of America's $25 billion participation in the TARP Capital Purchase Program, Merrill Lynch agreed and expects to issue $10 billion of non-voting preferred stock and related warrants to the U.S. Treasury pursuant to the program.

     **"*We continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal,*"** said John A. Thain, chairman and CEO of Merrill Lynch. "As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth." [Emphases added; footnote omitted.]

135.    These statements were materially false and misleading because, in spite of any efforts to "reduce exposure" or "de-leverage," Merrill, in fact, retained toxic amounts of bad securities on its balance sheet that, in the first half of October 2008 alone, were causing billions of dollars in new losses.

136.    The Proxy Statement also specifically incorporated by reference future documents to be filed with the SEC and made publicly available:

In addition, Bank of America and Merrill Lynch also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Merrill Lynch special meeting. These documents include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

137.    The Proxy Statement also incorporated by reference Merrill's filings on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, and September 30, 2008.   Each of these filings contained a certification by Deloitte, Merrill's independent registered public accounting firm, that no "material modifications" were necessary in Merrill's financial statement to make them accurate.  Deloitte's certification in the Form 10-Q for the third quarter 2008, for example, provided that:

We have reviewed the accompanying condensed consolidated balance sheet of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of September 26, 2008, and the related condensed consolidated statements of (loss)/earnings and comprehensive (loss)/income for the three-month and nine-month periods ended September 26, 2008 and September 28, 2007, and the related condensed consolidated statements of cash flows for the nine-month periods ended September 26, 2008 and September 28, 2007. These interim financial statements are the responsibility of Merrill Lynch's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

***Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***  [Emphasis added.]

138.    Similarly, the Proxy Statement incorporated by reference Merrill's filing on Form 10-K for the year ended December 31, 2007.  That form 10-K contained Deloitte's certification that:

We have audited the consolidated financial statements of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of December 28, 2007 and December 29, 2006, and for each of the three years in the period ended December 28, 2007, and the effectiveness of Merrill Lynch's internal control over financial reporting as of December 28, 2007, and have issued our reports thereon dated February 25, 2008 (which reports express unqualified opinions . . .).

We have also previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Merrill Lynch as of December 30, 2005, December 31, 2004, and December 26, 2003, the related consolidated statements of earnings, changes in stockholders' equity, comprehensive income, and cash flows for the years ended December 31, 2004, and December 26, 2003 (none of which are presented herein); *and we expressed unqualified opinions on those consolidated financial statements.* . . .

*In our opinion, the information set forth in the "Selected Financial Data" table under the captions "Results of Operations," "Financial Position" and "Common Share Data," for each of the five years appearing on page 19, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.* [Emphasis added.]

139.    Moreover, the Proxy Statement, under the heading of "Experts," stated that Deloitte's opinion formed an integral part of the Proxy Statement:

The consolidated financial statements and the related financial statement schedule incorporated by reference in this registration statement [sic] from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 28, 2007, and the effectiveness of Merrill Lynch & Co., Inc. and subsidiaries' internal control over financial reporting have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, incorporated herein by reference (*which report on the consolidated financial statements expresses an unqualified opinion . . .*). Such consolidated financial statements have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.  [Emphasis added.]

### 3.    The Proxy Statement Falsely Sets Forth "Fairness" Opinions by the Advisor Defendants.

140.    J.C. Flowers and FBK each provided a "fairness" opinion in the Proxy Statement concluding that the proposed purchase price of Merrill was "fair, from a financial point of view, to Bank of America."  These "fairness" opinions were dated September 14, 2008, the same day that

principal negotiations concerning the Merger had taken place.  The opinions were included in the

Proxy Statement sent to BofA shareholders.

141.    In the Proxy Statement, Defendants FPK and J.C. Flowers provided "fairness"

opinions to BofA shareholders stating that, in those Advisor Defendants' opinion, the Merger was

fair, from a financial point of view, to BofA. The FPK "fairness" opinion stated, in part:

> You have requested our opinion as to the fairness, from a financial point of
> view, to Bank of America Corporation (the "Company") of the Exchange Ratio (as
> defined below) to be paid by the Company pursuant to the terms of, and subject to
> the conditions set forth in, the Agreement and Plan of Merger to be dated as of
> September 15, 2008 (the "Merger Agreement") by and between the Company and
> Merrill Lynch & Co., Inc. ("Merrill Lynch").
>
> \* \* \* \*
>
> In connection with our review of the proposed Merger and the preparation of
> our opinion herein, we have examined: (a) the financial terms and conditions of a
> preliminary draft of the Merger Agreement; (b) certain audited historical financial
> statements of the Company and of Merrill Lynch for the five years ended December
> 31, 2007; (c) information regarding the strategic, financial and operational benefits
> anticipated from the Merger and the prospects of the Company (with and without the
> Merger); (d) the pro forma impact of the Merger on the earnings per share of the
> Company (before and after taking into consideration any goodwill created as a result
> of the Merger) based on certain pro forma financial information prepared by the
> senior management of the Company; (e) information regarding the amount and
> timing of potential cost savings and related expenses and synergies which senior
> management of the Company expects will result from the Merger, as well as certain
> estimated restructuring charges and negative revenue adjustments which senior
> management of the Company expects to result from the Merger (the "Expected
> Synergies"); (f) information regarding publicly available financial terms of certain
> recently-completed transactions in the investment banking industry; (g) current and
> historical market prices and trading volumes of the common stock of the Company
> and Merrill Lynch; and (h) certain other publicly available information on the
> Company and Merrill Lynch.
>
> \* \* \* \*
>
> In rendering our opinion, we have assumed and relied, without independent
> verification, upon the accuracy and completeness of all the information examined by,
> or otherwise reviewed or discussed with, us for purposes of this opinion. We have
> not made or obtained an independent valuation or appraisal of the assets, liabilities
> (contingent, derivative, off-balance sheet or otherwise) or solvency of the Company

or Merrill Lynch, including particularly any mark-to-market balance sheet adjustments resulting from the Merger, market conditions or otherwise. We relied solely upon information provided to us by the Company and other publicly available information with respect to Merrill Lynch's financial condition, results of operations and prospects.

*   *   *   *

**Based upon and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Ratio to be paid by the Company in the Merger is fair, from a financial point of view, to the Company. This opinion has been approved by our fairness committee.** [Emphasis added.]

142.  The FPK "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

143.  The J.C. Flowers "fairness" opinion stated, in part:

You have requested our opinion as of the date hereof as to the fairness, from a financial point of view, to Acquiror of the Exchange Ratio. In connection with this opinion, we have: (i) reviewed the financial terms and conditions of the Merger; (ii) analyzed certain historical and prospective business and financial information relating to the Company and Acquiror; (iii) held discussions with members of the senior managements of the Company and Acquiror with respect to the businesses and prospects of the Company; (iv) reviewed public information with respect to certain other companies we believed to be relevant; (v) reviewed the financial terms of certain business combinations involving companies we believed to be relevant; (vi) reviewed historical stock prices and trading volumes of the Company common stock and Acquiror common stock; and (vii) conducted such other financial studies, analyses and investigations as we deemed appropriate.

*   *   *   *

**Based on and subject to the foregoing, we are of the opinion that as of the date hereof the Exchange Ratio is fair, from a financial point of view, to Acquiror.** [Emphasis added.]

144.  The J.C. Flowers "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

145.    In addition, the Proxy Statement stated that the two "fairness" opinions had been based in substantial part on forward-looking information concerning Merrill and its effect on BofA, including:

- "financial and operating information with respect to the business, operations and **prospects** of Merrill Lynch furnished to FPK and J.C. Flowers by Bank of America"; and

- "discussions with members of senior management of Merrill Lynch with respect to the businesses and **prospects** of Merrill Lynch".

(Emphases added.)

146.    All of the above statements were false and misleading, in that, at the time they were issued and subsequently, FPK and J.C. Flowers lacked any reasonable basis to conclude that the Merger was fair to BofA—and the BofA Defendants knew or recklessly or negligently disregarded that fact.  Throughout their misconduct, FPK and J.C. Flowers not only violated Section 14(a) but also facilitated the BofA Defendants' violations of that statute—as well as aiding and abetting the BofA Defendants in their breaches of candor and other fiduciary duties to the Company and its shareholders.  In particular, the "fairness" opinions were false and misleading in that, among other things, they:

(a)    disregarded the financial condition of Merrill (including illiquidity and insolvency)—or the resulting price at which Merrill could be acquired—in the absence of BofA's precipitate $50 billion bid;

(b)    were based on older, no-longer-reliable projections of future losses and write-downs and did not take into account current projections of losses and write-downs, much less critically evaluate the assumptions behind such projections;

(c)    made no attempt to relate the current liquidity crisis at Merrill to the company's likely future results or its value to BofA;

(d)      made no attempt to compare Merrill's financial condition and likelihood of remaining a going concern to those of Lehman Brothers, whose financial and accounting records had been reviewed for BofA by J. Christopher Flowers earlier that same week in connection with a possible acquisition of Lehman Brothers, and which was widely known to face immediate bankruptcy in the absence of an acquisition; and

(e)      made no attempt to quantify the impact on Merrill's losses, cash flow, liquidity, and solvency from the severe liquidity problems also being experienced at the time by American International Group, Inc. ("AIG"), which provided tens of billions of dollars of credit default swap protection on Merrill's holdings of CDOs and whose financial and accounting records were being examined by J. Christopher Flowers at the request of AIG simultaneously with his engagement by BofA on the Merrill Merger.

### 4.    The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger.

147.    Under the heading "Recent Developments," the Proxy Statement disclosed that BofA had agreed to sell $25 billion in preferred stock to the United States Government pursuant to the Capital Purchase Program ("CPP") effectuated by Congress in the Emergency Economic Stabilization Act of 2008.  This amount included $10 billion of preferred stock related to the acquisition of Merrill if the Merger were consummated:

> On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury has the authority to, among other things, invest in financial institutions and purchase mortgages, mortgage-backed securities and certain other financial instruments from financial institutions, in an aggregate amount up to $700 billion, for the purpose of stabilizing and providing liquidity to the U.S. financial markets. On October 14, 2008, the U.S. Treasury announced a plan, referred to as the Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate.

In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28, 2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under "— Merrill Lynch & Co Developments — Unaudited — Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

148.    The Proxy Statement disclosed that Merrill would *not* participate in the CPP with the federal government, pending the outcome of the Merger.   This statement became false and misleading when the Proxy Statement was never updated to include information concerning Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

### 5.    The Proxy Statement Falsely States that Merrill Executives Will Not Receive Discretionary Bonuses for 2008 and Conceals the Fact that Defendants Had Agreed to Guarantee $5.8 Billion in Bonuses to Merrill Executives and Accelerate the Payment Thereof to December 2008, Before the Merger Was Set to Close.

149.    The Proxy Statement included, as an attachment, the full text of the Merger Agreement, *but it omitted the "disclosure schedule" setting forth the agreement about Merrill's*

*payment of VICP bonuses*.  Neither the "disclosure schedule" nor anything about its contents was

publicly disclosed at any time prior to the December 5, 2008, shareholder meetings. [6]

150.    The "disclosure schedule," which was omitted from the Proxy Statement, provided:

5.2(b)(iii),  5.2(c)(i),  and  5.2(c)(ii)—Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion. . . . Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards.  The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] . . . .  The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

151.    Not only did the proxy materials fail to disclose that the BofA Defendants had caused

BofA to authorize Merrill to pay up to $5.8 billion in discretionary and other year-end bonuses, but a

provision *from the Merger Agreement, which <u>was</u> disclosed, indicated the opposite*—i.e., that

Merrill *had no authority to, and would not, pay discretionary bonuses to employees without*

*BofA's prior consent*.  Rather than set forth the truth about these bonuses, the pertinent provision

stated only:

5.2    <u>Company Forbearances.</u>  During the period from the date of this Agreement to the Effective Time [the closing of the Merger], except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, [Merrill] shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of [BofA]:

* * * *

(c)   except as required under applicable law or the terms of any [Merrill] Benefit Plan existing as of the date hereof, (i) increase in

---

[6] It was not until January 16, 2009, with the pre-release of BofA's fourth quarter 2008 earnings that this information was finally disclosed.

> any manner the compensation or benefits of any of the current or
> former directors, officers or employees of [Merrill] or its
> Subsidiaries (collectively, "Employees") [or] (ii) pay any amounts
> to Employees not required by any current plan or agreement (other
> than base salary in the ordinary course of business) . . . .

152.    Subparagraph (c) to Section 5.2 of the Merger Agreement quoted above described one of approximately 18 enumerated actions that, as recited in the forbearance provision, Merrill purportedly agreed to refrain from taking prior to the closing of the Merger.  Although the forbearance provision as a whole refers generically to exceptions in the disclosure schedule, *there is no disclosure at all of what those exceptions were or the contents of the schedule anywhere in the Merger Agreement.*  Neither the "disclosure schedule" nor its contents were publicly disclosed at any time prior to the December 5, 2008, shareholder meetings.  Thus, there was no way to tell to what extent, if any, the unspecified exception applied to any particular action that Merrill was prohibited from taking.  Shareholders could not have known that BofA had *already* agreed to allow Merrill to pay Merrill executives up to $5.8 billion in discretionary bonuses—payments "not required by any current plan or agreement."

153.    Moreover, the text of the Proxy Statement, in a section describing the principal terms of the Merger Agreement, paraphrased the forbearance provision of Section 5.2 and listed the 18 "extraordinary" actions that Merrill had agreed not to take prior to closing—including the payment of discretionary compensation.  The relevant passage in the proxy statement qualified the discussion of the forbearance provision only by referring to "certain exceptions," which were left unspecified, and by stating that Merrill was prohibited from taking the "extraordinary" actions without "Bank of America's prior written consent," as follows:

> Merrill Lynch further agreed that, with certain exceptions or except with Bank of
> America's prior written consent . . . , Merrill Lynch will not, and will not permit any
> of its subsidiaries to, among other things, undertake the following extraordinary
> actions . . . except as required under applicable law or the terms of any Merrill Lynch

benefit plan (i) increase the compensation or benefits of any current or former directors, officers or employees [or] (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements . . . .

154.   The bonus information omitted from the Proxy Statement was highly material to BofA shareholders.  First, the bonuses meant that the asset to be acquired, Merrill, was worth $5.8 billion less than its purchase price—which, by the time of the Proxy Statement, based on BofA's share price, was well over 10 percent of the total cost.  Second, accelerating the bonus schedule meant that Merrill executives would, purely as a result of the Merger, reap gigantic windfalls, despite Merrill's abysmal financial performance in 2008.  Third, the acceleration of the bonuses as part of the Merger Agreement itself eliminated any opportunity for BofA to reduce or eliminate the bonus payments once the transaction closed.

### 6.   The Proxy Statement Falsely Recommends Approval of the Merger.

155.   Based on the extremely limited analysis recited above, the BofA Director Defendants unequivocally recommended that BofA's shareholders approve the Merger, as follows:

**Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors has unanimously approved and adopted the merger agreement and the transactions it contemplates, including the merger. *The Bank of America board of directors determined that the **merger, merger agreement and the transactions contemplated by the merger agreement** are advisable and in the best interests of Bank of America and its stockholders and unanimously recommends that you vote "FOR" approval of the issuance of shares of Bank of America common stock in the merger.*  [Emphases added.]

156.   The Proxy Statement indicated that the Merger would be "3.0% dilutive in 2009 and breakeven in 2010."  The Proxy Statement also included detailed reported results with respect to Merrill's operations for the quarter ending June 30, 2008 and, under a heading titled "Recent Developments," also discussed more recent financial results of Merrill.  These recommendations were based on the BofA Defendants' bad faith and disloyalty in desiring to acquire Merrill no matter

what the price tag or future liabilities, not on any reasoned determination that the transaction was in the best interests of BofA or its shareholders.

> **E.  The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity.**

157.   At the time of the issuance of the Proxy Statement and afterwards, each of the Defendants knew or were reckless or negligent in now knowing that Merrill's financial condition was dramatically deteriorating, and that the Proxy Statement contained the misstatements and omissions set forth herein, in violation of the federal securities laws and in violation of the BofA Defendants' duty of complete candor.  In spite of this knowledge or reckless or negligent disregard, each of the Defendants caused or allowed the Proxy Statement to set forth the misstatements and omissions, and each failed to cause a corrected, updated, or revised proxy statement to be issued before the Shareholder Vote.

158.   When the Merger was first announced on September 15, 2008, questions were raised by securities analysts concerning the valuation of Merrill at $29 per share, given Merrill's accumulating losses and uncertain future.  At that time, Defendants stated unequivocally that they knew and understood the value of Merrill's assets.

159.   During a conference call with analysts on September 15, 2008, Matthew O'Connor, an analyst at UBS, pointed out that "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced.  I guess the question is why pay $29 at this point?"  Another analyst raised the issue of the necessity of large write-downs on Merrill's assets, and asked whether the financial numbers presented with the

announcement included any mark-to-market write-downs.  Defendant Lewis quelled such concerns, stating:

> *The numbers that we presented today we have considered marks on the assets . . . .*
> I would tell you that, again, going back to the point of things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures. We are dealing with the same counterparties on things so again, *we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch has made.*  [Emphases added.]

160.   In addition, prior to the Closing of the Merger, other analysts alerted Defendants to the need for Merrill to take further write-downs.  For example, once they digested the news of the Merger and took a close look at Merrill, other analysts noted the necessity of further asset write-downs at Merrill that would drastically impair the value of the Merger to BofA.  A Deutsche Bank analyst report, dated September 16, 2008, stated:

> The big question surrounding capital market businesses [such as Merrill's] is, "how much more in write-downs are likely ahead?"  In particular, a new weakness at AIG has the potential to hurt Merrill's capital via any potential insurance on its ABS CDO.  Alternatively, additional selling of risky commercial or residential real estate assets could impact Merrill's commercial real estate securities ($18B), other risky mortgage assets ($31B; includes $10B alt-A, subprime and non-US residential), and leveraged finance ($8B), not withstanding declines in these amounts since the end of 2Q08.  In additions to the "risky" assets, Merrill also has $33.7B in US prime mortgages on balance sheet.

161.   In addition to these analysts' warnings, the recent large partial write-downs of Merrill's assets should have placed (and did place) Defendants on notice of the impaired condition of that company prior to the Merger.  In fact, on November 6, 2008, Merrill reported financial results for the quarter ending September 30, 2008, that included substantial write-downs in Merrill's assets and resulted in Merrill reporting a net loss of over $5 billion.  Similarly, in a *Wall Street Journal* article on November 8, 2008, it was revealed that Merrill Lynch was "planning to sell roughly $4 billion of distressed debt securities, including mortgages and complex investments, in a bid to cut its exposure to risky assets."  An article in the *Journal* dated November 17, 2008, indicated that the

United States Treasury would provide $10 billion to Merrill under the Troubled Asset Relief Program after the Merger was completed.

162.    Of course, the BofA Defendants did not need analysts, or even Merrill's publicly announced results, to uncover the truth about Merrill.  These defendants (together with the Merrill Defendants) had complete and unfettered access to Merrill's financial and accounting records beginning no later than September 15, 2008, the day the Merger was announced.

163.    Under the terms of the Merger Agreement, paragraph 6.1, Merrill was obligated to fully cooperate with BofA and the BofA Defendants in providing any information necessary in connection with the Proxy Statement.  Similarly, under paragraph 6.2, the BofA Defendants enjoyed full access to Merrill's financial and accounting records:

> Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, *each of Company and Company shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors, agents and other representatives of the other party, reasonable access, during normal business hours during the period prior to the [Merger's closing], to <u>all its properties, books, contracts, commitments and records,</u>* and, during such period, such party shall, and shall cause its Subsidiaries to, make available to the other party . . . all . . . information concerning its business, properties and personnel as the other party may reasonably request . . . .  [Emphases added.]

164.    Such access included access to Merrill's profit and loss ("P&L") reports, which showed the facts of Merrill's deteriorating positions.  Indeed, in a memo to Merrill employees following his termination, Defendant Thain stated:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.  However, they were incurred almost entirely on legacy positions and were due to market movements.  *We were completely transparent with Bank of America.  They learned about these losses when we did.  The acting CFO of my businesses was Bank of America's former Chief Accounting Officer.  They had daily access to our P & L, our positions and our marks.*  [Emphasis added.]

165.    Moreover, Defendants Lewis, Price and other senior executives among the BofA Defendants received weekly reports concerning Merrill's financial condition *beginning immediately*

*after the Merger Agreement was executed.*  Defendant Lewis, for example, testified before the New York Attorney General on April 23, 2009 as follows:

> *We were getting projections [concerning Merrill].  I was getting a P & L at Bank of America, but we were getting projections.  I don't recall getting them every day, but I was either hearing about them and in some cases I saw them.*  [Emphasis added.]

166.    Defendant Lewis similarly admitted to the House Committee on Government Oversight and Reform on June 11, 2009, that, beginning on September 15, 2008, he received weekly reports concerning Merrill's financial condition:

> Q.    Isn't it true that Bank of America examined Merrill Lynch's book of business before signing the merger agreement and then received detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 5th?
>
> A.    That is true.

167.    By November 2008, the losses at Merrill became so severe that, according to Defendant Price in testimony to the New York Attorney General earlier this year, he sought the advice of both inside legal counsel (specifically, Defendant Mayopolous) and outside legal counsel (specifically, the Wachtell law firm) as to whether BofA should disclose Merrill's expected fourth quarter losses to BofA shareholders.  Price further testified that BofA's decision not to disclose those losses was made after receiving such advice.  Price testified, in particular, that the BofA Defendants decided not to disclose such losses following a telephone call on November 20, 2008 with the Wachtell law firm.

168.    As Defendant Thain stated upon his forced departure from Merrill after the Closing, the weekly reports concerning Merrill that were sent to Lewis, Price, and other BofA Defendants were unmistakably clear about Merrill's rapidly deteriorating condition.  These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings.  In the first week of October, the reports showed, Merrill lost $1.3 billion, lost

$257 million the next week, lost $702 million the week after that, and then lost $2.2 billion in the week after that—for a total of $4.4 billion in October alone.  During the week of November 10, 2008, Merrill lost *another* $4.4 billion.

169.    At Kucinich's request, Pierre Sprey, a longtime Defense Department official who helped design the F-16 fighter, performed a statistical analysis of the Merrill losses and concluded "the evidence for a constantly deteriorating . . . trend is *much stronger on November 14 than it is on December 12.*"  (Emphasis added.)[7]  This conclusion was contrary to the BofA Defendants' repeated statements that they did not learn of the losses, nor could they have known about them, until *after* the Shareholder Vote on December 5, 2008.

170.    Further, according to the *New York Times* (February 9, 2009), shortly after the Merger was announced, BofA "quickly put 200 people at [Merrill], including a large financial team.  A Bank of America executive [Chief Accounting Officer Neil Cotty] was sent to New York from Charlotte to act as an interim chief financial officer *and had daily access to Merrill's profit-and-loss statements*."  (Emphasis added.)  The information available to BofA's 200-person transition team was the same information available to the senior management of Merrill, including Defendant Thain.  Thus, no aspect of Merrill's losses was or should have been opaque to the BofA Defendants.  Team leader Cotty reported directly to Defendant Lewis.  The BofA Director Defendants, who conducted weekly conference calls every Friday starting in September 2008 and continuing through December 2008, could not and should not have been unaware of Merrill's accelerating losses throughout the fourth quarter.

171.    According to the *Wall Street Journal* (February 6, 2009):

---

[7] Mr. Sprey's analysis was also put into the public record at the Lewis hearing.

*By the end of November, two months into the fourth quarter, Merrill had accumulated $13.34 billion in pretax quarterly losses, according to an internal document reviewed by The Wall Street Journal.* Some Bank of America executives expressed concern about proceeding with the takeover, people close to the bank say. . . . *[T]he bank decided to go ahead with Dec. 5 shareholder votes on the deal.* Shareholders of both Merrill and Bank of America gave their approval.

\* \* \*

Bank of America executives remained confident about the deal [in October]. *Doubts began to creep in shortly before Thanksgiving.  With more than a month to go until the end of the fourth quarter, the pretax quarterly losses at Merrill were approaching $9 billion*, according to people familiar with the figures.  *By month's end, the figure had exceeded $13 billion*, or $9.29 billion after taxes.

Most of the losses were coming from the securities firm's sales and trading department.  But business was even suffering in Merrill's lucrative wealth-management unit, which saw its revenue drop to $797 million in December, from $1.08 billion in October.  Still, not all the losses, which included expected write-downs on assets such as Merrill's investment in rental-car company Hertz Global Holdings Inc., should have come as a surprise to Bank of America.

\* \* \* \*

*At Bank of America, executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the "material adverse effect" clause in its merger agreement.*  Merger agreements typically specify certain "adverse" conditions that give an acquirer the right to abandon a deal.

\* \* \* \*

*The deliberations continued up until a few days before shareholders of Merrill and Bank of America were scheduled to vote*, one of these people says.  Senior Bank of America executives had "mixed emotions," this person says, but "everyone wanted to see the deal go through."  [Emphases added.]

172.    Defendant Lewis has stated publicly that internal BofA forecasts projected a $9 billion fourth-quarter loss (after taxes) for Merrill on December 5, 2008—a date which conveniently coincided in his memory with the date of the Shareholder Vote that was already underway that day. In actuality, however, Lewis was aware or should have been aware of the $9 billion *no later than the evening of December 3, 2008*, when he received the latest weekly BofA internal report on Merrill.  On this occasion, Defendant Rosato, BofA's Chief Accounting Officer, sent an e-mail

stating: "*4Q revenues [at Merrill] need to be adjusted down by $3B.*"  The existence and contents of Rosato's e-mail were immediately made known to Defendants Lewis and Price and the BofA Board.  That revision changed the estimated fourth-quarter net loss to $8.98 billion, worse than the previous Merrill forecast of $7.06 billion, which had been sent to Lewis and other executives only that same day.  The December 5, 2009, projection was shared with the BofA Board no later than at its meeting on December 9, 2008.

173.     Moreover, the New York Attorney General has discovered that:

> *By December 3, 2008, Bank of America learned that Merrill's forecasted losses had risen to more than $11 billion [before taxes], and with the addition of a $3 billion "contingency" they rose to more than $14 billion [before taxes]*.  Mr. Price testified that the decision not to disclose these escalating losses was not made until after conversations with Mr. Mayopolous.  Mr. Mayopolous in turn testified that he spoke with outside counsel [the Wachtell law firm] to request legal advice regarding the additional losses.  [Emphasis added.]

174.     In addition, as Defendant Lewis testified to the NYAG on April 23, 2009, by December 14, 2008, the projected loss had increased to $12 billion (after taxes).  This represented, in Lewis's words (according to his testimony to the New York Attorney General) a "staggering amount of deterioration."

175.     Despite the BofA Director Defendants' awareness of, or ready access to, that information, neither the Proxy Statement nor any supplements thereto, were ever updated or corrected to disclose the dramatic decreases in the value of Merrill's assets or the company's increasing losses.  The BofA Defendants, aided and abetted by Merrill Defendants and the Advisor Defendants, breached their duty to update and correct the material misstatements and omissions in the Proxy Statement, in violation of the federal securities laws and/or the duty of candor to BofA shareholders.

**F.     BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants.**

176.    BofA's shareholders approved the Merger in a special meeting held on December 5, 2008.  Lacking the material facts necessary to make an informed decision on whether to approve BofA's acquisition of Merrill, 82 percent of BofA's shareholders voted to approve the Merger and the issuance of additional BofA shares necessary to complete it.  The BofA Defendants promptly issued a press release announcing that the shareholders had approved the Merger.

177.    Pursuant to their undisclosed agreement not to invoke the MAC clause and play along with Messrs. Paulson and Bernanke's desires (in the bargain, keeping their lucrative positions as officers and directors and receiving billions of dollars in federal assistance), almost immediately after the votes were tallied, the BofA Defendants went to the federal government to seek additional assistance (on top of the $25 billion already received in that fall).  BofA Chairman Lewis expressly advised the Treasury that BofA would not be able to close the deal without billions more in assistance, due to Merrill's substantially deteriorated financial condition.  Thereafter, Lewis secured a promise of $20 billion in direct additional assistance to complete the Merger, as well as guarantees and indemnifications for $118 billion in additional exposure.  Of this amount, fully 75 percent – or $88.5 billion – arose from Merrill losses and liabilities.  The Merger was consummated on January 1, 2009.

**G.     The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact.**

178.    The BofA Defendants further breached their fiduciary duties to BofA and its shareholders by proceeding with the acquisition of Merrill after September 15, 2008, despite their knowledge of, and/or ready access to, information concerning Merrill's severely worsening financial condition and the immensely dilutive and destructive effect Merrill would have on BofA as a

consequence.  As set forth above, the BofA Defendants knew of, or recklessly or with gross negligence disregarded, Merrill's losses and liabilities, and the effect they would have on BofA, yet deceived shareholders by not revealing the extent of the losses before the Merger closed on January 1, 2009—thereby foregoing steps that could have spared BofA the damage complained of herein.

179.   In fact, pursuant to the Merger Agreement, the BofA Defendants could have terminated the Merger and been held harmless, upon uncovering events or circumstances evidencing a material adverse effect of precisely this nature.  The Merger Agreement included the following language in paragraph 3.8, defining a "Material Adverse Effect," the occurrence of which would allow the BofA Defendants to terminate the Merger prior to the scheduled closing on January 1, 2009:

> 3.8   Absence of Certain Changes or Events.  (a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term "Material Adverse Effect" means, with respect to Company or Company, as the case may be, *a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole* . . . .  [Emphasis added.]

180.   Certain items were excluded from the definition of "Material Adverse Effect," such as changes in accounting rules, rules and regulations, political conditions, general business conditions, and the like.  These exclusions, however, were not intended to apply if Merrill's financial and operational conditions took a sharp turn for the worse beyond plan, as they did.  For example, one exclusion was for "failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof"—indicating that the underlying causes of Merrill's results, such as asset impairments and write-downs, were to be ***included***.

181.   As Merrill's condition worsened in November and December 2008, Defendants Lewis became increasingly concerned about BofA's ability to complete the Merger.  Lewis

conferred with internal legal counsel to determine whether BofA had grounds to rescind the Merger

under the MAC clause.  Indeed, prior to the Shareholder Vote, Defendants Lewis, Price, Curl, and

the BofA Board were well aware that the significant deterioration in Merrill's asset values, and its

ballooning losses, justified invoking the MAC clause, yet deceptively and in bad faith took pains to

conceal these facts, in breach of their duties of loyalty, good faith, and candor.

182.     The New York Attorney General, in connection with its investigation of the Merger,

has uncovered at least some of Defendants' bad faith and deceptive conduct and (in a letter to

BofA's outside counsel, Lewis Liman, requesting greater cooperation) has made public evidence

that:

> ***four days before the shareholder vote on whether to approve the merger, Mr. Price
> and Gregory Curl, Bank of America's then Vice Chairman of Corporate
> Development, sought legal advice regarding the MAC clause.  This fact is of
> tremendous significance because it is at odds with Bank of America's position that
> it only became concerned with mounting losses after the shareholder vote.***  In
> particular, on December 1, 2008, Mr. Price and Mr. Curl requested legal advice from
> Mr. Mayopolous regarding whether Bank of America had a MAC in light of
> Merrill's deteriorating financial condition.  Mr. Mayopolous testified about the
> December 1, 2008 meeting:
>
> | Question: | Did you give advice about whether there was a [MAC] clause or not? |
> |---|---|
> | Mayopolous: | Did I give advice about whether I thought there was a material adverse [e]ffect or not? |
> | Question: | Yes. |
> | Mayopolous: | Yes. |

(Emphases added.)

183.     By Sunday, December 14, 2008, Merrill's condition had deteriorated so drastically

that Defendant Price called Defendant Lewis on a Sunday to inform him of the developments.

Attention among the BofA Defendants turned again to the MAC clause, and the Wachtell law firm

opined that grounds existed to invoke that clause to terminate the Merger.

184.    Thereafter, on Tuesday, December 16, 2008, Herlihy placed a call to Treasury official Ken Wilson, a deputy to Mr. Paulson.  Herlihy informed Wilson on BofA's behalf that, with Merrill's losses having mushroomed to almost $21 billion, BofA's legal counsel, the Wachtell law firm, had opined that BofA could terminate the Merger Agreement pursuant to the MAC clause. Mr. Wilson told Herlihy to "get Mr. Lewis to call Mr. Paulson."

185.    Then, on December 17, 2008, Lewis, on Herlihy's recommendation, called Mr. Paulson to inform him that, given the amount of losses and write-downs at Merrill, BofA lacked the capital to close the Merger.  Lewis informed Mr. Paulson for the first time that the BofA Defendants were "strongly considering" invoking the MAC to terminate the Merger, on the grounds that Merrill Lynch had suffered a "Material Adverse Effect."

186.    Mr. Paulson summoned Defendant Lewis to the Federal Reserve for a meeting that very evening.  Defendants Lewis, Price, and Moynihan flew to Washington for the meeting, which was also attended by Messrs. Paulson, Bernanke, and others.  Defendants Lewis and Price began the meeting by informing the participants of Merrill's projected losses.  Messrs. Bernanke and Paulson implored Lewis not to invoke the MAC clause to terminate the Merger, even venturing the unsolicited opinion that any attempt to do so would be legally infirm.  Messrs. Bernanke and Paulson also claimed that, if the deal were terminated, it would reflect poorly on Defendant Lewis and the BofA Director Defendants and suggest that they had not done adequate due diligence of Merrill.

187.    Thereafter, between December 17 and December 21, Defendant Lewis and other BofA Defendants participated in telephone conferences with Treasury and Fed officials, including Messrs. Paulson and Bernanke.  During these meetings, Lewis and the other BofA Defendants were repeatedly urged not to invoke the MAC clause on various grounds, including that it wouldn't work, it would be bad for the economy, and it would be bad for their reputations.  Defendants Price and

Brinkley were unambiguous in their steadfast opinion, as memorialized in an e-mail by one Fed official, that the MAC clause should have been invoked at the time:

> Spoke with Joe and Amy finally about 30 minutes ago.  They still feel comfortable that they would [win any] MAC lawsuit.  Also feel they have good liquidity (300 billion at window).  Also feel that while it will have very broad market implications that the equity markets will react positively to them (not sure I totally agree).  They said they want the transaction to go through but have to protect their shareholders and that is why they contacted us . . . .

188.    Meanwhile, Merrill Lynch's condition continued to deteriorate.  By December 21, 2008, the BofA Board determined that going through with the Merger would jeopardize BofA's existence as a going concern and that—despite the urgings of Fed officials—*it was in the Company's best interests to invoke the MAC clause and terminate the Merger.*  Accordingly, on that day, Defendant Lewis reached Mr. Paulson by telephone to inform of the Board's decision.  According to Defendant Lewis, Mr. Paulson then told Defendant Lewis that, if BofA invoked the MAC clause, he, Mr. Paulson, would remove BofA's management and Board from their offices.[8]

189.    To further induce Defendant Lewis and the BofA Board to preserve their lucrative positions and abandon their shareholders' interests in favor of their own, Mr. Paulson also told Defendant Lewis that, if the BofA Defendants caused BofA to go through with the Merger, the federal government would provide an additional cash infusion, through the government's purchase of shares of BofA preferred stock, and a guarantee against the losses which BofA would suffer in acquiring Merrill.  As known to Defendants, however, the proposed purchase of additional shares by the federal government would necessarily have a dilutive effect on existing BofA shareholders and

---

[8] Mr. Paulson later testified to the New York Attorney General that if he made a threat to remove the Board, it was at the request of Fed Chairman Bernanke.  Bernanke, in testimony before the House Committee, denied this, stating, "I did not tell Bank of America's management that the Federal Reserve would take action against the Board or management."  A spokesman for Paulson later said that Paulson's admonitions to Lewis were "his own" and not made at the behest of Bernanke.

cause them harm thereby, as Defendant Lewis later admitted in his testimony to the New York Attorney General.

190.    In their telephone call, Mr. Paulson further pressured Defendant Lewis to act deceptively and in bad faith and to continue to violate the BofA Defendants' duty of candor to shareholders, and not to make any disclosure of their conversation—including the government's proposal to make a cash infusion.  Mr. Paulson indicated to Defendant Lewis that, because BofA's fourth-quarter earnings were not set to be announced until January 20, 2009, the terms of the government's cash infusion could be worked out well ahead of that date, with no disclosure to shareholders or the public before that required disclosure, or the Closing on January 1, 2009.

191.    Defendant Lewis did not give a definite response to Mr. Paulson, stating only "Hank, let's deescalate this for a while.  Let me talk to our Board."  Lewis called a Board meeting for 4:00 p.m. the next day, December 22, 2008, to report on his conversation with Mr. Paulson and obtain the Board's complicity in yielding to Mr. Paulson's inducements and threats.

192.    At no time before the Merger closed did the BofA Defendants make disclosure to BofA shareholders of any of the above highly material information.

**H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders.**

193.    Even before he hung up the telephone with Mr. Paulson on December 21, 2008, Defendant Lewis had determined to cause BofA to capitulate to Mr. Paulson's threat.  Throughout the evening, Defendant Lewis canvassed fellow Board members informally to determine whether the Board would opt to preserve their jobs and support management's recommendation not to invoke the MAC solely on the basis of Mr. Paulson's inducements and promises.  Defendant Lewis also had a

series of telephone calls with Fed and Treasury officials in which he assured them that BofA would

play along with Mr. Paulson's desires.

194.    As evidence that Defendant Lewis and the Board decided to act deceptively to

preserve their own lucrative positions, and in bad faith, failed to invoke the MAC clause, the next

morning, a senior Fed official close to both Mr. Paulson and Mr. Bernanke, Arthur Angulo,

memorialized the events as follows:

> ***Yesterday [December 21, 2008], Ken Lewis gave separate assurances to Sec. Paulson and Chm. Bernanke that BAC will consummate the acquisition of MER as planned on 1/1/09.***  HMP and BSB will speak together with Lewis today, and they will express their commitment to work with BAC to come up with the "right response" to BAC's situation.  The timeframe for doing so is before 1/20/09, which is when BAC is tentatively scheduled to publicly release its 4Q 2008 earnings. [Emphasis added.]

195.    Moreover, even before the Board meeting on December 22, 2008, Defendant Lewis

telephoned Mr. Bernanke directly to report that the BofA Board would breach their duties of loyalty,

good faith, and candor and acquiesce to the demand to proceed with the Merger.  Mr. Bernanke

documented the conversation in an e-mail to Scott Alvarez, the Fed's general counsel, as well as

other Fed officials: "Had a good conversation with Lewis just now.  He confirms his willingness to

drop the MAC and to work with the government to develop whatever support package might be

needed for earnings announcement dates around Jan. 20."

196.    The Board meeting on December 22, 2008 was attended by Director Defendants

Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lewis, Massey, May, Ryan, Sloan, Tillman,

Lozano, and Spangler.  Also present were defendants Curl, Moynihan, Banks, Alphin, and Price.  At

the meeting, Lewis formally sought the Board's concurrence with management's decision not to

invoke the MAC clause.  Lewis had been able to reach "most" of the Board members before the

meeting, and they had indicated their support for Lewis's plan to give in to Mr. Paulson's demand.

There was no dissent from this consensus view at the meeting itself. Thus, the Board, having already determined that BofA's best interests lay in *invoking* the MAC clause, now determined— *based solely on Mr. Paulson's threat to remove them from office—not to do so*. As Lewis later testified to the New York Attorney General: "*Until we had that heated—I guess you would call it—from Paulson, we were still in the mode that the MAC was the best . . . .*" (Emphasis added.)

197.    Following the Board meeting, Defendant Lewis telephoned Mr. Paulson again to report on the Board's action and his conversation with Mr. Bernanke. Defendant Lewis also belatedly asked Mr. Paulson whether BofA could have the federal government's promise of assistance put into writing. Mr. Paulson refused, on the grounds that doing so would require public disclosure. The BofA Board, by then committed to its deceptive and self-serving scheme, again acquiesced in not disclosing these events.

198.    Defendant Lewis did not persist on this point. Instead, Defendant Lewis sent an e-mail to the Board and various BofA officers stating: "I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure *which, of course, we do not want*." (Emphasis added.)

199.    One point on which Lewis did persist was seeking to enlist the government's help in protecting himself from being held accountable to shareholders for his actions. In their telephone call before the December 22 Board meeting, Lewis told Bernanke that (as set forth in an e-mail from Mr. Bernanke to Mr. Alvarez) "he [Lewis] now fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at ML. . . . [H]e still asked whether he could use as a defense that the govt ordered him to proceed for systemic reasons. I said no." Mr. Alvarez also told Mr. Bernanke that it was neither "necessary [n]or appropriate" to give Lewis a letter purporting to mitigate his or the Board's responsibility for not invoking the MAC clause, or for not disclosing that

the Board had considered invoking the MAC clause but had decided not to based on Mr. Paulson's threat.

200.   In his response, however, Mr. Alvarez did specifically note that Defendant Lewis, and by implication, others at BofA, faced legal consequences if they did not, in fact, make adequate disclosures to shareholders regarding Merrill's deteriorating condition.   As evidence of this, Mr. Alvarez wrote:

> A different question that ***doesn't seem to be the one Lewis is focused on is related to*** **disclosure.   *Management may be exposed if it doesn't properly disclose information that is material to investors.***   There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial records. ***Lewis should be able to comply with all those reporting and certification requirements while also completing this deal.***   His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the ML losses when BA made its disclosures to get the shareholder vote on the ML deal in early December.   I'm sure his lawyers were much involved in that set of disclosures and Lewis was clear to us that he didn't hear about the increase in losses till recently. [Emphases added.]

201.   Following Mr. Paulson's purported threat on December 21, 2008, and the Board's acquiescence on December 22, 2008, discussions between BofA and the government turned to the terms of the promised governmental assistance to BofA.   Thus, another Board meeting was held on December 30, 2008.   At that meeting, the Board chiefly concerned itself with the timing, amounts, and documentation of the governmental assistance to be received.   The Board determined not to require written documentation from the government prior to the Closing on January 1, 2009—***and not to make any disclosure to BofA shareholders***.   Indeed, in determining not to require written documentation prior to Closing, the Board expressly credited Defendant Lewis's explanation (based on his conversation with Paulson) "that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, ***which formal action would require public disclosure***."   (Emphasis added.)

202.     The December 30 Board meeting minutes further reflect that the Board was specifically trying to conceal its disclosure of Merrill Lynch's losses until the announcement of BofA's fourth-quarter earnings in January, and until they received additional TARP funds.  As set forth in the meeting minutes, "Mr. Lewis concluded his remarks by stating that management will continue to work with federal regulators to transform the principles that have been discussed into an appropriately documented commitment to be codified and implemented in conjunction with the Corporation's earning release on January 20, 2009."

203.     Thereafter, without disclosing the need for additional capital or their capitulation in not invoking the MAC to save their positions, the BofA Defendants caused BofA to issue a press release on January 1, 2009, announcing the closing of the Merger.  This release said nothing about the grave losses at Merrill, BofA's inability to close without governmental assistance, the Board's decision to invoke the MAC clause, the negotiations with the government over assistance, the Board's retraction of its decision, and the purported threats to remove the Board and management.  Nor had any aspect of the deal been renegotiated.

**I.     Liability of BofA Defendants for the Above Misconduct.**

204.     It was not until January 16, 2009, when the BofA Defendants caused BofA to pre-announce its fourth quarter earnings, that shareholders began to learn the truth about all of these events.  However, in acceding to Mr. Paulson's threat, the BofA Defendants deliberately and continuously withheld crucial information from shareholders, in breach of their duties of care, candor, loyalty, and good faith, and in violation of the federal securities laws.

205.     Despite the fact that BofA had determined that Merrill Lynch's financial condition was so grave that it justified termination of the Merger pursuant to the MAC clause, at no time prior to the Closing did the BofA Defendants publicly disclose Merrill Lynch's devastating losses or the

impact it would have on BofA.  Nor did these defendants disclose that the Board had decided to invoke the MAC clause and would have done so but for their self-interested capitulation to Mr. Paulson's threat to try to get them removed from office if they had.  Nor did these defendants disclose that the Board had determined to seek and obtain $138 billion in additional federal TARP money to allow BofA to close the Merger.  Yet, if Merrill's losses (which Lewis deemed "staggering") were grave enough to cause Lewis and the Board to decide to terminate the Merger, then obviously those losses were material to shareholders.

206.     To the contrary, *withholding information* was expressly treated as one of the key *goals* of the process, and was expressly used to justify proceeding as Mr. Paulson wished even in the absence of written documentation of Mr. Paulson's promises.  The BofA Defendants thus not only *failed* to observe their duties of complete candor and transparency, they *deliberately, knowingly, recklessly, and with gross negligence acted consistently to disregard them, acting in bad faith to promote their own self-interest and then to cover up these facts*.

207.     In his testimony to the New York Attorney General in April 2009, Defendant Lewis belatedly attempted to justify his and the Board's bad-faith misconduct by suggesting that the question of disclosure was not up to anyone at BofA and that the decision not to disclose was based on direction from Paulson and Bernanke:  "I was instructed that 'We do not want a public disclosure.'"  Paulson, however, has testified to the House Committee on Oversight and Government Reform that his discussions with Lewis regarding disclosure concerned the *Treasury Department's public disclosures, not BofA's*.  Moreover, Lewis clarified in his own testimony to the House Committee in June 2009 that "[n]either Secretary Paulson nor the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something that we publicly—that we felt should be publicly disclosed."  In equally clear terms, Lewis told the House Committee:  "[d]uring all of that

time there was never, ever a time that the Federal Reserve or the Treasury Department told me that we should not disclose something that we thought would be a disclosable event." Similarly, in response to a question from Rep. Elijah Cummings as to whether Mr. Bernanke had ever advised Lewis against disclosure, Lewis testified: "No, sir. Well, the—he never said we should not disclose anything that was disclosable. *That would be our decision*, and I never heard from him on the issue of us not disclosing anything. (Emphasis added.)

208.    Bernanke, in his testimony to the House Committee, similarly stated:

> *As I wrote in a letter to this Committee, neither I nor any member of the Federal Reserve ever directed, instructed, or advised Bank of America to withhold from public disclosure any information relating to Merrill Lynch, including its losses, compensation packages or bonuses, or any other related matter.* These disclosure obligations belong squarely with the company, and the Federal Reserve did not interfere in the company's disclosure decisions.
>
> The Federal Reserve had a legitimate interest in knowing when Bank of America or Merrill Lynch intended to disclose the losses at Merrill Lynch. Given the fragility of the financial markets at that time, we were concerned about the potential for a strong, adverse market reaction to the reports of significant losses at Merrill Lynch. If federal assistance to stabilize these companies were to be effective, the necessary facilities would have to be in place as of the disclosure date. Thus, our planning was importantly influenced by the companies' planned disclosure schedule. *But the decisions and responsibilities regarding public disclosure always remained, as it should, with the companies themselves.* [Emphases added.]

209.    Thus, instead of determining to stop the Merger, renegotiate its price (perhaps using the MAC clause as leverage)—or, at the very least, inform shareholders of Merrill's devastating losses and seek a new shareholder vote—the BofA Defendants forged ahead with their intentional, reckless, or grossly negligent breach of their duties of care, loyalty, good faith, and candor and failed to express a word of any concern to shareholders. Asked why the BofA Defendants had chosen this course of action, Lewis later commented that "we did think we were doing the right thing for the country." The mantle of patriotism, however, does not obviate the fact that BofA shareholders were

never informed of the proposed course of action, which was theirs to approve when approving the

Merger.

210.    According to William D. Cohan, in "The Final Days of Merrill Lynch," *Atlantic*,

September 2009:

> Lewis "*had an easy out before the shareholder vote,*" a senior Wall Street mergers-
> and-acquisitions banker, who was also trained as a Wall Street lawyer, told me.
> "*He could easily have disclosed to shareholders* that 'We have done two months of
> due diligence now, and look at the 600 things we've found.' I've always wondered
> how could it be that they did not disclose to the world what they knew before
> December 5."
>
> . . .   "*He committed classic securities fraud,*" the senior Wall Street mergers banker
> says flatly.   "*He had a material knowledge of a material event in the middle of a
> shareholder vote.*"
>
>        *        *        *        *
>
> One senior Wall Street executive, upon learning of Lewis's actions, was incredulous.
> "There is no question what I would have done if I were in his shoes," he told me.   "*I
> would have told [Bernanke and Paulson] I was calling the MAC, was releasing the
> decision publicly, and dared them to fire me and the board—and that never would
> have happened, trust me.*"   Even a former Merrill Lynch executive, who was
> involved in the sale of the company to Bank of America and was familiar with the
> MAC language in the contract, said *Lewis should have used Merrill's fourth-
> quarter losses and the threat of calling a MAC as leverage to renegotiate
> downward the absurd price of the Merrill deal*.   "He could have used the MAC
> clause a pretext to renegotiate the deal," he said.   "That would have been a prudent
> thing to do."   [Emphases added.]

211.    Similarly, James Cox, a professor of corporate and securities law at Duke University,

has opined that it was "highly likely" that the $2 billion increase in Merrill's projected losses that

occurred on December 3, 2008, and was shared with Lewis, "would be material, but it is even more

likely to be material if this was indicative of conditions at Merrill that were deteriorating"—as, in

fact, was the case.

212.    Similarly, as noted by Jonathan Macey, Yale Law School deputy dean and Sam

Harris Professor of Corporate Law (*Deal Journal*, April 23, 2009):

Whatever [Defendant Lewis] was told by [Bernanke and Paulson] should not or does not in any shape or form get him off the hook. . . . Regulators are supposed to tell you to obey the law, not to disobey the law. **If you're the CEO, your first responsibility is not to your regulator, it's to your institution and shareholders.** . . . [Defendant Lewis] is the CEO of this massive company. He's not a clerk. **He's supposed to be able to stand up for the people whose interest he's hired to protect. He's basically saying that Bernanke's and Paulson's short-term political interests are more important than my shareholders.**

213.   Ironically, in the end, not even all of Mr. Paulson's staff thought that going through with the Merger was in BofA's best interests. Indeed, on December 21, 2008, one Federal Reserve official, Adam Ashcraft, wrote in an e-mail to several colleagues working on the issue: "**I think it is equally possible that the market looks at Merrill's 2008 q4 earnings release and sees BOA making a smart move by walking away from a black hole into which large amounts of time, effort, and money would have been going, potentially overwhelming the firm and inviting further dilution through future capital injections**." (Emphasis added.)

> **J.      In an Act of Corporate Waste, and in Further Breach of Their Duties of Loyalty and Good Faith, the BofA Defendants Secretly Allow the Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before the Merger Closes.**

214.   Before the Merger with BofA closed on January 1, 2009, the Merrill Defendants—with the approval of the BofA Defendants—paid themselves and fellow Merrill executives $3.6 billion in bonuses. These bonuses were paid well ahead of Merrill's disastrous earnings announcement for the fourth quarter—and further lowered the value of what BofA was acquiring in the Merger at an unconscionable and grossly unfair price. The bonuses were specifically approved by the BofA Defendants and, in fact, had been at the top of the list of key deal terms when the Merger was negotiated on September 13-14, 2008. Moreover, as set forth above, the fact and scope of the bonuses were entirely **omitted** in BofA's disclosures to shareholders seeking their approval of the Merger.

215.    Pursuant to longstanding company policy, Merrill paid year-end bonuses to its executives and employees pursuant to its VICP only in late January or early February of the following year.  That policy was secretly abandoned in 2008 so that Merrill executives could receive their bonuses prior to the Merger's close.

216.    Indeed, shortly after announcing the Merger, defendants Kraus, Stingi, and Ross began putting together an accelerated VCIP bonus schedule for 2008.  By the end of September 2008, these defendants had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses.  The Compensation Committee of the Merrill Board was scheduled to approve the final bonus pool in early December, more than three weeks *before* the end of the year for which the bonuses were to be paid and *before* the closing of the Merger.

217.    On November 11, 2008, defendants Thain, Stingi, Ross, and other Merrill Defendants held a conference call with the Merrill Compensation Committee.  During the call, Thain recommended that the Committee adopt the accelerated schedule, which contemplated approving the bonus pool on December 8, 2008, informing employees about their bonuses on December 22, 2008, and paying the cash awards on December 31, 2008.  Stock awards were to be made in early 2009, after the anticipated closing of the Merger.

218.    Merrill's Compensation Committee approved the accelerated schedule, and on the following day, November 12, 2008, Thain informed defendant Alphin at BofA of the bonus schedule, who then informed other BofA Defendants.

219.    Throughout the fall of 2008, the size of Merrill's proposed bonus pool was gradually reduced due to various factors, as were the bonuses planned for Merrill's top five executives.  By late November, Merrill's VCIP bonus pool was reduced to approximately $3.6 billion, with an expected current expense of $3 billion.  Incredibly, concerned that BofA might not have enough

stock to satisfy Merrill's stock awards, the BofA Defendants asked their counterparts at Merrill to pay 70 percent of the bonuses in cash and 30 percent in stock, instead of the 60-40 cash-stock split set forth in the Merger Agreement.  The Merrill Defendants complied with the request, increasing the recorded current period expense of the bonuses to $3.2 billion.

220.    The shareholder meetings for BofA and Merrill took place, as scheduled, on December 5, 2008.  The shareholders of both companies voted to approve the Merger.  The BofA Defendants did not make any disclosures to their shareholders prior to the shareholder meetings concerning Defendants' agreements that Merrill could pay up to $5.8 billion, or the revised plans to pay $3.6 billion, in discretionary year-end bonuses before the Merger closed.[9]

221.    On December 8, 2008, Merrill's Compensation Committee, headed by defendant Finnegan, approved a final VCIP pool of $3.6 billion.  Of this amount, only $700 million was for bonuses that had been contractually guaranteed earlier in 2008; the rest—$2.9 billion—was entirely discretionary.

222.    Merrill's employees were notified about their 2008 VCIP bonus on December 19, 2008, and received cash payments on December 31, 2008—*one day before the Merger closed*. VICP stock awards were made to Merrill employees in early 2009.

223.    The top four bonus recipients received $121 million.  One of these was defendant Thomas Montag, who also had been given a contract worth $39 million when he moved to Merrill from Goldman Sachs earlier in 2008.  Another was defendant Peter S. Kraus, who, in addition, had received $25 million just to join Merrill.  All told, 20 Merrill executives were paid more than $8 million apiece.  A total of 53 executives received more than $5 million each.  Nearly 700 executives,

---

[9] In fact, this was contrary to the disclosures regarding the payment of any bonuses to Merrill employees.

in total, received $1 million or more. All of these bonuses were paid despite Merrill's losses of over $27 billion for 2008.

224.    The planned payment of the bonuses were known to Lewis, Price, Alphin, and other BofA Defendants, including the members of the Compensation Committee of BofA's Board of Directors, and were specifically approved by those defendants, who deceptively acted to cover up these bonuses and also took no steps to stop them or recalculate them, even as BofA was deep into discussions with the government over what TARP monetary and other assistance BofA could receive in exchange for going through with the Merger despite Merrill's devastated condition.

225.    The New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses. A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating BofA's payment to its own executives of bonuses for 2008. In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses.

226.    On August 3, 2009, the SEC filed a complaint in the United States District Court for the Southern District of New York against BofA under Section 14(a). *See SEC v. Bank of America Corporation*, No. 09 Civ. 6829 (S.D.N.Y. filed Aug. 3, 2009). Simultaneously with the filing of that complaint, the SEC also purported to settle the complaint, with BofA agreeing to pay a $33 million penalty and consented to the entry of an injunction permanently enjoining the Company from committing Section 14(a) violations. The SEC did not initially file charges against any individual defendant at BofA.

227.    The SEC action was assigned to the Honorable Jed S. Rakoff. When the settlement was presented to the Court for approval on August 10, 2009, the Court **refused to approve it**. Among other reasons, Judge Rakoff questioned the propriety of not bringing charges against any

individual defendants, thus requiring BofA to satisfy the amount of any penalty and thereby *further* injuring shareholders who already had suffered as result of the misstatements at issue. In addition, Judge Rakoff questioned the amount of the penalty, $33 million, compared to the amount of the omitted bonus payments, $5.8 billion. Finally, Judge Rakoff questioned why BofA should be willing to agree to any penalty if, as its lawyers claimed, BofA made no misstatements in the Proxy Statement—and why, if key BofA decision makers allegedly relied entirely on the advice of counsel in not disclosing the bonuses, BofA was trying to assert the attorney-client privilege with respect to the advice it did receive. Judge Rakoff ordered additional briefing by both the SEC and BofA.

228.    In the SEC proceedings, both BofA and the SEC have represented to the Court that the disclosures in the Proxy Statement concerning bonuses were prepared entirely by the law firms—Wachtell and Shearman, respectively—that advised BofA and Merrill in the Merger. In particular, the decision to set forth the actual size of the allowed bonuses in a "disclosure schedule" to the Proxy Statement (a "schedule" that was never disseminated to shareholders) allegedly was made by lawyers at Wachtell and Shearman and Defendants Mayopolous and Brenner at BofA.

229.    After reviewing the parties' additional submissions, Judge Rakoff, on September 14, 2009, denied the proposed settlement and instructed the parties to proceed to litigation and be ready for trial in the spring of 2010. The Court rejected the settlement on the basis of the fact that it proposed to rectify the wrongdoing of BofA's management in concealing the bonuses by having "the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct," rather than being paid by individual wrongdoers. The Court also refused to credit the SEC's claim it would have been impossible to charge the individual wrongdoers, given that "lawyers drafted the documents at issue and made the relevant decisions concerning disclosure":

But if that is the case, *why are the penalties not then sought from the lawyers?* And *why, in any event, does that justify imposing penalties on the victims of the lie, the shareholders?*

\* \* \* \*

Moreover, it is noteworthy that, in all its voluminous papers protesting its innocence, Bank of America never actually provides the Court with the particularized facts that the Court requested, such as precisely how the proxy statement came to be prepared, exactly who made the relevant decisions as to what to include and not include so far as the Merrill bonuses were concerned, etc.

\* \* \* \*

Overall, . . . *the parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry*—all at the expense of the sole alleged victims, the shareholders. Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

*Nor is the proposed Consent Judgment reasonable. . . .*

For example, the Consent Judgment would effectively close the case without the S.E.C. adequately accounting for why, in contravention of its own policy, . . . it did not pursue charges against either Bank management or the lawyers who allegedly were responsible for the false and misleading proxy statements. The S.E.C. says this is because charges against individuals for making false proxy statements require, at a minimum, proof that they participated in the making of the false statements knowing the statements were false or recklessly disregarding the high probability the statements were false. But *how can such knowledge be lacking when, as the complaint in effect alleges, executives at the Bank expressly approved Merrill's making year-end bonuses before they issued the proxy statement denying such approval? The S.E.C. states, as noted, that culpable intent was nonetheless lacking because the lawyers made all the relevant decisions. But, if so, then how can the lawyers be said to lack intent?* [Footnote omitted.] [Emphases added.]

230.     The SEC has indicated that it will not appeal the Court's decision and that, instead, it will "vigorously pursue" charges against BofA—including possibly bringing charges against individual officers or directors of the Company. In addition, the Commission stated that it will use the discovery available in the proceedings possibly to broaden its case against BofA beyond misstatements relating to the Merrill bonuses.

## II.   THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH.

231.   The Proxy Statement (including the SEC filings and other documents incorporated by reference therein), as well as Proxy Supplements and other supplementary statements by Defendants, contained material misstatements and omissions in violation of the federal securities laws and in violation of the BofA Defendants' duty of candor and other fiduciary duties to shareholders, the effect of which was to harm the Company *and* to deprive each shareholder who voted on the Merger of the right to cast an informed vote.

### A.   False and Misleading Statements and Omissions in the Proxy Statement.

232.   Among other material misrepresentations and omissions were the following:

(a)   Defendants caused the Proxy Statement to significantly overvalue Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders.  At the time the Proxy Statement was filed on November 3, 2008, information concerning Merrill's $7 billion in losses so far in the fourth quarter (a highly material amount) were known or readily available to Defendants.

(b)   Defendants caused the Proxy Statement not to disclose that the "fairness" opinions provided by the Advisor Defendants were based on inadequate information and were not actual opinions as to the Merger's fairness at all, but rather ad hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action in furtherance of their own personal agendas at the expense of BofA and its shareholders;

(c)   While Defendants caused the Proxy Statement to purport to identify twelve "Risk Factors" from the Merger, none of these purported "Risk Factors" disclosed the known

fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value, impairing the value of the Merger to BofA shareholders;

(d)     Defendants caused the Proxy Statement to misrepresent that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time, when in fact Merrill was experiencing over $10 billion in new losses which *worsened* its exposures, leverage, and liquidity;

(e)     Defendants caused the Proxy Statement to omit to disclose that Merrill's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse event, and that management had received advice from Company legal counsel that the circumstances justifying terminating the Merger on that basis.

(f)     The Proxy Statement, while touting Merrill's favorable "prospects" as a material factor justifying the BofA Defendants' recommendation, was caused by Defendants to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008—amounts which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

(g)     Defendants caused the Proxy Statement to misrepresent Merrill's ability pay up to $5.8 billion in discretionary bonuses.  Specifically, Defendants caused the statements therein to constitute a misrepresentation that, under the terms of the Merger Agreement,

Merrill was only permitted to make "required" payments to its employees, such as salary and benefits, and was prohibited from paying discretionary year-end bonuses when, in fact, BofA had expressly authorized Merrill, as set forth in an ***undisclosed*** schedule, to pay up to $5.8 billion in discretionary year-end bonuses—a fact that a shareholder could not have known from reading the Proxy Statement or any other public source;

(h)     Defendants caused the Proxy Statement to falsely imply that BofA had not given its written consent to the payment of discretionary year-end bonuses at Merrill—which the Proxy Statement indicated "***will*** not be unreasonably withheld or delayed" (emphasis added)—when, in fact, by the time the Proxy Statement was prepared and distributed to shareholders by Defendants, BofA ***already*** had given its written consent, as set forth in the undisclosed schedule, that Merrill could pay up to $5.8 billion in discretionary bonuses;

(i)     Defendants caused the Proxy Statement to omit that the $5.8 billion in discretionary bonuses that BofA authorized Merrill to pay constituted approximately 12 percent of the $50 billion price that BofA had agreed to pay to acquire Merrill, nearly 30 percent of Merrill's total shareholder equity, and over eight percent of Merrill's total cash and cash equivalents on hand as of December 31, 2008, and thus were highly material;

(j)     The Proxy Statement, in incorporating Merrill's 2008 Proxy Statement, was caused by Defendants to make additional false and misleading statements with respect to the Merrill bonuses.  Specifically, whereas Merrill's 2008 Proxy stated that Merrill's bonuses were "paid in January for performance in the prior fiscal year," designed to link pay and performance so as to align employees' interests with shareholders', designed to provide a "strong incentive" to increase performance and enhance shareholder returns, and focused on "the performance of the Company as a whole," these statements were rendered false by the

Defendants' secret agreement to pay $5.8 billion in discretionary bonuses on an accelerated schedule regardless of Merrill's actual results in the remainder of 2008;

(k)     Defendants caused the Proxy Statement to state that the BofA Defendants' recommendation was based primarily on the "fairness" opinions received by FPK and J.C. Flowers (which opinions, in turn, were materially based on financial records and meetings with Merrill management concerning the "business, operations, and prospects" of Merrill) but caused it to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008 set forth herein.

(*l*)     The Proxy Statement was never updated to update or correct Defendants' statement that BofA would not need CPP funds to complete the Merger based on Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by the end of October and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

233.     In addition to the other material misstatements and omissions in the Proxy Statement, in violation of federal securities laws as well as the BofA Defendants' duty of complete candor in the context of a shareholder vote, Defendants also failed to update the Proxy Statement prior to the Shareholder Vote.  In fact, despite the fact that BofA shareholders did not vote on the Merger until December 5, 2008, ***over two-thirds of the way into the fourth quarter***, the Proxy Statement was not updated, corrected, amended, or supplemented by Defendants with any information concerning:

(a)     Actual losses, impairments, and write-downs being incurred by Merrill during the fourth quarter of 2008, or the risk that such losses would materially affect the value of the deal to BofA if the Merger were consummated, including the fact that by the end of

November, Merrill's losses had increased to $15.3 billion (pretax) thus far in the fourth quarter—a highly material amount;

(b)     The Proxy Statement's (and Merger Agreement's, which was attached as an exhibit to the Proxy Statement) statement that there was an "absence of material adverse changes" in Merrill's financial condition—a representation that became diametrically opposite to the truth with each passing day;

(c)     The Proxy Statement's statements that no "material adverse change" had occurred in BofA's financial condition, that BofA was in a "strong capital position, funding capabilities and liquidity," and that the *combined* BofA-Merrill would have a "strong capital position, funding capabilities and liquidity:; these statements also became diametrically untrue over time given the accumulating losses at Merrill, given the fact that BofA was projecting its own quarterly loss of at least $1.4 billion by the end of November 2008—and given the fact that BofA required, and in fact Defendants had obtained, the promise of additional funding in the amount of $20 billion (as well as $118 million in financial "guarantees") from the federal government specifically to complete the Merger;

(c)     the fact that the losses at Merrill were so grave that the BofA Defendants determined that it was in BofA's best interests to invoke the MAC clause and rescind the Merger Agreement, that this determination was shared with government officials, including Secretary of Treasury Paulson and Fed Chairman Bernanke, and that the BofA Defendants did not invoke the MAC clause *solely* because of the Mr. Paulson's threat to replace Defendant Lewis, the Board, and senior management if they tried to protect the Company's

and shareholders' interests—a threat also not disclosed to shareholders and one of dubious factual and legal basis;[10] or

        (d)     the fact that, in exchange for the government guarantee, BofA was required to issue an additional $4 billion in preferred stock to the Treasury and forego all future dividend payments in excess of $.01 per share per quarter for three years without government consent, which further diluted BofA's shareholders and eliminated that part of the value of their shares derived from expected dividends.

**B.**     **False and Misleading Supplementary Statements.**

234.    The Proxy Statement was rendered further false and misleading, in violation of the federal securities laws and/or the fiduciary duty of complete candor, by the BofA Defendants and the Merrill Defendants in their public statements communicated to shareholders after the deal was announced and before the Shareholder Vote.  For example, at a press conference on September 15, 2008, the day the Merger was announced, Defendant Lewis was asked about BofA's due diligence on the acquisition, given that it was completed over a single weekend.  Fielding the question for Defendant Lewis, Defendant Price, BofA's CFO, replied with lavish assurances that the BofA Defendants had done their homework:

> *We have had a tremendous amount of historical knowledge, both as a competitor with Merrill Lynch, but also have reviewed and analyzed the company over the years.*
>
> As Ken [Lewis] referenced, we did have an adviser several among them, *JC Flowers with pretty extensive knowledge of the company.* And while none of us like *the market turmoil we have been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset*

---

[10] Defendant Lewis, for example, testified to the House Oversight Committee on June 11, 2009, that he did not think that the Secretary of the Treasury had the power to remove him or any other Board member from office.

*classes*, so it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic.

In addition, as you would expect, we deployed the team that we would ordinarily deploy in these types of situations, which had well over 45 people from our team on site as well as others off site, outside counsel, and the like. So collectively with that group *and quite frankly, the progress that Merrill Lynch had made in reducing the risk exposures such, and analyzing them and having all of that laid out,* given the efforts that the management team has made over the last period, made it possible for us. [Emphases added.]

235.   At the press conference, Lewis also bragged about not needing government funds for the Merger: "Well, first of all, I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private. But we have asked for no relief, no capital relief on this deal."

236.   Similarly, Defendant Lewis reassured investors about Merrill's overall viability, based on the review by J.C. Flowers:

*Chris [Flowers'] comment was "it's night and day from the time we first looked at it to now." He was very complimentary of what John [Thain] and his team had done in terms of dramatically reducing the marks, in many cases not only — not reducing the marks but getting rid of the assets, which is the best thing to do, so a much lower risk profile than he'd seen earlier on.* [Emphasis added.]

237.   On BofA's third-quarter earnings call with analysts, broadcast on October 6, 2008, just after BofA had raised $10 billion in the market, an analyst asked Defendants whether BofA would need more money to cover the Merrill acquisition. Defendant Price again assured analysts that it would not: "We have considered the Merrill deal in our [intentions] here so that the numbers we were talking about as I've mentioned in the prepared remarks covered our anticipated needs from a Merrill standpoint."

238.   All of these statements were false and misleading because neither the BofA Defendants nor the Advisor Defendants, including FPK and J.C. Flowers, had performed any kind of comprehensive analysis of BofA and, consequently, had no reasonable basis to make any positive

representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved.

### C.   **False and Misleading Proxy *Supplements*.**

239.   The BofA Defendants filed two Proxy Supplements—one on November 21, 2008 and the other on November 26, 2008—that purported to update the Proxy Statement and provide further material information to shareholders concerning the Merger.  In actuality, however, these Proxy Supplements further misled shareholders—both by omitting to disclose the highly material information that had emerged since September 15, 2008 and discussed herein ***and by making new affirmative misrepresentations*.**  Specifically, the November 26, 2008 Proxy Supplement contained the following false and misleading statement made by Defendant Lewis:

> I usually don't comment on our stock price—it is investors' job to price our stock based on their appraisal of our performance and our prospects, and my job to lead the company.  But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how ***Bank of America is positioned to ride out this severe economic storm***.

> Investors have deep concerns about how long and deep the recession will be, how high unemployment will go, when housing prices will stabilize and what will be the catalyst to bring us out of the recession.  On banks in particular, they are concerned, among other things, about whether financial institutions have enough capital. These factors are putting tremendous pressure on the markets in general, and financial stocks in particular.

> Given this environment, ***Bank of America continues to be a strong, active player in the financial markets.  We are generating strong deposit growth and attracting new customer and client relationships throughout our company.  We continue to make loans to consumers and businesses to boost shareholder value*** and to do what we can to support economic activity.

> ***We are one of the most liquid banks in the world.  We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements and our own target.  In short, we believe we are one of the strongest and most stable major banks in the world.***

> I have gotten questions from associates and investors in recent weeks on two specific topics [including] the government capital injections into banks [TARP] . . . .

Regarding the federal capital injection, ***these were funds that we did not need and did not seek***.  At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, ***had more than adequate capital***.  We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.  [Emphases added.]

240.     These statements by Defendant Lewis were materially false and misleading because, at the time they were made, it was well known to Lewis and the BofA Defendants that Merrill's losses would be far north of $10 billion for the fourth quarter of 2008 and that BofA itself was projecting billion-dollar losses as a result, directly threatening its "strong capital position" and liquidity.  Moreover, in boasting that BofA "did not need and did not seek" federal TARP funds, Lewis misrepresented the scope of Merrill's and BofA's fourth quarter losses which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

III.   **AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET CAPITALIZATION IS PUNISHED, DEFENDANTS ARE INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS, AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY WITH THE COST OF SEC PENALTIES.**

A.   **The Truth Emerges Concerning
     Merrill's Devastation and Defendants' Wrongdoing.**

241.     On January 14, 2009, after the stock market closed for the day, the *Wall Street Journal* reported that the BofA Defendants were near an agreement with federal officials that would provide BofA with massive financial assistance from the government, including an infusion of fresh capital and the "backstopping" of tens of billions of dollars in toxic assets to help it close the acquisition of Merrill.  The *Journal* further reported that the additional funding had been sought earlier in December by defendant Lewis under the CPP:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion committed federal rescue funds, said it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

242.    On January 15, 2009, multiple news services carried the story of an impending government bailout, or even nationalization, of BofA relating to its acquisition of Merrill. The *New York Times* reported that day that Defendant Lewis, no later than early December 2008, had specifically instructed BofA lawyers, including the Wachtell law firm and defendants Mayopoulos and Brenner, to explore BofA's ability to terminate the Merger under the MAC clause. In reaction to this and similar news reports, the BofA Defendants announced that they would move up their announcement of BofA's fourth quarter earnings to the next day. The price of BofA common stock plummeted 18 percent from $10.20 to $8.32 that day.

243.    On January 16, 2009, Defendants had caused BofA to disclose its disastrous fourth-quarter results. The Company had a net loss of $1.79 billion. Tucked into the press release was the news that Merrill had lost a staggering $15.3 billion in the fourth quarter. In the same press release was the first public announcement of the BofA Defendants' secret deal with Messrs. Paulson and Bernanke: BofA would be caused to obtain $20 billion aid from the federal government to help it absorb Merrill's toxic securities, and that the government would provide protection against losses on $118 billion in selected capital markets exposure. The results included at least $8.75 billion in additional write downs related to Merrill.

244.    The *Wall Street Journal* reported that day, in an article entitled "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level," that ***the current market value of the***

*combined BofA/Merrill was less than BofA's stand-alone market value prior to the announcement of the Merger, implying that the market viewed Merrill as having negative value*.

245.    The *Wall Street Journal* further reported:  "[t]he development angered some Bank of America shareholders who began to question why . . . Lewis didn't discover the problems prior to the Sept. 15 deal announcement.  Many also wanted to know why he didn't disclose the losses prior to the vote on the Merrill deal on Dec. 5 or before closing the deal on Jan. 1."  The article quoted Bradley Dorman, managing partner of White Rock Point Partners, an investment adviser which held 315,000 shares of BofA, as stating that: "***Bank of America didn't do proper due diligence***."  (Emphasis added.)  The price of BofA common stock declined another 14 percent, from $8.32 to $7.18 that day.

246.    On January 17, 2009, an article entitled "Bank of America Goes on Offense: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry" in the *Wall Street Journal* quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group, as stating that Lewis "has very little credibility with the investor public right now."  Thereafter, on January 20, 2009, analysts opined that, based on the new information made available, BofA would need to raise at least $80 billion to restore its capital to adequate levels for a bank of its size and scope.  The price of BofA common stock again dropped, this time a whopping 29 percent, from $7.18 to $5.10 that day.

247.    All told, between January 14, 2009, and January 20, 2009, the price of BofA's stock declined from $10.20 to $5.10, a decline of a massive ***50 percent in just three trading days***.  With 6 billion shares outstanding, this represented a loss in market capitalization of ***$32.7 billion***.  The stock continued to plummet in succeeding weeks, falling to $3.14 per share on March 6, 2009—for a total loss in market capitalization of ***$45.2 billion***.

248.    The harm to the Company and its shareholders from Defendants' misconduct has been, and remains, profound.  From the start, the decision to acquire Merrill with tens of billions of dollars of valuable BofA common stock was rash, not predicated upon proper due diligence, and profoundly wasteful.   On September 12, 2008, Lehman Brothers was one day away from bankruptcy—i.e., worthlessness.  At the time, it was widely recognized that Merrill—which had an equivalent exposure to toxic securities as Lehman Brothers—was not far behind.

249.    Warren Buffett, one of the world's most respected investors, ably summarized the folly of the BofA Defendants' decision to pay $50 billion for Merrill, in an address to a conference sponsored by *Fortune* and recounted in an article posted on that magazine's website on September 15, 2009:

> If the Merrill deal solved one imminent crisis for policymakers, it only intensified the criticism of Lewis as an empire builder who hurt shareholders by turning BofA into a risk-laden colossus.

> Buffett alluded to that view in his comments Tuesday.  As regulators pressured Wall Street leaders over the weekend of Sept. 13-14 to find a private sector solution for Lehman's insolvency, Lewis was rushing to cinch a takeover that would give him control of Merrill's top-notch wealth management and investment banking franchises.

> And even though it was understood that Merrill Lynch would have trouble surviving once Lehman went down, Buffett noted that ***Lewis seemed to have inexplicably adopted the view that price was no object.***

> ***"Why pay X for Merrill Sunday when you could have had it for pennies on Monday?" Buffett said. "When Lehman failed, Merrill would have gone about five seconds later."***  [Emphasis added.]

250.    Moreover, aside from the loss of $45.2 billion in shareholder wealth, the Company's acceptance of additional TARP money to complete the Merrill deal, in exchange for preferred shares, has further substantially diluted shareholders' equity—just as the absorption of Merrill's $27 billion in losses for 2008 has decimated the Company's capital base and shareholder equity. Moreover, the Company also has been required to absorb Merrill's liabilities in connection with its

subprime and ARS-related exposure, draining yet further billions of dollars unnecessarily from BofA.

251.    In addition, the Company has had to expend many hundreds of millions in attorneys' fees and lost productivity on the part of senior executives in defending multiple investigations concerning the Merger, not only by law enforcement agencies such as the New York Attorney General and the SEC, but also by the United States Congress—including the House Committee on Oversight and Government Reform, led by Rep. Dennis Kucinich and Rep. Edolphus Towns.

252.    The Merrill Merger was promised to shareholders as being immediately accretive to wealth and earnings.  For example, in BofA's press release on September 15, 2008, Defendant Lewis stated that "[a]cquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders. . . .  Together, our companies are *more valuable* because of the synergies of our businesses."  (Emphasis added.)

253.    Defendant Lewis himself, however, has admitted that the BofA Defendants' decision to proceed with the Merger ultimately harmed any shareholder with less than a two or three year time horizon.  Lewis testified to the New York Attorney General as follows:

> Q.    Wasn't Mr. Paulson, by his instruction, really asking Bank of America shareholders to take a good part of the hit of the Merrill losses?

> A.    What he was doing was trying to stem a financial disaster in the financial markets, from his perspective.

> Q.    From your perspective, wasn't that one of the effects of what he was doing?

> A.    Over the short term, yes, but we still thought we had an entity that filled two big strategic holes for us and over long term would still be an interest to the shareholders.

> Q.    What do you mean by "short-term"?

> A.    Two to three years.

B.   **The SEC, FBI, DOJ, New York Attorney**
     **General, and Congress Conduct Investigations of Defendants.**

254.   Investigations against BofA and the BofA Defendants have been commenced by several law enforcements authorities, as well as various committees of the United States Congress.

255.   As noted above, the SEC filed civil proceedings against BofA on August 3, 2009. Although the Commission attempted simultaneously to enter into a settlement and consent decree with the Company, in exchange for a $33 million penalty, Judge Rakoff rejected the settlement and ordered the parties to trial.  The SEC has indicated that it will "vigorously pursue" the charges—including possibly bringing charges against individual officers and directors of BofA.

256.   The New York Attorney General, which has commenced its own investigation into the Merrill bonuses, intensified its law enforcement efforts in the wake of Judge Rakoff's questioning of the SEC settlement and BofA's attempt to invoke both the attorney-client privilege and the defense of reliance upon the advice of counsel.  On September 8, 2009, the Attorney General—before whom various BofA witnesses also had attempt to invoke both the attorney-client privilege and the reliance-of-counsel defense—sent a letter to counsel for BofA demanding that BofA waive the privilege in light of the proffered defense.

257.   In addition, the New York Attorney General stated that its investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*"  (Emphasis added.)  These instances comprised: (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

258.    After summarizing the instances of material nondisclosures (and the BofA witnesses' refusal to provide information based on the attorney-client privilege), the New York Attorney General further wrote:

> . . . [W]e cannot simply accept Bank of America's officers' bald assertions that their decisions to keep each of these material events from Bank of America's shareholders were based on a full review of all the relevant information by their inside and outside counsel.  The law is clear that Bank of America and its officers cannot assert an advice of counsel defense for their decisions, and at the same time persist in refusing to disclose the substance of the conversations with counsel. According, *we request that Bank of America reconsider its decision to prevent this Office from adequately probing these crucial issues.  We provide you with this final opportunity to reconsider.  Otherwise, we will proceed with our charging decisions without giving credit to the advice of counsel defense that Bank of America has not permitted us to test.*
>
> *Please provide us with Bank of America's decision by Monday, September 14, 2009. . . .*  [Emphasis added.]

259.    In response to the New York Attorney General's letter, the BofA Defendants caused BofA's counsel to send a reply letter that very same day.  In the reply, counsel on behalf of BofA, Lewis Liman, declined to waive the attorney-client privilege, as the Attorney General had requested. Counsel also purported to deny that the Company had even relied on an advice of counsel defense. In the wake of BofA's counsel's response, the Attorney General's office has stated that it will bring charges directly against officers and directors of BofA related to the four instances of nondisclosure identified in the Attorney General's letter.  In addition, on September 17, 2009, the Attorney General issued subpoenas for the testimony of five members of the BofA Board's Audit Committee— Defendants Barnet, Collins, Franks, Massey, and May.  Spokespersons for the Attorney General's Office have stated that the Audit Committee members are among the Board members most likely to have insight as to the Board's knowledge and involvement in the Merrill losses and the MAC clause discussions, and that, based on existing evidence, the Board will be shown to have had knowledge of

the losses and the MAC clause issue before the Shareholder Vote.  In addition, the Attorney General will subpoena the remaining Board members on a future date.

260.     As set forth above, the Committee on Oversight and Government Reform of the House of Representatives also has been conducting an investigation of the BofA Defendants' disclosures to shareholders and other conduct in the context of the losses at Merrill.  The Committee conducted hearings in the spring of 2009 and—like the New York Attorney General—began devoting renewed efforts to its investigation once the BofA Defendants' positions regarding the attorney-client privilege and the advice-of-counsel defense became public in the course of the SEC proceedings.

261.     On August 6, 2009, the Committee issued document requests to BofA concerning Merrill's fourth-quarter financial losses, BofA's receipt of financial assistance from the federal government, legal advice regarding disclosure of either issue, legal advice on the MAC clause, and Board meetings.  The BofA Defendants caused the Company counsel to send a letter to the Committee objecting to certain of the requests on the basis of attorney-client privilege and asking the Committee to "withdraw its requests" for privilege documents.   In addition, BofA was caused to produce 1,800 pages of documents, many of which were clearly irrelevant to the Committee's requests.

262.     The BofA Defendants' response prompted Rep. Edolphus Towns, Chairman of the Committee, to send a follow-up letter to Defendant Lewis on September 18, 2009 reiterating the request for responsive documents and giving BofA until noon on Monday, September 21, 2009 to respond.  In addition, Rep. Towns wrote:

> I am deeply disappointed to learn from your attorneys that you are refusing to provide the Committee with key documents I requested in my letter of August 6, 2009.  In plain terms, your refusal to provide the Committee with these documents,

without even providing a justification in some cases, leaves the impression that Bank of America is hiding information.

* * * *

Beyond the issue of producing documents containing legal advice, I am disappointed in your overall response to the Committee's request. The documents produced so far include a number of pages that are either partly or wholly redacted. These redactions are unexplained and are unacceptable.

In addition, many of the documents produced so far are clearly irrelevant to the Committee's investigation. . . .

For example, you sent copies of numerous emails you received from your own employees expressing admiration for your "awesome" performance on *60 Minutes*. You also included copies of emails alerting Bank of America employees to discounts at Wal-Mart, Target, and Costco; an announcement of the "Annual Pecan Sale," featuring "This Year's Crop of Mammoth Pecan Halves"; and an invitation to attend a conference on investment in East Asia, written in Chinese. There were numerous other pages of obviously irrelevant material.

Moreover, while your attorneys have evidently been enthusiastic about redacting information pertaining to issues that are the subject of the Committee's investigation, as well as personal information about Bank of America executives, they have been less thorough about redacting sensitive information belonging to your bank's customers. Documents produced so far include letters from Bank of America customers containing their credit card numbers, checking account numbers, and other personal information. None of the latter are relevant to our investigation.

While I am aware that some lawyers seem to believe it is traditional to pad the record with thousands of pages of irrelevant material, in my view this indicates that Bank of America does not take seriously the Committee's investigation. While we neither expect nor wish Bank of America to decide which documents among all relevant records we might be interested in, we do expect you to provide all *relevant* records, rather than just *any* records.

263.    Incredibly, even in response to Rep. Towns's follow-up letter, the BofA Defendants still caused Company to counsel to respond by, **once again, asking the House Committee to withdraw its requests concerning legal advice**. Moreover, they caused the Company **to fail to meet the Monday, September 21, 2009, deadline**.

264.    In response, Rep. Towns issued a press release stating in pertinent part:

"I am deeply troubled by Bank of America's refusal to give this Committee the records it needs to rightfully determine how and why a private deal became a public

-105-

bailout," said Chairman Towns. "The taxpayers are now on the hook for billions of dollars and they have a right to know how that happened."

A hearing was scheduled for September 30, 2009.

265.    In addition to the above, the *Charlotte Observer* reported on September 21, 2009 that, since March 2009, both the FBI and the DOJ have been conducting a criminal probe into BofA's Merger with Merrill.

**IV.    THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF INTEREST AND CIRCUMSTANCES GIVING RISE TO A SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS CREATING A REASONABLE DOUBT THAT THE BOARD COULD IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE.**

266.    With respect to the derivative counts in this complaint, demand upon the BofA Board to institute this action in the Company's name, for both wrongs committed against its wholly-owned subsidiary Merrill and wrongs committed directly against BofA also would be entirely futile, and is excused.

267.    The BofA Board consists of sixteen (16) individuals (referred to here as the BofA Director Defendants): Lewis, Gifford, Barnet, Bramble, Collins, Countryman, Franks, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward. For the reasons stated in this section and throughout this Complaint, none of these individuals is disinterested and independent with respect to the acts and omissions alleged herein, and therefore demand would be entirely futile.

268.    First, the BofA Director Defendants face a substantial likelihood of liability herein for making false and misleading statements in the Proxy Statement. Claims under Section 14(a) do not require proof of scienter, and the allegations concerning BofA Director Defendants' access to the facts concerning Merrill's rapidly deteriorating financial condition in the fourth quarter of 2008 are strong. Similarly strong are the allegations that the BofA Director Defendants breached their fiduciary duties in approving the Merger with Merrill based upon inadequate due diligence; failing to

terminate the transaction or at least provide corrected and updated information to shareholders concerning Merrill's financial condition before the December 5, 2008, Shareholder Vote; and failing to terminate the transaction or provide further information after the Shareholder Vote, even while Lewis sought and obtained over $100 billion in federal assistance directly tied to helping the deal go through.  The failure to make such adequate disclosures also constituted a breach of the duty of complete candor in the context of a Shareholder Vote.

269.    Second, the BofA Director Defendants will not knowingly sue Lewis and other members of the BofA Board of Directors for proceeding with the Merger in violation of their fiduciary duties, given that the these defendants reportedly received pressure from the federal government, including both the Department of the Treasury and the Federal Reserve System, to complete the Merger in spite of any difficulties—**_and risked losing their prestigious positions and corresponding reputations if they did not comply_**.  In their decision to accept the Fed's Faustian bargain, the BofA Defendants, and each of them, have already demonstrated that their loyalty lies to preserving their own positions and perquisites over and above serving the best interests of BofA and its shareholders.

270.    Third, the BofA Director Defendants face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.   To defend the fiduciary claims, the BofA Director Defendants will be concerned to emphasize the extent of the due diligence performed on Merrill and the breadth and scope of their knowledge of Merrill's condition; yet that position will only tend to prove a key element of the Section 14(a) claims and breach of the duty of candor claims that they should have known the true facts about Merrill and disclosed them in the Proxy Statement.

271.   Fourth, the BofA Director Defendants are unable to objectively consider pursuing these claims because, among other reasons:

(a)   **Lewis** is a high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Indeed, The Corporate Library, an independent investment research firm, rated BofA as a "Very High Concern" as a result of Lewis's high pay of almost $30,000,000, and the SEC has written to the Company for clarifications in regard to executive compensation levels, including that of CEO Lewis.

(b)   **Gifford** is a recent, former, high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Moreover, Gifford has entered into a highly-paid consulting agreement with BofA that requires the Company not only to pay him a retainer, but also to pay for office space, support staff, and a private jet.  For 2008, the value of those benefits equaled the following: (i) $50,000 in consulting fees; (ii) $947,682 in aircraft usage (which was the amount paid to a third party vendor); and (iii) $225,031 in office and administrative support.  In addition, the Company paid Gifford a tax gross-up in the amount of $281,307 related to his use of Company-provided aircraft.  Moreover, Gifford also served as the Chairman and Chief Executive Officer of FleetBoston where he, as a member of the FleetBoston Board, approved his own and other executive rewards while FleetBoston was under investigation by regulators for improper trading activities that favored some investors

over others.  Gifford also was an executive at FleetBoston when FleetBoston, in the wake of its own trading scandal, was acquired by BofA.

(c)    **Bramble** served as a Chief Executive Officer of MBNA and when MBNA was acquired by BofA in 2006.  Bramble recently retired from Allfirst Financial Inc. after it was discovered that Allfirst lost $691.2 million in a foreign currency trading scandal, and returned to work only after lucrative offers from MBNA, which BofA continued on his behalf after it acquired MBNA.  In connection with the MBNA acquisition, Bramble received an opulent buyout package and a seat on the BofA Board.

(d)    BofA Directors **Barnet, Collins, Countryman, May, and Ryan,** were, like Director **Gifford**, members of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others.  When FleetBoston was acquired by BofA in April 2004, these defendants received lucrative buyouts and other compensation and were presented with seats on the BofA Board.

(e)    Each of the BofA Director Defendants has received compensation far in excess of an amount that would render them independent under accepted standards.  The NYSE listing standards, for example, provide that "[a] director who receives . . . more than $100,000 per year in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation[,] is not independent."  Despite these standards, each of the directors received over $100,000 in stock awards alone in both 2006 and 2007.  Average compensation over the last two years for several directors has been egregiously disqualifying:  **Lewis** (over $25 million), **Gifford** ($1,616,990) **Spangler** ($576,646), **Ward** ($606,523), and **Massey** ($430,105).

(f)     At 16 directors, the BofA Board of Directors is large and unwieldy such that it can be and is dominated by **Lewis**, who serves as both the CEO and Chairman and has hand picked the majority of the BofA Board.  The Board's size contributes to the Company's being rated "High Governance Risk Assessment" by The Corporate Library, an independent investment research firm.

(g)     Six directors, **May, Ryan, Barnet, Collins, Countryman, and Gifford**, are designated as "Problem Directors" by The Corporate Library, in part due to their involvement with the FleetBoston Board of Directors, which approved substantial executive rewards even as FleetBoston was under regulatory investigations for multiple instances of improper activity.  Significantly, three of these "Problem Directors"—**May, Barnet, and Collins**—constitute a *majority* of the five-member Audit Committee, with **May** serving as its Chair.  Moreover, **Ryan** is Chair of Corporate Governance Committee.

(h)     Nine directors (more than half of the Board)—**Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward**—have no career experience in banking, investment banking, securities brokerage, or any other financial services industry.  Yet **Ward** (software) chairs the Asset Quality Committee; **Franks** (Army) serves on the Audit Committee, **Lozano** (publishing) serves on the Asset Quality Committee; **Massey** (college president) serves on the Audit Committee; **Mitchell** (media non-profit) serves on the Compensation and Benefits Committee and the Corporate Governance Committee; **Ryan** (pharmacy) chairs the Corporate Governance Committee and serves on the Compensation and Benefits Committee; **Sloan** (auto parts) is the "Lead Director," chairs the Executive Committee and the Compensation and Benefits Committee, and serves on the Corporate Governance Committee; **Spangler** (construction company) serves on the Compensation and

Benefits Committee and the Corporate Governance Committee; and **Tillman** (home improvement) serves on the Asset Quality Committee.  These directors rely heavily on the expertise and advice of other Board members who do have experience in banking or financial services and are not meaningfully independent of them with respect to BofA's acquisition of Merrill.  Moreover, the director compensation received by several of these directors—**Massey** (retired college president), **Franks** (retired Army officer), and **Mitchell** (media non-profit)—constituted a substantial portion of their annual earnings, making them dependent on BofA for their livelihood and further compromising their independence.

(i)     Three directors, **Gifford, Countryman, and May**, each serve as both a trustee of NSTAR, the energy utility company, and a member of the Board of Directors of CBS Corporation.  In addition, May is the Chairman and CEO of NSTAR.  These three directors therefore serve on interlocking Boards and are not meaningfully independent of one another.  In particular, Countryman and May are beholden to Gifford, an admittedly non-independent director, and will not act independently of his wishes.  Similarly, **Sloan and Tillman** serve together on the Board of Directors of Lowe's Companies, Inc. and are not meaningfully independent of one another.

(j)     There is a *100 percent overlap* among two supposedly separate and independent committees of the BofA Board – the Compensation and Benefits Committee and the Corporate Governance Committee.  These two committees comprise *exactly the same directors*:  **Mitchell, Ryan, Sloan, and Spangler**.  These committees have no meaningful distinction from the full BofA Board and exist simply to ratify the positions of the full BofA Board, which is dominated by Lewis, Gifford, and the FleetBoston and MBNA nominees.

(k)     **Countryman, Ryan, Lozano, Franks, Gifford, Massey, Sloan, and Ward** also served on the Boards of companies, other than BofA, that received a "D" rating by the Corporate Library, including the following:

| | |
|---|---|
| Charles Gifford | CBS Corporation (CBS)<br>Chairman of the CBS Nomination Committee |
| Thomas Ryan | Yum! Brands (YUM)<br>On the Yum! Brands executive pay and nomination committees |
| Thomas Ryan | CVS Caremark Corporation (CVS)<br>Served as CVS CEO and Chairman |
| Walter Massey | McDonald's (MCD) |
| Jacquelyn Ward | Sanmina-SCI Corporation (SANM) |
| Jacquelyn Ward | WellPoint (WLP) |
| Monica Lozano | Walt Disney (DIS) |
| Tommy Franks | CEC Entertainment (CEC) |

(*l*)     **Gifford, Ward and Mitchell** were the beneficiaries of the full BofA Board's decision to accelerate the vesting of stock options held by these defendants in order to avoid recognizing the related expense.

(m)     **Ward** served on the boards of six public companies, three more than would make her a disinterested and independent director under current standards.

(n)     The BofA Board farmed out its "Lead Director" position to **Sloan**, who is the current Chairman and Chief Executive Officer of General Parts International, Inc., a North Carolina-based distributor of automobile replacement parts.  Sloan cannot, and does not, exercise any independent judgment or control as the Lead Director, as a member of the BofA Board, as Chair of its Executive Committee, or as Chair of the Company's Compensation and Benefits Committee.  Rather, he is dominated and controlled by Lewis, Gifford, and

their cohorts from the FleetBoston and MBNA acquisitions (Barnet, Bramble, Collins, Countryman, May, and Ryan).

(o)     Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis**, **Gifford**, **Countryman**, and **Sloan**, chaired by Sloan, whose experience lies in auto parts, not banking.

272.     Each of the BofA Director Defendants was a member of one or more committees of the BofA Board at various times during the relevant period and in connection with the Merger.  As members of these Committees, these BofA Directors had specific oversight responsibilities for various aspects of BofA's operations, and each Committee was tasked with reporting back to the full Board.

273.     Each of the BofA Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's business units and capital position, and each of the BofA Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio of assets and business units:  (a) **May (Chair), Barnet, Collins, Franks,** and **Massey** (Audit Committee); (b) **Ward (Chair),**

Bramble, Lozano, and Tillman (Asset Quality Committee); (c) Sloan (Chair), Mitchell, Ryan, and Spangler (Compensation and Benefits Committee); (d) Ryan (Chair), Mitchell, Sloan, and Spangler (Corporate Governance Committee); and (e) Sloan (Chair) Countryman, Gifford, and Lewis (Executive Committee). Each of these Committees did, in fact, actively direct and control the Company's affairs during the relevant period. In 2008, the full Board met 13 times, the Audit Committee met 10 times, the Asset Quality Committee met 6 times, the Compensation and Benefits Committee met 5 times, the Corporate Governance Committee met 4 times, and the Executive Committee met 6 times.

274.    As members of the Audit Committee of the BofA Board, May (Chair), Barnet, Collins, Franks, and Massey had the ultimate responsibility at BofA for both "the effectiveness of the Corporation's system of internal controls" and "the compliance by the Corporation with legal and regulatory requirements." This mission was encapsulated in the following duties, among others:

- "*Review the scope and content of examinations of the Corporation performed by* the examination forces of the Federal Reserve Board, Comptroller of the Currency, and *other regulatory agencies and report their conclusions to the Board of Directors, including comments as to the suitability of necessary correction action taken, and to the response made to the regulators*";

- *Review with management, the Independent Registered Accounting Firm and the General Auditor any correspondence with regulators or government agencies* and any employee ("Whistleblower") complaints of published reports, *which raise significant issues regarding the Corporation's financial statements or accounting policies, procedures, or controls in accordance with the Committee's established procedures*";

- "Quarterly receive a report on *any significant deficiency or material weakness in the Corporation's internal controls* or any fraud involving an employee associated with internal controls";

- "Annually *review the Corporation's disclosure controls and procedures, including the Corporation's internal controls*"; and

- "Periodically *review with management and the Corporation's General Counsel the nature and status of significant legal matters.*"

(All emphases added.)

275.     The BofA Audit Committee met 12 times during 2007.  The BofA Audit Committee met a similar number of times in 2008.  However, when it came time to consider one of the most important transactions in BofA's history, *viz.*, the acquisition of Merrill, the Audit Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

276.     As members of the Asset Quality Committee of the BofA Board, **Ward (Chair), Bramble, Lozano, and Tillman** had the ultimate responsibility at BofA for "oversight of credit risks to the company's assets and related earnings."  This mission was encapsulated in the following duties, among others:

- "*review the asset quality trends and performance* of the Corporation and its subsidiaries";

- "*monitor management's adherence to prudent and sound credit policies and practices*"

- "*review credit concentrations, credit risk inherent in selected products and businesses,* and country risk";

- "review the adequacy of the allowance for loan and lease losses and related written policies and procedures"; and

- "*approve credit risk policies and management disciplines* as required by the Basel II accord or other regulatory requirements."

(All emphases added.)

277.     The BofA Asset Quality Committee met six times during 2007.  the BofA Asset Quality Committee met a similar number of times in 2008.  However, with respect to the Merger, the Asset Quality Committee held no separate meetings and/or failed to ensure that the value of the

losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

278.    As members of the Compensation and Benefits Committee of the BofA Board, **Sloan (Chair), Mitchell, Ryan, and Spangler** had the ultimate responsibility at BofA for "overall guidance with respect to the establishment, maintenance and administration of Bank of America Corporation's compensation programs and employee benefit plans."  This mission was encapsulated in the following duties, among others:

- "Determine and approve the compensation, including salary, incentive compensation and equity based awards, for the Chief Executive Officer and Bank of America Corporation's other executive officers";

- "Review and discuss with management the Compensation Discussion and Analysis section of Bank of America Corporation's annual proxy statement and produce the compensation committee report for inclusion in Bank of America Corporation's annual proxy statement"; and

- "Periodically review and make recommendations to the Board as to the form and amount of compensation for Bank of America Corporation's directors."

279.    The BofA Compensation and Benefits Committee met five times during 2007.  the BofA Compensation and Benefits Committee met a similar number of times in 2008.  However, with respect to the Merger, the Compensation and Benefits Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

280.    As members of the Corporate Governance Committee of the BofA Board, **Ryan (Chair), Mitchell, Sloan, and Spangler** had the ultimate responsibility at BofA for "matters of

corporate governance (defined for this purpose as the relationship of the board, the stockholders and management in determining the direction and performance of the company)" and for "recommend[ing] the corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies applicable to the company."  This mission was encapsulated in the following duties, among others:

- "solicit and review comments from all directors and report annually to the board with an assessment of the board's performance";

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval"

- "recommend appointments to board committees"; and

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval."

281.    The BofA Corporate Governance Committee met four times during 2007.  the BofA Corporate Governance Committee met a similar number of times in 2008.  However, with respect to the Merger, the Corporate Governance Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

282.    In addition, while BofA and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as

severance payments, stock grants, and stock awards as a result of their incompetent performance and deceptive activities.

283.    Each and every member of the Board of Directors held on to his or her position as a director and/or senior officer of the Company only because he or she was willing to violate his or her fiduciary duties or the federal securities laws and also sought to entrench themselves as a director for the reasons stated herein.  Specifically, where duty called for disclosure of Merrill's deteriorating condition in the fourth quarter of 2008, invocation of the MAC clause and/or renegotiation or termination of the Merger, and the disclosure of the BofA's communications with federal regulators on both these issues, the BofA Defendants, when told that faithfully discharging these duties would mean risking the loss of their positions at BofA by the actions of the Federal Reserve and/or the United States Treasury, willfully and knowingly abdicated these duties in favor of keeping their positions.

284.    The BofA Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of BofA or its shareholders.  The present Board of Directors of BofA has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including Lewis and Gifford are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the BofA Board are all personally named as defendants in the consolidated securities class action filed under this docket, which alleges that they committed fraud with respect to the merger.  This places Defendants in an irreconcilable conflict of interest regarding the prosecution of this action, and precludes them from exercising the independence necessary to make a good faith business judgment.

(f)     The members of the BofA Board, including each of the defendants herein, received substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of BofA.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(g)     The BofA directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

## V.     DUTIES OF THE BofA DEFENDANTS.

285.     By reason of their positions as officers, directors, and/or fiduciaries of BofA, and because of their ability to control the business and corporate affairs of the Company, the BofA Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, disclosure, oversight, and due care, and were and are required to use their utmost ability to control and manage BofA in a fair, just, honest and equitable manner.  The BofA Defendants were and are required to act in furtherance of the best interests of BofA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

286.     Each of the BofA Defendants had a duty to disclose fully and fairly to shareholders all material information within his or her control when seeking shareholder action such as a vote on whether or not to proceed with the Merger.  An item of information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote and/or that item would have assumed actual significance in the deliberations of a reasonable shareholder.

287.     Whenever directors or officers of a public corporation communicate with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith, and loyalty. The *sine qua non* of all such communications to shareholders is honesty.  Moreover, a fiduciary who learns that his or her earlier communications to his or her beneficiaries were false or misleading, and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements, also breaches his or her duty of loyalty and of full and fair disclosure.

288.     In addition to the duties of full disclosure imposed on the BofA Defendants as a result of their making affirmative statements and reports, each of these defendants had a duty to disseminate truthful information promptly that would be material to a reasonable investor in compliance with the integrated disclosure provisions of the SEC regulatory regime, including accurate and truthful information with respect to BofA's business, so that the market prices of the Company's public traded securities would be based on accurate, truthful, and complete information.

289.     Each director and officer of BofA owes to the Company and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the BofA Defendants had a duty to promptly disseminate accurate and truthful information with regard to their company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

290.     The BofA Defendants, because of their positions of control and authority as directors and/or officers of BofA, were able to, and did, exercise control over the wrongful acts

complained of herein and over the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the BofA Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the Company.

291.    To discharge their duties, the officers and directors of BofA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, these individuals were required to, among other things:

(i)    refrain from acting in any manner so as to favor the personal interest of the directors or officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    disclose all information to shareholders concerning Merrill or the impact of the Merrill Merger on BofA fully and fairly as that information became available, both before and after the Shareholder Vote on the Merger;

(iv)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(v)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an

adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(vi)    remain informed as to how the Company conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(vii)   ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(viii)  ensure that no inaccurate financial information about the Company was released to the public that would tend to artificially inflate the Company's stock price, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(ix)    ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company.

292.    Each of the BofA Defendants, by virtue of his or her position as a director and/or officer of BofA, owed the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the BofA Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

293.     In addition, the BofA Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required these defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

294.     The BofA Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.   The conduct of the BofA Officer Defendants was ratified by the BofA Director Defendants during the relevant period.

295.     The BofA Defendants also had specific duties imposed on them by the Company.

296.     BofA adopted "Corporate Governance Guidelines" in 2007 to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.  Among other things, the Corporate Governance Guidelines provided that the BofA Director Defendants had "complete and open access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Secretary or directly by the director." The Guidelines stressed:

> Bank of America's goal in everything we do is reaching for higher
> standards - for our customers, our shareholders, our associates and

our communities, upon which the future prosperity of our company rests. These Guidelines reflect the way we are striving for higher standards in corporate governance.

297.    BofA also had a "Code of Ethics" applicable to the entire Company, including

Defendants, which states in part:

### 1.2 Accounting

To ensure the integrity of its consolidated financial statements, Bank of America has established internal accounting and operating controls and procedures, including disclosure controls and procedures, and a Disclosure Committee.

All associates responsible for the preparation of the corporation's financial statements, or who provide information as part of that process, must maintain and adhere to these controls so that all underlying transactions, both within Bank of America and with third parties, are properly documented, recorded and reported.

In addition, all associates have the responsibility to promote full, fair, accurate, timely and understandable disclosure in reports and documents that Bank of America files with or submits to the Securities and Exchange Commission and in other public communications made by the corporation.

\*        \*        \*

Section 6: Compliance with Law

You must not take any action, either personally or on behalf of Bank of America, which violates any law, regulation or internal policy affecting Bank of America business.

\*        \*        \*

### 7.1 Restrictions on trading in Bank of America securities

You must not buy, sell, recommend or trade in Bank of America securities--either personally or on behalf of someone else--while in possession of material, nonpublic information relating to the corporation, except through trading programs pre-approved by the Legal Department. In addition, you must not communicate or disclose such information to others who may trade in Bank of America securities. Doing so may not only be a violation of your duty to keep

such information confidential, but also may be a violation of federal and state laws, and the laws of many countries.

If you are a Bank of America Corporation director or have been designated as an "insider" by the corporation, you must obtain special approvals before trading in Bank of America securities.

298.    In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.  These duties are highlighted *supra*.

## VI.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

299.    At all relevant times, as a result of their membership on the Board of Directors, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, each of the BofA Defendants had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.  Similar access was enjoyed by the Merrill Defendants with respect to Merrill's internal affairs.  Moreover, after the Merger was announced, the BofA Director Defendants had complete access to similar information concerning Merrill.

300.    At all relevant times, the BofA Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) preserve and enhance the BofA Defendants' directorial and managerial positions at BofA, as well as the power and prestige accruing to the BofA Defendants as a result of holding those positions; (b) transfer exorbitant unearned and wasteful sums of money to themselves; (c) deceive the investing public, including BofA's own shareholders, as to the Merrill Defendants' management of Merrill's operations, the company's financial health, stability, the accuracy and integrity of its accounting policies and other internal

controls, and its business prospects; and (d) purchase Merrill for BofA without adequate due diligence, and through the mechanism of a false and misleading Proxy Statement.

301.    In committing the wrongful acts alleged herein, the BofA Defendants, the Merrill Defendants, and the Advisor Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the BofA Defendants and the Merrill Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.  The Merrill Defendants aided and abetted the BofA Defendants in their breaches of duty with respect to the Merger and their filing of a false and misleading Proxy Statement.

302.    At all relevant times, each of the BofA Defendants was the agent of each of the other BofA Defendants, and was at all times acting within the course and scope of such agency.  At all relevant times, the BofA Director Defendants, the Merrill Defendants, and the Advisor Defendants was the agent of each of the others, and was at all times acting within the course and scope of such agency.

303.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

304.    The Merrill Defendants engaged in a conspiracy, common enterprise and/or common course of conduct to make improper statements about Merrill's financial performance, and its future business prospects, and to breach their duty of complete candor in the context of the

Shareholder Vote on the Merrill acquisition.  The BofA Defendants and the Advisor Defendants joined in and supported the Merrill Defendants' conspiracy and common enterprise with respect to the Merger.

305.     The purpose and effect of the BofA Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the BofA Defendants' violations of federal and state law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of BofA common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## VII.    DERIVATIVE ALLEGATIONS.

306.     Plaintiffs bring their "derivative" claims derivatively in the right and for the benefit of BofA to redress injuries suffered by it as a direct result of the breaches of fiduciary duty, dissemination of a false and misleading Proxy Statement, and other wrongs committed by the BofA Defendants.  BofA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

307.     Plaintiffs will adequately and fairly represent the interests of BofA in enforcing and prosecuting its rights.

308.     Plaintiffs were holders of BofA common stock during the wrongs complained of and remain so now.

309.     Prosecution of this action, independent of the BofA Board, is in the best interests of BofA.

## VIII.   CLASS ACTION ALLEGATIONS.

310.   Plaintiffs' "direct" claims are brought as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other persons who owned shares of BofA common stock as of October 10, 2008, the record date for the vote on approval of the proposed Merger, and were damaged thereby.  Excluded from the Class are the Defendants, affiliates of the Defendants, and the immediate family members of the Individual Defendants.

311.   The direct claims are properly maintainable as class claims for the following reasons:

(a)   The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2008, BofA had outstanding 5,017,579,321 shares of its common stock, held by individuals and institutions too numerous to bring separate actions.  Moreover, it is reasonable to assume that holders of BofA common stock are geographically dispersed throughout the United States and the world.

(b)   Plaintiffs will fairly and adequately protect the interests of the members of the Class, inasmuch as they are members of the Class and their claims are typical of the claims of all Class members.  Plaintiffs have retained competent counsel experienced in securities class action litigation.  Plaintiffs' interests are to obtain appropriate relief for themselves and for the Class for the harms arising out of the misconduct set forth herein.

(c)   There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include:

(i)   Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning

Merrill's deteriorating condition in the fourth quarter of 2008 and the impact it would have on BofA;

(ii)     Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning their determination that BofA was entitled to invoke the MAC clause to terminate the Merrill Merger, Messrs. Paulson and Bernanke's efforts to persuade them not to invoke the MAC clause, and their decision to accede to those demands;; and

(iii)    Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning BofA's need for, seeking of, and obtaining of, $20 billion in additional federal assistance to complete the Merrill acquisition, coupled with over $100 billion in federal "backstop" guarantees in connection with that transaction.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' direct claims.  It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims.  In addition, the bringing of separate actions would put a substantial and unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

(e)     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them.  No unusual difficulties are likely to be encountered in the management of the class claims.

(f)     The BofA Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

(g)     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the BofA Defendants, and/or adjudications which as a practical matter might be dispositive of the interests of other members of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**Derivatively Against the BofA Defendants for Breach of Fiduciary Duty**

312.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

313.    The BofA Defendants owed and owe BofA fiduciary obligations.  By reason of their fiduciary relationships, the BofA Officer Defendants and the BofA Director Defendants owed and owe BofA the highest obligation of good faith, fair dealing, loyalty, candor, oversight, and due care.

314.    The BofA Defendants, and each of them, breached their duties to BofA and its shareholders by, among other things:  (a) agreeing to acquire Merrill after only 10 hours of due diligence, based on incomplete information and insufficient analysis; (b) agreeing to pay tens of billions of dollars in valuable BofA common stock for Merrill, at a time when Merrill was in a liquidity turmoil, faced imminent bankruptcy filing, and could otherwise have been acquired for mere "pennies" on the dollar; (c) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from

Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; (d) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives; and (e) failing to invoke the MAC clause or otherwise terminate or renegotiate the Merger even though they knew and had determined that it was in BofA's best interests to do so. Such conduct was not, and could not have been, the result of rational business judgment, but rather constituted a pattern of bad faith and disloyalty to BofA and its shareholders.

315. As a direct and proximate result of the BofA Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages. As a result of the misconduct alleged herein, each of the BofA Defendants is liable to the Company.

## COUNT II

### Derivatively Against the Advisor Defendants for Breach of Fiduciary Duty

316. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

317. Each of the Advisor Defendants owed BofA and its shareholders the duty to perform due diligence necessary to accurately and reliably determine whether the terms of the proposed Merger and exchange ratio were fair from a financial point of view to BofA and continued to be fair.

318. The Advisor Defendants issued so-called "fairness" opinions, or otherwise counseled BofA as to the fairness of the proposed Merger, advising BofA that the Merger and exchange ratio were fair to BofA from a financial point of view.

319. The Advisor Defendants failed to perform the due diligence necessary under the circumstances. The "fairness" opinions or other advice to BofA therefore had no reasonable basis in

fact, were false and misleading, and breached the Advisor Defendants' duties to BofA and its shareholders.

320.    As a direct and proximate result of the Advisor Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT III

### Derivatively Against the Advisor Defendants for Professional Negligence

321.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

322.    As set forth herein, the Advisor Defendants, in issuing their "fairness" opinions or otherwise advising BofA on the fairness of the proposed Merger. failed to exercise the care that a professional employed to render such advice to BofA reasonably would have employed in the circumstances.

323.    The "fairness" opinions or other advice to BofA of the Advisor Defendants therefore had no reasonable basis in fact, were false and misleading, and constituted professional negligence on the part of the Advisor Defendants.

324.    As a direct and proximate result of the Advisor Defendants' firm' negligence, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT IV

### Derivatively Against the BofA Officer Defendants, Montag, and Kraus for Unjust Enrichment and Return of Unearned Compensation

325.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

326.     The BofA Officer Defendants were eligible for incentive compensation premised upon their achievement of BofA's business and financial goals in a legitimate and lawful manner. Each of the BofA Officer Defendants received substantial incentive compensation payments.

327.     By reason of their positions as officers of BofA, the BofA Officer Defendants owed fiduciary duties to the Company and its shareholders in connection with the operation, management, and direction of the Company.

328.     Defendants Montag and Kraus were eligible for incentive compensation premised upon their achievement of Merrill's business and financial goals in a legitimate and lawful manner. Each of these Defendants received substantial incentive compensation payments.

329.     By reason of their positions as officers of Merrill, Defendants Montag and Kraus owed fiduciary duties to Merrill in connection with the operation, management, and direction of Merrill.

330.     The BofA Officer Defendants failed to achieve BofA's business and financial goals except in an illegitimate and unlawful manner. Accordingly, the compensation payments to the BofA Officer Defendants were not properly awarded for the work performed and results achieved. Since these defendants did not obtain the business results expected, they have been unjustly enriched and must return to the Company the incentive compensation that was awarded to them.

331.     Defendants Montag and Kraus failed to achieve Merrill's business and financial goals except in an illegitimate and unlawful manner. Accordingly, the compensation payments to these Defendants were not properly awarded for the work performed and results achieved. Since these Defendants did not obtain the business results expected, they have been unjustly enriched and must return to the BofA, Merrill's new parent, the incentive compensation that was awarded to them.

## COUNT V

### Derivatively Against the BofA Defendants for Contribution

332.      Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333.      The conduct of the BofA Defendants has exposed BofA to significant liability under various federal and state laws.

334.      By reason of the foregoing, the BofA Defendants have caused BofA to suffer substantial harm.

335.      If BofA is held liable under federal or state laws for damages, civil penalties, restitution, or other relief, the BofA Defendants are liable to BofA for contribution.

## COUNT VI

### Derivatively Against the BofA Defendants for
### Breach of the Duties of Full Disclosure and Complete Candor

336.      Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

337.      The BofA Defendants, and each of them, violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

338.     As a direct and proximate result of the BofA Defendants' breaches of their duties of full disclosure and complete candor, BofA sustained significant damages arising out of the material misstatements to shareholders, and the BofA Defendants are liable to the Company.

## COUNT VII

### Derivatively Against the Merrill Defendants and the Advisor Defendants for Aiding and Abetting the BofA Defendants' Breach of Fiduciary Duties

339.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

340.     The BofA Defendants owed BofA fiduciary obligations.   By reason of their fiduciary relationships, the BofA Defendants owed BofA the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.  That the BofA Defendants owed these duties to BofA was well known to the Merrill Defendants and the Advisor Defendants.

341.     As is detailed in the preceding paragraphs, the BofA Defendants have breached their fiduciary duties to BofA.

342.     The Merrill Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.   The Merrill Defendants actively and knowingly induced the BofA Director Defendants to breach their fiduciary duties by offering a Merger transaction to BofA which would cause BofA to indemnify the Merrill Defendants and to assume billions of dollars in undisclosed losses and liabilities, to the detriment of BofA and its shareholders.

343.     Moreover, the Merrill Defendants concealed the fact of Merrill's growing losses and liabilities from the BofA Defendants and actively worked to prevent them from discovering the true facts.  Among other things, the Merrill Defendants convinced the BofA Defendants that Merrill's growing losses were "market related" and "in line" with other Wall Street firms, and they told the BofA Director Defendants that Merrill's exposure was the result of "legacy" trading positions and

not new positions that had been put on by defendant Montag since the deal was announced on September 15, 2008.

344.   The Advisor Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.  The Advisor Defendants knew that the BofA Defendants were breaching their fiduciary duties to BofA by issuing false and misleading statements in the Proxy Statement and otherwise in connection with the Merger, and the Advisor Defendants gave substantial assistance to the BofA Defendants by permitting their name and their "fairness" opinions to be used as indications of the fairness of the Merger to BofA.  FPK and J.C. Flowers received $20 million for their services to BofA.

345.   BofA was harmed as a direct and foreseeable consequence of these Defendants' misconduct.  As a result of the misconduct alleged herein, each of these Defendants is liable to BofA.

## COUNT VIII

### Derivatively Against the BofA Defendants,
### the Merrill Defendants, and the Advisor Defendants
### for Violation of Section 14(a) of the Exchange Act and Rule 14a-9

346.   This claim for relief, Count VIII, is not based on any allegations of knowing or reckless conduct by any defendant.  This claim does not allege, and does not sound in, fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

347.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this tile [15 U.S.C. § 781]."

349.   SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

350.   In the Proxy Statement, Plaintiff and all other BofA shareholders were solicited to vote to approve the Merger between BofA and Merrill.  A shareholder vote was required to approve this proposal.  Thus, the Proxy Statement was an essential causal link in the accomplishment of this proposal.

351.   The BofA Defendants, the Merrill Defendants, and the Advisor Defendants provided information which was contained in the Proxy Statement, allowed their names to be used in connection with the Proxy Statement and the solicitation of shareholder votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Statement, would have a continuing material relationship with BofA following the vote on the Merger and other issues presented in the Proxy Statement, solicited votes under the Proxy Statement, and caused the Proxy Statement to be disseminated to BofA's shareholders through the use of the United States mails and the means and instrumentalities of interstate commerce.

352.     The BofA Defendants, the Merrill Defendants, and the Advisor Defendants solicited proxies from the Plaintiff and other BofA shareholders by means of a proxy statement which contained false and misleading statements concerning the Merger, its benefits to shareholders, and other issues, and which omitted to state material facts that were necessary to make the statement contained therein not false and misleading.

353.     The Proxy Statement dated October 31, 2008, jointly issued by BofA and Merrill, and the supplemental filings and disseminations made by the defendants named herein in advance of the Shareholder Vote on the Merger on December 5, 2008, were false and misleading in light of the true financial condition of Merrill, and the combined BofA/Merrill, including in particular the existence of substantial losses that were first disclosed only on January 16, 2009, long after the Merger had closed.  These defendants in the exercise of reasonable care should have known the truth about Merrill's deteriorating financial condition and the existence of the losses by at least December 5, 2009, but failed to disclose such information, by supplementing the Proxy Statement or otherwise, before shareholders voted.

354.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood that a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Proxy Statement or a material part of the mix of information available to shareholders in deciding how to exercise their voting rights.  Thus, shareholders were denied the opportunity to make an informed decision in voting on the Merger.

355.     None of the materially false and misleading statements contained in the Proxy Statement, or material facts omitted therefrom, were known to Plaintiff or other BofA shareholders when they voted on the matters presented to them in the Proxy Statement on December 5, 2008.

356.    BofA was harmed and suffered damages as a result of the Merger which was approved through the use of a proxy statement in violation of Section 14(a) and Rule 14a-9.

## COUNT IX

**Directly Against the BofA Defendants for
Breach of the Duties of Full Disclosure and Complete Candor**

357.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

358.    The BofA Defendants violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

359.    As a direct and proximate result of these Defendants' breaches of their duties of full disclosure and complete candor, Plaintiffs and the Class were deprived of their right to cast an informed vote at the Shareholder Vote on the Merger on December 5, 2008.

360.    Plaintiffs and the Class have sustained significant damages arising out of the defects in the Proxy Statement which deprived them of the opportunity to cast an informed vote.  These damages, which are separate from the damages to BofA from similar acts misconduct which harmed BofA, include the amounts which BofA spent to negotiate the transaction and prepare the Proxy Statement, including $20 million in fees to the Advisor Defendants, over $100 million in fees to the Wachtell law firm, and tens of millions of dollars in printing and disseminating the Proxy Statement, tallying votes, and otherwise implementing the solicitation of shareholders.  Through the BofA

Defendants' breaches of the duty of candor, Plaintiffs and the Class were deprived of the value of the honest services of the parties providing those services.

361.     The BofA Defendants are liable to Plaintiffs and the Class for these damages.

## REQUEST FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.     Against all the BofA Defendants and the Advisor Defendants and in favor of BofA for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, unjust enrichment, professional negligence, aiding and abetting breach of fiduciary duties, contribution, and violations of the federal securities laws;

B.     Against all of the BofA Defendants and in favor of the Class for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, including the duty of full disclosure and complete candor.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the BofA Defendants' assets until BofA can recoup all of the monies improperly transferred to the BofA Defendants;

D.     Declaring that the BofA Defendants' improper payments to themselves through BofA's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers—as well as any assets or property acquired with such payments—be held in constructive trust for the benefit of BofA;

E.     Awarding to BofA restitution from the BofA Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other monies obtained by the BofA Defendants;

F.      Directing BofA to take all necessary actions to reform and improve its corporate governance and internal procedures, so as to comply with applicable laws and to protect BofA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

(i)      strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)     controlling  and  limiting  improper  payments  of  unearned compensation, corporate benefits, stock awards, and other emoluments;

(iii)    permitting  shareholders  to  nominate  at  least  three  additional candidates for election to the Board; and

(iv)    appropriately testing and then strengthening the internal audit and control functions demanded herein;

G.      Directing BofA to take all necessary actions to reform and improve their corporate governance and internal procedures regarding acquisitions, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following actions and policies:

(i)      providing that all material information concerning any mergers or acquisitions, including any such information calling into question the appropriateness

of proceeding with any such transaction, will be communicated to shareholders as soon as it is received, regardless of whether a shareholder vote has been completed;

(ii)     providing that no merger or other acquisition can be approved by the Board of Directors for recommendation to shareholders until the earlier of (x) the passage of five business days from the first communication of a potential transaction made to or received from a potential merger or acquisition partner, or (y) the Board's receipt of an opinion of outside, independent legal counsel, specifically retained for that purpose, that, in the circumstances presented, the time and scope of the due diligence performed by the Company and presented to the Board was adequate to make an informed decision to recommend approval of the transaction;

(iii)    providing that, with respect to any substantial merger or acquisition, an outside, independent legal counsel, specifically retained for that purpose, be appointed to represent shareholders to monitor the progress of the transaction from the date of recommendation of shareholder approval by the Board to the closing date; and

(iv)    terminating the employment of Lewis for cause and without the normal benefits of "severance" or "retirement" applicable to a "for good reason" resignation or a "without cause" termination.

H.     Requiring the BofA Defendants to remit to BofA all of the salaries, fees, bonuses, stock awards, and other compensation received for 2008;

I.     Requiring the BofA Director Defendants to take all necessary steps for restitution of all bonuses paid by Montag and Kraus in December 2008;

J.    Requiring the Advisor Defendants to remit to BofA all the fees paid to them for the "fairness" opinion and work performed in connection therewith;

K.    A judgment declaring the Proxy Statement to be materially false and misleading in violation of Section 14(a) of the Exchange Act;

L.    Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

M.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  October 9, 2009

LAW OFFICES OF CURTIS V. TRINKO, LLP

By:_____
Curtis V. Trinko
ctrinko@trinko.com
Kinny Wai Chan
Kchan@trinko.com
16 West 46th Street, 7th Floor
New York, New York 10036
Telephone: (212) 490-9550
Fax: (212) 986-0158

*Interim Liaison Counsel for Plaintiffs the Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System*

KAHN SWICK & FOTI LLC

Lewis S. Kahn
*lewis.kahn@ksfcounsel.com*
Michael A. Swick (a member of the bar of this Court)
*michael.swick@ksfcounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@ksfcounsel.com*
Kevin Oufnac
*kevin.oufnac@ksfcounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax: (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Fax: (504) 455-1498

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*the Louisiana Municipal Police Employees*
*Retirement System*

-and-

SAXENA WHITE P.A.

Maya Saxena
*msaxena@saxenawhite.com*
Joseph E. White, III
*jwhite@saxenawhite.com*
Christopher S. Jones (a member of the bar of this
Court)
*cjones@saxenawhite.com*
Lester R. Hooker
*lhooker@saxenawhite.com*
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3082

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*Hollywood Police Officers' Retirement System*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MD 2058 (DC) |
| This document relates to:<br><br>All Derivative Actions | Related File No. 09 CV 808 (DC) |

**CONSOLIDATED SHAREHOLDER
DERIVATIVE AND CLASS ACTION COMPLAINT
FOR BREACH OF FIDUCIARY DUTIES, AIDING AND
ABETTING,  UNJUST ENRICHMENT, CONTRIBUTION, AND
VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT**

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................1

JURISDICTION AND VENUE...........................................................................21

THE PARTIES...................................................................................................22

    Plaintiffs.....................................................................................................22

    Nominal Defendant ...................................................................................22

    The BofA Defendants................................................................................23

    The Merrill Defendants ............................................................................30

    The Advisor Defendants...........................................................................33

    Other Related Persons not Named as Defendants ...................................33

    Definitions of Groups...............................................................................35

I.      IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND
       GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND
       CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."................35

    A.    In Breach of their Duties of Loyalty and Good Faith, the BofA
        Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that
        it is Essentially Worthless in the Absence of Any Deal, and to Secretly
        Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of
        Actual Performance.........................................................................36

    B.    The BofA Defendants, Aided and Abetted by the Merrill Defendants
        and the Advisor Defendants, Conduct A Designedly Cursory "Due
        Diligence" of Merrill, in Further Gross Breach of Their Duties of
        Loyalty and Good Faith to BofA.....................................................38

    C.    The BofA Defendants, Aided and Abetted by the Merrill Defendants
        and the Advisor Defendants, Secretly Approve $5.8 Billion in
        Unwarranted Bonuses for Merrill Executives as Part of the Merger
        and Secretly Cause these Bonuses to be Paid on an Accelerated Basis
        *Before* the Merger Closes................................................................45

    D.    In Violation of Their Duties of Candor, Good Faith, and Loyalty, the
        BofA Defendants, Aided and Abetted by the Merrill Defendants and
        the Advisor Defendants, Cause BofA to Issue a Proxy Statement That
        Conceals Crucial Facts About Losses at Merrill and the Bonuses to be

Paid to Merrill Executives and is Otherwise Materially False and Misleading............................................................................46

    1.    The Proxy Statement Falsely Omits Information Concerning Bonuses, For Which the BofA Defendants Later Try to Deflect Blame onto BofA's External and Internal Legal Counsel............................................47

    2.    The Proxy Statement Falsely Describes Losses and Liabilities of Merrill. ....................................................50

    3.    The Proxy Statement Falsely Sets Forth "Fairness" Opinions by the Advisor Defendants..........................54

    4.    The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger..................................58

    5.    The Proxy Statement Falsely States that Merrill Executives Will Not Receive Discretionary Bonuses for 2008 and Conceals the Fact that Defendants Had Agreed to Guarantee $5.8 Billion in Bonuses to Merrill Executives and Accelerate the Payment Thereof to December 2008, Before the Merger Was Set to Close. ............59

    6.    The Proxy Statement Falsely Recommends Approval of he Merger...................................................................62

E.    The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity..........................................63

F.    BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants. ........................................................................70

G.    The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact...............................70

H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders....................................................75

I.      Liability of BofA Defendants for the Above Misconduct. ...............................79

J.      In an Act of Corporate Waste, and in Further Breach of Their Duties
        of Loyalty and Good Faith, the BofA Defendants Secretly Allow the
        Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before
        the Merger Closes ...............................................................................................83

II.     THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY
        DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN
        VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA
        DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH. ..........89

        A.      False and Misleading Statements and Omissions in the Proxy
                Statement. ........................................................................................... 89

        B.      False and Misleading Supplementary Statements................................ 94

        C.      False and Misleading Proxy *Supplements* ....................................... 96

III.    AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET
        CAPITALIZATION IS PUNISHED, DEFENDANTS ARE
        INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS,
        AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS
        DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR
        THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY
        WITH THE COST OF SEC PENALTIES. ..................................................... 97

        A.      The Truth Emerges Concerning Merrill's Devastation and
                Defendants' Wrongdoing............................................................... 97

        B.      The SEC, FBI, DOJ, New York Attorney General, and
                Congress Conduct Investigations of Defendants................................102

IV.     THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF
        INTEREST AND CIRCUMSTANCES GIVING RISE TO A
        SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS
        CREATING A REASONABLE DOUBT THAT THE BOARD COULD
        IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS
        AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE. ...................106

V.      DUTIES OF THE BofA DEFENDANTS. ....................................................120

VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ........126

VII.    DERIVATIVE ALLEGATIONS....................................................................128

VIII.   CLASS ACTION ALLEGATIONS. .............................................................129

**CLAIMS FOR RELIEF**.................................................................................**131**

    **COUNT I:  Derivatively Against the BofA Defendants for Breach of
Fiduciary Duty**..................................................................................**131**

    **COUNT II:  Derivatively Against the Advisor Defendants for Breach of
Fiduciary Duty**..................................................................................**132**

    **COUNT III:  Derivatively Against the Advisor Defendants for Professional
Negligence**........................................................................................**133**

    **COUNT IV:  Derivatively Against the BofA Officer Defendants, Montag, and
Kraus for Unjust Enrichment and Return of Unearned Compensation**...................**133**

    **COUNT V:  Derivatively Against the BofA Defendants for Contribution**..............**135**

    **COUNT VI:  Derivatively Against the BofA Defendants for Breach of the
Duties of Full Disclosure and Complete Candor**............................................**135**

    **COUNT VII:  Derivatively Against the Merrill Defendants and the Advisor
Defendants for Aiding and Abetting the BofA Defendants' Breach of
Fiduciary Duties**...............................................................................**136**

    **COUNT VIII:  Derivatively Against the BofA Defendants, the Merrill
Defendants, and the Advisor Defendants for Violation of Section 14(a) of the
Exchange Act and Rule 14a-9**................................................................**137**

    **COUNT IX:  Directly Against the BofA Defendants for Breach of the Duties
of Full Disclosure and Complete Candor**...................................................**140**

**REQUEST FOR RELIEF**...........................................................................**141**

**JURY DEMAND**......................................................................................**144**

Plaintiffs Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System (collectively, "Plaintiffs") bring this action derivatively on behalf of nominal defendant Bank of America Corporation ("BofA" or the "Company"), and directly on behalf of a Class of BofA shareholders (as defined herein), against certain directors and officers of BofA named herein (the "BofA Defendants") and other defendants (collectively, "Defendants"). Plaintiffs base their allegations on actual knowledge as to their own acts and on information and belief as to all other allegations after due investigation.

## NATURE AND SUMMARY OF THE ACTION

1.      This action arises from Defendants' wrongdoing in causing BofA to acquire Merrill Lynch & Co., Inc. ("Merrill") in a $50-billion merger transaction (the "Merger") agreed to on September 14, 2008, approved by BofA shareholders on December 5, 2008 (the "Shareholder Vote"), and consummated on January 1, 2009 (the "Closing"). The BofA Defendants recklessly and in bad faith caused the Company to commit to paying $50 billion for a company that was in the grips of a liquidity crisis placing it only days or, at most, weeks away from insolvency, and they did so in the course of only *a single day* (from the afternoon of Saturday, September 13, 2008 to the afternoon of Sunday, September 14, 2008).

2.      Bad faith, deliberate or reckless misconduct, and even outright disloyalty suffused the entire process by which the Merrill Merger was agreed to, presented to BofA's shareholders for approval, and consummated. Such wrongdoing was engaged in not only by the BofA Defendants, but also by other wrongdoers who either were bound by similar fiduciary duties to the Company and its shareholders, had similar obligations under the federal securities laws, or otherwise aided and abetted the BofA Defendants in their misconduct. These include officers and directors of Merrill

(sued herein as the Merrill Defendants), and BofA's investment bankers on the Merrill Merger (sued herein as the Advisor Defendants).

3.     The Merger was *agreed to*, with the unanimous approval of both companies' Boards of Directors, through a breach of the BofA Defendants' fiduciary duties (including the duties of loyalty, candor, and good faith), aided and abetted by the Company's investment bankers, as well as the officers and directors of Merrill, both named as defendants herein. Indeed, the Merger Agreement was executed based on an entirely perfunctory "due diligence" process that lasted only *10 hours* and was purposefully designed to give a green light to the Merger, and based on "fairness opinions" from the Company's investment bankers which, too, were merely post hoc rationalizations of a foreordained decision and which, in fact, deliberately disregarded Merrill's most recent financial projections and the impact of liquidity crises at other Wall Street firms—even though Merrill's viability was directly linked to the liquidity of those firms and even though those firms were themselves paying BofA's investment bankers for advice at the very same point in time. Officials at the Board of Governors of the Federal Reserve System (the "Federal Reserve" or the "Fed") have concluded that the BofA Defendants' due diligence was inadequate, and that the BofA Defendants knew it at the time.

4.     The Merger was *approved* by BofA's shareholders based on a false and misleading proxy statement (the "Proxy Statement") issued by the Board of Directors of BofA and other defendants, in violation of Section 14(a) of the Securities Exchange Act of 1934 and in breach of the duties of candor, loyalty, and good faith owed to the shareholders. These defendants, acting recklessly, in bad faith, and in conscious or reckless disregard of their duties, caused BofA to issue a Proxy Statement that was materially false and misleading in that, among other things, it:

- overvalued Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders;

- omitted the known fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value;

- omitted that the "fairness" opinions were based on incomplete information and were not actual opinions as to the Merger's fairness at all, but rather post hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action;

- misrepresented that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time;

- misrepresented that BofA would need no more than $25 million in financial assistance (which already had been received) to complete the Merger; and

- misrepresented Merrill's ability and intention to pay up to $5.8 billion in discretionary bonuses for 2008, before the Merger closed.

5.       The Proxy Statement not only was false and misleading when it was issued on October 16, 2008, but also was false and misleading by virtue of the fact that, while it was still effective and until the Shareholder Vote on December 5, 2008, Defendants deliberately, disloyally, and in bad faith took steps to assure that it was never corrected, amended, or updated to disclose the following highly material information:

- the fact that billions of dollars in additional losses were being incurred by Merrill in the fourth quarter of 2008, that these losses were accelerating, and that the losses reached approximately ***$14 billion*** two days before the Shareholder Vote;

- the fact that Merrill's financial results and losses on principal transactions during the fourth quarter of 2008 were sufficient, in the opinion of BofA's inside and outside legal counsel, to trigger the termination of the Merger due to the occurrence of a "material adverse event" pursuant to the merger agreement;

- the fact that BofA's Board of Directors had, in fact, decided to declare a "material adverse event" and terminate the Merger, but then quickly recanted

their decision once faced with perceived pressures by government officials to remove them from their jobs if BofA was caused to back out of the deal; and

- the fact that BofA had sought and obtained $20 billion in direct aid (coupled with over $118 billion in "backstop" guarantees) from the federal government to allow it to complete the Merger, and that the Company would not have been able to do so without such assistance.

6.      The Merger was ***consummated*** through further gross breaches of fiduciary duty (including the duties of loyalty, candor, and good faith) by the BofA Defendants, aided and abetted by other defendants.  Based on the cascading losses at Merrill and advised by legal counsel, BofA's Board of Directors determined in mid-December 2008 to terminate the Merger on the basis of the fact that Merrill had suffered a "material adverse event" allowing BofA to rescind the merger agreement pursuant to its terms.  However, in bad-faith disregard of their duty to act in the best interests of the Company by then acting on that decision, the BofA Directors immediately and loudly rescinded it and recklessly failed to pursue any alternatives, such as renegotiating the timing or price of the Merger using the "material adverse event" clause of the merger agreement (referred to herein as the "MAC clause") as leverage, consciously electing thereby to place their own  personal financial interests above the Company's.  Specifically, in mid-December 2008, the Board was informed (through Defendant Kenneth D. Lewis, Chief Executive Officer and Board Chairman) that Secretary of the Treasury Henry Paulson wished the Merger to be consummated regardless of Merrill's condition, and also that Mr. Paulson was threatening to try to have the entire Board removed from office if they did not comply.  However, rather than abide by their decision and face the consequences (or even resign in protest), the BofA Board members instead instantly retracted their

decision, causing Mr. Paulson to be notified of their decision even before the Board as a whole had been canvassed.[1]

7.       Having thus committed a textbook example of disloyalty, the BofA Defendants then compounded their wrongdoing by hiding from shareholders both the Board's "material adverse event" determination and its decision to reverse it under perceived pressure from Mr. Paulson—and even the fact that the Company had sought and obtained over $138 billion in direct aid and other assistance from the federal government solely to enable it to consummate the Merger.  To the contrary, the BofA Defendants expressly treated **withholding such information** as one of the key **goals** of the process by which the Merger was consummated.  These acts and omissions constituted further deliberate breaches of the BofA Defendants' fiduciary duties of loyalty and good faith, amounting to a vain attempt to "cover up" their own acts of wrongdoing, which were highly material to shareholders.

---

[1] In so doing, the BofA Board gave no consideration to the dubiousness of Mr. Paulson's threat—or to ways in which the MAC clause could have been used to BofA's advantage short of actually rescinding the Merger.  One senior Wall Street executive, upon learning of the Board's, was incredulous, telling an *Atlantic* reporter, "There is no question what I would have done if I were in his shoes . . . . "***I would have told [Bernanke and Paulson] I was calling the MAC, was releasing the decision publicly, and dared them to fire me and the board—and that never would have happened, trust me***."  Similarly, a former Merrill executive, who was involved in Merger, told the *Atlantic* reporter:  "He could have used the MAC clause a pretext to renegotiate the deal. . . .  "That would have been a prudent thing to do."

**After a Designedly Perfunctory "Due Diligence" Review, Defendants Violate Their Duties of Good Faith and Loyalty to BofA by Agreeing to Pay $50 Billion for a Virtually Bankrupt Company, While *Guaranteeing* $6 Billion in Bonuses to Company Executives**

8.     By the late summer of 2008, Merrill, with a large and perilous exposure to subprime-related securities, faced liquidity problems that jeopardized its very existence as a going concern.  As a consequence, the Board of Directors of Merrill and others at Merrill (sued herein as the "Merrill Defendants") were forced to put the entire company up for sale to an outside party.

9.     BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable disasters as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.  Over the weekend of September 13-14, 2008, representatives of the two companies gathered on orders from their Chairman-CEOs to negotiate a merger.  The deal—a stock-for-stock transaction in which Merrill would become a wholly-owned subsidiary of BofA—was peremptorily negotiated in the space of a single afternoon, Saturday, September 13, 2008, between Defendant Lewis, BofA's then-Chairman and CEO, and Defendant John A. Thain, the Chairman and CEO of Merrill.

10.    Rather than being properly focused on Merrill's deteriorating liquidity and inevitable bankruptcy as the only alternative to the Merger—and the correspondingly modest, if not fire-sale, price that BofA should pay—the negotiations under Defendant Lewis and the BofA Defendants instead were, from inception, pegged to the number of billions of dollars in *bonuses* that should be *guaranteed* to Merrill executives pursuant to the Merger, and to the amount of *premium* over Merrill's current share price BofA should pay.  Thus, the Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses

should be paid on an accelerated basis before the Merger closed on December 31, 2008. Similarly, the BofA Defendants, in a further act of disloyalty and bad faith, simply acceded to the Merrill team's demand that BofA pay an astonishing *70 percent premium* for Merrill's common stock based on the value of such stock at the time. With these deal terms in place, Defendants, in yet further acts of disloyalty and bad faith, then proceeded to conduct an ad hoc "due diligence" review of Merrill whose favorable result was foreordained by Defendants.

11.     According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, *10 hours*, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning. Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within days but for the transaction itself. The process was especially inadequate given Merrill's exposure to metastasizing losses in the market for auction rate securities ("ARS"), mortgage-backed securities ("MBS"), collateralized debt obligations ("CDOs"), and other toxic, highly-leveraged derivatives that made headlines throughout the nation's economy in the summer and fall of 2008.

12.     In recklessly agreeing to these terms, the BofA Director Defendants did not consider the scope, potential amount, or any other aspect of the liabilities that they were causing BofA to assume—including whether the assumption of such liabilities might cause serious or even fatal harm to BofA. The assumption of such liabilities without quantification or other consideration constituted a breach of these defendants' duties of loyalty, candor, and good faith, since the decision to do so could not have been taken in good faith or as the result of those defendants' informed business

judgment.  Indeed, in a move which shocked shareholders—who had, through Defendants' reckless, disloyal, and bad-faith misconduct, been kept in the dark throughout this process—on or about January 16, 2009, BofA announced that it had been required to obtain an ***additional*** $118 billion in aid and "backstop" liquidity guarantees from the government (on top of approximately $25 billion in aid already received) under the federal Troubled Asset Relief Program ("TARP"), just to stay afloat.

13.    In breach of their duties of good faith, loyalty, and candor, the Boards of Directors of both Merrill and BofA unanimously approved the Merger in great haste in separate afternoon meetings held on Sunday, September 14, 2008.  The transaction was first announced to BofA shareholders and the public on the morning of Monday, September 15, 2008.  The Shareholder Vote on the Merger was scheduled for December 5, 2008.

### Defendants Issue a False and Misleading Proxy Statement and Knowingly Deceive Shareholders With Respect to Billions of Dollars in Secret Bonuses to Merrill Executives

14.    As became obvious practically the moment it closed on January 1, 2009, following a favorable vote on December 5, 2008, the Merger was approved by BofA's shareholders based on inaccurate and misleading information furnished to them by certain of the Defendants.  The BofA Director Defendants sought shareholder consent to the Merger in a Schedule 14A Proxy Statement (the "Proxy Statement") issued on November 3, 2008—one month before the Shareholder Vote. The Proxy Statement contained statements concerning Merrill that were false and that omitted material information necessary to make the statements that were made not misleading, in violation of the federal securities laws and in breach of these defendants' duty of candor to shareholders. Among other things, these defendants failed to disclose, either in the Proxy Statement or subsequently, the unprecedented, and rapidly accelerating, losses at Merrill caused by its exposure to the various derivative securities—losses which quickly reached over $15 billion in the fourth quarter alone.

15.     That information, however, was already known or readily available to the BofA Defendants and their financial and legal advisors, as the BofA Defendants had obtained unfettered access to the entirety of Merrill's financial and accounting records immediately upon signing the Merger Agreement.  Moreover, Merrill's collapsing financial results, as well as the authorization to pay up to $5.8 billion in bonuses to Merrill executives, which together totaled in the tens of billions of dollars, were manifestly material to BofA shareholders in deciding how to vote on the Merger. By omitting to disclose this information, either in the Proxy Statement itself or in a corrective or updated disclosure, and by dwelling almost exclusively on the supposedly positive contribution Merrill would make to BofA, the BofA Director Defendants and their financial and legal advisors drafted, signed, and published the false and misleading Proxy Statement, violating Section 14(a) and Rule 14a-9 promulgated thereunder.  These actions also constituted a knowing, reckless, or grossly negligent violation of these defendants' duties of candor and full disclosure in the context of an action requiring shareholder approval—a violation which harmed not only the Company but also each shareholder directly who was asked to vote on the Merger.

16.     Recently, Rep. Dennis Kucinich, in his opening statement to the House of Representatives' Joint Full Committee-Subcommittee Hearing on the Government's Rescue of the Bank of America-Merrill Lynch Merger, summarized the findings of the hearings thus far:

> This Committee's investigation and two previous hearings have revealed that the *Government had concluded that Mr. Lewis's management of Bank of America was seriously deficient and possibly in legal jeopardy*.  Top staff at the Fed and Treasury had determined that *Mr. Lewis knew about accelerating losses at Merrill Lynch before the shareholder vote to ratify the merger, but he did not provide that information to shareholders.*  The top lawyer at the Fed had determined that Mr. Lewis and his management team were possibly *in violation of securities laws for withholding material information from shareholders. Top professional staff at the Fed had determined that Mr. Lewis and his management team had failed to do due diligence in acquiring Merrill Lynch* and were not up to the task of identifying and solving the problems in which they found themselves in late 2008.  [Emphases added.]

17.     In an even more flagrant violation of their duties of candor, loyalty, and good faith, the BofA Defendants took steps to *actively conceal* the fact that they had authorized Merrill to accelerate the payment of bonuses for 2008 from early January 2009 (when they otherwise would, by custom, occur) to December 2008, before the Merger was set to close, and that these bonuses would total up to *$5.8 billion* in discretionary bonuses—knowingly deceiving shareholders into believing that the exact opposite was true, *viz.*, that *no* discretionary bonuses would be paid at Merrill for 2008. Specifically, the bonuses were memorialized by the parties in a so-called "disclosure schedule" to the Merger Agreement. That "disclosure schedule" was appended by the BofA Defendants to the Merger Agreement and was *not* contained in the body of the Agreement. It therefore was *not disclosed to shareholders* in the Proxy Statement, which, as prepared by the BofA Defendants, attached the body of the Agreement *but not any of its appendices*.

18.     The bloated and undeserved bonuses that the BofA Defendants, aided and abetted by the Advisor Defendants and the Merrill Defendants (the latter of whom were motivated by their own self-interest to ensure that the bonuses not come to the attention of BofA shareholders, lest the Merger be voted down) caused to be secretly paid to Merrill executives did not come to light until well after the Merger closed on January 5, 2009. Once disclosed, however, these bonuses became the subject of multiple regulatory and law enforcement proceedings. In that regard, the New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses. A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating the payment of bonuses to the BofA Defendants for 2008. In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses. On August 3, 2009, the SEC filed a complaint relating to the bonuses in the United States District Court for the Southern District of

New York against BofA under Section 14(a).  The United States Securities and Exchange Commission ("SEC") has indicated that it will *try that case and not attempt to settle it*.

### After the Proxy Statement is Issued, Defendants
### Commit Further Knowing Deception of BofA Shareholders

19.     The Shareholder Vote to approve the acquisition of Merrill was held on December 5, 2008, with 82 percent of BofA shareholders voting in favor.  Little did shareholders know, however, that Defendants Lewis, Price, Cotty, and Curl—with the full knowledge and complicity of the BofA Board—had already secretly determined (and were deliberately withholding from shareholders) that, immediately after the vote (and assuming it was in favor of the Merger), BofA must turn to the United States Government for over one hundred billion dollars in additional assistance and "guarantees"—on top of the $25 billion BofA had already received—to enable BofA to complete the Merger.

20.     This was because, throughout the fall of 2008, Merrill suffered highly material undisclosed losses that greatly jeopardized the solvency of the combined company—a fact that was well known (or recklessly or negligently disregarded) by all Defendants.  Indeed, as Defendant Thain stated upon his forced departure from Merrill after the Closing, weekly profit-and-loss reports concerning Merrill were sent to Lewis, Price, and other BofA Defendants that made Merrill's rapidly deteriorating condition unmistakably clear.  These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings.  In October 2008 alone, Merrill lost another $7 billion.  In November 2008, Merrill lost an additional $6.3 billion and also suffered a goodwill impairment of $2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender.  Thus, by the eve of the shareholder vote on December 5, 2008, Merrill—undisclosed to BofA shareholders—had lost a staggering $15.3 billion so far in the fourth quarter of 2008.

**Defendants Determine that a "Material Adverse Event" has Occurred, Justifying
Rescission of the Merger, but Conceal this Fact from Shareholders and Then, in yet
Further Acts of Disloyalty and Bad Faith, Retract this Decision so as to Keep
<u>Their own Positions and Compensation and Withhold that Fact, too, from Shareholders</u>**

21.     On December 17, 2008, after the vote but before the Merger closed, Defendant Lewis informed Mr. Henry Paulson that the BofA Defendants considered Merrill's losses to constitute a "material adverse event" entitling BofA to cancel the Merger.  Defendant Lewis also falsely claimed, both to Mr. Paulson and Federal Reserve Chairman Ben Bernanke, that Merrill's enormous losses had only recently materialized—claims which Federal Reserve officials soon derided as "not credible."  After further meetings with Treasury and Fed officials—and as additional data concerning Merrill's losses became available—Defendant Lewis and the BofA Board concluded that Merrill's losses did, in fact, constitute a "material adverse event" justifying rescission of the Merger.  However, when Lewis informed Mr. Paulson of that determination, he was told by Mr. Paulson that he, Mr. Paulson, would try to get the entire Board and senior management, including Lewis, ousted from office if BofA was caused to back out of the Merger—a threat to which Defendant Lewis and the other BofA Defendants responded by hastening to assure Messrs. Paulson and Bernanke, in effect, that they would never dream of invoking the MAC clause. Lewis and the BofA Director Defendants thus secured a promise of $20 billion in direct assistance to complete the Merger, as well as protections against $118 billion in additional exposure from Merrill.  These developments were deliberately held secret from BofA shareholders until after the Merger closed on January 1, 2009.  As evidence of this deliberate, reckless, disloyal and bad-faith misconduct, in a December 22, 2008 email to the BofA Board, Defendant Lewis wrote:  "I just talked with Hank Paulson.  He said there is no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure ***which, of course, we do not want.***"

22.     The BofA Director Defendants' actions in determining that the Merger should be cancelled under the MAC clause based on advice from legal counsel, reversing that decision the moment they perceived their lucrative and prestigious positions to be at risk, and secretly securing $138 billion in federal assistance as the only means to consummate the Merger, yet acting deliberately to cover up these facts from shareholders, constituted further breaches of these defendants' fiduciary duties of candor, loyalty, and good faith, as well as violations of the federal securities laws.  If Merrill's exposure precluded BofA from being able to consummate the transaction, the BofA Defendants had a number of options by which they could have discharged their duties to shareholders, including rescinding the Merger under the MAC clause or at least trying to renegotiate the terms of the Merger, including the purchase price, with Merrill, perhaps using the MAC clause as leverage.

23.     All of these options, however, were knowingly rejected by the BofA Defendants, lest they be perceived with disfavor by a government bureaucracy that purported to hold their jobs in its hands.  All of these options, too, were withheld from shareholders, who also were willfully deprived by these defendants of any information concerning Merrill's losses, the Board's decision to invoke the MAC clause, the Board's reversal of that decision, or the $138 billion in additional financing BofA needed and obtained to complete the Merger.  The BofA Director Defendants simply determined to abdicate their own business judgment as to the best interests of the Company and its shareholders, defer to perceived pressure from government officials, and in the process keep their prestigious and lucrative positions at all costs.  This included the following 2007-2008 compensation to BofA Board members:  Lewis—$34.8 million; Gifford—$3.5 million; Sloan—$580,000; Barnet—$480,000; May—$398,000; Ward—$377,000; Collins—$381,000; Mitchell and Ryan—$378,000; and Bramble, Countryman, Franks, Lozano, Massey, Spangler, and Tillman—$338,000.

24.     As a respected commentator for the *New York Times*'s "DealBook" weblog, Steven

M. Davidoff, a professor at the University of Connecticut School of Law, has noted (February 9,

2009):

> *Ultimately, the . . . story is one of a bank that was being pushed hard by the federal government to do a deal without a whit of care about the effect on its shareholders.* The government implicitly threatened Ken Lewis's job, stated explicitly what BofA's legal options were, and offered a carrot if Bank of America completed the deal. Meanwhile, *despite the internal debate at BofA about whether or not to disclose the Merrill losses before the Bank of America vote, it again appears that shareholders were not in Bank of America's calculus.* Instead, the shareholder meeting was treated as an expiring option. Let's get it done so we can proceed to the deal. *The failure to disclose before the meeting is particularly galling because, if BofA had concluded there was no MAC before the meeting, its only out was through the shareholder vote. By not disclosing, BofA ensured that the deal would go through.*
>
> Both of these stories cast a harsh light on everyone: the government, Bank of America and Merrill. . . . But the wreckage is apparent. *I'm particularly troubled by the self-inflicted wounds Bank of America management appears to have imposed upon the company through their desire to proceed with the shareholder vote without disclosure of Merrill's losses.* The latter issue will now be settled in litigation and the shareholder process. [Emphases added.]

### "The $50 Billion Deal from Hell": As the Truth Belatedly Emerges, BofA's Market Capitalization is Punished; Defendants are Investigated by the NYAG, SEC, FBI, DOJ, and Congress; and the BofA Defendants Commit Still Further Acts Disloyalty and Bad Faith by Evading Responsibility for their Actions and Even Trying to Saddle the Company with the Cost of SEC Penalties

25.     It was not until January 14, 2009 that news first began to circulate concerning the

true size ($21 billion) of Merrill's theretofore-undisclosed fourth-quarter losses, the receipt of

massive federal assistance as the only way for BofA to be able to complete the Merger, and the fact

that the BofA Defendants had agreed to proceed with the Merger only after perceiving their

continuation in office to be called into question—thus creating an irreconcilable conflict of interest

that tainted all of their subsequent decision-making. Immediately thereafter, on January 16, 2009,

BofA shocked the market in announcing a fourth-quarter loss of $1.79 billion—a figure which would have been billions in *profits* but for the losses attributable to Merrill.  Accordingly, between January 14, 2009 and January 20, 2009, BofA's stock price dropped by 50 percent in only three trading days. BofA's stock price dropped an additional 15 percent on January 22, 2009, when news became available about Merrill's payment, with the BofA Defendants' express approval, of billions of dollars in unearned bonuses.  Defendant Thain, who had briefly run Merrill as a division of BofA, was fired amidst reports that he spent the latter part of December on a ski vacation in Vail, Colorado and spent $1.2 million refurbishing his private office at Merrill while the company itself lost $27 billion in 2008.

26.     The impact upon BofA from Defendants' conscious, reckless, and bad-faith misconduct has been profound.  When the Merger was first announced on September 15, 2008, it was valued at $50 billion, based on the then-current trading price of BofA's common stock.  By the eve of Closing, BofA's stock price had been driven so far down that the deal was worth only $19.4 billion.

27.     Merrill's losses of $27 billion for 2008—including $15 billion in losses for the fourth quarter that were unfolding right before the BofA Defendants' eyes throughout the October-December timeframe—contributed to the further collapse in BofA's market capitalization after the Merger closed on January 1, 2009.  Between December 31, 2008 and March 6, 2009—as news of Merrill's undisclosed losses and the Defendants' misconduct became widely reported in the press—BofA's share price dropped from $14.08 to $3.14—representing another $11 billion in wealth destruction.  All told, as a direct consequence of Defendants' bad faith and disloyalty, at least $136 billion in shareholder wealth was wiped out between September 15, 2008 and March 6, 2009.

28.     The damages to BofA do not end with the destruction of its shareholder base. As a consequence of acquiring Merrill, BofA has suffered permanent damage to its reputation as a sound, well-managed financial institution. Defendant Lewis was stripped of his position as Chairman of the Company's Board of Directors at the Company's annual shareholder meeting on April 29, 2009. As the uproar over the BofA Defendants' brazen acts of self-interest continued, and more and more damaged information has emerged from the investigations by various government agencies pointing toward their deceitfulness and complicity in the misconduct, Defendant Lewis was forced to resign his CEO position on September 30, 2009, stating that he would leave the Company by the end of the year. In addition, several other members of the Board who, with Lewis, helped engineer the bad-faith acquisition of Merrill, were only narrowly re-elected. Many have since resigned or been forced out. The Company has been obliged to defend multiple regulatory and law enforcement proceedings—including by the SEC, the New York Attorney General, and even the United States Congress. The Federal Bureau of Investigation ("FBI") and United States Department of Justice ("DOJ") are conducting criminal probes. The SEC recently filed a civil enforcement proceeding against BofA related to the BofA Defendants' failures to disclose the payment of some $5.8 billion in bonuses to Merrill employees before the Merger closed, in spite of Merrill's deteriorating condition.

29.     In addition, the New York Attorney General stated that its investigation has "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*" (Emphasis added.) These instances comprised: (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote

losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

30.     The BofA Defendants, further evidencing their bad faith and disloyalty to BofA, have consistently sought to evade any responsibility for their actions.  Defendant Lewis, for example, testified to both the New York Attorney General and the House Committee on Oversight and Government Reform that the BofA Defendants were completely unaware of the devastating losses until December 9, 2008 and did not consider invoking the MAC clause until December 17, 2008.  However, documentary and testimonial evidence obtained by the Attorney General and the Committee from other sources belies those assertions.  Specifically, as early as mid-November 2008, Merrill faced fourth-quarter losses of $9 billion, or nearly *double* its third-quarter losses, and discussions of the MAC clause among the BofA Defendants and the Company's legal counsel were under way well before the Shareholder Vote on December 5, 2008.

31.     Even recently, in what would otherwise be considered the aftermath of Defendants' misconduct, the BofA Defendants are continuing to try to deny their acts of bad faith and disloyalty to the Company.  In early August 2009, the BofA Defendants caused the Company to try to enter into a settlement and consent judgment with the SEC over the Merrill bonus charges.  In particular, these defendants executed a settlement of the charges which would have involved *BofA*—not any individual officers or directors—agreeing to a permanent injunction and the payment of a $33 million fine.

32.     The proposed consent judgment was presented to this Court, the Honorable Jed S. Rakoff presiding, for approval.  After a hearing and two rounds of briefing, Judge Rakoff issued an Order on September 14, 2009 *rejecting the settlement*.  The Court found that the proposed settlement was "*neither fair, nor reasonable, nor adequate*"—among other reasons, because it attempted to have the Company itself, rather than individual officers, accept blame and pay the

penalty, thereby effectively requiring BofA shareholders to be victimized twice.[2]  Finally, the Court

found that the BofA Defendants' vigorous protestations of innocence rendered unclear what point, if

any, would be served by an decree of permanent injunctive relief.  Wrote the Court:

> **[T]he parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry—all at the expense of the sole alleged victims, the shareholders.**  Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.
>
> Oscar Wilde once famously said that a cynic is "someone who knows the price of everything and the value of nothing." *Lady Windermere's Fan* (1892).  The proposed Consent Judgment in this case suggests a rather cynical relationship between the parties:  the S.E.C. gets to claim that it is exposing wrongdoing on the part of Bank of America in a high-profile merger; the Bank's management gets to claim that they have been coerced into an onerous settlement by overzealous regulators.  And ***all of this is done at the expense, not only of the shareholders, but also of the truth.***  [Emphases added.]

33.     Robert Bruner, dean of the Darden School of Business at the University of Virginia,

is an expert in the subject of failed business combinations.  His book, *Deals From Hell: M&A*

*Lessons That Rise Above the Ashes*, sets forth various criteria for failures.  The criteria include

destruction of market value, financial instability, impaired strategic position, organizational

weakness, damaged reputation, and violation of ethical standards and laws.

34.     Heidi N. Moore, a *Wall Street Journal* reporter writing on that newspaper's "Deal

Journal" weblog on January 22, 2009, applied Mr. Bruner's criteria to the Merrill Merger.  Her

conclusion:  "Check, check, check, check, check and mate."  Wrote Ms. Moore:

---

[2] In addition, the Court found that the SEC had too quickly credited the BofA Defendants' claims **both** that they had relied upon the advice of counsel in connection with the Company's disclosures of the Merrill bonuses **and** that the attorney-client privilege protected their communications with counsel and precluded charges against individual actors.

### Bank of America-Merrill Lynch: A $50 Billion Deal From Hell

***Mergers often prove troublesome, but few have set the land-speed record for disaster as fast as Bank of America's $50 billion acquisition of Merrill Lynch.***

Let us detail the ways.  Only three weeks after the deal closed on Jan. 1, there has been the departure of several high-level executives including the president, chief executive and head of wealth management of Merrill Lynch; an additional $20 billion in Treasury support; $118 billion of government backstops; a $15 billion loss at Merrill that came after repeated assurances from both sides that due diligence was solid; the massacre in Bank of America shares, which have fallen 78% since the bank agreed to acquire Merrill on Sept. 15; lawsuits surrounding the surprise announcement of the Merrill Lynch loss; the revelation that BofA CEO Kenneth Lewis himself contemplated calling the whole thing off in December; and widespread fears of even steeper losses on Merrill's troubled assets.  That doesn't even count the loss of market value.  Bank of America closed at $33.74 on the Friday before the deal was closed.  At Wednesday's close of $6.68, the company's market cap was $42.7 billion.  The stock was at a 52-week low of $5.50 recently.  ***BofA's low trading price represents a complete wipeout of Merrill Lynch's $17 trading price before the deal and the $29 price at which Merrill was acquired.***

*        *        *        *

***It is official.  Bank of America's acquisition of Merrill Lynch is a candidate for the title of "A Deal from Hell."***

### Pre-Suit Demand is Futile and Excused

35.      Plaintiffs have not made a demand on the BofA Board to institute this suit in the Company's name because doing so would be futile and useless gesture.  The Board, in determining to accede to perceived pressure from Mr. Paulson to go through with the Merger at all costs— purportedly on pain of losing their lucrative and prestigious positions—***have already demonstrated that their loyalty lies in preserving their own positions and self-interest rather than in serving the best interests of BofA and its shareholders***.  Moreover, Board members face a substantial likelihood of liability herein under Section 14(a) for making false and misleading statements in the Proxy Statement—and for their acts of bad faith, disloyalty, and other breaches of their fiduciary duties to BofA detailed herein, none of which are exculpated under Delaware Code Section 102(b)(7) and

each of which therefore give rise to a substantial potential for liability, rendering demand futile. Further, Board members face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.

36.    In addition, various individual Board members are conflicted from objectively considering a pre-suit demand based on their insider status, substantial compensation, lack of banking industry experience, presence on interlocking public company Boards of Directors, excessive outside Board commitments, and other conflicts.  *See infra*, part IV.  These include but are not limited to:

- **Lewis** and **Gifford** are corporate insiders of BofA who received $10 million and $1.6 million in compensation, respectively, from BofA, and the Board itself has **admitted** that they are "**categorically**" not independent.

- **Bramble** was CEO of MBNA and received an opulent buyout package and a seat on the BofA Board when BofA acquired MBNA; he recently retired from Allfirst Financial Inc. after it was discovered that Allfirst had lost $691.2 million in a foreign currency trading scandal.

- **Barnet, Collins, Countryman, May, Gifford,** and **Ryan** are legacies of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others; when BofA acquired FleetBoston, these defendants receive lucrative buyouts and seats on the BofA Board.  These same directors are designated as "Problem Directors" by The Corporate Library, an independent research organization, for approving bloated executive compensation to FleetBoston insiders while it was under investigation.  These six directors tend to act together, are beholden to one another, and dominate the Board.  Indeed, four of them, **May, Barnet,** and **Collins**, constitute a majority of the Audit Committee, with **May** serving as its Chair.

- **Lewis, Gifford, Spangler, Ward, and Massey** have received, over the last two years, far greater than ordinary director compensation ($34.8 million, $3.5 million, $580,000, $480,000, and $398,000, respectively), rendering them dependent on BofA for their livelihood and incapable of acting independently from other Board members who control these payouts.

- Nine directors, **Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman,** and **Ward** (more than half the Board) have no career experience in the banking, investment banking, securities brokerage, or any other financial services industry.  Their experience lies, rather, in such areas as software, armed forces,

publishing, academia, non-profit, pharmaceuticals, auto parts, home improvement, and construction.

- **Gifford, Countryman,** and **May,** besides being legacies of the FleetBoston Board, each serve with the others as trustees of NSTAR and members of the Board of CBS Corporation. Given these interlocking directorships, Countryman and May are beholden to Gifford, a corporate insider of BofA and a "*categorically*" non-independent director.

- Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis, Gifford, Countryman,** and **Sloan**, chaired by **Sloan**, whose experience lies in auto parts, not banking.

## JURISDICTION AND VENUE

37.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

38.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiffs

40.     Plaintiff Louisiana Municipal Police Employees Retirement System ("MPERS") is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana.  MPERS has been a continuous owner of BofA stock since at least September 1, 2008.  The Retirement System is an instrumentality of the State of Louisiana and a citizen thereof.

41.     Plaintiff Hollywood Police Officers' Retirement System ("HPORS") is a Florida municipal pension fund organized for the benefit of Hollywood's police officers.  HPORS has been a continuous owner of BofA stock since at least September 1, 2008.

### Nominal Defendant

42.     Nominal defendant BofA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management, and other financial and risk-management products and services.  As of March 4, 2009, BofA had issued and outstanding more than 6.4 billion shares of common stock.  BofA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.

**The BofA Defendants**

43.     Defendant Kenneth D. Lewis ("Lewis") is the Chief Executive Officer and President of BofA, and served as Chairman of the Board of Directors until his unscheduled termination from that position on April 29, 2009.  Defendant Lewis has been a director since 1999, became Chief Executive Officer in 2001, President in 2004, and has served continuously in those positions since. Lewis also became Chairman in 2005 and served continuously in that position until he was removed from this position by shareholders on April 29, 2009.  On September 30, 2009, Lewis notified the BofA Board of his intention to resign from the CEO position by the end of 2009.  He is also a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BofA, Lewis was paid $24.8 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $10.0 million in 2008.   Lewis is a citizen of North Carolina.

44.     Defendant Charles K. Gifford ("Gifford") has been a member of the Board since 2004, when Bank of America acquired FleetBoston, of which Gifford was CEO.  He is a member of the Executive Committee of the Board and was the Chairman of the Board until replaced by Lewis. Defendant Gifford serves with defendant Countryman and defendant May as both a trustee of NSTAR (an energy utility company) and a member of the Board of Directors of CBS Corporation. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Gifford was paid $1.4 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $1.9 million in 2007, and $1,631,396 in 2008.  Defendant Gifford is a citizen of North Carolina.

45.     Defendant William Barnet, III ("Barnet") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Audit Committee of the Board during the events complained of herein.  In exchange for his

purported trust, loyalty, and fidelity to BofA, Defendant Barnet was paid $397,847 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, $240,000 in 2008.  Defendant Barnet is a citizen of South Carolina.

46.     Defendant Frank P. Bramble, Sr. ("Bramble") has been a member of the Board since 2006, when BofA acquired MBNA.  He is a member of the Asset Quality Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Bramble was paid $324,861 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Bramble is a citizen of Delaware.

47.     Defendant John T. Collins ("Collins") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 29, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Collins was paid $244,500 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,000 in 2007, and $141,118 in 2008.  Defendant Collins is a citizen of Massachusetts.

48.     Defendant Gary L. Countryman ("Countryman") was a member of the Board from 2004, when Bank of America acquired FleetBoston, until he resigned on July 31, 2009.  He was a member of the Executive Committee of the Board during the events complained of.  Defendant Countryman serves with Defendant Gifford and Defendant May as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Countryman was paid $403,145 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Countryman is a citizen of Massachusetts.

49.      Defendant Tommy R. Franks ("Franks") was a member of the Board from 2006 until his resignation on June 17, 2009.  He was a member of the Audit Committee of the Board during the events complained of.  Defendant Franks is a retired general in the United States Army.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Franks was paid $318,984 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Franks is a citizen of Oklahoma.

50.      Defendant Monica C. Lozano ("Lozano") has been a member of the Board since 2006.  She is a member of the Asset Quality Committee of the Board.  Defendant Lozano publishes *La Opinion*, one of the largest Spanish-language newspapers in the United States.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Lozano was paid $263,486 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Lozano is a citizen of California.

51.      Defendant Walter E. Massey ("Massey") has been a member of the Board since 1998, and has been the Chairman of the Board since April 29, 2009.  Defendant Massey is President Emeritus of Morehouse College and a member of the Board of Directors of McDonald's Corporation.  He is a member of the Audit Committee of the Board.  Defendant Massey has long, close ties to Lewis; among other things, Lewis was co-chairman of a Morehouse College capital campaign when Massey was president of the college in the last several years.  Moreover, it was Lewis and Sloan who worked behind the scenes to elevate Massey to the Chairmanship of the Board when it became evident that shareholders might vote to unseat Lewis, which they did.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Massey was paid $649,692 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Massey is a citizen of Georgia.

52.     Defendant Thomas J. May ("May") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is the Chair of the Audit Committee of the Board. Defendant May serves with defendant Gifford and defendant Countryman as both a trustee of NSTAR and a member of the Board of Directors of CBS Corporation. He is the current Chairman and CEO of NSTAR. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant May was paid $469,117 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $240,517 in 2007, and $157,376 in 2008. Defendant May is a citizen of Massachusetts.

53.     Defendant Patricia E. Mitchell ("Mitchell") was a member of the Board from 2001 until she resigned on June 3, 2009. She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of. Defendant Mitchell is the President of the Paley Center for Media, a non-profit organization "dedicated to advancing understanding of the media," and a former President of Public Broadcasting Service. In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Mitchell was paid $415,558 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008. Defendant Mitchell is a citizen of New York.

54.     Defendant Thomas M. Ryan ("Ryan") has been a member of the Board since 2004, when Bank of America acquired FleetBoston. He is a member of the Compensation and Benefits Committee and the Chair of the Corporate Governance Committee of the Board. Defendant Ryan is the Chairman and CEO of CVS/Caremark Corporation, a provider of pharmacy and related healthcare services. In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Ryan was paid $432,890 in salaries, bonuses, fees, stock options, stock awards, and other

compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ryan is a citizen of Rhode Island.

55.      Defendant O. Temple Sloan ("Sloan") was a member of the Board from 1996 until May 26, 2009, when he resigned.  During the events complained of, he was the "Lead Director" of the Board, Chair of the Compensation and Benefits Committee, a member of the Corporate Governance Committee, and Chair of the Executive Committee of the Board.  Defendant Sloan is the Chairman of General Parts International, Inc., a distributor of automotive replacement parts.  He serves on the Board of Directors of Lowe's Companies, Inc., a home improvement retailer, which defendant Tillman formerly served as Chairman and CEO.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Sloan was paid $318,125 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $290,000 in 2007, and $290,000 in 2008.  Defendant Sloan is a citizen of North Carolina.

56.      Defendant Meredith R. Spangler ("Spangler") was a member of the Board from 1988 until she retired from Board service on April 29, 2009.  She and her family own over 32,000,000 shares of BofA common stock—approximately eight times as much as Lewis and 16 times as much as any other Board member.  She was a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board during the events complained of.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Spangler was paid $942,774 in salaries, bonuses, fees, stock options, stock awards, and other compensation for 2006, $210,517 in 2007, and $127,376 in 2008.   Defendant Spangler is a citizen of North Carolina.

57.      Defendant Robert L. Tillman ("Tillman") was a member of the Board from 2005 until May 29, 2009, when he resigned.  He was a member of the Asset Quality Committee of the Board during the events complained of.  Defendant Tillman is the former Chairman and CEO of

Lowe's Companies, Inc., a home improvement retailer.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Tillman was paid $317,479 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $210,517 in 2007, and $127,376 in 2008.  Defendant Tillman is a citizen of North Carolina.

58.      Defendant Jackie M. Ward ("Ward") was a member of the Board from 1994, until her resignation on June 3, 2009.  She was Chair of the Asset Quality Committee of the Board during the events complained of.  Defendant Ward is the retired Chairman and CEO of Computer Generation, Inc., a telecommunications software company.  She is also a member of the Boards of Directors of Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation, and Wellpoint, Inc., all of which are public companies.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Ward was paid $982,528 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, $230,517 in 2007, and $147,376 in 2008.  Defendant Ward also serves as a director of at least five other corporations: Equifax, Inc., Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation and Wellpoint, Inc.  Defendant Ward is a citizen of Georgia.

59.      Defendant Gregory Curl ("Curl") has been the Chief Risk Officer of BofA since June 30, 2009.  Previously, he was the Vice Chairman for Corporate Planning and Strategy at BofA.  Defendant Curl was one of BofA's principal negotiators on the Merrill Lynch acquisition.  Defendant Curl is a citizen of North Carolina.

60.      Defendant J. Steele Alphin ("Alphin") is the Chief Administrative Officer of BofA.  Defendant Alphin is a citizen of North Carolina.

61.      Defendant Joe L. Price ("Price") is the Chief Financial Officer of BofA.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Price was paid $6.5 million

in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007, and $4.0 million in 2008.  Defendant Price is a citizen of North Carolina.

62.     Defendant Amy Woods Brinkley ("Brinkley") was the Global Risk Executive of BofA until June 30, 2009, in charge of controlling the Company's credit, market, and operational risks.  In exchange for her purported trust, loyalty, and fidelity to BofA, Defendant Brinkley was paid $9.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Brinkley is a citizen of North Carolina.

63.     Defendant Brian T. Moynihan ("Moynihan") was, until August 10, 2009, the head of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA.  Defendant Moynihan replaced Defendant Thain in this position when Thain resigned on January 22, 2009.  Previously, Defendant Moynihan was the President of Global Corporate and Investment Banking of BofA, and also served as its General Counsel from December 10, 2008 until August 10, 2009.  He is a former high-ranking officer of FleetBoston, which BofA acquired in 2004.  Defendant Moynihan is a director of Black Rock, Incorporated.  In exchange for his purported trust, loyalty, and fidelity to BofA, Defendant Moynihan was paid $10.1 million in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Defendant Moynihan is a citizen of North Carolina.

64.     Defendant Neil A. Cotty ("Cotty") has been the Chief Financial Officer of BofA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BofA, since January 2009.  Defendant Cotty was a key member of the BofA-Merrill liaison team before the deal closed.  From April 2004 until December 2008, he was the Chief Accounting Officer of BofA.  Defendant Cotty is a citizen of North Carolina.

65.     Defendant Keith T. Banks ("Banks") is the President, Global Wealth and Investment Management of BofA.  He was a high-ranking officer of FleetBoston, which BofA acquired in 2004.  Defendant Banks is a citizen of North Carolina.

66.     Defendant Timothy Mayopolous ("Mayopolous") was the General Counsel of BofA until December 10, 2008, when he was terminated and replaced by Defendant Moynihan.  Mayopolous is a citizen of New York.

67.     Defendant Teresa Brenner ("Brenner") is an Associate General Counsel of BofA.  Defendant Brenner is a citizen of New York.

**The Merrill Defendants**

68.     Defendant John A. Thain ("Thain") was the Chief Executive Officer of Merrill and Chairman of the Merrill Board from 2007 to January 1, 2009.  Defendant Thain became the President of Global Banking, Securities and Wealth Management of BofA on January 1, 2009 but resigned in scandal on January 22, 2009, following reports of massive losses and wasteful practices at Merrill.  In 2007, Defendant Thain was paid over $17.3 million in salaries, bonuses, fees, stock options, stock awards, and other compensation.  Defendant Thain is a citizen of New York.

69.     Defendant Carol T. Christ ("Christ") was a member of the Merrill Board from 2007 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee of the Board.  In 2007, Defendant Christ was paid over $191,000 in fees, stock awards, and other compensation.  Defendant Christ is a citizen of Massachusetts.

70.     Defendant Armando M. Codina ("Codina") was a member of the Merrill Board from 2005 until January 1, 2009.  He was Chair of the Nominating and Corporate Governance Committee of the Board, and a member of the Management Development and Compensation Committee.  In

2007, Defendant Codina was paid over $270,000 in fees, stock awards, and other compensation. Defendant Codina is a citizen of Florida.

71.     Defendant Judith Mayhew Jonas ("Jonas") was a member of the Merrill Board from 2006 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Audit Committee of the Board.  In 2007, Defendant Jonas was paid over $275,000 in fees, stock awards, and other compensation.  Defendant Jonas is a citizen of the United Kingdom.

72.     Defendant Virgis W. Colbert ("Colbert") was a member of the Merrill Board from 2006 until January 1, 2009.  He was a member of the Public Policy and Responsibility Committee, the Nominating and Corporate Governance Committee, and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Colbert was paid over $261,000 in fees, stock awards, and other compensation.  Defendant Colbert is a citizen of Wisconsin.

73.     Defendant Aulana L. Peters ("Peters") was a member of the Merrill Board from 1994 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Management Development and Compensation Committee of the Board.  In 2007, Defendant Peters was paid over $270,000 in fees, stock awards, and other compensation.  Defendant Peters is a citizen of California.

74.     Defendant Charles O. Rossotti ("Rossotti") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chairman of the Finance Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Rossotti was paid over $274,000 in fees, stock awards, and other compensation.  Defendant Rossotti is a citizen of Maryland.

75.     Defendant John D. Finnegan ("Finnegan") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chair of the Management Development and Compensation Committee, and a member of the Finance Committee and the Nominating and Corporate Governance

Committee of the Board.  In 2007, Defendant Finnegan was paid over $282,000 in fees, stock awards, and other compensation.  Defendant Finnegan is a citizen of New Jersey.

76.     Defendant Joseph W. Prueher ("Prueher") was a member of the Merrill Board from 2001 until January 1, 2009.  He was Chair of the Public Policy and Responsibility Committee and a member of the Audit Committee of the Board.  In 2007, Defendant Prueher was paid over $278,000 in fees, stock awards, and other compensation.  Defendant Prueher is a citizen of Virginia.

77.     Defendant Ann N. Reese ("Reese") was a member of the Merrill Board from 2004 until January 1, 2009.  She was Chair of the Audit Committee and a member of the Finance Committee of the Board.  In 2007, Defendant Reese was paid over $277,000 in fees, stock awards, and other compensation.  Defendant Reese is a citizen of New York.

78.     Defendant Nelson Chai ("Chai") was the Executive Vice President and Chief Financial Officer of Merrill at all relevant times.  Defendant Chai is a citizen of New York.

79.     Defendant Gregory Fleming ("Fleming") was the President and Chief Operating Officer of Merrill during and for a period after the Merger negotiations.  Defendant Fleming was one of Merrill's principal negotiators on the merger with BofA.  Defendant Fleming is a citizen of New York.

80.     Defendant Peter Kraus was the Executive Vice President for Business Strategy and Investments at Merrill.  Defendant Kraus is a citizen of New York.

81.     Defendant Peter Stingi was the Global Head of Human Resources at Merrill.  Defendant Stingi  is a citizen of New York.

82.     Defendant Michael Ross was the Head of Global Compensation and Benefits at Merrill.  Defendant Ross is a citizen of New York.

**The Advisor Defendants**

83.     Defendant J.C. Flowers & Co. LLC ("J.C. Flowers") is a principal investment firm specializing in buyouts which also serves as a financial advisor to companies in the banking and financial services industries.  J.C. Flowers was founded, and is owned in part, by J. Christopher Flowers, who serves as its managing partner.  J.C. Flowers is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  J.C. Flowers purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

84.     Defendant Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK") is a leading global specialist investment bank focused on the financial services industry.  FPK is owned in part by J. Christopher Flowers, who also owns Defendant J.C. Flowers.  FPK is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  FPK purported to advise the BofA Defendants, and to provide a "fairness opinion," with respect to the Merger.

**Other Related Persons not Named as Defendants**

85.     Merrill, until it was acquired by BofA, Merrill was one of the oldest and biggest brokerage houses in the world, whose "thundering herd" of brokers served millions of institutional and private clients around the world, with well-regarded investment banking and trading operations.  The company continues as a unit of BofA, including its brokerage operations.

86.     Deloitte & Touche LLP ("Deloitte") is an independent registered public accounting firm that advises Merrill on a regular basis.  Deloitte is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principal place of business in New York,

New York.  Deloitte purported to advise the Merrill Defendants with respect to the Merger and prepared and approved Merrill's audited financial statements in connection with the Merger.

87.     Wachtell Lipton Rosen & Katz ("Wachtell") is a partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York. Wachtell purported to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

88.     Edward D. Herlihy ("Herlihy") is a partner at Wachtell.  Herlihy was the managing partner for Wachtell on the Merrill Merger engagement for BofA.

89.     Nicholas G. Demmo ("Demmo"), Jeannemarie O'Brien ("O'Brien"), and Matthew M. Guest ("Guest") are partners at Wachtell.  Together with Herlihy, they played key roles in purporting to advise the BofA Defendants in connection with the Merger, to represent BofA in negotiations, and to draft the legal documentation related to the Merger.

90.     Shearman and Sterling LLP ("Shearman") is a limited liability partnership organized and existing under laws of the State of New York, with its principal place of business in New York, New York.  Shearman purported to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

91.     John Madden ("Madden") is a partner at Shearman.  Madden was the managing partner for Shearman on the BofA Merger engagement for Merrill.

92.     John Marzulli ("Marzulli"), Scott Petelpiece ("Petelpiece"), and Linda Rappaport ("Rappaport") are partners at Shearman.  Together with Madden, they played key roles in purporting to advise Merrill in connection with the Merger, to represent Merrill in negotiations, and to draft the legal documentation related to the Merger.

## Definitions of Groups

93.     The "BofA Defendants" comprise those defendants named in paragraphs 43-67 hereof.

94.     The "BofA Director Defendants" (sometimes referred to herein as the "BofA Board" or the "Board") comprise those persons who served on the BofA Board during the events complained of and named in paragraphs 43-58 above.

95.     The "BofA Officer Defendants" comprise those defendants who served as officers of BofA during the events complained of named in paragraphs 43 and 59-67 above.

96.     The "Merrill Defendants" comprise those defendants named in paragraphs 68-82 above.

97.     The "Advisor Defendants" comprise those defendants named in paragraphs 83-84 above.

## I.    IN VIOLATION OF THEIR DUTIES OF LOYALTY, CANDOR, AND GOOD FAITH, DEFENDANTS CAUSED BofA TO EMBARK UPON, AND CLOSE AT ALL COSTS, THE "$50 BILLION DEAL FROM HELL."

98.     On Friday, September 12, 2008—in the wake of unprecedented liquidity demands arising from price declines in its investments in ARS, CDOs, MBS, and other highly-leveraged derivative securities—Merrill was at risk of failing.  With Merrill's share price down 36 percent that week alone and its access to credit markets in jeopardy—and with Lehman Brothers, Inc. teetering on the brink of bankruptcy as a result of its own liquidity emergency arising from similar toxic securities (it would file a petition for relief the following Monday)—Wall Street eyed Merrill as the next to succumb.  Knowing that Lehman's bankruptcy would cause Merrill, too, to collapse, Merrill's then-Chairman and CEO, Defendant Thain, frantically canvassed Wall Street for a business combination or other transaction which would generate enough cash to allow Merrill to survive.

99.     BofA was the Merrill Defendants' first choice for a merger partner.  Under the direction of the BofA Defendants and led by Defendant Lewis, who had long coveted Merrill as the crowning piece of a decades-long acquisitions binge that had included such notable catastrophes as Countrywide Mortgage—BofA was caused to express an immediate interest in buying Merrill.

**A.      In Breach of their Duties of Loyalty and Good Faith, the BofA Defendants Agree to Buy Merrill for $50 Billion Despite the Fact that it is Essentially Worthless in the Absence of Any Deal, and to Secretly Guarantee $5.8 Billion in Bonuses to Merrill Executives Regardless of Actual Performance.**

100.     Before approaching BofA, Merrill's then-President and Chief Operating Officer, defendant Fleming, placed an initial call to Herlihy, a partner and Co-Chairman of the Executive Committee at the Wachtell law firm, who had a close relationship with senior management at BofA. The following afternoon, Saturday, September 13, 2008, at Herlihy's suggestion, Defendant Thain met with BofA's then-Chairman and CEO, Defendant Lewis, to discuss a proposed business combination.  Thain initially proposed selling BofA only a 9.9 percent interest in Merrill.  Lewis responded that BofA was interested in a transaction, but only if it involved acquiring Merrill outright.  Thain agreed, and, later that same day, teams from both firms began conducting due diligence and negotiating the terms of a possible merger.

101.     The principal terms of the Merger were negotiated in the space of a single day—from late afternoon on Saturday, September 13, 2008 to late afternoon on Sunday, September 14, 2008— by teams headed by defendant Fleming for Merrill and by defendant Curl, Vice Chairman for Corporate Planning and Strategy for BofA.  According to testimony later given by Fleming and Curl to the SEC, *the negotiations were limited to just five issues, most of them addressing the compensation and perquisites various people affiliated with Merrill would gain from the deal.* The issues were:  the price BofA would pay; the payment of "retention" bonuses to Merrill's financial advisers; the scope of the MAC clause in the merger agreement; the number of Merrill

directors who would join the Board of Directors of BofA; and Merrill's ability pay year-end bonuses to its executives and employees pursuant to its Variable Incentive Compensation Program ("VICP"). The Merrill team demanded, and the BofA Defendants, in gross violation of their duties of good faith and loyalty to the Company, quickly agreed, that Merrill executives should receive bonuses of up to $5.8 billion, and that these bonuses should be paid on an *accelerated basis* before the Merger closed on December 31, 2008.

102.    Negotiation of the five issues involved only a perfunctory review of Merrill, and a deal was struck in a matter or *hours*, with the execution of the Merger Agreement at approximately 2 a.m. on the morning of Sunday, September 14, 2008.  The BofA Defendants, in a further act of disloyalty and bad faith, acceded to the Merrill team's demand that BofA pay an astonishing *70 percent premium* for Merrill's common stock based on the value of such stock at the time—in spite of the fact that Merrill, in the absence of a deal, would fail outright and probably be available for just "pennies" on the dollar in very short order, as noted investor Warren Buffett later recalled.  The deal subsequently received the approval of the Boards of BofA and Merrill, which met in separate sessions later that same afternoon.  Under the terms of the deal, BofA would pay 0.8595 of one BofA share for every share of Merrill—an arrangement valued at the time at $29 per Merrill share, for a total of $50 billion.  To memorialize their contract, the parties entered into a written agreement (the "Merger Agreement" or the "Agreement") whereby Merrill would become a wholly-owned subsidiary of BofA.  The Merger was first announced to the shareholders of both companies on the morning of September 15, 2008.

103.    The Merger was an immense financial undertaking for BofA which substantially diluted BofA shareholders.  Based on the Company's market capitalization on the day before the Merger was announced, the cost of the Merrill acquisition was 27 percent of BofA's market

capitalization.  In connection with the Merger—and subject to a vote of BofA shareholders—BofA committed to issue approximately 1.710 billion new shares of its common stock, and 359,100 shares of preferred stock.

**B.**   **The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Conduct A Designedly Cursory "Due Diligence" of Merrill, in Further Gross Breach of Their Duties of Loyalty and Good Faith to BofA.**

104.     Based on the BofA Defendants' own description of the decision to acquire Merrill for BofA, the BofA Defendants, aided and abetted by the other defendants, in negotiating and then approving the Merger, devoted insufficient process, relied upon insufficient due diligence, and conducted insufficient deliberation to the task at hand.

105.     According to the BofA Director Defendants' own statements to shareholders, the due diligence that they, substantially assisted by other Defendants, made of Merrill lasted, at most, ***10 hours***, beginning no earlier than the late afternoon of Saturday, September 13, 2008, and concluding when the Merger Agreement was signed at approximately 2 a.m. the next morning.  Such an investigation—occupying only a few brief hours of review and analysis—was, on its face, utterly inadequate to justify paying $50 billion for a company with complex liabilities that would be in Bankruptcy Court within a matter of days but for the transaction itself.

106.     Moreover, according to the Schedule 14A Proxy Statement dated October 31, 2008 which the BofA Director Defendants filed with the SEC and made publicly available on November 3, 2008, the BofA Board itself—in further breach of their duties of good faith, loyalty, and candor—considered, and approved, the Merger in the space of ***just a single afternoon*** (Sunday, September 14, 2008).

107.    The BofA Director Defendants' own statements to shareholders reveal their disloyalty and bad faith in approving the Merger based on such insufficient process.  In their own words, the BofA Defendants offered the following as the sum total of the deliberation they gave to the Merger:

> In the late afternoon on Sunday [September 14, 2008], the Bank of America board of directors met with members of Bank of America senior management and its outside advisors.  Bank of America senior management reviewed with the Bank of America board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction.  Bank of America senior management and the company's financial advisors, J.C. Flowers and FPK, presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction as more fully described below under the heading "— Opinion of Bank of America's Financial Advisors".  Each of J.C. Flowers and FPK orally advised the Bank of America board of directors, and indicated that it was prepared to render a written opinion to the same effect, that, as of such date and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon their review as described in their respective opinions and other matters as J.C. Flowers and FPK considered relevant, the proposed exchange ratio to be paid by Bank of America in the merger was fair, from a financial point of view, to Bank of America.  Bank of America's general counsel and Wachtell, Lipton, Rosen & Katz, counsel to Bank of America, discussed with the Bank of America board of directors the legal standards applicable to its decisions and actions with respect to the proposed transaction and reviewed the legal terms of the proposed merger.  Following review and discussion among the members of the Bank of America board of directors, including consideration of the factors described under "— Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Bank of America board of directors unanimously determined that the transaction was in the best interests of Bank of America and its stockholders and voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

108.    In the section of the Proxy Statement entitled "Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the BofA Board provided an exhaustive list of the 13 "material factors" that they had considered in approving the Merger:

- Its [the BofA Board's] understanding of Bank of America's business, operations, financial condition, earnings and prospects and of **Merrill Lynch's business,** operations, financial condition, earnings and prospects;

- *its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market*

***conditions,*** the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;

- ***the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement***, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;

- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;

- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;

- ***the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings***, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;

- ***the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch*** made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- ***the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors*** concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- ***the likelihood that the regulatory and stockholder approvals needed to complete the transaction*** will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- ***the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK***;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in *its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America*;

- *the potential impact of the transaction on the capital levels and credit rating of Bank of America*; and

- the need and ability to retain key Merrill Lynch personnel.

(Emphases added.)

109.    As set forth above, the BofA Defendants listed Merrill's future "prospects" as among the most important factors they used in justifying the decision to acquire Merrill at the bloated price they did.  In so doing, these Defendants caused the Proxy Statement to misrepresent the benefits of the Merger, including the value of the assets to be acquired by BofA, by, among other things, omitting to disclose any information concerning the tens of billions of dollars in additional losses being incurred by Merrill in the third and fourth quarters of 2008—losses which were well known to the BofA Defendants before shareholders voted and while the Proxy Statement was still effective amounts and which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

110.    Moreover, in announcing this 13-factor list, the BofA Defendants emphasized that "[t]he foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, *but includes all material factors considered by the Bank of America board of directors*." (Emphasis added.)  The BofA Defendants thus admit that they did not give significant consideration to the massive losses and write-downs to which Merrill was then exposed. Moreover, the omission of such losses and write-downs from the list further demonstrates that, while

known or recklessly or negligently disregarded by Defendants, these losses were *not*—as certain BofA Defendants would later claim—disclosed to shareholders prior to the vote.

111.    The Proxy Statement states that the due diligence investigation the BofA Defendants made of Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was concluded by "[e]arly in the morning of Sunday, September 14, 2008," when "Messrs. Thain and Lewis met in New York City [and] discussed the results of the due diligence investigations conducted by their companies' respective representatives." The Merger Agreement was actually signed at 2 a.m. on Sunday, September 14, 2008. Thus, the entire due diligence investigation could have occupied no more than *10 hours* and, on its face, was woefully incomplete, and inadequate for a proposed $50 billion acquisition of a company, Merrill, with dire liquidity problems and complex liabilities. The BofA Director Defendants' decision to approve the Merger based on such due diligence, and in a single Board meeting late in the afternoon of September 14, 2008, could not have been the product of informed business judgment.

112.    Similarly, the Proxy Statement states that, supposedly due to the "complexity" of the 13 "material" factors, the BofA Defendants "did not consider it practical to, nor did [they] attempt to, quantify, rank or otherwise assign relative weights to the specific factors that [they] considered in reaching [their] decision." Again, such a process could not have been an exercise of informed business judgment. The more "complex" individual factors are, the *greater* is the need to weigh, quantify, compare, and contrast them. The above statement is just an unintended admission of the fact that the BofA Director Defendants gave their approval hurriedly, with little analysis, and without consideration, or with reckless or negligent disregard, of the crucial "factor" of whether inheriting Merrill's losses and liabilities could harm BofA—and the anticipated impact of such harms.

113.    According to the Proxy Statement, in approving the Merger, the BofA Director Defendants placed substantial reliance on the opinion of BofA's investment bankers on the transaction, Defendants FPK and J.C. Flowers.  However,

> [i]n arriving at their respective opinions [deeming the Merger fair to BofA], neither FPK nor J.C. Flowers ascribed a specific range of value to Bank of America or Merrill Lynch, but rather each of FPK and J.C. Flowers made its determination as to the fairness, from a financial point of view, to Bank of America of the exchange ratio to be paid by Bank of America in the merger on the basis of such financial, comparative and other analyses as of the date of such opinions.

114.    In other words, FPK and J.C. Flowers simply took the price BofA proposed to pay for Merrill (expressed as an exchange ratio of BofA shares for Merrill shares) *as a given* and then labored to justify that price.  While touting their results as "fairness" opinions, these advisors never considered whether the pre-ordained price that BofA was to pay for Merrill was within an appropriate range of values to begin with.  As such, those "fairness" opinions were incomplete and untrustworthy, and the BofA Director Defendants' reliance on them was not the product of proper business judgment.  From start to finish, the "fairness" opinions were meant merely to provide cover for the BofA Defendants' existing decision to acquire Merrill.  As such, FPK and J.C. Flowers merely aided and abetted the BofA Defendants' breaches of fiduciary duty.[3]

115.    The patent inadequacy of this process has been widely and consistently noted— including by senior officials of the Federal Reserve.  For example, in a December 19, 2008, e-mail to colleagues concerning Merrill's financial condition and BofA's ability to complete the Merger, Fed official Tim P. Clark wrote as follows:

> *General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we*

---

[3] J.C. Flowers and FPK were paid $20 million for their 12-15 hours of investment banking work which purportedly enabled both bankers to opine that the proposed $50 billion merger transaction was fair to BofA and its shareholders.

have that *the deterioration at ML has been observably under way for the entire quarter—Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum it calls into question the adequacy of the due diligence process BAC has been doing in preparation for the takeover.* [Emphases added.]

116.    Similarly, an analysis of the status of the Merger, prepared by PIMCO for the Federal Reserve on December 21, 2008, stated:

*While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, BAC management's contention that the severity of MER's losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.*

- In the Proxy Statement and investor presentations the firm explicitly asserts that it has an understanding of MER's business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions.

- *Staff at the Federal Reserve has been aware of the firm's potentially large losses stemming from exposures to financial guarantors, which is the single largest area of risk exposure and driver of recent losses that have been identified by management. These were clearly shown in Merrill Lynch's internal risk management reports that BAC reviewed during their due diligence.*

- The potential for losses from other risk exposures cited by management, including those coming from leveraged loans and trading in complex structured credit derivatives products ('correlation trading') should also have been reasonably well understood, *particularly as BAC itself is also active in both these products.* [Emphases added.]

117.    Fed General Counsel Scott Alvarez similarly wrote to Chairman Bernanke on December 23, 2008: "*Lewis should have been aware of the problems at ML earlier (perhaps as early as mid-November) and not caught by surprise.* That could cause other problems for him around the disclosures BA made for the shareholder vote." (Emphasis added.)

118.    In sum, the due diligence conducted by the BofA Defendants—aided and abetted by other defendants—had its intended effect, which was to give an air of legitimacy to their decision to

cause BofA to pay $50 billion for a company that was on the verge of bankruptcy. This constituted a gross breach of these defendants' duties of good faith and loyalty to BofA and its shareholders.

>### C. The BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Secretly Approve $5.8 Billion in Unwarranted Bonuses for Merrill Executives as Part of the Merger and Secretly Cause these Bonuses to be Paid on an Accelerated Basis *Before* the Merger Closes.

119.     As noted above, bonuses for Merrill executives occupied a front-and-center position during the negotiations leading up to the Merger and dominated the Merger negotiation topics discussed by the parties.

120.     On the issue of VICP bonuses, a term sheet prepared on Saturday, September 14, 2008 reflected that BofA had agreed in principle that Merrill would be authorized to pay a bonus pool that would, at most, be "flat to last year"—i.e., would not exceed the amount of bonuses Merrill paid in 2007, taking into account fluctuations in headcount—with a maximum recorded expense of $4.5 billion.[4]

121.     Negotiators for BofA and Merrill agreed that 60 percent of Merrill's year-end bonuses would be paid in cash and 40 percent in stock, the same cash-stock division Merrill used in 2007, and that bonus allocations would be made in consultation with BofA. Throughout the course of the weekend, defendants Curl and Fleming reported to defendants Lewis and Thain, respectively, on the status of this and other aspects of the negotiations.

122.     The bonus pool that the BofA Defendants approved that was "flat" to 2007, taking headcount changes into consideration, amounted to $5.8 billion. Incredibly, this amount was ***greater*** than the pool Merrill itself was projecting for 2008. Indeed, earlier in 2008, members of Merrill's

---

[4] The annual financial statement expense for the bonuses reflected the cash portion of the total bonus pool and any stock grants awarded to employees in the same year in which the cash bonuses were paid.

Compensation Committee had determined to *reduce* the anticipated bonus pool compared to 2007 by 16.5 percent, due to losses at Merrill in the first half of 2008. Thus, prior to negotiations, Merrill had projected a total VICP pool of, at most, only $5.1 billion with a recorded expense of $3.5 billion. The BofA Defendants thus permitted Merrill to pay a bonus pool that was greater than the amount Merrill previously had projected by up to $700 million and that carried a recorded expense that was larger by $1 billion.

123.    During these discussions, Defendant Fleming also insisted that BofA agree to allow Merrill to accelerate the bonuses so that they would be paid *before the Merger closed*—on December 31, 2008, which was *well ahead of the normal mid-January payment date for the bonuses, and well ahead of the disclosure date for Merrill's fourth-quarter results*.

**D.    In Violation of Their Duties of Candor, Good Faith, and Loyalty, the BofA Defendants, Aided and Abetted by the Merrill Defendants and the Advisor Defendants, Cause BofA to Issue a Proxy Statement That Conceals Crucial Facts About Losses at Merrill and the Bonuses to be Paid to Merrill Executives and is Otherwise Materially False and Misleading.**

124.    Defendants harmed BofA by causing BofA shareholders to approve BofA's acquisition of Merrill through the means of a false and misleading proxy statement. As a consequence, BofA acquired a company whose losses and liabilities have already begun to overwhelm BofA, transforming what was supposed to be an accretive acquisition into one that represents an immense *destruction* of BofA shareholder wealth—and that, for a while, effectively transformed BofA into a ward of the federal government.

125.    The terms of the Merger were set forth in the Proxy Statement, dated October 31, 2008, which was filed with the SEC on November 3, 2008, and mailed to all shareholders of record of BofA and Merrill Lynch (including Plaintiffs) as of the record date of October 10, 2008. The Proxy Statement—which spanned 125 pages and an additional 100 pages in exhibits—solicited

proxies from shareholders on behalf of BofA and the BofA Board to vote in favor of the Merger at a special meeting of shareholders on December 5, 2008.

> **1.     The Proxy Statement Falsely Omits
> Information Concerning Bonuses, For
> Which the BofA Defendants Later Try to
> <u>Deflect Blame onto BofA's External and Internal Legal Counsel.</u>**

126.     In the days following the announcement of the Merger, the BofA Defendants and the Merrill Defendants, together with their companies' respective legal counsel, prepared the transactional and disclosure documents relating to the Merger.  BofA was represented by the Wachtell law firm, including Herlihy, Demmo, O'Brien, and Guest.  Merrill was represented by the Shearman law firm, including Madden, Marzulli, Petelpiece, and Rappaport.

127.     The agreement that the negotiating teams led by Defendants Fleming and Curl had reached during the weekend negotiations concerning the payment of VICP bonuses by Merrill was memorialized by Wachtell and Shearman in a so-called "disclosure schedule" to the Merger Agreement.  This "disclosure schedule" was appended to the Merger Agreement and was ***not*** contained in the body of the Agreement.  It therefore was ***not disclosed to shareholders*** in the Proxy Statement, which attached the body of the Agreement ***but not any of its appendices***.

128.     The relevant provision of the "disclosure schedule" provided that VCIP bonuses for 2008 "may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion."  In addition, "[t]he allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America]."

129.     The SEC, in connection with its investigation of the bonus payments, later questioned Defendants Lewis, Thain, and Fleming.  Asked why, each stated that he did not know why this information was set forth in a disclosure schedule as opposed to the text of the Merger Agreement

itself.  Defendants Lewis, Thain, Fleming, and Stingi told the SEC that that issue had been determined by lawyers at Wachtell and Shearman, and one or more of BofA's in-house lawyers, including Defendant Mayopolous, BofA's then-General Counsel, and Defendant Brenner.

130.    This was also confirmed during an August 10, 2009, before the Honorable Jed S. Rakoff, in which counsel for BofA and the SEC unsuccessfully tried to get the Court to approve an illusory settlement agreement of the SEC's fraud complaint against BofA filed that same day.  (*See infra*, ¶¶ 226-230.)  At that hearing, the following exchanges occurred:

| | |
|---|---|
| Court: | What you are saying, if I understand it, is that Bank of America and Merrill effectively lied to their shareholders about a highly material matter. |
| [SEC Counsel]: | What we are saying— |
| Court: | Is that right? |
| [SEC Counsel]: | That is essentially correct.   We are saying they made representations— |
| Court: | So who at Bank of America and Merrill was responsible for that? |
| [SEC Counsel]: | We have not alleged any individual misconduct. |
| Court: | Did this happen, was this some sort of government that performed these actions or were there human beings that wrote these documents? |
| [SEC Counsel]: | There were indeed human rogues [sic] who wrote these documents. |
| Court: | Were there human beings who made the decision. |
| [SEC Counsel]: | Yes, there were human beings to [sic] made the decision. |
| Court: | So who were they? |
| [SEC Counsel]: | As we point out in paragraph 12 of the complaint *the documents were drafted by lawyers of the company*. |
| Court: | Who made the decision not to disclose what had, according to your allegations, been an agreement already reached to pay bonuses up to in excess of five billion dollars. |
| [SEC Counsel]: | We have not made any allegations, your Honor— |
| Court: | Well, you could not have made the allegations you have made without having conducted an investigation; true? |
| [SEC Counsel]: | That's correct, we conducted an investigation. |
| Court: | And you must have determined, must not, then, who at least physically did the various acts that are alleged; yes? |
| [SEC Counsel]: | *We have determined to the extent that we were able to determine that lawyers crafted these documents for the company*. |
| Court: | *And who were the lawyers?* |
| [SEC Counsel]: | *I, I believe the lawyers were Wachtell—* |

| | |
|---|---|
| [BofA Counsel]: | ***Your Honor, the lawyers on both sides, if I may, the Bank of America side, Bank of America was represented by the law firm Wachtell, Lipton and on the Merrill Lynch was represented by the law firm Shearman & Sterling.*** |
| Court: | And were those lawyers aware when they drafted the proxy of the prior agreement to approve the bonuses? |
| [SEC Counsel]: | We have made no allegations with respect to what the lawyers did. |
| Court: | You are not going to be particularly effective with this court by telling me what I already know, namely, that you filed a rather uninformative bare bones complaint. |

*   *   *   *

| | |
|---|---|
| Court: | So if you are correct that this proxy statement was materially misleading in failing to disclose these arrangements, then at a minimum Mr. [Thain] or Mr. Lewis and I— |
| [SEC Counsel]: | Again, your Honor, we have not made any allegations with respect to Mr. [Thain] or Mr. Lewis and I— |
| Court: | Well, have you talked to them about it? |
| [SEC Counsel]: | We have spoken with relevant individuals. |
| Court: | And by relevant individuals, you mean Mr. Thain and Mr. Lewis? |
| [SEC Counsel]: | That's correct. |
| Court: | ***And what do they say.*** |
| [SEC Counsel]: | ***They were not aware, they relied on the lawyers' advice and they didn't what was in the disclosure schedule versus what was in the proxy statement that was distributed to shareholders, as to this issue, I should say.*** |
| Court: | Right.  Was that because they didn't read the proxy statement? |
| [SEC Counsel]: | I'm not— |
| Court: | That they signed off on? |
| [SEC Counsel]: | I don't, I don't think there is anything in the record about that. They obviously signed off on the proxy statement, but I'm not sure if they were asked specifically about— |
| Court: | You didn't ask them if they read the proxy statement that they signed? |
| [SEC Counsel]: | They were asked about their knowledge with respect to the specific transactions here, but, you know, they said that they were not aware of that on that [sic]. |
| Court: | This whole issue of bonuses wasn't, like, something that was not in the public eye or was an obscure issue at the time, was it? |
| [SEC Counsel]: | I don't know about at that time, your Honor.  It has since been public knowledge. |
| Court: | ***And did you attempt to find out whether the lawyers who prepared this and who apparently—Mr. Thain and Mr. Lewis*** |

-49-

> *relied on, according to what they told you, what they have to*
> *say about what they told Mr. Thain and Mr. Lewis or anyone*
> *else?*

[SEC Counsel]: There has been no waiver of the attorney-client privilege and
we have not probed communications.

Court: *Have you asked them to testify and they asserted the*
*privilege?*

[SEC Counsel]: *No, we didn't.*

Court: *You didn't even ask them to testify?*

[SEC Counsel]: *No, your Honor, we have not.*

*   *   *   *

[BofA Counsel]: [T]here were some statements that were made by my adversary
that I just wanted to maybe put in the correct order or clear up.
I mentioned that and proffered that *there would be evidence*
*that the lawyers negotiated the merger agreement, disclosure*
*schedule and the proxy statement.*

I don't believe that there is any evidence—with respect to
Mr. Curl and Mr. Fleming, I believe what the evidence would
show is that those two individuals negotiated the essential
business terms of the transaction, which included that VICP,
that's the incentive compensation, would remain flat to last
year.

That was what was negotiated over the weekend of
September 15. *The details of the disclosure schedule were*
*worked out over the ensuing month or so among the lawyers.*
I don't think there is any evidence in the record—

Court: Those evil lawyers are at it again. But, OK, I understand your
point.

[BofA Counsel]: Your Honor, I don't believe that there is any evidence that Mr.
Lewis or Mr. Thain were aware of the specific terms of the
disclosure schedules. Again without waiving the privilege, the
question is was the subject of the VICP or the disclosure
schedules discussed by the lawyers with Mr. Lewis. Just as to
the subject without getting into the content, I would proffer that
there would be no evidence that that subject was discussed.
[Emphases added.]

### 2.    The Proxy Statement Falsely Describes Losses and Liabilities of Merrill.

131.    The Proxy Statement incorporated by reference several documents, including

Merrill's Form 8-K filing dated October 16, 2008.  That Form 8-K, in turn, included Merrill's press

release announcing results for the third quarter, ending September 30, 2008, as well as a preliminary

-50-

unaudited earnings summary for the quarter. These results indicated a net loss from continuing operations of $5.1 billion, and an overall net loss of $5.2 billion.

132.    The October 16, 2008, Form 8-K reported that Merrill had experienced negative $6.5 billion "principal transactions revenues," indicating a net loss due to realized and unrealized losses (including trading losses, asset impairments and write-downs, and declines in mark-to-market valuations) in the securities held on its balance sheet.[5]

133.    Among the "significant items" causing such large negative revenues were $12.1 billion in purported asset losses and write-downs described as follows:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super senior ABS CDOs[1] and the termination and potential settlement of related hedges with monoline guarantor counterparties

    *    *    *    *

- Net write-downs of $3.8 billion principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer

    *    *    *    *

- Net losses of $2.6 billion resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures

134.    Moreover, the Form 8-K emphasized the positive **developments at Merrill in reducing balance sheet exposure**, including a highly positive comment from Defendant Thain regarding improvements in that area:

### Third Quarter and First Nine Months of 2008 Highlights

- Bank of America Corporation agreed to acquire Merrill Lynch & Co. in an all-stock transaction

---

[5] "Principal transactions revenues" are described by Merrill as including "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt. These investments are recorded at fair value. . . . Gains and losses are recognized on a trade date basis."

- Record year-to-date and third highest quarterly revenues in Rates and Currencies, up 27% from prior year-to-date

- Global Equity Linked Products (Derivatives) net revenue growth of 23% sequentially and 14% year-on-year

- Advisory revenues outperformed the market, increasing 12% sequentially; Merrill Lynch also ranked #2 in global announced M&A for the quarter

- Solid performance in Global Wealth Management despite challenging market environment; FA headcount increased by 240 from a year ago; Net new annuitized assets are up $21 billion year-to-date

- ***Significant progress in balance sheet and risk reduction***; RWA declined by approximately 15% over the quarter

- ***Substantial sale of $30.6 billion of gross notional amount of U.S. super senior ABS CDOs***

- ***Reductions of 98% of U.S. Alt-A residential mortgage net exposures***. Including planned sales, reductions of 56% in non-U.S. residential mortgages and 25% in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio

- ***Enhanced capital base*** through a $9.8 billion common stock offering and the $4.425 billion sale of the Bloomberg stake

- Subsequent to the third quarter, and as part of Bank of America's $25 billion participation in the TARP Capital Purchase Program, Merrill Lynch agreed and expects to issue $10 billion of non-voting preferred stock and related warrants to the U.S. Treasury pursuant to the program.

  **"*We continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal,*"** said John A. Thain, chairman and CEO of Merrill Lynch. "As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth."   [Emphases added; footnote omitted.]

135.    These statements were materially false and misleading because, in spite of any efforts to "reduce exposure" or "de-leverage," Merrill, in fact, retained toxic amounts of bad securities on its balance sheet that, in the first half of October 2008 alone, were causing billions of dollars in new losses.

136.    The Proxy Statement also specifically incorporated by reference future documents to be filed with the SEC and made publicly available:

In addition, Bank of America and Merrill Lynch also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Merrill Lynch special meeting. These documents include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

137.    The Proxy Statement also incorporated by reference Merrill's filings on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, and September 30, 2008.   Each of these filings contained a certification by Deloitte, Merrill's independent registered public accounting firm, that no "material modifications" were necessary in Merrill's financial statement to make them accurate.  Deloitte's certification in the Form 10-Q for the third quarter 2008, for example, provided that:

We have reviewed the accompanying condensed consolidated balance sheet of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of September 26, 2008, and the related condensed consolidated statements of (loss)/earnings and comprehensive (loss)/income for the three-month and nine-month periods ended September 26, 2008 and September 28, 2007, and the related condensed consolidated statements of cash flows for the nine-month periods ended September 26, 2008 and September 28, 2007. These interim financial statements are the responsibility of Merrill Lynch's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

***Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***  [Emphasis added.]

138.    Similarly, the Proxy Statement incorporated by reference Merrill's filing on Form 10-K for the year ended December 31, 2007.  That form 10-K contained Deloitte's certification that:

We have audited the consolidated financial statements of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of December 28, 2007 and December 29, 2006, and for each of the three years in the period ended December 28, 2007, and the effectiveness of Merrill Lynch's internal control over financial reporting as of December 28, 2007, and have issued our reports thereon dated February 25, 2008 (which reports express unqualified opinions . . .).

We have also previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Merrill Lynch as of December 30, 2005, December 31, 2004, and December 26, 2003, the related consolidated statements of earnings, changes in stockholders' equity, comprehensive income, and cash flows for the years ended December 31, 2004, and December 26, 2003 (none of which are presented herein); *and we expressed unqualified opinions on those consolidated financial statements.* . . .

*In our opinion, the information set forth in the "Selected Financial Data" table under the captions "Results of Operations," "Financial Position" and "Common Share Data," for each of the five years appearing on page 19, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.* [Emphasis added.]

139.    Moreover, the Proxy Statement, under the heading of "Experts," stated that Deloitte's opinion formed an integral part of the Proxy Statement:

The consolidated financial statements and the related financial statement schedule incorporated by reference in this registration statement [sic] from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 28, 2007, and the effectiveness of Merrill Lynch & Co., Inc. and subsidiaries' internal control over financial reporting have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, incorporated herein by reference (*which report on the consolidated financial statements expresses an unqualified opinion . . .*). Such consolidated financial statements have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing. [Emphasis added.]

### 3.    The Proxy Statement Falsely Sets Forth <u>"Fairness" Opinions by the Advisor Defendants.</u>

140.    J.C. Flowers and FBK each provided a "fairness" opinion in the Proxy Statement concluding that the proposed purchase price of Merrill was "fair, from a financial point of view, to Bank of America." These "fairness" opinions were dated September 14, 2008, the same day that

principal negotiations concerning the Merger had taken place.  The opinions were included in the

Proxy Statement sent to BofA shareholders.

141.    In the Proxy Statement, Defendants FPK and J.C. Flowers provided "fairness"

opinions to BofA shareholders stating that, in those Advisor Defendants' opinion, the Merger was

fair, from a financial point of view, to BofA. The FPK "fairness" opinion stated, in part:

> You have requested our opinion as to the fairness, from a financial point of
> view, to Bank of America Corporation (the "Company") of the Exchange Ratio (as
> defined below) to be paid by the Company pursuant to the terms of, and subject to
> the conditions set forth in, the Agreement and Plan of Merger to be dated as of
> September 15, 2008 (the "Merger Agreement") by and between the Company and
> Merrill Lynch & Co., Inc. ("Merrill Lynch").
>
> *   *   *   *
>
> In connection with our review of the proposed Merger and the preparation of
> our opinion herein, we have examined: (a) the financial terms and conditions of a
> preliminary draft of the Merger Agreement; (b) certain audited historical financial
> statements of the Company and of Merrill Lynch for the five years ended December
> 31, 2007; (c) information regarding the strategic, financial and operational benefits
> anticipated from the Merger and the prospects of the Company (with and without the
> Merger); (d) the pro forma impact of the Merger on the earnings per share of the
> Company (before and after taking into consideration any goodwill created as a result
> of the Merger) based on certain pro forma financial information prepared by the
> senior management of the Company; (e) information regarding the amount and
> timing of potential cost savings and related expenses and synergies which senior
> management of the Company expects will result from the Merger, as well as certain
> estimated restructuring charges and negative revenue adjustments which senior
> management of the Company expects to result from the Merger (the "Expected
> Synergies"); (f) information regarding publicly available financial terms of certain
> recently-completed transactions in the investment banking industry; (g) current and
> historical market prices and trading volumes of the common stock of the Company
> and Merrill Lynch; and (h) certain other publicly available information on the
> Company and Merrill Lynch.
>
> *   *   *   *
>
> In rendering our opinion, we have assumed and relied, without independent
> verification, upon the accuracy and completeness of all the information examined by,
> or otherwise reviewed or discussed with, us for purposes of this opinion. We have
> not made or obtained an independent valuation or appraisal of the assets, liabilities
> (contingent, derivative, off-balance sheet or otherwise) or solvency of the Company

or Merrill Lynch, including particularly any mark-to-market balance sheet adjustments resulting from the Merger, market conditions or otherwise. We relied solely upon information provided to us by the Company and other publicly available information with respect to Merrill Lynch's financial condition, results of operations and prospects.

*   *   *   *

***Based upon and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Ratio to be paid by the Company in the Merger is fair, from a financial point of view, to the Company. This opinion has been approved by our fairness committee.*** [Emphasis added.]

142.    The FPK "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

143.    The J.C. Flowers "fairness" opinion stated, in part:

You have requested our opinion as of the date hereof as to the fairness, from a financial point of view, to Acquiror of the Exchange Ratio. In connection with this opinion, we have: (i) reviewed the financial terms and conditions of the Merger; (ii) analyzed certain historical and prospective business and financial information relating to the Company and Acquiror; (iii) held discussions with members of the senior managements of the Company and Acquiror with respect to the businesses and prospects of the Company; (iv) reviewed public information with respect to certain other companies we believed to be relevant; (v) reviewed the financial terms of certain business combinations involving companies we believed to be relevant; (vi) reviewed historical stock prices and trading volumes of the Company common stock and Acquiror common stock; and (vii) conducted such other financial studies, analyses and investigations as we deemed appropriate.

*   *   *   *

***Based on and subject to the foregoing, we are of the opinion that as of the date hereof the Exchange Ratio is fair, from a financial point of view, to Acquiror.*** [Emphasis added.]

144.    The J.C. Flowers "fairness" opinion was false and misleading for the reasons set forth in paragraph 146 *infra*.

145.     In addition, the Proxy Statement stated that the two "fairness" opinions had been based in substantial part on forward-looking information concerning Merrill and its effect on BofA, including:

- "financial and operating information with respect to the business, operations and ***prospects*** of Merrill Lynch furnished to FPK and J.C. Flowers by Bank of America"; and

- "discussions with members of senior management of Merrill Lynch with respect to the businesses and ***prospects*** of Merrill Lynch".

(Emphases added.)

146.     All of the above statements were false and misleading, in that, at the time they were issued and subsequently, FPK and J.C. Flowers lacked any reasonable basis to conclude that the Merger was fair to BofA—and the BofA Defendants knew or recklessly or negligently disregarded that fact.  Throughout their misconduct, FPK and J.C. Flowers not only violated Section 14(a) but also facilitated the BofA Defendants' violations of that statute—as well as aiding and abetting the BofA Defendants in their breaches of candor and other fiduciary duties to the Company and its shareholders.  In particular, the "fairness" opinions were false and misleading in that, among other things, they:

(a)     disregarded the financial condition of Merrill (including illiquidity and insolvency)—or the resulting price at which Merrill could be acquired—in the absence of BofA's precipitate $50 billion bid;

(b)     were based on older, no-longer-reliable projections of future losses and write-downs and did not take into account current projections of losses and write-downs, much less critically evaluate the assumptions behind such projections;

(c)     made no attempt to relate the current liquidity crisis at Merrill to the company's likely future results or its value to BofA;

(d)     made no attempt to compare Merrill's financial condition and likelihood of remaining a going concern to those of Lehman Brothers, whose financial and accounting records had been reviewed for BofA by J. Christopher Flowers earlier that same week in connection with a possible acquisition of Lehman Brothers, and which was widely known to face immediate bankruptcy in the absence of an acquisition; and

(e)     made no attempt to quantify the impact on Merrill's losses, cash flow, liquidity, and solvency from the severe liquidity problems also being experienced at the time by American International Group, Inc. ("AIG"), which provided tens of billions of dollars of credit default swap protection on Merrill's holdings of CDOs and whose financial and accounting records were being examined by J. Christopher Flowers at the request of AIG simultaneously with his engagement by BofA on the Merrill Merger.

### 4.    The Proxy Statement Falsely States that BofA will Need No More than $25 Billion in Federal Assistance, Including to Complete the Merger.

147.    Under the heading "Recent Developments," the Proxy Statement disclosed that BofA had agreed to sell $25 billion in preferred stock to the United States Government pursuant to the Capital Purchase Program ("CPP") effectuated by Congress in the Emergency Economic Stabilization Act of 2008.  This amount included $10 billion of preferred stock related to the acquisition of Merrill if the Merger were consummated:

> On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury has the authority to, among other things, invest in financial institutions and purchase mortgages, mortgage-backed securities and certain other financial instruments from financial institutions, in an aggregate amount up to $700 billion, for the purpose of stabilizing and providing liquidity to the U.S. financial markets. On October 14, 2008, the U.S. Treasury announced a plan, referred to as the Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate.

In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28, 2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under "— Merrill Lynch & Co Developments — Unaudited — Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

148.    The Proxy Statement disclosed that Merrill would *not* participate in the CPP with the federal government, pending the outcome of the Merger.   This statement became false and misleading when the Proxy Statement was never updated to include information concerning Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

> **5.    The Proxy Statement Falsely States**
> **that Merrill Executives Will Not Receive**
> **Discretionary Bonuses for 2008 and Conceals**
> **the Fact that Defendants Had Agreed to Guarantee $5.8 Billion**
> **in Bonuses to Merrill Executives and Accelerate the Payment**
> **Thereof to December 2008, Before the Merger Was Set to Close.**

149.    The Proxy Statement included, as an attachment, the full text of the Merger Agreement, *but it omitted the "disclosure schedule" setting forth the agreement about Merrill's*

*payment of VICP bonuses*.  Neither the "disclosure schedule" nor anything about its contents was publicly disclosed at any time prior to the December 5, 2008, shareholder meetings. [6]

150.    The "disclosure schedule," which was omitted from the Proxy Statement, provided:

5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii)—Variable Incentive Compensation Program ("<u>VICP</u>") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion. . . . Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards.  The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] . . . .  The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

151.    Not only did the proxy materials fail to disclose that the BofA Defendants had caused BofA to authorize Merrill to pay up to $5.8 billion in discretionary and other year-end bonuses, but a provision *from the Merrill Agreement, which <u>was</u> disclosed, indicated the opposite*—i.e., that Merrill *had no authority to, and would not, pay discretionary bonuses to employees without BofA's prior consent*.  Rather than set forth the truth about these bonuses, the pertinent provision stated only:

5.2    <u>Company Forbearances.</u> During the period from the date of this Agreement to the Effective Time [the closing of the Merger], except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, [Merrill] shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of [BofA]:

\*   \*   \*   \*

(c)   except as required under applicable law or the terms of any [Merrill] Benefit Plan existing as of the date hereof, (i) increase in

---

[6] It was not until January 16, 2009, with the pre-release of BofA's fourth quarter 2008 earnings that this information was finally disclosed.

> any manner the compensation or benefits of any of the current or
> former directors, officers or employees of [Merrill] or its
> Subsidiaries (collectively, "Employees") [or] (ii) pay any amounts
> to Employees not required by any current plan or agreement (other
> than base salary in the ordinary course of business) . . . .

152.    Subparagraph (c) to Section 5.2 of the Merger Agreement quoted above described one of approximately 18 enumerated actions that, as recited in the forbearance provision, Merrill purportedly agreed to refrain from taking prior to the closing of the Merger.  Although the forbearance provision as a whole refers generically to exceptions in the disclosure schedule, *there is no disclosure at all of what those exceptions were or the contents of the schedule anywhere in the Merger Agreement.*  Neither the "disclosure schedule" nor its contents were publicly disclosed at any time prior to the December 5, 2008, shareholder meetings.  Thus, there was no way to tell to what extent, if any, the unspecified exception applied to any particular action that Merrill was prohibited from taking.  Shareholders could not have known that BofA had *already* agreed to allow Merrill to pay Merrill executives up to $5.8 billion in discretionary bonuses—payments "not required by any current plan or agreement."

153.    Moreover, the text of the Proxy Statement, in a section describing the principal terms of the Merger Agreement, paraphrased the forbearance provision of Section 5.2 and listed the 18 "extraordinary" actions that Merrill had agreed not to take prior to closing—including the payment of discretionary compensation.  The relevant passage in the proxy statement qualified the discussion of the forbearance provision only by referring to "certain exceptions," which were left unspecified, and by stating that Merrill was prohibited from taking the "extraordinary" actions without "Bank of America's prior written consent," as follows:

> Merrill Lynch further agreed that, with certain exceptions or except with Bank of
> America's prior written consent . . . , Merrill Lynch will not, and will not permit any
> of its subsidiaries to, among other things, undertake the following extraordinary
> actions . . . except as required under applicable law or the terms of any Merrill Lynch

benefit plan (i) increase the compensation or benefits of any current or former directors, officers or employees [or] (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements . . . .

154.     The bonus information omitted from the Proxy Statement was highly material to BofA shareholders.  First, the bonuses meant that the asset to be acquired, Merrill, was worth $5.8 billion less than its purchase price—which, by the time of the Proxy Statement, based on BofA's share price, was well over 10 percent of the total cost.  Second, accelerating the bonus schedule meant that Merrill executives would, purely as a result of the Merger, reap gigantic windfalls, despite Merrill's abysmal financial performance in 2008.  Third, the acceleration of the bonuses as part of the Merger Agreement itself eliminated any opportunity for BofA to reduce or eliminate the bonus payments once the transaction closed.

### 6.     The Proxy Statement Falsely Recommends Approval of the Merger.

155.     Based on the extremely limited analysis recited above, the BofA Director Defendants unequivocally recommended that BofA's shareholders approve the Merger, as follows:

**Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors has unanimously approved and adopted the merger agreement and the transactions it contemplates, including the merger. *The Bank of America board of directors determined that the **merger, merger agreement and the transactions contemplated by the merger agreement** are advisable and in the best interests of Bank of America and its stockholders and unanimously recommends that you vote "FOR" approval of the issuance of shares of Bank of America common stock in the merger.*  [Emphases added.]

156.     The Proxy Statement indicated that the Merger would be "3.0% dilutive in 2009 and breakeven in 2010."  The Proxy Statement also included detailed reported results with respect to Merrill's operations for the quarter ending June 30, 2008 and, under a heading titled "Recent Developments," also discussed more recent financial results of Merrill.  These recommendations were based on the BofA Defendants' bad faith and disloyalty in desiring to acquire Merrill no matter

what the price tag or future liabilities, not on any reasoned determination that the transaction was in the best interests of BofA or its shareholders.

### E. The BofA Defendants Become Aware of Highly Material Losses at Merrill No Later than October 2008 But, Aided and Abetted by the Merrill Defendants, and the Advisor Defendants, Make No Disclosure of These Losses to Shareholders or the Material Adverse Effect They Will Have on the Combined Entity.

157.    At the time of the issuance of the Proxy Statement and afterwards, each of the Defendants knew or were reckless or negligent in now knowing that Merrill's financial condition was dramatically deteriorating, and that the Proxy Statement contained the misstatements and omissions set forth herein, in violation of the federal securities laws and in violation of the BofA Defendants' duty of complete candor.  In spite of this knowledge or reckless or negligent disregard, each of the Defendants caused or allowed the Proxy Statement to set forth the misstatements and omissions, and each failed to cause a corrected, updated, or revised proxy statement to be issued before the Shareholder Vote.

158.    When the Merger was first announced on September 15, 2008, questions were raised by securities analysts concerning the valuation of Merrill at $29 per share, given Merrill's accumulating losses and uncertain future.  At that time, Defendants stated unequivocally that they knew and understood the value of Merrill's assets.

159.    During a conference call with analysts on September 15, 2008, Matthew O'Connor, an analyst at UBS, pointed out that "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced.  I guess the question is why pay $29 at this point?"  Another analyst raised the issue of the necessity of large write-downs on Merrill's assets, and asked whether the financial numbers presented with the

announcement included any mark-to-market write-downs.  Defendant Lewis quelled such concerns, stating:

> *The numbers that we presented today we have considered marks on the assets . . . .* I would tell you that, again, going back to the point of things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures. We are dealing with the same counterparties on things so again, *we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch has made.*  [Emphases added.]

160.    In addition, prior to the Closing of the Merger, other analysts alerted Defendants to the need for Merrill to take further write-downs.  For example, once they digested the news of the Merger and took a close look at Merrill, other analysts noted the necessity of further asset write-downs at Merrill that would drastically impair the value of the Merger to BofA.  A Deutsche Bank analyst report, dated September 16, 2008, stated:

> The big question surrounding capital market businesses [such as Merrill's] is, "how much more in write-downs are likely ahead?"  In particular, a new weakness at AIG has the potential to hurt Merrill's capital via any potential insurance on its ABS CDO.  Alternatively, additional selling of risky commercial or residential real estate assets could impact Merrill's commercial real estate securities ($18B), other risky mortgage assets ($31B; includes $10B alt-A, subprime and non-US residential), and leveraged finance ($8B), not withstanding declines in these amounts since the end of 2Q08.  In additions to the "risky" assets, Merrill also has $33.7B in US prime mortgages on balance sheet.

161.    In addition to these analysts' warnings, the recent large partial write-downs of Merrill's assets should have placed (and did place) Defendants on notice of the impaired condition of that company prior to the Merger.  In fact, on November 6, 2008, Merrill reported financial results for the quarter ending September 30, 2008, that included substantial write-downs in Merrill's assets and resulted in Merrill reporting a net loss of over $5 billion.  Similarly, in a *Wall Street Journal* article on November 8, 2008, it was revealed that Merrill Lynch was "planning to sell roughly $4 billion of distressed debt securities, including mortgages and complex investments, in a bid to cut its exposure to risky assets."  An article in the *Journal* dated November 17, 2008, indicated that the

United States Treasury would provide $10 billion to Merrill under the Troubled Asset Relief Program after the Merger was completed.

162.   Of course, the BofA Defendants did not need analysts, or even Merrill's publicly announced results, to uncover the truth about Merrill.  These defendants (together with the Merrill Defendants) had complete and unfettered access to Merrill's financial and accounting records beginning no later than September 15, 2008, the day the Merger was announced.

163.   Under the terms of the Merger Agreement, paragraph 6.1, Merrill was obligated to fully cooperate with BofA and the BofA Defendants in providing any information necessary in connection with the Proxy Statement.  Similarly, under paragraph 6.2, the BofA Defendants enjoyed full access to Merrill's financial and accounting records:

> Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, *each of Company and Company shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors, agents and other representatives of the other party, reasonable access, during normal business hours during the period prior to the [Merger's closing], to* <u>*all its properties, books, contracts, commitments and records,*</u> and, during such period, such party shall, and shall cause its Subsidiaries to, make available to the other party . . . all . . . information concerning its business, properties and personnel as the other party may reasonably request . . . .  [Emphases added.]

164.   Such access included access to Merrill's profit and loss ("P&L") reports, which showed the facts of Merrill's deteriorating positions.  Indeed, in a memo to Merrill employees following his termination, Defendant Thain stated:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.  However, they were incurred almost entirely on legacy positions and were due to market movements.  *We were completely transparent with Bank of America.  They learned about these losses when we did.  The acting CFO of my businesses was Bank of America's former Chief Accounting Officer.  They had daily access to our P & L, our positions and our marks.*  [Emphasis added.]

165.   Moreover, Defendants Lewis, Price and other senior executives among the BofA Defendants received weekly reports concerning Merrill's financial condition *beginning immediately*

*after the Merger Agreement was executed.*  Defendant Lewis, for example, testified before the New York Attorney General on April 23, 2009 as follows:

> *We were getting projections [concerning Merrill].  I was getting a P & L at Bank of America, but we were getting projections.  I don't recall getting them every day, but I was either hearing about them and in some cases I saw them.*  [Emphasis added.]

166.    Defendant Lewis similarly admitted to the House Committee on Government Oversight and Reform on June 11, 2009, that, beginning on September 15, 2008, he received weekly reports concerning Merrill's financial condition:

> Q.    Isn't it true that Bank of America examined Merrill Lynch's book of business before signing the merger agreement and then received detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 5th?
>
> A.    That is true.

167.    By November 2008, the losses at Merrill became so severe that, according to Defendant Price in testimony to the New York Attorney General earlier this year, he sought the advice of both inside legal counsel (specifically, Defendant Mayopolous) and outside legal counsel (specifically, the Wachtell law firm) as to whether BofA should disclose Merrill's expected fourth quarter losses to BofA shareholders.  Price further testified that BofA's decision not to disclose those losses was made after receiving such advice.  Price testified, in particular, that the BofA Defendants decided not to disclose such losses following a telephone call on November 20, 2008 with the Wachtell law firm.

168.    As Defendant Thain stated upon his forced departure from Merrill after the Closing, the weekly reports concerning Merrill that were sent to Lewis, Price, and other BofA Defendants were unmistakably clear about Merrill's rapidly deteriorating condition.  These reports were entered into the Congressional Record by Rep. Dennis Kucinich in connection with the House Oversight Committee Hearings.  In the first week of October, the reports showed, Merrill lost $1.3 billion, lost

$257 million the next week, lost $702 million the week after that, and then lost $2.2 billion in the week after that—for a total of $4.4 billion in October alone.  During the week of November 10, 2008, Merrill lost *another* $4.4 billion.

169.    At Kucinich's request, Pierre Sprey, a longtime Defense Department official who helped design the F-16 fighter, performed a statistical analysis of the Merrill losses and concluded "the evidence for a constantly deteriorating . . . trend is ***much stronger on November 14 than it is on December 12.***" (Emphasis added.)[7]  This conclusion was contrary to the BofA Defendants' repeated statements that they did not learn of the losses, nor could they have known about them, until *after* the Shareholder Vote on December 5, 2008.

170.    Further, according to the *New York Times* (February 9, 2009), shortly after the Merger was announced, BofA "quickly put 200 people at [Merrill], including a large financial team. A Bank of America executive [Chief Accounting Officer Neil Cotty] was sent to New York from Charlotte to act as an interim chief financial officer ***and had daily access to Merrill's profit-and-loss statements***." (Emphasis added.)  The information available to BofA's 200-person transition team was the same information available to the senior management of Merrill, including Defendant Thain. Thus, no aspect of Merrill's losses was or should have been opaque to the BofA Defendants.  Team leader Cotty reported directly to Defendant Lewis.  The BofA Director Defendants, who conducted weekly conference calls every Friday starting in September 2008 and continuing through December 2008, could not and should not have been unaware of Merrill's accelerating losses throughout the fourth quarter.

171.    According to the *Wall Street Journal* (February 6, 2009):

---

[7] Mr. Sprey's analysis was also put into the public record at the Lewis hearing.

*By the end of November, two months into the fourth quarter, Merrill had accumulated $13.34 billion in pretax quarterly losses, according to an internal document reviewed by The Wall Street Journal.*   Some Bank of America executives expressed concern about proceeding with the takeover, people close to the bank say. *. . . [T]he bank decided to go ahead with Dec. 5 shareholder votes on the deal.* Shareholders of both Merrill and Bank of America gave their approval.

*   *   *

Bank of America executives remained confident about the deal [in October]. *Doubts began to creep in shortly before Thanksgiving.  With more than a month to go until the end of the fourth quarter, the pretax quarterly losses at Merrill were approaching $9 billion*, according to people familiar with the figures.  *By month's end, the figure had exceeded $13 billion*, or $9.29 billion after taxes.

Most of the losses were coming from the securities firm's sales and trading department. But business was even suffering in Merrill's lucrative wealth-management unit, which saw its revenue drop to $797 million in December, from $1.08 billion in October. Still, not all the losses, which included expected write-downs on assets such as Merrill's investment in rental-car company Hertz Global Holdings Inc., should have come as a surprise to Bank of America.

*   *   *   *

*At Bank of America, executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the "material adverse effect" clause in its merger agreement.*  Merger agreements typically specify certain "adverse" conditions that give an acquirer the right to abandon a deal.

*   *   *   *

*The deliberations continued up until a few days before shareholders of Merrill and Bank of America were scheduled to vote*, one of these people says.  Senior Bank of America executives had "mixed emotions," this person says, but "everyone wanted to see the deal go through."  [Emphases added.]

172.    Defendant Lewis has stated publicly that internal BofA forecasts projected a $9 billion fourth-quarter loss (after taxes) for Merrill on December 5, 2008—a date which conveniently coincided in his memory with the date of the Shareholder Vote that was already underway that day. In actuality, however, Lewis was aware or should have been aware of the $9 billion *no later than the evening of December 3, 2008*, when he received the latest weekly BofA internal report on Merrill.  On this occasion, Defendant Rosato, BofA's Chief Accounting Officer, sent an e-mail

stating: "*4Q revenues [at Merrill] need to be adjusted down by $3B.*" The existence and contents of Rosato's e-mail were immediately made known to Defendants Lewis and Price and the BofA Board. That revision changed the estimated fourth-quarter net loss to $8.98 billion, worse than the previous Merrill forecast of $7.06 billion, which had been sent to Lewis and other executives only that same day. The December 5, 2009, projection was shared with the BofA Board no later than at its meeting on December 9, 2008.

173.    Moreover, the New York Attorney General has discovered that:

> *By December 3, 2008, Bank of America learned that Merrill's forecasted losses had risen to more than $11 billion [before taxes], and with the addition of a $3 billion "contingency" they rose to more than $14 billion [before taxes]*. Mr. Price testified that the decision not to disclose these escalating losses was not made until after conversations with Mr. Mayopolous. Mr. Mayopolous in turn testified that he spoke with outside counsel [the Wachtell law firm] to request legal advice regarding the additional losses. [Emphasis added.]

174.    In addition, as Defendant Lewis testified to the NYAG on April 23, 2009, by December 14, 2008, the projected loss had increased to $12 billion (after taxes). This represented, in Lewis's words (according to his testimony to the New York Attorney General) a "staggering amount of deterioration."

175.    Despite the BofA Director Defendants' awareness of, or ready access to, that information, neither the Proxy Statement nor any supplements thereto, were ever updated or corrected to disclose the dramatic decreases in the value of Merrill's assets or the company's increasing losses. The BofA Defendants, aided and abetted by Merrill Defendants and the Advisor Defendants, breached their duty to update and correct the material misstatements and omissions in the Proxy Statement, in violation of the federal securities laws and/or the duty of candor to BofA shareholders.

F.    **BofA Shareholders Are Caused to Vote in Favor of the Merger Based on False and Misleading Information Furnished to Them By Defendants.**

176.    BofA's shareholders approved the Merger in a special meeting held on December 5, 2008.  Lacking the material facts necessary to make an informed decision on whether to approve BofA's acquisition of Merrill, 82 percent of BofA's shareholders voted to approve the Merger and the issuance of additional BofA shares necessary to complete it.  The BofA Defendants promptly issued a press release announcing that the shareholders had approved the Merger.

177.    Pursuant to their undisclosed agreement not to invoke the MAC clause and play along with Messrs. Paulson and Bernanke's desires (in the bargain, keeping their lucrative positions as officers and directors and receiving billions of dollars in federal assistance), almost immediately after the votes were tallied, the BofA Defendants went to the federal government to seek additional assistance (on top of the $25 billion already received in that fall).  BofA Chairman Lewis expressly advised the Treasury that BofA would not be able to close the deal without billions more in assistance, due to Merrill's substantially deteriorated financial condition.  Thereafter, Lewis secured a promise of $20 billion in direct additional assistance to complete the Merger, as well as guarantees and indemnifications for $118 billion in additional exposure.  Of this amount, fully 75 percent – or $88.5 billion – arose from Merrill losses and liabilities.  The Merger was consummated on January 1, 2009.

G.    **The BofA Defendants Determine that a "Material Adverse Event" has Occurred, Justifying Termination of the Merger, But Knowingly Deceive Shareholders as to this Fact.**

178.    The BofA Defendants further breached their fiduciary duties to BofA and its shareholders by proceeding with the acquisition of Merrill after September 15, 2008, despite their knowledge of, and/or ready access to, information concerning Merrill's severely worsening financial condition and the immensely dilutive and destructive effect Merrill would have on BofA as a

consequence.  As set forth above, the BofA Defendants knew of, or recklessly or with gross negligence disregarded, Merrill's losses and liabilities, and the effect they would have on BofA, yet deceived shareholders by not revealing the extent of the losses before the Merger closed on January 1, 2009—thereby foregoing steps that could have spared BofA the damage complained of herein.

179.   In fact, pursuant to the Merger Agreement, the BofA Defendants could have terminated the Merger and been held harmless, upon uncovering events or circumstances evidencing a material adverse effect of precisely this nature.  The Merger Agreement included the following language in paragraph 3.8, defining a "Material Adverse Effect," the occurrence of which would allow the BofA Defendants to terminate the Merger prior to the scheduled closing on January 1, 2009:

> 3.8   <u>Absence of Certain Changes or Events</u>.  (a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term "<u>Material Adverse Effect</u>" means, with respect to Company or Company, as the case may be, *a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole . . . .*  [Emphasis added.]

180.   Certain items were excluded from the definition of "Material Adverse Effect," such as changes in accounting rules, rules and regulations, political conditions, general business conditions, and the like.  These exclusions, however, were not intended to apply if Merrill's financial and operational conditions took a sharp turn for the worse beyond plan, as they did.  For example, one exclusion was for "failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof"—indicating that the underlying causes of Merrill's results, such as asset impairments and write-downs, were to be ***included***.

181.   As Merrill's condition worsened in November and December 2008, Defendants Lewis became increasingly concerned about BofA's ability to complete the Merger.  Lewis

conferred with internal legal counsel to determine whether BofA had grounds to rescind the Merger

under the MAC clause.  Indeed, prior to the Shareholder Vote, Defendants Lewis, Price, Curl, and

the BofA Board were well aware that the significant deterioration in Merrill's asset values, and its

ballooning losses, justified invoking the MAC clause, yet deceptively and in bad faith took pains to

conceal these facts, in breach of their duties of loyalty, good faith, and candor.

182.    The New York Attorney General, in connection with its investigation of the Merger,

has uncovered at least some of Defendants' bad faith and deceptive conduct and (in a letter to

BofA's outside counsel, Lewis Liman, requesting greater cooperation) has made public evidence

that:

> ***four days before the shareholder vote on whether to approve the merger, Mr. Price and Gregory Curl, Bank of America's then Vice Chairman of Corporate Development, sought legal advice regarding the MAC clause.  This fact is of tremendous significance because it is at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote.***  In particular, on December 1, 2008, Mr. Price and Mr. Curl requested legal advice from Mr. Mayopolous regarding whether Bank of America had a MAC in light of Merrill's deteriorating financial condition.  Mr. Mayopolous testified about the December 1, 2008 meeting:
>
> | Question: | Did you give advice about whether there was a [MAC] clause or not? |
> |---|---|
> | Mayopolous: | Did I give advice about whether I thought there was a material adverse [e]ffect or not? |
> | Question: | Yes. |
> | Mayopolous: | Yes. |

(Emphases added.)

183.    By Sunday, December 14, 2008, Merrill's condition had deteriorated so drastically

that Defendant Price called Defendant Lewis on a Sunday to inform him of the developments.

Attention among the BofA Defendants turned again to the MAC clause, and the Wachtell law firm

opined that grounds existed to invoke that clause to terminate the Merger.

184.    Thereafter, on Tuesday, December 16, 2008, Herlihy placed a call to Treasury official Ken Wilson, a deputy to Mr. Paulson.  Herlihy informed Wilson on BofA's behalf that, with Merrill's losses having mushroomed to almost $21 billion, BofA's legal counsel, the Wachtell law firm, had opined that BofA could terminate the Merger Agreement pursuant to the MAC clause. Mr. Wilson told Herlihy to "get Mr. Lewis to call Mr. Paulson."

185.    Then, on December 17, 2008, Lewis, on Herlihy's recommendation, called Mr. Paulson to inform him that, given the amount of losses and write-downs at Merrill, BofA lacked the capital to close the Merger.  Lewis informed Mr. Paulson for the first time that the BofA Defendants were "strongly considering" invoking the MAC to terminate the Merger, on the grounds that Merrill Lynch had suffered a "Material Adverse Effect."

186.    Mr. Paulson summoned Defendant Lewis to the Federal Reserve for a meeting that very evening.  Defendants Lewis, Price, and Moynihan flew to Washington for the meeting, which was also attended by Messrs. Paulson, Bernanke, and others.  Defendants Lewis and Price began the meeting by informing the participants of Merrill's projected losses.  Messrs. Bernanke and Paulson implored Lewis not to invoke the MAC clause to terminate the Merger, even venturing the unsolicited opinion that any attempt to do so would be legally infirm.  Messrs. Bernanke and Paulson also claimed that, if the deal were terminated, it would reflect poorly on Defendant Lewis and the BofA Director Defendants and suggest that they had not done adequate due diligence of Merrill.

187.    Thereafter, between December 17 and December 21, Defendant Lewis and other BofA Defendants participated in telephone conferences with Treasury and Fed officials, including Messrs. Paulson and Bernanke.  During these meetings, Lewis and the other BofA Defendants were repeatedly urged not to invoke the MAC clause on various grounds, including that it wouldn't work, it would be bad for the economy, and it would be bad for their reputations.  Defendants Price and

Brinkley were unambiguous in their steadfast opinion, as memorialized in an e-mail by one Fed official, that the MAC clause should have been invoked at the time:

> Spoke with Joe and Amy finally about 30 minutes ago. They still feel comfortable that they would [win any] MAC lawsuit. Also feel they have good liquidity (300 billion at window). Also feel that while it will have very broad market implications that the equity markets will react positively to them (not sure I totally agree). They said they want the transaction to go through but have to protect their shareholders and that is why they contacted us . . . .

188.   Meanwhile, Merrill Lynch's condition continued to deteriorate. By December 21, 2008, the BofA Board determined that going through with the Merger would jeopardize BofA's existence as a going concern and that—despite the urgings of Fed officials—*it was in the Company's best interests to invoke the MAC clause and terminate the Merger.* Accordingly, on that day, Defendant Lewis reached Mr. Paulson by telephone to inform of the Board's decision. According to Defendant Lewis, Mr. Paulson then told Defendant Lewis that, if BofA invoked the MAC clause, he, Mr. Paulson, would remove BofA's management and Board from their offices.[8]

189.   To further induce Defendant Lewis and the BofA Board to preserve their lucrative positions and abandon their shareholders' interests in favor of their own, Mr. Paulson also told Defendant Lewis that, if the BofA Defendants caused BofA to go through with the Merger, the federal government would provide an additional cash infusion, through the government's purchase of shares of BofA preferred stock, and a guarantee against the losses which BofA would suffer in acquiring Merrill. As known to Defendants, however, the proposed purchase of additional shares by the federal government would necessarily have a dilutive effect on existing BofA shareholders and

---

[8] Mr. Paulson later testified to the New York Attorney General that if he made a threat to remove the Board, it was at the request of Fed Chairman Bernanke. Bernanke, in testimony before the House Committee, denied this, stating, "I did not tell Bank of America's management that the Federal Reserve would take action against the Board or management." A spokesman for Paulson later said that Paulson's admonitions to Lewis were "his own" and not made at the behest of Bernanke.

cause them harm thereby, as Defendant Lewis later admitted in his testimony to the New York Attorney General.

190.    In their telephone call, Mr. Paulson further pressured Defendant Lewis to act deceptively and in bad faith and to continue to violate the BofA Defendants' duty of candor to shareholders, and not to make any disclosure of their conversation—including the government's proposal to make a cash infusion.  Mr. Paulson indicated to Defendant Lewis that, because BofA's fourth-quarter earnings were not set to be announced until January 20, 2009, the terms of the government's cash infusion could be worked out well ahead of that date, with no disclosure to shareholders or the public before that required disclosure, or the Closing on January 1, 2009.

191.    Defendant Lewis did not give a definite response to Mr. Paulson, stating only "Hank, let's deescalate this for a while.  Let me talk to our Board."  Lewis called a Board meeting for 4:00 p.m. the next day, December 22, 2008, to report on his conversation with Mr. Paulson and obtain the Board's complicity in yielding to Mr. Paulson's inducements and threats.

192.    At no time before the Merger closed did the BofA Defendants make disclosure to BofA shareholders of any of the above highly material information.

**H.    The BofA Defendants, in Yet Further Acts of Disloyalty and Bad Faith, Retract Their Decision to Declare a "Material Adverse Event" in the Face of Purported Threats to their Offices and Positions by Treasury Secretary Paulson and Withhold These Developments, Too, from Shareholders.**

193.    Even before he hung up the telephone with Mr. Paulson on December 21, 2008, Defendant Lewis had determined to cause BofA to capitulate to Mr. Paulson's threat.  Throughout the evening, Defendant Lewis canvassed fellow Board members informally to determine whether the Board would opt to preserve their jobs and support management's recommendation not to invoke the MAC solely on the basis of Mr. Paulson's inducements and promises.  Defendant Lewis also had a

series of telephone calls with Fed and Treasury officials in which he assured them that BofA would play along with Mr. Paulson's desires.

194.    As evidence that Defendant Lewis and the Board decided to act deceptively to preserve their own lucrative positions, and in bad faith, failed to invoke the MAC clause, the next morning, a senior Fed official close to both Mr. Paulson and Mr. Bernanke, Arthur Angulo, memorialized the events as follows:

> *Yesterday [December 21, 2008], Ken Lewis gave separate assurances to Sec. Paulson and Chm. Bernanke that BAC will consummate the acquisition of MER as planned on 1/1/09.*  HMP and BSB will speak together with Lewis today, and they will express their commitment to work with BAC to come up with the "right response" to BAC's situation.  The timeframe for doing so is before 1/20/09, which is when BAC is tentatively scheduled to publicly release its 4Q 2008 earnings. [Emphasis added.]

195.    Moreover, even before the Board meeting on December 22, 2008, Defendant Lewis telephoned Mr. Bernanke directly to report that the BofA Board would breach their duties of loyalty, good faith, and candor and acquiesce to the demand to proceed with the Merger.  Mr. Bernanke documented the conversation in an e-mail to Scott Alvarez, the Fed's general counsel, as well as other Fed officials: "Had a good conversation with Lewis just now.  He confirms his willingness to drop the MAC and to work with the government to develop whatever support package might be needed for earnings announcement dates around Jan. 20."

196.    The Board meeting on December 22, 2008 was attended by Director Defendants Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lewis, Massey, May, Ryan, Sloan, Tillman, Lozano, and Spangler.  Also present were defendants Curl, Moynihan, Banks, Alphin, and Price.  At the meeting, Lewis formally sought the Board's concurrence with management's decision not to invoke the MAC clause.  Lewis had been able to reach "most" of the Board members before the meeting, and they had indicated their support for Lewis's plan to give in to Mr. Paulson's demand.

There was no dissent from this consensus view at the meeting itself. Thus, the Board, having already determined that BofA's best interests lay in *invoking* the MAC clause, now determined—*based solely on Mr. Paulson's threat to remove them from office—not to do so*. As Lewis later testified to the New York Attorney General: "*Until we had that heated—I guess you would call it—from Paulson, we were still in the mode that the MAC was the best . . . .*" (Emphasis added.)

197.    Following the Board meeting, Defendant Lewis telephoned Mr. Paulson again to report on the Board's action and his conversation with Mr. Bernanke. Defendant Lewis also belatedly asked Mr. Paulson whether BofA could have the federal government's promise of assistance put into writing. Mr. Paulson refused, on the grounds that doing so would require public disclosure. The BofA Board, by then committed to its deceptive and self-serving scheme, again acquiesced in not disclosing these events.

198.    Defendant Lewis did not persist on this point. Instead, Defendant Lewis sent an e-mail to the Board and various BofA officers stating: "I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure *which, of course, we do not want*." (Emphasis added.)

199.    One point on which Lewis did persist was seeking to enlist the government's help in protecting himself from being held accountable to shareholders for his actions. In their telephone call before the December 22 Board meeting, Lewis told Bernanke that (as set forth in an e-mail from Mr. Bernanke to Mr. Alvarez) "he [Lewis] now fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at ML. . . . [H]e still asked whether he could use as a defense that the govt ordered him to proceed for systemic reasons. I said no." Mr. Alvarez also told Mr. Bernanke that it was neither "necessary [n]or appropriate" to give Lewis a letter purporting to mitigate his or the Board's responsibility for not invoking the MAC clause, or for not disclosing that

the Board had considered invoking the MAC clause but had decided not to based on Mr. Paulson's threat.

200.   In his response, however, Mr. Alvarez did specifically note that Defendant Lewis, and by implication, others at BofA, faced legal consequences if they did not, in fact, make adequate disclosures to shareholders regarding Merrill's deteriorating condition.  As evidence of this, Mr. Alvarez wrote:

> A different question that ***doesn't seem to be the one Lewis is focused on is related to disclosure.  Management may be exposed if it doesn't properly disclose information that is material to investors.***  There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial records. ***Lewis should be able to comply with all those reporting and certification requirements while also completing this deal.***  His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the ML losses when BA made its disclosures to get the shareholder vote on the ML deal in early December.  I'm sure his lawyers were much involved in that set of disclosures and Lewis was clear to us that he didn't hear about the increase in losses till recently. [Emphases added.]

201.   Following Mr. Paulson's purported threat on December 21, 2008, and the Board's acquiescence on December 22, 2008, discussions between BofA and the government turned to the terms of the promised governmental assistance to BofA.  Thus, another Board meeting was held on December 30, 2008.  At that meeting, the Board chiefly concerned itself with the timing, amounts, and documentation of the governmental assistance to be received.  The Board determined not to require written documentation from the government prior to the Closing on January 1, 2009—***and not to make any disclosure to BofA shareholders***.  Indeed, in determining not to require written documentation prior to Closing, the Board expressly credited Defendant Lewis's explanation (based on his conversation with Paulson) "that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, ***which formal action would require public disclosure***."  (Emphasis added.)

202.    The December 30 Board meeting minutes further reflect that the Board was specifically trying to conceal its disclosure of Merrill Lynch's losses until the announcement of BofA's fourth-quarter earnings in January, and until they received additional TARP funds.  As set forth in the meeting minutes, "Mr. Lewis concluded his remarks by stating that management will continue to work with federal regulators to transform the principles that have been discussed into an appropriately documented commitment to be codified and implemented in conjunction with the Corporation's earning release on January 20, 2009."

203.    Thereafter, without disclosing the need for additional capital or their capitulation in not invoking the MAC to save their positions, the BofA Defendants caused BofA to issue a press release on January 1, 2009, announcing the closing of the Merger.  This release said nothing about the grave losses at Merrill, BofA's inability to close without governmental assistance, the Board's decision to invoke the MAC clause, the negotiations with the government over assistance, the Board's retraction of its decision, and the purported threats to remove the Board and management. Nor had any aspect of the deal been renegotiated.

**I.      Liability of BofA Defendants for the Above Misconduct.**

204.    It was not until January 16, 2009, when the BofA Defendants caused BofA to pre-announce its fourth quarter earnings, that shareholders began to learn the truth about all of these events.  However, in acceding to Mr. Paulson's threat, the BofA Defendants deliberately and continuously withheld crucial information from shareholders, in breach of their duties of care, candor, loyalty, and good faith, and in violation of the federal securities laws.

205.    Despite the fact that BofA had determined that Merrill Lynch's financial condition was so grave that it justified termination of the Merger pursuant to the MAC clause, at no time prior to the Closing did the BofA Defendants publicly disclose Merrill Lynch's devastating losses or the

impact it would have on BofA.  Nor did these defendants disclose that the Board had decided to invoke the MAC clause and would have done so but for their self-interested capitulation to Mr. Paulson's threat to try to get them removed from office if they had.  Nor did these defendants disclose that the Board had determined to seek and obtain $138 billion in additional federal TARP money to allow BofA to close the Merger.  Yet, if Merrill's losses (which Lewis deemed "staggering") were grave enough to cause Lewis and the Board to decide to terminate the Merger, then obviously those losses were material to shareholders.

206.    To the contrary, ***withholding information*** was expressly treated as one of the key ***goals*** of the process, and was expressly used to justify proceeding as Mr. Paulson wished even in the absence of written documentation of Mr. Paulson's promises.  The BofA Defendants thus not only ***failed*** to observe their duties of complete candor and transparency, they ***deliberately, knowingly, recklessly, and with gross negligence acted consistently to disregard them, acting in bad faith to promote their own self-interest and then to cover up these facts***.

207.    In his testimony to the New York Attorney General in April 2009, Defendant Lewis belatedly attempted to justify his and the Board's bad-faith misconduct by suggesting that the question of disclosure was not up to anyone at BofA and that the decision not to disclose was based on direction from Paulson and Bernanke:  "I was instructed that 'We do not want a public disclosure.'"  Paulson, however, has testified to the House Committee on Oversight and Government Reform that his discussions with Lewis regarding disclosure concerned the ***Treasury Department's public disclosures, not BofA's***.  Moreover, Lewis clarified in his own testimony to the House Committee in June 2009 that "[n]either Secretary Paulson nor the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something that we publicly—that we felt should be publicly disclosed."  In equally clear terms, Lewis told the House Committee:  "[d]uring all of that

time there was never, ever a time that the Federal Reserve or the Treasury Department told me that we should not disclose something that we thought would be a disclosable event." Similarly, in response to a question from Rep. Elijah Cummings as to whether Mr. Bernanke had ever advised Lewis against disclosure, Lewis testified: "No, sir. Well, the—he never said we should not disclose anything that was disclosable. *That would be our decision*, and I never heard from him on the issue of us not disclosing anything. (Emphasis added.)

208.   Bernanke, in his testimony to the House Committee, similarly stated:

> *As I wrote in a letter to this Committee, neither I nor any member of the Federal Reserve ever directed, instructed, or advised Bank of America to withhold from public disclosure any information relating to Merrill Lynch, including its losses, compensation packages or bonuses, or any other related matter.* These disclosure obligations belong squarely with the company, and the Federal Reserve did not interfere in the company's disclosure decisions.
>
> The Federal Reserve had a legitimate interest in knowing when Bank of America or Merrill Lynch intended to disclose the losses at Merrill Lynch. Given the fragility of the financial markets at that time, we were concerned about the potential for a strong, adverse market reaction to the reports of significant losses at Merrill Lynch. If federal assistance to stabilize these companies were to be effective, the necessary facilities would have to be in place as of the disclosure date. Thus, our planning was importantly influenced by the companies' planned disclosure schedule. *But the decisions and responsibilities regarding public disclosure always remained, as it should, with the companies themselves.* [Emphases added.]

209.   Thus, instead of determining to stop the Merger, renegotiate its price (perhaps using the MAC clause as leverage)—or, at the very least, inform shareholders of Merrill's devastating losses and seek a new shareholder vote—the BofA Defendants forged ahead with their intentional, reckless, or grossly negligent breach of their duties of care, loyalty, good faith, and candor and failed to express a word of any concern to shareholders. Asked why the BofA Defendants had chosen this course of action, Lewis later commented that "we did think we were doing the right thing for the country." The mantle of patriotism, however, does not obviate the fact that BofA shareholders were

never informed of the proposed course of action, which was theirs to approve when approving the

Merger.

210.     According to William D. Cohan, in "The Final Days of Merrill Lynch," *Atlantic*,

September 2009:

> Lewis **"had an easy out before the shareholder vote," a senior Wall Street mergers-and-acquisitions banker, who was also trained as a Wall Street lawyer, told me.** "**He could easily have disclosed to shareholders** that 'We have done two months of due diligence now, and look at the 600 things we've found.'  I've always wondered how could it be that they did not disclose to the world what they knew before December 5."
>
> . . .  "**He committed classic securities fraud**," the senior Wall Street mergers banker says flatly.  "**He had a material knowledge of a material event in the middle of a shareholder vote.**"
>
> *   *   *   *
>
> One senior Wall Street executive, upon learning of Lewis's actions, was incredulous. "There is no question what I would have done if I were in his shoes," he told me.  "***I would have told [Bernanke and Paulson] I was calling the MAC, was releasing the decision publicly, and dared them to fire me and the board—and that never would have happened, trust me***."  Even a former Merrill Lynch executive, who was involved in the sale of the company to Bank of America and was familiar with the MAC language in the contract, said **Lewis should have used Merrill's fourth-quarter losses and the threat of calling a MAC as leverage to renegotiate downward the absurd price of the Merrill deal**.  "He could have used the MAC clause a pretext to renegotiate the deal," he said.  "That would have been a prudent thing to do."  [Emphases added.]

211.     Similarly, James Cox, a professor of corporate and securities law at Duke University,

has opined that it was "highly likely" that the $2 billion increase in Merrill's projected losses that

occurred on December 3, 2008, and was shared with Lewis, "would be material, but it is even more

likely to be material if this was indicative of conditions at Merrill that were deteriorating"—as, in

fact, was the case.

212.     Similarly, as noted by Jonathan Macey, Yale Law School deputy dean and Sam

Harris Professor of Corporate Law (*Deal Journal*, April 23, 2009):

Whatever [Defendant Lewis] was told by [Bernanke and Paulson] should not or does not in any shape or form get him off the hook. . . . Regulators are supposed to tell you to obey the law, not to disobey the law. *If you're the CEO, your first responsibility is not to your regulator, it's to your institution and shareholders.* . . . [Defendant Lewis] is the CEO of this massive company. He's not a clerk. *He's supposed to be able to stand up for the people whose interest he's hired to protect. He's basically saying that Bernanke's and Paulson's short-term political interests are more important than my shareholders.*

213.    Ironically, in the end, not even all of Mr. Paulson's staff thought that going through with the Merger was in BofA's best interests. Indeed, on December 21, 2008, one Federal Reserve official, Adam Ashcraft, wrote in an e-mail to several colleagues working on the issue: "*I think it is equally possible that the market looks at Merrill's 2008 q4 earnings release and sees BOA making a smart move by walking away from a black hole into which large amounts of time, effort, and money would have been going, potentially overwhelming the firm and inviting further dilution through future capital injections.*" (Emphasis added.)

**J.    In an Act of Corporate Waste, and in Further Breach of Their Duties of Loyalty and Good Faith, the BofA Defendants Secretly Allow the Merrill Defendants to Pay Themselves $3.6 Billion in Bonuses Before the Merger Closes.**

214.    Before the Merger with BofA closed on January 1, 2009, the Merrill Defendants— with the approval of the BofA Defendants—paid themselves and fellow Merrill executives $3.6 billion in bonuses. These bonuses were paid well ahead of Merrill's disastrous earnings announcement for the fourth quarter—and further lowered the value of what BofA was acquiring in the Merger at an unconscionable and grossly unfair price. The bonuses were specifically approved by the BofA Defendants and, in fact, had been at the top of the list of key deal terms when the Merger was negotiated on September 13-14, 2008. Moreover, as set forth above, the fact and scope of the bonuses were entirely *omitted* in BofA's disclosures to shareholders seeking their approval of the Merger.

215.     Pursuant to longstanding company policy, Merrill paid year-end bonuses to its executives and employees pursuant to its VICP only in late January or early February of the following year.  That policy was secretly abandoned in 2008 so that Merrill executives could receive their bonuses prior to the Merger's close.

216.     Indeed, shortly after announcing the Merger, defendants Kraus, Stingi, and Ross began putting together an accelerated VCIP bonus schedule for 2008.  By the end of September 2008, these defendants had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses.  The Compensation Committee of the Merrill Board was scheduled to approve the final bonus pool in early December, more than three weeks *before* the end of the year for which the bonuses were to be paid and *before* the closing of the Merger.

217.     On November 11, 2008, defendants Thain, Stingi, Ross, and other Merrill Defendants held a conference call with the Merrill Compensation Committee.  During the call, Thain recommended that the Committee adopt the accelerated schedule, which contemplated approving the bonus pool on December 8, 2008, informing employees about their bonuses on December 22, 2008, and paying the cash awards on December 31, 2008.  Stock awards were to be made in early 2009, after the anticipated closing of the Merger.

218.     Merrill's Compensation Committee approved the accelerated schedule, and on the following day, November 12, 2008, Thain informed defendant Alphin at BofA of the bonus schedule, who then informed other BofA Defendants.

219.     Throughout the fall of 2008, the size of Merrill's proposed bonus pool was gradually reduced due to various factors, as were the bonuses planned for Merrill's top five executives.  By late November, Merrill's VCIP bonus pool was reduced to approximately $3.6 billion, with an expected current expense of $3 billion.  Incredibly, concerned that BofA might not have enough

stock to satisfy Merrill's stock awards, the BofA Defendants asked their counterparts at Merrill to pay 70 percent of the bonuses in cash and 30 percent in stock, instead of the 60-40 cash-stock split set forth in the Merger Agreement.  The Merrill Defendants complied with the request, increasing the recorded current period expense of the bonuses to $3.2 billion.

220.    The shareholder meetings for BofA and Merrill took place, as scheduled, on December 5, 2008.  The shareholders of both companies voted to approve the Merger.  The BofA Defendants did not make any disclosures to their shareholders prior to the shareholder meetings concerning Defendants' agreements that Merrill could pay up to $5.8 billion, or the revised plans to pay $3.6 billion, in discretionary year-end bonuses before the Merger closed.[9]

221.    On December 8, 2008, Merrill's Compensation Committee, headed by defendant Finnegan, approved a final VCIP pool of $3.6 billion.  Of this amount, only $700 million was for bonuses that had been contractually guaranteed earlier in 2008; the rest—$2.9 billion—was entirely discretionary.

222.    Merrill's employees were notified about their 2008 VCIP bonus on December 19, 2008, and received cash payments on December 31, 2008—*one day before the Merger closed*. VICP stock awards were made to Merrill employees in early 2009.

223.    The top four bonus recipients received $121 million.  One of these was defendant Thomas Montag, who also had been given a contract worth $39 million when he moved to Merrill from Goldman Sachs earlier in 2008.  Another was defendant Peter S. Kraus, who, in addition, had received $25 million just to join Merrill.  All told, 20 Merrill executives were paid more than $8 million apiece.  A total of 53 executives received more than $5 million each.  Nearly 700 executives,

---

[9] In fact, this was contrary to the disclosures regarding the payment of any bonuses to Merrill employees.

in total, received $1 million or more.  All of these bonuses were paid despite Merrill's losses of over $27 billion for 2008.

224.     The planned payment of the bonuses were known to Lewis, Price, Alphin, and other BofA Defendants, including the members of the Compensation Committee of BofA's Board of Directors, and were specifically approved by those defendants, who deceptively acted to cover up these bonuses and also took no steps to stop them or recalculate them, even as BofA was deep into discussions with the government over what TARP monetary and other assistance BofA could receive in exchange for going through with the Merger despite Merrill's devastated condition.

225.     The New York Office of Attorney General has commenced an investigation into the Merrill Defendants' payment of bonuses.  A similar investigation was commenced by the Attorney General of North Carolina, who is also investigating BofA's payment to its own executives of bonuses for 2008.  In addition, the Committee on Financial Services of the United States House of Representatives, led by Senator Barney Frank of Massachusetts, held hearings on the bonuses.

226.     On August 3, 2009, the SEC filed a complaint in the United States District Court for the Southern District of New York against BofA under Section 14(a).  *See SEC v. Bank of America Corporation*, No. 09 Civ. 6829 (S.D.N.Y. filed Aug. 3, 2009).  Simultaneously with the filing of that complaint, the SEC also purported to settle the complaint, with BofA agreeing to pay a $33 million penalty and consented to the entry of an injunction permanently enjoining the Company from committing Section 14(a) violations.  The SEC did not initially file charges against any individual defendant at BofA.

227.     The SEC action was assigned to the Honorable Jed S. Rakoff.  When the settlement was presented to the Court for approval on August 10, 2009, the Court ***refused to approve it***.  Among other reasons, Judge Rakoff questioned the propriety of not bringing charges against any

individual defendants, thus requiring BofA to satisfy the amount of any penalty and thereby *further* injuring shareholders who already had suffered as result of the misstatements at issue.  In addition, Judge Rakoff questioned the amount of the penalty, $33 million, compared to the amount of the omitted bonus payments, $5.8 billion.  Finally, Judge Rakoff questioned why BofA should be willing to agree to any penalty if, as its lawyers claimed, BofA made no misstatements in the Proxy Statement—and why, if key BofA decision makers allegedly relied entirely on the advice of counsel in not disclosing the bonuses, BofA was trying to assert the attorney-client privilege with respect to the advice it did receive.  Judge Rakoff ordered additional briefing by both the SEC and BofA.

228.    In the SEC proceedings, both BofA and the SEC have represented to the Court that the disclosures in the Proxy Statement concerning bonuses were prepared entirely by the law firms— Wachtell and Shearman, respectively—that advised BofA and Merrill in the Merger.  In particular, the decision to set forth the actual size of the allowed bonuses in a "disclosure schedule" to the Proxy Statement (a "schedule" that was never disseminated to shareholders) allegedly was made by lawyers at Wachtell and Shearman and Defendants Mayopolous and Brenner at BofA.

229.    After reviewing the parties' additional submissions, Judge Rakoff, on September 14, 2009, denied the proposed settlement and instructed the parties to proceed to litigation and be ready for trial in the spring of 2010.  The Court rejected the settlement on the basis of the fact that it proposed to rectify the wrongdoing of BofA's management in concealing the bonuses by having "the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct," rather than being paid by individual wrongdoers.  The Court also refused to credit the SEC's claim it would have been impossible to charge the individual wrongdoers, given that "lawyers drafted the documents at issue and made the relevant decisions concerning disclosure":

But if that is the case, ***why are the penalties not then sought from the lawyers?*** And ***why, in any event, does that justify imposing penalties on the victims of the lie, the shareholders?***

\*   \*   \*   \*

Moreover, it is noteworthy that, in all its voluminous papers protesting its innocence, Bank of America never actually provides the Court with the particularized facts that the Court requested, such as precisely how the proxy statement came to be prepared, exactly who made the relevant decisions as to what to include and not include so far as the Merrill bonuses were concerned, etc.

\*   \*   \*   \*

Overall, . . . ***the parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry***—all at the expense of the sole alleged victims, the shareholders. Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

***Nor is the proposed Consent Judgment reasonable. . . .***

For example, the Consent Judgment would effectively close the case without the S.E.C. adequately accounting for why, in contravention of its own policy, . . . it did not pursue charges against either Bank management or the lawyers who allegedly were responsible for the false and misleading proxy statements. The S.E.C. says this is because charges against individuals for making false proxy statements require, at a minimum, proof that they participated in the making of the false statements knowing the statements were false or recklessly disregarding the high probability the statements were false. But ***how can such knowledge be lacking when, as the complaint in effect alleges, executives at the Bank expressly approved Merrill's making year-end bonuses before they issued the proxy statement denying such approval? The S.E.C. states, as noted, that culpable intent was nonetheless lacking because the lawyers made all the relevant decisions. But, if so, then how can the lawyers be said to lack intent?*** [Footnote omitted.] [Emphases added.]

230.   The SEC has indicated that it will not appeal the Court's decision and that, instead, it will "vigorously pursue" charges against BofA—including possibly bringing charges against individual officers or directors of the Company. In addition, the Commission stated that it will use the discovery available in the proceedings possibly to broaden its case against BofA beyond misstatements relating to the Merrill bonuses.

## II.   THE PROXY STATEMENT AND SUPPLEMENTARY STATEMENTS BY DEFENDANTS CONTAIN FALSE AND MISLEADING STATEMENTS IN VIOLATION OF SECTION 14(A) AND IN BREACH OF THE BofA DEFENDANTS' DUTIES OF CANDOR, LOYALTY, AND GOOD FAITH.

231.   The Proxy Statement (including the SEC filings and other documents incorporated by reference therein), as well as Proxy Supplements and other supplementary statements by Defendants, contained material misstatements and omissions in violation of the federal securities laws and in violation of the BofA Defendants' duty of candor and other fiduciary duties to shareholders, the effect of which was to harm the Company *and* to deprive each shareholder who voted on the Merger of the right to cast an informed vote.

### A.   False and Misleading Statements and Omissions in the Proxy Statement.

232.   Among other material misrepresentations and omissions were the following:

(a)   Defendants caused the Proxy Statement to significantly overvalue Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true, downward-spiraling financial condition from BofA shareholders.  At the time the Proxy Statement was filed on November 3, 2008, information concerning Merrill's $7 billion in losses so far in the fourth quarter (a highly material amount) were known or readily available to Defendants.

(b)   Defendants caused the Proxy Statement not to disclose that the "fairness" opinions provided by the Advisor Defendants were based on inadequate information and were not actual opinions as to the Merger's fairness at all, but rather ad hoc constructs prepared purely to enable the BofA Defendants to claim legitimacy for a predetermined course of action in furtherance of their own personal agendas at the expense of BofA and its shareholders;

(c)   While Defendants caused the Proxy Statement to purport to identify twelve "Risk Factors" from the Merger, none of these purported "Risk Factors" disclosed the known

fact that Merrill's assets were too complex and illiquid to value with any degree of specificity in the time devoted to that task, or that there was a substantial risk that the true value of those assets was substantially less than the stated value, impairing the value of the Merger to BofA shareholders;

(d)    Defendants caused the Proxy Statement to misrepresent that Merrill continued to "reduce exposures and de-leverage the balance sheet," thereby creating and/or reinforcing the false impression that Merrill's losses were within expectations and that Merrill was operating according to plan at the time, when in fact Merrill was experiencing over $10 billion in new losses which *worsened* its exposures, leverage, and liquidity;

(e)    Defendants caused the Proxy Statement to omit to disclose that Merrill's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse event, and that management had received advice from Company legal counsel that the circumstances justifying terminating the Merger on that basis.

(f)    The Proxy Statement, while touting Merrill's favorable "prospects" as a material factor justifying the BofA Defendants' recommendation, was caused by Defendants to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008—amounts which were projected starting no later than November 2008 to reach $9 billion (after taxes), or nearly *double the losses Merrill reported for the third quarter of 2008*, and which continued to increase later in the quarter.

(g)    Defendants caused the Proxy Statement to misrepresent Merrill's ability pay up to $5.8 billion in discretionary bonuses.  Specifically, Defendants caused the statements therein to constitute a misrepresentation that, under the terms of the Merger Agreement,

Merrill was only permitted to make "required" payments to its employees, such as salary and benefits, and was prohibited from paying discretionary year-end bonuses when, in fact, BofA had expressly authorized Merrill, as set forth in an *undisclosed* schedule, to pay up to $5.8 billion in discretionary year-end bonuses—a fact that a shareholder could not have known from reading the Proxy Statement or any other public source;

(h)   Defendants caused the Proxy Statement to falsely imply that BofA had not given its written consent to the payment of discretionary year-end bonuses at Merrill—which the Proxy Statement indicated "*will* not be unreasonably withheld or delayed" (emphasis added)—when, in fact, by the time the Proxy Statement was prepared and distributed to shareholders by Defendants, BofA *already* had given its written consent, as set forth in the undisclosed schedule, that Merrill could pay up to $5.8 billion in discretionary bonuses;

(i)   Defendants caused the Proxy Statement to omit that the $5.8 billion in discretionary bonuses that BofA authorized Merrill to pay constituted approximately 12 percent of the $50 billion price that BofA had agreed to pay to acquire Merrill, nearly 30 percent of Merrill's total shareholder equity, and over eight percent of Merrill's total cash and cash equivalents on hand as of December 31, 2008, and thus were highly material;

(j)   The Proxy Statement, in incorporating Merrill's 2008 Proxy Statement, was caused by Defendants to make additional false and misleading statements with respect to the Merrill bonuses.  Specifically, whereas Merrill's 2008 Proxy stated that Merrill's bonuses were "paid in January for performance in the prior fiscal year," designed to link pay and performance so as to align employees' interests with shareholders', designed to provide a "strong incentive" to increase performance and enhance shareholder returns, and focused on "the performance of the Company as a whole," these statements were rendered false by the

Defendants' secret agreement to pay $5.8 billion in discretionary bonuses on an accelerated schedule regardless of Merrill's actual results in the remainder of 2008;

(k)     Defendants caused the Proxy Statement to state that the BofA Defendants' recommendation was based primarily on the "fairness" opinions received by FPK and J.C. Flowers (which opinions, in turn, were materially based on financial records and meetings with Merrill management concerning the "business, operations, and prospects" of Merrill) but caused it to omit information about the magnitude and impact of losses being incurred by Merrill during the fourth quarter of 2008 set forth herein.

(*l*)     The Proxy Statement was never updated to update or correct Defendants' statement that BofA would not need CPP funds to complete the Merger based on Merrill's and BofA's growing third and fourth quarter losses, which were already approximately $15.3 billion by the end of October and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

233.     In addition to the other material misstatements and omissions in the Proxy Statement, in violation of federal securities laws as well as the BofA Defendants' duty of complete candor in the context of a shareholder vote, Defendants also failed to update the Proxy Statement prior to the Shareholder Vote.  In fact, despite the fact that BofA shareholders did not vote on the Merger until December 5, 2008, *over two-thirds of the way into the fourth quarter*, the Proxy Statement was not updated, corrected, amended, or supplemented by Defendants with any information concerning:

(a)     Actual losses, impairments, and write-downs being incurred by Merrill during the fourth quarter of 2008, or the risk that such losses would materially affect the value of the deal to BofA if the Merger were consummated, including the fact that by the end of

November, Merrill's losses had increased to $15.3 billion (pretax) thus far in the fourth quarter—a highly material amount;

(b)     The Proxy Statement's (and Merger Agreement's, which was attached as an exhibit to the Proxy Statement) statement that there was an "absence of material adverse changes" in Merrill's financial condition—a representation that became diametrically opposite to the truth with each passing day;

(c)     The Proxy Statement's statements that no "material adverse change" had occurred in BofA's financial condition, that BofA was in a "strong capital position, funding capabilities and liquidity," and that the **combined** BofA-Merrill would have a "strong capital position, funding capabilities and liquidity:; these statements also became diametrically untrue over time given the accumulating losses at Merrill, given the fact that BofA was projecting its own quarterly loss of at least $1.4 billion by the end of November 2008—and given the fact that BofA required, and in fact Defendants had obtained, the promise of additional funding in the amount of $20 billion (as well as $118 million in financial "guarantees") from the federal government specifically to complete the Merger;

(c)     the fact that the losses at Merrill were so grave that the BofA Defendants determined that it was in BofA's best interests to invoke the MAC clause and rescind the Merger Agreement, that this determination was shared with government officials, including Secretary of Treasury Paulson and Fed Chairman Bernanke, and that the BofA Defendants did not invoke the MAC clause **solely** because of the Mr. Paulson's threat to replace Defendant Lewis, the Board, and senior management if they tried to protect the Company's

and shareholders' interests—a threat also not disclosed to shareholders and one of dubious factual and legal basis;[10] or

> (d)      the fact that, in exchange for the government guarantee, BofA was required to issue an additional $4 billion in preferred stock to the Treasury and forego all future dividend payments in excess of $.01 per share per quarter for three years without government consent, which further diluted BofA's shareholders and eliminated that part of the value of their shares derived from expected dividends.

**B.      False and Misleading Supplementary Statements.**

234.      The Proxy Statement was rendered further false and misleading, in violation of the federal securities laws and/or the fiduciary duty of complete candor, by the BofA Defendants and the Merrill Defendants in their public statements communicated to shareholders after the deal was announced and before the Shareholder Vote.  For example, at a press conference on September 15, 2008, the day the Merger was announced, Defendant Lewis was asked about BofA's due diligence on the acquisition, given that it was completed over a single weekend.  Fielding the question for Defendant Lewis, Defendant Price, BofA's CFO, replied with lavish assurances that the BofA Defendants had done their homework:

> *We have had a tremendous amount of historical knowledge, both as a competitor with Merrill Lynch, but also have reviewed and analyzed the company over the years.*
>
> As Ken [Lewis] referenced, we did have an adviser several among them, *JC Flowers with pretty extensive knowledge of the company.* And while none of us like *the market turmoil we have been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset*

---

[10] Defendant Lewis, for example, testified to the House Oversight Committee on June 11, 2009, that he did not think that the Secretary of the Treasury had the power to remove him or any other Board member from office.

*classes,* so it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic.

In addition, as you would expect, we deployed the team that we would ordinarily deploy in these types of situations, which had well over 45 people from our team on site as well as others off site, outside counsel, and the like. So collectively with that group *and quite frankly, the progress that Merrill Lynch had made in reducing the risk exposures such, and analyzing them and having all of that laid out,* given the efforts that the management team has made over the last period, made it possible for us. [Emphases added.]

235.    At the press conference, Lewis also bragged about not needing government funds for the Merger: "Well, first of all, I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private. But we have asked for no relief, no capital relief on this deal."

236.    Similarly, Defendant Lewis reassured investors about Merrill's overall viability, based on the review by J.C. Flowers:

*Chris [Flowers'] comment was "it's night and day from the time we first looked at it to now." He was very complimentary of what John [Thain] and his team had done in terms of dramatically reducing the marks, in many cases not only — not reducing the marks but getting rid of the assets, which is the best thing to do, so a much lower risk profile than he'd seen earlier on.* [Emphasis added.]

237.    On BofA's third-quarter earnings call with analysts, broadcast on October 6, 2008, just after BofA had raised $10 billion in the market, an analyst asked Defendants whether BofA would need more money to cover the Merrill acquisition. Defendant Price again assured analysts that it would not: "We have considered the Merrill deal in our [intentions] here so that the numbers we were talking about as I've mentioned in the prepared remarks covered our anticipated needs from a Merrill standpoint."

238.    All of these statements were false and misleading because neither the BofA Defendants nor the Advisor Defendants, including FPK and J.C. Flowers, had performed any kind of comprehensive analysis of BofA and, consequently, had no reasonable basis to make any positive

representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved.

### C.   False and Misleading Proxy *Supplements*.

239.     The BofA Defendants filed two Proxy Supplements—one on November 21, 2008 and the other on November 26, 2008—that purported to update the Proxy Statement and provide further material information to shareholders concerning the Merger.  In actuality, however, these Proxy Supplements further misled shareholders—both by omitting to disclose the highly material information that had emerged since September 15, 2008 and discussed herein *and by making new affirmative misrepresentations*.  Specifically, the November 26, 2008 Proxy Supplement contained the following false and misleading statement made by Defendant Lewis:

> I usually don't comment on our stock price—it is investors' job to price our stock based on their appraisal of our performance and our prospects, and my job to lead the company.  But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how *Bank of America is positioned to ride out this severe economic storm*.

> Investors have deep concerns about how long and deep the recession will be, how high unemployment will go, when housing prices will stabilize and what will be the catalyst to bring us out of the recession.  On banks in particular, they are concerned, among other things, about whether financial institutions have enough capital. These factors are putting tremendous pressure on the markets in general, and financial stocks in particular.

> Given this environment, *Bank of America continues to be a strong, active player in the financial markets.  We are generating strong deposit growth and attracting new customer and client relationships throughout our company.  We continue to make loans to consumers and businesses to boost shareholder value* and to do what we can to support economic activity.

> *We are one of the most liquid banks in the world.  We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements and our own target.  In short, we believe we are one of the strongest and most stable major banks in the world.*

> I have gotten questions from associates and investors in recent weeks on two specific topics [including] the government capital injections into banks [TARP] . . . .

Regarding the federal capital injection, ***these were funds that we did not need and did not seek***.  At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, ***had more than adequate capital***.  We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.  [Emphases added.]

240.    These statements by Defendant Lewis were materially false and misleading because, at the time they were made, it was well known to Lewis and the BofA Defendants that Merrill's losses would be far north of $10 billion for the fourth quarter of 2008 and that BofA itself was projecting billion-dollar losses as a result, directly threatening its "strong capital position" and liquidity.  Moreover, in boasting that BofA "did not need and did not seek" federal TARP funds, Lewis misrepresented the scope of Merrill's and BofA's fourth quarter losses which were already approximately $15.3 billion by this time and which would require additional TARP funding for BofA to close the Merger and absorb Merrill.

## III.   AS THE TRUTH BELATEDLY EMERGES, BOFA'S MARKET CAPITALIZATION IS PUNISHED, DEFENDANTS ARE INVESTIGATED BY THE NYAG, SEC, FBI, DOJ, AND CONGRESS, AND THE BofA DEFENDANTS COMMIT STILL FURTHER ACTS DISLOYALTY AND BAD FAITH BY EVADING RESPONSIBILITY FOR THEIR ACTIONS AND EVEN TRYING TO SADDLE THE COMPANY WITH THE COST OF SEC PENALTIES.

### A.    The Truth Emerges Concerning Merrill's Devastation and Defendants' Wrongdoing.

241.    On January 14, 2009, after the stock market closed for the day, the *Wall Street Journal* reported that the BofA Defendants were near an agreement with federal officials that would provide BofA with massive financial assistance from the government, including an infusion of fresh capital and the "backstopping" of tens of billions of dollars in toxic assets to help it close the acquisition of Merrill.  The *Journal* further reported that the additional funding had been sought earlier in December by defendant Lewis under the CPP:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion committed federal rescue funds, said it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

242.    On January 15, 2009, multiple news services carried the story of an impending government bailout, or even nationalization, of BofA relating to its acquisition of Merrill. The *New York Times* reported that day that Defendant Lewis, no later than early December 2008, had specifically instructed BofA lawyers, including the Wachtell law firm and defendants Mayopoulos and Brenner, to explore BofA's ability to terminate the Merger under the MAC clause. In reaction to this and similar news reports, the BofA Defendants announced that they would move up their announcement of BofA's fourth quarter earnings to the next day. The price of BofA common stock plummeted 18 percent from $10.20 to $8.32 that day.

243.    On January 16, 2009, Defendants had caused BofA to disclose its disastrous fourth-quarter results. The Company had a net loss of $1.79 billion. Tucked into the press release was the news that Merrill had lost a staggering $15.3 billion in the fourth quarter. In the same press release was the first public announcement of the BofA Defendants' secret deal with Messrs. Paulson and Bernanke: BofA would be caused to obtain $20 billion aid from the federal government to help it absorb Merrill's toxic securities, and that the government would provide protection against losses on $118 billion in selected capital markets exposure. The results included at least $8.75 billion in additional write downs related to Merrill.

244.    The *Wall Street Journal* reported that day, in an article entitled "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level," that ***the current market value of the***

-98-

*combined BofA/Merrill was less than BofA's stand-alone market value prior to the announcement of the Merger, implying that the market viewed Merrill as having negative value.*

245.     The *Wall Street Journal* further reported:  "[t]he development angered some Bank of America shareholders who began to question why . . . Lewis didn't discover the problems prior to the Sept. 15 deal announcement.  Many also wanted to know why he didn't disclose the losses prior to the vote on the Merrill deal on Dec. 5 or before closing the deal on Jan. 1."  The article quoted Bradley Dorman, managing partner of White Rock Point Partners, an investment adviser which held 315,000 shares of BofA, as stating that:  "*Bank of America didn't do proper due diligence*."  (Emphasis added.)  The price of BofA common stock declined another 14 percent, from $8.32 to $7.18 that day.

246.     On January 17, 2009, an article entitled "Bank of America Goes on Offense: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry" in the *Wall Street Journal* quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group, as stating that Lewis "has very little credibility with the investor public right now."  Thereafter, on January 20, 2009, analysts opined that, based on the new information made available, BofA would need to raise at least $80 billion to restore its capital to adequate levels for a bank of its size and scope.  The price of BofA common stock again dropped, this time a whopping 29 percent, from $7.18 to $5.10 that day.

247.     All told, between January 14, 2009, and January 20, 2009, the price of BofA's stock declined from $10.20 to $5.10, a decline of a massive *50 percent in just three trading days*.  With 6 billion shares outstanding, this represented a loss in market capitalization of *$32.7 billion*.  The stock continued to plummet in succeeding weeks, falling to $3.14 per share on March 6, 2009—for a total loss in market capitalization of *$45.2 billion*.

248.    The harm to the Company and its shareholders from Defendants' misconduct has been, and remains, profound.  From the start, the decision to acquire Merrill with tens of billions of dollars of valuable BofA common stock was rash, not predicated upon proper due diligence, and profoundly wasteful.   On September 12, 2008, Lehman Brothers was one day away from bankruptcy—i.e., worthlessness.  At the time, it was widely recognized that Merrill—which had an equivalent exposure to toxic securities as Lehman Brothers—was not far behind.

249.    Warren Buffett, one of the world's most respected investors, ably summarized the folly of the BofA Defendants' decision to pay $50 billion for Merrill, in an address to a conference sponsored by *Fortune* and recounted in an article posted on that magazine's website on September 15, 2009:

> If the Merrill deal solved one imminent crisis for policymakers, it only intensified the criticism of Lewis as an empire builder who hurt shareholders by turning BofA into a risk-laden colossus.

> Buffett alluded to that view in his comments Tuesday.  As regulators pressured Wall Street leaders over the weekend of Sept. 13-14 to find a private sector solution for Lehman's insolvency, Lewis was rushing to cinch a takeover that would give him control of Merrill's top-notch wealth management and investment banking franchises.

> And even though it was understood that Merrill Lynch would have trouble surviving once Lehman went down, Buffett noted that ***Lewis seemed to have inexplicably adopted the view that price was no object.***

> ***"Why pay X for Merrill Sunday when you could have had it for pennies on Monday?" Buffett said. "When Lehman failed, Merrill would have gone about five seconds later."***   [Emphasis added.]

250.    Moreover, aside from the loss of $45.2 billion in shareholder wealth, the Company's acceptance of additional TARP money to complete the Merrill deal, in exchange for preferred shares, has further substantially diluted shareholders' equity—just as the absorption of Merrill's $27 billion in losses for 2008 has decimated the Company's capital base and shareholder equity. Moreover, the Company also has been required to absorb Merrill's liabilities in connection with its

subprime and ARS-related exposure, draining yet further billions of dollars unnecessarily from BofA.

251.    In addition, the Company has had to expend many hundreds of millions in attorneys' fees and lost productivity on the part of senior executives in defending multiple investigations concerning the Merger, not only by law enforcement agencies such as the New York Attorney General and the SEC, but also by the United States Congress—including the House Committee on Oversight and Government Reform, led by Rep. Dennis Kucinich and Rep. Edolphus Towns.

252.    The Merrill Merger was promised to shareholders as being immediately accretive to wealth and earnings.  For example, in BofA's press release on September 15, 2008, Defendant Lewis stated that "[a]cquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders. . . .  Together, our companies are ***more valuable*** because of the synergies of our businesses."  (Emphasis added.)

253.    Defendant Lewis himself, however, has admitted that the BofA Defendants' decision to proceed with the Merger ultimately harmed any shareholder with less than a two or three year time horizon.  Lewis testified to the New York Attorney General as follows:

> Q.    Wasn't Mr. Paulson, by his instruction, really asking Bank of America shareholders to take a good part of the hit of the Merrill losses?
>
> A.    What he was doing was trying to stem a financial disaster in the financial markets, from his perspective.
>
> Q.    From your perspective, wasn't that one of the effects of what he was doing?
>
> A.    Over the short term, yes, but we still thought we had an entity that filled two big strategic holes for us and over long term would still be an interest to the shareholders.
>
> Q.    What do you mean by "short-term"?
>
> A.    Two to three years.

### B.    The SEC, FBI, DOJ, New York Attorney General, and Congress Conduct Investigations of Defendants.

254.    Investigations against BofA and the BofA Defendants have been commenced by several law enforcements authorities, as well as various committees of the United States Congress.

255.    As noted above, the SEC filed civil proceedings against BofA on August 3, 2009. Although the Commission attempted simultaneously to enter into a settlement and consent decree with the Company, in exchange for a $33 million penalty, Judge Rakoff rejected the settlement and ordered the parties to trial.  The SEC has indicated that it will "vigorously pursue" the charges—including possibly bringing charges against individual officers and directors of BofA.

256.    The New York Attorney General, which has commenced its own investigation into the Merrill bonuses, intensified its law enforcement efforts in the wake of Judge Rakoff's questioning of the SEC settlement and BofA's attempt to invoke both the attorney-client privilege and the defense of reliance upon the advice of counsel.  On September 8, 2009, the Attorney General—before whom various BofA witnesses also had attempt to invoke both the attorney-client privilege and the reliance-of-counsel defense—sent a letter to counsel for BofA demanding that BofA waive the privilege in light of the proffered defense.

257.    In addition, the New York Attorney General stated that its investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers *failed to disclose material non-public information to its shareholders . . . .*"  (Emphasis added.)  These instances comprised: (a) Merrill's fourth-quarter 2008 losses, and the BofA Defendants' discussion of whether to invoke the MAC clause, before the Shareholder Vote on the Merger; (b) failure to disclose a goodwill write-down of $2 billion associated with subprime-related losses; (c) post-Shareholder Vote losses at Merrill and the BofA Board's decision to invoke the MAC clause; and (d) the accelerated bonus payments at Merrill.

258.    After summarizing the instances of material nondisclosures (and the BofA witnesses'
refusal to provide information based on the attorney-client privilege), the New York Attorney
General further wrote:

> . . . [W]e cannot simply accept Bank of America's officers' bald assertions
> that their decisions to keep each of these material events from Bank of America's
> shareholders were based on a full review of all the relevant information by their
> inside and outside counsel.  The law is clear that Bank of America and its officers
> cannot assert an advice of counsel defense for their decisions, and at the same time
> persist in refusing to disclose the substance of the conversations with counsel.
> According, *we request that Bank of America reconsider its decision to prevent this
> Office from adequately probing these crucial issues.  We provide you with this final
> opportunity to reconsider.  Otherwise, we will proceed with our charging decisions
> without giving credit to the advice of counsel defense that Bank of America has not
> permitted us to test.*
>
> *Please provide us with Bank of America's decision by Monday, September
> 14, 2009. . . .*  [Emphasis added.]

259.    In response to the New York Attorney General's letter, the BofA Defendants caused
BofA's counsel to send a reply letter that very same day.  In the reply, counsel on behalf of BofA,
Lewis Liman, declined to waive the attorney-client privilege, as the Attorney General had requested.
Counsel also purported to deny that the Company had even relied on an advice of counsel defense.
In the wake of BofA's counsel's response, the Attorney General's office has stated that it will bring
charges directly against officers and directors of BofA related to the four instances of nondisclosure
identified in the Attorney General's letter.  In addition, on September 17, 2009, the Attorney General
issued subpoenas for the testimony of five members of the BofA Board's Audit Committee—
Defendants Barnet, Collins, Franks, Massey, and May.  Spokespersons for the Attorney General's
Office have stated that the Audit Committee members are among the Board members most likely to
have insight as to the Board's knowledge and involvement in the Merrill losses and the MAC clause
discussions, and that, based on existing evidence, the Board will be shown to have had knowledge of

the losses and the MAC clause issue before the Shareholder Vote.  In addition, the Attorney General will subpoena the remaining Board members on a future date.

260.    As set forth above, the Committee on Oversight and Government Reform of the House of Representatives also has been conducting an investigation of the BofA Defendants' disclosures to shareholders and other conduct in the context of the losses at Merrill.  The Committee conducted hearings in the spring of 2009 and—like the New York Attorney General—began devoting renewed efforts to its investigation once the BofA Defendants' positions regarding the attorney-client privilege and the advice-of-counsel defense became public in the course of the SEC proceedings.

261.    On August 6, 2009, the Committee issued document requests to BofA concerning Merrill's fourth-quarter financial losses, BofA's receipt of financial assistance from the federal government, legal advice regarding disclosure of either issue, legal advice on the MAC clause, and Board meetings.  The BofA Defendants caused the Company counsel to send a letter to the Committee objecting to certain of the requests on the basis of attorney-client privilege and asking the Committee to "withdraw its requests" for privilege documents.   In addition, BofA was caused to produce 1,800 pages of documents, many of which were clearly irrelevant to the Committee's requests.

262.    The BofA Defendants' response prompted Rep. Edolphus Towns, Chairman of the Committee, to send a follow-up letter to Defendant Lewis on September 18, 2009 reiterating the request for responsive documents and giving BofA until noon on Monday, September 21, 2009 to respond.  In addition, Rep. Towns wrote:

> I am deeply disappointed to learn from your attorneys that you are refusing to provide the Committee with key documents I requested in my letter of August 6, 2009.  In plain terms, your refusal to provide the Committee with these documents,

without even providing a justification in some cases, leaves the impression that Bank of America is hiding information.

* * * *

Beyond the issue of producing documents containing legal advice, I am disappointed in your overall response to the Committee's request. The documents produced so far include a number of pages that are either partly or wholly redacted. These redactions are unexplained and are unacceptable.

In addition, many of the documents produced so far are clearly irrelevant to the Committee's investigation. . . .

For example, you sent copies of numerous emails you received from your own employees expressing admiration for your "awesome" performance on *60 Minutes*. You also included copies of emails alerting Bank of America employees to discounts at Wal-Mart, Target, and Costco; an announcement of the "Annual Pecan Sale," featuring "This Year's Crop of Mammoth Pecan Halves"; and an invitation to attend a conference on investment in East Asia, written in Chinese. There were numerous other pages of obviously irrelevant material.

Moreover, while your attorneys have evidently been enthusiastic about redacting information pertaining to issues that are the subject of the Committee's investigation, as well as personal information about Bank of America executives, they have been less thorough about redacting sensitive information belonging to your bank's customers. Documents produced so far include letters from Bank of America customers containing their credit card numbers, checking account numbers, and other personal information. None of the latter are relevant to our investigation.

While I am aware that some lawyers seem to believe it is traditional to pad the record with thousands of pages of irrelevant material, in my view this indicates that Bank of America does not take seriously the Committee's investigation. While we neither expect nor wish Bank of America to decide which documents among all relevant records we might be interested in, we do expect you to provide all *relevant* records, rather than just *any* records.

263.    Incredibly, even in response to Rep. Towns's follow-up letter, the BofA Defendants still caused Company to counsel to respond by, **once again, asking the House Committee to withdraw its requests concerning legal advice**. Moreover, they caused the Company **to fail to meet the Monday, September 21, 2009, deadline**.

264.    In response, Rep. Towns issued a press release stating in pertinent part:

"I am deeply troubled by Bank of America's refusal to give this Committee the records it needs to rightfully determine how and why a private deal became a public

bailout," said Chairman Towns. "The taxpayers are now on the hook for billions of dollars and they have a right to know how that happened."

A hearing was scheduled for September 30, 2009.

265.    In addition to the above, the *Charlotte Observer* reported on September 21, 2009 that, since March 2009, both the FBI and the DOJ have been conducting a criminal probe into BofA's Merger with Merrill.

## IV.   THE BofA BOARD IS ENCUMBERED BY NUMEROUS CONFLICTS OF INTEREST AND CIRCUMSTANCES GIVING RISE TO A SUBSTANTIAL POTENTIAL FOR LIABILITY IN THIS ACTION, THUS CREATING A REASONABLE DOUBT THAT THE BOARD COULD IMPARTIALLY CONSIDER A DEMAND TO BRING THESE CLAIMS AND THEREBY RENDERING PRE-SUIT DEMAND FUTILE.

266.    With respect to the derivative counts in this complaint, demand upon the BofA Board to institute this action in the Company's name, for both wrongs committed against its wholly-owned subsidiary Merrill and wrongs committed directly against BofA also would be entirely futile, and is excused.

267.    The BofA Board consists of sixteen (16) individuals (referred to here as the BofA Director Defendants):  Lewis, Gifford, Barnet, Bramble, Collins, Countryman, Franks, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward.  For the reasons stated in this section and throughout this Complaint, none of these individuals is disinterested and independent with respect to the acts and omissions alleged herein, and therefore demand would be entirely futile.

268.    First, the BofA Director Defendants face a substantial likelihood of liability herein for making false and misleading statements in the Proxy Statement.  Claims under Section 14(a) do not require proof of scienter, and the allegations concerning BofA Director Defendants' access to the facts concerning Merrill's rapidly deteriorating financial condition in the fourth quarter of 2008 are strong.  Similarly strong are the allegations that the BofA Director Defendants breached their fiduciary duties in approving the Merger with Merrill based upon inadequate due diligence; failing to

terminate the transaction or at least provide corrected and updated information to shareholders concerning Merrill's financial condition before the December 5, 2008, Shareholder Vote; and failing to terminate the transaction or provide further information after the Shareholder Vote, even while Lewis sought and obtained over $100 billion in federal assistance directly tied to helping the deal go through. The failure to make such adequate disclosures also constituted a breach of the duty of complete candor in the context of a Shareholder Vote.

269.    Second, the BofA Director Defendants will not knowingly sue Lewis and other members of the BofA Board of Directors for proceeding with the Merger in violation of their fiduciary duties, given that the these defendants reportedly received pressure from the federal government, including both the Department of the Treasury and the Federal Reserve System, to complete the Merger in spite of any difficulties—***and risked losing their prestigious positions and corresponding reputations if they did not comply***. In their decision to accept the Fed's Faustian bargain, the BofA Defendants, and each of them, have already demonstrated that their loyalty lies to preserving their own positions and perquisites over and above serving the best interests of BofA and its shareholders.

270.    Third, the BofA Director Defendants face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger. To defend the fiduciary claims, the BofA Director Defendants will be concerned to emphasize the extent of the due diligence performed on Merrill and the breadth and scope of their knowledge of Merrill's condition; yet that position will only tend to prove a key element of the Section 14(a) claims and breach of the duty of candor claims that they should have known the true facts about Merrill and disclosed them in the Proxy Statement.

271.   Fourth, the BofA Director Defendants are unable to objectively consider pursuing these claims because, among other reasons:

(a)   **Lewis** is a high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Indeed, The Corporate Library, an independent investment research firm, rated BofA as a "Very High Concern" as a result of Lewis's high pay of almost $30,000,000, and the SEC has written to the Company for clarifications in regard to executive compensation levels, including that of CEO Lewis.

(b)   **Gifford** is a recent, former, high-level, highly-compensated executive officer of BofA whom the Board itself has deemed **"categorically" not independent** under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Moreover, Gifford has entered into a highly-paid consulting agreement with BofA that requires the Company not only to pay him a retainer, but also to pay for office space, support staff, and a private jet.  For 2008, the value of those benefits equaled the following: (i) $50,000 in consulting fees; (ii) $947,682 in aircraft usage (which was the amount paid to a third party vendor); and (iii) $225,031 in office and administrative support.  In addition, the Company paid Gifford a tax gross-up in the amount of $281,307 related to his use of Company-provided aircraft.  Moreover, Gifford also served as the Chairman and Chief Executive Officer of FleetBoston where he, as a member of the FleetBoston Board, approved his own and other executive rewards while FleetBoston was under investigation by regulators for improper trading activities that favored some investors

over others.  Gifford also was an executive at FleetBoston when FleetBoston, in the wake of its own trading scandal, was acquired by BofA.

(c)    **Bramble** served as a Chief Executive Officer of MBNA and when MBNA was acquired by BofA in 2006.  Bramble recently retired from Allfirst Financial Inc. after it was discovered that Allfirst lost $691.2 million in a foreign currency trading scandal, and returned to work only after lucrative offers from MBNA, which BofA continued on his behalf after it acquired MBNA.  In connection with the MBNA acquisition, Bramble received an opulent buyout package and a seat on the BofA Board.

(d)    BofA Directors **Barnet, Collins, Countryman, May, and Ryan,** were, like Director **Gifford**, members of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others.  When FleetBoston was acquired by BofA in April 2004, these defendants received lucrative buyouts and other compensation and were presented with seats on the BofA Board.

(e)    Each of the BofA Director Defendants has received compensation far in excess of an amount that would render them independent under accepted standards.  The NYSE listing standards, for example, provide that "[a] director who receives . . . more than $100,000 per year in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation[,] is not independent."  Despite these standards, each of the directors received over $100,000 in stock awards alone in both 2006 and 2007.  Average compensation over the last two years for several directors has been egregiously disqualifying:   **Lewis** (over $25 million), **Gifford** ($1,616,990) **Spangler** ($576,646), **Ward** ($606,523), and **Massey** ($430,105).

(f)      At 16 directors, the BofA Board of Directors is large and unwieldy such that it can be and is dominated by **Lewis**, who serves as both the CEO and Chairman and has hand picked the majority of the BofA Board.  The Board's size contributes to the Company's being rated "High Governance Risk Assessment" by The Corporate Library, an independent investment research firm.

(g)      Six directors, **May, Ryan, Barnet, Collins, Countryman, and Gifford**, are designated as "Problem Directors" by The Corporate Library, in part due to their involvement with the FleetBoston Board of Directors, which approved substantial executive rewards even as FleetBoston was under regulatory investigations for multiple instances of improper activity.  Significantly, three of these "Problem Directors"—**May, Barnet, and Collins**—constitute a *majority* of the five-member Audit Committee, with **May** serving as its Chair.  Moreover, **Ryan** is Chair of Corporate Governance Committee.

(h)      Nine directors (more than half of the Board)—**Franks, Lozano, Massey, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward**—have no career experience in banking, investment banking, securities brokerage, or any other financial services industry.  Yet **Ward** (software) chairs the Asset Quality Committee; **Franks** (Army) serves on the Audit Committee, **Lozano** (publishing) serves on the Asset Quality Committee; **Massey** (college president) serves on the Audit Committee; **Mitchell** (media non-profit) serves on the Compensation and Benefits Committee and the Corporate Governance Committee; **Ryan** (pharmacy) chairs the Corporate Governance Committee and serves on the Compensation and Benefits Committee; **Sloan** (auto parts) is the "Lead Director," chairs the Executive Committee and the Compensation and Benefits Committee, and serves on the Corporate Governance Committee; **Spangler** (construction company) serves on the Compensation and

Benefits Committee and the Corporate Governance Committee; and **Tillman** (home improvement) serves on the Asset Quality Committee. These directors rely heavily on the expertise and advice of other Board members who do have experience in banking or financial services and are not meaningfully independent of them with respect to BofA's acquisition of Merrill. Moreover, the director compensation received by several of these directors—**Massey** (retired college president), **Franks** (retired Army officer), and **Mitchell** (media non-profit)—constituted a substantial portion of their annual earnings, making them dependent on BofA for their livelihood and further compromising their independence.

(i)      Three directors, **Gifford, Countryman, and May**, each serve as both a trustee of NSTAR, the energy utility company, and a member of the Board of Directors of CBS Corporation. In addition, May is the Chairman and CEO of NSTAR. These three directors therefore serve on interlocking Boards and are not meaningfully independent of one another. In particular, Countryman and May are beholden to Gifford, an admittedly non-independent director, and will not act independently of his wishes. Similarly, **Sloan and Tillman** serve together on the Board of Directors of Lowe's Companies, Inc. and are not meaningfully independent of one another.

(j)      There is a *100 percent overlap* among two supposedly separate and independent committees of the BofA Board – the Compensation and Benefits Committee and the Corporate Governance Committee. These two committees comprise *exactly the same directors*: **Mitchell, Ryan, Sloan, and Spangler**. These committees have no meaningful distinction from the full BofA Board and exist simply to ratify the positions of the full BofA Board, which is dominated by Lewis, Gifford, and the FleetBoston and MBNA nominees.

(k)     **Countryman, Ryan, Lozano, Franks, Gifford, Massey, Sloan, and Ward**
also served on the Boards of companies, other than BofA, that received a "D" rating by the
Corporate Library, including the following:

| | |
|---|---|
| Charles Gifford | CBS Corporation (CBS)<br>Chairman of the CBS Nomination Committee |
| Thomas Ryan | Yum! Brands (YUM)<br>On the Yum! Brands executive pay and nomination committees |
| Thomas Ryan | CVS Caremark Corporation (CVS)<br>Served as CVS CEO and Chairman |
| Walter Massey | McDonald's (MCD) |
| Jacquelyn Ward | Sanmina-SCI Corporation (SANM) |
| Jacquelyn Ward | WellPoint (WLP) |
| Monica Lozano | Walt Disney (DIS) |
| Tommy Franks | CEC Entertainment (CEC) |

(*l*)     **Gifford, Ward and Mitchell** were the beneficiaries of the full BofA Board's
decision to accelerate the vesting of stock options held by these defendants in order to avoid
recognizing the related expense.

(m)     **Ward** served on the boards of six public companies, three more than would
make her a disinterested and independent director under current standards.

(n)     The BofA Board farmed out its "Lead Director" position to **Sloan**, who is the
current Chairman and Chief Executive Officer of General Parts International, Inc., a North
Carolina-based distributor of automobile replacement parts.  Sloan cannot, and does not,
exercise any independent judgment or control as the Lead Director, as a member of the BofA
Board, as Chair of its Executive Committee, or as Chair of the Company's Compensation
and Benefits Committee.  Rather, he is dominated and controlled by Lewis, Gifford, and

their cohorts from the FleetBoston and MBNA acquisitions (Barnet, Bramble, Collins, Countryman, May, and Ryan).

(o)      Each of the five committees of the BofA Board is either chaired by an interested director, or composed of a majority of interested directors, or both: (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis**, **Gifford**, **Countryman**, and **Sloan**, chaired by Sloan, whose experience lies in auto parts, not banking.

272.     Each of the BofA Director Defendants was a member of one or more committees of the BofA Board at various times during the relevant period and in connection with the Merger.  As members of these Committees, these BofA Directors had specific oversight responsibilities for various aspects of BofA's operations, and each Committee was tasked with reporting back to the full Board.

273.     Each of the BofA Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's business units and capital position, and each of the BofA Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio of assets and business units:  (a) **May (Chair), Barnet, Collins, Franks,** and **Massey** (Audit Committee); (b) **Ward (Chair),**

Bramble, Lozano, and Tillman (Asset Quality Committee); (c) Sloan (Chair), Mitchell, Ryan, and Spangler (Compensation and Benefits Committee); (d) Ryan (Chair), Mitchell, Sloan, and Spangler (Corporate Governance Committee); and (e) Sloan (Chair) Countryman, Gifford, and Lewis (Executive Committee). Each of these Committees did, in fact, actively direct and control the Company's affairs during the relevant period. In 2008, the full Board met 13 times, the Audit Committee met 10 times, the Asset Quality Committee met 6 times, the Compensation and Benefits Committee met 5 times, the Corporate Governance Committee met 4 times, and the Executive Committee met 6 times.

274.   As members of the Audit Committee of the BofA Board, May (Chair), Barnet, Collins, Franks, and Massey had the ultimate responsibility at BofA for both "the effectiveness of the Corporation's system of internal controls" and "the compliance by the Corporation with legal and regulatory requirements." This mission was encapsulated in the following duties, among others:

- "*Review the scope and content of examinations of the Corporation performed by* the examination forces of the Federal Reserve Board, Comptroller of the Currency, and *other regulatory agencies and report their conclusions to the Board of Directors, including comments as to the suitability of necessary correction action taken, and to the response made to the regulators*";

- *Review with management, the Independent Registered Accounting Firm and the General Auditor any correspondence with regulators or government agencies* and any employee ("Whistleblower") complaints of published reports, *which raise significant issues regarding the Corporation's financial statements or accounting policies, procedures, or controls in accordance with the Committee's established procedures*";

- "Quarterly receive a report on *any significant deficiency or material weakness in the Corporation's internal controls* or any fraud involving an employee associated with internal controls";

- "Annually *review the Corporation's disclosure controls and procedures, including the Corporation's internal controls*"; and

- "Periodically **review with management and the Corporation's General Counsel the nature and status of significant legal matters**."

(All emphases added.)

275.     The BofA Audit Committee met 12 times during 2007.  The BofA Audit Committee met a similar number of times in 2008.  However, when it came time to consider one of the most important transactions in BofA's history, *viz.*, the acquisition of Merrill, the Audit Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

276.     As members of the Asset Quality Committee of the BofA Board, **Ward (Chair), Bramble, Lozano, and Tillman** had the ultimate responsibility at BofA for "oversight of credit risks to the company's assets and related earnings."  This mission was encapsulated in the following duties, among others:

- "**review the asset quality trends and performance** of the Corporation and its subsidiaries";

- "**monitor management's adherence to prudent and sound credit policies and practices**"

- "**review credit concentrations, credit risk inherent in selected products and businesses,** and country risk";

- "review the adequacy of the allowance for loan and lease losses and related written policies and procedures"; and

- "**approve credit risk policies and management disciplines** as required by the Basel II accord or other regulatory requirements."

(All emphases added.)

277.     The BofA Asset Quality Committee met six times during 2007.  the BofA Asset Quality Committee met a similar number of times in 2008.  However, with respect to the Merger, the Asset Quality Committee held no separate meetings and/or failed to ensure that the value of the

losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

278.    As members of the Compensation and Benefits Committee of the BofA Board, **Sloan (Chair), Mitchell, Ryan, and Spangler** had the ultimate responsibility at BofA for "overall guidance with respect to the establishment, maintenance and administration of Bank of America Corporation's compensation programs and employee benefit plans."  This mission was encapsulated in the following duties, among others:

- "Determine and approve the compensation, including salary, incentive compensation and equity based awards, for the Chief Executive Officer and Bank of America Corporation's other executive officers";

- "Review and discuss with management the Compensation Discussion and Analysis section of Bank of America Corporation's annual proxy statement and produce the compensation committee report for inclusion in Bank of America Corporation's annual proxy statement"; and

- "Periodically review and make recommendations to the Board as to the form and amount of compensation for Bank of America Corporation's directors."

279.    The BofA Compensation and Benefits Committee met five times during 2007.  the BofA Compensation and Benefits Committee met a similar number of times in 2008.  However, with respect to the Merger, the Compensation and Benefits Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board.  Thus, these individuals will take no action against Defendants.

280.    As members of the Corporate Governance Committee of the BofA Board, **Ryan (Chair), Mitchell, Sloan, and Spangler** had the ultimate responsibility at BofA for "matters of

corporate governance (defined for this purpose as the relationship of the board, the stockholders and management in determining the direction and performance of the company)" and for "recommend[ing] the corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies applicable to the company." This mission was encapsulated in the following duties, among others:

- "solicit and review comments from all directors and report annually to the board with an assessment of the board's performance";

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval"

- "recommend appointments to board committees"; and

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval."

281.    The BofA Corporate Governance Committee met four times during 2007. the BofA Corporate Governance Committee met a similar number of times in 2008. However, with respect to the Merger, the Corporate Governance Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BofA Board. Thus, these individuals will take no action against Defendants.

282.    In addition, while BofA and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as

severance payments, stock grants, and stock awards as a result of their incompetent performance and deceptive activities.

283.    Each and every member of the Board of Directors held on to his or her position as a director and/or senior officer of the Company only because he or she was willing to violate his or her fiduciary duties or the federal securities laws and also sought to entrench themselves as a director for the reasons stated herein.  Specifically, where duty called for disclosure of Merrill's deteriorating condition in the fourth quarter of 2008, invocation of the MAC clause and/or renegotiation or termination of the Merger, and the disclosure of the BofA's communications with federal regulators on both these issues, the BofA Defendants, when told that faithfully discharging these duties would mean risking the loss of their positions at BofA by the actions of the Federal Reserve and/or the United States Treasury, willfully and knowingly abdicated these duties in favor of keeping their positions.

284.    The BofA Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of BofA or its shareholders.  The present Board of Directors of BofA has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including Lewis and Gifford are in a position to, and do, dominate and control the Board of Directors.   Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the BofA Board are all personally named as defendants in the consolidated securities class action filed under this docket, which alleges that they committed fraud with respect to the merger. This places Defendants in an irreconcilable conflict of interest regarding the prosecution of this action, and precludes them from exercising the independence necessary to make a good faith business judgment.

(f)     The members of the BofA Board, including each of the defendants herein, received substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of BofA. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(g)     The BofA directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

## V.      DUTIES OF THE BofA DEFENDANTS.

285.     By reason of their positions as officers, directors, and/or fiduciaries of BofA, and because of their ability to control the business and corporate affairs of the Company, the BofA Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, disclosure, oversight, and due care, and were and are required to use their utmost ability to control and manage BofA in a fair, just, honest and equitable manner.  The BofA Defendants were and are required to act in furtherance of the best interests of BofA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

286.     Each of the BofA Defendants had a duty to disclose fully and fairly to shareholders all material information within his or her control when seeking shareholder action such as a vote on whether or not to proceed with the Merger.  An item of information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote and/or that item would have assumed actual significance in the deliberations of a reasonable shareholder.

287.     Whenever directors or officers of a public corporation communicate with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith, and loyalty. The *sine qua non* of all such communications to shareholders is honesty.  Moreover, a fiduciary who learns that his or her earlier communications to his or her beneficiaries were false or misleading, and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements, also breaches his or her duty of loyalty and of full and fair disclosure.

288.     In addition to the duties of full disclosure imposed on the BofA Defendants as a result of their making affirmative statements and reports, each of these defendants had a duty to disseminate truthful information promptly that would be material to a reasonable investor in compliance with the integrated disclosure provisions of the SEC regulatory regime, including accurate and truthful information with respect to BofA's business, so that the market prices of the Company's public traded securities would be based on accurate, truthful, and complete information.

289.     Each director and officer of BofA owes to the Company and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the BofA Defendants had a duty to promptly disseminate accurate and truthful information with regard to their company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

290.     The BofA Defendants, because of their positions of control and authority as directors and/or officers of BofA, were able to, and did, exercise control over the wrongful acts

complained of herein and over the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the BofA Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the Company.

291.    To discharge their duties, the officers and directors of BofA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, these individuals were required to, among other things:

(i)    refrain from acting in any manner so as to favor the personal interest of the directors or officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    disclose all information to shareholders concerning Merrill or the impact of the Merrill Merger on BofA fully and fairly as that information became available, both before and after the Shareholder Vote on the Merger;

(iv)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(v)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an

adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(vi)    remain informed as to how the Company conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(vii)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(viii)    ensure that no inaccurate financial information about the Company was released to the public that would tend to artificially inflate the Company's stock price, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(ix)    ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company.

292.    Each of the BofA Defendants, by virtue of his or her position as a director and/or officer of BofA, owed the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the BofA Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

293.     In addition, the BofA Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, this required these defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

294.     The BofA Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.   The conduct of the BofA Officer Defendants was ratified by the BofA Director Defendants during the relevant period.

295.     The BofA Defendants also had specific duties imposed on them by the Company.

296.     BofA adopted "Corporate Governance Guidelines" in 2007 to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.   Among other things, the Corporate Governance Guidelines provided that the BofA Director Defendants had "complete and open access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Secretary or directly by the director." The Guidelines stressed:

> Bank of America's goal in everything we do is reaching for higher
> standards - for our customers, our shareholders, our associates and

our communities, upon which the future prosperity of our company rests. These Guidelines reflect the way we are striving for higher standards in corporate governance.

297.    BofA also had a "Code of Ethics" applicable to the entire Company, including

Defendants, which states in part:

### 1.2 Accounting

To ensure the integrity of its consolidated financial statements, Bank of America has established internal accounting and operating controls and procedures, including disclosure controls and procedures, and a Disclosure Committee.

All associates responsible for the preparation of the corporation's financial statements, or who provide information as part of that process, must maintain and adhere to these controls so that all underlying transactions, both within Bank of America and with third parties, are properly documented, recorded and reported.

In addition, all associates have the responsibility to promote full, fair, accurate, timely and understandable disclosure in reports and documents that Bank of America files with or submits to the Securities and Exchange Commission and in other public communications made by the corporation.

*        *        *

Section 6: Compliance with Law

You must not take any action, either personally or on behalf of Bank of America, which violates any law, regulation or internal policy affecting Bank of America business.

*        *        *

### 7.1 Restrictions on trading in Bank of America securities

You must not buy, sell, recommend or trade in Bank of America securities--either personally or on behalf of someone else--while in possession of material, nonpublic information relating to the corporation, except through trading programs pre-approved by the Legal Department. In addition, you must not communicate or disclose such information to others who may trade in Bank of America securities. Doing so may not only be a violation of your duty to keep

such information confidential, but also may be a violation of federal and state laws, and the laws of many countries.

If you are a Bank of America Corporation director or have been designated as an "insider" by the corporation, you must obtain special approvals before trading in Bank of America securities.

298.     In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.  These duties are highlighted *supra*.

## VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

299.     At all relevant times, as a result of their membership on the Board of Directors, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, each of the BofA Defendants had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.  Similar access was enjoyed by the Merrill Defendants with respect to Merrill's internal affairs.  Moreover, after the Merger was announced, the BofA Director Defendants had complete access to similar information concerning Merrill.

300.     At all relevant times, the BofA Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) preserve and enhance the BofA Defendants' directorial and managerial positions at BofA, as well as the power and prestige accruing to the BofA Defendants as a result of holding those positions; (b) transfer exorbitant unearned and wasteful sums of money to themselves; (c) deceive the investing public, including BofA's own shareholders, as to the Merrill Defendants' management of Merrill's operations, the company's financial health, stability, the accuracy and integrity of its accounting policies and other internal

controls, and its business prospects; and (d) purchase Merrill for BofA without adequate due diligence, and through the mechanism of a false and misleading Proxy Statement.

301.    In committing the wrongful acts alleged herein, the BofA Defendants, the Merrill Defendants, and the Advisor Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the BofA Defendants and the Merrill Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.  The Merrill Defendants aided and abetted the BofA Defendants in their breaches of duty with respect to the Merger and their filing of a false and misleading Proxy Statement.

302.    At all relevant times, each of the BofA Defendants was the agent of each of the other BofA Defendants, and was at all times acting within the course and scope of such agency.  At all relevant times, the BofA Director Defendants, the Merrill Defendants, and the Advisor Defendants was the agent of each of the others, and was at all times acting within the course and scope of such agency.

303.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

304.    The Merrill Defendants engaged in a conspiracy, common enterprise and/or common course of conduct to make improper statements about Merrill's financial performance, and its future business prospects, and to breach their duty of complete candor in the context of the

Shareholder Vote on the Merrill acquisition. The BofA Defendants and the Advisor Defendants joined in and supported the Merrill Defendants' conspiracy and common enterprise with respect to the Merger.

305.     The purpose and effect of the BofA Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the BofA Defendants' violations of federal and state law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of BofA common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## VII.     DERIVATIVE ALLEGATIONS.

306.     Plaintiffs bring their "derivative" claims derivatively in the right and for the benefit of BofA to redress injuries suffered by it as a direct result of the breaches of fiduciary duty, dissemination of a false and misleading Proxy Statement, and other wrongs committed by the BofA Defendants. BofA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

307.     Plaintiffs will adequately and fairly represent the interests of BofA in enforcing and prosecuting its rights.

308.     Plaintiffs were holders of BofA common stock during the wrongs complained of and remain so now.

309.     Prosecution of this action, independent of the BofA Board, is in the best interests of BofA.

## VIII.   CLASS ACTION ALLEGATIONS.

310.   Plaintiffs' "direct" claims are brought as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other persons who owned shares of BofA common stock as of October 10, 2008, the record date for the vote on approval of the proposed Merger, and were damaged thereby.  Excluded from the Class are the Defendants, affiliates of the Defendants, and the immediate family members of the Individual Defendants.

311.   The direct claims are properly maintainable as class claims for the following reasons:

(a)   The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2008, BofA had outstanding 5,017,579,321 shares of its common stock, held by individuals and institutions too numerous to bring separate actions.  Moreover, it is reasonable to assume that holders of BofA common stock are geographically dispersed throughout the United States and the world.

(b)   Plaintiffs will fairly and adequately protect the interests of the members of the Class, inasmuch as they are members of the Class and their claims are typical of the claims of all Class members.  Plaintiffs have retained competent counsel experienced in securities class action litigation.  Plaintiffs' interests are to obtain appropriate relief for themselves and for the Class for the harms arising out of the misconduct set forth herein.

(c)   There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include:

(i)   Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning

Merrill's deteriorating condition in the fourth quarter of 2008 and the impact it would have on BofA;

(ii)     Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning their determination that BofA was entitled to invoke the MAC clause to terminate the Merrill Merger, Messrs. Paulson and Bernanke's efforts to persuade them not to invoke the MAC clause, and their decision to accede to those demands;; and

(iii)     Whether the BofA Defendants breached their fiduciary duties of complete candor to shareholders by failing to disclose information concerning BofA's need for, seeking of, and obtaining of, $20 billion in additional federal assistance to complete the Merrill acquisition, coupled with over $100 billion in federal "backstop" guarantees in connection with that transaction.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' direct claims.  It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims.  In addition, the bringing of separate actions would put a substantial and unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

(e)     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them.  No unusual difficulties are likely to be encountered in the management of the class claims.

(f)     The BofA Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

(g)     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the BofA Defendants, and/or adjudications which as a practical matter might be dispositive of the interests of other members of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**Derivatively Against the BofA Defendants for Breach of Fiduciary Duty**

312.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

313.    The BofA Defendants owed and owe BofA fiduciary obligations.  By reason of their fiduciary relationships, the BofA Officer Defendants and the BofA Director Defendants owed and owe BofA the highest obligation of good faith, fair dealing, loyalty, candor, oversight, and due care.

314.    The BofA Defendants, and each of them, breached their duties to BofA and its shareholders by, among other things:  (a) agreeing to acquire Merrill after only 10 hours of due diligence, based on incomplete information and insufficient analysis; (b) agreeing to pay tens of billions of dollars in valuable BofA common stock for Merrill, at a time when Merrill was in a liquidity turmoil, faced imminent bankruptcy filing, and could otherwise have been acquired for mere "pennies" on the dollar; (c) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from

Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; (d) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives; and (e) failing to invoke the MAC clause or otherwise terminate or renegotiate the Merger even though they knew and had determined that it was in BofA's best interests to do so.  Such conduct was not, and could not have been, the result of rational business judgment, but rather constituted a pattern of bad faith and disloyalty to BofA and its shareholders.

315.     As a direct and proximate result of the BofA Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the BofA Defendants is liable to the Company.

## COUNT II

### Derivatively Against the Advisor Defendants for Breach of Fiduciary Duty

316.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

317.     Each of the Advisor Defendants owed BofA and its shareholders the duty to perform due diligence necessary to accurately and reliably determine whether the terms of the proposed Merger and exchange ratio were fair from a financial point of view to BofA and continued to be fair.

318.     The Advisor Defendants issued so-called "fairness" opinions, or otherwise counseled BofA as to the fairness of the proposed Merger, advising BofA that the Merger and exchange ratio were fair to BofA from a financial point of view.

319.     The Advisor Defendants failed to perform the due diligence necessary under the circumstances.  The "fairness" opinions or other advice to BofA therefore had no reasonable basis in

fact, were false and misleading, and breached the Advisor Defendants' duties to BofA and its shareholders.

320.    As a direct and proximate result of the Advisor Defendants' failure to perform their fiduciary obligations, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT III

### Derivatively Against the Advisor Defendants for Professional Negligence

321.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

322.    As set forth herein, the Advisor Defendants, in issuing their "fairness" opinions or otherwise advising BofA on the fairness of the proposed Merger. failed to exercise the care that a professional employed to render such advice to BofA reasonably would have employed in the circumstances.

323.    The "fairness" opinions or other advice to BofA of the Advisor Defendants therefore had no reasonable basis in fact, were false and misleading, and constituted professional negligence on the part of the Advisor Defendants.

324.    As a direct and proximate result of the Advisor Defendants' firm' negligence, BofA has sustained significant damages.  As a result of the misconduct alleged herein, each of the Advisor Defendants is liable to the Company.

## COUNT IV

### Derivatively Against the BofA Officer Defendants, Montag, and Kraus for Unjust Enrichment and Return of Unearned Compensation

325.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

326.    The BofA Officer Defendants were eligible for incentive compensation premised upon their achievement of BofA's business and financial goals in a legitimate and lawful manner. Each of the BofA Officer Defendants received substantial incentive compensation payments.

327.    By reason of their positions as officers of BofA, the BofA Officer Defendants owed fiduciary duties to the Company and its shareholders in connection with the operation, management, and direction of the Company.

328.    Defendants Montag and Kraus were eligible for incentive compensation premised upon their achievement of Merrill's business and financial goals in a legitimate and lawful manner. Each of these Defendants received substantial incentive compensation payments.

329.    By reason of their positions as officers of Merrill, Defendants Montag and Kraus owed fiduciary duties to Merrill in connection with the operation, management, and direction of Merrill.

330.    The BofA Officer Defendants failed to achieve BofA's business and financial goals except in an illegitimate and unlawful manner.  Accordingly, the compensation payments to the BofA Officer Defendants were not properly awarded for the work performed and results achieved. Since these defendants did not obtain the business results expected, they have been unjustly enriched and must return to the Company the incentive compensation that was awarded to them.

331.    Defendants Montag and Kraus failed to achieve Merrill's business and financial goals except in an illegitimate and unlawful manner.  Accordingly, the compensation payments to these Defendants were not properly awarded for the work performed and results achieved.  Since these Defendants did not obtain the business results expected, they have been unjustly enriched and must return to the BofA, Merrill's new parent, the incentive compensation that was awarded to them.

## COUNT V

### Derivatively Against the BofA Defendants for Contribution

332.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

333.    The conduct of the BofA Defendants has exposed BofA to significant liability under various federal and state laws.

334.    By reason of the foregoing, the BofA Defendants have caused BofA to suffer substantial harm.

335.    If BofA is held liable under federal or state laws for damages, civil penalties, restitution, or other relief, the BofA Defendants are liable to BofA for contribution.

## COUNT VI

### Derivatively Against the BofA Defendants for
### Breach of the Duties of Full Disclosure and Complete Candor

336.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

337.    The BofA Defendants, and each of them, violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger, or that the BofA Defendants purportedly had received threats from Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete the Merger, and other material items of information; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

338.     As a direct and proximate result of the BofA Defendants' breaches of their duties of full disclosure and complete candor, BofA sustained significant damages arising out of the material misstatements to shareholders, and the BofA Defendants are liable to the Company.

## COUNT VII

**Derivatively Against the Merrill Defendants and the Advisor Defendants
for Aiding and Abetting the BofA Defendants' Breach of Fiduciary Duties**

339.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

340.     The BofA Defendants owed BofA fiduciary obligations.  By reason of their fiduciary relationships, the BofA Defendants owed BofA the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.  That the BofA Defendants owed these duties to BofA was well known to the Merrill Defendants and the Advisor Defendants.

341.     As is detailed in the preceding paragraphs, the BofA Defendants have breached their fiduciary duties to BofA.

342.     The Merrill Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.  The Merrill Defendants actively and knowingly induced the BofA Director Defendants to breach their fiduciary duties by offering a Merger transaction to BofA which would cause BofA to indemnify the Merrill Defendants and to assume billions of dollars in undisclosed losses and liabilities, to the detriment of BofA and its shareholders.

343.     Moreover, the Merrill Defendants concealed the fact of Merrill's growing losses and liabilities from the BofA Defendants and actively worked to prevent them from discovering the true facts.  Among other things, the Merrill Defendants convinced the BofA Defendants that Merrill's growing losses were "market related" and "in line" with other Wall Street firms, and they told the BofA Director Defendants that Merrill's exposure was the result of "legacy" trading positions and

not new positions that had been put on by defendant Montag since the deal was announced on September 15, 2008.

344.     The Advisor Defendants aided and abetted the BofA Defendants' breaches of fiduciary duty.  The Advisor Defendants knew that the BofA Defendants were breaching their fiduciary duties to BofA by issuing false and misleading statements in the Proxy Statement and otherwise in connection with the Merger, and the Advisor Defendants gave substantial assistance to the BofA Defendants by permitting their name and their "fairness" opinions to be used as indications of the fairness of the Merger to BofA.  FPK and J.C. Flowers received $20 million for their services to BofA.

345.     BofA was harmed as a direct and foreseeable consequence of these Defendants' misconduct.  As a result of the misconduct alleged herein, each of these Defendants is liable to BofA.

## COUNT VIII

### Derivatively Against the BofA Defendants, the Merrill Defendants, and the Advisor Defendants for Violation of Section 14(a) of the Exchange Act and Rule 14a-9

346.     This claim for relief, Count VIII, is not based on any allegations of knowing or reckless conduct by any defendant.  This claim does not allege, and does not sound in, fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

347.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this tile [15 U.S.C. § 78l]."

349.    SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

350.    In the Proxy Statement, Plaintiff and all other BofA shareholders were solicited to vote to approve the Merger between BofA and Merrill.  A shareholder vote was required to approve this proposal.  Thus, the Proxy Statement was an essential causal link in the accomplishment of this proposal.

351.    The BofA Defendants, the Merrill Defendants, and the Advisor Defendants provided information which was contained in the Proxy Statement, allowed their names to be used in connection with the Proxy Statement and the solicitation of shareholder votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Statement, would have a continuing material relationship with BofA following the vote on the Merger and other issues presented in the Proxy Statement, solicited votes under the Proxy Statement, and caused the Proxy Statement to be disseminated to BofA's shareholders through the use of the United States mails and the means and instrumentalities of interstate commerce.

352.     The BofA Defendants, the Merrill Defendants, and the Advisor Defendants solicited proxies from the Plaintiff and other BofA shareholders by means of a proxy statement which contained false and misleading statements concerning the Merger, its benefits to shareholders, and other issues, and which omitted to state material facts that were necessary to make the statement contained therein not false and misleading.

353.     The Proxy Statement dated October 31, 2008, jointly issued by BofA and Merrill, and the supplemental filings and disseminations made by the defendants named herein in advance of the Shareholder Vote on the Merger on December 5, 2008, were false and misleading in light of the true financial condition of Merrill, and the combined BofA/Merrill, including in particular the existence of substantial losses that were first disclosed only on January 16, 2009, long after the Merger had closed.  These defendants in the exercise of reasonable care should have known the truth about Merrill's deteriorating financial condition and the existence of the losses by at least December 5, 2009, but failed to disclose such information, by supplementing the Proxy Statement or otherwise, before shareholders voted.

354.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood that a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Proxy Statement or a material part of the mix of information available to shareholders in deciding how to exercise their voting rights.  Thus, shareholders were denied the opportunity to make an informed decision in voting on the Merger.

355.     None of the materially false and misleading statements contained in the Proxy Statement, or material facts omitted therefrom, were known to Plaintiff or other BofA shareholders when they voted on the matters presented to them in the Proxy Statement on December 5, 2008.

356.     BofA was harmed and suffered damages as a result of the Merger which was approved through the use of a proxy statement in violation of Section 14(a) and Rule 14a-9.

## COUNT IX

### Directly Against the BofA Defendants for
### Breach of the Duties of Full Disclosure and Complete Candor

357.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

358.     The BofA Defendants violated their duties of complete candor and full disclosure by, among other things:  (a) failing to correct, update, or supplement the disclosures in the Proxy Statement to include disclosures concerning devastating losses at Merrill in the fourth quarter of 2008, or that the Board had determined a "Material Adverse Event" had occurred justifying rescission of the Merger; and (b) concealing the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives.

359.     As a direct and proximate result of these Defendants' breaches of their duties of full disclosure and complete candor, Plaintiffs and the Class were deprived of their right to cast an informed vote at the Shareholder Vote on the Merger on December 5, 2008.

360.     Plaintiffs and the Class have sustained significant damages arising out of the defects in the Proxy Statement which deprived them of the opportunity to cast an informed vote.  These damages, which are separate from the damages to BofA from similar acts misconduct which harmed BofA, include the amounts which BofA spent to negotiate the transaction and prepare the Proxy Statement, including $20 million in fees to the Advisor Defendants, over $100 million in fees to the Wachtell law firm, and tens of millions of dollars in printing and disseminating the Proxy Statement, tallying votes, and otherwise implementing the solicitation of shareholders.  Through the BofA

Defendants' breaches of the duty of candor, Plaintiffs and the Class were deprived of the value of the honest services of the parties providing those services.

361.   The BofA Defendants are liable to Plaintiffs and the Class for these damages.

## REQUEST FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.   Against all the BofA Defendants and the Advisor Defendants and in favor of BofA for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, unjust enrichment, professional negligence, aiding and abetting breach of fiduciary duties, contribution, and violations of the federal securities laws;

B.   Against all of the BofA Defendants and in favor of the Class for the amount of damages sustained by BofA as a result of these defendants' breaches of fiduciary duties, including the duty of full disclosure and complete candor.

C.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the BofA Defendants' assets until BofA can recoup all of the monies improperly transferred to the BofA Defendants;

D.   Declaring that the BofA Defendants' improper payments to themselves through BofA's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers—as well as any assets or property acquired with such payments—be held in constructive trust for the benefit of BofA;

E.   Awarding to BofA restitution from the BofA Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other monies obtained by the BofA Defendants;

F.      Directing BofA to take all necessary actions to reform and improve its corporate governance and internal procedures, so as to comply with applicable laws and to protect BofA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

(i)      strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)      controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

(iii)      permitting shareholders to nominate at least three additional candidates for election to the Board; and

(iv)      appropriately testing and then strengthening the internal audit and control functions demanded herein;

G.      Directing BofA to take all necessary actions to reform and improve their corporate governance and internal procedures regarding acquisitions, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BofA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following actions and policies:

(i)      providing that all material information concerning any mergers or acquisitions, including any such information calling into question the appropriateness

of proceeding with any such transaction, will be communicated to shareholders as soon as it is received, regardless of whether a shareholder vote has been completed;

(ii)     providing that no merger or other acquisition can be approved by the Board of Directors for recommendation to shareholders until the earlier of (x) the passage of five business days from the first communication of a potential transaction made to or received from a potential merger or acquisition partner, or (y) the Board's receipt of an opinion of outside, independent legal counsel, specifically retained for that purpose, that, in the circumstances presented, the time and scope of the due diligence performed by the Company and presented to the Board was adequate to make an informed decision to recommend approval of the transaction;

(iii)    providing that, with respect to any substantial merger or acquisition, an outside, independent legal counsel, specifically retained for that purpose, be appointed to represent shareholders to monitor the progress of the transaction from the date of recommendation of shareholder approval by the Board to the closing date; and

(iv)    terminating the employment of Lewis for cause and without the normal benefits of "severance" or "retirement" applicable to a "for good reason" resignation or a "without cause" termination.

H.      Requiring the BofA Defendants to remit to BofA all of the salaries, fees, bonuses, stock awards, and other compensation received for 2008;

I.       Requiring the BofA Director Defendants to take all necessary steps for restitution of all bonuses paid by Montag and Kraus in December 2008;

J.       Requiring the Advisor Defendants to remit to BofA all the fees paid to them for the "fairness" opinion and work performed in connection therewith;

K.       A judgment declaring the Proxy Statement to be materially false and misleading in violation of Section 14(a) of the Exchange Act;

L.       Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

M.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 9, 2009

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _Curtis V. Trinko_
Curtis V. Trinko
ctrinko@trinko.com
Kinny Wai Chan
Kchan@trinko.com
16 West 46th Street, 7th Floor
New York, New York 10036
Telephone: (212) 490-9550
Fax: (212) 986-0158

*Interim Liaison Counsel for Plaintiffs the Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System*

KAHN SWICK & FOTI LLC

Lewis S. Kahn
*lewis.kahn@ksfcounsel.com*
Michael A. Swick (a member of the bar of this Court)
*michael.swick@ksfcounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@ksfcounsel.com*
Kevin Oufnac
*kevin.oufnac@ksfcounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax: (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Fax: (504) 455-1498

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*the Louisiana Municipal Police Employees*
*Retirement System*

-and-

SAXENA WHITE P.A.

Maya Saxena
*msaxena@saxenawhite.com*
Joseph E. White, III
*jwhite@saxenawhite.com*
Christopher S. Jones (a member of the bar of this
Court)
*cjones@saxenawhite.com*
Lester R. Hooker
*lhooker@saxenawhite.com*
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3082

*Interim Co-Lead Counsel and Attorneys for Plaintiff*
*Hollywood Police Officers' Retirement System*

## VERIFICATION

I, Dave Strauss, as Chairman of the Hollywood Police Officers' Retirement System, state:

1.  I am authorized by the Board of Directors in my capacity as Chairman of the Board to execute this document.

2.  Hollywood Police Officers' Retirement System has been a shareholder of Bank of America Corporation both before and during the times when the misconduct complained of in the Consolidated Shareholder Derivative Complaint ("Complaint") occurred, has continuously held its Bank of America Corporation common stock since such time, and continues to hold such shares.

3.  Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

10-8           , 2009

Dave Strauss, Chairman
Hollywood Police Officers' Retirement System

## **VERIFICATION**

I, Kathy Bourque, am the Director of the Louisiana Municipal Police Employees' Retirement System (MPERS).

I have reviewed the foregoing Consolidated Shareholder Derivative Complaint, and I authorize its filing. As to those allegations in the complaint of which I have personal knowledge, I believe those allegations to be true. As to those allegations in the complaint of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true.

Baton Rouge, Louisiana, this 9th day of October, 2009.

Kathy Bourque
Director, Louisiana Municipal Police Employee's
Retirement System
7722 Office Park Blvd., Suite 200
Baton Rouge, LA 70809

## CERTIFICATE OF SERVICE

I, Curtis V. Trinko, hereby certify that on October 9, 2009, I filed the foregoing Consolidated Shareholder Derivative and Class Action Complaint For Breach of Fiduciary Duties, Aiding and Abetting, Unjust Enrichment, Contribution, and Violations of Section 14(a) of the Securities Exchange Act with the Clerk of Court of the Southern District of New York by means of in-person filing and electronic fiing, which will send a notice of electronic filing to all registered users.


_____
Curtis V. Trinko