USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-27-10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION
-------------------------------------------------------------x
THIS DOCUMENT RELATES TO:

ALL CONSOLIDATED SECURITIES
AND DERIVATIVE ACTIONS
-------------------------------------------------------------x

09 MD 2058 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

Plaintiffs allege that, at the peak of the 2008 financial crisis, Bank of America Corporation ("BofA") hastily agreed to the acquisition of Merrill Lynch & Co., Inc. ("Merrill"), just as Merrill was careening toward insolvency. Plaintiffs assert that in the days and months that followed, the defendants concealed and misstated critical aspects of the transaction, specifically matters related to bonuses, staggering losses accrued in the fourth quarter of 2008, and pressure to consummate the acquisition from officials at the Federal Reserve and the Treasury Department.

This Memorandum and Order addresses six motions to dismiss directed to two different complaints. In the shareholders' direct action (the "Securities Action"), a consolidated amended class action complaint asserts that defendants violated federal securities laws, and alleges claims on behalf of all persons who purchased or acquired BofA shares between September 15, 2008 and January 21, 2009 (the "Securities Complaint," or "Sec. Compl."). Plaintiffs in the derivative action (the "Derivative Plaintiffs" and the "Derivative Action") assert, on behalf of nominal defendant BofA, claims under both the federal securities laws and state law. In addition to their derivative claims, the Derivative Plaintiffs also assert a direct claim for breach of fiduciary duty.

All Securities Defendants move to dismiss the Securities Complaint pursuant to Rules 9(b) and 12(b)(6), Fed. R. Civ. P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"). The BofA directors and the BofA officers named in the Derivative Complaint (together, the "BofA Derivative Defendants") have moved to dismiss most of the claims pursuant to Rules 9(b), 12(b)(6) and 23.1. BofA, as nominal defendant, also has filed a motion to dismiss, and joins in the arguments of the BofA Derivative Defendants. The financial advisors retained by BofA in connection with the transaction (the "Financial Advisors") separately move to dismiss the four derivative claims asserted against them.

While there are distinctions between the Securities Complaint and the Derivative Complaint, they share the same core allegations. They also share certain theories of liability under Section 14(a) and Rule 14a-9. In discussing the two complaints' assertions under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., (the "'34 Act") and Rule 14a-9, the allegations of each are separately analyzed. Elsewhere, when the complaints set forth different factual assertions and theories of liability, they are specifically denoted. No allegation in either complaint is imputed to the other.

For the reasons explained below, the motions to dismiss the Securities Complaint are granted in part and denied in part. The BofA Derivative Defendants' and BofA's motions to dismiss the Derivative Complaint are granted in part and denied in part. The Financial Advisors' motion to dismiss is granted in its entirety.

BACKGROUND ............................................................................................................. 1

I.     FACTUAL HISTORY ...................................................................................... 1

       A.     Parties to the Securities Action ............................................................. 1

       B.     Parties to the Derivative Action ............................................................ 3

       C.     Negotiations Leading up to BofA's Acquisition of Merrill ................................ 4

       D.     Negotiations over Merrill's Bonus Pool ................................................. 5

       E.     Fairness Opinion and the BofA Board's Recommendation of the Merger ............ 7

       F.     BofA Announces Secondary Offering ................................................... 8

       G.     BofA and Merrill Incur Significant Losses in the Fourth Quarter of 2008............ 9

       H.     Joint Proxy Did Not Disclose Merrill's Growing Fourth Quarter Losses or
              the Bonus Arrangement........................................................................ 11

       I.     Consideration of the Invocation of the MAC Clause and the Offer of Federal
              Capital Support ................................................................................ 14

       J.     BofA Announces Fourth Quarter Results and Federal Financial Support............ 18

       K.     Claims Asserted in the Securities Complaint........................................... 19

       L.     Claims Asserted in the Derivative Complaint........................................... 20

II.    PROCEDURAL HISTORY............................................................................ 21

DISCUSSION .............................................................................................................. 22

I.     RULE 12(b)(6), RULE 9(b) AND THE PSLRA'S PLEADING
       THRESHOLD ................................................................................................ 22

II.    THAIN AND MERRILL'S MOTIONS TO DISMISS COUNT II OF THE
       SECURITIES COMPLAINT ARE GRANTED IN PART AND DENIED IN
       PART .............................................................................................................. 25

       A.     Thain and Merrill Had No Disclosure Duty to BofA Shareholders..................... 25

       B.     Thain and Merrill's Motions to Dismiss the Section 14(a) and Rule 14a-9
              Claims Are Denied.............................................................................. 27

III.   DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' '34 ACT CLAIMS
       FOR FAILURE TO ALLEGE ACTIONABLE MISSTATEMENTS OR
       OMISSIONS ARE GRANTED IN PART AND DENIED IN PART.................... 29

       A.     Background on Section 10(b) and Rule 10b-5.......................................... 29

       B.     Background on Section 14(a) and Rule 14a-9 .......................................... 30

       C.     Potential for Overlapping Damages Between the Direct and Derivative
              Section 14(a) Actions.......................................................................... 33

D.   Derivative Plaintiffs Fail to Allege That the Individual BofA Officers Are Liable Under Section 14(a) of the '34 Act ............................................................ 35

E.   Motions to Dismiss for Failure to Allege Actionable Misstatements and Omissions Are Granted in Part and Denied in Part ................................................ 40

   1.   Securities Complaint Adequately Alleges Material Misstatements Related to Merrill's Bonus Pool ..................................................................................... 40

      a.   Qualifying Language in the Joint Proxy and Merger Agreement Did Not Disclose BofA's Consent to the Merrill Bonuses ..................................... 40

      b.   Press Reports and Past Merrill SEC Filings Did Not Render the Joint Proxy Immaterial or Establish Truth on the Market as a Matter of Law at the Rule 12(b)(6) Stage ................................................................................ 48

   2.   For Substantially the Same Reasons, the Derivative Complaint Adequately States a Claim under Section 14(a) and Rule 14a-9 ........................................ 53

   3.   Securities Complaint Adequately Alleges the Materiality of Defendants' Omissions Concerning Fourth Quarter 2008 Losses .......................................... 54

   4.   For Substantially the Same Reasons, the Derivative Complaint Adequately Alleges That Section 14(a) and Rule 14a-9 Required the Disclosure of Merrill's Fourth Quarter Losses ......................................................................... 60

   5.   Claims in the Securities and Derivative Complaints Directed to the Merger Agreement's MAC Clause Are Dismissed ........................................................ 61

      a.   Securities Complaint Fails to Plausibly Allege That the Defendants Violated Section 10(b) and Rule 10b-5 by Failing to Disclose Developments Related to the MAC .............................................................. 61

      b.   For Substantially the Same Reasons, the Derivative Plaintiffs' Section 14(a) Claims Arising from the Terms of the MAC Are Dismissed ............... 63

      c.   Derivative Plaintiffs' Allegations Concerning Non-Disclosure of the Decision to Invoke the MAC Clause Fail to State a Claim under Section 14(a) or Rule 14a-9 .................................................................................... 64

   6.   Claims Directed to the Adequacy of BofA's Due Diligence Are Dismissed .... 65

      a.   The Securities Complaint Fails to Plausibly Allege That the Defendants' Representations Concerning Due Diligence Violated Section 10(b) and Rule 10b-5 ................................................................................................... 65

      b.   Similarly, the Derivative Plaintiffs Have Not Adequately Alleged That Statements in the Joint Proxy Regarding Due Diligence Violated Section 14(a) and Rule 14a-9 .................................................................................. 70

   7.   Securities Complaint and the Derivative Complaint Both Fail to Plausibly Allege That Defendants Ran Afoul of the '34 Act's Duty to Update ................ 71

      a.   Defendants in the Securities Complaint Had No General Duty to Update Certain Statements in Light of the October and November Losses ............... 71

b.   Derivative Plaintiffs' Section 14(a) and Rule 14a-9 Claims Based on Statements Regarding the Future Capital Position of BofA and Merrill Are Dismissed ........................................................................................ 73

8.   Motions to Dismiss the Securities Plaintiffs' Additional Section 10(b) and Rule 10b-5 Claims Are Granted in Part and Denied in Part ............................ 73

a.   Statements in BofA's Press Release of January 1, 2009 Are Non-Actionable .................................................................................................... 74

b.   Motion to Dismiss the Section 10(b) and Rule 10b-5 Claims Is Denied As to BofA's Allegedly Undisclosed Arrangement to Receive Federal Funds ........................................................................................................... 74

c.   Lewis's September 15 Remarks About Merrill's Liquidity Are Non-Actionable .................................................................................................... 77

d.   Statements by Lewis Regarding Regulator Pressure and Thain's Self-Interest Are Non-Actionable .......................................................................... 78

9.   Derivative Plaintiffs' Remaining Section 14(a) Claims Against the BofA Directors Are Dismissed ..................................................................................... 80

a.   Derivative Plaintiffs Have Not Adequately Alleged That the Joint Proxy Contained Misstatements or Omissions Regarding the Overvaluation of Merrill Assets and Undervaluation of Merrill Losses ..................................... 80

b.   Derivative Plaintiffs Have Not Adequately Alleged That Statements about Steps Taken to Improve Merrill's Financial Condition Were Misleading .................................................................................................... 80

c.   Derivative Plaintiffs Have Not Adequately Alleged That Statements Regarding Additional Government Funds to Close the Merger and the Government Guarantee Were Misleading ...................................................... 82

d.   Derivative Plaintiffs Have Not Alleged That the BofA Directors' Recommendation Regarding the Merger Was Subjectively False ................. 83

IV.   THE MOTIONS TO DISMISS THE SECTIONS 10(b) AND 14(a) CLAIMS FOR FAILURE TO ADEQUATELY PLEAD NEGLIGENCE AND SCIENTER ARE GRANTED IN PART AND DENIED IN PART ...................... 84

A.   Securities Plaintiffs Must Adequately Allege Scienter for Their Section 10(b) Claims and Negligence for Their Section 14(a) Claims.............................. 84

B.   Derivative Plaintiffs Also Must Adequately Allege Negligence for Their Section 14(a) Claims ............................................................................................. 88

C.   Securities Complaint Pleads Scienter for the Merrill Bonus Arrangement As to Lewis, Thain, BofA and Merrill, and Negligence As to the BofA Directors ................................................................................................................ 89

D.   Derivative Complaint Adequately Pleads Negligence on the Part of the BofA Directors Regarding the Merrill Bonuses .................................................. 92

E.    Securities Complaint Fails to Allege Scienter As to Merrill's Fourth-Quarter Losses, but Both the Securities Complaint and the Derivative Complaint Adequately Allege Negligence ....................................................................... 94

1.    Securities Complaint Does Not Satisfy the PSLRA and Rule 9(b) in Its Scienter Allegations Regarding the Fourth Quarter Losses ..................... 94

2.    Securities Complaint Adequately Alleges Negligence As to the Losses, and Its Section 14(a) and Rule 14a-9 Claims Survive ....................................... 95

3.    Derivative Complaint Adequately Alleges Negligence As to Merrill's Fourth Quarter Losses ........................................................................................ 96

F.    Securities Complaint Does Not Allege Scienter for the Failure to Disclose Federal Financial Support for the Transaction ........................................................ 97

V.    DERIVATIVE PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION FOR THEIR SECTION 14(a) CLAIMS AGAINST THE BOFA DIRECTORS AND DEMAND IS EXCUSED FOR THOSE CLAIMS ..... 99

A.    Derivative Plaintiffs Have Adequately Alleged Loss Causation for Their Section 14(a) Claims Against the BofA Directors ................................................ 99

B.    Demand Is Excused for the Derivative Plaintiffs' Section 14(a) Claims Against the BofA Directors ................................................................................... 101

VI.   DERIVATIVE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM AGAINST THE FINANCIAL ADVISORS .......................................................... 105

VII.  SECURITIES DEFENDANTS' MOTION TO DISMISS THE SECTION 20(a) CLAIM IS DENIED ...................................................................................... 106

VIII. SECURITIES DEFENDANTS' MOTION TO DISMISS THE SECURITIES PLAINTIFFS' '33 ACT CLAIMS IS GRANTED IN PART AND DENIED IN PART ....................................................................................................................... 106

IX.   MOTIONS TO DISMISS THE DERIVATIVE PLAINTIFFS' STATE LAW CLAIMS ARE GRANTED IN PART AND DENIED IN PART ........................ 110

A.    Derivative Plaintiffs Have Abandoned Their Aiding and Abetting a Breach of Fiduciary Duty Claim ....................................................................................... 110

B.    Motion to Dismiss the Derivative Breach of Fiduciary Duty Claims Against the BofA Officers and Directors Is Granted ...................................................... 110

1.    Demand Is Not Excused for the Breach of Fiduciary Duty Claims Arising from the Merger Approval Because the Derivative Plaintiffs Have Failed to Raise a Reasonable Doubt That the Board Acted Disloyally or in Bad Faith When It Approved the Merger ................................................................ 111

a.    BofA Directors Were Disinterested and Independent When They Approved the Merger ................................................................................. 111

b.    Derivative Complaint Fails to Plead That the BofA Directors Acted Disloyally or in Bad Faith When They Approved the Merger .................... 114

2.  Alternatively, Plaintiffs Have Failed to State a Claim Against the BofA Derivative Defendants for Breach of Fiduciary Duty Arising from the Time Prior to and Including the Board's Approval of the Merger .................. 116

3.  BofA Officers' Motion to Dismiss the Claims Based on Post-Approval Breaches of Fiduciary Duty is Granted ............................................................ 118

    a.  Derivative Plaintiffs Have Not Adequately Alleged That the BofA Officers Breached the Duty of Disclosure .................................... 119

    b.  Alleged Decision to Retract the Invocation of the MAC Clause ................. 122

C.  Derivative Plaintiffs Have Failed to State a Claim for Unjust Enrichment ........ 123

D.  Derivative Plaintiffs Have Failed to State a Claim for Contribution ................. 125

E.  Demand Is Not Excused for the Derivative Plaintiffs' Breach of Fiduciary Duty and Professional Negligence Claims Against the Financial Advisors ....... 126

F.  Derivative Plaintiffs Fail to State a Direct Claim Against the BofA Directors and Officers for Breach of Fiduciary Duty ........................................................ 127

G.  This Action Will Not Be Stayed or Dismissed in Favor of the Delaware Action ........................................................................................................................ 129

H.  Derivative Plaintiffs May File a Motion Requesting Leave to Amend ............. 131

X.  LETTERS OF FEBRUARY 2010 PLAY NO PART IN THE CONSIDERATION OF THESE MOTIONS ........................................................ 131

CONCLUSION ........................................................................................................................ 132

BACKGROUND

I.   FACTUAL HISTORY

For the purposes of the defendants' motions, all nonconclusory factual allegations are accepted as true.  S. Cherry St. LLC v. Hennessee Group LLC, 573 F.3d 98, 100 (2d Cir. 2009); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).  As the non-movants, all reasonable inferences are drawn in favor of the plaintiffs.  United States v. City of New York, 359 F.3d 83, 91 (2d Cir. 2004).

A.   Parties to the Securities Action.

BofA is a Delaware corporation with its headquarters in North Carolina.  (Sec. Compl. ¶ 33.)  It provides banking and non-banking financial services in the United States and internationally.  (Sec. Compl. ¶ 33.)  Its shares are traded on the New York Stock Exchange ("NYSE").  (Sec. Compl. ¶ 33.)  As of April 30, 2009, it had more than 6.4 billion shares of common stock outstanding.  (Sec. Compl. ¶ 33.)  Merrill is a financial services company incorporated in Delaware with its headquarters in New York.  (Sec. Compl. ¶ 34.)  It provides investment banking, research and wealth management services.  (Sec. Compl. ¶ 34.)  From the start of the class period through its acquisition by BofA on December 31, 2008, Merrill's shares traded on the NYSE.  (Sec. Compl. ¶ 34.)

On January 1, 2009, BofA closed the acquisition of Merrill, which then became a direct subsidiary of BofA.  (Sec. Compl. ¶ 34.)  The acquisition was structured as a stock-for-stock transaction in which Merrill shareholders swapped each Merrill share in exchange for 0.8595 of a share of BofA's common stock.  (Joint Proxy Cover Letter.)  In order to consummate the transaction, BofA issued approximately 1.71 billion shares of common stock and 359,100 shares of preferred stock.  (Joint Proxy Cover Letter.)  BofA

needed shareholder approval in order to issue the shares, which required, among other things, amendment to its certificate of incorporation.  (Joint Proxy, Notice of Special Meeting.) BofA and Merrill often describe the transaction as a "merger," although it was not a merger in the true sense, and was instead a stock-for-stock acquisition of Merrill by BofA.  Because the transactional documents and disclosures characterize the acquisition as a "merger," the Court will occasionally employ the parties' preferred terminology.

Defendant Kenneth Lewis was BofA's CEO, president, and chairman of the board of directors during the class period.  (Sec. Compl. ¶ 35.)  Lewis signed the Agreement and Plan of Merger (the "Merger Agreement") governing the acquisition.  (Sec. Compl. ¶ 35.) Lewis also signed the transmittal letter for BofA and Merrill's definitive joint proxy statement (the "Joint Proxy"), which was dated October 31, 2008 and filed with the SEC on November 3, 2008.  (Sec. Compl. ¶ 35.)

Defendant Joe L. Price was BofA's CFO.  (Sec. Compl. ¶ 36.)  Defendant Neil A. Cotty was BofA's Chief Accounting Officer prior to the announcement of the acquisition; after the acquisition's announcement, he was appointed Merrill's interim CFO and functioned as a liaison between BofA and Merrill.  (Sec. Compl. ¶ 37.)  Defendant John A. Thain was CEO and chairman of the board of Merrill from the beginning of the class period through December 31, 2008.  (Sec. Compl. ¶ 38.)  From January 1, 2009 through the end of the class period, Thain was president of global banking, securities and wealth management at BofA.  (Sec. Compl. ¶ 38.)

In addition to their claims against senior management of the two companies, the Securities Plaintiffs also bring claims against fifteen members of BofA's board of

directors.[1]  (Sec. Compl. ¶¶ 39-53.)  They assert claims under the Securities Act of 1933, 15

U.S.C. § 77a, et seq. (the "'33 Act") against the underwriters of a secondary offering of BofA

shares in October 2008.  (Sec. Compl. ¶¶ 362-395.)  Those two underwriter defendants are

Banc of America Securities LLC ("Banc of America"), which is a wholly-owned subsidiary

of BofA, and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS").  (Sec. Compl.

¶¶ 56-58.)

       The lead plaintiffs are public pension funds that owned shares of BofA

common stock during the class period.  (Sec. Compl. ¶¶ 27-31.)  Two of the lead plaintiffs,

the State Teachers Retirement System of Ohio and the Ohio Public Employees Retirement

System, purchased shares of BofA common stock as part of the company's secondary offering

in October 2008, which forms the basis of the Complaint's '33 Act claims.  (Sec. Compl. ¶¶

27-28.)

       B.  Parties to the Derivative Action.

       The Derivative Plaintiffs assert claims against all sixteen individuals who were

BofA directors at the time of the Merrill acquisition, including Lewis (the "BofA Directors").

(Deriv. Compl. ¶¶ 43-58.)  Other than defendant Lewis, who was also BofA's Chairman and

CEO during all relevant times, none of the directors were officers or employees of BofA.

(Deriv. Compl. ¶¶ 43-58.)

       In addition to Lewis, the Derivative Plaintiffs bring claims against a number of

BofA officers, including Price, Cotty, BofA Vice Chairman for Corporate Planning and

Strategy Gregory Curl, Chief Administrative Officer J. Steele Alphin, Global Risk Executive

---

[1] The defendants named in the Securities Complaint for their actions while on the BofA board of directors are
William Barnet III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K.
Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O.
Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman, and Jackie M. Ward.  (Sec. Compl. ¶¶ 39-53.)

- 4 -

Amy Woods Brinkley, Brian T. Moynihan, head of Global Banking and Global Wealth and Investment Management and after December 10, 2008, General Counsel, Keith T. Banks, President of BofA's Global Wealth and Investment Management unit, Timothy Mayopoulos, General Counsel until December 10, 2008, and Associate General Counsel Teresa Brenner (the "BofA Officers").  (Deriv. Compl. ¶¶ 59-67.)

Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System are the interim lead plaintiffs in the Derivative Action. (MDL Docket # 2.)  They are citizens of Louisiana and Florida, respectively.  (Deriv. Compl. ¶¶ 40-41.)  None of the BofA Officers or Directors is a citizen of Louisiana or Florida. (Deriv. Compl. ¶¶ 43-67.)

The Derivative Plaintiffs assert claims against the Financial Advisors, J.C. Flowers & Co. LLC ("J.C. Flowers") and Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK").  Each of the Financial Advisors provided the BofA board with an opinion that the consideration BofA paid for Merrill was fair, from a financial point of view, to BofA. (Deriv. Compl. ¶¶ 83-84.)  According to the Derivative Complaint, J.C. Flowers and FPK are limited liability companies "organized and existing under the laws of the State of Delaware," with their "principal place of business" in New York.  (Id.)

C.  Negotiations Leading up to BofA's Acquisition of Merrill.

On the morning of Saturday, September 13, 2008, Thain reached out to Lewis. (Sec. Compl. ¶ 4.)  At that time, Thain was CEO of Merrill, and Lewis was CEO of BofA. (Sec. Compl. ¶ 4; Deriv. Compl. ¶ 9.)  Thain believed that Lehman Brothers Holdings, Inc. ("Lehman Brothers") would soon file for bankruptcy, resulting in market turmoil that "would cause severe liquidity issues" for Merrill, beginning as early as the following Monday.  (Sec.

Compl. ¶ 4; Deriv. Compl. ¶ 98.)  Thain believed that a Lehman Brothers bankruptcy would trigger Merrill's own "catastrophic" collapse and "likely render [Merrill] effectively insolvent" on Monday.  (Sec. Compl. ¶ 62; Deriv. Compl. ¶ 98.)

According to the Securities Complaint, Lewis "had long coveted" Merrill, and stated as much in press interviews.  (Sec. Compl. ¶¶ 5, 59.)  Thain was aware of Lewis's interest, but previously rebuffed BofA's offers.  (Sec. Compl. ¶ 63.)  On Saturday morning, Lewis flew to New York, where he met Thain at 2:30 p.m.  (Sec. Compl. ¶ 64; Deriv. Compl. ¶ 100.)  Thain proposed selling a 9.9 percent stake of Merrill to BofA.  (Sec. Compl. ¶ 64; Deriv. Compl. ¶ 100.)  Lewis later recalled, "I responded to John, 'That's not really what I have envisioned here.  I want to buy the whole company, not invest 9 to 10 percent.'"  (Sec. Compl. ¶ 64.)  The two eventually agreed that any transaction would entail BofA acquiring Merrill in full, and "later that same day, teams from both firms began conducting due diligence and negotiating the terms of a possible merger."  (Deriv. Compl. ¶ 100.)

D.  Negotiations over Merrill's Bonus Pool.

As talks unfolded over the weekend, bonuses to Merrill employees became a major topic of negotiation.  (Sec. Compl. ¶¶ 6, 67; Deriv. Compl. ¶ 101.)  According to the Securities Complaint, Thain later stated that, alongside the acquisition price and the language of the Material Adverse Change clause (the "MAC"), the employee bonus arrangement was one of the three principal topics of negotiation.  (Sec. Compl. ¶ 67.)  The Derivative Complaint asserts that certain BofA officers involved in the negotiations later testified that "Merrill's ability to pay year-end bonuses to its executives and employees pursuant to its" incentive compensation program was a major topic of negotiation.  (Deriv. Compl. ¶ 101.)

The Securities Plaintiffs allege that Thain remained informed of the negotiations' progress through Greg Fleming, Merrill's president and chief operating officer. (Sec. Compl. ¶ 67.)  Merrill wanted to pay its officers and employees $5.8 billion in bonuses. (Sec. Compl. ¶ 68; Deriv. Compl. ¶ 10.)  This included bonuses for executive officers that ranged from $15 million to $40 million.  (Sec. Compl. ¶ 68.)  The Securities Complaint states that the $5.8 billion bonus pool totaled 12 percent of the transaction's value and 26 percent more than BofA's earnings in the first two quarters of 2008.  (Sec. Compl. ¶ 72.)  "It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008."  (Sec. Compl. ¶ 72.)

Merrill wanted to pay bonuses on an accelerated basis and prior to the transaction's closing, even though its past practice had been to pay bonuses after the close of the fiscal year.  (Sec. Compl. ¶¶ 69-70, 74; Deriv. Compl. ¶¶ 10, 215.)  The Securities Complaint asserts that the accelerated payment schedule prevented BofA from later reducing bonus payments, permitted Merrill officers "to reap gigantic bonuses" despite dismal financial results in 2008 and ultimately reduced the value of Merrill before BofA finalized the acquisition.  (Sec. Compl. ¶¶ 75-77.)  As characterized in the Securities Complaint, negotiations over the bonuses "dragged on for hours," and "delay[ed]" execution of the Merger Agreement until 2 a.m. on Monday, September 15, 2008 – one hour after Lehman Brothers filed for bankruptcy.  (Sec. Compl. ¶ 71.)  In press interviews, Lewis later indicated that the bonus negotiations were a source of hard feelings, and characterized the issue as "petty" and "selfish."  (Sec. Compl. ¶ 78.)

The Derivative Complaint alleges that a term sheet prepared on Sunday, September 14 reflected that as a result of the negotiations, BofA "had agreed in principle that Merrill would be authorized to pay a bonus pool that would, at most, be 'flat to last year' . . . with a maximum recorded expense of $4.5 billion."  (Deriv. Compl. ¶ 120.)  BofA and Merrill also agreed that Merrill's year-end bonuses would be paid in a 60/40 cash/stock split, the same as in 2007, and that "bonus allocations would be made in consultation with BofA." (Deriv. Compl. ¶ 121.)  Taking "headcount changes" into account, the parties agreed that the bonus pool would be $5.8 billion, which was greater than the pool that Merrill previously projected for 2008.  (Deriv. Compl. ¶ 122.)[2]  BofA also agreed to allow Merrill to accelerate its incentive bonus payments to December 31, 2008, prior to the closing of the transaction, and "ahead of the disclosure date for Merrill's fourth-quarter results."  (Deriv. Compl. ¶ 123.)

E.   <u>Fairness Opinion and the BofA Board's Recommendation of the Merger.</u>

The principal terms of the transaction were negotiated in approximately 24 hours, from late-afternoon on Saturday, September 13, to late-afternoon on Sunday, September 14, 2008.  (Deriv. Compl. ¶ 101.)  On Sunday, Lewis agreed that BofA would buy Merrill for $50 billion, valuing Merrill stock at $29 per share, which was a 70 percent premium over Merrill's $17 NYSE closing price the day before.  (Sec. Compl. ¶ 66.; Deriv. Compl. ¶ 102.)

According to the Joint Proxy, late on Sunday afternoon, the BofA Directors met with BofA "senior management and its outside advisors."  (Joint Proxy at 50.)  At that meeting, BofA's senior management and the Financial Advisors discussed the results of their due diligence exercise.  (Joint Proxy at 55.)  J.C. Flowers and FPK each delivered an oral

---

[2] Prior to the negotiations, Merrill was projecting a bonus pool of, at most, $5.1 billion, with a recorded expense of $3.5 billion.  (Deriv. Compl. ¶ 122.)

opinion that the exchange ratio of 0.8595 of a share of BofA for every share of Merrill "was

fair, from a financial point of view, to [BofA]."  (Joint Proxy at 51.)   The Joint Proxy would

later set forth the full text of the Financial Advisors' written fairness opinions.  The FPK

fairness opinion stated that FPK was "of the opinion that, as of the date hereof, the Exchange

Ratio to be paid by [BofA] in the Merger is fair, from a financial point of view, to [BofA]."

(Joint Proxy at D-3.)  The J.C. Flowers opinion stated: "we are of the opinion that as of the

date hereof the Exchange Ratio is fair, from a financial point of view, to [BofA]."  (Joint

Proxy at C-2.)  The actions of the Financial Advisors are material to the Derivative

Complaint.  They are not named as defendants in the Securities Complaint.

       BofA's general counsel defendant Mayopoulos and BofA's outside counsel

Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") then advised the board regarding "the

legal standards applicable to its decisions and actions with respect to the proposed transaction

and reviewed the legal terms of the proposed merger."  (Joint Proxy at 51.)  The BofA Board

then unanimously voted to approve the transaction.  (Joint Proxy at 51.)  The two companies

signed the Merger Agreement in the early morning of Monday, September 15.  (Joint Proxy at

51.)  Lewis signed on behalf of BofA, and Thain signed on behalf of Merrill.  (Joint Proxy at

A-46.)

       F.  <u>BofA Announces Secondary Offering.</u>

       On October 7, 2008, BofA conducted a secondary offering of common stock,

in which it sold 455,000,000 shares at $22 per share, netting proceeds of $9.9 billion (the

"Secondary Offering").  (Sec. Compl. ¶ 83.)  The Secondary Offering is the basis of claims

arising under the '33 Act.  (Sec. Compl. ¶¶ 362-395.)  According to the plaintiffs, the offering

documents expressly incorporated the Merger Agreement and the Form 8-K filing announcing

the acquisition; because the documents are alleged to be materially false and misleading, plaintiffs allege that statements made relating to the secondary offering were materially false and misleading.  (Sec. Compl. ¶ 201.)

### G.  BofA and Merrill Incur Significant Losses in the Fourth Quarter of 2008.

In October and November 2008, while shareholder approval of the transaction was pending, Merrill incurred significant losses.  (Sec. Compl. ¶¶ 7, 87; Deriv. Compl. ¶ 168.) In October 2008, Merrill lost approximately $7 billion.  (Sec. Compl. ¶ 88; Deriv. Compl. ¶ 20.)  Its total losses for October and November exceeded $15 billion.  (Sec. Compl. ¶ 90; Deriv. Compl. ¶ 20.)  In November, Merrill also took an impairment charge of approximately $2 billion to the value of its goodwill.  (Sec. Compl. ¶ 91; Deriv. Compl. ¶ 20.)  According to the Securities Complaint, Merrill's losses were substantial, particularly when contrasted with the $5.8 billion that BofA earned in the first nine months of 2008.  (Sec. Compl. ¶ 92.)

According to the Securities Complaint, defendants Lewis, Thain, Price and Cotty were aware of Merrill's losses as they occurred.  (Sec. Compl. ¶ 93.)  BofA assigned 200 employees to monitor Merrill's financial condition.  (Sec. Compl. ¶ 93; Deriv. Compl. ¶ 170.)  Thain later stated that BofA received frequent updates on Merrill's financial condition.  (Sec. Compl. ¶¶ 93-95.)  In press reports, BofA also stated that it was "kept informed of the financial condition" of Merrill.  (Sec. Compl. ¶ 96.)  Lewis later acknowledged that he was aware of Merrill's deteriorating financial condition as it occurred in real time.  (Sec. Compl. ¶¶ 97-98.)  Lewis led weekly calls with the BofA board of directors, which included discussion of Merrill's fourth quarter losses.  (Sec. Compl. ¶ 99.)

According to the Derivative Plaintiffs, the BofA Derivative Defendants "had complete and unfettered access to Merrill's financial and accounting records beginning no

later than September 15, 2008." (Deriv. Compl. ¶ 162.) This included access to Merrill's profit and loss reports, "which showed the facts of Merrill's deteriorating positions." (Deriv. Compl. ¶ 164.) In addition, "Lewis, Price and other senior executives among the BofA [Derivative] Defendants received weekly reports concerning Merrill's financial condition beginning immediately after the Merger Agreement was executed." (Deriv. Compl. ¶ 165 (emphasis added).)

According to the Securities Complaint, Merrill's fourth-quarter losses were so significant that BofA management discussed terminating the transaction "on several occasions." (Sec. Compl. ¶ 100.) Shortly before Thanksgiving, BofA executives began to discuss invoking the MAC. (Sec. Compl. ¶¶ 100-01.) The magnitude of Merrill's losses was not disclosed to BofA's shareholders. (Sec. Compl. ¶ 101.) Within BofA, internal disagreements broke out as to whether shareholders should be informed of the Merrill losses in advance of the proxy vote. (Sec. Compl. ¶ 102.)

Meanwhile, BofA's own losses were growing, making it more difficult to absorb Merrill's. (Sec. Compl. ¶ 103.) BofA was projecting a first-ever quarterly loss of $1.4 billion. (Sec. Compl. ¶ 103.) BofA executives told the Federal Reserve that BofA, excluding the Merrill acquisition, was "very thinly capitalized . . . ." (Sec. Compl. ¶ 103.)

According to the Derivative Plaintiffs, at some point in November, Merrill's losses became "so severe" that defendant Price sought the advice of Mayopoulos and Wachtell "as to whether BofA should disclose Merrill's expected fourth quarter losses to BofA shareholders." (Deriv. Compl. ¶ 167.) After receiving legal advice, BofA decided not to disclose the losses. (Deriv. Compl. ¶ 167.) According to the Derivative Complaint, the BofA Directors "conducted weekly conference calls every Friday starting in September 2008

and continuing through December 2008, [and] could not and should not have been unaware of Merrill's accelerating losses throughout the fourth quarter."  (Deriv. Compl. ¶ 170.)

The Derivative Plaintiffs allege that Lewis "was aware or should have been aware" of a projected $9 billion fourth-quarter loss at Merrill, "no later than the evening of December 3, 2008, when he received the latest weekly BofA internal report on Merrill." (Deriv. Compl. ¶ 172 (emphasis omitted).)  Plaintiffs allege that "on this occasion" Craig Rosato, BofA's Chief Accounting Officer sent an email to Lewis, which reported that Merrill's fourth quarter revenues would need a downward adjustment of $3 billion.  (Deriv. Compl. ¶ 172.)  This brought Merrill's fourth quarter loss to $9 billion.  (Deriv. Compl. ¶ 172.)  The "December 5, 200[8], projection was shared with the BofA Board no later than at its meeting on December 9, 2008."  (Deriv. Compl. ¶ 172.)  By December 14, 2008, Merrill's projected loss had grown to $12 billion.  (Deriv. Compl. ¶ 174.)

H. Joint Proxy Did Not Disclose Merrill's Growing Fourth Quarter Losses or the Bonus Arrangement.

Following the announcement of the transaction on September 15, 2008, BofA, Merrill and their respective legal counsel "prepared the transactional and disclosure documents relating to the Merger."  (Deriv. Compl. ¶ 126.)  BofA was represented by Wachtell, and Merrill was represented by Shearman & Sterling, LLP ("Shearman").  (Deriv. Compl. ¶ 126.)  The agreement regarding bonuses "was memorialized by Wachtell and Shearman" in section 5.2 of a disclosure schedule attached to the Merger Agreement (the "Disclosure Schedule").  (Deriv. Compl. ¶ 127.)  According to information provided to the SEC by several individuals, including Lewis, "lawyers at Wachtell and Shearman, and one or more of BofA's in-house lawyers, including Defendant Mayopolous [sic] . . . and Defendant Brenner," decided to place this information in the Disclosure Schedule, instead of the Merger

Agreement.  (Deriv. Compl. ¶ 129, 130.)  This Disclosure Schedule, which was not available

to shareholders prior to voting on the transaction, provided that incentive bonuses for 2008

"may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of

cash bonuses and the grant date of long-term incentive awards) . . . and (ii) do not result in

2008 [incentive-related] expense exceeding $4.5 billion."  (Deriv. Compl. ¶ 128 (quoting

Disclosure Schedule).)

     The terms of the merger were set forth in a definitive Joint Proxy filed with the

SEC and mailed to shareholders of record on November 3, 2008.  (Sec. Compl. ¶ 205; Deriv.

Compl. ¶ 125.)  In the Joint Proxy, the BofA Directors solicited proxies to vote on the merger

at a special meeting on December 5, 2008.  (Deriv. Compl. ¶ 125.)

     The Joint Proxy explains to shareholders the terms and conditions of, and the

basis for the boards' recommendations for, the acquisition.  (Sec. Compl. ¶ 206; Deriv.

Compl. ¶¶ 107-08, 125, 155.)  The Joint Proxy begins with a letter to shareholders of BofA

and Merrill, which features as its heading the separate corporate logos of the two companies.

(Joint Proxy Cover Letter.)  The letter is signed by both Lewis and Thain.  (Joint Proxy Cover

Letter.)  Among other things, the letter states that the BofA board unanimously recommended

the proposal to issue the shares necessary to purchase Merrill.  (Joint Proxy Cover Letter.)  By

the Court's count, the Joint Proxy incorporates by reference 78 separate SEC filings of either

BofA or Merrill.  (Joint Proxy at 123-24.)

     The Joint Proxy also attaches a copy of the Merger Agreement.  It describes

the Merger Agreement as "subject to important qualifications and limitations agreed to

between the parties," which "may have been included in the agreement for the purpose of

allocating risk between the parties rather than to establish matters as facts."  (Joint Proxy at

125.)  It asserted that certain "materials" are intended "only to provide you with information regarding the terms and conditions of the agreements, and not to provide any other factual information . . . ."  (Joint Proxy at 125.)  The Joint Proxy advised that provisions of the Merger Agreement "should not be read alone," but rather, in conjunction with the Joint Proxy and filings incorporated by reference.  (Joint Proxy at 125.)  Elsewhere, the Joint Proxy stated, "We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing the merger."  (Joint Proxy at 76.)

The Joint Proxy did not disclose the losses of Merrill or BofA in the fourth quarter of 2008, or disclose that bonuses were to be paid to Merrill personnel prior to the transaction's closing.  (Sec. Compl. ¶¶ 106, 207; Deriv. Compl. ¶¶ 232(g)-(j), 233(a).) According to both complaints, the Joint Proxy falsely stated that there had been an "absence of material adverse changes" to Merrill's financial conditions.  (Sec. Compl. ¶ 107; Deriv. Compl. ¶ 233(b).)  Both complaints assert that the Joint Proxy's incorporation by reference of a March 2008 proxy statement issued by Merrill adopted that proxy's representation that Merrill would not pay discretionary bonuses prior to January.  (Sec. Compl. ¶ 108; Deriv. Compl. ¶ 232(j).)  All plaintiffs contend that the Joint Proxy's representations as to the Merrill bonuses were false and misleading because Merrill had negotiated with BofA to pay up to $5.8 billion in bonuses and to make those payments earlier than in prior years, on a timeline prior to the transaction's closing.  (Sec. Compl. ¶¶ 214-20; Deriv. Compl. ¶¶ 232(g)-(j).)

BofA filed proxy supplements on November 21, and November 26, 2008. (Sec. Compl. ¶ 221; Deriv. Compl. ¶ 239.)  In the second proxy supplement Lewis stated that "Bank of America is positioned to ride out this severe economic storm."  (Sec. Compl. ¶ 222; Deriv. Compl. ¶ 239.)  Lewis also made statements about BofA's capital and liquidity

positions, and stated that, although BofA had received a capital injection from the federal government, "th[ose] were funds that [BofA] did not need and did not seek."  (Sec. Compl. ¶ 222; Deriv. Compl. ¶ 239.)  By the beginning of December 2008, Merrill had incurred approximately $15.3 billion in losses, including its $2 billion impairment charge taken to the value of corporate goodwill.  (Sec. Compl. ¶ 209; Deriv. Compl. ¶¶ 20, 240.)

All plaintiffs allege that the failure to disclose Merrill's losses rendered statements in the Joint Proxy false and misleading.  (Sec. Compl. ¶ 211; Deriv. Compl. ¶ 233(a).)  According to plaintiffs, Merrill's losses in the fourth quarter amounted to material adverse changes to its financial condition, as was evidenced by BofA's deliberations about invoking the MAC provision of the Merger Agreement.  (Sec. Compl. ¶ 211; Deriv. Compl. ¶¶ 233(b) & (c).)  As noted, the Joint Proxy represented that no material adverse change had occurred in Merrill's financial condition.  (Sec. Compl. ¶ 212; Deriv. Compl. ¶ 233(b).)

I.   Consideration of the Invocation of the MAC Clause and the Offer of Federal Capital Support.

Shareholders of BofA and Merrill voted to approve the transaction on December 5, 2008.  (Sec. Compl. ¶¶ 112, 225; Deriv. Compl. ¶¶ 1, 176.)  On December 9, defendants Lewis and Price met with BofA's board of directors to discuss Merrill's financial condition.  (Sec. Compl. ¶ 113.)  According to the Securities Complaint, Price estimated that Merrill would lose $9 billion after taxes, and described the scope of loss as "quite significant." (Sec. Compl. ¶ 113.)  The Derivative Complaint alleges that by December 5, 2008, Lewis was aware of a revised projection that Merrill would incur a $9 billion after-tax loss for the fourth quarter.  (Deriv. Compl. ¶ 172.)

In light of the accumulating losses, Lewis considered exercising BofA's right to terminate the transaction prior to the closing, as the MAC provision contemplated.  (Sec.

Compl. ¶ 113; Deriv. Compl. ¶¶ 181, 183.)  He called Treasury Secretary Paulson on

December 17, 2008.  (Sec. Compl. ¶ 114; Deriv. Compl. ¶ 185.)  Lewis told Paulson that

BofA was "strongly considering" invoking the MAC and terminating the acquisition.  (Sec.

Compl. ¶ 114; Deriv. Compl. ¶ 185.)

At Paulson's instruction, Lewis traveled to Washington, D.C. for a face-to-face

meeting at the Federal Reserve.  (Sec. Compl. ¶ 114; Deriv. Compl. ¶ 186.)  Attendees

included Paulson and Ben Bernanke, the chairman of the Federal Reserve Board (the "Fed").

(Sec. Compl. ¶ 115; Deriv. Compl. ¶ 186.)  Lewis stated that BofA was facing its first-ever

quarterly loss, and that Merrill's losses were so large that they threatened BofA's solvency.

(Sec. Compl. ¶ 115.)  Lewis said that BofA intended to invoke the MAC, stating that BofA

learned of the losses only in mid-December.  (Sec. Compl. ¶ 115.)  Bernanke and Paulson

urged Lewis not to invoke the MAC.  (Sec. Compl. ¶ 116; Deriv. Compl. ¶ 186.)

According to the Securities Complaint, Lewis then requested "a taxpayer

bailout," including a $50 billion guarantee of assets, as a condition to proceeding with the

transaction.  (Sec. Compl. ¶ 116.)  He agreed to provide the Fed with information about the

companies' fourth-quarter performances and risk exposures.  (Sec. Compl. ¶ 116.)  After

reviewing the materials, Fed officials concluded that Lewis's claim of surprise at Merrill's

losses was not credible.  (Sec. Compl. ¶ 117; Deriv. Compl. ¶ 115.)

On December 19, Lewis and Price again spoke to Paulson and Bernanke,

stating that Merrill's pre-tax losses exceeded $21 billion, and that the MAC would be

invoked.  (Sec. Compl. ¶ 124.)  Lewis indicated that the deal would proceed only if the

federal government agreed to purchase Merrill's toxic assets, or else guaranteed BofA against

any losses arising from them.  (Sec. Compl. ¶ 124.)  Officials countered that invoking the

MAC would raise questions from the public about BofA's diligence, financial condition and management.  (Sec. Compl. ¶ 125.)

According to the Derivative Complaint, on December 21, the "BofA Board determined that going through with the Merger would jeopardize BofA's existence as a going concern and that – despite the urgings of Fed officials – it was in [BofA's] best interests to invoke the MAC clause and terminate the Merger."  (Deriv. Compl. ¶ 188 (emphasis added).)  When Lewis informed Secretary Paulson of this decision, Paulson told Lewis that if BofA invoked the MAC clause, Paulson would remove BofA's directors and management from their positions.  (Sec. Compl. ¶ 126; Deriv. Compl. ¶ 188.)

The Derivative Complaint alleges that Lewis called a board meeting for 4:00 p.m. of the next day, December 22, 2008.  (Deriv. Compl. ¶ 191.)  Throughout the evening of December 21, 2008, according to the Derivative Complaint, Lewis "canvassed fellow Board members informally to determine whether the Board would opt to preserve their jobs and support management's recommendation not to invoke the MAC . . . . "  (Deriv. Compl. ¶ 193.)  All of the directors, except Patricia Mitchell and Jackie Ward attended the meeting.  (Deriv. Compl. ¶ 196.)  At that meeting, the board agreed not to invoke the MAC clause.  (Deriv. Compl. ¶ 196.)  Lewis subsequently informed Paulson and Bernanke that BofA would go forward with the acquisition.  (Sec. Compl. ¶¶ 127-28; Deriv. Compl. ¶ 197.)

Lewis feared that consummation of the transaction could subject BofA to shareholder suits.  (Sec. Compl. ¶ 129; Deriv. Compl. ¶ 199.)  He approached Fed officials to request measures to shield BofA from potential liability.  (Sec. Compl. ¶¶ 129-31; Deriv. Compl. ¶ 199.)  Bernanke and Fed General Counsel Scott Alvarez discussed BofA's potential shareholder liability in completing the acquisition.  (Sec. Compl. ¶¶ 129-31; Deriv. Compl. ¶¶

199-200.)  Partly acting under Alvarez's advice, Bernanke declined to take any actions that would limit BofA's liability.  (Sec. Compl. ¶¶ 129-31.)

BofA did, however, receive a $138 billion "taxpayer bailout," which consisted of a $20 billion capital infusion and a $118 billion guarantee against losses on certain risky assets, mainly those acquired from Merrill.  (Sec. Compl. ¶ 132; Deriv. Compl. ¶ 21.) According to the Securities Complaint, Lewis told the BofA board that "the verbal commitment of the Fed and Treasury" was material to management's recommendation to close on the acquisition.  (Sec. Compl. ¶ 133.)  As characterized in the Securities Complaint, "Lewis concealed the bailout from investors."  (Sec. Compl. ¶ 134.)  He told the BofA board that the Company would not enter into a written agreement concerning federal funds, because he could not risk public disclosure of government loans prior to closing of the transaction. (Sec. Compl. ¶¶ 134, 136; Deriv. Compl. ¶¶ 197-98, 201.)  Rather, according to both sets of plaintiffs, BofA concluded that the $138 billion package would be disclosed at the time of the Company's earnings release on January 20, 2009.  (Sec. Compl. ¶ 136; Deriv. Compl. ¶ 202.)

The Securities Plaintiffs allege that the defendants unlawfully failed to disclose, among other things, the role of federal officials in urging the completion of the transaction and providing funds to BofA, and the full scope of quarterly losses suffered by BofA and Merrill.  (Sec. Compl. ¶¶ 228-29.)  Similarly, the Derivative Plaintiffs allege that the BofA Derivative Defendants breached their fiduciary duty to BofA by failing to disclose the "devastating losses" at Merrill, the board's initial belief that a material adverse event had arisen, and federal involvement in exercising the MAC clause and providing financial support.  (Deriv. Compl. ¶ 314(c).)

J.   BofA Announces Fourth Quarter Results and Federal Financial Support.

BofA's acquisition of Merrill closed on January 1, 2009.  (Sec. Compl. ¶ 139; Deriv. Compl. ¶ 177.)  According to the Securities Complaint, "analysts had previously estimated" that BofA would report quarterly earnings of $.08 per share.  (Sec. Compl. ¶ 140.) However, rumors began to circulate in the financial press and in the investment community about anticipated losses.  On or around January 12, 2009, a Citigroup analyst reported that BofA might report a $3.6 billion loss for the fourth quarter of 2008, and cut dividends from $0.32 to $0.05 per share.  (Sec. Compl. ¶ 263.)  The next trading day, BofA shares fell from $12.99 to $11.43.  (Sec. Compl. ¶ 263.)  As rumors of losses circulated in the press, the stock price dropped to $8.32 at the close of trading on January 15.  (Sec. Compl. ¶¶ 262-65.)

On January 16, 2009, BofA disclosed the previous quarter's performances of BofA and Merrill and the federal funding.  (Sec. Compl. ¶ 145; Deriv. Compl. ¶ 243.)  That morning, the Treasury Department also disclosed the funding package.  (Sec. Compl. ¶ 144.) Later in the morning, BofA announced that Merrill's after-tax loss for the fourth quarter of 2008 totaled $15.31 billion (more than $21 billion before taxes), that BofA's quarterly losses totaled $1.8 billion, and that the federal government was providing $20 billion in capital to BofA while agreeing to provide protection against further losses on $118 billion of assets. (Sec. Compl. ¶ 145; Deriv. Compl. ¶ 243.)  According to the Securities Complaint, the quarterly results for both BofA and Merrill were far below previous analyst estimates.  (Sec. Compl. ¶ 145.)

That same day, Lewis stated that BofA needed the federal "bailout" to absorb Merrill's losses.  (Sec. Compl. ¶ 147.)  After the markets closed that day, the ratings agency Moody's downgraded BofA's credit rating, and Fitch downgraded Merrill's rating to an "F."

(Sec. Compl. ¶¶ 150, 266.)  Over the weekend, BofA and Merrill were subjects of negative

press accounts and analyst reports.  (Sec. Compl. ¶¶ 151-52.)  On January 20, 2009, which

was the next trading day, BofA shares declined to $5.10, representing a decline of an

additional 29%.  (Sec. Compl. ¶¶ 153, 267.)

   News broke of Merrill's bonus arrangement, with estimates that the payments

totaled approximately $3 to 4 billion.  (Sec. Compl. ¶ 155.)  On January 22, 2009, Lewis

terminated Thain.  (Sec. Compl. ¶ 156.)  That day, BofA's share price dropped from $6.68 per

share to $5.71.  (Sec. Compl. ¶ 161.)  According to the Securities Complaint, from January 12

to January 22, 2008, the price of BofA's preferred stock fell, on average, 32%.  (Sec. Compl.

¶ 269.)

   After the end of the class period, details about the transaction continued to

draw press attention, as well as investigations from state and federal regulators.  (Sec. Compl.

¶¶ 162-65, 169-77.)  In April 2009, BofA shareholders voted to terminate Lewis's position as

chairman of BofA's board.  (Sec. Compl. ¶ 166.)  Between May 2009 and the filing of the

Securities Complaint, "several" BofA directors and officers resigned.  (Sec. Compl. ¶ 168.)

   K. Claims Asserted in the Securities Complaint.

   Counts I through VI of the Securities Complaint assert claims pursuant to the

'34 Act.  Counts I and II of the Securities Complaint assert that defendants BofA, Merrill,

Thain, Lewis, Price and Cotty violated Section 10(b) of the '34 Act and Rule 10b-5

promulgated thereunder.  (Sec. Compl. ¶¶ 286-310.)  Counts III, IV and VI variously assert

claims of control person liability against defendants Lewis, Price, Thain and the BofA Board

of Directors pursuant to section 20(a) of the '34 Act, 15 U.S.C. § 78t(a).  (Sec. Compl.

¶¶ 311-26, 352-61.)  Count V asserts a violation of Section 14(a) of the '34 Act, 15 U.S.C.

- 20 -

§ 78n(a) and Rule 14a-9 promulgated thereunder, against BofA, Merrill, Lewis, Thain, Price, Cotty and the BofA directors, asserting that the Joint Proxy contained material misstatements and omissions, and was not sufficiently updated.  (Sec. Compl. ¶¶ 335-351.)

Counts VII through IX are asserted pursuant to the '33 Act, and brought on behalf of persons and entities that purchased BofA common stock in the secondary offering of October 2008.  Plaintiffs allege that the offering documents contained untrue statements and material omissions.  (Sec. Compl. ¶ 364.)  Count VII asserts that defendants BofA, Lewis, Price, Cotty, and the Underwriter Defendants unlawfully violated Section 11 of the '33 Act, 15 U.S.C. § 77k, because the secondary offering registration statement contained material omissions and misstatements.  (Sec. Compl. ¶¶ 372-382.)  Count VIII asserts that BofA and the Underwriter Defendants violated Section 12(a)(2) of the '33 Act, 15 U.S.C. § 77*l*(a)(2), by setting forth untrue statements and omissions in the secondary offering registration statement. (Sec. Compl. ¶¶ 383-90.)  Count IX asserts that Lewis, Price and the BofA directors violated Section 15 of the '33 Act, 15 U.S.C. § 77o, by failing to disclose "accurate and truthful information" about BofA's financial condition and results in connection with the secondary offering.  (Sec. Compl. ¶¶ 391-95.)

L.   <u>Claims Asserted in the Derivative Complaint.</u>

Counts I, II and VI assert derivative claims on behalf of BofA against the BofA Derivative Defendants and the Financial Advisors for breach of fiduciary duty.  (Deriv. Compl. ¶¶ 312-20, 336-38.)  Count III asserts a derivative claim against the Financial Advisors for professional negligence.  (Deriv. Compl. ¶¶ 321-24.)  Count IV asserts a derivative claim against the BofA Officers and others for unjust enrichment.  (Deriv. Compl. ¶¶ 325-31.)  Court V asserts a derivative claim for contribution against the BofA Derivative

Defendants.  (Deriv. Compl. ¶¶ 332-35.)  Count VII asserts claims against certain defendants for aiding and abetting the BofA Derivative Defendants' breaches of fiduciary duty.  (Deriv. Compl. ¶¶ 339-45.)  The final derivative claim is contained in Count VIII, which asserts a claim against the BofA Derivative Defendants and the Financial Advisors for violations of Section 14(a) and Rule 14a-9.  (Deriv. Compl. ¶¶ 346-56.)  Finally, in Count IX, the Derivative Plaintiffs assert a direct claim against the BofA Derivative Defendants for breach of fiduciary duty on behalf of the putative class.  (Deriv. Compl. ¶¶ 357-61.)

II.     PROCEDURAL HISTORY

On June 11, 2009, the Judicial Panel on Multidistrict Litigation transferred various private actions arising out of BofA's acquisition of Merrill to Judge Denny Chin, then of this District, for consolidated pretrial proceedings.  28 U.S.C. § 1407 (MDL Docket # 1).  In June and July of 2009, Judge Chin consolidated for all purposes a number of securities actions and appointed lead plaintiffs and lead counsel for the Securities Action.  (MDL Docket ## 2, 15.)  At the same time, Judge Chin consolidated for all purposes several derivative actions and appointed interim lead plaintiffs and co-lead counsel.  (MDL Docket ## 2, 16.)  The Securities Plaintiffs filed the Consolidated Amended Class Action Securities Complaint on September 25, 2009.  (MDL Docket # 29.)  The Derivative Plaintiffs filed the Consolidated Shareholder Derivative and Class Action Complaint on October 9, 2009.  (MDL Docket # 39.)

Three separate motions to dismiss the Securities Complaint were filed on November 24, 2009.  They were respectively filedon behalf of (1) BofA, Banc of America, and all BofA officers and directors named as defendants; (2) Thain; and (3) Merrill and MLPFS.  Thain and Merrill incorporate the arguments set forth by the BofA defendants.  The

plaintiffs filed a single memorandum in opposition to the motions.  On December 8, 2009, the

BofA Derivative Defendants, BofA as nominal defendant, the Financial Advisors, and several

other individuals (the "Derivative Merrill Defendants") filed motions to dismiss the

Derivative Complaint.  Plaintiffs voluntarily dismissed their claims against the Derivative

Merrill Defendants on February 2, 2009.  While the current motions to dismiss were pending,

Judge Chin was elevated to the United States Court of Appeals for the Second Circuit, and the

action was reassigned to me.  (MDL Docket # 250.)

       The Derivative Plaintiffs were directed to amend the Derivative Complaint to

include allegations regarding the citizenship of the Financial Advisors.  (MDL Docket ## 279,

289.)  Although that complaint has not yet been filed, the amendments will solely relate to

allegations concerning diversity jurisdiction.  Because the substantive allegations will be

identical to those of the original Derivative Complaint, the defendants in the Derivative

Action were not required to file new motions to dismiss.

DISCUSSION

    I.     RULE 12(b)(6), RULE 9(b) AND THE PSLRA'S PLEADING THRESHOLD.

       Pursuant to Rule 12(b)(6), Fed. R. Civ. P., "[t]o survive a motion to dismiss, a

complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d

187, 196 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.

2008)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'"  Iqbal, 129 S. Ct. at 1949 (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)).

Along with the standards of Rule 12(b)(6), "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134, 553 F.3d at 196 (citing Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident" charges and protects against strike suits. See ATSI Commc'ns, Inc. v. Shaar Funds, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)). Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" Id. at 104 (quoting Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

The PSLRA, for its part, has "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008) (quoting 15 U.S.C. § 78u-4(b)). It requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(l). Put differently, the PSLRA "insists that securities fraud complaints 'specify'

each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(l), (2)).  As the Second Circuit has repeatedly required, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord ATSI, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must . . . explain why the statements were fraudulent.  Allegations that are conclusory or unsupported by factual assertions are insufficient.") (citations omitted).

The PSLRA also "requires plaintiffs to state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)).  To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 314.

Although the Second Circuit has not directly addressed the issue, other courts have concluded that Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PSLRA, 15 U.S.C. § 78u-4(b)(1).  See, e.g., New York City Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1023 (9th Cir. 2010); Beck v. Dobrowski, 559 F.3d 680, 681-82 (7th Cir. 2009) (Posner, J.); DCML LLC v. Danka Bus. Sys. PLC, No. 08 Civ. 5829 (SAS), 2008 WL 5069528, at *1 (S.D.N.Y. Nov. 26, 2008).  The

relationships between Sections 10(b), 14(a) and the PSLRA are discussed in greater detail below.

II.     THAIN AND MERRILL'S MOTIONS TO DISMISS COUNT II OF THE SECURITIES COMPLAINT ARE GRANTED IN PART AND DENIED IN PART.

In the Securities Action, Defendants Thain and Merrill argue that the Securities Complaint fails to allege fraud with the particularity required by the PSLRA, and also contend that the '34 Act claims are misplaced because there is no duty extending from Merrill and its officers to the shareholders of BofA.  For the reasons explained below, the motions of Merrill and Thain are granted in part and denied in part.

A.   Thain and Merrill Had No Disclosure Duty to BofA Shareholders.

According to Merrill, its duties and obligations extended to its own shareholders, but not to the shareholders of BofA.  Because of its own distinct duties and the necessarily adverse interests of parties to an acquisition, Merrill asserts, there was no disclosure duty extending from Merrill to BofA shareholders, and thus no basis for liability.  Thain joins in Merrill's argument.

Nondisclosure claims asserted under Section 10(b) and Rule 10b-5 are premised on the existence of a fiduciary or similar obligation extending from a defendant to a shareholder.  Chiarella v. United States, 445 U.S. 222, 232 (1980) (a plaintiff asserting claims under Section 10(b) and Rule 10b-5 must "identify a relationship between [the defendant] and the [plaintiffs] that could give rise to a duty").  "[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."  Id. at 228.  The duty to disclose "arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and

confidence between them."  Id. at 228-29 (quotation marks omitted; alteration in original).

"[A] complete stranger who dealt with the sellers only through impersonal market

transactions" does not have an obligation to shareholders.  Id. at 232-33.  Chiarella held that

an employee of a financial printing firm who traded on the basis of material, nonpublic

information could not be liable under Section 10(b) and Rule 10b-5 because he owed no duty

to shareholders, and thus was under no duty to disclose his knowledge.  445 U.S. at 232-33;

see also Lowe v. S.E.C., 472 U.S. 181, 225 n.9 (1985) (White, J., concurring) (noting

"requirement" of Rule 10b-5 "that any nondisclosure violate an existing fiduciary duty").

These authorities address violations premised on nondisclosure, however, and

do not consider whether a fiduciary relationship is necessary for statements challenged as

affirmatively misleading.  In S.E.C. v. Dorozhko, 574 F.3d 42, 49 (2d Cir. 2009), Judge

Cabranes, writing for the panel, reviewed Chiarella and related authorities, and held that a

fiduciary obligation is necessary only when a party's silence is the basis of a securities fraud

claim.  Id.  "[A]n affirmative misrepresentation," by contrast, "is a distinct species of fraud.

Even if a person does not have a fiduciary duty . . . there is nonetheless an affirmative

obligation in commercial dealings not to mislead."  Id.  The SEC therefore had a viable

enforcement claim, against an individual who allegedly engaged in deceptive conduct and

undertook trades based on inside information, even in the absence of a fiduciary relationship

between the individual and the corporation.  Id.

Count II of the Securities Complaint asserts Section 10(b) and Rule 10b-5

claims against Thain and Merrill.  It alleges, in a conclusory fashion, that Thain and Merrill

"had a duty to disclose" the bonus arrangement, as well as "a duty to disclose" other

information that required updating and/or correction.  (Sec. Compl. ¶¶ 304-05.)  The basis for this duty, and why it should extend from Merrill to the shareholders of BofA, is not explained.

In light of Chiarella and Dorozhko, and the Securities Complaint's absence of a plausible allegation for a fiduciary relationship running from Thain and Merrill to BofA shareholders, plaintiffs' Section 10(b) and Rule 10b-5 claims are dismissed to the extent that they are based on allegedly material omissions and the breach of a duty to disclose.  For Section 10(b) and Rule 10b-5 purposes, this includes the purported "duty to disclose" the parties' bonus arrangement and allegedly adverse events that occurred while the proxy was outstanding.  (Sec. Compl. ¶¶ 304-05.)

To the extent that the plaintiffs allege that Thain and Merrill were responsible for false and misleading statements to BofA shareholders, however, Dorozhko holds that no fiduciary obligation is necessary to proceed with such claims.  The motion to dismiss plaintiffs' Section 10(b) and Rule 10b-5 claims arising out of such statements by Merrill or Thain is denied.  Whether plaintiffs have sufficiently alleged fraud under the PSLRA and Rule 9(b) as to any allegedly false and misleading statement is addressed below.

B.  Thain and Merrill's Motions to Dismiss the Section 14(a) and Rule 14a-9 Claims Are Denied.

Merrill and Thain also move to dismiss plaintiffs' claim brought under Section 14(a) and Rule 14a-9.  As with the Section 10(b) and Rule 10b-5 claims, they assert that no duty extends from the target company to shareholders of an acquiring company.

The text of Section 14(a) states that "[i]t shall be unlawful for any person . . . to solicit or permit the use of his name to solicit any proxy" in violation of an SEC regulation. 15 U.S.C. § 78n(a)(1) (emphasis added).  The basis for Section 14(a) liability is not the nature of the duty between the defendant and a shareholder, but whether that defendant has solicited

or permitted his or her name to be used in the allegedly unlawful proxy.  Rule 14a-9, in turn, prohibits "any statement" that is false or misleading as "to any material fact" at the time that it was made.  17 C.F.R. § 240.14a-9(a).

As a consequence, in the Section 14(a) and Rule 14a-9 context, courts have permitted claims to proceed when the management of one company allegedly misstates or omits material facts to the detriment of shareholders to the other party of the transaction.  In re McKesson HBOC, Inc. Securities Litigation held that the critical threshold for a Section 14(a) claim was participation in the drafting of the proxy: "anyone who knowingly participates in the distribution [of] a proxy solicitation should therefore expect to be held liable for false statements to all affected shareholders." 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000) (emphasis in original).  The claim was permitted to proceed against directors of the target company, who solicited proxies containing alleged misstatements that induced action by shareholders of the acquiring company.  Id.  As the defendants themselves note, other courts have permitted Section 14(a) claims to go forward when shareholders of one party to a transaction allege that the other party's management misstated or omitted a material fact.  See, e.g., Dasho v. Susquehanna Corp., 461 F.2d 11 (7th Cir. 1972) (Stevens, J.); In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 232 (S.D.N.Y. 2004).  Defendants argue that these cases are distinguishable, either because they arose from information that was uniquely in the knowledge of the transaction's counterparty, or else involved statements that were false at the time they were made.  But the Securities Complaint in this action asserts that certain allegedly actionable statements were false at the time they were made, and the text and judicial interpretations of Section 14(a) do not support defendants' interpretation that the information must be unique to the transaction's counterparty.

Merrill's and Thain's motions to dismiss the plaintiffs' Section 14(a) and Rule 14a-9 claims are denied. To the extent that Merrill and Thain challenge the Securities Complaint on other grounds, the arguments will be separately addressed below.

III.   DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' '34 ACT CLAIMS FOR FAILURE TO ALLEGE ACTIONABLE MISSTATEMENTS OR OMISSIONS ARE GRANTED IN PART AND DENIED IN PART.

In both the Securities and Derivative Actions, the defendants move to dismiss on the grounds that the plaintiffs fail to allege violations of Section 14(a) and Rule 14a-9 with the particularity required of the PSLRA. The Securities Complaint also asserts claims under Section 10(b) and Rule 10b-5; the Derivative Complaint raises no Section 10(b) claims. For the reasons explained below, the motions to dismiss are granted in part and denied in part.

A.   Background on Section 10(b) and Rule 10b-5.

Section 10(b) of the '34 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). "The SEC rule implementing the statute, Rule 10b-5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" ECA, Local 134, 553 F.3d at 197 (alterations in original) (quoting Rule 10b-5).

As Judge Cote has observed, "[s]ection 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing Ernst & Ernst, 425 U.S. at 206). An action

brought under Section 10(b) ultimately requires a plaintiff to prove (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  Stoneridge, 552 U.S. at 157 (citing Dura. 544 U.S. at 341-42).

       B.  Background on Section 14(a) and Rule 14a-9.

         As described by the Second Circuit, a "proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates."  Mendell v. Greenberg, 927 F.2d 667, 670 (2d Cir. 1990).  Section 14(a) and its implementing regulation, Rule 14a-9, establish liability for material misstatements or omissions in a proxy statement.  15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a).

         Together, these provisions seek to ensure that proxies accurately disclose material information to shareholders.  The "broad remedial purpose" of Rule 14a-9 "is not merely to ensure by judicial means that the transaction, when judged by its real terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448 (1976); see also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 381 (1970) (Section 14(a) "stemmed from a congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security brought on a public exchange.'") (alteration in original; quoting H.R. Rep. No. 1383, 73d Cong., 2d Sess. 13); J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation."); United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190,

1197-98 (2d Cir. 1993) (The SEC "promulgated Rule 14a-9 with the goal of preserving for all

shareholders who are entitled to vote, not just for those who sponsor proposals, the right to

make decisions based on information that is not false or misleading.").

      Section 14(a) is satisfied "[o]nly when the proxy statement fully and fairly

furnishes all the objective material facts" to allow a reasonably prudent investor "to make an

informed investment decision . . . ." Mendell, 927 F.2d at 674.  In interpreting the language

of a proxy statement, doubts are to "be resolved in favor of those the statute is designed to

protect." TSC Indus., 426 U.S. at 448.  Even "indefinite and unverifiable" terms, such as

observations that an offer was "fair" or of a "high" value, can be actionable under Section

14(a) and Rule 14a-9, because they are based on "provable facts." Virginia Bankshares, Inc.

v. Sandberg, 501 U.S. 1083, 1093-94 (1991).

      In order for liability to attach, any misstatement or omission must be material.

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder

would consider it important in deciding how to vote." TSC Indus., 426 U.S. at 449.  Such a

determination "requires delicate assessments of the inferences a 'reasonable shareholder'

would draw from a given set of facts and the significance of those inferences to him, and

these assessments are peculiarly ones for the trier of fact." Id. at 450; accord Mendell, 927

F.2d at 673 (materiality is a mixed question of law and fact best evaluated by a jury).

      As formulated by the Second Circuit, in ascertaining materiality, a plaintiff

must show a "substantial likelihood" that disclosure of the omitted fact would have

"significantly altered the 'total mix' of information made available." Koppel v. 4987 Corp.,

167 F.3d 125, 131 (2d Cir. 1999) (quotation marks omitted).  The "total mix" of information

"may include data sent to shareholders by a company in addition to its proxy materials," as

well as other information reasonably available to shareholders.  United Paperworkers, 985

F.2d at 1198.  Information is not "reasonably available" if it "is 'buried' in unrelated

discussions."  Id. at 1199.  "[W]idely reported" facts disseminated in the news media may be

part of the "total mix" of information.  Id.

    "The point of a proxy statement . . . should be to inform, not to challenge the

reader's critical wits."  Virginia Bankshares, 501 U.S. at 1097.  At the same time, "nit-picking

should not become the name of the game," and "[f]air accuracy, not perfection, is the

appropriate standard."  Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200

(2d Cir. 1978).

    Novel questions arising under Section 10(b) are often resolved with authority

applying Section 14(a), and vice versa.  See, e.g., Grace v. Rosenstock, 228 F.3d 40, 45-49

(2d Cir. 2000).  Moreover, "[t]he test of materiality under 14a-9 and 10b-5 is the same."

Goldberg v. Meridor, 567 F.2d 209, 222 n.3 (2d Cir. 1977) (Meskill, J., concurring in part and

dissenting in part); accord Beaumont v. Am. Can Co., 797 F.2d 79, 84 (2d Cir. 1986).  As

previously noted, the PSLRA's threshold for alleging with particularity a '34 Act violation

applies to both Sections 14(a) and 10(b).  Beck 559 F.3d at 681-82.

    Lastly, to state a Section 14(a) claim, a plaintiff must allege "that the proxy

solicitation itself, rather than the particular defect in the solicitation materials, was an essential

link in the accomplishment of the transaction."  Mills, 396 U.S. at 385.  In both the Securities

Action and the Derivative Action, the only relevant solicitations are related to the shareholder

vote that occurred on December 5, 2008.  Therefore, allegations relating to events that took

place after December 5, 2008, cannot form the basis of a Section 14(a) claim.  See In re AOL

<u>Time Warner</u>, 381 F. Supp. 2d at 242 (statement post-dating the shareholder vote "cannot constitute a 'solicitation' under Section 14(a)").

> C. Potential for Overlapping Damages Between the Direct and Derivative Section
>    14(a) Actions.

I first address who may recover under the Section 14(a) claims asserted in the Securities Action and the Derivative Action. In the Securities Action the shareholders of the acquiring corporation in a stock-for-stock transaction have brought a direct claim against the acquiring corporation, its directors, certain of its officers and others for violations of Section 14(a). Separately, in the Derivative Action, shareholders acting on behalf of the corporation have brought a derivative Section 14(a) claim against individuals who also are defendants in the Securities Action. It is important to distinguish the injury to shareholders <u>qua</u> shareholders from any injury to the corporation. If a harm were suffered by the shareholders as shareholders, then the same harm would not be a harm inflicted on the corporation. Similarly, if it were suffered by the corporation, then it would not be harm inflicted on the shareholder. A single act could, of course, inflict separate injury on both the corporation and the shareholder.

At a pretrial conference held on May 19, 2010, I asked the Securities and Derivative Plaintiffs to explain their damages theories. In letter briefs to the Court, the Securities Plaintiffs argued that they may recover "out-of-pocket" losses suffered as a result of the misstatements and omissions contained in the Joint Proxy. According to the Securities Plaintiffs, their out-of-pocket damages are equal to the diminution in the value of their personally held shares that occurred after corrective disclosures revealed the truth behind the Joint Proxy's representations. The Derivative Plaintiffs argue that BofA is entitled to damages arising from BofA's overpayment for Merrill, as well as damages that BofA incurred

over and above the overpayment for Merrill, including the injury to BofA's reputation and legal fees in defending legal and regulatory proceedings.

As the Supreme Court recognized in <u>Borak</u>, the "injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done to the corporation . . . ." 377 U.S. at 432. That is, the value of that corporation's stock may decrease because the corporation was damaged by an action that would not have been approved by fully-informed shareholders. But the value of that corporation's shares also may decrease once a corrective disclosure issues. That decrease is not necessarily co-extensive with injury to the corporation. Therefore, material omissions from a proxy statement could directly injure the corporation as well as the corporation's shareholders. See <u>Yamamoto v. Omiya</u>, 564 F.2d 1319, 1326 (9th Cir. 1977) ("[I]n light of . . . <u>Borak</u> and <u>Mills</u>, a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and derivative suits. The former action protects the shareholders' interest in 'fair corporate suffrage'."). There is at least a potential that the Securities Plaintiffs could show a diminution in the value of the shares that they held which was not due to an injury inflicted upon BofA. Therefore, it is possible for both sets of plaintiffs to prevail without double recovery. Both suits may proceed.[3]

---

[3] In a letter to the Court, the defendants in the Securities Action argue that the Securities Plaintiffs cannot prove transaction causation. <u>Wilson v. Great Am. Indus., Inc.</u>, 979 F.2d 924, 931 (2d Cir. 1992) ("We recognize that loss causation or economic harm to plaintiffs must be shown, as well as proof that the misrepresentations induced plaintiffs to engage in the subject transaction, that is, transaction causation."). The Securities Plaintiffs' theory is that the BofA shareholders were harmed when the BofA shares decreased in value after the truth about the transaction became public. The merger with Merrill could have been consummated only with BofA shareholder approval of the transaction. (Joint Proxy at 12.) Thus, the Joint Proxy was an essential link in the transaction because the acquisition could not have occurred without the shareholder vote. The Securities Plaintiffs have adequately pled transaction causation. <u>Mills</u>, 396 U.S. at 384-85 ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.").

Certain defendants in the Securities Action have moved to certify to the Delaware Supreme Court the question of whether shareholders of the acquiring corporation, who neither bought nor sold shares during the relevant period, have a direct claim against the acquiring corporation.  Specifically, they seek certification of the following question:

> Where a Delaware corporation issues its own shares in a stock-for-stock merger in exchange for shares held by the acquired company's shareholders, do acquiring company shareholders who were allegedly deprived of their right to cast an informed vote on the merger as a result of a materially false or misleading proxy solicitation – but who did not themselves buy, sell or exchange their shares in the merger – have a direct claim under Delaware law against the acquiring corporation and/or its officers or directors to recover damages for the post-merger decline in the market price of the acquiring company's shares when the allegedly misstated or omitted material facts were publicly disclosed?

(Def. Cert. Mem. at 2.)  Assuming, as I do, that this Court could in the exercise of discretion certify such a question,[4] I conclude that it is unnecessary.  As discussed above, BofA shareholders may bring both direct and derivative claims under Section 14(a) because there is a possibility that both the shareholders and the corporation were separately injured by the alleged material misstatements and omissions.  The motion to certify a question to the Delaware Supreme Court is denied.

> D. Derivative Plaintiffs Fail to Allege That the Individual BofA Officers Are
> Liable Under Section 14(a) of the '34 Act.

I next address whether the Derivative Plaintiffs have plausibly alleged that the BofA Officers may be subject to liability under Section 14(a) of the '34 Act.  The "starting point in every case involving construction of a statute is the language itself."  Ernst & Ernst, 425 U.S. at 197 (quotation marks omitted).  The language of Section 14(a) makes it "unlawful

---

[4] See Del. Sup. Ct. R. 41(a)(ii).

for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . <u>to solicit or to permit the use of his name to solicit</u> any proxy . . . ."  15 U.S.C. § 78n(a)(1) (emphasis added).  Thus, according to the plain language of Section 14(a), liability attaches only to defendants who actually solicited proxies or permitted the use of their name to solicit proxies.

The BofA proxy card, which was attached to the Joint Proxy distributed to BofA shareholders, stated in bold typeface: "**This Proxy is Solicited on Behalf of the Board of Directors**."  (Joint Proxy, Proxy Card (emphasis in original).)  Thus, the BofA Directors solicited proxies, and fall within the plain language of Section 14(a).  That solicitation was not made on behalf of the BofA Officers, and the BofA Officers were not "participants" within the meaning of the SEC's regulations governing the disclosure obligations of individuals who participate in a proxy solicitation.

Schedule 14A prescribes the information required in a proxy statement.  Item 4, titled "Persons Making the Solicitation," provides in part that if a proxy solicitation is made "otherwise than by the registrant" the proxy statement shall "state and give the names of the participants in the solicitation, as defined in paragraphs (a)(iii), (iv), (v) and (vi) of Instruction 3 to this item."  17 C.F.R. § 240.14a-101, Item 4(a)(2).[5]  The Derivative Complaint does not plausibly allege that the BofA Officers fall within Schedule 14A's definitions of "participants in the solicitation."  17 C.F.R. §§ 240.14a-101, Item 4, Instruction 3(a)(iii) (relating to groups or committees that solicit proxies, or individuals who organize, direct or arrange financing for those committees or groups); (a)(iv) ("[a]ny person who finances or joins with another to finance the solicitation of proxies"); (a)(v) (a person who lends money or extends credit or

---

[5] Item 4(a) applies to solicitations not subject to SEC Rule 14a-12(c).  Rule 14a-12(c) applies to solicitations opposing another solicitation with respect to the election or removal of directors, 17 C.F.R. § 240.14a-12(c), and is inapplicable to the Joint Proxy.

enters into a contract to finance "or otherwise induc[es] the purchase, sale, holding or voting of securities of the registrant by any participant or other persons"); (a)(vi)("[a]ny person who solicits proxies").  In addition, Instruction 3(b)(iv) excludes from the definition of "participant in a solicitation" "[a]ny person regularly employed as an officer or employee of the registrant or any of its subsidiaries who is not otherwise a participant."  17 C.F.R. § 240.14a-101, Item 4, Instruction 3(b)(iv).  Pursuant to the SEC's governing regulations, then, the BofA Officers can only be subject to Section 14(a) liability if they permitted the use of their name to solicit the proxies.

With the exceptions of Lewis (who is also a director) and Mayopoulos, none of the BofA Officers are mentioned in the Joint Proxy.  Defendant Mayopoulos is mentioned under a section titled "Legal Matters," which states: "The validity of the Bank of America common stock and preferred stock to be issued in connection with the merger will be passed upon for Bank of America by Timothy J. Mayopoulos, Executive Vice President and General Counsel of Bank of America."  (Joint Proxy at 118.)  Mayopoulos is also mentioned in section 9.4 of the Merger Agreement, which states that notices made pursuant to that agreement should be sent to several individuals, including Mayopoulos.  (Joint Proxy at A-43-44.)

Neither the Second Circuit nor the Supreme Court has directly addressed whether an officer may be liable for misstatements or omissions merely because his or her name appears somewhere in the text of an allegedly misleading proxy statement.  Other courts have, however, concluded that Section 14(a) requires a connection between the use of an officer's name and the company's solicitation.  See SEC v. Falstaff Brewing Corp., 629 F.2d 62, 68 (D.C. Cir. 1980) ("Of course, the simple appearance of one's name in a proxy statement does not trigger liability for any misstatement appearing therein.").  According to

the Ninth Circuit, to impose liability, "there must have been 'a substantial connection between the use of the person's name and the solicitation effort.'" Id. (quoting Yamamoto, 564 F.2d at 1323). In Falstaff Brewing, the D.C. Circuit followed Yamamoto, and found that there was a substantial connection between the use of the defendant's name – which appeared "eleven times in the nine-page proxy statement, in three separate items" – and the solicitation effort. Id. at 68-69. This was due, in part because the defendant's "reputation as a businessman, his plan for [the company], and his other dealings that could create conflicts of interest were important to the existing shareholders." Id. at 69. The defendant also reviewed a draft of the proxy statement a week before it was issued and read the final draft shortly after it was mailed to shareholders. Id. at 68.

        In Yamamoto, the Ninth Circuit held at the summary judgment stage that a defendant could not be subject to Section 14(a) when his role in the proxy was limited to the inclusion of his "name and address . . . as the proposed buyer" of the principal asset of the company whose shareholders were solicited. 564 F.2d at 1322-23. The Ninth Circuit concluded that the "mere presence of [the individual's] name in the materials (probably required by the SEC) did not reveal any significant control by [that person] over the statement, or his adoption of it that was sufficient to justify attaching liability to him. . . . It is hardly conceivable that the mere revelation that [the individual] was the proposed purchaser could have been an inducing factor in the granting of a shareholder's proxy." Id. at 1323. By contrast, when individuals listed in a proxy statement "hav[e] put their reputations in issue, [they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names." Chris-Craft Indus., Inc. v. Indep. Stockholders Comm., 354 F. Supp. 895, 915 (D. Del. 1973); see also Mendell v. Greenberg,

612 F. Supp. 1543, 1552 (S.D.N.Y. 1985) ("Since plaintiff does not allege that [the company] directly solicited any proxies or was a party to such solicitation, any claim of liability as a principal against [the company] is legally insufficient."), rev'd in part on other grounds by Mendell, 927 F.2d 667.

Mayopoulos was assigned the role of passing upon the validity of any stock that was issued as acquisition consideration and he was the designated recipient of any notices made pursuant to the Merger Agreement. Neither responsibility suggests that he had control over the contents of the Joint Proxy or that he would directly benefit from the action it proposed. The Derivative Plaintiffs do not allege that Mayopoulos's name appears within the context of a challenged statement. Thus, the allegations do not show a substantial and plausible connection to the solicitation process sufficient to subject Mayopoulos to liability under Section 14(a).

The Joint Proxy incorporates by reference 78 other documents filed with the SEC. (Joint Proxy at 123-24.) The Joint Proxy refers to these documents for additional information about then-current BofA executive officers. (Joint Proxy at 69.) The use of an officer's name in the text of an incorporated document, without more, provides an insufficient basis to bring the BofA Officers within the ambit of Section 14(a). Yamamoto, 564 F.3d at 1323. Therefore, the Derivative Plaintiffs do not state a claim against the BofA Officers, other than Lewis, for violating Section 14(a), and that claim is dismissed with respect to these defendants.[6]

---

[6] Although there is some authority indicating that the Financial Advisors cannot be subject to liability under Section 14(a), Mendell, 612 F. Supp. at 1551-52 (dismissing Section 14(a) claim against a financial advisor that provided a fairness opinion and participated in drafting the allegedly false proxy statement), the Financial Advisors have not raised this issue, and I need not address it in light of my conclusions below.

E.   Motions to Dismiss for Failure to Allege Actionable Misstatements and
     Omissions Are Granted in Part and Denied in Part.

The motions to dismiss filed by the BofA defendants in the Securities and

Derivative Actions principally argue that the plaintiffs have failed to allege with particularity

the existence of material misstatements or omissions.   I address each allegation in turn.

1.   Securities Complaint Adequately Alleges Material Misstatements
     Related to Merrill's Bonus Pool.

Defendants in the Securities and Derivative Actions argue that the plaintiffs'

securities fraud claims should be dismissed as they pertain to Merrill's bonus payments in

December 2008.  They contend that proxy materials neither misstated nor omitted Merrill's

intention to award employee bonuses.  For the reasons explained below, the defendants'

motions to dismiss the Securities Complaint's Section 10(b) and 14(a) claims relating to

Merrill's bonuses are denied.  The motions to dismiss the Derivative Complaint's Section

14(a) claim relating to the Merrill bonuses are also denied.

a.   Qualifying Language in the Joint Proxy and Merger Agreement
     Did Not Disclose BofA's Consent to the Merrill Bonuses.

"[U]pon choosing to speak, one must speak truthfully about material issues."

Caiola v. Citibank, N.A., New York, 295 F.3d 312, 331 (2d Cir. 2002).  "Rule 10b-5 creates a

statutory duty to speak the full truth when a defendant undertakes to say anything."  In re

Credit Suisse First Boston Corp. Sec. Litig., No. 97 Civ. 4760 (JGK), 1998 WL 734365, at *6

(S.D.N.Y. Oct. 20, 1998) (quotation marks omitted).

The defendants contend that the Joint Proxy and the Merger Agreement could

not plausibly be alleged to have been false and misleading, based in part on qualifying

language that permitted Merrill to administer special employee compensation, subject to

BofA's approval.  I begin by reviewing the Joint Proxy's representations as to employee

compensation.  Under the heading, "Covenants and Agreements," the Joint Proxy states in

relevant part:

> Merrill Lynch further agreed that, with certain exceptions or except with Bank
> of America's prior written consent (which consent will not be unreasonably
> withheld or delayed with respect to certain of the actions described below),
> Merrill Lynch will not, and will not permit any of its subsidiaries to, among
> other things, undertake the following extraordinary actions: . . . except as
> required under applicable law or the terms of any Merrill Lynch benefit plan,
> (i) increase the compensation or benefits of any current or former directors,
> officers or employees; (ii) pay any current or former directors, officers or
> employees any amounts not required by existing plans or agreements; (iii)
> become a party to, establish, adjust, or terminate any employee benefit or
> compensation plan or agreement . . . .

(Joint Proxy at 83-84.)  Separately, the Merger Agreement included a negative covenant that

Merrill would not "pay any amounts to Employees not required by any current plan or

agreement (other than base salary in the ordinary course of business)."  (Joint Proxy at A-31-

32.)  Defendants argue that the Merger Agreement meaningfully qualified this language, and

did so in a way that disclosed Merrill's conditional authority to award bonus compensation

prior to the transaction's closing.  Section 5.2 of the Merger Agreement states in part:

> Company Forbearances.  During the period from the date of this Agreement to
> the Effective Time, except as set forth in . . . Section 5.2 of the Company
> Disclosure Schedule or except as expressly contemplated or permitted by this
> Agreement, [Merrill Lynch] shall not . . . without the prior written consent of
> [Bank of America]: . . (c) except as required under applicable law or the terms
> of any Company Benefit Plan existing as the date hereof, . . . (ii) pay any
> amounts to Employees not required by any current plan or agreement (other
> than base salary in the ordinary course of business) . . . .

(Joint Proxy at A-31 (emphasis added).)

According to the defendants, section 5.2 of the Merger Agreement provides

three exceptions to its general bar against payment to employees not required by the current

plan or agreement.  The first exception applies to matters "set forth in . . . Section 5.2 of the

Company Disclosure Schedule."  The Merger Agreement defines the "Company Disclosure

Schedule" as setting forth "items the disclosure of which is necessary or appropriate . . . as an exception to . . . one or more of [Merrill Lynch's] covenants contained herein . . . ." (Joint Proxy at A-7.)  The Company Disclosure Schedule was included neither in proxy materials nor other public filings.

The second exception is based on section 5.2(c)'s carve-out for actions "expressly contemplated or permitted" by the Merger Agreement.  Section 5.1 of the Merger Agreement requires Merrill to "conduct its business in the ordinary course in all material respects," including "reasonable best efforts to maintain and preserve intact" its business organization and retain key officers and employees.  (Joint Proxy at A-31.)  According to the defendants, in a March 2008 proxy statement, Merrill explained the need to compensate employees at market rate as a means to retain them.  (Exhibit 7 to the Declaration of Jonathan Goldin, dated November 24, 2009 ("Goldin Dec.").)  Relatedly, section 6.5(a) of the Merger Agreement promised to maintain Merrill's "employee benefit plans and compensation opportunities" through December 31, 2009, on terms "substantially comparable" to those already in place.  (Joint Proxy at A-35.)  As a result, defendants contend, shareholders were adequately apprised of Merrill's bonus practices.

The third exception to the negative covenant provided that Merrill could make payments to employees, beyond base salary, with BofA's "prior written consent."  According to the defendants, section 5.2 was nothing more than a contractual provision that protected BofA against Merrill enjoying a "blank check" to pay bonuses without BofA's consent. (BofA Sec. Mem. at 15.)

Defendants contend that the investing public was aware that Merrill would distribute billions in bonuses for employees' performance in fiscal year 2008.  They note that

in Merrill's Form 10-Q filed with the SEC at the close of the third fiscal quarter of 2008, Merrill announced that it had reserved $11.17 billion for 2008 compensation. Merrill's expected bonus payments also were discussed in the press. Moreover, the defendants argue that the terms of the Merger Agreement and the Joint Proxy's statements concerning compensation were not representations of fact, but rather, reflected that Merrill could not undertake certain actions without authorization from BofA.

These arguments fail to reckon with the parties' undisclosed written agreement authorizing the payment of bonuses by Merrill. When the Joint Proxy was filed on October 31, 2008, the bonus payment to Merrill employees was more than hypothetical. Instead, BofA and Merrill had already agreed in writing that Merrill could, at its discretion, administer bonus payments up to $5.8 billion. (Sec. Compl. ¶¶ 6, 72.) The bonus issue was of sufficient importance that Thain later recalled it as one of the three major topics of the negotiation. (Sec. Compl. ¶ 67.) The terms of the bonus were memorialized in the undisclosed Company Disclosure Schedule. The existence of the Company Disclosure Schedule was noted in section 5.2 of the Merger Agreement, but the Company Disclosure Schedule was not released to the public, and its content, insofar as it related to bonuses, was not summarized in the proxy materials. (Sec. Compl. ¶ 198.) Under the Joint Proxy's own terms, any compensation increases or payments not required by a preexisting plan or agreement would constitute "extraordinary actions." (Joint Proxy at 83-84.) At the time the Joint Proxy and Merger Agreement were filed with the SEC and distributed to shareholders, BofA and Merrill had agreed that Merrill could make bonus payments in the amount of $5.8 billion, and make the payments on an expedited schedule that varied from Merrill's past practices. (Sec. Compl. ¶¶ 6, 74.)

The bonus payments ultimately totaled $3.6 billion, and not $5.8 billion. (Sec. Compl. ¶ 14.)  The Merger Agreement's qualifications to its negative covenant do not apprise investors of Merrill's bonus arrangement.  If "prior written consent" had been given to make payments of up to $5.8 billion, a reasonable investor may well have considered that information important to both the purchase of shares and the granting or withholding of a proxy.

Defendants argue, among other things, that SEC regulations do not require disclosure of bonuses in proxy statements.  But the absence of an express disclosure obligation does not immunize statements that were, in fact, alleged to have been materially false and misleading.  In Caiola, 295 F.3d at 330-31, the defendant made representations to an investor about aspects of its hedging strategies.  The defendant argued that it had no independent duty to disclose its hedging strategies, so that any misrepresentations made about the strategies were non-actionable.  Id. at 330-31.  The Second Circuit rejected this argument, holding that "the lack of an independent duty is not, under such circumstances, a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues."  Id. at 331; accord In re Bristol Myers Squibb Co., 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008); In re Credit Suisse, 1998 WL 734365, at *6.

Assuming the truth of the Securities Complaint, the Joint Proxy and the Merger Agreement portrayed bonus payments to Merrill employees as a contingent event, when, in reality, the parties had reached agreement as to the timing and range of bonuses.  At this stage, the Court concludes that the qualifying language in the Joint Proxy and the Merger Agreement would not apprise a reasonable shareholder that BofA had already consented to the "extraordinary action[]" of "pay[ing] any current for former directors, officers or

employees any amounts not required by existing plans or agreements . . . ."  (Joint Proxy at

83-84.)

            For similar reasons, the defendants' argument that the Merger Agreement

merely constituted a private allocation of risk between BofA and Merrill is unavailing.

According to the Joint Proxy, the Merger Agreement is "the legal document governing the

merger," and shareholders were advised in the Joint Proxy to "read the merger agreement

carefully and in its entirety . . . ."  (Joint Proxy at 76.)  A reasonable investor would have

understood the Merger Agreement to constitute a statement of fact.  See SEC's Titan Report,

Exch. Act. Rel. No. 51,283, 2005 WL 1074830 (Mar. 1, 2005) ("When an issuer makes a

public disclosure of information – via filing a proxy statement or otherwise – the issuer is

required to consider whether additional disclosure is necessary in order to put the information

contained in, or otherwise incorporated into that publication, into context so that such

information is not misleading.  The issuer cannot avoid this disclosure obligation simply

because the information published was contained in an agreement or other document not

prepared as a disclosure document.").[7]  Moreover, the defendants' heavy reliance on section

5.1 of the Merger Agreement, which provides that Merrill "shall . . . conduct its business in

the ordinary course in all material respects" and "use reasonable best efforts" to maintain "its

business organization . . . and retain the services of its key officers and key employees," is

---

[7] The SEC's report in the Titan case, which was issued to "highlight[]" required disclosure of contractual terms as required by Rules 10b-5 and 14a-9, constituted an informal agency interpretation, and is not entitled to the high deference afforded the product of an agency's notice-and-comment rulemaking.  See, e.g., New York City Emp. Ret. Sys. v. S.E.C., 45 F.3d 7, 12-13 (2d Cir 1995) ("courts will not accord great deference" to an SEC no-action letter, as it is an interpretative statement and not a formal rule).  To the extent that the Titan Report is well reasoned, the SEC has plenary power to interpret the '34 Act, and defendants have not argued that the Titan Report breaks with past pronouncements, I afford the Titan Report some deference.  See United States v. Mead Corp., 533 U.S. 219, 227-29 (2001) (listing factors for weighing an interpretative statement's power to persuade).

unavailing.  (Joint Proxy at A-31.)  This language did not, as defendants argue, "authorize[]
and contractually obligate[]" the employee bonuses.  (BofA Sec. Reply at 9, 11.)

   Of significance is the parties' decision not to file the Company Disclosure
Schedule or set forth in text the key provision concerning Merrill bonuses.  Item 601 of
Regulation S-K, which is an SEC rule governing the filing of exhibits, requires that "[a]ny
material plan of acquisition" does not need to attach schedules or similar attachments, "unless
such schedules contain information which is material to an investment decision and which is
not otherwise disclosed in the agreement or the disclosure document."  17 C.F.R.
§ 229.601(b)(2).  If schedules are omitted, the disclosure document "shall contain a list briefly
identifying the contents of all omitted schedules . . . ."  Id.  Section 5.2 of the Merger
Agreement refers only to an unspecified "except[ion]" contained in the Company Disclosure
Schedule.  The proxy materials do not disclose the nature of the exception, which, according
to the Securities Complaint, vitiated language in the Joint Proxy and the Merger Agreement
covenanting against the "extraordinary action[]" of paying non-required compensation.  A
reviewing shareholder would be left to speculate about the contents of the Disclosure
Schedule.

   The argument that Item 601 did not expressly require BofA or Merrill to file
the Disclosure Schedule largely misses the point of the rule, which requires disclosure of
information material to an investment decision.  The allegations state a claim that the
statements about compensation payments were misleading because they omitted information
necessary to render the statements truthful.  As discussed below, the omission was material.
Thus, Item 601 does not provide a defense, as a matter of law, to plaintiffs' claims.

In Glazer Capital Management, L.P. v. Magistri, 549 F.3d 736 (9th Cir. 2008), a Rule 10b-5 case, the Ninth Circuit held that qualifications contained in a merger agreement and a non-public disclosure schedule did not preclude liability for misstatements of contemporaneous facts.  In Glazer Capital, the acquired company announced in a press release that an internal investigation revealed potential violations of the Foreign Corrupt Practices Act (the "FCPA"), and did so at a point in time between the announcement of a potential merger and the merger's closing.  Id. at 740.  This announcement contradicted language in the merger agreement stating that the company was in compliance "with all laws."  Id. at 741.  The company reported its findings to the Department of Justice and the SEC, then subsequently entered a non-prosecution agreement, paid an $800,000 fine and received a cease-and-desist order from the SEC.  Id. at 740.

Plaintiffs asserted that the company's public representation of compliance "with all laws" violated Section 10(b) and Rule 10b-5.  Id. at 742.  The company argued that because the alleged misrepresentations were set forth in a merger agreement rather than a filing or statement to shareholders, and that because the merger agreement's terms were expressly qualified by an unreleased disclosure schedule, no reasonable investor would rely on the merger agreement's representations.  Id. at 741.  The Ninth Circuit rejected this argument.  It described the merger as "a very significant event for the company," one that should have led it to "expect[] intense investor interest in the details of the merger . . . ."  Id. "[T]hat the merger agreement was a private document and included reference to a non-public disclosure schedule would not, as a matter of law, prevent a reasonable investor from relying on its terms."  Id.  As a result, language in the merger agreement asserting that the company

was "in compliance in all material respects with all laws" was deemed actionable when the company thereafter revealed its non-compliance with the FCPA.  Id. at 742.

Glazer Capitol's reasoning is persuasive and consistent with the Second Circuit's approach to disclosure obligations under Section 14(a) and Rule 14a-9.  See Wilson v. Great Am. Inds., Inc., 855 F.2d 987, 992 (2d Cir. 1988) (Failure to disclose a "prospective" or "contingent" material fact may run afoul of Rule 14a-9 if "there appears to be a reasonable likelihood" that it will occur.); see also SEC's Titan Report, 2005 WL 1074830, at *2 ("[W]here a document containing such a representation is disclosed, if additional material facts exist, such as those contradicting or qualifying the disclosure of the original representation . . . omission of which makes that disclosure misleading, a company would also be required to disclose those facts.").  In this instance, Merrill's bonus scheme is portrayed merely as a contingent event, when, in fact, the negotiations resulted in an agreement as to both the amount and the timing of bonus payment.  There was "a great probability" that the bonuses were to be awarded and paid.  Wilson, 855 F.2d at 993.

The disclosure of the Merger Agreement's covenant that Merrill "shall not . . . pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business) . . ." was an affirmative statement that was arguably misleading in view of the undisclosed agreement on pre-closing bonus payments.

   b.  Press Reports and Past Merrill SEC Filings Did Not Render the
       Joint Proxy Immaterial or Establish Truth on the Market as a
       Matter of Law at the Rule 12(b)(6) Stage.

The BofA defendants argue that in SEC filings and other public statements, Merrill placed the plaintiffs on notice as to its bonus practices.  They additionally argue that reports in the press, which anticipated bonus payouts at Merrill, placed shareholders on

notice of Merrill's practices.  For these reasons, they argue, among other things, that the failure to disclose the bonus arrangement was immaterial.

In an October 16, 2008 press release filed via Form 8-K, Merrill stated that it had thus far accrued compensation and benefit expenses of $11.2 billion for the first nine months of 2008.  (Oct. 16, 2008 8-K, at Goldin Dec. Ex. 25.)  In a Merrill proxy statement of March 2008, which was distributed in advance of the company's annual shareholder meeting, Merrill emphasized the importance of retaining talented employees, stating that competitive pay was one route to employee retention.  (Goldin Dec. Ex. 7 at 28.)  It stated that Merrill "emphasize[s] variable pay as the core of [its] compensation policy," including an annual incentive bonus that is "[p]aid in January for performance in the prior fiscal year."  (Goldin Dec. Ex. 7 at 28.)  Merrill filed its Form 10-Q for the third quarter of 2008 on November 5, 2008, and cited "Non-interest expenses" as including "Compensation and benefits" in the amount of $11.17 billion.  (Goldin Dec. Ex. 34 at 5.)

Defendants argue that these filings, which were incorporated by reference into the Joint Proxy (Joint Proxy at 124), left it "apparent to any investor" that base salary constituted "only a portion of the $11.17 billion in compensation expense" accrued in the first three quarters of 2008.  (BofA Sec. Mem. at 18.)  They further argue that media reports in outlets such as CNN, Bloomberg News, The New York Times, NBC and Fox News discussed anticipated Merrill bonuses in October 2008, with estimated total payouts ranging from $3 billion to $6 billion.  (BofA Sec. Mem. at 19-20.)  Cumulatively, the defendants argue, the SEC filings and the press reports informed the investing public that Merrill would pay employee bonuses.  (BofA Sec. Mem. at 16.)

It is true that Merrill's filings reflected the compensation expenses for 2008, but plaintiffs' theory of liability is not that Merrill accumulated excessive funds for employee compensation. Rather, the Securities Complaint posits that the proxy materials gave the false impression, through misstatement and omission, that Merrill compensation would be limited to payments required by a preexisting plan or agreement. In essence, the Securities Complaint's theory is that BofA secretly consented to $5.8 billion in bonus awards, which later resulted in $3.6 billion of payments that might have been materially lower if BofA had effective control over the amount of the payments after closing.

The timing of the Merrill bonuses contradicts past statements of company policy. Merrill's proxy of March 2008 expressly stated that employee bonuses were to be "[p]aid in January for performance in the prior fiscal year." (Goldin Dec. Ex. 7 at 28.) A reasonable shareholder could have concluded that any bonus payments would then fall under the post-closing oversight of BofA. The defendants argue that the proxy's representation as to the timing of bonuses should be disregarded, since a "general description" of "compensation philosophy" for bonuses would not necessarily apply in the event that Merrill were to be acquired. (BofA Sec. Mem. at 24.) The defendants' selective reading of the March 2008 proxy amounts to cherry picking. If representations of general "compensation philosophy" cannot apply to Merrill in light of acquisition-related activities, neither, then, should Merrill's other March 2008 statements of "compensation philosophy" be considered applicable, including its stated practice of administering bonus payments or offering competitive salaries as a means of retaining talented employees. (Goldin Dec. Ex. 7 at 28; BofA Sec. Mem. at 18.)

Along with their reliance on Merrill's SEC filings, the defendants argue that press reports anticipated the bonuses in a way that placed the investing public on notice of their eventual payment.  Because of these press reports, the defendants argue, any failure to disclose the bonus arrangement was immaterial, and not in violation of the securities laws. "An omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). "Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."  Id.  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  Id.   "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  A fact is immaterial "if the information is trivial," or "is so basic that any investor could be expected to know it."  Id. at 162 (quotation marks omitted).  "Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred."  Id. at 165.

Under the "truth on the market" theory, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then

defraud the market." Id. at 167.  In asserting a truth on the market defense, a defendant

attempts to refute the argument that its misrepresentations affected stock price, because the

truth already was known.  Id.  Such information must be communicated "'with a degree of

intensity and credibility sufficient to counter-balance effectively any misleading information

created by' the alleged misstatements." Id. (quoting In re Apple Computer Sec. Litig., 886

F.2d 1109, 1116 (9th Cir. 1989)).  "A truth-on-the-market defense is intensely fact-specific

and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead

materiality." Id.; see also In re Columbia Sec. Litig., 155 F.R.D. 466, 482-83 (S.D.N.Y.

1994) ("[D]efendants' burden [in establishing truth on the market] is extremely difficult,

perhaps impossible, to meet at the summary judgment stage."); cf. Kronfeld v. Trans World

Airlines, Inc., 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious limitations on a

corporation's ability to charge its stockholders with knowledge of information omitted from a

document such as a proxy statement or prospectus on the basis that the information is public

knowledge and otherwise available to them.").[8]

On a motion to dismiss, a court may take judicial notice of the publication of a

newspaper article without converting the motion into one for summary judgment, provided

that consideration is limited to the fact of publication and not the truth of the article's

content.  See, e.g., Condit v. Dunne, 317 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2004)

(collecting cases); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp.

2d 243, 251 n.5 (S.D.N.Y. 2003).  However, I am unable to say at the Rule 12(b)(6) stage,

without further context, whether the cited articles speak to the Merrill bonuses with "a degree

---

[8] Defendants argue that Kronfeld, as well United Paperworkers, 985 F.2d at 1199, should be disregarded because
they predate the "Internet era."  The Second Circuit has not overruled or limited the reasoning of either opinion,
however, and Koppel, which was decided in the "Internet era" year of 1999, cited United Paperworkers's
reasoning as authoritative on matters concerning the availability of information to shareholders.  167 F.3d at
131-32.  I decline the defendants' invitation to disregard governing Second Circuit precedent.

- 53 -

of intensity and credibility" that effectively counterbalances language in the Merger

Agreement and Joint Proxy.  Ganino, 228 F.3d at 167; see also In re eSpeed, Inc. Sec. Litig.,

457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006) (a "collection of news articles" and "bad

publicity" fail to establish truth on the market for Rule 12(b)(6) purposes); In re Comverse

Tech., Inc. Sec. Litig., 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008) (press release insufficient

to establish truth on the market at Rule 12(b)(6) stage).

The defendants' motions, to the extent premised on an immateriality or "truth

on the market" argument addressed to the bonus arrangement, is denied.  Consistent with my

previous discussion of Thain and Merrill, the Section 10(b) and Rule 10b-5 claims against

them may proceed only to the extent that liability is premised on the theory that the bonus

language materially misstated facts, and not to the extent that material information was

omitted.  The scienter allegations relating to the bonus arrangement are addressed below.

2. For Substantially the Same Reasons, the Derivative Complaint
Adequately States a Claim under Section 14(a) and Rule 14a-9.

With slight factual variations, the Derivative Plaintiffs assert the same theory

as to why non-disclosure of the bonus arrangement violated Section 14(a) and Rule 14a-9.

According to the Derivative Plaintiffs, as of September 14, 2008, BofA "had agreed in

principle that Merrill would be authorized to pay a bonus pool that would, at most, be 'flat to

last year' . . . with a maximum recorded expense of $4.5 billion."  (Deriv. Compl. ¶ 120.)

This agreement was reflected in a term sheet.  (Deriv. Compl. ¶ 120.)  Taking increased head

count into account, the Complaint asserts that the BofA Defendants approved a "flat" bonus

pool of $5.8 billion.  (Deriv. Compl. ¶ 122.)  The Derivative Complaint also alleges that the

bonus agreement was one of five significant issues negotiated by BofA and Merrill.  (Deriv.

Compl. ¶ 101.)

As detailed above, I already have concluded that Securities Plaintiffs have adequately pled that the qualifying language in the Joint Proxy and Merger Agreement did not disclose the true bonus agreement between BofA and Merrill.  That conclusion applies with equal force to the Derivative Complaint, as does the determination that the Securities Complaint adequately alleges that the Merrill bonuses were material.[9]

> 3.  Securities Complaint Adequately Alleges the Materiality of Defendants' Omissions Concerning Fourth Quarter 2008 Losses.

The defendants in the Securities Action also move to dismiss the '34 Act claims arising out of the deteriorating financial conditions at Merrill and BofA in the fourth quarter of 2008.  Plaintiffs contend that the defendants failed to disclose $15 billion in losses at Merrill in October and November 2008, just as BofA was experiencing its first quarterly loss in company history.

According to the Securities Complaint, in October 2008, during the time between the transaction's announcement and the filing of the Joint Proxy, Merrill lost approximately $7 billion.  (Sec. Compl. ¶ 88.)  In an interview with the PBS program "Frontline," Thain later stated, "October was by far the worst."  (Sec. Compl. ¶ 88.)  Merrill continued losing approximately $1 billion a week in November, and also incurred an impairment charge to goodwill of approximately $2 billion.  (Sec. Compl. ¶¶ 89-91.)

The Securities Complaint alleges that BofA was aware of these losses as they occurred, and assigned approximately 200 of its employees to monitor Merrill's financial condition.  (Sec. Compl. ¶ 93.)  The Securities Complaint asserts that BofA executives "personally received regular updates as the fourth quarter progressed."  (Sec. Compl. ¶ 94.)

---

[9] As discussed more fully below in the section addressing negligence and scienter, Rule 9(b) does not apply to the Derivative Plaintiffs' Section 14(a) and Rule 14a-9 claims because they do not sound in fraud.

According to Thain, Merrill generated daily profit and loss statements, which were contemporaneously reviewed by BofA.  (Sec. Compl. ¶ 95.)  In Congressional testimony, Lewis stated that Merrill distributed "detailed financial reports every week" after the Merger Agreement was signed in September.  (Sec. Compl. ¶ 97.)  The Securities Complaint alleges that there were internal disagreements within BofA as to whether the ongoing losses should be disclosed to shareholders.  (Sec. Compl. ¶ 102.)

The defendants first argue that, as a matter of law, BofA and Merrill had no duty to update shareholders as to their financial results on an intra-quarterly basis, since quarterly reports are the mechanism for updating company finances and SEC regulations do not require intra-quarter financial statements.  See, e.g., Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 760 (7th Cir. 2007) (Easterbrook, J.) ("The securities laws create a system of periodic rather than continual disclosures."); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997) (Alito, J.) (revisions to earnings forecast do not create a "continuous duty to update the public with either forecasts or hard information that would in anyway change a reasonable investor's perception").  Yet these same rulings recognize that intra-quarter updates may be required, if intervening events trigger a duty to disclose.  Higginbotham, 495 F.3d at 760 ("Silence is not 'fraud' without a duty to disclose.") (emphasis added); In re Burlington Coat Factory, 114 F.3d at 1432 ("[U]pdating might be required if a prior disclosure [had] become materially misleading in light of subsequent events.") (alteration in original; quotation marks omitted).[10]

---

[10] None of the cases that defendants cite arose in a situation in which shareholders were asked to vote on a merger.  See Higginbotham, 495 F.3d at 756, (asserting claims under Section 10(b) and Rule 10b-5 arising from the corporation's restatement of its earnings); In re Burlington Coat Factory, 114 F.3d at 1414 (alleging that misleading statements and omissions made throughout the class period artificially inflated the company's stock price); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1412-13, 1421 (9th Cir. 1994) (alleging under the '33 Act misstatements in a debenture prospectus); In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 449

The Joint Proxy and the 10-Q filings for the third quarter of 2008 minced no words about the challenging economic climate and the likelihood that Merrill would continue to incur losses in the near and medium term.  The Joint Proxy, which was filed on November 3, 2008, stated that Merrill had suffered significant recent losses and that economic turmoil influenced its decision to pursue the transaction.  Under the "Recent Developments" heading, the Joint Proxy states that "[o]n October 16, 2008, Merrill Lynch announced a net loss from continuing operations for the third quarter of $5.1 billion, or $5.56 per diluted share, compared to a net loss from continuing operations of $2.4 billion, or $2.99 per diluted share, in the third quarter of 2007."  (Joint Proxy at 36.)  The Joint Proxy stated that in deciding to proceed with the transaction, Merrill considered "the current and prospective environment in which Merrill Lynch operates, which reflects challenging and uncertain investment banking industry conditions and risks that the Merrill Lynch board of directors expected to persist, including: the volatile valuations and illiquidity of certain financial assets and exposures . . . [and] generally uncertain national and international economic conditions[.]"  (Joint Proxy at 52 (emphasis added).)

Defendants also point to the 10-Q filings of Merrill and Bank of America for the third quarter of 2008, which were filed on November 5 and 6, 2008, respectively.  Merrill's Form 10-Q stated that the "adverse market environment intensified towards the end of the quarter, particularly in September, and was characterized by increased illiquidity in the credit markets, wider credit spreads, lower business and consumer confidence, and concerns

---

(S.D.N.Y. 2000) (alleging that during the class period, the defendants made misleading statements which artificially inflated the company's stock price); Blum v. Semiconductor Packaging Materials Co. Inc., No. C.A. 97-7078, 1998 WL 254035, at *1 (E.D. Pa. May 5, 1998) (alleging that the defendants "issued press releases and gave interviews . . . which materially misrepresented" the company's revenues in a particular quarter); Zucker v. Quasha, 891 F. Supp. 1010, 1013 (D.N.J. 1995) (alleging under the '33 Act that a registration statement and prospectus were materially false and misleading).

about corporate earnings and the solvency of many financial institutions."  (Merrill 3Q08 10Q

at 82.)  "Turbulent market conditions in the short and medium-term will continue to have an

adverse impact on our core business."  (Merrill 3Q08 10Q at 83.)  Separately, BofA's Form

10-Q filing of November 6, 2008, stated that "resulting economic pressure on consumers and

lack of confidence in the financial markets has adversely affected our business, financial

condition and results of operations.  We do not expect that the difficult conditions in the

financial markets are likely to improve in the near future.  A worsening of these conditions

would likely exacerbate the adverse effects of these difficult market conditions on us and

others in the financial institutions industry."  (BofA 3Q08 10Q at 175.)  BofA characterized

the "[c]urrent levels of market volatility" as "unprecedented."  (BofA 3Q08 10Q at 176.)  "If

current levels of market disruption and volatility continue or worsen, there can be no

assurance that we will not experience an adverse effect, which may be material, on our ability

to access capital and on our business, financial condition and results of operations."  (BofA

3Q08 10Q at 176.)  Investors were placed on notice that Merrill faced similar perils: "Merrill

Lynch and its business are subject to many of the same difficulties resulting from the market

turmoil and tightening of credit as we are . . . .  Merrill Lynch's ability to mitigate its risk by

selling or hedging its exposure is also limited by the market environment, and its future

results may continue to be materially impacted by the valuation adjustments applied to these

positions."  (BofA 3Q08 10Q at 176-77.)

        BofA and Merrill explicitly discussed the difficulties posed by the

"unprecedented" economic climate and the likelihood that such difficulties would persist for

the near future.  Specifically, both BofA and Merrill acknowledged the risk that Merrill faced

risks from economic "turmoil" and was suffering from "[t]urbulent market conditions" that

"will continue to have an adverse impact on our core business" in the "short and medium[]

term." (Merrill 3Q08 10Q at 83.)

It is also the case that, accepting the truth of the Securities Complaint's non-

conclusory allegations, at the time the Joint Proxy was filed on November 3, 2008, the

defendants were aware that Merrill already had incurred approximately $7 billion in losses in

October 2008. This was the highest monthly loss in the company's history. (Sec. Compl. ¶

184.) While the Joint Proxy and the third quarter 10-Q statements indeed painted a grim

portrait of Merrill's near-term and medium-term prospects, when the Securities Complaint's

allegations are accepted as true, at the time the Joint Proxy issued, the defendants were aware

that Merrill had suffered historically large losses in October. By the time the Joint Proxy

issued, the stormy forecast for the fourth quarter was not merely a projection: the storm had

arrived. These losses were a known fact to company insiders, yet were not disclosed to

BofA's shareholders.

The purpose of Rule 14a-9 is to "ensure disclosures by corporate management

in order to enable the shareholders to make an informed choice." TSC Indus., 426 U.S. at

448. Rule 14a-9 makes it unlawful to issue a proxy statement "which omits to state any

material fact necessary in order to make the statement therein not false or misleading." 17

C.F.R. § 240.14a-9(a). The rule was promulgated "with the goal of preserving for all

shareholders who are entitled to vote, not just for those who sponsor proposals, the right to

make decisions based on information that is not false or misleading." United Paperworkers,

985 F.2d at 1198; accord MONY Group, Inc. v. Highfields Capital Mgt., L.P., 368 F.3d 138

(2d Cir. 2004) ("The SEC rules promulgated under Section 14(a) are intended to level

somewhat the playing field for proxy contestants and to force disclosures that promote informed shareholder voting.").

Courts have held Section 14(a) claims to be viable when proxy issuers failed to adequately incorporate filings that set forth environmental liabilities, United Paperworkers, 985 F.2d at 1200-01, omitted discussion of directors' potentially conflicting interests, Mills, 396 U.S. at 378, and omitted disclosure of adverse court judgments, significant company loans, and the value of significant real estate holdings, Wilson, 855 F.2d at 991-94.  In Wilson, the Second Circuit also held that plaintiffs had asserted a viable Section 14(a) claim when the proxy statement disclosed a subsidiary's previous annual loss of $2.5 million but failed to disclose that in the first six months of the new fiscal year, that same company had already lost $2.1 million.  Id. at 994-95.

The defendants' argument that the negative forecast in the Form 10-Q filings and the Joint Proxy placed shareholders on adequate notice of Merrill's perilous financial condition is inextricably intertwined with the issue of materiality.  Defendants' theory invites the Court to hold that the more general – though indisputably grim – statements concerning the economic climate's effect on Merrill were sufficient to render immaterial the non-disclosure of Merrill's actual losses.  A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., 426 U.S. at 449.  The "total mix" of information goes beyond a proxy's four corners and includes information "reasonably available to the shareholders," including media reports and documents in the public domain.  United Paperworkers, 985 F.2d at 1198-99.

Here, accepting the truth of the Securities Complaint's allegations, Merrill's undisclosed losses of October 2008 were the largest monthly losses in the company's history.

(Sec. Compl. ¶ 184.)  The defendants were aware of the losses prior to the Joint Proxy's

filing.  (Sec. Compl. ¶¶ 93-95, 97.)  The Court cannot conclude, as a matter of law at the Rule

12(b)(6) stage, that the broad warnings of the Joint Proxy and the two 10-Q filings "enable[d]

the shareholders to make an informed choice."  TSC Indus., 426 U.S. at 448.

    This is not, as the defendants assert, tantamount to an obligation that a

company issue continuous updates of its financial condition.[11]  It is instead a recognition that

Section 14(a) and Rule 14a-9 apply even in a moment of significant "turbulence" and

"turmoil."  The Joint Proxy's general warnings came to fruition, and the Securities Complaint

alleges in a non-conclusory manner that the losses were well known to BofA's executives

and, in November, amounted to $1 billion per week.  As presently alleged, the Securities

Complaint plausibly asserts that both the scope and the timing of the losses raise "a

substantial likelihood that a reasonable shareholder would consider [them] important in

deciding how to vote."  TSC Indus., 426 U.S. at 449.

    The defendants' motions to dismiss Securities Plaintiffs' '34 Act claims, to the

extent that they are premised on a failure to disclose Merrill's losses of October and

November 2008, is denied.  However, as will be discussed, the Securities Complaint fails to

raise a cogent and compelling inference of scienter as to the non-disclosure of these losses.

> 4.  For Substantially the Same Reasons, the Derivative Complaint
>     Adequately Alleges That Section 14(a) and Rule 14a-9 Required the
>     Disclosure of Merrill's Fourth Quarter Losses.

    The Derivative Complaint contains, in essence, the same allegations regarding

the scope of Merrill's losses during the fourth quarter of 2008.  (Deriv. Compl. ¶¶ 232(f),

---

[11] In dictum, Judge Friendly declined to foreclose the possibility that Section 14(a) could require a company to
undertake sweeping measures if events required a supplement to a proxy statement, including last-minute proxy
amendments or shareholder revocation of an already-issued proxy.  See Gerstle v. Gamble-Skogmo, Inc., 478
F.2d 1281, 1297 n.15 (2d Cir. 1973).

233(a) & (c).)  The Second Circuit "has construed [Rule 14a-9] to encompass the omission of significant facts subsequent to the original dissemination of the proxy statement."  <u>S.E.C. v. Parklane Hosiery Co., Inc.</u>, 558 F.2d 1083, 1089 n.3 (2d Cir. 1977) (citing <u>Gerstle</u>, 478 F.2d at 1297 n.15).

The Derivative Plaintiffs have alleged in a non-conclusory manner that Merrill incurred a $4.4 billion loss in October, prior to the distribution of the Joint Proxy on November 5, 2008.  (Deriv. Compl. ¶ 168.)  Likewise, when BofA filed its two proxy supplements, on November 21 and November 28, 2008, Merrill already had incurred increased losses during November.  (<u>Id.</u>)  The Derivative Complaint alleges sufficient facts to foreclose the conclusion that, at this stage, Merrill's fourth quarter losses were immaterial as a matter of law.

5. Claims in the Securities and Derivative Complaints Directed to the <u>Merger Agreement's MAC Clause Are Dismissed.</u>

a. Securities Complaint Fails to Plausibly Allege That the Defendants Violated Section 10(b) and Rule 10b-5 by <u>Failing to Disclose Developments Related to the MAC.</u>

The Securities Plaintiffs assert that, to the extent that the Merger Agreement warranted that no material adverse effects would arise between the execution of the Merger Agreement and the closing of the transaction, the MAC itself triggered a disclosure duty when negative events unfolded prior to the shareholder vote.  Separately, they allege that internal discussions within BofA about invoking the MAC and terminating the transaction were of sufficient importance to trigger BofA's obligation to disclose the underlying sources of concern to shareholders.  These allegations fail to state a plausible claim that the defendants violated Section 10(b) and Rule 10b-5 in their conduct relating to the MAC.

I begin by reviewing the relevant terms of the MAC.  According to the Securities Complaint, the Merger Agreement warranted that Merrill had undergone no material adverse effect as of the date of the Merger Agreement, and that this would remain true until the close of the transaction.  (Sec. Compl. ¶ 211.)  The MAC provides that a "material adverse effect" arises when there is "a material adverse effect on (i) the financial condition, results of operations or business . . . taken as whole . . . ."  (Joint Proxy at A-13.)  The MAC then sets forth numerous circumstances that "shall not be deemed" to constitute a material adverse effect.  (Joint Proxy at A-13.)  These carve-outs from the MAC vary in breadth and substance, and include matters as diverse as changes in accounting standards, changes in statute or regulation, acts of terrorism, "changes in global, national, or regional political conditions . . . or general business, economic or market conditions," the failure to meet earnings projections, and changes in stock price.  (Joint Proxy at A-13 (emphasis added).)

At Item 1.02 of Form 8-K, Instruction 1, the SEC has promulgated a rule that "[n]o disclosure is required . . . during negotiations or discussions regarding a termination of a material definitive agreement unless and until the agreement has been terminated."  The SEC's regulation does not entirely dispose of the plaintiffs' MAC-related disclosure claim, however.  The plaintiffs do not assert that the '34 Act was violated because the defendants failed to invoke the MAC or disclose internal deliberations on whether to invoke the MAC.  Rather, they contend that the Merger Agreement warranted against the existence of a material adverse effect prior to the closing.  In the plaintiffs' view, the underlying fourth quarter losses at Merrill were sufficient to require disclosure of a material adverse effect, as warranted against by the MAC.  (Sec. Compl. ¶ 102.)

- 63 -

The Securities Complaint fails to connect its allegations of a material adverse effect to the actual language of the MAC.  The Securities Complaint does not explain how the defendants' action or inaction contradicted any specific term of the MAC.  It merely cites the existence of a MAC, alleges that BofA considered its invocation, and concludes, ipse dixit, that a material adverse effect existed and therefore further disclosure of Merrill's underlying financial conditions was required.  Of particular note is that the MAC excludes as an adverse material effect changes in "general business, economic or market conditions . . . ." (Joint Proxy at A-13.)  In failing to engage the text of the MAC, the Securities Complaint falls short of "demonstrat[ing] with specificity why and how" defendants fraudulently failed to comply with the MAC's warranty against a material adverse effect.  Rombach, 355 F.3d at 174; accord ATSI, 493 F.3d at 99 (a securities fraud complaint must explain why statements are fraudulent in nonconclusory allegations supported by fact).

The Securities Plaintiffs' general averment concerning the MAC does not allege fraud with particularity, and their MAC-based claim is dismissed.

b. For Substantially the Same Reasons, the Derivative Plaintiffs' Section 14(a) Claims Arising from the Terms of the MAC Are Dismissed.

For the reasons stated above, the Derivative Plaintiffs' claims based on the statement in the Joint Proxy that "[e]ach of Bank of America and Merrill Lynch has made representations and warranties to the other regarding, among other things . . . the absence of material adverse changes," are dismissed.  (Joint Proxy at 82; Deriv. Compl. ¶¶ 233(b) & (c).) So, too, are the Derivative Plaintiffs' claims based on the sections 7.2(a) and 7.3(a) of the Merger Agreement, which set as a condition precedent to the merger that the representations and warranties of BofA and Merrill would be true as of the "Effective Time," which the

- 64 -

Merger Agreement identified as the date when the merger became effective.  (Joint Proxy at A-1, A-40-41.)

The allegations that certain defendants discussed invoking the MAC do not save plaintiffs' claim.  Internal discussions about invoking a MAC clause, and seeking legal advice regarding the same, do not, in themselves, render misleading a statement that there has not been and will not be a material adverse effect.  As stated above, the SEC does not require disclosure of negotiations and discussion regarding termination unless the agreement actually has been terminated.  Item 1.02 of Form 8-K, Instruction No. 1.  If the mere consideration of invoking a MAC clause required disclosure of such consideration, there would be a powerful disincentive to entertain the discussion.  In some cases, this would work to the detriment of the company.

The Derivative Plaintiffs' claim directed to the MAC is dismissed.

     c.   Derivative Plaintiffs' Allegations Concerning Non-Disclosure of the Decision to Invoke the MAC Clause Fail to State a Claim under Section 14(a) or Rule 14a-9.

The Derivative Plaintiffs allege that the Joint Proxy should have been updated to reflect that the BofA Derivative Defendants had determined that it was in BofA's best interest to invoke the MAC clause, but they declined to do so solely due to Secretary Paulson's alleged threat to replace them.  (Deriv. Compl. ¶ 233(c)(c).)  Instead of alleging facts showing that BofA Officers or Directors had concluded a material adverse effect had occurred or that they had decided to invoke the MAC, plaintiffs make the conclusory allegation that "prior to the Shareholder Vote, Defendants Lewis, Price, Curl and the BofA Board were well aware that the significant deterioration in Merrill's asset values, and its

ballooning losses, justified invoking the MAC clause, yet deceptively and in bad faith took pains to conceal these facts . . . ."  (Deriv. Compl. ¶ 181.)

The earliest date by which the Derivative Plaintiffs allege that a defendant learned that BofA could invoke the MAC clause is December 14, 2008, which post-dates the shareholder vote.  Plaintiffs allege that on that date, "the Wachtell law firm opined that grounds existed to invoke [the MAC] clause to terminate the Merger."  (Deriv. Compl. ¶ 183.) This was over one week after the shareholder vote on December 5, 2008.  The remaining allegations regarding the decision to invoke the MAC clause, and the reversal of that decision, relate to events that occurred after December 14, 2008.  (Deriv. Compl. ¶¶ 184-191.)

Similarly, plaintiffs allege that the Joint Proxy should have disclosed that "management had received advice from" internal counsel that Merrill's losses justified invoking the MAC clause.  (Deriv. Compl. ¶ 232(e).)  However, plaintiffs have not alleged that internal BofA counsel opined that BofA could invoke the MAC clause before the shareholder vote.  The particular allegations the Derivative Plaintiffs do make state only that internal counsel both gave and received advice regarding Merrill's losses (Deriv. Compl. ¶¶ 167, 173, 182), but plaintiffs do not allege what that advice was.  The Derivative Plaintiffs' Section 14(a) claims are dismissed to the extent they are predicated on these statements.

      6.   Claims Directed to the Adequacy of BofA's Due Diligence Are <u>Dismissed.</u>

         a.   The Securities Complaint Fails to Plausibly Allege That the Defendants' Representations Concerning Due Diligence <u>Violated Section 10(b) and Rule 10b-5.</u>

The Securities Plaintiffs allege that BofA's due diligence was inadequate, and that defendants unlawfully misstated the extent of their investigation of Merrill and failed to disclose its inadequacy.  According to the plaintiffs, the defendants' purported failings were

material.  (Sec. Compl. ¶ 184.)  I conclude that the Securities Complaint fails to plausibly allege that the opinions expressed concerning the adequacy of due diligence were falsely held by defendants.

According to the Securities Complaint, on September 15, 2008, Price said in an investor call that the due diligence performed by BofA and its financial advisor had been "extensive."  (Sec. Compl. ¶ 179.)  Price stated that BofA was aware of Merrill's operations from their years as competitors, and had also "sent in a large team to review areas such as asset valuations, trading positions, and the like."  (Sec. Compl. ¶ 179.)  He stated that BofA's financial advisor was familiar with Merrill's condition because it had reviewed Merrill for other potential transactions.  (Sec. Compl. ¶ 179.)  Lewis stated in a press conference that the company's financial advisors "had done quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive.  They had looked at the marks very comprehensively . . . .  So that was one of the key ingredients to being able to do this as quickly as we did."  (Sec. Compl. ¶ 180.)  As a result of the due diligence, Lewis stated, he believed that Merrill had "a much lower risk profile" than before.  (Sec. Compl. ¶ 180.)

The Securities Complaint asserts that BofA misrepresented the scope and adequacy of its diligence efforts.  It alleges that BofA had not comprehensively analyzed Merrill's finances, and had no basis to make any representation about Merrill's risk profile. (Sec. Compl. ¶ 182.)  It also cites an analysis by Federal Reserve officials stating that BofA's statements implied "substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition."  (Sec. Compl. ¶ 182.)  In December 2008, Bernanke allegedly told Lewis that if the transaction were terminated, it would "reveal the falsity of his claims regarding 'adequate due diligence.'"  (Sec. Compl. ¶ 183.)  Mac Alfriend, a vice president at

the Fed, wrote to other senior Fed officials stating that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home . . . ."  (Sec. Compl. ¶ 183.)

The defendants argue that their representations made as to the adequacy of due diligence were appropriately qualified, and that investors therefore could not be misled as to the scope of BofA's due diligence.  As they note, in the investor call, Price was questioned by several analysts about the adequacy of due diligence "given the extremely abbreviated time frame" in which the transaction was negotiated.  (Sec. Compl. ¶ 179.)  Defendants also rely on BofA's statements concerning its past transactions with Merrill and its financial advisor's past experiences with Merrill, as well as Lewis's statements that Merrill had reduced its risk, as opposed to stating that it was eliminated altogether.  (Sec. Compl. ¶¶ 179-80.)

Defendants also contend that BofA's representations concerning its due diligence amounted to non-actionable statements of opinion and broad generalizations that could not be a basis for shareholder reliance.  They rely on ECA, Local 139, 553 F.3d at 205-06, which held that "generalizations" regarding "business practices" do not "amount to a guarantee" to shareholders.  But there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in "misrepresentations of existing facts."  Novak, 216 F.3d at 315.  "The sine qua non of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion."  Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 153-54 (S.D.N.Y. 2004) (Lynch, J.).  These statements fall into the category of fact-based expressions of opinion rather than enthusiastic, vague, forward-looking puffery.

Although there is some disagreement among the district courts in this Circuit as to whether recklessness can satisfy the subjective falsity requirement, the prevailing conclusion is that a plaintiff must allege that the defendant did not actually believe the stated opinion.[12]  The First and Ninth Circuits have also held that a plaintiff must allege that the defendant did not sincerely believe the stated opinion.  See Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1162 (9th Cir. 2009); In re Credit Suisse First Boston Corp., 431 F.3d 36, 47 (1st Cir. 2005), overruled on other grounds by Tellabs, 551 U.S. 308.  This comports with the Supreme Court's view in Virginia Bankshares that statements of belief are statements of fact in the sense that they convey that the speaker "do[es] act for the reasons given or hold the belief stated," and that such statements may be attacked by "circumstantial evidence bearing on the facts that would reasonably underlie the reasons claimed and the honesty of any statement" regarding those reasons.  501 U.S. at 1092-93.

"While in a misstatement of fact case the falsity and scienter requirements present separate inquiries, in false statement of opinion cases . . . the falsity and scienter requirements are essentially identical."  Podany, 318 F. Supp. 2d at 154.  This is because the subjective falsity requirement necessarily requires an inquiry into the defendant's state of

---

[12] See, e.g., In re Reserve Fund Sec. & Derivative Litig., __ F. Supp. 2d __, No. 09 MD 2011 (PGG), 2010 WL 685013, at *14 (S.D.N.Y. Feb. 24, 2010) (dismissing claim because complaint did not adequately allege that defendants misrepresented their opinions); CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 562 F. Supp. 2d 511, 564 (S.D.N.Y. 2008) (finding that an opinion was not materially false or misleading because there was "no conflict between" a party's knowledge of a fact and its opinion regarding a related issue), aff'd, 292 Fed. App'x 133 (2d Cir. 2008); Fisher v. Kanas, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006) (plaintiffs must show that the defendant did not actually hold the stated opinion); In re Salomon Analysts AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held."); Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003) ("the plaintiff must show both that the directors did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect" ) (emphasis in original), aff'd, 87 Fed. App'x 772 (2d Cir. 2004); but see In re PHLCORP, No. 88 Civ. 0306 (PNL), 1992 WL 85013, at *5 (S.D.N.Y. Apr. 10, 1992) (Leval, J.) (allowing plaintiff leave to file an amended complaint because "it would be precipitous to deny leave to amend on the grounds that allegations of anything short of knowing misrepresentation as to the tender offer's fairness are defective as a matter of law").

mind.  In <u>Novak</u>, opinion-based statements that certain inventory-related issues were "in good shape" or "under control" were deemed actionable when defendants were alleged to have known that the opposite was true.  216 F.3d at 315.  As Judge Lynch later explained in <u>Podany</u>, "[i]t is not sufficient to allege . . . that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that the defendant's opinion was unreasonable."  318 F. Supp. 2d at 154.  Judge Lynch also explained that to successfully plead that an opinion was fraudulently stated, it is tantamount to successfully pleading scienter as to those same statements, "since the statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion."  <u>Id.</u>  The reasoning of Judge Lynch and others is persuasive.  Thus, the PSLRA's requirement that a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," applies to the Securities Plaintiffs' allegations concerning the adequacy of due diligence.  15 U.S.C. § 78u-4(b)(2).

The Securities Complaint fails to allege with particularity that the statements by Lewis and Price were knowingly false at the time that they were uttered.  Accepting the truth of the Securities Complaint, Lewis and Price based their statements concerning the adequacy of their investigation on BofA's extensive dealings with Merrill, and its financial advisor's own long history with Merrill.  (Sec. Compl. ¶¶ 179-80.)  Their confidence was based on historic interactions, and not just an investigation undertaken over the weekend of the transaction's negotiation.  Moreover, Lewis's statement that Merrill had reduced its risk was not equivalent to stating that Merrill had altogether eliminated its risk.  (Sec. Compl.

¶ 180.)  The Securities Complaint does not plausibly allege that these opinions were falsely held at the time that they were expressed.

It is true that, months later, Fed regulators and Lewis questioned whether BofA performed adequate diligence of Merrill's risk portfolio.  (Sec. Compl. ¶¶ 182-83.)  Such retrospective critiques do not amount to an allegation that Lewis and Price knew their statements were false at the time they were uttered.  Because the Securities Complaint does not plausibly allege facts that Price and Lewis falsely stated their opinions about the adequacy of due diligence, defendants' motion to dismiss is granted as to those statements.

> b.  Similarly, the Derivative Plaintiffs Have Not Adequately Alleged That Statements in the Joint Proxy Regarding Due Diligence Violated Section 14(a) and Rule 14a-9.

The Derivative Plaintiffs allege that the Joint Proxy misrepresented the level of due diligence that was performed prior to the BofA Directors' decision to approve the merger.  They quote two portions of the Joint Proxy that address the due diligence process.  According to the Derivative Complaint, BofA "senior management" and the Financial Advisors "presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction . . . ."  (Deriv. Compl. ¶ 107.)  The Derivative Plaintiffs also allege that the Joint Proxy "states that the due diligence investigation the BofA Defendants made of Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was concluded by '[e]arly in the morning of Sunday, September 14, 2008,' when 'Messrs. Thain and Lewis met in New York City [and] discussed the results of the due diligence investigations conducted by their companies' respective representatives.'"  (Deriv. Compl. ¶ 111 (alteration in original).)

The Derivative Plaintiffs have not adequately alleged that those statements were false or misleading.  In fact, they repeatedly emphasize throughout the Derivative Complaint the truth of the latter statement: that the due diligence process lasted for 10 hours. (Deriv. Compl. ¶¶ 3, 11, 102, 105, 111, 314(a).)  The Derivative Complaint's allegations regarding the due diligence process essentially assert that it was "entirely perfunctory," and insufficient.  (Deriv. Compl. ¶¶ 3, 10, 11, 104, 107, 111, 115, 116, 118, 245, 248, 268, 300(d), 314(a).)  Merely alleging that due diligence was flawed, however, does not state a claim under Section 14(a) or Rule 14a-9, which require a misleading proxy statement.  See Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir. 1979) (stating that efforts "to dress up" breach of fiduciary duty claims as a Section 14(a) "suit of clothes have consistently been rejected"); Koppel, 167 F.3d at 133 ("We have long recognized that no general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty.").  The Derivative Plaintiffs' Section 14(a) claim is dismissed to the extent it is based on the statements regarding the due diligence performed prior to the board's decision to approve the merger.

> 7. Securities Complaint and the Derivative Complaint Both Fail to Plausibly Allege That Defendants Ran Afoul of the '34 Act's Duty to Update.
>
>> a. Defendants in the Securities Complaint Had No General Duty to Update Certain Statements in Light of the October and November Losses.

According to the Securities Plaintiffs, some of the defendants' representations triggered a duty to update past statements.  For the reasons explained below, the duty did not apply.

"A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."  In re IBM Corp. Sec. Litig., 163

F.3d 102, 110 (2d Cir. 1998).  There is no duty to update opinions, non-material remarks, "vague statements of optimism," or statements that were not forward-looking with a "factual representation that remains 'alive' in the minds of investors as a continuing representation . . . ."  Id.  "When objectively verifiable factors cause a significant change in a party's attitude toward a merger – a 'sharp break from . . . prior public positions,' the securities laws may require that previously disclosed intentions be corrected."  In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 748 (S.D.N.Y. 1989) (applying Section 14(e) of the '34 Act) (quoting Kamerman v. Steinberg, 123 F.R.D. 66, 71 (S.D.N.Y. 1988)).

Among the statements that the Securities Plaintiffs allege should have been updated were descriptions of the acquisition as a "major grand slam home run," the "strategic opportunity of a lifetime," and the prediction that it would "creat[e] more value for shareholders."  (Sec. Compl. ¶ 191.)  These vague statements of optimism did not require updating.[13]  Also, the characterization that Merrill had "dramatically" lowered its risk profile did not require updating.  (Sec. Compl. ¶ 80.)  Plaintiffs do not dispute that Merrill had, in fact, lowered its risk profile.  This was a forward-looking statement that did not trigger a duty to update.  In re IBM, 163 F.3d at 110.  In addition, BofA's representations that it had a "strong capital position" and that the transaction would result in a "strong capital position, funding capabilities and liquidity" from the combined company are vague statements of optimism that do not require updating.  (Sec. Compl. ¶¶ 212-13.)

The Securities Plaintiffs also point to an allegedly misleading statement by Price, who, in a conference call, asserted that approximately $10 billion earned in BofA's

---

[13] As with the statements contained in the January 1 press release discussed above, the optimistic statements contained in this September 15, 2008 press release and remarks made by Lewis are examples of non-actionable puffery.  ECA, Local 134, 553 F.3d at 205-06; Lasker, 85 F.3d at 59.  They do not, moreover, implicate the duty to correct, which varies from the duty to update, and is directed to historical statements of fact.  In re IBM, 163 F.3d at 109.

secondary offering "covered our anticipated needs from a Merrill standpoint." (Sec. Compl. ¶ 199.) Plaintiffs contend that this statement later required updating because, in order to absorb Merrill's losses, BofA required a capital injection from the federal government. The Securities Complaint does not, however, allege a connection between any asserted shortcomings in the Secondary Offering and the losses of the fourth quarter of 2008. Even assuming a connection between the Secondary Offering's proceeds and the need to "cover[]" fourth quarter losses – an interpretation of the remarks that is not supported by the text of this isolated quote – Price's statement was qualified to the extent that BofA's "needs" were described as "anticipated." (Sec. Compl. ¶199.)

The Securities Complaint fails to state a claim under Section 10(b) and Rule 10b-5 for failure to satisfy a duty to update.

> **b.  Derivative Plaintiffs' Section 14(a) and Rule 14a-9 Claims Based on Statements Regarding the Future Capital Position of BofA and Merrill Are Dismissed.**

The statements that BofA had a "strong capital position, funding capabilities and liquidity," and that the combined company would likewise have a "strong capital position, funding capabilities and liquidity" (Deriv. Compl. ¶ 233(c)), are the type of "vague statements of optimism or expressions of opinion" for which there was no duty to update. In re IBM, 163 F.3d at 110. Therefore, the Derivative Plaintiff's Section 14(a) and Rule 14a-9 claims based on these statements are dismissed.

> **8.  Motions to Dismiss the Securities Plaintiffs' Additional Section 10(b) and Rule 10b-5 Claims Are Granted in Part and Denied in Part.**

The Securities Plaintiffs assert claims that implicate statements and events that occurred following the shareholder vote. The defendants contend that these statements are not actionable under Section 10(b) and Rule 10b-5. With the exception of the defendants'

alleged non-disclosure of federal financial assistance in December 2008, which will be further discussed, the motion to dismiss for failure to allege fraudulent conduct is granted.

a.   Statements in BofA's Press Release of January 1, 2009 Are Non-Actionable.

Plaintiffs allege that a January 1, 2009 press release issued by BofA contains materially false and misleading statements, to the extent it states that the acquisition created "a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities." (Sec. Compl. ¶ 229.)  In an accompanying press release, defendant Lewis stated that the combined firm was "uniquely positioned to win market share" with its "significantly enhanced" capabilities.  (Sec. Compl. ¶ 229.)  Plaintiffs contend that the statement was materially false and misleading because it omitted discussion of "critical developments" that allegedly threatened the transaction.  (Sec. Compl. ¶ 229.)

Such remarks are non-actionable puffery that are too vague to permit reasonable investor reliance.  See, e.g., ECA, Local 134, 553 F.3d at 205-06 (statement touting "highly disciplined" risk management processes was non-actionable); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (predictions that company "business strategies [would] lead to continued prosperity," among other similar statements, were non-actionable puffery).  As a result, they are not actionable statements under Section 10(b) and Rule 10b-5, and the plaintiffs' claims are dismissed.

b.   Motion to Dismiss the Section 10(b) and Rule 10b-5 Claims Is Denied As to BofA's Allegedly Undisclosed Arrangement to Receive Federal Funds.

The Securities Complaint alleges that Lewis received a firm commitment from officials at Treasury and the Fed to provide BofA with extensive capital in order to consummate the acquisition.  Specifically, the Securities Complaint alleges that in exchange

for BofA's agreement to proceed with the transaction, the Treasury Department and the Federal Reserve provided a $20 billion capital infusion to BofA in exchange for a sale of preferred stock, and also agreed to guarantee losses of $118 billion in risky assets, the large majority of which came from Merrill.  (Sec. Compl. ¶ 132.)  It further alleges that these commitments were material and undisclosed.  (Sec. Compl. ¶ 134.)

The BofA defendants argue that they had no duty to disclose their communications with regulators, "no matter how material [they] may be."  (BofA Sec. Mem. at 53.)  They cite to the SEC rules of Form 8-K, which require disclosure of "material definitive agreement[s] not made in the ordinary course of business."  Form 8-K, at Item 1.01(a).  According to the defendants, the Securities Complaint does not allege a definitive agreement between BofA and federal regulators that triggered a disclosure obligation.

According to the minutes of a board of directors meeting on December 22, 2008, Lewis stated that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets," that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation," and that "the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."  (Sec. Compl. ¶ 132.)  The minutes summarize Lewis's remarks stating that management's recommendation to proceed with the acquisition was based on "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed and Treasury's committed assistance in existence no later than January 20,

2009," as well as "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."  (Sec. Compl. ¶ 133.)

According to the Securities Complaint, Lewis told the board of directors that there could be no written agreement with the federal government because such an agreement would be publicly disclosed.  In an e-mail sent to the board of directors on December 22, 2008, Lewis stated: "I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure, which, of course, we do not want."  (Sec. Compl. ¶ 134.)  According to board meeting minutes, on December 30, 2008, Lewis informed the board of directors that "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators."  (Sec. Compl. ¶ 135.)  At the same meeting, according to the minutes, Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of federal regulators to deliver assistance in the form of capital and asset production to the Corporation."  (Sec. Compl. ¶ 135.)  Lewis said that BofA "had clearly explained to the federal regulators the terms and conditions" required to complete the transaction, and received "strong assurances from all relevant federal regulators and policy makers" that BofA would receive "adequate and appropriate assets to neutralize the impact of the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009."  (Sec. Compl. ¶ 135.)  The minutes of the December 30 meeting further state, "Mr. Lewis explained that written

assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, which formal action would require public disclosure."  (Sec. Compl. ¶ 136.)

    These detailed, non-conclusory allegations plausibly allege that BofA received concrete assurances from officials at the Treasury and the Federal Reserve that BofA would receive a massive capital infusion in exchange for proceeding with the Merrill acquisition. (Sec. Compl. ¶¶ 132-36.)  As noted, the defendants contend that any agreement was not "definitive."  Form 8-K, at Item 1.01(a).  The authorities cited by defendants are distinguishable.  Both Vladimir v. Bioenvision, Inc., 606 F. Supp. 2d 473, 486 (S.D.N.Y. 2009), and Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992), rejected claims about the conduct of merger negotiations.  Here, the Securities Complaint alleges that a definitive agreement was reached between Bank of America and federal regulators but was intentionally not memorialized in order to avoid public disclosure.  Plaintiffs have adequately alleged the particulars of fraud under Section 10(b) and Rule 10b-5.  However, as explained below, the Securities Complaint fails to adequately allege scienter.

       c.   Lewis's September 15 Remarks About Merrill's Liquidity Are
        Non-Actionable.

    The Securities Plaintiffs also allege that Lewis issued false statements concerning Merrill's liquidity and its sustainability as an independent entity.  During the September 15, 2008 investor call, Lewis was questioned about the premium paid for Merrill, and stated, "One, probably the more likely is that Merrill had the liquidity and capacity to see this through.  It's not necessarily easy because of just the times.  But more likely than not, they would have seen this through and come out the other side."  (Sec. Compl. ¶ 185

(emphasis omitted).)  According to plaintiffs, Thain later stated that Merrill's sale was motivated by impending insolvency.  (Sec. Compl. ¶ 186.)

Thain's subsequent remarks cannot be imputed to Lewis, however, and the Securities Complaint does not plead with particularity that Lewis knew that his heavily qualified statement about Merrill's liquidity was false at the time that he uttered it.  See Novak, 216 F.3d at 315; Podany, 318 F. Supp. 2d at 153-54.  Because plaintiffs' theory of liability is premised on conclusorily imputing Thain's knowledge to Lewis, they fail to state a claim as to Lewis's September representations concerning Merrill's liquidity.

> d.  Statements by Lewis Regarding Regulator Pressure and Thain's Self-Interest Are Non-Actionable.

According to the Securities Complaint, Lewis made materially false and misleading statements on the September 15 investor call regarding federal pressure to complete the acquisition.  In response to analyst questions about whether federal regulators pushed for the deal to be done quickly, Lewis stated that "there was absolutely no pressure." (Sec. Compl. ¶ 187.)  According to the Securities Complaint, however, Treasury Secretary Paulson spoke to Thain and demanded the transaction's completion by September 15.  (Sec. Compl. ¶ 188.)  In an interview with the PBS program "Frontline," Thain recalled Paulson telling him, "John, you'd better make sure this happens."  (Sec. Compl. ¶ 65.)

The Securities Complaint also alleges that Lewis issued a false statement when he denied that Thain was motivated by self-interest during the negotiations.  In the September 15 call, Lewis said in reference to Thain that "it was never about him; it was always about the deal."  (Sec. Compl. ¶ 189.)  According to the plaintiffs, the negotiations were heavily focused on Thain's ability to receive a large compensation package for himself and his colleagues, to the point where bonus terms were one of the negotiation's biggest sticking

points.  (Sec. Compl. ¶ 190.)  Lewis also retrospectively described the bonus talks as implicating "petty kind of selfish things."  (Sec. Compl. ¶ 78.)

With respect to the foregoing, the plaintiffs have not alleged fraud with particularity.  While Lewis's denial of federal pressure was a statement of then-existing fact, the Securities Complaint does not allege with particularity that Lewis possessed any knowledge that contradicted his public comments.  In their opposition memorandum, the plaintiffs attempt to impute Thain's conversations with Paulson to Lewis, arguing that the Securities Complaint does not allege that pressure was exerted "solely" on Lewis and observing that it is "not credible" that BofA would have expedited the transaction without federal pressure.  (Sec. Opp. Mem. at 60.)  Such allegations are premised upon speculation and fail to satisfy the PSLRA's bar against "conclusory" fraud claims "unsupported by factual assertions . . . ."  ATSI, 493 F.3d at 99.

Lewis's comments that Thain's actions were "always about the deal" and "never about him" were subjective characterizations concerning Thain's character and intentions, and were too vague and opinion-based for a reasonable investor to rely upon them as a statement of fact.  See In re Merrill Lynch Auction Rate Sec. Litig., No. 09 MD 2030 (LAP), 2010 WL 1924719, at *10 (S.D.N.Y. May 11, 2010) ("general and vague" language is non-actionable puffery); In re Xinhua Fin. Media, Ltd. Sec. Litig., 07 Civ. 3994 (LTS), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives" describing management personnel as "strong," "experienced" and "capable" are non-actionable).

9.   Derivative Plaintiffs' Remaining Section 14(a) Claims Against the BofA Directors Are Dismissed.

a.   Derivative Plaintiffs Have Not Adequately Alleged That the Joint Proxy Contained Misstatements or Omissions Regarding the Overvaluation of Merrill Assets and Undervaluation of Merrill Losses.

According to the Derivative Complaint, defendants caused the Joint Proxy to "significantly overvalue Merrill's assets, undervalue[] its losses and liabilities, and otherwise conceal[] its true, downward-spiraling financial condition from BofA shareholders." (Deriv. Compl. ¶ 232(a).)  In addition, plaintiffs allege that the Joint Proxy failed to disclose the "substantial risk that the true value of those assets was substantially less than the stated value, impairing the value of the Merger to BofA shareholders."  (Deriv. Compl. ¶ 232(c).)

The allegation that the BofA Directors concealed Merrill's financial condition was addressed in substance above.  The remainder of these allegations are conclusory.  Iqbal, 29 S. Ct. at 1949.  They do not identify which assets were too complex or illiquid to value accurately or what the actual values were.  In addition, the Joint Proxy disclosed that one of the considerations of Merrill's board in recommending the merger was the "volatile valuations and illiquidity of certain financial assets" of Merrill.  (Joint Proxy at 52.)  Thus, the Derivative Plaintiffs' Section 14(a) claims are dismissed to the extent they are predicated on the statements regarding the value of Merrill's assets.

b.   Derivative Plaintiffs Have Not Adequately Alleged That Statements about Steps Taken to Improve Merrill's Financial Condition Were Misleading.

The Joint Proxy stated that Merrill continued to "reduce exposures and de-

leverage [its] balance sheet." (Deriv. Compl. ¶¶ 4, 134.)[14]  In addition, plaintiffs allege that during a September 15, 2008, press conference, defendant Price stated that Merrill had made progress in reducing its risk exposure. (Deriv. Compl. ¶ 234.)  At the same press conference, Lewis stated that a member of J.C. Flowers had commented that Merrill's marks were "night and day from the time we first looked at it to now." (Deriv. Compl. ¶ 236.)

The Derivative Plaintiffs claim that these statements were misleading because Merrill, in fact, was suffering additional losses throughout October and November 2008. (Deriv. Compl. ¶¶ 20, 232(d).)  But the fact that Merrill continued to suffer additional losses does not mean that Merrill had not reduced its exposure and de-leveraged its balance sheet. Plaintiffs have not alleged that Merrill took some action – other than suffering losses – that increased its leverage.  In addition, the Merrill 3Q08 Form 10-Q, which was incorporated by reference into the Joint Proxy, disclosed that "[t]urbulent market conditions in the short and medium-term will continue to have an adverse impact the valuation adjustments" to Merrill's positions. (Merrill 3Q08 Form 10-Q at 83.)  The BofA 3Q08 Form 10-Q stated that Merrill's "future results may continue to be materially impacted by the valuation adjustments . . . ." (BofA 3Q08 Form 10Q at 177.)  However, even if plaintiffs could allege facts demonstrating that these statements were misleading – which they do not – those statements cannot form the basis of a claim under Section 14(a) or Rule 14a-9, which are directed to the contents of a proxy solicitation.  The comments here were made at a press conference, and there is no allegation that they were incorporated by reference into the Joint Proxy.  Therefore, plaintiffs have failed to state a claim under Section 14(a) or Rule 14a-9 based on the above statements.

---

[14] This statement was contained in a press release included as part of Merrill's Form 8-K dated October 16, 2008, which was incorporated by reference into the Joint Proxy. (Deriv. Compl. ¶ 131.)

      c.   Derivative Plaintiffs Have Not Adequately Alleged That
Statements Regarding Additional Government Funds to
Close the Merger and the Government Guarantee Were
<u>Misleading.</u>

The Joint Proxy discussed the federal government's Capital Purchase Program

("CPP"), in which the government was authorized to invest in financial institutions and to

purchase the financial instruments the institutions held.  (Joint Proxy at 35.)  The Joint Proxy

disclosed that BofA had entered into an agreement with the Treasury by which the Treasury

would purchase $15 billion of a "new series of preferred stock."  (Joint Proxy at 35.)  In

addition, if the merger were completed prior to the Treasury's planned investment in Merrill,

then the Treasury would purchase from BofA $10 billion in additional preferred stock.  (Joint

Proxy at 35.)  The Joint Proxy further disclosed that, in light of the pending merger, Merrill

had decided not to sell securities to the Treasury.  (Joint Proxy at 36.)

According to Derivative Plaintiffs, these statements "became false and

misleading when the [Joint Proxy] was never updated to include information concerning

Merrill's and BofA's growing third and fourth quarter losses, which were already

approximately $15.3 billion by this time and which would require additional TARP funding

for BofA to close the Merger and absorb Merrill."  (Deriv. Compl. ¶ 148.)  The fact that these

two companies were suffering losses during the fourth quarter does not make the statements

about BofA's and Merrill's participation in the CPP false or misleading.  Plaintiffs allege that

the statements were false or misleading because "almost immediately after the votes were

tallied, the [BofA Derivative Defendants] went to the federal government to seek additional

assistance (on top of the $25 billion already received in that fall)."  (Deriv. Compl. ¶ 177.)

However, plaintiffs have not alleged facts sufficient to draw a reasonable inference that prior

to the shareholder vote any defendant knew that BofA would need additional federal funding.

In fact, plaintiffs quote from an article in their Derivative Complaint which states that "[d]iscussions over these [additional government] funds began in mid-December when Bank of America approached the Treasury Department."  (Deriv. Compl. ¶ 241.)

The Derivative Plaintiffs have not stated a Section 14(a) claim based on these statements.

> d. Derivative Plaintiffs Have Not Alleged That the BofA Directors' Recommendation Regarding the Merger Was Subjectively False.

In the Joint Proxy, the BofA Directors recommended the transaction's approval.  According to the Joint Proxy, the BofA board "determined that the merger, merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of Bank of America and its stockholders and unanimously recommends that you vote 'FOR' approval of the issuance of shares of Bank of America common stock in the merger."  (Joint Proxy at 29.)  According to plaintiffs, these "recommendations were based on the BofA Defendants' bad faith and disloyalty in desiring to acquire Merrill no matter what the price tag or future liabilities, not on any reasoned determination that the transaction was in the best interests of BofA or its shareholders."  (Deriv. Compl. ¶ 156.)

The Derivative Plaintiffs do not dispute that the board's recommendation of the merger was a statement of opinion.  As previously discussed, statements of opinion are actionable under Section 14(a) only if they are objectively and subjectively false.  Virginia Bankshares, 501 U.S. at 1092-93.  As discussed, to satisfy the subjective falsity requirement, "plaintiffs must allege with particularity that defendants did not sincerely believe the opinion they purported to hold."  Podany, 318 F. Supp. 2d at 154.  Thus, the PSLRA's requirement that a plaintiff must plead "with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind," applies to the Derivative Plaintiffs' claim

that the BofA Directors' opinion was false or misleading.  15 U.S.C. § 78u-4(b)(2).

The Derivative Plaintiffs have not alleged that the board members did not

actually hold the opinion they expressed in the Joint Proxy.  In fact, in Count VIII of the

Derivative Complaint, the count asserting the Section 14(a) claim, plaintiffs state that their

claim for relief "is not based on any allegations of knowing or reckless conduct by any

defendant," and that plaintiffs' Section 14(a) "claim does not allege, and does not sound in,

fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud."  (Deriv.

Compl. ¶ 346.)  Even if allegations of recklessness could satisfy the subjective falsity

requirement, which, as discussed above, they cannot, the Derivative Plaintiffs have disclaimed

any allegation of recklessness in their Section 14(a) claims.  (Deriv. Compl. ¶ 346.)

IV.   THE MOTIONS TO DISMISS THE SECTIONS 10(b) AND 14(a) CLAIMS FOR
      FAILURE TO ADEQUATELY PLEAD NEGLIGENCE AND SCIENTER ARE
      GRANTED IN PART AND DENIED IN PART.

A.   Securities Plaintiffs Must Adequately Allege Scienter for Their Section 10(b)
     Claims and Negligence for Their Section 14(a) Claims.

The defendants argue that the plaintiffs cannot satisfy the state-of-mind

thresholds required to state claims for relief under Sections 10(b) and 14(a).

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2).  The statute "unequivocally raise[d] the bar for pleading scienter . . . ."  Tellabs, 551

U.S. at 321 (alteration in original; quotation marks omitted).  In scrutinizing scienter

allegations, a court is to consider "whether all of the facts alleged, taken collectively, give rise

to a strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard."  Id. at 322-23 (emphasis in original).  A court also "must take

into account plausible opposing inferences." <u>Id.</u> at 323.  This requires close and comparative

scrutiny: "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'

– it must be cogent and compelling, thus strong in light of other explanations." <u>Id.</u> at 324.

In satisfying the scienter pleading threshold, "[a] complaint will survive . . .

only if a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 324.  A

plaintiff may demonstrate this by alleging facts "(1) showing that the defendants had both

motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence

of conscious misbehavior or recklessness." <u>ATSI</u>, 493 F.3d at 99.  Motives that are common

to corporate officers – for instance, "the desire for the corporation to appear profitable and the

desire to keep stock prices high to increase officer compensation" – do not rise to the level of

scienter. <u>ECA, Local 134</u>, 553 F.3d at 198.  "Rather, the 'motive' showing is generally met

when corporate insiders allegedly make a misrepresentation in order to sell their own shares at

a profit." <u>Id.</u>  When the defendant is a corporate entity, "the pleaded facts must create a

strong inference that someone whose intent could be imputed to the corporation acted with the

requisite scienter." <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>,

531 F.3d 190, 195 (2d Cir. 2008).

Alternatively, a plaintiff who cannot make a scienter showing through motive

and opportunity can still "raise a strong inference of scienter under the strong circumstantial

evidence prong, though the strength of the circumstantial allegations must be correspondingly

greater if there is no motive." <u>ECA, Local 134</u>, 553 F.3d at 198-99 (quotation marks

omitted).  The Second Circuit has stated that "securities fraud claims typically have sufficed

to state a claim based on recklessness when they have specifically alleged defendants'

knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  Novak, 216 F.3d at 308.  In addition, recklessness also may be successfully pleaded "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  Id.

Circumstantial evidence may support a claim of "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . ."  Id.  (quotation marks and citation omitted).  "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."  Id.  (internal citation omitted).

Defendants contend that the PSLRA and Rule 9(b) apply to the plaintiffs' Section 14(a) claims, and that because the plaintiffs' Section 14(a) claims sound in fraud, they are required to allege scienter under the PSLRA and Rule 9(b).  Wilson, however, held that negligence is sufficient to establish liability under Section 14(a) and Rule 14a-9: "Liability can be imposed for negligently drafting a proxy statement."  855 F.2d at 995.  It concluded that a proxy statement containing "materially false or misleading statements" was, "[a]s a matter of law," sufficient to establish liability under Rule 14a-9.  Id.  Judge Posner's opinion in Beck, 559 F.3d at 682, is also instructive.  It concluded that a Section 14(a) plaintiff need only establish that a misleading statement was a consequence of "at worst negligence by the issuer."  Id.  Beck further explained that "a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good

faith that there was nothing misleading in the proxy materials."  Id.; accord Exxon Mobil

Corp. Sec. Litig., 500 F.3d 189, 196 (3d Cir. 2007); Shidler v. All Am. Life & Fin. Corp., 775

F.2d 917, 926-27 (8th Cir. 1985); Bond Opportunity Fund, 2003 WL 21058251, at *4; Katz v.

Pels, 774 F. Supp. 121, 126 (S.D.N.Y. 1991).

      Relying on Rombach, 355 F.3d 164, the defendants contend that the plaintiffs'

Section 14(a) allegations sound in fraud, and that the PSLRA's scienter requirement and Rule

9(b) should govern here.  In Rombach, the Second Circuit concluded that when a '33 Act

complaint employs verbiage more commonly associated with fraud than negligence, claims

under the '33 Act may be subject to Rule 9(b) and the PSLRA's heightened pleading

standard.  Id. at 171.  Rombach's concerns do not apply here.  While the defendants argue that

the Securities Complaint's characterization of the Joint Proxy as "false and misleading" assert

claims that sound in fraud, the text of Rule 14a-9 itself prohibits the speaker from uttering

"false or misleading" statements "with respect to any material fact . . . ."  17 C.F.R.

§ 240.14a-9(a).  The defendants' proposed application of Rombach would treat any Rule 14a-

9 claim quoting the underlying rule as one sounding in fraud.  Such a reading is inconsistent

with Wilson, as well as the persuasive reasoning of Beck.

      Moreover, the plaintiffs have expressly disavowed any claim of fraud as to

their Section 14(a) and Rule 14a-9 claims.  (Sec. Compl. ¶¶ 327 ("The Proxy Claims are

based solely on negligence.  They are not based on any knowing or reckless conduct by or on

behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud,

scienter, or recklessness in these non-fraud claims."); 333(g) (defendants "negligently" failed

to update proxy materials); 335 (Section 14(a) claim "is based solely on negligence."); 347

("Each Defendant named in this [Section 14(a)] Count acted negligently . . . .").)  In Garber v.

Legg Mason, Inc., 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), aff'd, 347 Fed. App'x 665 (2d

Cir. Sept. 30, 2009), then-District Judge Chin concluded that a '33 Act claim could not be

construed to "sound in fraud" under Rombach when "plaintiffs have specifically disclaimed

any component of fraud."  As such, the plaintiff's '33 Act claims were to be scrutinized under

Rule 8(a), rather than Rule 9(b).  Id.; accord In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611,

631-32 (S.D.N.Y. 2007) (Lynch, J.); In re Prestige Brands Holding, Inc., 05 Civ. 6924 (CLB),

2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006).

       Thus, for the purpose of scrutinizing plaintiffs' Section 14(a) claim, I look to

whether plaintiffs adequately alleged negligence.  The Section 10(b) claims must, of course,

adequately allege scienter.

       B.   Derivative Plaintiffs Also Must Adequately Allege Negligence for Their
           Section 14(a) Claims.

       As with the Securities Plaintiffs' Section 14(a) claims, to state a claim under

Section 14(a), the Derivative Plaintiffs need only allege negligence, not scienter.  Although

certain allegations in the Derivative Complaint tend toward fraud – to wit, their allegation that

while the Joint Proxy was still effective, the defendants "deliberately, disloyally, and in bad

faith took steps to assure that it was never corrected, amended, or updated to disclose . . .

highly material information" (Deriv. Compl. ¶ 5) – most do not.  The Derivative Plaintiffs

allege that defendants "caused" the Joint Proxy to make certain misstatements or omit certain

information.  (Deriv. Compl. ¶¶ 232(a)-(k).)  In the count of the Derivative Complaint

specifically asserting a violation of Section 14(a), the Derivative Plaintiffs allege that the

defendants "in the exercise of reasonable care should have known the truth about" certain

facts.  (Deriv. Compl. ¶ 353.)  This language is consistent with negligence.

As discussed in relation to the Securities Complaint, the Derivative Complaint's references to "false and misleading statements" is necessary for any claim under Rule 14a-9, which prohibits "false or misleading" proxy statements.  17 C.F.R. § 240.14a-9(a).  Finally, the Derivative Plaintiffs do not assert any claim for fraud, and as with the Securities Plaintiffs, the Derivative Plaintiffs have explicitly stated that their Section 14(a) claim "is not based on any allegations of knowing or reckless conduct," and "does not allege, and does not sound in, fraud, and plaintiffs disclaim any reliance upon or reference to allegations of fraud."  (Deriv. Compl. ¶ 346.)

C.   Securities Complaint Pleads Scienter for the Merrill Bonus Arrangement As to Lewis, Thain, BofA and Merrill, and Negligence As to the BofA Directors.

The undisclosed bonus arrangement between BofA and Merrill was described after the fact by Thain as being one of the three "main things" that were considered in the negotiation.  (Sec. Compl. ¶ 67.)  According to the Securities Complaint, Lewis and Thain negotiated the bonus arrangement "through high-ranking intermediaries" and have acknowledged their involvement in and awareness of the bonus arrangement.  (Sec. Compl. ¶¶ 236, 256.)  The Securities Complaint alleges that the parties agreed to accelerate payment of the bonuses prior to the closing of the transaction and before Merrill's fourth quarter results were announced to the public.  (Sec. Compl. ¶ 69.)  In so doing, they departed from prior years' practice of paying bonuses in January.  (Sec. Compl. ¶ 69.)  As Thain later stated: "The timing . . . was determined when we signed the merger agreement.  The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."  (Sec. Compl. ¶ 74.)  The Securities Complaint alleges that the accelerated schedule prevented BofA from reducing or eliminating Merrill's bonus payments.  (Sec. Compl. ¶ 75.)  BofA's top human resources officer later

stated that there was a "giant gap" between the bonuses administered at BofA and those at Merrill, and stated that for every dollar in bonuses a BofA employee might receive, a Merrill employee would receive three.  (Sec. Compl. ¶ 76.)

A complaint may adequately allege scienter when it plausibly alleges that defendants "'knew facts or had access to information suggesting that their public statements were not accurate . . . .'"  Teamsters Local 445, 531 F.3d at 194 (quoting Novak, 216 F.3d at 311).  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 309.  A complaint may adequately plead reckless intent as to "defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business."  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001).

The Second Circuit has also held that "defendants' asserted actions contrary to expressed policy can form the basis for proof of recklessness."  Id.; accord Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir. 2000) (scienter supported by "a reckless failure to follow an announced policy of expensing royalty advances, thereby artificially inflating financial results"); Novak, 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").

Here, the Securities Complaint explicitly alleges awareness of the bonus arrangement on the part of Lewis and Thain, which was memorialized in the secret Disclosure Schedule.  According to the Securities Complaint, both were closely involved in the details of the bonus negotiations, the resolution of which was concealed to BofA shareholders and, the Securities Complaint asserts, contradictory to representations in the Merger Agreement and the Joint Proxy.  Together, these allegations raise an inference of recklessness that is "at least

as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314;

see also Freudenberg v. E*Trade Fin. Corp., __ F. Supp. 2d __, No. 07 Civ. 8538, 2010 WL

1904314, at *24 (S.D.N.Y. May 11, 2010) (Sweet, J.) (scienter adequately alleged when

internal communications about pursuing high-risk loans contradicted public statements of

conservative investment philosophy).

By contrast, the plaintiffs fail to allege scienter as to defendants Price and

Cotty.  In their opposition memorandum, the plaintiffs argue that "detailed allegations

demonstrate[d]" close involvement by Price and Cotty in the transaction, rendering it "neither

plausible nor credible" that they were unaware of the bonus arrangement.  (Sec. Opp. Mem. at

78.)  As support, plaintiffs cite only to remarks by Price concerning due diligence and general

allegations about Price and Cotty's roles in the negotiations.  (Sec. Compl. ¶¶ 36-37,

179.)  The allegations are too thin to ascribe even negligence to Price or Cotty, as Section

14(a) and Rule 14a-9 require.

As to the BofA directors, the Securities Complaint fails to allege scienter, but

adequately alleges negligence.  The Securities Complaint alleges that the board of directors

"voted to approve the merger, including Merrill's bonuses . . . ."  (Sec. Compl. ¶ 55.)  The

plaintiffs do not allege with particularity that the BofA directors recklessly or intentionally

violated Section 14(a).  The Joint Proxy failed to disclose the bonus arrangement or

summarize the relevant contents of the Disclosure Schedule.

The Joint Proxy was solicited on the directors' behalf.  (See Joint Proxy, Proxy

Card.)  As directors, they had authority over the Joint Proxy and other SEC filings, reviewed

the contents of the Merger Agreement and recommended shareholder approval of the

transaction.  (Sec. Compl. ¶¶ 55, 206, 315-16, 345.)  If the directors were aware that the Joint

Proxy was materially deficient (as is alleged), or if they should have been aware of deficiencies but took no steps to remedy or inquire about them (as is also alleged), the negligence standard of Section 14(a) would be satisfied.  Wilson, 855 F.2d at 995; In re JPMorgan Chase & Co. Sec. Litig., MDL No. 1783, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007).  An allegation of deliberate non-disclosure "demonstrates a culpable state of mind far in excess of negligence."  Wilson, 855 F.2d at 995.  The Securities Complaint sufficiently alleges negligence on the part of BofA's directors.

The motions to dismiss the Securities Complaint's bonus-related allegations is therefore granted in full as to Price and Cotty, and granted as to the Section 10(b) and Rule 10b-5 claims asserted against the BofA directors.  It is otherwise denied.

D.  Derivative Complaint Adequately Pleads Negligence on the Part of the BofA Directors Regarding the Merrill Bonuses.

The allegations contained in the Derivative Complaint are sufficient to allege that the BofA Directors acted negligently in failing to disclose the Merrill Bonuses.  The negligence standard is satisfied if the directors were aware that the Joint Proxy was materially deficient.  Wilson, 855 F.2d at 995.  According to the Derivative Complaint, the bonus payment was one of five issues negotiated between BofA and Merrill.  (Deriv. Compl. ¶ 101.)  BofA agreed to allow Merrill to pay $5.8 billion in bonuses on an accelerated basis prior to the transaction's closing.  (Deriv. Compl. ¶ 101.)  The Derivative Complaint alleges that the BofA Directors reviewed the terms of the proposed transaction before approving it.  (Deriv. Compl. ¶ 107.)  Finally, the Derivative Plaintiffs allege that the bonus payments were "known to" Lewis and BofA's Compensation and Benefits Committee (composed of defendants Mitchell, Ryan, Sloan and Spangler), and that these defendants "specifically approved" the bonus payments.  (Deriv. Compl. ¶¶ 53-56, 224.)

- 93 -

Although the BofA Directors relied on others, including legal counsel, to prepare the Joint Proxy, it is plausibly alleged that they should have been aware that it did not disclose the existence of the bonus agreement. Such an allegation is sufficient. This is not akin to holding the BofA Directors to a strict liability standard. Cf. Salit v. Stanley Works, 802 F. Supp. 728, 733 (D. Conn. 1992) ("Where plaintiffs have not pled that the individual defendants knew of the facts allegedly omitted from the proxy statement (and, not being alleged to have been personally involved in its issuance, therefore, had no duty to see that they were included in the statement), plaintiffs have insufficiently pled a negligence claim.").

In re McKesson HBOC, Inc., relied upon by the BofA Directors, is distinguishable. 126 F. Supp. 2d at 1267. In that case, the directors of an acquiring corporation relied on the audit provided by the acquired company's accounting firm, and so were unaware of the underlying accounting improprieties that were not disclosed in the proxy statement. Id. Here, according to the Derivative Complaint, the BofA Directors were aware of the bonus agreement, and a review of the Joint Proxy would have shown them that the agreement was not disclosed. It is true, as defendants argue, that the negligence standard "does not make impermissible any reliance on expertise of legal or financial counsel in areas pertinent to their respective expertise," or "impose upon directors the role of guarantors or insurers of the accuracy of proxy statements." Gould v. Am. Hawaiian S.S. Co., 351 F. Supp. 853, 865 (D. Del. 1972). But the Gould court also observed that "[s]ince § 14(a) imposes liability for the false and misleading . . . proxy materials on the solicitors . . . these defendant solicitors [may not] avoid liability by relying on . . . counsel to rectify errors in the proxy materials." Id. at 867. At this stage, the only question before this Court is whether the

Derivative Complaint states a claim.  Whether reliance upon others was sufficient to meet a

standard of reasonable care is a question for another day.

     E.  **Securities Complaint Fails to Allege Scienter As to Merrill's Fourth-Quarter Losses, but Both the Securities Complaint and the Derivative Complaint <u>Adequately Allege Negligence.</u>**

       1.  **Securities Complaint Does Not Satisfy the PSLRA and Rule 9(b) in Its <u>Scienter Allegations Regarding the Fourth Quarter Losses.</u>**

In <u>Kalnit v. Eichner</u>, 264 F.3d 131, 142-44 (2d Cir. 2001), the Second Circuit

discussed the threshold for pleading scienter against a defendant who is alleged to have

recklessly failed to disclose material facts to shareholders.  A plaintiff must allege, "'at the

least, conduct which is highly unreasonable and which represents an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the defendant

or so obvious that the defendant must have been aware of it.'"  <u>Id.</u> at 142 (quoting <u>Honeyman</u>

<u>v. Hoyt (In Re Carter-Wallace, Inc. Sec. Litig.)</u>, 220 F.3d 36, 39 (2d Cir. 2000)).  Discussing

<u>Novak</u> and <u>Rothman</u>, <u>Kalnit</u> noted that a reckless omission case arises when a defendant

knowingly sanctions procedures that violate company policy or avoids adequate financial

disclosure.  <u>Id.</u> at 142-43.  For scienter purposes, the Second Circuit distinguished <u>misleading</u>

<u>statements</u> in the merger context from a defendant's allegedly unlawful <u>omissions</u>: "Because,

as discussed earlier, this case does not present facts indicating a clear duty to disclose,

plaintiff's scienter allegations do not provide <u>strong</u> evidence of conscious misbehavior or

recklessness."  <u>Id.</u> at 144 (emphasis in original).

As discussed in detail above, the Joint Proxy and the defendants' Form 10-Q

filings for the third quarter of 2008 contained detailed disclosures of the dire economic

forecast for the coming fourth quarter.  I have previously concluded that, at the Rule 12(b)(6)

stage, plaintiffs have adequately alleged the materiality of the fourth quarter losses.  However,

the Securities Complaint fails to allege "<u>strong</u> evidence of conscious misbehavior or recklessness." <u>Id.</u> (emphasis in original). This is not an instance when, for example, a company's alleged financial perils were misleadingly downplayed or concealed by accounting abuses, only to be contradicted by internal documents.  <u>See</u>, <u>e.g.</u>, <u>AUSA Life Ins. Co. v. Ernst & Young</u>, 206 F.3d 202, 220-22 (2d Cir. 2000).  The Securities Complaint sufficiently alleges that the magnitude of the losses was material, but does not sufficiently allege how the failure to disclose the losses was "<u>highly</u> unreasonable" and "represent[ed] an <u>extreme departure from the standards of ordinary care . . . .</u>"  <u>Kalnit</u>, 264 F.3d at 142 (emphasis added).  The Securities Complaint fails to adequately and plausibly explain why a defendant would be motivated to accurately disclose a "turbulent" and "tumultuous" economic forecast for the quarter yet recklessly or intentionally conceal the dire reality as the quarter unfolded.

Because the Securities Complaint fails to allege scienter as to defendants' failure to disclose the fourth quarter losses, plaintiffs' Section 10(b) and Rule 10b-5 claims arising from the defendants' failure to disclose the fourth quarter losses are dismissed.

> 2.  Securities Complaint Adequately Alleges Negligence As to the Losses, and Its Section 14(a) and Rule 14a-9 Claims Survive.

To plead negligence under Section 14(a), the plaintiffs need not allege "highly unreasonable" conduct, an "extreme departure" from the ordinary of care, or "<u>strong</u> evidence" of recklessness.  <u>Kalnit</u>, 264 F.3d at 142, 144.  The Securities Complaint need only allege awareness of material deficiencies in a proxy statement.  <u>Wilson</u>, 855 F.2d at 995.  In this respect, there is a significant distinction between conduct that is knowingly or recklessly fraudulent, which the Securities Complaint has failed to allege, versus awareness of deficiencies.  The Securities Complaint does not satisfy the threshold of alleging fraud; it does, however, adequately set forth a theory grounded in negligence.  As previously noted,

Cotty acted as Merrill's interim CEO, had weekly meetings with Thain and provided regular updates to Lewis and Price.  (Sec. Compl. ¶¶ 93-97.)  Lewis held weekly meetings with the board of directors to update it on Merrill's losses.  (Sec. Compl. ¶ 99.)  According to the Securities Complaint, the individual defendants were aware of the losses as they were incurred and failed to disclose them, despite internal dissent as to whether the losses should be disclosed in advance of the shareholder vote.  (Sec. Compl. ¶ 102.)

Proxy statements must disclose "all material objective facts relating to the transaction."  Mendell, 927 F.2d at 674.  The Securities Complaint plausibly alleges that the fourth quarter losses were material, that all defendants were aware of the losses as they occurred, and that they had a duty to disclose them.  As a result, the Securities Complaint adequately alleges a strong inference of negligence on the part of the defendants as to the failure to disclose the losses of the fourth quarter of 2008.  Defendants' motions to dismiss this portion of plaintiffs' Section 14(a) and Rule 14a-9 claims are denied.

3.  Derivative Complaint Adequately Alleges Negligence As to Merrill's Fourth Quarter Losses.

Section 6.2 of the Merger Agreement obligated Merrill to grant BofA access to all of its "properties, books, contracts, commitments and records."  (Joint Proxy at A-34.)  According to the Derivative Complaint, shortly after the merger was announced, BofA placed a 200-member team at Merrill.  (Deriv. Compl. ¶ 170.)  The BofA Directors "conducted weekly conference calls every Friday starting in September 2008 and continuing through December 2008 . . . ."  (Deriv. Compl. ¶ 170.)  After the merger was announced, defendant Lewis began receiving financial projections and reports on Merrill's financial condition.  (Deriv. Compl. ¶¶ 165-66.)  Weekly reports containing Merrill's actual losses for the fourth quarter were distributed to Lewis and other defendants.  (Deriv. Compl. ¶ 20.)  These reports

showed that Merrill lost $7 billion in October and $6.3 billion in November.  (Deriv. Compl. ¶ 20.)  According to the Derivative Complaint, the BofA Derivative Defendants "decided not to disclose such losses following a telephone call on November 20, 2008 with the Wachtell law firm."  (Deriv. Compl. ¶ 167.)

Drawing all reasonable inferences in their favor, the Derivative Plaintiffs have raised a strong inference that the BofA Directors were aware of the losses incurred by Merrill during the fourth quarter of 2008.  Although the Derivative Plaintiffs do not allege that the BofA Directors discussed Merrill's losses or its financial performance during their weekly conference calls, it is reasonable to infer that they did, given the size of the Merrill transaction (27 percent of BofA's market capitalization (Deriv. Compl. ¶ 103)) and the fact that BofA senior management received regular reports on Merrill's performance.  Therefore, the Derivative Plaintiffs have pled sufficient facts to allow this claim to progress past the pleading stage.  Finally, as discussed previously, the BofA Directors' advice-of-counsel defense is unavailing at this stage.

F.   Securities Complaint Does Not Allege Scienter for the Failure to Disclose Federal Financial Support for the Transaction.

The Securities Complaint fails to satisfy the PSLRA's scienter threshold as to BofA's agreement to receive federal capital support in December 2008.  The scienter allegations on this claim are thin.  The Securities Complaint explicitly asserts scienter only as to Lewis's actions.  The scienter allegations going to the other individual defendants make no mention of the issue.  Other portions of the Securities Complaint that assert a Section 10(b) and Rule 10b-5 claim going to federal support say little by way of the defendants' states of mind.

Plaintiffs contend that Lewis was "conscious" of avoiding liability over non-disclosure of federal financial support, since he unsuccessfully sought out a letter from Bernanke providing immunity from civil claims arising out of the acquisition.  (Sec. Compl. ¶ 244.)  The Securities Complaint does not, however, contend that Lewis or any other defendant stood to gain from non-disclosure.  Plaintiffs do not allege that a quid pro quo-type arrangement was implicated in Lewis's request to Bernanke, or that failing to disclose the federal funding brought a benefit to any defendant.

The Securities Complaint also alleges that the decision not to disclose federal support originated in an instruction by Paulson.  According to the Securities Complaint, Paulson "instructed" Lewis not to disclose BofA's receipt of federal financial support, among other things.  (Sec. Compl. ¶ 249.)  Lewis also noted in an e-mail to the Board that Secretary Paulson declined to "send us a letter of any substance without public disclosure which, of course, we do not want."  (Sec. Compl. ¶ 134 (emphasis omitted).)  There is no allegation that Lewis or any other defendant hatched a scheme to avoid public disclosure of the federal capital support.  Rather than self-interested motivations, Lewis, according to the Securities Complaint, acted as "instructed" by Paulson.  While Paulson's instruction would not necessarily preclude a finding of scienter if other allegations established motive or recklessness, it anchors the defendants' concealment to Paulson's directions.

The Securities Complaint also asserts that BofA long intended to disclose the federal support in tandem with its announcement of fourth quarter results.  For instance, Board minutes note that the Fed and Treasury had promised "to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings . . . ."  (Sec. Compl. ¶ 132.)  According to Board minutes, BofA planned to announce the federal

support "in conjunction with [BofA's] earnings release on January 20, 2009," and no written assurance would be made prior to January 1, 2009, "because any written assurances would require formal action by the Fed and Treasury, which formal action would require public disclosure." (Sec. Compl. ¶ 136.) As it had planned, BofA announced the federal financial support on January 16, in tandem with its announcement of the fourth-quarter financial results. (Sec. Compl. ¶¶ 144-45.)

The Complaint does not plausibly allege how the announcement's timing offers circumstantial evidence of intent or motive to deceive and defraud. See, e.g., ECA, Local 134, 553 F.3d at 199 (to allege motive and opportunity to defraud, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud.") (quotation marks omitted). Nor does it reflect "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care . . . ." Kalnit, 264 F.3d at 142. Rather, assuming the truth of the Complaint's allegations, the defendants were acting at the instruction of the Treasury Secretary during a moment of acute economic and political uncertainty. There are no allegations of personal gain derived from the federal funds, or a violation of a statute or regulation in a "highly unreasonable" manner. As currently pleaded, the plaintiffs fail to allege scienter as to the non-disclosure of BofA's federal financial support, and the claim is dismissed.

V.    DERIVATIVE PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS
       CAUSATION FOR THEIR SECTION 14(a) CLAIMS AGAINST THE BOFA
       DIRECTORS AND DEMAND IS EXCUSED FOR THOSE CLAIMS.

A.    Derivative Plaintiffs Have Adequately Alleged Loss Causation for Their
       Section 14(a) Claims Against the BofA Directors.

The PSLRA requires a plaintiff to sufficiently allege "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15

U.S.C. § 78u-4(b)(4).  The defendants in the Securities Action have not challenged the

Securities Complaint's loss causation allegations.  The defendants in the Derivative Action,

however, argue that it was not possible for any alleged nondisclosure to have harmed BofA

because BofA's directors and certain senior officers allegedly knew the truth.  Therefore, their

knowledge should be imputed to BofA, which could not have been misled by the Joint Proxy.

> In general, the knowledge of fully-informed, disinterested and independent

directors will be attributed to the corporation.  Maldonado, 597 F.2d at 795 (dismissing a

derivative claim under Section 10(b) and Rule 10b-5 because the knowledge of disinterested

directors "was attributable to the Corporation and no 'deception' occurred within the meaning

of Rule 10b-5").  However, the BofA Derivative Defendants' argument is inapplicable in the

context of the Derivative Action.  First, the only Second Circuit authority defendants cite in

support of their argument is the Maldonado case, which recognized that "[w]hen a corporate

action requires shareholders' approval, full disclosure of material information must be made

to them."  587 F.2d at 793.  "Where approval by the shareholders is not necessary, however,

full disclosure to a disinterested board of directors is equivalent to full disclosure to the

shareholders."  Id.  Only where shareholder approval is unnecessary will the "knowledge of

the disinterested" directors "be attributed to the corporation and its stockholders, precluding

deception."  Id.  That is not the case here, because the BofA shareholders' approval was

necessary to consummate the merger.  (Joint Proxy at 12.)

> Second, in Borak, the Supreme Court recognized that, depending on the

circumstances, Section 14(a) claims may be asserted derivatively, and stated that the "injury

which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation

ordinarily flows from the damage done the corporation," but that the "damage suffered results

not from the deceit practiced on [an individual shareholder] alone but rather from the deceit practiced on the stockholders as a group." 377 U.S. at 432. Thus, according to <u>Borak</u>, even in a derivative context, the proper inquiry is whether the shareholders were deceived, not whether the corporation itself was deceived.

The authorities cited by BofA Derivative Defendants are not to the contrary, because they dismissed derivative claims brought under Section 10(b) and Rule 10b-5, in which the corporation could only recover if it was deceived. In <u>Maldonado</u>, the Second Circuit dismissed the derivative Section 10(b) and Rule 10b-5 claims because, given the knowledge of the independent and disinterested directors, there could not have been deception on the corporation. 597 F.2d at 795. In <u>Falkenberg v. Baldwin</u>, the court dismissed the plaintiff's derivative Section 10(b) and Rule 10b-5 claim because, "[i]n the absence of an adequate allegation of conflict of interest, or of deception by one group of officers or directors, or of a controlling influence over the directors and officers, the claim of a fraud in this context is meaningless." No. 76 Civ. 2409, 1977 WL 1025, at *2 (S.D.N.Y. June 13, 1977).[15] In contrast to these cases, the Derivative Plaintiffs have alleged that the corporation was damaged by a deception of the shareholders. This is sufficient to state a derivative claim under <u>Borak</u>.

B.    Demand Is Excused for the Derivative Plaintiffs' Section 14(a) Claims Against the BofA Directors.

Generally, a corporation's board of directors manages the affairs of the corporation. This would include the decision whether the corporation will bring suit on a

---

[15] <u>See</u> <u>also</u> <u>Ray v. Karris</u>, 780 F.2d 636, 641 (7th Cir. 1985) (stating that in the context of a derivative claim under Rule 10b-5, "[t]o the extent knowledge can be imputed to the corporation it is impossible to state that the corporation was deceived by or relied on any misrepresentations or omissions since forewarning would free non-interested parties to protect corporate interests through state law means")

potential claim against a third party.  However, a derivative action "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties."  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (emphasis and internal quotation marks omitted).  "Concerned about the potential for abuse of the remedy, however, equity courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions."  Scalisi v. Fund Asset Mgmt. L.P., 380 F.3d 133, 138 (2d Cir. 2004) (quotation marks omitted).  Thus, in general, before a plaintiff may bring a derivative action, the plaintiff must first demand that the board of directors bring suit.  Id. "However, demand may be excused where a shareholder is able to show that demand would be futile."  Id.

The Derivative Plaintiffs have not made a demand on the BofA board for any of the derivative claims the plaintiffs have asserted.  Plaintiffs instead allege that demand is excused for all of their claims.  (Deriv. Compl. ¶ 35.)  Rule 23.1(b)(3), Fed. R. Civ. P., requires a plaintiff bringing a derivative action who has not made a demand on the corporation's board to state with "particularity" in the complaint the reasons for not making demand.

Rule 23.1 does not create a demand requirement; it merely sets the standard for pleading that demand is excused.  Kamen, 500 U.S. at 96 ("On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings.").  It is the substantive law of the state of incorporation which determines whether there is a demand requirement, and if it is required, "whether demand is, in fact, futile."  Scalisi, 380 F.3d at 138.

BofA is a Delaware corporation.  Delaware law provides two separate tests for analyzing whether demand is excused as futile.  Under the test set forth in <u>Aronson v. Lewis</u>, demand is excused if the plaintiff alleges "particularized facts" creating "a reasonable doubt . . . that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  473 A.2d 805, 814 (Del. 1984), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000).  "The essential predicate for the <u>Aronson</u> test is the fact that a <u>decision</u> of the board of directors is being challenged in the derivative suit."  <u>Rales v. Blasband</u>, 634 A.2d 927, 933 (Del. 1993) (emphasis in original).

However, "[w]here there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application," making it impossible to perform the <u>Aronson</u> inquiry.  <u>Id.</u>  "Consistent with the context and rationale of the <u>Aronson</u> decision, a court should not apply the <u>Aronson</u> test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."  <u>Id.</u> at 933-34.  In such cases, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  <u>Id.</u> at 934.  If so, then under the <u>Rales</u> test, demand is excused.

A director is "interested" if "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or if "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  <u>Id.</u> at 936.  In such cases, a director is presumed to be unable to exercise

business judgment "without being influenced by the adverse personal consequences resulting from the decision." Id. "However, where a director's interest is based on his potential personal liability, the director can only be considered 'interested' if the potential personal liability rises to 'a substantial likelihood;' it is not sufficient that 'a mere threat' of personal liability is alleged." In re Am. Int'l Group, Inc. Derivative Litig., 700 F. Supp. 2d 419, 431 (S.D.N.Y. 2010) (quoting Rales, 634 A.2d at 933); see also Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Aronson, 473 A.2d at 816. Demand "futility is gauged by the circumstances existing at the commencement of a derivative suit." Id. at 810. "[D]irectors are entitled to a presumption that they were faithful to their fiduciary duties," and "the burden is upon the plaintiff in a derivative action to overcome that presumption." Beam v. Stewart, 845 A.2d 1040, 1048-49 (Del. 2004).

        The Rales test applies to the Section 14(a) claims against the BofA Directors because plaintiffs have not alleged that the BofA Directors made a conscious decision to exclude certain information from the Joint Proxy. See In re Am. Int'l Group, 419 F. Supp. 2d at 430; Seminaris, 662 A.2d at 1354. Plaintiffs are not challenging a business judgment about which information to include in the Joint Proxy. As discussed above, the Derivative Complaint adequately alleges that the Joint Proxy contained material misstatements and omitted material facts, and that the BofA Directors were negligent in allowing this to occur. The directors faced a "substantial likelihood" of personal liability on the Section 14(a) claim at the time the suit was commenced. This would have prevented them from exercising their disinterested and impartial judgment in responding to a demand request. Demand is therefore

excused with respect to the Section 14(a) claim against the directors.  Id. at 434 ("Applying the Rales test . . . the Court considers whether Plaintiff has pleaded sufficient particularized facts to create, by demonstrating a substantial likelihood of personal liability, a reasonable doubt that [the directors] could have exercised disinterested and independent judgment with respect to a demand to assert the claims.").

VI.    DERIVATIVE COMPLAINT FAILS TO STATE A SECTION 14(a) CLAIM
       AGAINST THE FINANCIAL ADVISORS.

The only statements contained in the Joint Proxy attributable to the Financial Advisors are the fairness opinions that they orally provided to BofA on September 14, 2008, (Deriv. Compl. ¶¶ 140-145), and were included in written form in the Joint Proxy.  (Joint Proxy at C-1-2, D-1-3.)  FPK stated as follows: "we are of the opinion that, as of the date hereof, the Exchange Ratio to be paid by [BofA] in the Merger is fair, from a financial point of view," to BofA.  (Joint Proxy at D-3.)  J.C. Flowers's opinion stated: "we are of the opinion that as of the date hereof the Exchange Ratio is fair, from a financial point of view, to [BofA]."  (Id. at C-2.)

As previously set forth in my discussion of representations going to the adequacy of BofA's due diligence, statements of opinion are actionable under Section 14(a) only if plaintiffs adequately plead that the opinions were actually false, and that the speaker did not actually hold the opinion expressed.  Virginia Bankshares, 501 U.S. at 1092-93; Podany, 318 F. Supp. 2d at 154.  The Derivative Plaintiffs have not pled facts that allow the Court to draw a strong inference – or even a reasonable inference – that the Financial Advisors did not believe that the exchange ratio of the merger was fair to BofA from a financial point of view.  Plaintiffs allege that the Financial Advisors "lacked any reasonable basis to conclude that the Merger was fair to BofA," but they do not allege that the Financial

Advisors did not believe their opinions.  (Deriv. Compl. ¶ 146.)  As discussed above, even if the subjective falsity requirement for stating a Section 14(a) claim based on an opinion could be satisfied by recklessness, plaintiffs have disclaimed any reliance on recklessness in their Section 14(a) claim.  (Deriv. Compl. ¶ 346.)  Therefore, the Derivative Plaintiffs have failed to state a Section 14(a) claim against the Financial Advisors.

### VII.   SECURITIES DEFENDANTS' MOTION TO DISMISS THE SECTION 20(a) CLAIM IS DENIED.

The defendants' motion to dismiss Count VI of the Securities Complaint, which asserts control person liability pursuant to Section 20(a) of the '34 Act, 15 U.S.C. § 78t(a), is denied.  Defendants' argument is based solely on the necessity of a primary violation in order to proceed with a section 20(a) claim.  See, e.g., Rombach, 355 F.3d at 177-78.  To the extent that the Securities Complaint adequately pleads a primary violation, defendants' motion to dismiss Count VI is denied.

### VIII.  SECURITIES DEFENDANTS' MOTION TO DISMISS THE SECURITIES PLAINTIFFS' '33 ACT CLAIMS IS GRANTED IN PART AND DENIED IN PART.

Counts VII through IX assert claims under sections 11, 12 and 15 of the '33 Act.  Count VII asserts that BofA, Lewis, Price, Cotty, BofA's board of directors, Banc of America and MLPFS violated Section 11 of the '33 Act, 15 U.S.C. § 77k, in the conduct of the Secondary Offering of October 2008.  (Sec. Compl. ¶¶ 372-82.)  Count VIII alleges that BofA, Banc of America and MLPFS violated Section 12(a) of the '33 Act, 15 U.S.C. § 77l(a)(2), as the issuer and underwriters of a secondary offering made using a registration statement that misstated and omitted material facts.  (Sec. Compl. ¶¶ 383-90.)  Count IX asserts control-person liability against Lewis, Price and the BofA board pursuant to Section 15 of the '33 Act, 15 U.S.C. § 77o.  (Sec. Compl. ¶¶ 391-95.)

On October 7, 2008, BofA announced its plans to raise $10 billion in a secondary offering, selling 455,000,000 shares of common stock at $22 per share.  (Sec. Compl. ¶ 363.)  Banc of America and MLPFS underwrote the offering.  (Sec. Compl. ¶ 363.) The secondary offering was set forth in a registration statement, which incorporated a prospectus supplement.  (Sec. Compl. ¶ 364.)  Plaintiffs allege that these offering documents violated the '33 Act to the extent that they incorporated by reference the Merger Agreement filed on Form 8-K with the SEC on September 18, 2008, which allegedly misstated and omitted material information concerning Merrill's employee bonuses.  (Sec. Compl. ¶ 365.) Separately, the plaintiffs allege that the registration statement was misleading to the extent that it incorporated BofA's press release of September 15, 2008, which was filed with the SEC on Form 8-K and included certain statements dismissed above as exemplars of puffery.[16] (Sec. Compl. ¶ 369.)

Defendants have submitted little support for their motion to dismiss the '33 Act claims.  Defendants argue that plaintiffs should be required to plead scienter, but that if the lower threshold of negligence governs, the defendants contend that the Securities Complaint still fails to state '33 Act violations.

The Second Circuit recently observed that "[i]ssuers are subject to 'virtually absolute' liability under Section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010).  Sections 11 and 12(a)(2) "give rise to liability more readily" than Section 10(b) and Rule 10b-5.  Id. at 360; see also Herman & MacLean v.

_____

[16] Statements cited in the Securities Complaint include assertions that the merger "creates a company unrivalled in its breadth of financial services and global reach" and "both enhances current strengths at Bank of America and creates new ones," Lewis's description of the merger as a "great opportunity for our shareholders," that the merger would make Bank of America "more valuable" and Thain's statement that the merger created the "leading financial institution in the world."  (Sec. Compl. ¶ 369.)

Huddleston, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually

absolute, even for innocent misstatements."); Ernst & Ernst, 425 U.S. at 200 (in Section 11,

"Congress created express liability regardless of the defendant's fault . . . .").

        Section 11 establishes liability for any material misstatement or omission in a

registration statement. 15 U.S.C. § 77k(a). Section 12(a)(2) establishes liability for "[a]ny

person who . . . offers or sells a security . . . by the use of any means or instruments . . . which

includes an untrue statement of a material fact or omits to state a material fact necessary in

order to make the statements . . . not misleading. 15 U.S.C. § 77*l*(a)(2). It is true that a '33

Act plaintiff must allege scienter when the underlying activity is part of a fraudulent scheme.

See, e.g., In re Morgan Stanley, 392 F.3d at 358; Zirkin v. Quanta Capital Holdings, Ltd., No.

07 Civ. 851 (RPP), 2009 WL 185940, at *11-12 (S.D.N.Y. Jan. 23, 2009). Even if plaintiffs

had so alleged, this Court has concluded that the Securities Complaint adequately alleges

scienter as to the bonus-related Section 10(b) claim, and the defendants' arguments do not

clarify how such an analysis would vary for the '33 Act claims, if it all. Specifically, it is

unclear whether the defendants contend that scienter should separately be alleged as to the

contents of the registration statement, or whether they contend the scienter analysis of the '33

Act remains focused on the Joint Proxy and Merger Agreement, since they were incorporated

by reference into the offering materials.

        For the same reasons set forth in the Section 14(a) discussion above, the

reasoning of Rombach, 355 F.3d at 171-72, does not require heightened pleading for any

state-of-mind requirement as to the '33 Act claims. First, the defendants offer only a

conclusory argument that the '33 Act allegations sound in fraud. (See BofA Sec. Mem. at 30

n.20 (incorporating Section 14(a) arguments by footnote).) Second, the Securities Complaint

sufficiently alleges that the '33 Act claims sound in negligence rather than fraud. (Sec. Compl. ¶¶ 362 ("The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of the defendants – i.e., they do not allege, and do not sound in, fraud – and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims."); 372 ("For purposes of this [Section 11] claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence and/or strict liability."); 376 ("These Defendants named in this Count acted negligently . . . ."); 377 ("The Underwriter Defendants acted negligently . . . ."); 383 ("For the purposes of this [Section 12(a)(2)] claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence."); 391 ("For the purposes of this [Section 15] claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.").) These allegations of negligence satisfy the notice pleading requirements of Rule 8, Fed. R. Civ. P.

To the extent that the plaintiffs allege violations of the '33 Act due to the non-actionable puffery contained in the September 15 press release, the '33 Act claims are dismissed. The defendants' motions to dismiss the '33 Act claims are otherwise denied.

As with the section 20(a) claim, the defendants rely on an absence of any primary violation as grounds for dismissing the Section 15 claim. The motion to dismiss the Section 15 claim is denied as to those portions of plaintiffs' Section 11 and 12(a) claims that survive this motion.

IX.   MOTIONS TO DISMISS THE DERIVATIVE PLAINTIFFS' STATE LAW
      CLAIMS ARE GRANTED IN PART AND DENIED IN PART.

      A.   Derivative Plaintiffs Have Abandoned Their Aiding and Abetting a Breach of
           Fiduciary Duty Claim.

           In their brief in opposition to the Financial Advisors' motion to dismiss, the

Derivative Plaintiffs stated that they would oppose the Financial Advisors' motion "with

respect to each claim except the claim for aiding and abetting breach of fiduciary duty."

(Deriv. Pls. Fin. Adv. Opp. at 2.)   Thus, the Derivative Plaintiffs have abandoned this claim.

See Lipton v. Cnty. of Orange, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may,

and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's

arguments that a claim should be dismissed.").   It is dismissed.[17]

      B.   Motion to Dismiss the Derivative Breach of Fiduciary Duty Claims Against
           the BofA Officers and Directors Is Granted.

           In Count I of their Derivative Complaint, plaintiffs assert a derivative claim for

breach of fiduciary duty against the BofA Officers and the BofA Directors.   (Deriv. Compl.

¶¶ 312-15.)   In Count VI, plaintiffs assert a derivative claim for breach of the "duties of

complete candor and full disclosure" against the same defendants.   (Deriv. Compl. ¶¶ 336-

38.)   Both claims allege that the defendants breached fiduciary duties owed to BofA.   The

parties essentially collapse the two counts, and instead, have briefed the breach of fiduciary

duty claims in terms of whether there was a breach of fiduciary duty in connection with the

transaction's approval, and whether there was then a breach of fiduciary duty after the board's

---

[17] According to the Derivative Complaint, both of the Financial Advisors are limited liability companies.   "For
purposes of diversity jurisdiction, a limited liability company has the citizenship of each of its members."
Strother v. Harte, 171 F. Supp. 2d 203, 205 (S.D.N.Y. 2001); see also Handlesman v. Bedford Vill. Assocs. Ltd.
P'ship, 213 F.3d 48, 51-52 (2d Cir. 2000).   Because the Derivative Plaintiffs have not alleged the citizenship of
each of the Financial Advisors' members (Deriv. Compl. ¶¶ 83-84), they have not alleged facts sufficient to
invoke this Court's subject matter jurisdiction by reason of diversity of citizenship.   28 U.S.C. § 1332(a).   Given
my conclusion above that the Derivative Plaintiffs have stated a claim on certain of their Section 14(a) claims, I
will exercise supplemental jurisdiction over their state law claims.   28 U.S.C. § 1367(a).

approval.  The BofA Directors have not moved to dismiss the Derivative Complaint insofar as it asserts a breach of fiduciary duty claim for actions taken after they approved the transaction.

      1.    **Demand Is Not Excused for the Breach of Fiduciary Duty Claims Arising from the Merger Approval Because the Derivative Plaintiffs Have Failed to Raise a Reasonable Doubt That the Board Acted <u>Disloyally or in Bad Faith When It Approved the Merger.</u>**

          a.    **BofA Directors Were Disinterested and Independent When <u>They Approved the Merger.</u>**

Because approving the merger was the BofA Directors' business decision, the <u>Aronson</u> test for demand excusal applies.  Under the <u>Aronson</u> test, demand is excused if the plaintiff alleges "particularized facts" creating "a reasonable doubt . . . that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  473 A.2d at 814.  The Derivative Complaint does not allege particular facts raising a reasonable doubt that the directors were independent or disinterested when they approved BofA's merger with Merrill.  There are no allegations that any of the directors had a personal financial stake in the merger, or that any personal financial benefit accrued to the directors as a result of the merger, other than any benefit that accrued to the BofA shareholders.  None of the directors are alleged to have worked for Merrill, been a director of Merrill or owned Merrill stock at the time of the merger.  In fact, the BofA Directors held a substantial number of BofA shares at the time of the merger.  (Joint Proxy at 12 (stating that as of the record date, BofA Directors and "executive officers" had the right to vote approximately 36.5 million shares of BofA).)  The directors, therefore, were disinterested under Delaware law.  See <u>Rales</u>, 634 A.2d at 936; see

also In re J.P. Morgan Chase & Co. Shareholder Litig., 906 A.2d 808, 821 (Del. Ch. 2005),

aff'd, 906 A.2d 766 (Del. 2006).

Although the Derivative Complaint alleges several reasons why the directors

were not independent, it does not allege facts sufficient to excuse demand. For example, the

Derivative Complaint alleges that the size of the BofA board makes it "large and unwieldy

such that it can be and is dominated by Lewis, who . . . has hand picked the majority of the

BofA Board." (Deriv. Compl. ¶ 271(f).) Similarly, the Derivative Plaintiffs allege that

defendants Lewis and Gifford "are in a position to, and do dominate and control" the board.

(Deriv. Compl. ¶ 284(b).) These are conclusory statements, and the Derivative Complaint

does not allege particularized facts showing that directors are dominated by Lewis or by

Gifford. Aronson, 473 A.2d at 816 ("[A] plaintiff charging domination and control of one or

more directors must allege particularized facts manifesting a direction of corporate conduct in

such a way as to comport with the wishes or interests of the corporation (or persons) doing the

controlling.") (quotation marks omitted).

The Derivative Plaintiffs allege that nine of the directors had no banking or

finance experience and in approving the Merrill acquisition relied heavily on those that did.

(Deriv. Compl. ¶ 271(h).) For this reason, according to the Derivative Plaintiffs, these nine

directors were not independent. (Deriv. Compl. ¶ 271(h).) This allegation is conclusory.

Plaintiffs have not alleged particularized facts demonstrating that these nine directors relied

heavily on other directors when they approved the transaction.

Plaintiffs allege that at least two and potentially all of the directors were not

independent, according to the NYSE's listing standards. (Deriv. Compl. ¶ 271(a), (b) & (e).)

According to the Derivative Complaint, under those standards, "[a] director who receives . . .

more than $100,000 per year in direct compensation from the listed company, other than

director and committee fees and pension or other forms of deferred compensation[,] is not

independent." (Deriv. Compl. ¶ 271(e) (alterations in original).)  In addition, the Derivative

Plaintiffs also allege that Lewis and Gifford were "not independent under . . . the Company's

own Director Independence Standards."  (Deriv. Compl. ¶¶ 271(a) & (b).)  But that does not

mean these directors lack independence sufficient to disable them from fairly assessing the

transaction.  See Beam, 845 A.2d at 1049 (director independence "is a fact-specific

determination made in the context of a particular case").

        Plaintiffs also allege that defendants Gifford, Countryman and May "each

serve as both a trustee of NSTAR . . . and a member of the Board of Directors of CBS

Corporation," and that because defendant May is the Chairman of NSTAR, the other two

directors are beholden to him.  (Deriv. Compl. ¶ 271(i).)  Likewise, plaintiffs allege that

defendants Sloan and Tillman serve together on another company's board of directors.

(Deriv. Compl. ¶ 271(i).)  Even if certain directors were beholden to each other, it does not

follow that the directors based their decision on something other than the corporate merits.

There also remained a majority of directors who were independent of each other and

disinterested.

        The Derivative Plaintiffs' argue that demand is excused because BofA's

directors and officers' insurance policy contains an "insured vs. insured" exclusion.  (Deriv.

Compl. ¶ 284(g).)  Courts applying Delaware law have repeatedly rejected this argument.  In

re Am. Int'l Group, 70 F. Supp. 2d at 433 (collecting cases applying Delaware law).  Finally, I

have considered the remainder of plaintiffs' allegations, including the allegations regarding

director compensation, and conclude that plaintiffs have not alleged particular facts creating a reasonable doubt about that the directors were independent.

                b.   Derivative Complaint Fails to Plead That the BofA Directors Acted Disloyally or in Bad Faith When They Approved the Merger.

       The second prong of the Aronson test requires plaintiffs to plead particularized facts creating a reasonable doubt that the merger was not a product of a "valid exercise of business judgment." Aronson, 473 A.2d at 814. This requires plaintiffs to plead facts sufficient to support an inference that the board committed a non-exculpated breach of fiduciary duty. In re Lear Corp. Shareholder Litig., 967 A.2d 640, 647-48 (Del. Ch. 2008).

       The BofA certificate of incorporation provides that, "[t]o the fullest extent permitted [under Delaware law,] a director of the Corporation shall not be personally liable to the Corporation . . . for monetary damage for breach of his duty as a director." (Exhibit B to the Declaration of Lawrence Portnoy in Support of the Motion to Dismiss the Derivative Complaint ("Portnoy Dec.").)[18] Section 102(b)(7) of the Delaware General Corporation Law provides that a corporation's certificate of incorporation may exculpate directors for breaches of fiduciary duty, other than breaches of the duty of loyalty or "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." 8 Del. Code Ann. § 102(b)(7). Thus, to satisfy the second prong of Aronson, plaintiffs must plead facts creating a reasonable doubt that the board did not act honestly or in good faith. In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003). "Such a claim cannot

---

[18] The Court may take judicial notice of the contents of BofA's certificate of incorporation pursuant to Rule 201(b)(2), Fed. R. Evid., which allows courts to take judicial notice of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." See Louisiana Mun. Police Emps. Ret. Sys. v. Blankfein, No. 08 Civ. 7605 (LBS), 2009 WL 1422868, at *7 (S.D.N.Y. May 19, 2009) (taking judicial notice that a corporation's "certificate of incorporation exculpates the Director Defendants from liability to the Company to the fullest extent allowed by Delaware law").

- 115 -

rest on facts that simply support the notion that the directors made an unreasonable or even grossly unreasonable judgment." In re Lear Corp., 967 A.2d at 652. "Rather, it must rest on facts that support a fair inference that the directors consciously acted in a manner contrary to the interests of [the corporation] and its stockholders." Id.

      The Derivative Plaintiffs argue that their allegations regarding the speed with which the due diligence process was conducted and the merger was approved, the fact that no board committee was appointed to review the merger, and that there was no attempt to negotiate better terms, sufficiently allege that the board acted in bad faith. Plaintiffs rely on Disney for support.

      In holding that plaintiffs had pled a non-exculpated breach of fiduciary duty, Disney stated that "the facts alleged in the new complaint suggest that the defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision." Id. at 289 (emphasis in original). In contrast to the board in Disney, the BofA Directors met with senior members of BofA management and outside advisors. (Deriv. Compl. ¶ 107.) They reviewed the terms of the proposed transaction. (Deriv. Compl. ¶ 107.) Two outside financial advisors presented the board with their due diligence findings "and additional information, including financial information regarding the two companies and the transaction . . . ." (Deriv. Compl. ¶ 107.) Both outside financial advisors provided the board with an opinion that the consideration BofA would pay was fair to BofA from a financial point of view. (Deriv. Compl. ¶ 107.)

      Essentially, plaintiffs' allegations amount to a claim that the BofA board's review and approval of the merger was inadequate. That, however, cannot form the basis of a claim that the directors acted in bad faith. Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 243

(Del. 2009).  Although the BofA board acted quickly in approving the merger, the Derivative Complaint does not allege that they acted disloyally, or that they were so inadequately informed that they could not exercise their business judgment.

The remainder of plaintiffs' allegations regarding the board's approval amount to post-hoc criticisms that the BofA board made a poor deal.  A poor decision does not mean that the directors acted disloyally.  Consequently, plaintiffs were not excused from making a demand on the board for their breach of fiduciary duty claims against the BofA Directors and Officers arising from the time prior to and including the board's decision to approve the merger, and those claims are dismissed pursuant to Rule 23.1.

> 2.  Alternatively, Plaintiffs Have Failed to State a Claim Against the BofA Derivative Defendants for Breach of Fiduciary Duty Arising from the Time Prior to and Including the Board's Approval of the Merger.

The Derivative Plaintiffs argue that the BofA Derivative Defendants breached their fiduciary duty to BofA by "agreeing to acquire Merrill after only 10 hours of due diligence, based on incomplete information and insufficient analysis," and by "agreeing to pay tens of billions of dollars in valuable BofA common stock for Merrill, at a time when Merrill was in a liquidity turmoil, faced [an] imminent bankruptcy filing, and could otherwise have been acquired for mere 'pennies' on the dollar."  (Deriv. Compl. ¶¶ 314(a) & (b).)

Rule 23.1 requires plaintiffs to plead particular facts showing why demand is excused, and Rule 8(a) only requires plaintiffs to plead enough facts to state a plausible claim. Although those two standards are different, for substantially the same reasons just discussed, plaintiffs have failed to state a claim against the BofA Directors for a non-exculpated breach of fiduciary duty.

Officers of Delaware corporations owe the same fiduciary duties to the corporation as do its directors.  Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009). Unlike the BofA Directors, section 102(b)(7) of the Delaware General Corporation Law does not allow BofA to exculpate the officer defendants from breaches of their fiduciary duty of care.  Both parties agree that the standard for liability for breaching the duty of care is "gross negligence."  See In re Lear Corp., 967 A.2d at 651.  To demonstrate gross negligence, plaintiffs must allege that the officers acted with "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."  Tomczak v. Morton Thiokol, Inc., CIV. A. No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990).  This standard is "extremely stringent."  In re Lear Corp., 967 A.2d at 652.

Plaintiffs allege that defendants Curl and Lewis negotiated the terms of BofA's acquisition of Merrill, and that each played a pivotal role in the due diligence on Merrill. Specifically, the Derivative Plaintiffs have alleged that Curl headed BofA's negotiation team and negotiated the Merrill bonus payments and the price BofA would pay for Merrill.  (Deriv. Compl. ¶¶ 54, 101.)  Plaintiffs also allege that Lewis and Price formed a 45-member team to perform the due diligence of Merrill, which lasted less than a day.  (Deriv. Compl. ¶ 234.) Although plaintiffs take issue with the terms of the deal, and the fact that the negotiations lasted only "a matter of hours," they have not pled any facts that allow the Court to reasonably infer that Curl, Lewis or Price conducted these negotiations recklessly or with deliberate disregard to the BofA shareholders' interests.  The mere fact that these officers represented BofA in negotiating the merger and in performing the due diligence of Merrill does not mean that they acted recklessly or outside the bounds of reason, even if the deal turned out to be a bad one.

The Derivative Complaint fails to set forth nonconclusory factual allegations that, if proven, would amount to gross negligence on the part of other BofA Officers. Plaintiffs argue that, based on the positions of these individuals, it may be reasonably inferred that each officer was a member of, or perhaps led, BofA's 45-member due diligence team. The only facts alleged that invite this inference are the officers' job titles, and for a few of them, a cursory job description.  (Deriv. Compl. ¶¶ 60-67.)  Plaintiffs do not allege that these officers were part of BofA's due diligence team.  They do not allege facts sufficient to support a reasonable inference that even if these defendants were part of the BofA due diligence team, they were grossly negligent in performing their due diligence functions.  Therefore, plaintiffs have failed to allege that the BofA Officers breached their fiduciary duty of care.

Likewise, plaintiffs have failed to allege that the BofA Officers breached their fiduciary duty of loyalty to the corporation.  There is no allegation that the BofA Officers were motivated by a self-interest that was not shared by the BofA shareholders, or by ill will. Therefore, plaintiffs can only state a claim for breach of the fiduciary duty of loyalty if they successfully allege that the officers acted in bad faith.  Lyondell, 970 A.2d at 239-40.  "[B]ad faith encompasses not only an intent to harm but also intentional dereliction of duty."  Id. at 240.  Thus, fiduciaries act in bad faith if they "knowingly and completely failed to undertake their responsibilities."  Id. at 243-44.  There are no allegations supporting such an inference. Therefore, the claims against the BofA Officers for breach of fiduciary duty arising out of the negotiation and approval of the merger are dismissed.

3.   BofA Officers' Motion to Dismiss the Claims Based on Post-Approval Breaches of Fiduciary Duty is Granted.

The BofA Director defendants do not move to dismiss the breach of fiduciary duty claims to the extent they are based on events that occurred between the board's approval

of the merger and its closing.  The BofA Officer defendants, however, move to dismiss the breach of fiduciary duty claims arising out of their actions after the board approved the transaction.

a.  Derivative Plaintiffs Have Not Adequately Alleged That the
BofA Officers Breached the Duty of Disclosure.

The Derivative Plaintiffs allege that the BofA Officers breached their fiduciary duty by failing to update the Joint Proxy to disclose the Merrill bonus agreement and Merrill's losses from the fourth quarter of 2008.  (Deriv. Compl. ¶¶ 314(c) & (d), 337(a) & (b).)  They also allege that the BofA Officers breached their duty of disclosure by not disclosing that "the Board had determined a [MAC] had occurred justifying rescission of the Merger, or that the BofA [Derivative ] Defendants purportedly had received threats from Secretary Paulson if the MAC clause were invoked, or that the decision to invoke the MAC had been rescinded, or that BofA had sought and obtained $138 billion in additional TARP funding to complete" the transaction.  (Deriv. Compl. ¶¶ 314(c), 337(a).)

The "duty of disclosure" is not an independent duty, but rather an application of both the duties of care and of loyalty.  Pfeffer v. Redstone, 965 A.2d 676, 684 (Del. 2009).  Under Delaware law, the duty of disclosure requires "directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action."  Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998).  "Corporate fiduciaries can breach their duty of disclosure under Delaware law by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."  Pfeffer, 965 A.2d at 684 (quotation marks and ellipsis omitted).

Delaware case law generally treats the duty of disclosure as one that applies to directors or, in some cases, majority shareholders.  E.g., Malone, 722 A.2d at 9 ("This Court

has held that a board of directors is under a fiduciary duty to disclose material information
when seeking shareholder action."); Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992)
("[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly
all material information within the board's control when it seeks shareholder action."); Wayne
Cnty. Emp. Ret. Sys. v. Corti, Civ. Act. No. 3534-CC, 2009 WL 2219260, at *8 (Del. Ch.
July 24, 2009) ("When a board of directors seeks shareholder action, the fiduciary duty of
disclosure, which is a specific application of the duties of care and loyalty, requires that the
board disclose fully and fairly all material information within the board's control.") (internal
quotation marks omitted), aff'd, 996 A.2d 795 (Del. 2010).[19]  The parties have not cited to
any case in which an officer of a Delaware corporation has been held liable for breaching a
duty of disclosure by failing to disclose material information not included in a proxy
statement.

However, in 2009, the Delaware Supreme Court held that officers of Delaware
corporations, "like directors, owe fiduciary duties of care and loyalty," to their corporation,
and those fiduciary duties "are the same as those of directors."  Gantler, 965 A.2d at 708-09.
In so holding, the court explicitly noted that it was simply reiterating a well-established
principle of Delaware law.  Id. at 709 n.36 ("That officers and directors of Delaware
corporations have identical fiduciary duties has long been an articulated principle of Delaware
law.") (citing Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939)).

The Gantler court's comment that officers' fiduciary duties are "the same as
those of directors" was contained in a discussion of the duty of loyalty.  The court was also
presented with duty of disclosure claims.  In the opinion containing the judgment reversed by

---

[19] In addition, in Metro Communication Corp. BVI v. Advanced Mobilecomm Techs. Inc., the Delaware Court
of Chancery held that managers of a limited liability corporation could be liable for failing to correct prior
statements they subsequently learned were false.  854 A.2d 121, 153 (Del. Ch. 2004).

the Delaware Supreme Court, the Court of Chancery specifically noted that the plaintiffs had

asserted a disclosure claim against the directors of a corporation, as well as one individual

who was an officer but not a director.  Gantler v. Stephens, Civ. Act. No. 2392-VCP, 2008

WL 401124, at *19 n.135 (Del. Ch. Feb. 14, 2008).  Those plaintiffs argued to the Court of

Chancery that the officer could be liable on a duty of disclosure theory because he was a

"filing person" under the federal securities laws.  Id.  The Court of Chancery ultimately did

not address whether this was a viable theory because it dismissed the plaintiffs' complaint on

other grounds.  Id.  In reversing the dismissal, the Delaware Supreme Court likewise did not

address the issue.  However, in its discussion of the plaintiffs' duty of disclosure claim, the

court reiterated the "well-settled" rule "that 'directors of Delaware corporations [have] a

fiduciary duty to disclose fully and fairly all material information within the board's control

when it seeks shareholder action.'"  Gantler, 965 A.2d at 710 (emphasis added).

There is no indication that in remarking about the duties of officers, the

Delaware Supreme Court was imposing on officers, whose duties, responsibilities and

authority may be relatively limited in this context, a duty to disclose to shareholders material

facts that were omitted from a proxy statement.  Such a duty could encourage a series of

independent communications from officers to shareholders, instead of one message from the

single body tasked with managing the affairs of Delaware corporations: the board of directors.

It therefore appears that Delaware law did not require the BofA Officers to disclose to

shareholders material information that was omitted from the Joint Proxy.

Delaware law also recognizes that a separate violation of fiduciary duty can

occur "[w]hen the directors are not seeking shareholder action, but are deliberately

misinforming shareholders about the business of the corporation, either directly or by a public

statement . . . ."  Malone, 722 A.2d at 14.  Even assuming this duty did apply to the BofA

Officers, the Derivative Plaintiffs' claims were based on omissions, not deliberate

misinformation.  (Deriv. Compl. ¶¶ 314, 337.)

The BofA Officers' motion to dismiss is granted with respect to the Derivative

Plaintiffs' duty of disclosure claims.

> b.  Alleged Decision to Retract the Invocation of the MAC Clause.

Aside from their non-disclosure claims, plaintiffs also allege that the BofA

Officers breached their fiduciary duty when they "fail[ed] to invoke the MAC clause or

otherwise terminate or renegotiate the Merger even though they knew and had determined that

it was in BofA's best interests to do so."  (Deriv. Compl. ¶ 314(e).)  Specifically, the

Derivative Complaint alleges that during November and December 2008, several BofA

Officers discussed whether BofA could invoke the MAC clause (Deriv. Compl. ¶ 181), sought

and rendered legal advice regarding the MAC clause, (Deriv. Compl. ¶ 182), and ultimately

received advice that grounds existed for invoking the MAC clause (Deriv. Compl. ¶ 184).  At

some point between December 17 and 21, two of the BofA Officers, Price and Brinkley, are

alleged to have formed an opinion that BofA would prevail in a lawsuit over the MAC clause.

(Deriv. Compl. ¶ 187.)  These allegations are sufficient only to support an inference that these

defendants were evaluating BofA's positions regarding the MAC clause.  They are not

sufficient to state a plausible claim that these defendants acted with "reckless indifference," a

"deliberate disregard" of the BofA shareholders, or that the BofA Officers acted disloyally.

Tomczak, 1990 WL 42607, at *12.

According to the Derivative Complaint, the BofA board decided to invoke the

MAC clause on December 21, 2008.  (Deriv. Compl. ¶ 188.)  It is also alleged that the board

reversed this decision on December 22, 2008, after Secretary Paulson allegedly threatened to "remove BofA's management and Board from their offices."  (Deriv. Compl ¶¶ 188, 196.) Although the Derivative Complaint alleges that certain BofA Officers attended the December 22 meeting at which Lewis "formally sought the Board's concurrence with management's decision" not to invoke the MAC clause, and that there was "no dissent from the consensus" at that meeting (Deriv. Compl. ¶ 196), there is no allegation that the BofA Officers other than Lewis advised the board to reverse its decision.

The Derivative Plaintiffs have not plausibly alleged that the BofA Officers breached their fiduciary duty with regard to the claims arising from the BofA board's decision not to invoke the MAC.

## C.   <u>Derivative Plaintiffs Have Failed to State a Claim for Unjust Enrichment.</u>

The Derivative Complaint asserts a claim of unjust enrichment against the BofA Officers.  The defendants argue that North Carolina law applies to plaintiffs' claim for unjust enrichment because BofA's principal place of business is in North Carolina and most of the BofA Officers are citizens of North Carolina.  (Deriv. Compl. ¶¶ 42, 59-65.)  Plaintiffs do not specifically deny that North Carolina law applies, but they cite to Delaware authority in their opposition brief.  I need not decide which state's law applies, as there is no conflict between the applicable laws of the two jurisdictions.  <u>Rogers v. Grimaldi</u>, 875 F.2d 994, 1002 (2d Cir. 1989) (a federal court exercising supplemental jurisdiction applies the choice of law rules of the forum state); <u>In re Allstate Ins. Co. (Stolarz)</u>, 81 N.Y.2d 219, 223 (N.Y. 1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.").

Under North Carolina law, a plaintiff must adequately allege that the defendant has been enriched "at another's expense under circumstances that, in equity and good conscience, call for an accounting by the wrongdoer." Ellis Jones, Inc. v. W. Waterproofing Co., Inc., 66 N.C. App. 641, 646 (N.C. Ct. App. 1984).  Under Delaware law, unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988). Under both states' laws, unjust enrichment occurs when a person has been enriched, to the detriment of another, under unfair or inequitable circumstances.

According to the Derivative Complaint, the BofA Officers were unjustly enriched because they "failed to achieve BofA's business and financial goals except in an illegitimate and unlawful manner," and therefore, "the incentive compensation payments" to these defendants "were not properly awarded for the work performed and results achieved." (Deriv. Compl. ¶ 330.)  Plaintiffs seek the return of any incentive compensation awarded to these defendants.  (Deriv. Compl. ¶ 330.)

Plaintiffs have not alleged that the BofA Officers benefitted from the unlawful conduct alleged in the Derivative Complaint.  Plaintiffs have not alleged that the "incentive compensation" the BofA Officers received was tied to the consummation of the merger with Merrill.  Similarly, plaintiffs do not allege what "BofA's business and financial goals" were, let alone how the alleged wrongdoing asserted in the Derivative Complaint helped the BofA Officers achieve those goals.  Because plaintiffs have failed to allege facts showing why it would be unfair or inequitable to allow the BofA Officers to retain their incentive compensation, their claim for unjust enrichment is dismissed for failure to state a claim.

In addition, demand is not excused for this claim. The Derivative Plaintiffs did not name the BofA Directors in the unjust enrichment claim. (Deriv. Compl. ¶¶ 325-31.) There are no allegations in the Derivative Complaint connecting the board to the alleged unjust enrichment of the officers. Plaintiffs do not allege that the board set the compensation levels for the "incentive compensation" at issue. Even if the members of the Compensation and Benefits Committee set the incentive compensation for the BofA Officers, the Derivative Plaintiffs have not pled particular facts creating a reasonable doubt that the majority of the board (even excluding Lewis) who were not members of that committee could have exercised their disinterested and independent business judgment in considering a demand to file suit. Rales, 634 A.2d at 934. Demand for the unjust enrichment claim, therefore, is not excused.

D. Derivative Plaintiffs Have Failed to State a Claim for Contribution.

Plaintiffs assert a claim for contribution against the BofA Directors and Officers. The BofA Derivative Defendants cite Delaware law on contribution. The Derivative Plaintiffs do not dispute that Delaware law applies.

Under Delaware law, the right of contribution is governed by the Uniform Contribution Among Tort-feasors Law, 10 Del. Code Ann. § 6301, et seq. The "inherent requirement" of a claim for contribution "is that the parties are joint tortfeasors who share a 'common liability.'" Builders & Managers, Inc. v. Dryvit Sys., Inc., No. Civ. A. 00C11111JEB, 2004 WL 304357, at *2 (Del. Super. Ct. Feb. 13, 2004). According to the Derivative Complaint, the BofA Derivative Defendants have "exposed BofA to a significant liability under various federal and state laws," causing BofA to suffer a "substantial harm." (Deriv. Compl. ¶¶ 333-34.) Plaintiffs have not alleged facts showing that BofA has suffered any liabilities under federal or state laws, or what "substantial harm" has been done to BofA

as a result of its joint tortfeasance with the BofA Directors and Officers.  Plaintiffs' bare

recitation of the elements of this cause of action does not satisfy the pleading requirements of

Rule 8(a), and this claim is dismissed.  <u>Twombly</u>, 550 U.S. at 555.  In addition, under

Delaware law, a "joint tort-feasor is not entitled to a money judgment for contribution until he

or she has by payment discharged the common liability or has paid more than his or her pro

rata share thereof."  10 Del. Code Ann. § 6302(b).  Plaintiffs have not alleged any payment

made by BofA to discharge a common liability of BofA and the BofA Derivative Defendants.

E.   Demand Is Not Excused for the Derivative Plaintiffs' Breach of Fiduciary
Duty and Professional Negligence Claims Against the Financial Advisors.

Plaintiffs assert claims for breach of fiduciary duty and professional negligence

against the Financial Advisors.  The <u>Rales</u> test applies to these claims because they do not

challenge a BofA board decision.  <u>Rales</u>, 634 A.2d at 934 n.9 ("For example, if a stockholder

brings a derivative suit alleging that a third party breached a contract with the corporation,

demand should not be excused simply because the subject matter of the suit – the third party's

breach of contract – does not implicate the business judgment rule."); <u>see also</u> <u>In re Trump</u>

<u>Hotels S'holder Derivative Litig.</u>, No. 96 Civ. 7820 (DAB), 2000 WL 1371317, at *11

(S.D.N.Y. Sept. 21, 2000).

In Count II of the Derivative Complaint, plaintiffs allege that the Financial

Advisors "owed BofA and its shareholders the duty to perform due diligence necessary to

accurately and reliably determine whether the terms of the proposed Merger and exchange

ratio were fair from a financial point of view to BofA and continued to be fair."  (Deriv.

Compl. ¶ 317.)[20]  According to plaintiffs, the Financial Advisors breached this duty by

---

[20] Although plaintiffs allege that the Financial Advisors owed a duty to BofA to determine whether the terms of
the merger continued to be fair to BofA from a financial point of view, this continuing obligation is expressly

"fail[ing] to perform the due diligence necessary under the circumstances" and, therefore, their fairness opinions "had no reasonable basis in fact, were false and misleading." (Deriv. Compl. ¶ 319.) In Count III, plaintiffs allege that the Financial Advisors "failed to exercise the care that a professional employed to render" a fairness opinion would have employed given the circumstances and, therefore, the fairness opinions "had no reasonable basis in fact," and were false and misleading. (Deriv. Compl. ¶¶ 322-23.)

These claims, therefore, arise from the same facts and circumstances as the plaintiffs' breach of fiduciary duty claim against the BofA Directors and Officers for approving the merger. Given my conclusion that the BofA board was disinterested and independent, and that plaintiffs had failed to plead particular facts showing that the BofA board committed a non-exculpated breach of fiduciary duty in approving the merger, I conclude that at the time the Derivative Complaint was filed, the BofA board could have "properly exercised its independent and disinterested business judgment in responding to a demand" on these claims. Rales, 634 A.2d at 934. The demand requirement, therefore, is not excused, and these claims are dismissed pursuant to Rule 23.1.

    F.  Derivative Plaintiffs Fail to State a Direct Claim Against the BofA Directors and Officers for Breach of Fiduciary Duty.

In addition to asserting derivative claims, the Derivative Plaintiffs also assert one direct claim. They allege that the BofA Derivative Defendants breached their fiduciary duties to the BofA shareholders by failing to "correct, update, or supplement the disclosures in the Proxy Statement" and by concealing "the fact of an authorized $5.8 billion in bonuses to be paid to Merrill executives." (Deriv. Compl. ¶ 358.) According to the Derivative

---

refuted by the words of both fairness opinions. Both opinions explicitly state that they are limited to addressing fairness "as of the date hereof," which was September 14, 2008. (Joint Proxy at C-2, D-3.)

Complaint, these breaches deprived the shareholders "of their right to cast an informed vote at the Shareholder Vote on the Merger on December 5, 2008."  (Deriv. Compl. ¶ 359.)  As a recovery, plaintiffs seek "the amounts which BofA spent to negotiate the transaction and prepare the [Joint Proxy], including $20 million in fees to the [Financial Advisors], over $100 million in fees to the Wachtell law firm, and tens of millions of dollars in [expenses for] printing and disseminating the [Joint Proxy], tallying votes, and otherwise implementing the solicitation of shareholders."  (Deriv. Compl. ¶ 360.)

       Plaintiffs have not alleged a causal connection between the harm alleged – denial of their right to vote – and the damages they seek.  Plaintiffs do not allege that if the BofA defendants had not breached their fiduciary duties, these costs would not have been incurred.  Instead, plaintiffs allege that the harm they suffered was from casting votes that were not fully informed.  But, as plaintiffs concede, the costs they seek to recover because of these alleged breaches "would have been incurred [by BofA] regardless [of] whether shareholders had voted the Merger down and/or the Merger had been rescinded or the Merger price renegotiated."  (Deriv. Pls. Opp. Br. at 48.)  Put differently, the Derivative Complaint does not plausibly allege that BofA would have avoided these costs if the Joint Proxy contained more fulsome and complete disclosures.  Thus, plaintiffs' claim for damages is not "logically and reasonably related," In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 766, 773 (Del. 2006), to the harm they are alleged to have suffered – denial of the right to cast a fully informed vote.  Plaintiffs' direct claim is therefore dismissed.[21]

---

[21] Because I have dismissed plaintiffs' direct claim, I need not reach the issue of whether there is an impermissible conflict of interest between the plaintiffs' derivative and direct claims.  See Fed. R. Civ. P. 23.1(a) ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."); see also St. Clair Shores Gen. Emps. Ret. Sys. v. Eibler, No. 06 Civ. 688 (SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) ("Courts in this Circuit have long found that plaintiffs

G.  This Action Will Not Be Stayed or Dismissed in Favor of the Delaware
    Action.

A separate stockholder derivative action is currently pending in Delaware

Court of Chancery, In re Bank of America Corporation Stockholder Derivative Litigation,

C.A. No. 4307-VCS (the "Delaware Action").  That action asserts a claim against the BofA

board for breach of fiduciary duty and a claim for waste of corporate assets against the

directors and others.  (Delaware Action Compl. ¶¶ 157-164, attached as Exhibit C to the

Declaration of Kevin L. Oufnac, dated February 8, 2010.)  As alternative relief, the BofA

Derivative Defendants ask the Court to abstain from exercising jurisdiction over this action

because it is substantially similar to the Delaware Action.

Both parties agree that in determining whether abstention is appropriate, the

Court should apply the six-factor test set forth in Colorado River Water Conservation District

v. United States, 424 U.S. 800, 817 (1976).  See Vill. of Westfield v. Welch's, 170 F.3d 116,

120 (2d Cir. 1999) ("Abstention under Colorado River applies where, as in the instant case,

state and federal courts exercise concurrent jurisdiction simultaneously.") (quotation marks

omitted).  "To determine whether abstention under Colorado River is appropriate, a district

court is required to weigh six factors, with the balance heavily weighted in favor of the

exercise of jurisdiction."  Id. at 121 (quotation marks omitted).  Those six factors are: "(1) the

assumption of jurisdiction by either court over any res or property; (2) the inconvenience of

the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction

---

attempting to advance derivative and direct claims in the same action face an impermissible conflict of
interest."); Tuscano v. Tuscano, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005) ("Any individual claims raised by a
shareholder in a derivative action present an impermissible conflict of interest."); Wall St. Sys., Inc. v. Lemence,
No. 04 Civ. 5299 (JSR), 2005 WL 292744, at *3 (S.D.N.Y. Feb. 8, 2005) ("[A]n individual shareholder has a
conflict of interest, and therefore cannot adequately represent other shareholders, when he simultaneously brings
a direct and derivative action."); Ryan v. Aetna Life Ins. Co., 765 F. Supp. 133, 135 (S.D.N.Y. 1991) (stating
that "the existence of an actual conflict disqualifies a plaintiff from acting as representative" in derivative and
direct capacities, and "courts in this District have applied a strict standard in scrutinizing simultaneous direct and
derivative actions for signs of conflict").

was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction."  Id.  No one factor is dispositive.  Id.  Because abstention is "an exception to a court's normal duty to adjudicate a controversy properly before it, the district court's discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved."  Dittmer v. Cnty. of Suffolk, 146 F.3d 113, 116 (2d Cir. 1998).  "Thus, there is little or no discretion to abstain in a case which does not meet traditional abstention requirements."  Id.

I assume, for these purposes, that the Delaware Action is a parallel state-court proceeding.  The first factor favors the exercise of jurisdiction, because this is not an in rem action.  Vill. of Westfield, 170 F.3d at 122 ("[T]he absence of a res points toward exercise of federal jurisdiction.") (quotation marks omitted; alteration incorporated).

Turning to the second and third factors, this forum is not inconvenient to the defendants as they already are litigating a claim arising out of substantially similar facts in this forum.  The mere potential for conflicting outcome between the two actions does not justify abstention under the "piecemeal litigation" factor.  Colorado River, 424 U.S. at 816.

The fourth factor tips in favor of abstention because, according to plaintiffs' brief, jurisdiction was obtained by the Delaware court on January 22, 2009, and by this Court on January 28, 2009.  Additionally, the Delaware action already has progressed beyond the motion to dismiss stage.  (Portnoy Dec. Ex. C.)

The fifth factor favors exercising federal jurisdiction.  State law applies the rule of decision on the remaining breach of fiduciary duty claims, and on the demand requirement, but federal law applies the rule of decision on the remaining Section 14(a)

claims.  Vill. of Westfield, 170 F.3d at 124 ("[T]he presence of federal issues strongly advises exercising federal jurisdiction.").  Here, I view this as a significant consideration because important federal policies are implicated.

Finally, regarding the sixth Colorado River factor, there is nothing before the Court to indicate that the Delaware court is an inadequate vehicle for the plaintiffs' protection, which counsels in favor of abstention.

Although some of the factors favor abstention, the test is not mechanical, and I conclude that on balance, abstention is not warranted.

### H.  Derivative Plaintiffs May File a Motion Requesting Leave to Amend.

The Derivative Plaintiffs have requested leave to amend the Derivative Complaint.  The Court should "freely give leave" to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs argue that leave to amend "is well warranted here, where new information emerges almost every day from the SEC and [New York Attorney General] investigations, media reports, and Congressional hearings."  (Deriv. Pls. Opp. Br. at 58.)  Plaintiffs, however, have not identified any information that they would include in an amended complaint.  Therefore, plaintiffs' request for leave to file an amended complaint is denied without prejudice.  Plaintiffs' may file a motion to amend their Derivative Complaint within 20 days of the date of hereof.  Should plaintiffs choose to file such a motion, they should consider whether an impermissible conflict exists.  See supra note 21.

### X.    LETTERS OF FEBRUARY 2010 PLAY NO PART IN THE CONSIDERATION OF THESE MOTIONS.

I briefly address a flurry of submissions made by the parties in February and March 2010, which purported to advise Judge Chin of a complaint filed by the New York Attorney General and developments in a separate SEC action.  No party argues that the

reported developments have a preclusive effect on this case.  They play no part in this Memorandum and Order.  The relevance of those proceedings, if any, may be revisited at a later point.

CONCLUSION

The Securities Complaint states Section 10(b) and Rule 10b-5 claims against Lewis, Thain, BofA and Merrill for alleged misstatements related to the bonus arrangement, and against Lewis and BofA for alleged omissions related to the bonus arrangement.  The Securities Complaint states claims under Section 14(a) and Rule 14a-9 against Lewis, Thain, BofA, Merrill and the BofA directors as to the bonus arrangement.  It also states claims under Section 14(a) and Rule 14a-9 against all defendants arising out of their failure to disclose Merrill's fourth quarter 2008 losses.  Because the foregoing claims survive, the Securities Complaint states a claim for control person liability pursuant to Section 20(a) of the '34 Act.  Finally, the Securities Complaint states claims under the '33 Act based on the alleged misstatements and omissions concerning Merrill's bonus payments.

The motions to dismiss are GRANTED as to the Securities Complaint's other theories of liability.  (MDL Docket # 59, 62, 64.)

The Derivative Complaint does not state a claim against the Financial Advisors, and their motion to dismiss is GRANTED.  (MDL Docket # 92.)

The Derivative Complaint states Section 14(a) and Rule 14a-9 claims against the BofA Directors for misstatements and omissions related to the bonus arrangement and for failing to disclose Merrill's fourth quarter 2008 losses.  The BofA Directors have not moved to dismiss the breach of fiduciary duty claims arising from their actions or omissions after they approved BofA's acquisition of Merrill.  The BofA Derivative Defendants' and nominal

- 133 -

defendant BofA's motions to dismiss are GRANTED with respect to the other theories of liability asserted in the Derivative Complaint. (MDL Docket ## 118, 127.) The Derivative Plaintiffs may file a motion to amend within 20 days.

The motion to certify a question to the Delaware Supreme Court is DENIED. (MDL Docket # 210.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        August 27, 2010