**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

All Securities Actions

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Master File No. 09 MDL 2058 (PKC)

**CONSOLIDATED SECOND**
**AMENDED CLASS ACTION**
**COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF CASE**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................. 2

II.  JURISDICTION AND VENUE ........................................................... 12

III.  PARTIES ............................................................................................ 13

    A.  Plaintiffs .................................................................................... 13

    B.  Defendants ................................................................................. 15

        1.  Corporate Defendants ................................................... 15

        2.  Officer Defendants ........................................................ 16

        3.  BoA Board Defendants ................................................. 18

        4.  The Underwriter Defendants.......................................... 20

IV.  OVERVIEW ....................................................................................... 21

    A.  BoA Hastily Seizes The Opportunity To Acquire Merrill, And Agrees To Pay A Significant Premium For The Company .................................... 21

    B.  BoA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End ................................ 23

    C.  Lewis Presents The Merger To Investors While Concealing The Bonus Agreement ................................................................................................. 26

    D.  During October And November 2008, Merrill's Losses Grow To At Least $15.5 Billion Before The Shareholder Vote .......................................... 29

    E.  BoA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote .............................................................. 31

    F.  Internal BoA Documents And Sworn Testimony Establish That Defendants Recognized That Merrill's Losses Should Be Disclosed In Advance Of The Shareholder Vote ......................................................................... 34

    G.  As Merrill's Losses Mount, Defendants Acknowledge That Disclosure Of Merrill's Losses Would Cause Shareholders To Vote Against The Merger – And Abruptly Reverse Their Decision To Disclose .............................. 36

    H.  As The Vote Approaches, Senior Management Is Informed That Merrill's Quarterly Losses Will Exceed $16 Billion, And Ignores Repeated Entreaties To Disclose The Losses ...................................................................... 39

    I.  While Merrill Deteriorates, The Billions In Merrill Bonuses Are Finalized........ 43

    J.  BoA And Merrill Issue The Materially False And Misleading Proxy.................. 44

    K.  Almost Immediately After Shareholders Approve The Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses Are Materially Higher Than What He Has Been Told, Seeks To Confront Price About That Discrepancy, And Is Immediately Fired ...................................................................... 46

L.    Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him ........................................................... 47

M.    With BoA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout ............................................. 53

N.    Internal BoA Emails Establish That, At The Same Time BoA's Senior Officers Decided Not To Disclose The Bailout Prior To The Merger's Close, They Internally Acknowledged That The Market Was Being Misled As To Merrill's True Financial Condition ..................................................................... 56

O.    The Merger Is Consummated While Defendants Lewis And Price Continue To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout ......................... 58

P.    The Prices Of BoA Securities Plummet As The Truth Emerges ......................... 59

Q.    Post-Class Period Events ......................................................................... 66

V.    FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS .......... 73

A.    The Merger Agreement Is Filed On September 18, 2008 ..................................... 73

B.    The Secondary Offering Documents ............................................................ 75

C.    The Proxy ............................................................................................. 75

D.    The Proxy Supplements ............................................................................ 79

E.    Defendants' Failure To Disclose Highly Material Information Prior To The Close Of The Merger ........................................................................... 79

VI.    SUMMARY OF SCIENTER ALLEGATIONS ................................................... 80

A.    Additional Evidence Of Lewis's Scienter .................................................... 82

B.    Additional Evidence Of Price's Scienter ..................................................... 90

C.    Additional Evidence Of Thain's Scienter .................................................... 92

VII.    LOSS CAUSATION – EXCHANGE ACT CLAIMS ........................................... 93

VIII.    RELIANCE: APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE FOR EXCHANGE ACT CLAIMS ................................................. 96

IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................... 98

X.    CLASS ACTION ALLEGATIONS ................................................................. 99

XI.    CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT ..................................................................................... 102

COUNT I ................................................................................................... 102

    For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 (Against
    Defendants BoA, Lewis, And Price For Misstatements And Omissions
    Regarding The Secret Bonus Agreement, Merrill's Pre-Vote Losses,
    BoA's Pre-Vote Losses, And The Taxpayer Bailout)

COUNT II .................................................................................................. 106

    For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 (Against
    Defendants Merrill And Thain for Misstatements Regarding The Secret
    Bonus Agreement)

COUNT III................................................................................................. 109

    For Violations Of Section 20(a) Of The Exchange Act (Against Defendants
    Lewis and Price)

COUNT IV................................................................................................. 110

    For Violations Of Section 20(a) Of The Exchange Act (Against Thain)

XII.    CLAIMS UNDER SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT ........... 112

COUNT V .................................................................................................. 114

    For Violations of Section 14(a) Of The Exchange Act (Against Defendants
    BoA, Merrill, Lewis, Thain, Price, Cotty, And The BoA Board For
    Misstatements And Omissions Regarding The Secret Bonus Agreement
    And Merrill's Pre-Vote Losses)

COUNT VI.................................................................................................. 116

    For Violations Of Section 20(a) Of The Exchange Act In Connection With
    The Proxy Claims (Against Defendants Lewis, Thain, Price, And
    The BoA Board)

XIII.    CLAIMS UNDER THE SECURITIES ACT .............................................. 119

COUNT VII ................................................................................................ 121

    For Violations Of Section 11 Of The Securities Act (Against BoA, Lewis,
    Price, Cotty, The BoA Board, And The Underwriter Defendants For
    Misstatements And Omissions Regarding The Secret Bonus Agreement)

COUNT VIII................................................................................................ 123

    For Violations Of Section 12(a)(2) Of The Securities Act (Against BoA And
    The Underwriter Defendants For Misstatements And Omissions
    Regarding The Secret Bonus Agreement)

COUNT IX................................................................................................... 124

    For Violations Of Section 15 Of The Securities Act (Against Defendants
    Lewis, Price, And The BoA Board)

1.      Court-appointed Lead Plaintiffs, the State Teachers Retirement System of Ohio; the Ohio Public Employees Retirement System; the Teacher Retirement System of Texas; Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V.; and Fjärde AP-Fonden (collectively, "Lead Plaintiffs"), bring this action individually and on behalf of all persons and entities who (i) purchased or otherwise acquired the common stock, preferred securities as described in Appendix A attached hereto (the "Preferred Securities"), debt securities as described in Appendix B attached hereto (the "Debt Securities"), or call options of Bank of America Corporation ("BoA" or the "Company") between September 18, 2008 and January 21, 2009, inclusive (the "Class Period"), excluding any shares of BoA common stock acquired by exchanging the stock of Merrill Lynch & Co., Inc. ("Merrill" or "Merrill Lynch") for BoA stock through the merger between the two companies consummated on January 1, 2009; (ii) held BoA common stock or 7% Cumulative Redeemable Preferred Stock, Series B ("Series B Preferred Stock") as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill; (iii) purchased BoA common stock issued under the Registration Statement and Prospectus for the $10 billion offering of BoA common stock that occurred on or about October 7, 2008; or (iv) sold BoA put options during the Class Period, and were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants (as set forth herein), present or former executive officers of BoA and Merrill, the members of Merrill's Board of Directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

2.      Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the investigation of Court-appointed Co-

Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP; Kaplan Fox & Kilsheimer LLP; and Barroway Topaz Kessler Meltzer & Check, LLP. This investigation included, but was not limited to, a review and analysis of: (i) public filings with the Securities and Exchange Commission ("SEC") by BoA and Merrill; (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by BoA or Merrill; (v) press releases and media reports; (vi) economic analyses of securities movement and pricing data; (vii) publicly available filings in legal actions brought against either or both companies; (viii) public material, including sworn testimony, obtained in connection with continuing investigations of BoA by the United States Congress, the New York Attorney General, and/or the SEC; (ix) documents produced to Lead Plaintiffs by Defendants; and (x) transcripts of sworn deposition testimony taken in connection with legal actions brought against BoA by the New York Attorney General and/or the SEC. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further discovery.

I.    <u>INTRODUCTION</u>

3.    This action involves a series of materially false and misleading statements and omissions by Defendants in connection with BoA's $50 billion acquisition of Merrill Lynch, which was announced on September 15, 2008, voted on by BoA's shareholders on December 5, 2008, and consummated on January 1, 2009.

4.    On the morning of Saturday, September 13, 2008, John A. Thain ("Thain"), Merrill's Chief Executive Officer, called Kenneth D. Lewis ("Lewis"), BoA's Chief Executive Officer, to propose a "strategic arrangement" between the two companies. As Thain knew, the

impending bankruptcy of Lehman Brothers Holdings Inc. ("Lehman") and the ensuing dislocations in the financial markets would cause severe liquidity issues for Merrill "beginning Monday morning," September 15, 2008. Indeed, as subsequently reported by *PBS Frontline* in a program entitled "Breaking the Bank," which initially aired on June 16, 2009 ("*PBS Frontline*"), Thain, along with the heads of most major investment banking firms, had attended a meeting on September 12 called for and presided over by Henry M. Paulson, the then-Secretary of the United States Treasury ("Secretary Paulson"), during which the discussions focused on attempts to find a buyer to avert Lehman's impending bankruptcy and the likelihood that Merrill – because of its own exposure to toxic assets – would be the next investment bank to fail.

5. Lewis, who had long coveted Merrill, readily accepted Thain's invitation and flew to New York City to meet with him that Saturday afternoon. By September 14, 2008, one day later, Lewis and BoA had agreed to acquire Merrill in one of the largest mergers in Wall Street history. Pursuant to the terms of the Merger Agreement, BoA agreed to pay $29 per share in stock to acquire Merrill – a total of $50 billion – a price that represented a substantial 70% premium over the price at which Merrill stock closed on September 12.

6. During the abbreviated merger negotiations, BoA and Merrill spent considerable time negotiating the discretionary year-end bonuses that Merrill executives and employees would receive for 2008. The bonus discussions lasted until 2 a.m. on September 15, and ultimately BoA agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses – an amount which represented 12% of the merger price, and more than 75% of the "record" $7.5 billion profit Merrill had reported in 2006 (the last year it would ever report a profit). BoA, Thain, and Lewis also agreed to allow Merrill to accelerate payment of these bonuses so that Merrill could pay them in December 2008, before the merger closed, rather than in January,

when bonuses were supposed to be paid at Merrill, to ensure that Merrill would be able to exercise significant control over the bonus amounts and the recipients of the bonuses.

7.    Throughout October and November 2008 – the two months immediately preceding the December 5, 2008 shareholder vote on the merger – Merrill and BoA suffered highly material undisclosed losses that were large enough to bankrupt Merrill, and were so severe that BoA could not absorb them. In October 2008 alone, Merrill had a staggering loss of more than $7.5 billion. In November 2008, Merrill lost an additional $5.8 billion, and also suffered a goodwill impairment of another $2.2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender. Thus, by the date of the merger vote, Merrill had lost at least $15.5 billion in just two months – and Defendants knew that Merrill was internally projecting billions of dollars of additional losses in December. The losses were so large that in the weeks preceding the shareholder vote, senior BoA executives discussed terminating the merger by invoking the "material adverse effect" clause in the merger agreement (commonly known as a "material adverse change" clause or "MAC"), reflecting the significance of the impact that Merrill's losses would have on the combined company.

8.    Notwithstanding these highly material facts, neither Merrill nor BoA disclosed any information relating to Merrill's enormous fourth quarter losses, or the fact that BoA had agreed to allow Merrill to pay billions of dollars in bonuses regardless of those losses, prior to the shareholder vote. Instead, on November 3, 2008, BoA and Merrill filed with the SEC a Joint Definitive Proxy Statement soliciting approval of the merger from the shareholders of both companies, which materially misstated and failed to disclose the agreement to pay up to $5.8 billion in bonuses before the merger closed, and also failed to disclose Merrill's dramatic October 2008 losses (as defined further below, the "Proxy"). Rather than disclosing the fact that

4

BoA had already agreed to allow Merrill to pay up to $5.8 billion in bonuses, the Proxy falsely represented that Merrill had agreed <u>not</u> to pay year-end performance bonuses or other discretionary incentive compensation prior to the closing of the merger without BoA's consent.

9.     Documents, sworn testimony, and acknowledgements by Defendants cited herein establish that both Merrill and BoA senior executives, including Defendants Thain and Lewis, were fully aware of both BoA's agreement to allow Merrill to pay the bonuses and the massive fourth quarter losses Merrill was experiencing.  Executives at BoA, including Defendant Lewis, expressly approved the Merrill bonuses, and were kept fully informed about Merrill's deteriorating financial condition from the time the merger was announced.  As Defendant Thain testified under oath, "Bank of America had daily access to the exact same financial information that I had," and "was totally up to speed as to what was happening."  Defendant Lewis also admitted before Congress that BoA received "detailed financial reports every week" from Merrill and that Merrill's losses were "clear" before the shareholder vote.

10.     Internal BoA documents and sworn testimony further establish that, in the weeks leading up to the merger, BoA decided that Merrill's losses were sufficiently material that they warranted disclosure prior to the shareholder vote – and that BoA abruptly reversed that decision after realizing that such disclosure would likely cause shareholders to vote against the merger.  This evidence also shows that, in order to ensure that no disclosure was made, BoA's most senior officers – who knew two days before the vote that Merrill had suffered losses in October and November of at least $15 billion – affirmatively misled BoA's General Counsel regarding the magnitude of the losses.  *See* ¶¶101-128, 139-142.

11.     On December 5, 2008, shareholders of BoA, oblivious to the fact that Merrill had lost at least $15.5 billion in the first two months of the fourth quarter, and that BoA and Merrill

had agreed to pay billions of dollars in bonuses to Merrill's executives notwithstanding these crippling losses, approved the merger. The closing date was set for January 1, 2009.

12.     Following the shareholder vote, Defendants continued to conceal highly material information from investors. Within days of the shareholder vote, Defendant Lewis internally acknowledged that Merrill's losses were so significant that BoA could not proceed with the merger. On or about December 17, 2008, Defendant Lewis called Secretary Paulson to inform him that Merrill's losses were so severe that BoA was going to terminate the merger by invoking the MAC. Summoned almost immediately to a meeting in Washington, D.C., Lewis falsely claimed to Secretary Paulson and Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve ("Chairman Bernanke"), that Merrill's losses only recently materialized in mid-December, and that he had been unaware of them until then.

13.     After reviewing Merrill's and BoA's financial data, senior officials of the U.S. Federal Reserve System (the "Federal Reserve") concluded that Lewis's claims of surprise were "not credible," and that Merrill's financial deterioration had been "observably under way over the entire quarter."[1] Indeed, documents and other evidence establish that Merrill's losses were far greater in October and November 2008 than in December 2008, and that BoA, which had appointed its Chief Accounting Officer, Neil A. Cotty ("Cotty"), to be Merrill's acting CFO when the merger was announced, knew of these losses as they occurred. Accordingly, Secretary Paulson and Chairman Bernanke told Lewis that invoking the MAC "after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition" would reveal the falsity of those statements, and "cast doubt in the minds of financial market participants . . . about the due diligence and analysis done by the company, its capability to consummate significant acquisitions, its overall risk management

---

[1] Throughout this Complaint, all emphasis is added unless otherwise noted.

processes, and the judgment of its management." As Secretary Paulson later testified to Congress, he also told Lewis that, if Lewis invoked the MAC, Lewis, BoA's senior management, and BoA's Board of Directors (the "BoA Board") would be terminated.

14. After this threat, and despite the fact that Merrill's losses were projected to be more than $21 billion for the quarter, Defendant Lewis agreed not to invoke the MAC. Instead, he agreed to proceed with the merger on the condition that the U.S. Government provide BoA with a $138 billion taxpayer bailout, consisting of a highly dilutive $20 billion capital infusion and an asset guarantee of $118 billion. Recognizing that disclosure of these facts would lead to a shareholder revolt, cause rating agency downgrades, and almost certainly prevent the merger from closing – and thus cost him his job – Defendant Lewis actively concealed the Government's commitment from BoA's shareholders and investors. In a December 22, 2008 email to the BoA Board after the deal with the Government was reached, Lewis expressed his personal desire not to disclose the bailout prior to the close of the merger, writing, "I just talked with Hank Paulson. He said there is no way the Federal Reserve and the Treasury could send us a letter of any substance [documenting the bailout] without public disclosure <u>which, of course, we do not want</u>."

15. Significantly, internal BoA documents and sworn testimony establish that, at the time BoA's senior officers made the decision not to disclose the bailout or Merrill's losses prior to the close of the merger, they knew that (i) this information was highly material; (ii) the market had no idea that Merrill had suffered these losses, and in fact believed that BoA was in better shape than its competitors precisely because it did not need "government assistance"; (iii) disclosure of the bailout prior to the merger close would cause the deal to crater; and (iv) the failure to disclose this information had created a "fundamental issue of lack of credibility" with

investors. Indeed, according to notes taken in December 2008 by a senior partner of BoA's outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), BoA's senior officers knew before the merger closed that investors "do not have an inkling this [Merrill's losses] is coming," and that if BoA "disclosed the ever increasing losses for the fourth quarter," it would have an "adverse impact" on BoA's credit ratings, cause the deal to "fall apart," and "presumably confirm materiality of the fourth quarter losses." *See* ¶¶166-172.

16.     The merger closed on January 1, 2009, with BoA shareholders and investors still unaware that (i) Merrill had lost more than $21 billion in the fourth quarter of 2008 and was insolvent; (ii) as a result of these massive losses, Lewis had advised the Treasury Department and the Federal Reserve that BoA had determined that a MAC had occurred and that BoA should not proceed with the merger; (iii) BoA had agreed to proceed with the merger only after Secretary Paulson told Lewis that he would be fired if BoA refused to proceed; (iv) as a result of that ultimatum, BoA's officers and directors faced a clear, irreconcilable conflict of interest in agreeing to proceed with the merger; (v) BoA could not absorb Merrill's losses, and had agreed to proceed with the merger only after obtaining a $138 billion taxpayer bailout; and (vi) notwithstanding Merrill's losses, Merrill had paid its executives and employees $3.6 billion in bonuses prior to the close of the merger, further depleting Merrill's resources.

17.     News about these materially adverse facts did not begin to enter the market until mid-January 2009. On Sunday, January 11, 2009, a Citigroup analyst wrote, based on information leaked to the market, that fourth quarter losses at Merrill were assumed to be $6 billion, including $7 billion in writedowns on Merrill's "high risk assets," and that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share. On January 15, 2009, *The Wall Street Journal* reported that BoA was "to get billions in

U.S. aid . . . because of Merrill's larger-than-expected losses in the fourth quarter."  In response, BoA moved its earnings conference call from January 20 to January 16, 2009.  On January 16, BoA announced that Merrill had suffered more than <u>$21 billion</u> of losses during the fourth quarter, and that BoA had suffered an additional $1.8 billion loss.  BoA also announced that the U.S. Government was extending a <u>$138 billion</u> taxpayer bailout to BoA, and that the Company was slashing its dividend from $0.32 to $0.01 per share to preserve capital.

18.    The news stunned the investment community.  J.P. Morgan analysts reported that Merrill's losses were "enormous" and "much worse" than expected, and *The New York Times* reported that Merrill's losses were "devastating."  Moreover, just as BoA's senior officers had acknowledged internally would happen in mid-December, Moody's Corp. ("Moody's") downgraded BoA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch Ratings, Inc. ("Fitch") downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

19.    In direct response to these disclosures, BoA shares lost more than half of their value, falling from $12.99 on January 9 (the trading day immediately prior to the January 11 disclosure) to $5.10 on January 20 – a market capitalization loss of approximately <u>$50 billion</u>. *The New York Times* described the loss as "one of the greatest destructions of shareholder value in financial history."  Yet, the prices of BoA common stock, Preferred Securities, Debt Securities, and options were still inflated and/or distorted, as Defendants continued to conceal the materially adverse fact that, despite Merrill's gargantuan losses, BoA had allowed Merrill to pay billions of dollars in bonuses to its executives and employees before the merger closed.

20.    On the night of January 21, 2009, the *Financial Times* reported that, in late December, immediately prior to the closing date, Merrill had paid $3-4 billion in bonuses despite its massive fourth quarter losses.  In response to the belated disclosure of billions of dollars in secret bonus payments, BoA stock fell an additional 15% on January 22, 2009.  Within hours of this disclosure, with shareholders in an uproar, Lewis was on his way to New York, where he fired Thain.

21.    The events surrounding the Merrill acquisition have continued to have a substantial negative effect on the Company.  In late January 2009, the New York Attorney General, Andrew M. Cuomo, initiated an investigation into Merrill's accelerated bonus payments.  On September 8, 2009, the New York Attorney General's office released a letter in which it stated that its ongoing investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders" – including Merrill's losses, the accelerated bonus payments, the undisclosed goodwill write-down, and the decision to invoke the MAC – and that "the facts of Bank of America's senior executives' knowledge of these events are straightforward."   On February 4, 2010, the New York Attorney General formally charged Defendants BoA, Lewis, and Joe L. Price (BoA's CFO) with four counts of securities fraud under New York's Martin Act, General Business Law §§ 352 and 353, alleging that Lewis, Price, and BoA made a series of false and misleading statements, and failed to disclose highly material information, concerning the secret bonus agreement, Merrill's fourth quarter losses, and the taxpayer bailout.

22.    In April 2009, BoA shareholders – expressing their fury over Lewis's conduct in connection with the merger – voted to strip Lewis of his position as Chairman of the BoA Board.

*BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties." Ten members of the BoA Board resigned after the merger closed. In May 2009, Congress initiated an investigation into the circumstances surrounding the merger, including BoA's refusal to disclose Merrill's losses, and held a series of hearings during which Lewis, Secretary Paulson, and Chairman Bernanke testified.

23.     In August 2009, the SEC sued BoA for violating Section 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that "Bank of America's failure to disclose the fact that it had agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses before the merger closed" violated the federal securities laws because "this omission made statements in Bank of America's proxy materials materially false and misleading." On the same day that the SEC filed its complaint, it announced that BoA had agreed to settle the action and pay a $33 million fine. On September 14, 2009, the United States District Court for the Southern District of New York rejected that settlement, holding that, given the strength of the allegations and the fact that no individual was either named as a defendant or contributing to the settlement, the proposed settlement was "neither fair, nor reasonable, nor adequate." On January 12, 2010, the SEC filed a second action against BoA, which asserted that BoA violated Section 14(a) by failing to disclose the "extraordinary" losses Merrill suffered prior to the shareholder vote. Ultimately, BoA agreed to a revised settlement of both actions, pursuant to which BoA paid a $150 million civil penalty and instituted certain corporate governance reforms. The Court accepted that settlement, finding that it was "clear" that BoA had made material misrepresentations and omissions to shareholders regarding the secret bonus agreement

and Merrill's fourth quarter losses. *S.E.C. v. Bank of America Corp.*, 2010 WL 624581 (S.D.N.Y. Feb. 22, 2010).

24.    Based on the facts alleged herein, Lead Plaintiffs assert claims under (i) Section 10(b) of the Exchange Act against Defendants BoA, Merrill, Lewis, Thain, and Price; (ii) Section 20(a) of the Exchange Act against Defendants Lewis, Thain, Price, and the BoA Board; (iii) Section 14(a) of the Exchange Act against Defendants BoA, Merrill, Lewis, Thain, Price, Cotty, and the BoA Board; (iv) Section 11 of the Securities Act of 1933 (the "Securities Act") against BoA, Lewis, Price, Cotty, the BoA Board, and the underwriters of BoA's $10 billion offering of common stock on or about October 7, 2008 (the "Secondary Offering"), Banc of America Securities LLC ("Banc of America"), and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"); (v) Section 12(a)(2) of the Securities Act against BoA, Banc of America, and MLPFS related to the Secondary Offering; and (vi) Section 15 of the Securities Act against Lewis, Price, and the BoA Board related to the Secondary Offering.

## II.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under (i) Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"); and (ii) Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

26.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

27.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

28.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

III.    PARTIES

   A.    **Plaintiffs**

29.    Lead Plaintiff, the State Teachers Retirement System of Ohio ("STRS Ohio"), is a public pension fund organized for the benefit of current and retired educators in Ohio.  As of June 30, 2008, STRS Ohio managed approximately $72.6 billion.  STRS Ohio serves approximately 458,000 active, inactive, and retired Ohio public educators.  STRS Ohio held 8,314,063 shares of BoA common stock as of October 10, 2008, the Record Date for voting in the merger, which were eligible to vote.  STRS Ohio also purchased 178,000 shares of BoA common stock in the Secondary Offering.  On June 30, 2009, this Court appointed STRS Ohio as a Lead Plaintiff for this litigation.

30.    Lead Plaintiff, the Ohio Public Employees Retirement System ("Ohio PERS"), is a public pension fund organized for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement system.  As of December 31, 2008, Ohio PERS managed approximately $59.2 billion. Ohio PERS serves approximately 936,000 members.  Ohio PERS held 10,090,511 shares of BoA common stock as of the Record Date,

which were eligible to vote.  Ohio PERS also purchased 150,000 shares of common stock in the Secondary Offering.  Ohio PERS also purchased bonds and preferred securities as listed in the attached certification.  On June 30, 2009, this Court appointed Ohio PERS as a Lead Plaintiff for this litigation.

31.     Lead Plaintiff, the Teacher Retirement System of Texas ("Texas Teachers"), is a public pension fund organized for the benefit of all employees of public education institutions throughout the State of Texas.  As of October 2008, Texas Teachers managed approximately $82 billion.  Texas Teachers serves more than 1.2 million members.  Texas Teachers held 9,017,666 shares of BoA common stock as of the Record Date, of which 6,110,585 were eligible to vote.  On June 30, 2009, this Court appointed Texas Teachers as a Lead Plaintiff for this litigation.

32.     Lead Plaintiff, Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V. ("PGGM"), is the public pension fund for the healthcare and welfare sector in the Netherlands, and the second largest pension fund in Europe. The pension fund serves more than 2 million members.  PGGM, acting for Stichting Pensioenfonds Zorg en Welzijn, currently has approximately $115.3 billion in assets under management for Stichting Pensioenfonds Zorg en Welzijn.  PGGM held 4,369,367 shares of BoA common stock for Stichting Pensioenfonds Zorg en Welzijn as of the Record Date, which were eligible to vote.  On June 30, 2009, this Court appointed PGGM as a Lead Plaintiff for this litigation.

33.     Lead Plaintiff Fjärde AP-Fonden ("AP-4") is a public pension fund in Sweden. AP-4 is part of the Swedish National Pension Fund System.  With over four million members and approximately $32 billion in assets under management, AP-4 is one of the largest pension funds in Scandinavia.  AP-4 held 2,604,640 shares of BoA common stock as of the Record Date,

of which 2,163,226 were eligible to vote.  On June 30, 2009, this Court appointed AP-4 as a Lead Plaintiff for this litigation.

34.    Lead Plaintiffs purchased BoA common stock, Preferred Securities, and Debt Securities during the Class Period on the New York Stock Exchange ("NYSE") as detailed in the certifications attached hereto as Appendix C and suffered damages as a result of the violations of the federal securities laws alleged herein.

35.    Named Plaintiff Grant Mitchell ("Mitchell" or "Named Plaintiff") is an individual investor in BoA securities.  Mitchell purchased BoA options during the Class Period as set forth in the certification attached hereto as Appendix D and suffered damages as a result of the violations of the federal securities laws alleged herein.

36.    Lead Plaintiffs and Named Plaintiff Mitchell have reviewed this Consolidated Second Amended Class Action Complaint (the "Complaint") and have authorized its filing.

### B.    Defendants

#### 1.    Corporate Defendants

37.    Defendant BoA is a Delaware corporation headquartered at 100 N. Tryon Street, Charlotte, North Carolina 28255.  BoA is one of the country's largest financial institutions, providing a range of banking and non-banking financial services and products domestically and internationally.  BoA securities actively trade on the NYSE under the ticker symbol BAC and, as of April 30, 2009, there were 6,402,966,457 shares of its common stock outstanding.  On or about October 7, 2008, BoA issued 455,000,000 shares of BoA common stock, with an underwriter option to issue an additional 68,250,000 shares of common stock, in the Secondary Offering.  The Secondary Offering was conducted pursuant to BoA's Shelf Registration Statement dated May 5, 2006 and filed with the SEC on Form S-3ASR (the "Secondary Offering

Registration Statement"), and a Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (the "Prospectus Supplement") (collectively, the "Offering Documents").

38.    Defendant Merrill is a Delaware corporation headquartered at 4 World Financial Center, New York, New York 10080.  Merrill is a global financial services company, providing investment banking, wealth management, and research services.  From the start of the Class Period through December 31, 2008, Merrill stock was actively traded on the NYSE under the ticker symbol MER.  As of January 1, 2009, Merrill became a direct subsidiary of BoA.

### 2.  **Officer Defendants**

39.    Defendant Lewis was BoA's Chief Executive Officer ("CEO"), President, and Chairman of the Board during the Class Period.  Lewis signed the Agreement and Plan of Merger between BoA and Merrill dated September 15, 2008 (the "Merger Agreement").  Lewis also signed BoA's Registration Statement on Form S-4, which was filed with the SEC on October 2, 2008, as amended on October 22 and October 29, 2008 on Form S-4/A (collectively, the "Proxy Registration Statement").  The Proxy Registration Statement included a preliminary version of the Joint Proxy Statement for the merger, as required by Rule 14a-3(a), which was identical in all relevant respects to the materially false and misleading Definitive Joint Proxy Statement, and a copy of the Merger Agreement.  Lewis also signed a cover letter for BoA's and Merrill's Definitive Joint Proxy Statement, which was dated October 31, 2008 and filed with the SEC on November 3, 2008 on Form DEFM14A and as a prospectus supplement on Form 424(b)(3) (together with the Proxy Registration Statement, the "Proxy").  Lewis further solicited approval of the merger through his recommendation as a member of BoA's Board of Directors to vote in favor of the merger, which repeatedly appeared throughout the Proxy.  In addition, Lewis signed BoA's false November 26, 2008 Proxy Supplement, which was filed with the SEC pursuant to

Rule 14a-b(6).  Lewis was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and was a signatory of BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.  Because of his senior position with the Company, Lewis possessed the power and authority to control the contents of the Merger Agreement, Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.

40.    Defendant Price was BoA's Chief Financial Officer ("CFO") during the Class Period.  Price signed the Proxy Registration Statement, and was also a signatory of the Secondary Offering Registration Statement by virtue of his having signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.  Because of his senior position with the Company, Price possessed the power and authority to control the contents of the Proxy, Proxy Supplements, Secondary Offering Registration Statement, BoA's press releases, investor and media presentations, and other SEC filings.

41.    Defendant Cotty was BoA's Chief Accounting Officer ("CAO") before the announcement of the merger.  Following the announcement of the merger, Cotty was appointed as Merrill's interim CFO, and acted as a direct liaison between BoA, including Lewis and Price, and Merrill.  Cotty simultaneously continued in his capacity as BoA's CAO.  Cotty signed the Proxy Registration Statement.  Cotty was also a signatory of the Secondary Offering Registration Statement when it was filed with SEC in 2006, and BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement.

17

42.    Defendant Thain was Merrill's CEO and Chairman of the Board from the beginning of the Class Period through December 31, 2008.  From January 1, 2009 through the end of the Class Period, Thain was the President of Global Banking, Securities and Wealth Management at BoA.  Thain signed the Merger Agreement on behalf of Merrill.  Thain also personally signed a cover letter for the materially false and misleading Proxy.  Because of his senior position with Merrill, Thain possessed the power and authority to control the contents of the Merger Agreement, Proxy and Merrill's press releases, investor and media presentations, and other SEC filings.  Defendant Lewis terminated Defendant Thain's employment with BoA on January 22, 2009.

**3.  BoA Board Defendants**

43.    Defendant William Barnet III ("Barnet") was a Director of BoA during the Class Period.  Defendant Barnet resigned from the BoA Board on July 31, 2009.

44.    Defendant Frank P. Bramble, Sr. ("Bramble") was a Director of BoA during the Class Period.

45.    Defendant John T. Collins ("Collins") was a Director of BoA during the Class Period.  Defendant Collins resigned from the BoA Board on July 29, 2009.

46.    Defendant Gary L. Countryman ("Countryman") was a Director of BoA during the Class Period.  Defendant Countryman resigned from the BoA Board on July 31, 2009.

47.    Defendant Tommy R. Franks ("Franks") was a Director of BoA during the Class Period.  Defendant Franks resigned from the BoA Board on June 17, 2009.

48.    Defendant Charles K. Gifford ("Gifford") was a Director of BoA during the Class Period.

49.     Defendant Monica C. Lozano ("Lozano") was a Director of BoA during the Class Period.

50.     Defendant Walter E. Massey ("Massey") was a Director of BoA during the Class Period.

51.     Defendant Thomas J. May ("May") was a Director of BoA during the Class Period.

52.     Defendant Patricia E. Mitchell ("Mitchell") was a Director of BoA during the Class Period.  Defendant Mitchell resigned from the BoA Board on June 3, 2009.

53.     Defendant Thomas M. Ryan ("Ryan") was a Director of BoA during the Class Period.

54.     Defendant O. Temple Sloan, Jr. ("Sloan") was a Director of BoA during the Class Period.  Defendant Sloan resigned from the BoA Board on May 26, 2009.

55.     Defendant Meredith R. Spangler ("Spangler") was a Director of BoA during the Class Period.  Defendant Spangler resigned in April 2009 from the BoA Board when she reached the age limit for board members.

56.     Defendant Robert L. Tillman ("Tillman") was a Director of BoA during the Class Period.  Defendant Tillman resigned from the BoA Board on May 29, 2009.

57.     Defendant Jackie M. Ward ("Ward") was a Director of BoA during the Class Period.  Defendant Ward resigned from the BoA Board on June 3, 2009.

58.     Defendants Barnet, Bramble, Collins, Countryman, Franks, Gifford, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward are collectively referred to as the "BoA Board" or the "BoA Board Defendants."

59.    The BoA Board Defendants participated in BoA Board meetings and conference calls, voted to approve the merger, including Merrill's bonuses, signed the Proxy Registration Statement, and solicited approval of the merger through the BoA Board's recommendation to vote in favor of the merger, which repeatedly appeared throughout the Proxy.  The BoA Board Defendants also signed the Secondary Offering Registration Statement at the time it was filed with the SEC on Form S-3ASR in 2006, signed BoA's Form 10-K filed with the SEC on February 28, 2008, which was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement, and were directors of the Company at the time of the filing of the Prospectus Supplement.  In their capacities as signatories of the documents set forth above, as well as by virtue of their authority to approve the merger and Merrill's bonuses and formally recommend in the Proxy that BoA's shareholders approve the merger, the BoA Board Defendants possessed the power and authority to control the contents of the Proxy, as well as BoA's press releases, investor and media presentations, and other SEC filings.

### 4.    **The Underwriter Defendants**

60.    Defendant Banc of America, a wholly owned subsidiary of BoA, was an underwriter for the Secondary Offering, selling 227,500,000 shares of common stock in the Secondary Offering.

61.    Defendant MLPFS, a wholly owned subsidiary of Merrill, was an underwriter for the Secondary Offering, selling 227,500,000 shares of common stock in the Secondary Offering.

62.    Defendants Banc of America and MLPFS are collectively referred to as the "Underwriter Defendants."

IV.    <u>OVERVIEW</u>

A.  **BoA Hastily Seizes The Opportunity To Acquire Merrill, And Agrees To Pay A Significant Premium For The Company**

63.    As *The Wall Street Journal* reported on September 15, 2008, Ken Lewis had "long coveted" Merrill.  Indeed, Merrill, a 94-year old pillar of Wall Street, possessed significant prestige and respect for which Lewis and the Charlotte-based BoA had "long clamored," and its acquisition was "the final piece" of Lewis's plan to make BoA the country's biggest bank by assets and arguably its most powerful financial institution, as Lewis himself acknowledged during an October 19, 2008 interview on *60 Minutes*:

| | |
|---|---|
| Question: | You always wanted Merrill Lynch. |
| Lewis: | We've always thought that was the best fit for us. |
| Question: | You were drooling for Merrill Lynch. |
| Lewis: | We have always thought it was . . . .  Yep. |

64.    As the financial markets collapsed in 2008, Defendant Lewis got the chance to acquire the company he coveted.  On Sunday, September 7, 2008, the U.S. Government seized the country's two largest mortgage companies, known as Fannie Mae and Freddie Mac, placed them into conservatorships, and agreed to inject as much as $100 billion into each institution to remedy its capital shortfall.  Days later, on September 11, 2008, American International Group, Inc. ("AIG") saw its stock price plummet 31% in the face of looming rating agency downgrades and resulting collateral calls, and immediately began negotiating a deal to, in effect, sell itself to the U.S. Government for $85 billion to avert imminent bankruptcy.

65.    The next day, Friday, September 12, 2008, it became clear that Lehman, one of Wall Street's most venerable institutions, would have to find a buyer or be forced to file for bankruptcy by September 15.  Lehman's bankruptcy – the largest in U.S. history – was certain to

further destabilize the financial markets by causing lenders to halt crucial daily funding to other financial companies with large exposure to similar mortgage-linked assets, leaving those companies vulnerable to collapse.

66.     As Merrill CEO John Thain realized, Lehman's bankruptcy would almost certainly trigger Merrill's own collapse.  Indeed, in a February 19, 2009 deposition taken by the New York Attorney General's office, Thain testified that he knew that Lehman's failure would likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008.  As Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill.   Accordingly, Thain immediately began searching for a buyer for Merrill.

67.     As Thain later stated, he knew that Lewis "always wanted" to acquire Merrill.  Thus, on the morning of Saturday, September 13, Thain called Lewis at his North Carolina home and said, "Ken, I think we should talk about a strategic arrangement."   Lewis, who had been rebuffed in several previous attempts to acquire Merrill, jumped at the opportunity, telling Thain he could meet him in New York that afternoon.

68.     By 2:30 p.m. that day, Thain and Lewis were sitting alone and face-to-face in BoA's corporate apartment in the Time Warner Center in New York.  Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America."   Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here.   I want to buy the whole company, not invest 9 to 10 percent.'"   Thain ultimately agreed to sell all of Merrill to BoA that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

69.     Accordingly, on September 14, 2008, only one day after Defendant Thain had first contacted Defendant Lewis to discuss a strategic investment, Defendant Lewis agreed on BoA's behalf to pay $50 billion for Merrill in an all-stock transaction whereby each share of Merrill would be exchanged for 0.8595 shares of BoA.  The agreement valued Merrill stock at $29 per share – a 70% premium to Merrill's $17 per share closing price on September 12.

**B.  BoA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End**

70.     Unbeknownst to shareholders and investors, BoA's and Merrill's senior officers spent a large portion of their limited time during the merger discussions negotiating the bonuses that Merrill's senior officers and employees would receive as part of the deal.  In fact, Defendant Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC. Defendants Lewis and Thain were involved in and kept continually apprised of these bonus negotiations.  Lewis negotiated the bonus agreement through Greg Curl, BoA's Vice Chairman of Corporate Development.  According to Thain's deposition testimony, he was kept informed of the negotiations, and all the terms of the agreement, through Greg Fleming, Merrill's President and Chief Operating Officer.

71.     According to a February 8, 2009 article in *The New York Times*, during these bonus negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone."  Subsequent media reports revealed that the list also provided for $30 million for Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai, President of Global Wealth Management Robert McCann, and General Counsel Rosemary

Berkery.  In total, Merrill sought the right to pay up to $5.8 billion in discretionary year-end and other bonuses to its executives and employees.

72.     Significantly, during these discussions, Merrill's senior executives also insisted that BoA agree to allow Merrill to <u>accelerate</u> payment of these bonuses so that they could be paid in December 2008 – before the merger was scheduled to close on January 1, 2009, and before Merrill's financial results for the fourth quarter became public.  This accelerated schedule deviated from Merrill's compensation practices and regular bonus schedule, under which annual bonuses were not even calculated, let alone paid, until January – <u>after</u> the close of the fiscal year.

73.     Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the merger Proxy, "pay for performance" was "the core of [Merrill's] compensation policy," and executive bonuses were "paid in January for performance in the prior fiscal year."  The March 2008 Proxy also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations."

74.     The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy – bringing Merrill to the precipice of collapse.

75.     Ultimately, BoA agreed to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger.  This highly material amount was

24

equal to <u>12% of the value of the merger</u>, and was in fact 26% <u>more</u> than BoA had earned during the first two quarters of 2008. It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

76.     The $5.8 billion in bonuses that BoA agreed to allow Merrill to pay was actually materially <u>greater</u> than the bonuses that Merrill itself had internally planned to pay prior to the collapse of the financial industry that occurred in the second half of 2008. Prior to the merger negotiations, Merrill had <u>reduced</u> its internally-projected bonus pool from $5.8 billion to $5.1 billion, or by 16.5%. Thus, the agreement with BoA permitted Merrill to pay bonuses that were at least $700 million greater than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

77.     BoA also permitted Merrill to pay these bonuses before the merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule. As Thain testified in his February 19, 2009 deposition: "The timing . . . was determined when we signed the merger agreement. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

78.     The acceleration of the bonuses was material to BoA shareholders and investors for several reasons. First, paying the bonuses in December meant that Merrill executives would be able to reap gigantic bonuses despite Merrill's 2008 financial performance.

79.     Second, the accelerated schedule eliminated any chance that BoA might reduce or eliminate Merrill's bonus payments once BoA assumed control of Merrill after the merger closed. As the Associated Press reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later." As Merrill's

executives knew, BoA's compensation policies were substantially less generous than Merrill's, making it likely that BoA would severely curtail Merrill's bonuses – especially if Merrill suffered large losses during the fourth quarter – unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated the other merger terms.  This was confirmed by BoA's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and BoA's – so big, in fact, that Smith gave "an example of someone in a role at Merrill that got paid three dollars, and that same role in Bank of America would have gotten paid one dollar."

80.    Third, paying billions of dollars in bonuses before the merger closed meant that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

81.    On *PBS Frontline*, Lewis stated that the bonuses were so large that they ruined the celebratory toast he had hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [of the merger process].  And frankly, it extends things to the point that I have never really been real happy by the time that champagne pours. Usually, you're mad at each other by then and you drink it politely and then leave. . . .  And that was about how I felt with this one."

**C.  Lewis Presents The Merger To Investors While Concealing The Bonus Agreement**

82.    On the morning of Monday, September 15, 2008, BoA and Merrill issued a joint press release in which they announced that BoA had agreed to acquire Merrill for $50 billion in stock in a deal scheduled to close on January 1, 2009.  In an investor conference call and press conference that day, Defendants Lewis, Thain, and Price made numerous statements designed to assure investors that the large premium was justified because Merrill was financially stable.

83.     For example, Lewis emphasized that BoA had conducted a "comprehensive[]" analysis of Merrill's financial condition, which had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much lower risk profile" than it previously possessed.  Lewis added that "we have very similar methodology valuations and we have very similar marks.  The structures – we're dealing with the same counterparties on things.  So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

84.     On September 18, 2008, the first day of the Class Period, BoA and Merrill each filed copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms.  The Merger Agreement did not say a word about the $5.8 billion in bonuses that BoA had agreed to let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the merger closed.  To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not, without the prior written consent of BoA:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

85.     Thereafter, between September 18 and November 3, 2008, when the definitive Proxy was filed with the SEC on Forms DEFM14A and 424(b)(3) and mailed to shareholders, BoA and Merrill continued to make numerous positive statements reassuring investors about their financial condition, the merger, and the combined company.  For example, on October 7, 2008, BoA conducted the Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion.  In the press release announcing the offering,

Lewis underscored BoA's "strength and stability," and stated that the merger "should significantly enhance our earnings." On a related investor and analyst conference call, Defendant Price, responding specifically to a question regarding any need for additional capital in connection with the merger, affirmatively stated that no new capital would be necessary.

86.    Similarly, on October 16, 2008, Merrill issued a press release in which Thain stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal."

87.    On October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to the "Troubled Asset Relief Program," or TARP. On October 19, 2008, Lewis appeared on *60 Minutes* and assured investors that BoA had actually benefited from the financial crisis because, in contrast to other banks, consumers were attracted to BoA's stability and thus were making deposits at a record pace, enhancing BoA's capital position. Lewis represented that the Merrill transaction proved that BoA's capital strength had enabled it to defeat and absorb weaker banks, and that BoA had "won" in its competition with "Wall Street."

88.    Lewis further stated that BoA did not need the TARP funding it had recently received, but that Secretary Paulson had forced Lewis to accept it with "no negotiations." Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and [] the right thing for America." In contrast to institutions that needed TARP funds to repair their capital bases, Lewis stated that BoA would "use [the TARP funds] to grow loans and to make more net income."

**D.  During October And November 2008, Merrill's Losses Grow To At Least $15.5 Billion Before The Shareholder Vote**

89.    Unbeknownst to BoA's shareholders and investors, throughout October and November 2008 – while BoA and Merrill were soliciting shareholder approval of the merger – Merrill was suffering undisclosed losses that were so large that they threatened the viability of Merrill, and were so severe that BoA could not absorb them and proceed with the merger.

90.    In October 2008, the first full month after the merger was announced, Merrill suffered losses of more than $7.5 billion.  As Thain admitted in his interview with *PBS Frontline*:

> If you look at what actually happened in the fourth quarter, <u>October was the worst month</u>, which is not surprising, because it comes right after the Lehman bankruptcy. <u>We lost about $7 billion in the month of October</u> . . . .  October was by far the worst.

91.    These losses were highly material.  The losses Merrill reported in the single month of October were greater than the "record" profit Merrill reported in the entire year of 2006.  In fact, after excluding quarter-end adjustments, these losses represented the greatest monthly loss in the company's history (and the second greatest monthly loss if such adjustments were included).  The losses were also almost three times greater than the $2.7 billion in pre-tax losses Merrill had suffered in September 2008 – the month that Lehman filed for bankruptcy and the markets collapsed, threatening Merrill's solvency and precipitating the sale of Merrill to BoA.  Significantly, over the course of the first three quarters of 2008, Merrill had lost an average of approximately $6.5 billion per quarter on a pre-tax basis.  The losses Merrill suffered in the <u>month</u> of October 2008 alone exceeded the average <u>quarterly</u> loss Merrill had reported in 2008 by roughly $1 billion.

92.    In November 2008, Merrill continued to suffer billions of dollars in losses.  According to an expert analysis of Merrill's weekly loss data for the fourth quarter – which was prepared by Congress to determine "what loss trends could reasonably be deduced from the loss

data available to [BoA's] decision makers" at the time – by November 14, Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

93.     Merrill's total pre-tax loss for the two months of October and November exceeded $15.5 billion – an amount that was substantially more than the record $12.8 billion pre-tax loss Merrill reported for the entire 2007 fiscal year.  As *The Wall Street Journal* reported on February 5, 2009, after reviewing an "internal document" which reported the losses, "<u>internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and December was looking even worse</u>."   In addition to this highly material $13.3 billion loss, according to a September 8, 2009 letter from the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans."   Merrill's Chief Accounting Officer, David Moser, has testified that on November 13, more than three weeks prior to the shareholder vote, he informed Defendants Price and Cotty that Merrill would take an approximately $2 billion goodwill writedown.  On November 20, Moser confirmed in an email that "we will be taking a significant writeoff of the goodwill … approximately $2.2 billion."  Including this $2.2 billion goodwill charge, Merrill's total losses by the end of November 2008 totaled at least <u>$15.5 billion</u>.

94.     Judged by any measure, Merrill's undisclosed losses were highly material to BoA shareholders and investors, as they brought Merrill to the brink of insolvency, and, as Lewis would publicly acknowledge when belatedly disclosing the taxpayer bailout, BoA could not absorb them without the government's assistance.   Indeed, Merrill's fourth quarter pre-vote

losses were substantially greater than the $5.8 billion BoA had earned through the first nine months of 2008, and more losses were expected before year-end.  Further, these losses were entirely unexpected by the investment community.  After Merrill highlighted the "significant progress in balance sheet and risk reduction" it had supposedly achieved in its October 16, 2008 press release, discussed above in ¶86, analysts had concluded that Merrill had significantly improved its financial condition in preparation for the merger with BoA.  Analysts' consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter <u>profit of</u> <u>$0.44 per share</u>.  For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse forecasted that Merrill would earn a fourth quarter profit of $0.63 per share and noted: "The strongest positive in the [third] quarter was the progress made on working down the investment bank's 'high risk' inventory. . . .  With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the <u>high risk positions came down an</u> <u>even more substantial 39%</u>."  That same day, Deutsche Bank forecasted that Merrill would earn a fourth quarter profit of $0.54 per share and reported, "Merrill's [third] quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America."  Similarly, on October 17, 2008, Buckingham Research Group reported that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter.  Likewise, on October 19, 2008, Oppenheimer concluded that Merrill "reported a '<u>clear the decks' style quarter with the major theme of de-risking the balance</u> <u>sheet</u> . . . ahead of the pending merger with Bank of America."

### E. BoA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote

95.    Defendants Lewis, Thain, Price, and Cotty knew of Merrill's losses as they occurred.  Indeed, Cotty became acting CFO of Merrill immediately after the merger was

announced, and acted as a direct liaison between Merrill and Defendants Lewis and Price.    In

addition, according to a February 8, 2009 *New York Times* article, "Bank of America, shortly

after the deal was announced, quickly put 200 people at the investment bank, including a large

financial team," to continuously monitor Merrill's financial condition.    As Thain wrote in a

January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America.  They learned about these
> losses when we did.  The acting CFO of my businesses was Bank of America's
> former Chief Accounting Officer.  They had daily access to our p&l [profit and
> loss statements], our positions and our marks.

96.    Moreover, Thain testified in his deposition taken by the New York Attorney

General that BoA executives not only had access to this detailed financial information, but

personally received regular updates as the fourth quarter progressed.  Thain testified that Merrill

held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief

financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what

was happening" throughout the fourth quarter.

97.    During Thain's *PBS Frontline* interview, he explained in greater detail that both

he and Merrill's senior executives, as well as BoA and its senior executives, all received daily,

"step-by-step" updates on Merrill's financial condition:

> Question:    And was Bank of America inside your books? . . .  Would they
> have known what was happening, what the projections were, how
> bad things actually were because of the Lehman collapse and what
> else had happened in the market?
>
> Thain:    <u>Yes, absolutely</u>. I believe in being totally transparent. They had
> acquired us. <u>We were completely transparent with them</u>. They had
> inserted the person who had been their chief accounting officer –
> he became the acting chief financial officer for the Merrill
> businesses. <u>We generate a daily profit and loss statement. They
> were getting that daily profit and loss statement, so they knew
> about the losses at the same time we did</u>.
>
> Question:    Which was when?

| | |
|---|---|
| Thain: | We get an update every day. |
| Question: | So they would have known all the way along? |
| Thain: | All the way along. |
| Question: | Step by step? |
| Thain: | Yes. |

98.     Indeed, BoA has admitted that it was aware of Merrill's financial condition.  As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said that 'we have not disputed that we were kept informed about the financial condition of the company.'"

99.     As set forth below at ¶¶145-148, although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware of the losses that occurred during October and November 2008.  Lewis was asked by one Representative whether BoA received "detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 15th?"  Lewis replied, "That is true."  The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . . ?  Isn't that true?"  Again, Lewis replied, "It is true."  At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that BoA stationed at Merrill immediately after the merger announcement reported Merrill's losses to Lewis before the shareholder vote.  Lewis responded, "I apologize if I haven't been clear.  The – we did have people there, and we did know that there were losses.  And that was clear both at our company and theirs."

100.     Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections.  I was getting a P and L at

Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

**F. Internal BoA Documents And Sworn Testimony Establish That Defendants Recognized That Merrill's Losses Should Be Disclosed In Advance Of The Shareholder Vote**

101.    Internal BoA documents and the sworn testimony of BoA executives establish that BoA's most senior officers were not only aware of Merrill's losses as they occurred, but immediately recognized how devastating those losses would be to the combined company. For example, on November 5, 2008, Cotty sent an email concerning Merrill's October results to Defendant Price with the striking notation: "Read and weep." Similarly, Merrill's Corporate Controller acknowledged in a November 9, 2008 email to Defendant Cotty how poor Merrill's results were, telling him that the "[n]umbers speak for themselves."

102.    On November 12, Defendants Price and Cotty received a forecast for Merrill's fourth quarter. In addition to setting forth Merrill's actual loss of $7.536 billion in October, the report stated that Merrill's fourth quarter losses were expected to be more than $8.9 billion pre-tax, or $5.4 billion after tax, assuming "no additional marks" or "other significant market dislocation items." These losses were so severe that they caused Defendant Price to immediately question whether they should be disclosed. "It prompted me to ask the disclosure question," Price testified to the SEC.

103.    Thus, that same day, Defendant Price informed BoA's General Counsel, Timothy Mayopoulos, that Merrill was forecasting a loss of approximately $5 billion after-tax for the quarter. Mayopoulos knew at once that BoA was likely required to disclose these losses to shareholders voting on the merger. As Mayopoulos testified to the New York Attorney General, he responded to this news by telling Price that "$5 billion is a lot of money," and "a disclosure was likely warranted."

104.     Similarly, BoA's outside counsel, Wachtell, concluded that Merrill's losses should be disclosed to investors.  After meeting with Price on November 12, Mayopoulos consulted Wachtell about disclosure of Merrill's losses.  According to the handwritten notes of Wachtell senior partner Eric Roth, Wachtell was told that Merrill "had a terrible October," and that "<u>ML lost $7B in October!</u>" (emphasis in original).  Roth's notes further show that Wachtell was asked, "do we have to get the # out?"

105.     According to Roth's notes, Wachtell conducted research on whether disclosure of Merrill's losses was required, and Roth reviewed a formal memo previously prepared by the firm which concluded that, under Section 14(a), "there <u>was a duty</u>" to disclose material facts arising after the issuance of a proxy.  (emphasis in original).  Significantly, as set forth in Roth's notes, Wachtell's research had concluded that BoA had a "duty to bring to sh. all info material to vote" "@ time of vote under federal proxy" law.

106.     The next day, November 13, Mayopoulos and other BoA in-house counsel met with Roth and other senior Wachtell partners to discuss disclosure of Merrill's losses.  At this meeting, as reflected in contemporaneous notes taken by Roth, BoA's in-house counsel and Wachtell agreed that Merrill's losses had to be disclosed prior to the shareholder vote.

107.     According to Roth's handwritten notes of this meeting, the lawyers discussed the fact that the consensus among analysts was for Merrill to report a profit for the fourth quarter, but that, unbeknownst to investors, Merrill would "be deep in the red."  In fact, according to BoA's own internal analysis of analysts' expectations at this time, the vast majority (9 out of 13) of analysts covering Merrill were forecasting the company to earn a profit for the fourth quarter of 2008.  For example, as BoA was aware, Credit Suisse was predicting that Merrill would earn a profit of $0.63 per share, Deutsche Bank was predicting that Merrill would report a profit of

$0.54 cents per share, and Oppenheimer was predicting that Merrill would report a profit of $0.32 cents per share. In fact, Deutsche Bank had raised its estimate for Merrill's fourth quarter results on October 16, 2008, after learning of Merrill's third quarter results, which reflected "a clean-up prior to its year-end merger with Bank of America."

108.    Roth's notes further show that, at this meeting, Mayopoulos recommended that "given ML's # – rec. both co. report [their financial results] week or so before" the vote. As Mayopoulos testified to the New York Attorney General, "I communicated to Wachtell that I believe my initial assessment was that a disclosure was warranted."

109.    Wachtell agreed that BoA was required to make a disclosure about Merrill's deteriorating financial condition. Significantly, as Roth wrote, the lawyers "all agree must be some discl[osure]" of Merrill's losses beyond what was in the Proxy. After discussing the contents of such a disclosure, the lawyers discussed the date for the disclosure and reached "consensus – 11/28!" because it was a "week before sh. meeting." (Emphases in original).

110.    That same day, November 13, Defendants Price and Cotty were informed by Merrill's Chief Accounting Officer, David Moser, that Merrill would take an approximately $2 billion goodwill writedown during the fourth quarter. That charge brought Merrill's actual pre-tax losses for the quarter incurred to date to more than $10 billion – and the quarter was not even half over.

### G.  As Merrill's Losses Mount, Defendants Acknowledge That Disclosure Of Merrill's Losses Would Cause Shareholders To Vote Against The Merger – And Abruptly Reverse Their Decision To Disclose The Losses

111.    On November 14, Defendant Price met with Defendant Thain. Although it had been agreed that Price would inform Thain of BoA's decision to disclose Merrill's financial condition before the shareholder vote, Price did not inform Thain that BoA's in-house and outside counsel had determined that a disclosure concerning Merrill's financial condition had to

be made.  Instead, according to the sworn testimony of Christopher Hayward, Merrill's Finance

Director, Price merely asked Thain "does Merrill plan to do any intra-quarter disclosure," to

which Thain responded "No."  Price did not discuss the issue further with Thain.

112.    By November 16, Defendants knew that Merrill's fourth quarter losses were

continuing to materially increase.  That day, Defendant Price emailed Cotty that Merrill "had a

pretax loss of $10.942 billion" for the fourth quarter, not including the approximately $2 billion

goodwill charge Merrill had decided it needed to take.  Thus, by November 16, Defendants Price

and Cotty knew that Merrill's losses for the fourth quarter would be at least $13 billion pre-tax,

and $8.5 billion after-tax.

113.    On November 18, Defendant Price met again with Mayopoulos to discuss

disclosure of Merrill's losses.  Significantly, Price did not tell Mayopoulos that Merrill's pre-tax

losses for the quarter had increased from $8.9 billion to $13 billion in the five days since they

had last met.  Instead, at the meeting, Price and Mayopoulos discussed the fact that disclosure of

Merrill's losses would impact shareholders' assessment of the transaction, and likely result in

shareholders voting the merger down.  As Mayopoulos testified, if Merrill's losses were

disclosed, "I knew there was a possibility that shareholders would vote down the merger."

Indeed, set forth prominently in the top right-hand corner of Mayopoulos's handwritten notes

from his meeting with Price was the question, underlined by Mayopoulos for emphasis: "What

happens if neg. shh vote"?

114.    Two days later, Price and Mayopoulos abruptly reversed course and decided that

BoA did not have to disclose Merrill's losses.  On November 20, Mayopoulos and Price met in

person, and spoke on the phone with senior Wachtell partners Ed Herlihy and Nicholas Demmo.

Once again, Defendant Price did not inform counsel that the losses were now in excess of $13

billion, including the $2.2 billion goodwill charge, leaving counsel with the impression that Merrill's losses were billions of dollars less than they truly were. Indeed, as Herlihy and Mayopoulos testified, at this time they still understood that Merrill's losses would only be $8.9 billion pre-tax (or approximately $5 billion after-tax) – or more than $4 billion less than what they actually were. They also had no idea that the losses had increased by nearly 50% in less than one week.

115.    At the meeting, Mayopoulos informed Herlihy and Demmo that no disclosure of these losses would be made. A principal basis for this determination was that Merrill's fourth quarter losses were supposedly not material because Merrill had suffered between $2 billion and $9.8 billion of after-tax losses in the last five quarters, and the $5 billion of after-tax losses which Mayopoulos had been told Merrill would report were within that range. Significantly, despite Price's knowledge of Merrill's true losses, he made no mention of the fact that Merrill's fourth quarter losses were more than $13 billion on a pretax basis, and $8.5 billion on an after-tax basis – or approximately 70% higher than Mayopoulos and Wachtell believed.

116.    Moreover, BoA's unsupported and arbitrary "materiality" analysis had no legal basis. As Mayopoulos admitted in his sworn testimony before the New York Attorney General, in reversing the prior decision to disclose Merrill's losses, neither he nor anyone else at BoA performed any legal research regarding BoA's disclosure duties. He did not read a single court decision or SEC rule, nor did he ask any in-house counsel at BoA to research the issue.

117.    In addition, upon changing their recommendation regarding disclosure, neither Mayopoulos nor Price asked Wachtell or any other counsel to opine as to BoA's disclosure responsibilities – notwithstanding the fact that, as of November 12, Mayopoulos, Price and Wachtell had already determined that some disclosure of the losses prior to the vote was

necessary.  As Herlihy testified before the New York Attorney General, "we were not disclosure counsel.  We never worked on any of their filings or disclosures relating to the filings."  Herlihy further testified that BoA did not request a legal opinion from Wachtell concerning BoA's reversal of its decision to disclose Merrill's losses.

### H.  As The Vote Approaches, Senior Management Is Informed That Merrill's Quarterly Losses Will Exceed $16 Billion, And Ignores Repeated Entreaties To Disclose The Losses

118.    Although BoA had unilaterally determined that Merrill's losses were supposedly immaterial so long as they were not the greatest quarterly loss in Merrill's history, by late November, Merrill's mounting losses caused Defendant Price to ask Mayopoulos to review the MAC clause in the Merger Agreement and advise him whether BoA had grounds to terminate the merger by invoking the MAC.  According to a February 5, 2009 article in *The Wall Street Journal*, "shortly before Thanksgiving," BoA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in its merger agreement."  The article further stated that the debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

119.    On December 1, Mayopoulos met with Defendant Price and Greg Curl (BoA's Vice Chairman of Corporate Development) to discuss whether BoA had grounds to invoke the MAC.  Mayopoulos informed Price and Curl that, based on the information that had been given to him (which was that Merrill's fourth quarter after-tax losses were expected to be $5 billion), he did not believe that BoA had grounds to invoke the MAC.

120.    Later that day, Defendant Cotty emailed updated loss figures to Defendant Price.  According to Cotty's email, Merrill's October and November losses now totaled approximately $12.7 billion pre-tax, excluding the $2.2 billion goodwill writedown of which they both knew.

Including that writedown, Merrill's total pre-tax losses for October and November <u>were now</u> <u>approximately $15 billion</u>.  Cotty's email also contained a forecast for Merrill to lose an additional $1 billion in December, bringing Merrill's pre-tax losses for the quarter to at least $16 billion.

121.    Certain BoA executives insisted that if the Company was not going to terminate the merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts.  According to the February 5, 2009 *Wall Street Journal* article quoted above, "<u>[t]here was disagreement inside the bank about whether to tell</u> <u>shareholders about Merrill's losses</u>," and this disagreement continued right up until "the night before the vote."  As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, <u>that investors should know about this before they vote</u>."

122.    Indeed, as Merrill's losses mounted, both BoA senior officers and Merrill's auditor concluded that Merrill's losses should be disclosed to shareholders voting on the merger so that they could cast an informed vote.  In late November, BoA Treasurer Jeffrey Brown told Defendant Price that "we should disclose" because "the losses were meaningful enough."  Price refused to do so.  In response, Brown warned him that he "didn't want to be talking through a glass wall over a telephone" if the losses were not disclosed – an admonition from one of BoA's own senior executives that the failure to disclose the losses could rise to the level of a criminal offense.

123.    Similarly, at approximately the same time, Merrill's auditor, Deloitte & Touche, recognized that Merrill's losses were sufficiently material that they warranted disclosure to shareholders.  According to the sworn testimony of Deloitte partner Thomas Graham, a "few

days prior to the vote," Graham and Deloitte supervisor Ven Kocaj informed Merrill's Chief Accounting Officer David Moser and Corporate Controller Gary Carlin that Merrill's losses were "material subsequent events to what occurred at the end of September that would be relevant for parties that were voting on [the merger]" and "sizable enough [to] probably warrant disclosure." As Graham further testified, he told Moser and Carlin that, "given the losses through what it looks like will be November when it closes, given the fact you have another couple of billion dollars coming down the road in goodwill impairment, we believe it's prudent that you might want to consider filing an 8-K to let the shareholders, who are voting on this transaction, know about the size of the losses to date."

124.    On December 3, two days before the shareholder vote, Defendants Lewis, Price, Cotty and Thain met specifically to discuss Merrill's staggering fourth quarter losses.  At this meeting, Cotty informed Lewis, Price, and Thain that Merrill's losses for November would be billions of dollars more than reflected in current forecasts – news that, according to Defendant Cotty's sworn testimony, created a "very somber environment."  After reviewing Merrill's loss information, Defendants Lewis and Price decided to revise Merrill's loss report to include an additional $2 billion of losses for November.

125.    The revised loss report, entitled "2008 4Q Pacing & FY Forecast Scenario," was circulated shortly after the meeting concluded.  The report set forth Merrill's November losses at more than $4.9 billion – or more than $1 billion per week – and stated that Merrill's total fourth quarter losses would exceed $14 billion, or approximately $9 billion after taxes.

126.    However, as these officers knew, even that report materially understated Merrill's losses.  As the first page of the revised 2008 4Q Pacing & FY Forecast Scenario report emphasized, it did not include any "goodwill writeoff," even though BoA's senior officers,

including Lewis and Price, knew that Merrill had decided in November to take a $2.2 billion goodwill writeoff. With the writeoff included, Merrill's expected fourth quarter losses were now more than $16.2 billion dollars on a pre-tax basis, and more than $10.5 billion on an after-tax basis – exceeding even the unsupported range that BoA had set for disclosure of Merrill's losses on November 20. Moreover, BoA's and Merrill's most senior officers now knew, two days before the shareholder vote, that Merrill's pre-tax losses for October and November alone would be at least $15 billion, and that the fourth quarter of 2008 was already by far the worst quarter in Merrill's history.

127.    After receiving this revised loss report on December 3, Price met with Mayopoulos concerning an unrelated litigation. At the end of that meeting, Price casually mentioned to Mayopoulos that "there had been revisions to the $5 billion after-tax forecast for Merrill Lynch's fourth quarter results." Although Price knew that Merrill's revised fourth quarter losses were now more than $10.5 billion after taxes and had exceeded even BoA's threshold for disclosure, Price misled Mayopoulos into believing that Merrill's losses were billions of dollars less. Specifically, according to Mayopoulos's sworn testimony before the New York Attorney General, the SEC, and Congress, Price informed Mayopoulos that Merrill's losses were only "$7 billion after taxes." Based on the false and incomplete information provided to him by Defendant Price, Mayopoulos again concluded, without performing any legal analysis or consulting outside counsel, that no disclosure needed to be made to shareholders voting on the transaction on December 5.

128.    As set forth more fully below at ¶¶139-142, when Mayopoulos learned days after the shareholder vote that Merrill's expected fourth quarter losses were materially higher than Price had informed him and sought to confront Defendant Price about this discrepancy,

Mayopoulos was immediately terminated without explanation, and escorted from BoA's premises.

129.    At the same time that Merrill was collapsing, BoA's own financial condition was materially deteriorating to the point where, as Lewis acknowledged when he sought the taxpayer bailout, BoA would be unable to absorb the losses suffered by Merrill.  As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the merger, BoA had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion – the first quarterly loss in BoA's history.  In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted BoA's own financial deterioration, writing that, "[a]s they [BoA senior executives] themselves noted the other night at our meeting, even on a standalone basis, the firm is very thinly capitalized," BoA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

### I.    While Merrill Deteriorates, The Billions In Merrill Bonuses Are Finalized

130.    While the financial condition of Merrill deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees.  According to Thain's deposition testimony, in early November 2008, he and BoA's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion.  On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review.  Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote;

employees would be informed of their bonuses on December 22; and employees would receive their cash awards by December 31.  On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

131.    Throughout this process, BoA's senior executives knew of the size and timing of the bonus payments.  As Thain stated to *PBS Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

### J.   <u>BoA And Merrill Issue The Materially False And Misleading Proxy</u>

132.    Notwithstanding the facts set forth above, the Proxy failed to disclose at any time before the shareholder vote on the merger <u>any</u> information about the billions of dollars in losses that had been suffered by either Merrill or BoA during October and November.  The Proxy also failed to disclose that Merrill would pay billions of dollars of bonuses before the merger's scheduled closing date, the payment of which further weakened Merrill's financial condition.

133.    On November 3, 2008, the Proxy was filed with the SEC on Forms DEFM14 and 424(b)(3) and mailed to shareholders.  The Proxy made no mention of the $7.5 billion in fourth quarter losses that Merrill had suffered by this date.

134.    The Proxy also affirmatively misrepresented that Merrill would <u>not</u> make any discretionary bonus payments before the merger closed on January 1, 2009.  Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch <u>will not</u>" pay any compensation that was "not required."  In addition, the Merger Agreement, which was attached to the Proxy as Appendix A, repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K, described above at ¶84.  Moreover, by incorporating Merrill's prior SEC filings, including the March 2008 Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual

bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance," as set forth above at ¶73.

135.    Section 14(a) and Rule 14a-9 required BoA to disclose all material facts to allow BoA shareholders to make an informed decision on the merger, and to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events.    By failing to disclose information regarding Merrill's fourth quarter 2008 losses in advance of the shareholder vote, and by failing to disclose the bonus agreement, Defendants violated the federal securities laws.

136.    Significantly, in the weeks after the Proxy was mailed to shareholders, BoA and Merrill updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or BoA, or the accelerated bonus payments.  Specifically, on November 21, 2008, BoA and Merrill each filed a Form 8-K pursuant to SEC Rule 425, updating the Proxy to disclose that they had settled certain derivative litigation relating to the merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the merger – without disclosing any information concerning Merrill's losses, the secret bonus agreement, or BoA's own deteriorating financial condition.

137.    Then, on November 26, 2008, with the vote less than ten days away, BoA again supplemented the Proxy with the stated purpose of bolstering BoA's stock price, by filing a letter from Lewis to shareholders pursuant to Rule 14a-6(b) that assured shareholders that BoA's financial condition remained extremely strong despite the upheaval in the market.  In that letter, which was written specifically to address investors' "deep concerns about . . . whether financial institutions have enough capital," Lewis represented that BoA was "one of the strongest and

most stable major banks in the world," as well as "one of the most liquid banks in the world." Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above, including either the secret bonus agreement or Merrill's staggering losses.

138. On December 5, 2008, BoA shareholders convened in Charlotte, North Carolina to vote on the merger, while Merrill shareholders convened in New York. BoA and Merrill shareholders voted in favor of the merger. Lewis represented that the merger was the crowning event in BoA's corporate history, noting that, "it puts us in a completely different league."

### K. Almost Immediately After Shareholders Approve The Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses Are Materially Higher Than What He Has Been Told, Seeks To Confront Price About That Discrepancy, And Is Immediately Fired

139. On Tuesday, December 9, 2008, the second business day following the shareholder vote, Defendants Lewis and Price met with the BoA Board to discuss Merrill's deteriorating financial condition. At the meeting, Defendant Price presented to the Board the $14 billion pre-tax loss figure ($9 billion after-tax) that Defendants Price, Lewis, Thain, and Cotty discussed on December 3, which still failed to include the $2.2 billion goodwill writedown. At that meeting, Price acknowledged that Merrill's massive fourth quarter losses were material to investors, stating that the "magnitude" of the losses was "quite significant."

140. Mayopoulos, who attended the December 9 Board meeting, testified that he was "surprised" by the size of the loss, as he had been told by Price on December 3 that Merrill's losses were only $7 billion. As a result, after this meeting, Mayopoulos sought to confront Price about the fact that Merrill's pre-vote losses were materially greater than Price had represented to him. According to Mayopoulos, he "want[ed] to talk to him [Price] about what's changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not." However, Mayopoulos was told that Price was unavailable for the rest of the day. Mayopoulos decided to meet with Price the next day.

141.     The next morning – before Mayopoulos could speak to Price – Mayopoulos, who had served as BoA's General Counsel for five years, and who had been told by Defendant Lewis on September 14, 2008 that he would be the General Counsel of the combined company, was summarily terminated without explanation, instructed to leave his personal effects behind, and immediately escorted from BoA's headquarters.  Mayopoulos was replaced as General Counsel by Brian Moynihan, who had not practiced law in 15 years, did not have an active license to practice law, and was promoted to another executive position within weeks of replacing Mayopoulos.

142.     Mayopoulos later testified to Congress:

> I was stunned. I had never been fired from any job, and I had never heard of the general counsel of a major company being summarily dismissed for no apparent reason and with no explanation.
>
> *          *          *
>
> I could not understand why I was dismissed so abruptly. I was surprised that I was given no opportunity to say goodbye to my colleagues and staff, and why there was no orderly transition of my work to Mr. Moynihan. No one, including Mr. Moynihan, ever contacted me to discuss what I had been working on.  Nearly a year later, I still do not know why I was terminated, who was involved in the decision to do so, or what their reasons or motivations were.

**L.  Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him**

143.     On December 12, 2008, one week after BoA shareholders voted to approve the merger, Defendants Lewis and Price received a report showing that Merrill would report a pre-tax loss for the quarter of at least $18 billion.  As a result, according to a February 5, 2009 *Wall Street Journal* article, Defendant "Lewis told Bank of America directors in a conference call that the bank might abandon the acquisition, which was supposed to close in two weeks."

144.     Thereafter, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that BoA had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis's deposition testimony.   Secretary Paulson

immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal Reserve.

145.    On the evening of December 17, 2008, Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and other Treasury and Federal Reserve officials.  Lewis began the discussion by reporting the dire financial condition of the combined company.  Lewis stated that BoA was projected to lose $1.4 billion in the fourth quarter – the Company's first quarterly loss in its history.  Lewis then reported that Merrill's massive fourth quarter losses were so large that they would materially impact BoA's tangible common equity and Tier 1 capital ratios.  Defendant Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses for the quarter of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes.  Lewis stated that BoA had concluded that a material adverse change had occurred in Merrill's financial condition, and that it would terminate the merger pursuant to the MAC.  In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

146.    Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for BoA and Merrill.  In response, Lewis raised the idea of BoA receiving a taxpayer bailout – including a "Citi-type" guarantee on $50 billion of assets – to proceed with the transaction, according to Price's handwritten notes.  Secretary Paulson asked for time to allow the Treasury and Federal Reserve to analyze the situation.  Lewis agreed to supply the Federal Reserve with information on Merrill's and BoA's fourth quarter performance and risk exposures, and to wait to hear back from

the regulators before taking further action.  Following this meeting, Lewis provided the regulators with the current and prior loss forecasts that BoA executives had been receiving throughout the fourth quarter.

147.  After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses.  As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email: "This claim is not credible."  On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise[]" was dubious:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter – albeit picking up significant[ly] around mid-November and carrying into December – Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect.

148.  Senior Federal Reserve officials repeated this conclusion in the Federal Reserve Merger Analysis, which stated:

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, [BoA] management's contention that the severity of [Merrill's] losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.

149.  According to the Federal Reserve Merger Analysis, BoA should not have been surprised by Merrill's losses because Merrill's largest risk exposures were well known to BoA. As that Analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "large losses stemming from exposures to financial guarantors."  These exposures and losses, Federal Reserve officials concluded, "were

49

clearly shown in Merrill Lynch's internal risk management reports that [BoA] reviewed during their due diligence."  In addition, Federal Reserve officials concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BoA] itself is also active in [] these products."

150.    The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BoA] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

151.    As noted above, evidence emerging as a result of federal and state investigations of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-December 2008.  Among other things, before the shareholder vote, BoA's executives (i) were fully aware that Merrill would report a loss for the fourth quarter of at least $16.2 billion; (ii) were so concerned with the magnitude of these losses that they discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were found not to be credible by senior government officials when they claimed that Merrill's losses and goodwill writedowns were "surprising," and had not materialized until after the shareholder vote.

152.    On December 19, 2008, Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Federal Reserve officials.  According to Defendant Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses in excess of $21 billion pre-tax, and that BoA would likely invoke the MAC.  Notably, the additional losses consisted principally of the $2.2 billion goodwill charge that BoA's senior management had been aware of since mid-November.  Secretary Paulson asked

Lewis what needed to be done to have the deal proceed.  Lewis raised two possibilities: the government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BoA.

153.    Price's handwritten notes show that Federal Reserve officials unequivocally told Lewis that a decision by BoA to invoke the MAC would reveal that BoA's prior statements about the benefits of the merger were false, and would cause the market to seriously question BoA's financial condition and the judgment of its management.  Chairman Bernanke testified before Congress that he told Lewis that "an attempt [by BoA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capacity to consummate significant acquisitions, its overall risk management processes and the judgment of its management."

154.    On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further.  Secretary Paulson bluntly told Lewis that the Federal Reserve would remove BoA's senior management if it tried to terminate the transaction.  According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America.  I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

155.    The threat to fire Lewis had its intended effect.  Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [BoA] were going to call the MAC."  After receiving this threat, Lewis reversed course.  As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

156.    That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BoA would proceed with the merger and would work with federal regulators on designing a bailout package.  Lewis made the decision to proceed with the merger even though he knew that the impact of Merrill's losses would harm BoA shareholders.  Specifically, at his deposition, Lewis was asked whether BoA's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them.  He responded that BoA's investors were harmed over the "short term," which he defined as "[t]wo to three years."

157.    Recognizing that his conduct would likely result in legal liability for misleading shareholders, Lewis next took the extraordinary step of trying to obtain protection from the Government against shareholder suits.  According to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]."  Thus, Lewis had asked Bernanke "whether he could use as a defense that the [Government] ordered him to proceed for systemic reasons."  Bernanke told Lewis "no."

158.    Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors could formally advise Lewis that invoking the MAC was not in the best interests of BoA, and whether Lewis could use such a letter as a defense from suit.  Alvarez responded that such a letter was not "appropriate."  Alvarez also underscored that Lewis faced liability for BoA's lack of disclosures to shareholders in advance of the shareholder vote.  Alvarez wrote:

Management may be exposed if it doesn't properly disclose information that is material to investors. There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . <u>His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BoA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December</u>.

159.     In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, <u>some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [BoA] made for the shareholder vote.</u>

## M. With BoA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout

160.     Ultimately, in order to proceed with the merger, Lewis requested and obtained a $138 billion taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of preferred stock, which diluted the ownership interests of other BoA shareholders, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill. In a BoA Board meeting on December 22, 2008, Lewis and Price told the BoA Board that Government officials had agreed to this bailout package. According to the meeting minutes, Lewis informed the BoA Board that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets"; that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation"; and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of

53

the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

161.    Lewis also made clear that management's recommendation to proceed with the merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

162.    After Lewis informed the BoA Board that the federal government had "confirmed that they will provide assistance to the Corporation," Lewis deliberated over "the importance of the timing of the announcement of the commitment of the Fed and Treasury."  Recognizing the material risk that BoA would be severely downgraded by credit rating agencies and that shareholders would demand that the merger be terminated if BoA disclosed the Government bailout before the merger closed – and knowing that, if the merger failed, he would be fired – Lewis made the conscious decision not to disclose the bailout until after the merger closed. Specifically, when Lewis learned that the Government would have to disclose that it was providing funding to BoA if the Government's commitment was reduced to writing, Lewis immediately advised the BoA Board that the Company would not enter into a written agreement because it could not complete the merger if this information was disclosed in advance of the merger's close.  On December 22, 2008, Lewis sent the following email to the Board with the subject "Privileged and Confidential to Board of Directors," evidencing his desire to conceal this information until after the merger was complete:

I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, <u>of course, we do not want</u>.

163.    On December 30, 2008, Lewis and Price met with the BoA Board to update them concerning the U.S. Government's commitment, and further underscored that the deal with the U.S. Government was firm and detailed.    According to the minutes of this meeting, "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators."  Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation."  Price "reported that he had confirmed to Mr. Bernanke and Mr. Paulson the reliance of the Board and management on the federal regulators' assurances."  Lewis added that:

> management of the Corporation had <u>clearly explained to the federal regulators the terms and conditions required</u> by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009.  In return, he reported, management has received <u>strong assurances from all relevant federal regulators and policy makers</u> that the Corporation will receive adequate and appropriate assets to <u>neutralize the impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009</u>.

164.    Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize the impact . . . resulting from the Corporation's acquisition of Merrill Lynch," Lewis again determined to withhold this information from BoA shareholders and investors.  According to the minutes of the BoA Board's December 30, 2008 meeting: "Mr. Lewis explained that written assurances would not be received <u>before January 1, 2009</u>" – the date the merger was scheduled to close – precisely "because any written assurances would require formal action by the Fed and Treasury, <u>which formal action would require public disclosure</u>."  Notes from that

meeting reflect that Lewis told the Board that BoA could not disclose the bailout, because it would "disrupt" the close of the merger. According to these notes, BoA was "Treating [the agreement] very close – Don't want leak."

165. Accordingly, rather than disclose information about the Government bailout at that time, BoA determined to announce it "in conjunction with [BoA's] earning release on January 20, 2009," weeks after the merger was set to close.

### N. Internal BoA Emails Establish That, At The Same Time BoA's Senior Officers Decided Not To Disclose The Bailout Prior To The Merger's Close, They Internally Acknowledged That The Market Was Being Misled As To Merrill's True Financial Condition

166. Significantly, at the same time Defendants Lewis and Price were obtaining the taxpayer bailout, BoA's senior officers and BoA's counsel were acknowledging internally that the failure to disclose the bailout and Merrill's losses was affirmatively misleading the market, which had "no inkling" that Merrill had suffered such devastating losses. These same emails make clear that BoA's senior officers knew that disclosure of this information would cause the deal to "fall apart," and "confirm [the] materiality of the fourth quarter losses."

167. On December 17, 2008, the same day that Lewis approached the government for the bailout, Jeff Brown, BoA's Treasurer, sent Defendant Price an email regarding a conversation he had had with Standard & Poor's. Brown made clear that he was "concerned" that S&P had no idea of Merrill's true financial condition:

> What concerns me is that they are not expecting poor results from ML this quarter and he [S&P] said the ratings committee noted substantial improvements in ML risk/balance sheet management.
>
> *       *       *
>
> But in light of ML's 4Q performance that we know relative to what they know …. This could be an issue and result in another downgrade. This is just my view, but they clearly think ML is more healthy than they are and that they have shed the worst risks.

168.    Brown further noted in that email that S&P believed that BoA was in significantly better shape than its competitors because, unlike them, BoA did not need government assistance:

> They are also moving to a new approach to assess relative ratings in this environment.  Basically all this means is that there are different rankings within a particular rating – ie) we are A+; another institution may have the same headline but be worse-off on a relative basis since they may need government programs to survive.  The view of S&P is that we do not need government assistance ... ie) we are now A+ regardless.  He noted that previously 5 institutions on a global basis were rated at the same or higher than BAC.  Now there are only 3 intuitions [sic] that would be considered higher and 2 of those were domestic (I presume WFC and JPM).

169.    Similarly, on December 17, 2008, Brown received an email from a member of BoA's Corporate Treasury Department regarding a conversation she had had with Moody's.  According to that email, Moody's had stated in this meeting that "you guys [BoA] are getting a great deal on this acquisition.  We think very highly of the Merrill franchise."  The email concluded with the sarcastic comment, "So, we have that going for us."

170.    Despite the fact that Brown had again expressed his "concerns" that the market was being misled, Defendant Price took no action.  Thus, two days later, on December 19, Brown forwarded the email he had received on December 17 directly to in-house disclosure counsel at BoA.  Brown wrote the following on that email:

> Moody's comment on the deal – again another sign agencies don't know what is coming.

171.    In-house counsel immediately forwarded Brown's email to Wachtell.  Wachtell then spoke to both Brown and BoA's in-house counsel.  According to notes of that December 19 discussion that were taken by Wachtell senior partner Peter Hein, the parties agreed that the failure to disclose Merrill's massive losses had resulted in a "fundamental issue of lack of credibility" with the market.  Significantly, the parties also agreed that, if those losses were

disclosed prior to the merger close, it would cause rating agency downgrades, resulting in the deal falling apart, and confirming the materiality of Merrill's undisclosed losses:

> Fundamental issue of lack of credibility with rating agencies to whom Target may not have disclosed the ever increasing losses for the fourth quarter; if Target now belatedly makes that disclosure, likely to have adverse impact on perception of rating agencies (who do not have an inkling this is coming); such a rating agency reaction would, if such reaction occurred after deal fell apart, presumably confirm materiality of the fourth quarter losses[.]

172.    These emails show that, at the time that BoA's most senior executive officers decided not to disclose the taxpayer bailout and Merrill's losses, they knew that (i) this information was highly material to investors; (ii) the market had no idea that Merrill had suffered such massive losses in the fourth quarter; (iii) disclosure of these material facts before the merger closed would inevitably cause rating agency downgrades and result in the deal falling apart; and (iv) the market was being misled by the failure to disclose these facts.  Indeed, on December 22, 2008, only five days after Brown informed Defendant Price that BoA's ratings depended on keeping the rating agencies in the dark about Merrill's losses and the need for the bailout, Lewis told that BoA Board that "of course, we do not want" public disclosure of these facts.

**O.    The Merger Is Consummated While Defendants Lewis And Price Continue To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout**

173.    By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter.  On that day – its last as an independent company – it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to BoA shareholders.

174.    On January 1, 2009, BoA closed its purchase of Merrill without ever disclosing to investors that (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) BoA had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the

combined company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse.

175.    Based on BoA's representations to the market as of that date, analysts had previously estimated that BoA would independently report earnings of $0.08 per share for the fourth quarter of 2008.    A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy.    Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told.    Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

## P. **The Prices Of BoA Securities Plummet As The Truth Emerges**

176.    News that Merrill and BoA would report much higher losses than expected began to leak into the market by no later than Sunday, January 11, 2009, when a Citigroup analyst forecast fourth quarter losses at Merrill to be $6 billion, including $7 billion in writedowns on Merrill's "high risk assets," and further wrote that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share.    In response, shares of BoA stock fell from $12.99 at the close of the market on the prior trading day to $11.43 on Monday, January 12, 2009 – a 12% drop.

177.    According to a June 1, 2009 article in the *Sydney Morning Herald*, on January 14, 2009 in Sydney, which was January 13 in New York, Merrill executives in Australia had informed Australian bond traders that Merrill was going to report "awful" news that was going to cause the market to "plummet" on January 15, 2009.    One trader reported that he was told that

the "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night," and that the news would "start to leak out." BoA shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009 on heavy volume.

178.    On the morning of January 15, 2009, *The Wall Street Journal* shocked investors with news that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co.," citing larger-than-expected but unquantified fourth quarter losses at Merrill. In response, BoA announced that it was moving its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned. The price of BoA stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009, on extremely heavy trading volume – an 18% drop which left BoA's share price at an 18-year low.

179.    During a BoA Board of Directors meeting on January 15, 2009, BoA director Gifford sent an email to fellow director May stating "it's screw the shareholders!!"

180.    On the morning of January 16, 2009, the Treasury Department issued a press release disclosing the Government bailout of BoA. Later that morning, *The Wall Street Journal* published an article entitled "Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury to Inject $20 Billion More: Stock at 1991 Level," in which it speculated that Merrill's losses "could total in excess of $10 billion," and further reported that:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan. Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991 . . . . Thursday's 18% stock-market drop gives the Charlotte, N.C. bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill. Its shares have lost over 40% of their value in the past seven trading sessions. The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't

discover the problems prior to the Sept. 15 deal announcement. <u>Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.</u>

181. Later that morning, BoA disclosed that (i) Merrill had suffered a fourth quarter after-tax net loss of $15.31 billion, or more than $21 billion before taxes, which accounted for more than 55% of Merrill's full year after-tax loss of $27 billion; (ii) BoA had suffered its own net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government was injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional preferred stock. With the fourth quarter losses, Merrill had lost a staggering ($24.44) per share for the year, and ($9.62) per share for the quarter, far below the fourth quarter <u>profit</u> for Merrill that the market had been led to expect. Similarly, BoA's own losses meant that it had lost ($0.48) per diluted share, a far cry from the $0.08 per share <u>profit</u> that analysts expected. In addition, BoA announced that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per share.

182. The $24 billion of preferred shares that BoA was required to sell to the U.S. Government under the terms of the bailout carried an 8% dividend rate, which would require BoA to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BoA common stock by approximately thirty cents per share for 2009. Further, BoA was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee – all of which further reduced its future earnings and diluted the value of its common stock. In addition, BoA's acceptance of this Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a

status that was so unique that, apart from BoA, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected BoA to additional Government oversight and restrictions.

183.     On the January 16, 2009 conference call to discuss these results, Lewis admitted that BoA was unable to absorb Merrill's losses without the taxpayer bailout:

> We went to our regulators and told them that we would not – that we could not close the deal without their assistance. As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

184.     Analysts and the financial press reacted with astonishment. On January 16, Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [Government] involvement."

185.     As Lewis admitted on *PBS Frontline*, "The magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."

186.     After the close of markets on January 16, 2009, as Defendant Price had been told would happen prior to the close of the merger, Moody's downgraded BoA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

187.     On Saturday, January 17, 2009, *The New York Times* published a lengthy article describing Merrill's massive losses as "devastating" and revealing that BoA's management had contemplated exercising the MAC after the vote but prior to the closing of the merger, and was

dissuaded by the Government from doing so. In addition, *The Wall Street Journal* reported that BoA's own weakened financial condition contributed to the need for Government aid.

188.    The next trading day, Tuesday, January 20, 2009 (following the weekend and the Martin Luther King, Jr. holiday), J.P. Morgan reported that BoA's fourth quarter losses were "enormous," adding:

> [BoA] announced a major agreement with the U.S. government that reflected primarily the poor acquisition of [Merrill] done without due diligence as well as some assets from its own weakening portfolio. [Merrill] over-represented its value given its large amount of high risk assets and the level of permanent dilution for [BoA] from the acquisition will likely be higher.

189.    In direct response to these disclosures, BoA shares fell from $8.32 per share, their opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 – a drop of 38.7% on extremely heavy volume over two days of trading.

190.    In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about this materially adverse information, BoA stock plummeted from $12.99 to $5.10 – a decline of 60% – causing a market capitalization loss of over $50 billion. Even at this price, BoA common stock, Preferred Securities, and Debt Securities all remained artificially inflated because news of the massive, accelerated bonuses had yet to be disclosed.

191.    Then, on January 21, 2009, just before midnight, the *Financial Times* broke the story of Merrill's accelerated bonus payments, reporting that Merrill had taken "the unusual step of accelerating bonus payments by a month last year." Although the amount of the bonuses was not public, the *Financial Times* further reported that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December," before the merger closed. According to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as "ridiculous," especially in light of Merrill's losses.

192.    After the *Financial Times* broke the news of Merrill's bonus payments, on the morning of January 22, 2009, Defendant Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job.  According to Thain's *PBS Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

193.    On January 22, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

194.    The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments – as well as the fact that they were paid amidst historically large losses – was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitated in part by "[v]itriol . . . over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated."  Similarly, the *Charlotte Observer* reported that "Thain's departure follows a raft of damaging revelations in recent days, including bigger-than-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed."  The *Los Angeles Times* reported on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the Associated Press reported that "on

Thursday came the news that [Lewis] didn't block Merrill management's decision to dole out billions of dollars in early bonuses even as [Lewis] was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

195.    Even after the *Financial Times* report, BoA and Merrill steadfastly refused to disclose or confirm the size of the bonuses.  As the *Charlotte Observer* reported on January 23, 2009, BoA still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

196.    The news of Merrill's bonus payments immediately triggered an investigation by the New York Attorney General.  On January 23, 2009, *The New York Times* reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized . . . as 'large, secret last-minute bonuses.'"  In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.

> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

197.    In response to the disclosure of Merrill's enormous, accelerated bonus payments, BoA stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009.  All told, BoA common stock fell 56% – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 – in response to these belated disclosures, destroying tens of billions of dollars in

shareholder value.  Similarly, the price of BoA's Preferred Securities fell by over 30% in the aggregate, while the Debt Securities likewise fell by 6.4% in the aggregate during this same time period.

**Q. Post-Class Period Events**

198.    The fallout from the revelations described above has been immense, resulting in additional civil and criminal investigations at both the federal and state levels.  In addition to the New York Attorney General's investigation, which resulted in a complaint being filed on February 4, 2010 against BoA, Lewis, and Price charging them with securities fraud, a similar investigation was initiated by the Attorney General of North Carolina to determine whether, among other things, Merrill and BoA had violated that state's laws against fraudulent transfers and civil racketeering.  Neil Barofsky, the TARP Inspector General, also opened a probe.

199.    Additionally, in January 2009, although it would not be disclosed to shareholders until mid-July 2009, the Federal Reserve and the Office of the Comptroller of the Currency downgraded the overall rating of BoA from "fair" to "satisfactory."  A letter sent by Federal Reserve officials explaining the action criticized BoA's management and directors for being "overly optimistic" about risk and capital.  As the letter explained, "Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future."  As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on BoA that, among other things, required it to address its problems with liquidity and risk management.

200.    On February 10, 2009, the New York Attorney General wrote a letter to Congress providing details on Merrill's accelerated bonus payments.  The letter detailed how Merrill's accelerated bonus schedule had allowed it to disproportionately reward its top executives despite

its massive losses – actions which the New York Attorney General described as "nothing short of staggering."  In particular, the New York Attorney General stated that:

> While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals.  Indeed, Merrill chose to make millionaires out of a select group of 700 employees.  Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group of <u>top executives what can only be described as gigantic bonuses</u>.

201.    Among the statistics that the New York Attorney General set forth were that (i) "[t]he top four bonus recipients received a combined $121 million"; (ii) "[t]he next four bonus recipients received a combined $62 million"; (iii) "[f]ourteen individuals received bonuses of $10 million or more and combined they received more than $250 million"; and (iv) "[o]verall, the top 149 bonus recipients received a combined $858 million."

202.    On April 29, 2009, at the Company's annual meeting, BoA shareholders voted to strip Lewis of his position as Chairman of the BoA Board in a vote that analysts deemed a rebuke to Lewis's conduct in connection with the merger.  *BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties."  At the shareholder meeting, Lewis conceded that BoA's shareholders "have carried a heavy burden" as a result of the Merrill acquisition.

203.    On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Federal Reserve.  BoA was deemed to need an additional $33.9 billion of Tier 1 common capital – far more than any other of the 19 banks tested.

204.    Beginning in May 2009, several members of BoA's Board of Directors resigned, including its lead independent director, O. Temple Sloan Jr., and Jackie Ward, chairman of the Board's asset quality committee.  Other departures included Chief Risk Officer Amy Woods Brinkley, and J. Chandler Martin, an enterprise credit and market risk executive.

205.     In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearings on the merger, with a particular focus on Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout.  During Lewis's testimony on June 11, 2009, Representative Dennis Kucinich told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008."  Representatives Peter Welch and Elijah Cummins both repeatedly pressed Lewis on the lack of disclosure to shareholders.  As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

206.     On August 3, 2009, the SEC filed a complaint against BoA in the United States District Court for the Southern District of New York, alleging that BoA had violated Section 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement.  That same day, the SEC announced that BoA had agreed to settle the action and pay a $33 million fine.

207.     As the SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without BoA's consent, in fact, BoA had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the

contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

208.    During the SEC's investigation, Merrill's most senior human resources executive, Peter Stingi ("Stingi"), whose responsibilities included monitoring the annual bonus pay of Merrill's competitors, acknowledged that the compensation expense set forth in Merrill's financial statements did not disclose Merrill's bonus plans.  Specifically, Stingi testified under oath that:

> We would not be able to see what our competitors' quarterly [bonus] accruals were because they like us would report their compensation and benefits expense [as an aggregate] . . . .  [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense.

209.    The day after the SEC filed its complaint, Representative Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch."  Representative Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that "our investigation has revealed . . . [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violations for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote."

210.    On September 8, 2009, the New York Attorney General sent a letter to BoA's outside counsel, which summarized the results of the New York Attorney General's investigation

and stated that it was in the process of "making charging decisions with respect to Bank of America and its executives."  The letter provided that, "<u>The facts of [Merrill's] cascading losses and bonus payments – and the facts of Bank of America's senior executives' knowledge of these events – are straightforward</u>."  The letter further provided that, "Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew"; (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly 'surprising'" losses after the shareholder vote; (iii) Bank of America's determination, "eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators"; and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

211.    On September 14, 2009, the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, rejected the proposed $33 million settlement of the suit filed by the SEC against BoA.  The Court held that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior BoA executives were sued or contributed to the settlement.  The Court found that the settlement violated the SEC's "normal policy in such situations [] to go after the company executives who were responsible for the lie," and rejected the SEC's contention that it did not have grounds for bringing claims against senior BoA

officials, remarking, "How can such knowledge [of the falsity of the statements in the Proxy] be lacking when, as the Complaint in effect alleges, executives at the Bank expressly approved making year-end bonuses before they issued the proxy statement denying such approval?"

212.    Following the Court's rejection of the settlement, the SEC filed a second action on January 12, 2010, which asserted claims against Bank of America for violating Section 14(a) by failing to disclose Merrill's "extraordinary" fourth quarter 2008 financial losses.  On February 4, 2010, BoA and the SEC jointly moved for approval of a Final Consent Judgment to resolve both of the SEC actions, submitting a Statement of Facts establishing that BoA's senior officers were aware of the bonus agreement and Merrill's losses.  Significantly, BoA admitted that the SEC Statement of Facts has an evidentiary basis and agreed to pay a civil penalty of $150 million and to implement certain corporate governance reforms.

213.    On February 22, 2010, Judge Rakoff approved the proposed settlement of the SEC actions.  In his Order approving the proposed settlement, Judge Rakoff noted that "it is clear to the Court" that:

> (1) the Proxy Statement that the Bank sent to its shareholders on November 3, 2008 soliciting their approval of the merger with Merrill Lynch & Co., Inc. ("Merrill") failed adequately to disclose the Bank's agreement to let Merrill pay its executives and certain other employees $5.8 billion in bonuses at a time when Merrill was suffering huge losses; and

> (2) the Bank failed adequately to disclose to its shareholders either prior to the shareholder approval of the merger on December 5, 2008 or prior to the merger's effective date of January 1, 2009 the Bank's ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008 (ultimately amounting to a net loss of $15.3 billion, the largest quarterly loss in the firm's history) and that Merrill had nonetheless accelerated the payment to certain executives and other employees of more than $3.6 billion in bonuses.

*S.E.C. v. Bank of America Corp.*, 2010 WL 624581, at *1 (S.D.N.Y. Feb. 22, 2010).

214.    The Court further determined that these omissions were material, holding that, "it seems obvious that a prudent Bank shareholder, if informed of the aforementioned facts, would

have thought twice about approving the merger or might have sought its renegotiation." *Id*. The Court further found that, "based on careful review of voluminous materials," including an extensive *ex parte* review of confidential deposition testimony provided by the New York Attorney General's office, BoA and its officers acted at least negligently in making these omissions, and specifically declined to make "any determination" of whether BoA and its officers acted intentionally because that issue was neither before the Court nor necessary to its decision. *Id*. at *3. While the Court noted that "a reasonable regulator" could conclude that BoA and its officers acted negligently, the Court also found that the facts supported "plausible contrary inferences" of intentional misconduct. *Id*.

215. On September 18, 2009, the *Charlotte Observer* reported that, for the prior six months, the F.B.I. and the U.S. Department of Justice had been conducting an extensive "criminal investigation" of BoA in connection with the merger. As part of this wide-ranging investigation, BoA "provided hundreds of thousands of documents and dozens of hours of executive time" to answer questions.

216. That same day, *Bloomberg* reported that, on September 17, 2009, Defendant Thain gave a speech at the Wharton School of the University of Pennsylvania, during which he made clear that BoA's claim that it lacked control over the bonuses paid to Merrill executives and employees was not true:

> [W]hen [BoA] said, "John Thain secretly accelerated these bonuses," they were lying and that has now trapped them into a lot of trouble because there is a piece of paper, there's a document that says, yes, in fact they agreed to this in September. So one take away for all of you is it's really always better to just tell the truth.

217. Then, on February 4, 2010, the New York Attorney General formally charged BoA, Lewis, and Price with four counts of securities fraud under New York's Martin Act, General Business Law §§ 352 and 353. Specifically, the New York Attorney General alleged that

BoA, Lewis, and Price made a series of false and misleading statements and omissions concerning, among other things, Merrill's massive fourth quarter losses; BoA's agreement to allow Merrill to pay billions in bonuses on an accelerated basis before the merger closed, despite Merrill's financial performance; and the undisclosed $138 billion taxpayer bailout that BoA required in order to complete the merger.  Defendants did not move to dismiss the New York Attorney General's complaint and, instead, answered the allegations on August 18, 2010.

V.      FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

    A.  **The Merger Agreement Is Filed On September 18, 2008**

    218.    On September 18, 2008, three days after Defendants announced the proposed merger, BoA and Merrill filed a Form 8-K with the SEC attaching the Merger Agreement.  The Merger Agreement assured BoA shareholders and investors that Merrill <u>would not</u> pay discretionary bonuses before the merger closed.  Specifically, in a section titled "Company Forbearances," the Merger Agreement provided that, "except as set forth in Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement," from September 15, 2008 through January 1, 2009, Merrill "<u>shall not</u>, and shall not permit any of its Subsidiaries to, without the prior written consent of [BoA]," undertake any of 18 enumerated actions, including:

> increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, 'Employees'), [or] pay any amounts to Employees not required by any current plan or agreement (<u>other than base salary in the ordinary course of business</u>).

    219.    This statement was materially misleading.  First, the statement set forth above represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before

the merger closed.  Second, the statement set forth above falsely reassured investors that BoA had not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA had already granted its consent with respect to the payment of $5.8 billion of bonuses.  As set forth above at ¶¶75-81, the undisclosed bonus agreement was highly material because, among other reasons, (i) the amount set aside to pay bonuses constituted 12% of the entire merger price and 30% of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses despite the fact that it lost more than $21 billion in the fourth quarter; and (iv) the payment of these bonuses before the merger closed ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

220.    The agreement allowing Merrill to pay $5.8 billion of bonuses pursuant to Merrill's VICP before the merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule."   While the Merger Agreement made a generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders.  Defendants' failure to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because they violated Item 601(b)(2) of Regulation S-K.  Item 601(b)(2) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement."   In addition, Item 601(b)(2) further provides that any plan of acquisition "shall contain a list briefly identifying the contents of all omitted schedules, together with an agreement to furnish supplementally a copy of any omitted schedule to the Commission

upon request."  Accordingly, Defendants' failure to publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement also rendered the September 18, 2008 Forms 8-K materially false and misleading.

### B.  The Secondary Offering Documents

221.    On October 6, 2008, BoA announced that it was conducting the Secondary Offering for approximately $10 billion.

222.    The Secondary Offering was conducted pursuant to BoA's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

223.    The Offering Documents expressly incorporated by reference BoA's Form 8-K filed with the SEC on September 18, 2008.  As set forth above at ¶¶218-220, the September 18 Form 8-K contained untrue statements of material facts and omitted to state material facts, thereby rendering the Offering Documents materially false and misleading.

### C.  The Proxy

224.    On October 2, 2008, BoA filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed two amendments on Forms S-4/A on October 22 and October 29, 2008.  On November 3, 2008, BoA and Merrill filed the definitive Proxy, including the attached Merger Agreement, with the SEC on Form DEFM14A and as a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3), and mailed it to shareholders.

225.    The Proxy, which included a cover letter signed by Defendants Lewis and Thain, explained the terms and conditions of the merger to shareholders, informed them about the background of the merger, and set forth the reasons why the BoA and Merrill Boards recommended that shareholders vote in favor of the merger.  The Proxy also informed BoA and Merrill shareholders that the shareholder vote on the merger would occur on December 5, 2008.

226.    The Proxy was materially false and misleading at the time it was filed because it failed to disclose any information whatsoever about Merrill's October 2008 losses.  At the time the Proxy was filed on November 3, 2008, Merrill had sustained more than $7.5 billion in losses in October alone – a highly material amount which Defendants were required to disclose.

227.    Moreover, as Merrill's losses increased, Defendants were under a duty to update the Proxy to correct any of the false and misleading statements or omissions they had previously made, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Defendants also were required to disclose Merrill's losses of October and November 2008 under Section 14(a) of the Exchange Act, because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts to allow a reasonably prudent investor to make an informed investment decision.  Defendants also had a duty to correct and/or update under Rule 14a-9, which required Defendants to update in proxy supplements "any statement in any earlier communication with respect to the solicitation of a proxy . . . which has become materially false or misleading."

228.    As set forth more fully above, by mid-November 2008, Merrill's losses had increased to at least $9 billion and were rapidly accelerating.  By the end of November, Merrill had suffered additional losses of more than $4 billion as well as a goodwill impairment of $2.2 billion.  Thus, by the beginning of December 2008 – just days before the shareholder vote on the merger – Merrill had already suffered a staggering $15.5 billion in total losses and impairments in October and November 2008, with billions of dollars of additional losses projected for December.

229.    In violation of their duty to disclose all material facts to allow BoA shareholders to make an informed decision in connection with the merger, and their duty to update and/or

correct the Proxy as a result of intervening events, Defendants never disclosed Merrill's massive losses at any time before the shareholder vote. These losses were highly material. Specifically, Merrill's $15.5 billion pretax loss for October and November 2008 substantially exceeded Merrill's pretax loss from continuing operations of $12.8 billion for all of 2007 – the worst year in its history. In fact, these losses were so material that, beginning in late November – weeks before the vote – BoA executives debated internally about terminating the merger by invoking the MAC. The failure to disclose the losses Merrill suffered in October and November 2008 prior to the shareholder vote rendered the Proxy materially false and misleading.

230.    The Proxy was also materially false and misleading because it failed to disclose that BoA had agreed to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed. As noted above, this secret bonus agreement was highly material. Indeed, as Merrill's losses increased to $15.5 billion before the shareholder vote, the undisclosed bonus agreement became even more material because it permitted the payment of billions of dollars in bonuses to Merrill's executives and employees despite the fact that Merrill's losses, and their impact on BoA, were catastrophic.

231.    In fact, rather than disclose this secret agreement, the Proxy falsely represented to investors that, as part of the merger, Merrill "will not" pay any discretionary bonuses. Specifically, the Proxy stated that, subject to "certain exceptions" which were unspecified, or unless it had BoA's "prior written consent," Merrill "will not . . . undertake the following [18] extraordinary actions," including:

> (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements; (iii) become a party to, establish, adjust, or terminate any employee benefit or compensation plan or agreement. . . .

232.    The Proxy further stated that BoA's "written consent" "will not be unreasonably withheld or delayed," falsely indicating that no such consent had been given.

233.    Similarly, the Merger Agreement attached to the Proxy assured investors that Merrill "shall not" make any discretionary bonus payments in language identical to that set forth in the agreement attached to the September 18, 2008 Form 8-K, reproduced above at ¶218.

234.    The statements in the Proxy and the Merger Agreement set forth in ¶¶230-233 above were materially false and misleading for the reasons set forth above at ¶¶219-220.

235.    In addition, the Proxy incorporated Merrill's March 2008 Proxy, which made other false statements about the bonus awards, including that (i) Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year"; (ii) "[t]he goal of our compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders"; (iii) Merrill's bonus policy "provide[s] a strong incentive to increase financial performance and enhance returns to shareholders"; (iv) Merrill's "pay for performance" policy "fosters an ownership culture that increases executive focus on Company-wide returns across economic and business cycles"; and (v) Merrill's "pay for performance" policy focused on "the performance of the Company as a whole," and was emphasized as "the core of our compensation policy."

236.    The statements set forth above in ¶235 were false.  Directly contrary to the statement that Merrill paid bonuses "in January for performance in the prior fiscal year," Merrill, BoA, Thain, and Lewis had already agreed to allow Merrill to pay up to $5.8 billion of bonuses in December, before the merger closed.  Moreover, directly contrary to the statements that Merrill's bonus practice and policy was to "pay for performance" in order to "enhance returns to

shareholders," the secret bonus agreement, including the accelerated schedule, allowed Merrill to pay billions of dollars in bonuses regardless of Merrill's massive fourth quarter and year-end losses and their effect on shareholders.

### D.  The Proxy Supplements

237.    As noted above, Defendants were under a continuing duty to update and correct the Proxy to disclose the material adverse facts set forth above, including the secret bonus agreement and Merrill's massive losses.  On November 21, 2008, BoA and Merrill filed a Proxy Supplement without disclosing any of these facts, and without correcting or updating any of their prior false and misleading statements.  Similarly, on November 26, 2008, as BoA executives were debating invoking the MAC, BoA filed another Proxy Supplement, attaching a letter from Lewis, which also failed to disclose any of these facts and did not correct or update any of BoA's or Lewis's false and misleading statements.  By failing to do so, these Proxy Supplements falsely affirmed that nothing in BoA's earlier proxy solicitations was, or had become, materially false or misleading.

### E.  Defendants' Failure To Disclose Highly Material Information Prior To The Close Of The Merger

238.    As alleged above, following the December 5, 2008 shareholder vote and prior to the close of the merger on January 1, 2009, Lewis and Price determined – and informed Secretary Paulson and Chairman Bernanke – that Merrill's losses were so large that BoA could not absorb them, and that, as a result, BoA had determined to terminate the merger by invoking the MAC.  Ultimately, rather than invoking the MAC, BoA requested and received a highly dilutive $138 billion taxpayer bailout in order to enable BoA to absorb Merrill's losses.  BoA, Lewis, and Price failed to disclose this highly material fact before the merger closed.

239.    In addition, on December 31, as Merrill's losses for the fourth quarter reached $21.5 billion, Merrill paid out the cash component of the $3.6 billion in bonuses, with BoA's knowledge and approval – a highly material fact that was also not disclosed before the merger closed.

VI.    SUMMARY OF SCIENTER ALLEGATIONS

240.    As alleged above, numerous facts give rise to the strong inference that, solely for the purpose of Plaintiffs' Section 10(b) claims, throughout the Class Period, Defendants BoA, Merrill, Lewis, Thain, and Price knew or recklessly disregarded that their statements and omissions set forth above were materially false and misleading when made.

241.    *First*, the senior executives of BoA, including Lewis and Price, possessed direct knowledge of Merrill's losses as they occurred, yet failed to disclose them.  As noted above at ¶95, immediately after the merger was announced, BoA installed 200 people at Merrill, including a large financial team, to monitor Merrill's financial condition and installed Defendant Cotty to act as Merrill's CFO.  Further, as set forth more fully above at ¶95, Thain issued a memo on January 26, 2009 stating that Merrill's senior executives tracked Merrill's losses on a daily basis, and provided senior BoA executives with this information, also on a daily basis.  In particular, Thain stated that BoA's senior executives had "daily access to our p&l [profit and loss statements], our positions and our marks."  Moreover, during Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, received daily, "step-by-step" updates on Merrill's financial condition (*see* ¶97).

242.    Given the facts set forth above, a BoA spokesperson told *The New York Times* that "we have not disputed that we were kept informed about the financial condition of the company." Indeed, knowledge of Merrill's losses was so well-known among BoA's senior executives that

between November 12 and December 3, 2008, BoA's senior executives repeatedly discussed terminating the merger pursuant to the MAC and informing shareholders of Merrill's mounting losses, as described more fully above at ¶¶101-128.

243.    *Second*, BoA's senior executives, including Lewis and Price, also knew of or recklessly disregarded the $2.2 billion goodwill impairment Merrill incurred before the shareholder vote – yet represented to regulators that it arose suddenly after the shareholder vote. As the New York Attorney General wrote in his September 8, 2009 letter, "Even though it was known of by November, this write-down became part of the purportedly 'surprising' losses that were included in Merrill's financials more than a month after the December 5 shareholder vote." These Defendants' knowledge of this write-down before the shareholder vote – and their false claims of "surprise" as to its existence – further supports an inference of scienter.

244.    *Third*, as set forth above, BoA's and Merrill's senior executives, including Lewis and Thain, were clearly aware of or recklessly disregarded the secret bonus agreement because (i) it was the focus of intense discussions during the merger negotiations and was one of the three "main" terms of the merger agreement; (ii) Defendants Lewis and Thain, who negotiated the bonus agreement through high-ranking intermediaries, have admitted their knowledge of the bonus agreement; and (iii) executives at each company played an active role in determining and/or approving the ultimate bonus amounts and specific payment dates at various points throughout the fourth quarter.  Moreover, these Defendants were clearly aware that the bonus agreement had not been disclosed because the bonus agreement was set forth in a separate document that was meant to be, and in fact was, withheld from the investing public.

245.    Additional facts summarized below further establish the individual scienter of Defendants Lewis, Thain, and Price, and, in turn, the corporate scienter of BoA and Merrill.

A. **Additional Evidence Of Lewis's Scienter**

246.    Lewis has admitted in sworn testimony before Congress and the New York Attorney General's office that he received regular updates on the financial condition of both BoA and Merrill throughout the Class Period and knew of the companies' escalating, unprecedented losses before the merger vote. As described more fully above at ¶¶99-100, Lewis admitted that BoA in general, and he in particular, received "detailed financial reports every week" from Merrill, and that he received profit and loss statements for BoA and regular projections of Merrill's losses. Indeed, during his congressional testimony, when asked whether any of the 200 financial analysts that BoA stationed at Merrill reported Merrill's losses to Lewis before the shareholder vote, Lewis responded:   "The – we did have people there, and we did know that there were losses.   And that was clear both at our company and theirs."   Similarly, as noted above in ¶97, during Thain's *PBS Frontline* interview, he stated that senior executives at both companies "knew about the losses at the same time we did."

247.    Indeed, throughout the fourth quarter, Defendants Lewis and Price continuously communicated about all issues relating to the merger including, among others, Merrill's fourth quarter losses. As Defendant Price testified, "Ken and I … are in and out of each other's offices all the time. … I keep him informed all the time on matters."

248.    Lewis knew or recklessly disregarded in advance of the shareholder vote that BoA would report pre-tax losses for the months of October and November of approximately $15 billion, and that Merrill's fourth quarter loss was already by far the worst quarter in Merrill's history as of the date of the vote, and that additional losses were expected for the remainder of the quarter. On December 3, 2008, Defendant Lewis participated in a meeting with, among others, Defendants Price and Thain, specifically to discuss Merrill's deteriorating financial condition. At that meeting, Lewis was informed that Merrill's November losses would be

billions of dollars more than what was reflected in current forecasts – news that created, in Cotty's words, a "very somber environment." The revised report set forth Merrill's November losses at $5 billion – or more than $1 billion per week. Thus, by December 3, two days before the shareholder vote, Lewis knew or recklessly disregarded that Merrill's pre-tax losses for October and November 2008 were approximately $15 billion and that Merrill was expecting to report at least an additional $1 billion in additional losses for December, bringing the expected loss for the quarter to more than $16 billion.

249.    Despite his knowledge or reckless disregard of these material losses, Defendant Lewis took no steps to determine whether they should be disclosed. Significantly, despite the fact that Lewis had unfettered access to experienced counsel, he did not seek any legal advice regarding the Company's disclosure responsibilities. Lewis did not consult with BoA's own General Counsel, and he did not consult with BoA's deal counsel, Wachtell. Lewis also took no steps to make sure that BoA's counsel was provided with the most recent and complete information regarding Merrill's financial condition. Prior to the shareholder vote, Lewis also failed to discuss Merrill's losses and BoA's disclosure responsibilities with Merrill's auditors, BoA's auditors, or BoA's Board of Directors, notwithstanding the obvious magnitude of the losses. Had Lewis truly intended to make sure that BoA fully complied with its disclosure obligations under the federal securities laws, he would have consulted with BoA's in-house and/or outside counsel. Indeed, given the importance of the merger, and the magnitude of the losses, there is no plausible innocent explanation for Lewis's failure to ask any of his lawyers for their advice. In light of his knowledge of Merrill's losses, Lewis's utter failure to consult with counsel – or any other advisor – regarding BoA's disclosure responsibilities was extremely

reckless, highly unreasonable, and represented an extreme departure from the standards of ordinary care.

250.    In addition to his violations of the securities law prior to the shareholder vote, in his capacity as CEO and Chairman of the BoA Board, Lewis led the Board meetings on December 9, December 22, and December 30, 2008, during which the BoA Board discussed Merrill's losses and decided – even though BoA senior management (including Lewis) claimed to the Government that a material adverse change had occurred in Merrill's financial condition – to consummate the merger and accept a $138 billion taxpayer bailout to allow BoA to absorb Merrill's losses, without disclosing any of these critical facts to BoA shareholders or investors. Lewis was also personally involved in the discussions with Secretary Paulson, Chairman Bernanke, and other regulators regarding all of those subjects, as described more fully above at ¶¶160-165.

251.    Further, Lewis personally chose not to disclose the bailout prior to the close of the merger, despite knowing that BoA had a definitive agreement with federal regulators. As set forth at ¶¶166-172, Lewis understood that the market had been led to believe that Merrill would be profitable in the fourth quarter and, thus, that BoA was viewed positively in the marketplace because it would not need Government assistance. Lewis further understood that if the market became aware of the bailout (and, thus, Merrill's losses) before the close of the merger, BoA would suffer credit rating agency downgrades and the deal would "fall apart." Accordingly, at the time Lewis made the decision not to disclose the taxpayer bailout, Lewis knew that concealing this information would mislead the market but affirmatively chose to do so in order to ensure that the merger closed.

252.    Moreover, in light of Secretary Paulson's threat to terminate Lewis and the BoA Board if the merger were not consummated, Lewis was highly motivated to conceal the bailout from shareholders.  Indeed, Federal Reserve officials themselves recognized that Lewis was highly motivated to ensure that he maintained his position as BoA's CEO.  In a December 23, 2008 internal Federal Reserve email, Federal Reserve Senior Vice President Mac Alfriend reported that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job . . . ."  In fact, in sworn testimony before the New York Attorney General's office, Lewis admitted that Secretary Paulson's threat changed his mind about invoking the MAC clause and terminating the deal.  Although generalized allegations of a defendant's motive to maintain his job are generally not sufficient to establish scienter, the fact that Lewis himself expressed to Federal Reserve officials that he was concerned with losing his job, and that he was told directly by the Secretary of the Treasury that he would be fired if the merger did not close are concrete, specific facts that are compelling evidence of his scienter.

253.    Lewis's deliberate concealment of the bailout is evidenced in his instructions to the Board.  In his December 22, 2008 email to the BoA Board, Lewis expressly told members of the BoA Board that BoA did not want the government to commit the terms of the bailout to writing because that would require "public disclosure, which of course we do not want."  Moreover, in a meeting with the Board on December 30, 2008, Lewis admonished the members of BoA's Board not to "leak/disclos[e]" this information.

254.    Further, when questioned by the New York Attorney General about his reasons for failing to disclose the bailout to shareholders prior to the close of the merger, Lewis lied.  Lewis falsely claimed that Secretary Paulson "instructed" him not to disclose the taxpayer bailout.

Lewis's lie was publicly exposed in an April 23, 2009 letter from the New York Attorney General to Congress (the "April 23 Letter"). The April 23 Letter stated that Secretary Paulson had informed the New York Attorney General's office that Secretary Paulson did <u>not</u> issue any such instruction.

255. After receiving the April 23 Letter, in June 2009 Congress summoned Lewis to testify on issues related to the merger. During his Congressional testimony, Lewis <u>recanted</u> his prior testimony to the New York Attorney General and testified that "[n]either Secretary Paulson nor the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something," adding "<u>nobody</u> ever told us that we should not disclose a disclosable event." Secretary Paulson unequivocally confirmed in his own sworn testimony before Congress that he never instructed Defendant Lewis not to disclose the bailout. As Secretary Paulson later testified to Congress, "[T]he suggestion has been made that I discouraged Mr. Lewis from making required disclosures to the public markets about losses at Merrill Lynch. <u>That simply did not happen and Mr. Lewis has denied it unambiguously</u> in testimony before this committee."

256. Lewis's attempted cover-up is further probative evidence of Lewis' culpable state of mind. There is no plausible innocent explanation for why Lewis would falsely state, under oath, his reasons for failing to disclose the bailout – and then tell the truth only once he knew that his misrepresentation had been revealed. The most plausible explanation is that Lewis knew or recklessly disregarded that he had a duty to disclose the firm commitment from the Government to provide the taxpayer bailout, and sought to evade responsibility for his violation of that duty. Indeed, Lewis was so conscious of his liability to shareholders for proceeding with the merger without disclosing Merrill's losses or the taxpayer bailout that, in an attempt to immunize

himself from lawsuits, he explicitly sought a letter from Chairman Bernanke stating that the merger was forced upon Lewis.  Federal Reserve officials refused.  *See* ¶157.

257.    Lewis was also motivated to conceal material facts from shareholders, and thus ensure that the merger was consummated, because Lewis knew that if investors learned the truth about Merrill's financial condition it would call into question his judgment and competence in agreeing to pay a substantial premium for Merrill in such a precipitous manner.  Indeed, as described more fully above at ¶153, Chairman Bernanke expressly told Lewis that if Lewis invoked the MAC after Lewis had praised the merger and extolled for months BoA's due diligence, it would "cast doubt" on Lewis's judgment.  In addition to those admonitions, a set of "Talking points for [BoA] Discussion," prepared by Federal Reserve officials in advance of their conversation with Lewis on December 21, 2008, provided that regulators also told Lewis that, if he were to invoke the MAC, it "would expose the weaknesses in [BoA]'s capital and asset quality," and "[t]he market would conclude that [BoA] was too weak to address the problems at [Merrill]."

258.    Moreover, Lewis's repeated inconsistencies in his statements to regulators and sworn testimony to Congress and the New York Attorney General, and in his public statements to BoA shareholders, serve as further strong circumstantial evidence of Lewis's fraudulent state of mind.  For example, on December 17, 2008, Lewis told federal regulators that he only became aware of Merrill's losses in mid-December, after the shareholder vote, because they purportedly "accelerated" at that time.  Likewise, during the January 16, 2009 conference call to discuss Merrill's losses, Lewis told investors that the "loss materialized late in the quarter in December." As set forth above, numerous facts establish that these statements were false, and amounted to nothing more than an attempt to cover up the fact that Lewis and his senior officers had personal

knowledge of or reckless disregard for Merrill's severe and accelerating losses throughout the entire fourth quarter and intentionally failed to disclose them even though they knew that disclosure should be made. For example, on *PBS Frontline*, Thain – who, as Merrill's CEO, had personal knowledge of the pace and timing of Merrill's losses – stated that Lewis's version of the facts was exactly the opposite of "what actually happened":

> Question:   Ken Lewis tells us that in the time between the Dec. 5 stockholders' meeting and his going to Washington and asking for the get-out-of-jail clause, something substantial changed. What would it have been, do you think?

> Thain:   <u>I don't know what he's referring to</u>. <u>If you look at what actually happened in the fourth quarter, October was the worst month</u>, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . <u>October was by far the worst</u>.

259.   Corroborating Thain's first-hand account, at the request of Congress, an impartial expert reviewed Merrill's internal loss data and independently concluded that any acceleration in Merrill's losses was clear by mid-November at the latest. Indeed, according to Congress's expert analysis of Merrill's weekly internal loss data, "<u>the evidence for a constantly deteriorating [] trend [in Merrill's losses] is much stronger on November 14 than it is on December 12</u>." Moreover, even without the benefit of this evidence, the country's most senior banking regulators, after reviewing Merrill's loss data, concluded that Lewis's claim of mid-December "surprise" was "not credible," as set forth above at ¶¶147-150.

260.   Lewis's knowledge of more than $16 billion in Merrill losses before the shareholder vote (with the projection of $1 billion in post-vote losses) further corroborates the conclusion that his claim of surprise was false. Indeed, as early as November 12, 2008, based principally on Merrill's October losses which had already occurred, senior BoA executives debated whether to disclose these losses, and by no later than December 1, 2008, senior BoA

executives sought legal advice from BoA's General Counsel regarding whether Merrill's ever-increasing losses were significant enough to terminate the merger.  As the New York Attorney General wrote, these facts were "of tremendous significance because [they are] at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote."

261.    As another example of Lewis's knowing and/or recklessly false and inconsistent statements, during Lewis's June 11, 2009 Congressional testimony, he initially stated that he "did not recall" asking Chairman Bernanke for a letter immunizing Lewis from shareholder suits – even though this request was highly unique and Lewis had made it just months earlier during a personal conversation between him and his chief regulator:

| Rep. Kucinich: | You requested a letter from the government saying that the government ordered you to close the deal to acquire Merrill. Wasn't there such a letter? |
| --- | --- |
| Lewis: | I don't recall such a letter. |
| Rep. Kucinich: | You're under oath. But your answer is you do not recall? |
| Lewis: | I do not recall a letter. |
| Rep. Kucinich: | Isn't it true that your request of that letter was motivated by your desire to protect yourself from your shareholders? |
| Lewis: | Well, sir, if I can't recall it, I can't answer the second question. |

262.    Lewis also made false statements to Congress regarding his involvement in approving Merrill's bonuses.  Lewis portrayed his involvement in approving the bonuses as "very limited," stating that Merrill was "a public company until the first of the year.  They had a separate board, separate compensation committee and we had no authority to tell them what to do, just urged them what to do."  In reality, as set forth above at ¶¶70-72, 74-75, 77 and 81, Lewis was directly involved in Merrill's bonus payments because he specifically authorized

Merrill to pay up to $5.8 billion of bonuses on an accelerated basis at the time he negotiated the Merger Agreement. This was a key term of the merger, which Lewis approved. Thain himself has stated that Lewis was "lying" when he sought to minimize his involvement in the bonuses.

**B. <u>Additional Evidence Of Price's Scienter</u>**

263.    As the Company's CFO, Price received the daily, "step-by-step" updates on Merrill's financial condition. Indeed, as the documents and testimony cited above establish, Defendant Price kept close watch on Merrill's losses and impairments throughout the entire fourth quarter, regularly received Merrill's loss reports, repeatedly discussed with other BoA executives whether to invoke the MAC or otherwise disclose Merrill's deteriorating financial condition, and made the conscious decision not to disclose these facts, as set forth above at ¶¶101-128. Further evidencing his actual knowledge of Merrill's losses, after the shareholder vote, Price (along with Lewis) was the individual who reported Merrill's mounting losses to the BoA Board on December 9, 22, and 30, 2008.

264.    Moreover, as set forth above at ¶¶101-111, on November 13, 2008, based on a November 12 Merrill report of an estimated $8.9 billion in pre-tax fourth quarter losses, BoA's in-house and outside counsel concluded that BoA needed to disclose these loss figures and informed Price of their conclusion. On November 20, despite this reasoned legal advice, Price and Mayopoulos, who had become concerned that shareholders would likely vote down the merger if BoA disclosed the losses, reversed this decision. In doing so, Price never informed Mayopoulos of the fact that during the week since BoA's in-house and outside counsel had initially concluded that disclosure was necessary, Merrill's losses had jumped by more than $4 billion. In sum, Price misled BoA's legal counsel in order to obtain the legal advice that Price wanted – namely, that BoA did not have to disclose Merrill's losses to shareholders or investors prior to the merger.

265.    Similarly, as set forth above at ¶¶124-127, on December 3, when Price learned that Merrill's fourth quarter losses had exceeded $10 billion (BoA's unsupported, self-imposed threshold for disclosure), Price lied to Mayopoulos, telling him that the forecasted loss for the fourth quarter was "approximately $7 billion." Then, as discussed above at ¶¶139-142, after the shareholder vote, when Mayopoulos learned that the losses were materially greater than Price had represented to him and sought to confront Price about the discrepancy, Mayopoulos was summarily fired and escorted off BoA's premises. Given Price's prior discussions with Mayopoulos regarding disclosure of Merrill's losses, there is no plausible innocent explanation for why Price did not provide Mayopoulos with the most complete, accurate, and up-to-date loss results. Similarly, the manner and timing of Mayopoulos's termination is strong circumstantial evidence that he was fired because he, in effect, knew too much, and BoA wanted to avoid the possibility that Mayopoulos, upon learning of the true extent of Merrill's losses, would recommend that the losses be disclosed before the merger closed.

266.    In addition, as discussed above at ¶¶121-122, Price ignored the advice of BoA's Treasurer, who, for fear that BoA's senior officers would be subject to criminal penalties for failing to disclose the losses, pleaded with Price to disclose the losses shortly before the shareholder vote.

267.    Moreover, after the shareholder vote, Price acted with scienter with respect to the concealment of the taxpayer bailout. As discussed above at ¶¶160-172, Price knew that, as of late December 2008, BoA had a firm agreement to receive the taxpayer bailout and that BoA's decision not to disclose the bailout materially misled investors. Specifically, on December 17, 2008, Price was personally informed by BoA's Treasurer that the market, based on the disclosures to date, (1) "clearly think[s] that ML is more healthy than they are" and would not

report "poor results"; and (2) that BoA did "not need government assistance." Despite his knowledge that the market would be misled by the failure to disclose the bailout, Price, with Lewis, determined to conceal the bailout in order to ensure that the merger would be consummated.

268.    Price also knew of Secretary Paulson's threat to terminate BoA's senior management if the merger were not consummated, and thus was highly motivated to conceal the bailout from shareholders. As set forth above, the threat by the Secretary of the Treasury that Price would be fired if the merger did not close is compelling evidence of his scienter.

## C. **Additional Evidence Of Thain's Scienter**

269.    Defendant Thain has admitted in sworn testimony that he had personal knowledge of the secret bonus agreement at the time it was being negotiated during the September 13-14, 2008 weekend. In his deposition, Thain testified that "I was aware that [the bonus agreement] was being negotiated." Thain further testified that he was kept apprised of all the salient terms of the agreement "[t]hrough discussions with, primarily, Greg Fleming," including the terms allowing "us, Merrill Lynch, to be able to pay bonuses to our employees prior to the deal closing," as well as the "cap on the amount that we could pay out."

270.    Moreover, Thain was intimately involved in finalizing the accelerated Merrill bonuses throughout the fourth quarter of 2008. In early November 2008, he and Alphin, BoA's Chief Administrative Officer, determined the final size of the bonus pool; on November 11, 2008, Thain presented the final bonus figures and the accelerated payment schedule to Merrill's Compensation Committee, which approved the accelerated schedule; and on November 12, 2008, Thain informed Alphin of this schedule.

VII.    LOSS CAUSATION – EXCHANGE ACT CLAIMS

271.    For purposes of the Exchange Act claims alleged herein, Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plaintiffs and the Class. Throughout the Class Period, the prices of BoA common stock, Preferred Securities, and Debt Securities were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  The prices for BoA's options were distorted during the Class Period on account of the artificially inflated price of BoA's common stock.  The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.  The true facts became known by investors and the market through a series of partial corrective disclosures.  By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in the prices of BoA common stock, Preferred Securities, and Debt Securities, and the pricing of BoA's options remained distorted throughout the Class Period.

272.    As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of BoA common stock, the Preferred Securities, and the Debt Securities declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Lead Plaintiffs and the members of the Class.  BoA's options also suffered significant declines when the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Defendants occurred, causing substantial damage to members of the Class who purchased call options or sold put options in BoA during the Class Period.

273.    On Sunday, January 11, 2009, a Citigroup analyst forecast fourth quarter losses at Merrill to be $6 billion, including $7 billion in writedowns on Merrill's "high risk assets," and

further wrote that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share. On Monday, January 12, 2009, the next trading day after the report was issued, shares of Bank of America common stock fell 12% on heavy volume, falling from $12.99 at the close of market the prior trading day to $11.43.

274.    On January 14, 2009 in Australia, which was January 13 in New York, Merrill executives in Australia warned a bond trader of imminent "awful" news, and admitted that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night." BoA common shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009, and fell further to close at $10.20 on January 14, 2009, all on heavy volume – a decline of approximately 11%.

275.    Further disclosures occurred on January 15, 2009, when *The Wall Street Journal* reported on the taxpayer bailout which was necessary to allow BoA to absorb Merrill's losses, prompting BoA common shares to drop 18% on extremely heavy volume of 552,669,186 shares, leaving BoA common shares to close at $8.32, an 18-year low. And on January 16, 2009, BoA announced terrible fourth quarter results, revealing, among other things, the $21.5 billion losses at Merrill and the fact that TARP funding had been necessary to complete the merger. These disclosures caused BoA common stock to drop an additional 13% on January 16 on extremely heavy volume.

276.    After the close of the markets on January 16, 2009,  it was reported that Moody's had downgraded BoA's credit rating due to "the disclosure of substantial losses of Merrill Lynch" and Fitch had downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive absent assistance provided by the U.S. Treasury."

277.     On Saturday, January 17, 2009, *The New York Times* reported that, given Merrill's "devastating" losses, BoA's management had sought to exercise the MAC after the vote but before the closing of the merger, and was dissuaded from doing so by the Government.  According to an analyst quoted in *The Wall Street Journal* article, Lewis "has very little credibility with the investor public right now."  On Tuesday, January 20, the next trading day, BoA's stock fell an additional 29%, also on extremely heavy volume, as a result of these disclosures.

278.     Finally, BoA common stock dropped another 15% on January 22, 2009, the trading day immediately following the *Financial Times* story revealing the accelerated bonus payments.  All told, BoA common stock dropped 56% from January 12, 2009 through and including January 22, 2009, while BoA options moved in price in a similar fashion as a result of the corrective disclosures made to the market by BoA or otherwise.

279.     From January 12, 2008 through January 22, 2008, the corrective disclosures set forth above had a similarly negative effect on the prices of the Preferred Securities and Debt Securities identified at Appendices A and B.  The price of the Preferred Securities fell, on average, 32% over this period.  Their cumulative negative returns from January 12, 2008 through and including January 22, 2008 are set forth in Appendix A.   The price of the Debt Securities fell, on average, 6.4% over this period.  Their cumulative negative returns from January 12, 2008 through and including January 22, 2008 are set forth in Appendix B.

280.     Each of the above-referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

281.    For the purposes of the Exchange Act claims, it was entirely foreseeable to BoA, Merrill, Lewis, Thain, Price, Cotty, and the BoA Board that concealing from investors (i) Merrill's and BoA's losses, (ii) the taxpayer bailout, and (iii) the secret agreement allowing Merrill to pay up to $5.8 billion in bonuses before the merger closed, would artificially inflate the price of BoA common stock, call options, Preferred Securities, and Debt Securities, and artificially distort the price of BoA put options during the Class Period.  It was similarly foreseeable that the ultimate disclosure of this information would cause the price of these securities to drop significantly as the inflation caused by Defendants' earlier misstatements was removed by the corrective disclosures set forth herein.

282.    In addition, solely with respect to the Section 14(a) claim, it was entirely foreseeable to Defendants that holders of BoA common stock would be saddled not only with the losses Merrill had suffered at the time of the shareholder vote, but any subsequent losses that Merrill would suffer prior to the close of the merger.

283.    Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act for Lead Plaintiffs and members of the Class who purchased or otherwise acquired BoA common stock, call options, Preferred Securities, or Debt Securities during the Class Period, and/or who sold BoA put options during the Class Period, and were damaged thereby.

## VIII.  RELIANCE: APPLICABILITY OF THE FRAUD-ON-THE-MARKET DOCTRINE FOR EXCHANGE ACT CLAIMS

284.    At all relevant times, the markets for BoA's common stock, options, Preferred Securities, and Debt Securities were efficient for the following reasons, among others:

     a.     The Company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    The Company's Preferred Securities either met the requirements for listing, and were listed and actively traded on the NYSE, or were actively traded in an efficient over-the-counter market;

c.    BoA's Debt Securities were registered with the SEC and traded on the NYSE and over-the-counter in active and efficient markets;

d.    The Company's options were listed and actively traded on the Chicago Board of Options and other national options exchanges, highly efficient markets;

e.    The average weekly trading volume for BoA common stock, as a percentage of BoA's outstanding shares, was 13.1% during the Class Period, the average weekly trading volume for the Preferred Securities during the Class Period was 3.53%, and the average weekly trading volume for the Debt Securities during the Class Period exceeded 1%;

f.    BoA's securities, including its Preferred Securities and Debt Securities, were rated by Moody's and Fitch Ratings;

g.    BoA was extensively followed by numerous securities analysts employed by firms including J.P. Morgan, Citigroup, Deutsche Bank, Ladenburg Thalman, Oppenheimer, and NAB Research, among others, who wrote reports about the Company and the value of its securities that entered the public marketplace;

h.    BoA met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Secondary Offering, among other SEC filings, as set forth in ¶37;

i.    As a regulated issuer, the Company filed periodic public reports with the SEC; and

j.    BoA communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the *Business Wire* news service, and conference calls with analysts and investors.

285.    As a result, the market for BoA's common stock and options, as well as the Preferred Securities and Debt Securities, promptly digested current information with respect to BoA from all publicly-available sources and reflected such information in the prices of these

securities.  Under these circumstances, all purchasers of the Company's publicly-traded common stock and call options, as well as the Preferred Securities and Debt Securities, during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.  Likewise, all sellers of the Company's put options during the Class Period suffered similar injury through their transactions at prices that were distorted by the artificially inflated price of BoA common stock, and a presumption of reliance applies.

## IX.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

286.    The PSLRA's statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

287.    None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Merrill's or BoA's then-existing financial condition and the payment of accelerated, discretionary bonuses to Merrill's executives and employees.

288.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Merrill's or BoA's financial condition and the payments of accelerated, discretionary bonuses to Merrill's executives and employees.  Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were

not sufficient to insulate Defendants from liability for their materially false and misleading statements.

289.     To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of BoA or Merrill who actually knew that the statement was false.

X.     CLASS ACTION ALLEGATIONS

290.     Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who (i) purchased or otherwise acquired the common stock, Preferred Securities, Debt Securities, or call options of BoA between September 18, 2008 and January 21, 2009, inclusive (defined above as the "Class Period"), excluding any shares of BoA common stock acquired by exchanging the stock of Merrill for BoA stock through the merger between the two companies consummated on January 1, 2009; (ii) held BoA common stock or Series B Preferred Stock as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill; (iii) purchased BoA common stock issued under the Registration Statement and Prospectus for the $10 billion offering of BoA common stock that occurred on or about October 7, 2008; or (iv) sold BoA put options during the Class Period, and were damaged thereby (defined above as the "Class").  Excluded from the Class are Defendants (as set forth herein), present or former executive officers of BoA and Merrill, the members of Merrill's Board of Directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

291.     The members of the Class are so numerous that joinder of all members is impracticable.  For example, as of December 31, 2008, BoA had 5,017,435,592 shares of common stock outstanding.  Throughout the Class Period, BoA common stock, Preferred Securities, Debt Securities, and options were all actively traded on national exchanges.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believes that Class members number in the thousands, if not millions.

292.     Lead Plaintiffs' and Named Plaintiff's claims are typical of the claims of the members of the Class.  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired BoA common stock, Preferred Securities, Debt Securities, or call options (or sold put options) in the market during the Class Period, were entitled to vote on the merger, or purchased BoA common stock in the Secondary Offering and sustained damages as a result of Defendants' conduct complained of herein.

293.     Lead Plaintiffs and Named Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs and Named Plaintiff have no interests that are adverse or antagonistic to the Class.

294.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

295.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b.    whether the Proxy and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

c.    whether and to what extent the market prices of BoA common stock, Preferred Securities, Debt Securities, and/or options were artificially inflated and/or distorted during the Class Period due to the non-disclosures and/or misstatements complained of herein;

d.    whether, solely with respect to the claims under Section 10(b) of the Exchange Act, Defendants acted with scienter;

e.    whether, solely with respect to the claims under Section 10(b) of the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

f.    whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

296.    The names and addresses of those persons and entities who purchased or otherwise acquired BoA common stock, call options, Preferred Securities or Debt Securities (or who sold put options) during the Class Period, or who voted in connection with the Proxy Claims are available from the Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

XI.    CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE
       EXCHANGE ACT

## COUNT I

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against Defendants BoA, Lewis, And Price For Misstatements And Omissions Regarding
### The Secret Bonus Agreement, Merrill's Pre-Vote Losses, BoA's Pre-Vote Losses, And The
### Taxpayer Bailout)

297.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

298.    During the Class Period, BoA, Lewis, and Price disseminated or approved the false statements and omissions set forth above and summarized below, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants BoA, Lewis, and Price acted with scienter in failing to disclose Merrill's fourth quarter 2008 losses, BoA's fourth quarter losses, and the taxpayer bailout.  Defendants BoA and Lewis also acted with scienter in making materially false and misleading statements and omissions regarding the agreement authorizing Merrill to pay up to $5.8 billion in bonuses before the merger closed.

299.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and members of the Class in connection with their purchases or acquisitions of BoA common stock, Preferred Securities, Debt Securities, or call options (or sales of BoA put options) during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts

omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding Merrill's financial condition and losses, BoA's financial condition and losses, the agreement authorizing Merrill to pay up to $5.8 billion in bonuses before the merger closed, and the taxpayer bailout.

300.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts that were required to be disclosed; made the above statements and omissions with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and members of the Class, regarding, among other things, the events that had materially adverse effects on Merrill's financial condition, BoA's financial condition, and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate, distort, and/or maintain the market price of BoA common stock, Preferred Securities, Debt Securities, and options; and (iii) cause Lead Plaintiffs and members of the Class to purchase BoA common stock, Preferred Securities, Debt Securities, or call options (or sell BoA put options) during the Class Period at artificially inflated and/or distorted prices.

301.    As described above, these Defendants had a duty to disclose Merrill's highly material losses and the secret bonus agreement when the Proxy was filed, before the shareholder vote, and before the merger closed, and to disclose the impact that these undisclosed events

would have on BoA's ability to absorb Merrill's losses.  These Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

302.    These Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events. Further, by continuing to speak about the merger in supplements to the Proxy, Defendants were under a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the merger.  Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Proxy, and in supplements to the Proxy, including the losses at both BoA and Merrill.  Defendants were also under a duty to disclose infrequent or unusual changes and events affecting income in the Proxy and in supplements to the Proxy.

303.    Similarly, these Defendants were also required to disclose, before the merger closed on January 1, 2009, the events which occurred in December 2008, as set forth above in ¶238, because such facts were highly material information and because they were under a continuing obligation and duty to correct and/or update their prior statements concerning the merger.

304.    Defendants BoA and Lewis are liable for all materially false and misleading statements made during the Class Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in (i) BoA's September 18, 2008 Form 8-K; (ii) the Proxy; (iii) BoA's November 21, 2008 Form 8-K, which supplemented the Proxy; and (iv) BoA's November 26, 2008 Proxy Supplement.  These statements were materially false and misleading because, among other things, they

misrepresented the terms of the Merger Agreement, and failed to disclose Merrill's and BoA's losses and the secret bonus agreement, and the impact that these undisclosed events would have on BoA's ability to absorb Merrill's losses.  They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.  Defendants BoA and Lewis are also liable for failing to disclose the taxpayer bailout.

305.    Defendant Price is also liable for failing to disclose Merrill's losses, BoA's losses, and the taxpayer bailout. He also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

306.    As described above, the Defendants named in this Count acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  Specifically, Defendants BoA, Lewis, and Price knew or were reckless in not knowing, *inter alia*, that the financial condition of Merrill was severely deteriorating throughout the fourth quarter of 2008, such that BoA could not absorb Merrill's losses without Government assistance. Similarly, Defendants BoA and Lewis knew or were reckless in not knowing that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.  Defendants BoA, Lewis, and Price also acted with scienter in that they knew of, but failed to disclose, the taxpayer bailout.

307.    As a result of these Defendants' conduct, the prices of BoA common stock, Preferred Securities, Debt Securities, and/or options were artificially inflated and/or distorted.

308.    Lead Plaintiffs and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BoA common

stock, Preferred Securities, Debt Securities and call options (or sold BoA put options at distorted prices). Lead Plaintiffs and the Class would not have purchased or otherwise acquired these securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material facts, or, with respect to put options, would not have sold them at the prices they did, if at all, had they been aware that the market price had been distorted by these Defendants' materially false and misleading statements and/or omissions of material facts.

309. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs, Named Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of BoA common stock or call options, Preferred Securities, or Debt Securities, and/or their sale of BoA put options during the Class Period.

## COUNT II

### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against Defendants Merrill And Thain for Misstatements Regarding The Secret Bonus Agreement)

310. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

311. During the Class Period, Defendants Merrill and Thain disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

312. These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and members of the Class in connection with their purchases or acquisitions of BoA common stock, Preferred Securities, Debt Securities and/or call options (or sales of BoA put options) during the Class Period. As detailed herein, the misrepresentations contained in Defendants' public statements included statements relating to Merrill's ability to pay bonuses before the merger closed.

313.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and members of the Class; made various false and/or misleading statements of material facts; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and members of the Class, regarding the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate, distort and/or maintain the market price of BoA common stock, Preferred Securities, Debt Securities, and options; and (iii) cause Lead Plaintiffs and other members of the Class to purchase BoA common stock, Preferred Securities, Debt Securities, or call options at artificially inflated prices (or to sell BoA put options at distorted prices).

314.    Defendants Merrill and Thain are liable for all materially false and misleading statements made during the Class Period, as alleged above, including, without limitation, the false and misleading statements set forth above which appeared in: (i) Merrill's September 18,

2008 Form 8-K; (ii) the Proxy; and (iii) Merrill's November 21, 2008 Proxy Supplement. These statements were materially false and misleading because, among other things, they misrepresented the terms of the Merger Agreement, including that the agreement authorized Merrill to pay up to $5.8 billion in bonuses before the merger closed. They also failed to correct and update prior misrepresentations.

315. As described above, the Defendants named in this Count acted with scienter in that they either had actual knowledge of the misrepresentations set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or were reckless in not knowing that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.

316. As a result of these Defendants' conduct, the prices of BoA common stock, Preferred Securities, Debt Securities, and call options were artificially inflated or, with respect to put options, were distorted throughout the Class Period.

317. Lead Plaintiffs and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BoA common stock, Preferred Securities, Debt Securities and call options (or sold BoA put options at distorted prices). Lead Plaintiffs and the Class would not have purchased or otherwise acquired these securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements, or, with respect to put options, would not have sold them at the prices they did, if at all, had they been aware that the market price had been distorted by these Defendants' materially false and misleading statements.

318.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs, Named Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of BoA common stock or call options, Preferred Securities, or Debt Securities, and/or their sales of BoA put options during the Class Period.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Lewis and Price)

319.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

320.    This Count is asserted against Defendants Lewis and Price for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of members of the Class.

321.    During their tenures as officers of BoA, each of these Defendants was a controlling person of BoA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of BoA, these Defendants had the power and authority to cause BoA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by BoA during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

322.    In their capacities as senior corporate officers of BoA, and as more fully described above, these Defendants were made aware of the circumstances surrounding the merger, including the terms of the merger, the bonus agreement, and the financial condition of Merrill and BoA.  In addition, these Defendants were also aware of the undisclosed events of December 2008 discussed above and the decision not to disclose those material events.

323.     As a result of the foregoing, Lewis and Price were control persons of BoA within the meaning of Section 20(a) of the Exchange Act.

324.     As set forth above, BoA violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of BoA and, as a result of their own aforementioned conduct, Lewis and Price are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BoA is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired BoA common stock, Preferred Securities, Debt Securities and/or call options, or who sold BoA put options during the Class Period.  Moreover, as detailed above, during the respective times these Defendants served as officers of BoA, each of these Defendants is responsible for the material misstatements and omissions made by BoA.

325.     As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs, Named Plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of BoA common stock, Preferred Securities, Debt Securities, and/or call options, or their sale of BoA put options during the Class Period.

## COUNT IV

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Thain)

326.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

327.     This Count is asserted against Defendant Thain for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of members of the Class.

328.    During his tenure as Merrill's CEO and Chairman, Defendant Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act. By reason of his positions of control and authority as Merrill's CEO and Chairman, Defendant Thain had the power and authority to cause Merrill to engage in the wrongful conduct complained of herein. Defendant Thain was able to and did control, directly and indirectly, the content of the public statements made by Merrill during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

329.    In his capacity as Merrill's CEO and Chairman, and as more fully described above, Defendant Thain was made aware of the circumstances surrounding the merger, including the terms of the merger and the bonus agreement. As a result of the foregoing, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.

330.    As set forth above, Merrill violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person of Merrill and, as a result of his own aforementioned conduct, Thain is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Merrill is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired BoA common stock, Preferred Securities, Debt Securities, and/or call options, or those who sold BoA put options during the Class Period. Moreover, as detailed above, during the respective times that Thain served as Merrill's CEO and Chairman, he was responsible for the material misstatements made by Merrill.

331.    As a direct and proximate result of Defendant Thain's conduct, Lead Plaintiffs, Named Plaintiff and other members of the Class suffered damages in connection with their

purchase or acquisition of BoA common stock, Preferred Securities, Debt Securities, and/or call options, or their sale of BoA put options, during the Class Period.

## XII.     CLAIMS UNDER SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

332.     The claims in Counts V and VI below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors who held BoA common stock or 7% Cumulative Redeemable Preferred Stock, Series B (defined above as "Series B Preferred Stock") on the Record Date of October 10, 2008 and were entitled to vote on the merger between BoA and Merrill.  The Proxy Claims are based solely on negligence.  They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

333.     The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger, including the Proxy, the documents incorporated into the Proxy, and the later-filed Proxy Supplements, contained misstatements and/or omissions of material facts.  Further, Defendants' later-filed Proxy Supplements did not, as required by law, update and correct their previously-made misstatements, and themselves contained material misstatements and/or omissions.

334.     Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage BoA shareholders to vote in favor of the merger.  These statements included the following (collectively referred to as the "Proxy Solicitations"):

(a)     Merrill's September 18, 2008 Form 8-K, set forth above at ¶¶218-220;

(b)     The Proxy and attached Merger Agreement, set forth above at ¶¶224-236;

(c)     BoA's and Merrill's November 21, 2008 Proxy Supplement, set forth above at ¶237; and

(d)    BoA's November 26, 2008 Proxy Supplement, set forth above at ¶237.

335.    All of the Proxy Solicitations were materially false and misleading.

336.    Specifically, the Proxy failed to disclose and/or misrepresented the following highly material information prior to the shareholder vote on December 5, 2008:

(a)    BoA had agreed to allow Merrill to pay up to $5.8 billion in bonuses on an accelerated basis, before the merger closed.  This agreement, which was set forth in a Disclosure Schedule that was never publicly filed or otherwise disclosed to shareholders before the vote on the merger, was highly material to investors because, among other reasons, it: (i) represented 12% of the merger price; (ii) constituted 30% of Merrill's stockholders' equity as of December 26, 2008; and (iii) ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

(b)    Before the shareholder vote, Merrill had already suffered approximately $15 billion in pre-tax losses and impairments – losses which precipitated internal discussions about invoking the MAC and terminating the merger – and was projecting billions of dollars of additional losses for December.

(c)    BoA did not have the ability to absorb Merrill's losses at its existing capital levels as of the end of November 2008.  Indeed, as set forth in the Federal Reserve Merger Analysis, BoA had suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss – the first quarterly loss in its history – thus further eroding its capital levels

337.    Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning the Merrill bonus agreement.  In violation of these duties, Defendants never disclosed any of the omitted facts before the

shareholder vote. Significantly, Defendants updated the Proxy twice, on November 21 and November 26, 2008, without disclosing any of the material facts originally omitted.

338. The false statements and omissions as set forth above proximately caused foreseeable losses to Lead Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures, causing BoA stock to fall from $12.99 at the close of trading on January 9, 2009, the day preceding the first corrective disclosure, to $5.71 at the close of trading on January 22, 2009, as set forth more fully above at ¶¶271-283.

## COUNT V

### For Violations of Section 14(a) Of The Exchange Act
### (Against Defendants BoA, Merrill, Lewis, Thain, Price, Cotty, And The BoA Board For Misstatements And Omissions Regarding The Secret Bonus Agreement And Merrill's Pre-Vote Losses)

339. Lead Plaintiffs repeat and reallege the allegations in ¶¶25-59, 332-338 as if set forth fully herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence. Defendants BoA, Merrill, Lewis, and Thain acted negligently in misrepresenting and failing to disclose the secret bonus agreement. Defendants BoA, Merrill, Lewis, Thain, Price, Cotty, and the BoA Board acted negligently in failing to disclose Merrill's fourth quarter 2008 losses before the shareholder vote.

340. The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

341.     Defendants named in this Count did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on December 5, 2008.

342.     Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy.

343.     BoA and Merrill are issuers of the Proxy.

344.     BoA and Merrill permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that Merrill would not pay discretionary bonus compensation.

345.     Defendant Lewis signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy and otherwise permitted the use of his name in the Proxy.

346.     Defendant Thain signed the cover letter for the Proxy and otherwise permitted the use of his name in the Proxy.

347.     Defendant Price signed the Proxy Registration Statement and subsequent amendments.

348.     Defendant Cotty signed the Proxy Registration Statement and subsequent amendments.

349.     The BoA Board Defendants signed the Proxy Registration Statement and subsequent amendments, and permitted the use of their names by, among other things, allowing the Proxy to represent that they recommended the merger.

350.     By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants sought to secure Lead Plaintiffs' and other Class members'

approval of the merger, and solicited proxies from Lead Plaintiffs and other members of the Class.

351.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, and/or omitting material facts required to be stated in order to make the statements contained therein not misleading.  Defendants were required to disclose the material facts discussed above, because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts to allow a reasonably prudent investor to make an informed investment decision.  These Defendants also acted negligently in failing to update the Proxy and its Supplements, which were false at the time they were issued and were also rendered false and misleading by the omission of material information that arose after their dissemination and before the December 5, 2008 shareholder vote.

352.    The solicitations described herein were essential links in the accomplishment of the merger.  As a result of these solicitations, the BoA shareholders approved the merger.

353.    Lead Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

354.    This claim is brought within the applicable statute of limitations.

355.    By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

## COUNT VI

### For Violations Of Section 20(a) Of The Exchange Act
### In Connection With The Proxy Claims
### (Against Defendants Lewis, Thain, Price, And The BoA Board)

356.    Lead Plaintiffs repeat and reallege the allegations in ¶¶25-59, 332-355 as if set forth fully herein.

357.     During their tenures as officers and/or directors of BoA, each of Defendants Lewis, Price, and the BoA Board was a controlling person of BoA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of BoA, these Defendants had the power and authority to cause BoA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the Proxy and the other solicitations described herein made by BoA during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

358.     The BoA Board Defendants participated in BoA Board meetings and conference calls, reviewed the Merger Agreement and voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through the BoA Board's recommendation to vote in favor of the merger, which repeatedly appeared throughout the Proxy. The BoA Board Defendants also signed numerous other filings with the SEC.

359.     In their capacities as senior corporate officers and/or directors of BoA, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above.  Indeed, these Defendants had access to information regarding the circumstances surrounding the merger, including the terms of the merger and analyses of the financial condition of Merrill.  As a result of the foregoing, Lewis, Price, and the BoA Board Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

360.     During his tenure as an officer and Chairman of the Board of Merrill, Thain was a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.  By reason of his position of control and authority as an officer and Chairman of Merrill, Thain had the power and authority to cause Merrill to engage in the wrongful conduct complained of

herein.  Thain was able to and did control, directly and indirectly, the contents of the Proxy and the other solicitations described herein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

361.    In his capacity as a senior corporate officer and Chairman of the Board of Merrill, and as more fully described above, Thain had access to information regarding the circumstances surrounding the merger, including the terms of the merger, and the financial condition of Merrill. As a result of the foregoing, Thain was a control person within the meaning of Section 20(a) of the Exchange Act.

362.    As set forth above, BoA and Merrill violated Section 14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of BoA and Merrill, and as a result of their own aforementioned conduct, Lewis, Price, Thain, and the BoA Board are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BoA and Merrill are liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of BoA or Merrill, each of these Defendants is responsible for the material misstatements and omissions made by BoA or Merrill.

363.    Lead Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

364.    This claim is brought within the applicable statute of limitations.

365.    By reason of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

XIII.    <u>CLAIMS UNDER THE SECURITIES ACT</u>

366.    The claims in Counts VII-IX are brought under Sections 11, 12 and 15 of the Securities Act.  The Securities Act claims are brought on behalf of persons or entities who purchased BoA common stock issued under the Secondary Offering Registration Statement in connection with BoA's Secondary Offering.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of the Defendants – *i.e.*, they do not allege, and do not sound in, fraud – and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

367.    On October 7, 2008, the Company announced its intention to raise $10 billion in the Secondary Offering through the sale of 455,000,000 shares of common stock at $22 per share.  As set forth above at ¶¶60-62, Banc of America and MLPFS acted as underwriters of the Secondary Offering.

368.    The Secondary Offering was conducted pursuant to the Secondary Offering Registration Statement, which incorporated the Prospectus Supplement (defined collectively above as the "Offering Documents").  The Offering Documents contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading with respect to BoA's pre-existing agreement allowing Merrill to pay up to $5.8 billion of discretionary bonuses before the merger closed.

369.    Specifically, the Offering Documents incorporated by reference BoA's Form 8-K filed with the SEC on September 18, 2008, which attached a copy of the Merger Agreement.  In a section titled "Company Forbearances," the Merger Agreement provided that, from September

15, 2008 through January 1, 2009, Merrill "shall not . . . without the prior written consent of [BoA]" pay discretionary bonus compensation.

370.    This statement was untrue, and omitted material facts because (i) it represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before the merger closed; and (ii) it created the impression that BoA had not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA had already agreed to the payment of $5.8 billion of bonuses.

371.    Defendants' undisclosed agreement allowing Merrill to pay these bonuses was highly material because, among other reasons, (i) the size of the bonuses constituted 12% of the entire merger price and 30% of Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule and allowed Merrill to award billions of dollars in bonuses prior to the close of the merger; (iii) it allowed Merrill to pay billions of dollars in bonuses despite the massive losses Merrill suffered in 2008; and (iv) the payment of these bonuses before the merger closed ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

372.    While the Merger Agreement made a generalized reference to the Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders either in the Offering Documents or otherwise. Defendants' failure to either publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement rendered BoA's September 18, 2008 Form 8-K materially false and misleading because it violated Item 601(b)(2) of Regulation S-K. Item 601(b)(2) requires that

(i) schedules to a plan of acquisition must be filed with the SEC if they contain material information that is not otherwise disclosed, and (ii) a plan of acquisition must contain a list describing the contents of omitted schedules, along with an agreement to provide the schedule to the SEC upon request.

## COUNT VII

### For Violations Of Section 11 Of The Securities Act
### (Against BoA, Lewis, Price, Cotty, The BoA Board, And The Underwriter Defendants For Misstatements And Omissions Regarding The Secret Bonus Agreement)

373.     Lead Plaintiffs repeat and reallege the allegations above at ¶¶25-62, 366-372, as if fully set forth herein.  For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence and/or strict liability.

374.     This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who purchased BoA common stock in the Secondary Offering against the Company, Lewis, Price, Cotty, the BoA Board, Banc of America, and MLPFS.

375.     The Secondary Offering Registration Statement contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

376.     BoA is the issuer of the common stock pursuant to the Secondary Offering Registration Statement.  As the issuer of the common stock, BoA is strictly liable to the members of the Class who purchased the common stock in the Secondary Offering for the materially untrue statements and omissions alleged herein that appeared in or were omitted from the Registration Statement.

377.     Defendant Lewis and the other members of the BoA Board were directors of BoA at the time of the filing of the false and misleading Prospectus Supplement and were signatories

of the Secondary Offering Registration Statement both by virtue of having signed the Secondary Offering Registration Statement at the time it was initially filed in 2006 and by having signed BoA's Form 10-K filed with the SEC on February 28, 2008. Defendant Price was a signatory of the Secondary Offering Registration Statement by virtue of having signed BoA's Form 10-K filed with the SEC on February 28, 2008. Defendant Cotty was a signatory of the Secondary Offering Registration Statement and signed BoA's Form 10-K filed with the SEC on February 28, 2008. The Form 10-K filed with the SEC on February 28, 2008 was expressly incorporated by reference into, and updated, the Secondary Offering Registration Statement. These Defendants named in this Count acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offering.

378. Banc of America and MLPFS were underwriters of the Secondary Offering. The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased the common stock in the Secondary Offering.

379. Lead Plaintiffs and other members of the Class purchased the common stock issued pursuant to the Secondary Offering Registration Statement.

380. Lead Plaintiffs and other members of the Class purchased BoA common stock in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

381. Lead Plaintiffs and the other members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement suffered substantial damages as a result of the untrue statements and omissions of material facts in the Secondary Offering Registration Statement, as they either sold these shares at prices below the Offering price of $22

per share or still held shares as of the date of the initial complaint containing claims under the Securities Act when the price of BoA common stock was below the Offering price of $22 per share.

382.    This claim is brought within the applicable statute of limitations.

383.    By reason of the foregoing, the Defendants named in this count have violated Section 11 of the Securities Act.

## COUNT VIII

### For Violations Of Section 12(a)(2) Of The Securities Act
### (Against BoA And The Underwriter Defendants For Misstatements And Omissions Regarding The Secret Bonus Agreement)

384.    Lead Plaintiffs repeat and reallege the allegations above at ¶¶25-62, 366-383, as if fully set forth herein.  For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

385.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased BoA common stock in the Secondary Offering, against the Company and the Underwriter Defendants.

386.    BoA was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Secondary Offering Registration Statement, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

387.    The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the common stock offered pursuant to the Secondary Offering Registration Statement, which contained untrue statements of material fact or omitted to state material facts necessary in order

to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

388.    Lead Plaintiffs and other members of the Class purchased BoA common stock in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

389.    Members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement and still hold that stock have sustained substantial damages as a result of the untrue statements of material facts and omissions in the Secondary Offering Registration Statement, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this count in return for the consideration paid with interest. Those members of the Class who have already sold their stock acquired in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement issued in connection with the Secondary Offering are entitled to rescissory damages from Defendants.

390.    This claim is brought within the applicable statute of limitations.

391.    By virtue of the foregoing, the Defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT IX

### For Violations Of Section 15 Of The Securities Act
### (Against Defendants Lewis, Price, And The BoA Board)

392.    Lead Plaintiffs repeat and reallege the allegations above at ¶¶25-62, 366-391 as if fully set forth herein.  For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim

any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

393.    This Count is asserted against Defendants Lewis, Price, and the BoA Board for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased the common stock issued pursuant to the Secondary Offering Registration Statement.

394.    At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Lewis, at the time of the filing of the Prospectus Supplement, served as Chairman of the Board of Directors, Chief Executive Officer and President of BoA. Lewis negotiated the terms of the Merger Agreement and was involved in the agreement to permit Merrill to pay up to $5.8 billion in discretionary bonuses. Defendant Price was CFO of BoA at the time of the filing of the Prospectus Supplement.  Each BoA Board Defendant reviewed and approved the Merger Agreement.

395.    Defendants Lewis, Price, and the BoA Board, prior to and at the time of the Secondary Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of BoA's business affairs, including the proposed merger.  As officers and/or directors of a publicly owned company, Lewis, Price, and the BoA Board had a duty to disseminate accurate and truthful information with respect to BoA's business, financial condition and results of operations, including its proposed merger with Merrill.  Defendants Lewis, Price, and the BoA Board participated in the preparation and dissemination of the Prospectus Supplement, and otherwise participated in the process necessary to conduct the Secondary Offering.  Because of their positions of control and authority as senior officers and/or directors of BoA, Lewis, Price, and the BoA Board were able

to, and did, control the contents of the Prospectus Supplement and, hence, the Secondary Offering Registration Statement, which contained materially untrue information.

396.    By reason of the aforementioned conduct, Defendants Lewis, Price, and the BoA Board are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as BoA is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiffs and members of the Class who purchased the common stock pursuant to the Secondary Offering Registration Statement.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies set forth in the Exchange Act and Securities Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs hereby demand a jury trial.

Dated: October 15, 2010
  New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By: _____
  Robert N. Kaplan
  Frederic S. Fox
  Joel B. Strauss
  Donald R. Hall
  Hae Sung Nam
  Melinda Rodon
  Irina Kobylevsky

850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____
  Max W. Berger
  Steven B. Singer
  Gerald H. Silk
  Hannah G. Ross
  Boaz A. Weinstein
  John J. Rizio-Hamilton
  Katherine M. Sinderson

1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**BARROWAY TOPAZ KESSLER MELTZER & CHECK LLP**

By: _____
  Gregory M. Castaldo
  David Kessler
  Sean M. Handler
  Darren J. Check
  Sharan Nirmul
  Jennifer L. Joost
  Richard A. Russo, Jr.

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Court-Appointed Co-Lead Counsel for the Class*

Dated: October 15, 2010
      New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By: _____
      Robert N. Kaplan
      Frederic S. Fox
      Joel B. Strauss
      Donald R. Hall
      Hae Sung Nam
      Melinda Rodon
      Irina Kobylevsky

850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____
      Max W. Berger
      Steven B. Singer
      Gerald H. Silk
      Hannah G. Ross
      Boaz A. Weinstein
      John J. Rizio-Hamilton
      Katherine M. Sinderson

1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**BARROWAY TOPAZ KESSLER MELTZER & CHECK LLP**

By: _____
      Gregory M. Castaldo
      David Kessler
      Sean M. Handler
      Darren J. Check
      Sharan Nirmul
      Jennifer L. Joost
      Richard A. Russo, Jr.

280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Court-Appointed Co-Lead Counsel for the Class*

**FLANAGAN LIEBERMAN
HOFFMAN & SWAIM**
Dennis Alan Lieberman
15 W. Fourth Street
Suite 100
Dayton, OH 45202
Tel: 937-223-5200

*Ohio Counsel*

# APPENDIX A

## APPENDIX A – Preferred Securities

| | CUSIP | Issue Date | Cumulative Return 1/12 - 1/22 |
|---|---|---|---|
| 1 | 060505682 | 1/29/08 | -37.41% |
| 2 | 22238E206 | 4/11/03 | -24.67% |
| 3 | 060505740 | 9/26/07 | -38.46% |
| 4 | 060505815 | 11/6/06 | -29.07% |
| 5 | 222388209 | 11/8/06 | -28.78% |
| 6 | 060505765 | 5/20/08 | -39.27% |
| 7 | 060505831 | 9/14/06 | -38.06% |
| 8 | 05518E202 | 8/9/02 | -27.33% |
| 9 | 060505724 | 11/20/07 | -45.43% |
| 10 | 055188205 | 1/31/02 | -33.51% |
| 11 | 055185201 | 4/30/03 | -29.75% |
| 12 | 05633T209 | 8/2/06 | -23.21% |
| 13 | 055187207 | 12/14/01 | -27.48% |
| 14 | 055189203 | 3/28/06 | -37.38% |
| 15 | 55270B201 | 11/27/02 | -32.09% |
| 16 | 05518T209 | 8/25/05 | -29.77% |
| 17 | 55266J200 | 6/27/02 | -31.76% |
| 18 | 33889X203 | 3/8/02 | -32.67% |
| 19 | 055184204 | 11/3/04 | -31.75% |
| 20 | 33889Y201 | 7/31/03 | -24.55% |
| 21 | 060505DR2 | 1/30/08 | -29.53% |
| 22 | 060505DT8 | 4/30/08 | -31.71% |

# APPENDIX B

**APPENDIX B – Debt Securities**

|  | CUSIP | Issue Date | Cumulative Return 1/12 - 1/22 |
|---|---|---|---|
| 1 | 06051GDX4 | 5/2/08 | -4.15% |
| 2 | 060505DP6 | 12/4/07 | -7.77% |
| 3 | 060505AG9 | 1/23/01 | -5.64% |
| 4 | 060505DA9 | 5/24/07 | -7.26% |
| 5 | 060505DH4 | 8/23/07 | -8.14% |
| 6 | 060505BS2 | 7/26/05 | -5.59% |
| 7 | 060505CS1 | 10/26/06 | -10.02% |
| 8 | 060505AQ7 | 4/22/02 | -5.22% |
| 9 | 060505AR5 | 9/25/02 | -5.45% |
| 10 | 060505AU8 | 11/7/02 | -6.40% |
| 11 | 060505AX2 | 1/23/03 | -6.51% |
| 12 | 060505BM5 | 6/8/04 | -7.96% |
| 13 | 060505CK8 | 8/14/06 | -5.48% |
| 14 | 060505DK7 | 9/11/07 | -5.07% |
| 15 | 060505CL6 | 8/14/06 | -12.11% |
| 16 | 060505BG8 | 11/18/03 | -8.52% |
| 17 | 060505BD5 | 7/22/03 | -4.55% |
| 18 | 060505DL5 | 9/11/07 | -9.39% |
| 19 | 06050TKN1 | 3/13/07 | -3.96% |
| 20 | 06051GDW6 | 5/2/08 | -2.35% |
| 21 | 060505AD6 | 2/14/00 | -2.09% |

# APPENDIX C

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

I, William J. Neville, on behalf of Lead Plaintiff, State Teachers Retirement System of Ohio ("Ohio STRS"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.      Ohio STRS did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Ohio STRS is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Ohio STRS has reviewed the Complaint and authorizes its filing.

4.      Attached in Schedule A are Ohio STRS' transactions during the Class Period in the securities that are the subject of this Complaint.

5.      Ohio STRS has full power and authority to bring suit to recover for its investment losses.

6.      I am authorized to make legal decisions on behalf of Ohio STRS with regard to this action.

7.      Ohio STRS intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Kaplan Fox & Kilsheimer LLP and Bernstein Litowitz Berger & Grossman LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      Ohio STRS has sought to serve and either was not appointed or is waiting to be appointed as lead plaintiff and representative party on behalf of the class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

- *Freudenberg v. E\*Trade Financial Corp., et al.*, No. 07-cv-8538 (S.D.N.Y.)
- *In re Citigroup Inc. Sec. Litig.*, No. 07-cv-09901 (S.D.N.Y.)
- *In re BP plc Securities Litigation*, No. 10-md-2185 (N.D. Tex.)

9.     Other than in this action, Ohio STRS has sought to serve and was appointed as lead plaintiff and representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

- *Zuckerman v. Scottish Re Group LTD, et al.*, No. 06-cv-5853 (S.D.N.Y.)
- *In re Merrill Lynch & Co. Sec., Derivative and ERISA Litig.*, No. 07-cv-9633 (S.D.N.Y.)

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct to extent of my knowledge.

Executed this 15ᵗʰ day of October, 2010.

By: _____
William J. Neville
General Counsel
*State Teachers Retirement System of Ohio*

**SCHEDULE A**

| Type | CUSIP | Transaction | Date | Shares | Price |
|------|-------|-------------|------|--------|-------|
| Common Stock | 060505104 | Purchase | 10/7/2008 | 78,000 | $22.0000 |
| Common Stock | 060505104 | Purchase | 10/7/2008 | 100,000 | $22.0000 |
| Common Stock | 060505104 | Purchase | 10/7/2008 | 50,000 | $25.1340 |
| Common Stock | 060505104 | Purchase | 10/8/2008 | 100,000 | $21.2516 |
| Common Stock | 060505104 | Purchase | 10/31/2008 | 486,600 | $24.1700 |
| Common Stock | 060505104 | Purchase | 11/5/2008 | 22 | $23.8595 |
| Common Stock | 060505104 | Purchase | 11/5/2008 | 23 | $23.8200 |
| Common Stock | 060505104 | Purchase | 11/5/2008 | 19,135 | $24.0530 |
| Common Stock | 060505104 | Purchase | 11/5/2008 | 17,600 | $24.0437 |
| Common Stock | 060505104 | Purchase | 11/5/2008 | 42,002 | $24.2500 |
| Common Stock | 060505104 | Purchase | 11/7/2008 | 12,674 | $20.2859 |
| Common Stock | 060505104 | Purchase | 11/17/2008 | 12,157 | $15.5245 |
| Common Stock | 060505104 | Purchase | 12/4/2008 | 13,290 | $14.7208 |
| Common Stock | 060505104 | Purchase | 12/22/2008 | 16,256 | $13.6528 |
| Common Stock | 060505104 | Purchase | 1/2/2009 | 32,000 | $14.2475 |
| Common Stock | 060505104 | Purchase | 1/12/2009 | 25,721 | $11.9409 |
| Common Stock | 060505104 | Sale | 9/16/2008 | (45,208) | $28.0245 |
| Common Stock | 060505104 | Sale | 9/16/2008 | (51,000) | $25.8603 |
| Common Stock | 060505104 | Sale | 9/19/2008 | (50,000) | $37.0094 |
| Common Stock | 060505104 | Sale | 9/26/2008 | (60,000) | $36.9973 |
| Common Stock | 060505104 | Sale | 10/8/2008 | (5,931) | $22.2007 |
| Common Stock | 060505104 | Sale | 10/16/2008 | (3,324) | $23.2553 |

| Type | CUSIP | Transaction | Date | Par Value | Price |
|------|-------|-------------|------|-----------|-------|
| Debt Security | 06051GDX4 | Sale | 11/18/2008 | $12,000,000 | $91.6790 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

I, Julie Becker, on behalf of Lead Plaintiff, Ohio Public Employees Retirement System ("Ohio PERS"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint") that:

1.    Ohio PERS did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.    Ohio PERS is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.    Ohio PERS has reviewed the Complaint and authorizes its filing.

4.    Attached in Schedule A are Ohio PERS' transactions during the Class Period in the securities that are the subject of this Complaint.

5.    Ohio PERS has full power and authority to bring suit to recover for its investment losses.

6.    I am authorized to make legal decisions on behalf of Ohio PERS with regards to this action.

7.    Ohio PERS intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firms of Kaplan Fox & Kilsheimer LLP and Bernstein Litowitz Berger & Grossman LLP, which have extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.    Ohio PERS has sought to serve and either was not appointed or is waiting to be appointed as lead plaintiff and representative party on behalf of the class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

- *Reimer v. Federal Home Loan Mortgage Corp., et al.,* No. 07-cv-10526 (S.D.N.Y.)
- *In re BP plc Securities Litigation,* No. 10-md-2185 (N.D. Tex.)

9.      Other than in this action, Ohio PERS has sought to serve and was appointed as lead plaintiff and representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

- *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp., et al.,* No. 08-cv-00160 (N.D. Ohio)

10.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Executed this 14th day of October, 2010.


By:    *Julie Becker*
       Julie Becker
       General Counsel
       *Ohio Public Employees Retirement System*

## SCHEDULE A

| Type | CUSIP | Transaction | Date | Shares | Price |
|------|-------|-------------|------|--------|-------|
| Common Stock | 060505104 | Purchase | 9/18/2008 | 1,400 | $30.0100 |
| Common Stock | 060505104 | Purchase | 10/1/2008 | 115,000 | $37.5800 |
| Common Stock | 060505104 | Purchase | 10/7/2008 | 150,000 | $22.0000 |
| Common Stock | 060505104 | Purchase | 10/14/2008 | 1,110 | $26.6100 |
| Common Stock | 060505104 | Purchase | 10/30/2008 | 211,074 | $22.6100 |
| Common Stock | 060505104 | Purchase | 10/31/2008 | 385,691 | $23.6300 |
| Common Stock | 060505104 | Purchase | 11/3/2008 | 4,300 | $23.8300 |
| Common Stock | 060505104 | Purchase | 11/4/2008 | 38,962 | $24.3700 |
| Common Stock | 060505104 | Purchase | 11/4/2008 | 61,306 | $24.1100 |
| Common Stock | 060505104 | Purchase | 11/13/2008 | 4,500 | $16.3500 |
| Common Stock | 060505104 | Purchase | 11/19/2008 | 47,895 | $13.6900 |
| Common Stock | 060505104 | Purchase | 11/21/2008 | 5,364 | $10.7300 |
| Common Stock | 060505104 | Purchase | 11/21/2008 | 1,670 | $10.7600 |
| Common Stock | 060505104 | Purchase | 11/26/2008 | 1,190 | $14.4100 |
| Common Stock | 060505104 | Purchase | 11/28/2008 | 18,407 | $15.8300 |
| Common Stock | 060505104 | Purchase | 12/5/2008 | 27,230 | $15.2400 |
| Common Stock | 060505104 | Purchase | 12/8/2008 | 10,407 | $17.1400 |
| Common Stock | 060505104 | Purchase | 12/10/2008 | 1,382 | $16.5600 |
| Common Stock | 060505104 | Purchase | 12/12/2008 | 1,210 | $14.6400 |
| Common Stock | 060505104 | Purchase | 12/15/2008 | 1,149 | $14.1900 |
| Common Stock | 060505104 | Purchase | 12/22/2008 | 1,337 | $13.6200 |
| Common Stock | 060505104 | Purchase | 12/24/2008 | 24,424 | $13.1600 |
| Common Stock | 060505104 | Purchase | 12/30/2008 | 41,804 | $12.8200 |
| Common Stock | 060505104 | Purchase | 12/30/2008 | 460,000 | $12.8500 |
| Common Stock | 060505104 | Purchase | 1/6/2009 | 88,546 | $14.4300 |
| Common Stock | 060505104 | Purchase | 1/7/2009 | 17,192 | $13.9700 |
| Common Stock | 060505104 | Purchase | 1/9/2009 | 6,600 | $13.1600 |
| Common Stock | 060505104 | Purchase | 1/16/2009 | 10,658 | $7.3800 |
| Common Stock | 060505104 | Purchase | 1/20/2009 | 19,176 | $5.7200 |
| Common Stock | 060505104 | Purchase | 1/21/2009 | 19,832 | $5.9000 |
| Common Stock | 060505104 | Sale | 9/18/2008 | (100,000) | $28.3900 |
| Common Stock | 060505104 | Sale | 9/22/2008 | (667) | $35.0100 |
| Common Stock | 060505104 | Sale | 10/2/2008 | (5,005) | $37.4400 |
| Common Stock | 060505104 | Sale | 10/6/2008 | (600) | $32.5500 |
| Common Stock | 060505104 | Sale | 10/8/2008 | (6,172) | $22.3200 |
| Common Stock | 060505104 | Sale | 10/24/2008 | (154,600) | $21.3600 |
| Common Stock | 060505104 | Sale | 11/19/2008 | (1,960) | $13.4400 |
| Common Stock | 060505104 | Sale | 11/21/2008 | (150,000) | $11.5700 |
| Common Stock | 060505104 | Sale | 12/1/2008 | (1,210) | $14.1100 |
| Common Stock | 060505104 | Sale | 12/12/2008 | (400,000) | $14.7100 |
| Common Stock | 060505104 | Sale | 1/12/2009 | (6,800) | $11.8900 |
| Common Stock | 060505104 | Sale | 1/13/1990 | (0.33) | $14.4300 |
| Common Stock | 060505104 | Sale | 1/13/2009 | (0.91) | $14.3600 |

| Type | CUSIP | Transaction | Date | Shares | Price |
|------|-------|-------------|------|--------|-------|
| Common Stock | 060505104 | Sale | 1/13/2009 | (0.01) | $14.0000 |
| Common Stock | 060505104 | Sale | 1/13/2009 | (0.30) | $14.4300 |
| Common Stock | 060505104 | Sale | 1/13/2009 | (7,160) | $10.9300 |
| Common Stock | 060505104 | Sale | 1/13/2009 | (0.10) | $14.4000 |
| Common Stock | 060505104 | Sale | 1/15/2009 | (200,000) | $7.5300 |

| Type | CUSIP | Transaction | Date | Units | Price |
|------|-------|-------------|------|-------|-------|
| Preferred Security | 060505DR2 | Purchase | 10/3/2008 | 125,000 | $83.5000 |
| Preferred Security | 060505DR2 | Sale | 12/30/2008 | 5,000,000 | $72.2500 |

| Type | CUSIP | Transaction | Date | Units | Price |
|------|-------|-------------|------|-------|-------|
| Bond Security | 060502DP6 | Purchase | 12/4/2008 | 8,300,000 | $95.4400 |
| Bond Security | 06051GDX4 | Sale | 10/17/2008 | 1,290,000 | $86.2030 |
| Bond Security | 06051GDX4 | Sale | 12/4/2008 | 8,000,000 | $95.6000 |
| Bond Security | 060505CK8 | Sale | 11/4/2008 | 1,000,000 | $97.2260 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Teacher Retirement System of Texas (hereinafter, "Texas Teachers" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.      Texas Teachers did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Texas Teachers is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Texas Teachers has reviewed the Complaint and authorizes its filing.

4.      Attached in Schedule A are Texas Teachers' transactions during the Class Period in the securities that are the subject of this Complaint.

5.      Texas Teachers has full power and authority to bring suit to recover for its investment losses.

6.      I, Ronnie Jung, Executive Director of Texas Teachers, am authorized to make legal decisions on behalf of Texas Teachers with regard to this action.

7.      Texas Teachers intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Bernstein Litowitz Berger & Grossmann LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      Other than in this action, Texas Teachers has not served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9.      Other than in this action, Texas Teachers has not sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24ᵗʰ day of September, 2009.

**Teacher Retirement System of Texas**

By:  _Ronnie Jung_

Ronnie Jung
*Executive Director*

**SCHEDULE A**

| Type | Transaction | Date | Shares | Price |
|---|---|---|---|---|
| Common Stock | Purchase | 09/15/2008 | 4,000 | $28.1734 |
| Common Stock | Purchase | 09/22/2008 | 6,000 | $34.9089 |
| Common Stock | Purchase | 09/29/2008 | 2,000 | $33.5426 |
| Common Stock | Purchase | 10/06/2008 | 2,000 | $32.1999 |
| Common Stock | Purchase | 10/16/2008 | 840,700 | $23.9793 |
| Common Stock | Purchase | 10/31/2008 | 819,000 | $23.0343 |
| Common Stock | Purchase | 11/03/2008 | 10,000 | $23.5934 |
| Common Stock | Purchase | 12/22/2008 | 168,000 | $13.7118 |
| Common Stock | Purchase | 12/23/2008 | 138,000 | $13.1194 |
| Common Stock | Purchase | 01/08/2009 | 8,754 | $13.4330 |
| Common Stock | Purchase | 01/12/2009 | 27,800 | $11.4300 |
| Common Stock | Sale | 09/30/2008 | -559,400 | $33.7135 |
| Common Stock | Sale | 10/03/2008 | -86,000 | $35.4627 |
| Common Stock | Sale | 10/07/2008 | -8,900 | $26.3396 |
| Common Stock | Sale | 10/08/2008 | -11,982 | $20.0890 |
| Common Stock | Sale | 10/20/2008 | -17,000 | $23.8710 |
| Common Stock | Sale | 12/08/2008 | -17,000 | $17.2417 |
| Common Stock | Sale | 12/15/2008 | -6,000 | $14.2049 |
| Common Stock | Sale | 01/06/2009 | -0.150 | $14.2667 |
| Common Stock | Sale | 01/08/2009 | -0.034 | $10.2941 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Stichting Pensioenfonds Zorg en Welzijn, duly represented by PGGM Vermogensbeheer B.V. (hereinafter, "PGGM" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.     PGGM did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.     PGGM is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.     PGGM has reviewed the Complaint and authorizes its filing.

4.     Attached in Schedule A are PGGM's transactions during the Class Period in the securities that are the subject of this Complaint.

5.     PGGM has full power and authority to bring suit to recover for its investment losses.

6.     I, Femke van 't Groenewout, Senior Advisor Responsible Investment at PGGM, am authorized to make legal decisions on behalf of PGGM with regard to this action.

7.     PGGM intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      Other than in this action, PGGM has not served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9.      PGGM has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re American International Group, Inc. 2008 Securities Litigation*, No. 08-4772 (S.D.N.Y.).

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24ᵗʰ day of September, 2009.

**Stichting Pensioenfonds Zorg en Welzijn,
duly represented by PGGM Vermogensbeheer B.V.**

By: _____
Femke van 't Groenewout
*Senior Advisor Responsible Investment*

## SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 9/19/2008 | 20,101 | $37.4825 |
| Common Stock | Purchase | 9/22/2008 | 830 | $35.0224 |
| Common Stock | Purchase | 10/1/2008 | 11,455 | $36.4424 |
| Common Stock | Purchase | 10/8/2008 | 375,766 | $22.0500 |
| Common Stock | Purchase | 10/9/2008 | 22,010 | $22.3907 |
| Common Stock | Purchase | 11/18/2008 | 24,888 | $15.1755 |
| Common Stock | Purchase | 11/28/2008 | 4,072,074 | $15.8240 |
| Common Stock | Purchase | 12/2/2008 | 450 | $14.4336 |
| Common Stock | Purchase | 12/2/2008 | 18,370 | $14.3800 |
| Common Stock | Purchase | 12/8/2008 | 5,686 | $17.1158 |
| Common Stock | Purchase | 12/11/2008 | 4,055 | $15.9675 |
| Common Stock | Purchase | 12/16/2008 | 1,400 | $14.4428 |
| Common Stock | Purchase | 12/16/2008 | 3,100 | $14.4428 |
| Common Stock | Purchase | 12/16/2008 | 26,100 | $14.4428 |
| Common Stock | Purchase | 12/29/2008 | 287,870 | $12.9425 |
| Common Stock | Purchase | 12/30/2008 | 1,910 | $12.8079 |
| Common Stock | Purchase | 12/30/2008 | 3,154 | $12.7868 |
| Common Stock | Purchase | 12/31/2008 | 302,923 | $14.0825 |
| Common Stock | Purchase | 1/7/2009 | 156,600 | $14.0505 |
| Common Stock | Sale | 9/30/2008 | (240,286) | $34.9823 |
| Common Stock | Sale | 10/14/2008 | (1,870) | $25.7342 |
| Common Stock | Sale | 10/31/2008 | (270,770) | $24.1674 |
| Common Stock | Sale | 11/17/2008 | (400) | $15.4511 |
| Common Stock | Sale | 11/21/2008 | (764,813) | $10.7992 |
| Common Stock | Sale | 11/21/2008 | (764,812) | $10.9320 |
| Common Stock | Sale | 12/19/2008 | (1,400) | $13.7974 |
| Common Stock | Sale | 12/19/2008 | (3,100) | $13.7974 |
| Common Stock | Sale | 12/19/2008 | (5,220) | $13.7974 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO FEDERAL SECURITIES LAWS

Lead Plaintiff, Fjärde AP-Fonden ("AP4" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws in the Consolidated Amended Class Action Complaint filed in this action (the "Complaint"), that:

1.      AP4 did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      AP4 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      AP4 has reviewed the Complaint and authorizes its filing.

4.      Attached in Schedule A are AP4's transactions during the Class Period in the securities that are the subject of this Complaint.

5.      AP4 has full power and authority to bring suit to recover for its investment losses.

6.      I, Agneta Wilhelmson Kåremar, Administrative Director of AP4, am authorized to make legal decisions on behalf of AP4 with regard to this action.

7.      AP4 intends to actively monitor and vigorously pursue this action for the benefit of the class, and it has retained the law firm of Barroway Topaz Kessler Meltzer & Check, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent Plaintiff in this action.

8.      In addition to this action, Plaintiff is currently serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Stratte-McClure v. Lynch*, No. 09-2017 (S.D.N.Y.).

9.    AP4 has sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Minneapolis Firefighters' Relief Association v. Medtronic Inc.*, No. 08-6324 (D. Minn.); *In re Wachovia Equity Securities Litigation*, No. 08-6171 (S.D.N.Y.); and *In re Citigroup Inc. Securities Litigation*, No. 07-9901 (S.D.N.Y.).

10.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24 day of September, 2009.

Fjärde AP-Fonden

By: _____

Agneta Wilhelmson Kåremar
*Administrative Director*

## SCHEDULE A

| Type | Transaction | Date | Shares | Price |
|------|-------------|------|--------|-------|
| Common Stock | Purchase | 9/26/2008 | 652,976 | $36.7000 |
| Common Stock | Purchase | 10/7/2008 | 60,000 | $24.5200 |
| Common Stock | Purchase | 10/7/2008 | 54,510 | $24.2641 |
| Common Stock | Purchase | 10/8/2008 | 107,100 | $22.0500 |
| Common Stock | Purchase | 10/9/2008 | 308,613 | $22.3917 |
| Common Stock | Purchase | 10/9/2008 | 25,701 | $23.6600 |
| Common Stock | Purchase | 1/15/2009 | 144,000 | $8.5325 |
| Common Stock | Sale | 7/31/2008 | (0.08) | $32.9800 |
| Common Stock | Sale | 11/24/2008 | (132,800) | $13.6349 |
| Common Stock | Sale | 11/25/2008 | (132,800) | $14.5758 |

# APPENDIX D

## CERTIFICATION

I, Grant Mitchell ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transaction(s) in the **Bank of America Corp.** security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| **SEE ATTACHED** |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _25_ day of _MAY_____, 2010.

**GRANT MITCHELL**

# E✱TRADE FINANCIAL

**Accounts**   **Trading & Portfolios**   **Banking**

✱ Open An Account   ⊛ Online Service Center   ∴ Feedback

Search: Enter Question or Keywords [GO]
Retirement & Guidance

Quotes: Enter Symbol or Name [US ▾] [GO]
Investing Products

Quotes & Research

Trade | Portfolios | View Orders | Balances | Transaction History | IPO Center | Active Trading | Global Trading | Options Trading |
Futures Trading

## View Orders

Open | Executed | Cancelled | Individual Fills | Expired | Rejected | All | 2-Second Execution Guarantee | Bond Orders

May 24, 2010 11:54 PM ET

? Alerts   ↻ Refresh   Portfolio   ⊘ Help

Account: 6561-8202 GRANT L MITCHELL TTEE GRA
Date range: From [ ] To: [ ] (mm/dd/yyyy)
Order number: [ ]
Or Security type: All

Symbol: vbaad
Order type: All
Order status: Executed
Results per page: 20

SUBMIT
College Search Criteria

### Order Summary

† = Share-weighted Average    * = Execution Guarantee Eligible

Orders

| Date | Order # | Type | Order Type | Quantity (Exec / Entered) | Symbol | Price Type | Term | Price | Price Executed | Status | Related Links |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/23/09 | 5126 | Option | Sell Close | 10 | VBAAD | Limit | Day | 1.45 | 1.45 | Executed | Gains/Losses |
| 06/08/09 | 5012 | Option | Sell Close | 3 | VBAAD | Limit | Day | 3.40 | 3.40 | Executed | Gains/Losses |
| 02/27/09 | 4941 | Option | Buy Open | 3 | VBAAD | Limit | Day | 0.5000 | 0.5000 | Executed | Portfolios |
| 01/03/09 | 4868 | Option | Buy Open | 2 | VBAAD | Limit | Day | 2.76 | 2.76 | Executed | Portfolios |
| 12/19/08 | 4847 | Option | Buy Open | 2 | VBAAD | Limit | Day | 3.20 | 3.20 | Executed | Portfolios |
| 12/18/08 | 4841 | Option | Buy Open | 2 | VBAAD | Limit | Day | 3.40 | 3.40† | Executed | Portfolios |
| 11/18/08 | 4791 | Option | Buy Open | 2 | VBAAD | Limit | Day | 4.00 | 4.00 | Executed | Portfolios |
| 11/17/08 | 4790 | Option | Buy Open | 2 | VBAAD | Limit | Day | 4.35 | 4.35 | Executed | Portfolios |

GAINSKEEPER    Prepare your Schedule D fast! Download your trades into GainsKeeper and minimize your tax preparation time. Learn more

SCHEDULE A

| Type of Security Bank of American Options | Number | Bought (B) | Sold (S) | Date | Price |
|---|---|---|---|---|---|
| Jan 020 Call (2011) | 2 | (B) | | 12/16/08 | $3.40 |
| JAN 20 Call " | 2 | 8 | | 01/08/09 | 2.28 |
| JAN 20 Call " | 2 | B | | 12/19/08 | 3.20 |
| Nov 08 | | | | | |
| JAN 20 Call " | 2 | B | | 11/18/08 | 4.00 |
| JAN 20 Call " | 2 | B | | 11/17/08 | 4.35 |
| | | | | | |
| JAN 20 Call " | 10 | | 5 | 7/23/09 | 1.45 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |