## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File<br><br>No. 09 MDL 2058 (PKC)<br><br>ECF CASE |

THIS DOCUMENT RELATES TO:



THOMAS P. DINAPOLI, COMPTROLLER OF THE STATE OF NEW YORK, AS ADMINISTRATIVE HEAD OF THE NEW YORK STATE AND LOCAL RETIREMENT SYSTEMS AND AS SOLE TRUSTEE OF THE NEW YORK STATE COMMON RETIREMENT FUND, THE NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, and THE PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO,

Related File

No. 10-CV-5563 (PKC)

**COMPLAINT**

**JURY TRIAL DEMANDED**

ECF CASE

               Plaintiffs,

     v.

BANK OF AMERICA CORPORATION, KENNETH D. LEWIS, JOSEPH L. PRICE, and NEIL A. COTTY,

               Defendants.

## TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ................................................................. 2

    A.    Defendants Made Material Misrepresentations, Omitted Material Facts And Failed To Correct Material Misstatements In The Proxy Statement And Related Solicitation Materials ...................................................... 10

    B.    Defendants Knowingly And/Or Recklessly Made Materially False And Misleading Statements And Omitted Material Facts Concerning BOA's Acquisition Of Merrill Lynch During The Section 10(b) Relevant Period ......... 14

    C.    Defendants Gradually Disclosed Previously Withheld And/Or Misrepresented Material Facts ...................................................... 16

II.   JURISDICTION AND VENUE ............................................................. 17

III.  THE PARTIES ...................................................................................... 18

    A.    Plaintiffs ....................................................................................... 18

    B.    Defendant Bank Of America Corporation ..................................... 20

    C.    Individual Defendants ................................................................... 20

        1.    Kenneth D. Lewis ................................................................ 20

        2.    Joseph L. Price .................................................................... 21

        3.    Neil A. Cotty ....................................................................... 22

IV.   FACTUAL BACKGROUND ................................................................. 24

    A.    Pre-Merger BOA ........................................................................... 24

    B.    Pre-Merger Merrill ........................................................................ 25

    C.    The Lehman Meetings ................................................................... 26

    D.    Merrill Initiates Merger Discussions With BOA ........................... 28

    E.    Defendants' Purported Due Diligence On The Merger ................... 29

    F.    The Merger Valuation And Pricing Negotiations .......................... 30

    G.    BOA Secretly Agrees To Permit Merrill To Pay Up To $5.8 Billion In Bonuses To Merrill Employees Prior To The Merger Closing Date ................... 30

    H.    The Merger Presentation To BOA's Board Of Directors ................. 34

V.    SUMMARY OF CLAIMS .................................................................... 35

VI.   DEFENDANTS' VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER ........................ 36

    A.    Materially False And Misleading Statements And Omissions Of Material Fact In The Proxy Statement And Related Solicitation Materials ................. 36

        1.    Defendants Announce the Merger ........................................ 36

        2.    The Merger Presentation to Investors ................................... 37

i

3.   The September 15, 2008 Analyst Conference Call .................................. 38

4.   The Undisclosed Agreement to Permit Billions of Dollars in Bonuses to Merrill Employees .................................................. 41

5.   The Proxy Statement ......................................................................... 42

6.   The Fairness Opinions ...................................................................... 46

7.   The Proxy Statement's Disclosure of Government Financing ................ 48

B.   The Merger Agreement Provided Defendants With The Means To Protect BOA Shareholders, Which Defendants Neglected to Do .................................... 50

1.   Defendants' Continuous Access to Merrill's Financial Information ........ 50

2.   The Companies' Representations and Warranties ................................... 53

C.   Defendants Fail To Correct The Material Misstatements And Omissions In The Proxy Statement ........................................................................................ 56

1.   The November 21, 2008 Amendment to the Proxy Statement ................ 57

2.   The November 26, 2008 Amendment to the Proxy Statement ................ 58

3.   The November 26, 2008 Press Release .................................................. 60

4.   BOA Shareholders, Including Plaintiffs, Vote to Approve the Merger .... 60

5.   Defendant Lewis Abruptly Fires Timothy Mayopoulos as BOA's General Counsel After He Sought Information on Merrill's Growing Losses ........................................................................................ 61

6.   BOA Consults with Merrill on Paying Undisclosed Bonuses to Merrill Employees .......................................................................... 63

7.   Defendant Lewis' Undisclosed December 17, 2008 Meeting with Federal Regulators and Subsequent Undisclosed Negotiations to Prevent Merrill's Losses from Derailing the Merger .............................. 64

D.   BOA Finally Discloses Merrill's Fourth Quarter Losses And BOA's Request For, And Receipt Of, Additional Federal Financing .............................. 74

1.   Defendant Lewis' Memorandum to BOA Employees ............................. 75

2.   BOA's Fourth Quarter 2008 Press Release ........................................... 76

3.   BOA's Fourth Quarter Earnings Conference Call .................................. 78

E.   Ensuing Investigations ........................................................................................ 80

1.   The New York State Attorney General's Investigation of BOA's Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses ...................................................................... 80

2.   The Oversight Committee Investigation and the SEC Action Further Confirm Defendants' Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses .................................. 83

VII.    TOLLING OF THE STATUTE OF LIMITATIONS .......................................................... 86

COUNT I:    Violation of § 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants ...................................................... 86

COUNT II:    Violation of § 20(a) of the Exchange Act Against Defendants Lewis, Price, and Cotty.............................................................................................. 89

VIII.    DEFENDANTS' VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER ................................................. 91

   A.    Defendants Knowingly And/Or Recklessly Made Materially False And Misleading Statements And Failed To Disclose Material Facts ........................... 91

   B.    Defendants Eventually Disclose The Truth ........................................................ 102

   C.    Additional Scienter Allegations For Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act ...................................................................... 104

   D.    Loss Causation For Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act ...................................................................................................... 106

   E.    Group Pleading ................................................................................................... 107

   F.    Fraud On The Market Presumption .................................................................... 109

   G.    The Safe Harbor Provision Of The PSLRA Is Inapplicable To Plaintiffs' Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act................. 110

COUNT III:    Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against BOA and Defendants Lewis and Price .............................. 111

COUNT IV:    Violation of § 20(a) of the Exchange Act Against Defendants Lewis, Price, and Cotty.............................................................................................. 114

IX.    PRAYER FOR RELIEF ......................................................................................... 117

X.    JURY DEMAND .................................................................................................... 118

Plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund, the New York State Teachers' Retirement System, and the Public Employees' Retirement Association of Colorado (collectively, the "Plaintiffs") allege the following upon information and belief, except for those facts pertaining to Plaintiffs, which are based upon personal knowledge.

Plaintiffs' information and belief is based upon, among other things, a continuing investigation, directed and supervised by Plaintiffs and conducted by and through Plaintiffs' undersigned counsel, into the facts and circumstances alleged herein concerning the merger announced on September 15, 2008 (the "Merger") between Bank of America Corporation ("BOA" or the "Company") and Merrill Lynch & Co., Inc. ("Merrill") including, without limitation, review and analysis of:

(i)     BOA's Registration Statement, filed on Form S-4 with the U.S. Securities and Exchange Commission ("SEC") on October 2, 2008, as amended on October 22, 2008 and October 29, 2008 on forms S-4/A (collectively, the "Proxy Registration Statement");

(ii)    the Schedule 14A Definitive Joint Proxy Statement dated October 31, 2008 and filed with the SEC on November 3, 2008, and all appendices thereto and documents incorporated by reference therein (together with the Proxy Registration Statement, the "Proxy Statement" or the "Proxy");

(iii)   the SEC Form 425 filings by BOA dated November 21, 2008 and November 26, 2008, purporting to amend the Proxy Statement;

(iv)    press conferences, analyst conference calls and conferences, and corresponding transcripts thereof, conducted by or concerning BOA and/or Merrill;

(v)     press releases, public statements, news articles, and other publications disseminated by and/or concerning BOA, the other defendants named herein (collectively, the "Defendants") and/or Merrill;

    (vi)    analyst reports concerning BOA and its operations;

    (vii)    the corporate websites of BOA, Merrill, and related parties;

    (viii)    documents, press releases, and additional materials regarding investigations conducted by the SEC and the Attorney General of the State of New York ("Attorney General") concerning, among other things, the veracity of Defendants' public statements in connection with the Merger, including the Attorney General's complaint against BOA and related parties filed on February 4, 2010;

    (ix)    testimony of persons with knowledge of, and/or who participated in, the consummation of the Merger, pursuant to the investigation conducted by the Domestic Policy Subcommittee of the House of Representatives' Oversight and Government Reform Committee (the "Oversight Committee Investigation"), and certain documents produced to the Oversight Committee as part of its Investigation;

    (x)    BOA internal documents, including e-mails, notes, and minutes from Board of Directors meetings that BOA has produced to Congress, the Attorney General, the SEC, and/or other regulators in connection with investigations into the facts and circumstances surrounding the Merger; and

    (xi)    other public information concerning BOA and the other Defendants.

Many additional facts supporting the allegations herein are known only to Defendants and are within their exclusive custody or control. Plaintiffs believe that additional evidentiary support for the allegations herein will exist after a reasonable opportunity to conduct discovery.

## I.    SUMMARY OF THE ACTION

    1.    This action arises from Defendants' wholesale failure to communicate with BOA's shareholders, including Plaintiffs, completely and truthfully in connection with the Merger between BOA and Merrill as required under the federal securities laws. Defendants obtained shareholder approval for the Merger based upon materially false and misleading

statements and omissions of material fact in the Proxy Statement and related solicitation materials, which Defendants failed to correct.

2.      BOA shareholders, like Plaintiffs, who were entitled to vote on the Merger did so without critical facts, including, but not limited to:  (i) BOA failed to conduct adequate due diligence in connection with the Merger; (ii) the extent of Merrill's tremendous fourth quarter 2008 losses, which Defendants knew to be at least $15.3 *billion* on a pre-tax basis prior to the December 5, 2008 shareholder vote approving the Merger (the "Shareholder Vote"); and (iii) BOA and Merrill's undisclosed agreement to permit Merrill to pay up to $5.8 billion in bonuses to Merrill employees prior to the January 1, 2009 Merger closing date (the "Closing Date"), out of which $3.6 billion was paid on or before December 31, 2008.  These undisclosed facts were material to BOA shareholders' votes in connection with the Merger.

3.      Under the weight of Merrill's undisclosed losses, the Merger was only salvaged through a $138 billion taxpayer bailout, consisting of an emergency infusion of more than $20 billion in government capital and $118 billion in asset guarantees.  This funding was in direct contrast to BOA's statements before the Merger that the Company did not need government assistance.

4.      From the time the Merger was first announced on September 15, 2008 (the "Merger Announcement") through the Shareholder Vote on December 5, 2008 and the Closing Date on January 1, 2009, Defendants misrepresented and failed to disclose material facts concerning the Merger, and failed to correct the Proxy Statement as required by law.  Defendants did not begin to disclose the truth until weeks after the Closing Date, thus ensuring that BOA shareholders entitled to vote on the Merger lacked material information required for a fully informed decision.

5.      Plaintiffs suffered substantial damages as a result of Defendants' material misrepresentations and omissions in connection with the Merger.  Plaintiffs assert claims under Section 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act") because they were entitled to vote for the approval of the Agreement and Plan of Merger between Merrill and BOA, dated September 15, 2008 (the "Merger Agreement"), and Plaintiffs voted 32,549,905 shares of BOA common stock that they owned on October 10, 2008 (the "Record Date") in favor of the Merger.

6.      As alleged herein, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by negligently misrepresenting and omitting material facts in the Proxy Statement and related solicitation statements concerning, among other things:

- the adequacy of the due diligence conducted in connection with the Merger;

- the exposure to substantial losses and corresponding negative impact upon the fairness of the Merger to BOA shareholders resulting from, among other things, troubled assets on Merrill's balance sheet; and

- the secret agreement between BOA and Merrill permitting Merrill to pay up to $5.8 billion in bonuses to Merrill employees prior to the Closing Date.

7.      Defendants further violated Section 14(a) and Rule 14a-9 of the Exchange Act by negligently *failing to correct* the Proxy Statement and related solicitation materials to prevent the statements therein from being materially false and misleading when Defendants had reason to know, among other things, that:

- as of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion and increased to $15.3 billion prior to the Shareholder Vote;

- BOA met with its attorneys to consider whether Merrill's astronomical losses for the fourth quarter of 2008 permitted or

4

required BOA to abandon the Merger prior to the Shareholder Vote;

- on December 8, 2008 – the first business day after the Shareholder Vote approving the Merger – BOA permitted Merrill to make $3.6 billion in undisclosed bonus payments to Merrill employees prior to the Closing Date;

- after consulting with BOA's Board of Directors, BOA's Chief Executive Officer, Defendant Kenneth Lewis ("Lewis"), met with Treasury Secretary Henry Paulson ("Paulson") and Federal Reserve Chairman Benjamin Bernanke ("Bernanke") in Washington, D.C. on December 17, 2008 to discuss BOA's desire to terminate the Merger based upon Merrill's losses; and

- as a result of Defendant Lewis' secret meetings with federal regulators, BOA obtained more than $20 billion in additional federal funding and $118 billion in related financial guarantees, without which the Merger would have unraveled.

8.      In addition to their negligent misstatements and omissions identified above, Defendants BOA, Lewis, and Joseph L. Price ("Price"), BOA's then Chief Financial Officer, violated Section 10(b) and Rule 10b-5 of the Exchange Act by knowingly and/or recklessly making materially false and misleading statements and omissions of material fact during the period from September 15, 2008 through January 21, 2009 (the "Relevant Period") concerning the Merger and its purportedly positive impact on BOA.  The New York State Common Retirement Fund purchased 3,058,802 shares, the New York State Teachers' Retirement System purchased 945,620 shares, and the Public Employees' Retirement Association of Colorado purchased 1,377,200 shares of BOA common stock on the open market during the Relevant Period and suffered damages thereby.

9.      The Merger, which BOA touted to its shareholders as creating a "company unrivaled in its breadth of financial services and global reach," has instead resulted in substantial damages to Plaintiffs.  Additionally, the Merger spawned congressional investigations, other

federal and state regulatory investigations, lawsuits by the SEC and the Attorney General, and resignations of multiple BOA Board members, including Defendant Lewis' December 31, 2009 resignation as Chief Executive Officer of BOA.

10.     At BOA's April 29, 2009 annual meeting, BOA shareholders voted to strip Defendant Lewis of his position as Chairman of BOA's Board of Directors based upon his conduct in connection with the Merger. *BusinessWeek* reported that same day that the "vote marked the first time that a company in the Standard & Poor's 500-stock index [had] been forced by shareholders to strip a CEO of chairman duties. . . ." At the shareholder meeting, Defendant Lewis conceded that BOA's shareholders "have carried a heavy burden" as a result of the Merger.

11.     In June 2009, the Oversight Committee Investigation commenced with testimony from persons with knowledge of, and/or who participated in, the consummation of the Merger, including, among others, Paulson, Bernanke, and Defendants Lewis, Price, and Neil A. Cotty ("Cotty"), BOA's Chief Accounting Officer. The Investigation focused on Defendants' failure to timely disclose:

       (i)     Merrill's mounting fourth quarter 2008 losses;

       (ii)    the secret agreement to pay up to $5.8 billion in bonuses to Merrill employees, of which $3.6 billion was paid prior to the Closing Date; and

       (iii)   BOA's arrangement with federal regulators to receive a combined $138 billion taxpayer bailout to save the Merger.

12.     On August 3, 2009, the SEC sued BOA for violating Section 14(a) and Rule 14a-9 of the Exchange Act (the "SEC Action"), alleging that "Bank of America's failure to disclose [its agreement before the merger closed] to allow Merrill to pay up to $5.8 billion in

discretionary bonuses" violated the federal securities laws because "this omission made statements in Bank of America's proxy materials materially false and misleading."

13.    On the same day that the SEC filed its complaint, it announced that BOA had agreed to settle the SEC Action and pay a $33 million fine.  However, on September 14, 2009, the Honorable Jed. S. Rakoff, United States District Court Judge for the Southern District of New York, rejected the settlement, determining that, given the apparent strength of the allegations, the proposed settlement was "neither fair, nor reasonable, nor adequate."  Judge Rakoff also called the proposed settlement a breach of "justice and morality" and ordered the parties to appear for trial on February 1, 2010.

14.    On February 4, 2010, the SEC and BOA agreed to a new settlement requiring BOA to pay a $150 million fine and to implement certain internal control procedures.  On February 22, 2010, Judge Rakoff "reluctantly" granted the parties' settlement.  After reviewing hundreds of pages of deposition testimony and other evidentiary material, Judge Rakoff noted that:  (i) the Proxy Statement "failed adequately to disclose [BOA's] agreement to let Merrill pay . . . $5.8 billion in bonuses at a time when Merrill was suffering huge losses"; and (ii) BOA "failed adequately to disclose [prior to the Shareholder Vote or Closing Date BOA's] ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008."  While characterizing the $150 million settlement as "half-baked justice at best" and "far from ideal" given that it was paltry in light of the circumstances, Judge Rakoff nevertheless approved the settlement.  In so doing, Judge Rakoff gave "substantial deference" to the SEC "as the regulatory body having primary responsibility for policing the securities markets" and exercised "judicial restraint" to not impose the Court's "own preferences."

15.     On September 8, 2009, Attorney General Cuomo sent a letter to BOA's outside counsel noting that the Attorney General's ongoing investigation had identified, at a minimum, the following four instances in the fourth quarter of 2008 where the Defendants failed to disclose material non-public information to BOA's shareholders:

(i)     BOA's knowledge just prior to December 5, 2008 of Merrill's more than $14 billion in fourth quarter 2008 losses;

(ii)    Merrill's goodwill charge of more than $2 billion associated with subprime-related losses prior to the Shareholder Vote;

(iii)   BOA's determination eight business days after the Shareholder Vote that it had a strong legal basis to terminate the Merger because of Merrill's enormous losses; and

(iv)    the $3.6 billion in accelerated undisclosed bonus payments to Merrill employees that BOA approved on December 8, 2008.

The Attorney General concluded:  "***[t]he facts of the cascading losses and bonus payments – and the facts of [BOA's] senior executives' knowledge of these events – are straightforward.***"[1]

16.     Pursuant to the ongoing investigations by the Oversight Committee, the Attorney General, and the SEC, BOA agreed on October 12, 2009 to waive the attorney-client privilege and produced certain documents to these parties.  Among other things, those documents confirm that Defendants knew of Merrill's fourth quarter 2008 losses before both the Shareholder Vote and the Closing Date.

17.     For example, Defendant Cotty, BOA's Chief Accounting Officer, wrote an e-mail on November 5, 2008 – one month before the Shareholder Vote – to Defendant Price that included Merrill's October 2008 financial report.  The e-mail, which estimated Merrill markdowns and "other large items" of $5.3 billion, included Defendant Cotty's comment: "***Read and weep***."  Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin,

---

[1] Throughout this Complaint, all emphasis to quoted statements is added unless otherwise noted.

Merrill's then Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated:  "***What a disaster!***"  As detailed more fully herein, these documents confirm that Defendants had reason to know that the Proxy materials, pursuant to which Plaintiffs and other BOA shareholders approved the Merger, were materially false and misleading.

18.     Similarly, an October 14, 2009 article in *The New York Times* cited a January 15, 2009 e-mail from BOA Board member Charles Gifford ("Gifford") to BOA Board member Thomas May ("May") stating that the Merger "***screw[ed] the shareholders!***"  May replied "***[n]o trail***," suggesting that Gifford should not write messages that could later be detrimental to BOA if produced in litigation.

19.     Before many of the facts alleged herein emerged, the General Counsel of the Federal Reserve, Scott Alvarez ("Alvarez"), highlighted in a December 23, 2008 e-mail to Bernanke Defendants' likely liability for BOA's failure to disclosure Merrill's fourth quarter losses and massive bonuses prior to the Shareholder Vote:

> Management may be exposed if it doesn't properly disclose information that is material to investors.  There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . ***His [Lewis'] potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BOA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.***

As the facts alleged herein demonstrate, Defendants had access to daily information demonstrating Merrill's massive fourth quarter 2008 losses before the Shareholder Vote, and they are liable for failing to disclose these losses.  In fact, by November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders.  Defendants, however, failed to

make any disclosures regarding Merrill's known fourth quarter 2008 losses until after both the

Shareholder Vote and Closing Date.

20.     On February 4, 2010, the Attorney General filed a complaint against Defendants

BOA, Lewis, and Price asserting causes of action under the New York Martin Act and New York

Executive Law for securities fraud and "persistent fraud or illegality" arising from the facts and

circumstances detailed herein.  In a press release issued that day, the Attorney General stated:

> Bank of America, through its top management, engaged in a concerted effort to
> deceive shareholders and American taxpayers at large.  This was an arrogant
> scheme hatched by the bank's top executives who believed they could play by
> their own set of rules.  In the end, they committed an enormous fraud and
> American taxpayers ended up paying billions for Bank of America's misdeeds.

**A.      Defendants Made Material Misrepresentations, Omitted Material
Facts And Failed To Correct Material Misstatements In The Proxy
Statement And Related Solicitation Materials**

21.     On September 13, 2008, out of concern that Merrill, like Lehman Brothers

Holdings, Inc. ("Lehman"), was facing imminent collapse, Merrill Chief Executive Officer, John

Thain ("Thain"), initiated discussions with BOA that resulted in the Merger.  The terms of the

Merger that allowed Merrill to stave off its demise were negotiated in hastily arranged meetings

between BOA and Merrill, which transpired over the course of a day-and-a-half.  BOA and its

outside financial advisors, J.C. Flowers & Co. LLC ("J.C. Flowers") and Fox-Pitt Kelton

Cochran Caronia Waller LLC ("Fox-Pitt") (together, the "Financial Advisors"), purportedly

conducted due diligence in connection with the Merger, including an examination of Merrill's

financial condition, during this same brief period of time.  BOA's Board of Directors

unanimously approved the terms of the transaction on September 14, 2008 after the purported

due diligence was completed.  Thus, over the course of approximately 36 hours, a merger of two

of the largest financial services institutions in the world was proposed and agreed upon by

BOA's Board of Directors.

22.    Early on September 15, 2008, BOA and Merrill executed the Merger Agreement, which set forth the terms of the transaction.  Among other things, the Merger Agreement gave BOA and its agents complete access to Merrill's books and records throughout the period leading up to the January 1, 2009 Closing Date.  Thus, from the date that the Merger was announced through the Closing Date, BOA and its agents had the ability to monitor Merrill's financial performance and the status of its assets, the impairment of which necessitated the Merger.

23.    Following Defendants' purportedly adequate due diligence, BOA agreed to purchase Merrill in an all-stock transaction pursuant to which BOA would exchange 0.8595 shares of the Company's common stock for each share of Merrill (the "Exchange Ratio").  Based upon BOA's September 12, 2008 closing price of $33.74 per share, Merrill shareholders would receive consideration of $29.00 for each share of Merrill stock, which represented a premium of approximately 70% over the $17.05 closing price of Merrill's common stock on September 12, 2008, the last trading day before the Merger was announced.  At this time, the value of the transaction was approximately $50 billion.

24.    On November 3, 2008, BOA filed the Proxy Statement dated October 31, 2008 with the SEC and mailed copies of it to BOA shareholders, including Plaintiffs.  The Proxy Statement enumerated the putative steps taken by BOA and the Financial Advisors in conducting due diligence of Merrill, and contained the BOA Board of Directors' unanimous recommendation that BOA shareholders approve the Merger.

25.    The Proxy Statement contained materially false and misleading statements and failed to disclose material facts necessary to make the statements therein not misleading.  For example, the Proxy Statement materially misstated the adequacy of the due diligence conducted by BOA and the Financial Advisors suggesting, among other things, that their collective,

purportedly extensive prior knowledge of both Merrill and BOA was an adequate substitute for a more thorough analysis. Further, despite referencing "material factors" that Defendants considered in approving the Merger, the Proxy Statement did not disclose the likelihood that Merrill would continue to suffer the significant losses in its trading and investment securities portfolios that necessitated the Merger.

26.     The Proxy Statement, like Defendants' public statements preceding it and following it, also failed to disclose BOA's agreement to permit Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date.

27.     Making matters worse, Defendants failed to honor their continuing legal obligation to update and correct the Proxy Statement to reflect what they knew or should have known about, among other things:

> (i)     Merrill's growing losses in the fourth quarter of 2008, causing BOA to consider scrapping the Merger prior to the Shareholder Vote;
>
> (ii)     BOA's December 8, 2008 approval of the payment of $3.6 billion (out of the $5.8 billion agreed upon) in bonuses to Merrill employees prior to the Closing Date; and
>
> (iii)     BOA's meeting with federal regulators to discuss BOA's potential termination of the Merger based upon the devastating impact of Merrill's still-undisclosed fourth quarter losses, which resulted in a $138 billion taxpayer bailout to prevent the Merger from imploding.

28.     In fact, the Oversight Committee Investigation has confirmed that by November 12, 2008, Defendants were consulting internally with BOA's attorneys to determine whether they were required to disclose Merrill's then-known fourth quarter 2008 losses. The Attorney General's investigation has also confirmed that Defendants knew of Merrill's mounting losses in

November 2008 — prior to the Shareholder Vote.  Specifically, on September 8, 2009, the

Attorney General wrote a letter to BOA's outside counsel stating, in part:

> In November 2008, [BOA] became aware of at least $9 billion in previously
> undisclosed forecasted losses at [Merrill].  [BOA's] Chief Financial Officer,
> [Defendant] Price, has testified that his decision not to disclose those losses came
> after receiving legal advice from [BOA's] then General Counsel, Timothy
> Mayopoulos, as well as from outside counsel.  [Defendant] Price further testified
> that [BOA] decided not to disclose Merrill's expected fourth quarter losses
> following a call on November 20, 2008 with outside counsel.

29.     These huge losses sparked a debate among Defendants as to whether to terminate

the Merger before the Shareholder Vote.  As the Attorney General noted in his September 8,

2009 letter, Merrill's fourth quarter 2008 losses "were so great that [BOA] officers sought

guidance – *before [BOA] shareholders approved the merger* – about the applicability of the

[Material Adverse Effect] clause in its merger agreement with [Merrill], the very same provision

relied upon eight business days after the merger was approved, when [BOA] told regulators it

had a legal basis to terminate the merger."  (emphasis in original.)

30.     Despite filing amendments to the Proxy Statement with the SEC on November 21

and November 26, 2008, Defendants failed to disclose these material facts bearing upon the

fairness of the Merger.  Instead, BOA shareholders were deprived of information that was

material to their vote, and an overwhelming 82% of votes, including those based upon the

32,549,905 BOA shares that Plaintiffs voted, were cast in favor of the Merger on December 5,

2008.

31.     Even after the Shareholder Vote, the Defendants were required to update the

Proxy Statement and related solicitation materials before consummating the Merger on the

Closing Date.  They failed to meet this obligation as well.

32.     In addition to permitting Merrill to pay billions of dollars in bonuses to its

employees prior to the Closing Date, Defendants also failed to disclose that Merrill's known pre-

tax losses ballooned to $21 billion by the end of the fourth quarter of 2008, sending Defendant

Lewis on an emergency trip to meet with Bernanke and Paulson in Washington, D.C. on

December 17, 2008 to discuss walking away from the Merger. Equally amazing, Defendants

failed to disclose the $138 billion government bailout that BOA obtained to salvage the Merger

as a result of Defendant Lewis' hat-in-hand meeting with federal regulators.

33.     The facts above, as discussed more fully herein, demonstrate that Defendants

violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by depriving

BOA shareholders, including Plaintiffs, of information that was clearly material to their vote on

the Merger. The approval of the Merger was instead based upon a materially false and

misleading Proxy Statement and related solicitation materials that were essential links in

obtaining the necessary BOA shareholder votes. Plaintiffs have suffered damages directly

caused by Defendants' violations.

**B.    Defendants Knowingly And/Or Recklessly Made Materially False
        And Misleading Statements And Omitted Material Facts Concerning
        BOA's Acquisition Of Merrill Lynch During The Section 10(b)
        Relevant Period**

34.     Plaintiffs' allegations of Defendants' negligence are all that is required to plead

Defendants' violations of Section 14(a) and Rule 14a-9 of the Exchange Act. Scienter is not, and

cannot be construed as, an element of such claims. Nevertheless, Defendants also knowingly

and/or recklessly made materially false and misleading statements and omissions of material fact

concerning BOA's prospects in connection with the Merger which artificially inflated the price

of BOA securities during the Relevant Period. Certain of these materially false and misleading

statements give rise to separate and distinct claims under Section 10(b) and Rule 10b-5 of the

Exchange Act.

35.     For example, on or about September 15, 2008, BOA agreed to permit Merrill to pay up to $5.8 billion in bonuses to its employees before the scheduled Closing Date on January 1, 2009.  These bonuses were clearly material, equaling 11.6% of the total value of the Merger at the time.  Ultimately, on December 8, 2008, BOA authorized Merrill to pay $3.6 billion in bonuses prior to the Closing Date, representing 62% of the total potential bonus payments agreed to on September 15, 2008.  BOA was also aware that Merrill historically paid year-end discretionary bonuses in January, and the agreement allowed Merrill to accelerate the payment of these bonuses prior to the January 1, 2009 Closing Date.  At no point during the Relevant Period did Defendants disclose to the investing public the existence of BOA's agreement with Merrill or the eventual payment of the Merrill bonuses.

36.     Defendants also failed to disclose to investors Merrill's massive fourth quarter losses in late November 2008 when they knew that Merrill had already lost at least $13.3 billion for the quarter.  By the morning of the Shareholder Vote, Defendants knew that Merrill's losses had increased to $15.3 billion, but failed to disclose this material information.

37.     Defendants further failed to disclose to investors that as a result of Defendant Lewis' December 17, 2008 emergency meeting with Paulson and Bernanke, BOA accepted $138 billion from the government, consisting of more than $20 billion in additional capital and $118 billion in asset guarantees, to rescue the Merger – a material omission in light of Defendants' prior disclosure of the Company's receipt of federal funding, including those in the November 26, 2008 amendment to the Proxy Statement, and assurances that BOA would not need additional government financing to complete the Merger.

38.     In celebrating the closing of the Merger on January 1, 2009, Defendants made materially false and misleading statements and omissions of material fact by claiming, among

15

other things, that the transaction "uniquely positioned [BOA] to win market share and expand

[BOA's] leadership position in markets around the world."

39.     Defendants knowingly and/or recklessly failed to disclose that Merrill had

suffered staggering losses during the fourth quarter of 2008 that caused BOA to seriously

consider abandoning the deal.  As Plaintiffs would later learn, the Merger came about only

through BOA's receipt of a massive amount of additional government funding.

C.     **Defendants Gradually Disclosed Previously Withheld And/Or Misrepresented Material Facts**

40.     On January 12, 2009, news began to emerge indicating that BOA would report

disappointing financial results.  On this day, a Citigroup analyst advised that BOA would report

massive losses and cuts its dividend.  In response, BOA's share price declined from its opening

price of $12.86 to close at $11.43.

41.     After the close of trading on January 14, 2009, BOA's December 2008

discussions with federal regulators and its need for additional federal funding based upon

Merrill's still undisclosed fourth quarter 2008 losses became public in an article appearing in *The

Wall Street Journal*.  The next day, BOA's common stock lost 18% of its value, dropping from

$10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009.

42.     On January 16, 2009, BOA issued its preliminary financial results for the fourth

quarter and full year of 2008, disclosing, among other things, BOA's loss of $1.79 billion for the

fourth quarter of 2008 and, at last, Merrill's $15.31 billion fourth quarter net loss (more than $21

billion before taxes).  On this news, BOA's stock price dove again, from $8.32 per share on

January 15, 2009 to $7.18 per share at the close of trading on January 16, 2009.

43.     During BOA's fourth quarter 2008 conference call on January 16, 2009,

Defendant Lewis admitted, among other things, that Defendants knew of Merrill's extreme

losses prior to completing the Merger and that negotiations with federal regulators to salvage the transaction had also taken place before the Merger closed:

> ***We went to our regulators and told them that we would not - that we could not close the deal without their assistance***. As a result, we have agreed to the issuance of $20 billion in Tier-1 qualifying TARP preferred [stock] as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee that is essentially insurance protection on approval of capital markets related assets.

44.     During the call, Defendant Lewis also acknowledged that BOA evaluated its rights to terminate the Merger under the Merger Agreement and decided to move forward only with the assistance of regulators.  Defendant Lewis stated that he intentionally sought to avoid taking any action that would result in re-pricing the Merger because doing so would have necessitated a new shareholder vote on the transaction, perhaps defeating the Merger.

45.     After the market closed on January 21, 2009, *The Financial Times* issued a story reporting that Merrill had made accelerated bonus payments, estimated at between $3-$4 billion, before the Closing Date.

46.     Upon these disclosures of previously omitted material facts, the price of BOA shares closed at $5.71 on January 22, 2009, down approximately 50% from the first partial disclosure of the truth on January 14, 2009, marking a $28.03 per share decrease from its closing price on September 12, 2008 – the last trading day before Defendants announced the Merger.

## II.     JURISDICTION AND VENUE

47.     This action arises under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.  This action also asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

48. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 27 of the Exchange Act, 15 U.S.C. § 78aa.

49. Venue is proper in this district pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts and omissions alleged herein, including the preparation and dissemination of the Proxy Statement and other materially false and misleading information, occurred in substantial part in this district.

50. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange ("NYSE").

**III. THE PARTIES**

    **A. Plaintiffs**

51. Plaintiff, Thomas P. DiNapoli, Comptroller of the State of New York, is Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("NYSCRF"):

(a) NYSCRF was established under Article 9 of the New York Retirement and Social Security Law, and holds and invests the assets of the New York State and Local Employees' Retirement System and the New York State and Local Police and Fire Retirement System;

(b) NYSCRF is one of the largest public pension funds in the United States. NYSCRF provides pension, disability and death benefits for New York state and local government employees and employees of certain other participating employers;

(c) As of March 31, 2010, NYSCRF had more than one million members, beneficiaries and retirees, and total net assets of approximately $132.5 billion;

(d)        NYSCRF owned 17,776,029 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted all of its shares in favor of the Merger, and purchased approximately 3,058,802 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period and has been damaged thereby;

(e)        NYSCRF asserts claims under both Sections 14(a) and 10(b) of the Exchange Act.

52.        Plaintiff, New York State Teachers' Retirement System ("NYSTRS"), established in 1921 by the New York State Legislature, provides retirement, disability and death benefits to eligible New York State teachers and administrators;

(a)        NYSTRS is one of the ten largest public retirement systems in the nation, serving nearly 427,000 active members, retirees and beneficiaries;

(b)        As of June 30, 2010, NYSTRS had total net assets of approximately $76.8 billion;

(c)        NYSTRS owned 14,821,503 shares of BOA common stock as of the Record Date, continued to own these shares through the Shareholder Vote, voted all of its shares eligible to be voted in favor of the Merger, and purchased approximately 945,620 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period and has been damaged thereby;

(d)        NYSTRS asserts claims under both Sections 14(a) and 10(b) of the Exchange Act.

53.        Plaintiff, the Public Employees' Retirement Association of Colorado ("Colorado PERA"), established in 1931 and operated by authority of the Colorado General Assembly, provides retirement and other benefits to the employees of more than 400 government agencies and public entities in the State of Colorado;

(a)    Colorado PERA's membership includes employees of the Colorado state government, most teachers in the State of Colorado, many university and college employees, judges, many employees of Colorado cities and towns, Colorado State Troopers, and the employees of a number of other public entities within the State of Colorado;

(b)    With approximately $37.4 billion in assets and more than 230 employees, Colorado PERA is the 25th largest public pension plan in the United States;

(c)    Colorado PERA owned 4,281,973 shares of BOA common stock as of the Record Date, continued to own these shares through the Shareholder Vote, voted all of its shares eligible to be voted in favor of the Merger, and purchased approximately 1,377,200 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period and has been damaged thereby;

(d)    Colorado PERA asserts claims under both Sections 14(a) and 10(b) of the Exchange Act.

### B.    Defendant Bank Of America Corporation

54.    Defendant BOA is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located at 100 North Tryon Street, Charlotte, North Carolina.  BOA is traded on the NYSE under the symbol "BAC."  BOA is duly registered as a bank holding company and financial holding company under the Bank Holding Company Act of 1956, as amended.  The Company provides various financial services to both retail and commercial customers in the United States and internationally.

### C.    Individual Defendants

#### 1.    Kenneth D. Lewis

55.    Defendant Kenneth D. Lewis was, at all relevant times, BOA's Chief Executive Officer, President, and Chairman of its Board of Directors.  Defendant Lewis signed the

materially false and misleading Proxy Statement on BOA's behalf and was responsible for the accuracy and completeness of the information contained and incorporated by reference within it. Moreover, Defendant Lewis voted in favor of the Merger and recommended the Merger to BOA shareholders in the Proxy Statement.

56.    As set forth herein, Defendant Lewis made materially false and misleading public statements and/or omitted material facts regarding the Merger in at least the following:

> (i)    an analyst conference call on September 15, 2008;
>
> (ii)   an analyst conference call on October 6, 2008 regarding BOA's third quarter 2008 earnings;
>
> (iii)  an amendment to the Proxy Statement filed with the SEC on November 26, 2008 on Form 425/8-K;
>
> (iv)   a BOA press release on December 5, 2008 announcing shareholder approval of the Merger;
>
> (v)    a BOA press release on January 1, 2009 announcing the closing of the Merger;
>
> (vi)   a BOA press release on January 16, 2009 announcing BOA's fourth quarter and year-end financial results; and
>
> (vii)  an analyst conference call on January 16, 2009 regarding BOA's fourth quarter and year-end financial results.

**2.    Joseph L. Price**

57.    Defendant Joseph L. Price was, at all relevant times, BOA's Chief Financial Officer.  On January 12, 2010, Defendant Price was named as President of BOA's Consumer & Small Business Banking division.  Defendant Price signed the Proxy Registration Statement and was responsible for the accuracy and completeness of the information contained in the Proxy and incorporated by reference within it.  Defendant Price made or caused to be made materially false and misleading public statements on behalf of BOA during the Relevant Period in Company

press releases, conference calls with analysts, and in relevant BOA public filings with the SEC in

favor of the Merger.

58.    As set forth herein, Defendant Price also made materially false and misleading

public statements regarding the Merger in at least the following:  (i) an analyst conference call on

September 15, 2008; and (ii) an analyst conference call on October 6, 2008 regarding BOA's

third quarter 2008 earnings.

### 3.    Neil A. Cotty

59.    Defendant Neil A. Cotty was, at all relevant times, BOA's Chief Accounting

Officer.  Defendant Cotty signed the Proxy Registration Statement and was responsible for the

accuracy and completeness of the information contained in the Proxy and incorporated by

reference within it.  After the Merger Announcement on September 15, 2008, Defendant Cotty

was appointed as Merrill's interim Chief Financial Officer ("CFO"), and acted as a direct liaison

between BOA and Merrill, reporting to Defendants Lewis and Price.  As Merrill's interim CFO,

Cotty had daily access to and knew of Merrill's fourth quarter 2008 financial losses,

as confirmed by Merrill's then Chief Executive Officer, Thain, on January 26, 2009.  On January

12, 2010, Defendant Cotty was named as BOA's interim CFO, a position he held until May 11,

2010.  Defendant Cotty is BOA's current Chief Accounting Officer..

60.    Lewis, Price, and Cotty are collectively referred to herein as the "Individual

Defendants."  As referenced above, BOA, Lewis, Price, and Cotty are collectively referred to

herein as "Defendants."

61.    The Individual Defendants had the duty to make full, candid, and timely

disclosures of all material facts relating to the business, operations, performance, and prospects

of BOA, as well as all material facts pertaining to the Merger.  These duties included updating

representations in the Proxy Statement and related documents to correct the statements therein

that were materially misleading and/or omitted material facts.  Among other things, the

Individual Defendants were required to:

- conduct and supervise the business of BOA in accordance with all applicable laws and regulations; and

- supervise the preparation of the Company's SEC filings, including but not limited to, the Proxy Statement and any and all amendments thereto, and approve any reports concerning the financial reporting and results of BOA.

62.     As controlling persons of a publicly-held company whose common stock was, at all relevant times, registered with the SEC pursuant to the Exchange Act and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, and prospects.  Each of the Individual Defendants also had a duty to correct any previously issued statements that were or had become materially misleading or untrue.  The performance of such duties by the Individual Defendants was required so that shareholders eligible to vote on the Merger would have all relevant information prior to the Shareholder Vote and prior to the consummation of the Merger, and so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

63.     As a result of the Individual Defendants' failure to fulfill the foregoing obligations, BOA shareholders voted to approve the Merger without information material to their vote.  Such information, which was available to the Company and the Individual Defendants, concerned, among other things, the negative impact of Merrill's dire financial condition on the value of the Merger and BOA's undisclosed agreement to permit billions of dollars in bonus payments to be made to Merrill employees.

64. Additionally, as a result of the Individual Defendants' failures, BOA's common stock was artificially inflated during the Relevant Period. As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs, in purchasing BOA's common stock, were damaged.

## IV.    FACTUAL BACKGROUND

### A.    Pre-Merger BOA

65. Beginning in 1992, BankAmerica Corporation, founded in California in 1904, purchased leading regional retail banks in California, Washington, Arizona, Idaho and Oregon. By 1994, BankAmerica Corporation had become the largest commercial bank in the U.S. in terms of deposits. In 1997, NationsBank Corporation, founded in North Carolina in 1874, surpassed BankAmerica Corporation to become the largest commercial bank in the U.S. in terms of deposits through its own acquisitions of regional banks in Florida and Georgia. In 1998, NationsBank Corporation completed the then largest bank acquisition in history when it acquired BankAmerica Corporation to create BOA, which became the largest commercial bank in the U.S. in terms of deposits and the only true coast-to-coast bank franchise, with more than 4,800 branches in 22 states.

66. In 2001, Defendant Lewis, a NationsBank Corporation employee during that company's era of acquisitions and the chief lieutenant of its former-CEO, became Chairman and CEO of BOA. Unlike his predecessor, Defendant Lewis intended to institute an era of entrenchment at BOA and grow the Company organically by increasing the customer base in the Company's traditional core businesses: commercial and retail banking, mortgage lending, and credit cards.

67. Defendant Lewis' intended discipline did not last long. Beginning in 2004, he steered BOA through a campaign to acquire banks and financial institutions in a massive

spending spree that eventually totaled more than $120 billion.  For example, in 2004, BOA purchased FleetBank Financial, the largest bank in New England, for $47.2 billion.  In 2005, BOA purchased MBNA Corporation, the largest independent issuer of credit cards in the U.S., for $34.6 billion.  In 2007, BOA purchased United States Trust Company, the largest trust company in the U.S., for $3.3 billion and LaSalle Bank Corporation, an Illinois-based regional bank, for $21 billion.

68.    By November 2006, BOA had $1.45 trillion in assets, second only to Citigroup Inc., and its common stock was trading at an all-time high of more than $54 per share.  On November 29, 2006, BOA's market capitalization reached $243.7 billion, finally surpassing Citigroup Inc. as the most valuable bank in the world in terms of market capitalization.

69.    On January 11, 2008, BOA announced that it was acquiring troubled Countrywide Financial Corporation ("Countrywide"), the largest mortgage lender in the U.S., for approximately $4 billion, and on September 15, 2008 BOA announced the Merger with Merrill, Defendant Lewis' most ambitious acquisition to date.  BOA's common shares closed at $33.74 on September 12, 2008, the last trading day before the Merger Announcement.

**B.    Pre-Merger Merrill**

70.    Founded in 1914, Merrill grew to become one of the world's leading providers of wealth management, brokerage, corporate finance, and investment banking services, with offices in 40 countries and territories around the world.  In particular, Merrill was a preeminent provider of retail brokerage and wealth-management services, with more than 20,000 advisors and more than $1.7 trillion in client assets.

71.    Like many of its peer financial institutions, beginning no later than 2003, Merrill expanded from its core businesses (brokerage services, corporate finance and investment banking) to become a central participant in the subprime mortgage industry.  From 2004 through

2006, Merrill was the biggest underwriter of mortgage-backed collateralized debt obligations ("CDOs") in the world and, by 2006, was also one of the leading originators of subprime mortgages through its subsidiaries, including First Franklin Financial Corporation.  CDOs are a type of structured security collateralized by pools of underlying assets, such as asset-backed securities, mortgage loans, auto loans, and/or credit card receivables.  Many of Merrill's CDOs were comprised of risky subprime mortgages.

72.      Merrill's massive bets on the subprime industry appeared to pay huge dividends. Merrill reported record profits in 2006 of $7.5 billion, making it the second most profitable firm on Wall Street after Goldman Sachs & Co.  Merrill's common stock price hit an all-time high of $97.53 per share in January 2007.

73.      However, Merrill's purported profits derived from subprime activities were short-lived.  On October 24, 2007, less than ten months after it reported record profits, Merrill announced a net loss in the third quarter of 2007 of $2.3 billion, attributed to $7.9 billion in write-downs on CDOs and subprime mortgages.  The losses were not only Merrill's first quarterly losses in more than six years, but were also the largest losses in the company's history.

### C.    The Lehman Meetings

74.      In early September 2008, Lehman, a competitor of Merrill and BOA, faced significant declines in its stock price from its exposure to subprime-related assets.  As a result of the severity of Lehman's stock decline, Merrill and BOA became involved in a series of meetings with federal regulators, Lehman, and other investment banks designed to save Lehman from bankruptcy.  It was in connection with these emergency meetings from September 12-14, 2008 that the Merger between BOA and Merrill was proposed, negotiated, and finalized.

75. During the week of September 8, 2008, following Lehman's announcement that it had not secured an anticipated merger deal with Korean Development Bank, the value of Lehman common stock declined by approximately 80%.

76. The prevailing wisdom among market analysts heading into the weekend of September 13-14, 2008 was that Lehman was likely to file for bankruptcy in the next several days given its inability to find new sources of credit or another company willing to merge with it. If Lehman filed for bankruptcy, Merrill's financial condition would also be negatively affected given Merrill's substantial counterparty transactions with Lehman.

77. In an effort to stave off Lehman's bankruptcy, an emergency meeting among high level officials from the United States Treasury Department, the Federal Reserve Bank, the SEC, and senior executives at the largest U.S. financial institutions was held on the evening of Friday, September 12, 2008 at the offices of the Federal Reserve Bank of New York. In attendance from the government were then Treasury Secretary Paulson, then President of the Federal Reserve Bank of New York Timothy Geithner, and then SEC Chairman Christopher Cox. The bank executives at the meeting included Morgan Stanley CEO John Mack, JPMorgan Chase CEO James Dimon, Goldman Sachs CEO Lloyd Blankfein, Citigroup CEO Vikram Pandit, then Merrill CEO Thain, and representatives from BOA, the Royal Bank of Scotland Group Plc, and Bank of New York Mellon Corporation.

78. Earlier that day, Secretary Paulson instructed his policy director Michele Davis and legislative affairs chief Kevin Fromer to inform U.S. financial institutions through media communications that the federal government would not supply taxpayer money to subsidize a bailout of Lehman.

79.     On Saturday, September 13, 2008, Lehman's president, Herbert H. McDade III, gave a presentation on Lehman's financial condition to the same group of government officials and financial institutions present at the prior night's meeting.  Mr. McDade outlined the significant asset write-downs and losses suffered by Lehman.  The dire news concerning Lehman's assets and liabilities was reinforced by certain financial institutions that had reviewed their respective Lehman exposures.

80.     BOA, Barclays, and HSBC had each previously expressed interest in merging with Lehman, but only on the condition that the federal government provide financial assistance to support the transaction as it did earlier in the year in transactions involving Bear Stearns, Freddie Mac, and Fannie Mae, respectively.  Now, in the absence of direct government support, the prospects for a viable merger to save Lehman from bankruptcy became increasingly remote as the Saturday meetings progressed.

**D.     Merrill Initiates Merger Discussions With BOA**

81.     Merrill had conducted a telephone conference the morning of September 12, 2008, during which senior management made a presentation to the company's Board of Directors on general market conditions, Lehman's financial situation, Merrill's capital and overall liquidity, Merrill's recent stock performance, and potential ratings agency downgrades of Merrill's stock.  At the conclusion of the presentation, Merrill's Board of Directors instructed senior management to explore alternatives to protect Merrill's interests.

82.     During the course of the Lehman meetings on September 13, Thain telephoned Defendant Lewis to discuss a possible transaction between Merrill and BOA.  Defendant Lewis was immediately receptive to Thain's call, and by 2:30 p.m. that same day the two men met in person in New York City to discuss a possible business combination.

83.     At this Saturday afternoon meeting, Thain initially proposed to sell BOA a 9.9% equity stake in Merrill.  BOA would also provide Merrill with a credit facility as part of the contemplated transaction.  In response, Defendant Lewis stated that BOA was not interested in acquiring a minority stake in Merrill, but did express an interest in negotiating a business combination between the two companies.

84.     Defendant Lewis believed there was a strategic fit between BOA and Merrill, and was eager to acquire Merrill's industry-leading retail brokerage and wealth management businesses.  By the end of the afternoon, Thain agreed to sell Merrill to BOA on the condition that Merrill shareholders receive a substantial control premium above Merrill's September 12, 2008 closing price of $17.05 per share.

### E.     Defendants' Purported Due Diligence On The Merger

85.     Throughout the remainder of the day on September 13, 2008, management of both BOA and Merrill met internally and with their respective advisors to discuss the terms of the possible Merger in greater detail.  These parties began to undertake their due diligence investigations of BOA and Merrill.

86.     BOA retained J.C. Flowers and Fox-Pitt as Financial Advisors on the Merger negotiations.  By this point, the parties were contemplating an all-stock transaction and, as part of their engagement, the Financial Advisors were to issue fairness opinions on the Merger's Exchange Ratio for converting Merrill stock into BOA stock.

87.     Merrill's due diligence was handled internally by its affiliated entity Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS").  MLPFS was also engaged to issue a fairness opinion on the agreed Exchange Ratio for the Merger.

88.     The companies' respective due diligence investigations continued throughout the remainder of Saturday, September 13, and into the following morning.

### F.    The Merger Valuation And Pricing Negotiations

89.    Early on Sunday, September 14, 2008, less than 24 hours after their initial conversation, Thain and Defendant Lewis met again to discuss the results of their due diligence investigations and the perceived benefits of a merger between the companies. At this meeting, Defendant Lewis and Thain agreed to have representatives of their companies and their legal advisors begin negotiating the terms of the Merger Agreement between BOA and Merrill. This included negotiations on the valuation and pricing of the potential acquisition.

90.    BOA retained the law firm of Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") to work on the documentation of the Merger Agreement. Merrill's legal counsel on the transaction was the law firm of Shearman & Sterling LLP.

91.    Merrill representatives again indicated that under the Merger terms, the company would be seeking a significant premium on its September 12, 2008 common stock closing price of $17.05 per share, plus an appropriate multiple of book value.

92.    BOA and Merrill ultimately agreed to present their respective Boards with a proposed transaction price of $29.00 for each share of Merrill common stock – a 70% premium over Merrill's September 12 closing price. This equaled an Exchange Ratio of 0.8595 based on the $33.74 closing price for a share of BOA common stock on September 12, 2008.

### G.    BOA Secretly Agrees To Permit Merrill To Pay Up To $5.8 Billion In Bonuses To Merrill Employees Prior To The Merger Closing Date

93.    According to statements that Thain made on September 17, 2009, fiscal year 2008 bonuses for Merrill employees were one of the "main things" discussed during the Merger negotiations. Thain further stated that the other major components of the transaction discussed at this time were the price of the deal and the "Material Adverse Effect" clause in the Merger Agreement (commonly referred to as the "material adverse change" clause or "MAC"). The

planned bonus payments to Merrill employees were not disclosed before the Shareholder Vote or the Closing Date.

94.    The secret bonus provisions of the Merger were negotiated by Greg Curl, BOA's Global Corporate Strategic Development and Planning Executive, and Greg Fleming, Merrill's President and Chief Operating Officer.

95.    Historically, Merrill paid its employees bonuses in January based upon their performance for Merrill's prior fiscal year.  Merrill described its compensation policy in its 2008 Definitive Proxy which was filed with the SEC on March 14, 2008 (and later incorporated by reference into the Proxy Statement).  The Definitive Proxy stated that "[t]he goal of [Merrill's] compensation program is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of [Merrill] as a whole had to be the dominant consideration in formulating its compensation determinations."  As detailed herein, Merrill's payment of astronomical and undisclosed "performance" bonuses in light of the company's crippling losses at the time was inconsistent with the objectives of Merrill's compensation policy.

96.    During the bonus negotiations prior to the September 15, 2008 Merger Announcement, Merrill not only sought the right to pay up to $5.8 billion in discretionary year-end bonuses to its executives and employees, but it also insisted that it be allowed to accelerate these bonuses so that they could be paid in December 2008.  Thus, the bonuses would be paid before the Merger was scheduled to close on January 1, 2009 and before Merrill's financial results for the fourth quarter of 2008 became public.  These material facts were not disclosed.

97.    According to a February 7, 2009 *New York Times* article, during the bonus negotiations "[a] page was ripped from a notebook, and someone on Merrill's team scribbled

eight-digit figures for each of Merrill's top five executives, including $40 million for Thain alone." The *New York Times* article further stated that the bonuses were not in consideration for performance, but rather "were fees for getting the merger done, akin to what investment bankers receive for blockbuster deals. Thain in particular felt he deserved a hefty payout for his deal-making heroics, according to five individuals with detailed knowledge of the situation. . . ." Ultimately, after hours of bonus negotiations, BOA agreed to permit Merrill to pay up to $5.8 billion in discretionary bonuses to its executives and employees.

98.      Significantly, BOA agreed to Merrill's acceleration of the bonus payments to December 31, 2008, a day before the Closing Date. As Thain testified in his February 19, 2009 deposition taken by the Attorney General's Office: "***The timing . . . was determined when we signed the merger agreement***. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

99.      The relevant provision governing payment of Merrill's bonuses was included in a "Disclosure Schedule" that was appended to the Merger Agreement, ***but was omitted from the publicly filed version of the Merger Agreement***. This provision stated:

> 5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) . . . and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion . . . . Sixty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [BOA] . . . . The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [BOA].

100.      The "Disclosure Schedule" was never publicly disclosed, and the contents of the Schedule were not provided in the Merger Agreement, the Proxy Statement, or any of the

Defendants' public statements made prior to the Closing Date.  Accordingly, the Disclosure

Schedule was never seen by BOA shareholders, including Plaintiffs, prior to either the

Shareholder Vote or the Closing Date.  In direct contrast to the Disclosure Schedule, a provision

in the Merger Agreement entitled "Company Forbearances" stated that Merrill would not "pay

any amounts to [directors, officers, or employees] not required by any current plan or agreement

(other than base salary in the ordinary course of business)."  Significantly, this provision was ***the***

***only*** provision shareholders, including Plaintiffs, saw prior to the Shareholder Vote and Closing

Date regarding Merrill's bonuses.  This disclosure, which purported to limit compensation to

"required" payments, failed to provide Plaintiffs with the material information that BOA had

***already*** authorized payment of up to $5.8 billion in bonus payments to Merrill employees.

106. 101.    As the Attorney General highlighted in his complaint, Merrill continued to falsely

represent in letters to the Attorney General on November 5, 2008 and to the Oversight

Committee on November 24, 2008 that it planned to make incentive compensation decisions at

year-end, from which it logically followed that Merrill would wait until after year-end to actually

pay bonuses.  For example, Merrill stated to the Oversight Committee:

> Merrill Lynch operates on a calendar-year basis.  The Management Development
> and Compensation Committee of the Board of Directors makes incentive
> compensation decisions at year-end.  Consistent with this calendar year-end
> process, incentive compensation decisions for 2008 have not yet been made.

106. 102.    According to the Attorney General, these representations were false and

misleading because Merrill's Compensation Committee had agreed to an accelerated timetable

on November 11, 2008, nearly two weeks before the letter to the Oversight Committee was

written, which involved setting a date of December 8, 2008 to allocate up to $5.8 billion in bonus

payments.  Additionally, BOA "sat back" and "tacitly approved" Merrill's payout of these

bonuses in "its worst year of financial performance on record, one in which its losses exceeded $27 billion after taxes."

103.    While $3.6 billion in bonuses were eventually paid out prior to the Closing Date, the $5.8 billion in total bonuses that BOA agreed to permit Merrill to pay on September 15, 2008 constituted approximately:

(i)     11.6% of the Merger's $50 billion total value;

(ii)    26% more than BOA earned during the first two quarters of 2008;

(iii)   30% of Merrill's total stockholder equity; and

(iv)    8% of Merrill's total cash and cash equivalents as of December 31, 2008.

Plaintiffs and other BOA shareholders voted on the Merger only after receiving inaccurate and incomplete material facts from the Defendants regarding Merrill's bonus payments. The accurate and complete facts that should have been shared with BOA shareholders, including Plaintiffs, were in Defendants' possession but were not disclosed until well after the Closing Date.

**H.    The Merger Presentation To BOA's Board Of Directors**

104.    Late in the afternoon on Sunday, September 14, 2008, less than 36 hours after Thain first contacted Defendant Lewis to discuss a possible transaction, BOA's senior management and the Financial Advisors presented the results of their abbreviated due diligence of Merrill to BOA's Board of Directors. The presentation included, among other things, a truncated analysis of the two companies' financial information.

105.    Following a review of these presentations on September 14, 2008, BOA's Board of Directors determined that the Merger was in the best interests of BOA and its stockholders and voted unanimously to approve the contemplated Merger Agreement, which was still being

finalized.  Merrill's Board of Directors held a separate meeting at approximately the same time and also voted unanimously to approve the transaction.

106.    Both companies and their respective advisors continued to finalize the definitive agreements for the transaction following approval of the Merger by the Boards of BOA and Merrill.

107.    In the early morning of September 15, 2008, approximately 48 hours after Thain had initially contacted Defendant Lewis, both BOA and Merrill executed the Merger Agreement, which set forth the terms of the Merger.

108.    Under the Merger Agreement, the purchase price for Merrill was approximately $50 billion, comprised of $44 billion for Merrill's common shares and $6 billion for stock options, convertible securities, and restricted stock units.  BOA anticipated issuing approximately 1.71 billion shares of common stock and 359,100 shares of preferred stock in the Merger.

## V.    SUMMARY OF CLAIMS

109.    Plaintiffs state a claim in Count I for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against all Defendants.  Count I is not based upon any allegations of fraudulent or knowing misconduct by any Defendant, and Plaintiffs disclaim any reference to or reliance upon allegations of fraud for its claim under Count I, which is based solely upon Defendants' negligence.  Count II states a claim for control person liability under Section 20(a) of the Exchange Act against Defendants Lewis, Price and Cotty in connection with the primary violation of Section 14(a).

110.    Separately, in Counts III and IV, Plaintiffs assert claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against BOA and Defendants

Lewis and Price, and Section 20(a) against Defendants Lewis, Price, and Cotty.  These claims

are independent of the other claims alleged herein.

## VI.    DEFENDANTS' VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER

### A.    Materially False And Misleading Statements And Omissions Of Material Fact In The Proxy Statement And Related Solicitation Materials

#### 1.    Defendants Announce the Merger

111.    On September 15, 2008, BOA issued a press release entitled "Bank of America

Buys Merrill Lynch Creating Unique Financial Services Firm" (the "September 15, 2008 Press

Release"), announcing the Merger and describing Merrill as a "leading global wealth

management, capital markets and advisory company."  In the September 15, 2008 Press Release,

Defendant Lewis described the Merger as "a great opportunity for our shareholders" and claimed

that "[t]ogether, [the] companies are more valuable because of the synergies in our businesses."

112.    The September 15, 2008 Press Release also stated that through the Merger, BOA

"expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012," and that "[t]he

acquisition is expected to be accretive to earnings by 2010."  Merrill was described as adding

"strengths in global debt underwriting, global equities and global merger and acquisition advice."

The only specific information in the September 15, 2008 Press Release regarding Merrill's

financial condition was the assertion that the company had total client assets of approximately

$1.4 trillion and owned half of BlackRock, Inc., a leading investment management company.

The September 15, 2008 Press Release made no reference to Merrill's trading and investment

assets, which were largely illiquid and susceptible to significant future write-downs.

113.    The September 15, 2008 Press Release also explained that in connection with the

Merger, BOA would file a Registration Statement with the SEC on Form S-4.  This SEC filing

would include the Proxy Statement issued by BOA and Merrill containing important information about the Merger.  The September 15, 2008 Press Release was incorporated by reference into the Proxy Statement.

114.    Immediately following the September 15, 2008 Press Release, there was speculation among market analysts that BOA had paid too much for Merrill.  Moreover, there were concerns that BOA could not possibly have conducted sufficient due diligence to adequately evaluate Merrill's financial condition in the 36 hours preceding the Merger.  As alleged below, Defendants made materially misleading and incomplete statements in the Proxy Statement refuting each of these concerns.

### 2.    The Merger Presentation to Investors

115.    The mechanics of the Merger and the considerations behind it were summarized in a slideshow presentation to BOA and Merrill investors on September 15, 2008 (the "Merger Presentation").  The Merger Presentation was entitled "Creating the Premier Financial Services Company in the World," and listed both Thain and Defendant Lewis on the front cover.  BOA filed the Merger Presentation with the SEC on Form 425.

116.    The Merger Presentation, designed to encourage BOA shareholders to approve the Merger, described Merrill as a "premium franchise," a "[l]eading global wealth manager," a "leading global investment bank," and a company with an "[e]xperienced management team." On a slide entitled "Strategic Rationale" for the Merger, the presentation listed the following: (i) "Diversify business mix"; (ii) "Significant enhancement to [BOA's] investment banking capabilities"; (iii) "Leadership position in retail brokerage and wealth management"; and (iv) "Brings global scale in investment management."

117.    The Merger Presentation also included a slide entitled "Stable Merrill Lynch Core Franchise Despite Market Challenges" which graphically depicted Merrill's quarterly net

revenues from 2005 through the first half of 2008.  While the graph indicated that Merrill's net revenues for the first half of 2008 were approximately $14.9 billion, it omitted any information regarding the significant company losses in such asset categories as investment securities, private equity investments, and loans during this same time period.  Merrill's losses in these asset categories would ultimately prove to be enormous.

118.    In addition to the positive depiction of Merrill's net revenues, the presentation contained a slide entitled "Other Considerations" which purported to address the "Risk" associated with the Merger.  This slide represented the following with respect to the Merger "Risk":

-    Due diligence complete

-    Significant progress by Merrill Lynch in reducing risk

-    Asset valuations carefully reviewed

119.    Taken together, the slides gave every assurance that the Merger was in the best interests of BOA and its shareholders.  Among other things, the Merger Presentation omitted material facts indicating the continuing deterioration of Merrill's assets and the billions of dollars in bonus payments that BOA had agreed to permit Merrill to pay its employees prior to the Closing Date.

### 3.    The September 15, 2008 Analyst Conference Call

120.    In connection with the Merger Announcement, Thain and Defendants Lewis and Price conducted an analyst conference call on September 15, 2008 (the "September 15, 2008 Analyst Call").

121.    Addressing the issue of the Merger price, Matthew O'Connor, a UBS analyst, stated that "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's

stock as selling off today and this week if the deal hadn't been announced. I guess the question is why pay $29 at this point?"

122.    Among other considerations, Defendant Lewis stated that BOA agreed to the Merger price given that "the long-term benefits were so overwhelming, it was such a strategic opportunity that we elected . . . to go ahead and do it at this time."

123.    In addressing concerns regarding the adequacy of due diligence performed by and on behalf of BOA, Defendant Lewis described J.C. Flowers as follows:

> J.C. Flowers or Chris Flowers is someone we've known for quite some time. We've done several deals with him. We know his firm very well, and it was fortunate that we did because his firm – he and his ***firm had done quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive.*** They had looked at the marks very comprehensively, so this allowed us to have him and [his] team as an adviser, and just update the information they already had. ***So that was one of the key ingredients to being able to do this as quickly as we did. . . .***

124.    The foregoing statement, made in connection with soliciting proxies for the Merger, was materially misleading because J.C. Flowers' "recent and extensive" work on Merrill did not provide an adequate basis to determine the fairness of the Merger or the Exchange Ratio. As the Attorney General stated in his complaint, "'fairly recently' was a misleading description" as BOA was relying on diligence J.C. Flowers "had done on Merrill in late 2007 in connection with another potential investment [that was] never completed."

125.    Defendant Price reiterated the assertion that J.C. Flowers' prior knowledge of Merrill had allowed J. C. Flowers to conduct adequate due diligence in an extremely abbreviated time period, and added that: "the progress that Merrill Lynch had made in reducing risk exposures and analyzing them and having all that laid out given the efforts that the management team has made over the last period made it possible for us."

126.    Defendant Price's statements during the September 15, 2008 Analyst Call were made on behalf of BOA and in connection with soliciting proxies for the Merger.  The statements were materially misleading because neither BOA's nor J.C. Flowers' prior experience with Merrill provided an adequate basis to determine the fairness of the Merger or the Exchange Ratio.  Nor did Merrill's purported efforts to reduce risk provide a basis for the due diligence performed in connection with the Merger to be as abbreviated as it was.

127.    Defendant Lewis also provided further reassurance that Merrill's assets were sound and had been examined carefully by BOA.  Like Price, he indicated that Thain "and his team had made incredible progress" in reducing the risk exposures in Merrill's asset portfolios.  Defendant Lewis also assured investors that "Merrill had the liquidity and capacity to see [the Merger] through."  When questioned on whether BOA had considered Merrill's CDO portfolio for purposes of taking marks in connection with the Merger, Defendant Lewis again stated:

> [t]he numbers that we presented today, we had considered marks on the assets. . . . I will tell you that again going back to the point on things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures.  We're dealing with the same counterparties on things. . . . *we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself [in terms of risk reduction]*."

128.    Given the inquiries regarding the severe risks associated with Merrill's illiquid CDO asset classes, Defendants were acutely aware that investors and BOA shareholders wanted detailed information concerning Merrill's asset valuations and write-downs prior to voting on the Merger.  Defendants had an obligation to ensure that the Proxy Statement, and the documents incorporated by reference therein, contained accurate and complete information concerning Merrill's assets in order for BOA shareholders, including Plaintiffs, to make a fully informed decision regarding the Merger.

129.    Rather than meeting this obligation, Defendants failed to include details about Merrill's rapidly deteriorating financial condition in the Proxy Statement and failed to correct these statements as Merrill's losses grew.  Instead, Defendants gave materially misleading assurances that adequate due diligence on Merrill's assets had been conducted in connection with negotiating and pricing the Merger.

**4.    The Undisclosed Agreement to Permit Billions of Dollars in Bonuses to Merrill Employees**

130.    As noted above, Defendants failed to disclose that at the time the Merger Agreement was executed, BOA had secretly agreed to permit Merrill to pay its employees up to $5.8 billion in bonuses before the Merger's scheduled Closing Date.

131.    Remarkably, the agreement, which permitted Merrill to pay bonuses equaling approximately 11.6% of the total Merger consideration, was not documented in the public Merger Agreement that was later incorporated into the Proxy Statement distributed to BOA shareholders, including Plaintiffs.  Instead, the agreement on the Merrill bonuses was hidden in a non-public "Disclosure Schedule" appended to the Merger Agreement.

132.    The existence and terms of the bonus agreement were material to BOA shareholders, including Plaintiffs, and Defendants should have known that the bonuses would be viewed unfavorably, particularly in light of the fact that BOA received at least $15 billion from the Treasury Department under the Troubled Asset Relief Program ("TARP") in October 2008.  Indeed, as Thain stated, Merrill's bonuses were one of the three "main things" focused on in the merger negotiations.  As such, it would be expected that the bonuses would be part of the information disseminated to BOA shareholders, including Plaintiffs, prior to the Shareholder Vote.

### 5.    The Proxy Statement

133.    On November 3, 2008, the Schedule 14A Definitive Joint Proxy Statement, dated October 31, 2008, was filed with the SEC.  The Proxy Statement contained the statements discussed below, which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, stated material facts requiring correction based upon subsequent facts and events, and/or omitted material facts necessary to prevent such statements from being false or misleading.

134.    The Proxy Statement began with a letter signed by Defendant Lewis (the "Shareholder Letter") setting forth the basic terms of the Merger, including the 0.8595 Exchange Ratio by which each Merrill share would be converted into shares of BOA.  In bold letters at the bottom of the Shareholder Letter, it stated that *"[t]he Bank of America board of directors unanimously recommends that Bank of America stockholders vote FOR the proposal to issue shares of Bank of America common stock in the merger and FOR the other related proposals.*"  (emphasis in original.)  The letter indicated the same recommendation by the Merrill Board of Directors to Merrill shareholders.

135.    The opposite page of the Shareholder Letter contained a "Notice of Special Meeting of Stockholders" addressed to BOA shareholders by order of BOA's Board of Directors. This notice indicated that a special meeting of BOA shareholders would be held on December 5, 2008 to consider and vote on, among others, the proposal to:  (i) issue new BOA shares as contemplated by the Merger Agreement; and (ii) adopt an amendment to BOA's certificate of incorporation to increase the number of authorized shares of BOA common stock from 7.5 billion to 10 billion.  The notice indicated that BOA's Board of Directors had set the close of business on October 10, 2008 as the Record Date for shareholder eligibility to vote on the

Merger.  Finally, the notice stated that only holders of BOA common stock and Series B

Preferred stock as of the Record Date would be entitled to vote on the Merger.

136.    The Proxy Statement enumerated the following bases (among others) upon which

BOA and its Board of Directors purportedly concluded that the Merger was in the best interests

of the Company and its shareholders:

> In reaching its conclusion to approve the merger agreement, the Bank of America
> board considered a number of factors, including the following material factors:
>
> - its understanding of Bank of America's business, operations,
>   financial condition, earnings and prospects and of Merrill Lynch's
>   business, operations, financial condition, earnings and prospects;
>
> - its understanding of the current and prospective environment in
>   which Bank of America and Merrill Lynch operate, including
>   economic and market conditions, the competitive environment and
>   ***the likely impact of these factors on Bank of America and Merrill
>   Lynch***;
>
> - the review by the Bank of America board of directors with its legal
>   advisors of the structure of the merger and the financial and other
>   terms of the merger and stock option agreement, including the
>   review by the Bank of America board of directors with its financial
>   advisors of the exchange ratio, and the expectation of Bank of
>   America's legal advisors that the merger will qualify as a
>   transaction of a type that is generally tax-free for U.S. federal
>   income tax purposes;
>
> \*        \*        \*
>
> - the reports of Bank of America management and the financial
>   presentation by J.C. Flowers and FPK [Fox-Pitt] to Bank of
>   America's board of directors concerning the operations, financial
>   condition and prospects of Merrill Lynch and the expected
>   financial impact of the merger on the combined company;
>
> - the likelihood that the regulatory and stockholder approvals needed
>   to complete the transaction will be obtained in a timely manner and
>   that the regulatory approvals will be obtained without the
>   imposition of adverse conditions;

- the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;

- the potential impact of the transaction on the capital levels and credit rating of Bank of America; and

- the need and ability to retain key Merrill Lynch personnel.

137.    The factors considered by BOA's Board of Directors, as enumerated in the Proxy Statement, omitted any consideration of the realistic and foreseeable risk that Merrill's CDO portfolio, in particular, would continue to decline in value and force further write-downs at Merrill.  In fact, at the time the Proxy Statement was filed on November 3, 2008, Merrill had already sustained more than $7.5 billion in losses as of October 2008 alone.  Merrill's pre-tax losses had climbed to $15.3 billion by the morning of December 5, 2008 – the day of the Shareholder Vote.  Defendants' failure to adequately consider these issues or to disclose that they had not considered these issues rendered the Proxy Statement materially false and misleading.

138.    Defendants' failure to disclose this material information concerning Merrill's then known fourth quarter 2008 losses, which were over $7.5 billion and escalating at the time the Proxy Statement was filed on November 3, 2008, violated Defendants' duty to comply with SEC Schedule 14A governing what information is required in a proxy statement.  Specifically, Schedule 14A requires that the issuer disclose information required by Item 303 of Regulation S-

K.  Item 303 of Regulation S-K requires, among other things, disclosure of known material trends, demands, commitments, events and/or uncertainties that have had, or that the registrant reasonably expects will have, a material favorable or unfavorable impact on its liquidity, capital resources, or net sales, revenues and/or income from continuing operations.

139.    Defendants failed to comply with Item 303 of Regulation S-K when the Proxy Statement was filed on November 3, 2008.  By that time, Defendants were well aware of the billions of dollars in losses Merrill had already sustained for the fourth quarter of 2008 and the continuing acceleration of Merrill's losses, which would materially impact both BOA's and Merrill's liquidity, capital resources, and income from continuing operations.  Prior to the Shareholder Vote, Defendants failed to correct the Proxy Statement to comply with Item 303 of Regulation S-K to inform BOA shareholders of Merrill's $13.3 billion in losses for October and November 2008, not including Merrill's $2.3 billion goodwill impairment, which significantly reduced the overall value of the Merger.

140.    The continued risk of loss in Merrill's CDO asset portfolio was a material factor that should have been carefully considered by Defendants prior to their approval and recommendation of the Merger to BOA shareholders.  Defendants' failure to do so demonstrates that, contrary to their assertions in the Proxy Statement and the September 2008 Merger Announcements, adequate due diligence of Merrill was not, in fact, performed.

141.    The Proxy Statement also contained a section entitled "Risk Factors" which purported to set forth a list of important considerations for BOA shareholders to weigh prior to voting on the proposed Merger.  Of the twelve enumerated "Risk Factors" identified in the Proxy Statement, *none* addressed the significant risk of loss or decline in the overall value of the Merger given the untenable state of Merrill's illiquid assets, particularly its CDO portfolio.

Instead, the "Risk Factors" section of the Proxy Statement only made general reference to the companies' potential inability to "successfully combine the business of Bank of America and Merrill Lynch" as a possible factor which might result in a failure to realize the full benefits of the Merger.

142.    Despite what was known, or should have been known, by Defendants concerning Merrill's growing losses in the fourth quarter of 2008, Defendants failed to disclose the substantial risk that such losses could very well exceed the total value of the Merger itself.  As alleged below, Defendants also failed to update or correct these material omissions and misstatements prior to either the Shareholder Vote or the Closing Date.

### 6.    The Fairness Opinions

143.    The Proxy Statement also materially misstated the adequacy of Defendants' due diligence of Merrill prior to the approval of the Merger by BOA's Board of Directors.  In support of BOA's due diligence efforts, the Proxy Statement cited the fairness opinions provided by J.C. Flowers and Fox-Pitt, each dated September 14, 2008 (the "Fairness Opinions").  Both Fairness Opinions were incorporated by reference into the Proxy Statement.  As noted above, the Fairness Opinions concluded that the Exchange Ratio to be paid by BOA under the Merger was fair to BOA from a financial standpoint.

144.    The Proxy Statement indicated that in reaching their conclusions, the Financial Advisors had reviewed and analyzed, among other things:

- the proposed financial terms of the Merger as of September 14, 2008;

- publicly available information concerning BOA that such firm believed to be relevant to its analysis;

- publicly available information concerning Merrill that such firm believed to be relevant to its analysis;

- financial and operating information with respect to the business, operations and prospects of BOA furnished to J.C. Flowers and Fox-Pitt;

- financial and operating information with respect to the business, operations and prospects of Merrill furnished to J.C. Flowers and Fox-Pitt;

- a comparison of historical financial results and then current financial condition of BOA and Merrill with each other and with those of other companies that such firm believed to be relevant to its analysis;

- a comparison of the financial terms of the Merger with the financial terms of certain other transactions that each firm believed to be relevant to its analysis;

- the trading histories of BOA common stock and Merrill common stock from September 2003 to September 2008; and

- the potential pro forma impact of the Merger on the future financial condition and performance of BOA, including estimated synergies arising from the combination of the two companies, goodwill created as a result of the Merger, and increases in BOA's earnings per share.

145.    The Proxy Statement and J.C. Flowers' Fairness Opinion also indicated that J.C. Flowers had "participated in discussions with members of senior management of Merrill Lynch with respect to the businesses and prospects of Merrill Lynch."

146.    Despite the lengthy list of informational sources purportedly considered, it is undisputed that Defendants provided the Financial Advisors with less than 36 hours to conduct due diligence concerning BOA's proposed purchase of a complex company that had approximately $26 billion in market capitalization and $1.7 trillion in client assets. Defendants neglected to recognize that 36 hours was not enough time for the Financial Advisors to have an adequate basis to issue their Fairness Opinions.

147.    The Proxy Statement attempted to overcome this clear deficiency in Defendants' due diligence efforts by asserting that both of the Financial Advisors were chosen to render the Fairness Opinions "because of their respective expertise, reputation, and familiarity with Bank of America and Merrill Lynch, and because their senior professionals have substantial experience in transactions comparable to the merger."  As noted above, statements to this effect had also been made by Defendants Lewis and Price during the September 15, 2008 Analyst Call addressing the Merger.  Contrary to these statements, Defendants were negligent in not knowing that the Financial Advisors' purported knowledge of BOA and Merrill could not overcome such an abbreviated due diligence review, which did not permit the Financial Advisors to conduct independent valuations.

148.    The purported adequacy of the Financial Advisors' prior knowledge and previous review of Merrill as a substitute for complete and current due diligence in connection with the Merger was false and misleading given the significant losses at Merrill already underway during the third quarter of 2008.  These losses continued to escalate in the fourth quarter of 2008, as BOA eventually disclosed on January 16, 2009.  Defendants were, at a minimum, negligent in failing to incorporate these facts into their due diligence and solicitation of BOA shareholder votes in favor of the Merger.

### 7.    The Proxy Statement's Disclosure of Government Financing

149.    The Proxy Statement also included a section entitled "Recent Developments," containing a detailed description of the participation of both BOA and Merrill in federal government financing programs.

150.    Specifically, BOA disclosed in the Proxy Statement and in its October 30, 2008 Form 8-K, incorporated by reference therein, that on October 26, 2008, BOA had entered into an agreement with the U.S. Treasury under the $250 billion Capital Purchase Program ("CPP").

The CPP was a component of TARP implemented under the Emergency Economic Stabilization Act of 2008, signed into law on October 3, 2008.  The Proxy Statement provided details of BOA's agreement under the CPP, pursuant to which:

> [BOA] will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America.  In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. . . . If the merger is completed prior to Treasury making an investment in Merrill Lynch . . . Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

151.    Thus, the Proxy Statement only informed Plaintiffs of the specific terms of BOA's initial participation in the CPP.  As discussed below in Section VI.C.7, Defendants failed to update the Proxy Statement to disclose that Defendants negotiated an additional $20 billion capital infusion under the TARP program in mid-December 2008 to prevent the Merger from imploding.

152.    The foregoing statements in the September 15, 2008 Press Release, the Merger Presentation, the September 15, 2008 Analyst Call, and the Proxy Statement (including the Fairness Opinions) were false and misleading with respect to material facts, or omitted material facts necessary in order to make the statements therein not false and misleading, because Defendants had reason to know and/or were negligent in not knowing that, among other things:

(i)    BOA's Board of Directors did not have an adequate basis upon which to recommend the Merger;

(ii)    BOA did not perform due diligence adequate to evaluate Merrill's true financial condition;

(iii)    BOA did not adequately evaluate Merrill's troubled asset classes;

(iv)    BOA did not effectively evaluate Merrill's efforts to offload troubled assets and reduce its risk of exposure to potential future losses;

(v)     The Financial Advisors did not have an adequate and reasonable basis to issue the Fairness Opinions included in the Proxy Statement; and

(vi)    Given the foregoing, the Proxy Statement misled BOA shareholders into believing that BOA, its Board of Directors, and the Financial Advisors had an adequate basis to evaluate the substantial risk of loss associated with Merrill's assets and the benefits of the Merger, including the value of the assets to be acquired from Merrill.

153.    As a result of the materially false and misleading statements in the Proxy Statement and related solicitation materials, and the omitted material facts necessary to correct the certain statements and to prevent other statements from being materially misleading, BOA shareholders as of the Record Date, including Plaintiffs, were deprived of material information in connection with their vote on the Merger, and thereby suffered damages.

**B.     The Merger Agreement Provided Defendants With The Means To Protect BOA Shareholders, Which Defendants Neglected to Do**

154.    The Merger Agreement – excluding the undisclosed schedule regarding Merrill's bonuses – was attached as Appendix A to the Proxy Statement.  Certain provisions of the Merger Agreement provided Defendants with important access to Merrill's financial statements, as well as termination rights which could be exercised to protect the interests of BOA and its shareholders.  These access and termination rights gave Defendants the necessary means to know of Merrill's true financial condition prior to the Shareholder Vote and the Closing Date, as well as the means to renegotiate a Merger price that would have been more favorable to Plaintiffs and to BOA's other shareholders.

**1.     Defendants' Continuous Access to Merrill's Financial Information**

155.    The Merger Agreement required BOA and Merrill to cooperate with each other in providing necessary company information to be used for preparing and filing the Proxy

Statement.  Specifically, under Article 6.1 entitled "<u>Regulatory Matters</u>," BOA and Merrill

agreed that they:

> shall promptly prepare and file with the SEC the Form S-4, in which the Joint Proxy Statement will be included as a prospectus.  Each of [BOA and Merrill] shall use its reasonable best efforts to have the Form S-4 declared effective under the Securities Act as promptly as practicable after such filing, and [Merrill] shall thereafter mail or deliver the Joint Proxy Statement to its stockholders. . . .
> ***[Merrill] shall furnish all information concerning [Merrill] and the holders of [Merrill] Common Stock as may be reasonably requested in connection with any such action.***

\*          \*          \*

> [Merrill and BOA] shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case subject to applicable laws relating to the confidentiality of information, all the information relating to [Merrill] or [BOA], as the case may be, and any of their respective Subsidiaries, that appear in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement.
>
> (c) ***Each of [BOA] and [Merrill] shall, upon request, furnish to the other all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with the Joint Proxy Statement*** . . . .

156.    The Merger Agreement also explicitly provided BOA and its representatives with

unfettered access to all of Merrill's books and records to the extent not otherwise protected by

applicable confidentiality laws:

> <u>Access to Information</u>.  (a) Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, each of [Merrill] and [BOA] shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors, agents and other representatives of the other party, reasonable access, during normal business hours during the period prior to the [effective date of the merger], ***to all its properties, books, contracts, commitments and records, and, during such period, such party shall, and shall cause its Subsidiaries to, make available to the other party . . . (ii) all other information concerning its business, properties and personnel as the other party may reasonably request***. . . .

51

157.     Under these express provisions of the Merger Agreement, ***Defendants had a right of complete access to all of Merrill's financial information***, including information on the valuations and performance of Merrill's CDO asset portfolio and its other subprime mortgage-exposed assets, at least as early as September 15, 2008 when the Merger Agreement was executed.  Merrill complied with its obligation under the Merger Agreement to provide Defendants with full access to Merrill's financial information.

158.     In fact, on January 25, 2009, in a farewell memorandum to former Merrill colleagues, Thain confirmed exactly what the Merger Agreement provided:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.  However, they were incurred almost entirely on legacy positions and were due to market movements.  ***We were completely transparent with Bank of America.  They learned about these losses when we did.***  The acting CFO of my businesses [Defendant Cotty] was Bank of America's former Chief Accounting Officer. ***They had daily access to our p&l, our positions and our marks.  Our year end balance sheet target (which we more than met) was given to us by Bank of America's CFO.***

159.     On January 25, 2009, Thain gave an interview where he again rejected speculation and suggestions (this time by Defendant Lewis and others at BOA) that Merrill withheld information from BOA concerning Merrill's fourth quarter losses.  Thain emphasized that, as was required by the Merger Agreement, Merrill provided BOA with access to all of Merrill's books and records on a daily basis in the months preceding the Closing Date:

> ***They were seeing exactly the same information that we saw.  We gave them complete access to everything that we had***. . . . Well, let me say it this way.  The – the acting chief financial officer [Defendant Cotty] had come from Bank of America.  He was their formal – former chief accounting officer.  He and his team, which were – for all practical purposes, our day-to-day CFOs, they had direct access to our daily P&Ls, to our positions, to our marks.

160.     BOA's representations in the Proxy Statement concerning, among other things, Defendants' purported due diligence of Merrill and the "fairness" of the Exchange Ratio were materially false and misleading in light of Defendants' clear access to the information necessary

to carefully investigate and analyze Merrill's asset portfolios and financial statements between September 15, 2008 and the Closing Date. Defendants' representations concerning the Merger should have been based upon Defendants' continuing assessment of Merrill's financial condition and not solely upon the Financial Advisors' hasty 36-hour due diligence of Merrill.

161.    Defendants were negligent in failing to exercise their right to review Merrill's financial statements prior to the Closing Date given what they knew, or had reason to know, of Merrill's deteriorating financial condition during this period – a condition which, in fact, necessitated the Merger. To the extent Defendants exercised their right of access to Merrill's books and records, they were negligent, at a minimum, in failing to detect and/or to disclose Merrill's deteriorating financial condition to BOA shareholders to prevent statements made in the Proxy Statement from being materially misleading and/or to correct statements which had become false and misleading based upon Merrill's deteriorating financial condition.

## 2.    The Companies' Representations and Warranties

162.    In describing the terms of the Merger Agreement, the Proxy Statement included a section entitled "Representations and Warranties." This section summarized the "Representations and Warranties" made by both BOA and Merrill to each other in the Merger Agreement. Among others, these included representations concerning both companies':

      (i)     proper corporate organization;

      (ii)    capitalization;

      (iii)   authority to execute the Merger Agreement;

      (iv)   filing of required government forms and consents;

      (v)    accurate financial statements, internal controls, and accounting/auditing practices;

      (vi)   compliance with applicable laws; and

(vii)    *the absence of material adverse changes.*

163.    Article 9.2 of the Merger Agreement provided, among other things, that:

No representation or warranty of [Merrill] contained in Article III . . . shall be deemed untrue, inaccurate or incorrect for any purpose under this Agreement, and no party hereto shall be deemed to have breached a representation or warranty for any purpose under this Agreement, in any case as a consequence of the existence or absence of any fact, circumstance or event unless such fact, circumstance or event, individually or taken together with all other facts, circumstances or events . . . has had or would reasonably be expected to have a Material Adverse Effect with respect to [Merrill or BOA].

164.    The Merger Agreement contained the companies' representations that no "Material Adverse Effect" had occurred between a date certain and the closing of the Merger. With respect to Merrill's representation and warranty to this effect, Section 3.8 of the Merger Agreement, entitled "Absence of Certain Changes or Events," stated that:

(a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on [Merrill].  As used in this Agreement, the term "Material Adverse Effect" means, with respect to [BOA or Merrill], as the case may be, a material adverse effect on (i) *the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole* . . .

Accordingly, prior to the Closing Date, Merrill represented that it had not experienced any material adverse effects on its financial condition and business results.

165.    However, as described in more detail below, Defendants had reason to know that these statements were materially false and misleading as of at least the end of November 2008. By then, Defendants were aware that Merrill was experiencing massive fourth quarter losses of at least $13.3 billion.  The Oversight Committee Investigation has confirmed that by November 12, 2008, Defendants were consulting internally with BOA's attorneys to ascertain whether they needed to disclose Merrill's then-known fourth quarter 2008 losses.  Former BOA General Counsel Timothy Mayopoulos' ("Mayopoulos") November 17, 2009 testimony before the Oversight Committee also confirms that Defendants consulted both Mayopoulos and BOA's

outside counsel at Wachtell Lipton on whether these losses should be disclosed. Although there was an initial agreement that Merrill's known fourth quarter 2008 losses should be disclosed prior to the Shareholder Vote, Defendants failed to do so.

166. The Attorney General's complaint reveals that between November 12 and December 3, 2008, Mayopoulos advised Defendants that BOA was not required to make additional disclosures concerning Merrill's forecasted fourth quarter 2008 losses based, in part, on his discussions with BOA's outside counsel at Wachtell Lipton. However, during the December 3 final discussion Defendant Price had with Mayopoulos concerning whether BOA should disclose Merrill's losses, Defendant Price provided Mayopoulos with a $7 billion "forecasted" after-tax loss. At this time, Defendant Price knew — based upon his conversation with Defendants Lewis and Cotty *that same day* — that Merrill's losses were already over $10 billion after taxes. According to Mayopoulos' testimony to the Attorney General: "[T]he closer you got to $10 billion . . . the case for making disclosure became more compelling" as $10 billion was the most Merrill lost in the preceding five quarters. To the detriment of BOA shareholders, Defendants never disclosed Merrill's enormous fourth quarter losses until after the Closing Date.

167. Indeed, Merrill's losses were so severe that on December 17, 2008, Defendant Lewis arranged an emergency meeting with federal regulators to obtain additional financing for the Merger. Consequently, given Merrill's known but undisclosed fourth quarter 2008 losses, Defendants were required to correct representations in the Proxy Statement concerning, among other things, the "fairness" of the Exchange Ratio and the Merger being in the best interests of BOA shareholders to prevent the Proxy Statement from being materially false, misleading, and incomplete.

168.     Similarly, Defendants were also aware that BOA was itself experiencing significant fourth quarter losses of at least $1.4 billion – the first quarterly loss in 17 years – which further compromised the Company's ability to withstand Merrill's losses.  Defendants were also required to disclose this material fact, but failed to do so.

169.     Defendants also failed to correct previous positive statements about the Merger by failing to disclose that, by no later than early December 2008, Defendants were evaluating whether to exercise BOA's right to terminate the Merger under the MAC.  For example, on December 1, 2008 – *four days prior to the Shareholder Vote* – Defendant Price and Greg Curl sought advice from Mayopoulos regarding the MAC clause and whether BOA could terminate the Merger based upon Merrill's known fourth quarter losses.

170.     In this regard, under Article 7.2 of the Merger Agreement, BOA was only required to enter into the Merger subject to Merrill's satisfaction of its "Representations and Warranties," including the representation that no changes or events constituting a "Material Adverse Effect" had occurred prior to the Closing Date.  Article 8.1 of the Merger Agreement further provided BOA with the right to terminate the Agreement prior to the Closing Date if there had been a breach in any of the "Representations and Warranties" by Merrill.  Defendants' failure to disclose that they were considering terminating the Merger in early December 2008 constituted a material failure to correct false and misleading statements in the Proxy Statement, and further demonstrates the materiality of Merrill's growing losses which Defendants failed to disclose.

**C.     Defendants Fail To Correct The Material Misstatements And Omissions In The Proxy Statement**

171.     Defendants had a continuing obligation, from the date the Proxy Statement was filed and distributed through the consummation of the Merger, to update and correct it to prevent

any statement therein from being materially misleading or incomplete.  In particular, Defendants had a duty to provide BOA shareholders, including Plaintiffs, with corrected information to reflect what they knew, or should have known, about, among other things:  (i) Merrill's significant losses for the fourth quarter of 2008, which were known to be at least $13.3 billion by the end of November 2008 and $15.3 billion prior to the Shareholder Vote; (ii) BOA's September 2008 agreement to permit Merrill to pay up to $5.8 billion in bonuses to Merrill employees, of which Merrill paid $3.6 billion prior to the Closing Date; and (iii) the necessity for BOA to obtain emergency government financing to complete the transaction — ultimately a $138 billion bailout, consisting of a $20 billion capital infusion and $118 billion in asset guarantees.

### 1.    The November 21, 2008 Amendment to the Proxy Statement

172.    On November 21, 2008, BOA filed a Form 425/8-K updating information contained in the Proxy Statement on pending Merger-related litigation involving Merrill (the "First Proxy Amendment").  This amendment also supplemented certain sections of the Proxy Statement pertaining to Merrill resulting from the settlement of these lawsuits.

173.    Under a section entitled "Litigation Relating to the Merger," the Proxy Statement described a series of class action lawsuits brought on behalf of Merrill shareholders in the Supreme Court of the State of New York and the Court of Chancery of the State of Delaware. These lawsuits challenged the Merger on state law breach of fiduciary duty grounds.  The status of several derivative lawsuits brought on Merrill's behalf in federal and state courts in New York and Delaware was also outlined in this section of the Proxy Statement (collectively, the "Merrill Actions").

174.    The First Proxy Amendment announced that certain of the Merrill Actions had been settled as follows:

On November 21, 2008, the defendants entered into a memorandum of understanding with the plaintiffs in the Court of Chancery and in the Southern District of New York actions regarding settlement of the Court of Chancery action and the merger-related claims in the Southern District of New York action.  In connection with the settlement contemplated by the memorandum of understanding, Merrill Lynch and Bank of America agreed to make certain additional disclosures related to the proposed merger, which are contained in this Form 8-K. . . .

175.    These additional disclosures in the First Proxy Amendment were limited to Merrill's:  (i) Board of Directors' information call on September 14, 2008; (ii) potential credit ratings downgrade; (iii) discussions regarding potential transactions with other financial institutions; (iv) due diligence of BOA; (v) financial advisor MLFPS; (vi) executive positions in the merged company; and (vii) consideration of certain derivative lawsuits against current and former Merrill directors.  The First Proxy Amendment failed to provide any additional or specific detail concerning Merrill's deteriorating financial condition despite Defendants' daily access to Merrill's financial information and knowledge that Merrill had already amassed billions of dollars in losses for the ongoing fourth quarter of 2008.  Nor did the First Proxy Amendment disclose that BOA had agreed to permit Merrill to pay up to $5.8 billion in bonuses prior to the Closing Date.

### 2.    The November 26, 2008 Amendment to the Proxy Statement

176.    On November 26, 2008, BOA filed another Form 425/8-K amendment to the Proxy Statement (the "Second Proxy Amendment").  This amendment consisted of a letter from Defendant Lewis touting BOA's purported liquidity and financial strength despite declining financial markets at that time.

177.    In the letter, Defendant Lewis sought to reassure BOA shareholders that the Company was well-positioned to survive the financial crisis and was, in fact, continuing to grow:

***Bank of America continues to be a strong, active player in the financial markets.***  We are generating strong deposit growth and attracting new customer

and client relationships throughout our company.  We continue to make loans to consumers and businesses to boost shareholder value and to do what we can to support economic activity.

*We are one of the most liquid banks in the world.*  We successfully raised capital in October and now have Tier 1 capital that exceeds both regulatory requirements and our own target.  *In short, we believe we are one of the strongest and most stable major banks in the world.*

178.    As evidence of BOA's purported economic strength, Defendant Lewis explicitly stated in his letter that BOA had no need for the $25 billion in taxpayer money it received on or about October 28, 2008 under the TARP/CPP program:

*Regarding the federal capital injection, these were funds that we did not need and did not seek.*  At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, *had more than adequate capital*.  We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.

Thus, Defendant Lewis represented to BOA shareholders that BOA was accepting approximately $25 billion in TARP/CPP financing merely to lend its support to the Treasury Department's overall efforts to bolster the financial markets.

179.    The Second Proxy Amendment made no mention of the Merger or Merrill and did not address Merrill's financial condition, even though, as of late November 2008, Defendants knew that Merrill's mounting fourth quarter losses were approaching $13 billion.  While Defendants did amend the Proxy Statement twice, neither amendment provided any additional information regarding Merrill's rapidly deteriorating financial condition or the agreed upon Merrill bonuses, which bore directly upon the fairness of the Merger to BOA shareholders.  To the contrary, both amendments gave the impression that BOA's financial footing was secure and that the Merger was proceeding apace.

180.    No other amendment or supplement to the Proxy Statement was ever filed.

### 3.    The November 26, 2008 Press Release

181.    On November 26, 2008, BOA issued a press release announcing that it had received the required approval from the Board of Governors of the Federal Reserve System to proceed with the Merger (the "November 26, 2008 Press Release").  In celebrating this approval, Defendants again positively characterized the Merger without disclosing the ballooning losses within Merrill that were threatening the viability of the transaction:

> ***Merrill Lynch is expected to enhance Bank of America's current strengths*** by creating a company with the leading position in wealth management as well as in global debt underwriting, global equities and global merger and acquisition advice.  Once the purchase is complete, Bank of America will have the largest wealth management business in the world with nearly 20,000 financial advisors and approximately $2.5 trillion in client assets.

> 'Combining the leading global wealth management, capital markets and advisory firm with the largest consumer and corporate bank in the U.S. creates the world's premier financial services company with unrivalled breadth and global reach,' said [Defendant Lewis].  ***'This presents a compelling opportunity for our customers and shareholders.'***

182.    Again, Defendants failed to provide any additional information relating to Merrill's financial condition or its potential effect on the Merger despite the fact that the "compelling opportunity" that Defendant Lewis proclaimed the Merger represented to BOA shareholders had dramatically changed based upon Merrill's staggering fourth quarter 2008 losses.

### 4.    BOA Shareholders, Including Plaintiffs, Vote to Approve the Merger

183.    On December 5, 2008, at a special meeting of all BOA shareholders as of the Record Date, approximately 82% of BOA shareholders voted to approve the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials. Plaintiffs voted all of their BOA shares eligible to be voted in favor of the Merger.

184.    In a press release issued after the Shareholder Vote (the "December 5, 2008 Press Release"), Defendants celebrated the shareholders' approval and asserted that the Merger would make BOA a stronger company.  Specifically, Defendant Lewis stated in the press release that "Bank of America will have the premier financial services franchise" as a result of the Merger.

185.    Despite Defendants' numerous positive statements concerning the Merger, the December 5, 2008 Press Release misrepresented and omitted material facts.  The true but concealed and/or misrepresented facts known to and/or recklessly disregarded by Defendants included, but were not limited to:

> (i)     as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;
>
> (ii)    as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion;
>
> (iii)   according to the Attorney General's complaint, on the morning of December 5, 2008, prior to the Shareholder Vote, Defendants knew Merrill's losses were approximately $15.3 billion.  By the evening of December 5, Merrill's known losses had increased to approximately $16.2 billion;
>
> (iv)    as the Attorney General's investigation has revealed, BOA officers privately sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's historic losses; and
>
> (iv)    BOA had negotiated and entered into an undisclosed agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

**5.    Defendant Lewis Abruptly Fires Timothy Mayopoulos as BOA's General Counsel After He Sought Information on Merrill's Growing Losses**

186.    According to the Attorney General's complaint, at a BOA Board meeting held on December 9, 2008, Mayopoulos first learned that Defendant Price had misrepresented to him

Merrill's actual known after-tax fourth quarter losses. On that day, Mayopoulos learned that Merrill's then-forecasted after-tax losses were approximately $9 billion, not $7 billion as Defendant Price had stated. Mayopoulos was surprised by the discrepancy in the two numbers and sought to speak with Defendant Price "to understand what had happened."

187. Mayopoulos tried to get in contact with Defendant Price, but Defendant Price's assistant informed Mayopoulos that Price was in a meeting with Defendant Lewis and other senior business executives for the rest of the afternoon on December 9. Mayopoulos decided that he would contact Defendant Price the next day, December 10, "to talk to him about what's changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not."

188. On December 10, however, Mayopoulos was abruptly fired as BOA's General Counsel and was immediately escorted from the premises by an HR executive. Mayopoulos was replaced by Brian Moynihan, a former FleetBoston Financial executive who started at BOA when it acquired Fleet in 2003. At the time that Moynihan replaced Mayopoulos as BOA's General Counsel, Moynihan was not practicing law and had not done so for fifteen years. Moreover, Moynihan's bar membership was inactive.

189. According to the Attorney General's complaint, Moynihan acted as BOA's General Counsel for approximately six weeks, "a key portion of which period was taken up with [BOA's] efforts to secure government assistance by threatening to invoke the MAC." After that time, on January 20, 2009, Moynihan became the head of BOA's Global Banking and Global Wealth Management group and is the current Chief Executive Officer of BOA.

190. Mayopoulos stated in his congressional testimony that he was "stunned" when he was fired as BOA's General Counsel and that he "had never been fired from any job . . . never

heard of the general counsel of a major company being summarily dismissed for no apparent reason and with no explanation." Mayopoulos has never received an explanation from BOA or any related party as to why he was summarily terminated even after consistently receiving great performance reviews and being promised by Defendant Lewis that he would be the General Counsel of the combined company after the Merger was completed.

> **6.    BOA Consults with Merrill on Paying Undisclosed Bonuses to Merrill Employees**

191.    As is now clear from facts uncovered by the Attorney General's investigation into the circumstances surrounding the secret bonuses paid by Merrill, on or about December 8, 2008, Andrea Smith, BOA's head of human resources, met with Thain to discuss bonus payments to Merrill employees. Rather than eliminating the bonuses based upon Merrill's mounting fourth quarter losses, which at this time were known by both parties to be well over $16 billion, Smith and Thain only discussed reducing certain of the Merrill bonuses to correspond more closely to the compensation typically received by BOA employees in similar positions. Further, J. Steele Alphin, Chief Administrative Officer of BOA and a top aide and close confidant to Defendant Lewis, had at least one discussion with Thain regarding reducing the bonuses to "under $4.0 billion." However, at no point did Defendants update the Proxy Statement or disclose to BOA shareholders that such enormous bonuses would be paid to Merrill employees.

192.    By early December 2008, Defendants were aware that Merrill would lose at least $15.3 billion in the fourth quarter of 2008. Merrill's losses escalated to over $21 billion prior to the Closing Date. In light of these known catastrophic losses, the fact that Merrill intended to use $3.6 billion of its increasingly scarce cash on hand to pay accelerated bonuses to employees, many of whom would not be retained by BOA, was clearly material to BOA shareholders and

investors, including Plaintiffs, yet Defendants did not update the Proxy Statement or otherwise

disclose these facts.

> ### 7. Defendant Lewis' Undisclosed December 17, 2008 Meeting with Federal Regulators and Subsequent Undisclosed Negotiations to Prevent Merrill's Losses from Derailing the Merger

193.    On December 17, 2008, only twelve days after Plaintiffs and other BOA

shareholders voted in favor of the Merger, Defendant Lewis requested an emergency meeting

with then Treasury Secretary Paulson and Federal Reserve Chairman Bernanke to discuss grave

concerns with the Merger stemming from Merrill's fourth quarter losses.  This meeting followed

an earlier telephone call between Defendant Lewis and Paulson during which Defendant Lewis

explained that BOA would not be able to cover Merrill's huge losses for the quarter and was

considering terminating the Merger under the "MAC" clause.

194.    During Defendant Lewis' February 26, 2009 deposition taken as part of the

Attorney General's investigation, Defendant Lewis testified that he reported on the dismal

financial condition of the combined company at the December 17, 2008 meeting.  He stated that

BOA was projected to lose $1.4 billion in the fourth quarter – BOA's first quarterly loss in 17

years.  Defendant Lewis then reported that Merrill's fourth quarter 2008 losses were so large that

they threatened BOA's solvency.

195.    Handwritten notes from the December 17, 2008 meeting, released by Congress,

reveal that Defendant Price, who was also present, told the regulators that Merrill had recently

suffered "unusual" losses and was now projecting losses of approximately $18 billion on a pre-

tax basis, or a $12.5 billion net loss after taxes, for the entire fourth quarter of 2008.

Accordingly, Defendants concluded that a "material adverse change" had likely occurred in

Merrill's financial condition and that BOA could terminate the Merger pursuant to the MAC

clause.  Defendant Lewis falsely claimed that BOA only learned of Merrill's losses in mid-December when such losses allegedly accelerated.

196.     According to Defendant Price's notes, both Bernanke and Paulson urged Defendant Lewis not to terminate the Merger pursuant to the MAC clause.  Defendant Lewis responded by proposing that BOA receive a taxpayer bailout, and offered as an example a "Citi" guarantee of $50 billion of assets to proceed with the Merger.  Ultimately, Defendant Lewis supplied the Treasury and the Federal Reserve with Merrill's and BOA's fourth quarter 2008 financial information so the regulators could further analyze the situation.

197.     During the federal regulators' examination, it became clear that Defendant Lewis had falsely claimed that BOA only recently learned of Merrill's fourth quarter 2008 losses.  Kevin M. Warsh, a member of the Board of Governors of the Federal Reserve that was examining Merrill's fourth quarter 2008 financial information, stated in an e-mail:  "***This claim is not credible***."   On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, e-mailed other Federal Reserve officials and noted:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that ***the deterioration at [Merrill] has been observably under way over the entire quarter . . . Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect.  At a minimum, it calls into question the adequacy of the due diligence process [BOA] has been doing in preparation for the takeover***.

198.     Other senior Federal Reserve officials echoed Clark's sentiments.  For example, as set forth in an internal Federal Reserve memorandum entitled "Analysis of Bank of America & Merrill Lynch Merger":

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, ***[BOA] management's contention that the severity of Merrill's losses only came to light in recent days is***

*problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition*.

\*     \*     \*

[The] single largest area of risk exposure and driver of recent losses that have been identified by management [was Merrill's] large losses stemming from exposures to financial guarantors. . . . [These exposures and losses] were clearly shown in Merrill Lynch's internal risk management report that [BOA] reviewed during their due diligence. . . . [R]isk exposures cited by management . . . should also have been reasonably well understood, particularly as [BOA] itself is also active in these products."

199.    Additionally, Defendant Lewis' claim that BOA only learned of Merrill's fourth quarter 2008 losses in mid-December is flatly refuted by internal documents that BOA produced to the Attorney General, the SEC, and to Congress as part of their ongoing investigations into the facts and circumstances surrounding the Merger.  For example, Defendant Cotty's November 5, 2008 e-mail to Defendant Price included Merrill's October 2008 financial report which estimated markdowns and "other large items" of $5.3 billion, and included Defendant Cotty's comment: "***Read and weep***."  Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin, Merrill's then Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated:  "***What a disaster!***"

200.    The Attorney General's complaint also alleges that Defendants' representations that they just became aware of Merrill's "unusual" losses were "simply false and misleading." While Defendants claimed that Merrill's losses after the Shareholder Vote accelerated by $7 billion, Merrill's actual losses only increased by $1.4 billion after the Shareholder Vote.

201.    Defendant Lewis' meetings with regulators at the Federal Reserve led certain of those officials to conclude that Defendant Lewis was concerned that the inadequacy of the abbreviated due diligence conducted in connection with the Merger would be exposed.  In this regard, on December 23, 2008, Federal Reserve Senior Vice President, Mac Alfriend, stated in

an e-mail that Defendant Lewis "is worried about stockholder lawsuits; ***knows they did not do a good job of due diligence*** and the issues facing the company are finally hitting home and ***[Lewis] is worried about his own job*** after cutting loose lots of very good people."

202.    Defendant Price's December 17, 2008 handwritten notes from the meeting with Paulson and Bernanke also revealed that Federal Reserve officials informed Defendant Lewis that a decision by BOA to invoke the MAC clause would lead to the market questioning BOA's prior statements about the Merger and show that statements concerning BOA's due diligence were false.  Additionally, if BOA terminated the Merger, the market would undoubtedly question BOA's financial condition and its judgment.  In fact, on June 25, 2009, Bernanke testified before the Oversight Committee that he told Defendant Lewis that:

> an attempt [by BOA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capability to consummate significant acquisitions, its overall risk management processes and the judgment of its management.

203.    Defendant Lewis called Paulson on December 21, 2008 to continue discussions about how to salvage the Merger.  During this conversation, Paulson informed Defendant Lewis that if BOA terminated the Merger, the Federal Reserve could remove BOA's Board of Directors and management.  In this regard, Paulson stated in testimony given on July 16, 2009 before the Oversight Committee:

> It was . . . appropriate for me to remind [Lewis] under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America.  I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

204.    Paulson's message was clearly understood by Defendant Lewis.  According to Defendant Lewis' deposition taken by the Attorney General, before his conversation with

Paulson, Defendant Lewis stated that "we [BOA] were going to call the MAC."  Subsequently, Defendant Lewis changed his mind and decided not to terminate the Merger.

205.    It was ultimately agreed that BOA would issue an additional $20 billion in Tier-1 qualifying preferred stock under the TARP program.  Part of this $20 billion included an issuance of $4 billion in BOA preferred securities in exchange for $118 billion in asset guarantees to protect against a further deterioration in BOA's illiquid assets mostly attributable to Merrill.  Under this guarantee, BOA would be responsible for the first $10 billion in losses on the pool of $118 billion in illiquid assets.  The Treasury Department and the Federal Deposit Insurance Corporation would take on the next $10 billion in losses.  Finally, the Federal Reserve Bank would be responsible for 90% of any additional losses in the asset pool, and BOA would cover the rest.  BOA agreed to proceed with the Merger based on this promise of additional government assistance, but did not inform BOA shareholders of the new financial details of the Merger.

206.    None of the Defendants ever updated or corrected the Proxy Statement and related solicitation materials prior to the Closing Date to disclose the dire circumstances that required an unprecedented government bailout to prevent the Merger from imploding.  Indeed, Defendants' negotiation for an additional *$20 billion* cash infusion twelve days after the Shareholder Vote, and fourteen days before the Merger closed, contrasts directly with Defendant Lewis' assertion in the Second Proxy Amendment that BOA had "more than adequate capital."

207.    Defendants should have known that information regarding the Company's receipt of federal financing under the TARP/CPP program to salvage the Merger was material information requiring an update to the Proxy Statement.  Their failure to update the Proxy

Statement to provide information concerning the additional $20 billion needed to consummate the Merger rendered the Proxy Statement materially false and misleading.

208.     As alleged below in Section VI.D., details regarding this additional federal financing and Merrill's calamitous fourth quarter losses were not disclosed to Plaintiffs or other BOA shareholders until weeks *after* the Merger had closed.

209.     In this regard, the Attorney General sent a letter to Congressional officials on April 23, 2009 in connection with his investigation which stated, among other things, that:

> Despite the fact that Bank of America had determined that Merrill Lynch's financial condition was so grave that it justified termination of the deal pursuant to the MAC clause, Bank of America did not publicly disclose Merrill Lynch's devastating losses or the impact it would have on the merger.  Nor did Bank of America disclose that it had been prepared to invoke the MAC clause and would have done so but for the intervention of the Treasury Department and the Federal Reserve.

210.     Defendants also failed to disclose their awareness of potential liability for misinforming shareholders about the Merger.  On December 22, 2008, Bernanke e-mailed the General Counsel of the Federal Reserve, Scott Alvarez, stating that Defendant Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]."  (emphasis in original.)

211.     Bernanke then asked Alvarez whether the Federal Reserve could provide a formal letter advising Defendant Lewis that invoking the MAC clause was not in the best interests of BOA, and whether Defendant Lewis could use such a letter as a defense from potential lawsuits.  Alvarez responded that such a letter was not "appropriate."

212.     On December 22, 2008, Defendant Lewis e-mailed members of BOA's Board of Directors, among others, to inform them that neither the Federal Reserve nor the Treasury could send a letter without unwanted public disclosure.  Specifically, Defendant Lewis stated:  "I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury

could send us a letter of any substance without public disclosure which, of course, *we do not want*."

213.    Defendant Lewis and BOA's Board of Directors held a meeting on December 22, 2008.  According to the minutes of this meeting, Defendant Lewis informed BOA's Board of Directors of the $138 billion government bailout to salvage the Merger and that "the Treasury and Fed would [have] remove[d] the Board and management of [BOA]" had BOA invoked the MAC clause.  Defendant Lewis' statements reflected in the December 22, 2008 Board meeting minutes reveal that the $138 billion government bailout was a material definitive agreement by December 22, 2008.  Nevertheless, Defendants failed to disclose this agreement or the circumstances necessitating the government bailout until well after the Closing Date.

214.    In a December 23, 2008 e-mail to Bernanke, Alvarez stated the following concerning potential liability for BOA's failure to disclose Merrill's fourth quarter losses prior to the Shareholder Vote:

> Management may be exposed if it doesn't properly disclose information that is material to investors.  There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . *His [Lewis'] potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BOA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.*

> First, we didn't order [Lewis] to go forward – we simply explained our views on what the market reaction would be and left the decision to him.  Second, making hard decisions is what he gets paid for and only he has the full information needed to make the decision – so we shouldn't take [Lewis] off the hook by appearing to take the decision out of his hands.

Notably, Alvarez's account contradicted Defendant Lewis' contention that federal regulators forced the Merger to proceed by prohibiting BOA's invocation of the MAC clause.

215.    In a subsequent e-mail to Bernanke, Alvarez noted that Federal Reserve officials concluded that Defendant Lewis' knowledge of Merrill's fourth quarter losses prior to the

Shareholder Vote may cause "problems," *i.e.*, potential liability for his failure to disclose these

losses.  Specifically, Alvarez stated:

> [O]nce we're in litigation, all our documents become subject to discovery and, as
> you'll remember from Deborah's presentation, some of our analysis suggests that
> Lewis should have been aware of the problems at [Merrill] earlier (perhaps as
> early as mid-November) and not caught by surprise.  That could cause other
> problems for him around the disclosures [BOA] made for the shareholder vote.

216.    Despite the necessity of a massive taxpayer bailout to salvage the Merger,

Defendants again determined to withhold this information from BOA shareholders, including

Plaintiffs.  According to the minutes of a special meeting of BOA's Board of Directors held on

December 30, 2008:  "[Defendant] Lewis explained that written assurances would not be

received before January 1, 2009, because any written assurances would require formal action by

the Fed and Treasury, ***which formal action would require public disclosure***."  However,

because Defendants knew that the government's $138 billion bailout was firmly in place as of

December 22, 2008, they decided to proceed with the Merger.  Instead of disclosing this

information before the Closing Date, Defendants determined to announce it "in conjunction with

[BOA's] earnings release on January 20, 2009."  Once again, as discussed herein, Defendants at

all times were required to update the Proxies, even after the Shareholder Vote.

217.    On June 25, 2009, pursuant to the Oversight Committee Investigation, Bernanke

provided sworn testimony confirming that BOA's failure to disclose material facts concerning

the Merger lay solely with the Company.  Specifically, Bernanke testified:

> Neither I nor any member of the Federal Reserve ever directed, instructed, or
> advised Bank of America to withhold from public disclosure any information
> relating to Merrill Lynch, including its losses, compensation packages or bonuses,
> or any other related matter.  These disclosure obligations belong squarely with the
> company, and the Federal Reserve did not interfere in the company's disclosure
> decisions.

218.    On July 16, 2009, after Paulson testified as part of the Oversight Committee

Investigation, Representative Dennis J. Kucinich, Chairman of the Oversight Committee

Investigation, stated:

> [N]othing in Mr. Paulson's testimony today justifies the Government's decision to
> ignore evidence that [BOA] withheld information from its shareholders about
> mounting losses at [Merrill] before the crucial shareholder vote on December 5 –
> a potentially <u>illegal</u> act.
>
> *        *        *
>
> Top staff at the Fed and Treasury had determined that Mr. Lewis knew about
> accelerating losses at [Merrill] <u>before</u> the shareholder vote to ratify the merger,
> but he did not provide that information to shareholders.

(emphasis in original.)

219.    While Paulson reminded Defendant Lewis of his power to remove Lewis and

BOA Board members if they decided to terminate the Merger, Paulson *did not*, *and could not*,

alter Defendants' obligation to disclose material information to Plaintiffs and other BOA

shareholders concerning the Merger.  In particular, Defendants had a duty under SEC Form 8-K

to disclose the material definitive agreement with the government to receive a $138 billion

taxpayer bailout, but failed to do so.

220.    In his testimony before the Oversight Committee, Defendant Lewis himself

acknowledged this disclosure duty and denied that Paulson or Bernanke had interfered with any

BOA disclosures.  Specifically, Defendant Lewis testified that "[n]either Secretary Paulson nor

the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something that

we publicly — that we felt should be publicly disclosed."  In response to questioning from the

Oversight Committee on this subject, Defendant Lewis elaborated that "[Bernanke] never said

we should not disclose anything that was disclosable.  ***That would be our decision*** and I never

heard from him on the issue of us not disclosing anything."

221.    As made clear by the internal documents cited above, Defendants – at a minimum – negligently failed in their duty to update the Proxy Statement and the documents incorporated therein, including, among others, the September 15, 2008 public statements, the First and Second Proxy Amendments, and the press releases concerning the Shareholder Vote.  Moreover, the Proxy Statement and the documents incorporated therein were either false and misleading with respect to material facts and/or omitted material facts necessary to make such statements not false and misleading, because Defendants knew, among other things:

(i)     No later than mid-November 2008 that BOA could not support Merrill's massive losses, jeopardizing consummation of the Merger;

(ii)    No later than the end of November 2008, *at least 5 days before the Shareholder Vote*, that Merrill's actual fourth quarter 2008 losses would be at least $13.3 billion;

(iii)   The morning of the Shareholder Vote, Merrill's actual fourth quarter 2008 losses were at least $15.3 billion;

(iv)    BOA had agreed in an undisclosed schedule to the Merger Agreement to permit Merrill to distribute up to $5.8 billion in bonuses to its employees before the Merger closed, of which $3.6 billion was actually distributed by Merrill on December 31, 2008;

(v)     Defendant Lewis was meeting with federal regulators in search of (further dilutive) federal funding necessary to complete the Merger; and

(vi)    BOA's senior management was evaluating BOA's rights to terminate the Merger and that BOA consummated the Merger only upon receipt of billions of dollars in undisclosed federal funding.

222.    As a result of Defendants' failure to correct the Proxy Statement, BOA shareholders as of the Record Date were prevented from exercising their voting rights based upon available, but undisclosed, material facts.  Plaintiffs suffered damages by voting all of their BOA shares eligible to be voted in favor of the Merger based upon materially misrepresented

and incomplete facts.  Defendants failed to correct the materially misleading Proxy, which formed an essential link in obtaining BOA shareholder approval, and the Merger was completed on the Closing Date based upon materially false and misleading information.

### D.    BOA Finally Discloses Merrill's Fourth Quarter Losses And BOA's Request For, And Receipt Of, Additional Federal Financing

223.    On January 12, 2009, news began to emerge indicating that BOA would report a substantial loss for the fourth quarter of 2008.  Specifically, *Bloomberg* issued a story detailing a Citigroup analyst's client note advising that BOA would report fourth quarter losses and a substantial divided reduction.  On this news, BOA's stock price declined from its $12.86 January 12, 2009 opening price to close at $11.43 that day.

224.    Late in the day on January 14, 2009, *The Wall Street Journal* reported that certain BOA senior executives had met with federal regulators in December 2008 to discuss financial assistance for the Merger based upon Merrill's fourth quarter 2008 losses.  This was the first time BOA shareholders, including Plaintiffs, learned of the extent of Merrill's losses for the fourth quarter of 2008 and BOA's need for additional government capital to consummate the Merger.  Defendants had no comment on the January 14, 2009 *Wall Street Journal* article.

225.    On January 15, 2009, articles in both *The Wall Street Journal* and *The New York Times* reported in greater detail that BOA was finalizing a deal with the federal government to obtain additional financial aid to support the Merger.  Both articles also confirmed that this additional financing under the TARP/CPP program was sought by and promised to Defendant Lewis in mid-December 2008.

226.    As reported in the January 15th *Wall Street Journal* article:

The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.

*Discussions over these funds began in mid-December* when Bank of America approached the Treasury Department.  The bank, already the recipient of $25 billion in committed federal rescue funds, said that it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

227.    The January 15, 2009 *New York Times* article also confirmed that Defendant Lewis learned of Merrill's fourth quarter losses and negotiated with Messrs. Paulson and Bernanke to obtain additional financing to consummate the Merger at least two weeks *before* the Merger closed:

> The preparations for further support come after *Bank of America's chief executive, Kenneth D. Lewis, told regulators in mid-December that the shotgun deal it signed just two months earlier with Merrill Lynch was in jeopardy.*
>
> *Billions of dollars in write-downs on mortgages, commercial real estate and other credit assets at the brokerage firm climbed into double-digit territory in the fourth quarter, pushing Merrill into a substantial loss*. . . .

228.    At the end of trading on January 15, 2009, BOA's common stock lost 18% of its value, closing at $8.32 per share on heavy trading volume.  This was a $1.88 drop from the $10.20 per share closing price on January 14, 2009, leaving BOA's common stock price at an 18-year low.

## 1.    Defendant Lewis' Memorandum to BOA Employees

229.    Defendant Lewis responded to the growing media coverage surrounding BOA's negotiations with the government and Merrill's fourth quarter losses with a memorandum to BOA employees on January 15, 2009 entitled, "Bank of America Remains Strong."

230.    The memorandum acknowledged the press coverage "reporting that Bank of America is in discussions with the Treasury Department regarding financial assistance with the Merrill Lynch transaction."  However, the memorandum provided no further elaboration on this

subject, and simply stated that "we expect to talk about this when we report fourth-quarter

financial results."

231.    The remainder of the memorandum provided assurance to BOA employees that

the Company's financial condition was sound and continued to grow:

> The core of the company, Bank of America, remains strong.
>
> We are one of the world's leading financial institutions with broad earnings diversity and a large growing deposit base.
>
> In fact, we have experienced significant growth in both retail and commercial deposits.  We continue to serve one out of every two American households, helping them navigate these challenging times.
>
> *        *        *
>
> The financial services industry as a whole is being affected, as demonstrated by competitors' recent earnings reports.
>
> This extraordinary period has called for extraordinary measures. . . .
>
> And we remain focused on delivering strong results, as we have in past decades and will in the future.

232.    The full text of Defendant Lewis' memorandum to BOA employees was posted

on the *Deal Journal* page of *The Wall Street Journal*, and in the *Associated Press* on or about

January 15, 2009.

### 2.    BOA's Fourth Quarter 2008 Press Release

233.    In a January 16, 2009 press release, BOA reported its financial results for fiscal

year 2008 and the fourth quarter of 2008 (the "January 16, 2009 Press Release").  For the fourth

quarter of 2008, BOA had a significant net loss of $1.79 billion compared with net income of

$268 million a year earlier.

234.    Although BOA's fourth quarter results did not account for, and were not based

on, Merrill's fourth quarter 2008 results, the press release that accompanied BOA's earnings

report revealed the shocking depth of Merrill's losses.  Specifically, the "Transition Update"

section of the press release indicated that "Merrill Lynch preliminary results indicate *a fourth-quarter net loss of $15.31 billion*, or $9.62 per diluted share, driven by severe capital market dislocations." *Merrill's fourth quarter 2008 pre-tax losses were over $21 billion.*

235.   As part of this tremendous fourth quarter loss, the January 16, 2009 Press Release identified the following "[s]ignificant negative fourth-quarter items for Merrill Lynch":

– Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion.

– Goodwill impairments of $2.31 billion.

– Leveraged loan write-downs of $1.92 billion.

– $1.16 billion in the U.S. Bank Investment Securities Portfolio write-downs.

– Commercial real estate write-downs of $1.13 billion.

236.   BOA's "Supplemental Information for Fourth Quarter 2008" was incorporated by reference into the January 16, 2009 Press Release.  In turn, BOA's "Supplemental Information" attached "Selected Fourth Quarter 2008 Merrill Lynch Results," reflecting net negative revenue of $13.109 billion from "principal transactions" in the fourth quarter.  Merrill had previously defined "principal transactions" revenue to include "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt."  The Merrill results incorporated by reference into the BOA press release also indicated that Merrill had a net loss of $3.39 billion in the "Other" revenue category.  The financial results defined "Other" to include "investment securities, private equity investments, loans and other miscellaneous items."

237.   BOA also announced for the first time in the January 16, 2009 Press Release that it had entered into an agreement with federal regulators for additional financing to absorb Merrill's losses and to salvage the Merger.  The agreement was described as follows:

In view of the continuing severe conditions in the markets and economy, *the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate.*

*In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure*, primarily from the former Merrill Lynch portfolio.  Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses.  Bank of America would pay a premium of 3.4 percent of those assets for this program.

238.    Following the issuance of the January 16, 2009 Press Release, BOA's common stock price dropped 14% from $8.32 per share on January 15, 2009, to $7.18 per share at the close of trading on January 16, 2009.

### 3.    BOA's Fourth Quarter Earnings Conference Call

239.    On January 16, 2009, BOA held its fourth quarter 2008 earnings conference call. During the call, Defendant Lewis elaborated on the recently announced Merrill losses and confirmed the new funding arrangements with the federal government.

240.    Defendant Lewis also confirmed that Defendants were aware of Merrill's losses prior to the completion of the Merger and that negotiations with federal regulators to salvage the transaction had taken place before the Merger closed:

We went to our regulators and told them that *we could not close the deal without their assistance.*  As a result, we have agreed to the issuance of $20 billion in tier-1 qualifying TARP preferred [stock] as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee that is essentially insurance protection on approval of capital markets related assets.

241.    When asked by an analyst on the call whether anything was missed during BOA's due diligence, Defendant Lewis attributed the losses to a much greater deterioration in Merrill's assets than BOA's management had anticipated:

In a nutshell, much, much higher deterioration of the assets we had identified than we had expected going into the fourth quarter. . . . So it wasn't an issue of not

identifying the assets.  *It was that we did not expect the significant deterioration, which happened in mid to late December that we saw.*

242.    As noted above, the Attorney General's investigation confirmed that by the end of November 2008, Merrill's fourth quarter losses were $13.3. billion, which Defendants knew or should have known before the Shareholder Vote and the Closing Date.  Specifically, the Attorney General's September 8, 2009 letter revealed that Defendants knew at the end of November 2008 that Merrill had sustained more than $13 billion in fourth quarter 2008 losses and that Merrill would need to take a goodwill charge of more than $2 billion associated with subprime related losses.  The September 8, 2009 letter also revealed that Defendants determined on December 17, 2008, that BOA likely had a legal basis to terminate the Merger because of Merrill's enormous fourth quarter 2008 losses.

243.    Finally, Defendant Lewis acknowledged the materiality of Merrill's losses to BOA shareholders when he attempted to justify Defendants' decision to proceed with the Merger without disclosing the losses and the government support.  In response to an analyst's inquiry during the January 16, 2009 conference call on why Defendants did not seek to renegotiate a better price with Merrill once it learned of Merrill's losses, Defendant Lewis did not assert that the losses were immaterial, but rather stated that a "re-pricing, assuming it could be agreed, *would have required a new stockholder vote* both at Bank of America and at Merrill Lynch and therefore the Merger would have been delayed by at least a couple of months."

244.    Upon these disclosures, BOA shares dropped from $7.18 to close at $5.10 per share on January 20, 2009, the next trading day following the earnings conference call.

245.    On January 21, 2009, BOA's common stock price rebounded from its $5.10 per share close on January 20, 2009 to close at $6.68.  As reported by *Bloomberg* that same day,

BOA's share price gain was based upon Lewis's and five BOA directors' purchase of more than 500,000 shares to shore up BOA's ailing stock price.

246.    After the market closed on January 21, 2009, *The Financial Times* reported that Merrill made accelerated bonus payments estimated to be between $3-$4 billion at the same time that Merrill was recording unprecedented losses and BOA was seeking additional capital from government regulators.  The fall-out was swift.  In response to this disclosure of Merrill's accelerated bonus payments, BOA's common stock price lost a substantial portion of its director-driven price recovery — dropping from a close of $6.68 per share on January 21, 2009 to close at $5.71 per share on January 22, 2009.  That same day, January 22, 2009, Thain met with BOA's Board of Directors and was forced to resign from his position at BOA.

247.    The foregoing statements demonstrate that Defendants understood that the omitted information concerning Merrill's losses and BOA's requirement of further federal funding was material to the integrity of the Shareholder Vote.  Rather than providing the Company's shareholders with this material information, Defendants failed to update and/or correct the Proxy Statement and related solicitation materials as required under Section 14(a) and Rule 14a-9 of the Exchange Act, causing BOA shareholders, including Plaintiffs, to suffer significant damages.

     **E.**    **Ensuing Investigations**

          **1.**    **The New York State Attorney General's Investigation of BOA's Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses**

248.    On January 27, 2009, the Attorney General subpoenaed Thain to testify on the timing and nature of the bonus payments authorized in the few days following the Shareholder Vote.  The subpoena was issued in connection with an investigation that the Attorney General

commenced in September 2008 concerning bonuses by investment banks that had received

TARP financing, including Merrill.

249.    On February 10, 2009, pursuant to a request from the United States House

Committee on Financial Services, the Attorney General sent a letter to Committee Chairman

Barney Frank addressing the Merrill bonuses.  The letter set forth certain of the Attorney

General's findings to that date as follows:

> Merrill Lynch secretly moved up the planned date to allocate bonuses and then
> richly reward their failed executives.  Merrill Lynch had never before awarded
> bonuses at such an early date and this timetable allowed Merrill to dole out huge
> bonuses ahead of their awful fourth quarter earnings announcement and before the
> planned takeover of Merrill by Bank of America.

The Attorney General's letter to Congressman Frank also expressly highlighted BOA's approval

of Merrill's bonuses and the Company's failure to disclose these massive and unconscionable

pre-approved bonus payments, or Merrill's fourth quarter losses prior to the Closing Date:

> Merrill Lynch's decision to secretly and prematurely award approximately $3.6
> billion in bonuses, ***and Bank of America's apparent complicity in it***, raises
> serious and disturbing questions.  ***By December 8, 2008, Merrill and presumably
> Bank of America must have been aware that the fourth quarter and yearly
> earnings results were disastrous***. . . . In the face of these losses, federal taxpayers
> were forced to help Bank of America acquire Merrill.

250.    On February 19, 2009, Thain testified in response to the Attorney General's

subpoena and confirmed that he had met with Andrea Smith on or about December 8, 2008 to

discuss Merrill's bonuses and that BOA was at all times made aware of and consulted on the

bonuses.  However, purportedly at the direction of BOA, Thain refused to disclose the specific

amounts and recipients of the bonuses.  On February 23, 2009, the Attorney General moved to

compel Thain's testimony in this regard and the next day Thain disclosed details of the bonuses.

On February 27, 2009, Defendant Lewis testified in response to a similar subpoena.

251.    On April 23, 2009, the Attorney General sent a letter to certain Congressional and federal regulators who oversee TARP to inform them of the findings from his ongoing investigation into the Merger.  The Attorney General confirmed in the letter that Merrill's fourth quarter losses were "known to Bank of America executives prior to the [Shareholder Vote]" and that the December 30, 2008 BOA Board of Directors meeting minutes established that BOA "was trying to time its disclosure of Merrill Lynch's losses to coincide with the announcement of its earnings in January" after the Closing Date.  The Attorney General also noted that Defendant Lewis acknowledged that BOA's decision not to terminate the Merger pursuant to the "MAC" clause would likely harm BOA shareholders for the next "three year[s]."

252.    On September 8, 2009, the Attorney General sent a letter to BOA's outside counsel, Lewis Liman, confirming, among other things, that BOA only went forward with the Merger after receiving a verbal commitment from Paulson to support the Merger with taxpayer funds.  Specifically, the Attorney General's September 8, 2009 letter stated:

> Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses. . . . Yet, it took Bank of America more than a month to make public disclosure of its dire financial condition – a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information.  Bank of America further failed to disclose . . . that it had received the government's oral commitment to support the merger with taxpayer funds.

253.    The Attorney General's September 8, 2009 letter also summarized his findings by stating that "[o]ur investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders."  These four instances included:

> (i)    BOA's knowledge as of November 2008 of Merrill's more than $14 billion fourth quarter 2008 losses;

(ii)    Merrill's goodwill charge of more than $2 billion associated with subprime related losses prior to the Shareholder Vote;

(iii)   BOA's determination eight days after the Shareholder Vote that it had a legal basis to terminate the Merger because of Merrill's enormous losses; and

(iv)   the $3.6 billion in accelerated undisclosed bonus payments to Merrill employees that BOA approved on December 8, 2008.

254.    On February 4, 2010, the Attorney General filed a complaint against Defendants BOA, Lewis, and Price asserting causes of action under the New York Martin Act and New York Executive Law for securities fraud arising out of the same facts and circumstances alleged herein regarding the Merger.

> **2.**    **The Oversight Committee Investigation and the SEC Action Further Confirm Defendants' Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses**

255.    The Oversight Committee Investigation and the SEC Action further confirm that Defendants knew, but failed to disclose – prior to both the Shareholder Vote and the Closing Date – BOA's agreement to permit Merrill to pay billions of dollars in bonuses to Merrill's employees and Merrill's massive fourth quarter 2008 losses.

256.    As noted above, beginning in June 2009, the Oversight Committee Investigation commenced a series of hearings with people who had knowledge of and/or participated in the consummation of the Merger, including, among others, Paulson, Bernanke, and Defendant Lewis.  The Oversight Committee obtained testimony from many people who were integral to the consummation of the Merger.  The Investigation particularly focused on Defendants' failure to disclose:

(i)    Merrill's mounting losses;

(ii)    the agreement to pay up to $5.8 billion in bonuses, of which $3.6 billion was paid prior to the Closing Date; and

(iii)    BOA's arrangement with federal regulators to receive a $138 billion taxpayer bailout to save the Merger.

257.    Based upon its investigation, the Oversight Committee determined that evidence existed demonstrating possible securities law violations resulting from Defendants' failure to disclose Merrill's mounting losses weeks before the Shareholder Vote.  Among other things, the Committee concluded that BOA failed to perform an adequate forecast of continuing losses at Merrill for the fourth quarter of 2008 based upon the losses which Defendants were aware of in mid-November.

258.    The SEC also commenced an investigation of the Merger, which led to the filing of the SEC Action on August 3, 2009, as amended on February 4, 2010.  The SEC Action asserted claims under Section 14(a) and Rule 14a-9 of the Exchange Act based on the same facts and circumstances alleged herein.

259.    On October 12, 2009, BOA agreed to waive the attorney-client privilege and produced certain documents to the Oversight Committee, the Attorney General, and the SEC in connection with their respective investigations regarding the Merger.  These documents revealed that Defendants knew the full extent of Merrill's fourth quarter 2008 losses both before the Shareholder Vote and the Closing Date.

260.    For example, Defendant Cotty wrote an e-mail on November 5, 2008 – one month before the Shareholder Vote – to Defendant Price that included Merrill's October 2008 financial report.  The e-mail, which estimated markdowns and "other large items" of $5.3 billion, included Defendant Cotty's comment:  "***Read and weep***."  Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin, Merrill's former Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated:  "***What a disaster!***"

261.    Similarly, on October 14, 2009, an article in *The New York Times* cited to a January 15, 2009 e-mail from Gifford to May, both BOA Board members, stating that the Merger "***screw[ed] the shareholders!***"  May replied "***no trail***," suggesting that Gifford should not write messages that could later be produced in litigation.

262.    On November 17, 2009, Mayopoulos provided sworn testimony to the Oversight Committee, where he stated, among other things, that the issue of whether BOA should disclose Merrill's then-known fourth quarter 2008 losses "arose around November 12, 2008" – approximately 3 weeks before the Shareholder Vote and almost two months prior to the Closing Date.

263.    Such documents and sworn testimony establish that Defendants knew or should have known the magnitude of Merrill's fourth quarter 2008 losses and the billions of dollars in bonus payments prior to the Shareholder Vote.  Nevertheless, Defendants failed to disclose this material information to BOA shareholders, including Plaintiffs.

264.    On February 4, 2010, the SEC and BOA agreed to a settlement of the SEC Action.  Under the settlement, BOA is required to pay a $150 million fine and implement certain internal control procedures.  On February 22, 2010, Judge Rakoff "reluctantly" approved the settlement.  After reviewing hundreds of pages of deposition testimony and other evidentiary material produced in the SEC Action, Judge Rakoff noted that:  (i) the Proxy Statement "failed adequately to disclose [BOA's] agreement to let Merrill pay . . . $5.8 billion in bonuses at a time when Merrill was suffering huge losses"; and (ii) BOA "failed adequately to disclose [prior to the Shareholder Vote or Closing Date BOA's] ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008."

265.    While characterizing the settlement as "half-baked justice at best" and "far from ideal" given that the settlement amount was paltry in light of the alleged misconduct, Judge Rakoff nevertheless approved the settlement.  Judge Rakoff gave "substantial deference" to the SEC "as the regulatory body having primary responsibility for policing the securities markets" and exercised the Court's "judicial restraint" to not impose its "own preferences."

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

266.    Any applicable statute(s) of limitations with respect to Plaintiffs' claims has been tolled since no later than January 21, 2009 by the filing of the class action complaint in the action captioned *Steven J. Sklar v. Bank of America Corp. et al.*, No. 09-cv-580 (S.D.N.Y.), pursuant to the doctrine announced in *American Pipe v. & Construction Co. v. Utah*, 414 U.S. 538, 552 (1974) and *In re WorldCom Securities Litigation*, 496 F.3d 245 (2d Cir. 2007).  The *Sklar* action was consolidated on June 30, 2009 into the action captioned *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MD 2058 (PKC) (S.D.N.Y.).

**COUNT I:    Violation of § 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants**

267.    Plaintiffs incorporate by reference and reallege all preceding paragraphs, other than paragraphs 8, 34-39, and 110, as if fully set forth herein.

268.    The claim set forth below under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against all Defendants is not based upon any allegations of knowing or reckless misconduct.  Further, this claim does not allege fraud or sound in fraud.  Plaintiffs explicitly disclaim reference to or reliance upon any allegations of fraud in connection with this claim, which sounds in negligence pursuant to the Exchange Act and case law interpreting it.

269.     Plaintiffs assert this claim against all Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, which prohibit making material misstatements and/or omissions in proxy statements and require statements of material facts necessary to correct statements in proxy solicitation materials so that they are not materially false and misleading.

270.     Defendants solicited proxies, permitted the use of their names to solicit proxies, signed proxy materials, and made other public statements to solicit proxies from Plaintiffs and other investors, by means of the Proxy Statement and other public representations, containing statements, as set forth in greater detail above, which at the time and in light of the circumstances under which they were made were false and misleading with respect to material facts regarding the Merger.  Defendants also failed to disclose material facts regarding the Merger necessary to prevent statements in the Proxy Statement and related solicitation materials from being materially false and misleading or to correct the statements made in the Proxy Statement and other public representations such that they were not materially false and misleading.

271.     BOA and Merrill were the issuers of the Proxy Statement and each permitted the use of its name in the Proxy Statement representing, among other things, that neither company experienced any "Material Adverse Effect" as defined in the Merger Agreement and that the Merger was in the best interests of each company's shareholders.

272.     Defendant Lewis signed the Proxy and the Second Proxy Amendment.  Defendant Lewis also permitted the use of his name in the Proxy Statement and solicited BOA shareholder votes in the September 15, 2008 Press Release, the Merger Presentation, the September 15, 2008 Analyst Call, the Second Proxy Amendment, and the November 26, 2008 Press Release.

Defendant Lewis failed to disclose material facts in the Proxy Statement, all documents incorporated by reference therein, and related solicitation materials concerning the Merger.

273.     Defendant Price signed the Proxy Registration Statement, solicited BOA shareholder votes in the September 15, 2008 Analyst Call, and failed to disclose material facts in the Proxy Statement, all documents incorporated by reference therein, and related solicitation materials concerning the Merger.

274.     Defendant Cotty signed the Proxy Registration Statement, failed to disclose material facts in the Proxy Statement, all documents incorporated by reference therein, and related solicitation materials concerning the Merger.

275.     Each of the Defendants had a duty to update and/or correct statements made in the Proxy Statement and related solicitation materials prior to the Closing Date regarding Merrill's deteriorating financial condition, the undisclosed bonuses, and the need for a taxpayer bailout to salvage the Merger.  These Defendants failed to update and/or correct statements made in the Proxy Statement and related solicitation materials, despite their knowledge of and access to material nonpublic information that had a direct impact on the valuation of the Merger.

276.     The Proxy Statement, all documents incorporated therein, and related solicitation materials were essential links in obtaining the BOA shareholder votes, including Plaintiffs', required to complete the Merger on January 1, 2009.  Defendants sat by idly and allowed BOA shareholders to approve the Merger on December 5, 2008 on the basis of the materially false and misleading Proxy Statement and related solicitation materials without disclosing material facts arising since the Proxy Statement's dissemination.  Specifically, Defendants failed to disclose, among other things:  (i) Merrill's billions of dollars in losses for the fourth quarter of 2008; (ii) the agreement to pay up to $5.8 billion in bonuses, of which $3.6 billion was paid prior to the

Closing Date; and (iii) BOA's arrangement with federal regulators to receive a $138 billion taxpayer bailout to save the Merger.

277.     From the first partial disclosure of the material facts omitted from the Proxy Statement and related solicitation materials on January 12, 2009 to the close of trading on January 22, 2009, BOA's stock price dropped from its opening price of $12.86 on January 12, 2009 to close at $5.71 per share on January 22, 2009.

278.     Plaintiffs voted all of their BOA shares eligible to be voted in favor of the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials.  Plaintiffs were denied the opportunity to make a fully informed decision in voting on the Merger based upon Defendants' materially false and misleading statements.

279.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Plaintiffs have sustained and will continue to sustain injury based upon its votes in favor of the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials.

**COUNT II:     Violation of § 20(a) of the Exchange Act Against Defendants Lewis, Price, and Cotty**

280.     Plaintiffs incorporate by reference all preceding paragraphs, other than paragraphs 8, 34-39, and 110, as if fully set forth herein.  This claim is asserted against Defendants Lewis, Price, and Cotty.

281.     From the September 15, 2008 announcement of the Merger through the disclosure of previously omitted material facts beginning on January 12, 2009, Defendants Lewis, Price, and Cotty were senior executive officers and/or directors of BOA and were privy to confidential and proprietary information concerning BOA and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations.

282.    Because of their high-level positions within BOA, Defendants Lewis, Price, and Cotty exercised day-to-day control over BOA and had regular access to non-public information about BOA's business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's Board of Directors, and committees thereof, and reports and other information provided to them in connection therewith.

283.    Defendants Lewis, Price, and Cotty each acted as a controlling person of BOA within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, daily participation in and/or awareness of the Company's operations, and/or intimate knowledge of the statements made concerning the Merger in the Proxy Statement and disseminated to the investing public, Defendants Lewis, Price, and Cotty had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading Proxy Statement and related solicitation materials.  Defendants Lewis, Price, and Cotty were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

284.    In particular, Defendants Lewis, Price, and Cotty had direct and supervisory involvement in the day-to-day operations of the Company in connection with the Merger and, therefore, had the power and/or ability to control or influence the particular transactions and/or statements giving rise to Plaintiffs' claims under Section 14(a) and Rule 14a-9 of the Exchange

Act alleged herein, and exercised the same. Defendants Lewis, Price, and Cotty had reason to know that BOA disseminated a materially false and misleading Proxy Statement, failed to correct the statements therein and in related solicitation materials from being materially false and misleading, and were direct participants in these violations of Section 14(a) and Rule 14a-9.

285.    BOA violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder through the statements and omissions set forth above. By virtue of their positions as controlling persons, Defendants Lewis, Price, and Cotty are also liable pursuant to Section 20(a) of the Exchange Act for such violations. Plaintiffs suffered damages as a direct and proximate result of the wrongful conduct by Defendants Lewis, Price, and Cotty.

## VIII.    DEFENDANTS' VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

### A.    Defendants Knowingly And/Or Recklessly Made Materially False And Misleading Statements And Failed To Disclose Material Facts

286.    During the Relevant Period from September 15, 2008 through January 21, 2009, Defendants made a series of materially false and misleading statements and failed to state material facts necessary to make the statements they made, in light of the circumstances in which they were made, not misleading. Defendants' material misstatements and omissions artificially inflated the price of BOA common stock trading on the open market during that time. In making such statements and/or omitting such facts, Defendants knew and/or recklessly disregarded numerous facts known to them before and throughout the Relevant Period concerning, among other things: (i) BOA's failure to conduct adequate due diligence on the Merger; (ii) BOA's agreement to permit Merrill to pay up to $5.8 billion in employee bonuses prior to the close of the Merger, out of which $3.6 billion in bonuses were paid prior to the Closing Date; (iii) Merrill's significant fourth quarter 2008 losses; and (iv) the necessity for BOA to obtain tens of billions of dollars in government financing to consummate the Merger.

287.    In the September 15, 2008 Press Release announcing the Merger, Defendants

stated, among other things:

> Bank of America Corporation today announced it has agreed to acquire Merrill
> Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company
> unrivalled in its breadth of financial services and global reach.
>
> 'Acquiring one of the premier wealth management, capital markets, and advisory
> companies is a great opportunity for our shareholders,' Bank of America
> Chairman and Chief Executive Officer Ken Lewis said.  'Together, our
> companies are more valuable because of the synergies in our businesses.'

288.    Later on September 15, 2008, Defendants Lewis and Price participated in a press

conference with analysts to promote the Merger.  During this telephone conference, Defendant

Lewis addressed concerns over the adequacy of due diligence conducted by, among others, J.C.

Flowers, in connection with the Merger by stating:

> [H]e and his ***firm had done quite an amount of due diligence on Merrill Lynch
> fairly recently, and it was very, very extensive***.  They had looked at the marks
> very comprehensively, so this allowed us to have him and [his] team as an
> adviser, and just update the information they already had.  ***So that was one of the
> key ingredients to being able to do this as quickly as we did***. . . .

289.    Addressing the same concerns over the adequacy of the due diligence, Defendant

Price stated:

> ***Clearly we've had a tremendous amount of historical knowledge both as a
> competitor with Merrill Lynch but also have reviewed and analyzed the
> company over the years.***

290.    During the September 15, 2008 Analyst Call, questions predictably arose

concerning BOA's assessment of Merrill's risk exposure.  Defendant Price assured investors that

such risks were adequately considered prior to agreeing to the Merger and gauging its future

impact upon BOA's financial health:

> ***[I]t's not as if we don't have a very significant knowledge of the markets around
> the asset classes that are most problematic***. . . . and quite frankly the progress
> that Merrill Lynch had made in reducing risk exposures and analyzing them and

having all that laid out given the efforts that the management team has made over the last period made it possible for us.

291.     Echoing Defendant Price's statements, Defendant Lewis indicated that Merrill had made "incredible progress" in reducing its risk exposure.  In response to questions concerning whether Merrill's CDO portfolio was evaluated in connection with the Merger, Defendant Lewis stated:

> The numbers that we presented today, we had considered marks on the assets. . . . I would tell you that again going back to the point on things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures.  We're dealing with the same counterparties on things. . . . *we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself* . . . in terms of 'risk reduction.'

292.     Significantly, Defendant Lewis went on to assert that "*we have asked for no relief, capital relief on this deal*" from the federal government and that "*there was no pressure from regulators . . . absolutely no pressure*" to finalize the Merger.

293.     The statements made by Defendants in the September 15, 2008 Press Release and Analyst Call concerning, among other things, the benefits of the Merger, the adequacy of due diligence, and the progress that Merrill had made in reducing its risk of further losses were materially false and misleading and omitted material facts.  The true but concealed and/or misrepresented facts that Defendants knew and/or recklessly disregarded at the time the statements were made included, but were not limited to:

> (i)     the abbreviated due diligence of Merrill conducted by Defendants and the Financial Advisors was woefully inadequate to determine the fairness of the Merger, and Defendants' reliance upon stale information purportedly known from prior work on behalf of Merrill could not serve as a reliable substitute for current due diligence of Merrill prior to agreeing to the material terms of the Merger;

> (ii)    there was a risk of further material losses at Merrill in the very same business areas that suffered the losses precipitating the Merger, which would cause harm to BOA and its shareholders; and

93

(iii)    BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

294.    Moreover, despite their statements celebrating the Merger, Defendants failed to correct or update Defendant Lewis' assertion that BOA needed no government financing for the transaction.  In fact, as alleged above, BOA required significant government funding to address Merrill's losses and consummate the Merger.

295.    On October 6, 2008, Defendants Lewis and Price conducted a conference call with analysts in conjunction with BOA's third quarter 2008 earnings announcement (the "October 6, 2008 Earnings Call").  During the call, Defendant Lewis announced that BOA was raising $10 billion in additional capital through a stock offering that would "ensure we can handle the economic scenario we face, continue to be a source of liquidity to our customers and still take advantage of opportunities to grow our market share."

296.    On the call, an analyst asked Defendants Lewis and Price whether BOA would later raise additional capital to cover the Merger:

> Just to be clear, I know when you announced the Merrill deal you alluded to raising capital and possibly cutting the dividends.  The $10 billion you're raising today, should we expect that to be that and then done or look for additional capital once the Merrill deal is closed?

In response to this question, Defendant Price assured the analyst that BOA considered the Merger when contemplating the $10 billion offering and that BOA would not need additional capital because of the Merger:

> We have considered the Merrill deal in our intentions here so the numbers we are talking about, as I mentioned in the prepared remarks, covered [sic] our anticipated needs from a Merrill standpoint.

297.    Defendant Price's statements during the October 6, 2008 Earnings Call were made on behalf of BOA and were materially false and misleading and omitted material facts required to make them not misleading.  To the extent that Defendant Lewis's statements were not false when made, they were subject to Defendants' legal duty to update no later than December 17, 2008, when Defendants knew that BOA needed additional financing to complete the Merger. BOA, in fact, required at least $20 billion in additional government assistance to complete the Merger, which Defendants did not disclose to BOA shareholders, including Plaintiffs, to correct Defendant Price's statement above until January 16, 2009.

298.    On or about November 3, 2008, BOA filed its Schedule 14A Proxy Statement, dated October 31, 2008, with the SEC in which Defendants promoted the Merger as accretive and beneficial to its business going forward based putatively upon, among other things:

- Defendants' understanding of BOA's business, operations, financial condition, earnings and prospects and of Merrill's business, operations, financial condition, earnings and prospects;

- Defendants' understanding of the current and prospective environment in which BOA and Merrill operate, including economic and market conditions, the competitive environment and *the likely impact of these factors on BOA and Merrill*;

- the BOA Board of Directors' review with BOA's legal advisors of the structure of the Merger and the financial and other terms of the Merger and stock option agreement, including the review by the board of directors with the Financial Advisors of the Exchange Ratio;

- the reports of BOA's management and the financial presentation by the Financial Advisors to BOA's board of directors concerning the operations, financial condition and prospects of Merrill and the expected financial impact of the Merger on the combined company; and

- the potential impact of the transaction on the capital levels and credit rating of BOA.

299.    The Proxy Statement also included a discussion of BOA's October 2008 receipt of federal funding.  In this regard, Defendants represented:

> [BOA] will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America.  In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. . . . If the merger is completed prior to Treasury making an investment in Merrill Lynch . . . Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

Despite accepting government funds and anticipating potential additional financial aid in connection with the Merger, Defendants failed to disclose that BOA had agreed to permit Merrill to pay up to $5.8 billion in accelerated bonuses – equal to more than 30% of the government financial aid that BOA had already received – to Merrill employees prior to the Closing Date.

300.    The statements made by Defendants in the Proxy Statement concerning, among other things, the adequacy of the due diligence conducted in connection with the Merger, the benefits of the Merger to BOA, the financial health of Merrill in light of the current "market conditions," and BOA's receipt of federal financing were materially false and misleading for the same reasons stated in ¶ 293 above.

301.    On November 21, 2008, BOA filed the First Proxy Amendment with the SEC. This amendment purported to supplement the disclosures in certain sections of the Proxy Statement based upon a proposed settlement of certain shareholder lawsuits filed in Delaware and New York.  These lawsuits challenged, among other things, the adequacy of the disclosures in the Proxy Statement concerning the potential impact of a Merrill credit rating downgrade.

302.    Despite filing the First Proxy Amendment with the SEC to disclose this information for the purported benefit of investors, including Plaintiffs, Defendants failed to provide investors with critical financial information needed to assess the continuing viability and

financial condition of BOA following the Merger.  Namely, Defendants said nothing about Merrill's billions of dollars in losses for the fourth quarter of 2008, which they knew of based upon their daily access to such information pursuant to the terms of the Merger Agreement. Moreover, Defendants failed to disclose the agreement to pay up to $5.8 billion in bonuses to Merrill employees prior to the Closing Date.  Instead of disclosing this material information, Defendants merely referred investors, including Plaintiffs, to the materially false and misleading Proxy Statement for information concerning the impact of this transaction upon BOA.

303.    On November 26, 2008, BOA filed the Second Proxy Amendment with the SEC, consisting of a letter from Defendant Lewis to BOA investors purporting to address *"how Bank of America is positioned to ride out this severe economic storm."*  Although Defendants already knew that Merrill had amassed approximately $13.3 billion in pre-tax losses for the fourth quarter of 2008 and that Merrill would expend billions of dollars in additional funds for Merrill employee bonuses prior to the Closing Date, Defendants failed to mention these material facts. Instead, Defendants, through Defendant Lewis, made the following statements to shore up investor confidence:

> *Bank of America continues to be a strong, active player in the financial markets*.
>
> *            *            *
>
> *We are one of the most liquid banks in the world.*  We successfully raised capital in October and now have Tier 1 capital that exceeds both regulatory requirements and our own target.  *In short, we believe we are one of the strongest and most stable major banks in the world.*
>
> *            *            *
>
> *Regarding the federal capital injection, these were funds that we did not need and did not seek.*  At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, had more than adequate capital.  *We accepted the funds from the government as part of a broad plan to stabilize the financial*

*markets generally, and will pay interest to the government on the funds until the investment is paid back.*

\*      \*      \*

I am confident that after this storm passes, *investors will see the value in our franchise*, the power of our brand, and especially, our associates' ability to create broad, deep and long-lasting financial relationships.

304.    In addition to the Second Proxy Amendment, BOA issued the November 26, 2008 Press Release to announce approval of the Merger by the Board of Governors of the Federal Reserve System.  In praising this approval, Defendants made the following materially false and misleading statements, which, among other things, failed to disclose Merrill's growing losses which threatened the Merger:

*Merrill Lynch is expected to enhance Bank of America's current strengths* by creating a company with the leading position in wealth management as well as in global debt underwriting, global equities and global merger and acquisition advice.  Once the purchase is complete, Bank of America will have the largest wealth management business in the world with nearly 20,000 financial advisors and approximately $2.5 trillion in client assets.

'Combining the leading global wealth management, capital markets and advisory firm with the largest consumer and corporate bank in the U.S. creates the world's premier financial services company with unrivalled breadth and global reach,' said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. *'This presents a compelling opportunity for our customers and shareholders.'*

305.    The statements made and issued by Defendants in the First Proxy Amendment, the Second Proxy Amendment, and the November 26, 2008 Press Release concerning, among other things, the Company's liquidity, the financial position of BOA going forward, the adequacy of disclosures in the Proxy Statement, the purported shareholder opportunity that the Merger presented, BOA's ability to forego further financial assistance, and the Company's position to "ride out [the] severe economic storm" were materially false and misleading and omitted material facts.  The true but concealed and/or misrepresented facts known to and/or

recklessly disregarded by Defendants at the time the statements were made included, but were not limited to:

(i)    on or about November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders;

(ii)    as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;

(iii)    as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion, which would cause BOA to suffer unprecedented losses;

(iv)    Merrill had suffered $15.3 billion in fourth quarter losses prior to the Shareholder Vote and, as the Attorney General and SEC's investigations have revealed, BOA officers sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's astronomical losses;

(v)    there was a risk of further material losses at Merrill in the very same business areas that suffered the losses precipitating the Merger that also threatened BOA's financial position and ability to consummate the Merger; and

(vi)    BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

306.    On December 5, 2008, BOA issued a press release celebrating shareholder approval of the Merger at the special meeting convened in connection with the Shareholder Vote. Defendants made the following statements in this press release, among others, which were materially false and misleading and omitted material facts:

Bank of America Corporation shareholders during a special meeting today approved the acquisition of Merrill Lynch & Co., Inc. by authorizing the shares of common stock to be issued in the merger.

'*When this transaction closes*, Bank of America will have the premier financial services franchise anchored by the cornerstone relationship products and services

99

of deposits, credit and debit cards, mortgages and wealth management,' said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. '***With Merrill Lynch, we also will significantly add to our global footprint in several businesses***, including investment banking and sales and trading, enabling us to deepen existing client relationships and create greater opportunity to establish new ones.'

*    *    *

The combination also adds strengths in global debt underwriting, global equities and global merger and acquisition advice. After the acquisition, ***Bank of America would be the number one global debt underwriter, the top underwriter of global equity and the fourth-largest adviser on announced global mergers and acquisitions based on pro forma 2008 results through November 30***.

307. Defendants' statements in the December 5, 2008 Press Release, concerning, among other things, the positive impact that the Merger would have upon BOA's business and the post-Merger outlook for BOA based upon the Company's and Merrill's pro forma 2008 financial results through November 30, 2008 were materially false and misleading for the same reasons stated in ¶ 305 above.

308. On the Closing Date, BOA issued a press release entitled "Bank of America Completes Merrill Lynch Purchase – Gains Strength in Wealth Management, International and Investment Banking Business" (the "January 1, 2009 Press Release"). Despite the fact that BOA almost terminated the Merger based upon Merrill's staggering fourth quarter 2008 losses and was only able to proceed with the Merger with additional financial aid from the government, Defendants did not disclose these material facts. Instead, Defendants claimed:

Bank of America Corporation today completed its purchase of Merrill Lynch & Co., Inc. creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities.

'We created this new organization because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking,' said Bank of America Chairman and Chief Executive Officer Ken Lewis. ***'We are now uniquely positioned to win market share and expand our leadership position in markets around the world.'***

100

*     *     *

The combination also adds strengths in debt and equity underwriting, sales and trading, and merger and acquisition advice, creating significant opportunities to deepen relationships with corporate and institutional clients around the globe.

*     *     *

*As previously announced, Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012.  Cost reductions will come from a range of sources, including the elimination of positions announced on December 11, and the reduction of overlapping technology, vendor and marketing expenses.  In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Merrill Lynch customers.*

309.    Defendant Lewis also reiterated his earlier assertions about the benefits of the

Merger for BOA shareholders:

> We created this organization because we believed that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking.

310.    Defendants' statements in the January 1, 2009 Press Release concerning, among

other things, the positive impact of the Merger upon BOA's financial condition and

competitiveness were materially false and misleading and omitted material facts.  The true but

concealed and/or misrepresented facts known to and/or recklessly disregarded by Defendants at

the time the statements were made included, but were not limited to:

(i)     BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

(ii)    on or about November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders;

(iii)   as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;

(iv)    as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion, which would cause BOA to suffer unprecedented losses;

(v)    Merrill had suffered $15.3 billion in fourth quarter losses prior to the Shareholder Vote and, as the Attorney General and SEC's investigations have revealed, BOA officers sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's astronomical losses;

(vi)    on December 8, 2008 – the first business day after the Shareholder Vote approving the Merger – BOA permitted Merrill to make $3.6 billion in bonus payments to Merrill employees prior to the Closing Date;

(vii)    on December 8, 2008, Defendant Price gave a presentation to BOA's Board of Directors specifically laying out the perceived impact of Merrill's massive losses for the fourth quarter of 2008 upon BOA's future financial condition;

(viii)    after consulting with BOA's Board of Directors and lawyers, Defendant Lewis met with Paulson and Bernanke in Washington, D.C. on December 17, 2008 to discuss BOA's contemplated termination of the Merger based upon Merrill's losses; and

(ix)    as a result of Defendant Lewis' meetings with federal regulators, BOA obtained a $138 billion government bailout, consisting of more than $20 billion in additional federal funding and $118 billion in related financial guarantees, to salvage the Merger, without which the Merger would have unraveled.

**B.    Defendants Eventually Disclose The Truth**

311.    On January 12, 2009, Bloomberg issued a story detailing a Citigroup analyst's client note advising that BOA would report substantial losses for the fourth quarter of 2008 and a correspondingly large dividend reduction.  In response, BOA's stock price declined from its $12.86 January 12, 2009 opening price to close at $11.43 that day.

312.    Public disclosure of the previously misrepresented and omitted material facts concerning the Merger known to and/or recklessly disregarded by Defendants continued with an

article published in *The Wall Street Journal* on January 14, 2009.  Among other things, this article contained a discussion of BOA's need for additional federal financial aid based upon Merrill's still-undisclosed fourth quarter 2008 losses.

313.    The next day, both *The Wall Street Journal* and *The New York Times* published articles setting forth additional details on the undisclosed mad scramble at BOA to hold the Merger together after federal regulators discouraged BOA from abandoning the deal based upon Merrill's losses, as alleged above in ¶¶ 225-27.

314.    In reaction to this previously undisclosed material information, BOA's common stock lost 18% of its value, closing at $8.32 per share on January 15, 2009 on heavy trading volume.  This was a $1.88 drop from the $10.20 per share closing price on January 14, 2009.

315.    On January 16, 2009, BOA issued the January 16, 2009 Press Release setting forth the Company's putative financial results for fiscal year 2008 and the fourth quarter of 2008 and disclosing, for the first time, the agreement that BOA entered into with federal regulators to obtain additional financing to salvage the Merger, as alleged above in ¶¶ 233-37.

316.    In reaction to the still-incomplete disclosures in BOA's January 16, 2009 Press Release, BOA's common stock price declined another 14%, from $8.32 per share on January 15, 2009, to $7.18 per share at the close of trading on January 16, 2009.

317.    On January 16, 2009, BOA held its fourth quarter 2008 earnings conference call. As alleged above in ¶¶ 239-43, Defendant Lewis provided previously undisclosed material facts during this call concerning Merrill's enormous fourth quarter 2008 losses and the circumstances pursuant to which BOA obtained further federal financial aid to consummate the Merger.  On January 20, 2009, the first trading day after January 16, 2009, BOA shares closed at $5.10.

318.     On January 21, 2008, BOA's common stock rebounded to close at $6.68 per share based upon BOA insiders' large stock purchases, as alleged above in ¶ 245.

319.     In response to *The Financial Times* January 21, 2009 disclosure of Merrill's accelerated bonus payments, as alleged above in ¶ 246, BOA's common stock price closed at $5.71 per share.  Upon disclosures of previously misrepresented and omitted material facts, BOA's common stock declined by $28.03 per share from its $33.74 closing price on September 12, 2008 (the last trading day before BOA announced the Merger) to its closing price of $5.71 per share on January 22, 2009.

### C.     Additional Scienter Allegations For Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act

320.     Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in BOA's name were materially false and misleading, knew or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public, including Plaintiffs, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as a primary violator of the federal securities laws.

321.     In addition to their conscious misbehavior, each of the Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of BOA and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts.  This direct involvement was heightened in the context of the 36-hour negotiations precipitating the Merger, which closed only three-and-one-half months after being announced.

322.    Each of the Defendants was privy to confidential financial information concerning the Company's business, financial condition and future business outlook, and had access to material, nonpublic information concerning both BOA's and Merrill's true financial condition. As a result, each of the Defendants could falsify and/or conceal information disclosed to the public concerning the Merger and the Company's business and performance, and Defendants' public statements failed to accurately disclose material information known to Defendants.  With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

323.    As alleged herein, the Merger Agreement provided Defendants with complete daily access to Merrill's financial information.  After the end of the Relevant Period, Thain, Merrill's former CEO, confirmed that these provisions of the Merger Agreement gave Defendants the ability to monitor and report upon Merrill's financial deterioration on a real-time basis.

324.    On Thursday, January 22, 2009, following Defendants' late disclosure of Merrill's staggering fourth quarter losses, Thain agreed to "resign" from his position at the new BOA.  On January 25, 2009, in a farewell memorandum to former Merrill colleagues, Thain addressed the losses and refuted rising speculation that Merrill had somehow hidden financial information from BOA.  Instead, Thain confirmed exactly what the Merger Agreement provided:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.  However, they were incurred almost entirely on legacy positions and were due to market movements.  ***We were completely transparent with Bank of America.  They learned about these losses when we did.***  The acting CFO of my businesses [Defendant Cotty] was Bank of America's former Chief Accounting Officer.  ***They had daily access to our p&l, our positions and our marks.  Our year end balance sheet target (which we more than met) was given to us by Bank of America's CFO.***

325.    On January 26, 2009, Thain gave an interview where he disputed the suggestion that Merrill withheld information from BOA concerning Merrill's potential fourth quarter losses. Thain stated that Merrill provided BOA access to all of its books and records in the months preceding the Merger's close:

> ***They were seeing exactly the same information that we saw. We gave them complete access to everything that we had.*** . . . Well, let me say it this way. The – the acting chief financial officer [Defendant Cotty] had come from Bank of America. He was their formal – former chief accounting officer. He and his team, which were – for all practical purposes, our day-to-day CFOs, they had direct access to our daily P&Ls, to our positions, to our marks.

326.    Thain's statements comported with the findings of federal regulators, who concluded as early as December 19, 2008 that Lewis' claims that Defendants were not aware of Merrill's losses were "not credible."

327.    Documents that BOA has produced to the Attorney General, the SEC, and to Congress also reveal that Defendants knew of Merrill's staggering fourth quarter 2008 losses prior to belatedly disclosing these material facts on January 16, 2009.

### D.    Loss Causation For Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act

328.    At all relevant times, BOA's common stock traded on the NYSE. As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for BOA's common stock during the Relevant Period. Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by supporting the false positive public perception of BOA's business, operations, performance and prospects.

329.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to BOA's financial and operational condition or to cause and direct that such

information be disseminated, and to promptly correct or update any previously disseminated information that was materially misleading to the market. As a result of their failure to do so, the price of BOA's common stock was artificially inflated during the Relevant Period, directly causing Plaintiffs to suffer damages when Defendants eventually disclosed the truth.

330.    Defendants' materially false and misleading statements and omissions of material fact in press releases, SEC filings and other public statements during the Relevant Period directly caused losses to Plaintiffs. On the strength of these false statements, the Company's common stock was artificially inflated to a Relevant Period high of $38.13 at the close of trading on October 1, 2008.

331.    From the time that the truth about BOA's losses and its secret negotiations with the government for an additional capital infusion to absorb Merrill's losses and salvage the Merger first emerged, until the time that BOA finally acknowledged the extent of Merrill's losses and Merrill's secret bonus payments, the price of BOA common stock declined in a series of material steps from $12.86 per share at the beginning of trading on January 12, 2009, to $5.71 per share at the close of trading on January 22, 2009 – a total decline of approximately 50% – as the market processed each set of previously undisclosed facts. Each such disclosure removed a portion of the artificial inflation from the price of BOA's common stock caused by Defendants' prior material misrepresentations and omissions, and directly caused Plaintiffs to suffer damages.

### E.    Group Pleading

332.    Defendants Lewis, Price, and Cotty are liable for the materially false and misleading statements pleaded herein in support of Plaintiffs' claim under Section 10(b) and Rule 10b-5 of the Exchange Act that were issued by or in the name of the Company, as each of those statements was "group-published" information, and resulted from the collective actions of these Defendants. It is appropriate to treat Defendants Lewis, Price, and Cotty as a group and to

presume that the public filings, press releases and other public statements complained of herein are the product of the collective actions of this narrowly defined group of Defendants.

333.    Defendants Lewis, Price, and Cotty, by virtue of their high-level positions within BOA, directly and actively participated in the management and day-to-day operations of the Company, and were privy to confidential non-public information concerning the business and operations of BOA, including material financial information pertaining to Merrill, to which Defendants Lewis, Price, and Cotty had unfettered and continuous access throughout the Relevant Period pursuant to the Merger Agreement.

334.    The Merger was negotiated, agreed to, voted upon, and closed in an accelerated period during which Defendants Lewis, Price, and Cotty were directly involved on a daily basis in numerous matters relating specifically to the Merger, including, but not limited to:

(i)     recommending the Merger to BOA's Board of Directors;

(ii)    reviewing and authorizing the filing and dissemination of the Proxy Statement and the amendments thereto;

(iii)   monitoring and receiving reports and updates concerning Merrill's financial condition;

(iv)    discussing the possibility of terminating the Merger prior to the Shareholder Vote based upon the billions of dollars in fourth quarter 2008 losses that BOA and Defendants Lewis, Price, and Cotty knew Merrill had already sustained by November 2008;

(v)     agreeing on behalf of BOA to accept significant additional government funding to rescue the Merger; and

(vi)    electing to not disclose their December 17, 2008 request for additional federal financial aid until well after the Closing Date.

In addition, Defendants Lewis, Price, and Cotty were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by BOA and approved or ratified those statements, and, therefore, adopted them as their own.

F.    **Fraud On The Market Presumption**

335.    At all relevant times, the market for BOA common stock was an efficient market

for the following reasons, among others:

> (i)    BOA's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 6.3 billion shares issued and outstanding and a public trading float of more than 6.3 billion shares as of the end of the Relevant Period;
>
> (ii)    as a registered and regulated issuer of securities, BOA filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;
>
> (iii)    BOA regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;
>
> (iv)    BOA was followed by several different securities analysts employed by major brokerage firms and financial institutions, including Goldman Sachs, JPMorgan Chase & Co., Citigroup Inc., UBS and Morgan Stanley, which followed BOA's business and wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Those reports were publicly available and affected the public marketplace;
>
> (v)    the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of BOA's securities; and
>
> (vi)    without knowledge of the misrepresented or omitted facts, Plaintiffs purchased BOA common stock on the open market between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of BOA securities was artificially inflated by Defendants' misrepresentations and omissions.

336.    As a result of the above, the market for BOA common stock promptly digested

current information with respect to the Company from all publicly available sources and

reflected such information in the price of BOA's securities.  Under these circumstances, all

purchasers of BOA common stock during the Relevant Period suffered similar injuries through their purchases of shares on the open market at prices which were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

G.    **The Safe Harbor Provision Of The PSLRA Is Inapplicable To Plaintiffs' Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act**

337.    As alleged herein, Defendants acted with scienter in connection with the materially false and misleading statements and omissions of material fact giving rise to claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because at the time they issued public documents and other statements in BOA's name, each of the Defendants knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts.  Moreover, each of the Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and omissions; and knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as a primary violator of the federal securities laws.

338.    As set forth in detail in this Complaint, Defendants Lewis, Price and Cotty participated in and/or knew of the misconduct alleged herein by virtue of their control over, and/or receipt of, BOA's materially false and misleading statements and/or their association with the Company, which made them privy to confidential proprietary information concerning BOA that was used to artificially inflate its financial results.  Defendants Lewis, Price and Cotty knew and/or recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

339.    The statutory safe harbor for certain forward-looking statements does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded

herein are "forward-looking" and/or no such statement was appropriately identified as a "forward-looking statement" when made.  Rather, the statements alleged herein as materially false and misleading under Section 10(b) and Rule 10b-5 all relate to facts and conditions existing at the time the statements were made.  Moreover, meaningful cautionary statements did not specifically identify important factors that could cause actual results to differ materially from those in any putatively forward-looking statements.

340.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein in support of Plaintiffs' claims under Section 10(b) and Rule 10b-5 of the Exchange Act which is deemed to be forward-looking, Defendants are liable for the false forward-looking statements because at the time each such statement was made, each Defendant actually knew that any such forward-looking statement was materially false or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of BOA who actually knew that each such statement was false and/or misleading when made.  None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any plan, projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT III:  Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against BOA and Defendants Lewis and Price**

341.    Plaintiffs repeat and reallege ¶¶ 8, 34-39, 47-108, 110, 225-27, 233-37, 239-43, 245-46, 266, and 286-340 as if fully set forth herein.  This claim is asserted against BOA and Defendants Lewis and Price.

342.    During the Relevant Period, BOA and Defendants Lewis and Price used the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges to make materially false and misleading statements and omissions of material fact to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of BOA common stock; and (iii) cause Plaintiffs to purchase BOA common stock on the open market at artificially inflated prices that did not reflect their true value.  As the Defendants gradually disclosed the truth, the trading price of BOA common stock fell precipitously.  In furtherance of their unlawful scheme, plan, and course of conduct, BOA and Defendants Lewis and Price took the actions set forth herein.

343.    BOA and Defendants Lewis and Price, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon purchasers of BOA common stock, including Plaintiffs, in an effort to maintain artificially inflated market prices for BOA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

344.    BOA and Defendants Lewis and Price are sued as primary participants in the wrongful conduct alleged herein.

345.    BOA and Defendants Lewis and Price were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the dissemination of information to the investing public they either knew or recklessly disregarded was materially false and misleading.

346.     BOA and Defendants Lewis and Price had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  The material misrepresentations and omissions by BOA, Lewis and Price were made knowingly and/or recklessly and for the purpose and effect of misrepresenting and/or concealing the truth with respect to BOA's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

347.     The dissemination of the materially false and misleading information and the failure to disclose material facts, as set forth above, artificially inflated the market price of BOA's common stock during the Relevant Period.  In ignorance of the fact that the market prices of BOA's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by BOA and Defendants Lewis and Price, and on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by BOA and Defendants Lewis and Price, but not disclosed in public statements by these Defendants during the Relevant Period, Plaintiffs purchased BOA's common stock during the Relevant Period at artificially inflated prices.  As the truth eventually emerged, the price of BOA's common stock fell.

348.     At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of BOA, which was misrepresented and/or concealed by BOA and Defendants Lewis and Price, Plaintiffs would not

have purchased BOA's common stock during the Relevant Period, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

349.    By virtue of the foregoing, BOA and Defendants Lewis and Price have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

350.    As a direct and proximate result of the wrongful conduct of Defendants BOA, Lewis and Price, Plaintiffs suffered damages in connection with their transactions in the Company's common stock during the Relevant Period.

**COUNT IV:    Violation of § 20(a) of the Exchange Act Against Defendants Lewis, Price, and Cotty**

351.    Plaintiffs repeat and reallege ¶¶ 8, 34-39, 47-108, 110, 225-27, 233-37, 239-43, 245-46, 266, and 286-350 as if fully set forth herein.  This Claim is asserted against Defendants Lewis, Price, and Cotty.

352.    During the Relevant Period, Defendants Lewis, Price, and Cotty were senior executive officers and/or directors of BOA and, consistent with their day-to-day control of BOA, were privy to confidential and proprietary information concerning BOA and its business, operations, performance, and prospects, including its compliance with applicable federal, state, and local laws and regulations.

353.    Because of their high-level positions and day-to-day management of BOA, Defendants Lewis, Price, and Cotty had regular access to non-public information about its business, operations, performance, and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's Board of Directors, and committees thereof, and reports and other information provided to them in connection therewith.

354.    Defendants Lewis, Price, and Cotty each acted as a controlling person of BOA within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Defendants Lewis, Price, and Cotty had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading.

355.    Defendants Lewis, Price, and Cotty were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.  Accordingly, Defendants Lewis, Price, and Cotty were culpable participants in the Company's violations of Section 10(b) and Rule 10b-5.

356.    For example, Defendants Lewis, Price, and Cotty were well aware of Merrill's massive fourth quarter 2008 losses as they were accruing.  As detailed in ¶¶ 155-60 above, Defendant Cotty became Merrill's acting CFO after the Merger Announcement, and had "daily access" to Merrill's financial information.  Thain confirmed on January 25 and 26, 2009 that Defendant Cotty, who reported to Defendant Price, had "complete access" to and knowledge of Merrill's fourth quarter 2008 losses.  According to a September 17, 2009 *Wall Street Journal* article, prior to the Shareholder Vote, BOA's Board of Directors "participated in weekly conference calls led by [Defendant] Lewis that included updates from [BOA's] finance chief, [Defendant] Price, on Merrill's estimated fourth-quarter losses."

357.    Defendants Lewis, Price, and Cotty participated in and/or knew of the undisclosed December 2008 negotiations with federal regulators, which ultimately led to a $138 billion government bailout to salvage the Merger.  As detailed in the December 22, 2009 BOA Board of Directors meeting minutes, Defendant Lewis informed BOA's Board of the conversations with federal regulators, including Lewis' contemplated use of the MAC clause to terminate the Merger.

358.    In addition to Defendant Price's materially false and misleading statements and/or omissions of material fact detailed herein, Defendant Price was a culpable participant in BOA's violations of Section 10(b) and Rule 10b-5 by his direct knowledge of and/or participation in: (i) the secret agreement to permit Merrill to pay up to $5.8 billion in bonuses to Merrill employees; (ii) Merrill's massive fourth quarter 2008 losses, which he knew to be at least $15.3 billion prior to the Shareholder Vote, causing BOA to suffer unprecedented losses; and (iii) the undisclosed negotiations with federal regulators to obtain a $138 billion government bailout to salvage the Merger.

359.    Defendants Lewis, Price, and Cotty had direct and supervisory involvement in the day-to-day operations of the Company, especially in the context of the Merger, and, therefore had, or are presumed to have had, the power to control or influence the particular transactions and/or statements giving rise to Plaintiffs' claims under Section 10(b) and Rule 10b-5 of the Exchange Act alleged herein, and exercised the same.  Defendants Lewis, Price, and Cotty had actual knowledge that BOA was disseminating false and misleading statements or omitting material facts in connection with the Merger or recklessly disregarded the same, and were culpable participants in these violations of Section 10(b) and Rule 10b-5.

360.     As set forth above, BOA and Defendants Lewis and Price each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Lewis, Price, and Cotty are also liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct by Defendants Lewis, Price, and Cotty, Plaintiffs suffered damages in connection with their purchases of the Company's common stock during the Relevant Period.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment including:

A.     Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.     Awarding Plaintiffs their costs and expenses incurred in this action, including counsel fees and expert fees; and

C.     Such other and further relief as the Court may deem just and proper.

**X.    JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: October 27, 2010

ENTWISTLE & CAPPUCCI LLP

By: _____

Andrew J. Entwistle
Johnston de F. Whitman, Jr.
Jonathan H. Beemer
Joshua K. Porter
Jordan A. Cortez
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

ABBEY SPANIER RODD & ABRAMS, LLP
Judith L. Spanier
Karin E. Fisch
Natalie S. Marcus
212 E. 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Richard M. Heimann
Joy A. Kruse
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Counsel for Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund, the New York State Teachers' Retirement System, and the Public Employees' Retirement Association of Colorado*

118