**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                        :

IN RE BANK OF AMERICA CORP.      :
SECURITIES, DERIVATIVE, AND      :
EMPLOYMENT RETIREMENT INCOME  :         Master File No. 09-MD-2058 (PKC)
SECURITY ACT (ERISA) LITIGATION  :
                        :          ECF CASE
-------------------------------------------------------------------x
                        :

THIS DOCUMENT RELATES TO       :
                        :
All Securities Actions               :
                        :
-------------------------------------------------------------------x

### REPLY MEMORANDUM OF LAW IN SUPPORT OF BANK DEFENDANTS' MOTION TO DISMISS CLAIMS, AND NEW PLAINTIFF CLASSES, ASSERTED IN THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Mitchell A. Lowenthal
Lewis J. Liman
CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
One Liberty Plaza
New York, NY 10006-1470
(212) 225-2000

Peter C. Hein
Eric M. Roth
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019-6150
(212) 403-1000

*Attorneys for Bank of America Corporation,*
*Kenneth D. Lewis, Joe L. Price, Neil A. Cotty,*
*William Barnet III, Frank P. Bramble, John T.*
*Collins, Gary L. Countryman, Tommy R. Franks,*
*Charles K. Gifford, Monica C. Lozano, Walter E.*
*Massey, Thomas J. May, Patricia E. Mitchell,*
*Thomas M. Ryan, O. Temple Sloan, Jr., Meredith*
*R. Spangler, Robert L. Tillman and Jackie M.*
*Ward, and Banc of America Securities LLC*

Dated: January 28, 2011

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES .................................................................................................... ii

I.      THE SAC FAILS TO ADEQUATELY PLEAD SCIENTER ................................................ 1

        A.      Plaintiffs Still Fail to Allege a Motive for the Purported Fraud .................................. 1

        B.      Plaintiffs Still Fail to Allege Intent ........................................................................... 3

                1.      No Knowing Omission in the Proxy .............................................................. 3

                2.      Plaintiffs Fail to Allege Scienter After the Filing of the Proxy ...................... 5

II.     THE SAC DOES NOT IDENTIFY AN ACTIONABLE MISSTATEMENT OR
        OMISSION UNDER SECTION 10(B) .............................................................................. 14

III.    THE JANUARY 2009 DISCLOSURE OF ADDITIONAL TARP ASSISTANCE
        DID NOT VIOLATE SECTION 10(B) ............................................................................. 18

IV.     THE NEW PLAINTIFF CLASSES FAIL TO ASSERT A CLAIM FOR RELIEF
        AND LACK STANDING TO ASSERT CLASS CLAIMS ................................................. 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**RULES AND STATUTES**

15 U.S.C. § 78u-4(b)(1) ................................................................................................. 15

15 U.S.C. § 78u-4(b)(2) .............................................................................................22-23

15 U.S.C. § 7241 ........................................................................................................... 11

Del. Gen. Corp. Law § 251(b)......................................................................................... 2

Securities Exchange Act § 10(b) ............................................................................ passim

Securities Exchange Act § 14(a) ........................................................................15- 17, 25

17 C.F.R. § 205.3(b)........................................................................................................ 9

17 C.F.R. § 240.13a-11(c).............................................................................................. 19

Exchange Act Rel. No. 39157, 1997 WL 597984, Report of Investigation Pursuant to
Section 21(a) ................................................................................................................. 13

Rule 9(b)................................................................................................................... 1, 22

Rule 10b-5 .........................................................................................................6, 15-17

Rule 12(b)(6) ................................................................................................................... 5

Rule 12(f) ...................................................................................................................... 21

Rule 14a-9 ...............................................................................................................15-16

Rule 23 .....................................................................................................................23-24

**CASES**

Aaron v. SEC,
446 U.S. 680 (1980) .............................................................................................. 16, 17

Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,
651 F. Supp. 2d 155 (S.D.N.Y. 2009).....................................................................24-25

Backman v. Polaroid Corp.,
910 F.2d 10 (1st Cir. 1990) ........................................................................................... 6

Basic, Inc. v. Levinson,
485 U.S. 224 (1988) ..................................................................................................... 6

Bay Harbour Mgmt. LLC v. Carothers,
282 Fed. App'x 71 (2d Cir. 2008) ................................................................................ 6

Billard v. Rockwell Int'l Corp.,
683 F.2d 51 (2d Cir. 1982) .......................................................................................... 1

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
511 U.S. 164 (1994) ............................................................................................. 16 - 17

Chill v. Gen. Elec. Co.,
101 F.3d 263 (2d Cir. 1996) ................................................................................... 3, 13

DeCicco v. United Rentals, Inc.,
602 F. Supp. 2d 325 (D. Conn. 2009) ........................................................................ 20

Elec. Specialty Co. v. Int'l Controls Corp.,
409 F.2d 937 (2d Cir. 1969) ........................................................................................ 6

Elkind v. Liggett & Myers, Inc.,
635 F.2d 156 (2d Cir. 1980) ........................................................................................ 6

Ernst & Ernst v. Hochfelder,
425 U.S. 185 (1976) ................................................................................................... 17

FW/PBS, Inc. v. City of Dallas,
493 U.S. 215 (1990) ................................................................................................... 23

Glazer v. Formica Corp.,
964 F.2d 149 (2d Cir. 1992) ....................................................................................... 16

Gunther v. Capital One, N.A.,
703 F. Supp. 2d 264 (E.D.N.Y. 2010) ....................................................................... 24

Higginbotham v. Baxter Int'l, Inc.,
495 F.3d 753 (7th Cir. 2007) ..................................................................................... 18

Hoffman v. UBS-AG,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) ....................................................................... 24

In re Am. Intl. Grp., Inc. Sec. Litig.,
265 F.R.D. 157 (S.D.N.Y. 2010) ............................................................................... 23

In re Ames Dep't Stores Inc. Stock Litig.,
991 F.2d 953 (2d Cir. 1993) ...................................................................................... 16

In re Centerline Holding Co. Sec. Litig.,
380 Fed. App'x 91 (2d Cir. 2010) ................................................................................ 6

In re Dynex Capital, Inc. Sec. Litig.,
No. 05 Civ. 1897, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) .................................. 25

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .......................................................................... 24

In re IndyMac Mortgage-Backed Sec. Litig.,
718 F. Supp. 2d 495 (S.D.N.Y. 2010) ........................................................................... 24

In re Lehman Bros. Sec. & ERISA Litig.,
684 F. Supp. 2d 485 (S.D.N.Y. 2010) ........................................................................... 24

In re N. Telecom Ltd. Sec. Litig.,
116 F. Supp. 2d 446 (S.D.N.Y. 2000) ............................................................................. 6

In re NTL Inc. Sec. Litig.,
347 F. Supp. 2d 15 (S.D.N.Y. 2004) ............................................................................. 16

In re Parmalat Sec. Litig.,
No. 04-MD-1653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ................................. 24

In re Scholastic Corp. Sec. Litig.,
252 F.3d 63 (2d Cir. 2001) ............................................................................................ 16

In re Time Warner Inc. Sec. Litig.,
9 F.3d 259 (2d Cir. 1993) ................................................................................... 6, 19, 20

Kalnit v. Eichler,
264 F.3d 131 (2d Cir. 2001) ............................................................................................ 6

King County, Wash. v. IKB Deutsche Industriebank AG,
Nos. 09 Civ. 8387, 09 Civ. 8822, 2010 WL 2010943 (S.D.N.Y. May 18, 2010) .......... 24

Lewis v. Casey,
518 U.S. 343 (1996) ...................................................................................................... 25

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) ...................................................................................................... 23

Merck & Co. v. Reynolds,
130 S. Ct. 1784 (2010) .................................................................................................... 7

New Jersey Carpenters Health Fund v. Residential Capital, LLC,
No. 08 Civ. 8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ................................. 25

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000)..............................................................................2, 4, 6, 13

Press v. Quick & Reilly, Inc.,
218 F.3d 121 (2d Cir. 2000)..............................................................................2

Public Emp. Ret. Sys. v. Merrill Lynch & Co., Inc.,
714 F. Supp. 2d 475 (S.D.N.Y. 2010)..............................................................24

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)..............................................................................2

San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
75 F.3d 801 (2d Cir. 1996)..............................................................................4, 19

SEC v. Czarnik,
No. 10 Civ. 745, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010).......................1, 4

SEC v. Enters. Solutions, Inc.,
142 F. Supp. 2d 561 (S.D.N.Y. 2001)..............................................................9

SEC v. Howard,
376 F.3d 1136 (D.C. Cir. 2004) .......................................................................13

SEC v. Nat'l Student Mktg. Corp.,
457 F. Supp. 682 (D.D.C. 1978) ......................................................................9

Shields v. Citytrust Bancorp,
25 F.3d 1124 (2d Cir. 1994)..............................................................................2

Shurkin v. Golden State Vintners, Inc.,
303 Fed. App'x 431 (9th Cir. 2008)..................................................................18

Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.,
552 U.S. 148 (2008) .........................................................................................17

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) .....................25

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
531 F.3d 190 (2d Cir. 2008)..............................................................................4

United States v. Ingredient Tech. Corp.,
698 F.2d 88 (2d Cir. 1983)................................................................................11

United States v. New York City Health & Hosp. Corp.,
No. 95 Civ. 7649, 2000 WL 1610802 (S.D.N.Y. Oct. 27, 2000).....................1

Plaintiffs' Opposition ("Opp.") eschews the standards previously recognized by this Court in dismissing the identical fraud claims.[1] It ignores that the SAC's allegations must not just be plausible, but also both cogent and compelling, and wrongly rejects the Second Circuit's requirement that where, as here, a plaintiff has received substantial discovery, allegations must be even more "greatly" particularized.[2] And it defends the SAC under the wrong standards: it mischaracterizes as "factual disputes" Bank Defendants' requests that the Court, in assessing whether Plaintiffs' inferences are cogent and compelling, consider not just Plaintiffs' conclusions but the full text of the documents upon which they base their characterizations, as the Court is required to do under the PSLRA.[3]

The SAC also fails on the merits. It does not answer the question the Court raised in its prior decision. The documents the SAC relies upon contradict any claim that there was a "fundamental change" in Merrill's performance apparent to Bank Defendants prior to the shareholder vote (let alone prior to the issuance of the Proxy) and that the Bank Defendants ignored a clear duty to disclose, much less acted with scienter. Further, there was no duty to disclose any TARP agreement before January 2009, let alone any delay in doing so that was the result of any intent to defraud. Finally, Plaintiffs lack standing to assert claims on behalf of virtually all the debt, preferred, and options purchasers.

## I.     THE SAC FAILS TO ADEQUATELY PLEAD SCIENTER

### A.     Plaintiffs Still Fail to Allege a Motive for the Purported Fraud

---

[1]     Defendants Merrill Lynch & Co., Inc. ("Merrill"), Merrill Lynch, Pierce, Fenner & Smith, Inc. and John Thain join in this memorandum of law to the extent applicable.

[2]     Plaintiffs assert that "no court has ever adopted this argument." Opp. 20. Much like the SAC's description of source documents, this assertion cannot be squared with the Circuit's words in Billard v. Rockwell Int'l Corp., 683 F.2d 51, 57 (2d Cir. 1982), which declined to "decide whether the complaint . . . would be sufficient in a case where no discovery has been had," but affirmed dismissal because the "policies underlying Rule 9(b) call upon us to require greater precision" when – as here – there has been substantial discovery. See also United States v. New York City Health & Hosp. Corp., No. 95 Civ. 7649, 2000 WL 1610802, at *2 (S.D.N.Y. Oct. 27, 2000) (applying Billard and noting, "a 'greater precision' is required when discovery has been had in a prior case").

[3]     See SEC v. Czarnik, No. 10 Civ. 745, 2010 WL 4860678, at *3 (S.D.N.Y. Nov. 29, 2010) (On a motion to dismiss, "[a] court . . . may also consider documents incorporated by reference or attached to the complaint as exhibits, documents the plaintiff knew of or possessed and relied upon in framing the complaint and items of which judicial notice may be taken.").

Plaintiffs do not explain why Bank Defendants – having "minced no words [in the Proxy] about the challenging economic climate and the likelihood that Merrill would continue to incur losses in the near and medium term," August 27 Order at 56 – would nonetheless have an interest in intentionally or recklessly disregarding a duty to disclose information about Merrill's fourth quarter losses, which were entirely consistent with those warnings.[4] The most Plaintiffs offer is that in mid-October 2008 (shortly after the Merger was announced and well before any fourth quarter losses were known), Lewis stated in an interview that Merrill "was the best fit" for the Bank and that he was "drooling" for Merrill. See SAC ¶ 63; Opp. 5, 28-29, 34-35. This Court already correctly rejected the identical allegations, see AC ¶¶ 59-60; August 27 Order at 95, which are manifestly inadequate to establish scienter. In every instance in which a corporation agrees to a merger, its Board and CEO must believe that the transaction is in the best interests of the shareholders – and say so. See Del. Gen. Corp. Law § 251(b).[5]

Plaintiffs fail to make any allegation that between when estimated October losses are first alleged to have been known and the shareholder vote, any Bank Defendant had an interest in having the Merger close if it was not in the shareholders' best interests – i.e., that a Bank Defendant would gain "some concrete and personal" benefit from the fraud.[6] The only allegation in the SAC is that Lewis was threatened with the loss of his job if the Merger failed. SAC ¶¶ 154-55. This is not sufficient to support an inference of scienter for a number of reasons including that the alleged threat was not made until after the shareholder vote.[7]

---

[4]     Plaintiffs attempt to re-litigate the August 27 Order by arguing – wrongly – that Press v. Quick & Reilly, Inc., 218 F.3d 121, 130 (2d Cir. 2000), holds that risk disclosures cannot negate allegations of fraudulent intent as a matter of law. Opp. 24. But Press explicitly refused to "grapple with [that] thorny issue" because the complaint failed for other reasons. 218 F.3d at 130. More importantly, Plaintiffs' reliance on Press is misplaced: the Circuit held that the Press plaintiffs' allegations were implausible in light of defendants' risk disclosures, which is exactly what the Court held in its August 27 Order.

[5]     See also Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (desire to accomplish the transaction is "part of the officers' and directors' financial responsibilities to the Company" and insufficient to establish scienter).

[6]     Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000).

[7]     See Shields v. Citytrust Bancorp, 25 F.3d 1124, 1130 (2d Cir. 1994) (holding that motive cannot "be pleaded by alleging the defendant's desire for continued employment").

2

Further, the notion that Lewis wanted the Merger to "close at all costs" to save his job or for other unspecified reasons is undermined by Plaintiffs' allegations: they allege that in late November 2008, Bank Defendants were interested in terminating the Merger, SAC ¶¶ 118-19, and that later in December Bank Defendants "Decide[d] to Invoke The MAC and Terminate The Deal," id. ¶ 143.[8] Moreover, had Bank Defendants desired to "complete the merger at any cost," Opp. 5, they would never have included the "dire warnings" in the Proxy; conversely, had Bank Defendants known prior to the December 5 shareholder meeting of the results that later caused them to seek to terminate the transaction, they would have had every interest in disclosing Merrill's losses.

### B.    Plaintiffs Still Fail to Allege Intent

The failure to plead a motive to commit fraud in the Proxy requires (i) "'the strength of the circumstantial allegations [to] be correspondingly greater,'" August 27 Order at 85 (quoting ECA v. J.P. Morgan Chase Co., 553 F.3d 187, 198-99 (2d Cir. 2009)), and (ii) the SAC to allege facts "approximat[ing] an actual intent to aid in the fraud being perpetrated."[9]  The SAC fails to meet these standards. Defs. Br. 21.

### 1.    No Knowing Omission in the Proxy

Plaintiffs do not dispute that the Proxy was dated October 31, 2008 and shareholders were explicitly instructed that the information it contained was accurate only as of that date. Id. at 5. Nor do they identify a single report or statement demonstrating that Bank Defendants were aware that "Merrill had suffered historically large losses in October" either as of that date or at any time prior to the November 3 Proxy issuance and, accordingly, do not sufficiently plead that that Bank Defendants were aware that "[b]y the time the Joint Proxy issued, the stormy forecast for the fourth

---

[8]    Plaintiffs do not dispute that if, as Plaintiffs allege, Bank Defendants had wanted to terminate the Merger, their motive would have been to disclose the losses. Defs. Br. 18-19.  Instead, Plaintiffs recant and argue that the SAC does not claim that the Bank Defendants actually intended to terminate the Merger. Opp. 34-35.  But this argument flies in the face of the plain language of the SAC. See SAC ¶ 118 ("Price asked Mayopoulos to review the MAC clause in the Merger Agreement and advise him whether BoA had grounds to terminate the merger by invoking the MAC. . . . BoA's senior executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the material adverse effect clause in its merger agreement . . . [T]he debate over whether to invoke the MAC continued up until a few days before [the shareholder vote]."); id. ¶¶ 119, 143, 145, 152, 155.

[9]    Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (quotation marks omitted).

quarter was not merely a projection: the storm had arrived."[10]  August 27 Order at 58.  Instead,

Plaintiffs contend, Opp. 9, 10 n.5, that the Bank must have known the full October results one day

after the end of the month, or on November 3, 2008, because Thain stated in a June 2009 media

interview that the Bank received Merrill's "daily profit and loss statement[s]," and testified that

Cotty "sat in meetings and discussions and was totally up-to-speed on what was happening," SAC

¶¶ 96, 97.[11]  But when alleging that defendants possessed "unreleased or internal information that

allegedly contradict[s] [defendants'] public statements," a plaintiff must identify with specificity the

reports that contain the undisclosed information indicating "who prepared the projected figures,

when they were prepared, how firm the numbers were, or which [company] officers reviewed

them."[12]  The SAC does nothing of the sort.  It fails to identify a single report on or before

November 3 that contained October results.  Indeed, the first document the SAC identifies BAC

executives received relating to Merrill's October results was a <u>November 5</u> email, and Plaintiffs

concede it only reported "<u>estimated</u>" results, which differed by nearly $1.5 billion from the actual

October monthly results obtained a week later.  SAC ¶ 101; Defs. Br. 6.  At most, then, the SAC

pleads that estimated October results – which as a matter of undisputed law there is no duty to

disclose, Defs. Br. 32 n.54 – were first provided to the Bank on November 5, after the Proxy was

filed and well after the Proxy's October 31 date.[13]  The Proxy thus was not false when issued and no

---

[10]    Plaintiffs sheepishly announce in a footnote what the SAC did not: that the class period for this claim could
begin no earlier than November 3, 2008.  Opp. 21 n.15.

[11]    Plaintiffs tellingly do not include the question in response to which Thain gave this response.  Thain was being
asked about the time period between December 8 and December 31.  <u>See</u> Supp. Decl. of Jennifer Kennedy Park ("Park
Supp. Decl.") Ex. 1.  Thain does not represent, and Plaintiffs fail to specifically allege, that Cotty attended any meeting
prior to November 3 at which October's results were discussed.  <u>Id.</u>

[12]    <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 812-13 (2d Cir.
1996) (quotation marks omitted) (alterations in original); <u>see also</u> <u>Teamsters Local 445 Freight Div. Pension Fund v.</u>
<u>Dynex Capital Inc.</u>, 531 F.3d 190, 196 (2d Cir. 2008) ("'[W]here plaintiffs contend defendants had access to contrary
facts, they must specifically identify the reports or statements containing this information.'" (internal quotations
omitted)); <u>Novak</u>, 216 F.3d at 309 (same); <u>Czarnik</u>, 2010 WL 4860678, at *6 (same).

[13]    For this same reason Plaintiffs' new reliance on the testimony of Thomas Graham is of no import.  Opp. 33.
That the forecasts reflected actual losses attributable to assets that could be marked on a daily basis, <u>i.e.</u>, the "P and L,"
does not mean that the <u>projected</u> losses reflected in the forecasts that were by their own terms "preliminary" and "TBD"
were "clear."  Indeed, they could not have been because, as Merrill disclosed, the assets underlying these preliminary
and TBD projected losses could only be marked on a month- or quarter-end basis.  Defs. Br. 6 & n.12.  Further,

4

Bank Defendant acted with scienter.

## 2. Plaintiffs Fail to Allege Scienter After the Filing of the Proxy

Plaintiffs' allegations admit that Price voluntarily and without prompting approached counsel in mid-November for advice about whether any supplemental disclosure need be made in light of Merrill's losses; assert that the Bank's General Counsel and its outside counsel conferred on the question (outside the presence of Price) on not just one but two occasions; and assert that at the first of these initial meetings the lawyers agreed there must be "some discl[osure]" but acknowledge that on November 20 Mayopoulos (with Wachtell at worst silent) advised Price that no further disclosure was required.   Opp. 10-11, 25 n.20.  These allegations themselves refute any contention of scienter.  Moreover, Plaintiffs also do not dispute that the documents upon which they rely establish that the initial disclosure contemplated was a "trend disclosure," like the "MD+A" section of a Form 10-Q or 10-K, with "not much" detail that would simply "refer to past trend of losses," Defs. Br. 25-26; and that, after specifically reviewing Merrill's and the Bank's Forms 10-Q and 10-K (which had that trend disclosure), Mayopoulos concluded no further disclosure was required.[14] Id. at 26-27 & n.45.  Plaintiffs' failure to dispute these facts further dooms their claims.  Plaintiffs' other contentions, moreover, do nothing to sustain their scienter allegations.

A.   Merrill's "Terrible Losses." Plaintiffs argue that Bank Defendants possessed scienter because Merrill had suffered "'terrible' losses" and Bank Defendants knew that certain stock analysts had expected a profitable quarter.  Opp. 1, 22-23.  The relevant question is not whether losing billions of dollars was terrible, but whether the SAC alleges with the detail required

---

Graham's testimony is never mentioned in the SAC, making citation to it entirely improper in opposition to a Rule 12(b)(6) motion.

[14]      Plaintiffs attempt to side-step these facts by speculating that "[o]bviously, all the participants at this [November 13] meeting were well aware of the purported 'risk disclosures' in the Proxy and BoA's and Merrill's other SEC filings – indeed, certain participants at that meeting drafted these documents."  Opp. 17, 25 n.20.  But some of the most explicit warnings upon which Mayopoulos based his conclusion were in Merrill's third quarter Form 10-Q, which advised that the "adverse market environment intensified towards the end of the [third] quarter," and predicted that "[t]urbulent market conditions in the short- and medium-term will continue to have an adverse impact on [Merrill's] core businesses" in light of the "severe" dislocations in the credit markets.  Park Decl. Ex. 1, at 82, 83.  Moreover, the SAC is bereft of any allegation that those Bank lawyers – which included litigators and deal lawyers – had prepared the relevant sections of the Bank's third quarter Form 10-Q filing, much less had studied them with the question in mind of whether any further disclosure was necessary in light of the report of Merrill's monthly loss for October.

by the PSLRA both that Bank Defendants knew the undisclosed information and that they

intentionally or recklessly failed to disclose that information in disregard of a clear duty to do so.[15]

It does not.

First, none of the SAC's paragraphs Plaintiffs cite for the point that Lewis and Price knew

that the market's expectations differed from their own alleged that either had this knowledge prior

to the shareholder vote.[16] And the Second Circuit has squarely rejected "fraud by hindsight."[17]

Second, the mere fact that Merrill's own internal interim results and projections differed

from those some market commentators were expecting does not come close to establishing the

existence of a clear duty to disclose – much less scienter. There is "no duty to disclose [the

company's] own forecasts or to warn the analysts (and the public) that their optimistic view was not

shared by the company."[18] The alleged "materiality" of the losses is beside the point: a fact need

not be disclosed simply because it is material,[19] and materiality alone is not sufficient to give rise to

---

[15]     See Kalnit v. Eichler, 264 F.3d 131, 142-43 (2d Cir. 2001); see also In re Centerline Holding Co. Sec. Litig., 380 Fed. App'x 91, 93 (2d Cir. 2010) ("[W]here liability is premised upon alleged material omissions, if the complaint 'does not present facts indicating a clear duty to disclose' – such as that arising from the need to correct or update prior statements – 'plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.'" (quoting Kalnit, 264 F.3d at 144)); August 27 Order at 94.

[16]     See Opp. 22; SAC ¶¶ 104, 107-09, 171, 264. Neither Price nor Lewis is alleged to have participated in the November 13 meeting among Mayopoulos and Wachtell partners at which analyst estimates were alleged to have been discussed. Id. ¶¶ 104-09. The remaining statements that allegedly informed Price and Lewis of the market's expectations postdate the shareholder vote. Id. ¶¶ 167-70 (quoting December 17 email from Jeff Brown to Price forecasting a credit rating agency reaction "in light of ML's 4Q performance that we know relative to what they know"); id. ¶¶ 171-72 (quoting December 19 email from Peter Hein). In fact, those paragraphs do not contain any substantive allegation against Lewis.

[17]     See Bay Harbour Mgmt. LLC v. Carothers, 282 Fed. App'x 71, 75 (2d Cir. 2008) (confirming that "fraud by hindsight" is "not actionable in this Circuit"); Novak, 216 F.3d at 307. The only cases Plaintiffs cite in support of their point involved defendants who knew the disclosures they made were false when they made them.

[18]     Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980); see also In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 458-59 (S.D.N.Y. 2000) (citing Elkind, 635 F.2d at 163); cf. Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 949 (2d. Cir. 1969) (finding "nothing in the securities legislation requiring" a company to "correct a misstatement in the press not attributable to it").

[19]     Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); see also In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"); Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) ("Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.") (quotation marks omitted). Nor is it sufficient to argue – as Plaintiffs do – that the Court has held that there is a duty to disclose. Opp. 21-25.

a strong inference of scienter.[20]

Indeed, Plaintiffs now concede that the actual October losses were not the worst in Merrill's history and were not greater than Merrill's pre-tax profits for 2006. Defs. Br. 6 & n.14; Opp. 33 n.28. In fact, the actual October pre-tax losses ($7.536 billion pre-tax) and estimated fourth quarter pre-tax losses ($8.942 billion) reflected in the November 12 Forecast, Defs. Br. 7; SAC ¶ 102; Park Decl. Ex. 9, were in line with Merrill's prior-quarter losses and therefore could not constitute a "fundamental change" in Merrill's business. Defs. Br. 3 & nn.7-8. Merrill had not made a mid-quarter disclosure in any of those prior quarters, and Plaintiffs offer no reason why Bank Defendants should have inferred that there was a duty to disclose Merrill's losses when not even Merrill had previously done so.

Having twice failed to meet their own false standards for judging the materiality of the October losses, Plaintiffs now propose a novel "clear duty" standard – that the losses were "highly material" and therefore clearly had to be disclosed because they were greater than Merrill's annual pre-tax profits in each of the years from 2001 to 2005. Opp. 33 n.28. Plaintiffs offer no explanation for why profits Merrill generated in the years before the 2007 credit crisis have any relevance to Merrill's results during that crisis. If anything, Plaintiffs' argument undermines their position: the actual October losses and the fourth quarter forecasted losses were within the range of losses Merrill had experienced for the five prior quarters. Opp. 12.

B.   "Disregarding" Advice of Counsel. Plaintiffs next argue that Bank Defendants "disregarded the advice of BoA's General Counsel and Wachtell to disclose Merrill's losses" and "pressured" Mayopoulos to "reverse[] his disclosure decision because . . . [Price] knew that, if the losses were disclosed, shareholders would vote the merger down." Opp. 1, 26-27. The facts pleaded in the SAC contradict that nonsensical supposition.

First, Plaintiffs admit that it was Price who first asked Mayopoulos on November 12 and again on December 3 whether disclosure of Merrill's losses was necessary. SAC ¶¶ 102-103; 127.

---

[20]    Merck & Co. v. Reynolds, 130 S. Ct. 1784, 1797 (2010).

7

Plaintiffs never attempt to explain why Price would have asked those questions if he was intent on manipulating the information he provided to the Bank's lawyers and ignoring their advice if he did not like it. Their theory thus fails the test of cogency.

Second, despite Plaintiffs' contrary characterization, neither the Wachtell November 13 notes – the basis for Plaintiffs' allegations – nor the SAC support the inference that the lawyers concluded on November 13 that disclosure of Merrill's interim-period October monthly loss numbers was required or that they conveyed any such conclusion to their client. The notes state that the group discussed whether there should be trend disclosure, and thus are entirely consonant with the testimony of all of the lawyers that no advice was given that disclosure of interim results or forecasts was required. Defs. Br. 27 n.49.

Third, the SAC gives no reason why Price would pressure Mayopoulos to reverse his disclosure decision – or allege any facts that he did so – even if there was a disclosure decision to reverse. Plaintiffs do not allege that Price had a reason to deceive shareholders. Defs. Br. 17. If Mayopoulos had advised that disclosure should be made and if that disclosure would have resulted in the failure of the transaction, Price would have had the same interest as every other shareholder in that result. Indeed, far from alleging a desire for the Merger to close at all costs, Plaintiffs allege that in late November Price asked Mayopoulos to ascertain if the Bank "had grounds to terminate the Merger by invoking the MAC" and on December 1, met with Mayopoulos to discuss that topic. SAC ¶¶ 118-19. Thus, while Plaintiffs allege in conclusory form that Price pressured Mayopoulos not to disclose due to a desire to close at all costs, Opp. 27, the SAC alleges facts establishing that Price would have had every interest in disclosing to scuttle the Merger.

Fourth, the contention that Wachtell sat idly by while their client allegedly defied their advice makes no sense. In particular, Plaintiffs allege Bank Defendants consulted Wachtell specifically to seek advice on whether disclosure of Merrill's interim results was necessary, SAC ¶ 104, and then in Wachtell's presence reached a determination not to disclose material information notwithstanding a known clear duty to do so, Opp. 12. But Wachtell agreed that no further disclosure was needed. Defs. Br. 28. Even if as Plaintiffs allege, Wachtell remained silent, Opp.

8

29, the only cogent inference from such silence would be that Wachtell agreed with Mayopoulos's conclusion that no disclosure was required and that the meeting's participants so understood: if Wachtell believed otherwise it was required to speak and so inform the Bank. See New York Rules of Prof'l Conduct R. 1.13(b)); see 17 C.F.R. § 205.3(b) (Sarbanes-Oxley). And if Wachtell believed (as it did, Defs. Br. 28) that further disclosure was not required, Plaintiffs clearly cannot establish Bank Defendants' knowledge of a clear duty to disclose.[21]

  C. Alleged Lies to Counsel. Plaintiffs' assertion that Price lied to Mayopoulos when he told him of $5 billion in Merrill after-tax losses prior to November 20 and of $7 billion in Merrill after-tax losses on December 3, SAC ¶¶ 112-15, 124-27; Opp. 11-14, makes no more sense than their assertion that he defied Mayopoulos's advice.

  First, as Plaintiffs admit, the potential goodwill impairment and the "wild-ass guesses" make up the entirety of the information Price is alleged to have failed to provide to Mayopoulos.[22] Defs.

---

[21] Plaintiffs' cases about the "lawyers' silence" are irrelevant: each relates to the successful assertion of advice of counsel. See SEC v. Enters. Solutions, Inc., 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001); SEC v. Nat'l Student Mktg. Corp., 457 F. Supp. 682, 711 n.68 (D.D.C. 1978). The Bank Defendants' point is that the facts alleged by Plaintiffs do not come close to supporting a cogent inference of scienter.

[22] Plaintiffs assert that, by November 16, Price was aware of estimated Merrill fourth quarter losses of $8.5 billion after-tax or $13 billion pre-tax, but did nothing to update the figure of "approximately $5 billion after-tax" that he gave Mayopoulos on November 12. SAC ¶¶ 112-15. Plaintiffs calculate a $13 billion pre-tax figure by adding a $2 billion goodwill impairment charge that Merrill had not yet taken. Id. ¶ 112. In addition, the email that Plaintiffs' rely on for this allegation makes clear that another $2 billion consisted of speculation by a Bank employee regarding losses Merrill could incur (but had not yet incurred) over the remainder of the quarter. Id.; Defs. Br. 8. Plaintiffs' argument that the estimate came from Cotty, Opp. 11 n.7, entirely misses the point. The email Plaintiffs reference indicated that Merrill's projection for the quarter was still $8.942 billion and that while Cotty speculated that there could be another $2 billion in pre-tax losses for the quarter, Defs. Br. 8, Merrill was also predicting a $1.6 billion after-tax benefit, which would have offset this loss. Plaintiffs tellingly offer no response to this offset, or explain why, if Price had omitted this offset, he should have included a "wild-ass guess" of approximately the same amount not reflecting any actual losses and added as a guess by the Bank itself. Opp. 11 n.7. Even ignoring the offset, after subtracting the goodwill and the speculation by Bank employees, Plaintiffs' figure shrinks to approximately $9 billion pre-tax or approximately $5.4 billion after-tax – the same figure Price shared with Mayopoulos.

  Plaintiffs next assert that by the evening of December 3, Lewis and Price were aware of losses at Merrill of more than $16.2 billion pre-tax, or $10.5 billion after-tax, but Price only informed Mayopoulos of an after-tax loss of $7 billion. SAC ¶ 127; Opp. 13-14. There is not a single allegation in the SAC that on or before December 3 Lewis had any discussions with Mayopoulos about Merrill's losses. And with respect to Price, Plaintiffs' allegations and the documents on which they rely make clear that this $16.2 billion figure includes $2.2 billion of goodwill and $3 billion of pre-tax "wild-ass guesses" that reflected additions made by Bank executives based on their own speculation. SAC ¶¶ 124-26; Defs. Br. 10 & n.22. Subtracting the $5.2 billion that Plaintiffs improperly include, one is left with a pre-tax loss of $11 billion, or $7 billion after-tax, which is what Price is alleged to have conveyed to Mayopoulos. SAC ¶ 127. Actually, because even the $11 billion pre-tax/$7 billion after-tax number includes forecasted losses for December of $600 million, the aggregate of the monthly for October and November available as of December 3 was even less.

Br. 8-11, 29-32. Once these are removed, the losses Price is alleged to have been aware of –
approximately $9 billion pre-tax leading up to November 20 and approximately $11 billion pre-tax
on December 3 – are entirely consistent with what Price told Mayopoulos. SAC ¶¶ 103-14, 127;
Defs. Br. 8-11, 29-32. Goodwill and "wild-ass guesses" had no place in the disclosure analyses,
and the SAC notably fails to plead that Price (or anyone) believed otherwise, thus undermining
Plaintiffs' contention that Price intentionally withheld what he believed was relevant information
from Mayopoulos in order to secure advice that disclosure was not required.

The goodwill impairment was irrelevant to the Bank's shareholders and to the disclosure
analysis for two reasons and would have been so understood. First, Bank shareholders were told
that purchase accounting rules required the Bank to write off all of Merrill's goodwill if the Merger
closed.[23] Defs. Br. 11-13. Second, the contemporaneous documents drafted by Merrill that the
SAC cites explicitly state that the goodwill impairment charge Merrill ultimately took resulted from
a decline in the Bank's share price,[24] SAC ¶ 93; Defs. Bf. 8, 11-13, 29 & n.51, and the Bank's
shareholders were told that, irrespective of the Merger's closing, Merrill could take – and disclose –
a goodwill charge at the end of the quarter, not earlier, as it did, precisely as required by Form 8-K.
As a separate legal entity, Merrill decided when and whether to take the charge and Plaintiffs do not
allege that Merrill had taken the charge as of December 3. SAC ¶ 93; Defs. Br. 11-13, 29. Thus,
even if Price somehow knew before December 3 that Merrill had decided to take the charge and

---

[23]     Plaintiffs misconstrue the relevance of the purchase accounting rules. Opp. 34. Merrill remained an
independent company throughout the 2008 fourth quarter to which purchase accounting rules accordingly had no
application. Pursuant to other GAAP principles, it took a goodwill charge at the end of that quarter. But – if the Merger
closed and Merrill lost its independence – purchase accounting rules required that all of Merrill's goodwill be written
off, as the Bank's shareholders were specifically told. See Defs. Br. 11-12.

[24]     Plaintiffs allege that Merrill's goodwill impairment was related to First Franklin and Merrill's fourth quarter
performance based on an after-the-fact 2009 NYAG letter upon which Plaintiffs improperly rely. Defs. Br. 13 n.23.
But the contemporaneous documents available to Price stated the contrary. SAC ¶ 93; Defs. Br. 8, 11-13, 29 & n.51.
Merrill's Form 10-K reported that, "Due to the severe deterioration in the financial markets in the fourth quarter of 2008
and the related impact on the fair value of Merrill Lynch's reporting units, an impairment analysis was conducted in the
fourth quarter of 2008." Park Decl. Ex. 11 at 20. Plaintiffs do not dispute that, in the fourth quarter, in light of the
Merger Agreement, Merrill's stock traded with reference to the market price of the Bank's stock and, thus, the fair value
of Merrill's reporting units was a function of the Bank's stock market value. Defs. Br. 13 n.23. Thus, as the Bank's
stock price fell, so did the fair value for goodwill accounting purposes of Merrill's reporting units, which is what led to
the goodwill impairment.

thought about its relevance, the more compelling inference is that he would have concluded it was not relevant to a disclosure analysis.

There is also no allegation that Price would have thought the "wild-ass guesses" that Plaintiffs use to inflate the loss figures would be relevant to a disclosure analysis. Plaintiffs do not contest that there is no duty to disclose forecasts, predictions, or "wild-ass guesses," Defs. Br. 6 n.14, 24 n.44, so Price could not have disregarded a "clear duty" by omitting these components when he sought legal advice. There is no allegation that Price believed in spite of the law that these speculations were sufficiently concrete even to permit disclosure. And Mayopoulos testified that they would not have been appropriate to consider for public disclosure and would not have influenced his decision.[25] Although Plaintiffs argue that Bank Defendants believed the "TBD" ("To Be Determined") marks and "wild-ass guesses" were sufficiently concrete to share with the federal government in late December, Opp. 17, they do not (and cannot) dispute that the internal forecasts were only provided then because regulators requested them in connection with the Federal Reserve's oversight responsibilities and thus were not a representation by Bank Defendants about the reliability of the documents. The documents made available to the regulators went far beyond what has been or needed to be publicly disclosed. Defs. Br. 19 n.32.

And even if disclosure determinations could be based on estimates, projections, and "wild-ass guesses," Price had no reason to withhold information from Mayopoulos that in fact supported a decision not to disclose.[26] Because, as Plaintiffs allege, Mayopoulos was using the largest of the

---

[25]     Plaintiffs' contention that "Mayopoulos unequivocally testified to Congress, the SEC, and the New York Attorney General that Price gave him information that was materially inaccurate, and understated Merrill's losses by billions of dollars," Opp. 27, is false. Mayopoulos testified that he was provided with a loss estimate that did not include Cotty's $3 billion "wild-ass guess," Park Supp. Decl. Ex. 2, and then testified that "I believe my legal advice would have been that such a guess was not an appropriate basis for a public disclosure. The law is clear that public disclosures to shareholders must be based on information that is reasonably reliable." Id.; see also Park Supp. Decl. Ex. 3; Park Supp. Decl. Ex. 4.

[26]     The cases Plaintiffs cite highlight the weaknesses of their claim. See Opp. 27. In them, defendants are alleged to have concealed information from and lied to auditors. While a publicly traded company must disclose all fraud or significant internal control deficiencies to its auditor as a matter of law, see 15 U.S.C. § 7241, there is no similar duty to seek advice of counsel. Therefore, the most rational way for a defendant to conceal information from counsel would be to avoid raising the issue with counsel at all. The only case Plaintiffs cite involving advice of counsel, United States v. Ingredient Tech. Corp., 698 F.2d 88, 96 (2d Cir. 1983), is wholly different: there, the Circuit rejected a Due Process fair

previous five quarters of Merrill losses as a "threshold" under which no disclosure was required, (Opp. 14), even using Plaintiffs' inflated numbers, the figures that Price is alleged to have been aware of prior to the shareholder vote – $11 billion pre-tax on November 20 and $14 billion pre-tax on December 3 – were under Mayopoulos's threshold, (Defs. Br. 10-11), and projected results for November and December that were better than Merrill's actual results for October.

Second, for the same reasons discussed above, if Price intended not to reveal some of Merrill's fourth quarter losses to Mayopoulos, he did not need to ask for Mayopoulos's advice at all – and certainly not a second time if he had already received the no-disclosure advice he purportedly sought. SAC ¶¶ 102-103, 127. Plaintiffs offer no plausible reason why Price would raise the issue of disclosure only to deceive the very lawyer whose counsel he sought. Price had no reason to lie to Mayopoulos. Plaintiffs have not identified any interest Price had other than doing what was necessary to comply with the federal securities laws. He is not alleged to have had any personal interest in seeing his counsel's advice come out in only one particular way.[27] Indeed, as of November 16, when Plaintiffs allege Price received an email reflecting $10.942 billion in forecasted pre-tax losses (or $13 billion pre-tax with the addition of the goodwill impairment), id. ¶ 112, no one had concluded that disclosure was required, and thus, there was no disclosure decision which Price would have needed to reverse by lying to Mayopoulos.

Moreover, Plaintiffs' allegations of conscious misbehavior and recklessness against Lewis are nonexistent. In all the paragraphs of the SAC cited, Opp. 6-15, none refers to a meeting in which Lewis is alleged to have participated, a conversation to which Lewis was a party, a statement Lewis is alleged to have made or any other action that Lewis is alleged to have taken or not taken

---

notice challenge to a criminal statute because, among a variety of factors, defendants' lies to auditors and attorneys demonstrated their awareness of wrongful conduct.

[27]     Plaintiffs rely on a snippet of Mayopoulos's notes from November 18 in which he wrote, "What happens if neg. shh vote?" Opp. 12. For reasons they never explain, Plaintiffs try to read that note as a statement that a negative shareholder vote should be avoided. They offer no reason to give the statement – punctuated by a question mark – such a reading. That counsel – or the CFO – wanted to understand what would happen if there was a negative shareholder vote hardly suggests that they had an interest in avoiding that outcome. See Defs. Br. 21 & n.37; Park Decl. Ex. 20, at 75-76. Indeed, as noted, Plaintiffs allege that simultaneously Price was meeting with Mayopoulos to consider terminating the transaction. See supra p. 8.

with respect to disclosing Merrill's losses, seeking the advice of counsel, consideration of the MAC to terminate the Merger or the termination of the Bank's General Counsel.[28]

In sum, accepting _arguendo_ that there was information Mayopoulos was not provided, the various non-fraudulent inferences that may be drawn (e.g., that Price shared with counsel the known information about Merrill's results and did not view "wild-ass guesses" or potential to-be-booked goodwill charges to be significant to a disclosure analysis) outweigh any inference that Bank Defendants intentionally lied to counsel.[29]

---

[28]    The same is true of Plaintiffs' discussion of scienter, Opp. 21-26 – not a single paragraph of the SAC cited refers to actions by Lewis, except for two paragraphs (SAC ¶¶ 83, 85) that refer to statements he made in October 2008, before any fourth quarter losses were known. In fact, the only statement by Lewis even mentioned in those pages is one he made after-the-fact to Congress. Opp. at 9. At most, that statement suggests an awareness of Merrill's losses at the time; there is no citation to facts suggesting that he was aware of any requirement to disclose them. Plaintiffs' sole allegation related to Lewis's knowledge of the disclosure discussions regarding Merrill's losses before the December 5 shareholder vote is that Price kept Lewis "informed all the time" on matters relating to the Merger. Plaintiffs go on to speculate that Lewis deceived and ignored the Bank's lawyers and bullied them into giving the advice he wanted. Opp. 26. But such an allegation, which does not specify the time or place of any meeting between Lewis and Price or the contents of any communication between them, does not meet Plaintiffs' burden of alleging particularized facts giving rise to a strong inference of scienter. See Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Plaintiffs also claim that Lewis should be held liable for securities fraud because he did not personally consult Mayopoulos regarding disclosure. Opp. 30. But delegation by the CEO of a major corporation of a disclosure issue to his CFO is hardly "ostrich-like willful ignorance" and does not rise to the level of an "extreme departure from standards of ordinary care." August 27 Order at 86 (quotation marks omitted). See generally SEC v. Howard, 376 F.3d 1136 (D.C. Cir. 2004) (allegations that an executive failed to directly consult with counsel do not amount to "an extreme departure from the standards of ordinary care," "so obvious that the actor must have been aware of it," when his executive colleague had consulted with counsel and conveyed the results of that advice (quotation marks omitted)). Notably, the SEC Report of Investigation cited in Bank Defendants' Motion to Dismiss states that executives have a collective obligation to seek disclosure advice on behalf of the company when necessary. That is precisely what happened here when, as Plaintiffs allege, Price consulted internal and external counsel on behalf of the Bank. SAC ¶¶ 104-14, 127; see Exchange Act Rel. No. 39157, 1997 WL 597984, at *6, Report of Investigation Pursuant to Section 21(a) of the Sec. Exchange Act of 1934 Concerning Conduct of Certain Former Officers & Directors of W.R. Grace & Co. (Sept. 30, 1997).

[29]    Plaintiffs also argue that "Lewis and Price were acknowledging internally that their failure to disclose Merrill's losses had misled investors" based on the advice of various third parties that Merrill's losses should be disclosed. Opp. 7-8. However, the allegation that Thomas Graham, a Deloitte & Touche partner, advised Merrill that Merrill should consider the issue of disclosure does not establish scienter by Bank Defendants. Opp. 7, 33; cf. Chill, 101 F.3d at 268 (scienter cannot be imputed from subsidiary to parent). Plaintiffs further misstate the December 19 email from Wachtell attorney Peter Hein claiming it says that the Bank's nondisclosure had "resulted in a 'fundamental issue of lack of credibility,'" and that disclosure would "cause the deal to 'f[a]ll apart.'" Opp. 8. It does not. The email postdates the shareholder vote by weeks, and concerns Merrill's "credibility" and the hypothetical consequence to Merrill of calling a MAC. Defs. Br. 45; Park Supp. Decl. Ex. 5. Plaintiffs also cite an email authored by Jeff Brown that allegedly expressed a desire to disclose; however, disagreement within a company about whether to disclose information, no matter how colorful, does not support an inference that the company or its executives were aware of a duty to disclose information. See Defs. Br. 33 n.57.

D.     Termination of Mayopoulos.  Finally, Plaintiffs suggest that "the suspicious manner and timing of Mayopoulos's termination is . . . compelling evidence of Lewis's and Price's scienter." Opp. 28. But Plaintiffs do not even attempt to allege that Lewis or Price engineered or orchestrated Mayopoulos's termination, much less because of anything he had said or would say about disclosure of Merrill's losses.[30] Nor do Plaintiffs explain why, if, as they allege, Price had successfully bullied Mayopoulos into accepting his view on November 20, he would not have been able to do so on December 9. Indeed, the SAC does not even allege that Price was aware that Mayopoulos wanted to speak with him or had concerns about the disclosure issue. Defs. Br. 34 & n.58. There is no allegation that Mayopoulos spoke with Price about his desire to meet; there is no allegation that Mayopoulos told anyone why he sought to meet with Price and there is no allegation that Price ever learned that Mayopoulos sought a meeting on disclosure issues or any other subject. Plaintiffs' only rejoinder is that someone must have told Price that Mayopoulos wanted to meet with him. Opp. 15 n.12. But they fail to cite any basis for this speculation. Mayopoulos's request for a meeting is alleged to have occurred two business days after the shareholder vote on one of the most important transactions in the Bank's history, the same day as a major Board meeting, three weeks before the close of the Merger, and in the midst of a severe economic crisis. Plaintiffs offer no reason to infer that if Price had been told that Mayopoulos wanted to meet, he would have assumed the reason would be to "confront" him about a disclosure issue.[31]

## II.     THE SAC DOES NOT IDENTIFY AN ACTIONABLE MISSTATEMENT OR OMISSION UNDER SECTION 10(b)

By its silence, the Opposition concedes that Section 10(b) liability will not lie for failing to

---

[30]     Plaintiffs offer no explanation for how Brian Moynihan's elevation to General Counsel after Mayopoulos's termination supports an inference that Mayopoulos was fired to prevent him from giving disclosure advice. Opp. 28. There are no allegations in the SAC that support the inference that Moynihan would be incapable of rendering disclosure advice (or seeking the input of outside counsel regarding disclosure advice) merely because he did not have an active bar membership. That Moynihan remains at the Bank today as CEO undermines any suggestion that his elevation was part of a cover-up; the Bank clearly had a desire to retain him.

[31]     Plaintiffs do not dispute that Judge Rakoff was "fully satisfied with the view of Mayopoulos's firing advanced by the Bank is supported by substantial evidence." Defs. Br. 34 n.58. While Plaintiffs respond that Judge Rakoff noted that "plausible" contrary inferences could also be drawn, Opp. 15 n.12, under the PSLRA inferences of scienter need to be cogent and compelling. See Defs. Br. 14-15 (quoting Tellabs, 551 U.S. at 324); see also August 27 Order at 84-85.

satisfy a filing obligation under Section 14(a) – even assuming Plaintiffs had adequately pled that Bank Defendants failed to satisfy their obligations under Section 14(a). Indeed, Plaintiffs do not cite a single case to support the notion that the failure to make a filing required by Section 14(a) supports Section 10(b) liability, and Bank Defendants are aware of no such case.

Plaintiffs do not identify a single statement by Bank Defendants that was false "when made." Defs. Br. 35 & n.60. Nor do they dispute that the PSLRA abolished any Section 10(b) duty to update, id. 36 n.63, or identify any "forward-looking" statement in the Proxy that would have remained "alive in the mind" of investors and would have required updating or correcting. Id. at 36. These are fatal concessions.

Under Rule 10b-5(b) and the PSLRA it is only unlawful to make actionable misstatements or misleading omissions.[32] But the SAC does not allege that the Proxy made any untrue statements of material fact regarding Merrill's fourth quarter losses or that it omitted any fact "necessary to make the statements made, in the light of the circumstances under which they were made, not misleading" – the Proxy was silent about Merrill's fourth quarter results and the Bank did not make any statements about Merrill's fourth quarter results after November 3. And, while some courts have identified a limited duty to speak under Section 10(b) when the defendant has made a statement that requires correction, Plaintiffs here have identified no such statements and thus no such Section 10(b) duty.

Plaintiffs instead rely on a series of non-sequiturs. First, they argue that the Court already held that there was an enforceable duty to disclose under Section 10(b). They are wrong. The Court held that Section 14(a) and Rule 14a-9 – not Section 10(b) – require the disclosure of the information based on the facts pleaded in the AC. But Section 14(a) and Section 10(b) create different duties and serve different purposes. As Plaintiffs concede, Section 14(a) was passed to

---

[32]     The PSLRA is explicit on this point. See 15 U.S.C. § 78u-4(b)(1) ("In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

protect shareholders entitled to vote on the corporate transaction, not buyers and sellers in the marketplace.[33] And, to that end, Rule 14a-9 requires that proxy solicitors "correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading," 17 C.F.R. § 240.14a-9 (emphasis added), and is not limited – as Rule 10b-5 is – to the making of any statement that is false and misleading when made. Indeed, that the SEC chose to create a limited duty to correct under Rule 14a-9 and at the same time chose not to do so under Rule 10b-5 demonstrates that it did not intend the duties under the two schemes to be co-extensive, further supporting the Bank Defendants' argument that there can be no Section 10(b) liability for an alleged failure to discharge a Section 14(a) filing requirement.[34]

Plaintiffs next argue that a duty to disclose arises under Section 10(b) where another statute or SEC regulation requires disclosure. Opp. 42. But, at most, each and every case they cite involved a statement that – when made by the defendant – was either false or misleadingly incomplete because it failed to include information a statute or rule required. In those cases, it may be argued that there is an implied representation that the form includes all the information required to be included and therefore the statement is false when made because the absence of information conveys the misleading impression that such information does not exist.[35] Here, by contrast, Bank

---

[33]     Opp. 47 (citing United Paperworks Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1197-98 (2d Cir. 1993)).

[34]     See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176-77 (1994) ("Congress knew how to impose aiding and abetting liability when it chose to do so [citing general criminal aiding and abetting statute]. . . . we presume it would have used the words 'aid' and 'abet' in the statutory text [of Section 10(b)]. But it did not."); Aaron v. SEC, 446 U.S. 680, 697-698 (1980) (finding the inclusion of a language requiring proof of scienter in Section 17(a)(1) of the 1933 Securities Act, compared with the exclusion of such language from Section 17(a)(2)-(3), to indicate that there was no scienter requirement under Sections 17(a)(2)-(3)).

[35]     See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 70 (2d Cir. 2001) (upholding Section 10(b) claim based on defendant failure to disclose trend information that was required under Item 303 of Regulation S-K); In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15, 37 (S.D.N.Y. 2004) (same).

        Plaintiffs also rely on In re Ames Dep't Stores Inc. Stock Litig., 991 F.2d 953, 963 (2d Cir. 1993), for the principle that a duty to disclose arises under Section 10(b) where another statute required such disclosure. But all Ames stands for is the principle that persons not entitled to recover under Section 11 of the Securities Act may recover under Section 10(b) based on the same misstatement or omissions where they are also able to show scienter. Indeed, consistent with Bank Defendants' argument, in Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992), cited by Plaintiffs, the Court dismissed plaintiffs' claims, finding that there was no duty to disclose because there was no

16

Defendants made no statement that was false or incomplete when made.

Plaintiffs also argue that material misstatements and omissions in a proxy statement violating Section 14(a) are always actionable under Section 10(b). That argument is exceptional only for what it does not state – in every case Plaintiffs cite the proxy statement is alleged to be false when made. Opp. 43. Plaintiffs do not cite one case where a defendant has been held liable under Section 10(b) for failing to update or correct a Section 14(a) filing.

Finally, Plaintiffs contend that the recognition of a Section 10(b) claim for the failure to satisfy a Section 14(a) filing requirement is consistent with the structure of the federal securities laws because those laws were enacted "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." Opp. at 43 (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972)). But those principles do not permit Section 10(b) to be extended beyond its existing bounds.[36] And Plaintiffs offer no reason to believe that Section 14(a) liability would not be sufficient to achieve a high standard of business ethics in the securities industry.

If anything, Plaintiffs' arguments highlight the inherent difficulties created by the rule they advocate. They contend that a company soliciting proxies is required to update the proxy "immediately" upon material information becoming "known after the issuance of a proxy," Opp. 44, and that the failure to engage in "immediate" and continuous updates can give rise to a claim not only for damages in favor of the company against the officers responsible for the proxy solicitation but also against the company in favor of each and every market participant who bought stock during

---

actionable misstatement and "the established view is that a 'duty to speak' must exist before the disclosure of material facts is required under Rule 10b-5" (internal quotation marks omitted).

[36]     See Aaron, 446 U.S. at 695 (noting that "'generalized references to the remedial purposes' of the securities laws 'will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit'" (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979) (quotation marks omitted)); see also Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc., 552 U.S. 148, 165 (2008) (stating that "the § 10(b) private right should not be extended beyond its present boundaries," in holding that a claim may not be stated based on allegations of deceptive acts outside the purchase or sale of securities); accord Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199-201 (1976); Cent. Bank, 511 U.S. at 179 (declining to extend private right of action under Section 10(b) to aiders and abettors and noting that a "survey of the express causes of action in the securities Act reveals that each (like § 10(b)) specifies the conduct for which defendants may be held liable").

17

the period before the proxy is updated.  That rule would be impossible to administer and would undermine Section 14's purpose.  As the allegations of this very case illustrate, a company with an outstanding proxy frequently comes into possession of material, non-public information – sometimes that information is about results, other times it is about products, it could even be about personnel.  In the case of Section 14, any duty is to a defined class whose potential damage claim is limited – only those persons eligible to vote can pursue a Section 14 claim, and indeed they would suffer no damages if they receive the information before exercising their vote.  By contrast, under Plaintiffs' Section 10(b) theory, a right would arguably lie in each and every person who purchases stock on each and every day the company is in possession of non-disclosed material information even if the company ultimately disclosed the information in advance of the shareholder vote and satisfied its duty to the Section 14(a) class.  Plaintiffs' bootstrapping would thereby create a new duty of continuous disclosure under Section 10(b).[37]  No precedent supports the existence of such a broadly-defined duty – and for good reason.  Such continuous reporting of changing and incomplete results would be confusing and misleading for shareholders and disruptive of the markets in which shares trade.[38]

## III.    THE JANUARY 2009 DISCLOSURE OF ADDITIONAL TARP ASSISTANCE DID NOT VIOLATE SECTION 10(B)

Relying on the obligation imposed by Form 8-K to disclose "material definitive agreements," Plaintiffs argued that the Bank had reached such an agreement with the government in late December which it accordingly had a duty under Section 10(b) to disclose.  AC Opp. 74-75.  The Court accepted that such an agreement had been reached then, August 27 Order at 74-75, but held that Plaintiffs had not established scienter.  Id. at 55-56.  The Court properly dismissed the claim.

---

[37]     See Shurkin v. Golden State Vintners, Inc., 303 Fed. App'x 431, 433 (9th Cir. 2008) (holding that the securities laws only require periodic, not continuous, disclosure); Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th Cir. 2007) ("The securities laws create a system of periodic rather than continual disclosures.").

[38]     Moreover, the failure of Plaintiffs to establish a duty to disclose under Section 10(b), or at the least, that such a duty is debatable, is an additional reason that Bank Defendants could not have consciously or recklessly ignored a "clear duty" to disclose.

**No duty**. The failure to file a document otherwise required by Form 8-K does not alone give rise to a violation of Section 10(b). 17 C.F.R. § 240.13a-11(c); Defs. Br. 41. Plaintiffs therefore cannot point to Form 8-K as the basis for a duty to disclose that gives rise to Section 10(b) liability.[39]   In the absence of that duty, Plaintiffs' claim fails as a matter of law.

Plaintiffs attempt to make one argument to fill this gap: they contend that Section 10(b) imposes a duty to disclose "other approaches" to reaching a previously disclosed corporate objective when they are "under active and serious consideration." Opp. 41 (quoting In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993)). This recycles an argument Plaintiffs made before that the Court rejected. Time Warner (the "outer limit of the line that separates disclosable plans from plans that need not be disclosed"[40]), is about the duty to update a prior statement. 9 F.3d at 267-68. Citing Time Warner, Plaintiffs previously argued that a series of statements had to be updated as a result of Merrill's fourth quarter financial performance. AC Opp. 42-47 (including that "BoA's highest executives had internally debated terminating the merger precisely because Merrill had suffered a MAC," id. at 46). The Court held otherwise, August 27 Order at 70-72, and Plaintiffs identify no statement (much less one the Court has not already rejected) as requiring updating by reason of the additional TARP agreement.

Time Warner is also inapposite for a second reason. The Circuit suggested that disclosure might be required (the case was remanded) because Time Warner "publicly hyped strategic alliances" as its solution to its debt problem, 9 F.3d at 268 – "thereby inducing investors to believe that alternatives were excluded,"[41] – when in fact Time Warner had secretly decided to sell securities through a rights offering, and subsequently did so. While the Bank did consider its right to declare a MAC, Plaintiffs no longer contend that Section 10(b) required disclosure of the mere

---

[39]     The defense did not previously bring this safe harbor to the Court's attention. Opp. 40. Nor did Plaintiffs, even as they urged a result that the safe harbor foreclosed.

[40]     San Leandro, 75 F.3d at 810.

[41]     San Leandro, 75 F.3d at 810 (emphasis added).

19

consideration of that rejected option.[42]  Instead, they argue the Bank had to disclose the additional

TARP agreement – an agreement that was consistent with, indeed, dependent upon, closing the

Merger.  And there is no dispute that the Bank pursued to closure its planned merger with Merrill; it

did not abandon that plan, much less "exclude" taking steps that would facilitate completing it.  The

additional TARP agreement was thus the antithesis of the "sharp break" from the strategic alliance

solution Time Warner's rights offering signaled.[43]

**No scienter.**  The AC failed because it did not plead a "strong inference" of scienter; it did

not cogently allege that the Bank had a fraudulent motive to disclose the additional TARP

agreement in January rather than December.  August 27 Order at 77, 97-99; September 16 Order at

2.  The SAC similarly fails to plead the requisite "strong inference" of scienter.

First, Plaintiffs argue the Bank was so blindly determined that it withheld disclosure of the

TARP agreement to prevent the Merger from "f[a]ll[ing] apart."  Opp. 36.  This is the SAC's

scienter cornerstone, and it is hollow.  Plaintiffs do not deny that, following the December 5

shareholder vote, the Merger Agreement provided only one relevant basis to prevent a closing –

declaring a MAC.  Defs. Br. 42.  Unable to explain how disclosing a TARP agreement with the

government would have prevented the Merger from closing, Plaintiffs just assume the conclusion

by lifting the phrase "fell apart" from an email from one Wachtell litigator (charged with mounting

a MAC case) to other litigators about points to add to a litigation "checklist," and then twisting the

phrase out of context.  This emailed "checklist" point uses the term "fell apart" in the context of

describing the possible consequences to Merrill if the Bank declared a MAC.  See Defs. Br. 45 &

n.83; id. 18-19 (explaining facts relevant to invoking a MAC); Park Supp. Decl. Ex. 5.  Indeed, the

email says literally nothing about a TARP agreement, and given its subject – the consequences of

declaring a MAC – presupposes that there would be no such TARP agreement, since the additional

---

42      The Court also dismissed Plaintiffs' claims based upon the Bank's MAC considerations.  August 27 Order at
61-62.

43      See DeCicco v. United Rentals, Inc., 602 F. Supp. 2d 325, 344 (D. Conn. 2009) (disclosure required under
Section 10(b) where there is a "significant change" that constitutes a "sharp break from prior public positions")
(quotation omitted).

TARP assistance was provided to enable the Merger to close by avoiding the declaration of a MAC. Plaintiffs do not respond to any of these points. Nor do they explain how private email communications between Wachtell litigators could be imputed to Lewis or Price.[44]

While the Plaintiffs' argument thus falls of its own weight, it is dependent upon a false construction of the SAC. Plaintiffs recognize the impossibly conflicting allegations that, on the one hand, Bank Defendants intentionally withheld disclosure of the TARP agreement to prevent the Merger from "falling apart" but on the other were pursuing invoking the MAC to achieve that very purpose. Defs. Br. 42-44. Unable to reconcile this conflict, Plaintiffs protest that the "SAC does not allege that Lewis and Price 'wanted' to invoke the MAC and terminate the merger." Opp. 37 (emphasis omitted). But the SAC explicitly says otherwise. See supra n.7. Indeed, Section L of the SAC's Overview is entitled "Lewis Secretly Decides to Invoke the MAC and Terminate The Deal," and the SAC specifically pleads that the intensity of the discussions between Lewis and Secretary Paulson about invoking the MAC led the latter to threaten to remove the Bank's management if it did so. SAC ¶ 154; Defs. Br. 43 n.78.

Second, Plaintiffs struggle to explain why the few weeks' difference between when disclosure of the TARP agreement was made and when Plaintiffs allege it should have been can only be explained by intent to defraud. Opp. 38-40. Lewis's October 2008 statement that he had long sought for the Bank to acquire Merrill – not because of some concrete and personal benefit to him, but because of the benefit Merrill would convey to the Bank – hardly constitutes a "strong

---

[44]    Instead, Plaintiffs complain that Bank Defendants do "not substantively address" their reference to a December 22 email to Board members where Lewis allegedly said that "we do not want" disclosure of a TARP agreement. Opp. 36. But the Court has already rejected this allegation as inadequate to establish scienter. August 27 Order at 97-99. Plaintiffs' representation that Bank Defendants asserted that the TARP agreement was withheld on Secretary Paulson's instructions is equally unfair. Opp. 37. As the Court's August 27 Order makes clear, that was Plaintiffs' allegation, and it was insufficient to establish scienter. August 27 Order at 97-99. Plaintiffs try to resurrect this claim by contending that Lewis lied to the NYAG about Paulson's alleged instruction. Opp. 37. Notably, Plaintiffs have the full transcript, and despite their PSLRA obligations pointedly fail to cite any such testimony in the SAC, or produce it on this Motion. Defs. Br. 47. Instead, the SAC solely cites to the NYAG's characterization of it. SAC ¶ 254. For the reasons this Court has explained at length, that violates Rule 12(f) and is inadequate as a matter of law. Defs. Br. 46-47 (citing Footbridge Ltd. Trust v. Countrywide Home Loans, Inc., No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010). Moreover, using Lewis's own testimony, Bank Defendants established that the NYAG had misdescribed it. Defs. Br. 46-47; Park Decl. Ex. 27 at 2. Tellingly, Plaintiffs offer no response.

inference" of scienter. And, as with the AC, the SAC contains "no allegations of personal gain derived from the federal funds [provided by the TARP agreement], or a violation of a statute or regulation in a 'highly unreasonable' manner." August 27 Order at 99. Even if disclosure of the TARP agreement would, as Plaintiffs contend, have "disrupted" the Merger's closing,[45] that does not come close to establishing the "personal financial gain" necessary. See supra p. 4. Moreover, assuming, as Plaintiffs do, that terminating the Merger was in the shareholders' best interests, Lewis beneficially owned nearly 5 million shares of the Bank's stock, Defs. Br. 17 n.28; his personal financial interests were thus powerfully associated with those of other Bank shareholders.[46]

Plaintiffs also offer no explanation how disclosure of the TARP agreement would have led to the termination of the Merger, and there is no allegation that the Bank believed it would. Instead, Plaintiffs argue – without citation to the SAC, or explanation – that disclosure of the TARP agreement "would in turn have led to disclosure of Merrill's losses." Opp. 39. This is sheer ipse dixit, and far below what a pleading subject to the heightened standards of the PLSRA and Rule 9(b) must meet. To make the allegation appear to have substance, Plaintiffs contend that "Wachtell" recognized this would happen. Opp. 39. But the reference is to the "fell apart" email, SAC ¶ 171, which refers to the possible effect the Bank declaring a MAC on Merrill; it says nothing about a TARP agreement, let alone the effect disclosure of one would have – and decidedly do not, even remotely, suggest that "BoA shareholders [would] file suit to enjoin the merger." Opp. 39.

As the Court noted in its September 16 Order (at 1), Plaintiffs gave "a cramped reading to th[e] Court's ruling [in its August 27 Order] on the absence of a plausible allegation of scienter as to the so-called federal bailout." The SAC, and the actual content of the source documents that are integral to it, still contain no "cogent and compelling" inference of scienter. 15 U.S.C. § 78u-

---

[45]    Notably, however, there is no well-pleaded allegation that it would have. Defs. Br. 46 n.85.

[46]    Plaintiffs belittle this objective fact by contending that Lewis and Price were restricted as to when they could sell their shares. Opp. 39 n.42. This is a truism of all corporate insiders, and inadequate as a matter of law and logic to create a conflict between their interests and those of fellow shareholders. Indeed, if anything, that Lewis and Price could not freely sell their shares would have given them greater motivation to disclose adverse facts if they thought that the Merger was not in the Bank's interest – so that other shareholders could vote it down – rather than withholding those facts and suffering a personal loss on their own significant investment in the Bank. Defs. Br. 17.

4(b)(2); September 16 Order at 2.  In addition, Plaintiffs also fail to show a Section 10(b) duty to disclose the TARP agreement.  For these two separate and independent reasons, the SAC's allegations about the TARP agreement fail to state a Section 10(b) claim.

## IV.    THE NEW PLAINTIFF CLASSES FAIL TO ASSERT A CLAIM FOR RELIEF AND LACK STANDING TO ASSERT CLASS CLAIMS

Standing is a threshold question that cannot be waived,[47] and which Plaintiffs shoulder the burden of establishing.[48]  They fail to do so.

The sole identified plaintiff that purchased any preferred shares, Ohio PERS, fails to state a claim as a matter of law.  Defs. Br. 47-48.  Apart from one series, the named plaintiffs who owned debt securities fail to state a claim as a matter of law.  Defs. Br. 49-50.  There is no dispute, therefore, that these preferred and debt claims must be dismissed.

Plaintiffs nevertheless contend that they can pursue Exchange Act claims on behalf of holders of 22 series of preferred shares, 20 bond series and options they do not even bother to catalogue because (1) they have brought a "class action" and (2) the legal theories of the identified plaintiffs, who bought other securities, are the same as those absent parties whose rights Plaintiffs were to unilaterally champion.  The Supreme Court has decidedly rejected the former, see Defs. Br. 48, and the latter is decidedly wrong.

Plaintiffs plainly confuse the Rule 23 typicality requirement with standing.  In doing so, they principally rely on In re American International Group, Inc. Securities Litigation, 265 F.R.D. 157 (S.D.N.Y. 2010).  See Opp. 46.  But they omit AIG's analysis, including the following apt statement of the law:

> There is conflicting case law in the Second Circuit on whether a court may certify a class of purchasers of a security or fund that was not also purchased by the Lead Plaintiffs.  However, the most recent cases, which have addressed this question as one of standing rather than under the Rule 23 requirements, have found that where purported class representatives "bought only . . . ordinary shares as opposed to debt .

---

[47]     FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31 (1990).

[48]     Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

. . they lack standing to bring claims on behalf of those class members who
purchased . . . debt notwithstanding the allegations that the same general course of
conduct allegedly engaged in by defendants caused injury to all putative class
members."[49]

Rather than take issue with the many cases from within this Circuit that reject their standing

construct, Plaintiffs write them off wholesale as "inapposite" because "they do not involve a

common course of conduct." Opp. at 48. This distinction cannot be squared with those cases.

Judge Sand, for example, could not have been clearer when he held that plaintiffs have no standing

to act for purchasers of other securities even when they assert "a single course of wrongful

conduct," and specifically rejected a Rule 23 "typicality" analysis as a standing proxy.[50]

Plaintiffs thus have no standing to pursue claims on behalf of holders of securities that they

did not own, as King County, Wash. v. IKB Deutsche Industriebank AG, Nos. 09 Civ. 8387, 09

Civ. 8822, 2010 WL 2010943, at *1-2 (S.D.N.Y. May 18, 2010), pointedly makes clear. There

Judge Scheindlin dismissed on standing grounds Section 10(b) claims that purchasers of U.S. notes

sought to assert on behalf of purchasers of European notes, even though the claims of both sets of

note holders relied on the same facts and legal theories. The Bank Defendants relied upon IKB in

the opening papers, Defs. Br. 48-49; Plaintiffs ignore it. Abu Dhabi Commercial Bank v. Morgan

---

[49]   In re AIG, 265 F.R.D. at 165 (quoting In re Parmalat Sec. Litig., No. 04-MD-1653, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21, 2008)).

[50]   Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 531-32 (S.D.N.Y. 2008). Judge Kaplan was equally plain: even though plaintiffs contended that offering documents for securities they purchased had the same "misstatements and omissions" as offering documents for others that they did not purchase, plaintiffs suffered no "injury from the offerings in which they did not purchase and thus have no standing" to assert claims on behalf of those other purchasers. In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010); see also In re IndyMac Mortgage-Backed Sec. Litig., 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010); Gunther v. Capital One, N.A., 703 F. Supp. 2d 264, 274 (E.D.N.Y. 2010); Public Emp. Ret. Sys. v. Merrill Lynch & Co., Inc., 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010).

Further, courts in this district and elsewhere have held that a lead plaintiff does not have standing to assert claims on behalf of class members who purchased other securities that the purported class representative did not purchase, specifically in the context of Section 10(b) claims. Parmalat, 2008 WL 2895539, at *3 ("The [class representatives], moreover, during the Class Period bought only Parmalat ordinary shares, as opposed to debt. Accordingly, they lack standing to bring claims on behalf of those class members who purchased Parmalat debt notwithstanding the allegations that the same general course of conduct allegedly engaged in by defendants caused injury to all putative class members." (citing In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 497 (S.D.N.Y. 2004))). See also In re Enron Corp. Sec., Derivative & "ERISA" Litig., 529 F. Supp. 2d 644, 724 (S.D. Tex. 2006) (dismissing Securities Act § 12(a)(2) and Exchange Act § 10(b) claims as to foreign debt securities for lack of standing where no named plaintiff purchased those securities).

Stanley & Co., 651 F. Supp. 2d 155 (S.D.N.Y. 2009), also underscores this point. There, plaintiffs contended that their ownership of a subset of the securities at issue gave them standing to assert the claims of others, so "long as [they] alleged a single course of wrongful conduct with regard to each security."[51]  But that argument "misse[d] the mark" because to have standing "one of the named plaintiffs must have purchased [each of the] securities" plaintiffs seek to represent on a class basis.[52]

Finally, Plaintiffs argue standing should be given different meaning when it comes to Section 14(a) claims. Opp. at 47-48.  But the requirement here is a constitutional one – not statutory.  Bank Defendants do not contest the standing of Lead Plaintiffs to assert Section 14(a) claims on behalf of owners of common stock – and Plaintiffs do not dispute that there is no named plaintiff who purchased the only series of preferred shares (Series B) that had voting rights.  The law is now clear that simply asserting the same alleged wrong is a decidedly insufficient basis on which to confer standing,[53] and not surprisingly Plaintiffs cite to no authority holding otherwise in the Section 14(a) context.  Indeed, the authorities Plaintiffs cite do not even address whether holders of one type of security have standing to pursue claims under Section 14(a) on behalf of holders of another.

## CONCLUSION

For the foregoing reasons, the Court should grant Bank Defendants' Motion to Dismiss.

---

[51]     Id. at 174 (quotation omitted).

[52]     Id. at 174-75.  The only decisions from this District (or from within this Circuit) Plaintiffs cite are a pre-Kings County decision by Judge Scheindlin, Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc. No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005), when only "[v]ery few courts ha[d] addressed the [standing] issue," id. at *7, and Judge Baer's decision in In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009), which it appears he has reconsidered, see New Jersey Carpenters Health Fund v. Residential Capital, LLC, No. 08 Civ. 8781, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) (Baer, J.) ("[A] plaintiff must have purchased in the particular offering in order to have standing to challenge related material misstatements and omissions.").

[53]     See Lewis v. Casey, 518 U.S. 343, 357 (1996).

CLEARY GOTTLIEB STEEN & HAMILTON    WACHTELL, LIPTON, ROSEN & KATZ
LLP

By _____    By _____ /s/ Peter C. Hein _____

Mitchell A. Lowenthal              Peter C. Hein
Lewis J. Liman                     Eric M. Roth
One Liberty Plaza                  51 West 52nd Street
New York, NY 10006                 New York, NY 10019
Phone: (212) 225-2000              Phone: (212) 403-1000
Fax: (212) 225-3999                Fax: (212) 403-2000
Email: mlowenthal@cgsh.com         Email: pchein@wlrk.com
Email: lliman@cgsh.com             Email: emroth@wlrk.com

*Attorneys for Bank of America Corporation,
Kenneth D. Lewis, Joe L. Price, Neil A. Cotty,
William Barnet III, Frank P. Bramble, John T.
Collins, Gary L. Countryman, Tommy R. Franks,
Charles K. Gifford, Monica C. Lozano, Walter E.
Massey, Thomas J. May, Patricia E. Mitchell,
Thomas M. Ryan, O. Temple Sloan, Jr., Meredith
R. Spangler, Robert L. Tillman, Jackie M. Ward,
and Banc of America Securities LLC*

Dated: New York, New York
January 28, 2011