UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE: BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME            Master File No. 09 MD 2058 (PKC)
SECURITY ACT (ERISA) LITIGATION
------------------------------------------------------------x    MEMORANDUM AND ORDER
THIS DOCUMENT RELATES TO:

CONSOLIDATED SECURITIES ACTION
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

   Plaintiffs assert that the defendants, including Bank of America Corporation

("BofA"), are liable for a series of misstatements and omissions related to BofA's acquisition of

Merrill Lynch & Co., Inc. ("Merrill"). On August 27, 2010, this Court issued a Memorandum

and Order that granted in part and denied in part three motions to dismiss filed by the defendants.

See In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig., 757

F. Supp. 2d 260 (S.D.N.Y. 2010) (the "2010 Opinion"), reconsideration denied, 2010 WL

4237304 (S.D.N.Y. Oct. 8, 2010).

   The 2010 Opinion concluded that the plaintiffs successfully alleged claims under

the federal securities laws, but dismissed certain discrete claims, including claims brought

pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. §

78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, insofar as they were

directed to (a) defendants' alleged failure to disclose losses that Merrill incurred in the fourth

quarter of 2008, and (b) defendants' non-disclosure of federal financial assistance made to BofA

for the purpose of facilitating the Merrill transaction. 757 F. Supp. 2d at 325-28. In granting

these portions of the defendants' motions, the Court concluded that plaintiffs had not alleged

scienter consistent with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4

(the "PSLRA"), and the law of this Circuit.  The plaintiffs' Section 10(b) and Rule 10b-5 claim survived to the extent that it was premised on material misstatements related to Merrill's employee bonus pool.  757 F. Supp. 2d at 295-300, 322-24.

Plaintiffs thereafter filed a Consolidated Second Amended Class Action Complaint (the "Complaint").  (Docket # 363.)  The Complaint's amendments purport to cure the plaintiffs' inadequate scienter allegations.  Plaintiffs also assert claims on behalf of new categories of BofA securities owners.  BofA and its defendant officers and directors (the "BofA Defendants") have filed a motion to dismiss.[1]  (Docket # 369.)  Defendants John A. Thain, Merrill and Merrill Lynch, Pierce, Fenner & Smith Incorporated join in the motion and rely in full on BofA's submissions.  (Docket # 372, 373.)

The present motion is primarily directed to Count I of the Complaint.  Count I asserts violations of Section 10(b) and Rule 10b-5 against BofA, its former Chief Executive Officer Kenneth D. Lewis and its former Chief Financial Officer Joe L. Price.  (Compl. ¶¶ 297-309.)  It alleges that BofA, Lewis and Price did not adequately disclose Merrill's deteriorating financial condition in the fourth quarter of 2008.  (Compl. ¶¶ 297-309.)  It also alleges that the same three defendants failed to disclose the federal government's financial support to BofA, which allegedly was made in order to facilitate the Merrill transaction.  (Compl. ¶¶ 299-300, 303-05, 307-09.)  The defendants argue that the claims should be dismissed because the Complaint does not allege actionable omissions or a strong inference of scienter.  Separately, the defendants contend that the class plaintiffs do not have Article III standing to assert claims on behalf of certain categories of BofA securities owners.

---

[1] The BofA Defendants include Bank of America, Kenneth D. Lewis, Joe L. Price, Neil A. Cotty, William Barnet III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward.  (Compl. ¶¶ 37, 39-41, 43-57.)

- 3 -

For the reasons explained, the defendants' motion to dismiss is granted in part, but denied as to plaintiffs' Section 10(b) and Rule 10b-5 claims arising out of Merrill's losses in the fourth quarter of 2008.

BACKGROUND

For the purposes of this motion, all non-conclusory factual allegations are accepted as true, see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949–50 (2009), and all reasonable inferences are drawn in favor of the plaintiffs. See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). I incorporate and apply the pleading standards for the PSLRA and Rule 9(b) as set forth in the 2010 Opinion. 757 F. Supp. 2d at 285-86, 289, 320-21.[2]

The 2010 Opinion summarized the plaintiffs' allegations and theories of liability. I briefly recount them here.

The plaintiffs bring claims individually and on behalf of those who purchased BofA's publicly traded common stock, preferred shares, debt securities and/or call options between September 18, 2008 and January 21, 2009. (Compl. ¶ 1.) According to the plaintiffs, the defendants misrepresented or omitted material information about Merrill's financial condition and the terms of BofA's acquisition of Merrill.[3]

---

[2] Defendants argue that the plaintiffs should be held to a pleading standard even more exacting than the PSLRA, since the plaintiffs have had access to discovery in other actions. It is true that in Billard v. Rockwell Int'l Corp., 683 F.2d 51, 57 (2d Cir. 1982), a '34 Act case, the Second Circuit held that Rule 9(b) "require[s] greater precision . . . when full discovery has been had in a prior case." Billard pre-dates the PSLRA's enactment, however, and apparently has never been applied for the principle that defendants advance. Billard, moreover, noted a failure to set forth "any supporting detail" as to the fraud claim, a pleading failure that would be critical to any application of the PSLRA and Rule 9(b). I therefore scrutinize the Complaint consistent with the PSLRA and Rule 9(b), and not some higher pleading standard.

[3] In addition to claims under Section 10(b) and Rule 10b-5, the plaintiffs assert that defendants violated Section 14(a) of the '34 Act and Rule 14a-9 promulgated thereunder, 15 U.S.C. § 78n(a)(1) & 17 C.F.R. § 240.14a-9(a), Section 20(a) of the '34 Act, 15 U.S.C § 78t(a), and sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2) & 77o. As discussed in the 2010 Opinion, Section 14(a) and Rule 14a-9 govern disclosure obligations as to the contents of proxy statements. 757 F. Supp. 2d at 289-91 (summarizing Section 14(a) and Rule 14a-9). Certain of the alleged misrepresentations and omissions that plaintiffs claim violated Section 10(b) and Rule 10b-5 are also claimed to have violated Section 14(a) and Rule 14a-9. See, e.g., id. at 295-300, 303-07 (discussing

- 4 -

The defendants' motion revisits two areas discussed at length in the 2010 Opinion. The first relates to extensive losses that Merrill incurred during the fourth quarter of 2008. Between the acquisition's announcement and its consummation, Merrill's quarterly pre-tax losses totaled $21 billion. (Compl. ¶ 173.) According to the Complaint, BofA officers had contemporaneous knowledge of Merrill's losses but elected not to disclose the losses to shareholders until January 16, 2009, by which point, BofA shareholders had already approved the Merrill transaction, and the acquisition had been finalized. (See, e.g., Compl. ¶¶ 101-02, 112, 118-27, 181.) The Complaint asserts that BofA officers were aware of a significant disparity between the market's favorable perceptions of Merrill's value and the truth of its deteriorating finances. (Compl. ¶¶ 166-72.) According to plaintiffs, the defendants violated Section 10(b) and Rule 10b-5 by not disclosing the Merrill losses to shareholders.

The 2010 Opinion concluded that the plaintiffs adequately alleged that Merrill's fourth-quarter losses constituted material omissions. 757 F. Supp. 2d at 303-07. At the same time, it concluded that plaintiffs failed to allege facts satisfying the scienter requirements of the PSLRA and the Second Circuit's interpretation of Rule 9(b), Fed. R. Civ. P. Id. at 325-26. The Court noted that in past public filings, BofA had acknowledged a perilous environment in the financial markets. Id. Also, while Merrill's losses were material, the plaintiffs had not alleged that their non-disclosure amounted to a departure from ordinary care sufficiently extreme to satisfy the recklessness standard of scienter. Id. As a consequence, the Court dismissed plaintiffs' Section 10(b) and Rule 10b-5 claim, to the extent that it was premised on omissions relating to Merrill's fourth-quarter results. Id.[4]

---

allegations as to Merrill's bonus pool and losses). This Memorandum and Order does not revisit the claims that survived the previous motion to dismiss.

[4] The 2010 Opinion concluded that the plaintiffs alleged a violation of Section 14(a) and Rule 14a-9, as Section 14(a) required the plaintiffs to allege negligence consistent with Rule 8 and not scienter consistent with Rule 9(b)

A second issue raised in the pending motion relates to federal financial support for BofA's acquisition of Merrill.  According to the Complaint, after BofA shareholders approved the transaction, Lewis began to question whether BofA could absorb Merrill's losses, and contemplated invoking a Material Adverse Change clause, which allowed BofA a conditional basis to terminate the transaction.  (Compl. ¶ 144.)  Lewis communicated his concerns about Merrill's deteriorating finances to Treasury Secretary Henry Paulson, and a series of meetings and discussions followed between BofA officers, officials of the Treasury Department ("Treasury") and officials of the Federal Reserve (the "Fed").  (Compl. ¶¶ 144-50, 152-65.)  According to the Complaint, officials at Treasury and the Fed strongly urged BofA to complete the acquisition, arguing that any other action would undermine investor confidence in BofA and Merrill.  (Compl. ¶¶ 146, 153-54.)

BofA then received what plaintiffs characterize as "a $138 billion taxpayer bailout" amounting to "a $20 billion capital infusion in exchange for a sale of preferred stock" and a $118 billion guarantee against losses on high-risk assets, most of which originated with Merrill.  (Compl. ¶ 160.)  The "bailout" was negotiated after the shareholder vote approving BofA's acquisition of Merrill.  (Compl. ¶ 12.)  According to the Complaint, at Lewis's direction, BofA did not publicly disclose federal financial support contemporaneous with its acceptance of the assistance; instead, BofA disclosed it at the time it announced fourth-quarter earnings. (Compl. ¶¶ 162, 164-65, 172.)  Plaintiffs allege that ratings agencies and analysts incorrectly perceived BofA as one of the few major financial institutions that did not need federal assistance, and, as a result, concluded that BofA was uniquely positioned to survive the difficult economic environment.  (Compl. ¶ 168.)

---

and the PSLRA.  757 F. Supp. 2d at 320-22, 326.  This Memorandum and Order does not address any Section 14(a) claim.

- 6 -

As with Merrill's fourth-quarter losses, the 2010 Opinion concluded that the Complaint adequately alleged material omissions as to BofA's receipt of federal financial assistance, but that the Complaint did not adequately allege scienter. 757 F. Supp. 2d at 314-16, 327-28. The plaintiffs had not alleged that any defendant personally benefited from the non-disclosure, and failed to sufficiently allege either motive or recklessness in delaying the disclosure to the end of the quarter. Id. at 327-28.

DISCUSSION

> I.    On the Issue of Merrill's Fourth Quarter Losses, the Complaint Raises a Strong Inference of Recklessness.

Although the Complaint's amendments and the motion are primarily directed toward whether defendants recklessly omitted information that they were obligated to disclose, plaintiffs also contend that defendants had a motive to commit securities fraud. Before discussing the recklessness allegations, I note that plaintiffs have not alleged motivations consistent with the scienter standard as set forth by the PSLRA and the Second Circuit.

According to plaintiffs, Lewis was "drooling" at the opportunity to acquire Merrill, and viewed the transaction as the realization of a long-time business goal. (Compl. ¶ 63.) Plaintiffs also contend that Lewis "was highly motivated to ensure that he maintained his position as BoA's CEO" after Paulson "bluntly told Lewis that the Federal Reserve would remove BoA's senior management if it tried to terminate the transaction." (Compl. ¶¶ 154, 252.) The foregoing, according to plaintiffs, provided the motivation for not disclosing fourth quarter losses prior to the quarter's conclusion.

These motivations for delaying disclosure to the end of the quarter do not raise a strong inference of scienter. There is no allegation that Lewis or Price could have personally profited from either the delay or the closure of the Merrill transaction. See, e.g., ECA, Local 134

IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009); see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100 (2d Cir. 2001) ("To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize 'concrete benefits' through the deception."); Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000) (same).  A long-held motivation to acquire Merrill because of its size, history and prestige is a business goal, which does not support an inference of scienter.  Chill v. Gen'l Elec. Co., 101 F.3d 263, 267-68 (2d Cir. 1996) (scienter not supported by the motive "to maintain the appearance of corporate profitability, or of the success of an investment . . . ."); San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 813-14 (2d Cir. 1996) (rejecting motive of maintaining high bond and credit ratings).  Similarly, Paulson's threat to direct the termination of BofA's management, at most, provides a motive to "prolong the benefits of holding corporate office," which is insufficient to support an inference of scienter.  Novak, 216 F.3d at 307.

The Complaint fails to raise a strong inference that the defendants had a motive to commit securities fraud.

Plaintiffs may, however, allege scienter if the Complaint sufficiently alleges that the defendants engaged in "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care."  ECA, Local 134, 553 F.3d at 202-03.  In a securities fraud case, "reckless disregard for the truth" means "conscious recklessness," which is "a state of mind approximating actual intent, and not merely a heightened form of negligence."  S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original; quotation marks omitted).  Examples of recklessness include plausible allegations that the defendants "'knew facts or had access to information suggesting that their public statements were not

accurate'" or "'failed to check information they had a duty to monitor.'"  Teamsters Local 445

Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (quoting

Novak, 216 F.3d at 311)..

According to the plaintiffs, as the fourth quarter of 2008 progressed, Price

provided BofA's general counsel with partial and inaccurate information about Merrill's losses,

in hopes of eliciting a legal conclusion that BofA was not required to disclose those losses.  In

essence, plaintiffs contend, Price misled BofA's own attorneys so that they would advise against

disclosure.  Meanwhile, the Complaint depicts Lewis, then BofA's chief executive, as

disengaged from the disclosure issue and failing to act with diligence.  By contrast, defendants

argue that they were dealing with tentative, "soft" numbers, conferring with counsel in good

faith, and had no reasonable basis to conclude that disclosure was required.

For the reasons explained, defendants' motion is denied.

### A.  The Complaint Alleges Recklessness as to Price.

Plaintiff's scienter allegations concerning Price are directed to his knowledge of

Merrill's losses, his understanding of BofA's disclosure obligations and the extent to which he

was forthright with BofA counsel as to Merrill's losses.

According to the Complaint, Price had contemporaneous knowledge of Merrill's

fourth-quarter results.  On November 12, Price and Neal A. Cotty[5] received a report setting

Merrill's October before-tax losses at $7.536 billion and estimating that the quarter's after-tax

losses would total $5.4 billion, or $8.9 billion before taxes.  (Compl. ¶ 102.)  On that same day,

Price told BofA's general counsel, Timothy Mayopoulos, that Merrill expected to incur $5

---

[5] Cotty is a defendant in this action, but is not alleged to have violated Section 10(b) and Rule 10b-5.  Prior to the announcement of the Merrill transaction, he was BofA's Chief Accounting Officer, and was subsequently appointed Merrill's interim CFO, where he "acted as a direct liaison of BoA, including Lewis and Price, and Merrill."  (Compl. ¶ 41.)

billion in after-tax losses for the quarter.  (Compl. ¶ 103.)  Mayopoulos testified that, at that point, he told Price that "$5 billion is a lot of money," and that "a disclosure is likely warranted." (Compl. ¶103.)  Price also has testified that the initial figure "prompted me to ask the disclosure question."  (Compl. ¶ 102.)

For both plaintiffs and defendants, this November 12 conversation between Price and Mayopoulos is pivotal to the scienter issue.  At that point, Price knew that Mayopoulos was disposed toward disclosing a loss totaling $5 billion for the quarter.  According to plaintiffs, this conversation shows that Price knew that disclosure would likely be required.  For the defendants, the conversation shows that Price informed counsel about Merrill's recent results, and then acted in good-faith reliance on counsel.

In the weeks that followed, Price continued to receive updates about the losses at Merrill.  According to the Complaint, on November 16, Price e-mailed Cotty stating that Merrill's pre-tax losses would now total $10.492 billion for the quarter, not including an additional $2 billion impairment writedown to Merrill's goodwill.  (Compl. ¶ 112.)  On December 1, Cotty e-mailed Price stating that the combined losses for October and November had grown to $12.7 billion before taxes, with an additional loss of $1 billion forecast for December.  (Compl. ¶ 120.)  On December 3, a meeting took place between Lewis, Cotty, Price and Thain.  (Compl. ¶ 124.)  In what Cotty later described as a "very somber environment," Cotty announced that Merrill's losses would be "billions of dollars" more than previously forecast.  (Compl. ¶ 124.)  Lewis and Price then circulated a loss report, titled "2008 4Q Pacing & FY Forecast Scenario," that described a $4.9 billion loss for November and stated that the quarterly losses would total more than $14 billion, amounting to $9 billion after taxes.  (Compl. ¶¶ 124-25.)

While Price and others in BofA management reviewed the scope of Merrill's losses, Mayopoulos and outside counsel at Wachtell, Lipton, Rosen & Katz ("Wachtell") were evaluating the extent of BofA's disclosure obligations.  Mayopoulos conferred with Wachtell on November 12 and 13.  (Compl. ¶¶ 104-09.)  Mayopoulos later testified, "I communicated to Wachtell that I believed my initial assessment was that a disclosure was warranted."[6]  (Compl. ¶ 108.)  The notes of Eric Roth, a Wachtell attorney, include the statements, "all agree must be some discl", "consensus – 11/28!" and "week before sh. Meeting."  (Compl. ¶ 109.)

A second meeting between Price and Mayopoulos occurred on November 18.  (Compl. ¶ 113.)  At that time, Price did not inform Mayopoulos of the revised fourth-quarter loss estimates, which, at that point, had grown from $8.9 billion to $13 billion for the quarter, before taxes.  (Compl. ¶ 113.)  Among other things, Price and Mayopoulos discussed whether disclosure of the losses would prompt shareholders to vote against the transaction.  (Compl. ¶ 113.)  Two days later, on November 20, Price and Mayopoulos agreed that BofA would not disclose Merrill's losses.  (Compl. ¶ 114.)  Mayopoulos testified that at this time, he still believed losses would total $8.9 billion before taxes and $5 billion after taxes.  (Compl. ¶ 114.)  Price and Mayopoulos also spoke jointly with outside counsel at Wachtell.  (Compl. ¶ 114.)  Again, Price made no mention of the revised Merrill loss figures.  (Compl. ¶¶ 114-15.)

Price and Mayopoulos met again on December 3.  (Compl. ¶ 127.)  Price informed him of revisions to Merrill's loss totals.  (Compl. ¶ 127.)  Plaintiffs allege that at this point, Price knew that Merrill's losses would total $10.5 billion after taxes, but he told Mayopoulos that they would total only $7 billion after taxes.  (Compl. ¶ 127.)  According to the

---

[6] Testimony and documents quoted in the body of the Complaint are properly considered on this motion to dismiss.  See, e.g., DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  Of course, plaintiffs need not prove that they have a claim; they need only allege a plausible claim.  Plaintiffs' allegations of the content of testimony are accepted as true and all reasonable inferences are drawn in their favor as the non-movants.

- 11 -

Complaint, Mayopoulos believed that because this loss was in the same range as recent quarterly losses experienced by Merrill, disclosure was not required.[7]  (Compl. ¶ 127.)  Mayopoulos did not learn of the higher loss figures until December 9, when Price made a presentation to the BofA board with Mayopoulos in attendance, at which point Price announced pre-tax losses of $14 billion (or $9 billion after taxes) not including an additional $2 billion writedown to Merrill's goodwill value.  (Compl. ¶ 139.)  Mayopoulos later testified that he was "surprised" by the loss figure, given his then-understanding of the numbers.  (Compl. ¶ 140.)

Following the board meeting, Mayopoulos attempted to speak with Price about the revised loss figure, "why it's changed" and "what does it mean with respect to whether we should make a disclosure or not."  (Compl. ¶ 140.)  The next morning, before he reached Price, Mayopoulos was "terminated without explanation," and escorted from BofA headquarters.  (Compl. ¶ 141.)  Mayopoulos later testified to Congress that he "was stunned" by the termination, was not subsequently contacted by BofA to discuss any ongoing legal matters, and that he remains unaware of the basis for his termination.  (Compl. ¶ 142.)

As additional support for an inference of recklessness as to Price, plaintiffs point to statements from BofA's then-treasurer, non-party Jeffrey Brown.  In late November, Brown told Price that "we should disclose" because "the losses were meaningful enough," and stated to Price that he "didn't want to be talking through a glass wall over a telephone" if the losses were not disclosed – an allusion to imprisonment.  (Compl. ¶ 122.)  On December 17, Brown e-mailed Price about his conversation with an analyst at the Standard & Poor's ("S&P") ratings agency.  (Compl. ¶ 167.)  Brown stated, among other things, that "[w]hat concerns me is that they are not

---

[7] Mayopoulos, who is not a defendant in this action, had concluded that BofA's disclosure obligations were guided by whether Merrill's quarterly losses were within the range of Merrill's other recent quarterly losses, which varied from $2 billion to $9.8 billion, after taxes.  (Compl. ¶¶ 115-16.)  Plaintiffs allege that this approach was arbitrary and baseless, and that Mayopoulos never researched possible disclosure requirements and sought no formal guidance from Wachtell.  (Compl. ¶¶ 116-17.)

expecting poor results from ML this quarter" and that the S&P ratings committee "noted substantial improvements in ML risk/balance sheet management." (Compl. ¶ 167.) The e-mail observed a disparity between what BofA knew and "what they know" at S&P. (Compl. ¶ 167.) Brown speculated that Merrill's losses could "result in another downgrade. This is just my view, but they clearly think ML is more healthy than they are and that they have shed the worst risks." (Compl. ¶ 167.)

In setting forth a plausible nonculpable explanation for Price's conduct, the defendants raise three principal arguments. First, they contend that BofA was working with estimated losses amounting to "soft" data, and that such information is not sufficiently concrete to support a scienter inference, let alone require disclosure. Second, they contend that it makes no sense for Price to affirmatively seek out legal guidance about BofA's disclosure obligations, but then proceed to mislead counsel about the underlying details. Third, they contend that Price was unaware of the framework that Mayopoulos was using to weigh BofA's disclosure obligations, so that there is no plausible basis to infer that Price could have misled Mayopoulos. Defendants contend that it would "defy common sense" to infer recklessness based on such facts.

On the degree of certainty as to the underlying data showing Merrill's losses, the Court is unable at the Rule 12(b)(6) stage to assess the extent to which BofA weighed "soft" figures as opposed to more concrete data. The Complaint's non-conclusory allegations and the defendants' contrary interpretations simply conflict. Defendants note that Cotty described one calculation as a "WAG" – shorthand for "wild ass guess," and that certain e-mails use the word "estimates." Yet the Complaint also alleges with particularity that Merrill provided BofA with specific, contemporaneous data about its assets and their value while the transaction was pending. Defendant Thain testified that "Bank of America had daily access to the exact same

- 13 -

financial information that I had," "was totally up to speed as to what was happening," and received "a daily profit and loss statement. They were getting the daily profit and loss statement, so they knew about the losses at the same time we did." (Compl. ¶¶ 9, 97.) Thain also stated in an internal memorandum that Merrill was "completely transparent" with BofA, which had "daily access" to Merrill's profit and loss statements, its positions and its marks. (Compl. ¶ 95.) In other proceedings, Thain testified that Cotty participated in weekly Monday meetings with Merrill to discuss the prior week's results. (Compl. ¶ 96.) Lewis has similarly stated that after signing the September 15 merger agreement, BofA received "detailed financial reports every week" from Merrill. (Compl. ¶ 99.) He testified to Congress that "we did have people there, and we did know that there were losses. And that was clear both at our company and theirs." (Compl. ¶ 99.) He separately has described the figures as "projections." (Compl. ¶ 100.) BofA appointed Cotty, its chief accounting officer, to act as Merrill's CFO while the merger was pending. (Compl. ¶ 13.) BofA allegedly assigned 200 employees to Merrill "shortly after" the deal was announced, "including a large financial team." (Compl. ¶ 95.)

Such allegations are not, as the defendants contend, merely conclusory. (Def. Mem. at 23.) At the close of discovery, it may be that the record supports BofA's contention that it was working only with soft estimates, tentative projections and a "WAG," and that the information in its possession does not support an inference of scienter or, indeed, even a duty to disclose. At the pleading stage, however, the plaintiffs have alleged with particularity that BofA received ongoing updates on Merrill's finances and that Price was personally informed of Merrill's losses. Whether those figures were concrete and reliable, or, as the defendants contend, "soft," can be assessed only on a more complete factual record.[8]

---

[8] For this same reason, I decline the defendants' invitation to yet again revisit the issue of whether BofA's non-disclosure of Merrill's fourth-quarter losses constitutes an actionable omission under Section 10(b) and Rule 10b-5.

As to the defendants' contentions relating to Mayopoulos, the Complaint sets forth nonconclusory factual allegations that, upon hearing the initial – and lowest – Merrill loss report, Mayopoulos told Price that disclosure was likely warranted. (Compl. ¶ 103.) While Price may not have known the particulars of Mayopoulos's disclosure analysis, it is implausible to conclude that Price, the CFO of BofA, did not understand that there was a correlation between the size of Merrill's losses and BofA's disclosure obligations. As noted, in Price's initial discussion with Mayopoulos, Mayopoulos observed that $5 billion was "a lot of money" and likely required disclosure. (Compl. ¶ 103.)

The defendants have accurately observed that attorney notes indicate that counsel considered various scenarios and courses of action, and did not reach a firm conclusion that disclosure was required.[9] At the same time, the Complaint alleges that Price cherry-picked figures and even then was untimely in giving counsel updated information. Defendants argue that Price's "[c]onsultation with counsel is the very antithesis of scienter." (Def. Mem. at 18.) But "[t]o establish a reliance on the advice of counsel defense, a defendant 'has to show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith.'" SEC v. Cavanagh, 2004 WL 1594818, at *27 (S.D.N.Y. July 16, 2004) (Cote, J.) (quoting Markowski v. SEC, 34

---

The 2010 Opinion discussed in detail the circumstances involving Merrill's fourth quarter losses, before concluding that, in the Rule 12(b)(6) context, they were actionable under the '34 Act. 757 F. Supp. 2d at 303-07. The Complaint alleges that by the time the Proxy was filed on November 3, 2008, Merrill had already sustained more than $7.5 billion in losses for the month of October, a fact that was not disclosed in the Proxy or in subsequent statements. (Compl. ¶ 132-33, 136.) At the pleading stage, the Court is not in a position to reach any conclusion as to the certainty of those loss figures. Defendants also contend that plaintiffs fail to allege a date certain by which disclosure was required, but, as presently alleged, the Proxy of November 3 omitted Merrill's October losses, and was never subsequently updated.

[9] For example, November 13 notes from Wachtell counsel indicated a need for "more info," a consensus that Merrill would "prob. be deep in the red," considered whether BofA should issue a "trend discl[osure]," and stated that "Joe" – presumably, defendant Joe Price – was "to engage ML" in the near future. (Park Dec. Ex. 20.) Wachtell counsel has testified in other proceedings that at the close of the November 13 call, "the conclusion of the call was more work was going to be done," and "people at" BofA would "go back" and review disclosures by both Merrill and BofA. (Park Dec. Ex. 23 at 23.) The same Wachtell attorney has testified that he viewed Wachtell's role as "more of a sounding board than anything else," but that he "agreed" with Mayopoulos's thinking. (Park Dec. Ex. 23 at 50.)

F.3d 99, 105 (2d Cir. 1994)).  "Good faith reliance on the advice of counsel means more than simply supplying counsel with information," and in the securities context, a CFO, like other "corporate executives," has an independent duty to ensure compliance with disclosure obligations.  SEC v. Enterprises Solutions, Inc., 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001) (Cedarbaum, J.).  According to the Complaint, as Price received updates about Merrill's growing losses, legal counsel was left out of the loop, and was working with only a partial understanding of Merrill's financial health.  As currently alleged, Price impeded counsel from making a fully informed analysis.  Defendants contend that Price, the CFO of one of the nation's largest financial services businesses, was never explicitly told that BofA had a duty to disclose Merrill's losses, but this contention loses force in light of Price's failure to keep counsel up to date on the magnitude of the losses.

The failure to update counsel about Merrill's losses takes on greater significance in light of disagreement elsewhere within BofA management.  In considering Brown's comments favoring disclosure, the Court is mindful that strong disagreements may arise within management on many issues, and that the frank airing of opinions may invite banter and hyperbole.  Nevertheless, in late November, BofA's corporate treasurer was strongly advocating to Price that BofA make a public disclosure.  (Compl. ¶ 122.)  Brown later circulated within BofA, and to Price specifically, additional alleged misperceptions held by the ratings agencies and again advocated for disclosure, prompting no apparent reconsideration or action.  (Compl. ¶¶ 167-71.)

Weighing "plausible opposing inferences," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007), I conclude that the Complaint alleges recklessness as to Price, and satisfies the scienter requirement.  It is plausible to infer that, upon receiving

Mayopoulos's initial disposition to recommend disclosure, Price engaged in "conscious recklessness" amounting to "an extreme departure from the standards of ordinary care."  S. Cherry St., 573 F.3d at 109; ECA, Local 134, 553 F.3d at 202-03.  At the pleading stage, such an inference is more cogent and compelling than the non-culpable inferences set forth by the defendants.

### B.  The Complaint Alleges Recklessness as to Lewis.

Price has testified in other proceedings that throughout the fourth quarter, he ensured that Lewis was "ke[pt] informed all the time on matters," and that they were "in and out of each other's offices all the time."  (Compl. ¶ 247.)  As to Merrill, Lewis has testified that "we did have people there, and we did know that there were losses.  All that was clear both at our company and theirs."  (Compl. ¶ 246.)  In a television interview, Thain stated that management of BofA and Merrill "knew about the losses at the same time . . . ."  (Compl. ¶ 246.)  Lewis also attended the December 3, 2008 meeting with Price and Thain, where Merrill's losses for October and November were discussed as totaling $15 billion.  (Compl. ¶ 248.)

According to the Complaint, although Lewis "had unfettered access to experienced counsel," he sought no legal advice as to BofA's disclosure obligations.  (Compl. ¶ 249.)  Plaintiffs assert that Lewis "took no steps" to see whether counsel had complete and recent information as to Merrill's losses, and did not discuss the losses or disclosure with the BofA board or company auditors.  (Compl. ¶ 249.)  Plaintiffs also assert that, in light of the transaction's importance and the scope of Merrill's losses, Lewis was reckless in failing to seek guidance on BofA's disclosure obligations.  (Compl. ¶ 249.)

The Second Circuit has stated that the "'egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'"

Novak, 216 F.3d at 308 (ellipsis in original; quoting Chill, 101 F.3d at 269).  Novak surveyed

Second Circuit authority upholding recklessness-based scienter allegations, particularly

including instances in which management possessed facts that contradicted public statements or

else failed to review or monitor information within its oversight.  Id. at 308-09.  By contrast, the

failure to anticipate future events, monitor the allegedly fraudulent acts of persons outside of

defendant's supervision, or present an overcautious or "gloomy" outlook do not support an

inference of scienter.  Id. at 309.

Here, the Complaint alleges that Lewis – BofA's CEO, president, and the

chairman of its board of directors – was informed of Merrill's losses, but that he took no action

to review or ensure compliance with BofA's disclosure obligations.  The Complaint otherwise

depicts Lewis as closely engaged with the transaction's details.  (See, e.g., Compl. ¶¶ 63, 67-70,

81, 83, 98-100, 124-26, 139, 143-46, 151-62.)  The Complaint adequately alleges that, by virtue

of his position within BofA and his awareness of Merrill's losses, Lewis's inaction on the

disclosure issue raises a strong inference of recklessness.

II.     The Defendants' Motion is Granted as to Plaintiffs' Claim Going Toward
        Federal Financial Support for the Transaction.

A.   SEC Rule 13a-11(c) and the 2010 Opinion.

Separately, Count I asserts that Lewis and Price acted recklessly in failing to

disclose federal financial support that was conceived and finalized in the final days of 2008 and

the first weeks of 2009.  The federal financial support was disbursed by January 20, 2009.

(Compl. ¶¶ 160-61, 165.)   The 2010 Opinion denied the defendants' motion to dismiss for

failure to allege an actionable omission arising out of the federal financial support to BofA.  757

F. Supp. 2d at 314-16.  At that time, the defendants relied solely on an argument that the

Complaint failed to allege a "material definitive agreement" between BofA and federal officials

as to federal support for the transaction.  See id.  SEC Form 8-K requires disclosure of "material definitive agreement[s] not made in the ordinary course of business."  Form 8-K, at Item 1.01(a), available at http://www.sec.gov/about/forms/form8-k.pdf.  This Court previously held that the "detailed, non-conclusory allegations plausibly allege that BofA received concrete assurances from officials at the Treasury and the Federal Reserve that BofA would receive a massive capital infusion in exchange for proceeding with the Merrill acquisition."  757 F. Supp. 2d at 316.  Because the Complaint alleged a definitive agreement, the Court concluded, the plaintiffs had adequately alleged a failure to comply with Item 1.01(a) of Form 8-K, and the Complaint therefore identified an actionable omission.  Id. at 315-16.

The defendants now point to a rule of the SEC that was not raised in the previous motion to dismiss.  At 17 C.F.R. § 240.13a-11(c), the SEC provides that "[n]o failure to file a report on Form 8–K that is required solely pursuant to Item 1.01 . . . of Form 8–K shall be deemed to be a violation of 15 U.S.C. 78j(b) and § 240.10b-5."  In other words, the failure to disclose a material definitive agreement under Form 8-K at Item 1.01(a) does not, itself, amount to an actionable omission under Section 10(b) and Rule 10b-5.  Plaintiffs note only that the defendants did not rely on this rule in their prior motion to dismiss, but the timing of defendants' citation does not undermine its relevance.  As a result, the plaintiffs cannot allege that the failure to comply with Item 1.01(a) is, standing alone, sufficient to state a claim under Section 10(b) and Rule 10b-5.

B.  The Complaint Otherwise Fails to Satisfy the PSLRA and Rule 9(b).

As an alternative basis for alleging an actionable omission, the plaintiffs assert that a defendant has a duty to disclose information when developments known to the company render as misleading prior public statements concerning an intended approach for meeting a

business goal.  In re Time Warner, Inc. Securities Litigation, 9 F.3d 259, 268 (2d Cir. 1993).

Specifically, Time Warner observed that "when a corporation is pursuing a specific business goal

and announces that goal as well as an intended approach for reaching it, it may come under an

obligation to disclose other approaches to reaching the goal when those approaches are under

active and serious consideration."  Id.  Plaintiffs contend that disclosure of the federal support

was required because it represented a material change for BofA's "intended approach for"

consummating the transaction, and modified the terms of the transaction by altering the way in

which BofA financed the Merrill acquisition.  (Pl. Mem. at 41.)

It is plaintiffs' obligation under Rule 9(b) and the PSLRA to allege with

particularity conduct amounting to securities fraud.  See 15 U.S.C. § 78u-4(b)(1) (the PSLRA

requires a complaint to "specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed."); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d

Cir. 2007) (under the PSLRA, a plaintiff must allege specific and particularized facts as to why

conduct amounted to fraud).  I quote in part the plaintiffs' attempt to apply Time Warner to the

facts of this case:

> Not only did the bailout represent a material change in BoA's
> 'intended approach for' accomplishing the merger, but this
> undisclosed material information fundamentally modified the
> terms of the merger by altering the way in which BoA financed its
> acquisition of Merrill and transforming the combined company
> into a ward of the state – information that was highly material to
> investors purchasing BoA securities in the open market.

(Opp. Mem. at 41.)  The Complaint does not, however, allege which statements were rendered

misleading by the non-disclosure of federal financial assistance.  Mindful that the Second Circuit

- 20 -

has since characterized Time Warner as approaching "nearly to the outer limit of the line that separates disclosable plans from plans that need not be disclosed," San Leandro, 75 F.3d at 810, plaintiffs are obligated to allege with particularity how the federal financial assistance contradicted prior statements describing the acquisition and its financing, thereby rendering any such statements misleading.  A generalized argument in a memorandum of law is no substitute for the particularized allegations required by the PSLRA and Rule 9(b).  The Complaint cites no representations made by BofA concerning its financing or the role vel non of federal financial support.  As a result, it does not allege which statements were allegedly rendered fraudulent by the defendants' omissions.[10]  Consequently, the plaintiffs fail to satisfy Rule 9(b), the PSLRA and the framework set forth by Time Warner and San Leandro.

> III.    The Class Plaintiffs Do Not Have Standing to Assert Claims on Behalf of Certain Categories of Securities Holders.

The Complaint expands the plaintiff class to encompass additional categories of BofA securities owners.  Specifically, it seeks to bring claims on behalf of purchasers of 22 series of BofA preferred shares, purchasers of 21 series of BofA bonds, and owners of call options purchased during the class period and put options sold during the class period.  (Compl. ¶¶ 290-309 & App'x A, B.)  Defendants argue that, with two exceptions, these claims should be dismissed because the class plaintiffs did not themselves purchase or sell these securities, and therefore lack Article III standing to bring a justiciable claim.

---

[10] Separately, I note that the Complaint sets forth certain statements that Lewis made on 60 Minutes in October 2008 concerning funds administered under the Troubled Asset Relief Program ("TARP"), which Paulson allegedly required of all major financial institutions.  (Compl. ¶¶ 87-88.)  In those statements, Lewis claimed that BofA had "won" against its competition, that BofA did not itself need TARP funding, and that BofA accepted the TARP funding only because Paulson did not "want to expose" which banks "really needed the capital" and which did not.  (Compl. ¶¶ 87-88.)  The allegedly mandatory TARP funding of October 2008 was part of a different plan than the federal financial package later arranged in December 2008 and January 2009, and the Complaint does not allege that Lewis's statements concerning TARP are relevant to the alleged omissions concerning the later assistance specifically directed to BofA.

Defendants rely on <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), and its application in the securities fraud context.  <u>Lujan</u> held in part that in order to have Article III standing, a plaintiff must have suffered an injury in fact, one that is concrete and particularized. <u>Id.</u> at 560.  As the Supreme Court later observed, "'[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996) (ellipsis in original) (quoting <u>Simon v. Eastern Ky. Welfare Rights Org</u>, 426 U.S. 26, 40 n.20 (1976)).

Several district courts have relied on <u>Lujan</u> and its progeny to conclude that plaintiffs had no standing to bring claims seeking to recover losses in securities in which the named plaintiffs themselves had no stake.  As observed by <u>In re AIG Advisor Group</u>, 2007 WL 1213395, at *3-6 (E.D.N.Y. Apr. 25, 2007), "[t]hat plaintiffs would represent a class of similarly situated claimants does not exempt them from the requirement that '[a]t the pleading stage' they must set forth some 'general factual allegations of injury resulting from the defendant's conduct.'"  <u>Id.</u> at *4 (alteration in original; quoting <u>Lewis</u>, 518 U.S. at 358).  Judge Gleeson rejected the plaintiffs' argument that the issue should be resolved at the class-certification stage, stating that standing was instead a threshold issue.  <u>Id.</u> at *6.  He concluded that "[i]n this securities fraud case, the named plaintiffs can allege no injury from the purchase or sale of funds they never invested in."  <u>Id.</u>; <u>accord</u> <u>In re Smith Barney Transfer Agent Lit.</u>, 765 F. Supp. 2d 391, 399-400 (S.D.N.Y. 2011) (because named plaintiffs neither purchased nor sold shares in funds, they lacked standing to assert securities fraud claims); <u>King County, Wash. v. IKB Deutsche Industriebank AG</u>, 2010 WL 2010943, at *2 (S.D.N.Y. May 18, 2010) ("Because

plaintiffs cannot assert class claims on behalf of purchasers of securities they themselves did not buy, plaintiffs lack standing to sue on behalf of purchasers of the European Commercial Paper."); Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) ("If a party, such as Plaintiffs in this case, is not personally injured by the alleged action of a defendant then he is not entitled to come into court and litigate that action, regardless of whether the disposition of his case necessarily requires the same result as the case of another.  As such, Plaintiffs lack standing for claims relating to funds in which they did not personally invest.").

Plaintiffs have not articulated any meaningful basis to distinguish this line of authority.  They correctly note, however, that there is some divergent authority in this District. For instance, in In re Dynex Capital, Inc. Securities Litigation, 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009), the court concluded at the Rule 12(b)(6) stage that plaintiffs could pursue claims on behalf of holders of bond series that the plaintiffs themselves did not purchase, because defendants allegedly "made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects."  Dynex did not discuss any contrary authorities, however, and it is not apparent that they were raised.  Id.  In addition, In re American International Group, Inc. Securities Litigation, 265 F.R.D. 157, 165 (S.D.N.Y. 2010), arose in the class certification context and not the Rule 12(b)(6) stage.  The court acknowledged that "the most recent cases, which have addressed this question as one of standing, rather than under the Rule 23 requirements," had concluded that plaintiffs do not have standing to bring claims on behalf of those who held bonds that named plaintiffs themselves did not own.  Id.  The court concluded that plaintiffs were without standing to pursue '33 Act claims that were based on different actions than those giving rise to class plaintiffs' '34 Act injuries, but also concluded that plaintiffs had standing to bring claims on behalf of holders of bonds that the

plaintiffs did not themselves own.  Id. at 164-67.  Given the different procedural posture of that ruling, and that the lead plaintiffs "address[ed] their argument to adequate representation under Rule 23(a)(3), rather than to standing," id. at 165, it has limited bearing here.

Consistent with Judge Gleeson's opinion in In re AIG Advisor Group, 2007 WL 1213395, at *3-6, and the bulk of the authority in this District, I conclude that the plaintiffs do not have standing to bring claims on behalf of purchasers or sellers of securities that the plaintiffs did not themselves purchase or sell during the class period.  As applied to each category of securities holders, the standing issues may be summarized as follows:

Preferred Shares.  Plaintiff Ohio PERS allegedly purchased Series K preferred shares of BofA on October 3, 2008, and sold all such shares on December 30, 2008.  (Ohio PERS Trading Certificate, attached to Compl.)  Defendants note that Ohio PERS cannot satisfy the loss causation standard of Section 10(b) because it sold its shares prior to BofA's issuance of corrective disclosures.  Plaintiffs have not argued to the contrary.  Also, defendants contend, Series K holders had no voting rights and therefore do not have a Section 14(a) claim.  For reasons explained, the Court concludes that lead plaintiffs do not have standing to pursue either Section 10(b) or Section 14(a) claims on behalf of purchasers of BofA's preferred shares.

Debt Securities.  Plaintiffs purport to bring claims on behalf of holders of 21 series of bonds.  Two named class representatives traded BofA bonds: Ohio STRS and Ohio PERS.  Ohio STRS purchased no bonds during the class period; it sold one series of bonds in November 2008.  Ohio PERS sold two bond series during the class period, prior to the corrective disclosures, and purchased one series of bonds, CUSIP 060505DP6, on December 4, 2008.  According to the defendants, there is, at most, a class claim on behalf of holders of the series of bonds that Ohio PERS purchased on December 4, 2008.  For reasons explained, the Court

- 24 -

concludes that lead plaintiffs have standing to pursue claims solely on behalf of purchasers of CUSIP 060505DP6 bonds, which were purchased by Ohio PERS on December 4, 2008.

Options.   The Complaint identifies one class representative who purchased 10 call options for $35 and sold them for $14.50, for a loss of more than $20.  (Compl., Ex. D.) This class representative's call options were callable in January 2011.  (Id.)  Defendants argue that, at most, the class may assert a claim on behalf of holders of January 2011 call options, but not any other category of call option.  For reasons explained, the Court concludes that lead plaintiffs have standing to pursue claims solely on behalf of holders of January 2011 call options.[11]

CONCLUSION

The defendants' motion to dismiss is GRANTED as to plaintiffs' Section 10(b) and Rule 10b-5 claim directed toward non-disclosure of federal financial assistance.  The motion also is GRANTED as to plaintiffs' standing to pursue claims on behalf of holders of BofA preferred shares, debt securities and call options, and only those claims brought on behalf of holders of CUSIP 060505DP6 bonds and January 2011 call options may proceed.  The defendants' motion is DENIED as to plaintiffs' Section 10(b) and Rule 10b-5 claims directed to non-disclosure of Merrill's losses in the fourth quarter of 2008.

---

[11] Counsel to plaintiff Charles Dornfest separately submitted two letter-briefs in opposition to the motion to dismiss. Dornfest argues that the defendants' standing arguments should be rejected because Dornfest, as a purchaser of BofA options during the class period, provides standing for lead plaintiffs to pursue all BofA options claims.  (Feb. 16 letter at 2; Feb. 28 letter at 1-3.)  Dornfest is not a class plaintiff.  Lead counsel notes that it "did not authorize" the letters and that Dornfest "does not speak" for class plaintiffs.  (Mar. 2 letter.)  In an Order of April 9, 2010, Judge Chin, to whom this case was then assigned, denied Dornfest's motion to be appointed lead plaintiff, and noted that Dornfest was free to pursue his claims in an individual action.  (Docket # 240, at 5.)  The Order also observed that adding additional lead plaintiffs "would interfere with the Lead Plaintiffs' ability and authority to manage" the action.  (Docket #240, at 4-5.)  Because Dornfest is not a named class representative, his purchases do not establish standing to pursue classwide claims.

- 25 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        July 29, 2011