**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                  :
                                                                  :
IN RE BANK OF AMERICA CORP.          :     Master File No. 09 MD 2058 (PKC)
SECURITIES, DERIVATIVE, AND          :
EMPLOYEE RETIREMENT INCOME            :     ECF CASE
SECURITY ACT (ERISA) LITIGATION      :
                                                                  :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                  :
THIS DOCUMENT RELATES TO:            :
                                                                  :
The Consolidated Securities Action   :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES**
**AND CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND ..................................................................................... 5

    A.    Defendants Announce The Merger While Concealing The Bonus
          Agreement ..................................................................................................... 5

    B.    Unbeknownst To The Market, Merrill Suffers Massive Losses Before
          The Shareholder Vote .................................................................................... 6

    C.    BoA Receives A $138 Billion Taxpayer Bailout To Absorb Merrill's
          Losses ........................................................................................................... 8

    D.    Defendants Internally Acknowledged That The Market Was Unaware Of
          Merrill's Losses ............................................................................................ 9

    E.    The Market Was Stunned To Learn Of Merrill's Staggering Fourth
          Quarter Losses And The Secret Bonus Agreement ..................................... 10

III. LEGAL ARGUMENT ............................................................................................ 11

    A.    Plaintiffs Satisfy The Prerequisites Of Rule 23(a) ...................................... 12

          1.    Numerosity Is Established ................................................................ 12

          2.    Commonality Is Established .............................................................. 12

          3.    Typicality Is Established ................................................................... 13

          4.    Adequacy Is Established ................................................................... 14

    B.    The Requirements Of Rule 23(b) Are Satisfied ......................................... 16

          1.    Common Issues Predominate As To Plaintiffs' Section 14(a)
                Claim ................................................................................................ 16

          2.    Common Issues Predominate As To Plaintiffs' Section 10(b)
                Claim ................................................................................................ 18

                a.    Materiality Of Merrill's Losses ........................................... 19

                b.    Materiality Of The Bonus Agreement .................................. 21

           3.    Superiority Is Established ................................................................. 22

i

C.     Defendants' Anticipated Arguments Are Without Merit ................................................ 22

1.     Defendants' Anticipated Arguments As To Section 10(b) Are Meritless .......................................................................................................... 23

2.     Defendants' Anticipated Arguments As To Section 14(a) Are Meritless .......................................................................................................... 27

IV.  CONCLUSION........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972)..................................................................................21

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ......................................................20

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................16

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  2011 WL 3211472 (S.D.N.Y. Jul. 29, 2011) .......................................3, 21

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...............................................*passim*

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1998)...............................................................................4, 18

*Browning Debenture Holders Comm. v. Dasa Corp.*,
  524 F.2d 811 (2d Cir. 1975) .....................................................................16

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989)..............................................................18

*City P'ship Co. v. Jones Intercable, Inc.*,
  213 F.R.D. 576 (D. Colo. 2002) ...............................................................17

*Consol. Rail Corp. v. Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) .......................................................................12

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) .....................................................................21

*In re DaimlerChrysler AG Sec. Litig.*,
  216 F.R.D. 291 (D. Del. 2003) .................................................................17

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) .........................................................12, 15

*In re Dynex Capital, Inc. Sec. Litig.*,
  2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ..............................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011)................................................................3, 24

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
  2007 WL 2230177 (S.D.N.Y. Jul. 27, 2007) ...................................13, 14

*In re Fannie Mae Sec. Litig*,
  247 F.R.D. 32 (D.D.C. 2008) ...................................................19

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .....................................................14, 15

*Fogarazzo v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ...............................................12, 13

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000) ....................................................24

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...............................................28

*In re Globalstar Sec. Litig.*,
  2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ................................*passim*

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).............................................................4, 17

*In re IPO Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) .....................................................11

*Katz v. Image Innovations Holdings, Inc.*,
  2010 WL 2926196 (S.D.N.Y. Jul. 22, 2010) .................................12

*Koppel v. 4987 Corp.*,
  191 F.R.D. 360 (S.D.N.Y. 2000) ...........................................4, 17, 24

*Lane v. Page*,
  272 F.R.D. 558 (D.N.M. 2011)................................................17

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) .........................................18, 22, 25, 27

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011) ...................................................17

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) ...................................................12

*In re Marsh & McLennan Cos. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...................................................................12

*Maywalt v. Parker & Parsley Petroleum Co.*,
  147 F.R.D. 51 (S.D.N.Y. 1993) ....................................................................................11

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970)....................................................................................................3, 16

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) .............................................................15, 21, 26, 27

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ......................................................................................16

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) ..................................................................................16

*In re Oxford Health Plans, Inc.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................................12

*Pa. Ave. Funds v. Inyx Inc.*,
  2011 WL 2732544 (S.D.N.Y. Jul. 5, 2011) ..........................................................*passim*

*In re PE Corp. Sec. Litig.*,
  228 F.R.D. 102 (D. Conn. 2005) .................................................................................24

*Pellman v. Cinerama, Inc., et al.*,
  89 F.R.D. 386 (S.D.N.Y. 1981) ..................................................................................17

*In re Piedmont Office Trust, Inc. Sec. Litig.*,
  264 F.R.D. 693 (N.D. Ga. 2010) .................................................................................17

*Pub. Empl. Ret. Sys. Of Miss. v. Merrill Lynch & Co.*,
  2011 WL 3652477 (S.D.N.Y. Aug. 22, 2011)...............................................4, 13, 16, 17

*In re Sadia, S.A. Sec. Litig.*,
  269 F.R.D. 298 (S.D.N.Y. 2010) .....................................................................18, 20, 21

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007)........................................................................19

*SEC v. Bank of Am.*,
  2010 WL 624581 (S.D.N.Y. Feb. 22, 2010)................................................................19

*SEC v. Bank of Am. Corp.*,
  677 F. Supp. 2d 717 (S.D.N.Y. 2010) ...................................................................25, 26

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
   985 F.2d 1190 (2d Cir. 1993) ...................................................................29

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ...........................................................11, 13

*In re Vivendi Universal S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .........................................................11, 13, 14

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ................................................................22

*In re Worldcom, Inc. Sec. Litig.*,
   2005 WL 517331 (S.D.N.Y. Mar. 4, 2005) ..................................................28

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ......................................................15, 17, 28

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a) ..................................................................................11, 13, 14

Fed. R. Civ. P. 23(b) ........................................................................................11, 16

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) ...............................................................15

## I.   PRELIMINARY STATEMENT

Court-appointed Lead Plaintiffs[1] and named plaintiff Grant Mitchell (collectively, "Plaintiffs") respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Civ. P. 23(a), (b)(3) and (g), seeking:  (1) certification of a class of Bank of America Corp. ("BoA") investors, as defined below; (2) Plaintiffs' appointment as Class Representatives; and (3) appointment of Lead Counsel[2] as Class Counsel (the "Motion").

This securities class action arises out of Defendants' material misrepresentations and omissions between September 18, 2008 and January 21, 2009, inclusive (the "Class Period"), concerning BoA's acquisition of Merrill Lynch & Co., Inc. ("Merrill").  The gravamen of Plaintiffs' allegations is that Defendants made material misstatements and omissions before and after the shareholder vote approving the most important merger in BoA's history, namely, its $50 billion acquisition of Merrill (the "Merger"), which was announced on September 15, 2008, approved on December 5, 2008, and closed on January 1, 2009.

Unbeknownst to investors, during the Merger negotiations, BoA agreed to allow Merrill to pay up to $5.8 billion in fiscal year 2008 bonuses on an accelerated basis, regardless of Merrill's financial performance, and prior to the Merger's close (the "Bonus Agreement").  ¶¶ 6, 70-81.[3]  In addition, in the two months prior to the December 5, 2008 shareholder vote, Merrill suffered losses so large that BoA could not consummate the Merger without substantial government assistance.  ¶¶ 89-127.  Indeed, before the shareholder vote took place, BoA considered whether Merrill's losses were so severe that BoA could invoke the "Material Adverse Effect Clause" (the "MAC"), which would allow

---

[1] Lead Plaintiffs are the State Teachers Retirement System of Ohio, the Ohio Public Employees Retirement System, the Teacher Retirement System of Texas, Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V., and Fjärde AP-Fonden.

[2] Lead Counsel are Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), Kaplan Fox & Kilsheimer LLP ("Kaplan Fox"), and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz").

[3] All citations to "¶__" are to the Consolidated Second Amended Class Action Complaint (the "Complaint").

BoA to terminate the Merger.  Yet, Defendants made no public disclosure of Merrill's losses.  Days after the vote, BoA informed the U.S. Government that Merrill's fourth quarter losses were so severe that BoA had grounds to terminate the Merger.  *See* ¶¶ 118, 143-55.  Ultimately, in order to absorb Merrill's massive losses and complete the transaction, BoA required a $138 billion taxpayer bailout.  *See* ¶¶ 160-65.

The market first learned of Merrill's losses in mid-January 2009, culminating with BoA's admission on January 16 that Merrill had suffered a $21.5 billion pre-tax loss for the fourth quarter of 2008 and that, in order to close the Merger, BoA had sought and received the taxpayer bailout.  *See* ¶¶ 160-65.  BoA's stock price collapsed, declining by nearly 45% between January 12 and 16, 2009.  Analysts and the financial press widely reported that they were stunned by Merrill's losses, which they described as "much, much worse than expected," "devastating," and "shocking."  *See* September 26, 2011 Rebuttal Report of Chad Coffman at ¶ 23 (the "Coffman Rebuttal Report"), attached as Exhibit 1 to the Declaration of Gregory M. Castaldo ("Castaldo Decl.").

A week later, on January 21, 2009, the truth about the Bonus Agreement emerged when a news article reported that, despite its catastrophic losses, Merrill had accelerated the payment of billions of dollars of bonuses to its employees before the Merger closed.  BoA's stock price fell precipitously again, declining another 15%.  Analysts and the financial press called the Merrill bonuses "ridiculous" and a "damaging revelation," and New York's Attorney General immediately launched an investigation into Merrill's "large, secret, last-minute bonuses."  ¶¶ 191-96.

Based on the facts summarized above and alleged in detail in the Complaint, Plaintiffs asserted claims under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  The Court largely sustained these claims in opinions dated August 27, 2010 and July 29, 2011.  *See In re Bank of*

*Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010); *In re Bank of Am. Corp.*

*Sec., Deriv., & ERISA Litig.*, 2011 WL 3211472 (S.D.N.Y. Jul. 29, 2011).

Plaintiffs now request certification of the following class (the "Class"):

(i) As to claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who held BoA common stock as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill, and were damaged thereby; and (ii) as to claims under Sections 10(b) and 20(a) of the Exchange Act, all persons and entities who purchased or otherwise acquired BoA common stock during the period from September 18, 2008 through January 21, 2009, inclusive, excluding shares of BoA common stock acquired by exchanging stock of Merrill for BoA stock through the merger between the two companies consummated on January 1, 2009, and were damaged thereby; and (iii) as to claims under Sections 10(b) and 20(a) of the Exchange Act, all persons and entities who purchased or otherwise acquired January 2011 call options of BoA from September 18, 2008 through January 21, 2009, inclusive, and were damaged thereby; and (iv) as to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, all persons and entities who purchased BoA common stock issued under the Registration Statement and Prospectus for the BoA common stock offering that occurred on or about October 7, 2008, and were damaged thereby. Excluded from the Class are Defendants, present or former executive officers of BoA and Merrill, present or former members of Merrill's and BoA's Board of Directors and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions).

This case is ideally suited for class treatment under Fed. R. Civ. P. 23 ("Rule 23"). In particular, with respect to Plaintiffs' Section 14(a) claim, reliance is not an element. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 383 (1970) ("Use of a solicitation that is materially misleading is itself a violation of the law[.]") (citation and internal quotation marks omitted). Absent reliance, the other Section 14(a) elements – materially misleading statements or omissions and causation – are routinely found to be common issues. *See, e.g., Pa. Ave. Funds v. Inyx Inc.*, 2011 WL 2732544, at *6 (S.D.N.Y. Jul. 5, 2011) ("common issues … include … materially false and misleading statements or omissions … and causation"). Moreover, as the Supreme Court has held, proof of loss causation is not required at the class certification stage with respect to any of Plaintiffs' claims. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011). Thus, in light of the very limited nature of Plaintiffs' Section 14(a) claim, there is a clear predominance of common issues, and class

certification is appropriate.  *See, e.g.*, *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 365 & n.9 (S.D.N.Y. 2000) (certifying Section 14(a) class based on the allegation that defendants "misleadingly omitted information from a proxy").

The same holds true for Plaintiffs' Section 11 and 12(a)(2) claims – the elements of these claims raise common questions.  Under Section 11, if a plaintiff purchased a security issued pursuant to a registration statement, "he need only show a material misstatement or omission to establish his *prima facie* case."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  Thus, like Plaintiffs' Section 14(a) claim, Plaintiffs' Securities Act claims are ideally suited for class certification. *See, e.g.*, *Pub. Empl. Ret. Sys. Of Miss. v. Merrill Lynch & Co.*, 2011 WL 3652477, at *1 (S.D.N.Y. Aug. 22, 2011).

Class certification is also proper with respect to Plaintiffs' Section 10(b) claims.  While reliance is an element of Plaintiffs' Section 10(b) claims, Plaintiffs have established that a presumption of reliance applies pursuant to the fraud-on-the-market theory of reliance.  In connection with this motion, Plaintiffs have submitted the expert report of Chad Coffman, CFA, which establishes that BoA common stock traded in an efficient market.[4]  Additionally, Defendants do not dispute that the market for BoA common stock was efficient.  Indeed, BoA was one of the largest banks in the world and one of the most widely held stocks on the New York Stock Exchange – the paradigm of market efficiency. Further, the undisclosed and misrepresented information relating to the Bonus Agreement and Merrill's fourth quarter losses was clearly material.  Accordingly, pursuant to the fraud-on-the-market doctrine, a presumption of reliance applies to Plaintiffs' Section 10(b) claims.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1998).

For the reasons set forth more fully herein, Plaintiffs' Motion should be granted.

---

[4] *See* Castaldo Decl., Ex. 2, August 29, 2011 Expert Report of Chad Coffman at Section VII (the "Coffman Report").  *See also* Castaldo Decl., Ex. 1.

## II.    FACTUAL BACKGROUND

### A.    Defendants Announce The Merger While Concealing The Bonus Agreement

Between September 14 and 15, 2008, BoA CEO Ken Lewis ("Lewis") and Merrill CEO John Thain ("Thain") negotiated the terms of BoA's $50 billion acquisition of Merrill.  ¶¶ 63-69.  As Thain later stated, the negotiations turned on three "main things": (1) the Merger price; (2) the language of the MAC in the Merger Agreement; and (3) an agreement on Merrill's ability to pay bonuses.  ¶ 70. The resulting Bonus Agreement was evidenced by an undisclosed side agreement, contained on Disclosure Schedule 5.2 to the Merger Agreement, in which BoA agreed to allow Merrill to pay up to $5.8 billion in bonuses to its executives and employees prior to the close of the Merger and regardless of Merrill's actual financial performance.  ¶¶ 70-81.  The undisclosed $5.8 billion Bonus Agreement exceeded Merrill's internally projected bonus pool (which was then $5.1 billion), represented 12% of the total amount to be paid to acquire Merrill, and far exceeded the amount BoA would pay its own employees doing similar work.  ¶¶ 75-79.

Defendants filed the Merger Agreement with the SEC on September 18, 2008, and later attached it to BoA's definitive proxy statement, filed with the SEC on November 3, 2008 (the "Proxy").  ¶ 84.  Defendants did not attach Disclosure Schedule 5.2 or otherwise describe the material terms of the Bonus Agreement in the Merger Agreement or Proxy.  *Id*.  Instead, Defendants made a series of false statements in the Merger Agreement and Proxy concerning Merrill's ability to pay bonuses.  For example, the Proxy affirmatively misrepresented that Merrill would not make any discretionary bonus payments before the Merger closed on January 1, 2009.  Indeed, the Proxy identified discretionary bonus payments as an "extraordinary action," and assured investors that "Merrill Lynch will not" pay any compensation that was "not required."  ¶ 134.  Further, contrary to the undisclosed Bonus Agreement, the Proxy falsely stated that "pay for performance" was "the core of

[Merrill's] compensation policy," and that executive bonuses were "paid in January for performance in the prior fiscal year." ¶¶ 73, 134.

**B.      Unbeknownst To The Market, Merrill Suffers Massive Losses Before The Shareholder Vote**

As soon as the Merger was announced, BoA's senior management took an active role in overseeing Merrill's financial performance, placing no less than 200 BoA employees in Merrill's headquarters. ¶ 95. Defendants received regular and detailed updates on Merrill's financial results, including specific breakdowns of net losses. ¶¶ 101-26. As Thain later testified, BoA "had daily access to the exact same financial information that I had," and "was totally up to speed as to what was happening." ¶¶ 9, 96, 97.

Following Merrill's reporting of its third quarter results in mid-October 2008, analysts reported that Merrill had "clean[ed] up" and "de-risk[ed]" its balance sheet, and predicted Merrill would return to profitability in the fourth quarter. ¶ 94. However, Defendants were regularly informed to the contrary. In October alone, Merrill lost $7.5 billion. ¶ 90. On November 5, Merrill's Interim CFO, Neil Cotty, forwarded information about Merrill's losses to Defendant Joseph Price ("Price"), BoA's CFO, adding: "Read and weep." ¶ 101. Nevertheless, the Proxy made no mention of Merrill's losses. ¶ 133.

On November 12, with Merrill's fourth quarter losses at $9 billion pre-tax (and $5.4 billion after tax), Price approached BoA's then-General Counsel, Timothy Mayopoulos ("Mayopoulos"), to ask whether disclosure of Merrill's losses was required. ¶¶ 102-03. Mayopoulos concluded that "disclosure was likely warranted." ¶ 103. Similarly, BoA's outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), noted that the market was expecting Merrill to be profitable, and agreed that there "must be some discl[osure]" of the losses before the vote. ¶¶ 108-09.

6

By November 18, Merrill's fourth quarter net loss had increased to $13 billion pre-tax ($8.5 billion after-tax).  ¶ 113.  On that day, Price met with Mayopoulos, and they discussed that disclosure of Merrill's losses before the shareholder vote would likely cause shareholders to vote down the Merger.  *Id.*  Further showing that Defendant Price appreciated the materiality of Merrill's losses to investors and the consequence of disclosure, he did not tell Mayopoulos that Merrill's losses had grown to $13 billion in the days since Mayopolous and Wachtell had decided that disclosure was warranted.  *Id.*  Two days later, Price and Mayopoulos informed Wachtell that BoA would not disclose Merrill's losses, relying on a contrived argument that the $5 billion after-tax loss of which Mayopoulos and Wachtell were aware was within the range of quarterly losses that Merrill had incurred over the previous five quarters.  ¶¶ 114-15.

By the end of November 2008, with Merrill's losses approaching $15 billion pre-tax (and nearly $10 billion after-tax), BoA executives actively discussed terminating the Merger by invoking the MAC.  ¶¶ 118-120.  Defendants were also repeatedly warned to disclose Merrill's losses.  In late November, BoA Treasurer Jeffrey Brown ("Brown") told Price that "we should disclose" because "the losses were meaningful enough."  ¶ 122.  When Price refused, Brown warned Price that he "didn't want to be talking through a glass wall over a telephone."  *Id.*  Similarly, a few days prior to the vote, Merrill's auditors at Deloitte & Touche advised Merrill that its losses were "material subsequent events to what occurred at the end of September that would be relevant for parties that were voting on" the Merger and "sizable enough [to] probably warrant disclosure."  ¶ 123.

On December 3, Defendants Lewis and Price received a loss report reflecting that Merrill's fourth quarter losses would exceed $16 billion pre-tax and $10.5 billion after-tax, including a $2.2 billion goodwill impairment charge.  ¶ 126.  Tellingly, when Defendant Price met with Mayopoulos on December 3, Price continued to mislead Mayopoulos about the magnitude of Merrill's

losses, informing Mayopoulos that the $5 billion after-tax loss had only increased to "$7 billion after taxes" – or $3.5 billion less than Price knew the after-tax losses to be.  ¶ 127.

Two days later, on December 5, BoA shareholders – unaware that they were voting to acquire a business that was approaching insolvency – voted overwhelmingly in favor of the Merger.  ¶ 138.

### C.    BoA Receives A $138 Billion Taxpayer Bailout To Absorb Merrill's Losses

On December 9, Defendants Lewis and Price informed the BoA Board that Merrill's expected losses for the fourth quarter were $14 billion pre-tax ($9 billion after-tax).  ¶ 139.[5]  Mayopoulos, who attended the meeting, has since testified before Congress that he was surprised by the $9 billion figure.  ¶ 140.  Accordingly, that same day, Mayopoulos tried to speak with Price "about what's changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not," but was told that Price was unavailable.  *Id.*  The next morning, when Mayopoulos arrived at work, he was immediately terminated without explanation and escorted from the building.  ¶ 141.

On December 12, Defendants Lewis and Price informed the BoA Board that Merrill's losses were so significant "that the bank might abandon the acquisition."  ¶ 143.  Then, on December 17, Lewis told then-Treasury Secretary Henry Paulson that Merrill's losses were so material that BoA was prepared to invoke the MAC to terminate the Merger.  ¶ 144.  Lewis explained that Merrill's fourth quarter losses (which he characterized as "unusual") were so large that closing the Merger would materially harm BoA's capital position.  ¶ 145.  Ultimately, after the U.S. Government provided BoA with a $138 billion taxpayer bailout package in order to absorb Merrill's losses, Lewis agreed to complete the Merger.  ¶¶ 160-65.  According to handwritten notes of a subsequent meeting with regulators to discuss the bailout, Secretary Paulson stated that the "magnitude of [Merrill's] losses

---

[5] The known $2.2 billion goodwill charge was not discussed.  *Id.*

[was] breath-taking," and that "losses of ML size will shake [the] market" because they were "so far beyond expectations." *See* Castaldo Decl., Ex. 3, Handwritten Notes at pp. 1, 3, 5.

### D.   Defendants Internally Acknowledged That The Market Was Unaware Of Merrill's Losses

As Lewis was obtaining the bailout, Defendants internally acknowledged that the market was not expecting Merrill's massive losses.   On December 17, Brown informed Defendant Price that Standard & Poor's – a sophisticated market participant – "is … not expecting poor results from ML this quarter," and "in light of ML's 4Q performance that we know relative to what they know … [t]his could be an issue and result in another downgrade."   ¶ 167.   Two days later, BoA's treasury department informed Brown that another rating agency, Moody's, believed that BoA was "getting a great deal on this acquisition."   ¶ 169.   Brown forwarded this information to BoA's in-house disclosure counsel, stating that it was "again another sign [rating] agencies don't know what is coming."   ¶ 170. BoA's in-house disclosure counsel shared Brown's concerns with Wachtell, BoA's outside counsel, which advised that the failure to disclose Merrill's losses had created a "fundamental issue of lack of credibility" with the market.   ¶ 171.   As Wachtell concluded, "belatedly" disclosing Merrill's losses would "likely [] have [an] adverse impact on perception of rating agencies (who do not have an inkling this is coming)" and, if the "deal fell apart," it would "confirm [the] materiality of the fourth quarter losses."   *Id.*   Nevertheless, no disclosure of the losses was made before the Merger's closing.

Merrill's final day as a public company was December 31, 2008.   On that day, notwithstanding the fact that Merrill had suffered a pre-tax loss of more than $21 billion for the fourth quarter of 2008, and that BoA needed an enormous taxpayer bailout to close the Merger, Merrill paid out $3.6 billion in bonuses to its executives and employees pursuant to the accelerated schedule contemplated by the undisclosed Bonus Agreement.   ¶ 173.

**E.      The Market Was Stunned To Learn Of Merrill's Staggering Fourth Quarter Losses And The Secret Bonus Agreement**

In mid-January 2009, the market learned the truth about Merrill's fourth quarter losses.  ¶¶ 176-86.  Among other things, on January 15, the *Wall Street Journal* reported that the U.S. Government was bailing out BoA so that it could absorb Merrill's fourth quarter losses (which the article could not quantify).  ¶ 178.  BoA accelerated its earnings report to January 16 and, on that date, admitted that Merrill had suffered $21.5 billion in pre-tax losses for the fourth quarter and, thus, BoA needed the $138 billion taxpayer bailout to close the Merger.  ¶ 180-81.

Rating agencies immediately downgraded Merrill and BoA, citing Merrill's "massive losses" and the fact that Merrill would not have survived without the bailout.  ¶ 276.  The analyst and news commentary was harsh and unequivocal, including that:

- "Merrill Lynch reported a <u>devastating</u> $15.3 billion loss in the fourth quarter ….  'A lot of times companies would disclose losses of that magnitude,' said Michael Mayo, an analyst at Deutsche Bank. 'This was dramatic.'" *See* Castaldo Decl., Ex. 1 at ¶ 23.

- "[T]he decent core earnings from BAC was more than offset by the <u>shocking loss</u> at Merrill Lynch ….  This loss was <u>significantly and materially higher than anyone's expectations</u>." *Id.*

- "Merrill was <u>much, much worse than expected</u> – Merrill lost $15bn, 3X worse than last quarter.  To put $15 bn after-tax in perspective, 60% of the common equity base of the company base was lost in one quarter." *Id.*

- "The <u>real source of disappointment was a much larger than anticipated loss at Merrill</u> ….  The amount of the losses for Merrill in 4Q were <u>clearly more than we anticipated</u>."  *Id.* at ¶ 23 & n.19.

Notably, Defendant Lewis himself acknowledged that "[t]he magnitude of the loss, obviously, at Merrill Lynch <u>really stunned people</u>.  And so it was a bad day and <u>it did shock a lot of people</u> and disappoint a lot of people."  ¶ 185.  As the truth concerning Merrill's losses was disclosed in mid-January 2009, the price of BoA common stock fell approximately 45%, wiping out nearly $50 billion in BoA's market capitalization.  ¶¶ 19, 273-75.

The market's reaction to the belated disclosure of the Bonus Agreement was similarly clear. After the market closed on January 21, 2009, a *Financial Times* article revealed that Merrill had paid between $3 to $4 billion in bonuses in December 2008 despite its massive fourth quarter losses.  ¶ 191. The price of BoA stock immediately fell 15%.  ¶ 197.  Analysts described the bonus payments as "ridiculous," the financial press reported that the size and accelerated schedule of the bonus payments was a "damaging revelation," and New York's Attorney General launched an investigation into the "large, secret last-minute bonuses."  ¶¶ 191-97.

## III.   <u>LEGAL ARGUMENT</u>

The class action mechanism is well-suited for securities actions.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (explaining that the Second Circuit "has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country"); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006).  To be certified, plaintiffs must satisfy the prerequisites of Rule 23(a), namely, "numerosity," "commonality," "typicality," and "adequacy."  *See* Fed. R. Civ. P. 23(a).  In addition, plaintiffs must satisfy one of the requirements of Rule 23(b), in this case by demonstrating under Rule 23(b)(3) that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

In reviewing the Rule 23 criteria, the Court should not resolve factual issues that are not relevant to a particular Rule 23 requirement.  *See In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (citing *In re IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).  The Court must "assure that a class certification motion does not become a pretext for a partial trial of the merits."  *Id.*;

*see also Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *2 (S.D.N.Y. Jul. 22, 2010) ("A motion for class certification should not … become a mini-trial on the merits.").

### A.   Plaintiffs Satisfy The Prerequisites Of Rule 23(a)

#### 1.   Numerosity Is Established

In this Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *3 (S.D.N.Y. Dec. 1, 2004). "[C]ourts in this district have certified plaintiff classes based on the volume of outstanding shares." *Inyx*, 2011 WL 2732544, at *3 (collecting cases). During the Class Period, BoA had between 4.6 billion and 6.4 billion shares of common stock outstanding, with an average daily trading volume of 133 million shares on the New York Stock Exchange. *See* Castaldo Decl., Ex. 2 at ¶¶ 26, 60.[6] Numerosity is indisputable.

#### 2.   Commonality Is Established

"The commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos. Sec. Litig.*, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009); *see also In re Globalstar*, 2004 WL 2754674, at *4. "The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005); *see also In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000). "Commonality 'does not mean that all issues must be identical as to each member.'" *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156

---

[6] BoA also sold 455 million shares of common stock worth approximately $10 billion in its secondary offering on October 7, 2008, upon which Plaintiffs' Securities Act claims are based. *See* ¶ 24.

(S.D.N.Y. 2008) (citation omitted). Indeed, "[u]nder this court's jurisprudence, a single common question of law or fact may suffice." *Inyx*, 2011 WL 2732544, at *4.

Plaintiffs' claims concern common material misstatements and/or omissions about the Bonus Agreement and Merrill's massive fourth quarter losses. Thus, "[c]ommon questions of law and fact include whether certain statements were false and misleading," whether they were material, and "whether [the] statements violated the federal securities laws." *Inyx*, 2011 WL 2732544, at *4; *see also Merrill Lynch & Co.*, 2011 WL 3652477, at *6 ("[C]ourts in this Circuit have held that the … commonality requirement is 'plainly satisfied [where] the alleged misrepresentations … relate to all the investors, [as the] existence and materiality of such misrepresentations obviously present important common issues.'") (citation omitted); *Fogarazzo*, 232 F.R.D. at 180; *Veeco*, 235 F.R.D. at 238.

Plaintiffs' Exchange Act claims (Sections 10(b) and 14(a)) also raise the common issue of whether Defendants' misrepresentations and omissions caused Plaintiffs' losses, and Plaintiffs' Section 10(b) claim raises the additional common issue of whether Defendants acted with scienter. *Inyx*, 2011 WL 2732544, at *4 ("whether [material misstatements or omissions] were knowingly and recklessly issued, and ensuing causation issues" present common questions); *Globalstar*, 2004 WL 2754674, at *4.[7] Rule 23(a)(2)'s commonality requirement is plainly satisfied here.

### 3. **Typicality Is Established**

Courts in this District "have emphasized that the typicality requirement is not demanding." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. Jul. 27, 2007). "[T]he typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions." *Vivendi*, 242 F.R.D. at 84-85. To establish typicality,

---

[7] In addition, Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act rest on the common legal and factual questions of whether there has been an underlying violation of Sections 10(b), 14(a), 11, or 12(a)(2), respectively, and whether certain Defendants exercised "control" over the violators. *See, e.g.*, *Globalstar*, 2004 WL 2754674, at *4.

plaintiffs must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation and internal quotations omitted). "When the same unlawful conduct was directed at or affected both the named plaintiff and the prospective class, typicality is usually met." *Inyx*, 2011 WL 2732544, at *4 (citing *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)); *In re Vivendi*, 242 F.R.D. at 85 (same). "Typicality 'does not require that the factual background of each named plaintiffs' claim be identical to that of all class members.'" *EVCI Sec. Litig.*, 2007 WL 2230177, at *13 (citation omitted).

Here, Plaintiffs' claims are typical of the claims of the Class. Like other members of the Class, Plaintiffs' claims are based on material misstatements and omissions concerning the undisclosed Bonus Agreement and Merrill's massive fourth quarter 2008 losses. The legal and factual arguments Plaintiffs advance regarding Defendants' liability are the same as the arguments that other Class members would advance in support of their claims. Accordingly, the typicality requirement is satisfied. *See, e.g.*, *In re Vivendi*, 242 F.R.D. at 85 ("[P]laintiffs will necessarily seek to develop facts relating to … the dissemination of allegedly false or misleading statements …. Such allegations … generally … satisfy the typicality requirement."); *see also Inyx*, 2011 WL 2732544, at *4; *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 781215, at *8 (S.D.N.Y. Mar. 7, 2011) (finding claims to be typical because legal theories and proof would be the same for plaintiffs' claims and claims of class members).

### 4.    <u>Adequacy Is Established</u>

Rule 23(a) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy entails an inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and

2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Flag Telecom*, 574 F.3d at 35 (citation and internal quotation marks omitted).[8]

Here, based upon their purchases of BoA common stock and/or options during the Class Period and their eligibility to vote on the Merger, Plaintiffs' interests are directly aligned with the interests of the Class, which was injured by the same materially untrue statements and omissions. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (explaining that "named plaintiffs' interests are directly aligned with those of the absent class members; they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments"). When Plaintiffs prove their claims, they will also prove the Class's claims, satisfying the adequacy requirement. *See, e.g., Inyx*, 2011 WL 2732544, at *5; *Globalstar*, 2004 WL 2754674, at *4.

Plaintiffs have also demonstrated their commitment to monitor and supervise the prosecution of this Action on behalf of the Class. Plaintiffs have retained experienced counsel, receive regular status updates, participate in strategic decisions, and are actively engaged in discovery. Indeed, Plaintiffs include several of the largest public pension funds in the world, collectively with hundreds of billions of dollars under management, and are precisely the type of institutional investors Congress sought to empower when enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* H.R. Rep. No. 104-369, at 28 (1995) (Conf. Rep.). Plaintiffs, who have a considerable interest in obtaining a recovery for the Class, easily satisfy the adequacy requirement of Rule 23(a)(4). Finally, proposed Class Counsel are highly qualified and capable of prosecuting this Action. *See* Firm Resumes, Castaldo Decl., Exs. 4-6.

In sum, the requirements of Rule 23(a) are satisfied.

---

[8] A finding that a proposed class representative satisfies the typicality inquiry constitutes "strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Damassia*, 250 F.R.D. at 158. *See also In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008).

**B.**     **The Requirements Of Rule 23(b) Are Satisfied**

Plaintiffs seek class certification under Rule 23(b)(3) because, as set forth below, "questions of law or fact common to the class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1.**     **Common Issues Predominate As To Plaintiffs' Section 14(a) Claim**

Certification under Rule 23(b)(3) is appropriate where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Class-wide issues predominate if resolution of some of the legal and factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc*., 306 F.3d 1247, 1252 (2d Cir. 2002). Notably, "predominance does not require a plaintiff to show that there are no individual issues." *In re NYSE Specialists Sec. Litig*., 260 F.R.D. 55, 75 (S.D.N.Y. 2009). Indeed, while individual issues may arise "in all class action cases, … to allow various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws." *Merrill Lynch*, 2011 WL 3652477, at *12 (citation and internal quotation marks omitted).

Plaintiffs' burden to establish predominance as to their Section 14(a) claim is extremely limited. Section 14(a) does not require Plaintiffs to plead or prove reliance, as it is not an element of the claim. *See Mills*, 396 U.S. at 383; *Browning Debenture Holders Comm. v. Dasa Corp.*, 524 F.2d 811, 815 (2d Cir. 1975) ("[T]he broad, prophylactic purposes of [Section] 14(a) would be frustrated if plaintiffs were required to prove … reliance.").

The remaining elements of Plaintiffs' Section 14(a) claim – materiality, falsity, and loss causation – all present paradigmatic common questions, as noted above. Given the straightforward

legal nature of a Section 14(a) claim, courts across the country routinely hold that class certification is appropriate.  *See, e.g.*, *Koppel*, 191 F.R.D. at 366 & n.9 (certifying Section 14(a) class and holding that "courts have been particularly 'unwilling to consider individual issues of … reliance' as barriers to class certification … in cases alleging material omissions in proxy solicitations") (citation omitted); *Pellman v. Cinerama, Inc., et al.*, 89 F.R.D. 386, 390 (S.D.N.Y. 1981) ("virtually all of the major issues in this case are common"); *Lane v. Page*, 272 F.R.D. 558, 580 (D.N.M. 2011) (predominance established based on "whether the Defendants omitted and/or misrepresented material facts … in connection with the SunCal Merger"); *In re Piedmont Office Trust, Inc. Sec. Litig.*, 264 F.R.D. 693, 701-02 (N.D. Ga. 2010).[9]

The same is true here.  Plaintiffs' Section 14(a) claim rests on a core set of material misrepresentations and omissions in the Proxy concerning the Bonus Agreement and Merrill's losses. Accordingly, Plaintiffs' Section 14(a) claim turns predominantly, if not exclusively, on common, Class-wide questions concerning whether the Proxy's misstatements and omissions were misleading and material.  Thus, predominance is established.[10]

---

[9] *See also In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 296 & n.2, 300 (D. Del. 2003) (certifying Section 14(a) class and holding that "courts have concluded that questions of reliance are not relevant to the determination of class certification" for Section 14(a) claims); *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 582 (D. Colo. 2002) (holding that common issues predominate based on "substantially identical omissions and misstatements [in] … the Proxy statements").

[10] Certification of Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act is proper for the same reasons. Plaintiffs are not required to plead scienter, reliance, or loss causation, and "need only show a material misstatement or omission to establish [their] *prima facie* case."  *Huddleston*, 459 U.S. at 382; *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).  Because the core issue in Plaintiffs' Securities Act claims is the existence of material misstatements and omissions concerning the Bonus Agreement in the registration statement and prospectus for BoA's common stock offering – an issue that is common to the Class – these claims easily satisfy the predominance requirement.  *See Globalstar*, 2004 WL 2754674, at *5; *Merrill Lynch*, 2011 WL 3652477, at *1 ("As courts have repeatedly found, suits alleging violations of the securities laws, particularly those brought pursuant to Sections 11 and 12(a)(2), are especially amenable to class action resolution" because they "depend[], more than anything else, on establishing that certain statements and omissions common to … the offering[] were material misrepresentations: a classic basis for a class action."); *WorldCom*, 219 F.R.D. at 293.

### 2.      **Common Issues Predominate As To Plaintiffs' Section 10(b) Claim**

As explained above, common issues predominate with respect to Defendants' material misstatements and omissions regarding the Bonus Agreement and Merrill's massive losses in the fourth quarter.  Further, as this Court has recognized, "the common issues here include whether defendants publicly issued or disseminated information with … scienter and causation."  *Inyx*, 2011 WL 2732544, at *6; *see also Globalstar*, 2004 WL 2754674, at *5.

Unlike Section 14(a) and Securities Act claims, Section 10(b) claims require a showing of reliance.  Here, however, reliance can be presumed under the "fraud-on-the-market" doctrine set forth in *Basic*, 485 U.S. at 246.  Under the fraud-on-the-market theory, a presumption of reliance applies where a defendant has made a material misrepresentation or omission and the company's stock traded in an efficient market.  *Inyx*, 2011 WL 2732544, at *8; *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 307 (S.D.N.Y. 2010).  The fact that BoA common stock traded on the New York Stock Exchange alone demonstrates that the market was efficient.  *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("no argument could be made that the New York Stock Exchange is not an efficient market") (citing *Basic*, 485 U.S. at 249 n.29).  Under these circumstances, courts routinely find that common issues of reliance predominate, and certify classes asserting claims under Section 10(b) of the Exchange Act.  *See, e.g.*, *Inyx*, 2011 WL 2732544, at *10.

To determine market efficiency, courts analyze the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  *See, e.g.*, *Inyx*, 2011 WL 2732544, at *9.[11]  Plaintiffs' expert, Chad Coffman, submitted a report which analyzed the *Cammer* factors and determined that the evidence overwhelmingly demonstrates the efficiency of the market for BoA common stock during the Class

---

[11] The *Cammer* factors are: (1) a large weekly trading volume; (2) the existence of a significant number of analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

18

Period.  *See* Castaldo Decl., Ex. 2 at Section VII.  Critically, Defendants' expert does <u>not</u> contest that the market for BoA stock was efficient.  Thus, there is no dispute as to market efficiency during the Class Period.  *See* Castaldo Decl., Ex. 1 at ¶ 7.[12]

Further, there can be no serious question that the misstatements and omissions concerning the Bonus Agreement and Merrill's losses were material.  Indeed, this Court has already held that the Complaint's detailed allegations establish, at this stage of the proceedings, that Defendants made material misstatements and omissions concerning Merrill's losses and the Bonus Agreement.  *See Bank of Am.*, 757 F. Supp. 2d at 295-302, 303-07.  Similarly, in the SEC action, Judge Rakoff concluded that, "[d]espite the Bank's somewhat coy refusal to concede [] materiality," it was "obvious" that Merrill's "historically great losses" and the Bonus Agreement were material.  *See SEC v. Bank of Am.*, 2010 WL 624581, at *1 (S.D.N.Y. Feb. 22, 2010).  As set forth below, the facts adduced to date further confirm the materiality of Merrill's losses and the Bonus Agreement.

### a.      Materiality Of Merrill's Losses

Independent of the Court's prior rulings, the following facts are sufficient to establish that Merrill's 2008 fourth quarter losses were material for the purposes of class certification.  By the end of October 2008, the first full month after the Merger was announced, Merrill had suffered massive losses of more than $7.5 billion, an amount exceeding the record profit Merrill had reported in the entire year of 2006.  *See* ¶¶ 7, 90-91.  These losses triggered internal discussions at BoA about whether the losses should be disclosed to shareholders.  *See* ¶¶ 89-91, 101-29.  Indeed, days before the shareholder vote, BoA executives discussed terminating the Merger because of the massive losses at Merrill and, just

---

[12] Because investors in the January 2011 call options are entitled to rely on the fraud-on-the-market presumption, and the efficiency of the market for BoA options is established by the efficiency of the market for BoA common stock, Plaintiffs have also demonstrated that the market for BoA options was efficient during the Class Period.  *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) (where "[p]laintiffs have adduced sufficient evidence demonstrating that the market for SA stock during the class period was efficient" the options seller is "entitled to rely on the fraud on the market theory"); *In re Fannie Mae Sec. Litig*, 247 F.R.D. 32, 41-42 (D.D.C. 2008) (same).

days after the shareholder vote, BoA made the decision to terminate the Merger because of Merrill's losses – a fact that by itself is sufficient to establish that the losses were material.   ¶¶ 143-55. Moreover, Merrill's losses were so significant that BoA could not absorb them without receiving a $138 billion taxpayer bailout.   ¶¶ 156, 160-64.

Further, BoA's most senior officers and outside counsel expressly recognized that Merrill's losses were material, unexpected by the market, and had to be disclosed.   ¶¶ 103-09, 122.   For example, BoA's Treasurer, Jeffrey Brown, informed Defendant Price that Merrill's losses were material enough to require disclosure, and Brown and Wachtell stated that the market had "[no] inkling" of these massive losses.   ¶¶ 122, 171.   Moreover, the market's response to the disclosure of Merrill's losses confirms their materiality.   Following the disclosure of the losses, rating agencies downgraded BoA and Merrill, and analysts reported that Merrill's losses were "shocking," "devastating," and "significantly and materially higher than anyone's expectations."   *See* Castaldo Decl., Ex. 1 at ¶ 23; *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (omission was material where "financial professionals were taken by surprise").   Defendant Lewis himself <u>admitted</u> that Merrill's losses "shock[ed]" the market, and BoA and Merrill admitted in their Forms 10-K for 2008 that Merrill's losses were "larger than expected."   *See* ¶ 185; *see also* Castaldo Decl., Ex. 1 at ¶ 25.

Finally, Plaintiffs' expert report establishes that BoA's stock price fell by a statistically significant amount in direct response to the disclosure of Merrill's fourth quarter losses.   *See* Castaldo Decl., Ex. 2 at ¶ 54; Castaldo Decl., Ex. 1 at ¶ 20.   The significant decline in BoA's stock price further establishes that investors considered substantial losses at Merrill to be a material fact.   *See Sadia*, 269 F.R.D. at 302 ("[W]here a plaintiff can demonstrate that a stock price decline followed a corrective disclosure, a court can infer that the information contained in that disclosure was material …

throughout the class period."); *Monster*, 251 F.R.D. at 138 (concluding that omission was material and applying presumption of reliance where stock price declined 8% following disclosure).

These facts more than adequately demonstrate that Merrill's losses were material for purposes of class certification.[13]

### b.    Materiality Of The Bonus Agreement

The amount in the Bonus Agreement constituted approximately 12% of the Merger consideration, 8% of Merrill's available cash, and was one of the "three main" terms that the parties negotiated in connection with the Merger.  ¶¶ 70-81.  The Bonus Agreement allowed Merrill to pay billions of dollars in bonuses on an expedited basis, before the Merger closed – notwithstanding the fact that Merrill had incurred losses that were so material that BoA could not close the Merger without government assistance.

The market's reaction to the disclosure of Merrill's bonus payments further demonstrates the Bonus Agreement's materiality.  In direct response to the news that $3-4 billion in bonus payments had been made prior to the Merger's close, the price of BoA common stock fell by 15%, a decline that Plaintiffs' expert has determined was statistically significant.  *See* Castaldo Decl., Ex. 1 at ¶ 35; *see also In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 784 (3d Cir. 2009) ("[A] drop in stock price in an efficient market is one way to show materiality."); *Monster*, 251 F.R.D. at 138; *Sadia*, 269 F.R.D. at 302.  Further, analysts described the bonus payments as "ridiculous," and the financial press widely reported that the disclosure of the size and accelerated schedule of the bonus payments was a

---

[13] Moreover, under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972), a presumption of reliance applies where the defendants had an obligation to disclose the information and the information withheld was material.  *Inyx*, 2011 WL 2732544, at *7 ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.") (*quoting Affiliated Ute*, 406 U.S. at 153-54).  Further, in its decisions on the motions to dismiss, this Court has repeatedly held that Defendants had a duty under Section 10(b) to disclose Merrill's losses.  *See Bank of Am.*, 757 F. Supp. 2d at 303-07; *Bank of Am.*, 2011 WL 3211472, at *8, n.8.  Further, as noted above, Merrill's undisclosed losses were material.  Thus, reliance is presumed with respect to the losses under *Affiliated Ute* as well.

"damaging revelation."   ¶¶ 191, 194.   The news of Merrill's bonus payments also triggered an investigation by New York's Attorney General into Merrill's "large, secret last-minute bonuses." ¶ 196.  These facts amply demonstrate that the Bonus Agreement was material, and a presumption of reliance applies pursuant to the fraud-on-the-market theory.

### 3.   Superiority Is Established

Rule 23(b)(3) requires that a class action also be "superior to other available methods for fairly and efficiently adjudicating the controversy."  As a general matter, "securities suits such as this easily satisfy the superiority requirement[.]"  *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 (S.D.N.Y. 2008).  As a court in this District explained:

> [m]ost violations of the federal securities laws … inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.  Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be "fair" nor an adjudication of their claims.  Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

*Lapin*, 254 F.R.D. at 187 (ellipses in original) (quoting *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008)).

Here, the putative Class consists of a large number of investors in BoA's common stock, many of whose individual damages are small enough to render individual litigation prohibitively expensive, and who would lack a means of redress without the availability of a class action.  Additionally, concentrating Class members' claims in a single action and forum is the most efficient use of judicial resources.  Finally, this Action presents no likely case management issues.

### C.   Defendants' Anticipated Arguments Are Without Merit

As set forth above, Plaintiffs have demonstrated that the requirements of Rule 23 are met with respect to their claims arising under the Exchange Act and Securities Act.  While this is an extremely

straightforward case for class certification, during class certification discovery, Defendants submitted an expert report from Professor Allen Ferrell ("Ferrell") which suggests that Defendants will improperly attempt to make the class certification inquiry into a full-blown trial on the merits (the "Ferrell Report").  *See* Castaldo Decl., Ex. 7.  In particular, the Ferrell Report suggests that Defendants will ask the Court to conclude as a matter of law, at this stage of the litigation, that: (i) the Bonus Agreement and Merrill's losses were already known to the market, and thus were not material; (ii) the disclosures of these facts did not cause Plaintiffs' losses; and (iii) damages under Section 14(a) cannot be calculated by reference to the decline in the price of BoA stock following the corrective disclosures.  *Id*.  As explained below, the Court should reject these arguments, as they may not be resolved at this stage of the litigation and, in any event, are wrong.

### 1.     Defendants' Anticipated Arguments As To Section 10(b) Are Meritless

With respect to Plaintiffs' claims under Section 10(b), Ferrell asserts that the information concerning Merrill's losses and the Bonus Agreement was immaterial as a matter of law, and that the disclosure of this information did not cause the decline in BoA's stock price in January 2009.  *See* Castaldo Decl., Ex. 7 at 4-6.  In support of his contentions, he argues that the market purportedly expected Merrill to report "substantial losses" for the fourth quarter, and that the market also expected Merrill's payment of bonuses.  *See id.* at 9, 14-15.  Each of these assertions is wrong.

First, for purposes of this motion, it is sufficient to note that even Ferrell, Defendants' own expert, determined that there were statistically significant declines in the price of BoA common stock on both January 15, 2009, when the *Wall Street Journal* reported that BoA needed a bailout to absorb Merrill's "larger-than-expected" losses, and on January 22, 2009, the first trading day after the *Financial Times* broke the news that Merrill had taken "the unusual step of accelerating bonus payments" totaling between $3 billion to $4 billion.  *See* Castaldo Decl., Ex. 7 at 22.  This concession

is powerful evidence that the information regarding Merrill's losses and the Bonus Agreement was not known to the market, and was material.[14]

Second, in essence, Ferrell is asserting a "truth-on-the-market" affirmative defense with respect to Merrill's losses and the Bonus Agreement. However, as this Court has already held, Defendants' burden of establishing a "truth on the market" affirmative defense is almost "impossible [] to meet at the summary judgment stage." *Bank of Am.*, 757 F. Supp. 2d at 301-302; *see also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (defendants must demonstrate that undisclosed information was clearly communicated to market with "a degree of intensity and credibility" to fully counteract any misstatements or omissions). It is axiomatic that such a defense cannot be established at class certification. Indeed, given that the record in this case is still being developed, the Court cannot and should not, at the class certification stage, engage in the detailed factual analysis and weighing of conflicting evidence necessary to resolve the fact-intensive jury questions presented by this defense. *See, e.g.*, *In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 110-11 (D. Conn. 2005) ("[Q]uestions of whether the information was disseminated and available [to the market], and what weight to give to that information, are factual questions that go to the merits of the plaintiffs' claims, and therefore are inappropriate to address at this [class certification] stage of the proceedings."); *Koppel*, 191 F.R.D. at 366, n.9 ("Courts have been particularly 'unwilling to consider individual issues of materiality and reliance' as barriers to class certification both in cases involving 'a [defendant's] common course of conduct,' and in cases alleging material omissions in proxy solicitations.") (internal citations omitted).

---

[14] While Ferrell claims that there was purportedly confounding information on those days, his assertions go solely to the issue of loss causation and cannot be entertained on this motion. *See Halliburton*, 131 S. Ct. at 2184. Moreover, the information that Ferrell claims is "confounding" with respect to the January 15 stock price decline – including the bailout that BoA admitted in its SEC filings was required by Merrill's losses, and the dividend cut that the Government required as part of the bailout (*see* Castaldo Decl., Ex. 7 at 23) – is directly related to BoA's ability to absorb Merrill's massive fourth quarter loss. *See* Castaldo Decl., Ex. 1 at ¶¶ 19, 31. Similarly, the information that Ferrell asserts is confounding with respect to the January 22 stock price decline – *i.e.*, reports concerning Thain's future with BoA (*see* Castaldo Decl., Ex. 7 at 24-25) – is not confounding because Thain was terminated as a direct result of Merrill's bonus payments and losses. *See* ¶¶ 192-194; Castaldo Decl., Ex. 1 at ¶ 37.

Third, even if the Court were to consider Defendants' truth-on-the-market affirmative defense

at this stage of the proceedings, it is meritless.  As to the Bonus Agreement, the Ferrell Report merely

re-hashes the same truth-on-the-market argument Defendants made at the motion to dismiss stage, and

relies on the same speculative news articles that this Court found insufficient over a year ago.  *See,*

*e.g.,* Castaldo Decl., Ex. 7 at 14-15 and Ex. 2.  Both this Court and Judge Rakoff have already rejected

Defendants' contention that news articles speculating that Merrill may (or may not) pay bonuses

obviated the need for BoA to disclose the Bonus Agreement.  *See Bank of Am.*, 757 F. Supp. 2d at 300-

02 ("Merrill's bonus scheme is portrayed [in the public disclosures] merely as a contingent event,

when, in fact, the negotiations resulted in an agreement as to both the amount and the timing of bonus

payment.").  In the SEC's action, Judge Rakoff similarly concluded that these articles not only failed to

establish truth-on-the-market, but were irrelevant because they did not disclose the Bonus Agreement,

holding:

> The fact that the media were predicting, as the Bank claims, that Merrill would in fact
> pay bonuses is <u>entirely irrelevant</u> to any aspect of this issue, for the alleged falsehood
> consisted of representing as a contingency what was in fact an agreement already
> reached, and it does not appear that virtually any of the media reports disclosed that
> agreement.

*SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) (emphasis added); *see also*

*Lapin*, 254 F.R.D. at 183-84 (rejecting truth on the market defense at class certification based on

general reports).[15]

Further, Plaintiffs have now submitted the Coffman Rebuttal Report, which establishes that the

price of BoA stock declined by a statistically significant amount (15%) on January 22, 2009 in direct

---

[15] Contrary to Ferrell's conclusion that these articles render the Bonus Agreement immaterial, the media's speculation on potential bonus payments by Merrill and other Wall Street firms actually demonstrates that the market was extremely concerned with whether investment banks that had recently received taxpayer funds would pay bonuses.  Moreover, these articles made clear that bonuses could be altered or cancelled at any time depending upon financial performance or other relevant circumstances.  *See, e.g.*, *Firms Still Setting Aside Billions for Bonuses*, N.Y. TIMES, at p. 2 (Oct. 27, 2008) (cited in Ex. 2 to the Ferrell Report) ("At the end of this year, companies could decide against paying the money accrued for bonuses and instead use part of it to cover severance costs.") attached as Castaldo Decl., Ex. 8.

response to the disclosure of Merrill's bonus payments.  *See* Castaldo Decl., Ex. 1 at ¶ 35.  The significant decline in the price of BoA's stock demonstrates that the market was previously unaware of the Bonus Agreement.  *See, e.g.*, *Monster*, 251 F.R.D. at 136-37, 138 (rejecting truth-on-the-market defense and finding materiality).

Similarly, with respect to Merrill's losses, Plaintiffs expect Defendants to argue that, because some analysts were purportedly expecting Merrill to report some loss for the fourth quarter, the staggering losses Merrill ultimately reported in January 2009 were not material.  Again, this is nothing more than a "truth-on-the-market" affirmative defense which, as set forth above, cannot be credited at this stage of the case.  Further, this argument is without merit.  As the Court has recognized, Second Circuit law is clear that the Company's own disclosures, and not speculative reports issued by third parties, are relevant for determining whether the market was on notice of particular facts omitted from a proxy.  *See Bank of Am.*, 757 F. Supp. 2d at 302 ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them.") (quoting *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 736 (2d Cir. 1987)).  This is especially true here, where the Proxy specifically instructed investors to "not rely" on any "representation about the merger or our companies that is different from, or in addition to, that contained in this document."  *Bank of Am. Corp.*, 677 F. Supp. 2d at 718-20.  Because BoA clearly did not disclose Merrill's staggering losses in the Proxy, this Court has already rejected the assertion that the market was sufficiently aware of Merrill's losses to render them immaterial.  *See Bank of Am. Corp.*, 757 F. Supp. 2d at 304-06.

Further, the actions and admissions of Defendants themselves establish that the market was not aware of Merrill's historic losses.  As noted above, BoA's senior officers and counsel acknowledged as

late as December 17, 2008 that the market had "[no] inkling" of Merrill's massive losses, while Defendant Lewis admitted that the disclosure of Merrill's losses "shocked" the market, and Merrill and BoA admitted in their Forms 10-K for 2008 that the losses were "larger than expected."  Indeed, Defendants have not pointed to any evidence that investors knew that Merrill was suffering losses so large that BoA had decided to terminate the Merger, and ultimately required a $138 billion bailout to complete the transaction.  *See Monster*, 251 F.R.D. at 136-37 ("This failure of Monster to produce evidence of a single class member who had actually figured out what Monster claims so many class members would have figured out is telling."); *Lapin*, 254 F.R.D. at 183-84 (same).

Moreover, contrary to Ferrell's conclusion that the market was expecting Merrill's staggering losses, the market reaction to the disclosure of Merrill's losses makes clear that investors were stunned. BoA's stock price immediately declined on January 16 by a statistically significant amount, and analysts, rating agencies, and the financial press called Merrill's losses "shocking," "devastating," and "significantly and materially higher than anyone's expectations." *See* Castaldo Decl., Ex. 1 at ¶ 23.  In sum, the facts adduced to date make clear that any "truth-on-the-market" defense is without merit.

## 2.    Defendants' Anticipated Arguments As To Section 14(a) Are Meritless

With respect to Plaintiffs' Section 14(a) claims, Plaintiffs expect Defendants to again argue, just as they did at the motion to dismiss stage, that because Plaintiffs did not "transact" or "exchange" their shares in the Merger, damages cannot be calculated by reference to the decline in BoA's stock price in January 2009, and Plaintiffs' claim is derivative in nature.  *See* Castaldo Decl., Ex. 7 at 14, 15 and 18.  This argument fails for several reasons.  First, this Court has already held that Plaintiffs' Section 14(a) claim is direct, and that Plaintiffs may seek damages based on the decline in the value of BoA stock following the corrective disclosures.  *See Bank of Am.*, 757 F. Supp. 2d at 292.  Contrary to Ferrell's contention that Plaintiffs can pursue only a derivative claim, this Court has already held that "a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct

27

and derivative suits. The former action protects the shareholders' interest in 'fair corporate suffrage.'"  *Id*.  The Court further held that Plaintiffs may proceed with their claims based on the damages theory "that the BofA shareholders were harmed when the BofA shares decreased in value after the truth about the transaction became public."  *Id*. at n.3.  In reaching the holdings noted above, the Court flatly rejected the premise of Ferrell's arguments, namely, that Plaintiffs must have "transacted" (*i.e.*, bought, sold, or exchanged) their shares in the Merger in order to assert their Section 14(a) claims.  As the Court held, no such "transaction" requirement exists under Section 14(a).  *Id*. (holding that "transaction causation" was adequately pled based solely on the fact that "the Joint Proxy was an essential link in the transaction because the acquisition could not have occurred without the shareholder vote"); *see also* Mem. and Order dated Oct. 8, 2010, Dkt. No. 345, at 3 (denying interlocutory appeal and reconsideration of that holding).

Second, as this Court has recognized, it is black-letter law that questions concerning damages have no bearing on class certification.  *See, e.g.*, *Inyx*, 2011 WL 2732544, at *6 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)).  Indeed, courts in this District uniformly hold that where, as here, "liability can be determined on a class-wide basis," the requirements of Rule 23 are satisfied, and issues concerning the calculation of damages present no bar to class certification.  *See, e.g.*, *WorldCom*, 219 F.R.D. at 302-03 (damages arguments "can be swiftly rejected" at the class certification stage).  Damages questions in securities class actions are a matter for proof at trial, and are resolved by expert evidence presented to the jury.  *See, e.g.*, *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004); *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 517331, at *2 (S.D.N.Y. Mar. 4, 2005).

Third, Plaintiffs have submitted the expert report of Professor Stephen J. Choi, J.D., Ph.D, dated September 26, 2011 (the "Choi Report").  *See* Castaldo Decl., Ex. 9.  As Professor Choi opines,

taking account of the decline in the price of BoA stock following the corrective disclosures is the appropriate way to measure the harm inflicted on the Class here.  *See* Castaldo Decl., Ex. 9 at ¶ 5.  As Professor Choi explained, a class of holders of BoA common stock who were eligible to vote on the Merger is appropriate under Section 14(a) because neither Section 14(a) nor Rule 14a-9 requires a plaintiff to have purchased, sold, or exchanged its shares.  *See id.* at ¶ 9.  In contrast to the "transaction-based focus" of Section 10(b), Section 14(a) focuses on the adequacy of proxy disclosures, and thus provides a cause of action to <u>any</u> investor whose right to a fully informed vote was infringed by a misleading proxy solicitation, regardless of whether they "transacted" their shares. *See, e.g.*, *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1197-98 (2d Cir. 1993) (Rule 14a-9 was "promulgated … with the goal of preserving for all shareholders who are entitled to vote … the right to make decisions based on information that is not false or misleading").  Moreover, as the Choi Report sets forth, as a matter of economic harm the Section 14(a) remedy for direct investor harm is the difference between (i) the value of their investments they were led to expect at the time of the vote based on materially misleading or incomplete disclosures, and (ii) the value of their investments that they actually received as a result of shareholder approval of the merger.  *See* Castaldo Decl., Ex. 9 at ¶¶ 5(c), 29.  Thus, the best way to measure the economic harm in this case is by reference to the decline in BoA's stock price when material information concerning the Merger was revealed.  *See id.* at ¶ 31.

In sum, Defendants' anticipated arguments are without merit.

## IV.    CONCLUSION

For all the reasons stated herein, the Court should grant Plaintiffs' Motion in all respects.

Dated: October 17, 2011
      New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By:    */s/ Fred S. Fox*
        Robert N. Kaplan
        Frederic S. Fox

        850 Third Avenue, 14th Floor
        New York, NY  10022
        Tel:  (212) 687-1980
        Fax:  (212) 687-7714

        *Attorneys for Plaintiffs*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By:    */s/ Steven B. Singer*
        Max W. Berger
        Steven B. Singer

        1285 Avenue of the Americas
        New York, NY  10019
        Tel:  (212) 554-1400
        Fax:  (212) 554-1444

        *Attorneys for Plaintiffs*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

By:    */s/ David Kessler*
        David Kessler
        Gregory M. Castaldo

        280 King of Prussia Road
        Radnor, PA 19087
        Tel:  (610) 667-7706
        Fax:  (610) 667-7056

        *Attorneys for Plaintiffs*