# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | ) ) ) ) ) ) ) |

Master File No. 09 MDL 2058 (PKC)

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

## I.    INTRODUCTION

1.       My name is Chad Coffman.  I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

2.       I have been asked by counsel for the Lead Plaintiffs in this matter to examine and opine on whether the market for Bank of America Corporation ("BoA" or the "Company") common stock ("Bank of America Common Stock" or "Common Stock") was efficient during the Class Period.[1]

3.       The materials I have relied upon in forming my opinions are summarized in **Appendix A**.  Global Economics Group is being compensated at an hourly rate of $525 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case.  My qualifications are described below.

## II.    QUALIFICATIONS

4.       I hold a Bachelors Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago.  I am also a CFA charter-holder.  The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period is from September 18, 2008 through and including January 21, 2009 (Consolidated Second Amended Class Action Complaint ("Complaint") at ¶ 1).

5.      I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination and antitrust.  I have been engaged numerous times as a valuation expert both within and outside the litigation context.  My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters.  As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

6.      My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.


### III.    SUMMARY OF OPINIONS

7.      After analyzing Bank of America Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Bank of America Common Stock was efficient throughout the Class Period.  This opinion is based upon my analysis described in **Section VII**, below.

8.      The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Bank of America's business operations.  **Section V** discusses the reliance requirement and the "fraud on the market" theory.  **Section VI** introduces the *Cammer*

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

factors and other factors for evaluating market efficiency under the "fraud on the market" theory, and **Section VII** evaluates the *Cammer* factors and other efficiency factors for Bank of America Common Stock.

9.     I understand that discovery in this case is ongoing and has not yet been completed.  Therefore, I reserve the right to amend this report to reflect new information available to me in light of the ongoing discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF BANK OF AMERICA

10.     Bank of America is a bank holding company and a financial holding company that provides financial services and products in three business segments: "Global Consumer and Small Business Banking," "Global Corporate and Investment Banking" and "Global Wealth and Investment Management."[3]  In 2008, Global Consumer and Small Business Banking accounted for over $58 billion of revenue, Global Corporate and Investment Banking accounted for over $13 billion of revenue and Global Wealth and Investment Management accounted for nearly $8 billion in revenue.[4] As of December 31, 2008 (prior to the merger with Merrill Lynch), Bank of America held $1.8 trillion in assets and a retail banking footprint covering more than 82% of the U.S.  population.[5]

---

[3] 2008 Bank of America Corp. SEC Form 10-K, p. 1.

[4] 2008 Bank of America Corp. SEC Form 10-K, p. 13.

[5] 2008 Bank of America Corp. SEC Form 10-K, p. 1.

## V.    DISCUSSION OF RELIANCE REQUIREMENT

11.    Class members' reliance on the alleged misstatements and omissions is a required element for certain of Plaintiffs' claims.  Plaintiffs assert the "fraud on the market" theory of reliance in this matter.  The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic v. Levinson*:

> In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business….  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements….  The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[6]

12.    As indicated in *Basic*, in an open, developed and efficient market, market prices reflect what is known about a company.  If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated compared to what the price would have been if the truth were known (but-for misleading information).  Thus, in an efficient market where plaintiffs prove there were material misrepresentations, all purchasers implicitly relied on those misrepresentations.

13.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.  The esteemed economist Dr. Eugene Fama, in his seminal

---

[6] *Basic v. Levinson*, 485 U.S. 224, 240 (1988).

research, first outlined definitions of an "efficient market."[7]  He described different levels of efficiency which he called "weak-form," "semi-strong-form" and "strong-form" efficiency.[8]

14.     The market efficiency standard adopted by *Basic* as necessary for the presumption of reliance conforms to Dr. Fama's "semi-strong form" efficiency.  "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price.  This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[9]  The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

15.     In the next section, I explain the factors that I understand are regularly considered by Courts in determining whether the market for a particular security is efficient.

---

[7] Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970, p. 383.

[8] "Weak-form" efficiency requires that historical prices are not predictive of future prices.  Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices.  Therefore, technical analysis will not produce consistent excess returns over time.  "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price.  Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.  Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns.  "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price.  In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[9] *Basic v. Levinson*, 485 U.S. 224, 240 (1988).

## VI.   *CAMMER* FACTORS

16.     In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[10]

17.     The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[11]  As articulated below, the adopted definition of efficiency is clearly consistent with Fama's definition of "semi-strong" efficiency.[12] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one.  And an efficient market will almost invariably be a developed one.[13]

---

[10] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989.

[11] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 2.

[12] Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* Vol. 25, 1970, p. 383.

[13] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 2 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) (emphasis added).

18.     While there is a clear and well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient."  In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors beyond the *Cammer* factors.  To be clear, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

19.     In the subsequent sections I evaluate each of the *Cammer* factors, as well as the following additional factors that are relevant to assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns).

20.     In **Section VII**, I empirically evaluate each factor for the Common Stock during the putative Class Period.


## VII.     APPLICATION OF EFFICIENCY FACTORS TO BANK OF AMERICA COMMON STOCK

### A.  OVERVIEW

21.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for Bank of America Common Stock was efficient throughout the Class Period.

22.     My analyses and related conclusions concerning the factors relevant to a finding of market efficiency for the Common Stock throughout the Class Period are discussed below.  In addition to the discussion below, **Exhibit 1** summarizes how for each of the factors examined, the empirical evidence supports a finding that the Common Stock traded in an efficient market.  As further background to my analyses, **Exhibit 2** displays the Common Stock closing price and trade volume for each day throughout the Class Period.

23.     To summarize, the average weekly trading volume for the Common Stock far exceeds benchmarks that the Courts have established.  During the Class Period, the average **daily** trade volume for the Common Stock was approximately **133.64 million shares**.  This is a tremendous quantity of shares trading hands and, as I will demonstrate, is extremely high relative to other common stocks traded on the NYSE.  Also, there were an abundance of securities analysts following and reporting on Bank of America, and Bank of America had one of the largest market capitalizations of all firms on the NYSE and NASDAQ.  I also empirically demonstrate a strong cause and effect relationship between new Company-specific information and the market price of Bank of America Common Stock during the Class Period.  These facts, among others, support my conclusion that Bank of America Common Stock traded in an open, developed, and efficient market throughout the Class Period.


### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

24.     The first *Cammer* factor is the average weekly trading volume of a security.  According to one authority cited by the *Cammer* court,

> [T]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for

a security is an efficient one; 1% would justify a substantial presumption.[14]

25.     Volume as a fraction of shares outstanding is an important indicator of market efficiency.  First, volume is objectively quantifiable and comparable across securities.  Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[15]  Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security.  As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[16]

26.     Bank of America Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market.  The average weekly turnover for the Common Stock was 12.50%.  **Exhibit 3** plots the Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[17]  Indeed, the average *daily* volume during the Class Period was 133.64 million shares.  The volume of trading for the Common

---

[14] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 28 (citing Bromberg, et al.).

[15] Continuity means that trades may occur at any time.  Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information).  William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45.  Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes."  Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug.  1988) as cited by *Cammer*, p. 2.  Market depth refers to the number of shares that can be traded at quoted prices.  A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price.  *See* Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1(4) pp. 269-364.

[16] Randall S.  Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems* Vol. 63, p. 108.

[17] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

27. Another measure of the concepts underlying this *Cammer* factor (continuity, liquidity, and market depth) is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[18]  The advantage of this measure is that Bank of America Common Stock's annualized turnover velocity can be compared directly with other stocks that trade on the same exchange based on exchange-reported statistics.  The average annualized turnover velocity ratio for Bank of America Common Stock was 417% for all of 2008, compared with the NYSE average of 240% over the same period.[19]  Over the Class Period, the annualized turnover velocity for Bank of America was even higher, at 691%.  Thus, Bank of America Common Stock had an average annualized turnover that exceeded the average stock trading on the NYSE, thus further supporting that it traded in an efficient market.

28. In short, the relatively high trading volume in the Common Stock throughout the Class Period supports the conclusion that the market for this security was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

29. The *Cammer* decision stated the following related to analyst coverage:

> …it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the

---

[18] Turnover velocity is simply the average turnover (the first *Cammer* Factor) expressed in dollar terms: **Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding

[19] Turnover velocity for the NYSE is from World Federation of Exchanges; http://www.world-exchanges.org/statistics.

[auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[20]

30.     Analyst coverage, while not required for market efficiency in my opinion, is important confirmatory evidence of efficiency.  Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities and that the information is widely distributed.

31.     During the Class Period, there was an abundance of analyst coverage of Bank of America.  **Exhibit 4** shows that there were at least 125 analyst reports issued during the Class Period by 32 separate equity analysts for Bank of America.[21]  Major firms such as Credit Suisse, Citigroup, JP Morgan, Lehman Brothers, Morgan Stanley and UBS issued analyst reports on Bank of America.  These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analysis and recommendations of the analysts to investors.  In addition, there were reports by credit rating agencies and others that evaluated Bank of America's creditworthiness and other publicly-traded securities.  The extensive coverage of Bank of America by securities analysts supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

32.     Since 1989 when the *Cammer* decision was rendered, there has been an explosion of alternative methods by which publicly available information about publicly-traded securities is disseminated to investors.  For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[22] and other media, the ability of individual and

---

[20] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 22.

[21] This almost certainly understates the total amount of analyst coverage since many analyst reports are not available through third party data providers.

[22] RSS is an acronym for Really Simple Syndication or Rich Site Summary.  RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content.  The

institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

33.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account.  Thus, in addition to the substantial analyst coverage of Bank of America, there were many other sources of information dissemination.  For example, there was substantial public press regarding Bank of America.  A search for articles classified as related to Bank of America by Factiva over the Class Period results in over 4,700 articles.  There were 153 SEC filings that are available online at EDGAR at no out-of-pocket cost.[23]  There were numerous other sources of information available throughout the Class Period that I do not attempt to quantify.  The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply and demand for information regarding Bank of America in the public arena throughout the Class Period.

34.     In summary, the number of analyst reports, other investment reports covering Bank of America and its other publicly-traded securities, and the substantial public dissemination of news and other information regarding Bank of America provides evidence of a robust and active market for information about Bank of America and evidence that the Common Stock traded in an efficient market.

---

RSS feeds are generally simple headlines and brief descriptions if the user is interested they can click to see additional information.  Content viewed in the RSS reader or news aggregator is known as an RSS feed.  RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships.  (http://www.rss-specifications.com/ and  http://www.rss-specifications.com/what-is-rss.htm)

[23] Excludes SEC Form 3, 4 and 5, which relate only to equity ownership by directors, officers, and owners of more than ten percent of a class of the company's equity.

## D. *CAMMER* FACTOR 3: MARKET MAKERS

35.   The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion.  Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[24]

36.   The basic premise that the number of market makers can serve as an efficiency criteria relates to the notion that market makers are:

> …presumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow").  Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[25]

37.   As noted above, *Cammer* states that the number of market makers is relevant to consider the market efficiency of securities traded in an over-the-counter market with no volume reporting.  On such markets, there may be reason for concern regarding liquidity and information dissemination.  However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE which are often assumed to be efficient,[26] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[27]

---

[24] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 28.

[25] Brad M.  Barber, Paul A.  Griffin and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *The Journal of Corporation Law*, Winter 1994, 19 Iowa J. Corp. L. 285.

[26] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 2 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)).

[27] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market.  *See* http://www.nyse.com/equities/nyseequities/1166830723427.html; William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995,

38.     Throughout the Class Period, the Common Stock traded on the NYSE, which is a more advanced and efficient market than an over-the-counter market described for this *Cammer* factor.  The NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day.  Rather than decentralized market makers providing liquidity for trading (which was the case for the security at issue in *Cammer*), the NYSE conducts trading on a continuous auction system where an assigned specialist is physically present at all times during open trading.[28]  These "specialists" are required by exchange rules to maintain a "fair and orderly" market and to take the other side of a trade even if it means having to buy or sell from their own accounts.[29]  The specialist system thus provides continuous liquidity for the security. In addition, much of the trading (currently a vast majority) is accomplished by electronically matching orders without the involvement of a specialist or market makers at all.[30]

39.     Thus, the NYSE has a market structure that combines both an auction system and electronic trading and does not rely on the less efficient mechanism of decentralized market makers to provide liquidity.  Therefore, the number of "market makers" itself is not a relevant metric.  However, Bank of America Common Stock, by virtue of trading on the NYSE, easily meets the spirit of this *Cammer* factor throughout the Class Period.

---

pp. 45-53;  Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[28] William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp 45-53.  Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[29] Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[30] Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

## E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

40.     The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> It would be helpful to allege the Company was entitled to file an S-3
> Registration Statement in connection with public offerings or, if ineligible,
> such ineligibility was only because of timing factors rather than because
> the minimum stock requirements set forth in the instructions to Form S-3
> were not met.  Again, it is the number of shares traded and value of shares
> outstanding that involve the facts which imply efficiency.[31]

41.     Through Form S-3, the SEC allows certain companies that have previously
provided sufficiently high levels of public information to incorporate prior SEC filings by
reference into current filings and not repeat the information, since it is already deemed to be
widely publicly available.[32] In order to be eligible to issue a Form S-3, among other things, a
company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for
more than one year, 2) must have filed all documents in a timely manner for the past twelve
months and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on
debts or material leases.  Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not
a requirement.  Interpreted in this way, the standard makes sense as an indicator of efficiency.

42.     Bank of America was S-3 eligible and, in fact, filed a Form S-3ASR, which is an
automatic shelf registration statement for use by well-known seasoned issuers.[33]  A Form S-
3ASR allows a company to register unspecified amounts of different specified types of securities
using a single form.

43.     Bank of America filed a Form S-3ASR during the Class Period and met the SEC's
standards as a seasoned issuer for which information is already widely distributed.  Therefore,

---

[31] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April
19, 1989, p. 22.

[32] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

[33] Bank of America Corp. SEC Form S-3ASR dated November 14, 2008.

Bank of America meets this *Cammer* efficiency factor which supports the conclusion that the Common Stock traded in an efficient market.

### F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

44.    The fifth *Cammer* Factor relates to how a security reacts to new information and states:

> …one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[34]

45.    Establishing a causal connection between new company-specific news events and movements in the market price is convincing evidence of market efficiency.  A technique often relied upon by academics, both inside and outside of the context of litigation, to establish such a causal connection is called the "event study."  An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[35]  Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place.  Event studies have now been used for over 30 years and appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[36]

46.    To analyze cause and effect, I performed an event study to determine whether Bank of America's stock reacted swiftly and significantly to earnings announcements.  I also

---

[34] *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19, 1989, p. 27.

[35] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

[36] John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* Vol. 11, 1998, pp. 111-137.

performed an event study on certain days during the Class Period without significant company-specific news.  Based on the event study I have performed, which explicitly controls for market and industry factors, I find that there is a clear cause and effect relationship between new public information about Bank of America and the market price of its common stock after controlling for market effects.  I now describe in further detail the event study methodology, the events I test, and the results.

47.     An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities.  New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports.  An event study begins by specifying a model of what price movements are "expected" based on outside market factors and then testing whether the deviation from expected price movements are sufficiently large that simple random movement can be rejected as the cause.

48.     A well accepted method for performing an event study is to estimate a regression model over some period of time to observe the typical relationship between the market price of the relevant security and broad market factors.  I have performed such an analysis where I evaluate the relationship between Bank of America's Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return and the S&P 500 Financial Index.[37]

49.     The model indicates that there is a positive correlation between the Common Stock and the control variables.  For example the estimated coefficient for the S&P 500 is 1.02 which means that a 1% rise in the S&P 500 predicts a 1.02% increase in Bank of America's return.  The estimated coefficient for the S&P Financial Index is 1.46, meaning that the expected return for Bank of America is about a 1.46% increase for every 1% increase in the S&P Financial

---

[37] I have removed Bank of America and Merrill Lynch from the S&P 500 Financial Index which is a capitalization-weighted index with the S&P 500 as its parent index.

Index over and above the return of the S&P 500. **Exhibit 5** shows the coefficients from the regression model.

50.     Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model.  For example, on October 30, 2008 the model predicts, based on movements in the control indices, that absent any new firm-specific information the price of the Common Stock would rise by 1.05%.  Because of the inherent randomness observed in stock price returns, we do not expect the model to predict returns exactly.  In this example we observe an actual return of 2.06%.  Thus, the "abnormal return" is 1.01% (the actual return of 2.06% minus the predicted return of 1.05%).  We then rely on the standard deviation of the errors from the regression model to tell us if this abnormal return of 1.01% is sufficiently large that we reject random movement as the explanation.

51.     A "t-statistic" measures the number of standard deviations between the actual observation and the prediction.  For the example date, an abnormal return of 1.01% represents 0.31 standard deviations or a t-statistic of 0.31 (1.01% abnormal return divided by the standard deviation of the errors of 3.21%).  Probability theory tells us that based on randomness alone, the abnormal return should only have a t-statistic of greater than 1.96 standard deviations 5% of the time.[38]  Restating this point another way, we have 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation.  Since our example has a t-statistic of 0.31, we would say that the abnormal return is not statistically significant and we could not reject randomness as the cause.  However, if on a

---

[38] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

particular day we observe an abnormal return that has a t-statistic of a magnitude greater than 1.96 ("statistically significant") and we observe new firm-specific information, we reject randomness as the explanation and infer that the new information is the cause of the stock price movement.

52.     Using the model described above, I test whether there were statistically significant returns on the same days for which there were earnings announcements during the Class Period. I analyze these events because there are many academic articles and financial treatises that explain theoretically and demonstrate empirically that earnings announcements (especially earnings surprises) and changes in dividend policy often (but not necessarily always) cause a material change in investors' beliefs regarding the value of a security.[39]

53.     On October 6, 2008 after the market closed, Bank of America announced earnings for Q3 2008.[40]  Bank of America reported that its net income was $0.15 per share, less than a quarter of analysts' consensus estimates of roughly $0.65.[41]  In addition, Bank of America stated that it would raise $10 billion in capital and cut its dividend in half, from $0.64 per share to $0.32, "which signal[ed] a weak 09 outlook."[42]  In the immediately following trading session on October 7, 2008, Bank of America Common Stock fell by 26.23% while the event study model

---

[39] For example, see William H.  Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, (1968), pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting: Selected Studies 1971 , pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[40] "Bank of America Announces Third Quarter Earnings and Capital Raising Initiatives; Earns $1.18 Billion, or $0.15 Per Share; Selling Approximately $10 Billion in Common Stock; Reduces Fourth Quarter Dividend 50 Percent to $0.32," *PR Newswires*, October 6, 2008, 16:10; "'Perfect Storm' produces a capitulation," *HSBC Global Research,* October 7, 2008.

[41] "Preannc'd 3Q08 Results; Capital Actions Smart Move," *Fox-Pitt Kelton*, October 7, 2008.

[42] "Credit, Cap Mkts Drove Very Weak 3Q, Capital Raise, Dividend Cut - Weak Outlook – ALERT," *J.P.Morgan,* October 7, 2008.

predicts a return of -11.47%.  Thus the abnormal return on October 7, 2008 is -14.75%.  With a t-statistic of -4.59, this movement is statistically significant.  This demonstrates that Bank of America's market price reacted quickly and significantly to this news.[43]

54.      On January 16, 2009, before the market opened, Bank of America announced Q4 2008 earnings, including those for recently acquired Merrill Lynch.[44]  Bank of America announced that Merrill Lynch had a $15 billion after-tax loss for Q4. As a result, this led to the need for a $20 billion investment from the U.S. Government, as well as slashing the common stock dividend from $0.32 per share to $0.01 per share.  In a conference call, Bank of America Chief Executive Officer Ken Lewis stated "[w]e went to our regulators and told them that we would not -- that we could not close the deal without their assistance.  As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee."[45]  A Deutsche Bank analyst report stated that "the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [government] involvement."  An analyst at Goldman Sachs wrote that "Merrill was much, much worse than expected – Merrill lost $15 bn, 3X worse than last quarter" and that Merrill Lynch had "significantly weakened the already-tight capital position of Bank of

---

[43] This date falls within the temporary short selling ban imposed by the SEC on a large number of financial stocks, including Bank of America.  The ban was in effect from September 19, 2008 through October 8, 2008.  The price reaction on October 7, 2008 provides a direct example of how the ban on short selling did not prevent Bank of America's market price from quickly incorporating new information.  In addition, according to the data on Exhibit 3 there was no apparent impact on Bank of America's trading volume during the short selling ban, nor was there a discernable impact on Bank of America's bid-ask spread.

[44] "Bank of America Earns $4 Billion in 2008; Fourth-Quarter Net Loss of $1.79 Billion; Extends $115 Billion in New Credit in Fourth Quarter; $15.31 Billion Fourth-Quarter Net Loss at Merrill Lynch; U.S. Invests $20 Billion in Bank of America; Also Provides Insurance for $118 Billion in Exposure; Quarterly Dividend Reduced to $.01," *PR Newswires*, 16 January 16, 2009, 06:00.

[45] "Q4 2008 Bank of America Corporation Earnings Conference Call – Final," *Voxant FD (FAIR DISCLOSURE) Wire,* January 16, 2009.

America."[46]   Analysts at Sandler O'Neill wrote that "the magnitude of the losses across each of these areas exceeded our expectations significantly.  The Merrill Lynch 4Q08 loss looks much worse than expected…."[47]   On that day of trading, Bank of America Common Stock fell by 13.70% while the regression model predicts a return of -2.47%.  Thus the abnormal return on January 16, 2009 is -11.23%.  With a t-statistic of -3.49, this movement is statistically significant.  Again, the rapid and significant price impact demonstrates that Bank of America's market price reacted quickly and significantly to new information.

55.     To expand upon the cause and effect analysis I also show that there are not statistically significant returns on days with little news about Bank of America or Merrill Lynch. To select a sample of appropriate dates, I considered the two dates in the Class Period with the lowest number of articles related to either Bank of America or Merrill Lynch.[48]   I confirmed that the articles on each day did not have material news that one would expect to cause a significant price movement in Bank of America Common Stock.  These dates are December 4, 2008 and January 5, 2009.

56.     On December 4, 2008, Bank of America Common Stock fell by 4.72%, with a predicted return of -1.25%.  Thus the abnormal return is -3.46%.  With a t-statistic of -1.08, this movement is small enough that we cannot reject the hypothesis that it is due to randomness.

57.     On January 5, 2009, Bank of America Common Stock fell by 2.44%, with a predicted return of -3.22%.  Thus the abnormal return is 0.78%.  With a t-statistic of 0.24, this movement is small enough that we cannot reject the hypothesis that it is due to randomness.

---

[46] "Bank of America 4Q08: First Take," *Deutsche Bank,* January 16, 2009; "First-Take: Self-inflicted wounds," *Goldman Sachs,* January 16, 2009.

[47] "4Q08 First Look," *Sandler O'Neill*, January 16, 2009.

[48] I chose the two days with the lowest number of news articles on Factiva excluding the days immediately surrounding the Christmas holiday.

58.     Therefore, on both of these days with the least number of stories and no material news, unsurprisingly, neither resulted in a significant movement in Bank of America's stock price, thereby further supporting the notion that there is a cause and effect relationship between new material news and changes in the market price of Bank of America's Common Stock. Based on the analyses described herein, I find that there is a clear cause and effect relationship between new material public information about Bank of America and the market price of its Common Stock.

## G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

59.     Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[49]  Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

60.     Bank of America Common Stock had higher market capitalization than the vast majority of NYSE stocks, thus suggesting this factor is supportive of efficiency.  During the Class Period, Bank of America had between 4.6 billion and 6.4 billion shares outstanding. According to the Schedule 14a documents filed by Bank of America in 2008 and 2009, insiders held roughly 1% of the outstanding shares.[50]

61.     Based on the market price, the market capitalization for the Common Stock averaged $89.4 billion during the Class Period.  **Exhibit 6** shows that the Common Stock's market capitalization fell around the 98th percentile of the combined NYSE and NASDAQ

---

[49] Randall S.  Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems,* Vol. 63, p. 117.

[50] Bank of America Def-14a filed March 19, 2008 and Bank of America Def-14a filed March 18, 2009.

markets during the Class Period.[51]  In other words, at year-end 2008, the Common Stock had a higher market capitalization than at least 98% of the firms on the combined NYSE and NASDAQ.

62.      Given that the Common Stock's market capitalization is consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for the Common Stock.

## H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

63.      The bid-ask spread is an important indicator of the degree to which a market is developed.  The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.  In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies.  Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

64.      I analyzed bid-ask spreads for Bank of America Common Stock during the Class Period.  During this period, the time-weighted bid-ask spread for Bank of America Common Stock in each month ranged from 0.014% and 0.073%.[52]  When compared against a random sample of 100 other common stocks on the NYSE and NASDAQ in December 2008, Bank of

---

[51] The market capitalization of all the companies that were traded in the NYSE and the NASDAQ as of December 30, 2008 was acquired from Bloomberg.

[52] I calculated a time-weighted average bid-ask spread for Bank of America Common Stock for each month from September 2008 to January 2009 using data received from TICK database.  *See* www.tickdata.com.  September 2008 and January 2009 data are limited to the Class Period.

America Common stock had the 11th lowest bid-ask spread, respectively.[53]  The median time-weighted average bid-ask spread for a randomly selected group of 100 other NYSE and NASDAQ stocks was 0.58% in December 2008.[54]  Accordingly, this analysis suggests the Common Stock's bid-ask spread compares favorably with other exchange traded stocks and further supports a conclusion of market efficiency.

## I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

65.     Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own.  These investors include mutual funds, pension funds, investment banks and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios.  Most institutions that hold over $100 million in assets are required to report their equity holdings on a quarterly basis on SEC Form 13F.[55]  As **Exhibit 7** shows, these large institutions reported owning a majority of all Bank of America Common Stock during the Class Period.  For the quarter ending dates within the Class Period,[56] institutions held at least 60% of the shares of outstanding Common Stock according to CapitalIQ.  This high level of institutional ownership of Bank of America Common Stock during the Class Period, coupled with the high

---

[53] I chose December 2008 because it is the last full month of the Class Period.  Quote data for Bank of America and other publicly traded stocks were obtained from the TICK database.  *See* www.tickdata.com.

[54] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security.  Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread.  I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D.  Huang, Hans R.  Stall, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* Vol. 41, 1996, pp. 313-357.

[55] See http://www.sec.gov/about/forms/form13f.pdf.

[56] Quarter-end dates in the Class Period are September 30, 2008 and December 31, 2008.

trading volume, indicates that the market price was reflective of active trading by extremely sophisticated and knowledgeable investors and supports a conclusion of market efficiency.

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

66.     If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated."  Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price.

67.     Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news.  Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[57]

68.     A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[58]  If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.  Even if the regression shows a significant result for a certain period, then one must ask whether the effect is persistently significant and large enough to suggest a predictable arbitrage opportunity in the next period.

---

[57] Doron Avramov, Tarun Chorida, and Amit Goyal, "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance,* Vol. LXI, No. 5, 2006, pp. 2367-2368; Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* Vol. 6, Nos. 2/3, 1978, pp. 95-101.

[58] William H.  Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

69.     **Exhibit 8** displays the autocorrelation coefficient for Bank of America Common Stock using the abnormal returns from the event study model described above.  The coefficient is small and statistically insignificant.  This is inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits.  Therefore, this factor also supports the conclusion that Bank of America Common Stock traded in an efficient market throughout the Class Period.

70.     In sum, every factor analyzed supports my opinion that Bank of America Common Stock traded in an efficient market.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 29, 2011.

Chad Coffman

# Appendix A

## Appendix A

## List of Documents Relied Upon

**Court Documents**

- Consolidated Second Amended Class Action Complaint, filed October 22, 2010
- Memorandum & Order Motion to Dismiss, filed July 29, 2011
- Memorandum & Order Motion to Dismiss, filed August 27, 2010

**Court Decisions and Securities Law**

- *Basic v. Levinson*, 485 U.S. 224, 240 (1988)
- *Cammer v. Bloom*, 711 F. Supp 1264 (D.N.J. 1989)

**SEC Filings/Forms**

- Bank of America Forms 10-K for fiscal years 2006 – 2008
- Bank of America Forms 10-Q for fiscal quarters from 2007Q1 – 2009Q1
- Bank of America Form 8-K filed October 3, 2008
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf
- Bank of America proxy statements (Def-14a) from 2007-2011
- Bank of America Form S-3ASR filed November 14, 2008

**Security Data**

- Historical data for Bank of America and Merrill Lynch Common Stock, S&P 500 Total Return Index, and S&P 500 Financial Index obtained from Bloomberg
- Quote data for Bank of America during the Class Period, and quote data for 100 random companies trading on the New York Stock Exchange and NASDAQ for December 2008 and January 2009 obtained from www.tickdata.com
- Institutional holdings data obtained from CapitalIQ
- The market capitalization of all the companies that traded on the NYSE and the NASDAQ during the Class Period obtained from Bloomberg
- Turnover velocity data for the NYSE from the World Federation of Exchanges, see http://www.world-exchanges.org/statistics

**News**

- Bank of America and Merrill Lynch news headlines and articles downloaded from Factiva for the Class Period
- Bank of America Earnings Conference Call transcripts during the Class Period

**Bank of America Analyst Reports**

- Numerous analyst and credit rating reports regarding Bank of America and Merrill Lynch issued during the Class Period

**Academic Articles/Texts**

- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35(1), March 1980.

- Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1(4) pp. 269-364.

- Doron Avramov, Tarun Chorida, and Amit Goyal, "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance,* Vol. LXI, No. 5, 2006, pp. 2367-2368.

- Brad M. Barber, Paul A. Griffin and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *The Journal of Corporation Law*, Winter 1994, 19 Iowa J. Corp. L. 285.

- William H. Beaver. "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research*, Vol. 6, Empirical Research in Accounting: Selected Studies 1968, 1968.

- Alessandro Beber and Marco Pagano, "Short-Selling Bans around the World: Evidence from the 2007-09 Crisis," *Journal of Finance (forthcoming),* August 2011.

- John Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* Vol. 11, 1998, pp. 111-137.

- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

- Eugene F. Fama. 1970. "Efficient Capital Markets: A Review of Theory and Empirical Work." *The Journal of Finance* Vol. 25(2).

- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, pg. 644.

- Roger D. Huang and Hans R. Stall, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial*

*Economics,* Vol. 41, 1996, pp. 313-357.

- Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics,* Vol. 6, Nos. 2/3, 1978, pp. 95-101.

- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research*, Vol. 9, Empirical Research in Accounting: Selected Studies 1971, 1971.

- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53.

- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.

- Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems,* Vol. 63.

# Appendix B

**CHAD W. COFFMAN, CFA**

Global Economics Group, LLC
140 South Dearborn Street, Suite 400
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com


**EMPLOYMENT:**

    **Global Economics Group, LLC**
        President (2008 - Current)

        Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, San Francisco and Atlanta, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

    **Market Platform Dynamics, LLC**
        Chief Financial Officer & Chief Operating Officer (2010 – Current)

        Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

    **Chicago Partners, LLC**
        Principal (2007 – 2008)
        Vice President (2003 – 2007)
        Director (2000 – 2003)
        Senior Associate (1999 – 2000)
        Associate (1997 – 1999)
        Research Analyst (1995 – 1997)


**EDUCATION:**

    **CFA**    Chartered Financial Analyst, 2003

    **M.P.P.**  University of Chicago, 1997
          Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

B.A.    Knox College, 1995
        Economics, Magna Cum Laude
        Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
        Supply Pricing:  Using Galesburg, Illinois as a Case Study"
        Dean's List Every Term
        Phi Beta Kappa


**SELECTED EXPERIENCE:**

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack Grubman's analyst coverage of various companies.  This included supporting multiple experts at high-profile arbitration where plaintiffs claimed $900 million in damages.  Arbitration panel returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
  - WorldCom
  - Enron
  - Tyco
  - Parmalat
  - Sears
  - Atlas Air
  - UnumProvident
  - XL Capital
  - Household Finance/HSBC
  - Dynegy
  - Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading.  Developed models to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom.  Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares.  Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.</u>  Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>.  Filed declaration August 5, 2008 re: plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.

- Testifying expert in <u>DVI Securities Litigation, United States District Court, Eastern District of Pennsylvania, 2:03-CV-05336-LDD.</u>  Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation</u>, Supreme Court of the State of New York, Index No. 603568/2007. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York.</u> Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division.</u> Filed declaration March 16, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts.</u>  Filed expert report August 6th, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York.</u> Filed declaration October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann.</u> Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010.  Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD</u>.  Filed rebuttal expert report July 8, 2010. Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD</u>. Filed rebuttal expert report August 23, 2010.  Deposition October 7, 2010.  Filed rebuttal reply report November 5, 2010.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB)</u>.  Filed expert report January 14, 2011.

- Testifying expert in <u>In re Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD)</u>.  Filed expert report February 7, 2011.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, United States Postal Service.  United States District Court for the District of Columbia. C.A 1:00CV-1834 (TFH)</u> – Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

      Knox College, Teaching Assistant - Statistics, (1995)
      Knox College, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

      Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

      Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

      Associate Member CFA Society of Chicago
      Associate Member CFA Institute
      Phi Beta Kappa

**AWARDS:**

      1994  Ford Fellowship Recipient for Summer Research.

1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

Pro bono consulting for Cook County State's Attorney's Office.

# Exhibits

**Exhibit 1**
**Summary of Efficiency Factors for Bank of America, Inc. Common Stock**

| Factor | Summary of Factor | Bank of America Common Stock |
|---|---|---|
| Average Weekly Trading Volume Cammer I | Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption | • Average weekly trading volume of 12 50% as a percentage of shares outstanding (133 64 million shares traded daily) |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors " | • During the Class Period at least 32 securities analysts issued 125 analyst reports |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion  Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption " | • Exchange-Traded (NYSE), not over the counter |
| SEC Form S-3 Eligibility Cammer IV | It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency | • S-3 Eligible as they filed an S-3ASR on November 14, 2008 |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price " | • Event study demonstrates a clear cause and effect relationship |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following | • As of December 29, 2008, Bank of America's market capitalization was $64 9B, which is at the 98th percentile of NYSE and NASDAQ stocks combined  • Insiders held roughly 1% of the shares outstanding |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price | • Based on a random sample of stocks, Bank of America's Common Stock bid-ask spread is lower than over 90% of the stocks that traded on the NYSE and NASDAQ |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own | • As of the two quarter-end dates during the Class Period where institutional holding data are available, institutions held at least 60% of the shares outstanding |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price | • No evidence of autocorrelation |

**Exhibit 2**
**Bank of America Common Stock Daily Closing Price &Volume**
**September 18, 2008 - April 21, 2009**



Source: Bloomberg

**Exhibit 3**
**Bank of America Common Stock Average Weekly Trading Volume**
**As a Percentage of Shares Outstanding**
**September 18, 2009 - January 20, 2009**



Source: Bloomberg
Note: The last week consists of only one trading day and is excluded from the "Average Weekly Volume as Percentage of Shares Outstanding" calculations.  Each week is defined as five consecutive trading days.

**Exhibit 4**

**Summary of Available Bank of America Securities Analyst Reports
During the Class Period**

**Common Stock Reports**

| | Total |
|---|---|
| Ativo | 1 |
| Atlantic | 1 |
| Baird | 1 |
| Barclays | 9 |
| Bernstein Research | 3 |
| Best Independent Research | 2 |
| Buckingham | 4 |
| Citigroup | 6 |
| Credit Suisse | 10 |
| Deutsche Bank | 8 |
| FBR | 1 |
| Ford Equity | 1 |
| Fox-Pitt Kelton | 10 |
| Goldman Sachs | 1 |
| HSBC | 4 |
| IBIS World | 2 |
| ISS M and A Insight | 1 |
| JP Morgan | 7 |
| Keefe Bruyette | 1 |
| Ladenburg Thalmann | 8 |
| Lehman Brothers | 2 |
| Morgan Stanley | 5 |
| NAB Research | 1 |
| Oppenheimer | 6 |
| PriceTarget Research | 5 |
| RBC Capital Markets | 4 |
| Sandler O'Neill | 2 |
| Sterne Agee | 1 |
| Stifel Nicolaus | 2 |
| TheStreet.com | 2 |
| UBS | 9 |
| ValueEngine | 5 |
| **Total** | **125** |

Note: Bank of America was also rated by all three major credit rating agencies: Moody's, Fitch, and Standard & Poor's
Source: Analyst Reports obtained from Counsel and Thomson

**Exhibit 5**
**Bank of America, Inc. Common Stock Market Model**

| | |
|---|---|
| **Time Period:** | September 18, 2008 to January 11, 2009[1] |
| **Number of Observations:** | 79 |
| **Adjusted R-Square:** | 0.87 |
| **Root Mean Squared Error** | 3.21% |

| Variable | Coefficient | t Value |
|---|---|---|
| Intercept | 0.00 | 0.06 |
| S&P 500 Total Return | 1.02 | 6.09 |
| S&P 500 Financial Index[2] | 1.46 | 11.18 |

Source: Bloomberg

[1] I have removed October 7, 2008 due to the highly significant abnormal return on that day as a result of an earnings announcement. The estimation period ends on January 11, 2009, prior to Plaintiffs' alleged corrective disclosure period (which includes the 4th quarter earnings announcement on January 16, 2009).

[2] I have removed Bank of America and Merrill Lynch from the index.

**Exhibit 6**
**Bank of America, Inc. Common Stock**
**Market Capitalization Compared to Companies Traded on NYSE & NASDAQ**

| Date | Shares Outstanding (In Millions) | Market Price Per Share | Market Cap (In Millions) | Percentile Rank in NYSE | Percentile Rank in NYSE & NASDAQ |
|---|---|---|---|---|---|
| September 30, 2008 | 4,560 | $35.00 | $159,604 | 99th | 99th |
| December 29, 2008 | 5,018 | $12.94 | $64,927 | 97th | 98th |
| March 31, 2009 | 6,401 | $6.82 | $43,657 | 96th | 98th |

Source: Bloomberg

**Exhibit 7**

**Bank of America, Inc. Common Stock Shares Outstanding,
Insider Holdings and Institutional Holdings**

| Date | Shares Outstanding (in Millions) | Insider Holdings (in Millions) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in Millions) | Institutional Holdings % of Shares Outstanding |
|------|------|------|------|------|------|
| September 30, 2008 | 4,560 | 38.74 | 0.85% | 2,873 | 63.01% |
| December 31, 2008 | 5,018 | 38.74 | 0.77% | 3,125 | 62.29% |
| March 31, 2009 | 6,401 | 40.16 | 0.63% | 3,469 | 54.19% |

Sources: Capital IQ; Bloomberg; SEC Schedule 14a, 2008 - 2009.

**Exhibit 8**
**Autocorrelation Coefficient for Bank of America Common Stock**

| Time Period | Coefficient on Previous Day Abnormal Return[1] | T-statistic |
|---|---|---|
| September 18, 2008 - January 21, 2009 | 0.04 | 0.34 |

[1] I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. I have removed October 7, 2008 from the event study regression due to the highly significant abnormal return on that day as a result of an earnings announcement. The estimation period ends on January 11, 2009, prior to Plaintiffs' alleged corrective disclosure period (which includes the 4th quarter earnings announcement on January 16, 2009).