# Exhibit 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MDL 2058 (PKC) |
| THIS DOCUMENT RELATES TO: CONSOLIDATED SECURITIES ACTIONS | |

**EXPERT REBUTTAL REPORT OF STEPHEN J. CHOI, J.D., Ph.D.**

**September 26, 2011**

## I.   Qualifications

1.      I am the Murray and Kathleen Bring Professor of Law at the New York University Law School.  I received a J.D. from Harvard Law School in 1994 where I graduated first in my class and was a Supervising Editor of the Harvard Law Review.  While at Harvard Law School I was awarded the Fay Diploma, the Sears Prize, and the Irving Oberman Memorial Award.  I received a Ph.D. in economics with a focus on corporate finance and industrial organization from Harvard University in 1997.  Before joining the New York University Law Faculty I was the Roger J. Traynor Professor of Law at the University of California, Berkeley Law School.

2.      My primary research focus is in the area of securities regulation with an emphasis on securities class action litigation.  I have published more than 60 articles in journals including the Yale Law Journal, Stanford Law Review, California Law Review, Columbia Law Review, University of Chicago Law Review, Journal of Empirical Legal Studies, Journal of Legal Studies, and Journal of Law, Economics, and Organization.   The Corporate Practice Commentator's annual survey recognized eleven of my articles as one of the ten best articles in the areas of corporate and securities law (various years).  I was recently listed among the most cited corporate and securities law scholars in legal academia and was the highest cited for those under fifty years old.[1]  I am the co-author of a casebook on securities regulations used in law schools in the United States (Securities Regulations: Cases and Analysis 2nd Edition, published by Foundation Press).

---

[1] See http://www.leiterrankings.com/new/2010_scholarlyimpact.shtml.

3.      I have taught securities regulation since I entered into legal academia and teach the course at NYU regularly to over 100 students.  I was the chair of the Association of American Law Schools' section on Securities Regulation for 2006-2007, a member of the Board of Directors of the American Law and Economics Association for 2007-2010, and a former term member of the U.S. Council on Foreign Relations for 2000-2005.   In addition, I have made numerous presentations on corporate and securities-related issues.

4.      My CV is attached as Exhibit A.  A list of my expert testimony in the past four years is attached as Exhibit B.  A list of the sources that I rely upon in this report is attached as Exhibit C. I am being compensated at a rate of $700 per hour for my independent review, analysis, and testimony provided in this case.  My compensation is not contingent upon my conclusions or on the outcome of this matter.

## II.      Summary of Opinion

5.      I have been asked to review Allen Ferrell's expert report dated September 16, 2011. After reviewing Ferrell's expert report, I have reached the following opinions about the report.

(a) Ferrell's expert report improperly conflates the elements of Section 14(a) and Rule 10b-5 private causes of action.   In doing so, Ferrell incorrectly applies to Section 14(a) the securities transaction-focused statutory limitation of Section 10(b) that, by its own terms, applies only to Rule 10b-5 claims.  Section 14(a) claims are not limited to securities transactions the way Rule 10b-5 claims are.   To the contrary, Section 14(a) focuses on the adequacy of proxy disclosures relating to a shareholder vote.  A class of holders of securities of Bank of America entitled to vote on the Merrill Lynch merger is appropriate under Section 14(a).

(b) Ferrell's expert report incorrectly states that material misrepresentations and omissions that interfere with a shareholder's right to an informed vote on a merger create only a corporate harm. Instead, the harm from such misrepresentations and omissions is a direct harm to shareholders. This harm includes the change in the value and qualitative nature of the shareholder's investment as well as the lost opportunities that the shareholders could have otherwise influenced Bank of America to take (including simply not going forward with the Merrill merger).

(c) Ferrell's expert report incorrectly construes the proper measure of damages to investors from disclosure defects that impair the shareholder's right to an informed vote on a merger. The harm to investors giving rise to a Section 14(a) claim is the difference between (1) the value of their investments they were led to expect at the time of the vote based on materially false and incomplete disclosures, and (2) the value the investors actually received as a result of shareholder approval of the merger. The damages measure should reflect this economic harm. For a company like Bank of America, whose stock trades in an efficient market, the stock market reaction to the revelation of the full material information pertinent to the merger provides the best measure of the economic harm to investors from the interference with the shareholder right to vote.

(d) Ferrell's expert report incorrectly contends that those Bank of America shareholders that also owned Merrill Lynch shares at the time of the merger must bear an offset against their damages and thus should be excluded from the class (see Ferrell expert report at p. 34-35). Section 14(a) class membership, however, does not turn on predictions of individualized damages but instead on whether a shareholder was entitled to vote on a merger affected by allegedly materially incorrect or incomplete disclosures. Ferrell is also incorrect in his offset

analysis. The harm to the Bank of America stockholders from the misrepresentations, as evidenced by the decline of the stock price upon revelation of the truth, has no predictable or even logical correlation to theoretical gains or benefits to Merrill shares. Ferrell focuses narrowly on overpayment, and ignores the harm to Bank of America shareholders from the change in the qualitative nature of their investment and from the cost of lost opportunities due to the defective disclosures that affected the shareholder vote for the merger.

## III.   Analysis of Ferrell's Expert Report

## A.   The Independence of the Rule 10b-5 and Section 14(a) Causes of Action

6.   Ferrell's expert report improperly conflates the Section 14(a) and Rule 10b-5 (promulgated under Section 10(b)) private causes of action and, by doing so, incorrectly applies the limitations of Section 10(b) that apply only for Rule 10b-5 actions to Section 14(a). Section 14(a) and Section 10(b) of the Securities Exchange Act of 1934 are two distinct provisions of the Securities Exchange Act that serve different purposes. Federal courts have recognized separate private causes of action under each provision. The two provisions stand independent of one another.

7.   Ferrell's expert report ignores the fundamental distinction between these separate causes of action. Instead, because some overlap exists between the basic elements of a Rule 10b-5 and a Section 14(a) cause of action, Ferrell makes the incorrect leap to assume that all of the requirements of Rule 10b-5 liability apply to Section 14(a) claims. Simply because certain elements of the two causes of action overlap—such as the materiality requirement and, as discussed below, a focus on the stock market reaction upon corrective disclosures as a measure of damages—does not mean that all of the prerequisites necessary to establish liability under

Rule 10b-5 pertain to Section 14(a).[2]

8.     Relying on Rule 10b-5, Ferrell incorrectly applies the transaction-based limitation set forth in Rule 10b-5 to Section 14(a) claims, in order to develop a so-called "economic" theory of harm.  Ferrell's focus on an actual securities transaction as a prerequisite to class membership is limited solely to the Rule 10b-5 context.  Indeed, Rule 10b-5 explicitly provides that it applies only "in connection with the purchase or sale of securities".[3]  With this explicit doctrinal limitation, it follows that only investors who purchased (or sold) during a time when material information resulted in an overvalued (or undervalued) securities price may obtain relief under Rule 10b-5.  This limitation is not an "economic" theory, but rather a statutory limitation on a cause of action that can otherwise apply to a far wider range of circumstances.  The transaction-focus of Rule 10b-5 necessarily limits the size and scope of a potential class in a securities class action to those investors who engaged in a securities transaction.  Thus, the economic logic of looking at transactions results directly from Rule 10b-5's transaction-based statutory limitation and thus applies only within the confines of Rule 10b-5.

9.     Section 14(a) and Rule 14a-9 promulgated thereunder, by their terms, do not require any purchase, sale or exchange of shares to establish liability.  Moreover, Section 14(a) contains a completely different inherent limitation on the size and scope of its potential class—shareholders entitled to vote.   Nonetheless, Ferrell's expert report improperly extends his "logic and

---

[2] For example, Rule 10b-5 also requires a showing of reliance by plaintiffs on alleged material misstatements.  In contrast, the Supreme Court in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), held that shareholders asserting a Section 14(a) claim do not need to prove that the defect in the proxy statement had a decisive effect on the voting.  See id. at 384-85.  Instead, the Court held that: "Where the misstatement or omission in a proxy statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote."  Id. at 384.

[3] See also the Supreme Court's holding in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), limiting Rule 10b-5 to only investors who actually purchased or sold securities.

economics" analysis beyond the confines of Rule 10b-5 to conclude that a "holder class" is not possible for a class action under Section 14(a) (see Ferrell expert report at p. 28). Unlike under Rule 10b-5, the harm sought to be redressed through a Section 14(a) action does not turn on the presence or absence of individual securities transactions. Instead, Section 14(a), as applied in Rule 14a-9, focuses on material misstatements and omissions in a proxy solicitation related to a shareholder vote. Rather than turning on the presence or absence of a transaction while misrepresentations are distorting securities prices, Section 14(a), by its own terms, seeks to protect the entitlement of particular shareholders to vote based on all material information. In misconstruing Section 14(a), Ferrell artificially divides the class of investors that are (or are not) eligible to bring a Section 14(a) cause of action based on the date on which they transact securities (see Ferrell expert report at p. 32-34). The dates of securities transactions are irrelevant for a Section 14(a) claim. Instead, what matters for Section 14(a) is whether an investor is eligible to vote on the subject matter of a proxy statement (i.e., was the investor a shareholder at the record date for the vote).

10.    Another point of confusion that arises from Ferrell's incorrect attempt to apply Section 10(b)'s transaction focus to Section 14(a) is Ferrell's assertion that Rule 10b-5 requires that "subsets" of investors win and other subsets lose when investors purchase or sell securities—a concept that Ferrell refers to as the "basic redistributive nature of the Rule 10b-5 damage analysis" (Ferrell expert report at p. 28). This "subset" of investors approach, however, is not applicable to Section 14(a), which, as discussed above, focuses on the effect of defective disclosures on the class of all stockholders with the right to vote, and not on individual

shareholder-level securities transactions.[4]

11.    Importantly, in discussing Section 14(a) in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1 (1977), the Supreme Court did not segment among different subsets of stockholders, but instead emphasized that Section 14(a) addresses "'deceit practiced on the stockholders as a group'" (citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).  The Supreme Court wrote that: "The *Borak* Court was thus focusing on all stockholders [as] the owners of the corporation as the beneficiaries of § 14(a).  Stockholders as a class therefore plainly constituted the 'especial class' for which the proxy provisions were enacted...." *Id.* at 33 n.21.  Consequently, the plaintiffs' inclusion of stockholders who were holders of Bank of America stock as of the record date comports with the focus of Section 14(a) on the shareholders with the right to vote as the appropriate class.

12.    The nature of the harm that Section 14(a) seeks to redress differs fundamentally from the harm sought to be addressed by Rule 10b-5.  Unlike the typical Rule 10b-5 case involving a securities transaction, the typical Section 14(a) case involves a shareholder vote for a major corporate event, such as a merger.  In the Rule 10b-5 case, the investor typically cannot change the underlying value of her investment—instead, the harm being redressed by the statutory cause of action comes from the transaction-related decisions the investor made.  In the Section 14(a) case, in contrast, shareholders, through their vote, have the ability to affect the underlying value of their investments.  The harm to shareholders from materially incomplete or inaccurate

---

[4] With respect to Rule 10b-5 itself, Ferrell is also incorrect.  Neither Section 10(b) nor Rule 10b-5 requires that a "subset" of investors benefit from the loss of investors who purchase and sell securities.  There is no explicit language requiring a benefit to other investors in either Section 10(b) or Rule 10b-5; such a benefit is simply not part of the cause of action under Rule 10b-5.  Many securities class actions allege Rule 10b-5 claims where there is no subset of investors on the opposite side of a transaction that benefit from the transaction.  For example, many Rule 10b-5 securities class actions involve issuers selling securities directly to investors in an offering of securities.  In these class actions, at least with respect to the securities sold in the offering, the company itself benefits at the expense of investors paying too much directly to the company for the company's securities.

disclosure is the loss of their ability to affect the value of their individual investment through the collective shareholder vote.  Regardless of when investors bought their shares, the investors who have the right to vote (in the case of Bank of America, the shareholders of record as of October 10, 2008) have the power to affect the nature of their individual investment and thus are directly harmed when defective disclosures undermine this right.  A class of such holders is proper and expected under Section 14(a).

**B.      Interference with the Right to Vote Directly Harms Shareholders**

13.     Ferrell's report also incorrectly characterizes the harm to shareholders from material misrepresentations and omissions that interfere with their right to vote as only a corporate-level harm (see Ferrell expert report at p. 32-33).  Instead, the harm caused by interference with an individual shareholder's right to an informed vote in the merger context is a direct harm to shareholders and thus gives rise to a direct lawsuit under Section 14(a).

14.     Harm that results from disclosure defects affecting the vote are direct shareholder harms for at least three reasons.  First, the right to vote on a merger is an individual right, the violation of which gives rise to a direct cause of action.  State corporate law establishes rules of corporate governance that allocate most control over the corporation to the board of directors. Shareholders of publicly-held corporations typically give corporate managers the power to make day-to-day decisions.  However, corporate and securities laws give shareholders the right to vote on certain major events, including, in particular, certain mergers.[5]  Unlike the ordinary business decision, in which shareholders have no control over the decision, shareholders are given an approval right over these major transactions through the vote.  The law specifically vests

---

[5] See Delaware General Corporation Law § 251.

shareholders with an individual right to vote in this context, and the violation of this right directly harms the shareholders who possess it.

15.     Second, the significance of the change at issue in a shareholder vote involving the ratification of a merger exposes shareholders to a potentially large shift in the value and character of their investment.  The reason shareholders are given an individual right to vote on certain merger transactions, including the acquisition of Merrill, is because the outcome of the vote can and typically does fundamentally alter the nature and value of their investment.  The effect of the Merrill merger on Bank of America is a perfect illustration of this point.

16.     Further, while it is generally true that mergers have the potential to affect the value of personally-held shares, this is particularly the case where, as here, the acquiring company uses its own stock as consideration in the merger.  Using as merger consideration newly-issued shares does not cost the acquiring company any corporate resources but instead imposes a direct cost on the shareholders, whose investment value turns, in part, on the total number of shares issued and outstanding.

17.     Third, the interest at stake for shareholders in a large value merger is qualitatively different in another respect.  In an ordinary business decision where shareholders have no vote and thus no direct say, the company managers typically can implement decisions subject to the minimal constraints of the business judgment rule.  In contrast, where shareholders have a say through the vote, the ability of shareholders to change or indeed control the range of strategic directions a corporation may pursue leads to qualitatively different investment outcomes.  With the vote, shareholders have the ability to affect corporate policy in the affirmative best interests of the shareholders and no longer are forced to accept whatever the managers decide.  Where the

right to exercise this vote is impaired by material misrepresentations or omissions in a proxy statement, the harm to the shareholders includes the lost opportunity to use their leverage through the vote to push management to consider other investment choices. Such shareholder loss is illustrated, for example, by the opportunity cost related to other institutions or assets Bank of America could have acquired at the time if the Bank of America shareholders had full disclosure on the Merrill transaction.

18.     This opportunity cost from interference with the shareholder vote is far from merely theoretical in the case of Bank of America during 2008. Ferrell incorrectly articulates the harm alleged in this Action as an overpayment by Bank of America for Merrill. He assumes that had the truth been disclosed, Bank of America would simply have paid a lower amount to acquire Merrill. This premise is incorrect. Had the truth been known, shareholders given the power to determine whether they agree with the Board's judgment about the merits of the Merrill acquisition could have demanded and obtained a wide range of alternative outcomes, including not doing any deal at all or pressuring the board to pursue alternative transactions that may have provided greater value than acquiring Merrill.

19.     Many financial institutions during the financial crisis of 2008-2009 were in or near financial distress. Facing a liquidity crunch and, in the case of banks, the need to improve their capital ratios, many financial institutions sought to unload their mortgage backed securities and derivative positions onto the market, creating a fire sale environment. In a fire sale environment, financial institutions with relative financial strength may profit through the purchase of distressed assets and institutions—building a position of strength from which to profit when the fire sale environment eventually recedes. On *60 Minutes*, Kenneth Lewis, the CEO of Bank of America, assured shareholders that Bank of America's capital position put it in a position to

benefit from the financial crisis.[6]

20.     Examples of building strength during the financial crisis exist and highlight why disclosure of the truth before the vote may well have motivated Bank of America shareholders to reject the Merrill merger and demand that management and the Board pursue alternative opportunities.  To illustrate, this point, I examined the actions of two of the "peer" institutions of Bank of America and Merrill Lynch as identified by the Ferrell expert report (see Ferrell expert report Appendix C) that were in relative positions of financial strength during the financial crisis: Barclays and JP Morgan Chase.[7]  Public news reports exist on the relative financial strength of Barclays and JP Morgan Chase during the financial crisis—similar to the position of relative financial strength that Bank of America enjoyed prior to the Merrill merger.[8]

21.     Using its relative financial strength, Barclays purchased the investment banking and capital markets operations of Lehman Brothers out of bankruptcy for a fire sale price of $250 million in 2008.  According to a recent New York Times Dealbook article, this purchase paid off greatly for Barclays.  Writing for the New York Times, Steven M. Davidoff reported: "Barclays paid anything but retail for Lehman, and in the process acquired a powerful franchise in the United States. Barclays is now the seventh-largest American investment bank measured by

---

[6] See Consolidated Second Amended Class Action Complaint, filed October 22, 2010 at p. 28.

[7] JP Morgan Chase was one of the top 10 peer institutions for Bank of America and Merrill Lynch.  Barclays was one of the top 10 peer institutions for Merrill Lynch.

[8] See JP Morgan Chase & Company 2011 Earnings: Second Quarter, New York Times, updated July 14, 2011 (available at http://topics.nytimes.com/top/news/business/companies/morgan_j_p_chase_and_company/index.html) ("Like all other financial institutions, JPMorgan was badly battered by the financial crisis of 2008. But it was not as deeply exposed to the mortgage market as some of its rivals, and was able to profit from others' pain."). Similarly, Barclays, unlike other banks in the U.K., did not turn to the U.K. government for a bailout. See Landon Thomas Jr., Barclays to Write Down £8 Billion, but Asks for No Help, New York Times, January 26, 2009 (available at http://www.nytimes.com/2009/01/27/business/worldbusiness/27barclays.html) (reporting that Barclays said that "it had no need for new capital, saying that its expected profit from strong performance in investment banking, commercial banking and wealth management should enable it to withstand the pain of the write-downs."). In the press release announcing the Merrill Lynch merger, Ken Lewis, the CEO of Bank of America, underscored Bank of America's "strength and stability" (see Consolidated Second Amended Class Action Complaint, filed October 22, 2010 at p. 28).

revenue, according to Dealogic. The former Lehman bankers are competing strongly in some crucial areas. In advising on mergers and acquisitions in the United States, Barclays was fifth in the first half of the year, according to Dealogic. Barclays was also the largest adviser on debt offerings in the world and third-largest in the United States."[9]  Similarly, JP Morgan purchased Washington Mutual in late 2008, giving JP Morgan control over more than 2,000 Washington Mutual bank branches.  JP Morgan also absorbed Bear Stearns in 2008 for a price of $10 per share (less than one sixth of Bear Stearns' share price two weeks prior to the date the $10 per share price was agreed upon).[10]  As the New York Times put it: "The two moves allowed [JP Morgan] to leapfrog rivals in the investment banking rankings and expand its consumer lending franchise. The bank's performance as it emerged from the credit crisis earned it a spot at the pinnacle of American finance."[11]

22.     The correct time to measure the lost opportunity cost to the investment value of Bank of America's shareholders from the defective disclosures affecting the merger vote is at the time of the vote in December 2008.  Simply because a bad decision that was induced through defective disclosures may one day turn out better than expected (at the time of vote if full disclosure were made) does not change the fact that the decision was bad for shareholders at the time the vote took place.  Measuring harm at the time of the vote is important, because shareholders are not entitled to compensation for the opposite situation, where a decision turns out worse than

[9] Steven M. Davidoff, The Merrill Lynch and Lehman Deals, 3 Years Later, New York Times Dealbook, dated Sept 13, 2011 (available at http://dealbook.nytimes.com/2011/09/13/the-merrill-lynch-and-lehman-deals-3-years-later/).
[10] See Landon Thomas Jr. and Eric Dash, Seeking Fast Deal, JPMorgan Quintuples Bear Stearns Bid, New York Times, March 25, 2008 (available at http://www.nytimes.com/2008/03/25/business/25bear.html?ref=business).  Bear Stearns stock price on March 10, 2008 was $62.30 per share and its price on March 11, 2008 was $62.97 per share.
[11] See JP Morgan Chase & Company 2011 Earnings: Second Quarter, New York Times, updated July 14, 2011 (*available at* http://topics.nytimes.com/top/news/business/companies/morgan_j_p_chase_and_company/index.html).  Indeed, *The Wall Street Journal* reported that shareholders of Washington Mutual complained about the "unfair fire-sale price" at which JP Morgan was able to purchase Washington Mutual to the benefit of the JP Morgan shareholders.  See Mike Spector, New Insider Details of J.P. Morgan's Deal for Wamu, Deal Journal, Wall Street

expected if full disclosure had been made.  As I explain below in Section C, the measure of the harm at the time of the vote is the change in the stock price when corrective information enters the market, or in this case, January 2009.  The key point is that by denying Bank of America shareholders all material information, the Defendants denied them their individual right and power to override the acquisition decisions of management and the Board.  This harm is direct.

23.     With this caveat in mind on the proper time to determine opportunity cost, I nonetheless looked at long-term performance of the stock of each financial institution from January 1, 2009 to December 31, 2010 as a measure of the relative performance of Barclays', JP Morgan Chase's, and Bank of America's efforts to take advantage of the financial crisis through acquisition.  Once the financial crisis eased in 2010, those financial institutions that took advantage of the crisis to acquire assets and institutions to enhance their market positions should have experienced positive returns.  Barclays' stock gained 75.3% from January 1, 2009 to December 31, 2010, while JP Morgan Chase's stock gained 35.3%.  In contrast, Bank of America stock lost 6.9%.[12]  While many other factors, of course, can affect long-term stock performance, the prominent role each institution's acquisitions during the financial crisis played in the nature of the institutions' post-acquisition businesses likely drove much of this performance.  The choice of how a financial institution with strength used its strength during the financial crisis had very real consequences for the investors of each institution.

24.     Investors of Bank of America with full information could have used their vote to reject the Merrill merger and shift Bank of America toward other, higher-valued opportunities during

---

Journal Blogs, Nov. 1, 2010  (available at http://blogs.wsj.com/deals/2010/11/01/how-flint-beat-out-oxygen-and-boron-for-washington-mutual/).

[12] I also looked at the stock price of Barclays, JP Morgan Chase, and Bank of America on September 16, 2011. Compared with the price of each financial institution on January 1, 2009, Barclays was 10.4% higher on September 16, 2011; JP Morgan was 6.6% higher for the same time period. In contrast, Bank of America's stock price was 49.5% lower on September 16, 2011 compared to its price on January 1, 2009.

the financial crisis. The lack of full information closed off these other opportunities for Bank of America's investors. Importantly, because Bank of America's management was set on the Merrill merger, these were opportunities available to the investors of Bank of America only if the investors were able to exercise their right to a fully informed vote to override the corporation's decision on the Merrill merger.

25.    Empirical studies corroborate the independent value of the right to vote for investors. Shares with greater voting rights typically trade at higher prices than shares with *identical* rights to a corporation's cash flows but with lesser voting rights. Having the power to direct the corporate affairs through the vote increases the value of an investment for shareholders. Cox and Roden (2002), for example, examined a dataset of 98 firms trading in the U.S. that had two classes of publicly traded common stock from 1984 to 1999 with different voting rights.[13] Among other things, Cox and Roden reported that the higher voting class stock traded at a significant premium relative to lower voting class stock even when the two classes promised the same rights to corporate cash flows through dividends.[14] Cox and Roden reported higher vote premiums for firms that experienced poor performance, leading them to suggest that: "Voting rights should have value if they provide the shareholders the opportunity to exert pressure that improves performance and increases the value of the future cash flows."[15]

26.    Finally, treating the investment harm to shareholders who receive materially incomplete or incorrect disclosures in the context of a shareholder vote on a merger as a direct harm also

---

[13] See Steven R. Cox and Dianne M. Roden, The Source or Value of Voting Rights and Related Dividend Promises, 8 Journal of Corporate Finance 337 (2002). See also Luigi Zingales, What Determines the Value of Corporate Votes?, 110 The Quarterly Journal of Economics 1047 (1995) (reporting a 10.5% mean premium for higher voting class stock compared with lower voting class stock).

[14] See Cox and Roden, supra note 13, at 342 (reporting that firms that promise equal dividends to both classes averaged an 11.1% annual voting premium).

[15] Id. at 345. See also id. at 347 ("High-vote shares have an option that low-vote shares do not: a potential real impact on how the business is run which is particularly valuable when performance declines.").

comports with the federal policy behind Section 14(a). Section 14(a) encompasses a broad remedial goal to ensure full and adequate disclosure to enable shareholders to exercise meaningfully their right to vote in mergers. To ensure adequate enforcement of Section 14(a), the Supreme Court in *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), recognized *both* direct and derivative actions under Section 14(a). See id. at 431. In implying a private direct right of action under Section 14(a), the Court stressed the need to focus on the "protection of investors" and providing for supplemental deterrence given the limitations on the SEC's enforcement resources. See id. at 431-432.

27.    The objective espoused in *Borak* to provide supplemental private enforcement leads to strong policy reasons for courts to favor treating a Section 14(a) harm as direct to the shareholders rather than derivative. The Supreme Court in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), in determining the causal requirement of Section 14(a), was particularly concerned with obstacles that might impede a private cause of action under Section 14(a). As a result, the Supreme Court rejected the defendants' argument that the "fairness" of a merger should act as a defense against allegations of material misstatements and omissions in the proxy statement. The Supreme Court in *Mills* wrote: "recognition of the fairness of the merger as a complete defense would confront small shareholders with an additional obstacle to making a successful challenge to a proposal recommended through a defective proxy statement. The risk that they would be unable to rebut the corporation's evidence of the fairness of the proposal, and thus to establish their cause of action, would be bound to discourage such shareholders from the private enforcement of the proxy rules that 'provides a necessary supplement to Commission action.' *J. I. Case Co. v. Borak*, 377 U.S., at 432, 84 S.Ct. at 1560." *Id.* at 382. This policy of not discouraging individual shareholders from pursuing private enforcement of the proxy rules

counsels in favor of direct over derivative actions.  Because derivative suits are on behalf of the corporation (despite the fact that the right to an informed vote is a shareholder right),[16] shareholders face procedural barriers to bringing a derivative lawsuit, including the need to make demand of the board of directors or to defend against a challenge for failure to make demand.  In light of the added cost and delay of such procedural requirements, an overly broad interpretation of when a harm is derivative as opposed to direct may lead shareholders to choose not to bring a meritorious and socially valuable Section 14(a) lawsuit in the first place.[17]


C.      **The Measure of Damages under Section 14(a)**

28.      Ferrell incorrectly states that for Section 14(a) plaintiffs: "The alleged inflation that was removed from the market for Bank of America shares at the time of the alleged January 2009 stock drops is not a logical measure of their injury" (Ferrell expert report at p. 34).  Ferrell moreover mischaracterizes the damages measure for Section 14(a) as a "Rule 10b-5 theory of harm" (Ferrell expert report at p. 31) simply because of the reference to changes in the stock price upon revelation of the previously misrepresented or omitted material information as a measure of Section 14(a) damages.  Rule 10b-5 damages do not have a monopoly on looking to the stock price change as a measure of damages.  The mere fact that Section 14(a) also looks to the stock price change to measure damages does not import a "Rule 10b-5 theory of harm" into Section 14(a).  Instead, the Section 14(a) theory of harm and damages is distinct and independent from Rule 10b-5.

---

[16] For example, the *Borak* Court wrote that Section 14(a) "stemmed from the congressional belief that '(f)air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H.R.Rep. No. 1383, 73d Cong., 2d Sess., 13." *Borak*, 377 U.S., at 431.

[17] Cf. *Mills v. Electric Auto-Lite Co.*, 396 U.S. at 385 ("[R]esolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.").

29.     Because Section 14(a) does not focus on securities transactions by individual investors but instead on their right to vote, establishing damages under Section 14(a) does not require the claimants to have engaged in a transaction.  Instead, the damage to investors results from a direct connection between the material misrepresentations and omission at issue and the shareholders' decision on how to vote their shares on the Merrill Lynch merger.  The direct harm to investors is equal to the value to their investments that they expected to receive from exercising their shareholder right to vote based on the materially false or incomplete information given to them, and the true value (as reflected in the value of their investment upon revelation of the truth) of what the shareholders actually received from the vote.

30.     Providing investors with damages that compensate investors for the expected value of their investments based on defective disclosures that affected a merger vote also compensates the investors for the harm they suffer due to the opportunity cost of foregone alternative investments and the change in the qualitative nature of their investment.  Presumably because the investors as a group voted in favor of a proposed transaction, the expected value of the merger based on the defective disclosure was sufficient to cause investors collectively to choose to bear the costs from lost opportunities and the change in the qualitative nature of their investment.  The expected value of the merger thus encompassed the magnitude of these costs.  The difference between expected value based on defective disclosures and true value at the time of the vote therefore provides a metric of the magnitude of the direct harm to the investors from these costs.

31.     For companies whose stock is traded in liquid, efficient, secondary markets, such as Bank of America, the stock price after the initial release of materially false and incomplete information about the merger (but before the revelation of the truth) will reflect the expected value of the merger based on the materially false or incomplete information given to shareholders.  The

17

reflection of materially false or incomplete information in the stock price, of course, may not necessarily mean that the stock price will increase. It could be, for example, that the stock price would otherwise have declined but for disclosure defects regarding the merger.

32.     After the revelation of the truth in January 2009 concerning the prior materially false and incomplete information relating to Merrill's bonuses and losses, the market price adjusted to reflect the true value of the merger. The size of this adjustment reflects the removal of the inflated value due to the merger-related disclosures and thus provides an objective, market-based measure of the difference between what investors expected they would receive from the merger, based on defective disclosures, and what they actually received as investors for purposes of Section 14(a) damages.

**D.     Cross-Ownership and the Section 14(a) Class**

33.     Ferrell's expert report incorrectly contends that those Bank of America shareholders that also owned Merrill Lynch shares at the time of the merger must bear an offset against their damages and therefore should be excluded from the Section 14(a) class (see Ferrell expert report at p. 34-35). Under Section 14(a), eligibility for class membership turns on whether a shareholder had the right to vote (based on ownership as of the record date), and not on the predicted individualized damages for a particular shareholder.

34.     Even assuming, *arguendo*, the relevance of damages offsets for determining class membership, Ferrell's analysis of offsets with respect to Section 14(a) damages for direct harm to the shareholders of Bank of America is in error. Ferrell's offset analysis depends on his incorrect view of shareholder harm as based solely on overpayment. Interference with the right to vote on a merger through defective disclosures, however, qualitatively affects the value of the

investment of Bank of America's shareholders in a way that overlapping ownership of Merrill shares does not address. Put another way, Ferrell is wrong to assume a dollar-for-dollar correlation of losses to Bank of America shareholders from the merger with hypothetical benefits or avoided losses to Merrill shareholders.

35. Assume for the sake of argument that an investor owns equivalent amounts of Bank of America and Merrill shares. Consider the investor's ownership of Merrill shares. Simply looking at the consideration paid to the investor for her ownership of Merrill shares is an inaccurate measure of the investor's gain (if any). The correct measure of the investor's gain due to Merrill share ownership from the merger is the difference between what the investor received from the merger and what the investor would have received from her ownership of Merrill shares if the merger had not occurred. If shareholders of Bank of America had voted down the Merrill merger, many possibilities exist for what might have happened to Merrill, making a precise determination of the investor's gain based on her Merrill share ownership from the merger speculative. Depending on what alternatives existed for Merrill, Merrill shareholders may have received an even greater return had the Bank of America merger not occurred and thus suffered a loss due to the merger from their Merrill share ownership.

36. Now consider the investor's ownership of Bank of America shares. Looking solely at the consideration paid to Merrill shareholders in the merger is an incomplete measure of the loss to the investor from her ownership of Bank of America shares. Defective disclosure relating to the merger vote harms the investor's investment in Bank of America shares in at least two ways independent of the consideration paid for Merrill shares. First, the qualitative nature of the investor's investment in Bank of America is changed by the merger. Even for the investor with equal investments in Bank of America and Merrill there is a qualitative change. Prior to the

merger, the investor had equal amounts invested in two separate companies with separate management and business plans. After the merger, even if the assets of the combined company derive from the previously separate companies, the nature of the business is changed due to the elimination of one set of managers and their business plans. Owning shares in one combined entity is not the same qualitative investment as owning an equivalent dollar amount of shares in two separate entities.

37.     Second, the Bank of America investor who votes in favor of the Merrill merger due to defective disclosures bears an opportunity cost on the value of her Bank of America shares based on the other avenues Bank of America could have pursued but for the merger. With full disclosure, the shareholders could have used their individual rights as shareholders to vote and alter the strategic plans of Bank of America toward other directions, including not pursuing Merrill and possibly going after other acquisition targets. Even if Bank of America paid fair value for Merrill, the investor with overlapping ownership would lose with respect to her Bank of America investment due to this opportunity cost. As discussed above in Section C, the stock price change upon corrective disclosures relating to the materially incorrect or incomplete proxy disclosures on the merger provides an objective metric for the direct harm to Bank of America shareholders. The harm to Bank of America shares from consummating the merger would not correlate to any assumed gains that Merrill shares would have enjoyed, or declines that Merrill shares avoided by virtue of the merger.

38.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted,

Stephen J. Choi                                September 26, 2011

**Appendix A**

STEPHEN J. CHOI
NYU Law School
40 Washington Sq. South
New York, NY 10012
(212) 992-8962; stephen.choi@nyu.edu

EMPLOYMENT

| | | |
|---|---|---|
| 2005 to Present | **NYU Law School** | **New York, NY** |
| | Murray and Kathleen Bring Professor | |
| | William T. Comfort, III Professor (2005-2006) | |
| | Awarded Albert Podell Distinguished Teaching Award (2009) | |

| | | |
|---|---|---|
| 1998 to 2005 | **UC Berkeley Law School** | **Berkeley, CA** |
| | Roger J. Traynor Professor | |

| | | |
|---|---|---|
| 1995 to 1998 | **University of Chicago Law School** | **Chicago, IL** |
| | Assistant Professor | |
| | Visiting Assistant Professor | |

| | | |
|---|---|---|
| 1994 to 1995 | **McKinsey & Company** | **New York, NY** |
| | Associate | |

EDUCATION

J.D., Harvard Law School, *magna cum laude*, June 1994
> Awards:  Fay Diploma (Awarded to the J.D. candidate in the graduating class with the highest combined GPA for three years of study at Harvard Law School), Sears Prize, Irving Oberman Memorial Award, and John M. Olin Fellowship in Law and Economics
> Activities: Harvard Law Review (Supervising Editor) and Legal Methods Instructor

Ph.D., Harvard University, Department of Economics, June 1997
> Fields: Industrial Organization, Corporate Finance
> Awards: Jacob K. Javits Fellowship in Economics and Harvard Grant in Economics.
> Dissertation: Empirical evidence on the impact of securities regulation on the financial markets

A.B., Harvard College, *magna cum laude*, June 1988
> Awards: John Harvard Scholarship, Harvard College Scholarship, and Fulbright Fellowship (South Korea).  *Summa Cum Laude* Senior Honors Thesis

EXTERNAL SERVICE AND MEMBERSHIPS

Member (2007-2010), American Law and Economics Association Board of Directors
Chair (2006-2007), Committee of the Securities Regulation Section, Association of American Law
> Schools
Term Member (2000-2005), Council on Foreign Relations
Referee: *American Law and Economics Review, Journal of Law and Economics, Journal of Legal Studies, Journal of Law, Economics, and Organization,* and *International Review of Law and Economics*

## BOOKS

3.      Securities Regulation: The Essentials (Aspen Publishing 2008) (with Adam Pritchard)

2.      Statutory Supplement to Securities Regulation (Foundation Press, 2005-2011) (with Adam Pritchard)

1.      Securities Regulation: Cases and Analysis 2d Edition (Foundation Press, 2008) (with Adam Pritchard) (casebook website at www.choipritchard.com)

## ARTICLES

61.      The Supreme Court's Impact on Securities Class Actions: An Empirical Assessment of Tellabs, forthcoming Journal of Law, Economics, & Organization (with Adam Pritchard)

60.      The Price of Pay for Play in Securities Class Actions, forthcoming Journal of Empirical Legal Studies (with Adam Pritchard)

59.      What do Federal District Judges Want? An Analysis of Publications, Citations, and Reversals, forthcoming Journal of Law, Economics, & Organization (with Mitu Gulati and Eric Posner)

58.      Motions for Lead Plaintiff in Securities Class Actions, 40 Journal of Legal Studies 205 (2011)

57.      Judging Women, 8 Journal of Empirical Legal Studies 504 (2011) (with Mitu Gulati and Eric Posner)

56.      Punitive Damages in Securities Arbitration: An Empirical Study, 39 Journal of Legal Studies 497 (2010) (with Theodore Eisenberg)

55.      The Power of Proxy Advisors: Myth or Reality?, 59 Emory Law Journal 869 (2010) (with Jill Fisch and Marcel Kahan)
        **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2010)**

54.      Attorneys as Arbitrators, 39 Journal of Legal Studies 109 (2010) (with Adam Pritchard and Jill Fisch)

53.      Professionals or Politicians: The Uncertain Empirical Case for an Elected Rather Than Appointed Judiciary 26 Journal of Law, Economics, & Organization 290 (2010) (with Mitu Gulati and Eric Posner)

52.      Director elections and the role of proxy advisors. 82 S. Cal. L. Rev. 649 (2009) (with Jill Fisch and Marcel Kahan)
        **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2009)**

51.      The Screening Effect of the Private Securities Litigation Reform Act, 6 Journal of Empirical Legal Studies 35 (2009) (with Karen Nelson and Adam Pritchard)

50.      Are Judges Overpaid?: A Skeptical Response to the Judicial Salary Debate, 1 Journal of Legal

Analysis (2009) (with Mitu Gulati and Eric Posner)

49.   Transnational Litigation and Global Securities Class-Action Lawsuits, 2009 Wisconsin Law Review 465 (2009) (with Linda Silberman)

48.   Judicial Evaluations and Information Forcing: Ranking State High Courts and Their Judges, 58 Duke L.J. 1313 (2009) (with Eric Posner and Mitu Gulati)

47.   Trading Votes for Reasoning: Covering in Judicial Opinions, 81 Southern California Law Review 735 (2008) (with Mitu Gulati)

46.   On Beyond CalPERS: Survey Evidence on the Developing Role of Public Pension Funds in Corporate Governance, 61 Vand. L. Rev. 315 (2008) (with Jill Fisch) **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2008)**

45.   Bias in Judicial Citations, 37 Journal of Legal Studies 87 (2008) (with Mitu Gulati)

44.   The Market Penalty for Mutual Fund Scandals, 87 B.U. L. Rev. 1021 (2007) (with Marcel Kahan) **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2008)**

43.   Do the Merits Matter Less After the Private Securities Litigation Reform Act, 23 J.L. Econ. & Org. 598 (2007)

42.   The Future Direction of Takeover Law in Korea, 7 Journal of Korean Law (2007)

41.   Ranking Judges According to Citation Bias (as a Means to Reduce Bias), 82 Notre Dame L. Rev 1279 (2007) (with Mitu Gulati)

40.   The Problems with Analysts, 59 Ala. L. Rev. 161 (2007)

39.   Securities Litigation and its Lawyers: Changes During the First Decade After the PSLRA, 106 Colum. L. Rev. 1489 (2006) (with Robert Thompson) **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2007)**

38.   Contract as Statute, 104 Mich. L. Rev. 1129 (2006) (with Mitu Gulati)

37.   An Empirical Study of Securities Disclosure Practice, 80 Tul. L. Rev. 1023 (2006) (with Mitu Gulati)

36.   Behavioral Economics and the Regulation of Public Offerings, 10 Lewis & Clark L. Rev. 85 (2006)

35.   The Rat Race as an Information-Forcing Device, 81 Ind. L.J. 53 (2006) (with Scott Baker and Mitu Gulati)

34.   Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act, 83 Wash U.L.Q. 869 (2005) (with A.C. Pritchard and Jill Fisch)

**(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2006)**

33.  Which Judges Write Their Opinions (And Should We Care)?, 32 Fla. St. U.L.Rev. 1077 (2005) (with Mitu Gulati)

32.  Mr. Justice Posner? Unpacking the Statistics, 61 N.Y.U. Annual Survey of American Law 19 (2005) (with Mitu Gulati)

31.  Choosing the Next Supreme Court Justice: An Empirical Ranking of Judicial Performance, 78 Southern California Law Review 23 (2004) (with Mitu Gulati)

30.  Evidence on Securities Class Actions, 57 Vand. L. Rev. 1465 (2004)

29.  Innovation in Boilerplate Contracts: The Case of Sovereign Bonds, 53 Emory L. J. 929 (2004) (with Mitu Gulati)

28.  Should Issuers Be On the Hook for Laddering?  An Empirical Analysis of the IPO Market Manipulation Litigation, 73 U. Cinn. L. Rev. 179 (2004) (with Adam Pritchard)

27.  A Tournament of Judges?, 92 California Law Review 299 (2004) (with Mitu Gulati)

26.  The Exit Consent Solution for Sovereign Distress: Some Complications, forthcoming International Financial Law Review (2004) (with Mitu Gulati)

25.  A Framework for the Regulation of Securities Market Intermediaries, 1 Berkeley Bus. L. J. 45 (2004)

24.  How to Fix Wall Street: A Voucher Financing Proposal, 113 Yale Law Journal 269 (2003) (with Jill Fisch)
     **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2003)**

23.  Behavioral Economics and the SEC, 56 Stanford Law Review 1 (2003) (with Adam Pritchard)

22.  Expanding the Arbitration Contract, 36 Vanderbilt Journal of Transnational Law 1233 (2003)

21.  Internalizing Outsider Trading, 101 Michigan Law Review 313 (2002) (with Ian Ayres)
     **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and Securities Articles of 2003)**

20.  Establishing a New Stock Market for Shareholder Value Oriented Firms in Korea, 3 Chicago Journal of International Law 277 (2002) (with Kon Sik Kim)

19.  Law, Finance, and Path Dependence: Developing Strong Securities Markets, 80 Texas Law Review 1657 (2002).

18.  Playing Favorites with Shareholders (with Eric Talley), 75 Southern California Law Review 271 (2002).

17.     Channeling Global Securities Market Competition, 16 The Transnational Lawyer 211 (2002)

16.     Selective Disclosures in the Public Capital Markets, 35 UC Davis Law Review 533
        (2001)

15.     Choice and Federal Intervention in Corporate Law, 87 Virginia Law Review 961
        (2001) (with Andrew Guzman)

14.     Promoting Issuer Choice in Securities Regulation, 41 Virginia Journal of
        International Law 815 (2001)

13.     Assessing Regulatory Responses to Globalizing Securities Markets, 2
        Theoretical Inquiries in Law 613 (2001)

12.     The Unfounded Fear of Regulation S: Empirical Evidence on Offshore Securities
        Offerings, 50 Duke Law Journal 663 (2000)
        **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and
        Securities Articles of 2001)**

11.     Resales of Offshore Securities Into the United States: Evaluating the Overvaluation Risk
        to U.S. Investors, 78 Washington University Law Quarterly 519 (2000)

10.     Proxy Issue Proposals: Testing the Impact of the 1992 SEC Reforms, 16
        Journal of Law, Economics, and Organization 233 (2000)

9.      Regulating Investors Not Issuers:  A Market-Based Proposal, 88 California Law Review 280
        (March, 2000)

8.      Portable Reciprocity: Rethinking the Reach of U.S. Securities Regulation, 71 Southern California
        Law Review 983 (July, 1998) (with Andrew Guzman).

7.      Gatekeepers and the Internet: Rethinking the Regulation of Small Business Capital
        Formation, 2 Journal of Small and Emerging Business Law 27 (Summer, 1998).

6.      Market Lessons For Gatekeepers, 92 Northwestern University Law Review 916 (Spring, 1998)
        **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and
        Securities Articles of 1998)**

5.      Company Registration: Toward a Status-Based Antifraud Regime, 64 University of Chicago Law
        Review 567 (1997).
        **(Recognized by Corporate Practice Commentator as one of the Top 10 Corporate and
        Securities Articles of 1997)**

4.      National Laws, International Money: Regulation in a Global Capital Market, 65 Fordham Law
        Review 1855 (1997) (with Andrew Guzman).

3.      The Dangerous Extraterritoriality of American Securities Law, 17 Northwestern Journal of
        International Law & Business 207 (1996) (with Andrew Guzman).

2.       Fraud in the New-Issues Market: Empirical Evidence on Securities Class Actions, 144 University of Pennsylvania Law Review 903 (1996) (with James Bohn).

1.       Note, Investor Liability: Financial Innovations in the Regulatory State and the Coming Revolution in Corporate Law, 107 Harvard Law Review 1941 (1994).

**Appendix B: Testimony in the Last Four Years**

None

**Appendix C: Materials Relied Upon**

**Court Documents**

Consolidated Second Amended Class Action Complaint, filed October 22, 2010

**Security Data**

Historical data for Bank of America, JP Morgan Chase, and Barclays PLC.

**News Articles**

JP Morgan Chase & Company 2011 Earnings: Second Quarter, New York Times, updated July 14, 2011 (available at http://topics.nytimes.com/top/news/business/companies/morgan_j_p_chase_and_company/index.html)

Steven M. Davidoff, The Merrill Lynch and Lehman Deals, 3 Years Later, New York Times, dated Sept 13, 2011 (available at http://dealbook.nytimes.com/2011/09/13/the-merrill-lynch-and-lehman-deals-3-years-later/).

Mike Spector, New Insider Details of J.P. Morgan's Deal for Wamu, Deal Journal, Wall Street Journal Blogs, Nov. 1, 2010 (available at http://blogs.wsj.com/deals/2010/11/01/how-flint-beat-out-oxygen-and-boron-for-washington-mutual/).

Landon Thomas Jr., Barclays to Write Down £8 Billion, but Asks for No Help, New York Times, January 26, 2009 (available at http://www.nytimes.com/2009/01/27/business/worldbusiness/27barclays.html)

Landon Thomas Jr. and Eric Dash, Seeking Fast Deal, JPMorgan Quintuples Bear Stearns Bid, New York Times, March 25, 2008 (available at http://www.nytimes.com/2008/03/25/business/25bear.html?ref=business).

**Academic Articles**

Steven R. Cox and Dianne M. Roden, The Source or Value of Voting Rights and Related Dividend Promises, 8 Journal of Corporate Finance 337 (2002).

Luigi Zingales, What Determines the Value of Corporate Votes?, 110 The Quarterly Journal of Economics 1047 (1995).