**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

IN RE BANK OF AMERICA CORP.          :     Master File No. 09 MD 2058 (PKC)
SECURITIES, DERIVATIVE, AND          :
EMPLOYEE RETIREMENT INCOME       :     ECF CASE
SECURITY ACT (ERISA) LITIGATION      :
                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

THIS DOCUMENT RELATES TO:          :
                                          :

The Consolidated Securities Action     :
                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

LEGAL ARGUMENT ........................................................................................................ 4

I.    The Court Should Certify The Class As To Plaintiffs' Section 14(a) Claim ........................ 4

      A.    Defendants Improperly Seek Reconsideration Of The Court's Prior Legal
            Determinations ................................................................................................. 4

      B.    The Evidence Adduced To Date Demonstrates That Class Members Have
            Suffered Direct Economic Harm .................................................................... 9

II.   Defendants' Sole Challenge To Certification Of The Section 10(b) Class Fails ............... 13

      A.    The Secret Bonus Agreement Was Material .............................................. 13

            1.    Defendants' Truth-On-The-Market Defense Contradicts Second Circuit
                  Law And Is Belied By The Facts ........................................................ 16

            2.    Plaintiffs Are Not Required To Show That BoA's Stock Price Increased
                  In Response To Defendants' Bonus-Related Misrepresentations ................ 20

      B.    Merrill's Undisclosed Massive Fourth-Quarter Losses Were Material ...................... 21

            1.    Defendants Have Failed To Establish That The Market Expected
                  Merrill's Losses .............................................................................. 23

            2.    Defendants' Loss Causation Arguments Violate The Express Holding
                  Of The Supreme Court In *Halliburton* ............................................ 26

III.  The Securities Act Class Should Be Certified .................................................... 28

IV.   Plaintiffs' Class Definition Is Proper ............................................................ 28

      A.    The Section 10(b) Class Definition Is Not Overbroad ................................ 28

      B.    Defendants' Damages "Offset" Argument Is Premature And Meritless .................... 29

V.    The Court Should Certify A Class Of Purchasers Of January 2011 Call Options ............. 30

CONCLUSION ................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrahamson v. Fleschner*,
   568 F.2d 862 (2d Cir. 1977) ................................................................................................ 29

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ............................................................................................................ 13

*Amorosa v. AOL Time Warner Inc.*,
   409 F. App'x 412 (2d Cir. 2011) ...................................................................................... 7, 8

*Argent Class Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.*,
   315 F. Supp. 2d 666 (E.D. Pa. 2004) ................................................................................. 29

*Barrows v. Forrest Labs., Inc.*,
   742 F.2d 54 (2d Cir. 1984) .............................................................................................. 11, 12

*Byrnes v. Faulkner, Dawkins & Sullivan*,
   550 F.2d 1303 (2d Cir. 1977) ............................................................................................. 29

*Daubert v. Merrill Dow Pharms. Inc.*,
   509 U.S. 579 (2005) .............................................................................................................. 8

*DeMarco v. Robertson Stephens, Inc.*,
   228 F.R.D. 468 (S.D.N.Y. 2005) ...................................................................................... 1, 6

*Edge Partners, L.P. v. Dockser*,
   944 F. Supp. 438 (D. Md. 1996) ...................................................................................... 7, 9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ................................................................... 9, 15, 26, 27, 28

*Fogarazzo v. Lehman Bros., Inc.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................................... 13, 26

*Goldkratz v. Griffin*,
   1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) ......................................................................... 8

*Grace v. Rosenstock*,
   228 F.3d 40 (2d Cir. 2000) .................................................................................................... 7

*In re Alstom, S.A. Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................................... 20, 27

*In re Alstom, S.A. Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................................. 22

*In re Arakis Energy Corp. Sec. Litig.*,
  1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ....................................................... 30

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
  2011 WL 3211472 (S.D.N.Y. Jul. 29, 2011) ........................................... 23, 27, 30

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ....................................................... *passim*

*In re Bristol-Myers Squibb Sec. Litig.*,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) ........................................................ 20

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ..................................................................................... 9

*In re Globalstar Sec. Litig.*,
  2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ...................................................... 30

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................... 7, 9

*In re Monster Worldwide Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ................................................................. 15, 22

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................. 20, 21

*In re Northfield Lab. Inc. Sec. Litig.*,
  264 F.R.D. 407 (N.D. Ill. 2009) ........................................................................ 27

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) .............................................................. 26

*In re Sadia, S.A. Sec. Litig.*,
  269 F.R.D. 298 (S.D.N.Y. 2010) ..................................................... 13, 14, 20, 27

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) .............................................................. 20

*In re Sepracor Inc. Sec. Litig.*,
  233 F.R.D. 52 (D. Mass. 2005) ........................................................................ 29

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) .............................................................. 20

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................. 28, 29

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ............................................................................................. 7

*Koppel v. 4987 Corp.*,
　167 F.3d 125 (2d Cir. 1999) ................................................................................ 6

*Kronfeld v. Trans World Airlines, Inc.*,
　832 F.2d 726 (2d Cir. 1987) .............................................................................. 19

*Lapin v. Goldman Sachs & Co.*,
　254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................ 27

*Matrixx Init., Inc. v. Siracusano*,
　131 S. Ct. 1309 (2011) ....................................................................................... 13

*McKesson HBOC, Inc. v. New York State Common Ret. Fund Inc.*,
　339 F.3d 1087 (9th Cir. 2003) ........................................................................... 29

*McLaughlin v. Am. Tobacco Co.*,
　522 F.3d 215 (2d Cir. 2008) ................................................................................ 6

*Minpeco v. Conticommodity Servs. Inc.*,
　676 F. Supp. 486 (S.D.N.Y. 1987) ..................................................................... 29

*N.Y.C. Emp. Ret. Sys. v. Jobs*,
　593 F.3d 1018 (9th Cir. 2010) ............................................................................. 7

*N.J. and Its Div. of Inv. v. Sprint Corp.*,
　314 F. Supp. 2d 1119 (D. Kan. 2004) ................................................................. 8

*Pa. Ave. Funds v. Inyx Inc.*,
　2011 WL 2732544 (S.D.N.Y. Jul. 5, 2011) ................................................. *passim*

*Randall v. Loftsgaarden*,
　478 U.S. 647 (1986) ........................................................................................... 29

*SEC v. Bank of Am. Corp.*,
　677 F. Supp. 2d 717 (S.D.N.Y. 2010) .......................................................... 17, 18

*SEC v. Bank of Am. Corp.*,
　2010 WL 624581 (S.D.N.Y. Feb. 22, 2010) ................................................. 16, 22

*SEC v. National Sec., Inc.*,
　393 U.S. 453 (1969) .......................................................................................... 1, 6

*United Paperworkers Int'l. Union v. Int'l. Paper Co.*,
　985 F.2d 1190 (2d Cir. 1993) .................................................................. 3, 7, 17, 19

*Waters v. Int'l Precious Metals Corp.*,
　172 F.R.D. 479 (S.D. Fla. 1996) ....................................................................... 29

*Weisberg v. Coastal States Gas Corp.*,
　609 F.2d 650 (2d Cir. 1979) ................................................................................ 7

**STATUTES/RULES**

15 U.S.C. § 78n(a) ............................................................................................................. 6

Fed. R. Civ. P. 23 ......................................................................................................*passim*

Plaintiffs respectfully submit this reply memorandum in support of their Motion pursuant to Fed. R. Civ. P. 23(a), (b)(3) and (g), seeking: (1) certification of the Class; (2) Plaintiffs' appointment as Class Representatives; and (3) Lead Counsel's appointment as Class Counsel.[1]

## PRELIMINARY STATEMENT

Unable to meaningfully challenge Plaintiffs' showing that the Class meets the elements of Rule 23, Defendants try to turn the Court's class certification inquiry into a motion to reconsider the Court's prior legal decisions, and a trial on the factual merits of Plaintiffs' claims. Defendants' arguments should be rejected.

With respect to Plaintiffs' Section 14(a) claim, Defendants challenge class certification by repeating their argument that only investors who purchased or exchanged their shares in a merger can pursue a direct Section 14(a) claim. The Court has already rejected this contention and, contrary to Defendants' position, Plaintiffs are not required to establish by a preponderance of the evidence at class certification that the Court's prior legal decision was correct. As then-District Judge Lynch held in rejecting a defendant's attempt to oppose class certification by rearguing legal issues decided at the motion to dismiss stage: "Whatever else may be required of plaintiffs' class certification motion, it is emphatically <u>not</u> an opportunity for a second round of review, at a higher standard no less, of the substantive merits of plaintiffs' underlying claims." *DeMarco v. Robertson Stephens, Inc.*, 228 F.R.D. 468, 476 (S.D.N.Y. 2005).

In fact, well-settled case law and the express language of Section 14(a) squarely support the Court's prior legal opinions. As the Supreme Court has long held, "§ 14 applies to all proxy solicitations, <u>whether or not in connection with a purchase or sale</u>." *SEC v. National Sec., Inc.*, 393 U.S. 453, 468 (1969). Defendants cite to no authority, legal or otherwise, undermining this precedent. Even if the Court required Plaintiffs to establish at this stage that Defendants' material

---

[1] Capitalized terms not otherwise defined herein have the same meaning as set forth in Plaintiffs' opening brief (ECF No. 479). All emphasis is added in this memorandum unless otherwise noted. The exhibits referenced herein are attached to the Declaration of Joshua A. Naftalis dated October 31, 2011 ("Def. Ex. __") or the Declaration of Steven B. Singer dated November 11, 2011 ("Singer Ex. __"). All references to: (1) "¶¶ __" are to the Complaint; (2) "Motion" are to Plaintiffs' opening brief; and (3) "Opp." are to Defendants' opposition brief (ECF No. 487).

misstatements and omissions directly harmed the Class, Plaintiffs have done so.  Plaintiffs submitted the expert report of Chad Coffman, CFA, who demonstrated that BoA's common stock experienced statistically significant price declines when the news about Merrill's losses and bonuses was disclosed.  Plaintiffs also submitted the expert report of Professor Stephen Choi, Ph.D. in economics, who explained that the decline in the price of BoA stock caused by the disclosure of the facts misrepresented in the Proxy is the appropriate way to measure BoA investors' direct harm. Nothing more is required at this stage.

Defendants' challenges to certifying the Section 10(b) class fare no better.  Defendants' sole argument is that Plaintiffs are not entitled to the fraud-on-the-market presumption of reliance because Merrill's fourth-quarter losses and the secret Bonus Agreement were purportedly immaterial and known by the market.  However, the evidence of materiality is overwhelming.  With respect to Merrill's losses, Defendants' own conduct belies any contention that the market knew of or expected Merrill to report such significant losses before the end of the Class Period.  Not only did Defendants internally discuss invoking the <u>Material</u> Adverse Effect Clause (the "MAC") and disclosing the losses prior to the shareholder vote, but within <u>days</u> of the vote, the Bank's most senior officers: (1) decided to invoke the MAC and determined that they could not complete the Merger because of Merrill's losses; (2) secretly sought and obtained one of the largest Government bailouts in history to absorb those losses and close the Merger; and (3) acknowledged in their internal emails that the market had "no inkling" that Merrill was going to report "poor results" for the fourth quarter.

Defendants now point to a single analyst report (that was issued after the shareholder vote), which estimated that Merrill might report certain write-downs, as "proof" that the market supposedly knew of Merrill's historic losses in December 2008.  This argument must be rejected. <u>First</u>, Defendants' truth-on-the-market defense faces a nearly insurmountable hurdle at any stage of this litigation, and is clearly premature now.  *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) ("'There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a

document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them.'") (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987)).  <u>Second</u>, it is impossible to reconcile Defendants' argument that the massive fourth-quarter losses were immaterial with their own conduct in November and December 2008.  <u>Third</u>, Defendants' argument ignores the dramatic reaction of the market when the news about the losses was disclosed in January 2009, as evidenced by the reaction of both the analyst community and the rating agencies, and the statistically significant decline in the price of BoA common stock.  <u>Finally</u>, regardless of what any single analyst may have believed, Defendants' internal emails establish that analysts' consensus expectations as of the vote were for Merrill to report <u>virtually no net losses</u> for the fourth quarter.  *See* Def. Ex. 94.  In sum, the evidence easily demonstrates that the undisclosed losses were material to investors.

Similarly, Plaintiffs submitted extensive evidence showing that the undisclosed Bonus Agreement was material.  As set forth in the Coffman report, BoA stock experienced a statistically significant decline on January 22, the day after the news about the secret bonuses was disclosed. Defendants' own expert <u>agreed</u> that the stock price experienced a statistically significant decline that day.  While Defendants' expert attributed this statistically significant decline to nothing (*i.e.*, "randomness"), such factual assertions cannot be considered at this stage, let alone accepted.  The stock's statistically significant decline following the disclosure of the bonus payments is indisputably sufficient at this (or any) stage to establish the fraud-on-the-market presumption.

In response, Defendants again assert a truth-on-the-market defense, submitting the same articles they put forward in connection with their motions to dismiss in both this case and the SEC Action.  Second Circuit law is clear that this defense cannot prevail.  *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (media "reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials"), *cited in Bank of Am.*, 757 F. Supp. 2d at 302 n.8. Further, as both this Court and Judge Rakoff have found, these articles, at most, show only that the market was aware that Merrill <u>might</u> pay bonuses.  None of them disclosed the existence of a firm

3

agreement allowing Merrill to hand its employees, before the Merger closed, billions of dollars in cash regardless of its financial condition. *See Bank of Am.*, 757 F. Supp. 2d at 301-02. To the contrary, virtually every article Defendants cite stated that bonuses were determined at the end of the year, and could be changed or altered in light of the company's financial condition. Indeed, while Defendants contend that the market supposedly knew that Merrill would pay massive bonuses in 2008, Merrill told Congress only days before the shareholder vote that no bonus decisions had been made. Accordingly, Defendants continue to fall far short of meeting their onerous burden at this stage (and any stage, for that matter) to show "truth on the market."

In sum, the Class here easily satisfies the requirements of Rule 23, and should be certified.

## LEGAL ARGUMENT

**I.**     **The Court Should Certify The Class As To Plaintiffs' Section 14(a) Claim**

   **A.**     **Defendants Improperly Seek Reconsideration Of The Court's Prior Legal Determinations**

Plaintiffs' opening brief established that their Section 14(a) claim readily satisfied all the elements of Rule 23. *See* Motion at 3-4, 11-17. As Plaintiffs explained, reliance is not an element of a Section 14(a) claim, and the elements that do apply – *i.e.*, the existence of a materially misleading statement or omission in the proxy, and causation – present common issues. *See, e.g.*, *Pa. Ave. Funds v. Inyx Inc.*, 2011 WL 2732544, at *6 (S.D.N.Y. Jul. 5, 2011). Given the very limited nature of the elements of Plaintiffs' Section 14(a) claim, common issues predominate and class certification is appropriate. *See* Motion at 3-4, 11-17.

Notably, in their Opposition, Defendants do <u>not</u> dispute that the Section 14(a) class satisfies the requirements of Rules 23(a) and 23(b)(3). *See* Opp. at 2-15. Rather, Defendants reprise purely <u>legal</u> arguments that the Court rejected more than a year ago, and which do not relate to any element of Rule 23. Specifically, Defendants argue for a third time that, "[t]o recover damages on a direct claim under Section 14(a), plaintiffs must demonstrate that they sold or exchanged their shares in a transaction authorized by the allegedly misleading proxy." Opp. at 5, 11-15. The Court has already rejected this argument, and Defendants' improper attempt to seek reconsideration at class

certification should be denied.

In its August 27, 2010 Order substantially denying Defendants' motions to dismiss, the Court thoroughly considered and rejected Defendants' assertion that Plaintiffs must have purchased or exchanged their BoA shares to maintain a direct Section 14(a) claim.  *See Bank of Am.*, 757 F. Supp. 2d at 292.  The Court also held that Plaintiffs had properly alleged that they suffered direct harm based on the decline in BoA's share price, which was distinct from any harm suffered by the Company.  As the Court held, the decline in BoA's stock price "is not necessarily co-extensive with injury to the corporation.  Therefore, material omissions from a proxy statement could directly injure the corporation as well as the corporation's shareholders. … '[I]n light of ... *Borak* and *Mills*, a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and derivative suits.  The former action protects the shareholders' interest in 'fair corporate suffrage.'" *Id.* (quoting *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977)).  Defendants moved for interlocutory appeal or reconsideration, and the Court adhered to its rulings.  *See* Oct. 8, 2010 Order Denying Def. Mot. For Reconsideration (ECF No. 345).[2]

Nevertheless, Defendants now argue that, on class certification, Plaintiffs "have the burden to show, by a preponderance of the evidence, that they have a cognizable theory for recovering direct damages under Section 14(a)."  Opp. at 1.  However, the Court has already determined that Plaintiffs <u>have</u> set forth a cognizable theory for recovering direct damages under Section 14(a).  *See Bank of Am.*, 757 F. Supp. 2d at 292 n.3 ("The Securities Plaintiffs' theory is that the BofA shareholders were harmed when the BofA shares decreased in value after the truth about the transaction became public.").  Contrary to Defendants' assertion, while Plaintiffs have to satisfy the elements of Rule 23 on this motion, it is not Plaintiffs' burden to establish by a preponderance of the evidence that the Court's prior decision on these legal issues is correct.

---

[2]  The Court has also rejected Defendants' argument that Delaware state law, and not federal law, controls whether Plaintiffs' claims are direct.  *Compare* Opp. at 14 *with Bank of Am.*, 757 F. Supp. 2d at 292-93.  In any event, under both federal and state law, Plaintiffs have properly stated a direct claim under Section 14(a).  *See* Pl's Opp. To Mot. To Certify A Question Of Law (ECF No. 237) at 1-3, 5-21.

In *DeMarco*, Judge Lynch soundly rejected what Defendants attempt to do here:

> Finally, in the guise of objections to the definition of the class, defendants also attempt to re-argue issues decided against them on the motion to dismiss, such as the appropriate measure of loss causation and the temporal extent of the alleged fraud. … Whatever else may be required of plaintiffs' class certification motion, it is emphatically not an opportunity for a second round of review, at a higher standard no less, of the substantive merits of plaintiffs' underlying claims. Plaintiffs' claim that [defendants] committed securities fraud … survived a motion to dismiss, and those substantive claims may proceed to summary judgment without further review.

228 F.R.D. at 476; *see also Inyx*, 2011 WL 2732544, at *2 ("a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement") (citation omitted).[3]

Moreover, Defendants' claim that Plaintiffs cannot "identify a single case that supports" the Court's holding that Plaintiffs need not have exchanged their shares to state a direct Section 14(a) claim (Opp. at 1) is incorrect.  Section 14(a) prohibits misleading solicitations to shareholders who vote on "any" corporate action – not just those actions that entail a purchase, sale or exchange of shares.  *See* 15 U.S.C. § 78n(a).  As the Supreme Court has long held:

> [Sections 10(b) and 14(a)] of the Act apply to different sets of situations.  Section 10(b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale.  The fact that there may well be some overlap is neither unusual nor unfortunate.

*National Sec.*, 393 U.S. at 468.  Indeed, contrary to what Defendants contend (*see* Opp. at 12-13), courts universally hold that Section 14(a)'s "transaction requirement" is met where, as here, the misleading proxy is "the essential link" to the shareholder vote approving the corporate action – regardless of whether an exchange of shares occurred.  *See Bank of Am.*, 757 F. Supp. 2d at 292 n.3 (citing *Mills*, 396 U.S. at 385); *Koppel v. 4987 Corp.*, 167 F.3d 125, 137 (2d Cir. 1999) ("It has long been clear that a plaintiff alleges sufficient causation when the plaintiff points to a material violation

---

[3]  Defendants' reliance on *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), is misplaced.  *See, e.g.*, Opp. at 3, 26 n.27.  *McLaughlin* was not a securities class action, but a RICO case brought by smokers allegedly deceived by defendants' marketing of light cigarettes.  522 F.3d at 220.  In *McLaughlin*, the court merely held that plaintiffs had failed to state a damages theory that was "cognizable under [the] RICO" statute and susceptible to common proof because determining why each smoker chose to smoke light cigarettes was an inherently individualized inquiry.  *Id.* at 227-28.  This conclusion has no bearing here, as the decline in BoA's stock price may be shown by common evidence, and the requirements of RICO are irrelevant.

of the proxy rules in a situation where shareholder approval was necessary for a company to complete an allegedly unfavorable transaction."), *quoted in* Oct. 8, 2010 Order Denying Def. Mot. For Reconsideration (ECF No. 345) at 3.  Thus, there is a litany of decisions sustaining direct Section 14(a) claims that do not involve <u>any</u> purchase, sale, or exchange of shares, including claims brought by shareholders of an acquiring corporation.[4]  Defendants cite to no authority supporting their argument that a shareholder must "have bought, sold or exchanged" his shares in order to state a direct Section 14(a) claim.[5]

The Court also correctly held that Plaintiffs can seek damages based on the decline in the price of BoA stock following the corrective disclosures.  Again, Defendants cite no law precluding a plaintiff asserting a direct Section 14(a) claim from recovering damages based on the decline in a company's share price following corrective disclosures.  To the contrary, the Second Circuit recently reaffirmed that a plaintiff bringing a direct Section 14(a) claim may seek such damages.  In *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 415 (2d Cir. Feb. 2, 2011), the plaintiff asserted a direct Section 14(a) claim alleging that Ernst & Young ("E & Y") made false and misleading statements that were incorporated into a merger proxy statement.  *Id.* at 2.  The plaintiff sought damages to recover "his stock['s] lost value when [defendant's] share prices fell as

---

[4]  *See, e.g.*, *United Paperworkers Int'l v. Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (upholding direct Section 14(a) claim concerning a vote on a shareholder proposal); *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979) (upholding direct Section 14(a) claims concerning vote on the election of directors); *N.Y.C. Emp. Ret. Sys. v. Jobs*, 593 F.3d 1018, 1021-23 (9th Cir. 2010) (reversing district court's conclusion that Section 14(a) claims concerning a vote on a stock option plan were derivative, and holding that they were direct); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266, 1269 (N. D. Cal. 2000) (recognizing direct Section 14(a) claim by shareholders of acquiring company); *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 440 (D. Md. 1996) (same).

[5]  The closest Defendants come in their Opposition is an inaccurate citation to the Second Circuit's discussion of transaction causation in *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000).  *See* Opp. at 12 n.12.  However, the language quoted by Defendants concerns transaction causation for a Section 10(b) claim – <u>not</u> a Section 14(a) claim.  *Grace*, 228 F.3d at 46.  Moreover, Defendants' theory is frivolous.  Under Defendants' theory, if all other facts stayed the same except that BoA had structured the Merger so that its shareholders received new stock equal in value to their BoA shares, their receipt of this new piece of paper would entitle them to bring a direct claim.  This distinction has no basis. The right to sue directly under Section 14(a) does not turn on whether a shareholder received a particular piece of paper in the merger.  *See Bank of Am.*, 757 F. Supp. 2d at 289-90 (collecting Supreme Court cases holding that the "broad remedial purpose" of Section 14(a) is "to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice"); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) ("[I]t is also well-settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.").

information concerning [defendant's] accounting practices was gradually disseminated to the public." *Id*. The Second Circuit agreed, holding that the proper inquiry was whether the "misstatement or omission in E & Y's audit opinion was revealed to the market resulting in a diminution in the value of [plaintiff's] securities" – precisely as Plaintiffs contend here. *Id*. at 3.[6]

Numerous other courts have concluded that a plaintiff may recover damages under Section 14(a) based on the decline in the company's share price upon a corrective disclosure. *See, e.g.*, *Goldkratz v. Griffin*, 1999 WL 191540, at *8 (S.D.N.Y. Apr. 6, 1999) (Cote, J.) (the "standard" measure of damages for a direct Section 14(a) claim is "out-of-pocket damages" based on the "decrease in value" of the stock); *N.J. and Its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1142 (D. Kan. 2004) (sustaining direct Section 14(a) claim seeking recovery from a stock price decline because there was "clearly a connection between the [corporate action voted upon] and plaintiff's injury in that the stock price declined after the conflict of interest was revealed").[7]

Finally, Defendants contend that "plaintiffs have failed to cite a single case from any court adopting a stock-drop measure of damages in a Section 14(a) case brought by an acquiring shareholder." Opp. at 13. This assertion is wrong. Defendants have conceded in their prior briefing that Plaintiffs <u>have</u> cited cases that "<u>involved Section 14(a) claims of the type at issue here</u> – claims for damages brought by acquiring company shareholders, allegedly deprived of the right to cast an informed vote on a merger, for the post-merger decline in the market price of their shares." *See* Def. Reply Mem. In Support Of Mot. To Certify Question Of Law (ECF No. 242) at

---

[6] In *Amorosa*, the Second Circuit ultimately affirmed the dismissal of the plaintiff's Section 14(a) claim because there, unlike in this case, the district court found that the plaintiff had failed to plead that there was in fact a corrective disclosure that caused the price of the stock to drop. *See* 409 F. App'x at 416.

[7] Given the authority cited above, the Court should not consider the report of Defendants' expert, Professor Allen Ferrell, in which he principally opines that: (1) Plaintiffs cannot state a direct claim because they did not exchange their shares in the Merger, and (2) as a matter of law, Plaintiffs cannot seek damages based on the decline in BoA's share price after the corrective disclosures occurred. Professor Ferrell's conclusions flatly contradict the language of Section 14(a) and the well-established law applying it, and should be disregarded. Tellingly, Defendants do not even cite the Ferrell report in their discussion of Plaintiffs' Section 14(a) claim (*see* Opp. at 1-15), and for good reason: the report rests entirely on Ferrell's personal, subjective opinion, and does not contain a single case, piece of economic or legal literature, or any other kind of study or analysis that supports its assertions. In sum, the Ferrell report is unreliable and entitled to no weight. *See Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579, 590 (2005) ("Proposed [expert] testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known.").

9-10 (citing, *inter alia*, *McKesson*, 126 F. Supp. 2d 1248 and *Edge Partners*, 944 F. Supp. 438). Indeed, consistent with the authority above, the *McKesson* court approved a measure of damages based on the "dramatic decrease in the trading price of McKesson" stock even though McKesson shareholders had <u>not</u> exchanged their shares in the merger. *McKesson*, 126 F. Supp. 2d at 1252.[8]

In sum, class certification is not the vehicle for Defendants to seek reconsideration of the Court's prior holdings and, in any event, the Court's conclusions were indisputably correct.[9]

> **B.      The Evidence Adduced To Date Demonstrates That Class Members Have Suffered Direct Economic Harm**

Even if the Court is inclined to delve into the merits and consider whether Plaintiffs have submitted sufficient evidence establishing that Class members were harmed by the material misrepresentations in the Proxy, Plaintiffs have done so.

To start, Plaintiffs have submitted the expert report of Chad Coffman. Mr. Coffman's event study shows that BoA's stock price declined in a statistically significant manner when, after the Merger closed, news about Merrill's losses and bonuses emerged. *See* Def. Ex. 5 at ¶¶ 8(i), 9(i), 20, 35, n.29. Notably, even using an event study that was biased against finding any statistically significant price movements, Defendants' expert agreed that BoA's stock price declined in a statistically significant manner on January 15, when news of the bailout and Merrill's larger-than-

---

[8] The *McKesson* court ultimately dismissed the Section 14(a) claims on technical pleading grounds, but stated that "it should be a relatively simple matter to restate the Section 14(a) allegations in the proper form." *Id.* at 1268 n.10.

[9] In contending that *In re Flag Telecom Holdings Limited Securities Litigation*, 574 F.3d 29 (2d Cir. 2009), requires the Court to revisit its prior legal rulings, Defendants mischaracterize the Court's legal determinations and the Second Circuit's decision. *See* Opp. at 4. In its August 27, 2010 Order, the Court found that there was a "potential" for Plaintiffs to show direct harm based on "a diminution in the value of the shares that they held." *Bank of Am.*, 757 F. Supp. 2d at 292. Thus, the Court permitted Plaintiffs to seek damages based on the decline in BoA's stock price, but obviously did not, and could not, make a conclusive finding on the extent of those damages at the pleading stage, since only a jury can decide that issue. *Flag Telecom* does not, as Defendants erroneously assert, support revisiting the question of whether Plaintiffs can potentially recover for the diminution in the value of their shares. In *Flag Telecom*, the Second Circuit held only that an "in-and-out" plaintiff, who sold his stock before any corrective disclosure, could not establish loss causation and thus did not satisfy the typicality and adequacy requirements. *See* 574 F.3d at 40-41. Here, Plaintiffs do not seek to include such "in-and-out" traders in the Class, and thus, *Flag Telecom* is inapposite. *See infra* at 28-29. Further, unlike *Flag Telecom*, the damages arguments Defendants raise here do not implicate any element of Rule 23. Moreover, the Supreme Court in *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011), specifically held that courts may not consider any issues relating to loss causation at the class certification stage.

expected losses was reported, and on January 22, when Merrill's bonuses were first reported.  *See* Def. Ex. 4 at 22 (concluding that "January 15, 2009 and January 22, 2009 are statistically significant").

There is no *bona fide* dispute that a decline in the price of BoA stock represents harm suffered directly by the shareholders.  Defendants previously argued to this Court that "[t]he alleged $136 billion 'in market value destruction' [], based upon the change in BofA's share price between September 15, 2008 and March 6, 2009 is <u>not</u> a measure of loss by BofA, but rather of the decline in the value of stock owned by stockholders."  BoA Defs. Reply Mem. Of Law In Supp. Of Mot. To Dismiss Consol. S'holder Deriv. & Class Action Compl. (ECF No. 214) at 13.  Defendants have further asserted that BoA was neither harmed nor suffered damages as a result of the Merger.  *See* Answers of Def. Lewis and Outside Director Defs. (ECF Nos. 354 & 355) at ¶ 356 & Eighth Affirmative Defense.  Similarly, Defendants' expert, Professor Ferrell, testified that shareholders experienced losses when the price of their stock declined.  *See* Singer Ex. 1 at 262:25-263:4 ("obviously if I own stock and it goes down in value, I have a loss relative to the value it had immediately prior to the corrective disclosure.").[10]

In rebuttal to Ferrell's incorrect legal conclusion that Plaintiffs' Section 14(a) claim is derivative, Plaintiffs submitted the expert report of Professor Stephen Choi, one of the most distinguished securities experts in the country.  As Professor Choi explained, consistent with the economic and remedial objectives of Section 14(a), Plaintiffs may assert a direct claim under Section 14(a) on behalf of a class of holders of BoA securities who were eligible to vote on the Merger.  *See* Def. Ex. 6 at ¶¶ 5-27.  Professor Choi further opined that Plaintiffs' theory of direct damages for their Section 14(a) claim was appropriate under economic principles.  Professor Choi explained that the proper way to measure the direct harm to investors under Section 14(a) is by

---

[10]  Defendants continue to incorrectly insist that BoA's stock price declined solely because of a market "perception" that BoA had "overpa[id]" for Merrill.  Opp. at 10.  While Plaintiffs are not required to establish loss causation at this stage, and while the Court cannot resolve this fact-intensive dispute at class certification, the evidence adduced to date makes clear that BoA's stock price declined because the market learned that, contrary to Defendants' representations, Merrill had suffered losses so severe that BoA needed a bailout to close the Merger.

reference to the stock price declines following corrective disclosures, because these declines "reflect[] the removal of the inflated value due to the merger-related disclosures and thus provide[] an objective, market-based measure" of damages.  *See id.* at ¶ 32; *see also id.* at ¶¶ 28-31.[11]  Based on Defendants' assertions, as well as opinions by both Plaintiffs' and Defendants' experts, the diminution in value of BoA common stock attributable to the alleged misrepresentations and omissions constitutes direct shareholder harm.

In response, Defendants make a series of attacks on Professor Choi that either ignore or mischaracterize his position.  First, contrary to Defendants' assertion that Professor Choi's report is unsupported (Opp. at 4-6), Professor Choi explicitly grounded his economic analysis on pertinent economic and legal literature, caselaw, legislative history and statutory language.  *See, e.g.*, Def. Ex. 6 at ¶¶ 25-27 & nn. 2-5, 13-17.[12]

Second, Defendants mischaracterize Professor Choi's report and testimony in contending that he supposedly "admitted" at his deposition that the "out of pocket" measure of damages does not apply to Plaintiffs' Section 14(a) claim.  *See* Opp. at 5.  To the contrary, Professor Choi made clear that Section 14(a) does not require a purchase of shares, and that the appropriate measure of damages is based on the decline in BoA's share price following the corrective disclosures – precisely as Plaintiffs have alleged.  *See* Def. Ex. 6 at ¶¶ 5(a), (c), 29, 32; Def. Ex. 8 at 234:18-24 ("[T]he way the shareholders are harmed [is] by that stock price drop in January 2009. … [T]he precise way [damages] are shown in the BofA case is a stock price drop.").[13]

Third, Defendants assert that Professor Choi "is essentially advocating a 'benefit of the bargain' damage measure," which they claim is purportedly "precluded as a matter of law" in this

---

[11] Contrary to Defendants' assertion that Professor Choi's opinion was a "legal brief" (Opp. at 4), Professor Choi rendered economic opinions concerning the direct harm suffered by the shareholders.  *See, e.g.*, Def. Ex. 8 at 218:6-17.

[12] While Defendants similarly contend that Professor Choi's report was based on "demonstrably false assumptions and admitted 'speculation'" (Opp. at 6), the deposition excerpt they cite to "prove" this point simply involves Professor Choi responding to a question that was outside the scope of his report, while appropriately cautioning that such an answer would be speculative.  *See* Def. Ex. 8 at 251:9-252:2.

[13]  Defendants similarly contend that Professor Choi's securities law textbook defines out-of-pocket damages in such a way as to require a "purchase" of securities at an inflated price.  *See* Opp. at 5.  However, Defendants ignore that the single line from the textbook they quote relates to Section 10(b), and not Section 14(a).  *See* Def. Ex. 96 at 143.

case by the Second Circuit's decision in *Barrows v. Forrest Laboratories, Inc.*, 742 F.2d 54 (2d Cir. 1984). Opp. at 6. However, Professor Choi testified unequivocally that he was <u>not</u> employing a benefit-of-the-bargain approach, and that Section 14(a) damages should be measured by a different standard – namely, the decline in the price of BoA stock. *See* Def. Ex. 8 at 229:18-24 ("I wouldn't call it benefit of the bargain because – precisely because we have a shareholder drop. … That's a measurable, quantifiable loss."); *id.* at 226:17-229:24 (same).[14]

   **Fourth**, Defendants appear to argue that Professor Choi's damages measure is inaccurate because it is supposedly based on the incorrect assumption that "Bank shareholders had a uniform expectation as to the value of the merger." Opp. at 7. However, Professor Choi's damages measure is not based on any assumption as to how investors may have viewed the Merger. Instead, it is based on the declines in BoA's stock price following the corrective disclosures, which "provide an objective, market-based measure" of damages. Def. Ex. 6 at ¶ 32; *see also* Def. Ex. 8 at 226:21-22.[15]

   **Finally**, Defendants incorrectly contend that Professor Choi's damages measure is "speculative" because it is supposedly based on calculating the value of the "lost opportunity" to pursue alternative transactions to the Merger. *See* Opp. at 8-9. While Professor Choi explained that BoA shareholders were harmed by the Proxy's misrepresentations because (among other reasons), they were prevented from using their "vote to push management to consider other investment choices," he did <u>not</u> state that damages should be calculated on the basis of these lost opportunities. Rather, Professor Choi stated that damages should be calculated based solely on the decline in BoA's stock price – an objective standard that accurately reflects "the economic harm to investors

---

[14]  In any event, Defendants' reliance on *Barrows* is misplaced. *Barrows* stands for the unremarkable proposition that damage awards cannot be speculative. *See* 742 F.2d at 59-60. In *Barrows*, plaintiffs sold their company, and then sued – eleven years later – claiming that the shares they had acquired had a much lower "true value" at the time of the transaction. *Id.* at 56-57. The Court found that calculating damages would be too speculative and, accordingly, denied plaintiff's motion to amend the complaint. *Id.* Unlike in *Barrows*, damages here are non-speculative and easily calculable by reference to the decline in BoA's stock price just weeks after the Merger closed.

[15]  Because Professor Choi's damages measure is based only on the declines in BoA's stock price, Defendants' argument that it requires "an individualized inquiry into each class member's state of mind" is wrong. *See* Opp. at 7.

from the interference with the shareholder right to vote." Def. Ex. 6 at ¶ 5(c).[16]

## II.     Defendants' Sole Challenge To Certification Of The Section 10(b) Class Fails

Defendants' only challenge to certifying the Section 10(b) class concerns predominance. *See* Opp. at 15-37.  While Defendants do not dispute that the market for BoA stock was efficient, they contend that Plaintiffs have failed to establish that Merrill's historic losses and the secret Bonus Agreement were material for the purpose of invoking the fraud-on-the-market presumption of reliance.  *See id.*  Defendants are wrong.  To establish materiality for the purposes of class certification, "plaintiffs need only meet the 'total mix' standard adopted in *Basic* and routinely applied by courts throughout the country."  *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 314 (S.D.N.Y. 2010); *see also Matrixx Init., Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (materiality inquiry is "fact-specific").  As set forth below, Plaintiffs have shown that Merrill's massive losses and the secret Bonus Agreement were material for the purpose of invoking the fraud-on-the-market presumption.  Accordingly, the burden has shifted to Defendants to "rebut[] the presumption by a preponderance of the evidence," which they have failed to do.  *Inyx*, 2011 WL 2732544, at *8.[17]

### A.     The Secret Bonus Agreement Was Material

The facts summarized in Plaintiffs' opening brief easily demonstrate the materiality of the Bonus Agreement for the purpose of invoking the fraud-on-the-market presumption.  Defendant Thain stated that the Bonus Agreement was one of the "three main" Merger terms that the parties negotiated.  ¶¶ 70-71.  The Bonus Agreement authorized the payment of $5.8 billion in bonuses,

---

[16]  Defendants suggest in a footnote that the vote deserves less protection because it was required by NYSE rules instead of federal or Delaware law.  *See* Opp. at 10 n.11.  By its own terms, Section 14(a) applies to "any" shareholder vote to approve a transaction.  Defendants cite no legal basis to exclude from Section 14(a)'s purview a vote required by stock exchange rules.

[17]  Similarly, in order to rebut the presumption of reliance regarding omitted material information under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), Defendants now have the burden of "prov[ing] that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'"  *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 100 (S.D.N.Y. 2009).  Defendants have not even attempted to meet this burden.

which represented 12% of the Merger consideration, and permitted Merrill to pay these bonuses on an expedited basis, before the Merger closed, and regardless of Merrill's financial performance. *See* ¶¶ 75-76. As the Court held, these facts contradicted the Proxy's assurances that "Merrill Lynch will <u>not</u>" pay discretionary bonuses, that "pay for performance" was "the core of [Merrill's] compensation policy," and that executive bonuses were "paid in January for performance in the prior fiscal year." *Bank of Am.*, 757 F. Supp. 2d at 296, 300-01.

In addition, Defendants concealed the Bonus Agreement from investors at a time when the market and the Government were heavily focused on the compensation practices of Wall Street banks that had suffered large losses and received taxpayer funds.[18] During the fourth quarter of 2008, the New York Attorney General and the United States Congress initiated inquiries to obtain information concerning Merrill's bonuses. In response to Congress's inquiry, Merrill represented in writing on November 24, 2008 that "<u>incentive compensation decisions for 2008 have not yet been made</u>" – thoroughly discrediting Defendants' argument that the market knew Merrill had an agreement authorizing it to pay multi-billion dollar bonuses before the Merger closed. *See* Singer Ex. 4 at 1.

The reaction of BoA's stock price when the information about the bonuses was disclosed further establishes materiality. While Defendants incorrectly assert that *The Financial Times* article published on the night of January 21, 2009 contained "no new news" (*see* Opp. at 23-25), that article revealed to the market for the first time that Merrill had taken "the <u>unusual step of accelerating bonus payments</u> by a month," and had paid $3-4 billion in bonuses notwithstanding its historic losses.[19] Def. Ex. 53. In response to this disclosure, BoA's stock price plummeted 12% the next trading day, January 22. The event study conducted by Plaintiffs' expert, Mr. Coffman, established that this decline was statistically significant. *See* Def. Ex. 5 at ¶ 35; *see also Sadia*, 269

---

[18] *See* Singer Ex. 2 ("Wall Street is coming under mounting political pressure to cut bonuses for top executives, traders and bankers in what was already expected to be a down year for pay."); Singer Ex. 3 (same).

[19] Defendants' alternative argument that *The Financial Times* article was not "corrective" because Defendants never misrepresented the timing of Merrill's bonus payments (*see* Opp. at 25) disregards the Court's determination that "[t]he timing of the Merrill bonuses contradict[ed] past statements of company policy … that employee bonuses were to be paid in January for performance in the prior fiscal year." *Bank of Am.*, 757 F. Supp. 2d at 301.

F.R.D. at 312-14 (plaintiffs satisfied "the 'total mix' standard" on class certification where event study showed "statistically significant 'unpredicted' decline" in stock price); *In re Monster Worldwide Inc. Sec. Litig.*, 251 F.R.D. 132, 138 (S.D.N.Y. 2008) (same). *The Financial Times* article also sparked critical public reaction, with analysts and the financial press widely criticizing the payment of the "ridiculous" bonuses as a "damaging revelation."  Within a day, the New York Attorney General initiated an inquiry into Merrill's "large, secret, last-minute bonuses."  *See* ¶¶ 191-96.

Significantly, Defendants' expert <u>agreed</u> that the stock price decline on January 22 was statistically significant – an admission that is fatal to any argument that the Bonus Agreement was not material.  *See* Def. Ex. 4 at 22.  While Defendants' expert claimed that *The Financial Times* article did not cause this decline, he had no explanation for what "new" information did.  Indeed, Defendants' expert <u>could not identify any other news that day that could have caused BoA's stock to drop</u>, and could only speculate that the cause might be "randomness" (a 5% probability based on his own study).  As he conceded at his deposition:

> I have not done the necessary research to pin down what in fact caused the statistically significant price impact, if it is not <u>randomness</u> on the 22nd.

Singer Ex. 1 at 217:5-9.  While Defendants are free to argue to the jury that nothing – *i.e.*, "randomness" – might have caused BoA's January 22 stock price decline, this assertion cannot be credited at this stage of the litigation.[20]

Defendants also incorrectly contend that the undisclosed Bonus Agreement could not have been material until Defendants became aware that Merrill had suffered significant losses for the fourth quarter, which they assert is November 12, 2008, and thus, the Class Period cannot begin until that date.  *See* Opp. at 41-42.  However, the Bonus Agreement was material as of September

---

[20]  Defendants have abandoned their loss causation argument, made by Professor Ferrell in his report (*see* Def. Ex. 4 at 24-25), that other news, including Thain's firing, caused the stock price decline on January 22.  Indeed, such arguments cannot even be considered at this stage in light of *Halliburton*.  *See* 131 S. Ct. at 2183.  In any event, as demonstrated in Mr. Coffman's rebuttal report, virtually all of the stock price decline on that date occurred well before any potential confounding information was released.  *See* Def. Ex. 5 at ¶ 38.

18, 2008, the date on which the misleading Merger Agreement was filed, because it constituted an undisclosed fundamental term of the Merger Agreement.  *See* ¶¶ 70-81.  As the Court has held, the Bonus Agreement was material on September 18, regardless of Merrill's subsequent financial performance:

> At the time the Joint Proxy and Merger Agreement were filed with the SEC and distributed to shareholders, BofA and Merrill had agreed that Merrill could make bonus payments in the amount of $5.8 billion, and make the payments on an expedited schedule that varied from Merrill's past practices.  … If "prior written consent" had been given to make payments of up to $5.8 billion, a reasonable investor may well have considered that information important to both the purchase of shares and the granting or withholding of a proxy.

*Bank of Am.*, 757 F. Supp. 2d at 297.[21]

In sum, these facts more than adequately satisfy any burden to show materiality at this early stage of the litigation.  *See SEC v. Bank of Am. Corp.*, 2010 WL 624581, at *1 (S.D.N.Y. Feb. 22, 2010) (it was "obvious" that the Bonus Agreement was material).

## 1. Defendants' Truth-On-The-Market Defense Contradicts Second Circuit Law And Is Belied By The Facts

Notwithstanding the fact that Merrill represented to Congress in writing on November 24, 2008 that its bonus decisions had "not yet been made" (*see* Singer Ex. 4 at 1), Defendants now contend that the market supposedly knew that Merrill would pay billions of dollars of bonuses before the Merger closed.  *See* Opp. at 19-23.  Specifically, Defendants rehash the same "truth-on-the-market" defense that they raised in their motions to dismiss, contending that: (1) certain speculative news articles supposedly informed investors that Merrill would pay billions of dollars in bonuses before the Merger closed; (2) Merrill's reported compensation expense accruals in its SEC filings made clear that it planned to pay significant bonuses for 2008; and (3) the Merger Agreement and Proxy explained that Merrill would pay bonuses by stating that Merrill would operate its business in the "ordinary course in all material respects."  *See id.*  These arguments are

---

[21] Defendants also incorrectly contend that the Complaint's "first substantive scienter allegation" as to Merrill's losses relates to November 12, 2008 and, thus, Defendants' duty to disclose the losses could not have arisen prior to that date. Opp. at 41-42.  Plaintiffs allege that Defendants knew of Merrill's staggering October losses no later than the date the Proxy was filed, or November 3, 2008. *See* ¶¶ 95-110.

again without merit.

      First, Defendants' argument contradicts Second Circuit law.  As this Court has expressly held, "[t]here are <u>serious limitations</u> on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them."  *Bank of Am.*, 757 F. Supp. 2d at 302 & n.8 (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987)).  In *United Paperworkers International Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993), the defendant argued at <u>summary judgment</u> that misrepresentations in a proxy were rendered immaterial by statements in various news articles and SEC filings.  The district court "rejected [defendant's] contention that public press reports and [the company's] 10-K Report should be viewed as part of the total mix of information reasonably available to shareholders."  *Id*.  The Second Circuit affirmed, holding that "the mere presence in the media of sporadic news reports does <u>not</u> give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading, and such reports should <u>not</u> be considered to be part of the total mix of information."  *Id*.  Indeed, the Proxy here specifically instructed shareholders <u>not</u> to rely on anything other than the Proxy.  *See Bank of Am.*, 677 F. Supp. 2d at 718 (rejecting Defendants' argument because the Proxy instructed investors to disregard all "information … that is different from, or in addition to, that contained in this document").  Accordingly, Defendants' contention that news reports and other public information rendered the Proxy's misrepresentations immaterial as a matter of law cannot be accepted at any stage of the litigation, let alone at class certification.

      Second, as this Court has already held, the news articles that Defendants cite did <u>not</u> inform the market that Merrill would pay billions of dollars in bonuses before the Merger closed.  *See Bank of Am.*, 757 F. Supp. 2d at 302 (holding that these articles did not "speak to the Merrill bonuses with 'a degree of intensity and credibility' that effectively counterbalances language in the Merger Agreement and Joint Proxy").  Similarly, in excluding Defendants' articles from evidence in the SEC Action, Judge Rakoff held that:

> The fact that the media were predicting, as the Bank claims, that Merrill would in fact pay bonuses <u>is entirely irrelevant</u> …, for the alleged falsehood consisted of representing as a contingency what was in fact an agreement already reached, and <u>it does not appear that virtually any of the media reports disclosed that agreement</u>.

*SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010).  The same remains true on this Motion:  Defendants have failed to point to a single article disclosing that, as part of the Merger, BoA and Merrill had a firm agreement authorizing Merrill to pay billions of dollars in bonuses on an expedited basis.

Far from disclosing these facts, the articles reported that bonus payments by Wall Street banks were uncertain at best, and that no final decision had been made.  For example, *The New York Times*, *Bloomberg*, and Today Show reports on which Defendants rely (*see* Opp. at 24) all made clear that:

- "Bonuses are not paid until the end of the fiscal year, <u>so firms could choose to reallocate those funds</u>."  (Def. Exs. 35, 36);

- "At the end of this year, <u>companies could decide against paying the money accrued for bonuses</u> and instead use part of it to cover severance costs. . . '<u>Whether what you see is what they're going to pay, you can't tell yet</u>.'"  (Def. Exs. 35, 36); and

- "Merrill Lynch and [other banks] all say they <u>haven't made any final decisions on bonus payout yet</u>, they're simply setting money aside."  (Def. Ex. 37).[22]

Equally baseless is Defendants' contention that the market supposedly knew that Merrill accelerated its payment of multi-billion dollar bonuses before the close of the Merger.  *See* Opp. at 20.  The "disclosure" on which Defendants principally rely consists of a single, ambiguous line in a British newspaper, *The Telegraph*, which merely mentioned that bonuses are "<u>due at the end of the month</u>."  *Id*.  This article was not picked up by any media outlet in this country, and neither quantified the amount of bonuses that would be paid nor stated that they would be paid before the Merger closed.  The other articles cited by Defendants in support of this assertion also did not disclose that bonuses would be paid before the Merger closed, and stated only that Merrill

---

[22] Other articles on which Defendants rely also stated that bonuses were uncertain: "Just because they've been accruing money for incentive pay <u>doesn't mean they will pay it out in full</u>" and "[b]anks will decide what to pay out in bonuses in the coming months…. [W]orkers are uneasy about whether the bonus money will really come." Def. Ex. 33.

18

employees would "find out their bonuses later" in December.  *See* Opp. at 24 & n.21.  Moreover, under Second Circuit law, such vague "disclosures" – none of which were made by the company – are patently insufficient to establish that the market knew that Merrill would, contrary to the express terms of the Proxy, expedite the payment of multi-billion dollar bonuses notwithstanding Merrill's financial condition.  *See Kronfeld*, 832 F.2d at 736; *United Paperworkers*, 985 F.2d at 1199.

Third, the Court has already considered and rejected Defendants' argument that the compensation expense accruals in Merrill's SEC filings disclosed that Merrill would expedite the payment of billions of dollars in bonuses.  *See* Opp. at 21.  As the Court explained, these compensation accruals are irrelevant because "plaintiffs' theory of liability is not that Merrill accumulated excessive funds for employee compensation.  Rather, the Securities Complaint posits that the proxy materials gave the false impression, through misstatement and omission, that Merrill compensation would be limited to payments required by a preexisting plan or agreement."  *Bank of Am.*, 757 F. Supp. 2d at 301-02.  Merrill's accruals are also irrelevant because, absent the secret Bonus Agreement, BoA would not have been bound by Merrill's accruals, and would have retained the authority to reduce – or eliminate – any bonuses.  Further, Merrill's most senior human resources executive has testified that Merrill's reported compensation accruals did not disclose the amount of bonus payments that Merrill planned to make, because the accruals included other expenses, such as salaries, benefits, and commissions so that "you really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense."  ¶ 208.

Fourth, the Court has also rejected Defendants' argument that the Proxy and Merger Agreement "made clear that Merrill would pay bonuses" because Merrill promised to conduct its business in the "ordinary course."  *See* Opp. at 22.  After considering the same language from the Proxy and Merger Agreement that Defendants quote in their brief, the Court determined that these documents were materially misleading because, among other reasons, they failed to disclose the Bonus Agreement.  *See Bank of Am.*, 757 F. Supp. 2d at 296, 297 (finding that Defendants' argument "fail[s] to reckon with the parties' undisclosed written agreement authorizing the payment

of bonuses by Merrill," and that the "ordinary course" provision did "not apprise investors of Merrill's bonus arrangement").[23]

> ### 2. Plaintiffs Are Not Required To Show That BoA's Stock Price Increased In Response To Defendants' Bonus-Related Misrepresentations

Defendants also incorrectly contend that, in order to invoke the fraud-on-the-market presumption, Plaintiffs must show not only that BoA stock declined on the date of the corrective disclosure, but also that the stock price underlined increased on each day that Defendants made bonus-related misrepresentations. *See* Opp. at 18-19. Defendants are wrong. As with their other novel arguments, Defendants have failed to cite a single case in which any court has accepted their position.

To the contrary, courts in this District and nationwide have consistently held that, "at the class certification stage, plaintiffs need not submit evidence that misstatements and omissions artificially inflated the price of [the stock] at the time they were made or throughout the class period." *Sadia*, 269 F.R.D. at 313-14; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 561 (S.D.N.Y. 2011) ("Vivendi contends that … there can be no liability for statements made on days on which inflation remained constant or decreased. Vivendi has not identified a single case to support this proposition, and the Court is aware of none."); *In re Alstom, S.A. Sec. Litig.*, 253 F.R.D. 266, 279 (S.D.N.Y. 2008) (same).[24]

The only case that Defendants cite in support of their argument, *In re Moody's Corp.*

---

[23] Contrary to Defendants' assertions that: (1) Plaintiffs knew of the Bonus Agreement because of the news articles and other publicly available information (*see* Opp. at 19); and (2) Plaintiffs did not interpret the Proxy to bar Merrill's bonus payments (*see* Opp. at 22), Plaintiffs testified that they, like the rest of the market, were surprised by the bonus payments. *See* Singer Ex. 11 at 115:16-116:7 (expressing "surprise[]" at the disclosure of the payment of bonuses to Merrill Lynch employees"); Def. Ex. 14 at 182:2-4 (expressing surprise because "[t]he bonuses were paid before they would normally be paid in the first quarter of 2009"); Singer Ex. 12 at 240:6-13 ("[W]hat none of [the articles introduced by Defendants] mention is the fact alleged in the complaint that the bonuses at Merrill were not under discussion but had been agreed to contractually at the time the merger was entered into. … [O]ne would not have learned that from any of these articles.").

[24] *See also In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *17 (D.N.J. Aug. 17, 2005) ("Defendants cite no case, and the Court is aware of no case, wherein, in addition to a price change upon disclosure of corrective information, there must be a price change coinciding with the alleged misstatement or omission."); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340 (N.D. Ga. 2007) ("Contrary to Defendants' argument, the mere absence of a statistically significant underlined increase in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock.").

*Securities Litigation*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011), directly contradicts it.  *See* Opp. at 18-19.  As the *Moody*'s court held, materiality can be demonstrated "where the alleged misrepresentation caused a statistically significant increase in the price <u>or</u> where a corrective disclosure caused a statistically significant decline in the price."  *Moody's*, 274 F.R.D. at 493.  Unlike in *Moody's*, BoA's stock price declined by a statistically significant amount after Merrill's bonus payments were first disclosed.  No further showing is required.

In sum, Defendants have failed to carry their burden of rebutting the fraud-on-the-market presumption by proving that the Bonus Agreement was immaterial.

### B.    Merrill's Undisclosed Massive Fourth-Quarter Losses Were Material

The facts summarized in Plaintiffs' opening brief establish that Merrill's losses were material.  *See* Motion at 6-11, 19-21.  As of the shareholder vote, Merrill's undisclosed fourth-quarter losses exceeded $16.2 billion.[25]  *See* ¶¶ 124-26.  These losses were so devastating that:

- BoA discussed invoking the MAC and terminating the Merger before the shareholder vote (Motion at 19-20);

- Defendants were repeatedly advised to disclose Merrill's losses before the shareholder vote by, among others, their legal counsel and BoA Treasurer Jeffrey Brown, who told Defendant Price in late November that "we should disclose" Merrill's losses because he "didn't want to be talking through a glass wall over a telephone" (*id* at 6-7);

- Defendant Price misled BoA's General Counsel as to the true extent of Merrill's losses to ensure that no disclosure was made (*id*. at 7);

- Only days after the vote, Defendants sought to invoke the MAC and terminate the Merger (*id*. at 8); and

- In order to consummate the Merger and absorb Merrill's losses, Defendants sought and obtained a $138 billion taxpayer bailout (*id*. at 8-9).

In addition, BoA's most senior officers acknowledged in their emails that Merrill's massive undisclosed losses were material.  *See, e.g.*, ¶¶ 167, 170 (quoting, *inter alia*, December 17 and 19

---

[25] Defendants incorrectly state that Plaintiffs allege that only $12.4 billion in losses were known at the time of the vote. *Compare* Opp. at 30 *with* Compl. ¶ 126.

emails from BoA Treasurer Brown to Defendant Price and BoA's in-house counsel discussing how the rating agencies were "not expecting poor results from ML this quarter," "clearly think ML is more healthy than they are," and "don't know what is coming"). Defendant Lewis has admitted that the "magnitude" of Merrill's losses "stunned" and "shock[ed]" investors, and BoA and Merrill stated in their SEC filings that the losses were "larger than expected." *See* Motion at 10, 20.[26]

The reaction of the financial community further confirms the materiality of Merrill's losses. In response to the corrective disclosures, BoA's stock price plummeted approximately 45%, wiping out nearly $50 billion in BoA's market capitalization. *See* Motion at 10. Mr. Coffman's event study established that, on each of the alleged corrective disclosure days, BoA's stock price experienced statistically significant declines, further demonstrating the materiality of Merrill's losses.[27] *See* Def. Ex. 5 at ¶¶ 8(i), 20, n.29; *see also Monster*, 251 F.R.D. at 138 (finding "a sufficient showing of materiality as to warrant the application of *Basic*" where expert found a statistically significant price decline after the corrective disclosure). Moreover, the rating agencies immediately downgraded BoA, and analysts expressed astonishment at Merrill's "shocking" losses, which they reported were "significantly and materially higher than anyone's expectations" and "much, much worse than expected." *See* Motion at 10-11; *see also In re Alstom, S.A. Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (omission material where "financial professionals were taken by surprise").

While any one of these facts, taken alone, would be sufficient to establish the materiality of Merrill's losses for purposes of invoking the fraud-on-the-market presumption, when considered collectively, they unquestionably establish materiality at this – or any – stage of the litigation. *See Bank of Am.*, 2010 WL 624581, at *1 ("[d]espite the Bank's somewhat coy refusal to concede []

---

[26] Defendants contend that Plaintiffs "have pointed only to allegations in their complaint . . . which are insufficient on this motion." Opp. at 27 & n.28. Plaintiffs do not have to prove the Complaint's allegations at this stage. *See, e.g.*, *Inyx*, 2011 WL 2732544, at *2 ("On a motion to certify a class, the court accepts all allegations in the pleadings as true."). Nevertheless, if the Court wishes Plaintiffs to supplement the record with the actual documents quoted in the Complaint, Plaintiffs will submit them.

[27] Defendants' expert agreed that BoA's stock declined by a statistically significant amount on January 15, 2009, following the news of Merrill's larger-than-expected losses. *See* Def. Ex. 4 at 22.

materiality," it was "obvious" that Merrill's "historically great losses" were material).[28]

### 1. Defendants Have Failed To Establish That The Market Expected Merrill's Losses

In response to this evidence, Defendants again attempt to establish a "truth-on-the-market" defense, asserting that they did not have to disclose Merrill's losses because the market supposedly knew as of the date of the vote that Merrill was suffering massive losses for the fourth quarter. *See* Opp. at 28-32. Their sole support for this argument is a single analyst report estimating write-downs on certain Merrill assets. This argument should be rejected.

First, as the Court has held, Defendants' burden to establish a truth-on-the-market defense, even at summary judgment, is almost "impossible" to meet. *Bank of Am.*, 757 F. Supp. 2d at 301-02 (citation omitted). As discussed above, the law in the Second Circuit is clear that Defendants, having sent their investors a false and misleading Proxy, cannot base a truth-on-the-market defense on the speculation of a third-party analyst. *See* authorities cited *supra* at 2-4, 17.

Second, there is no way to reconcile Defendants' own conduct with their assertions that Merrill's fourth-quarter losses were "immaterial" and "widely reported." Defendants offer no explanation – nor could they – for why, if the losses were "immaterial," they decided to invoke the "Material Adverse Effect" Clause and terminate the Merger just days after the vote, and needed to obtain a $138 billion bailout to absorb Merrill's losses. *See* Motion at 9. Nor do they explain why, if the losses were "widely known," BoA executives were internally discussing their obligation to disclose the severe, mounting loses prior to the vote and expressing concern that the rating agencies "don't know what is coming" and "are not expecting poor results from ML this quarter." *Id.* Similarly, Defendants cannot explain why, if the market was aware of Merrill's losses, BoA's regulators, including the Treasury Department and the Federal Reserve, did not know of those losses until BoA approached them for the bailout shortly after the vote. *See* ¶¶ 143-51.

---

[28] Defendants' effort to reargue that they had no duty to disclose Merrill's fourth-quarter losses (*see* Opp. at 26, n.27) should be rejected. *See In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2011 WL 3211472, at *8, n.8 (S.D.N.Y. Jul. 29, 2011); *Bank of Am.*, 757 F. Supp. 2d at 303-06.

Defendants' silence on these points speaks volumes.[29]

Third, Defendants' argument ignores that, as of the date of the vote, the overwhelming majority of analysts were expecting Merrill to report, at most, *de minimis* losses for the fourth quarter. On December 1, 2008, only four days before the vote, Merrill's most senior executives, including Defendant Thain, reviewed an internal report providing the latest analyst estimates for Merrill. *See* Def. Ex. 94. This report showed that numerous analysts were estimating that Merrill would report a <u>profit</u> for the fourth quarter, and the consensus view was that Merrill would report a minute loss of only $70 million – or <u>less than one half of one percent</u> of Merrill's actual reported loss of $21.5 billion. *Id.*[30]

Fourth, the testimony of Defendants' expert eviscerates Defendants' truth-on-the-market defense. Ferrell was forced to admit that many analysts and sophisticated market participants (including the rating agencies) had positive expectations for Merrill's fourth-quarter performance. As Ferrell testified, in the market "<u>there [wa]s heterogeneity. There [wa]s a dispersion across analysts of a view. I agree that there were analysts that were positive as of October or even November on Merrill Lynch</u>." Singer Ex. 1 at 82:5-9. Indeed, Ferrell stated that the market's expectations for Merrill's fourth-quarter performance was a "fact issue." *Id*. at 139:15-17. Given this admission and the other facts discussed above, Defendants' contention that Merrill's fourth-quarter losses were immaterial based on an analyst estimate fails.

Fifth, the single analyst report on which Defendants rely discussed only write-downs on certain categories of Merrill's assets and did <u>not</u> contain any prediction for Merrill's fourth-quarter net losses. *See* Singer Ex. 5 at 96:10-97:1. Moreover, the report used a methodology to estimate

---

[29] While Defendants imply that the losses only became material toward the end of December (*see* Opp. at 27-28), this assertion is contradicted by these events, all of which occurred before or just days after the vote (and long before the end of the quarter). *See, e.g.*, ¶ 101 ("Read and weep."); ¶¶ 102-28. In sum, the notion that the losses only became material after December 5 (but before December 17, when Lewis asked Secretary Paulson for a bailout) defies credulity and raises fact issues that cannot be resolved at this stage.

[30] Defendants suggest that certain of these estimates were stale because they had not been updated since mid-October 2008. *See* Opp. at 32 n.34. Not only is this a factual argument that the Court should not consider at this stage, but it ignores the fact that this information was sent to Merrill's CEO just days before the vote. Further, each of these estimates had been published *after* Merrill reported its third-quarter results, was no more than six weeks old, and was unquestionably part of the "total mix" of information.

the write-downs that both Merrill and Defendants' expert publicly discredited in 2008.  Specifically,

that report did not value Merrill's actual assets (which were not publicly disclosed), but rather

compared Merrill's general asset classes against a generic index, known as the ABX index.  *See*

Def. Ex. 75 at 2 ("[w]e acknowledge that this methodology isn't perfect").  As Defendants' expert

explained in an article he authored in 2008, it was impossible to determine what losses Merrill

would report in any given quarter because "[w]hat is not known is how many securities remain on

[Merrill's] balance sheet[] that may need to be written down even further in the future."  Singer Ex.

6 at 22-23; *see also* Singer Ex. 1 at 53:16-58:20.  Similarly, in May 2008, Markit, the creator of the

ABX index, specifically warned that the index "was not designed to be uncritically extrapolated to

the broader [asset-backed securities] market, and it was certainly not designed as a valuation tool

for individual securities."  *See* Singer Ex. 7.

> While Defendants now conveniently contend that the report's methodology was reliable and

appropriate, in a July 2008 submission to a court in this District, Merrill said the exact opposite.  In

moving to dismiss another action, Merrill made clear that it was "inappropriate" to use the ABX

index to estimate losses.  As Merrill stated in its motion:

> Pointing to the ABX and TABX does not help Plaintiffs because they cannot allege
> facts showing that these indices represented the value of Merrill's CDOs.  Indeed,
> Markit, the company that created the ABX and TABX, recently explained the
> inappropriateness of using its indices to value individual securities[.]

Singer Ex. 8 at 13.[31]

> Finally, Defendants again argue, as they did in their motions to dismiss, that they did not

need to disclose the losses because: (1) Merrill had reported losses in prior quarters; and (2) the

Bank's disclosures of general "economic turmoil" made disclosure of Merrill's known losses

unnecessary.  *See* Opp. at 30-32.  The Court has already rejected these arguments (*see Bank of Am.*,

757 F. Supp. 2d at 304-06), and the evidence shows that the Bank's most senior officers knew that

the market did not expect Merrill's losses.  *See, e.g.*, ¶¶ 166-72 (emails between Jeffrey Brown,

---

[31] Because this analyst report did not inform the market that Merrill was suffering massive losses, the fact that BoA's
stock price increased the day after the report was published is irrelevant.  *See* Opp. at 2.

Defendant Price, and BoA's counsel stating that market was "not expecting poor results from ML"); Def. Ex. 94 (email to Defendant Thain showing that consensus estimates as of December 1, 2008 were for Merrill to report virtually no net losses). In addition, at his deposition, Defendants' expert discredited any contention that Merrill's prior losses informed the market that Merrill would report historically large losses in the fourth quarter. *See* Singer Ex. 1 at 50:21-25 (Q: "But isn't it the case that past write-downs and losses are not necessarily an indication of future write-downs and losses?" Ferrell: "I agree with that.").

In sum, Defendants' arguments that the losses were not material cannot be credited.

### 2. Defendants' Loss Causation Arguments Violate The Express Holding Of The Supreme Court In *Halliburton*

Defendants also argue that supposed "confounding information," including BoA's own losses, the taxpayer bailout, and Merrill's post-vote losses caused BoA stock to decline on January 15 and 16. *See* Opp. at 35-37. Defendants imply that this inquiry is related to their materiality arguments, but it is nothing more than a challenge to loss causation. These arguments should be rejected because they directly contradict the Supreme Court's holding in *Erica P. John Fund, Inc. v. Halliburton Co.*, that, at class certification, plaintiffs are not required to prove that their "loss could not otherwise be explained by some additional factors revealed then to the market." 131 S. Ct. 2179, 2185 (2011); *see also Inyx*, 2011 WL 2732544, at *7 n.2 ("A plaintiff need not show loss causation in order to obtain class certification.").[32] In addition, determining the portion of the stock price declines (if any) caused by supposed "confounding information" is, at best, related only to the calculation of Class-wide damages, is susceptible to common evidence, and thus poses no bar to class certification. *See Inyx*, 2011 WL 2732544, at *4 ("causation issues" raise common questions).

In any event, much of the supposed "confounding" information here is nothing of the sort. The information Defendants proffer as confounding, such as the taxpayer bailout and rumors of

---

[32] The cases cited by Defendants do not require disentanglement of potential confounding factors at the class certification stage. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (considering confounding factors at summary judgment); *Fogarazzo*, 263 F.R.D. at 109 (pre-*Halliburton*, stating that "successful employment of a [loss causation] methodology and demonstration that the [misstatements at issue] did indeed cause plaintiffs' loss is unnecessary at the class certification stage").

BoA's nationalization (*see* Opp. at 35-36), is directly connected to and caused by Merrill's losses. *See Sadia*, 269 F.R.D. at 316 n.143 (loss causation satisfied where loss was foreseeable and "caused by the materialization of the concealed risk") (internal citations omitted).[33]  Indeed, BoA and Merrill admitted that the bailout was the direct result of Merrill's "unexpected" losses, stating that the bailout was "due to larger than expected 2008 fourth quarter losses of Merrill Lynch."  Singer Ex. 9 at 16; Singer Ex. 10 at 21.

The Court should also reject Defendants' assertion that stock price declines caused by the disclosure of post-vote losses (if any) are not attributable to Defendants' fraud because Defendants were purportedly not obliged to disclose losses incurred after the shareholder vote. *See* Opp. at 34, 36; *see also id.* at 27.  As the Court recognized in sustaining Plaintiffs' Section 10(b) claims, Defendants were obligated to disclose losses that arose after the vote. *See In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2011 WL 3211472, at *2 (S.D.N.Y. Jul. 29, 2011) (sustaining Section 10(b) claim based on Defendants' failure to disclose "Merrill's quarterly pretax losses total[ing] $21.5 billion … until January 16, 2009").  Further, even accepting Defendants' faulty premise that post-vote losses are irrelevant to Plaintiffs' Section 10(b) claims, $16.2 billion of Merrill's fourth-quarter losses, or more than 75% of the fourth-quarter loss, had occurred by the date of the vote. The pre-vote losses caused BoA to decide, just a week after the vote and long before the close of the quarter, to invoke the MAC and seek historic Government intervention. *See* ¶¶ 143-53.  Thus, the facts that caused investors' losses in January relate directly to the losses that existed as of the vote.

---

[33] Defendants also incorrectly argue that, at this stage, the Court is required to parse each alleged disclosure in January 2009 to determine whether it is "corrective." *See* Opp. at 33-34.  To do so would violate the Supreme Court's holding in *Halliburton* that loss causation issues have no bearing on class certification. *See* 131 S. Ct. at 2183.  Further, it is black-letter law that Plaintiffs are not required to establish each and every corrective disclosure to obtain class certification. *See, e.g.*, *In re Northfield Lab. Inc. Sec. Litig.*, 264 F.R.D. 407, 412 (N.D. Ill. 2009) ("Defendants have not cited a single case supporting the theory that, for purposes of class certification, Plaintiffs must articulate the new information revealed in each corrective disclosure.").  To establish materiality at class certification, at most, all Plaintiffs must do is show that there was a statistically significant decline in response to one of the corrective disclosures, which they have done. *See, e.g.*, *Alston*, 253 F.R.D. at 281.  Although Defendants' expert found that certain of these stock declines were not statistically significant, "a 'battle of the experts' is not appropriate at the class certification stage, as the relevant question is only whether Plaintiff's expert's methodology will apply to the entire class." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008).

**III.    The Securities Act Class Should Be Certified**

Plaintiffs' opening brief established that their Securities Act claims satisfied Rule 23.  *See* Motion at 12, 13, 17.  Defendants offer three opposing arguments, each of which is meritless.

First, Defendants argue that numerosity has not been established.  *See* Opp. at 38.  Plaintiffs' opening brief identified the number of shares issued in the offering.  *See* Motion at 12 n.6.  In the context of a $10 billion, 455 million share stock offering, nothing more is required.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280 (S.D.N.Y. 2003) (numerosity presumed where company issued "billions of dollars of debt securities").  Second, Defendants contend that Plaintiffs have not identified any material misrepresentation or omission in the offering documents, arguing again that the secret Bonus Agreement was not material.  Defendants' argument fails for the same reasons set forth above in Section II.A.[34]  Third, Defendants contend that Plaintiffs cannot demonstrate that Class members' shares are "traceable" to the October 7, 2008 offering materials. There are no "tracing" issues because Plaintiffs seek to certify a Securities Act class of purchasers of BoA stock issued "under" the offering documents, not "traceable" to those documents.

**IV.    Plaintiffs' Class Definition Is Proper**

**A.    The Section 10(b) Class Definition Is Not Overbroad**

Defendants incorrectly contend that the Section 10(b) class period cannot begin until November 12, 2008 because Plaintiffs have "inextricably tied their bonus claim to their loss claim." Opp. at 41.  However, Plaintiffs' bonus-related claims exist independently of Merrill's losses.  *See supra* at 15-16.  Defendants also contend that the Class may not include so-called "in-and-out" investors who sold prior to the first corrective disclosure, which they claim is January 15, 2009, because such Class members cannot demonstrate loss causation.  *See* Opp. at 42.  This, too, is wrong.  First, the complaint specifically alleges that the first corrective disclosure occurred on January 11, 2009, not January 15.  *See* ¶¶ 176, 273.  Second, as set forth above at pages 26-27,

---

[34] Defendants also contend that the Securities Act class cannot be certified because Merrill's fourth-quarter losses had not yet materialized at the time of the Offering.  *See* Opp. at 40.  However, Plaintiffs' Securities Act claims relate solely to misrepresentations regarding the secret Bonus Agreement, not Merrill's fourth-quarter losses.  *See* ¶¶ 366-72; *Bank of Am.*, 757 F. Supp. 2d at 346.

Defendants' argument contravenes the Supreme Court's decision in *Halliburton*, which precludes consideration of loss causation at this stage.  <u>Finally</u>, Plaintiffs do not seek to include "in-and-out" traders (*i.e.*, people who sold before January 11, 2009) in the Class, as the Class definition includes only those investors who were "damaged" by the alleged misstatements.  *See* Motion at 3.

**B.      Defendants' Damages "Offset" Argument Is Premature And Meritless**

Defendants also incorrectly assert that the Section 14(a) class must exclude investors whose Merrill shareholdings exceeded their BoA shareholdings by a certain amount, because their losses in BoA stock were "offset" by the "gain" they supposedly received by exchanging their Merrill shares.  Opp. at 42-43.  A motion for class certification is not the appropriate time to determine the formula for calculating individual class members' recoverable damages.  *WorldCom*, 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification.").[35]  Further, numerous courts have held that there is no basis to apply an "offset" to damages based on investors' alleged profits from separate transactions because doing so would undermine the "deterrent purpose" of the securities laws.  *See, e.g.*, *Randall v. Loftsgaarden*, 478 U.S. 647, 664 (1986).[36]  Here, the offset that Defendants seek is particularly inappropriate because it is based upon Class members' holdings of the stock of two <u>different</u> companies.[37]

Finally, Defendants' novel argument mischaracterizes Plaintiffs' theory of Section 14(a) damages.  Plaintiffs have never alleged that Class damages under Section 14(a) emanate from any

---

[35] Defendants' cases do not support consideration of their offset theory at class certification.  *See* Opp. at 42-43; *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977) (summary judgment); *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir. 1977) (same); *Minpeco v. Conticommodity Servs. Inc.*, 676 F. Supp. 486 (S.D.N.Y. 1987) (same); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996) (motion in limine).

[36] *See also In re Sepracor Inc. Sec. Litig.*, 233 F.R.D. 52, 54 (D. Mass. 2005) (refusing to offset losses in Sepracor bonds with profits in Sepracor stock); *Argent Class Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 681 (E.D. Pa. 2004).

[37] The Ninth Circuit rejected a related argument in *McKesson HBOC, Inc. v. New York State Common Retirement Fund Inc.,* where McKesson sued the shareholders of an acquired company for unjust enrichment on the grounds that the merger was undertaken based on false statements by the acquired company's executives.  339 F.3d 1087 (9th Cir. 2003).  The court held that the more equitable course of action would be to pursue those who made the false statements in the first place if they so desired.  *Id.* at 1093-94.

"overpayment." Rather, Plaintiffs have made clear that their Section 14(a) damages rest upon Defendants' material misstatements and omissions, which impaired the Class's right to cast a fully informed vote on the Merger. The best measure of damages for this voting impairment is the diminution in value of BoA shares once the corrective disclosures were made to the market. *See* Def. Ex. 6 at ¶¶ 28-32. As Professor Choi explained, Defendants are "wrong to assume a dollar-for-dollar correlation of losses to [BoA] shareholders from the Merger with hypothetical benefits or avoided losses to Merrill shareholders." *Id.* at ¶ 34; *see also id.* ¶¶ 35-37.

## V.       The Court Should Certify A Class Of Purchasers Of January 2011 Call Options

Regarding the call options class, Defendants challenge numerosity, market efficiency, and the scope of the class definition. *See* Opp. at 44-45. Defendants' arguments fail. First, "Plaintiffs need not set forth an exact class size as a precondition to show numerosity." *In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *3 (S.D.N.Y. Dec. 1, 2004). Here, more than 58,000 call option interests were outstanding at the end of the Class Period. *See* Singer Ex. 13; *see also In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *5 (E.D.N.Y. Apr. 27, 1999) (numerosity shown where 24,234 option contracts were sold). Second, as Defendants have conceded, Plaintiffs have demonstrated that the market for BoA common stock was efficient during the Class Period. The call options class may rely upon this evidence to invoke the fraud-on-the-market presumption. *See* Motion at 19 n.12.[38] Finally, as the Court previously held, Mr. Mitchell has standing to represent a class of purchasers of January 2011 call options. *Bank of Am.*, 2011 WL 3211472, at *14. As such, the definition of the options class is appropriate.

## CONCLUSION

For the reasons set forth herein and in Plaintiffs' prior submissions, Plaintiffs' Motion should be granted.

---

[38] Defendants cite to Mr. Coffman's expert report in another case analyzing options to support their assertion that Plaintiffs must separately demonstrate market efficiency for options. *See* Opp. at 44. Whatever analysis the plaintiffs' counsel may have asked Mr. Coffman to perform in a different case has no bearing on whether Plaintiffs must proffer separate expert testimony on the efficiency of the options market here.

Dated: November 11, 2011
      New York, New York

**KAPLAN FOX & KILSHEIMER LLP**


By:    */s/ Fred S. Fox*
        Robert N. Kaplan
        Frederic S. Fox
        850 Third Avenue, 14th Floor
        New York, NY  10022
        Tel:  (212) 687-1980
        Fax:  (212) 687-7714

        *Attorneys for Plaintiffs*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**


By:    */s/ Steven B. Singer*
        Max W. Berger
        Steven B. Singer
        1285 Avenue of the Americas
        New York, NY  10019
        Tel:  (212) 554-1400
        Fax:  (212) 554-1444

        *Attorneys for Plaintiffs*

**KESSLER TOPAZ MELTZER
& CHECK, LLP**


By:    */s/ David Kessler*
        David Kessler
        Gregory M. Castaldo
        280 King of Prussia Road
        Radnor, PA 19087
        Tel:  (610) 667-7706
        Fax:  (610) 667-7056

        *Attorneys for Plaintiffs*