**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
               :
               :
IN RE BANK OF AMERICA CORP.      :   Master File No. 09 MD 2058 (PKC)
SECURITIES, DERIVATIVE, AND     :
EMPLOYEE RETIREMENT INCOME    :   ECF CASE
SECURITY ACT (ERISA) LITIGATION   :
               :
               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
               :
THIS DOCUMENT RELATES TO:      :
               :
The Consolidated Securities Action    :
               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF UNDISPUTED FACTS .................................................... 6

      A.    Defendant Lewis Based His Decision To Approve The Merger Price On
            BoA's Accretion/Dilution Analysis ...................................................... 6

      B.    BoA Highlighted The Accretion/Dilution Analysis As A "Material Factor"
            Supporting The Merger .......................................................................... 8

      C.    Merrill Suffered Massive Losses In October 2008 ................................. 9

      D.    Prior To The Vote, Merrill's Staggering Losses Required BoA To Take
            Dramatic Actions That Materially Reduced The Combined Company's
            Earnings Ability ................................................................................... 10

            1.    Merrill's Pre-Vote Losses Decimated Its Capital And Forced BoA
                  To Direct Merrill To Shrink Its Balance Sheet ........................... 10

            2.    Wachtell's Documents Confirm That Merrill's Balance Sheet Reduction
                  Was Necessitated By Its Staggering Losses And Significantly Reduced
                  The Combined Company's Earnings Ability ............................... 14

            3.    Merrill's Pre-Vote Losses Materially Impacted Its Liquidity Position,
                  Forcing BoA To Issue Nearly $20 Billion Of Debt ................... 16

      E.    Days Before The Shareholder Vote, Merrill's Fourth Quarter Losses
            Materially Increased ............................................................................ 20

      F.    At The Shareholder Meeting, Defendant Lewis Falsely Assured Investors
            That BoA's Accretion/Dilution Analysis Had Not Changed ............... 21

      G.    Defendants Presented Merrill's Fourth Quarter Losses And Their Impact
            On The Accretion/Dilution Analysis To BoA's Board ....................... 22

      H.    Defendant Lewis Has Admitted That The Accretion/Dilution Figures Set
            Forth In The Proxy Were False As Of The Date Of The Shareholder Vote ......... 23

      I.    One Week After The Vote, BoA Sought To Terminate The Merger Because
            Of The Material Adverse Impact Of Merrill's Massive Losses .......... 24

III.  ARGUMENT ................................................................................................. 27

      A.    The Legal Standards Governing Partial Summary Judgment .............. 27

B.     Partial Summary Judgment Is Appropriate Because Defendants Have Admitted The Falsity And Materiality Of Their Statements Concerning The Accretive And Dilutive Impact Of The Merger ............................................. 28

     1.     Summary Judgment Should Be Granted As To The Falsity Of Defendants' Accretion/Dilution Statements ............................................. 29

     2.     Summary Judgment Should Be Granted As To The Materiality of Defendants' Accretion/Dilution Statements ............................................. 33

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................................27

*Bacolitsas v. 86th & 3rd Owner, LLC*,
    2010 WL 3734088 (S.D.N.Y. Sept. 21, 2010)........................................................28

*Caiola v. Citibank, N.A.*,
    295 F.3d 312, 331 (2d Cir. 2002) ............................................................................30

*Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A.*,
    1996 WL 680265 (S.D.N.Y. Nov. 25, 1996)..........................................................34

*DaimlerChrysler Ins. Co. v. Pambianchi*,
    762 F. Supp. 2d 410 (D. Conn. 2011)......................................................................28

*DeCicco v. United Rentals, Inc.*,
    602 F. Supp. 2d 325 (D. Conn. 2009)................................................................32, 33

*Delchi Carrier SpA v. Rotorex Corp.*,
    71 F.3d 1024 (2d Cir. 1995)....................................................................................28

*Gerstle v. Gamble-Skogmo, Inc.*,
    478 F.2d 1281 (2d Cir. 1973)..................................................................................31

*Goldberg v. Meridor*,
    567 F.2d 209 (2d Cir. 1977)....................................................................................33

*Humane Soc. of U.S. v. HVFG, LLC*,
    2010 WL 1837785 (S.D.N.Y. May 6, 2010) ..........................................................28

*In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)............................................................. *passim*

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
    2010 WL 6397500 (S.D. Fla. Aug. 18, 2010).........................................................29

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998).................................................................................5, 32

*In re Time Warner Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) .......................................................................................32

iii

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).........................................................................28, 29, 33

*Koppel v. 4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999)..........................................................................................33

*Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986)..........................................................................................34

*Mendell v. Greenberg*,
    927 F.2d 667 (2d Cir. 1990)............................................................................................5

*Moe v. United States*,
    668 F. Supp. 2d 497 (W.D.N.Y. 2009).........................................................................28

*Scheffer v. Civil Service Emp. Ass'n, Local 828*,
    610 F.3d 782 (2d Cir. 2010)..........................................................................................27

*SEC v. Roor*,
    2004 WL 1933578 (S.D.N.Y. Aug. 30, 2004)..............................................................34

*Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series
    1999-C1 v. Love Funding Corp.*,
    2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)..............................................................34

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    995 F.2d 375 (2d Cir. 1993)..........................................................................................34

## RULES

Fed. R. Civ. P. 56......................................................................................................................27

## OTHER AUTHORITIES

SEC Release No. 34-16343, 1979 WL 173161 .........................................................................31

SEC Release No. 34-23789, 1986 WL 722059 .........................................................................31

## I.  INTRODUCTION

This case arises in part from Defendants' failure to disclose the staggering fourth quarter losses that Merrill Lynch & Co., Inc. ("Merrill") suffered prior to the December 5, 2008 shareholder vote on the merger (the "Merger") between Bank of America Corp. ("BoA" or the "Bank") and Merrill.  As set forth below, at the end of fact discovery in this Action, Plaintiffs obtained sworn testimony establishing that Merrill's undisclosed losses rendered certain of Defendants' statements concerning the Merger false, including statements made in the Joint Definitive Proxy Statement (the "Proxy") that Defendants used to solicit shareholder approval of the Merger.

Specifically, Defendant Kenneth Lewis, the Bank's former CEO, admitted during his March 27, 2012 deposition in this Action that key representations about how "accretive" and "dilutive" the Merger would be if BoA shareholders approved the deal – including statements that Lewis personally made at the December 5 shareholder meeting to vote on the Merger – were inaccurate as of the date of the vote.  *See* Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of Lead Plaintiffs' Motion for Partial Summary Judgment at ¶¶ 94-98 (hereinafter "¶__").  In light of these admissions, Plaintiffs make this narrow motion for partial summary judgment as to the falsity and materiality elements of their claims under Sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") with respect to Defendants' statements concerning the accretive and dilutive impact of the Merger.  Plaintiffs will prove the remaining elements of their claims – including scienter for Section 10(b) and loss causation for both Sections 14(a) and 10(b) – at trial.

BoA's calculation of the accretive or dilutive nature of the Merger was critical to both the Bank and its shareholders in determining whether to approve the Merger.  ¶¶ 6-35.  The Merger

would be "accretive" if acquiring Merrill would increase BoA's earnings per share following the Merger, and "dilutive" if acquiring Merrill would decrease those earnings. ¶¶ 7-8. Defendant Lewis testified that he would not have agreed to the Merger unless it was only minimally dilutive in the first year after the acquisition (2009) and breakeven to slightly accretive in the second year (2010). ¶¶ 9-21. Indeed, Lewis testified that he initially rejected the proposed Merger because the accretion/dilution analysis was unacceptable, and that he only agreed to the Merger once he was provided with an accretion/dilution analysis showing that the Merger would be just 3% dilutive in 2009 and breakeven to slightly accretive in 2010. ¶¶ 13-21.

In announcing the Merger on September 15, 2008, Defendants repeatedly emphasized the importance of this accretion/dilution calculation. ¶¶ 30-33. For example, in a press release, analyst presentation, and investor call held that day, Defendants underscored that the transaction was expected to be "3% dilutive in 2009" and "breakeven in 2010." *Id*. The Proxy repeated these accretion/dilution figures and, significantly, represented that they were a "<u>material factor</u>" supporting the Board's recommendation that shareholders vote in favor of the transaction. ¶¶ 34-35.[1]

The importance of Defendants' representations concerning the accretion/dilution analysis was further emphasized at the December 5 shareholder meeting convened in connection with the vote on the Merger. At that meeting, in response to a shareholder question concerning the dilutive impact of the transaction, Lewis referred shareholders to the accretion/dilution figures set forth in the Bank's September 15 analyst presentation, and again asserted that the Merger would be minimally dilutive in 2009 and "breakeven" in 2010. ¶¶ 92-93.

---

[1] Throughout this brief, all emphasis is added unless otherwise noted.

Discovery has shown that, by the date of the vote, Defendants' representations regarding the accretive/dilutive impact of the Merger had become materially false and misleading. Defendant Lewis specifically admitted that, as of the vote, BoA's accretion/dilution calculation had changed "dramatically," and that the figures disclosed in the Proxy "were no longer accurate." ¶¶ 94-98. As Lewis testified, by the vote, BoA no longer expected the Merger to be only 3% dilutive in 2009 and breakeven in 2010. Rather, BoA expected the Merger to be more than 13% dilutive in 2009 and 2.8% <u>dilutive</u> in 2010. *Id.*

As explained below, the "dramatic" change in the accretion/dilution analysis was caused by Merrill's massive, undisclosed fourth quarter losses. ¶¶ 47-78, 120-25, 127-29. Merrill suffered a pre-tax loss of more than $7.5 billion in October 2008, and by December 3, 2008, Defendants expected Merrill to report a pre-tax loss for the 2008 fourth quarter of at least $16 billion. ¶¶ 42, 46, 81-88. Prior to the vote, these losses forced BoA to take significant actions that severely impaired Merrill's and the combined company's ability to generate earnings in future years – the primary driver of the accretion/dilution analysis. ¶¶ 47-78, 120-25, 127-29, 134-36.

As reflected in the contemporaneous emails of BoA's most senior executives and in memoranda prepared in December 2008 by the Bank's counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), Merrill's fourth quarter losses decimated the company's capital position prior to the December 5 vote. ¶¶ 47-56. As a result, by no later than November 26, 2008 – ten days before the vote – BoA was forced to take the drastic action of ordering Merrill to shrink its balance sheet by liquidating hundreds of billions of dollars of assets. ¶¶ 57-63, 119-21. According to the sworn testimony of BoA Treasurer Jeffrey Brown, this dramatic liquidation of Merrill's assets reduced the combined company's future earnings ability by at least $1 billion per

year.  ¶¶ 63-64, 120-25, 130, 134-36.  As a Wachtell memorandum made clear: "The severe impact of these losses on MER's financial condition going forward – and the financial condition of the combined company in the event the merger closed – cannot be overstated.  … <u>There is no question that [Merrill's] massive capital burn stands to reduce the overall earnings potential of MER for years to come</u>."  ¶ 130.

Merrill's fourth quarter losses also required BoA to issue billions of dollars of new debt prior to the close of the Merger, which further lowered the combined company's earnings capacity.  ¶¶ 66-80, 127-29.  Specifically, Merrill's losses caused its liquidity position to become so dire that, as reflected in Wachtell's notes of its discussions with BoA Treasurer Brown, Merrill would be "<u>dead w/in a week</u>" absent the Merger.  ¶ 127.  As a result, BoA was forced to issue $20 billion in debt during the fourth quarter of 2008 solely because of Merrill – including a "mammoth" $9 billion debt offering on December 1, just four days prior to the shareholder vote.  ¶¶ 75-77.  The interest and other expenses associated with these debt offerings reduced the combined company's earnings ability by an additional $500 million per year, or $1.5 billion over the three-year term of the new debt.  ¶ 129.  Collectively, the balance sheet reduction and debt issuances caused by the losses reduced the combined company's earnings ability by at least $1.5 billion per year, and caused the accretion/dilution analysis to materially change for the worse by the time of the vote.  ¶¶ 124, 129.

In light of these indisputable facts, Plaintiffs are entitled to judgment as a matter of law as to the elements of falsity and materiality under Sections 14(a) and 10(b) of the Exchange Act with respect to Defendants' public statements about the accretion/dilution analysis.  <u>First</u>, Lewis's sworn admissions leave no genuine dispute that his statement at the December 5

shareholder meeting reiterating the Bank's prior accretion and dilution calculations was materially false when made.  ¶¶ 92-98.

Second, there can be no genuine dispute that BoA's pre-vote statements concerning accretion and dilution had become materially false by the date of the vote and are actionable. This Court has previously held, consistent with Second Circuit law, that Defendants had a duty pursuant to Section 14(a) of the Exchange Act to ensure that the "'proxy statement fully and fairly furnishes all the objective material facts' to allow a reasonably prudent investor 'to make an informed investment decision.'" *In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 290 (S.D.N.Y. 2010) (quoting *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990)).  The fact that the Proxy's representations concerning the accretive/dilutive impacts of the Merger were admittedly false by the time of the vote violated this well-established legal principle.  ¶¶ 35-36, 94-98.

In addition, as this Court has recognized, under the Exchange Act, Defendants had a duty to update their forward-looking statements when "a statement, reasonable at the time it is made, becomes misleading because of a subsequent event," as occurred here.  *In re Bank of Am.*, 757 F. Supp. 2d at 313 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)). Defendants violated this duty by failing to update their statements made on September 15 and in the Proxy concerning the accretion/dilution analysis, which had become false as of the date of the vote.  ¶¶ 30-36, 94-98.

Third, there can be no genuine dispute as to the materiality of these misrepresentations. As noted above, the Proxy specifically identified the Bank's accretion/dilution calculation as a "material factor" in the Board's recommendation that shareholders approve the deal.  ¶ 35.

While not the only evidence of materiality, the Bank's representation in the Proxy that the accretion/dilution calculation was "material" is dispositive, even if viewed alone.

For the foregoing reasons, and as set forth more fully below, Plaintiffs' motion for partial summary judgment as to the falsity and materiality of the statements related to the accretion/dilution analysis should be granted.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Defendant Lewis Based His Decision To Approve The Merger Price On BoA's Accretion/Dilution Analysis

On the morning of Saturday, September 13, 2008, Defendant John A. Thain, Merrill's CEO, called Defendant Lewis to propose a strategic arrangement between the two companies. ¶ 1. That day, BoA began conducting due diligence on Merrill. ¶ 2. During its due diligence, BoA reached three principal conclusions about Merrill's financial condition. ¶¶ 3-5. First, BoA learned that Merrill expected to report a "breakeven" 2008 fourth quarter, *i.e.*, that Merrill would suffer "no losses." ¶ 3. Second, BoA determined that Merrill had adequate capital to support its asset base, and thus did not need to reduce its balance sheet. ¶¶ 4, 120-21. Third, BoA determined that Merrill's liquidity position was stable. ¶ 5.

At the same time, executives from both companies were negotiating possible merger terms. ¶ 12. Defendant Lewis testified that during these negotiations, he was "very focused on" BoA's calculation of the accretive and dilutive effect of the Merger, and that he based his decision to approve the price of the deal on this analysis. ¶¶ 6-21. On Sunday, September 14, 2008, Greg Curl ("Curl"), BoA's Vice Chairman of Corporate Development, presented Defendant Lewis with proposed merger terms. ¶ 13. Curl described a stock-for-stock transaction valuing Merrill at $29 per share, along with an accretion/dilution analysis showing the transaction to be dilutive in both 2009 and 2010. ¶¶ 9, 14-16. Lewis found this initial

accretion/dilution analysis unacceptable, and rejected the proposed deal on that basis. ¶¶ 15-16. As Lewis testified, he required the transaction "to be at least break-even in the second year and cumulatively accretive in the third year," and the initial accretion/dilution figures did not satisfy these criteria:

> Q: Okay. And when you came to – when Mr. Curl came to you first and said $29 per share, what did you say in response to that?

> A: Well, I can't recall the accretion and dilution numbers now, but it seemed a little too – it seemed a little too dilutive and we didn't get the accretion back soon enough. And so I told him that we had to go back and either get a better price or we had to look more carefully at the synergies and the cost reductions, and he did.

¶¶ 9, 15-16.

Accordingly, later in the day on September 14, Lewis was presented with an improved accretion/dilution calculation that was the product of revised synergies and cost savings. ¶ 17. In the improved accretion/dilution analysis, BoA estimated that, at the proposed price of $29 per share, Merrill's pro forma impact on the combined company's results would be 2.5% dilutive in 2009, 0.3% accretive in 2010, and 3.6% accretive in 2011. ¶ 18. Lewis testified that this "accretion and dilution was better, that is less dilution and more accretion." ¶¶ 19-20. Based on this accretion/dilution calculation, Lewis agreed to recommend the Merger to BoA's Board at a special meeting. ¶¶ 21-22.

At the BoA Board meeting later that day, Defendant Lewis, Defendant Joe L. Price (BoA's Chief Financial Officer), and the Bank's financial advisors for the Merger explained that the accretive/dilutive impact of the proposed deal was a key reason for supporting the transaction. ¶¶ 22-29.[2] Defendant Gifford, one of the BoA Board members present at the special

---

[2] The Bank's financial advisors were J.C. Flowers & Co. LLC and Fox-Pitt Kelton Cochran Caronia Waller. ¶¶ 23, 25.

meeting, testified that one of the "principal four issues" that he considered in evaluating a merger was the accretion/dilution analysis, and that it was "very satisfactory" in this instance. ¶¶ 27-28. Thus, the BoA Board determined to recommend that BoA shareholders approve the acquisition of Merrill in a stock-for-stock transaction that valued Merrill at $50 billion, or $29 per share. ¶ 29. As set forth below, the Proxy represented that the accretion/dilution analysis was one of the "material factors" considered by the entire BoA Board in deciding to unanimously approve the merger agreement and recommend that BoA shareholders approve the deal. ¶ 35.

**B.     BoA Highlighted The Accretion/Dilution Analysis As A "Material Factor" Supporting The Merger**

In announcing the Merger and soliciting shareholder approval of the transaction, BoA repeatedly underscored the importance of the accretion/dilution analysis. ¶¶ 30-36. For example, on September 15, 2008, the day BoA announced the Merger, BoA highlighted the accretion/dilution analysis on no less than three occasions:

- In the press release announcing the merger agreement, BoA stated that the "acquisition [of Merrill] is expected to be accretive to earnings by 2010." ¶¶ 30-31.[3]

- In an investor presentation promoting the benefits of the transaction, called "Creating the Premier Financial Services Company in the World," BoA stated that the Merger was expected to be "3% dilutive in 2009" and "Breakeven in 2010." ¶ 32.

- In a conference call with investors, Defendant Price emphasized that BoA had "estimate[d] the transaction to be 3% dilutive in the first year and breakeven to slightly accretive in the second year before restructuring charges." ¶ 33.

Significantly, the Proxy filed by BoA and Merrill on November 3 soliciting shareholder approval of the Merger also emphasized the accretion/dilution analysis. ¶¶ 34-36. The Proxy expressly listed the accretion/dilution calculation as one of the "<u>material factors</u>" upon which the

---

[3] This press release announcing the Merger was also incorporated by reference into the Proxy. ¶ 36.

BoA Board recommended that shareholders approve the Merger. ¶¶ 34-35. In a section titled "Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Proxy stated:

> In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following <u>material factors</u>:

> …. [T]he fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being <u>3.0% dilutive in 2009 and breakeven in 2010</u>[.]

¶ 35. Based on these accretion/dilution figures, the Proxy recommended "that Bank of America stockholders vote 'FOR'" the Merger. *Id.*

### C.    Merrill Suffered Massive Losses In October 2008

Contrary to BoA's expectations that Merrill would have a "breakeven" 2008 fourth quarter and not report <u>any</u> losses, Merrill suffered a loss of more than $7.5 billion pre-tax in the month of October alone. ¶¶ 37-42. This $7.5 billion October loss exceeded Merrill's record net profits for all of 2006. ¶¶ 42-43. Merrill's October loss also exceeded the loss Merrill reported for the first quarter of 2008 and was virtually equal to the loss that Merrill reported for the second quarter of 2008. ¶¶ 42, 44. Defendants themselves immediately recognized how devastating Merrill's October losses were. For example, on November 5, 2008, Defendant Neil A. Cotty, BoA's Chief Accounting Officer who had been installed by Defendant Lewis as Merrill's acting CFO, emailed Defendant Price a preliminary report on Merrill's October results that reflected a $6.1 billion pre-tax loss. ¶¶ 39-40. Cotty's email to Price gave the telling instruction to "<u>Read and weep.</u>" ¶ 40. During a November 7, 2008 BoA Board meeting, Defendant Lewis informed the Board that "October may have been the worst month in history." ¶ 41. Two days later, on November 9, Merrill's Chief Accounting Officer and Corporate Controller emailed

Merrill's final October 2008 results to Cotty, reflecting a pre-tax loss of $7.536 billion, and told him that the "[n]umbers speak for themselves." ¶ 42.

**D.    Prior To The Vote, Merrill's Staggering Losses Required BoA To Take Dramatic Actions That Materially Reduced The Combined Company's Earnings Ability**

As explained in detail below, by the time of the shareholder vote, the massive undisclosed losses that Merrill suffered in the fourth quarter of 2008 caused BoA's accretion/dilution analysis to materially change for the worse. ¶¶ 47-64, 66-78, 94-98, 120-25, 127-30. In particular, Merrill's losses significantly decreased the future earnings power of Merrill and the combined company, which was the primary driver of the accretion/dilution analysis. ¶¶ 47-64, 66-78, 120-25, 127-30, 134-36. As a result, by the date of the vote, the Bank's representations regarding the anticipated accretive/dilutive impact of the Merger were no longer true. ¶¶ 94-98. Rather than being only 3% dilutive in 2009 and "breakeven" in 2010, as of the vote BoA expected the Merger to be more than 13% dilutive in 2009 and 2.8% dilutive in 2010. *Id.*

1.    Merrill's Pre-Vote Losses Decimated Its Capital And Forced BoA To Direct Merrill To Shrink Its Balance Sheet

As noted above, at the time the Merger was announced, BoA did not expect that Merrill would need to reduce its assets during the fourth quarter. ¶¶ 120-21. However, during November 2008, Merrill continued to suffer billions of dollars in additional losses. ¶ 46.[4] By no later than November 26, 2008, these undisclosed losses had decimated Merrill's capital base and devastated key capital ratios that regulators and the market focused on to assess Merrill's financial viability. ¶¶ 47-56. As explained below, in direct response to the destruction of

---

[4] Specifically, as of the date of the December 5 vote, Merrill determined that it had suffered another $5.8 billion in pre-tax losses for November. ¶ 46.

Merrill's capital base, and prior to the shareholder vote, BoA's most senior officers directed Merrill to liquidate hundreds of billions of dollars of assets during the fourth quarter. ¶¶ 57-61. Pursuant to the instructions of BoA's senior officers, Merrill liquidated more than $200 billion of assets during the quarter – or more than 25% of the assets on Merrill's balance sheet. ¶¶ 62, 65. BoA's own documents establish that the massive reduction in Merrill's income-generating assets reduced its earnings ability by between $1 billion and $4 billion per year on a pre-tax basis. ¶¶ 122-25; *see also* ¶¶ 63, 117-21, 130, 134-36.

By way of background, a critical measure of Merrill's capital was its tangible common equity, which represents the amount of common equity that is supported by tangible assets (*e.g.*, cash and securities). ¶¶ 47-50. Tangible common equity is an important measure of strength for a financial institution because it represents what common stockholders would receive if the institution were to dissolve. An institution's tangible common equity is evaluated by its tangible common equity ratio ("TCE Ratio"), a financial formula that measures an entity's tangible common equity relative to its assets. For example, if an entity has $3 billion of tangible common equity and $100 billion of tangible assets, its TCE Ratio is 3%. Inadequate tangible common equity levels are a strong indication that a financial institution has an insufficient cushion to absorb actual and potential losses. Accordingly, Merrill's tangible common equity and TCE Ratio were of critical importance to BoA and its shareholders. ¶¶ 47-50. BoA Treasurer Brown testified that tangible common equity is the "cleanest form of capital" with the "highest loss absorption," and that the TCE Ratio "certainly … [was a ratio that] the market focused on" in the fourth quarter of 2008. ¶¶ 47-49.

As an entity suffers losses, its tangible common equity (and, in turn, its TCE Ratio) are reduced. When this occurs, in order to stabilize the declining TCE Ratio, the entity can either:

(1) raise new common equity by conducting a stock offering (thus increasing the numerator in the TCE Ratio); or (2) sell some of its assets (thus decreasing the denominator in the TCE Ratio). Because a financial institution earns income by generating a "spread" on its assets, when an institution is forced to sell assets in order to stabilize its capital position, the institution's future earnings ability can be diminished.  ¶¶ 53, 63-64.[5]

In this case, the record establishes that Merrill's tangible common equity and TCE Ratio were directly and negatively impacted by the losses Merrill suffered prior to the vote.  ¶¶ 52-64, 119, 130, 134.  As Defendant Lewis testified, the losses that Merrill suffered in October and November 2008 severely eroded Merrill's tangible common equity and TCE Ratio:

> Q.      But the problem with Merrill Lynch was that the losses had reduced its capital so much that the tangible common equity ratio had become very – unacceptably low, correct?
>
> A.      That's true.

¶¶ 54-55.[6]

In light of Merrill's severe capital deterioration, by late November 2008, BoA's senior executives began to discuss ways to stabilize Merrill's collapsing TCE Ratio.  ¶¶ 53-60, 120-21.[7] They came to the conclusion that the only way to stem the destruction of Merrill's capital ratio was to demand that Merrill sell a substantial amount of the assets on its balance sheet (thereby

---

[5] A "spread" represents the difference between the cost of financing an asset and the income that the asset generates.

[6] Similarly, BoA's current CEO, Brian Moynihan, testified that Merrill's losses created a capital "hole" at Merrill that Lewis recognized needed to be "filled."  As Moynihan testified, "[t]he concept was, 'You got to fill the hole' – that was Ken [Lewis's] words: 'You got to fill the hole.'"  ¶ 56.

[7] Merrill's losses also materially eroded its Tier 1 capital ratio, which measures an entity's Tier 1 capital as a percentage of its risk weighted assets.  Under federal regulations, an entity must maintain a Tier 1 capital ratio of 6.00% to be considered "well capitalized."  ¶ 51.  Merrill's fourth quarter losses caused its Tier 1 capital ratio to fall well below the 6.00% benchmark.  Specifically, BoA determined that Merrill's Tier 1 capital ratio was 4.59% when including $10 billion of funds that Merrill had been allotted under the Troubled Asset Relief Program ("TARP") in October 2008.  *Id.*  BoA further determined that, excluding the $10 billion in TARP funds that Merrill had been allotted, Merrill's Tier 1 capital ratio was 2.01%.  *Id.*

reducing the denominator in Merrill's TCE Ratio). *Id.* Thus, as BoA Treasurer Brown testified, "to avoid [Merrill's] capital ratio completely getting crushed," BoA was forced to order Merrill to "reduce assets to help offset some of that . . . capital deterioration." ¶ 63.

Accordingly, by no later than November 26 – <u>ten days before the shareholder vote</u> – senior BoA executives, including Treasurer Brown, directed Merrill to materially reduce the size of Merrill's balance sheet. ¶¶ 57-60. In response, Merrill executives informed Brown that a "no-pain" balance sheet threshold would be $800 billion in total assets. ¶ 58. As Brown testified, this meant that any reduction of Merrill's balance sheet below $800 billion in total assets would have a negative "material impact" on Merrill's business. ¶ 59.

Notwithstanding the "material impact" it would have on Merrill, BoA ordered Merrill to reduce its total assets <u>far below</u> the "no pain" threshold of $800 billion. ¶¶ 60-62. On November 26, 2008, Brown emailed Defendant Price and Brian Moynihan, BoA's former President of Global Wealth and Investment Management and its current CEO, concerning a conversation between Brown and Merrill's Treasurer regarding the need to reduce Merrill's balance sheet. ¶¶ 57-59. In that email, Brown informed Price and Moynihan that the $800 billion threshold was not "aggressive enough" given the grave state of Merrill's capital:

> [Merrill executives] estimate [that a] 'no-pain' balance sheet target could be $800B. I said the $800B did not sound aggressive enough to me given what I see happen[ing] on our businesses in CMAS [Capital Markets and Advisory Services]. They agreed, and will have conversations next week with Thain and [Tom] Montag [ML president of Global Banking and Markets].

¶ 58.

Moynihan agreed, responding that the "goal" should be to reduce Merrill's balance sheet to $600 billion – or $200 billion below the "no pain" threshold. ¶¶ 57-60. Similarly, according to an email from Defendant Cotty to Moynihan, on December 3, Defendants Lewis and Price

personally instructed Defendant Thain to significantly reduce Merrill's balance sheet because of concerns over Merrill's TCE Ratio. As Cotty wrote:

> Ken [Lewis] and Joe [Price] spent time with John [Thain] to <u>underscore the importance of the tangible capital ratio</u> and get the balance sheet down. Ken's words "<u>push as hard as you can [to reduce the balance sheet] and only think about stopping when you think you've pushed too far and then … push some more</u>."

¶ 61.

In direct response to BoA's instructions, during the fourth quarter of 2008 Merrill decreased its balance sheet by more than $200 billion (from $876 billion in assets at the end of the third quarter to $667 billion in assets at the end of the fourth quarter) – liquidating <u>over 25%</u> of its assets as a result of the capital destruction caused by Merrill's losses. ¶ 62. As Defendant Thain emphasized in a January 2009 memo he sent to Merrill employees following his termination from BoA, Merrill "more than met" the balance sheet target that "was given to us by [BoA]." ¶ 65.

   2. Wachtell's Documents Confirm That Merrill's Balance Sheet Reduction Was Necessitated By Its Staggering Losses And Significantly Reduced The Combined Company's Earnings Ability

Wachtell's handwritten notes and memoranda unequivocally demonstrate that Merrill's enormous pre-vote losses caused BoA to order Merrill's balance sheet reduction, which in turn significantly reduced the combined company's earnings power in future years. ¶¶ 112-25, 130. In mid-December 2008, attorneys from Wachtell, including senior Wachtell partners Eric Roth and Peter Hein, met with BoA's senior officers – including Defendants Lewis, Price, Cotty and BoA Treasurer Brown – to discuss BoA's grounds for terminating the Merger by invoking the "material adverse effect" clause in the merger agreement (the "MAC"). ¶¶ 112-17, 119, 123. As a memorandum prepared by Wachtell summarizing these discussions made clear, Merrill's balance sheet reduction was not anticipated at the time BoA agreed to and announced the

14

Merger, but was necessitated by the unexpectedly large fourth quarter losses Merrill had suffered by Thanksgiving:

> Target's need to reduce assets was not known or anticipated at time of signing; has become necessary and identified just before Thanksgiving as a necessary step to deal with increasing losses that were not anticipated at time of signing.

¶ 121.

The Wachtell memorandum further explained that these losses destroyed Merrill's capital base, triggering the need to sell assets:

> Losses in Q4 have substantially reduced Target's capital. At time of due diligence, Target had tangible common equity of approx. $26b; now has tangible common equity of only $12.6b – a 50% reduction (even after TARP). … Reduction in capital necessitates reduction in balance sheet, which will reduce earnings potential in future years.

¶ 120.

As the Wachtell memorandum further provided, Merrill's balance sheet reduction had significantly reduced the future earnings ability of the combined company. ¶¶ 120, 122; *see also* ¶¶ 123-125, 130. This is because, as noted above, BoA and Merrill generated income by earning a "spread" on their assets, and the forced sale of a significant portion of Merrill's balance sheet deprived the combined company of the opportunity to generate revenue from those assets. ¶¶ 63-64. As Moynihan testified: "How you earn money in financial services is your balance sheet, and if your balance sheet is half as big or less than half as big, it is quite clear that would impact its earnings." ¶ 64.

Specifically, BoA's executives informed Wachtell that the asset reduction caused a "[l]oss of potential for earning" at a spread of "50 basis points" (or 0.5%) on the assets that Merrill was forced to liquidate. ¶ 122. Brown testified that applying the spread of 0.5% to the

$200 billion of assets that Merrill was forced to sell in the fourth quarter of 2008, the combined company's future earnings capacity had been reduced by at least $1 billion annually. ¶ 124.

Notably, however, Brown and BoA believed that this 50 basis point (or 0.5%) spread was "conservative[]." ¶ 123. According to Wachtell's notes of its conversations with Brown, BoA actually earned a 2% spread on its assets (or 200 basis points). *Id.* The impact of Merrill's balance sheet reduction on the combined company's earnings capacity is even more significant when applying BoA's 2% spread. Based on the 2% spread that BoA believed it could earn, Merrill's balance sheet reduction reduced its projected pre-tax income by <u>$4 billion</u> per year – an amount that nearly equaled BoA's pre-tax income for all of 2008.

As Moynihan testified, the reduction in Merrill's capital and balance sheet meaningfully impacted the combined company's future earnings streams, to the detriment of BoA's shareholders:

> Q: And since Bank of America was purchasing Merrill Lynch, it would obviously affect Bank of America earnings streams?
>
> A: <u>Our shareholders were not getting the benefit they were supposed to get</u>. We were giving them [Merrill shareholders] a portion of a company [*i.e.*, BoA] to get back earnings gain [and] capital, and <u>neither of those were going to be present</u>.

¶ 125.

3. Merrill's Pre-Vote Losses Materially Impacted Its Liquidity Position, Forcing BoA To Issue Nearly $20 Billion Of Debt

Merrill's dramatic fourth quarter losses also fueled an unexpected liquidity crisis at Merrill beginning in early October 2008. ¶¶ 66-80, 127-29. As a result of this liquidity crisis, BoA was forced to issue a massive amount of debt in order to absorb Merrill, including a "mammoth" $9 billion debt offering on December 1 – <u>four days before the shareholder vote</u>. ¶¶ 74-80. These offerings caused BoA to incur approximately $525 million per year in

additional expenses for the three years following the Merger, further damaging the combined company's earnings capacity. ¶¶ 127-29.

By way of background, liquidity consists of cash and liquid assets that an entity uses to fund its business operations. There is a direct, negative relationship between an entity's liquidity position and the losses that it suffers. For example, when the value of an entity's liquid assets declines, the entity suffers a loss on those assets and a decrease in liquidity, as it now has a lesser amount of liquid assets to fund its business. Moreover, if the entity has financed its assets (as financial institutions do) and the value of those assets declines, the creditor may seek additional collateral (often in the form of cash) to preserve its collateral position (*i.e.*, the amount of collateral it holds against the value of the loan). By virtue of these increased collateral postings, losses on an entity's financed assets also siphon away liquidity in the form of cash. BoA Treasurer Brown confirmed that, in this case, Merrill's fourth quarter losses caused Merrill's liquidity crisis for these reasons. ¶¶ 66-68.

Specifically, Brown, who was responsible for monitoring Merrill's liquidity, testified that Merrill's losses were one of the "main drivers" of its deteriorating liquidity position, and "you couldn't really separate the events." ¶¶ 66, 68. Similarly, Brown testified that Merrill's "losses" and "collateral postings" were the two "main drivers" of Merrill's depressed liquidity position during the fourth quarter of 2008: "I mean, [to] the best of my recollection, you know, again, Merrill Lynch was having to post a decent amount of collateral. That combined with losses they were experiencing were the main drivers. So those – those would be the most significant [factors]" causing the deterioration in Merrill's liquidity position. ¶ 67.

Merrill's senior executives grasped the severity of the bank's deteriorating liquidity early in the fourth quarter. On October 21, 2008, Merrill Lynch's Treasurer Eric Heaton wrote

Defendant Thain and Merrill Lynch's President, Gregory Fleming, to alert them that Merrill had lost a remarkable $35 billion in cash in the first 15 days of the fourth quarter alone, explaining:

> We are at wits end in [treasury]. . . . We are reaching a point in our liquidity position where we do have to take more aggressive action. Both equities and ficc [Fixed Income, Currency and Commodities] need to shrink to generate cash – we have lost 35b of cash in the first 15 business days of this qtr . . . . Our businesses are too big for our cash position and market environment.

¶ 70.[8]

This deterioration in Merrill's liquidity continued as the fourth quarter progressed, and reached emergency levels prior to the shareholder vote. Indeed, while Merrill normally maintained at least 12 months of liquidity, before the shareholder vote BoA concluded that Merrill had only enough liquidity to fund its operations for two months – or approximately 15% of the liquidity that Merrill normally maintained. ¶¶ 70-74. In explaining Merrill's dire liquidity position to Wachtell, Brown stated that the Bank's "regulators would be all over me if [BoA] didn't show adequate liquidity" for the combined company and, accordingly, BoA "need[ed] to lock up term funding" to stabilize Merrill. ¶¶ 127-28.

Thus, as a direct result of Merrill's liquidity crisis, BoA decided before the vote that it needed to issue nearly $20 billion of debt through a series of public offerings. ¶¶ 75-80. The first of these offerings was for $9 billion and occurred on December 1, four days before the shareholder vote. ¶ 75. Internal BoA documents make clear that this $9 billion offering – characterized by Merrill executives as "mammoth" – was conducted solely because of Merrill's fourth quarter losses, and that absent Merrill's losses, BoA would not have issued this debt. ¶¶ 76-78. Internal BoA documents also make clear that these debt issuances had a direct and

---

[8] *See also* October 10 Heaton email stating that "[i]t will be another bad cash day – business really needs to slow down / shrink;" October 11 Heaton email stating that "[t]o be blunt – as per my prior message – business needs to shrink and operate defensively – if not, it will be unpleasant;" October 17 Heaton email stating that the business "need[s] to work thru the weekend to figure out how to raise cash." ¶ 71.

negative impact on the accretion/dilution calculation. Specifically, in an email dated December 4, BoA Treasurer Brown explained to other senior BoA executives that the debt offerings were necessitated solely by Merrill, and worsened the "dilution impacts" of the Merger:

> BAC stand-alone. I would not have issued any debt in 4q, 1q, 2q. <u>Due to ML, we raised $9B in debt this week, need to raise another $5B in 1q and $5b in 2q</u>….
>
> <u>How do we think about the cost of this debt…ie) I think you should be including this in the dilution impacts for ML</u>. Their liquidity position at hold-co isn't pretty.
> …
> <u>It hurts your #s I know … but this is real … and should be associated with the transaction</u>.

¶¶ 77-78.

Notwithstanding the fact that BoA acknowledged internally that the $9 billion offering was conducted solely because of Merrill's deteriorated financial condition, the offering documents publicly filed in connection with the offering were silent concerning Merrill or the true causes for the offering. Instead, BoA merely stated that it would use the offering proceeds for "general corporate purposes," without giving any hint that Merrill was on the verge of collapse. ¶ 79.

Ultimately, Merrill's liquidity issues were so severe that BoA could not wait until the first or second quarters of 2009 to issue the more than $10 billion of additional debt referenced in Brown's December 4, 2008 email. ¶¶ 77, 80. Instead, BoA was forced to issue the additional debt in December 2008 because of the impact of Merrill's losses on the combined company's liquidity position. *Id*. In fact, Merrill's liquidity position was so dire that BoA Treasurer Brown told Wachtell lawyers in mid-December that Merrill would be "<u>dead [within] a week</u>" if the Merger did not close. ¶ 127.

Merrill's liquidity crisis and the resulting $20 billion in debt offerings had a materially negative impact on BoA's earnings for the three years following the Merger. As Wachtell explained in an internal memo, these offerings alone cost BoA "$525 million per year" going forward and "$1.5 billion in aggregate for [the] lifetime of financing." ¶ 129.

* * *

In sum, the impact of Merrill's 2008 fourth quarter losses – including the combined effect of the balance sheet reduction and the costs associated with the debt offerings – significantly impacted the combined company's future earnings capacity. ¶¶ 47-64, 66-80, 120-25, 127-30, 134-36. In turn, this reduction in future earnings ability materially changed the Bank's accretion/dilution analysis.[9] As explained below in Section II.H, Defendant Lewis confirmed in sworn deposition testimony that the accretion/dilution analysis had dramatically worsened by the date of the December 5 shareholder vote. ¶¶ 94-98.

E.     **Days Before The Shareholder Vote, Merrill's Fourth Quarter Losses Materially Increased**

On December 3, 2008 – two days before the vote – Defendants Lewis, Thain, Price and Cotty met to further assess Merrill's actual and anticipated fourth-quarter losses. ¶¶ 81-88. In that meeting, these senior BoA and Merrill officers reviewed Merrill's latest loss reports, which reflected that Merrill had incurred pre-tax losses to date of $10.415 billion and expected total fourth-quarter pre-tax losses of $11.043 billion. ¶¶ 81-83. After discussing Merrill's financial performance, Defendant Lewis concluded that Merrill's anticipated overall pre-tax fourth-quarter losses should be increased by $3 billion. ¶ 84. Defendants Cotty, Price and Thain agreed, and

---

[9] While Lead Plaintiffs' motion does not require the Court to resolve any issues of causation, for the Court's convenience, Lead Plaintiffs have explained herein how Merrill's massive fourth quarter losses caused the accretion/dilution analysis to materially change for the worse by the date of the vote. Lead Plaintiffs will demonstrate at trial the causal relationship between Merrill's 2008 fourth quarter losses and the negative change in the accretion/dilution calculation.

Defendant Lewis instructed them to formally revise Merrill's loss estimates. ¶¶ 84-86.[10] Consistent with Lewis's instruction, Merrill and BoA generated a revised forecast at 6 P.M. on December 3, which reflected a fourth-quarter loss of $14.043 billion, or approximately $9 billion after-tax. ¶¶ 85-88.[11]

Soon after this meeting, and prior to the vote, BoA Treasurer Brown informed Defendant Price that Merrill's losses should be disclosed. ¶¶ 89-91. Brown testified that he told Price "that we should disclose. That the losses were meaningful enough." ¶ 89. When Price refused to disclose Merrill's losses, Brown pointedly warned him that the failure to disclose could be a criminal offense, stating that he did not want to be "talking through a glass wall over a telephone" if no disclosure was made. ¶¶ 90-91.

F.      At The Shareholder Meeting, Defendant Lewis Falsely Assured Investors That BoA's Accretion/Dilution Analysis Had Not Changed

At the December 5, 2008 shareholder meeting to vote on the Merger, a shareholder specifically asked Defendant Lewis about the accretive/dilutive impact of the Merger. ¶¶ 92-93. In response to this question, Defendant Lewis reaffirmed the accretion/dilution analysis that BoA had set forth in the September 15 analyst presentation, press release, conference call, and the Proxy, and assured shareholders that the merger would be 3% dilutive in 2009 and "breakeven" in 2010. Specifically, Lewis had the following exchange with a shareholder participant at the meeting:

---

[10] As noted above, in addition to discussing Merrill's loss forecast, in this meeting Defendant Lewis ordered Thain to "push [*i.e.*, reduce the balance sheet] as hard as you can and only think about stopping when you think you've pushed too far and then… push some more." ¶ 61.

[11] The $14 billion loss figure reflected in the revised December 3 forecast did not include an additional $2.2 billion goodwill impairment charge that Defendants knew by no later than November 20, 2008 Merrill would incur in the fourth quarter. ¶ 88. Indeed, on November 20, Merrill's Head of Accounting Policy, David Moser, informed Merrill's Chief Financial Officer, Nelson Chai, and Merrill's Chief Accounting Officer, Gary Carlin, that "we will be taking a significant write-off of the goodwill … approximately $2.2 billion." *Id.* Including this $2.2 billion goodwill impairment charge, Merrill's expected fourth quarter losses were $16.2 billion as of December 3, 2008. ¶¶ 45, 88.

| PARTICIPANT: | You didn't respond to the lady's comment. This will dilute our shares. Will it not? Yes or no; not in the future, someday, but this afternoon? |
|---|---|
| MR. LEWIS: | We have said as I recall in the [September 15] presentation that we will have dilution in the first year, break-even in the second; and then accretion in the third. |
| PARTICIPANT: | Oh good, okay…. |

¶ 93.  After receiving Lewis's false assurances,  BoA's shareholders approved the proposed Merger.  ¶ 99.

### G.   Defendants Presented Merrill's Fourth Quarter Losses And Their Impact On The Accretion/Dilution Analysis To BoA's Board

On December 9, 2008, two business days after the vote, BoA's Board met for the first time following the shareholder vote.   ¶ 100.   In advance of this meeting, Defendant Price prepared a presentation that provided, among other things, an update on Merrill's financial condition and the Merger's impact on BoA.   ¶¶ 101-05.   At the meeting, Defendant Price informed the Board that Merrill's expected losses for the fourth quarter had reached $14 billion pre-tax ($9 billion after-tax) – the same losses that Defendants determined prior to the vote on December 3, 2008.   ¶¶ 87, 101, 104-05.   Defendant Price further stated that "the magnitude of the losses is quite significant."   ¶ 102.

Price also presented the re-calculated accretion/dilution figures to the Board, advising them that the Merger was expected to be "13.1% dilutive" in 2009 – or 337% more dilutive than the 3% figure BoA had previously disclosed on September 15 and in the Proxy.   ¶¶ 30-36, 103-05.   Defendant Price also informed the Board that, rather than being breakeven in 2010 as BoA had previously represented, the Merger was expected to be "2.8% dilutive" – or 280% worse than BoA had disclosed.   *Id.*   As explained below in Section II.H, Defendant Lewis confirmed in

his deposition that these revised accretion/dilution figures represented the Merger's accretive and dilutive impact <u>as of the date of the vote</u>. ¶¶ 94-98.

BoA's General Counsel, Timothy Mayopoulos, who attended the December 9 Board meeting, testified that this was the first time he had been informed that Merrill's 2008 fourth quarter losses had reached $9 billion after-tax, or that the accretion/dilution analysis had changed from what BoA had disclosed to its shareholders in the Proxy. ¶¶ 106-07. Indeed, Mayopoulos testified that he was "surprised to learn about this $14 billion pretax loss and $9 billion after-tax loss," and that he had not been advised of the change in BoA's accretion/dilution analysis until the December 9 Board meeting. *Id.* Accordingly, after the December 9 Board meeting, Mayopoulos tried to speak with Defendant Price about Merrill's increased fourth quarter losses and whether they should be disclosed. ¶¶ 108-09.

However, Mayopoulos was told that Defendant Price was unavailable. ¶ 108. Although Mayopoulos had previously been told by Defendant Lewis that he would be general counsel of the combined company after the Merger closed, after Mayopoulos arrived at work the next morning, and before he could meet with Defendant Price, Mayopoulos was fired without explanation and immediately escorted from the premises, without being given the opportunity to collect his personal belongings. ¶¶ 110-11.[12]

### H. Defendant Lewis Has Admitted That The Accretion/Dilution Figures Set Forth In The Proxy Were False As Of The Date Of The Shareholder Vote

Defendant Lewis confirmed during his deposition that the revised accretion/dilution analysis that Price presented to the BoA Board on December 9 represented the true accretive and

---

[12] As Mayopoulos testified, the human resources executive assigned to handle Mayopoulos's departure initially refused to remove Mayopoulos from the premises but was "told to be quiet and go do what he was told." Mayopoulos further testified that he was forced to sneak his birthstone ring (a gift from his grandfather) out of his desk, because he was not allowed to gather his personal belongings before he was escorted out of the building. ¶¶ 110-11.

dilutive impact of the Merger <u>as of the date of the December 5 shareholder vote</u>. ¶¶ 94-98. As Defendant Lewis <u>admitted</u>, by the date of the vote, there had been a "<u>significant change in the dilution and accretion analysis</u>," and the numbers that BoA had previously represented had changed "<u>dramatically</u>" to become the figures in the December 9 board presentation. *Id.* Accordingly, Lewis testified that, by December 5, 2008, the representations that BoA had made concerning accretion and dilution were "<u>no longer accurate</u>." ¶ 94. Defendant Lewis testified as follows:

> Q. Now, as of December 5, 2008, the numbers set forth in the September 15 presentation regarding accretion and dilution, they were no longer accurate, correct?
>
> A. <u>They were not these numbers, no.</u>
>
> Q. These numbers – the numbers set forth on page 16 of [the September 15 analyst presentation] were not accurate, correct?
>
> A. <u>They had changed to this [referencing the numbers in the December 9 Board presentation].</u>
>
> Q. And that was as of December 5, 2008, right?
>
> A. <u>Yes.</u>
>
> Q. And when you say – I'm sorry, when you say it had changed – they had changed to this, what is the "this" you are referring to? The figures set forth in Mr. Price's December 9th board presentation?
>
> A. <u>Meaning they were different than these, yes.</u>

*Id.*

### I. One Week After The Vote, BoA Sought To Terminate The Merger Because Of The Material Adverse Impact Of Merrill's Massive Losses

On December 12, 2008, one week after the shareholder vote, senior BoA executive Greg Curl contacted BoA's counsel at Wachtell and informed them that, because of Merrill's fourth quarter losses, BoA wanted to "get [] out" of the merger by invoking the MAC. ¶ 112. As set

forth in a memorandum prepared by Wachtell, to invoke the MAC, BoA was required to demonstrate that Merrill's losses had "substantially threaten[ed] [its] overall earnings potential" in "a durationally significant manner." ¶ 113. In order to document BoA's basis for invoking the MAC, Wachtell senior partners Peter Hein and Eric Roth conducted an extensive investigation of Merrill's financial condition and its long-term impact on the combined company. ¶¶ 114-16. Wachtell reviewed scores of internal BoA and Merrill documents, including email and analyses of Merrill's losses and their impact on Merrill's capital and liquidity, and interviewed numerous senior BoA executives, including Defendants Lewis, Price, and Cotty, and BoA Treasurer Brown. ¶¶ 114-17, 119, 123.

As set forth in the handwritten notes and memoranda memorializing these discussions, BoA's senior executives explained that Merrill's fourth quarter losses were "disproportionate in size to [its] peers." ¶¶ 117-18, 130. According to Roth's handwritten notes, BoA Treasurer Brown further explained that, as a result of Merrill's fourth quarter losses, Merrill had "burned half [its] capital…. This is a BIG ISSUE." ¶ 119; *see also* ¶¶ 120, 130. As noted above in Section II.D, Brown further stated that Merrill's future earnings ability had been significantly reduced because of the forced balance sheet reduction and the approximately $20 billion in debt offerings that BoA was required to conduct because of Merrill's devastated financial condition. ¶¶ 77-78, 120-29.

Based on these facts, Wachtell and BoA concluded that BoA could assert a MAC. ¶¶ 131-36. As set forth in a set of talking points drafted by Wachtell in December 2008, BoA had determined that Merrill's fourth quarter losses were so catastrophic that its earnings ability had been impaired for years to come, and that consummating the merger could constitute a breach of fiduciary duty by BoA:

The severe impact of these losses on MER's financial condition going forward – and the financial condition of the combined company in the event the merger closed – cannot be overstated. At the time we entered into the Merger Agreement, MER had tangible common equity of approximately $25.6 billion. As a result of MER's anticipated losses and goodwill write-downs this quarter, however, it has managed to burn some $13 billion of capital – or more than half its tangible common equity – in a little over three months.

…

There is no question that [Merrill's] massive capital burn stands to reduce the overall earnings potential of MER for years to come: the reduction in tangible common equity means that MER must reduce the size of its balance sheet, and the reduction in MER's balance sheet means that MER will not be capable of generating the same level of earnings as the parties anticipated it would when we agreed to merge.

…

We are not blind to the fact that other major investment banks – such as Goldman Sachs and Morgan Stanley – have recently announced Q4 losses. But the losses at Goldman Sachs and Morgan Stanley – each of whom reported about $2 billion in losses on asset bases of $887 billion and $658 billion respectively – pale by comparison to the … losses that MER will sustain this quarter.

It is clear that the current market dislocations have had a disproportionately adverse effect on MER as compared to other major investment banks.

Under the circumstances, BAC's Board of Directors has serious concerns as to whether it can go forward with the proposed merger consistent with its fiduciary duty to BAC stockholders.

¶ 130.

On December 17, Defendants Lewis and Price informed U.S. Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben S. Bernanke that BoA had grounds to invoke the MAC and terminate the merger. ¶¶ 131-136. According to the handwritten notes of Federal Reserve General Counsel Scott Alvarez, Defendant Lewis explained that there had been a "material adverse change" in Merrill's financial condition because, while BoA had "orig[inally] forecast breakeven 4Q" for Merrill, Merrill's massive fourth quarter losses had consumed "50%

[of its] tangible equity" and "destroyed some ability to earn" income in the future. ¶ 134.[13]
While Lewis stated that BoA was inclined to terminate the merger, Lewis also raised the prospect of BoA consummating the merger on the condition that it receive a taxpayer-funded "guarantee" to "cap [the] losses" that BoA was exposed to from Merrill's toxic assets. ¶ 135.

Federal officials were staggered by the size of Merrill's fourth quarter losses. As reflected in Alvarez's notes, Secretary Paulson stated that Merrill's fourth quarter losses were "breath-taking" and "so far beyond expectations," and that "losses of ML size will shake [the] market." ¶ 137. Ultimately, the Federal Government agreed to provide a $138 billion bailout package to BoA to allow it to consummate the merger. ¶ 138.

The market was astonished to learn of Merrill's true financial condition. When the news about Merrill's 2008 fourth quarter losses and the bailout was disclosed to the market in mid-January, BoA shares lost more than half of their value in four trading days, resulting in a market capitalization loss of approximately $50 billion. As Lewis later stated in describing the market's response to the disclosure of Merrill's fourth quarter results, "the magnitude of the loss . . . at Merrill Lynch <u>really stunned people</u>." ¶ 140.

III. **ARGUMENT**

A. **The Legal Standards Governing Partial Summary Judgment**

The standards for summary judgment are well settled. Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Scheffer v. Civil Service Emp.*

---

[13] Similarly, according to the email of BoA associate general counsel Teresa Brenner, during a December 19 call between Wachtell and regulators, Eric Roth "made a very strong case as to why there is a MAC … due to magnitude and duration of future lost earnings." ¶ 136.

*Ass'n, Local 828*, 610 F.3d 782, 787 (2d Cir. 2010). As this Court has held in granting summary judgment, "[w]hen the moving party has met this initial burden…, the opposing party must 'set out specific facts showing a genuine issue for trial,' and cannot rest 'merely on allegations or denials' of the facts asserted by the movant." *Bacolitsas v. 86th & 3rd Owner, LLC*, 2010 WL 3734088, at *3 (S.D.N.Y. Sept. 21, 2010) (Castel, J.) (quoting Fed. R. Civ. P. 56(e)(2)).

Partial summary judgment is particularly appropriate where, as here, it is based on defendants' admissions. In such cases, courts recognize that no reasonable juror would disregard defendants' admissions and find in their favor. *See Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995) (affirming grant of plaintiff's motion for summary judgment based on "ample admissions"); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 660-61 (S.D.N.Y. 2004) (partially granting plaintiffs' partial summary judgment motion based on defendants' admission).[14]

## B. Partial Summary Judgment Is Appropriate Because Defendants Have Admitted The Falsity And Materiality Of Their Statements Concerning The Accretive And Dilutive Impact Of The Merger

With respect to their Section 14(a) and 10(b) claims, Plaintiffs seek summary judgment on the elements of falsity and materiality as to the following five statements concerning the accretive and dilutive impact of the Merger:

- In the September 15, 2008 press release announcing the Merger, BoA stated that the "acquisition [of Merrill] is expected to be accretive to earnings by 2010." ¶¶ 30-31, 36.

---

[14] *See also DaimlerChrysler Ins. Co. v. Pambianchi*, 762 F. Supp. 2d 410, 427 (D. Conn. 2011) (granting plaintiffs' motion for summary judgment based on defendant's admissions in deposition and public disclosures); *Humane Soc. of U.S. v. HVFG, LLC*, 2010 WL 1837785, at *7 (S.D.N.Y. May 6, 2010) (granting in part plaintiff's motion for summary judgment based on defendants' admissions and deposition testimony); *Moe v. United States*, 668 F. Supp. 2d 497, 508 (W.D.N.Y. 2009) (granting plaintiff's summary judgment motion based on "admissions during [defendant's] deposition").

- In the September 15, 2008 investor presentation announcing the Merger, BoA stated that the merger was expected to be "3% dilutive in 2009" and "Breakeven in 2010." ¶ 32.

- In a September 15, 2008 investor call announcing the Merger, Defendant Price "estimate[d] the transaction to be 3% dilutive in the first year and breakeven to slightly accretive in the second year before restructuring charges." ¶ 33.

- In the November 3, 2008 Proxy, BoA stated that the Merger would be "3.0% dilutive in 2009 and breakeven in 2010." ¶¶ 35-36.

- At the December 5, 2008 shareholder meeting, Defendant Lewis stated that the transaction will be "break-even in [2010]; and then accretion in [2011]." ¶ 93.

As set forth below, partial summary judgment is appropriate because Defendants have admitted the falsity and materiality of these statements as of the time of the shareholder vote.

1.      Summary Judgment Should Be Granted As To The Falsity Of Defendants' Accretion/Dilution Statements

The falsity analysis of Defendants' accretion/dilution statements is straightforward. Defendant Lewis admitted during his deposition that the accretion/dilution analysis had "changed dramatically" and "significant[ly]" and was "no longer accurate" by the date of the shareholder vote. ¶¶ 94-98. His admission establishes as a matter of law that Defendants' accretion/dilution statements were false as of the date of the shareholder vote for purposes of Plaintiffs' Section 14(a) and 10(b) claims. *See, e.g.*, *WorldCom*, 346 F. Supp. 2d at 661 (granting plaintiffs' partial summary judgment where defendant admitted falsity in their restated SEC filings); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *30 (S.D. Fla. Aug. 18, 2010) (granting plaintiffs' partial summary judgment where evidence established that "no genuine issue of fact exist[ed] as to the falsity" of four challenged statements).

As set forth below, there can be no dispute that each of Defendants' accretion/dilution statements was false and misleading as of the date of the shareholder vote.

a.    Defendant Lewis's Accretion/Dilution Statement At The
December 5 Shareholder Meeting Was False When Made

It is beyond dispute that Defendant Lewis's statement at the shareholder vote about the accretive and dilutive impact of the Merger was false when made. Specifically, at that meeting, Defendant Lewis was asked by a BoA shareholder about the dilutive impact of the Merger. ¶¶ 92-93. In response to the shareholder's question, Defendant Lewis falsely reaffirmed the outdated and incorrect accretion/dilution analysis provided on September 15 and in the Proxy and reiterated that "we will have dilution in the first year, break-even in the second; and then accretion in the third." ¶ 93.

As noted above, Defendant Lewis admitted the falsity of his statement at the December 5 meeting. ¶¶ 94-98. He testified under oath that the accretion/dilution numbers he represented to BoA's shareholders had "changed dramatically" and "significant[ly]" and were "no longer accurate" as of the date of the shareholder vote. *Id.* The revised accretion/dilution analysis stated that the deal would be 13.1% dilutive in 2009 – *i.e.*, 337% worse than previously represented – and 2.8% dilutive in 2010 – *i.e.*, 280% worse than previously represented. ¶¶ 94-96. Given Defendant Lewis's admissions of falsity at his deposition, Plaintiffs are entitled to, at minimum, partial summary judgment that his statement at the shareholder meeting concerning the accretive impact of the Merger was false and misleading when made. *See In re Bank of Am.*, 757 F. Supp. 2d at 295 ("[U]pon choosing to speak, one must speak truthfully about material issues.") (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).

b.    Defendants' Earlier Accretion/Dilution Statements Became False
And Misleading As Of The Date Of The Vote

Plaintiffs are also entitled to partial summary judgment as to the falsity of Defendants' accretion/dilution statements prior to the shareholder vote. As Defendant Lewis has admitted,

30

these earlier statements, even if true when made, became false and misleading by December 5. ¶¶ 94-98. Under Section 14(a), the Proxy needed to remain truthful, non-misleading, and complete at least through the date of the shareholder vote. In addition, under both Sections 14(a) and 10(b), Defendants had a duty to update their earlier accretion/dilution statements once they were no longer accurate.

(1) Section 14(a) Required Defendants To Provide<br>Truthful And Complete Information In Their Proxy<br>Solicitations

As this Court has held, "Section 14(a) is satisfied '[o]nly when the proxy statement fully and fairly furnishes all the objective material facts' to allow a reasonably prudent investor 'to make an informed investment decision....'" *In re Bank of Am.*, 757 F. Supp. 2d at 290 (citing *Mendell*, 927 F.2d at 674). Significantly, under Section 14(a), the Proxy must be truthful and complete with all material information <u>as of the date of the shareholder vote</u>. As Judge Friendly held in *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 n.15 (2d Cir. 1973), "we cannot suppose that management can lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement without disclosing facts arising since its dissemination if these are so significant as to make it materially misleading."[15]

Here, according to Defendant Lewis's own admissions, the Proxy included an accretion/dilution analysis that was no longer accurate by the date of the shareholder vote. ¶¶ 35-36, 94-98. This accretion/dilution calculation, which the Proxy itself identified as "material," continued to assure BoA's shareholders that the merger would be "3.0% dilutive in

---

[15] *See also* SEC Release No. 34-16343, 1979 WL 173161, at *4 ("Even in a situation wherein a statement when made was true and correct, and is rendered incorrect due to a change in circumstances or other subsequent event, appropriate action should be taken to correct the misstatement prior to the meeting."); SEC Release No. 34-23789, 1986 WL 722059, at *5 ("When there have been material changes in the proxy soliciting material or material subsequent events (in contrast to routine updating), an additional proxy card, along with revised or additional proxy soliciting material, should be furnished to security holders ... to permit security holders to assess the information and to change their voting decisions if desired.").

2009 and breakeven in 2010." ¶ 35. BoA shareholders were not told that the accretion/dilution analysis contained in the Proxy had, according to BoA's own CEO, changed "dramatically" and "significant[ly]." ¶¶ 97-98. Nor were BoA shareholders advised that BoA's corrected accretion/dilution analysis contemplated that the merger would be 13.1% dilutive in 2009 and 2.8% dilutive in 2010. ¶¶ 94-96. As a result, the statements concerning the accretive and dilutive impact of the Merger were incomplete and false and misleading as of the date of the vote.

(2)      Defendants Were Required To Update Their<br>Accretion/Dilution Statements

Under both Sections 10(b) and 14(a), Defendants also had a duty to update their forward-looking accretion/dilution statements once they became false and misleading. As this Court has recognized, "[a] duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Bank of Am.*, 757 F. Supp. 2d at 312 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)). Such a duty exists where, as here, defendants' forward-looking statements "remain[ed] 'alive' in the minds of investors as [] continuing representation[s]" in support of the Merger. *See IBM*, 163 F.3d at 110; *see also In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (obligation to update statements if they become "misleading as the result of intervening events"); *DeCicco v. United Rentals, Inc.*, 602 F. Supp. 2d 325, 345 (D. Conn. 2009) (duty to update triggered when a change in attitude regarding a corporate transaction is "sufficiently significant as to render prior or subsequent public disclosures materially misleading").

As Defendant Lewis has admitted, intervening events "dramatically" and "significant[ly]" impacted BoA's original accretion/dilution analysis, rendering it outdated and "no longer accurate" by the date of the shareholder vote. ¶¶ 94-98. Nevertheless, Defendants

neither updated their earlier accretion/dilution statements nor informed BoA shareholders or investors that the accretion/dilution analysis had changed "significant[ly]" for the worse. *Id.* Indeed, rather than providing BoA's shareholders with an updated and accurate accretion/dilution analysis at the December 5 meeting, Defendant Lewis <u>repeated</u> the incorrect accretion/dilution figures. ¶¶ 92-93. Defendants' failure to satisfy their duty to update rendered their statements about the accretive and dilutive impact of the Merger false and misleading as of the date of the vote.

2.     Summary Judgment Should Be Granted As To The Materiality of
Defendants' Accretion/Dilution Statements

The well-established standard for materiality under the securities laws is the same under Sections 10(b) and 14(a) of the Exchange Act. *See Goldberg v. Meridor*, 567 F.2d 209, 222 n.3 (2d Cir. 1977) ("The test for materiality under 14a-9 and 10b-5 is the same."). Under both sections, a statement or omission is material if it would "significantly alter[] the 'total mix' of information." *In re Bank of Am.,* 757 F. Supp. 2d at 290 (quoting *Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999)).

Although materiality is normally a question of fact, the materiality analysis is straightforward on this motion. Having identified the accretion/dilution analysis in the Proxy as a "<u>material factor</u>" to the Board's approval and recommendation of the Merger, Defendants cannot now genuinely dispute the materiality of their statements. ¶ 35. Courts hold that where, as here, Defendants expressly admit the materiality of their statements, the ultimate question of materiality may be appropriately resolved as a matter of law by summary judgment. *See, e.g.*, *WorldCom,* 346 F. Supp. 2d at 661 (granting partial summary judgment on the materiality of particular statements based on defendants' admissions in restatement).

Even assuming that Defendants' admission alone were not enough, additional "overwhelming evidence" corroborates the admission in the Proxy that the accretion/dilution calculation was material. ¶¶ 10-29. *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 995 F.2d 375, 377 (2d Cir. 1993) (summary judgment proper where the evidence is "so overwhelming that 'there is no genuine issue as to any material fact'"); *Carlisle Ventures, Inc. v. Banco Espanol De Credito, S.A.*, 1996 WL 680265, at *8 (S.D.N.Y. Nov. 25, 1996) (Sotomayor J.) (granting plaintiff's motion for summary judgment where "the only reasonable conclusion a trier of fact could draw is that [the] deception was material").[16] This evidence includes the following:

- Defendant Lewis admitted at his deposition that the accretion/dilution analysis was "important" to his decision to acquire Merrill and something that he was "focused on" during the negotiations. ¶ 11. He further testified that he initially rejected the Merger proposal based on an inferior accretion/dilution calculation, and only approved the Merger price once he was presented with the more favorable accretion/dilution analysis that was disclosed to investors on September 15, 2008 and presented in the Proxy. ¶¶ 13-21.

- BoA's financial advisors opined that the transaction was fair to BoA's shareholders based on the accretion/dilution analysis. ¶¶ 23, 25.

- BoA Board member Defendant Gifford testified that he was "very satisf[ied]" with the accretion/dilution analysis for the Merger, which was one of the "principal four issues" that he generally considered in deciding whether to approve a merger. ¶¶ 26-28.

- Defendant Price underscored the significance of the accretion/dilution analysis to investors during the September 15 conference call announcing the Merger in order "to help [investors] analyze the transaction." ¶ 33.

---

[16] *See also Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co.*, 799 F.2d 867, 868-70, 876 (2d Cir. 1986) (affirming grant of plaintiff's summary judgment motion where evidence was so "overwhelming" there was no genuine issue of material undisputed fact); *SEC v. Roor*, 2004 WL 1933578, at *5 (S.D.N.Y. Aug. 30, 2004) (granting summary judgment motion where there was no "serious question" that challenged statements were material); *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, 2005 WL 2582177, at *5, *7 (S.D.N.Y. Oct. 11, 2005) (granting plaintiff's motion for summary judgment where the evidence was "overwhelming").

In light of Defendants' admission, as well as the above corroborating evidence, reasonable minds cannot differ on the issue of materiality of Defendants' accretion/dilution statements.

## CONCLUSION

For the reasons set forth above, Lead Plaintiffs' motion for partial summary judgment should be granted.

Dated: June 3, 2012
New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By:     */s/ Fred S. Fox*
Robert N. Kaplan
Frederic S. Fox

850 Third Avenue, 14th Floor
New York, NY  10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

*Attorneys for Lead Plaintiffs*
*and the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By:     */s/ Steven B. Singer*
Max W. Berger
Steven B. Singer

1285 Avenue of the Americas
New York, NY  10019
Tel:  (212) 554-1400
Fax:  (212) 554-1444

*Attorneys for Lead Plaintiffs*
*and the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

By:     */s/ David Kessler*
David Kessler
Gregory M. Castaldo

280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056

*Attorneys for Lead Plaintiffs*
*and the Class*