**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYMENT RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION

Master File No. 09 MDL 2058 (PKC)
ECF CASE

-------------------------------------------------------------

THIS DOCUMENT RELATES TO

The Consolidated Securities Class Action

---

### DECLARATION OF GREGORY F. SMOLAR IN SUPPORT OF
### KENNETH D. LEWIS' MOTION FOR SUMMARY JUDGMENT

I, Gregory F. Smolar, declare as follows:

I am an associate at the law firm of Debevoise & Plimpton LLP, attorneys for Defendant

Kenneth D. Lewis in this Action.  I make this declaration, on personal knowledge, which is

based on my familiarity with this litigation, to put before the Court certain facts and other

information in support of Defendant Kenneth D. Lewis' Motion for Summary Judgment on all of

the claims remaining against him.  In some instances, the attached exhibits were produced to Mr.

Lewis with redactions, which are indicated with the phrase "Redacted by BAC," or another

similar indication.  Additionally, pursuant to this Court's January 20, 2010 Stipulation and Order

Governing the Production and Exchange of Confidential Material, Debevoise & Plimpton LLP

has made additional redactions to several of the exhibits to remove personal confidential

information such as names, addresses, telephone numbers and the dollar amount of D&O

insurance.  These redactions are denoted by a redaction box bearing the legend: "D&P

Redaction."

1.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from Kenneth D. Lewis' March 27, 2012 deposition in this Action.

2.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from Kenneth D. Lewis' March 6, 2012 deposition in the parallel derivative action pending in the Delaware Court of Chancery styled *In re Bank of Am. Corp. S'holder Derivative Litig.*, CA. No. 4307-CS.

3.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from Kenneth D. Lewis' October 30, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.*, 09-CV-6829 (S.D.N.Y.).

4.      Attached hereto as Exhibit 4 is a true and correct copy of an excerpt from Thomas J. May's December 21, 2011 deposition taken in this Action.

5.      Attached hereto as Exhibit 5 is a true and correct copy of an excerpt from Teresa Brenner's December 13, 2011 deposition in this Action.

6.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from Joe L. Price's April 5 and 6, 2012 deposition taken in this Action.

7.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from John Steele Alphin's November 13, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.*, 09-CV-6829 (S.D.N.Y.).

8.      Attached hereto as Exhibit 8 is a true and correct copy of an excerpt from Timothy Mayopoulos' March 30, 2012 deposition taken in this Action.

9.      Attached hereto as Exhibit 9 is a true and correct copy of an excerpt from Charles Gifford's December 8, 2011 deposition taken in this Action.

10.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from Gregory Curl's January 22, 2012 deposition in this Action.

11.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from Nicholas

G. Demmo's November 16, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.,* 09-

CV-6829 (S.D.N.Y.).

12.     Attached hereto as Exhibit 12 is a true and correct copy of an excerpt from

Kenneth D. Lewis' February 26, 2009 testimony before the Office of the New York Attorney

General.

13.     Attached hereto as Exhibit 13 is a true and correct copy of an excerpt from of

Bank of America's Form 8-K, filed September 18, 2008.  A complete copy of this filing can be

accessed at http://www.sec.gov/Archives/edgar/data/70858/000089882208000889/0000898822-

08-000889-index.htm.

14.     Attached hereto as Exhibit 14 is a true and correct copy of  excerpts from Bank of

America's Definitive Proxy Statement, filed November 3, 2008.  A complete copy of this filing

can be accessed at

http://www.sec.gov/Archives/edgar/data/70858/000095012308014243/0000950123-08-014243-

index.htm.

15.     Attached hereto as Exhibit 15 is a true and correct copy of excerpts from Nicholas

G. Demmo's March 5, 2012 deposition in this Action.

16.     Attached hereto as Exhibit 16 is a true and correct copy of an email and

attachment from Nicholas G. Demmo to Teresa M. Brenner and others dated September 18,

2008, BAC-502-WLRK-A 00002390 to BAC-502-WLRK-A 00002391.

17.     Attached hereto as Exhibit 17 is a true and correct copy of an excerpt from Jeffrey

P. Crandall's November 30, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.,* 09-

CV-6829 (S.D.N.Y.).

18.     Attached hereto as Exhibit 18 is a true and correct copy of excerpts from Jeffrey P. Crandall's January 12, 2012 deposition in this Action.

19.     Attached hereto as Exhibit 19 is a true and correct copy of an email from Patricia A. Kuhn to Adam Kaminsky dated October 22, 2008, BAC-502-SS 00010821 to BAC-502-SS 00010823.

20.     Attached hereto as Exhibit 20 is a true and correct copy of an excerpt from the Disclosure Schedules to the September 15, 2008 Agreement and Plan of Merger, BAC-ML-NYAG00000280-UR, BAC-ML-NYAG00000292-UR to BAC-ML-NYAG00000294-UR.

21.     Attached hereto as Exhibit 21 is a true and correct copy of excerpts from Nicholas G. Demmo's January 13, 2012 deposition in the parallel derivative action pending in the Delaware Court of Chancery styled *In re Bank of Am. Corp. S'holder Derivative Litig.*, CA. No. 4307-CS.

22.     Attached hereto as Exhibit 22 is a true and correct copy of an excerpt from Timothy Mayopoulos' December 22, 2011 deposition in the parallel derivative action pending in the Delaware Court of Chancery styled *In re Bank of Am. Corp. S'holder Derivative Litig.*, CA. No. 4307-CS.

23.     Attached hereto as Exhibit 23 is a true and correct copy of an email from Ross A. Fieldston to Teresa Brenner and others dated September 20, 2008, BAC-502-SS 00082986.

24.     Attached hereto as Exhibit 24 is a true and correct copy of an email from Craig Culbert to Richard Alsop and others dated September 24, 2008, BAC-502-SS 00058964 to BAC-502-SS 00058965.

25.     Attached hereto as Exhibit 25 is a true and correct copy of an email from James Cuneo to "WLRK Team – Internal" dated October 1, 2008, BAC-502-WLRK-A 00022370.

26.     Attached hereto as Exhibit 26 is a true and correct copy of an excerpt from JeanneMarie O'Brien's November 20, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.,* 09-CV-6829 (S.D.N.Y.).

27.     Attached hereto as Exhibit 27 is a true and correct copy of excerpts from Neil Cotty's March 16, 2012 deposition in this Action.

28.     Attached hereto as Exhibit 28 is a true and correct copy of an attachment from an email from Nancy Meloth to Neil Cotty, copying others, dated November 12, 2008, BAC-ML-NYAG10106372 to BAC-ML-NYAG10106385.

29.     Attached hereto as Exhibit 29 is a true and correct copy of an excerpt from Neil Cotty's January 19, 2012 deposition in the parallel derivative action pending in the Delaware Court of Chancery styled *In re Bank of Am. Corp. S'holder Derivative Litig.,* CA. No. 4307-CS.

30.     Attached hereto as Exhibit 30 is a true and correct copy of an excerpt from Neil Cotty's December 16, 2009 deposition in the action styled *SEC v. Bank of Am. Corp.,* 09-CV-6829 (S.D.N.Y.).

31.     Attached hereto as Exhibit 31 is a true and correct copy of "Merrill Lynch & Co 2008 4Q Pacing & FY Forecast Scenario," dated December 3, 2008, BAC-ML-NYAG-502-00064560 to BAC-ML-NYAG-502-00064565.

32.     Attached hereto as Exhibit 32 is a true and correct copy of Plaintiffs' Response to Interrogatory No. 2 of Kenneth D. Lewis' First Set of Interrogatories to Plaintiffs, as excerpted from Plaintiffs' Responses and Objections to Kenneth D. Lewis' First Set of Interrogatories to Plaintiffs, dated May 14, 2012.

33.     Attached hereto as Exhibit 33 is a true and correct copy of an excerpt from Bank of America's Form 424(b)(5), filed October 9, 2008.  A complete copy of this filing can be

accessed online at

http://www.sec.gov/Archives/edgar/data/70858/000095014408007527/0000950144-08-007527-

index.htm.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C.
     June 3, 2012


/s/ Gregory F. Smolar

# Exhibit 1

**To Smolar Declaration in**
**Support of Motion for Summary Judgment**

Page 1

1

2   ** C O N F I D E N T I A L **

3   UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

4   Master File No. 09-MD-2058 (PKC)

------------------------------------x

5

IN RE BANK OF AMERICA CORP. SECURITIES,

6   DERIVATIVE AND EMPLOYMENT RETIREMENT

INCOME SECURITY ACT (ERISA) LITIGATION

7

------------------------------------x

8

9   THIS DOCUMENT RELATES TO

All Securities Actions

10

11   ------------------------------------x

March 27, 2012

12                 9:03 a.m.

13

14

15        Videotaped Deposition of KENNETH D.

16   LEWIS, taken by Plaintiffs, pursuant to

17   Notice, held at the Ritz-Carlton Golf

18   Resort, 2600 Tiburon Drive, Naples,

19   Florida, before Todd DeSimone, a

20   Registered Professional Reporter and

21   Notary Public.

22

23

24

25

Page 16

```
 1              LEWIS - CONFIDENTIAL
 2    was 2000 to 2009.                          09:12:17AM
 3        Q.      What's the difference between   09:12:19AM
 4    CEO and president?                          09:12:20AM
 5        A.      Well, the CEO is the person in  09:12:22AM
 6    charge, at least in our company that was    09:12:26AM
 7    the most powerful title, and you can -- at  09:12:29AM
 8    some point I had planned to give that       09:12:34AM
 9    title to the person that would be my        09:12:36AM
10    successor and named somebody chief          09:12:39AM
11    operating officer.  As it turned out, we    09:12:43AM
12    didn't take that step.                      09:12:45AM
13        Q.      Let's deal with the 2001 to     09:12:47AM
14    2009 time period.  Other than CEO,          09:12:52AM
15    president and chairman, did you hold any    09:12:55AM
16    other titles or positions at Bank of        09:12:56AM
17    America?                                    09:12:58AM
18        A.      Not that I recall.              09:12:58AM
19        Q.      Could you just describe, just   09:12:59AM
20    generally for me, your educational          09:13:04AM
21    background.  You don't have to go to high   09:13:05AM
22    school.  Just college and any advanced      09:13:08AM
23    degrees is fine.                            09:13:09AM
24        A.      I have an undergraduate degree  09:13:10AM
25    from Georgia State University in Atlanta    09:13:15AM
```

```
 1              LEWIS - CONFIDENTIAL
 2    in finance, bachelor of business        09:13:17AM
 3    administration.  And this isn't a degree, 09:13:20AM
 4    but I spent about a month and a half I   09:13:22AM
 5    think it was at Stanford at their        09:13:24AM
 6    executive program.                       09:13:26AM
 7        Q.     Now, you've been deposed before 09:13:29AM
 8    in connection with what we will call the 09:13:33AM
 9    Bank of America/Merrill Lynch merger,    09:13:36AM
10    right?                                   09:13:38AM
11        A.     Right.                        09:13:39AM
12        Q.     And I'm going to ask you, we  09:13:39AM
13    will do it this way, I think it will be  09:13:42AM
14    quicker, because I want to find out how  09:13:45AM
15    many times and by whom.                  09:13:47AM
16               You have been deposed by the  09:13:48AM
17    New York Attorney General's office,      09:13:49AM
18    correct?                                 09:13:50AM
19        A.     Correct.                      09:13:51AM
20        Q.     And how many times were you   09:13:51AM
21    deposed by them?                         09:13:52AM
22        A.     Once.                         09:13:53AM
23        Q.     And that was in February 2009; 09:13:54AM
24    do you recall?                           09:13:57AM
25        A.     It was around then.  I can't  09:13:57AM
```

Page 57

1            LEWIS - CONFIDENTIAL
2     didn't say this at the start, because I      09:50:20AM
3     know you have been through this before,       09:50:22AM
4     but if you need to take a break.              09:50:23AM
5         A.      Because I'm 65 years old?         09:50:25AM
6         Q.      No, because actually I'll         09:50:28AM
7     probably need to take one before you do,      09:50:29AM
8     and I'm 45, there you go.  But, you know,     09:50:32AM
9     just let me know.                             09:50:34AM
10        A.       I have until April the 9th to    09:50:35AM
11    be 65.  I shouldn't be declaring I'm 65       09:50:38AM
12    before I am.                                  09:50:41AM
13        Q.      You get like -- Social Security 09:50:41AM
14    kicks in.  No, it might be kicked in -- I     09:50:41AM
15    don't even know.  Well, happy birthday.       09:50:45AM
16        A.      Thank you.                        09:50:47AM
17        Q.      Now, you've previously            09:50:50AM
18    testified, you know, actually in the          09:50:52AM
19    Delaware case, I think, that you became       09:50:55AM
20    aware that Merrill Lynch had -- that you      09:50:57AM
21    became aware sometime in November 2008        09:51:00AM
22    that Merrill Lynch had suffered some          09:51:03AM
23    significant losses; do you recall that        09:51:05AM
24    testimony?                                    09:51:07AM
25        A.      Yeah, I recall that testimony     09:51:07AM

Page 58

1              LEWIS - CONFIDENTIAL

2    and I recall the fact that I did in          09:51:12AM

3    November learn of some significant losses,   09:51:15AM

4    yes.                                          09:51:18AM

5        Q.       When did you learn of that?     09:51:18AM

6        A.       All I can recall is sometime in 09:51:21AM

7    November.  The best I can recall it was a    09:51:25AM

8    $5 billion number.  But that's vague, too.   09:51:28AM

9        Q.       Can I just give you, I mean,    09:51:31AM

10   was it early November, was it around         09:51:34AM

11   Thanksgiving, do you recall anything         09:51:36AM

12   about --                                     09:51:38AM

13       A.       I can't recall.                 09:51:38AM

14       Q.       How did you learn of that?  I   09:51:43AM

15   mean, who told you?                          09:51:48AM

16       A.       It would be -- it would have    09:51:49AM

17   been Joe Price.  I don't recall the form.    09:51:51AM

18   But he would have been my point person       09:51:54AM

19   that would tell me something like that.      09:51:56AM

20       Q.       And how did he tell you about   09:51:58AM

21   this?  How did it happen?                    09:51:59AM

22       A.       I don't remember.  Either I was 09:52:01AM

23   constantly walking into his office or he     09:52:06AM

24   was constantly walking into mine.  It was    09:52:08AM

25   not a formal relationship.  He was next      09:52:12AM

Page 59

1              LEWIS - CONFIDENTIAL

2   door, in the next office.  I don't know if    09:52:15AM

3   he showed me something or he just told me,    09:52:17AM

4   but I remember that number.                   09:52:21AM

5       Q.      And what did he say when he        09:52:25AM

6   told you about that number?                   09:52:26AM

7       A.      All I recall is the number.  I     09:52:27AM

8   don't recall what he said.                    09:52:29AM

9       Q.      Did he tell you what that $5       09:52:30AM

10  billion consisted of?                         09:52:34AM

11      A.      He might very well have.  I        09:52:37AM

12  just don't remember.                          09:52:38AM

13      Q.      Did he tell you, and I'm          09:52:41AM

14  talking about in November, this               09:52:43AM

15  conversation, this is the first time you      09:52:45AM

16  have learned of -- this is the first time     09:52:47AM

17  you learned that Merrill suffered losses,     09:52:49AM

18  correct?                                      09:52:51AM

19      A.      As far as I can recall.           09:52:51AM

20      Q.      And did Mr. Price say anything     09:52:54AM

21  about losses that Merrill had suffered in     09:52:57AM

22  the month of October?                         09:52:59AM

23      A.      I don't recall that.  But that     09:53:01AM

24  estimate would have included those.           09:53:09AM

25      Q.      The estimate would have           09:53:12AM

Page 67

1              LEWIS - CONFIDENTIAL

2      A.       Right.                    10:00:31AM

3      Q.       And if you look, there is a    10:00:31AM

4  line item 4Q08F, which is forecast; do you  10:00:34AM

5  see that on the right?                 10:00:38AM

6      A.       Right.                    10:00:38AM

7      Q.       And then below it, it says    10:00:39AM

8  Pretax Earnings, a loss of a little over    10:00:41AM

9  $8.9 billion?                          10:00:44AM

10     A.       Right.                    10:00:45AM

11     Q.       And then ML, you see that below  10:00:46AM

12 it, ML Operating, you know, roughly $5.4    10:00:48AM

13 billion loss?                          10:00:53AM

14     A.       Right.                    10:00:54AM

15     Q.       Is that the number that    10:00:55AM

16 Mr. Price shared with you?             10:00:56AM

17     A.       Again, I can't remember whether  10:00:57AM

18 he told me -- he told me about the number  10:00:59AM

19 or showed me a document.  I just can't     10:01:05AM

20 recall.  The thing that I remember is $5    10:01:07AM

21 billion after tax.                     10:01:10AM

22     Q.       Did he show you any documents   10:01:11AM

23 at that time or did he just say Ken, this  10:01:12AM

24 is what it --                          10:01:14AM

25     A.       Like I just said, I don't     10:01:15AM

Page 71

1               LEWIS - CONFIDENTIAL
2     my best to try to figure out, you know,     10:03:48AM
3     what you did or what you recall.            10:03:50AM
4         A.      If I could recall, I mean, I    10:03:52AM
5     would tell you, obviously, but I don't.     10:03:53AM
6         Q.      Just so I'm clear, okay, you    10:03:55AM
7     don't recall speaking to anyone at Merrill  10:03:59AM
8     Lynch about the losses, correct?            10:04:01AM
9         A.      I don't know if I did or        10:04:02AM
10    didn't, but I don't recall.                 10:04:03AM
11        Q.      Did you talk to the board about 10:04:05AM
12    these losses?  Again, this is November,     10:04:08AM
13    right around the time when Mr. Price gives   10:04:10AM
14    you this number.                            10:04:12AM
15        A.      I do not recall.                10:04:13AM
16        Q.      Did you talk to anyone at J.C.  10:04:14AM
17    Flowers?                                    10:04:19AM
18        A.      No.  I'm 99.9 percent sure I    10:04:19AM
19    didn't have any conversations with J.C.     10:04:27AM
20    Flowers or anybody there.                   10:04:27AM
21        Q.      Did you tell Mr. Price to do    10:04:29AM
22    anything?                                   10:04:30AM
23        A.      I don't recall.                 10:04:30AM
24        Q.      Now, you also previously        10:04:32AM
25    testified, and, again, this is actually     10:04:41AM

Page 72

```
 1           LEWIS - CONFIDENTIAL
 2   just a couple of weeks ago, that during     10:04:44AM
 3   this conversation you had with Mr. Price    10:04:47AM
 4   in November you and he also discussed the   10:04:49AM
 5   issue of disclosure of Merrill Lynch's      10:04:52AM
 6   losses.  Do you recall that testimony?      10:04:54AM
 7       A.      No.  In November?               10:04:55AM
 8       Q.      Yeah, November.                 10:04:57AM
 9       A.      No.                             10:04:58AM
10       Q.      Let me ask you, did you discuss 10:04:59AM
11   the issue of disclosure of Merrill Lynch's  10:05:04AM
12   losses --                                   10:05:07AM
13       A.      Excuse me, I'm sorry, I'm       10:05:08AM
14   sorry.  I was thinking -- I was thinking    10:05:09AM
15   December and the meeting of November.  I    10:05:13AM
16   apologize.                                  10:05:17AM
17       Q.      No problem.                     10:05:17AM
18       A.      He came to me at some point,    10:05:19AM
19   and it was November, I'm pretty sure, and   10:05:22AM
20   said that he had gone -- he had gone to     10:05:26AM
21   Tim Mayopoulos, the general counsel, and    10:05:30AM
22   discussed the issue of should there be an   10:05:33AM
23   announcement.  And best I can recall --     10:05:41AM
24   oh, and I also think that Tim consulted     10:05:46AM
25   with someone at Wachtell Lipton.  I'm not   10:05:51AM
```

Page 73

1           LEWIS - CONFIDENTIAL

2    sure I remember all of the reasons that      10:05:56AM

3    they thought there was not disclosure.       10:05:57AM

4            I remember him saying that,          10:05:59AM

5    number one, there was acknowledgment there   10:06:01AM

6    was huge volatility in the marketplace,      10:06:03AM

7    that the proxy described volatile            10:06:09AM

8    instruments subject to change in market      10:06:13AM

9    value, the fact that Merrill had had         10:06:16AM

10   larger losses than that in the past, the     10:06:22AM

11   fact that there had been no predictions      10:06:27AM

12   publicly of any profits or losses in the     10:06:31AM

13   fourth quarter.                              10:06:34AM

14           There may have been -- there         10:06:35AM

15   may have been some more.  At some times --   10:06:39AM

16   at some point I recall they were still       10:06:41AM

17   single-digit, at that point they were        10:06:45AM

18   single-digit and not double-digit, and       10:06:47AM

19   that kind of related to the point about      10:06:49AM

20   Merrill's losses being higher in other       10:06:51AM

21   quarters.  And there is probably something   10:06:54AM

22   I'm missing.  But that's what I recall       10:06:56AM

23   about the reasons given for nondisclosure.   10:06:58AM

24        Q.     Okay.  This conversation you     10:07:00AM

25   had with Mr. Price in November, was this     10:07:02AM

Page 75

1           LEWIS - CONFIDENTIAL
2    about the issue of disclosure of the        10:07:48AM
3    losses?                                     10:07:50AM
4       A.      I've given you every -- to the   10:07:51AM
5    extent he said something else, I can't      10:07:54AM
6    recall, but those are what -- those are     10:07:57AM
7    the points I remember him making or         10:07:58AM
8    relaying from Tim.                          10:08:02AM
9       Q.      What did you say in response?    10:08:04AM
10      A.      I said okay, well, we've got it  10:08:07AM
11   in the hands of the experts.  I didn't say  10:08:13AM
12   that.  But I said something to the point    10:08:15AM
13   that the right people had looked at it and  10:08:19AM
14   we will go by their decision.               10:08:23AM
15      Q.      What did Mr. Price say about --  10:09:01AM
16   and I realize you said -- you talked about  10:09:05AM
17   some of the reasons or the reasons that he  10:09:10AM
18   said about not disclosure.  What did he     10:09:12AM
19   say specifically?  Did he say we shouldn't  10:09:14AM
20   disclose this?  Did he say we are not       10:09:16AM
21   legally required to disclose it?  What did  10:09:18AM
22   he say about that?                          10:09:20AM
23      A.      I don't recall the exact         10:09:21AM
24   terminology used, but it made me believe    10:09:23AM
25   that it was not an issue.                    10:09:29AM

Page 77

1              LEWIS - CONFIDENTIAL

2      Q.        Did Price tell you why he went   10:10:44AM

3   to Tim Mayopoulos in the first place?        10:10:52AM

4      A.        Well, that would be -- that      10:10:55AM

5   would be how the process works.  I mean,     10:10:57AM

6   we leave that decision to the combination    10:10:59AM

7   of our Finance Group and Legal Group, and    10:11:03AM

8   I think even Risk Management gets            10:11:06AM

9   involved.                                     10:11:09AM

10             But they are in charge of          10:11:09AM

11   disclosure, and they are -- and then Joe     10:11:11AM

12   is the point person to come to me.  But it   10:11:14AM

13   is something that I allow the decision to    10:11:17AM

14   be made at that level, so it is pure, that   10:11:21AM

15   the experts make that call.                  10:11:23AM

16      Q.        When you say the process, what  10:11:25AM

17   process are you referring to?               10:11:27AM

18      A.        Well, it is just, I guess I     10:11:28AM

19   should call it the practice that we've       10:11:30AM

20   employed for as long as I can recall.        10:11:34AM

21      Q.        And practice about what?        10:11:36AM

22      A.        Of how disclosure comes about.  10:11:39AM

23      Q.        Did Bank of America have a      10:11:41AM

24   policy about disclosure?  Because you draw   10:11:42AM

25   a distinction.                              10:11:46AM

Page 108

```
1                LEWIS - CONFIDENTIAL
2     five paragraphs down, "Mr. Price provided    10:58:15AM
3     a Merrill Lynch update"?                      10:58:18AM
4        A.      Right.                             10:58:19AM
5        Q.      "Discussion ensued, including      10:58:19AM
6     government actions, potential accounting      10:58:21AM
7     rule changes, proposed tactics of            10:58:23AM
8     competitors, and OCC directives."            10:58:25AM
9              Do you see that?                     10:58:28AM
10       A.      I do.                              10:58:28AM
11       Q.      During this -- this was a phone    10:58:29AM
12    call.  During this telephone conference of    10:58:32AM
13    the board of directors, did Mr. Price say     10:58:35AM
14    anything to the board regarding Merrill       10:58:38AM
15    Lynch's fourth quarter losses?               10:58:41AM
16       A.      I don't recall this meeting,       10:58:43AM
17    much less any specific discussion.  I know    10:58:46AM
18    we had them, and obviously we had this        10:58:49AM
19    meeting, but I don't recall it.              10:58:52AM
20       Q.      So you don't recall whether or     10:58:53AM
21    not he informed the board -- said anything    10:58:56AM
22    about Merrill Lynch's fourth quarter          10:58:59AM
23    losses during this telephone call?           10:59:01AM
24       A.      I don't recall.                    10:59:03AM
25       Q.      Now, at some point after the --    10:59:03AM
```

Page 109

1                LEWIS - CONFIDENTIAL

2    at some point in December 2008, you            10:59:24AM

3    learned that Merrill's fourth quarter          10:59:30AM

4    losses had increased; is that correct?         10:59:32AM

5        A.      That's correct.                     10:59:33AM

6        Q.      And when was that?                  10:59:34AM

7        A.      I do remember two dates,            10:59:35AM

8    December 3rd and then December 5th,            10:59:38AM

9    because that's my sister's birthday.  But      10:59:40AM

10   December 3rd was both a profit plan            10:59:43AM

11   meeting and an update on the Merrill           10:59:47AM

12   losses.  And I recall a $7 billion number.     10:59:50AM

13       Q.      Just so I'm clear, so you          10:59:55AM

14   learned about $5 billion in losses             10:59:59AM

15   sometime in November, right?                   11:00:02AM

16       A.      Correct.                           11:00:05AM

17       Q.      And the next thing -- and then     11:00:09AM

18   December 3rd you learned that losses had       11:00:10AM

19   grown to $7 billion, correct?                  11:00:12AM

20       A.      Estimated losses for the           11:00:14AM

21   quarter, yes.                                   11:00:15AM

22       Q.      Estimated losses had grown to      11:00:15AM

23   $7 billion.                                     11:00:18AM

24               In between those periods of        11:00:19AM

25   time, when Mr. Price talked to you about       11:00:21AM

Page 111

1              LEWIS - CONFIDENTIAL

2       Q.      So on December 3rd you learned  11:01:07AM

3    the estimated loss had grown to $7         11:01:13AM

4    billion.  And how did you learn that?      11:01:17AM

5    Tell me.                                    11:01:19AM

6       A.      There was a meeting with Joe     11:01:20AM

7    Price, Neil Cotty, John Thain and myself,  11:01:23AM

8    it may have been somebody else, but that's 11:01:27AM

9    who I recall being in the meeting.  And to 11:01:29AM

10   the best of my recollection, John was on   11:01:31AM

11   the phone, but that's just my              11:01:33AM

12   recollection.                              11:01:36AM

13      Q.      And where were -- so Mr. Thain   11:01:39AM

14   was on the phone?                          11:01:42AM

15      A.      Right.                          11:01:43AM

16      Q.      And where were you and          11:01:44AM

17   Mr. Price and Mr. Cotty?                   11:01:48AM

18      A.      To the best of my knowledge, it 11:01:50AM

19   was in Joe Price's office at his           11:01:51AM

20   conference table.  It could have been in   11:01:56AM

21   my conference room.  But I think that it   11:01:58AM

22   was in his office.                         11:02:01AM

23      Q.      And what was the purpose of the 11:02:02AM

24   call?                                      11:02:04AM

25      A.      Well, there were several        11:02:05AM

Page 115

```
1              LEWIS - CONFIDENTIAL
2    estimate, 20 days, loss of another $1.842    11:05:29AM
3    billion.  So according to date, estimate     11:05:34AM
4    is almost $6.4 billion, and then December     11:05:38AM
5    BTG -- what does BTG mean?  Do you see        11:05:42AM
6    that?                                         11:05:46AM
7        A.      I don't know what that stands     11:05:46AM
8    for.                                          11:05:47AM
9        Q.      Probably something to go?         11:05:48AM
10   Balance to go, I'm told.  All right, we       11:05:52AM
11   got it.                                       11:05:54AM
12       A.      Balance to go.                    11:05:54AM
13       Q.      Balance to go, okay.  But I       11:05:55AM
14   read this correctly, right, in terms of       11:05:58AM
15   the numbers on here?                          11:05:59AM
16       A.      Yes.                              11:06:00AM
17       Q.      Now, during this call, there      11:06:00AM
18   was a discussion about increasing the         11:06:07AM
19   projected losses for the fourth quarter of    11:06:12AM
20   2008, correct?                                11:06:15AM
21       A.      No, I wouldn't characterize it    11:06:17AM
22   as that.  To the best of my recollection,     11:06:19AM
23   after we looked at this, I asked Neil         11:06:22AM
24   Cotty, "Neil, obviously," and said           11:06:24AM
25   "obviously the market is so volatile, it      11:06:28AM
```

Page 116

```
 1              LEWIS - CONFIDENTIAL
 2   is hard to predict, but give me a downside   11:06:31AM
 3   on this number."                             11:06:34AM
 4              My recollection is he said,       11:06:36AM
 5   "Well, I will say $2 billion, but I need     11:06:37AM
 6   to describe it as a wild-ass guess, a        11:06:43AM
 7   WAG."  And then subsequently he put the      11:06:47AM
 8   guess into -- added it to the $7 billion.    11:06:49AM
 9       Q.      Did he use that -- he used that  11:06:53AM
10   word, "this is a wild-ass guess"?            11:06:56AM
11       A.      Right.                           11:06:58AM
12       Q.      Or did he call it a WAG?         11:06:58AM
13       A.      Well, I don't know if he said    11:07:01AM
14   "WAG" or "wild-ass guess," but he said one   11:07:03AM
15   or the other.                                11:07:06AM
16       Q.      Well, which one did he --        11:07:07AM
17       A.      I don't recall.                  11:07:09AM
18       Q.      But he either said this is a     11:07:10AM
19   wild-ass guess or a WAG, and it is -- what   11:07:12AM
20   did you say, $2 billion?                     11:07:15AM
21       A.      $2 billion is what I recall      11:07:17AM
22   after tax.                                   11:07:19AM
23       Q.      Why were you asking him --       11:07:19AM
24   after tax, okay.  What was it pretax, $3     11:07:20AM
25   billion?                                     11:07:22AM
```

Page 117

```
 1              LEWIS - CONFIDENTIAL
 2        A.       $3 billion, yeah.           11:07:22AM
 3        Q.       Why were you asking him about  11:07:24AM
 4    downside in this number?                  11:07:28AM
 5        A.       Well, it just -- the numbers  11:07:30AM
 6    seemed to get bigger, you know, each time  11:07:32AM
 7    we looked at it in terms of because it was 11:07:35AM
 8    an estimate.  So the previous estimate     11:07:38AM
 9    would have been for the entire period, and 11:07:40AM
10    so this new estimate for the entire period 11:07:42AM
11    had grown and I wanted to kind of have a   11:07:45AM
12    downside.                                  11:07:49AM
13        Q.       So he said $3 billion pretax,  11:07:50AM
14    or $2 billion after tax, whatever it is,   11:08:08AM
15    the downside, and what did you say in      11:08:10AM
16    response to that?                          11:08:12AM
17        A.       I don't recall, but, again, we 11:08:13AM
18    put it in the number.                      11:08:15AM
19        Q.       Mr. Cotty testified in this    11:08:17AM
20    case, I will just tell you, I will try to  11:08:20AM
21    refresh your recollection, he said that -- 11:08:22AM
22    he said "I think we were going to go on to 11:08:28AM
23    2009, and Ken said something to the        11:08:32AM
24    effect, wait a minute, Neil, we've got to  11:08:34AM
25    close down 2008.  And Ken asked John how   11:08:37AM
```

Page 149

```
 1              LEWIS - CONFIDENTIAL
 2    Wachtell memo, and it says that, you know,   11:41:02AM
 3    the need to reduce assets was identified     11:41:04AM
 4    just before Thanksgiving.  So I'm just       11:41:06AM
 5    wondering if that would ring a bell that     11:41:08AM
 6    here we are right before Thanksgiving,       11:41:11AM
 7    this came up.                                11:41:14AM
 8        A.      No, it doesn't ring a bell.      11:41:14AM
 9        Q.      You also had a -- withdrawn.     11:41:16AM
10                You've also I think testified    11:41:35AM
11    to the SEC that you had a discussion with    11:41:38AM
12    Mr. Price on December 3rd, 2008 regarding    11:41:41AM
13    disclosure of Merrill's losses, a second     11:41:45AM
14    conversation?                                11:41:47AM
15        A.      Right.                           11:41:48AM
16        Q.      Is that accurate?                11:41:48AM
17        A.      Yes.                             11:41:49AM
18        Q.      And you remember it being        11:41:49AM
19    December 3rd?                                11:41:50AM
20        A.      I do not remember the date.      11:41:52AM
21    But I remember -- I remember the             11:41:53AM
22    conversation with Joe.                       11:41:55AM
23        Q.      Tell me, do you recall           11:41:56AM
24    generally the timing of that conversation?   11:41:59AM
25        A.      I don't.                         11:42:00AM
```

Page 150

1              LEWIS - CONFIDENTIAL

2      Q.      Tell me the --              11:42:01AM

3      A.      I know it was before December  11:42:02AM

4   the 5th.   That's all I remember.       11:42:04AM

5      Q.      Tell me about that          11:42:06AM

6   conversation.                          11:42:09AM

7      A.      I can't remember it verbatim,  11:42:09AM

8   but he said he had gone to Tim Mayopoulos,  11:42:14AM

9   and I don't know if he said Herlihy, or  11:42:19AM

10  Ed, but I knew who it was, that is       11:42:23AM

11  somebody at Wachtell Lipton, and gone over  11:42:26AM

12  the issue of disclosure again.  I said   11:42:28AM

13  gone to, I meant talked to; I don't mean  11:42:30AM

14  necessarily physically going there.      11:42:33AM

15              And the word back was that the  11:42:39AM

16  same reasons that were given in November,  11:42:41AM

17  they still held.                         11:42:44AM

18     Q.      I don't know if you were     11:42:52AM

19  finished.                               11:42:54AM

20     A.      I'm finished, yes.           11:42:55AM

21     Q.      Well, what prompted Mr. Price  11:42:57AM

22  to go back to Mr. Mayopoulos at that time;  11:43:02AM

23  do you recall?                          11:43:07AM

24     A.      I don't recall.  It seems    11:43:07AM

25  logical that if you went with 5, you would  11:43:10AM

Page 151

1           LEWIS - CONFIDENTIAL
2    go with 7 plus 2.                      11:43:15AM
3        Q.      Did Mr. Price tell you why he  11:43:17AM
4    had gone back to Mr. Mayopoulos?        11:43:28AM
5        A.      I don't recall him saying.  He  11:43:30AM
6    just said he -- the best I can recall, he  11:43:31AM
7    just said he had done that.             11:43:33AM
8        Q.      And did he tell you -- you said 11:43:34AM
9    7 plus 2.  Did he tell you he gave him --  11:43:37AM
10   withdrawn.                              11:43:41AM
11           Mr. Price didn't say anything,  11:43:41AM
12   but you are assuming that Mr. Price went  11:43:45AM
13   back to Mr. Mayopoulos because you now had  11:43:47AM
14   a larger estimate for Merrill Lynch's   11:43:49AM
15   fourth quarter, right?                  11:43:51AM
16       A.      Correct.                    11:43:52AM
17       Q.      What was the estimate at the  11:43:53AM
18   time -- or what estimate did Mr. Price  11:43:55AM
19   provide Mr. Mayopoulos?                 11:43:57AM
20       A.      I don't know, because I wasn't  11:43:59AM
21   privy to the conversation.  My assumption  11:44:01AM
22   was that it was $9 billion.             11:44:03AM
23       Q.      And what is your assumption  11:44:05AM
24   based on?                               11:44:06AM
25       A.      Because we had added the two  11:44:07AM

Page 170

1              LEWIS - CONFIDENTIAL

2    anticipated that, yes.                    12:17:53PM

3        Q.       And also accurate at the time   12:17:54PM

4    of due diligence what you were estimating   12:17:55PM

5    dilution to be, right?                    12:17:57PM

6        A.       Yeah, as best as I can recall,   12:17:58PM

7    yeah.                                     12:18:01PM

8        Q.       That's a significant change in   12:18:01PM

9    the dilution and accretion analysis; you   12:18:07PM

10   would agree with that?                    12:18:10PM

11       A.       Yes.                          12:18:11PM

12       Q.       And you are aware in this       12:18:11PM

13   case -- accretion was important to you in   12:18:16PM

14   doing this deal, right?  I think you       12:18:17PM

15   testified that that was something you were   12:18:19PM

16   very focused on; is that fair to say?      12:18:21PM

17       A.       Right.                        12:18:23PM

18       Q.       And Bank of America and Merrill 12:18:23PM

19   Lynch, I think we've said, they filed a    12:18:26PM

20   joint proxy statement in connection with   12:18:28PM

21   the merger, right?                        12:18:30PM

22       A.       Right.                        12:18:31PM

23       Q.       On or about November 3rd?      12:18:32PM

24       A.       I don't recall the date.      12:18:35PM

25       Q.       Did you read that proxy before 12:18:37PM

Page 171

1              LEWIS - CONFIDENTIAL
2    it was filed?                          12:18:38PM
3        A.      I did.                      12:18:39PM
4        Q.      Did you read the whole thing?  12:18:40PM
5        A.      I read it.  I didn't proofread  12:18:41PM
6    it, but I read it.                      12:18:43PM
7        Q.      The whole thing, you read?  12:18:44PM
8        A.      Uh-huh.                     12:18:45PM
9        Q.      You sat down and read it?   12:18:46PM
10       A.      Uh-huh.                     12:18:47PM
11       Q.      Do you recall there being in  12:18:48PM
12   there a section entitled Bank of America's  12:18:56PM
13   Reasons for the Merger, Recommendations of  12:18:58PM
14   the Bank of America Board of Directors?  12:19:01PM
15       A.      I recall reading that section,  12:19:02PM
16   but I don't recall the reasons.        12:19:05PM
17       Q.      Let me hand it to you.  So I'm  12:19:07PM
18   going to show you -- you can put -- just  12:19:11PM
19   leave that open, that one.             12:19:15PM
20               But I'm going to show you what  12:19:17PM
21   has been marked as Plaintiffs' Exhibit  12:19:19PM
22   149, and this is actually a copy of the  12:19:20PM
23   joint proxy.  You can ignore I guess the  12:19:27PM
24   first couple of pages.  But, in any event,  12:19:31PM
25   please just take a look at that, if you  12:19:34PM

Page 274

|   |   |   |
|---|---|---|

1          LEWIS - CONFIDENTIAL

2     Mr. Alphin that Merrill Lynch had paid its    03:29:10PM

3     bonuses prior to year-end, what did you       03:29:13PM

4     say to him?                                   03:29:15PM

5          A.      Well, I don't recall what I      03:29:17PM

6     said to him.                                  03:29:18PM

7          Q.      Did you do anything?             03:29:20PM

8          A.      Not to my recollection.          03:29:22PM

9          Q.      Did you speak to John Thain?     03:29:23PM

10         A.      I don't recall speaking to him.  03:29:26PM

11    I may have, but I don't recall speaking to    03:29:27PM

12    him.                                          03:29:29PM

13         Q.      Do you recall speaking to        03:29:29PM

14    anyone about this issue other than            03:29:30PM

15    Mr. Alphin?                                   03:29:32PM

16         A.      No, I do not.  I very well       03:29:33PM

17    could have talked to, again, Temple Sloan     03:29:35PM

18    about it, but I don't recall the              03:29:38PM

19    conversation.                                 03:29:39PM

20         Q.      Now, at some point did you       03:29:39PM

21    learn that Bank of America had                03:29:42PM

22    contractually agreed to allow Merrill         03:29:44PM

23    Lynch to pay bonuses to its employees         03:29:47PM

24    before year-end?                              03:29:50PM

25         A.      No.  I learned at some point     03:29:52PM

Page 275

1                    LEWIS - CONFIDENTIAL
2      that there was -- that we had jointly      03:29:55PM
3      agreed to a ceiling on the amount of       03:29:59PM
4      bonuses to be paid, but I don't recall the 03:30:02PM
5      issue of when they paid them being an      03:30:03PM
6      issue.                                     03:30:05PM
7          Q.        When did you become aware of 03:30:09PM
8      that joint agreement to the ceiling on the 03:30:59PM
9      amount of bonuses?                         03:31:06PM
10         A.        I don't remember.            03:31:07PM
11         Q.        Was it in 2008?              03:31:07PM
12         A.        I don't recall.              03:31:09PM
13         Q.        It could have been after 2008? 03:31:10PM
14         A.        I guess it could have been.  I 03:31:13PM
15     just don't remember.                       03:31:15PM
16         Q.        What was your reaction to that 03:31:15PM
17     when you found that out?                   03:31:18PM
18         A.        Well, I would expect them to 03:31:20PM
19     pay bonuses.  I would hope they would pay  03:31:22PM
20     bonuses so they could retain the key       03:31:24PM
21     people.  I didn't focus on the amount      03:31:26PM
22     because I knew Steele and Andrea Smith had 03:31:28PM
23     probably focused on that.                  03:31:31PM
24         Q.        So did you think that even with 03:32:04PM
25     the cap in place, was it your              03:32:07PM

# Exhibit 2

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

C.A. No. 4307-CS

IN RE:  BANK OF AMERICA

CORPORATION STOCKHOLDER

DERIVATIVE LITIGATION,


\*\*\* CONFIDENTIAL \*\*\*


VIDEOTAPED DEPOSITION OF KENNETH D. LEWIS


Taken on Behalf of the Plaintiffs


DATE TAKEN:     MARCH 6, 2012

TIME:           8:59 a.m. - 6:26 p.m.

PLACE:          LA PLAYA BEACH & GOLF RESORT
                9891 GULF SHORE DRIVE
                NAPLES, FLORIDA 34108


Examination of the witness taken before:

Joan L. Pitt
Registered Merit Reporter
Certified Realtime Reporter
Florida Professional Reporter
HUDSON REPORTING & VIDEO          1-800-310-1769

182

1   this document?

2       A.   I don't recall having any input.  I have read

3   it.

4       Q.   Did you read it before it was mailed to the

5   stockholders?

6       A.   Yes, as best I can recall, I saw a draft before

7   it was -- before it was sent.

8       Q.   Did you go through it and --

9       A.   I did.

10      Q.   Did you review it for accuracy?

11      A.   I did.

12      Q.   Let me ask you to look at page 49.  There's a

13  section that begins Background of the Merger.  Do you

14  see that?

15      A.   I do.

16      Q.   Did you review that section?

17      A.   I did.

18      Q.   Find anything to be inaccurate?

19      A.   Not that I -- no, because I would have called

20  somebody and told them.

21      Q.   Let me ask you to look at page -- the section

22  beginning on page 54 that's titled Bank of America

23  Reasons for the Merger, Recommendation of the Bank of

24  America Board of Directors.  Do you see that?

25      A.   I do.

183

1    Q.   Did you review that section?

2    A.   I did.

3    Q.   Do you find anything to be inaccurate?

4    A.   I did not.

5    Q.   And one of the -- do you see that one of the

6    material factors listed as having been considered by the

7    board was the fairness opinions?

8    A.   The 1, 2, 3, 4, right?

9    Q.   Well, there are -- they carry over onto page

10   55.

11   A.   Okay.  I see that, yes.

12   Q.   You don't disagree with that, correct?

13   A.   No, I think that was one -- one reason, yeah.

14   Q.   And the third bullet from the top of page 55

15   refers to the estimates of accretion-dilution, correct?

16   A.   The third from the top?

17   Q.   The third from the top of page 55.   Third

18   bullet.

19   A.   Yeah, I see the -- I see the bullet point.

20   Q.   You don't disagree with that, do you?

21   A.   I didn't at the time, no.

22   Q.   You don't now?

23   A.   Well, I've got a lot more information now.

24   Q.   But, I mean, you don't disagree as of this

25   ' time?

New York
Connecticut

Hudson Reporting & Video
Nationwide 1-800-310-1769

New Jersey
Pennsylvania

184

```
 1      A.   No, no.

 2      Q.   Let me ask you to look at page -- the section

 3   beginning on page 63, which is titled Opinions of Bank

 4   of America's Financial Advisors.  Do you see that?

 5      A.   I do.

 6      Q.   Did you review that section?

 7      A.   I did.

 8      Q.   Did you find anything inaccurate in it?

 9      A.   No.

10      Q.   Let me ask you to look at the exhibit that

11   begins on page C-1.  You see that?

12      A.   I don't know how I would find it.

13           MR. CERESNEY:  Towards the back.

14      Q.   Towards the back.  Very -- almost to the end of

15   the document.  It has C-1 at the bottom of the page.

16      A.   Oh, I see.  Okay, I got it.

17      Q.   Did you review C-1 and C-2, which is the

18   J.C. Flowers opinion letter?

19      A.   I read the whole thing.  I don't remember this

20   now, but -- but I read the whole thing, so I would have

21   read this.

22      Q.   Okay.  So you read also the FPK opinion letter

23   attached, right?

24      A.   Right.

25      Q.   Did you have any discussion with any of the
```

1      Q.    And the third paragraph from the bottom

2    indicates that Mr. Price updated fourth quarter results

3    and projected earnings per share, including reasons for

4    movement of market impacts.  Do you see that?

5      A.    I do.

6      Q.    Did Mr. Price talk about Merrill there?

7      A.    I don't recall.

8      Q.    On the next page, about the middle of the page

9    there is an indication that Mr. Price provided a Merrill

10   Lynch update.  Do you see that?

11     A.    Right, I do.

12     Q.    And by this time, November 21, had Mr. Price

13   shared with you information relating to the fourth

14   quarter estimate that he had received on the 12th?

15     A.    Again, what I remember is in November he shared

16   what I think I recall as a $5 billion loss number, but I

17   don't recall the -- the specific date.

18     Q.    Well, prior to the board meetings in November,

19   would Mr. Price and you discuss what Mr. Price was going

20   to convey to the board?

21     A.    Usually -- usually he would -- and I think

22   maybe -- I think always, but I'm not sure, but the

23   practice was for him to send me his, not his

24   presentation, but his slides.

25     Q.    And what about with respect to the -- the

206

1    He would just walk to my office and sit down and talk.

2    But I don't recall him doing anything, but it's

3    possible.

4        Q.   His office is close to yours, was close to

5    yours?

6        A.   Next to mine.

7        Q.   And after the board call, there's a -- at 11

8    there's a write-in matter relating to John Thain.  Do

9    you see that?

10       A.   Right.

11       Q.   What was that relating to?

12       A.   This looks to me like a -- it was a meeting

13   with John Thain, but I don't recall the meeting.  The

14   handwriting is -- is Brenda Meredith's.

15       Q.   As of November 21, 2008, did you -- were you

16   aware that some discussions had been had with

17   Mr. Mayopoulos and Wachtell relating to disclosure

18   around losses?

19       A.   The meeting that I described that I had in

20   November where I -- where I learned of a $5 billion

21   number, as best I can recollect, was the time that I

22   also heard that Joe -- well, Joe told me that he had

23   gone to Tim Mayopoulos and asked if he -- if he thought

24   that this number would be something that would -- should

25   be disclosed, and Joe told me that Tim had said he

207

1   had -- he did not think so.  And I don't recall if he

2   said that before or after he contacted Wachtell Lipton,

3   but it's my understanding that Tim actually did call

4   Wachtell Lipton and that there was consensus on the fact

5   that that was not a disclosable event.

6       Q.   Did -- was that discussion you had with

7   Mr. Price prior to the November 21 board call?

8       A.   I don't know how many times I need to say it.

9   I honestly do not recall when that meeting took place.

10      Q.   But it was in November?

11      A.   But -- I'm -- I'm almost positive that it was

12  in November.

13           MR. KRINER:  Off the record.

14           THE VIDEOGRAPHER:  Going off the record.  The

15      time is 3:02 p.m.

16           (Recess from 3:02 until 3:14 p.m.)

17           THE VIDEOGRAPHER:  Back on the record.  The

18      time is 3:14 p.m.

19  BY MR. KRINER:

20      Q.   Mr. Lewis, let me ask you to take a look at

21  your calendar, Exhibit 5 --

22      A.   Okay.

23      Q.   -- and specifically the column that relates to

24  December 3rd, 2008, which I believe is page Bates 3724.

25  That would be the right-hand column, I believe.

211

1    review the new estimate for the fourth quarter loss.

2           (Lewis Exhibit No. 33 was marked for

3    identification.)

4      Q.    The reporter's handed you Exhibit 33, which is

5    some e-mail traffic on December 3rd, and it has some

6    attachments relating to Merrill Lynch.  Do you have

7    that?

8      A.    I do.

9      Q.    And there's an attachment that begins on page

10   BAC-ML-DE00018866, and it's titled Merrill Lynch & Co

11   2008 4Q Pacing & FY Forecast Scenario.  Do you see that?

12     A.    I do.

13     Q.    Did you receive a copy or see a copy of this

14   document on December 3rd?

15     A.    I don't recall specifically if -- if it was

16   this document, but I did receive a document, and I do

17   remember, as I mentioned, a $7 billion after tax loss.

18     Q.    And how did the $7 billion after tax loss

19   estimate compare with the assumption that you had in

20   mind for the fourth quarter of '08 for Merrill Lynch at

21   the time the board approved the transaction?

22     A.    It was $7 billion more of a loss, because

23   the -- the -- what I was told was that the company was

24   expecting a break-even quarter.

25     Q.    And let me ask you to look at page

222

 1    might want to see that estimate of the fourth quarter

 2    loss for Merrill prior to the stockholder vote?

 3         A.    I didn't focus on the directors as much as I

 4    focused on Joe coming to me and telling me that he had

 5    gone again to see if there was a need for public

 6    disclosure of that -- of that loss.

 7         Q.    And so did you personally make a decision about

 8    whether that information should be disclosed?

 9         A.    No, I was not the decision-maker.  The process

10    called for Joe to be the point person in coordination

11    with the general counsel, and that was the process we'd

12    followed for decades.

13         Q.    You as a director and chairman of Bank of

14    America, were you required to accept the advice of

15    counsel as far as whether disclosure was required or

16    not?

17         A.    I don't know if there's a legal -- a legal

18    requirement, but I do not have a legal background and I

19    always thought it was in the best interest of the

20    shareholders to keep it pure and let your chief

21    financial officer and general counsel come to an opinion

22    and then follow that -- and follow that advice.

23         Q.    But ultimately the decision is with the

24    chairman of the board and the directors about what gets

25    disclosed and what not, right, perhaps based on the

223

1  advice of counsel, correct?

2      A.    It -- yeah, the final say is the directors and

3  the board -- excuse me -- the board and the chairman,

4  but it was based on the advice of Joe -- of counsel and

5  Joe.

6      Q.    But the directors, you or any of the other

7  directors, are not required to accept the advice of

8  counsel about that disclosure, correct?

9      A.    It was -- it was my opinion that was the much

10  better way to go, and I consciously made a decision that

11  I should not be involved in the process because I did

12  not have a legal background.

13          Further, I had been told on several occasions

14  that securities law is very complicated and that even --

15  that even good corporate lawyers defer to security

16  lawyers on -- on the subject.

17     Q.    Did you also consciously decide not to give

18  that decision to the outside directors?

19     A.    I don't know when I talked to them.  I don't

20  know -- I don't recall talking about it.  I don't know

21  that I didn't, but just don't remember talking about it.

22     Q.    But you didn't take the information to them

23  before the stockholder vote, correct?

24     A.    No, the information was in the hands of Joe

25  Price, who talked to Tim Mayopoulos, and I was told

# Exhibit 3

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Ken Lewis                                    October 30, 2009

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------)
                              )
SECURITIES and EXCHANGE       )
COMMISSION,                   )
                              )
              Plaintiff,      )
                              )
        VS.                   )
                              )
BANK OF AMERICA,              )
                              )
              Defendant.      )
                              )
------------------------------)

VIDEOTAPED DEPOSITION OF KEN LEWIS

New York, New York

Friday, October 30, 2009

Reported by:
Robert X. Shaw, CSR
CSR NO. 817
JOB NO. 304938

Ken Lewis                                    October 30, 2009

Page 16

1                    Ken Lewis

2      over time.

3           Q.   Okay.

4                How many mergers or acquisitions

5      has Bank of America participated in since

6      you've been CEO?

7           A.   Since I've been CEO, we've done

8      Fleet.  We've done U.S. Trust.

9                MBNA. And Merrill Lynch.

10          Q.   Countrywide Financial?

11          A.   I'm sorry.  Countrywide.

12          Q.   And what about LaSalle Bank?

13          A.   And LaSalle.

14          Q.   Okay.  Let's take each of those,

15     and talk about them briefly.

16               When was the Fleet acquisition?

17          A.   Fleet was -- gosh, I've forgotten.

18               Was it 2005?

19               I've actually forgotten the date,

20     but.

21          Q.   Okay.

22               What was Fleet?

23          A.   Fleet, it was a bank in the

24     Northeast.

25          Q.   A commercial bank?

Ken Lewis                                    October 30, 2009

Page 22

1                    Ken Lewis
2      Mr. Curl was also involved in the
3      negotiations.
4                    What was the delegation of duties
5      as between the two of you?
6                    MS. WHITE:   This is in the Fleet
7              transaction?
8              Q.    In the Fleet transaction.
9              A.    In the Fleet transaction he was,
10     ah, he was in the background supplying the
11     information, supplying the different stereos
12     on price, but did not, was not the front
13     person in this particular one.
14             Q.    Okay.  You were the front
15     negotiator in that transaction?
16             A.    I was.
17             Q.    Okay.  And the MBNA deal, what was
18     your role?
19             A.    The MBNA deal was a little less --
20     we, he and I both got a 'phone call from
21     Wachtel asking if we would be interested.
22                    And Greg was more negotiator there,
23     and I met one time with Bruce Hammonds, who's
24     the CEO, but Greg was more the person in that
25     one.

Ken Lewis                                    October 30, 2009

1               Ken Lewis

2        Q.    Well, why did you determine to --

3               Why was Mr. Curl the lead

4    negotiator on that transaction, as opposed to

5    the way it had operated with the Fleet

6    transaction?

7        A.    Because Chad Gifford had preferred

8    it to be that way, and it was much lengthier,

9    and there were a lot more social terms in

10   that particular deal than subsequent deals.

11       Q.    And Mr. Gifford is who?

12       A.    Is the CEO and chairman, was the

13   CEO and chairman of Fleet.

14       Q.    So, you're saying the Fleet

15   transaction had a lot more social terms, you

16   said?

17       A.    Correct.

18       Q.    And it was Mr. Gifford's desire

19   that you be lead negotiator?

20       A.    Correct.

21       Q.    What about on the United States

22   Trust deal, who was the lead negotiator on

23   that?

24       A.    Greg.  I got the first 'phone call

25   from Chuck Schwab, and then, then Greg kind

Ken Lewis                                    October 30, 2009

Page 24

1                    Ken Lewis
2    of took it from there, and it was very small,
3    and there were no social issues.
4         Q.    Okay.  And what about the LaSalle
5    deal?
6         A.    LaSalle, Greg did virtually all,
7    because it was owned by ABN AMRO, a foreign
8    bank.  He had the contacts there, and he did
9    virtually all of that.
10        Q.    And the Countrywide deal?
11        A.    Countrywide, it's similar.
12              I had, I had initial contact with
13   the CEO, but then he took it from there, and
14   there had been a previous relationship
15   because we had, we had a preferred stock
16   investment in the company.
17        Q.    On the transactions when Mr. Curl
18   was leading the negotiations, how would he
19   keep you apprised of the developments?
20        A.    He would either come into my office
21   and tell me of the developments, or he would
22   call me, or in some cases he would send
23   usually a person named David Belk, who would
24   happen to have some of the financial data.
25        Q.    And would he ask for your input?

Ken Lewis                                          October 30, 2009

Page 92

1            Ken Lewis
2            MR. BLACK:  We've marked, as
3       Exhibit 36, P-36, a document that's
4       titled "Agreement and Plan of Merger by
5       and between Merrill Lynch and Co. Inc.
6       and Bank of America Corporation."
7            (Plaintiff's Exhibit 36, documents
8       Bates No. 198 to 301, entitled
9       "Agreement and Plan of Merger by and
10      between Merrill Lynch & Co. Inc. and
11      Bank of America Corporation,"  marked
12      for identification as of this date.)
13      Q.   Mr. Lewis, do you recognize this
14  document?
15      A.   I do.
16      Q.   Were you involved in the
17  negotiation over the actual drafting of the
18  merger agreement?
19      A.   No, I was not.
20      Q.   Who was in charge of that?
21      A.   Our counsel and Wachtel Lipton.
22      Q.   And your counsel was who?
23      A.   Tim Mayopoulos, or somebody that he
24  assigned.  I don't know if he did it
25  personally, or if he assigned somebody.

Ken Lewis                                    October 30, 2009

1                   Ken Lewis

2        Q.   And did Mr. Curl have any role in

3    those discussions?

4        A.   It's my understanding that he did.

5        Q.   What was his role?

6        A.   I don't know what -- I think that

7    there were certain things that he would have

8    looked at in here, but I would not know which

9    ones.

10       Q.   Is it fair to say Mr. Curl was in

11   charge of making sure that the negotiated

12   terms were somehow reflected in the merger

13   agreement?

14       A.   Yes.

15       Q.   Can you turn to page, ah, the page

16   that ends with the number 266, please.

17       A.   Yes.

18       Q.   Do you recognize your signature

19   there?

20       A.   I do.

21       Q.   That's your signature?

22       A.   Yes, it is.

23       Q.   When did you sign this document?

24       A.   Either late Sunday night or early

25   morning on the 15th, either the Sunday night,

Ken Lewis                                    October 30, 2009

1                    Ken Lewis
2    they have, in fact, complied with that?
3        A.    I would not be qualified to judge
4    the quality of that work.
5              I would expect them to, to the
6    extent that it needs to be reviewed, to have
7    it reviewed by the right people, and that may
8    include external counsel.
9        Q.    Well, you understand, from the
10   business perspective, when you entered into
11   the merger agreement, you understood the key
12   terms yourself; right?
13       A.    Yes.
14       Q.    And you understood that those were
15   the terms that were to be communicated to the
16   shareholders; correct?
17       A.    (Indicating).
18       Q.    And so, what did you do to ensure
19   that those key terms were, in fact,
20   communicated to shareholders?
21       A.    Um, I had great lawyers and great
22   outside counsel looking at that to see that
23   the document is prepared correctly.
24       Q.    And do you go over the document
25   with them to ensure that, in fact --

705f152f-4975-4132-b529-6195faa3b4ec

Ken Lewis                                    October 30, 2009

Page 196

1                          Ken Lewis
2          A.    No.   I would not feel qualified to
3    go over the document with them.   They are the
4    experts.
5          Q.    Well, when you said you wouldn't be
6    qualified, you're the CEO and chairman of the
7    company; right?
8          A.    Right.   But not a lawyer.
9          Q.    Fair enough.
10               But you have the ability to
11   determine whether or not key information is
12   actually being conveyed to shareholders;
13   right?
14         A.    But I wouldn't know, in totality,
15   what key information needed to be given to
16   shareholders, and they would.
17         Q.    But on any particular point, you
18   would have the ability to determine as to
19   whether or not that point -- for example,
20   price, you would have the ability to
21   determine whether the price was communicated
22   to the shareholders; right?
23         A.    Well, I mean, I have a bond of
24   trust with a finance group, and an accounting
25   group, and an outside counsel that they have

Ken Lewis                                    October 30, 2009

Page 197

1                   Ken Lewis

2      done that.

3           Q.   But that wasn't my question.

4                My question is:  You had the

5      ability to determine whether or not price is

6      being communicated to the shareholders;

7      right?

8           A.   I would be able to look in there

9      and see if it was, yes.

10          Q.   Okay.  So, when you file the proxy

11     statement, do you, in fact, look at the proxy

12     statement to determine whether those key

13     terms that are, in your view, important to

14     the transaction, are, in fact, related in the

15     document?

16          A.   No.  I have the bond of trust with

17     my legal counsel and my finance group.

18          Q.   And in the bond of trust, you have

19     a discussion with them to discuss whether or

20     not the key terms are being conveyed?

21          A.   No.  I have trust that they are

22     conveying it properly, in totality.

23          Q.   So, you have no discussion -- is it

24     your testimony that when you signed the proxy

25     statement, you might review segments, but you

Ken Lewis                                    October 30, 2009

1                    Ken Lewis
2         A.   And, as I mentioned, I was, there's
3    some confusion on my part between the 5.8 and
4    the 4.5, but I knew that -- that range, yes.
5         Q.   And you did not, at any point in
6    time, make inquiry as to whether that cap was
7    going to be disclosed to shareholders?
8         A.   No.
9         Q.   Did you have any discussions with
10   anybody before the vote as to whether or not
11   that information should be disclosed to
12   shareholders?
13        A.   Again, that was not in my
14   consciousness.
15        Q.   The answer is No?
16        A.   No.
17        Q.   Are you aware that the disclosure
18   schedule that set forth the cap was not
19   attached to the merger agreement that was
20   sent to shareholders?
21        A.   No.
22        Q.   All right.  I'm sorry.
23             It was not attached to the merger
24   agreement that was included in the proxy
25   statement that was sent to shareholders?

Ken Lewis                                    October 30, 2009

Page 264

1                      Ken Lewis

2    different times and said he had met with Tim

3    Mayopoulos, and they had discussed the issue

4    with, ah, with Wachtel Lipton, and that the,

5    and that the issue was, should these be in

6    the disclosure, should these be disclosed,

7    and Joe said that the, ah, that they said

8    there was not a disclosable item.

9         Q.    Who is the "they" in the "they

10   said"?

11        A.    They, the lawyers.

12        Q.    Tim Mayopoulos and Wachtel Lipton?

13        A.    Yes, and Wachtel Lipton.

14        Q.    And you said Mr. Price came to you

15   two times?

16        A.    Yes.

17        Q.    When were the two times?

18        A.    I can't recall the time of the

19   first one, but sometime around this time he

20   came to me a second time.

21        Q.    So, "this time" meaning December

22   3rd?

23        A.    Correct.  Sometime around here he

24   came again and said he had gone through the

25   same process and that the, ah, the same

Ken Lewis                                    October 30, 2009

Page 265

1                    Ken Lewis
2       answer came back, it was not a disclosable
3       item.
4            Q.    The first time that he came to you,
5       was that before you had these specific
6       numbers?
7            A.    Um, yes.
8            Q.    And was that in November?
9            A.    I can't remember.
10           Q.    He indicated that the analysis was
11      -- was the analysis the same?
12           A.    Yes.
13           Q.    And what factors went into that
14      analysis?
15           A.    I had subsequently learned
16      probably, I can't remember if I knew then or
17      not, but there were a number of things that
18      Tim had done and Wachtel had done, and they
19      had reviewed the proxy to see if there was
20      disclosure around volatile instruments that
21      would be subject to price fluctuations.
22                 They had gone back and looked at
23      the losses that had occurred prior to that,
24      of that year.
25                 And there was the comment about the

Ken Lewis                                    October 30, 2009

1                    Ken Lewis

2      fact that it was generally known in the

3      marketplace that there is a credit meltdown

4      going on.

5                    I think there was a fourth one, and

6      I can't remember.

7          Q.    Did you have any direct

8      conversation with Mr. Mayopoulos on this

9      topic?

10         A.    No.

11         Q.    Did you have any direct

12     conversation with Wachtel Lipton?

13         A.    Not that I recall.

14         Q.    Did you, yourself, express any

15     position as to whether you thought this

16     information should be disclosed to

17     shareholders?

18         A.    No.  After that extensive ah --

19     dive into it, I would not think that I would

20     be qualified to say what was or what was not.

21         Q.    During the course of that

22     discussion, did you have any input as to what

23     your view was?

24         A.    No.  He gave me the results of

25     their analysis.

Ken Lewis                                    October 30, 2009

Page 295

1                    Ken Lewis
2         Q.    Okay.  Would you describe the
3    process by which you reviewed parts of the
4    proxy statement?
5         A.    Mainly along the lines of things
6    that I had an interest in, or had knowledge
7    of -- for instance, the background.
8              And then, and then the financials,
9    but not a proofread type review.
10        Q.    What else did you do, sir, to
11   assure yourself that the proxy contained all
12   the appropriate information?
13        A.    We'd been in that processing place
14   with the lawyers and the accountants to make
15   sure that everything is in proper form.
16        Q.    Now, I want to ask you some
17   questions about the state of your knowledge
18   at various points in time.
19              As of December 5th, the date of the
20   shareholder meeting, do you know whether the
21   Merrill Lynch comp committee had met to
22   finalize the pools with respect to bonuses?
23        A.    I do not recall that, no.
24        Q.    And, sir, do you know ah --
25              Do you know whether you knew, as of

# Exhibit 4

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1

1
2
3    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
4    Master File No. 09-MD-2058 (PKC)
     ----------------------------------x
5

     IN RE BANK OF AMERICA CORP. SECURITIES,
6    DERIVATIVE AND EMPLOYMENT RETIREMENT
     INCOME SECURITY ACT (ERISA) LITIGATION
7

     ----------------------------------x
8

     THIS DOCUMENT RELATES TO
9    All Securities Actions
10   ----------------------------------x
11

     IN THE COURT OF CHANCERY
12   OF THE STATE OF DELAWARE
     C.A. No. 4307-CS
13   ----------------------------------x
14   IN RE BANK OF AMERICA CORPORATION
     STOCKHOLDER DERIVATIVE LITIGATION
15

     ----------------------------------x
16              December 21, 2011
                9:08 a.m.
17
18       Videotaped Deposition of THOMAS J.
19   MAY, called as a witness by and on behalf of
20   the Plaintiffs, pursuant to the applicable
21   provisions of the Federal Rules of Civil Procedure,
22   before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR #13192,
23   NH-CSR #91, MA-CSR #12393 and Notary Public, within and
24   the Commonwealth of Massachusetts at the Hilton Boston
25   Hotel, 89 Broad Street, Boston, Massachusetts.

74

| | | |
|---|---|---|
| 1 | America board. | 10:50:18 |
| 2 | Those were the essential terms that I | 10:50:20 |
| 3 | recall. | 10:50:22 |
| 4 | Q.    And you weren't asked at this meeting to | 10:50:28 |
| 5 | approve the specific merger agreement; is that | 10:50:29 |
| 6 | correct? | 10:50:31 |
| 7 | A.    That's correct. | 10:50:32 |
| 8 | Q.    Did you ever see the merger agreement for | 10:50:33 |
| 9 | Bank of America's acquisition of Merrill Lynch? | 10:50:35 |
| 10 | A.    Yes. | 10:50:37 |
| 11 | Q.    And when would you have seen that for the | 10:50:37 |
| 12 | first time, sir? | 10:50:39 |
| 13 | A.    I don't recall. | 10:50:40 |
| 14 | Q.    Would it have been after it was executed? | 10:50:40 |
| 15 | A.    I don't recall. | 10:50:46 |
| 16 | Q.    Do you normally review drafts of merger | 10:50:47 |
| 17 | agreements? | 10:50:49 |
| 18 | A.    Typically, not.  We rely on management. | 10:50:50 |
| 19 | It's something that's delegated to management and | 10:50:55 |
| 20 | its outside law firms and expert law firms. | 10:50:59 |
| 21 | In this case, we -- we had Ed Herlihy and | 10:51:02 |
| 22 | his team that were involved and have done many of | 10:51:09 |
| 23 | these -- many of these transactions. | 10:51:15 |
| 24 | Q.    And can you identify Ed Herlihy, please. | 10:51:18 |
| 25 | A.    He was our lead attorney at Wachtell | 10:51:21 |

# Exhibit 5

**To Smolar Declaration in
Support of Motion for Summary Judgment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Master File No. 09-MD-2058 (PKC)
-----------------------------------x

IN RE BANK OF AMERICA CORP. SECURITIES,
DERIVATIVE AND EMPLOYMENT RETIREMENT
INCOME SECURITY ACT (ERISA) LITIGATION

-----------------------------------x

THIS DOCUMENT RELATES TO
All Securities Actions

-----------------------------------x

IN THE COURT OF CHANCERY
OF THE STATE OF DELAWARE
C.A. No. 4307-CS
-----------------------------------x

IN RE BANK OF AMERICA CORPORATION
STOCKHOLDER DERIVATIVE LITIGATION

-----------------------------------x
                December 13, 2011
                9:45 a.m.


        Videotaped Deposition of TERESA

BRENNER, taken by Plaintiffs, pursuant to

Notice, held at the offices of Bernstein

Litowitz Berger & Grossmann LLP, 1285

Avenue of the Americas, New York, New

York, before Todd DeSimone, a Registered

Professional Reporter and Notary Public of

the State of New York.

f161c3c4-3023-4708-9684-b393857066ba

Page 80

| | | |
|---|---|---|
| 1 | T. BRENNER | |
| 2 | right, to understand what the terms of the | 10:49:54AM |
| 3 | deal are? | 10:49:55AM |
| 4 | MS. PARK:  Objection to the | 10:49:56AM |
| 5 | form. | 10:49:57AM |
| 6 | A.      Not necessarily. | 10:49:57AM |
| 7 | Q.      So you can advise the company | 10:49:59AM |
| 8 | about its disclosure obligations without | 10:50:03AM |
| 9 | knowing the terms of the deal; is that | 10:50:05AM |
| 10 | your testimony? | 10:50:06AM |
| 11 | A.      There's a group of people that | 10:50:07AM |
| 12 | we rely on to help us evaluate disclosure | 10:50:08AM |
| 13 | decisions.  We had competent, very | 10:50:12AM |
| 14 | competent, external counsel who had helped | 10:50:14AM |
| 15 | us do many acquisitions over the years and | 10:50:17AM |
| 16 | they assisted us and the internal team | 10:50:20AM |
| 17 | with preparing the documents that were | 10:50:24AM |
| 18 | required to consummate a merger. | 10:50:26AM |
| 19 | Q.      Did you consider it in any | 10:50:27AM |
| 20 | respect part of your responsibility to | 10:50:29AM |
| 21 | make sure that the counsel, the external | 10:50:31AM |
| 22 | counsel, were doing their jobs | 10:50:35AM |
| 23 | appropriately? | 10:50:36AM |
| 24 | A.      I relied on them to do their | 10:50:38AM |
| 25 | jobs appropriately.  I don't believe I -- | 10:50:40AM |

# Exhibit 6

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Page 1

1    *** C O N F I D E N T I A L ***

2

3    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
4    Master File No. 09-MD-2058 (PKC)
     ----------------------------------x
5
     IN RE BANK OF AMERICA CORP. SECURITIES,
6    DERIVATIVE AND EMPLOYMENT RETIREMENT
     INCOME SECURITY ACT (ERISA) LITIGATION
7
     ----------------------------------x
8
9    THIS DOCUMENT RELATES TO
     All Securities Actions
10
11   ----------------------------------x
                    Volume I
12
                  April 5, 2012
13
                   1:28 p.m.
14
15            Videotaped Deposition of JOE L.
16   PRICE, taken by Plaintiffs, pursuant to Notice,
17   held at the Charlotte Marriott City Center, 100 West
18   Trade Street, Charlotte, North Carolina, before
19   Cindy A. Hayden, Registered Merit Reporter,
20   Certified Realtime Reporter and Notary Public of
21   the State of North Carolina.
22
23
24
25

Page 216

1      *** C O N F I D E N T I A L ***
2
3      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
4      Master File No. 09-MD-2058 (PKC)
       ----------------------------------x
5
       IN RE BANK OF AMERICA CORP. SECURITIES,
6      DERIVATIVE AND EMPLOYMENT RETIREMENT
       INCOME SECURITY ACT (ERISA) LITIGATION
7
       ----------------------------------x
8
9      THIS DOCUMENT RELATES TO
       All Securities Actions
10
11     ----------------------------------x
                        Volume II
12
                      April 6, 2012
13
                       8:33 a.m.
14
15                  Videotaped Deposition of JOE L.
16     PRICE, taken by Plaintiffs, pursuant to Notice,
17     held at the Charlotte Marriott City Center, 100 West
18     Trade Street, Charlotte, North Carolina, before
19     Cindy A. Hayden, Registered Merit Reporter,
20     Certified Realtime Reporter and Notary Public of
21     the State of North Carolina.
22
23
24
25

Page 31

| | | |
|---|---|---|
| 1 | Bank of America's financial -- | 01:56:49PM |
| 2 | MR. LIMAN:  Objection to the form. | 01:56:50PM |
| 3 | MR. JEFFRESS:  Objection to form. | 01:56:52PM |
| 4 | BY MR. CASTALDO: | 01:56:53PM |
| 5 | Q.   -- earnings forecast? | 01:56:53PM |
| 6 | MR. LIMAN:  I take it, Greg, an | 01:56:54PM |
| 7 | objection from one suffices for all -- to | 01:56:57PM |
| 8 | preserve the objection for all? | 01:57:00PM |
| 9 | MR. CASTALDO:  That's fine. | 01:57:00PM |
| 10 | MR. LIMAN:  Thanks. | 01:57:01PM |
| 11 | THE WITNESS:  Say that again, I'm | 01:57:02PM |
| 12 | sorry. | 01:57:04PM |
| 13 | BY MR. CASTALDO: | 01:57:11PM |
| 14 | Q.   Now, did you believe it was | 01:57:11PM |
| 15 | important to stay aware of what the consensus | 01:57:12PM |
| 16 | analyst estimates were for Bank of America in | 01:57:16PM |
| 17 | your position as CFO? | 01:57:20PM |
| 18 | MR. LIMAN:  Objection to the form. | 01:57:21PM |
| 19 | THE WITNESS:  Look, it was one of | 01:57:23PM |
| 20 | many things that I was aware of.  I don't | 01:57:26PM |
| 21 | know that I weighed importance one way or | 01:57:29PM |
| 22 | another.  You know, it was one of many. | 01:57:32PM |
| 23 | BY MR. CASTALDO: | 01:57:35PM |
| 24 | Q.   What was your position with Bank of | 01:57:38PM |
| 25 | America when Bank of America acquired | 01:57:42PM |

Page 32

| | | |
|---|---|---|
| 1 | Countrywide Financial? | 01:57:43PM |
| 2 | A.   The -- I was in the CFO role. | 01:57:46PM |
| 3 | Q.   And when was that, sir, if you | 01:57:51PM |
| 4 | recall? | 01:58:02PM |
| 5 | A.   You know, I don't recall the exact | 01:58:02PM |
| 6 | dates.  We had a -- kind of a -- we had an | 01:58:08PM |
| 7 | investment in them and then we ultimately had a | 01:58:11PM |
| 8 | transaction.  I'd have to go back to look to get | 01:58:14PM |
| 9 | the -- you know, the exact dates for you. | 01:58:17PM |
| 10 | Q.   Do you recall Bank of America being | 01:58:20PM |
| 11 | interested in acquiring Lehman Brothers in | 01:58:26PM |
| 12 | September of 2008? | 01:58:28PM |
| 13 | A.   Do -- I recall us looking at Lehman | 01:58:31PM |
| 14 | Brothers. | 01:58:38PM |
| 15 | Q.   And -- and what do you -- do you | 01:58:38PM |
| 16 | recall the details concerning that potential | 01:58:43PM |
| 17 | acquisition? | 01:58:45PM |
| 18 | A.   Again, I remember us looking at it. | 01:58:48PM |
| 19 | It never got to the point of an acquisition. | 01:58:50PM |
| 20 | Be -- be more specific.  You know, I can try to | 01:58:54PM |
| 21 | be -- be more responsive.  I'm sorry. | 01:58:57PM |
| 22 | Q.   How did that interest arise, if you | 01:58:58PM |
| 23 | recall? | 01:59:02PM |
| 24 | A.   Again, I'm not -- I'm only taking | 01:59:02PM |
| 25 | exception to your word interest because I think | 01:59:05PM |

Page 66

| | | |
|---|---|---|
| 1 | utilized earnings forecasts going forward? | 02:41:15PM |
| 2 | MR. LIMAN: Objection, foundation. | 02:41:19PM |
| 3 | THE WITNESS: Just -- just looking | 02:41:21PM |
| 4 | at the way they did this number on here | 02:41:24PM |
| 5 | it looks like they showed forward cash | 02:41:27PM |
| 6 | flows. | 02:41:30PM |
| 7 | BY MR. CASTALDO: | 02:41:31PM |
| 8 | Q. Did you have any concerns during | 02:41:32PM |
| 9 | this weekend, sir, that the analyst estimates | 02:41:33PM |
| 10 | for Merrill Lynch were not either accurate or | 02:41:36PM |
| 11 | reliable? | 02:41:40PM |
| 12 | A. I think my recollection is that | 02:41:43PM |
| 13 | they, you know, seemed reasonable -- it is -- my | 02:41:50PM |
| 14 | recollection is they seemed reasonable subject | 02:41:53PM |
| 15 | to things that were determined in purchase | 02:41:56PM |
| 16 | accounting, you know, at that -- on that | 02:41:59PM |
| 17 | weekend, but, again, this was a -- kind of a | 02:42:02PM |
| 18 | markets-driven business and, you know, that's | 02:42:05PM |
| 19 | the -- that's the -- kind of the estimate that | 02:42:07PM |
| 20 | we had from -- or that I -- I recollect having | 02:42:09PM |
| 21 | in -- from IBES. | 02:42:12PM |
| 22 | Q. And, sir, during the time that you | 02:42:14PM |
| 23 | were CFO, approximately how many companies did | 02:42:19PM |
| 24 | Bank of America acquire? | 02:42:23PM |
| 25 | A. Two, maybe three. | 02:42:26PM |

Page 167

| | |
|---|---|
| 1 | know, that's over on the right-hand side in | 05:19:54PM |
| 2 | addition to those three. | 05:19:55PM |
| 3 | Q.   And so it was your understanding, | 05:19:58PM |
| 4 | sir, that as of November 12th -- well, strike | 05:20:07PM |
| 5 | that. | 05:20:14PM |
| 6 | You expected, sir, as of November | 05:20:14PM |
| 7 | 12th that Merrill Lynch would lose approximately | 05:20:16PM |
| 8 | 10.9 billion dollars for the fourth quarter of | 05:20:19PM |
| 9 | 2008? | 05:20:22PM |
| 10 | MR. JEFFRESS:  Objection, | 05:20:24PM |
| 11 | mischaracterizes the testimony. | 05:20:25PM |
| 12 | THE WITNESS:  Yeah.  What -- what I | 05:20:26PM |
| 13 | expected was the forecast showed this | 05:20:29PM |
| 14 | 10.942 tax affected which gave you six | 05:20:34PM |
| 15 | and a half and there was a tax | 05:20:37PM |
| 16 | transaction that brought it down to four | 05:20:40PM |
| 17 | and a half.  I -- I expected that was the | 05:20:43PM |
| 18 | most current forecast that was available | 05:20:46PM |
| 19 | to me. | 05:20:48PM |
| 20 | BY MR. CASTALDO: | 05:20:49PM |
| 21 | Q.   And what was your reaction to | 05:20:49PM |
| 22 | receiving this forecast? | 05:20:51PM |
| 23 | A.   I believe this is the forecast that, | 05:20:52PM |
| 24 | you know -- or -- you know, forecast or | 05:20:56PM |
| 25 | knowledge of a forecast that prompted me to ask | 05:20:58PM |

Page 168

| | | |
|---|---|---|
| 1 | Mr. -- had to ask Tim Mayopoulos, you know, if | 05:21:01PM |
| 2 | we had some disclosure -- incremental disclosure | 05:21:05PM |
| 3 | obligation around it given a proxy. | 05:21:09PM |
| 4 | Q.   And why did this forecast prompt you | 05:21:12PM |
| 5 | to seek Mr. Mayopoulos's advice on -- on | 05:21:14PM |
| 6 | disclosure? | 05:21:17PM |
| 7 | A.   I mean, I think -- I thought it was | 05:21:21PM |
| 8 | prudent to seek his advice. | 05:21:22PM |
| 9 | Q.   And my question was why, sir? | 05:21:24PM |
| 10 | A.   Because there was a loss, you know, | 05:21:26PM |
| 11 | of this magnitude. | 05:21:29PM |
| 12 | Q.   So it was the mag -- was it the | 05:21:30PM |
| 13 | magnitude of the loss that -- | 05:21:32PM |
| 14 | A.   My -- my -- I don't know about -- I | 05:21:36PM |
| 15 | thought about it that hard.  My recollection is | 05:21:38PM |
| 16 | I've got a forecast and this was a sizable loss | 05:21:40PM |
| 17 | and I, you know, thought it prudent to go to Tim | 05:21:44PM |
| 18 | and ask about it. | 05:21:47PM |
| 19 | Q.   Did you speak to anyone concerning | 05:21:48PM |
| 20 | this forecast prior to seeking Mr. Mayopoulos's | 05:21:52PM |
| 21 | advice? | 05:21:56PM |
| 22 | A.   You know, again, I don't have an | 05:21:57PM |
| 23 | absolute recollection, but I would have received | 05:22:04PM |
| 24 | it from Neil and had to get an understanding of | 05:22:06PM |
| 25 | it, you know, from -- from him, so somewhat.  I | 05:22:08PM |

Page 201

| | | |
|---|---|---|
| 1 | A.    I mean, Tim would have made -- I | 06:11:17PM |
| 2 | mean, the -- the way the control mechanisms are | 06:11:19PM |
| 3 | set up in the company, you know, he would have | 06:11:22PM |
| 4 | made Amy aware, which is where he reported to, | 06:11:24PM |
| 5 | and I guess is -- and I would have made Ken | 06:11:27PM |
| 6 | aware.  You know, I mean, we'd have, you know -- | 06:11:29PM |
| 7 | in other words, it wouldn't have stopped there | 06:11:31PM |
| 8 | if it wasn't following counsel's advice. | 06:11:33PM |
| 9 | Q.    And you testified, sir, that you | 06:11:38PM |
| 10 | ultimately gave Mr. Lewis the details of this | 06:11:47PM |
| 11 | decision; is that correct, after November 20th? | 06:11:51PM |
| 12 | MR. JEFFRESS:  Objection to form. | 06:11:55PM |
| 13 | THE WITNESS:  I ultimately informed | 06:11:58PM |
| 14 | Ken that based on the work that had been | 06:12:03PM |
| 15 | done, you know, that we didn't think that | 06:12:05PM |
| 16 | there was any incremental disclosure | 06:12:08PM |
| 17 | necessary.  That's -- I mean, that's my | 06:12:10PM |
| 18 | recollection, yes, sir. | 06:12:11PM |
| 19 | BY MR. CASTALDO: | 06:12:19PM |
| 20 | Q.    Did you discuss with Mr. Mayopoulos | 06:12:36PM |
| 21 | or Wachtell the possibility that the losses | 06:12:39PM |
| 22 | would continue at Merrill Lynch in November and | 06:12:42PM |
| 23 | December? | 06:12:46PM |
| 24 | MR. LIMAN:  Objection to the form. | 06:12:47PM |
| 25 | THE WITNESS:  You know, my -- my | 06:12:49PM |

Page 237

| | | |
|---|---|---|
| 1 | you know, where they're necessary but not | 08:52:32AM |
| 2 | anything of this nature, no, sir. | 08:52:34AM |
| 3 | Q.    Not in connection with any | 08:52:36AM |
| 4 | disclosure issues? | 08:52:37AM |
| 5 | A.    No, sir. | 08:52:38AM |
| 6 | Q.    And, Mr. Price -- Price, we briefly | 08:52:41AM |
| 7 | discussed yesterday your conversations with | 08:52:45AM |
| 8 | Mr. Lewis regarding this decision; do you | 08:52:48AM |
| 9 | recall -- do you recall that discussion? | 08:52:52AM |
| 10 | A.    Yes, sir. | 08:52:55AM |
| 11 | Q.    Do you remember how soon after the | 08:52:56AM |
| 12 | 20th you informed Mr. Lewis of this decision? | 08:53:00AM |
| 13 | A.    No.   Ken and I, you know, interacted | 08:53:04AM |
| 14 | daily on a number of things and I generally kept | 08:53:13AM |
| 15 | him apprised, so I don't remember the exact or | 08:53:16AM |
| 16 | the specific -- specific time. | 08:53:19AM |
| 17 | Q.    And -- and what did you specifically | 08:53:20AM |
| 18 | tell Mr. Lewis regarding this decision? | 08:53:22AM |
| 19 | A.    Again, I don't recollect the exact | 08:53:25AM |
| 20 | conversation, but I would have let him know that | 08:53:28AM |
| 21 | I called the question, you know, and asked the | 08:53:31AM |
| 22 | question and that, you know -- I may have | 08:53:34AM |
| 23 | updated him in the interim and said a process | 08:53:35AM |
| 24 | was going on but ultimately with the conclusion | 08:53:38AM |
| 25 | told him the conclusion that we reached. | 08:53:41AM |

Page 238

| | | |
|---|---|---|
| 1 | Q.   And did you tell him specifically | 08:53:43AM |
| 2 | that you had decided disclosure was not | 08:53:47AM |
| 3 | necessary at this time? | 08:53:50AM |
| 4 | A.   Again, as we talked about yesterday, | 08:53:53AM |
| 5 | you know, I think this was more of the consensus | 08:53:55AM |
| 6 | of the group.  I mean, clearly Tim had a | 08:53:58AM |
| 7 | recommendation, but, you know, we collectively | 08:54:00AM |
| 8 | in the group all thought it made sense and | 08:54:02AM |
| 9 | that's what we followed and I followed.  I | 08:54:05AM |
| 10 | probably conveyed to him more in the context of | 08:54:07AM |
| 11 | that was, you know, what the -- what the -- what | 08:54:10AM |
| 12 | the process was. | 08:54:13AM |
| 13 | Q.   And do you recall the reasons -- | 08:54:15AM |
| 14 | explaining the reasons why the decision was made | 08:54:20AM |
| 15 | to Mr. Lewis? | 08:54:22AM |
| 16 | A.   You know, I had -- I don't -- I | 08:54:25AM |
| 17 | don't recollect exact conversation.  My -- my, | 08:54:32AM |
| 18 | again, vague recollection is I would have, you | 08:54:35AM |
| 19 | know, kind of just given him the crux of the -- | 08:54:37AM |
| 20 | of the answer being that -- you know, the | 08:54:40AM |
| 21 | conclusion of the disclosures that were already | 08:54:42AM |
| 22 | out there, you know, et cetera.  I don't think | 08:54:44AM |
| 23 | I'd have taken him through all the details | 08:54:45AM |
| 24 | entirely. | 08:54:48AM |
| 25 | Q.   Did you ask Mr. Lewis his opinion | 08:54:50AM |

Page 245

| | | |
|---|---|---|
| 1 | others, what that was, and that's my | 09:00:56AM |
| 2 | recollection of when he -- when we got -- | 09:00:59AM |
| 3 | I think it was Bill McNairy or Bill | 09:01:01AM |
| 4 | involved. | 09:01:03AM |
| 5 | BY MR. CASTALDO: | 09:01:05AM |
| 6 | Q.   Are you aware, sir, that Mr. Lewis | 09:01:07AM |
| 7 | testified in this action that the disclosure | 09:01:10AM |
| 8 | decision in November 2008 was -- was made by | 09:01:13AM |
| 9 | you, sir? | 09:01:17AM |
| 10 | A.   I'm trying to remember if I actually | 09:01:21AM |
| 11 | knew he said those words.  I don't know that he | 09:01:24AM |
| 12 | said those exact words, but I was the one that | 09:01:27AM |
| 13 | conveyed, you know, our direction to him, | 09:01:29AM |
| 14 | absolutely. | 09:01:32AM |
| 15 | Q.   What was Mr. Lewis's response during | 09:01:34AM |
| 16 | your discussion of this issue with him in | 09:01:56AM |
| 17 | November of 2008? | 09:01:59AM |
| 18 | A.   You know, I don't know -- again, I | 09:02:02AM |
| 19 | don't remember the exact conversation.  I | 09:02:06AM |
| 20 | don't -- you know, I -- my recollection it | 09:02:12AM |
| 21 | was -- it was a matter of fact.  You know, I | 09:02:15AM |
| 22 | mean, it was more of this is the process we went | 09:02:16AM |
| 23 | through, here's the conclusion we reached.  As I | 09:02:18AM |
| 24 | talked about earlier, I don't -- I don't have a | 09:02:21AM |
| 25 | vivid recollection of any particular response | 09:02:23AM |

```
                                                      Page 334

 1          A.    No, I would have gone to our general   11:10:40AM

 2   counsel.                                            11:10:42AM

 3          Q.    And did you discuss this potential     11:10:45AM

 4   disclosure issue with anybody else with respect    11:10:50AM

 5   to the revised forecast received on December       11:10:54AM

 6   3rd, 2008?                                          11:10:57AM

 7          A.    You know, my -- my recollection is I   11:10:58AM

 8   kind of informed Ken of, you know, Tim was still   11:11:03AM

 9   on the same place and it still made sense, but,    11:11:06AM

10   you know, that -- I think that would have been,    11:11:09AM

11   you know, kind of the next step for me.            11:11:12AM

12          Q.    And what specifically did you tell     11:11:14AM

13   Mr. Lewis?                                          11:11:15AM

14          A.    Again, I talked to Ken daily on a      11:11:16AM

15   number of things.  My recollection is I just       11:11:19AM

16   told him, you know, that -- you know, that the     11:11:21AM

17   conclusion that was reached was the same.          11:11:24AM

18          Q.    And did you tell Mr. Lewis that you    11:11:29AM

19   had run the disclosure issue by both               11:11:32AM

20   Mr. Mayopoulos and Wachtell Lipton?                11:11:35AM

21          A.    You know, my recollection is -- is     11:11:37AM

22   just Tim -- is I would have just said Tim.         11:11:42AM

23   That's who we would have looked to.  I mean,       11:11:45AM

24   really it's Tim's call on doing otherwise.         11:11:46AM

25          Q.    And what do you mean by that's Tim's   11:11:52AM
```

# Exhibit 7

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Alphin

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

     vs.        09-CV-6829

BANK OF AMERICA,

        Defendant.
------------------------------x


      JOHN STEELE ALPHIN

      New York, New York

     Friday, November 13, 2009


Reported by:  Steven Neil Cohen, RPR

Job No. 304997

John Steele Alphin                    November 13, 2009

Page 21

1                        Alphin
2      supervisor of yours?
3           A.    Was not a supervisor.
4           Q.    Now, let's see.  You were in human
5      resources prior to 2001, is that what your
6      testimony was?
7           A.    Human resources -- I started with
8      the bank.  From 1977 until 1980 I actually
9      worked in the bank as a banker.
10               In 1980 I moved into the HR
11      function and actually stayed in various HR
12      functions in the different locations
13      until -- actually until just a couple of
14      years ago when it started expanding -- well,
15      the Fleet merger is when I picked up some
16      other responsibilities.
17           Q.    All right.
18               Then in 2001 what was your title?
19           A.    2001 I would have been the
20      corporate personnel exec.
21           Q.    What is that, is that a global
22      human resources position?
23           A.    Yes.
24           Q.    And what did that entail?
25           A.    Being responsible for delivering

John Steele Alphin                    November 13, 2009

1                      Alphin

2     all the HR policies, procedures, processes

3     from hiring to payroll to benefit to comp to

4     recruiting to the personnel generalist,

5     consulting advisory role, so a full HR

6     function, as we probably all would agree.

7          Q.    During the period 2001 to 2007

8     Bank of America made various acquisitions,

9     correct?

10          A.    That is correct.

11          Q.    Which acquisitions were those?

12          A.    We bought MBNA, Fleet and Merrill

13     Lynch, are the ones that I can recall.

14               MR. LOWENTHAL:  Countrywide.

15               THE WITNESS:  Excuse me.  Good

16          heavens, Countrywide.

17               MR. LOWENTHAL:  LaSalle.

18               THE WITNESS:  LaSalle, right.

19               There have been a lot of them over

20          33 years.  I have to pause and think

21          about all of them.

22               I actually worked on LaSalle,

23          actually went to Chicago and worked on

24          that one a good bit myself.

25               The Countrywide, I did not work on

John Steele Alphin                                    November 13, 2009

1                          Alphin

2          that personally.

3     BY MR. BLACK:

4          Q.    When you say you "worked on it,"

5     what do you mean by that?

6          A.    LaSalle is a good example.  I

7     would go and actually vet through the --

8     their existing contracts with the associates

9     and building or selecting the team that was

10    going to be on the ground in Chicago.

11              Plus looking at all the benefits,

12    payroll issues and consolidating the

13    payroll.

14         Q.    When you say you didn't work on

15    it, who performed that function for Bank of

16    America?

17         A.    Countrywide?

18         Q.    Yes.

19         A.    Two people worked on it a lot

20    more.  I actually sent a gentleman, whose

21    name is Gary Snyder, who actually relocated

22    to California.

23         Q.    You said two gentlemen.  Who else?

24         A.    John Harris spent some time on it

25    also and John Harris is a direct report to

John Steele Alphin                    November 13, 2009

Page 24

1                        Alphin
2       mine and, in essence, has worked on multiple
3       mergers.
4           Q.    What about with respect to the
5       Fleet transaction?
6           A.    Fleet again I worked on that a lot
7       myself, in Boston a lot myself.  Again,
8       looking at structure, looking at
9       implementing structure, pay, recruiting and
10      overall direction of how we are going to
11      organize that company and put it together.
12      So I did spend -- spent a good bit of time
13      there.
14          Q.    MBNA?
15          A.    MBNA, I spent very little time
16      because again I asked someone to relocate
17      and move and they spent more time there than
18      I did, John Harris being one.
19          Q.    Who else?
20          A.    And then Katy Morgan, I asked her
21      to move and she actually moved to Wilmington
22      to work on the deal.
23          Q.    So how did you determine for each
24      of these transactions whether or not you
25      were going to be playing a lead role or

John Steele Alphin                     November 13, 2009

1                        Alphin

2        A.    Yes.

3        Q.    How did he know that?

4        A.    Because I would have been charged

5    with that as part of my merger

6    responsibilities as I had been for the 20

7    previous years.

8        Q.    Well, specifically what was it

9    that Mr. Lewis would have charged you with

10   respect to working with Merrill Lynch on the

11   size of their pool?

12       A.    Spending the right amount of money

13   to keep the key people in the company.

14       Q.    It is fair to say that although

15   you didn't have the ability to make any

16   final determinations for Merrill Lynch, you

17   could advise and have some influence over

18   the final size of the Merrill Lynch pool?

19            MR. LOWENTHAL:  Objection to the

20       form.

21            Go ahead.

22            THE WITNESS:  I don't know my

23       level of success there.  I know John --

24       John ultimately reacted by paying less

25       than he could have.  That is the only

# Exhibit 8

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Page 1

1

2    ** C O N F I D E N T I A L **

3    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

4    Master File No. 09-MD-2058 (PKC)

     ----------------------------------x

5

     IN RE BANK OF AMERICA CORP. SECURITIES,

6    DERIVATIVE AND EMPLOYMENT RETIREMENT

     INCOME SECURITY ACT (ERISA) LITIGATION

7

     ----------------------------------x

8

9    THIS DOCUMENT RELATES TO

     All Securities Actions

10

11   ----------------------------------x

                  March 30, 2012

12                9:05 a.m.

13

14

15       Videotaped Deposition of TIMOTHY

16   MAYOPOULOS, taken by Plaintiffs, pursuant

17   to Notice, held at the offices of Kaplan

18   Fox & Kilsheimer LLP, 850 Third Avenue,

19   New York, New York, before Todd DeSimone,

20   a Registered Professional Reporter and

21   Notary Public of the State of New York.

22

23

24

25

1              MAYOPOULOS - CONFIDENTIAL

2      his staff.                                   09:32:12AM

3          Q.      And you were involved in other  09:32:13AM

4      mergers -- you were involved in mergers     09:32:19AM

5      when you were at Bank of America; is that   09:32:23AM

6      correct?                                     09:32:24AM

7          A.      Yes, I was.                      09:32:24AM

8          Q.      Which ones?                      09:32:25AM

9          A.      The bank acquired Fleet Boston.  09:32:26AM

10     The deal had already been announced at the  09:32:31AM

11     time I became the general counsel.  But I   09:32:33AM

12     was involved in helping to close -- secure  09:32:36AM

13     all the regulatory approvals and close      09:32:39AM

14     that transaction.  So Fleet Boston, U.S.    09:32:40AM

15     Trust, Countrywide, Merrill Lynch.  I       09:32:44AM

16     think there were a total of six of them.    09:33:01AM

17         Q.      LaSalle?                         09:33:02AM

18         A.      And LaSalle Bank in Chicago.     09:33:03AM

19         Q.      In connection with each of them  09:33:06AM

20     you had dealings with the Federal Reserve?  09:33:08AM

21         A.      I don't recall whether in each  09:33:11AM

22     and every one I had dealings with the       09:33:13AM

23     Federal Reserve, but typically I would.  I  09:33:15AM

24     also had dealings with Mr. Alvarez's        09:33:18AM

25     office in connection with an investment     09:33:22AM

# Exhibit 9

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Master File No. 09-MD-2058 (PKC)

------------------------------------x

IN RE BANK OF AMERICA CORP. SECURITIES,

DERIVATIVE AND EMPLOYMENT RETIREMENT

INCOME SECURITY ACT (ERISA) LITIGATION

------------------------------------x

THIS DOCUMENT RELATES TO

All Securities Actions

------------------------------------x

IN THE COURT OF CHANCERY

OF THE STATE OF DELAWARE

C.A. No. 4307-CS

------------------------------------x

IN RE BANK OF AMERICA CORPORATION

STOCKHOLDER DERIVATIVE LITIGATION

------------------------------------x

            Videotaped Deposition of CHARLES GIFFORD,

taken by Plaintiffs, pursuant to Notice, held at the

Hilton Boston Downtown, Financial District, 89 Broad

Street, Boston, Massachusetts  02110, before Lisa M.

Valdario, a Registered Professional Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, taken on Thursday, December 8, 2011 at

9 a.m.

| | | | |
|---|---|---|---|
| 1 | | authenticity, I should present a motion to get new | 11:25:14 |
| 2 | | management. | 11:25:18 |
| 3 | Q | Do you recall if you received any advance | 11:25:20 |
| 4 | | materials prior to these weekly meetings? | 11:25:23 |
| 5 | A | Rarely.  I can't recall any advance materials. | 11:25:26 |
| 6 | Q | Do you recall whether or not minutes or notes were | 11:25:30 |
| 7 | | kept of these weekly update meetings? | 11:25:32 |
| 8 | A | I believe there were minutes but I can't recall | 11:25:35 |
| 9 | | exactly what the minutes said.  I thought I | 11:25:38 |
| 10 | | reviewed some of the minutes yesterday, but I'm | 11:25:40 |
| 11 | | not certain if all of them were updated.  Some of | 11:25:42 |
| 12 | | them were official board minutes.  Some of them | 11:25:45 |
| 13 | | were updates.  Legally, I'm not sure what we're | 11:25:47 |
| 14 | | required to do or what was done. | 11:25:50 |
| 15 | Q | If you could take a look at the document that I | 11:25:53 |
| 16 | | marked as Exhibit, I think 55. | 11:25:56 |
| 17 | A | Yup. | 11:26:00 |
| 18 | Q | Do you recognize this document? | 11:26:01 |
| 19 | A | I recognize it as an email from me to Brian | 11:26:03 |
| 20 | | Moynihan. | 11:26:07 |
| 21 | Q | And who is Brian Moynihan? | 11:26:07 |
| 22 | A | Brian Moynihan was an executive of Bank of | 11:26:09 |
| 23 | | America, previous executive at Fleet Boston, and | 11:26:11 |
| 24 | | someone for whom I had a great deal of respect. | 11:26:15 |
| 25 | Q | And you may have just mentioned this, but what was | 11:26:19 |

108

| 1 | | his position at Bank of America as of the date of | 11:26:22 |
| 2 | | this email? | 11:26:25 |
| 3 | A | I can't remember.  He had a number of different | 11:26:26 |
| 4 | | positions over a period of five years and I don't | 11:26:27 |
| 5 | | know what it was at this particular time.  Brian | 11:26:29 |
| 6 | | was, I might add, might be helpful to you, at | 11:26:32 |
| 7 | | Fleet he was head of mergers and acquisition, and | 11:26:36 |
| 8 | | Fleet did a heck of a lot of mergers and | 11:26:41 |
| 9 | | acquisitions so he's just a like a brain I like to | 11:26:43 |
| 10 | | ask periodically. | 11:26:47 |
| 11 | Q | Do you recall why you sent this email, looks like | 11:26:49 |
| 12 | | the morning after the board meeting? | 11:26:51 |
| 13 | A | Yes, ma'am. | 11:26:54 |
| 14 | Q | And why did you send it? | 11:26:54 |
| 15 | A | I don't know why I sent it.  I never know why I | 11:26:56 |
| 16 | | send emails.  As we get into my other emails, when | 11:26:59 |
| 17 | | I send an email, I don't proofread.  I don't ask | 11:27:02 |
| 18 | | myself why I'm sending it.  I just send it. | 11:27:08 |
| 19 | Q | So say write here, "My issue is process and | 11:27:10 |
| 20 | | prudent time for management and board to review, | 11:27:11 |
| 21 | | especially in a crazed atmosphere."  What issue | 11:27:12 |
| 22 | | are you talking about here? | 11:27:16 |
| 23 | A | You know, this has come up in previous | 11:27:18 |
| 24 | | depositions, to be candid.  For me, as I think | 11:27:21 |
| 25 | | I've testified to you, it was a crazed day for | 11:27:27 |

# Exhibit 10

**To Smolar Declaration in
Support of Motion for Summary Judgment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Master File No. 09-MD-2058 (PKC)
----------------------------------x

        IN RE BANK OF AMERICA CORP. SECURITIES,
DERIVATIVE AND EMPLOYMENT RETIREMENT
INCOME SECURITY ACT (ERISA) LITIGATION

----------------------------------x

THIS DOCUMENT RELATES TO
All Securities Actions

----------------------------------x

        IN THE COURT OF CHANCERY
OF THE STATE OF DELAWARE
C.A. No. 4307-CS
----------------------------------x
IN RE BANK OF AMERICA CORPORATION
STOCKHOLDER DERIVATIVE LITIGATION



----------------------------------x

                January 22, 2012

                9:30 a.m.



        Videotaped Deposition of GREGORY

CURL, taken by Plaintiffs, pursuant to

Notice, held at the offices of Kaplan Fox

& Kilsheimer LLP, 850 Third Avenue, New

York, New York, before Todd DeSimone, a

Registered Professional Reporter and

Notary Public of the State of New York.

1

2      Q.      Did he give you any details

3   about the timing of the transaction?

4      A.      As I recall, no.

5      Q.      And who is Ed Herlihy?

6      A.      He is a partner at Wachtell

7   Lipton.

8      Q.      And Wachtell Lipton has

9   represented Bank of America from time to

10  time, correct?

11     A.      I think for a number of years.

12     Q.      And Mr. Fleming, who is he?

13     A.      I believe his title was

14  president, Merrill Lynch.

15     Q.      And prior to this time, have

16  you ever talked to Mr. Fleming?

17             MR. LOWENTHAL:  When you say

18  "this time," you mean September of '08?

19             MS. NAM:  Yes, September of

20  '08.

21     A.      Yes.

22     Q.      What was the subject matter

23  that you talked to him about generally?

24     A.      He was a calling officer who

25  called on me for probably 15 years on

 1

 2     discussions around the verbal agreement

 3     that you had with Mr. Fleming about VICP?

 4          A.     Not that I -- not that I

 5     recall.  I mean, it was just a, you know,

 6     it was at kind of a more -- yeah.

 7          Q.     I think you can set that aside.

 8                 Now, going back to the verbal

 9     agreement about the VICP payments, prior

10     to agreeing to -- strike that.

11                 Prior to entering into this

12     verbal agreement with Mr. Fleming, did you

13     talk to anyone about that?

14          A.     Yes.  I had cleared that with

15     Steele Alphin in HR, that we are going to

16     put this in the agreement and is this

17     something that -- as I recall, he was fine

18     with that, yeah.  I'm not an HR person.

19          Q.     So you asked for his opinion on

20     whether this was --

21          A.     Well, not only his opinion, his

22     agreement.

23          Q.     And Mr. Steele agreed to that?

24          A.     Yes.

25                 MR. LOWENTHAL:  Mr. Alphin.

```
 1
 2                MS. NAM:  I'm sorry.
 3      A.       As I recall, yes, he did.
 4      Q.       Did you talk to anybody else
 5   regarding this proposal?
 6      A.       As I recall, no.  I don't
 7   recall who he talked to.  But I would get
 8   clearance from HR.
 9      Q.       So did you raise this issue
10   with Mr. Alphin and he came back to you
11   with a positive response, or was it --
12      A.       I don't recall what it was,
13   what the time, yeah.
14      Q.       And what did you tell
15   Mr. Alphin?
16      A.       Exactly what the agreement was,
17   yeah.
18      Q.       And the agreement was that
19   Merrill Lynch could pay bonuses up to 2007
20   levels?
21      A.       No, the agreement was that in
22   the ordinary course, given the governance
23   and the directors, etc., they could not
24   pay in excess of that 2007 level.
25      Q.       Under your understanding of
```

Page 115

```
 1
 2   VICP bonus payments?
 3       A.       As I recall, I'm not an HR -- I
 4   was documenting inside the agreement an
 5   existing comp plan.
 6       Q.       Did you ever consider linking
 7   performance to Merrill Lynch's ability to
 8   pay VICP bonuses?
 9       A.       Once again, for the purposes of
10   the merger agreement, that's why I viewed
11   this as a business transition issue.  That
12   was a matter that in the ordinary course
13   would be dealt with by the appropriate
14   people in HR and compensation people.
15       Q.       Did you tell Mr. Lewis about
16   the verbal agreement that you made with
17   Mr. Fleming?
18       A.       As I recall, I did, yes.
19       Q.       When did you tell him about
20   that?
21       A.       I don't recall specifically.
22       Q.       Was it before the board
23   approved or after?
24       A.       I don't -- I don't recall.
25       Q.       Was it before the merger
```

1

2    agreement was signed?

3        A.        As I recall, it was, yeah.

4        Q.        And did Mr. --

5        A.        In fact, I know -- I have a --

6    because it was done on Sunday and the

7    merger agreement wasn't signed until

8    later, yeah.

9        Q.        And what was your conversation

10   with Mr. Lewis concerning the agreement

11   that you made with Mr. Fleming?

12       A.        As I recall, I told him that

13   they had wanted some reference to VICP.

14   It was in the ordinary course under the

15   terms of the plan as it was constituted,

16   and that Steele Alphin, you know, the HR

17   people, could give him any more details if

18   he wanted them.

19       Q.        Did you tell him that they were

20   capped at a $4.5 billion expense?

21       A.        I don't recall exactly how I

22   phrased it.

23       Q.        And what was his reaction?

24       A.        I don't -- I don't recall.

25       Q.        Did you discuss the VICP

# Exhibit 11

**To Smolar Declaration in**
**Support of Motion for Summary Judgment**

1

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

       -against-               09-CV-6829

BANK OF AMERICA CORP.,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                 November 16, 2009
                 9:39 a.m.

Deposition of NICHOLAS DEMMO, taken by Plaintiff,

pursuant to Subpoena, held at Securities and

Exchange Commission, Three World Financial

Center, New York, New York, before Lisa

Rosenfeld, a Shorthand Reporter and Notary

Public within and for the State of New York.

                                                          17
1                    Demmo - Confidential
2      and it also provides information about the
3      schedules and what they cover. But as far as a
4      stand-alone list, no, I've never seen that.
5          Q.    But does the merger document identify
6      the contents of the schedule?
7          A.    Yes, it identifies you've got
8      exceptions to the reps and warranties, exceptions
9      to the negative covenants, and then depending
10     upon the agreement, there could be other sections
11     that have specific schedule references.
12         Q.    Are you familiar with the corporation
13     Bank of America?
14         A.    Yes.
15         Q.    When was the first time that Bank of
16     America became a client of Wachtell?
17         A.    I don't know.
18         Q.    When is the first time that you
19     worked on any matter involving Bank of America?
20         A.    I've worked opposite Bank of America
21     several times. The first time I can recall
22     working for Bank of America was on -- was summer
23     of 2005.
24         Q.    And prior to September 2008
25     approximately how many different matters

```
                                                    18
 1                 Demmo - Confidential
 2    concerning Bank of America have you worked on?
 3              MR. MIRVIS:  By that, you mean on
 4         either side?
 5              MR. VASILESCU:  Yes.
 6         Q.   No, let's just say representing Bank
 7    of America.
 8         A.   Well, working backwards, I would say
 9    the Merrill deal.  Prior to that we represented
10    them in the LaSalle transaction.  Prior to that
11    we represented them in the -- when they bought
12    the second half of Marsico, a fund management
13    company.
14              Then prior to that was the -- to the
15    best of my recollection, was the summer of 2005,
16    which was a company by the name of Works which
17    was more of a credit card technology management
18    company.
19         Q.   Is there someone at Wachtell who is
20    the relationship partner with Bank of America?
21         A.   Ed Herlihy.
22         Q.   While you've been at Wachtell has he
23    always been the relationship partner with Bank of
24    America?
25         A.   Yes.
```

78

1                    Demmo - Confidential
2        their specific needs are.  So I'm not sure I
3        fully understand your question.
4             Q.    You mentioned that there was a
5        business understanding between Bank of America
6        and Merrill Lynch regarding the VICP?
7             A.    Yes.
8             Q.    What was that business understanding?
9             A.    Well, it boiled down to the VICP
10       being the same as the prior year, although when I
11       actually first heard from Greg Curl it was
12       actually a formula, I forget precisely what it
13       was but I think it was the expense couldn't be
14       greater than either of two things.  One was the
15       prior year VICP and the other was the current
16       year accrual rate on the VICP plus an additional
17       amount.
18            Q.    Now if this was a business agreement,
19       did you consider putting it in the merger
20       agreement itself?
21            A.    No.
22            Q.    Why not?
23            A.    It's not something you typically put
24       in a merger agreement.
25            Q.    Why not?

                                                              79
1                    Demmo - Confidential
2           A.    Because first of all, the number was
3     merely permissive, it wasn't necessarily an
4     amount that was going to be paid out.  And if you
5     told employees there was let's say 5.8 minus the
6     guarantee $5 billion as incentive comp available,
7     people would tend to expect Merrill Lynch to pay
8     that out when in reality that wasn't necessarily
9     what they were going to pay that out, and in fact
10    they didn't pay that out, they paid out
11    3 billion.  So the notion of putting that in
12    specifically sort of guaranteed the result when
13    that's not what you were trying to do.
14          Q.    But could you put in some language in
15    the merger agreement that wouldn't cause
16    employees to expect that they're going to get the
17    same bonuses the year before, for example, could
18    you put in some language in the merger agreement
19    that said that Bank of America and Merrill Lynch
20    had come to an agreement as to how much money
21    Merrill Lynch can pay if it wants to in bonuses
22    before the closure and that that amount is not
23    disclosed in the merger agreement?
24          A.    I mean you could -- obviously you
25    could put in whatever you want to the merger

                                                        80
 1                  Demmo - Confidential
 2      agreement, but I've never seen anyone put
 3      anything like that in.
 4              Q.    But what's your understanding as to
 5      what goes into a merger agreement, is it what
 6      other people have done before or what is material
 7      to the agreement?
 8              A.    Well, there's two components to it.
 9      The main component is the requirements of both
10      S-4 and 14a which draws in from other sections of
11      the law like Reg SK, which has specific detail,
12      and then obviously there's also the 14a-9 which
13      talks about material misstatements, and in item
14      601 that you were pointing to before which talks
15      about the disclosure schedules, and if there's
16      anything material to an investment decision there
17      that's not previously been disclosed.
18              So you're not drawing from prior
19      disclosures but prior disclosures are obviously
20      consistent because everyone is following the same
21      rules.
22              Q.    But each deal is somewhat different
23      from other deals, isn't that right?
24              A.    Yes.
25              Q.    And I mean other than Bear Stearns,

129

1                    Demmo - Confidential
2      the S-4, did you consider comparing the VICP
3      terms up to 2007 levels with whatever
4      representations BA made to the public regarding
5      how it was going to undertake cost savings in a
6      deal?
7            A.    I'm not aware of any public
8      statements about producing incentive
9      compensation, so that would have, to my
10     recollection, there would have been nothing to
11     compare.
12           Q.    No, just to the general
13     representations that it would find $7 billion in
14     savings, was there any discussion of that at BA
15     or Wachtell?
16           A.    How they would get to the 7 billion
17     dollar number?
18           Q.    Yes, if the VICP terms related to
19     that in any way.
20           A.    No.
21           Q.    Is it fair to say -- strike that.
22     Were there other compensation issues that were
23     being negotiated with Merrill Lynch around that
24     time?
25                 MR. LOWENTHAL:   Objection to the

                                                    130
1                 Demmo - Confidential
2          form.
3                 MR. MIRVIS:   What time are we talking
4          about?
5          Q.    In September and October of 2008?
6          A.    I don't believe that the disclosure
7     schedules were finalized until maybe October
8     22nd, and my recollection is that the last items
9     that, they weren't being negotiated hotly through
10    that point, it was more a matter of it took a
11    while for them to get finished, but I think the
12    last ones to get finished were the ones related
13    to compensation matters.  Beyond that, I'm not
14    aware of any September/October comp discussions.
15                MR. VASILESCU:   Let's mark as Exhibit
16         113 an e-mail dated October 1, 2008 from
17         you to Tim Mayopoulos and several other
18         people.
19                (Plaintiff's Exhibit 113, e-mail
20         dated October 1, 2008 from Mr. Demmo to
21         Tim Mayopoulos and others, was so marked
22         for identification.)
23         Q.    Do you recall if in -- at some point
24    you learned that there was a discussion regarding
25    giving Mr. Thain and Mr. Fleming some sort of

# Exhibit 12

**To Smolar Declaration in
Support of Motion for Summary Judgment**

----------------------------------------------------------------

IN RE: EXECUTIVE COMPENSATION INVESTIGATION

BANK OF AMERICA - MERRILL LYNCH

----------------------------------------------------------------

EXAMINATION of KENNETH LEE LEWIS,

taken at the State of New York, Office of the

Attorney General, 120 Broadway, New York, New

York, on February 26, 2009 at 4:30 p.m., before

SARA FREUND, a Shorthand Reporter and a Notary

Public of the State of New York.

Confidential Supervisory Discovery Material       BAC-ML-CL00004285

```
 1                    K.L. Lewis

 2        very strongly not to pay them early.  I don't

 3        know if they gave consequences like that.

 4             MR. CORNGOLD:  You didn't tell them to

 5        give consequences like that?

 6             THE WITNESS:  No.

 7             MR. LAWSKY:  We had other testimony that

 8        the early payment of the Merrill bonuses was

 9        contemplated back in September when the deal

10        was struck.  Is that true?

11             THE WITNESS:  I have no recollection of

12        time of payment

13             MR. LAWSKY:  Being an issue in the

14        initial negotiations.

15             THE WITNESS:  Right.

16             MR. LAWSKY:  Were you involved in those

17        negotiations?

18             THE WITNESS:  No.

19             MR. LAWSKY:  Were you involved in the

20        September negotiations in general?

21             THE WITNESS:  Yes.

22             MR. LAWSKY:  Were you involved at all in

23        the negotiations over the bonus provision

24        with regard to the $5.8 billion?

25             THE WITNESS:  I was not.
```

CONFIDENTIAL

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

Confidential Supervisory Discovery Material                    BAC-ML-CL00004396

# Exhibit 13

**To Smolar Declaration in
Support of Motion for Summary Judgment**

# BANK OF AMERICA CORP /DE/ (BAC)

## 8-K
Current report filing
Filed on 09/18/2008
Filed Period 09/15/2008





# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 8-K
### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported):
**September 18, 2008 (September 15, 2008)**

## BANK OF AMERICA CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 1-6523 | 56-0906609 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**100 North Tryon Street**
**Charlotte, North Carolina 28255**
(Address of principal executive offices)

**(800) 299-2265**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

------------------------------------------------------------

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☒ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

**The Merger Agreement**

On September 15, 2008, Bank of America Corporation ("Bank of America") and Merrill Lynch & Co., Inc. ("Merrill Lynch"), entered into an Agreement and Plan of Merger, dated as of September 15, 2008 (the "Merger Agreement"), pursuant to which a wholly-owned merger subsidiary of Bank of America ("Merger Sub") will, subject to the terms and conditions of the Merger Agreement, merge (the "Merger") with and into Merrill Lynch, with Merrill Lynch continuing as the surviving company and a subsidiary of Bank of America.

Subject to the terms and conditions of the Merger Agreement, which has been approved by the Boards of Directors of both companies, if the Merger is completed, each share of Merrill Lynch common stock will be converted into 0.8595 (the "Exchange Ratio") of a share of Bank of America common stock. Non-convertible preferred stock of Merrill Lynch will be exchanged for preferred stock issued by Bank of America having substantially identical terms. Convertible preferred stock of Merrill Lynch will remain outstanding after the Merger and will thereafter be convertible in accordance with its terms into shares of Bank of America common stock based on the Exchange Ratio. In addition, as of consummation of the Merger, outstanding Merrill Lynch stock options and other stock-based awards will be converted into stock options and other stock-based awards with respect to shares of Bank of America common stock, with adjustments to reflect the Exchange Ratio.

Following the consummation of the Merger, three existing directors of Merrill Lynch will be appointed to newly created directorships on the Board of Directors of Bank of America.

The Merger Agreement, included as Exhibit 2.1, contains (a) customary representations and warranties of Merrill Lynch and Bank of America, including, among others, with respect to: corporate organization, capitalization, corporate authority, third party and governmental consents and approvals, reports and regulatory matters, financial statements, compliance with law and legal proceedings, absence of certain changes, and taxes; and additional customary representations by Merrill Lynch, including, among others, with respect to: employee matters, intellectual property, certain contracts, loan assets, securitizations and its investment advisory business; (b) covenants of Merrill Lynch and Bank of America to conduct their respective businesses in the ordinary course until the Merger is completed; and (c) covenants of Merrill Lynch and Bank of America not to take certain actions during such period. Merrill Lynch has also agreed not to (i) solicit proposals relating to alternative business combination transactions or (ii) subject to certain exceptions, enter into discussions, or enter into any agreement, concerning, or provide confidential information in connection with, any proposals for alternative business combination transactions.

The representations and warranties of each party set forth in the Merger Agreement have been made solely for the benefit of the other party to the Merger Agreement. In addition, such representations and warranties (a) have been qualified by confidential disclosures made to the other party in connection with the Merger Agreement, (b) will not survive consummation of the Merger and cannot be the basis for any claims under the Merger Agreement by the other party after termination of the Merger Agreement except as a result of a knowing breach as of the date of the Merger Agreement, (c) are subject to the materiality standard contained in Section 9.2 of the Merger Agreement which may differ from what may be viewed as material by investors, (d) were made only as of the date of the Merger Agreement or such other date as is specified in the Merger Agreement, and (e) may have been included in the Merger Agreement for the purpose of allocating risk between Bank of America and Merrill Lynch rather than establishing matters as facts. Accordingly, the Merger Agreement is included with this filing only to provide investors with information regarding the terms of the Merger Agreement, and not to provide investors with any other factual information regarding the parties or their respective businesses. The Merger Agreement should not be read alone, but should instead be read in conjunction with the other information regarding the companies and the Merger that will be contained in, or incorporated by reference into, the proxy statement/prospectus that the parties will be filing in connection with the Merger, as well as in the Forms 10-K, Forms 10-Q and other filings that each of Bank of America and Merrill Lynch make with the Securities and Exchange Commission ("SEC").

The Board of Directors of Bank of America has adopted a resolution recommending approval of the issuance of Bank of America common stock in the Merger by its stockholders and Bank of America has agreed to submit a proposal for such issuance to its stockholders for consideration. The Board of Directors of Merrill Lynch has adopted a resolution recommending approval of the Merger and adoption by its stockholders and Merrill Lynch has agreed to submit the Merger Agreement to its stockholders for consideration.

Consummation of the Merger is subject to certain customary conditions, including, among others, approval of the stockholders of both Bank of America and Merrill Lynch, governmental filings and regulatory approvals and expiration of applicable waiting periods, accuracy of the representations and warranties of the other party (generally subject to a material adverse effect standard), and material compliance by the other party with its obligations under the Merger Agreement.

The Merger Agreement contains certain termination rights for Merrill Lynch and Bank of America, as the case may be, applicable upon: final, non-appealable denial of required regulatory approvals; the first anniversary of the date of the Merger Agreement if the Merger has not been completed by that time; a breach by the other party that is not or cannot be cured within 30 days' notice of such breach if such breach would result in a failure of the conditions to closing set forth in the Merger Agreement; if either Bank of America's stockholders or Merrill Lynch's stockholders fail to approve the transaction by the required vote; a failure by Bank of America or Merrill Lynch to use reasonable best efforts to obtain the affirmative vote of their respective stockholders; a failure by the Board of Directors of Merrill Lynch to recommend the Merger to its stockholders; or a breach by Merrill Lynch of its obligations in any material respect regarding any alternative business combination proposals.

The foregoing description of the Merger and the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is attached hereto as Exhibit 2.1, and is incorporated into this report by reference.

**Stock Option Agreement**

In connection with the Merger Agreement, Merrill Lynch has granted to Bank of America an irrevocable option (the "Option") to purchase, under certain circumstances, up to 19.9% of its outstanding common shares at a price, subject to certain adjustments, of $17.05 per share (the "Stock Option Agreement"). A copy of the Stock Option Agreement is attached as Exhibit 99.1 hereto and is incorporated herein by reference, and the description of the Stock Option Agreement set forth herein is qualified in its entirety by reference to such Exhibit.

**Forward-Looking Statements**

This filing contains forward-looking statements, including statements about the financial conditions, results of operations and earnings outlook of Bank of America Corporation. The forward-looking statements involve certain risks and uncertainties. Factors that may cause actual results or earnings to differ materially from such forward-looking statements include, among others, the following: 1) projected business increases following process changes and other investments are lower than expected; 2) competitive pressure among financial services companies increases significantly; 3) general economic conditions are less favorable than expected; 4) political conditions including the threat of future terrorist activity and related actions by the United States abroad may adversely affect the company's businesses and economic conditions as a whole; 5) changes in the interest rate environment and market liquidity reduce interest margins, impact funding sources and effect the ability to originate and distribute financial products in the primary and secondary markets; 6) changes in foreign exchange rates increases exposure; 7) changes in market rates and prices may adversely impact the value of financial products; 8) legislation or regulatory environments, requirements or changes adversely affect the businesses in which the company is engaged; 9) changes in accounting standards, rules or interpretations, 10) litigation liabilities, including costs, expenses, settlements and judgments, may adversely affect the company or its businesses; 11) mergers and acquisitions and their integration into the company; and 12) decisions to downsize, sell or close units or otherwise change the business mix of any of the company. Accordingly, readers are cautioned not to place undue reliance on forward-looking statements,

which speak only as of the date on which they are made. Bank of America does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements are made. For further information regarding Bank of America Corporation, please read the Bank of America reports filed with the SEC and available at www.sec.gov.

**Additional Information About this Transaction**

In connection with the proposed merger, Bank of America will file with the SEC a Registration Statement on Form S-4 that will include a joint proxy statement of Bank of America and Merrill Lynch that also constitutes a prospectus of Bank of America. Bank of America and Merrill Lynch will mail the joint proxy statement/prospectus to their respective stockholders. Bank of America and Merrill Lynch urge investors and security holders to read the joint proxy statement/prospectus regarding the proposed merger when it becomes available because it will contain important information. You may obtain copies of all documents filed with the SEC regarding this transaction, free of charge, at the SEC's website (www.sec.gov). You may also obtain these documents, free of charge, from Bank of America's website (www.bankofamerica.com) under the tab "About Bank of America" and then under the heading "Investor Relations" and then under the item "SEC Filings". You may also obtain these documents, free of charge, from Merrill Lynch's website (www.ml.com) under the tab "Investor Relations" and then under the heading "SEC Filings."

**Proxy Solicitation**

Bank of America, Merrill Lynch and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from stockholders in favor of the merger. Information regarding the persons who may, under the rules of the SEC, be considered participants in the solicitation of the stockholders in connection with the proposed merger will be set forth in the joint proxy statement/prospectus when it is filed with the SEC. You can find information about Bank of America's executive officers and directors in its definitive proxy statement filed with the SEC on March 19, 2008. You can find information about Merrill Lynch's executive officers and directors in its definitive proxy statement filed with the SEC on March 14, 2008. You can obtain free copies of these documents from Bank of America and Merrill Lynch using the contact information above.

**ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.**

(d) Exhibits.

The following exhibits are filed herewith:

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America Corporation. |
| 99.1 | Stock Option Agreement, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. (issuer) and Bank of America Corporation (grantee). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BANK OF AMERICA CORPORATION

By: *Teresa M. Brenner*

TERESA M. BRENNER
Associate General Counsel

Dated: September 18, 2008

**EXHIBIT INDEX**

EXHIBIT NO.   DESCRIPTION OF EXHIBIT

2.1   Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch

& Co., Inc. and Bank of America Corporation.

99.1   Stock Option Agreement, dated as of September 15, 2008, by and between Merrill Lynch &

Co., Inc. (issuer) and Bank of America Corporation (grantee).

Exhibit 2.1

AGREEMENT AND PLAN OF MERGER

by and between

MERRILL LYNCH & CO., INC.

and

BANK OF AMERICA CORPORATION

_____

DATED AS OF SEPTEMBER 15, 2008

**TABLE OF CONTENTS**

P

ARTICLE I                     THE MERGER
        1.1                   The Merger
        1.2                   Effective Time
        1.3                   Effects of the Merger
        1.4                   Conversion of Stock
        1.5                   Stock Options and Other Stock-Based Awards; ESPP
        1.6                   Certificate of Incorporation and Bylaws of the Surviving Company
        1.7                   Directors and Officers
        1.8                   Tax Consequences

ARTICLE II                    DELIVERY OF MERGER CONSIDERATION
        2.1                   Exchange Agent
        2.2                   Deposit of Merger Consideration
        2.3                   Delivery of Merger Consideration

ARTICLE III REPRESENTATIONS AND WARRANTIES OF COMPANY
        3.1                   Corporate Organization
        3.2                   Capitalization
        3.3                   Authority; No Violation
        3.4                   Consents and Approvals
        3.5                   Reports; Regulatory Matters
        3.6                   Financial Statements
        3.7                   Broker's Fees
        3.8                   Absence of Certain Changes or Events
        3.9                   Legal Proceedings
        3.10                  Taxes and Tax Returns
        3.11                  Employee Matters
        3.12                  Compliance with Applicable Law
        3.13                  Certain Contracts
        3.14                  Risk Management Instruments
        3.15                  Investment Securities and Commodities
        3.16                  Property
        3.17                  Intellectual Property
        3.18                  Environmental Liability
        3.19                  Broker-Dealer and Investment Advisory Matters
        3.20                  Securitization Matters
        3.21                  State Takeover Laws
        3.22                  Interested Party Transactions
        3.23                  Reorganization
        3.24                  Opinion
        3.25                  Company Information

**TABLE OF CONTENTS**
(continued)

Pa

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT
| | |
|---|---|
| 4.1 | Corporate Organization |
| 4.2 | Capitalization |
| 4.3 | Authority; No Violation |
| 4.4 | Consents and Approvals |
| 4.5 | Reports; Regulatory Matters |
| 4.6 | Financial Statements |
| 4.7 | Broker's Fees |
| 4.8 | Absence of Certain Changes or Events |
| 4.9 | Legal Proceedings |
| 4.10 | Taxes and Tax Returns |
| 4.11 | Compliance with Applicable Law |
| 4.12 | Reorganization; Approvals |
| 4.13 | Opinion |
| 4.14 | Certain Contracts |
| 4.15 | Risk Management Instruments |
| 4.16 | Intellectual Property |
| 4.17 | Parent Information |

ARTICLE V          COVENANTS RELATING TO CONDUCT OF BUSINESS
| | |
|---|---|
| 5.1 | Conduct of Businesses Prior to the Effective Time |
| 5.2 | Company Forbearances |
| 5.3 | Parent Forbearances |

ARTICLE VI ADDITIONAL AGREEMENTS
| | |
|---|---|
| 6.1 | Regulatory Matters |
| 6.2 | Access to Information |
| 6.3 | Stockholder Approval |
| 6.4 | NYSE Listing |
| 6.5 | Employee Matters |
| 6.6 | Indemnification; Directors' and Officers' Insurance |
| 6.7 | Additional Agreements |
| 6.8 | Advice of Changes |
| 6.9 | Exemption from Liability Under Section 16(b) |
| 6.10 | No Solicitation |
| 6.11 | Dividends |
| 6.12 | Redemption of Exchangeable Shares |
| 6.13 | Tax Matters |

ARTICLE VII CONDITIONS PRECEDENT
| | |
|---|---|
| 7.1 | Conditions to Each Party's Obligation to Effect the Merger |
| 7.2 | Conditions to Obligations of Parent |

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 7.3 | | Conditions to Obligations of Company |

ARTICLE VIII TERMINATION AND AMENDMENT

| | | |
|---|---|---|
| 8.1 | | Termination |
| 8.2 | | Effect of Termination |
| 8.3 | | Fees and Expenses |
| 8.4 | | Amendment |
| 8.5 | | Extension; Waiver |

ARTICLE IX GENERAL PROVISIONS

| | | |
|---|---|---|
| 9.1 | | Closing |
| 9.2 | | Standard |
| 9.3 | | Nonsurvival of Representations, Warranties and Agreements |
| 9.4 | | Notices |
| 9.5 | | Interpretation |
| 9.6 | | Counterparts |
| 9.7 | | Entire Agreement |
| 9.8 | | Governing Law; Jurisdiction |
| 9.9 | | Publicity |
| 9.10 | | Assignment; Third Party Beneficiaries |

Exhibit A—Stock Option Agreement

Exhibit B—Amendment to Surviving Company Certificate of Incorporation

iii

Agency or other Governmental Entity in connection with the transactions contemplated by this Agreement, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portions of the Joint Proxy Statement relating to Parent and its Subsidiaries and other portions within the reasonable control of Parent and its Subsidiaries will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. The Form S-4 will comply in all material respects with the provisions of the Securities Act and the rules and regulations thereunder.

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS

5.1 <u>Conduct of Businesses Prior to the Effective Time</u>. Except as expressly contemplated by or permitted by this Agreement or with the prior written consent of the other party, during the period from the date of this Agreement to the Effective Time, each of Company and Parent shall, and shall cause each of its respective Subsidiaries to, (a) conduct its business in the ordinary course in all material respects, (b) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships and retain the services of its key officers and key employees and (c) take no action that would reasonably be expected to adversely affect or materially delay the ability of Company, Parent or Merger Sub to obtain any necessary approvals of any Regulatory Agency or other Governmental Entity required for the transactions contemplated hereby or to perform its covenants and agreements under this Agreement or to consummate the transactions contemplated hereby or thereby.

5.2 <u>Company Forbearances</u>. During the period from the date of this Agreement to the Effective Time, except as set forth in this Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent:

(a) other than in the ordinary course of business consistent with past practice, incur any indebtedness for borrowed money, or assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other individual, corporation or other entity (it being understood and agreed that incurrence of indebtedness in the ordinary course of business consistent with past practice shall include the creation of deposit liabilities, securitizations, sales of certificates of deposit and entering into repurchase agreements, participation in structured note programs and the rollover of indebtedness for borrowed money outstanding as of the date hereof from time to time as such indebtedness becomes due and payable, in each case in the ordinary course of business consistent with past practice);

(b) (i) adjust, split, combine or reclassify any of its capital stock;

(ii) make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock (except (A) for regular quarterly cash dividends on the Company Common Stock at

41

a rate not in excess of $0.35 per share with record dates and payment dates consistent with the prior year, (B) dividends on the Company Preferred Stock, (C) dividends paid by any of the Subsidiaries of Company to Company or to any of its wholly-owned Subsidiaries, and (D) the acceptance of shares of Company Common Stock in payment of the exercise price or withholding Taxes incurred by any employee or director in connection with the exercise of stock options or stock appreciation rights or the vesting of restricted shares of (or settlement of other equity-based awards in respect of) Company Common Stock granted under a Company Stock Plan, the Company Cap Plan or a Company Deferred Equity Unit Plan, in each case in accordance with past practice and the terms of the applicable the Company Stock Plan, Company Cap Plan and related award agreements or a Company Deferred Equity Unit Plan);

(iii) grant any stock options, stock appreciation rights, restricted shares, restricted stock units, deferred equity units, awards based on the value of Company's capital stock or other equity-based award with respect to shares of Company Common Stock under any of the Company Stock Plans, the Company Cap Plan or any of the Company Deferred Equity Unit Plans or otherwise, or grant any individual, corporation or other entity any right to acquire any shares of its capital stock; or

(iv) issue any additional shares of capital stock or other securities, except pursuant to the exercise of stock options or stock appreciation rights or the settlement of other equity-based awards granted under a Company Stock Plan, the Company Cap Plan or a Company Deferred Equity Unit Plan that are outstanding as of the date of this Agreement;

(c) except as required under applicable law or the terms of any Company Benefit Plan existing as of the date hereof, (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, "Employees"), (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business), (iii) become a party to, establish, amend, commence participation in, make any adjustment, terminate or commit itself to the adoption of any stock option plan or other stock-based compensation plan, compensation (including any employee co-investment fund), severance, pension, retirement, profit-sharing, welfare benefit, or other employee benefit plan or agreement or employment agreement with or for the benefit of any Employee (or newly hired employees), (iv) accelerate the vesting of any stock-based compensation or other long-term incentive compensation under any Company Benefit Plans, (v) (x) hire employees in the position of Vice President or above or (y) terminate the employment of any employee in the position of Vice President or above (other than due to terminations for cause) or (vi) take any action which could reasonably be expected to give rise to a "good reason" (or any term of similar import) claim;

(d) sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any material amount of its properties or assets (including pursuant to securitizations) to any individual, corporation or other entity other than a Subsidiary or cancel, release or assign any material amount of indebtedness to any such person or any material claims held by any such person, in each case other than in the ordinary course of business consistent with past practice or pursuant to contracts in force at the date of this Agreement;

42

(e) enter into any new line of business or change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking, operating, securitization and servicing policies, except as required by applicable law, regulation or policies imposed by any Governmental Entity;

(f) transfer ownership, or grant any license or other rights, to any person or entity of or in respect of any material Company IP, other than grants of non-exclusive licenses pursuant to License Agreements entered into in the ordinary course of business consistent with past practice;

(g) other than in the ordinary course of business consistent with past practice, make any material investment either by purchase of stock or securities, contributions to capital, property transfers, or purchase of any property or assets of any other individual, corporation or other entity;

(h) take any action, or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code;

(i) amend its charter or bylaws, or otherwise take any action to exempt any person or entity (other than Parent or its Subsidiaries) or any action taken by any person or entity from any Takeover Statute or similarly restrictive provisions of its organizational documents or terminate, amend or waive any provisions of any confidentiality or standstill agreements in place with any third parties;

(j) (i) amend or otherwise modify, except in the ordinary course of business, or knowingly violate, in each case in any material respect, the terms of, any Company Contract, or (ii) create, renew or amend any agreement or contract or, except as may be required by applicable law, other binding obligation of Company or its Subsidiaries containing (A) any material restriction on the ability of Company or its Subsidiaries to conduct its business as it is presently being conducted or (B) any material restriction on the ability of Company or its affiliates to engage in any type of activity or business;

(k) commence or settle any material claim, action or proceeding;

(l) take any action or fail to take any action that is intended or may reasonably be expected to result in any of the conditions to the Merger set forth in Article VII not being satisfied;

(m) implement or adopt any material change in its Tax accounting or financial accounting principles, practices or methods, other than as may be required by applicable law, GAAP or regulatory guidelines;

(n) file or amend any material Tax Return, make or change any material Tax election, or settle or compromise any material Tax liability, in each case, other than in the ordinary course of business or as required by law; or

43

(o) agree to take, make any commitment to take, or adopt any resolutions of its board of directors in support of, any of the actions prohibited by this Section 5.2.

5.3 <u>Parent Forbearances</u>. Except as expressly permitted by this Agreement or with the prior written consent of Company, during the period from the date of this Agreement to the Effective Time, Parent shall not, and shall not permit any of its Subsidiaries to, (a) amend, repeal or otherwise modify any provision of the Parent Certificate or the Parent Bylaws in a manner that would adversely affect Company, the stockholders of Company or the transactions contemplated by this Agreement; (b) take any action, or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code; (c) take any action or willfully fail to take any action that is intended or may reasonably be expected to result in any of the conditions to the Merger set forth in Article VII not being satisfied; (d) take any action that would be reasonably expected to prevent, materially impede or materially delay the consummation of the transactions contemplated by this Agreement; or (e) agree to take, make any commitment to take, or adopt any resolutions of its board of directors in support of, any of the actions prohibited by this Section 5.3.

ARTICLE VI

ADDITIONAL AGREEMENTS

6.1 <u>Regulatory Matters</u>. (a) Parent and Company shall promptly prepare and file with the SEC the Form S-4, in which the Joint Proxy Statement will be included as a prospectus. Each of Parent and Company shall use its reasonable best efforts to have the Form S-4 declared effective under the Securities Act as promptly as practicable after such filing, and Company shall thereafter mail or deliver the Joint Proxy Statement to its stockholders. Parent shall also use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions contemplated by this Agreement, and Company shall furnish all information concerning Company and the holders of Company Common Stock as may be reasonably requested in connection with any such action.

(b) The parties shall cooperate with each other and use their respective reasonable best efforts to promptly prepare and file all necessary documentation, to effect all applications, notices, petitions and filings, to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties (including any unions, works councils or other labor organizations) and Governmental Entities that are necessary or advisable to consummate the transactions contemplated by this Agreement (including the Merger), and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such third parties or Governmental Entities. Company and Parent shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case subject to applicable laws relating to the confidentiality of information, all the information relating to Company or Parent, as the case may be, and any of their respective Subsidiaries, that appear in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties shall act reasonably and as promptly as practicable. The parties shall consult with each other with respect to the obtaining of all permits, consents, approvals and

44

IN WITNESS WHEREOF, Company and Parent have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

MERRILL LYNCH & CO., INC.

By:       /s/ John A. Thain
Name:     John A. Thain
Title:    Chairman and Chief Executive Officer

BANK OF AMERICA CORPORATION

By:       /s/ Kenneth D. Lewis
Name:     Kenneth D. Lewis
Title:    Chairman, Chief Executive Officer and
          President

*Signature Page to Agreement and Plan of Merger*

# Exhibit 14

**To Smolar Declaration in
Support of Motion for Summary Judgment**

# BANK OF AMERICA CORP /DE/ (BAC)

# DEFM14A
Definitive proxy statement relating to a merger,acquisition, or disposition
Filed on 11/03/2008





### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# SCHEDULE 14A
**(Rule 14A-101)**

**Information Required in Proxy Statement**
**Schedule 14A Information**
**Proxy Statement Pursuant to Section 14(a) of**
**the Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐  Preliminary Proxy Statement             ☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to § 240.14a-12

# Bank of America Corporation
**(Name of Registrant as Specified In Its Charter)**

_____
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.
☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)  Title of each class of securities to which transaction applies:

(2)  Aggregate number of securities to which transaction applies:

(3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

(4)  Proposed maximum aggregate value of transaction:

(5)  Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)  Amount Previously Paid:

(2)  Form, Schedule or Registration Statement No.:

(3)  Filing Party:

(4)  Date Filed:

Table of Contents

   

**MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT**

Dear Stockholder:

On September 15, 2008, Merrill Lynch & Co., Inc. and Bank of America Corporation announced a strategic business combination in which a subsidiary of Bank of America will merge with and into Merrill Lynch. If the merger is completed, holders of Merrill Lynch common stock will have a right to receive 0.8595 of a share of Bank of America common stock for each share of Merrill Lynch common stock held immediately prior to the merger. In connection with the merger, Bank of America expects to issue approximately 1.710 billion shares of common stock and 359,100 shares of preferred stock (the terms of which are described starting on page 93).

The market value of the merger consideration will fluctuate with the market price of Bank of America common stock. The following table shows the closing sale prices of Bank of America common stock and Merrill Lynch common stock as reported on the New York Stock Exchange on September 12, 2008, the last trading day before public announcement of the merger, and on October 30, 2008, the last practicable trading day before the distribution of this document. This table also shows the implied value of the merger consideration proposed for each share of Merrill Lynch common stock, which we calculated by multiplying the closing price of Bank of America common stock on those dates by 0.8595, the exchange ratio.

|  | Bank of America Common Stock | | Merrill Lynch Common Stock | | Implied Value of One Share of Merrill Lynch Common Stock | |
|---|---|---|---|---|---|---|
| At September 12, 2008 | $ | 33.74 | $ | 17.05 | $ | 29.00 |
| At October 30, 2008 | $ | 22.78 | $ | 17.78 | $ | 19.58 |

The merger is intended to qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended, and holders of Merrill Lynch common stock are not expected to recognize any gain or loss for United States federal income tax purposes on the exchange of shares of Merrill Lynch common stock for shares of Bank of America common stock in the merger, except with respect to any cash received instead of fractional shares of Bank of America common stock. However, under some circumstances described in this document, the merger will not qualify as a reorganization, and each of us has agreed that in such circumstances we would complete the merger on a taxable basis.

The market prices of both Bank of America common stock and Merrill Lynch common stock will fluctuate before the merger. You should obtain current stock price quotations for Bank of America common stock and Merrill Lynch common stock. Bank of America common stock is quoted on the NYSE under the symbol "BAC." Merrill Lynch common stock is quoted on the NYSE under the symbol "MER."

At a special meeting of Bank of America stockholders, Bank of America stockholders will be asked to vote on the issuance of Bank of America common stock in the merger and certain other matters. The stock issuance proposal requires the votes cast in favor of such proposal to exceed the votes cast against such proposal at the special meeting by holders of Bank of America common stock and 7% Cumulative Redeemable Preferred Stock, Series B, which we refer to as Series B Preferred Stock, voting together without regard to class.

At a special meeting of Merrill Lynch stockholders, Merrill Lynch stockholders will be asked to vote on the adoption of the merger agreement and certain other matters. To adopt the merger agreement and to approve the related certificate amendment requires the affirmative vote of the holders of a majority of the outstanding shares of Merrill Lynch common stock entitled to vote.

Holders of Merrill Lynch preferred stock and holders of depositary shares representing Merrill Lynch preferred stock are not entitled to and are not being requested to vote at the Merrill Lynch special meeting.

**The Bank of America board of directors unanimously recommends that Bank of America stockholders vote FOR the proposal to issue shares of Bank of America common stock in the merger and FOR the other related proposals.**

**The Merrill Lynch board of directors unanimously recommends that Merrill Lynch stockholders vote FOR adoption of the merger agreement and FOR the other related proposals.**

This document describes the special meetings, the merger, the documents related to the merger and other related matters. Please carefully read this entire document, including "Risk Factors" beginning on page 23 for a discussion of the risks relating to the proposed merger. You also can obtain information about our companies from documents that each of us has filed with the Securities and Exchange Commission.

KENNETH D. LEWIS

Chairman, Chief Executive Officer and

President Bank of America Corporation

JOHN A. THAIN

Chairman and Chief Executive Officer

Merrill Lynch & Co., Inc.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Bank of America common stock or preferred stock to be issued under this document or determined if this document is accurate or adequate. Any representation to the contrary is a criminal offense.

The date of this document is October 31, 2008, and it is first being mailed or otherwise delivered to Bank of America and Merrill Lynch stockholders on or about November 3, 2008.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT VOTING PROCEDURES FOR THE SPECIAL MEETINGS | 1 |
| SUMMARY | 5 |
| Selected Consolidated Historical Financial Data of Bank of America | 15 |
| Selected Consolidated Historical Financial Data of Merrill Lynch | 17 |
| Unaudited Selected Pro Forma Combined Financial Information | 19 |
| Comparative Per Share Data | 21 |
| Cautionary Statement Regarding Forward-Looking Statements | 22 |
| RISK FACTORS | 23 |
| THE BANK OF AMERICA SPECIAL MEETING | 27 |
| Matters to Be Considered | 27 |
| Proxies | 27 |
| Solicitation of Proxies | 28 |
| Record Date | 28 |
| Voting Rights and Vote Required | 28 |
| Recommendation of the Bank of America Board of Directors | 29 |
| Attending the Meeting | 30 |
| THE MERRILL LYNCH SPECIAL MEETING | 31 |
| Matters to Be Considered | 31 |
| Proxies | 31 |
| Solicitation of Proxies | 32 |
| Record Date | 32 |
| Voting Rights and Vote Required | 32 |
| Recommendation of the Merrill Lynch Board of Directors | 33 |
| Attending the Meeting | 33 |
| INFORMATION ABOUT THE COMPANIES | 34 |
| Bank of America Corporation | 34 |
| MER Merger Corporation | 34 |
| Merrill Lynch & Co., Inc. | 34 |
| RECENT DEVELOPMENTS | 35 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS | 38 |
| THE MERGER | 49 |
| Background of the Merger | 49 |
| Merrill Lynch's Reasons for the Merger; Recommendation of the Merrill Lynch Board of Directors | 51 |
| Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors | 54 |
| Opinion of Merrill Lynch's Financial Advisor | 56 |
| Opinions of Bank of America's Financial Advisors | 63 |
| Board of Directors and Management of Bank of America Following Completion of the Merger | 69 |
| Public Trading Markets | 69 |
| Bank of America's Dividend Policy | 69 |
| Merrill Lynch Stockholders Do Not Have Dissenters' Appraisal Rights in the Merger | 69 |
| Regulatory Approvals Required for the Merger | 70 |

i

|  | Page |
|---|---|
| Litigation Relating to the Merger | 71 |
| Merrill Lynch's Officers and Directors Have Financial Interests in the Merger | 73 |
| THE MERGER AGREEMENT | 76 |
| Terms of the Merger | 76 |
| Treatment of Merrill Lynch Stock Options and Other Equity-Based Awards | 76 |
| Treatment of Merrill Lynch Preferred Stock | 77 |
| Treatment of Exchangeable Shares of Merrill Lynch & Co., Canada Ltd. | 79 |
| Closing and Effective Time of the Merger | 80 |
| Conversion of Shares; Exchange of Certificates; Book-Entry Shares | 80 |
| Representations and Warranties | 82 |
| Covenants and Agreements | 83 |
| Reasonable Best Efforts of Merrill Lynch and Bank of America to Obtain the Required Stockholder Vote | 85 |
| Agreement Not to Solicit Other Offers | 86 |
| Employee Matters | 87 |
| Indemnification and Insurance | 87 |
| Conditions to Complete the Merger | 88 |
| Termination of the Merger Agreement | 89 |
| Effect of Termination | 89 |
| Expenses and Fees | 89 |
| Amendment, Waiver and Extension of the Merger Agreement | 90 |
| STOCK OPTION AGREEMENT | 91 |
| DESCRIPTION OF NEW BANK OF AMERICA PREFERRED STOCK | 93 |
| ACCOUNTING TREATMENT | 97 |
| UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER | 97 |
| Tax Consequences if the Merger Qualifies as a Reorganization | 98 |
| Tax Consequences if the Merger Does Not Qualify as a Reorganization | 99 |
| Backup Withholding | 99 |
| COMPARISON OF STOCKHOLDERS' RIGHTS | 100 |
| AMENDMENT TO BANK OF AMERICA'S STOCK PLAN | 104 |
| AMENDMENT TO THE BANK OF AMERICA AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | 115 |
| AMENDMENT TO THE MERRILL LYNCH RESTATED CERTIFICATE OF INCORPORATION | 116 |
| COMPARATIVE MARKET PRICES AND DIVIDENDS | 117 |
| LEGAL MATTERS | 118 |
| EXPERTS | 118 |
| OTHER MATTERS | 119 |
| STOCKHOLDERS SHARING AN ADDRESS | 119 |
| OVERSEAS SHAREHOLDERS | 119 |
| WHERE YOU CAN FIND MORE INFORMATION | 123 |
| Bank of America SEC Filings | 123 |
| Merrill Lynch SEC Filings | 124 |

Table of Contents

**APPENDICES**

**APPENDIX A**
Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America
   Corporation (including Amendment No. 1, dated as of October 21, 2008)      A-1
**APPENDIX B**
Stock Option Agreement, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America
   Corporation      B-1
**APPENDIX C**
Opinion of J.C. Flowers & Co. LLC      C-1
**APPENDIX D**
Opinion of Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC      D-1
**APPENDIX E**
Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated      E-1
**APPENDIX F**
Amendment to Bank of America's 2003 Key Associate Stock Plan, as Amended and Restated      F-1

iii

Table of Contents

## THE MERGER AGREEMENT

*The following describes certain aspects of the merger, including material provisions of the merger agreement. The following description of the merger agreement is subject to, and qualified in its entirety by reference to, the merger agreement, which is attached to this document as Appendix A and is incorporated by reference in this document. We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing the merger.*

### Terms of the Merger

Each of the Merrill Lynch board of directors and the Bank of America board of directors has approved the merger agreement, which provides for the merger of Merger Sub with and into Merrill Lynch. Merrill Lynch will be the surviving corporation in the merger and will remain a subsidiary of Bank of America. Each share of Merrill Lynch common stock, par value $1.33 1/3 per share, issued and outstanding immediately prior to the completion of the merger, except for specified shares of Merrill Lynch common stock held by Merrill Lynch and Bank of America, will be converted into the right to receive 0.8595 of a share of Bank of America common stock. If the number of shares of Bank of America common stock changes before the merger is completed because of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar change in capitalization, then an appropriate and proportionate adjustment will be made to the number of shares of Bank of America common stock into which each share of Merrill Lynch common stock will be converted.

Bank of America will not issue any fractional shares of Bank of America common stock in the merger. Instead, a Merrill Lynch stockholder who otherwise would have received a fraction of a share of Bank of America common stock will receive an amount in cash rounded to the nearest cent. This cash amount will be equal to such stockholder's proportionate interest in the net proceeds from the sale in the open market by the exchange agent, on behalf of all such holders, of the aggregate fractional shares of Bank of America common stock that would otherwise have been issued. The sale described in the previous sentence will occur as soon as practicable following the merger.

Non-convertible preferred stock of Merrill Lynch will be converted into preferred stock issued by Bank of America having substantially identical terms except for the additional voting rights described in "The Merger Agreement — Treatment of Preferred Stock," starting on page 77. Convertible preferred stock of Merrill Lynch will remain outstanding after the merger and will thereafter be convertible in accordance with its terms into shares of Bank of America common stock based on the exchange ratio of 0.8595.

Prior to the effective time of the merger, the certificate of incorporation of Merrill Lynch will be amended to reflect changes in the terms of convertible preferred stock of Merrill Lynch described below. The merger agreement provides that Bank of America may change the structure of the merger. No such change will alter the amount or kind of merger consideration to be provided under the merger agreement, adversely affect the tax treatment of Merrill Lynch's stockholders as a result of receiving the merger consideration or the tax treatment of the parties to the merger agreement, or impede or delay completion of the merger.

### Treatment of Merrill Lynch Stock Options and Other Equity-Based Awards

Each outstanding option to acquire Merrill Lynch common stock granted under Merrill Lynch's stock incentive plans will be converted automatically at the effective time of the merger into an option to purchase Bank of America common stock and will continue to be governed by the terms of the Merrill Lynch stock plan and related grant agreements under which it was granted, except that:

- the number of shares of Bank of America common stock subject to each converted Bank of America stock option will be equal to the product of the number of shares of Merrill Lynch common stock previously subject to the Merrill Lynch stock option and 0.8595, rounded down to the nearest whole share; and

- the exercise price per share of Bank of America common stock subject to each converted Bank of America stock option will be equal to the exercise price for each share of Merrill Lynch common stock

76

Table of Contents

previously subject to the Merrill Lynch stock option immediately prior to completion of the merger divided by 0.8595, rounded up to the nearest cent.

Restricted shares of Merrill Lynch common stock outstanding immediately prior to the effective time of the merger will be converted automatically at the effective time of the merger into restricted shares of Bank of America common stock. The number of restricted shares of Bank of America common stock will be equal to the product of the number of shares of Merrill Lynch common stock previously subject to the Merrill Lynch restricted share award and 0.8595, rounded to the nearest whole share.

Restricted share units in respect of Merrill Lynch common stock outstanding immediately prior to completion of the merger will be converted automatically at the effective time of the merger into restricted share units in respect of shares of Bank of America common stock. The number of shares of Bank of America common stock subject to each converted restricted share unit will be equal to the product of the number of shares of Merrill Lynch common stock previously subject to the Merrill Lynch restricted share unit and 0.8595, rounded to the nearest whole share. The Bank of America restricted share units will be payable or distributable in accordance with the terms of the Merrill Lynch agreement, plan or arrangement relating to the restricted share units.

Cap units in respect of Merrill Lynch common stock outstanding immediately prior to completion of the merger will be converted automatically at the effective time of the merger into cap units in respect of shares of Bank of America common stock. The number of shares of Bank of America common stock subject to each converted cap unit will be equal to the product of the number of shares of Merrill Lynch common stock previously subject to the Merrill Lynch cap unit and 0.8595, rounded to the nearest whole share. The Bank of America cap units will be payable or distributable in accordance with the terms of the agreement, plan or arrangement relating to the Merrill Lynch restricted share units.

Merrill Lynch deferred equity units, which are amounts denominated in Merrill Lynch common stock and held in participant accounts pursuant to certain of Merrill Lynch's deferred compensation plans, will be converted automatically at the effective time of the merger into deferred equity units in respect of shares of Bank of America common stock. The number of shares of Bank of America common stock subject to each converted deferred equity unit will be equal to the product of the number of shares of Merrill Lynch common stock in which the Merrill Lynch deferred equity unit was previously denominated and 0.8595, rounded to the nearest whole share. The deferred equity units will be payable or distributable in accordance with the terms of the Merrill Lynch deferred compensation plans applicable to the deferred equity units.

Prior to the effective time of the merger, the Merrill Lynch 1986 Employee Stock Purchase Plan will be amended to reflect the merger, including the substitution of Bank of America common stock for Merrill Lynch common stock to effectuate the assumption of the plan. As of immediately after completion of the merger, a maximum of up to 16,449,695 shares of Bank of America common stock (less the number of shares of Company Common Stock issued under the ESPP with respect to any purchase periods ending prior to the Effective Time, multiplied by the Exchange Ratio) will be authorized for issuance to employees of Merrill Lynch and its subsidiaries, following the merger. Bank of America has the right to terminate the plan following the effective time of the merger.

**Treatment of Merrill Lynch Preferred Stock**

Upon completion of the merger, (i) each share of Merrill Lynch Preferred Stock Series 1 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 1, (ii) each share of Merrill Lynch Preferred Stock Series 2 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 2, (iii) each share of Merrill Lynch Preferred Stock Series 3 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 3, (iv) each share of Merrill Lynch Preferred Stock Series 4 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 4, (v) each share of Merrill Lynch Preferred Stock Series 5 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of

Table of Contents

America Preferred Stock Series 5, (vi) each share of Merrill Lynch Preferred Stock Series 6 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 6, (vii) each share of Merrill Lynch Preferred Stock Series 7 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 7 and (viii) each share of Merrill Lynch Preferred Stock Series 8 issued and outstanding immediately prior to completion of the merger will be converted into one share of Bank of America Preferred Stock Series 8.

The terms of the Bank of America Preferred Stock Series 1, Bank of America Preferred Stock Series 2, Bank of America Preferred Stock Series 3, Bank of America Preferred Stock Series 4, Bank of America Preferred Stock Series 5, Bank of America Preferred Stock Series 6, Bank of America Preferred Stock Series 7, and Bank of America Preferred Stock Series 8 will be substantially identical to the terms of the corresponding series of Merrill Lynch preferred stock, except for the additional voting rights described below. We sometimes refer to the Bank of America Preferred Stock Series 1, Bank of America Preferred Stock Series 2, Bank of America Preferred Stock Series 3, Bank of America Preferred Stock Series 4, Bank of America Preferred Stock Series 5, Bank of America Preferred Stock Series 6, Bank of America Preferred Stock Series 7, and Bank of America Preferred Stock Series 8, collectively, as the New Bank of America Preferred Stock. As of August 29, 2008 (i) 50,000 shares were authorized as Merrill Lynch Preferred Stock Series 1, 21,000 of which were outstanding, (ii) 50,000 shares were authorized as Merrill Lynch Preferred Stock Series 2, 37,000 of which were outstanding, (iii) 43,333 shares were authorized as Merrill Lynch Preferred Stock Series 3, 27,000 of which were outstanding, (iv) 23,333 shares were authorized as Merrill Lynch Preferred Stock Series 4, 20,000 of which were outstanding; (v) 50,000 shares were authorized as Merrill Lynch Preferred Stock Series 5, 50,000 of which were outstanding, (vi) 65,000 shares were authorized as Merrill Lynch Preferred Stock Series 6, 65,000 of which were outstanding, (vii) 50,000 shares were authorized as Merrill Lynch Preferred Stock Series 7, 50,000 of which were outstanding, and (viii) 97,750 shares were authorized as Merrill Lynch Preferred Stock Series 8, 89,100 of which were outstanding.

The holders of Bank of America Preferred Stock Series 1, Bank of America Preferred Stock Series 2, Bank of America Preferred Stock Series 3, Bank of America Preferred Stock Series 4, Bank of America Preferred Stock Series 5 and Bank of America Preferred Stock Series 8 shall be entitled to vote on all matters submitted to a vote of the holders of Bank of America common stock, voting together with the holders of common stock as one class. Each share shall be entitled to 150 votes. The holders of Bank of America Preferred Stock Series 6 and Bank of America Preferred Stock Series 7 shall be entitled to vote on all matters submitted to a vote of the holders of Bank of America common stock, voting together with the holders of common stock as one class. Each share shall be entitled to 5 votes.

Each outstanding share of Merrill Lynch non-convertible preferred stock is presently represented by depositary shares, or Merrill Lynch Depositary Shares, that are listed on the NYSE and represent (a) with respect to the Merrill Lynch Preferred Stock Series 6 and Merrill Lynch Preferred Stock Series 7, a one-fortieth interest in a share of Merrill Lynch preferred stock and (b) with respect to the Merrill Lynch Preferred Stock Series 1, Merrill Lynch Preferred Stock Series 2, Merrill Lynch Preferred Stock Series 3, Merrill Lynch Preferred Stock Series 4, Merrill Lynch Preferred Stock Series 5 and Merrill Lynch Preferred Stock Series 8, a one-twelve hundredth interest in a share of Merrill Lynch preferred stock. Upon completion of the merger, Bank of America will assume the obligations of Merrill Lynch under the (i) Deposit Agreement, dated as of November 1, 2004, among Merrill Lynch, The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as depositary, and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch Floating Rate Non-Cumulative Preferred Stock, Series 1), (ii) Deposit Agreement, dated as of March 14, 2005, among Merrill Lynch, The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), as depositary, and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch Floating Rate Non-Cumulative Preferred Stock, Series 2), (iii) Deposit Agreement, dated as of November 17, 2005, among Merrill Lynch, The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.) and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch 6.375% Non-Cumulative Preferred Stock, Series 3), (iv) Deposit Agreement, dated as of November 17, 2005, among Merrill Lynch, The Bank of New York Mellon (as successor to JPMorgan Chase Bank, N.A.), and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch Floating Rate Non-Cumulative Preferred Stock,

78

Table of Contents

Series 4), (v) Deposit Agreement, dated as of March 30, 2007, among Merrill Lynch, The Bank of New York Mellon (as successor to The Bank of New York) and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch Floating Rate Non-Cumulative Preferred Stock, Series 5), (vi) Deposit Agreement, dated as of January 28, 2004, among Merrill Lynch (as successor to First Republic Bank), Mellon Investor Services LLC, as depositary, and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch 6.70% Noncumulative Perpetual Preferred Stock, Series 6), (vii) Deposit Agreement, dated as of March 18, 2005, among Merrill Lynch (as successor to First Republic Bank), Mellon Investor Services LLC, as depositary, and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch 6.25% Noncumulative Perpetual Preferred Stock, Series 7) and (viii) Deposit Agreement, dated as of April 29, 2008, among Merrill Lynch, The Bank of New York Mellon (as successor to The Bank of New York) and the Holders from Time to Time of Depositary Receipts (relating to the Merrill Lynch 8.625% Non-Cumulative Preferred Stock, Series 8). Bank of America will instruct the depositaries, each referred to as a Depositary, as depositary under each of the deposit agreements, or Deposit Agreements, to treat the shares of New Bank of America Preferred Stock received by it in exchange for shares of Merrill Lynch preferred stock as newly deposited securities under the applicable Deposit Agreement. In accordance with the terms of the relevant Deposit Agreement, the Merrill Lynch Depositary Shares will thereafter represent the shares of the relevant series of New Bank of America Preferred Stock. Such depositary shares will continue to be listed on the New York Stock Exchange upon completion of the merger under a new name and traded under a new symbol.

Shares of preferred securities issued by Merrill Lynch's subsidiaries will remain issued and outstanding following completion of the merger, and the terms of those preferred shares will generally be unaffected by the merger. Each share of 9.00% Non-Voting Mandatory Convertible Non-Cumulative Preferred Stock, Series 2, and the 9.00% Non-Voting Mandatory Convertible Non-Cumulative Preferred Stock, Series 3, outstanding immediately prior to completion of the merger shall remain issued and outstanding and shall have the rights, privileges, powers and preferences as set forth in Merrill Lynch's certificate of incorporation, as amended by the certificate amendment described herein. Holders of Merrill Lynch preferred stock, Merrill Lynch Depositary Shares or preferred securities issued by Merrill Lynch's subsidiaries are not entitled to vote on the merger or at the special meeting.

EACH DEPOSITARY IS THE ONLY HOLDER OF RECORD OF SHARES OF MERRILL LYNCH PREFERRED STOCK THAT ARE REPRESENTED BY DEPOSITARY SHARES. ALL HOLDERS OF MERRILL LYNCH DEPOSITARY SHARES SHOULD FOLLOW THE INSTRUCTIONS GIVEN TO THEM BY THEIR BROKER.

### Treatment of Exchangeable Shares of Merrill Lynch & Co., Canada Ltd.

In accordance with the terms of the merger agreement, Merrill Lynch is obligated to redeem the exchangeable shares in accordance with their terms. The documents governing the exchangeable shares provide that, as a result of the merger being proposed, Merrill Lynch Canada has the right to cause the redemption (or repurchase by an affiliate of Merrill Lynch Canada) of the exchangeable shares in accordance with their terms. Merrill Lynch Canada has determined to exercise its right to redeem the exchangeable shares and its affiliate has determined to exercise its overriding right to purchase the exchangeable shares on the redemption date. The redemption date is the later of the fifth Toronto business day following the date of the special meeting and December 4, 2008.

Upon the repurchase by an affiliate of Merrill Lynch Canada, of the exchangeable shares, holders of such shares will be required to dispose of them in exchange for Merrill Lynch common stock on a one-for-one basis. The holders of exchangeable shares who receive such Merrill Lynch common stock, and continue to hold such Merrill Lynch common stock at the time of the completion of the merger, will subsequently receive the merger consideration in the same manner as other holders of Merrill Lynch common stock. The redemption or repurchase of the exchangeable shares will not, however, be conditional upon the completion of the merger.

Generally, a Canadian resident who holds Merrill Lynch Canada exchangeable shares as capital property and who disposes of them in exchange for Merrill Lynch common stock will realize a capital gain (or capital loss) under the *Income Tax Act* (Canada) equal to the amount by which the fair market value of the

Table of Contents

Merrill Lynch common stock received by the holder, less any reasonable costs of disposition, exceeds (or is less than) the adjusted cost base of the Merrill Lynch Canada exchangeable shares disposed of by the holder.

**This summary is of a general nature and is not comprehensive. It is not intended to be, nor should it be construed to be, legal or tax advice to any particular holder of Merrill Lynch Canada exchangeable shares. Accordingly, holders of Merrill Lynch Canada exchangeable shares will need to consult with their own tax advisors for advice regarding the Canadian income tax consequences to them of the disposition of such shares in exchange for Merrill Lynch common stock and the subsequent receipt of Bank of America common stock upon the merger.**

### Closing and Effective Time of the Merger

The merger will be completed only if all of the following occur:

- the merger agreement is adopted by Merrill Lynch stockholders;
- the issuance of shares of Bank of America common stock is approved by the Bank of America stockholders;
- we obtain all required governmental and regulatory consents and approvals; and
- all other conditions to the merger discussed in this document and the merger agreement are either satisfied or waived.

The merger will become effective when a certificate of merger is filed with the Secretary of State of the State of Delaware. However, we may agree to a later time for completion of the merger and specify that time in the certificate of merger in accordance with Delaware law. In the merger agreement, we have agreed to cause the completion of the merger to occur no later than the fifth business day following the satisfaction or waiver of the last of the conditions specified in the merger agreement, or on another mutually agreed date. If these conditions are satisfied or waived during the two weeks immediately prior to the end of a fiscal quarter of Bank of America, then Bank of America may postpone the closing until the first full week after the end of that quarter. It currently is anticipated that the effective time of the merger will occur on or after December 31, 2008, but we cannot guarantee when or if the merger will be completed.

### Conversion of Shares; Exchange of Certificates; Book-Entry Shares

The conversion of Merrill Lynch common stock into the right to receive the merger consideration will occur automatically upon completion of the merger. As soon as reasonably practicable after completion of the merger, the exchange agent will exchange certificates representing shares of Merrill Lynch common stock for merger consideration to be received pursuant to the terms of the merger agreement. Prior to the completion of the merger, Bank of America will select a bank or trust company subsidiary of Bank of America or another bank or trust company reasonably acceptable to Merrill Lynch to be the exchange agent, who will exchange certificates representing shares of Merrill Lynch common stock for the merger consideration and perform other duties as explained in the merger agreement.

Shares of Merrill Lynch common stock held in the Direct Registration System (DRS) are being automatically converted into whole shares of Bank of America common stock in DRS form. An account statement will be mailed to you confirming this automatic conversion.

Shares of Merrill Lynch common stock held in the book-entry form will be automatically converted into whole shares of Bank of America common stock in book-entry form. An account statement will be mailed to you confirming this automatic conversion.

#### *Letter of Transmittal*

As soon as reasonably practicable after completion of the merger, the exchange agent will mail a letter of transmittal to each holder of a Merrill Lynch common stock certificate at the effective time of the merger. This mailing will contain instructions on how to surrender Merrill Lynch common stock certificates in

80

Table of Contents

exchange for statements indicating book-entry ownership of Bank of America common stock and a check in the amount of cash to be paid instead of fractional shares. If a holder of a Merrill Lynch common stock certificate makes a special request, however, Bank of America will issue to the requesting holder a Bank of America stock certificate in lieu of book-entry shares. When you deliver your Merrill Lynch stock certificates to the exchange agent along with a properly executed letter of transmittal and any other required documents, your Merrill Lynch stock certificates will be cancelled and you will receive statements indicating book-entry ownership of Bank of America common stock, or, if requested, stock certificates representing the number of full shares of Bank of America common stock to which you are entitled under the merger agreement. You also will receive a cash payment for any fractional shares of Bank of America common stock that would have been otherwise issuable to you as a result of the merger.

Holders of Merrill Lynch common stock should not submit their Merrill Lynch stock certificates for exchange until they receive the transmittal instructions and a form of letter of transmittal from the exchange agent.

If a certificate for Merrill Lynch common stock has been lost, stolen or destroyed, the exchange agent will issue the consideration properly payable under the merger agreement upon receipt of appropriate evidence as to that loss, theft or destruction and appropriate and customary indemnification.

After completion of the merger, there will be no further transfers on the stock transfer books of Merrill Lynch, except as required to settle trades executed prior to completion of the merger.

### Withholding

The exchange agent will be entitled to deduct and withhold from the cash in lieu of fractional shares payable to any Merrill Lynch stockholder the amounts it is required to deduct and withhold under any federal, state, local or foreign tax law. If the exchange agent withholds any amounts, these amounts will be treated for all purposes of the merger as having been paid to the stockholders from whom they were withheld.

### Dividends and Distributions

Until Merrill Lynch common stock certificates are surrendered for exchange, any dividends or other distributions declared after the completion of the merger with respect to Bank of America common stock into which shares of Merrill Lynch common stock may have been converted will accrue, without interest, but will not be paid. Bank of America will pay to former Merrill Lynch stockholders any unpaid dividends or other distributions, without interest, only after they have duly surrendered their Merrill Lynch stock certificates.

Prior to the effective time of the merger, Merrill Lynch and its subsidiaries may not make, declare or pay any dividend or distribution on its capital stock or repurchase any shares of its capital stock, other than:

- regular quarterly cash dividends on Merrill Lynch common stock at a rate not to exceed $0.35 per share of Merrill Lynch common stock with record dates and payment dates consistent with the prior year;

- dividends on Merrill Lynch's preferred stock;

- dividends paid by any subsidiary of Merrill Lynch to Merrill Lynch or to any of its wholly owned subsidiaries; or

- the acceptance of shares of Merrill Lynch common stock in payment of the exercise of a stock option or stock appreciation rights or the vesting of restricted shares of (or settlement of other equity-based awards in respect of) Merrill Lynch common stock granted under a Merrill Lynch stock plan, financial advisor capital accumulation award plan or deferred equity unit plan, in each case in accordance with past practice and the terms of the applicable plan.

Merrill Lynch and Bank of America have agreed to coordinate declaration of dividends so that holders of Merrill Lynch common stock will not receive two dividends, or fail to receive one dividend, for any quarter with respect to their Merrill Lynch common stock and any Bank of America common stock any holder receives in the merger.

Table of Contents

**Representations and Warranties**

The merger agreement contains customary representations and warranties of Merrill Lynch and Bank of America relating to their respective businesses. With the exception of certain representations and warranties that must be true and correct in all material respects (or, in the case of specific representations and warranties regarding the capitalization of Merrill Lynch, true and correct except to a de minimis extent), no representation or warranty will be deemed untrue, inaccurate or incorrect as a consequence of the existence or absence of any fact, circumstance or event unless that fact, circumstance or event, individually or when taken together with all other facts, circumstances or events, has had or would reasonably be expected to have a material adverse effect on the company making the representation. In determining whether a material adverse effect has occurred or would reasonably be expected to occur, the parties will disregard any effects resulting from (1) changes in generally accepted accounting principles or regulatory accounting requirements applicable generally to companies in the industries in which the relevant party and its subsidiaries operate (except to the extent that the effects of such a change are disproportionately adverse to such party as compared to other companies in such industries), (2) changes in laws, rules or regulations or the interpretation of laws, rules or regulations by governmental authorities of general applicability to companies in the industries in which the relevant party and its subsidiaries operate (except to the extent that the effects of such a change are disproportionately adverse to such party as compared to other companies in such industries), (3) actions or omissions taken with the prior written consent of the other party or expressly required by the merger agreement, (4) changes in global, national or regional political conditions (including acts of terrorism or war) or in general business, economic or market conditions, including changes generally in prevailing interest rates, currency exchange rates, credit markets and price levels or trading volumes in the United States or foreign securities markets, in each case, generally affecting the industries in which the relevant party or its subsidiaries operate and including changes to any previously correctly applied asset marks resulting therefrom (except to the extent that the effects of such a change are disproportionately adverse to such party as compared to other companies in such industries), (5) the execution of the merger agreement or public disclosure of the merger or the transactions contemplated by the merger agreement, including acts of competitors or losses of employees to the extent resulting therefrom, (6) failure to meet earning projections in and of itself, but not including any underlying causes thereof, or (7) changes in the trading price of either party's common stock in and of itself, but not including any underlying causes thereof. The representations and warranties in the merger agreement do not survive the completion of the merger.

Each of Bank of America and Merrill Lynch has made representations and warranties to the other regarding, among other things:

- corporate matters, including due organization and qualification;

- capitalization;

- authority relative to execution and delivery of the merger agreement and the stock option agreement and the absence of conflicts with, or violations of, organizational documents or other obligations as a result of the merger;

- required governmental filings and consents;

- the timely filing of reports with governmental entities, and the absence of investigations and enforcement actions by regulatory agencies;

- financial statements, internal controls and accounting or auditing practices;

- broker's fees payable in connection with the merger;

- the absence of material adverse changes;

- conduct of business in the ordinary course of business since June 27, 2008;

- legal proceedings;

- taxes and tax returns;

Table of Contents

- material contracts;
- risk management instruments and derivatives;
- compliance with applicable laws;
- tax treatment of the merger;
- the receipt of financial advisors' opinions;
- intellectual property; and
- the accuracy of information supplied for inclusion in this document and other similar documents.

In addition, Merrill Lynch has made other representations and warranties about itself to Bank of America as to:

- employee matters, including employee benefit plans;
- investment securities and commodities;
- owned and leased real property;
- environmental liabilities;
- broker dealer, fund and investment advisory matters;
- securitizations;
- the inapplicability of state takeover laws; and
- interested party transactions.

The representations and warranties described above and included in the merger agreement were made by each of Bank of America and Merrill Lynch to the other. These representations and warranties were made as of specific dates, may be subject to important qualifications and limitations agreed to by Bank of America and Merrill Lynch in connection with negotiating the terms of the merger agreement, and may have been included in the merger agreement for the purpose of allocating risk between Bank of America and Merrill Lynch rather than to establish matters as facts. The merger agreement is described in, and included as an appendix to, this document only to provide you with information regarding its terms and conditions, and not to provide any other factual information regarding Merrill Lynch, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the information provided elsewhere in this document and in the documents incorporated by reference into this document. See "Where You Can Find More Information" on page 123.

### Covenants and Agreements

Each of Merrill Lynch and Bank of America has undertaken customary covenants that place restrictions on it and its subsidiaries until completion of the merger. In general, each of Bank of America and Merrill Lynch agreed to (1) conduct its business in the ordinary course in all material respects, (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees, and (3) take no action that would reasonably be expected to adversely affect or materially delay its ability to obtain any necessary regulatory and governmental approvals, perform its covenants or complete the merger. Merrill Lynch further agreed that, with certain exceptions or except with Bank of America's prior written consent (which consent will not be unreasonably withheld or delayed with respect to certain of the actions described below), Merrill Lynch will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions:

- incur indebtedness or in any way assume the indebtedness of another person, except in the ordinary course of business consistent with past practice;

83

Table of Contents

- adjust, split, combine or reclassify any of its capital stock;

- make, declare or pay any dividends or other distributions on any shares of its capital stock, or redeem, purchase or otherwise acquire any shares of its capital stock, except as set forth above in "— Conversion of Shares; Exchange of Certificates — Dividends and Distributions" (Bank of America has agreed to allow Merrill Lynch to repurchase shares of Merrill Lynch common stock in connection with the issuance of shares under Merrill Lynch's stock incentive, financial advisor capital accumulation award plan, and deferred equity unit plans);

- issue or grant shares, stock options, stock appreciation rights, restricted shares, restricted stock units, deferred equity units, awards based on the value of Merrill Lynch's capital stock or other equity-based awards outside the parameters set forth in the merger agreement;

- except as required under applicable law or the terms of any Merrill Lynch benefit plan, (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements; (iii) become a party to, establish, adjust, or terminate any employee benefit or compensation plan or agreement; (iv) accelerate the vesting of any stock-based compensation or other long-term incentive compensation under any of Merrill Lynch's employee benefit plans; (v) hire employees in the position of vice president or above or terminate (other than for cause) the employment of employees in the position of vice president or above; or (vi) take any action which could reasonably be expected to give rise to a "good reason" claim;

- other than in the ordinary course of business, consistent with past practice or pursuant to contracts in force as of September 15, 2008, sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any material assets or properties or cancel, release or assign any material indebtedness;

- enter into any new line of business or change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking, operating, securitization and servicing policies other than as required by applicable law, regulation or policies imposed by any governmental entity;

- transfer ownership or grant rights to its material intellectual property, except for certain grants of licenses in the ordinary course of business consistent with past practice;

- make any material investment either by purchase of securities, capital contributions, property transfers or purchase of property or assets other than in the ordinary course of business consistent with past practice;

- take any action or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code;

- amend its charter and bylaws or otherwise take any action to exempt another person from any applicable takeover law or defensive charter or terminate, amend or waive any provisions of any confidentiality or standstill agreements in place with any third parties;

- amend or knowingly violate certain material contracts or enter into any obligation that would impose material restrictions on the business of Merrill Lynch, its subsidiaries or its affiliates;

- commence or settle any material claim, action or proceeding;

- take or fail to take any action that is intended, or may reasonably be expected to, result in any of the conditions to the merger to fail to be satisfied;

- implement or adopt any material change in its tax accounting or financial accounting principles, practices or methods, except as required by applicable law, generally accepted accounting principles or regulatory guidelines;

84

Table of Contents

- file or amend any material tax return, make or change any material tax election or settle or compromise any material tax liability, in each case, other than in the ordinary course of business or as required by law; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

As discussed under "Recent Developments", Bank of America and Merrill Lynch have agreed to grant such waivers or amendments to the merger agreement as may be required to permit the CPP investment, including the granting of waivers to the covenants concerning the issuance of capital stock, the amendment of Merrill Lynch's charter for the creation of preferred stock to be issued to the U.S. Treasury pursuant to the CPP and the merger qualifying as a reorganization under Section 368(a) of the Code.

Bank of America agrees that, except as permitted by the merger agreement or with Merrill Lynch's prior written consent, Bank of America will not, among other things, undertake the following extraordinary actions:

- amend any governing documents in a manner that would adversely affect Merrill Lynch or its stockholders or the transactions contemplated by the merger agreement;

- take any action or knowingly fail to take any action reasonably likely to prevent the merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code;

- take any action or willfully fail to take any action that is intended, or may be reasonably expected, to result in any of the conditions to the merger failing to be satisfied;

- take any action that would reasonably be expected to prevent, materially impede or materially delay completion of the merger; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

The merger agreement also contains covenants relating to the preparation of this document and the holding of the special meetings of Merrill Lynch and Bank of America stockholders, access to information of the other company and public announcements with respect to the transactions contemplated by the merger agreement. Merrill Lynch has agreed to consult with Bank of America regarding certain tax planning matters. Bank of America has also agreed to cause the shares of Bank of America common stock issued in the merger to be approved for listing on the NYSE.

In addition, the merger agreement contains a covenant that Merrill Lynch shall take all action necessary to redeem the exchangeable shares which were issued by Merrill Lynch Canada in connection with the merger with Midland Walwyn Inc., prior to completion of the merger.


**Reasonable Best Efforts of Merrill Lynch and Bank of America to Obtain the Required Stockholder Vote**

Merrill Lynch has agreed to use its reasonable best efforts to hold a meeting of its stockholders as soon as is reasonably practicable for the purpose of Merrill Lynch stockholders voting on the adoption of the merger agreement. Merrill Lynch will use its reasonable best efforts to obtain such stockholder approval. The merger agreement requires Merrill Lynch to submit the merger agreement to a stockholder vote even if its board of directors no longer recommends adoption of the merger agreement. The board of directors of Merrill Lynch has unanimously approved the merger and adopted resolutions directing that the merger be submitted to the Merrill Lynch stockholders for their consideration.

Bank of America has also agreed to use its reasonable best efforts to hold a meeting of its stockholders as soon as is reasonably practicable and to use its reasonable best efforts to obtain stockholder approval of the issuance of shares of Bank of America common stock to Merrill Lynch stockholders in the merger. The merger agreement requires Bank of America to submit the proposal to issue shares of common stock to a stockholder vote even if its board of directors no longer recommends such proposal. The board of directors of Bank of America has unanimously approved the merger and has adopted resolutions directing that the issuance of the common stock be submitted to Bank of America stockholders for their consideration.

Table of Contents

**Agreement Not to Solicit Other Offers**

Merrill Lynch also has agreed that it, its subsidiaries and their officers, directors, employees, agents and representatives will not, directly or indirectly:

- initiate, solicit, encourage or facilitate (including by way of furnishing information) any inquiries or proposals for any "Alternative Proposal" (as defined below); or

- participate in any discussions or negotiations, or enter into any agreement, regarding any "Alternative Transaction" (as defined below).

However, prior to the special meeting of Merrill Lynch stockholders, Merrill Lynch may consider and participate in discussions and negotiations with respect to a bona fide Alternative Proposal, and furnish information in connection therewith, if it has first entered into a confidentiality agreement with a party proposing the Alternative Proposal on terms substantially similar to, and no less favorable to Merrill Lynch than, Merrill Lynch's confidentiality agreement with Bank of America and the Merrill Lynch board of directors determines in good faith (after consultation with outside legal counsel) that failure to take these actions would cause the board to violate its fiduciary duties to Merrill Lynch stockholders under applicable law.

Merrill Lynch has agreed in the merger agreement:

- to cease any existing discussions or negotiations with respect to any Alternative Proposal conducted prior to execution of the merger agreement, and to use reasonable best efforts to cause all persons other than Bank of America who have been furnished with confidential information in connection with an Alternative Proposal within the 12 months prior to the date of the merger agreement to return or destroy such information;

- to notify Bank of America promptly (but no later than 24 hours) after it receives any Alternative Proposal, or any material change to any Alternative Proposal, or any request for nonpublic information relating to Merrill Lynch or any of its subsidiaries or access to Merrill Lynch's properties, books or records, and to provide Bank of America with relevant information regarding the Alternative Proposal or such request; and

- to use its best efforts to keep Bank of America fully informed, on a current basis, of any material changes in the status and any material changes in the terms of any such Alternative Proposal.

As used in the merger agreement, an "Alternative Proposal" means any inquiry or proposal, including any indication of an intention to make a proposal, regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving Merrill Lynch or any of its subsidiaries that, if completed, would constitute an Alternative Transaction.

As used in the merger agreement, "Alternative Transaction" means any of the following:

- a transaction in which any person or group (other than Bank of America or its affiliates), directly or indirectly, acquires or would acquire more than 15% of the outstanding shares of Merrill Lynch or any of its subsidiaries or outstanding voting power or of any new series or new class of Merrill Lynch preferred stock that would be entitled to a class or series vote with respect to a merger with Merrill Lynch or any of its subsidiaries, whether from Merrill Lynch or pursuant to a tender offer or exchange offer or otherwise;

- a merger, share exchange, consolidation or other business combination involving Merrill Lynch or any of its subsidiaries (other than the merger being described here);

- any transaction in which any person or group (other than Bank of America or its affiliates) acquires or would acquire control of assets (including, for this purpose, the outstanding equity securities of subsidiaries of Merrill Lynch and securities of the entity surviving any merger or business combination including any of Merrill Lynch's subsidiaries) of Merrill Lynch or any of its subsidiaries representing more than 15% of the fair market value of all the assets, net revenues or net income of Merrill Lynch and its subsidiaries, taken as a whole, immediately prior to such transaction; or

86

Table of Contents

- any other consolidation, business combination, recapitalization or similar transaction involving Merrill Lynch or any of its subsidiaries, other than the transactions contemplated by the merger agreement.

The Merrill Lynch board of directors has unanimously adopted a resolution recommending that the Merrill Lynch stockholders adopt the merger agreement. Under the merger agreement, except as provided in the paragraph below, the Merrill Lynch board of directors may not withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, its recommendation, take any public action or make any public statement in connection with the meeting of Merrill Lynch stockholders that is substantively inconsistent with its recommendation, or approve or recommend, or publicly propose to approve or recommend, or fail to recommend against, any Alternative Proposal. Any of these actions is referred to as a "Change of Recommendation."

The Merrill Lynch board of directors may make a Change of Recommendation if the board receives an unsolicited Alternative Proposal that constitutes a Superior Proposal (as defined below) and that Superior Proposal has not been withdrawn, the board determines in good faith (after consultation with outside legal counsel) that, in light of such Superior Proposal, the failure to effect such Change of Recommendation would cause it to violate its fiduciary duties to Merrill Lynch stockholders under applicable law and Merrill Lynch complies with certain notice and negotiation requirements.

As used in the merger agreement, "Superior Proposal" means any third party proposal to acquire all of Merrill Lynch's equity or assets, net revenues or net income of Merrill Lynch and its subsidiaries, that Merrill Lynch's board of directors determines in reasonable good faith judgment, after consultation with its financial advisor and outside counsel, would be more favorable, from a financial point of view, to the Merrill Lynch stockholders than the transactions contemplated by the merger agreement and is reasonably capable of being completed.

**Employee Matters**

Bank of America has agreed, from completion of the merger through December 31, 2009, to maintain employee benefit plans and compensation opportunities for the benefit of individuals who are, on the closing date of the merger, actively employed by Merrill Lynch and its subsidiaries that are substantially comparable, in the aggregate, to those made available to those employees immediately prior to completion of the merger.

In addition, Bank of America has agreed, to the extent any Merrill Lynch employee becomes eligible to participate in Bank of America benefit plans following the merger:

- to recognize each employee's service with Merrill Lynch prior to completion of the merger for purposes of eligibility, participation, vesting and, except under defined benefit pension plans, benefit accrual, in each case under the Bank of America plans to the same extent such service was recognized under comparable Merrill Lynch plans prior to completion of the merger; and

- to use reasonable best efforts to waive any exclusion for pre-existing conditions or eligibility waiting periods under any Bank of America health, dental, vision or other welfare plans, to the extent such limitation would have been waived or satisfied under a corresponding Merrill Lynch plan in which such employee participated immediately prior to completion of the merger, and recognize any health, dental or vision expenses incurred in the year in which the merger closes (or, if later, the year in which such employee is first eligible to participate) for purposes of applicable deductible and annual out-of-pocket expense requirements under any health, dental or vision plan of Bank of America.

**Indemnification and Insurance**

The merger agreement requires the current rights of the directors and officers of Merrill Lynch and its subsidiaries to indemnification under these entities' organizational documents and other disclosed agreements to continue in effect for six years after completion of the merger. The merger agreement also provides that, upon completion of the merger, Bank of America will cause the surviving corporation to indemnify, defend and hold harmless, and provide advancement of expenses to, all past and present officers and directors of

Table of Contents

Merrill Lynch and its subsidiaries against all losses or liabilities incurred in their capacities as such to the fullest extent permitted by applicable laws.

The merger agreement requires Bank of America to maintain for a period of six years after completion of the merger Merrill Lynch's current directors' and officers' liability insurance policy, or policies of at least the same coverage and amount and containing terms and conditions that are not less advantageous than the current policy, with respect to acts or omissions occurring prior to completion of the merger, except that Bank of America is not required to incur an annual premium expense greater than 250% of Merrill Lynch's current annual directors' and officers' liability insurance premium. If Bank of America is unable to maintain such a policy because the annual premium expense is greater than 250% of Merrill Lynch's current annual directors' and officers' liability insurance premium, Bank of America is obligated to obtain as much comparable insurance as is available for the amount that is 250% of Merrill Lynch's current premium.

### Conditions to Complete the Merger

Our respective obligations to complete the merger are subject to the fulfillment or waiver of certain conditions, including:

- the adoption of the merger agreement by Merrill Lynch stockholders;

- the approval of the issuance of shares of common stock of Bank of America by Bank of America stockholders;

- the approval of the listing of the Bank of America common stock to be issued in the merger on the NYSE, subject to official notice of issuance;

- the effectiveness of the registration statement of which this document is a part with respect to the Bank of America common stock and preferred stock to be issued in connection with the merger under the Securities Act and the absence of any stop order or proceedings initiated or threatened by the SEC for that purpose; and

- the absence of any order, decree or injunction by any court or other governmental entity or other law that prohibits or makes illegal completion of the transactions contemplated by the merger agreement.

Each of Bank of America's and Merrill Lynch's obligations to complete the merger is also separately subject to the satisfaction or waiver of a number of conditions including:

- the receipt by each of Bank of America and Merrill Lynch of a legal opinion with respect to certain United States federal income tax consequences of the merger;

- the receipt and effectiveness of all governmental and other approvals, registrations and consents, and the expiration of all related waiting periods required to complete the merger; and

- the truth and correctness of the representations and warranties of the other party in the merger agreement, subject to the materiality standard provided in the merger agreement, and the performance by the other party in all material respects of its obligations under the merger agreement and the receipt of certificates from the other party to that effect.

As discussed under "Recent Developments," Bank of America and Merrill Lynch have determined to waive the tax opinion closing conditions under certain circumstances.

We cannot provide assurance as to when or if all of the conditions to the merger can or will be satisfied or waived by the appropriate party. As of the date of this document, we have no reason to believe that any of these conditions will not be satisfied.

Table of Contents

**Termination of the Merger Agreement**

The merger agreement can be terminated at any time prior to completion of the merger by mutual consent of Bank of America and Merrill Lynch if authorized in a written instrument by each of our boards of directors, or by either party in the following circumstances:

- if any of the required regulatory approvals are denied or completion of the merger has been enjoined, prohibited or made illegal by a court or other governmental entity (and the denial or prohibition is final and nonappealable);

- if the merger has not been completed by September 15, 2009, unless the failure to complete the merger by that date is due to the terminating party's failure to abide by the merger agreement;

- if there is a breach by the other party that would cause the failure of the closing conditions described above, unless the breach is capable of being, and is, cured within 30 days following written notice of the breach to the party committing the breach;

- if the other party has committed a breach in any material respect of its obligation to use reasonable best efforts to obtain stockholder approval;

- if the Merrill Lynch stockholders fail to adopt the merger agreement at the special meeting convened for purposes of adopting the merger agreement; or

- if the Bank of America stockholders fail to approve the issuance of shares of Bank of America common stock to Merrill Lynch stockholders at the special meeting convened for the purpose of approving the issuance of shares of Bank of America common stock in the merger.

In addition, Bank of America may terminate the merger agreement if:

- Merrill Lynch's board of directors (1) fails to recommend the adoption of the merger agreement by the Merrill Lynch stockholders, (2) makes any Change of Recommendation, (3) approves or recommends any Alternative Proposal or publicly proposes to do so, or (4) fails to recommend that the Merrill Lynch stockholders reject any tender offer or exchange offer that constitutes an Alternative Transaction within the statutorily provided time for making such a recommendation; or

- Merrill Lynch materially breaches its agreement to use reasonable best efforts to obtain stockholder approval.

**Effect of Termination**

If the merger agreement is terminated, it will become void and have no effect, and there will be no liability on the part of Bank of America, Merrill Lynch or any of their respective subsidiaries, except that (1) both Bank of America and Merrill Lynch will remain liable for any knowing breach of the merger agreement and (2) designated provisions of the merger agreement will survive the termination, including, but not limited to, the confidential treatment of information and publicity restrictions. In the event of any termination of the merger agreement, the stock option agreement will remain in full force and effect in accordance with its terms. Please see the section entitled "Stock Option Agreement" starting on page 91 for a description of the stock option agreement.

**Expenses and Fees**

In general, each of Bank of America and Merrill Lynch will be responsible for all expenses incurred by it in connection with the negotiation and completion of the transactions contemplated by the merger agreement, whether or not the merger is completed. However, the costs and expenses of printing and mailing this document, and all filing and other fees paid to the SEC in connection with the merger, will be borne equally by Merrill Lynch and Bank of America.

Table of Contents

**Amendment, Waiver and Extension of the Merger Agreement**

Subject to applicable law, the parties may amend the merger agreement by action taken or authorized by their respective boards of directors at any time before or after approval of matters presented in connection with the merger by the stockholders of each of the parties. However, after any adoption of the merger agreement by the Merrill Lynch stockholders or the approval of the issuance of shares of Bank of America common stock by the Bank of America stockholders, there may not be, without further approval of those stockholders, any amendment of the merger agreement that requires further approval under applicable law.

At any time prior to the completion of the merger, each of us, by action taken or authorized by our respective boards of directors, to the extent legally allowed, may:

- extend the time for the performance of any of the obligations or other acts of the other party;
- waive any inaccuracies in the representations and warranties of the other party; or
- waive compliance by the other party with any of the other agreements or conditions contained in the merger agreement.

90

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

Bank of America has filed with the SEC a registration statement under the Securities Act that registers the distribution to Merrill Lynch stockholders of the shares of Bank of America common stock to be issued in connection with the merger. The registration statement, including the attached exhibits and schedules, contains additional relevant information about Bank of America and Bank of America stock. The rules and regulations of the SEC allow us to omit certain information included in the registration statement from this document.

You may read and copy this information at the Public Reference Room of the SEC at 100 F Street, NE, Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the SEC's Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an internet website that contains reports, proxy statements and other information about issuers, like Bank of America and Merrill Lynch, who file electronically with the SEC. The address of the site is http://www.sec.gov. The reports and other information filed by Bank of America with the SEC are also available at Bank of America's website at http://www.bankofamerica.com. The reports and other information filed by Merrill Lynch with the SEC are also available at Merrill Lynch's investor relations website at http://www.ir.ml.com. We have included the web addresses of the SEC, Bank of America, and Merrill Lynch as inactive textual references only. Except as specifically incorporated by reference into this document, information on those web sites is not part of this document.

The SEC allows Bank of America and Merrill Lynch to incorporate by reference information in this document. This means that Bank of America and Merrill Lynch can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is considered to be a part of this document, except for any information that is superseded by information that is included directly in this document.

This document incorporates by reference the documents listed below that Bank of America and Merrill Lynch previously filed with the SEC. They contain important information about the companies and their financial condition.

**Bank of America SEC Filings**

| (SEC File No. 001-06523; CIK No. 0000070858) | Period or Date Filed |
|---|---|
| Annual Report on Form 10-K | Year ended December 31, 2007 |
| Proxy Statement | Dated March 19, 2008 |
| Quarterly Reports on Form 10-Q | Quarters ended March 30, 2008 and June 30, 2008 |
| Current Reports on Form 8-K | Current Reports for events that occurred on July 1, 2008, July 21, 2008, July 23, 2008, July 25, 2008, and September 15, 2008 (two filings) October 2, 2008, October 3, 2008, October 6, 2008, October 7, 2008, and October 26, 2008 (other than the portions of those documents not deemed to be filed) |
| The description of Bank of America common stock set forth in a registration statement filed pursuant to Section 12 of the Exchange Act and any amendment or report filed for the purpose of updating those descriptions | |

123

Table of Contents

Merrill Lynch SEC Filings

| (SEC File No. 001-07182; CIK No. 0000065100) | Period or Date Filed |
|---|---|
| Annual Report on Form 10-K | Year ended December 28, 2007 |
| Proxy Statement | Dated March 14, 2008 |
| Quarterly Reports on Form 10-Q | Quarters ended March 28, 2008 and June 27, 2008 |
| Current Reports on Form 8-K | Current Reports for events that occurred on June 27, 2008 (two filings), June 30, 2008 (four filings), July 3, 2008, July 7, 2008 (six filings), July 11, 2008, July 14, 2008, July 17, 2008, July 25, 2008, July 28, 2008 (two filings), July 29, 2008 (two filings), July 30, 2008 (two filings), July 31, 2008 (two filings), August 1, 2008, August 7, 2008 (two filings), August 8, 2008(six filings), August 12, 2008, August 21, 2008, August 26, 2008 (two filings), August 28, 2008, September 3, 2008, September 4, 2008, September 8, 2008, September 9, 2008 (four filings), September 14, 2008, September 15, 2008, September 18, 2008, September 29, 2008, October 1, 2008, October 3, 2008 (four filings), October 6, 2008, October 7, 2008, October 16, 2008, and October 26, 2008 (other than the portions of those documents not deemed to be filed) |

In addition, Bank of America and Merrill Lynch also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Merrill Lynch special meeting. These documents include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

Bank of America has supplied all information contained or incorporated by reference in this document relating to Bank of America, as well as all pro forma financial information, and Merrill Lynch has supplied all information relating to Merrill Lynch.

Documents incorporated by reference are available from Bank of America and Merrill Lynch without charge, excluding any exhibits to those documents unless the exhibit is specifically incorporated by reference as an exhibit in this document. You can obtain documents incorporated by reference in this document by requesting them in writing or by telephone from the appropriate company at the following addresses:

| Bank of America Corporation | Merrill Lynch & Co., Inc. |
|---|---|
| Bank of America Corporate Center | 222 Broadway —17th Floor |
| 100 N. Tryon Street | New York, New York 10038 |
| Charlotte, North Carolina 28255 | Attention: Judith A. Witterschein |
| Investor Relations | Corporate Secretary |
| Telephone: (704) 386-5681 | Telephone: (212) 670-0432 |

*Bank of America stockholders and Merrill Lynch stockholders requesting documents should do so by November 28, 2008, to receive them before their special meeting. You will not be charged for any of these documents that you request. If you request any incorporated documents from Bank of America or Merrill Lynch, Bank of America or Merrill Lynch will mail them to you by first class mail, or another equally prompt means, as soon as practicable after it receives your request.*

*You should rely only on the information contained or incorporated by reference in this document. Neither Bank of America nor Merrill Lynch has authorized anyone to give any information or make any representation about the merger or our companies that is different from, or in addition to, that contained in this document or in any of the materials that have been incorporated in this document. Therefore, if anyone does give you information of this sort, you should not rely on it. You should assume that the information in this document is accurate only as of October 31, 2008. You should also assume that the information contained in any document incorporated by reference herein is accurate only as of*

124

the date of such document. Neither the mailing of this document to stockholders nor the issuance of Bank of America common stock creates any implication to the contrary.

If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this document or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this document does not extend to you. The information contained in this document speaks only as of the date of this document unless the information specifically indicates that another date applies.

This document contains a description of the representations and warranties that each of Bank of America and Merrill Lynch made to the other in the merger agreement. Representations and warranties made by Bank of America, Merrill Lynch and other applicable parties are also set forth in contracts and other documents (including the merger agreement) that are attached or filed as exhibits to this document or are incorporated by reference into this document. These representations and warranties were made as of specific dates, may be subject to important qualifications and limitations agreed to between the parties in connection with negotiating the terms of the merger agreement, and may have been included in the agreement for the purpose of allocating risk between the parties rather than to establish matters as facts. These materials are included or incorporated by reference only to provide you with information regarding the terms and conditions of the agreements, and not to provide any other factual information regarding Merrill Lynch, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the other information provided elsewhere in this document or incorporated by reference into this document.

125

**APPENDIX A**

AGREEMENT AND PLAN OF MERGER

by and between

MERRILL LYNCH & CO., INC.

and

BANK OF AMERICA CORPORATION

DATED AS OF SEPTEMBER 15, 2008

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| Article I | THE MERGER | A-1 |
| 1.1 | The Merger | A-1 |
| 1.2 | Effective Time | A-1 |
| 1.3 | Effects of the Merger | A-1 |
| 1.4 | Conversion of Stock | A-2 |
| 1.5 | Stock Options and Other Stock-Based Awards; ESPP | A-2 |
| 1.6 | Certificate of Incorporation and Bylaws of the Surviving Company | A-4 |
| 1.7 | Directors and Officers | A-5 |
| 1.8 | Tax Consequences | A-5 |
| Article II | DELIVERY OF MERGER CONSIDERATION | A-5 |
| 2.1 | Exchange Agent | A-5 |
| 2.2 | Deposit of Merger Consideration | A-5 |
| 2.3 | Delivery of Merger Consideration | A-5 |
| Article III | REPRESENTATIONS AND WARRANTIES OF COMPANY | A-7 |
| 3.1 | Corporate Organization | A-8 |
| 3.2 | Capitalization | A-8 |
| 3.3 | Authority; No Violation | A-10 |
| 3.4 | Consents and Approvals | A-10 |
| 3.5 | Reports; Regulatory Matters | A-11 |
| 3.6 | Financial Statements | A-12 |
| 3.7 | Broker's Fees | A-13 |
| 3.8 | Absence of Certain Changes or Events | A-13 |
| 3.9 | Legal Proceedings | A-14 |
| 3.10 | Taxes and Tax Returns | A-14 |
| 3.11 | Employee Matters | A-15 |
| 3.12 | Compliance with Applicable Law | A-17 |
| 3.13 | Certain Contracts | A-17 |
| 3.14 | Risk Management Instruments | A-18 |
| 3.15 | Investment Securities and Commodities | A-18 |
| 3.16 | Property | A-18 |
| 3.17 | Intellectual Property | A-19 |
| 3.18 | Environmental Liability | A-20 |
| 3.19 | Broker-Dealer and Investment Advisory Matters | A-20 |
| 3.20 | Securitization Matters | A-22 |
| 3.21 | State Takeover Laws | A-24 |
| 3.22 | Interested Party Transactions | A-24 |
| 3.23 | Reorganization | A-24 |
| 3.24 | Opinion | A-24 |
| 3.25 | Company Information | A-24 |

A-i

Table of Contents

| | | Page |
|---|---|---|
| Article IV | REPRESENTATIONS AND WARRANTIES OF PARENT | A-24 |
| 4.1 | Corporate Organization | A-25 |
| 4.2 | Capitalization | A-25 |
| 4.3 | Authority; No Violation | A-26 |
| 4.4 | Consents and Approvals | A-26 |
| 4.5 | Reports; Regulatory Matters | A-27 |
| 4.6 | Financial Statements | A-28 |
| 4.7 | Broker's Fees | A-29 |
| 4.8 | Absence of Certain Changes or Events | A-29 |
| 4.9 | Legal Proceedings | A-29 |
| 4.10 | Taxes and Tax Returns | A-29 |
| 4.11 | Compliance with Applicable Law | A-29 |
| 4.12 | Reorganization; Approvals | A-29 |
| 4.13 | Opinion | A-29 |
| 4.14 | Certain Contracts | A-29 |
| 4.15 | Risk Management Instruments | A-30 |
| 4.16 | Intellectual Property | A-30 |
| 4.17 | Parent Information | A-31 |
| Article V | COVENANTS RELATING TO CONDUCT OF BUSINESS | A-31 |
| 5.1 | Conduct of Businesses Prior to the Effective Time | A-31 |
| 5.2 | Company Forbearances | A-31 |
| 5.3 | Parent Forbearances | A-33 |
| Article VI | ADDITIONAL AGREEMENTS | A-33 |
| 6.1 | Regulatory Matters | A-33 |
| 6.2 | Access to Information | A-34 |
| 6.3 | Stockholder Approval | A-34 |
| 6.4 | NYSE Listing | A-35 |
| 6.5 | Employee Matters | A-35 |
| 6.6 | Indemnification; Directors' and Officers' Insurance | A-36 |
| 6.7 | Additional Agreements | A-37 |
| 6.8 | Advice of Changes | A-37 |
| 6.9 | Exemption from Liability Under Section 16(b) | A-37 |
| 6.10 | No Solicitation | A-37 |
| 6.11 | Dividends | A-39 |
| 6.12 | Redemption of Exchangeable Shares | A-39 |
| 6.13 | Tax Matters | A-39 |
| Article VII | CONDITIONS PRECEDENT | A-40 |
| 7.1 | Conditions to Each Party's Obligation to Effect the Merger | A-40 |
| 7.2 | Conditions to Obligations of Parent | A-40 |
| 7.3 | Conditions to Obligations of Company | A-41 |

A-ii

|  |  | Page |
|---|---|---|
| Article VIII | TERMINATION AND AMENDMENT | A-41 |
| 8.1 | Termination | A-41 |
| 8.2 | Effect of Termination | A-42 |
| 8.3 | Fees and Expenses | A-42 |
| 8.4 | Amendment | A-42 |
| 8.5 | Extension; Waiver | A-42 |
| Article IX | GENERAL PROVISIONS | A-43 |
| 9.1 | Closing | A-43 |
| 9.2 | Standard | A-43 |
| 9.3 | Nonsurvival of Representations, Warranties and Agreements | A-43 |
| 9.4 | Notices | A-43 |
| 9.5 | Interpretation | A-44 |
| 9.6 | Counterparts | A-44 |
| 9.7 | Entire Agreement | A-44 |
| 9.8 | Governing Law; Jurisdiction | A-44 |
| 9.9 | Publicity | A-45 |
| 9.10 | Assignment; Third Party Beneficiaries | A-45 |

Exhibit A — Stock Option Agreement

Exhibit B — Amendment to Surviving Company Certificate of Incorporation

Table of Contents

IN WITNESS WHEREOF, Company and Parent have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

MERRILL LYNCH & CO., INC.

By: /s/ John A. Thain

Name:   John A. Thain
Title:   Chairman and Chief Executive Officer

BANK OF AMERICA CORPORATION

By: /s/ Kenneth D. Lewis

Name:   Kenneth D. Lewis
Title:   Chairman, Chief Executive Officer and President

*Signature Page to Agreement and Plan of Merger*

A-46

# Exhibit 15

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1
2    ** C O N F I D E N T I A L **
3    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
4    Master File No. 09-MD-2058 (PKC)
     -----------------------------------x
5
     IN RE BANK OF AMERICA CORP. SECURITIES,
6    DERIVATIVE AND EMPLOYMENT RETIREMENT
     INCOME SECURITY ACT (ERISA) LITIGATION
7
     -----------------------------------x
8
9    THIS DOCUMENT RELATES TO
     All Securities Actions
10
11   -----------------------------------x
12
     IN THE COURT OF CHANCERY
13   OF THE STATE OF DELAWARE
     C.A. No. 4307-CS
14   -----------------------------------x
15   IN RE BANK OF AMERICA CORPORATION
     STOCKHOLDER DERIVATIVE LITIGATION
16
     -----------------------------------x
17                  March 5, 2012
                    9:36 a.m.
18
19        Videotaped Deposition of NICHOLAS
20   DEMMO, taken by Plaintiffs, pursuant to
21   Notice, held at the offices of Kaplan Fox
22   & Kilsheimer LLP, 850 Third Avenue, New
23   York, New York, before Todd DeSimone, a
24   Registered Professional Reporter and
25   Notary Public of the State of New York.

Page 28

```
 1              DEMMO - CONFIDENTIAL
 2   time the market opened on Monday morning.   10:00:17AM
 3      Q.       And why is that?                10:00:20AM
 4              MR. LIMAN:  Objection to the     10:00:22AM
 5   form.                                       10:00:23AM
 6      A.       The reason that people were     10:00:24AM
 7   trying to get the deal announced by Monday  10:00:25AM
 8   morning is to, you know, get rid of the     10:00:28AM
 9   risk that there might be a run on Merrill    10:00:30AM
10   Lynch as a result of Lehman going           10:00:33AM
11   bankrupt.                                   10:00:34AM
12      Q.       When did you stop working on -- 10:00:37AM
13   if you recall, when did you stop working    10:00:54AM
14   on a potential Lehman transaction?          10:00:57AM
15      A.       I'm not positive if it was the  10:01:01AM
16   Friday or if it was, you know, into         10:01:07AM
17   Saturday.  I think it was either of those   10:01:11AM
18   two days, but, again, I don't remember      10:01:14AM
19   specifically.                               10:01:16AM
20      Q.       In terms of SEC filings, what,  10:01:17AM
21   if any, SEC filings were you involved in    10:01:32AM
22   drafting on behalf of Bank of America       10:01:35AM
23   during the period September 13, 2008        10:01:39AM
24   through January 21, 2009?                   10:01:42AM
25      A.       From announcement to the Bank   10:01:46AM
```

```
 1              DEMMO - CONFIDENTIAL
 2    of America earnings announcement, I recall    10:01:50AM
 3    being involved in working on the 8-K that     10:01:52AM
 4    Bank of America filed to announce the         10:01:58AM
 5    transaction.  I'm not sure whether there      10:01:59AM
 6    was one or two.  There may have been two      10:02:01AM
 7    8-Ks in connection with that.  There were     10:02:04AM
 8    multiple filings of a registration            10:02:08AM
 9    statement on Form S-4, including a final      10:02:11AM
10    amendment to the Form S-4 on a Form 424.      10:02:15AM
11              And I think that we were            10:02:25AM
12    involved in the 8-K that was filed in         10:02:27AM
13    connection with the earnings release as a     10:02:33AM
14    result of the -- because we had been          10:02:36AM
15    working on the TARP and the other elements    10:02:37AM
16    of government assistance, so I think we        10:02:39AM
17    helped on that as well.                       10:02:42AM
18        Q.      That's the earnings release       10:02:43AM
19    that was issued in January 2009?              10:02:45AM
20        A.      The 8-K that was filed when the   10:02:49AM
21    earnings release came out, yes.               10:02:51AM
22        Q.      And did you have any              10:02:53AM
23    involvement in drafting or commenting on      10:02:56AM
24    Bank of America's quarterly report for its    10:03:01AM
25    third quarter of 2008?                        10:03:07AM
```

Page 39

```
 1            DEMMO - CONFIDENTIAL
 2    point, could Merrill pay up to $5.8        10:16:11AM
 3    billion in VICP bonuses for 2008 prior to  10:16:15AM
 4    the merger?                                 10:16:22AM
 5            MR. LIMAN:  Objection to the        10:16:23AM
 6    form.                                       10:16:24AM
 7    A.      Well, subject to -- subject to      10:16:25AM
 8    the rest of the terms, in terms of the     10:16:30AM
 9    VICP expense not exceeding $4.5 billion    10:16:32AM
10    minus other comp expense, the points about 10:16:37AM
11    the form of award, change in control      10:16:42AM
12    terms, you know, consultation about the    10:16:47AM
13    allocation among employees; but subject to 10:16:51AM
14    those things, yes.                          10:16:53AM
15    Q.      You've testified I believe that    10:16:55AM
16    this disclosure schedule was not publicly  10:16:58AM
17    available, correct?                         10:17:01AM
18    A.      Correct.                            10:17:02AM
19    Q.      And you never advised anyone at    10:17:02AM
20    BofA prior to December 5th, 2008 -- I'm    10:17:08AM
21    sorry, strike that.                         10:17:13AM
22            You never advised anyone at        10:17:13AM
23    BofA prior to the December 5th, 2008       10:17:15AM
24    shareholder vote whether the VICP         10:17:19AM
25    agreement should be publicly disclosed; is 10:17:22AM
```

Page 40

```
 1            DEMMO - CONFIDENTIAL
 2    that correct?                          10:17:29AM
 3       A.      Could you read the question  10:17:29AM
 4    back?  I didn't -- this wasn't required 10:17:30AM
 5    disclosure and I never told before or   10:17:32AM
 6    after December 5th that this should have 10:17:35AM
 7    been disclosed.                         10:17:37AM
 8             MR. FOX:  I move to strike that 10:17:38AM
 9    answer.  Can you read back the question, 10:17:39AM
10    please.                                 10:17:41AM
11             MR. LIMAN:  I think the answer  10:17:41AM
12    is perfectly responsive.                10:17:43AM
13             MR. ANDERS:  It was responsive  10:17:44AM
14    to the question.  It is what it is.     10:17:45AM
15             (The record was read.)         10:18:01AM
16             MR. LIMAN:  Objection.  Asked   10:18:03AM
17    and answered.                           10:18:05AM
18       A.      I didn't advise anyone to    10:18:05AM
19    disclose it and I would not have advised 10:18:07AM
20    anyone to disclose it.                  10:18:10AM
21       Q.      I'm just trying to actually get 10:18:18AM
22    at the fact of it here, not whether you 10:18:21AM
23    would or wouldn't have.                 10:18:23AM
24             Is it correct to say that you  10:18:26AM
25    never issued, or Wachtell never issued  10:18:28AM
```

```
 1                DEMMO - CONFIDENTIAL
 2    legal advice to Bank of America that it      10:18:31AM
 3    did not have to disclose the VICP            10:18:39AM
 4    exception contained in the disclosure        10:18:45AM
 5    schedule?                                    10:18:46AM
 6               MR. LIMAN:  Objection to form.    10:18:47AM
 7               MR. ANDERS:  Objection.  Asked    10:18:48AM
 8    and answered.                                10:18:53AM
 9        A.      We never told Bank of America    10:18:53AM
10    that they didn't have to disclose it, but    10:18:54AM
11    I think it would be safe for Bank of         10:18:56AM
12    America to assume that if we didn't          10:18:58AM
13    disclose something like this, it was in a    10:19:00AM
14    document that we knew about and were         10:19:03AM
15    involved in, that the disclosure wasn't      10:19:04AM
16    required.                                    10:19:06AM
17               MR. FOX:  Again, move to strike   10:19:09AM
18    the last part of the disclosure about what   10:19:10AM
19    would be assumed.                            10:19:14AM
20               MR. LIMAN:  I think it is         10:19:15AM
21    responsive.                                  10:19:16AM
22        Q.      Did you discuss with anyone at   10:19:27AM
23    BofA at any point prior to December 5th,     10:19:29AM
24    2008 whether the VICP information            10:19:33AM
25    contained in this disclosure schedule was    10:19:38AM
```

Page 42

| | |
|---|---|
| 1 | DEMMO - CONFIDENTIAL |
| 2 | material to Bank of America shareholders?   10:19:40AM |
| 3 | MR. LIMAN:   Objection to the   10:19:46AM |
| 4 | form.   10:19:46AM |
| 5 | A.   Can you repeat the question,   10:19:48AM |
| 6 | please?   10:19:49AM |
| 7 | (The record was read.)   10:20:03AM |
| 8 | A.   I never discussed this in that   10:20:06AM |
| 9 | context.   10:20:08AM |
| 10 | Q.   Do you have an understanding of 10:20:10AM |
| 11 | what "material" means as a legal term in   10:20:15AM |
| 12 | the context of the federal securities   10:20:21AM |
| 13 | laws?   10:20:24AM |
| 14 | A.   Yes.   10:20:25AM |
| 15 | Q.   And that term generally   10:20:25AM |
| 16 | concerns whether information would be   10:20:28AM |
| 17 | significant to an investor in light of the   10:20:30AM |
| 18 | total mix of information available to that   10:20:33AM |
| 19 | investor; is that correct?   10:20:36AM |
| 20 | MR. LIMAN:   Objection.   10:20:37AM |
| 21 | A.   As a general proposition, and   10:20:40AM |
| 22 | depending upon the context, whether it is   10:20:43AM |
| 23 | a vote or buying securities or whatever it   10:20:45AM |
| 24 | happens to be, yes.   10:20:47AM |
| 25 | Q.   And were you aware in the fall   10:20:48AM |

```
1              DEMMO - CONFIDENTIAL
2    of 2008 there was a Congressional          10:20:51AM
3    investigation by Congressman Waxman which  10:20:57AM
4    included inquiries into compensation and   10:21:02AM
5    bonuses?                                   10:21:05AM
6       A.      Across the financial services   10:21:05AM
7    industry generally, yes, I recall that.    10:21:07AM
8       Q.      And were you aware that around  10:21:09AM
9    the same time that the New York Attorney   10:21:11AM
10   General had sent letters to various banks, 10:21:16AM
11   including Bank of America, regarding        10:21:20AM
12   compensation?                              10:21:23AM
13           MR. ANDERS:  Objection.            10:21:25AM
14      A.      Yes.                            10:21:26AM
15      Q.      And did you consider the        10:21:26AM
16   possibility of disclosing the VICP cap     10:21:29AM
17   prior to December 5th in light of the      10:21:34AM
18   heightened public scrutiny regarding bank  10:21:37AM
19   compensation practices?                    10:21:40AM
20           MR. LIMAN:  Objection to the       10:21:41AM
21   form.                                      10:21:42AM
22           THE WITNESS:  Read that back,      10:21:43AM
23   please.                                    10:21:44AM
24           (The record was read.)             10:21:57AM
25      A.      You know, I don't remember      10:21:58AM
```

Page 44

```
 1              DEMMO - CONFIDENTIAL
 2    specifically this period of 2008.  I mean,   10:22:00AM
 3    whenever you have something going on you      10:22:03AM
 4    are always considering whether information    10:22:05AM
 5    might be material.                            10:22:07AM
 6              But, you know, today I              10:22:09AM
 7    certainly don't think this was material,      10:22:10AM
 8    and I don't recall thinking at the time       10:22:12AM
 9    that even in light of what was going on       10:22:13AM
10    politically that this was material to         10:22:15AM
11    investors, no.                                10:22:17AM
12              MR. FOX:  Could I hear that         10:22:26AM
13    answer back, please.                          10:22:27AM
14              (The record was read.)              10:22:51AM
15              MR. FOX:  Move to strike the        10:22:52AM
16    part of the answer that starts "But, you      10:22:54AM
17    know, today," as nonresponsive.               10:22:57AM
18              MR. LIMAN:  It is responsive.       10:22:59AM
19              MR. FOX:  I didn't ask that         10:23:01AM
20    question, so it's not.                        10:23:02AM
21              MR. LIMAN:  It is.  You don't       10:23:03AM
22    just get to edit the answers to exclude       10:23:05AM
23    things you don't like.                        10:23:08AM
24              MR. FOX:  It is not that I          10:23:10AM
25    don't like them.  I didn't ask the           10:23:12AM
```

Page 45

```
 1            DEMMO - CONFIDENTIAL
 2    question.  The witness doesn't get to      10:23:13AM
 3    answer --                                  10:23:17AM
 4            MR. ANDERS:  Just keep asking       10:23:18AM
 5    questions.                                 10:23:19AM
 6            MR. FOX:  -- questions that         10:23:19AM
 7    aren't asked.                              10:23:19AM
 8            MR. ANDERS:  It is more             10:23:20AM
 9    productive to keep asking questions and    10:23:21AM
10    keep going.  It is on the transcript.      10:23:23AM
11            MR. FOX:  We are going to keep      10:23:23AM
12    going.  That's what we are going to do.    10:23:25AM
13       Q.    Just to follow up on that, I      10:23:33AM
14    think you said, in part of that last       10:23:36AM
15    answer, that you didn't consider the       10:23:40AM
16    information material in 2008, the VICP      10:23:41AM
17    bonus information, you didn't consider     10:23:45AM
18    that material; is that correct?  I think   10:23:47AM
19    you said that.                             10:23:49AM
20       A.    That's true.                      10:23:50AM
21       Q.    And what analysis did you         10:23:51AM
22    undertake to determine whether that        10:23:52AM
23    information was material at that time?     10:23:55AM
24    Tell me what you did.                      10:23:58AM
25       A.    I have no idea.  This was three   10:23:59AM
```

```
1              DEMMO - CONFIDENTIAL
2    years ago.  I knew that this existed.  We      10:24:01AM
3    had a merger proxy.  You are including         10:24:03AM
4    material information.  This was not            10:24:05AM
5    related to the merger truly.  It was           10:24:09AM
6    ordinary course payments to employees.         10:24:11AM
7              If it had been executive             10:24:14AM
8    officers who eventually got an award, you      10:24:15AM
9    would have had to have considered that         10:24:18AM
10   because there is disclosure around that        10:24:20AM
11   because it raises potential conflicts          10:24:21AM
12   issues.                                        10:24:23AM
13             But, you know, you are talking       10:24:24AM
14   here about, you know, bonuses that they've     10:24:25AM
15   been generally accruing for during the         10:24:28AM
16   year, it is bonuses you get to pay people      10:24:30AM
17   to keep them.  You are buying a people         10:24:35AM
18   business.                                      10:24:37AM
19        Q.      That's what you do, right?        10:24:37AM
20        A.      That's what you do.               10:24:38AM
21        Q.      You don't recall anything that    10:24:40AM
22   you did in 2008 to make any determination      10:24:43AM
23   as to whether the information that's           10:24:46AM
24   contained in the disclosure schedule as it     10:24:49AM
25   relates to VICP bonuses was material; is       10:24:53AM
```

```
 1            DEMMO - CONFIDENTIAL
 2    Forbearances if such actions were      03:16:52PM
 3    contemplated or permitted by the       03:16:57PM
 4    agreements?                            03:16:58PM
 5        A.      Yes.                        03:17:02PM
 6        Q.      Now, you were also asked -- you 03:17:04PM
 7    can put that down, Mr. Demmo.          03:17:06PM
 8            You were also asked by Mr. Fox 03:17:07PM
 9    questions with respect to the advice that 03:17:12PM
10    Wachtell provided with respect to      03:17:17PM
11    disclosure of the cap on VICP.  Do you 03:17:21PM
12    recall being asked questions about that 03:17:25PM
13    topic?                                 03:17:27PM
14            MR. FOX:  Objection.           03:17:27PM
15        A.      Yes.                        03:17:28PM
16        Q.      And you gave an answer,     03:17:28PM
17    Mr. Demmo, that you could understand how 03:17:32PM
18    Bank of America could assume from      03:17:35PM
19    Wachtell's review that Wachtell did not 03:17:43PM
20    think that disclosure was required.  Do 03:17:46PM
21    you recall giving that answer?         03:17:49PM
22            MR. FOX:  Objection.           03:17:51PM
23        A.      I don't remember specifically 03:17:51PM
24    what we said, but we knew -- we knew the 03:17:52PM
25    VICP arrangement, and we were, you know, 03:17:56PM
```

| | | |
|---|---|---|
| 1 | DEMMO - CONFIDENTIAL | |
| 2 | one of the two law firms and really the | 03:18:00PM |
| 3 | main law firm drafting the merger proxy, | 03:18:02PM |
| 4 | and if we thought that the VICP needed to | 03:18:05PM |
| 5 | be disclosed expressly in the merger | 03:18:07PM |
| 6 | proxy, we would have put it in there and | 03:18:10PM |
| 7 | it is safe for Bank of America to assume | 03:18:13PM |
| 8 | that we would do that. | 03:18:16PM |
| 9 | Q.      And am I correct, sir, that you | 03:18:22PM |
| 10 | never indicated to Bank of America that | 03:18:24PM |
| 11 | disclosure of the cap on VICP was | 03:18:25PM |
| 12 | required? | 03:18:28PM |
| 13 | MR. FOX:  Objection. | 03:18:29PM |
| 14 | A.      That's correct. | 03:18:30PM |
| 15 | MR. LIMAN:  What's the basis of | 03:18:33PM |
| 16 | the objection? | 03:18:34PM |
| 17 | MR. FOX:  To form. | 03:18:35PM |
| 18 | MR. LIMAN:  Are you willing to | 03:18:37PM |
| 19 | tell me anything more besides form? | 03:18:38PM |
| 20 | MR. FOX:  No. | 03:18:40PM |
| 21 | Q.      Now, you also were asked | 03:18:45PM |
| 22 | questions -- withdrawn. | 03:18:47PM |
| 23 | Mr. Fox also asked you a | 03:18:48PM |
| 24 | question about whether you conducted any | 03:18:50PM |
| 25 | analysis of whether the disclosure of the | 03:18:54PM |

1          DEMMO - CONFIDENTIAL
2    VICP cap was required in the proxy          03:18:58PM
3    statement.                                   03:19:01PM
4             Do you recall being asked           03:19:01PM
5    questions about that general topic?          03:19:02PM
6       A.    Yes.                                03:19:04PM
7       Q.    Sir, did you bring any legal        03:19:05PM
8    expertise to bear on the question of         03:19:12PM
9    whether disclosure of the VICP cap was       03:19:15PM
10   required?                                    03:19:18PM
11      A.    Well, again, I mean, I knew         03:19:19PM
12   about the VICP cap, and I have been doing    03:19:21PM
13   this for, whatever, 14 and a half years,     03:19:25PM
14   and there wasn't something that needed to    03:19:29PM
15   be disclosed.                                03:19:31PM
16           MR. LIMAN:  I've got nothing         03:19:32PM
17   further.  Thank you.                         03:19:35PM
18           MR. JEFFRESS:  I have no             03:19:37PM
19   questions.                                   03:19:38PM
20           MR. FOX:  I just have one            03:19:39PM
21   follow-up question.                          03:19:43PM
22   EXAMINATION BY MR. FOX:                      03:19:43PM
23      Q.    Are you familiar with Section       03:19:45PM
24   10b of the Exchange Act and Rule 10b-5?      03:19:46PM
25      A.    Yes.                                03:19:51PM

# Exhibit 16

**To Smolar Declaration in
Support of Motion for Summary Judgment**

| From: | Demmo, Nicholas G. |
|---|---|
| Sent: | Thursday, September 18, 2008 11:48 AM |
| To: | Brenner, Teresa M. (Bank of America Corporation); Stitt, Kevin (Bank of America Corporation); 'McEntire, Lee'; 'Pakzad, Leyla'; Stickler, Robert L. (Bank of America Corporation); 'Silvestri, Scott'; 'Noneman, Patricia J'; Shearer, Randy J. (Bank of America Corporation) |
| Cc: | Mayopoulos, Timothy J. (timothy.mayopoulos@bankofamerica.com); Fieldston, Ross A.; Veblen, Mark F. |
| Subject: | RE: URGENT: RE: BAC: Form 8-K (MER/Merger Agreement).DOC |
| Attachments: | #1294168v14_WLRK_ - MER_BAC merger agreement.DOC |


#1294168v14_WLR
K_ - MER_BAC me...

          Final is attached.

_____

From: Brenner, Teresa -Legal [mailto:teresa.brenner@bankofamerica.com]
Sent: Thursday, September 18, 2008 11:46 AM
To: Stitt, Kevin (Bank of America Corporation); McEntire, Lee; Pakzad, Leyla; Stickler,
Robert L. (Bank of America Corporation); Silvestri, Scott; Noneman, Patricia J; Shearer,
Randy J. (Bank of America
Corporation)

Cc: Mayopoulos, Timothy J. (Bank of America Corporation); Fieldston, Ross A.; Veblen, Mark
F.; Demmo, Nicholas G.
Subject: URGENT: RE: BAC: Form 8-K (MER/Merger Agreement).DOC


This 8-K will be filed at 12:15 p.m. today.

Ross, please send all of the Bank of America addresses on this e-mail a copy of the final
merger agreement immediately.




_____

From: Brenner, Teresa -Legal
Sent: Thursday, September 18, 2008 11:17 AM
To: Stitt, Kevin; McEntire, Lee; Pakzad, Leyla; Stickler, Robert L; Silvestri, Scott;
Noneman, Patricia J; Shearer, Randy J

Cc: Mayopoulos, Timothy; RAFieldston@wlrk.com
Subject: BAC: Form 8-K (MER/Merger Agreement).DOC


All,

Please see the attached draft of the BAC Form 8-K regarding the Merrill
Lynch acquisition.                           Redacted by BAC

                    Redacted by BAC

                                              The long
summary approach is in response to SEC guidance issued this summer.   If
you have any comments or questions, please call me at D&P Redaction or
Ross at D&P Redaction.

                                   1

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)          BAC-502-WLRK-A 00002390

Thanks,
Teresa

2

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)

BAC-502-WLRK-A 00002391

# Exhibit 17

**To Smolar Declaration in**
**Support of Motion for Summary Judgment**

Jeffrey P.  Crandall                    November 30, 2009

CONFIDENTIAL

Page 1

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

          -against-              09-CV-6829

BANK OF AMERICA CORP.,

                 Defendant.

----------------------------------------

                 November 30, 2009
                 9:44 a.m.

Videotaped deposition of JEFFREY P. CRANDALL,

taken by Plaintiff, pursuant to Subpoena, held

at Securities and Exchange Commission, Three

World Financial Center, New York, New York,

before Lisa Rosenfeld, a Shorthand Reporter and

Notary Public within and for the State of New

York.

Jeffrey P. Crandall                    November 30, 2009
                    CONFIDENTIAL

Page 22

1                    Crandall - Confidential
2          Q.    In the transactions that you have
3    worked on, did your work also include the
4    preparation of disclosure schedules?
5          A.    Yes.
6          Q.    What are disclosure schedules?
7          A.    Disclosure schedules are schedules to
8    a merger agreement that basically they cover a
9    number of things.  One is they list exceptions to
10   representations and they typically will have
11   provisions relating to covenants or expansion of
12   certain covenants or exceptions to certain
13   covenants.  But a lot of it has to do with
14   representations and exceptions to those
15   representations.
16         Q.    What is then the purpose of having
17   the schedules?
18         A.    The purpose of having the schedules
19   is to basically go into some detail about things
20   in the merger agreement where you want to make it
21   clear that notwithstanding a particular provision
22   in the merger agreement, there might be an
23   exception.  So it's a way of allocating risk
24   between the parties or to make it clear in the
25   case of a covenant that the target company is

Jeffrey P.  Crandall                      November 30, 2009
                    CONFIDENTIAL

                                                    Page 23
1                    Crandall - Confidential
2        going to have flexibility to do certain things
3        between the signing and the closing.
4             Q.   Are the provisions that are put in
5        disclosure schedules part of the agreement
6        between the acquired company and the acquirer?
7             A.   That's correct.
8             Q.   Is there a reason why provisions are
9        placed in the disclosure schedule as opposed to
10       the merger agreement itself?
11            A.   I think part of the reason, I mean
12       sometimes the provisions are confidential,
13       sometimes it's -- and I think a lot of it has to
14       do with just common practice, that that's what
15       practitioners typically do is put provisions in
16       the disclosure schedules.
17            Q.   Are compensation matters sometimes
18       put in disclosure schedules?
19            A.   Very often.
20            Q.   And why are compensation matters
21       placed in disclosure schedules?
22            A.   I think there could be a variety of
23       reasons.  I mean I think number one is
24       occasionally you'll find, for example, even in
25       non-ordinary course of business thing that's

Jeffrey P.  Crandall                    November 30, 2009
                    CONFIDENTIAL

                                              Page 24
1                    Crandall - Confidential
2      supposed to happen, for example target company
3      will say, oh, I have a covenant that says I can't
4      adopt a new plan, we need to adopt a defined
5      benefit plan this quarter.  I just want to give
6      you the head's up that we're going to do it, so
7      let's agree to an exception and put it in the
8      schedule.
9              Q.   Why would such an exception not be
10     put in the merger agreement itself?
11             A.   Very often it's confidential, these
12     are things that may or may not happen, for
13     example.  You don't want to say to your work
14     force we're going to do all these things when you
15     may decide later on that you're not going to do
16     those things.
17             Q.   Aside from confidentiality, any other
18     reasons for placing provisions relating to
19     compensation matters in a disclosure schedule as
20     opposed to in the merger agreement itself?
21             A.   Sometimes it's competitive
22     information that you wouldn't want to make
23     publicly available in the context of
24     compensation.
25             Q.   What type of information would you

af2ccfc9-e02a-4c6b-a450-f94f868361fa

Jeffrey P.   Crandall                    November 30, 2009

CONFIDENTIAL

1                    Crandall - Confidential
2      consider competitive?
3              A.    It could be lots of things, it could
4      be new employment arrangement for senior
5      management.  It could be new programs that you
6      intend to put in place.  It could be incentive or
7      stock options.  It could be lots of things, new
8      stock option grants that you intended to make.
9      Those would very often be in the schedule.
10             Q.    In the deals that you have worked on
11     who made the determination with respect to
12     compensation matters as to whether a provision is
13     going to be in the merger agreement or a
14     disclosure schedule?
15                   MS. OH:  Objection to form.
16                   You can answer.
17             A.    I mean in terms of the decision, I
18     can say that the common practice in virtually all
19     of the transactions that I've seen is that
20     provisions relating to compensation, any
21     exceptions to those -- the covenants, for
22     example, in the merger agreement would be in the
23     schedule.  It's not something where you sit down
24     and have a protracted discussion, gee, we put it
25     in the merger agreement, do you put it in the

af2ccfc9-e02a-4c6b-a450-f94f868361fa

Jeffrey P.  Crandall                    November 30, 2009
                  CONFIDENTIAL

                                             Page 26
1              Crandall - Confidential
2     schedules.  It will invariably wind up in the
3     schedules.  That's a common practice for a long
4     time.
5          Q.   Would you say in the deals that you
6     have worked on, for lack of a better word, the
7     template of the document that you would use for
8     the transaction had some compensation matters in
9     the disclosure schedule?
10              MS. OH:  Objection to form.
11              You can answer.
12         A.   Very often there would be something
13    in the disclosure schedule.
14         Q.   Have you been instructed by a client
15    in the past to put a provision related to
16    compensation in a disclosure schedule?
17              MR. WEISBURG:  In answering that
18              question, just answer it yes or no, don't
19              disclose any privileged communications
20              with clients.
21         A.   No.
22         Q.   Have you ever suggested to a client
23    that a certain provision relating to compensation
24    be removed from the merger agreement and be
25    placed in the disclosure schedule instead?

af2ccfc9-e02a-4c6b-a450-f94f868361fa

Jeffrey P. Crandall                    November 30, 2009
                    CONFIDENTIAL

                                              Page 27
1              Crandall - Confidential
2              MR. WEISBURG:  Same instruction.
3         A.    No.
4         Q.    Is it your understanding that merger
5    agreements in connection with transactions
6    between public companies are publicly filed?
7         A.    Yes.
8         Q.    What is that understanding based on?
9         A.    It's just an understanding based on
10   the proxy rules in either Schedule 14a or S-4
11   that there's a requirement to file the merger
12   agreement and it's been done in every transaction
13   I've ever worked on.
14        Q.    How about disclosure schedules, are
15   they publicly disclosed?
16        A.    I have never seen a situation where a
17   disclosure schedule had been filed.
18        Q.    And do you know why?
19        A.    I think it's -- one, it's been common
20   practice, and number two, I will say that that's
21   an area that I would defer to my M&A colleagues
22   on because that comes within the area of their
23   expertise.
24        Q.    Would it be fair to say, Mr.
25   Crandall, that disclosure schedules contain,

af2ccfc9-e02a-4c6b-a450-f94f868361fa

Jeffrey P. Crandall                    November 30, 2009
                    CONFIDENTIAL

                                              Page 28
1                Crandall - Confidential
2      among other things, exceptions from ordinary
3      course items?
4            A.    Not --
5                  MR. WEISBURG:  Can you read that
6            back, please.
7                  (Record read)
8            A.    I don't think that's always true.  I
9      think that on occasion might be true depending on
10     the circumstances.
11           Q.    With respect to compensation matters,
12     have you seen a disclosure schedule or have
13     worked on a disclosure schedule that contained
14     provisions allowing for the payment of
15     compensation in the ordinary course in the
16     disclosure schedule?
17           A.    Yes.
18                 MS. OH:  Objection to form.
19                 You can answer.
20           Q.    Putting aside for a moment the Bank
21     of America/Merrill Lynch transaction, have you
22     ever worked on an M&A deal where discretionary
23     year-end bonuses were provided for in a
24     disclosure schedule?
25           A.    I can say that it's been -- again

af2ccfc9-e02a-4c6b-a450-f94f868361fa

# Exhibit 18

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Page 1

1
2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      Master File No. 09-MD-2058 (PKC)
       ----------------------------------x
4
       IN RE BANK OF AMERICA CORP. SECURITIES,
5      DERIVATIVE AND EMPLOYMENT RETIREMENT
       INCOME SECURITY ACT (ERISA) LITIGATION
6
       ----------------------------------x
7
8      THIS DOCUMENT RELATES TO
       All Securities Actions
9
10     ----------------------------------x
11
       IN THE COURT OF CHANCERY
12     OF THE STATE OF DELAWARE
       C.A. No. 4307-CS
13     ----------------------------------x
14     IN RE BANK OF AMERICA CORPORATION
       STOCKHOLDER DERIVATIVE LITIGATION
15
       ----------------------------------x
16                    January 12, 2012
                      9:33 a.m.
17
18          Videotaped Deposition of JEFFREY
19     CRANDALL, taken by Plaintiffs, pursuant to
20     Notice, held at the offices of Kaplan Fox
21     & Kilsheimer LLP, 850 Third Avenue, New
22     York, New York, before Todd DeSimone, a
23     Registered Professional Reporter and
24     Notary Public of the State of New York.
25

```
 1                    J. CRANDALL
 2   understand that you are out of the office.  11:05:15AM
 3   Wachtell has deleted the reference to the   11:05:17AM
 4   FA retention pool and the VICP in our       11:05:19AM
 5   draft disclosure schedules."               11:05:21AM
 6              Does that refresh your           11:05:22AM
 7   recollection about Wachtell's position      11:05:24AM
 8   with respect to whether the VICP provision  11:05:26AM
 9   should be in the disclosure schedule?       11:05:29AM
10       A.      My best recollection of this    11:05:31AM
11   e-mail was that this really just involved   11:05:33AM
12   that Wachtell -- I think they didn't know   11:05:41AM
13   where they were in the provision and they   11:05:44AM
14   just took it out, placeholder, and that it  11:05:46AM
15   was going to be addressed later.  But I     11:05:50AM
16   didn't take this to mean that they were     11:05:52AM
17   objecting as a substantive matter to        11:05:55AM
18   putting it in the schedules.  That's the    11:05:58AM
19   best of my recollection on that point.      11:06:01AM
20       Q.      Do you recall Jeannemarie       11:06:03AM
21   O'Brien suggesting that the VICP provision  11:06:05AM
22   be in a waiver letter?                      11:06:09AM
23              MS. PARK:  Objection.            11:06:11AM
24       A.      No.                             11:06:12AM
25       Q.      Now, at a certain point did the 11:07:30AM
```

Page 75

```
1                    J. CRANDALL
2    terms of the VICP provision become        11:07:33AM
3    finalized?                                11:07:39AM
4        A.      Yes.                          11:07:39AM
5        Q.      And when was that?            11:07:40AM
6        A.       I would say approximately the  11:07:42AM
7    third week of October.                    11:07:44AM
8        Q.       I'm going to hand to you what  11:07:48AM
9    has been previously marked Exhibit 139.   11:07:58AM
10   This document is Bates stamped            11:08:14AM
11   BAC-ML-NYAG00000280-UR to 301.  And it is  11:08:18AM
12   the Disclosure Schedules to the Agreement  11:08:26AM
13   and Plan of Merger By and Between Merrill  11:08:28AM
14   Lynch & Company, Inc. and Bank of America  11:08:31AM
15   Corporation dated September 15th, 2008.   11:08:33AM
16               Is this the final version of  11:08:36AM
17   the disclosure schedule as you understand  11:08:38AM
18   it?                                       11:08:40AM
19       A.      That's my understanding.      11:08:41AM
20       Q.      And if you take a look at page  11:08:43AM
21   14, I'm not referring to the Bates number,  11:08:49AM
22   but actually the page number.             11:08:52AM
23       A.      Okay.                         11:08:54AM
24       Q.      Does this reflect the agreement  11:08:56AM
25   between Bank of America and Merrill Lynch  11:09:01AM
```

Page 84

| | | |
|---|---|---|
| 1 | J. CRANDALL | |
| 2 | I'm sorry, Shearman's litigation | 11:27:16AM |
| 3 | department was involved in? | 11:27:19AM |
| 4 | A. Possibly involving some | 11:27:20AM |
| 5 | end-of-the-year payments for senior | 11:27:24AM |
| 6 | management. There may have been | 11:27:25AM |
| 7 | discussions involving the litigation team. | 11:27:27AM |
| 8 | But, again, I can't say I remember | 11:27:29AM |
| 9 | definitively. | 11:27:31AM |
| 10 | Q. And was that a disclosure issue | 11:27:32AM |
| 11 | for the proxy? | 11:27:38AM |
| 12 | A. No. | 11:27:39AM |
| 13 | Q. Now, sometime in the fall of | 11:27:53AM |
| 14 | 2008 you considered whether the VICP | 11:27:59AM |
| 15 | provision that's in the disclosure | 11:28:01AM |
| 16 | schedule was required to be disclosed in | 11:28:03AM |
| 17 | the proxy, correct? | 11:28:07AM |
| 18 | A. That's correct. | 11:28:08AM |
| 19 | Q. Could you describe how you came | 11:28:09AM |
| 20 | to consider that question, the genesis of | 11:28:11AM |
| 21 | that question? | 11:28:14AM |
| 22 | A. Sure. I had reviewed the | 11:28:15AM |
| 23 | proxy. My associate, my senior associate, | 11:28:20AM |
| 24 | Patricia Kuhn had reviewed the proxy. | 11:28:22AM |
| 25 | I had asked Patty to do a form | 11:28:24AM |

| 1 | J. CRANDALL | |
|---|---|---|
| 2 | considering whether this information, the | 11:34:12AM |
| 3 | VICP provision, was material and should be | 11:34:15AM |
| 4 | disclosed in the proxy, the correct | 11:34:19AM |
| 5 | analysis would be to analyze it on behalf | 11:34:21AM |
| 6 | of all investors, including Bank of | 11:34:23AM |
| 7 | America investors? | 11:34:25AM |
| 8 | A.      From my perspective, I suppose | 11:34:26AM |
| 9 | I could have said I'm looking at this from | 11:34:29AM |
| 10 | the perspective of my client, but that's | 11:34:31AM |
| 11 | not what I did. | 11:34:33AM |
| 12 | Q.      And you don't have an opinion | 11:34:35AM |
| 13 | one way or the other whether that's the | 11:34:42AM |
| 14 | correct analysis or not? | 11:34:44AM |
| 15 | MS. PARK:  Objection. | 11:34:46AM |
| 16 | A.      I would have deferred to the | 11:34:47AM |
| 17 | securities experts at my firm.  But, | 11:34:48AM |
| 18 | again, I looked at -- I looked at it -- I | 11:34:52AM |
| 19 | did look at it from the perspective of | 11:34:54AM |
| 20 | both sets of shareholders. | 11:34:55AM |
| 21 | Q.      And what factors did you | 11:35:07AM |
| 22 | consider in determining whether the VICP | 11:35:08AM |
| 23 | provision was something that should be | 11:35:12AM |
| 24 | disclosed in the proxy? | 11:35:15AM |
| 25 | A.      There were a variety of | 11:35:17AM |

1                    J. CRANDALL

2    factors.  The first is, as I had mentioned    11:35:19AM

3    already, I thought that what Wachtell had     11:35:22AM

4    drafted in terms of the description of 5.2    11:35:24AM

5    was correct.                                  11:35:27AM

6              Number two, I looked at who         11:35:28AM

7    would be participating in this bonus pool,    11:35:31AM

8    and there were approximately, my              11:35:35AM

9    understanding, was approximately 40,000       11:35:36AM

10   Merrill rank and file employees in that       11:35:39AM

11   pool and I noted that the SEC disclosure      11:35:41AM

12   rules clearly do not require disclosure       11:35:43AM

13   with respect to ordinary employee            11:35:46AM

14   compensation, rank and file employee         11:35:50AM

15   compensation.                                 11:35:52AM

16             I also noted that this was         11:35:53AM

17   really an ordinary course of business type    11:35:55AM

18   thing.  This was consistent with past        11:35:58AM

19   practice.  The amount that was -- the        11:36:00AM

20   outer parameter was in fact less than what    11:36:04AM

21   had been paid in the prior year.  That was    11:36:06AM

22   one of the things I considered.               11:36:09AM

23             I had learned during the course 11:36:11AM

24   of our discussions that there had been an     11:36:12AM

25   accrual on Merrill Lynch's financial          11:36:17AM

1                    J. CRANDALL

2     statements through the third quarter for    11:36:19AM

3     this expense and those financial            11:36:21AM

4     statements were part of the disclosure to   11:36:23AM

5     shareholders and the aggregate amount was   11:36:25AM

6     already in there, at least in terms of      11:36:28AM

7     what was accrued through that point in      11:36:30AM

8     time.  So that was already part of the      11:36:31AM

9     record.                                     11:36:33AM

10              The other thing is I noted that   11:36:33AM

11    this was a forbearance covenant, this       11:36:35AM

12    wasn't a provision that said this is        11:36:38AM

13    something that definitely will happen.      11:36:40AM

14    This is something that can happen.  This    11:36:42AM

15    was an administrative provision that said   11:36:45AM

16    between Merrill Lynch and Bank of America   11:36:46AM

17    if there is certain things that Merrill     11:36:47AM

18    thinks it should do, it has to come back    11:36:50AM

19    for a discussion with Bank of America.      11:36:52AM

20              And I noted -- so, for example,   11:36:55AM

21    if you had paid bonuses before the closing  11:36:57AM

22    then this administrative process needed to  11:37:01AM

23    take place.  If you paid those bonuses a    11:37:03AM

24    day after the closing, this provision       11:37:05AM

25    would not have applied at all.  That was    11:37:07AM

Page 93

```
1                    J. CRANDALL
2    definitely part of the thinking.          11:37:09AM
3              And I think the other factor    11:37:11AM
4    is -- two other factors, one is that these 11:37:14AM
5    were not, as part of my ordinary course   11:37:16AM
6    analysis, these were not transaction      11:37:19AM
7    bonuses.  These were not things that were 11:37:20AM
8    only happening because of the transaction. 11:37:23AM
9    They would have happened with or without  11:37:25AM
10   the transaction.  And I think the other   11:37:27AM
11   thing and important factor is that we had 11:37:29AM
12   a separate provision -- a separate        11:37:32AM
13   covenant in the merger agreement, I       11:37:35AM
14   believe it was Section 6.5, which said    11:37:37AM
15   very clearly that through the end of 2009 11:37:39AM
16   shareholders should know that employees   11:37:42AM
17   are going to be receiving employee benefit 11:37:44AM
18   plans and compensation opportunities which 11:37:48AM
19   would have included bonuses that would    11:37:50AM
20   have been substantially comparable in the 11:37:53AM
21   aggregate to what they were getting       11:37:55AM
22   before.                                   11:37:57AM
23             So looking at all those factors 11:37:58AM
24   in the aggregate, my belief was that this 11:38:00AM
25   was not material and did not need to be   11:38:03AM
```

```
 1                    J. CRANDALL
 2    disclosed.                              11:38:05AM
 3        Q.       Now, one of the things that you 11:38:22AM
 4    said that you looked at was the         11:38:23AM
 5    description of 5.2 was correct?         11:38:25AM
 6        A.       Uh-huh.                     11:38:29AM
 7        Q.       And earlier you had said it was 11:38:29AM
 8    technically correct; is that right?     11:38:31AM
 9        A.       Yes.                        11:38:33AM
10        Q.       What do you mean by         11:38:33AM
11    "technically correct"?                  11:38:37AM
12        A.       It noted that -- it described 11:38:39AM
13    the forbearance provision and it noted  11:38:41AM
14    that there were exceptions which could  11:38:44AM
15    have involved either getting Bank of    11:38:46AM
16    America's consent and then it went on to 11:38:50AM
17    note that there were other exceptions, and 11:38:52AM
18    the merger agreement itself which was part 11:38:54AM
19    of the proxy specifically said there were 11:38:56AM
20    exceptions in Section 5.2 of the        11:38:59AM
21    disclosure schedule.                    11:39:01AM
22        Q.       Do you know if the disclosure 11:39:02AM
23    schedule was publicly filed?            11:39:05AM
24        A.       It was not.                 11:39:07AM
25        Q.       And at the time you were    11:39:08AM
```

# Exhibit 19

**To Smolar Declaration in
Support of Motion for Summary Judgment**

| From: | Patricia A Kuhn <PKuhn@Shearman.com> |
| Sent: | Wednesday, October 22, 2008 5:15 PM |
| To: | Adam Kaminsky <adam.kaminsky@shearman.com> |
| Subject: | FW: WLRK Comments to Shearman 10/20 VICP Rider.DOC |
| Attach: | WLRK Comments to Shearman 10_20 VICP Rider (2).DOC |

here it is.

**From:** MKrasnovsky@wlrk.com [mailto:MKrasnovsky@wlrk.com]
**Sent:** Monday, October 20, 2008 6:10 PM
**To:** Patricia A Kuhn
**Cc:** JMOBrien@wlrk.com; DKahan@wlrk.com
**Subject:** WLRK Comments to Shearman 10/20 VICP Rider.DOC

Patty, see changes to the VICP rider that we discussed tracked in the attached. We
believe our client is comfortable with these changes and would appreciate confirmation
from you that yours is as well.

Thank you very much.

Mike
*******************************************************************

Any tax advice contained in this communication is not intended or written to be used, and cannot
be used, for the purpose of avoiding tax penalties and is not intended to be used or referred to in
promoting, marketing or recommending a partnership or other entity, investment plan or
arrangement.
*******************************************************************

Please be advised that this transmittal may be a confidential attorney-client communication or
may otherwise be privileged or confidential. If you are not the intended recipient, please do not
read, copy or re-transmit this communication. If you have received this communication in error,
please notify us by e-mail (helpdesk@wlrk.com) or by telephone (call us collect at 212-403-
4357) and delete this message and any attachments. Thank you in advance for your cooperation
and assistance.

www.wlrk.com
*******************************************************************

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)

# RIDER

- 5.2(b)(iii), 5.2(c)(i) and 5.2 (c)(ii) - Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) less any 2008 incentive compensation value (other than any value in respect of any replacement cash or long-term incentive awards) in respect of the New Hire Cash Compensation Pool, and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion, less any 2008 incentive compensation expense (other than any expense in respect of any replacement cash or long-term incentive awards) in respect of the New Hire Cash Compensation Pool. Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by the Company in consultation with Parent, *provided* that in no event shall such long-term incentive awards contain acceleration or vesting rights (whether single or double trigger and including the rights provided in the applicable Company equity incentive plan) in connection with the Merger (except for any such rights applicable to equity awards granted in satisfaction of a 2008 VICP guarantee to the extent specifically required by the terms of an offer letter entered into prior to September 14, 2008) or any "good reason" termination feature (including vesting in connection with a "good reason" termination, except any good reason termination

[FieldDocProperty]                              [FieldPage]

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)

BAC-502-SS 00010822

feature applicable to equity awards granted in satisfaction of a 2008 VICP guarantee to the extent specifically required by the terms of an offer letter entered into prior to September 14, 2008). The allocation of the 2008 VICP among eligible employees shall be determined by the Company in consultation with Parent.

[FieldDocProperty]                              [FieldPage]

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)                              BAC-502-SS 00010823

# Exhibit 20

**To Smolar Declaration in
Support of Motion for Summary Judgment**

**EXECUTION VERSION**

DISCLOSURE SCHEDULES[1]

to

AGREEMENT AND PLAN OF MERGER

by and between

MERRILL LYNCH & CO., INC.

and

BANK OF AMERICA CORPORATION

Dated September 15, 2008

---

[1] This Company Disclosure Schedule has been prepared and delivered pursuant to the Agreement and Plan of Merger, dated as of September 15, 2008 (the "Agreement"), by and between Merrill Lynch & Co., Inc., a Delaware corporation (the "Company"), and Bank of America Corporation, a Delaware corporation ("Parent").

This Company Disclosure Schedule and the information and disclosures contained herein are intended to qualify and limit the representations and warranties of the Company contained in the Agreement. Inclusion of any item in this Company Disclosure Schedule (i) shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would have a Material Adverse Effect and (ii) shall not constitute, nor be deemed to be, an admission of liability concerning such item by the Company. Nor in such cases where a representation or warranty is qualified by a reference to materiality or Material Adverse Effect shall the disclosure of any matter in this Company Disclosure Schedule imply that any other undisclosed matter that has a greater value or could otherwise be deemed more significant (i) is or is reasonably likely to be material or (ii) has had or is reasonably likely to result in a Material Adverse Effect. Matters reflected in this Company Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected in this Company Disclosure Schedule. Such additional matters are set forth for information purposes and do not necessarily include other matters of a similar nature. The headings contained in this Company Disclosure Schedule are for convenience of reference only and shall not be deemed to modify or influence the interpretation of the information contained in this Company Disclosure Schedule or the Agreement.

Terms defined in the Agreement and not otherwise defined in this Company Disclosure Schedule are used herein as defined in the Agreement. This information is disclosed in confidence for the purposes contemplated in the Agreement and is subject to the confidentiality provisions of the Agreement and any confidentiality agreement or non-disclosure agreement executed by the parties hereto relating to the transactions contemplated by the Agreement.

FOIL Confidential Treatment Requested by Bank Of America Corporation

Shearman and Sterling LLP, have applied to the staff of the Securities and Exchange Commission requesting a waiver with respect to MLD's failure to file current reports on Form 8-K during 2007.

### Section 3.22
### Interested Party Transactions

None.

### Section 5.1
### Conduct of Business

See the disclosures set forth under <u>Section 3.8</u> above relating to FDS, the Temasek closing and the $70 billion facility, which are hereby incorporated by reference herein.

### Section 5.2
### Company Forbearances

- 5.2 (a) and 5.2(d) - The Company may incur indebtedness (including the posting of appropriate collateral), even if outside the ordinary course of business, pursuant to the Primary Dealer Credit Facility and the Term Securities Lending Facility or any other facility established by a U.S. governmental entity.

- 5.2 (b)(ii) - Merrill Lynch & Co. Canada Ltd. may pay cash dividends on the Exchangeable Shares consistent with past practice (provided that such dividends may not be increased over the amount of the prior dividend) including record dates and payment dates consistent with the prior year, and may issue shares of Company Common Stock in connection with Exchangeable Shares as required pursuant to the terms of such Exchangeable Shares.

- 5.2(b)(iii) - The Company previously committed to make grants of equity awards (as previously disclosed in writing to Parent) to individuals who received offers of employment prior to the date of the Agreement from the Company or its Subsidiaries in an aggregate number of shares not in excess of (i) 3,721,521 with respect to individuals other than D&P Redaction

# D&P Redaction

D&P Redaction and excluding one of D&P Redaction    grants, (ii) shares with a value of not in excess of $12,500,000, in the aggregate, with respect to D&P Redaction

# D&P Redaction

D&P Redaction and (iii)

shares with a value of $20,000,000 with respect to one of D&P Redaction    grants.

- 5.2(c) – Employees of the Company and its Subsidiaries may be provided the opportunity to amend their deferral elections under the deferred compensation plans of the Company and its

13

BAC-ML-NYAG00000292-UR

Subsidiaries previously identified by the Company to Parent in writing, in accordance with the transition election program previously described to Parent in writing and otherwise in accordance with Section 409A of the Code provided that such transition election program (i) does not increase the Company's costs, in other than an immaterial respect and (ii) is not applicable to any director or executive officer of the Company or any other member of the Company's Executive Management Team.

- 5.2(b)(iii), 5.2(c)(i) and 5.2 (c)(ii) - Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) less any 2008 incentive compensation value (other than any value in respect of any replacement cash or long-term incentive awards) in respect of the New Hire Cash Compensation Pool, and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion, less any 2008 incentive compensation expense (other than any expense in respect of any replacement cash or long-term incentive awards) in respect of the New Hire Cash Compensation Pool. Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by the Company in consultation with Parent, *provided* that in no event shall such long-term incentive awards contain acceleration or vesting rights (whether single or double trigger and including the rights provided in the applicable Company equity incentive plan) in connection with the Merger (except for any such rights applicable to equity awards granted in satisfaction of a 2008 VICP guarantee to the extent specifically required by the terms of an offer letter entered into prior to September 14, 2008) or any "good reason" termination feature (including vesting in connection with a "good reason" termination, except any good reason termination feature applicable to equity awards granted in satisfaction of a 2008 VICP guarantee to the extent specifically required by the terms of an offer letter entered into prior to September 14, 2008). The allocation of the 2008 VICP among eligible employees shall be determined by the Company in consultation with Parent.

- 5.2(c)(ii), 5.2(c)(iii) and 5.2 (c)(v) - The Company has extended offer letters which have not yet been accepted to the following individuals: (i) Graham Goldsmith; and (ii) Fjodor Duschek.

- 5.2 (c)(ii), 5.2(c)(iii) and 5.2(c)(v) - The Company and its Subsidiaries may: (i) hire employees whose individual annual cash compensation does not exceed $3 million, subject to an annualized cash compensation limit for all such hired employees of up to $100 million in the aggregate (the "New Hire Cash Compensation Pool"); and (ii) hire an unrestricted number of financial advisors in the ordinary course of business consistent with past practice and on terms that are consistent with past practice.

- 5.2 (c)(v) - The Company has entered into an agreement with Rohit D'Souza to terminate his employment as of September 30, 2008.

14

FOIL Confidential Treatment Requested by Bank Of America Corporation

BAC-ML-NYAG00000293-UR

- 5.2 (c)(v) - The Company and its Subsidiaries may implement employee terminations (i) pursuant to reductions in force relating to non-financial advisor global wealth management or global technology headcount, as previously discussed with Parent, (ii) as may be required by law or in connection with a violation of Company policies, or (iii) otherwise in consultation with Parent.

- 5.2 (c)(vi) - The Company and its Subsidiaries may take actions for valid business purposes in the ordinary course of business with respect to employees in the position of Vice President or below (other than with respect to financial advisors) (and not systemic changes or changes impacting groups or categories of employees) that could constitute "good reason" with respect to the "good reason" triggers in the Company Benefit Plans relating to (x) positions and responsibilities and (y) relocation.

- 5.2(d) - Execution and delivery of definitive agreements by the Company and/or its affiliates, and consummation of the sale of a controlling interest in FDS.

- 5.2(n) - Subject to consultation in accordance with Section 6.13 of the Agreement, the proposed liquidation of a Subsidiary, pursuant to an election under Treasury Regulation Section 301.7701-3 (following its conversion from a public limited company (plc) to a limited company), as previously discussed between the Company and Parent, shall not require the prior written consent of Parent.

In the event the Company requests the consent of Parent required to take any action described in Section 5.2(a), 5.2(b)(iii) (provided that any such grants shall be made in consultation with Parent and shall not contain acceleration or vesting rights (whether single or double trigger and including the rights provided in the applicable Company equity incentive plan) in connection with the Merger or any "good reason" termination feature (including vesting in connection with a "good reason" termination), 5.2(d), 5.2(j)(i) (so long as there is no change of control provision that would be triggered by the Merger), 5.2(j)(ii) (but only to the extent that any such agreement or contract is in connection with an action contemplated by Section 5.2(d) of the Agreement) or 5.2(k) (so long as with respect to any proposed settlement for a single action or proceeding (or threatened action or proceeding), such settlement includes only monetary relief, does not involve an admission of guilt or wrongdoing and does not involve aggregate cash payments in excess of $20 million) of the Agreement, Parent's consent shall not be unreasonably withheld or delayed.

### Section 6.6
### Annual Premiums

- D&P Redaction for D&O insurance (including a broker service fee).

15

FOIL Confidential Treatment Requested by Bank Of
America Corporation

BAC-ML-NYAG00000294-UR

# Exhibit 21

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
----------------------------------------

In Re BANK OF AMERICA CORPORATION        C.A. No.
                                         4307-VCS
STOCKHOLDER DERIVATIVE LITIGATION

----------------------------------------

                          January 13, 2012
                          9:05 a.m.

        Videotaped deposition of NICHOLAS DEMMO, taken

        by Plaintiffs, pursuant to Subpoena, held at

        the offices of Horwitz Horwitz & Paradis LLP,

        570 Seventh Avenue, New York, New York, before

        Joseph R. Danyo, a Shorthand Reporter and Notary

        Public within and for the State of New York.

        HUDSON REPORTING & VIDEO, INC.

        124 West 30th Street, 2nd Fl.

        New York, New York 10001

        Tel: 212-273-9911   Fax: 212-273-9915

35

1                          Demmo

2    the acquisition?

3            A.   Yes.

4            Q.   What was his role in the process of

5    drafting the proxy statement?

6            A.   You know, I don't remember.  I just,

7    I know he was one of the people that was

8    involved.

9            Q.   Was he working under your

10   supervision?

11           A.   Again we were all working on the

12   proxy to get it done.

13           Q.   You were a partner.  He was an

14   associate.  Was he working under your

15   supervision?

16           A.   Yes.

17           Q.   What was your role in preparing the

18   proxy statement?

19           A.   I was one of the lawyers who helped

20   draft and review and finalize the proxy

21   statement.

22           Q.   Was anyone from Bank of America

23   working on drafting the proxy statement?

24           A.   Well, we were really doing the

25   drafting.  We would have sent it to Bank of

36

1                         Demmo

2    America for their review and comments, but it is

3    primarily a document driven by outside lawyers

4    because it is describing the merger terms and

5    whatnot, but obviously there are things you need

6    from your client, from the other side.

7         Q.    Who were you working with at Bank of

8    America in the drafting process?

9         A.    I mean I don't remember everyone.

10   Teresa Brenner was the main person with whom we

11   interfaced on those sorts of things.

12        Q.    Who else?

13        A.    I don't remember.

14        Q.    Mr. Belk?

15        A.    Probably not.

16        Q.    Why do you say probably not?

17        A.    You know, it is an SEC disclosure

18   document.  There is not a lot of financial

19   information in it.  Mr. Belk may have been

20   involved if there was a particular question that

21   he knew the answer to and others didn't, but it

22   is not really a document that I would expect

23   there would be things that he would be the only

24   person who knew.

25        Q.    Who at Wachtell on the Wachtell team

100

1                           Demmo
2          A.    In the discussions between the
3    parties about the VICP, I was involved in that,
4    yes, personally.
5          Q.    Who on behalf of Bank of America
6    decided to address the exception to the section
7    5.2 negative covenant in a disclosure schedule?
8                MR. LIMAN:  Objection to form.
9                MR. ANDERS:  Objection to form.
10         Q.    Do you recall that -- strike that
11   question.  There was an exception -- the merger
12   agreement includes a negative covenant with
13   respect to the payment of discretionary
14   compensation, is that correct?
15               MR. LIMAN:  Objection to form.
16               MR. ANDERS:  Objection to form.
17         A.    The merger agreement includes a
18   negative covenant that relates to compensation
19   generally, yes.
20         Q.    Right, and it was decided to address
21   an exception to that negative covenant in a
22   disclosure schedule, correct?
23               MR. ANDERS:  Objection to form.
24               MR. LIMAN:  Objection to form.
25         A.    Exceptions to negative covenants are

1                    Demmo

2    typically in the disclosure schedule.  I don't

3    know that anyone had to make any specific

4    decision, one, and, two, the VICP stuff wasn't

5    worked out until five weeks after the merger

6    agreement was done, so it would have been

7    impossible to put it in the merger agreement.

8          Q.    To your knowledge, did Wachtell

9    provide any advice or counsel to Bank of America

10   concerning where to address the exception to the

11   negative covenant?

12         A.    Why would we?  That is the kind of

13   disclosure that goes in the disclosure schedule.

14         Q.    So is that answer yes or no?

15               MR. LIMAN:  Objection to the form.

16         A.    My answer is there is no specific

17   advice or discussion about where it should go.

18   It was one of those things that everyone involved

19   in the deal would have said or any other deal

20   would have said, of course, it goes in the

21   disclosure schedules.

22         Q.    And the disclosure schedules weren't

23   finalized at the time of the merger agreement,

24   correct?

25         A.    Correct.

# Exhibit 22

**To Smolar Declaration in
Support of Motion for Summary Judgment**

1

1   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

3

4   IN RE:  BANK OF AMERICA        C.A. No. 4307-CS

5   CORPORATION STOCKHOLDER

6   DERIVATIVE LITIGATION

7

8

9      VIDEOTAPED DEPOSITION OF TIMOTHY J. MAYOPOULOS

10

11  DATE TAKEN:       DECEMBER 22, 2011

12  TIME:             9:01 a.m.

13  LOCATION:         James, McElroy & Diehl

                      600 South College Street

14                    Charlotte, North Carolina

15  TAKEN BY:         Counsel for the Plaintiff

16  REPORTED BY:      CINDY A. HAYDEN, RMR, CRR

17  VIDEOGRAPHER:     LEN HARRIS

18

19

20

21

22  HUDSON REPORTING & VIDEO, INC.

23  124 West 30th Street, 2nd Fl.

24  New York, New York 10001

25  Tel: 212-273-9911  Fax: 212-273-9915

169

1          Q.   In your experience as general counsel

2     at Bank of America, was the board typically -- the

3     board of Bank of America typically given the proxy

4     statement to approve its contents before it's

5     mailed?

6                MR. LOWENTHAL:   Objection to the form.

7                THE WITNESS:   I don't recall whether

8     the board was typically -- whether that typically

9     happened with the board or not.

10    BY MR. KRINER:

11         Q.   What was --

12         A.   And I don't know whether the board

13    received a draft of this before it was filed or

14    not.  I just don't recall.

15         Q.   Did you have any role in the contents

16    of the proxy statement?

17         A.   My role was to make sure we had the

18    right people working on it, Wachtell and people on

19    my staff, as well as to review a draft of this

20    document before it was filed, which I did.  And I

21    focused on certain parts of it that I thought I had

22    some particular knowledge or expertise about,

23    but -- so I -- that was my role in connection with

24    preparing the document.

25         Q.   Was there someone at or on behalf of

1    Bank of America who was primarily in charge with

2    assembling the contents of the proxy statement?

3         A.    Well, the proxy statement is typically

4    drafted by the outside counsel for the company, in

5    this case Wachtell Lipton.  They're highly

6    experienced and knowledgeable about what proxy

7    statements are supposed to contain.  And they draft

8    it.  It's obviously a joint document between Bank

9    of America and Merrill Lynch.  So Shearman &

10   Sterling, another well-known law firm, was also

11   involved in preparing and drafting the proxy

12   statement.  So the two law firms together do the

13   primary drafting and collection of information, but

14   obviously, as I said earlier, there are lots of

15   people who are involved in contributing information

16   that ends up being reported in the proxy statement.

17        Q.    Was there a procedure or process in

18   place for engaging the board concerning the

19   contents of the proxy statement?

20        A.    Not that I recall.

21        Q.    Do you have any knowledge concerning

22   communications between Wachtell and Fox-Pitt Kelton

23   concerning the language of the Fox-Pitt fairness

24   opinion letter to be disclosed in the proxy

25   statement?

# Exhibit 23

**To Smolar Declaration in
Support of Motion for Summary Judgment**

| From: | <RAFieldston@wlrk.com> |
|---|---|
| Sent: | Saturday, September 20, 2008 2:23 AM |
| To: | <teresa.brenner@bankofamerica.com>; <jonathan_santelli@ml.com>; <spetepiece@shearman.com>; <anoreuli@shearman.com>; <Craig.Culbert@Shearman.com> |
| Cc: | <NGDemmo@wlrk.com>; <MGuest@wlrk.com>; <JDCuneo@wlrk.com> |
| Subject: | Draft BAC MER S-4/Proxy |

Attached, please find a draft of the S-4/Proxy. In the interest of time, we are distributing this simultaneously to both Bank of America and Merrill. This draft remains subject to continued review and comment by our client. We would appreciate your comments on this draft by 12:00pm on Tuesday, with the goal of filing by mid-week. Thanks.


Ross A. Fieldston
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019-6150
(212) 403-1340 (Tel.)
(212) 403-2340 (Fax)
Redacted (Mobile)





Draft S-4 BAC and
MER.DOC

- Draft S-4 BAC and MER.DOC

1

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure and Protective Order
09 Civ. 6829 (S.D.N.Y.)                                                      BAC-502-SS 00082986

# Exhibit 24

**To Smolar Declaration in**
**Support of Motion for Summary Judgment**

| From: | Craig Culbert |
|---|---|
| Sent: | Wednesday, September 24, 2008 8:17 AM |
| To: | richard_alsop@ml.com; judy_witterschein@ml.com; cara_londin@ml.com; jonathan_santelli@ml.com; Pia_Thompson@ml.com; Mason_Reeves@ml.com; Joanne_Tsung@ml.com; margaret_nelson@ml.com; gale_chang@ml.com; elizabeth_mcclure@ml.com |
| Cc: | John J Madden; John A Marzulli Jr; Scott D Petepiece; Andrew J Noreuil; Margaret J. Davidson |
| Subject: | FW: Draft BAC MER S-4 / Proxy |
| Attachments: | 5-DVComparison_NYDOCS02-#852641-v1-MER_BAC_S-4_Draft-NYDOCS02-#852641-v3-MER_BAC_S-4_Draft.doc; 6-NYDOCS02-#852641-v3-MER_BAC_S-4_Draft.DOC |

All,

Please see below. The revised draft S-4 has been sent to WLRK.

Best regards,

Craig Culbert

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
D +1.212.848.7653 | F +1.212.646.7653
craig.culbert@shearman.com

From: Craig Culbert
Sent: Wednesday, September 24, 2008 4:09 AM
To: NGDemmuo@wlrk.com; MGuest@wlrk.com; JDCuneo@wlrk.com
Cc: John J Madden; John A Marzulli Jr; Scott D Petepiece; Andrew J Noreuil; Robert Katz; Margaret J. Davidson; Gaurav Sud

Subject: Draft BAC MER S-4 / Proxy

Redacted

Craig Culbert

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
D +1.212.848.7653 | F +1.212.646.7653
craig.culbert@shearman.com

1

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure and Protective Order
09 Civ. 6829 (S.D.N.Y.)                                                    BAC-502-SS 00058964

2

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure and Protective Order
09 Civ. 6829 (S.D.N.Y.)                                                    BAC-502-SS 00058965

# Exhibit 25

**To Smolar Declaration in
Support of Motion for Summary Judgment**

**From:** Cuneo, James D.
**Sent:** Wednesday, October 01, 2008 1:44 AM
**To:** Bank of America/Merrill Lynch - WLRK Team - Internal (03144-0044)
**Subject:** FW: Revised BAC MER S-4 / Proxy

**Attachments:** BCH15211BNY007_BITS_N_CPO_0028_BAC.pdf; BCH15211BNY007_BITS_C_CPO_0035
_BAC.pdf

 

BCH15211BNY007_ BCH15211BNY007_
BITS_N_CPO_0028..BITS_C_CPO_0035..

FYI

---

From: Cuneo, James D.
Sent: Wednesday, October 01, 2008 1:40 AM
To: Bank of America - Merrill Lynch & Co. - BAC Xternal (90000-0007)
Cc: Demmo, Nicholas G.; Guest, Matthew M.; Fieldston, Ross A.
Subject: Revised BAC MER S-4 / Proxy


Attached are clean and marked proofs of the revised S-4/Proxy.  We expect to file
Wednesday afternoon, so please send any final comments as early as possible.



Thank you,
James

James D. Cuneo
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, N.Y.  10019-6150
Phone:  (212) 403-1116
Fax: (212) 403-2116
HYPERLINK "mailto:jdcuneo@wlrk.com"jdcuneo@wlrk.com

1

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to
10/14/09 Disclosure and Protective Order, 09 Civ. 6829 (S.D.N.Y.)          BAC-502-WLRK-A 00022370

# Exhibit 26

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Jeannemarie O'Brien                    November 20, 2009

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

    -vs-                    09-CV-6829

BANK OF AMERICA,

        Defendant.

------------------------------------


      C O N F I D E N T I A L

        VIDEOTAPED DEPOSITION OF

JEANNEMARIE O'BRIEN, the witness herein,

taken at the offices of the Securities and

Exchange Commission, 3 World Financial

Center, New York, New York, pursuant to

Subpoena, on Friday, November 20, 2009 at

9:40 a.m., before Linda Salzman, a Shorthand

Reporter and notary public, within and for

the State of New York.

Jeannemarie O'Brien                    November 20, 2009

CONFIDENTIAL

1          J. O'Brien - Confidential

2     worked out, I think were more along the

3     detail line.

4          Q.    Did you have any understanding that

5     the merger agreement references -- when the

6     merger agreement was signed on September

7     14th, I believe, or September 15th, that

8     there were references to the disclosure

9     schedule?

10         A.    Yes.

11         Q.    At that point, did the disclosure

12    schedule exist?

13              MR. LIMAN:   Objection to form.

14         A.    I don't know if I received a hard

15    copy at some point over the weekend, but I

16    know that the first record of an electronic

17    copy being sent to me was sometime Monday,

18    early morning.

19         Q.    Do you know when Mr. Lewis and

20    Mr. Thain signed the merger agreement, do you

21    know whether they received a copy of the

22    disclosure schedule?

23              MR. ANDERS:   Objection to form and

24         foundation.

25         A.    No, I would imagine the disclosure

Jeannemarie O'Brien                    November 20, 2009
                    CONFIDENTIAL

1         J. O'Brien - Confidential

2    schedule is something they did not receive at

3    whatever time they signed on Sunday night.

4         Q.   Why do you think that?

5         A.   I don't think it would be something

6    that you would typically ask a CEO to review,

7    and I don't believe it was finalized.

8         Q.   So ordinarily the disclosure

9    schedule would not be appended to the merger

10   agreement when it's being executed?

11        A.   No.  It's something that can be

12   worked out and, you know, people have a

13   general, you know, they normally like to have

14   a general idea what they say, but here we

15   were in, you know, we didn't.  We were

16   waiting to get them and we got them when we

17   got them.

18        Q.   And then turning to the black-lined

19   attachment relating to Section 5.2, if you

20   see the fourth bullet point, it's struck out

21   in its entirety, that bullet point reads,

22   "VICP for 2008 (at 2007 level) on terms

23   agreed by the parties."

24             Do you have an understanding of why

25   this was struck out in its entirety?

# Exhibit 27

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Page 177

```
 1
 2                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 3      -----------------------x
                                )
 4      IN RE BANK OF AMERICA    )
        CORP. SECURITIES,        )
 5      DERIVATIVE AND           ) Master File No.
        EMPLOYMENT RETIREMENT    )
 6      INCOME SECURITY ACT      ) 09-MD-2058(PKC)
        (ERISA) LITIGATION       )
 7                                )
        -----------------------x  )
 8                                )
        THIS DOCUMENT RELATES TO  )
 9      All Securities Actions    )
                                  )
10      -----------------------x  )
                                  )
11      IN THE COURT OF           )
        CHANCERY OF THE STATE OF  )
12      DELAWARE                  )
        C.A. No. 4307-CS          )
13                                )
        -----------------------x  )
14                                )
        IN RE BANK OF AMERICA     )
15      CORPORATION STOCKHOLDER   )
        DERIVATIVE LITIGATION     )
16                                )
        -----------------------x
17
           BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
18              1285 AVENUE OF THE AMERICAS
                    NEW YORK, NEW YORK
19                   MARCH 16, 2012
                      8:40 A.M.
20
21
             CONTINUED VIDEOTAPED DEPOSITION OF
22                NEIL ANDREW COTTY
23
24      Reported by:
        DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE
25
```

Page 198

1         Neil A. Cotty - Confidential

2         Q.    And this is a forecast for          08:58:21

3    Merrill Lynch's fourth quarter results         08:58:23

4    of operations; is that correct?               08:58:26

5         A.    That would be correct.             08:58:27

6         Q.    And do you recall being sent       08:58:31

7    a forecast for the fourth quarter prior       08:58:35

8    to November 12th, 2008?                       08:58:37

9         A.    I believe this is the first        08:58:43

10   forecast I received with regard to the        08:58:49

11   first quarter -- fourth quarter of            08:58:52

12   2008.                                         08:58:54

13        Q.    And do you recall having any       08:58:54

14   discussions prior to November 12th,           08:58:55

15   2008 concerning the expectations for          08:59:00

16   Merrill Lynch's fourth quarter               08:59:01

17   performance?                                  08:59:03

18        A.    No, I do not.                      08:59:03

19        Q.    And what is the estimate,          08:59:08

20   sir, for the fourth quarter 2008 pretax       08:59:13

21   earnings on this page?                        08:59:15

22        A.    On Line 36, fourth quarter         08:59:16

23   pretax earnings for the fourth quarter        08:59:25

24   of 2008 I believe is 8 billion 942            08:59:28

25   million.                                      08:59:31

| | | |
|---|---|---|
| 1 | Neil A. Cotty - Confidential | |
| 2 | Q.    And you say, "Further, | 13:23:00 |
| 3 | December may take some further hits. | 13:23:04 |
| 4 | Turning a profit in December may prove | 13:23:07 |
| 5 | to be challenging." | 13:23:09 |
| 6 | Why did you expect December | 13:23:11 |
| 7 | to take some further hits as of | 13:23:12 |
| 8 | December 3rd, 2008? | 13:23:17 |
| 9 | A.    Um.   I don't recall why I | 13:23:18 |
| 10 | said that, made that statement. | 13:23:27 |
| 11 | Q.    Do you recall why you made | 13:23:28 |
| 12 | the statement "turning a profit in | 13:23:33 |
| 13 | December may prove to be challenging?" | 13:23:35 |
| 14 | A.    No, I do not, but supports | 13:23:43 |
| 15 | my December forecast placeholder that I | 13:23:46 |
| 16 | had last time.  I don't know why.  I | 13:23:49 |
| 17 | imagine I had some rationale.  I just | 13:23:52 |
| 18 | don't recall the reason. | 13:23:53 |
| 19 | Q.    Did Mr. Thain respond to | 13:23:54 |
| 20 | your e-mail, do you know, sir? | 13:23:59 |
| 21 | A.    No, I don't recall a | 13:24:00 |
| 22 | response to the e-mail. | 13:24:05 |
| 23 | Q.    Do you have a call with Mr. | 13:24:07 |
| 24 | Thain concerning the fourth quarter '08 | 13:24:11 |
| 25 | pacing and forecast and the 2009 plan | 13:24:15 |

Page 329

1          Neil A. Cotty - Confidential

2      on December 3rd, 2008?                    13:24:18

3          A.   Yes, I believe it was later      13:24:20

4      that evening with others in the room.     13:24:23

5          Q.   And who else was there?          13:24:25

6          A.   Um.   In the room would have     13:24:27

7      been John Thain, myself, Nelson Chai.     13:24:30

8      And when I say in the room, it would      13:24:34

9      have been at Merrill Lynch's corporate    13:24:36

10     offices, so we were in the room.   In     13:24:39

11     Charlotte would have been Ken Lewis and   13:24:42

12     Joe Price.                                13:24:45

13         Q.   And -- and why was this call     13:24:45

14     being held on December 3rd, 2008?         13:24:50

15         A.   Um.   Joe called the meeting     13:24:51

16     or wanted to have the meeting, or I       13:24:56

17     don't know if were Joe or Ken, but,       13:24:58

18     again, I assume it was to review          13:25:03

19     both -- both the 2008 forecast and 2009   13:25:05

20     plan which are attached.                  13:25:08

21         Q.   And during this call, sir,       13:25:08

22     did you explain your expectations for     13:25:14

23     the fourth quarter at Merrill Lynch as    13:25:20

24     of December 3rd, 2008?                    13:25:24

25         A.   Um.   The way the meeting ran    13:25:26

Page 330

1        Neil A. Cotty - Confidential

2    to my recollection is we went through        13:25:35

3    this December 3rd forecast and either        13:25:36

4    Ken or Joe asked me to walk through it,       13:25:41

5    and, you know, I did the sort of the         13:25:44

6    elevator speech of what was behind some       13:25:47

7    of the numbers, driving some of the          13:25:54

8    numbers.  And so that was my role, was       13:25:56

9    to go through the document on Page 2 of       13:25:59

10   the forecasting.  And I would have          13:26:01

11   flipped to some of the relevant            13:26:04

12   attachments in support of the             13:26:06

13   discussion such as Page 3, but            13:26:08

14   that's -- that's what I did with regard       13:26:13

15   to 2008.                      13:26:14

16        Q.   And did you discuss your         13:26:15

17   placeholder of a billion dollars for        13:26:21

18   November 2008?                   13:26:26

19        A.   Um.  I believe the way it        13:26:26

20   was discussed or came up, and Ken          13:26:30

21   asked, you know, how do you feel, Neil,      13:26:33

22   was -- about this forecast, and I          13:26:37

23   believe at the time I gave him a range       13:26:39

24   of I could see anywhere from 1 billion       13:26:42

25   to 3 billion downside to this number.       13:26:44

Page 331

1           Neil A. Cotty - Confidential

2           Q.    And when you say "downside          13:26:48

3    to this number," you mean the quarterly         13:26:49

4    estimate or the November estimate?              13:26:51

5           A.    I was solely focused I             13:26:53

6    believe at the time on the 11 billion           13:26:55

7    043 and, you know, thinking there could         13:26:57

8    be another billion to -- to 3 billion           13:26:59

9    on that number, the low side being the          13:27:00

10   billion of the CVA wild -- WAG, and 3           13:27:04

11   billion a -- a more conservative range          13:27:09

12   if you will.  So that was the range             13:27:16

13   that I presented to the group, 1 to 3.          13:27:18

14          Q.    So it would be the 11              13:27:21

15   billion presented here on Page 2 of the         13:27:27

16   forecast plus an additional 1 to 3             13:27:32

17   billion?                                        13:27:35

18          A.    That's correct.                    13:27:35

19          Q.    What was Mr. Thain's               13:27:35

20   reaction to your opinion of the fourth          13:27:40

21   quarter 2008?                                   13:27:45

22          A.    Um.  When I -- when I put          13:27:45

23   the 1 to 3 billion out he -- I don't            13:27:52

24   recall the reaction.  And then I think          13:27:55

25   we were going to go on to 2009 and Ken          13:28:04

# Exhibit 28

**To Smolar Declaration in
Support of Motion for Summary Judgment**

| From: | Meloth, Nancy (Corporate Planning) <nancy_meloth@ml.com> |
| Sent: | Wednesday, November 12, 2008 11:49 PM (GMT) |
| To: | Cotty, Neil <neil.cotty@bankofamerica.com> |
| Cc: | Hayward, Christopher (Finance Director) <christopher_hayward@ml.com>, Carlin, Gary (Corporate Controller) <gary_carlin@ml.com> |
| Subject: | 4Q forecast |
| Attach: | fcstasof111208 ( Summary for Neil) v2.xls;firm e2a summary 111108.xls |

Neil:

4Q forecast. Please note a few things:

Treasury does not have a balance sheet target for 4Q – either stand alone or in conjunction with BAC partners

We have populated current bal sheet assets on the attached but not a qtr end forecast. Let us know if you want us to follow up on this with Treasury.

The "bal to go" for Nov/Dec assumes **no additional marks, cva, fva or other significant market dislocation items for balance of quarter**.

<<fcstasof111208 ( Summary for Neil) v2.xls>>


Attached also is the e2a for month of October vs what we should you and Joe last Friday

<<firm e2a summary 111108.xls>>



Please advise if you have any questions




This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Unless specifically indicated, this message is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Merrill Lynch. Subject to applicable law, Merrill Lynch may monitor, review and retain e-communications (EC) traveling through its networks/systems. The laws of the country of each sender/recipient may impact the handling of EC, and EC may be archived, supervised and produced in countries other than the country in which you are located. This message cannot be guaranteed to be secure or error-free. This message is subject to terms available at the following link: http://www.ml.com/e-communications_terms/. By messaging with Merrill Lynch you consent to the foregoing.

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | Merrill Lynch & Co | | |
| 15 | | | | | | 2008 4Q & FY Forecast | | |
| 16 | | | | | | November 12, 2008 | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106373

# Merrill Lynch & Co.
## 4Q'08 Forecast

|  |  |  |  | 4Q08 Forecast |  |  |  | 4Q08F B/(W) |  |
|---|---|---|---|---|---|---|---|---|---|
| Revenue ex Marks/FVA/One-Time | 4Q07 | 3Q08 | Oct Act (26 days) | Nov MTD (7 days) | QTD Estimate | BTG | 4Q08F | B/(W) 3Q08 | B/(W) 4Q07 |
| FICC | 854 | 628 | (1,389) | 160 | (1,230) | 249 | (980) | (258.0%) | (214.8%) |
| Equity | 1,653 | 1,386 | 1,037 | 58 | 1,095 | 555 | 1,650 | 20.8% | (0.2%) |
| IBK | 1,080 | 571 | 102 | 41 | 143 | 509 | 652 | 14.1% | (39.6%) |
| GPID | 298 | (315) | (296) | (120) | (416) | (184) | (600) | (90.5%) | (301.6%) |
| GMI Other | (180) | 136 | 67 | (8) | 58 | (118) | (60) | (144.1%) | 66.7% |
| GMI | 3,704 | 2,369 | (479) | 130 | (349) | 1,011 | 662 | (72.3%) | (82.1%) |
|  |  |  |  |  |  |  |  |  |  |
| GPC | 3,414 | 2,933 | 1,094 | 329 | 1,423 | 1,574 | 2,997 | 2.2% | (12.2%) |
| GIM | 151 | 88 | (18) | 15 | (3) | 49 | 46 | (47.3%) | (69.4%) |
| GWM | 3,564 | 3,021 | 1,076 | 344 | 1,421 | 1,622 | 3,043 | 0.7% | (14.6%) |
|  |  |  |  |  |  |  |  |  |  |
| Corporate | (72) | 287 | 532 | (12) | 519 | (644) | (125) | (143.5%) | (73.2%) |
| ML&Co ex Marks/FVA/One-Time | 7,196 | 5,897 | 1,130 | 461 | 1,590 | 1,989 | 3,580 | (37.2%) | (50.3%) |
| Significant Items (Non-Marks) | - | 2,133 | (2,619) | - | (2,619) | - | (2,619) |  |  |
| Total Marks | (16,718) | (10,556) | (2,720) | - | (2,720) | - | (2,720) |  |  |
| FVAs | 1,331 | 2,842 | (1,078) | (8) | (1,086) | - | (1,086) |  |  |
| Total Marks/Significant Items | (15,387) | (5,581) | (6,417) | (8) | (6,424) | - | (6,424) |  |  |
|  |  |  |  |  |  |  |  |  |  |
| Total Revenue | (8,192) | 16 | (5,287) | 453 | (4,834) | 1,989 | (2,844) | NM | 65.3% |
|  |  |  |  |  |  |  |  |  |  |
| Comp | 3,021 | 2,725 | 1,051 | 310 | 1,361 | 1,772 | 2,823 | (3.6%) | 6.6% |
| Non Comp | 2,335 | 1,819 | 612 | 248 | 860 | 1,589 | 2,211 | (21.6%) | 5.3% |
| VIOP | 1,318 | 758 | 495 | 122 | 617 | 477 | 972 | (28.2%) | 26.3% |
| Total Expenses ex One-Time | 6,675 | 5,302 | 2,168 | 680 | 2,838 | 3,848 | 6,006 | (13.3%) | 10.0% |
|  |  |  |  |  |  |  |  |  |  |
| FF/ARS | 54 | 425 | 92 | - | 92 | - | 92 |  |  |
| Restructuring | - | 40 | (1) | - | (1) | 1 | - |  |  |
| Temasek | - | 2,500 | - | - | - | - | - |  |  |
|  |  |  |  |  |  |  |  |  |  |
| PTE | (14,920) | (8,251) | (7,636) | (227) | (7,763) | (1,859) | (8,942) | (8.4%) | 40.1% |
|  |  |  |  |  |  |  |  |  |  |
| Taxes | (4,623) | (3,132) | (3,000) | (90) | (3,090) | (559) | (3,559) | 13.7% | (23.0%) |
|  |  |  |  |  |  |  |  |  |  |
| ML Operating ATE | (10,297) | (5,119) | (4,536) | (137) | (4,673) | (1,300) | (5,383) | (5.2%) | 47.7% |
|  |  |  |  |  |  |  |  |  |  |
| All In Results: |  |  |  |  |  |  |  |  |  |
| EPS | $ (12.57) | $ (5.56) |  |  |  |  | $ (3.46) | $ 2.10 | $ 9.11 |
| ROE | (131.5%) | (107.5%) |  |  |  |  | #DIV/0! | NM | NM |
| Pre-Tax Margin | NM | NM |  |  |  |  | NM | NM | NM |
| Comp Ratio | NM | NM |  |  |  |  | NM | NM | NM |
| Non Comp Ratio | NM | NM |  |  |  |  | NM | NM | NM |
| Tax Rate | 31.0% | 38.0% | 39.6% |  |  |  | 39.8% | (1.8) pts | (8.8) pts |
|  |  |  |  |  |  |  |  |  |  |
| Ex Marks/FVA/One-Time Results |  |  |  |  |  |  |  |  |  |
| Revenue | 7,196 | 5,897 | 1,130 |  |  | 1,989 | 3,580 | -37% | -50% |
| PTE | 521 | 395 | (1,028) |  |  | (1,859) | (2,426) | -714% | -566% |

Page 1

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106374

| | A | B | C | D | E | F G | H | I | J | K | L | M | P | O | T | W | Y | Z | AB | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | ATE | | 352 | | 274 | | (714) | | | | | | (1,290) | | (1,884) | | -714% | | -560% | |
| 54 | EPS | $ | 0.28 | $ | 0.15 | | | | | | | | | | $ (1.97) | | $ (2.12) | | $ (2.26) | |
| 55 | Preferred Dividends | | 107 | | 107 | | | | | | | | | | 107 | | | | | |
| 56 | Mandatory | | 38 | | 149 | | | | | | | | | | 149 | | | | | |
| 57 | Net to Common EPS | | 254 | | 167 | | | | | | | | | | (1,940) | | | | | |
| 58 | Common Shares | | 825 | | 984 | | | | | | | | | | 984 | | | | | |
| 59 | Diluted Shares | | 895 | | 1,144 | | | | | | | | | | 1,144 | | | | | |
| 60 | | | | | | | | | | | | | | | | | | | | |
| 61 | Preferred Dividends | | 73 | | 107 | | | | | | | | | | 107 | | | | | |
| 62 | Mandatory | | - | | 2,212 | | | | | | | | | | 38 | | | | | |
| 63 | Net to Common EPS | | (10,368) | | (7,438) | | | | | | | | | | (5,529) | | | | | |
| 64 | Net to Common ROE | | (10,369) | | (7,438) | | | | | | | | | | (5,529) | | | | | |
| 65 | Common Shares | | 625 | | 1,339 | | | | | | | | | | 1,599 | | | | | |
| 66 | Diluted Shares | | 895 | | 1,446 | | | | | | | | | | 1,678 | | | | | |
| 67 | Average Common Equity | | 31,541 | | 27,683 | | | | | | | | | | | | | | | |
| 68 | | | | | | | | | | | | | | | | | | | | |
| 69 | Common Equity | | 27,549 | | 29,750 | | | | | | | | | | | | | | | |
| 70 | Preferred Stock | | 4,363 | | 8,605 | | | | | | | | | | | | | | | |
| 71 | Trust Preferred Securities | | 4,725 | | 4,773 | | | | | | | | | | | | | | | |
| 72 | Equity Capital | | 36,657 | | 43,128 | | | | | | | | | | | | | | | |
| 73 | | | | | | | | | | | | | | | | | | | | |
| 74 | Total Assets | | 1,020,050 | | 875,760 | | 882,100 | est | 884,199 | est | | | | | TBD | | | | | |
| 75 | Adjusted Assets | | 847,343 | | 572,395 | | 574,900 | est | 581,143 | est | | | | | TBD | | | | | |
| 76 | | | | | | | | | | | | | | | | | | | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106375

| A | D | K | L | M | N | O | P Q |
|---|---|---|---|---|---|---|---|
| 1 | | | | | Merrill Lynch & C | | |
| 2 | | | | | ML&CO Pacing (Internal | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | 3Q08 | | | Sep08 YTD | |
| 6 | | Total | Daily Avg (65 days) | | Total | Daily Avg (185 days) | |
| 7 Revenue ex Marks/FVA/One-Time | | | | | | | |
| 8 | | | | | | | |
| 9 Global Rates and Currencies | | 1,174 | 18 | | 3,634 | 19 | |
| 10 Credit | | (224) | (3) | | 116 | 1 | |
| 11 CPI | | (59) | (1) | | 186 | 1 | |
| 12 Global Principal Credit Group | | (244) | (4) | | (651) | (3) | |
| 13 Municipal Products | | 30 | 0 | | 224 | 1 | |
| 14 Global Structured Finance & Inv | | 54 | 1 | | 27 | 0 | |
| 15 Global Mortgages | | (24) | (0) | | 425 | 2 | |
| 16 ML BUSA Investment Portfolio | | (3) | (0) | | (242) | (1) | |
| 17 Global Commercial Real Estate | | 1 | 0 | | 2 | 0 | |
| 18 Commodities | | 184 | 3 | | 699 | 3 | |
| 19 Global Prop Trading | | 5 | 0 | | 540 | 3 | |
| 20 FICC Management | | (264) | (4) | | (153) | (1) | |
| 21 FICC | | 628 | 10 | | 4,766 | 24 | |
| 22 | | | | | | | |
| 23 Cash | | 649 | 10 | | 2,064 | 11 | |
| 24 Equity Linked | | 417 | 6 | | 1,190 | 6 | |
| 25 Equity Financing & Services | | 310 | 5 | | 1,128 | 6 | |
| 26 Strategic Risk Group | | 49 | 1 | | 200 | 1 | |
| 27 Alternative Investment | | (39) | (1) | | (90) | (0) | |
| 28 Equity Management | | (17) | (0) | | 132 | 1 | |
| 29 Equity | | 1,368 | 21 | | 4,623 | 24 | |
| 30 | | | | | | | |
| 31 IBK | | 571 | 9 | | 2,280 | 12 | |
| 32 | | | | | | | |
| 33 GPID | | (315) | (5) | | (373) | (2) | |
| 34 | | | | | | | |
| 35 Other GMI | | 136 | 2 | | (374) | (2) | |
| 36 | | | | | | | |
| 37 Total GMI | | 2,389 | 37 | | 10,922 | 59 | |
| 38 | | | | | | | |
| 39 GPC | | 2,933 | 45 | | 9,448 | 48 | |
| 40 GIM | | 88 | 1 | | 325 | 2 | |
| 41 GWM | | 3,021 | 46 | | 9,773 | 50 | |
| 42 | | | | | | | |
| 43 Corporate | | 287 | 4 | | (122) | (1) | |
| 44 | | | | | | | |
| 45 Total ML&CO ex Marks ex One-Time [1] | | 5,697 | 88 | | 20,572 | 105 | |
| 46 | | | | | | | |
| 47 Core Marks | | (2,482) | | | (18,733) | | |
| 48 One-Time Marks | | (8,175) | | | (8,175) | | |
| 49 Significant Items (Non-Marks) | | 2,133 | | | 2,133 | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106376

D.

Basis] [1]

| | 4Q08 Pacing | | | | | | 4Q'08F | | FY'08F | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Oct Act (25 days) | Nov MTD (7 days) | QTD Est (32 days) | Daily Avg (32 days) | BTG | Daily Avg (33 days) | 4Q08F | Daily Avg (65 days) | FY08F | Daily Avg (260 days) |
| | 510 | 164 | 674 | 21 | 396 | 12 | 1,070 | 16 | 4,704 | 18 |
| | (819) | (35) | (854) | (27) | (91) | (3) | (945) | (15) | (829) | (3) |
| | (227) | (15) | (242) | (8) | (8) | (0) | (250) | (4) | (64) | (0) |
| | (126) | (2) | (128) | (4) | (192) | (6) | (320) | (5) | (971) | (4) |
| | (30) | 2 | (28) | (1) | (7) | (0) | (36) | (1) | 188 | 1 |
| | (21) | (0) | (21) | (1) | 81 | 2 | 60 | 1 | 87 | 0 |
| | 8 | (0) | 6 | 0 | (238) | (7) | (230) | (4) | 195 | 1 |
| | 51 | (15) | 35 | 1 | (10) | (0) | 26 | 0 | (217) | (1) |
| | 10 | (1) | 9 | 0 | 56 | 2 | 65 | 1 | 67 | 0 |
| | 277 | 95 | 372 | 12 | 63 | 2 | 435 | 7 | 1,094 | 4 |
| | (726) | 7 | (719) | (22) | (66) | (2) | (785) | (12) | (245) | (1) |
| | (296) | (40) | (336) | (11) | 266 | 8 | (70) | (1) | (223) | (1) |
| | (1,349) | 160 | (1,230) | (38) | 249 | 8 | (980) | (15) | 3,786 | 16 |
| | | | | | | | | | | |
| | 259 | 64 | 323 | 10 | 307 | 9 | 630 | 10 | 2,694 | 10 |
| | 694 | (37) | 658 | 21 | 167 | 5 | 825 | 13 | 2,015 | 8 |
| | 121 | 25 | 146 | 5 | 89 | 3 | 235 | 4 | 1,363 | 5 |
| | 18 | 8 | 25 | 1 | 14 | 0 | 40 | 1 | 240 | 1 |
| | (7) | 3 | (4) | (0) | 4 | 0 | - | - | (90) | (0) |
| | (48) | (6) | (54) | (2) | (26) | (1) | (90) | (1) | 52 | 0 |
| | 1,037 | 58 | 1,095 | 34 | 558 | 17 | 1,650 | 25 | 6,273 | 24 |
| | | | | | | | | | | |
| | 102 | 41 | 143 | 4 | 509 | 15 | 652 | 10 | 2,932 | 11 |
| | | | | | | | | | | |
| | (298) | (120) | (418) | (13) | (184) | (6) | (600) | (9) | (973) | (4) |
| | | | | | | | | | | |
| | 67 | (8) | 58 | 2 | (118) | (4) | (60) | (1) | (434) | (2) |
| | | | | | | | | | | |
| | (479) | 130 | (349) | (11) | 1,011 | 31 | 662 | 10 | 11,584 | 45 |
| | | | | | | | | | | |
| | 1,094 | 329 | 1,423 | 44 | 1,574 | 48 | 2,997 | 46 | 12,445 | |
| | (18) | 15 | (3) | (0) | 49 | 1 | 46 | 1 | 371 | |
| | 1,076 | 344 | 1,421 | 44 | 1,622 | 49 | 3,043 | 47 | 12,816 | 49 |
| | | | | | | | | | | |
| | 532 | (13) | 519 | 16 | (644) | (20) | (125) | (2) | (247) | (1) |
| | | | | | | | | | | |
| | 1,130 | 451 | 1,550 | 50 | 1,989 | 60 | 3,580 | 55 | 24,152 | 93 |
| | | | | | | | | | | |
| | (2,720) | - | (2,720) | | - | | (2,720) | | (21,453) | |
| | - | - | - | | - | | - | | (8,175) | |
| | (2,619) | - | (2,619) | | - | | (2,619) | | (486) | |

Page 4

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106377

| | A | D | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|
| 50 | FVAs | | 2,842 | | | 5,036 | | | |
| 51 | Total Marks/Significant Items | | (5,551) | | | (19,739) | | | |
| 52 | | | | | | | | | |
| 53 | Total MLACO Revenue | | 16 | 0 | | 834 | 4 | | |
| 54 | | | | | | | | | |
| 55 | Excludes Marks, FVA and One-Time items including Freddie / Fannie, Project NOW, CDO sale / Monoline termination, Bloomberg gain on sale | | | | | | | | |
| 56 | and other market dislocations. 4Q08 excludes ML CDS MTM exposure against Sigma-collateralized CLNs | | | | | | | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106378

| | R | S | T | U | V | W | X | Y | Z | AA | AB | AC AD | AE | AF | AG | AH AI AJ | AK | AL | AM | AN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 | (1,076) | | (8) | | (1,086) | | | | - | | | | (1,086) | | | | 3,950 | | | |
| 51 | (6,417) | | (8) | | (6,424) | | | | - | | | | (6,424) | | | | (26,163) | | | |
| 52 | | | | | | | | | | | | | | | | | | | | |
| 53 | (5,287) | | 453 | | (4,834) | | (151) | | 1,989 | | 60 | | (2,844) | | (44) | | (2,011) | | | (8) |
| 54 | | | | | | | | | | | | | | | | | | | | |
| 55 | | | | | | | | | | | | | | | | | | | | |
| 56 | | | | | | | | | | | | | | | | | | | | |

Page 6

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106379

Merrill Lynch & Co.
FY2008 Forecast

| A | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | AA | AB | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ in millions | FY 2006 | | 1Q | | 2Q | | 3Q | | 4Q | | FY 2007 | | 1Q | | 2Q | | 3Q | | 4QP | |
| | | | | | | | FY 2007 Actual | | | | | | | | | | Current 08 Forecast | | | |
| Net Revenue ex Marks ex One-Time | | | | | | | | | | | | | | | | | | | | |
| FICC | 7,974 | | 2,949 | | 2,557 | | 1,850 | | 854 | | 8,216 | | 2,056 | | 2,082 | | 628 | | (980) | |
| Non-Marks One-Time Items | | | - | | - | | - | | - | | - | | - | | - | | (1,860) | | (2,215) | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | (8,274) | | - | |
| Core Marks | - | | (251) | | (147) | | (8,158) | | (16,797) | | (25,353) | | (6,135) | | (9,571) | | (2,121) | | (2,310) | |
| Total FICC Marks | | | (251) | | (147) | | (8,158) | | (16,797) | | (25,353) | | (6,135) | | (9,571) | | (10,395) | | (2,310) | |
| Total FICC | 7,974 | | 2,698 | | 2,409 | | (6,300) | | (15,943) | | (17,135) | | (4,083) | | (7,488) | | (11,727) | | (5,505) | |
| Equity | 4,842 | | 1,646 | | 1,823 | | 1,353 | | 1,653 | | 6,474 | | 1,503 | | 1,752 | | 1,368 | | 1,860 | |
| Non-Marks One-Time Items | | | - | | - | | - | | - | | - | | - | | - | | (47) | | (322) | |
| Total Equity | 4,842 | | 1,646 | | 1,823 | | 1,353 | | 1,653 | | 6,474 | | 1,503 | | 1,752 | | 1,322 | | 1,328 | |
| IBK | 3,735 | | 1,292 | | 1,359 | | 1,090 | | 1,080 | | 4,852 | | 751 | | 957 | | 571 | | 652 | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | - | | (181) | |
| Core Marks | - | | - | | - | | (301) | | (81) | | (382) | | (803) | | (226) | | (355) | | (363) | |
| IBK | 3,735 | | 1,292 | | 1,359 | | 789 | | 999 | | 4,469 | | 149 | | 731 | | 217 | | 108 | |
| GPID | 2,762 | | 624 | | 383 | | 541 | | 298 | | 1,845 | | 86 | | (144) | | (315) | | (600) | |
| Non-Marks One-Time Items | | | - | | - | | - | | - | | - | | - | | - | | 4,206 | | (30) | |
| Core Marks | - | | 226 | | 189 | | (26) | | 160 | | 549 | | 113 | | (6) | | (27) | | (92) | |
| GPID | 2,762 | | 850 | | 572 | | 515 | | 457 | | 2,394 | | 199 | | (150) | | 3,864 | | (722) | |
| Other GMI | (930) | | (233) | | (321) | | (150) | | (180) | | (885) | | (203) | | (218) | | 139 | | (60) | |
| GMI | 18,384 | | 6,278 | | 5,831 | | 4,692 | | 3,704 | | 20,505 | | 4,103 | | 4,430 | | 2,199 | | 862 | |
| Non-Marks One-Time Items | - | | - | | - | | - | | - | | - | | - | | - | | (8,274) | | (2,748) | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | (8,274) | | - | |
| Core Marks | - | | (25) | | 42 | | (8,485) | | (16,718) | | (25,187) | | (6,529) | | (9,803) | | (2,504) | | (2,765) | |
| Total GMI Marks | | | (25) | | 42 | | (8,485) | | (16,718) | | (25,187) | | (6,529) | | (9,803) | | (10,777) | | (2,765) | |
| GMI "All In" | 18,384 | | 6,253 | | 5,872 | | (3,793) | | (13,015) | | (4,682) | | (2,526) | | (5,373) | | (8,199) | | (4,851) | |
| GPC | 11,476 | | 3,133 | | 3,332 | | 3,341 | | 3,414 | | 13,219 | | 3,349 | | 3,186 | | 2,933 | | 2,997 | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | 99 | | - | |
| Core Marks | - | | - | | - | | - | | - | | - | | 49 | | 132 | | 22 | | 45 | |
| Total GPC Marks | - | | - | | - | | - | | - | | - | | 49 | | 132 | | 121 | | 45 | |
| Total GPC | 11,476 | | 3,133 | | 3,332 | | 3,341 | | 3,414 | | 13,219 | | 3,398 | | 3,297 | | 3,054 | | 3,042 | |
| GIM | 111 | | 127 | | 175 | | 148 | | 151 | | 600 | | 162 | | 75 | | 88 | | 46 | |
| GWM | 11,586 | | 3,260 | | 3,507 | | 3,489 | | 3,594 | | 13,820 | | 3,511 | | 3,241 | | 3,021 | | 3,043 | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | 99 | | - | |
| Core Marks | - | | - | | - | | - | | - | | - | | 49 | | 132 | | 22 | | 45 | |
| Total GWM Marks | - | | - | | - | | - | | - | | - | | 49 | | 132 | | 121 | | 45 | |
| GWM "All In" | 11,586 | | 3,260 | | 3,507 | | 3,489 | | 3,594 | | 13,820 | | 3,560 | | 3,373 | | 3,142 | | 3,088 | |
| MLIM | 1,861 | | 1 | | 0 | | 0 | | (1) | | 1 | | 0 | | 0 | | (0) | | - | |
| Corporate | (19) | | 99 | | 53 | | 74 | | (72) | | 153 | | (203) | | (206) | | 287 | | (126) | |
| Non-Marks One-Time Items | - | | - | | - | | - | | - | | - | | - | | - | | (66) | | 129 | |
| Corporate FVAs | - | | (9) | | 28 | | 609 | | 1,331 | | 1,959 | | 2,103 | | 91 | | 2,842 | | (1,086) | |
| Corporate "All In" | (19) | | 90 | | 81 | | 683 | | 1,259 | | 2,112 | | 1,899 | | (115) | | 3,063 | | (1,082) | |
| ML&CO ex Marks/FVA/One-Time | 31,812 | | 8,537 | | 9,380 | | 8,256 | | 7,196 | | 34,478 | | 7,411 | | 7,464 | | 5,596 | | 3,680 | |
| Non-Marks One-Time Items | - | | - | | - | | - | | - | | - | | - | | - | | 2,133 | | (2,618) | |
| FVAs | - | | (9) | | 28 | | 609 | | 1,331 | | 1,959 | | 2,103 | | 91 | | 2,842 | | (1,086) | |
| One-Time Marks | - | | - | | - | | - | | - | | - | | - | | - | | (8,175) | | - | |
| Core Marks | - | | (25) | | 42 | | (8,485) | | (16,718) | | (25,187) | | (6,580) | | (9,671) | | (2,462) | | (2,720) | |
| Total Marks | - | | (25) | | 42 | | (8,485) | | (16,718) | | (25,187) | | (6,580) | | (9,671) | | (10,656) | | (2,720) | |
| Total Marks/Significant Items | - | | (34) | | 70 | | (7,876) | | (15,387) | | (23,228) | | (4,477) | | (9,580) | | (5,681) | | (6,424) | |

Page 7

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106380

| | AD | AE | AF | AG | AH |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | 2008F Bk(W) | | |
| 6 | FY 2008F | | vs. 2007 | | |
| 7 | | | | | |
| 8 | 3,766 | | (4,432) | (53.9%) | |
| 9 | (4,175) | | (4,175) | NM | |
| 10 | (9,274) | | | | |
| 11 | (20,141) | | | | |
| 12 | (28,415) | | (3,081) | -12.1% | |
| 13 | (29,904) | | (11,668) | -68.1% | |
| 14 | 6,273 | | | | |
| 15 | (366) | | | | |
| 16 | 5,904 | | (570) | -8.8% | |
| 17 | 2,932 | | (1,920) | (39.6%) | |
| 18 | (161) | | | | |
| 19 | (1,547) | | (1,164) | NM | |
| 20 | 1,204 | | (3,265) | -73.1% | |
| 21 | (973) | | (2,818) | (152.7%) | |
| 22 | 4,176 | | | | |
| 23 | (12) | | | | |
| 24 | 3,191 | | 798 | 33.3% | |
| 25 | (434) | | 450 | 50.9% | |
| 26 | 11,584 | | (8,921) | (43.5%) | |
| 27 | (549) | | | | |
| 28 | (8,274) | | | | |
| 29 | (21,700) | | | | |
| 30 | (29,974) | | (4,787) | (19.0%) | |
| 31 | (18,939) | | (14,267) | NM | |
| 32 | | | | | |
| 33 | 12,445 | | (774) | (5.9%) | |
| 34 | 99 | | | | |
| 35 | 247 | | | | |
| 36 | 346 | | 346 | NM | |
| 37 | 12,791 | | (428) | (3.2%) | |
| 38 | 371 | | (230) | (38.3%) | |
| 39 | 12,816 | | (1,904) | (7.3%) | |
| 40 | 99 | | | | |
| 41 | 247 | | | | |
| 42 | 346 | | 346 | NM | |
| 43 | 13,162 | | (658) | (4.8%) | |
| 44 | | | | | |
| 45 | (0) | | (1) | (114.3%) | |
| 46 | (247) | | (400) | NM | |
| 47 | 63 | | | | |
| 48 | 3,950 | | 1,991 | 101.6% | |
| 49 | 3,766 | | 1,654 | 78.3% | |
| 50 | | | | | |
| 51 | 24,162 | | (10,326) | (30.0%) | |
| 52 | (486) | | | | |
| 53 | 3,950 | | | | |
| 54 | (8,175) | | | | |
| 55 | (21,453) | | | | |
| 56 | (29,627) | | | | |
| 57 | (26,163) | | Page 8 | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106381

| | A | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | AA | AB | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58 | Total ML&CO Revenue | 21,812 | | 8,903 | | 8,460 | | 380 | | (8,182) | | 11,261 | | 2,834 | | (2,118) | | 16 | | (3,844) | |
| 59 | | | | | | | | | | | | | | | | | | | | | |
| 60 | GMI | 3,219 | | 1,054 | | 1,084 | | 1,128 | | 1,275 | | 4,539 | | 1,581 | | 1,107 | | 1,128 | | 1,210 | |
| 61 | GWM | 5,683 | | 1,658 | | 1,649 | | 1,661 | | 1,752 | | 6,720 | | 1,849 | | 1,673 | | 1,592 | | 1,596 | |
| 62 | MLIM | 384 | | (0) | | 0 | | 0 | | 0 | | 0 | | 0 | | (0) | | 0 | | - | |
| 63 | Corporate | 14 | | 5 | | (10) | | 0 | | (6) | | (12) | | 16 | | (9) | | 5 | | 17 | |
| 64 | Comp | 9,320 | | 2,717 | | 2,723 | | 2,781 | | 3,021 | | 11,243 | | 3,448 | | 2,771 | | 2,728 | | 2,823 | |
| 65 | | | | | | | | | | | | | | | | | | | | | |
| 66 | GMI Non Comp ex One-Time | 3,853 | | 1,123 | | 1,217 | | 1,284 | | 1,517 | | 5,140 | | 1,243 | | 1,333 | | 1,141 | | 1,432 | |
| 67 | GMI Non Comp ex One-Time (FF) | - | | - | | - | | 110 | | 54 | | 164 | | - | | - | | - | | - | |
| 68 | GMI | 3,853 | | 1,123 | | 1,217 | | 1,394 | | 1,571 | | 5,304 | | 1,243 | | 1,335 | | 1,141 | | 1,432 | |
| 69 | GWM Non Comp ex One-Time | 2,628 | | 607 | | 652 | | 673 | | 837 | | 2,769 | | 799 | | 721 | | 687 | | 776 | |
| 70 | GWM Non Comp One-Time | - | | - | | - | | - | | - | | - | | - | | - | | - | | - | |
| 71 | GWM | 2,628 | | 607 | | 652 | | 673 | | 837 | | 2,769 | | 799 | | 721 | | 687 | | 776 | |
| 72 | MLIM | 466 | | 0 | | 0 | | (0) | | (0) | | 0 | | 0 | | (0) | | 0 | | (0) | |
| 73 | Corp Non Comp ex One-Time | 99 | | 118 | | 33 | | (26) | | (19) | | 106 | | (2) | | 5 | | (9) | | 4 | |
| 74 | Corp Non Comp One-Time (ARS) | - | | - | | - | | - | | - | | - | | - | | - | | 425 | | 92 | |
| 75 | Corporate | 99 | | 118 | | 33 | | (26) | | (19) | | 106 | | (2) | | 5 | | 416 | | 96 | |
| 76 | Non Comp ex One-Time | 7,047 | | 1,849 | | 1,902 | | 1,930 | | 2,335 | | 8,014 | | 2,040 | | 2,059 | | 1,819 | | 2,211 | |
| 77 | Non Comp One-Time | - | | - | | - | | 110 | | 54 | | 164 | | - | | - | | 425 | | 92 | |
| 78 | Total Non Comp | 7,047 | | 1,848 | | 1,902 | | 2,040 | | 2,389 | | 8,178 | | 2,040 | | 2,059 | | 2,244 | | 2,303 | |
| 79 | | | | | | | | | | | | | | | | | | | | | |
| 80 | GMI | 4,568 | | 1,735 | | 1,510 | | (835) | | 1,469 | | 3,878 | | 480 | | 547 | | 584 | | 772 | |
| 81 | GWM | 834 | | 223 | | 239 | | 220 | | 85 | | 757 | | 200 | | 219 | | 165 | | 204 | |
| 82 | MLIM | 264 | | 0 | | (0) | | 0 | | 0 | | 0 | | - | | 0 | | - | | - | |
| 83 | Corporate | (23) | | 179 | | 260 | | (187) | | (235) | | 16 | | 70 | | (46) | | 8 | | (4) | |
| 84 | VICP | 5,644 | | 2,137 | | 2,008 | | (982) | | 1,318 | | 4,661 | | 750 | | 720 | | 768 | | 972 | |
| 85 | | | | | | | | | | | | | | | | | | | | | |
| 86 | Restructuring | - | | - | | - | | - | | - | | - | | - | | 445 | | 40 | | - | |
| 87 | Temasek Payment | - | | - | | - | | - | | - | | - | | - | | - | | 2,500 | | - | |
| 88 | | | | | | | | | | | | | | | | | | | | | |
| 89 | Total Expenses ex One-Time | 22,011 | | 6,702 | | 6,633 | | 3,908 | | 6,075 | | 23,917 | | 6,235 | | 5,550 | | 5,302 | | 6,008 | |
| 90 | Total Expenses | 22,011 | | 6,702 | | 6,633 | | 4,019 | | 6,729 | | 24,081 | | 6,235 | | 5,994 | | 8,267 | | 6,098 | |
| 91 | | | | | | | | | | | | | | | | | | | | | |
| 92 | GMI PTE ex Marks | 6,743 | | 2,367 | | 2,020 | | 3,117 | | (556) | | 6,948 | | 799 | | 1,443 | | (464) | | (2,752) | |
| 93 | GMI | 6,743 | | 2,342 | | 2,062 | | (5,478) | | (17,326) | | (18,400) | | (5,829) | | (8,360) | | (9,042) | | (8,264) | |
| 94 | GWM PTE ex Marks | 2,431 | | 771 | | 967 | | 938 | | 890 | | 3,564 | | 664 | | 626 | | 573 | | 487 | |
| 95 | GWM | 2,431 | | 771 | | 967 | | 938 | | 890 | | 3,564 | | 713 | | 759 | | 694 | | 512 | |
| 96 | MLIM | 737 | | 1 | | (0) | | 0 | | (1) | | 1 | | 0 | | 0 | | (0) | | 0 | |
| 97 | Corporate PTE ex FVAs | (109) | | (203) | | (230) | | 294 | | 188 | | 48 | | (287) | | (159) | | 286 | | (142) | |
| 98 | Corporate | (109) | | (212) | | (202) | | 803 | | 1,519 | | 2,007 | | 1,815 | | (510) | | 87 | | (1,190) | |
| 99 | Pre-Tax Earnings ex Marks ex One-Time | 9,801 | | 2,935 | | 2,757 | | 4,348 | | 520 | | 10,561 | | 1,176 | | 1,915 | | 395 | | (2,426) | |
| 100 | Pre-Tax Earnings | 9,801 | | 2,902 | | 2,827 | | (3,636) | | (14,921) | | (12,831) | | (3,301) | | (8,116) | | (8,261) | | (8,942) | |
| 101 | | | | | | | | | | | | | | | | | | | | | |
| 102 | Taxes ex Marks ex One-Time | 2,633 | | 698 | | 844 | | 1,330 | | 159 | | 3,232 | | 380 | | 586 | | 121 | | (742) | |
| 103 | Taxes | 2,633 | | 871 | | 817 | | (1,259) | | (4,623) | | (4,195) | | (1,333) | | (3,476) | | (3,132) | | (3,559) | |
| 104 | | | | | | | | | | | | | | | | | | | | | |
| 105 | ML Operating ATE ex Marks ex One-Time | 7,169 | | 2,037 | | 1,914 | | 3,017 | | 361 | | 7,329 | | 816 | | 1,329 | | 274 | | (1,684) | |
| 106 | ML Operating ATE | 7,165 | | 2,031 | | 2,010 | | (2,380) | | (10,298) | | (8,636) | | (1,968) | | (4,634) | | (5,120) | | (5,383) | |
| 107 | | | | | | | | | | | | | | | | | | | | | |
| 108 | | | | | | | | | | | | | | | | | | | | | |
| 109 | ex Marks ex One-Time Results: | | | | | | | | | | | | | | | | | | | | |
| 110 | EPS | $7.25 | | $2.13 | | $1.99 | | $3.29 | | $0.32 | | $7.75 | | $0.68 | | $1.06 | | $0.15 | | ($1.97) | |
| 111 | | | | | | | | | | | | | | | | | | | | | |
| 112 | ROE | 20.3% | | 21.8% | | 19.8% | | 31.2% | | 3.4% | | 19.4% | | 10.8% | | 19.7% | | 2.3% | | (26.7%) | |
| 113 | | | | | | | | | | | | | | | | | | | | | |
| 114 | Pre-Tax Margin | 30.8% | | 30.5% | | 29.4% | | 52.7% | | 7.2% | | 30.6% | | 15.9% | | 25.6% | | 6.9% | | -67.8% | |
| 115 | | | | | | | | | | | | | | | | | | | | | |

Page 9

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106382

| | AD | AE | AF | AG | AH |
|---|---|---|---|---|---|
| 58 | (2,011) | | (13,261) | (117.9%) | |
| 59 | | | | | |
| 60 | 5,027 | | (487) | (10.7%) | |
| 61 | 6,708 | | 11 | 0.2% | |
| 62 | 0 | | | | |
| 63 | 28 | | - | NM | |
| 64 | 11,765 | | (823) | (4.7%) | |
| 65 | | | | | |
| 66 | 5,148 | | (9) | (0.2%) | |
| 67 | | | | | |
| 68 | 5,149 | | 155 | 2.9% | |
| 69 | 2,982 | | (213) | (7.7%) | |
| 70 | | | | | |
| 71 | 2,982 | | (213) | (7.7%) | |
| 72 | (0) | | 0 | 100.0% | |
| 73 | (3) | | 109 | 102.7% | |
| 74 | 517 | | | | |
| 75 | 514 | | (408) | NM | |
| 76 | 8,128 | | (114) | (1.4%) | |
| 77 | 517 | | | | |
| 78 | 8,645 | | (467) | (6.7%) | |
| 79 | | | | | |
| 80 | 2,382 | | 1,486 | 58.6% | |
| 81 | 792 | | (25) | (3.3%) | |
| 82 | 0 | | | | |
| 83 | 25 | | (9) | (59.4%) | |
| 84 | 3,200 | | 1,481 | 31.4% | |
| 85 | | | | | |
| 86 | 484 | | | | |
| 87 | 2,500 | | | | |
| 88 | | | | | |
| 89 | 23,093 | | 824 | 3.4% | |
| 90 | 26,694 | | (2,513) | (10.4%) | |
| 91 | | | | | |
| 92 | (974) | | (7,922) | (114.0%) | |
| 93 | (31,496) | | (13,093) | (71.1%) | |
| 94 | 2,332 | | (1,232) | (34.6%) | |
| 95 | 2,079 | | (686) | (24.8%) | |
| 96 | (0) | | | | |
| 97 | (296) | | (347) | NM | |
| 98 | 213 | | (1,785) | (89.4%) | |
| 99 | 1,058 | | (9,502) | (90.0%) | |
| 100 | (28,605) | | (15,774) | (122.9%) | |
| 101 | | | | | |
| 102 | 324 | | 2,908 | 90.0% | |
| 103 | (11,499) | | 7,305 | 174.1% | |
| 104 | | | | | |
| 105 | 735 | | | | |
| 106 | (17,106) | | (8,470) | (98.1%) | |
| 107 | | | | | |
| 108 | | | | | |
| 109 | | | | | |
| 110 | ($0.17) | | ($7.92) | -102.2% | |
| 111 | | | | | |
| 112 | (0.7%) | | | -2011.6% | |
| 113 | | | | | |
| 114 | 4.4% | | | -2624.6% | |
| 115 | | | Page 10 | | |

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106383

| | A | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | AA | AB | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | Comp Ratio | 47.0% | | 50.4% | | 50.4% | | 24.0% | | 60.3% | | 46.1% | | 56.6% | | 48.6% | | 61.1% | | 106.0% | |
| 117 | | | | | | | | | | | | | | | | | | | | | |
| 118 | Non Comp Ratio | 22.2% | | 19.2% | | 20.3% | | 23.4% | | 32.5% | | 23.2% | | 27.5% | | 27.5% | | 31.9% | | 61.8% | |
| 119 | | | | | | | | | | | | | | | | | | | | | |
| 120 | Book Value / Share | $41.35 | | $42.25 | | $43.55 | | $39.60 | | $29.34 | | $29.34 | | $25.93 | | $21.43 | | $18.59 | | $14.97 | |
| 121 | | | | | | | | | | | | | | | | | | | | | |
| 122 | Tax Rate | 26.9% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | | 30.6% | |
| 123 | | | | | | | | | | | | | | | | | | | | | |
| 124 | | | | | | | | | | | | | | | | | | | | | |
| 125 | All In Results: | | | | | | | | | | | | | | | | | | | | |
| 126 | EPS | $7.25 | | $2.12 | | $2.10 | | ($2.99) | | ($12.57) | | ($10.73) | | ($2.20) | | ($4.95) | | ($5.56) | | ($3.46) | |
| 127 | | | | | | | | | | | | | | | | | | | | | |
| 128 | ROE | 20.3% | | 21.8% | | 21.0% | | (27.0%) | | (131.5%) | | (25.2%) | | (31.6%) | | (82.3%) | | (107.5%) | | (76.6%) | |
| 129 | | | | | | | | | | | | | | | | | | | | | |
| 130 | Pre-Tax Margin | 30.6% | | 30.2% | | 29.9% | | (958.4%) | | NM | | (114.0%) | | (112.5%) | | NM | | -53197.8% | | NM | |
| 131 | | | | | | | | | | | | | | | | | | | | | |
| 132 | Comp Ratio | 47.0% | | 50.5% | | 50.0% | | 521.1% | | NM | | 141.4% | | 143.0% | | NM | | 22456.3% | | NM | |
| 133 | | | | | | | | | | | | | | | | | | | | | |
| 134 | Non Comp Ratio | 22.2% | | 19.2% | | 20.1% | | 537.2% | | NM | | 72.7% | | 69.5% | | NM | | 14466.8% | | NM | |
| 135 | | | | | | | | | | | | | | | | | | | | | |
| 136 | Book Value / Share | $41.35 | | $42.25 | | $43.55 | | $39.60 | | $29.34 | | $29.34 | | $25.93 | | $21.43 | ($8.00) | $18.59 | | $14.97 | |
| 137 | | | | | | | | | | | | | | | | | | | | | |
| 138 | Tax Rate | 26.9% | | 30.0% | | 28.9% | | 34.6% | | 31.0% | | 32.7% | | 40.4% | | 42.9% | | 36.0% | | 39.8% | |
| 139 | | | | | | | | | | | | | | | | | | | | | |
| 140 | | | | | | | | | | | | | | | | | | | | | |
| 141 | Revenue Ex Marks Ex One-Time | 31,812 | | 9,537 | | 9,390 | | 8,256 | | 7,195 | | 34,478 | | 7,411 | | 7,464 | | 5,696 | | 3,560 | |
| 142 | Total PTE | 9,801 | | 2,935 | | 2,757 | | 4,348 | | 520 | | 10,551 | | 1,176 | | 1,915 | | 395 | | (2,426) | |
| 143 | Total Taxes | 2,633 | | 898 | | 844 | | 1,330 | | 159 | | 3,232 | | 380 | | 586 | | 121 | | (742) | |
| 144 | Total ATE | 7,169 | | 2,037 | | 1,914 | | 3,017 | | 361 | | 7,329 | | 816 | | 1,329 | | 274 | | (1,684) | |
| 145 | | | | | | | | | | | | | | | | | | | | | |
| 146 | Preferred Dividends | 188 | | 54 | | 72 | | 73 | | 73 | | 272 | | 65 | | 88 | | 107 | | 107 | |
| 147 | Mandatory | - | | - | | - | | - | | - | | - | | 110 | | 149 | | 149 | | 149 | |
| 148 | Net to Common | 6,981 | | 1,963 | | 1,842 | | 2,944 | | 289 | | 7,057 | | 751 | | 1,240 | | 167 | | (1,940) | |
| 149 | Net to Common ROE | 6,981 | | 1,963 | | 1,842 | | 2,944 | | 289 | | 7,057 | | 751 | | 1,240 | | 167 | - | (1,940) | |
| 150 | Share Count | 963.0 | | 930.2 | | 923.3 | | 895.3 | | 895.3 | | 910.8 | | 1,106.5 | | 1,143.6 | | 1,143.8 | | 984.1 | |
| 151 | Average Common Equity | 34,349 | | 36,335 | | 36,951 | | 37,712 | | 34,206 | | 36,301 | | 27,870 | | 25,182 | | 29,585 | | 29,034 | |
| 152 | | | | | | | | | | | | | | | | | | | | | |
| 153 | | | | | | | | | | | | | | | | | | | | | |
| 154 | Preferred Dividends | 188 | | 54 | | 72 | | 73 | | 73 | | 272 | | 65 | | 88 | | 107 | | 107 | |
| 155 | Mandatory | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 110 | | 149 | | 2,212 | | 38 | |
| 156 | Net to Common EPS | 6,981 | | 1,976 | | 1,938 | | (2,453) | | (10,370) | | (8,908) | | (2,143) | | (4,871) | | (7,438) | | (5,529) | |
| 157 | Net to Common ROE | 6,981 | | 1,976 | 0 | 1,938 | | (2,453) | 0 | (10,370) | 0 | (8,908) | | (2,143) | 0 | (4,871) | 0 | (7,438) | | (5,529) | 0 |
| 158 | Share Count | 963.0 | | 930.2 | | 923.3 | | 821.6 | | 825.0 | | 830.2 | | 974.1 | | 984.1 | | 1,338.9 | | 1,598.7 | |
| 159 | Average Common Equity | 34,349 | | 36,333 | | 38,975 | | 36,363 | | 31,541 | | 35,295 | | 27,146 | | 23,664 | | 27,683 | | 28,137 | |
| 160 | Ending Equity | 35,692 | | 37,049 | | 37,567 | | 33,870 | | 27,549 | | 27,549 | | 25,549 | | 21,113 | | 29,750 | | 23,947 | |
| 161 | Ending Period shares Outstanding | 668.6 | | 676.9 | | 362.6 | | 855.4 | | 936.1 | | 936.1 | | 985.1 | | 985.4 | | 1,600.1 | | 1,600.1 | |
| 162 | Tax Rate | 26.9% | | 30.0% | | 28.9% | | 34.6% | | 31.0% | | 32.7% | | 40.4% | | 42.9% | | 36.0% | | 39.8% | |

Page 11

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106384

| | AD | AE | AF | AG | AH |
|---|---|---|---|---|---|
| 116 | 62.0% | | | -1583.6% | |
| 117 | | | | | |
| 118 | 33.7% | | | -1041.0% | |
| 119 | | | | | |
| 120 | $14.97 | | ($14.37) | -49.0% | |
| 121 | | | | | |
| 122 | 30.6% | | | 0.0% | |
| 123 | | | | | |
| 124 | | | | | |
| 125 | | | | | |
| 126 | ($16.36) | | ($5.65) | (52.6%) | |
| 127 | | | | | |
| 128 | (73.1%) | | | (47.9) pts | |
| 129 | | | | | |
| 130 | NM | | | NM | |
| 131 | | | | | |
| 132 | NM | | | NM | |
| 133 | | | | | |
| 134 | NM | | | NM | |
| 135 | | | | | |
| 136 | $14.97 | | ($14.37) | (49.0%) | |
| 137 | | | | | |
| 138 | 40.2% | | | (7.6) pts | |
| 139 | | | | | |
| 140 | | | | | |
| 141 | 24,152 | | | | |
| 142 | 1,059 | | | | |
| 143 | 324 | | | | |
| 144 | 736 | | | | |
| 145 | | | | | |
| 146 | 367 | | | | |
| 147 | 556 | | | | |
| 148 | (188) | | | | |
| 149 | (188) | | | | |
| 150 | 1,095 | | | | |
| 151 | 27,920 | | | | |
| 152 | | | | | |
| 153 | | | | | |
| 154 | 367 | | | | |
| 155 | 2,506 | | | | |
| 156 | (19,982) | | | | |
| 157 | (19,982) | | | | |
| 158 | 1,220.1 | | | | |
| 159 | 27,316 | | | | |
| 160 | 23,947 | | | | |
| 161 | 1,600.1 | | | | |
| 162 | 40.2% | | | | |

Page 12

FOIL Confidential Treatment
Requested By Bank Of America Corporation

BAC-ML-NYAG10106385

# Exhibit 29

**To Smolar Declaration in**
**Support of Motion for Summary Judgment**

Page 1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
----------------------------------------

In Re BANK OF AMERICA CORPORATION        C.A. No.
                                         4307-VCS
STOCKHOLDER DERIVATIVE LITIGATION

----------------------------------------

                    January 19, 2012
                    9:09 a.m.

        Videotaped deposition of NEIL COTTY, taken by

        Plaintiffs, pursuant to Subpoena, held at the

        offices of Horwitz Horwitz & Paradis LLP,

        570 Seventh Avenue, New York, New York, before

        Joseph R. Danyo, a Shorthand Reporter and Notary

        Public within and for the State of New York.

        HUDSON REPORTING & VIDEO, INC.

        124 West 30th Street, 2nd Fl.

        New York, New York 10001

        Tel: 212-273-9911    Fax: 212-273-9915

Page 243

1                     Cotty

2  conclusions looking at it today.

3          Q.   Do you know if Mr. Price discussed

4  the schedule that is in Cotty 32 with Mr. Lewis?

5          A.   I'm not privy to that.  I don't know.

6          Q.   Did you discuss the schedule in Cotty

7  32 with Mr. Lewis?

8          A.   I don't recall discussing it with Mr.

9  Lewis.

10         Q.   Aside from the December 3rd meeting

11 with Mr. Thain, Mr. Lewis and Mr. Price, did you

12 have any interactions with Mr. Lewis during the

13 fourth quarter of 2008?

14         A.   Not that I recall, no.

15         MR. SCHWARTZ:  I ask the reporter to

16         mark as Exhibit 33 a document Bates

17         stamped BAC ML NYAG 10026898 through 901,

18         and the last three pages are a printout of

19         the native file.

20         (Cotty Exhibit 33, Document bearing

21         Bates numbers BAC ML NYAG 10026898 through

22         901, was so marked for identification, as

23         of this date.)

24         Q.   If you could take a moment and review

25 Exhibit 33 and tell me if you can identify it.

# Exhibit 30

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Page 1

Confidential - Cotty

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

        vs.          09-CV-6829

BANK OF AMERICA,

                Defendant.
-------------------------------x



                CONFIDENTIAL


            NEIL ANDREW COTTY

            New York, New York

        Wednesday, December 16, 2009









Reported by:  Steven Neil Cohen, RPR

Job No. 305877

Neil Andrew Cotty                          December 16, 2009
                    CONFIDENTIAL

                                               Page 158
1                   Confidential - Cotty
2        you saw for adjustments coming out of the
3        Ken Lewis, John Thain meeting.
4             Q.    That is the adjustment that you
5        had proposed?
6             A.    We proposed a one point -- 1 to
7        3 billion range.
8                   Before we went on to the 2009
9        plan, Ken says, wait a minute, we need to
10       put a place holder in.  I don't know if he
11       said place holder but Neil threw out a 1 to
12       3 billion range, we need to decide what to
13       put in, and Ken says it sounds like it is
14       3 billion and so we put in a
15       $3 billion place holder for the quarter.
16            Q.    Did anyone disagree with that
17       place holder?
18            A.    No.  Not at all.
19            Q.    Did anyone think it was too small?
20            A.    Nobody said too small at all.
21            Q.    Did you view it as a conservative
22       place holder?
23            A.    I viewed it as a good number, a
24       conservative place holder.  I thought 3
25       billion is a big number.

5b97551f-42b8-4f1b-a635-0f5d56072923

# Exhibit 31

**To Smolar Declaration in
Support of Motion for Summary Judgment**

# Merrill Lynch & Co

## 2008 4Q Pacing & FY Forecast Scenario

### 12/3/2008 (Revised 6PM)

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064560

# Merrill Lynch & Co.
## 4Q08 Forecast Assumptions

### A. November estimate excludes:

✓ CVA marks

✓ Correlation marks

### B. November estimate includes:

✓ $1.8 bln on DTA

✓ ($714) mln on OTTI

✓ ($2.0) bln TBD marks

### C. December Forecast assumes:

✓ Based on 20 days, revenue pacing $73 per day

✓ ($1.0) bln TBD marks

✓ Assumes incentives of $3.5 bln for FY08

✓ Assumes $300 mln December non-comp spike based on historical trends

✓ No goodwill write-off

Page 1

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 8829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064561

## Merrill Lynch & Co.
## 4Q'08 Forecast

| | 4Q07 | 3Q08 | Sep08 YTD | Oct Act (26 days) | Nov Est (20 days) | 4Q'08 Placing QTD Est (45 days) | Dec BTG (20 days) | 4Q08F | FY08 Fcst |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue ex Marks/FVA/One-Time** | | | | | | | | | |
| FICC | 854 | 628 | 4,766 | (1,389) | (804) | (2,193) | 17 | (2,176) | 2,591 |
| Equity | 1,653 | 1,368 | 4,623 | 1,037 | 10 | 1,048 | 467 | 1,515 | 6,138 |
| IBK | 1,080 | 571 | 2,280 | 102 | 26 | 127 | 305 | 432 | 2,712 |
| GPID | 298 | (316) | (373) | (296) | (387) | (683) | (17) | (700) | (1,073) |
| GMI Other | (180) | 136 | (372) | 67 | 3 | 70 | (40) | (40) | (414) |
| GMI | 3,704 | 2,389 | 10,922 | (479) | (1,153) | (1,631) | 663 | (968) | 9,953 |
| GPC | 2,414 | 2,933 | 9,448 | 1,094 | 892 | 1,986 | 914 | 2,900 | 12,348 |
| GIM | 151 | 88 | 325 | (18) | (26) | (44) | (16) | (60) | 265 |
| GWM | 3,564 | 3,021 | 9,773 | 1,078 | 866 | 1,942 | 898 | 2,840 | 12,613 |
| Corporate | (72) | 287 | (122) | 532 | 1,781 | 2,313 | (105) | 2,208 | 2,086 |
| **ML&Co ex Marks/FVA/One-Time** | **7,196** | **5,697** | **20,572** | **1,130** | **1,494** | **2,624** | **1,455** | **4,080** | **24,652** |
| Significant Items (Non-Marks) | | 2,133 | 2,133 | (2,619) | (720) | (3,338) | | | 2,086 |
| Total Marks | (16,718) | (10,656) | (26,907) | (2,720) | (3,789) | (6,509) | (7,509) | | (34,417) |
| FVAs | 1,331 | (2,842) | (5,006) | (1,078) | 225 | (853) | (853) | | 4,183 |
| Total Marks/Significant Items | (15,387) | (5,681) | (19,739) | (6,417) | (4,264) | (10,701) | (11,000) | | |
| **Total Revenue** | **(8,192)** | **16** | **834** | **(6,287)** | **(2,790)** | **(8,077)** | **456** | **(7,621)** | **(6,787)** |
| Comp | 3,021 | 2,725 | 8,942 | 1,051 | 883 | 1,934 | 888 | 2,823 | 11,765 |
| Non Comp | 2,335 | 1,819 | 5,917 | 612 | 655 | 1,267 | 944 | 2,212 | 8,129 |
| VICP | 1,318 | 758 | 2,228 | 495 | 550 | 1,045 | 252 | 1,297 | 3,525 |
| **Total Expenses ex One-Time** | **6,875** | **5,302** | **17,087** | **2,158** | **2,089** | **4,247** | **2,085** | **6,333** | **23,419** |
| FF/ARS | 54 | 425 | 425 | 92 | | 92 | | 92 | 517 |
| Restructuring | | 40 | 484 | (1) | | (1) | | (1) | 484 |
| Temasek | | 2,500 | 2,500 | | | | | | 2,600 |
| **PTE** | **(14,920)** | **(8,251)** | **(19,863)** | **(7,536)** | **(4,878)** | **(12,415)** | **(1,629)** | **(14,043)** | **(33,706)** |
| Taxes | (4,623) | (3,132) | (7,949) | (3,000) | (1,756) | (4,756) | (299) | (5,056) | (12,996) |
| **ML Operating ATE** | **(10,297)** | **(5,119)** | **(11,723)** | **(4,536)** | **(3,122)** | **(7,659)** | **(1,329)** | **(8,988)** | **(20,710)** |
| Tax Rate* | 31.0% | 38.0% | 40.4% | 39.8% | 36.0% | 38.3% | | 36.0% | 38.8% |
| **All In Results:** | | | | | | | | | |
| EPS | $ (12.57) | $ (5.55) | $ (13.16) | $ (2.86) | | | | $ (5.71) | $ (19.33) |
| ROE | (131.5%) | (107.5%) | (220.1%) | NM | | | | (147.5%) | (91.1%) |
| Pre-Tax Margin | NM | NM | NM | NM | | | | NM | NM |
| Comp Ratio | NM | NM | NM | NM | | | | NM | NM |
| Non Comp Ratio | NM | NM | NM | NM | | | | NM | NM |
| Tax Rate | 31.0% | 38.0% | 40.4% | 39.8% | | | | 36.0% | 38.8% |
| **Ex Marks/FVA/One-Time Results** | | | | | | | | | |
| Revenue | 7,196 | 5,697 | 20,572 | 1,130 | | | 1,456 | 4,080 | 24,652 |
| PTE | 521 | 395 | 3,485 | (1,028) | | | (629) | (2,251) | 1,234 |
| ATE | 382 | 274 | 2,419 | (714) | | | (436) | (1,562) | 856 |
| EPS | $ 0.28 | $ 0.15 | $ 1.91 | $ (0.78) | | | | $ (1.85) | $ (0.07) |

* 4Q08F tax rate based on prior PTE estimates.

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064562

## Merrill Lynch & Co.
### Marks Detail & One-Time Items Summary

| | FY2007 | 1Q08 | 2Q08 | 3Q08 | Sep08 YTD | FY2008 Oct'08 | Nov'08 Est | Dec'08 F | 4Q08F | FY08 |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Super Senior | (14,592) | (1,782) | (3,459) | (4,719) | (9,960) | (72) | (200) | | (272) | (10,232) |
| Secondary Trading | (2,221) | 310 | (33) | (117) | 160 | | | | | 160 |
| **Total U.S. ABS CDO** | (16,819) | (1,472) | (3,492) | (4,836) | (9,800) | (72) | (200) | | (272) | (10,072) |
| US Subprime | (3,236) | (307) | (544) | (391) | (1,242) | | | | (119) | (1,361) |
| Alt A | (399) | (402) | (492) | (549) | (1,443) | | | | (13) | (1,456) |
| US Prime [1] | 14 | 31 | 67 | (123) | (25) | | | | 31 | 7 |
| Non US | (508) | (105) | (286) | (1,225) | (1,616) | | | | (362) | (1,978) |
| **Residential Mortgage** | (4,129) | (782) | (1,255) | (2,288) | (4,325) | | | | (462) | (4,788) |
| Investment Portfolio | (959) | (421) | (1,673) | (852) | (2,946) | | | | (730) | (3,676) |
| Commercial Real Estate [2] | 466 | 53 | (15) | (832) | (794) | | | | (430) | (1,224) |
| CVA on monolines/other insurers | (3,148) | (3,031) | (2,888) | (1,302) | (7,221) | | | | (1,352) | (8,573) |
| Lev Fin - FICC | (206) | (324) | (123) | (191) | (638) | | | | (442) | (1,080) |
| Lev Fin - IBK | (362) | (603) | (226) | (354) | (1,183) | | | | (820) | (2,003) |
| Other / TBD | | | | | | | (2,000) | (1,000) | (3,000) | (3,000) |
| **Total Marks** | (25,187) | (6,580) | (9,671) | (10,656) | (26,907) | (2,719) | (3,789) | (1,000) | (7,509) | (34,416) |
| Fair Value Adjustments | 1,959 | 2,103 | 91 | 2,842 | 5,036 | (1,078) | 225 | | (853) | 4,183 |
| Freddie / Fannie | | | | | | | | | (506) | (506) |
| Other Market Dislocations | | | | | (1,568) | | | | (733) | (2,301) |
| GSPID One-Time | | | | | (90) | | | | (30) | (120) |
| Bloomberg Gain on Sale | | | | 4,296 | 4,296 | | | | | 4,296 |
| Other Loan Portfolio | | | | | | | | | (544) | (544) |
| CPI / PCG | | | | | | | | | (434) | (434) |
| Credit Prop - Auto Industry | | | | | | | | | (434) | (434) |
| CVA Related (Equity & FICC CVA's) | | | | | | | | | (525) | (525) |
| Sigma-collateralized CLNs | | | | | | | | | (652) | (652) |
| EMEA Synthetic RMBS/CMBS & Correlation | | | | | | | | | (245) | (245) |
| Susquehanna CDS Hedge from LEH Bankruptcy | | | | | | | | | (409) | (409) |
| FAS133 | | | | | | | | | (80) | (80) |
| **One-Time Items Non-Marks** | | | | 2,132 | 2,132 | 129 | 175 | | (3,339) | (1,207) |
| **Total Marks/FVA/One-Time** | (23,228) | (4,477) | (9,580) | (5,681) | (19,739) | | | | (11,701) | (31,440) |

1. US Prime / Resi includes GWM gains: 1Q -34, 2Q +116, 3Q +99, Oct08 +36
2. CRE includes GWM gains: 1Q +15, 2Q +22, 3Q +22, Oct08 +9

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064563

**October 2006 Marks / Significant Items**

| | FICC | Equity | IBK | GPID | CorpGWM | Total | Commentary / Drivers |
|---|---|---|---|---|---|---|---|
| **I - Corp Loans / PCG & CPI** | | | | | | | |
| Lev / Fin marks | (196) | | | | | (589) | ✓ Losses in Lev Portfolio largely due to Treasury positions ($906mm), which include both legacy hung positions and new deal activity, along with losses of ($224mm) on Corp Hoof Portfolio. Relationship loans had markdowns of ($660mm), partially offset by gains on CDS hedges of $51.6mm |
| Other Loan Portfolio | (25) | (22) | (181) | | | (278) | |
| Corporate Loan Portfolio (incl. Lev / Fin) | (271) | (22) | (181) | | | (837) | ✓ CYIP/PCG results impacted by ($43mm) MTM on inventory primarily consisting of subordinated positions in the capital structure of smaller, highly leveraged personal firm, unsecured debt, converts) plunged in value in October as worries of a severe global recession intensified. |
| PCG/CPI | (434) | | (244) | | | (434) | |
| **Total** | **(701)** | **(22)** | **(544)** | | | **(1,271)** | |
| **II - Residential Mortgage:** | | | | | | | |
| Non US Real | (196) | | | | | (190) | ✓ Primarily due to write-downs of European Residential Whole Loan positions. |
| AFA | (13) | | | | | (13) | |
| US Real | | | | | | | |
| US Subprime (Incl GPI) | (119) | | | | | (119) | ✓ Model correction to appropriately cap the value of the CDS protection purchased from CDO's where the super senior obligation outperform was pushed out to legal maturity of eliminated altogether. |
| US Prime (Incl (Q)Base & AJM for GPI and GWM) | 42 | | | (45) | 58 | 32 | |
| **Total** | **(290)** | | | **(45)** | **56** | **(290)** | |
| **III - Commercial Real Estate:** | | | | | | | |
| EMEA REF | (156) | | | | | (156) | ✓ LCCDM remarks on EMEA Commercial Whole Loan portfolio due to lower SG level from Lone Star. |
| US CMBS Secondary | (84) | | | | | (84) | ✓ CMBS Secondary trading desk markdowns due to spreads widening. |
| US Conduit Loans | (144) | | | | | (144) | ✓ Remark on Hyatt's and Hilton Commercial Whole Loan positions. |
| Real Estate Investments | | | | (46) | | (46) | |
| GWM CRE | | | | | 9 | 9 | |
| **Total** | **(384)** | | | **(46)** | **9** | **(430)** | |
| **IV - Investment Portfolio:** | | | | | | | |
| Securities Investment Portfolio | (16) | | | | | (16) | |
| **V - Correlation Book:** | | | | | | | |
| EMEA-Synthetic RMBS/CMBS | (406) | | | | | (440) | ✓ Primarily due to remark of long synthetic CDS, CLOs and ABS positions. |
| **Total** | **(406)** | | | | | **(440)** | |
| **VI - CVA related** | | | | | | | |
| Equity | | (300) | | | | (300) | ✓ ML CDS spreads narrowed approximately 200 basis pts while counterparty spreads widened during October |
| Credit | (1,500) | | | | | (1,660) | ✓ CVA losses due to an increase in hedge mark-to-mark exposures primarily on MBIA, CIFG, XLCA, and Radian. |
| Rates & Currencies | (723) | | | | | (733) | ✓ Primarily due to losses on Merrill Lynch spread tightening on derivative liabilities and counterparty spreads widening on derivative assets. |
| **Total** | **(2,414)** | **(300)** | | | | **(2,714)** | |
| **VII - U.S. ABS CDO:** | | | | | | | |
| U.S. Super senior | (72) | | | | | (72) | ✓ Primarily due to MEZZ Super Senior losses driven by further deterioration of underlying CDO collateral. |
| **VIII - Other:** | | | | | | | |
| Sigma CLN's | (245) | | | | | (245) | ✓ Derivative mark-to-mark losses on CLNs that were under-collateralized with Sigma paper. |
| **Total** | **(245)** | | | | | **(245)** | |
| **Total before FVA** | **(4,526)** | **(322)** | **(544)** | **(92)** | **46** | **(5,438)** | |
| GPID (Structured Finance) | | | | (30) | | (30) | ✓ GPSI America's results negatively impacted by ($30mm) due to requirement losses on two asset-based lending facilities as current borrower's financial conditions weakened (potential bankruptcy filing in one instance) and the underlying collateral securing our facilities will not be sufficient to recover our current principal outstanding. |
| FAS 133 | | | | | 129 | 129 | ✓ Mainly driven by FAS 133 ineffectiveness P&L gain of $25.3mm, which includes trades that had to be re-executed post terminating swap: with Lehman, offset by ($100mm) due to MTM on FX crisis currency basis swap due to significant movements in the European currencies. |
| FVA | | | | | (1,078) | (1,078) | ✓ Primarily attributed to IB's where credit spreads tightened by ~120bps to the middle and far end of the curves. |
| **Grand Total** | **(4,656)** | **(322)** | **(544)** | **(122)** | **(905)** | **(6,417)** | |

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064564

**November 2008 Marks / Significant Items**

| | FICC | Equity | IBK | GPID | Corp/OWM | Total | Commentary / Drivers |
|---|---|---|---|---|---|---|---|
| **I - Corp Loans / PCG & CPI** | | | | | | | |
| Lev Finance | (246) | - | (457) | - | - | (703) | ✓ Losses in Loan Portfolio largely due to Transitory positions ($580mm), which include both legacy hung positions and new deal activity; along with losses of ($385mm) on Core Hold Portfolio. Relationship loans had markdowns of ($250mm), partially offset by gains on CDS hedges of $200mm |
| Other Loan Portfolio | (96) | (3) | (172) | - | - | (256) | |
| Corporate Loan Portfolio (incl. Lev Fin) | (334) | (5) | (629) | - | - | (909) | |
| PCG/CPI | - | - | - | - | - | - | |
| Total | (334) | (5) | (629) | - | - | (969) | |
| **II - Residential Mortgage:** | | | | | | | |
| Non US Res'l | (8) | (5) | (639) | - | - | (8) | ✓ Primarily due to write-downs of European Residential Whole Loan positions (Mortgages PLC / Wave) |
| Alt A | - | - | - | - | - | - | |
| US Subprime (incl RPI) | - | - | - | - | - | - | |
| US Prime (incl ICBbac & ANM (re GPI and... | - | - | - | - | - | - | |
| Total | (8) | - | - | - | - | (8) | |
| **III - Commercial Real Estate:** | | | | | | | |
| EMEA REE | | | | | | | |
| US CMBS Secondary | (164) | - | - | - | - | (164) | ✓ European Real Estate Lending |
| US Special Loans | - | - | - | - | - | - | |
| Real Estate Investments | - | - | - | - | - | - | |
| GNMA CRE | - | - | - | - | - | - | |
| Total | (164) | - | - | - | - | (164) | |
| **II - Investment Portfolio:** | | | | | | | |
| Securities Investment Portfolio | (714) | - | - | - | - | (714) | ✓ OTTI |
| **V - Correlation Book:** | | | | | | | |
| EMEA Synthetic RMBS/CMBS | - | - | - | - | - | - | |
| **III - CVA related** | | | | | | | |
| Equity | - | (95) | - | - | - | (95) | ✓ Counterparty spreads widened |
| Credit | - | - | - | - | - | - | |
| Rates & Commodities (FICC Mgmt) (Core) | 41 | - | - | - | - | 41 | ✓ Widening of MCR spreads +89 m, CF spreads widening less hedges, (52) min |
| Total | 41 | (95) | - | - | - | (24) | |
| **VII - U.S. ABS CDO:** | | | | | | | |
| U.S. Super Senior | (200) | - | - | - | - | (200) | ✓ Due to a large 30yr deal which was not rehedged (because of the lehman bankruptcy) until mid month and therefore failed effectiveness testing. Coupling that were normal deals that failed effectiveness testing because of interest rate volatility. |
| **IV - Other:** | | | | | | | |
| Credit Prop - Auto Industry (JX/CHBU) | (355) | - | - | - | - | (525) | ✓ Driven by the inversion of the HVOL4/HVOL3 curve, causing large losses since the index is heavy with auto names. |
| GNF&S CDS hedge | - | (80) | - | - | - | (80) | ✓ Susquehanna CDS hedge from LEH bankruptcy (net of recovery) |
| Other TBD | (2,000) | - | - | - | - | (2,000) | ✓ Marks TBD |
| Total | (2,525) | - | - | - | - | (2,895) | |
| **Total before FVA** | (3,944) | (190) | (629) | - | 175 | (4,564) | |
| FAS 133 | - | - | - | - | 175 | 175 | ✓ Primarily attributed to the pre paid gas contracts out of houston which discount the notes off of libor and the credit curve. Although the credit curve was flat, USd LIBOR rates were extremely volatile throughout the month. |
| FVA | - | - | - | - | 225 | 225 | |
| **Grand Total** | (3,904) | (190) | (629) | - | 408 | (4,339) | |

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00064565

# Exhibit 32

**To Smolar Declaration in
Support of Motion for Summary Judgment**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | 09 MD 2058 (PKC) |
| THIS DOCUMENT RELATES TO: The Consolidated Securities Action | |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO KENNETH D. LEWIS'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 33.3 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Court-appointed Class Representatives the State Teachers Retirement System of Ohio, the Ohio Public Employees Retirement System, the Teacher Retirement System of Texas, Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V., Fjärde AP-Fonden, and Grant Mitchell (collectively, "Plaintiffs") hereby respond and object to Defendant Kenneth D. Lewis's First Set of Interrogatories To Plaintiffs (the "Interrogatories") as follows:

### INTRODUCTION

Plaintiffs' responses to these Interrogatories are made for the sole purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, admissibility, privilege, privacy and the like, and any and all other objections are reserved and may be interposed at the time of trial.

1

with Price, Thain, and Cotty a loss report that reflected that Merrill would pay bonuses of $3.525 billion for 2008, notwithstanding an estimated after-tax loss for the year of over $20.5 billion. *See* PX 491. The loss report reviewed by Lewis also reflected that Merrill would accrue $1.297 billion in bonus expense for the fourth quarter of 2008 (approximately 175% greater than the prior three quarters), notwithstanding an estimated $9 billion after-tax loss for the fourth quarter. *Id.*; *see also* PX 11.

Lewis and BoA remained informed of the accelerated timing of Merrill's bonus payments throughout the fourth quarter. For example, Alphin notified Lewis about the accelerated timing of Merrill's bonus payments "within two or three days" after Alphin learned about the acceleration in November. *See* Alphin Tr. (NYAG - 2/8/12) at 77:20-78:12. On December 9, 2008, Lewis attended a meeting of the BoA's Compensation Committee, during which the Committee "reviewed the year-end compensation timeline" for Merrill. *See* BAC-ML-DE-UR-00156051-2; *see also* BAC-ML-NYAG70345873.

Thain and other witnesses have confirmed that Lewis and BoA approved Merrill's 2008 bonuses, and that any claim to the contrary is untrue. For example, Thain has publicly stated: "[T]hey agreed in September that we could pay up to $5.8 billion of bonuses. They were totally involved in the process to do that…. And basically when I got fired in January – when they said John Thain secretly accelerated these bonuses – they were lying." *See* PX 534; *see also* Finnegan Tr. at 225:15-227:20.

**Interrogatory No. 2**

With respect to Paragraph 95 of the Second Amended Complaint, identify any fact supporting the allegation that Mr. Lewis "knew of Merrill's losses as they occurred."

**Response to Interrogatory No. 2:**

Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome because it purports to require Plaintiffs to identify "*any* fact supporting the allegation that Mr. Lewis 'knew of Merrill's losses as they occurred.'" Plaintiffs further object to this Interrogatory because it is duplicative of other interrogatories and discovery requests. Plaintiffs further object to this Interrogatory because it quotes only a portion of Plaintiffs' allegations set forth in Paragraph 95 of the Second Amended Complaint. Plaintiffs refer Defendants to the Second Amended Complaint for its complete and accurate contents.

As noted above in Plaintiffs' response to Interrogatory No. 1, Lewis was the President, Chief Executive Officer, and Chairman of BoA's Board during all relevant times (*see* Lewis Tr. at 12:19-16:2), and, as set forth in BoA's bylaws, Lewis was responsible for "supervis[ing] and control[ling] the business and affairs of the Corporation."

BoA and Lewis were kept informed of Merrill's fourth quarter losses as they occurred. As Defendant Thain explained, "Ken Lewis and the Bank of America team" were "seeing exactly the same information that [Merrill and Thain] saw. [Merrill] gave them complete access to everything that [Merrill] had." *See* PX 179. They "had daily access to [Merrill's] p&l [profit and loss statements], [Merrill's] positions and [its] marks," and BoA "knew about the losses at the same time [Merrill] did." *See* PX 351; *see also* April 17, 2009 PBS Frontline interview of Thain. Lewis admitted to Congress that BoA received "detailed financial reports every week" from Merrill, that "we did know that there were losses," and that Merrill's losses were "clear" before the shareholder vote. *See* BAC-ML-CL00028174, at 216.

Lewis spoke, "quite often daily," with Price, who was one of his direct reports and who "generally kept [Lewis] apprised." *See* Price Tr. at 237:17-25; Price Tr. (NYAG) at 22:9-13. Price, who was regularly receiving information about Merrill's loss expectations, kept Lewis "up

9

to speed on everything" related to Merrill's losses. *See* Price Tr. (NYAG) at 103:23-104:3, 346:3-17; *see also*, *e.g.*, PX 210, 235, 485, 594. Lewis was "constantly walking into [Price's] office or [Price] was constantly walking into [Lewis' office]." *See* Lewis Tr. at 58:22-24. As a result, Lewis was "hearing about [Merrill's fourth quarter loss estimates] and in some cases [he] saw them." *See* Lewis Tr. (NYAG) at 10:13-18.

Lewis and Price also received information about Merrill's losses from Neil Cotty, BoA's Chief Accounting Officer. Cotty was appointed to be Merrill's acting Chief Financial Officer and was "in residence at Merrill" after the Merger was announced specifically in order to update Lewis and BoA on any changes in Merrill's financial condition. *See* Chai Tr. at 107:19-108:24; Cotty Tr. (SEC) at 63:18-63:25; Lewis Tr. at 119:13-20. As Lewis testified, Cotty was "actively engaged in looking at [Merrill's] numbers," including Merrill's "daily statements" and marks on its assets. *See* Lewis Tr. at 120:5-16. In this capacity, Cotty regularly reported to, and communicated with, Lewis and Price about Merrill's losses during the fourth quarter of 2008. For example, on November 5, 2008, Cotty sent an email concerning Merrill's October results to Price with the notation: "Read and weep." *See* PX 235; *see also*, *e.g.*, PX 210, 485, 594. Cotty explained that he used these words to ensure that Price would "focus" on the attachment and the loss data in particular. *See* Cotty Tr. at 148:14-149:14. In addition, as set forth further below, on December 3, 2008, Cotty met with Lewis, Price and Thain to discuss Merrill's fourth quarter losses. *See* Lewis Tr. at 111:2-112:11.

At his deposition, Lewis specifically recalled that he learned in November 2008 of "significant" fourth quarter losses at Merrill of approximately $5 billion after taxes. *See* Lewis Tr. at 57:17-59:12, 67:15-21, 109:13-16. Lewis further recalled that, on December 3, during his meeting with Price, Thain, and Cotty, he was told that Merrill's losses for the fourth quarter had

10

grown to approximately $7 billion after taxes. *Id.* at 108:25-109:21, 111:2-113:18. During this meeting, Lewis was presented with a written loss report that detailed Merrill's approximate $7 billion after-tax loss for the fourth quarter, including Merrill's more than $7.5 billion actual pre-tax loss for the month of October. *Id.* at 114:16-24; PX 566. After reviewing and discussing Merrill's loss information with Cotty, Price and Thain, Lewis determined that Merrill's estimated loss for the quarter had to be increased to $9 billion after-taxes. *See* Cotty Tr. at 331:19-332:15; Lewis Tr. at 117:13-121:12; PX 11. As Lewis testified, this $9 billion loss was included that evening on Merrill's loss report at Lewis's direction. *See* Lewis Tr. at 115:17-117:2, 121:4-12; *see also* PX 11. As explained further below, after the December 5 shareholder vote, Lewis continued to receive additional information on Merrill's fourth quarter losses as they were occurring. Lewis received updated loss estimates on December 12, 17 and 19, among other times, and discussed them with Defendant Price and other senior executives, BoA's outside counsel, and federal regulators, including the Chairman of the Federal Reserve and the Secretary of the Treasury. *See* Lewis Tr. at 220:11-222:2; *see also*, *e.g.*, Moynihan Tr. (NYAG) at 191:10-192:7; BAC-ML-NYAG70276757; PX 438; PX 443; PX 569.

Lewis also knew of Merrill's losses through his role as the Chairman of BoA's Board of Directors and his attendance at Board meetings. At a Board meeting that occurred right after the shareholder vote on December 5, Price told the Board that Merrill was expected to report $9 billion of losses in the fourth quarter of 2008. *See* Price Tr. at 352:5-22. At the December 9, 2008 Board meeting, Price again told the Board that Merrill was "forecast[ed] to have a net loss of $9 billion" in the fourth quarter of 2008 and that, "due to the relative size of the Merrill Lynch exposures, the magnitude of the losses is quite significant and has been further impacted by the fact that banking flows which would act as a buffer have all but evaporated." *See* PX 340; *see*

11

*also* Lewis Tr. 164:14-168:22. In addition, Price told the Board at that meeting that, as a result of Merrill's losses, BoA was forced to issue $9 billion of long-term debt prior to the shareholder vote. *See* PX 340.

Lewis also knew of Merrill's losses through his discussions concerning whether the losses should be disclosed to BoA's shareholders. On at least two occasions prior to the December 5 shareholder vote, Lewis specifically discussed with Price whether Merrill's losses, due to their enormity, should be disclosed. *See* Lewis Tr. at 72:10-81:23, 149:10-153:25; Lewis Tr. (SEC) at 263:20-264:8.

Lewis also knew of Merrill's losses through his decision, prior to the shareholder vote, to dramatically reduce Merrill's balance sheet. As reflected in a memorandum prepared by BoA's lawyers after speaking with Lewis and others, "[t]he need to reduce assets ha[d] become necessary and was identified just before Thanksgiving as a necessary step to deal with increasing losses that were not anticipated at [the] time of signing [the Merger Agreement]." *See* PX 277; *see also* Lewis Tr. at 133:7-24. Indeed, on December 3, Lewis met with Thain to "underscore the importance of tangible capital ratio," which had deteriorated by a "large amount" prior to the vote as a result of Merrill's losses. *See* PX 543; *see also* Lewis Tr. at 125:13-16, 126:17-128:2, 148:3-12. During that meeting, Lewis instructed Thain that, as result of Merrill's losses, Thain needed to "push [in reducing the balance sheet] as hard as you can and only think about stopping when you think you've pushed too far and then… push some more." *See* PX 543; *see also* Lewis Tr. at 131:19-132:5. Lewis also told his lawyers at Wachtell, Lipton, Rosen & Katz ("Wachtell") that, as a result of its fourth quarter losses, Merrill was required to significantly reduce its balance sheet. *See* Roth Tr. at 264:17-265:23.

Lewis also knew of Merrill's losses through his communications concerning whether to terminate the Merger based on a "materially adverse change" in Merrill's financial condition. Lewis participated in multiple communications and meetings with BoA executives, Wachtell attorneys, and the federal government concerning Merrill's losses and their "materially adverse" impact on Merrill and the combined company. *See* Lewis Tr. at 219:8-266:22; Alphin Tr. at 176:20-177:24. For example, during a December 15 meeting, Lewis and Price told their attorneys at Wachtell that "[w]e know that Merrill [has losses] disproportionately worse … than [Goldman Sachs and Morgan Stanley] this quarter." *See* Roth Tr. at 222:14-223:25. During a December 17 meeting, Lewis, Moynihan and Price again told their attorneys at Wachtell that the "Q4 loss of 12.5 BN @ ML" was "disproportionate in size [to Merrill's peers]," with Merrill "burn[ing] 50% common equity … necessary to support [its] business." *See* PX 569. On that same day, Lewis also told the federal government that Merrill's losses were $12.5 billion after taxes, with Merrill losing "about 50% [of its] tangible equity." *See* PX 438. During a December 19 meeting, Lewis told the federal government that Merrill's pre-tax losses were $21.4 billion, including a $2.3 billion goodwill charge. *See* PX 443.

Lewis also knew of Merrill's losses through his discussions with Thain and other Merrill executives. Lewis spoke with Thain on a weekly basis, which included discussions concerning Merrill's financial condition and its fourth quarter losses. *See* Thain Tr. at 166:13-18; Roth Tr. at 240:19-24, 264:17-21. For example, Lewis and Thain participated in discussions on both December 3 and 9 concerning Merrill's pre-vote estimated fourth quarter loss in excess of $9 billion. *See* PX 74.

The federal regulators, who interacted with Lewis about Merrill's losses, also believed that Lewis knew of Merrill's losses as they occurred. In fact, they concluded that Lewis was not

being truthful when he feigned surprise of Merrill's losses. They concluded that there were "clear signs in the data we have that the deterioration at ML ha[d] been observably under way over the entire quarter, albeit picking up significant around mid-November" and that "Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect." *See* PX 264; *see also* Alfriend Tr. at 62:11-63:4. The federal regulators further concluded that Lewis must have been aware of the losses by "as early as mid-November" and predicted that his failure to disclose the losses to investors "could cause other problems around the disclosures BA made for the shareholder vote." *See* PX 441. As Governor of the Federal Reserve Mr. Kevin Warsh reiterated at his deposition, he was "somewhat skeptical that [Merrill's losses] could have been such a surprise." *See* Warsh Tr. at 83:21-84:18.

**Interrogatory No. 3**

With respect to Paragraph 126 of the Second Amended Complaint, identify any fact supporting the allegation that Mr. Lewis "knew that Merrill had decided in November to take a $2.2 billion goodwill writeoff."

**Response to Interrogatory No. 3:**

Plaintiffs object to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome because it purports to require Plaintiffs to identify "*any* fact supporting the allegation Mr. Lewis 'knew that Merrill had decided in November to take a $2.2 billion goodwill writeoff.'" Plaintiffs further object to this Interrogatory because it is duplicative of other interrogatories and discovery requests. Plaintiffs further object to this Interrogatory because it quotes only a portion of Plaintiffs' allegations set forth in Paragraph 126 of the Second Amended Complaint. Plaintiffs refer Defendants to the Second Amended Complaint for its complete and accurate contents.

As noted above in Plaintiffs' response to Interrogatory No. 1, Lewis was the President, Chief Executive Officer, and Chairman of BoA's Board during all relevant times (*see* Lewis Tr.

Robert N. Kaplan
Frederic S. Fox
**KAPLAN FOX**
**& KILSHEIMER LLP**
850 Third Avenue, 14th Fl.
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

Max W. Berger
Steven B. Singer
**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Gregory M. Castaldo
David Kessler
**KESSLER TOPAZ**
**MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

*Co-Lead Counsel for Plaintiffs in the Securities Actions*

# Exhibit 33

**To Smolar Declaration in
Support of Motion for Summary Judgment**

Table of Contents

**Filed Pursuant to Rule 424(b)(5)**
**Registration No. 333-133852**

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee(1) |
|---|---|---|---|---|
| Common Stock, $0.01 par value | 523,250,000 | $22.00 | $11,511,500,000 | $452,401.95 |

(1) Calculated in accordance with Rule 457(r) of the Securities Act of 1933.



## 455,000,000 Shares of Common Stock

We are offering 455,000,000 shares of our common stock, par value $0.01 per share, for sale in this offering. We will receive all of the net proceeds from the sale of our common stock.

Our common stock is listed on the New York Stock Exchange under the symbol "BAC." On October 7, 2008, the last reported sale price of our common stock on the New York Stock Exchange was $23.77 per share.

**Investing in our common stock involves risks. See "Risk Factors" beginning on page S-7 of this prospectus supplement.**

---

*Our common stock is not a savings account, deposit, or other obligation of a bank. Our common stock is not insured by the Federal Deposit Insurance Corporation or any other governmental agency.*

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy of this prospectus supplement or the attached prospectus. Any representation to the contrary is a criminal offense.*

---

| | Per Share | | Total |
|---|---|---|---|
| Public offering price | $ 22.00 | $ | 10,010,000,000 |
| Underwriting discounts and commissions | 0.55 | | 250,250,000 |
| Proceeds (before expenses) | $ 21.45 | $ | 9,759,750,000 |

We have granted to the underwriters an option to purchase up to 68,250,000 additional shares of our common stock, on the same terms and conditions set forth above, if the underwriters sell more than 455,000,000 shares of our common stock in this offering. The underwriters can exercise this right at any time and from time to time, in whole or in part, within 30 days of the date of this prospectus supplement.

We will deliver the shares of common stock in book-entry only form through the facilities of The Depository Trust Company on or about October 10, 2008.

## Banc of America Securities LLC                      Merrill Lynch & Co.

---

**Prospectus Supplement to Prospectus dated May 5, 2006**

**October 7, 2008**

TABLE OF CONTENTS

Prospectus Supplement

|  | Page |
|---|---|
| About this Prospectus Supplement | S-3 |
| Bank of America Corporation | S-4 |
| Countrywide Acquisition | S-4 |
| Merger Agreement with Merrill Lynch | S-4 |
| Recent Financial Information | S-5 |
| The Offering | S-6 |
| Risk Factors | S-7 |
| Use of Proceeds | S-10 |
| Capitalization | S-11 |
| U.S. Federal Income Tax Considerations | S-13 |
| Consequences to U.S. Holders | S-14 |
| Consequences to Non-U.S. Holders | S-15 |
| Backup Withholding and Information Reporting | S-16 |
| Reportable Transactions | S-17 |
| Underwriting | S-18 |
| Selling Restrictions | S-20 |
| Forward-Looking Statements | S-26 |
| Legal Matters | S-26 |

Prospectus

|  | Page |
|---|---|
| About this Prospectus | 3 |
| Prospectus Summary | 4 |
| Risk Factors | 8 |
| Currency Risks | 8 |
| Other Risks | 9 |
| Bank of America Corporation | 11 |
| General | 11 |
| Business Segment Information | 11 |
| Regulatory Considerations | 11 |
| Acquisitions and Sales | 11 |
| Use of Proceeds | 12 |
| Description of Debt Securities | 13 |
| General | 13 |
| The Indentures | 13 |
| Form and Denomination of Debt Securities | 14 |
| Different Series of Debt Securities | 14 |
| Fixed-Rate Notes | 15 |
| Floating-Rate Notes | 16 |
| Indexed Notes | 23 |
| Floating-Rate/Fixed-Rate/Indexed Notes | 23 |
| Original Issue Discount Notes | 24 |
| Payment of Principal, Interest, and Other Amounts Due | 24 |
| No Sinking Fund | 26 |
| Redemption | 26 |
| Repayment | 27 |
| Repurchase | 27 |
| Conversion | 27 |
| Exchange, Registration, and Transfer | 27 |
| Subordination | 28 |
| Sale or Issuance of Capital Stock of Banks | 29 |
| Limitation on Mergers and Sales of Assets | 29 |
| Waiver of Covenants | 30 |
| Modification of the Indentures | 30 |
| Meetings and Action by Securityholders | 30 |
| Defaults and Rights of Acceleration | 30 |
| Collection of Indebtedness | 31 |
| Payment of Additional Amounts | 31 |
| Redemption for Tax Reasons | 34 |
| Defeasance and Covenant Defeasance | 34 |
| Notices | 35 |
| Concerning the Trustees | 35 |
| Governing Law | 35 |
| Description of Warrants | 36 |
| General | 36 |
| Description of Debt Warrants | 36 |
| Description of Universal Warrants | 37 |
| Modification | 38 |
| Enforceability of Rights of Warrantholders; No Trust Indenture Act Protection | 38 |
| Unsecured Obligations | 38 |
| Description of Purchase Contracts | 38 |
| General | 38 |
| Purchase Contract Property | 39 |
| Information in Prospectus Supplement | 39 |

Prepaid Purchase Contracts; No Trust Indenture Act Protection ........ 40
Non-Prepaid Purchase Contracts; No Trust Indenture Act Protection ........ 40
Pledge by Holders to Secure Performance ........ 41
Settlement of Purchase Contracts That Are Part of Units ........ 41
Failure of Holder to Perform Obligations ........ 42
Unsecured Obligations ........ 42
Description of Units ........ 42
General ........ 42
Unit Agreements: Prepaid, Non-Prepaid, and Other ........ 43
Modification ........ 43
Enforceability of Rights of Unitholders; No Trust Indenture Act Protection ........ 43
Unsecured Obligations ........ 44
Description of Preferred Stock ........ 44
General ........ 44
The Preferred Stock ........ 44
Authorized Classes of Preferred Stock ........ 45
Description of Depositary Shares ........ 48
General ........ 48
Terms of the Depositary Shares ........ 48
Withdrawal of Preferred Stock ........ 49
Dividends and Other Distributions ........ 49
Redemption of Depositary Shares ........ 49
Voting the Deposited Preferred Stock ........ 50
Amendment and Termination of the Deposit Agreement ........ 50
Charges of Depositary ........ 50
Miscellaneous ........ 50
Resignation and Removal of Depository ........ 51
Description of Common Stock ........ 51
General ........ 51
Voting and Other Rights ........ 51
Dividends ........ 51
Registration and Settlement ........ 52
Book-Entry Only Issuance ........ 52
Certificates in Registered Form ........ 52
Street Name Owners ........ 53
Legal Holders ........ 53
Special Considerations for Indirect Owners ........ 53
Depositories for Global Securities ........ 54
Special Considerations for Global Securities ........ 57
Registration, Transfer, and Payment of Certificated Securities ........ 58
U.S. Federal Income Tax Considerations ........ 58
Taxation of Debt Securities ........ 60
Taxation of Common Stock, Preferred Stock, and Depositary Shares ........ 72
Taxation of Warrants ........ 77
Taxation of Purchase Contracts ........ 77
Taxation of Units ........ 77
Reportable Transactions ........ 78
EU Directive on the Taxation of Savings Income ........ 78
Plan of Distribution ........ 79
Distribution Through Underwriters ........ 79
Distribution Through Dealers ........ 79
Distribution Through Agents ........ 79
Direct Sales ........ 80
General Information ........ 80
Market-Making Transactions by Affiliates ........ 80
ERISA Considerations ........ 82
Where You Can Find More Information ........ 85
Forward-Looking Statements ........ 85
Legal Matters ........ 85
Experts ........ 85

## ABOUT THIS PROSPECTUS SUPPLEMENT

In considering an investment in the common stock, you should rely only on the information included or incorporated by reference in this prospectus supplement and the attached prospectus. We have not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. If information in this prospectus supplement is inconsistent with information in the attached prospectus, the information in this prospectus supplement supersedes the information in the attached prospectus. The delivery of this prospectus supplement, at any time, does not imply that there has been no change in our affairs since the date of this prospectus supplement or that the information in this prospectus supplement or the attached prospectus is correct as of any time after its date.

This prospectus supplement and the attached prospectus do not constitute an offer to sell or the solicitation of an offer to buy the common stock in any jurisdiction in which that offer or solicitation is unlawful. The distribution of this prospectus supplement and the attached prospectus and the offering of the common stock in some jurisdictions may be restricted by law. If you have received this prospectus supplement and the attached prospectus, you should find out about and observe these restrictions. See "Underwriting."

This prospectus supplement has been prepared on the basis that any offer of the common stock in any Member State of the European Economic Area (each, a "Relevant Member State") which has implemented the Prospectus Directive (2003/71/EC) (the "Prospectus Directive") will be made pursuant to an exemption under the Prospectus Directive, as implemented in that Relevant Member State, from the requirement to publish a prospectus for offers of the common stock. Accordingly, any person making or intending to make an offer in that Relevant Member State of the common stock which is the subject of the offering contemplated in this prospectus supplement and the attached prospectus may only do so in circumstances in which no obligation arises for us or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. Neither we nor the underwriters have authorized, and neither we nor they authorize, the making of any offer of the common stock in circumstances in which an obligation arises for us or the underwriters to publish a prospectus for such offer.

**Persons outside the United States who come into possession of this prospectus supplement and the attached prospectus must inform themselves about and observe any restrictions relating to the offering of the common stock and the distribution of this prospectus supplement and the attached prospectus outside of the United States.**

Unless otherwise indicated or the context requires otherwise, all references in this prospectus supplement to "Bank of America," "BAC," "we," "us," and "our" are to Bank of America Corporation. Capitalized terms used, but not defined, in this prospectus supplement are defined in the attached prospectus.

## BANK OF AMERICA CORPORATION

Bank of America Corporation is a Delaware corporation, a bank holding company, and a financial holding company. Bank of America Corporation was incorporated in 1998 as part of the merger of Bank of America Corporation with NationsBank Corporation. Our principal executive offices are located at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina 28255, United States of America, and our telephone number is (704) 386-5681. Additional information about us is available on our website at *www.bankofamerica.com*. We have included our web address as an inactive textual reference only. Except as specifically incorporated by reference in this prospectus supplement, information on our website is not part of this prospectus supplement.

### Countrywide Acquisition

On July 1, 2008, we completed our acquisition of Countrywide Financial Corporation ("CFC") and its subsidiaries. In connection with this acquisition, CFC merged into our wholly-owned merger subsidiary (the "Countrywide acquisition"), with our subsidiary continuing in existence as the surviving entity and changing its name to Countrywide Financial Corporation.

### Merger Agreement with Merrill Lynch

On September 15, 2008, we announced that we had entered into an Agreement and Plan of Merger, dated as of September 15, 2008, with Merrill Lynch & Co., Inc. ("Merrill Lynch"). Under the merger agreement, our newly-formed wholly-owned merger subsidiary will, subject to the terms and conditions of the merger agreement, merge into Merrill Lynch (the "Merrill Lynch merger"), with Merrill Lynch continuing as the surviving entity and our wholly-owned subsidiary. Under the terms of the merger agreement, if the Merrill Lynch merger is completed, each share of Merrill Lynch common stock will be converted into 0.8595 (the "exchange ratio") of a share of our common stock, each share of non-convertible preferred stock of Merrill Lynch will be exchanged for preferred stock issued by us having substantially identical terms, and convertible preferred stock of Merrill Lynch will remain outstanding after the Merrill Lynch merger and will thereafter be convertible in accordance with its terms into shares of our common stock based on the exchange ratio. Completion of the Merrill Lynch merger is subject to certain customary conditions, including, among others, approval of the stockholders of both Bank of America and Merrill Lynch and receipt of regulatory approvals.

In connection with the Merrill Lynch merger, we plan to hold a special meeting of the holders of our common stock at which these holders will be asked to approve the issuance of our common stock in the Merrill Lynch merger and other proposals. Our board of directors currently has fixed the close of business on October 10, 2008 as the record date for determining the holders of our common stock entitled to vote at this special meeting. This record date is subject to change by our board of directors. Purchasers of shares of common stock sold in this offering will be entitled to vote at the special meeting so long as they hold such shares on the record date.

On September 15, 2008, we filed with the Securities and Exchange Commission ("SEC") a Form 8-K containing the press release announcing the Merrill Lynch merger. On September 18, 2008, we filed with the SEC a Form 8-K containing a copy of the merger agreement. On October 3, 2008, we filed with the SEC a Form 8-K containing historical financial statements of Merrill Lynch and preliminary unaudited pro forma condensed combined financial data which give effect to the Merrill Lynch merger, but do not reflect the Countrywide acquisition. Each of these Forms 8-K contains additional information and is incorporated by reference into this prospectus supplement. Copies of the reports on Form 8-K are available at the SEC's website at *http://www.sec.gov*.

## THE OFFERING

| | |
|---|---|
| **Common stock we are offering** | 455,000,000 shares of common stock, par value $0.01 per share. |
| **Option to purchase additional shares** | We have granted the underwriters an option to purchase up to 68,250,000 additional shares of common stock if the underwriters sell more than 455,000,000 shares of common stock in this offering. The underwriters can exercise this right at any time and from time to time, in whole or in part, within 30 days of the date of this prospectus supplement. |
| **Common stock outstanding after this offering** | 5,017,054,554 shares of common stock outstanding (or 5,085,304,554 shares of common stock if the underwriters exercise their option to purchase additional shares in full). |
| **Use of proceeds** | We estimate that the net proceeds of this offering will be approximately $9.76 billion (or $11.22 billion if the underwriters exercise their option to purchase additional shares in full). We expect to use the net proceeds of this offering for general corporate purposes. |
| **Risk factors** | See "Risk Factors" and other information included or incorporated by reference in this prospectus supplement for a discussion of factors you should consider carefully before deciding to invest in shares of our common stock. |
| **New York Stock Exchange symbol** | BAC |

The number of shares of common stock to be outstanding immediately after this offering is based on 4,562,054,554 shares outstanding as of September 30, 2008 (which includes the approximately 106.7 million shares issued in the Countrywide acquisition), together with the issuance by us of 455,000,000 shares of our common stock in this offering, or 523,250,000 shares if the underwriters exercise their option to purchase additional shares in full. This number does not reflect any issuance of shares of our common stock in connection with the Merrill Lynch merger. If we complete the Merrill Lynch merger, we anticipate that we will issue approximately 1,193 million shares of our common stock in connection therewith. See "Capitalization."

## RISK FACTORS

Your investment in our common stock involves risks. This prospectus supplement does not describe all of those risks. The following is a list of certain risks specific to our shares of common stock. Before purchasing any shares of our common stock, you should consider carefully these risks and the more detailed explanation of risks described in our Annual Report on Form 10-K for the year ended December 31, 2007 under the caption "Item 1A. Risk Factors," as well as other information included or incorporated by reference into this prospectus supplement or the attached prospectus, including the additional risks identified in our Form 8-K filed with the SEC on October 6, 2008.

**Our share price may fluctuate.**

The market price of our common stock could be subject to significant fluctuations due to a change in sentiment in the market regarding our operations or business prospects, the Merrill Lynch merger and our potential assumption of Merrill Lynch's debt securities, our intended assumption of CFC's debt, future sales or acquisitions to which we are party, this offering, or future sales of our securities. Such risks may be affected by:

- operating results that vary from the expectations of management, securities analysts, and investors;
- developments in our business or in the financial sector generally;
- regulatory changes affecting our industry generally or our business and operations;
- the operating and securities price performance of companies that investors consider to be comparable to us;
- announcements of strategic developments, acquisitions, and other material events by us or our competitors;
- our ability to integrate the companies and the businesses that we acquire, including Merrill Lynch and CFC;
- changes in the credit, mortgage, and real estate markets, including the market for mortgage-related and other asset-backed securities; and
- changes in global financial markets and global economies and general market conditions, such as interest or foreign exchange rates, stock, commodity, credit or asset valuations or volatility.

Stock markets, in general, have experienced over the year, and continue to experience, significant price and volume volatility, and the market price of our common stock may continue to be subject to similar market fluctuations that may be unrelated to our operating performance or prospects. Increased volatility could result in a decline in the market price of our common stock.

**There may be future sales or other dilution of our equity, which may adversely affect the market price of our common stock.**

Except as described under "Underwriting," we are not restricted from issuing additional common stock or preferred stock, including securities that are convertible into or exchangeable for, or that represent the right to receive, common stock or preferred stock. The issuance of additional shares of common stock or convertible securities will dilute the ownership interest of our existing common stockholders. The market price of our common stock could decline as a result of this offering as well as other sales of a large block of shares of our common stock or preferred stock or similar securities in the market after this offering, or the perception that such sales could occur. In addition, the conversion ratio of our convertible securities is subject to

S-7

certain anti-dilution adjustments and any adjustment of these conversion ratios could further dilute our common stockholders.

**You may not receive dividends on the common stock.**

Holders of our common stock are only entitled to receive such dividends as our board of directors may declare out of funds legally available for such payments. Furthermore, holders of our common stock are subject to the prior dividend rights of holders of our preferred stock or the depositary shares representing such preferred stock then outstanding. Although we have historically declared cash dividends on our common stock, we are not required to do so and may reduce or eliminate our common stock dividend in the future.

**The common stock is equity and is subordinate to our existing and future indebtedness and preferred stock.**

Shares of the common stock are equity interests in us and do not constitute indebtedness. As such, shares of the common stock will rank junior to all of our indebtedness and to other non-equity claims against us and our assets available to satisfy claims against us, including in our liquidation. Additionally, holders of our common stock are subject to the prior dividend and liquidation rights of holders of our outstanding preferred stock or the depositary shares representing such preferred stock then outstanding. Our board of directors is authorized to issue additional classes or series of preferred stock without any action on the part of the holders of our common stock. As of September 30, 2008, the aggregate liquidation preference of all our outstanding preferred stock was $24.2 billion. In addition, if we complete the Merrill Lynch merger, we intend to issue additional shares of our preferred stock in exchange for Merrill Lynch preferred stock. The common stock will also be subject to prior dividend and liquidation rights of this additional preferred stock.

**If we are deferring payments on our outstanding junior subordinated notes or are in default under the indentures governing those securities, we will be prohibited from making distributions on the common stock.**

The terms of our outstanding junior subordinated notes prohibit us from declaring or paying any dividends or distributions on our capital stock, including our common stock, or purchasing, acquiring, or making a liquidation payment on such stock, if we are aware of any event that would be an event of default under the indenture governing those junior subordinated notes or at any time when we have deferred payment of interest on those junior subordinated notes.

**Our ability to pay dividends depends upon the results of operations of our subsidiaries.**

We are a holding company that conducts substantially all of our operations through our bank subsidiaries and other subsidiaries. As a result, our ability to make dividend payments on the common stock depends primarily upon the receipt of dividends and other distributions from our subsidiaries. There are various regulatory restrictions on the ability of our banking subsidiaries to pay dividends or make other payments to us.

In addition, our right to participate in any distribution of assets of any of our subsidiaries upon the subsidiary's liquidation or otherwise, and thus your ability as a holder of the common stock to benefit indirectly from such distribution, will be subject to the prior claims of creditors of that subsidiary, except to the extent that any of our claims as a creditor of such subsidiary may be recognized. As a result, the common stock effectively will be subordinated to all existing and future liabilities and obligations of our subsidiaries.

You should rely only on the information incorporated by reference or provided in this prospectus supplement and the attached prospectus. We have not authorized anyone to provide you with different information. We are not offering the securities in any jurisdiction where the offer is not permitted. You should not assume that the information in this prospectus supplement is accurate as of any date other than the date on the front of this document.



**455,000,000 Shares
of Common Stock**

_____

**PROSPECTUS SUPPLEMENT**
_____

**Banc of America Securities LLC**

**Merrill Lynch & Co.**

October 7, 2008