UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MDL 2058 (PKC) ECF CASE |
| THIS DOCUMENT RELATES TO The Consolidated Securities Class Action | Oral Argument Requested |

## MEMORANDUM OF LAW IN SUPPORT OF
## BOFA'S MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

CLEARY, GOTTLIEB,
   STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY  10006
(212) 225-2000

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*
*Bank of America Corporation and*
*Banc of America Securities LLC*

# Table of Contents

Pages

Table of Authorities ............................................................................................. iii

Preliminary Statement ........................................................................................... 1

Statement of Facts ................................................................................................. 7

Argument ............................................................................................................... 7

I.    PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE THAT MEMBERS
      OF THE SECTION 14(a) CLASS SUSTAINED ANY COMPENSABLE
      INJURY OR ACTUAL DAMAGES ................................................................ 8

      A.    The Section 14(a) Class Seeks to Recover for a Stock-Price Drop that
            Reflects the Market's Perception of Direct Injury to the Company ..................... 8

      B.    The Section 14(a) Class Did Not Actually Suffer the Damages
            Sought Under Plaintiffs' Theory of Damages ...................................... 13

      C.    Plaintiffs Have Failed to Connect Their Claimed Section 14(a)
            Damages to an Alleged Impairment of Their Voting Rights ............................... 17

      D.    Plaintiffs Fail to Offer Any Evidence Supporting Their Claim of
            Direct Injury to Section 14(a) Class Members .................................... 20

      E.    In Any Event, Plaintiffs Cannot Recover Stock-Price Declines Caused by
            Disclosure of Losses Known Only After the Vote on December 5, 2008 ........... 22

II.   PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION FOR
      MANY OF THEIR CLAIMS ......................................................................... 23

      A.    Plaintiffs' Exchange Act Claims Require Proof that a
            Corrective Disclosure Revealed Previously Unpublished Facts
            About the Alleged Fraud ........................................................... 23

      B.    Plaintiffs Cannot Establish Loss Causation for Their Claims Based on
            Merrill Lynch Bonus Payments Because the Single Alleged Corrective
            Disclosure on Which They Rely Did Not Contain New Information ................. 26

      C.    Plaintiffs' Securities Act Bonus Claims Also Fail ................................. 32

      D.    Plaintiffs Cannot Establish Loss Causation for Many of Their Claims
            Under the Exchange Act Based on Merrill's Fourth Quarter Losses ................. 33

            1.    January 12, 2009 Was Not a Corrective Disclosure Date ........................ 34

2. January 13, 2009 Was Not a Corrective Disclosure Date.......................... 38

Conclusion ....................................................................................................................... 43

# Table of Contents

**Page(s)**

**CASES**

*A Slice of Pie Prods., LLC* v. *Wayans Bros. Entm't,*
  487 F. Supp. 2d 33 (D. Conn. 2007) ........................................................41

*United States* v. *Alcan Aluminum Corp.,*
  990 F.2d 711 (2d Cir. 1993) ........................................................................8

*Amorosa* v. *AOL Time Warner Inc.,*
  409 F. App'x 412 (2d Cir. 2011) ..............................................................23

*In re Apple Computer Sec. Litig.,*
  886 F.2d 1109 (9th Cir. 1989) ..................................................................25

*Arent* v. *Distribution Scis., Inc.,*
  975 F.2d 1370 (8th Cir. 1992) ..................................................................13

*In re Bank of Am. Corp. Sec.,* Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................ *passim*

*In re Bank of Am. Corp. Sec.,* Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.,
  No. 09 MDL 2058, 2012 WL 370278 (S.D.N.Y. Feb. 6, 2012) ................... *passim*

*In re BankAtlantic Bancorp, Inc. Sec. Litig.,*
  No. 07 Civ. 61542, 2010 WL 6397500 (S.D. Fla. Aug. 18, 2010) ........................35

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston,*
  2012 WL 118486 (D. Mass. Jan. 13, 2012) ..............................................39

*Burlington Coat Factory Warehouse Corp.* v. *Esprit De Corp.,*
  769 F.2d 919 (2d Cir. 1985) ......................................................................41

*Calamore* v. *Juniper Networks Inc.,*
  364 F. App'x 370 (9th Cir. 2010) ..........................................................9, 18

*Catogas* v. *Cyberonics, Inc.,*
  292 F. App'x 311 (5th Cir. 2008) ..............................................................24

*Celotex Corp.* v. *Catrett,*
  477 U.S. 317 (1986) .....................................................................................7

*Crocker* v. *FDIC,*
  826 F.2d 347 (5th Cir. 1987) ..............................................................13, 17

*Dura Pharm., Inc.* v. *Broudo,*
  544 U.S. 336 (2005) ...................................................................................23

iv

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. MDL-1446, 2005 WL 2230169 (S.D. Tex. Sept. 12, 2005) ..................................11, 13

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  Nos. MSL-1446 et al., 2007 WL 789141 (S.D. Tex. Mar. 12, 2007) ............................... 12-13

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
  131 S. Ct. 2179 (2011) ..................................................................................................25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .................................................................................32, 39, 43

*Goldkrantz* v. *Griffin*,
  No. 97 Civ. 9075 (DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999),
  *aff'd*, 201 F.3d 431 (2d Cir. 1999) .............................................................................14

*Halebian* v. *Berv*,
  590 F.3d 195 (2d Cir. 2009) ...........................................................................................9, 12

*Heilweil* v. *Mount Sinai Hosp.*,
  32 F.3d 718 (2d Cir. 1994) ...............................................................................................7

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
  906 A.2d 766 (Del. 2006) ..............................................................................................17

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ...........................................................................................24

*Kelley* v. *Rambus, Inc.*,
  No. C 07-1238 JF, 2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) ...........................................9

*Lee* v. *Marsh & McLennan Cos., Inc.*,
  No. 009717/2006, 2007 WL 4303514 (N.Y. Sup. Ct. Nassau Cnty. Dec. 7, 2007) ...............12

*Levine* v. *Seilon, Inc.*,
  439 F.2d 328 (2d Cir. 1971) ............................................................................................16

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2011) .........................................................................................42

*Manzo* v. *Rite Aid Corp.*,
  No. Civ. A. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002),
  *aff'd*, 825 A.2d 239 (Del. 2003) ...............................................................................11, 12

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................................................................7

v

*McKowan Lowe & Co., Ltd.* v. *Jasmine, Ltd.*,
    231 F. App'x 216 (3d Cir. 2007) .........................................................24

*McKowan Lowe & Co., Ltd.* v. *Jasmine, Ltd.*,
    No. 94 Civ. 5522, 2005 WL 1541062 (D.N.J. June 30, 2005),
    *aff'd*, 231 F. App'x 216 (3d Cir. 2007).................................................33

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)...............................................24, 29, 34

*Meyer* v. *St. Joe Co.*,
    No. 5:11-Civ-27, 2012 WL 94584 (N.D. Fla. Jan. 12, 2012).............35

*Nat'l Junior Baseball League* v. *Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................35

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)................................................... passim

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ..............................................................42

*Perlman* v. *Salomon Inc.*,
    No. 92 Civ. 5208 (RPP), 1995 WL 110076 (S.D.N.Y. Mar. 14, 1995)...................13

*Quintel Corp., N.V.* v. *Citibank, N.A.*,
    596 F. Supp. 797 (S.D.N.Y. 1984)......................................................14

*Schuster* v. *Gardner*,
    25 Cal. Rptr. 3d 468 (Ct. App. 2005)..................................................13

*In re Scientific Atlanta, Inc. Sec. Litig.*,
    754 F. Supp. 2d 1339 (N.D. Ga. 2010)................................................24

*Shirvanian* v. *DeFrates*,
    161 S.W.3d 102 (Tex. Ct. App. 2004) .................................................13

*Smith* v. *Waste Mgmt., Inc.*,
    407 F.3d 381 (5th Cir. 2005) ..............................................................10

*Stephenson* v. *PricewaterhouseCoopers, LLP*,
    No. 11-1204-cv, 2012 WL 1764191 (2d Cir. May 18, 2012)................12

*Stratte-McClure* v. *Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011)..................................................42

*Strougo* v. *Bassini*,
    282 F.3d 162 (2d Cir. 2002)..................................................................9

*Tenet Healthcare Corp.* v. *Cmty. Health Sys., Inc.*,
No. 3:11-CV-732-M, 2012 WL 936388 (N.D. Tex. Mar. 21, 2012) .....................................20

*Thornton* v. *Bernard Techs., Inc.*,
C.A. No. 962-VCN, 2009 WL 426179 (Del. Ch. Feb. 20, 2009) ...........................................18

*Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004) ...............................................................................................10

*Virginia Bankshares, Inc.* v. *Sandberg*,
501 U.S. 1083 (1991) .......................................................................................................20

*Weinstock* v. *Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) .................................................................................................7

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ...................................................................................24, 39

*In re Winstar Commc'ns*,
No. 01 Civ. 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .................................35

*Woodard* v. *Monticello Cent. Sch. Dist.*,
No. 06-CV-13361 (KMK), 2008 WL 5062125 (S.D.N.Y. Dec. 1, 2008) ...............................41

*In re WorldCom, Inc.*,
323 B.R. 844 (Bankr. S.D.N.Y. 2005) ................................................................................13

## STATUTES

Securities Act of 1933 § 11, 15 U.S.C. § 77k ....................................................... *passim*

Securities Act of 1933 § 12, 15 U.S.C. § *77l* ...................................................... *passim*

Securities and Exchange Act of 1934 § 10, 15 U.S.C. § 78j .................................. *passim*

Securities and Exchange Act of 1934 § 14, 15 U.S.C. § 78n ................................. *passim*

Private Securities Litigation Reform Act of 1995 § 101(b), 15 U.S.C. § 78u-4(b)(4) .................23

## OTHER AUTHORITIES

Brief for Former SEC Commissioners and Law Professors as *Amici Curiae* in Support of
Petitioners' Petition, *Apollo Grp., Inc.* v. *Policemen's Annuity & Benefit Fund of
Chi.*, No. 10-649, 2010 WL 5172861 (U.S. Dec. 17, 2010) .....................................................35

James Wm. Moore et al., *Moore's Federal Practice* (3d ed. 2012) .................................8

Fed. R Civ. P. 56 ...............................................................................................................1, 7

Fed. R. Civ. P. 56(a) 2010 advisory committee's note ....................................................................7

S.D.N.Y. Local Civ. R. 56.1 ...........................................................................................................7

N.Y.S.E. Rule 312.03(c) ................................................................................................................20

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants Bank of America Corporation and Banc of America Securities LLC (together, "BofA")  submit this memorandum of law in support of their motion for summary judgment dismissing plaintiffs' claims (i) under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), for lack of evidence of damages; (ii) under Sections 10(b) and 14(a) of the Exchange Act, to the extent those claims are premised on alleged misrepresentations or omissions concerning bonuses for employees of Merrill Lynch & Co., Inc. ("Merrill"), for lack of evidence of loss causation; (iii) under Sections 11 and 12 of the Securities Act of 1933 ("Securities Act"), because undisputed facts establish the defense of negative causation; and (iv) under Sections 10(b) and 14(a) of the Exchange Act, to the extent those claims are based on declines in the price of BofA stock on January 12 and 13, 2009, for lack of evidence of loss causation.

### Preliminary Statement

In allowing this case to proceed past the motion to dismiss stage, this Court gave plaintiffs the opportunity to try to develop evidence to support their claims and provided guidance about the nature and quantum of evidence required to move forward.  Now, with discovery concluded, it is evident that plaintiffs have failed to heed this Court's guidance. Instead, plaintiffs grossly overreach, seeking billions of dollars in damages based on evidence that does not satisfy the Court's directives and theories that cannot be reconciled with Second Circuit precedent.  Rule 56 was designed for precisely these circumstances, so that defendants are not prejudiced by permitting factually and legally untenable claims to be presented to the jury.

*First*, the billions of dollars in damages plaintiffs seek under Section 14(a) of the Exchange Act for alleged misrepresentations or omissions in BofA's proxy statement—the vast

majority of the damages plaintiffs demand in this action—are unavailable because plaintiffs have failed to show, as is their burden, that those damages arise from direct injury to members of the Section 14(a) class rather than alleged injury to the Company.  As this Court explained earlier in this case, the "'injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done to the corporation.'"  *In re Bank of Am. Corp. Sec.*, *Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.* (hereinafter "*Bank of Am.*"), 757 F. Supp. 2d 260, 291-92 (S.D.N.Y. 2010) (quoting *J.I. Case Co.* v. *Borak*, 377 U.S. 426, 432 (1964)).  That alleged injury to the corporation is actionable by shareholders, if at all, only through a derivative action brought on behalf of the corporation.

As this Court further explained, plaintiffs may recover damages under Section 14(a) only if plaintiffs' evidence demonstrates "a diminution in the value of the shares that [members of the Section 14(a) class] held *which was not due to an injury inflicted upon BofA*."  *Bank of Am.*, 757 F. Supp. 2d at 292 (emphasis added).  This Court allowed plaintiffs to proceed to discovery on their Section 14(a) claims on the ground that there was "at least a potential" that plaintiffs could make such a showing, *id.*, and that, based solely on the pleadings, "there plausibly may be distinct, non-overlapping grounds for both direct and derivative recovery," *Bank of Am.*, No. 09 MDL 2058, 2012 WL 370278, at *5 (S.D.N.Y. Feb. 6, 2012).

Discovery is now complete and it is clear that plaintiffs have not satisfied the burden established by this Court, as they have not adduced evidence demonstrating that they sustained direct damages on their Section 14(a) claims.  Plaintiffs argue that they were injured directly because their right to cast an informed vote on the merger was impaired.  Plaintiffs, however, have failed to show that the damages they seek are a measure of any alleged impairment to voting rights.  Instead, plaintiffs demand the entire decline in BofA's stock price

following the purported corrective disclosures.  But as *holders* of BofA stock, the Section 14(a)

class members did not purchase BofA stock at artificially inflated prices.  They thus did not

sustain an out-of-pocket loss after the alleged corrective disclosures occurred and the purported

artificial inflation dropped out of the stock price.  The stock-price drop that the Section 14(a)

class seeks to recover reflects the market's diminished assessment of Merrill's value to BofA as

a merger partner—and Merrill, of course, was an asset that indisputably belonged to BofA.  If

BofA overpaid for Merrill, any resulting claim belongs directly to the Company and only

indirectly to its shareholders.

Plaintiffs can point to no precedent or evidence to the contrary.  No case law

supports plaintiffs' novel interpretation of Section 14(a).  As for evidence, in response to

interrogatories asking plaintiffs to "identify the damages (or the methodology for computing

them) sought on behalf" of the Section 14(a) class, plaintiffs refused to answer, objecting that the

inquiries were "premature," as "the information sought regarding damages is subject to expert

testimony."[1]  The expert reports plaintiffs submitted as proof of damages under Section 14(a),

however, do not identify any injury to shareholders that is not entirely dependent on an injury to

BofA.  The only expert for plaintiffs on the merits who offers any opinion on shareholder injury

under Section 14(a) is Chad Coffman.  And Mr. Coffman's report simply declares, without

elaboration or support, that the losses to the Section 14(a) class "are most reliably measured by

quantifying the loss in value to [BofA] shareholders that occurred upon revelation of the

---

[1]   Relevant excerpts of lead plaintiffs' responses and objections to BofA's first set of
      interrogatories are attached as Exhibits 1-6 to the Declaration of Audra J. Soloway dated
      June 3, 2012 (the "Soloway Declaration") in support of this motion.  (*See* Soloway
      Declaration Exhibit ("Ex.") 1 Response No. 12; Ex. 2 Response No. 12; Ex. 3 Response No.
      12; Ex. 4 Response No. 12; Ex. 5 Response No. 12; Ex. 6 Response No. 12.)  Exhibits to the
      Soloway Declaration are cited throughout as "Ex."

corrective information." (Ex. 7 ¶ 139.) Neither Mr. Coffman's report nor his deposition

testimony explains *why* class-wide damages under Section 14(a) are "most reliably measured" in

this way. In fact, Mr. Coffman admitted that he never formed an opinion on whether "it was

BofA that was directly harmed by the failure to receive the full value that it had bargained for in

the merger." (Ex. 8 at 277:9-24.) Mr. Coffman added: "I haven't formed an opinion on whether

BofA was directly harmed or not." (*Id.* at 277:23-24.)

        *Second*, based on the undisputed facts, plaintiffs cannot prove loss causation

relating to the Merrill employee bonuses. Nor, based on the undisputed facts, can they prove

loss causation relating to the alleged corrective disclosures of fourth quarter 2008 losses that

supposedly caused the price of BofA stock to drop on January 12 and 13, 2009.

        To establish loss causation in the Second Circuit based upon an alleged corrective

disclosure, plaintiffs must offer evidence establishing *both* that the price of the stock experienced

a statistically significant decline following the disclosure *and* that the disclosure disseminated

*new* factual information not previously revealed about the alleged fraud. *See In re Omnicom*

*Grp., Inc. Sec. Litig.*, 597 F.3d 501, 508, 511-513 (2d Cir. 2010) (citing *In re Flag Telecom*

*Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009)). As this Circuit has emphasized,

newspaper articles, analyst reports, or other public statements that merely repeat or comment on

previously disclosed facts do not satisfy plaintiffs' burden of demonstrating loss causation. *See*

*Omnicom*, 597 F.2d at 511-12.

        Here, the alleged corrective disclosures on which plaintiffs rely contained no *new*

corrective facts that had not previously been disclosed. Accordingly, plaintiffs cannot carry their

burden under the Exchange Act of establishing loss causation. And based upon the same

undisputed evidence, defendants are entitled to summary judgment on plaintiffs' Securities Act claims because they have established their negative causation defense.

*Bonuses*.  Plaintiffs seek damages for alleged misrepresentations or nondisclosures about Merrill's payment of employee bonuses based upon a single purported corrective disclosure in an article published in the *Financial Times* after the close of trading on January 21, 2009.  All of the relevant facts in that article about the Merrill bonuses, however, were repeatedly and unqualifiedly disclosed in press reports in the weeks and months *before* January 21—including multiple articles, presented to this Court for this first time on this motion, stating unequivocally that Merrill Lynch had paid bonuses before the end of 2008.  Because plaintiffs cannot establish that any corrective disclosure about the bonuses resulted in a statistically significant drop in the price of BofA's stock, defendants are entitled to summary judgment on plaintiffs' bonus claims.

*Fourth Quarter Losses—January 12*.  Plaintiffs also seek damages based upon a Citigroup analyst report issued on January 11, 2009.  The analyst report forecast what plaintiffs claim was a larger estimate of Merrill's losses during the fourth quarter of 2008 than previous analyst estimates.  The Citigroup analyst report, however, did not disclose any new fact about Merrill's fourth quarter losses that had not been previously disclosed.  It merely provided the Citigroup analyst's opinion about Merrill's losses based on the analyst's interpretation of public data that were already available to the market.  Notably, more than a month earlier, another analyst had forecast a more negative assessment of Merrill's fourth quarter results.

*Fourth Quarter Losses—January 13*.  Finally, plaintiffs seek damages based upon a decline in the price of BofA stock on January 13, 2009, but they are unable to point to any public disclosure about Merrill's fourth quarter 2008 losses that could account for that decline.

Abandoning their first claimed "corrective disclosure," which had nothing to do with the merger, plaintiffs have now concocted a new theory that corrective information about those Merrill losses leaked into the market by January 13, causing the stock decline on that date.  The only public disclosure on January 13 that plaintiffs have identified in aid of their leakage theory is a speech by Federal Reserve Chairman Ben Bernanke about the possibility of increased federal aid to domestic financial institutions.  Although the speech did not mention BofA or Merrill (let alone Merrill's fourth quarter losses), plaintiffs contend that investors assumed it referred to BofA. But speculation about assumptions that investors might have made is insufficient evidence of loss causation.  The law requires proof of the mechanism by which new, corrective facts about Merrill's fourth quarter losses were disclosed to the market, and plaintiffs have adduced no evidence linking the investors' alleged assumption to such a corrective disclosure of Merrill's losses.  Instead of evidence, plaintiffs cite internal BofA emails that, at most, reflect either concerns about the possibility of information leaks or leaks occurring *after* the January 13 stock-price drop.  Concerns about the potential for a leak, however, are not evidence of a leak. Plaintiffs have proffered no evidence that any previously undisclosed information about Merrill's fourth quarter losses actually leaked to the market on January 13, which is the date of the stock-price drop for which they seek billions of dollars in damages.

For these reasons and those discussed below, defendants are entitled to summary judgment dismissing plaintiffs' claims:  (i)  under Section 14(a), for lack of evidence of damages; (ii) under Sections 10(b) and 14(a) of the Exchange Act premised on alleged misrepresentations or omissions concerning Merrill employee bonuses, for lack of evidence of loss causation; (iii) under Sections 11 and 12 of the Securities Act, because undisputed facts establish the defense of negative causation; and (iv) under Sections 10(b) and 14(a), to the extent

those claims are based on declines in the price of BofA stock on January 12 and 13, 2009, for lack of evidence of loss causation.

### Statement of Facts

The facts relevant to this motion are set forth in the accompanying Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 and in the Argument below.

### Argument

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the non-moving party bears the burden of proof on an essential element of its case, the party moving for summary judgment discharges its burden by "pointing out" to the Court that the non-moving party lacks admissible evidence to establish that essential element. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-25 (1986); *see* Fed. R. Civ. P. 56(c).

To avoid summary judgment, plaintiffs cannot "rest upon the mere allegations" of their pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322 n.3. And they must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Unsupported allegations do not create a material issue of fact," *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), and "a plaintiff cannot rely on conjecture or surmise," *Heilweil* v. *Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (internal quotation marks omitted).

Under Rule 56, "summary judgment may be requested not only as to an entire case but also as to a claim . . . or part of a claim." Fed. R. Civ. P. 56(a) 2010 advisory committee's note. In a complex class action such as this, where plaintiffs seek billions of dollars

based on a variety of legal theories, partial summary judgment on claims that lack adequate substantiation is an important case management tool for narrowing the issues and providing a foundation for settlement.  As the Second Circuit noted in *United States* v. *Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993), summary judgment is a "powerful" case management tool "which, by effectively isolating the issues to be resolved, avoids lengthy and perhaps needless litigation" and encourages settlement.  *See also* 11 James Wm. Moore et al., *Moore's Federal Practice* – Civil ¶ 56.121[5] (3d ed. 2012) (encouraging use of partial summary judgment motions in complex civil litigation because a "decision on an important issue might resolve the entire case, narrow the issues, or even provide a foundation for settlement" and thus can also "promote judicial efficiency").

## I.

### PLAINTIFFS HAVE FAILED TO ADDUCE EVIDENCE THAT MEMBERS OF THE SECTION 14(a) CLASS SUSTAINED ANY COMPENSABLE INJURY OR ACTUAL DAMAGES

**A.    The Section 14(a) Class Seeks to Recover for a Stock-Price Drop That Reflects the Market's Perception of Direct Injury to the Company**

The Section 14(a) class seeks to recover as damages a series of declines in the market price of BofA stock for "each share of [BofA] Common Stock *held* as of October 10, 2008" and retained through the period of purported corrective disclosures in January 2009. (Ex. 7 ¶ 139 (emphasis added).)  Plaintiffs contend that these stock-price declines are the "best measure" of compensation for the alleged impairment of the Section 14(a) class members' "right to cast a fully informed vote on the Merger."  (Ex. 9 at 30.)

This argument ignores this Court's ruling that plaintiffs cannot recover for declines in BofA's stock price "due to an injury inflicted upon BofA."  *Bank of Am.*, 757 F.

Supp. 2d 260, 292 (S.D.N.Y. 2010).  As plaintiffs stated in their class certification motion, the

stock-price declines on which plaintiffs premise their damages claim "reflect[ ] the removal of

the inflated value" impounded in BofA's stock price "due to [defendants' allegedly misleading]

merger-related disclosures."  (Ex. 9 at 10-11 (internal quotation marks omitted).)  The merger,

however, was a transaction in which BofA engaged, not BofA's shareholders.  BofA, and not its

shareholders, thus would realize any *direct* benefits from the transaction.  BofA's shareholders

would realize corresponding *indirect* benefits in the form of higher share prices, but only insofar

as the direct benefits realized by BofA flowed through to them pro rata as the owners of a more

valuable corporation.  Likewise, to the extent that the transaction turned out to be less beneficial

than expected, BofA shareholders would experience only indirect injury in the form of lower

share prices.

      The governing law on this issue is that of Delaware.[2]  Courts applying Delaware

law have consistently held that stock-price declines like those at issue here reflect the market's

perception of a direct injury to the corporation, and only an indirect injury to shareholders.  Such

an injury is therefore not compensable through a direct award to shareholders who merely held

stock when the value of the shares was allegedly inflated.

---

[2]   *See*, *e.g.*, *Calamore* v. *Juniper Networks Inc.,* 364 F. App'x 370, 371-72 (9th Cir. 2010) (looking to Delaware law as the law of the state of incorporation to determine (i) whether claims under Section 14(a) were derivative or direct and (ii) available remedies on such claims); *Halebian* v. *Berv*, 590 F.3d 195, 204 (2d Cir. 2009) (holding that rule of *Kamen* v. *Kemper Financial Services*, 500 U.S. 90 (1991), mandated application of state law to determine whether claim under Investment Company Act of 1940 was derivative or direct); *Strougo* v. *Bassini*, 282 F.3d 162, 167-69 (2d Cir. 2002) (same); *Kelley* v. *Rambus, Inc.*, No. C 07-1238 JF, 2008 WL 5170598, at *3 n.5 (N.D. Cal. Dec. 9, 2008) (citing Delaware law on whether Section 14(a) claim was derivative or direct); *see also Kamen*, 500 U.S. at 98-99, 108 (1991) ("[W]here a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate *state* law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute." (emphasis in original)).

The Fifth Circuit's decision in *Smith* v. *Waste Management, Inc.*, 407 F.3d 381 (5th Cir. 2005), is on point.  The plaintiff there asserted state-law claims for fraud and negligent misrepresentation, based on allegations that he would have sold shares in the defendant corporation in May 1999 but for false statements that its net income and earnings per share were on the rise.  *Id.* at 382-83.[3]  According to the *Smith* plaintiff, the stock price declined when accurate earnings information was revealed two months later.  *Id.*  Plaintiff sued "in connection with losses he sustained when [the] share price fell."  *Id.* at 382.

Applying Delaware law, the Fifth Circuit held that the *Smith* plaintiff had failed to state a direct claim.  The Fifth Circuit observed that under the test prescribed by the Delaware Supreme Court in *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), "'[t]he analysis [of whether a claim is direct or derivative] must be based solely on the following questions:  Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?'"  *Smith*, 407 F.3d at 384 (quoting *Tooley*, 845 A.2d at 1035).  Under this test, "[t]he stockholder's claimed direct injury *must be independent of any alleged injury to the corporation*.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*."  *Id.* (emphasis in *Smith*) (quoting *Tooley*, 845 A.2d at 1039).  The Fifth Circuit held that plaintiff had failed to identify such an injury because the harm he alleged—a decline in stock price caused by corrective disclosures about the

---

[3]    As the description in the text indicates, *Smith* was a holder claim.  Attempts to recover indirect damages for stock-price declines often arise in the context of "holder" claims, which are claims by investors who—like members of the Section 14(a) class here—do not allege that they purchased shares at artificially inflated prices.  Instead, a holder plaintiff alleges that a defendant's misrepresentation caused it to retain securities, and that these securities later decreased in price when the market learned the truth concealed by the misrepresentation.

company's financial state—reflected an injury to the corporation visited on shareholders only

indirectly by virtue of their stock ownership:

> [W]hen a corporation, through its officers, misstates its financial condition, *thereby causing a decline in the company's share price when the truth is revealed*, the corporation itself has been injured. Here, the harm that befell Smith—*the drop in share price caused by the untimely disclosure of unfavorable financial data*—was a harm that befell all of Waste Management's stockholders equally. Stated differently, *the misconduct alleged by Smith did not injure Smith or any other shareholders directly, but instead only injured them indirectly as a result of their ownership of Waste Management shares*.  As such, Smith cannot prove his injury without also simultaneously proving an injury to the corporation.

*Id.* at 385 (emphasis added).

Other courts addressing "holder" claims have recognized the same principle in

ruling stock-price declines to reflect derivative rather than direct injuries.[4]  *Manzo* v. *Rite Aid*

*Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825

A.2d 239 (Del. 2003), cited by *Smith*, is illustrative.  In that case, plaintiff alleged that the

corporation and certain director defendants "falsely overstat[ed] earnings and the value of assets

---

[4]  It does not follow, however, that any such injury would necessarily be an injury for which the corporation would be entitled to compensation in a derivative action.  In many holder cases, the alleged artificial inflation in the stock price of a corporate defendant supposedly resulted at least in part from misrepresentations by the corporation's officers and directors concerning the corporation's financial condition, instead of (or in addition to) undisclosed conduct by the directors and officers that wasted corporate assets.  *See*, *e.g.*, *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, No. MDL-1446, 2005 WL 2230169, at *1 (S.D. Tex. Sept. 12, 2005) (addressing purportedly direct claim that defendants "misrepresented the financial condition of Enron corporation and [thereby] induced [p]laintiff . . . and a putative class to hold onto their Enron securities").  In these cases, as here, directors and officers could have defended against a derivative action by arguing, among other things, that an artificial inflation in the price of a corporation's shares induced by misrepresentations concerning the corporation's financial condition is not necessarily itself a compensable injury to the corporation.  That potential defense, even if successful, would not alter the conclusion that the alleged injury at issue was derivative, not direct, in nature.

11

while understating expenses, in virtually every single piece of financial information released by Rite Aid for over three years," and that the effect of the "mismanagement and persistent overstatement of Rite Aid's financial picture was to artificially inflate the price at which Rite Aid stock traded." *Manzo*, 2002 WL 31926606, at *1-2. "Ultimately, . . . a series of events exposed the nature and scope of the wrongdoing, and Rite Aid's share price plummeted." *Id.* at *2; *see also id.* ("events and revelations about the management and practices of Rite Aid[ ] were greeted by plunging share prices"). The *Manzo* plaintiff, a Rite Aid shareholder, asserted purportedly direct claims for, among other things, breach of fiduciary duty. The Delaware Court of Chancery, however, concluded that "[t]o the extent that plaintiff was deprived of accurate information upon which to base investment decisions and, as a result, received a poor rate of return on her Rite Aid shares, she experienced an injury suffered by all Rite Aid shareholders in proportion to their pro rata share ownership. This would state a derivative claim." *Id.* at *5.

The Second Circuit has endorsed the same proposition in a case applying Massachusetts law. *See Halebian* v. *Berv*, 590 F.3d 195, 205 (2d Cir. 2009). As the Second Circuit explained, "[h]arm to a corporation may manifest itself as harm to its shareholders in the form of a lower stock price. But the wrong underlying a derivative action is *indirect*, at least as to the shareholders. It adversely affects them merely as they are the owners of the corporate stock; only the corporation itself suffers the direct wrong." *Id.* (internal quotation marks omitted) (emphasis in original).[5]

---

[5]   *See also*, *e.g.*, *Stephenson* v. *PricewaterhouseCoopers, LLP*, No. 11-1204-cv, 2012 WL 1764191, at *2 (2d Cir. May 18, 2012) (applying *Tooley* to determine that claim by holder was derivative rather than direct); *Lee* v. *Marsh & McLennan Cos., Inc.*, No. 009717/2006, 2007 WL 4303514, at *5 (N.Y. Sup. Ct. Nassau Cnty. Dec. 7, 2007) ("[T]he decrease in stock values was an injury collectively endured 'by all the shareholders, rather than independently by the plaintiff[] or any other individual shareholder'" (quoting *Kramer* v. *W.*

### B.   The Section 14(a) Class Did Not Actually Suffer the Damages Sought Under Plaintiffs' Theory of Damages

Indirect claims like those asserted by the shareholders in the Section 14(a) class are distinct from direct claims brought by investors who claim to have purchased or sold securities in reliance on a misrepresentation affecting the price of the securities, such as the Section 10(b) class.  A purchaser or seller—unlike a holder—buys or sells at a particular time and price, and sustains a unique injury if the price of that transaction was artificially manipulated by misrepresentations or omissions.  A purchaser or seller may thus recover damages in a direct action based on the purchaser's actual payment of an artificially high transaction price, or the

---

*Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988))); *Newby* v. *Enron Corp. (In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, Nos. MSL-1446 et al., 2007 WL 789141, at *14 (S.D. Tex. Mar. 12, 2007) (noting that Texas courts frequently look to Delaware law principles and that under those principles, plaintiffs' claims were derivative because "[d]iminution in value of [plaintiffs'] particular bonds is no different from the diminution in value of all Enron securities allegedly caused by misrepresentations of Enron's financial condition"); *In re Enron Corp.*, 2005 WL 2230169, at *1, *3-4 (applying *Tooley* and *Smith* to determine that claims for inducement to retain Enron stock that later lost value were derivative under Oregon law); *In re WorldCom, Inc.*, 323 B.R. 844, 849 n.5, 851 (Bankr. S.D.N.Y. 2005) (applying Delaware principles of corporate law to determine that claim "for diminution in the value of [plaintiff's] shares" was derivative under Georgia law); *Schuster* v. *Gardner*, 25 Cal. Rptr. 3d 468, 476 (Ct. App. 2005) (purportedly direct claim was derivative in nature under Delaware law because "alleged harms were to the corporation, and the harm to the shareholders, dilution in stock value, was incidental thereto and common to all shareholders"); *Shirvanian* v. *DeFrates*, 161 S.W.3d 102, 110 (Tex. Ct. App. 2004) (under *Tooley*, plaintiffs' claims "predicated on the decline in the value of their . . . stock" were "based on mismanagement of the corporation's assets" and could not succeed "without showing an injury to the corporation"); *cf. Crocker* v. *FDIC*, 826 F.2d 347, 352 (5th Cir. 1987) (concluding as a matter of Mississippi law that "because the only injury the Crockers have effectively alleged is a decline in the value of the Bank stock, they have failed to state a direct, personal injury distinct from that suffered by the corporation that would permit them to maintain an individual cause of action"); *Arent* v. *Distribution Scis., Inc.*, 975 F.2d 1370, 1374 (8th Cir. 1992) (determining purportedly direct claims were derivative under Minnesota law as "[d]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right" (internal quotation marks omitted)).

seller's actual receipt of an artificially low transaction price.[6]  Such investors are "out-of-pocket" for the difference between the price at which they actually bought or sold securities and the price at which the transaction would have occurred but for the misrepresentation.[7]  (There is consequently no dispute that the Section 10(b) class can claim stock-drop damages if plaintiffs prove all of the elements of their claim.)  This reasoning can also be applied to shareholders of an *acquired* corporation in a merger, who may bring claims under Section 14(a) alleging that they—in effect, as sellers of shares in the acquired corporation as a result of the merger— received inadequate consideration for their shares.[8]

The same cannot be said of the Section 14(a) class members here.  That class includes "all persons and entities who *held* [BofA] common stock as of October 10, 2008, and were entitled to vote on the merger between [BofA] and Merrill."  *Bank of Am.*, 2012 WL 370278, at *1 (emphasis added); *compare with id.* (defining Section 10(b) class to include "all persons and entities who *purchased or otherwise acquired* BofA common stock during the period from September 18, 2008 through January 21, 2009, inclusive" (emphasis added)).  To be part of the Section 14(a) class, an investor by definition needs only to have been a holder of

---

[6]   *See*, *e.g.*, *Perlman* v. *Salomon Inc.*, No. 92 Civ. 5208 (RPP), 1995 WL 110076, at *2 (S.D.N.Y. Mar. 14, 1995) (explaining that purchaser claim was direct where plaintiffs suffered an injury distinct from the corporation because the price they paid for the securities was "artificially inflated" due to fraud).

[7]   *See*, *e.g.*, *Quintel Corp., N.V.* v. *Citibank, N.A.*, 596 F. Supp. 797, 802 (S.D.N.Y. 1984) ("Absent special circumstances, the actual damages of a defrauded purchaser are his out-of-pocket losses, defined as the excess of what he paid over the actual value of what he received.").

[8]   *See Goldkrantz* v. *Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *7 (S.D.N.Y. Apr. 6, 1999) (stating, in opinion addressing claims asserted under Section 14(a) by a former shareholder of an acquired corporation, that "[t]he normal measure of recovery is out-of-pocket damages, defined as the difference between the price paid for the security and its true value absent the fraud on the date of the transaction"), *aff'd*, 201 F.3d 431 (2d Cir. 1999) (table).

BofA shares on October 10, 2008.  These investors obviously could not have overpaid for BofA stock owing to a misrepresentation in the proxy statement, as the proxy statement was issued on November 3, 2008, and the 14(a) shareholders necessarily acquired their shares prior to that date.

The pension funds suing as lead plaintiffs, for example, collectively owned more than 34 million shares of BofA common stock on October 10, 2008.[9]  After the proxy statement was issued on November 3, 2008, the price of those shares was supposedly inflated as a result of defendants' alleged misrepresentations in the proxy statement about the merger.  These pension fund plaintiffs thus did not overpay for these shares based on any misrepresentation in the proxy statement as they had purchased their shares weeks before the proxy was issued.  Under plaintiffs' theory of damages, those pension fund plaintiffs would nonetheless be entitled to recover an amount equal to the full drop in the price of BofA stock when the purported corrective disclosures removed this artificial inflation from the stock price.  The pension fund plaintiffs would thus receive an award based on the entire amount of the alleged inflation—a sum of $149 million—simply because they happened to *hold* their shares when the price of their shares was supposedly inflated. [10]

Like those lead plaintiffs, the other members of the Section 14(a) class did not purchase BofA shares at a price that was artificially inflated by misrepresentations or omissions in the proxy statement.  By definition, they purchased BofA shares before October 10, 2008, which is *before* the issuance of the proxy statement at issue in this case and consequently *before*

---

[9]   *See* Ex. 10 at 3.

[10]   The $149 million figure stated in the text is calculated by subtracting from the 34,396,247 shares owned as of the record date (*see* Ex. 10 at 3) the number of shares sold by January 21, 2009 (3,043,040.834, *see* Ex. 11 at 138-54), and multiplying the resulting total (31,353,206.166) by $4.74, the total damages per share sought by plaintiffs (*see* Ex. 7 ¶ 139). This calculation results in an amount of $148,614,197.23.

any artificial inflation in the price of BofA stock caused by that proxy statement.  The members of the Section 14(a) class then *held* their shares until after the alleged corrective disclosures removed any artificial inflation from the price of the stock.  Such holders have no individual injury or actual damages arising from a transient alleged artificial inflation in the price of their shares during a period when they merely held their shares and did not trade.  To award damages to the Section 14(a) class members based on such an artificially inflated price would be to compensate the class members for their loss of an opportunity to sell their shares at a price inflated by an alleged fraud.  An award of stock-drop damages to such an investor would clearly be a windfall.

As *Levine* v. *Seilon, Inc.*, 439 F.2d 328 (2d Cir. 1971), shows, the law does not recognize such a "loss" as a compensable direct injury to shareholders.  In *Levine*, the defendant corporation announced an exchange offer in which holders of its preferred shares would be able to exchange those shares for shares of common stock at a fixed ratio.  *Id*. at 330.  That offer had the effect of driving up the market price of the preferred shares significantly during the summer and fall of 1968.  *Id*. at 330-31.  According to the *Levine* plaintiff, the corporation never intended to consummate the exchange offer.  The corporation instead planned to redeem (and subsequently did redeem) the preferred shares at the lower price at which they were callable.  *Id*. at 331-32.  Judge Friendly, writing for the Second Circuit, rejected the idea that the plaintiff was somehow entitled to the difference between the call price and the market price as allegedly inflated by defendants' false promise:

> Even if he would have sold during the summer had it not been for
> Seilon's allegedly false representation as to the exchange offer,
> Levine cannot persuasively claim that his loss in not doing so was
> caused by Seilon's representation since, according to the
> complaint, if the representation had not been made, the price of his

> stock would not have been inflated, and there would have been no
> gain to be realized by a sale.

*Id.* at 334.  The plaintiff therefore had not suffered any "actual damages" within the meaning of

Section 28(a) of the Exchange Act:

> The plain fact is that save for the possibility of selling to an
> innocent victim, Levine lost nothing from Seilon's alleged fraud
> except the euphoria he doubtless experienced during the summer
> and fall of 1968.  This does not constitute the "actual damages,"
> see § 28(a), compensable under . . . the Securities Exchange
> Act . . . .

*Id.* at 335.

The same logic applies here.  Members of the Section 14(a) class effectively seek

the profits that those shareholders could have gained had they sold their shares when the price of

BofA's stock was allegedly inflated by defendants' purported misrepresentations.  But as *Levine*

demonstrates, plaintiffs cannot recover "actual damages" based on a transient artificial inflation

in BofA's stock price when they (and the other members of the Section 14(a) class) did not

transact at the allegedly artificially inflated price.[11]

### C.   Plaintiffs Have Failed to Connect Their Claimed Section 14(a) Damages to an Alleged Impairment of Their Voting Rights

The Section 14(a) class members have argued that they suffered a direct harm of a

different kind:  an alleged impairment of the right to cast an informed vote on the merger.

Defendants do not dispute that under Delaware law, "where it is claimed that a duty of disclosure

violation impaired the stockholders' right to cast an informed vote, that claim is direct."  *In re*

*J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006).  As the Delaware

Supreme Court noted, however, that proposition alone "leaves unanswered" the additional

---

[11]   *See also Crocker*, 826 F.2d at 352 n.6 ("It is too much to ask the court to recognize an injury
based on a lost profit to which no one was lawfully entitled.").

question of "what relief flows from the disclosure violation." *Id*.[12]  The answer to this additional

question turns on the "fundamental principle governing entitlement to compensatory damages,

which is that the damages must be logically and reasonably related to the harm or injury for

which compensation is being awarded." *Id.* at 773.  And damages from the impairment of the

right to vote are not the same as damages from paying too much for a company.

For example, in *In re J.P. Morgan*, shareholders of J.P. Morgan claimed that

because of a materially misleading proxy statement, they were duped into approving J.P.

Morgan's stock-for-stock acquisition of Bank One at a price that included an excess premium of

$7 billion.  *Id*. at 769.  Plaintiffs brought a direct action asserting common-law claims against

J.P. Morgan's directors.  *Id.* at 768.  Plaintiffs' position was that as indirectly transacting parties,

they were entitled to an award of damages equal to the $7 billion in excess consideration paid by

J.P. Morgan.  *Id.* at 769, 771-72.  In plaintiffs' view, members of the shareholder class were

"out-of-pocket" for this amount because the shares of Bank One acquired by J.P. Morgan were

collectively worth $7 billion less than the consideration paid by J.P. Morgan.  *Id.*

The Delaware Supreme Court rejected the argument that the $7 billion was an

appropriate measure of the injury suffered by shareholders on their disclosure claim.  As it

---

[12]   Additional authority applying Delaware law recognizes that superficially "direct" claims—
including claims under Section 14(a)—"may be dismissed where a shareholder seeks a
recovery owed to the corporation."  *Calamore*, 364 F. App'x at 371-72 (citing *In re J.P.
Morgan*); *see also id.* at 372 ("[e]ven if other remedies 'flow naturally' from the avoidance of
[a shareholder vote undertaken in violation of Section 14(a)], these remedies are unavailable"
where "they impermissibly 'conflate' [a plaintiff's] direct claim with a derivative claim");
*Thornton* v. *Bernard Techs., Inc.*, C.A. No. 962-VCN, 2009 WL 426179, at *3 & n.28 (Del.
Ch. Feb. 20, 2009) (even though disclosure claims were "on their face . . . direct in nature,"
"[t]o the extent that the Plaintiffs [sought] to recover for losses suffered by [the corporation],
those claims [we]re derivative in nature because any recovery would benefit the entity as a
whole" and "[p]laintiffs had done nothing more than paint[ ] derivative claims with a
disclosure coating").

explained, "the $7 billion damage figure has no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote." *Id.* at 773 (emphasis in original). "Indeed, . . . if the plaintiffs' damages theory [were] valid, the directors of an acquiring corporation would be liable to pay both the corporation and its shareholders the same compensatory damages for the same injury.  That simply cannot be." *Id.* (footnote omitted)

Here, too, the damages sought by plaintiffs lack the requisite "logical or reasonable relationship" to the harm allegedly done to members of the Section 14(a) class *individually* for deprivation of their right to cast an informed vote.  That is because the only harm plaintiffs identify is a drop in the price of BofA stock.  This stock-price drop occurred when disclosures supposedly revealed to the market the true value of an acquisition by BofA, and thus supposedly removed from the stock price an artificial inflation allegedly caused by defendants' misstatements concerning the merger.  As the courts explained in *Manzo* and *Smith,* such stock-price declines are not "independent" of injury to BofA; they instead reflect a BofA shareholder's pro rata portion of any injury to BofA.  (*See supra* at pp. 10-12.)

In other words, the stock-price declines plaintiffs claim as damages might conceptually be a "logical and reasonable" consequence of BofA's failure to realize the expected value of the transaction.[13]  But that would *not* make the declines a "logical and reasonable consequence" of the shareholders' individual loss of the right to cast an informed vote.

---

[13]   Defendants vigorously dispute that this is in fact the case.

Suppose, for example, the merger had occurred without a shareholder vote at all.[14] And suppose the value of the merger to BofA, as revealed to the market by subsequent corrective disclosures, had been less than the value allegedly implied by defendants' representations.  In that event, BofA's stock price would presumably have declined.  Individual shareholders who did not transact at artificially inflated prices, however, would clearly be unable to recover those declines in direct actions.  The outcome should be no different here simply because a vote occurred; the *claimed damages* still derive from an alleged injury to BofA.[15]

### D.  Plaintiffs Fail to Offer Any Evidence Supporting Their Claim of Direct Injury to Section 14(a) Class Members

Mr. Coffman, who is plaintiffs' damages expert, also was not able to provide a rational basis for the damages sought by the Section 14(a) class.  While Mr. Coffman opined that damages under Section 14(a) "are most reliably measured by quantifying the loss in value to [BofA] shareholders that occurred upon revelation of the corrective information" (Ex. 7 ¶ 139), he failed to provide any basis supporting that opinion.

---

[14]   BofA was required to put the Merrill merger to a shareholder vote only by virtue of New York Stock Exchange Rule 312.03(c), which requires shareholder approval for the issuance of shares in excess of 20% of a corporation's then-outstanding common stock.  *See* Ex. 12. No vote on the merger was required by any state or federal law or by BofA's governing documents.  Had BofA paid cash, or a combination of cash and stock such that no more than 20% of its outstanding common stock was required to be issued as merger consideration, no vote would have been needed at all.

[15]   In any event, there is no reason to think that Section 14(a) entitles plaintiffs to recover damages of that type.  In *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083 (1991), the Supreme Court—noting that Congress "expressly provided private rights of action in §§ 9(e), 16(b), and 18(a)" of the Exchange Act, but not in Section 14(a)—called Congress's silence a "serious obstacle" to expansion of the implied private right of action under Section 14(a). 501 U.S. at 1104.  *See also Tenet Healthcare Corp.* v. *Cmty. Health Sys., Inc.*, No. 3:11-CV-732-M, 2012 WL 936388, at *2-3 (N.D. Tex. Mar. 21, 2012) (applying *Virginia Bankshares* and concluding there was no basis to infer that target corporation had standing under Section 14(a) to pursue costs incurred in investigation of potential Section 14(a) claim).

In fact, Mr. Coffman testified that until this case he had never before given an expert opinion on damages under Section 14(a).  (Ex. 8 at 266:21-267:2.)  He stated that the basis for his opinion was nothing more than "information[ ] in the complaint" and his own "view" of the matter.  (*Id.* at 267:3-270:25.)  And he conceded that his report does not cite any economic literature on this issue or any case law on Section 14(a), that he had not found any economic literature supporting his view of damages under Section 14(a), and that he is not aware of a single economist in any case (other than this one) who has expressed a view similar to his concerning Section 14(a) damages.  (*Id.* at 273:18-276:25).

Critically, Mr. Coffman acknowledged that he made no effort to differentiate any portion of the stock-price drop supposedly constituting injury to members of the Section 14(a) class as individuals from that reflecting alleged injury to BofA.  *See id.* at 277:9-24 (quoted *supra* at p. 4).)  Instead, Mr. Coffman simply asserted that the Section 14(a) class is entitled to the *entire* stock-price decline supposedly attributable to the correction of misrepresentations in the proxy statement.

This approach ignores this Court's ruling on defendants' motion to dismiss, which held that plaintiffs here must identify and prove direct damages that are distinct from those sought in the Consolidated Derivative Action pending before this Court.  In the derivative action, plaintiffs seek to recover, among other things, "damages arising from BofA's overpayment for Merrill."  757 F. Supp. 2d at 291.  The Court allowed plaintiffs in this case to move forward on their Section 14(a) claim provided that they establish that they could prevail "without double recovery."  *Id.* at 292 (emphasis added).  Plaintiffs, however, have proceeded as though this statement were a license to ignore *any* potential impact on BofA's stock price of the harms alleged in the derivative complaint.  By insisting that the members of the Section 14(a) class are

21

entitled to recover the entire amount of the stock-price declines attributable to alleged corrective disclosures about the merger, and failing to tie any quantified portion of the January 2009 stock declines to an alleged impairment of the class members' voting rights, plaintiffs have ignored the Court's test for establishing Section 14(a) damages.

> **E.    In Any Event, Plaintiffs Cannot Recover Stock-Price Declines Caused by Disclosure of Losses Known Only After the Vote on December 5, 2008**

Finally, plaintiffs seek Section 14(a) class damages based on stock-price declines attributable to the disclosure of losses that became known to defendants only after the shareholder vote on December 5, 2008.  In his March 16, 2012 expert report, Mr. Coffman states that only some of Merrill's losses for the fourth quarter of 2008 were "incurred" (or even "projected") as of December 5, 2008.  (Ex. 7 ¶ 132; *see also id.* ¶ 26(i)-(ii) (differentiating Merrill's "losses prior to the shareholder vote" from those "[f]ollowing the shareholder vote")).  Yet Mr. Coffman calculates damages for the Section 14(a) class based on stock-price declines that he attributes to the disclosure of the *entire* amount of Merrill's fourth quarter losses.  As he testified at his recent deposition, "there's not a piece of information on the corrective disclosure dates that specifically identifies the losses that had occurred as of December 5, but it discloses the aggregate losses."  (Ex. 8 at 262:25-263:13; *see also id.* at 280:15-281:19.)[16]

This Court has already held, however, that "allegations relating to events that took place after [the day of the shareholder vote] cannot form the basis of a Section 14(a) claim."  757 F. Supp. 2d at 291.  This ruling bars members of the Section 14(a) class from recovering

---

[16]    Notably, Mr. Coffman's approach to calculating damages under Section 14(a) differs from his approach with respect to plaintiffs' claims under Section 10(b).  For purposes of the latter claims, Mr. Coffman at least *purports* to identify for each day during the class period an amount of inflation in BofA's stock price corresponding only to losses "incurred" and "projected" on the day in question.  (*See* Ex. 7. ¶ 132.)

damages based on the disclosure of losses that were not known or forecast at the time of the vote on December 5.

## II.

### PLAINTIFFS CANNOT ESTABLISH
### LOSS CAUSATION FOR MANY OF THEIR CLAIMS

A.   **Plaintiffs' Exchange Act Claims Require Proof that a Corrective Disclosure Revealed Previously Unpublished Facts About the Alleged Fraud**

Under the Private Securities Litigation Reform Act of 1995, plaintiffs bear the burden of proving loss causation to sustain their claims under Sections 10(b) and 14(a) of the Exchange Act.  *See* 15 U.S.C. § 78u-4(b)(4); *accord Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 346 (2005) (Section 10(b) plaintiff must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss"); *Amorosa* v. *AOL Time Warner Inc.*, 409 F. App'x 412, 415 (2d Cir. 2011) ("For both his 14(a) and 10(b) claims, [plaintiff] has the burden of pleading and proving loss causation.").

To establish loss causation by an alleged corrective disclosure, as plaintiffs purport to do here for a number of dates (*see, e.g.*, Ex. 7 ¶ 6), plaintiffs must show that the alleged corrective disclosure reported *new facts* to the market about the claimed fraud that had not previously been revealed.  The Second Circuit's decision in *Omnicom* makes this clear. There, the Court of Appeals affirmed summary judgment for the defense on loss causation grounds because the plaintiff "failed to demonstrate any new information in [a purportedly corrective news article] regarding [a company's] alleged fraud." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, at 512-13.  That was appropriate, the Second Circuit held, because the only information in the article that related to the "specific misrepresentations alleged in the

complaint" had been disclosed by prior media reports, and a repetition of information that is already "known to the market" cannot be a corrective disclosure. *Id.* at 505-06, 508, 511-13.[17]

The Second Circuit has also made clear that without evidence linking a stock-price drop to a corrective disclosure of the fraud alleged, proof that the stock-price drop was statistically significant does not show loss causation. *See Omnicom*, 597 F.3d at 508, 511-13 (where plaintiffs' expert failed to establish a corrective disclosure, stock-price drop following the disclosure did not suffice to prove loss causation (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-42 (2d Cir. 2009) (same)).[18]

Plaintiffs' expert on loss causation, Mr. Coffman, does not dispute these elementary points. Indeed, Mr. Coffman has acknowledged that "[t]o qualify as a corrective disclosure, I require that *newly-released* information result in a statistically significant stock

_____

[17] *See also Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("[c]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time"); *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1370 (N.D. Ga. 2010) (corrective disclosure must "reveal[ ] new information which an earlier omission fraudulently concealed"); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 263-65, 269 (3d Cir. 2005) (article disclosing adverse information about company's revenue-recognition policies was not corrective because the author was merely "reading between the lines" of prior, allegedly "opaque" disclosures).

[18] *See also McKowan Lowe & Co., Ltd.* v. *Jasmine, Ltd.*, 231 F. App'x 216, 218 (3d Cir. 2007) (affirming summary judgment dismissing Securities Act and Exchange Act claims on loss causation grounds because "plaintiffs failed to show that prior to the statistically significant drops in Jasmine's stock, there were *any* disclosures to the market-direct or indirect-which revealed the truth that was allegedly concealed" (emphasis in original)); *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("Any reliable theory of loss causation that uses corrective disclosures will have to show *both* that corrective information was revealed and that this revelation caused the resulting decline in price." (emphasis added)); *Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 317 (5th Cir. 2008) (dismissing for lack of loss causation because "[a]lthough the stock price dropped dramatically on the day of the 1 August 2006 press release, no new facts concerning Cyberonics' stock-option accounting were disclosed in that release which demonstrated that the 'truth became known' about Cyberonics' challenged financial statements").

price decline."  (*See* Ex. 7 ¶ 6 (emphasis added); *see also* Ex. 13 at 227:18-229:2.)  And he has

agreed that "just because something is statistically significant, you can't infer that there must

have been material news."  (Ex. 13 at 259:7-25; *see also id.* at 261:14-262:6.)

It is important to distinguish these loss causation requirements from the "truth-on-

the-market" inquiry the Court considered earlier in this case.  At the pleading and class

certification stages of this litigation, the Court addressed whether certain alleged

misrepresentations were effectively counterbalanced by news articles published around the same

time, so as to negate liability under the "truth-on-the-market" theory.  *See Bank of Am.*, No. 09

MDL 2058, 2012 WL 370278, at *8 (S.D.N.Y. Feb. 6, 2012); *Bank of Am.*, 757 F. Supp. 2d 260,

300-02 (S.D.N.Y. 2010).  Truth-on-the-market is a front-end inquiry:  it focuses on whether the

truth was known to the market *at the time the misrepresentation was made*, thereby rebutting the

fraud-on-the-market presumption of reliance.  *See In re Apple Computer Sec. Litig.*, 886 F.2d

1109, 1116 (9th Cir. 1989) (where many of the challenged optimistic statements about a product

appeared in news articles that also discussed its risks, fraud-on-the-market presumption was

rebutted at summary judgment).

Loss causation, by contrast, "addresses a matter different from whether an

investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a

stock."  *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011).  Loss

causation is a back-end inquiry:  it focuses on whether a subsequent loss was caused by factors

other than a corrective disclosure of the earlier misrepresentation (*see id.*), such as confounding

news and, for the purposes of our argument here, whether the allegedly concealed information

was published *before the alleged corrective disclosure*.

**B.**      **Plaintiffs Cannot Establish Loss Causation for Their Claims Based on Merrill Lynch Bonus Payments Because the Single Alleged Corrective Disclosure on Which They Rely Did Not Contain New Information**

To establish loss causation for their claims relating to Merrill's December 2008 employee bonuses, plaintiffs rely on a single alleged corrective disclosure—a *Financial Times* article published after the close of trading on January 21, 2009 (the "*FT* Article") (Ex. 14)—that, plaintiffs contend, caused the price of their BofA stock to drop on January 22, 2009.  (*See* Ex. 11 ¶¶ 20, 191, 197, 278, 280.)  Mr. Coffman, plaintiffs' expert, has opined that the *FT* Article marked the first public disclosure of three facts:  (i) that Merrill paid employee bonuses in December 2008 before merging with BofA in January 2009; (ii) that these payments totaled between $3 billion and $4 billion; and (iii) that Merrill paid these 2008 bonuses despite Merrill's large losses in the fourth quarter of 2008.  (*See* Ex. 15 ¶ 9; Ex. 7 ¶¶ 109-11; *see also* Ex. 9 at 14.)

The *FT* Article, however, was not a corrective disclosure, because the allegedly "corrective" information contained in the article had already been publicly reported.  In fact, each of the three supposedly "corrective" facts in the *FT* Article had already been published by other major media outlets, including the *Financial Times* itself, in prior news articles.  These articles—which are being presented to the Court for the first time on this motion—are not the October 2008 press reports anticipating bonus payouts at Merrill with the kind of "language that qualified the likelihood of Merrill bonuses" described by the Court's earlier rulings in this matter.  *See Bank of Am.*, 2012 WL 370278, at *8.  Instead, they are articles published in late December 2008 and early January 2009, after BofA shareholders approved the merger, stating unequivocally that Merrill was in fact paying bonuses in December 2008 and further stating what the aggregate amount of those bonuses had been.

As we now discuss, these articles show that the *FT* Article was not a corrective

disclosure revealing new facts.

***Acceleration of bonus payments to December 2008.*** Plaintiffs contend that the

January 21 *FT* Article "revealed to the market for the first time that Merrill had taken 'the

unusual step of accelerating bonus payments by a month'" to December 2008 from January

2009.  (Ex. 9 at 14.)  But numerous prior articles in the *Financial Times*, the *New York Times*, the

*Wall Street Journal*, and other publications reported that Merrill either would pay or had already

paid the bonuses in December 2008, in advance of the merger closing.  For example:

- On December 19, 2008, the *Wall Street Journal*'s "Deal Journal" blog reported that "[b]ankers at Dresdner Kleinwort and *Merrill Lynch* [on] Friday [December 19, 2008] will find out their bonus for this year in what will be the last time the banks make the payments to staff before coming under new ownership" (Ex. 16 (emphasis added)), and the *New York Times* reported that "Merrill Lynch will . . . notify workers of its bonuses, beginning Friday [December 19, 2008] and continuing into next week" (Ex. 17).

- On December 21, 2008, the *Observer* reported that "[o]rdinarily, traders and bankers at Merrill Lynch would not learn of their bonuses until the New Year, but the impending takeover of the Wall Street firm by Bank of America on 1 January [2009] prompted the management *to bring forward the bonus date to Friday* [December 19, 2008]."  (Ex. 18 (emphasis added).)

- On December 23, 2008, the *New York Times*, *Reuters*, and *HedgeWorld Daily News* each reported that "Merrill and Morgan Stanley handed out year-end pay in the last week, sources say, with some bankers earning bonuses in an otherwise dismal year." (Exs. 19, 20 & 21.)

- On January 16, 2009, the *Financial Times* reported that "[e]xcluding the top five managers, *Merrill paid bonuses to many of its executives and employees last month* [i.e., in December 2008], although not to [its then-head of Global Sales and Trading]."  (Ex. 22 (emphasis added).)

- On January 20, 2009, the *Australian Financial Review* stated unequivocally that "*Merrill Lynch . . . paid bonuses last month*"—i.e., in December 2008—and that "[i]t is understood that Merrill brought its date forward to clear its balance sheet of bonus-related liabilities before the merger with Bank of America."  (Ex. 23.)

27

*Estimated amount of aggregate bonus payment.*  Plaintiffs also contend that the January 21, 2009 *FT* Article revealed that Merrill "had paid $3-4 billion in bonuses" to its employees.  (Ex. 9 at 14.)  Plaintiffs base this contention on the *FT* Article's comment that "[a] person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December [2008]."  (Ex. 14; Ex. 11 ¶ 191.)  But that was not new information.  The same information—indeed, an estimate even closer to the actual sum of $3.6 billion that plaintiffs allege Merrill paid in bonuses for 2008 (Ex. 11 ¶ 173)—had been disclosed to the market a month earlier.  On December 21, 2008, the *Observer* reported that bankers at Merrill "shared in . . . bonuses last week," that "London-based traders at . . . Merrill Lynch . . . all received notification of their bonuses," and that "[t]he [bonus] pool at Merrill Lynch, which is yet to report fourth quarter figures, is likely to amount to $3.5bn (£2.33bn) on the basis of a total compensation bill of around $13bn."  (Ex. 18.)  The *Guardian* reported the same estimate on January 2, 2009:  "The [bonus] pool at Merrill Lynch . . . is likely to amount to $3.5bn on the basis of a total compensation bill of about $13bn."  (Ex. 24.)

Curiously, Mr. Coffman characterizes the *Observer* and *Guardian* articles as speculating, rather than reporting, "on the size of Merrill's year-end bonus pool."  (*See* Ex. 15 ¶ 16.)  But those articles both contain estimates of the Merrill bonus payments that were far more certain than the imprecise range of "about $3bn to $4bn" that the *FT* Article said an unnamed source had "estimated." (Ex. 14.)

*Merrill paid the bonuses despite fourth quarter losses.*  Finally, plaintiffs contend that the January 21, 2009 *FT* Article was the first public disclosure that Merrill "had paid $3-4 billion in bonuses notwithstanding its historic [fourth quarter] losses."  (Ex. 9 at 14.)  The market had that information at least five days earlier, on January 16, 2009.  First, by January

16, the market indisputably was aware of the full extent of Merrill's fourth quarter 2008 losses, as BofA formally announced them on January 16. (Ex. 7 ¶ 102.)  Second, on the same day as those earnings announcements, the *Financial Times* itself published a January 16 article reporting that "Merrill paid bonuses to many of its executives and employees last month" (Ex. 22.)  Third, by January 16, the information from earlier published articles cited above had already entered the market, including the report in a December 21, 2008 *Observer* article that bankers at Merrill "shared in . . . bonuses last week," and that the "[bonus] pool at Merrill Lynch . . . is likely to amount to $3.5bn" (Ex. 18).  Thus, well before publication of the January 21, 2009 *FT* Article, information was in the market showing that Merrill had paid between $3 and $4 billion in bonuses in December 2008 despite its allegedly "historic" fourth quarter losses (Ex. 9 at 14).  The *FT* Article was therefore not a corrective disclosure as to this fact.  It is wholly irrelevant that, as plaintiffs argue, the *FT* Article expressly contrasted the bonus payments with Merrill's fourth quarter losses, because all the elements of the comparison were already publicly known.

      As the courts have recognized, an efficient market can put two and two together. For example, in *In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005), a company's stock price did not experience a statistically significant reaction when the company disclosed the existence of a subsidiary's allegedly aggressive policy of recognizing certain payments as revenue.  *Id.* at 263-65, 269.  Two months later, the *Wall Street Journal* published an article that, "reading between the lines of this disclosure," and relying on information contained elsewhere in the disclosure and an assumption made by the reporter about the average of the payments, estimated that billions of dollars of these payments had been recognized as revenue under the policy.  *Id.* at 263-65, 269-71.  The company's stock price dropped

significantly following publication of the article.  The plaintiff argued that the *Journal* article

was a corrective disclosure, and that the defendant's original "disclosure was so opaque that it

should not have counted as a disclosure."  *Id.* at 270.  According to the plaintiff, that was why

"the stock price did not drop until *The Wall Street Journal's* reporter made public the estimated

magnitude of the [revenue] recognition."  *Id.*  But the Third Circuit rejected as untenable the

plaintiff's argument that in an efficient market such as the one for the company's stock,

"investors and analysts stood in uncomprehending suspension for over two months until the

*Journal* brought light to the market's darkness."  *Id.*  Because the *Journal* article merely

synthesized data that had been previously disclosed, the court concluded that the article's

analysis could not have been new to the market and thus could not have been a corrective

disclosure.  *Id.* at 270-71.  The Third Circuit reasoned:

> [Lead plaintiff] is trying to have it both ways:  the market
> understood all the good things that [the company] said about its
> revenue but was not smart enough to understand [its allegedly
> opaque] disclosure [concerning its revenue recognition policy].
> An efficient market for good news is an efficient market for bad
> news.  The *Journal* reporter simply did the math [in her article];
> the efficient market hypothesis suggests that the market made these
> basic calculations months earlier.

*Id.*

Here, too, plaintiffs cannot "have it both ways."  Having premised this class

action on their assertion that BofA stock traded in an efficient market that "promptly digested

current information with respect to [BofA] from all publicly available sources" (Ex. 11 ¶¶ 284-

85), plaintiffs cannot say the market tuned in when the *FT* Article reported on Merrill's bonuses,

but ignored the slew of prior news reports and disclosures revealing every one of the purportedly

"corrective" facts later repeated in the *FT* Article.  *See Omnicom*, 597 F.3d at 511 ("[h]aving

sought to establish investor reliance by the fraud-on-the-market theory . . . [plaintiff] must concede that the numerous public reports on the [allegedly fraudulent] transaction were 'promptly digested' by the market and 'reflected . . . in Omnicom's stock price'" before the news article cited by plaintiffs as an alleged corrective disclosure).

   In light of the disclosures preceding the January 21 *FT* Article, that article was not a corrective disclosure with respect to any of the allegedly "corrective" information in it.  The *FT* Article did not reveal any "then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint."  *Omnicom*, 597 F.3d at 511.  The only thing that was arguably "new" about the *FT* Article was its negative take on those previously reported facts.  It is well-established, however, that "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."  *Id.* at 512.  There can be no genuine dispute that the press reports prior to the *FT* Article preclude plaintiffs from proving loss causation with respect to the bonus claims.  *See id.* at 505 nn.1-2, 512 (*Wall Street Journal* article was not a corrective disclosure of allegedly fraudulent transaction because prior news articles in *InternetNews.com*, *New Media Agencies*, *Advertising Age* and *Fortune* reported facts of the transaction).

   Plaintiffs' arguments to the contrary boil down to phantom distinctions between the *FT* Article and the numerous press reports that preceded it.  For example, their expert, Mr. Coffman, contends that the prior articles described above did not disclose "that [BofA] and Merrill had secretly agreed to permit Merrill to pay billions of dollars in discretionary bonuses to Merrill employees prior to the closing of the Merger despite Merrill's financial performance." (Ex. 15 ¶ 5(iv)(a).)  But neither did the January 21 *FT* Article.  Plaintiffs' expert does not deny that the first news reports of that alleged agreement were in subsequent articles published on

January 26 and 30, 2009, and he concedes that the price of BofA stock had no statistically

significant reaction to those articles.  (*See id*. ¶ 25 (acknowledging "the lack of an additional

stock price reaction to [those] subsequent news reports").)  Moreover, while the *FT* Article

quoted a BofA spokesperson stating that "BofA was informed of [Thain's] decision" to pay

bonuses (Ex. 14), the same information had appeared in the *New York Times* more than a month

earlier (Ex.  17 ("Bank of America . . . played a role in limiting [Merrill's] bonuses")).

Because it reported no new facts on the subject, the single *FT* Article that

plaintiffs cite was not a corrective disclosure.  Accordingly, plaintiffs cannot satisfy their burden

of establishing loss causation for their bonus claims under Exchange Act Sections 10(b) and

14(a) predicated on those alleged misrepresentations, and defendants are entitled to summary

judgment on those claims.

### C.    Plaintiffs' Securities Act Bonus Claims Also Fail

Defendants are also entitled to summary judgment on plaintiffs' bonus claims

under Sections 11 and 12(a)(2) of the Securities Act.  The drop in BofA's stock price on

January 22, 2009 is the only alleged loss plaintiffs attribute to any purported corrective

disclosure of the claimed misrepresentations about Merrill's employee bonuses.  As shown

above, however, there was no corrective disclosure of the alleged bonus misrepresentations

associated with that stock-price drop.  That showing also establishes that any losses plaintiffs

suffered must have resulted from something other than the alleged misrepresentations challenged

by plaintiffs' bonus claims, thereby negating causation for those claims under the Securities Act.

On this point, the Second Circuit's decision in *In re Flag Telecom Holdings, Ltd.*

*Securities Litigation*, 574 F.3d 29 (2d Cir. 2009) is instructive.  There, the court held that the

proposed testimony of the plaintiffs' expert did not adequately substantiate allegations that

partial corrective disclosures occurred before in-and-out traders sold their stock. *Id.* at 40-42.

As a result, loss causation was lacking with respect to the in-and-out traders' claims under the

Exchange Act, and negated with respect to claims under the Securities Act. *Id.; accord*

*McKowan Lowe & Co., Ltd.* v. *Jasmine, Ltd.*, No. 94 Civ. 5522, 2005 WL 1541062, at *12 &

nn.12-13 (D.N.J. June 30, 2005) (ruling that defendants' showing that plaintiffs lacked sufficient

proof of loss causation under the Exchange Act also negated causation under the Securities Act,

and adopting defense argument that defendants are not obligated to explain what other factors

caused price drop), *aff'd*, 231 F. App'x 216, 218 (3d Cir. 2007) ("we agree with the District

Court's resolution of the critical issues of loss causation and proximate cause").

      For these reasons, defendants have met their burden of negating causation with

respect to plaintiffs' bonus claims under the Securities Act, and summary judgment should be

granted dismissing those claims as a matter of law.

    **D.**    **Plaintiffs Cannot Establish Loss Causation for Many of Their Claims Under the Exchange Act Based on Merrill's Fourth Quarter Losses**

      Plaintiffs claim that defendants violated Sections 10(b) and 14(a) of the Exchange

Act by failing to make adequate disclosure of losses that Merrill incurred in the fourth quarter of

2008. (Ex. 11 ¶¶ 7-16, 24.) Plaintiffs contend, based on an event study performed by

Mr. Coffman, that they suffered losses when the price of BofA stock dropped on four dates—

January 12, 13, 15 and 16, 2009—following alleged "partial corrective disclosures" regarding

Merrill's fourth quarter losses. (*Id.* ¶¶ 271-76, 279-80; Ex. 7 ¶¶ 6-7, 97-104.)

      Contrary to plaintiffs' contentions, however, there was no "corrective"

information in the materials plaintiffs cite that had not already been publicly reported to the

market before the January 12 and 13 stock-price drops. Accordingly, for reasons discussed in

Point II above, plaintiffs cannot establish loss causation based on the stock-price declines on those dates, and their multi-billion dollar damage claims based on those declines should be dismissed.

### 1.      January 12, 2009 Was Not a Corrective Disclosure Date

Plaintiffs attribute the January 12 stock-price drop to a January 11 Citigroup analyst's report forecasting "a much larger [fourth quarter 2008] loss estimate for Merrill than previous analysts' estimates."  (Ex. 7 at ¶ 99; Ex. 25.)  Plaintiffs contend that the Citigroup "forecast represents a partial corrective disclosure because it lowered the market's expectations of [fourth quarter 2008] earnings for Merrill."  (Ex. 7 at ¶ 99.)

Plaintiffs are wrong.  For at least two reasons, the Citigroup report did not reveal new facts about the fraud alleged that had not already been published to the market, as required to establish a corrective disclosure under the Second Circuit's ruling in *Omnicom*.

*First*, the Citigroup analyst report's forecast did not reveal "some then-undisclosed fact" about Merrill's fourth quarter 2008 losses.  *See Omnicom*, 597 F.3d at 511. The report merely provided the analyst's opinion of "forecasted . . . loss estimates" for Merrill that, plaintiffs contend, were greater than the prevailing consensus estimates of other analysts. (Ex. 7 ¶¶ 54, 99; Ex. 11 ¶¶ 176, 273.)  But plaintiffs offer no evidence that the Citigroup analyst's opinion was based on anything other than inferences from publicly available data (*cf.* Ex. 26 ¶ 31)—inferences other market participants could have drawn.  *See Merck*, 432 F.3d at 270 (rejecting argument that the market could not infer the implications of company's revenue recognition policy because the argument rested on the untenable assumption that "investors and analysts stood in uncomprehending suspension for over two months until the [*Wall Street Journal*] brought light to the market's darkness").  The Citigroup analyst's opinion is not the

kind of previously unrevealed fact required to establish a corrective disclosure of the omission

alleged in this case.  *See Omnicom*, 597 F.3d at 511-12 (requiring disclosure of a new "hard fact"

correcting the "specific misrepresentations alleged in the complaint").[19]  At most, it is nothing

more than "a negative characterization of already-public information," which as a matter of law

cannot be a corrective disclosure.  *Id.* at 512 (citing *Hunter,* 477 F.3d at 187-88 (negative

characterization of previously disclosed facts cannot constitute a corrective disclosure) and

*Merck,* 432 F.3d at 269-70 (same)).[20]

---

[19]   *Accord Nat'l Junior Baseball League* v. *Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561-62 n.34 (D.N.J. 2010) (issuance of analyst reports that speculate about a company's future prospects do not show loss causation); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07 Civ. 61542, 2010 WL 6397500, at *28 (S.D. Fla. Aug. 18, 2010) ("[T]he evidence does not support a claim that the Fitch downgrade revealed any then-undisclosed facts related to the alleged misrepresentations or omissions.  While the ratings change surely amounted to a negative assessment of the news, the downgrade was merely an analysis or negative characterization of already public information."); *see also Meyer* v. *St. Joe Co.*, No. 5:11-Civ-27, 2012 WL 94584, at *3-*5 (N.D. Fla. Jan. 12, 2012) (investor presentation was not a corrective disclosure because all the information in the presentation "ha[d] been obtained from publically available sources . . . [including] SEC filings, press releases, and earnings call transcripts" (citations and internal quotation marks omitted)).

[20]   Before the Second Circuit issued its decision in *Omnicom*, some courts in this Circuit had held that an analyst report that synthesizes already-public information can be a corrective disclosure.  *See, e.g., In re Winstar Commc'ns*, No. 01 Civ. 3014 (GBD), 2006 WL 473885, at *14-15 (S.D.N.Y. Feb. 27, 2006) ("The claimed ability of [analysts at] Asensio to arrive at [their] findings by an examination of the publicly reported financials [of Winstar] does not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available information.").  After *Omnicom*, that no longer is the law in this Circuit.  As explained in a recent amicus brief submitted to the Supreme Court on behalf of several prominent former SEC Commissioners, in *Omnicom* the Second Circuit joined other Circuits in ruling that such a "republication or amplification of previously disclosed facts cannot constitute a corrective disclosure."  *See* Brief for Former SEC Commissioners and Law Professors as *Amici Curiae* in Support of Petitioners' Petition, *Apollo Grp., Inc.* v. *Policemen's Annuity & Benefit Fund of Chi.*, No. 10-649, 2010 WL 5172861, at *11 (U.S. Dec. 17, 2010) (citing *Omnicom* in concluding that the Second Circuit is one of the Circuits in which an analyst report cannot be a corrective disclosure where the report merely repackages and comments on facts already in the public domain, and thus does "not contain any new facts not previously disclosed but only offer[s] the third party analyst's opinions").

*Second*, the Citigroup analyst's forecast also could not have been a corrective disclosure because other analysts previously forecast more negative assessments of Merrill's financial results in the fourth quarter of 2008.  In his report published on January 11, 2009, the Citigroup analyst forecast that Merrill would report fourth quarter losses of $6 billion, largely because of about $7 billion in estimated mark-to-market asset write-downs.  (Ex. 25 at BAC-ML-NYAG00765019.)  But more than a month earlier, on December 7, 2008, Morgan Stanley analyst Betsy Graseck issued a report estimating that Merrill would take $11 billion in downward purchase accounting adjustments, including 8.9 billion in "mark to market hits in [Merrill's] assets" in the fourth quarter (Ex. 27 at BAC-ML-NYAG10018789), based on her analysis of publicly available data (Ex. 28 at 66:19-94:20).  The Citigroup analyst report thus contained no "new information" about the alleged omission here, as required for a corrective disclosure.  *See Omnicom*, 597 F.3d at 513 ("Because [plaintiff] failed to demonstrate any new information in the [purportedly corrective news] article regarding Omnicom's alleged fraud, [plaintiff] has failed to show a price decline due to a corrective disclosure").

The Court's prior decision addressing the Graseck report is not to the contrary.  *See Bank of Am.*, 2012 WL 370278, at *9-10.  In that decision, the Court addressed whether, for purposes of rebutting the presumption of reliance on alleged omissions about Merrill's fourth quarter losses, the Graseck report demonstrated that the losses "already were known to the market and factored into BofA's share price" at the time of the alleged omissions.  *See id.* at *9-10 (internal quotation marks omitted).  By contrast, the issue addressed here is whether, by comparison to the earlier Graseck report, the Citigroup analyst report reported *new facts* about the losses that had not already been disclosed.  Because the Citigroup analyst's report disclosed

no information not previously disclosed by Graseck, the Citigroup report cannot, as a matter of law, have been a corrective disclosure.

Plaintiffs in the past have noted that Graseck has acknowledged that her methodology "'isn't perfect,' but that '[it is] the best indicator of asset class declines in the absence of detailed information on the banks' portfolios.'"[21] The reliability of Graseck's methodology, however, is immaterial to whether the Citigroup report disclosed new information to the market.  Indeed, the Citigroup report provided *no information at all* about its methodology for estimating Merrill's asset write-offs or the fourth quarter losses.[22]  Likewise, though "[n]umerous analysts also reached conclusions that varied from Graseck's" (*Bank of Am.*, 2012 WL 370278, at *10), it is equally true that numerous analysts reached conclusions that varied from those in the Citigroup report.

In his most recent expert report, Mr. Coffman also asserts that "[u]nlike the January 12 Citi Report, the Graseck Report did not provide an expected 4Q 08 profit or loss figure for Merrill."  (Ex. 29 ¶ 6(viii).)  But there is no material difference between the two reports in this respect.  The only reference to fourth quarter losses in the Citigroup report is in a footnote in the middle of the report estimating goodwill adjustments from the BofA/Merrill merger.  The footnote shows that the Citigroup analyst lowered his estimate of Merrill Lynch stockholder equity as of the closing date by $6.5 billion, after adjusting for an "estimated $6

---

[21]  *Bank of Am.*, 2012 WL 370278, at *10 (quoting Ex. 27 at BAC-ML-NYAG10018786).

[22]  At a deposition in this matter, plaintiffs' expert Coffman testified that he could not recall "who wrote the Citi report," did not "know anything about the author's reputation or the circulation" of the report, and did not "come to a conclusion one way or the other whether the report issued by Citi on January 11th was accurate and reliable." (Ex. 13 at 263:3-18.) Methodological considerations thus cannot distinguish the informational value of Morgan Stanley analyst Graseck's report from the Citigroup analyst report on which plaintiffs rely.

billion loss for [Merrill] in 4Q" 2008.   (Ex. 25 at BAC-ML-NYAG00765019.)  Graseck's report

provided an even larger downward adjustment of Merrill's shareholder equity as of the merger

closing of $8.9 billion.  (Ex. 27 at BAC-ML-NYAG10018789.)  Thus, if anything, the Graseck

report provided an even more negative assessment of Merrill's fourth quarter results than did the

later Citigroup report.

### 2.      January 13, 2009 Was Not a Corrective Disclosure Date

Nearly three years into this case, plaintiffs abandoned their original theory of loss

causation concerning the drop in the price of BofA stock on January 13, 2009.  Plaintiffs alleged

in their Complaint that on January 13, 2009 (January 14 in Australia), Merrill executives in

Australia informed Australian bond traders that Merrill was going to report "awful" news that

would cause the market to "plummet" the next day, in reliance on an article in the *Sydney*

*Morning Herald*.  (Ex. 11 ¶¶ 177, 274.)  That article, however, did not concern Merrill's losses in

the fourth quarter of *2008*, but its losses *a year earlier*, in the fourth quarter of 2007.  For this

reason, plaintiffs' expert eventually conceded that it was impossible for the article to evidence a

corrective disclosure of the fraud alleged in this case.  (*See* Ex. 13 at 253:22-254:4.)

Recognizing that the Complaint was simply mistaken in calling those events a

corrective disclosure, but unwilling to drop their claim for billions of dollars in alleged damages

from the January 13 stock-price drop, plaintiffs have concocted a wholly new theory.  In an

expert report served on March 16, 2012, plaintiffs' expert now contends that the January 13

stock-price drop was caused by "news of the U.S. Government bailout [of BofA] resulting from

Merrill's substantial [fourth quarter 2008] losses beg[inning] to leak to the market by no later

than January 13."  (Ex. 7 ¶ 100.)  In other words, plaintiffs cannot identify any corrective public

disclosure, and instead contend that the January 13 stock-price drop was caused by purported

leaks of events that had not yet been disclosed.

To survive summary judgment with a "leakage" theory of loss causation,

plaintiffs must establish the mechanism by which the truth was revealed.  For example, in *Flag*

*Telecom*, the Second Circuit rejected a leakage theory "because Plaintiffs failed to demonstrate

that any of the information that 'leaked' into the market . . . revealed the truth with respect to the

specific misrepresentations alleged."  574 F.3d at 41; *see also Bricklayers & Trowel Trades Int'l*

*Pension Fund* v. *Credit Suisse First Boston*, 2012 WL 118486, at *10 (D. Mass. Jan. 13, 2012)

("plaintiffs must establish the mechanism by which the truth was revealed").

As the Tenth Circuit has stated:

> [A]ny [loss causation] theory—even a leakage theory that posits a
> gradual exposure of the fraud rather than a full and immediate
> disclosure—will have to show some mechanism for how the truth
> was revealed.  A plaintiff cannot simply state that the market had
> learned the truth by a certain date and, because the learning was a
> gradual process, attribute all prior losses to the revelation of the
> fraud.  The inability to point to a single corrective disclosure does
> not relieve the plaintiff of showing how the truth was revealed; he
> cannot say, "Well, the market *must* have known."

*In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138-39 (10th Cir. 2009) (emphasis in

original) (citations omitted).

Here, plaintiffs have not come forward with evidence sufficient to link the

January 13 stock-price drop to any leak about the Merrill losses that plaintiffs claim defendants

failed to disclose.  On the contrary, plaintiffs' expert has admitted that no analyst or market

commentator made such a connection prior to the January 13 stock-price drop.  (*See* Ex. 30 ¶ 25

& n.22).  Plaintiffs thus cannot establish the mechanism by which the truth was revealed.  And

none of the purported evidence cited by Mr. Coffman as support for his theory addresses this defect.

          *Bernanke Speech.*  The sole public disclosure on January 13 that Mr. Coffman cites in support of his leakage theory is a speech by Ben Bernanke, the Chairman of the Federal Reserve.  (*See* Ex. 7 ¶¶ 56-57, 100; Ex. 31.)  According to Mr. Coffman, the Fed Chairman's speech suggested that the federal government was more likely to provide financial assistance to domestic financial institutions than had previously been thought.  (*See* Ex. 7 ¶¶ 56-57, 100.)  The speech did not mention BofA, Merrill, or their merger, let alone Merrill's losses for the fourth quarter of 2008.  The speech itself thus could not have been a corrective disclosure, because it did not reveal anything new about the Merrill losses that were allegedly concealed by the claimed fraud.

          Plaintiffs seek to remedy this evidentiary gap by pointing to an internal BofA email.  In this email, a BofA investor relations employee wrote on January 13:  "Assumption from investors is he [Chairman Bernanke] is talking about <u>us</u> in this section [of his speech]."  (Ex. 32 (emphasis in original).)  But the email, even if fully credited, is not evidence that the Bernanke speech itself constituted a disclosure of new information to the market concerning Merrill's losses for the fourth quarter of 2008.  Plaintiffs have adduced no evidence showing the mechanism by which new, corrective facts about Merrill's losses were disclosed to the market on January 13, and that is what the law requires to establish a corrective disclosure of the Merrill losses.  Plaintiffs have therefore failed to proffer evidence sufficient to create a genuine question of fact as to loss causation for the stock drop on January 13.

          In any event, the out-of-court assertions in the internal BofA email that plaintiffs rely upon are inadmissible hearsay that cannot be a basis for withstanding summary judgment on

loss causation.  *See, e.g.*, *Burlington Coat Factory Warehouse Corp.* v. *Esprit De Corp.*, 769

F.2d 919, 924 (2d Cir. 1985) (non-moving party "cannot rely on inadmissible hearsay in

opposing a motion for summary judgment").  As noted above, in the email, a BofA investor

relations employee wrote:  "Assumption from investors is [Chairman Bernanke] is talking about

us in this section [of his speech] . . . .   According to the Citi traders It [*sic*] is making large

investors and traders extremely nervous and driving volumes well up on our stock." (Ex. 32.)  It

is apparent from the face of this email that the "[a]ssumption" the BofA employee attributes to

investors is nothing more than his third-hand account of what "Citi traders" told him they had

heard from "large investors and traders."  The email is of no help to plaintiffs' leakage theory

unless it is offered to prove the truth of the hearsay assertion that investors assumed Chairman

Bernanke's speech was about BofA.  And there is no exception to the bar against hearsay

evidence that allows plaintiffs to prove what investors assumed about the speech based on such a

game of telephone.  *See Woodard* v. *Monticello Cent. Sch. Dist.*, No. 06-CV-13361 (KMK),

2008 WL 5062125, at *10 (S.D.N.Y. Dec. 1, 2008) (granting summary judgment where "the

only evidence Plaintiff has produced relating to this allegation is, at best, double hearsay and

cannot help Plaintiff avoid summary judgment"); *A Slice of Pie Prods., LLC* v. *Wayans Bros.*

*Entm't*, 487 F. Supp. 2d 33, 36-37 (D. Conn. 2007) (affiant's understanding based on

inadmissible hearsay could not be relied upon to withstand summary judgment).

   *Alleged Leaks.*  Plaintiffs also cite internal email exchanges among BofA

employees or government officials expressing concern about the *possibility* of information leaks

to the market.[23]  For instance, plaintiffs' expert points to an email exchange among BofA

---

[23] Because the internal emails that plaintiffs' expert cites are not public documents that were
 dispersed to the market, the emails themselves could not have been corrective disclosures.

employees on January 9, 2009 speculating that the SEC staff had been made aware of

unspecified information that arguably concerned Merrill's fourth quarter losses (Ex. 7 ¶ 55

(citing Ex. 33)), and plaintiffs have suggested that the company moved forward its planned

earnings release due to concerns about the possibility of such a leak (*see* Ex. 34 at 413:19-418:10

(examining witness about Ex. 35)).[24]  But concern about a *potential* leak is not evidence of an

*actual* leak, as plaintiffs' expert Coffman admitted during his most recent deposition.  (*See* Ex. 8

at 108:10-16 (agreeing that "suspicion of a leak . . . doesn't in and of itself constitute proof" of "a

leak into the market").)  The January 9 email exchange and the others like it do not show that

news regarding Merrill's fourth quarter losses had in fact reached the market, much less that the

purported leak entered the market on January 13 as plaintiffs contend.[25]  *See In re Manulife Fin.*

*Corp. Sec. Litig.*, 276 F.R.D. 87, 96, 103 (S.D.N.Y. 2011) (dismissing leakage theory where

complaint "ma[de] no allegations about where, when, or by whom . . . rumors were reported");

*Stratte-McClure* v. *Stanley*, 784 F. Supp. 2d 373, 390 (S.D.N.Y. 2011) (dismissing leakage

theory based on vague allegations of "'first rumors, then speculation, and finally . . .

---

*See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393-94 (9th Cir. 2010) (internal email cited by plaintiffs was "not evidence of what the market learned of and reacted to [when Oracle's stock price dropped] on March 1, 2001" and thus was not sufficient to prevent summary judgment on loss causation grounds).

[24]  When he was asked about this email exchange during his most recent deposition in this matter, Mr. Coffman conceded that "I don't have evidence that the SEC leaked, nor am I suggesting that this e-mail is proof that the SEC leaked any information." (Ex. 8 at 112:11-14.)  Mr. Coffman further testified:  "I'm not suggesting that that line of this e-mail suggests that the SEC, in fact, leaked anything." (*Id*. at 106:21-107:16.)

[25]  Mr. Coffman does not establish who leaked information about Merrill's fourth quarter 2008 losses to the public in time to cause the January 13, 2009 stock price drop, let alone where, when, or how such a leak occurred. (Ex. 7 ¶ 55 & nn.92-94, ¶¶ 56-59 & nn.95-97, ¶¶ 100-01 & n.152.)

confirmation by the Company of large losses relating to undisclosed exposures to U.S. subprime markets'").

The other documents on which plaintiffs rely show, at most, information leaks *after* the January 13 stock drop, and thus cannot establish loss causation for that drop. In particular, plaintiffs rely on an article in the *Wall Street Journal* issued after the close of trading on January 14 reporting that the government was close to finalizing an agreement to provide assistance to BofA (Ex. 7 ¶¶ 60-61; Ex. 36), and an internal BofA email in the afternoon on January 14 in which a BofA employee asserts that the *Journal* "is calling everybody they can think of in the company to ask about a 'trusted source' telling them that Washington is assembling a 'giant rescue package' for [BofA]" (Ex. 7 ¶ 58 (quoting Ex. 37)). But plaintiffs offer no evidence that any corrective information about Merrill's fourth quarter losses was leaked the day before. Thus, these documents provide no support for plaintiffs' contention that a leak of this information was the cause of the January 13 stock drop. *See Flag Telecom*, 574 F.3d at 41 (corrective disclosure after stock drops sued on by in-and-out-traders could not establish loss causation for their claims).

### Conclusion

For these reasons, this Court should grant summary judgment dismissing plaintiffs' claims (i) under Section 14(a) of the Exchange Act, for lack of evidence of damages; (ii) under Sections 10(b) and 14(a) of the Exchange Act, to the extent those claims are premised on alleged misrepresentations or omissions concerning Merrill employee bonuses, for lack of evidence of loss causation; (iii) under Sections 11 and 12 of the Securities Act, because undisputed facts establish the defense of negative causation; and (iv) under Sections 10(b) and

14(a) of the Exchange Act, to the extent those claims are based on declines in the price of BofA

stock on January 12 and 13, 2009, for lack of evidence of loss causation.

Dated:  New York, New York
        June 3, 2012

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:  _s/ Daniel J. Kramer_____
        Brad S. Karp
        Theodore V. Wells Jr.
        Daniel J. Kramer
        Walter Rieman
        Marc Falcone
        Audra J. Soloway

1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
dkramer@paulweiss.com

and

Mitchell A. Lowenthal
Lewis J. Liman
Jennifer Kennedy Park
CLEARY, GOTTLIEB, STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY  10006
(212) 225-2000

and

Peter C. Hein
Eric M. Roth
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Defendants*
*Bank of America Corporation and*
*Banc of America Securities LLC*

44