UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MDL 2058 (PKC) <br><br> **ECF CASE** |
| This Document Relates To: The Consolidated Securities Action | **Electronically Filed** |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT JOHN A. THAIN'S MOTION FOR SUMMARY JUDGMENT

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
(212) 698-3500

*Attorneys for Defendant John A. Thain*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT .............................................................................................................. 11

POINT I
      PLAINTIFFS CANNOT ESTABLISH
      THAT THAIN ACTED WITH SCIENTER ........................................................ 11

      A.     The Applicable Standards ....................................................................... 11

             1.     The Standard for Summary Judgment ...................................... 11

             2.     The Standard for Assessing Evidence of Scienter .................... 12

             3.     The Standard for "Recklessness" Under Section 10(b) ........... 15

      B.     Plaintiffs Cannot Demonstrate That Thain's Alleged
             Failure to Correct the Proxy Constituted an "Extreme
             Departure From the Standards of Ordinary Care" ................................ 16

POINT II
      PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION
      WITH RESPECT TO THE SECTION 10(b) CLAIM AGAINST THAIN .................... 22

POINT III
      SUMMARY JUDGMENT FOR THAIN ON THE
      SECTION 20(a) CLAIMS SHOULD BE GRANTED ..................................... 24

Conclusion ................................................................................................................... 25

TABLE OF AUTHORITIES

*Apollo Grp. Inc. Sec. Litig.*,
    509 F. Supp. 2d 837 (D. Ariz. 2007) ....................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ..................................................................................24

*Carlton v. Mystic Transp., Inc.*,
    202 F.3d 129 (2d Cir. 2000) ................................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................12

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ................................................................................15

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................................22

*Feinberg v. Benton*,
    No. 05–4847, 2007 WL 4355408, (E.D. Pa. Dec.13, 2007) .................................13

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007) ................................................................................12

*Howard v. S.E.C.*,
    376 F.3d 1136 (D.C. Cir. 2004) ..........................................................................17

*In re Bank of America Corp. Sec. Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) .......................................................... *passim*

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .............................................................................19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ..................................................................................23

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................................................................16

*In re Northern Telecom Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..................................................................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................................23

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)...............................................................21

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)......................................................................................20

*In re September 11 Litig.*,
  500 F. Supp. 2d 356 (S.D.N.Y. 2007)...................................................................12

*In re Symbol Techs. Class Action Litig.*,
  950 F. Supp. 1237 (E.D.N.Y. 1997) .....................................................................19

*In re Winstar Commc'ns Sec. Litig.*,
  No. 01 CV 3014, 01 CV 11522, 2010 WL 3910322 (S.D.N.Y. Sept. 29, 2010)..............13, 15

*In re Winstar Commc'ns Sec. Litig.*,
  No. 01 CV 3014, 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)......................13

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005)...................................................................................12

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...................................................................................15

*Nolfi v. Ohio Ky. Oil Corp.*,
   562 F. Supp. 2d 904 (E.D. Ohio 2008) ................................................................13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................................6, 20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  05 Civ. 9016, 2007 WL 528703 (S.D.N.Y. Feb. 20, 2007) ...................................14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  592 F. Supp. 2d 608 (S.D.N.Y. 2009)..............................................................14, 15

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).....................................................................................20

*South Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).....................................................................................15

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ........................................................................... 19, 21

*S.E.C. v. First Jersey Securities, Inc.*,
  101 F.3d 1450 (2d Cir. 1996).................................................................................24

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    148 F. App'x 66 (2d Cir. 2005) .................................................................................14, 21

*Stephenson v. PricewaterhouseCoopers, LLP*,
    No. 11-1204-cv, 2012 WL 1764191 (2d Cir. May 18, 2012)..................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................12, 13, 18

## STATUTES/RULES

15 U.S.C. § 78t(a) ...........................................................................................................24

Fed. R. Civ. P. 56(c) ...............................................................................................11, 12

## OTHER AUTHORITIES

Christine Harper and Alison Vekshin, *Frank Calls for 'Moratorium" on Wall Street
    Bonuses (Update 2),* BLOOMBERG, October 22, 2008 ............................................................8

Christine Harper and Serena Saitto, *Broken Securities Industry Still Has $20 Billion to
    Pay Bonuses,* BLOOMBERG, October 27, 2008...................................................................8

*Fight For The Middle Class; Ohio Voting Problems,* (CNN television broadcast)
    October 23, 2008 ........................................................................................................8

Greg Farrell, *Merrill's troubles anger BofA executives*, FINANCIAL TIMES,
    January 16, 2009 ........................................................................................................9

Michael Flaterly, *Asia bankers brace for job cuts,* NEW YORK TIMES,
    December 23, 2008 .....................................................................................................9

Michael Flaterly, *Jobs axe hangs over investment baks in Asia,* REUTERS,
    December 23, 2008 .....................................................................................................9

Rachel Beck and Joe Bel Bruno, *No curbs on Wall Street pay despite meltdown,*
    ASSOCIATED PRESS, October 24, 2008................................................................................8

Simon Bowers, *Wall Street banks in $70bn staff payout*, THE GUARDIAN,
    October 17, 2008........................................................................................................8

Vesna Poljak, *Bonus blues at investment banks,* THE AUSTRALIAN FINANCIAL REVIEW,
    January 20, 2009 ........................................................................................................9

Defendant John A. Thain ("Thain") respectfully submits this memorandum of law in support of his motion pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for summary judgment with respect to all claims asserted against him in the Consolidated Second Amended Class Action Complaint (the "SAC"). In addition to the arguments set forth below, to the extent applicable, Thain expressly adopts and incorporates as if fully set forth herein the arguments in support of summary judgment set forth in the Memorandum of Law In Support of BofA's Motion For Summary Judgment, dated June 3, 2012 (the "BofA Memorandum") and the Memorandum of Law in Support of Kenneth D. Lewis's Motion for Summary Judgment, dated June 3, 2012 (the "Lewis Memorandum").

## PRELIMINARY STATEMENT

This Court previously held that Thain, as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Merrill Lynch & Co., Inc. ("Merrill"), owed no duty of disclosure to shareholders of Bank of America Corporation ("BAC" or "BofA"). Hence, he cannot be liable pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") or Rule 10b-5 thereunder for any alleged *omissions* in the November 3, 2008 Joint Proxy with respect to payments by Merrill pursuant to its Variable Incentive Compensation Program (the "VICP" or the "Bonuses"). Thus, the only possible basis for a securities fraud claim against Thain is the Proxy's inclusion of certain negative covenant language that allegedly implied that the Bonuses were "contingent" and which the Court found to have been "arguably misleading." But, despite the benefit of voluminous discovery, Plaintiffs cannot meet their burden of demonstrating that Thain acted with scienter in connection with this alleged misrepresentation.

Indeed, the record is bereft of any proof of negligence, let alone intentional wrongdoing. To the contrary, the uncontradicted evidence shows that Thain had no involvement in the drafting of the bonus-related disclosures, which was instead handled by sophisticated securities

counsel who were aware of the parties' agreement as to the Bonuses.  Moreover, Thain was aware that the publicly-disclosed Merger Agreement required Merrill to "use reasonable best efforts" to "retain the services of its key officers and key employees" and to "conduct its business in the ordinary course," and that Merrill had throughout 2008 disclosed accruals for employee compensation that contemplated the payment of the Bonuses that ultimately were paid to employees.  Given these circumstances, Plaintiffs have not and cannot establish any inference of scienter much less one that is more compelling than an inference that Thain acted in good faith.  Summary judgment for Thain with respect to Count II should therefore be granted.  *See* Point I *infra*.

In addition, Plaintiffs cannot, as they must, come forward with any evidence that they suffered damages as a result of the alleged misstatements in the Proxy regarding Bonuses. Notably, they have failed to identify any date on which they claim the market price for BAC stock dropped as a result of a disclosure that "corrected" the Proxy's alleged misrepresentation that the Bonuses were merely "contingent."  On this basis, too, summary judgment for Thain on Count II should be granted.  *See* Point II *infra*.

Finally, given Plaintiffs' inability to demonstrate that Thain acted with scienter or negligently in connection with the Proxy's disclosures as to the Bonuses or that he acted negligently in connection with the disclosure of Merrill's forecasted fourth-quarter losses, summary judgment for Thain on Counts IV and VI, which allege respectively that he is liable pursuant to Section 20(a) of the Exchange Act, as a control person of Merrill for Merrill's violation of Section 10(b) and Section 14(a) of the Exchange Act is also appropriate.  *See* Point III *infra*.

## STATEMENT OF FACTS

Defendant John A. Thain was CEO and Chairman of the Board of Directors of Merrill from the beginning of the Class Period through December 31, 2008.  Merrill, Proxy Statement (Schedule 14A), November 3, 2008 ("Proxy") at 49 (annexed as Exhibit 1 to the accompanying Declaration of Jamie L. Halavais, dated June 3, 2012 ("Halavais Declaration")).[1]  On the morning of Saturday, September 13, 2008, Thain reached out to Kenneth Lewis, the then CEO, President, and Chairman of the Board of Directors of BAC, to discuss the possibility of a strategic relationship between the two companies.  Proxy at 49 (Ex. 1).  Over the weekend, Merrill and BAC had intense substantive discussions regarding the possibility of a merger of the two companies, which culminated in the announcement, on Monday, September 15, 2008, of the acquisition of Merrill by BAC (the "Merger").  Proxy at 49-51 (Ex. 1).

Among the items that the parties negotiated on Sunday, September 14, 2008, was a cap on Merrill's year-end Bonuses.[2]  Such discussions resulted in a term sheet pursuant to which BAC agreed in principle that any Bonuses paid by Merrill would be subject to an aggregate maximum recorded expense equal, after adjusting for headcount reductions, to the amount of bonuses paid in 2007 (the "Bonus Cap" or "Bonus Cap Agreement").   Fleming Dep. at 99:17-100:18 (Ex. 3); Thain Dep. 79:15-80:5 (Ex. 2).

The practice at BAC regarding drafting legal documents and disclosures was to involve internal lawyers, external counsel, and the business people with expertise in the relevant subject

---

[1]     All referenced exhibits are annexed to the Halavais Declaration.

[2]     Transcript of the Deposition of John A. Thain, sworn to March 22, 2012 ("Thain Dep.") at 72:15-22 (Ex. 2); Transcript of the Deposition of Gregory Fleming, sworn to February 23, 2012  (Ex. 3) at 116:9-117:11.

matter.[3]  Thus, the task of preparing the Merger Agreement, the Proxy, and other necessary securities law filings related to the Merger was delegated to certain members of BAC management with the assistance of in-house counsel and Wachtell, Lipton, Rosen & Katz ("Wachtell"), BAC's outside counsel for the transaction.[4]  Similarly, Merrill retained Shearman & Sterling LLP ("Shearman") to work with its in-house lawyers advising it in connection with the preparation of the Merger Agreement, the Proxy, and other necessary securities law filings related to the Merger.[5]

Wachtell and Shearman, with the involvement of BAC and Merrill in-house lawyers, drafted all of the Merger-related materials, including those relating to compensation issues.[6]  In particular, during the weekend of Merger negotiations, Wachtell and the other lawyers were informed that an understanding had been reached between Merrill and BAC about the Bonus Cap

---

[3]     Transcript of the Deposition of Teresa Brenner, sworn to December 13, 2011 ("Brenner Dep.") at 23:13-19 (Ex. 4); Transcript of the Deposition of Neil Cotty, sworn to March 15, 2012 at 28:9-29:8 (Ex. 5) (discussing process with respect to "Q" and "K" filings).

[4]     Transcript of the Deposition of Kenneth Lewis in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to October 30, 2009 at 92:16-25, 107:20-108:5, 195:9-196:8 (Ex. 6); Transcript of the Deposition of Thomas May, sworn to December 21, 2011 at 74:16-23 (Reviewing drafts of merger agreements is "something that's delegated to management and its outside law firms and expert law firms.  In this case, we -- we had Ed Herlihy and his team that were involved and have done many of these -- many of these transactions.") (Ex. 7); Brenner Dep. at 80:11-18 ("We had competent, very competent, external counsel who had helped us do many acquisitions over the years and they assisted us and the internal team with preparing the documents that were required to consummate a merger.") (Ex. 4).

[5]     Proxy at 50-51 (Ex. 1); Transcript of the Deposition of Rosemary Berkery in the New York Attorney General Investigation *In re: Executive Compensation Investigation Bank of America – Merrill Lynch*, sworn to September 23, 2009 ("Berkery NYAG Dep.") at 155:20-24 (Ex. 8); Transcript of the Deposition of Rosemary Berkery in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to December 9, 2009 ("Berkery SEC Dep.") at 35:9-14, 74:20-24 (Ex. 9); Transcript of the Deposition of Richard Alsop, sworn to December 22, 2011 ("Alsop Dep.") at 23:21-22 (Ex. 10); Transcript of the Deposition of Gregory Fleming in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to October 22, 2009 ("Fleming SEC Dep.") at  204:11-22 (Ex. 11).

[6]     Statement of Timothy Mayopoulos before the United States Congress dated November 16, 2009  at 3 (Ex. 12); Transcript of the Deposition of Jonathan Santelli in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to December 18, 2009 at 18:10-19:13, 77:13-22 (Ex. 13); Berkery NYAG Dep. at 132:18 – 133:3 (Ex. 8); Alsop Dep. at 27:2-8, 83:3-10, 165:14-166:12 (Ex. 10).

Agreement.[7]  Consistent with their roles as counsel drafting a complex legal document, counsel

for BAC and Merrill made considered judgments about documenting and disclosing the Bonus

Cap Agreement and related matters.[8]

      Thus, as relevant here, Section 5.1 of the Merger Agreement provides that: "Except as

expressly contemplated by or permitted by this Agreement or with the prior written consent of

the other party," Merrill should "(a) conduct its business in the ordinary course in all material

respects, [and] (b) use reasonable best efforts to maintain and preserve intact its business

organization…and retain the services of its key officers and key employees...[.]"  BAC (Form 8-

K), September 15, 2008 at 41 (Ex. 19).  And, Section 5.2 of the Merger Agreement (the

"Negative Covenant") states (*id.* at 41-42 (Ex. 19)), in pertinent part:

> During the period from the date of this Agreement to the Effective
> Time, except as set forth in this Section 5.2 of the Company
> Disclosure Schedule or except as expressly contemplated or
> permitted by this Agreement, Company shall not, and shall not
> permit any of its Subsidiaries to, without the prior written consent
> of Parent [to] . . . (c) . . . (i) increase in any manner the
> compensation or benefits of any of the current or former directors,
> officers or employees of Company or its Subsidiaries (collectively,
> "Employees"); (ii) pay any amounts to Employees not required by
> any current plan or agreement (other than base salary in the
> ordinary course of business). . . .

      As part of the Merger Agreement, counsel for BAC and Merrill determined to

memorialize their clients' understanding about the Bonus Cap in a non-public portion of the

---

[7]     Transcript of the Deposition of Nicholas Demmo, sworn to March 5, 2012 ("Demmo Dep.") at 31:25-32:10 (Ex. 14).

[8]     *See* Transcript of the Deposition of Gregory Curl, sworn to January 22, 2012 at 118:22-120:10 (incorporating the VICP agreement into the disclosure schedule was "done by lawyers") (Ex. 15); Transcript of the Deposition of Jeffrey Crandall in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to November 30, 2009 ("Crandall SEC Dep.") at 22:6-28:17 (Ex. 16); Transcript of the Deposition of Nicholas Demmo in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to November 16, 2009 ("Demmo SEC Dep.") at 78:18-80:21 (Ex. 17); *see also* Email from Nicholas Demmo to Teresa Brenner, dated September 15, 2008 (BAC-502-WLRK 00187636) (Ex. 18).

Merger Agreement denominated the "Disclosure Schedules to Agreement and Plan of Merger" ("Disclosure Schedule").[9]   Negotiations over the express terms of the Disclosure Schedule, including the final terms of the Bonus Cap, continued among the lawyers until well into October.[10]

In its final form, Schedule 5.2 of the Disclosure Schedule stated, in relevant part (at 14 (Ex. 21)), that Merrill could make 2008 VICP payments up to adjusted 2007 levels:

> [Bonuses] may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value…and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion…Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards.  The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [BAC]…The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [BAC].

Likewise, the Proxy was drafted by the Bank's outside counsel, Wachtell, with the participation of Merrill's outside counsel, Shearman.[11]   Numerous drafts of the Proxy and associated Securities and Exchange Commission ("SEC") filings were exchanged among BAC, Merrill, and their outside counsel prior to the finalization of these documents.[12]   Certain

---

[9]     *See* Crandall SEC Dep. at 22:6-28:17 (Ex. 16); Demmo SEC Dep. at 78:18-80:21 (Ex. 17); Berkery SEC Dep. at 124:9-23 (Ex. 9).

[10]    Demmo SEC Dep. at 130:6-13 (Ex. 17); Transcript of the Deposition of Jeffrey Crandall, sworn to January 12, 2012 ("Crandall Dep.") at 74:25-75:7 (Ex. 20).

[11]    Transcript of the Deposition of Nicholas Demmo in *In re: Bank of America Corp. Stockholder Deriv. Litig*, C.A. No. 4307-CS, sworn to January 13, 2012 at 35:22-36:6 (Ex. 22); *see also* Transcript of the Deposition of Timothy Mayopoulos in *In re: Bank of America Corp. Stockholder Deriv. Litig*, C.A. No. 4307-CS, sworn to December 22, 2011 at 169:25-170:16 ("[Wachtell is] highly experienced and knowledgeable about what proxy statements are supposed to contain.  And they draft it.") (Ex. 23); Crandall Dep. at 85:5 ("Wachtell had done the first draft [of the Proxy]") (Ex. 20); Berkery NYAG Dep. at 132:18-133:3 (Ex. 8); Alsop Dep. at 83:3-10, 165:14-166:12 (Ex. 10).

[12]    *See* email from Mark Veblen to Teresa Brenner dated September 15, 2008 (BAC-ML-NYAG-502-00005618) (Ex. 24); email from Ross Fieldston to Teresa Brenner, *et al.*, dated  [con't . . .]

members of BAC and Merrill management also reviewed the Proxy before it was filed, including Mr. Lewis and Mr. Thain.[13]  The Proxy was filed with the SEC and mailed to BAC shareholders of record on November 3, 2008.  *See* Proxy Cover Page (Ex. 1).

The Proxy did not attach Schedule 5.2 (or any other portion of the Disclosure Schedule) because Wachtell and Shearman had concluded that it did not need to be publicly disclosed.[14] No one suggested to Thain that there was any issue regarding the Proxy's disclosures with respect to the Bonuses, and Thain was aware that the lengthy Proxy had been prepared by outside counsel.  *See* Transcript of the Deposition of John Thain in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to November 4, 2009 at 153:11-155:3 (Ex. 30).  As Thain was also aware, in its quarterly filings with the SEC throughout 2008, Merrill disclosed that it was accruing billions of dollars for compensation and benefits, inclusive of bonus payments.[15]

---

September 20, 2008 (BAC-502-SS 00082986) (Ex. 25); email from Craig Culbert to Richard Alsop, *et al.*, dated September 24, 2008 (BAC-502-SS 00058964) (Ex. 26).

[13]   *See* Brenner Dep. at 102:7-19 (Ex. 4); Alsop Dep. at 78:19-79:7 (Ex. 10)), Transcript of the Deposition of Kenneth Lewis in *In re: Bank of America Corp. Stockholder Deriv. Litig*, C.A. No. 4307-CS, sworn to March 6, 2012 at 28:19-29:1 (Ex. 27); Thain Dep. at 94:2-5 (Ex. 2).

[14]   *See* Demmo Dep. at 217:7-15 (Ex. 14); Transcript of the Deposition of Ed Herlihy in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to November 17, 2009 at 195:12-196:4 (Ex. 28); Demmo Dep. at 39:22-40:7 (Ex. 14); Crandall Dep. at 90:21-94:2 (Ex. 20); Transcript of the Deposition of Patricia Kuhn in *Sec. and Exch. Comm'n v. Bank of America*, 09-CV-6829, sworn to December 21, 2009 at 77:11-78:4 (Ex. 29).

[15]   Merrill's Quarterly Report dated May 5, 2008 reported compensation and benefits accrual of $4.196 billion for first quarter of 2008, compared to $4.854 billion for the same period in 2007.  Merrill (Form 10-Q), May 5, 2008 at 4 (Ex. 31).  Merrill's Quarterly Report dated August 5, 2008 reported compensation and benefits accrual of $7.687 billion for the first two quarters of 2008, compared to $9.585 billion for the same period in 2007.  Merrill (Form 10-Q), August 5, 2008 at 5 (Ex. 32).  And Merrill's Quarterly Report dated November 4, 2008 – the first quarterly report filed after the Merger Agreement was signed – reported compensation and benefits accrual of $11.170 billion for the first three quarters of 2008, compared to $11.564 billion for the same period in 2007.  Merrill (Form 10-Q), November 4, 2008 at 5 (Ex. 33).

These disclosures received substantial coverage in media reports.[16]

On December 5, 2008, authorized shareholders of BAC and Merrill voted to approve the Transaction.  Merrill (Form 8-K), December 5, 2008 at 2 (Ex. 39).  Subsequently, on December 8, 2008, Merrill's Board of Directors approved the payment of the Bonuses in the amount of $3.6 billion.[17]  The actual amount of Bonuses approved on December 8 was entirely consistent with the prior public disclosures and media commentary and was substantially less than the Bonus Cap agreed to as part of the Merger Agreement.  *See* Exs. 21, 31-38.

In late December 2008, Merrill employees received the cash component of their Bonuses; the remainder was paid by BAC in BAC stock in January 2009 after the closing of the Merger on

---

[16]  *See, e.g.*, Simon Bowers, *Wall Street banks in $70bn staff payout*, THE GUARDIAN, October 17, 2008, at 2  (Merrill "accrued" $11.7 billion "for salaries and bonuses" and that "the total accrued in the last quarter grew 76% to $3.49 bn") (Ex. 34); Christine Harper and Alison Vekshin, *Frank Calls for 'Moratorium" on Wall Street Bonuses (Update 2),* BLOOMBERG, October 22, 2008, at 1  ("Goldman Sachs, Morgan Stanley and Merrill Lynch set aside a combined $33.3 billion to pay salaries, bonuses and benefits in the first nine months of this year, down 20 percent from $41.8 billion in the same period in 2007.  Banks typically pay about two-thirds of the total in year-end bonuses.") (Ex. 35); *Fight For the Middle Class; Ohio Voting Problems*, (CNN television broadcast) October 23, 2008, at 7  ("We were able to get figures for four major banks. . . . Merrill Lynch, $11.2 billion . . . . Total -- more than $61 billion set aside in salaries and bonuses for the first three quarters.  At three of the four, those numbers are down from the same period last year.") (Ex. 36); Rachel Beck and Joe Bel Bruno, *No curbs on Wall Street pay despite meltdown*, ASSOCIATED PRESS, October 24, 2008, at 2 ("Merrill Lynch's costs for pay were $11.2 billion for the first nine months of the year, 3 percent less than last year.  That nearly matches the company's $11.7 billion overall loss so far this year.") (Ex. 37); Christine Harper and Serena Saitto, *Broken Securities Industry Still Has $20 Billion to Pay Bonuses*, BLOOMBERG, October 27, 2008, at 1 ("[f]ive straight quarters of losses and a 70 percent slide in its stock this year haven't stopped Merrill Lynch & Co. from allocating about $6.7 billion to pay bonuses.") (Ex. 38).

[17]  Minutes of the December 8, 2008 Meeting of the Management Development and Compensation Committee of the Board of Directors ("MDCC") at 10-11 (Ex. 40); December 8, 2008 MDCC 2008 Final VICP Pools and MP Recommendations at 3 (Ex. 41).

January 1, 2009.[18]  Beginning in late December 2008, the media reported that Merrill had paid

Bonuses.[19]

The Court's 2010 Opinion

In a Memorandum and Order, dated August 27, 2010 (*In re Bank of America Corp. Sec.

Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010)) (the "2010 Opinion"), this Court, *inter alia*, granted

in part and denied in part Thain's motion to dismiss the initial Consolidated Amended

Complaint.  With respect to the Section 10(b) claim regarding disclosure of the Bonuses (Count

II), the Court, as an initial matter, held that, in the "absence of a plausible allegation for a

fiduciary relationship running from Thain and Merrill to BofA shareholders," neither Thain nor

Merrill could, as a matter of law, be held liable pursuant to Section 10(b) and Rule 10b-5 "based

on allegedly material omissions and the breach of a duty to disclose."  *Id.* at 288.  Accordingly,

to the extent premised on a purported "duty to disclose" the parties' Bonus arrangement and

allegedly adverse events that occurred while the Proxy was outstanding, the Court dismissed the

Plaintiffs' securities fraud claims.  *Id.*[20]

---

[18]     Alsop Dep. at 77:11-15 (Ex. 10); Transcript of the Deposition of John Thain in the New York
Attorney General Investigation *In re: Executive Compensation Investigation Bank of America –
Merrill Lynch*, sworn to February 19, 2009  at 95:3-5 (Ex. 42).

[19]     *See, e.g.*, Michael Flaherty, *Jobs axe hangs over investment banks in Asia*, REUTERS, December 23,
2008, at 1 (reporting that "Merrill and Morgan Stanley handed out year-end pay in the last week,
sources say, with some bankers earning bonuses in an otherwise dismal year.") (Ex. 43); Michael
Flaherty, *Asia bankers brace for job cuts*, NEW YORK TIMES, December 23, 2008, at 2 (same) (Ex.
44); Greg Farrell, *Merrill's troubles anger BofA executives*, FINANCIAL TIMES, January 16, 2009, at 2
("Excluding the top five managers, Merrill paid bonuses to many of its executives and employees last
month . . . ") (Ex. 45); Vesna Poljak, *Bonus blues at investment banks*, THE AUSTRALIAN FINANCIAL
REVIEW, January 20, 2009, at 1 ("Merrill Lynch . . . paid bonuses last month") (Ex. 46).

[20]     In the 2010 Opinion, the Court also dismissed the fraud claim against Thain based on alleged
omissions relating to Merrill's fourth quarter 2009 losses (Count I).  The Court held that the complaint
did not allege adequately that Thain acted with scienter.  2010 Opinion at 326.  As a result, the only
remaining fraud claim against Thain relates to the alleged misrepresentation in the Proxy regarding the
Bonuses (Count II of the SAC).

The Court held, however, that no fiduciary obligation was required for BAC shareholders to allege that Thain and Merrill were liable pursuant to Section 10(b) and Rule 10b-5 for *affirmatively misleading statements* made in the Proxy.  2010 Opinion at 287-88 (emphasis added).  Having determined that, even absent a fiduciary relationship and a concomitant duty of disclosure, Thain could be responsible for a false and misleading statement in the Proxy, the Court assessed, for purposes of a motion to dismiss, whether Plaintiffs could possibly prove the Proxy contained any material inaccuracies.

As interpreted by the Court, Section 5.2 provides for three exceptions to the Merger Agreement's provision that Merrill would not pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).  The first exception applies to matters "set forth in ... Section 5.2 of the Company Disclosure Schedule."  2010 Opinion at 296 (citing Proxy at A–7).

The second exception is based on Section 5.2(c)'s carve-out for actions "expressly contemplated or permitted" by the Merger Agreement.  For example, Section 5.1 of the Merger Agreement required Merrill to "conduct its business in the ordinary course in all material respects, including reasonable best efforts to maintain and preserve intact  its business organization and retain key officers and employees.  (Joint Proxy at A–31.)"  *Id.* (internal quotation marks omitted).  Similarly, Section 6.5(a) of the Merger Agreement agreed to maintain Merrill's "employee benefit plans and compensation opportunities through December 31, 2009, on terms substantially comparable" to those already in place.  *Id.*

The third exception is Section 5.2's provision that Merrill could make payments to employees, beyond base salary, with BofA's "prior written consent."  2010 Opinion at 297.

After reviewing the applicability of these three exceptions, the Court found that none

negated the Proxy's purported portrayal of "bonus payments to Merrill employees as a

contingent event."  2010 Opinion at 298.  Specifically, the Court found that such an implication

could be found to be misleading given that, "[w]hen the Joint Proxy was filed on October 31,

2008, the bonus payment to Merrill employees was more than hypothetical . . . BofA and Merrill

had already agreed in writing that Merrill could, at its discretion, administer bonus payments up

to $5.8 billion."  2010 Opinion at 297.

The Court concluded:

> The disclosure of the Merger Agreement's covenant that Merrill
> "shall not . . . pay any amounts to Employees not required by any
> current plan or agreement (other than base salary in the ordinary
> course of business)  . . ." was an affirmative statement that was
> *arguably misleading* in view of the undisclosed agreement on pre-
> closing bonus payments.

2010 Opinion at 300 (emphasis added).

# ARGUMENT

## POINT I

### PLAINTIFFS CANNOT ESTABLISH THAT THAIN ACTED WITH SCIENTER

A.      The Applicable Standards

1.      The Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  Where the nonmoving party bears the burden of proof at trial, as is the case here

with respect to Thain's scienter, the burden on the party seeking summary judgment "may be dis-

charged by showing—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007).

If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). Merely showing, however, that there is "some metaphysical doubt as to the material facts" is inadequate. *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Nor may the non-movant "rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)). As the Supreme Court explained in *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986):

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

### 2. The Standard for Assessing Evidence of Scienter

"To establish liability under [Section] 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 (1976)). In the seminal *Tellabs* case, the Supreme Court construed the meaning of language in the Private Securities Litigation Reform Act ("PSLRA") requiring that a plaintiff adduce facts giving rise to a "strong inference that the defendant acted with the required state of mind." The Court explained that "[i]t does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the

requisite state of mind." *Tellabs*, 551 U.S. at 314.  Rather, in assessing allegations of scienter, a factfinder "must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.*  The Court made clear that, to "qualify as strong," the inference must be "more than merely plausible or reasonable" but "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

The *Tellabs* Court "emphasize[d] ... that under [its] construction of the "strong inference" standard [of the PSLRA], a plaintiff is not forced to plead more than she would be required to prove at trial" since "[a]t trial, she must then prove her case by a 'preponderance of the evidence'" (i.e. "that it is *more likely* than not that the defendant acted with scienter"). *Tellabs*, 551 U.S. at 328-29.  Accordingly, summary judgment with respect to a Section 10(b) claim should be granted in favor of a defendant unless the plaintiff comes forward with evidence sufficient to demonstrate that the plaintiff could, at trial, meet its burden of demonstrating that it was "*more likely* than not that the defendant acted with scienter." *Tellabs*, 551 U.S. at 329.[21]

Plaintiffs' burden to demonstrate significant evidence of scienter in response to a motion for summary judgment is not precluded or diminished simply because this Court has previously determined on Thain's motion to dismiss that the pleading's allegations raised a sufficient inference of scienter.  On a motion for summary judgment, what counts is evidence, not mere allegations.  *Compare In re Winstar Commc'ns Sec. Litig.*, No. 01 CV 3014, 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb 27, 2006) (denying accounting firm's motion to dismiss with respect to scienter), *with In re Winstar Commc'ns Sec. Litig.*, No. 01 CV 3014, 01 CV 11522, 2010 WL 3910322 (S.D.N.Y. Sept. 29, 2010) (granting accounting firm's motion for summary judgment

---

[21]     Courts have found that "the *Tellabs* analysis is at least instructive in the summary judgment context." *Feinberg v. Benton*, No. 05–4847, 2007 WL 4355408, at *6 & n. 1 (E.D. Pa. Dec.13, 2007).  *See also Nolfi v. Ohio Ky. Oil Corp.*, 562 F. Supp. 2d 904, 910 (E.D. Ohio 2008) ("underlying rationale [of *Tellabs* ] is applicable to the summary judgment setting").

with respect to scienter); *compare Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 05 Civ. 9016, 2007 WL 528703 (S.D.N.Y. Feb. 20, 2007) (denying fund administrator's motion to dismiss with respect to scienter), *with Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009) (granting fund administrator's motion for summary judgment with respect to scienter).[22]

In *Pension Committee*, a case involving a hedge fund that was fraudulently marking its portfolio, Judge Scheindlin initially denied the motion to dismiss of the hedge fund administrator (the Citco Defendants) finding that the complaint "state[d] with particularity facts giving rise to a strong inference that [the Citco Defendants] acted recklessly by ignoring red flags of fraud, by failing to follow their own stated policies of independently reviewing valuations, and by failing to timely inform investors or authorities that they believed the Fund to be grossly (and illegally) overvalued."  2007 WL 528703, at *5.  Stating that "on a motion to dismiss the Court must accept all of the factual allegations in the Complaint as true and draw every inference in plaintiffs' favor," the Court concluded that, "in conjunction with the emails and memoranda quoted in the [complaint], defendants' alleged disregard for the red flags - notably, the holdings that miraculously skyrocketed from being worth pennies to tens of millions - support inferences of knowledge and recklessness attributable to [the Citco Defendants]."  *Id*. at *5 n.66.

Approximately two years later, however, after the completion of extensive discovery, the Court, upon reviewing the actual evidence submitted by plaintiffs in opposition to a motion for summary judgment with respect to scienter, reached the opposite conclusion, finding that the

---

[22]    *See also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (finding that "the district court correctly granted summary judgment dismissing [the Section 10(b)] claim because [plaintiff] [] failed to provide sufficient evidence that would enable a jury to conclude that [defendant] had the scienter required for such a claim"); *In re Northern Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 465 (S.D.N.Y. 2000) (granting motion for summary judgment on scienter, finding that plaintiffs had "not shown that any of the [] statements were made recklessly").

documents and testimony were "insufficient to establish that the Citco Defendants were reckless" and granted summary judgment for the fund administrator with respect to certain of the securities fraud claims.  Notably, the Court found that the fund administrator's failure to comply with its "duty to verify the value of the securities in the portfolio…in the absence of further evidence of deceit -- would at most amount to negligence, not recklessness."  592 F. Supp. 2d 627.[23]

      3.      The Standard for "Recklessness" Under Section 10(b)

The Court of Appeals for the Second Circuit recently reiterated that, to satisfy Section 10(b)'s scienter requirement, a plaintiff must "demonstrate[] . . . recklessness of a sufficient degree to create an inference of intent."  *Stephenson v. PricewaterhouseCoopers, LLP*, No. 11-1204-cv, 2012 WL 1764191, at *3 (2d Cir. May 18, 2012).  Put another way, what is required is "conscious recklessness . . . a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*."  *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original).

Conduct satisfies such a heightened degree of recklessness only if it is "at the least, ... highly unreasonable and [] represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' "  *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir. 1978)).  *See also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  It is an "*egregious* refusal to see the

---

[23]      Similarly, in *Winstar*, even though the Court had previously held that the allegations of the complaint raised a strong inference of the defendant's scienter, Judge Daniels granted summary judgment for auditing firm, Grant Thornton, finding that "[t]he voluminous and extensive evidentiary record neither disclose[d] facts constituting strong circumstantial evidence of GT's conscious misbehavior or recklessness, nor does it present any material disputed facts relating to GT's scienter."  "In the absence of evidence that would support an inference that GT acted with the requisite scienter," the Court granted summary judgment for the defendant.  2010 WL 3910322, at *5 (citing *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984)).  The same result is warranted here.

*obvious*, or to investigate the doubtful, [that] may in some cases give rise to an inference of ... recklessness." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Chill*, 101 F.3d at 269) (emphasis added).

B.    Plaintiffs Cannot Demonstrate That Thain's Alleged Failure to Correct the Proxy
      Constituted an "Extreme Departure From the Standards of Ordinary Care"

Summary judgment for Thain with respect to Plaintiffs' Section 10(b) claim (Count II) should be granted.  Despite extensive discovery, Plaintiffs cannot come forward with actual evidence sufficient to raise a genuine issue of material fact as to whether they could, at trial, meet their burden of demonstrating that it was "more likely than not" that Thain's conduct constituted an "extreme departure from the standards of ordinary care" to constitute actionable recklessness under the federal securities laws.  Indeed, there is absolutely no evidence whatsoever that Thain played any role in any determination to omit the Disclosure Schedule from the Proxy and no evidence that he was aware of the possibility that the Proxy could arguably be read inaccurately to imply that the Bonuses were "contingent."[24]

To the contrary, it is undisputed that Thain knew that responsibility for the drafting of the Proxy had been delegated to the parties' eminent outside counsel, Wachtell and Shearman, as well as in-house counsel, that the lawyers were aware of the terms of the Disclosure Schedule and Bonus Cap Agreement, and that these sophisticated securities lawyers had, by allowing the

---

[24]    The same undisputed facts that belie scienter also preclude any finding that Thain acted negligently in connection with the issuance of the Proxy and thus require summary judgment for Thain with respect to Plaintiffs' claim pursuant to Section 14(a) of the Exchange Act (Count V).  *See* Lewis Memo. at Point II (citing, *inter alia*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005), and *S.E.C. v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011)).

Proxy to be filed, concluded that it complied with the federal securities laws.[25]

Moreover, it would not have been "obvious" to even a very careful reader of the Proxy that it could be construed to have been misleading with respect to the Bonuses.  As an initial matter, the Proxy was entirely accurate given that Section 5.2 expressly stated that the Negative Covenant was subject to exceptions "set forth in [] Section 5.2 of the Company Disclosure Schedule."

Furthermore, Section 5.1 expressly required that Merrill "conduct its business in the ordinary course in all material respects" and "use reasonable best efforts to maintain and preserve intact its business organization . . . and retain the services of its key officers and key employees. . . [.]"  In light of this explicit language, it could not have been an "extreme departure from the standards of ordinary care" for Thain, a Wall Street veteran cognizant of the essential role year-end bonuses play in financial firm compensation, to have concluded that the Bonuses qualified as "ordinary course," and as part of Merrill's best efforts to retain its key employees.  Such a conclusion is buttressed by the fact that even Plaintiffs have been unable to identify any evidence that any of their personnel read the Proxy and Merger Agreement and interpreted it to mean that Merrill would not pay bonuses.[26]

---

[25]    Thain is not invoking the affirmative defense of reliance on counsel.  Rather, the burden is on Plaintiffs to prove that Thain acted with scienter.  The evidence shows, however, that the drafting of the Proxy was delegated by BofA and Merrill management to counsel, including Wachtell and Shearman, and that Thain thus understood the task of drafting the Proxy to be in the hands of highly trained professionals.  As the court explained in *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004), the involvement of counsel "need not be a formal defense" but rather can constitute a "green flag" to a senior executive who is aware that counsel were consulted but did not directly obtain advice.  *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004).

[26]    *See* Teacher Retirement System Of Texas' Verified Answers And Objections To Bank Of America Corporation's First Set Of Interrogatories dated September 6, 2011 at Response No. 13 (Ex. 47); Fjarde AP-Fonden's Answers And Objections To Bank Of America Corporation's First Set Of Interrogatories dated September 6, 2011 at Response No. 13 (Ex. 48); Grant Mitchell's Answers And Objections To Bank Of America Corporation's First Set Of Interrogatories dated September 6, 2011 at Response No. 13 (Ex. 49); Ohio Public Employees Retirement System's Amended Verified Answers And Objections To Bank Of America Corporation's First Set Of Interrogatories    [con't . . .]

We respectfully submit that, in light of such circumstances, summary judgment for Thain on Count II is warranted. Given the total dearth of any evidence of Thain's bad faith, his awareness of the delegation to experienced counsel of the drafting responsibilities for the Proxy, and the applicability of Section 5.2's exceptions, Plaintiffs simply cannot demonstrate by a preponderance of the evidence that Thain's alleged failure to recognize that the Proxy was "arguably misleading" in portraying the Bonuses as "contingent" constituted an "extreme departure from the standards of ordinary care ... to the extent that the danger was either known to [him] or so obvious that [he] must have been aware of it." In fact, until December 8, 2008, when, after substantial consultation between Merrill and BofA, the Bonuses were approved by Merrill's Board of Directors, the Bonuses remained "contingent."[27] Given the totality of these circumstances, an innocent explanation for the presence of any arguably confusing language in the Proxy is plainly a more "compelling" inference than an inference of Thain's scienter. *Tellabs*, 551 U.S. at 324.

In determining, in its 2010 Opinion, that Plaintiffs' initial Complaint had, at the pleading stage, raised a strong inference of Thain's scienter with respect to the "arguably misleading" implication in the Proxy as to Bonuses, the Court focused almost exclusively on the allegations that Thain had, after the fact, described the "bonus arrangement . . . as being one of the three

---

dated September 15, 2011 at Response No. 13 (Ex. 50); State Teachers Retirement System Of Ohio's Verified Answers And Objections To Bank Of America Corporation's First Set Of Interrogatories dated September 6, 2011 at Response No. 13 (Ex. 51); Answers And Objections Of Stichting Pensioenfonds Zorg En Welzijn, Represented By PGGM Vermogensbeheer B.V. To Bank Of America Corporation's First Set Of Interrogatories dated September 6, 2011 at Response No. 13 (Ex. 52); *see also* Transcript of the Deposition of Agneta Wilhelmson Karemar, sworn on September 27, 2011 at 113:13-23 (Ex. 53).

[27]    Minutes of the December 8, 2008 Meeting of the MDCC at 10-11 (Ex.40); Transcript of the Deposition of John Finnegan sworn on February 28, 2012 at 203:15-18 (Ex. 54); Transcript of the Deposition of Peter Kraus at 187:18-188:9 (Ex. 55). That Schedule 5.2 gave Merrill the contractual right to award Bonuses up to the amount of the Bonus Cap did not make the payment of Bonuses up to the amount of the Bonus Cap (or any lesser amount) non-contingent.

18

'main things' that were considered in the negotiation" and had acknowledged his "involvement in and awareness of the bonus arrangement."  2010 Opinion at 322.  In revisiting this analysis on a motion for summary judgment, however, Plaintiffs can no longer rely on mere allegations but must be able to adduce evidence sufficient for a factfinder reasonably to determine by a preponderance of the evidence that Thain's conduct was an extreme departure from the standards of ordinary care.  Thus, at this stage, with discovery complete, the mere fact that Thain was aware of the Bonus Cap Agreement cannot, standing alone, support a strong inference of scienter.  Something more is clearly required in order to elevate Thain's failure to rewrite a complex legal document into a badge of fraud.

Indeed, as the Court stated in *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989), the argument that "actual knowledge of the facts withheld amply establishes the necessary degree of scienter ... misconstrues the relevant inquiry:  The question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing.'"  *Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)).  *See also In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1245 (E.D.N.Y. 1997) ("[Plaintiffs] contend that any time there is an inconsistency between a company's public statement and information in its internal documents, then a jury may properly find scienter. . . This is simply wrong, and ignores the Second Circuit standard . . ."); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022-25 (9th Cir. 2005) ("knowledge" as basis for scienter requires awareness by defendant not just of underlying facts, but of the "false or misleading" nature of the statement in question); *Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 843-44 (D. Ariz. 2007) (drawing

distinction between knowledge of particular facts, and "knowledge" that a party's failure to disclose those facts would have a misleading effect). [28]

Here, there is no evidence that Thain was aware that the disclosure regarding the Negative Covenant might mislead BAC shareholders.  To the contrary, Section 5.2 explicitly provided an exception for items set forth in the Disclosure Schedule, Thain knew that Merrill had publicly disclosed its accrual of substantial compensation expenses wholly consistent with the Bonuses ultimately approved by Merrill's Board[29] and Thain was aware that the Merger Agreement (a) allowed Merrill to conduct its business in the "ordinary course" and (b) compelled him to use his reasonable best efforts to retain Merrill's key employees.  Moreover, Thain's scienter is belied by the fact that he knew responsibility for the drafting of the Merger Agreement and the Proxy had been delegated to external and internal counsel and that the lawyers were aware of the Bonus Cap Agreement.  All of these undisputed facts demonstrate that Plaintiffs

---

[28]    In the section of the 2010 Opinion addressing the sufficiency of the initial Complaint's scienter allegations with respect to Thain, the Court noted that "[t]he Second Circuit has also held that 'defendants' asserted actions contrary to expressed policy can form the basis for proof of recklessness.'"  757 F. Supp. 2d at 323.  This statement presumably refers to the allegation that, by providing for payment of Bonuses prior to the closing of the Transaction, BAC and Merrill had agreed to "depart[] from [Merrill's] prior year's practice of paying bonuses in January." *Id.* at 323.  *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 76 (2d Cir. 2001), which was cited by the Court for this proposition, involved a company's failure to take an accounting charge notwithstanding its recent adoption of a related accounting standard.  Similarly, *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000), involved a "reckless failure to follow an announced policy of expensing royalty advances," and *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), the adoption of inventory management practices that violated the company's own publicly stated markdown policy.  In all three cases, the failure to follow an announced accounting policy buttressed a finding of recklessness with respect to an alleged fraudulent inflation of financial results because a divergence from policy supported an inference that the defendant knew that the relevant disclosure was false.  In the case at bar, however, while Thain acknowledges that he was aware of the VICP Agreement, there is no evidence that the arguably misleading statement in the Proxy was apparent to him.  Accordingly, given that the Court has already held that Thain cannot be liable for Merrill not disclosing that Bonuses would be paid prior to Closing (which, in any event, was at most a change from past practice, not a departure from an accounting or other "policy"), the timing of the payment of the Bonuses has no relevance to Thain's scienter.

[29]    Thain understood that analysts covering Merrill were able to use the disclosed compensation accruals to estimate the amount of bonuses that were likely to be paid.  Thain Dep. at 96:8-97:18 (Ex. 2).

cannot prove by a preponderance of the evidence that the misstatement was "so obvious that any reasonable man would be legally bound as knowing." *Schlifke,* 866 F.2d at 946 (quoting *Sundstrand,* 553 F.2d at 1045).

*In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010), is particularly instructive here.  In *REMEC*, the court granted summary judgment on a Section 10(b) claim in light of the plaintiff's failure to offer "*concrete evidence* [of the defendant's scienter] from which a jury might return a verdict in his favor." *Id.* at 1250 (emphasis added). Central to the court's conclusion was the "the level of transparency" that existed between the company and its auditors, who had "full access to conduct a thorough, professional, and independent audit." *Id.* at 1246.  Similarly, here, it was Shearman and Wachtell (as well as numerous Merrill and BAC in-house lawyers) that had full transparency with respect to the terms of the Merger Agreement, including the Disclosure Schedule, and yet concluded that the Proxy was accurate in all material respects.  That Thain did not recognize the possibility that the disclosure regarding the Negative Covenant might, in the absence of an annexed Disclosure Schedule, be arguably construed as misleading is hardly evidence of scienter where, as here, experienced corporate counsel likewise did not see any issue.

In sum, the only issue here is whether Plaintiffs can come forward with sufficient evidence to be able to demonstrate by a preponderance of the evidence that Thain's limited role with respect to the affirmative language in a complex legal document constituted an "extreme departure from the standards of ordinary care."  We respectfully submit that, given, *inter alia*, the delegation of the Proxy drafting to counsel and the total lack of any evidence of Thain's awareness of any concerns about the Proxy disclosure, they cannot.  Summary judgment for Thain with respect to Count II is therefore well warranted.  *Steed Fin.*, 148 F. App'x at 69.

## POINT II

## PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION
## WITH RESPECT TO THE SECTION 10(b) CLAIM AGAINST THAIN

Plaintiffs bear the burden of proving loss causation to sustain their claim against Thain under Section 10(b) of the Exchange Act.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (Section 10(b) plaintiff must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss").  As detailed below, Plaintiffs are unable to identify any stock drop attributable to a corrective disclosure of the Proxy's arguably misleading implication that the Bonuses were merely "contingent."  Hence, summary judgment for Thain on Count II is warranted on this basis as well.

Plaintiffs contend that an article in the *Financial Times* published after the close of trading on January 21, 2009 (the "*FT* Article") constituted the one and only corrective disclosure with respect to alleged misrepresentations and omissions in the Proxy relating to the Bonuses. Notably, however, Plaintiffs' expert witness, Chad Coffman, does not contend that the *FT* Article was a corrective disclosure with respect to the mere fact that Merrill had, prior thereto, actually paid out Bonuses to its employees.  Rather, Mr. Coffman offers the far narrower opinion that the *FT* Article was the first public disclosure that (a) Merrill paid Bonuses in December 2008, (b) in an amount totaling between $3 and $4 billion, and (c) despite incurring large losses in the fourth quarter.  Expert Report of Chad Coffman, CFA, dated March 16, 2012, ¶ 109 (Ex. 56); Expert Rebuttal Report of Chad Coffman, CFA, dated April 29, 2012, ¶ 70 (Ex. 57); Plaintiffs' Reply Memorandum Of Law In Support Of Their Motion For Class Certification And

Appointment Of Class Representatives And Class Counsel, dated November 11, 2011 at 14 (Doc. # 494).[30]

With respect to the Section 10(b) claim against Thain, however, Plaintiffs' concede that, by the time the *FT* Article was published, the market was already aware that Merrill had paid Bonuses.  That concession is fatal.[31]  Under the Court's 2010 Opinion, the only possible basis for imposing liability on Thain pursuant to Section 10(b) is the Proxy's arguably misleading implication that the Bonuses were "contingent."  Accordingly, if, by January 22, 2008, the market was already aware that the Bonuses had been paid and were therefore no longer "contingent," the *FT* Article was not a corrective disclosure with respect to the Section 10(b) claim against Thain.

Absent any stock drop attributable to an initial disclosure that the Bonuses had in fact been paid and were no longer merely "contingent," Plaintiffs cannot, as a matter of law, demonstrate that they suffered any damages attributable to the section 10(b) claim against Thain.  Summary judgment for Thain on Count II is therefore warranted on this basis as well.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009).

---

[30]     As detailed in the BofA Memorandum (at Point II.B.), the *FT* Article was not in fact a corrective disclosure with respect to any of these items.

[31]     Even putting aside Plaintiffs' concession, it is indisputable that the media had already reported that Merrill had paid Bonuses *before* January 21, 2009.  *See* articles cited at fn. 19 *supra.*

## POINT III

## SUMMARY JUDGMENT FOR THAIN ON THE
## SECTION 20(a) CLAIMS SHOULD BE GRANTED

Counts IV and VI of the Complaint allege respectively that, pursuant to Section 20(a) of the Exchange Act, Thain is liable as a control person for Merrill's alleged violations of Section 10(b) and 14(a).  A plaintiff bringing a Section 20(a) claim must demonstrate: (*i*) a primary violation by the controlled person; (*ii*) control of the primary violator by the defendant; and (*iii*) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (citing *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  Even if a plaintiff adequately pleads § 20(a) liability, the defendant may demonstrate that he acted in good faith, and that he "did not directly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t(a);  *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996).

As detailed in Point I *supra*, however, Plaintiffs cannot prove by a preponderance of the evidence that Thain acted with scienter or that he acted negligently in connection with the disclosures regarding the Bonuses in the Proxy.  Nor, given the undisputed facts detailed in the Lewis Memorandum, did Thain fail to act with the required duty of care in connection with the disclosure of Merrill's forecasted fourth-quarter losses.  Summary judgment for Thain with respect to Counts IV and IV is therefore warranted.

## CONCLUSION

For all of the foregoing reasons, as well as the reasons set forth in BofA's Memorandum and the Lewis Memorandum, Defendant John A. Thain respectfully requests that summary judgment be entered in his favor as to all claims.

Dated:  June 3, 2012
        New York, New York

DECHERT LLP


By:/s/ David S. Hoffner
    Andrew J. Levander
    andrew.levander@dechert.com
    David S. Hoffner
    david.hoffner@dechert.com
    1095 Avenue of the Americas
    New York, New York  10036-6797
    (212) 698-3500
    *Attorneys for Defendant John A. Thain*