**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                  :
                                                                  :
IN RE BANK OF AMERICA CORP.                                       :    Master File No. 09 MD 2058 (PKC)
SECURITIES, DERIVATIVE, AND                                       :
EMPLOYEE RETIREMENT INCOME                                        :    ECF CASE
SECURITY ACT (ERISA) LITIGATION                                   :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                  :
THIS DOCUMENT RELATES TO:                                         :
                                                                  :
The Consolidated Securities Action                                :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**PLAINTIFFS' OMNIBUS OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  Preliminary Statement ..................................................................................... 1

II.  Summary Judgment Standards ....................................................................... 8

III.  The Bank Is Not Entitled To Summary Judgment ........................................ 10

    A.  Plaintiffs May Seek Section 14(a) Damages Based On The Decline In BoA's Stock Price Following Corrective Disclosures ..................................... 10

        1.  Defendants' Arguments That Plaintiffs May Not Seek Damages Because They Did Not Exchange Their Shares Contradict The Court's Prior Decisions And Well-Settled Authority ................................. 10

        2.  The Record Unequivocally Establishes That BoA's Stock Price Decline Does Not Reflect Harm To The Bank ........................................... 15

        3.  Plaintiffs Seek Section 14(a) Damages Based On Their Impaired Voting Rights, Not A "Windfall" Based On A Hypothetical Lost Opportunity To Sell Their Shares ..................................................... 17

        4.  Defendants' Arguments That Plaintiffs Have Failed To Connect Their Claimed Damages To The Impairment Of Their Voting Rights Also Contradict The Court's Prior Decisions ...................................... 18

        5.  There Is No Risk Of Double Recovery Between The Direct And Derivative Section 14(a) Claims ....................................................... 21

    B.  Defendants' Loss Causation Arguments Fail ....................................... 23

        1.  Defendants Fail To Show As A Matter Of Law That The January 11 Citigroup Report Was Not Corrective ............................................. 26

        2.  Defendants Fail To Show As A Matter Of Law That The Disclosures On January 13, 2009 Were Not Corrective ............................................. 31

        3.  Plaintiffs May Recover Section 14(a) Damages For Stock Price Declines Caused By The Disclosure Of Merrill's Fourth Quarter Losses ..................... 38

        4.  Defendants Again Fail To Establish That The January 21, 2009 *Financial Times* Article Contained No "New News" ..................................... 40

        5.  Defendants' Securities Act Arguments Also Fail ............................................. 51

IV.  Defendant Lewis Is Not Entitled To Summary Judgment ................................. 51

    A.  Legal Standards For Plaintiffs' Exchange Act Claims ......................... 52

        1.  The Element Of Negligence Under Section 14(a) ........................... 52

        2.  The Fact-Intensive Element Of Scienter Under Section 10(b) ...................... 54

B.      There Is A Genuine Factual Dispute As To Whether Lewis Acted Negligently And Recklessly In Failing To Disclose Merrill's Staggering Fourth Quarter Losses ................................................................................................. 55

      1.  Defendant Lewis's Affirmative Misstatements About The Accretive/Dilutive Impact Of The Merger Defeat Any Good Faith Defense ................................ 55

      2.  Defendant Lewis Knew Of Merrill's Massive Losses And Their Impact On Merrill ................................................................................................. 57

      3.  BoA Violated Its Own Internal Procedures For Ensuring The Accuracy Of Its SEC Filings, Including The Proxy ........................................ 60

C.      Defendant Lewis's Disguised Advice-Of-Counsel Affirmative Defense Does Not Absolve Him Of Responsibility For His Misstatements And Omissions Concerning Merrill's Losses ........................................................ 61

D.      There Is A Genuine Factual Dispute As To Whether Lewis Acted Negligently And Recklessly In Failing To Disclose The Secret Bonus Agreement ............... 65

E.      Defendant Lewis Is Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims ............................................................................ 68

F.      Defendant Lewis Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims ......................................................................... 69

V.      Defendants Price And Cotty Are Not Entitled To Summary Judgment .......................... 71

A.      Defendants Price And Cotty Are Not Entitled To Summary Judgment On Plaintiffs' Section 14(a) Claims .............................................................. 71

B.      Defendant Price Is Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims ............................................................................ 79

C.      Defendant Price Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims ......................................................................... 81

VI.    Defendant Thain Is Not Entitled To Summary Judgment ................................................. 83

A.      Defendant Thain Is Not Entitled To Summary Judgment On Plaintiffs' Section 10(b) Claims .......................................................................... 84

      1.  Defendant Thain Misstates The Law Governing The Scienter Inquiry At Summary Judgment ......................................................................... 84

      2.  There Is A Genuine Factual Dispute As To Whether Thain Acted Recklessly In Making Misrepresentations Concerning The Bonus Agreement ................ 85

      3.  Defendant Thain's Post-Hoc Rationalizations For His Recklessness Raise Genuine Issues Of Fact ...................................................................... 88

            4. Defendant Thain's "Unique" Challenge To Loss Causation Fails .................. 90

    B.      Defendant Thain Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims ........................................................................................... 91

VII.    The Director Defendants Are Not Entitled To Summary Judgment ................................. 92

    A.      The Director Defendants Are Not Entitled To Summary Judgment On Plaintiffs' Section 14(a) Claims.................................................................................. 92

            1. There Is A Genuine Factual Dispute As To Whether The Director Defendants Acted Negligently In Failing To Disclose Merrill's Losses ........................... 92

            2. There Is A Genuine Factual Dispute As To Whether The Director Defendants Acted Negligently In Failing To Disclose The Bonus Agreement .................. 96

    B.      The Director Defendants Are Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims ................................................................................. 99

    C.      The Director Defendants Are Also Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims ................................................................. 100

VIII.    Conclusion ..................................................................................................................... 101

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. High-Income Trust v. AlliedSignal,*
   329 F. Supp. 2d 534 (S.D.N.Y. 2004) ........................................................................83

*Amorosa v. AOL Time Warner Inc.,*
   409 F. App'x 412 (2d Cir. 2011) ......................................................................12, 38

*Beck v. Dobrowski,*
   559 F.3d 680 (7th Cir. 2009) ..........................................................................52, 53

*Berman v. Thomson,*
   403 F. Supp. 695 (N.D. Ill. 1975) ............................................................................98

*Bricklayers & Trowel Trades Int'l Pension Fund,*
   2012 WL 118486 (D. Mass. Jan 13, 2012) ............................................................36

*Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg,*
   929 F. Supp. 105 (S.D.N.Y. 1996) ..................................................................72, 75

*Costello v. Grundon,*
   651 F.3d 614 (7th Cir. 2011) ....................................................................................85

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ..................................................................................................37

*DeMaria v. Andersen,*
   153 F. Supp. 2d 300 (S.D.N.Y. 2001) ....................................................................83

*Dolin v. Contemporary Fin. Solutions, Inc.,*
   2009 WL 4730465 (D. Colo. Dec. 8, 2009) ..........................................................37

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) ..........................................................................................26, 34

*Easton Capital Partners, L.P. v. Rush,*
   2011 WL 3809927 (S.D.N.Y. Aug. 26, 2011) ......................................................25

*Edge Partners, L.P. v. Dockser,*
   944 F. Supp. 438 (D. Md. 1996) ..............................................................................13

*Ellison v. Am. Image Motor Co.,*
   36 F. Supp. 2d 628 (S.D.N.Y. 1999) ......................................................................83

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.,*
   343 F.3d 189 (2d Cir. 2003) ....................................................................................24

*EP Medsystems, Inc. v. EchoCath, Inc.*,
   235 F.3d 865 (3d Cir. 2000)...........................................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) ..................................................................................23

*Escott v. BarChris Const. Corp.*,
   283 F. Supp. 643 (S.D.N.Y. 1968).................................................................100

*Feit v. Leasco Data Processing Equip. Corp.*,
   332 F. Supp. 544 (E.D.N.Y. 1971) ................................................................100

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
   391 U.S. 253 (1968)..........................................................................................9

*Freeland v. Iridium World Comm., Ltd.*,
   545 F. Supp. 2d 59 (D.D.C. 2008) ..................................................................44

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................25, 26

*Goldkrantz v. Griffin*,
   1999 WL 191540 (S.D.N.Y. Apr. 6, 1999).......................................................12

*Gould v. Am. Hawaiian S.S. Co.*,
   351 F. Supp. 853 (D. Del. 1972)........................................................97, 98, 100

*Halebian v. Berv*,
   590 F.3d 195 (2d Cir. 2009).......................................................................11, 12

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
   116 F.3d 28 (2d Cir. 1997)...............................................................................93

*Howard v. SEC*,
   376 F.3d 1136 (D.D.C. 2004) .....................................................................62, 63

*Humane Soc'y of U.S. v. HVFG, LLC*,
   2010 WL 1837785 (S.D.N.Y. May 6, 2010) ....................................................82

*Ideal Steel Supply Corp. v. Anza*,
   652 F.3d 310 (2d Cir. 2011)..........................................................................9, 84

*In the Matter of Joslyn, et al.*,
   2004 WL 2387455 (Oct. 26, 2004)..................................................................72

*In re Adams Golf, Inc. Sec. Litig.*,
   618 F. Supp. 2d 343 (D. Del. 2009).................................................................68

*In re AOL Time Warner Sec. & ERISA Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................................73

*In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010) ......................................................... *passim*

*In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*,
   2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...................................................54, 59

*In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*,
   -- F.R.D. --, 2012 WL 370278 (S.D.N.Y. Feb. 6, 2012) .................................. *passim*

*In re Bristol-Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) .................................................................25

*In re Bristol-Myers Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) .....................................................26, 39

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ...................................................................24, 36, 51

*In re JWP Inc. Sec. Litig.*,
   928 F. Supp. 1239 (S.D.N.Y. 1996) ...................................................................101

*In re Lehman Bros. Sec. & ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...........................................................24, 39, 80

*In re Livent, Inc. Noteholders Sec. Litig.*,
   355 F. Supp. 2d 722 (S.D.N.Y. 2005) ...........................................................68, 98

*In re Loewen Grp. Inc. Sec. Litig.*,
   395 F. Supp. 2d 211 (E.D. Pa. 2005) .................................................................25

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) ...........................................................................37

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal 2000) .....................................................12, 13, 74

*In re Merck & Co. Sec. Litig.*,
   432 F. 3d 261 (3d Cir. 2005) ...........................................................................28, 50

*In re MetLife Demutualization Litig.*,
   262 F.R.D. 217 (E.D.N.Y. 2009) .......................................................................37

*In re Novatel Wireless Sec. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011) ............................................................25, 85

vi

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ............25, 26, 27, 47

*In re Real Estate Assoc. Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1142 (C.D. Cal. 2002) .................................................................12

*In re Refco Inc. Sec. Litig.*,
    2011 U.S. Dist. LEXIS 33554 (S.D.N.Y. Mar. 28, 2011) ......................................54

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d (S.D.N.Y. 2007).............................................................................70

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010).............................................................63, 89

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).............................................................................57, 61, 66

*In re SLM Corp. Sec. Litig.*,
    2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ...........................................................44

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010).....................................................................25

*In re Tommy Hilfiger, Sec. Litig.*,
    2007 WL 5581705 (S.D.N.Y. Jul. 20, 2007) ..........................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) .....................................................................26

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009).................................................................24, 47

*In re Wells Real Estate Inv. Trust, Inc. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 143057 (N.D. Ga. Aug. 2, 2010) ......................................53

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009) ...............................................................................37

*In re Winstar Commc'ns.*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).......................................................25, 87

*In re Winstar Commc'ns Sec. Litig.*,
    2010 WL 3910322 (S.D.N.Y. Sept. 29, 2010).........................................................87

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ................................................ *passim*

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)..............................................................69, 99

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................9, 54

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964)..............................................................11, 20

*J.P. Morgan Chase & Corp. S'holder Litig.*,
   906 A.2d 766 (Del. 2006) ..............................................................18, 19

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir. 1999)..............................................................13

*Krauth v. Executive Telecard, Inc.*,
   870 F. Supp. 543 (S.D.N.Y. 1994)..............................................................72

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2d Cir. 1987)..............................................................42, 50

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................25

*Lentell v. Merrill Lynch*,
   396 F.3d 161 (2d Cir. 2005)..............................................................24, 26, 35

*Levine v. Seilon, Inc.*,
   439 F.2d 328 (2d Cir. 1971)..............................................................17

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011)..............................................................68

*Long Island Lighting Co. v. Barbash*,
   779 F.2d 793 (2d Cir. 1985)............................................................ *passim*

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..............................................................26

*Manzo v. Rite Aid Corp.*,
   2002 WL 31926606 (Del. Ch. Dec. 19, 2002)..............................................................14

*Markowski v. SEC*,
   34 F.3d 99 (2d Cir. 1994) ..............................................................61, 62, 89

*McClellan v. Smith*,
   439 F.3d 137 (2d Cir. 2006)..............................................................9, 14

*McKenna v. Smart Techs.*,
  2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)............................................................70, 83

*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*,
  2005 WL 1541062 (D.N.J. June 30, 2005) ..................................................................51

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970)......................................................................11, 12, 13, 20

*Montoya v. Mamma.com Inc.*,
  2005 WL 1278097 (S.D.N.Y. May 31, 2005) ......................................................25

*Morales v. Quintel Entertainment, Inc.*,
  249 F.3d 115 (2d Cir. 2001)..........................................................................9

*New Jersey and Its Div. of Inv. v. Sprint Corp.*,
  314 F. Supp. 2d 1119 (D. Kan. 2004) .............................................................12

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................. *passim*

*Owens v. Gaffken & Barringer Fund, LLC*,
  2011 WL 1795310 (S.D.N.Y. May 5, 2011) ............................................54, 55, 56

*Pa. Ave. Funds v. Inyx Inc.*,
  2011 WL 1795931 (S.D.N.Y. May 5, 2011) ......................................................69

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  592 F. Supp. 2d 608 (S.D.N.Y. 2009)..............................................................87

*Phaneuf v. Fraikin*,
  448 F.3d 591 (2d Cir. 2006)..........................................................................9

*Press v. Chemical Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999).....................................................................54, 84

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
  207 F. Supp. 2d 292 (S.D.N.Y. 2002).............................................................57

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)..........................................................................61

*SEC v. Enterprises Solutions, Inc.*,
  142 F. Supp. 2d 561 (S.D.N.Y. 2001).......................................................61, 63, 65, 88

*Sargent v. Genesco, Inc.*,
  492 F.2d 750 (5th Cir. 1974) .......................................................................72

*SEC v. Bank of Am. Corp.*,
    2009 WL 2842940 (S.D.N.Y. Aug. 25, 2009) ........................................................88

*SEC v. Bank of Am. Corp.*,
    677 F. Supp. 2d 717 (S.D.N.Y. 2010) ................................................................42

*SEC v. Battenberg*,
    2011 WL 3472619 (E.D. Mich. Aug. 9, 2011) ..........................................................56

*SEC v. Czarnik*,
    2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ..........................................................59

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ..........................................................................54

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) ..............................................................62, 63, 65

*SEC v. McNulty*,
    137 F.3d 732 (2d Cir. 1998) ..........................................................................59

*SEC v. Mut. Benefits Corp.*,
    2004 U.S. Dist. LEXIS 23008 (S.D. Fla. Nov. 10, 2004) ........................................56

*SEC v. Nat'l Sec., Inc.*,
    393 U.S. 453 (1969) ..................................................................................13

*SEC v. Okin*,
    132 F.2d 784 (2d Cir. 1943) ..........................................................................78

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ........................................................................85

*SEC v. Savoy Indus., Inc.*,
    665 F.2d 1310 (D.C. Cir. 1981) ......................................................................65

*SEC v. Scott*,
    565 F. Supp. 1513 (S.D.N.Y. 1983) ..............................................................61, 67

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ........................................................................96

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997) ..................................................................61

*Silverman v. Motorola*,
    259 F.R.D. 163 (N.D. Ill. 2009) ......................................................................34

*Silverman v. Motorola, Inc.*,
798 F. Supp. 2d 954 (N.D. Ill. 2011) ................................................................62

*Smith v. Waste Management, Inc.*,
407 F.3d 381 (5th Cir. 2005) ............................................................................14

*Stratte-McClure v. Morgan Stanley*,
784 F. Supp. 2d 373 (S.D.N.Y. 2011) ...............................................................37

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ................................................................................26

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ...........................................................................................20

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993) ................................................................42, 43, 50

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993) ..................................................................................37

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) .........................................................................................20

*Vivenzio v. City of Syracuse*,
611 F.3d 98 (2d Cir. 2010) .............................................................................8, 9

*Wilson v. Great Am. Indus., Inc.*,
855 F.2d 987 (2d Cir. 1988) .................................................................53, 92, 96

*Winiger v. SI Management L.P.*,
32 F. Supp. 2d 1144 (N.D. Cal. 1997) ..............................................................72

*Wortley v. Camplin*,
333 F.3d 284 (1st Cir. 2003) .............................................................................24

*Yamamoto v. Omiya*,
564 F.2d 1319 (9th Cir. 1977) ..........................................................................11

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
571 F.3d 206 (2d Cir. 2009) .............................................................................37

**STATUTES / RULES**

15 U.S.C. § 77k(B)(3)(A) ....................................................................................68, 99

15 U.S.C. § 78n(a)(1) ........................................................................................13, 71

15 U.S.C. § 77l(b) ...................................................................................................51

17 C.F.R. § 229.512 ..........................................................................................79, 80

17 C.F.R. § 230.430B ..............................................................................................80

17 C.F.R. § 240.14a-1(*l*)(iii) ....................................................................................72

17 C.F.R. § 240.14a-101 ...................................................................................72, 76

29 Fed. Reg. 341 (1964) ..........................................................................................72

70 Fed. Reg. 44722-01(2005) ............................................................................79, 80

Fed. R. Civ. P. 32(a) ................................................................................................93

Fed. R. Civ. P. 56(c) .................................................................................................8

Fed. R. Evid. 703 .....................................................................................................37

Fed. R. Evid. 801(c) .................................................................................................37

Fed. R. Evid. 801(d)(2)(D) ......................................................................................37

I.      **Preliminary Statement**

This case presents a paradigmatic violation of Section 14(a) of the Securities Exchange Act of 1934.  On December 5, 2008, the shareholders of Bank of America Corp. ("BoA" or the "Bank") voted to approve one of the most important events in the Bank's history – the acquisition of Merrill Lynch & Co., Inc. ("Merrill") for $50 billion (the "Merger"). Unbeknownst to BoA shareholders, however, the Merger that shareholders approved was far from the transaction described in the Joint Definitive Proxy Statement (the "Proxy").   In soliciting shareholder approval of the Merger, Defendants concealed the fact that Merrill had suffered devastating losses in the two months preceding the shareholder vote and that, as a result, BoA had been forced to take extraordinary actions that seriously damaged the financial prospects for the combined entity going forward.

Specifically, by the date of the shareholder vote, BoA's most senior officers knew that Merrill would report a loss for the fourth quarter of 2008 of more than $16 billion pre-tax. Pl. 56.1 ¶¶ 81-88.[1]  Defendants also knew that these staggering losses had decimated Merrill's capital base and liquidity position, which forced BoA to take drastic and unanticipated steps to keep Merrill afloat.  Pl. 56.1 ¶¶ 47-80.  Among other things, two days before the vote, BoA's CEO and Chairman, Ken Lewis, ordered Merrill's CEO, John Thain, to liquidate hundreds of billions of dollars of assets from Merrill's balance sheet – telling him to "push as hard as you can [to reduce the balance sheet] and only think about stopping when you think you've pushed too far and then . . . push some more."  Pl. 56.1 ¶ 61.  In addition, solely because of Merrill's losses, BoA was forced to issue $20 billion of debt in December 2008, including a "mammoth" $9

---

[1] Citations to "CS" refer to Plaintiffs' Counterstatement Of Facts.  Citations to "Pl. Response" refer to Plaintiffs' Omnibus Response Pursuant to Rule 56.1 To Defendants' Statements Of Undisputed Material Facts.  Citations to "Pl. 56.1" refer to the Statement Of Undisputed Facts Pursuant to Local Civil Rule 56.1 In Support Of Lead Plaintiffs' Motion For Partial Summary Judgment (ECF No. 595).  Citations to "Pl. Mem." refer to Lead Plaintiffs' Memorandum Of Law In Support Of Their Motion For Partial Summary Judgment (ECF No. 590).

billion offering that was conducted on December 1, 2008. Pl. 56.1 ¶¶ 75-80. As set forth in Plaintiffs' motion for partial summary judgment, these actions materially reduced Merrill's and the combined company's ability to generate income in future years. Pl. Mem. at 3-4. Thus, by the date of the shareholder vote, Merrill's crippling fourth quarter losses had dramatically altered the company's financial condition, and significantly changed Defendants' expectations for the Merger. Indeed, while the Proxy represented that the Merger would be "breakeven" or slightly accretive to BoA by 2010, Lewis himself testified under oath that BoA knew as of the vote that those statements were no longer true. Pl. 56.1 ¶¶ 94-98.

BoA shareholders voted on the Merger without being informed of any of these highly material facts. Defendants also failed to tell BoA shareholders before the vote that, as part of the Merger, the Company had secretly agreed to allow Merrill to pay bonuses to its employees of up to $5.8 billion on an accelerated basis prior to the close of the Merger, and without any consideration of Merrill's disastrous financial condition (the "Bonus Agreement"). CS ¶¶ 2-11. Thus, Merrill handed out $3.6 billion in "incentive" bonuses in late December 2008, notwithstanding the facts that: (i) Merrill had suffered fourth quarter losses that brought it to the brink of insolvency; (ii) BoA needed a $138 billion taxpayer bailout to close the Merger because of those losses; and (iii) the Proxy falsely represented to shareholders that Merrill employed a "pay for performance" policy pursuant to which bonuses were paid only after the year ended, in order to "provide an <u>integral link</u> between pay and performance and to fully align the interests of employees with those of shareholders." CS ¶¶ 183-84.[2]

BoA shareholders did not learn of these facts until almost two weeks after the Merger had closed. Between January 12 and January 21, 2009, a series of corrective disclosures belatedly

---

[2] All emphasis is added unless otherwise noted.

revealed: (i) Merrill's disastrous fourth quarter 2008 financial performance; (ii) that Merrill's dismal financial condition had forced BoA to seek the bailout from the federal government; and (iii) that BoA had permitted Merrill to pay $3.6 billion in year-end bonuses prior to the Merger closing, notwithstanding Merrill's catastrophic results.  CS ¶¶ 243-45, 252-59, 266-70, 276-81. BoA's stock price was pummeled when the market learned the truth about the Merger, causing extensive losses to Plaintiffs and other BoA shareholders.  *Id.*

Against this factual backdrop, each Defendant now seeks to avoid liability.  Tellingly, no Defendant challenges the record evidence that the Proxy was materially false and misleading. Instead, Defendants point the finger at each other (or their lawyers) for the material misrepresentations and omissions in the Proxy, and contend that, even if they violated Section 14(a), Plaintiffs cannot establish damages as a matter of law because they did not purchase or exchange their shares in connection with the Merger.  Defendants' arguments recycle legal and factual contentions that the Court has on numerous occasions already considered – and rejected – and they raise issues of fact that only the jury can decide.

For example, although BoA now concedes (after three years of arguing to the contrary) that Plaintiffs can state a direct Section 14(a) claim, it continues to assert that Plaintiffs cannot recover for the decline in the value of their shares because they did not exchange their stock in the Merger.  *See* BoA Mem. at 2-4, 8-22.  However, as the Court has repeatedly held, Section 14(a) does not require a shareholder to purchase or exchange his shares in order to recover damages, and courts have routinely recognized that the best measure of harm to a shareholder under Section 14(a) is the diminution of the value of their shares directly caused by the disclosure of the facts that were misstated or omitted.  *See In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 291-92 & n.3 (S.D.N.Y. 2010); *In re Bank of*

3

*America Corp. Sec., Deriv. & ERISA Litig.*, -- F.R.D. --, 2012 WL 370278, at *5-6 (S.D.N.Y. Feb. 6, 2012).

Defendants also argue that Plaintiffs have not established that all of BoA's stock price decline following the corrective disclosures represents harm to the shareholders, and that some unidentified portion of that decline may represent harm to BoA itself. *See* BoA Mem. at 2-3, 8-12, 20-21. While this argument misconstrues the Court's decisions in this case, as well as the relevant law, it also raises fact issues that cannot be resolved at this stage. BoA does not, and cannot, point to a single piece of evidence showing that BoA, as opposed to its shareholders, was harmed by the conduct at issue. To the contrary, Defendants have consistently asserted in this litigation that BoA was not harmed by the Merger, and their own experts have now affirmatively opined that the Merger was <u>at all times</u> "value-enhancing" to BoA. CS ¶¶ 301-08, 312. Accordingly, Defendants cannot credibly contend that BoA's stock price decline does not reflect shareholder harm – and, at minimum, the jury must weigh these contested facts.

Defendant Lewis, BoA's former CEO and Chairman, blames BoA's securities law violations on his former CFO, Defendant Joe Price, as well as BoA's internal and outside attorneys. *See* Lewis Mem. at 1-3, 14-22. According to Lewis, he cannot be found negligent or reckless as a matter of law because he delegated all disclosure decisions to his subordinates. *Id*. This is not the law, and the record belies Lewis's assertions. First, as set forth in Plaintiffs' motion for partial summary judgment, no lawyer could, or did, advise Lewis to make false and misleading statements concerning the accretive/dilutive impact of the Merger to BoA shareholders. Pl. Mem. at 21-22; CS ¶ 126. Second, Lewis was well aware of Merrill's massive losses and the impact they were having on Merrill, yet he never spoke with any attorney regarding his or BoA's disclosure obligations. CS ¶¶ 106-10, 144-48. Lewis also violated

4

BoA's own internal disclosure procedures.   CS ¶¶ 150-67.   BoA maintained a "Disclosure Committee" comprised of BoA's most senior officers, and headed by Lewis and Price, that was specifically responsible for ensuring the accuracy and integrity of BoA's public disclosures, including its "proxy statements."   CS ¶¶ 150-54.   Remarkably, the Disclosure Committee was never asked to review the Proxy, or to consider whether the losses (or the secret Bonus Agreement) should be disclosed.   CS ¶¶ 159-67.   In light of these facts, Lewis cannot credibly contend that he acted in "good faith" as a matter of law.

Moreover, Lewis's thinly disguised "reliance on counsel" defense rests on a fiction. Lewis took no steps to ensure that counsel was informed of the relevant facts.   CS ¶¶ 100-11, 134-48.   BoA's then-General Counsel, Timothy Mayopoulos, has testified that he was not informed before the vote of the true magnitude of Merrill's losses and their impact on Merrill, and that such information would have been significant to him.   CS ¶¶ 113-28.   Further, Defendant Price himself has directly contradicted Lewis's testimony about what Price supposedly told him.   While Lewis claims that Price told him on or about December 3, 2008, that BoA's outside counsel, Wachtell Lipton Rosen & Katz ("Wachtell"), had informed Price that no disclosure of Merrill's losses was required, Price testified that he did <u>not</u> tell Lewis he had spoken with Wachtell at that time – and the record is clear that no one at BoA <u>ever</u> spoke with Wachtell about the increasing losses between November 20 and December 12.   CS ¶¶ 128-38. Only a jury can decide whether Price or Lewis is telling the truth.

Defendants Price and Neil Cotty principally argue that they did not "solicit" proxies as a matter of law because they did not sign the Proxy.   Price Mem. at 5-8.   However, whether Price and Cotty "solicited" proxies is a question of fact for the jury.   Price and Cotty signed the Form S-4 Registration Statement concerning the Merger (the "Form S-4"), which specifically

incorporated the Proxy.  CS ¶¶ 41-50.  The Form S-4 was the document through which BoA registered the shares to effect the Merger, and was a necessary and integral step to accomplishing the transaction.  *Id*.  While Price argues that the Form S-4 supposedly contained an express disclaimer that it "was not a proxy solicitation," he conveniently excised the full quote from that purported disclaimer, which states that the Form S-4 is not a solicitation <u>only</u> in any jurisdiction where "it is unlawful to make any such offer or solicitation."  CS ¶¶ 44-45, 47-50.  Price does not identify a single jurisdiction where it was "unlawful" to solicit proxies through the Form S-4 and, further illustrating the falsity of his argument, the exact boilerplate "disclaimer" appeared in the Proxy itself.  *Id*.  While Price made numerous other statements concerning the Merger that qualify as "solicitations," these facts raise an issue of fact with respect to whether Price "solicited" proxies within the meaning of Section 14(a).

Thain moves for summary judgment with respect to Plaintiffs' Section 10(b) claims regarding the secret Bonus Agreement, arguing that he did not possess scienter as a matter of law because, among other things, he relied upon BoA and its lawyers to draft the Proxy.  *See* Thain Mem. at 1-2, 16-21.  This argument ignores an abundance of facts supporting a finding that he acted, at a minimum, recklessly.  For example, Thain admitted in his sworn testimony that the Bonus Agreement was a key term of the Merger which he played a role in negotiating, but that he did not read the full Proxy before signing it, never looked to see if the Bonus Agreement was disclosed, and did not seek legal advice from any attorney concerning whether it had to be disclosed.  CS ¶¶ 4, 18, 29-38, 55.  Indeed, Thain testified that he believed the Bonus Agreement had been disclosed, and that he was surprised when he first learned, <u>after</u> the Merger closed, that it had not been.  CS ¶ 29.  Such facts are sufficient for a jury to find that Thain acted with at least recklessness.

The Director Defendants contend that Plaintiffs cannot prove their negligence with respect to Section 14(a) as a matter of law because they were purportedly never told about Merrill's losses prior to the shareholder vote on December 5, 2008. Dir. Mem. at 4, 16-23. The record, however, contains contradictory facts – including Defendant Price's testimony that he kept the Directors apprised of Merrill's financial condition throughout the pendency of the Merger during weekly Board meetings. CS ¶¶ 197-203. Further, even if the Director Defendants were not affirmatively told about Merrill's losses, a "reasonable" director asking shareholders to vote in favor of the Merger would have sought updates concerning Merrill's fourth quarter performance, especially considering what the Director Defendants contend were "unprecedented market conditions." Significantly, however, the record contains no evidence that any Director sought or reviewed any information about Merrill's fourth quarter financial performance after the Merger was announced. CS ¶¶ 204-08. Their failure to inquire into Merrill's financial condition clearly raises fact issues as to their negligence. *See In re WorldCom, Inc. Sec. Litig.*, 2005 WL 638268, at *11 (S.D.N.Y. Mar. 21, 2005) ("the law has consistently placed upon directors the duty to conduct a reasonable investigation … and has not permitted them simply to accept at face value the representations of management").

Similarly, as to the non-disclosure of the Bonus Agreement, the Director Defendants again claim that they were "out of the loop" and not privy to any information. Dir. Mem. at 2-3, 13-16. However, all these Defendants had to do to learn of the existence of the Bonus Agreement was to ask for a copy of the Disclosure Schedule that was referred to, but not disclosed, in the Merger Agreement, and read it. CS ¶¶ 3, 24, 217. In fact, Director Defendants have testified that they never read the Merger Agreement or Disclosure Schedule, and made no effort to determine whether the Proxy was accurate as of the date of the vote. CS ¶¶ 57-59, 217-

20.  At a minimum, the Director Defendants' failure to read the documents comprising the very transaction for which they solicited BoA shareholder proxies raises serious questions of fact regarding their negligence.

Finally, Defendants' loss causation arguments are without merit.  BoA Mem. at 4-6, 23-43.  In contending that Plaintiffs cannot demonstrate loss causation as a matter of law for the stock price decline on January 22, 2009, Defendants rehash their argument that the January 21 *Financial Times* article did not reveal "new news" because other newspaper articles supposedly revealed the information about Merrill's bonus payments earlier.  *Id*. at 5, 26-33.  The Court has already considered virtually all of this evidence at the pleading stage and again at class certification, and has held that Defendants' cited articles contain numerous "infirmities" that undermine Defendants' contentions and preclude judgment as a matter of law, including "language that qualified the likelihood of Merrill bonuses."  *Bank of Am.*, 2012 WL 370278, at *8.  Defendants offer no reason for the Court to abandon its prior rulings.  As for Defendants' arguments that the disclosures on January 12 and 13 cannot be corrective disclosures as a matter of law (*see* BoA Mem. at 33-43), these assertions raise fact-intensive issues regarding the market's expectations for Merrill's fourth quarter performance and the existence of leakage that are not appropriate for summary judgment.

As set forth more fully below, Defendants' motions should be denied.

## II.    Summary Judgment Standards

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citation omitted).  "The Supreme Court teaches that 'all that is required [from a nonmoving

party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vivenzio*, 611 F.3d at 106.

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011). In conducting its analysis, "the court 'may not make credibility determinations or weigh the evidence' and '*must draw all reasonable inferences in favor of the nonmoving party*.'" *Id.* (emphasis in original); *see also Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("all reasonable inferences must be drawn against the party whose motion is under consideration"). "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *McClellan*, 439 F.3d at 144; *see also Phaneuf v. Fraikin*, 448 F.3d 591, 595 (2d Cir. 2006) (court is to "eschew credibility assessments"); *see also In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 500 (S.D.N.Y. 2005) ("[W]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment.") (internal quotation marks omitted).

**III.    The Bank Is Not Entitled To Summary Judgment**

    **A.    Plaintiffs May Seek Section 14(a) Damages Based On The Decline In BoA's Stock Price Following Corrective Disclosures**

After three years of arguing to the contrary, Defendants now concede that Plaintiffs may pursue a <u>direct</u> claim for violations of Section 14(a).  *See* BoA Mem. at 17 (admitting that "where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct").  Nevertheless, Defendants continue to contend that – even assuming that they violated Section 14(a) – Plaintiffs may not recover any damages <u>as a matter of law</u>.  *See* BoA Mem. at 1-4, 8-21.  Defendants are wrong.  As set forth below, the vast majority of Defendants' contentions are merely rehashed legal arguments that the Court has already considered and rejected numerous times.  Defendants' lone "new" argument – that Plaintiffs have failed to "differentiate" the portion of the BoA stock price decline that represents harm to shareholders from any portion that might reflect harm to the Bank – mischaracterizes the Court's opinions, is belied by Defendants' admissions and other evidence in this case, and, at a bare minimum, cannot be resolved at summary judgment as a matter of law.[3]

    **1.    Defendants' Arguments That Plaintiffs May Not Seek Damages Because They Did Not Exchange Their Shares Contradict The Court's Prior Decisions And Well-Settled Authority**

As they did at the motion to dismiss and class certification stages, Defendants contend that Plaintiffs cannot seek damages based on BoA's stock price decline following the corrective disclosures because they did not exchange their shares in the Merger.  *See* BoA Mem. at 1-4, 8-21.  Defendants repeat their arguments that: (i) Delaware law governs this issue; and (ii) as a matter of Delaware law, because Plaintiffs did not exchange their shares in the Merger, "stock-price declines like those at issue here reflect the market's perception of a direct injury to the

---

[3] Because Merrill only joins in the Bank's motion, Merrill's motion should be denied for the reasons set forth herein.

corporation," which is "not compensable through a direct award to shareholders." BoA Mem. at 9. Tellingly, while Defendants claim that the decline in BoA's stock price supposedly represents harm for which Plaintiffs may not recover, they also contend that the Bank is not "entitled to compensation" for that harm "in a derivative action." BoA Mem. at 11, n.4. Thus, Defendants' position is clear: regardless of whether they violated Section 14(a), <u>no one</u> can recover for any harm caused by the decline in the stock price attributable to those violations. This is obviously not the law.

Defendants' arguments directly contradict this Court's prior opinions. First, as the Court held at the motion to dismiss stage, federal law – not Delaware law – governs Plaintiffs' ability to recover Section 14(a) damages based on the decline in the price of their BoA stock. *Bank of Am.*, 757 F. Supp. 2d at 292. The Court also held that the decline in BoA's stock price following the corrective disclosures represents a direct injury to shareholders, compensable through Plaintiffs' Section 14(a) claim:

> [T]he value of [a] corporation's stock may decrease because the corporation was damaged by an action that would not have been approved by fully-informed shareholders. <u>But the value of that corporation's shares also may decrease once a corrective disclosure issues. That decrease is not necessarily co-extensive with injury to the corporation. Therefore, material omissions from a proxy statement could directly injure the corporation, as well as the corporation's shareholders.</u> *See Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977) ("[I]n light of . . . *Borak* and *Mills*, a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and derivative suits. The former action protects the shareholders' interest in 'fair corporate suffrage'."). There is at least a potential that the Securities Plaintiffs could show a diminution in the value of the shares that they held that was not due to an injury inflicted on BofA. Therefore, it is possible for both sets of plaintiffs to prevail without double recovery.

*Id.*[4]

---

[4] Defendants again rely on a case that the parties extensively addressed at the motion to dismiss stage – *Halebian v. Berv*, 590 F.3d 195 (2d Cir. 2009) – to incorrectly claim that the Second Circuit has "endorsed the [] proposition" that, under Delaware law, stock price declines reflect derivative harm under Section 14(a) as a matter of law. *See*

The Court's holding accords with well-established law.  Courts widely recognize that the "standard" measure of direct damages in a Section 14(a) case is the decline in the price of the plaintiff's personally-held shares when the truth emerges.  *See, e.g.*, *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 389 (1970) (injured shareholders asserting direct Section 14(a) claim may recover damages based on the "reduction of the earnings or earnings potential of their holdings"); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 415 (2d Cir. 2011) (Sotomayor, J.) (recognizing that, under Section 14(a), a plaintiff may recover damages for "his stock['s] lost value when [the company's] share prices fell as information concerning [the company's] accounting practices was gradually disseminated to the public");[5] *Goldkrantz v. Griffin*, 1999 WL 191540, at *8 (S.D.N.Y. Apr. 6, 1999) (Cote, J.) (the "standard" measure of damages for a direct Section 14(a) claim is based on the "decrease in value" of the stock); *New Jersey and Its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1142 (D. Kan. 2004) (sustaining direct Section 14(a) claim seeking recovery from a stock price decline because there was "clearly a connection between the [corporate action voted upon] and plaintiff's injury in that the stock price declined after the conflict of interest was revealed"); *In re Real Estate Assoc. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002) (for a direct Section 14(a) claim, "generally, a plaintiff's injury will be the diminution in the value of his or her investment"); *In re*

---

BoA Mem. at 12.  *Halebian* did not involve a Section 14(a) claim, but concerned claims under the Investment Advisors Act of 1940 and Massachusetts state law.  Moreover, the Second Circuit recognized that, even under Delaware law, "[w]here a shareholder has been denied one of the most critical rights he or she possesses [as a shareholder] – the right to a fully informed vote – <u>the harm suffered is almost always an individual, not corporate harm.</u>"  *Id.* at 209.  The Second Circuit nevertheless affirmed the dismissal of the plaintiff's claims on grounds that are irrelevant here, namely: (i) the plaintiff had failed to demonstrate that Massachusetts law "specifically embraced Delaware law" on this point; and (ii) the essence of the claims was not a disclosure violation, but a breach of fiduciary duty based on diversion of corporate assets – which was "plainly a classic derivative claim."  *Id.* at 208-09. The additional authorities cited in footnote 5 of BoA's brief are inapposite, as none of those cases concerned a Section 14(a) claim or a shareholder vote on a merger.  Further, all but one of those cases concerned only state law claims, and the single case that involved a federal claim arose under the RICO statute, not the Exchange Act.

[5] In *Amorosa*, the Second Circuit ultimately affirmed the dismissal of the plaintiff's Section 14(a) claim because there, unlike in this case, the plaintiff had failed to plead that a corrective disclosure caused the price of the stock to drop.  *See* 409 F. App'x at 416.

*McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266, 1269 (N.D. Cal 2000) (acquiring company shareholders "indisputably harmed" by "sharp drop" in stock price resulting from disclosure of information allegedly misstated in the proxy statement).[6]

Similarly, the Court has previously and correctly held that Plaintiffs' ability to seek damages based on BoA's stock price decline does <u>not</u> turn on whether they exchanged their shares in the Merger. *Bank of Am.*, 757 F. Supp. 2d at 291-92 & n.3.[7]  The language of the statute and Supreme Court and Second Circuit authority are consistent.  Section 14(a) prohibits misleading proxy solicitations in connection with a shareholder vote on "<u>any</u>" corporate action – not just those actions that require a purchase, sale or exchange of shares.  15 U.S.C. § 78n(a)(1).  In light of Section 14(a)'s clear language, the Supreme Court has long held that "<u>§ 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale</u>."  *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 468 (1969).  Thus, Section 14(a)'s transaction causation requirement is met where, as here, the false and misleading proxy solicitation is the "essential link" in effecting the transaction.  *Bank of Am.*, 757 F. Supp. 2d at 292 n.3; *see also Mills*, 396 U.S. at 385; *Koppel*, 167 F.3d at 137.

Indeed, Defendants' argument that Plaintiffs cannot recover damages for the decline in their stock because they did not exchange their BoA shares in the Merger is nonsensical.  According to Defendants, Plaintiffs' ability to recover such damages depends on whether, in

---

[6] While the Bank again asserts that "[n]o case law supports plaintiffs' novel interpretation of Section 14(a)" (*see* BoA Mem. at 3), this contention disregards this Court's prior opinions, the numerous supporting authorities cited above, and Defendants' concessions in their own prior briefing that other courts have indeed sustained "<u>Section 14(a) claims of the type at issue here</u> – claims for damages brought by <u>acquiring company shareholders</u>, allegedly deprived of the right to cast an informed vote on a merger, <u>for the post-merger decline in the market price of their shares</u>."  ECF No. 242 at 9-10 (citing, *inter alia*, *McKesson*, 126 F. Supp. 2d 1248 and *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438 (D. Md. 1996)).

[7] The Court reaffirmed its holding at the class certification stage, noting that "several" Supreme Court and Second Circuit "authorities have recognized that shareholders may bring direct claims under Section 14(a)" regardless of whether they exchanged their shares. *Bank of Am.*, 2012 WL 370278, at *6 (citing *Mills*, 396 U.S. at 385; *Koppel v. 4987 Corp.*, 167 F.3d 125, 137 (2d Cir. 1999); and *McKesson*, 126 F. Supp. 2d at 1266, 1269 (upholding Section 14(a) claim brought by acquiring company's shareholders)).

connection with the Merger, Plaintiffs physically exchanged their BoA stock for new shares of BoA stock <u>with the exact same value</u>.  However, the existence of rights and remedies under Section 14(a) does not turn on such technicalities.  Defendants are still unable to cite a single decision where any court has held that a plaintiff may not directly recover Section 14(a) damages because he did not exchange his shares in the transaction at issue.

Although Defendants now claim that the Fifth Circuit's decision in *Smith v. Waste Management, Inc.*, 407 F.3d 381 (5th Cir. 2005), is supposedly dispositive on this issue (*see* BoA Mem. at 10), it is far more telling that, in Defendants' numerous prior submissions, Defendants relegated any discussion of *Smith* to a passing reference in a single footnote.  *Smith* is irrelevant. *Smith* did not involve a claim under Section 14(a) or any federal statute.  It did not arise from a merger or a shareholder vote of any kind.  Rather, the plaintiff in *Smith* brought state law claims to recover for harm that he suffered when he "deci[ded] to retain his Waste Management shares" based on the company's "positive representation about Waste Management's future earnings." 407 F.3d at 382.  That is a far cry from the case here, where Plaintiffs assert federal Section 14(a) claims arising from the impairment of their right to cast an informed vote on a merger.  As set forth above, courts universally hold that, under Section 14(a), a plaintiff may seek damages based on the decline in the value of personally held shares.[8]

---

[8] Defendants' reliance on the Delaware Chancery Court's decision in *Manzo v. Rite Aid Corp.*, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002), is also misplaced.  *See* BoA Mem. at 11-12.  *Manzo* concerned state law claims and did not involve a merger or a shareholder vote.  Further, the *Manzo* plaintiff did <u>not</u> seek damages based on the decline in Rite Aid's stock price, but rather sought damages under two theories that are not at issue here: "investment opportunity losses" (*i.e.*, "money damages to compensate plaintiff for the return she *could* have earned had she invested elsewhere," which "amounts to speculation founded upon uncertainty") and "benefit of the bargain damages."  *Id*. at *5 (emphasis in original).

## 2.    The Record Unequivocally Establishes That BoA's Stock Price Decline Does Not Reflect Harm To The Bank

Defendants' argument that the stock price decline represents harm to the Bank contradicts the record in this case – including the positions Defendants have taken in their briefs, pleadings, and fact and expert discovery.  Indeed, no party in this case has <u>ever</u> claimed that the false Proxy harmed the Bank.  The only evidence adduced in this case is that the Bank was not harmed, and that BoA's stock price decline reflects harm to shareholders.

For example, Defendants have <u>admitted</u> that the declines following the corrective disclosures in this Action did <u>not</u> reflect injury to BoA, but only harm to BoA's shareholders, stating: "The alleged $136 billion 'in market value destruction' [] based upon the change in BofA's share price between September 15, 2008 and March 6, 2009 [], <u>is not a measure of loss by BofA, but rather of the decline in value of stock owned by its stockholders</u>."  CS ¶ 302.  Similarly, in their answer to the complaint in the derivative action, BoA's directors took the position that "neither BofA nor plaintiffs have suffered any loss, damage, or injury as a result of the conduct of the Outside Director Defendants alleged in the Complaint."  CS ¶ 303.  In this Action, in response to Plaintiffs' interrogatory to Defendants requesting that they "[i]dentify all damages [they] claim BoA sustained as a result of the Merger, including the types and amounts of damages," Defendants refused to identify <u>any</u> damages to BoA.  CS ¶ 306-08.  Even in their motion for summary judgment, Defendants "vigorously" dispute that BoA failed "to realize the expected value of the [Merger]."  BoA Mem. at 19, n.13.

In fact, the only evidence that Defendants have proffered on this issue is that, even if the Proxy was materially false, BoA <u>benefitted</u> from the Merger.  Specifically, Defendants have asserted in the expert report of Professor Anil Shivdasani that the Merger was "value-enhancing" for BoA at all relevant times, including at the time of the corrective disclosures at issue.  In

particular, Professor Shivdasani opined that, "[a]s of January 16, 2009, when Bank of America announced earnings for 4Q 2008, … the Transaction was value-enhancing to Bank of America," and BoA had actually <u>underpaid</u> for Merrill.  CS ¶¶ 304-05.  In sum, having failed to identify any harm to the Bank – and having asserted that the Bank <u>benefitted</u> from the Merger – Defendants cannot now obtain a judgment that, as a matter of law, the decline in the value of BoA stock represents harm to BoA.

Moreover, the recent settlement of the BoA derivative action provides powerful confirmation that any potential harm to the Bank is *de minimis* at most, and is unrelated to the decline in the value of BoA stock following the corrective disclosures.  As the Court is aware, the parties in the derivative action have entered into a proposed settlement that would release all derivative claims in exchange for a payment of $20 million.  Defendants have informed the Court that this proposed recovery is "substantial" and "a very sizeable amount."  *See* ECF No. 556 at 15.  While the Court has not yet approved that settlement, as the party-in-interest, BoA has a fiduciary duty to ensure that the settlement is in its best interests, and adequately compensates the Bank for any purported injury it suffered.  Thus, BoA can only take the position that the $20 million settlement is reasonable and adequate compensation for any purported injury to the Bank.   If the decline in the price of BoA stock truly constituted harm to BoA – a decline that Defendants contend represents "billions of dollars in damages" (BoA Mem. at 1) – then a $20 million recovery could hardly be considered "substantial" and "a very sizeable amount."[9]

---

[9] Defendants cannot be heard to argue that the settlement amount is due to any purported weakness in the derivative plaintiffs' Section 14(a) claims.  In their brief opposing the Delaware derivative plaintiffs' petition for an order to show cause, Defendants argued to the Court that the reason they settled with the federal derivative plaintiffs is precisely because they were concerned about the strength of the Section 14(a) claims, which could not be asserted in the Delaware action.  As Defendants argued, Section 14(a) is only subject to a negligence standard, whereas the Delaware claims were subject to an "exceedingly difficult" standard.  ECF No. 556 at 6; *see also id*. at 2, 10-14.

### 3.     Plaintiffs Seek Section 14(a) Damages Based On Their Impaired Voting Rights, Not A "Windfall" Based On A Hypothetical Lost Opportunity To Sell Their Shares

Defendants contend that because Plaintiffs did not exchange their shares at an artificially inflated price, awarding damages based on the decline in BoA's stock price would constitute a "windfall" to Plaintiffs. BoA Mem. at 13-17. Specifically, Defendants assert that awarding such damages "would [] compensate the class members for their loss of an opportunity to sell their shares at a price inflated by the alleged fraud." BoA Mem. at 16-17. Defendants are wrong. Plaintiffs allege that their right to cast an informed vote on the Merger was impaired, and seek damages based on the decline in their personally-held shares when the truth concerning the Merger was revealed. A hypothetical "lost opportunity" to sell shares into the market at artificially inflated prices is not at issue in Plaintiffs' Section 14(a) claims.

Remarkably, Defendants contend that *Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir. 1971) – a 40-year old Second Circuit decision that they have never cited in any of their prior briefs on this issue – is supposedly controlling. BoA Mem. at 16-17. Defendants' reliance on *Levine* is misplaced. *Levine* did not concern a merger, a shareholder vote, a corrective disclosure, or the measure of damages under Section 14(a). Rather, the sole issue in *Levine* was whether a plaintiff whose preferred shares had been <u>lawfully</u> redeemed by the company could recover damages under Section 10(b) equal to the difference between: (i) a higher price implied by an exchange offer that the company announced but allegedly never intended to consummate, and (ii) the lower price at which the company redeemed the plaintiff's shares. 439 F.2d at 333-34. The plaintiff in *Levine* was thus explicitly seeking damages based on the lost opportunity to sell shares at a higher price. This holding has no application here.

17

**4.    Defendants' Arguments That Plaintiffs Have Failed To Connect Their Claimed Damages To The Impairment Of Their Voting Rights Also Contradict The Court's Prior Decisions**

Defendants also contend that, as a matter of Delaware law, Plaintiffs cannot recover for the decline in BoA's stock price because "Plaintiffs have failed to connect their claimed Section 14(a) damages to an alleged impairment of voting rights."  BoA Mem. at 17-19.  Specifically, Defendants assert that the stock price declines at issue bear no "logical or reasonable relationship" to the impairment of Plaintiffs' voting rights and, at most, "might conceptually" reflect "BofA's failure to realize the expected value of the transaction."  *Id*.  Defendants' sole support for this argument is a case that the Court considered and rejected at the pleading stage – the Delaware Supreme Court's decision in *J.P. Morgan Chase & Corp. Shareholder Litigation,* 906 A.2d 766 (Del. 2006).  Defendants' recycled argument fails.

First, this argument again contradicts the Court's prior holdings and well-established law. As noted above, this Court has already held that the damages Plaintiffs seek are directly related to the impairment of their right to cast an informed vote.  *Bank of Am.*, 757 F. Supp. 2d at 291-92 & n.3.  As the Court recognized, Plaintiffs assert that:  (i) Defendants violated Class members' right to cast a fully informed vote on the Merger by virtue of the materially false and misleading Proxy; and (ii) Class members suffered direct economic harm when the market price of their stock declined upon the disclosure of the facts that were misrepresented and omitted in the Proxy.  *Id*.  The harm for which Plaintiffs seek relief is best measured by the diminution of the value of their shares that was directly caused by the disclosure of the facts that were misstated and omitted.[10]  As set forth above, courts regularly hold that this measure of damages is clearly

---

[10] Defendants incorrectly contend that Plaintiffs "demand the entire decline in BofA's stock price following the purported corrective disclosures."  BoA Mem. at 2, 15.  To the contrary, Plaintiffs have been conservative in their damage calculations.  In calculating damages under the Exchange Act, Plaintiffs' expert, Chad Coffman, conducted an event study, which courts have universally recognized as an appropriate methodology.  Through his event study,

"connected" to the impairment of voting rights and permit plaintiffs to seek such damages under Section 14(a).  *See supra* at 11-13.

Second, Defendants have proffered no evidence to support their speculative and fact-intensive assertion that the declines in BoA's stock price following the corrective disclosures "might conceptually" reflect the Bank's "failure to realize the expected value of the transaction." BoA Mem. at 19.  Indeed, in their brief, Defendants actually contradict their own position, saying that they "vigorously dispute that this is in fact the case."  *Id*. at n.13.  Such speculative and inconsistent musings about what "might" have occurred are no basis to grant summary judgment.

Third, the Delaware Supreme Court's decision in *J.P. Morgan*, which the Court thoroughly considered and rejected at the pleading stage, remains irrelevant.  The plaintiffs in *J.P. Morgan* did not bring a Section 14(a) claim, and expressly rested their damage theory on J.P. Morgan's alleged $7 billion overpayment for Bank One.  906 A.2d at 771 (plaintiffs sought damages "equal to the $7 billion premium that (plaintiffs allege) the defendants wrongfully caused JPMC to overpay for Bank One").  Unlike Plaintiffs here, the *J.P. Morgan* plaintiffs did not seek damages based on any decline in J.P. Morgan's stock price.

Defendants next attempt to sever the link between the impairment of shareholders' voting rights and the declines in BoA's stock price by positing a self-serving hypothetical.  Defendants argue that if "the merger had occurred without a shareholder vote at all," BoA's stock "presumably" still would have declined when the truth concerning the Merger was revealed, and

---

Mr. Coffman isolated the statistically significant abnormal returns in BoA's stock price that were caused by the corrective disclosures.  Using conservative assumptions, he removed from his damages calculations any declines in BoA's stock price that were attributable to factors unrelated to the misstatements or omissions in this case, including broad market movements and information specifically concerning BoA, and not relating to the alleged misstatements or omissions. CS ¶ 242.  Based on Mr. Coffman's analysis, Plaintiffs assert that only a portion of the BoA stock price declines following the corrective disclosures represent compensable damages.

Section 14(a) Class members should not be permitted to recover for that decline "simply because a vote occurred."  BoA Mem. at 20.  This argument is absurd, as it ignores the basic fact that the Merger <u>could not have occurred but for the shareholder vote</u>, and that Section 14(a) expressly pertains to shareholder votes.  Thus, the shareholder vote was the condition precedent that enabled the Merger to take place, ultimately resulting in shareholder losses when the truth about the transaction was revealed.[11]

Indeed, in crafting the Exchange Act, Congress specifically decided that the availability of certain rights and remedies <u>should</u> hinge on whether there was a shareholder vote.  Section 14(a) "stemmed from a congressional belief that <u>fair corporate suffrage is an important right</u> that should attach to every equity security brought on a public exchange," and Rule 14(a)(9) was specifically designed with the "<u>broad remedial purpose</u> … to ensure disclosures by corporate management in order to <u>enable the shareholders to make an informed choice</u>."  *Bank of Am.*, 757 F. Supp. 2d at 289-90 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) and *Mills*, 396 U.S. at 381).  For nearly 50 years, the Supreme Court has held that the violation of these provisions gives rise to a cause of action and a right of recovery.  *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964).  Defendants' effort to undermine this basic precept of the securities laws must be rejected.[12]

---

[11] Defendants suggest in a footnote that the vote in this case deserves less protection because it was required by a New York Stock Exchange Rule.  *See* BoA Mem. at 20, n.14.  Section 14(a) prohibits materially misleading proxy solicitations in connection with "any" shareholder vote, and plainly covers votes required by stock exchange rules.

[12] Defendants also incorrectly suggest that *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), holds that Plaintiffs may not recover for the decline in the value of their shares under Section 14(a).  *See* BoA Mem. at 20, n.15.  In that case, the Supreme Court merely held that causation could not be shown because, unlike here, the class consisted "of minority shareholders <u>whose votes are not required by law or corporate bylaw to authorize the transaction giving rise to the claim</u>."  *Id*. at 1099.

### 5.    There Is No Risk Of Double Recovery Between The Direct And Derivative Section 14(a) Claims

Defendants also contend that Plaintiffs have "ignore[d] this Court's ruling on defendants' motion to dismiss, which held that plaintiffs here must identify and prove direct damages that are distinct from those sought in the Consolidated Derivative Action pending before this Court." BoA Mem. at 21; *see also id.* at 1-4, 20-22.  Specifically, Defendants assert that Plaintiffs have failed to comply with a supposed requirement to "differentiate any portion of the stock-price drop supposedly constituting injury to members of the Section 14(a) class as individuals from that reflecting alleged injury to BofA." *Id.* at 21.  Defendants are wrong.

First, as described in detail above, the record in this case establishes that there can be no double recovery because there is not a single piece of record evidence that the decline in BoA's stock price reflects harm suffered by the Bank.  Indeed, no party has ever claimed that the stock price decline reflects harm to the Bank, and Defendants, in their pleadings and throughout discovery, have consistently taken the position that the Bank suffered no harm – and that BoA's stock price decline represents only harm to the shareholders.  *See supra* at 15-16.  In fact, of Defendants' five experts, not one, including their damages expert, Allen Ferrell, opines that any of the stock price drop represents harm to the Bank.  To the contrary, to the extent that the Bank has submitted any evidence on this issue, it has asserted that the "the Transaction was value-enhancing to Bank of America."  CS ¶¶ 304-05.  Moreover, as explained above, the fact that BoA was willing to settle the derivative action for a payment to BoA of $20 million – a sum it has described as a "substantial" recovery for any harm done to the Bank – demonstrates that if the Bank suffered any injury at all, it was a *de minimis* injury that bears no relationship to the decline in the price of its stock.  These admissions and the other evidence summarized above foreclose any contention that the Bank suffered meaningful harm, or that there is any danger of a

21

double recovery under Section 14(a).  At minimum, a genuine factual dispute exists as to any possibility that the harm suffered by Plaintiffs overlaps with any purported harm to BoA itself.

Second, Defendants misconstrue the Court's rulings regarding Plaintiffs' ability to pursue Section 14(a) damages based on the decline in BoA's stock price.  As noted above, the Court held that stock price declines following corrective disclosures may represent direct harm to shareholders.  *Bank of Am.*, 757 F. Supp. 2d at 291-92.  As the Court further explained, such harm is "not necessarily co-extensive with injury to the corporation," and it is therefore possible for both direct and derivative plaintiffs "to prevail without double recovery."  *Id*. at 292.

Similarly, at class certification, the Court held that "direct Section 14(a) claims may be brought against the defendants, with the qualification that no double recovery is permitted on either the derivative claims or the Section 10(b) claims."  *Bank of Am.*, 2012 WL 370278, at *5.  Most recently, in a decision that Defendants ignore, this Court explicitly recognized that the alleged injuries sustained by the company are "distinct" from the alleged injuries to the shareholders:

> The derivative plaintiffs bring claims on behalf of BofA, and seek payment of money damages to BofA itself.  The alleged injuries in the derivative case are distinct from those asserted in a related securities fraud class action, in which shareholders seek to recover damages from BoA, among others.  See In re Bank of Am. Corp. Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig., 757 F. Supp. 2d 260, 291-92 (S.D.N.Y. 2010).

Order dated May 14, 2012 (ECF No. 564) at 2.

The Court never held that there was, in fact, any harm to the Bank, much less that Plaintiffs were required to identify any supposed harm to the Bank, and then disaggregate it from the stock price decline.  Rather, the Court has explicitly recognized that the damages sought in this Action and the derivative action are separate and "distinct," and that the only limitation on Plaintiffs' ability to recover damages is that there can be no "double recovery."  Consistent with

this limitation, as set forth above, the record evidence demonstrates that the stock price decline represents only harm to shareholders, and the Bank has conceded that it cannot recover for this decline.

Finally, Defendants' assertion that Plaintiffs' expert, Chad Coffman, "was not able to provide a rational basis for the damages sought by the Section 14(a) class," is misplaced and wrong.  BoA Mem. at 20-21.  Whether Plaintiffs may base Section 14(a) damages on the decline in BoA's stock price is a legal question that this Court has already resolved pursuant to Supreme Court and Second Circuit authority.  Further, although it is not required, Mr. Coffman provided a cogent economic rationale for why the stock price declines were directly related to the impairment of Class members' right to cast an informed vote, and explained that these objectively verifiable declines were the "most reliable way to quantify the loss [Class members] suffered as a result of not having full information" concerning the Merger.  CS ¶ 309.[13]

## B.   Defendants' Loss Causation Arguments Fail

Defendants do not dispute on this motion that loss causation exists for the declines in BoA's stock price on January 15 and 16, 2009.  However, with respect to the stock price declines on January 12, 13 and 22, Defendants advance numerous arguments on the fact-intensive issue of loss causation that are wrong on the law and raise issues of fact that cannot be resolved at summary judgment.

"[L]oss causation is the 'causal connection between the material misrepresentation and the [economic] loss' suffered by investors."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.

---

[13] Although Defendants state that Mr. Coffman has not previously opined with respect to Section 14(a), and did not cite "economic literature" specifically concerning the measure of Section 14(a) damages in his report, these contentions are red herrings.  Defendants' own damages expert has never given an opinion with respect to Section 14(a) damages prior to this case, and also cited no literature on the measure of Section 14(a) damages in his multiple reports.  CS ¶ 310.  Mr. Coffman is a highly qualified and experienced expert who has opined with respect to damages in more than a dozen securities class actions, including several in this District, and is well-versed in calculating damages under the Exchange Act.  *See* Ross Decl., Ex. 100 at Appendix B, pp. 2-4.

Ct. 2179, 2183 (2011).  A plaintiff establishes loss causation by demonstrating "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (quoting *Lentell v. Merrill Lynch*, 396 F.3d 161, 172 (2d Cir. 2005) (emphasis in original)).  "In the Second Circuit, loss causation may be established either by (1) a corrective disclosure or (2) a materialization of a concealed risk."  *Lehman Bros.*, 799 F. Supp. 2d at 304.  With respect to the latter theory, a plaintiff must demonstrate "that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk.  A loss is foreseeable if it is 'within the zone of risk *concealed* by the misrepresentations and omissions alleged[.]'"  *Id*. at 304-05 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (emphasis in original)).

Loss causation raises questions that are inherently and intensely factual in nature.  *See Lentell*, 396 F.3d at 174 ("Loss causation is a fact-based inquiry"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 197 (2d. Cir. 2003) (loss causation "is a matter of proof at trial").[14]  "Because causation is fundamentally a factual matter, the relevant factors may include the time between the event and the decline, the prominence of the fraud-related news relative to other news, or how new the information is."  *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (internal citations omitted).  Courts in this District have cautioned that, in evaluating loss causation, "courts must still rely on basic summary judgment principles to determine whether a genuine issue of fact has been raised."  *Id*.

---

[14] *See also Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) (in securities cases, "[p]roximate causation and intervening cause are usually issues for the jury to resolve"); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) (in securities cases, "[w]hether the plaintiff has proven causation is usually reserved for the trier of fact").

Consistent with these principles, courts generally do not resolve the fact-intensive issue of loss causation at summary judgment.[15]

To establish loss causation, "a neat and tidy single disclosure" is not required.  *In re Tommy Hilfiger, Sec. Litig.*, 2007 WL 5581705, at *3 (S.D.N.Y. Jul. 20, 2007).  Rather, a series of "partial disclosures can satisfy the loss causation requirement."  *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (citation omitted).[16]  Nor is there any requirement that "a corrective disclosure take a particular form or be of a particular quality . . . . It is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation."  *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 560 (S.D.N.Y. 2010) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) *aff'd*, 597 F.3d 501 (2d Cir. 2010)); *see also Bristol Myers*, 586 F. Supp. 2d at 165 (same).

There is also no "'requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.'"  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 243 (S.D.N.Y. 2006) (citation omitted).  Indeed, "in addition to formal disclosure by a defendant, 'the market may learn of possible fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.'"  *In re Winstar Commc'ns.*, 2006 WL 473885, at *14 (S.D.N.Y.

---

[15] *See, e.g.*, *Easton Capital Partners, L.P. v. Rush*, 2011 WL 3809927, at *8-9 (S.D.N.Y. Aug. 26, 2011) (summary judgment denied because a "reasonable jury could find that the topic of the alleged misrepresentations was the cause of [defendant's] ultimate demise"); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011) (summary judgment denied because fact question existed as to whether "analyst reports … 'introduced no 'new' factual information into the market'"); *In re Loewen Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 217-18 (E.D. Pa. 2005) (denying summary judgment on loss causation even without expert report).

[16] *See also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) ("[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."); *Montoya v. Mamma.com Inc.*, 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005) ("loss causation does not require *full* disclosure and can be established by *partial* disclosure during the class period which causes the price of shares to decline") (emphasis in original).

Feb. 27, 2006); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 264 (5th Cir. 2009) ("*Dura* does not prevent a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such truth by persons other than the defendants.").[17]

There is also no requirement that the corrective disclosure be a "'mirror image'" of Defendants' misstatements or omissions.  *E\*Trade*, 712 F. Supp. 2d at 202; *In re Bristol-Myers Sec. Litig.*, 2005 WL 2007004, at *20 (D.N.J. Aug. 17, 2005) (rejecting argument that "alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").  Rather, "the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" *E\*Trade*, 712 F. Supp. 2d at 202; *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001) (loss causation requirement satisfied where misrepresentations about executive officer's financial expertise revealed by company's financial problems).

### 1.    Defendants Fail To Show As A Matter Of Law That The January 11 Citigroup Report Was Not Corrective

On Sunday, January 11, 2009, Citigroup issued an analyst report (the "Citi Report") on BoA that contained material new information concerning Merrill's fourth quarter 2008 financial performance.  Specifically, the Citi Report estimated that Merrill would report a net loss for the fourth quarter of $6 billion, or $3.75 per share.  CS ¶ 243.  As set forth below, this new report forecast losses for Merrill that were dramatically higher than prior estimates, and informed the market that Merrill's fourth quarter financial performance would be significantly worse than expected.

---

[17] As courts in this District have recognized, "*Omnicom* did not purport to re-define the law of loss causation, or to overrule the previous Second Circuit cases (*Castellano*, *Suez Equity*, *Lentell*, etc.)."  *See In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 559 (S.D.N.Y. 2011).

On January 12, 2009, the first trading day following the issuance of the Citi Report, BoA's stock price declined by 12%. CS ¶ 244. Plaintiffs' expert, Mr. Coffman, conducted an event study using well-accepted statistical methodologies to determine whether (i) the changes in the price of BoA stock were statistically significant, and (ii) there was economic evidence to link such price declines to the revelation of the facts that had been allegedly misstated and/or omitted in the Proxy. CS ¶ 242. Mr. Coffman determined that the 12% stock price decline on January 12 was statistically significant, and that part of that decline was caused by the new information about Merrill's losses in the Citi Report. CS ¶¶ 244-45.

In response to this evidence, Defendants assert that the Citi Report cannot be considered a corrective disclosure. These arguments misstate the law and raise issues of fact that cannot be resolved on this motion.

First, relying principally on the Second Circuit's *Omnicom* decision, Defendants contend that the Citi Report cannot be a corrective disclosure because it is merely a "'negative characterization of already-public information' which as a matter of law cannot be a corrective disclosure." BoA Mem. at 34-35 (quoting *Omnicom*, 597 F.3d at 512). Defendants' assertion is legally and factually incorrect. In *Omnicom*, the court found that the alleged corrective disclosure, a *Wall Street Journal* article, simply regurgitated information about a transaction that had been previously disclosed and was widely known in the market. 597 F.3d at 512. Here, however, the Citi Report did not simply repackage and "negatively characterize" publicly-available information about Merrill. Rather, the Citi Report provided investors, for the first time, with a materially higher quarterly loss estimate for Merrill than anyone had previously provided.

Thus, the Citi Report moved the market because it gave updated "hard" financial information that had not been previously disclosed.[18]

Defendants also contend that the Court must find, as a matter of law, that the Citi Report did not provide any "new information" because the market supposedly must have known that Merrill would suffer losses larger than the $6 billion figure disclosed in the Citi Report.  *See* BoA Mem. at 36-38.  The sole basis for Defendants' argument is the December 7, 2008 Morgan Stanley report by Betsy Graseck (the "Graseck Report"), which Defendants previously relied on at class certification to purportedly establish this same point.  Specifically, Defendants contend that, because the Graseck Report estimated that Merrill would take $8.9 billion of "marks" on certain assets, the market purportedly knew that Merrill would report net losses for the quarter of at least $8.9 billion.  BoA Mem. at 36-38.  This argument is wrong and, at a minimum, raises myriad factual issues regarding what the market supposedly "expected" as of January 12, 2009.

First, unlike the Citi Report, the Graseck Report did not provide any expected fourth quarter profit or loss figures for Merrill.  CS ¶¶ 230-31.  Ms. Graseck specifically testified that her estimate of write-downs on a certain subset of assets did not take into account profits that Merrill might earn on other assets, or other revenues Merrill might earn from other business segments.  *Id*.  Thus, as Ms. Graseck testified, her estimate of write-downs was not a quarterly loss estimate, and her report did not provide any estimate for Merrill's fourth quarter results.  *Id*.

---

[18] The Third Circuit's opinion in *In re Merck & Co., Sec. Litig.*, 432 F. 3d 261 (3d Cir. 2005) on which Defendants also heavily rely, is inapplicable to the case at bar.  In *Merck*, plaintiffs sought to establish causation based on a stock price decline that followed a *Wall Street Journal* article providing a calculation of the issuer's revenue. Significantly, the calculation in the article rested entirely on figures that the company had previously disclosed.  *Id*. at 270.  As the Third Circuit recognized, if the newspaper reporter could conduct basic math resting on historical figures that had been disclosed by the company two months earlier, so too could investors and research analysts have done this analysis:  "The *Journal* reporter simply did the math on June 21; the efficient market hypothesis suggests that the market made these basic calculations months earlier."  *Id*. at 271.  In contrast, here, there is no basis to infer that investors could have calculated Merrill's staggering losses before the Citi Report revealed a $6 billion figure, which itself turned out to be materially low.

Second, contrary to what Defendants contend, the evidence shows that even after the fourth quarter ended – and after the Graseck Report was issued – the market expected Merrill to report, at most, only minimal losses for the fourth quarter.  Indeed, on January 5, 2009, Fox-Pitt Kelton ("FPK") – which was one of BoA's financial advisors for the Merger – issued an analyst report, entitled "[u]pgrading BoA to Outperform on MER Deal," which commented favorably on the Merger.  CS ¶ 240.   In that report, FPK estimated that Merrill would record a net loss for the fourth quarter of only $1.62 per share, or $2.6 billion – $6.3 billion less than Graseck's write-down estimate.[19]  Id.  The FPK report further noted that the current analyst consensus for Merrill was a loss of only "($0.15)/shr [or approximately $240 million] with a wide range, from a loss of ($1.15)/shr to a gain of $0.56/shr."  Id.  Defendants can offer no explanation for why, if the market was purportedly aware on December 7 that Merrill would suffer at least $8.9 billion in losses (or even $6 billion), the Bank's own financial advisor would issue a report three weeks later estimating that Merrill's losses would be a fraction of that amount.  At a minimum, this creates a genuine dispute of fact regarding the market's expectations for Merrill's fourth quarter performance as of January 12.

Third, the Graseck Report suffers from numerous infirmities that raise additional factual issues as to whether it actually informed the market that Merrill would suffer significant losses for the fourth quarter of 2008.  As the Court previously recognized, the Graseck Report could not be found to have informed the market of Merrill's losses as a matter of law because, among other things, "the Graseck report was not based on the value of Merrill's actual assets, which were not publicly disclosed, but was based on a comparison of Merrill's general assets against a generic

---

[19] FPK estimated that Merrill would record a loss of $1.62 per-share for the quarter, which amounts to a loss of $2.6 billion based on the number of Merrill shares outstanding.  CS ¶ 240.  FPK also estimated that Merrill would record "key concern" write-downs of $4.5 billion for the quarter, which is less than half of Ms. Graseck's estimate and further demonstrates that estimations of Merrill's "writedowns" are not the same as estimations of "losses."

index known as the ABX index." *Bank of Am.*, 2012 WL 370278, at *10. The Graseck Report acknowledged as much, stating that it lacked "detailed information on the banks' portfolios," and that its "methodology isn't perfect." CS ¶ 232. Indeed, both Merrill and Defendants' expert, Mr. Ferrell, have publicly discredited the methodology that Graseck employed. As Ferrell explained in an article he authored in 2008, it was impossible to determine what losses Merrill would report in any given quarter because "[w]hat is not known is how many securities remain on [Merrill's] balance sheet[] that may need to be written down even further in the future." CS ¶¶ 234-35. Similarly, during his October 13 deposition, Ferrell testified that the ABX index was "not perfect" for valuing Merrill's assets and that "I'm not giving my imprimatur to this specific methodology." CS ¶ 233.

In fact, in May 2008, Markit, the creator of the ABX index, specifically warned that the index "was not designed to be uncritically extrapolated to the broader [asset-backed securities] market, and it was certainly not designed as a valuation tool for individual securities." CS ¶ 238. Merrill itself agrees. In a July 2008 motion to dismiss another case in this District, Merrill made clear that it was "inappropriate" to use the ABX index to estimate Merrill's losses:

> Pointing to the ABX and TABX does not help Plaintiffs because they cannot allege facts showing that these indices represented the value of Merrill's CDOs. Indeed, Markit, the company that created the ABX and TABX, recently explained the inappropriateness of using its indices to value individual securities[.]

CS ¶¶ 236. In sum, as Mr. Coffman explained in his report in this case, many market participants "have criticized the ABX index as not adequately indicative of the performance of the specific 20 underlying assets [comprising the index], let alone entire asset classes." CS ¶ 237.

For all of these reasons, the Court determined at class certification that the Graseck Report did not inform the market as a matter of law that Merrill would suffer significant losses in

the fourth quarter of 2008. *Bank of Am.*, 2012 WL 370278, at *10. Thus, Defendants cannot now argue that, as a matter of law, the Graseck Report informed the market that Merrill would suffer $8.9 billion of losses for the fourth quarter of 2008. At a bare minimum, the widely-acknowledged unreliability of Ms. Graseck's methodology creates a genuine dispute of fact regarding the market's expectations of Merrill's losses.[20]

Finally, the fact that there was no stock price decline, let alone a statistically significant decline, in response to the Graseck Report, is further evidence that the market did not view the Graseck Report's estimate of write-downs as reliable. CS ¶ 239. In contrast, in response to the Citi Report, BoA's stock price declined 12% on January 12, which Mr. Coffman opined was statistically significant. CS ¶¶ 244-45. While Defendants suggest that this decline on January 12 was due to randomness or factors other than Merrill's estimated losses set forth in the Citi Report, this is, at best, a factual dispute that only a jury can decide.

### 2. Defendants Fail To Show As A Matter Of Law That The Disclosures On January 13, 2009 Were Not Corrective

#### a. Plaintiffs Adduced Significant Evidence Of Leakage About Merrill's Losses And BoA's Need For The Bailout

There is no dispute that news of Merrill's fourth quarter losses, and BoA's resulting need for a bailout, leaked to the market before BoA disclosed this information. In the early afternoon of January 14, a senior BoA executive informed Defendant Price that the *Wall Street Journal* was "calling everybody they can think of in the company to ask about a 'trusted source' telling them that Washington is assembling a 'giant rescue package' for BAC." CS ¶ 256. After the

---

[20] Defendants assert that the Citi Report purportedly suffers from the same flaws as the Graseck Report because it supposedly "provided *no information at all* about its methodology." BoA Mem. at 37. However, Defendants cite no case law requiring the disclosure of an analyst's methodology in order for a report by that analyst to be corrective. Moreover, the Citi Report specifically stated the basis for its estimate of Merrill's earnings: "We believe we have taken a very conservative approach based on inputs from fixed income markets, prior cycles, and detailed knowledge of the portfolios. We include our assumptions on cumulative losses in our note. Note, that this analysis is built into our earnings model[.]" CS ¶ 243.

close of trading that day, the *Wall Street Journal* broke the news that BoA required a massive bailout as a result of Merrill's "larger-than-expected losses in the fourth quarter."  CS ¶ 257.  In direct response to this report, BoA was forced to accelerate its earnings announcement, moving it from January 20, 2009, to January 16, 2009 at 7 a.m.  CS ¶¶ 260-69.

Evidence establishes that BoA was aware that this information was leaking to the market well before January 14.  As Brian Moynihan, BoA's then-General Counsel and current CEO, explained, BoA was "worried" and "afraid" that leaks would occur given that numerous parties, including third parties, were involved in discussions concerning the bailout.  CS ¶ 250.  Specifically, Moynihan testified:

> A:   [O]f course we worried about leaks because we were now working with the Fed with outside parties to assess the assets in the asset wrap [part of the bailout].
>
> Q:   So you were afraid there would be a leak that you were getting assistance from the Fed?
>
> A:   You are afraid, yes, because you are going to involve literally tens of people, tens and maybe fifties of people looking at these assets.  They had to hire outsiders to look at them.

*Id*.

By no later than January 9, 2009, the breach that Moynihan was "worried" about had, in fact, occurred.  On that day, Moynihan emailed Defendant Price and BoA's Chief Risk Officer, Amy Woods Brinkley, regarding a "breach" of confidentiality about the bailout. CS ¶ 246.  Moynihan wrote: "Spoke to [Federal Reserve Board Governor] Kevin [Warsh] re the breach today that [N]eil [Cotty] called about.  He will get after the people on confidentiality."  *Id*.  Defendant Price forwarded Moynihan's email to Greg Curl and David Belk, BoA's Vice Chairman of Corporate Development and Vice President of Corporate Development, respectively.  CS ¶ 247.  In response, Belk wrote, "What breach?"  Defendant Price explained

that "<u>UST [United States Treasury] called Sec [SEC] and they called Cotty – commented in front of a number of people</u>."  *Id.*  In that same exchange, Belk expressed that there was "no way to keep this quiet past [M]onday [January 12, 2009].  Too many people/3rd parties involved."  Curl confirmed Belk's concern, stating that "<u>if the [SEC] knows, the world will know</u>."  CS ¶ 248.  As a result, Defendant Cotty testified that, by no later than January 11, senior BoA executives discussed accelerating Merrill's earnings release because of "rumors on the street" concerning Merrill's fourth quarter results.  CS ¶ 251.

On January 13 at 8 a.m. EST, the Chairman of the Federal Reserve, Ben Bernanke, gave a well-publicized speech at the London School of Economics addressing steps the Federal Reserve was taking to stabilize financial institutions in the United States.  CS ¶ 252.  In that speech, Chairman Bernanke informed the market that, in light of "losses" on "troubled assets held by banks," more government bailouts of financial institutions were likely to occur.  As reported by *The New York Times* on its website that day, as well as numerous other media outlets, and as posted on the website of the Federal Reserve that day, Chairman Bernanke stated:

> [M]ore capital injections and guarantees may become necessary to ensure stability and the normalization of credit markets…. Should the Treasury decide to supplement injections of capital by removing troubled assets from institutions' balance sheets, as was initially proposed for the U.S. financial rescue plan, several approaches might be considered…. Another [approach] is to provide asset guarantees, under which the government would agree to absorb, presumably in exchange for warrants or some other form of compensation, part of the prospective losses on specified portfolios of troubled assets held by banks.

CS ¶¶ 252-53.

Following the open of the market on January 13, as Chairman Bernanke's speech was publicly reported, BoA's stock price declined on significant volume.  On January 13, BoA's Vice President of Investor Relations, Lee McEntire, informed BoA's senior executives that investors believed that Chairman Bernanke was referring to BoA when he made the comments

set forth above.  Specifically, at approximately 2 p.m. EST, McEntire informed Defendant Price, BoA Treasurer Jeffrey Brown and Chief Accounting Officer Craig Rosato, that Chairman Bernanke's remarks had made "large investors and traders extremely nervous" that BoA required "more capital injections and guarantees."  CS ¶ 254.  Significantly, McEntire wrote that investors were trading large amounts of BoA stock based on this information:

> Assumption from investors is [Chairman Bernanke] is talking about us in this section [of his speech]….  According to the Citi traders It is making large investors and traders extremely nervous and driving volumes well up on our stock.

*Id*.  By the close on January 13, BoA's stock price had declined by 6.8%.  CS ¶ 255.  Mr. Coffman has opined that this decline was statistically significant and was attributable to the leakage concerning BoA's need for additional capital as a result of the Merrill transaction.  *Id*.

Thus, Plaintiffs have accumulated powerful evidence that news of BoA's need for a bailout had leaked to the market by no later than January 13 – including the admission by senior BoA executives that the market was trading large volumes of BoA stock that day based specifically on this information.  It is difficult to imagine more compelling evidence of leakage than the Bank's own admissions.  At a minimum, this evidence is sufficient to raise a genuine issue of material fact as to whether corrective information leaked to the market on January 13.

### b.      Defendants' Attacks On Plaintiffs' Evidence Fail

Despite these facts, Defendants make several unavailing arguments.  First, Defendants contend that, in the absence of an express public disclosure of Merrill's losses and the bailout, Plaintiffs have failed to demonstrate loss causation for January 13.  *See* BoA Mem. at 40.  However, courts universally recognize that "leakage" of the truth to the market, without an express disclosure of the truth, is an acceptable method to show economic loss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Silverman v. Motorola*, 259 F.R.D.

163, 170-71 (N.D. Ill. 2009) (investors could establish loss causation through evidence that information leaked into the market before corrective disclosures revealed truth).  Defendants themselves tacitly acknowledge the viability of the leakage theory of loss causation.  *See* BoA Mem. at 39.  Thus, contrary to Defendants' arguments, Plaintiffs are not required to show a public disclosure of the truth in order to demonstrate loss causation.

Second, Defendants contend that, because Chairman Bernanke did not specifically identify Merrill or BoA as recipients of further taxpayer bailout funds in his speech, the evidence of leakage is insufficient.  *See* BoA Mem. at 40.  However, there is no requirement that the leaked information expressly contain the word "Merrill" or "BoA."  As BoA internally admitted at the time, investors understood Chairman Bernanke's reference to a government bailout for financial institutions to be "talking about <u>us</u>" (CS ¶ 254 (emphasis in original)), making clear that, even if Chairman Bernanke did not name BoA or Merrill, investors understood him to be talking about the combined company.[21]  At a minimum, this fact, in combination with the statistically significant stock price decline on January 13, creates a fact issue for the jury.

Third, Defendants contend that Plaintiffs have failed to adequately establish leakage because McEntire did not specifically state in his email that investors attributed BoA's need for additional capital to Merrill's losses.  *See* BoA Mem. at 39-40.  Defendants are wrong.  Plaintiffs are required only to demonstrate that the decline in BoA's stock price results from the disclosure of a risk that falls "within the zone of risk *concealed* by the misrepresentations and omissions."  *See Lentell*, 396 F.3d at 173 (emphasis in original).  The market's belief that BoA required an

---

[21] Defendants' statement that "plaintiffs' expert has admitted" that no analyst or market commentator made the connection between Merrill's losses and the January 13 stock price decline is a clear misstatement of the record.  *See* BoA Mem. at 39.  The passage in Plaintiffs' expert's report that Defendants appear to be citing states that "no analyst or market commentator had previously predicted [before January 16] that <u>Merrill's Q4 2008 losses would be so material that BoA would seek to invoke the MAC and need a Government bailout to survive</u>" – a statement that is indisputably true and irrelevant to Plaintiffs' causation theory for January 13.

35

additional bailout falls within this zone of risk because there is no dispute that BoA needed the bailout as a result of Merrill's undisclosed losses. Indeed, BoA has admitted in its own SEC filings that the bailout was due to Merrill's massive unexpected and undisclosed fourth quarter losses. CS ¶ 269. Moreover, the evidence set forth above demonstrates that news of Merrill's losses had leaked to the market even before January 13. In fact, no later than January 11, BoA contemplated moving up its earnings announcement because of "rumors on the street" concerning Merrill's fourth quarter results. CS ¶ 251. Accordingly, the market's understanding of Chairman Bernanke's speech raises a genuine dispute of material fact.

Fourth, Defendants contend that Plaintiffs are required to "establish the mechanism by which the truth was revealed" by establishing "who leaked information" and "where, when, or how such a leak occurred." BoA. Mem. at 39, 42, n.25. There is no such requirement in the law, and Defendants cite to none. To defeat Defendants' motion, all Plaintiffs are required to do is to raise a genuine factual dispute as to whether a leak occurred – and the evidence summarized above easily satisfies this requirement. *Flag Telecom*, on which Defendants rely, does not require a specific "mechanism" by which the truth was revealed. Instead, in *Flag Telecom*, the court found that plaintiffs had failed to demonstrate that any of the information that leaked revealed the truth about the alleged misrepresentations. *See* 574 F.3d at 41.[22] In contrast, Plaintiffs here have put forth significant evidence that BoA's need for a bailout leaked to the market by January 13. Further, Plaintiffs have demonstrated the primary "mechanism" of the leak: McEntire's email specifically identifies Chairman Bernanke's January 13 speech as the source of the market's belief that the combined company required additional capital.[23]

---

[22] *Bricklayers and Trowel Trades Int'l Pension Fund*, 2012 WL 118486 (D. Mass. Jan 13, 2012) (cited at BoA Mem. at 39) was not a leakage case and had nothing to say about the evidentiary requirements to prove leakage.

[23] Defendants' cases are not to the contrary. Rather, the courts in those cases rejected plaintiffs' attempts to argue loss causation for a full stock price decline over months – without any identified disclosures or any evidence of

Last, recognizing the strength of Plaintiffs' evidentiary support for their leakage theory, Defendants contend that McEntire's January 13 email is hearsay.  However, McEntire's email is admissible as an admission of a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(D), which provides that a statement is not hearsay if it is "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  The statement by McEntire, who as BoA's Vice President of Investor Relations commonly evaluated investor reaction to market news, clearly falls within the scope of his employment with BoA.  *See, e.g.*, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (concluding email by vice president of company was admissible under Rule 801(d)(2)(D) because she was an agent of a party to the action acting within scope of her employment).  Furthermore, his email demonstrates BoA's recognition of the causes of the January 13 stock price decline, which is highly probative non-hearsay evidence of loss causation.  *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 236-37 (E.D.N.Y. 2009) (evidence offered to show defendants' state of mind not hearsay) (citing Fed. R. Evid. 801(c)).[24]

---

specific leaks – simply because "the market must have known."  *See In re Williams Sec. Litig*, 558 F.3d 1130, 1138 (10th Cir. 2009) (rejecting loss causation theory based on "a number of tiny corrective disclosures occur[ing] each and every day of the [two-year] class period"); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103-104 (S.D.N.Y. 2011) (rejecting loss causation theory for two-month period based on "bare allegation that rumors were circulating in the market" that was "so general that it fail[ed] to provide the Defendants with proper notice of what rumors Lead Plaintiffs are referring to").  Other cases involved failures to link market rumors with the allegedly undisclosed information at all – which, in contrast, Plaintiffs have clearly done here.  *See Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 390-91 (S.D.N.Y. 2011) (plaintiffs did "not allege whether the rumors related to the inaccurate write-down at the heart of the Complaint").

[24] Moreover, even if the January 13 email were inadmissible – which it is not – Mr. Coffman can rely on the email as support for his opinion that the stock price drop on January 13 was in response to leakage.  Experts may rely upon inadmissible evidence so long as it is "of a type reasonably relied upon by experts in the particular field."  Fed. R. Evid. 703; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'"); *Dolin v. Contemporary Fin. Solutions, Inc.*, 2009 WL 4730465, at *3 (D. Colo. Dec. 8, 2009) (permitting plaintiff's securities expert report based in part of hearsay).  Mr. Coffman's reliance on the email is a matter of credibility, not admissibility.  *See United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993).

### 3. Plaintiffs May Recover Section 14(a) Damages For Stock Price Declines Caused By The Disclosure Of Merrill's Fourth Quarter Losses

Defendants also assert that, as a matter of law, Plaintiffs may not recover Section 14(a) damages for some unidentified portion of the stock price decline that they suggest may be attributable to "the disclosure of losses that were not known or forecast at the time of the vote on December 5." BoA Mem. at 22-23. Defendants' sole support for this assertion is a statement from the Court's August 27, 2010 opinion that "allegations relating to events that took place after December 5, 2008, cannot form the basis of a Section 14(a) claim." *Bank of Am.*, 757 F. Supp. 2d at 291. However, this argument misconstrues the Court's decision. The Court was not referring to a limitation on recoverable damages, but explaining that only statements made on or before the date of the vote can be actionable under Section 14(a). *Id.* As the Court recognized, Plaintiffs' Section 14(a) claim fully comports with this limitation because Defendants' liability is based only on the misstatements and omissions that they made on or before the date of the vote. *Id.*

Defendants' argument is also wrong on the law. As noted above, once a proxy omits or misrepresents a material fact, a defendant may be liable for any resulting "investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions." *Amorosa*, 409 Fed. App'x at 415 (quoting *Lentell*, 396 F.3d at 173). In this case, discovery has shown that the massive fourth quarter losses at Merrill, which were belatedly revealed to the market in mid-January, were squarely within the "zone of risk" concealed by Defendants as of the date of the vote. Defendants expected Merrill to suffer at least $16.2 billion in pre-tax losses as of the date of the vote – an amount that Defendants do not contest was highly material and which represented more than 75% of the losses that Merrill ultimately incurred. CS ¶¶ 114, 267. In violation of Section 14(a), Defendants failed to disclose this material

information to shareholders voting on the Merger.  As a direct result of the disclosure of Merrill's losses to the market in mid-January 2009, BoA's share price declined.  CS ¶¶ 244-45, 255, 258-59, 270.  Because Merrill had already suffered massive losses as of the date of the vote, the "risk" or "subject" that caused this stock price decline – *i.e.*, Merrill's catastrophic fourth quarter results – was plainly within the zone of risk that Defendants concealed as of December 5, 2008.[25]

Defendants also contend that none of the corrective disclosures "specifically identifies the losses that had occurred as of December 5."  BoA Mem. at 22.  However, the law does not require Defendants to have disclosed the exact amount of losses that existed as of December 5 for loss causation to exist.  *See, e.g.*, *In re Bristol-Myers*, 2005 WL 2007004, at *20 (a corrective disclosure need not "be the linguistic mirror image of the alleged fraud").  Judge Kaplan's recent decision in *Lehman* is illustrative.  In *Lehman*, the defendants argued that there could be no loss causation as a matter of law because the relevant disclosures (a series of write-downs and downgrades that ultimately culminated in Lehman's bankruptcy) did not specifically reveal the exact alleged accounting fraud that caused Lehman's demise.  In rejecting this contention and holding that loss causation was adequately pled, Judge Kaplan explained that loss causation existed because "the alleged misstatements and omissions concealed the extent of" deterioration at Lehman, and later disclosures of write-downs and downgrades – and ultimately Lehman's bankruptcy – constituted the "materialization of those risks," regardless of whether they disclosed the "precise" fraud at issue.  *Lehman Bros.*, 799 F. Supp. 2d at 305-06.  This reasoning

---

[25] Defendants suggest that Mr. Coffman's methodology for calculating Section 14(a) damages conflicts with his approach under Section 10(b) because, for Section 10(b) purposes, Mr. Coffman calculated the artificial inflation in BoA's shares for each day during the Class Period based on Merrill's incurred and projected losses to date.  *See* BoA Mem. at 22 n.16.  However, Section 10(b), unlike Section 14(a), contains a "purchase or sale" requirement.  Thus, calculating damages under Section 10(b) requires the identification of the particular amount by which BoA's stock price was inflated on each day during which purchases were potentially made.

applies with even greater force here, as the disclosure of Merrill's losses in January 2009 plainly constituted the materialization of the concealed risk that existed as of the date of the vote.

### 4. Defendants Again Fail To Establish That The January 21, 2009 *Financial Times* Article Contained No "New News"

As the Court has held, Plaintiffs adequately alleged that the Proxy and Merger Agreement made a series of false and misleading statements concerning Merrill's ability to pay discretionary bonuses. For example, the Proxy stated that Merrill "shall not" pay discretionary bonuses without BoA's consent. CS ¶¶ 23, 53. The Proxy further represented that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "<u>the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations</u>." CS ¶ 183. To ensure that this "integral link" was not severed, the Proxy further assured shareholders that Merrill's executive bonuses were "[p]aid in January for performance in the prior fiscal year." CS ¶ 184. Contrary to these statements, BoA had secretly agreed, as part of the Merger, to permit Merrill to pay up to $5.8 billion in bonuses to its employees on an accelerated basis, prior to the close of the Merger, and without any consideration of Merrill's financial performance. CS ¶¶ 2-10, 168, 171-76, 183-96.

Notably, in their motions, no Defendant has argued that these statements were not materially false and misleading. Instead, the Bank contends that it cannot be liable for these misstatements as a matter of law because certain newspaper articles supposedly informed the market that the above representations were not true. *See* BoA Mem. at 5, 26-32. This argument is meritless.

On the night of January 21, 2009, the *Financial Times* published an article that revealed to investors for the first time that Merrill had taken "the unusual step of accelerating bonus

payments by a month," and had paid $3-4 billion in bonuses notwithstanding its historic fourth quarter losses.  CS ¶¶ 276-77.  In contrast with prior media speculation, the *Financial Times* article, for the first time, definitively stated that Merrill had, in fact, paid multi-billion dollar bonuses for 2008, notwithstanding its massive fourth quarter losses.  The article also quantified the amount of the bonuses paid as $3-4 billion, and revealed that the bonuses were paid outside the ordinary course by Merrill and on an accelerated basis prior to the Merger's close.  *Id*.  Additionally, the article was the first to contain a statement by BoA that the Bank knew about Merrill's $3-4 billion in accelerated bonus payouts for 2008.  *Id*.  These new disclosures shocked the public, with analysts and the financial press widely criticizing the payment of the "ridiculous" bonuses as a "damaging revelation" and the New York Attorney General initiating an immediate inquiry into Merrill's "large, secret, last-minute bonuses." CS ¶ 293.  On January 22, the first trading day after the publication of the *Financial Times* article, BoA's stock price plummeted 14.5%.  CS ¶ 278.  Both parties' experts agree that this decline was statistically significant, and Mr. Coffman has opined that it was caused by the disclosure of new information in the *Financial Times* article.  CS ¶¶ 279-81.

In response to these facts, Defendants argue – for at least the third time – that news articles published prior to January 21, 2009 disclosed to investors all of the information in the *Financial Times* article, and supposedly "corrected" all of the false statements in the Proxy regarding Merrill's ability to pay bonuses and its compensation practice.  *See* BoA Mem. at 26-33.  Defendants' argument still fails.

As the Court is aware, at the motion to dismiss stage, Defendants argued that, based on "widespread news accounts," the market was well aware that Merrill would pay billions in bonuses and was not misled by the false statements in the Proxy.  ECF No. 65 at 19-20.  After

thoroughly considering Defendants' argument, the Court "decline[d] the defendants' invitation to disregard governing Second Circuit precedent," (*Bank of Am.*, 757 F. Supp. 2d at 302 & n.8), which instructs that:

> the mere presence in the media of sporadic news reports does <u>not</u> give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading, and such reports should <u>not</u> be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials.

*United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993); *see also Bank of Am.*, 757 F. Supp. 2d at 302 (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) ("[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them")).  This principle applies with particular force here, as the Proxy expressly instructed shareholders to "rely only on the information contained in or incorporated by reference in this document," and "not rely on … any representation about the merger or our companies that is different from, or in addition to, that contained in this document."  CS ¶ 54.  Further, after considering the numerous news articles Defendants submitted, the Court concluded that the cited articles did not "speak to the Merrill bonuses with 'a degree of intensity and credibility' that effectively counterbalances language in the Merger Agreement and Joint Proxy." *Bank of Am.*, 757 F. Supp. 2d at 302; *see also SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) (Rakoff, J.) (concluding that news articles proffered by BoA did not disclose the Bonus Agreement and were "entirely irrelevant").

Then, in opposing class certification, Defendants argued that Rule 23's "rigorous analysis" required the Court to examine the "merits" of Plaintiffs' claims, and that this merits analysis would demonstrate that "January 22, 2009 was not a 'corrective disclosure' day as no

new news concerning Merrill's payment of bonuses was revealed." *See* ECF No. 487 at 1, 23-25. The Court once again considered Defendants' argument, including a review of the ten additional media reports submitted by Defendants and the expert report of Allen Ferrell (which also cited a litany of media reports).  Following the "rigorous analysis" required at class certification, the Court again rejected Defendants' argument, holding that "the record offered by defendants reflects the same infirmities" that existed at the motion to dismiss stage.  *See Bank of Am.*, 2012 WL 370278, at *8.  The Court further found that the selected "press reports cited by defendants" undermined their position, "includ[ing] language that qualified the likelihood of Merrill bonuses."  *Id.*  The Court also again directed Defendants to the Second Circuit's decision in *United Paperworkers*, noting that the Second Circuit upheld a denial of summary judgment on the basis that "'sporadic news reports' contradicting proxy solicitation materials did not provide shareholders with notice of allegedly misleading statements."  *Id.* (quoting 985 F.2d at 1199).

Now, four months after the Court's class certification decision, "it's déjà vu all over again."  Notwithstanding the Court's two prior rulings and controlling Second Circuit law, Defendants now argue for a third time that the Court should hold, as a matter of law, that the truth had already entered the market before the *Financial Times* article was published on January 21, 2009.  Their argument once again fails.

### a.  Defendants Cannot Obtain Summary Judgment By Renaming Their Rejected Truth-On-The-Market Defense

In an attempt to sidestep the Court's prior holdings, Defendants seek to recast their "truth-on-the-market" defense as one of "loss causation."  And with good reason – the Court has observed that Defendants' burden to prove this argument is nearly impossible to meet at summary judgment.  *See Bank of Am.,* 757 F. Supp. 2d at 302 ("[D]efendants' burden [in establishing truth on the market] is extremely difficult, perhaps impossible, to meet at the

summary judgment stage.").  Defendants' attempt to restyle their truth-on-the-market defense should be rejected.  Courts have consistently held that defendants may not obtain summary judgment on loss causation grounds merely by repackaging a failed truth-on-the-market defense, as Defendants attempt to do here:

> In its discussion on loss causation, [Defendant] again tries to inject its truth on the market defense, which the Court has decided is a jury question. In fact, most of [Defendant]'s loss causation arguments rest on establishing that the disclosures revealed information already known to the market, and thus could not have negatively affected the market. The Court holds that this remains a factual determination to be decided by the jury, and that, as a result, [Defendant] cannot prevail on summary judgment…. Because a reasonable jury might find that [Defendant] cannot prevail on its truth on the market defense, it could also find that Plaintiffs' losses were caused by the relevant misrepresentations.

*Freeland v. Iridium World Comm., Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008).  This principle holds particularly true here.  Indeed, as set forth below, discovery has revealed substantial evidence that confirms that the *Financial Times* article contained "new news" and caused the statistically significant drop in BoA stock on January 22, 2009.

### b.    The Stock Price Reaction To The *Financial Times* Article Confirms That The Article Contained "New News"

The swift and severe decline in BoA's stock price shortly after the publication of the *Financial Times* report raises a genuine factual dispute as to whether the article contained "new news."  *See Bank of Am.*, 2012 WL 370278, at *8 (citing *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *6 (S.D.N.Y. Jan. 24, 2012) ("evidence of a stock price movement following corrective disclosures may be a relevant factor in the legal assessment of materiality")).  On January 22, 2009, the first trading day following the *Financial Times* report, BoA's stock price plummeted 14.5%.  CS ¶ 278.  At class certification and again during the latest round of expert discovery, both sides' experts conducted event studies, and both sides' experts agreed that BoA's stock drop on January 22, 2009 was statistically significant. CS ¶¶ 279-80.

Further, as the Court noted in granting class certification, Defendants' expert Allen Ferrell – who is the same expert they proffer at this stage – claimed that sheer "randomness" caused the decline on January 22. *Bank of Am.*, 2012 WL 370278, at *8. However, following the Court's class certification decision, Ferrell changed his mind and opined that the stock drop on January 22 was caused by Thain's termination. CS ¶¶ 294, 297. Although Defendants nowhere mention their loss causation expert's new opinion in their summary judgment brief, the change in Ferrell's position itself raises a factual dispute as to the cause of the stock price decline on January 22. Moreover, Plaintiffs' expert, Mr. Coffman, has demonstrated that Ferrell's latest opinion is belied by the fact that nearly <u>90%</u> of the decline in BoA's stock price on January 22 occurred <u>before</u> there was any news concerning Thain's termination. CS ¶¶ 295-96.[26] In any event, both parties' experts agree that there was a statistically significant stock price decline on January 22, but disagree as to the precise cause – a classic battle of the experts that cannot be resolved as a matter of law.

### c. The Market Commentary Following The *Financial Times* Article Confirms That It Contained "New News"

The response of sophisticated market observers and financial media to the January 21 *Financial Times* article is also fatal to Defendants' recycled argument that the article contained no "new news." Within hours of its publication, a number of sources – including *The Wall Street Journal*, *Reuters*, *Bloomberg*, *Dow Jones,* and *The New York Times* – wrote news articles concerning Merrill's bonus payments, and <u>uniformly attributed the source of their new</u>

---

[26] At class certification, the first news that Ferrell identified relating to Thain's firing occurred at 10:30 a.m. CS ¶ 295. As Mr. Coffman explained, by that time, approximately 90% of the stock drop had occurred. CS ¶ 296. After the Court issued its class certification decision, Ferrell identified <u>for the first time</u> a televised news report on CNBC that purportedly revealed Thain's firing as of 9:44 a.m. on January 22, 2009 (the "Faber Report"). CS ¶¶ 297-98. Ferrell was unable to explain why, if the CNBC report was so relevant, he failed to cite it at class certification. Of course, the reason he did not cite that report is because it does not support his point. The Faber Report says nothing about Thain being terminated – a fact that Dr. Ferrell was forced to admit at his recent deposition. CS ¶¶ 299-300 ("It does not say in that – in the 9:44 a.m. [report] that he is going to be resigning or terminated[.]").

information to the revelations in the January 21 *Financial Times* article.  CS ¶¶ 282-92.  For example, on January 22, *The New York Times* reported that the "controversy over [BoA's] acquisition of Merrill Lynch appeared to grow on Thursday [January 22] with a report in the *Financial Times*."  CS ¶ 286.  *Dow Jones* similarly stated that "the Financial Times reported Thursday" that "Merrill Lynch handed out up to $4 billion in bonus payments to employees a month earlier than it usually does, and just three days before it was sold to Bank of America Corp."  CS ¶ 284.  Over a dozen well-recognized media outlets similarly described how the "the *Financial Times* revealed" new information about Merrill's bonuses, including their size, accelerated payment schedule, and the fact that they had been paid notwithstanding Merrill's crippling losses.  CS ¶¶ 282-92 (citing numerous articles).[27]  Tellingly, a number of those media outlets that reported on the *Financial Times*' revelations are the same media outlets that Defendants contend previously disclosed this information to investors in news articles published "months *before* January 21."  *See* BoA Mem. at 5.

In their motion, Defendants fail to address the above-mentioned articles discussing the new information "revealed" in the *Financial Times* article, even though these articles were identified by Mr. Coffman in his expert report over three months ago.  Defendants offer no explanation of how, if the *Financial Times* reported "stale" information on January 21, the article was identified as providing "new news" by, among others, *The Wall Street Journal*, *Reuters*, *Bloomberg*, *Dow Jones*, and *The New York Times*.  Nor do Defendants provide any explanation

---

[27] *See, e.g.*, CS ¶¶ 282-92 (citing, *inter alia*, "It's Not Their Money," *The New York Times*, January 23, 2009 ("According to a report in The Financial Times on Thursday, Merrill granted $3 billion to $4 billion in bonuses in December[.]"); "Financial News: Cuts Begin at Bank of America Merrill Lynch," *Dow Jones Factiva*, January 22, 2009 ("The cuts come as it emerged that Merrill Lynch staff shared a bonus pool worth as much as $4 billion (EUR3.1 billion), according to a source cited by the Financial Times, while Bank of America staff have yet to receive a bonus payment"); "Are You In-Thain? He Spends Huge in a Crisis, Merrill CEO Gets Boot As Losses Grow," *NY Daily News*, Helen Kennedy, January 23, 2009 ("The Financial Times revealed that in December, just days before the Bank of America takeover, Merrill rushed through $4 billion in bonuses, which are typically given in late January")).

for why the very same media outlets that Defendants claim disclosed the relevant information "months *before* January 21" expressed surprise and shock when they read the *Financial Times* article and wrote their own breaking news reports attributing the "new news" to the *Financial Times*.

Thus, the facts here are the exact <u>opposite</u> of the situation in *Omnicom*. In *Omnicom*, there was a host of news reports following the alleged corrective disclosure that expressly stated that the news article at issue in that case "did <u>not</u> raise any new factual issues." 597 F.3d at 507-08. In stark contrast, here, over a dozen major media outlets identified the *Financial Times* article as containing "new information," and Defendants have failed to identify a single document (other than their prior briefs in this Action) that identified the *Financial Times* article as containing "stale" news. As the court recently explained in denying defendants' motion for judgment as a matter of law in *Vivendi*, "[w]hile the court in *In re Omnicom* could point to particular articles explicitly stating that the Wall Street Journal article disclosed no new information, [plaintiff's expert here] can point to articles noting the market's 'surprise' at the downgrade." 634 F. Supp. 2d at 372. While the widespread market recognition that the *Financial Times* article was the source of the "new" information about Merrill's bonuses is sufficient to establish a genuine issue of fact, when coupled with the statistically significant decline in the price of BoA stock, it is easily sufficient to demonstrate loss causation.

> **d.    Defendants' Latest News Articles Fail To Establish That The *Financial Times* Article Contained No "New News"**

The only thing "new" about Defendants' latest attempt to demonstrate that the *Financial Times* article contained no "new news" is a citation to nine articles not previously cited in their

earlier submissions.  *See* BoA Mem. at 5.[28]  Significantly, Defendants offer no explanation for why they waited at least <u>three years</u> and through <u>two rounds</u> of motion practice before bringing these purportedly dispositive articles to the Court's attention, and their silence on this issue speaks volumes.  Defendants do not claim (nor could they) that they and their experts did not know about these articles when they made their earlier submissions to the Court.[29]  Nor can they seriously contend that they withheld relevant evidence from the Court when they argued at class certification that the Court should conduct a "rigorous" analysis of the "<u>merits</u>" to determine whether newspaper articles disclosed the truth to the market.  Defendants' failure to cite these articles in their prior submissions is powerful confirmation that they say nothing "new," are far less relevant than the articles previously submitted, and provide no grounds to avoid a trial of Plaintiffs' claims concerning the secret Bonus Agreement.

A review of Defendants' nine "new" articles confirms the true reason why Defendants did not cite them earlier.  Like their earlier articles, all of "the press reports cited by defendants included language that qualified the likelihood of Merrill bonuses."  *Bank of Am.*, 2012 WL 370278, at *8.  Of the nine "new" articles, three of them are virtually identical and concern only "<u>[i]nvestment bankers in Asia</u>" (not the United States) and state that only "<u>some</u>" (not even all) of these bankers in Asia received bonuses.  Pl. Response to Bank Def. Statement No. 49.  These reports neither provide any quantification of Merrill's bonuses, nor mention Merrill's catastrophic fourth quarter losses.  Another of the "new" articles cited by Defendants as supposed "evidence" that the market knew about the secret Bonus Agreement says just the

---

[28] Defendants attempt to justify their recycled arguments by claiming that their prior arguments focused on articles published in October, before the Proxy was published, whereas their arguments here are focused on articles published in December and January.  This is not true.  At class certification, Defendants offered – and the Court found insufficient – numerous articles and media reports that were issued after the Proxy was filed.  *See* ECF No. 488, Naftalis Decl. Exs. 40-48.

[29] If Defendants were somehow not aware of these articles until now, this would obviously raise fact issues as to whether the market could have been aware of them.

opposite.  On the subject of bonuses, Defendants' December 19 *Dow Jones* article quotes Merrill employees as stating that "[i]t is all rumor and counter-rumor.  I haven't heard anything," and that for most employees, "there isn't likely to be anything" in bonuses in 2008.  Pl. Response to Bank Def. Statement No. 47.

Similarly, Defendants' December 19 *New York Times* article states that "the buzz of money … is all but silenced," and that workers were expected to be "notified" of bonuses (if any) "next week" – not that any bonuses were or would be paid.  Pl. Response to Bank Def. Statement No. 46.  Indeed, this article actually perpetuated Defendants' misrepresentations in the Proxy, inaccurately stating that "Bank of America played a role in limiting bonuses" at Merrill – when, in reality, unbeknownst to investors, BoA had ceded control over Merrill's bonus payments.  *Id*.  Finally, none of these "new" articles revealed that BoA had agreed to let Merrill pay multi-billion dollar bonuses on an accelerated basis despite suffering catastrophic fourth quarter losses.

Defendants' two "new" articles dated after the disclosure of Merrill's losses also do not contain the information first revealed by the *Financial Times* on January 21.  One of these articles, a January 16 *Financial Times* article, was authored by the very same reporter who penned the *Financial Times* article on January 21.  Pl. Response to Bank Def. Statement No. 51.  Defendants cannot seriously contend that the reporter who authored the January 21 news-breaking article actually reported the exact same information in an article published five days earlier.  Indeed, the January 16 *Financial Times* article omits critical information about the Bonus Agreement contained in the January 21 report; the January 16 article contains no quantification of the bonus pool and no confirmation from BoA of its involvement in the bonus payout.  The sole remaining article Defendants cite, a January 20 article published in the

*Australian Financial Review*, also did not quantify the amount of bonuses that Merrill would pay and, in addition, was not picked up by any media outlet in this country.  Pl. Response to Bank Def. Statement No. 52.  In sum, none of Defendants' newly cited articles are meaningfully different than those previously submitted to the Court.  They certainly provide no basis for holding that as, a matter of law on this disputed record, the January 21 *Financial Times* article contained no "new news."

Defendants also mistakenly contend that, based on the news available prior to the January 21 *Financial Times* article, reasonable investors should have "put two and two together" and realized that Merrill and BoA had secretly agreed to accelerate the payment of $3.6 billion in bonuses, notwithstanding Merrill's historic fourth quarter losses and the express terms of the Proxy.  *See* BoA Mem. at 29-30.[30]  This is nonsense.  Second Circuit law is clear that investors are <u>not</u> required to sort through speculative, unconfirmed and highly qualified media reports in order to attempt to divine material facts that are required to be disclosed in a Proxy.  *See supra* at 41-43 (discussing *United Paperworkers*, 985 F.2d at 1199 and *Kronfeld*, 832 F.2d at 736).  Moreover, as noted above, the articles on which Defendants rely did not disclose that Merrill had, in fact, with BoA's knowledge, accelerated the payment of billions of dollars in bonuses despite its staggering losses.  In light of these facts, reasonable investors "doing the math," as Defendants assert they were, would have concluded that, under Merrill's "pay for performance" policy as described in the Proxy, Merrill and BoA would have at least considered Merrill's catastrophic fourth quarter losses when deciding bonuses, and that bonuses would have been impacted by those results.

---

[30] As discussed above at page 28, n.18, Defendants' reliance on *Merck*, 432 F.3d 261, is misplaced.  There, investors could "put two and two together" by calculating figures contained in separate parts of the company's own disclosures (*id*. at 271) – not inferring the existence of a material but undisclosed side agreement based on unconfirmed, speculative news reports contradicted by BoA's and Merrill's disclosures.

### 5.    Defendants' Securities Act Arguments Also Fail

Defendants also fail to demonstrate that, as a matter of law, Plaintiffs' Securities Act claims should be dismissed.  Under the Securities Act, the burden is squarely on Defendants to prove that the decline in BoA's stock price resulted from factors other than the alleged misrepresentations and omissions.  *See* 15 U.S.C. § 771(b).  Defendants have not met this burden.  As set forth above, Defendants' expert has offered conflicting testimony regarding the cause of the stock price decline on January 22, opining first that it was due to "randomness" and now that it was due to Defendant Thain's firing.  *See supra* at 44-45.  Plaintiffs have put forward a host of evidence demonstrating that the stock price decline was not caused by "randomness" or Thain's firing, but instead was caused by the disclosure of the information in the January 21 *Financial Times* article.  *Id.*[31]  Thus, at a minimum, there is a genuine factual dispute as to whether the *Financial Times* article caused the stock price decline on January 22.

## IV.    Defendant Lewis Is Not Entitled To Summary Judgment

Defendant Lewis seeks summary judgment with respect to all the claims asserted against him: (i) the Section 14(a) claims concerning his misstatements and omissions about Merrill's massive fourth quarter losses and the Bonus Agreement; (ii) the Section 10(b) claims concerning his misstatements and omissions about Merrill's losses and the Bonus Agreement; (iii) the Section 11 claims concerning his misstatements and omissions about the Bonus Agreement; and (iv) the control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

---

[31] Neither of the cases Defendants rely on to argue that they are not required to offer any alternative evidence of causation redeem their argument.  In *Flag Telecom*, the plaintiffs had failed to plead any corrective disclosures that took place before a proposed class representative's stock sales, rendering him an "in and out" trader and allowing the Second Circuit to conclude that there was a lack of causation.  574 F.3d at 33-34.  Similarly, in *McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, the defendants had offered proof that the alleged misrepresentations did not cause plaintiffs' losses, and plaintiffs "adduced no evidence to the contrary."  2005 WL 1541062, at *12 (D.N.J. June 30, 2005).  This is a far cry from the clear evidence offered by Plaintiffs here.

Lewis does not dispute on this motion that his and BoA's representations and omissions regarding Merrill's losses and the Bonus Agreement were materially false and misleading. Rather, his defense rests on the legally and factually incorrect proposition that, even assuming he and BoA made materially misleading statements and omissions, he is immune from liability because he purportedly relied on others to make all disclosure decisions. Specifically, he claims that, as a matter of law, he was neither negligent nor reckless in not disclosing Merrill's losses because he relied in "good faith" on Defendant Price's supposed statements to him that counsel had determined no disclosures were required. *See* Lewis Mem. at 1-7, 14-19. Similarly, Lewis contends that he was neither negligent nor reckless in not disclosing the Bonus Agreement because he "delegated" all decision-making for the Bank's disclosures to "merger specialists and legal advisors," who Lewis claims were responsible for ensuring the accuracy and completeness of these disclosures. *See id.* at 4, 7-9, 19-22.

Lewis's efforts to evade responsibility for BoA's non-compliance with the federal securities laws by hiding behind lawyers, Price, and other so-called "experts" should be rejected. Lewis's arguments misconstrue the law, which requires that a CEO take responsibility for his own statements and the disclosures issued in his name. Further, Lewis's fact-intensive assertions are belied by the evidence at every turn and, at best, raise factual disputes for the jury to resolve.

## A.  Legal Standards For Plaintiffs' Exchange Act Claims

### 1.  The Element Of Negligence Under Section 14(a)

A "Section 14(a) plaintiff need only establish that a misleading statement was a consequence of 'at worst negligence by the issuer.'" *Bank of Am.*, 757 F. Supp. 2d at 320-22 (quoting *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (Posner, J.)). "[N]egligence is not a state of mind; it is a failure … to come up to the specified standard of care." *Beck*, 559 F.3d at 682. As this Court has recognized, there is no "good faith" defense under Section 14(a).

52

"[A] proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed <u>in perfect good faith</u> that there was nothing misleading in the proxy materials."  *Bank of Am.*, 757 F. Supp. 2d at 321 (quoting *Beck*, 559 F.3d at 682).

Significantly, the existence of materially false and misleading statements or omissions in a proxy is, by itself, sufficient to establish negligence under Section 14(a).  The Second Circuit and other courts across the country have held that, "[a]s a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [] negligence standard."  *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) (quoted in *Bank of Am.*, 757 F. Supp. 2d at 321); *see also, e.g.*, *Beck*, 559 F.3d at 682 ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer."); *In re Wells Real Estate Inv. Trust, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 143057, at *33 (N.D. Ga. Aug. 2, 2010) ("[I]f the fact finder determines that the information withheld was material, then these defendants would be, as a matter of law, negligent in choosing to omit the information from the Proxy materials.").

Because good faith is no defense to liability under Section 14(a), Lewis's argument that he relied in good faith on counsel and others to determine whether Merrill's fourth quarter losses and the Bonus Agreement should be disclosed cannot prevent Plaintiffs' Section 14(a) claims from going to the jury.  *Bank of Am.*, 757 F. Supp. 2d at 321; *Wilson*, 855 F.2d at 995; *Beck*, 559 F.3d at 682; *Wells Real Estate*, 2010 U.S. Dist. LEXIS 143057, at *32-35.  Moreover, as explained below, the record is replete with facts demonstrating that Lewis acted at least negligently in failing to disclose Merrill's losses and the Bonus Agreement.

### 2.   The Fact-Intensive Element Of Scienter Under Section 10(b)

Under Section 10(b) of the Exchange Act, a plaintiff is required to establish that the defendant acted with scienter. *Bank of Am.*, 757 F. Supp. 2d at 286.  Scienter may be proven by demonstrating a defendant's recklessness, defined as conduct that is "highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 325.  "The Second Circuit has stated that the 'egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'" *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2011 WL 3211472, at *9 (S.D.N.Y. July 29, 2011) (quoting *Novak v. Kasaks*, 216 F3d. 300, 308 (2d Cir. 2000)).

As this Court has held, "'[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences.'" *Owens v. Gaffken & Barringer Fund, LLC*, 2011 WL 1795310, at *5 (S.D.N.Y. May 5, 2011) (Castel, J.) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).  Indeed, Second Circuit law is clear that scienter determinations present quintessential fact issues that must be resolved by the jury. *See Press*, 166 F.3d at 538 ("[w]hether a given intent existed is generally a question of fact, appropriate for resolution by a trier of fact") (internal quotation marks omitted); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) ("Whether or not a given intent existed, is, of course, a question of fact."); *In re Refco Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 33554, at *31 (S.D.N.Y. Mar. 28, 2011) (same); *WorldCom*, 352 F. Supp. 2d at 500 (same). Ultimately, as this Court has recognized, "[a] factual determination of intent often turns on circumstantial evidence and reasonable inferences to be drawn therefrom" as well as an

54

assessment of "the credibility of witnesses" – exactly the type of determinations that are reserved for the fact-finder.  *Owens*, 2011 WL 1795310, at *5 (collecting cases).[32]

As set forth below, numerous facts developed during discovery readily establish that Lewis acted at least recklessly for the purposes of Section 10(b), and preclude judgment against Plaintiffs as a matter of law.

**B.      There Is A Genuine Factual Dispute As To Whether Lewis Acted Negligently And Recklessly In Failing To Disclose Merrill's Staggering Fourth Quarter Losses**

**1.      Defendant Lewis's Affirmative Misstatements About The Accretive/Dilutive Impact Of The Merger Defeat Any Good Faith Defense**

Defendant Lewis made materially false statements related to Merrill's losses – an act that no amount of legal advice can justify or excuse, and that is squarely at odds with his assertions of "good faith."   Specifically, as described more fully in Plaintiffs' motion for partial summary judgment, Lewis made material misrepresentations to BoA's shareholders concerning the accretive and dilutive impact of the Merger.   In soliciting shareholder approval of the Merger, Lewis and BoA repeatedly emphasized that the transaction was expected to be just 3% dilutive in 2009 and breakeven to slightly accretive in 2010, and the Proxy signed by Lewis stated that these accretion/dilution figures were a "material factor" supporting the Board's recommendation that shareholders vote in favor of the transaction.   Pl. 56.1 ¶¶ 30-36.   Similarly, at the December 5, 2008 shareholder meeting, in response to a shareholder question concerning the dilutive impact of the Merger, Lewis personally assured shareholders that the Merger would be only 3% dilutive in 2009 and breakeven in 2010.   Pl. 56.1 ¶¶ 92-93.

---

[32] Indeed, even Defendant Price, who – like Lewis – is a Section 10(b) Defendant in this matter, concedes that the issue of intent "cannot be resolved on summary judgment and must await trial."  Price Mem. at 1.

However, Lewis has now <u>admitted</u> in sworn testimony that BoA's accretion/dilution analysis had changed "dramatically" by the date of the vote, and thus, his statements to shareholders – including his personal statements at the shareholder meeting – were materially false.  Pl. 56.1 ¶¶ 94-98.  In particular, Lewis admitted that, as of the date of the vote, BoA expected the Merger to be more than 13% dilutive in 2009 and 2.8% dilutive in 2010 – a change that Lewis admitted represented a "significant" difference from the figures he had repeatedly presented to shareholders in soliciting their approval of the deal.  *Id.*

Lewis's false statements concerning accretion/dilution cannot be reconciled with his claim to have acted in "good faith," and eviscerate any assertion that he relied on his attorneys to ensure that his statements were accurate and complete.  The evidence establishes that Lewis and BoA never informed counsel of the material change in the accretion/dilution analysis (CS ¶ 126) and, even if Lewis had sought such counsel, there is no legal advice that can absolve a lie.  The law is clear that where, as here, a defendant knowingly misrepresents a material fact, the defendant cannot escape liability by claiming that a lawyer blessed the deception.  *See SEC v. Mut. Benefits Corp.*, 2004 U.S. Dist. LEXIS 23008, at *71-74 (S.D. Fla. Nov. 10, 2004) ("in light of the Court's other findings regarding defendants' misrepresentations and material omissions, it would be difficult to conclude that defendants relied on their counsel's advice *in good faith*") (emphasis in original); *SEC v. Battenberg*, 2011 WL 3472619, at *5 (E.D. Mich. Aug. 9, 2011) (reliance on advice of counsel does not negate scienter requirement where defendant is aware that public disclosures contain material false or misleading statements).  At the very least, the jury must decide the credibility of Lewis's "good faith" defense by considering his conduct in misrepresenting the Bank's accretion/dilution calculations.

### 2. Defendant Lewis Knew Of Merrill's Massive Losses And Their Impact On Merrill

The evidence also demonstrates that Lewis <u>knew</u> before the vote of Merrill's massive losses and their catastrophic impact on Merrill. *See* Pl. 56.1 ¶¶ 54-56, 61-65, 75-76, 80-88. Indeed, on December 3, 2008, two days before the vote, Lewis decided, in consultation with Defendants Price, Thain, and Cotty, to increase Merrill's pre-tax loss estimate to more than $14 billion for the fourth quarter, and ordered Thain to reduce Merrill's balance sheet because the losses had decimated Merrill's capital ratios. Pl. 56.1 ¶¶ 61, 81-88. Based on these facts, a reasonable juror could conclude that Lewis acted recklessly in failing to disclose this information to shareholders voting on the Merger. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (recklessness may be established where defendant "knew facts or had access to non-public information contradicting their public statements"); *Novak*, 216 F.3d at 308 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292, 299 (S.D.N.Y. 2002) (summary judgment denied where there was evidence of "'defendants' knowledge of facts or access to information contradicting their public statements'").

Moreover, contrary to his contention, Lewis was well aware of numerous "red flags" concerning Merrill's financial condition that should have caused him to question whether disclosure was required. *See* Lewis Mem. at 17. Among other things, Lewis testified that Merrill's losses had caused it to suffer a "large" reduction in its capital prior to the vote, requiring him to order Thain to liquidate hundreds of billions of dollars of Merrill's income-generating assets in an attempt to stabilize its capital position. Pl. 56.1 ¶¶ 54-56, 61. As

Defendant Cotty recounted in a December 3 email to Moynihan just hours after Lewis issued his instruction to Thain:

> Ken [Lewis] and Joe [Price] spent time with John [Thain] to underscore the importance of the tangible capital ratio and get the balance sheet down. Ken's words "push as hard as you can [to reduce the balance sheet] and only think about stopping when you think you've pushed too far and then … push some more."

Pl. 56.1 ¶ 61.  As detailed in Plaintiffs' motion for partial summary judgment, the reduction of Merrill's balance sheet decreased Merrill's ability to earn future income by at least $1 billion per year, and fundamentally changed the economics of the Merger, including by causing the accretion/dilution analysis to materially change for the worse.  *See* Pl. Mem. at 3-4; Pl. 56.1 ¶ 124.

Moreover, the evidence establishes that Merrill's losses triggered a liquidity crisis at Merrill that required BoA to issue $20 billion in debt in the fourth quarter of 2008 – including a "mammoth" $9 billion debt offering prior to the vote.  *See* Pl. 56.1 ¶¶ 66-80.  These debt offerings reduced the combined company's future income by an additional $500 million per year, further impacting the accretion/dilution analysis.  *See* Pl. Mem at 4; Pl. 56.1 ¶ 129.[33]

Notwithstanding his knowledge of Merrill's crippled financial condition, Lewis took no steps to ascertain how this obviously material information impacted the disclosure analysis.  In particular, Lewis: (i) took <u>no</u> steps to determine personally whether Merrill's losses should be disclosed to shareholders; (ii) <u>never</u> communicated with or sought the advice of either in-house counsel (Mayopoulos) or outside counsel (Wachtell) on the issue of disclosure; (iii) provided <u>no</u> information to counsel in connection with the analysis of whether Merrill's losses should be disclosed; (iv) did <u>nothing</u> to inquire (let alone confirm) whether counsel had been provided with

---

[33] To the extent that Lewis claims he was unaware that this $9 billion offering was necessitated by Merrill's losses, such an assertion would only raise additional fact issues and (even if credited) ultimately highlight his recklessness. The notion that a CEO would not know the reason for an unplanned $9 billion debt offering is not credible, and a jury could conclude on that fact alone that Lewis was reckless in utterly abdicating his responsibilities as CEO.

accurate and complete information regarding Merrill's losses; and (v) did <u>nothing</u> to satisfy himself that the decision not to disclose Merrill's historic losses was reasonable and appropriate. CS ¶¶ 100-11, 134-48.

Indeed, contrary to Lewis's assertion in his brief that he "did not absent himself or ignore the question" of disclosure, Lewis testified that he purposely removed himself from the analysis of whether Merrill's fourth quarter losses should be disclosed, stating that "<u>I did not want to get involved in a disclosure issue</u>." CS ¶ 111. Lewis testified that the disclosure decision was made by others, and he simply accepted it without any inquiry, oversight, or approval, asserting "No, I do not [review or approve the disclosure decision]. I take that as the decision." *Id.* In short, Lewis abdicated all responsibility to ensure that the Bank's – and his own – public statements were accurate and complete.[34] As this Court has recognized, far from providing immunity from liability under the securities laws, such derelict conduct by the CEO of a publicly-traded company demonstrates extreme recklessness. *See Bank of Am.*, 2011 WL 3211472, at *9-10 ("By virtue of his position within BofA and his awareness of Merrill's losses, Lewis's inaction on the disclosure issue raises a strong inference of recklessness."); *SEC v. Czarnik*, 2010 WL 4860678, at *9 (S.D.N.Y. Nov. 29, 2010) (one cannot "escape liability for fraud by closing his eyes to what he saw and could readily understand") (quoting *SEC v. McNulty*, 137 F.3d 732, 737 (2d Cir. 1998)). At a bare minimum, based on the facts above, a reasonable juror could find that Lewis acted both negligently and recklessly.

---

[34] If Lewis had inquired regarding BoA's disclosure obligations, he presumably would have learned that Price and BoA's in-house and external counsel had unanimously agreed that the $5 billion in after-tax losses BoA knew of on November 12 required disclosure, but that Mayopoulos reversed that decision after he and Price considered that such disclosure would likely result in a negative shareholder vote. CS ¶¶ 66-99.

###### 3.  BoA Violated Its Own Internal Procedures For Ensuring The Accuracy Of Its SEC Filings, Including The Proxy

Lewis also knew that he and BoA violated the Bank's own internal procedures for ensuring the accuracy and completeness of its disclosures.  BoA maintained a "Disclosure Committee" consisting of BoA's "principal financial executive, general counsel, risk management executive, investor relations executive and general auditor," which reported to Lewis and Price.  CS ¶ 156.  According to its charter, the Disclosure Committee was charged with ensuring that "all public disclosures made by the Corporation should be accurate and complete, fairly present the Corporation's financial condition and results of operations in all material respects, and be made on a timely basis, as required by applicable laws and stock exchange requirements."  CS ¶ 151.  The specific purpose of the Disclosure Committee was to allow Lewis and Price to "fulfill[] their responsibility for oversight of the accuracy and timeliness of the disclosures made by the Corporation."  CS ¶ 152.  To accomplish this purpose, the Disclosure Committee was specifically charged with reviewing BoA's SEC filings, including Forms 10-K, Forms 10-Q, Forms 8-K, and "proxy statements."  CS ¶ 153.  The Disclosure Committee was also charged with "[p]articipat[ing] in discussions and mak[ing] recommendations to the Senior Officers [*i.e.*, Lewis and Price] … related to the materiality of information and determination of disclosure obligations."  CS ¶ 153.  The charter also granted Lewis and Price the power to submit any other disclosure issues for the Disclosure Committee to consider.  CS ¶ 154.

Nevertheless, Lewis testified that neither he nor anyone else ever asked the Disclosure Committee to review the Proxy at any time during the fourth quarter.  CS ¶¶ 159-60.  Nor did Lewis (or anyone) ask the Disclosure Committee to consider whether Merrill's losses should be disclosed to shareholders.  CS ¶¶ 161-66.  As a result, the Disclosure Committee never reviewed

the Proxy or was consulted on any disclosure issues regarding Merrill's losses or the Bonus Agreement.   CS ¶¶ 158-67.   Lewis's conscious decision to abrogate BoA's own internal disclosure process raises additional factual issues as to his recklessness and demonstrates negligence.   As the Court has recognized, "actions contrary to expressed policy can form the basis for proof of recklessness."   *See Bank of Am.,* 757 F. Supp. 2d at 323 (citing *Scholastic Corp. Sec. Litig.*, 252 F.3d at 76); *see also Rothman v. Gregor,* 220 F.3d 81, 91 (2d Cir. 2000) (scienter supported by "a reckless failure to follow an announced policy"); *Novak*, 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").

### C.   Defendant Lewis's Disguised Advice-Of-Counsel Affirmative Defense Does Not Absolve Him Of Responsibility For His Misstatements And Omissions Concerning Merrill's Losses

Lewis responded to an interrogatory from Plaintiffs by stating that "he does not plan to assert reliance on counsel as an affirmative defense to any of the claims asserted" against him. CS ¶ 149.   Yet, Lewis now seeks summary judgment based on what is, in essence, a reliance on counsel defense.   Specifically, Lewis asserts that he "received reports from BAC's CFO that the question of disclosure had been vetted proactively with expert counsel on two occasions and that counsel had concluded that disclosure was not warranted."   Lewis Mem. at 1.   Even if the Court permits Lewis to raise this defense in the face of his sworn interrogatory response, Lewis's argument misreads the law and contradicts the evidence.

As a threshold matter, even if Lewis could put forward undisputed evidence sufficient to establish an advice of counsel defense – which he cannot – his motion would still fail.   Reliance on counsel "is not a complete defense" to liability under the federal securities laws.   *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994).   As Judge Cedarbaum aptly stated in *SEC v. Enterprises Solutions, Inc.*, "[g]ood faith reliance on the advice of counsel means more than

simply supplying counsel with information.  Corporate executives have an <u>independent duty</u> to insure that proper disclosures are made."  142 F. Supp. 2d 561, 575-76 (S.D.N.Y. 2001); *see also SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865 (S.D.N.Y. 1997) (directors have a "well-defined" obligation to ensure accuracy of publicly filed information); *SEC v. Scott*, 565 F. Supp. 1513, 1535 (S.D.N.Y. 1983) ("The reliance-on-counsel defense . . . does not mean that one can totally abdicate responsibility by consulting counsel.").

Accordingly, even where all the elements of reliance on counsel are satisfied, this showing does not, as a matter of law, negate scienter.  At most, reliance on counsel is merely one factor to be balanced by the jury in the fact-intensive scienter analysis.  *See Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 969 (N.D. Ill. 2011) ("The weight of authority suggests that evidence of reliance is merely relevant to the question whether a defendant acted with the requisite scienter"); *see also Howard v. SEC*, 376 F.3d 1136, 1147-48 (D.D.C. 2004) (reliance on counsel is "simply evidence of good faith").  For this reason alone, Lewis's motion fails.

In any event, Lewis cannot establish the facts needed to support a reliance-on-counsel defense.  To establish the defense, Lewis must demonstrate that he: (i) made complete disclosure to counsel of all relevant facts; (ii) sought advice as to the legality of his conduct; (iii) received advice that his conduct was legal; and (iv) relied on that advice in good faith.  *See, e.g.*, *Markowski*, 34 F.3d at 104-05; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972).  He cannot do so.

<u>First</u>, Lewis's defense raises serious credibility issues that can only be resolved by the jury, as there is a hotly contested dispute as to what Price told Lewis before the shareholder vote.  Lewis testified that, on or about December 3, 2008, Price told him that Price had spoken with Wachtell senior partner Ed Herlihy about disclosure of Merrill's losses, which then stood at $14

billion pre-tax and $9 billion after tax.  CS ¶¶ 114, 134-37.  According to Lewis, Price said that

Herlihy had informed him that BoA was not required to disclose Merrill's losses.  *Id.*  Lewis

testified that he took comfort in the supposed fact that Wachtell was involved and had vetted the

question of disclosure.  CS ¶¶ 134-37.

However, Price has testified that <u>he never spoke with Wachtell on or about December 3,</u>

<u>and that he did not tell Lewis that he spoke with Wachtell at that time</u>.  CS ¶ 138.  Moreover,

Herlihy and other senior Wachtell partners testified that Wachtell was never consulted about any

type of disclosure whatsoever after November 20, and was never informed of the true magnitude

of Merrill's losses, or their impact on Merrill, until one week <u>after</u> the vote.  CS ¶¶ 129-33.  In

light of this evidence, the Court cannot accept Lewis's claim that Price told him that Price had

consulted with Wachtell on December 3.  Given that (i) Price has testified that he did not tell

Lewis on or about December 3 that he recently spoke with Wachtell, and (ii) the record leaves no

doubt that this purported conversation between Price and Herlihy never actually occurred, the

jury will have to decide whether Lewis or Price (or neither) is telling the truth.

<u>Second</u>, Lewis's assertion that he relied on counsel is replete with genuine factual

disputes that preclude a finding that he cannot be liable as a matter of law.  As noted above,

Lewis himself <u>never</u> spoke with either Mayopoulos or Wachtell about whether disclosure was

required.[35]  CS ¶¶ 100-11, 134-48.  In addition, Lewis took <u>no</u> steps to ensure counsel was

provided with complete and accurate information concerning Merrill's losses and their impact on

---

[35] Lewis's contention that he was not required to consult directly with counsel is unavailing.  In *Enterprises Solutions*, Judge Cedarbaum stated unequivocally that a CEO's failure to seek informed legal advice on an issue of disclosure is evidence of scienter.  142 F. Supp. 2d at 576 (finding that CEO "never sought advice from counsel with respect to disclosure," and holding that CEO's "failure to ensure that [a material fact] was disclosed demonstrates reckless disregard for the truth").  Further, *Howard* and *REMEC*, which Lewis cites in support of this proposition, are inapposite.  In *Howard*, the defendant <u>had</u> consulted directly with the company's internal counsel, *see* 376 F.3d at 1149 (noting that Howard "also relied on inside counsel . . . with whom he communicated directly"), while *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1212 (S.D. Cal. 2010), involved alleged accounting errors, not an issue over which the CEO had direct personal responsibility.

Merrill and the combined company.  *Id.*  As a consequence of this failure, BoA's counsel was <u>not</u> provided with accurate and complete information prior to the vote.  Indeed, Mayopoulos unequivocally testified that he was not informed of the true extent of Merrill's losses prior to the vote.  Specifically, Mayopoulos testified that, on December 3, Price provided him with <u>incorrect</u> information concerning Merrill's losses, informing him that the losses were only $7 billion after-tax when in fact they had risen to $9 billion after-tax.  CS ¶¶ 114-17.  Mayopoulos specifically testified that he would have wanted to know the information with which he was not provided, and that it would have raised a "substantially more difficult [disclosure] question."  CS ¶¶ 118-19, 128.[36]  The fact that Lewis did not take any steps to ensure that Mayopoulos received the December 3 estimate, when Lewis himself participated in the preparation of that estimate, alone raises serious questions as to Lewis's scienter, let alone his negligence.

Mayopoulos further testified that he was never informed of additional key facts concerning the impact of Merrill's losses on its financial condition.  For example, Mayopoulos was never informed that the losses had materially reduced Merrill's capital and forced BoA to direct Merrill to significantly shrink Merrill's balance sheet.  CS ¶¶ 120, 124-25.  Nor was he informed that the losses had triggered a liquidity crisis at Merrill that forced BoA to issue billions of dollars in debt.  CS ¶¶ 121-23.  Nor was he informed that, by the time of the vote, the accretion/dilution figures set forth in the Proxy had become materially false.  CS ¶ 126.

The record also establishes that BoA excluded Wachtell from the disclosure analysis at the critical time in the weeks before the vote.  Wachtell's senior partners have uniformly testified

---

[36] Mayopoulos further testified that, had he been informed of the true loss figure, it would have possibly changed his recommendation because the $9 billion figure (1) was "a substantially bigger number" than he had been given; and (2) it "suggest[ed] that perhaps people didn't really know how bad it could get" since "this would have been a second substantial increase" from the November loss figures.  CS ¶¶ 118-19.  Mayopoulos also testified unequivocally that, had he been given the true loss figure, he "clearly would have wanted to talk to Wachtell Lipton" about disclosure.  CS ¶ 128.

that they were <u>not</u> informed of Merrill's key December 3 loss estimate prior to the vote, and that Wachtell was not consulted <u>at all</u> on the issue of disclosure after November 20.  CS ¶¶ 129-33. Indeed, Wachtell did not learn of the magnitude of Merrill's losses until December 12, when BoA contacted Wachtell one week after the vote to <u>terminate</u> the transaction because of Merrill's losses.  CS ¶¶ 129-30.  Significantly, according to the testimony of senior Wachtell partner Nicholas Demmo, when BoA executives contacted Wachtell on December 12 to terminate the transaction, they provided Wachtell with the same $14 billion pre-tax loss figure that Lewis, Price, Thain and Cotty had discussed on December 3.  *Id*.

In sum, Lewis's failure to ensure that counsel was provided with accurate information is powerful evidence of his scienter and, at a minimum, creates triable issues of fact as to whether he can invoke a reliance on counsel defense.

### D.    There Is A Genuine Factual Dispute As To Whether Lewis Acted Negligently And Recklessly In Failing To Disclose The Secret Bonus Agreement

Lewis also seeks summary judgment as to Plaintiffs' Exchange Act claims arising from his misstatements and omissions concerning the Bonus Agreement.  As noted above, Lewis contends that, as a matter of law, he did not act negligently or recklessly in making material omissions and misstatements because he "delegated" the preparation of the Merger Agreement and Proxy to "experienced and reliable merger specialists and legal advisors" who – unlike Lewis – were supposedly responsible for the accuracy and completeness of the Bank's disclosures.  Lewis Mem. at 20.  Again, Lewis's argument misconstrues the law and ignores critical facts.[37]

---

[37] In seeking summary judgment on Plaintiffs' bonus-related claims, Lewis also relies on the arguments raised by BoA and Thain in their motions for summary judgment. Lewis Mem. at 19, 22.  For the reasons set forth in Sections III and VI, the arguments raised by BoA and Thain lack merit, and Lewis's motion should also be denied in this regard.

First, as noted above, the law is clear that Lewis had "an independent duty to insure that proper disclosures are made." *Enterprises Solutions*, 142 F. Supp. 2d at 575-76.  Lewis cannot escape liability simply by claiming that he passively relied upon others to prepare required public disclosures.  *See SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1315, n.28 (D.C. Cir. 1981) ("Compliance with federal securities laws cannot be avoided simply by retaining outside counsel to prepare required documents.").  This policy is mirrored in BoA's own Disclosure Committee charter.  CS ¶¶ 152 (CEO is "responsib[le] for oversight of the accuracy and timeliness of the disclosures made by the Corporation").  Lewis does not dispute that, as of September 15, 2008, BoA had agreed to allow Merrill to accelerate the payment of up to $5.8 billion in bonuses prior to the vote, regardless of Merrill's fourth quarter financial performance.[38]  *See* Lewis Mem. at 8. Lewis also "does not dispute" that he "was aware of the agreement." *Id.* at 9.  In light of these facts, regardless of whether counsel was involved in the drafting of the Merger Agreement and Proxy, Lewis was independently responsible for ensuring that the bonus-related disclosures in these documents were materially accurate and complete.  His liability under the federal securities laws does not turn on whether he personally prepared the Merger-related documents.  *See Scholastic*, 252 F.3d at 76 (scienter established where defendant "knew facts or had access to non-public information contradicting their public statements"); *Novak*, 216 F.3d at 308 (same).

Second, while Lewis claims that he relied on the disclosure decisions of counsel and others, Lewis has not made any showing that he sought or received any disclosure advice with respect to the Bonus Agreement.  Indeed, despite knowing that BoA had agreed to allow Merrill

---

[38] Lewis states that, as of September 18, 2008 (when the misleading Merger Agreement he signed was filed with the SEC), the "memorialization" of the Bonus Agreement was "still being negotiated between" counsel. Lewis. Mem. at 8.  To the extent Lewis is suggesting that the Bonus Agreement was not firm as of the date of the Merger Agreement, or could not have been disclosed as of that date, he is wrong.  Greg Curl, who negotiated the Bonus Agreement on behalf of Lewis and BoA, testified that the Bonus Agreement was agreed upon as of September 14, 2008.  CS ¶¶ 8-9.  When counsel finished "memorializing" the agreement reached on September 14 is irrelevant.

to pay up to $5.8 billion in bonuses in 2008, nothing in the record suggests that Lewis sought advice from counsel on whether the Merger Agreement and Proxy properly reflected the parties' agreement with respect to bonuses.  Mayopoulos, BoA's General Counsel, testified that no one consulted him as to whether disclosure of the Bonus Agreement was necessary.  CS ¶ 39 ("[A]t no time did anyone raise or discuss with me whether the potential year-end bonus pool for Merrill Lynch employees should be disclosed to shareholders," and "I gave no advice on that topic.").  Similarly, Wachtell was not asked to, and did not, opine as to whether the Bonus Agreement should be disclosed.  CS ¶ 40 (Demmo testifying that "[w]e never told Bank of America that they didn't have to disclose it").  Accordingly, Lewis's claim of "good faith" reliance on others with respect to the nondisclosure of the Bonus Agreement is unsupported by the evidence and, at best, raises a fact issue that cannot be resolved as a matter of law.  *Scott*, 565 F. Supp. at 1535 (reliance on counsel defense "requires more than such a complacent attitude" and requires that defendant "actively sought and relied on the advice of counsel").

Third, as noted above, Lewis violated the Bank's own internal procedures for ensuring the accuracy and completeness of its disclosures.  Lewis failed to have the Disclosure Committee review the Proxy before it was provided to shareholders, and he failed to ask the Committee to determine whether the Bonus Agreement was required to be disclosed.  CS ¶¶ 158-60, 167.  Lewis failed to even inquire as to whether anyone else had brought these issues to the Disclosure Committee.  *Id*.  Lewis's decision to bypass the Bank's own internal disclosure process also serves as convincing evidence of his negligence and recklessness.  *See Bank of Am.*, 757 F. Supp. 2d at 323.

In sum, at a bare minimum, the facts summarized above raise a triable issue of fact as to whether Lewis acted negligently and recklessly in failing to disclose the Bonus Agreement.

### E.      Defendant Lewis Is Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims

Lewis also asserts that he is entitled to summary judgment on Plaintiffs' Section 11 claims based on his purported affirmative defense of "due diligence."  Lewis Mem. at 22.  In particular, Lewis claims that he has established this affirmative defense as a matter of law for the same reasons noted directly above, *i.e.*, that he supposedly delegated all disclosure decisions with respect to the Bonus Agreement to counsel and other advisors.  Lewis's argument fails under Section 11 as well.

The Second Circuit recently reaffirmed that Section 11 places a "minimal burden on a plaintiff."  *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).  Certain defendants (although not issuers) may seek to avoid liability under Section 11 if they can prove an affirmative defense of "due diligence."[39]  *See* 15 U.S.C. § 77k(B)(3)(A).  The burden of proving the due diligence defense is a "heavy one."  *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 733 (S.D.N.Y. 2005).  "For decades courts have recognized that what constitutes both a reasonable investigation and a reasonable belief in the accuracy of a registration statement hinges on a fact-intensive inquiry into, among other things, the nature of the individual director's relationship to the company."  *WorldCom*, 2005 WL 638268, at *8.  Accordingly, "summary judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment.'"  *In re Adams Golf, Inc. Sec. Litig.*, 618 F. Supp. 2d 343, 351 (D. Del. 2009).

This case presents no exception.  As noted above, Lewis has not offered a shred of

---

[39] Specifically, a defendant seeking to avoid liability on this basis bears the burden of demonstrating that they conducted a "reasonable investigation" that provided "reasonable ground to believe" that the offering materials were true and complete.  15 U.S.C. § 77k(B)(3)(A).

evidence establishing that he conducted <u>any</u> investigation – let alone a "reasonable" one – into whether BoA's bonus-related disclosure were accurate and complete.  Nor has he offered any evidence showing "a reasonable belief in the accuracy of a registration statement."  Moreover, the entire thrust of Lewis's argument turns the notion of "due diligence" on its head: Lewis contends that, as BoA's most senior executive officer and Chairman, he was supposedly entitled to <u>abdicate</u> all responsibility for conducting any investigation into the accuracy of the Bank's disclosures.  This argument contradicts the most elemental notion of "due diligence," and plainly cannot be accepted as a matter of law.  *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 678 (S.D.N.Y. 2004) ("Today, as in 1933 when Section 11 became law, the word 'investigation' connotes a 'thorough' or "'searching inquiry.'").

## F.    Defendant Lewis Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims

Lewis also moves for summary judgment as to Plaintiffs' control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.  *See* Lewis Mem. at 18-19, 22.[40]  As set forth below, his arguments fail.

To state a claim under Section 20(a), a plaintiff must show: (i) a primary violation by the controlled entity; (ii) control of the primary violator by the individual defendant; and (iii) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'"  *Pa. Ave. Funds v. Inyx Inc*., 2011 WL 1795931, at *2 (S.D.N.Y. May 5, 2011) (Castel, J.).  Where a plaintiff establishes these elements, a defendant may attempt to avoid liability by invoking a "good faith" affirmative defense.  The defendant

---

[40] Lewis asserts no specific arguments as to why Plaintiffs' bonus-related control person claims under either Section 20(a) or Section 15 should be dismissed.  Indeed, Lewis's brief does not even expressly request dismissal of Plaintiffs' bonus-related control person claims under Section 20(a).  To the extent that Lewis is relying on the arguments set forth in BoA's and Thain's briefs (*see* Lewis Mem. at 19, 22), those arguments fail for the reasons set forth in Sections III and VI.

bears the burden of proof on this defense, and must prove two prongs: (i) "that he exercised due care in his supervision of the violator's activities in that he maintained and enforced a reasonable and proper system of supervision and internal controls"; and (ii) "that he did not directly or indirectly induce the underlying fraud." *Worldcom*, 2005 WL 638268, at *14-15.

With respect to Plaintiffs' Section 20(a) claim, Lewis does <u>not</u> contest that the Bank violated Sections 14(a) and 10(b), or that Lewis was a control person. Lewis's sole argument is that, as a matter of law, he is not "a culpable participant" and that he has established his "good faith" affirmative defense. Lewis Mem. at 19. Lewis's only basis for these contentions is his claim that Price supposedly informed him that counsel had determined that disclosure of Merrill's losses was not required. *Id.*

For all of the reasons set forth above in Sections IV(B)-(D), there are myriad issues of fact as to whether Lewis acted negligently for the purposes of Section 14(a) and with scienter for the purposes of Section 10(b). Consequently, the record is replete with facts sufficient to demonstrate his culpable participation for the purposes of Section 20(a).[41] For these same reasons, Lewis has fallen woefully short of establishing his "good faith" affirmative defense as a matter of law. *See, e.g.*, *Worldcom*, 2005 WL 638268, at *14-15 (rejecting Section 20(a) good faith defense at summary judgment given factual questions about whether defendant "did his part to assure that an adequate system of internal controls existed at WorldCom").

To prove a Section 15 violation, a plaintiff must establish that a primary violation of Section 11 occurred and there was "actual control" of the primary violator by the defendant.

---

[41] Lewis incorrectly suggests that, in order to demonstrate "culpable participation" for the Section 20(a) claim predicated on a <u>negligence</u>-based Section 14(a) claim, Plaintiffs must establish a state of mind "similar to the scienter requirement." Lewis Mem. at 19. Section 20(a) imposes purely derivative liability. *See Bank of Am,* 757 F. Supp. 2d at 332. Since Plaintiffs' Section 14(a) claim requires only a showing of "at most negligence" (*id.* at 321), the derivative Section 20(a) claim requires nothing more. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 611, 662 (S.D.N.Y. 2007) ("It makes little sense … to hold that the same facts are sufficient to support a claim for primary liability but insufficient to support a claim for control liability.").

*McKenna v. Smart Techs.*, 2012 WL 1131935, at *19 (S.D.N.Y. Apr. 3, 2012).  Lewis's sole argument with respect to Section 15 is that there was no underlying Section 11 violation because he has established his affirmative defense of "due diligence."  Lewis Mem. at 22.  For all the reasons set forth above in Section IV(D), Lewis has plainly failed to prove his "due diligence" affirmative defense as a matter of law.

## V.    Defendants Price And Cotty Are Not Entitled To Summary Judgment

In his motion for summary judgment, Defendant Price concedes that the claims against him under Sections 10(b) and 20(a) of the Exchange Act based upon Merrill's fourth quarter losses present genuine issues of material fact that the jury must decide at trial.  *See* Price Mem. at 1.[42]  Instead, Defendant Price seeks summary judgment as to the remainder of the claims against him based on disputed questions of fact, including: (i) whether his actions and statements promoting the Merger to BoA shareholders could be perceived as "solicitations" under the proxy rules (an argument joined by Defendant Cotty); (ii) whether he signed a registration statement in connection with BoA's October 2008 secondary securities offering; and (iii) whether he is sufficiently culpable to be held liable as a control person under Section 20(a) of the Exchange Act and Section 15 of the Securities Act for material misstatements concerning the secret Bonus Agreement.  Each of these arguments presents disputed factual issues that must await trial.

### A.    Defendants Price And Cotty Are Not Entitled To Summary Judgment On Plaintiffs' Section 14(a) Claims

Defendant Price contends that he is entitled to summary judgment as to Plaintiffs' Section 14(a) claim against him because he purportedly did not solicit shareholder approval of

---

[42] Specifically, Price concedes that these claims "go[] to Mr. Price's intent as well as the softness of intra-quarter financial figures in a volatile marketplace," and thus "cannot be resolved at summary judgment and must await trial."  Price Mem. at 1.

the Merger.  Defendant Cotty joins in Price's motion on this point.  As set forth below, these arguments fail.

Under Section 14(a), a defendant can be held liable if he or she solicits proxies, is a participant in a proxy solicitation, or permits his or her name to be used in a proxy solicitation. *See* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-101, Item 4.  The SEC broadly defines "solicitation" to "include . . . [any] communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(*l*)(iii).  The Second Circuit has held that this broad definition applies "not only to direct requests to furnish, revoke or withhold proxies, but also to communications which may indirectly accomplish such a result or constitute a step in a chain of communications designed ultimately to accomplish such a result." *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir. 1985) (reversing summary judgment).[43]

Thus, "[i]f an issuer makes a recommendation or makes other statements that reasonably portray the transaction in a favorable light – [*i.e.*,] presents the transaction in a manner objectively likely to predispose security holders toward or against it – it must comply with the proxy rules." *Capital Real Estate*, 929 F. Supp. at 114; *Winiger v. SI Management L.P.*, 32 F. Supp. 2d 1144, 1148 (N.D. Cal. 1997) (same).  In sum, "the proxy rules apply to any person seeking to influence the voting of proxies, regardless of whether the person is seeking authorization to act as a proxy." *In the Matter of Joslyn, et al.*, 2004 WL 2387455, at *11 (Oct. 26, 2004) (quoting SEC Release No. 34-29315 (June 17, 1991)).

---

[43] *See also Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg*, 929 F. Supp. 105, 110 (S.D.N.Y. 1996); *Krauth v. Executive Telecard, Inc.*, 870 F. Supp. 543, 547 (S.D.N.Y. 1994) (communication is a solicitation "if it is part of a continuous plan intended to end in solicitation and to prepare the way for success") (quotations omitted).

Whether or not a particular communication is a solicitation within the meaning of Section 14(a) is a question of fact dependent upon the nature of the communication and the circumstances under which it is transmitted.  *See Sargent v. Genesco, Inc*., 492 F.2d 750, 767 (5th Cir. 1974) (citing Securities Exchange Act, Release No. 7208, 29 Fed. Reg. 341 (1964)).  As the Second Circuit has held, in determining whether a communication to shareholders is a solicitation under Rule 14a-1(*l*), courts look to the "totality of circumstances" surrounding the communication and assess if it "is 'reasonably calculated' to influence the shareholders' votes." *Long Island Lighting Co.*, 779 F.2d at 796.  A court's examination includes "the nature of the communication and the circumstances under which it was distributed." *Id*.

Defendants Price and Cotty played critical roles in soliciting shareholder approval of the Merger, including by signing the Form S-4 issued in connection with the Merger.  CS ¶¶ 41, 47, 49.  The Form S-4 was the filing by which BoA registered the securities to be issued in the Merger with the SEC.  Significantly, the Form S-4 included the Proxy, which contained all of the misstatements and misrepresentations at issue in this Action, followed by the signatures of Defendants Lewis, Price, Cotty, and BoA's Board of Directors.  CS ¶¶ 41-43, 47-50.[44]  It also included the Merger Agreement.  CS ¶ 42.  Given that the Form S-4 signed by Price and Cotty contained the Proxy, there can be no serious dispute that the Form S-4 constituted a solicitation to shareholders, bringing Price and Cotty squarely within the ambit of Section 14(a).

Moreover, the Form S-4 was an integral step in the proxy solicitation process and, indeed, was a necessary instrument to effect the Merger.  The primary question put to BoA shareholders by the Proxy was whether to "approve the issuance of shares of Bank of America common stock as contemplated by the Agreement and Plan of Merger" set forth in the Form S-4.

---

[44] While Defendant Price provided excerpts of the Forms S-4 signed by Defendant Lewis (*see* ECF No. 586, Declaration of Melissa Armstrong, Exs. 2-4), he failed to provide to the Court the full text of the Forms S-4, which make it clear that the Proxy is an integral part of the filing.

CS ¶ 51.  Since the Form S-4 was the disclosure document by which BoA registered the shares used to consummate the Merger, it "constitute[d] a step in a chain of communications designed ultimately to accomplish" the transaction.  *Long Island Lighting Co.*, 779 F.2d at 796.  Indeed, courts routinely recognize that a Form S-4 and proxy statement are together the central solicitation for purpose of Section 14(a) liability.  *See, e.g.*, *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 232 (S.D.N.Y. 2004) ("conclud[ing] that there is no basis upon which to dismiss the § 14(a) claims" where "the Form S-4 Registration statement at issue here, *i.e.*, the Joint Proxy Statement . . . was signed by the Chairman and Chief Executive Officers of both AOL and Time Warner").[45]

In addition, other proxy solicitations issued by BoA expressly identified the Form S-4 as a communication that was integral to the Merger.  The Proxy itself made clear that the Form S-4 was a necessary step in obtaining shareholder approval for and completing the Merger, listing the Form S-4 as a filing that was "necessary in connection with the consummation by Company of the Merger."  CS ¶ 51.  Furthermore, in the supplements to the Proxy, which BoA filed with the SEC on November 21 and 26, 2008, respectively (the "Proxy Supplements"), BoA expressly referred shareholders to the Form S-4 and described it as a communication issued "[i]n connection with the proposed merger:"

> In connection with the proposed merger, Bank of America has filed with the Securities and Exchange Commission (the "SEC"), along with other relevant documents, a Definitive Registration Statement on Form S-4 that includes a joint proxy statement of Bank of America and Merrill Lynch that also constitutes a prospectus of Bank of America.

CS ¶¶ 61, 64.  At a minimum, based on all of the facts summarized above, the question of whether the Form S-4 constitutes a "step in a chain of communications designed ultimately to

---

[45] Other courts have found that the proxy statement and the prospectus are together a proxy solicitation.  *See, e.g.*, *McKesson*, 126 F. Supp. 2d at 1253 ("the two companies solicited proxies through a joint proxy statement and prospectus").

accomplish" shareholder approval (*see Long Island Lighting Co.*, 779 F.3d at 796) presents a genuine dispute of fact for the jury.

In addition to signing the Form S-4, Defendant Price participated in several other communications to shareholders that were specifically directed toward promoting the Merger and garnering BoA shareholder approval.   For example, on September 15, 2008, Price participated in a conference call to discuss BoA's recommendation that its shareholders vote in favor of the Merger.  CS ¶¶ 19-22.  During this call, Price highlighted the purported synergies of the Merger by stating that BoA estimated "the transaction to be 3% dilutive in the first year and breakeven to slightly accretive in the second year before restructuring charges."  CS ¶ 21.  Price also contended that the Merger was a "rare opportunit[y] to expand our franchise for the long-term benefit of shareholders."   CS ¶ 22.   Similarly, at the December 5 shareholder meeting, Defendant Price again spoke in support of the Merger when he confirmed Lewis's false statement regarding the accretive/dilutive impact of the transaction, explaining that "[t]he dilution of the transaction in the shares associated with [the] transaction reflected in the proxy, Mr. Lewis has referred to as shown in the financials there."  CS ¶ 65.   Price's communications to shareholders on September 15 and December 5 constituted the precise type of communication that courts have determined to be proxy solicitations under Rule 14a-1(*l*)(1)(iii).   *Capital Real Estate*, 929 F. Supp. at 114 (press release was a solicitation where "[i]t portrayed the [offer] prices in a favorable light both by juxtaposing them with recent trading prices and by characterizing them as 'full value'").[46]

---

[46] In its decision on Defendants' motion to dismiss the derivative action, the Court found that Defendants' statements during the conference call on September 15, 2008 could not form the basis of a claim under Section 14(a) because they were not expressly incorporated by reference into the Proxy. *Bank of Am.*, 757 F. Supp. 2d at 318. Plaintiffs respectfully submit that the Court's decision as to the adequacy of the derivative complaint should not control the issue here.  In the derivative case, the Court was not presented with any argument on this issue, much less the Second Circuit's decision in *Long Island Lighting Co.*, 779 F.2d at 796, which is discussed above.  As the Second Circuit's decision makes clear, to exclude statements outside the proxy that "may indirectly accomplish" the

In response to these facts, Defendants Price and Cotty make a series of flawed arguments in which they contend that they did not engage in solicitation as a matter of law.

First, Price argues that the Form S-4 is not a proxy solicitation because the Form S-4 supposedly contained boilerplate language stating that "[t]his document does not constitute [. . .] the solicitation of a proxy." *See* Price Mem. at 8. This argument fails, and is itself misleading. To start, this language does not say what Defendant Price claims it does, as Price omitted the key portion of the passage on which he relies. The full quotation provides as follows (the portion omitted by Price is underlined):

> This document does not constitute an offer to sell, or a solicitation of an offer to buy, any securities, or the solicitation of a proxy, <u>in any jurisdiction to or from any person to whom it is unlawful to make any such offer or solicitation in such jurisdiction.</u>

CS ¶ 44.[47] Thus, by definition, the Form S-4 <u>was</u> a "solicitation of a proxy" in any jurisdiction where it <u>was not unlawful to solicit proxies</u>. Remarkably, while Price advises the Court that the selected language he quotes means the Form S-4 is not a solicitation, he ignores the fact that <u>the Proxy itself contains the identical disclaimer</u>. CS ¶ 45. Moreover, despite the fact that it is Defendant Price's burden on this motion to establish that the Form S-4 is not a solicitation, <u>he fails to identify a single jurisdiction where it was unlawful for the Form S-4 to constitute a solicitation</u>. His failure to do so is fatal to his motion.

Second, Price and Cotty contend that they only signed the Form S-4 in their capacities as BoA's CFO and CAO, respectively, and thus they cannot be "participants" in the solicitation as a matter of law. *See* Price Mem. at 7; Cotty Mem. at 3. They contend that Rule 14a-101

---

same goal of a proxy statement would allow registrants to avoid the requirements of Section 14(a) by simply failing to incorporate false and misleading proxy solicitations into the official proxy statement.

[47] *See also* CS ¶ 46 (Form S-4 and Proxy both stating "If you are in a jurisdiction where offers to exchange or sell, or solicitations of offers to exchange or purchase, the securities offered by this document or the solicitation of proxies is unlawful, or if you are a person to whom it is unlawful to direct these types of activities, then the offer presented in this document does not extend to you").

categorically excludes from the definition of "participant" "[a]ny officer or director of, or any person regularly employed by, any other participant." *Id.*  However, SEC regulations provide that employees who are otherwise excluded as "participants" are considered solicitation participants if they otherwise take part in solicitation activity. *See* 17 C.F.R. § 240.14(a)-101 (participants include any "person who solicits proxies").  The facts here demonstrate that there is, at a minimum, a genuine issue of material fact as to whether Price and Cotty were "person[s] who solicit[] proxies."

Third, Price and Cotty argue that the Court's prior conclusion that the federal derivative complaint did not "plausibly allege" that BoA officers were participants in BoA's solicitation of proxies should control the Court's decision here.  Price Mem. at 5-8.[48]  Relatedly, Price relies heavily on the Court's finding in the derivative action that, based on the proxy card's statement that "This Proxy is solicited on Behalf of the Board of Directors," only BoA's Board solicited proxies pursuant to the formal Proxy.[49]  Price Mem. at 5-6.  Of course, what is far more significant is not the Court's decision in the derivative action, but the fact that Price and Cotty did not make these arguments in this Action – a tacit concession that the complaint here did adequately allege that they solicited proxies.  Further, Defendants' reliance upon the pleading in a different case, which did not contain the facts now at issue here, is misplaced.  Unlike here, the derivative plaintiffs did not allege or otherwise demonstrate that Defendants Price and Cotty acted as solicitors through the Form S-4.  In addition, the derivative plaintiffs did not plead or

---

[48] Price and Cotty each assert that the only way they can "'otherwise' be a participant in the solicitation" is if their solicitation is "wholly separate" from their duties as an employee.  Price Mem. at 6; Cotty Mem. at 2.  There is no basis in law for this distinction and they cite none.  Nor do they explain how or why any employee would be soliciting proxies "separate" from their duties as an employee.  For example, it is inconceivable that any solicitation performed by Defendant Lewis (who Defendants concede acted as a solicitor here) was "wholly separate" from Defendant Lewis's duties as CEO and Chairman of the Board.

[49] Plaintiffs respectfully submit that this statement alone indicates that there are other entities or persons actually performing the act of soliciting the Proxy "on behalf of the Board."

argue the fact that the Proxy Supplements made clear that, in addition to the BoA Board members explicitly identified in the Proxy as solicitors, several other categories of persons – including "executive officers," such as Price and Cotty – "may be engaged in a solicitation of proxies," and that "[a]t the commencement of a proxy solicitation" BoA executive officers "may be deemed to be participants in such solicitation" – precisely as Price and Cotty did through the Form S-4. CS ¶¶ 62-64. The Proxy Supplements' identification of other persons that "may be deemed participants" in the solicitation of proxies demonstrates that the card attached to the Proxy did not provide an exclusive and exhaustive list of persons soliciting proxies. Moreover, this purported distinction is irrelevant to Defendant Price's statements endorsing the Merger during the September 15 conference call and the December 5 shareholder meeting. Thus, at a minimum, in this Action, genuine issues of facts exist as to whether Price and Cotty were participants in the solicitation of proxies.[50]

Fourth, Defendant Price argues that the Form S-4 could not constitute a solicitation because it was issued before the definitive proxy was filed on November 3, 2008. This is contrary to well-established law. *See SEC v. Okin*, 132 F.2d 784, 786 (2d Cir. 1943) (cited in *Long Island Lighting Co.*, 779 F.2d at 796) (holding letter to shareholders constituted a solicitation because it was "to pave the way for an out-and-out solicitation later"). As the Second Circuit held in *Okin*:

> [W]ere it not so, an easy way would be open to circumvent the statute; one need only spread the misinformation adequately before beginning to solicit, and the Commission would be powerless to protect shareholders. The earlier stages in the execution of such a continuous purpose must be subject to regulation, if the purpose of Congress is to be fully carried out.

---

[50] Price and Cotty also argue that they cannot be held liable for "permit[ting] the use of [their] name[s]" to solicit proxies pursuant to the Proxy. Price Mem. at 7; Cotty Mem. at 2. These arguments, which are directed to a separate ground for finding their liability under Section 14(a), are irrelevant, because there is a genuine issue of material fact regarding whether these Defendants are solicitors or participants in solicitation based on their solicitations in the Form S-4, the September 15 conference call, and the December 5 shareholder meeting.

*Id.*

In sum, there are at least genuine issues of material fact as to whether Defendants Price and Cotty were participants in soliciting shareholder approval of the Merger.  Any one of the above actions would be sufficient to establish a genuine dispute of fact regarding whether their statements were solicitations; taken together, they easily establish their role as solicitors.

**B.     Defendant Price Is Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims**

In October 2008, BoA conducted a secondary stock offering for approximately $10 billion pursuant to a shelf registration statement dated May 5, 2006 and a prospectus supplement filed on October 9, 2008.  The prospectus supplement incorporated by reference the Form 8-K issued on September 18, 2008, which included the Merger Agreement and the false statements contained therein regarding Merrill's ability to pay bonuses.  The prospectus supplement also incorporated BoA's Form 10-K for 2007, which Price signed.  Price contends that he cannot be held liable under Section 11 of the Securities Act because he purportedly did not sign the registration statement within the meaning of Section 11.[51]

SEC regulations make it clear that Price is considered a signatory to the registration statement.  Section 10(a)(3) of the Securities Act and the rules promulgated thereunder obligate an issuer to update a prospectus with current information.  The SEC has stated that a registrant may satisfy the statute by incorporating annual and quarterly filings by reference.  *See* 17 C.F.R. § 229.512(a)(i-iii)(B); *see also* SEC Release No. 33-8591, 70 Fed. Reg. 44722-01, 44729 n.61 (Aug. 3, 2005) (Section 10(a)(3) is satisfied by the filing of a Form 10-K).  Annual filings that are incorporated by reference into a registration statement to satisfy the requirements of Section

---

[51] Price's argument that Plaintiffs have "abandoned or withdrawn" their Section 11 claim against him is without merit.  *See* Price Mem. at 10.  As Price himself acknowledges, Plaintiffs' counsel have advised him that Plaintiffs are pursuing a Section 11 claim against Price.  *Id.*  Nowhere have Plaintiffs conceded that Price is not liable for the failure to disclose material facts concerning the Bonus Agreement in connection with the October offering.

10(a)(3) are considered a new registration statement "for the purpose of determining any liability under the Securities Act of 1933." 17 C.F.R. § 229.512(a)(2).

The SEC has indicated that any signatories of documents such as annual or quarterly filings that are filed to satisfy Section 10(a)(3) are deemed to be signers of the registration statement. Specifically, the SEC has stated that "[a]ny person signing any report or document incorporated by reference in the prospectus that is part of the registration statement or the registration statement, other than a document filed for the purposes of updating the prospectus pursuant to Section 10(a)(3) . . . , is deemed not to be a person who signed the registration statement as a result." *See* 70 Fed. Reg. at 44774 (interpreting 17 C.F.R. § 230.430B(f)(4)). Further, other SEC regulations make it clear that an annual filing "incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof." 17 C.F.R. § 229.512(b); *see also* 17 C.F.R. § 230.430B(i) (requiring issuers to adhere to 17 C.F.R. § 229.512(b)).

Thus, Price was a signatory of the registration statement once documents with his signature, namely BoA's 2007 Form 10-K, were incorporated by reference into the shelf registration statement, and he is liable under Section 11.[52]

---

[52] Price's reliance on *Lehman Bros.* is misguided. *See* Price Mem. at 12-13. There, Judge Kaplan held that for purposes of determining liability under the Securities Act, each of the filings made with the SEC (which included the 2007 10-K that Lehman's CFO signed) was deemed to be "a new registration statement." 799 F. Supp. 2d at 316. According to Judge Kaplan, Lehman's CFO who, like Price, had not signed the shelf registration statement, "therefore became a signor of the 'new' registration statements by virtue of her having signed those filings." *Id.* While the court in *Lehman Bros.* determined that the defendant officer's liability was limited to the false statements in the annual SEC filing she signed, this conclusion is not supported by Section 11, which imposes liability for those who sign the "registration statement." Thus, if the annual filing created a new registration statement upon its incorporation, then all signatories to that annual filing become liable under Section 11 for the false statements in the registration statement.

## C.   Defendant Price Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims

Defendant Price also moves for summary judgment as to Plaintiffs' control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, solely to the extent such claims are related to material misrepresentations and omissions concerning the secret Bonus Agreement.  *See* Price Mem. at 13-17.  As set forth below, his arguments fail.

Plaintiffs' Section 20(a) claims against Price arise from both Section 10(b) and Section 14(a).  Price does not contest that BoA committed a primary violation of Sections 14(a) or 10(b), or that he exercised control over BoA.  As to culpable participation, he argues that Plaintiffs have failed to demonstrate that he "knew or should have known" about the Bonus Agreement.  *See* Price Mem. at 15.  As discussed above, Plaintiffs' Section 20(a) claim predicated on Section 14(a) violations require "at most negligence," which does not require demonstrating that Price "knew or should have known" about the Bonus Agreement.  In any event, the record in this case is replete with evidence that Price knew of, or at a minimum recklessly ignored, the undisclosed Bonus Agreement.[53]

First, Price signed the Form S-4, which attached the Merger Agreement.  CS ¶¶ 41-42. The Bonus Agreement was one of the four "key terms" of the Merger Agreement, and the Merger Agreement referenced the Disclosure Schedule memorializing the Bonus Agreement twelve times.  CS ¶¶ 3-4.  Despite signing the Form S-4, Price now contends that he was kept in the dark about the Bonus Agreement until sometime after January 1, 2009.  *See* Armstrong Decl., Ex. 13.  A jury could reasonably find that as a signatory to the Form S-4 filed with the SEC, the

---

[53] To the extent Price argues that Section 20(a) has a scienter element, he is wrong.  Section 20(a) does not require Plaintiffs to prove Price's state of mind in order to satisfy the culpable participation element.  *See WorldCom*, 2005 WL 638268, at *13 ("To read a scienter requirement into the *prima facie* case for a Section 20(a) claim would unreasonably strain the plain language of a clearly written provision.").

Company's CFO should have reviewed (or did review) the Disclosure Schedule referenced, but not disclosed, in the Merger Agreement.

Second, contemporaneous emails among BoA's and Merrill's senior officers establish that Price was advised of Merrill's payment of bonuses pursuant to the Bonus Agreement, including the total bonus expense figure to be recorded for the quarter. Specifically, on November 12, 2008, Bob Qutub, BoA's Head of Global Investment Banking, forwarded an email to Price which provided an update on the bonuses that Merrill planned to pay pursuant to the Bonus Agreement. The email stated: "We are now hearing that the [Merrill] 2008 VICP (this year's bonus) will be closer to 3.2 bil not 4.661 bil – this is still subject to change but unlikely to be at 2007 levels." CS ¶¶ 177-78 (emphasis in original). The fact that Price was advised of the bonuses that the Bonus Agreement authorized Merrill to pay, and that Price received updates concerning the payment of those bonuses, raises a fact issue as to his knowledge of the agreement.

The only evidence Price submits to counter the above facts is a new, one-page declaration he submitted in support of his motion, in which he summarily states that he "was unfamiliar with the provision in the non-public schedule to the merger agreement . . . capping Merrill Lynch's ability to pay 2008 VICP bonuses at $5.8 billion." *See* Armstrong Decl., Ex. 13, Declaration of Joe L. Price. Price's self-serving declaration should be disregarded, as it raises significant credibility issues. Price submitted this declaration months after fact discovery ended, and after he was deposed for over two days. Price's counsel had ample opportunity to question him on the very matters set forth in his declaration, but chose not to do so.[54] *See Humane Soc'y of U.S. v. HVFG, LLC*, 2010 WL 1837785, at *7 (S.D.N.Y. May 6, 2010) ("These late-filed declarations,

---

[54] While persons opposing summary judgment have been allowed to submit declarations where there is no direct conflict with their prior testimony, it cannot be the case that a party can purposefully avoid cross examination on an issue and then obtain summary judgment based on an untested declaration.

submitted with no other evidentiary support, are insufficient to raise a material dispute in light of the prior admissions and deposition testimony….").  Thus, Price deliberately sought to avoid cross examination on these very issues, his assertions have not been tested by the normal adversarial process, and they cannot serve as a basis for this Court to determine, as a matter of law, that Price knew nothing about the Bonus Agreement.  Even if the Court were inclined to consider this proposed declaration, it contradicts the above record demonstrating that Price knew (or should have known) of the Bonus Agreement.

With respect to Plaintiffs' Section 15 claims, as discussed above, Section 15 requires only a primary violation of Section 11 and "actual control" of the primary violator.  Price does not contest that BoA violated Section 11 by failing to disclose the Bonus Agreement or that Price exercised "actual control" over BoA.  Instead, he suggests that Plaintiffs cannot demonstrate his culpable participation for the purposes of Section 15 liability.  Even assuming, *arguendo*, that Plaintiffs are required to demonstrate Price's culpable participation for Section 15 liability – which they are not[55] – as discussed above, there is a genuine dispute of material fact as to his culpable participation.  Moreover, as discussed above, there is, at a minimum, a genuine dispute as to whether Price had "reasonable ground to believe in the existence of" the Bonus Agreement.

## VI.   Defendant Thain Is Not Entitled To Summary Judgment

Defendant Thain seeks summary judgment principally on the grounds that Plaintiffs cannot meet their burden of establishing scienter or loss causation under Section 10(b) for the

---

[55] Price erroneously argues that "culpable participation" is an element of a plaintiff's *prima facie* case under Section 15.  *See* Price Mem. at 15, n.14.  His argument contravenes the overwhelming weight of authority in this District holding that "culpable participation" is not an element of a Section 15 claim.  *See McKenna*, 2012 WL 1131935, at *20 ("The Court agrees with the weight of the authority in this Circuit and declines to impose the additional 'culpable participation' requirement."); *Am. High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 549, n.10 (S.D.N.Y. 2004) ("[T]his Court joins the apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15.") (internal quotations omitted)).  Price's reliance on *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 638 (S.D.N.Y. 1999) and *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), is misplaced, as both *Ellison* and *DeMaria* rely on cases that discussed Section 20(a) and its culpable participation requirement in conjunction with Section 15.

Proxy's misrepresentations concerning the Bonus Agreement.  *See* Thain Mem. at 1-2, 16-21.

However, Thain misapprehends the applicable legal standards at summary judgment governing

the scienter inquiry, which preclude the Court from weighing disputed scienter facts and drawing

inferences in his favor.  Additionally, Thain ignores the factual disputes concerning whether he

acted with recklessness or actual knowledge in approving and disseminating a proxy that

contained false and misleading statements about the Bonus Agreement.  Finally, Thain's

challenge to Plaintiffs' showing of loss causation is based on a fundamental mischaracterization

of the Court's prior orders and Plaintiffs' allegations.

### A.    Defendant Thain Is Not Entitled To Summary Judgment On Plaintiffs' Section 10(b) Claims

#### 1.    Defendant Thain Misstates The Law Governing The Scienter Inquiry At Summary Judgment

Thain urges the Court to weigh the evidence of scienter and draw inferences in his favor

based on the Supreme Court's decision in *Tellabs*.  *See* Thain Mem. at 2, 12-13, 18-19.  Thain

asserts that, under *Tellabs*, he is entitled to summary judgment because Plaintiffs' showing of

scienter is not a "strong" one.  *See* Thain Mem. at 13, 19 (citing *Tellabs*).  Thain further contends

that he is entitled to summary judgment under *Tellabs* because, "given the totality of

circumstances, an innocent explanation for the presence of any arguably confusing language in

the Proxy is … a more 'compelling' inference than an inference of Thain's scienter."  *See* Thain

Mem. at 18 (citing *Tellabs*).  Thain misunderstands *Tellabs*, a case that governs only the pleading

requirements of scienter, and the law governing summary judgment.

As the Second Circuit has instructed, "[i]n reviewing the evidence to determine whether

the movant is entitled to judgment as a matter of law, the court 'may not make credibility

determinations or weigh the evidence' and '*must draw all reasonable inferences in favor of the

nonmoving party.*'"  *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011)

(emphasis in original) (citing cases).  The Second Circuit has further instructed that courts should be "lenient in allowing scienter issues to withstand summary judgment" because "[w]hether a given intent existed is generally a question of fact, appropriate for resolution by a trier of fact." *See supra* at 54-55 (citing, *inter alia*, *Press*, 166 F.3d at 538).

Contrary to Thain's suggestion otherwise, nothing in *Tellabs* – a case that only concerned requirements at the pleading stage – overrides these settled principles.  As the Seventh Circuit explained in reversing an order granting summary judgment:

> Neither the PSLRA nor *Tellabs* changed the well-established summary judgment standard.  Indeed, the [Supreme] Court observed [in *Tellabs*] that "the test at each stage [pleading, summary judgment, and judgment as a matter of law] is measured against a different backdrop."  On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts.  Rather, the court's task is to determine based on the record whether there is a genuine issue of material fact requiring trial.  The district court erred in holding the [plaintiffs] to proof of facts that would raise a strong inference of scienter.

*Costello v. Grundon*, 651 F.3d 614, 635-36 (7th Cir. 2011) (citations omitted).[56]  In sum, Thain's attempt to rewrite the basic standards governing summary judgment fails.

### 2. There Is A Genuine Factual Dispute As To Whether Thain Acted Recklessly In Making Misrepresentations Concerning The Bonus Agreement

As the Court held at the motion to dismiss stage, Plaintiffs may demonstrate that Thain acted with scienter with evidence that he was "closely involved in the details of the bonus negotiations, the resolution of which was concealed to BofA shareholders and … contradictory to representations in the Merger Agreement and the Joint Proxy."  *Bank of Am.*, 757 F. Supp. 2d at 320.  Discovery has confirmed these facts, and much more.

---

[56] *Accord SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) ("[B]ecause the PSLRA did not alter the substantive requirements for scienter under § 10(b), ... the standard on summary judgment or JMOL remains unaltered…."); *Novatel*,  830 F. Supp. 2d at 1017-18 ("[A]t summary judgment, the standard [for scienter] is less stringent – the PSLRA requirement of pleading a 'strong' inference of scienter 'puts securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial, where a simple inference of scienter is sufficient to support a jury's verdict.'").

Thain testified that the Bonus Agreement was one of the "four main things" that Merrill negotiated with BoA during the September 13-14 Merger weekend. CS ¶ 4. Thain personally presented the Bonus Agreement to Merrill's Board on September 14, explaining that "BAC had expressed its willingness to maintain the 2008 variable incentive compensation pool at the same level as that of 2007." CS ¶ 12. On the morning of September 15, Thain signed the Merger Agreement. CS ¶ 17. As Thain stated, BoA and Merrill "agreed in September that we could pay up to $5.8 billion of bonuses," and the deal was "structured so that the bonuses would be paid prior to closing." CS ¶ 10.

After executing the Bonus Agreement, Thain continued to play an integral role in its implementation. First, Thain handpicked Peter Kraus – Thain's long-time friend, who Thain handed a $29.4 million guaranteed bonus for only four months of work at Merrill – to oversee the bonus process. CS ¶ 168. Next, Thain and Kraus approved a bonus pool of $3.6 billion and an accelerated payout date that would ensure that Merrill's bonuses were paid prior to the close of the Merger, without regard to Merrill's financial condition, and before BoA could impose its more conservative compensation philosophy. CS ¶¶ 171-76, 190. Thain made these determinations over the protests of BoA and Defendant Lewis, who advocated that bonuses should be paid after year-end and based on the "full year's performance." CS ¶¶ 185-86.

These facts raise an issue of fact whether Thain acted at least recklessly. As discussed above, the Second Circuit has long held that recklessness can be shown by evidence of "defendants' knowledge of facts or access to information contradicting their public statements." *See supra* at 57 (citing *Novak*, 216 F.3d at 308). Alternatively, the recklessness requirement is met where facts demonstrate "that defendants failed to review or check information that they had a duty to monitor." *Id.* Here, Thain knew about the undisclosed Bonus Agreement, but

nevertheless signed a Proxy that misrepresented Merrill's ability to pay bonuses.  CS ¶¶ 2-10, 183-96.  In addition, Thain failed to review the Proxy in its entirety or check to ensure the Bonus Agreement was properly disclosed.  CS ¶¶ 18, 55.  These facts alone are sufficient to establish scienter and defeat Thain's motion for summary judgment.[57]

Moreover, the evidence reflects that Thain took <u>no</u> meaningful steps to ensure that the Bonus Agreement was disclosed to investors.  He never read the entirety of the Proxy or the filed Merger Agreement that he signed.  CS ¶¶ 17-18, 55.  He never considered or discussed whether the Bonus Agreement – a "key term" to the Merger – required disclosure.  CS ¶ 31.  He never asked any lawyers, colleagues, or Merrill board members for their views or advice on whether the Bonus Agreement should be disclosed to investors.  CS ¶¶ 31-36.  Further, in November 2008, he permitted Merrill to affirmatively misrepresent to Congress, which was investigating corporate bonus practices, that Merrill would make its 2008 bonus decisions "<u>at year-end</u>" and that "decisions for 2008 <u>have not yet been made</u>" – assertions which Thain knew were false.  CS ¶¶ 169-79.

Indeed, Thain has testified that he did not even know whether the Bonus Agreement was publicly disclosed until <u>after</u> the shareholder vote and his termination.  CS ¶ 29.  As Thain admitted at his deposition, he was surprised to learn that the Bonus Agreement had not been disclosed in the Proxy, conceding that he "<u>had assumed incorrectly that it had been filed</u>."  *Id*. ("I went to look for [the Disclosure Schedule] on the SEC website … [and] I couldn't find it.").  Under such circumstances, a reasonable juror could readily find that Thain acted with

---

[57] Thain mistakenly attempts to rely upon *In re Winstar Commc'ns Sec. Litig.*, 2010 WL 3910322 (S.D.N.Y. Sept. 29, 2010), and *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009).  *See* Thain Mem. at 13-15. The court in *Winstar* dealt with the recklessness standard for a "non-fiduciary accountant," which does not apply to Thain, the CEO of the Merrill. The court in *Pension Comm.* found that there was no scienter as to certain claims because evidence suggested that the fund administrator did not have "a duty to verify . . . the value of the securities," which similarly is not at issue here.  592 F. Supp. 2d at 628.

recklessness, at minimum, in issuing a Proxy that falsely and misleadingly represented that there was no Bonus Agreement.[58]

### 3. Defendant Thain's Post-Hoc Rationalizations For His Recklessness Raise Genuine Issues Of Fact

Without disputing the above scienter facts, Thain points to other, additional "facts" that he contends outweigh Plaintiffs' showing of scienter.  As noted, Thain's attempt to urge the Court to weigh the evidence and make contested factual findings reflects a fundamental misunderstanding of the relevant inquiry at summary judgment.  *See supra* at 84-85.  In any event, Thain's purported justifications for his recklessness should be rejected.

First, borrowing a page from Lewis's playbook, Thain asserts that he cannot be held liable under Section 10(b) because "the task of preparing the Merger Agreement, the Proxy, and other necessary securities law filings related to the Merger was delegated" to BoA management, Wachtell, and Merrill's outside counsel, Shearman & Sterling ("Shearman").  Thain Mem. at 3-4.  Thain is wrong.  As discussed above, "[c]orporate executives have an independent duty to insure that proper disclosures are made.  Compliance with federal securities laws cannot be avoided by simply retaining outside counsel to prepare required documents."  *Enterprises Solutions*, 142 F. Supp. 2d at 576.[59]  Indeed, even a legitimate reliance-on-counsel defense is just one factor among many for the jury to consider, and no basis to grant summary judgment.  *See*

---

[58] Thain asserts in a single footnote on page 16 of his brief that "the same undisputed facts that belie scienter" also entitle him to summary judgment on Plaintiffs' claims under Section 14(a).  Thain Mem. 16 n.24.  He is wrong on two counts.  First, even where evidence is insufficient to establish scienter, that same evidence can make a compelling case for negligence.  *See, e.g.*, *Bank of Am.*, 757 F. Supp. 2d at 325-26.  Second, Thain ignores the evidence that raises genuine issues of fact as to both his negligence and recklessness for failure to disclose the Bonus Agreement.

[59] Although Thain argues that he has not asserted an affirmative defense of advice of counsel, *see* Thain Mem. 17 n.25, Thain has in fact sought to introduce evidence of his alleged good faith reliance on the advice of counsel.  *See SEC v. Bank of Am.*, 2009 WL 2842940 at *2 (S.D.N.Y. Aug. 25, 2009) (opining that sworn deposition testimony by BoA officers that "they relied entirely on counsel to decide what was or was not disclosed in the proxy statement" is sufficient to invoke reliance on counsel defense and thus waive attorney-client privilege).

*supra* at 61-62 (citing, *inter alia*, *Markowski*, 34 F.3d 99 at 105 ("Even where these prerequisites are satisfied, such reliance is not a complete defense, but only one factor for consideration.")).

Here, the analysis is particularly straightforward because Thain did <u>not</u> rely on the advice of counsel in making a disclosure decision. As he admitted at his deposition, he never sought or received any legal advice on the issue of whether the Bonus Agreement should be disclosed. CS ¶¶ 31-36. Indeed, Merrill's in-house counsel has testified that they were never asked to consider (and did not opine on) whether the Bonus Agreement should be disclosed. CS ¶¶ 33-35. Senior Shearman partner Jeffrey Crandall testified that Shearman's consideration of this issue consisted of a conversation he had with an associate and a conversation he had with another Shearman partner that lasted "approximately half an hour," which involved no legal research, and which was never communicated to Merrill or memorialized in any writing.[60] CS ¶¶ 36-37.

Thain next asserts that he is entitled to summary judgment because, if a "careful reader" had reviewed the Proxy, he would not have found it "obvious" that the Proxy was misleading. Thain Mem. at 19. Even if this were the relevant test for scienter (which it is not), Thain would still not be entitled to summary judgment. First, this contention on its face raises fact issues as to what would be "obvious" to a "careful reader." Moreover, this Court has held that the "bonus language [in the Proxy and Merger Agreement] materially misstated facts," and Thain does not dispute on this motion that the statements at issue were materially misleading. *Bank of Am.*, 757 F. Supp. 2d at 302. Accordingly, Thain's argument that the misleading nature of these statements was not "obvious" is irrelevant.

---

[60] Thain's reliance on *REMEC*, in support of his reliance on counsel argument is misplaced. *See* Thain Mem at 21. *REMEC* concerned specific accounting issues related to the defendant company's goodwill. However, the *REMEC* CEO was apprised of the goodwill-related decisions made by the CFO, accounting firm, and audit committee, thus exercising a degree of oversight or monitoring of the accounting professionals. *See* 702 F. Supp. 2d at 1239-51. By contrast, here, there was no monitoring or oversight by Thain.

Further, even if this issue were relevant, there is record evidence demonstrating that the misleading nature of the bonus-related representations was clear to anyone who was familiar with the Bonus Agreement. BoA's own counsel at Wachtell, Nicholas Demmo, testified that there was nothing vague or ambiguous about the Merger's negative covenant prohibiting bonus payments (also known as "VICP payments") to Merrill employees prior to the close of the Merger. As Demmo explained, "[w]ithout any exceptions, this [Section 5.2 of the Merger Agreement] says you can't pay any amount – you can't pay any amount other than base salary. VICP wasn't base salary. So by definition [Merrill] w[as]n't paying VICP unless there was an exception." CS ¶¶ 27-28.[61]

### 4.    Defendant Thain's "Unique" Challenge To Loss Causation Fails

Finally, Thain asserts that he is entitled to summary judgment on Plaintiffs' Section 10(b) claim because the January 21 *Financial Times* article purportedly was not a corrective disclosure. *See* Thain Mem. at 22-24. Thain's arguments are largely duplicative of BoA's challenges to loss causation, raising the same factual disputes that render BoA's arguments inappropriate for resolution as a matter of law. *See supra* at 40-50.

Thain's lone "unique" loss causation argument is based on a mischaracterization of the Court's prior orders and Plaintiffs' allegations. Specifically, Thain asserts in his motion that "[u]nder the Court's 2010 Opinion, the only possible basis for imposing liability on Thain pursuant to Section 10(b) is the Proxy's arguably misleading implication that the Bonuses were 'contingent.'" Thain Mem. at 23. Thain next asserts that Plaintiffs cannot prove loss causation

---

[61] In support of his argument that the Proxy's misrepresentations were not "obvious," Thain asserts that none of the Lead Plaintiffs "read the Proxy and Merger and interpreted it to mean that Merrill would pay bonuses." Thain Mem. at 17. This argument misses the point. Unlike Thain, Lead Plaintiffs did not know about the Bonus Agreement and had no reason to believe that the statements in the Proxy were false and misleading.

because they "concede that, by the time the *FT* Article was published, the market was already aware that Merrill had paid Bonuses" – *i.e.*, were no longer contingent.  Thain Mem. at 23.

Both of these assertions are wrong.  The Court never held that the statements in the Proxy were false and misleading only because they created the "implication that the Bonuses were 'contingent,'" as Thain asserts.  *See* Thain Mem. at 23.  Rather, the Court held the statements in the Proxy were "misleading in view of the undisclosed agreement on pre-closing bonus payments."  *Bank of Am.*, 757 F. Supp. 2d at 288.  Similarly, Plaintiffs have never "concede[d] that, by the time the FT Article was published, the market was already aware that Merrill had paid Bonuses," as Thain asserts.  *See* Thain Mem. at 23.  For these reasons alone, Thain's loss causation argument fails.

### B.    Defendant Thain Is Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims

Thain also conclusorily asserts that he is entitled to summary judgment as to Plaintiffs' Section 20(a) control person claims arising out of Merrill's primary violations.  *See* Thain Mem. at 23-25.  Significantly, Thain neither contests that a primary violation occurred nor claims that he did not control Merrill.  Instead, Thain argues that the Court should find as a matter of law that he did not act with the requisite "culpable participation" because he purportedly did not act with scienter or negligence.[62]   However, for the same reasons discussed above, there are numerous issues of fact concerning whether Thain acted with knowledge or negligence regarding the Proxy's disclosures.  Accordingly, Thain's motion for summary judgment as to Plaintiffs' Section 20(a) claims should also be denied.

---

[62] As noted above, Section 20(a) does not require Plaintiffs to prove Thain's state of mind in order to satisfy the culpable participation element.  *See WorldCom*, 2005 WL 638268 , at *13  ("To read a scienter requirement into the *prima facie* case for a Section 20(a) claim would unreasonably strain the plain language of a clearly written provision.").

**VII.    The Director Defendants Are Not Entitled To Summary Judgment**

    **A.    The Director Defendants Are Not Entitled To Summary Judgment On Plaintiffs' Section 14(a) Claims**

The Director Defendants contend that they cannot be held liable under Section 14(a) because they were purportedly ignorant of Merrill's anticipated fourth quarter losses and the undisclosed Bonus Agreement until after the shareholder vote. *See* Dir. Mem. at 4.  However, as the Court has previously recognized, there is no requirement of actual knowledge under Section 14(a); a showing of negligence is enough. *Bank of Am.*, 757 F. Supp. 2d at 324 (citing *Wilson*, 855 F.2d at 995 ("plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive")).   Under Section 14(a)'s negligence standard, the Director Defendants are liable if either (i) "the directors were aware that the Joint Proxy was materially deficient;" or (ii) "they should have been aware of deficiencies but took no steps to remedy or inquire about them." *Bank of Am.*, 757 F. Supp. 2d at 324.  Under either test, there are genuine issues of fact that cannot be resolved as a matter of law.

    **1.    There Is A Genuine Factual Dispute As To Whether The Director Defendants Acted Negligently In Failing To Disclose Merrill's Losses**

The Director Defendants contend that no reasonable juror could find that they acted negligently in failing to ensure that BoA "disclos[ed] information regarding Merrill's fourth quarter performance before the December 5, 2008 stockholder vote." Dir. Mem. at 4.  In making this argument, the Director Defendants point the finger squarely at Lewis and Price, and contend that "the record is clear that the Outside Directors received no interim or forecasted fourth quarter results" from BoA's management. *Id*.  However, the record is decidedly not "clear" or "undisputed" on this point.   In fact, BoA's CFO, Defendant Price, disputes the Director

92

Defendants' version of the facts, testifying that he personally provided the Directors with this information.

Specifically, during the fourth quarter of 2008, BoA held weekly telephonic Board meetings during which Merrill's massive losses were discussed.  Defendant Price testified under oath that during these weekly board meetings he personally "provided an update of whatever I knew" about Merrill Lynch, including "the most current forecast for the fourth quarter."  CS ¶ 200.  On this point, Price was emphatic, stressing at his deposition that at "every one of those [weekly board] meetings I provided them with an update of the forecast that I had."  CS ¶ 201; *see also id*. (Price testifying that he would tell the Director Defendants "where things stood on pertinent issues . . . where the forecast stood at that point").  While the Director Defendants apparently disagree with Price's sworn testimony, their conflicting accounts preclude summary judgment.  *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997) ("choices between conflicting versions of the events, and weighing of the evidence are matters for the jury, not for the court on a motion for summary judgment").[63]

Moreover, even if the Court were to find as a matter of law that Defendant Price testified falsely (and that the Director Defendants were never advised of Merrill's losses prior to the shareholder vote), the Director Defendants would still not be entitled to summary judgment on Plaintiffs' Section 14(a) claims.  This is because, under Section 14(a)'s negligence standard, the Director Defendants should have inquired about Merrill's massive losses once they were

---

[63] As the Court knows, discovery in the case and the Delaware action was not coordinated.  Nevertheless, in their motion, the Director Defendants rely extensively upon their testimony in the depositions taken in the Delaware Derivative Action, which Plaintiffs did not attend.  Their reliance on such testimony violates both: (i) Fed. R. Civ. P. 32(a), which specifically provides that such testimony may not be used against Plaintiffs at a hearing or trial in this case, and (ii) their express agreement "on behalf of Defendants in both actions … that any testimony elicited solely in the Delaware Derivative Action or the Federal Derivative Action will not be admissible in the Consolidated Securities Action."  *See* Ross Decl., Ex. 172 at 2.  Accordingly, such testimony may not be used against Plaintiffs and should not be considered on this Motion.  *See id*.; *see also* Fed. R. Civ. P. 32(a).

provided with information about Merrill's deteriorating financial condition in the fourth quarter of 2008, as described below.  *See Bank of Am.*, 757 F. Supp. 2d at 324.

When the Director Defendants approved the Merger in September 2008, they were assured that Merrill was financially stable and would have a "flat" fourth quarter – *i.e.*, with no losses or profits – despite Merrill's prior losses and the challenging economic environment.  CS ¶ 14.  The Director Defendants' expectation that Merrill was financially stable was also reflected in BoA's favorable accretion-dilution analysis, which the Proxy specifically identified as a "material factor[]" to the Board's approval of the Merger.  Pl. 56.1 ¶ 35.  By November, however, the Director Defendants were warned by Defendant Lewis that "October may have been the worst month in history" and that there were "market disruption related charges to Merrill Lynch."  CS ¶ 202.[64]  The Director Defendants were further informed of the "impact of the economic downturn on Merrill Lynch," and that "Merrill [wa]s facing the same difficulties" plaguing BoA's own financial performance in the fourth quarter.  CS ¶ 203.

Despite these facts, the record establishes that the Director Defendants took no steps to ascertain the extent of Merrill's deterioration, to determine whether this information was material, or to investigate whether the Proxy accurately and completely disclosed it.  Indeed, there is no evidence in the record showing that the Director Defendants asked a single question at any of the nine board meetings held between September 14 and December 5, 2008 about the impact of market conditions on Merrill's fourth quarter results.  CS ¶¶ 197-98, 204-07, 212, 214.

---

[64] The Director Defendants make the unsupported factual assertion that the Board only discussed Merrill's "market-disruption-related losses for the *third quarter*," not the fourth quarter.  *See* Dir. Mem. at 17.  Defendants' unsupported factual assertion in their brief is belied by the record and cannot be credited.  Indeed, there was a Board discussion of Merrill Lynch's "market disruption related charges" on November 7, 2008 – nearly forty days after the end of the third quarter and only two days after Defendant Price received a revised loss estimate for Merrill Lynch with the notation "read and weep" detailing a one-month loss of $6.1 billion for October.  CS ¶ 202; Pl. 56.1 ¶¶ 39-40.  As noted above, the minutes from this meeting reflect that the Board discussed financial performance in "October" – not the third quarter.  The Director Defendants' baseless factual assertion in their brief that this November discussion concerned "losses for the *third quarter*" only highlights the factual dispute concerning what information was provided to the Director Defendants.

Nor did they request or review a single piece of financial information concerning Merrill's fourth quarter performance prior to the vote. CS ¶ 208. Nor did they ask any questions about how "the worst month in history" (during which Merrill suffered an actual loss of $7.536 billion) impacted Merrill, BoA's accretion-dilution analysis, or its expectation that Merrill would have a "flat" fourth quarter. CS ¶¶ 204-07, 212, 214.

Having failed to take <u>any</u> of the basic steps summarized above to assess whether BoA's shareholders were entitled to information about Merrill's losses prior to the shareholder vote, the Director Defendants cannot credibly assert that they are entitled to judgment as a matter of law on Plaintiffs' Section 14(a) claim. The law is clear that a director may not abdicate all responsibility to inquire as to critical facts and then contend that he cannot be found negligent as a matter of law. As Judge Cote held in *WorldCom* in the context of a Section 11 claim, "the law has consistently placed upon directors the duty to conduct a reasonable investigation … and has not permitted them simply to accept at face value the representations of management." 2005 WL 638268, at *11. At a bare minimum, the Directors' failure to make any meaningful inquiry into Merrill's financial condition or the accuracy of the Bank's disclosures raises issues of fact as to their negligence. *See id.* at *12 (denying director's summary judgment motion where the director "has not shown that he conducted any sort of investigation, much less a reasonable investigation in light of all relevant circumstances").[65]

---

[65] The Director Defendants argue that, as a matter of law, they cannot be liable for the failure to disclose prior to the vote that: (i) a MAC had occurred, or (ii) the accretion/dilution figures had become materially false. *See* Dir. Mem. at 21-22. However, these two undisclosed facts are entirely derivative of Merrill's losses, and thus, the Director Defendants' failure to disclose these facts is the direct consequence of their failure to properly investigate Merrill's financial performance. Further, the Director Defendants misstate Plaintiffs' claims concerning the MAC. Plaintiffs do not allege that the Director Defendants should have known that BoA had actually decided to invoke the MAC prior to the vote, but rather that BoA believed the drastic reduction in Merrill's capital and earnings potential constituted a MAC. Indeed, BoA Treasurer Brown confirmed that, by no later than November 26, 2008, Merrill had suffered a "material impact" on its business. Pl. 56.1 ¶ 59. Finally, the assertion that the Director Defendants were not required to disclose the materially worse accretion/dilution figures as of the vote because they were based on

The Director Defendants also attempt to avoid liability under Section 14(a) by pointing to the "fact" that BoA's "management had considered whether Merrill's forecasts warranted any additional disclosure and determined they did not."  *See* Dir. Mem. at 20.  As an initial matter, their argument glosses over the relevant inquiry – whether the Director Defendants conducted a reasonable investigation (which they did not).  Their argument also ignores that, according to the Director Defendants, they had no idea that Merrill had suffered any significant losses, let alone that management was considering disclosing them.  CS ¶¶ 209-16.  The Director Defendants cannot claim that they were not negligent as a matter of law based on an analysis that they did not conduct and of which they were unaware.[66]

### 2.   There Is A Genuine Factual Dispute As To Whether The Director Defendants Acted Negligently In Failing To Disclose The Bonus Agreement

The Director Defendants also contend that no reasonable juror could find that they acted negligently in failing to ensure that BoA disclosed the Bonus Agreement.  *See* Dir. Mem. at 4.  Here too, however, the Director Defendants' argument is predicated on a disputed factual assertion – namely, that there is "no evidence that the Outside Directors knew or should have known" of the Bonus Agreement.  *Id*.  Contrary to their assertion, there is overwhelming evidence that the Director Defendants knew or should have known of the Bonus Agreement.

---

internal loss estimates cannot be credited given that the Director Defendants themselves told investors that these figures were "material" to their approval of the Merger.

[66] The Director Defendants' reliance on *SEC v. Shanahan*, 646 F. 3d 536 (8th Cir. 2011) is misplaced.  Both this Court and the Second Circuit have rejected the Eighth Circuit's holding that "scienter is an element" for a Section 14(a) claim asserted against outside directors.  *See Bank of Am.*, 757 F. Supp. 2d at 321 (citing *Wilson*, 855 F.2d at 995).  Additionally, the facts at issue in *Shanahan*, which involved a failure to disclose backdated stock options, are readily distinguishable from those present here.  *See* 646 F.3d at 539.  Most notably, in *Shanahan*, the SEC made no showing that the director defendant was or should have been aware that the improper backdating practice had not been disclosed.  *Id*. at 547.  Here, there is extensive evidence that the Director Defendants knew or should have known that Merrill suffered substantial losses in the fourth quarter that were not disclosed.

To start, all the Director Defendants had to do to learn of the Bonus Agreement was to ask for a copy of the Disclosure Schedule – which was referenced twelve times in the Merger Agreement – and read it.  Not only did they fail to do this, but many Director Defendants testified that they failed to review the Merger Agreement that they approved, and failed to inquire as to whether the Proxy that they used to solicit shareholder approval was accurate as of the date of the vote.  *See* CS ¶¶ 57-59, 217-20.  Director Defendant Charles Gifford aptly summed up the Board's failure to take any steps to ensure that the Board's own solicitations were accurate and complete.  When asked, "Did you have any understanding of what role you as a director had, and whether or not you needed to review the proxy before it was mailed out," Gifford testified as follows: "No, I did not.  Just be to be clear on that, it's my view that the contents of the proxy is a management responsibility, because we're certainly not carrying any responsibility."  CS ¶ 57.  The Director Defendants' failure to review the basic documents setting forth the terms of the transaction for which they solicited shareholder approval, or to ensure that those documents were accurate, easily raises issues of fact as to their negligence.  *See WorldCom*, 2005 WL 638268, at *11-12; *Gould*, 351 F. Supp. at 868 ("The … contention that a director may escape liability for a materially false proxy statement because he lacked scienter or knowledge of its falsity by reason of his failure to read the statement is almost too disingenuous to believe.  To exonerate a director for his failure to peruse the very materials the accuracy of which is his legal responsibility would effectively emasculate the proxy provisions.").

Moreover, Director Defendant John Collins testified that "the subject of Merrill Lynch's bonuses was raised" during a Board meeting in the fourth quarter of 2008, with BoA Head of Human Resources "Steele Alphin inform[ing] the board of the expected bonuses that Merrill

Lynch was going to pay," which Alphin stated was "[a]pproximately $5 billion."[67]  CS ¶ 225.

The fact that the Board was informed that Merrill was expected to pay up to $5 billion in bonuses

also creates a genuine factual dispute regarding whether the Director Defendants knew or should

have known of the Bonus Agreement.

In response to these facts, the Director Defendants contend that they are immune from

liability under Section 14(a) because, although they did not review the Proxy, Merger Agreement

or Disclosure Schedule, BoA's management and counsel did.  *See* Dir. Mem. at 15.  This Court

and others have uniformly held that blind reliance on management and counsel's work product is

not a defense to director liability under Section 14(a).  *See Bank of Am.*, 757 F. Supp. 2d at 325

(quoting *Gould v. Am. Hawaiian S.S. Co.*, 351 F. Supp. 853, 865 (D. Del. 1972) ("Since § 14(a)

imposes liability for the false and misleading . . . proxy materials on the solicitors . . . these

defendant solicitors [may not] avoid liability by relying on . . . counsel to rectify errors in the

proxy materials.")); *Livent,* 355 F. Supp. 2d at 733 (defendants "cannot satisfy this burden . . . by

blindly relying on outside counsel").[68]  There is no basis to depart from these authorities here,

and engraft an unprecedented exception into Section 14(a) that would encourage directors to

choose inaction and ignorance over "rigorous director scrutiny of [the Proxy]."  *See Berman v.*

*Thomson*, 403 F. Supp. 695, 699 (N.D. Ill. 1975) (explaining that the application of Section 14(a)

---

[67] Defendant Gifford also recalled that Steele Alphin discussed Merrill compensation issues at a BoA Board meeting.  *See* CS ¶ 226.  Although Defendants Collins and Gifford did not specifically recall the date of this Board discussion, it necessarily occurred prior to the shareholder vote.  This is because, on November 11, 2008, Merrill's Compensation Committee approved a bonus pool of approximately $3.8 billion, and after that date, Merrill's bonuses were obviously no longer "expected" to be $5 billion.  CS ¶¶ 171-73, 177-78.

[68] In their motion, the Director Defendants <u>again</u> selectively quote from the Delaware district court's decision in *Gould* for the uncontroversial proposition that the negligence standard "does not make impermissible *any* reliance on expertise of legal or financial counsel in areas pertinent to their respective expertise."  *See* Dir. Mem. at 13. However, as this Court explained in rejecting the Director Defendants' argument at the motion to dismiss stage, "the *Gould* court also observed that '[s]ince § 14(a) imposes liability for the false and misleading ... proxy materials on the solicitors ... these defendant solicitors [may not] avoid liability by relying on ... counsel to rectify errors in the proxy materials.'"  *Bank of Am.*, 757 F. Supp. 2d at 325.

to outside directors "serves to encourage rigorous director scrutiny of this type of document, thereby protecting the investing public, as was the intent of the Securities Act of 1934").

### B. The Director Defendants Are Not Entitled To Summary Judgment On Plaintiffs' Section 11 Claims

The Director Defendants also assert that they are entitled to summary judgment on Plaintiffs' Section 11 claims based on their affirmative defense of "due diligence."  Dir. Mem. at 6-9.   However, as discussed above, to prevail on a "due diligence" defense the Director Defendants bear the burden of demonstrating that they conducted a "reasonable investigation" that provided "reasonable ground to believe" that the offering materials were true and complete. *See supra* at 67-68 & n.39; *see also* 15 U.S.C. § 77k(B)(3)(A); *WorldCom,* 346 F. Supp. 2d at 678 ("the word 'investigation' connotes a 'thorough' or 'searching inquiry'").   Determining whether the Director Defendants conducted the requisite "'searching inquiry'" involves an "exquisitely fact intensive inquiry that depends on the circumstances surrounding a particular issuer and the alleged misstatement."  *WorldCom*, 346 F. Supp. 2d at 679.[69]

Here, the same facts that preclude the Director Defendants from satisfying their burden under Section 14(a) are more than sufficient to create a genuine issue of fact as to whether they have satisfied their heavy burden of establishing a "due diligence" defense as a matter of law. As discussed above, the Director Defendants have failed to present <u>any</u> evidence that they conducted <u>any</u> investigation into whether the Offering Documents adequately disclosed the Bonus Agreement, let alone a "reasonable" one entitling them to summary judgment under

---

[69] In their motion, the Director Defendants seek to distinguish *WorldCom*, in which the Court denied the director defendants' motion for summary judgment, emphasized the "fact-intensive inquiry" of their asserted due diligence defense, and held that they "are not excused from performing a meaningful due diligence investigation due to the involvement of professionals."  *WorldCom*, 2005 WL 638268, at *8.  Their attempt fails.  Indeed, the facts are even stronger in this case.  In *WorldCom*, the alleged fraud concerned a complex accounting scheme, which the director defendants vigorously argued they could not deduce based on a review of the company's financial statements.  Here, in contrast, a simple review of the Merger Agreement, the Proxy, or the Disclosure Schedule would have informed the Director Defendants that BoA had failed to publicly disclose the Bonus Agreement.

Section 11. *Id.* (summary judgment denied where director had "not shown that he conducted *any* sort of investigation, much less a reasonable investigation in light of all relevant circumstances").

Moreover, the Director Defendants' blind reliance on counsel and management's approval of the Merger Agreement also does not entitle them to immunity under Section 11, as they assert. *See* Dir. Mem. at 11. To the contrary, the law is settled that "directors are not excused from performing a meaningful due diligence investigation due to the involvement of professionals . . . in a given securities offering." *WorldCom*, 2005 WL 638268, at *6-7; *see also Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544, 582 (E.D.N.Y. 1971) ("Tacit reliance on management assertions is unacceptable"); *Gould*, 351 F. Supp. at 868 (denying director defendants motion for summary judgment where they relied on management's word and made little if any effort to verify management's representations); *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 688 (S.D.N.Y. 1968) (an outside directors' general inquiries "in the nature of a credit check" do not satisfy Section 11's due diligence requirement). In sum, the Director Defendants have failed to meet their burden to show that they are entitled to summary judgment disposing of Plaintiffs' Section 11 claims.

## C.   The Director Defendants Are Also Not Entitled To Summary Judgment On Plaintiffs' Control Person Claims

The Director Defendants also move for summary judgment as to Plaintiffs' control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. *See* Dir. Mem. at 23-25. The Director Defendants do not dispute the existence of a primary violation of the Exchange Act and the Securities Act, nor do they dispute their control over BoA, the primary violator. Instead, they argue that: (i) Plaintiffs have failed to demonstrate their culpable participation for purposes of Section 20(a) or, alternatively, that the Director Defendants are entitled to summary judgment on their affirmative defense of "good faith;" and (ii) the Director

100

Defendants are entitled to summary judgment as to the Section 15 claims based on their affirmative defense that they had "no knowledge of or reasonable ground to believe in the existence of" the Bonus Agreement.  *Id*.  For the reasons discussed above at pages 96-98, these arguments fail.

As detailed above, there are numerous questions of fact as to whether the Director Defendants knew or had reason to know of Merrill's losses and the Bonus Agreement, precluding summary judgment here as to Plaintiffs' Section 20(a) claims.  *See In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1260 (S.D.N.Y. 1996) (denying summary judgment and holding that "plaintiffs have . . . presented evidence that raises a question of fact regarding whether the audit committee defendants were willfully blind to the fraud going on around them").  For the same reasons, there are, at a minimum, myriad disputed questions of fact regarding whether the Director Defendants knew or should have known of the Bonus Agreement.  Thus, the Director Defendants' summary judgment motion as to Plaintiffs' control person claims should be denied.

## VIII.  Conclusion

For the above reasons, Defendants' motions for summary judgment should be denied.

Dated: June 29, 2012
       New York, New York

**KAPLAN FOX & KILSHEIMER LLP**

By:    */s/ Fred S. Fox*
       Robert N. Kaplan
       Frederic S. Fox
       850 Third Avenue, 14th Floor
       New York, NY 10022
       Tel: (212) 687-1980
       Fax: (212) 687-7714

       *Attorneys for Plaintiffs*
       *and the Class*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

By:    */s/ Steven B. Singer*
       Max W. Berger
       Steven B. Singer
       1285 Avenue of the Americas
       New York, NY 10019
       Tel: (212) 554-1400
       Fax: (212) 554-1444

       *Attorneys for Plaintiffs*
       *and the Class*

**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**

By:    */s/ David Kessler*
       David Kessler
       Gregory M. Castaldo
       280 King of Prussia Road
       Radnor, PA 19087
       Tel: (610) 667-7706
       Fax: (610) 667-7056

       *Attorneys for Plaintiffs*
       *and the Class*