**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
:
IN RE BANK OF AMERICA CORP. :
SECURITIES, DERIVATIVE, AND :
EMPLOYEE RETIREMENT INCOME :
SECURITY ACT (ERISA) LITIGATION :
: Master File No. 09 MD 2058 (PKC)
------------------------------------ x ECF Case
:
THIS DOCUMENT RELATES TO : Oral Argument Requested
:
The Consolidated Securities Action :
:
:
------------------------------------ x

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# KENNETH D. LEWIS' MOTION FOR SUMMARY JUDGMENT

Mary Jo White
Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Phone: (212) 909-6000
Fax: (212) 909-6836
Email: ajceresn@debevoise.com

Colby A. Smith
DEBEVOISE & PLIMPTON LLP
555 13th Street N.W.
Washington, D.C. 20004
Phone: (202) 383-8000
Fax: (202) 383-8118
Email: casmith@debevoise.com

*Counsel for Defendant Kenneth D. Lewis*

**TABLE OF CONTENTS**

I. Mr. Lewis Is Entitled to Summary Judgment on the Loss and Bonus Cap Issues Pleaded in Plaintiffs' Second Amended Complaint ............................................................. 3

   A. Plaintiffs Have Failed to Establish that Mr. Lewis Acted with Scienter or Negligence Regarding the Decision Not to Disclose Merrill's Projected Fourth-Quarter Losses ................................................................................................. 3

   B. Mr. Lewis Is Not Liable for Nondisclosure of Merrill's Bonus Cap ...................... 7

II. Plaintiffs' New Allegations Should Be Disregarded, and in Any Event Are Insufficient to Demonstrate Scienter or Negligence .............................................................. 9

   A. Plaintiffs' New Allegations Should Be Rejected As Untimely ............................... 9

   B. Plaintiffs' New Allegations Do Not Establish a Genuine Issue of Fact Regarding Mr. Lewis' Scienter or Negligence ...................................................... 10

III. Conclusion ................................................................................................................ 14

# TABLE OF AUTHORITIES

**CASES**

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372 (S.D.N.Y. 2009) ............................................................................................................. 10

*Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) ................................................................. 7

*Coram Healthcare Corp. v. Cigna*, No. 00-cv-2677, 2002 WL 32910044 (S.D.N.Y. July 24, 2002) ..................................................................................................... 9

*Gulf U.S.A. Corp. v. Fed. Ins. Co.*, 259 F.3d 1049 (9th Cir. 2001) ...................................... 10

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004) ........................................................... 1, 4, 7

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................................................................... 7

*In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................. 1, 4, 5, 8

*Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987 (2d Cir. 1988) ............................................ 7

**STATUTES AND REGULATIONS**

15 U.S.C. § 77k (Section 11 of the Securities Act) ............................................................... 8

15 U.S.C. § 77o (Section 15 of the Securities Act) ............................................................... 8

15 U.S.C. § 78j(b) (Section 10(b) of the Exchange Act) ....................................................... 3

15 U.S.C. § 78n(a) (Section 14(a) of the Exchange Act) ................................................... 3, 7

15 U.S.C. § 78t(a) (Section 20(a) of the Exchange Act) ........................................................ 7

Fed. R. Civ. P. 32 .................................................................................................................. 10

Fed. R. Civ. P. 56 ............................................................................................................ 10, 14

**OTHER AUTHORITIES**

John A. Kimpflen et al., 10A *Federal Procedure* § 26:498 (2012) ..................................... 10

Plaintiffs' Opposition Memorandum of Law ("Opposition" or "Pl. Opp. Br.") does not dispute that Mr. Lewis was informed, on two occasions prior to the December 5, 2008 shareholder vote, that BAC's CFO[1] and legal counsel had considered whether Merrill's projected fourth-quarter 2008 losses needed to be disclosed, and had concluded, for several articulated and logical reasons, that such disclosure was not warranted.  It is not conceivable that Mr. Lewis' decision to defer to this conclusion, involving as it did such a complex securities-law question, could under the law amount to reckless or negligent conduct.

Unable to dispute that the legal conclusion regarding disclosure was conveyed to Mr. Lewis, plaintiffs assert that the securities laws do not permit a CEO like Mr. Lewis to delegate disclosure issues to the CFO and legal counsel, suggesting instead that Mr. Lewis was required to make his own disclosure determination by speaking to the lawyers directly, by cross-examining his CFO on what information was given to the lawyers and by personally convening the Disclosure Committee to consider the issue.  Plaintiffs' attempt to avoid dismissal of their claims against Mr. Lewis utterly fails under the law on this record.  Plaintiffs' contention that Mr. Lewis was required to consult counsel directly flies in the face of the established law cited in our opening brief that plaintiffs not only fail to distinguish, but even endorse later in their Opposition. *See, e.g.*, *Howard v. SEC*, 376 F.3d 1136, 1148-49 (D.C. Cir. 2004); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1241 (S.D. Cal. 2010).  Mr. Lewis had absolutely no reason to believe that the attorneys did not have complete and accurate information when offering their advice.  And the Disclosure Committee charter did not require that the Disclosure Committee review the Merger Proxy, let alone convene on a disclosure issue that arose after the Merger Proxy's dissemination.  In any event, the decision of whether or not to convene the Disclosure

---

[1]   All abbreviations and capitalized terms used in this brief have the same meaning as they do in Mr. Lewis' opening Motion.

Committee was appropriately left to General Counsel Timothy Mayopoulos, whom Mr. Lewis was told and understood had been consulted and who was better positioned to determine whether the input of the Disclosure Committee was needed.

Similarly, with respect to disclosure of Merrill's Bonus Cap, plaintiffs cannot dispute that the Merger Proxy was drafted entirely by highly experienced legal counsel fully aware of the Bonus Cap who decided against disclosing it in the Merger Proxy.  Again, consistent with the cases that permit a CEO to delegate technical, legal matters to competent counsel, Mr. Lewis did nothing wrong by not questioning the disclosure decisions that Wachtell and other lawyers made regarding bonuses.

Recognizing the insufficiency of the proof with respect to the Second Amended Complaint's ("SAC's") allegations concerning the loss and Bonus Cap issues, plaintiffs attempt to defeat Mr. Lewis' summary judgment motion by offering a host of new, unpleaded allegations about accretion/dilution, balance-sheet reductions and liquidity issues.  These new allegations should be disregarded because they amount to a highly prejudicial attempt to amend the SAC after discovery has closed and in defiance of the Court's scheduling order.  Even if these allegations were to be considered, they do not raise genuine issues of fact sufficient to withstand summary judgment.  Mr. Lewis' statement on accretion/dilution at the December 5, 2008 shareholders' meeting was completely accurate – he simply (and correctly) referred to the previous presentation the Bank published on September 15, 2008 regarding the accretion/dilution forecast conducted over the merger negotiation weekend.  Further, that forecast represented the best information available to him as of the shareholders' meeting, and there is no evidence that Mr. Lewis made that statement with scienter or negligence.  *See* BofA's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Docket # 646 ("BAC Opp. Br.")

at 11-13, 18-20.  Nor is there any basis for finding that Mr. Lewis understood that the balance-sheet reductions would meaningfully impact Merrill's future performance or that participation in a new U.S.-government lending program to help banks increase their liquidity was related to Merrill's liquidity issues.

Accordingly, Mr. Lewis is entitled to summary judgment on all claims.[2]

## I. Mr. Lewis Is Entitled to Summary Judgment on the Loss and Bonus Cap Issues Pleaded in Plaintiffs' Second Amended Complaint.

### A. *Plaintiffs Have Failed to Establish that Mr. Lewis Acted with Scienter or Negligence Regarding the Decision Not to Disclose Merrill's Projected Fourth-Quarter Losses.*

In an attempt to show that Mr. Lewis acted in a manner that was "highly unreasonable" and an "extreme departure from the standards of ordinary care" under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and in violation of the standards of a "reasonable and ordinarily prudent person" under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), *see* Memorandum of Law in Support of Kenneth D. Lewis' Motion for Summary Judgment, Docket # 601 ("Lewis Br.") at 11-12, plaintiffs point to five different steps they claim he should have taken in connection with the disclosure of Merrill's projected losses, including: "determine personally" whether Merrill's losses should be disclosed; communicate with counsel directly; provide information directly to counsel; inquire whether counsel had been provided accurate and complete information; and satisfy himself that the decision not to disclose was reasonable and appropriate.  Pl. Opp. Br. at 58-59.  The common thread underlying these points is plaintiffs' allegation that Mr. Lewis did nothing to review the disclosure decision.  But the actual record developed directly rebuts that allegation.  It cannot be disputed that Mr. Lewis personally

---

[2]  Mr. Lewis joins in the Reply Memorandum of Law in Support of Bank of America's Motion for Summary Judgment and in the Reply Memorandum of Law in Further Support of Defendant John A. Thain's Motion for Summary Judgment.

discussed the disclosure decision with his CFO and was satisfied in light of that discussion that the decision not to disclose was reasonable and appropriate. Lewis Br. at 16-18.

What plaintiffs' arguments boil down to is that Mr. Lewis should have participated directly in the discussions with counsel about disclosure. But plaintiffs' argument that Mr. Lewis is liable for any nondisclosure by BAC unless he personally communicated with counsel and directly supervised their analysis is contrary to the law. *See, e.g.*, *Howard*, 376 F.3d at 1148-49 (ruling that a company executive was *not* liable for the company's securities violation where he had been informed by other company personnel that outside counsel had specifically approved the company's securities filings). In *Howard,* the court emphasized how "illogical," "impractical and highly inefficient" it would be to require company executives to consult personally with the attorney offering the actual legal advice, and determined that no such personal consultation is required to negate scienter. *Id.* *Howard* clearly stands for the proposition that executives can rely on processes undertaken by their expert legal advisors that are reasonably designed to ensure compliance with the requirements of the federal securities laws, even if the executives themselves did not directly communicate with counsel. That same conclusion fully applies here.

Similarly, in *In re REMEC*, the court granted summary judgment to a defendant CEO after concluding he lacked scienter in connection with the company's overstatement of its goodwill. 702 F. Supp. 2d at 1251. The court noted that while the CEO had not participated in the goodwill analysis himself, he "was certainly apprised of significant accounting decisions," and "relied in good faith on the[] competence and expertise" of the accounting department, CFO and outside auditors. *Id.* at 1241. Although plaintiffs attempt to distinguish *In re REMEC* in their argument against Mr. Lewis, later in their brief, when addressing Mr. Thain's arguments,

they concede that the fact that the *In re REMEC* CEO "was apprised of the goodwill-related decisions made by the CFO, accounting firm, and audit committee" meant that the CEO "exercis[ed] a degree of oversight or monitoring of the accounting professionals." *Compare* Pl. Opp. Br. at 63 n.35 *with* Pl. Opp. Br. at 89 n.60.  Plaintiffs have thus acknowledged that *In re REMEC* stands for the proposition that a CEO exercises appropriate oversight when he is apprised of the conclusions of the company's skilled professionals and relies on them – precisely as Mr. Lewis did here.

Plaintiffs also claim that Mr. Lewis personally should have brought Merrill's projected losses to the attention of BAC's Disclosure Committee.  *See id.* at 60-61.  But this criticism ignores the clear evidence that the Disclosure Committee's function did *not* extend to merger proxies.  *See* Supplemental Declaration of Gregory F. Smolar ("Smolar Supp. Decl.") Ex. 1 at 19:2-24 (Mayopoulos Dep.) (Disclosure Committee reviewed proxies for annual shareholders' meeting, not merger proxies).  In fact, plaintiffs can point to no evidence that the Disclosure Committee had ever been involved in any disclosures other than BAC's periodic filings and annual proxy.  Nor was the disclosure decision regarding Merrill's projected fourth-quarter losses related to the review of the Merger Proxy, since those projected losses arose *after* the Merger Proxy was issued.  Moreover, Mr. Mayopoulos was a member of the Disclosure Committee, *id.* at 17:17-21; had authority to interpret the Disclosure Committee's charter and to call meetings of the Disclosure Committee, Declaration of Hannah G. Ross, Docket # 653, Ex. 59 at BAC-ML-CL00841869 (providing General Counsel with authority to interpret committee charter and call committee meetings); and was the Chairman of the committee that brought Disclosure Committee determinations to Mr. Lewis' attention, Smolar Supp. Decl. Ex. 1 at 21:10-22:24 (Mayopoulos Dep.).  It was certainly appropriate for Mr. Lewis, who knew that

5

Mr. Mayopoulos had been consulted on the disclosure decision, to rely on Mr. Mayopoulos to determine whether there was a need to convene the Disclosure Committee. There can be no basis for criticizing Mr. Lewis for having failed to personally call such a meeting.

Plaintiffs also claim that there is a "hotly contested dispute" as to whether Mr. Price told Mr. Lewis on December 3, 2008 that Wachtell had been consulted and that there are "serious questions" about whether Mr. Price provided Mr. Mayopoulos with all relevant information at that time. Pl. Opp. Br. at 61-64. But these disputes make no difference to an analysis of Mr. Lewis' state of mind. Whether Mr. Price told Mr. Lewis that Wachtell had been consulted (or, in the alternative, said that legal counsel or "Tim" had been consulted), Mr. Lewis was in the same position – he reasonably believed the issue had been considered by the Bank's legal counsel and that no disclosure was warranted. Nor does it matter to Mr. Lewis' state of mind what information Mr. Price actually provided to Mr. Mayopoulos. Mr. Lewis had no reason to doubt that Mr. Mayopoulos had been informed of the relevant facts and no red flags suggested that Mr. Lewis needed to cross-examine BAC's skilled and experienced CFO to understand every detail conveyed to counsel. Mr. Lewis therefore cannot be said to have acted recklessly or negligently.

Finally, the cases plaintiffs cite to support their argument are inapposite. *Enterprise Solutions*, for example, concerned two defendants engaged in a rampant fraud to portray a shell company as a leader in Internet security software. Given that their entire course of conduct was the antithesis of "good faith," the court easily dispatched one defendant's argument that he lacked scienter for one aspect of the claims against him (the nondisclosure of a bankruptcy at a company he previously controlled) merely because that information had been provided to company counsel, where counsel had offered no opinion on disclosure. *Enterprise Solutions*, 142 F. Supp. 2d at 575-76. Here, by contrast, Mr. Lewis was aware that BAC's experienced and

6

skilled CFO and General Counsel had both considered the disclosure issues and concluded no disclosure was warranted. This case therefore bears no resemblance to *Enterprise Solutions*.[3]

In short, plaintiffs have offered *no* countervailing evidence or case law tending to show that Mr. Lewis acted in a manner that constituted a departure from the standard of a reasonable and ordinarily prudent person, let alone in a manner that was an "extreme departure" from such a standard. In fact, if Mr. Lewis were to be found liable based on the facts here, it would rewrite the federal securities laws and set a very troubling and unwise precedent for CEOs of all companies, requiring: (*i*) that they personally consult directly with a company's experts on every issue that comes before them rather than relying on the competence of trusted lieutenants to seek such views, and then (*ii*) that they second-guess those experts rather than defer to the very views those experts were asked to formulate. *See, e.g.*, *Howard*, 376 F.3d at 1148 (argument that executives must personally consult with counsel "cannot be correct" and "makes no sense whatsoever").[4]

### B. *Mr. Lewis Is Not Liable for Nondisclosure of Merrill's Bonus Cap.*

The arguments discussed above apply with equal force to the claim that Mr. Lewis failed to ensure that the Disclosure Schedule reflecting Merrill's Bonus Cap was part of the Merger

---

[3] Through selective quotations from the case law, plaintiffs also attempt to impose a strict-liability standard on the Section 14(a) claims by implying that *any* material deficiency in BAC's disclosures automatically renders Mr. Lewis personally liable. *See* Pl. Opp. Br. at 52-53 (citing, among others, *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010); *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); and *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988)). However, the cases cited by plaintiffs make clear that the relevant standard under Section 14(a) is negligence. *See, e.g.*, *Bank of Am.*, 757 F. Supp. 2d at 321-22. Here, having been made aware that counsel considered the disclosure question – the last time only two days before the shareholder meeting – Mr. Lewis can hardly be said to have failed to meet a standard of ordinary care by deferring to that advice.

[4] As discussed more fully in Mr. Lewis' Motion, the same analysis also supports summary judgment for Mr. Lewis on plaintiffs' related control-person claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Lewis Br. at 13, 18-19. Plaintiffs' only response is to claim that summary judgment is inappropriate for the reasons they offer in connection with their principal claims, Pl. Opp. Br. at 70, an argument which fails for the reasons described in this Reply.

Proxy.  Here again, plaintiffs claim that Mr. Lewis had an "independent duty" to ensure proper disclosures, and that Mr. Lewis failed to consult the Disclosure Committee.  Pl. Opp. Br. at 65-67.  Again, however, plaintiffs fail to counter the argument in Mr. Lewis' opening brief that Mr. Lewis was justified in delegating disclosure decisions to the counsel who had drafted the Merger Agreement, were still negotiating and drafting the Bonus Cap, were drafting the Merger Proxy, and were familiar with the law's disclosure requirements.  In fact, the record is clear that BAC's lawyers at Wachtell *specifically considered* the question of how the Bonus Cap should be treated in the Merger Proxy, and *specifically concluded* that no disclosure of the schedule was required.  *See* Demmo Dep. at 217:7-15  ("I knew about the VICP cap, and I have been doing this for, whatever, 14 and a half years, and there wasn't something that needed to be disclosed."); *id.* at 39:22-40:20 (bonus agreement "wasn't required disclosure and [Wachtell] never told [BAC] before or after December 5th that this should have been disclosed").  As one Wachtell partner testified in light of Wachtell's involvement in the negotiations and the preparation of the Merger Proxy, "I think it would be safe for Bank of America to assume that if we didn't disclose something like this, [and] it was in a document that we knew about and were involved in, that the disclosure wasn't required."  *Id.* at 40:3-41:16.  Under these circumstances, the law did not require Mr. Lewis to insert himself into the Merger Proxy preparation process and overrule Wachtell.  It is sufficient under the law that he understood that preparation of the Merger Proxy had been delegated to legal counsel, and that no red flags were raised.  *See In re REMEC*, 702 F. Supp. 2d at 1241.  When Mr. Lewis reviewed the Merger Proxy prior to signing it, he had no reason to doubt that counsel had done their job thoroughly and appropriately.[5]  Lewis SUF ¶ 13.

---

[5]  As with Merrill's losses, plaintiffs' subsidiary bonus claims pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, should fail for the same reasons as their principal claims.  Lewis Br. at 12-13, 22.

8

**II.     Plaintiffs' New Allegations Should Be Disregarded, and in Any Event Are Insufficient to Demonstrate Scienter or Negligence.**

Apparently realizing that the SAC is insufficient to withstand summary judgment, the bulk of plaintiffs' response is devoted to several new theories related to accretion/dilution, balance-sheet reductions and liquidity. Plaintiffs' attempt to turn these new blunderbuss contentions into issues of fact with respect to Mr. Lewis' scienter and negligence should be rejected both procedurally and on the merits.

**A.     *Plaintiffs' New Allegations Should Be Rejected As Untimely.***

As BAC discussed in its Opposition to Plaintiffs' Motion for Partial Summary Judgment, it is wholly improper for plaintiffs to attempt to inject new theories of liability into this case at such a late stage. BAC Opp. Br. at 33-39; *see also Coram Healthcare Corp. v. Cigna*, No. 00-cv-2677, 2002 WL 32910044, at *11 (S.D.N.Y. July 24, 2002) ("it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment") (internal citations omitted). Not only have plaintiffs' new claims never been tested against the strict pleading requirements of the PSLRA, but their approach also leaves Mr. Lewis and this Court to guess what Mr. Lewis is supposed to have known about these issues, when he is supposed to have known it, and how that knowledge purportedly may have rendered his conduct reckless or negligent. Moreover, there is no allegation – much less evidence – that the Lead Plaintiffs even attended the December 5 shareholders' meeting or ever heard what Mr. Lewis said there about the accretion/dilution forecast, much less that any of them traded or exercised a vote based upon Mr. Lewis's statement. Nor was any claim based upon this statement ever presented for class certification analysis. To the contrary, at class certification plaintiffs exclusively pursued an omissions theory on their fourth-quarter loss allegations. Plaintiffs' tactic is highly prejudicial and plaintiffs' failure to plead these allegations should lead the Court to disregard them.

9

### B. *Plaintiffs' New Allegations Do Not Establish a Genuine Issue of Fact Regarding Mr. Lewis' Scienter or Negligence.*

Even if the Court were to allow plaintiffs to amend the SAC at this stage, Mr. Lewis still would be entitled to summary judgment.

As plaintiffs made clear in their own Motion for Partial Summary Judgment, their accretion/dilution claim is based exclusively on Mr. Lewis' testimony that – based on the documents he was shown at his deposition, including the December 9 Board presentation by Mr. Price – as of December 5, BAC's accretion/dilution analysis based on internal forecasts differed from the September 15 accretion/dilution analysis based on First Call estimates that were included in the Merger Proxy. *See generally* Lead Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment, Docket # 590 ("Pl. Mem."). Notwithstanding this testimony, which simply followed from the documents Mr. Lewis was shown at his deposition, nowhere in the factual record is there any evidence that on December 5, Mr. Lewis was aware of revised accretion/dilution numbers that were different from those disclosed by BAC on September 15. In fact, Mr. Lewis testified in the related Delaware litigation that the September 15 accretion/dilution analysis remained the best information available to him at the time of the shareholders' meeting on December 5. BofA's Counterstatement of Material Facts and Response to Plaintiffs' Local Rule 56.1 Statement, Docket # 658 ("BAC 56.1 Opp."), at ¶ 88.[6]

---

[6] Plaintiffs incorrectly argue that citation to testimony in related actions is inappropriate. *See* Plaintiffs' Response to Defendants' Local Rule 56.1 Statements, Docket # 657 ("Pl. 56.1 Opp."), at ¶¶ 72-99. In contrast to Rule 32(a), which governs the use of depositions only "[a]t a hearing or trial," sworn deposition testimony "may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding," as it is equivalent to an affidavit under Rule 56(c). *Gulf U.S.A. Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001); *see also* John A. Kimpflen et al., 10A *Federal Procedure* § 26:498 (2012). Moreover, the parties' agreement that Delaware testimony "will not be admissible" in this action is also irrelevant. Evidence in support of a summary judgment motion need not be presented in admissible form; it must merely "set out *facts* that *would be* admissible in evidence" at trial. *See* Fed. R. Civ. P. 56(c)(4) (emphasis added); *see also, e.g., Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 383 (S.D.N.Y. 2009). Therefore, testimony in related Delaware, SEC and NYAG actions is evidence that may be considered on summary judgment.

As the record makes clear, information that might have affected the accretion/dilution calculation, such as Merrill's profit plan for 2009, an early draft of which was shown to Mr. Lewis on December 3, was "not credible" at that early stage in the planning process. *Id.* at ¶ 89. In addition, the accretion/dilution calculation involves a comparison of BAC's projected performance on a stand-alone basis against the projected performance of the merged BAC and Merrill entity. As a result, if BAC's projected performance in 2009 and future years had declined, a potential reduction in Merrill's prospective results may not have had a meaningful impact on the accretion/dilution calculation. As of December 5, there is nothing in the record to suggest that Mr. Lewis knew all the variables in the accretion/dilution calculation, let alone what the outcome of that calculation might be.

Even more fundamentally, there is no evidence that Mr. Lewis's statement was false in any way. He simply referred back to the presentation made by the Bank on September 15, 2008 which set forth the accretion/dilution forecast made over the merger negotiation weekend, and accurately reported what that presentation said. *See, e.g.*, BAC Opp. Br. at 2-3. There is therefore nothing in the record to raise a disputed issue of fact relating to Mr. Lewis' accretion/dilution comment on December 5, let alone whether he acted recklessly or negligently in making that statement.

As in their Motion for Partial Summary Judgment, plaintiffs also attempt to tether their accretion/dilution argument to various allegations concerning Merrill's balance sheet and liquidity. Pl. Opp. Br. at 58 (alleging Merrill's reduced balance sheet "caus[ed] the accretion/dilution analysis to materially change" and Merrill's "liquidity crisis…further impact[ed] the accretion/dilution analysis"). Because these capital and liquidity allegations simply support the accretion/dilution claim, they fail for the same reasons.

11

Even analyzed individually, however, these claims do nothing to create a material issue of fact undermining summary judgment because plaintiffs cannot establish that Mr. Lewis acted recklessly or negligently. With respect to Merrill's balance-sheet reduction, plaintiffs assert that "the reduction in Merrill's balance sheet decreased Merrill's ability to earn future income by at least $1 billion per year, and fundamentally changed the economics of the Merger." Pl. Opp. Br. at 58 (citing Pl. Mem. at 3-4; Plaintiffs' Statement of Undisputed Facts ("Pl. 56.1") ¶ 124). The evidence allegedly supporting this assertion is: (a) testimony by former BAC Treasurer Jeff Brown and current BAC CEO Brian Moynihan concerning the effect Merrill's capital position *may* have had on BAC, *see* Pl. Mem. at 3-4; Pl. 56.1 at 63-64, 124-25; (b) documents drafted by Wachtell *in mid- to late December 2008* concerning Merrill's financial condition, *see* Pl. Mem. at 4; Pl. 56.1 at 120-22, 130; and (c) various statements by BAC to government officials *in mid- to late December* when BAC was considering terminating the Merger, *see* Pl. 56.1 at 134-36. As described in BAC's Counterstatement and Response to Plaintiffs' Local Rule 56.1 Statement, none of the evidence remotely supports plaintiffs' assertions about the effect of Merrill's balance-sheet reductions on BAC's income. BAC 56.1 Opp. at ¶¶ 110-116, Responses to Nos. 63-64, 120-125, 130, 134-36.

Even more importantly, none of the cited evidence addresses or supports in *any* way the idea that Mr. Lewis knew *on December 5* that Merrill's effort to reduce assets on its balance sheet would affect its future earnings. In fact, the evidence is to the contrary. As Mr. Lewis testified, Merrill's balance-sheet reduction involved the disposition of assets on which Merrill was earning a low margin. *See* Smolar Supp. Decl. Ex. 2 at 132:7-133:3, 139:24-140:14 (Lewis Dep.). As a result, Mr. Lewis would not expect – on December 5 or at any later time – that Merrill's balance-sheet reduction would materially harm its ability to earn future income. *See id.*

12

Further, the record confirms that the reduction in assets in fact involved low-margin assets, just as Mr. Lewis had expected. Smolar Supp. Decl. Ex. 3 at BAC-ML-NYAG00068683 (Hayward 01/14/09 Email). According to an analysis by BAC after the fourth quarter closed, the largest part of Merrill's $200 billion fourth-quarter asset reduction ($136 billion) reflected "standard quarter end reductions as well as reduced financing requirements of client positions." *Id.* Other reductions resulted from changed economic conditions and decisions by Merrill's customers, including reductions in receivables due in part to reduced customer margin loans ($51 billion), and reduced business levels due to the economic crisis ($36 billion). *Id*. Further, Mr. Brown, on whose testimony plaintiffs' claims about asset reductions principally rely, stated unequivocally on January 13, 2009 that the impact of Merrill's asset reductions on "future business/revenue flow" would be "not much." Smolar Supp. Decl. Ex. 4 at BAC-ML-NYAG10004611. Speculation by Mr. Brown or notes taken by Wachtell lawyers based on his speculation before the fourth quarter ended about what could have happened under certain hypothetical circumstances (of which Mr. Lewis was unaware) simply cannot establish that Mr. Lewis acted with scienter in failing to disclose this speculation he never knew about, particularly when that speculation proved to be wrong and was inconsistent with what actually happened.

     Plaintiffs' arguments about Merrill's liquidity fare no better. Plaintiffs claim the "evidence establishes" that BAC's issuance of $20 billion in debt was necessitated by Merrill's "liquidity crisis." Pl. Opp. Br. at 58. As explained in BAC's Counterstatement and Response to Plaintiffs' Local Rule 56.1 Statement, the evidence does not establish any such thing, because in fact BAC had decided to take advantage of low interest rates offered by a new U.S. government lending program well before any issues arose concerning Merrill's liquidity. *See, e.g.*, BAC 56.1 Opp. at ¶¶ 117-130. And as for Mr. Lewis' knowledge that this debt was related to Merrill's

liquidity, the undisputed record offers *no* support for any assertion that Mr. Lewis knew or was reckless in not knowing that BAC was raising capital to undergird Merrill's liquidity or that issuing debt pursuant to a well-priced government program would impact Merrill's future earnings.  *See* Declaration of Steven B. Singer, Docket # 593, Ex. 41 at BAC-ML-NYAG00899138-39 (Mr. Lewis not copied on the emails).  All plaintiffs can muster in response is a weak footnote that there must be an issue of fact as to whether Mr. Lewis, as CEO, was reckless if he claims not to understand the link between Merrill's liquidity and BAC's debt offerings.  Pl. Opp. Br. at 58 n.33.  Such rank speculation falls well short of creating a genuine issue of fact.  Plaintiffs' contentions about Merrill's liquidity position, therefore, provide no basis for denying summary judgment.

The simple fact is that, even if the Court were to entertain plaintiffs' unpleaded claims, they provide no evidence that Mr. Lewis acted recklessly or negligently.

### III.   Conclusion

For all of the above reasons, plaintiffs have failed to rebut Mr. Lewis' arguments that summary judgment should be granted in his favor.[7]

---

[7] Plaintiffs' Counterstatement of Facts fails to raise a genuine dispute of material fact precluding summary judgment.  As none of the applicable rules calls for a response to plaintiffs' Counterstatement (*see* Fed. R. Civ. P. 56; Local Civ. R. 56.1), Mr. Lewis will not burden the Court with a paragraph-by-paragraph response to plaintiffs' Counterstatement.  Mr. Lewis reserves the right to dispute all factual and legal contentions in plaintiffs' Counterstatement and to object on any grounds to the admissibility of the purported evidence cited therein during future pre-trial proceedings and at trial.

14

Dated: New York, New York
July 17, 2012

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/Andrew J. Ceresney
Mary Jo White
Andrew J. Ceresney
919 Third Avenue
New York, New York 10022
Phone: (212) 909-6000
Fax: (212) 909-6836
Email: ajceresn@debevoise.com

-and-

Colby A. Smith
555 13th Street N.W.
Washington, D.C. 20004
Phone: (202) 383-8000
Fax: (202) 383-8118
Email: casmith@debevoise.com

*Counsel for Defendant Kenneth D. Lewis*