UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | : | Master File No. 09 MDL 2058 (PKC) |
| | : | ECF CASE |
| ———————————————— x | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | Related File No. 10-cv-2284 (PKC) |
| Stichting Pensioenfonds ABP, et al. v. Bank of America Corp., et al. | : | |
| | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| ———————————————— x | : | |

**FOURTH AMENDED CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................... 2

II.   JURISDICTION AND VENUE........................................................................... 3

III.  THE PARTIES..................................................................................................... 4

      A.   PLAINTIFFS .............................................................................................. 4

      B.   DEFENDANTS ........................................................................................... 8

           1.   Bank of America Corporation...................................................... 8

           2.   Individual Defendants .................................................................. 9

IV.   BACKGROUND ................................................................................................ 14

      A.   BOFA AGREES TO ACQUIRE MERRILL ................................................ 14

      B.   MERRILL SECURES A SECRET DEAL WITH BOFA TO PAY DISCRETIONARY
           YEAR-END BONUSES EXCEEDING THEIR INTERNAL BUDGETING PRE-
           MERGER, ON AN ACCELERATED SCHEDULE............................................ 20

      C.   MERRILL'S FOURTH QUARTER LOSSES APPROACH AND EXCEED HALF OF
           THE PURCHASE PRICE OF THE COMPANY ............................................. 25

      D.   THE AFTERMATH ................................................................................... 38

      E.   THE GOVERNMENT INVESTIGATIONS AND LITIGATION .......................... 45

           1.   Multi-District Litigation............................................................ 45

           2.   Delaware Derivative Case.......................................................... 45

           3.   New York Attorney General's Investigation and Allegations of
                Civil Fraud in New York v. Bank of America Corp., et al......... 46

           4.   Investigation by the United States House Committee on Oversight
                and Government Reform............................................................. 49

           5.   SEC Investigation and Securities and Exchange Commission v.
                Bank of America Corp. .............................................................. 53

           6.   Possible Criminal Investigation ............................................... 58

V.    MISLEADING STATEMENTS AND OMISSIONS IN THE PROXY, PROXY
      SUPPLEMENTS, AND OTHER DOCUMENTS INCORPORATED BY
      REFERENCE THEREIN.................................................................................... 58

A. THE MERGER ANNOUNCEMENT ON SEPTEMBER 15, 2008 ..................................... 59

B. THE SEPTEMBER 18, 2008 SEC FORM 8-K DISCLOSING THE TERMS OF THE MERGER AGREEMENT............................................................................. 62

C. THE MERRILL DISCLOSURES REGARDING THE VICP ............................................. 64

D. THE 3Q08 EARNINGS CALL AND THE SECONDARY OFFERING DOCUMENTS.......... 67

E. MERRILL'S OCTOBER 16, 2008 PRESS RELEASE AND THIRD QUARTER 10-Q ........ 68

F. THE NOVEMBER 3 FINAL PROXY ......................................................................... 70

G. THE PROXY SUPPLEMENTS .................................................................................. 73

H. THE DECEMBER 5, 2008 SHAREHOLDER MEETING ................................................. 76

I. SUBSEQUENT MATERIAL OMISSIONS ..................................................................... 76

VI. MATERIALITY ............................................................................................................ 78

A. BONUSES............................................................................................................... 78

B. FOURTH QUARTER LOSS ESTIMATES AND PROJECTIONS......................................... 80

VII. LOSS CAUSATION ..................................................................................................... 84

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR................................... 86

IX. CLAIMS UNDER SECTIONS 14(A) AND 20(A) OF THE EXCHANGE ACT............. 87

COUNT I
FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
(AGAINST ALL DEFENDANTS) ............................................................................................ 91

COUNT II
FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
(AGAINST THE INDIVIDUAL DEFENDANTS)..................................................................... 94

X. PRAYER FOR RELIEF................................................................................................. 96

JURY DEMAND ...................................................................................................................... 98

Plaintiffs Stichting Pensioenfonds ABP, International Fund Management S.A., Deka International Luxemburg S.A., Deka Investment GmbH (on its own behalf and also as legal successor to Deka FundMaster Investmentgesellschaft mbH), Aaron M. Katz, Joel R. Katz (Individually and as Trustee For Margolin Family Trust A, Margolin Family Trust B and Joel R. Katz Family Trust), Martin I. Fineberg, Jeremy Fineberg, Sylvia Weissmann, Parker Family Investments LLC, Jeffrey R. Parker, The 1991 Jeffrey R. Parker Family Trust, Drew E. Parker, The 1994 Drew E. Parker Family Trust, Keith D. Parker, Julie M. Sorin, The 1994 Julie P. Mantell Family Trust, Michael A. Parker, Mark D. Wender, Elliot Wender, Penina Wender, Jill W. Goldstein, Stanley L. Wender, and Razelle M. Wender, Jerry E. Finger, Finger Interests Number One, Ltd, Ambassador Life Insurance Company, Select Investors Exchange Fund, L.P., Richard Finger, JEF Family Trust, 1976 Real Estate Trust, Walter G. Finger, The Jerry E. Finger Family Trust D/T/D 12/28/1989, The Jerry E. Finger 1976 Real Estate Trust, Leo R. Jalenak, Peggy E. Jalenak and KERS & Co. ("Plaintiffs"), by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents; press releases; news articles; analysts' statements; conference call transcripts and presentations; transcripts from speeches and remarks given by the Defendants; testimony before several governmental investigatory bodies (including the United States Congress, the United States Securities and Exchange Commission, and the New York Attorney General); and documents produced to and made public by these investigatory bodies.  Plaintiff makes the following allegations against Bank of America Corporation ("BofA" or the "Company"), Kenneth D. Lewis, Joe L. Price, Neil A. Cotty, John A. Thain, William Barnet III, Frank P. Bramble, Sr., John T. Collins, Gary L.

Countryman, Gen. Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman, and Jackie M. Ward (collectively, "Defendants"). Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.      This is a direct action seeking compensation for damages caused by the Defendants' negligent use of materially misleading proxy materials to solicit shareholder votes to approve BofA's $29.1 billion acquisition of Merrill Lynch & Co., Inc. ("Merrill"), including a proxy statement dated on or about November 3, 2008, various documents incorporated by reference therein, and later proxy supplements (the proxy materials are hereinafter referred to as the "Proxy"), and false statements made during the December 5, 2008 shareholder meeting at which BofA's shareholders voted to approve the merger.

2.      The Proxy negligently failed to disclose that BofA had approved a secret bonus schedule giving authority to Merrill to pay bonuses up to $5.8 billion to Merrill employees, negligently failed to disclose BofA's inadequate due diligence performed prior to signing the agreement to acquire Merrill, negligently failed to disclose that BofA had internally written down Merrill's goodwill by $2.3 billion, and negligently failed to disclose massive fourth-quarter losses mounting at Merrill prior to the December 5, 2008 shareholder vote.

3.      The Defendants further negligently failed to cure these misstatements and omissions before the December 5 vote, as required by the federal securities laws, when they learned of additional record losses accumulating at Merrill after the November 3 proxy had been mailed. These quarterly losses were later disclosed to be $21.5 billion ($15.8 billion on an after-tax basis) – more than half of the $29.1 billion deal value as reported by BofA – and had so

significantly impacted the anticipated future earnings of Merrill and the combined company that earlier statements concerning the anticipated accretive/dilutive impact of the Merger had become materially false and misleading as of the date of the shareholder vote.

4.    Had BofA shareholders known of these material facts, they would not have voted for the proposed acquisition at the shareholder vote on December 5, 2008.  The shareholders where thus deprived of the fundamental right to be fully and fairly informed at the shareholder vote.  When the public started to learn the truth after the shareholder vote, BofA's share price plummeted, erasing billions of dollars of shareholder equity.  The Defendants' failure to comply with the federal securities laws thus caused injury to BofA shareholders, including the Plaintiff.

5.    Plaintiffs held and were entitled to vote common shares of BofA on October 10, 2008, the record date for voting in the December 5, 2008 shareholder vote.  Plaintiffs continued to hold BofA common shares through January 1, 2009.

6.    This complaint only asserts claims for negligence and/or strict liability under Sections 14(a) and 20(a) of the Exchange Act and various SEC Rules promulgated pursuant thereto, and does not assert any claims for fraud, deceit, or any other wrongful conduct.  Any claims for fraud are specifically disclaimed.

II. **JURISDICTION AND VENUE**

7.    The claims herein arise under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rules 14a-3 and 14a-9, 17 C.F.R. §§ 240.14a-3 and 240.14a-9, promulgated pursuant thereto.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1332.

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the misleading statements and omissions were made in or issued

3

from this District. BofA has a substantial presence in New York, as does Merrill. Many of the acts and transactions giving rise to the violations of law complained of occurred here. The Judicial Panel on Multidistrict Litigation has also assigned a related class action to the Southern District of New York.

10.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

III. **THE PARTIES**

   A.   **PLAINTIFFS**

11.    Plaintiff Stichting Pensioenfonds ABP ("ABP") is an entity established under the laws of the Kingdom of the Netherlands, and is the pension fund for public employees in the governmental and education sectors in the Netherlands. With assets of €208 billion as of December 31, 2009, ABP is the EU's largest pension fund, and one of the three largest pension funds in the world. ABP has approximately 2.8 million participants and retirees in the fund (*e.g.*, civil servants, educators, university employees, policemen and firemen), and its assets represent around 35% of total Dutch pension fund assets. ABP maintains its office and principal place of business at Oude Lindestraat 70, Postbus 2889, 6411 EJ Heerlen, The Netherlands.

12.    Plaintiff International Fund Management S.A. ("IFM") is an investment fund management company established under Luxembourg law and based in Luxembourg. IFM is a subsidiary of DekaBank Deutsche Girozentrale ("DekaBank"), one of the largest German financial institutions and services providers, with assets under management in its subsidiaries of more than €160 billion, and group locations in Germany, Luxembourg and Switzerland. IFM is a 100% subsidiary of DekaBank and a Luxembourg fund management company of mutual funds

4

known as "fonds commun de placement" or "FCPs." Under Luxembourg law, a manager of FCPs has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs. As IFM makes all investments in its own name, and also pursuant to applicable Luxembourg law, IFM has standing to pursue this action for the economic benefit of the FCPs in which the investments are allocated.

13.     Plaintiff Deka International S.A. Luxemburg ("DIL") is an investment fund management company established under the laws of Luxembourg and is a 100% subsidiary of DekaBank. DIL is a Luxembourg fund management company of FCPs, and as such it has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs. As DIL makes all investments in its own name, and also pursuant to applicable Luxembourg law, DIL has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

14.     Plaintiff Deka Investment GmbH ("DI"), a subsidiary of DekaBank, is known as a Kapitalanlagegesellschaft ("KAG"). Under the German Investment Act, a KAG invests the assets of a third party in its own name and makes investments in such name for the benefit of a third party. A KAG's investment power and legal ownership of the funds carries with it the right to bring legal claims, in its own name, to recover losses incurred by any funds set up by the KAG. As DI makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

15.     Plaintiff DI is also the legal successor by merger to Deka FundMaster Investmentgesellschaft mbH ("DFM"), another subsidiary of DekaBank which was an investment and fund management company established under the laws of Germany. DFM was

5

KAG in the form of a "Master KAG," which is a fund management platform for third party institutional assets under German investment company law. As DFM made all investments in its own name, and also pursuant to applicable German law, it had standing prior to its merger with DI to pursue this action for the economic benefit of the funds in which the investments are allocated. After the August 2010 merger of DFM into DI, DI has standing to pursue this action for the economic benefit of the funds previously managed by DFM.

16.     Plaintiff Aaron Katz is an individual domiciled in the State of New York.

17.     Plaintiff Joel Katz is an individual domiciled in the State of New York. He is Trustee for the Margolin Family Trust A and Margolin Family Trust B and Joel R. Katz Family Trust and is authorized to bring this action on behalf of all three trusts.

18.     Plaintiff Martin I. Fineberg is an individual domiciled in the State of New Jersey.

19.     Plaintiff Jeremy Fineberg is an individual domiciled in the State of New York.

20.     Plaintiff Sylvia Weissmann is an individual domiciled in Jerusalem, Israel.

21.     Plaintiff Parker Family Investments LLC is a New Jersey limited liability company.

22.     Plaintiff Jeffrey R. Parker is an individual domiciled in the State of New Jersey. He is a trustee for Plaintiffs The 1994 Drew E. Parker Family Trust and the 1994 Julie P. Mantell Family Trust.

23.     Plaintiff The 1991 Jeffrey R. Parker Family Trust is a trust based in the State of New York.

24.     Plaintiff Drew E. Parker is an individual domiciled in the State of New Jersey. He is a trustee for Plaintiff The 1994 Julie P. Mantell Family Trust.

6

25.     Plaintiff The 1994 Drew E. Parker Family Trust is a trust based in the State of New Jersey.

26.     Plaintiff Keith D. Parker is an individual domiciled in the State of Tennessee.

27.     Plaintiff Julie M. Sorin is an individual domiciled in the State of Tennessee.  She is a trustee for Plaintiff The 1991 Jeffrey R. Parker Family Trust.

28.     Plaintiff The 1994 Julie P. Mantell Family Trust is a trust based in the State of Tennessee.

29.     Plaintiff Michael A. Parker is an individual domiciled in the State of New Jersey. He is a trustee for The 1991 Jeffrey R. Parker Family Trust and The 1994 Drew E. Parker Family Trust.

30.     Plaintiff Mark D. Wender is an individual domiciled in the State of Tennessee.

31.     Plaintiff Elliot Wender is an individual domiciled in the State of Tennessee.

32.     Plaintiff Penina Wender is an individual domiciled in the State of Tennessee.

33.     Plaintiff Stanley L. Wender is an individual domiciled in the State of Tennessee.

34.     Plaintiff Razelle M. Wender is an individual domiciled in the State of Tennessee.

35.     Plaintiff Jill W. Goldstein is an individual domiciled in the State of New York.

36.     Plaintiff Jerry E. Finger is a citizen of the State of Texas.

37.     Plaintiff Finger Interests Number One. Ltd., is a limited partnership organized under the laws of the State of Texas.  The general partner and all of the limited partners of Finger Interests are residents of the State of Texas.

38.     Plaintiff Ambassador Life Insurance Company is a Texas Corporation organized under the law of the State of Texas with a principal place of business in Houston, Texas.

7

39. Plaintiff Select Investors Exchange Fund, L.P., is a limited partnership organized under the law of the State of Delaware with a principal place of business in Houston, Texas.

40. Plaintiff Richard Finger is a citizen of the State of Texas.

41. Plaintiff JEF Family Trust is an irrevocable trust organized under the law of Texas with a principal place of business in Houston, Texas.

42. Plaintiff 1976 Real Estate Trust is an irrevocable trust organized under the law of Texas with a principal place of business in Houston, Texas.

43. Plaintiff Walter Finger is a citizen of the State of Texas.

44. Plaintiff The Jerry E. Finger Family Trust d/t/d 12/28/1989 is a Trust organized under the law of Texas with a principal place of business in Houston, Texas.

45. Plaintiff The Jerry E. Finger 1976 Real Estate Trust is a Trust organized under the law of Texas with a principal place of business in Houston, Texas.

46. Plaintiffs Leo R. Jalenak and Peggy E. Jalenak are citizens of the state of Tennessee.

47. Plaintiff KERS & Co. is a general partnership formed under the laws of the State of Kansas whose partners are citizens of Kansas and Colorado.

**B. DEFENDANTS**

### 1. Bank of America Corporation

48. Defendant BofA is a Delaware corporation headquartered in Charlotte, North Carolina. It is one of the nation's largest financial services institutions, offering a broad range of commercial and retail banking and brokerage services, corporate and investment banking products and services, and other financial services and products both domestically and internationally.

## 2.  Individual Defendants

49.     Defendant Kenneth A. Lewis ("Lewis") at all relevant times until December 31,
2009, was BofA's Chief Executive Officer ("CEO") and President and until April 29, 2009,
BOfA's Chairman.   During this time, Defendant Lewis signed the Agreement and Plan of
Merger between BoA and Merrill ("Merger Agreement").   Defendant Lewis also signed BoA's
Registration Statement on Form S-4, filed on October 2, 2008, as amended on October 22 and
October 29, 2008 by Form S-4/A (collectively, the "Proxy Registration Statement").   The Proxy
Registration Statement contained a copy of the Merger Agreement and, pursuant to Rule 14a-
3(a), a preliminary version of the Joint Proxy Statement for the merger, which was identical in all
relevant aspects to the materially misleading Definitive Joint Proxy Statement.   Lewis also
signed a cover letter for Merrill and BofA's Joint Proxy Statement, dated October 31, 2008, and
filed with the SEC on or about November 3, 2008 on form DEFM14A and as a prospectus
supplement on Form 424(b)(3) (together with the Proxy Registration Statement, the "Proxy").
Lewis also signed the November 26, 2008 Proxy Supplement that was filed with the SEC.   Lewis
made other misleading statements that were later incorporated into the Proxy.   For example, on
September 15, 2008, Lewis made misleading statements during an analyst conference call,
during a press conference call, during an investor presentation, and in a BofA press release
issued that day.   Lewis also solicited approval of the merger through his recommendation in the
Proxy as a member of the Board of Directors of BofA to vote in favor of the merger.   Finally,
Lewis made false statements during the December 5, 2008 meeting during which BofA's
shareholders voted to approve the merger.    Because of his senior position within the Company,
Lewis possessed the power and authority to control the contents of the Proxy.

50.     Defendant Joe L. Price ("Price") served as Chief Financial Officer ("CFO") of
BofA during all relevant times.   During this time, Defendant Price signed BofA's SEC filings,

including, but not limited to, BofA's Proxy Registration Statement, and participated in conference calls that were incorporated into the Proxy. Defendant Price also certified BofA's 2007 Form 10-K and 2008 Form 10-Qs that were incorporated by reference into the Proxy. Because of his senior position within the Company, Price possessed the power and authority to control the contents of the Proxy. Price additionally made false statements during a September 15, 2008 investor conference call.

51.    Defendant Neil A. Cotty served as Chief Accounting Officer ("CAO") at BofA during all relevant times, and from the announcement of the Merrill acquisition through the consummation of the transaction, also served as Merrill's interim CFO, acting as a liaison between Merrill and BofA. As CAO, Cotty reported to Lewis and signed the Proxy Registration Statement. Cotty also signed the BofA 2007 Form 10-K, which was incorporated into the Proxy.

52.    Defendant John A. Thain was, at all relevant times, Merrill's CEO and Chairman. Thain signed the Merger Agreement on behalf of Merrill, and co-signed the cover letter to the BofA Proxy. For three weeks starting on January 1, 2009, Thain was the President of Global Banking, Securities, and Wealth Management at BofA. He was forced to resign on January 22, 2009. Thain made misleading statements on a September 15, 2008 analyst conference call, during a press conference call, and in a BofA press release issued that day, which were incorporated into the Proxy. Thain also made false statements during a September 15, 2008 investor presentation,

53.    Defendant William Barnet, III ("Barnet") was a director of BofA during all relevant times. He served as a member of the Audit Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

10

54.     Defendant Frank P. Bramble, Sr. ("Bramble") was a director of BofA during all relevant times. He served on the Asset Quality Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

55.     Defendant John T. Collins ("Collins") was a director of BofA during all relevant times. He served on the Audit Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

56.     Defendant Gary L. Countryman ("Countryman") was a director of BofA during all relevant times. He served on the Compensation and Benefits Committee, the Corporate Governance Committee, and the Executive Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

57.     Defendant General Tommy R. Franks ("Franks") was a director of BofA during all relevant times. He served on the Audit Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

58.     Defendant Charles K. Gifford ("Gifford") was a director of BofA during all relevant times. He served on the Asset Quality Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

59.     Defendant Monica C. Lozano ("Lozano") was a director of BofA during all relevant times. She served on the Asset Quality Committee, voted to approve the merger, signed

11

the Proxy Registration Statement, and solicited approval of the merger through her recommendation in the Proxy to vote in favor of the merger.

60.     Defendant Walter E. Massey ("Massey") is the current Chairman of BofA who took over from Lewis in April 29, 2009, after BoA shareholders stripped Lewis of his chairmanship.  He was on the BofA board during all relevant times.  He served on the Audit Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

61.     Defendant Thomas J. May ("May") was a director of BofA during all relevant times.  He served as chair of the Audit Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

62.     Defendant Patricia E. Mitchell ("Mitchell") was a director of BofA during all relevant times.  She served as a member of the Compensation and Benefits Committee and the Corporate Governance Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through her recommendation in the Proxy to vote in favor of the merger.

63.     Defendant Thomas M. Ryan ("Ryan") was a director of BofA during all relevant times.  He served as chairman of the Corporate Governance Committee.  He was also a member of the Compensation Committee.  He voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

64.     Defendant O. Temple Sloan, Jr. ("Sloan") was a director of BofA during all relevant times, and was the lead independent director at BoA until May 2009.  He also served as

12

chair of the Compensation Committee and chair of the Executive Committee and as a member of the Corporate Governance Committee. He voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

65. Defendant Meredith R. Spangler ("Spangler") was a director of BofA during all relevant times. She served on the Compensation and Benefits Committee, and the Corporate Governance Committee. She voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through her recommendation in the Proxy to vote in favor of the merger.

66. Defendant Robert L. Tillman ("Tillman") was a director of BofA during all relevant times. He served on the Asset Quality Committee and the Executive Committee, voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through his recommendation in the Proxy to vote in favor of the merger.

67. Defendant Jackie M. Ward ("Ward") was a director of BofA during all relevant times, and was chairman of the board's Asset Quality Committee until her resignation on June 3, 2009. She voted to approve the merger, signed the Proxy Registration Statement, and solicited approval of the merger through her recommendation in the Proxy to vote in favor of the merger.

68. The defendants identified in ¶¶ 49-67 are collectively referred to herein as the "Individual Defendants."

69. By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about BofA and Merrill, their businesses, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through BofA's internal corporate documents,

13

conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as BofA officers and/or directors.

70.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential, proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

71.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially misleading statements and information alleged herein.  The Individual Defendants negligently disregarded the fact that materially misleading statements were being issued regarding the Company and allowed their names to be used for the purpose of soliciting proxies, in violation of securities laws.

## IV. **BACKGROUND**

### A.     **BofA Agrees to Acquire Merrill**

72.     Over the weekend of September 12, 2008, Lehman Brothers was failing, and was trying to find a way to avoid filing for bankruptcy protection.  Many analysts were concerned that other financial institutions were equally vulnerable.  Investors were particularly concerned about Merrill's health due to the fact that the firm had exposure to high-risk mortgage-backed

14

securities and other illiquid assets, although at this point the extent of Merrill's exposure was not known to the general public.

73.     The heads of America's largest financial institutions were well aware that Lehman's impending bankruptcy and the ensuing aftershocks could cause historic liquidity issues in the market on Monday, September 15, 2008, the day the bankruptcy would be announced. To try to stem the damage, Henry M. Paulson, then-Secretary of the United States Treasury ("Secretary Paulson"), had called a meeting on September 12, 2008 and invited the heads of several major investment banking firms, including Thain, then-CEO of Merrill. At this meeting, discussion centered around attempts to find a buyer for Lehman to stave off its impending bankruptcy, and the likelihood that Merrill might be the next bank to fail due to its own exposure to toxic assets and high leverage.

74.     Thain knew for some time that BofA and its CEO Lewis had a desire to acquire Merrill. The catalyst for the acquisition came when it became clear over the weekend of September 12, 2008, that Lehman might not find a buyer, and Thain feared that Merrill might be forced into bankruptcy. Indeed, Greg Fleming, Merrill's COO and president, urged Thain to call Lewis on September 13, 2008, to discuss a solution to save Merrill.

75.     Thain knew, and later admitted, that Merrill would be effectively insolvent if it did not find a buyer that weekend. Thain admitted in a speech to the Wharton School of Business a year later on September 17, 2009, that due to the "amount of bad assets on [the Merrill] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill.

76.     On Saturday, September 13, 2008, Thain called Lewis, who was at home in North Carolina, and said "Ken, I think we should talk about a strategic arrangement." Lewis agreed to meet Thain in New York to discuss his proposal that afternoon.

77.     Hours later, Thain and Lewis were sitting alone in BofA's corporate apartment in the Time Warner Center in New York. Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America." Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here. I want to buy the whole company, not invest 9 to 10 percent." Thain ultimately agreed to sell all of Merrill to BofA that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

78.     The next day, Sunday, September 14, 2008, Defendant Lewis agreed on BofA's behalf to purchase Merrill in a stock swap transaction whereby each common share of Merrill would be exchanged for 0.8595 shares of BofA stock. This ratio implied a price of $29 per Merrill share – a 70% premium to Merrill's $17 per share closing price on September 12.

79.     Later that same day, BofA's board of directors to approve the transaction However, they thought they were convening to approve the acquisition of *Lehman Brothers, not Merrill.* Defendant Thomas May expressed "surprise" when he learned upon entering the meeting that Merrill was the target, not Lehman. Nevertheless, the boards of both BofA and Merrill unanimously approved the proposed merger on September 14, which was publicly announced on September 15, 2008, only hours after Lehman announced its bankruptcy.

80.     Merrill had one thing BofA and Lewis craved – prestige – and Lewis felt that by acquiring Merrill, he would make BofA the country's biggest bank by assets and its most powerful financial institution. During the September 15 investor call that followed the announcement of the merger, Lewis said he hoped Merrill would become "the crown jewel of the company." Lewis told investors that the acquisition was a "good thing for America" and a good thing for what would be the largest bank in the United States. Lewis also stated "this was a

16

unique opportunity to acquire a high-quality company that will not only enhance our long-term prospects but truly creates a firm that is unparalleled in the industry."

81.     In the same call, Defendant Price stated "from a risk or due diligence perspective …. we sent in a large team to review areas such as asset valuations, trading positions and the like. We also were joined by a team from JC Flowers that had done extensive due diligence over some time in reviewing other potential transactions, so they were very familiar with Merrill Lynch's books."   Price also commented in response to an analyst question on that call that Merrill had made progress "in reducing the risk exposures and analyzing them." Lewis added, in response to the due diligence question, that JC Flowers' current review of the Merrill books was much more robust than in previous attempts to buy Merrill; he said the comparison between the efforts was "night and day, that John [Thain] and his team had made incredible progress since the first time [Flowers] had looked at it."

82.     Within days of the takeover announcement, BofA's transition team arrived at Merrill to figure out how to combine the two companies.  200 BofA employees set up camp on one floor of Merrill's headquarters, and Defendant Cotty moved into an office on the 32nd floor. The group became involved in nearly every aspect of Merrill's operations, tracking Merrill's financial condition on a weekly basis.

83.     In October, BofA installed its chief accounting officer as Merrill's CFO.  BofA also had access to daily profit and loss statements from Merrill, and all trading positions.

84.     On October 7, 2008, BofA held an investor conference call in conjunction with the release of its preliminary third quarter results.   BofA announced that it was issuing $10 billion of common shares to recapitalize the firm, and that they were cutting the dividend in half.  The offering would be at $22/share, an 8 percent discount to the previous day's closing

price. When asked about the share issuance on the 3Q08 earnings call, Lewis said "the recession is going to be a little deeper than we thought."

85.     On October 16, 2008, Merrill released its results for the third quarter. These results were subsequently reported on Form 10-Q, which Merrill filed with the SEC on November 5, 2008 and which was prospectively incorporated by reference into the Proxy.

86.     In the October 16, 2008 release, Merrill appeared to clear the decks: it announced a net loss of $5.2 billion in the quarter, reflecting a $5.7 billion write-down from the sale of CDOs and the termination and settlement of guarantees on those securities. In prior quarters, Merrill's CDOs were responsible for billions of dollars of losses, and Merrill's efforts to sell them in the third quarter was touted by Merrill's management as a significant step in "de-leverag[ing] the balance sheet." Indeed, the sales and write-downs were described by Merrill as a "significant milestone in our risk reduction efforts" that "will materially enhance the company's capital position and financial flexibility going forward."

87.     After BofA's October 7 release and Merrill's October 16 release, the market was led to believe that the banks' financial prospects had improved. Their share prices rose following the releases, and many analysts, relying on the banks' disclosures, believed Merrill would even show a fourth-quarter profit. For example, Sanford C. Bernstein analyst Bradley Hintz issued a report on October 17 estimating that Merrill would have a net gain of approximately $900 million in the fourth quarter. Meredith Whitney, formerly at Oppenheimer, estimated on October 20, 2008 that Merrill's net income in the fourth quarter would exceed $500 million. And UBS analyst Glenn Schorr estimated that Merrill would have a quarterly net gain of approximately $400 million. BofA had access to these reports.

88.     Some analysts were predicting a fourth-quarter loss at Merrill, but most less than $1 billion. For example, Kenneth Worthington at JPMorgan estimated a net loss of $280 million, and James Mitchell of Buckingham Research estimated a loss of approximately $875 million. The largest fourth quarter loss predicted in October was $1.85 billion (by Douglas Sipkin of Wachovia Capital), a marked improvement from the $5.2 billion loss reported for the third quarter. Thus, all analysts believed that Merrill would significantly improve its results in the fourth quarter, and many were expecting a profit.

89.     Even Defendants Lewis and Price have testified that they expected Merrill to break even in the fourth quarter. In a sworn deposition before the SEC on October 30, 2009, Lewis testified that at the end of the third quarter, he expected Merrill to break even in the fourth quarter. Likewise, in a sworn deposition before the SEC on December 18, 2009, Price testified that at the time the merger was negotiated, he expected Merrill to come close to breaking even in the fourth quarter of 2008.

90.     BofA filed a preliminary version of the Proxy on Form S-4 with the SEC, and filed two amendments to the Proxy on October 22 and 29, 2008, on Forms S-4/A. Only the third quarter numbers were included, and no mention was made of the losses mounting during October.

91.     On October 30, the Treasury forced BofA to recapitalize further and purchased $15 billion of BofA preferred and common shares, and $10 billion of Merrill preferred shares.

92.     On or about November 3, 2008, Merrill and BofA mailed to shareholders a Joint Definitive Proxy Statement (the "November 3 Proxy") to solicit approval of the merger from the shareholders of both companies, and announced a shareholder vote on December 5, 2008. The Proxy, discussed in more detail *infra*, incorporated by reference a number of previous SEC

19

filings and other disclosures, and emphasized the "strong capital position" of the combined company and represented that there had been no "material adverse changes" to Merrill's financial position. The Proxy also included a *pro forma* statement of the combined financial position of the two companies, and stated that Merrill had agreed not to pay year-end bonuses or other discretionary performance awards prior to the closing of the merger without BofA's consent.

93.     Subsequent to the November 3 Proxy, BofA mailed to shareholders two Proxy supplements, one on November 21, and one on November 26.

**B.      MERRILL SECURES A SECRET DEAL WITH BOFA TO PAY DISCRETIONARY YEAR-END BONUSES EXCEEDING THEIR INTERNAL BUDGETING PRE-MERGER, ON AN ACCELERATED SCHEDULE**

*"We are a pay-for-performance company."*

– BofA CEO Ken Lewis in a January, 2009 email confirming his decision to ask the BofA board of directors not to award 2008 bonuses to top BofA executives

94.     Despite only having a day to work out the details of the deal, BofA and Merrill managed to find time to negotiate a detailed schedule to the merger agreement that governed the discretionary year-end bonuses that Merrill executives or employees could receive for 2008 pursuant to Merrill's Variable Incentive Compensation Program (VICP). Thain later noted that the bonus schedule was one of the major points the parties negotiated and it delayed the signing of the merger agreement until 2am on September 15 – mere hours before the markets were to open, even though an hour earlier, at 1am, Lehman filed for bankruptcy, throwing Merrill's prospects into peril.

95.     In the end, BofA agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses. BofA also agreed that Merrill could pay the bonuses in December of 2008, before the merger closed, rather than in January of 2009, which was the customary time for

Merrill to award bonuses. In this way, Merrill could seem to control the bonus amounts and recipients prior to the consummation of the merger.

96.     The amount of Merrill bonuses approved by BofA was equal to 12% of the merger price as determined by the banks' share prices on September 15, 2009, 20% of the merger price on the date of consummation, and more than 75% of the $7.5 billion profit Merrill had reported in 2006, the last year Merrill had reported a profit. Bonuses were to be awarded in the form of sixty percent cash, forty percent stock, and the bonus allocations and final decisions about the form of bonus would be made by Merrill in consultation with BofA.

97.     Despite the enormity of the approved bonus pool both in nominal terms and as a percentage of the deal value, BofA excluded the schedule from the version of the merger agreement filed with the SEC and given to shareholders. Only after the deal closed and the bonuses were eventually paid did the relevant provision of the schedule make its way into the press. It provides:

> 5.2(b)(iii), 5.2(c)91), and 5.2(c)(ii) – Variable Incentive Compensation program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) … and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion … Sixty percent of the overall VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [BofA] … The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [BofA].

98.     Merrill's Variable Incentive Compensation Program – the basis for the bonuses in the schedule – was defined in the Merrill 2007 10-K as follows: "'Variable Incentive

Compensation' means the variable incentive compensation or office manager incentive compensation that is paid in cash to certain employees of the Company *generally in January or February* of the Plan Year with respect to the prior Fiscal Year." (emphasis added). The Merrill 2007 10-K was incorporated by reference in the BofA Proxy.

99.     The Merger Agreement – at least the portion shared with shareholders prior to the Dec. 5 shareholder vote – stated that Merrill would not pay discretionary bonuses to its employees, nor did they have authority to do so. According to the provision, entitled "Company Forbearances," Merrill agreed that it would not "pay any amounts to [employees] not required by any current plan or agreement (other than base salary in the ordinary course of business)" without the prior written consent of BofA or except for what was set forth in Section 5.2 of the Company Disclosure Schedule. Even though the "Company Forbearances" provision refers to the exceptions set forth in Section 5.2, the Merger Agreement does not set forth what those exceptions were, nor does it disclose the contents of the Schedule.

100.    Neither the Schedule nor its contents was publicly disclosed at any time prior to the December 5 shareholder meetings. Because the "Company Forbearances" provision stated that Merrill would not, and had no authority to, pay bonuses to its employees, and because the Schedule was never disclosed publicly, whether by publication, inclusion in either the Merger Agreement or Proxy or by other publication or dissemination before the shareholder meetings, shareholders would not have known that BofA had actually agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses.

101.    After the Merger Announcement in September, Merrill started to assemble the bonus payment schedule for 2008, and by the end of September had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses. In negotiations with

22

BofA, Merrill proposed payments in December 2008, before the close of their fourth quarter, and before the Merger's consummation on January 1, 2009. This early payment of the bonuses violate the actual written terms of the VICP itself, which states that bonuses are supposed to reflect all four quarters of performance, and will be paid in after these results are evaluated. Indeed, Merrill's March 14, 2008 Proxy, incorporated by reference in the BofA merger proxy, stated that bonuses were paid in January for performance in the prior fiscal year, and that "pay for performance" was an important part of the compensation policy.

102.    Despite agreement on the secret bonus schedule, BofA and Merrill did not initially come to agreement concerning bonuses specifically for Merrill's top five executives. These executives had not received a year-end bonus from Merrill in the prior year (2007) due to Merrill's $7.8 billion full-year loss. Merrill's 2008 losses through September 2008 were already worse than all of 2007, but Merrill management, with the knowledge and approval of BofA and its senior executives, proceeded with tentative plans to pay a total of over $130 million in year-end "performance" bonuses for these five men alone. Top executives from both companies discussed the amount of these bonuses throughout the fall of 2008. None of these discussions or plans were disclosed to shareholders prior to the Dec. 5 vote.

103.    On November 11, 2008, Merrill's Compensation Committee approved the accelerated schedule: final approval of the bonus pool would occur on December 8, 2008 (exactly one business day after the shareholder vote), communications to employees regarding the bonuses would occur on December 22, and the cash portion of the bonuses would be awarded on December 31, 2008. The stock awards were to be made in January 2009.

104.    Bank of America knew of the developments regarding Merrill's VICP bonuses throughout the fall of 2008, and was informed of the accelerated schedule approved by the

23

Merrill Board of Directors on November 12, 2009. In late November 2008, the size of the Merrill bonus pool was decreased to $3.6 billion, including those bonuses planned for Merrill's top executives. BofA was concerned that it did not have enough stock to pay the stock award portion of the bonuses, and as a consequence Steele Alphin, BofA's Chief Administrative Officer and one of the bank's most senior executives, seen as the right-hand man to Lewis, had at least two conversations with Thain prior to December 5, and another conversation on December 11, concerning the Merrill VICP bonuses. Alphin asked Thain and other Merrill representatives to award bonuses in the form of 70 percent cash, 30 percent stock, to fall in line with the form in which BofA traditionally awarded its bonuses. This increased the recorded current period expense of the bonuses to $3.2 billion. The two companies agreed that the stock portion of the bonuses would be paid on January 2.

105. On December 8, 2008, Merrill's Compensation Committee awarded $3.62 billion in bonuses, one business day after the shareholder vote but several weeks before the final fourth quarter's financial results had been determined. These bonuses were paid between December 29 to December 31, 2008, days before the merger was set to close. The committee deferred any decision to pay bonuses to Merrill's top five executives to the full board of directors. In the end, just as in 2007, none of the top five Merrill executives received a bonus for 2008. Merrill's employees were notified of their bonuses on December 19 and received the cash portion on December 31, 2008, one day before the merger was consummated.

106. As Rep. Dennis Kucinich noted in an April 6, 2009 letter to Mary Schapiro of the SEC, "In the context of a company that was simultaneously recording losses large enough to threaten the existence of the business itself, it is difficult to see what consideration Merrill

received in exchange for the bonuses. The bonuses do not correlate with performance, nor were they retention bonuses."

107.    Indeed, as New York Attorney General Andrew Cuomo outlined in a February 10, 2009 letter to Representative Barney Frank as Chairman of the House Committee on Financial Services, "Merrill chose to make millionaires out of a select group" and awarded "what can only be described as gigantic bonuses." In the same quarter that Merrill took a $15.8 billion in quarterly loss, Merrill also awarded the following bonus payments:

- The top four bonus recipients received a combined $121 million;

- The next four bonus recipients received a combined $62 million;

- The next six bonus recipients received a combined $66 million;

- Fourteen individuals received a combined $250 million, comprising bonuses of $10 million or more.

108.    Merrill eventually paid out $3.6 billion in bonuses in December just before the merger was completed and BofA disclosed its heavy losses, and these bonuses were not disclosed to shareholders until after the merger closed. BofA spokesman Scott Silvestri claimed that BofA only had a right to consult with Merrill on the bonuses and urged Merrill to reduce the numbers, stating that Merrill ultimately reduced the bonuses by 40 percent. However, the schedule attached to the merger documents clearly states that BofA authorized bonuses of up to $5.8 billion for Merrill employees.

### C.    MERRILL'S FOURTH QUARTER LOSSES APPROACH AND EXCEED HALF OF THE PURCHASE PRICE OF THE COMPANY

109.    In the two and a half months following the merger announcement and before the shareholder vote on the merger, Merrill rapidly incurred massive losses that put Merrill at risk of becoming insolvent. The losses incurred in October and November and early December) were known to BofA and were serious enough that BofA executives discussed terminating the merger

by invoking the "material adverse effect" clause in the merger agreement ("MAC"). At a minimum, they clearly should have been disclosed to investors prior to voting on the merger on December 5th, 2008.

110.    Despite Merrill's efforts to shed some of its legacy of toxic assets in the months prior to executing the merger agreement with BofA, and its representations in press releases to investors and during merger negotiations that it had properly written down retained assets, the weeks following the deal with BofA saw Merrill incur the largest losses in its history. Thain failed to rein in Merrill's trading arm, a longtime profit center for Merrill, which supposedly was taking low-risk positions in currencies, commodities and bonds. It was the trading operations that would incur the bulk of the fourth-quarter losses, including the credit positions that were part of Merrill's proprietary trading book. Merrill's portfolio of $50 billion in corporate bonds was massively devalued in the fourth quarter as a result of the credit meltdown. Merrill's $50 billion in "correlation trades" also incurred heavy losses when the price of bonds fell far more than the price of the credit default swaps rose due to panicking investors dumping the swaps.

111.    None of these mounting losses were disclosed to shareholders prior to the Dec. 5 vote, despite numerous representations made to shareholders regarding Merrill's financial health, and numerous opportunities to correct previous misstatements.

112.    On October 3, 2008, BofA filed an 8-K containing "unaudited pro-forma condensed combined financial data" from both Merrill and BofA. This 8-K was incorporated by reference into the Proxy.

113.    On or about November 3, 2008, BofA and Merrill filed a joint definitive proxy statement on Form DEFM14A to solicit approval of the merger transaction from their shareholders. The Proxy incorporated the recent SEC filings by reference, and again,

26

shareholders were not told of the Merrill's losses in October. Shareholders were mailed copies of the joint proxy statement, and the shareholder meetings for both firms in order to vote for approval of the merger were scheduled for December 5, 2008.

114. BofA's first confirmation of the full-month October losses at Merrill came on November 4, 2008, when members of Merrill's reporting unit forwarded Merrill's preliminary October results to Defendant Cotty. The Merrill results indicated a pretax loss of $6.113 billion for the month of October.

115. The next day, November 5, 2008, Cotty sent the results in an email to Price with the message "Read and weep."

116. On November 6, BofA's official third quarter numbers were released, but no mention was made of the Merrill October losses.

117. On November 9, 2008, Gary Carlin, Vice President and Corporate Controller at Merrill, sent an email to Defendant Cotty reporting fourth quarter pretax losses to date of $7.536 billion. He said in the email, "Numbers speak for them selves [sic]." Cotty forwarded the figures to Price two hours later.

118. On November 12, 2008, Merrill produced an updated report of the fourth quarter losses which included actual incurred pre-tax losses of $7.536 billion in October losses plus an additional $227 million in actual pretax losses for the first seven days in November. The fourth quarter report showed total fourth quarter pretax losses of $8.942 billion. Most of these pretax losses consisted of actual losses to date ($7.763 billion), while only projecting an additional quarterly loss of $1.179 billion.

119. Even more shocking was that Merrill failed to produce in the November 12 report any revenue projections for the one category of the statement called "Significant Items," which,

27

not coincidentally, is the category for derivative assets such as CDOs that were falling in value. The lines in this category are simply left blank, even though every other line contains a projection for the rest of the quarter. Even worse, when the total projected fourth quarter pretax losses were projected, these blanks were assumed to be zero, meaning, fourth quarter revenue projections assumed that the assets under the greatest pressure would not fall in value. An article in Fortune Magazine succinctly dubbed this trick "funky math." The "Significant Items" with the blank entries are highlighted in the box below:

Merrill Lynch & Co.
4Q'08 Forecast

| Revenue ex Marks/FVA/One-Time | 4Q07 | 3Q08 | Oct Act (25 days) | Nov MTD (7 days) | QTD Estimate | BTG | 4Q08F | B/(W) 3Q08 | B/(W) 4Q07 |
|---|---|---|---|---|---|---|---|---|---|
| FICC | 654 | 628 | (1,389) | 160 | (1,230) | 249 | (980) | (256.0%) | (214.8%) |
| Equity | 1,653 | 1,368 | 1,037 | 58 | 1,095 | 555 | 1,650 | 20.6% | (0.2%) |
| IBK | 1,590 | 571 | 102 | 41 | 143 | 509 | 652 | 14.1% | (59.5%) |
| GPID | 298 | (315) | (298) | (120) | (418) | (184) | (600) | (90.5%) | (301.6%) |
| GMI Other | (190) | 128 | 67 | (8) | 58 | (118) | (60) | (144.1%) | 55.7% |
| GMI | 3,704 | 2,506 | (479) | 130 | (349) | 1,011 | 662 | (72.3%) | (82.1%) |
| GPC | 2,414 | 2,932 | 1,094 | 329 | 1,423 | 1,574 | 2,997 | 2.2% | (12.2%) |
| GSM | 151 | 88 | (18) | 15 | (3) | 49 | 46 | (47.5%) | (69.4%) |
| GWM | 3,564 | 3,021 | 1,076 | 344 | 1,421 | 1,622 | 3,043 | 0.7% | (14.6%) |
| Corporate | (72) | 287 | 532 | (13) | 519 | (644) | (125) | (143.6%) | (73.2%) |
| ML&Co ex Marks/FVA/One-Time | 7,196 | 5,697 | 1,130 | 461 | 1,590 | 1,989 | 3,580 | (37.2%) | (50.3%) |
| Significant Items (Non-Marks) | | 2,133 | (2,619) | - | (2,619) | | (2,619) | | |
| Total Marks | (16,716) | (10,659) | (2,720) | - | (2,720) | | (2,720) | | |
| FVAs | 1,331 | 2,647 | (1,076) | (5) | (1,085) | | (1,086) | | |
| Total Market Significant Items | (15,387) | (5,881) | (6,417) | (5) | (6,424) | | (6,424) | | |
| Total Revenue | (8,192) | 16 | (5,287) | 455 | (4,834) | 1,988 | (2,844) | NM | 65.3% |
| Comp | 3,021 | 2,725 | 1,051 | 310 | 1,361 | 1,772 | 2,823 | (3.6%) | 6.6% |
| Non Comp | 2,339 | 1,619 | 612 | 248 | 860 | 1,599 | 2,211 | (21.6%) | 5.3% |
| VCP | 1,315 | 758 | 495 | 122 | 617 | 477 | 972 | (28.2%) | 26.2% |
| Total Expenses ex One-Time | 6,675 | 5,102 | 2,158 | 680 | 2,838 | 3,848 | 6,006 | (13.3%) | 10.0% |
| Restructuring | - | 40 | (1) | | (1) | 1 | - | | |
| Temozek | - | 2,500 | - | | - | - | - | | |
| PTE | (14,920) | (9,251) | (7,536) | (227) | (7,763) | (1,859) | (8,942) | (9.4%) | 40.1% |
| Taxes | (4,623) | (3,132) | (3,000) | (90) | (3,090) | (569) | (3,559) | 13.7% | (23.0%) |
| ML Operating ATE | (10,297) | (6,119) | (4,536) | (137) | (4,673) | (1,300) | (5,383) | (5.2%) | 47.7% |
| All In Results: | | | | | | | | | |
| EPS | $ (12.57) | $ (6.56) | | | | | $ (3.45) | $ 2.10 | $ 9.11 |
| Pre-Tax Margin | NM | NM | | | | | NM | NM | NM |
| Tax Rate | 31.0% | 38.0% | 39.8% | | | | 39.8% | (1.8) pts | (8.8) pts |
| Ex Marks/FVA/One-Time Results: | | | | | | | | | |
| Revenue | 7,196 | 5,697 | 1,130 | | | 1,989 | 3,580 | -37% | -50% |
| PTE | 521 | 396 | (1,028) | | | (1,859) | (2,426) | -714% | -596% |
| ATE | 362 | 274 | (714) | | | (1,290) | (1,684) | -714% | -565% |
| EPS | $ 0.28 | $ 0.15 | | | | | $ (1.97) | $ (2.12) | $ (2.26) |
| Average Common Equity | 31,541 | 27,552 | | | | | | | |
| Common Equity | 27,549 | 29,750 | | | | | | | |
| Preferred Stock | 4,383 | 8,605 | | | | | | | |
| Trust Preferred Securities | 4,725 | 4,773 | | | | | | | |
| Equity Capital | 36,657 | 43,128 | | | | | | | |
| Total Assets | 1,020,050 | 875,780 | 862,100 est | 864,199 est | | | TSO | | |
| Adjusted Assets | 647,343 | 572,395 | 574,900 est | 561,143 est | | | TBO | | |

Page 7

(10,942)

-675  Alt-A from OCI to P&L
-1000  neil gut
-300  structured note fva (oct reversed 900 m)

120.   When Merrill shared the November 12 forecast above with BofA executives,

BofA insisted on underlining increasing the projected pretax losses by another $2 billion, for a total projected

pretax loss of almost $11 billion. Of this "adjustment," $675 million reflected a guess related to

Alt-A assets, $300 million to structured notes, and $1 billion to reflect the "gut" feeling of

BofA's CAO, Neil Cotty, with respect to how much worse the numbers would get. Cotty was

aware that the forecast did not include either present valuations or forward-looking projections

29

for these illiquid assets (the category of assets most likely to fall in value), and BofA adjusted for this omission based on guesses and a "gut" feeling.

121. On or before November 26, BofA became aware that the losses at Merrill were continuing to grow worse, and now were projected to be more than $13 billion (pretax) on a full-quarter basis. Yet in a letter to employees issued on November 26, the day the Fed approved the merger, Lewis wrote that BofA was "one of the strongest and most stable major banks in the world." This letter was filed with the SEC and incorporated into the Proxy. Lewis claimed that the October 30 capital injection represented "funds that we did not need and did not seek" and that these funds were forced on BofA as part of a larger plan to "stabilize the financial markets." No mention was made of the fact that BofA had agreed to acquire a bank that was hemorrhaging money.

122. By December 1, 2008, Merrill's actual incurred pretax losses had reached $13.3 billion. These losses were detailed in an email from Cotty to Price and were comprised of actual incurred pretax losses of $7.536 billion for October and $3.458 billion (known) pretax losses for November. These two amounts, when added to the known goodwill impairment charge of $2.3 billion pretax that was known since at least early November, reached $13.3 billion in total. There were additional expected November pretax losses of $394 million that had not yet been confirmed by Merrill personnel.

123. During a December 3, 2008 conference call at 4pm among Lewis, Price, Thain, and Cotty to review the Merrill $13.3 billion in pretax losses incurred to date and the outlook for the fourth quarter, Cotty advised Lewis that management had not yet closed the books for November, and there may be more downside. Specifically, he noted that the losses could increase, by another $3 billon pretax, or $2 billion after tax for the fourth quarter. They saw

30

projections estimating that Merrill would have a $9 billion fourth-quarter after-tax loss, and approximately $14 billion pretax, excluding the goodwill impairment charge. Cotty thought pre-tax losses could increase by another $1 to 3 billion after that point, bringing losses to $15-17 billion. This additional adjustment, mirroring his "gut" feeling adjustment in November, became known within BofA as the "Cotty plug" or the "WAG," which stood for "wild ass guess." Merrill's reported fourth-quarter pre-tax losses would ultimately exceed $21 billion, and Cotty's gut and WAG estimates proved to be too low, as Merrill's actual losses exceeded his worst case estimate.

124. Merrill's substantially increased losses had also resulted in a material diminution in the anticipated accretive/dilutive impact of the Merger. While BofA had told its shareholders that the Merger would be 3% dilutive in 2009 and breakeven in 2010, BofA had learned ahead of the December 5, 2008 shareholder vote that, due to the markedly decreased earnings power of Merrill and the combined company in light of the substantial losses, the Merger was expected to be 13% dilutive in 2009 and 2.8% dilutive in 2010 – 337% more dilutive than the 3% figure BofA had previously disclosed.

125. Although the loss estimates and projections steadily increased as the fourth quarter progressed, the vast majority of the eventual $21 billion pre-tax loss had occurred prior to the December 5 shareholder vote. BofA most senior management reviewed reports from their own chief accounting officer that Merrill had already incurred actual pretax losses of $14 billion on December 3, and BofA's own chief accounting officer expected additional pretax losses of $3 billion. The chart below summarizes what BofA knew of Merrill's losses prior to the shareholder vote:

31

| Projected Merrill 4Q08 Losses | | | |
|---|---|---|---|
| Date | Projected after-tax loss | Projected pre-tax loss | Including BofA Adjustment |
| Nov. 12 | $5 billion | $9 billion | $11 billion |
| Nov. 26 | | $11 billion | $13 billion |
| Dec. 3 | $9 billion | $14 billion | $15-17 billion |

126. Although it was now known by most of BofA senior management that BofA was projecting $14-17 billion of losses prior to the shareholder vote, BofA's outside counsel Wachtell Lipton and BofA's own general counsel were not fully appraised of the new and higher level of actual incurred and projected losses at Merrill. For example, on November 12, Defendant Price requested a legal review of whether the $5 billion after-tax loss ($7 billion after-tax including BofA's adjustments) of actual incurred losses to that date should be disclosed to BofA shareholders voting to approve the merger. The review was done at the top, by the General Counsel, Tim Mayopoulos. Mayopoulos' initial reaction was that the losses known to senior BofA management on November 12 should be disclosed to shareholders: "My reaction was that $5 billion is a lot of money, and I believe my initial reaction was that a disclosure was likely warranted."

127. Also on November 12, Mayopoulos called outside counsel at Wachtell Lipton (Ed Herlihy, Eric Roth and Nicholas Demmo) and reported Merrill's situation. Mr. Demmo wrote in his notes, "all had a terrible October. Nov. so far is flat. ML lost $7B in October! do we have to get the # out?" There is no indication in the notes that Wachtell was told that BofA was at that time actually projecting full-quarter pretax losses of almost $11 billion, not $7 billion. Nor is there any indication in the notes of outside counsel that they knew of Cotty's "gut" reserve for

additional losses, and most importantly, no indication in the notes that they were told of Merrill's inability to make any realistic loss projections for the Merrill assets most under stress due to market conditions.

128.    During the November 12, 2008 call between BofA general counsel Mayopolous and outside counsel Wachtell, it was agreed that disclosure of the losses to shareholders was proper based on the amount of losses already known on November 12.  The lawyers at Wachtell thus confirmed the "initial reaction" of Mayopoulos to make disclosure to shareholders.

129.    The next day, on November 13, 2008, Mayopoulos and Wachtell held a conference call to discuss disclosure requirements.  The notes taken by Wachtell attorneys Ed Herlihy and Nicholas Demmo indicate that Mr. Mayopoulos told them to assume that the remainder of November financial results at Merrill would be *better*, despite the clear indication on the November 12 Projection of further losses.  Despite the incorrect and insufficient information about continuing and higher projected future losses at Merrill, counsel at Wachtell again expressed concern about disclosure, noting, "worried about not disclosing?"  The conclusion of the meeting was that the parties agreed that making disclosure of the Merrill losses to shareholders was the proper course of action.

130.    On November 14, Price met with Thain, Cotty and other members of Merrill's management to "discuss" the financial condition of Merrill and the assets held on Merrill's books.  Contrary to the advice of BofA's inside and outside counsel, Price did not inform Thain and other Merrill management that BofA would be disclosing Merrill's losses to shareholders.  Rather Price asked Thain whether Merrill intended to disclose the losses. Defendant Thain indicated to Price that Merrill did not make intra-quarter disclosure of losses as a matter of

policy. Price thus ignored advice of counsel and did not actively raise the idea of disclosing losses to shareholders with Merrill. (NYAG page 20-21)

131. By November 20th, BofA was fully aware that Merrill would have to take a goodwill charge of $2.3 billion, raising pre-tax loss projections again, due in part to the failure of Merrill's acquisition of sub-prime loan originator First Franklin Financial Corporation. It was known since at least November 13, 2008 to Merrill and BofA that some substantial goodwill impairment charge would have to be taken in the fourth quarter, yet it only became public as part of the "surprising losses" that were reported in Merrill's financials in January 2009. Merrill's former Corporate Controller, Gary Carlin, and former Chief Accounting Officer and Head of Accounting Policy and Corporate Reporting, David Moser, both claim that they did not disclose this charge mid-quarter based on advice received from then in-house attorney Richard Alsop, in testimony to the New York Attorney General, as follows:

> Q: And what, generally, did [Moser] say to you?
>
> Carlin: He suggested that we discuss whether or not there was a need to file an 8-K with OGC.
>
> Q: Why would there be a need to file an 8-K?
>
> Carlin: because we had a potential write-off of goodwill.
>
> ....
>
> Q: Who contacted, I guess, in-house counsel, you or Mr. Moser?
>
> Carlin: I think we were both on the phone.
>
> Q: And who at in-house counsel did you contact?
>
> Counsel for Carlin: I just want to caution the witness we're definitely getting into a privileged conversation, so we should take it one question at a time.
>
> Carlin: Richard Alsop.
>
> ...

> Q: Why were you satisfied [with not making a disclosure]?
>
> Counsel for Carlin: Without revealing the contents of a privileged conversation.
>
> Carlin: Based on several things, but the conversation with Richard Alsop.

132.    On November 20, 2008, David Moser of Merrill informed BofA that the amount of the goodwill write-down would be approximately$2.2 billion.  This amount was not reflected in any of the previous loss reports generated by Merrill and sent to BofA, even though Deloitte auditor Thomas Graham said in testimony that he confronted at least one Merrill executive about whether the goodwill charge would be disclosed to the shareholders prior to the shareholder vote. He further encouraged Merrill to contact outside counsel about filing an 8-K to disclose this issue to shareholders.  There is also no indication that the lawyers at Wachtell were told that the Merrill loss estimates and projections did not include the additional $2.3 billion write-down.By December 1, 2008, senior executives at BofA had gotten so worried about the state of Merrill's finances that Defendant Price and BofA Vice Chairman of Corporate Development Gregory Curl sought legal advice from general counsel Tim Mayopoulos about invoking the Material Adverse Change clause of the merger agreement (the "MAC") on December 1, 2008 – *four days before* the shareholder vote to approve the merger, and again on December 3, 2008, two days before the vote. As Mayopoulos testified before the office of New York Attorney General Andrew Cuomo:

> **Question:** Did you give advice about whether there was a MAC clause or not?
>
> **Mayopoulos:** Did I give advice about whether I thought there was a material adverse effect or not?
>
> **Question:** Yes.
>
> **Mayopoulos**: Yes.

133.    Defendant Mayopoulos also testified to Congress that he was asked in early December 2008 prior to the shareholder vote to render legal advice related to the MAC clause based on projected losses calculated in November, but was not told of the higher $14-17 billion loss projection until December 9, 2008.    Representative Connolly asked if Mayopoulos wondered why senior executives were suddenly asking for advice on the MAC clause, and Mayopoulos said, "Mr. Price did not tell me why he was asking. He just asked me to review with him the terms of the Material Adverse Change Clause . . . ."  Connolly then asked, "In retrospect, Mr. Mayopoulos, would a reasonable person perhaps deduct that the reason he initiated that conversation on or about December 1 was that in matter of fact he was in possession of the extent of Merrill Lynch's material losses . . . ?" to which Mayopoulos merely replied, "I don't know what Mr. Price knew at the time."

134.    On December 3, BofA general counsel Tim Mayopoulos repeated his advice to CFO Price that the projected fourth quarter losses were not high enough to disclose to shareholders. We now know, however, that Mayopoulos had not been apprised of the new $14-17 billion pre-tax loss projection when he rendered his advice, and was working off stale data provided to him in mid-November projecting pretax losses of approximately $5 to $7 billion. He would not learn of the new projection until Price presented it to the BofA board of directors after the shareholder vote on December 9, 2008.

135.    Others at BofA with access to the Merrill losses were deeply concerned about the decision not to disclose the truth to shareholders. For example, BofA's corporate treasurer Jeffrey Brown voiced his concern directly to Defendant Price prior to the shareholder vote, saying that he thought the losses were "meaningful enough" to disclose. He recently testified to the New York Attorney General's office that by the shareholder vote, "it's about a $9 billion

after-tax number. That's a fairly significant loss for a corporation to experience in one quarter." After Price dismissed Brown's concerns, Brown warned Price of the possible criminal repercussions of the failure to disclose: "I stated to Mr. Price that I didn't want to be talking through a glass wall over a telephone."

136.     Likewise, Deloitte partner Thomas Graham recently testified that prior to the shareholder vote, he advised BofA to disclose the truth to the shareholders, saying that the losses "were sizable enough [to] probably warrant disclosure. They were material subsequent events to what occurred at the end of September that would be relevant for parties that were voting."

137.     When Mayopoulos learned on December 9 that BofA and Merrill had been revising loss estimates higher and were not sharing the new data with him, he tried to get in touch with Price, but was unable to reach him. Mayopoulos was fired the next day, December 10, 2008, without warning, and without explanation. At the same time, BofA dismissed deputy general counsel David Onorato, chief of litigation and securities inquiries. Merrill's veteran general counsel, Rosemary Berkery, quickly left as well, right before Christmas, 2008. Lewis eventually named Edward O'Keefe as the new general counsel for BofA. BofA claims that the terminations were not related to the merger and not performance-related.

138.     Thain testified on February 19, 2009 that BofA had "daily access to the exact same financial information that I had." BofA had dispatched Defendant Cotty, BofA's Chief Accounting Officer, during the fourth quarter to work with Merrill's finance team. At Merrill, Cotty was active in preparing accounts and working with Merrill executives set to report to him after the deal closed. With Cotty's involvement, Merrill took a fourth quarter write-down of $1.9 billion in leveraged loans and a $2.9 billion reserve against exposure to derivatives linked to asset-backed securities. Cotty also approved a $1 billion write-down of credit default swaps

involving investment-grade companies. Cotty, not Merrill's Chief Financial Officer Nelson Chai, signed Merrill's annual report, issued in February 2009.

139.   Although BofA had daily and full access to the numbers at Merrill, BofA negligently failed to disclose any of the facts above to shareholders prior to the December 5 vote. BofA negligently failed to disclose a bonus schedule that authorized Merrill to pay bonuses potentially up to $5.8 billion; negligently failed to disclose that Merrill's pretax losses were accumulating by approximately $1 billion each week; negligently failed to disclose that Merrill's losses had resulted in a material change to the previously-reported anticipated accretion/dilution analysis; negligently failed to disclose a $2.3 billion pretax impairment at Merrill due to a write-down in goodwill; and negligently failed to disclose that top management was so concerned about losses at Merrill that they engaged counsel to advise whether they could invoke the MAC and abandon the deal.

140.   On Friday, December 5, 2008, shareholders of both banks approved the merger. 82% of the votes at the BofA shareholder meeting were cast in favor of the deal.

### D.   THE AFTERMATH

"... a thing of beauty ..."

– BoA CEO Ken Lewis describing the Merrill deal in a Bloomberg Television interview, February 25, 2009, after Merrill's massive fourth-quarter losses were finally disclosed

141.   On Sunday, December 7, only two days after shareholders approved the merger, Merrill's Corporate Controller Gary Carlin sent Merrill's updated November financial report showing $13.3 billion in pretax losses to Cotty with the message "What a disaster."

142.   On Monday, December 8, 2008, Merrill's board gathered at the World Financial Center headquarters to hear chilling news; after-tax losses for October and November already stood at around $7 billion, an amount that exceeded projections for the entire fourth quarter.

Losses for the full fourth quarter were projected to be $15.5 billion on a pre-tax basis, and $9 billion after-tax.

143.    And losses continued to grow.  A week after the vote, loss estimates grew to $12.5 billion on an after-tax basis, after Merrill booked billions of dollars of additional losses. Outside counsel at Wachtell recommended the company had a basis to consider invoking the MAC clause and backing out.  Brian Moynihan, the new general counsel who took over the position after Tim Mayopoulos was fired, was involved in these talks.

144.    Lewis called Treasury Secretary Hank Paulson the morning of December 17, 2008 to say he had just learned about "surprising" Merrill losses for the fourth quarter. Lewis then flew to Washington, DC that afternoon to meet with Federal Reserve Chairman Ben Bernanke and Paulson.

145.    Bernanke, along with certain Federal Reserve employees, was skeptical of Lewis' claims that the news of the growing losses was "surprising."  Jeffrey Lacker, an employee of the Federal Reserve Bank of Richmond, noted in a December 20, 2008 email, "Just had a long talk with Ben [Bernanke]. Says that they think the MAC threat is irrelevant because its not credible. Also intends to make it even more clear that if they play that card and they need assistance, management is gone."

146.    Two days later, however, Lacker wrote: "[Bernanke's] sense is that [Lewis] is just generally anxious about the merger, not trying to shake anyone down."

147.    Fed employee Deborah Bailey wrote to Mac Alfriend and Roger Cole on December 20, 2008, noting, "I always had my doubts about the quality of the due diligence they did on the [Merrill] deal.  Don't forget they paid a premium.  How do you pay a premium and now ask for help? This will not go over well at all."

148.    Officials from the Federal Reserve concluded that Lewis must have known about the accelerating losses at Merrill as early as mid-November, several weeks before the merger. An email from Tim Clark, a senior adviser with the Federal Reserve, sent to the assistant to Chairman Bernanke and to Scott Alvarez, among others, noted:

> General consensus forming among many of us on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter – albeit picking up significant [sic] around mid-November and carrying into December – Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum it calls into question the adequacy of the due diligence process [BofA] has been doing in preparation for the takeover.

149.    Similarly, a restricted Federal Reserve memo dated December 21, 2008, titled "Analysis of Bank of America & Merrill Lynch Merger," notes that "[BoA] management's contention that the severity of [Merrill's] losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition." The memo indicates that Merrill's losses "were clearly shown in Merrill's internal risk management reports that [BofA] reviewed during their due diligence." The memo also states that "the potential for losses from other risk exposures cited by management, including those coming from leveraged loans and trading in complex structured credit derivatives products ('correlation trading') should also have been reasonably well understood, particularly as [BoA] itself is also active in both these products."

150.    During the fourth quarter of 2008, BofA was also suffering losses. Although these losses were smaller than those at Merrill, BofA also failed to disclose them to shareholders. The Federal Reserve's internal analysis concluded that as of December 21, 2008, BofA's after-tax quarterly net loss was about $1.4 billion, representing "more than four times management's projected losses from just two weeks ago."

151.    Bernanke and Paulson urged Lewis to close the deal, and assured Lewis that they would provide a rescue package to BofA to ensure it had adequate capital to complete the deal. However, the government refused to put the guarantee of additional taxpayer capital injections and asset guarantees into writing.

152.    As the gravity of the situation began to sink in, fears at BofA turned to the consequences of failing to exercise the MAC and failing to disclose the losses to shareholders. On December 22, 2008, Fed Chairman Bernanke wrote a confidential email to Scott Alvarez, Fed general counsel: "[Lewis] said he now fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]. I don't think that's very likely and said so. However, he still asked whether he could use as a defense that the govt ordered him to proceed for systemic reasons. I said no."

153.    That same day, December 22, Lewis wrote an email to certain of BofA's board of directors and officers to update them on his discussions with the government: "I just talked with Hank Paulson. He said there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure, which, of course, we do not want."

154.    BofA's December 22, 2008 Board of Directors Meeting Minutes reflect that Lewis reported to the board that Paulson had threatened Lewis and the Board with the loss of their positions if the deal did not go through. The minutes however also note that the board clarified that it is not persuaded by the federal regulators' statement that the board and management would be removed if BofA would fail to acquire Merrill by exercising the MAC clause.

155.    The next day, Scott Alvarez, general counsel at the Federal Reserve, wrote to Chairman Bernanke and expressed additional skepticism of Lewis' claim that he was "surprised"

by the growing losses: "some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [BofA] made for the shareholder vote."

156.    Later, Alvarez was even more blunt: "[Lewis'] potential liability here will be whether he knew (or reasonably should have known) the magnitude of the ML losses when BA made its disclosures to get the shareholder vote on the ML deal in early December."

157.    That same day, Mac Alfriend of the Richmond Federal Reserve emailed Jeffrey Lacker and Jennifer Burns, also of the Richmond Federal Reserve, and stated "I think he [Lewis] is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he is worried about his own job after cutting loose lots of very good people."

158.    BofA's December 30, 2008 Board minutes indicate that the reason the federal officials would not provide written assurance that additional TARP funds would be forthcoming is that "written assurances would require formal action by the Fed and the Treasury, while formal action would require public disclosure."

159.    The Board minutes also report that Lewis told federal regulators that the losses at Merrill were so bad that it would have been proper to assert the material adverse change clause in the merger agreement, and he refrained from doing so only after the regulators articulated their concerns with systemic risk issues. Lewis also told regulators that absorbing the Merrill losses would injure BofA to such a degree that it would be appropriate for the federal government to make BofA whole.

160.    On January 1, 2009, the deal closed as scheduled. Although Merrill voting shares had been valued at $50 billion on the date the deal was announced (and total value counting all Merrill securities was even higher), because of the fall in BofA's share price, Merrill's voting shares were valued at only $19.4 billion on January 1. The total deal price, including all Merrill securities, was $29.1 billion at the January 1st closing.

161.    BofA's share price closed at $17.84 on the first full trading day after the shareholders of both companies approved the merger. Over the following month, the share price gradually declined as analysts became increasingly pessimistic about Merrill's losses, so that by January 9, 2009, the price had fallen to $12.99.

162.    On January 12, 2009, news started to leak that BofA would report numbers much worse than expected. For instance, on the morning of January 12, a Citigroup analyst warned investors, apparently based on leaked information, that BofA was preparing to report multi-billion-dollar losses and significantly reduce its dividend. BofA's share price fell by approximately 10%, from $12.86 to $11.43.

163.    On January 13, 2009, additional rumors filtered to New York from bond traders in Australia that Merrill was about to report losses much worse than expected. BofA's share price fell to $10.65, and to $10.20 on January 14.

164.    On January 15, 2009, news further leaked that to help close the deal, the Treasury would be making an additional investment in BofA. The Wall Street Journal reported (one day before BofA disclosed it) that BofA had accepted billions of dollars of additional TARP money because of the perilous state of Merrill's finances. The Journal commented, "Lewis's optimistic statements on the deal throughout left investors ill-prepared to expect potential losses so severe

43

that the U.S. Treasury would have to step in with additional funds." BofA's share price plummeted another 15% in one day to $8.32.

165.     The next day, on January 16, 2009, BofA released its bombshell preliminary fourth quarter earnings statement in which it disclosed that Merrill's fourth quarter loss, exceeded $21 billion pre-tax ($15.3 billion after-tax). BofA itself incurred an additional $1.8 billion of losses. BofA also officially confirmed the rumors from previous days what was informally promised by the Treasury in December, but not disclosed until January 16 -- the Treasury would invest yet another $20 billion in bailout funds and would provide further protection against losses on $118 billion in toxic assets. Lewis said publicly that this agreement was not signed and he did not plan to use it. The after-tax loss estimate would later prove to be too low, and was later increased by $500 million to $15.84 billion.

166.     In the earnings conference call disclosing those disastrous losses, Lewis stated that BofA would not have acquired Merrill without the government's assistance, despite his assurances in September 2008 that he and his executives, with the help of J.C. Flowers, had conducted adequate due diligence on Merrill's assets. By Monday, January 20, BofA's share price had fallen to $5.10.

167.     On January 21, information about the bonuses Merrill paid was finally leaked to the press. It was thus not until 6 weeks after the shareholder vote, and 3 weeks after the deal was closed, that shareholders finally learned material details of the deal that they were entitled to know when voting on December 5. Most of these details were first learned through leaks, and proper disclosures were only made thereafter.

### E.   THE GOVERNMENT INVESTIGATIONS AND LITIGATION

*"There's something rotten in the cotton here – no ifs, ands or buts about it."*

– U.S. Representative Edolphus Towns, Chairman of the House Committee on Oversight and Government Reform, to reporters following a Congressional hearing on June 25, 2009

#### 1.   Multi-District Litigation

168.   After BofA finally disclosed the full extent of the losses, a number of private suits were filed in various federal courts asserting claims against BofA on behalf of various shareholders, or derivatively against various BofA officers and directors on behalf of BofA.

169.   On February 25, 2009, Judge Denny Chin in the Southern District of New York issued an order coordinating the various actions, and eventually the Judicial Panel on Multidistrict Litigation created an MDL in the SDNY, assigned to Judge Chin, and organized the MDL into three actions: a securities class action, an ERISA action, and a derivative action.

170.   The defendants in the MDL actions have filed various motions to dismiss, and the briefing is still continuing as of the date of this Complaint.   Judge Chin has stayed discovery pending the resolution of these motions.

171.   This instant action is related to the securities class action in the MDL.

#### 2.   Delaware Derivative Case

172.   Starting on January 22, 2009, a series of derivative actions were filed in Delaware Chancery Court on behalf of BofA, against a number of officers and directors, related to the Merrill transaction.   The cases were consolidated, and an amended consolidated derivative complaint was filed on May 8, 2009.

173.   In many ways, the Delaware action parallels the derivative action in the MDL: it alleges corporate waste and other breaches of fiduciary duties stemming from the failure to do

adequate due diligence, failure to exercise the MAC, and notably, failure to disclose the mounting losses at Merrill prior to the Dec. 5, 2008 shareholder vote.

174.    After briefing and then oral argument on October 12, 2009, Vice Chancellor Strine denied the defendants' motion to dismiss, and the case is now in discovery.

### 3.    New York Attorney General's Investigation and Allegations of Civil Fraud in *New York v. Bank of America Corp., et al.*

175.    In the fall of 2008, New York Attorney General Andrew Cuomo was conducting an ongoing inquiry into various aspects of executive compensation at Wall Street firms, including Merrill.

176.    On October 29, 2008, the NYAG asked Merrill to detail, among other things, its plans for executive bonuses in 2008, including the criteria Merrill planned to use in determining what, if any, bonuses were appropriate for its top executives.

177.    On November 5, 2008, Merrill responded and stated that any bonuses would be based upon a combination of performance and retention needs.  No mention was made of the secret bonus schedule to the BofA merger agreement, and no mention was made of the decision to accelerate the bonus payments before full-year performance could even be calculated.

178.    On December 8, 2008, the NYAG wrote to the Merrill board expressing shock at early reports of Thain's requested $10 million bonus.  Little did the NYAG know that on the very day that he wrote that letter, the board approved $3.6 billion of bonuses on an accelerated schedule.

179.    In late January, 2009, after learning of the full extent of the Merrill bonus pool, the NYAG launched a formal investigation into the bonuses paid by Merrill at the end of 2008. The NYAG wrote to the U.S. House Committee on Financial Services to report that "Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and

Bank of America's apparent complicity in it, raises serious and disturbing questions." The NYAG went on to break down the details of the bonus pool, which averaged $91,000 per employee. The top four bonus recipients received a combined $121 million.

180.    On January 27, 2009, Thain was subpoenaed to testify before the Attorney General, and did testify on February 19, 2009, and again on February 24, 2009.

181.    On February 20, 2009, Lewis was subpoenaed, and testified on February 26, 2009.

182.    Other witnesses included Andrea Smith (on February 12), John D. Finnegan (March 3), Steele Alphin (March 4), Neil Cotty (March 4), Greg Fleming (March 5), and Steve Goodman (March 5).

183.    Cuomo's investigation helped to establish that BofA was intimately involved in the amount, timing and composition of the secret Merrill bonuses: While Lewis testified to Congress on February 11, 2009 that Merrill had a "separate board, separate compensation committee, and we had no authority to tell them what to do," this was contradicted by Thain's testimony on February 19, 2009, (one week later) to the NYAG, where Thain testified that BofA was "an integral part of the process of determining both what the ultimate pool size was and what individuals got." Thain indicated that he meant mainly BofA officers Andrea Smith and Steele Alphin, but that "any of the other [BofA] people, if they asked for information, would get it." With respect to acting Merrill CFO Cotty and BofA CFO Price, Thain testified, "we were in the mode of anything they wanted to see we would provide to them."

184.    In a September 8, 2009 letter to BofA's outside counsel, Lewis J. Lipman of Cleary Gottlieb Steen & Hamilton LLP, New York Attorney General Andrew Cuomo reported that his investigation had uncovered "at least four instances in the fourth quarter of 2008 where

47

Bank of America and its senior officers failed to disclose material non-public information to its

shareholders." Three of these instances were prior to the December 5, 2008 shareholder vote:

> **Losses Prior to Shareholder Approval of the Merger**: By
> November, Bank of America knew that Merrill expected pre-tax
> losses for the fourth quarter of nearly $9 billion. Those expected
> losses jumped to more than $14 billion just prior to the December
> 5, 2008 shareholder meeting convened to vote on the merger's
> approval.

> **Goodwill Write-Downs**: Bank of America and Merrill failed to
> disclose prior to the shareholder vote that Merrill needed to take a
> goodwill charge of more than $2 billion associated with sub-prime
> related losses. Even though it was known of by November, this
> write-down became part of the purportedly "surprising" losses that
> were included in Merrill's financials more than a month after the
> December 5 shareholder vote.

> **Accelerated Bonus Payments**: On November 11, 2008, Merrill
> decided to accelerate its bonus payments (which BofA allowed to
> be $3.6 billion), and bonus determinations were approved on
> December 8, 2008.

185.    On February 4, 2010, NYAG Cuomo filed a civil action against BofA, Lewis and

Price, alleging securities fraud under New York law.

186.    In the complaint, Cuomo charged unequivocally that "Bank of America's

management misled its shareholders by not disclosing massive losses that were mounting at

Merrill Lynch so that shareholders would approve the deal." He further charged:

> "by December 5, 2008, the day that Bank of America shareholders voted
> to approve the merger with Merrill Lynch, Merrill had incurred actual
> pretax losses of more than $16 billion. Bank management also knew at
> this time that additional losses were forthcoming and that Merrill had
> become a shadow of the company Bank of America had described in its
> Proxy Statement and other public statements advocating the merger. The
> Bank's management thus left the Bank's shareholders in the dark about
> fundamental changes at Merrill that were obviously important to their
> voting decision."

### 4. Investigation by the United States House Committee on Oversight and Government Reform

187. On April 6, 2009, Representative Kucinich, Chairman of the Domestic Policy Subcommittee of the House Committee on Oversight and Government Reform, wrote to SEC Chairman Mary Schapiro about the "troubling" assertions made by New York Attorney General Andrew Cuomo. At the time, Chairman Kucinich was concerned only with the secret bonuses, and asked the SEC to comment on what steps it would take to "redress the material omission."

188. On June 4, 2009, the Subcommittee announced that it would conduct hearings into the merger, which would not only address the secret bonuses, but all disclosures, and the role of the federal government in the acquisition. The Subcommittee also subpoenaed various documents from the Federal Reserve that the Committee staff had reviewed earlier.

189. On June 11, 2009, the Subcommittee convened its first hearing, which included testimony from BofA CEO Ken Lewis.

190. During that first hearing, Rep. Kucinich noted that an analysis by a statistics expert found that "the mid-November loss should have alerted Bank of America to an accelerating deterioration in Merrill Lynch, and the loss evident in mid-December merely confirms a trend apparent in mid-November."

191. Rep. Kucinich also remarked that Fed officials believed that Lewis was potentially liable under the securities laws "by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008."

192. On June 25, 2009, the Committee convened its second hearing, which included testimony from Fed Chairman Ben Bernanke. After reviewing formerly highly confidential

internal documents at the Fed in preparation for the hearing, Subcommittee Chairman Kucinich said in his opening statement:

> The Fed found, in contradiction to Ken Lewis's representations, that Bank of America failed to do adequate due diligence in acquiring Merrill Lynch. The Fed found that Bank of America had known about accelerating losses at Merrill since mid-November, when shareholders could have used that information to decide on ratification of the merger. And senior officials at the Fed believed that Bank of America could be in violation of securities laws for fai7ling to inform shareholders about the Merrill losses known in mid-November.

193.    On August 4, 2009, Subcommittee Chairman Kucinich wrote to SEC Chairman Mary Schapiro, requesting that the SEC expand its investigation of BofA into possible securities law violations stemming from the failure to disclose projected fourth-quarter losses with shareholders in advance of the December 5, 2008 vote. Included with the letter was a copy of a "statistical study" submitted to Congress by an independent statistics expert finding that "Bank of America had strong statistical reasons to believe that the losses evident in mid-November would continue through the end of the year."

194.    On September 30, 2009, the Committee held its third hearing, inviting SEC Chairman Mary Schapiro, former SEC Chairman Christopher Cox, and FDIC Chairman Sheila Bair to testify.

195.    On November 17, 2009, the Committee held its fourth hearing, inviting four witnesses from BofA to testify: Brian Moynihan, Tim Mayopoulos, Charles Gifford, and Thomas May.

196.    In advance of the hearing, the Republican committee staff released its Staff Memorandum to counter the Majority Staff Memorandum. Although the two groups disagreed on a number of issues related to the roles of the Fed, Treasury and BofA during December 2008 and January 2009, the Republican memo clearly demonstrated bipartisan consensus on the events

50

prior to the December 5, 2008 shareholder vote.  For example, the Republican staff was in complete agreement with the later findings of the full Democrat-controlled Committee on the following points:

- On November 12, 2008, Merrill's fourth-quarter after-tax losses were known to exceed $5 billion, and projected pre-tax losses were approaching $9 billion;

- On December 3, 2008, Merrill's pre-tax fourth-quarter losses had hit $11 billion;

- Later in the day on December 3, 2008, after consultation among BofA and Merrill executives, and additional $3 billion pre-tax contingency was added to the projection to better estimate potential losses in November and December, bringing projected fourth-quarter pre-tax losses to $14 billion.

- Tim Mayopoulos, the General Counsel, rendered advice related to disclosure based on stale data, and was not told of the new $14 billion projection.  Instead, he rendered advice based on a lower figure.

197.    On December 10, 2009, after four hearings and in advance of the fifth and final hearing, the Subcommittee released its official "Investigation Findings" and reported them to the Full Committee.  Among other things, the Subcommittee found:

- Top officials at the Federal Reserve concluded that Bank of America knew or should have known in mid-November about the mounting losses at Merrill Lynch.

- The top lawyer at the Fed speculated in email to Chairman Bernanke that Bank of America could be liable for securities law violations as a result of not disclosing that information to the Bank's shareholders.

- The November 12 forecast, created by Merrill Lynch and used by Bank of America's lawyers as a basis to determine if there was something shareholders should know before they approved the merger, omitted any forecast of how the most troublesome investments would perform in November and December.

- In an interview with the Subcommittee, the former Merrill CFO admitted that the November 12, 2008 forecast was not a valid forecast.

- BofA recognized that the November 12 forecast was deficient on the most crucial aspect of the acquisition – the potential for huge losses at Merrill

51

Lynch. In an interview with staff, Mr. Cotty conceded that the November 12 forecast was of "questionable validity."

- BofA failed to do any actual analysis to make up for the Merrill omissions. On the contrary, BofA pulled a number out of thin air on November 13, which was recorded on the forecast document as the "gut" feeling of Cotty. BofA simply created an assumption that Merrill's illiquid assets would almost break even for November, thereby spreading October's bad results over two months.

- The attorneys at BofA and at Wachtell did not question the financial information they were given, in spite of the glaring and obvious omission and the explicit reference to a "gut" feeling. They advised BofA not to make further disclosures to its shareholders in advance of the merger vote, based on a deficient forecast and a "gut" feeling.

- The November 12 forecast's omission of any projection for losses in CDOs and other illiquid investments, and the implication that Merrill would break even in those investments for the remainder of the quarter, was material to the advice Mayopoulos gave to BofA.

- Lewis, Price, Cotty and Thain further agreed to pull another number out of thin air (the "WAG") to supplement Merrill's omission of CDO performance in their December 3 forecast as well.

198.    In his opening statements before the start of the December 11, 2009 hearings, Chairman Kucinich stated that the Subcommittee investigation found evidence of possible securities violations at Bank of America:

- Bank of America relied on the November 12 forecast for Fourth Quarter '08, created by Merrill Lynch, that omitted any forecast of how collateralized debt obligations, subprime mortgage backed securities, [and] credit default swaps would perform in the quarter.

- The former Merrill CFO admitted to staff that the November 12 forecast was not, in fact, a valid forecast.

- Bank of America knew at the time that the November 12 forecast was of "questionable validity."

- However, Bank of America did not do any actionable financial analysis to make up for the Merrill omissions. Instead, Bank of America merely pulled a number out of thin air on November 13, which was recorded on a forecast as the gut feeling of Neil Cotty, Bank of America's chief accounting officer. Bank of America simply created an assumption that

> Merrill Lynch's illiquid assets would almost break even for November, thereby spreading October's bad results over two months.

199.    Chairman Kucinich concluded:

> **The glaring omissions and inaccurate financial data in the critical November 12 Forecast make Bank of America's decision not to disclose to shareholders unsupportable**. Furthermore, the flaws in the forecast document were so obvious that they should have alerted the attorneys to the necessity of reasonable investigation before making a decision on Bank of America's legal duties to disclose. **The apparent fact that they did not mount such an investigation makes the decision not to disclose Merrill's losses to shareholders an egregious violation of securities laws**. (emphasis added).

200.    During the December 11, 2009 hearing, Congresswoman Jackie Speier told SEC Director of Enforcement Khuzami, "I am deeply troubled with your description of what took place. You said that the bank misled the shareholders. The bank didn't mislead the shareholders. It lied to the shareholders. It was a boldfaced lie."

### 5.    SEC Investigation and *Securities and Exchange Commission v. Bank of America Corp.*

201.    On August 3, 2009, the SEC filed suit in the Southern District of New York against BofA, charging BofA with making materially false and misleading statements in connection with the Proxy with respect to the secret bonus agreement. The case was assigned to Judge Rakoff. The SEC charged in the complaint:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

202.    Simultaneously with the SEC's complaint, the SEC and BofA requested the court's approval for a proposed settlement pursuant to which BofA would pay a monetary penalty of $33 million and be enjoined from future violations.

203.    On August 10, 2009, Judge Rakoff held a hearing to consider the proposed settlement. The court asked, "What you are saying, if I understand it, is that Bank of America and Merrill effectively lied to their shareholders about a highly material matter," and the SEC responded, "That is essentially correct." The SEC also took issue with BofA's contention that the Proxy was not misleading because an investor could piece together various disclosures and surmise that a secret agreement might be lurking at the bank but not disclosed:

> MR. ROSENFELD [for the SEC]: The proxy statement is what the shareholders rely on. Disclosures about a particular agreement need to be made within the four corners of the proxy statement. The fact that somebody could have looked and teased out a puzzle by looking at some accruals which are not defined as bonuses might have known how things operate and put 15 things together to come up with it is irrelevant if it was not properly disclosed. It's not meant to be a puzzle. The proxy disclosure rules are meant to put shareholders on notice what they are asked to approve.

> THE COURT: If you are right about that, frankly my recollection of the law in this area is consistent with yours but I have not addressed this particular case obviously, if you are right about that, then the effect of the proxy statement was materially misleading.

204.    After additional briefing, on September 14, 2009, Judge Rakoff rejected the proposed settlement. In his Memorandum Order, he said that the SEC had made "very serious allegations" and found the proposed settlement "unfair," "unreasonable," "inadequate," and "worse than pointless." He said the proposed settlement was so weak that it suggested a rather cynical relationship between the SEC and BofA, and ordered that the case be ready for trial by February 1, 2010.

205. On January 4, 2010, Judge Rakoff excluded from trial any evidence of media speculation in 2008 of what the Merrill bonuses might be. He held, "since the Bank itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information."

206. SEC Chairman Khuzami admitted in his December 11, 2009 testimony before the House Oversight Committee that the SEC had widened its investigation to include the failure of BofA to disclose to shareholders the mounting losses at Merrill prior to the shareholder vote. One month later, on January 12, 2010, the SEC filed a second suit against BofA charging the bank with violations of Section 14(a) of the Exchange Act for failing to disclose the mounting losses at Merrill prior to the December 5, 2008 vote.

207. The SEC charged BofA with serious violations of the U.S. securities laws, stating in the complaint:

> Despite its representation that it would update shareholders about fundamental changes to the information previously disclosed, Bank of America kept shareholders in the dark as they were called upon to vote on the proposed merger at the end of a quarter of nearly unprecedented volatility and uncertainty. The absence of any disclosure concerning Merrill's extraordinary losses deprived shareholders of up-to-date information that was essential to their ability to evaluate whether to approve the merger upon the terms presented to them, which had principally been negotiated before Merrill sustained these losses. Bank of America's failure to make any disclosure concerning Merrill's October and November losses violated Bank of America's express undertaking to apprise investors of fundamental changes and rendered its prior disclosures materially false and misleading in violation of the federal securities laws.

208. On February 4, 2010, the SEC and BofA announced a proposed settlement of both cases. Coincidentally, this settlement was announced on the very day that NYAG Cuomo filed civil fraud charges against BofA, Lewis and Thain.[1]

---

[1] Concurrent with the proposed SEC settlement, North Carolina Attorney General Roy Cooper announced an agreement with BofA which adopted the terms of the SEC settlement, plus additional reforms, including BofA's agreement to meet with the North Carolina AG's office twice per year to discuss compliance with the agreement,

209.    In the proposed consent, BofA would be required to pay one dollar in disgorgement and a $150 million penalty, with the funds to be "distributed to harmed Bank of America shareholders." BofA also agreed to "a series of remedial undertakings designed to reform its disclosure and corporate governance processes for the benefit of shareholders."

210.    On February 11, 2010, Judge Rakoff delayed approval of the proposed settlement, and requested that the parties submit certain underlying discovery materials, such as deposition testimony, emails and other documents, related to a number of issues, and told the parties to indicate whether they would agree to certain modifications to the proposed remedial undertakings.

211.    On February 22, 2010, Judge Rakoff reluctantly approved a $150 million settlement between the Securities and Exchange Commission and BofA, calling the settlement "half-baked justice", while noting his obligation to yield to the wishes of a regulatory authority seeking a settlement before his court.

212.    After reviewing the submitted materials, Judge Rakoff issued an opinion and order dated February 22, 2010, in which he held:

> "it is clear to the court that:
>
> (1)    The Proxy Statement that the Bank sent to its shareholders on November 3, 2008 soliciting their approval of the merger with [Merrill] failed adequately to disclose the Bank's agreement to let Merrill pay its executives and certain other employees $5.8 billion in bonuses at a time when Merrill was suffering huge losses; and
>
> (2)    the Bank failed adequately to disclose to its shareholders either prior to the shareholder approval of the merger on December 5, 2008 or prior to the merger's effective date of January 1, 2009 the Bank's ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008 (ultimately amounting to a net loss of $15.3 billion, the largest quarterly loss in

and to maintain an anonymous hotline to encourage employees to report potential violations or problems to the bank's auditors. BofA has also agreed to pay $1 million to the North Carolina Department of Justice for consumer protection and education efforts.

the firm's history) and that Merrill had nonetheless accelerated the payment to certain executives and other employees of more than $3.6 billion in bonuses.

Despite the Bank's somewhat coy refusal to concede the materiality of these nondisclosures, *it seems obvious that a prudent Bank shareholder, if informed of the aforementioned facts, would have thought twice about approving the merger or might have sought its renegotiation*" (emphasis added).

213.    Judge Rakoff also held "that the S.E.C.'s conclusion that the Bank and its officers acted negligently, rather than intentionally, in causing the nondisclosures that are the predicates to the settlement here proffered, is a reasonable conclusion, supported by substantial evidence, that a reasonable regulator could draw."

214.    The $150 million fine is to be deposited into an interest-bearing account, to be held until further order of the court. These funds are to be distributed at a later date pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, in accordance with the principle that distributions are to be made to current and former BofA shareholders who were affected by the non-disclosures, and not to BofA shareholders with respect to BofA shares held as a result of former Merrill shareholdings.

215.    According to Judge Rakoff in his February 22, 2010 Opinion and Order, the principle of distributing the $150 million only to some shareholders and not others was proposed by the parties to ensure that only those shareholders "who were harmed by the Bank's nondisclosures" would receive compensation. Judge Rakoff ordered that any revisions of the proposed consent "must include such terms." Judge Rakoff continued:

"What the proposal does, in effect, is to transfer $150 million from all shareholders to those current Bank shareholders who were victimized by the non-disclosures. Since the S.E.C. . . . estimates that this latter group is roughly 50 percent of all current Bank shareholders, the effect is to transfer $75 million from Merrill "legacy" shareholders to Bank "legacy" shareholders. But another way, it serves to renegotiate the price that Bank shareholders would have paid to Merrill shareholders for purchasing Merrill shares if the disclosures had not been made."

216.    The fact that BofA consented to a Fair Fund structure that only compensates those BofA shareholders actually harmed by the non-disclosures, and does not compensate other BofA shareholders, illustrates conclusively that the Plaintiff's Section 14(a) and Section 20(a) claims are direct, not derivative.

217.    On February 24, 2010, Judge Rakoff approved the settlement.

### 6.    Possible Criminal Investigation

218.    The *Charlotte Observer* reported on September 18, 2009 that the United States Department of Justice, working with the Federal Bureau of Investigation, have been conducting a criminal investigation for approximately 6 months before the date of the article.  The FBI's reported involvement opens up the possibility of criminal charges, although the FBI refused to comment.

## V. MISLEADING STATEMENTS AND OMISSIONS IN THE PROXY, PROXY SUPPLEMENTS, AND OTHER DOCUMENTS INCORPORATED BY REFERENCE THEREIN

219.    The Proxy, including documents incorporated by reference therein, and later supplements, for the reasons set forth in the paragraphs above, contained false and misleading statements in violation of Section 14(a) of the Exchange Act.  The Proxy: (1) provided pro-forma financial information for BofA and Merrill that failed to disclose losses at Merrill incurred and projected prior to December 5, 2008; (2) failed to disclose a $2.3 billion goodwill charge associated with subprime operations losses, which were known by November, but became part of the "surprising" losses that were included in Merrill's financials released more than a month after the shareholder vote; (3) failed to disclose that BofA had approved the timing, amount, and composition of accelerated bonus payments to Merrill employees that were authorized up to $5.8 billion; (4) failed to disclose that BofA was considering invoking the merger agreement's MAC

clause and had even consulted outside counsel on the issue; and (5) failed to disclose updated accretion and dilution information.

### A.   THE MERGER ANNOUNCEMENT ON SEPTEMBER 15, 2008

220.   When BofA and Merrill announced the deal on the morning of September 15, 2008, Defendants made misleading and false statements in connection with soliciting proxies in support of the merger in three communications that day, including a press release (the "September 15 Press Release"), an investor call (the "September 15 Investor Call"), a press conference (the "September 15 Press Conference"), and a joint BofA-Merrill investor presentation led by Defendants Lewis and Thain (the "September 15 Investor Presentation"). The September 15 Press Release was included in a Form 8-K that BofA filed with the SEC and later incorporated by reference in the Proxy, and is to be understood in the context of the comments made by BofA and Merrill in the September 15 Investor Call, the September 15 Press Conference, and the September 15 Investor Presentation.

221.   In the September 15 Press Release, BofA called the Merrill deal "a great opportunity for our shareholders" and claimed, "[t]ogether, our companies are more valuable." It also stated that "[t]he acquisition is expected to be accretive to earnings by 2010."

222.   These statements made in the September 15 Press Release were false and misleading because BofA's due diligence of Merrill was inadequate, and the amount of losses Merrill incurred in the last quarter of 2008 was so large that BofA would not have been able to absorb them absent a government bailout.

223.   During the September 15 Investor Call in which Lewis, Thain and Price participated, Lewis endorsed the comments of Price that BofA was well aware of Merrill's assets due to its status as a competitor and that while the due diligence period had been short, it had been adequate.

224.     During the September 15 Investor Call, Price stated, "[W]e estimate the transaction to be 3% dilutive in the first year and break-even to slightly accretive in the second year before restructuring charges."

225.     During the September 15 Investor Call, Price also said:

> . . . from a risk or due diligence perspective as you heard Ken say we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. We sent in a large team to review areas such as asset valuations, trading positions and the like. We also were joined by a team from J.C. Flowers that had done extensive due diligence over some time in reviewing other potential transactions, so they were very familiar with Merrill Lynch's books.
>
> ***
>
> Clearly we've had a tremendous amount of historical knowledge both as a competitor with Merrill Lynch but also have reviewed and analyzed the company over the years. As Ken referenced, we did have several advisors, among them J.C. Flowers with pretty extensive knowledge of the company.

226.     Lewis supported Price's comments, adding:

> "... in comparing [Merrill] to a previous review that [it was] was night and day, that [Thain] and his team had made incredible progress since the first time they had looked at it."

227.     When asked by an investor why BofA paid $29 at that point, Lewis responded:

> ... Merrill had the liquidity and capacity to see this through; not necessarily easy because of just the times, but more likely than not they would have seen this through and come out on the other side. ... We thought Matt the long-term benefits were so overwhelming, it was such a strategic opportunity that we elected not to roll the dice and to go ahead and do it at this time. I don't know anybody who's perfect at picking the absolute bottom and we thought we had a compelling situation for the shareholder over the long term and at the time we did.

228.     These statements were materially false and misleading because Merrill did not have, as of September 15, the "liquidity and capacity to see this through." Indeed it was well-

60

known to Merrill and to BofA that Merrill was close to failure. Thain admitted in sworn deposition testimony before the New York Attorney General that Merrill would effectively become insolvent as of Monday, September 15, if BofA had not stepped in and purchased Merrill. There was particular concern at the time of the deal regarding the amount of bad assets Merrill had on its balance sheets, which was "precisely why we sold the company" as Thain later admitted in a September 17, 2009 speech.

229. Thain commented in the investor call that "As you know we have been consistently reducing the risky assets on our balance sheet.... So you will see when we report, on our third quarter balance sheet you will see a further reduction in those risky assets most of which has already been completed." Thain, however, avoided answering an investor's question about how much of the risky assets would be off the Merrill balance sheet by the end of the third quarter.

230. In the September 15 Press Conference that Lewis and Thain ran, both men continued to assure investors that Merrill's bad assets would not be a problem. Lewis professed familiarity with Merrill's risk because the two banks shared "very similar methodology valuation" and "very similar marks." Lewis said, "These structures – we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

231. These statements were materially false and misleading. Contrary to BofA's representations about Merrill dramatically reducing its risk profile, in an internal analysis, Federal Reserve officials noted that Merrill had maintained large "risk exposures" and "vulnerabilities" which exposed the company to losses of between $13.4 billion and $23.2 billion. The risk exposure was so material that Federal Reserve Senior Vice President Mac

Alfriend described them as "scary and ugly" in an email, and in another email to fellow Federal Reserve officials dated December 23, 2008, noted that Lewis was worried about shareholder lawsuits, as he "knows they did not do a good job of due diligence" and that the "issues facing the company are finally hitting home." Lewis himself acknowledged BofA's due diligence had been deficient in his approach to Bernanke on December 17, 2008.

232. During the September 15 Investor Presentation, led by Lewis and Thain, BofA and Merrill Lynch stated that the merger was expected to be "3% dilutive in 2009" and "Breakeven in 2010."

233. By the time of the shareholder vote, Defendants knew that these statements had become materially false and misleading, because Defendants learned that Merrill Lynch's losses in the fourth quarter of 2008 had risen to more than $14 billion pre-tax (approximately $9 billion after tax), rendering these earlier estimations of the accretive/dilutive impact of the merger unrealistic and inaccurate. Defendants had a duty to update the publicly-disclosed anticipated accretive/dilutive impact of the Merger in advance of the shareholder vote, yet did nothing to correct these misstatements.

234. Defendants also made false and misleading representations that the government was not pressuring them to complete the Merger. In fact, as Thain later admitted, Treasury Secretary Paulson had demanded that BofA and Merrill finalize the transaction by Monday morning, September 15, 2008.

### B. THE SEPTEMBER 18, 2008 SEC FORM 8-K DISCLOSING THE TERMS OF THE MERGER AGREEMENT

235. On September 18, 2008, BofA and Merrill filed a Form 8-K with the SEC attaching the September 15, 2008 Merger Agreement as Exhibit 2.1, which described the terms

of the transaction. Defendants Lewis and Thain signed the Merger Agreement. The September 18, 2008 8-K filing was incorporated by reference in the Proxy.

236. The Merger Agreement stated that Merrill would not pay discretionary bonuses before the merger closed without the prior written permission of BofA. The Agreement represented that "except as set forth in . . . Section 5.2 of the Company Disclosure Schedule or . . . without the prior written consent of [Bank of America]," Merrill would not "pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business)."

237. This disclosure was false and misleading because BofA purposefully did not include a secret addendum to the Merger Agreement that already authorized Merrill to pay up to $5.8 billion in bonuses prior to the end of the year.

238. Pursuant to Item 601(a) of SEC Regulation S-K, an 8-K announcing the terms of a merger must contain information material to an investment decision. Specifically, Item 601(a) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement." Item 601(a) further requires that any plan of acquisition must "contain a list briefly identifying the contents of all omitted schedules, together with an agreement to furnish supplementally a copy of any omitted schedule to the Commission upon request." While Defendants were permitted under the rules to provide a mere summary of contents instead of the actual schedule, BofA failed even to disclose the summary of the secret schedule. At no time prior to the shareholder vote did BofA amend the Form 8-K or otherwise disclose the Schedule or its contents to investors.

239.    The failure of the Proxy to disclose the secret bonus schedule was the basis of the SEC's complaint against BofA.    SEC Chairman Khuzami, testifying before the House Government Oversight Committee, said:

> [T]he proxy materials that were sent to shareholders, which was the basis upon which they would decide as to whether or not to vote to approve the merger, stated that Merrill Lynch could not pay discretionary bonuses without the consent of Bank of America.  In fact, what the proxy solicitation did not disclose, that there had already been an agreement that Bank of America would allow Merrill to pay up to $5.8 billion in exactly those kinds of bonuses, so *the proxy was misleading because it suggested that no consent had been given and no such bonuses would be paid without such consent when, in fact, the consent had already been given.*
> (emphasis added)

240.    In response to BofA's argument in the civil case before Judge Rakoff that the disclosures were not misleading because the media was already assuming that bonuses would be paid, the SEC shot back: "investors were not required to ignore Bank of America's express statements in the proxy materials and rely instead on media speculation that may have suggested that these statements were misleading."  Judge Rakoff later agreed, and has barred all evidence at trial of media reports contradicting BofA's disclosures related to the Merrill bonuses.

### C.    THE MERRILL DISCLOSURES REGARDING THE VICP

241.    Merrill's Variable Incentive Compensation Program – the basis for the bonuses in the secret schedule discussed above – was defined in the Merrill 2007 Form 10-K as follows: "'Variable Incentive Compensation' means the variable incentive compensation or office manager incentive compensation that is paid in cash to certain employees of the Company *generally in January or February* of the Plan Year *with respect to the prior Fiscal Year*." (emphasis added).  The Merrill 2007 Form 10-K was incorporated by reference in the BofA Proxy.

242. The terms of the VICP itself state that it is supposed to reflect all four quarters of performance. Merrill's March 14, 2008 proxy, which was incorporated by reference in the BofA Proxy, flatly stated that bonuses were to be ***paid in January for performance in the prior fiscal year,*** and that "pay for performance" was an important part of the compensation policy. The March 14, 2008 proxy also stated, "The goal of our compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders."

243. These statements were false and misleading because the September 15, 2008 merger agreement in fact changed the terms of the VICP and authorized bonuses pursuant to the VICP to be paid prior to the close of the fiscal year, and paid in an amount not linked to performance.

244. At the August 10, 2009 hearing before Judge Rakoff in SEC v. Bank of America, the court asked the SEC, "they [the bonuses] were paid on an accelerated schedule, not the company's normal schedule, is that right?" and the SEC responded, "That is correct."

245. The Proxy, which incorporated by reference Merrill's 2007 Form 10-K and March 2008 Proxy, never disclosed to shareholders that the bonuses would be paid "on an accelerated schedule, not the company's normal schedule."

246. The New York Attorney General's investigation determined that Merrill decided on November 11, 2008 to accelerate the bonus payments.

247. Andrea Smith, a human resources executive at BofA whose division includes Merrill, testified before the New York Attorney General on February 12, 2009, that she knew of Merrill's bonus plans in the first half of November. Ms. Smith testified, "The first knowledge I

had about the process that they [Merrill] were going to use was in the first half of November, which was when I discovered that they were going to be paying out prior to the 1st of the year."

248.   BofA executives thus knew of Merrill's plans prior to the November BofA Proxy Supplements, yet failed to correct the earlier Proxy which had incorporated Merrill's 10-K by reference.

249.   In addition, neither the Proxy nor the Proxy Supplements ever disclosed to shareholders that the bonuses would not be linked to 2008 full-year performance, as had been previously represented in the Merrill disclosures that BofA expressly incorporated by reference. U.S. Rep. Dennis Kucinich, Chairman of the House Domestic Policy Subcommittee, noted in an April 4, 2009 letter to Mary Schapiro of the SEC, "In the context of a company that was simultaneously recording losses large enough to threaten the existence of the business itself, it is difficult to see what consideration Merrill received in exchange for the bonuses.  The bonuses do not correlate with performance, nor were they retention bonuses."  Given that the bonuses were determined and paid before the year even ended, and well before Merrill knew its year-end financial performance, it was impossible for the bonuses to reflect full-year performance.

250.   Even BofA's chief accounting officer, Defendant Cotty, was "outraged" when he heard that his own company knew of and had approved Merrill's plan to pay the bonuses on an accelerated schedule.  At his deposition before the New York Attorney General on March 4, 2009, Cotty was asked what the implication was of the early bonuses.  Cotty answered:

> "Bank of America awards bonuses in January, and, therefore, you get people working 150 percent during the holiday season when a lot of people want to go skiing and take off.  So if the bonuses in the envelope was in hand, a lot of them might have said, Jeez, I don't need this stuff any more.  I'm out of here.  So they were awarded their bonus when I needed them at the most critical time. *So I was outraged*." (emphasis added).

### D.   THE 3Q08 EARNINGS CALL AND THE SECONDARY OFFERING DOCUMENTS

251.   On October 6, 2008, BofA held an investor call to announce earnings for the third quarter of 2008 ("Q3 2008 Earnings Call"). In the call, Lewis announced BofA was conducting a secondary offering ("Secondary Offering") for $10 billion and that the offering was sufficient to cover BofA's capital needs. BofA sold 455,000,000 shares of stock at $22 per share, for a total of $9.9 billion.

252.   The Secondary Offering was conducted pursuant to BofA's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

253.   The Offering Documents were incorporated by reference in the Proxy, and themselves expressly incorporated by reference BofA's Form 8-K filed with the SEC on September 15, 2008, and Form 8-K filed with the SEC on September 18, 2008. These documents rendered the Offering Documents materially false and misleading as the 8-K forms contained materially false and misleading statements and omitted to state material facts that would correct the materially false and misleading statements.

254.   In the press release accompanying the Secondary Offering, Lewis falsely stated that the merger "should significantly enhance our earnings."

255.   On the Q3 2008 Earnings Call, Price said that the Secondary Offering was sufficient to cover BofA's capital needs required by the Merrill transaction, stating that the offering "covered our anticipated needs from a Merrill standpoint."

256.   The Offering Documents are materially misleading because they omitted any mention of Merrill's dire financial condition and BofA's inability to absorb Merrill's losses. The Offering Documents and Investor Call of October 6, 2008, provided further reassurance that investors should vote for the merger. Despite the obligation to correct the misstatements in these

disclosures as more information became known to BofA, they were not corrected, and remained false and misleading.

### E.    MERRILL'S OCTOBER 16, 2008 PRESS RELEASE AND THIRD QUARTER 10-Q

257.    Merrill issued its preliminary financial results for the third quarter in an October 16, 2008 Press Release, stating a net loss of $5.1 billion.  This Press Release was included in Merrill's October 16, 2008 Form 8-K, and was incorporated by reference in the BofA Proxy. Merrill claimed these losses were the result of reducing Merrill's exposure in selling toxic assets before the Merger.

258.    Indeed, Thain claimed that Merrill "continue[d] to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal," and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent . . . earnings power."

259.    Analysts took Thain's misleading statement to mean that Merrill had significantly improved its financial prospects in cleaning house, and that it might even turn a profit in the fourth quarter.

260.    As an example, Credit Suisse reported the same day that  "The strongest positive in the quarter was the progress made on working down the investment bank's 'high risk' inventory. . . . With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%."

261.    Deutsche Bank similarly expressed the general understanding of the investment community, stating on the same day, "Merrill's quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America."  The report forecasted earnings of $0.54 per share for the fourth quarter.  The next day Buckingham Research Group published a report in which

they said that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter. That same day, Thomson First Call consensus estimates stated that Merrill would have positive earnings of $0.44 per share in the fourth quarter. Finally, on October 19, 2008, Oppenheimer concluded that Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet . . . ahead of the pending merger with Bank of America."

262.    Thain's statements were materially false and misleading, because despite public statements about "reduce exposures" and "deleverage the balance sheet," Merrill had retained enough toxic assets to make BofA top executives read Merrill's terrifying losses lurking between the lines of Merrill's financial reports and "weep" just days later. Despite Thain's sunny statements, Merrill had retained enough toxic assets on its books to cause $7 billion losses in October and more than $21 billion by the time the Merger was consummated.

263.    Merrill also reported its third-quarter numbers in its November 5th 10-Q, which was incorporated prospectively by reference into the Proxy. The 10-Q stated that on "September 26, 2008, Merrill conducted a goodwill impairment test . . . Based on this analysis, Merrill Lynch determined that there was no impairment of goodwill." It continued, "given the continued challenging conditions in the financial markets and the related impact on the market value of financial institutions, we will perform an interim impairment test for goodwill in the fourth quarter of 2008, which could result in an impairment charge."

264.    These statements were materially false and misleading because just one week after the 10-Q was filed, BofA had determined that Merrill would have to take a write-down to one of its divisions in the fourth quarter. By November 20, 2008, BofA knew the precise amount

of the write-down \$2.3 billion, and yet failed to report the impairment charge to shareholders in advance of the vote.

### F.    THE NOVEMBER 3 FINAL PROXY

265.    BofA filed a Preliminary Proxy on October 2, 2008, and two amendments on Forms S-4/A on October 22 and 29, 2008. BofA and Merrill filed a Joint Proxy on November 3, 2008, which included the Merger Agreement, with the SEC on Form DEFM14A, and mailed it to shareholders. The Definitive Proxy was also filed as a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3). The cover letter to the Definitive Proxy was signed by Lewis and Thain, and set forth the background of the Merger, the terms and conditions of the Merger, and the reasons why both the boards of directors of Merrill and BofA recommended that shareholders vote in favor of the Merger. According to the Proxy, the shareholder meetings to vote on the Merger were set for December 5, 2008.

266.    The Proxy expressly warned shareholders, in its opening pages, to rely only "on the information contained or incorporated by reference into this document."

267.    The Proxy did not disclose the extent of Merrill's losses, even though they were highly material – and, to an extent, known as of the date of the mailing to the shareholders. Merrill had suffered more than \$7 billion in losses in October alone – before the November 3 filing of the Proxy, which was a highly material amount that Defendants were required to disclose, given the fact that it was almost a tenth of the deal value at the time the Merger Agreement was inked, and that the losses were regarded as highly material both within BofA at the time and in hindsight by government regulators. At the very least, the fact that Merrill's losses continued to accelerate after October triggered Defendant's duty to update their statements on the deal, as Rule 14a-9 requires that Defendants update in proxy supplements "any statement in any earlier communication with respect to the solicitation of a proxy . . . which has become

70

materially false or misleading." Nor did the Proxy disclose that Merrill was marking billions of dollars of assets at inappropriately high levels that would lead to substantial markdowns.

268.    As the rapidly-rising losses at Merrill mounted by mid-November 2008 to $9 billion, Defendants did nothing to disclose them. Nor did Defendants disclose the losses at the end of November, which saw an additional $4 billion in losses and a $2 billion goodwill impairment. At the beginning of December, days before the shareholder vote, Defendants had not disclosed Merrill's staggering losses of $15.3 billion in total losses in October and November 2008, never mind the projections of billions of dollars of losses in December.

269.    The Proxy contained several materially false and misleading statements concerning the expected accretive/dilutive impact of the Merger. For example, the Board included among its "Reasons For The Merger" "the fact that application of such potential expense savings and other transaction−related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third−party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010."

270.    Further, the Proxy included the opinions of BofA's and Merrill Lynch's financial advisors. Both of BofA's financial advisors found that the Merger would be only marginally dilutive to BofA' shareholders in 2009 and accretive by 2010. Specifically, according to the Proxy, "each of FPK and J.C. Flowers determined that the merger would be 2.5% dilutive to Bank of America's consensus analyst estimated EPS in 2009, 0.3% accretive to Bank of America's consensus analyst estimated EPS in 2010, and increasingly accretive to Bank of America's consensus analyst estimated EPS in subsequent years."

271.   Similarly, the Proxy stated that Merrill Lynch's financial advisor, Merrill Lynch Pierce Fenner & Smith, Incorporated ("MLPFS"), had "determined that the proposed transaction would be 0.8% accretive to GAAP earnings per share in 2009 and 2.8% accretive to GAAP earnings per share in 2010."

272.   These statements in the Proxy were materially false and misleading because, as set forth in detail above, Defendants knew by the time of the December 5, 2008 shareholder vote that these statements concerning the anticipated accretive/dilutive effect of the Merger were no longer accurate, because Merrill's massive (undisclosed) losses for the fourth quarter of 2008 had significantly decreased the future earnings power of Merrill and the combined company, which was the primary driver of the accretion/dilution analysis.  Despite their actual knowledge that the previously-reported accretion/dilution analysis had become false as of the date of the December 5, 2008 shareholder vote, Defendants failed to cause the Proxy to be updated to correct the by-then false accretion/dilution analysis contained therein.

273.   The Proxy was also false and misleading because BofA failed to disclose in it the agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed. The omission from the Proxy of the Schedule describing BofA's assent to Merrill's payment of VICP bonuses and of any description of that agreement violated proxy regulations that required the proxy to furnish any such "not otherwise disclosed" schedules to a merger agreement that contain material information to an investment decision, and to provide a list briefly identifying the contents of any omitted schedules. Instead, by appending the Merger Agreement, the Proxy gave the false sense to investors that pursuant to the merger, Merrill "will not" pay any discretionary bonuses and that BofA had not given its prior written consent. Shareholders would

not have known that in fact BofA had expressly authorized Merrill to pay up to $5.8 billion in bonuses from this or any other public source.

### G.    THE PROXY SUPPLEMENTS

274.    The defendants were under a continuing duty to supplement the November 3 Proxy to correct any material misstatements or omissions therein.

275.    Several BofA executives have admitted to receiving real-time financial information from Merrill. Defendant Thain repeatedly stated that BofA knew everything that Merrill knew, when they knew it.

276.    In a restricted Federal Reserve analysis of the merger, the Fed noted: "In the merger proxy statement and investor presentations the firm explicitly asserts that it has an understanding of the outlook for the firm based on prospective economic and market conditions."

277.    On November 12, 2008, an internal Merrill estimate of October losses and forecast of November and December losses was shared with BofA executives, projecting fourth quarter losses of $9 billion. BofA did more than just review the document; it also insisted on increasing the projected losses by $2 billion, for a total of almost $11 billion. Of this "adjustment," $675 million reflected a guess related to Alt-A assets, $300 million to structured notes, and $1 billion to reflect the "gut" feeling of BofA's CAO, Neil Cotty, with respect to how much worse the numbers would get. BofA general counsel Tim Mayopoulos called outside counsel at Wachtell Lipton and reported Merrill's situation.

278.    Likewise, the New York Attorney General's investigation determined that Merrill decided on November 11, 2008 to accelerate the bonus payments. Andrea Smith, a human resources executive at BofA, testified that she knew of Merrill's undisclosed bonus plans in the first half of November. The accelerated schedule approved on Nov. 11, 2008 also made it

impossible for the bonuses to be linked to 2008 full-year performance, as had been previously represented in the Merrill disclosures that BofA expressly incorporated by reference.

279.    On November 21, 2008, nine days after BofA executives learned of the ballooning losses at Merrill and eight days after they learned of Merrill's decision to accelerate the secret bonuses, BofA filed a Proxy Supplement on Form 8-K, disclosing new events to shareholders pursuant to a memorandum of understanding with plaintiffs in a derivative case in Delaware Chancery Court.   These additional disclosures that BofA decided to make to shareholders included adding a statement about Lehman's bankruptcy, discussing the impact of a potential credit rating downgrade, changing some language to the background of the merger, offering an additional paragraph of detail about Merrill's financial advisor, and disclosing that some Merrill officers had financial interests in the merger.   These disclosures were considered material enough to warrant a Proxy Supplement, but BofA did not disclose the growing $11 billion loss at Merrill, nor the decision to accelerate the secret bonuses.

280.    The failure of the November 21, 2008 Proxy Supplement to disclose the Merrill losses or to correct earlier misstatements related to the Merrill bonuses rendered the Proxy Supplement false and misleading.

281.    Defendant Lewis testified before Congress that the failure to disclose the November 12, 2009 loss estimates and forecast was based on the advice of counsel.  However, as noted above, Chairman Kucinich noted in his opening statement at the December 11, 2009 Congressional hearings:

> The glaring omissions and inaccurate financial data in the critical November 12th forecast were so obvious that they should have . . . alerted the attorneys to the necessity of reasonable investigation before making a decision on Bank of America's legal duties to disclose. ***The apparent fact that they did not mount such an investigation makes the decision not to disclose Merrill's losses to***

***shareholders an egregious violation of securities laws.*** (emphasis added).

282.    On or before November 26, BofA became aware that the losses at Merrill were continuing to grow worse, and now were projected to be more than $13 billion (pretax) on a full-quarter basis. Yet in a letter to employees issued on November 26, the day the Fed approved the merger, Lewis wrote that BofA was "one of the strongest and most stable major banks in the world." Lewis claimed that the October 30 capital injection represented "funds that we did not need and did not seek" and that these funds were forced on BofA as part of a larger plan to "stabilize the financial markets."

283.    BofA filed this letter with the SEC on November 26, 2008, as a second Proxy Supplement pursuant to Rule 425. The letter's content was materially misleading. Although Lewis claimed that BofA did not need the additional capital, in less than a month he would be begging the federal government for even more capital to help BofA absorb the losses at Merrill. In addition, the November 26 Proxy Supplement was false and misleading because it failed to disclose the increasing losses at Merrill, and failed to correct earlier disclosures regarding the Merrill bonuses.

284.    Still further, BofA determined in November that Merrill would have to take a goodwill charge of approximately $2 billion, due in part to the failure of Merrill's acquisition of sub-prime loan originator First Franklin Financial Corporation. This charge was known prior to the November 26, 2008 Proxy Supplement, but was not disclosed, making the Proxy Supplement false and misleading.

285.    Further, because Defendants knew, no later than November 26, 2008, that the previously-disclosed accretion/dilution analysis was no longer accurate, the November 26 Proxy

Supplement was false and misleading because it failed to correct the by-then-false statements concerning the anticipated accretive/dilutive impact of the Merger.

### H.   THE DECEMBER 5, 2008 SHAREHOLDER MEETING

286.   During the December 5, 2008 Shareholder Meeting, Lewis had the following exchange with a shareholder during which Lewis falsely assured investors that BofA's accretion and dilution analysis had not changed:

> PARTICIPANT:      You didn't respond to the lady's comment. This will dilute our shares.  Will it not?  Yes or no; not in the future, someday, but this afternoon?
>
> MR. LEWIS:      *We have said as I recall in the [September 15] presentation that we will have dilution in the first year, break-even in the second; and then accretion in the third*.
>
> PARTICIPANT:      Oh good, okay….

287.   This statement was materially false and misleading because, as set forth in detail above, Lewis knew by the time of the December 5, 2008 shareholder vote that the anticipated accretion/dilution impact disclosed in the September 15, 2008 presentation was no longer accurate, because Merrill's massive (undisclosed) losses for the fourth quarter of 2008 had significantly decreased the future earnings power of Merrill and the combined company, which was the primary driver of the accretion/dilution analysis.  Under these circumstances, Lewis's statement that the Merger would result in a "breakeven" second year and an accretive third year was materially false and misleading.

### I.   SUBSEQUENT MATERIAL OMISSIONS

288.   Defendants had a duty under the federal securities laws to update or cure their misleading statements described above because additional disclosures were necessary to make the prior statements not misleading.  The Defendants failed to do so.

289. After the November 26, 2008 Proxy Supplement, but prior to the shareholder vote, Merrill's losses ballooned to approximately $14 billion.

290. During a December 3, 2008 conference call at 4pm among Lewis, Price, Thain, and Cotty, losses were adjusted up by $3 billon pretax, or $2 billion after tax. They saw projections estimating that Merrill would have a $9 billion fourth-quarter after-tax loss, and approximately $14 billion pretax. Cotty even thought losses could increase by another $1 to 3 billion after that point.

291. BofA had gotten so worried about the state of Merrill's finances that Defendant Price and an unidentified bank vice chairman sought legal advice from general counsel Tim Mayopoulos about invoking the MAC before the shareholder vote to approve the merger.

292. Merrill's slumping performance represented a fundamental change to the financial information that Bank of America provided shareholders in the November 3, 2008 Proxy. In connection with the merger, Bank of America also publicly filed a registration statement in which it represented that it would update shareholders about any fundamental changes in the information previously disclosed. The failure to disclose the ballooning losses at Merrill known prior to the shareholder vote violated this representation and violated SEC rules requiring the disclosure of material information to shareholders.

293. Further, Merrill's ballooning losses had caused the Company's previously issued statements concerning the expected accretive/dilutive impact of the Merger to have become false and misleading. Merrill's losses had significantly decreased the future earnings power of Merrill and the combined company. Because this anticipated future earnings power was the primary driver of the accretion/dilution analysis, Merrill's dramatically increased losses had markedly changed the accretion and dilution analysis. Rather than expecting the Merger to be 3% dilutive

in 2009 and breakeven in 2010, as of the December 5, 2008 shareholder vote BofA had revised its expectations such that the Merger was expected to be 13% dilutive in 2009 and 2.8% dilutive in 2010. The failure to disclose the materially changed accretion/dilution analysis prior the shareholder vote violated BofA's representation that it would update shareholders about any fundamental changes in the information previously disclosed and violated SEC rules requiring the disclosure of material information to shareholders.

294. The SEC, in a January 11, 2010 press release announcing its intention to file charges against BofA related to the mounting losses known prior to the shareholder vote, stated:

> Bank of America erroneously and negligently concluded that no disclosure concerning these extraordinary losses was required as shareholders were called upon to vote on the proposed merger with Merrill Lynch . . .

> The lack of any disclosure about the losses deprived shareholders of up-to-date information that was essential to their ability fairly to evaluate whether to approve the merger on the terms presented to them. . . .

> Bank of America's failure to disclose this information violated its undertaking to update shareholders concerning fundamental changes to previously disclosed information, and rendered its prior disclosures materially false and misleading.

## VI. **MATERIALITY**

### A. BONUSES

295. The secret schedule to the merger agreement approving up to $5.8 billion of accelerated bonuses during a year of record losses would have been considered by any reasonable shareholder important when deciding how to vote, and thus is material. $5.8 billion exceeded all of BofA's profits to that point in 2008, and was a full 12% of the merger deal price at signing. The importance of the bonus schedule only grew as the relative value increased in proportion to the declining value of the deal as BofA's share price fell.

296.     The approved bonus pool was also the equivalent of 36.2% of the monies the Treasury, through the Troubled Assets Relief Program (TARP), allocated to Merrill and awarded to BofA after the merger; and the approved bonus pool represented the equivalent of over 20% of Merrill's fourth quarter losses; and the approved bonus pool was more than *22 **times larger*** than the bonus pool at AIG ($3.6 billion versus "only" $165 million at AIG).  By any of these metrics, the bonuses were material.

297.     In its complaint filed in the Southern District of New York, the SEC charged BofA with violations of the proxy rules, asserting:

> Given the size of the discretionary bonuses Bank of America had authorized in relation to the total value of the transaction, as well as the deteriorating financial condition of Merrill and the financial markets as a whole, ***Bank of America's repeated failure to disclose that authorization to shareholders voting on the merger was material.***  (emphasis added)

298.     Merrill had also represented that bonuses are tied to performance, and would only be paid in January based on year-end results.  A reasonable shareholder also would have considered it material to his vote to know that in 2008 Merrill was authorized by BofA to act contrary to past practices and contrary to its own representations and pay the bonuses on an accelerated schedule before the fourth quarter figures were final.

299.     In his September 8, 2009 letter to BofA's outside counsel, New York Attorney General Andrew Cuomo concluded that the size and timing of the bonus payments were "material."

300.     In his February 22, 2010 opinion and order in *SEC v. Bank of America*, Judge Rakoff, in referring to both the undisclosed bonuses and the fourth quarter losses, called the Bank's refusal to concede the materiality of the nondisclosures "somewhat coy."  He wrote: "it seems ***obvious*** that a prudent Bank shareholder, if informed of the [nondisclosures], would have

79

thought twice about approving the merger or might have sought its renegotiation" (emphasis added).

## B.   FOURTH QUARTER LOSS ESTIMATES AND PROJECTIONS

301.   The losses incurred by Merrill in the fourth quarter (including the $2.3 billion goodwill impairment), and undisclosed to BofA shareholders prior to the December 5, 2008 vote, were unquestionably material, as they would have been considered by any reasonable shareholder to be important when deciding how to vote.   As New York Attorney General Andrew Cuomo charged in his February 4, 2010 complaint, BofA's "management thus left the Bank's shareholders in the dark about fundamental changes at Merrill that were *obviously important to their voting decision*." (emphasis added).

302.   Although Merrill voting shares were valued at $50 billion on the date the deal was announced, because of the fall in BofA's share price, Merrill was valued at only $19.4 billion on January 1.   The total deal price, including all Merrill securities, was $29.1 billion.   By either measure, Merrill's pre-tax loss of $21.5 billion and after-tax loss of $15.8 billion in the fourth quarter was more than half of the total value of Merrill, and the pre-tax loss actually exceeded the entire voting equity portion of the deal value.   Even the Merrill losses known prior to the shareholder vote on December 5 were approaching or already exceeding half of the deal value, and were thus clearly material.

303.   In addition, prior to the shareholder vote, BofA was so concerned with the Merrill losses that BofA executives seriously considered invoking the MAC.   By definition, if the loss data had BofA so worried that it engaged outside counsel to discuss whether it could invoke the MAC, that data would be material to investors.

304. On Sunday, December 7, only two days after shareholders approved the merger, Merrill's Corporate Controller Gary Carlin, in an email to Cotty at BofA, referred to Merrill's November numbers as "a disaster."

305. After Merrill disclosed on October 16, 2008, its third quarter loss of more than $5 billion, many analysts believed that Merrill's disclosures (which were incorporated by reference into the BofA Proxy) implied a pending fourth quarter *profit*. For instance, Credit Suisse reported in its report dated the same day that "The strongest positive in the quarter was the progress made on working down the investment bank's 'high risk' inventory. . . . With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%."

306. Deutsche Bank similarly expressed the general understanding of the investment community, stating on the same day, "Merrill's quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America." The report forecasted earnings of $0.54 per share for the fourth quarter. The next day Buckingham Research Group published a report in which they said that Merrill had "aggressively reduced its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter. That same day, Thomson First Call consensus estimates stated that Merrill would have positive earnings of $0.44 per share in the fourth quarter. Finally, on October 19, 2008, Oppenheimer concluded that Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet . . . ahead of the pending merger with Bank of America."

307. In sworn testimony, BofA's own CEO (Defendant Lewis) and CFO (Defendant Price) admitted that at the end of the third quarter of 2008, they expected Merrill to come close to breaking even in the fourth quarter.

308. Given these views from analysts and BofA's own CEO and CFO, any projected losses mounting at Merrill around this time, let alone the record losses known to BofA and Merrill, would have been considered material to shareholders at the December 5 shareholder meeting.

309. Some analysts were warning prior to December 5 of possible Merrill losses, but of any entirely different magnitude than Merrill knew internally. For instance, Citigroup analyst Keith Horowitz wrote on Dec. 2, 2008 that the firms may have combined write-downs of $5.1 billion in the fourth quarter, only $3 billion of which was at Merrill. This was the most pessimistic estimate on the street prior to the vote, and as noted above, most analysts were expecting a profit. Thus, Merrill's projected losses in excess of $12 billion were clearly material.

310. In testimony before a joint session of the House Oversight and Government Reform Committee and Domestic Policy Subcommittee ("House Committee") on June 11, 2009, Lewis admitted that a loss of $12 billion was "of consequence" to him. Before the December 5 shareholder vote, BofA already knew that Merrill's losses would exceed $12 billion.

311. According to the February 4, 2010 complaint filed by NYAG Cuomo, former BofA General Counsel Tim Mayopoulos testified that the Merrill losses known by BofA as early as November 12 required disclosure: "My reaction was that $5 billion is a lot of money, and I believe my initial reaction was that a disclosure was likely warranted." If the General Counsel thought that $5 billion was "a lot of money" and disclosure was "likely warranted," then certainly the larger losses known by December 5 were material and also warranted disclosure.

312. BofA's own auditor, Deloitte partner Thomas Graham, advised BofA that the Merrill losses were material enough to be disclosed. He testified in NYAG Cuomo's investigation that prior to the vote, he advised BofA to disclose the truth to the shareholders,

saying that the losses "were sizable enough [to] probably warrant disclosure. They were material subsequent events to what occurred at the end of September that would be relevant for parties that were voting" (emphasis added).

313.    The United States House of Representative Domestic Policy Subcommittee concluded in its Investigation Findings: "The November 12 forecast's omission of any projection for losses in CDOs and other illiquid investments, and the implication that Merrill Lynch would break even in those investments for the remainder of the quarter, was material to the advice Mayopoulos gave to Bank of America." (emphasis added).  If a flaw in the calculation of one component of the quarterly loss projection was deemed material to BofA's counsel, certainly the entire loss projection would have been material to BofA shareholders.

314.    When the SEC charged BofA with violations of Section 14(a) of the Exchange Act for failing to disclose the losses, it concluded that the information was material: "Bank of America's failure to disclose this information violated its undertaking to update shareholders concerning fundamental changes to previously disclosed information, and rendered its prior disclosures materially false and misleading." (emphasis added).

315.    In his September 8, 2009 letter to BofA's outside counsel, New York Attorney General Andrew Cuomo concluded that "those large and increasing losses" at Merrill known to Bank of America prior to the December 5, 2008 shareholder vote were "material."

316.    After the shareholders approved the deal, Defendant Lewis then told federal regulators that because half of Merrill's tangible equity had disappeared in two months, BofA could not complete the merger absent a taxpayer bailout.  According at NYAG Cuomo in his February 4, 2010 complaint, Merrill's known losses on the day of the shareholder vote were almost the same as the losses known at the time Defendant Lewis requested the bailout; the

difference was only $1.4 billion. If these losses were so large that they imperiled BofA's very existence absent a taxpayer bailout, they were clearly material. In fact, NYAG Cuomo charges that the information known to BofA management in advance of the vote was "***unquestionably material***" (emphasis added).

317.   One portfolio manager, Peter Sorrentino, summed up investor sentiment months later in an interview with Bloomberg. Referring to BofA's failure to disclose the Merrill losses, he said:

> Everyone involved knew that was a clear violation, that's material non-public information, so basically we just closed the rule book during the crisis and said we don't care, we need to keep the lights on, and we'll deal with that mañana . . . . Logic went out the window and they were just acting out of fear. [It was] completely panic mode.

## VII.   LOSS CAUSATION

318.   BofA's share price closed at $17.84 on the first full trading day after the shareholders of both companies approved the merger. Over the following month, the share price gradually declined as analysts became increasingly pessimistic about Merrill's losses, so that by January 9, 2009, the price had fallen to $12.99. As news began to leak of the full extent of the losses (and BofA finally came clean) during the week of January 12, 2009, more than half of BofA's shareholder equity was wiped out. BofA's share price fell from $12.86 at the open on Monday, January 12, 2009, to $5.10 per share at the close on January 20, 2009.

319.   The loss of shareholder value after the December 5, 2008 shareholder vote represented approximately *three times* the value of the deal itself. Even the share price decline after the January 12 leaks represented approximately *twice* the value of the deal. The *New York Times* on January 26, 2009 described the equity loss as "one of the greatest destructions of shareholder value in financial history."

320.    If shareholders had been expecting the Merrill losses announced that week, the share price would not have fallen so dramatically when the truth was finally disclosed. The final disclosure and the sudden and massive loss of shareholder value are clearly linked.

321.    82% of the votes cast on December 5, 2008 at the BofA meeting were cast in favor of the deal, so less than 33% of those votes would have had to change to block the merger. As events during the week of January 12, 2009 make plain, shareholder anger was literally unprecedented, and far more than 33% of the vote would have changed had the truth been known.

322.    For example, at the annual shareholders meeting in April 2009, BofA shareholders voted to remove Lewis from his position as Chairman of the Board. According to *BusinessWeek* magazine, this stunning vote of no confidence was the first time in American history "that a company in the Standard & Poor's 500-stock index had been forced to strip a CEO of chairman duties." On September 30, 2009, Lewis announced his resignation from the company, effective December 31, 2009.

323.    Even Defendant Lewis knew that Merrill's losses would injure BofA shareholders. During his testimony before the New York Attorney General, Lewis was asked, "Wasn't Mr. Paulson, by his instruction, really asking Bank of America shareholders to take a good part of the hit of the Merrill losses?" to which Lewis responded, "Over the short term, yes."

324.    As reported in BofA's official December 30, 2008 Board Minutes, Defendant Lewis told federal regulators that the losses at Merrill were so bad that it would have been proper to assert the material adverse change clause in the merger agreement, and he refrained from doing so only after the regulators articulated their concerns with systemic risk issues. Lewis also

told regulators that absorbing the Merrill losses would injure BofA to such a degree that it would be appropriate for the federal government to make BofA whole.

325. Given these events, it is clear that a reasonable shareholder who knew of the truth on December 5, 2008, would have voted against the merger, and certainly at least 33% of the shares cast in favor of the merger would have been changed to votes against. With the merger voted down, BofA would not have had to absorb Merrill's losses.

## VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

326. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly misleading statements pleaded in this Complaint. The statements complained of concern Merrill's financial health and historical and/or current conditions affecting the Company. Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made. To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

327. Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) should have known the statement was misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of BofA who should have known that the statement was materially misleading when made yet allowed it to be made.

## IX.    CLAIMS UNDER SECTIONS 14(A) AND 20(A) OF THE EXCHANGE ACT

328.    Plaintiffs held BofA common stock on the Record Date of October 10, 2008 and were entitled to vote on the merger between BofA and Merrill.  Plaintiffs continued to hold BofA common stock through January 1, 2009.  Plaintiffs bring claims under Sections 14(a) and 20(a) of the Exchange Act.

329.    The Defendants negligently made misstatements of material facts and omissions of material facts when soliciting shareholder approval of the merger, including the Proxy, the documents incorporated into the Proxy, the later-filed Proxy Supplements, statements made by Defendants on conference calls discussing the merger, statements made by Defendants during investor presentations discussing the merger, and statements made during the shareholder meeting at which the merger was approved.    Defendants did not update and correct these statements (as they were required to by law) in the Proxy Supplements which were filed after the previous misstatements and omissions.  Further, these later-filed Proxy Supplements themselves contained material misstatements and omissions.  Defendants also did not update their statements prior to the shareholder vote to temper their optimistic opinions about the strength of the merger and its value to BofA shareholders (as they were required to by law) when Defendants experienced a "change of heart" about the merits of the transaction.  Defendant Lewis made an affirmatively false statement at the very meeting at which BofA's shareholders voted to approve the merger.

330.    Defendants' proxy solicitations contained statements which inevitably colored the market's view of the deal and encourage BofA shareholders to vote in favor of the merger, as detailed above.

331.    Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, and to update and/or correct any misleading

statements that they had made. Defendants negligently violated their duty by failing to disclose any of the omitted facts before the shareholder vote. It is not as if Defendants lacked an opportunity to do so. Indeed, Defendants updated the Proxy twice, on November 21 and November 26, 2008, without disclosing any of the material facts described above that had been originally omitted from the Proxy.

332.    Defendants also had a duty to correct and update the Proxy Solicitations, which also contained numerous statements which were either materially misleading at the time they were made or were rendered misleading by subsequent events. These materially misleading statements included the following:

a.    The September 15, 2008 misstatements about BofA's "very, very extensive" due diligence of Merrill, including a "comprehensive" analysis of Merrill's financial condition. These statements were materially misleading when made because Lewis has confirmed that BofA's due diligence was inadequate. Federal regulators also confirmed this fact after reviewing BofA's due diligence efforts.

b.    The September 15, 2008 statements issued by BofA concerning the benefits of the merger to BofA's shareholders, including that the merger would create the "leading financial institution in the world," was a "great opportunity" for shareholders, and made BofA more "valuable." These statements were misleading because Defendants had failed to adequately consider the risks posed by Merrill's portfolio of toxic assets and therefore had no reasonable factual basis to make these statements. Defendants also had a duty to update or cure these misstatements concerning the effects of the merger as they were aware, before the shareholder vote, that Merrill's devastating losses would materially and adversely impact BofA's financial condition.

c.    The September 15, 2008 misstatements about Merrill's "dramatically" reduced "risk profile." These statements were materially misleading, considering the inadequacy of BofA's due diligence. Indeed, in October 2008, mere weeks after Defendants made these statements, Merrill experienced the worst month in its history by incurring $7 billion of losses on high-risk assets that existed as of September 15, 2008; similarly Merrill's perilous losses in the fourth quarter of 2008 were due almost entirely to "legacy positions" that Merrill held as of September 15, 2008, according to Thain; furthermore, Thain was aware that Lehman's bankruptcy on September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets;" and Federal Reserve officials reviewed Merrill's assets and financial condition, and concluded in mid-December 2008 that Merrill had retained tens of billions of dollars of high-

risk exposures. At no time before the shareholder vote did Defendants correct or cure these misstatements, despite having ample opportunity to do so.

d. The September 15, 2008 misstatement that BofA and Merrill faced "absolutely no pressure" from federal regulators to finalize the merger. In reality, Secretary Paulson was adamant that the parties finalize the transaction before the markets opened on Monday, September 15, 2008, given that weekend's discussions by the chiefs of various Wall Street banks of Merrill's perilous financial condition and likely collapse given the example of Lehman Brothers the week before.

e. The September 15, 2008 misstatements the day the merger was announced that Merrill had "the liquidity and capacity" to survive the market turmoil as an independent entity to justify the substantial premium that BofA had agreed to pay for Merrill. Thain subsequently admitted that Merrill's situation was dire and that it would have become insolvent as early as the morning of September 15, 2008 in part because Lehman's bankruptcy would have a catastrophic effect on Merrill because of the volume of toxic assets Merrill still carried on its balance sheets.

f. Thain's assurances on September 15, 2008 that he had not sought to pursue his own self-interests in negotiating the merger because "it was never about him; it was always about the deal." In fact, much of the merger negotiations related to the discretionary bonuses to Merrill executives and employees that Merrill was planning to pay and ensuring that these bonuses were paid well ahead of schedule and that certain of Thain's colleagues and top employees were assured hundreds of millions of dollars' worth of this pool. Thain also delayed the signing of the Merger agreement by insisting on tens of millions of dollars in personal compensation in connection with the merger.

g. The September 15, 2008 statements that the merger was expected to be 3% dilutive in 2009 and breakeven in 2010.

h. Defendant Price's October 6, 2008 statement that the $10 billion Secondary Offering "covered [BoA's] anticipated [capital] needs from a Merrill standpoint." BofA's capital needs in connection with the merger had actually exceeded by late November 2008 the capital it had raised in the Secondary Offering. Defendants had a duty to cure or update this statement by the shareholder vote on December 5, which they failed to do.

i. Defendant Thain's October 16, 2008 statement that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" prior to the merger's close. This statement was materially misleading because Thain himself admitted that almost all of the losses Merrill suffered at an accelerated pace in the fourth quarter arose from "legacy" positions that Merrill had retained. Indeed, Merrill had retained significant amounts of toxic assets on its balance sheet, which led to its $7 billion of losses by October. Even federal regulators concluded that Merrill retained a dangerously high risk profile as of October 2008 after examining its financial position.

j.  The misstatements in the Proxy that Merrill's bonuses would be "paid in January for performance in the prior fiscal year," when in fact 2008 bonuses were scheduled to be paid early, before the close of the fourth quarter and fiscal year.

k.  The misstatements in the Merger Agreement and Proxy that Merrill "shall not" and "will not" pay any discretionary bonuses before the merger closed without BofA's prior written consent, despite the fact that BofA had already approved both the payment of up to $5.8 billion in bonus compensation for Merrill's employees and an accelerated schedule to pay the bonuses in December, before the merger closed.

l.  The false statements made by Lewis during the December 5, 2008 shareholder meeting that the accretion/dilution analysis disclosed in September 2008 had not changed and that the merger was expected to be dilutive in the first year, breakeven in the second year, and accretive in the third year.

m.  Despite the fact that a material adverse change had occurred in Merrill's financial condition before the vote, the Proxy and November 26, 2008 Proxy Supplement contained multiple misstatements, including that there was an "absence of material adverse changes" in Merrill's financial condition that was "disproportionately adverse" to its peer institutions; that BofA and the combined company had a "strong capital position, funding capabilities, and liquidity;" and that BofA was "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world." The truth was that the combined company was so weak that it needed massive government assistance, and the deal would materially and negatively impact BofA's financial condition because Merrill had already suffered $7 billion in losses at the time the Proxy was filed on November 3, 2008. This amount was almost equal to BofA's pre-tax income for the first three quarters of 2008. Merrill's losses were also growing – by December 5, 2008, Merrill's pre-tax losses had ballooned to $15.3 billion and had triggered debate within BofA as to whether to invoke the Merger Agreement's MAC. Finally, even federal regulators conceded that BofA's capital levels were "very thin" and that BofA was unprepared for further deterioration, which was certain to occur with the Merrill acquisition. Defendant Lewis himself admitted in the BofA Board Minutes of December 30, 2008, that the losses were material, that it was "appropriate that the federal government make [BofA] whole for the deterioration in Merrill Lynch's operating results and financial condition." Lewis, just days after the vote, decided to invoke the MAC because of BofA's inability to absorb Merrill's losses, in order to force the government to give a $138 billion bailout to BofA.

333.  These misstatements and omissions proximately caused foreseeable losses to Plaintiffs once the risks concealed by these misleading statements and omissions materialized through leaks and a series of partial disclosures. As a result of the disclosures, BofA stock

dropped from $17.84 on December 8, 2008 (the first full trading day after the shareholder vote) to $5.10 on January 20, 2009.

## COUNT I
### For Violations of Section 14(a) of the Exchange Act
### (Against All Defendants)

334.    Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

335.    This cause of action is asserted by Plaintiffs against all Defendants, based on the negligent misstatements of material facts in the Proxy, documents attached thereto, documents incorporated by reference therein, and negligent misstatements of material facts made during the September 15, 2008 Press Conference, Investor Call and Investor Presentation, and at the December 5, 2008 shareholder meeting. The Proxy and attached and incorporated documents also negligently omitted material facts required to be stated in order to correct or cure the statements contained in it.

336.    Defendants were negligent in failing to update or cure the Proxy, documents attached thereto, and documents incorporated by reference therein, and in failing to correct misstatements made during the September 15, 2008 Press Conference, Investor Call and Investor Presentation, and during the December 5, 2008 shareholder meeting when material information arose after the publication of these documents, but before the shareholder vote on December 5, 2008.

337.    Defendants, jointly and severally, solicited and/or permitted their names to be used in solicitations contained in the Proxy.

338.    BofA and Merrill are issuers of the Proxy.

339. BofA and Merrill permitted the use of their names in the Proxy and allowed the Proxy to represent that neither company had experienced material adverse effects, and that Merrill would not pay discretionary bonus compensation without BofA's approval.

340. Defendant Lewis signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy and permitted the use of his name in the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Call, Investor Presentation, Press Conference, Press Release, and during the December 5, 2008 Shareholder Meeting.

341. Defendant Thain signed the cover letter for the Proxy and permitted the use of his name in the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Call, Investor Presentation, Press Conference, and Press Release.

342. Defendant Price signed the Proxy Registration Statement and subsequent amendments, and solicited the votes of shareholders in the September 15, 2008 Investor Call, and Press Release.

343. Defendant Cotty signed the Proxy Registration Statement and subsequent amendments.

344. The BofA Board Defendants signed the Proxy Registration Statement and subsequent amendments, and permitted the use of their names by, among other things, allowing the Proxy to represent that they recommended the merger.

345. By means of the Proxy and documents attached to it or incorporated by reference to it and other statements made to BofA shareholders during the September 15, 2008 Press Conference, Investor Call and Investor Presentation and during the December 5, 2008

92

shareholder meeting, Defendants solicited proxies and sought to secure Plaintiffs' approval of the merger.

346.    All Defendants negligently made misleading statements of material facts, or negligently omitted material facts required to be stated in order to make the statements not misleading, and negligently failed to update their statements with material information that arose after the statements were made and before the December 5, 2008 shareholder vote, in the proxy statement filed in connection with the Merger concerning the terms of the Merger agreement and the financial condition of Merrill.

347.    Defendants Lewis and Thain additionally made misleading statements of material facts, or negligently omitted material facts required to be stated in order to make the statements not misleading, and negligently failed to update their statements with material information that arose after the statements were made and before the December 5, 2008 shareholder vote, during the September 15, 2008 Investor Presentation and Press Conference.

348.    Defendant Price additionally made misleading statements of material facts, or negligently omitted material facts required to be stated in order to make the statements not misleading, and negligently failed to update their statements with material information that arose after the statements were made and before the December 5, 2008 shareholder vote, during the September 15, 2008 Investor Call.

349.    Defendant Lewis additionally made misleading statements of material facts, or negligently omitted material facts required to be stated in order to make the statements not misleading, and negligently failed to update his statements with material information, during the December 5, 2008 shareholder meeting.

350.     These solicitations were essential links in the accomplishment of the merger, and as a result the BofA shareholders approved the merger.

351.     Plaintiffs, who were eligible to vote on the merger, were denied the opportunity to make an informed decision and were damaged as a direct and proximate result of the misleading statements and omissions made by Defendants.

352.     This claim is made within the applicable statute of limitations.

353.     By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rules 14a-3 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.14a-3 and 240.14a-9.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

354.     Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

355.     This cause of action is asserted by Plaintiffs against Defendants Lewis, Price, Thain and Cotty, based on the negligent misstatements of material facts in the Proxy, documents attached thereto, and documents incorporated by reference therein, and in failing to correct misstatements made during the September 15, 2008 Press Conference, Investor Call and Investor Presentation and during the December 5, 2008 shareholder meeting. The Proxy and attached and incorporated documents also negligently omitted material facts required to be stated in order to correct or cure the statements contained in it.

356.     Defendants negligently failed to update or cure the Proxy or to correct statements made during the September 15, 2008 Press Conference, Investor Call and Investor Presentation and during the December 5, 2008 shareholder meeting when material information arose after the publication of these documents, but before the shareholder vote on December 5, 2008.

94

357.    Defendants, jointly and severally, solicited and/or permitted their names to be used in solicitations contained in the Proxy.

358.    BofA and Merrill are issuers of the Proxy.

359.    BofA and Merrill permitted the use of their names in the Proxy and allowed the Proxy to represent that neither company had experienced material adverse effects, and that Merrill would not pay discretionary bonus compensation without BofA's approval.

360.    Defendant Lewis signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy and permitted the use of his name in the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Call Investor Presentation, Press Conference, and Press Release,and during the December 5, 2008 Shareholder Meeting.

361.    Defendant Thain signed the cover letter for the Proxy and permitted the use of his name in the Proxy, and solicited the votes of shareholders in the September 15, 2008 Investor Presentation, Investor Call, and Press Conference.

362.    Defendant Price signed the Proxy Registration Statement and subsequent amendments, and solicited the votes of shareholders in the September 15, 2008 Investor Call and during the October 6, 2008 conference call.

363.    Defendant Cotty signed the Proxy Registration Statement and subsequent amendments.

364.    The BofA Board Defendants signed the Proxy Registration Statement and subsequent amendments, and permitted the use of their names by, among other things, allowing the Proxy to represent that they recommended the merger.

365.     By means of the Proxy and documents attached to it or incorporated by reference to it and by means of the statements made during the September 15, 2008 Press Conference, Investor Call and Investor Presentation and during the December 5, 2008 shareholder meeting, Defendants solicited proxies and sought to secure Plaintiffs' approval of the merger.

366.     All Defendants negligently made misleading statements of material facts, or negligently omitted material facts required to be stated in order to make the statements not misleading, and negligently failed to update their statements with material information that arose after the statements were made and before the December 5, 2008 shareholder vote, in the proxy statement filed in connection with the Merger and/or during the September 15, 2008 Press Conference, Investor Call, Investor Presentation, and the December 5, 2008 shareholder meeting concerning the terms of the Merger agreement and the financial condition of Merrill.

367.     These solicitations were essential links in the accomplishment of the merger, and as a result the BofA shareholders approved the merger.

368.     Plaintiffs, who were eligible to vote on the merger, were denied the opportunity to make an informed decision and were damaged as a direct and proximate result of the misleading statements and omissions made by Defendants.

369.     This claim is made within the applicable statute of limitations.

370.     By reason of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Awarding all damages and other remedies set forth in the Exchange Act in favor of Plaintiffs against Defendants in an amount to be proven at trial, including interest thereon;

B.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

C.     Awarding Plaintiffs such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: New York, New York
July 26, 2012

**SUSMAN GODFREY L.L.P.**
STEPHEN D. SUSMAN
HARRY P. SUSMAN
ALEXANDER L. KAPLAN
654 Madison Av., 5th Fl.
New York, NY 10065-8404
(212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiffs Jerry E. Finger,*
*Finger Interests Number One, Ltd,*
*Ambassador Life Insurance Company, Select*
*Investors Exchange Fund, L.P., Richard*
*Finger, JEF Family Trust, 1976 Real Estate*
*Trust, Walter G. Finger, The Jerry E. Finger*
*Family Trust D/T/D 12/28/1989, The Jerry E.*
*Finger 1976 Real Estate Trust, Leo R.*
*Jalenak, Peggy E. Jalenak and KERS & Co.,*
*and Co-Liaison Counsel for the Individual*
*Actions*

OF COUNSEL:

**DIAZ, REUS & TARG, LLP**
Alexander Reus
100 SE Second Street, Suite 2610
Miami, FL 33131

*Counsel for Plaintiffs International Fund*
*Management S.A., Deka International*
*Luxemburg S.A., and Deka Investment*
*GmbH*

**GRANT & EISENHOFER P.A.**

JAY W. EISENHOFER
DANIEL L. BERGER
BRENDA F. SZYDLO
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

AND

JEFFREY A. ALMEIDA
CHRISTINE M. MACKINTOSH
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

*Attorneys for Plaintiffs ABP, International*
*Fund Management S.A., Deka International*
*Luxemburg S.A., Deka Investment GmbH,*
*Aaron M. Katz, Joel R. Katz (Individually and*
*As Trustee For Margolin Family Trust A,*
*Margolin Family Trust B, and Joel R. Katz*
*Family Trust), Martin I. Fineberg, Jeremy*
*Fineberg, Sylvia Weissmann, Parker Family*
*Investments LLC, Jeffrey R. Parker, The*
*1991 Jeffrey R. Parker Family Trust, Drew E.*
*Parker, The 1994 Drew E. Parker Family*
*Trust, Keith D. Parker, Julie M. Sorin, The*
*1994 Julie P. Mantell Family Trust, Michael*
*A. Parker, Mark D. Wender, Elliot Wender,*
*Penina Wender, Jill W. Goldstein, Stanley L.*
*Wender, and Razelle M. Wender; and Co-*
*Liaison Counsel for the Individual Actions*

98

**Certificate of Service**

I hereby certify that on July 26, 2012, the attached Fourth Amended Consolidated Complaint was served via email on the following parties:

Lewis J. Liman
CLEARY GOTTLIEB STEEN &
HAMILTON, LLP
One Liberty Plaza
New York, NY 10006
212-225-2000
212-225-3499 (fax)
lliman@cgsh.com

Brad S. Karp
Theodore V. Wells Jr.
Daniel J. Kramer
Walter Rieman
Marc Falcone
Audra J. Soloway
Meredith A. Arfa
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 255-1632
dkramer@paulweiss.com

Peter C. Hein
Eric M. Roth
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street New York, NY 10019
(212) 403-1000

(Counsel to Bank of America Corp., William Barnett, III, Frank Bramble, Sr., John T. Collins, Neil Cotty, Gary Countryman, Gen. Tommy Franks, Charles Gifford, Kenneth Lewis, Monica Lozano, Walter Massey, Thomas May, Patricia Mitchell, Thomas Ryan, O. Temple Sloan, Meredith Spangler, Robert Tillman and Jackie Ward)

David S. Hoffner
Andrew Levander
Jennie B. Krasner
DECHERT, LLP
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 891-9431
(212) 891-9598 (fax)
david.hoffner@dechert.com

(Counsel for Jonathan Thain)


David C. Ware
Gregory F. Smolar
Mary Jo White
Andrew J. Ceresney
Sok T. Tea
Colby A. Smith
DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Phone: 212-909-6000
Fax: 212-909-6836
dcware@debevoise.com
gfsmolar@debevoise.com
mjwhite@debevoise.com
ajceresn@debevoise.com
sttea@debevoise.com
casmith@debevoise.com

(Counsel for Kenneth Lewis)

Bradford Berry
William H. Jeffress, Jr.
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7921
(202) 585-4060 (fax)
william.jeffress@bakerbotts.com

Julia E. Guttman
BAKER BOTTS L.L.P
30 Rockefeller Plaza
New York, NY 10112
202-639-7751
202-585-1087 (fax)
julia.guttman@bakerbotts.com

(Counsel for Joel Price)

_____
Daniel L. Berger