Exhibit A

EXECUTION COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
                                                    :
                                                    :
IN RE BANK OF AMERICA CORP.                         :
SECURITIES, DERIVATIVE, AND                         :
EMPLOYEE RETIREMENT INCOME                          :
SECURITY ACT (ERISA) LITIGATION                     :          Master File
                                                    :       No. 09 MD 2058 (PKC)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                               ECF CASE
                                                    :
THIS DOCUMENT RELATES TO                            :
                                                    :
Consolidated Derivative Action                      :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION AND AGREEMENT OF
## COMPROMISE, SETTLEMENT AND RELEASE

This Stipulation and Agreement of Compromise, Settlement and Release (the

"Stipulation" or the "Settlement") is entered into by counsel for the plaintiffs and defendants in

this consolidated derivative action, styled *In re Bank of America Corp. Securities, Derivative and*

*Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (the

"Derivative Action"), and counsel for Bank of America Corporation ("BAC" or the "Bank"), and

is hereby submitted for approval by the Court.

**WHEREAS**:

A.      On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc. ("Merrill") in a

stock-for-stock transaction (the "Merger").

B.      Beginning on or about January 22, 2009, various BAC stockholders filed putative

stockholder derivative lawsuits, securities class actions, ERISA class actions and individual

actions related to the Merger in various jurisdictions, including this Court, against various

combinations of BAC and Merrill, their officers and directors and certain other defendants,

alleging, among other things, that certain material information was omitted from the joint definitive proxy statement filed with the United States Securities and Exchange Commission and mailed to stockholders on November 3, 2008 seeking shareholder consent for the issuance of shares necessary to consummate the Merger and certain other related matters (the "Proxy Statement") and that the individual defendants breached their fiduciary duties in connection with the Merger.

C.      On June 30, 2009, the Court issued an Opinion ordering that, among other things: (a) the various derivative actions before it be consolidated into the Derivative Action; (b) Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System be appointed interim lead plaintiffs in the Derivative Action ("Plaintiffs"); and (c) the law firms of Kahn Swick & Foti, LLC and Saxena White P.A. be appointed as interim lead counsel in the Derivative Action ("Lead Counsel").

D.      On July 29, 2009, the Court entered a Consolidation Order, consolidating the following derivative actions into the Derivative Action: *Louisiana Municipal Police Employees Retirement System v. Lewis, et al.*, No. 09 Civ. 808; *Waldman v. Lewis, et al.*, No. 09 Civ. 834; *Hollywood Police Officers' Retirement System v. Lewis, et al.*, No. 09 Civ. 1174; *Siegal v. Lewis, et al.*, No. 09 Civ. 1331; *Smith v. Lewis, et al.*, No. 09 Civ. 1333; *Lehmann v. Lewis, et al.*, No. 09 Civ. 1434; *Young v. Lewis, et al.*, No. 09 Civ. 1561; *Anderson v. Lewis, et al.*, No. 09 Civ. 1572; *West Palm Beach Firefighters Pension Fund v. Lewis, et al.*, No. 09 Civ. 2581; and *Westmoreland County Employee Retirement System v. Lewis, et al.*, No. 09 Civ. 2609.  The Consolidation Order also provided that the Derivative Action be coordinated for pretrial purposes with the related consolidated securities and ERISA actions under the same caption, *In*

*re Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC).

E.      On October 9, 2009, Plaintiffs filed a consolidated complaint in the Derivative Action (the "Complaint"), naming as defendants Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward (collectively, "Defendants" and, with Plaintiffs, the "Parties"), among others, and alleging generally, purportedly on behalf of BAC, violations of Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), in connection with the Proxy Statement, breaches of fiduciary duty under state law in connection with the Merger and other claims.

F.      On December 8, 2009, Defendants moved to dismiss certain claims in the Derivative Action.

G.      On August 18, 2010, Lead Counsel engaged in a caucus session with the Hon. Layn R. Phillips (Ret.), in Chicago, Illinois regarding preliminary terms upon which this Action might be settled.

H.      On August 27, 2010, the Court granted in part and denied in part Defendants' motion to dismiss, holding that a pre-litigation demand on the BAC board of directors was excused and permitting Plaintiffs to pursue the claims asserted in the litigation on the Bank's behalf.

I.      Extensive discovery has been conducted in connection with the Derivative Action and related proceedings.  Lead Counsel have reviewed more than 2.5 million pages of documents produced in the Derivative Action and other civil and regulatory proceedings related to the

Merger; participated in, and/or reviewed copies of transcripts of, more than 100 depositions of Defendants and other relevant witnesses taken in connection with the various civil and regulatory proceedings related to the Merger; and retained and worked with experts to evaluate issues of causation and damages and to evaluate Defendants' conduct in connection with the Merger and advise on potential corporate governance reforms.

J.      Since the fall of 2011, counsel for the Parties have engaged in arm's-length discussions and negotiations regarding a potential resolution of the Derivative Action, on the basis of certain corporate-governance reforms at BAC and/or certain monetary consideration to be paid on behalf of Defendants by BAC's insurance carriers that provide coverage applicable to the claims asserted in the Derivative Action (the "D&O Carriers"), pursuant to the terms of the relevant policies.

K.      On February 29, 2012, counsel for the Parties and the D&O Carriers participated in a mediation, conducted by Judge Phillips, regarding the monetary consideration to be included in a settlement of the Derivative Action.

L.      Following the February 29, 2012 mediation, counsel for the Parties continued to have discussions regarding issues related to a settlement of the Derivative Action, including further negotiation through Judge Phillips regarding the monetary consideration to be included in any such settlement.

M.      As a result of the Parties' arm's length discussions and negotiations, including during and subsequent to the February 29, 2012 mediation, the Parties reached an agreement providing for the settlement of the Derivative Action on the terms and conditions set forth below, which will include but not be limited to a release of all claims in the Derivative Action.

N.      On April 12, 2012, the Parties entered into a memorandum of understanding (the "MOU") setting forth the material terms of the Settlement.

O.      Lead Counsel have thoroughly reviewed and analyzed the facts and circumstances relating to the claims asserted in the Derivative Action, including conducting arm's length discussions with counsel to Defendants, reviewing publicly available information, analyzing the extensive discovery record, reviewing applicable case law and other authorities and consulting with retained experts.  Plaintiffs brought their claims in good faith and continue to believe that their claims have legal merit.  However, Plaintiffs recognize that there are legal and factual defenses to the claims asserted in the Derivative Action, which present substantial risks to the successful resolution of any litigation, especially in complex shareholder derivative litigation such as the Derivative Action.  Accordingly, in light of these risks and based on their evaluation of the claims and their substantial experience, Lead Counsel have determined that the Settlement, which confers substantial benefits upon BAC and its stockholders, is fair, reasonable and adequate, and in the best interests of the Bank and its stockholders.

P.      Defendants have vigorously denied, and continue vigorously to deny, all allegations of wrongdoing, fault, liability or cognizable damage to BAC, deny that they engaged in any wrongdoing, deny that they committed any violation of law, deny that the Proxy Statement is in any way deficient, deny that they acted improperly in any way, believe that they acted properly at all times, believe the Derivative Action has no merit, and maintain that they have committed no disclosure violations or any other breach of duty whatsoever in connection with the Merger or any related disclosures.  Defendants are entering into this Settlement solely because they consider it desirable that the Derivative Action be settled and dismissed with prejudice in order to, among other things, (i) eliminate the burden, inconvenience, expense,

5

uncertainty and distraction of further litigation; and (ii) finally put to rest all claims that were or could have been asserted against Defendants in the Derivative Action.

Q.     Based on the foregoing, the Parties believe that it is reasonable and appropriate to seek approval of the Settlement by the Court based upon the terms set forth herein and the benefits and protections to be provided thereby.

**NOW THEREFORE, IT IS STIPULATED AND AGREED**, subject to approval by the Court pursuant to Federal Rule of Civil Procedure 23.1, by and between the undersigned counsel for the Parties, in consideration of the benefits flowing to the Parties from, and as described in, the Settlement, that all Released Claims (as defined below) shall be and hereby are fully and finally compromised, settled, released and discontinued, and that the Derivative Action shall be dismissed with prejudice on the merits and without costs (except as provided herein) as to all Released Parties upon the terms and conditions herein.

## <u>DEFINITIONS</u>

In addition to the terms defined above, the following additional terms shall have the meanings specified below:

1.     "Delaware Action" means the pending derivative action in the Court of Chancery for the State of Delaware, styled *In re Bank of America Corp. Stockholder Derivative Litigation*, C.A. No. 4307-CS.

2.     "Final Approval" of the Settlement means the date, following the Court's entry of the Order and Final Judgment, on which the Order and Final Judgment is final and no longer subject to appeal or further review, whether as a result of affirmance on or exhaustion of any possible appeal or review, lapse of time or otherwise, *provided, however*, and notwithstanding any provision to the contrary in this Settlement, Final Approval of the Settlement shall not

6

include, and the Settlement is expressly not conditioned upon, the approval of an application for attorneys' fees and the reimbursement of expenses to Lead Counsel as contemplated in Paragraph 26 below or any appeal or further review related thereto.

3.      "North Carolina Action" means the pending derivative action in the Superior Court for the State of North Carolina, styled *Cunniff v. Lewis*, No. 09 CVS 3978.

4.      "Notice" means the Notice of Settlement of Stockholder Derivative Litigation, substantially in the form attached hereto as Exhibit C.

5.      "Notice Costs" means the costs and expenses incurred in providing notice of the Settlement to BAC stockholders.

6.      "Order and Final Judgment" means an order entered by the Court, substantially in the form attached hereto as Exhibit E, finally approving the Settlement and dismissing the Derivative Action with prejudice on the merits and without costs to any party (except as provided in Paragraphs 21 and 26 below).

7.      "Person" means any individual, corporation, professional corporation, limited-liability company, partnership, limited partnership, limited-liability partnership, association, joint-stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives or assignees.

8.      "Preliminary Approval Order" means an order entered by the Court, substantially in the form attached hereto as Exhibit B, setting forth the date for a Settlement Hearing on the proposed Settlement, directing notice thereof and preliminarily determining, for purposes of the Settlement only, that the Derivative Action is properly maintained as a shareholder derivative action on behalf of BAC.

9.      "Released Claims" means any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, matters, issues and controversies of any kind, nature or description whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims (defined below), whether based on state, local, foreign, federal, statutory, regulatory, common or other law or rule, brought or that could be brought derivatively or otherwise by or on behalf of BAC against any of the Released Parties (defined below), which now or hereafter are based upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims or any other matters, things or causes whatsoever, or any series thereof, that are, were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved or referred to in the Derivative Action and relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding, including, without limitation, any and all claims by or on behalf of BAC which are based upon, arise out of, relate in any way to, or involve, directly or indirectly:  (i) the Merger; (ii) the Proxy Statement, including all supplements thereto, or any other disclosures or purported omissions relating, directly or indirectly, to the Merger, the performance or financial condition of Merrill prior to the closing of the Merger or any governmental assistance contemplated or provided, in whole or in part, in connection with the Merger; or (iii) any of the allegations in any complaint or amendment(s) thereto filed in the Derivative Action, the Delaware Action, the

8

North Carolina Action, or any action consolidated into any such actions; *provided, however*, that the Released Claims shall not include (a) claims to enforce this Settlement or (b) any claims (other than claims for relief predicated on an alleged misrepresentation or omission after September 14, 2008 or claims released pursuant to the Order and Final Judgment in the action captioned, *County of York Employees Retirement Plan v. Merrill Lynch & Co., Inc. et al.*, C.A. No. 4066-VCN (Del. Ch. Aug. 31, 2009)) against any current or former director, officer or employee of Merrill based on any alleged breach prior to January 2, 2009 of any alleged duty to Merrill or its stockholders that have been asserted in (i) the Verified Third Amended Shareholder Derivative and Class Action Complaint filed on July 27, 2009 in the action captioned, *In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litigation*, No. 07 Civ. 9696 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the caption, *Sollins v. O'Neal et al.*, No. 11-1589, or (ii) the Amended Complaint filed on September 14, 2009 in the action captioned, *Lambrecht v. O'Neal et al.*, No. 09 Civ. 8259 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the caption, *Lambrecht v. O'Neal et al.*, No. 11-1285.  For the avoidance of doubt, the Released Claims do not include (1) any direct claims on behalf of present or former BAC stockholders that are being prosecuted in the individual and class actions that have been coordinated for pretrial purposes with the derivative action under the caption, *In re Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC) (the "Securities Actions"); (2) in the event of an adverse judgment in the Securities Actions, claims, if any, by BAC to recover fees and expenses advanced by BAC in the Securities Actions against any person for whom BAC has advanced fees and expenses in such actions; (3) in the event of a payment of money damages by

9

BAC in satisfaction of a judgment against BAC in the Securities Actions, claims, if any, by BAC for contribution; or (4) any derivative claims related to Bank of America's residential loan activities that have been or might be asserted in the action captioned, *American European Insurance Company, et al. v. Moynihan, et al.*, C.A. No. 7436, which is currently pending in the Court of Chancery of the State of Delaware.

10.　　"Released Parties" means (i) Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward; (ii) any other individual or entity that was originally named as a defendant in the Derivative Action or any of the constituent actions underlying the Derivative Action, the Delaware Action, the North Carolina Action or any action consolidated into any such actions; (iii) all other current and former employees, officers, directors and advisers of BAC and Merrill, to the extent of any claimed liability relating, directly or indirectly, to any decisions to proceed with the Merger or any disclosures or purported nondisclosures relating to the Merger or the performance or financial condition of Merrill prior to the closing of the Merger or any governmental assistance contemplated or provided, in whole or in part, in connection with the Merger; and (iv) for each and all of the foregoing persons or entities (but only to the extent such persons or entities are released as provided above), any and all of their respective past or present family members, spouses, heirs, trusts, trustees, executors, estates, administrators, beneficiaries, distributees, foundations, agents, employees, fiduciaries, partners, partnerships, general or limited partners or partnerships, joint ventures, member firms, limited-liability companies, corporations, parents, subsidiaries, divisions, affiliates, associated entities, stockholders, principals, officers, managers,

directors, managing directors, members, managing members, managing agents, predecessors, predecessors-in-interest, successors, successors-in-interest, assigns, financial or investment advisors, advisors, consultants, investment bankers, entities providing any fairness opinion, underwriters, brokers, dealers, lenders, commercial bankers, attorneys, personal or legal representatives, accountants and associates.

11.     "Releases" means the releases set forth in Paragraphs 16 and 17 below.

12.     "Settlement Hearing" means the hearing at which the Court will review the adequacy, fairness and reasonableness of the Settlement and determine whether to issue the Order and Final Judgment.

13.     "Summary Notice" means the Notice of Settlement of Stockholder Derivative Litigation, substantially in the form attached hereto as Exhibit D.

14.     "Unknown Claims" means any claims of Plaintiffs or BAC or any BAC stockholder that he, she or it does not know or suspect exist in his, her or its favor at the time of the release of the Released Claims as against the Released Parties, including without limitation those which, if known, might have affected the decision to enter into or object to the Settlement.

## SETTLEMENT CONSIDERATION

15.     In connection with the Settlement, (i) BAC has agreed to implement a program of corporate-governance reforms described in Exhibit A hereto that is tailored to address the particular allegations made in the Derivative Action; and (ii) the D&O Carriers have agreed to pay, on behalf of Defendants, the sum of $20 million to BAC.  The D&O Carriers shall pay the amount referenced in the preceding sentence within forty-five (45) days after Final Approval of the Settlement, and BAC shall implement the corporate-governance reforms as soon as practicable after such payment by the D&O Carriers.

11

## RELEASES

16.     Upon Final Approval, Plaintiffs, BAC and by operation of law BAC's stockholders shall and hereby do completely, fully, finally and forever release, relinquish, settle, and discharge each and all of the Released Parties from and with respect to any and all of the Released Claims, and will be forever barred and enjoined from commencing, instituting or prosecuting any action or proceeding, in any forum, asserting any of the Released Claims against any of the Released Parties.

17.     Upon Final Approval, Defendants, individually and collectively, shall and hereby do completely, fully, finally and forever release, relinquish, settle, and discharge each and all of the Plaintiffs, Lead Counsel and all other plaintiffs' counsel from and with respect to any and all claims arising out of or relating to the initiation, prosecution, and resolution of the Derivative Action, excepting any claim to enforce the Stipulation or Settlement.

## EFFECT OF RELEASES

18.     The Released Claims include any and all Unknown Claims.  With respect to any of the Released Claims, the parties stipulate and agree that upon Final Approval of the Settlement, Plaintiffs and BAC shall have, and each BAC stockholder shall be deemed to have, and by operation of the final order and judgment by the Court shall have, expressly waived, relinquished and released any and all provisions, rights and benefits conferred by or under California Civil Code § 1542 or any law or principle of common law of the United States or any state or territory of the United States which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM

OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Plaintiffs and BAC acknowledge, and all BAC stockholders by operation of law shall be deemed to have acknowledged, that they may discover facts in addition to or different from those now known or believed to be true with respect to the Released Claims, but that it is the intention of Plaintiffs, BAC and all BAC stockholders by operation of law, to completely, fully, finally and forever extinguish any and all Released Claims, known or unknown, suspected or unsuspected, which now exist, heretofore existed or may hereafter exist, and without regard to the subsequent discovery of additional or different facts.  Plaintiffs and BAC acknowledge, and all BAC stockholders by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of "Released Claims" was separately bargained for and was a material element of the Settlement and was relied upon by each and all of Defendants in entering into the Stipulation and agreeing to the Settlement.

## PRELIMINARY APPROVAL

19.     As soon as practicable after the Stipulation has been executed, the parties to the Derivative Action shall jointly submit this Stipulation, together with its related documents, to the Court and request entry of the Preliminary Approval Order:  (a) preliminarily determining that the Derivative Action is properly brought as a shareholder derivative action; (b) preliminarily approving the Settlement; (c) setting a date for hearing of a motion for final approval of the Settlement and Lead Counsel's application for an award of attorneys' fees and expenses; (d) directing the form and manner of notice to stockholders of the Settlement and of their right to object; (e) setting dates for the receipt of objections and the filing of final approval papers; (f) staying all proceedings in the Derivative Action except as may be necessary to implement the Settlement; and (g) granting such other and further relief as the Court deems just and proper.

13

## NOTICE

20.     Notice of the proposed Settlement shall be provided to BAC stockholders in the following manner (or in such other manner directed by the Court):  (i) BAC's publishing the Summary Notice, substantially in the form of Exhibit D to the Stipulation, as a quarter-page advertisement in the national and local editions of the *Wall Street Journal* and *Investor Business Daily*; (ii) Lead Counsel's publishing the same or substantially the same notice via a national wire service; and (iii) BAC's causing the Stipulation and the Notice, substantially in the form of Exhibit C to the Stipulation, to be made electronically available at a website to be identified in the Summary Notice created specifically for the purpose of disseminating notice, and to be sent by U.S. Mail to persons who request such Notice by calling a hotline number to be identified in the Summary Notice.

21.     BAC shall bear all Notice Costs related to promulgating notice in the manner set forth in items (i) and (iii) above, and Lead Counsel shall bear the costs and expenses related to promulgating notice in the manner set forth in item (ii) above.

## STAY OF PROCEEDINGS

22.     The Parties agree to abide by and seek the continuation of the stay of proceedings in the Derivative Action, granted by the Court on April 12, 2012, and not to initiate any proceedings other than those related to the Settlement itself.  The Parties also agree to use their reasonable best efforts to prevent, stay or seek dismissal of or oppose entry of any interim or final relief in favor of BAC or any BAC stockholder in any other litigation that challenges the Settlement or otherwise involves, directly or indirectly, a Released Claim.  Notwithstanding the generality of the foregoing, the Parties specifically agree that they expect and intend that the Releases and the Order and Final Judgment contemplated herein will be effective to release, bar

14

and preclude the claims being asserted against the Defendants in the Delaware Action and in the North Carolina Action, and Defendants have accordingly moved to stay the Delaware Action, pending Final Approval of the Settlement.

## DISMISSAL WITH PREJUDICE

23.     If the Settlement is approved by the Court, the Parties shall jointly and promptly request that the Court enter the Order and Final Judgment in the Derivative Action substantially in the form attached hereto as Exhibit E.

24.     Following Final Approval of the Settlement, Defendants will move in the respective courts to dismiss the Delaware Action and the North Carolina Action, in each case with prejudice, based on the doctrine of *res judicata*, collateral estoppel, the effect of the Releases to be given in connection with the Settlement and any similar or additional theory, and Plaintiffs agree to cooperate with Defendants' efforts to obtain such dismissals.

## CONDITIONS OF SETTLEMENT

25.     The Settlement (including the Releases given pursuant to the terms of this Stipulation) shall be null and void and of no force and effect, unless otherwise agreed by the Parties in accordance with Paragraph 45 herein, if:  (i) the Court does not enter the Order and Final Judgment; (ii) the Derivative Action is not dismissed with prejudice against all Defendants, without the award of any damages, costs, fees or the grant of further relief except for the payments contemplated by this Stipulation; or (iii) the Parties do not obtain Final Approval of the Settlement for any reason.  In addition, Defendants shall have the right in their sole discretion to terminate this Settlement in the event that any Released Claim is commenced or prosecuted against any of the Released Parties in any court prior to Final Approval of the Settlement and (following a motion by any Defendant) is not dismissed with prejudice or stayed pending Final

15

Approval of the Settlement.  In the event of such termination, this Stipulation shall be deemed null and void (except as provided in Paragraph 32 below), the Parties shall be deemed to be in the respective positions they were in prior to the execution of this Stipulation and BAC shall return to the D&O Carriers any payment made to BAC pursuant to Paragraph 15 herein.

## ATTORNEYS' FEES

26.     Lead Counsel intend to apply to the Court for an award of fees and expenses in connection with the Derivative Action (the "Fee Application"), which shall be the only fee application made by counsel for any plaintiff in the Derivative Action.  Defendants agree that Plaintiffs and their counsel in the Derivative Action are entitled to an award of reasonable attorneys' fees and expenses, and agree to negotiate in good faith regarding an award of fees and expenses to be sought in the Fee Application that would avoid a contested application, but Defendants otherwise reserve all rights with respect to the Fee Application.  The Parties acknowledge and agree that any fees and expenses awarded by the Court in the Derivative Action, plus simple interest on such amounts accruing from the date on which the Court enters the Order and Final Judgment approving the Settlement and grants an award of fees and expenses, through the date of payment of any such award, at a rate equal to the "3-month CDs (secondary market)" rate published monthly by the Federal Reserve, shall be paid by BAC within ten (10) business days after the later of:  (i) the payment of the $20 million by the D&O Carriers to BAC as provided in Paragraph 15; (ii) dismissal with prejudice of the Delaware Action; (iii) dismissal with prejudice of the North Carolina Action; and (iv) dismissal with prejudice of all other pending actions, if any, asserting any Released Claim against any Released Party.

16

27.      Neither the resolution of, nor any ruling regarding, the Fee Application or any award of attorneys' fees and expenses shall be a precondition to the Settlement or the dismissal of the Derivative Action with prejudice and entry of the Order and Final Judgment in accordance with the terms of the Stipulation.  The Court may consider and rule upon the fairness, reasonableness and adequacy of the Settlement independently of the Fee Application and any fee award, and any failure of the Court to approve the Fee Application in whole or in part shall have no impact on the effectiveness of the Settlement.  Notwithstanding anything in this Stipulation to the contrary, the effectiveness of the Releases and the other obligations of the parties under the Settlement (except with respect to the payment of attorneys' fees and expenses) shall not be conditioned upon or subject to the resolution of any appeal from any order, if such appeal relates solely to the issue of any award of attorneys' fees or the reimbursement of expenses.

28.      Defendants and their counsel shall have no responsibility for, and no liability whatsoever with respect to, the allocation among Lead Counsel of any fees or expenses awarded by the Court.  Any dispute regarding any allocation of fees or expenses among Lead Counsel shall have no effect on the Settlement.  The payment of any fees and expenses by BAC shall be subject to Lead Counsel's joint and several obligation to make appropriate refunds or repayments of the applicable portion of the fee received, if, as a result of any further proceedings or collateral attack, the amount of the fee awarded is reduced or the judgment of dismissal as contemplated in the Settlement Agreement is not accorded full effect or the Defendants withdraw from the Settlement in accordance with the terms of the Stipulation.

## COOPERATION

29.      The Parties and their respective counsel agree to cooperate fully with one another in seeking the Court's approval of the Settlement and to use their best efforts to effect the

consummation of this Stipulation and the Settlement (including, but not limited to, resolving any objections raised with respect to the Settlement).

30.     Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Stipulation.

31.     If any of the Released Claims are asserted or continue to be litigated against any of the Released Parties in any court prior to Final Approval of the Settlement, Plaintiffs and their counsel shall join, if requested by Defendants, in any motion to dismiss or stay such proceedings and otherwise shall use their reasonable efforts to cooperate with Defendants to effect a withdrawal or dismissal of the claims.

## STIPULATION NOT AN ADMISSION

32.     The existence of this Stipulation, its contents and any negotiations, statements or proceedings in connection therewith will not be argued to be, and will not be construed or deemed to be, a presumption, concession or admission by any of the Released Parties or any other person of any fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Derivative Action or otherwise or that BAC, Plaintiffs or Lead Counsel, any present or former stockholders of BAC or any other person, have suffered any damage attributable in any manner to any of the Released Parties.  Nor shall the existence of this Stipulation and its contents or any negotiations, statements or proceedings in connection therewith be construed as a presumption, concession or admission by Plaintiffs or Lead Counsel of any lack of merit of the Released Claims, or that BAC has not suffered cognizable damages caused by Defendants.  The existence of the Stipulation, its contents or any negotiations, statements or proceedings in connection therewith, shall not be offered or admitted in evidence or referred to, interpreted, construed, invoked or otherwise used by any person for any purpose in the Derivative Action or

otherwise, except as may be necessary to effectuate the Settlement.  This provision shall remain in force in the event that the Settlement is terminated for any reason whatsoever. Notwithstanding the foregoing, any of the Released Parties may file the Stipulation or any judgment or order of the Court related hereto in any other action that may be brought against them, in order to support any and all defenses or counterclaims based on *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

## NO WAIVER

33.    Any failure by any party to insist upon the strict performance by any other party of any of the provisions of this Stipulation shall not be deemed a waiver of any of the provisions hereof, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Stipulation by such other party.

34.    No waiver, express or implied, by any party of any breach or default in the performance by the other party of its obligations under this Stipulation shall be deemed or construed to be a waiver of any other breach, whether prior, subsequent, or contemporaneous, under this Stipulation.

## AUTHORITY

35.    This Stipulation will be executed by counsel to the Parties and BAC, each of whom represents and warrants that he or she has been duly authorized and empowered to execute this Stipulation on behalf of such party, and that it shall be binding on such party in accordance with its terms.

## SUCCESSORS AND ASSIGNS

36.     This Stipulation is, and shall be, binding upon, and inure to the benefit of, the

Parties and their respective agents, executors, administrators, heirs, successors and assigns;

*provided, however*, that no Party shall assign or delegate its rights or responsibilities under this

Stipulation without the prior written consent of the other Parties.

## GOVERNING LAW AND FORUM

37.     This Stipulation, and any dispute arising out of or relating in any way to this

Stipulation, whether in contract, tort or otherwise, shall be governed by and construed in

accordance with the laws of the State of New York, without regard to conflict-of-laws principles.

Each of the Parties:  (i) irrevocably submits to the personal jurisdiction of any state or federal

court sitting in New York, New York, as well as to the jurisdiction of all courts to which an

appeal may be taken from such courts, in any suit, action or proceeding arising out of or relating

to this Stipulation and/or the Settlement; (ii) agrees that all claims in respect of such suit, action

or proceeding shall be brought, heard and determined exclusively in the Court (provided that, in

the event that subject-matter jurisdiction is unavailable in the Court, then all such claims shall be

brought, heard and determined exclusively in any other state court sitting in New York, New

York); (iii) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion

or other request for leave from such court; (iv) agrees not to bring any action or proceeding

arising out of or relating to this Stipulation in any other court; and (v) EXPRESSLY WAIVES

THE RIGHT TO A JURY TRIAL, AND AGREES NOT TO PLEAD OR TO MAKE ANY

CLAIM THAT ANY SUCH ACTION OR PROCEEDING IS SUBJECT (IN WHOLE OR IN

PART) TO A JURY TRIAL.  Each of the Parties waives any defense of inconvenient forum to

the maintenance of any action or proceeding brought in accordance with this paragraph.  Each of

the Parties further agrees to waive any bond, surety or other security that might be required of

any other Party with respect to any such action or proceeding, including an appeal thereof.  Each

of the Parties further consents and agrees that process in any such suit, action or proceeding may

be served on such Party by certified mail, return receipt requested, addressed to such Party or

such Party's registered agent in the state of its incorporation or organization, or in any other

manner provided by law, and in the case of Plaintiffs by giving such written notice to Lead

Counsel at their addresses set forth in the signature blocks below.

<div align="center">

**WARRANTY**

</div>

38.    Lead Counsel each represent, on behalf of their respective clients, that (i) their

clients have been continuous stockholders of BAC at all times relevant to the allegations in the

Complaint and through the date of this Stipulation; and (ii) none of the Released Claims has been

assigned, encumbered or in any manner transferred in whole or in part, and that they and their

respective clients will not attempt to assign, encumber or in any manner transfer in whole or in

part any of the Released Claims.

39.    Each party represents and warrants that the party has made such investigation of

the facts pertaining to the Settlement provided for in this Stipulation, and all of the matters

pertaining thereto, as the party deems necessary and advisable.

<div align="center">

**ENTIRE AGREEMENT**

</div>

40.    This Stipulation and the attached exhibits constitute the entire agreement among

the Parties and BAC with respect to the subject matter hereof, supersede all prior or

contemporaneous oral or written agreements, understandings or representations.  All of the

exhibits hereto are incorporated by reference as if set forth herein verbatim, and the terms of all

exhibits are expressly made part of this Stipulation.  This Stipulation replaces the MOU, which

<div align="center">

21

</div>

shall be of no further force or effect upon the execution of this Stipulation, excepting those provisions of the MOU intended to survive the termination thereof.

## INTERPRETATION

41.     Each term of this Stipulation is contractual and not merely a recital.

42.     This Stipulation will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

43.     Section and/or paragraph titles have been inserted for convenience only and will not be used in determining the terms of this Stipulation.

44.     The terms and provisions of this Stipulation are intended solely for the benefit of the Parties, and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights or remedies upon any other person or entity, except with respect to (a) any attorneys' fees and expenses to be paid to Lead Counsel pursuant to the terms of this Stipulation; and (b) the Released Parties who are not signatories hereto, and who shall be third-party beneficiaries under this Stipulation entitled to enforce it in accordance with its terms.

## AMENDMENTS

45.     This Stipulation may not be amended, changed, waived, discharged or terminated (except as explicitly provided herein), in whole or in part, except by an instrument in writing signed by the parties to this Stipulation.  Any such written instrument signed by the parties to this Stipulation shall be effective upon approval of the Court, without further notice to BAC stockholders, unless the Court requires such notice.

## COUNTERPARTS

46.     This Stipulation may be executed in any number of actual, telecopied or electronically mailed counterparts and by each of the different parties on several counterparts, each of which when so executed and delivered will be an original.  This Stipulation will become effective when the actual or telecopied counterparts have been signed by each of the parties to this Stipulation and delivered to the other parties.  The executed signature page(s) from each actual, telecopied or electronically mailed counterpart may be joined together and attached and will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have caused this Stipulation, dated as of June 19, 2012, to be executed by their duly authorized attorneys.

*[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURE PAGES TO FOLLOW]*

EXECUTION COPY

Maya Saxena
Joseph E. White, III
Christopher S. Jones
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3082

Lawrence Portnoy
Charles S. Duggan
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 701-5800

Lewis S. Kahn
Michael A. Swick
Albert M. Myers
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Tel: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Plaintiffs*

*Counsel for Defendants Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward*

BANK OF AMERICA CORPORATION

By: Edward P. O'Keefe
General Counsel
100 N. Tryon Street
Charlotte, NC 28255-0001
Tel: (704) 386-5681
Fax: (980) 386-6699

24

**EXECUTION COPY**

Maya Saxena
Joseph E. White, III
Christopher S. Jones
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3082

Lewis S. Kahn
Michael A. Swick
Albert M. Myers
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Tel:  (504) 455-1400
Fax:  (504) 455-1498

*Lead Counsel for Plaintiffs*

Lawrence Portnoy
Charles S. Duggan
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000
Fax:  (212) 701-5800

*Counsel for Defendants Kenneth D. Lewis,
Charles K. Gifford, William Barnet, III, Frank
P. Bramble, Sr., John T. Collins, Gary L.
Countryman, Tommy R. Franks, Monica C.
Lozano, Walter E. Massey, Thomas J. May,
Patricia E. Mitchell, Thomas M. Ryan, O.
Temple Sloan, Meredith R. Spangler, Robert
L. Tillman and Jackie M. Ward*

BANK OF AMERICA CORPORATION

By:  Edward P. O'Keefe
General Counsel
100 N. Tryon Street
Charlotte, NC 28255-0001
Tel:  (704) 386-5681
Fax:  (980) 386-6699

Maya Saxena
Joseph E. White, III
Christopher S. Jones
SAXENA WHITE P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3082

Lawrence Portnoy
Charles S. Duggan
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 701-5800

*Counsel for Defendants Kenneth D. Lewis,*
*Charles K. Gifford, William Barnet, III, Frank*
*P. Bramble, Sr., John T. Collins, Gary L.*
*Countryman, Tommy R. Franks, Monica C.*
*Lozano, Walter E. Massey, Thomas J. May,*
*Patricia E. Mitchell, Thomas M. Ryan, O.*
*Temple Sloan, Meredith R. Spangler, Robert*
*L. Tillman and Jackie M. Ward*

Lewis S. Kahn
Michael A. Swick
Albert M. Myers
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Tel: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Plaintiffs*

BANK OF AMERICA CORPORATION

By: Edward P. O'Keefe
General Counsel
100 N. Tryon Street
Charlotte, NC 28255-0001
Tel: (704) 386-5681
Fax: (980) 386-6699

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                       :
                                                                       :
                                                                       :
IN RE BANK OF AMERICA CORP.                                            :
SECURITIES, DERIVATIVE, AND                                            :
EMPLOYEE RETIREMENT INCOME                                             :
SECURITY ACT (ERISA) LITIGATION                                        :         Master File
                                                                       :         No. 09 MD 2058 (PKC)
                                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                                 ECF CASE
                                                                       :
THIS DOCUMENT RELATES TO                                               :
                                                                       :
Consolidated Derivative Action                                        :
                                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CORPORATE GOVERNANCE TERM SHEET

        In accordance with the terms of the foregoing Settlement, Bank of America Corp. ("BAC" or the "Company") agrees to implement the following corporate-governance reforms in connection with the settlement of the Derivative Action.  BAC will maintain these measures in place for at least four (4) years from their adoption.

Creation of a Corporate Development Committee

        BAC will create a new board-level Corporate Development Committee with responsibility for overseeing certain acquisition-related activities of the Company for transactions valued at $2 billion or more.  The committee will provide oversight of transactions within its purview to ensure that management vets such transactions carefully and performs appropriate due diligence.  For transactions ultimately approved by the full BAC board of directors (the "Board"), the committee will also provide oversight of management's integration- and transition-related activities.  The responsibilities and authority of the committee shall be set forth in greater detail in a charter, substantially in the form of the draft charter attached to this Term Sheet.

Changes to Disclosure Committee Charter

        BAC will amend the charter of its Disclosure Committee to provide that the Disclosure Committee shall (i) have responsibility to review and consider the accuracy, completeness and timeliness of disclosures required in connection with any acquisitions that fall within the purview of the Corporate Development Committee; and (ii) conduct a semi-annual review to identify for implementation industry-leading oversight practices in connection with the Company's disclosures (including acquisition-related disclosures) and to review progress on such goals.

Other Corporate Governance Changes

- *Continuing Education*:  BAC's Corporate Governance Guidelines shall be amended to provide specifically that the Company's orientation program for new directors include sessions regarding corporate governance best practices and an overview of director duties.   In addition, the guidelines shall be amended to provide that management shall prepare additional educational sessions for directors, periodically as appropriate, on matters relevant to the Company and its business, including sessions relating to corporate governance best practices and director duties.

- *Enterprise Risk Committee Meeting Attendance*:  The charter of the Enterprise Risk Committee ("ERC") of the Board shall be amended to provide that, in the normal course of business and barring exigent circumstances, the Company's Chief Risk Officer or equivalent shall be expected to attend all regular ERC meetings, and the Company's Chief Compliance Officer shall be expected to attend ERC meetings at least twice per year.

# BANK OF AMERICA CORPORATION
# [DRAFT] CORPORATE DEVELOPMENT COMMITTEE CHARTER

## Purpose

The Corporate Development Committee (the "Committee") of Bank of America Corporation (the "Company") is responsible for assisting the Board of Directors of the Company (the "Board") in exercising oversight over the Company's consideration of potential mergers and acquisitions valued at greater than $2 billion ("Applicable Transactions"), and monitoring the progress and transition risks in connection with any Applicable Transactions approved by the Board.  The Committee shall also review periodically with management the Company's acquisition strategies, as appropriate.  In addition, the Committee shall act as the formal liaison to the full Board in connection with the Committee's activities.  All such responsibilities, and others as noted throughout this Charter, shall be carried out in accordance with sound corporate governance principles as reflected in the Company's Corporate Governance Guidelines and other internal governance protocols.

## Membership

The Committee shall consist of no fewer than three members of the Board, who shall be directors who meet the criteria for independence as established by the Board in accordance with the New York Stock Exchange listing standards and any other required laws, rules and regulations regarding independence as they are in effect from time to time.  The Board or the Corporate Governance Committee may identify other qualifications that are necessary to preserve the independence of Committee members.

The members of the Committee and the chair of the Committee shall be appointed, and may be replaced, by the Board on the recommendation of the Corporate Governance Committee.

In addition to other duties set forth herein, the Chair of the Committee shall chair all regular sessions of the Committee and set agendas for meetings.  If the Chair is unable to act, all of his or her responsibilities hereunder shall be performed by the Committee member who has served the longest on the full Board, until such time as the Chair is able to act.

## Committee Authority and Responsibilities

In carrying out its oversight responsibilities as set forth above, the Committee shall oversee senior management's establishment of policies and guidelines, to be adopted by the Board, establishing appropriate systems (including policies, procedures and/or management committees) to ensure that Applicable Transactions are vetted carefully and that adequate due diligence is performed prior to Board approval of any Applicable Transaction.  In connection with any Applicable Transaction to be submitted to the Board for approval, the Committee shall meet at least once, telephonically or in person, with members of senior management to review management's compliance with applicable policies and procedures related to the Company's consideration of the Applicable Transaction, prior to its presentation to the Board for approval.

In addition, following approval by the Board of any Applicable Transaction, the Committee shall oversee management's activities with respect to post-acquisition integration and business development opportunities and monitor, as appropriate, any material transitional risks related to the Applicable Transaction.

The Committee shall convene as frequently as necessary to fulfill its Charter and responsibilities and to act on any matter within its jurisdiction, and shall meet in person at least once annually.  Any Executive Officer, including the CEO, the Chairperson of the Board or other member of the Board who receives any inquiry, overture or proposal – however formal or informal – about the Company's interest in an Applicable Transaction must report such contact to the Chair of the Committee as soon as reasonably practicable.  This requirement will be publicized to all Executive Officers and Board members of the Company no less than once annually.  Upon receiving notice of an Applicable Transaction that requires action by the Committee, the Chair of the Committee shall convene a meeting or meetings thereof for purposes of acting upon it.

The Committee shall report its findings to the Board at each regular meeting following a meeting of the Committee, or, if applicable, at any special meeting of the Board convened in connection with an Applicable Transaction.  The Committee shall review and reassess this Charter annually and recommend any proposed changes to the Board for approval and shall conduct an annual review of its own performance.

## Additional Authority

The Board delegates to the Committee, in order to further the performance of the Committee's responsibilities, the authority to conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities, with full access to all books, records, facilities and personnel of the Company.  In connection with this authority, or as otherwise appropriate, the Committee may request that Company management prepare and present post-acquisition performance reviews on Applicable Transactions with such frequency as the Committee may designate.

The Board further delegates to the Committee, in order to further the performance of its responsibilities, the power and authority to obtain, at its discretion, advice and assistance from internal or external financial, legal, investment banking, accounting or other advisors, and to hire and compensate such external advisors at the Company's expense.  The Committee retains the authority, in its sole discretion, to terminate or limit the scope of activity of such external advisers.

The Committee may request that any members of Company management or other members of the Board attend a meeting or meetings of the Committee or meet with any members of or advisers to the Committee.  All non-management Board members who are not members of the Committee may attend any meetings of the Committee but may not vote.  The Committee may, in its discretion, exclude any invitees or non-members from its proceedings at any time.

The Committee may form, and delegate authority to, subcommittees when appropriate.

**Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
      :
      :
IN RE BANK OF AMERICA CORP.      :
SECURITIES, DERIVATIVE, AND      :
EMPLOYEE RETIREMENT INCOME      :
SECURITY ACT (ERISA) LITIGATION      :     Master File
      :     No. 09 MD 2058 (PKC)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
      :     ECF CASE
THIS DOCUMENT RELATES TO      :
      :
Consolidated Derivative Action      :
      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER SETTING SCHEDULE AND
## PRELIMINARILY APPROVING PROPOSED SETTLEMENT

The parties to the consolidated stockholder derivative action, styled *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (the "Derivative Action"), currently pending before the United States District Court for the Southern District of New York (the "Court"), having applied pursuant to Federal Rule of Civil Procedure 23.1 for an order preliminarily approving the proposed settlement of the Derivative Action in accordance with the Stipulation and Agreement of Compromise, Settlement and Release entered into by the parties on June 19, 2012 (the "Stipulation"), upon the terms and conditions set forth therein (the "Settlement"); the Court having read and considered the Stipulation and accompanying documents; and all parties having consented to the entry of this Order,

**NOW, THEREFORE**, this _____ day of _____, 2012, upon application of the parties,
**IT IS HEREBY ORDERED** that:

1.      Except for terms defined herein, the Court adopts and incorporates the definitions in the Stipulation for purposes of this Order.

2.      The Court preliminarily approves the Settlement, as embodied in the Stipulation and the exhibits attached thereto, as fair, reasonable and adequate, pending a final hearing on the proposed Settlement as provided herein.

3.      For the purposes of the proposed Settlement only, the Court preliminarily finds that the Derivative Action was properly brought as a derivative action for and on behalf of Bank of America Corporation ("BAC"), and that Plaintiffs fairly and adequately represent the interests of BAC stockholders ("BAC Stockholders") similarly situated in enforcing the rights of BAC.

4.      Lead Counsel is authorized to act on behalf of BAC Stockholders with respect to all acts required by the Stipulation or such other acts which are reasonably necessary to consummate the Settlement set forth in the Stipulation.

5.      A hearing (the "Settlement Hearing") shall be held on _____, 2012 at _____ _.m., Eastern Time, at the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 12C, New York, New York 10007, to:

       a.      determine whether the Settlement should be approved as fair, reasonable and adequate;

       b.      determine whether an Order and Final Judgment should be entered dismissing the Derivative Action with prejudice;

       c.      hear and address any objections to the Settlement; and

       d.      rule on such other matters as the Court may deem appropriate.

6.      The Court reserves the right to (i) approve the Settlement at or after the Settlement Hearing with such modification(s) as may be consented to by the parties to the

2

Stipulation and without further notice to BAC Stockholders; and (ii) adjourn the Settlement

Hearing or any adjournment thereof, without further notice of any kind to BAC Stockholders.

7.      If the Settlement is approved at or following the Settlement Hearing, Lead

Counsel shall file an application for an award of attorneys' fees in an amount not to exceed $13

million, and for reimbursement of their expenses incurred in prosecuting the case in an amount

not to exceed $600,000 (the "Fee Application").  Following the filing of the Fee Application, the

Court shall enter an order (the "Fee Hearing Order") setting a date for a hearing to consider the

Fee Application (the "Fee Hearing"), and providing instructions to file any objections to the Fee

Application, which the Court will consider at the Fee Hearing.

8.      At least sixty (60) calendar days prior to the Settlement Hearing:  (a) BAC shall

publish a Summary Notice, in the form of Exhibit D to the Stipulation, as a quarter-page

advertisement in the national and local editions of the *Wall Street Journal* and *Investor Business*

*Daily*; (b) Lead Counsel shall publish the same or substantially the same Summary Notice via a

national wire service; and (c) BAC shall cause the Stipulation and the Notice, in the form of

Exhibit C to the Stipulation, to be made electronically available at a website to be identified in

the Summary Notice created specifically for the purpose of disseminating notice (the "Settlement

Website"), and to be sent by U.S. Mail to persons who request such Notice by calling a hotline

number to be identified in the Summary Notice.  The parties shall, at or before the Settlement

Hearing, file with the Court proof of publication of such notice.  In addition, if the Settlement is

approved, BAC shall, within seven (7) calendar days of the Court's entry of the Fee Hearing

Order, cause the Fee Application and the Fee Hearing Order to be posted on the Settlement

Website.  The costs of the notice described in this paragraph shall be borne in accordance with

the terms of the Stipulation.

3

9.      The Court approves, in form and substance, the Notice and Summary Notice, and finds that the form and method of notice specified herein constitutes the best notice practicable under the circumstances, constitutes due and sufficient notice of the Settlement Hearing to all persons entitled to receive such notice and fully satisfies the requirements of due process, Federal Rule of Civil Procedure 23.1 and applicable law.

10.     All proceedings and pending deadlines in the Derivative Action, other than such proceedings as may be necessary to effectuate the terms and conditions of the Settlement, are hereby stayed and suspended until further order of this Court.

11.     Any BAC Stockholder who objects to any aspect of the Settlement or the Order and Final Judgment to be entered in the Derivative Action, may appear in person or by his or her attorney at the Settlement Hearing and present evidence or argument that may be proper and relevant; *provided, however*, that, except for good cause shown, no person other than Lead Counsel and counsel for Defendants and BAC shall be heard and no papers, briefs, pleadings or other documents submitted by any BAC Stockholder shall be considered by the Court unless, not later than twenty-eight (28) calendar days prior to the Settlement Hearing directed herein:  (i) a statement of the objections by the BAC Stockholder; (ii) the grounds for such objections; and (iii) proof of ownership of BAC common stock, as well as all documents or writings such person desires the Court to consider, are filed by such person with the Court, and, on or before such filing, are served by hand or mail on the following counsel of record:

Lead Counsel for Plaintiffs:                        Lewis S. Kahn, Esq.
                                                    Michael A. Swick, Esq.
                                                    Albert M. Myers, Esq.
                                                    Kahn Swick & Foti, LLC
                                                    206 Covington Street
                                                    Madisonville, Louisiana 70447

4

                                                       Maya Saxena, Esq.
Joseph E. White, III, Esq.
Christopher S. Jones, Esq.
Saxena White P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431

Counsel for Defendants:                 Lawrence Portnoy, Esq.
Charles S. Duggan, Esq.
Brian M. Burnovski, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

12.     Any BAC Stockholder who fails to object in the manner described above shall be deemed to have waived the right to object (including any right of appeal) and shall be forever barred from raising such objection in this or any other action or proceeding unless the Court orders otherwise.

13.     All papers in support of the Settlement shall be filed and served fourteen (14) calendar days prior to the deadline for BAC Stockholders to object to the Settlement, and all reply papers shall be filed and served seven (7) calendar days before the Settlement Hearing.

14.     If the Settlement is approved by the Court following the Settlement Hearing, an Order and Final Judgment will be entered as described in the Stipulation.  Without affecting the finality of that Order and Final Judgment, the Court shall retain continuing jurisdiction to consider the Fee Application, address any objections thereto and enter any separate judgment(s) for fees and expenses.

15.     If the Settlement, including any amendment made in accordance with the Stipulation, is not approved by the Court or shall not become effective for any reason whatsoever, the Settlement (including any modification thereof made with the consent of the parties as provided for in the Stipulation), and certifications herein and any actions taken or to be

taken in connection therewith (including this Order and any judgment entered herein) shall be terminated and shall become void and of no further force and effect, except for BAC's and Lead Counsel's obligations to pay, in accordance with the terms of the Stipulation, expenses incurred in connection with provision of the notice prescribed by this Order.  In that event, neither the Stipulation, nor any provision contained in the Stipulation, nor any action undertaken pursuant thereto, nor the negotiation thereof by any party, shall be deemed an admission, concession or received as evidence in this or any other action or proceeding.

16.     The existence of the Stipulation, its contents and any negotiations, statements or proceedings in connection therewith will not be argued to be, and will not be construed or deemed to be, a presumption, concession or admission by any of the Released Parties or any other person of any fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Derivative Action or otherwise or that BAC, Plaintiffs or Lead Counsel, any present or former stockholders of BAC or any other person, have suffered any damage attributable in any manner to any of the Released Parties.  Nor shall the existence of the Stipulation and its contents or any negotiations, statements or proceedings in connection therewith be construed as a presumption, concession or admission by Plaintiffs or Lead Counsel of any lack of merit of the Released Claims, or that BAC has not suffered cognizable damages caused by Defendants.  The existence of the Stipulation, its contents or any negotiations, statements or proceedings in connection therewith, shall not be offered or admitted in evidence or referred to, interpreted, construed, invoked or otherwise used by any person for any purpose in the Derivative Action or otherwise, except as may be necessary to effectuate the Settlement.  Notwithstanding the foregoing, any of the Released Parties may file the Stipulation or any judgment or order of the Court related hereto in any other action that may be brought against them, in order to support any

and all defenses or counterclaims based on *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

17.     The Court may, for good cause, extend any of the deadlines set forth in this Order without further notice to BAC Stockholders, and the Court retains jurisdiction to consider all further applications arising out of or connected with the Settlement.

**It is SO ORDERED.**


Dated: _____          _____
                                              THE HONORABLE P. KEVIN CASTEL
                                              U.S. DISTRICT JUDGE

**Exhibit C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: :
: :
: :
IN RE BANK OF AMERICA CORP.                                     :
SECURITIES, DERIVATIVE, AND                                     :
EMPLOYEE RETIREMENT INCOME                                      :
SECURITY ACT (ERISA) LITIGATION         :          Master File
:          No. 09 MD 2058 (PKC)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:          ECF CASE
THIS DOCUMENT RELATES TO                                  :
:
Consolidated Derivative Action                                :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SETTLEMENT OF STOCKHOLDER DERIVATIVE LITIGATION

**TO:    ALL RECORD AND BENEFICIAL OWNERS OF BANK OF AMERICA CORP. COMMON STOCK AS OF JUNE 19, 2012, WHO CONTINUE TO OWN SUCH SHARES ("BAC STOCKHOLDERS")**

THIS NOTICE IS GIVEN pursuant to an Order of the United States District Court for the Southern District of New York (the "Court" or the "Federal Court"), to inform you of a proposed settlement (the "Settlement") in the above-captioned derivative action (the "Derivative Action"), which was brought derivatively on behalf of Bank of America Corp. ("BAC" or the "Company"), in connection with the Company's acquisition of Merrill Lynch & Co., Inc. ("Merrill").

This Notice also informs you of the Court's preliminary approval of the Settlement and of your right to participate in a hearing to be held on _____ __, 2012, before the Honorable P. Kevin Castel at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007 (the "Settlement Hearing"), to determine whether the Court should approve the Settlement as fair, reasonable and adequate. ***Because this is a shareholder***

*derivative action brought for the benefit of BAC, no individual BAC Stockholder has the right*

*to receive any individual compensation as a result of the settlement of this action.*

**THE FOLLOWING RECITATION DOES NOT CONSTITUTE FINDINGS OF THE COURT.  IT IS BASED ON THE STATEMENTS OF THE PARTIES AND SHOULD NOT BE UNDERSTOOD AS AN EXPRESSION OF ANY OPINION OF THE COURT AS TO THE MERITS OF ANY OF THE CLAIMS OR DEFENSES RAISED BY ANY OF THE PARTIES OR THE FAIRNESS OR ADEQUACY OF THE PROPOSED SETTLEMENT.**

## I.   BACKGROUND OF THE ACTION

On January 1, 2009, BAC acquired Merrill in a stock-for-stock transaction (the "Merger").  Within several weeks, various BAC stockholders began filing lawsuits in various state and federal courts challenging aspects of the Merger on a variety of legal grounds.  These suits included stockholder derivative lawsuits, as well as class actions and individual actions under the federal securities laws.  The derivative actions generally asserted claims that the defendants had breached fiduciary duties in connection with the approval of the Merger and that disclosures regarding the Merger and Merrill were misleading or omitted material information that should have been disclosed.  In some of these derivative actions, the disclosure claims were based on alleged breaches of fiduciary under Delaware law.  In others, the derivative plaintiffs also asserted disclosure violations under the federal securities laws.

In June and July 2009, the Court consolidated various derivative actions before it into this single Derivative Action, and appointed Louisiana Municipal Police Employees Retirement System and Hollywood Police Officers' Retirement System as interim lead plaintiffs ("Plaintiffs") and appointed the law firms of Kahn Swick & Foti, LLC and Saxena White P.A. as interim co-lead counsel ("Lead Counsel").  It also ordered that the Derivative Action be coordinated for pretrial purposes with related consolidated securities and ERISA actions, also before the Court, under the common caption, *In re Bank of America Corp. Securities, Derivative*

*and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC).

On October 9, 2009, Plaintiffs in the Derivative Action filed a consolidated complaint (the "Complaint"), naming as defendants Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward (collectively, "Defendants" and, with Plaintiffs, the "Parties"), among others, and alleging generally, purportedly on behalf of BAC, violations of Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and breaches of fiduciary duty under state law in connection with the Merger and other claims.

On December 8, 2009, Defendants moved to dismiss certain claims in the Derivative Action. On August 27, 2010, the Court granted in part and denied in part Defendants' motion to dismiss, holding that demand on the BAC board of directors was excused and permitting Plaintiffs to pursue the claims asserted in the litigation on BAC's behalf.

Extensive discovery was conducted in connection with the Derivative Action and related proceedings. Lead Counsel reviewed more than 2.5 million pages of documents produced in the Derivative Action and other civil and regulatory proceedings related to the Merger; participated in, and/or reviewed copies of transcripts of, more than 100 depositions of Defendants and other relevant witnesses taken in connection with the various civil and regulatory proceedings related to the Merger; and retained and worked with experts to evaluate issues of causation and damages and to evaluate Defendants' conduct in connection with the Merger and advise on potential corporate governance reforms.

Since the fall of 2011, counsel for the Parties have engaged in arm's-length discussions and negotiations regarding a potential resolution of the Derivative Action, on the basis of certain corporate-governance reforms at BAC and/or certain monetary consideration to be paid on behalf of Defendants by BAC's insurance carriers that provide coverage applicable to the claims asserted in the Derivative Action (the "D&O Carriers"), pursuant to the terms of the relevant policies.

On February 29, 2012, counsel for the Parties and the D&O Carriers participated in a mediation session, conducted by Judge Layn Phillips, a nationally recognized mediator, regarding the monetary consideration to be included in a settlement of the Derivative Action. Following the February 29, 2012 mediation, counsel for the Parties continued to have discussions regarding the issues related to a settlement of the Derivative Action, including further negotiation through Judge Phillips regarding the monetary consideration to be included in any such settlement.

On March 16, plaintiffs in a parallel derivative action captioned, *In re Bank of America Corp. Stockholder Derivative Litigation*, C.A. No. 4307-CS, pending in the Court of Chancery for the State of Delaware (the "Delaware Action"), moved in the Delaware Court for an order enjoining the parties from proceeding with the settlement on the grounds that it was allegedly inadequate and collusive, and moved in the Federal Court for similar relief and an order permitting them to intervene in the Derivative Action pending in the Federal Court.

On May 4, 2012, the Delaware Court denied the Delaware plaintiffs' motion on the ground that it did not have the power to enjoin the Settlement.

On May 14, 2012, the Federal Court denied the Delaware plaintiffs' motion on the ground that the Delaware plaintiffs had failed to meet the requirements for intervention and could present any objections they might have to the Settlement at the Settlement Hearing.

On June 19, 2012, the Parties and BAC executed a Stipulation of Settlement (the "Stipulation"), which sets forth the complete terms of the Settlement.

On _____ __, 2012, the Federal Court entered an order preliminarily approving the Settlement, setting a schedule for the Federal Court's final review of the Settlement, and establishing customary notice and objection procedures for BAC Stockholders.

## II.   TERMS OF THE SETTLEMENT

In consideration for the settlement and release of all Released Claims (as described in Section III below), (i) the D&O Carriers have agreed to pay, on behalf of Defendants, the sum of $20 million to BAC; and (ii) BAC has agreed to implement a program of corporate-governance reforms, including the creation of a new board-level committee to oversee major acquisitions by BAC; modifications to the charter of BAC's disclosure committee to ensure more systematic oversight of the Bank's acquisition-related disclosures; changes to BAC's corporate governance guidelines related to director education requirements for BAC directors; and amendments to the charter of the Enterprise Risk Committee ("ERC") of the BAC board of directors relating to the attendance of certain corporate officers at ERC meetings.

## III.   DISMISSALS AND RELEASES

The Stipulation provides that, subject to approval by the Federal Court pursuant to Federal Rule of Civil Procedure 23.1, for good and valuable consideration, the Derivative Action shall be dismissed on the merits with prejudice as to all Defendants and against Plaintiffs and all BAC Stockholders, and all Released Claims (defined below) shall be completely, fully, finally

and forever released, relinquished, settled, discharged and dismissed with prejudice and without costs, as to all Released Parties.[1]

"Released Claims" means any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, matters, issues and controversies of any kind, nature or description whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims (defined below), whether based on state, local, foreign, federal, statutory, regulatory, common or other law or rule, brought or that could be brought derivatively or otherwise by or on behalf of BAC against any of the Released Parties (defined below), which now or hereafter are based upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims or any

---

[1] "Released Parties" means (i) Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward; (ii) any other individual or entity that was originally named as a defendant in the Derivative Action or any of the constituent actions underlying the Derivative Action, the Delaware Action (defined below), the North Carolina Action (defined below) or any action consolidated into any such actions; (iii) all other current and former employees, officers, directors and advisers of BAC and Merrill, to the extent of any claimed liability relating, directly or indirectly, to any decisions to proceed with the Merger or any disclosures or purported nondisclosures relating to the Merger or the performance or financial condition of Merrill prior to the closing of the Merger or any governmental assistance contemplated or provided, in whole or in part, in connection with the Merger; and (iv) for each and all of the foregoing persons or entities (but only to the extent such persons or entities are released as provided above), any and all of their respective past or present family members, spouses, heirs, trusts, trustees, executors, estates, administrators, beneficiaries, distributees, foundations, agents, employees, fiduciaries, partners, partnerships, general or limited partners or partnerships, joint ventures, member firms, limited-liability companies, corporations, parents, subsidiaries, divisions, affiliates, associated entities, stockholders, principals, officers, managers, directors, managing directors, members, managing members, managing agents, predecessors, predecessors-in-interest, successors, successors-in-interest, assigns, financial or investment advisors, advisors, consultants, investment bankers, entities providing any fairness opinion, underwriters, brokers, dealers, lenders, commercial bankers, attorneys, personal or legal representatives, accountants and associates.

6

other matters, things or causes whatsoever, or any series thereof, that are, were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved or referred to in the Derivative Action and relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding, including, without limitation, any and all claims by or on behalf of BAC which are based upon, arise out of, relate in any way to, or involve, directly or indirectly:  (i) the Merger; (ii) the Proxy Statement, including all supplements thereto, or any other disclosures or purported omissions relating, directly or indirectly, to the Merger, the performance or financial condition of Merrill prior to the closing of the Merger or any governmental assistance contemplated or provided, in whole or in part, in connection with the Merger; or (iii) any of the allegations in any complaint or amendment(s) thereto filed in the Derivative Action, the Delaware Action, the action captioned, *Cunniff v. Lewis*, No. 09 CVS 3978, pending in the Superior Court for the State of North Carolina (the "North Carolina Action"), or any action consolidated into any such actions; *provided, however*, that the Released Claims shall not include (a) claims to enforce this Settlement or (b) any claims (other than claims for relief predicated on an alleged misrepresentation or omission after September 14, 2008 or claims released pursuant to the Order and Final Judgment in the action captioned, *County of York Employees Retirement Plan v. Merrill Lynch & Co., Inc. et al.*, C.A. No. 4066-VCN (Del. Ch. Aug. 31, 2009)) against any current or former director, officer or employee of Merrill based on any alleged breach prior to January 2, 2009 of any alleged duty to Merrill or its stockholders that have been asserted in (i) the Verified Third Amended Shareholder Derivative and Class Action Complaint filed on July 27, 2009 in the action captioned, *In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litigation*, No. 07 Civ. 9696 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the

7

caption, *Sollins v. O'Neal et al.*, No. 11-1589, or (ii) the Amended Complaint filed on September 14, 2009 in the action captioned, *Lambrecht v. O'Neal et al.*, No. 09 Civ. 8259 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the caption, *Lambrecht v. O'Neal et al.*, No. 11-1285. For the avoidance of doubt, the Released Claims do not include (1) any direct claims on behalf of present or former BAC stockholders that are being prosecuted in the individual and class actions that have been coordinated for pretrial purposes with the derivative action under the caption, *In re Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC) (the "Securities Actions"); (2) in the event of an adverse judgment in the Securities Actions, claims, if any, by BAC to recover fees and expenses advanced by BAC in the Securities Actions against any person for whom BAC has advanced fees and expenses in such actions; (3) in the event of a payment of money damages by BAC in satisfaction of a judgment against BAC in the Securities Actions, claims, if any, by BAC for contribution; or (4) any derivative claims related to Bank of America's residential loan activities that have been or might be asserted in the action captioned, *American European Insurance Company, et al. v. Moynihan, et al.*, C.A. No. 7436, which is currently pending in the Court of Chancery of the State of Delaware.

If the Settlement becomes final, the releases will extend to any claims of Plaintiffs or BAC or any BAC stockholder that he, she or it does not know or suspect exist in his, her or its favor at the time of the release of the Released Claims as against the Released Parties, including without limitation those which, if known, might have affected the decision to enter into or object to the Settlement ("Unknown Claims"). Plaintiffs, BAC and BAC stockholders shall be deemed to have expressly waived, relinquished and released any and all provisions, rights and benefits

conferred by or under any law or principle of common law that may have the effect of limiting

the releases set forth above, including section 1542 of the California Civil Code.[2]

Following final approval of the Settlement and entry of the Order and Final Judgment,

Defendants will seek to dismiss all other pending derivative lawsuits relating to the Merger,

which includes derivative actions in Delaware and North Carolina, with prejudice, based on the

provisions in the Settlement.

## IV.   REASONS FOR THE SETTLEMENT

Lead Counsel have thoroughly reviewed and analyzed the facts and circumstances

relating to the claims asserted in the Derivative Action, including conducting arm's length

discussions with counsel to Defendants, reviewing publicly available information, analyzing the

extensive discovery record, reviewing applicable case law and other authorities and consulting

with retained experts.  Plaintiffs brought their claims in good faith and continue to believe that

their claims have legal merit.  However, Plaintiffs recognize that there are legal and factual

defenses to the claims asserted in the Derivative Action, which present substantial risks to the

successful resolution of any litigation, especially in complex shareholder derivative litigation

such as the Derivative Action.  Accordingly, in light of these risks and based on their evaluation

of the claims and their substantial experience, Lead Counsel have determined that the Settlement,

which confers substantial benefits upon BAC and its stockholders, is fair, reasonable and

adequate, and in the best interests of the Bank and its stockholders.

Defendants have vigorously denied, and continue vigorously to deny, all allegations of

wrongdoing, fault liability or cognizable damage to BAC, deny that they engaged in any

---

[2]   Section 1542 of the California Civil Code states:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

wrongdoing, deny that they committed any violation of law, deny that the Proxy Statement is in any way deficient, deny that they acted improperly in any way, believe that they acted properly at all times, believe that the Derivative Action has no merit, and maintain that they have committed no disclosure violations or any other breach of duty whatsoever in connection with the Merger or any related disclosures.  Defendants are entering into this Settlement solely because they consider it desirable that the Derivative Action be settled and dismissed with prejudice in order to, among other things, (i) eliminate the burden, inconvenience, expense, uncertainty and distraction of further litigation; and (ii) finally put to rest all claims that were or could have been asserted against Defendants in the Derivative Action.

## V.    PLAINTIFFS' ATTORNEYS FEES AND EXPENSES

If the Settlement is approved, Lead Counsel intend to apply to the Federal Court for an award of fees and expenses in connection with the Derivative Action (the "Fee Application"), which shall be the only fee application made by counsel for any plaintiff in the Derivative Action.  Defendants and BAC agree that Plaintiffs and their counsel in the Derivative Action are entitled to an award of reasonable attorneys' fees and expenses.  The Settlement, however, is not conditioned on the Court granting the Fee Application or awarding any particular amount of attorneys' fees and expenses, and the parties have not reached an agreement with respect to the appropriate amount of fees and expenses Lead Counsel should be awarded.

The parties have agreed that any application for fees and expenses by Lead Counsel shall be presented to the Court for consideration after the Court's approval of the Settlement.  The parties believe that this approach will appropriately focus the Settlement Hearing on the Court's evaluation of the fairness, reasonableness and adequacy of the Settlement.  It will also further judicial economy because the Court will evaluate the Fee Application only if the Settlement is

approved.  At that time, Lead Counsel will ask the Court to award attorneys' fees in an amount

not to exceed $13 million, and for reimbursement of their expenses incurred in prosecuting the

case in an amount not to exceed $600,000.  This fee amount represents Lead Counsel's current

combined professional fees of $10.4 million based upon approximately 24,000 hours prosecuting

this case to date, enhanced by a risk multiplier of 1.25.  If the Settlement is approved, the Court

will hold a separate hearing to consider the Fee Application and any objections thereto.

Defendants and BAC will consider the Fee Application but have advised Lead Counsel that they

plan to object to an application seeking fees in the range of $13 million.  The Fee Application

and information regarding the hearing to consider the Fee Application will be made available at

www._____.com or by calling (xxx) xxx-xxxx.

## VI.   <u>**SETTLEMENT HEARING**</u>

The Court has scheduled the Settlement Hearing for _____, 2012 at

_____ _.m., Eastern Time, at the United States District Court for the Southern District of

New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom

12C, New York, New York 10007, to:  (i) determine whether the Settlement should be approved

by the Court as fair, reasonable and adequate; (ii) determine whether an Order and Final

Judgment should be entered in the Derivative Action pursuant to the Stipulation; (iii) hear and

address any objections to the Settlement; and (iv) rule on such other matters as the Court may

deem appropriate.

The Court has reserved the right to adjourn the Settlement Hearing or any adjournment

thereof, without further notice of any kind to BAC Stockholders.  The Court has also reserved

the right to approve the Settlement at or after the Settlement Hearing with such modification(s)

as may be consented to by the parties to the Stipulation and without further notice to BAC Stockholders.

## VII.    RIGHT TO APPEAR AND OBJECT

Any BAC Stockholder who objects to any aspect of the Settlement and/or the Order and Final Judgment to be entered in the Derivative Action, or who otherwise wishes to be heard, may appear in person or by his or her attorney at the Settlement Hearing and present evidence or argument that may be proper and relevant.  If you want to do so, however, you must no later than twenty-eight (28) calendar days prior to the Settlement Hearing, file with the Court, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, the following:  (i) proof of ownership of BAC common stock; (ii) a statement of the objections by the BAC Stockholder; and (iii) the grounds for the objections, as well as all documents or writings such person desires the Court to consider.  Also, on or before the date you file such papers, you must serve them by hand or mail on the following counsel of record:

Lead Counsel for Plaintiffs:

Lewis S. Kahn, Esq.
Michael A. Swick, Esq.
Albert M. Myers, Esq.
Kahn Swick & Foti, LLC
206 Covington Street
Madisonville, Louisiana 70447

Maya Saxena, Esq.
Joseph E. White, III, Esq.
Christopher S. Jones, Esq.
Saxena White P.A.
2424 N. Federal Highway, Suite 257
Boca Raton, Florida 33431

Counsel for Defendants:

Lawrence Portnoy, Esq.
Charles S. Duggan, Esq.
Brian M. Burnovski, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

Unless the Court otherwise directs, no person shall be entitled to object to the approval of the Settlement, to any Order and Final Judgment entered thereon or to otherwise to be heard, except by serving and filing a written objection and supporting papers and documents as prescribed above. ***Any BAC Stockholder who fails to object in the manner described above shall be deemed to have waived the right to object (including any right of appeal) and shall be forever barred from raising such objection in this or any other action or proceeding unless the Court orders otherwise.***

## VIII.   <u>ORDER AND FINAL JUDGMENT OF THE COURT</u>

If the Court determines that the Settlement is fair, reasonable and adequate, the parties will ask the Court to enter an Order and Final Judgment, which will, among other things:

1.     approve the Settlement as fair, reasonable and adequate, pursuant to Federal Rule of Civil Procedure 23.1;

2.     authorize and direct the performance of the Settlement in accordance with its terms and conditions and reserve jurisdiction to supervise the consummation of the Settlement provided herein; and

3.     dismiss the Derivative Action with prejudice on the merits and release the Released Parties from the Released Claims.

## IX.   <u>SCOPE OF THE NOTICE</u>

This Notice contains only a summary of the Action and the terms of the proposed Settlement. For more details about the matters involved in the Action and the terms and conditions of the Settlement, you or your attorney may inspect the case files in the Office of the Clerk of Court, United States District Court for the Southern District of New York, Daniel

Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, during regular business hours.

Please visit www._____.com or call (xxx) xxx-xxxx if you wish to obtain a copy of the Stipulation.  Should you have any other questions regarding the proposed Settlement or the Derivative Action, please contact Lead Counsel for Plaintiffs:

| | |
|---|---|
| Lewis S. Kahn, Esq. | Maya Saxena, Esq. |
| Michael A. Swick, Esq. | Joseph E. White, III, Esq. |
| Albert M. Myers, Esq. | Christopher S. Jones, Esq. |
| Kahn Swick & Foti, LLC | Saxena White P.A. |
| 206 Covington Street | 2424 N. Federal Highway, Suite 257 |
| Madisonville, Louisiana 70447 | Boca Raton, Florida 33431 |
| (504) 455-1400 | (561) 394-3399 |

**PLEASE DO NOT CALL OR WRITE THE COURT REGARDING THIS NOTICE.**

DATED: _____ __, 2012     BY ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
                                                                  :
                                                                  :
IN RE BANK OF AMERICA CORP.                                       :
SECURITIES, DERIVATIVE, AND                                       :
EMPLOYEE RETIREMENT INCOME                                        :
SECURITY ACT (ERISA) LITIGATION                                   :         Master File
                                                                  :    No. 09 MD 2058 (PKC)
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x        ECF CASE
                                                                  :
THIS DOCUMENT RELATES TO                                          :
                                                                  :
Consolidated Derivative Action                                    :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SETTLEMENT OF STOCKHOLDER DERIVATIVE LITIGATION

**TO:  ALL RECORD AND BENEFICIAL OWNERS OF BANK OF AMERICA CORP. COMMON STOCK AS OF JUNE 19, 2012, WHO CONTINUE TO OWN SUCH SHARES ("BAC STOCKHOLDERS"):**

THIS NOTICE IS GIVEN pursuant to an Order of the United States District Court for the Southern District of New York (the "Court"), to inform you of a proposed stipulated settlement (the "Settlement") in the above-captioned derivative action (the "Action").  The Action involves claims, brought derivatively on behalf of Bank of America Corporation ("BAC"), against certain of its current and former directors alleging violations of Section 14(a) of the Securities Exchange Act of 1934 and certain breaches of fiduciary duty in connection with BAC's acquisition of Merrill Lynch & Co., Inc., which closed on January 1, 2009.

YOU ARE HEREBY NOTIFIED THAT, a hearing will be held on _____ __, 2012, at __ _.m., before the Honorable P. Kevin Castel, at the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 12C, New York, NY 10007, for the purpose of determining whether the Settlement should be approved as fair, reasonable and adequate.  If the Settlement is approved, the Court will hold a separate hearing at a later date to consider an application by Lead Counsel for plaintiffs in the Action for an award of attorneys' fees and for the reimbursement of expenses incurred in the prosecution of the Action.  ***Because this is a stockholder derivative action brought for the benefit of BAC, no individual BAC Stockholder has the right to receive any individual compensation as a result of the settlement of this action.***  In accordance with the terms of the Settlement, and in consideration for certain broad releases, the insurance carriers who provide coverage applicable to the claims asserted in the Derivative Action have agreed to pay, on behalf of Defendants, the sum of $20 million to BAC, and BAC has agreed to implement certain corporate-governance reforms, including the creation of a new board-level committee to

oversee major acquisitions by BAC; modifications to the charter of BAC's disclosure committee to ensure more systematic oversight of the Bank's acquisition-related disclosures; changes to BAC's corporate governance guidelines related to director education requirements for BAC directors; and amendments to the charter of the Enterprise Risk Committee (ERC) of the BAC board of directors relating to the attendance of certain corporate officers at ERC meetings.

**IF YOU ARE AN OWNER OF BAC COMMON STOCK, YOUR RIGHTS MAY BE AFFECTED BY THE SETTLEMENT.** This notice contains only a summary of the Action and the terms of the Settlement. If you are a current BAC Stockholder, you may obtain a copy of a detailed Notice of Settlement of Stockholder Derivative Litigation describing the Action, the proposed Settlement, and the rights of BAC Stockholders with regard to the Settlement, as well as a copy of the Stipulation of Settlement, by visiting the website www._____.com, or by calling (xxx) xxx-xxxx. Should you have any other questions regarding the proposed Settlement or the Action, please contact Lead Counsel for Plaintiffs:

| | |
|---|---|
| Lewis S. Kahn, Esq. | Maya Saxena, Esq. |
| Michael A. Swick, Esq. | Joseph E. White, III, Esq. |
| Albert M. Myers, Esq. | Christopher S. Jones, Esq. |
| Kahn Swick & Foti, LLC | Saxena White P.A. |
| 206 Covington Street | 2424 N. Federal Highway, Suite 257 |
| Madisonville, Louisiana 70447 | Boca Raton, Florida 33431 |
| (504) 455-1400 | (561) 394-3399 |

Any objection to the Settlement must be filed with the Clerk of the Court (Honorable P. Kevin Castel, United States District Court, Southern District of New York, 500 Pearl Street, New York, NY 10007) in this case numbered 09 MD 2058 (PKC), no later than _____, 2012 and served by hand or first class mail (postage prepaid) for delivery by the same date on Plaintiffs' Counsel (at the address listed above) and on counsel for Defendants (at the address listed below):

Lawrence Portnoy, Esq.
Charles S. Duggan, Esq.
Brian M. Burnovski, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

**PLEASE DO NOT CALL OR WRITE THE COURT REGARDING THIS NOTICE.**

DATED: _____, 2012   BY ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

IN RE BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION           Master File
                                         No. 09 MD 2058 (PKC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :            ECF CASE

THIS DOCUMENT RELATES TO      :

Consolidated Derivative Action      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>ORDER AND FINAL JUDGMENT</u>

A hearing having been held before this Court (the "Court") on _____ __, 2012,

pursuant to the Court's Order of _____ __, 2012 (the "Scheduling and Preliminary Approval

Order"), upon a Stipulation and Agreement of Compromise, Settlement and Release, executed on

June 19, 2012 (the "Stipulation"), in the consolidated stockholder derivative action captioned *In

re Bank of America Securities, Derivative, and Employee Retirement Income Security Act

(ERISA) Litigation*, Master File No. 09 MD 2058 (the "Derivative Action"), which was joined

and consented to by all of the parties to the Derivative Action; the Scheduling and Preliminary

Approval Order and the Stipulation being incorporated herein by reference; it appearing that due

notice of said hearing was given in accordance with the aforementioned Scheduling and

Preliminary Approval Order and that said notice was adequate and sufficient; the parties having

appeared by their attorneys of record; the attorneys for the respective parties having been heard

in support of the proposed settlement (the "Settlement") of the Derivative Action; and an

opportunity to be heard having been given to all other persons desiring to be heard as provided in the notice; and the entire matter of the Settlement having been considered by the Court;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, this ___ day of _____, 2012, as follows:

18.     Unless otherwise defined herein, all defined terms shall have the meanings as set forth in the Stipulation.

19.     The Notice of Settlement of Stockholder Derivative Litigation has been given to stockholders of Bank of America Corporation ("BAC" or the "Company") pursuant to and in the manner directed by the Preliminary Approval Order; proof of publication of the required notice was filed with the Court; and full opportunity to be heard has been offered to all parties, BAC stockholders and persons in interest.  The form and manner of the notice provided is hereby confirmed to have been the best notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Federal Rule of Civil Procedure 23.1, due process and applicable law, and it is further determined that all BAC stockholders are bound by the Order and Final Judgment herein.

20.     The Court reconfirms that, for settlement purposes only, the Derivative Action is properly maintained as a shareholder derivative action on behalf of BAC, and that Plaintiffs fairly and adequately represented the interests of stockholders similarly situated in enforcing the rights of BAC stockholders.  Lead Counsel is authorized to act on behalf of BAC stockholders with respect to all acts required by the Stipulation or such other acts which are reasonably necessary to consummate the Settlement set forth in the Stipulation.

21.     The Settlement is found to be fair, reasonable and adequate, and is hereby approved pursuant to Federal Rule of Civil Procedure 23.1.  The parties to the Stipulation are

hereby authorized and directed to comply with and to consummate the Settlement in accordance
with its terms and provisions, and the Clerk is directed to enter and docket this Order and Final
Judgment in the Action.

22.     This Court has jurisdiction over the subject matter of the Derivative Action,
including all matters necessary to effectuate the Settlement and this Final Judgment and over all
parties to the Action.

23.     The Action and the Released Claims are hereby dismissed on the merits with
prejudice as to all Defendants in the Derivative Action and against all Released Parties on the
merits and, except as may be awarded by the Court as contemplated below in Paragraph 14,
without fees or costs.

24.     "Released Claims" means any and all manner of claims, demands, rights,
liabilities, losses, obligations, duties, damages, costs, debts, expenses, interest, penalties,
sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements,
judgments, decrees, matters, issues and controversies of any kind, nature or description
whatsoever, whether known or unknown, disclosed or undisclosed, accrued or unaccrued,
apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or
unsuspected, liquidated or not liquidated, fixed or contingent, including Unknown Claims
(defined below), whether based on state, local, foreign, federal, statutory, regulatory, common or
other law or rule, brought or that could be brought derivatively or otherwise by or on behalf of
BAC against any of the Released Parties (defined below), which now or hereafter are based
upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions,
transactions, occurrences, statements, representations, misrepresentations, omissions, allegations,
facts, practices, events, claims or any other matters, things or causes whatsoever, or any series

3

thereof, that are, were, could have been, or in the future can or might be alleged, asserted, set forth, claimed, embraced, involved or referred to in the Derivative Action and relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding, including, without limitation, any and all claims by or on behalf of BAC which are based upon, arise out of, relate in any way to, or involve, directly or indirectly:  (i) the Merger; (ii) the Proxy Statement, including all supplements thereto, or any other disclosures or purported omissions relating, directly or indirectly, to the Merger, the performance or financial condition of Merrill prior to the closing of the Merger or any governmental assistance contemplated or provided, in whole or in part, in connection with the Merger; or (iii) any of the allegations in any complaint or amendment(s) thereto filed in the Derivative Action, the action captioned, *In re Bank of America Corp. Stockholder Derivative Litigation*, C.A. No. 4307-CS, pending in the Court of Chancery for the State of Delaware (the "Delaware Action"), the action captioned, *Cunniff v. Lewis*, No. 09 CVS 3978, pending in the Superior Court for the State of North Carolina (the "North Carolina Action"), or any action consolidated into any such actions; *provided, however*, that the Released Claims shall not include (a) claims to enforce this Settlement or (b) any claims (other than claims for relief predicated on an alleged misrepresentation or omission after September 14, 2008 or claims released pursuant to the Order and Final Judgment in the action captioned, *County of York Employees Retirement Plan v. Merrill Lynch & Co., Inc. et al.*, C.A. No. 4066-VCN (Del. Ch. Aug. 31, 2009)) against any current or former director, officer or employee of Merrill based on any alleged breach prior to January 2, 2009 of any alleged duty to Merrill or its stockholders that have been asserted in (i) the Verified Third Amended Shareholder Derivative and Class Action Complaint filed on July 27, 2009 in the action captioned, *In re Merrill Lynch & Co., Inc. Securities, Derivative and*

4

*ERISA Litigation*, No. 07 Civ. 9696 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the caption, *Sollins v. O'Neal et al.*, No. 11-1589, or (ii) the Amended Complaint filed on September 14, 2009 in the action captioned, *Lambrecht v. O'Neal et al.*, No. 09 Civ. 8259 (S.D.N.Y.), which was dismissed and is on appeal before the United States Court of Appeals for the Second Circuit under the caption, *Lambrecht v. O'Neal et al.*, No. 11-1285.  For the avoidance of doubt, the Released Claims do not include (1) any direct claims on behalf of present or former BAC stockholders that are being prosecuted in the individual and class actions that have been coordinated for pretrial purposes with the derivative action under the caption, *In re Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC) (the "Securities Actions"); (2) in the event of an adverse judgment in the Securities Actions, claims, if any, by BAC to recover fees and expenses advanced by BAC in the Securities Actions against any person for whom BAC has advanced fees and expenses in such actions; (3) in the event of a payment of money damages by BAC in satisfaction of a judgment against BAC in the Securities Actions, claims, if any, by BAC for contribution; or (4) any derivative claims related to Bank of America's residential loan activities that have been or might be asserted in the action captioned, *American European Insurance Company, et al. v. Moynihan, et al.*, C.A. No. 7436, which is currently pending in the Court of Chancery of the State of Delaware.

25. "Released Parties" means (i) Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward; (ii) any other individual or entity that was originally named as a defendant in the Derivative Action or any of

the constituent actions underlying the Derivative Action, the Delaware Action, the North

Carolina Action or any action consolidated into any such actions; (iii) all other current and

former employees, officers, directors and advisers of BAC and Merrill, to the extent of any

claimed liability relating, directly or indirectly, to any decisions to proceed with the Merger or

any disclosures or purported nondisclosures relating to the Merger or the performance or

financial condition of Merrill prior to the closing of the Merger or any governmental assistance

contemplated or provided, in whole or in part, in connection with the Merger; and (iv) for each

and all of the foregoing persons or entities (but only to the extent such persons or entities are

released as provided above), any and all of their respective past or present family members,

spouses, heirs, trusts, trustees, executors, estates, administrators, beneficiaries, distributees,

foundations, agents, employees, fiduciaries, partners, partnerships, general or limited partners or

partnerships, joint ventures, member firms, limited-liability companies, corporations, parents,

subsidiaries, divisions, affiliates, associated entities, stockholders, principals, officers, managers,

directors, managing directors, members, managing members, managing agents, predecessors,

predecessors-in-interest, successors, successors-in-interest, assigns, financial or investment

advisors, advisors, consultants, investment bankers, entities providing any fairness opinion,

underwriters, brokers, dealers, lenders, commercial bankers, attorneys, personal or legal

representatives, accountants and associates.

26.     Plaintiffs, BAC and by operation of law all BAC stockholders, shall and hereby

do completely, fully, finally and forever release, relinquish, settle and discharge each and all of

the Released Parties from and with respect to any and all of the Released Claims, and will be

forever barred and enjoined from commencing, instituting or prosecuting any action or

proceeding, in any forum, asserting any of the Released Claims against any of the Released Parties.

27.     Defendants, individually and collectively, shall and hereby do completely, fully, finally and forever release, relinquish, settle and discharge each and all of the Plaintiffs, Lead Counsel and all other plaintiffs' counsel from and with respect to any and all claims arising out of or relating to the initiation, prosecution and resolution of the Derivative Action, excepting any claim to enforce the Stipulation or Settlement.

28.     The Releases include any claims of Plaintiffs or BAC or any BAC stockholder that he, she or it does not know or suspect exist in his, her or its favor at the time of the releases of the Released Claims against the Released Parties, including without limitation those which, if known, might have affected the decision to enter into or to object to the Settlement ("Unknown Claims").  Plaintiffs and BAC shall have, and all BAC stockholders shall be deemed to have, and by operation of the final order and judgment by the Court shall have, expressly waived, relinquished and released any and all provisions, rights and benefits conferred by or under California Civil Code § 1542 or any law or principle of common law of the United States or any state or territory of the United States which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Plaintiffs and BAC acknowledge, and all BAC stockholders by operation of law shall be deemed to have acknowledged, that they may discover facts in addition to or different from those now known or believed to be true with respect to the Released Claims, but that it is the intention of

Plaintiffs, BAC and all BAC stockholders by operation of law, to completely, fully, finally and forever extinguish any and all Released Claims, known or unknown, suspected or unsuspected, which now exist, heretofore existed or may hereafter exist, and without regard to the subsequent discovery of additional or different facts.  Plaintiffs and BAC acknowledge, and all BAC stockholders by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of "Released Claims" was separately bargained for and was a material element of the Settlement and was relied upon by each and all of Defendants in entering into the Stipulation and agreeing to the Settlement.

29.     Plaintiffs, BAC and each and every BAC stockholder are hereby permanently barred and enjoined from asserting, commencing, prosecuting, assisting, instigating, continuing or in any way participating in the commencement or prosecution of any action, whether directly, representatively, derivatively or in any other capacity, asserting any of the Released Claims that are released pursuant to this Order and Final Judgment or under the Stipulation.

30.     Neither the Stipulation, the Settlement, this Order and Final Judgment, nor any act performed, statement made or document executed pursuant to or in furtherance of the Settlement is or may be construed or deemed to be a presumption, concession or admission (i) by any of the Released Parties or any other person of any fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Derivative Action or otherwise or that BAC, Plaintiffs or Lead Counsel, any present or former stockholders of BAC or any other person, have suffered any damage attributable in any manner to any of the Released Parties; or (ii) by Plaintiffs or Lead Counsel of any lack of merit of the Released Claims, or that BAC has not suffered cognizable damages caused by Defendants.  The existence of the Stipulation and its contents, the Settlement, this Order and Final Judgment or any negotiations, statements or proceedings in connection

8

therewith, shall not be offered or admitted in evidence or referred to, interpreted, construed, invoked or otherwise used by any person for any purpose in the Derivative Action or otherwise, except as may be necessary to effectuate the Settlement.  Notwithstanding the foregoing, any of the Released Parties may file the Stipulation or any judgment or order of the Court related hereto in any other action that may be brought against them, in order to support any and all defenses or counterclaims based on *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

31.     Lead Counsel shall file an application for an award of attorneys' fees in an amount not to exceed $13 million, and for reimbursement of their expenses incurred in prosecuting the case in an amount not to exceed $600,000 (the "Fee Application").  Following the filing of the Fee Application, the Court will enter an order setting a date for a hearing to consider the Fee Application (the "Fee Hearing"), and providing instructions to file any objections to the Fee Application, which the Court will consider at the Fee Hearing.

32.     The effectiveness of the Order and Final Judgment and the obligations of Plaintiffs, Lead Counsel, BAC, BAC stockholders and Defendants under the Settlement shall not be conditioned upon or subject to the resolution of any appeal that relates solely to the issue of attorneys' fees and expenses.

33.     The Court further orders, adjudges and decrees that all other relief be, and is hereby, denied, and that this Order and Final Judgment disposes of all the claims and all the parties in the above-styled and numbered stockholder derivative action.

34.     Without affecting the finality of this Order and Final Judgment in any way, this Court retains jurisdiction over all matters relating to the administration and consummation of the

Settlement and all parties hereto for the purpose of construing, enforcing and administering the Settlement and for the purpose of considering the Fee Application and entering any separate judgment(s) for fees and expenses to Lead Counsel.

35.    In the event that the Settlement does not become effective or that Defendants exercise their right to terminate the Settlement in accordance with the terms of the Stipulation, then this Order and Final Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated, and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided for and in accordance with the Stipulation.

Dated: _____

_____
THE HONORABLE P. KEVIN CASTEL
U.S. DISTRICT JUDGE

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------- x
                    :

IN RE BANK OF AMERICA CORP.     :      Master File
SECURITIES, DERIVATIVE, AND      :   No. 09 MD 2058 (PKC)
EMPLOYEE RETIREMENT INCOME    :
SECURITY ACT (ERISA) LITIGATION  :      ECF Case
                    :

---------------------------------- x
                    :

THIS DOCUMENT RELATES TO       :
                    :
Consolidated Derivative Action     :
                    :
                    :

---------------------------------- x

**AFFIDAVIT OF LAWRENCE PORTNOY, ESQ.
IN SUPPORT OF MEMORANDUM OF LAW IN OPPOSITION TO
PETITION FOR AN ORDER TO SHOW CAUSE**

STATE OF NEW YORK       )
                    )   SS.
COUNTY OF NEW YORK   )

LAWRENCE PORTNOY, being duly sworn, deposes and says:

1.     I am a partner of the law firm of Davis Polk & Wardwell LLP, counsel for the

individual defendants ("Defendants") in the above-captioned action, and am admitted to practice

before this Court.

2.     I submit this Affidavit in support of Defendants' Memorandum of Law in

Opposition to Petition for an Order to Show Cause.

3.     Counsel for Defendants initially reached out to counsel for plaintiffs in a parallel

derivative action pending in the Delaware Chancery Court in the spring or summer of 2011,

months before any settlement discussions ever took place with counsel for plaintiffs in the

consolidated derivative action pending in this Court. At that time, I raised with Robert Kriner, a partner of Chimicles & Tikellis LLP, one of the Delaware Plaintiffs' counsel, whether new corporate governance measures might be a means of settling this case.

4.     Mr. Kriner rejected the possibility of a settlement on that basis, and stated that the Delaware Plaintiffs would only consider a cash settlement that exceeded the very substantial insurance coverage existing under Defendants' D&O policies applicable to the derivative claims. He also advised me that the Delaware Plaintiffs were uninterested in pursuing settlement discussions at the time. Neither Mr. Kriner nor any of the counsel for the Delaware Plaintiffs made any specific settlement demand, either at that time or any time since.

5.     Several months later, in the fall of 2011, counsel for the New York Plaintiffs raised with me the possibility of discussing a settlement. As I had with Mr. Kriner, I suggested that it might be possible to reach a settlement based on corporate governance measures. Counsel for the New York Plaintiffs informed me they were willing to consider such measures as part of a settlement, and the parties agreed to think on the subject further.

6.     In the following weeks, counsel for Defendants and the New York Plaintiffs had several discussions about potential new governance provisions, including the possible creation of a new board-level committee to oversee certain M&A activity of Bank of America Corporation ("BAC"). During those discussions, counsel for the New York Plaintiffs took the position that a settlement would also have to include a monetary component. Defendants' counsel maintained that a monetary contribution was inappropriate given the weakness of the derivative claims.

7.     On October 24, 2011, counsel for the New York Plaintiffs made a formal settlement demand to Defendants' counsel. The demand included a number of corporate governance reforms and described the contours of the proposed new board-level committee that

2

counsel had previously discussed. The demand also reiterated the New York Plaintiffs' position regarding a monetary payment from Defendants or their insurance carriers to the Bank.

8.     After receiving the demand, Defendants' counsel shared the New York Plaintiffs' proposed corporate governance changes with counsel for BAC, and had further discussions with New York Plaintiffs' counsel regarding the proposals.

9.     On December 16, 2011, Defendants' counsel responded to the New York Plaintiffs' demand. Defendants stated that they were willing to explore a settlement based on certain of the New York Plaintiffs' proposed corporate governance reforms, subject to certain modifications. Defendants also reiterated their position that, given the factual and legal infirmities in Plaintiffs' case, a monetary payment by Defendants or their insurance carriers was unwarranted.

10.     In late December 2011, I received a telephone call from one of the lawyers representing the Delaware Plaintiffs, Daniel Krasner, a partner of Wolf Haldenstein Adler Freeman & Herz LLP. Mr. Krasner told me that the Delaware Plaintiffs had reconsidered their position and were now ready to discuss a potential cash settlement within the applicable policy limits, but he did not make any particular settlement demand as part of the conversation.

11.     Several days later, and before I could even reach Defendants to discuss this overture, I received a call from Mr. Kriner and, possibly, Paul Paradis of Horwitz, Horwitz & Paradis, also co-lead counsel for the Delaware Plaintiffs. They asked me whether I had been contacted by Mr. Krasner, and I told them that I had been and what Mr. Krasner had said. Messrs. Kriner and Paradis told me that Mr. Krasner had no authority to speak for the Delaware Plaintiffs. They stated that, contrary to Mr. Krasner's statements, the Delaware Plaintiffs were still not interested in discussing any settlement within the limits of the applicable D&O policies.

3

Again, they did not present any demand of what the Delaware Plaintiffs would require to settle their claims.

12.     On January 5, 2012, the New York Plaintiffs raised certain questions with Defendants about the corporate governance proposal outlined by Defendants on December 16, 2011. The New York Plaintiffs also reiterated their position regarding a monetary payment by or on behalf of Defendants to the Bank. Given Defendants' prior refusals to discuss a monetary contribution, the New York Plaintiffs suggested that the parties mediate the issue of a monetary contribution with Judge Layn Phillips, a nationally recognized mediator.

13.     After discussions regarding the New York Plaintiffs' position on a monetary component, the D&O carriers authorized Defendants' counsel to explore a possible monetary settlement with the New York Plaintiffs. Over the next several weeks, during January and February 2012, counsel for Defendants and the New York Plaintiffs had numerous discussions about the proposed corporate governance changes and the possibility of a monetary contribution by the D&O carriers. By mid-February 2012, the parties had largely agreed on a framework for corporate governance reforms, but on the subject of a monetary contribution, the New York Plaintiffs, Defendants and the D&O carriers remained far apart.

14.     On February 10, 2012, Mr. Kriner telephoned me and asked whether I had been discussing settlement with the New York Plaintiffs. I told him that I had. I observed that the Delaware Plaintiffs had been uninterested in pursuing discussions, but stated that I was prepared to hear any message Mr. Kriner wanted to convey regarding settlement. Mr. Kriner then proposed a meeting to discuss the subject, which was scheduled for the following Tuesday, February 14, 2012.

15. The Delaware Plaintiffs' assertion in their Petition that they did not learn that Defendants were negotiating with the New York Plaintiffs until after the February 14, 2012 meeting (Pet. at 8) is thus false. The February 14 meeting was proposed specifically by Mr. Kriner during the call on February 10 that he had initiated by asking whether Defendants had been having settlement discussions with the New York Plaintiffs, and after I told him that such discussions had been taking place.

16. On February 14, 2012, my colleague Brian Burnovski and I, along with Daniel Dreisbach of Richards, Layton & Finger, met in New York with Messrs. Kriner and Paradis, as well as Michael Schwartz of Horwitz, Horwitz & Paradis, present for the Delaware Plaintiffs. Although the meeting had been scheduled for the purpose of discussing settlement, the Delaware Plaintiffs stated at the outset that they were not prepared to make a demand. They did invite Defendants to consider possible "structural" economic consideration, such as the possible return of personal BAC stock or options. In response, I invited Delaware Plaintiffs' counsel to discuss the merits of the case, stating my belief that neither of the plaintiffs' groups in the two pending derivative actions had developed evidence to support any bad faith claim, and thus I did not see any settlement value in the Delaware law claims, much less value that would justify an out-of-pocket contribution by Defendants. The Delaware Plaintiffs then stated that they were unwilling to discuss the merits of their claims before Defendants moved for summary judgment (on April 20), purportedly because they did not want to give Defendants advance notice of the evidence for their claims. They also said, somewhat inconsistently, that the evidence would be set forth in their forthcoming responses to Defendants' contention interrogatories. Given the Delaware Plaintiffs' refusal to make a demand or to discuss the strength of their claims, there was nothing to discuss. The meeting lasted no more than fifteen minutes, without any discussion of

settlement, despite the Delaware Plaintiffs' request only a few days before to meet for that specific purpose.

17.     On February 17, 2012, a regularly scheduled status conference was held in this Action and the related securities class action before this Court. Following the conference, the parties to the derivative action met in chambers to advise the Court about the status of the parties' settlement efforts, including that they had been discussing a framework for settlement that included corporate governance reforms which had largely been agreed, but that they remained far apart on the terms of a monetary component. The parties agreed to keep the Court apprised of any developments.

18.     The following week, on February 20, 2012, one of the New York Plaintiffs' counsel, Joseph White of Saxena White P.A., reiterated the suggestion that the parties mediate the monetary component of a settlement before Judge Phillips. On February 29, 2012, counsel for Defendants, the New York Plaintiffs and certain of the D&O carriers participated in a six-hour mediation conducted by Judge Phillips at Defendants' counsel's offices in New York. No agreement was reached, but progress was made, and the parties continued their discussions over the next several weeks, including by telephone through Judge Phillips.

19.     During a meet-and-confer on March 16, 2012 with Delaware Plaintiffs' counsel to discuss Defendants' anticipated motion for summary judgment, as required by the Scheduling Order, I outlined the basis for Defendants' planned summary judgment motion—in particular, the absence of any evidence supporting a claim of bad faith against any of the Defendants. In response, Mr. Kriner stated that, because the parties were bound to disagree, there was no need to debate the evidence. I then pressed the Delaware Plaintiffs to cite *any* evidence supporting a claim of bad faith. Mr. Kriner responded that "all" of the evidence had to be considered together.

Consistent with this position, when the Delaware Plaintiffs responded later that evening to Defendants' contention interrogatories, they pointed to more or less "all" of the record evidence as supporting their claims. For each interrogatory, they cited a virtual avalanche of record material that, while voluminous, did not support their claims and, in many instances, was entirely irrelevant. In an April 6, 2012 letter (a copy of which is attached as Exhibit A to this Affidavit), I objected to the Delaware Plaintiffs' responses.

20.    On or about March 23, 2012, I received a letter from Mr. Schwartz (a copy of which is attached as Exhibit B to this Affidavit) concerning a March 19, 2012 meeting between the Delaware Plaintiffs and counsel for BAC, which stated that the Delaware Plaintiffs "remain prepared to engage in good-faith settlement negotiations," and that they were "in agreement" with me that "such discussions should be simultaneously conducted jointly with Plaintiffs' counsel in both the Delaware and New York Actions."

21.    On March 28, 2012, I sent a letter to Mr. Schwartz (a copy of which is attached as Exhibit C to this Affidavit) to correct certain inaccurate statements in his March 23 letter, including that (1) the Delaware Plaintiffs had "repeatedly" conveyed their willingness to engage in good-faith settlement negotiations; and (2) I had told them that I thought joint negotiations with the New York Plaintiffs were appropriate. To the contrary, as I explained in the letter, based on the settlement-related discussions with the Delaware Plaintiffs described above, it was apparent that, "at every turn, the Delaware plaintiffs have been unwilling to engage in settlement discussions," and that any joint negotiations with the New York Plaintiffs would, accordingly, not be fruitful.

22.    On March 29, 2012, Mr. Wolfe responded to Mr. Schwartz's March 23 letter on behalf of the Bank, to make clear that the Bank's intention for the March 19 meeting was simply

to solicit the Delaware Plaintiffs' views regarding the value of the Delaware claims and relative

benefits of any proposed settlement, and that the Bank remained available to reconvene toward

that goal. The March 29 letter is attached as Exhibit D to this Affidavit.

23.     The Delaware Plaintiffs did not respond in writing to my March 28 letter or Mr.

Wolfe's March 29 letter. Rather, on March 30, 2012, Mr. Paradis left a telephone message for

me. I was out of the office at the time and I returned the call on Monday, April 2, together with

Mr. Burnovski. During the April 2 call, Mr. Paradis stated that he believed that the recent

rhetoric had gotten "heated," a comment that I took to refer to the recent correspondence

between the Delaware Plaintiffs and counsel for Defendants and BAC between March 23 and 29.

He then suggested that he and I have lunch one-on-one to discuss the case. During the brief

call—and contrary to his representations to this Court, Paradis Aff. ¶ 48—Mr. Paradis *never*

mentioned any supposed "reverse auction" or suggested that Defendants or the New York

Plaintiffs had done anything improper by engaging in settlement negotiations. Nor did Mr.

Paradis make any settlement demand or, indeed, even explicitly address settlement.

24.     On April 11, 2012, Mr. Paradis and I met for lunch. At no time during the lunch

did Mr. Paradis mention any supposed "reverse auction," suggest that Defendants or the New

York Plaintiffs had done anything improper by engaging in settlement negotiations or make any

settlement demand on behalf of the Delaware Plaintiffs.

25.     On April 12, 2012, after more than six months of negotiations, Defendants and the

New York Plaintiffs executed, along with BAC, a Memorandum of Understanding (the "MOU"),

a copy of which is attached as Exhibit E to this Affidavit, reflecting an agreement in principle to

settle the New York Action. The MOU provides for a $20 million payment to the Bank by

Defendants' D&O insurance carriers as well as adoption by the Board of governance reforms

that, among other things, would establish a new committee of the Board to oversee certain M&A transactions by the Bank. If approved by this Court, the settlement would release all claims asserted on behalf of BAC related to the Merger and would require dismissal of the claims asserted in the New York Action and the Delaware Action.

26. There is no agreement among the parties regarding any amount of fees for counsel for the New York Plaintiffs. The MOU states that counsel intend to seek an award of attorneys' fees and expenses and that Defendants agree that they are entitled to reasonable attorneys' fees and expenses and will negotiate with them in good faith, but reserve all rights with regard to any fee application. To date, the parties have not negotiated or reached any understanding regarding the attorneys' fees and expenses that will be sought by New York Plaintiffs' counsel in their fee petition.

27. On the afternoon of April 12, 2012, the parties to the New York Action advised this Court by letter of the MOU and requested that further proceedings in this Action be stayed pending the completion of a definitive settlement agreement and its submission for approval by this Court. Later that afternoon, the Court endorsed the parties' letter granting a stay. A copy of the endorsed letter is attached as Exhibit F to this Affidavit.

28. Immediately after signing the MOU, I called Mr. Paradis to advise the Delaware Plaintiffs of the proposed settlement and its terms. I asked whether or not the Delaware Plaintiffs would support the settlement and whether, in either event, they would support a stay of the Delaware Action pending final approval of the settlement. I explained that Defendants wanted to notify the Delaware Court of the settlement as soon as possible. Mr. Paradis said that the Delaware Plaintiffs would need a few hours to evaluate the terms of the proposed settlement and requested that Defendants hold off on notifying the Delaware Court. Later that evening, I

9

believe around 7:00 p.m., Mr. Burnovski and I contacted Mr. Paradis for an update. Mr. Paradis informed us that the Delaware Plaintiffs were still evaluating their position and would need several additional hours to respond. Mr. Paradis and I spoke again later, I believe around 9:30 p.m., but Mr. Paradis again could not, or would not, tell me what the Delaware Plaintiffs' position was on the settlement and said that the Delaware Plaintiffs would need until the morning to get back to me.

29.     The next morning, April 13, 2012, brought no response from the Delaware Plaintiffs. At around noon, I left a voicemail for Mr. Paradis, which was never returned. Instead, shortly before 2:00 p.m., Defendants' counsel were served with the Delaware Plaintiffs' motion for a temporary restraining order in the Delaware Action seeking to enjoin Defendants, the New York Plaintiffs and BAC from entering into the settlement or submitting it to this Court for consideration and preliminary approval. This motion is included as an exhibit to the Delaware Plaintiffs' petition that was filed in this Court.

30.     Based on discussions with counsel for the New York Plaintiffs, it is my understanding that prior to the depositions taken in the coordinated New York actions, they conferred with counsel for plaintiffs in the related consolidated class action regarding class counsel's anticipated questioning to ensure that any issues relevant to the derivative claims would be addressed during the deposition.

31.     I also understand from counsel for Bank of America that the New York Plaintiffs requested and received transcripts of depositions taken by Plaintiffs in the Delaware Action, while the Delaware Plaintiffs never requested transcripts of the depositions taken in the coordinated New York actions.

32. I have received and reviewed documents showing that the New York Plaintiffs have continuously held shares of BAC stock since before the filing of the New York derivative action, and that together they currently hold 277,466 shares. I have also received and reviewed documents showing that the Delaware Plaintiffs together hold 9,642 shares.

33. In addition to the foregoing, attached are true and correct copies of the following documents:

Exhibit G:    Transcript of Conference in *In re Bank of America Corp. Stockholder Derivative Litig.*, C.A. No. 4307-CS (Del. Ch. Apr. 9, 2009)

Exhibit H:    Transcript of Argument and Ruling on Motion to Dismiss in *In re Bank of America Corp. Stockholder Derivative Litig.*, C.A. No. 4307-CS (Del. Ch. Oct. 12, 2009)

Exhibit I:    Final Consent Judgment as to Defendant Bank of America Corporation in *Securities & Exchange Commission v. Bank of America Corp.*, Nos. 09 Civ. 6829 & 10 Civ. 215 (S.D.N.Y. Feb. 24, 2010)

Exhibit J:    Transcript of Settlement Hearing in *In re Allion Healthcare Inc. Shareholders Litig.*, C.A. No. 5022-CC (Del. Ch. Jan. 19, 2011)

Exhibit K:    August 30, 2011 Order in *In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (PKC) (S.D.N.Y.)

Exhibit L:    Affidavit of Mitchell A. Lowenthal, dated April 17, 2012, submitted in response to the Delaware Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery in *In re Bank of America Corp. Stockholder Derivative Litig.*, C.A. No. 4307-CS

Exhibit M:    Affidavit of Donald J. Wolfe, Jr., dated April 18, 2012, submitted in response to the Delaware Plaintiffs' Motion for Preliminary Injunction and Expedited Discovery in *In re Bank of America Corp. Stockholder Derivative Litig.*, C.A. No. 4307-CS

_____

Lawrence Portnoy
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for the Individual Defendants*

SWORN TO AND SUBSCRIBED
Before me this 27th day of April, 2012

_____
Notary Public

ANDREA WHITTLETON
NOTARY PUBLIC, State of New York
No. 01WH6098950
Qualified in Kings County
Commission Expires Sept. 22, 2015

Exhibit C

IN THE COURT OF THE CHANCERY
OF THE STATE OF DELAWARE

C. A. NO. 4307-VCS


In Re  BANK OF AMERICA CORPORATION
STOCKHOLDER DERIVATIVE LITIGATION



- - -

Tuesday, October 11, 2011

- - -



VIDEOTAPED DEPOSITION OF WILLIAM BARNET,

III, taken at 299 North Church Street,

Spartanburg, South Carolina, commencing at 9:11

a.m., before Yvonne R. Bohannon, Registered Merit

Reporter, Certified Realtime Reporter and Notary

Public.

1    A.  I -- I don't know whether the audit
2  committee did or did not deal with that issue at
3  this meeting.  I think what he's referring to is
4  the myriad of issues associated with integrating
5  an internal audit function which was our basic
6  responsibility.
7    Q.  Okay.
8    A.  In working with the external auditor,
9  in this case Mr. Swyers, to be sure on January --
10  on D day, January 1st, that we had in place the
11  proper internal auditing mechanisms.  That's what
12  I think this refers to.
13    Q.  Okay.  That's -- that's good enough.
14  Set that aside.
15    Let's look at the December 9 meeting
16  minutes for the full board which I assume was held
17  after the audit committee meeting?
18    A.  Correct.
19    Q.  And this is previously marked as
20  Mitchell Exhibit 39.  It's a long document, but
21  we're only going to look at one part of it.
22    A.  Okay.
23    Q.  So look at the bottom of page seven
24  which is Bates page 3299.  There's a reference to
25  a crisis report on Merrill Lynch's projected

1  income for the fourth quarter.  Do you see that?
2    A.  I do.
3    Q.  And that's the fourth quarter
4  reporting you got on the 9th that you referred to
5  earlier this afternoon, correct?
6    A.  Yes.  It is the 9th -- I mean, I'm not
7  sure what the question represents, but --
8    Q.  You were referring to getting --
9    A.  The first time --
10    Q.  -- information that --
11    A.  Yeah, the first time we had an
12  estimate for the fourth quarter.  Is that what
13  you're asking me?
14    Q.  Yes.
15    A.  That's right.
16    Q.  And just -- you can --
17    A.  To my knowledge.
18    Q.  Yes, to your knowledge.
19    And just look at the paragraph that
20  carries over to eight to refresh your recollection
21  a little on that presentation, but I'm going to go
22  to the presentation itself next rather than the
23  board meeting.
24    A.  Uh-huh.
25    Q.  I'll get that out while you're looking

1  at that.
2    Okay.  And here is Mitchell Exhibit
3  38.  It's a little bit of a monstrous hybrid
4  exhibit I created early on here.  I keep bringing
5  it with me, so it keeps existing.  But I'll
6  represent that the first part of it is remarks
7  prepared for at least Mr. Price I think to -- for
8  his presentation, and the latter half -- smaller
9  half of it is a PowerPoint style presentation that
10  went along with his remarks, but it's really two
11  different documents combined.
12    A.  So this was the verbiage that he used
13  to -- to walk us through the --
14    Q.  That's my understanding.  And if you
15  see anything that suggests --
16    A.  Right.
17    Q.  -- that it's not true, let me know,
18  but that's my understanding.
19    All right.  Do you recall him saying
20  in words or substance that at that point it looked
21  like Merrill Lynch was forecast to have a net loss
22  of nine billion for the quarter, either pretax or
23  post-tax?
24    A.  That -- that would --
25    MR. DUGGAN:  Objection to the form.

1    A.  I mean, which -- which question are
2  you asking me?  I mean, I remember -- I remember
3  the -- the figure noted in both places, that there
4  would be an after tax loss of about nine billion
5  dollars.
6  BY MR. HARRAR:
7    Q.  Do you recall being presented with the
8  components of that figure?
9    A.  I recall a long and exhaustive
10  dissertation on -- on a whole bunch of issues,
11  including Merrill Lynch, from Countrywide, to the
12  bank, to our results for '08 and projections for
13  '09, and credit cards and everything.  And Merrill
14  Lynch was included in that.  I'm not sure where it
15  is.
16    Q.  If you'll look at page 95 of his
17  prepared remarks, Bates number 1822 --
18    A.  Of his prepared remarks?
19    Q.  His prepared remarks, so it's in the
20  first half of the document.
21    Does that page and the next two pages
22  after it, 95 through 97, refresh your recollection
23  in any way about his remarks on Merrill Lynch at
24  that meeting?  Take a little time to look at it.
25    A.  Do you want me to go through 97 or

Exhibit D

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

----------------------------------X

In Re BANK OF AMERICA CORPORATION          C.A. No.

STOCKHOLDER DERIVATIVE LITIGATION          4037-VCS

----------------------------------X

June 21, 2011

9:03 a.m.


-   -   -


HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

-   -   -


VIDEOTAPED DEPOSITION of FRANK PAUL BRAMBLE, SR.

Baltimore, Maryland

June 21, 2011


Pages:  1 - 355

Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,

CCR, RSA

Job Number: 4696

HUDSON REPORTING & VIDEO                1-800-310-1769

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    been very interested in -- you know, when
3    you make an acquisition, you want to make
4    sure that the companies can work together
5    going forward.
6           And here, you have a commercial
7    bank merging -- acquiring an investment
8    bank, and that gets into the whole brand
9    issue and things of that nature.  And it --
10   I do recall that conversation.
11          Q.    Was there any discussion at any
12   point in time in the fall of 2008 as to the
13   level of bonus payments Merrill Lynch was
14   going to make to its employees at the end of
15   2008 --
16          A.    Not that I recall --
17          Q.    -- and May of 2009?
18          A.    -- not that I recall.
19          Q.    Do you recall receiving any
20   shareholder correspondence during 2008
21   concerning the activities of the asset
22   quality committee?
23          A.    No, I don't remember receiving
24   any physical correspondence.
25          It's possible that a -- a

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    letter -- if there were a letter or
3    something, it may have been provided to the
4    asset quality committee, but I have no
5    specific recollection of that.
6           Q.    Okay.  Do you recall seeing
7    during 2008 any correspondence from either
8    shareholders or -- or -- or groups
9    questioning any directors' independence?
10          A.    Not that I -- not that I
11   recall.
12          Q.    Okay.  Do you recall seeing any
13   shareholder proposals during 2008 concern --
14   raising issues with any of the director's
15   independence?
16          A.    Not that I can recall, not
17   in -- in this time frame.
18          MR. SCHWARTZ:  I'm going to ask
19   the reporter to mark as Exhibit 8 --
20   it's a letter from CtW Investment
21   Group dated February 6th, 2008,
22   addressed to Frank P. Bramble, Sr.
23          - - -
24          (Whereupon, a letter was marked,
25   for identification purposes, as Bramble

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    Deposition Exhibit Number 8.)
3          - - -
4    BY MR. SCHWARTZ:
5          Q.    Do you recall seeing Bramble
6    Exhibit 8 before, Mr. Bramble?
7          A.    Yeah, I -- I have -- I believe
8    I have seen this.
9          Q.    Okay.  When was the first time
10   you recall seeing this?
11          A.    I -- I -- I -- I don't recall,
12   but I -- I didn't remember seeing it within
13   the time frame that we're dealing with.
14          Q.    Okay.  Do you believe you would
15   have saw this letter sometime around the
16   period of February 2008?
17          A.    I assume -- I assume so.  I
18   would say our corporate secretary, I found,
19   always did a good job; that if there was
20   anything that we needed to know as directors
21   and is normal cor- -- good corporate
22   governance activities, I would have -- I
23   think I would have seen this.
24          Q.    Okay.  And did you discuss the
25   substance of this letter with any other

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    member of Bank of America's board of
3    directors?
4          A.    This -- this -- these kind of
5    things, in practice, would go into the
6    corporate governance committee, which I
7    believe at the time was chaired by Tom Ryan.
8          And the -- if -- if the
9    committee felt they needed to interview a
10   director or call a director, it was their
11   prerogative to do it.  If they didn't think
12   it was necessary, they would -- you know,
13   they would come to their own conclusions and
14   recommendations to the full board as to
15   whether there were any conflicts of interest
16   on the part of any directors.
17          I can't specifically remember
18   whether Tom called me about this or
19   discussed it with me specifically, but
20   the -- the corporate governance committee
21   had the responsibility at the board level to
22   make those judgments and make
23   recommendations to the full board.
24          Q.    Okay.  Did you ever discuss
25   with anyone at Bank of America what basis

FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL

1  I don't know what the timing of that call
2  would have been.
3          I know that he had numerous
4  conversations during that period of time,
5  and clearly, he had a conversation with the
6  Government saying that we're not certain
7  that we can go through with this transaction
8  without Governmental support.
9          Q.    And do you know if Mr. Lewis
10  had that conversation prior to informing the
11  board of his questions about whether the MAC
12  should be invoked?
13          A.    My recollection in looking at
14  this (verbatim) minutes is that he did have
15  conversations with the Government and --
16  because in -- in this meeting, he shared
17  with us the reactions of the Government to
18  that discussion.
19          Q.    Okay.  And -- and did Mr. Lewis
20  inform the board on December 22nd that he
21  had called Secretary Paulson on December 21
22  and informed him that the board wanted to
23  invoke the MAC?
24          A.    I don't recall that.

FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL

1          Q.    Okay.  And having reviewed the
2  notes -- the minutes of the December 22nd,
3  2008 board meeting, did it refresh your
4  recollection at all as to anything
5  additional that Mr. Lewis reported to the
6  board about the Fed's reaction to Mr. Lewis'
7  conversation?
8          A.    No.  I -- I think what was
9  described here in these minutes is complete.
10          Q.    Okay.
11          A.    By the way, just as a general
12  comment, it would -- I would be shocked,
13  based on my experience with Ken Lewis as
14  chairman of the company, that he would ever
15  say -- I have no knowledge, no history of
16  him ever speaking on behalf of the board
17  without talking to the board first.
18          Q.    At the December 22nd, 2008
19  board meeting, was there any discussion
20  about reaching out to Mr. Thain and trying
21  to renegotiate the terms of the merger?
22          A.    I don't recall that, no.
23          Q.    Prior to the merger closing on
24  January 1, 2009, was there any discussion

FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL

1  amongst the board about reaching out to
2  Mr. Thain to renegotiate the terms of the
3  merger based on Merrill Lynch's escalating
4  losses?
5          A.    No, I don't believe so.
6          Q.    At any point, did Mr. Lewis
7  report to the board that Secretary Paulson
8  had threatened to remove management and the
9  board if they went ahead with invoking the
10  MAC?
11          A.    I believe that was discussed
12  at -- at this -- at this meeting.  I can't
13  remember if it was Paulson or Bernanke or
14  both of them.  I don't remember.  But I do
15  recall that being mentioned.
16          Q.    Okay.  And was there any
17  discussion amongst the board of BAC
18  management as to whether they believed the
19  Fed had the authority to remove BAC's
20  management and directors if they went ahead
21  with the MAC?
22          A.    I don't -- I don't recall that.
23          My own personal reaction is
24  that that comment didn't impact me at all.

FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL

1  And, in fact, in the -- in that environment,
2  there may have been some directors that
3  would've said thank you very much and went
4  home.
5          These were tough times, and --
6  but my sense in that particular call is that
7  the board, if anything, thought that was,
8  you know -- you know -- wouldn't impact our
9  decision-making and -- and shame on the
10  Government for even saying something like
11  that.
12          Q.    Did Mr. Lewis inform the board
13  of any conversations he had had with
14  Wachtell concerning invoking the MAC?
15          A.    My recollection there is
16  probably.  I can't recall if Wachtell was on
17  the call or not.
18          But certainly, in providing
19  information about the MAC, there would have
20  been some discussion about what it means,
21  but I don't recall specifically.  But he
22  would have felt a responsibility to inform
23  the board on what a MAC process would be.
24          Q.    Okay.  If you could look at the

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    There may be one other in there.
3           But the -- the -- the ability
4    of Bank of America to bring focus and
5    attention to candidates is -- is -- is
6    impressive.  And they will bring -- they
7    will bring people from across the country to
8    participate in the process of evaluating and
9    identifying candidates and -- and
10   integrating candidates.
11          Ken Lewis, as chairman, I felt,
12   was very selective.  I think he did a good
13   job of informing the board of calls that
14   he -- you know, another part of this is
15   knowing when not to do a transaction.
16          And many people called Bank of
17   America in good times and in bad times, and
18   Ken received many calls.  And he -- but he
19   would oftentimes say no way.  Schwaab was an
20   example that he just didn't think it.  But
21   he would always inform the board.
22          So I think in terms of
23   understanding when a transaction makes sense
24   and then knowing how to bring the
25   transaction in, I continue to believe that

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    Bank of America does that well.
3           Q.    All right.  I think, in
4    response to some of Mr. Schwartz' questions,
5    you had mentioned that prior to the
6    Merrill Lynch transaction, you had worked
7    with Wachtell Lipton?
8           A.    Yes.
9           Q.    Prior to the Merrill Lynch
10   transaction, had you come to form a view of
11   Wachtell Lipton's value as an M & A advisor?
12          A.    Yeah.  I -- I always thought
13   they were the absolute best.  I had used
14   them on numerous transactions throughout my
15   career and found them to be second to none.
16          I mean, they were completely --
17   I had great trust and respect for Wachtell
18   Lipton and the attention that they gave a
19   transaction.
20          Not suggesting there aren't
21   other great law firms, but they were always
22   available to me 24 hours a day, seven days a
23   week.  And I have tremendous respect for
24   their skills and capability in M & A
25   transaction, particularly banking

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    transactions.
3           Q.    All right.  You mentioned
4    you -- you had worked on many, many M & A
5    transactions.
6           If I could ask you, prior to
7    the Merrill Lynch transaction, the
8    B of A/Merrill Lynch transaction, can you
9    estimate how many M & A transactions you,
10   personally, worked on?
11          A.    It would be an estimate --
12          Q.    Sure.
13          A.    -- but several hundred.  I
14   would say at -- at -- at least 100, many of
15   them small in various locations.  But
16   probably at least 100, maybe as many as 200
17   during my career.
18          Q.    Would the vast majority, if not
19   all of those, be in the financial services
20   and banking area?
21          A.    Certainly, all -- I actually
22   was involved in a few things as -- in a
23   not-for-profit, but yeah, almost all in the
24   financial services industry.
25          Q.    Okay.  Mr. Schwartz asked you

1    FRANK PAUL BRAMBLE, SR. -- CONFIDENTIAL
2    about the -- the -- the -- the disclosure
3    documents in connection with the
4    Merrill Lynch transaction, particularly the
5    proxy statement.
6           Did you have an understanding
7    as to who the board had delegated
8    responsibility to with respect to the
9    preparation of those materials?
10          A.    Yes.
11          Q.    And who -- who -- who had the
12   board delegated responsibility to?
13          A.    The board -- the board had
14   delegated it to the management team, to
15   the -- the legal team and to the -- in this
16   particular case, to Wachtell Lipton.
17          Q.    At any point prior to the
18   transaction closing, did it come to your
19   attention that there were any issues or
20   problems with respect to the disclosures
21   that had been made?
22          A.    None.
23          Q.    All right.  Mr. Bramble, I
24   don't think, at this point, I have anything
25   else.  Although if I would -- if I could ask

# Errata Sheet

**Case Name:**  *In re Bank of America Corporation Stockholder Derivative Litigation*
(C.A. No. 4307-VCS)

**Date of Deposition:**  June 21, 2011

**Witness's Name:**  Frank Paul Bramble, Sr.

| Page & Line | Change | Reason/Code |
|---|---|---|
| 18:5 | change "undergraduating" to "undergraduate" | clarification |
| 20:19 | change "a" to "an" | to correct transcription error |
| 37:17 | change "get to" to "make" | to correct transcription error |
| 65:6-7 | change "being in" to "being put into" | clarification |
| 89:17 | change "of" to "by" | to correct transcription error |
| 110:5 | change "day" to "days" | to correct transcription error |
| 128:21 | change "was" to "were" | to correct transcription error |
| 130:2 | change "making" to "asking" | clarification |
| 141:12 | change "know" to "knew" | to correct transcription error |
| 192:2 | change "resolution" to "resolutions" | to correct transcription error |
| 236:10 | change "minutes" to "meetings" | to correct transcription error |
| 252:21 | insert "a" in between "having" and "conversation" | to correct transcription error |
| 260:24 | change "than" to "in" | to correct transcription error |
| 271:16 | insert "or" in between "valuation" and "appraisal" | to correct transcription error |
| 313:10 | change "meaning" to "meeting" | to correct transcription error |
| 331:3 | insert "he" before "struck" | to correct transcription error |
| 346:19 | change "Schwaab" to "Schwab" | to correct transcription error |
| 346:20 | change "it." to "it -- but" | to correct transcription error |
| 347:25 | change "transaction" to "transactions" | to correct transcription error |

By: _____
Frank Paul Bramble, Sr.

Sworn to before me this  PCW
7 day of Jan. , ~~2011.~~ 2012

_____
Notary Public

PAMELA C. WHYE
NOTARY PUBLIC, BALTIMORE COUNTY
STATE OF MARYLAND
My Commission Expires May 10, 2014

Exhibit E

C O N F I D E N T I A L

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

----------------------------------------

In Re BANK OF AMERICA CORPORATION          C.A. No.
                                           4307-VCS

STOCKHOLDER DERIVATIVE LITIGATION

----------------------------------------

                        June 14, 2011
                        9:00 a.m.

Deposition of GARY COUNTRYMAN, taken by

Plaintiffs, pursuant to Notice, held at the

offices of Horwitz Horwitz & Paradis LLP,

570 Seventh Avenue, New York, New York, before

Joseph R. Danyo, a Shorthand Reporter and Notary

Public within and for the State of New York.

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911   Fax: 212-273-9915

Countryman - Confidential

1 conversations about the fourth quarter losses,
2 that is all, but I didn't know the details of
3 their conversation.
4     Q.   Did Mr. Lewis report to the board on
5 December 19, 2008 that he had conversations with
6 Mr. Thain concerning Merrill Lynch's fourth
7 quarter losses?
8     A.   I don't remember specifically, but he
9 had to have had.
10     Q.   You don't recall any of the substance
11 of any of those conversations?
12     A.   No, I do not.
13     Q.   Did Mr. Lewis report back to the
14 board concerning conversations he had with the
15 government concerning Merrill Lynch's fourth
16 quarter projected losses?
17     A.   He did.
18     Q.   Do you recall when he reported back
19 to the board?
20     A.   It may have been the same day.
21     Q.   What do you recall Mr. Lewis
22 informing the board concerning his conversations
23 with the Fed concerning Merrill Lynch's fourth
24 quarter losses?


1          Countryman - Confidential
2 conversations about the fourth quarter losses,
3 that is all, but I didn't know the details of
4 their conversation.
5     Q.   Did Mr. Lewis report to the board on
6 December 19, 2008 that he had conversations with
7 Mr. Thain concerning Merrill Lynch's fourth
8 quarter losses?
9     A.   I don't remember specifically, but he
10 had to have had.
11     Q.   You don't recall any of the substance
12 of any of those conversations?
13     A.   No, I do not.
14     Q.   Did Mr. Lewis report back to the
15 board concerning conversations he had with the
16 government concerning Merrill Lynch's fourth
17 quarter projected losses?
18     A.   He did.
19     Q.   Do you recall when he reported back
20 to the board?
21     A.   It may have been the same day.
22     Q.   What do you recall Mr. Lewis
23 informing the board concerning his conversations
24 with the Fed concerning Merrill Lynch's fourth
25 quarter losses?

1          Countryman - Confidential
2     A.   The Fed said they were opposed to our
3 invoking the MAC clause.  They indicated that
4 they believed it would not succeed.  They
5 believed that if we invoked the MAC clause, it
6 would create grave systemic risk in the American
7 economy, additional systemic risk, which wouldn't
8 be good for the American economy or Bank of
9 America, and they essentially said that if we
10 insisted on going forward with it, that the full
11 force of their regulatory authority would come
12 down on the Bank of America.
13     Q.   When you say would come down on the
14 Bank of America, what do you recall specifically
15 being said?
16     A.   It was made clear that there would be
17 what I guess I would describe as additional
18 regulatory oversight and it was made clear that
19 both the management and the board of directors
20 would be forced out in one way or another.
21     Q.   Was there a board discussion
22 concerning the information that Mr. Lewis relayed
23 to the board?
24     A.   Yes, there was.
25     Q.   What do you recall of that

1          Countryman - Confidential
2 discussion?
3     A.   I'm not sure it was at the same time
4 it was first reported.  We discussed the idea
5 that the government was absolutely opposed to
6 doing it and we did not think it was in the
7 long-term interest of our shareholders to have
8 the kind of regulatory oversight that we imagine
9 would happen if we went forward with the MAC
10 clause.
11     Q.   Did the board have a response to the
12 threat from the government that the BAC
13 management and board would be removed if they
14 went ahead with the MAC?
15     A.   The board had a discussion of that
16 and agreed that that was not -- that was not what
17 was going to be driving the board.  What was
18 going to be driving the board was what was in the
19 best interests of shareholders and what we
20 believed wholeheartedly was that the kind of
21 regulatory oversight that was threatened would
22 not be in our shareholders' interest.
23     Q.   Was there any discussion of what form
24 this regulatory oversight would encompass?
25     A.   It didn't require a lot of

1          Countryman - Confidential
2 discussion, because -- and it didn't require a
3 lot of imagination.  Most of us had been through
4 in earlier lives federal oversight, that is to
5 say, the Federal Reserve oversight and had a
6 pretty good idea of what it would be.
7     Q.   What was your understanding of what
8 that would be?
9     A.   Involvement in virtually every
10 significant operating and strategic question of
11 the bank.
12     Q.   What else was discussed?
13     A.   What else was discussed where?
14     Q.   At the meeting that you are referring
15 to where you discussed -- Mr. Lewis discussed the
16 government's response to Mr. Lewis's
17 conversation.
18     A.   We discussed the wisdom of going
19 forward with the MAC under the circumstances that
20 we faced.
21     Q.   Did the board seek legal counsel in
22 connection with that discussion?
23     A.   I don't remember specifically, but I
24 am sure there was.
25     Q.   Do you recall whether there was

1          Countryman - Confidential
2    recently addressed regarding the question of the
3    marks. Did you have any reason when you sent
4    this to doubt that the marks were correct?
5        A.   No.
6        Q.   At any point in time have you come to
7    learn that any of the marks were not correct?
8        A.   What do you mean by correct?
9        Q.   That at the time there was something
10   flawed with respect to the marks?
11       A.   The marks at the time?
12       Q.   Yes.
13       A.   No.
14       Q.   Going back to the period between
15   September 14 and December 31, 2008, was the board
16   kept apprised of developments regarding Merrill
17   Lynch in a timely fashion?
18       A.   Yes, I believe it was. We had great
19   confidence in management and our advisors that
20   anything that was changing in Merrill from what
21   we expected at the time we entered into the
22   transaction, we expected that it would be
23   reported to us in a timely fashion, and I believe
24   it was.
25       Q.   At any point in that period, did you

1          Countryman - Confidential
2    feel a need to ask management to provide you with
3    information regarding Merrill Lynch that it was
4    not already given to you?
5        A.   No. We had the full expectation that
6    there was full transparency with management and
7    they would provide whatever information was
8    appropriate for the board to see.
9        Q.   Going to the decision not to invoke
10   MAC, could you just lay out for us the reasons
11   that you believe the board concluded against
12   invoking the MAC clause in December 2008?
13       A.   One of the reasons was that the
14   federal government was absolutely opposed to it
15   and we knew that the regulatory authorities would
16   make it very difficult for us and would not be in
17   the best interests of shareholders.
18       Q.   Were there other reasons?
19       A.   Can you ask the question again.
20       Q.   In addition to concerns about the
21   views of the federal regulators, were there other
22   reasons that caused the board to decide against
23   invoking it?
24       A.   All along there was the question of
25   whether we would invoke the MAC it would be

1          Countryman - Confidential
2    successful and there was always some doubt that
3    it would be, so that was always a consideration.
4        Q.   Did the board have any concern with
5    respect to systemic risk?
6        A.   The board absolutely was worried
7    about systemic risk. The federal government was
8    worried about it. We were worried about it,
9    because we were part of that system and what was
10   good for the American system was going to be good
11   for the Bank of America. We were that large.
12       Q.   Going to the meeting on
13   December 22nd, when the board instructed
14   management to seek to obtain written assurances
15   from the government regarding its intention to
16   provide assistance, had the definitive terms been
17   worked out with the government at that time?
18       A.   As of December 22nd?
19       Q.   Yes.
20       A.   No.
21       Q.   And as of December 30th, had the
22   definitive terms of the government's expected
23   assistance been worked out?
24       A.   No.
25       Q.   Was the income that you earned as a

1          Countryman - Confidential
2    Bank of America director material to you at the
3    time?
4        A.   No.
5        MR. DUGGAN:  I have no other
6    questions.
7        MR. SCHWARTZ:  I have nothing. Thank
8    you for your time, Mr. Countryman.
9        THE WITNESS:  I would like to say
10   thank you, but it is difficult.
11       MR. DUGGAN:  The witness will read
12   and sign.
13       (Time noted:  4:34 p.m.)
14   _____
15
16   Subscribed and sworn to
17   before me this_____day of_____, 2011.
18   _____
19
20
21
22
23
24
25

<div align="center">**Errata Sheet**</div>

**Case Name:**   *In re Bank of America Corporation Stockholder Derivative Litigation*
(C.A. No. 4307-VCS)

**Date of Deposition:**   June 14, 2011

**Witness's Name:**   Gary Countryman

| Page & Line | Change | Reason/Code |
|---|---|---|
| 7:18 | change "Jane Magnotta" to "Jean McDonough" | to correct transcription error |
| 10:16 | insert "and Tom May" after "Chad Gifford" | to supplement testimony in order to correct oversight |
| 13:21 | change "it has been" to "it was in" | to correct transcription error |
| 14:21 | insert "at" after "and" | to correct transcription error |
| 36:22 | change "Lehman's" to "Lehman" | to correct transcription error |
| 37:4 | change "it" to "them" | to correct transcription error |
| 45:23 | delete "on" | to correct transcription error |
| 62:11 | change "markets and the concern" to "markets – the concern" | to correct transcription error |
| 63:5 | change "was worth" to "were worth" | to correct transcription error |
| 72: 17-18 | insert "that" between "at that time" and "markets" | to correct transcription error |
| 73:3 | insert "we" between "and" and "had" | to correct transcription error |
| 74:17 | change "and where there" to "and there" | to correct transcription error |
| 82:5 | insert "it" between "and" and "was" | to correct transcription error |
| 82:25 | change "subject is 'Throwing, and the body is up'" to "subject is 'Throwing,' and the body is 'up'" | to correct transcription error |
| 84:5-6 | change "in where we felt that we didn't have much time that" to "in, where we felt that we didn't have much time and that" | to correct transcription error |
| 95:21 | insert "on" between "America" and "September" | to correct transcription error |
| 103:19 | change "Ann" to "Anne" | to correct transcription error |
| 109:22 | insert "on" before "October 3, 2008" | to correct transcription error |
| 114:23 | insert "on" between "board" and "October" | to correct transcription error |
| 130:15 | delete "the" and insert "on" before "October" | to correct transcription error |
| 136: 24-25 | insert "an" between "of" and "October" | to correct transcription error |
| 138:3 | change "board of directors meeting of" to "board of directors of" | to correct transcription error |
| 138:17 | change "drafters" to "directors" | to correct transcription error |

| | | | |
|---|---|---|---|
| | 143:11-12 | change "of November 7th board of directors Bank of America" to "from November 7th, of the board of directors of Bank of America" | to correct transcription error |
| | 152:9 | delete "first of" | to correct transcription error |
| | 157:24 | delete "At" | to correct transcription error |
| | 162:10 | change "capital adequacy" to "adequate capital" | to correct transcription error |
| | 172:16-17 | change "gave a surprising or amazing." to "said, 'surprising' or 'amazing.'" | to correct transcription error |
| | 179:12 | delete "the" | to correct transcription error |
| | 180:8 | change "imagine" to "imagined" | to correct transcription error |
| | 185:16 | insert "the" between "of" and "government" | to correct transcription error |
| | 187:6 | change "not" to "neither" | to correct transcription error |
| | 205:6 | change "Try" to "Trying" | to correct transcription error |
| | 207:10 | delete "that for" | to correct transcription error |
| | 208:16 | change "market" to "mark" | to correct transcription error |
| | 208:25 | change "market" to "mark" | to correct transcription error |
| | 211:3 | delete "it" | to correct transcription error |
| | 211:9-10 | insert "the" between "invoke" and "MAC" | to correct transcription error |
| | 211:10 | change "MAC," to "MAC clause," | to correct transcription error |
| | 211:16 | insert "it" between "and" and "would" | to correct transcription error |

By: _____

Gary Countryman

Sworn to before me this
22 day of June, 2011.

_____
Notary Public

Exhibit F

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

_____

                                        )

In Re BANK OF AMERICA CORPORATION       )

                                        )   C.A. No.

STOCKHOLDER DERIVATIVE LITIGATION       )   4307-VCS

_____)


                        October 4, 2011

                        9:05 A.M.


            VIDEOTAPED DEPOSITION of GENERAL TOMMY

FRANKS, taken by Plaintiffs pursuant to Notice, held at

the Marriott Dallas City Center, 650 North Pearl Street,

Team Room, Dallas, Texas  75201, before Dawn M. Green,

CSR, CLR, a Shorthand Reporter within and for the State

of Texas.

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel:  212-273-9911  Fax:  212-273-9915

1  approval to raise that -- the level of stock in that --
2  in that pool.  So that's a -- so that's a -- a partial
3  answer.
4        On Page 19 there's reference by Temple
5  Sloan to the Merrill Lynch executive compensation proxy
6  information.  And I looked at this recently in
7  preparation for this, and my -- my recollection of that
8  is -- is actually an inappropriate use of the term
9  "proxy."  I believe that that discussion had to do with
10  what was contained in Merrill Lynch -- in Merrill
11  Lynch's 10-Q talking about compensation rather than what
12  I had initially thought, which was that this was related
13  to the 3 November proxy.  So that is in here about the
14  Merrill compensation of the stock plan.
15        And, sir, on Page 21, there is mention
16  of -- to continue my comment about the Arizona meeting
17  which had occurred previously where Ken Lewis met with
18  Merrill employees out in Arizona, there is continuation
19  of this business of:  "Lewis interjected that he has
20  already impressed upon Merrill associates the importance
21  of core values and will continue to do so."  And "with
22  regard to Merrill Lynch, Mr. Harris explained the
23  Corporation's implementation of core processes to
24  accelerate integration," (as read).  And I'll leave the
25  rest of that alone.

1        This is the cultural issue that I mentioned
2  earlier about the difference in pay expectation between
3  traders and -- and bankers.  And as I said earlier, this
4  was -- this was a theme that was discussed on several
5  occasions with a view of management and of the board
6  that -- that the core appreciation of compensation was
7  different between Merrill and the Bank of America and
8  would require work.  That's -- that's what that section
9  is about.
10    Q.  Were there any discussions during the third or
11  fourth quarter of 2008 concerning the bonus pool that
12  Merrill Lynch had reserved or intended to pay for 2008?
13    A.  I don't recall discussions in -- with -- with
14  the full board of the specifics of the Merrill bonus
15  pool which I now know was $5.3 billion as a result of an
16  annex or an appendix to the September filing -- filing
17  document that said we're going to acquire Merrill.  I
18  don't know -- I don't know when I found out that the
19  limitation on -- on that bonus pool was at '07 levels,
20  but I now know it.  I don't recall -- I don't recall
21  numbers ever coming before the board, only the cultural
22  discussion that I described a minute ago and then
23  discussions after the fact in January when the Merrill
24  bonus issue came up.  And then I did see all the
25  mathematics, and -- and I'll leave it at that.

1    Q.  So you -- there was no discussion during the
2  September 14th board meeting to approve the Merrill
3  Lynch merger as to the Merrill Lynch bonus pool?
4    A.  In September, no.
5    Q.  When was the next meeting of the Bank America
6  board?
7    A.  7th of November.
8    Q.  And was there a particular purpose to that
9  meeting?
10    A.  Periodic update since the 22nd of October.
11  What -- what comes to a bit preparatory for -- no,
12  that's wrong.
13        My memory of the 7th of November actually
14  goes around a discussion of market dislocation,
15  difficulty in the financials which started out with this
16  was a conference call, not a special meeting, and Ken
17  Lewis made the comment that -- that October may be the
18  worst month the bank has ever had.  And with regard to
19  con- -- to content beyond a general update, I don't have
20  it in my memory.
21    Q.  Was there any discussion of Merrill Lynch
22  during the November 7th board call?
23    A.  I don't -- I don't recall.  I will say that --
24  and will look at the minutes -- but I will say that
25  there may well have been discussion of Merrill at -- on

1  that call.
2    Q.  I'm going to hand you what's been previously
3  marked as Countryman Exhibit 21.
4        (Documents handed to witness.)
5    A.  The minutes of that November 7th meeting
6  and -- and I -- I see my name mentioned as attending and
7  I was.  And as I said, it was an update over the last
8  16 days by -- by Lewis.  My note that I believe reflects
9  his comment that -- that this may be the worst month
10  that -- or October may be the worst month we've seen,
11  continued market disruption related charges to Merrill,
12  across their portfolio concerns with counterparty risk.
13    Q.  (BY MR. SCHWARTZ)  Before you go on --
14    A.  Yes, sir.
15    Q.  -- do you recall what was said with respect to
16  market disruptive related charges to Merrill?
17    A.  No, sir, I don't specifically.  It was the same
18  general categorization of issues within Merrill where we
19  were seeing difficulties.
20    Q.  Specific assets or categories of assets?
21    A.  Categories.
22    Q.  Okay.
23    A.  Then the top of the next page is the comment
24  that I did remember, "worst month in history."  Based on
25  flight to quality, the bank's deposits have grown.

1  that is that that discussion had to do with the first
2  part of the note where Mr. Lewis reports that: "First
3  and foremost, Treasury and Fed were unified in their
4  view that failure of the Corporation to complete the
5  acquisition would result in systemic risk to the
6  financial services system and would have adverse
7  consequences for the Corporation," (as read).
8       My recollection is that the adverse
9  consequences for the corporation that are referred to
10 here are the same as what's referred to down here; and
11 that is, a board discussion that says what happens if
12 Bank of America invokes material adverse change and then
13 loses it, and in the process destroys the product
14 that -- that the bank is after, that being Merrill
15 Lynch. And so, that is the context that I believe that
16 discussion took place in.
17     Q.  Did any member of the board request that
18 Mr. Price do an analysis of the effect closing the
19 Merrill Lynch transaction would have on BAC if there was
20 no Government assistance?
21     A.  Not to my knowledge. I don't recall that in
22 the discussion. Mr. Lewis simply restates the
23 recommendation, says that -- or the intent -- says that:
24 "No vote is required by the Board," which is -- which is
25 correct. The vote to do the deal had been -- had been

1  made back in September. Instructive also, and I think
2  very important, is the next to the last paragraph on
3  Page 3 that says: "After considerable discussion, the
4  board was absolutely clear in saying that" -- "that the
5  board was not persuaded or influenced by the statement
6  of the Fed, that they'd remove the board and remove
7  management."
8       That is an absolute fact, and I -- and I
9  remember it well. There was -- in fact, there was
10 probably something more closely akin to shock than
11 anything else when Mr. Lewis offered that comment to
12 begin with because I think -- I won't speak for other
13 members of the board, but I'll speak for myself. I
14 thought that was absurd. I thought it was ridiculous.
15 And -- and I believe there was a comment during that
16 discussion to the effect of, "Well, they can't do that."
17 And I have no idea who made the comment, because it was
18 a phone call. And I'll let it rest beyond that.
19     Q.  Did Mr. Lewis ever inform the board that
20 Wachtell attorneys told them to take Paulson's threat
21 seriously?
22     A.  I have no memory of that.
23     Q.  Okay.
24     A.  That doesn't mean it didn't happen, sir. It
25 means that I don't have a memory of it.

1      Q.  I understand.
2      A.  I don't have a memory of Ken Lewis saying that
3  to the board.
4      Q.  And how did the December 22nd board meeting
5  end?
6      A.  With instruction to Ken Lewis, "Go to
7  Washington and get it in writing."
8      Q.  During the December 22nd board meeting, was
9  there any discussion by the board or management
10 concerning whether this new information should be
11 disclosed to BAC shareholders?
12         MR. PORTNOY:  Objection to the form of the
13 question.
14     Q.  (BY MR. SCHWARTZ) Well, let me restate the
15 question. Was there any discussion during the
16 December 22nd board meeting as to whether the company
17 should disclose to shareholders that the company and
18 board was considering invoking a MAC?
19     A.  I recall no discussion of disclosure at all
20 during that -- during that time.
21     Q.  Was there any consideration during the
22 December 22nd board meeting to disclose to shareholders
23 the discussions the board and management was having with
24 Secretary Paulson?
25     A.  No.

1      Q.  And when did Mr. Lewis get back to the board
2  next?
3      A.  I think the 30th of December, to be sure, with
4  a special -- as a special telephonic meeting, but I
5  think also by -- by e-mail to members of the board that
6  said words to the effect of, "This will be oral only,"
7  and I don't recall the entirety of that -- of that
8  e-mail, but I believe it came by e-mail and then the
9  meeting on the December 30th.
10     Q.  As of the December 22nd board meeting, were you
11 comfortable with -- strike that.
12         I'm going to hand you what's been
13 previously marked as Countryman Exhibit 23 and ask you
14 if you recall seeing this e-mail before.
15         (Documents handed to witness.)
16     A.  Yes, I have seen it before. It was sent -- it
17 was sent to me and others, as indicated, following the
18 meeting on December 22nd.
19     Q.  (BY MR. SCHWARTZ) And do you believe you
20 received this e-mail on or about December 22nd?
21     A.  I believe so.
22     Q.  And when you received this e-mail, did you
23 discuss it with anyone?
24     A.  I did not. And -- well, I don't know that I --
25 I don't know that I saw this e-mail on December 22nd.

Exhibit G

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Master File No. 09-MD-2058 (PKC)

------------------------------------x

IN RE BANK OF AMERICA CORP. SECURITIES,

DERIVATIVE AND EMPLOYMENT RETIREMENT

INCOME SECURITY ACT (ERISA) LITIGATION

------------------------------------x

THIS DOCUMENT RELATES TO

All Securities Actions

------------------------------------x

IN THE COURT OF CHANCERY

OF THE STATE OF DELAWARE

C.A. No. 4307-CS

------------------------------------x

IN RE BANK OF AMERICA CORPORATION

STOCKHOLDER DERIVATIVE LITIGATION

------------------------------------x


          Videotaped Deposition of CHARLES GIFFORD,

taken by Plaintiffs, pursuant to Notice, held at the

Hilton Boston Downtown, Financial District, 89 Broad

Street, Boston, Massachusetts  02110, before Lisa M.

Valdario, a Registered Professional Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, taken on Thursday, December 8, 2011 at

9 a.m.

## 270

1  thought the strategic rationale was strong.  I    04:21:11
2  also felt that we went through a period of time,    04:21:16
3  particularly in December and January, where it    04:21:18
4  looked very bad.  Right now I think it looks very    04:21:21
5  good.  January '09 it looked very bad.  October    04:21:25
6  '09, I can't remember.    04:21:29
7  Q  Do you recall when you received this memo, whether    04:22:00
8  or not you discussed with Anne your views on    04:22:02
9  what's in here?    04:22:04
10  A  I don't recall that.  As I testified, I don't    04:22:06
11  recall reading this, let alone talking to her    04:22:08
12  about it.  And I don't understand why she sent it    04:22:11
13  to me.    04:22:16
14  Q  At this time, was Ken Lewis still the CEO of Bank    04:22:18
15  of America?    04:22:23
16  A  Yes, he was.    04:22:24
17  Q  Had he announced an intention to remain CEO of    04:22:24
18  Bank of America?    04:22:28
19  A  I can't remember when, I can't remember when he    04:22:31
20  announced publicly when he decided to retire, that    04:22:35
21  he would retire at the year end.  I don't know    04:22:41
22  when that took place.  I believe it had taken    04:22:43
23  place by that, by the time the search committee    04:22:46
24  was in place, but I'm not sure.    04:22:49
25  Q  Do you recall who was on the search committee?    04:22:51

## 271

1  A  Sure do.    04:22:53
2  Q  Were you on the search committee?    04:22:54
3  A  Yes, I was.    04:22:55
4  Q  Who else was on the search committee?    04:22:56
5  A  This same Tom May, this bad man, and I want you to    04:22:58
6  give him hell.  Don Powell, who you just got this,    04:23:01
7  we talked about; Tom Ryan, and Chad Holiday, and    04:23:05
8  Walter Massey, the then chairman.    04:23:11
9     MR. PORTNOY:  I just need to have the record    04:23:13
10  reflect, in case someone is seeing this without    04:23:15
11  the benefit of the video, that when he called Tom    04:23:16
12  May a bad man, it was with a broad smile on his    04:23:18
13  face and it was clearly a joke.    04:23:22
14  A  I would like to repeat.  That was a joke and it's    04:23:25
15  late in the day.    04:23:27
16  Q  I'm sorry, did you say that Don Powell was on the    04:23:28
17  search committee?    04:23:31
18  A  Yes, ma'am.    04:23:32
19  Q  Is it possible that this memo was sent as it    04:23:33
20  relates to the search committee's activities?    04:23:38
21  A  That's what I speculated 10 minutes ago.    04:23:41
22     (Email marked Exhibit No. 89 for    04:24:13
23     identification.)    04:23:44
24     MS. JOOST:  Marking as Exhibit No. 89 a    04:24:15
25  one-page document Bates number BAC-DIR-SDNY    04:24:17

## 272

1  00000260.  Mr. Gifford, if you could take a moment    04:24:21
2  to review the document.    04:24:26
3  A  This email, the first one is from Gary Spiess to    04:25:03
4  me, excuse me, on the second date, the January 22,    04:25:11
5  '09, and the second from me to Tom May dated    04:25:15
6  January 23rd.  I'm sorry, I said Gary Spiess.  I    04:25:19
7  meant Peter Manning.    04:25:27
8  Q  Oh, I must have given you the wrong document.    04:25:28
9     Do you recall the context of this email    04:26:28
10  exchange?    04:26:30
11  A  The context.  I see what's written here, yes,    04:26:31
12  ma'am.    04:26:35
13  Q  And it says here -- who is Peter Manning?    04:26:36
14  A  Peter Manning is a former employee of Fleet    04:26:44
15  Boston.    04:26:46
16  Q  And who is Gary Spiess?    04:26:47
17  A  He is a former general counsel of Fleet Boston.    04:26:49
18  Q  And did you often communicate with Mr. Manning and    04:26:52
19  Mr. Spiess with respect to Bank of America?    04:26:55
20  A  Former associates at Fleet Boston.  I'd like to    04:26:59
21  think of them also as friends.    04:27:02
22  Q  And Mr. Manning writes, "How long can the board    04:27:06
23  put up with the CEO, i.e. letting Merrill pay    04:27:10
24  bonuses of billions while Merrill was losing an    04:27:14
25  extra 15 billion?"  Do you know what he's    04:27:18

## 273

1  referring to there?    04:27:20
2  A  The 15 billion or the bonuses?    04:27:22
3  Q  The bonuses.    04:27:25
4  A  I assume he's referring to the bonuses that were    04:27:28
5  paid to Merrill employees, whenever they were paid    04:27:31
6  to Merrill employees, January or whatever.    04:27:35
7  Q  Do you recall whether or not Merrill paid bonuses    04:27:44
8  to its employees prior to the close of the merger?    04:27:44
9  A  I don't recall when we paid bonuses to Merrill.  I    04:27:49
10  wasn't involved in those conversations,    04:27:52
11  considerations.  So I don't know when.  I assume    04:27:56
12  it was at the end of the year or right around the    04:27:59
13  end of the year.    04:28:01
14  Q  Were you aware of the fact that there was a term    04:28:02
15  of the merger agreement that Merrill could pay up    04:28:07
16  to 5.8 billion in discretionary bonuses prior to    04:28:11
17  the close of the merger?    04:28:15
18  A  Was I aware of, no.    04:28:18
19  Q  At no time were you aware of that?    04:28:21
20  A  You know, after the, at some point this stuff was    04:28:23
21  in the press.  I knew it then but I can't remember    04:28:26
22  the amounts or the terms.  We didn't, when we    04:28:30
23  first discussed the deal, we didn't discuss    04:28:34
24  compensation for the employees, neither John Thain    04:28:37
25  nor other individuals.    04:28:44

1 Q And to be clear, you never saw a copy of the 04:28:45
2 merger agreement? 04:28:49
3 A Correct. 04:28:51
4 Q Or any disclosure schedule that would have been 04:28:51
5 included with the merger agreement. 04:28:54
6 A That is correct. 04:28:55
7 (Email memo marked Exhibit No. 90 for 04:28:55
8 identification.) 04:28:55
9 MS. JOOST: Mark as Exhibit number 90 a 04:29:03
10 one-page document numbered BAC-DIR-SDNY 00000257. 04:29:11
11 Q Mr. Gifford, if you could take a moment, review 04:29:24
12 the document. 04:29:27
13 A Yes, this is a memo from Gary to me and my reply 04:29:32
14 to Gary, both -- one dated July 16 and one January 04:29:38
15 19. 04:29:42
16 Q And Mr. Spiess writes, "Now re BAC. This looks 04:29:42
17 like a big miss on the diligence numbers and a big 04:29:47
18 mess. Does not reflect well. I've been a 04:29:50
19 defender but are we seeing a little hubris here? 04:29:53
20 I hope no future for Thain at least." 04:29:56
21 And you wrote, you know, "I shouldn't 04:30:00
22 comment too much, but my experience is your 04:30:02
23 comments are never too far from the mark." 04:30:04
24 Did you agree with Mr. Spiess's assessment 04:30:07
25 that this was a big miss on the diligence numbers 04:30:09

1 with respect to the Merrill Lynch transaction? 04:30:12
2 A I absolutely didn't agree with him on the big miss 04:30:15
3 on the diligent numbers, as we spent quite a bit 04:30:18
4 of time this morning. The diligence process, I 04:30:22
5 believed at the time we approved it, was a process 04:30:25
6 that had integrity. I believe any due diligence 04:30:29
7 process that had been taken place on September 14, 04:30:33
8 or whatever the date was, if you go by how he 04:30:36
9 calls it a big miss, would have been a big miss 04:30:40
10 for one reason, not because of due diligence 04:30:44
11 because the markets cratered. So I don't think 04:30:46
12 that's a question. 04:30:51
13 As I previously testified, in January and 04:30:53
14 right around, coincidentally this memo is on 04:30:56
15 January 19, the first discussion we had with the 04:31:00
16 board about a MACC, the numbers were so bad at 04:31:02
17 that time, I don't know what he knew publicly at 04:31:05
18 the time on the numbers. I don't think he could 04:31:09
19 have known anything because I don't think Merrill 04:31:10
20 released numbers, but internally, the projections 04:31:13
21 were such that we considered a MACC. 04:31:16
22 If we considered a MACC, then it's fair to 04:31:19
23 say we had a mess on our hands, at that time, at 04:31:23
24 that moment in time. But in my opinion, and why I 04:31:26
25 voted in September for this transaction, the 04:31:30

1 long-term outlook was good, positive for the 04:31:33
2 shareholders. 04:31:36
3 In December 10, just like it's the shortest 04:31:37
4 day of the year, it looked gloomy. I can't 04:31:39
5 comment on how it did month by month by month. 04:31:43
6 But we decided against a MACC for the reasons I've 04:31:46
7 already testified. And candidly, the thought that 04:31:49
8 we had in September of '08 about the strategic 04:31:57
9 rationale is looking to be the prevailing concept 04:31:58
10 right now. It's a little windy, I apologize. 04:32:01
11 Q Ultimately, do you believe that it was the board's 04:32:20
12 right to approve the merger, or was it the right 04:32:27
13 of the shareholders to approve the merger? 04:32:31
14 A Shareholders did approve the merger. 04:32:34
15 Q Ultimately -- is it fair to say that both the 04:32:36
16 board and the shareholders had a right to approve 04:32:51
17 the merger with Merrill Lynch? 04:32:55
18 A The board has a responsibility to recommend a 04:32:59
19 transaction like this to the shareholders if they 04:33:04
20 believe it's in the best interest of the 04:33:08
21 shareholders. I don't think it's a question of 04:33:10
22 right. It wouldn't go to the shareholders without 04:33:13
23 the recommendation of the board presumably. 04:33:16
24 Q And as a board member, you were privy to 04:33:19
25 information, very specific information about 04:33:24

1 Merrill Lynch and its assets when you approved the 04:33:26
2 merger, is that accurate? 04:33:32
3 A We, as we previously discussed and I previously 04:33:34
4 testified, we had a presentation which to my 04:33:37
5 satisfaction showed that this was in the best 04:33:41
6 interest of shareholders, and that included the 04:33:44
7 issues that I talked about, strategic rationale, 04:33:46
8 risk, personnel, I forgot one, I'm getting tired, 04:33:49
9 financial results, accretion and dilution. 04:33:54
10 Q Would you also agree that the shareholders were 04:33:58
11 not privy to information, very specific 04:34:01
12 information about Merrill's positions in certain 04:34:06
13 assets, Merrill's forecasted fourth quarter losses 04:34:11
14 when they approved the merger on December 5? 04:34:16
15 MR. PORTNOY: Object to the form of the 04:34:19
16 question. 04:34:20
17 A As I've testified, if I thought there was 04:34:21
18 important information that I had, I would have 04:34:27
19 felt the shareholders should know it too. I 04:34:29
20 specifically testified that I didn't have fourth 04:34:32
21 quarter results. The first projection I had of 04:34:34
22 the fourth quarter was December 9, which 04:34:37
23 deteriorated rapidly over the span of 10 days. 04:34:41
24 Q At the board meeting on October 22, did you or any 04:34:45
25 other director request an update on the fourth 04:34:49

# Errata Sheet

**Case Name:** *In re Bank of America Corp. Securities, Derivative and Employment Retirement Income Security Act (ERISA) Litigation (09-MD-2058)*

**Date of Deposition:** December 8, 2011

**Witness's Name:** Charles K. Gifford

| Page & Line | Change | Reason/Code |
|---|---|---|
| global | change "Fleet Boston" to "FleetBoston" | spelling error |
| global | change "Bank Boston" to "BankBoston" | spelling error |
| global | change "Baybanks" to "BayBank" | spelling error |
| global | change "Myopolous" to "Mayopoulos" | spelling error |
| global | change "MACC" to "MAC" | spelling error |
| 11:23 | delete "a" | clarification |
| 14:24 | change "know in what context means" to "know what 'in what context' means" | transcription error |
| 15:11 | change "receive and discuss strategy, receive and discuss" to "receive reports and discuss strategy, receive reports and discuss" | clarification |
| 16:5 | change "skiddish" to "skittish" | spelling error |
| 19:9-10 | insert commas after "predecessor" and after "Boston" | punctuation error |
| 25:4 | change "were our advisors" to "was our advisor" | clarification |
| 25:21 | delete "the" | clarification |
| 28:18 | change "in" to "on" | transcription error |
| 29:17 | change "successive" to "successor" | transcription error |
| 32:2 | change "was" to "were" | clarification |
| 42:23 | change "customer" to "company" | transcription error |
| 56:7 | change "railing" to "roiling" | transcription error |
| 69:3 | insert "chief" before "financial officer" | clarification |
| 70:1 | change "talk" to "talked" | transcription error |
| 72:1 | change each "J.D." to "J.C." | misstatement |
| 72:6 | change "J.D." to "J.C." | misstatement |
| 73:1 | change "J.D." to "J.C." | misstatement |
| 74:13 | delete "the board of" | misstatement |
| 81:8 | change "from" to "for" | transcription error |
| 82:18 | change "first" to "third" | misstatement |
| 95:10 | delete "not of" | clarification |
| 102.19 | change "hardy" to "hearty" | spelling error |
| 106:16 | delete "while you've got other paper" | clarification (to delete aside to court reporter) |
| 109:21 | change "is" to "it's" | transcription error |
| 110:11 | change "of" to "for" | transcription error |
| 113:12 | change "I've been" to "I haven't been" | transcription error |

| Page & Line | Change | Reason/Code |
|---|---|---|
| 115:24 | insert "and" between "meeting," and "we" | transcription error |
| 116:2 | change "suiters" to "suitors" | spelling error |
| 116:6 | change "suiters" to "suitors" | spelling error |
| 125:18 | change "transcribing" to "transmitting" | misstatement |
| 129:15-16 | change "would be advantageous" to "would be more advantageous" | transcription error |
| 130:24-25 | change "I don't recall. That I don't recall. . ." to "I don't recall that. I don't recall. . ." | punctuation error |
| 132:9 | change "this is" to "the" | transcription error |
| 132:10 | change "move, just" to "move -- just" | punctuation error |
| 132:13 | change "for us that" to "for us to -- that" | transcription error |
| 139:20 | change "council" to "counsel" | spelling error |
| 140:22 | change "fourth" to "four" | transcription error |
| 147:25 | insert "says" between "it" and "rapidly." | clarification |
| 154:14-15 | change "for" to "'04'" | transcription error |
| 156:18 | change "October" to "October --" | punctuation error |
| 165:16 | change "at" to "about" | transcription error |
| 166:5 | change "require," to "require --" | punctuation error |
| 171:6 | insert "Bank of" after "part of" | clarification |
| 172:19 | change "formerly" to "formally" | transcription error |
| 176:3 | change "MDNA" to "MD&A" | transcription error |
| 181:7 | change "MDNA" to "MD&A" | transcription error |
| 181:9 | change "MDNA" to "MD&A" | transcription error |
| 185:25 | insert "on" before "Merrill Lynch" | transcription error |
| 192:7 | change "Mr.," to "Mr. --" | punctuation error |
| 199:7 | change "reference" to "referenced" | transcription error |
| 218:7 | change "everything." to "everything?" | punctuation error |
| 227:25 | change "14th" to "14" | transcription error |
| 228:7 | change "pretax" to "post tax" | misstatement |
| 228:21 | change "good will" to "goodwill" | spelling error |
| 228:23 | change "good will" to "goodwill" | spelling error |
| 231:7 | change "that tipped" to "the continued" | transcription error |
| 231:18 | change "folsome" to "fulsome" | spelling error |
| 239:12 | delete "the" | transcription error |
| 246:10-11 | change "So if their following acquisition is part of our company, if" to "So if they're – following the acquisition – as part of our company – if" | transcription error |
| 246:24 | change "lone" to "loan" | spelling error |
| 255:17 | change "disclosure on that discussion" to "discussion on that disclosure" | misstatement |
| 262:8 | change "December" to "January" | misstatement |
| 263:9 | insert "meeting" after "board" | transcription error |

| Page & Line | Change | Reason/Code |
|---|---|---|
| 268:3 | change "digit" to "digits" | transcription error |
| 271:7 | change "Holiday" to "Holliday" | spelling error |
| 274:14 | change "July" to "January" | transcription error |
| 276:3 | change "10" to "19th" | misstatement |
| 279:1 | change "updates. Again, weekly with few exceptions, which" to "updates – again, weekly, with few exceptions -- which" | punctuation error |
| 284:21 | change "December" to "September" | misstatement |

By: _____
Charles K. Gifford

Sworn to before me this
25TH day of JANUARY, 2012



Notary Public

IRIAL N ONEILL
Notary Public
Commonwealth of Massachusetts
My Commission Expires February 20, 2015



Exhibit H

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

C.A. No. 4307-CS

IN RE: BANK OF AMERICA
CORPORATION STOCKHOLDER
DERIVATIVE LITIGATION,

*** CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF KENNETH D. LEWIS

Taken on Behalf of the Plaintiffs

DATE TAKEN: MARCH 6, 2012

TIME: 8:59 a.m. - 6:26 p.m.

PLACE: LA PLAYA BEACH & GOLF RESORT
9891 GULF SHORE DRIVE
NAPLES, FLORIDA 34108

Examination of the witness taken before:
Joan L. Pitt
Registered Merit Reporter
Certified Realtime Reporter
Florida Professional Reporter
HUDSON REPORTING & VIDEO        1-800-310-1769

---

1        APPEARANCES
2
Counsel for Plaintiffs:
3
ROBERT J. KRINER, JR., ESQ.
4     SCOTT M. TUCKER, ESQ.
Chimicles & Tikellis, LLP
5     Attorneys at Law
222 Delaware Avenue, Suite 1100
6     Wilmington, Delaware 19899
MICHAEL A. SCHWARTZ, ESQ.
7     EFRAT PELLET, ESQ.
Horwitz Horwitz & Paradis
8     Attorneys at Law
570 Seventh Avenue, 20th Floor
9     New York, New York 10018
10
Counsel for Defendant Bank of America:
11
LAWRENCE PORTNOY, ESQ.
12    Davis Polk & Wardwell, LLP
Attorneys at Law
13    450 Lexington Avenue
New York, New York 10017
14
SHAWN J. CHEN, ESQ.
15    Cleary Gottlieb Steen & Hamilton, LLP
Attorneys at Law
16    2000 Pennsylvania Avenue, Northwest
Washington, D.C. 20006-1801
17
Counsel for Defendant Kenneth Lewis:
18
ANDREW J. CERESNEY, ESQ.
19    GREGORY F. SMOLAR, ESQ.
Debevoise & Plimpton, LLP
20    Attorneys at Law
555 13th Street, Northwest
21    Washington, D.C. 20004
22    JAMES F. WYATT, III, ESQ.
Wyatt & Blake, LLP
23    Attorneys at Law
435 East Morehead Street
24    Charlotte, North Carolina 28202-2609
25    Also Present: Kevin Bundy, Videographer

---

1             I N D E X
2    WITNESS                         PAGE
3    Called by the Plaintiffs:
4    KENNETH D. LEWIS
5      DIRECT EXAMINATION BY MR. KRINER............... 9
6      CROSS-EXAMINATION BY MR. CERESNEY............. 331
7    CERTIFICATE OF REPORTER OATH..................... 333
8    CERTIFICATE OF REPORTER......................... 334
9    ERRATA SHEET.................................... 335
10
11            E X H I B I T S
12   LEWIS                          PAGE
13   No. 1   TRANSCRIPT OF MORNING SESSION OF A JOINT  11
14           HEARING OF THE HOUSE OVERSIGHT AND
15           GOVERNMENT REFORM COMMITTEE AND DOMESTIC
16           POLICY SUBCOMMITTEE
17           BAC-ML-CL00028160 - 8237
18   No. 2   DEPOSITION TESTIMONY OF 10/30/09      12
19   No. 3   3/18/09 DEFINITIVE PROXY STATEMENT OF   28
20           BANK OF AMERICA
21   No. 4   9/29/08 E-MAIL                   34
22           BAC-ML-NYAG10074184 - 4186
23   No. 5   CALENDAR  BAC-ML-NYAG00003698 - 3746   49
24   No. 6   9/13/08 E-MAIL  BAC-ML-NYAG10057622    71
25

---

1    No. 7   11/5/08 E-MAIL W/ATTACHMENTS        73
2            BAC-ML-NYAG70288687 - 8697
3    No. 8   HANDWRITTEN NOTES            86
4            BAC-502-WLRK00000446 - 0604
5    No. 9   MINUTES OF SPECIAL BOARD MEETING OF BOARD 100
6            OF DIRECTORS OF BANK OF AMERICA
7            CORPORATION OF 9/14/08
8            UR-BAC-ML-NYAG00003747 - 3761
9    No. 10  12/15/08 E-MAIL W/ATTACHMENTS     106
10           BAC-502-WLRK-0000993 - 1005
11   No. 11  PROJECT BULL FAIRNESS OPINION     127
12           PRESENTATION  BAC-ML-NYAG70309815 - 9983
13   No. 12  9/16/08 PRESS RELEASE        129
14           BAC-DIR-DE00002817 - 2818
15   No. 13  WRITTEN SCRIPT BAC-ML-NYAG70287605 - 7621 131
16   No. 14  FINAL TRANSCRIPT OF 9/15/08 CONFERENCE  132
17           CALL  BAC-MY-NYAG00000396 - 0420
18   No. 15  MINUTES OF SPECIAL MEETING OF BOARD OF   142
19           DIRECTORS OF BANK OF AMERICA CORPORATION
20           9/19/08  BAC-ML-NYAG00003762 - 3772
21   No. 16  9/22/08 E-MAIL  BAC-DIR-DE00002292   147
22   No. 17  NOTES OF TELEPHONE CONFERENCE OF THE    149
23           BOARD OF DIRECTORS OF BANK OF AMERICA
24           CORPORATION 9/26/08
25           BAC-ML-DE00010278- 0280

1 (Pages 1 to 4)

1  teams together, getting cost saves. These are
2  operational matters. There wouldn't have been a
3  financial discussion.
4      Q.  How do you get that from this entry?  Is that
5  from your recollection?
6      A.  Well, that was what Jim Eckerle was responsible
7  for.  I wouldn't have had -- I mean, that was what I
8  would talk to him about.
9      Q.  He wouldn't have been present for a discussion
10  you had with Mr. Price on financials?
11     A.  No.  And these were regularly scheduled
12  meetings.
13     Q.  Well, did Mr. Price hang around after the
14  meeting with Mr. Eckerle to discuss what he was going to
15  report to the board about Merrill financials?
16     A.  I don't recall.  It's probably unlikely,
17  since -- that he would have done it here because of
18  the -- it usually took about 30 minutes to go over the
19  details of the -- of whatever Jim wanted to talk about.
20     Q.  Do you think Mr. Price did that before the
21  November 21 meeting, give you a download on what he
22  expected to tell the board?
23     A.  It's possible.  It's possible he could have
24  done it that -- that morning earlier, because we
25  didn't -- we didn't record every time we had a meeting.

1  He would just walk to my office and sit down and talk.
2  But I don't recall him doing anything, but it's
3  possible.
4      Q.  His office is close to yours, was close to
5  yours?
6      A.  Next to mine.
7      Q.  And after the board call, there's a -- at 11
8  there's a write-in matter relating to John Thain.  Do
9  you see that?
10     A.  Right.
11     Q.  What was that relating to?
12     A.  This looks to me like a -- it was a meeting
13  with John Thain, but I don't recall the meeting.  The
14  handwriting is -- is Brenda Meredith's.
15     Q.  As of November 21, 2008, did you -- were you
16  aware that some discussions had been had with
17  Mr. Mayopoulos and Wachtell relating to disclosure
18  around losses?
19     A.  The meeting that I described that I had in
20  November where I -- where I learned of a $5 billion
21  number, as best I can recollect, was the time that I
22  also heard that Joe -- well, Joe told me that he had
23  gone to Tim Mayopoulos and asked if he -- if he thought
24  that this number would be something that would -- should
25  be disclosed, and Joe told me that Tim had said he

1  had -- he did not think so.  And I don't recall if he
2  said that before or after he contacted Wachtell Lipton,
3  but it's my understanding that Tim actually did call
4  Wachtell Lipton and that there was consensus on the fact
5  that that was not a disclosable event.
6      Q.  Did -- was that discussion you had with
7  Mr. Price prior to the November 21 board call?
8      A.  I don't know how many times I need to say it.
9  I honestly do not recall when that meeting took place.
10     Q.  But it was in November?
11     A.  But -- I'm -- I'm almost positive that it was
12  in November.
13         MR. KRINER:  Off the record.
14         THE VIDEOGRAPHER:  Going off the record.  The
15  time is 3:02 p.m.
16         (Recess from 3:02 until 3:14 p.m.)
17         THE VIDEOGRAPHER:  Back on the record.  The
18  time is 3:14 p.m.
19  BY MR. KRINER:
20     Q.  Mr. Lewis, let me ask you to take a look at
21  your calendar, Exhibit 5 --
22     A.  Okay.
23     Q.  -- and specifically the column that relates to
24  December 3rd, 2008, which I believe is page Bates 3724.
25  That would be the right-hand column, I believe.

1      A.  Okay.
2      Q.  The first entry in that column is agenda
3  meeting at 10 o'clock.  Do you see that?
4      A.  Yes.
5      Q.  What does that relate to?
6      A.  Well, we -- we will have a proposed agenda, and
7  then we'll go around the room and see if anybody else
8  has any other items to add to the agenda other than
9  what's being proposed by the secretary.
10     Q.  And who -- who would be involved in this
11  meeting?  Or who was involved in the meeting?
12     A.  My direct reports, but it would be if they were
13  available.  It wasn't that they always had to come.
14     Q.  To what agenda does that refer?
15     A.  Usually to the board agenda.
16     Q.  On December 3rd, 2008, what board agenda would
17  that refer to?
18     A.  I don't -- I don't know.  I don't recall.  But
19  I see that Alice Herald had come to see me the day
20  before, so I -- I presume that was a meeting that we
21  talked about the agenda and then she was with the whole
22  team.
23     Q.  And Greg Fleming had also seen you the day
24  before?
25     A.  Yes.

**52 (Pages 205 to 208)**

1    Q.  Well, you as chairman could have said, right,
2  within your authority, "I don't agree with Wachtell, I
3  don't agree with Mayopoulos, I think we should
4  disclose," correct?  You could have said that?
5        MR. CERESNEY:  Objection.
6    A.  I presume I could.  I think that would be
7  unwise.
8    Q.  But the other directors could have thought
9  otherwise, correct?
10    A.  My --
11       MR. CERESNEY:  Objection.
12    A.  -- my perception is they would have thought it
13  unwise as well.
14    Q.  But you don't know, right?
15       MR. CERESNEY:  Objection to form.
16    A.  I don't know, but I do know we had a process
17  and they knew about the process.
18    Q.  They didn't know about the disclosure
19  discussions with Wachtell, though, did they?
20    A.  Not to my -- well, I don't know when they knew,
21  or if they did.
22    Q.  You didn't tell them?
23    A.  I did not tell them.  Well, I don't -- I didn't
24  tell them before the shareholders meeting, to the best
25  of my knowledge.

1    Q.  So did you yourself consciously decide not to
2  tell the board regarding the estimate you had of
3  Merrill's fourth quarter loss and also that there had
4  been discussions with Wachtell concerning disclosure?
5       MR. CERESNEY:  Objection to form.
6    A.  I didn't -- I don't know if I made a conscious
7  decision or not.  I didn't, I mean, so in actuality I
8  did not.
9    Q.  Why didn't you?
10    A.  Well, we were meeting with -- with them.  We
11  had kept them up -- we had been talking to them on a
12  weekly basis.  Secondly, the -- what came back from
13  Wachtell and Mayopoulos from -- through Joe was that
14  there was not a disclosable event.  Had there been one,
15  we would have done that.
16    Q.  And that was advice of counsel, correct?
17    A.  That was advice of counsel and Joe's opinion.
18    Q.  And the -- you as a director and the rest of
19  the board weren't required to accept either that advice
20  of counsel or Mr. Price's opinion, correct?
21       MR. PORTNOY:  Objection; asked and answered.
22       MR. CERESNEY:  Objection to form.
23    A.  We were not required to have that process, but
24  we elected to have that process.
25    Q.  But that wasn't my question.  My question was

1  whether, given that you had that process, were you as a
2  director or the other outside directors required to
3  accept that advice?
4       MR. CERESNEY:  Objection.
5    A.  Not to my knowledge.  I don't think at the time
6  we had a lawyer on our board, so we did not have a legal
7  expert.
8    Q.  When did you learn about the discussions
9  that -- that Mr. Mayopoulos and Mr. Price had with
10  Wachtell?
11    A.  You mean the second time, the 7 -- the
12  $7 billion loss?
13    Q.  You knew -- Mr. Price -- I believe you
14  testified previously Mr. Price came to you twice --
15    A.  Correct.
16    Q.  -- correct?
17    A.  And I'm asking, which time do you mean?
18    Q.  The second one, was that around December 3rd?
19    A.  Correct.
20    Q.  And the first time was sometime before that?
21    A.  Correct.
22    Q.  And what was the question put to Wachtell the
23  first time that Mr. Price came to you?
24    A.  I don't know -- I wasn't there, so I don't know
25  the specific, but Joe relayed to me that he went to

1  Mayopoulos, and my understanding is that in the
2  conversation with Joe that then Mayopoulos went to
3  Wachtell.  I'm not sure of that, but that's my
4  understanding.
5    Q.  Did Mr. Price tell you why he went to
6  Mr. Mayopoulos?
7    A.  Right, he -- he went to Mayopoulos to determine
8  if he thought there was a MAC -- excuse me -- a
9  disclosable event.
10    Q.  Did he tell you what led him to go to Wachtell
11  about that particular piece of information?  Or strike
12  that.
13       Did he tell you what led him to go to
14  Mr. Mayopoulos about that particular piece of
15  information?
16    A.  Well, he had gone -- he had gone to him at the
17  $5 billion level, as I recall, I think it was 5 billion,
18  and so it was natural that since the number had
19  increased that he would go again.
20    Q.  Did he tell you why he went to Mr. Mayopoulos
21  about the $5 billion number?
22    A.  The same thing, that he wanted to -- he wanted
23  to get clarity as to whether that was a disclosable
24  event or not.
25    Q.  Did he discuss with you what triggered his

**57 (Pages 225 to 228)**

Exhibit I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------)
                              )
SECURITIES and EXCHANGE       )
COMMISSION,                   )
                              )
            Plaintiff,        )
                              )
       VS.                    )
                              )
BANK OF AMERICA,              )
                              )
            Defendant.        )
                              )
------------------------------)

VIDEOTAPED DEPOSITION OF KEN LEWIS

New York, New York

Friday, October 30, 2009

Reported by:
Robert X. Shaw, CSR
CSR NO. 817
JOB NO. 304938

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00109963

1                    Ken Lewis

2    merger agreement is actually attached to the

3    proxy statement?

4        A.    I don't remember.

5        Q.    Did you, in fact, review this proxy

6    statement before it was sent out?

7        A.    I reviewed parts of it.

8        Q.    And did you look to see whether or

9    not the merger agreement was attached?

10       A.    No.

11       Q.    As CEO and chairman of Bank of

12   America, what do you regard to be your

13   responsibility in terms of communicating the

14   significant terms of the merger to your

15   shareholders?

16       A.    I would think, my duties are to

17   ensure that we have a process with the best

18   people we can get to comprehensively describe

19   the agreement.

20       Q.    And what do you do to ensure that

21   they have, in fact, done that, done that

22   function properly?

23       A.    Hire the best people I can.

24       Q.    And as far as the work product that

25   they generate, what do you do to ensure that

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110156

194

1                    Ken Lewis

2     they have, in fact, complied with that?

3          A.   I would not be qualified to judge

4     the quality of that work.

5               I would expect them to, to the

6     extent that it needs to be reviewed, to have

7     it reviewed by the right people, and that may

8     include external counsel.

9          Q.   Well, you understand, from the

10    business perspective, when you entered into

11    the merger agreement, you understood the key

12    terms yourself; right?

13         A.   Yes.

14         Q.   And you understood that those were

15    the terms that were to be communicated to the

16    shareholders; correct?

17         A.   (Indicating).

18         Q.   And so, what did you do to ensure

19    that those key terms were, in fact,

20    communicated to shareholders?

21         A.   Um, I had great lawyers and great

22    outside counsel looking at that to see that

23    the document is prepared correctly.

24         Q.   And do you go over the document

25    with them to ensure that, in fact --

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110157

1                    Ken Lewis

2         A.    No.   I would not feel qualified to

3    go over the document with them.   They are the

4    experts.

5         Q.    Well, when you said you wouldn't be

6    qualified, you're the CEO and chairman of the

7    company; rignt?

8         A.    Right.   But not a lawyer.

9         Q.    Fair enough.

10              But you have the ability to

11   determine whether or not key information is

12   actually being conveyed to shareholders;

13   right?

14        A.    But I wouldn't know, in totality,

15   what key information needed to be given to

16   shareholders, and they would.

17        Q.    But on any particular point, you

18   would have the ability to determine as to

19   whether or not that point -- for example,

20   price, you would have the ability to

21   determine whether the price was communicated

22   to the shareholders; right?

23        A.    Well, I mean, I have a bond of

24   trust with a finance group, and an accounting

25   group, and an outside counsel that they have

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110158

                    Ken Lewis
1
2    done that.
3           Q.   But that wasn't my question.
4           My question is:  You had the
5    ability to determine whether or not price is
6    being communicated to the shareholders;
7    right?
8           A.   I would be able to look in there
9    and see if it was, yes.
10          Q.   Okay.  So, when you file the proxy
11   statement, do you, in fact, look at the proxy
12   statement to determine whether those key
13   terms that are, in your view, important to
14   the transaction, are, in fact, related in the
15   document?
16          A.   No.  I have the bond of trust with
17   my legal counsel and my finance group.
18          Q.   And in the bond of trust, you have
19   a discussion with them to discuss whether or
20   not the key terms are being conveyed?
21          A.   No.  I have trust that they are
22   conveying it properly, in totality.
23          Q.   So, you have no discussion -- is it
24   your testimony that when you signed the proxy
25   statement, you might review segments, but you

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110159

197

1                    Ken Lewis

2       Q.    And how was that $3 billion

3    allocated?

4            That $3 billion was for the fourth

5    quarter?

6       A.    Correct.

7       Q.    And how was that allocated as

8    between the months?

9       A.    I don't recall the different, the

10   months, I just recall the quoted forecast.

11      Q.    Did Tim Mayopoulos receive this

12   handout?

13      A.    I don't know.

14      Q.    P-53.

15            (Plaintiff's Exhibit 53, documents

16            Bates Nos. 6332 to 37 , marked for

17            identification as of this date.)

18      Q.    This document is entitled Merrill

19   Lynch & Co. 2008 fourth quarter Pacing & FY

20   Forecast -- and four-year forecast Scenario

21   dated 12/3/2008, revised 6 p.m.

22      A.    Okay.

23      Q.    Mr. Lewis, did you receive a

24   revised version of the previous document that

25   we looked at with the numbers in it?

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110224

1                          Ken Lewis

2            A.    I can't recall if I received it or

3       heard about it, but I did know that it had

4       been revised.

5            Q.    Okay.  If you turn to the page that

6       says page 2 at the bottom, I believe you have

7       that.

8            A.    Yes.

9            Q.    Do you see that the revised fourth

10      quarter forecast there is $14 billion --

11           A.    Yes.

12           Q.    -- pre-tax and $8.9 billion post

13      tax --

14           A.    Yes.

15           Q.    -- and $4.8 billion for November?

16           A.    Correct.

17           Q.    Did Mr. Mayopoulos receive this

18      document?

19           A.    I don't know.

20           Q.    Did you have any discussions in

21      December, 2008, prior to the shareholder

22      vote, as to whether the proxy statement

23      should be updated to disclose these

24      additional losses?

25           A.    Yes.  Joe Price came to me two

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110225

1                    Ken Lewis
2       different times and said he had met with Tim
3       Mayopoulos, and they had discussed the issue
4       with, ah, with Wachtel Lipton, and that the,
5       and that the issue was, should these be in
6       the disclosure, should these be disclosed,
7       and Joe said that the, ah, that they said
8       there was not a disclosable item.
9            Q.   Who is the "they" in the "they
10      said"?
11           A.   They, the lawyers.
12           Q.   Tim Mayopoulos and Wachtel Lipton?
13           A.   Yes, and Wachtel Lipton.
14           Q.   And you said Mr. Price came to you
15      two times?
16           A.   Yes.
17           Q.   When were the two times?
18           A.   I can't recall the time of the
19      first one, but sometime around this time he
20      came to me a second time.
21           Q.   So, "this time" meaning December
22      3rd?
23           A.   Correct.  Sometime around here he
24      came again and said he had gone through the
25      same process and that the, ah, the same

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110226

264

1                    Ken Lewis

2    answer came back, it was not a disclosable

3    item.

4         Q.    The first time that he came to you,

5    was that before you had these specific

6    numbers?

7         A.    Um, yes.

8         Q.    And was that in November?

9         A.    I can't remember.

10        Q.    He indicated that the analysis was

11   -- was the analysis the same?

12        A.    Yes.

13        Q.    And what factors went into that

14   analysis?

15        A.    I had subsequently learned

16   probably, I can't remember if I knew then or

17   not, but there were a number of things that

18   Tim had done and Wachtel had done, and they

19   had reviewed the proxy to see if there was

20   disclosure around volatile instruments that

21   would be subject to price fluctuations.

22              They had gone back and looked at

23   the losses that had occurred prior to that,

24   of that year.

25              And there was the comment about the

705f152f-4975-4132-b529-6195faa3b4ec

Confidential Treatment Requested by Bank of America
Confidential Information Produced Pursuant to 10/14/09
Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y)

BAC-ML-NYAG-502-00110227



Exhibit J

1
2
3  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
4  Master File No. 09-MD-2058 (PKC)
   ------------------------------------x
5
   IN RE BANK OF AMERICA CORP. SECURITIES,
6  DERIVATIVE AND EMPLOYMENT RETIREMENT
   INCOME SECURITY ACT (ERISA) LITIGATION
7
   ------------------------------------x
8
   THIS DOCUMENT RELATES TO
9  All Securities Actions
10 ------------------------------------x
11
   IN THE COURT OF CHANCERY
12 OF THE STATE OF DELAWARE
   C.A. No. 4307-CS
13 ------------------------------------x
14 IN RE BANK OF AMERICA CORPORATION
   STOCKHOLDER DERIVATIVE LITIGATION
15
   ------------------------------------x
16             December 21, 2011
               9:08 a.m.
17
18       Videotaped Deposition of THOMAS J.
19 MAY, called as a witness by and on behalf of
20 the Plaintiffs, pursuant to the applicable
21 provisions of the Federal Rules of Civil Procedure,
22 before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR #13192,
23 NH-CSR #91, MA-CSR #12393 and Notary Public, within and
24 the Commonwealth of Massachusetts at the Hilton Boston
25 Hotel, 89 Broad Street, Boston, Massachusetts.

Q.   Do you recognize these materials, sir?   10:44:10

A.   Yes, I do.   10:44:11

Q.   And do you recall when you received these   10:44:12
materials?   10:44:13

A.   On September 14th.   10:44:19

Q.   And the time of day, sir; do you recall?   10:44:20

A.   I thought it was sometime midday.   10:44:26

Q.   And did you review these materials before   10:44:27
your special board of directors meeting that night?   10:44:29

A.   Yes, I did.   10:44:33

Q.   And how long did you take to review these   10:44:34
materials?   10:44:35

A.   I had spent a few hours, not just   10:44:42
reviewing this material, but reviewing some of the   10:44:45
Merrill financial information -- their 10-K.   10:44:47

When I recognized that it was Merrill   10:44:51
Lynch, I was interested in going to their Web site   10:44:55
and pulling out their financial data to look at   10:44:57
their financial history -- that went beyond what   10:44:59
was in the package.   10:45:04

So I spent a few hours looking at this and   10:45:07
other Merrill financial information.   10:45:10

Q.   And -- and why were you looking at   10:45:11
Merrill's financial information?   10:45:14

A.   Well, I was interested to see, recognizing   10:45:15

from these materials that they had been in a loss   10:45:20
position, as we mentioned, in the last year.   I   10:45:23
wanted to look at what the potential had been, what   10:45:26
-- what they had been providing in terms of   10:45:29
earnings per share and revenues in normal times.   10:45:34

And so I hearkened back to the years of --   10:45:39
whatever it was, 2004, 2005, 2006, when they were   10:45:45
making $5 to $7 billion a year -- to get a sense on   10:45:48
what the true potential of this organization was   10:45:53
going forward when things -- markets calmed down.   10:45:56

Q.   If you would turn, sir, to the second page   10:46:07
of this document.   You'll see an agenda.   10:46:09

Do you see that, sir?   10:46:17

A.   Yes, I do.   10:46:24

Q.   And the No. 3 item listed there is,   10:46:25
"Proposed Transaction."   10:46:28

Do you see that, sir?   10:46:30

A.   Yes.   10:46:30

Q.   And "d" under that item is, "Board   10:46:30
Responsibilities"?   10:46:33

A.   Yes.   10:46:34

Q.   Do you recall board responsibilities being   10:46:34
discussed at this September 14th meeting?   10:46:36

A.   I do.   10:46:38

Q.   And what was that discussion, sir?   10:46:41

A.   I believe we had our outside counsel that   10:46:43
reminded us of the duties of care and duties of   10:46:50
loyalty regarding transactions of this nature.   10:46:55

A pretty standard discussion that preceded   10:47:03
many -- if not most -- if not all -- of our   10:47:05
acquisition transactions.   10:47:10

Q.   And other than with your outside counsel,   10:47:15
was there any discussion amongst the board of their   10:47:18
responsibilities at this meeting?   10:47:21

A.   I think the board -- as I said, this was   10:47:23
one of many transactions that we had done in the   10:47:26
last 10 years; and I think the board -- while it   10:47:28
was reminded -- certainly understood their   10:47:33
responsibilities.   10:47:35

Q.   Item No. 5 on this agenda, sir, is a "Vote   10:47:38
on Proposal."   10:47:41

Do you see that?   10:47:42

A.   Yes.   10:47:43

Q.   Do you recall specifically what you voted   10:47:44
on on this day, September 14th, 2008?   10:47:45

A.   There's a whole host of -- of votes --   10:47:50
typical votes that are accompanying this package   10:47:54
that not only approves the transaction, but   10:47:59
delegates to management the responsibility to   10:48:05
develop and enter into a merger agreement, to   10:48:11

prepare -- with outside counsel and internal   10:48:17
counsel -- the appropriate proxy materials and   10:48:22
disclosures.   10:48:25

And so it was a delegation to management   10:48:27
to execute all of the necessary elements and   10:48:29
agreements regarding the transaction.   10:48:34

Q.   What specific elements of the transaction   10:48:38
were you being asked to approve at this meeting?   10:48:40

A.   We were being asked to approve the -- the   10:48:45
basic terms of the agreement that are laid out in   10:48:50
this package.   10:48:57

Q.   I'm asking you, sir, what are those basic   10:49:06
terms?   10:49:08

A.   (Witness reviews document.)  That we would   10:49:10
be acquiring 100 percent of the stock of Merrill   10:49:20
Lynch; that we would be doing that with our own   10:49:26
stock on an exchange of .8595 Bank of America   10:49:29
shares for each outstanding Merrill share; that --   10:49:37
that we would be providing for a process and   10:49:44
delegating to management to -- to obtain approvals   10:49:50
from both sets of shareholders, as well as   10:49:55
approvals from the required regulatory authorities;   10:50:00
that in the merger agreement, it would provide for   10:50:04
three of -- of the Merrill directors that they   10:50:08
would so choose to become part of the Bank of   10:50:14

Exhibit K

"C O N F I D E N T I A L"
IN THE COURT OF CHANCERY
OF THE STATE OF DELAWARE
C.A. NO. 4307-BCS

IN RE:                              :
                                    :
BANK OF AMERICA CORPORATION   :
STOCKHOLDER DERIVATIVE        :
LITIGATION                    :

Transcript of the videotape deposition of ERIC ROTH, called for Oral Examination in the above-captioned matter, said deposition taken by and before SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public for the State of New York, at the offices of WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP, 270 Madison Avenue, New York, New York, on Thursday, January 19, 2012, commencing at 9:03 a.m.

HUDSON REPORTING & VIDEO, INC.
124 West 30th Street, 2nd Fl.
New York, New York 10001
Tel: 212-273-9911  Fax: 212-273-9915  JOB NO. 5418

1   A P P E A R A N C E S :
2
3   CHIMICLES & TIKELLIS, LLP
    BY:  ROBERT J. KRINER, JR., ESQ.
    BY:  SCOTT M. TUCKER, ESQ.
4   222 Delaware Avenue, Suite 1100
    Wilmington, Delaware  19801
5   (302) 656-2500
    RobertKriner@chimicles.com
6   ScottTucker@chimicles.com
    Counsel for the Plaintiffs
7
    DAVIS POLK & WARDWELL, LLP
8   BY:  BRIAN M. BURNOVSKI, ESQ.
    450 Lexington Avenue
9   New York, New York  10017
    (212) 450-4874
10  Brian.burnovski@davispolk.com
    Counsel for Bank Defendants
11
    POTTER ANDERSON & CORROON, LLP
12  BY:  MATTHEW E. FISCHER, ESQ.
    Hercules Plaza
13  1313 North Market St.
    Wilmington, DE 19801
14  (302) 984-6000
    mfischer@potteranderson.com
15  Counsel for Bank of America
    (NO APPEARANCE)
16
    DEBEVOISE & PLIMPTON, LLP
17  BY:  GREGORY F. SMOLAR, ESQ.
    555 13th Street, N.W.
18  Washington D.C.  20004
    (202) 383-8038
19  Gfsmolar@debevoise.com
    Counsel for Kenneth Lewis
20
    WACHTELL, LIPTON, ROSEN & KATZ
21  BY:  DAVID B. ANDERS, ESQ.
    BY:  THEODORE N. MIRVIS, ESQ.
22  51 West 52nd Street
    New York, New York  10019-6150
23  (212) 403-1000
    DBAnders@wlrk.com
24  Tmirvis@wlrk.com
    Counsel for Deponent Eric Roth, Esq
25

1   A P P E A R A N C E S  C O N T I N U E D :
2
    CLEARY GOTTLIEB STEEN & HAMILTON
3   BY:  JENNIFER KENNEDY PARK, ESQ.
    BY:  CAROLYN CHU, ESQ.
4   One Liberty Plaza
    New York, New York  10006
5   (212) 225-2000
    Jpark@cgsh.com
6   Cchu@cgsh.com
    Counsel for Bank of America and the Individual
7   Defendants
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  A L S O  P R E S E N T :
24
    NICHOLAS GUZMAN
25  VIDEOGRAPHER

1        IT IS HEREBY STIPULATED AND AGREED by
2   and between the attorneys for the respective
3   parties herein, that filing and sealing be and
4   the same are hereby waived.
5        IT IS FURTHER STIPULATED AND AGREED
6   that all objections, except as to the form of the
7   question, shall be reserved to the time of the
8   trial.
9        IT IS FURTHER STIPULATED AND AGREED
10  that the within deposition may be sworn to and
11  signed before any officer authorized to
12  administer an oath, with the same force and
13  effect as if signed and sworn to before the
14  Court.
15
16
17
18
19
20
21
22
23
24
25

1  (Pages 1 to 4)

ERIC ROTH, ESQ. - CONFIDENTIAL
1
2 most part not lawyers, lay people, that not
3 withstanding the size of Merrill's losses, a MAC
4 claim had difficulties. This document was
5 written -- I was wearing my counselor's house as
6 opposed to my advocate's house. There are times
7 over this course of this week where I functioned
8 more as an advocate. In this particular setting,
9 I was functioning more as a counselor.
10 And I was telling the Board, if you read
11 these, this is not going to be an easy case.
12 Here is the Delaware law. It is a standard that
13 is by design, you know, difficult for a buyer to
14 meet. I took them through the various elements
15 and tried to explain to them in the particular
16 the notion of durational significance and how
17 even a very sizeable loss in a single quarter
18 does not necessarily translate into a
19 durationally significant impact on overall
20 earnings capacity potential because it's measured
21 in years, not months.
22 And I explained to them some of the
23 factual difficulties based on the interviews we
24 had conducted the previous day in proving that
25 case here. And what I did point out to them in

ERIC ROTH, ESQ. - CONFIDENTIAL
1
2 terms of warnings included the fact that a lot of
3 these losses were not cash losses. A lot of
4 these losses were in the form of mark to market
5 or mark to model losses. They held, you know,
6 enormous -- an enormous portfolio of securities,
7 much of it fixed income.
8 Under FAS 157, they were required to mark
9 those to market and where there was not a market,
10 to mark to model. So, as credit spreads widened,
11 the value of their fixed income portfolio
12 decreased. And, of course, in October of 2008,
13 you had -- you know, the credit spreads had never
14 been wider. So on the assumption -- once credit
15 spreads narrowed, today's losses could be
16 tomorrow's gains, if these securities continue to
17 be held. And, of course, nobody was buying in
18 the fixed income markets, right, so just by way
19 of example.
20 And I make these points in this memo. So
21 you asked and, you know, did anybody advise the
22 Board as to, you know, the difficulties of the
23 strategy, this memo did that, beyond the sort of
24 the technical elements of Delaware law and the
25 difficulty of providing durational significance

ERIC ROTH, ESQ. - CONFIDENTIAL
1
2 on these facts.
3 I pointed out, you know, in the last
4 section of the memo called, "other relevant
5 factors," the considerations apart from black
6 letter law, but I recall the practical
7 difficulties of pursuing the invocation of a MAC,
8 including -- and I pointed out the things the
9 Board ought to consider, that they should keep in
10 mind the potential downside if we litigated this
11 case and lost that Merrill could file a Chapter
12 11 petition, that it could -- that all of its
13 counterparties could flee and we -- not
14 withstanding that, lose the MAC case because
15 events that happened, losses that happened as a
16 result of the implication of a MAC are carved
17 out, of course. So we lose the case and then
18 we're required to buy a carcass. I didn't use
19 those words, you know, but that thought was in
20 here.
21 I also pointed out that the litigation
22 dynamic, once we invoked a MAC, would change. We
23 are -- our litigation adversary could either be a
24 Chapter 11 trustee or, if there is a federal
25 takeover -- in essence, the caption is Bank of

ERIC ROTH, ESQ. - CONFIDENTIAL
1
2 America versus Ben Bernanke, Henry Paulsen and
3 the capitalist system as we know it, right. And
4 I'm being facetious but only a little. And so
5 the practical realities of litigating a case like
6 that and being, you know, blamed for causing
7 Lehman II were such that in the real world, even
8 in Delaware Chancery, we might -- we might be
9 looked at with disfavor; in other words, adding
10 to the already difficult standards that Delaware
11 law imposed.
12 The practical implications of asserting a
13 MAC claim were such that a reasonable businessman
14 might think twice or three times or more before
15 asserting one.
16 So, in answer to your question -- pardon
17 -- forgive the length of my response -- but, yes,
18 the Board was put on notice of the risks of the
19 assertion of a MAC claim.
20 Q. Did anyone at Wachtell convey to
21 anyone at Bank of America Wachtell's views of the
22 advisability of telling the regulators the bank
23 intended to call a MAC?
24 A. Well, we have gone through many --
25 we've gone through several sets of notes or

43 (Pages 169 to 172)

**ERRATA SHEET FOR DEPOSITION TRANSCRIPT**
**OF ERIC M. ROTH DATED JAN. 19, 2012**

| PAGE/LINE(S) | CHANGE | REASON |
|---|---|---|
| p. 13, line 21 | delete "out done," insert "outdone" | spelling error |
| p. 14, line 7 | delete comma and second "no," insert Q. You were referring to two meetings there? A. No. | transcription error |
| p. 14, line 17 | delete "I'll," insert "I'd" | transcription error |
| p. 20, line 4 | insert "time of the" between "the" and "board" | transcription error |
| p. 22, line 6 | delete "the" | transcription error |
| p. 22, line 19 | delete "had" | transcription error |
| p. 22, line 21 | delete "a" | transcription error |
| p. 23, line 19 | insert "case" after "Court" | transcription error |
| p. 23, line 25 | delete "remained" and insert "remain" | transcription error |
| p. 26, line 4 | delete "Flemming," insert "Fleming" | spelling error |
| p. 26, line 5 | delete "Thane," insert "Thain" | spelling error |
| p. 27, line 13 | delete second "had" | transcription error |
| p. 27, line 14 | delete "loss," insert "lost" | transcription error |
| p. 28, line 10 | delete "partners," insert "attorneys" | accuracy |
| p. 28, line 15 | delete "Lexus," insert "LEXIS" | spelling error |
| p. 29, line 11 | insert period after "point" and begin new sentence with "That" | transcription error |
| p. 29, line 21 | insert dash after "it's" | transcription error |
| p. 30, line 14 | delete "from," insert "about" | accuracy |
| p. 32, line 12 | open quotation marks before "Mayopoulos" | clarity |

| PAGE/LINE(S) | CHANGE | REASON |
|---|---|---|
| p. 163, line 15 | delete comma and insert dash between "know" and "just" | clarity |
| p. 164, line 20 | delete "Thane," insert "Thain" | spelling error |
| p. 165, line 5 | delete "Thane," insert "Thain" | spelling error |
| p. 163, line 8 | delete "down sides," insert "downsides" | clarity |
| p. 166, line 5 | delete "secretary Of," insert "Department of" | accuracy |
| p. 166, line 6 | delete "Paulsen," insert "Paulson" | spelling error |
| p. 167, line 17 | delete "good will," insert "goodwill" | spelling error |
| p. 167, line 18 | delete "good will," insert "goodwill" | spelling error |
| p. 167, line 19 | delete "fed," insert "Fed" | clarity |
| p. 167, line 24 | delete "fed," insert "Fed" | clarity |
| p. 167, line 25 | delete "fed," insert "Fed" | clarity |
| p. 168, line 14 | delete "I can," insert "Can I" | transcription error |
| p. 169, lines 2-3 | delete "not withstanding," insert "notwithstanding" | spelling error |
| p. 169, line 5 | delete "house," insert "hat" | transcription error |
| p. 169, line 6 | delete "house," insert "hat" | transcription error |
| p. 170, line 18 | insert "this is" between "so" and "just" | transcription error |
| p. 170, line 23 | delete comma and insert period after "that" and capitalize "Beyond" | transcription error |
| p. 171, line 2 | delete comma and insert period after "facts" | transcription error |
| p. 171, line 6 | delete "but I recall," insert "what I would call" | transcription error |
| p. 171, lines 13-14 | delete "not withstanding," insert "notwithstanding" | spelling error |

| PAGE/LINE(S) | CHANGE | REASON |
|---|---|---|
| p. 171, line 16 | delete "implication," insert "invocation" | transcription error |
| p. 172, line 2 | delete "Paulsen," insert "Paulson" | spelling error |
| p. 173, line 5 | insert period after "think" and capitalize "So" | transcription error |
| p. 173, line 9 | delete "passed," insert "past" | transcription error |
| p. 173, line 13 | delete "Paulsen," insert "Paulson" | spelling error |
| p. 174, line 20 | delete "act," insert "react" | transcription error |
| p. 174, line 22 | delete "Moynahan," insert "Moynihan" | spelling error |
| p. 175, line 2 | delete "Moynahan," insert "Moynihan" | spelling error |
| p. 175, line 17 | delete "fed," insert "Fed" | clarity |
| p. 175, line 18 | delete "Moynahan," insert "Moynihan" | spelling error |
| p. 175, line 22 | delete "Moynahan," insert "Moynihan" | spelling error |
| p. 176, line 3 | delete ", correct," insert "directly" | transcription error |
| p. 176, line 4 | delete "Moynahan," insert "Moynihan" | spelling error |
| p. 177, line 10 | delete "Moynahan" insert "Moynihan" | spelling error |
| p. 177, line 20 | delete "fascia," insert "facie" | spelling error |
| p. 179, line 12 | close quotation marks after "treasury," delete "note" and insert "though" | transcription errors |
| p. 179, line 14 | delete "Keaton," insert "Heaton" | transcription error |
| p. 179, lines 19-20 | place quotation marks around "factors driving deterioration, collateral posting biggest" and around "one" | clarity |
| p. 179, line 21 | place quotation marks around "one" and "biggest one" | clarity |
| p. 180, line 15 | delete "Euro," insert "zero" | transcription error |
| p. 180, line 23 | delete "Michelle," insert "Miss Schilling" | transcription error |

Eric M. Roth

Subscribed and sworn to before me
this 19th day of April, 2012

Notary Public

ANDREA RIINA
Notary Public, State of New York
No. 02RI5059491
Qualified in New York County
Commission Expires September 20, 20 14

-16-



Exhibit L

" C O N F I D E N T I A L "

IN THE COURT OF CHANCERY
OF THE STATE OF DELAWARE
C.A. NO. 4307-BCS

IN RE:                          :
                                :
BANK OF AMERICA CORPORATION     :
STOCKHOLDER DERIVATIVE          :
LITIGATION                      :


Transcript of the videotape deposition of THOMAS

M. RYAN, called for Oral Examination in the

above-captioned matter, said deposition taken by

and before SILVIA P. WAGE, a Certified Shorthand

Reporter, Certified Realtime Reporter, Registered

Professional Reporter, and Notary Public for the

State of New York, at the offices of HORWITZ,

HORWITZ & PARADIS, 570 Seventh Avenue, 20th

Floor, New York, New York, on Thursday, October

6, 2011, commencing at 9:03 a.m.

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915   JOB NO. 5098

1  CONFIDENTIAL - THOMAS M. RYAN
2  but...
3  (There is a discussion off the record.)
4  MR. PORTNOY: When the witness said,
5  this was the follow-up, he was referring to Ryan
6  Exhibit 23, which are the minutes from the
7  meeting on the 22nd.
8  A. Well, you could -- top of Page 2 you
9  can see Ken -- what Ken reported, right. "The
10  first and foremost treasury said, unified in
11  their view. Treasury and the fed failure to do
12  this would be just systemic disaster for the --
13  for the economy, the industry and Bank of
14  America."
15  I mean, if it's disaster for the financial
16  services industry, we're the leader in the
17  financial services industry, one or two depending
18  how you look at it, it's going to be problematic
19  for us.
20  They stated they'd invoke the material
21  adverse change --
22  (There is a discussion off the record.)
23  A. I don't know what it says.
24  MR. PORTNOY: I'm not sure we even
25  know what that question is. So maybe let's go

1  CONFIDENTIAL - THOMAS M. RYAN
2  back to a question and answer format here.
3  Q. Okay. So what's your --
4  A. I'll tell you my recollection.
5  Q. Tell me your recollection of what --
6  A. This is my recollection. Ken came
7  back -- sorry. It's late.
8  Ken came back and said, they're ballistic,
9  you guys can't walk from this deal. This is
10  going to of severe impact on the system, you
11  know, we know stuff you guys don't know, blah,
12  blah, blah. And if it has a severe impact on the
13  system, it's going to have a severe impact on
14  Bank of America. It's going to have a severe
15  impact on Bank of America shareholders.
16  You guys can't walk away from this deal.
17  You can't invoke a MAC. You know, we'll get rid
18  of the board. We'll get rid of directors. We'll
19  get rid of blah, blah, blah. Let's figure out a
20  way to get you assistance.
21  I don't know what the minutes say, but
22  that's what my recollection of what Ken came back
23  with?
24  Q. And it's your recollection that
25  either Mr. Bernanke or Mr. Paulsen stated that if

1  CONFIDENTIAL - THOMAS M. RYAN
2  the company invoked a MAC, that the management
3  and the board would be removed?
4  A. That is correct.
5  Q. Was there any discussion around the
6  ability of government to remove the directors and
7  management?
8  A. First of all, I said, I didn't care.
9  And, second of all, I said, do they even have the
10  power to do that. And I don't even know if I got
11  an answer.
12  Q. Did anyone else comment on that?
13  A. You know what, it was -- it was --
14  from my take on the call, no one cared about
15  that. That was either Bernanke or Paulsen just
16  pumping their chest and it didn't bother me.
17  But, I mean, it wasn't affecting my decision or
18  my actions one way or the other.
19  Q. Did you ask Mr. Lewis whether he
20  cares if he gets removed from his job?
21  A. He didn't care. I didn't ask him
22  that.
23  Q. Did he say, I don't care?
24  A. I didn't ask him that.
25  Q. No, but did he say voluntarily, I

1  CONFIDENTIAL - THOMAS M. RYAN
2  don't care?
3  A. I don't -- I don't -- no, I don't
4  recall that.
5  Q. So what did the -- with that
6  information from Mr. Lewis, what did the Board
7  determine to do?
8  A. I had more discussion around it and I
9  guess it was on that call that -- I can't
10  remember if we -- we decided that, okay, what
11  does it mean for assistance.
12  And Ken said, listen, they just said they
13  would help us, you know. We weren't sure what
14  the costs were. We weren't sure what assistance
15  would look like, but we knew there was more
16  upside here than downside. And I think someone
17  and I don't remember who but someone wanted this
18  in writing.
19  Q. Well, the terms of the -- of whatever
20  assistance it was would impact the effect on Bank
21  of America, correct?
22  A. Sure, yeah.
23  Q. Was there any analysis whether
24  without government assistance what the impact
25  would be on Bank of America of closing the deal

**Errata Sheet**

**Case Name:**  *In re Bank of America Corporation Stockholder Derivative Litigation*
(C.A. No. 4307-CS)

**Date of Deposition:**  October 6, 2011

**Witness's Name:**  Thomas M. Ryan

| Page & Line | Change | Reason/Code |
|---|---|---|
| global | change "Yum" to "Yum!" | spelling error |
| global | change "integrade" to "integrate" | spelling error |
| global | change "Paulsen" to "Paulson" | spelling error |
| global | change "Paulsen's" to "Paulson's" | spelling error |
| global | change "Thane" to "Thain" | spelling error |
| global | change "Agusta" to "Augusta" | spelling error |
| global | change "hurtles" to "hurdles" | spelling error |
| global | change "Paulsen" to "Paulson" | spelling error |
| 17:6 | change "Long's Drug" to "Longs Drug" | spelling error |
| 17:7 | change "Savon Drug" to "Sav-On Drugs" | spelling error |
| 35:12 | change "Jack" to "Chad" | transcription error |
| 40:14 | change "Long's Drug" to "Longs Drug" | spelling error |
| 108:11-12 | change "to be pre-ivonic (phonetic) go forward" to "to be accretive on a go forward" | transcription error |
| 137:10-11 | change "if we our capital markets team saw" to "if we – our capital markets team – saw" | punctuation error |
| 183:6 | change "someone" to "something" | transcription error |
| 190:10 | change "somewhere" to "some were" | transcription error |
| 192:5 | change "rounding around" to "a rounding error on" | transcription error |
| 216:5 | Change "Hank" to "Thain" | transcription error |
| 216:20-21 | change "you don't know that" to "you don't do that" | transcription error |
| 220:8 | change "conciliarly" to "consigliere" | spelling error |
| 243:10 | change "of" to "have a" | transcription error |
| 248:13 | change "Treasurer" to "Treasury" | transcription error |
| 266:17 | change "pre-imminent" to "preeminent" | spelling error |
| 266:21 | change "pre-imminent" to "preeminent" | spelling error |

By: _____
Thomas M. Ryan

Sworn to before me this
1st day of December, 2011.

_Lynn A. Kapiskas_
Notary Public
My Commission Expires:
6/24/13

Exhibit M

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE:  BANK OF AMERICA      C.A. No. 4307-VCS

CORPORATION STOCKHOLDER

DERIVATIVE LITIGATION

CONFIDENTIAL

VIDEOTAPE DEPOSITION OF O. TEMPLE SLOAN, JR.

DATE TAKEN:     OCTOBER 19, 2011

TIME:        9:03 a.m.

LOCATION:     Raleigh Marriott City Center

500 Fayetteville Street

Raleigh, North Carolina

TAKEN BY:     Counsel for the Plaintiff

REPORTED BY:    CINDY A. HAYDEN, RMR, CRR

VIDEOGRAPHER:   LEN HARRIS

HUDSON REPORTING & VIDEO      1-800-310-1769

---

1    APPEARANCES OF COUNSEL:
2       ATTORNEYS FOR THE PLAINTIFFS
3       MICHAEL A. SCHWARTZ, ESQ.
        EFRAT PELLET, ESQ.
4       Horwitz, Horwitz & Paradis
        570 Seventh Avenue
5       20th Floor
        New York, NY  10018
6       (212) 986-4500
        mschwartz@hhplawny.com
7       epellet@hhplawny.com
8
        ATTORNEYS FOR THE DEFENDANT
9       O. TEMPLE SLOAN, JR.:
10      LAWRENCE J. PORTNOY, ESQ.
        BRIAN M. BURNOVSKI, ESQ.
11      Davis Polk & Wardwell
        450 Lexington Avenue
12      New York, New York  10017
        (212) 450-4000
13      lawrence.portnoy@davispolk.com
        brian.burnovski@davispolk.com
14
15      ATTORNEYS FOR THE DEFENDANT
        BANK OF AMERICA:
16
        MATTHEW E. FISCHER, ESQ.
17      Potter Anderson & Corroon, LLP
        Hercules Plaza
18      1313 North Market Street
        Wilmington, DE  19801
19      (302) 984-6000
        mfischer@potteranderson.com
20
21      ATTORNEYS FOR THE DEFENDANT
        KENNETH D. LEWIS:
22
        SOK T. TEA
23      Debevoise & Plimpton, LLP
        919 Third Avenue
24      New York, NY  10022
        (212) 909-6888
25      sttea@debevoise.com

1  freezing up which saturated everything.  I mean, it

2  just took the whole industry right off the table.

3  And the transaction itself or the bank itself or

4  the combination of the two wasn't what the real

5  threat was.  I mean, all of that was a result of

6  industry freezing up if I'm saying it right.  I'm

7  probably not saying it right.  So the transaction

8  became a victim of -- of the world we lived in at

9  that moment.

10  Q.  Okay.  Thank you.  You also testified

11  that you thought that towards the end of December

12  if the board could have gotten out of the Merrill

13  transaction it would have.  And a very

14  straightforward question, why couldn't the bank at

15  that point get out of the Merrill Lynch

16  transaction?

17  MR. SCHWARTZ:  Objection.  Go ahead.

18  THE WITNESS:  Go ahead?

19  MR. PORTNOY:  Actually, Mike, what's

20  the objection?

21  MR. SCHWARTZ:  I'm not sure that

22  correctly states his testimony.

23  THE WITNESS:  Well, we --

24  BY MR. PORTNOY:

25  Q.  All right.

1  A.  I think I did say we would have gotten

2  out if we could, but if the MAC clause hadn't been

3  explained to us that we couldn't win and I think if

4  the bank thought -- board of directors thought they

5  could have gotten out of the transaction, at that

6  point I think they would have.  I don't think

7  there's any question in anybody's mind, in the

8  minutes, in the testimonies or anything else.

9  There were other reasons that you wanted to go

10  forward.  Number one is still strategically it was

11  a great play.  Number two, there were -- the

12  industry going off the table was a huge threat to

13  the transaction.  The fact that you know you're

14  going to be in lawsuits are another -- if you don't

15  go through with the completion is another reason to

16  do it.  There were a lot of reasons to do it, there

17  were reasons not to do it, but at the end of the

18  day, the board had the option to invoke the MAC.

19  Never was that option taken away from the board.

20  It was advised that that was not a good move and it

21  was not likely to succeed, but I think if -- I

22  don't know what the board would have done if the

23  government hadn't agreed to step in.  That --

24  that's speculation.  But once the government agreed

25  to step in, then I think everybody agreed it was

1   the best interest of the country, the bank, the

2   financial system for -- for the merger to go

3   through.

4          I got to say it one more time.  I mean,

5   you live through these things on TV.  We lived

6   through them in real time and it -- it is

7   unbelievable.  I mean, it's just incredible what

8   went on in this period of time in our country's

9   history.  Probably nothing -- only thing that would

10  have been close to it would have been Black Friday

11  in 1929 when all the banks closed.

12      Q.   Is your understanding it was the

13  conclusion of the board at the end of the day that

14  it was in the best interest of the bank to go

15  forward with the Merrill transaction?

16      A.   Absolutely.

17      Q.   And do you have a view as to how that

18  transaction has turned out for Bank of America?

19      A.   Well, the Merrill transaction has been

20  incredibly successful, and -- particularly in light

21  of -- you know, the banking system is still not

22  great.  We saw the paper -- I mean, the news and I

23  just looked at it and Goldman Sachs reported a big

24  loss yesterday.  So, I mean, it's not out of the

25  woods by any stretch, so -- but Merrill has

1   performed very well and it performed well in '9 --

2   in 2009.  It was just a great move.  It's just

3   unfortunate that the world -- got caught up in a

4   bad world.

5      Q.   Jumping to a -- a slightly different

6   topic.  You testified that you would have expected

7   management to bring to the board facts or issues

8   that the board should know about.  What is it about

9   the experience you had sitting on the Bank of

10  America board that would have led you to that

11  expectation?

12      A.   Well, I sat on that board for 13 years

13  through two CEOs and a lot of -- several CFOs and

14  some change in senior management during that time,

15  and I think any director would tell you the same

16  I'll tell you.  I mean, I had no reason at any time

17  to think that the officers of the company weren't

18  totally open to the board in what they told them

19  and the opinions they expressed to them.  I mean,

20  I -- and to this day I'd make the same comment.  If

21  they didn't I would be one shocked human being.  I

22  mean, I just never had any indication that -- that

23  the board wasn't fully informed, adequately

24  informed and truthfully informed.

25      Q.   Do you have any sense of the level of

Exhibit N

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE:  BANK OF AMERICA CORPORATION
STOCKHOLDER DERIVATIVE LITIGATION      C.A. No. 4307-VCS

DEPOSITION OF JACQUELYN M. WARD

*** HIGHLY CONFIDENTIAL ***

Taken on Behalf of the Plaintiffs

DATE TAKEN:    JUNE 10, 2011

TIME:          8:59 A.M. - 4:10 P.M.

PLACE:         DELRAY BEACH MARRIOTT
               10 NORTH OCEAN BOULEVARD
               DELRAY BEACH, FLORIDA 33483

Examination of the witness taken before:

Susan D. Wasilewski

Registered Professional Reporter
Certified Realtime Reporter
Certified CART Provider
Certified Manager of Reporting Services
Florida Professional Reporter

1  States' financial system.
2  Q. Let me ask you to turn to page 4 of the
3  minutes. The last paragraph refers to Mr. Lewis
4  conveying that the federal regulators had a clear
5  position that the corporation declined an equity
6  infusion at this time, do you see that?
7  A. Yes.
8  Q. Do you know what that discussion refers to?
9  A. I believe that refers to TARP moneys.
10  Q. Do you understand that the Fed communicated to
11  Mr. Lewis that if you don't take an equity infusion now,
12  it will cost the company more later if you come looking
13  for it?
14  A. That's what this states.
15  Q. Is that your recollection of what was
16  communicated?
17  A. I am fuzzy there. Sorry.
18  Q. Did the Bank of America board have any role in
19  determining the amount of the bonuses paid to the
20  Merrill Lynch employees prior to the closing of the
21  merger?
22  A. No, they did not, not to my knowledge.
23  Q. When did you first learn about the amount of
24  bonuses potentially payable to the Merrill Lynch
25  employees prior to the merger?

1  MR. LIMAN: Objection to the form.
2  A. Prior to the merger?
3  Q. Yes. Did you learn at any time prior to the
4  closing of the merger any information regarding bonuses
5  payable to Merrill Lynch employees?
6  A. I don't recall it in that time frame.
7  Q. Did there ever come a time when you developed
8  any concerns or misgivings about the Merrill Lynch
9  transaction?
10  A. In late December we obviously discussed the
11  potential of the MAC due to the fact that economic
12  conditions were worsening and that we should look at all
13  activities within the bank relative to our capital
14  positions and our capital outflows. I did not ever have
15  any second thoughts relative to the Merrill acquisition
16  and the fact that it filled out a long-term strategy for
17  us and that it was going to be successful as long as the
18  entire economy didn't go away at that point in the form
19  that we knew it, because it offered to us new markets,
20  it offered to us products, it rounded out what we needed
21  for growth in retail markets, wealth management. It
22  gave us access to talent that you would have -- that
23  would take a very long time to go out and hire and we
24  acquired it.
25  All of the long-term strategy fits that existed

1  there are the things that had been known by Bank of
2  America for a period of time, and it was a period of
3  time that Bank of America identified that Merrill was
4  the most appropriate acquisition for us in that space,
5  and I'm not discussing what happened in any of these
6  meetings, I'm talking about prior to that, when we would
7  have strategy discussions and where we should put our
8  annual plans and our long-term strategic plans.
9  Q. Did you ever hear any other Bank of America
10  directors express any second thoughts regarding the
11  Merrill Lynch transaction?
12  A. No.
13  Q. Did you have any part in negotiation of the
14  terms of the federal assistance?
15  A. No.
16  Q. Did the board generally have any part in
17  negotiation of the terms?
18  A. Not to my knowledge.
19  Q. Who did?
20  A. Our outside experts and our management team.
21  MR. KRINER: I have nothing further. Thank
22  you, Ms. Ward.
23  THE WITNESS: Thank you very much.
24  MR. KRINER: Questions, Counsel?
25  MR. PORTNOY: I have nothing. Anyone else?

1  MR. LIMAN: Nothing from us.
2  MR. PORTNOY: Thank you.
3  THE WITNESS: Thank you.
4  THEREUPON, the Deposition of JACQUELYN M. WARD,
5  taken at the instance of the Plaintiffs, was concluded
6  at 4:10 p.m.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Errata Sheet

**Case Name:**      *In re Bank of America Corporation Stockholder Derivative Litigation*
(C.A. No. 4307-VCS)

**Date of Deposition:**  June 10, 2011

**Witness's Name:**    Jacquelyn M. Ward

| Page & Line | Change | Reason/Code |
|---|---|---|
| Global | change "Sumo" to "SuMo" | to correct transcription error |
| 5:18 | change "Jenn" to "Jen" | to correct transcription error |
| 11:3 | insert "in the" between "GE" and "late" | to correct transcription error |
| 12:6 | change "with" to "by" | to correct transcription error |
| 14:25 | delete "the" | to correct transcription error |
| 16:18 | change "product" to "products" | to correct transcription error |
| 26:7 | change "was" to "were" | to correct transcription error |
| 26:11 | change "MaguireWoods" to "McGuireWoods" | to correct transcription error |
| 32:3 | delete "board of" | to correct transcription error |
| 33:3 | change "HSPC" to "HSBC" | to correct transcription error |
| 34:9 | delete "with" | to correct transcription error |
| 34:10 | change "as" to "is" | to correct transcription error |
| 36:22 | delete "in" | to correct transcription error |
| 37:25 | delete "what" | to correct transcription error |
| 44:13 | change "industry" to "industries" | to correct transcription error |
| 45:8 | insert "on" between "executive" and "the" | to correct transcription error |
| 49:13 | insert "Committee" between "Quality" and "members" | to correct transcription error |
| 50:8 | change "I" to "it" | to correct transcription error |
| 52:13 | change "items" to "issues" | to correct transcription error |
| 52:15 | insert "Committee" after "Quality" | to correct transcription error |
| 62:2 | delete "being" | to correct transcription error |
| 65:2 | insert "Committee" after "Asset Quality" | to correct transcription error |
| 65:22 | change "McKenseys" to "McKinseys" | to correct transcription error |
| 74:19 | change "can" to "can't" | to correct transcription error |
| 80:13 | change "Jan" to "Chan" | to correct transcription error |
| 80:18 | delete "that," | to correct transcription error |
| 88:5 | delete "the" | to correct transcription error |
| 93:13 | change "making" to "giving" | to correct transcription error |
| 95:12 | change "it" to "they" | to correct transcription error |
| 101:3 | insert "board meeting," after "Bank of America" and change "the" to "on" | to correct transcription error |
| 106:14 | change "HBK" to "FPK" | to correct transcription error |
| 109:22 | change "at" to "on" | to correct transcription error |
| 115:3 | delete "the" | to correct transcription error |

| 122:1 | insert "presentations" after "initial" | to correct transcription error |
|-------|----------------------------------------|-------------------------------|
| 122:15 | change "Jan" to "Chan" | to correct transcription error |
| 133:3 | insert "reports," after "status" | to correct transcription error |
| 143:22 | delete "on those timings" | to correct transcription error |
| 149:19 | change "not" to "no" | to correct transcription error |
| 158: 17-18 | change "to have Bank of America hold" to "for Bank of America to hold" | to correct transcription error |
| 159:19 | change "in" to "and" | to correct transcription error |
| 167:16 | change "filled out" to "fulfilled" | to correct transcription error |

By: _____
Jacquelyn M. Ward

Sworn to before me this
_12th_ day of _September_ 2011.

_____
Notary Public

SUZANNE L. LOWENTHAL
Notary Public, Georgia
Fulton County
My Commission Expires
March 26, 2012

2



Exhibit O



Copyright 2005 The New York Times Company
The New York Times

September 12, 2005 Monday
Late Edition - Final

**SECTION:** Section C; Column 2; Business/Financial Desk; Pg. 1

**LENGTH:** 1019 words

**HEADLINE:** Oracle's Chief in Agreement to Settle Insider Trading Lawsuit

**BYLINE:** By JONATHAN D. GLATER

**BODY:**

Lawrence J. Ellison, chief executive of Oracle, has reached a tentative agreement under which he would pay $100 million to charity to resolve a lawsuit charging that he engaged in insider trading in 2001, a lawyer involved in the case said.

The unusual settlement, which requires the approval of Oracle's board and could still break down, would be one of the largest payments made to resolve a shareholder suit of this kind, known as a derivative lawsuit. Typically in derivative lawsuits, damages are paid directly to the company. Under the terms of the settlement, Mr. Ellison would designate the charity and the payments, to be made over five years, would be paid in the name of Oracle. It is unclear whether the payments would be tax-deductible by Mr. Ellison.

The lawsuit charged that Mr. Ellison, known for his brash and combative pronouncements, sold almost $900 million of shares ahead of news that Oracle would not meet its expected earnings target. The same amount of stock, after the announcement, was worth slightly more than half as much.

According to the court docket for the case, which was filed in Superior Court in San Mateo, Calif., a hearing on the settlement -- which requires court approval -- is scheduled for Sept. 26. Under the terms of the agreement, the lawyers who brought the case for shareholders would receive about $22.5 million, separate from the $100 million payment.

"The plaintiffs believe this is a very innovative settlement providing a positive benefit to Oracle," said Joseph J. Tabacco Jr. of Berman DeValerio Pease Tabacco Burt & Pucillo, one of the lawyers representing shareholders in the suit. "It resolves a lawsuit that has been pending for almost five years."

A spokeswoman for Oracle declined to comment. Alan N. Salpeter, a lawyer at Mayer Brown Rowe & Maw who has represented Mr. Ellison, also declined to comment.

The settlement is a surprising turn in the litigation that followed an announcement by Oracle on March 1, 2001, that the company's results for the third quarter of 2001 would not meet market estimates. The day after the announcement, Oracle's shares closed at $16.88, down from $21.38 at the close of trading the day before. Mr. Ellison had sold nearly $900 million in Oracle stock in the last two weeks of January of that year for an average price of $30.76 a share, according to court documents.

In 2004, Forbes magazine estimated Mr. Ellison's net worth to be $13.7 billion. According to a recent filing, Mr. Ellison owns about 1.2 billion shares of Oracle, or about 24 percent of the company's outstanding stock.

Shareholders sued in Chancery Court in Delaware, where Oracle is incorporated, charging that Mr. Ellison and another executive, Jeffrey O. Henley, who was then Oracle's chief financial officer, sold shares knowing of the downward revision in expected earnings and before the news was made public. (In derivative lawsuits, shareholders sue on behalf of a company; the right to sue is derived from the corporation.)

Vice Chancellor Leo E. Strine Jr., who oversaw that lawsuit, decided in November 2004 that "no rational trier of fact" could find that Mr. Ellison and Mr. Henley possessed nonpublic information at the time of the stock sales and traded on that knowledge. The decision was upheld on appeal by the Delaware Supreme Court earlier this year.

Why Mr. Ellison (Mr. Henley was later dropped from the California case) decided to settle a very similar derivative lawsuit in California for such a large amount, after successfully defending himself in Delaware, is a question with different possible answers. But the fact that the payment is going to charity, rather than the company itself, suggests that both sides compromised.

"I've never heard of anything, structured from the beginning as a settlement this large, going to a charity," said Michael A. Perino, a law professor at St. John's University School of Law. Typically, Mr. Perino said, a derivative action results in a payment to the company. "The difference between a derivative suit and a securities class action is that a derivative suit is brought under state law on behalf of the corporation itself for an injury that the corporation has suffered," he said.

In April, three eBay executives agreed to pay $3.4 million to settle a derivative lawsuit, with half of those proceeds going to charity.

Oracle still faces a shareholder lawsuit in federal court in San Francisco. That suit was dismissed by the trial court judge but was essentially reinstated by an appellate court. Resolving the derivative lawsuit against Mr. Ellison frees Oracle to battle that case without worry that one set of proceedings could be used against the company in the other.

Another reason a settlement might have been attractive is uncertainty for both sides about the law governing derivative lawsuits in California, said Eric L. Talley, a law professor at the University of Southern California. In the Delaware case, Judge Strine found that shareholders could not establish that Mr. Ellison both possessed inside information and traded because of what he knew. It is not clear that the shareholders would have to meet as difficult a test to make a case under California law.

For the plaintiffs, California law also holds the possibility of higher damages. A California statute provides that anyone who engages in insider trading may be liable "for damages in an amount up to three times the difference between the price at which the security was purchased or sold and the market value which the security would have had at the time of the purchase or sale if the information known to the defendant had been publicly" available at the time of sale.

In other words, for example, damages could be based on the assumption that the closing price of $16.88 on March 2 was what the price would have been when Mr. Ellison sold 29 million of his shares for an average price of $30.76. Trebling the difference between $30.76 and $16.88 on 29 million shares amounts to slightly more than $400 million.

"I don't know if I'd take a chance on that," Mr. Talley said.

**URL:** http://www.nytimes.com

**GRAPHIC:** Photo: Lawrence J. Ellison, Oracle's chief, at a news conference at the company's headquarters in 2001. (Photo by Paul Sakuma/Associated Press)

**LOAD-DATE:** September 12, 2005



Exhibit P



# BANK OF AMERICA CORP /DE/ (BAC)

BANK OF AMERICA CORPORATE CENTER
100 N TRYON ST
CHARLOTTE, NC 28255
704. 386.8486
http://www.bankofamerica.com

# 10–K

**FORM 10–K**
**Filed on 02/28/2008 – Period: 12/31/2007**
File Number 001–06523



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10–K

**ANNUAL REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

(Mark One)

[✓]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007

or

[  ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to

**Commission file number:**

1–6523

**Exact Name of Registrant as Specified in its Charter:**

# Bank of America Corporation

**State or Other Jurisdiction of Incorporation or Organization:**
Delaware

**IRS Employer Identification No.:**
56–0906609

**Address of Principal Executive Offices:**
Bank of America Corporate Center
100 N. Tryon Street
Charlotte, North Carolina 28255

**Registrant's telephone number, including area code:**
(704) 386–5681

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Common Stock | New York Stock Exchange |
|  | London Stock Exchange |
|  | Tokyo Stock Exchange |
| Depositary Shares, Each Representing a 1/1000th interest in a share of 6.204% Non–Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of Floating Rate Non–Cumulative Preferred Stock, Series E | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of 6.625% Non–Cumulative Preferred Stock, Series I | New York Stock Exchange |
| Depositary Shares, Each Representing a 1/1,000th interest in a share of 7.25% Non–Cumulative Preferred Stock, Series J | New York Stock Exchange |
| 7.25% Non–Cumulative Perpetual Convertible Preferred Stock, Series L | New York Stock Exchange |
| Minimum Return Index EAGLES[SM], due June 1, 2010, Linked to the +Nasdaq–100 Index® | American Stock Exchange |
| Minimum Return Index EAGLES®, due June 28, 2010, Linked to the S&P 500® Index | American Stock Exchange |
| Minimum Return – Return Linked Notes, due June 24, 2010, Linked to the Nikkei 225 Index | American Stock Exchange |
| Minimum Return Basket EAGLES[SM], due August 2, 2010, Linked to a Basket of Energy Stocks | American Stock Exchange |
| Minimum Return Index EAGLES®, due August 28, 2009, Linked to the Russell 2000® Index | American Stock Exchange |
| Minimum Return Index EAGLES®, due September 25, 2009, Linked to the Dow Jones Industrial Average[SM] | American Stock Exchange |
| Minimum Return Index EAGLES®, due October 29, 2010, Linked to the Nasdaq–100 Index® | American Stock Exchange |



# BANK OF AMERICA CORP /DE/ (BAC)

BANK OF AMERICA CORPORATE CENTER
100 N TRYON ST
CHARLOTTE, NC 28255
704. 386.8486
http://www.bankofamerica.com

# EX–3.A

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF REGISTRANT**
**10–K Filed on 02/28/2008 – Period: 12/31/2007**
File Number 001–06523



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 3(a)

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
BANKAMERICA CORPORATION

BankAmerica Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies that (i) the Certificate of Incorporation of the Corporation was originally filed on July 31, 1998, (ii) the Corporation was originally incorporated under the name "NationsBank (DE) Corporation," which name was changed to "NationsBank Corporation" on September 25, 1998 and to "BankAmerica Corporation" on September 30, 1998, (iii) this Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, and (iv) the Amended and Restated Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

1. The name of the Corporation is Bank of America Corporation.

2. The purposes for which the Corporation is organized are to engage in any lawful act or activity for which corporations may be organized and incorporated under the General Corporation Law of the State of Delaware.

3. The number of shares, par value $.01 per share, the Corporation is authorized to issue is Five Billion One Hundred Million (5,100,000,000), divided into the following classes:

| Class | Number of Shares |
|-------|------------------|
| Common | 5,000,000,000 |
| Preferred | 100,000,000 |

The class of common ("Common Stock") has unlimited voting rights and, after satisfaction of claims, if any, of the holders of preferred shares, is entitled to receive the net assets of the Corporation upon distribution.

The Board of Directors of the Corporation shall have full power and authority to establish one or more series within the class of preferred shares (the "Preferred Shares"), to define the designations, preferences, limitations and relative rights (including conversion rights) of shares within such class and to determine all variations between series.

The Board of Directors of the Corporation has

G.     Voting Rights.

Holders of Series BB Preferred Stock shall have no voting rights except as required by law and as follows: in the event that any quarterly dividend payable on the Series BB Preferred Stock is in arrears, the holders of Series BB Preferred Stock shall be entitled to vote together with the holders of Common Stock at the Corporation's next meeting of shareholders and at each subsequent meeting of shareholders unless all dividends in arrears have been paid or declared and set apart for payment prior to the date of such meeting. For the purpose of this paragraph G, each holder of Series BB Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which his Series BB Preferred Stock is then convertible.

H.     Reacquired Shares.

Shares of Series BB Preferred Stock converted, redeemed, or otherwise purchased or acquired by the Corporation shall be restored to the status of authorized but unissued shares of preferred stock without designation as to series.

I.     No Sinking Fund.

Shares of Series BB Preferred Stock are not subject to the operation of a sinking fund.

4. The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street in the City of Wilmington, County of New Castle. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

5. No holder of any stock of the Corporation of any class now or hereafter authorized shall have any preemptive right to purchase, subscribe for, or otherwise acquire any shares of stock of the Corporation of any class now or hereafter authorized, or any securities exchangeable for or convertible into any such shares, or any warrants or other instruments evidencing rights or options to subscribe for, purchase or otherwise acquire any such shares whether such shares, securities, warrants or other instruments be unissued, or issued and thereafter acquired by the Corporation.

6. To the fullest extent permitted by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation, its shareholders or otherwise for monetary damage for breach of his duty as a director. Any repeal or modification of this Article shall be prospective only and shall not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

7. In furtherance and not in limitation of the powers conferred

by law, the Board of Directors of the Corporation is expressly authorized and empowered to make, alter and repeal the Bylaws of the Corporation by a majority vote at any regular or special meeting of the Board of Directors or by written consent, subject to the power of the stockholders of the Corporation to alter or repeal any Bylaws made by the Board of Directors.

8. The Corporation reserves the right at any time from time to time to amend or repeal any provision contained in this Certificate of Incorporation, and to add any other provisions authorized by the laws of the State of Delaware at the time in force; and all rights, preferences and privileges conferred upon stockholders, directors or any other persons by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this Article.

9. Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

10. Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation or may be effected by consent in writing in lieu of a meeting of such stockholders only if consents are signed by all stockholders of the Corporation entitled to vote on such action.

IN WITNESS WHEREOF, BankAmerica Corporation has caused this Amended and Restated Certificate of Incorporation to be signed by Hugh L. McColl, Jr., its Chairman of the Board and Chief Executive Officer, and attested to by James W. Kiser, its Secretary, this 28th day of April, 1999.

BANKAMERICA CORPORATION

By: /s/ Hugh L. McColl, Jr.
Hugh L. McColl, Jr.
Chairman of the Board and Chief Executive Officer

ATTEST:

By: /s/ James W. Kiser
James W. Kiser
Secretary

Exhibit Q

MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS

OF

BANK OF AMERICA CORPORATION

September 14, 2008

Pursuant to due notice, a special meeting of the Board of Directors of Bank of America Corporation (the "Corporation") was held by telephone at 5:00 p.m. EST on Sunday, September 14, 2008.

The following Directors were present constituting a quorum: Messrs. William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Kenneth D. Lewis, Walter E. Massey, Thomas J. May, Thomas M. Ryan, O. Temple Sloan, Jr., Robert L. Tillman, and Mmes. Monica C. Lozano, Patricia E. Mitchell, Meredith R. Spangler and Jackie M. Ward.

Also present were: Messrs. J. Steele Alphin, Keith T. Banks, Jeffrey J. Brown, Gregory L. Curl, Bruce Hammonds, Timothy J. Mayopoulos, Liam E. McGee, Brian T. Moynihan, Joe L. Price and Mmes. Amy Woods Brinkley, Barbara J. Desoer, Anne M. Finucane, and Alice A. Herald, officers of the Corporation. Messrs. Ajay Asija, Managing Director, (Fox-Pitt Kelton Cochran Caronia Waller ("FPK")), J. Christopher Flowers, Chairman and Chief Executive Officer, (J.C. Flowers & Co. LLC ("J.C. Flowers")), Edward D. Herlihy, Partner, (Wachtell, Lipton, Rosen & Katz), John Roddy, Managing Director, (FPK), David Schamis, Managing Director, (J.C. Flowers), John Waller, President, (FPK) and Mark Winkelman, Operating Partner, (J.C. Flowers), advisers to the Board and the Corporation, joined and left the meeting as indicated in the minutes.

Mr. Lewis chaired the meeting and Ms. Herald kept the minutes.

Mr. Lewis noted that roll call had been taken and that the Directors had been sent informational materials in advance of the meeting.

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

Mr. Lewis began the meeting by describing the state of the financial markets and financial institutions. He described the market turmoil, particularly as anticipated Monday morning, September 15, 2008.

Mr. Lewis reported that on Friday, September 12, 2008, the Corporation had commenced due diligence regarding the potential acquisition of Lehman Bros. at the encouragement of Secretary Treasury Paulson and Federal Reserve Chairman Bernanke. He advised that the Corporation terminated its due diligence early Saturday when, among other issues, the government announced it would not be part of a solution for Lehman Bros.

Mr. Lewis reported that he was contacted on Saturday by John Thain. He stated basic terms of a proposed acquisition of Merrill Lynch & Co., Inc. (the "Target") by the Corporation were discussed. He reported that the Corporation commenced due diligence and that JC Flowers, which had recently completed due diligence of the Target, was also retained.

Mr. Price then described the proposed acquisition of the Target with stock of the Corporation based on an exchange ratio of 0.8595. He reported the shares to be exchanged equate to a purchase price of approximately $50 billion and reported other details of the transaction.

Mr. Price explained the strategic rationale for the transaction, highlighting enhancement of the Corporation's capabilities in fixed income, equities and investment management and a leadership position in retail brokerage and wealth management.

He described the Target organization and its financials, highlighting assets recently sold, revenue run rates and financial metrics, including earnings. Discussion ensued, including inquiries regarding historical financials and numerous balance sheet items of the Target.

Mr. Price discussed the diverse business mix of the combined organizations. He explained the key terms of the proposed Merger Agreement and Stock Option Agreement, highlighting the requirement of granting three (3) seats on the Corporation's Board of Directors to directors of the Target and the delivery to the Directors of a Fairness Opinion to be discussed later in the meeting. Discussion ensued regarding the due diligence of the Target previously performed by J.C. Flowers. Mr. Moynihan and Ms. Brinkley elaborated further regarding the scope of the due diligence.

2

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003748

Mr. Price then provided a detailed description of the due diligence of the Target performed directly by the Corporation, highlighting review of the Target's large corporate loan commitments; the consistency and distinctions between the marks of the Corporation and the Target; and single name risk concentrations in the Target's portfolio. Discussion ensued, including duplications of portfolios and CDOs of the Corporation and the Target. Discussion continued regarding, in part, the scope, breadth and duration of the due diligence; the breadth and depth of the professionals of the Corporation involved; the Corporation's past due diligence experience; the scope of the Target's litigation; the Target's benefit plans; the role of outside counsel in the due diligence; and senior executives of the Target. Further discussion ensued regarding the length and depth of the due diligence of J.C. Flowers and J. C. Flowers' experience and qualifications. Directors questioned the timing of the transaction and discussion ensued regarding the importance of timing in light of pending and anticipated market turmoil, and recent market information.

Mr. Price reported an analysis of the transaction regarding stock price, exchange ratios, premiums and earnings multiples. Discussion ensued, including reasons for market differences in multiples of banks and investment banks and long term forward looking projections for the financial services industry and the economy.

Mr. Price continued with a financial overview of the transaction and certain assumptions applied to the analysis. He clarified the transaction is subject to regulatory approvals and is expected to close in the first quarter of 2009. He reported anticipated expense efficiencies of the transaction through 2012. Mr. Price commented on the Corporation's liquidity and capital as related to the transaction, addressing change in control clauses and proposed rating agency contact.

Mr. Lewis discussed the perspective of the Federal Reserve and Treasury Department regarding the Corporation's current capital status and that status as impacted by the transaction.

Mr. Price provided a review of the Corporation's historical and current capital positions and explained the expected initial impact of the transaction on the Corporation's Tier 1 capital and longer term projections. Discussion ensued, including the value of liquidity in the current volatile environment and anticipated marketplace valuations given the current market turmoil.

3

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003749

At Mr. Lewis' request, Mr. Moynihan discussed meetings he attended recently with the Federal Reserve and other major banks to discuss continued liquidity and stability in the markets and expectations for the markets on Monday, September 15, 2008.

At Mr. Lewis' request, Ms. Brinkley discussed certain market risks, including broker dealers, and how they were being addressed, particularly as to daylight overdraft risk.

Mr. Lewis shared his expectations for possible impending capital relief from the Federal government.

Discussion ensued, including timing of the proposed transaction, reasons to wait out the market, the Target's immediate continued viability and the impact of that viability in the current volatile market. Discussion ensued regarding the appropriateness of the proposed price in the chaos of the current market. At Mr. Lewis' request, Mr. Curl provided additional information regarding the Target, including perceived potential purchasers, market timing and the Target's revenue stream, marks, capital structure and cash flows and clarified management's recommendation of the need to move quickly in the current environment. Discussion ensued, including short term and long term expectations regarding the impact of the proposed transaction to the Corporation's stock price.

A copy of Mr. Price's presentation is filed with the records of the meeting.

Mr. Lewis introduced the advisors to the Directors and the Corporation who then joined the meeting.

Mr. Flowers described the Target as a unique and valuable franchise and explained the strategic benefits of the transaction. He described the prior due diligence conducted by his firm on the Target and provided a comparative analysis based on similar organizations reviewed by his firm, emphasizing the difficulty of any analysis in the unique market havoc. At Mr. Lewis' request, Mr. Flowers addressed the benefits of acting with immediacy and the uncertainties and risks of postponing a decision on the transaction to observe market movement in the ensuing week to possibly obtain a lower purchase price.

Discussion ensued about appropriate timing of the transaction given market uncertainties and the probability of striking a purchase price reflecting a bottom in the market.

4

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003750

Further discussion included the status of the commercial and residential mortgage market, historical exchange ratios and changes in the Target since the date of the firm's initial due diligence and asset valuations. Mr. Flowers reaffirmed the difficulty of predictability in market movement and responded to questions concerning the quality of the Target's marks.

Mr. Flowers clarified that the Directors would receive a fairness opinion from J.C. Flowers and FPK.

Mr. Lewis introduced Mr. Waller who described FPK, its qualifications and credentials. Mr. Waller introduced Mr. Roddy, who described the firm's presentation which would demonstrate that the proposed transaction was fair to the shareholders of the Corporation. Mr. Roddy repeated the basic terms of the transaction. He discussed the exchange ratio, pre and post adjustment evaluations, and transaction metrics. He further reviewed the terms of the Merger Agreement, including a discussion of the price.

The presentation concluded with an explanation of the details and types of analysis employed in rendering the fairness opinion, and an explanation that while there is no direct comparative to the Target, comparatives employed from historical markets, though differing from the current market environment, had been utilized in the analysis.

There being no further questions for the advisors, the advisors left the meeting.

Discussion ensued, including the historical view by management of the Target as the long term most suitable candidate for a diverse and efficient business mix with the Corporation. Benefits to the Corporation from the acquisition of the Target were further discussed. How management and staff would address the demands of the increased workload of the proposed acquisition, particularly as imposed by the proposed timetable, possible integration structures and branding were discussed. Mr. Lewis elaborated on the desirability and potential of the Target's retail operations as the "crown jewel" of the Target. Mr. Lewis addressed the cultural differences of the organizations, the cooperative perspective of the Target's senior management and the talent available to the Corporation through the acquisition.

Discussion ensued including retention strategies for key employees, use of retention bonuses and the ability to avoid a raid of top talent by competitors. Further discussion ensued including the focus of the acquired businesses going forward, synergies to be gained and the value of certain components of the Target's business.

5

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003751

Mr. Mayopoulos addressed litigation and legal issues.

Discussion ensued, including how to effectively rationalize or calibrate the dilutive aspects of the acquisition in light of the current, volatile market; balancing of the long term strategic benefit with the short term impact of the proposed transaction to the Corporation; and whether the status of the Countrywide acquisition should impact decisioning of the transaction.

Mr. Price commented on the Stock Option Agreement.

After further discussion, upon a motion duly made and seconded, it was unanimously resolved as follows:

WHEREAS, Bank of America Corporation (the "Company") proposes to enter into an Agreement and Plan of Merger (as it may be amended or supplemented from time to time, the "Merger Agreement"), by and between the Company and Merrill Lynch & Co., Inc., a Delaware corporation ("Merrill Lynch") (capitalized terms used in these resolutions and not otherwise defined herein shall have the meaning ascribed thereto in the Merger Agreement) and a related Stock Option Agreement; and

WHEREAS, the Merger Agreement provides for, among other things, the merger of the Company with a wholly owned Delaware subsidiary of the Company to be newly formed following the entry into the Merger Agreement for the purposes of carrying out the transactions contemplated thereby ("Merger Sub") (the "Merger"), and, subject to the terms and conditions thereof, in the Merger (i) each outstanding share of common stock of Merrill Lynch, par value $1.33 1/3 per share (the "Merrill Lynch Common Stock"), will be converted into the right to receive 0.8595 of a share of the Company's common stock, par value $0.01 per share (the "Company Common Stock"), (ii) each share of the Specified Series (as defined in the Merger Agreement) of the preferred stock of Merrill Lynch, par value 1.00 per share (the "Merrill Lynch Preferred Stock"), outstanding immediately prior to the Effective Time will be converted into a share of preferred stock of the Company having rights, privileges, powers and preferences substantially identical to those of the relevant Specified Series (the "Company Preferred Stock"), and (iii) each share of the Convertible Series (as defined in the Merger Agreement) of Merrill Lynch Preferred Stock outstanding immediately prior to the Effective Time will remain issued and outstanding and will thereafter be convertible into shares of Company Common Stock based on the Merger exchange

6

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003752

ratio, in each case subject to limitations set forth in, and on the terms of, the Merger Agreement; and

WHEREAS, the Stock Option Agreement provides the Company with the option to purchase up to 19.9% of the outstanding Merrill Lynch Common Stock, exercisable under specified circumstances relating to a competing offer for Merrill Lynch, and the right to put the option to Merrill Lynch for cash under certain circumstances and subject to certain limitations; and

WHEREAS, Merrill Lynch and certain of its subsidiaries have indebtedness and other obligations outstanding as of the date hereof; and

WHEREAS, at this meeting of the Board of Directors of the Company, the Board of Directors has reviewed with management and the Company's legal and financial advisors the Merger, the terms of the Merger Agreement and the Stock Option Agreement, and the transactions contemplated thereby; and

WHEREAS, the Board of Directors has received the opinions of Fox-Pitt, Kelton and J.C. Flowers & Co. LLC that the Merger Consideration is fair from a financial point of view to the stockholders of the Company; and

WHEREAS, the Board of Directors finds that the Merger Agreement and the Merger and the other transactions contemplated by the Merger Agreement and the Stock Option Agreement are advisable and are fair to and in the best interests of the Company and its stockholders, as well as its other constituencies.

NOW, THEREFORE, BE IT:

Approval of the Merger Agreement, the Stock Option
Agreement and the Transactions Contemplated Thereby

RESOLVED, that based upon the presentations made to the Board of Directors at this meeting and upon such other matters as were deemed relevant by the Board, the Board of Directors determines that the Merger Agreement, the Merger, the Stock Option Agreement and the other agreements and transactions contemplated by the Merger Agreement are advisable, fair to and in the best interests of the Company and its stockholders, as well as its other constituencies, and hereby approves and adopts the Merger Agreement, the Stock Option Agreement and the transactions contemplated thereby (including without limitation the Merger and the formation of

7

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003753

Merger Sub, the appointment of directors and officers thereof, the subscription to the capital stock of Merger Sub and the giving of consent as sole stockholder of Merger Sub to Merger Sub's entry into the Merger Agreement and to the Merger), with the foregoing approval to be deemed to constitute, without limitation, the requisite approval of the Board of Directors for purposes of the applicable provisions of the Certificate of Incorporation of the Company, as amended, and the General Corporation Law of the State of Delaware (the "DGCL"); and

RESOLVED, further, that the Chairman of the Board of Directors, the President, and any Vice President or more senior officer of the Company, or any of them acting alone be, and each hereby is, authorized for and on behalf of the Company to execute and deliver the Merger Agreement and the Stock Option Agreement in substantially the form presented to the Board at this meeting with such changes as such officer(s) executing the same may approve, the execution and delivery of the Merger Agreement and the Stock Option Agreement by such officer to be deemed conclusive evidence that the Board of Directors of the Company and the Company approved the Merger Agreement and the Stock Option Agreement as executed; and

RESOLVED, further, that the proper officers of the Company, or any of them acting alone, be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, amendments, instruments and other documents and to perform and do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to effectuate or carry out the provisions of the Merger Agreement, the Stock Option Agreement and the intent and purposes of the foregoing resolutions in connection with such agreements, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

### Regulatory Filings

RESOLVED, further, that the proper officers of the Company be, and hereby are, authorized and directed, on behalf of and in the name of the Company and/or its subsidiaries, to prepare, sign and file, or cause to be filed, with any applicable federal, state, local or foreign country regulatory or supervisory body, including without limitation the Board of Governors of the Federal Reserve System and all other appropriate state, federal or foreign banking, consumer finance, mortgage banking, insurance, consumer lending or other regulatory authorities and appropriate stock exchanges, stock markets and self-regulatory organizations and government

8

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003754

sponsored entities, all applications, requests for approval, consents, interpretations, no-action requests or other determinations, notices and other information and documents, and any modifications or supplements thereto, as may be necessary or appropriate in connection with the Merger and the Merger Agreement, the Stock Option Agreement and the transactions contemplated thereby, together with all agreements and other information and documents required or appropriate, and any publications required, in connection therewith, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

RESOLVED, further, that, without limiting the foregoing, the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company and/or its subsidiaries, to prepare, or assist others in preparing, all documentation, to effect all filings and to obtain all permits, consents, approvals and authorizations of all third parties, trustees and regulatory authorities and other governmental or self regulatory authorities necessary to consummate the transactions contemplated by the Merger Agreement, including the Merger, and the Stock Option Agreement, to execute personally or by attorney-in-fact any such required filings or amendments or supplements to any of the foregoing, and to cause any such required filings and any amendments thereto to become effective or otherwise approved, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

### Joint Proxy Statement/Prospectus
### and Other Securities Law Filings

RESOLVED, further, that the proper officers of the Company be, and each of them hereby is, authorized and directed for, on behalf of and in the name of the Company, to prepare, sign and file, or cause to be filed, with the Securities and Exchange Commission (the "Commission") any and all statements, reports or other information concerning the Merger Agreement, the Merger, the Stock Option Agreement and the transactions contemplated thereby, that may be deemed advisable or may be required under the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder (the "Exchange Act"), or the Securities Act of 1933, as amended, and the rules and regulations of the Commission promulgated thereunder (the "Securities Act"), including without limitation (A) a joint proxy statement/prospectus for delivery to the stockholders of Merrill Lynch and the stockholders of the Company (the "Joint Proxy Statement/Prospectus"), (B) a registration statement on Form S-4 which shall include such Joint Proxy Statement/Prospectus, and any amendment or amendments (including post-effective

9

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

amendments or supplements) thereto, relating to shares of Company Common Stock as may be issuable in connection with the Merger, or upon conversion of any shares of the Convertible Series of Merrill Lynch Preferred Stock, and the votes of the Company stockholders and the Merrill Lynch stockholders relating to the transactions contemplated by the Merger Agreement (the "Registration Statement"), together with any other documents required or appropriate in connection therewith and (C) a registration statement on Form S-8 (or any successor form) or another appropriate form; and

RESOLVED, further, that the proper officers of the Company be, and each of them hereby is, authorized in the name and on behalf of the Company, to take all such other actions and to execute all such documents as such officer may deem necessary or appropriate for compliance with the Securities Act, the Exchange Act, or any applicable state securities or similar laws, in connection with the Merger Agreement, the Merger, the Stock Option Agreement and the transactions contemplated thereby, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

RESOLVED, further, that, without limiting the foregoing, the proper officers of the Company be, and each of them hereby is, authorized and directed, in the name and on behalf of the Company to prepare all documentation and to effect all filings (and requests for no-action letters) as may be necessary or advisable under the various securities laws, regulations and rules of the United States or any state or foreign jurisdiction in connection with the Merger Agreement, the Merger, the Stock Option Agreement and the transactions contemplated thereby, to execute personally or by attorney-in-fact such documentation and filings or amendments or supplements to any of the foregoing, and to cause such documentation and filings and any amendments and supplements thereto to become effective or otherwise approved, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

## Submission to Stockholders

RESOLVED, further, that in connection with the Merger and the consummation of the transactions contemplated in connection therewith, each of the Chairman of the Board of Directors of the Company and the Chief Executive Officer of the Company is authorized to cause the issuance of shares of Company Common Stock pursuant to the terms of the Merger Agreement (the "Stock Issuance") to be submitted for approval by the stockholders of the

10

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003756

Company at a meeting of such stockholders in accordance with the DGCL, at such date, time and place, and with such record date for determining stockholders entitled to notice of and to vote at such meeting (the "Record Date") as either of the Chairman of the Board of Directors or the Chief Executive Officer of the Company may from time to time designate, and to take any action in connection therewith that the Chairman of the Board of Directors or the Chief Executive Officer of the Company considers desirable or appropriate, in his or her discretion (and to the extent required by law to take the actions contemplated hereby the foregoing are each hereby constituted as a special committee of the Board of Directors for the limited purpose of performing the actions contemplated by this resolution); and

RESOLVED, further, that the Board of Directors hereby recommends the approval of the Stock Issuance to the stockholders of the Company and that the proper officers of the Company be, and each of them hereby is, authorized and directed, for and on behalf of the Company, to communicate such recommendation to, and to solicit proxies on behalf of Board of Directors from, the holders of the Company Common Stock entitled to vote at the aforementioned meeting in favor of such approval; and

RESOLVED, further, that the proper officers of the Company be, and each of them hereby is, authorized and directed, for and on behalf of the Company, to mail to the stockholders of record as of the close of business on the Record Date, a Notice of Meeting accompanied by the Joint Proxy Statement/Prospectus; and

## Power of Attorney

RESOLVED, further, that each officer or Director who may be required to sign the Registration Statements or any amendment, exhibit or other document related thereto (whether for and on behalf of the Company, as an officer or Director of the Company, or in any other capacity) be, and each hereby is, authorized to execute a power of attorney appointing Timothy J. Mayopoulos, Alice A. Herald and Teresa M. Brenner, and each of them, severally, as his or her attorney and agent, with full power of substitution and resubstitution, on his or her behalf in any such capacity to sign and file the Registration Statements and any and all amendments, exhibits and other documents related thereto which any such attorney or substitute may deem necessary or advisable to be filed with the Commission, with full power and authority to perform and do any and all acts and things whatsoever which any such attorney or substitute may deem necessary or advisable to be performed or done in connection with any or all of the above-described matters, as

11

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003757

fully as such officer or Director might or could do if personally present and acting and as fully as the Company might or could do by a properly authorized agent; and

## Agent for Service

RESOLVED, further, that Timothy J. Mayopoulos be, and hereby is, appointed as "Agent for Service" of the Company to receive notices, orders, communications and other documents from the Commission in connection with the Registration Statements and any and all amendments and supplements thereto, with all the powers incident to such appointment; and

## NYSE Listing Matters

RESOLVED, further, that the proper officers of the Company or any of them acting alone be, and each hereby is, authorized for and on behalf of the Company, to prepare, execute, and cause to be filed with the New York Stock Exchange (the "NYSE") any and all applications, agreements, forms, or other papers as may be necessary or advisable with respect to the listing on the NYSE of the Company Common Stock issuable in the Merger, or upon conversion of the Convertible Series of Merrill Lynch Preferred Stock, such applications, agreements, forms, or other papers to be in such form as may be approved by the officer executing the same, the execution thereof by such officer to be conclusive evidence of such approval; and

## Preferred Stock Conversion

RESOLVED, further, that the proper officers of the Company or any of them acting alone be, and each hereby is, authorized to file, execute, verify, acknowledge, and deliver for and on behalf of the Company, any and all notices, certificates, amendments, agreements, instruments and other documents (including one or more Certificates of Designations or listing applications) to perform and do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to effectuate the conversion of each share of the Specified Series the Merrill Lynch Preferred Stock into a share of the relevant series of Company Preferred Stock, or the intent and purposes of the foregoing resolutions in connection with the Merger and the issuance of the Company Preferred Stock; and

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order, 09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003758

## Blue Sky Procedures

RESOLVED, further, that the proper officers of the Company or any of them acting alone be, and each hereby is, authorized for and on behalf of the Company to take any and all actions which he or she may deem necessary or advisable in order to obtain a permit for, or register or qualify, the Company Common Stock that may be issued in connection with the Merger, or upon conversion of the Convertible Series of Merrill Lynch Preferred Stock, for issuance or to request an exemption from registration of the Company Common Stock, or to register or obtain a license for the Company as a dealer or broker under the securities laws of such states of the United States of America and of such foreign jurisdictions as such officers or any of them may deem advisable, and in connection with such registrations, permits, licenses, qualifications and exemptions, to execute, acknowledge, verify, deliver, file and publish or cause to be published all such applications, reports, resolutions, surety bonds, consents to service of process, appointments of attorneys to receive service of process, powers of attorney and other papers and instruments and to take any and all further action which they or any of them may deem necessary or advisable in order to maintain such registrations, permits, licenses, qualifications and exemptions in effect for as long as they may deem to be in the best interests of the Company; and that the execution by any such officer of any such document or the taking of any such act in connection with the foregoing matters to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

RESOLVED, further, that the proper officers of the Company or any of them acting alone be, and each hereby is, authorized for and on behalf of the Company to execute and file irrevocable written consents on the part of the Company to be sued in such states of the United States of America wherein such consents to service of process may be requisite under the securities laws thereof in connection with said registrations, permits, licenses, qualifications or exemptions, and to appoint the appropriate state official agent of the Company for the purpose of receiving and accepting process; and

## Exchange Agent

RESOLVED, further, that the proper officers of the Company or any of them acting alone hereby are authorized to appoint an exchange agent in connection with the exchange of certificates of Merrill Lynch Common Stock in exchange for certificates of Company Common Stock as contemplated in the Merger Agreement, and that such officers hereby are authorized for and on behalf of the Company to execute and deliver such agreements, documents, certificates

13

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003759

and instruments as may be reasonably requested by the exchange agent in connection with its appointment or in connection with the issuance of the Company Common Stock; and

## Indebtedness

RESOLVED, further, that the proper officers of the Company, or any of them acting alone, be, and each hereby is, authorized to file, execute, verify, acknowledge and deliver, for and on behalf of the Company, any and all notices, certificates, agreements, supplements, amendments, instruments and other documents and to perform and do or cause to be performed or done any and all such acts or things and to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable in connection with the existing indebtedness of the Company or the Merrill Lynch or its subsidiaries, in each case, in order to effectuate the Merger, the Merger Agreement, the Stock Option Agreement and the transactions contemplated thereby, the taking of any such action to be deemed conclusive evidence that the Board of Directors of the Company and the Company have authorized such action; and

## Additional Actions

RESOLVED, further, that the Board of Directors of the Company hereby adopts and incorporates by reference any form of specific resolution to carry into effect the purpose and intent of the foregoing resolutions, or covering authority included in matters authorized in the foregoing resolutions, including forms of resolutions in connection therewith that may be required by the Commission, the NYSE, any state, institution, person, or agency, or otherwise, and any trustee or other party to any indenture, trust or similar agreements of Merrill Lynch and its subsidiaries, and the Secretary of the Company hereby is directed to insert a copy thereof in the minute book of the Company following this action by the Board of Directors and to certify the same as having been duly adopted thereby; and

RESOLVED, further, that the proper officers of the Company or any of them acting alone be, and each hereby is, authorized (i) to file, execute, verify, acknowledge, and deliver for and on behalf of the Company, any and all notices, certificates, amendments, agreements, instruments and other documents, (ii) to perform and do or cause to be performed or done any and all such acts or things and (iii) to pay or cause to be paid all necessary fees and expenses, in each case in the name and on behalf of the Company, as they or any of them may deem necessary or advisable to effectuate or carry out the provisions of the Merger Agreement, the Stock Option

14

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003760

Agreement and the intent and purposes of the foregoing resolutions in connection with the Merger and the registration, issuance, and delivery of the Company Common Stock; and

RESOLVED, further, that all actions heretofore taken by any of the directors, officers, representatives or agents of the Company or any of its affiliates in connection with the Merger and any other transactions contemplated in the Merger Agreement or the Stock Option Agreement or otherwise referred to in the foregoing resolutions be, and each of the same hereby is, ratified, confirmed and approved in all respects as the act and deed of the Company; and

RESOLVED, further, that any resolutions inconsistent with the foregoing or with any action of any officer pursuant to the foregoing are hereby modified or rescinded so as to be consistent herewith and therewith.

There being no further business to come before the Board, the meeting was adjourned.

Kenneth D. Lewis
Chairman of the Board

Alice A. Herald
Secretary

15

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)

UR-BAC-ML-NYAG00003761



Exhibit R



The New York Times

# Business

Search All NYTimes.com    Go

Orange Savings Account℠

Search Business    Go

Financial Tools    Select a Financial Tool

More in Business »

World Business | Markets | Economy | DealBook | Media & Advertising | Small Business | Your Money | Energy & Environment

## Firms still setting aside billions for bonuses

By Christine Harper and Serena Saitto

**NEW YORK —** Five straight quarters of losses and a 70 percent slide in its stock this year have not stopped Merrill Lynch from allocating about $6.7 billion to pay bonuses.

Goldman Sachs and Morgan Stanley, both still on track for profitable years, have set aside about $13 billion for bonuses after three quarters, down 28 percent from a year ago. Even some employees at Lehman Brothers, which declared the biggest bankruptcy in U.S. history last month, will get the same bonus they received a year ago.

The worst U.S. financial crisis since the Great Depression, a $700 billion bailout, public outcry over excessive pay and the demise of three of the biggest securities firms will not deter Wall Street from offering year-end rewards to employees, compensation experts say.

"Critical producers and critical managers will be retained with the same bonus they had last year," said Robert Sloan, head of U.S. financial-services recruiting at Egon Zehnder International, an executive-search firm in New York. "The others will see sharp cuts."

Goldman, the most profitable Wall Street firm until it opted to become a bank holding company last month, has set aside about $6.85 billion for bonuses, or an average of $210,300 for each employee, down 32 percent from $339,400 a year ago. Morgan Stanley, which was the second-biggest securities firm until it also converted to a bank, has $6.44 billion for bonuses, or $138,700 per person, down 20 percent from last year. Both firms accrue a fixed percentage of their revenue for compensation, so the decline in bonus pools matches the drop in revenue.

The money Merrill has set aside for bonuses equates to an average $110,000 for each of its 60,900 people, up from $108,000 a year ago because more than 3,000 jobs have been cut.

The bonus figures are based on estimates that about 60 percent of the compensation and benefits expenses reported by the companies will be paid in year-end bonuses, as occurred in past years. Average bonuses are not an indication of how much any employee will receive, because payments range widely from assistants to top traders. Bonuses are not paid until the end of the fiscal year, so firms could choose to reallocate the funds.

"We are in the process of determining appropriate levels of year-end compensation, and no decisions have been made," said Mark Lake, a spokesman at Morgan Stanley. Ed Canaday, a spokesman for Goldman in New York, declined to comment.

A spokeswoman for Merrill, Jessica Oppenheim, said the firm's accrued bonuses were not down as much as those at Goldman and Morgan Stanley because Merrill cut expenses last year, when it also had a loss. Compensation costs are down 18 percent this year, compared with the first nine months of 2006, Merrill's last profitable year.

A worldwide economic slowdown, caused in part by the financial industry's losses, and a U.S. Treasury plan to spend $250 billion of taxpayer money buying stakes in banks, have made pay a political issue this year.

"There should be a moratorium on bonuses," said Barney Frank, chairman of the U.S. House of Representatives' Financial Services Committee. "If nobody gave them, there

Get DealBook by E-Mail

Sign up for the latest financial news delivered before the opening bell and after the market close.

Sign Up

See Sample | Privacy Policy

TWITTER

LINKEDIN

SIGN IN TO E-MAIL

PRINT

SHARE

MOST POPULAR - BUSINESS

E-MAILED   BLOGGED   VIEWED

1. New Drugs for Lipids Set Off Race
2. A Capitalist's Dilemma, Whoever Wins on Tuesday
3. A Promising Drug With a Flaw
4. Bucks: You Should Try a Multi-Day Spending Cleanse
5. Fight Builds Over Online Royalties
6. Facing an Election Night Clamor
7. A Storm-Battered Supply Chain Threatens Holiday Shopping
8. DealBook: HSBC May Face Charges in a Laundering Inquiry
9. Corner Office: If I Hire You, What's Your 100-Day Plan?
10. As Scandal Flared, BBC's Leaders Missed Red Flags

Go to Complete List »

Trade Free for 60 Days

E✱TRADE    OPEN AN ACCOUNT

E✱TRADE SECURITIES LLC

wouldn't be a competitive aspect."

In Zurich, protesters blocked UBS's private-banking branch on the Paradeplatz last week to seek curbs on executive pay after Switzerland's largest bank was forced to ask for government aid.

"I'm just flabbergasted that the financial community has failed to show any sense of leadership on this issue and doesn't seem to understand how angry people are at them," said Nell Minow of Corporate Library, a corporate-governance research company. "They are just a bonus away from having the villagers come after them with torches."

Goldman, Morgan Stanley, Merrill, Lehman and Bear Stearns awarded their employees a cumulative $145 billion in bonuses from 2003 through 2007, according to estimates based on company reports. Last year the firms paid out a record $39 billion.

At the end of this year, companies could decide against paying the money accrued for bonuses and instead use part of it to cover severance costs, said Rose Marie Orens, a partner based in New York for Mercer, the human resources consulting unit of Marsh & McLennan, who specializes in executive compensation for financial-service companies. Goldman and Morgan Stanley end their fiscal year in November, and Merrill's ends in December.

"Whether what you see is what they're going to pay, you can't tell yet," she said. "It's highly unlikely they'll add to those numbers and more likely they'll bring them down."

Lehman filed for bankruptcy on Sept. 15. Merrill Lynch and Bear Stearns were rescued in emergency sales to Bank of America, based in Charlotte, North Carolina, and JPMorgan Chase in New York. Goldman and Morgan Stanley are each receiving $10 billion of capital from the government.

Bank of America is offering Merrill's U.S. brokers bonuses of as much as 100 percent of the revenue they generate to keep them after the deal is complete, people briefed on the plan have said.

Employees at Lehman Brothers in Europe have been promised by their new owner, Nomura Holdings, that they will receive the same bonus as last year, according to two people familiar with the situation.

Share prices and profits have dropped more than bonuses so far. Goldman's profit has fallen 47 percent this year, and the stock is down 53 percent. Morgan Stanley's earnings have tumbled 41 percent, and the shares have shed 69 percent of their value.

Still, "smart companies are going to reward those people who performed well," said Daniel Moynihan of Compensation Resources in Upper Saddle River, New Jersey.

Even without bonuses, Wall Street's traders and bankers typically receive salaries that range from $80,000 to $600,000 a year.

**More Articles in Business »**

**INSIDE NYTIMES.COM**

| OPINION » | HEALTH » | STYLE » | ARTS » | OPINION » | N.Y. / REGION » |
|---|---|---|---|---|---|
|  |  |  |  | **Anxiety: Big Spiders**<br>I circle my jar of spiders. Out of sheer exhaustion, I take off the lid and slide in. I tell them to go ahead, eat me alive. |  |
| Room for Debate: What if Voting Started at 13? | Unlikely Model in H.I.V. Efforts: Sex Film Industry | Retrospective \| Nicolas Ghesquière at Balenciaga | Fake Art May Keep Popping Up for Sale | | No Turning Lights Out on Halloween in New Jersey |

Exhibit S



# BANK OF AMERICA CORP /DE/ (BAC)

BANK OF AMERICA CORPORATE CENTER
100 N TRYON ST
CHARLOTTE, NC 28255
704. 386.8486
https://www.bankofamerica.com/

# DEFM14A

**DEFINITIVE PROXY STATEMENT**
**Filed on 11/03/2008**
File Number 001–06523



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# SCHEDULE 14A
### (Rule 14A–101)
### Information Required in Proxy Statement
### Schedule 14A Information
### Proxy Statement Pursuant to Section 14(a) of
### the Securities Exchange Act of 1934

Filed by the Registrant    ☑
Filed by a Party other than the Registrant    ☐
Check the appropriate box:

☐   Preliminary Proxy Statement                     ☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))**
☑   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to § 240.14a–12

# Bank of America Corporation
### (Name of Registrant as Specified In Its Charter)
### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.
    (1)     Title of each class of securities to which transaction applies:

    (2)     Aggregate number of securities to which transaction applies:

    (3)     Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)     Proposed maximum aggregate value of transaction:

    (5)     Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    (1)     Amount Previously Paid:

    (2)     Form, Schedule or Registration Statement No.:

    (3)     Filing Party:

    (4)     Date Filed:

**THE MERGER**

**Background of the Merger**

Management and the boards of directors of both Bank of America and Merrill Lynch regularly review and consider potential strategic options for their companies in light of their respective performance, business needs and the challenges and opportunities presented by the economic and industry environment. As part of this process, senior management of both companies have met informally from time to time with senior management of other financial institutions, including each other, regarding industry trends and strategic considerations. Among these considerations has been the possibility of a combination of Bank of America and Merrill Lynch.

During the week of September 8, 2008, the prices of publicly traded shares of many major financial services companies declined significantly as speculation and reports about financial difficulties at Lehman Brothers Holdings, Inc. began to circulate. On September 10, 2008, Lehman Brothers pre–announced a $3.9 billion net loss for its third quarter of 2008, as well as a number of initiatives to bolster its financial viability; however, the equity markets remained volatile. Merrill Lynch's common stock price declined by approximately 36 percent during that week. On the morning of Friday, September 12, 2008, the Merrill Lynch board of directors held an informational conference call. During the conference call, senior management of Merrill Lynch updated the directors on recent market conditions, developments relating to Lehman Brothers' financial viability, and the status of, and certain considerations with respect to, Merrill Lynch's capital, liquidity and business results, Merrill Lynch's recent stock performance and potential rating agency actions. The Merrill Lynch board of directors urged senior management to continue to evaluate the potential impact of these market developments on Merrill Lynch and the possible courses of action Merrill Lynch might pursue in response to various possible scenarios, and stressed the need for Merrill Lynch to be prepared to act quickly as events unfolded.

On Saturday morning, September 13, 2008, John Thain, Chairman and Chief Executive Officer of Merrill Lynch, contacted Ken Lewis, Chairman, Chief Executive Officer and President of Bank of America. Mr. Thain told Mr. Lewis that, in light of the extremely distressed conditions in the financial services industry generally and the investment banking industry in particular, he believed that it might be beneficial to both companies to explore one or more potential investment or other transactions between Merrill Lynch and Bank of America. Mr. Lewis agreed that such discussions could be in both companies' best interests and agreed to meet with Mr. Thain later that day in New York City.

On Saturday afternoon, Messrs. Lewis and Thain met in New York City. The two executives discussed the unprecedented market environment that had triggered significant dislocations, the near–bankruptcy of The Bear Stearns Companies Inc. and the apparently imminent bankruptcy of Lehman Brothers. Mr. Thain proposed to Mr. Lewis that Bank of America consider acquiring a 9.9% equity stake in Merrill Lynch and provide a credit facility to Merrill Lynch. Mr. Lewis responded that Bank of America was not interested in acquiring a minority stake in Merrill Lynch, but that Bank of America would be interested in discussing a potential business combination with Merrill Lynch. Mr. Lewis expressed his view of the strategic fit between the two organizations and his belief that the combination of the two companies would result in a leading position in retail brokerage and wealth management, significantly enhanced investment banking capabilities and global scale in investment management. Messrs. Thain and Lewis agreed to further discuss both alternatives.

Following that afternoon meeting, and in view of the need to move expeditiously in light of the apparently imminent bankruptcy of Lehman Brothers and deteriorating market conditions, both companies began to arrange meetings among members of management and their advisors to discuss the challenges and benefits of a transaction and to undertake their respective business, financial, operational and legal due diligence investigations. The discussions among Bank of America, Merrill Lynch and their management teams and advisors, as well as their due diligence investigations, continued throughout the night and into the next day and night.

Also on Saturday, representatives of Merrill Lynch engaged in exploratory discussions regarding a transaction with two other large financial services companies, including with respect to the potential for a minority investment and credit facility with one company and for a business combination with the other company. The discussions regarding a potential minority investment did not result in the development of a transaction that the senior management of Merrill Lynch or its board of directors determined to be as favorable to Merrill Lynch or its stockholders as the combination proposed with Bank of America. After meeting with the other company, Merrill Lynch did not pursue further discussions regarding a potential combination because senior management of Merrill Lynch concluded that such a transaction was not readily achievable.

Early in the morning of Sunday, September 14, 2008, Messrs. Thain and Lewis met in New York City. At this meeting, Messrs. Thain and Lewis discussed the results of the due diligence investigations conducted by their companies' respective representatives. Mr. Lewis and Mr. Thain discussed the strategic rationale for a business combination of Bank of America and Merrill Lynch and considered how the businesses of Merrill Lynch and Bank of America would complement each other. At the conclusion of the meeting, Messrs. Thain and Lewis agreed to have representatives of Merrill Lynch and Bank of America and their respective legal advisors pursue the negotiation of the terms of the agreements that would govern the proposed business combination transaction.

Later that day, the Merrill Lynch board of directors held an informational conference call. In addition to the directors, Shearman & Sterling LLP, counsel to Merrill Lynch, and Cravath, Swaine & Moore LLP, counsel to the non–employee directors, participated in the conference call. On the conference call, Mr. Thain updated the directors on the meetings held over the weekend between government officials and senior executives at leading financial services companies to provide financial assistance to Lehman Brothers, the exploratory discussions with two other institutions regarding the potential for a strategic transaction, the status of discussions with Bank of America regarding the proposed business combination transaction, and the status of, and certain considerations with respect to, Merrill Lynch's capital, liquidity and business results and the potential impact on Merrill Lynch of the expected public announcements regarding the expected bankruptcy filing by Lehman Brothers and the reported liquidity issues facing American International Group. The Merrill Lynch board of directors indicated their agreement that representatives of Merrill Lynch and its legal advisors continue negotiating the terms of the proposed merger with Bank of America and its legal advisors with a view to reaching an agreement that could be presented to the Merrill Lynch board of directors that evening, particularly in light of the market uncertainties and related risks Merrill Lynch would be expected to face when the markets opened the next day. Mr. Thain proposed that the Merrill Lynch board of directors plan to meet at 6:00 p.m. that evening, and subsequently left the conference call together with the other representatives of Merrill Lynch and their advisors. The non–employee directors continued the conference call in executive session with their independent counsel for purposes of discussing the proposed business combination transaction with Bank of America and the alternatives available to Merrill Lynch.

From September 13, 2008 through September 14, 2008, representatives of Merrill Lynch met several times with representatives of Bank of America to discuss valuation and pricing for shares of Merrill Lynch common stock in any proposed business combination transaction. During these discussions, representatives of Merrill Lynch indicated that Merrill Lynch would be seeking a significant premium to the closing price of $17.05 for shares of Merrill Lynch common stock on the NYSE on September 12, 2008, as well as an appropriate multiple of book value. These discussions resulted in the parties' agreement to present to their respective boards a proposed transaction having a price of $29.00 for each share of Merrill Lynch common stock, which equated to an exchange ratio of 0.8595 based on the closing price for shares of Bank of America common stock on the NYSE on September 12, 2008.

In the late afternoon on Sunday, the Bank of America board of directors met with members of Bank of America senior management and its outside advisors. Bank of America senior management reviewed with the Bank of America board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction. Bank of America senior management and the company's financial advisors, J.C. Flowers and FPK, presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction as more fully described below under the heading "— Opinion of Bank

50

of America's Financial Advisors". Each of J.C. Flowers and FPK orally advised the Bank of America board of directors, and indicated that it was prepared to render a written opinion to the same effect, that, as of such date and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon their review as described in their respective opinions and other matters as J.C. Flowers and FPK considered relevant, the proposed exchange ratio to be paid by Bank of America in the merger was fair, from a financial point of view, to Bank of America. Bank of America's general counsel and Wachtell, Lipton, Rosen & Katz, counsel to Bank of America, discussed with the Bank of America board of directors the legal standards applicable to its decisions and actions with respect to the proposed transaction and reviewed the legal terms of the proposed merger. Following review and discussion among the members of the Bank of America board of directors, including consideration of the factors described under "— Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Bank of America board of directors unanimously determined that the transaction was in the best interests of Bank of America and its stockholders and voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

Shortly after the start of the Bank of America board meeting, the Merrill Lynch board of directors met with members of Merrill Lynch's senior management and Merrill Lynch's financial advisors and outside legal advisors. Merrill Lynch senior management reviewed with the Merrill Lynch board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction and updated the directors on developments in the discussions with representatives of Bank of America since the adjournment of the conference call earlier in the day. Merrill Lynch senior management apprised the Merrill Lynch board of directors of its due diligence investigations of Bank of America. MLPFS reviewed its financial analyses regarding the proposed merger with the Merrill Lynch board of directors as more fully described below under the heading "— Opinion of Merrill Lynch's Financial Advisor." MLPFS then rendered to the Merrill Lynch board of directors its oral opinion, which opinion was subsequently confirmed in writing, that as of September 14, 2008, based upon the assumptions made, matters considered and limits of such review, as set forth in its opinion, the exchange ratio in the merger was fair from a financial point of view to holders of Merrill Lynch common stock. In addition, Shearman & Sterling LLP reviewed with the Merrill Lynch board of directors the legal terms of the proposed merger and the legal standards applicable to its decisions and actions with respect to the proposed transaction. Following review and discussion among the members of the Merrill Lynch board of directors, including consideration of the factors described under "— Merrill Lynch's Reasons for the Merger; Recommendation of the Merrill Lynch Board of Directors," the Merrill Lynch board of directors determined that the merger was advisable and in the best interests of Merrill Lynch and its stockholders, and the Merrill Lynch board of directors voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

Following approval of each board of directors, the parties and their counsel continued to work to finalize and document the legal terms of the definitive agreements for the transaction, and early in the morning on September 15, 2008, the parties entered into the merger agreement and the stock option agreement and the transaction was announced in a press release issued by Bank of America.

### Merrill Lynch's Reasons for the Merger; Recommendation of the Merrill Lynch Board of Directors

The Merrill Lynch board of directors consulted with Merrill Lynch's management, as well as its legal and financial advisors, in its evaluation of the merger. In reaching its conclusion to adopt the merger agreement and in determining that the merger is advisable and in the best interests of Merrill Lynch and its stockholders, the Merrill Lynch board of directors considered a number of factors, including the following factors:

- *Strategic and Other Business Advantages*

  - that Bank of America is one of the largest financial institutions in the world, with significant scale and strength in the commercial and consumer banking arena that uniquely compliments Merrill Lynch's global wealth management and global markets and investment banking businesses;

Exhibit T

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| IN RE UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 06-1216 JMR/FLN |
|---|---|

**AFFIDAVIT OF KARL L. CAMBRONNE**
**IN SUPPORT OF PRELIMINARY APPROVAL**

STATE OF MINNESOTA          )
                                                    )  ss
COUNTY OF HENNEPIN       )

1.     I am Lead Counsel for Lead Plaintiffs in the above-captioned derivative litigation.

2.     Attached hereto as Exhibit A is Plaintiffs' proposed Order preliminarily approving the settlement, directing notice of the settlement to shareholders of UnitedHealth Group Incorporated ("UnitedHealth") and establishing a briefing schedule.

3.     Attached hereto as Exhibit A-1 is the proposed form of notice to be sent to current shareholders of UnitedHealth.  As of this date, there remains a dispute between various parties about the precise content of the Notice.

4.     Attached hereto as Exhibit B is a summary of the monetary relief obtained for UnitedHealth as a result of the joint efforts of Plaintiffs and the SLC.

5.     Attached hereto as Exhibit C is a summary of the actions taken and corporate governance reforms adopted by UnitedHealth as a result of this litigation.

Dated this 14th day of November, 2008 in Minneapolis, Minnesota.

/s/  Karl L. Cambronne
Karl L. Cambronne


Subscribed and sworn to before
me this 14th day of November, 2008


/s/  Dawn J. Proulx
Notary Public

# EXHIBIT B

## Summary of Remediation
### (Amounts In Millions)

| | Voluntary 2006 Black Scholes | Voluntary 2006 Intrinsic Value | 2007 Settlements | 2007 Settlements Black Scholes | 2007 Settlements Intrinsic Value | Total Remediation Black Scholes | Total Remediation Intrinsic Value |
|---|---|---|---|---|---|---|---|
| **SETTLING DEFENDANTS** | | | | | | | |
| William McGuire | | | | | | | |
| Option Repricing | $ 181.0 | $ 198.8 | Options Forfeited[1] | $ 321.9 | $ 320.3 | $ 502.9 | $ 519.1 |
| | | | Employment Benefits Forfeited | 99.4 | 99.4 | 99.4 | 99.4 |
| Total | 181.0 | 198.8 | Total | 421.3 | 419.7 | 602.3 | 618.5 |
| David Lubben | | | | | | | |
| Option Repricing | 2.7 | 3.6 | Options Forfeited[1] | 5.5 | 2.9 | 5.5 | 2.9 |
| | | | Employment Benefits Forfeited | 1.95 | 1.95 | 1.95 | 1.95 |
| | | | Cash | 20.55 | 20.55 | 23.3 | 24.2 |
| Total | 2.7 | 3.6 | Total | 28.0 | 25.4 | 30.7 | 29.0 |
| William Spears | | | | | | | |
| — | | | Options Forfeited | (To Be Determined By Binding Arbitration) | | TBD | TBD |
| Total | 2.7 | 3.6 | Total | — | — | | |
| Total Voluntary 2006 | 183.7 | 202.4 | Total 2007 Settlements | 449.3 | 445.1 | 633.0 | 647.5 |
| **NON-SETTLING DEFENDANTS** | | | | | | | |
| | Voluntary 2006 | | Additional Remediation 2007 | | | | |
| Stephen Hemsley | | | | | | | |
| Option Forfeited[2] | 100.0 | 97.7 | | | | 100.0 | 97.7 |
| Option Repricing | 77.5 | 91.4 | Option Repricing | 50.0 [3] | 50.0 | 127.5 | 141.4 |
| Total | 177.5 | 189.1 | Total | 50.0 | 50.0 | 227.5 | 239.1 |
| 12 Other Executives[4] | | | | | | | |
| Option Repricing | 27.4 | 36.1 | — | | | 27.4 | 36.1 |
| Total Voluntary 2006 | 204.9 | 225.2 | Total Additional Remediation 2007 | 50.0 | 50.0 | 254.9 | 275.2 |
| **TOTAL 2006 REMEDIATION** | $ 388.6 | $ 427.6 | **TOTAL 2007 REMEDIATION** | $ 499.3 | $ 495.1 | $ 887.9 | $ 922.7 |

(1) Stock options were valued based on the closing stock price on 12/4/2007 of $54.33.

(2) Stock options were valued based on the closing stock price on the date of the option repricing agreement, 11/7/2006, of $49.54.

(3) Represents the intrinsic value. Included as Black Scholes Value for comparative purposes.

(4) Two non-settling defendants and 10 non-defendant executives (excluding Hemsley, McGuire and Lubben).


tabbles
EXHIBIT B

Exhibit U

# Bloomberg

# Merrill Said to Cut Bonuses by 50% as Revenue Slumps (Update2)

By Bradley Keoun and Jacqueline Simmons - Dec 03, 2008

Dec. 3 (Bloomberg) -- Merrill Lynch & Co. plans to cut year- end bonuses in half after more than $20 billion of losses that forced the U.S. securities firm to sell itself to Bank of America Corp., two people with knowledge of the situation said.

The average bonus reduction will be about 50 percent at the New York-based company, and some traders and investment bankers will face steeper cuts, said the people, who declined to be identified because the plans aren't public. While employees won't find out their bonuses until later this month, division managers are being told now how much they'll get to distribute.

Merrill's revenue through September fell 96 percent from a year earlier, forcing Chief Executive Officer John Thain to slash compensation -- the firm's biggest expense. Congressmen and regulators scrutinizing Wall Street pay have sought to ensure that economic-rescue funds from the U.S. government are used to stimulate lending and not to enrich executives.

The drop in bonuses at Merrill would be less severe than the 70 percent average cut for senior Wall Street executives that compensation consultant Johnson Associates predicted last month. Bonuses for rank-and-file workers may fall by 10 percent to 45 percent, according to Johnson.

Bonuses account for the bulk of a year's pay for most traders and investment bankers, and usually fall when markets sour.

Merrill spokeswoman Selena Morris declined to comment. The shares slipped 4.3 percent to $11.06 in New York trading today.

Shareholder Vote

A crisis of confidence sent Merrill shares plunging 36 percent in a single week during September, forcing the firm to sell itself to Charlotte, North Carolina-based Bank of America. Shareholders of both companies are scheduled to vote on the deal this week, with the closing targeted for the end of December.

Merrill and Bank of America were allotted a combined $25 billion of government money in October, when the Treasury Department agreed to invest $125 billion in nine of the biggest U.S. banks to bolster their dwindling capital.

Hit with mortgage-bond writedowns and plunging investment- banking fees, Merrill may report a loss this year of $13.3 billion, based on the average estimate of nine analysts surveyed by Bloomberg. That would be almost twice as wide as the $7.8 billion loss for 2007, then a record for the 94-year-old firm.

The company has dropped 78 percent this year in New York Stock Exchange composite trading and closed yesterday at $11.56.

Compensation Costs

Merrill's costs for compensation and benefits this year through September totaled $11.2 billion, down 3 percent from a year earlier. Although bonuses aren't paid until the end of the year, Wall Street firms usually estimate them in advance and account for a portion of the payout costs in each quarter.

Even if Merrill set aside nothing for compensation in the fourth quarter, the firm's 60,900 employees still would reap an average of $184,000 in compensation and benefits for the full year.

In 2007, Merrill paid out a total of $15.9 billion in compensation, or about $248,000 per employee.

Merrill's net revenue for the first nine months of this year totaled $834 million, or $13,695 per employee, compared with $19.4 billion in the 2007 period. The plunge in revenue stemmed from trading losses on bonds and other assets. The bulk of Merrill's writedowns came in the fixed-income-trading division, which contributed negative net revenue of $21.4 billion. Investment-banking net revenue plunged 25 percent to $2.58 billion.

Advisers' Commissions

Merrill's brokerage division, the biggest of its kind in the U.S. with 16,850 financial advisers, generated $10.2 billion of net revenue during the first nine months, down 2 percent from the prior year. Brokers don't depend on bonuses as traders and investment-bankers do, because their annual pay is based on a formula that's linked to sales.

Goldman Sachs Group Inc., Wall Street's most profitable firm, said last month Chief Executive Officer Lloyd Blankfein and six deputies would forgo year-end bonuses. Executives at Frankfurt-based Deutsche Bank AG and UBS AG in Zurich also have agreed to waive pay.

Merrill officials have declined to comment on bonuses for top executives, saying the payouts hadn't been set. Thain, 53, a former Goldman Sachs executive, received a $15 million bonus when he joined Merrill last December.

To contact the reporters on this story: Bradley Keoun in New York at bkeoun@bloomberg.net; Jacqueline Simmons in Paris at jackiem@bloomberg.net

To contact the editor responsible for this story: Otis Bilodeau at obilodeau@bloomberg.net

©2010 BLOOMBERG L.P. ALL RIGHTS RESERVED.

Exhibit V





**New User?** Register **Sign In** Help **Make Y! My Homepage** Mail My Y! Yahoo!

Search **Search Web**

HOME | INVESTING | NEWS | PERSONAL FINANCE | MY PORTFOLIOS | EXCLUSIVES

**Get Quotes** Finance Search Fri, Nov 2, 2012, 5:16PM EDT - U.S. Markets closed

Dow **1.05%** Nasdaq **1.26%**

200 FREE TRADES Fidelity

E*TRADE OPEN AN ACCOUNT E*TRADE SECURITIES LLC

RESEARCH BAC TD Ameritrade

**Bank of America Corporation (BAC)** - NYSE **Add to Portfolio** Like 1.8k

**9.85** **0.11(1.13%)** 4:00PM EDT | After Hours : **9.83** **0.02 (0.20%)** 5:16PM EDT - Nasdaq Real Time Price

## Historical Prices

**Get Historical Prices for:** GO

**Set Date Range**

**Start Date:** Dec 2 2008 Eg. Jan 1, 2010

**End Date:** Dec 3 2008

- (•) Daily
- ( ) Weekly
- ( ) Monthly
- ( ) Dividends Only

Get Prices

First | Previous | Next | Last

**Prices**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| Dec 3, 2008 | 13.70 | 15.18 | 13.39 | 15.05 | 128,501,000 | 14.80 |
| Dec 3, 2008 | | | 0.32 Dividend | | | |
| Dec 2, 2008 | 13.46 | 14.69 | 12.91 | 14.37 | 136,087,200 | 13.82 |

* Close price adjusted for dividends and splits.

First | Previous | Next | Last

**Download to Spreadsheet**

Currency in USD.

AdChoices

Copyright © 2012 Yahoo! Inc. All rights reserved. Privacy Policy - About Our Ads - Terms of Service - Copyright/IP Policy - Send Feedback - Yahoo! - ABC News Network

Quotes are **real-time** for NASDAQ, NYSE, and NYSE MKT. See also delay times for other exchanges. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off.

Fundamental company data provided by Capital IQ. Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data, daily updates, fund summary, fund performance, dividend data and Morningstar Index data provided by Morningstar, Inc.

Exhibit W

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 20106-VCS |
| v. | ) ) | |
| MAURICE R. GREENBERG, EDWARD E. MATTHEWS, HOWARD I. SMITH, THOMAS R. TIZZIO, and C.V. STARR & CO., INC., | ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., a Delaware corporation, | ) ) ) ) | |
| Nominal Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR APPROVAL OF SETTLEMENT
AND AN AWARD OF ATTORNEYS' FEES AND COSTS**

Dated: December 9, 2008

OF COUNSEL:

Jennifer Heisinger, Esq.
(admitted pro hac vice)
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
(302) 622-7000 telephone
(302) 622-7100 facsimile

**GRANT & EISENHOFER P.A.**

Stuart M. Grant (Del. I.D. 2526)
Cynthia A. Calder (Del. I.D. 2978)
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
(302) 622-7000 telephone
(302) 622-7100 facsimile

*Attorneys for Plaintiff Teachers' Retirement
System of Louisiana*

service fees to Starr International Company ("SICO"), another private company then owned by, among others, Greenberg and certain officers and directors of AIG.

TRSL prosecuted this action vigorously and negotiated a comprehensive Settlement that will result in a significant benefit to AIG. The Settlement provides for a monetary recovery of $115 million – the largest settlement ever in a derivative suit in the Delaware Court of Chancery. The details of the Settlement are set forth more fully herein and in the Stipulation of Settlement, which was filed with the Court on September 29, 2008.

TRSL respectfully suggests that the proposed Settlement is fair, adequate, and in the best interests of AIG and AIG's public shareholders. Additionally, TRSL respectfully requests an award of $25,875,000 in attorneys' fees and $2,188,959.97 in expenses, to be paid by AIG to Plaintiff's Counsel from the Settlement fund as compensation for the substantial benefits achieved in the Action. AIG and the Individual Defendants have agreed not to object to an award of attorneys' fees and expenses in these amounts, and TRSL respectfully suggests that these amounts are fair and in accordance with the precedent of this Court in similar situations. Additionally, no shareholder has objected to any aspect of the Settlement, including the request for attorneys' fees and expenses.

## STATEMENT OF FACTS

Nominal Defendant AIG is a Delaware corporation with its principal place of business located in New York, New York. The parties to the Action are TRSL, AIG (solely as a nominal defendant), Starr and certain of AIG's former officers or directors,

namely Greenberg, Edward E. Matthews, Howard I. Smith, and Thomas R. Tizzio, (the "Individual Defendants," and collectively with Starr, the "Defendants").[1]

**TRSL Files this Action in the Court of Chancery**

On December 31, 2002, TRSL filed a shareholder's derivative complaint in the Delaware Court of Chancery, initiating this Action. *See* Calder Aff. ¶ 8. At that time, Greenberg was firmly in charge at AIG and was widely regarded as one of the world's most powerful business leaders. Greenberg was credited with transforming AIG into one of the world's largest insurance companies and consistently delivering impressive financial growth and profits.

Despite the fact that Greenberg had turned AIG into the world's premier insurance company with a sales network of more than 150,000 managing general agents worldwide, he and the other Defendants caused AIG to pay Starr hundreds of millions of dollars in commissions for the "production of insurance business," as the transactions were described in AIG's proxy statements. AIG also paid SICO millions of dollars each year for the use of SICO's luxury yacht, its premier golf club, and certain of its properties.

In challenging these self-dealing transactions, TRSL asserted: (a) derivative claims for breach of the fiduciary duty of loyalty with respect to payments of commissions by AIG to Starr in the years 1999 through 2001; (b) derivative claims for breach of the fiduciary duty of care with respect to the payments of commissions by AIG

---

[1] In addition to this recitation of facts, a detailed description of Grant & Eisenhofer's efforts in prosecuting this Action is set forth fully in the Affidavit of Cynthia A. Calder in Support of

to Starr in 1999 through 2001; (c) a derivative claim for breach of fiduciary duty arising from an alleged usurpation of corporate opportunity; and (d) derivative claims for breach of fiduciary duties with respect to payments of "service" and "rental" fees to SICO. The Action sought an award of damages to compensate AIG for the harm it suffered as a result of these transactions.

**The SLC Investigation**

In response to the litigation, the AIG board of directors formed a special litigation committee ("SLC") consisting of two non-management directors of AIG who had no financial interest in Starr or SICO (Marshall A. Cohen and Frank J. Hoenemeyer). The SLC, appointed in January 2003, was charged by the board to investigate the claims asserted in the Action and to determine, among other things, whether pursuit of such claims would serve the best interests of AIG and its stockholders. On August 14, 2003, the SLC issued a 146-page report ("First SLC Report") detailing its findings and filed a motion to terminate the Action. From August 14, 2003 to May 2005, TRSL and the SLC engaged in discovery and briefing regarding the SLC's motion to terminate the Action. *See* Calder Aff. ¶¶ 12, 13.

**AIG's Façade Begins to Crumble in Early 2005**

From the time the Action was filed until at least March of 2005, Greenberg defended himself against accusations of self-dealing and domination of the AIG board by pointing to AIG's impressive growth and profits under his leadership. However, in early

Approval of Settlement and an Award of Attorneys' Fees (the "Calder Aff."), which is being filed contemporaneously herewith and is incorporated herein by reference.

2005 the validity of AIG's growth and profits was called into question. These transactions included the increase in AIG's reserves (the mark of fiscal health for an insurer) through suspect transactions with Gen Re Corporation and AIG affiliates treated as arms-length third parties. Media reports also indicated that Mr. Greenberg had caused AIG to pay kickbacks – euphemistically called "contingent commissions" – to the Marsh & McLennan ("Marsh") brokerage house (headed by none other than Greenberg's son Jeffrey) in order to get business steered to AIG.

Revelations about these and other transactions caught the attention of the New York Attorney General and other government regulators, who launched investigations into some of AIG's more suspect business practices. The deeper the government investigators probed, the more potential wrongdoing they found at AIG. Under the threat of criminal indictment of AIG, the AIG board, which had long been content to allow Greenberg free reign, decided that it was time for Greenberg to "retire" as CEO, and Greenberg left that position with extreme reluctance in March 2005. Greenberg was soon forced to relinquish his position as Chairman as well, and shortly thereafter resigned from the AIG Board altogether. In 2006, the board entered into a global settlement of the regulatory investigations of AIG, whereby AIG paid $1.6 billion into a settlement fund to be allocated among state funds and others.

**TRSL Amends its Complaint and the SLC Withdraws its Motion to Terminate**

On May 17, 2005, TRSL filed an amended complaint ("Amended Complaint") that expanded the scope of the claims alleged in the Initial Complaint to include the years 2002, 2003, 2004 and 2005 and added new defendants, including Starr, to the case. On

May 27, 2005, the SLC requested that the Court postpone scheduling of oral argument on the SLC's motion to terminate the Action in order to facilitate settlement discussions among the parties.

Those discussions resulted in the SLC's deciding to withdraw its motion to terminate the Action in return for TRSL's agreement (i) to dismiss its claims with prejudice against all present and past AIG directors who never owned Starr stock, and (ii) to dismiss its claims without prejudice against all present and past AIG directors who owned Starr stock and who remained with AIG following Greenberg's departure from AIG. On February 16, 2006, the Court approved the agreement between TRSL and the SLC.

**Defendants' Motion to Dismiss**

On or about October 31, 2005, the remaining defendants (Greenberg, Matthews, Smith and Starr) filed motions to dismiss the Amended Complaint. The parties fully briefed the motions to dismiss, and the Court heard oral argument on the motions to dismiss on May 24, 2006. On June 21, 2006, the Court granted in part and denied in part the defendants' motions to dismiss the Amended Complaint. On July 21, 2006, TRSL filed a second amended derivative complaint ("Second Amended Complaint") in the Action to conform the complaint to the Court's June 21, 2006 ruling.

**Discovery, Expert Reports and the Addition of Tizzio as a Defendant**

Between July 2006 and June 2008, the parties conducted extensive fact and expert discovery related to the claims set forth in the Second Amended Complaint. In addition to exchanging multiple sets of discovery requests and preparing and responding to


Exhibit X

# MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS

## OF

## BANK OF AMERICA CORPORATION

December 22, 2008

Pursuant to due notice, a special meeting of the Board of Directors of Bank of America Corporation (the "Corporation") was held by telephone at 4:00 p.m. EST on Monday, December 22, 2008.

The following Directors were present constituting a quorum: Messrs. William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Kenneth D. Lewis, Walter E. Massey, Thomas J. May, Thomas M. Ryan, O. Temple Sloan, Jr., Robert L. Tillman, and Mmes. Monica C. Lozano, Meredith R. Spangler and Jackie M. Ward.

Also present were: Messrs. J. Steele Alphin, Keith T. Banks, Gregory L. Curl, Bruce Hammonds, Liam E. McGee, Brian T. Moynihan, Joe L. Price, Richard K. Struthers, and Mmes. Amy Woods Brinkley, Barbara J. Desoer, Anne M. Finucane, and Alice A. Herald, officers of the Corporation.

Mr. Lewis chaired the meeting and Ms. Herald kept the minutes.

Mr. Lewis noted that roll call had been taken. Mr. Lewis stated that he had spoken to most of the Directors by telephone earlier in the day regarding the events of the preceding weekend.

Mr. Lewis stated the purpose of the special meeting is to insure that the Board is in accord with management's recommendation to complete the acquisition of Merrill Lynch & Co., Inc. ("Merrill Lynch") as scheduled on January 1, 2009, pursuant to the terms of that certain Agreement and Plan of Merger ("Merger Agreement"), dated September 15, 2008, after due consideration of the undertakings and admonitions of the federal regulators.

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

Mr. Lewis reported that a series of calls had occurred between management of the Corporation and federal regulators as well as individual calls with Mr. Paulsen, Secretary of the Treasury ("Treasury") and Mr. Bernanke, Chairman of the Board of Governors of the Federal Reserve ("Fed"). He reported the key points of the calls to be: (i) first and foremost, the Treasury and Fed are unified in their view that the failure of the Corporation to complete the acquisition of Merrill Lynch would result in systemic risk to the financial services system in America and would have adverse consequences for the Corporation; (ii) second, the Treasury and Fed stated strongly that were the Corporation to invoke the material adverse change ("MAC") clause in the merger agreement with Merrill Lynch and fail to close the transaction, the Treasury and Fed would remove the Board and management of the Corporation; (iii) third, the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets; and (iv) fourth, the Fed and Treasury stated that the investment and asset protection promised could not be provided or completed by the scheduled closing date of the merger, January 1, 2009; that the merger should close as scheduled; and that the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation.

Mr. Lewis reiterated that he had discussed in detail the content of the previous conversations with federal regulators with the Board. He reported that in addition to the previously described conversations, he had spoken again with Mr. Bernanke who stated that he, Mr. Bernanke, has spoken to other federal regulators, including the Office of the Comptroller of the Currency ("OCC") and the FDIC, and has confirmed that the OCC, FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ("federal regulators") to the Corporation.

Mr. Lewis stated that, based on his discussions with members of the Board, management recommended that the Corporation not exercise the MAC clause under the Merger Agreement with Merrill Lynch and that the Corporation proceed and close the Merrill Lynch acquisition on January 1, 2009, as originally contemplated. The Board discussed with Mr. Moynihan the potential litigation risks relating to the prospect of the Corporation asserting a right to not complete the merger based on a MAC, as well as related risks and discussions of the same with federal regulators.

2

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

Mr. Lewis stated further that the Corporation will proceed diligently with the work required to document the commitment from the Fed, Treasury and others to facilitate an announcement of the commitment in conjunction with the Corporation's earnings release on January 20, 2009.

Mr. Lewis restated that management's recommendation is based on the following facts: instruction from the Fed and Treasury not to exercise the MAC clause in the Merger Agreement; the assurance of the Fed and Treasury that the Corporation can complete the acquisition of Merrill Lynch on the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed and Treasury's committed assistance in existence no later than January 20, 2009, the scheduled date of the Corporation's earnings release; and Mr. Lewis' comfort with the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed.

Mr. Lewis noted that no vote was required by the Board, but that he wished to open the recommendation for discussion among the Board and management.

Discussion ensued, with the Board clarifying that is was not persuaded or influenced by the statement by the federal regulators that the Board and management would be removed by the federal regulators if the Corporation were to exercise the MAC clause and fail to complete the acquisition of Merrill Lynch. The Board concurred it would reach a decision that it deemed in the best interest of the Corporation and its shareholders without regard to this representation by the federal regulators.

Further discussion ensued, including accurate characterization by the federal regulators of their commitment to the Corporation when announced; the relevant assets of Merrill Lynch; the importance of the timing of the announcement of the commitment of the Fed and Treasury; the Corporation's dividends and incentive compensation; the desirability of a written commitment from the federal regulators; the reliability of the representatives of the federal regulators; the desirability of asset purchases and equity infusions; the Corporation's ability to further negotiate after the consummation of the merger; further inquiry regarding specific assurances by the federal regulators; the Corporation's recent responses to certain requests of federal regulators; and the advice of counsel.

3

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

After discussion, the Board requested that management obtain further clarification of certain potential terms, conditions and assurances regarding the commitment from the federal regulators.

There being no further business to come before the Board, the meeting was adjourned.

_Kenneth D. Lewis_
Kenneth D. Lewis
Chairman of the Board

_Alice A. Herald_
Alice A. Herald
Secretary

4

Confidential Treatment Requested by Bank of America Corporation
Confidential Information Produced Pursuant to 10/14/09 Disclosure & Protective Order,
09 Civ. 6829 (S.D.N.Y.)
Confidential Supervisory Discovery Material

BAC-ML-NYAG-502-00001128

Exhibit Y

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE UNITEDHEALTH GROUP INCORPORATED SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 06-1216 JMR/FLN |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR FINAL APPROVAL OF SETTLEMENT OF DERIVATIVE ACTION**

Settlement should be approved as it conferred a substantial benefit on UnitedHealth.

Lead Plaintiffs and their counsel believe that the proposed Settlement is in the best

interests of UnitedHealth and its shareholders.

## I.      HISTORY OF THE LITIGATION

The Joint Declaration thoroughly sets forth the factual and procedural history of

the Federal Derivative Action and the efforts of Lead Plaintiffs' Counsel in prosecuting

this matter from inception through a successful negotiated conclusion.  To avoid

repetition, Lead Plaintiffs incorporate the Joint Declaration here as the statement of facts

and procedure.

## II.     THE TERMS OF THE SETTLEMENT

The filing, prosecution, and settlement of the Federal Derivative Action have

created significant benefits for UnitedHealth and its shareholders.

### A.      THE MONETARY COMPONENT OF THE SETTLEMENT

The monetary component of the Settlement is complex and involves both the

payment of cash and the repricing of UnitedHealth stock options, the forfeiture of

options, and the forfeiture of various employment benefits.  As explained in Exhibit B to

the Cambronne Affidavit, filed by Lead Plaintiffs in support of preliminary approval of

the Settlement, the value of the monetary remediation ranged from $887.9 million to

$922.7 million as of the time the respective settlement agreements were entered into

(depending on the method of valuation used).[2]  [Docket No. 373.]  This total value

_____

[2]  The Black Scholes option pricing model calculates the present value of a stock
option based on specific information about the terms of the option (*e.g.*, the stock price,

changes (and has changed) with fluctuations in the stock price of UnitedHealth.  As of the

close of the market on January 29, 2009, the value was $658.0 million (Black Scholes)

and $718.0 million (intrinsic).  (Joint Decl. ¶¶ 13-20.)[3]  The monetary value of the

Settlement will remain a "moving target" until it is finally approved and consummated in

accordance with its terms.  In any event, notwithstanding the significant share price drop

since December 2007 (when the settlement package was first presented to the Court), the

value of the Settlement remains not only significant, but historic.  Lead Plaintiffs believe

that no other derivative action has recovered anywhere near as much money for the

benefit of a company and its shareholders as this case.

## B.   CORPORATE GOVERNANCE REFORMS

In addition to the monetary relief obtained through this litigation, extraordinary

and far-reaching governance reforms at UnitedHealth have been achieved in large part as

a result of this litigation and through direct negotiations between Lead Plaintiffs' counsel

and counsel for UnitedHealth.  (*Id.* ¶¶ 20, 54-56.)  The reforms included addressing the

following issues and concerns:[4]

(i)      Lead Independent Director Position;

---

exercise price and expected term).  An alternative stock option value, termed "intrinsic value," is determined by taking the excess of the market price over the option exercise price as of a given date.

[3] The Joint Declaration in Support of Proposed Settlement of Derivative Action and Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl.") is authored by Karl L. Cambronne, Michelle H. Blauner, Chad Johnson, Michael J. Barry, and Brian F. Rice.

[4] The specific reforms are detailed in Exhibit C to the Affidavit of Karl L. Cambronne submitted in support of the Motion for Preliminary Approval.  [Docket No. 373.]

Exhibit Z



# FORM DEF 14A

## BANK OF AMERICA CORP /DE/ - BAC

**Filed: March 18, 2009 (period: April 29, 2009)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

# Table of Contents

DEF 14A - DEFINITIVE NOTICE AND PROXY STATEMENT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

**(Rule 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**
**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934 (Amendment No.    )**

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐
Check the appropriate box:

☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

# Bank of America Corporation

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

PAYMENT OF FILING FEE (Check the appropriate box):

☒  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    1)    Title of each class of securities to which transaction applies:

    2)    Aggregate number of securities to which transaction applies:

    3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    4)    Proposed maximum aggregate value of transaction:

    5)    Total fee paid:

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1) Amount Previously Paid:

_____

2) Form, Schedule or Registration Statement No.:

_____

3) Filing Party:

_____

4) Date Filed:

_____

**STOCK OWNERSHIP**

As of December 31, 2008, we had two classes of voting securities, Common Stock and Series B Preferred Stock. Effective January 1, 2009 with the Merrill Lynch acquisition, eight additional classes of voting preferred stock were added. Our classes of voting securities are the Common stock, Series B Preferred Stock, Series 1 Preferred Stock, Series 2 Preferred Stock, Series 3 Preferred Stock, Series 4 Preferred Stock, Series 5 Preferred Stock, Series 6 Preferred Stock, Series 7 Preferred Stock and Series 8 Preferred Stock. As of February 9, 2009, we did not know of any person who beneficially owned 5% or more of the Common Stock or the Series 1-8 Preferred Stock (collectively, along with the Series B Preferred Stock, the "Preferred Stock"). The following table sets forth as of February 9, 2009, information regarding the sole holder known to us to beneficially own more than 5% of the Series B Preferred Stock.

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percent of Class |
|---|---|---|
| Carolyn C. Glassman & Albert Irl Dubinsky<br>TR UA Apr 8 82<br>Carolyn Glassman Trust<br>1815 Locust Street<br>St. Louis, MO 63103 | 2,018 shares | 26% |

(1)    All shares of Series B Preferred Stock indicated in the table are subject to the sole investment and voting power of the named individuals.

The following table sets forth information as of February 9, 2009, with respect to the beneficial ownership of Common Stock by: (i) each director and nominee for director; (ii) each executive officer named in the Summary Compensation Table; and (iii) all directors, nominees and executive officers as a group. As of February 9, 2009, no director, nominee or executive officer of the Corporation owned any shares of the Preferred Stock other than as disclosed below.

| Name | Amount and Nature of Beneficial Ownership (1)(2)(3)(4)(5) |
|---|---|
| William Barnet, III (6) | 197,130 |
| Frank P. Bramble, Sr. | 123,806 |
| Virgis W. Colbert | 21,062 |
| John T. Collins (7) | 191,859 |
| Gary L. Countryman (8) | 73,908 |
| Barbara J. Desoer (9) | 1,946,832 |
| Tommy R. Franks | 53,105 |
| Charles K. Gifford (10) | 325,745 |
| Bruce L. Hammonds (11) | 1,198,493 |
| Kenneth D. Lewis (12) | 4,697,070 |
| Monica C. Lozano | 13,126 |
| Walter E. Massey (13) | 56,539 |
| Thomas J. May (14) | 69,590 |
| Liam E. McGee (15) | 1,063,184 |
| Patricia E. Mitchell | 34,334 |
| Joe. L. Price (16) | 944,020 |
| Joseph W. Prueher (17) | 15,715 |
| Charles O. Rossotti (18) | 26,135 |
| Thomas M. Ryan (19) | 117,905 |
| O. Temple Sloan, Jr. (20) | 310,816 |
| Meredith R. Spangler (21) | 32,087,301 |
| Robert L. Tillman | 235,993 |
| Jackie M. Ward (22) | 169,455 |
| All directors, nominees and executive officers as a group (26 persons) (23) | 48,833,387 |

18

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009

(1) The numbers in the table represent shares of Common Stock. Each director, nominee and executive officer beneficially owned less than 1% of the shares of Common Stock outstanding.

(2) All shares of Common Stock indicated in the table are subject to the sole voting and investment power of the directors, nominees and executive officers, except as otherwise set forth in the footnotes below.

(3) Includes the following number of units of Common Stock equivalents credited to the following non-employee directors under the Director Deferral Plan as of February 9, 2009: Mr. Barnet, 12,124 units; Mr. Bramble, 12,126 units; Mr. Collins, 4,639 units; Mr. Countryman, 28,714 units; Mr. Franks, 12,126 units; Mr. Gifford, 12,256 units; Mrs. Lozano, 12,126 units; Dr. Massey, 44,831 units; Mr. May, 32,818 units; Ms. Mitchell, 25,024 units; Mr. Ryan, 31,087 units; Mr. Sloan, 3,419 units; Mrs. Spangler, 75,677 units; Mr. Tillman, 15,993 units; Ms. Ward, 78,666 units; and all directors as a group, 401,626 units. These units, which are held in individual accounts in each director's name, will be paid in cash upon the director's retirement to the extent vested based on the fair market value of the Common Stock at that time. See "Corporate Governance—Director Compensation."

(4) Includes restricted stock units awarded under the Key Associate Stock Plan (or its predecessor, the Bank of America Corporation Key Employee Stock Plan), as of February 9, 2009, to the following named executive officers: Ms. Desoer, 217,961 units; Mr. Hammonds, 133,193 units; Mr. Lewis, 1,168,839 units; Mr. McGee, 242,980 units; and Mr. Price, 89,949 units. As of February 9, 2009, all executive officers as a group held 2,340,012 restricted stock units. Each restricted stock unit has a value equal to the fair market value of a share of Common Stock and receives dividend equivalents but does not have any voting rights. These units will be paid in shares of Common Stock at vesting or, in certain circumstances, after termination of employment.

(5) Includes, for each of the following directors, 8,000 shares of Common Stock which such directors could acquire within 60 days after February 9, 2009 through the exercise of stock options: Dr. Massey; Ms. Mitchell; Mr. Sloan; Mrs. Spangler; and Ms. Ward.

(6) Includes 70,128 stock units held under the FleetBoston Directors Deferred Compensation and Stock Unit Plan (the "FleetBoston Director Stock Unit Plan") and a total of 65,245 shares of Common Stock owned by certain family members, the Barnet Revocable Trust, the Mary G. Barnet Revocable Trust, the Barnet Company and Barnet Development Corporation.

(7) Includes 30,500 stock units held under the FleetBoston Director Stock Unit Plan and 6,600 shares of Common Stock owned by Mr. Collin's spouse.

(8) Includes 12,534 stock units held under the FleetBoston Director Stock Unit Plan, 16,655 stock units held under the BankBoston Director Retirement Benefits Exchange Program (the "BKB Exchange Program"), 483 stock units held under the BankBoston Director Stock Award Plan (the "BKB Director Stock Award Plan") and 2,630 shares that Mr. Countryman could acquire within 60 days after February 9, 2009 under the BankBoston Director Stock Option Plan for Non-Employee Directors (the "BKB Director Stock Option Plan").

(9) Includes 1,567,200 shares of Common Stock which Ms. Desoer could acquire within 60 days after February 9, 2009 through the exercise of stock options.

(10) Includes 1,090 shares of Common Stock held as a custodian for two of Mr. Gifford's children. At February 9, 2009, 100,000 of these shares of Common Stock had been pledged as collateral.

(11) Includes 363,093 shares of Common Stock which Mr. Hammonds could acquire within 60 days after February 9, 2009 through the exercise of stock options.

(12) Includes 1,325,000 shares of Common Stock which Mr. Lewis could acquire within 60 days after February 9, 2009 through the exercise of stock options and 400,000 shares of Common Stock owned by Mr. Lewis' spouse. In addition, as of February 9, 2009, Mr. Lewis owned 86,000 Depositary shares of 8.20% Non-Cumulative Preferred Stock, Series H which represents less than 1% of such Preferred Stock.

(13) Includes 490 shares of Common Stock over which Dr. Massey shares voting and investment power with his spouse.

(14) Includes 21,983 stock units held under the FleetBoston Director Stock Unit Plan, 3,052 stock units held under the BKB Exchange Program, 5,362 stock units held under the BKB Director Stock Award Plan, an interest in 1,603 shares under a deferred compensation plan of Mr. May's current employer, 2,630 shares that Mr. May could acquire within 60 days after February 9, 2009 under the BKB Director Stock Option Plan and 450 shares of Common Stock jointly held with his spouse.

19

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009

(15) Includes 741,500 shares of Common Stock which Mr. McGee could acquire within 60 days after February 9, 2009 through the exercise of stock options.

(16) Includes 791,500 shares of Common Stock that Mr. Price could acquire within 60 days after February 9, 2009 through the exercise of stock options and 17,756 shares of Common Stock owned by his spouse.

(17) Mr. Prueher's beneficial ownership includes 3,908 shares acquired by exchange in the Merrill Lynch acquisition on January 1, 2009 and 745 shares of Common Stock owned by Mr. Prueher's spouse.

(18) Mr. Rossotti's beneficial ownership includes 3,867 shares acquired by exchange in the Merrill Lynch acquisition on January 1, 2009, and includes 6,206 stock units payable in cash held under the Merrill Lynch Non-Employee Fee Deferral Plan.

(19) Includes 27,579 stock units held under the FleetBoston Director Stock Unit Plan and 804 shares of Common Stock owned by Mr. Ryan's spouse.

(20) Includes 3,200 shares of Common Stock owned by Mr. Sloan's spouse.

(21) Includes 32,003,624 shares of Common Stock owned by Mrs. Spangler's spouse, certain other family members for whom Mrs. Spangler's spouse acts in a fiduciary capacity and C. D. Spangler Construction Company, Golden Eagle Industries, Inc., C. D. Spangler Foundation, Delcap, Inc. and Delcor, Inc., all of which are parties related to Mrs. Spangler's spouse, and over which Mrs. Spangler shares voting and investment power. At February 9, 2009, an unspecified number of these shares of Common Stock had been pledged as collateral.

(22) Includes 40,000 shares of Common Stock that could be acquired at any time upon conversion of 2,000 shares of Non-Cumulative Convertible Preferred Stock, Series L held by Ms. Ward, which represents less than 1% of such Preferred Stock, 3,540 shares of Common Stock that could be acquired at any time upon conversion of 177 shares of Non-Cumulative Convertible Preferred Stock, Series L held by Ms. Ward's spouse (which together with Ms. Ward's Series L Preferred Stock represents less than 1% of such Preferred Stock), and 1,375 shares of Common Stock held by Ms. Ward's spouse. In addition, 1,000 Depositary shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series M are held by Ms. Ward and 400 depositary shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series M are held by Ms. Ward's spouse, representing in the aggregate less than 1% of such Preferred Stock.

(23) Includes 8,670,304 shares of Common Stock which such persons could acquire within 60 days after February 9, 2009, through the exercise of stock options. Such persons had sole voting and investment power over 16,827,823 shares of Common Stock and shared voting or investment power or both over 32,005,564 shares.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our directors and some of our officers to file reports with the SEC indicating their holdings of, and transactions in, our equity securities. Based solely on a review of the copies of such reports we received, and written representations from the reporting persons, we believe that, during 2008, our reporting persons complied with all Section 16(a) filing requirements, except that, due to an administrative error on the part of the Corporation, a late Form 4 was filed on behalf of Mr. Lewis to report the purchase of 86,000 shares of 8.20% Non-Cumulative Preferred Stock, Series H, and 3,714 restricted stock units were inadvertently omitted from a Form 3 filed on behalf of Mr. Rosato.

## COMPENSATION AND BENEFITS COMMITTEE REPORT

The Compensation and Benefits Committee has reviewed and discussed with management the Compensation Discussion and Analysis that immediately follows this report. Based on this review and discussion, the Compensation and Benefits Committee has recommended to the Board that the Compensation Discussion and Analysis be included in this proxy statement and incorporated by reference into our Annual Report on Form 10-K for the year ended December 31, 2008.

The Corporation is participating in the Troubled Assets Relief Program (TARP) established by the United States Department of the Treasury under the Emergency Economic Stabilization Act of 2008.

As required by the TARP, the Compensation and Benefits Committee certifies that it has reviewed with our senior risk officers the TARP Senior Executive Officer incentive compensation arrangements for 2008 and has made rea-

20

sonable efforts to ensure that such arrangements do not encourage our TARP Senior Executive Officers to take unnecessary and excessive risks that threaten the value of our company. See "Troubled Assets Relief Program (TARP)" on page 25 for additional information concerning our TARP Senior Executive Officers.

*Submitted by the Compensation and Benefits Committee of the Board:*

O. Temple Sloan, Jr., Chairman*
Patricia E. Mitchell*
Thomas M. Ryan*
Meredith R. Spangler*

Gary L. Countryman**
Charles O. Rossotti**

 *Member of the Committee throughout all of 2008 and through the February 26, 2009 Committee meeting at which this Report was approved, and involved in all deliberations and actions of the Committee during and with respect to 2008.

**Member of the Committee effective January 28, 2009. Accordingly, Messrs. Countryman and Rossotti did not participate in any deliberations or actions of the Committee before that date, including Committee actions with respect to compensation decisions for 2008 and the Committee's review of the TARP Senior Executive Officer incentive compensation arrangements for 2008.

## COMPENSATION DISCUSSION AND ANALYSIS

### Executive Summary

Although we were one of the few major financial institutions to be profitable for 2008, our results did not meet our expectations. Therefore, consistent with our pay-for-performance philosophy, Mr. Lewis recommended that no year-end compensation be paid to him or any other executive officer.

The Board of Directors reviewed our 2008 performance and after careful consideration of Mr. Lewis' recommendation, ultimately concluded that no year-end cash or equity incentive compensation should be awarded to Mr. Lewis or any other executive officer for 2008, including the named executive officers whose compensation is set forth in the Summary Compensation Table on page 27.

### Overview of 2008 Executive Compensation Program

We operate a large, global financial services business in a very competitive environment. There are many challenges inherent in running a business of our size and scope. To best meet these challenges, we have designed our executive compensation program to attract and retain the highest quality executive officers and directly link pay to our performance. This pay-for-performance philosophy results in a compensation program that aligns our executive officers' interests with those of our stockholders, provides pay that varies depending on performance and can be easily understood by our stockholders.

The key compensation element for our executive officers is an opportunity to earn a year-end incentive award based on our performance. The Compensation and Benefits Committee may, in its discretion, provide this award in a mix of cash incentive, restricted stock and stock option awards. Historically, the Committee has delivered most of the year-end incentive award in a balanced mix of restricted stock and stock options because stock ownership is the simplest, most direct way to align our executive officers' interests with those of our stockholders.

The Compensation and Benefits Committee determines these year-end incentive awards in the exercise of its informed discretion without formulas or weightings. The Committee places the greatest emphasis on company-wide financial performance, with a particular focus on operating earnings, operating earnings per share, total stockholder return and revenue as collectively the best indicators of our financial performance. The Committee gen- erally reviews growth in these measures over one-year and multi-year periods. The Committee may also consider the financial performance of individual lines of business and other factors such as quality and sustainability of earnings and successful implementation of strategic initiatives.

21

Our executive officers also receive base salary in order to have a level of predictable income. Base salary forms only a minor part of the total compensation opportunity. The Compensation and Benefits Committee establishes the base salary levels for our executive officers to reflect each executive officer's scope of responsibility and accountability within the company and to be part of a competitive total compensation package.

Historically, the Compensation and Benefits Committee took into account compensation practices and financial performance at a group of leading U.S. financial services companies when deciding base salary levels and year-end compensation awards for our executive officers. Review of competitor compensation practices and financial performance is by necessity a backwards looking exercise, based on data from prior years. The extraordinary economic environment experienced in the financial services industry during 2008 caused such historic competitor data to become less relevant and was therefore not considered in making 2008 executive compensation decisions.

Prior to 2008, our practice was to establish a target total compensation package for each executive officer at the beginning of each year comprised of base salary and year-end cash incentive, restricted stock and stock option target awards. However, due to the extraordinary economic environment during 2008, the target total compensation packages established at the beginning of 2008 ultimately were not a factor in our 2008 compensation decisions.

**Pay-for-Performance Features of Our Program**

Our year-end compensation decisions over the last several years most clearly illustrate the direct linkage between our executive officers' pay and our company's performance. For 2006, our company achieved good performance results, and accordingly the total compensation awards for our executive officers approximated target levels. For 2007, we awarded compensation for our executive officers significantly below target levels based on our performance. And as discussed more fully below, our executive officers received no year-end cash or equity compensation awards for 2008 as a result of our company's performance.

Many of our program's unique features further demonstrate the commitment to our pay-for-performance philosophy.

*Conditions of Stock Ownership*

- We encourage long-term stock ownership by our executive officers, with award features such as no vesting on restricted stock and stock option awards until the third anniversary of the grant and an additional three-year hold requirement on net proceeds from stock option exercises. See "Grants of Plan-Based Awards" beginning on page 31 for more details about the vesting rules, including the impact of termination of employment on vesting.

- In addition, our Corporate Governance Guidelines include stock ownership requirements for our executive officers. Under these requirements, our Chief Executive Officer must hold at least 500,000 shares of our Common Stock and our other executive officers at least 150,000 shares. We disregard stock options (whether vested or unvested) for this purpose. New executive officers have up to five years to meet these requirements. As of December 31, 2008, all of our executive officers who have been executive officers for at least five years met these requirements.

- Our Key Associate Stock Plan, which is the plan under which we make equity awards to our executive officers and other key associates, prohibits discounted stock options, reload stock options or stock option re-pricing.

*Severance and SERPs*

- We do **not** have any employment, severance or change in control agreements with any of our executive officers.

- We also have a policy prohibiting future employment or severance agreements with our executive officers that provide severance benefits exceeding two times base salary and bonus, unless the agreement has been approved by our stockholders.

- Executive officers do not earn additional retirement income under any supplemental executive retirement plans.

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009

- We have an annual stock option award process that provides for a pre-established, regular grant date following written policies and procedures. If we award stock options other than as part of the annual process, those awards also have a pre-established regular grant date following our written policies.

*Recoupment Policies*

- Since October 2007, we have had a recoupment policy under which the Board can require reimbursement of any incentive compensation paid to an executive officer whose fraud or intentional misconduct caused the company to restate its financial statements. In October 2008, we broadened the recoupment policy in accordance with the Troubled Assets Relief Program (TARP). See page 25 for additional information about TARP recoupment.

**Our 2008 Compensation Decisions**

One of the Compensation and Benefits Committee's primary responsibilities is to review our performance and approve the compensation of our executive officers, and subject to further approval by the Board, our Chief Executive Officer's compensation. However, in light of the extraordinary economic environment that evolved during 2008, the 2008 year-end compensation decisions for all of the executive officers were made by the full Board, excluding Mr. Lewis. Salary and all other elements of compensation actually paid for 2008 and reflected in the Summary Compensation Table on page 27 were approved by the Compensation and Benefits Committee.

Our executive officers are not engaged directly with the Committee in setting the amount or form of executive officer compensation. However, as part of the annual performance review for our executive officers other than the Chief Executive Officer, the Committee considers the Chief Executive Officer's perspective on each executive officer's individual performance and compensation as well as the performance of our various business segments and lines of business.

The full Board, excluding Mr. Lewis, reviewed our financial performance for 2008. The Board also considered the recommendation of Mr. Lewis that no year-end compensation be awarded to him or any other executive officer.

Even with the exceptional challenges presented by the economic environment, we were one of the few major financial institutions to be profitable for 2008. We also made progress on a number of projects during 2008 that we expect will create value for our company in future years. We acquired both Countrywide and Merrill Lynch, in addition to completing a highly successful transition at LaSalle.

Regardless of our profitability and continued progress and growth, our performance for 2008 did not meet our expectations, including a loss for the fourth quarter.

Based on these results and Mr. Lewis' recommendation, and given the pay-for-performance directive of our executive compensation program, the Board, after careful consideration and deliberation, ultimately determined that no year-end cash incentive, restricted stock or stock option awards should be awarded to Mr. Lewis or any other executive officer for 2008 performance.

23

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009

The following chart shows the results of these compensation decisions:

**Compensation Decisions For Performance Year 2008**

| Name | Base Salary ($) | Cash Incentive ($) | Restricted Stock ($) | Stock Options (#) |
|---|---|---|---|---|
| Kenneth D. Lewis | 1,500,000 | 0 | 0 | 0 |
| Joe L. Price | 800,000 | 0 | 0 | 0 |
| Barbara J. Desoer | 800,000 | 0 | 0 | 0 |
| Bruce L. Hammonds (1) | 800,000 | 0 | 0 | 0 |
| Liam E. McGee | 800,000 | 0 | 0 | 0 |

(1) The Compensation and Benefits Committee established Mr. Hammonds' total target compensation effective as of July 1, 2008 commensurate with his new role as an executive officer. Prior to becoming an executive officer, Mr. Hammonds' base salary was $600,000.

The 2008 row in the Summary Compensation Table on page 27 shows amounts expensed in the financial statements during 2008 for restricted stock and stock option awards made for performance in 2005, 2006 and 2007. Therefore, none of the equity amounts in the Summary Compensation Table reflect compensation decisions for performance in 2008.

**Our Other Compensation Practices**

*Other Elements of Compensation*

The other elements of our executive compensation program are as follows:

*Retirement Benefits*

Executive officers participate in our various employee benefit plans designed to provide retirement income. Our qualified and nonqualified pension plans provide a retirement income base, and our qualified and nonqualified 401(k) plans permit additional retirement savings. To encourage retirement savings under the qualified and nonqualified 401(k) plans, we provide an employer matching contribution.

We limit eligible compensation for earning benefits under the qualified and nonqualified pension plans and for employer matching contributions under the qualified and nonqualified 401(k) plans to the first $250,000 in annual cash compensation. As a result, the Compensation and Benefits Committee's decisions to grant annual performance-based cash incentive, restricted stock and stock option awards do not create any additional retirement benefits earned under these plans.

Our executive officers do not earn additional retirement income under any SERPs. We believe that our executive officers should be able to provide for their retirement needs from the compensation they earn based on our performance.

- Consistent with our pay-for-performance philosophy, we froze benefits effective December 31, 2002 under the Bank of America Corporation and Designated Subsidiaries Supplemental Executive Retirement Plan (the "Bank of America SERP") in which Mr. Lewis and Ms. Desoer participate. Accordingly, no additional benefits are earned under the Bank of America SERP for compensation or service for periods beginning after December 31, 2002.

24

Source: BANK OF AMERICA CORP, DEF 14A, March 18, 2009