Exhibit AA

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 3978

JAMES CUNNIFF, Derivatively and on
Behalf of Bank of America Corp.,

        Plaintiff,

  v.

KENNETH D. LEWIS, WILLIAM
BARNET III, FRANK P. BRAMBLE, SR.,
JOHN T. COLLINS, GARY L.
COUNTRYMAN, TOMMY R. FRANKS,
CHARLES K. GIFFORD, MONICA C.
LOZANO, WALTER E. MASSEY,
THOMAS J. MAY, PATRICIA E.
MITCHELL, THOMAS M. RYAN, O.
TEMPLE SLOAN, JR., MEREDITH R.
SPANGLER, ROBERT L. TILLMAN, and
JACKIE M. WARD,

        Defendants,

BANK OF AMERICA CORP.,  a Delaware
Corporation,

        Nominal Defendant.

**ORDER**

The Court heard this matter on 15 July 2009, on the Defendants' Motion to Stay Pursuant to N.C. Gen. Stat. § 1-75.12 (the "Motion").  After considering the Court file, the Motion, the briefs and exhibits submitted by the parties, and the arguments of counsel, the Court **GRANTS** the Motion.  In support of its ruling, the Court enters the following:

**FINDINGS OF FACT**

1.     Plaintiff is a resident of Arkansas and is a shareholder of nominal Defendant Bank of America Corp. ("the Bank").  (Compl. ¶ 10; Pl.'s Mem. Opp. Defs.' Mot. Stay 3.)

2.      The Bank is a Delaware corporation.  It maintains its principal office in Charlotte, North Carolina.  (Compl. ¶ 11.)

3.      According to Plaintiff, the Individual Defendants named in the Complaint all serve on the Bank's Board of Directors.  (Compl. ¶¶ 12-27.)

4.      Plaintiff filed this derivative action on 17 February 2009 asserting claims against the Individual Defendants for breach of fiduciary duty, gross mismanagement, abuse of control, and waste of corporate assets arising from a 15 September 2008 merger agreement between the Bank and Merrill Lynch & Co., Inc. (the "Merger").  (Compl. ¶¶ 76-93.)

5.      At the time Plaintiff filed suit, four derivative actions related to the Merger were already pending in the Delaware Court of Chancery.[1]  Since then, two other actions have been filed in Delaware:  a putative class action suit and a purported class and derivative action.  (Mem. Supp. Defs.' Mot. Stay 4-5; Pl.'s Mem. Opp. Defs.' Mot. Stay 3.)

6.      On April 27, 2009, the Delaware Court of Chancery consolidated all six cases pending in Delaware.  The Delaware court's order also provided that "[a]ny further actions hereafter filed involving the same subject mater shall be consolidated into the consolidated case[.]"  (Mem. Supp. Defs.' Mot. Stay 5; Pl.'s Mem. Opp. Defs.' Mot. Stay 3.)

7.      The Court of Chancery appointed lead counsel for plaintiffs in the consolidated actions, and plaintiffs there have since filed a verified consolidated amended derivative complaint. (Mem. Supp. Defs.' Mot. Stay 5; Defs.' Mot. Stay, Ex. H; Pl.'s Mem. Opp. Defs.' Mot. Stay 3)

---

[1] Multiple actions alleging similar claims are also pending in the United States District Court for the Southern District of New York.  (Mem. Supp. Defs.' Mot. Stay 6.)

Based on the above Findings of Fact, the Court enters the following:

## **CONCLUSIONS OF LAW**

1.     Defendants request that the Court stay this case in favor of the consolidated actions pending in the Delaware Court of Chancery.

2.     This Court has authority to enter a stay pursuant to N.C. Gen. Stat. § 1-75.12 (2007), which states:

> (a) When Stay May be Granted. -- If, in any action pending in any court of this State, the judge shall find that it would work substantial injustice for the action to be tried in a court of this State, the judge on motion of any party may enter an order to stay further proceedings in the action in this State.  A moving party under this subsection must stipulate his consent to suit in another jurisdiction found by the judge to provide a convenient, reasonable and fair place of trial.

3.     Whether to grant or deny a stay "'is a matter within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion.'"  *Lawyers Mut. Liab. Ins. Co. of N.C. v. Nexsen Pruet Jacobs & Pollard,* 112 N.C. App. 353, 356, 435 S.E.2d 571, 573 (1993) (internal citation omitted).

4.     In making its determining under N.C.G.S. § 1-75.12:

> the trial court may consider the following factors:  (1) the nature of the case, (2) the convenience of the witnesses, (3) the availability of compulsory process to produce witnesses, (4) the relative ease of access to sources of proof, (5) the applicable law, (6) the burden of litigating matters not of local concern, (7) the desirability of litigating matters of local concern in local courts, (8) convenience and access to another forum, (9) choice of forum by the plaintiff, and (10) all other practical considerations.

*Id.*

5.     The Court is not obligated to consider each enumerated factor, nor is it necessary that the Court find that all factors positively support a stay.  *Id.* at 357, 435 S.E.2d at 574.  Instead, the Court acts within its discretion if it considers whether "(1) a substantial injustice would result if

the trial court denied the stay, (2) the stay is warranted by those factors present, and (3) the alternative forum is convenient, reasonable, and fair." *Id.*

6.      In this case, Defendants focus on the nature of the claims and the substantive law that will apply to those claims in urging the Court to grant the stay.  Defendants note that this is a derivative action alleging that the Individual Defendants breached their fiduciary duties and committed other misconduct in connection with their approval of the Merger and their subsequent recommendation of the same to the Bank's shareholders.  (Mem. Supp. Defs.' Mot. Stay 9.)

7.      Defendants also point out that the Bank is a Delaware corporation.  As such, Defendants assert that the misconduct alleged by Plaintiff relative to the Merger will be evaluated according to Delaware law, and that the Individual Defendants are already responding to such claims in the Delaware Court of Chancery and elsewhere.  For that reason, the Individual Defendants contend that "they should not be subjected to the burden of litigating a later-filed and duplicative case in this Court that adds nothing to the Delaware and federal actions that are already proceeding." (Mem. Supp. Defs.' Mot. Stay 3.)

8.      Plaintiff does not dispute that Delaware law will govern the principal issues in this case. (Pl.'s Mem. Opp. Defs.' Mot. Stay 9.)  Plaintiff also concedes that, at time he filed suit in North Carolina, four similar actions were already pending in the Delaware Court of Chancery.  (Pl.'s Mem. Opp. Defs.' Mot. Stay 3.)

9.      According to Plaintiff, however, "[b]ecause of the timing with which the Delaware actions were filed, they could not incorporate additional facts concerning the Merger that were reported by news sources" and uncovered by government regulators investigating the allegations, which Plaintiff has included in his Complaint.  (Pl.'s Mem. Opp. Defs.' Mot. Stay 3.)

10.     Plaintiff also contends that his choice of forum is entitled to substantial weight, particularly because Plaintiff chose to file this derivative action in the Bank's "home" state. (Pl.'s Mem. Opp. Defs.' Mot. Stay 10.)

11.     Plaintiff argues further, but presents no evidence, that (1) the convenience of the witnesses, (2) the availability of compulsory process to produce witnesses, and (3) the relative ease of access to sources of proof, all support denial of the stay. (Pl.'s Mem. Opp. Defs.' Mot. Stay 6-8.)

12.     Finally, Plaintiff insists that North Carolina has a substantial interest in resolving this dispute, given the Bank's influence on the economy of this state. (Pl.'s Mem. Opp. Defs.' Mot. Stay 9.)

13.     After considering the parties' contentions and the relevant factors informing the Court's decision as to a stay, the Court **GRANTS** the Motion.

14.     First, the Court is not persuaded by Plaintiff's suggestion that his Complaint should proceed because it pleads more facts than those alleged in the Delaware actions. In that regard, the Court notes that the verified consolidated amended derivative complaint filed in Delaware pleads even more facts than those alleged by Plaintiff here. (Defs.' Mot. Stay, Ex. H.) In any event, so long as Plaintiff has met his minimal pleading burden, the only relevant question is whether Plaintiff can prove the claims alleged. *See* N.C. R. Civ. P. 8(a) (2007) (stating that a pleading is sufficient if it contains "[a] *short and plain* statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief . . ." ) (emphasis added).

15.     Turning to those factors relevant to the Court's analysis of the Motion, there is little

doubt that North Carolina has a substantial interest in this dispute.  The Bank maintains its

principal office in Charlotte, North Carolina, and is one of the largest employers in this State.

On the other hand, Delaware's interest is also substantial, given that the Bank is incorporated

there and that resolution of the claims turns on the application of Delaware law.  Because the

Court finds these competing interests to be in relative equipoise, this factor does not weigh for or

against granting a stay.

16.     The Court also recognizes that a plaintiff's choice of forum is generally given great

deference in considering whether to grant a stay in favor of another venue.  *See Firstar Bank,*

*N.A. v. Interlease 757 Aircraft Investors, L.L.C.*, 1:01 CV 706, 2002 U.S. Dist. LEXIS 20974, at

*10 (M.D.N.C. Aug. 23, 2002) (citation omitted) ("[U]nless the balance is strongly in favor of

the defendant, the plaintiff's choice of forum should rarely be disturbed").

17.     Here, however, Plaintiff's decision to litigate in North Carolina is entitled to slightly less

deference because: (1) Plaintiff filed a derivative lawsuit that largely mirrors actions previously

filed in Delaware and consolidated for trial there; (2) Plaintiff has no connection to North

Carolina and thus would suffer no great inconvenience if the Court requires him to litigate this

matter (if at all) in Delaware; and (3) in a derivative action, Plaintiff is but one of many potential

plaintiffs, all of whom could contend that the litigation should proceed in their home courts.  *See*

*Strauss v. West Highland Capital, Inc.,* 00 Civ. 01184, 2000 U.S. Dist. LEXIS 14937, at *5

(S.D.N.Y. Oct. 6, 2000) (*citing Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947)).

18.     Indeed, a stay is appropriate in this case precisely because of the nature of Plaintiff's

action.  Plaintiff does not seek individual relief in his Complaint; rather he brings his claims

derivatively on behalf of the Bank to hold the Individual Defendants accountable for their

6

alleged breach of fiduciary duty, gross mismanagement, abuse of control, and waste of corporate assets in connection with the Merger.  In that regard, the factual allegations supporting Plaintiff's claims are virtually identical to those raised by the litigants in Delaware.

19.    Plaintiff also does not dispute that Delaware law will govern the principal issues in this case.  And although this Court is certainly capable of applying that law, it would be a waste of this Court's resources to do so when the Delaware Court of Chancery is already overseeing litigation of materially identical claims.

20.    The other factors relevant to the Court's stay analysis do not compel a different result. Although neither party presented any evidence on the point, the Court surmises that many potential witnesses reside or are employed in Charlotte, North Carolina.  That said, it is also likely that many of these witnesses are current or former employees of the Bank.  As such, they are under the Bank's control and would appear at trial, whether in Delaware or North Carolina. Accordingly, the convenience of the witnesses and the availability of compulsory process to produce witnesses are relative non-factors in the Court's resolution of the Motion.

21.    Similarly, the relative ease of access to sources of proof is not a particularly significant factor in this case.  While the Court assumes that some (if not many) of the records related to the Merger are located in North Carolina, the relevant documents and other sources of proof are readily accessible to both parties, regardless of where the litigation proceeds.  As such, the locations of sources of proof do not point clearly to a single jurisdiction as more or less convenient.

22.    Finally, because there is little doubt that either this Court or the Delaware Court of Chancery can provide the parties with a fair, reasonable, and convenient forum, this factor too does not sway the analysis one way or the other.

23.     In the end, the critical practical consideration for the Court is judicial economy.  Simply put, this Court's limited resources need not be expended in this case because: (1) an alternate forum (Delaware) is already managing derivative claims identical to those filed by the Plaintiff; and (2) Delaware has a substantial interest in the litigation, given that the entity alleged to have been harmed is incorporated there, and that Delaware law will govern the claims.

24.     Against this backdrop, the Court is persuaded that allowing the litigation to proceed on two fronts would be substantially unjust in that it would subject Defendants to unnecessary expense and hardship.

## CONCLUSION

The Court holds that a "substantial injustice" would result of it were to deny the Motion. The Court holds further that a stay is warranted by those factors present, and that the Delaware Court of Chancery is a convenient, reasonable, and fair alternative forum.  *Lawyers Mut. Liab. Ins. Co. of N.C. v. Nexsen Pruet Jacobs & Pollard,* 112 N.C. App. at 357, 435 S.E.2d at 574. Accordingly, the Court **GRANTS** the Motion and stays this action, subject to the Court's authority pursuant to N.C. Gen. Stat. § 1-75.12(b) (2007) to modify the stay order and take such other action as the interests of justice require.

This the 6th day of October 2009.


/s/ Albert Diaz
Albert Diaz
Special Superior Court Judge

8

Exhibit BB

Richard M. Heimann (State Bar No. 063607)
Joy A. Kruse (State Bar. No. 142799)
Nancy Chung (State Bar. No. 225584)
Mikaela Bernstein (State Bar. No. 261301)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone:   (415) 956-1000
Facsimile:   (415) 956-1008
Email: jheimann@lchb.com
Email: jakruse@lchb.com
Email: nchung@lchb.com
Email: mbernstein@lchb.com

*Lead Counsel For the Derivative Plaintiffs*

[Additional Counsel Listed On Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE BROADCOM CORPORATION DERIVATIVE LITIGATION | Master File No. CV06-3252R (CWx) |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF PARTIAL SETTLEMENT** |
| | Hearing Date:   December 14, 2009<br>Time:               10:00 a.m.<br>Ctrm:               8<br>Judge:             Hon. Manuel L. Real |

1  the three Non-Settling Defendants remain in the same position they would have
2  been in absent the Settlement.

3        It is the opinion of Lead Counsel for Derivative Plaintiffs, the SLC and
4  Broadcom that the Settlement constitutes an exceedingly favorable resolution for
5  Broadcom of a substantial portion of this complex case.  The Settlement is further
6  recommended by the Court-appointed Special Master, John Francis Carroll, who,
7  along with the Hon. Daniel Weinstein (Ret.), presided over the mediation and
8  negotiations among the Settling Parties for over sixteen months.  In short, it is the
9  judgment of each of these parties that the $118,000,000 in consideration for the
10  Company's releases of the Settling Defendants is a resolution that is fair, adequate
11  and reasonable to Broadcom, on whose behalf the derivative claims were brought.

12        Accordingly, the Settlement should be approved.

13  **II.**    **BACKGROUND**

14      **A.**    **Broadcom's Voluntary Stock Options Review And Restatement**

15        In May 2006, various news agencies and financial analysts reported that a
16  number of companies appeared to have granted stock options to employees and
17  executives just before increases in the companies' stock prices.  In response,
18  Broadcom, under the direction of the Audit Committee of its Board of Directors,
19  initiated a voluntary review of all option grants made since the Company's initial
20  public offering in April 1998.

21        Broadcom disclosed the findings of this review in its Form 10-K/A for 2005,
22  filed with the SEC on January 23, 2007 (the "Restatement").  One of the findings
23  was that the grant dates for some employee stock options awarded between April
24  1998 and May 2003 were selected with hindsight.  The Restatement disclosed
25  separately that the Company had not accurately accounted for stock-based
26  compensation expenses associated with many other stock option grants made
27  during that period.  As a result, Broadcom recorded $2.220 billion in net additional

28

stock-based deferred compensation expenses for the years 1998 through 2005. All of those expenses were non-cash accounting charges.

### B. The Options-Related Litigations

Broadcom's stock options issues resulted in three types of private civil actions: this consolidated derivative litigation (the "Federal Derivative Action"), consolidated derivative litigation in state court, and a federal shareholder class action (also in this Court). The complaints in each of the litigations allege, generally, that the defendants intentionally manipulated certain Broadcom stock option grants to benefit themselves and others, and (in the class action) to artificially inflate the Company's stock price. Broadcom's historical stock option practices also resulted in a criminal investigation by the United States Attorney's Office (the "USAO") and the subsequent indictment of two former Broadcom officers.

### 1. This Federal Derivative Action

In October 2006, this Court consolidated the multiple shareholder derivative actions pending in this Court under the caption *In re Broadcom Corporation Derivative Litigation*, Master File CV-06-3252-R (CWx), and appointed Richard M. Heimann of Lieff, Cabraser, Heimann & Bernstein, LLP to serve as lead counsel ("Lead Counsel"). On November 3, 2006, plaintiffs filed their Consolidated Amended Derivative Complaint (the "Amended Complaint").

The Amended Complaint asserts claims against thirteen individual defendants on behalf of Broadcom, which is named as a nominal defendant. The claims include alleged violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, rescission, constructive fraud, insider trading, violations of California Corporations Code §§ 25402 and 25403, and an accounting and constructive trust. The Amended Complaint alleges, among other things, that defendants intentionally manipulated

certain of Broadcom's stock option grant dates between 1997 and May 2003 in order to enrich themselves at the expense of Broadcom and Broadcom shareholders. The Amended Complaint further alleges that Broadcom has incurred significant expenses as a result of the historic options granting problems, including but not limited to, legal fees and expenses in connection with internal investigations and lawsuits. The Amended Complaint seeks recovery for the Company for these and other alleged harms.

### 2. The State Derivative Action

On September 18, 2006, a Consolidated Complaint alleging derivative claims purportedly on behalf of Broadcom was filed in Orange County Superior Court against the Settling Defendants and certain other current and former Broadcom officers and directors (the "State Derivative Action"). On January 8, 2007, the state Court entered an order staying prosecution of the State Derivative Action.

### 3. The Consolidated Class Action

In November 2006, this Court consolidated putative shareholder class actions under the caption *In Re Broadcom Corporation Class Action Litigation*, Case No. CV-06-5036-R (CWx) (the "Class Action"), and appointed New Mexico State Investment Council to serve as Lead Class Plaintiff. In connection with the Court's preliminary approval of the Settlement in the Federal Derivative Action, described below, a partial stay was entered in the Class Action. *See* Dkt. Nos. 328, 329.

### 4. The DOJ's Criminal Action

In June 2008, Non-Settling Defendants Dr. Nicholas and Mr. Ruehle were indicted in the Central District of California for alleged crimes related to stock options backdating at Broadcom. (*See United States v. Henry T. Nicholas, III, et al.*, Case No. CR 08-00139-CJC.). Also in June 2008, Non-Settling Defendant Dr. Samueli pled guilty to making a materially false statement to the SEC in connection with its investigation of alleged stock options backdating at the

Exhibit CC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : 09 Civ. 6829 (JSR) |
| | : 10 Civ. 0215 (JSR) |
| -against- | : ECF Cases |
| | : |
| BANK OF AMERICA CORPORATION, | : |
| | : |
| Defendant. | : |
| | : |

**MEMORANDUM OF PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**
**IN SUPPORT OF ENTRY OF PROPOSED CONSENT JUDGMENT**

Scott L. Black
Attorney for Plaintiff
Securities and Exchange Commission
New York Regional Office
Three World Financial Center, Suite 400
New York, New York 10281
Tel: (212) 336-0029

Of Counsel:

George S. Canellos
David Rosenfeld
Alexander M. Vasilescu
Joseph O. Boryshansky
Wendy B. Griffin

access to the withheld information — including the extraordinary losses that Merrill experienced in October and November of 2008 — the shareholders could have voted against the merger and effectively demanded a lower price for the acquisition of Merrill.  The distribution of the proposed penalty to harmed Bank of America shareholders is designed to compensate these shareholders and to deter future corporate proxy disclosure violations.  By targeting harmed shareholders, the proposed distribution of the penalty funds addresses the Court's concern, raised in the Sept. 14 Order, that a civil penalty would further penalize the victims of disclosure violations.

## II.

### The Remedial Undertakings Contained In The Proposed Order Will Enhance And Improve Bank of America's Disclosure and Governance Processes

The Commission believes that the undertakings contemplated by the proposed settlement provide an effective means of corporate reform that would help to avoid future violations by Bank of America.  The agreed-upon undertakings have been crafted to collectively enhance the Bank's disclosure processes, provide its shareholders with a voice on compensation-related matters, and strengthen the ability of the Bank's Compensation Committee to access independent information and advice and bring an independent perspective to bear on compensation matters. Such reforms should inure to the long-term benefit of Bank of America's shareholders.

Exhibit DD

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

[✓]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2009

or

[   ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from          to

**Commission file number:**

1-6523

**Exact name of registrant as specified in its charter:**

# Bank of America Corporation

**State or other jurisdiction of incorporation or organization:**

Delaware

**IRS Employer Identification No.:**

56-0906609

**Address of principal executive offices:**

Bank of America Corporate Center

100 N. Tryon Street

Charlotte, North Carolina 28255

**Registrant's telephone number, including area code:**

(704) 386-5681

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Common Stock | New York Stock Exchange |
| | London Stock Exchange |
| | Tokyo Stock Exchange |
| Depositary Shares, each Representing a 1/1,000th interest in a share of 6.204% Non-Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares, each Representing a 1/1,000th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series E | |
| Depositary Shares, each Representing a 1/1,000th Interest in a share of 8.20% Non-Cumulative Preferred Stock, Series H | New York Stock Exchange |
| Depositary Shares, each Representing a 1/1,000th interest in a share of 6.625% Non-Cumulative Preferred Stock, Series I | New York Stock Exchange |
| Depositary Shares, each Representing a 1/1,000th interest in a share of 7.25% Non-Cumulative Preferred Stock, Series J | New York Stock Exchange |
| 7.25% Non-Cumulative Perpetual Convertible Preferred Stock, Series L | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation Floating Rate Non-Cumulative Preferred Stock, Series 1 | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation Floating Rate Non-Cumulative Preferred Stock, Series 2 | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation 6.375% Non-Cumulative Preferred Stock, Series 3 | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation Floating Rate Non-Cumulative Preferred Stock, Series 4 | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation Floating Rate Non-Cumulative Preferred Stock, Series 5 | New York Stock Exchange |
| Depositary Shares, each representing a 1/40th interest in a share of Bank of America Corporation 6.70% Non-cumulative Perpetual Preferred Stock, Series 6 | New York Stock Exchange |
| Depositary Shares, each representing a 1/40th interest in a share of Bank of America Corporation 6.25% Non-cumulative Perpetual Preferred Stock, Series 7 | New York Stock Exchange |
| Depositary Shares, each representing a 1/1,200th interest in a share of Bank of America Corporation 8.625% Non-Cumulative Preferred Stock, Series 8 | New York Stock Exchange |
| 7.00% Trust Preferred Securities of Countrywide Capital IV (and the guarantees related thereto) | New York Stock Exchange |
| 7.00% Capital Securities of Countrywide Capital V (and the guarantees related thereto) | New York Stock Exchange |
| Capital Securities of BAC Capital Trust I (and the guarantee related thereto) | New York Stock Exchange |
| Capital Securities of BAC Capital Trust II (and the guarantee related thereto) | New York Stock Exchange |
| Capital Securities of BAC Capital Trust III (and the guarantee related thereto) | New York Stock Exchange |
| 5 7/8% Capital Securities of BAC Capital Trust IV (and the guarantee related thereto) | New York Stock Exchange |
| Capital Securities of BAC Capital Trust V (and the guarantee related thereto) | New York Stock Exchange |
| Capital Securities of BAC Capital Trust VIII (and the guarantee related thereto) | New York Stock Exchange |
| 6.0% Capital Securities of BAC Capital Trust X (and the guarantee related thereto) | New York Stock Exchange |
| 6 5/8% Capital Securities of BAC Capital Trust XII (and the guarantee related thereto) | New York Stock Exchange |
| Floating Rate Preferred Hybrid Income Term Securities of BAC Capital Trust XIII (and the guarantee related thereto) | New York Stock Exchange |
| 5.63% Fixed to Floating Rate Preferred Hybrid Income Term Securities of BAC Capital Trust XIV (and the guarantee related thereto) | New York Stock Exchange |

Table of Contents

of risk processes and business activities. Examples of tools, methods and processes used include: self-assessments conducted by the lines of business in concert with independent risk assessments by Governance and Control (part of "identify and measure"); a system of controls and supervision which provides assurance that associates act in accordance with laws, regulations, policies and procedures (part of "mitigate and control"); independent testing of control and mitigation plans by Credit Review and Corporate Audit (part of "monitor and test"); and a summary risk report which includes key risk metrics that measure the performance of the Corporation against risk limits and the Risk Appetite Statement (part of "report and review").

The formal processes used to manage risk represent only one portion of our overall risk management process. Corporate culture and the actions of our associates are also critical to effective risk management. Through our Code of Ethics, we set a high standard for our associates. The Code of Ethics provides a framework for all of our associates to conduct themselves with the highest integrity in the delivery of our products or services to our customers. We instill a risk-conscious culture through communications, training, policies, procedures, and organizational roles and responsibilities. Additionally, we continue to strengthen the linkage between the associate performance management process and individual compensation to encourage associates to work toward enterprise-wide risk goals.

## Board Oversight

The Board oversees management of the Corporation's businesses and affairs. In its oversight of the Corporation, the Board's goal is to set the tone for the highest ethical standards and performance of our management, associates and the Corporation as a whole. The Board strongly believes that good corporate governance practices are important for successful business performance. Our corporate governance practices are designed to align the interests of the Board and management with those of our stockholders and to promote honesty and integrity throughout the Corporation. Over the past year, we have enhanced our corporate governance practices in many important ways, and we continue to monitor best practices to promote a high level of performance from the Board, management and our associates. The Board has adopted Corporate Governance Guidelines that embody long-standing practices of the Corporation as well as current corporate governance best practices.

In 2009, the Board established a special Board committee with five non-management members (the "Special Governance Committee") to review and recommend changes in all aspects of the Board's activities. In recognition of the increased complexity of our company following the major acquisitions of Merrill Lynch and Countrywide, and the challenges of the current business environment, the Board has strengthened its membership by appointing new directors who are independent of management and demonstrate significant banking, financial and investment banking expertise. In addition, the Board has assessed and further developed its structures and processes through which it fulfills its oversight role by the following: modifying committee membership and leadership to best leverage the abilities and backgrounds of the Board members; recasting the Asset Quality Committee as a more targeted and focused Credit Committee and establishing the Enterprise Risk Committee such that these two committees, together with the Audit Committee, work in complement to ensure that key aspects of risk, capital and liquidity management are specifically overseen by committees with clear and affirmative oversight responsibilities set forth in their committee charters; working with management and outside regulatory experts to redesign

management reports to the Board and committees; periodically reviewing the composition of the Board in light of the Corporation's business and structure to identify and nominate director candidates who possess relevant experience, qualifications, attributes and skills to the Board; and enhancing the director orientation process to include, among other changes, increased interaction with executive management and increased focus on key risks.

At the Corporation, the Audit, Credit and Enterprise Risk Committees are charged with a majority of the risk oversight responsibilities on behalf of the Board. In 2009, as noted above, the Board recast the Asset Quality Committee as a more targeted and focused Credit Committee and established a new Enterprise Risk Committee. The Credit Committee oversees, among other things, the management of our credit exposures on an enterprise-wide basis, our response to trends affecting those exposures, the adequacy of the allowance for credit losses and our credit related policies. The Enterprise Risk Committee, among other things, oversees our management of and policies and procedures with respect to material risks on an enterprise-wide basis, including market risk, interest rate risk, liquidity risk and reputational risk. It also oversees our capital management and liquidity planning. The Audit Committee retains oversight responsibility for operational risk, the integrity of our consolidated financial statements, compliance, legal risk and overall policies and practices relating to risk management. In addition to the three risk oversight committees, the Compensation and Benefits Committee oversees the Corporation's compensation practices in order that they do not encourage unnecessary and excessive risk taking by our associates.

The Audit, Credit and Enterprise Risk Committees work in tandem to provide enterprise-wide oversight of the Corporation's management and handling of risk. Each of these three committees reports regularly to the Board on risk-related matters within its responsibilities and together this provides the Board with integrated insight about our management of strategic, credit, market, liquidity, compliance, operational and reputational risks.

Starting in 2009, the Board formalized its process of approving the Corporation's articulation of its risk appetite, which is used internally to help the directors and management understand more clearly the Corporation's tolerance for risk in each of the major risk categories, the way those risks are measured and the key controls available that influence the Corporation's level of risk-taking. The Board intends to undertake this process annually going forward. The Board also approves, at a high level, following proposal by management, the Corporation's framework for managing risk.

At meetings of the Board and the Audit, Credit and Enterprise Risk Committees, directors receive updates from management regarding enterprise risk management, including our performance against the identified risk appetite. The Chief Risk Officer, who is responsible for instituting risk management practices that are consistent with our overall business strategy and risk appetite, and the General Counsel, who manages legal risk, both report directly to the Chief Executive Officer and lead management's risk and legal risk discussions at Board and committee meetings. In addition, the Corporate General Auditor, who is responsible for assessing the company's control environment over significant financial, managerial, and operating information, is independent of management and reports directly to the Audit Committee. The Corporate General Auditor also administratively reports to our Chief Executive Officer. Outside of formal meetings, Board members have regular access to senior executives, including the Chief Risk Officer and the General Counsel.

Exhibit EE

EFiled:  Dec 17 2010  3:57PM EST
Transaction ID 34926521
Case No. 769-VCS

## IN COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC. CONSOLIDATED DERIVATIVE LITIGATION | Civil Action No.  769-VCS |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR APPROVAL OF SETTLEMENT AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Peter C. Harrar
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

*Co-Lead Counsel for Plaintiffs*

GRANT & EISENHOFER P.A.
Stuart M. Grant (Del. I.D. 2526)
Megan D. McIntyre (Del. I.D. 3307)
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100

*Co-Lead Counsel for Plaintiffs*

## PRELIMINARY STATEMENT

Plaintiffs Teachers' Retirement System of Louisiana and City of New Orleans Employees' Retirement System (together, "Plaintiffs") respectfully submit this memorandum in support of: (1) approval pursuant to Court of Chancery Rule 23.1 of the settlement ("Settlement") of this shareholder derivative action (the "Action") on the terms set forth in the Agreement that was filed with the Court on August 26, 2010 (the "Settlement Agreement"); and (2) an award of attorneys' fees and expenses to Plaintiffs' counsel, Grant & Eisenhofer P.A. ("G&E") and Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") (together, "Lead Counsel").

This Action was brought derivatively on behalf of American International Group, Inc. ("AIG") to recover the damages suffered by AIG as a result of various fraudulent schemes engaged in by certain AIG officers, directors and employees, acting in concert with Marsh & McLennan Companies, Inc. ("Marsh"), General Reinsurance Corp. ("Gen Re") and ACE Ltd. ("ACE"). After over five years of litigation, Plaintiffs have negotiated a very favorable Settlement with the defendants who are current or former officers, directors or employees of AIG (the "D&O Defendants"),[1] whereby AIG will

---

[1] In addition to this Action, the Settlement will resolve similar shareholder derivative actions that are pending in the U.S. District Court for the Southern District of New York, and in New York state court. Accordingly, although the only remaining defendants in this Action are Maurice Greenberg, Howard Smith, Edward Matthews and Thomas Tizzio, the term "D&O Defendants" refers to a broader group that also includes the following individuals who are defendants in one or more of the New York actions: Vincent Cantwell, Michael Castelli, Carols Coello, Robert Jacobson, Christian Milton, John Mohs, L. Michael Murphy, Karen Radke, Martin Sullivan, Jean-Baptist Tateossian, Joseph Umansky, Bernard Aidinoff, Steven Bensinger, Marshall Cohen, William Dooley, Martin Feldstein, Ellen Futter, Stephen Hammerman, Richard Holbrooke, George Miles, Kristian Moor, Win Neuger, Edmund Tse, Jay Wintrob and Frank Zarb.

receive a cash recovery of $90 million, less attorneys' fees and expenses.  The Settlement also resolves the outstanding disputes between and among AIG, the D&O Defendants, and their insurance carriers.  AIG is a signatory to the Settlement Agreement, and supports the Settlement.

Plaintiffs respectfully submit that the proposed Settlement is fair, adequate, and in the best interests of AIG and AIG's public shareholders.  Additionally, Lead Counsel respectfully request an award of $20,250,000 in attorneys' fees (22.5% of the Settlement amount) as compensation for the substantial benefits achieved in the Action, and reimbursement of $819,367.82 in litigation expenses, to be paid from the Settlement fund.  AIG and the D&O Defendants have agreed not to object to an award of attorneys' fees and expenses in these amounts, and Plaintiffs submit that these amounts are fair and in accordance with the precedents of this Court in similar situations.

**STATEMENT OF FACTS**

## HISTORY OF THE ACTION

On October 21, 2004, a shareholder derivative complaint captioned *John Paul Fulco, Trustee f/b/o Lucia Forastiere Irrevocable June Forastiere Backe Children's Trust v. Greenberg et al.* was filed in this Court.  This complaint was followed by two additional shareholder derivative complaints, captioned *Jerome Kaplan, Trustee, Trust of Edith J. Kaplan v. Greenberg et al.* and *Paula Rosen v. Greenberg et al.*, filed on October 22, 2004 and November 4, 2004, respectively.  On December 7, 2004, the Court consolidated these three cases under the caption *American International Group, Inc. Consolidated Derivative Litigation*, C.A. No. 769-VCS, and a consolidated complaint

2

was filed on February 22, 2005.  *See* Affidavit of Peter C. Harrar in Support of Petition for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Harrar Aff."), ¶ 4.  The  consolidated complaint alleged, *inter alia*, that certain AIG officers and employees had breached their fiduciary duties by causing AIG to participate in illegal bid-rigging and kickback schemes with Marsh.  *See* Affidavit of Megan D. McIntyre in Support of Plaintiffs' Motion for Approval of Settlement and an Award of Attorneys' Fees and Costs ("McIntyre Aff."), ¶ 4.

In April 2005, two additional shareholder derivative actions were filed on behalf of AIG, alleging that certain AIG officers and directors had breached their fiduciary duties by causing AIG to enter into a sham reinsurance transaction with Gen Re, as well as other transactions that were structured for the purpose of deceiving investors about AIG's business and financial condition.  *See* McIntyre Aff. ¶ 5; Harrar Aff. ¶ 5.

On May 17, 2005, the Teachers' Retirement System of Louisiana ("TRSL") filed an amendment to an existing complaint in a separate action that had been filed in 2002, captioned *Teachers Retirement System of Louisiana v. Aidinoff, et al*., C.A. No. 20106 (Del. Ch.).  This amended complaint expanded the scope of the claims alleged in TRSL's 2002 complaint to include the years 2002, 2003, 2004 and 2005 and to include claims relating to the Marsh bid-rigging and kickback schemes.   McIntyre Aff. ¶ 6. Additionally, the amended complaint alleged that AIG officers and directors had breached their fiduciary duties by causing AIG to enter into a sham reinsurance transaction with Gen Re, and to engage in accounting fraud and other unlawful conduct. *Id*.

Exhibit FF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PFIZER INC. SHAREHOLDER
DERIVATIVE LITIGATION

No. 09-CV-7822 (JSR)

ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT AND AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
Mark Lebovitch, Esq.
David L. Wales, Esq.
Beata Gocyk Farber, Esq.
Jeroen van Kwawegen, Esq.
Jonathan D. Uslaner, Esq.
Kristin Ann Meister, Esq.
1285 Avenue of the Americas
New York, NY  10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444

*Court-Appointed Lead Derivative Counsel*

educate itself about and take action to address the types of problematic conduct that gave rise to this Action. The Settlement also creates one of the largest cash payments ever in a shareholder derivative suit – $75 million. The Settlement segregates those funds in a unique (we believe unprecedented) trust structure that will ensure this significant sum of money is used solely to support the valuable corporate governance changes required by the Settlement, thus insulating the Committee and its activities from internal budgetary or other pressures.

The substantial benefits of the Settlement are further detailed in the accompanying affidavit of Columbia Law Professor Jeffrey Gordon, a noted expert on corporate governance and an architect of the corporate governance program in the Settlement.[1] The unique nature of the Settlement is also highlighted in the affidavits in support of preliminary approval of the Settlement submitted by Harvey Pitt and Richard Breeden, two former Chairmen of the United States Securities and Exchange Commission ("SEC"), and testifying experts for the Defendants.

Plaintiffs alleged in the Amended Verified Derivative Complaint (the "Complaint") that the Company's board of directors (the "Board") and certain senior officers (the "Executive Defendants") breached their fiduciary duties over a period of years by disregarding, if not fostering, widespread unlawful drug promotional practices. The action originated with the September 2009 announcement that Pfizer agreed to have a subsidiary plead guilty to a felony, and to pay the largest criminal fine in U.S. history and the largest civil fraud settlement involving any pharmaceutical company to resolve investigations into alleged improper marketing practices with respect to numerous drugs over a period of years.

Plaintiffs were concerned that future violations of drug promotion laws could result in federal debarment of Pfizer. This would wipe out a substantial percentage of Pfizer's revenues

---

[1]    The Affidavit of Jeffrey Gordon dated February 7, 2011 is cited herein as "Gordon Aff."

and would be ruinous for Pfizer's shareholders. One of Plaintiffs' core objectives in this Action was to ensure that the Defendants (and future Pfizer directors and officers) would never consider Pfizer's payment of criminal fines as a mere cost of doing business but, instead, would take the appropriate steps to prevent similar drug marketing violations from occurring in the future.

Defendants fought Plaintiffs every step of the way. Defendants were represented by two of the best known defense attorneys in the United States – Robert Fiske, Jr., a senior partner of Davis Polk & Wardwell and Dennis Block, a senior partner of Cadwalader Wickersham & Taft, both of whom were deeply involved in the case on a day-to-day basis. Defendants – a blue chip Board that includes a Nobel laureate, the chief of medical services at Massachusetts General Hospital, a former majority whip in Congress and numerous chief executives of other prominent public companies – used every tool at their formidable disposal to oppose Plaintiffs' efforts.

The parties to this day dispute which version of events is the truth, as this Court witnessed at the preliminary approval hearing. Plaintiffs insisted that Defendants willfully ignored a stream of "red flags," including internal healthcare compliance audit reports, whistleblower complaints, and letters from the FDA warning of widespread illegal marketing of Pfizer pharmaceuticals. Meanwhile, Defendants insisted that they always acted in good faith and took appropriate actions to address allegations of off-label marketing of Pfizer's drugs, and that any misconduct was the work of rogue employees. They further insisted that the Board reasonably relied on the Audit Committee, the General Counsel and Chief Compliance Officer to address isolated instances of wrongdoing, and that certain admitted problems were mere "legacy matters" – instances of misconduct by subsidiaries that occurred before Pfizer acquired them.

Besides litigating on a demanding schedule and under the shadow of a rarely, if ever, satisfied Delaware legal standard for proving disloyalty claims, Plaintiffs fought to overcome

Exhibit GG

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                        :
IN RE BANK OF AMERICA CORP.         :
SECURITIES, DERIVATIVE, AND        :
EMPLOYMENT RETIREMENT INCOME   :     Master File No. 09 MDL 2058 (PKC)
SECURITY ACT (ERISA) LITIGATION    :
                        :
-----------------------------------------------------------x
                        :
THIS DOCUMENT RELATES TO       :
                        :
All Derivative Actions              :
                        :
-----------------------------------------------------------x

## <u>DECLARATION OF LAYN R. PHILLIPS</u>

I, Layn R. Phillips, declare as follows:

1.    I submit this Declaration in my capacity as the mediator in connection with the settlement reached between Lead Plaintiffs and Defendants in the Consolidated Derivative Actions as embodied in the April 12, 2012 Memorandum of Understanding.

2.    I am a former United States District Court Judge, currently employed as a partner with the firm of Irell & Manella LLP, where I founded and chair the firm's Alternative Dispute Resolution Center. I am a member of the bars of Oklahoma, Texas, California and the District of Columbia, as well as the United States Courts of Appeals for the Ninth and Tenth Circuits and the Federal Circuit.

3.    While serving as a United States Attorney, I personally tried many cases and oversaw the trials of numerous other cases before I was nominated by President Reagan to serve as a United States District Judge in the Western District of Oklahoma. During my judicial tenure, I presided over trials in all three districts of Oklahoma, and sat by designation on the United States Court of Appeals for the Tenth Circuit. I also presided over cases in federal

districts in Texas, New Mexico and Colorado. While on the bench, I presided over a total of more than 140 trials. I left the bench in 1991, and joined Irell & Manella shortly thereafter.

4.     In addition to litigating, I devote a considerable amount of my professional time to service as a mediator and arbitrator in connection with large, complex cases such as this. I have successfully mediated numerous complex commercial cases, including dozens of securities class action cases. Due to my efforts as a mediator, I have been nationally recognized by the International Institute for Conflict Prevention and Resolution ("IICPR"). I also serve on the IICPR's National Panel of Distinguished Neutrals. I am also a Fellow in the American College of Trial Lawyers.

5.     On August 18, 2010, Lead Counsel of Saxena White PA and Kahn, Swick & Foti, LLC engaged in a private caucus session with me in Chicago, Illinois. During this session, we preliminarily discussed the terms upon which the case might be settled, other considerations relating to any possible settlement and the merits of the case. In late July 2011, I spoke again with Lead Counsel, who provided me with an update of what had happened since the private caucus session.

6.     In late February 2012, Lead Counsel and Defendants' Counsel contacted me to request my assistance in mediating this case. A mediation session was scheduled on February 29, 2012 in New York. Having mediated other cases with Saxena White, Kahn Swick & Foti and Davis Polk & Wardwell, I had seen first-hand the professional advocacy these experienced securities litigators were capable of, and I anticipated (and expected) that both sides would present their positions clearly, concisely and accurately. In advance of this session, counsel submitted detailed, comprehensive mediation statements.

7.    Based on my review of counsels' respective mediation statements, it was clear to me that counsel were well-versed in the relative merits of their claims and defenses, and in the evidence and theories that supported each side's position.  It was also apparent that there was a significant gap between the parties' respective monetary settlement positions and that achieving a settlement would be difficult.

8.    During the mediation session, I engaged in numerous discussions with Lead Counsel, Defendants' Counsel, and representatives of its D&O insurance carriers in an effort to find common ground between the parties' positions.

9.    The parties made progress at this mediation session but could not agree on a monetary contribution amount despite my efforts.  After a few weeks of continued discussions with Lead Counsel and Defendants' Counsel, the parties remained at an impasse.  At this point, in an effort to overcome the difference between the parties' respective positions, I issued a mediator's proposal containing key terms and conditions, including a $20 million monetary component.  On March 29, 2012, the parties accepted my proposal. In my experience, it is rare that a D&O insurance carrier agrees to pay money to the nominal defendant in a derivative action as they did here.

10.    The settlement negotiations were conducted at arm's length, in good faith, free of collusion, and did not involve any discussion of Lead Counsel's fees.  I was personally involved in the exchange of offers to compromise by both sides and saw no evidence of a "reverse auction."

Dated:  April 27, 2012

Layn R. Phillips

Exhibit HH



GRANTED

EFiled: May 9 2012 11:49AM EDT
Transaction ID 44149537
Case No. 4307-CS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **IN RE BANK OF AMERICA** | : | |
| **CORPORATION STOCKHOLDER** | : | C.A. No. 4307-CS |
| **DERIVATIVE LITIGATION** | : | |

### [PROPOSED] ORDER

WHEREAS, on April 13, 2012, Plaintiffs filed a Motion for Injunctive Relief and Expedited Discovery;

WHEREAS, on April 19, 2012, the Individual Defendants filed a Cross-Motion to Stay Litigation;

WHEREAS, after briefing, on May 4, 2012, a hearing was held on the motions.

NOW THEREFORE, the Court, having considered the briefs on Plaintiffs' Motion for Injunctive Relief and Expedited Discovery and the Individual Defendants' Cross-Motion to Stay Litigation and for the reasons stated by the Court at the May 4, 2012 hearing,

IT IS HEREBY ORDERED this _____ day of _____, 2012, that:

1. Plaintiffs' Motion for Injunctive Relief and Expedited Discovery is **DENIED.**

2. The Individual Defendants' Cross-Motion to Stay Litigation is **GRANTED.**

_____
Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 44104011 |
| **Current Date:** | May 09, 2012 |
| **Case Number:** | 4307-CS |
| **Case Name:** | CONF ORD CONS W4310 4314 4316 4356 4389 VCS In re: Bank Of America Corp Stockholder Derivative Litigation |
| **Court Authorizer:** | Leo E Strine |

**/s/ Judge Leo E Strine**

Exhibit II

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE BANK OF AMERICA CORPORATION STOCKHOLDER DERIVATIVE LITIGATION | : : : : : : | C.A. No. 4307-CS<br><br>REDACTED VERSION --<br>FILED APRIL 25, 2012 |

## INDIVIDUAL DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:
Lawrence Portnoy
Charles S. Duggan
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

Daniel A. Dreisbach (#2583)
Lisa A. Schmidt (#3019)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for the Individual Defendants*

Dated:  April 20, 2012

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

    A.    Parties to the Action ............................................................................. 4

    B.    BAC's Long-Standing Desire To Acquire Merrill ................................... 4

    C.    BAC Board Seizes Possibly Fleeting Opportunity
        To Acquire Merrill .............................................................................. 6

    D.    The Proxy Solicitation for Approval of the Share Issuance ..................... 9

    E.    Merrill and BAC Issue Third Quarter Form 10-Qs ................................ 10

    F.    Merrill's Interim and Forecasted Losses for the
        Fourth Quarter .................................................................................. 12

    G.    BAC Stockholders Approve the Merger ................................................ 17

    H.    The December 9 Regular Board Meeting ............................................... 17

    I.    BAC Considers Invoking MAC Clause ................................................. 18

    J.    The Merger Closes ............................................................................. 22

    K.    BAC's and Merrill's Fourth Quarter Results and the
        Proposed Government Assistance ......................................................... 22

    L.    The Success of the Acquisition to Date ................................................ 22

ARGUMENT ..................................................................................................... 23

I.    APPLICABLE LEGAL STANDARD ............................................................. 23

II.    THERE IS NO EVIDENCE THAT DEFENDANTS WITHHELD ANY
    INFORMATION PRIOR TO THE STOCKHOLDER VOTE IN BAD
    FAITH ......................................................................................................... 24

    A.    Defendants Did Not Withhold Information Regarding
        Merrill's Forecasted Fourth Quarter Losses in Bad Faith ....................... 25

        1.    Outside Directors ...................................................................... 25

2.       Mr. Lewis .................................................................................. 30

B.       Defendants Did Not Withhold Information About the Bonus
Cap in Bad Faith ......................................................................... 32

III.    THERE IS NO EVIDENCE THAT DEFENDANTS WITHHELD ANY
INFORMATION AFTER THE STOCKHOLDER VOTE IN BAD FAITH ....... 35

A.       Post-Vote Interim and Forecasted Losses .................................. 37

B.       BAC's Consideration of Asserting a MAC .............................. 38

C.       BAC's Discussions with Regulators ......................................... 39

IV.     THERE IS NO EVIDENCE THAT DEFENDANTS ACTED
DISLOYALLY BY NOT INVOKING THE MAC CLAUSE OR
SEEKING TO RENEGOTIATE ....................................................... 40

A.       There Is No Evidence That the Threat To Remove Management and
the Board Inappropriately Influenced Any of the Defendants ................. 40

B.       The Decision Not To Invoke the MAC Clause Was Based on
Legitimate Business Considerations ......................................... 43

C.       Renegotiation Was Not Seen as a Viable Option ..................... 45

V.      THERE IS NO EVIDENCE THAT DEFENDANTS COMMITTED
WASTE .......................................................................................... 47

CONCLUSION ................................................................................. 48

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

<u>PAGE</u>

*In re 3Com S'holders Litig.*,
    2009 WL 5173804 (Del. Ch. Dec. 18, 2009).............................................................35

*In re Anderson, Clayton S'holders Litig.*,
    519 A.2d 680 (Del. Ch. 1986)....................................................................27, 34

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
    650 A.2d 1270 (Del. 1994) ......................................................................29

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................37, 38

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ........................................................................47

*Burkhart v. Davies*,
    602 A.2d 56 (Del. 1991) ..........................................................................24

*Frank v. Arnelle*,
    1998 WL 668649 (Del. Ch. Sept. 16, 1998),
    *aff'd*, 725 A.2d 441 (Del. 1999)................................................................24

*Goodwin v. Live Entm't, Inc.*,
    1999 WL 64265 (Del. Ch. Jan. 25, 1999),
    *aff'd*, 741 A.2d 16 (Del. 1999) (TABLE) ............................................. *passim*

*Howard v. SEC*,
    376 F.3d 1136 (D.C. Cir. 2004).................................................................31

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) ........................................................................24

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ............................................................................36

*McMillan v. Intercargo Corp.*,
    768 A.2d 492 (Del. Ch. 2000)...............................................................29, 31

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
    854 A.2d 121 (Del. Ch. 2004)...................................................................36

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002)............................................................................42

*In re S. Peru Copper Corp. S'holder Derivative Litig.*,
    C.A. No. 961-VCS (Del. Ch. Dec. 21, 2010) (TRANSCRIPT) ...............................47

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ...........................................................................32

*In re Transkaryotic Therapies, Inc.*,
    954 A.2d 346 (Del. Ch. 2008)..................................................................23, 36

*In re W. Nat'l Corp. S'holders Litig.*,
    2000 WL 710192 (Del. Ch. May 22, 2000).............................................. 23-24

*In re Walt Disney Co. Derivative Litig.*,
    731 A.2d 342 (Del. Ch. 1998), *rev'd in part*
    *on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ...................42

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) .............................................................................24

STATUTES & RULES

8 *Del. C.* § 102(b)(7)........................................................................................24

8 *Del. C.* § 141(e)............................................................................................31

Ct. Ch. R. 56(c)...............................................................................................23

OTHER AUTHORITIES

69 Fed. Reg. 15594 (Mar. 25, 2004)................................................................38

Defendants William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward (the "Outside Directors") and Kenneth D. Lewis (together with the Outside Directors, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment on all claims in the Verified Consolidated Amended Derivative Complaint, dated May 8, 2009 ("Complaint" or "Compl.").

## **INTRODUCTION**

In mid-September 2008, during a period of unprecedented financial turmoil, the Bank of America Corporation ("BAC") board of directors (the "Board") made a considered business judgment to acquire Merrill Lynch & Co., Inc. ("Merrill"), one of the world's foremost financial institutions and a leading brokerage and investment firm, in a stock-for-stock merger (the "Merger").  No member of the Board had any personal interest in the transaction not shared by all BAC stockholders.

Plaintiffs here charge that the Court should hold Defendants personally liable in money damages for alleged omissions in the Merger proxy (the "Proxy") and for not taking action to prevent the Merger from closing.  Count I of the Complaint asserts that Defendants breached their duty of loyalty by (1) not disclosing Merrill's forecasted losses for the fourth quarter of 2008, its ability to pay up to $5.8 billion in bonuses for 2008 and certain events occurring after the vote; and (2) not terminating the merger agreement pursuant to its material adverse effect ("MAC") clause or seeking to renegotiate its terms.  Compl. ¶¶ 24, 157-60.[1]  Count II charges

---

[1] The Complaint asserts that Defendants also breached their duty of loyalty by agreeing to acquire Merrill after "only 31 hours of due diligence," *id.*, but Plaintiffs have apparently abandoned any such claim.  *See* Ex. 92 at 71:6-10 (Tr. of Argument and Ruling on Motion to

that Defendants committed waste by permitting BAC to issue shares in exchange for Merrill shares to effectuate the Merger.  Compl. ¶¶ 161-64.

On October 12, 2009, the Court denied Defendants' motion to dismiss, based on the Complaint's allegations that the Board "knew that the situation had materially deteriorated at Merrill . . . before the stockholder vote" and consciously decided not to disclose that information to stockholders.  Ex. 92 at 118:12-119:15 (10/12/09 Hr'g Tr.).  The Court noted, however, that establishing liability for the alleged non-disclosures would be "difficult."  *Id.* at 121:16-21; *see also id.* at 79:19-80:11 (Plaintiffs face a "pretty high hurdle").  As to the claim that Defendants breached their duty of loyalty by proceeding with the Merger, the Court could not rule out that "[e]ntrenchment" and "circle-the-wagons" motives animated the Board's decision.  *Id.* at 121:22-122:16, 126:4-16.  The Court again cautioned, however, that Plaintiffs had "a very difficult case to prove," because there were other "perfectly proper" motivations "in the mix."  *Id.* at 125:9-13.

In the two-and-a-half years since the Court's ruling, Plaintiffs have received nearly 3 million pages of documents, including over 100 transcripts of testimony taken in the course of prior governmental investigations into the Merger.  Plaintiffs themselves have taken almost 50 depositions, with many witnesses testifying for the second, third or fourth time.  Yet after all this discovery, there is no evidence that creates a triable issue of fact as to any of Plaintiffs' claims.

First, there are no facts that create a genuine issue as to whether Defendants decided in bad faith not to disclose information to stockholders.  The Outside Directors never received a specific forecast of Merrill's fourth quarter losses prior to the stockholder vote, or any information that they believed to be material and decided in bad faith not to disclose.  Although

---

Dismiss (Oct. 12, 2009) ("10/12/09 Hr'g Tr.")); *see also id.* at 4:23-5:1 (Court remarking that exculpatory provision in BAC Certificate of Incorporation "blows that [claim] out").

References to "Ex. __" are to the documents attached as exhibits to the Transmittal Affidavit of Lisa A. Schmidt, filed herewith.

Mr. Lewis was apprised of certain loss forecasts prior to the stockholder vote, there is no evidence that he withheld this information in bad faith.  To the contrary, he was specifically told by his CFO that legal counsel had advised that no supplemental disclosure was required, and he had no basis to second guess that advice.

Nor is there any evidence of bad faith concerning the alleged non-disclosure of Merrill's authority to pay up to $5.8 billion in 2008 bonuses (the "Bonus Cap"), which was documented in a confidential schedule to the Merger Agreement.  Defendants delegated the task of preparing the Proxy to appropriate BAC officers, to be assisted by inside and outside counsel.  Counsel made the decision that the Bonus Cap did not need to be disclosed in the public portion of the Merger Agreement.  There is no evidence that the Outside Directors were even aware of the Bonus Cap, or that any Defendant had any reason to question the judgment of experienced counsel.

There is likewise no evidence of bad faith non-disclosure of the post-vote events identified by Plaintiffs.  There was no duty to disclose any such information after the stockholder vote, nor was any statement in the Proxy rendered false by subsequent events.

Second, there is no evidence that Defendants breached their duty of loyalty in deciding against invoking the MAC clause to terminate the Merger.  Plaintiffs' allegation that Defendants decided against invoking the MAC clause "to preserve their positions within BAC in the fac[e] of a threat of removal by the government," Compl. ¶ 155, is unsupported.  To a person, Defendants testified unequivocally that such considerations played no role in the directors' decision-making.  The uncontroverted evidence shows that, to the contrary, the Board's decision was based entirely on legitimate business considerations.

Finally, there is no genuine dispute that BAC issued shares in the Merger for a corporate purpose and in exchange for consideration, and thus no basis for Plaintiffs' claim of waste.

## STATEMENT OF FACTS

### A.    Parties to the Action

Plaintiffs are two BAC stockholders who own approximately 9,642 BAC shares.[2]  Ex. 33 at 12:24-13:6 (Houx Dep.); Ex. 40 at 113:3-13 (Rothbaum Dep.); Compl. ¶¶ 27, 32.[3]

Defendants are BAC's fifteen Outside Directors during the relevant period and then-Chairman and CEO, Mr. Lewis.  Defendants have distinguished backgrounds in business, government or academia, and a majority have served as directors of other public companies, including CBS, CVS/Caremark, Disney, FleetBoston, Liberty Mutual, Lowe's, McDonald's, MBNA, NSTAR, SYSCO, Sun MicroSystems and Yum! Brands.  *See* Ex. 59 at 15-17 (BAC 2008 Annual Proxy).  Several have served as CEOs of public companies, including Mr. Ryan (CVS/Caremark), Mr. Gifford (FleetBoston), Mr. Countryman (Liberty Mutual) and Mr. Tillman (Lowe's), *see id.*, and several have substantial experience in the financial services industry, with their entire careers in banking, *see* Ex. 8 at 23:11-15 (Lewis Dep.); Ex. 2 at 30:24-31:2 (Bramble Dep.); Ex. 6 at 22:13-16 (Gifford Dep.).

### B.    BAC's Long-Standing Desire To Acquire Merrill

For many years, even before Mr. Lewis's tenure as Chairman and CEO, BAC had sought to acquire an investment bank and considered Merrill the prime target.  *See, e.g.*, Ex. 20 at 13:20-14:11 (Tillman Dep.) (BAC "had been looking at Merrill Lynch over the last 10 or 12 years").

---

[2] Four of the six named Plaintiffs, Compl. ¶¶ 27-32, have been voluntarily dismissed.  Ex. 94.

[3] "Dep." refers to testimony in this Action.  "SDNY Dep." refers to testimony in the parallel consolidated class and derivative actions pending in New York federal court.  "Coord. Dep." refers to testimony under a joint caption in both this Action and the parallel Merger-related actions pending in New York federal court.  "SEC Dep." refers to testimony in the action styled *SEC v. Bank of America Corp.*, 09-CV-6829 (S.D.N.Y.).  "NYAG Dep." refers to testimony taken by the Office of the New York Attorney General.

Indeed, Mr. Lewis's predecessor, Hugh McColl, had remarked in 1998 that an acquisition of

Merrill by BAC would create "the perfect bank."  Ex. 18 at 29:21-30:19 (Sloan Dep.).

The strategic rationale for adding Merrill was "obvious."  *Id.* at 31:14-32:5.  It had global

reach and industry-leading positions in wealth management and investment banking, which

presented opportunities for revenue diversification and cross-selling.  Ex. 42 at BAC-ML-

NYAG70288214; Ex. 43 at UR-BAC-ML-NYAG00003748.  Its "retail trading platform, the

thundering herd [Merrill's roughly 16,000 financial advisors], global reach, [and] more than a

trillion dollars in represented asset holdings" made it "a virtual perfect match" for BAC.  Ex. 5 at

56:22-57:5 (Franks Dep.); *see also* Ex. 2 at 100:11-101:11 (Bramble Dep.) ("synergistic

potential" of BAC and Merrill made it a "powerful combination"); Ex. 21 at 167:14-168:4 (Ward

Dep.) (Merger offered new markets, ability for growth in retail and wealth management and

"access to talent" that would have taken a "very long time" to develop organically).

Historically, "Merrill always was too expensive to acquire."  Ex. 13 at 90:22-92:13 (May

Dep.).[4]  In the fall of 2008, however, with the collapse of Bear Stearns and amidst concerns

about Lehman Brothers, Ex. 66 at 49 (Proxy); Compl. ¶¶ 57-58, Merrill's stock price had fallen

dramatically, making an acquisition feasible.  *See* Ex. 13 at 92:6-13 (May Dep.) (Merrill's stock

had "taken a big hit in relation to ours"); Ex. 64 at FPK0005930 (historical exchange ratio

analysis); Ex. 66 at 49, 68 (Proxy).  Indeed, in the week ending September 13, 2008, Merrill's

stock price fell approximately 36%.  Ex. 66 at 49 (Proxy).

---

[4] In late 2007, Mr. Lewis had discussed a combination with Merrill's then-CEO, Ex. 8 at
30:1-31:9 (Lewis Dep.), and the price range was "a whole lot higher" than what was agreed in
September 2008.  Ex. 18 at 30:20-31:13 (Sloan Dep.); *see also* Ex. 25 at 77:13-78:16 (Curl.
Coord. Dep.) (the "price was just, frankly, way too expensive").

C.      **BAC Board Seizes Possibly Fleeting Opportunity To Acquire Merrill**

On the evening of Sunday, September 14, 2008, the Board held a special telephonic

meeting to consider a potential acquisition of Merrill.  Mr. Lewis informed the Board that John

Thain, Merrill's CEO, had contacted him the prior day about a potential transaction, given

concerns in view of Lehman's likely bankruptcy about distressed conditions in the financial

services industry.  Ex. 43 at UR-BAC-ML-NYAG00003748; Ex. 66 at 49 (Proxy).  A BAC due

diligence team had met with their Merrill counterparts throughout the night and into the next day,

which led to negotiations over a potential transaction.  Ex. 66 at 49-50 (Proxy); Ex. 43 at UR-

BAC-ML-NYAG00003748.  The parties had reached an agreement to present to their respective

boards a proposed stock-for-stock transaction in which BAC would acquire all of Merrill's

common stock based on a fixed exchange ratio of 0.8595, which equated to a price of $29 per

Merrill share based on BAC's September 12, 2008 closing price.  *See* Ex. 66 at 50 (Proxy).[5]

During the September 14 special meeting, Defendants reviewed the potential acquisition

with BAC management and its financial and legal advisors.  Ex. 66 at 50-51 (Proxy); Ex. 43 at

UR-BAC-ML-NYAG00003747-52.  The discussion was "robust."  Ex. 1 at 50:25-51:8 (Barnet

Dep.).  As related by BAC's then-Corporate Secretary, Alice Herald, Defendants analyzed the

opportunity "in a very detailed . . . calm and deliberative fashion.  There was a lot of give and

take, . . . question and answer to try to reach a conclusion."  Ex. 32 at 83:25-84:17 (Herald Dep.).

BAC's financial advisors, J.C. Flowers & Co. LLC ("JCF") and Fox-Pitt Kelton Cochran

Caronia Waller (USA) LLC ("FPK"), reviewed with the Board "the details and types of

analysis" they conducted.  Ex. 43 at UR-BAC-ML-NYAG00003751; *see also* Ex. 13 at 136:11-

138:21 (May Dep.); Ex. 60 at UR-BAC-DIR-DE00001326 (notes of Mr. May).  The financial

---

[5] Merrill had sought a price in "the 30's."  Ex. 27 at 117:8-119:25 (Fleming Dep.).  When
BAC "drew a line in the sand" at $29 per share, Mr. Thain was reluctant to agree, but ultimately
relented.  *Id.* at 125:17-128:14.

advisors opined orally that the consideration to be exchanged by BAC was fair from a financial point of view to BAC and its stockholders.  Ex. 66 at 51 (Proxy).  Based on the exchange ratio of 0.8595 and BAC's most recent closing price, the value of BAC stock to be exchanged was approximately $50 billion.  *See* Ex. 42 at BAC-ML-NYAG70288213; Ex. 66 at 50 (Proxy).  Christopher Flowers of JCF advised, however, that the key consideration in a stock-for-stock transaction was "relative value," rather than the dollar value.  Ex. 29 at 91:11-24 (Flowers Dep.).

The Board discussed and questioned the adequacy of the due diligence, particularly given the condensed time frame in which the opportunity had been evaluated.  Ex. 43 at UR-BAC-ML-NYAG00003749; *see also, e.g.*, Ex. 5 at 42:16-25 (Franks Dep.) (directors "asked very pointed questions" of management, given "the compression of the due diligence period"); Ex. 7 at 76:21-77:8 (Gifford SDNY Dep.) (testifying that, given the "short period of due diligence," he had questioned whether BAC had "a good enough understanding of the quality of . . . those assets so that the financial transaction would make sense for our shareholders").

The Board concluded that the diligence was appropriate and adequate, notwithstanding the timing.  BAC's experienced due diligence team included more than 45 professionals, Ex. 42 at BAC-ML-NYAG70288220, and the Board was confident in their ability to conduct due diligence quickly.  Ex. 2 at 109:11-18 (Bramble Dep.) (testifying that BAC had "a stellar record of acquisitions and a very experienced management team"); Ex. 6 at 268:23-269:6 (Gifford Dep.) (BAC's acquisition team was "perhaps the most experienced" of "any financial institution in the country"); Ex. 17 at 42:18-43:2 (Ryan Dep.) (team "knew what to look for, where to look and what rocks to look under"); Ex. 25 at 60:3-8, 60:25-61:6 (Curl Coord. Dep.) (BAC had previously undertaken due diligence over the course of a weekend in a transaction of this

size).[6]  Moreover, BAC was familiar with Merrill's business, as a competitor and from having

long regarded it as an acquisition target.  *See* Ex. 17 at 62:5-24 (Ryan Dep.) ("[W]e had followed

this company.  We had public information.  It wasn't like we were starting out cold."); Ex. 8 at

95:13-18 (Lewis Dep.) (given business dealings, BAC had "a lot of knowledge" about Merrill);

Ex. 25 at 58:21-59:9 (Curl Coord. Dep.).[7]  In addition, JCF had itself conducted a "considerable

amount" of due diligence on Merrill in or around December 2007.  Ex. 25 at 60:14-18 (Curl

Coord. Dep.); *see also* Ex. 29 at 54:21-55:11 (Flowers Dep.); Ex. 43 at UR-BAC-ML-

NYAG00003748-49.  JCF told the Board that being familiar with Merrill's assets had enabled it

to update its information in a relatively brief period.  *See, e.g.*, Ex. 13 at 99:24-100:18 (May

Dep.); Ex. 17 at 61:20-62:24 (Ryan Dep.).  According to JCF, Merrill appeared to have made

substantial strides since late 2007 in reducing the "toxic assets" on its books.  *See, e.g.*, Ex. 8 at

96:1-14 (Lewis Dep.).[8]

Among other considerations, the Board "weighed the pros and cons of waiting until

later."  Ex. 3 at 55:9-56:6 (Collins Dep.); *see also, e.g.*, Ex. 21 at 106:6-20 (Ward Dep.) (Board

"fully vetted" whether to wait).  Directors questioned whether, if they waited, BAC might be

able to buy Merrill for less, *see* Ex. 11 at 63:9-18, 64:23-65:7 (Lozano Dep.), and Mr. Flowers

explained the "uncertainties and risks of postponing a decision," Ex. 43 at UR-BAC-ML-

---

[6] After a similarly short diligence period, BAC's diligence team had recently decided against pursuing a merger with Lehman Brothers.  *See* Ex. 8 at 43:11-44:17, 47:11-48:13 (Lewis Dep.).

[7] Defendants also understood that BAC had "similar assets" on its books, Ex. 7 at 71:3-22 (Gifford SDNY Dep.), and took comfort from having been informed that BAC and Merrill had both marked these assets similarly, *i.e.*, "conservatively."  Ex. 5 at 67:20-69:1 (Franks Dep.); *see also, e.g.*, Ex. 3 at 76:8-25 (Collins Dep.) (same).

[8] In late 2007, based on its due diligence, JCF offered to make a cash investment in Merrill valued around $40 per share, but Merrill ultimately found investors willing to pay more.  Ex. 29 at 55:21-56:20 (Flowers Dep.).  Notably, at that time, JCF was willing to pay substantially more than BAC agreed to pay just 8.5 months later, despite the fact that JCF, unlike BAC, was contemplating a minority investment and thus could not capitalize on the "substantial synergies and business benefits from combining the two firms."  *Id.* at 90:20-91:10.

NYAG00003750.  Waiting would risk losing Merrill to a third party or a possible Merrill

bankruptcy, which would "destro[y] the franchise" and "mak[e] it much less attractive."  Ex. 29

at 124:2-18 (Flowers Dep.); *see also* Ex. 25 at 83:11-84:17 (Curl Coord. Dep.) (BAC understood

that Goldman Sachs and Morgan Stanley were also in discussions with Merrill).

     After considering all these matters, the Board concluded that it was in the best interests of

BAC's stockholders to seize the chance to acquire Merrill at a fair price, rather than try to time

the bottom of the market and risk losing a unique strategic opportunity.  *See, e.g.*, Ex. 2 at

160:17-163:6 (Bramble Dep.) (given that the opportunity "could disappear," the Board seized the

chance "to get it at a reasonable price," believing that it was "strategically, . . . an extraordinary

transaction for our shareholder[s] if we could keep the brand and the value in place"); Ex. 18 at

74:24-76:3 (Sloan Dep.) (Board "moved quickly" in view of the "strategic" benefits of the

transaction, weighed against the lack of "assurances [that Merrill would be intact on] Monday").

The Board's vote of approval was unanimous.  Ex. 66 at 51 (Proxy).

     The Board formally authorized resolutions delegating to the appropriate BAC officers the

tasks of finalizing a merger agreement and preparing and filing a merger proxy, including

ensuring that it complied with the federal securities laws and applicable state laws.  Ex. 43 at

UR-BAC-ML-NYAG00003754-56.  The parties and their counsel then continued to work to

finalize the definitive transaction agreement, which was signed early the next morning (the

"Merger Agreement").  *See* Ex. 66 at 51 (Proxy); Ex. 62 (BAC 9/15/08 8-K).

     **D.**    **The Proxy Solicitation for Approval of the Share Issuance**

     On November 3, 2008, BAC filed with the SEC and mailed to stockholders a joint

definitive proxy statement announcing a special meeting of BAC stockholders to be held on

December 5, 2008 to vote on the issuance of BAC common stock contemplated by the Merger

Agreement.  Ex. 66 (Proxy).  The Proxy was prepared by BAC's outside counsel, Wachtell,

Lipton, Rosen & Katz ("Wachtell").  Ex. 26 at 35:22-36:6 (Demmo Dep.); *see also* Ex. 34 at

169:25-170:16 (Mayopoulos Dep.) (Wachtell is "highly experienced and knowledgeable about

what proxy statements are supposed to contain.  And they draft it.").  Internal counsel and certain

members of BAC management, including Mr. Lewis, reviewed the Proxy before it was filed.

*See* Ex. 22 at 102:7-19 (Brenner Coord. Dep.); Ex. 8 at 28:19-29:1 (Lewis Dep.).

      The Proxy stated that Merrill had a net loss from continuing operations of $8.6 billion in

2007 and $6.6 billion for the first half of 2008, and that it expected a $5.1 billion net loss for the

third quarter.  Ex. 66 at 17, 36 (Proxy).  The Proxy made no forecasts or positive statements

about Merrill's fourth quarter.  Rather, it warned that "[d]uring the past few weeks"—*i.e.*, in

October, within the fourth quarter—"market conditions have been extremely volatile." *Id.* at 38.

It warned that the "challenging and uncertain" market environment was "expected to persist,"

and it predicted "volatile valuations and illiquidity of certain financial assets and exposures" and

"generally uncertain national and international economic conditions." *Id.* at 52.

      BAC disclaimed any undertaking to update any forward-looking statements in the Proxy.

*See id.* at 22.  JCF and FPK each likewise disclaimed any obligation or intention to update or

revise its opinion "based on circumstances or events occurring after [September 14, 2008]." *Id.*

at 63.  Merrill and BAC advised that they did not intend to ask their financial advisors for

updated opinions, and that, accordingly, "none of the opinions will address the fairness of the

exchange ratio from a financial point of view at the time the merger is completed." *Id.* at 24.

     **E.**    **Merrill and BAC Issue Third Quarter Form 10-Qs**

      On November 5 and 6, 2008, Merrill and BAC filed their third quarter 10-Qs, which the

Proxy incorporated by reference.  Both filings warned about the unprecedented disruptions

affecting the financial markets and their expected negative impact on both companies in the near-

and medium-term.

Merrill's 10-Q reported the same third quarter results disclosed in the Proxy.  It had lost $8.3 billion pretax and $5.1 billion after-tax from continuing operations.  Ex. 67 at 4 (Merrill Q3 2008 10-Q).  Without the benefit of two extraordinary one-time gains, totaling $7.1 billion pretax, Merrill's reported loss for the quarter would have been even higher—more than $15 billion pretax and $9 billion after-tax.  *See id.* at 4, 77.  Merrill's 10-Q also warned that the credit crisis was continuing and would continue to adversely affect Merrill's financial results:

- The "***adverse market environment intensified towards the end of the [third] quarter, particularly in September***, and was characterized by increased illiquidity in the credit markets, wider credit spreads, lower business and consumer confidence, and concerns about corporate earnings and the solvency of many financial institutions."

- "***Turbulent market conditions in the short and medium-term will continue to have an adverse impact*** on [Merrill's] core businesses."

- Federal Reserve actions to increase liquidity "will likely not have an immediate impact on market conditions.  The ***near-term risk of spread-widening*** and the ***threat of additional ratings agency downgrades of structured securities***, as well as the ***closure and consolidation of certain financial service institutions, continue[] to impact the industry***."

*Id.* at 82-83 (emphasis added).

BAC's third quarter 10-Q likewise warned of the continuing impact of market dislocations on BAC's and Merrill's businesses, and made clear that conditions in the financial markets were unlikely to improve in the near term:

- The "market turmoil and tightening of credit have led to . . . increased market volatility and widespread reduction of business activity generally.  ***The resulting economic pressure on consumers and lack of confidence in the financial markets has adversely affected our business, financial condition and results of operations***."

- "***We do not expect that the difficult conditions in the financial markets are likely to improve in the near future.***  A worsening of these conditions would likely exacerbate the adverse effects of these difficult market conditions on us and others in the financial institutions industry."

- "***In recent weeks [i.e., during the fourth quarter], the volatility and disruption***" in the capital and credit markets "***has reached unprecedented levels***," and "[i]f current levels of market disruption and volatility continue or worsen, there can be no assurance that we

will not experience an adverse effect, which may be material, on our ability to access capital and on our business, financial condition and results of operations."

Ex. 69 at 175-76 (BAC Q3 2008 10-Q) (emphasis added).

BAC also pointedly warned that Merrill was "subject to many of the same difficulties resulting from the market turmoil and tightening of credit." *Id.* at 176. The 10-Q advised that, among other things, "*[v]aluation of [Merrill's] exposures will continue to be impacted by external market factors*, including default rates, rating agency actions, and the prices at which observable market transactions occur and the continued availability of these transactions," and that Merrill's "ability to mitigate its risk by selling or hedging its exposures is also limited by the market environment, and its *future results may continue to be materially impacted* by . . . valuation adjustments." *Id.* at 177 (emphasis added).[9]

### F.    Merrill's Interim and Forecasted Losses for the Fourth Quarter

In keeping with its usual practice, Merrill prepared various interim financial results and forecasts during the fourth quarter of 2008, strictly for internal use, *see* Ex. 30 at 70:10-15, 71:2-7 (Hayward Coord. Dep.), which were created by Merrill's financial planning and analysis group, led by Nancy Jordan (whose name at the time was Nancy Meloth), *see id.* at 113:6-14.

Merrill's interim forecasts had limited predictive value. They were frequently adjusted and were not subjected to the robust checks required for quarter-end financial statements. Ex. 35 at 96:23-97:11, 98:6-14 (Meloth NYAG 6/4/09 Dep.). Merrill's Treasurer, Eric Heaton, testified that they "generally proved to be very inaccurate," Ex. 31 at 148:17-22 (Heaton Dep.), especially

---

[9] These worsening market conditions were widely reported. For example, the *Wall Street Journal* reported on November 24, 2008 that "forecasts for the economy are only worsening" and that "banks will likely take bigger losses on mortgages, auto loans and credit-card debt," and on December 2, 2008 that there were "growing pressures on financial firms amid a steep and unexpected fall in prices of all kinds of assets." Exs. 73, 74. Plaintiffs were aware that these conditions would likely adversely affect Merrill's near-term results. *See* Ex. 33 at 62:20-63:18 (Houx Dep.) (given its past performance and that "everything was tanking at that time," Ms. Houx expected that Merrill would continue losing money into 2009).

during the market disruptions of late 2008, *see, e.g.*, Ex. 41 at 118:7-9 (Thain Dep.) ("forecasting in this environment was almost meaningless").  Many of Merrill's "significant items or marks were not done or computed intra-month, only at month-end and after month-end."  Ex. 30 at 199:10-14, 363:20-366:10 (Hayward Coord. Dep.).  And even items computed monthly were not immediately available at month-end, because Merrill generally took six to ten days to close its books.  *See id.* at 125:5-25; Ex. 41 at 102:9-12 (Thain Dep.).[10]

During November and December 2008, Merrill shared certain of its internal forecasts with Neil Cotty, who was expected to serve as CFO of the combined companies' Global Investment Bank.  *See* Ex. 23 at 14:15-20, 64:16-65:3 (Cotty Dep.).  Mr. Cotty periodically forwarded these forecasts to others at BAC, including Joe Price, the CFO.  *Id.* at 234:20-235:5; *see also, e.g.*, Ex. 76 at BAC-ML-DE00018864-77.

On November 4, Ms. Jordan emailed to Mr. Cotty an estimate of the then-known October 2008 P&L items that Merrill reported on a monthly basis, which estimated a loss of $3.8 billion after-tax ($6.1 billion pretax).  *See* Ex. 68 at BAC-ML-NYAG10003553.  This "preliminary" estimate was prepared "during the process of closing the month of October's financial results."  Ex. 30 at 152:15-20 (Hayward Coord. Dep.).  It did not contain any projection for the rest of the quarter.  *See* Ex. 68 at BAC-ML-NYAG10003553.

Merrill's final interim results for October were provided to BAC in a November 12 report that also estimated a fourth quarter loss of $5.4 billion after-tax ($8.9 billion pretax).  *See* Ex. 70 at BAC-ML-NYAG10106374.  This was the first forecast for the fourth quarter received by

---

[10] The difficulty of forecasting accurately resulted in Merrill having to raise capital twice in two months in late 2007 and early 2008.  Merrill had raised capital in December 2007 based on its forecasted needs at the time.  However, "when they closed the [December] books in January, the P&L was materially different than where the forecasts were at the end of December," such that Merrill had to raise more capital in January 2008.  *See* Ex. 31 at 148:23-149:12 (Heaton Dep.).

Cotty.  *See* Ex. 23 at 98:16-25, 104:2-6 (Cotty Dep.).  It reflected October month-end interim

results for those businesses that reported or were "marked" (*i.e.*, subject to valuation

adjustments) on a monthly basis, and incorporated one week of interim data for November but

generally did not reflect any estimate for marks for the balance of the quarter.  Ex. 30 at 196:14-

199:14, 203:7-20 (Hayward Coord. Dep.); Ex. 70 at BAC-ML-NYAG10106372 ("The 'bal to

go' for Nov/Dec assumes no additional marks, cva, fva or other significant market dislocation

items for balance of quarter." (emphasis omitted)).  Although the November 12 report was

prepared after Merrill closed its books for October, as explained by Christopher Hayward,

Merrill's Finance Director, "everything intra-quarter [was] actually an estimate," because there

were "many items" (including marks on certain asset classes that were recorded on a quarterly,

not monthly, basis) that could not be reflected until the quarter closed.  *See* Ex. 30 at 224:19-

225:11, 363:20-366:10 (Hayward Coord. Dep.).

     After receiving the November 12 report, Mr. Price sought legal advice from BAC's then-

General Counsel, Timothy Mayopoulos, and Wachtell regarding whether further disclosure was

required.  *See* Ex. 37 at 138:1-140:11 (Price Dep.).  After several discussions, Mr. Mayopoulos

concluded at the end of a lengthy call on November 20 that further disclosure was unnecessary.

*See* Ex. 34 at 224:11-227:6 (Mayopoulos Dep.).  He based this conclusion on several

considerations.  First, there was no "duty to update," because prior disclosures did not make any

projections or statements about "what the expected future financial performance of Merrill would

be."  *Id.* at 224:11-225:2.  Second, the projected losses were "in line with" Merrill's losses over

the past four or five quarters.  *Id.* at 225:2-20.  Third, BAC had clearly warned stockholders that

"market conditions were very bad, circumstances in the markets were quite volatile, [and] the

earnings of [BAC] and its competitors were very much at risk," and that these concerns "also

appl[ied] to Merrill." *Id.* at 225:20-226:9. Fourth, there were many "public events that would lead one to conclude that a company like Merrill Lynch would likely continue to have very serious financial troubles." *Id.* at 226:9-227:6. Based on the "totality of information out there in the marketplace," Mr. Mayopoulos concluded that a reasonable investor would "not be surprised by the fact that Merrill Lynch would continue to post substantial financial losses." *Id.* at 226:25-227:6. In addition, there were "challenges [in] making any disclosure about these projected losses, given how volatile the markets were and how uncertain the projection was," as well as risks in "putting out a disclosure that ended up not being accurate." *Id.* at 195:13-23.

Everyone on the November 20 call, including the Wachtell lawyers, concurred with Mr. Mayopoulos's analysis. *See* Ex. 22 at 307:25-309:8 (Brenner Coord. Dep.); Ex. 26 at 127:5-9 (Demmo Dep.); Ex. 71 at BAC-ML-NYAG-502-00064580 (notes of Mr. Price reflecting that it was "[c]oncluded w/ Tim + Ed [Herlihy of Wachtell] that no pre meeting disclosure necessary"). After the call, Mr. Price apprised Mr. Lewis of the group's reasoning and conclusion. Ex. 10 at 263:20-266:25 (Lewis SEC Dep.).

On December 3, Ms. Jordan emailed Mr. Cotty an updated fourth quarter forecast. *See* Ex. 76 at BAC-ML-DE00018864-77. The December 3 report included a forecasted fourth quarter loss of $7.1 billion after-tax, or $11 billion pretax, but did not contain final results for November or any marks for Merrill's distressed correlation book or credit valuation adjustments. *See id.* at BAC-ML-DE00018867-68; Ex. 30 at 243:7-13 (Hayward Coord. Dep.) (at the time of the December 3 report, "the month of November hadn't yet been closed," and "there were no significant revenue marks estimated or included for the month of December").

Later that day, senior BAC and Merrill executives, including Mr. Lewis, Mr. Thain, Mr. Price and Mr. Cotty, discussed Merrill's preliminary 2009 business plan and the latest fourth

quarter forecast.  Ex. 24 at 152:12-20 (Cotty SEC Dep.).  At Mr. Lewis's request, Mr. Cotty

suggested that a "conservative" contingency of $3 billion pretax ($2 billion after-tax) be added to

the forecast, as a "place holder" for Merrill's as-yet unreported November results and possible

additional losses in December.  *Id.* at 158:8-24.  Cotty described the $3 billion figure as a "wild

ass guess."  Ex. 8 at 236:4-11 (Lewis Dep.).  That evening, Merrill circulated a revised 6 p.m.

version of the forecast including Cotty's $3 billion "guess."  The revised forecast projected a

quarterly loss of $14 billion pretax, or $9 billion after-tax.  *See* Ex. 77 at BAC-ML-

NYAG70060260, 67-72; Ex. 23 at 182:3-183:8 (Cotty Dep.).

On or about December 3, Mr. Price again consulted Mr. Mayopoulos about disclosure in

view of the upcoming stockholder vote.  Mr. Mayopoulos advised that the new information about

Merrill's interim and projected losses did not alter his conclusion that no additional disclosure

was required, because the projected loss was "still in the range of losses that Merrill Lynch had

been suffering for some time," the disclosures that "were out in the marketplace had not

changed" and the "overall market conditions and events that were occurring in the marketplace

had not changed" or, if anything, "were becoming even more difficult" to predict.  *See* Ex. 34 at

246:2-247:2 (Mayopoulos Dep.); Ex. 37 at 203:13-204:7 (Price Dep.); *see also* Ex. 38 at 99:22-

100:4 (Price NYAG 3/16/09 Dep.).  On or about December 3, Mr. Price told Mr. Lewis that he

had gone "through the same process" and the "same answer came back"—*i.e.*, "it was not a

disclosable item."  Ex. 10 at 264:21-265:3 (Lewis SEC Dep.).[11]

---

[11] The record is ambiguous as to whether the December 3 forecast shared with Mr.
Mayopoulos included Mr. Cotty's "guess."  *Compare* Ex. 37 at 213:1-214:9 (Price Dep.), *with*
Ex. 34 at 246:2-6 (Mayopoulos Dep.).  Similarly, Mr. Price understood—as reflected in his
contemporaneous notes (Ex. 78 at BAC-ML-NYAG-502-00064560)—that Mr. Mayopoulos
would confirm with Wachtell his conclusion that no further disclosure was required.  Ex. 37 at
229:9-13 (Price Dep.).  But Mr. Mayopoulos does not recall whether he discussed the December
3 forecast with Wachtell, Ex. 34 at 247:16-20 (Mayopoulos Dep.), and Wachtell witnesses have
testified that they were not consulted, *e.g.*, Ex. 26 at 134:2-6 (Demmo Dep.).  Regardless, Mr.

### G.     BAC Stockholders Approve the Merger

On December 5, 2008, the stockholders of BAC voted to approve the issuance of BAC common stock in connection with the Merger.  Ex. 88 at 10 (BAC 2008 10-K).

### H.     The December 9 Regular Board Meeting

On December 9, a regular meeting of the Board was held to review and approve BAC's annual plan for 2009.  *See* Ex. 56 at BAC-ML-DE00003296-301; Ex. 13 at 176:20-177:7 (May Dep.).  Mr. Price reviewed with the Board the results of BAC's various businesses and the outlook for the following year.  *See* Ex. 56 at BAC-ML-DE0003296-99; Ex. 55 at BAC-ML-NYAG10006634-80.  He reported Merrill's revised December 3 forecast that projected an after-tax loss of $9 billion for the fourth quarter (*i.e.*, including Cotty's "guess").  Ex. 55 at BAC-ML-NYAG10006681; *see also, e.g.*, Ex. 5 at 163:7-17 (Franks Dep.).  This was the first time the Outside Directors recall being given a specific forecast for Merrill's fourth quarter.  *See, e.g.*, Ex. 2 at 290:14-23 (Bramble Dep.); Ex. 5 at 163:23-164:1 (Franks Dep.); Ex. 14 at 198:8-11 (May SDNY Dep.); Ex. 17 at 198:17-18 (Ryan Dep.).

Although they were disappointed by the projected loss, *e.g.*, Ex. 13 at 199:22-25 (May SDNY Dep.); Ex. 16 at 135:3-7 (Mitchell Dep.), the Outside Directors viewed it in the context of Merrill's significant losses over the previous several quarters and the substantial and well-publicized economic turmoil affecting the entire financial services industry.  *See, e.g.*, Ex. 4 at 161:18-23 (Countryman Dep.) ("not surprised," given "environment that we were in"); Ex. 14 at 199:22-200:8 (May SDNY Dep.) ("not a shocking number" in view of Merrill's past losses and the environment); Ex. 17 at 197:12-21 (Ryan Dep.); Ex. 21 at 147:5-11 (Ward Dep.).  As one director explained, the Board approved the Merger with a view toward its "long term" strategic

---

Lewis had no reason to doubt that Mr. Price shared current information with Mr. Mayopoulos or that they had gone through the "same process" as in November, and arrived at the same conclusion that no disclosure was required.

value, not for results in a single quarter or year.  Ex. 13 at 183:15-184:5 (May Dep.); *see also,* *e.g.*, Ex. 20 at 65:22-66:9 (Tillman Dep.) (Board approved acquisition based on the long-term value that Merrill would provide "in the out years," and given the "disruption within the financial markets," it would have been a "tragedy" if the Board had taken a "shortsighted" view based on a single quarter).

## I.      BAC Considers Invoking MAC Clause

On December 12, 2008, Ms. Jordan sent Mr. Cotty an updated forecast for Merrill's projected fourth quarter financial results based on information as of December 10.  *See* Ex. 79 at BAC-ML-NYAG00005789-93.  This forecast was the first to include November month-end results, although it remained tentative, because it did not reflect December results or actual quarter-end marks.  *See id.* at BAC-ML-NYAG00005790-93 ("December marks are very rough placeholders clearly subject to market movements").  Nevertheless, in the span of about a week, the projected loss for the fourth quarter had worsened dramatically, rising to $18.1 billion pretax and $12.5 billion after-tax.  *Compare* Ex. 77 at BAC-ML-NYAG70060269, *with* Ex. 79 at BAC-ML-NYAG00005790.

Mr. Price received the updated forecast on December 12 and was concerned that, in a short time, Merrill's estimate of projected losses had not only "gone through the [$3 billion pretax] contingency," but had increased beyond that by an "incremental" $4 billion, pretax.  Ex. 37 at 280:8-14 (Price Dep.).  Mr. Price was troubled by "the speed with which [the projected losses] changed from the prior forecast," the "size of the change," the aggregate impact the forecasted losses could have on the combined companies' financial position and the concern that Merrill's fourth quarter results could deteriorate further.  Ex. 38 at 77:10-78:3 (Price NYAG 3/16/09 Dep.).  Late on December 12, Mr. Price discussed the forecast with Mr. Curl.  Ex. 25 at 216:24-217:6 (Curl Coord. Dep.).

On December 14, Mr. Price and Mr. Curl informed Mr. Lewis of the "significant" acceleration of Merrill's projected losses in a "relatively short time."  Ex. 8 at 271:19-272:8, 274:15-18 (Lewis Dep); *see also* Ex. 38 at 169:2-171:17 (Price NYAG 3/16/09 Dep.).  Mr. Lewis instructed Mr. Price to obtain legal advice from counsel concerning the MAC.  *See* Ex. 8 at 276:11-14 (Lewis Dep.).  According to Mr. Lewis, this was the first occasion he had considered invoking the MAC, Ex. 9 at 18:9-18 (Lewis NYAG Dep.), and contrary to the Complaint (¶ 104), there is no evidence that anyone at BAC considered invoking the MAC clause prior to December 12, *see, e.g.*, Ex. 38 at 157:15-17 (Price NYAG 3/16/09 Dep.) (December 12 is "when the first question came into my mind about whether it would be appropriate to complete the transaction"); Ex. 25 at 187:3-10 (Curl Coord. Dep.) (same).[12]

Early in the week of December 15, Mr. Lewis and other BAC executives spoke with Wachtell on several occasions about BAC's rights under the Merger Agreement and the MAC clause.  Wachtell advised that BAC had a "good faith basis to assert a MAC," Ex. 39 at 186:19-187:14 (Roth Dep.), but that there were "high hurdles" to prevailing in a litigated case, *id.* at 95:22-96:22; *see also* Ex. 83 at BAC-502-WLRK 00001417-27.

On December 17, Mr. Lewis telephoned Treasury Secretary Henry Paulson to advise him that BAC was "strongly considering" invoking the MAC clause, and they arranged to meet later that day.  Ex. 8 at 291:20-24, 292:20-24 (Lewis Dep.).  At the meeting, Mr. Lewis informed Secretary Paulson and Federal Reserve Chairman Benjamin Bernanke that BAC had reservations about closing the Merger.  *See* Ex. 36 at 149:5-9 (Moynihan Dep.).  The regulators agreed to discuss the situation further after getting "up to speed."  Ex. 8 at 293:20-22 (Lewis Dep.).

---

[12] Messrs. Price, Curl and Mayopoulos discussed the MAC clause on December 1, but Mr. Mayopoulos considered the conversation simply a "primer" on the MAC clause, and he "didn't interpret it as a suggestion that they or somebody else was actively considering invoking [it]."  Ex. 34 at 241:22-242:9- (Mayopoulos Dep.).

On a December 19 Board call, management advised the Board that it was considering a MAC in view of the accelerated projected losses.  *See* Ex. 20 at 67:25-68:4 (Tillman Dep.); Ex. 1 at 175:5-19 (Barnet Dep.).[13]  Mr. Moynihan reviewed the "pluses and minuses" of invoking the MAC clause, Ex. 36 at 164:11-19 (Moynihan Dep.); Ex. 84 at BAC-ML-NYAG-502-00000917-21, and the Board reached a consensus that management should both continue its analysis of such a claim and continue its dialogue with the regulators, *see, e.g.*, Ex. 4 at 175:22-25 (Countryman Dep.); Ex. 5 at 184:1-4 (Franks Dep.); Ex. 11 at 145:23-146:7 (Lozano Dep.).

Over the next few days, BAC's management engaged in further discussions with officials from the Treasury and Federal Reserve, *see, e.g.*, Ex. 36 at 197:13-25 (Moynihan Dep.), who were "adamant" that BAC did not have a MAC and that calling one would "pose systemic risk" to the U.S. financial system and imperil the Bank.  Ex. 8 at 294:24-295:6 (Lewis Dep.).

On Sunday, December 21, Mr. Lewis telephoned Secretary Paulson and advised him that BAC still was "strongly considering a MAC."  *Id.* at 298:20-23.  Mr. Lewis testified that Secretary Paulson responded that, although the Government was "supportive of Bank of America" and wanted "to be of help," officials "feel so strongly" that calling a MAC was not in the Bank's best interest that "we would remove the board and management."  Ex. 9 at 52:13-21 (Lewis NYAG Dep.).  Mr. Lewis did not view this statement as one to be taken literally, Ex. 8 at 302:23-303:6 (Lewis Dep.), but it conveyed "the seriousness" of the Federal Reserve and Treasury that invoking the MAC clause could "caus[e] systemic risk," *id.* at 307:1-7.  Such risk was a concern for BAC as one of the largest participants in the financial system.  *See, e.g.*, Ex. 4 at 212:4-11 (Countryman Dep.).  Secretary Paulson and Fed Chairman Bernanke also assured

---

[13] Prior to December 19, Mr. Lewis had kept Mr. Sloan, the Board's lead director, apprised of the prior week's developments, including Merrill's revised forecasted losses and the discussions with federal regulators.  *See* Ex. 18 at 152:18-23, 153:1-10, 154:8-16 (Sloan Dep.); Ex. 8 at 284:5-6 (Lewis Dep.); Ex. 81 at UR-BAC-ML-NYAG00289463 (Sloan 12/15/08 Notes); Ex. 82 at UR-BAC-DIR-DE00001928 (Sloan 12/17/08 Notes).

Mr. Lewis that they were willing to provide financial assistance to help the Bank close the transaction.  Ex. 85 at BAC-502-WLRK (CSI) 00000138 (Talking Points for 12/22/08 Board Call); *see also* Ex. 38 at 219:2-19, 223:12-17 (Price NYAG 3/16/09 Dep.).  As a result of these discussions, Mr. Lewis became convinced that "it was not in the shareholders' best interest to call a MAC."  Ex. 8 at 303:19-23 (Lewis Dep.).

The following day, Monday, December 22, the Board held a special meeting to further discuss the MAC issue.  *See* Ex. 57 at BAC-ML-NYAG-502-00001125-28.  Based on a variety of factors, including the "systemic risk" and potential "adverse consequences" for BAC that calling a MAC would entail, the Government "commitment" to provide financial support for the transaction and the risks of not prevailing if it were to pursue a MAC claim, management recommended that the Bank complete the Merger as scheduled.  *Id.* at BAC-ML-NYAG-502-00001126-27.  Mr. Lewis advised the Board of Mr. Paulson's threat to remove the Board and management if BAC invoked the MAC clause, *id.* at BAC-ML-NYAG-502-00001126, but the Board unanimously agreed that "it was not persuaded or influenced" by it, *id.* at BAC-ML-NYAG-502-00001127; *see also* pp. 40-41 & n.21, *infra*.  At the conclusion of the meeting, the Board requested that BAC's management get assurances from the Government in writing and more detail about its offer of support.  Ex. 2 at 313:7-17 (Bramble Dep.); *see* Ex. 57 at BAC-ML-NYAG-502-00001127.

On December 30, 2008, the Board held another special meeting, during which Mr. Lewis updated the Board on management's ongoing discussions with the Government.  *See* Ex. 58 at BAC-ML-NYAG-502-00001129-34.  Although the Government was not willing to provide a written commitment, and no definitive agreement had been reached, the Government had provided strong assurances that BAC would receive adequate support to permit it to close the

transaction.  *Id.* at BAC-ML-NYAG-502-00001133.  These oral assurances persuaded the Board that proceeding with the Merger was the best option available to the Bank.  *See, e.g.*, Ex. 2 at 317:11-17 (Bramble Dep.) ("[B]ased on that verbal commitment and . . . management's view of how that support would impact the capital and liquidity of the corporation going forward, we felt that it was appropriate to – to close the transaction without invoking any MAC."); Ex. 18 at 190:9-191:3 (Sloan Dep.) ("[O]nce the government agreed to step in, then I think everybody agreed it was [in] the best interest of the country, the bank, the financial system . . . for the merger to go through.").

### J.     The Merger Closes

The Merger closed as contemplated on January 1, 2009.  Ex. 88 at 17 (BAC 2008 10-K).  Because the price of BAC's stock had fallen significantly throughout the fall of 2008, the value of BAC common stock to be exchanged in the Merger had declined from approximately $50 billion to $19.4 billion at the time of closing.  *Id.* at 124.

### K.     BAC's and Merrill's Fourth Quarter Results and the Proposed Government Assistance

On January 16, 2009, BAC reported an after-tax loss of $1.79 billion for the fourth quarter of 2008 and announced that Merrill had an after-tax loss of $15.31 billion for the quarter.  Ex. 87 at 1-2 (BAC 1/16/09 Earnings Release).  BAC also announced that the Government had agreed to provide it TARP funds in the form of an investment of $20 billion in preferred stock and to provide protection against further losses on $118 billion in selected capital exposure, including from the former Merrill portfolio.  *Id.* at 2.

### L.     The Success of the Acquisition to Date

The combination of Merrill's business with BAC makes it difficult to measure precisely Merrill's contribution to BAC's results in the years since the Merger closed, but it is clear that

Merrill made substantial contributions to BAC's net income almost immediately.  In the first quarter of 2009, BAC reported that, excluding certain merger-related costs, Merrill contributed approximately $3.7 billion to BAC's total net income of $4.2 billion:  nearly 90% of the combined company's net income, even though Merrill stockholders received only 20% of the combined company's equity in the Merger.  Ex. 90 at 3, 12 (BAC Q1 2009 10-Q); Ex. 25 at 176:7-14 (Curl Coord. Dep.).

Since then, the Merger has continued to fulfill the long-term strategic potential foreseen by Defendants.  As one Defendant who is still on the Board testified, "[t]he synergistic potential, which is being realized" is simply "unbelievable," and "it's really been a marvelous transaction for our shareholders."  Ex. 2 at 340:13-341:19 (Bramble Dep.); *see also, e.g.*, Ex. 13 at 94:8-20 (May Dep.) (testifying that Merrill's "thundering herd" has been successfully cross-selling "their financial products to our customers," and "it's turned out to be a very successful merger"); Ex. 6 at 158:8-22 (Gifford Dep.) (testifying that, although he was not "feeling very positive" about Merrill in December 2008 or January 2009 when the "sun was darkest," Merrill has since proven to be "terrific," and he is "[v]ery glad we have it for our shareholders").

## ARGUMENT

### I.   APPLICABLE LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Ct. Ch. R. 56(c).  Once the moving party demonstrates that no material factual dispute exists, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."  *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008).  To meet that burden, the nonmoving party must present *evidence*—"not guesses, innuendo or unreasonable inferences."  *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192,

at *6 (Del. Ch. May 22, 2000).  Additionally, where, as here, the nonmoving party bears the burden of proof, summary judgment is appropriate where that party fails to make a sufficient showing on any essential element of its case.  *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).

In light of the exculpatory provision in BAC's Certificate of Incorporation, as authorized by 8 *Del. C.* § 102(b)(7), in order to survive summary judgment, Plaintiffs must demonstrate a triable issue of fact as to whether Defendants breached their duty of loyalty by acting in bad faith.[14]  *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239-40 (Del. 2009); *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 65 (Del. 2006).  As shown below, the record supplies no evidence that would permit any such inference, and summary judgment should accordingly be granted in Defendants' favor on all claims asserted in the Complaint.

## II.  THERE IS NO EVIDENCE THAT DEFENDANTS WITHHELD ANY INFORMATION PRIOR TO THE STOCKHOLDER VOTE IN BAD FAITH

As this Court explained at the motion to dismiss hearing, in order to establish a non-exculpated disclosure claim, Plaintiffs must show that Defendants "kn[e]w information, they kn[e]w that it's material, and they consciously [chose] not to disclose it."  Ex. 92 at 121:17-21 (10/12/09 Hr'g Tr.); *see also Frank v. Arnelle*, 1998 WL 668649, at *10 (Del. Ch. Sept. 16, 1998) (plaintiff must show that "director defendants knowingly or deliberately failed to disclose facts that *they knew were material*" (emphasis in original)), *aff'd*, 725 A.2d 441 (Del. 1999).  The record supplies no evidence that would meet these requirements.

Where, as here, a board of directors is not interested in a transaction, there is "strong support" for the conclusion that any alleged nondisclosures did *not* result from disloyalty or bad faith.  *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *7 n.4 (Del. Ch. Jan. 25, 1999) (citing

---

[14] BAC's Certificate of Incorporation provides that "[t]o the fullest extent permitted" under Delaware law, "a director of the Corporation shall not be personally liable to the Corporation . . . for monetary damage for breach of his duty as a director."  Ex. 93 at Art. 6.

*Frank*, 1998 WL 668649, at *10 (where transaction was not an "interested" one, "the alleged disclosure violations simply cannot implicate the duty of loyalty")), *aff'd*, 741 A.2d 16 (Del. 1999) (TABLE).  Plaintiffs have already conceded that they face a "pretty high hurdle" in proving their disclosure claims.  Ex. 92 at 80:7-11 (10/12/09 Hr'g Tr.).  Indeed, Defendants are not aware of a single case under Delaware law since the passage of § 102(b)(7) in which disinterested directors who did not profit from a transaction have been held personally liable in money damages for failing to disclose information about the transaction to stockholders.

### A.    Defendants Did Not Withhold Information Regarding Merrill's Forecasted Fourth Quarter Losses in Bad Faith

The Complaint alleges that Defendants knew but chose not to disclose to stockholders prior to the December 5, 2008 vote that Merrill had suffered pretax losses of approximately $13.3 billion (or about $9 billion post-tax) for October and November, and that December was "looking even worse."  *E.g.*, Compl. ¶¶ 101, 105.  There is no evidence in the record that raises any genuine issue about whether Defendants decided in bad faith not to disclose such information.  As described below, the Outside Directors did not even become aware until after the stockholder vote of the $9 billion loss forecast that Plaintiffs allege they decided not to disclose.  Although Mr. Lewis was aware of a mid-November forecast for the fourth quarter and December 3 update, Mr. Price had informed him that Mr. Mayopoulos and Wachtell had determined that no disclosure was required as a result of either forecast—a conclusion that Mr. Lewis had no reason to doubt.

### 1.    Outside Directors

Contrary to Plaintiffs' allegations, *e.g.*, Compl. ¶ 102, the Outside Directors never learned of the $9 billion loss forecast prior to the December 5 vote.  That forecast was not created or circulated until the evening of December 3, Ex. 77 at BAC-ML-NYAG70060260-72 (2008 4Q

Pacing Report, 12/3/08 6 p.m.), almost two weeks **after** the Board's November 21 voluntary call, its last one before the vote.  Ex. 54 at BAC-ML-NYAG00287707-09.  There is no evidence that the Board was given this information prior to the vote, and Plaintiffs accordingly cannot prevail on their claims.

Nor is there evidence sufficient to create a triable issue that the Outside Directors received any specific fourth quarter forecast prior to the stockholder vote.  The Board did receive a general update on the Merrill transition during its November 21 call, *see id.*, and was told, as reflected in one Defendant's notes, that BAC and Merrill were "experiencing similar problems" and that Merrill's "Liquidity [was] OK" and its "core int[erest] income [was] holding well," *see* Ex. 72 at BAC-DIR-DE00000180-82 (Franks notes of 11/21/08 Board Call); Ex. 5 at 150:6-8 (Franks Dep.).  Those notes do not reflect any specific forecast for Merrill's fourth quarter, however.[15]

The Outside Directors have uniformly testified that the first time they learned of *any* specific forecast for Merrill's fourth quarter was at the Board's regular, year-end planning meeting on December 9, four days after the stockholder vote.  *See, e.g.*, Ex. 1 at 167:6-15 (Barnet Dep.) (12/9 meeting was "the first time we had an estimate for the fourth quarter"); Ex. 2 at 290:14-23 (Bramble Dep.); Ex. 4 at 151:18-22 (Countryman Dep.); Ex. 5 at 163:18-164:1 (Franks Dep.); Ex. 6 at 135:6-11 (Gifford Dep.).  Given the absence of meaningful evidence that the Directors knew about the projected losses, they cannot be held liable for any non-disclosure.

---

[15] General Franks testified that he did not ask specifically about Merrill's forecasted results for the fourth quarter during the November 21 call because the Merger "was viewed as a strategic acquisition" (*i.e.*, not about "near term" quarterly results), and it "satisfied [him] to know" that "Merrill was in about the same shape that the bank was in."  Ex. 5 at 150:18-152:18 (Franks Dep.).  Prior to the November 21 call, the Board had last convened on November 7, 2008.  But at that time, BAC had not received any forecast of Merrill's fourth quarter results. *See* pp. 13-14, *supra* (citing Mr. Cotty's testimony that November 12 was the first time he received a fourth quarter forecast).

For this reason alone, they are entitled to summary judgment.  *See* Ex. 92 at 121:16-22 (10/12/09

Hr'g Tr.) (threshold requirement to prove bad faith nondisclosure is that Defendants "know [the]

information"); *see also Goodwin*, 1999 WL 64265, at *18 (granting summary judgment for

board defendants on disclosure claim where there was no evidence that they were aware of the

relevant information); *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 680, 693 (Del. Ch.

1986) (no duty to disclose information of which board is unaware).[16]

        In any event, even if—contrary to their uniform recollection—the Outside Directors

could be shown to have received some earlier forecast, there is still no evidence from which to

infer any bad faith conduct.  The record reflects that the Board was strenuously discharging its

oversight responsibilities through the almost-twelve-week period between the Board's approval

of the Merger on September 14, 2008 and the stockholder vote on December 5.  Between

September 14 and the December 5 stockholder vote, the Board met nine times—on average,

every nine days—including five voluntary informational calls.  *See* Exs. 44-54.  The calls were

instituted in late-September 2008 by Mr. Lewis at the Board's request to keep the directors

"apprised of what's going on."  Ex. 63 at BAC-DIR-DE00002292; *see also, e.g.*, Ex. 1 at 62:19-

64:7 (Barnet Dep.) (in light of deteriorating markets, the Board requested "more intense

---

        [16] Although at one point Mr. May testified that he believed an estimate of Merrill's fourth
quarter performance was included among the materials presented to the Board in October 2008,
Ex. 15 at 91:17-92:18 (May NYAG Dep.), he ultimately had no independent recollection of the
Board receiving a specific forecast, *id.* at 94:9-12.  And that testimony was clearly mistaken,
given the uncontroverted proof that BAC did not receive any such forecast until November.
Likewise, although Mr. Price testified that he "would have kept" the Board apprised of Merrill's
"most current forecast that [he] had throughout the period," *e.g.*, Ex. 38 at 142:2-5 (Price NYAG
3/16/09 Dep.), there is no evidence that he provided any particular number on any particular
date, much less that he or any other member of management conveyed any concerns about such
information before the December 5 vote or raised an issue about disclosure.  Indeed, even
assuming that Mr. Price had advised the Board of the $5 billion in forecasted and interim losses
known as of November 21 (the last time the Board convened before the stockholder vote), there
is no basis to infer that Mr. Price raised any "red flags" about such information, given that the
day before he had decided in consultation with counsel that no additional disclosure was
necessary.  *See* pp. 13-15, *supra*.

communication" in the form of meetings that "were much more frequent than we would

normally have scheduled"); Ex. 20 at 101:6-23 (Tillman Dep.) (Board met more frequently than

any other on which he has sat).  Though the calls were voluntary, "most directors attended,"

because the Board was "very engaged in what was going on in our company and in our country

at that time."  Ex. 2 at 191:10-20 (Bramble Dep.); *see also* Ex. 11 at 70:21-71:8 (Lozano Dep.)

("just about every director was on every call").

      In the meetings and calls in the period prior to the vote, the Board discussed issues

arising from the unprecedented economic climate and its effect on BAC's businesses, and also

received frequent updates regarding the Merger transition.  *See, e.g.*, Ex. 5 at 64:24-65:11

(Franks Dep.) (meetings "would virtually always include an update on Merrill, where they were,

where the transition was"); Ex. 18 at 129:11-14 (Sloan Dep.) (Board was "constantly being

updated on . . . the status of the merger, as we would with any other merger").[17]

      During this period, in "the context of a deteriorating economic environment," the Board

was not told anything "alarming" or "overly significant about Merrill."  Ex. 11 at 122:2-18

(Lozano Dep.); *see also, e.g.*, Ex. 17 at 140:24-141:7 (Ryan Dep.) (same).  They were not

advised prior to the shareholder vote that Merrill was experiencing financial distress

disproportionate to the well-publicized troubles also facing the entire financial services industry,

nor were they told anything that would have raised "red flags" about the Merger disclosures or

---

[17] Among other Merrill-related issues, the Board discussed management integration and talent-planning and retention, *see* Ex. 45 at BAC-ML-NYAG00288042 (9/26/08 Vol. Call); Ex. 52B at BAC-ML-NYAG00003828-UR (10/22/08 Mtg.); the effect of the Merger on BAC's capital planning, *see* Ex. 51 at UR-BAC-ML-DE00003251 (10/15/08 Mtg.); Ex. 52B at BAC-ML-NYAG00003815-UR (10/22/08 Mtg.); Merrill's third quarter results and market-disruption-related losses, *see* Ex. 51 at UR-BAC-ML-DE00003266 (10/15/08 Mtg.); Ex. 52B at BAC-ML-NYAG00003814-UR (10/22/08 Mtg.); Ex. 53 at UR-BAC-ML-DE00009948 (11/7/08 Vol. Call); and plans to review risk oversight for the Merrill transition, *see* Ex. 52B at BAC-ML-NYAG00003812-UR (10/22/08 Mtg.).

caused the Board to rethink its recommendation.  *See, e.g.*, Ex. 6 at 264:20-265:1 (Gifford Dep.)

(the Board did not receive any information "during that period . . . to give any indication

whatsoever that the circumstances since September 14th had changed" such that the Merger

"wouldn't be beneficial to our shareholders").

The Board was never advised, or given reason to believe, that additional disclosures

about Merrill's financial condition were required.  *See, e.g.*, Ex. 2 at 349:17-22 (Bramble Dep.)

(testifying that it never came to his attention that "there were any issues or problems with respect

to the disclosures that had been made").  Several Defendants testified that they relied on "the

experts and the management team" who had the appropriate expertise to assess the adequacy of

the disclosures.  Ex. 21 at 132:13-21 (Ward Dep.); *see also* Ex. 7 at 245:8-11 (Gifford SDNY

Dep.) (testifying that he is "not equipped . . . to opine on when we should disclose something,"

and that "[t]here are people that are retained and trained to advise us as such"); Ex. 13 at 143:15-

18 (May Dep.) ("[W]e rely on our internal management, accountants, lawyers, external lawyers

and external CPA firms to be sure that our disclosure is adequate.").

Because the evidence in the record provides no basis to argue that the Outside Directors

knowingly breached any disclosure obligation, summary judgment must be granted in favor of

each of them.  *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1287-88 (Del. 1994)

(affirming summary judgment on disclosure claims where § 102(b)(7) provision applied and

there was no evidence of intentional nondisclosure); *Goodwin*, 1999 WL 64265, at *17 (granting

summary judgment where there was no evidence of "intentional or unfaithful" omission);

*McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim regarding

alleged omission in proxy, where no facts supplied a basis to infer "that any such omission

resulted from more than a mistake about what should have been disclosed").

###### 2.     Mr. Lewis

Unlike the Outside Directors, Mr. Lewis was told prior to the stockholder vote of certain forecasts of Merrill's fourth quarter performance.  There is no evidence, however, that he decided in bad faith not to disclose this information.  To the contrary, the record unambiguously shows that he discussed with his CFO whether additional disclosure was necessary, and was assured that the issue had been discussed with counsel and that the determination based on the legal advice received was that no additional disclosure was necessary.  Mr. Lewis had no reason to second-guess that conclusion.

By November 2008, Mr. Lewis learned that Merrill was forecasting an estimated fourth quarter loss of approximately $5 billion after-tax ($9 billion pretax).  *See* Ex. 8 at 206:19-21 (Lewis Dep.); Ex. 70 at BAC-ML-NYAG10106372-75; *see also* pp. 13-15, *supra*.  On December 3, he was told that the forecasted loss estimate had increased to approximately $7 billion after-tax ($11 billion pretax).  Ex. 8 at 209:16-211:1 (Lewis Dep.); Ex. 76 at BAC-ML-DE00018864-68.  At Mr. Lewis's request, Mr. Cotty suggested adding a contingency of $3 billion pretax, or $2 billion after-tax, which was a "wild ass guess" as to the potential "downside" for the remainder of the quarter.  Ex. 8 at 236:4-11 (Lewis Dep.); Ex. 24 at 157:15-158:25 (Cotty SEC Dep.).  With the addition of Mr. Cotty's guess, the projected quarterly loss was $14 billion pretax, or $9 billion after-tax.  *See* Ex. 23 at 182:3-183:15 (Cotty Dep.); Ex. 77 at BAC-ML-NYAG70060260, 67-72.  *See also* pp. 15-16, *supra*.

Mr. Lewis has testified that in connection with both the November 12 and December 3 forecasts, he was advised by Mr. Price that he had consulted with Mr. Mayopoulos and Wachtell, and that they had determined that no additional disclosure was necessary.  Ex. 10 at 263:20-264:23 (Lewis SEC Dep.); *see also* Ex. 8 at 206:15-207:5 (Lewis Dep.) (no further disclosure required in view of November forecast); *id.* at 226:12-15 (same in view of December 3 forecast).

This testimony is supported by Mr. Price's contemporaneous notes.  Ex. 71 at BAC-ML-NYAG-502-00064580 ("Concluded [as of November 20] w Tim [Mayopoulos] & Ed [Herlihy] that no premeeting disclosures necessary"); Ex. 37 at 186:15-19 (Price Dep.); Ex. 78 at BAC-ML-NYAG-502-00064560 (as of December 3, "Per Tim M still same views + w/ Ed").[18]

This record supplies no evidence from which to infer that Mr. Lewis acted in bad faith.  He believed that he "had discharged [his] duties" by ensuring that there was a process in place to address potential disclosure issues.  Ex. 8 at 312:17-25 (Lewis Dep.).  Mr. Lewis "do[es] not have a legal background" and "thought it was in the best interest of the shareholders" to allow the "chief financial officer and general counsel [to] come to an opinion and then . . . follow that advice."  *Id.* at 222:17-22; *see also id.* at 223:13-16 (noting complexity of securities laws and need to rely on legal professionals).  It was not necessary for Mr. Lewis to have been involved directly in the deliberations.  *See Howard v. SEC*, 376 F.3d 1136, 1148-49 (D.C. Cir. 2004) (where certain officers seek legal advice, requiring others to seek the same advice directly from counsel would be "illogical and make[] no sense" as it "not only would run up the legal bills, but it would be impractical and highly inefficient"); *see also, e.g.*, Ex. 20 at 44:19-46:8 (Tillman Dep.) (testifying that, at Lowe's, the proxy statement was handled "by the CFO and the legal department," with CEO involvement only if issues required his attention).  Accordingly, having relied in good faith on the report that no disclosure was necessary, Mr. Lewis is "fully protected."  8 *Del. C.* § 141(e); *Goodwin*, 1999 WL 64265, at *17; *McMillan*, 768 A.2d at 507.

---

[18] Although there is some ambiguity in the record regarding whether Mr. Mayopoulos was advised of Mr. Cotty's contingency when he provided his advice around December 3 that no further disclosure was required, and whether Mr. Mayopoulos consulted Wachtell to confirm his conclusion, *see* n.11, *supra*, those issues supply no reason to question Mr. Lewis's good faith reliance on Mr. Price's report that he and counsel had concluded that additional disclosure was not required.

Nor were there any "red flags" that should have caused Mr. Lewis to second-guess the reasoned judgment of his CFO and General Counsel. *See Stone v. Ritter*, 911 A.2d 362, 373 (Del. 2006) (absent "red flags," courts assess bad faith in the oversight context to ensure that a reasonable reporting system exists, and not by assessing adverse outcomes). Plaintiffs have alleged that Mr. Lewis should have known that Merrill's forecasted losses were material and had to be disclosed, because unnamed BAC "executives" purportedly were debating as early as before Thanksgiving (*i.e.*, prior to the stockholder vote) "whether Merrill's losses were so severe that the bank could walk away from the deal" pursuant to the MAC clause. Compl. ¶ 104. The Court relied heavily on this allegation in denying Defendants' motion to dismiss. *See, e.g.*, Ex. 92 at 120:9-121:15 (10/12/09 Hr'g Tr.) (inferring that Mr. Lewis would be involved in the discussions and that the Outside Directors would have been aware of them). But this key premise of Plaintiffs' bad-faith theory turns out to be entirely unfounded. There is no evidence that anyone at BAC considered invoking the MAC clause until at least a week *after* the stockholder vote, in response to the December 12 forecast that, for the first time, projected losses of $12.5 billion after-tax ($18.1 billion pretax). *See, e.g.*, Ex. 38 at 154:12-25, 157:12-17 (Price NYAG 3/16/09 Dep.) (December 12 is "when the first question came into my mind about whether it would be appropriate to complete the transaction"); Ex. 25 at 187:3-10 (Curl Coord. Dep.) (same); Ex. 8 at 276:5-277:16 (Lewis Dep.) (first raised MAC on December 14); *see also* pp. 18-19 & n.12, *supra*.

**B.      Defendants Did Not Withhold Information**
**         About the Bonus Cap in Bad Faith_____**

The Complaint alleges that Defendants "deliberately chose not to supplement the Proxy" to inform stockholders that the Merger Agreement included the Bonus Cap permitting Merrill to pay its employees up to $5.8 billion in bonuses for 2008. Compl. ¶ 15. In opposing Defendants'

motion to dismiss, Plaintiffs argued that it was fair to infer that the Board knew about the Bonus Cap and omitted that information from the Proxy in bad faith. *See* Ex. 92 at 75:19-78:7 (10/12/09 Hr'g Tr.). The record unambiguously shows, however, that the Board did not know before the stockholder vote about the Bonus Cap and, moreover, that none of the Defendants had cause to think that the Proxy omitted any information about the subject that had to be disclosed.

As is typically the case, the Merger Agreement contained certain representations, warranties and covenants. One was that Merrill would conduct business in the "ordinary course." Ex. 66 at A-31 (Proxy). Another was that it would use its "reasonable best efforts to . . . retain the services of key officers and employees." *Id.* A third provided that—except as otherwise provided in the Merger Agreement, and except with BAC's prior written consent— Merrill would refrain from "pay[ing] any current or former directors, officers or employees any amounts not required by existing plans or agreements." *Id.* at A-31-32. This third covenant was also subject to exceptions "set forth in . . . Section 5.2 of the Company Disclosure Schedule." *Id.* This non-public schedule included the Bonus Cap (a ceiling equal to Merrill's 2007 bonuses). Ex. 61 at BAC-ML-NYAG00000293-UR. Nicholas Demmo, a Wachtell corporate partner who worked on the transaction, explained that exceptions to negative covenants are "typically" contained in a disclosure schedule, and he did not even consider including the agreement regarding bonuses in the Merger Agreement itself. Ex. 26 at 100:20-101:21 (Demmo Dep.) ("[E]veryone involved in the deal" or "any other deal would have said, of course, it goes in the disclosure schedules.").

Contrary to Plaintiffs' representations at the October 12, 2009 hearing, *see* Ex. 92 at 77:24-78:7 (10/12/09 Hr'g Tr.), the Bonus Cap was *not* reviewed with the Board during the September 14 meeting. *See* Ex. 42 at BAC-ML-NYAG70288219 (listing "Key terms" of merger

agreement presented to Board).  Merrill's bonus pool for 2008 "never came up" during the

September 14 Board meeting.  Ex. 17 at 265:2-12 (Ryan Dep.); *see also* Ex. 5 at 144:1-4 (Franks

Dep.); Ex. 11 at 66:12-17 (Lozano Dep.).  Management never raised the Bonus Cap or any

related disclosure issues with the Outside Directors at any time prior to the stockholder vote.

*See, e.g.*, Ex. 21 at 167:3-6 (Ward Dep.) (did not recall learning prior to the closing of the

Merger any information regarding bonuses payable to Merrill employees); Ex. 2 at 242:11-18

(Bramble Dep.); Ex. 5 at 143:10-25 (Franks Dep.).  The absence of evidence that the Outside

Directors knew about the Bonus Cap, by itself, compels summary judgment in their favor.  *See*

*Goodwin*, 1999 WL 64265, at *18; *Anderson, Clayton*, 519 A.2d at 693.

Moreover, the Outside Directors and Mr. Lewis had properly delegated the task of

preparing the Proxy to the appropriate BAC officers.  Ex. 43 at UR-BAC-ML-NYAG00003755-

56.  Defendants understood that members of BAC's management team—which had substantial

M&A experience—would be assisted in that task by both in-house counsel and BAC's outside

counsel for the transaction, Wachtell.  *See, e.g.*, Ex. 2 at 348:25-349:16 (Bramble Dep.) (Board

delegated responsibility for disclosure documents to management team and Wachtell); Ex. 4 at

91:17-92:5 (Countryman Dep.) (testifying that he reviewed Proxy, but "relied primarily on

management and our team of advisors").  This delegation of responsibility to highly competent

professionals was entirely proper and is inconsistent with any claim of bad faith.

Counsel made the considered judgment that the terms of the Disclosure Schedule did not

need to be disclosed in the Proxy.  Defendants had no role in that decision, nor any reason to

question it.  As Mr. Lewis testified, BAC had "great lawyers and great outside counsel" to make

sure the Proxy disclosed the key terms of the Merger that needed to be disclosed, and not being a

lawyer, he "would not feel qualified" to second-guess their expert decisions.  Ex. 10 at 195:9-

196:16 (Lewis SEC Dep.); *see generally In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009) ("So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to *management's* business judgment." (emphasis added)).

Finally, Defendants had no reason to hide the Bonus Cap.  As Mr. Lewis testified, that aspect of the Merger "was not in [his] consciousness," Ex. 10 at 207:17-21 (Lewis SEC Dep.), because it was not a significant component of the transaction, *id.* at 111:4-12.  Indeed, Greg Fleming, Merrill's President, who negotiated the Bonus Cap, described it as merely a "placeholder" that far exceeded what Merrill expected to pay and what it did, in fact, pay ($3.6 billion).  Ex. 28 at 101:16-21, 102:20-103:9, 112:20-25, 139:6-12 (Fleming SDNY Dep.); Ex. 25 at 93:22-94:17 (Curl Coord. Dep.) ("That was not a target, that was a cap, okay, big difference.").  Moreover, as Mr. Lewis testified, it was "business common sense that an investment bank would absolutely pay bonuses in 2008."  Ex. 10 at 109:7-10 (Lewis SEC Dep.). It did not occur to Mr. Lewis that "anybody that knew anything about investment banks" would think that Merrill "was not going to pay bonuses."  *Id.* at 297:19-298:8.[19]

## III.   THERE IS NO EVIDENCE THAT DEFENDANTS WITHHELD ANY INFORMATION AFTER THE STOCKHOLDER VOTE IN BAD FAITH

Summary judgment is also warranted for Plaintiffs' claims that Defendants breached their duty of loyalty by not disclosing certain information in the period between the December 5 vote

---

[19] Nor is there evidence that any BAC stockholder believed that Merrill would not pay 2008 bonuses.  To the contrary, it was widely reported in the press that Merrill *would* pay bonuses and had been accruing bonus expense.  *See, e.g.*, Ex. 65 (10/27/08 *N.Y. Times* article reporting that "[f]ive straight quarters of losses and a 70 percent slide in its stock this year have not stopped Merrill Lynch from allocating about $6.7 billion to pay bonuses" for 2008); Ex. 75 (12/3/08 Bloomberg.com article reporting that Merrill "plans to cut year-end bonuses in half after more than $20 billion of losses that forced the U.S. securities firm to sell itself to [BAC]" and noting that Merrill's compensation accruals for the first three quarters of 2008, which include estimated amounts for bonuses, were down only three percent from 2007 levels).

and the closing of the Merger on January 1, 2009.  *See* Compl. ¶ 24.  Again, there is simply no evidence to support these claims.

To begin, Defendants had no fiduciary obligation to disclose any developments subsequent to the vote, even if material.  After the vote, no further action was being requested of BAC's stockholders.  Consequently, Defendants had no fiduciary duty to make any disclosures to them.  *See Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998) ("In the absence of a request for stockholder action," directors are "not require[d] . . . to provide shareholders with information concerning the finances or affairs of the corporation."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131, 153 (Del. Ch. 2004) (rejecting argument that mere possession of material facts about the corporation's business gives rise to a duty to disclose, because fiduciaries have "no distinctive state law duty to disclose" absent "a request for stockholder action" (internal quotations and citation omitted)).

Defendants could not "deliberately misinform[] shareholders about the business of the corporation," *Malone*, 722 A.2d at 14, but Plaintiffs have not asserted that Defendants misinformed stockholders about any post-vote developments.  There is no allegation that Defendants issued any misleading information between December 5 and January 1, 2009.  Nor was any of the information that Plaintiffs assert should have been disclosed necessary to "correct" any prior statement, because nothing in the Proxy (or elsewhere) was rendered false by subsequent events.

Moreover, Defendants had no reason to believe that any earlier communications were false, and therefore cannot be shown to have "knowingly and in bad faith remain[ed] silent even as [stockholders] continue[d] to rely on those earlier statements."  *Metro Commc'n*, 854 A.2d at 153; *see also Transkaryotic*, 954 A.2d at 362-63 (granting summary judgment on disclosure

claims in part because plaintiffs did not present evidence of bad faith); *Goodwin*, 1999 WL 64265, at *7-20 (same).

A.    **Post-Vote Interim and Forecasted Losses**

The Complaint alleges that Defendants knew that Merrill's losses had "ballooned to almost $21 billion on a pretax basis" by mid-December and chose not to disclose this information at the direction of Secretary Paulson and Chairman Bernanke.  Compl. ¶¶ 114, 131-32, 135.  But no disclosure was required.  The Proxy contained no projections or positive statements about Merrill's fourth quarter that were rendered false by post-vote estimated losses.  Rather, the Proxy, and BAC's and Merrill's third quarter 10-Qs that were incorporated by reference, contained stark warnings about the state of the financial markets and its implications for Merrill's fourth quarter results.  *See* pp. 10-12, *supra* (summarizing warnings that, among other things, "market conditions have been extremely volatile" during "the past few weeks," and the "challenging and uncertain" market environment was "expected to persist").  These warnings "painted a grim portrait of Merrill's near-term and medium-term prospects."  *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 305 (S.D.N.Y. 2010) (Castel, J.).  There is thus no genuine basis to argue that disclosure of the projected losses was required.

Moreover, Plaintiffs' sole allegation of bad faith—that Defendants followed orders by federal officials not to disclose, *see* Compl. ¶¶ 131-32—lacks any evidentiary support.  When asked whether the Government instructed him not to disclose Merrill's projected losses, Mr. Lewis testified, "That wasn't an issue that was being exchanged [with the Government]."  Ex. 9 at 87:6-88:13 (Lewis NYAG Dep.).  Nor is there the slightest shadow of bad faith.  No Defendant was ever advised that additional disclosure regarding Merrill's financial condition was required.  *See, e.g.*, Ex. 2 at 349:17-22 (Bramble Dep.) (no issues or problems with Merger disclosures were brought to Board's attention prior to closing).  And, of course, Merrill's actual

losses were eventually disclosed as part of the regular cycle of reporting in January 2009, which makes it implausible to think that Defendants would wrongfully withhold the same information only a short time before.

### B. BAC's Consideration of Asserting a MAC

The Complaint also alleges that Defendants were required to disclose "the Board's decisions regarding the MAC."  Compl. ¶ 135.  Contrary to the Complaint's allegations, however, the Board "never came to the conclusion . . . to exercise a MAC."  Ex. 8 at 311:4-7 (Lewis Dep.); *see also, e.g.*, Ex. 2 at 312:3-8 (Bramble Dep.) ("It never got to that point, not even close."); Ex. 21 at 149:7-21 (Ward Dep.).  Rather, the Board decided against invoking the MAC clause, and the Merger closed as planned.  *See* Compl. ¶¶ 134, 136.

After the stockholder vote, management and the Board *considered* invoking the MAC clause in view of new mid-December forecasts for Merrill's fourth quarter.  But that consideration was not something that had to be disclosed.  Indeed, requiring such disclosure would risk confusing stockholders with announcements of contingent and unresolved courses of action.  It would also deprive companies of the ability to consider their legal options without disclosure to potential counterparties.  To be sure, "[i]f the mere consideration of invoking a MAC clause required disclosure of such consideration, there would be a powerful disincentive to entertain the discussions," which could "work to the detriment of the company."  *In re Bank of Am.*, 757 F. Supp. 2d at 308.[20]

---

[20] Notably, Item 1.02 of Form 8-K—entitled "Termination of a Material Definitive Agreement"—requires the disclosure of certain information "[i]f a material definitive agreement which was not made in the ordinary course of business . . . is terminated . . . and such termination . . . is material."  69 Fed. Reg. 15594, 15620 (Mar. 25, 2004).  But Instruction No. 1 to that Item expressly states:  "No disclosure is required solely by reason of this Item 1.02 during negotiations or discussions regarding termination of a material definitive agreement *unless and until the agreement has been terminated*."  *Id.* (emphasis added).  Until termination actually occurs, no disclosure is required.

In any event, no Defendant had reason to believe that disclosing the MAC considerations was required, and there is thus no basis to attribute the lack of disclosure to bad faith.

### C.   BAC's Discussions with Regulators

As with the Board's internal evaluation of the MAC clause, there was likewise no duty to disclose that BAC was discussing a potential assistance package with the Government in late-December 2008.  Compl. ¶ 135.  First, the Board had no obligation to disclose *any* such development affecting the Bank's business, because, as noted above, there is no obligation to disclose absent a request for stockholder action.  Nor was there anything to disclose.  There was no agreement with the Government, only assurances that support would be forthcoming.  As Mr. Lewis testified:

> [T]here was nothing specific. . . . There was no form of security agreed to.  There was no definitive amount. . . . [T]hey were still talking about some other form rather than preferred . . . as a possibility.  There was no interest rate.  There was no amount . . . on the fencing . . . and that never happened, actually.  So I don't know what you would disclose.

Ex. 8 at 320:24-321:8 (Lewis Dep.); *see also, e.g.*, Ex. 6 at 316:14-22 (Gifford Dep.) ("we didn't have anything to disclose," because "we couldn't pin the government down on what they would do, particularly the terms"); Ex. 5 at 206:2-5 (Franks Dep.) (BAC "was not close enough with the Fed at that time as of the 30th of December to know what form this agreement was going to take"); Ex. 4 at 212:21-24 (Countryman Dep.); Ex. 2 at 321:10-19 (Bramble Dep.).

Nor is there any evidence that the Defendants engaged in bad faith conduct by not disclosing such discussions.  Plaintiffs allege that Defendants did not disclose the discussions with the Government at the instruction of the Government.  *See* Compl. ¶¶ 132-33.  The record supplies no support for that assertion, but rather, refutes it.  Mr. Lewis testified that he was never instructed not to disclose information that BAC believed had to be disclosed.  Ex. 91 at BAC-ML-CL00079631-32 (Tr. of 6/11/09 Congr. Hearing).  And although the Government did "not

want a public disclosure" regarding the assistance it would be willing to provide for BAC "until
[the agreement] was completed," Ex. 9 at 87:22-88:9 (Lewis NYAG Dep.), that statement is
inadequate to support an inference that Defendants withheld information from shareholders in
bad faith.  No Defendant was ever advised by any of the lawyers involved in the MAC
discussions that the ongoing negotiations with the Government had to be disclosed or had any
other reason to believe that disclosure was required.  Absent evidence of such a belief, there is no
basis to think that they did not disclose in bad faith.

**IV.   THERE IS NO EVIDENCE THAT DEFENDANTS
ACTED DISLOYALLY BY NOT INVOKING THE
MAC CLAUSE OR SEEKING TO RENEGOTIATE**

Finally, there is no triable issue of fact that Defendants breached their fiduciary duty of
loyalty by deciding not to invoke the MAC clause to seek to terminate the Merger Agreement or
to renegotiate its terms.  *See* Compl. ¶ 155.  Given the absence of any evidence that Defendants
acted out of self-interest in proceeding with the Merger, and in the face of overwhelming
evidence of myriad perfectly valid reasons to do so, Plaintiffs have failed to present any plausible
basis to conclude that Defendants acted disloyally.

**A.   There Is No Evidence That the Threat To Remove Management
and the Board Inappropriately Influenced Any of the Defendants**

Plaintiffs have failed to adduce any evidence that would permit a conclusion that
Defendants decided against invoking the MAC clause "to preserve their positions within BAC in
the fac[e] of a threat of removal by the government"  Compl. ¶ 155.

When Mr. Lewis informed the Board on December 22, 2008 that Secretary Paulson had
threatened to remove management and the Board if BAC invoked the MAC clause, Defendants
unanimously rejected any personal concern for their positions as a motivating factor in their
decision-making.  *See* Ex. 57 at BAC-ML-NYAG-502-00001127.  As one director testified, Mr.

Paulson's statement "carried no water with the [B]oard whatsoever." Ex. 11 at 147:17-23 (Lozano Dep.); Ex. 6 at 308:3-20 (Gifford Dep.) (directors made clear that the threat "would not be a basis of the Board decision" and that any decision would be based "on what we thought were the best interests of shareholders"); Ex. 13 at 210:14-211:2 (May Dep.) (directors were "offended" by the threat, "as if a seat on the [B]oard would affect our decision-making and our responsibility to the shareholders," and "asked to be sure that our indignation was recognized in [the] minutes"); Ex. 19 at 115:11-17 (Spangler Dep.) (decision to consummate the merger "was not prefaced by the fact that they were going to remove the board and the management"; rather, the Board "felt it was the best decision for the Bank of America and for its shareholders").[21] Moreover, Mr. Lewis testified that, although the threat conveyed the seriousness of the regulators' position, he did not think it was to be taken literally. As he explained, removing the Board and management would probably be "worse than calling a MAC" in terms of systemic risk. Ex. 8 at 302:23-304:2 (Lewis Dep.).

Nor is there evidence that a concern for retaining their positions would prompt any of the Defendants to act disloyally. Indeed, the roughly $240,000 that the Outside Directors received annually in Board fees during the relevant period was not material to them in view of their overall financial resources.[22] To the contrary, it would not have moved them "to even think about" acting disloyally. Ex. 18 at 174:4-11 (Sloan Dep.).

---

[21] *See also* Ex. 4 at 180:11-22 (Countryman Dep.) (the threat "was not . . . going to be driving the [B]oard"); Ex. 5 at 199:1-14 (Franks Dep.) (was an "absolute fact" that the threat did not persuade or influence the Board); Ex. 17 at 244:13-18 (Ryan Dep.) ("[N]o one cared about that."); Ex. 18 at 173:25-174:11 (Sloan Dep.) ("[I]t's almost an insult to your intelligence."); Ex. 16 at 152:7-14 (Mitchell Dep.) (threat was "very quickly dismissed as a reason for action one way or the other"); Ex. 12 at 172:22-173:10 (Massey Dep.) (same); Ex. 2 at 308:24-25 (Bramble Dep.) ("comment didn't impact me at all"); Ex. 3 at 175:20-176:3 (Collins Dep.) ("I never heard anyone speak about the individual effect anything could have on them.").

[22] *See, e.g.,* Ex. 2 at 50:5-23 (Bramble Dep.) (███████████████████ ; Ex. 3 at 23:18-20 (Collins Dep.) (████████████████); Ex. 6 at 58:22-59:9 (Gifford Dep.) (█

In addition, Defendants' substantial personal holdings of BAC stock make it implausible that they ever would have proceeded in a manner that they perceived as contrary to the Bank's interests just to retain their positions. For a substantial majority of Defendants, including Mr. Lewis, the value of their personal stock holdings in December 2008 greatly exceeded the compensation they stood to receive from BAC.[23] No evidence backs Plaintiffs' implausible notion that Defendants would compromise the value of these holdings to preserve their positions at BAC. *Cf. In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 356-57 (Del. Ch. 1998) (noting that an "economically rational individual whose priority is to protect the value of his . . . shares" would not "intentionally risk his own and his family's interests in order to placate" an interested party), *rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). As for Mr. Lewis, his BAC stock holdings and pension alone were worth more than $110 million, *see* Ex. 89 at 18, 36 (BAC 2009 Annual Proxy), far outweighing his $1.5 million in salary in 2008, *id.* at 24; *see also* n.23, *supra*. *See generally Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (materiality of disabling "interest" must be assessed "in the context of the director's economic circumstances"); *id.* at 25 n.50.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

██████████████); Ex. 12 at 25:7-14 (Massey Dep.) (████████████████); Ex. 13 at 25:20-25 (May Dep.) (███████████████); Ex. 17 at 20:3-20 (Ryan Dep.) (███ █████████); Ex. 21 at 36:11-15 (Ward Dep.) (██████████████████); *see also* Ex. 11 at 160:10-18 (Lozano Dep.) (income earned as a BAC director was not material); Ex. 4 at 212:25-213:4 (Countryman Dep.) (same).

[23] At the time of the Board's decision against invoking the MAC clause, December 22, 2008, Mr. Lewis's stock was worth over $60 million. Among the Outside Directors, seven held stock worth over $1 million, one exceeding $400 million. *See* Ex. 59 at 18 (BAC 2008 Annual Proxy) (reporting stock beneficially owned as of December 31, 2007); Ex. 89 at 18 (BAC 2009 Annual Proxy) (reporting stock beneficially owned as of February 9, 2009). The closing price of BAC stock on December 22, 2008 was $13.53. *See* Ex. 95 (table of closing prices of BAC stock from September 12, 2008 through January 2, 2009). The chart included as Exhibit 96 provides the value of each Defendant's December 31, 2007 BAC stock holdings at the December 22, 2008 price.

**B.     The Decision Not To Invoke the MAC Clause Was
        Based on Legitimate Business Considerations**

The uncontroverted evidence shows that the Board's decision to proceed with the Merger

was driven by valid considerations of BAC's best interests.

First, the Bank's legal counsel had opined that success in litigation over the MAC clause

was uncertain, and had drafted talking points for management to present to the Board regarding

the legal and practical difficulties.  *See* Ex. 39 at 169:10-19 (Roth Dep.); Ex. 84 at BAC-ML-

NYAG-502-00000917-921 (12/19 Talking Points).  Eric Roth, one of the Wachtell litigators who

analyzed the claim, advised management that there were "high hurdles," including, among other

things, the need to show a "durationally significant loss" that impacts earnings capacity over

"years, not months," Ex. 39 at 96:5-22, 168:22-169:21 (Roth Dep.); *see also id.* at 169:22-170:19

(noting challenges to establishing durational significance, given that Merrill's losses were

primarily in the form of mark-to-market valuation adjustments), and the talking points noted that

"no Delaware court ha[d] ever found that a MAC occurred permitting an acquiror to terminate a

merger agreement," Ex. 84 at BAC-ML-NYAG-502-00000918.  The Board appreciated that,

even though the case was potentially "winnable," Ex. 8 at 283:16-22 (Lewis Dep.), there were

significant risks that litigation would not succeed, *e.g.*, Ex. 2 at 334:18-335:16 (Bramble Dep.)

(viewed success as "less likely than more likely").[24]

The Board also considered that if BAC invoked the MAC clause and lost, it would be

forced to buy a substantially devalued asset, because Merrill's employees would likely leave and

its customers or counterparties might stop doing business with it before the resolution of the

---

[24] *See also, e.g.*, Ex. 4 at 195:10-13 (Countryman Dep.) ("[I]nvoking the MAC
successfully was a long shot."); Ex. 6 at 308:21-309:2 (Gifford Dep.) ("[W]e would not
prevail."); Ex. 11 at 141:23-142:15 (Lozano Dep.) ("highly unlikely that a MAC would
prevail"); Ex. 12 at 183:18-21 (Massey Dep.) ("very uncertain"); Ex. 18 at 161:16-22 (Sloan
Dep.) ("odds are slim and none").

litigation.  *See* Ex. 39 at 171:3-172:15 (Roth Dep.) (explaining risk of BAC being forced to "buy a carcass"); Ex. 2 at 334:18-335:16 (Bramble Dep.) ("[I]t would have extended the time frame, it would have created a lot of uncertainty and it would've had a very high chance of having that franchise disappear" or "irreparably harm[ing] the brand."); Ex. 5 at 198:8-16 (Franks Dep.) (noting risk of losing litigation and "in the process destroy[ing] the product"); Ex. 6 at 320:1-9 (Gifford Dep.) ("stockholders would be the probable losers of being forced to buy something that would be worth a hell of a lot less as a result of the litigation"); *see also* Ex. 84 at BAC-ML-NYAG-502-00000921.  In short, "the consequences of failure would be dramatic."  Ex. 4 at 195:10-13 (Countryman Dep.).  The uncontroverted record demonstrates that Defendants were unwilling to take that risk, and Plaintiffs have failed to show any evidence that would plausibly demonstrate that this judgment was motivated by disloyal considerations.

Second, the Board took account of the views of the Treasury Department and the Federal Reserve that calling a MAC would cause systemic risk for the national financial system, which would negatively affect BAC.  *See, e.g.*, *id.* at 212:4-11 ("The federal government was worried about [systemic risk].  We were worried about it, because we were part of that system and what was good for the American system was going to be good for the Bank of America."); Ex. 17 at 242:15-19 (Ryan Dep.) ("[I]f it's [a] disaster for the financial services industry . . . it's going to be problematic for us."); Ex. 12 at 179:20-25 (Massey Dep.) ("[A]s a result of the financial services system itself being at risk . . . that would almost necessarily have adverse consequences for us since we were such a central player in the financial markets."); *see also* Ex. 57 at BAC-ML-NYAG-502-00001126.

Third, the Government's assurance that it would negotiate an assistance package for BAC presented the prospect of a solution to BAC's near-term capital concerns, while preserving the

Merger's long-term strategic benefits.  *See* Ex. 12 at 185:8-19 (Massey Dep.) ("[G]iven the [F]ed's support during this . . . very, very turbulent period, it was still my view that if we could get through this period with this support that . . . the long-term benefits for the merger . . . could still be possible."); Ex. 17 at 239:25-240:4 (Ryan Dep.) ("[I]f we get some assistance, this is going to help our balance sheet, our ratios, our liquidity and then, ultimately, the deal and our shareholders."); Ex. 18 at 190:24-191:3 (Sloan Dep.) ("[O]nce the government agreed to step in, then I think everybody agreed it was [in] the best interest of the country, the bank, the financial system for the merger to go through.").  This prospect of governmental assistance to bridge the near-term issues posed by Merrill's unexpectedly large fourth quarter losses presented an alternative to invoking the MAC that was less fraught with risk.

### C.   Renegotiation Was Not Seen as a Viable Option

Plaintiffs argue that the Board's failure to try to renegotiate the terms of the Merger demonstrates that Defendants were not acting in BAC's best interests.  *E.g.*, Compl. ¶ 22.  But the record demonstrates that renegotiation was considered and determined not to be a viable option.  *See* Ex. 17 at 239:10-12 (Ryan Dep.) ("[T]he general feeling was it was unlikely we were going to be able to renegotiate a deal . . . .").

First, a renegotiated purchase price would not have solved the real concern created by Merrill's losses—*i.e.*, the capital adequacy of the combined entity.  *See* Ex. 2 at 339:18-340:5 (Bramble Dep.) (renegotiation "wouldn't have altered anything related to the capital challenges for the corporation"); Ex. 37 at 318:8-18 (Price Dep.) (renegotiation would not necessarily address the "capital diminution that had occurred because of the losses needed to support the business"); Ex. 39 at 123:3-10 (Roth Dep.) ("You're going to go to [Thain] and say what, make the price lower?  Fine . . . you still have the capital hole.").

Second, a new deal on new terms would have required a new stockholder vote.  The uncertainties about the outcome of such a vote could have led to a substantial impairment of Merrill's business, if it survived at all.  Ex. 39 at 94:2-17 (Roth Dep.); Ex. 80 at BAC-502-WLRK 00000494 (notes of Mr. Roth expressing Mr. Curl's view that Merrill will "never make it to 3/31"); *see also* Ex. 87 at 15 (Tr. of 1/16/09 BAC Earnings Call) (renegotiation would have required a new stockholder vote, which would have led to "considerable uncertainty and could have well cost more than the repricing we would have saved").

Finally, there is no evidence that Merrill would have accepted different terms.  *See* Ex. 2 at 338:18-339:7 (Bramble Dep.) (recounting view that Merrill would "never entertain anything like that"); Ex. 17 at 232:3-11 (Ryan Dep.) (same).  By December 2008, BAC's stock price had declined substantially from its closing price at the time the Merger was announced, and thus, as a function of the fixed exchange ratio (and the absence of any "collar"), the value of BAC stock being paid to Merrill stockholders had declined from almost $50 billion to about $20 billion.  *See* Ex. 20 at 75:14-76:2 (Tillman Dep.); Ex. 88 at 124 (BAC 2008 10-K).  Likewise, as a result of a $10 billion stock issuance by BAC in October 2008, Merrill's stockholders were also receiving, on a relative basis, materially less equity in the combined entity than had originally been contemplated.  *See* Ex. 25 at 176:7-14 (Curl Coord. Dep.) (testifying that, as of December 1, the October equity offering had resulted in a 16-2/3% reduction in Merrill's "economic interest in the resulting company").

\*     \*     \*

Unsupported and implausible speculation cannot substitute for evidence that Defendants acted disloyally.  As this Court has explained, at summary judgment, after a full opportunity for discovery, plaintiffs have the burden to put forward a "plausible" basis to find that the defendants

have committed a non-exculpated breach of fiduciary duty.  *In re S. Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-VCS, at 126:9-13 (Del. Ch. Dec. 21, 2010) (TRANSCRIPT). Here, as in *Southern Peru*, no such basis exists.  Plaintiffs' wild conjecture of improper motivations for not invoking the MAC clause fall far short of the plausible basis they must show at this stage of the case, particularly when weighed against the abundant evidence of perfectly proper considerations driving the Board's actions.  Because there is simply "no evidence against any of these directors in the record that would support a rational inference of disloyalty," Defendants are entitled to summary judgment.  *See id.* at 128:7-15.

## V.   THERE IS NO EVIDENCE THAT DEFENDANTS COMMITTED WASTE

The uncontroverted evidence shows that the Merger was an attractive business combination to which BAC was bound absent legal cause to terminate the Merger Agreement. The Board's decision to proceed with the Merger in view of the substantial legal and business risks of attempting to invoke the MAC clause, the availability of government assistance in the closing of the Merger and the still-held belief in the long-term strategic benefits of the Merger, raises no genuine issue that the Merger was "a transfer of corporate assets that serve[d] no corporate purpose" or "for which no consideration at all [was] received."  *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000).  Accordingly, Defendants are also entitled to summary judgment on Plaintiffs' claim of waste.

## <u>CONCLUSION</u>

For the foregoing reasons, summary judgment should be granted in favor of Defendants on all claims in the Complaint, and the action should be dismissed with prejudice.

OF COUNSEL:

Lawrence Portnoy
Charles S. Duggan
Brian M. Burnovski
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

Dated:  April 20, 2012

/s/ Daniel A. Dreisbach
Daniel A. Dreisbach (#2583)
Lisa A. Schmidt (#3019)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for the Individual Defendants*

Exhibit JJ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO

Consolidated Derivative Action

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-13-12

Master File
No. 09 MD 2058 (PKC)

ECF CASE

## ORDER SETTING SCHEDULE AND
## PRELIMINARILY APPROVING PROPOSED SETTLEMENT

The parties to the consolidated stockholder derivative action, styled *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MD 2058 (the "Derivative Action"), currently pending before the United States District Court for the Southern District of New York (the "Court"), having applied pursuant to Federal Rule of Civil Procedure 23.1 for an order preliminarily approving the proposed settlement of the Derivative Action in accordance with the Stipulation and Agreement of Compromise, Settlement and Release entered into by the parties on June 19, 2012 (the "Stipulation"), upon the terms and conditions set forth therein (the "Settlement"); the Court having read and considered the Stipulation and accompanying documents; and all parties having consented to the entry of this Order,

**NOW, THEREFORE,** this _13th_ day of _July_, 2012, upon application of the parties,
**IT IS HEREBY ORDERED** that:

PKC

1.     Except for terms defined herein, the Court adopts and incorporates the definitions in the Stipulation for purposes of this Order.

2.     The Court preliminarily approves the Settlement, as embodied in the Stipulation and the exhibits attached thereto, as fair, reasonable and adequate, pending a final hearing on the proposed Settlement as provided herein.

3.     For the purposes of the proposed Settlement only, the Court preliminarily finds that the Derivative Action was properly brought as a derivative action for and on behalf of Bank of America Corporation ("BAC"), and that Plaintiffs fairly and adequately represent the interests of BAC stockholders ("BAC Stockholders") similarly situated in enforcing the rights of BAC.

4.     Lead Counsel is authorized to act on behalf of BAC Stockholders with respect to all acts required by the Stipulation or such other acts which are reasonably necessary to consummate the Settlement set forth in the Stipulation.

5.     A hearing (the "Settlement Hearing") shall be held on January 11, ~~2012~~ 2013  PKC at 11:30 a.m., Eastern Time, at the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 12C, New York, New York 10007, to:

   a.     determine whether the Settlement should be approved as fair, reasonable and adequate;

   b.     determine whether an Order and Final Judgment should be entered dismissing the Derivative Action with prejudice;

   c.     hear and address any objections to the Settlement; and

   d.     rule on such other matters as the Court may deem appropriate.

6.     The Court reserves the right to (i) approve the Settlement at or after the Settlement Hearing with such modification(s) as may be consented to by the parties to the

2

Stipulation and without further notice to BAC Stockholders; and (ii) adjourn the Settlement

Hearing or any adjournment thereof, without further notice of any kind to BAC Stockholders.

      7.     If the Settlement is approved at or following the Settlement Hearing, Lead

Counsel shall file an application for an award of attorneys' fees in an amount not to exceed $13

million, and for reimbursement of their expenses incurred in prosecuting the case in an amount

not to exceed $600,000 (the "Fee Application"). Following the filing of the Fee Application, the

Court shall enter an order (the "Fee Hearing Order") setting a date for a hearing to consider the

Fee Application (the "Fee Hearing"), and providing instructions to file any objections to the Fee

Application, which the Court will consider at the Fee Hearing.

      8.     At least ~~sixty (60)~~ *ninety (90)* calendar days prior to the Settlement Hearing:  (a) BAC shall

publish a Summary Notice, in the form of Exhibit D to the Stipulation, as a quarter-page

advertisement in the national and local editions of the *Wall Street Journal* and *Investor Business

Daily*; (b) Lead Counsel shall publish the same or substantially the same Summary Notice via a

national wire service; and (c) BAC shall cause the Stipulation and the Notice, in the form of

Exhibit C to the Stipulation, to be made electronically available at a website to be identified in

the Summary Notice created specifically for the purpose of disseminating notice (the "Settlement

Website"), and to be sent by U.S. Mail to persons who request such Notice by calling a hotline

number to be identified in the Summary Notice.  The parties shall, at or before the Settlement

Hearing, file with the Court proof of publication of such notice.  In addition, if the Settlement is

approved, BAC shall, within seven (7) calendar days of the Court's entry of the Fee Hearing

Order, cause the Fee Application and the Fee Hearing Order to be posted on the Settlement

Website.  The costs of the notice described in this paragraph shall be borne in accordance with

the terms of the Stipulation.

*PKC*

9.      The Court approves, in form and substance, the Notice and Summary Notice, and finds that the form and method of notice specified herein constitutes the best notice practicable under the circumstances, constitutes due and sufficient notice of the Settlement Hearing to all persons entitled to receive such notice and fully satisfies the requirements of due process, Federal Rule of Civil Procedure 23.1 and applicable law.

10.     All proceedings and pending deadlines in the Derivative Action, other than such proceedings as may be necessary to effectuate the terms and conditions of the Settlement, are hereby stayed and suspended until further order of this Court.

11.     Any BAC Stockholder who objects to any aspect of the Settlement or the Order and Final Judgment to be entered in the Derivative Action, may appear in person or by his or her attorney at the Settlement Hearing and present evidence or argument that may be proper and relevant; *provided, however*, that, except for good cause shown, no person other than Lead Counsel and counsel for Defendants and BAC shall be heard and no papers, briefs, pleadings or other documents submitted by any BAC Stockholder shall be considered by the Court unless, not later than twenty-eight (28) *forty-five 45* calendar days prior to the Settlement Hearing directed herein:  (i) a statement of the objections by the BAC Stockholder; (ii) the grounds for such objections; and (iii) proof of ownership of BAC common stock, as well as all documents or writings such person desires the Court to consider, are filed by such person with the Court, and, on or before such filing, are served by hand or mail on the following counsel of record:

Lead Counsel for Plaintiffs:                    Lewis S. Kahn, Esq.
                                                Michael A. Swick, Esq.
                                                Albert M. Myers, Esq.
                                                Kahn Swick & Foti, LLC
                                                206 Covington Street
                                                Madisonville, Louisiana 70447

> Maya Saxena, Esq.
> Joseph E. White, III, Esq.
> Christopher S. Jones, Esq.
> Saxena White P.A.
> 2424 N. Federal Highway, Suite 257
> Boca Raton, Florida 33431

Counsel for Defendants:

> Lawrence Portnoy, Esq.
> Charles S. Duggan, Esq.
> Brian M. Burnovski, Esq.
> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017

12. Any BAC Stockholder who fails to object in the manner described above shall be deemed to have waived the right to object (including any right of appeal) and shall be forever barred from raising such objection in this or any other action or proceeding unless the Court orders otherwise.

13. All papers in support of the Settlement shall be filed and served ~~fourteen (14)~~ twenty-one (21) PKC calendar days prior to the deadline for BAC Stockholders to object to the Settlement, and all reply papers shall be filed and served ~~seven (7)~~ fourteen (14) PKC calendar days before the Settlement Hearing.

14. If the Settlement is approved by the Court following the Settlement Hearing, an Order and Final Judgment will be entered as described in the Stipulation. Without affecting the finality of that Order and Final Judgment, the Court shall retain continuing jurisdiction to consider the Fee Application, address any objections thereto and enter any separate judgment(s) for fees and expenses.

15. If the Settlement, including any amendment made in accordance with the Stipulation, is not approved by the Court or shall not become effective for any reason whatsoever, the Settlement (including any modification thereof made with the consent of the parties as provided for in the Stipulation), and certifications herein and any actions taken or to be

5

taken in connection therewith (including this Order and any judgment entered herein) shall be terminated and shall become void and of no further force and effect, except for BAC's and Lead Counsel's obligations to pay, in accordance with the terms of the Stipulation, expenses incurred in connection with provision of the notice prescribed by this Order. In that event, neither the Stipulation, nor any provision contained in the Stipulation, nor any action undertaken pursuant thereto, nor the negotiation thereof by any party, shall be deemed an admission, concession or received as evidence in this or any other action or proceeding.

16.    The existence of the Stipulation, its contents and any negotiations, statements or proceedings in connection therewith will not be argued to be, and will not be construed or deemed to be, a presumption, concession or admission by any of the Released Parties or any other person of any fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Derivative Action or otherwise or that BAC, Plaintiffs or Lead Counsel, any present or former stockholders of BAC or any other person, have suffered any damage attributable in any manner to any of the Released Parties. Nor shall the existence of the Stipulation and its contents or any negotiations, statements or proceedings in connection therewith be construed as a presumption, concession or admission by Plaintiffs or Lead Counsel of any lack of merit of the Released Claims, or that BAC has not suffered cognizable damages caused by Defendants. The existence of the Stipulation, its contents or any negotiations, statements or proceedings in connection therewith, shall not be offered or admitted in evidence or referred to, interpreted, construed, invoked or otherwise used by any person for any purpose in the Derivative Action or otherwise, except as may be necessary to effectuate the Settlement. Notwithstanding the foregoing, any of the Released Parties may file the Stipulation or any judgment or order of the Court related hereto in any other action that may be brought against them, in order to support any

and all defenses or counterclaims based on *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

17. The Court may, for good cause, extend any of the deadlines set forth in this Order without further notice to BAC Stockholders, and the Court retains jurisdiction to consider all further applications arising out of or connected with the Settlement.

**It is SO ORDERED.**

Dated: 7-13-12

THE HONORABLE P. KEVIN CASTEL
U.S. DISTRICT JUDGE

Exhibit KK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED   8 - 3 - 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IN RE: BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION

-----------------------------------------------------------x

THIS DOCUMENT RELATES TO:

THE CONSOLIDATED DERIVATIVE
ACTIONS

-----------------------------------------------------------x

Master File No. 09 MD 2058 (PKC)

ORDER

CASTEL, District Judge:

       Nancy Rothbaum, a shareholder of Bank of America Corporation ("BofA") has

submitted what she has styled a "Motion" to reconsider this Court's Order granting preliminary

approval of a proposed settlement of the Consolidated Derivative Actions.  Ms. Rothbaum is not

a party to any proceeding before the Court.  The Order granting preliminary approval provides

for a mechanism for shareholders, such as Ms. Rothbaum, to file an objection before final

approval.  A final approval hearing is set for January 11, 2013 at 11:30 a.m.  (Order of July 13,

2012, Docket # 690.)  There is no procedure under Rule 23.1, Fed. R. Civ. P.,  for individual

shareholders to object to preliminary approval.

       That said, I have read and considered Ms. Rothbaum's July 17, 2012

memorandum in support of her objection, as well as her declaration and that of Michael

Schwartz in support of the objection.  Preliminary approval is not an empty act and this Court

would not grant preliminary approval of a settlement which on its face was inadequate or

collusive or as to which the proposed notice or method of notice was inadequate.   However, on

- 2 -

the record at this stage, the Court has found no facially inadequacy in the proposed settlement and there are no apparent defects in the proposed notice.

The matter may look differently when the Court has had a full opportunity to consider which elements of damages are recoverable against the individual defendants in a derivative suit on behalf of the corporation, as distinguished from a suit by shareholders against the individual defendants. By the time of the settlement hearing, the Court will also have a better sense of the strength of the derivative claims through the trial of the securities claims in the class action. It will have the benefit of hearing from all shareholders in the final approval process.

If Nancy Rothbaum had standing to object to preliminary approval and/or move to reconsider the grant of preliminary approval, an issue I need not decide, I would nevertheless adhere to the order granting preliminary approval and setting a schedule for final approval. She is welcome to file an objection to the settlement in connection with the final approval process.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
August 2, 2012

Exhibit LL

As filed with the Securities and Exchange Commission on September 28, 2012

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# WASHINGTON, D.C. 20549

# FORM 8-K

———————————————

## CURRENT REPORT
## PURSUANT TO SECTION 13 OR 15(D) OF THE
## SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported):**
September 28, 2012

———————————————

# BANK OF AMERICA CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-6523** | **56-0906609** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**100 North Tryon Street**
**Charlotte, North Carolina 28255**

(Address of principal executive offices)

**(704) 386-5681**

(Registrant's telephone number, including area code)

**Not Applicable**

(Former name or former address, if changed since last report)

———————————————

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 8.01.**          **OTHER EVENTS.**

On September 28, 2012, the Bank of America Corporation issued a press release announcing the settlement of Merrill Lynch acquisition-related class action litigation. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

**ITEM 9.01.**          **FINANCIAL STATEMENTS AND EXHIBITS.**

**(d) Exhibits.**

The following exhibit is filed herewith:

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| 99.1 | Press Release dated September 28, 2012 |

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**BANK OF AMERICA CORPORATION**

By:   /s/ Michael Pressman
_____
Michael Pressman
Assistant General Counsel

Dated: September 28, 2012

3

**INDEX TO EXHIBITS**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| 99.1 | Press Release dated September 28, 2012 |

4



September 28, 2012

Investors May Contact:
Kevin Stitt, Bank of America, 1.980.386.5667
Lee McEntire, Bank of America, 1.980.388.6780

Reporters May Contact:
Jerry Dubrowski, Bank of America, 1.980.388.2840
jerome.f.dubrowski@bankofamerica.com

**Bank of America Reaches Settlement in Merrill Lynch Acquisition-Related Class Action Litigation**

*Total Third-Quarter 2012 Litigation Expense Estimated to Be Approximately $1.6 Billion*

*Litigation Expense, Valuation Adjustments for Improvement in the Company's Credit Spreads and U.K. Tax Charge Are Expected to Negatively Impact EPS by Approximately $0.28 in Third Quarter 2012*

CHARLOTTE - Bank of America today announced it, and certain of its current and former officers and directors, have agreed, subject to court approval, to settle a class action lawsuit brought in 2009 on behalf of investors who purchased or held Bank of America securities at the time the company announced plans to acquire Merrill Lynch.

Under terms of the proposed settlement, Bank of America would pay a total of $2.43 billion and institute certain corporate governance policies. Plaintiffs had alleged, among other claims, that Bank of America and certain of its officers made false or misleading statements about the financial health of Bank of America and Merrill Lynch. Bank of America denies the allegations and is entering into this settlement to eliminate the uncertainties, burden and expense of further protracted litigation.

"Resolving this litigation removes uncertainty and risk and is in the best interests of our shareholders," said Chief Executive Officer Brian Moynihan. "As we work to put these long-standing issues behind us, our primary focus is on the future and serving our customers and clients."

The proposed settlement will be reviewed by Judge Kevin Castel in the United States District Court for the Southern District of New York, where the class action is pending. Further information concerning the details of the settlement are available from the court's docket, *In Re Bank of America Securities Derivative & Employment Retirement Income Sec. Act (ERISA) Litigation, 09 MDL 2058 (PKC)* or from plaintiffs' lead counsel, Bernstein Litowitz Berger & Grossmann LLP; Kaplan Fox & Kilsheimer LLP; and Barroway Topaz Kessler Meltzer & Check, LLP.

The amount to be paid under the proposed settlement will be covered by a combination of Bank of America's existing litigation reserves and incremental litigation expense to be recorded in the third quarter of 2012. The company estimates total litigation expense will be approximately $1.6 billion for the three months ended September 30, 2012, which includes the incremental costs of the related settlement above previous accruals and other litigation-related items.

The settlement agreement also contemplates that Bank of America will institute and/or continue certain corporate governance enhancements until January 1, 2015, including those relating to majority voting in director elections, annual disclosure of non-compliance with stock ownership guidelines, policies for a board committee regarding future acquisitions, the independence of the board's compensation committee and its compensation consultants, and conducting an annual "say-on-pay" vote by shareholders.

**Litigation expense, improvements in the company's credit spreads and the U.K. Tax charge are expected to negatively impact reported third quarter EPS by approximately $0.28**

In addition to the litigation expense, the company expects that its third-quarter 2012 financial results will be adversely impacted by approximately $1.9 billion (pretax) in negative fair value option (FVO) adjustments and debit valuation adjustments (DVA) related to the improvement in the company's credit spreads, and the previously reported charge of approximately $800 million to income tax expense for changes in the U.K. corporate tax rate and the related effect on the deferred tax asset valuation.

Bank of America is scheduled to report third-quarter 2012 financial results on October 17.

*Forward-looking statements*

*Certain statements in this press release represent the current expectations, plans or forecasts of Bank of America based on available information and are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.*

*Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. These statements often use words like "expects," "anticipates," "believes," "estimates," "targets," "intends," "plans," "predict," "goal" and other similar expressions or future or conditional verbs such as "will," "may," "might," "should," "would" and "could." The forward-looking statements made in this press release include, without limitation, statements concerning: that litigation expense, valuation adjustments for improvement in the company's credit spreads, and U.K. tax charge will negatively impact EPS by approximately $0.28 in Third Quarter 2012; final approval of the settlement; that the amount to be paid under the proposed settlement will be covered by a combination of Bank of America's existing litigation reserves and incremental litigation expense of approximately $1.6 billion for the three months ended September 30, 2012, which includes the cost of the related settlement above previous accruals and other litigation-related items; the institution of certain corporate governance enhancements; that increased litigation expense,*

*improvements in the company's credit spreads and the U.K. tax charge are expected to negatively impact third quarter EPS by approximately $0.28; that the company expects its third-quarter 2012 financial results will be adversely impacted by approximately $1.9 billion (pretax) in FVO adjustments and DVA related to the improvement in the company's credit spread, and the charge of approximately $800 million to income tax expense for changes in the U.K. corporate tax rate and the related effect on the deferred tax asset valuation. Forward-looking statements speak only as of the date they are made, and Bank of America undertakes no obligation to update any forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statement was made.*

*These statements are not guarantees of future results or performance and involve certain risks, uncertainties and assumptions that are difficult to predict and are often beyond Bank of America's control. Actual outcomes and results may differ materially from those expressed in, or implied by, any of these forward-looking statements. You should not place undue reliance on any forward-looking statement and should consider all of the following uncertainties and risks, as well as those more fully discussed under Item 1A. "Risk Factors" of Bank of America's 2011 Annual Report on Form 10-K and in any of Bank of America's other subsequent Securities and Exchange filings; the accuracy of estimates used in determining the expected litigation expense; whether and to what extent challenges will be made to the settlement and the timing of the court approval process; the receipt of final court approval; and that unexpected events may affect our litigation expense, valuation adjustments for improvement in the company's credit spreads, or tax expense related to changes in the U.K. tax rate.*

### Bank of America

Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. The company provides unmatched convenience in the United States, serving approximately 56 million consumer and small business relationships with approximately 5,600 retail banking offices and approximately 16,200 ATMs and award-winning online banking with 30 million active users. Bank of America is among the world's leading wealth management companies and is a global leader in corporate and investment banking and trading across a broad range of asset classes, serving corporations, governments, institutions and individuals around the world. Bank of America offers industry-leading support to approximately 4 million small business owners through a suite of innovative, easy-to-use online products and services. The company serves clients through operations in more than 40 countries. Bank of America Corporation stock (NYSE: BAC) is a component of the Dow Jones Industrial Average and is listed on the New York Stock Exchange.

For more Bank of America news, visit the Bank of America newsroom.

**www.bankofamerica.com**

**###**

Exhibit MM

9/28/12 Reuters News 22:04:17

Loaded Date: 09/28/2012

Reuters News
Copyright 2012 Reuters

September 28, 2012

UPDATE 4-BofA pays $2.4 bln to settle claims over **Merrill**

Martha **Graybow**
Rick Rothacker

 Sept 28 (Reuters) - Bank of America Corp <BAC.N> agreed on Friday to pay $2.43 billion to settle claims it hid crucial information from shareholders when it bought investment bank Merrill Lynch & Co at the height of the financial crisis.

The settlement, among the biggest of its kind to stem from the 2008 meltdown, underscores how Bank of America is still suffering from decisions it made during the crisis, even as competitors are moving on.

 The second largest U.S. bank likely lost money in the third quarter in large part because of the agreement, while other major banks, including JPMorgan Chase & Co <JPM.N> and Wells Fargo & Co <WFC.N> are expected to earn billions of dollars each.

 As Lehman Brothers failed in September 2008, Bank of America agreed to buy Merrill Lynch. But in the weeks after that agreement, the bank tried unsuccessfully to scrap the deal. Merrill Lynch generated more than $15 billion of losses and its executives agreed to award employees up to $5.8 billion of bonuses.

 Bank of America's shareholders voted to approve the deal in December 2008. After the merger closed, Bank of America shares fell sharply, and investors sued, saying Merrill's losses and bonuses should have been disclosed before the vote.

 Bank of America denied the lawsuit's allegations, but CEO Brian Moynihan said the bank agreed to settle to remove uncertainty and put the case behind it.

 The Merrill Lynch deal, as well as the bank's 2008 purchase of subprime lender Countrywide Financial, have ended up costing Bank of America billions, with the bank's mortgage business alone losing more than $35 billion since the Countrywide deal.

 But the Merrill Lynch acquisition has also given much needed revenue to Bank of America. While the bank does not break out its results from Merrill Lynch, its wealth management and investment banking units, which owe much of their business to Merrill, generated nearly $160 billion of revenue from 2009 through June, or 43 percent of the bank's overall revenue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Friday's settlement, which requires court approval, would resolve a case set for an Oct. 22 trial in U.S. District Court in Manhattan. Investors sued the company and executives including former Chief Executive Ken Lewis, but Bank of America said it was footing the bill for the settlement.

At a brief hearing before Judge Kevin Castel on Friday afternoon, the judge told lawyers, "This is, needless to say, a good development," referring to the settlement. Few expect the settlement to face the obstacles that Bank of America experienced in 2009 when settling with the Securities and Exchange Commission over this same acquisition. A judge rejected the bank's initial settlement and forced both parties to renegotiate it.

LONG-SOUGHT DEAL

In September 2008, Bank of America's Lewis told his shareholders that buying Merrill Lynch was a real opportunity. The investment bank had the biggest retail brokerage on the Street, which gave Bank of America a new channel for selling products like credit cards.

As the deal started to look bad toward the end of 2008, Lewis tried to back out of it. But then-Treasury Secretary Henry Paulson pressured him to go through with the transaction. In January 2009, when Bank of America closed on its Merrill Lynch purchase, it received a $20 billion government bailout to shore up its balance sheet.

Bank of America has since repaid the money. Lewis retired at the end of 2009.

The deal helped the financial system but hurt Bank of America's shareholders, said Gary Townsend, chief executive of Hill-Townsend Capital in Chevy Chase, Maryland. Bank of America shares have slid more than two-thirds since the Merrill deal was announced in September 2008.

"It's good to get a bad tooth removed. But the question is, 'How expensive was Ken's mistake back in 2008?,'" Townsend said.

Lewis, when contacted by Reuters, declined to comment on the settlement.

The Merrill deal was valued at $50 billion when announced, but the final price was around $29.1 billion as Bank of America's shares fell.

Bank of America's acquisitions have continued to bring it pain. Since the financial crisis, the bank has agreed to pay more than $16 billion in 12 settlements with mortgage investors and other accords linked to takeovers, counting an $8.5 billion pact that still needs court approval.

On top of that $16 billion, Bank of America is on the hook for $11.8 billion in payments, mortgage modifications and loan refinancings as part of a $25 billion settlement this year over allegedly faulty handling of foreclosures.

EXPECTED LOSS

The bank expects to incur total litigation expenses of about $1.6 billion in the third quarter. It said that expense, a U.K. tax charge and a charge related to improvements in the company's credit spreads would hit quarterly results by about 28 cents per share. That would likely trigger a loss for the period. Analysts had expected profit of 14 cents per share when the bank releases results on Oct. 17, according to Thomson Reuters I/B/E/S.

Lead plaintiffs in the lawsuit included the State Teachers Retirement System of Ohio, the Ohio Public Employees

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Retirement System and the Teacher Retirement System of Texas. The case was originally filed in 2009 by former Ohio Attorney General Richard Cordray, now director of the U.S. Consumer Financial Protection Bureau.

 Four to five million shareholders could be eligible to share in the settlement, said Dan Tierney, spokesman for Ohio Attorney General Mike DeWine. Payouts will depend on the number of shares owned, he said.

 Bank of America shares slipped 9 cents to $8.88 on the New York Stock Exchange in afternoon trading.

 Prior to this accord, the largest crisis-era investor class action settlement involved allegations Wachovia, now part of Wells Fargo & Co <WFC.N>, misled investors about the quality of loans sold before the financial downturn, according to NERA Economic Consulting.

 Wells Fargo agreed last year to pay $590 million to resolve that lawsuit, on top of $37 million that auditor KPMG LLP agreed to pay.

 Overall, the largest securities fraud settlements in U.S. history include the $7.2 billion agreement with investors stemming from the collapse of Enron; the $6.2 billion WorldCom settlement; and the $3.2 billion agreement over the accounting scandal at Tyco International, according to Stanford Law School's Securities Class Action Clearinghouse.

 Under the Bank of America settlement, the bank will also make changes to its corporate governance through Jan. 1, 2015. Some of the changes already were part of a February 2010 settlement with the U.S. Securities and Exchange Commission, including provisions on independence of the board compensation committee and an annual shareholder vote on executive pay.

 The plaintiffs' law firms leading the case are expected to apply for $150 million in fees, said Tierney, the Ohio attorney general's spokesman. The law firms include Bernstein Litowitz Berger & Grossmann; Kaplan Fox and Kessler Topaz Meltzer & Check. The fee, which would be subject to court approval, works out to 6 percent of the settlement fund.

 (Additional reporting by Grant McCool and Nate Raymond in New York, Tom Hals in Wilmington, Delaware and Tanya Agrawal in Bangalore; Editing by Supriya Kurane, Jeffrey Benkoe and David Gregorio)

 * Q3 results likely to be hit by 28 cents per share -BofA

 * With legal charges and other items, Q3 loss likely -analysts

 * Bank still suffering from crisis-era decisions

 * Investors accuse bank of withholding information when buying Merrill

 (New throughout, adds details on settlement, background on other BofA litigation and plaintiffs' law firms)

 ((tanya.agrawal@thomsonreuters.com)(within US +1 646 223 8780)(outside U.S +91 80 4135 5800)(Reuters Messaging: tanya.agrawal.reuters.com@reuters.net))

(C) Reuters 2012. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing, or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit NN

MWR         Saxena White P.A. and Kahn Swick & Foti, LLC Announce the
            Oct 12 2012  11:00:00


Saxena White P.A. and Kahn Swick & Foti, LLC Announce the Proposed
Settlement of the Bank of America Corp. Stockholder Derivative
Litigation

NEW YORK, NY -- (Marketwire) -- 10/12/12 --  The following statement
is being issued by Saxena White P.A. and Kahn Swick & Foti, LLC
regarding the Bank of America Corp. Stockholder Derivative
Litigation.

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK

In re Bank of America Corp. Securities, Derivative, and Employee
Retirement Income Security Act (ERISA) Litigation
 Master File No. 09
MD 2058 (PKC)
 This Document Relates to: Consolidated Derivative
Action

NOTICE OF SETTLEMENT OF STOCKHOLDER DERIVATIVE LITIGATION

TO: ALL RECORD AND BENEFICIAL OWNERS OF BANK OF AMERICA CORP. COMMON
STOCK AS OF JUNE 19, 2012, WHO CONTINUE TO OWN SUCH SHARES ("BAC
STOCKHOLDERS"):

THIS NOTICE IS GIVEN pursuant to an Order of the United States
District Court for the Southern District of New York (the "Court"),
to inform you of a proposed stipulated settlement (the "Settlement")
in the above-captioned derivative action (the "Action"). The Action
involves claims, brought derivatively on behalf of Bank of America
Corporation ("BAC"), against certain of its current and former
directors alleging violations of Section 14(a) of the Securities
Exchange Act of 1934 and certain breaches of fiduciary duty in
connection with BAC's acquisition of Merrill Lynch & Co., Inc., which
closed on January 1, 2009.

YOU ARE HEREBY NOTIFIED THAT, a hearing will be held on January 11,
2013, at 11:30 a.m., before the Honorable P. Kevin Castel, at the
United States District Court for the Southern District of New York,
Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street,
Courtroom 12C, New York, NY 10007, for the purpose of determining
whether the Settlement should be approved as fair, reasonable and
adequate. If the Settlement is approved, the Court will hold a
separate hearing at a later date to consider an application by Lead
Counsel for plaintiffs in the Action for an award of attorneys' fees
and for the reimbursement of expenses incurred in the prosecution of
the Action. Because this is a stockholder derivative action brought
for the benefit of BAC, no individual BAC Stockholder has the right
to receive any individual compensation as a res
ult of the settlement
of this action. In accordance with the terms of the Settlement, and
in consideration for certain broad releases, the insurance carriers
who provide coverage applicable to the claims asserted in the
Derivative Action have agreed to pay, on behalf of Defendants, the
sum of $20 million to BAC, and BAC has agreed to implement certain
Copyright (c) 2012

MWR          Saxena White P.A. and Kahn Swick & Foti, LLC Announce the
              Oct 12 2012  11:00:00
corporate-governance reforms, including the creation of a new
board-level committee to oversee major acquisitions by BAC;
modifications to the charter of BAC's disclosure committee to ensure
more systematic oversight of the Bank's acquisition-related
disclosures; changes to BAC's corporate governance guidelines related
to director education requirements for BAC directors; and amendments
to the charter of the Enterprise Risk Committee (ERC) of the BAC
board of directors relating to the attendance of certain corporate
officers at ERC meetings.

IF YOU ARE AN OWNER OF BAC COMMON STOCK, YOUR RIGHTS MAY BE AFFECTED
BY THE SETTLEMENT. This notice contains only a summary of the Action
and the terms of the Settlement. If you are a current BAC
Stockholder, you may obtain a copy of a detailed Notice of Settlement
of Stockholder Derivative Litigation describing the Action, the
proposed Settlement, and the rights of BAC Stockholders with regard
to the Settlement, as well as a copy of the Stipulation of
Settlement, by visiting the website
www.bankofamericaderivativesettlement.com, or by calling (866)
220-1326. Should you have any other questions regarding the proposed
Settlement or the Action, please contact Lead Counsel for Plaintiffs:

*T

Lewis S. Kahn, Esq.                    Joseph E. White, III, Esq.
Michael A. Swick, Esq.                 Saxena White P.A.
Albert M. Myers, Esq.                  2424 N. Federal Highway, Suite 257
Kahn Swick & Foti, LLC                 Boca Raton, Florida 33431
206 Covington Street                   (561) 394-3399
Madisonville, Louisiana 70447
(504) 455-1400

*T

Any objection to the Settlement must be filed with the Clerk of the
Court (Honorable P. Kevin Castel, United States District Court,
Southern District of New York, 500 Pearl Street, New York, NY 10007)
in this case numbered 09 MD 2058 (PKC), no later than November 27,
2012, and served by hand or first class mail (postage prepaid) for
delivery by the same date on Plaintiffs' Counsel (at the address
listed above) and on counsel for Defendants (at the address listed
below):

*T

Lawrence Portnoy, Esq.
Charles S. Duggan, Esq.
Brian M. Burnovski, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

*T

Copyright (c) 2012

MWR          Saxena White P.A. and Kahn Swick & Foti, LLC Announce the
             Oct 12 2012  11:00:00
PLEASE DO NOT CALL OR WRITE THE COURT REGARDING THIS NOTICE.

*T


DATED: October 12, 2012    BY ORDER OF THE UNITED STATES DISTRICT COURT
                           FOR THE SOUTHERN DISTRICT OF NEW YORK

*T


Media contact(s):
Saxena White P.A.
(561) 394-3399

Kahn Swick & Foti, LLC
(504) 455-1400

-0- Oct/12/2012 15:00 GMT

Copyright (c) 2012

Exhibit OO

# INVESTOR'S BUSINESS DAILY

## Affidavit of Publication

Name of Publication:   Investor's Business Daily
Address:   12655 Beatrice Street
City, State, Zip:   Los Angeles, CA 90066
Phone #:   310.448.6700
State of:   California
County of:   Los Angeles

I, **Stephan Johnson**, for the publisher of **Investor's Business Daily,** published in the city of Los Angeles, state of California, county of Los Angeles hereby certify that the attached notice(s) for **Davis Polk and Wardwell LLP** was printed in said publication on the following date(s):

**October 12th, 2012: BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION**

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 12th day of October, 2012, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____ (Seal)



RICHARD C. BRAND II
Commission # 1923876
Notary Public - California
Los Angeles County
My Comm. Expires Feb 25, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x

IN RE BANK OF AMERICA CORP.      :
SECURITIES, DERIVATIVE, AND      :            Master File
EMPLOYEE RETIREMENT INCOME     :            No. 09 MD 2058 (PKC)
SECURITY ACT (ERISA) LITIGATION   :

                                ECF CASE

----------------------------------------------x

THIS DOCUMENT RELATES TO:      :

Consolidated Derivative Action

----------------------------------------------x

## NOTICE OF SETTLEMENT OF STOCKHOLDER DERIVATIVE LITIGATION

### TO: ALL RECORD AND BENEFICIAL OWNERS OF BANK OF AMERICA CORP. COMMON STOCK AS OF JUNE 19, 2012, WHO CONTINUE TO OWN SUCH SHARES ("BAC STOCKHOLDERS"):

THIS NOTICE IS GIVEN pursuant to an Order of the United States District Court for the Southern District of New York (the "Court"), to inform you of a proposed stipulated settlement (the "Settlement") in the above-captioned derivative action (the "Action"). The Action involves claims, brought derivatively on behalf of Bank of America Corporation ("BAC"), against certain of its current and former directors alleging violations of Section 14(a) of the Securities Exchange Act of 1934 and certain breaches of fiduciary duty in connection with BAC's acquisition of Merrill Lynch & Co., Inc., which closed on January 1, 2009.

YOU ARE HEREBY NOTIFIED THAT, a hearing will be held on January 11, 2013, at 11:30 a.m., before the Honorable P. Kevin Castel, at the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 12C, New York, NY 10007, for the purpose of determining whether the Settlement should be approved as fair, reasonable and adequate. If the Settlement is approved, the Court will hold a separate hearing at a later date to consider an application by Lead Counsel for plaintiffs in the Action for an award of attorneys' fees and for the reimbursement of expenses incurred in the prosecution of the Action. *Because this is a stockholder derivative action brought for the benefit of BAC, no individual BAC Stockholder has the right to receive any individual compensation as a result of the settlement of this action.* In accordance with the terms of the Settlement, and in consideration for certain broad releases, the insurance carriers who provide coverage applicable to the claims asserted in the Derivative Action have agreed to pay, on behalf of Defendants, the sum of $20 million to BAC, and BAC has agreed to implement certain corporate-governance reforms, including the creation of a new board-level committee to oversee major acquisitions by BAC; modifications to the charter of BAC's disclosure committee to ensure more systematic oversight of the Bank's acquisition-related disclosures; changes to BAC's corporate governance guidelines related to director education requirements for BAC directors; and amendments to the charter of the Enterprise Risk Committee (ERC) of the BAC board of directors relating to the attendance of certain corporate officers at ERC meetings.

IF YOU ARE AN OWNER OF BAC COMMON STOCK, YOUR RIGHTS MAY BE AFFECTED BY THE SETTLEMENT. This notice contains only a summary of the Action and the terms of the Settlement. If you are a current BAC Stockholder, you may obtain a copy of a detailed Notice of Settlement of Stockholder Derivative Litigation describing the Action, the proposed Settlement, and the rights of BAC Stockholders with regard to the Settlement, as well as a copy of the Stipulation of Settlement, by visiting the website www.bankofamericaderivativesettlement.com, or by calling (866) 220-1326. Should you have any other questions regarding the proposed Settlement or the Action, please contact Lead Counsel for Plaintiffs:

Lewis S. Kahn, Esq.                          Joseph E. White, III, Esq.
Michael A. Swick, Esq.                     Saxena White P.A.
Albert M. Myers, Esq.                      2424 N. Federal Highway, Suite 257
Kahn Swick & Foti, LLC                  Boca Raton, Florida 33431
206 Covington Street                     (561) 394-3399
Madisonville, Louisiana 70447
(504) 455-1400

Any objection to the Settlement must be filed with the Clerk of the Court (Honorable P. Kevin Castel, United States District Court, Southern District of New York, 500 Pearl Street, New York, NY 10007) in this case numbered 09 MD 2058 (PKC), no later than November 27, 2012, and served by hand or first class mail (postage prepaid) for delivery by the same date on Plaintiffs' Counsel (at the address listed above) and on counsel for Defendants (at the address listed below):

Lawrence Portnoy, Esq.
Charles S. Duggan, Esq.
Brian M. Burnovski, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

### PLEASE DO NOT CALL OR WRITE THE COURT REGARDING THIS NOTICE.

DATED: October 12, 2012                         BY ORDER OF THE UNITED
                                             STATES DISTRICT COURT FOR
                                           THE SOUTHERN DISTRICT OF
                                           NEW YORK