UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                 :
IN RE BANK OF AMERICA CORP.        :            Master File
SECURITIES, DERIVATIVE, AND      :    No. 09 MD 2058 (PKC)
EMPLOYEE RETIREMENT INCOME    :         ECF Case
SECURITY ACT (ERISA) LITIGATION    :
-------------------------------------------------------------- x
                                 :
This document relates to:                :
                                 :
Consolidated Derivative Action        :
-------------------------------------------------------------- x

**DECLARATION OF MICHAEL A. SCHWARTZ
IN SUPPORT OF OBJECTION OF THE LABORERS NATIONAL PENSION FUND
AND NANCY ROTHBAUM TO FINAL APPROVAL OF PROPOSED SETTLEMENT
OF THE CONSOLIDATED DERIVATIVE ACTION**

I.      HISTORY OF THE CONSOLIDATED DERIVATIVE ACTION ...................1

      A.  The Consolidated Derivative Plaintiffs Failed To Develop
          The Factual Record Necessary To Support Their Claims ...........................2

      B.  Defendants Refused to Conduct Discovery of
          the Consolidated Derivative Plaintiffs .........................................................5

      C.  Consolidated Derivative Plaintiffs Failed to Obtain
          an Opinion from a Damages Expert .............................................................5

II.     HISTORY OF THE DELAWARE DERIVATIVE ACTION...........................7

      A.  The Delaware Chancery Court Recognized
          That Important Issues Of Delaware Law Are
          Being Litigated In The Delaware Derivative Action ....................................8

      B.  Fact Discovery In The Delaware Derivative Action.....................................9

          i.   Document Discovery ......................................................................10

          ii.  Depositions ....................................................................................10

               1.  The Director Defendants.......................................................10

               2.  Financial and Legal Advisors ...............................................11

               3.  Present And Former BofA And Merrill Employees .............12

      C.  Discovery Conducted By Defendants Of The Delaware Plaintiffs ..............12

      D.  Discovery Motions Filed By The Delaware Plaintiff ..................................12

          i.   Delaware Plaintiff Uncovered That BofA Sanitized
               Its Production To Remove Damning Evidence
               Of Material Misstatements In The Merger Proxy............................12

          ii.  Delaware Plaintiff Uncovered Evidence
               Of Document Destruction .................................................................14

      E.  Expert Discovery .......................................................................................16

      F.  Summary Judgment ....................................................................................20

III. THE FACTUAL RECORD DEVELOPED BY THE
DELAWARE PLAINTIFF ESTABLISHES THAT THE
DIRECTOR DEFENDANTS BREACHED THEIR
FIDUCIARY DUTIES OWED TO BOFA..............................................20

    A. The Parties ...............................................................................20

    B. Events Leading Up To The Merger ...........................................21

        i. Merrill Lynch Faced Bankruptcy Unless
A Merger Partner was Found..............................................22

        ii. Merrill's Senior Executives Grew Concerned
About The Survival Of Merrill ...........................................22

        iii. BofA Conducted 12 Hours Of Due Diligence On
Merrill Before Agreeing To Pay A 70% Premium ..........................24

        iv. BofA Board's Merger Financial Advisors Were
Retained By BofA Executive Greg Curl As
A Result Of His Close Personal Friendship With
JC Flowers ...........................................................................25

        v. BofA Agrees To Pay $29 Per Share For Merrill..............................27

        vi. BofA Telephonic Board Meeting Sunday, September 14 ................29

            1. The Financial Advisor Presentation.......................................29

            2. Despite Serious Reservations Not Aired
During Board Meeting, Board Unanimously
Approved Merger...................................................................32

    C. Despite Reckless Approval On Meager Record
Board Does Not Believe It Owed A Fiduciary Duty
To Monitor Merrill During The Transition Period ........................33

    D. Lewis And Price Conducted An Analyst Call September 15, 2008
To Discuss The Merger and Made Representations that
Became Materially False and Misleading......................................34

    E. Preparation And Filing Of The Merger Proxy ..............................35

        i. FPK Spent Weeks Finalizing The Fairness
Opinion Presentation and Removed Cautionary
Language in Response to BofA's Threat............................35

F.  The Board Was Kept Informed Of Merrill's Deteriorating
Financial Condition Through The Close of the Merger ...............................38

    i.  BofA Management Received Daily And Weekly
Updates Of Merrill's Financial Condition ........................................41

    ii.  BofA Installed its CAO as Acting CFO of Merrill ...........................42

    iii.  During Weekly Board Calls And Regularly
Scheduled Meetings, CEO Lewis And CFO Price
Kept The Board Informed Of Merrill's Deteriorating
Financial Condition .........................................................................42

        1.  September 19, 2008 Special Meeting Of The Board ............42

        2.  September 26, 2008 Telephone Conference of the Board .....43

        3.  October 3, 2008 Telephone Conference of the Board ..........43

        4.  October 5, 2008 Special Meeting Of The Board ..................44

        5.  October 13, 2008 Board Executive Committee Call ............44

        6.  October 15, 2008 Special Meeting Of The Board ................45

        7.  October 22, 2008 Regular Meeting Of The Board ...............45

Beginning On November 4, 2008 BofA Received
Merrill Daily P&Ls ................................................................................46

CFO Price Grew Alarmed With Merrill's October's Losses
and Sought Advice As To Whether Merrill's Losses
Should Be Disclosed To BofA Stockholders .................................................47

        8.  November 7, 2008 Telephone Conference
of the Board .........................................................................47

BofA's General Counsel And Wachtell Agreed That Disclosure
Of Merrill's Losses Was Warranted .............................................................48

On November 21, 2008 BofA Received Merrill's 2009 Forecast ................52

        9.  November 21, 2008 Board Telephone Conference ...............53

In The Weeks Leading Up To The Stockholder Vote
The Senior Executives Of BofA And Merrill Met
Repeatedly To Discuss Merrill's Deteriorating
Financial Condition............................................................................55

The December 1, 2008 Merrill Forecast And 2009 Plan Update ................56

The December 1, 2008, Merrill Update Caused Price
To Fear That Merrill's Losses Constituted A MAC ....................................57

The December 2, 2008 Merrill Forecast And 2009 Plan Update ................57

The December 3, 2008, Meeting Among Lewis, Price,
Cotty, Thain And Chai.................................................................................58

The December 4, 2008 Merrill Forecast And 2009 Plan Update ................60

BofA Update Of The Accretion/Dilution Model Prior
To The Stockholder Vote.............................................................................61

Belk's Updated Merger Model Was Immediately
Incorporated into a Presentation to the Board ...............................................63

Despite Serious Concerns By BofA's Three Top Financial Officers
That Merrill's Financial Condition Should Be Disclosed
No Disclosures Were Made Prior To Stockholder Vote...............................63

CFO Cotty Urged Disclosure Of Merrill's Financial Condition .................64

Price Consulted In-House Counsel About Disclosure .................................64

December 5 Stockholder Vote ....................................................................65

       10. December 5, 2008 Board Telephone Conference ................68

       11. December 9, 2008 Board Meeting .......................................68

BofA Fired General Counsel Mayopoulos When
He Sought To Confront Price Concerning Merrill's Losses........................71

Beginning On December 12, 2008 BofA
Evaluated Invoking The MAC.....................................................................72

On December 17, 2008 BofA Informed The Regulators
That BofA Intended To Invoke The MAC ..................................................72

iv

12. December 19, 2008 Telephone Conference of the Board......74

Secretary Paulson Threatened To Fire Defendant Lewis
and Remove The Director Defendants..........................................75

13. December 22, 2008 Special Meeting Of The Board..............75

14. The Director Defendants' Reactions
To The Government Assistance.............................................78

G. The Federal Regulators Removed
The Director Defendants From BofA's Board.............................80

IV.   THE COLLUSIVE SETTLEMENT DISCUSSIONS ........................80

V.   THE DELAWARE PLAINTIFF LEARNS OF THE
SETTLEMENT OF THE CONSOLIDATED
DERIVATIVE ACTION .........................................................................88

A. The Delaware Plaintiff Files Motion for Injunctive Relief.........................89

B. Delaware Plaintiff Files Petition for an Order to Show Cause
Seeking to Protect BofA From the Collusive Settlement .............................90

VI.   CONSOLIDATED DERIVATIVE PLAINTIFFS ACTIVELY
TRADED BOFA COMMON STOCK DURING THE PENDENCY
OF THIS ACTION WHILE IN POSSESSION OF
CONFIDENTIAL DISCOVERY MATERIAL....................................91

VII.   PRELIMINARY APPROVAL OF THE
PROPOSED SETTLEMENT ..............................................................93

A. Court Grants Preliminary Approval...................................................95

B. Delaware Plaintiff's Objection to Preliminary Approval ............................95

VIII.   THE MEDIATOR'S LACK OF SUPPORT FOR
THE PROPOSED SETTLEMENT.....................................................97

IX.   DELAWARE PLAINTIFF RENEWED REQUEST
FOR CONSOLIDATED DERIVATIVE PLAINTIFFS'
MEDIATION STATEMENT ............................................................101

X.   THE SETTLEMENT OF THE CONSOLIDATED
SECURITIES ACTION....................................................................101

XI.    THE SETTLEMENT IN *SEC V. BANK OF AMERICA CORP.* .......................102

I, MICHAEL A. SCHWARTZ, being duly sworn, depose and say:

1.      I am a partner of the law firm of Horwitz, Horwitz & Paradis, counsel for objectors Laborers National Pension Fund, and Nancy Rothbaum, lead plaintiff in *In Re Bank of America Corporation Stockholder Derivative Litigation*, C.A. No. 4307-CS (Del. Ch. Ct.) (the "Delaware Derivative Action"), and court-appointed Co-Lead Counsel in the Delaware Derivative Action.  I am admitted to practice before this Court and have personal knowledge of the facts set forth herein, which are known to me to be true and correct.  I could and would testify competently about the matters set forth herein if called upon to do so.

2.      I respectfully submit this Declaration in support of the Objection of the Laborers National Pension Fund ("LNPF") and Nancy Rothbaum (the "Delaware Plaintiff") (collectively, the "Objectors") to Final Approval of Proposed Settlement of the Consolidated Derivative Actions (the "Objection").

3.      LNPF provides retirement income security for workers represented by the Laborers' International Union of North America and affiliated Local Unions and District Councils, primarily in the pipeline, building and construction industries.  Annexed hereto as Exhibit 1 is proof of LNPF's ownership of 132,200 shares of Bank of America Corp. ("BofA") common stock.

4.      Annexed hereto as Exhibit 2 is proof of the Delaware Plaintiff's ownership of BofA common stock.

## I.  HISTORY OF THE CONSOLIDATED DERIVATIVE ACTION

5.      The plaintiffs in the captioned Consolidated Derivative Action (the "Consolidated Derivative Plaintiffs") filed their Amended Consolidated Shareholder Derivative and Class Action Complaint for Breach of Fiduciary Duties, Aiding and Abetting, Unjust Enrichment,

Contribution, and Violations of Section 14(a) of the Securities Exchange Act on June 9, 2010 (Dkt # 288). This Complaint alleged claims against the Director Defendants William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward (collectively, the "Director Defendants" or the "Board"), who were directors serving on BofA's Board between September 2008 and January 2009, for violations of Section 14(a) of the Securities Exchange Act of 1934 and breaches of fiduciary duty, in connection with BofA's disclosures relating to BofA's merger with Merrill Lynch & Co. ("Merrill") on September 14, 2008 (the "Merger").

6.      In addition to the Director Defendants, the plaintiffs in the Consolidated Derivative Action named 26 additional defendants (Dkt # 288, ¶¶ 59-84) who were either voluntarily dismissed (Dkt # 181), or dismissed by this Court pursuant to August 27, 2010 Memorandum and Order (Dkt # 303).

## A.      The Consolidated Derivative Plaintiffs Failed to Develop the Factual Record Necessary to Support Their Claims

7.      The Consolidated Derivative Plaintiffs had no incentive to vigorously litigate BofA's derivative claims asserted in connection with the Merger.

8.      Once the Consolidated Derivative Plaintiffs accepted Defendants October 24, 2011, invitation to make a settlement demand solely consisting of corporate governance "reforms" (Dkt # 559, ¶ 7), the Consolidated Derivative Action was in a settlement mode toward a non-cash, corporate governance-based settlement *before* the November 16, 2011, start of depositions in the Consolidated Actions.

9.      Lacking the incentive to develop the record necessary to prepare their case for

trial, the Consolidated Derivative Plaintiffs rode the coat-tails of the government investigations, plaintiffs' counsel in the Consolidated Securities Action and the Delaware Plaintiff's counsel. For example, on October 29, 2009, counsel for the Consolidated Derivative Plaintiffs requested from counsel for the Delaware Plaintiff a copy of the discovery requests they had served in the Delaware Action because counsel for the Consolidated Derivative Plaintiffs had yet to seek discovery in their own Action.

10.     Counsel for the Consolidated Derivative Plaintiffs not only failed to conduct a single deposition, but also ceded the responsibility for conducting such depositions to plaintiffs' counsel in the Consolidated Securities Action who were adversarial to BofA.  Dkt # 558, ¶ 16. In addition, at the time the proposed Settlement was reached, depositions of key witnesses for the derivative claims, such as BofA's CEO and CFO, had not occurred.

11.     When the Consolidated Derivative Plaintiffs went into their sole mediation session on February 29, 2012, they still lacked vital information concerning (i) damages; (2) the probability of success on the merits of their claims; and (3) what ability, if any, each of these Director Defendants had to contribute to any potential settlement, or to satisfy a judgment.  The Consolidated Derivative Plaintiffs' reliance on the government investigations and settlement in *Securities and Exchange Commission v. Bank of America Corporation*, Civil Action Nos. 09-6829, 10-0215 (S.D.N.Y), as a basis for "being fully informed," as discussed below, was flawed since the government investigations failed to uncover the strong evidence supporting the derivative claims that was only discovered by the Delaware Plaintiff.

12.     The Consolidated Derivative Plaintiffs' reliance on the government investigations and the litigation efforts of the Delaware Plaintiff is apparent by the complete lack of discovery motion practice before this Court.  Moreover, the Consolidated Derivative Plaintiffs' failure to

depose critical witnesses named as defendants in their Complaint – BofA's Merger financial advisors, J.C. Flowers & Co. LLC, ("JCF") and Fox-Pitt Kelton Cochran Caronia Waller LLC, ("FPK") (collectively, the "Financial Advisors") – prevented them from uncovering crucial evidence of the Director Defendants' breaches of fiduciary duty which led to material misstatements in the October 31, 2008, joint proxy issued in connection with the Merger (the "Merger Proxy").

13.     Defendants were well aware of the lack of vigor being exhibited by the Consolidated Derivative Plaintiffs in litigating their Action.  This was evidenced by the following exchange during a discovery-related hearing before Chancellor Strine in the Delaware Derivative Action, when counsel for the Director Defendants Mr. Portnoy stated, "I've talked to [Consolidated Derivative Plaintiffs] about any particular discovery they want in their action, the New York Derivative action, and they've said no."  Ex. 3 at 8 (September 6, 2011, Transcript of Scheduling Conference).  This stands in stark contrast to the six sets of document requests and over 48 subpoeanae *duces tecum* served by the Delaware Plaintiff.

14.     In addition, the Consolidated Derivative Plaintiffs inexplicably failed to depose 13 of the 15 outside Director Defendants, and as a result, failed to uncover material evidence in support of the Directors Defendants' liability as well as their ability to contribute to any potential settlement.

15.     The failure to obtain even this basic information in a litigation involving damages in the billions of dollars with $500 million in available D&O insurance coverage, and where the collective net worth of the Director Defendants readily exceeds $1 billion, clearly evidences the grossly inadequate nature of both the proposed Settlement and representation provided to BofA by the Consolidated Derivative Plaintiffs and their counsel.

**B.      Defendants Refused to Conduct Discovery
of the Consolidated Derivative Plaintiffs**

16.      Although Defendants conducted depositions of all of the Delaware plaintiffs, the Defendants chose not to depose either of the two Consolidated Derivative Plaintiffs.  By failing to do so, this Court is deprived of critical evidence necessary to evaluate the adequacy of the Consolidated Derivative Plaintiffs to represent the interests of BofA.

17.      The motivation for this lack of discovery became evident when, as discussed below, this Court granted the Delaware Plaintiff's Application for Discovery of, among other things, the Consolidated Derivative Plaintiffs' ownership and trading in BofA common stock. This discovery led to uncovering what the Director Defendants already knew – that the Consolidated Derivative Plaintiffs traded 1 million shares of BofA common stock during the pendency of this action and while in the possession of confidential discovery material.  ¶¶ 384-391, below.

**C.      Consolidated Derivative Plaintiffs Failed to Obtain
an Opinion from a Damages Expert**

18.      Unable to discern the basis for the Consolidated Derivative Plaintiffs' decision to settle BofA's $5 billion derivative claim for $20 million, the Delaware Plaintiff requested that the Consolidated Derivative Plaintiffs provide them with, among other things, the report of any experts they retained in this litigation.  Ex. 5 (letter dated May 15, 2012 to Joseph W. White and Lewis S. Kahn from Michael A. Schwartz).

19.      When Consolidated Derivative Plaintiffs refused this request, the Delaware Plaintiff filed an Application for Discovery on July 6, 2012, in this Court.  Dkt # 719.

20.      On July 20, 2012, this Court ordered that the Consolidated Derivative Plaintiffs produce to the Delaware Plaintiff "any expert report served pursuant to Rule 26(a)(2), Fed. R.

Civ. P., or (2) any expert report not served but actually shared with the mediator or with counsel for the defendants in the course of negotiations or mediation." Dkt # 707 at 2.

21.     By letter dated August 10, 2012, the Consolidated Derivative Plaintiffs admitted that they "do not possess" any expert report responsive to the Court's Order. Ex. 6.

22.     This admission confirmed that the Consolidated Derivative Plaintiffs entered into the proposed Settlement without the benefit of an expert opinion as to damages. It is also an admission that they ignored this Court's March 16, 2012, deadline to serve expert reports. Dkt # 462, Civil Case Management Plan and Scheduling Order dated September 16, 2011.

23.     Based on the foregoing, the Consolidated Derivative Plaintiffs' representation that they "retained and worked with experts to evaluate issues of causation and damages…" contained in the Notice of Settlement prepared and issued by the Consolidated Derivative Plaintiffs was materially false and misleading. Dkt # 662-1 at 3.

24.     Even at this late date, the Consolidated Derivative Plaintiffs refuse to disclose to this Court their view of damages. In their Memorandum of Law in Support of Motion for Final Approval of Proposed Settlement, the Consolidated Derivative Plaintiffs take great pains to criticize the Delaware Plaintiff's expert report. However, the Consolidated Derivative Plaintiffs continue to conceal from this Court their own view on the amount of damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty.

25.     On the issue of damages, all the Court has before it is the Consolidated Derivative Plaintiffs' misguided and incorrect damage theory alleged in their Consolidated Derivative Complaint:

> The impact upon BofA from Defendants' conscious, reckless, and bad-faith misconduct has been profound. When the Merger was first announced on September 15, 2008, it was valued at $50 billion, based on the then-current trading price of BofA's common stock. By the eve of Closing, BofA's stock price

had been driven so far down that the deal was worth only $19.4 billion.

Dkt # 288, ¶ 26.

26.     This damage theory is irrational to the point that it is one of the main defenses that the Director Defendants have asserted to the claim for damages in the derivative actions.

## II.     HISTORY OF THE DELAWARE DERIVATIVE ACTION

27.     On January 22, 2009, Delaware Plaintiff filed a stockholder derivative action in Delaware Chancery Court against nominal defendant BofA, Chairman and CEO Kenneth D. Lewis, and the other 15 Director Defendants.

28.     This action was later consolidated with other similar actions filed in the Delaware Chancery Court and re-styled, *In re Bank of America Corporation Stockholder Derivative Litigation*.

29.     The Delaware Plaintiff, along with the other Lead Plaintiffs in the Delaware Derivative Action, filed the Verified Consolidated Amended Derivative Complaint on May 8, 2009 (the "Delaware Derivative Complaint").   Ex. 7.   The Delaware Derivative Complaint alleges that with Merrill teetering on failure in the midst of extreme market turmoil, BofA management hastily arranged and recommended an acquisition of Merrill over the course of a weekend after limited due diligence, and, on Sunday, September 14, 2008, the Director Defendants hastily approved the acquisition of Merrill, for $50 billion in BofA stock, at a 70% premium to Merrill's previous closing price.  (Id., ¶¶ 68-73.)

30.     The Delaware Plaintiff further alleges that following the Director Defendants' approval of the Merger, Merrill's financial condition continued to dramatically deteriorate up to and through the December 5, 2008, meeting of BofA stockholders to vote on the Merger ("Stockholder Vote").   The Delaware Plaintiff claims, among other things, that against this

backdrop, the Director Defendants failed to disclose material information concerning Merrill's

financial condition and the Merger prior to the Stockholder Vote and thereafter bowed to

government pressure to close the Merger on the original terms without disclosure, in breach of

their fiduciary duty of loyalty.  (Id., ¶¶ 13-26, 89-165.)

31.     On June 19, 2009, Defendants filed their Motion to Dismiss the Delaware

Derivative Action under Chancery Court Rules 23.1 and 12(b)(6).

32.     On October 12, 2009, the Delaware Chancery Court denied Defendants' Motion

to Dismiss, finding that demand was excused.  Ex. 8, October 12, 2009, Transcript of Argument

and Ruling on Motion to Dismiss, in relevant part, at 112-127.

**A.      The Delaware Chancery Court Recognized That Important Issues
Of Delaware Law Are Being Litigated In The Delaware Derivative Action**

33.     The Delaware Chancery Court recognized the importance of the Delaware State

law issues being litigated in the Delaware Derivative Action.  For example, Chancellor Strine

stated to counsel for BofA during a conference:

> THE COURT: [T]his is a case about a deal, right, and whether it was good for the
> stockholders of the company…As I understand it, this is the idea that the Bank of
> America fiduciaries breached their fiduciary duties and did a deal which was bad
> for their stockholders; right?
>
> MR. PORTNOY: That's the core of it.
>
> MR. KRINER: Right.
>
> THE COURT: That is a core Delaware law issue...frankly, if you mislead your
> stockholders in connection with the stockholder vote, that's a breach of fiduciary
> duty.  I believe that sort of thing would be a breach of fiduciary duty going back
> before there were federal securities laws.  The idea that when you ask your -- the
> object of your fiduciary duties, you know, ward or something like that, to give a
> consent, the idea that you have to give all the material facts and do so truthfully is
> not something that was simply invented in the 1930s as a matter of federal
> statutory law.

Ex. 3 at 3-4.

34.     The Delaware Chancery Court went on to observe:

I also really don't understand when the allegation is this is a catastrophically injurious merger to Bank of America and its stockholders, how that doesn't **raise pretty core concerns of state, you know, corporate law. . .**

* * *

**And as I said, we got a derivative case involving very important issues Delaware law that's waiting to move forward.**  And it's going to move forward.

Id. at 17-18; 27-28 (emph. added).

35.     In response, counsel for the Director Defendants, Larry Portnoy, agreed with Chancellor Strine and responded in relevant part:

And **I don't disagree about the primacy of Delaware and the Delaware interests here**.  And we moved to stay in New York, and we were – that motion was denied.

Id. at 14 (emph. added).

36.     Defendants knew well the implications under Delaware law and chose to spend millions of dollars actively litigating the derivative claims in Delaware Chancery Court for two years thereafter.

37.     This Court recognized that the trial of the Delaware Derivative Action would precede the trial of the captioned Consolidated Actions.   During a September 7, 2011, Conference, this Court set the trial for the Consolidated Actions after the conclusion of the trial in the Delaware Derivative Action, noting, "Chancellor Strine set a trial date.  His trial date as far as I'm concerned takes priority because he set his already."  Ex. 9, September 7, 2011, Transcript of Court Conference, in relevant part, at 21-22.

B.     **Fact Discovery In The Delaware Derivative Action**

38.     Discovery in the Delaware Derivative Action commenced on October 12, 2009, with the denial of Defendants' motion to dismiss.

9

i.    **Document Discovery**

39.    Despite Defendants' representations that the 2.6 million pages of documents produced to the various government entities investigating the Merger satisfied their burden to produce documents to the Delaware Plaintiff, the Delaware Plaintiff believed the government productions were incomplete as a result of the narrow scope of the government investigations, and vigorously sought additional discovery from Defendants.

40.    The Delaware Plaintiff served a total of six separate document requests upon Defendants as it became clear that material, relevant information had not been requested by the government investigations or produced in the government productions.

41.    Additionally, the Delaware Plaintiff directed over 45 subpoenae *duces tecum* to numerous non-parties, including BofA's Merger Financial Advisors and BofA's legal advisors in connection with the Merger, Wachtell, Lipton, Rosen & Katz ("Wachtell").

42.    In response to the Delaware Plaintiff's document requests, subpoenae *duces tecum*, and motions to compel as discussed below, Defendants and non-parties produced over 3.8 million pages of documents.

ii.    **Depositions**

43.    The Delaware Plaintiff began a comprehensive deposition program in May 2011 and completed the last deposition on March 6, 2012.  In total, the Delaware Derivative Plaintiff deposed 48 witnesses including the Financial Advisors.

**1.  The Director Defendants**

44.    The Delaware Plaintiffs deposed all 16 of the Director Defendants.

45.    During the coordinated discovery in the Consolidated Actions, however, the Consolidated Derivative Plaintiffs deposed only 3 of the 16 Director Defendants.  As a result of

the failure to depose all of the Director Defendants, as discussed below, the Consolidated Derivative Plaintiffs failed to uncover material information concerning the Director Defendants' liability as well as their financial ability to contribute to a settlement of the derivative actions.

### 2.   Financial and Legal Advisors

46.    The Delaware Plaintiff conducted extensive discovery of BofA's Financial Advisors, including deposing seven principles and employees of JCF and FPK.

47.    In contrast, even though the Consolidated Derivative Plaintiffs named the Financial Advisors as defendants, the Consolidated Derivative Plaintiffs did not conduct any discovery of the Financial Advisors whatsoever.  The Consolidated Derivative Plaintiffs' failure to do so is inexplicable in light of the fact that the fairness opinions authored by the Financial Advisors were included in the Merger Proxy, and the Financial Advisors were in possession of discovery relevant to the claims asserted by the Consolidated Derivative Plaintiffs.

48.    Discovery taken of BofA's Financial Advisors by the Delaware Plaintiff led to the filing of a motion to compel against BofA, and production of previously withheld BofA and Wachtell documents, which in turn, resulted in the Delaware Plaintiff uncovering the fact that BofA directed Wachtell to threaten FPK to induce it to materially alter its fairness opinion included in the Merger Proxy.

49.    This BofA threat resulted in FPK deleting material cautionary language from its fairness opinion that was intended to inform BofA stockholders of the serious reservations FPK had about its fairness opinion (the "BofA Threat").  The SEC failed to uncover the BofA Threat which resulted in material misstatements in the Merger Proxy.

50.    The Delaware Plaintiff also deposed three Wachtell attorneys who acted as BofA's Merger legal advisors and further developed facts concerning both the BofA Threat and

the fact that BofA concluded in November 2008 that disclosure concerning Merrill's losses was warranted prior to the Stockholder Vote.  In addition, the Delaware Plaintiff uncovered that, Wachtell believed BofA had good cause to declare a MAC and that CEO Lewis notified federal regulators of BofA's intent to declare a MAC over Wachtell's objection.

### 3.    Present and Former BofA and Merrill Employees

51.    The Delaware Plaintiff deposed numerous present and former BofA employees who were integral in analyzing the pro forma effects of the Merger on BofA, as well as keeping the Director Defendants informed of material information concerning the effects of Merrill's deteriorating financial condition on BofA's financials during the period following the Director Defendants' approval of the Merger up until the close of the Merger on December 31, 2008 (the "Merger Transition Period").

52.    In addition, the Delaware Plaintiff deposed former Merrill employees, including former CEO John Thain and former CFO Nelson Chai, who testified that BofA had full access to Merrill's financial information during the Merger Transition Period and that BofA's Chief Accounting Officer, Neil Cotty, effectively became acting CFO of Merrill during this Merger Transition Period.

### C. Discovery Conducted by Defendants of the Delaware Plaintiffs

53.    Defendants sought extensive discovery of the Delaware plaintiffs, including voluminous interrogatories and document requests.

54.    Moreover, Defendants deposed each of the Delaware plaintiffs in order to inquire into their fitness to represent BofA's interest in the Delaware Derivative Action.

### D.    Discovery Motions Filed by the Delaware Plaintiff

#### i. Delaware Plaintiff Uncovered That BofA Sanitized its Production to Remove Damning Evidence of Material Misstatements in the Merger Proxy

55. BofA has continuously asserted that the 2.6 million pages of documents originally produced to the various government agencies and plaintiffs in the Consolidated Actions as well as the Delaware Derivative Action, was an over-inclusive, "comprehensive," exhaustive universe of all documents relating to the Merger gathered from all custodians believed potentially to possess relevant information.  Ex. 10, December 4, 2009 Letter from Matthew E. Fischer.

56. These repeated representations were proven false.  An exhaustive review of the productions by BofA and Wachtell, as compared to the productions by the Financial Advisors, led the Delaware Plaintiff to conclude that BofA sanitized the documents it produced on its and Wachtell's behalf.

57. For example, the Delaware Plaintiff uncovered that documents plainly and materially relevant to non-disclosures in the Merger Proxy – including the BofA Threat – were produced in response to the subpoenae served on the Financial Advisors, but had not been produced or logged by BofA or Wachtell.  ¶¶ 143-151 below for a detailed discussion of the "BofA Threat" which led to a material omission in the Merger Proxy.

58. The Delaware Plaintiff ultimately uncovered that BofA withheld from its productions to the SEC and other government entities, as well as the private plaintiffs in all the related actions, the FPK fairness opinion letters that contained the cautionary language, as well as the correspondence concerning BofA's desire to remove language from FPK's fairness opinion which would have informed BofA's stockholders of FPK's concerns with respect to the limitations of its fairness opinion.

59. Based on these findings, on December 19, 2011, the Delaware Plaintiff sought an order to compel BofA and Wachtell, on whose behalf BofA had collected, produced and redacted documents, to produce in unredacted form all documents and communications previously

withheld or redacted concerning the Merger Proxy and the Financial Advisors' fairness opinions therein.

60.     In response to BofA's argument that the documents at issue were redacted and withheld on the basis of relevance, Chancellor Strine found the sanitized documents to be highly relevant to the Delaware Plaintiff's claims:

> Quite frankly, we're not talking about documents today that are not related to the merger, that have nothing to do with the plaintiffs' claims. **What the stockholders were told at the time they approved the deal is pretty front and center in this.** In the total mix of information, the reliability of the fairness opinions on which the deal was originally premised might still be important. What the board knew about those, whether there were people at Bank of America who, frankly, wished to portray to the stockholders a more solid basis to rely upon the banker's opinion than the banker wished to convey, or, frankly, a more solid one than the board was given, I mean, I don't know. **I haven't seen the evidence; but the idea that it's irrelevant, it's certainly relevant to the merger.**

Ex. 11, January 23, 2012, Transcript of Oral Argument on Plaintiffs' Motion to Compel and Ruling of the Court, in relevant part, at 36-37 (emph. added).

61.     The Delaware Court of Chancery granted the Delaware Plaintiff's motion and ordered BofA to produce all non-privileged documents relating to BofA's Financial Advisors and the Merger Proxy, stating, "[i]t's certainly core -- relevant to the Merger what the proxy statement says about the fairness opinion."  Id. at 68:21-22.

## ii. Delaware Plaintiff Uncovered Evidence of Document Destruction

62.     Following BofA's belated compliance with the January 23 Order, BofA revealed information which indicated that, despite a September 19, 2008, litigation hold relating to the Merger, important documents of at least one key BofA senior officer and custodian, David Belk, appear to have been destroyed and possibly irretrievably lost during the Merger Transition Period.

63.     As early as September 13, 2010, however, BofA represented to the Delaware

Plaintiff that BofA provided notice of the September 19, 2008, litigation hold to 66 specifically named BofA employees, including Mr. Belk, "all of whom it was believed could potentially possess relevant information, to preserve all documents related to the merger."   Ex. 12, September 13, 2010 Letter from Matthew Fischer to Robert Kriner at 2.  Based on the documents which BofA produced following the January 23 Order, however, the Delaware Plaintiff believed gaps remained in BofA's document production, particularly relating to Mr. Belk's emails and Merger financial models.

64.     During his deposition by the Delaware Derivative Plaintiff, Mr. Belk admitted that he would, "routinely delete documents on my computer, you know, in the normal course of business."  Ex. 13, David Belk Delaware Deposition Transcript ("DE Tr.") at 53:3.[1]

65.     In light of this testimony,  BofA finally revealed that, contrary to its repeated, prior representations, Mr. Belk deleted documents until a January 26, 2009, litigation hold was put in place, nearly ***four months after*** the Director Defendants approved the Merger.  During these four months, Mr. Belk updated the BofA Merger models to reflect the disastrous financial impact Merrill's losses were having on BofA's Merger projections.

66.     The fact that Mr. Belk was identified by BofA as a key custodian of documents relating to the Merger is hardly surprising.  Mr. Belk was Senior Vice President in BofA's Corporate Development department, which functioned as BofA's mergers and acquisitions team. Mr. Belk reported to the department's Vice Chairman, Greg Curl, who was one of Defendant Chairman and CEO Ken Lewis' direct reports.  Ex. 14, Gregory Curl Jan. 23, 2012 DE Tr. at 24:12-15.  BofA's executive officers testified to Mr. Belk's integral role in the Merger, including running acquisition financial models.  Ex. 15, Jeffrey Brown (BofA Treasurer) DE Tr. at 35:18-

---

[1] All deposition transcripts cited herein are annexed as relevant excerpts.

36:20 (Mr. Belk was involved in merger due diligence and in modeling pro forma financials). Additionally, Mr. Belk worked closely with the Financial Advisors to create pro forma financial models during the Merger weekend.  Ex. 16, Loren Felsman DE Tr. at 29:8-9.

67.     Specifically, absent from BofA's productions were versions of the Merger financial models referred to by witnesses during their deposition testimony.  Indeed, even though BofA had a template model it utilized to evaluate the Merger, no version of this document was found in BofA's productions.  Moreover, transmittal emails containing or concerning the Merger financial models were not produced, aside from a single email sent the day before the Stockholder Vote which attached a sobering update of the Merger model.  ¶¶ 255-260 below.

68.     This discovery led the Delaware Plaintiff to file a Supplemental Motion to Compel on March 26, 2012, seeking leave to take discovery concerning the destruction of Merger-related documents.  Ex. 17.  Further, the Delaware Plaintiff sought to reserve the right to request evidentiary rulings based on the spoliation of evidence.  This motion remains *sub judice* and could have dire consequences for the Director Defendants in the form of an adverse inference should Chancellor Strine find that material evidence was spoliated.

**E.     Expert Discovery**

69.     On April 6, 2012, the Delaware Plaintiff served the Corrected Expert Report of Professor Anthony Saunders.  Ex. 18.  Professor Saunders was retained by the Delaware Plaintiff to opine on the issue of damages incurred by BofA as a result of the Merger.

70.     Professor Saunders is the John M. Schiff Professor of Finance, and former Chair of the Department of Finance, at the Stern School of Business at New York University. Professor Saunders received his Ph.D. from the London School of Economics and has taught both undergraduate and graduate level courses at New York University since 1978.  He has more

than 30 years of experience in assessing the financial health of companies, with a specialized focus on banking practices and the behavior of financial institutions and markets.  *Id.* at 1.

71.     Professor Saunders utilized two approaches to estimate damages incurred by BofA as a result of the Merger.  First, he performed an event study analysis, utilizing BofA's stock price reaction to the newly disclosed material information concerning Merrill on January 16, 2009, to estimate damages.  In addition, he utilized standard valuation techniques employed in mergers and acquisition to value Merrill, which include a: (i) discounted cash flow analysis; (ii) comparable companies anaylsis; and (iii) comparable transactions anaylsis.  Professor Saunders then utilized the Merrill valuation obtained using these three methodologies in order to calculate damages resulting from the Director Defendants' breaches of fiduciary duty in connection with the Merger.

72.     Additional measures of damages incurred by BofA were determined by Professor Saunders by: (i) calculating the cost of the government assistance provided to BofA by the United States Treasury in connection with the Merger as first disclosed on January 14, 2009 (the "Government Assistance"); and (ii) considering the $150 million fine paid by BofA to the SEC pursuant to the Consent Judgment in *Securities and Exchange Commission v. Bank of America Corp.,* 09 civ. 6829, 10 civ. 0215, (SDNY).  *Id.* at 3.

73.     Professor Saunders opined that the damages incurred by BofA as a result of the Merger, obtained using the event study, are $3.884 billion.  *Id.* at 3.

74.     Professor Saunders further opined that:

A.          the damages incurred by BofA as a result of the Merger, as estimated using the valuation approach described above, are $4.554 billion as of December 31, 2008;

B.      BofA incurred additional damages of $1.861 billion, representing the cost to BofA of the government financial assistance necessary to close the Merger;

C.      BofA also incurred damages of $150 million as a result of the Consent Judgment entered into with the SEC in *Securities and Exchange Commission v. Bank of America Corp.,* 09 civ. 6829, 10 civ. 0215, (SDNY), approved by Judge Rakoff pursuant to an Opinion and Order dated February 22, 2010.  *Id.* at 4.

75.      Professor Saunders opined that total damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty in connection with ther Merger ranged from $5.895 to $6.565 billion. *Id.* at 5.

76.      Professor Saunders further opined that BofA's officers and Director Defendants were fully aware of the impact of Merrill's losses on BofA's capital prior to the close of the Merger.  For example, Professor Saunders relied on the fact that Director Defendant May testified as follows:

Q. Right.  And I'm trying to understand from your perception whether there was any threat of concern expressed by management concerning the mounting losses at 9 billion for the fourth quarter at the December 9 meeting?

A. Nobody likes losses, period.  So when you say concern, yeah.  Everybody was concerned.  But it didn't change our view on the merger.  At this stage, the escalation of the losses, the rapidity with which they had grown in a week's time or 10 days or whatever, was of an alarming nature, and so there was a pause in discussion about what this was doing and what kind of a hole it would create in our balance sheet.

*Id.* at 20.

77.      In addition, Professor Saunders relied on BofA CFO Joe Price's testimony in response to a question about declines in Merrill's valuation:  "[T]he capital hole or the capital diminution that had occurred because of the losses needed to support the business." *Id*. at 20.

78.     Professor Saunders found that BofA Director Defendant Countryman understood that "the capital hole created by deterioration of Merrill Lynch" necessitated $25 billion of additional TARP assistance from the government.  *Id.* at 20-21.

79.     Professor Saunders concluded that because of the large "capital hole" resulting from Merrill's fourth quarter 2008 losses, BofA was forced to obtain regulatory help to "cure the capital problem."  *Id.*  This regulatory assistance took the form of an additional $20 billion in TARP infusions, as well as credit guarantees.  Thus, BofA Director Defendant Sloan stated:

> Then we talked about the injection of funds and then how -- if the bank was going to be forced to buy Merrill at that point in time…just how big is this hole because there's, you know, 150 billion dollars worth of this paper sitting out there, and we asked the Fed to give us a wraparound protection because the bank couldn't absorb that kind of hit.

*Id.* at 22.

80.     Professor Saunders also concluded that Merrill's undisclosed fourth quarter 2008 losses were material, as confirmed by internal BofA communications which reflected concerns about Merrill's poor fourth quarter 2008 performance.  For example, Professor Saunders relied upon an email authored by Peter Hein of Wachtell which stated that:

> Fundamental issue of lack of credibility with rating agencies to whom Target [MER] may not have disclosed the ever increasing losses for the fourth quarter; if Target now belatedly makes that disclosure, likely to have adverse impact on perception of rating agencies (**who do not have an inkling this is coming**); such a rating agency reaction would, if such reaction occurred after deal fell apart, presumably confirm materiality of the fourth quarter losses; also poses significant risk of acquirer [BAC] since acquirer faces prospect if it goes ahead that because of Target's lack of credibility there will be extreme negative reaction by rating agencies if acquisition occurs and then the information Target has not provided to rating agencies become known to them belatedly.

*Id.* at 25-26.

81.     Thus, Professor Saunders concluded that his conservative estimate of total damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty,

utilizing the event study estimate of damages, plus Government Assistance and SEC Settlement damages, is $5.895 billion.

      **F.**    **Summary Judgment**

      82.    On April 20, 2012, the Director Defendants filed their Motion for Summary Judgment in the Delaware Derivative Action seeking to dismiss all claims in the Verified Consolidated Amended Derivative Complaint.

      83.    Had Chancellor Strine not stayed the Delaware Derivative Action, as discussed below, the Delaware Plaintiff was prepared to submit the strong factual record developed to defeat the Director Defendants' Motion for Summary Judgment, and prevail at trial which was scheduled to commence on October 22, 2012, and conclude on November 7, 2012.

**III.**    **THE FACTUAL RECORD DEVELOPED BY THE DELAWARE PLAINTIFF ESTABLISHES THAT THE DIRECTOR DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES OWED TO BofA**

      **A.**    **The Parties**

      84.    Thirteen of the fifteen outside Director Defendants did not have a background in banking, and therefore, were not well suited to run what was, at the time of the Merger, the largest bank in the country.  Ex. 19, Patricia Mitchell DE Tr. at 7:24-8:7 (former news reporter and president and CEO of Paley Center for Media); Ex. 20, Monica Lozano DE Tr. at 10:7-16 (CEO of Spanish language media company); Ex. 21, Jacquelyn Ward DE Tr. at 11:17-12:2 (founder and former CEO of communications company); Ex. 22, Robert Tillman DE Tr. at 5:11-18 (former CEO of Lowe's Companies); Ex. 23, Tommy Franks DE Tr. at 43:20 (admitted "limited experience in business").

      85.    Following the January 1, 2009, close of the Merger, BofA's regulators demanded the resignation of 11 of the 16 Director Defendants who approved the Merger and that they be

replaced with directors who had a background in banking and were otherwise suited to fulfill their fiduciary duties as a director of one of the largest banks in the country.   ¶¶ 338-340 herein.

86.    A number of the outside Director Defendants were beholden to BofA and Chairman and CEO Lewis for a number of reasons.  Ex. 24, O. Temple Sloan, Jr. DE Tr. at 17-19 (BofA provided lines of credit to Director Defendant Sloan's businesses); Ex. 25 (upon learning she would be asked to resign from the Board, Director Defendant Mitchell stated, "Hate losing income…"); Ex. 26, Charles Gifford DE Tr. at 45:16-48:20; 51:20-52:14[2] (Lewis helped establish Gifford's bonus of up to $8,000,000 for acting as Chairman of BofA for one year and BofA pays for Gifford's secretary and office in perpetuity); Ex. 183 (Retirement Agreement between Defendant Gifford and BofA).

87.    For years, the outside Director Defendants approved every merger or business combination they were presented with, even though the Director Defendants privately criticized the way the Board approved mergers.  Ex. 27.

**B.    Events Leading Up To The Merger**

88.    A merger with Merrill was viewed by CEO Lewis to one day be the crowning achievement of his legacy.  Ex. 24, Sloan DE Tr. at 92-93 ("Q. [D]id Mr. Lewis ever raise in words or substance that acquiring Merrill Lynch was one of the goals he wanted to achieve before he retired?  A. Oh, yeah, there was no question about that. I mean, you know, he -- he was a protégé of Mr. McColl, as were others, but that had been their objective a long time.")

---

[2] Director Defendants' counsel notified Objector's counsel on November 27, 2012 that they objected to the disclosure of the bonus amount CEO Lewis was instrumental in awarding Director Defendant Gifford, even though it is unclear how the payment was not required to be disclosed publicly by SEC proxy rules.  The redactions on Ex. 26 reflect Director Defendants' counsel's direction.  Objectors are prepared to submit this information *in camera* upon direction of the Court.

### i. Merrill Lynch Faced Bankruptcy Unless
### A Merger Partner Was Found

89.     In the days and weeks leading up to the Merger weekend, the U.S. financial

markets had been in unprecedented states of disruption and turmoil.  Ex. 28, Gregory Fleming

DE Tr. at 37:12-15 (Merrill's president testified as to the "nightmare that was unfolding in the

financial markets"); Ex. 29, Frank Bramble, Sr. DE Tr. at 104:2-3 ("very volatile times for the

world and the country and the financial markets").

90.     Bear Sterns had collapsed, Lehman Brothers ("Lehman") was rumored to be the

next to fail, and AIG was in a precarious financial position.  According to J. Christopher

Flowers, principle of JCF, without outside assistance, "there was a good chance [AIG] would

have to file for bankruptcy."  Ex. 30, J. Christopher Flowers DE Tr. at 31:2-4.

91.     Mr. Flowers described the environment at the time of the Merger as "a time of

dramatic catastrophe in the financial system."  Ex. 31.

92.     With Lehman teetering on collapse, at the request of Treasury Secretary Paulson,

BofA, with the assistance of JCF, began due diligence on Lehman in connection with a potential

acquisition.  After a few days of due diligence on Lehman, on Saturday, September 13, 2008,

BofA's CFO Price, Greg Curl, BofA's head of corporate strategy, along with Mr. Flowers,

informed Secretary Paulson that without $50 billion of government assistance, BofA would not

acquire Lehman.  Ex. 30, Flowers DE Tr. at 26:11-15.

### ii. Merrill's Senior Executives Grew Concerned
### About The Survival Of Merrill

93.     Secretary Paulson immediately summoned the heads of the major Wall Street

banks to the New York Federal Reserve to inform them that the U.S. government would not bail

out Lehman.  Ex. 28, Fleming DE Tr. at 67-68; Ex. 32, John Thain DE Tr. at 41:24-42:7.  This

statement sent shock waves through the room, and especially to CEO Thain, who knew that a Lehman bankruptcy filing would have dire consequences to the survival of Merrill.  CEO Thain testified that:

> [T]he Lehman bankruptcy would result in significant chaos in the marketplace and that chaos in the marketplace had the potential to cause problems for Merrill Lynch.

Ex. 32, Thain DE Tr. at 19:22-20:2

> [I]n a very chaotic and difficult market it is likely that [Merrill's mortgage and mortgage-related assets] would have continued to fall in value…I was concerned that a Lehman bankruptcy might result in a market environment that it was difficult for anyone including Merrill Lynch to maintain short-term funding.

Id. at 20: 6-12; 20-23.

94.     Merrill's CFO Chai was convinced that Merrill would not survive a Lehman bankruptcy without a merger.  Ex. 33, Nelson Chai DE Tr. at 41:24-42:2 ("[I] have an opinion that [Merrill] would **not have survived** had [Merrill] not done a transaction of some sort post-Lehman bankruptcy").  Ex. 32, Thain DE Tr. 41:24-42:7.

95.     On Saturday morning, September 13, 2008, as BofA's due diligence teams were returning to Charlotte, NC, following the conclusion of their due diligence on Lehman, CEO Thain called CEO Lewis to set up a meeting to "explore strategic alternatives."  Ex. 32 Thain DE Tr. at 29:14-20.  CEO Lewis agreed and immediately flew on a corporate plane to New York.  Ex. 34, Kenneth Lewis DE Tr. at 63:1-24.  CEOs Lewis and Thain met in New York at 2:30 pm, discussed the pending Lehman bankruptcy and "talked a little bit about the business logic of a potential combination and how the businesses might fit together and we agreed that we would" continue discussions of strategic alternatives and begin due diligence.  Ex. 32, Thain DE Tr. at 31:17-20; 34:3-7.

### iii.  BofA Conducted 12 Hours Of Due Diligence On Merrill Before Agreeing To Pay A 70% Premium

96.     BofA's due diligence teams were summoned back to BofA's corporate jets on Saturday, September 14, 2008, for a 7:45 pm flight to New Jersey (Ex. 35), and began to arrive at the offices of Wachtell around 10 pm to begin the due diligence.  Ex. 15, Brown DE Tr. at 53:24-54:7.

97.     Following no more than 12 hours of due diligence, by 10:57 am on Sunday, September 14, CEOs Lewis and Thain agreed on Merger consideration of $29 per share, representing a 70% premium to the closing price of Merrill's common stock the day before.  Ex. 36; Ex. 16, Felsman DE Tr. at 34 (confirming due diligence was completed by the morning of Sunday, September 14, 2008).

98.     The rushed nature of BofA's due diligence was evident by the fact that, among other things, failed to interview Merrill's CEO Thain and CFO Chai.  As a result, BofA failed to learn of Merrill's two senior most executives' views concerning the effect of a Lehman bankruptcy on Merrill, or Merrill's forecasts for the fourth quarter of 2008.  Ex. 33, Chai DE Tr. at 70:12-17, 80:4-9; Ex. 32 Thain DE Tr. at 38:13-25; 55:24-56:4 (during due diligence, no one from BofA or its Financial Advisors sought Thain's view as to Merrill's financial condition); Ex. 37, John Roddy DE Tr. at 128:6-129:16 (FPK's senior managing director testified that if FPK had more than a few hours to prepare the fairness opinion presentation, FPK would have conducted due diligence, including, meeting with Merrill's CFO to go over Merrill's financial condition and projections).

99.     BofA Treasurer Jeff Brown testified that, as a result of the rushed due diligence, there was not enough time to adequately asses Merrill's financial condition.  Ex. 15, Brown DE Tr. 81:14-21.

### iv.  BofA Board's Merger Financial Advisors Are Retained By BofA Executive Greg Curl As A Result Of His Close Personal Friendship With JC Flowers

100.    Mr. Curl retained his close, personal friend, Mr. Flowers, to advise BofA in connection with the Merger.  Mr. Curl and Mr. Flowers had been close personal friends for years, with Mr. Curl sitting on the board of directors of companies JCF has invested in.  Ex. 14, Curl Jan. 23, 2012 DE Tr. at 9:22-10:18; Ex. 38, Curl Jan. 22, 2012 DE Tr. at 193:5-23.  In addition, JCF was beholden to CEO Lewis because BofA had invested $100 million in JCF investment vehicles, and around the time of the Merger, the investment increased to approximately $150 million.  Ex. 30, Flowers DE Tr. at 14.

101.    The Merger Proxy falsely represented that the Financial Advisors were selected and retained by the Director Defendants to provide them with an opinion as to the fairness of the proposed Merger:

> Bank of America's board of directors selected FPK and J.C. Flowers because of their respective expertise, reputation and familiarity with Bank of America and Merrill Lynch, and because their senior professionals have substantial experience in transactions comparable to the merger.

Ex. 39, Merger Proxy, in relevant part, p. 68.

102.    The foregoing statement in the Merger Proxy was materially false and misleading at the time it was made because: (i) JCF had never previously provided a fairness opinion in any merger transaction; and (ii) JCF had actually been retained "to do mark to market on certain derivative and real estate assets at Merrill Lynch."  Ex. 14, Curl Jan. 23, 2012 DE Tr. at 11:3-5.  According to Mr. Flowers, JCF "took a look at some of the assets of Merrill Lynch, and we also took a look at the overall impact or pro forma effect of a merger between Merrill Lynch and Bank of America."  Ex. 30, Flowers DE Tr. at 39:25-40:4.

103.    The JCF due diligence team, consisting of five individuals, began arriving at

Wachtell "late in the day" on Saturday, September 13, 2008.  Ex. 16, Felsman DE Tr. at 26:5.

The same JCF due diligence team shuttled between Wachtell and AIG where they were

simultaneously performing due diligence of AIG in connection with a potential investment by

JCF.  Id. at 33.  The lead "analyst" for JCF on the transaction was a twenty-something-year old

with a B.A. degree in industrial and labor relations.  Id. at 10:10-11:7.

104.     Fairness opinions were far outside JCF's field.  JCF's Loren Felsman testified that

"I don't know of any fairness opinions that we have issued, other than this."  Id. at 180:4-5; Id. at

15:9-16:11 (JCF's business was not providing advisory services to clients, but investing on its

own behalf).

105.     Because JCF had never provided a fairness opinion in a merger transaction, on

Sunday morning, September 14, 2008, JCF brought in FPK to start drafting a fairness opinion.

Id. 180:4-5; Ex. 37, Roddy DE Tr. at 30-31.  The senior executive on the FPK team was John

Waller, who had "spent significantly more time advising insurance companies than credit-

oriented financial institutions."  Ex. 37, Roddy DE Tr. at 74:19-77:12.  Mr. Waller was unable to

remember any other bank related fairness opinion that he worked on.  Ex. 40, John Waller DE

Tr. at 11:8-21.

106.     The substantive fairness opinion work, the bulk of which fell to FPK, was

confined to limited analysis undertaken over a few hours on Sunday afternoon.  Id. at 69:7 -70:1;

Ex. 41, (Waller Ex. 3) (Sunday morning email from Waller indicating that Mr. Flowers had just

requested FPK's help on the fairness opinion).  FPK analysts did not begin work on the fairness

opinion until late Sunday morning.  Ex. 37, Roddy Tr. at 20:3-12;  Ex. 42, Ajay Asija DE Tr. at

12:7-19;  Ex. 43, Kiros Shirazi DE Tr. at 20:2-5, 38:20-39:2.  FPK performed absolutely no due

diligence of its own on Merrill and relied solely on the models prepared by Mr. Belk and JCF.

Ex. 37, Roddy DE Tr. at 126:21-129:16; Ex. 44, Al Troncoso DE Tr. at 87:7-21; Ex. 45,

107.    In their haste to provide a fairness opinion in a matter of just a few hours, the Financial Advisors and BofA relied on financial projections for Merrill made by Wall Street analysts, rather than Merrill's own internal forecasts, and incorrectly attributed the Wall Street analysts' projections to Merrill management.  This mistake, however, was not caught until weeks after the Board approved the Merger and was unknown to FPK at the time they orally provided the Board with the fairness opinion presentation.  Ex. 46, Eric Roth (Wachtell attorney) DE Tr. 58:17-60-18 ("inconveivable to me that anybody doing a transaction of this sort prices it off what Wall Street analyst know or say").

### v. BofA Agrees To Pay $29 Per Share For Merrill

108.    By the morning of September 14, 2008, CEO Lewis agreed to pay $29 per share for Merrill after meeting with Mr. Curl and Mr. Belk to review the accretion/dilution model they prepared.  According to Mr. Curl, BofA's head of M&A, the purpose of the accretion/dilution model was to evaluate the impact of the Merger on the earnings per share of BofA.  Ex. 14, Curl Jan. 23, 2012 DE Tr. at 15:24-16:3.  CEO Lewis specifically relied on the accretion/dilution model because the focus was on "earnings of Merrill Lynch and what they would bring to the…combined company."  Ex. 34, Lewis DE Tr. at 83:11-14.

109.    Mr. Belk's accretion/dilution model was based on analyst forecasts of Merrill's 2009 net income of $4.125 billion.  Ex. 13, Belk DE Tr. at 22:1-11.  This forecast was included in the Board materials for the September 14, 2008, Board meeting to approve the Merger.  Ex. 47, p. 10.  The Financial Advisors' Merger model used these same numbers.  Ex. 48; Ex.37, Roddy DE Tr. at 41:24-42:9.

110.    CEO Lewis testified that, after reviewing Mr. Belk's accretion/dilution model on

the morning of September 14, 2008, he instructed Mr. Belk and Mr. Curl to revise the accretion

dilution model so "the deal looked better from an accretion dilution standpoint." In particular,

Mr. Lewis testified:

> Q. And **did you direct Mr. Curl and Mr. Belk to go back and either look for a better price or more cost saves**?
>
> A. **I did**.
>
> Q. And what happened? Did they come back to you?
>
> A. They came back to me. I do not know the time frame, but **they came back to me with -- with more cost saves, as I recall, and -- and the deal looked better from an accretion-dilution standpoint, and I said, "I think we can go forward on the basis of this, of these numbers**."
>
> Q. And did they -- they showed you a revised analysis at that point?
>
> A. Yes.
>
> Q. And is that the -- **was that analysis put into the board book that was ultimately sent to the board**?
>
> A. As -- **to the best of my knowledge, it was, yes**.

Ex. 34, Lewis DE Tr. at 91:5-21. Id. at 80:20-81:4.

111.    The accretion/dilution model, which CEO Lewis blessed as forming the basis for

the $29 per share Merger consideration, showed that the Merger would be **dilutive in 2009,

break-even in 2010, and accretive in 2011**. Ex. 49 at BAC-ML-CL00487800.

112.    According to CEO Lewis, it was BofA's standard model that a merger

> [W]ould be diluted in the first year because of you're not going to be able to get the cost saves as quickly, the second year we thought you should be able to show some accretion, and then the third year would be accretive as well.

Ex. 34, Lewis DE Tr. at 82:23-83:5.

113.    This was in line with BofA's "general guideline" that a merger "would turn

accretive…12 or 18 months following closing and recover the dilution incurred in approximately

three years….” Ex. 14, Curl Jan. 23, 2012 DE Tr. at 16:12-22.

### vi. BofA Telephonic Board Meeting Sunday, September 14

114.    With no advance warning to the fact that BofA was considering a merger with

Merrill, or that BofA management had taken it upon themselves to retain financial advisors on

the Board's behalf, on the evening of Saturday, September 13, 2008, BofA notified the Director

Defendants that a Special Meeting of the Board would be held at 5 pm the following day.  Ex.

50.  The purpose of the meeting was not disclosed.  Id.

115.    By 3:29 pm on Sunday, September 14, 2008, BofA began faxing materials to the

Director Defendants for the Special Meeting.  Ex. 47; Ex.55 (materials received after the meeting

started).

116.     Due to the hasty manner in which the Board meeting was called, the Board

members had little or no time to review the Board materials prior to the start of the meeting.  Ex.

51, William Barnet DE Tr. at 28:6-29:13.

117.    These Board materials did not contain any analysis from the Financial Advisors.

Ex. 55.

118.    The BofA Board meeting, which began at 5 pm, and lasted under one hour, was

tightly controlled by CEO Lewis.  Ex. 52. Ex. 15, Brown DE Tr. at 105:3.

### 1. The Financial Advisor Presentation

119.    During the Board meeting, CEO Lewis directed Mr. Flowers to impress upon the

Director Defendants why the Merger needed to be approved before the markets opened on

Monday, September 15, 2008.  Ex. 52 at 4.

120.    The Director Defendants accepted CEO Lewis' representations that JCF was

retained because it had recently conducted due diligence of Merrill and therefore was in a

position to advise the Board without question.  Id. at 4.  Had any of the Director Defendants

inquired as to the prior due diligence conducted by JCF, they would have learned that nearly

one-year prior, JCF had performed a few hours of due diligence of Merrill in connection with an

invitation by Merrill CEO Thain to JCF to make an investment in Merrill.  More importantly, the

Board would have learned that, as a result of this limited due diligence, JCF concluded that any

investment by JCF of its own money in Merrill would necessitate a substantial discount to

Merrill's then current stock price.  Ex. 30, Flowers DE Tr. at 54:21-57:12.  Ex. 33, Chai DE Tr.

30:16-32:2.  (Merrill's CFO testified that the extent of JCF's prior due diligence was an

evaluation of Merrill's "real estate portfolio."  Ex. 53 at 24:15-16 (JCF's prior due diligence

"was not something [BofA] relied upon.").

      121.    Following Mr. Flowers' remarks as to why the Board needed to act quickly,

FPK's John Roddy delivered an "oral" "draft" fairness opinion presentation to the Board.  Ex. 54

(noting in draft minutes that the "oral" fairness opinion presentation was a "Draft" and to "Get

Document – get to Board"); Ex. 52 at 5.

      122.    The Board was not provided with a written or final fairness opinion presentation

at the time of the Board meeting.  Ex. 54 at BAC-ML-NYAG-HC-502-00000599.

      123.    No Director Defendant requested or received a hard copy of a draft or final

fairness opinion presentation prior to the final Merger Proxy being disseminated to BofA's

stockholders.  Ex. 56, Alice Herald DE Tr. at 110:17-21 (BofA corporate secretary confirming

that the lack of a record of any of the Director Defendants receiving the fairness opinion

presentation indicates that one was never provided to them).

      124.    According to CEO Lewis, as Chairman of the Board, he did not believe it was the

responsibility of the Board to review the Financial Advisors' fairness opinion presentation, but

"assumed" BofA executives would conduct such a review:

> Q. Did you receive a fairness opinion from J.C. Flowers and FPK?
>
> A. I don't recall personally seeing one.
>
> Q. Did you ever ask for one?
>
> A. I don't recall that I did.
>
> Q. Is there a reason why you -- if you were told that you would be getting one, is there any reason you wouldn't follow up to ask, if you didn't receive one, where it was?
>
> MR. CERESNEY: Objection to form.
>
> A. I would -- I would assume if I didn't receive it that somebody had and had reviewed it and it was okay.
>
> Q. That's -- that's an opinion directed to the board, isn't it?
>
> A. Yeah, but -- but in assigning the responsibility to somebody else or allowing somebody else to do it, that doesn't mean you can't get an even better answer, because you'd have the experts looking at it.
>
> Q. Did you assign the responsibility to someone else?
>
> A. I didn't assign it, but **in many times the process takes care of itself and somebody would review it, and I'm confident somebody did get it and somebody did review it.  I just don't know who.**

Ex. 34, Lewis DE Tr. at 115:3-116:3.

125.    Mr. Roddy made "clear" to the Board that FPK did not perform due diligence on Merrill, and informed them of the "limitations" of their fairness opinion presentation caused by the "relatively short time that [FPK] had to conduct this analysis.  Ex. 37, Roddy DE Tr. at 127:9-15.  Mr. Roddy's presentation put the Director Defendants on notice of the importance of being informed of Merrill's financial condition during the Merger Transition Period.

### 2. Despite Serious Reservations Not Aired During Board Meeting The Board Unanimously Approved Merger

126.    Despite the fact that (i) the Merger was the largest transaction this Board had ever been asked to consider, (ii) the financial markets were in turmoil, (iii) only 12 hours of due diligence was performed, and (iv) the Board only considered the Merger for less than one hour before voting to approve it, almost all of the witnesses in attendance at the Board meeting testified that only **two** questions were posed by the Director Defendants.  Id. Ex. 15, Brown DE Tr. at 106:6-13; Ex. 24, Sloan DE Tr. at 33:2-13 (weeks would be a "reasonable amount of due diligence"); Ex. 23, Franks DE Tr. at 50:9-10 ("[T]his is a very, very short due diligence period");  Ex. 20, Lozano DE Tr, at 24:11-26:10;   Ex. 19, Mitchell DE Tr. at 20:14-22:10.

127.    In disregard of their fiduciary duties, a number of the Director Defendants *privately* raised serious concerns with respect to the Merger *after* the Board meeting, but remained silent during the Board meeting.

128.    For example, Director Defendant Countryman had fundamental concerns regarding the due diligence done on Merrill's assets, but only raised these concerns in a private email sent to Director Defendant Gifford an hour after the conclusion of the Board meeting: "**God help us if the mark is wrong.**"  Ex. 57.  Ex. 58, Gary Countryman DE Tr. at 208:16-209:17.

129.    Also not raised during the September 14, 2008, Board meeting was Director Defendant Gifford's concern with the manner in which the Board approved acquisitions.  Ex. 27 ("**[I]t's the way we approved acquisitions that tick me off the most!!!**").  To this, Defendant Barnet responded, "**Agreed.**" Id.

130.    In addition, immediately following the conclusion of the September 14, 2008 Board Meeting, Director Defendant Gifford emailed Director Defendant May, "**Throwing Up.**"

Ex. 59.

131.    Days later, following the September 19, 2008, Board Meeting, Defendant Barnet

emailed Defendant Gifford stating he was "**stunned**" about the Board meeting presentation

concerning deteriorating conditions in the market.  Ex. 60; Ex. 51, Barnet DE Tr. at 71:14-19.

Defendant Barnet went on to privately criticize BofA management and recognize that "**real**

**issues**" existed. Ex. 60.

132.    On October 8, 2008, Defendant Gifford sent an email to Defendant Sloan

recognizing that the Director Defendants "are going to take heat for a bunch of stuff."  Ex. 61 at

BAC-DIR-DE00002519.

### C.    Despite Reckless Approval On Meager Record, Board Does Not Believe It Owed A Fiduciary Duty To Monitor Merrill During The Transition Period

133.    Emblematic of the Boards' cavalier attitude of the fiduciary duties owed to the

Bank, Chairman Lewis testified that he did not believe he or the other Director Defendants owed

any fiduciary duties with respect to the Merger once they voted to approve it.

Q. Did you -- did you -- did you have an understanding that the board of directors of
Bank of America had any fiduciary duties with respect to the transaction during
the period between the time they approved the transaction and the stockholder
vote?

A. **I don't recall thinking of any fiduciary responsibilities.**

* * *

A. I would have thought I -- we would have fiduciary responsibilities to approve the
deal, b**ut my view was that the management team took over after that to
begin organizing the consolidation of the two companies.**

Q. So you don't -- do -- do you have a belief as to whether the directors of Bank of
America had fiduciary duties with respect to the transaction after they approved
the deal?

MR. CERESNEY: Objection to form.

A. **I cannot relate to you a specific fiduciary duty that comes to mind.**

Ex. 34, Lewis DE Tr. at 135:3-136:4.

134.    The Director Defendants uniformly testified that they relied upon BofA

management to keep them informed of all material information concerning Merrill during the

Merger Transition Period.  Ex. 19, Mitchell DE Tr. at 158:9-160:2.

135.    As discussed below, CEO Lewis and CFO Price have both confirmed that they

kept the Director Defendants informed of all material information concerning Merrill up through

the date of the close of the Merger.

> **D.      Lewis And Price Conducted An Analyst Call September 15, 2008,
> To Discuss The Merger and Made Representations that
> Became Materially False and Misleading**

136.    On September 15, 2008, CEO Lewis, CEO Thain, and CFO Price made a

presentation to analysts to discuss the Merger.  During this presentation, CFO Price disclosed

that as a result of BofA's:

> **modeling for EPS accretion…[BofA] estimate[s] the transaction to be 3%
> dilutive in the first year and breakeven to slightly accretive in the second
> year before restructuring charges**.

Ex. 62 at BAC-ML-NYAG00000400 (emph. added).

137.    This projection was based on the BofA Merger model which relied on Wall Street

analyst forecasts of Merrill 2009 income of $4.125 billion.

138.    The foregoing statement became materially false and misleading by mid-

November as Merrill's fourth quarter losses escalated and Merrill's forecast for 2009 fell by over

$3 billion.  ¶¶ 185-224 herein.

139.    In an effort to allay market fears concerning the hasty due diligence performed by

BofA, during the presentation Mr. Price falsely stated that BofA was "joined by a team from JC

Flowers that had done extensive due diligence over some time in reviewing other potential transactions, so they were very familiar with Merrill Lynch's books." Ex. 62 at 400-401, (CEO Lewis stating, "the JC Flowers piece is key because they were renewing an effort that had already gone on…").

140.    As discussed above, JCF's prior due diligence of Merrill was neither extensive nor relied upon by BofA.

> **E.     Preparation and Filing of the Merger Proxy**

141.    Following the Director Defendants hasty approval of the Merger, BofA, along with Wachtell and the Financial Advisors, began the process of preparing the Merger Proxy which was ultimately filed with the SEC on November 3, 2008.

142.    Despite the fact that the Merger Proxy contained the Director Defendants' recommendation to BofA stockholders to vote for the Merger, the Director Defendants, aside from CEO Lewis, did not review any portion of the Merger Proxy prior to it being mailed to stockholders.  Ex. 56, Herald DE Tr. at 110:17-21 (BofA corporate secretary confirming that the lack of a record of any of the Director Defendants receiving a Merger Proxy indicates that one was never provided to them).  Ex. 20, Lozano DE Tr. at 102:6-14; Ex. 51, Barnet DE Tr. at 122:4-123:8; Ex. 19, Mitchell DE Tr. at 109:19-110:12.

> **i. FPK Spent Weeks Finalizing The Fairness Opinion Presentation**
> **And Removed Cautionary Language in Response to BofA's Threat**

143.    Documents produced by the Financial Advisors demonstrate that the FPK internal opinion committee approved the contents of the FPK fairness opinion letter on September 25, 2008, and executed it that same day. Ex. 63.

144.    This "final" FPK fairness opinion letter, which was provided to BofA, included the following cautionary language which Mr. Roddy conveyed to the Director Defendants during

the September 14, 2008, Board meeting:

> The market and industry circumstances surrounding the Merger have been extraordinary.  In the context of the current credit market crisis in the United States and its dramatic impact on the value, volatility and viability of many financial institutions and investment banking firms, on Saturday, September 13, 2008, the Company commenced preliminary negotiations to potentially acquire Merrill Lynch.  In connection with, and shortly after, the commencement of such preliminary negotiations on such date, we were engaged by the Company to provide certain financial advisory services in connection with the Company's potential acquisition of Merrill Lynch and to prepare this opinion with a view toward the Company's being in a position to consider entering into the Merger Agreement by Sunday evening, September 14, 2008.  **As a result of these extraordinary circumstances and the exigencies of the brief time period involved, our review of the information described below was necessarily extremely limited and was performed without the benefit of independent verification.  Accordingly, we did not perform many of the due diligence inquiries and analysis that we would customary conduct under normal circumstances in connection with rendering a fairness opinion in connection with a transaction such as the Merger.**  Moreover, the unprecedented nature of the current market conditions and their uncertain future potential impact on the value, volatility and viability of financial institutions and investment banking firms, including Merrill Lynch, may **render many customary and accepted valuation criteria and metrics less reliable** as traditional measures of assessing the fairness, from a financial point of view, of a transaction such as a Merger.

Ex. 63 at FPK0005327 (emph. added); Ex. 37, Roddy DE Tr. at 127:9-15.

145.    FPK's general counsel has testified that the foregoing cautionary language was "**important**" to the fairness opinion letter.  Ex. 44, Troncoso DE Tr. at 50:17-53:2.

146.    Upon review of the FPK fairness opinion letter, Wachtell (on behalf of BofA) returned a redlined version striking the above-quoted cautionary text intended to be disclosed to BofA stockholders.  Ex. 45 at UR-BAC-502-WLRK-A 00047658.

147.    In response, FPK relented and removed certain of the cautionary language but refused to remove the following:

> In addition, we note that the company retained our firm over the weekend of September 13, 2008, and consequently, we did not perform many of the due diligence inquiries and analysis that we would customarily conduct under normal circumstances in connection with rendering a fairness opinion in connection with

a transaction such as the Merger.

Ex. 64 at JCF0009223.

148.    Faced with FPK's refusal to comply with BofA's demand to remove the above cautionary language from the fairness opinion letter, Mr. Belk communicated with his boss, Mr. Curl (who reported directly to Ken Lewis), that Mr. Flowers would "deal with FPK." Ex. 65 ("I talked to Flowers, he will deal with FPK").

149.    Mr. Belk, the BofA executive responsible for the Financial Advisors (Ex. 73), thereupon instructed Wachtell to convey the threat to FPK that BofA was going to remove all references to FPK and FPK's fairness opinion from the Merger Proxy unless FPK removed the offending cautionary language.  Ex. 65.  Wachtell relayed BofA's threat to FPK as follows:

> **I've spoken with Bank of America.  They would rather not have the opinion than have the opinion with that language included.**  I honestly believe you should be ok from a legal perspective - there have been many big bank deals where the bankers come in at the last minute, and BofA certainly appreciates the impact of the rushed timing.  But obviously it's your decision.  **If you'd prefer this approach, please let us know and we'll go ahead and take references to FPK and the copy of your opinion out of the S-4 draft.**

Ex. 64, at JCF0009222 (emphasis added).

150.    The implication of BofA's Threat, as delivered by Wachtell, was not lost on FPK as they understood that without a signed engagement letter from BofA, the removal of the FPK fairness opinion letter from the Merger Proxy would result in FPK forfeiting its $1 million fee for the engagement.  Ex. 44, Troncoso DE Tr. at 79:4-12.  Ex. 30, Flowers DE. Tr. at 89 (Mr. Flowers had allocated $1 million of JCF's $20 million fee to FPK).

151.    FPK quickly succumbed to the BofA Threat, which resulted in a sanitized version of the FPK fairness opinion letter being submitted to the SEC, and ultimately disclosed to the stockholders.  Had the Director Defendants reviewed the Merger Proxy or final fairness opinion

letter before filing with the SEC, they would have known that the cautionary language contained in the oral fairness opinion presentation given to them during the September 14, 2008, Board meeting was not contained in the written presentation ultimately disclosed to stockholders.

>   **F.      The Board Was Kept Informed Of Merrill's Deteriorating Financial Condition Through the Close of the Merger**

152.    At the time that the Director Defendants approved the Merger, they were keenly aware that: (1) the Merger due diligence was conducted over a matter of hours; (2) Merrill was in a precarious financial position as a result of the Lehman bankruptcy; and (3) the risks to BofA of going ahead with the Merger due to the instability of the financial markets in September 2008, which continued to exist throughout the Merger Transition Period.  Ex. 24, Sloan DE Tr. at 101, 46, 53 ("fragile" and "difficult" economic condition of the country and the "instability of the financial marketplace").

153.    As a result, the Director Defendants were aware that they owed BofA a fiduciary duty to monitor Merrill's financial condition, and its effect on BofA, through the December 31, 2008, close of the Merger.  According to Director Defendant Sloan:

>   Q. What, if anything, did the board do between September 14th, 2008, and December 5th, 2008, to satisfy itself that the merger was still fair to Bank of America shareholders?
>
>   A. Well, I'm not sure I understand exactly what you're asking me, but, I mean, in **weekly calls and monthly calls we were constantly being updated on the -- on the status of the merger, as we would with any other merger.**  As it relates to did somebody ask to be digging into financials during all that period of time, I don't think so.

Ex. 24, Sloan DE Tr. at 129:6-16.

154.    CEO Lewis and CFO Price were aware of their duty to keep the Director Defendants informed of Merrill's deteriorating financial condition, as well as the impact this deterioration was having on BofA's financial condition.  Both CEO Lewis and CFO Price

testified that they kept the Director Defendants informed as to Merrill's financial condition during the period between the September Board vote to approve the Merger and the Stockholder Vote.

155. CFO Price testified that it was his practice to keep the Board informed as to all pertinent and material financial items, which included updates as to Merrill's financial condition during this period.

> Q. Did you have a practice of getting financial updates during voluntary board calls?
>
> A. …I**f there was something pertinent that I would have felt necessary or if I had any forecasts or if I had information to convey, you know, at that time, I would have, you know -- you know, my recollection is that's the type of topical things that we would have been conveying as a management team**.

Ex. 66, Joe Price DE Tr. at 34:7-16.

> A. You know, again, I think **I would have generally kept [the Director Defendants] -- if I had a new forecast, I would have told [the Director Defendants] what the new forecast was**.

Id. at 196:1-4.

> Q. Did you have any routine with respect to keeping Mr. Lewis updated as to the financial condition of Bank of America?
>
> A. I mean, there would have been, you know, **periodic reportings and forecasts and things of that nature that would have kept him posted**, that would have been recurring, I guess, is the way I'd call it.

Id. at 27:18-25.

> Q. And would you have any routine or practice with respect to providing Mr. Lewis oral updates on Bank of America's finances?
>
> A. Again, **I kept him reasonably up to speed on the things that I would have felt pertinent,** you know, for him to be aware of.  And so those could have included, you know, our financial forecast or things that were happening or transactions that were happening or things of that nature.

Id. at 28:6-14.

156.    CEO Lewis testified that during the Merger Transition Period, both he and CFO

Price did a good job of keeping the Board informed with respect to Merrill's financial condition

and forecasts:

Q. **Was one of the things you had in mind keeping the board updated on the Merrill acquisition?**

A. **It included that,** but, again, Bank of America -- we were focused on Bank of America.

Q. And you were focused on Merrill Lynch as well, right?

A. Yeah, uh-huh. I guess the point I'm trying to make to you is we were -- we could run Bank of America. We couldn't run Merrill Lynch at that -- during that time.

Q. But -- but the bank had some access to information about Merrill Lynch during that period, correct?

A. Right, but they had a separate board, separate committees, and it was still a public company.

Q. **And while you couldn't run their company, you could certainly provide to the board information you learned about the company, correct?**

A. **Correct, which we did.**

Q. **You think you did a good job with that?**

A. **I think we did.**

Q. You think you did a good job keeping the board and the outside directors currently informed of what management and you knew about the projections at Merrill Lynch?

A. I don't recall the specific times, but **I think Joe, when he had information that he thought was -- was appropriate, he would always share it with them.**

Q. From your perspective sitting here today, do you think you and management did a good job keeping the outside directors currently informed about projection information that the bank was receiving from Merrill Lynch?

A. As far as I know.

Ex. 34, Lewis DE Tr. at 148:4-149:12.

### i. BofA Management Received Daily And Weekly Updates Of Merrill's Financial Condition

157.    Immediately following the Board vote to approve the Merger, CFO Price began receiving daily and weekly updates from Treasurer Brown concerning Merrill's liquidity and overall financial condition.  Ex. 66, Price DE Tr. at 87; Ex. 15, Brown DE Tr. at 139-149 (during the transition period Mr. Brown provided CFO Price with "Weekly Capital Forecasts" that reflected BofA's capital levels and the "resulting impact of Merrill").  Ex. 67, Eric Heaton (Merrill Treasurer) DE Tr. at 69:8-72:13; Id. at 146:6-11.

158.    In addition, Treasurer Brown kept CFO Price "**updated as to the pro formas, pro forma capital and liquidity models with respect to [BofA] and Merrill.**"  Ex. 15, Brown DE Tr. at 136.

159.    Treasurer Brown kept CFO Price informed as to Merrill's deteriorating financial condition:

> Q. Was there any type of trend in Merrill Lynch's cash position during the transition period?
>
> A. Yes.
>
> Q. What was the trend that you saw?
>
> A. Their liquidity position continued to deteriorate.

Ex. 15, Brown DE Tr. at 137.

160.    In addition, in order to keep BofA senior management and the Director Defendants informed concerning Merrill's financial condition during the period leading up to the Stockholder Vote, BofA installed a transition team at Merrill which took up an entire floor of Merrill's New York office.  Ex 33, Chai DE Tr. 111:7-11.

### ii. BofA Installed its CAO as Acting CFO of Merrill

161.    The transition team was headed by BofA's Chief Accounting Officer, Neil Cotty, who "took over the effective day-to-day duties of the Merrill Lynch CFO responsibilities for part of November and December." Ex. 33, Chai DE Tr. at 28:19-22; Id. at 111:8-11 ("Neil Cotty at some point in October was on the grounds and they took over a whole floor of our building, and they had full access to all information"); Ex. 32, Thain DE Tr. at 90-91.

162.    According to CEO Lewis, Mr. Cotty's "functional role was to -- to be at Merrill Lynch looking over their -- their financial results."  In addition, CEO Lewis testified that:

> Q. And he was -- what was the purpose of his being there to look over the financial results?
>
> A. **Just to be able to provide us updates on the performance of the company.**

Ex. 34, Lewis DE Tr. at 189:21-190:5.

### iii. During Weekly Board Calls and Regularly Scheduled Meetings, CEO Lewis and CFO Price Kept the Board Informed of Merrill's Deteriorating Financial Condition

#### 1.    September 19, 2008 Special Meeting Of The Board

163.    On September 17, 2008, Lead Director, Defendant Sloan, met with Chairman Lewis who provided Defendant Sloan with an update on Merrill.  In his role as Lead Director of BofA, Defendant Sloan was "the liaison between the chairman and the board" and would update the other board members during executive sessions of the Board and telephonically between Board meetings.  (Ex. 24, Sloan DE Tr. at 39-40.)

164.    Based on his practice, Defendant Sloan would have relayed this information to the other Director Defendants during the September 19, 2008 Special meeting of the Board.

165.    On September 22, Defendant Barnet directed Gifford to a Wall Street Journal article which addressed ill-prepared boards that fail to curb powerful management.  Defendant

Gifford responded: "Talk about timely!!!…Am calling KDL tomorrow with some thoughts and hope to heck [defendant Sloan] saw this article, best."  Ex 68 Barnet Ex. 6.  In a later email to Defendant Barnet, Gifford said: "Bill -- we might ruffle some but I sure don't think it's time to sit back…when you think back to Friday there was an awful lot thrown at us – so much so different from our afternoon in July**… and these are time that, I believe, require more continuous focus**…."  *Id.*  Barnet agreed: "**am pleased they're instituting weekly meetings… maybe they are 'getting it'… scary times for sure**…." *Id.*

### 2. September 26, 2008 Telephone Conference of the Board

166.    Beginning on September 26, 2008, a practice of holding weekly voluntary board calls was instituted for the purpose of keeping the Board updated as the financial markets and the economy deteriorated.  Ex. 69.

167.    During the September 26, 2008, voluntary Board call, "Mr. Price presented a detailed, current financial update, reflecting the large market movements in the volatile, unprecedented markets…He explained the EPS impact of the major market changes."  Ex. 70 at BAC-ML-DE00010279.

168.    In addition, at Chairman Lewis' direction, the Director Defendants were provided with a Merrill update concerning:

> [A] proposed facility to be extended to **Merrill Lynch** by the Corporation.  Ms. Brinkley provided a detailed description of the transaction…Mr. Gagnon, SVP; Risk Management Executive, who is…**personally familiar with the collateral and marks.  Discussion ensued.**

Ex. 70 at BAC-ML-DE00010280 (emph. added).

### 3. October 3, 2008 Telephone Conference of the Board

169.    According to the Notes of October 3, 2008, Telephone Conference of the Board: "Mr. Lewis asked Mr. Price to address capital levels at the Corporation…." Ex. 71 at BAC-ML-

43

DE00009952.

170.     A discussion of BofA's capital levels necessitated a discussion of the effect
Merrill's financial condition was having on BofA's capital.  As testified to by Treasurer Brown,
BofA's capital levels were impacted by Merrill's financial condition during the transition period,
as reflected in the "Weekly Capital Forecasts" he provided to CFO Price.  Id./Ex. 15, Brown DE
Tr. at 139-149.

### 4. October 5, 2008 Special Meeting Of The Board

171.     During the October 5, 2008, Special Meeting of the Board, CFO Price provided
the Director Defendants with a capital update which included the impact of Merrill forecasts on
BofA's financial condition:

> Mr. Price restated the prior forecast to include the impact of capital actions, the
> dividend reduction and the addition of common equity.  **He highlighted the
> rapid projected return to Tier 1 targets both before and after the proposed
> Merrill Lynch acquisition**.  Mr. Price then repeated the **key assumptions of the
> Merrill Lynch acquisition, including assets, net income**…Mr. Price reported
> **the forecast for the combined Corporation and Merrill Lynch in the format
> of the previous forecasts** assuming no dividend reduction or additional common
> equity, highlighting EPS.  He then reported the forecast assuming the
> recommended reduction and increase in common equity.  Discussion ensued,
> including the projected year end closing date for the Merrill Lynch acquisition
> and pending year end purchase accounting charges.

Ex. 72 at BAC-ML-NYAG00003778 (emph. added).

### 5. October 13, 2008 Board Executive Committee Call

172.     On October 13, 2008, during a meeting of the Executive Committee of the Board
of Directors, attended by Defendants Countryman, Gifford, Sloan and Chairman Lewis, there
was a discussion of the $25 billion Treasury Department TARP allocation to BofA and Merrill
and the financial implications thereof.  Ex. 74 and Ex. 75 at UR-BAC-DIR-DE00002791.

44

### 6. October 15, 2008 Special Meeting Of The Board

173.     During the October 15, 2008, Special meeting of the Board, Chairman Lewis

updated the Director Defendants as to Merrill's financial condition by providing a:

> [C]onfidential report on Merrill Lynch's expected earnings, including the
> consistency of the earnings with the Corporation's expectations.  Discussion
> ensued.

Ex. 76 at UR-BAC-ML-DE00003266 (emph. added).

174.     In addition, there was a continuing discussion of the implications of the $25

billion in TARP assigned to be allocated between BofA and Merrill and an analysis of how the

combined Merrill and BofA TARP funds would impact BofA's capital:

> Mr. Lewis reported that it is anticipated that the $25 billion of capital currently
> allocated between the Corporation and Merrill Lynch under the Program will be
> invested entirely in the Corporation.  Discussion ensued.

Id. at UR-BAC-ML-DE00003251.

### 7. October 22, 2008 Regular Meeting Of The Board

175.     On October 17, 2008, Lead Director, Defendant Sloan, met with Chairman Lewis

where he updated Defendant Sloan as to Merrill's deteriorating financial condition.  Ex. 77

(Defendant Sloan's handwritten notes recording his October 17, 2008, meeting with Chairman

Lewis, "**Merrill Lynch-timing (loss-size)**").

176.     During the October 22, 2008 Regular Meeting of the Board, CFO Price provided

the Director Defendants with an update of Merrill's fourth quarter losses.  Ex. 78 at BAC-ML-

NYAG00003814-UR (Board minutes reflect a discussion of "**Merrill Lynch's market

disruption related losses**").

177.     During the Executive Session that followed, it would have been Defendant

Sloan's practice to update the other Director Defendants as to his conversations with CEO Lewis

concerning Merrill.  (Ex. 24, Sloan DE Tr. at 39-40.)

178.    In addition, during Board committee meetings held that same day, there were numerous discussions concerning the Merrill transaction.  Ex. 79; Ex. 80 at BAC-ML-CL00023670-1.

**Beginning On November 4, 2008 BofA Receives Merrill Daily P&Ls**

179.    On November 3, 2008, Mr. Cotty, assumed the responsibility of acting CFO of Merrill in order to transition him into his new role of CFO of Merrill as of the January 1, 2009 close of the Merger.  Ex. 33, Chai DE Tr. at 28:17-22.  As of November 3, 2008, Mr. Cotty was on site at Merrill's offices and worked closely with Mr. Thain and Merrill's finance staff.  Id. (Chai DE Tr.) at 111:7-11; Ex. 32, Thain DE Tr. at 89:18-91:14.

180.    Beginning on November 4, 2008, Mr. Cotty began receiving via email Merrill's daily profit and loss reports (Daily P&L").  Ex. 81.  In addition, pursuant to his November 4, 2008, request, Mr. Cotty was granted electronic access to Merrill's financial databases.   Ex. 82 at UR-BAC-ML-NYAG01064545-7.

181.    Mr. Cotty's denial that he did not receive Merrill's Daily P&L beginning on November 4, 2008, rang hollow when confronted with copies of the daily emails he received attaching the Daily P&L. Ex. 83, in relevant part.

182.    In addition, on November 4, 2008, Mr. Cotty received a summary of Merrill's October financials which estimated an October pre-tax loss of $6.1 billion.  Ex. 84.

183.    CFO Price, similarly began receiving the Merrill Daily P&L from Mr. Cotty on or about November 18.  Ex. 85.

184.    According to CEO Thain, "We were completely transparent with Bank of America.  They learned about these losses when we did," adding "they had access to basically

any other information they wanted, but the electronic feed of the daily P&L's is the best example." Ex. 32, Thain DE Tr. at 95:10-13.

**CFO Price Grew Alarmed With Merrill's October's Losses and Sought  Advice As To Whether The Losses Should  Be Disclosed To BofA Stockholders**

185.     On November 5, 2008, CFO Price received an email from Mr. Cotty forwarding Merrill's October 2008 P&L which forecast a **pre-tax loss of $6.113 billion**.  Mr. Cotty's email read "**Read and weep**."  Ex. 86.

186.     As explained by Mr. Cotty:

Q. When you said read and weep, were you referring to Merrill's financial results for October 2008?

A. Yes, I was talking about their net income, preliminary estimate.

Ex. 87, Neil Cotty DE Tr. at 81:5-9.

187.     Two days later on November 7, 2008, CFO Price received an updated Merrill October 2008 P&L in which Merrill's pre-tax loss had grown to **$6.972 billion**.  Ex. 88.

188.     Both the size of Merrill's October 2008 loss and the trend in the escalation of that loss from November 5, 2008 to November 7, 2008, were so material that CFO Price grew concerned that a disclosure of the loss was required, as discussed below.

**8. November 7, 2008 Telephone Conference of the Board**

189.     On November 7, 2008, at 7 am, CFO Price met with Mr. Cotty and members of Merrill's finance team to discuss Merrill's October 2008 $6.972 billion loss, which had so concerned CFO Price.  Ex. 89, in relevant part, at UR-BAC-ML-NYAG00006652.

190.     Later that morning at 10:30 am, CEO Lewis conducted a conference call with the Board during which Mr. Price updated the Director Defendants as to Merrill's financial condition.  According to the Notes of the November 7, 2008 Telephone Conference:

Mr. Price delivered an overview of current financials and projections.

* * *

**Mr. Price…further discussed market disruption related charges to Merrill Lynch.**

* * *

Discussion ensued with questions and answers including…**trading losses…Merrill Lynch…the status of the Merrill Lynch Acquisition**…

Ex. 90 at UR-BAC-ML-DE00009948-9 (emph. added).

191.    According to an email from Defendant Barnet to Defendant Gifford concerning the November 7, 2008, Board call, the "Call was somber…**more bad numbers and news."** Ex. 91.

192.    On November 12, 2008, Director Defendant Sloan met with CEO Lewis, during which time they again discussed Merrill.  Ex. 92.

**BofA's General Counsel And Wachtell Agreed That**
**Disclosure Of Merrill's Losses Was Warranted**

193.    Thereafter, on November 12, 2008, no later than 1:51 pm, CFO Price sought out BofA's General Counsel, Timothy Mayopoulos, to discuss whether Merrill's October 2008 losses had created a disclosable event.  According to Mr. Mayopoulos,

Mr. Price wanted legal advice as to **whether there needed to be public disclosure of these losses**, and I believe we discussed the fact that I was going to reach out to Wachtell Lipton, outside counsel for the company on the merger.

Ex. 93 at 19:12-17.

194.    In turn, Mr. Mayopoulos contacted Ed Herlihy of Wachtell, and a telephonic meeting was set up for 4 pm that day to discuss CFO Price's concerns.  Ex. 94, Ed Herlihy DE Tr. at 39:17-40:10.

195.    At 4:49 pm, Mr. Cotty received a Merrill fourth quarter forecast which reflected

Merrill's actual pre-tax loss for October of **$7.5 billion** and forecast a fourth quarter pre-tax loss of $8.9 billion.  Ex. 95.

196.    The following day, on November 13, 2008, Mr. Mayopoulos spoke with Mr. Herlihy, Eric Roth and Nick Demmo at Wachtell.  Attorneys Herlihy, Roth and Demmo testified that Merrill's October 2008 losses were discussed on this call.  Ex. 96, Nicholas Demmo DE Tr. at 117:21-120:2; Ex. 46, Roth DE Tr. at 27:10-24; 42:4-17; Ex. 94, Herlihy DE Tr. at 39:17-40:19.

197.    At the conclusion of this call, there was a consensus that BofA would make a trend disclosure that would make clear that market movements led to the October problems and impacted the financial results of Merrill. Ex. 46, Roth DE Tr. at 45:10-47:5; 50:15-51:8.   According to Mr. Demmo's testimony:

> A. I think Mr. Mayopoulos's view was that it didn't really matter whether -- he wasn't focused on whether there had to be disclosure.  **He had decided that there should be disclosure and let's figure out what that should be.**
>
> Q. Did he communicate that to Wachtell?
>
> A. Yes.
>
> Q. Did Wachtell agree with that conclusion?
>
> A. Sure.  **We figured no reason not to make additional disclosure, if that was necessary.**

Ex. 96, Demmo DE Tr. at 122:9-20;  Ex. 46,  Roth DE Tr. at 54:4-13; Ex. 97 (November 14, 2008 email from BofA in-house counsel Brenner to Wachtell's Demmo, "will you start drafting the disclosure we discussed yesterday?").  Ex. 98, Mayopoulos 34, in relevant part, at 479 (Mayopoulos handwritten notes dated November 13, 2008, "All agree there must be some discl.").  CFO Price, however, testified that a decision was reached "no pre-meeting disclosure

necessary." Ex. 66, Price DE Tr. at 186:15-16.

198.    Between November 12 and November 21, there were a series of meetings between and among BofA's Management Team and CEO Thain, CFO Chai and Wachtell on the subject of disclosure of Merrill's losses.  CEO Lewis was kept apprised to the substance of these discussions.  Ex. 66, Price DE Tr. at 172:2-15.

199.    CFO Price held a meeting on November 13, 2008, with CFO Chai, and acting CFO Cotty, and another meeting on November 14, 2008, with CEO Thain.  During these meetings, CFO Price raised the issue as to whether Merrill's losses should be publicly disclosed. CEO Thain took the position that Merrill's stockholders did not need "any incremental incentive to vote for the deal."  Ex. 99 at 232:24-233:4.

200.    By November 16, 2008, CFO Price was aware that Mr. Cotty was forecasting that Merrill's fourth quarter pre-tax loss had grown to $**10.942 billion**.  Ex. 100.

201.    On November 20, 2008, acting CFO Cotty sent CFO Price an email attaching "**more bad news**" in the form of Merrill's Daily Net Revenue Report.  Ex. 101.

202.    According to Wachtell attorney Demmo, on November 20, 2008, a follow-up meeting was held during which BofA General Counsel Mayopoulos and CFO Price made, "the determination" that a trend disclosure was not necessary.  Ex. 96, Demmo DE Tr. at 123:13-124:4; 125:12-19; 127:19-128:18.  During this meeting. Mr. Mayopoulos provided Mr. Demmo with the analysis he had done to reach his conclusion.

203.    According to Mr. Mayopoulos, the alleged decision that no disclosure of Merrill's fourth quarter 2008 losses were required was based on the falsity that there "hadn't been any projections or statements about expected future financial performance of Merrill Lynch either in Merrill Lynch's disclosures or in the announcements, that had been made at the time the merger

50

was announced." Ex. 102, Timothy Mayopoulos DE Tr. at 224:17-21.

204.    In fact, Mr. Mayopoulos's statement is rendered false by the fact that BofA had

made public statements about the expected future financial performance of Merrill, as contained

in the Merger Proxy and statements made by CEO Lewis and CFO Price on September 15, 2008.

205.    As discussed above, during a September 15, 2008, presentation to analysts to

discuss the Merger, CFO Price stated that as a result of BofA's "modeling for EPS

accretion…[BofA] estimate[s] the transaction to be 3% dilutive in the first year and breakeven to

slightly accretive in the second year before restructuring charges." Ex. 62.  BofA knew that

Merrill's losses by mid-November had rendered these estimates unattainable.

206.    Moreover, the Merger Proxy included BofA's materially false and misleading

statement concerning the purportedly accretive nature of the Merger when it disclosed the

following:

> Based on these assumptions, each of FPK and J.C. Flowers determined that the
> merger would be 2.5% dilutive to Bank of America's consensus analyst estimated
> EPS in 2009, 0.3% accretive to Bank of America's consensus analyst estimated
> EPS in 2010, and increasingly accretive to Bank of America's consensus analyst
> estimated EPS in subsequent years.

Ex. 39, p. 68.

207.    By mid-November, BofA was well aware that the foregoing statements were

materially false and misleading by the fact that throughout the Merger Transition Period, as

Merrill's financial condition progressively deteriorated, BofA continuously updated its

accretion/dilution model in order for BofA to be fully informed of the impact of Merrill's losses

on BofA's financial condition.  Ex. 103; Ex. 104 (November 15, 2008, email from treasurer

Brown to CFO Price concerning an update of the capital model to account for Merrill's fourth

quarter losses).

208.    BofA's Disclosure Committee, which was made up of BofA management, violated its charter by not reviewing the Merger Proxy prior to filing with the SEC, and not reviewing the November 20, 2008, decision not to make a trend disclosure concerning Merrill's losses.  Ex. 87, Cotty DE Tr. at 22:20-22; Ex. 66, Price DE Tr. at 24:16-20; 178:22-179:9; Ex. 105 ("The [Disclosure] Committee shall assist the Senior Officers in fulfilling their responsibility for oversight of the accuracy and timeliness of [all public] disclosures made by the Corporation…[including]…information required by the Corporation to be disclosed to the [SEC]").

**On November 21, 2008 BofA Received Merrill's 2009 Forecast**

209.    On November 21, 2008, at 10:05 am, acting CFO Cotty received via email Merrill's November 19, 2008, fourth quarter forecast, which showed a pre-tax loss of **$7.7 billion**.  Ex. 106, in relevant part, at BAC-ML-NYAG00018824.  In addition, this email attached Merrill's "FY2009 Plan" dated November 20, 2008.  The "FY2009 Plan," which was Merrill's fiscal budget for 2009 ("2009 Plan"), forecasted **2009 revenue of $2.307 billion**.  This revenue projection was approximately **44% less** than the 2009 revenue projection of $4.125 billion that the Director Defendants relied upon in approving the Merger and which formed the basis for the accretion/dilution forecast contained in the Merger proxy.  Id. at BAC-ML-NYAG00018640; Ex. 107, p. 2.

210.    Mr. Cotty provided this updated financial information to CFO Price.  Ex. 87, Cotty DE Tr. at 77:10-15 (Mr. Cotty testified that he kept CFO Price informed as to Merrill's forecast and projections throughout the Transition Period, "I know I sent him forecasts, kept him informed").

### 9. November 21, 2008 Board Telephone Conference

211.    The next Board telephone conference was scheduled for November 21, 2008, at 10:30 am.

212.    In preparation for this Board call, on November 18, 2008, BofA's finance team prepared a document entitled "**Merrill Lynch Key Stats for BOD**" containing updated Merrill financial information, including accretion/dilution figures.  Ex. 108.

213.    An hour before the Board call, CFO Price met with CEO Thain.  CFO Price raised again the issue of whether Merrill was going to make a disclosure of its losses.  Mr. Thain repeated his view that, from the perspective of Merrill's shareholders, additional disclosures were not necessary.

214.    During the 10:30 am Board call, CEO Lewis and CFO Price updated the 13 of the 15 Director Defendants in attendance, with "pertinent" financial information, including "forecasts."  Ex. 66, Price DE Tr. at 34:7-16.

215.    Mr. Price, who was armed with Merrill's most recent fourth quarter 2008 forecast and 2009 Plan (Ex. 106), provided the Board with an update of Merrill's financial condition.  Ex. 66, Price DE Tr. at 192-194; Ex. 109 (December 4, 2008 email from Cotty acknowledging that **Price provided the Board with an update as to  "ML trading results" during the November 21, 2008, Board meeting**).

216.    The November 21, 2008, Notes of Telephone Conference of the Board reflected that CFO Price provided the Board with an update as to Merrill's deteriorating financial condition:

> Mr. Price updated fourth quarter results to date and projected EPS, including reasons for movement and market impacts.

*  *  *

**Mr. Price provided a Merrill Lynch update.  Discussion ensued…**

Ex. 110 (emphasis added).

217.    Chairman Lewis viewed Merrill's escalating fourth quarter loss as significant because, at the time the Director Defendants approved the Merger on September 14, 2008, the assumption was that Merrill would **break-even for the fourth quarter of 2008**.  Ex. 34, Lewis DE Tr. at 211:22-24.

218.    While CFO Price could not recall whether he updated the Director Defendants as to the discussions BofA's management team had with Wachtell concerning disclosure of Merrill's losses, he confirmed that Chairman Lewis was apprised of those discussions.  Ex. 66, Price DE Tr. at 192-194.  ("I would have informed Ken.  You know, I'm not saying it wasn't a discussion.  I don't recollect it being -- you know, I don't recollect a specific presentation on that or something.  I'm just not precluding it because I don't remember the details of all the discussions"); Id. at 30:17-31:2 (Price would update the Director Defendants on pertinent issues facing the BofA management team); Id. at 30:7-16; 32:4-21.

219.    CEO Lewis testified that CFO Price provided him with updates promptly after receiving financial information about Merrill.  Ex. 34, Lewis DE Tr. at 188:2-190:5.

220.    The Director Defendants do not dispute that Chairman Lewis and CFO Price kept them fully informed as to Merrill's financial condition.  According to Lead Director Defendant Sloan:

A. A director only knows what management tells him, and we didn't have any reason to question, still don't, what -- you know, what management knew and what they should have told us. So I would say no, the board was still fully supportive.

Q. **So it was your belief up to December 5th that if there was information concerning Merrill Lynch that should be provided to the board that management would have done it?**

A. **That's my belief, yes, sir**.

Ex. 24, Sloan DE Tr. at 130:4-14.

221.    This sentiment was confirmed by Director Defendant Countryman when his counsel elicited during cross examination that the Board was kept informed as to the financial condition of Merrill throughout the Merger Transition Period:

Q. Going back to the period between September 14 and December 31, 2008, **was the board kept apprised of developments regarding Merrill Lynch in a timely fashion**?

A. **Yes, I believe it was.**  We had great confidence in management and our advisors that anything that was changing in Merrill from what we expected at the time we entered into the transaction, we expected that it would be reported to us in a timely fashion, and **I believe it was**.

Ex. 58, Countryman DE Tr. at 210:14-24; Ex. 20, Lozano DE Tr. 44:7-10 ("We were getting updates from management, from Ken's senior team, from Ken himself, and on a number of occasions, consistently over that period of time.")

**In The Weeks Leading Up To The Stockholder Vote The Senior Executive Of BofA And Merrill Meet Repeatedly To Discuss Merrill's Deteriorating Financial Condition**

222.    On the afternoon of November 21, 2008, acting CFO Cotty met with CEO Thain to discuss Merrill's Fiscal Year 2009 Plan.  Ex. 111, in relevant part, at BAC-ML-NYAG00003635; Ex. 112.

223.    As a result of this meeting, Mr. Thain downwardly revised the Merrill 2009 Plan to reflect his negative views on Merrill's 2009 prospects.  Ex. 112; Ex. 87, Cotty DE Tr. at 148:19-24 (Cotty testified Mr. Thain made "downward adjustments" to Merrill's 2009 earnings expectations); Ex. 113 at 820 (Mr. Cotty met with CEO Thain to discuss 2009 Plan right before Thanksgiving and CEO Thain was "very negative"); Id. at 816 (Wednesday before Thanksgiving, Treasurer Brown was "told losses increasing").

224.    On November 25, 2008, Mr. Cotty received an updated Daily Net Revenue report from a Merrill finance personnel with the note, "**Awful**."  Ex. 114.  Mr. Cotty promptly forwarded this report to CFO Price.  Ex. 115 at BAC-ML-NYAG00821734-6.

225.    Beginning on December 1, 2008, in preparation for a December 3, 2008, meeting among CEO Lewis, CFO Price, CEO Thain, CFO Chai and acting CFO Cotty, the fourth quarter 2008 forecast and 2009 Plan were updated and circulated to the meeting participants.  Ex. 116; Ex. 117 at BAC-ML-NYAG-502-00064566.

226.    As BofA received Merrill's financial updates, BofA's finance team, including Mr. Cotty, prepared an update for the Board as to Merrill's financial condition, including a "refresh on merger model including changed estimates."  Ex. 118 at BAC-ML-NYAG70342913 (December 1, 2008, email from Steve Brown to Neil Cotty).

**The December 1, 2008 Merrill Forecast And 2009 Plan Update**

227.    On December 1, 2008, at 3:15 pm, Merrill finance personnel provided Mr. Cotty with an updated 2009 Plan which forecast a fourth quarter pre-tax lax loss of $**10.16 billion** (after-tax loss $6.496 billion) and **2009 after-tax earnings of $952 million**.  Ex. 119.  This updated 2009 earnings forecast of $952 million stood in stark contrast to the $4.125 billion 2009 earnings forecast which formed the basis for the Merger Proxy disclosure and September 15, 2008, presentation to analysts.

228.    In turn, the BofA finance team, with Mr. Belk's help, was busy updating the Merger model to take into account the latest Merrill financial updates, and comparing the updated Merger model to Wall Street analyst models for the Merger.  Ex. 120.

229.    For example, on December 1, 2008, at 4:09 pm, Mr. Belk provided CFO Price a comparison of BofA's updated Merger model to the most recent UBS Merger model.  This

comparison showed that UBS was projecting that the Merger would be 7.9% accretive in 2009, and 1% accretive in 2010, while the BofA model projected the Merger to be 4.4% dilutive in 2009, and 2.8% dilutive in 2010.  Ex. 120.  This comparison was made all the more disturbing by the fact that BofA had yet to incorporate Merrill's 2009 Plan update, which projected 2009 earnings of **$952 million, whereas Mr. Belk's Merger model still projected Merrill 2009 earnings of $3.5 billion**.

### The December 1, 2008, Merrill Update Caused Price To Fear That Merrill's Losses Constituted A MAC

230.    Just four days prior to the BofA Stockholder Vote on the Merger, on December 1, 2008, CFO Price requested a meeting with Mr. Curl and Mr. Mayopoulos to discuss the MAC clause in the Merger agreement.  According to Mr. Mayopoulos, the discussion centered on the:

> **[Q]uestion about whether the losses and, you know, Merrill's overall financial condition represented a material adverse change.**

Ex. 102, Mayopoulos DE Tr. at 242:12-15; Ex. 121.

### The December 2, 2008 Merrill Forecast And 2009 Plan Update

231.    At 4:00 pm on December 2, 2008, Mr. Cotty met with Mr. Thain to discuss Merrill's updated 2008 Forecast and 2009 Plan.  Ex.111 at BAC-ML-NYAG00003637; Ex. 122.

232.    The Merrill 2009 Plan demonstrated the extent to which Merrill's fourth quarter losses were impacting Merrill's 2009 Plan.  Merrill was now forecasting 2009 after-tax earnings of only $610 million (pre-tax earnings of $872 million) a decrease of $3.52 billion, or **85% less** than, the $4.125 billion forecast that was provided to the Board in connection with their vote to approve the Merger and formed the basis for the Merger Proxy disclosure concerning the accretive nature of the Merger.  Ex. 116.

233.    Chairman Lewis and CFO Price knew that the publicly disclosed

accretion/dilution figures, which were based on the $4.125 billion forecast, were no longer attainable.

234.    The change in forecast was so disturbing, that acting Merrill CFO Cotty immediately asked to be provided with the September 14 Board package which contained the $4.125 billion Merrill 2009 Forecast provided to the Board.  Ex. 123.

235.    CEO Lewis and CFO Price knew that this continued downward trend in Merrill's 2009 Forecast would have a significant and material effect on the accretive nature of the Merger as disclosed in the Proxy.

236.    Also on December 2, 2008, BofA's finance personnel, including Treasurer Brown, recognized that as a result of Merrill's write downs of its assets during the fourth quarter, BofA would be required to "infuse capital" into Merrill by the end of the year.  In addition, "**given the potential size of the infusion" the Director Defendants would need to be informed because their approval would be required**.  Ex. 124 (emph. added).

**The December 3, 2008, Meeting Among Lewis, Price, Cotty, Thain And Chai**

237.    In preparation for a December 3, 2008, 4:00 pm meeting with Lewis and Price, Mr. Cotty emailed Mr. Thain expressing concern that Merrill's 2009 Plan would "not be sufficient to cover the preferred dividends…."  Ex. 125; Ex 89 at UR-BAC-ML-NYAG00006656; Ex. 111 at BAC-ML-NYAG00003637; Ex. 87, Cotty DE Tr. at 167:9-14.

238.    The December 3 meeting participants, Lewis, Price, Thain, Chai and Cotty, were provided with and discussed Merrill's updated December 3, 2008 fourth quarter forecast and 2009 Plan.  Ex. 87, Cotty DE Tr. at 171-173.  The updated fourth quarter forecast was a pre-tax **loss of $11.043 billion** (after-tax loss of $7.068 billion).  Even worse, the 2009 Plan was for Merrill after-tax **earnings of $481 million** (pre-tax earnings of $687 million).  Ex. 126, Ex. 127,

Ex. 128.

239.     With respect to Merrill's fourth quarter forecast, acting CFO Mr. Cotty cautioned that he believed an additional $3 billion of losses should be added to Merrill's fourth quarter forecast.  No one in attendance disagreed.  Ex. 87, Cotty DE Tr. 171-173.

240.     In contrast to the Merger weekend assumption that Merrill would break-even for the fourth quarter of 2008, the $14 billion pre-tax loss forecast was highly material.  Ex. 34, Lewis DE Tr. at 211:22-24.

241.     With respect to the 2009 Plan, Mr. Thain's view was that Merrill would be lucky to break even in 2009.  Ex. 113 at 778.  Indeed, after Thanksgiving, Mr. Thain had grown "very negative" about Merrill's prospects and began to drop the 2009 revenue forecast contained in the 2009 Plan.  Id. at 820.

242.     The significance of the 2009 Plan was not lost on CEO Lewis.  CEO Lewis testified that $481 million projected 2009 earnings were only 10% of the $4.125 billion projected as of September 14, 2008, when the Director Defendants approved the Merger.  Ex. 34, Lewis DE Tr. at 212.

243.     Moreover, CEO Lewis understood that the 2009 earnings projections formed the basis for the accretion/dilution model upon which the $29 per share Merger consideration was based.  Id. at 80:20-81:4.  As a result, CEO Lewis understood that the Merger would have a more dilutive effect in 2009 than as publicly disclosed during the September 15, 2008 analyst call as represented in the Merger Proxy, rendering these statements materially false and misleading.  Id. at 212-213.

244.     CEO Lewis instructed Mr. Thain that the 2009 Plan "needed to get to be a bigger number."  Id. at 214:1-3.  A decision was made to reduce Merrill's 2009 expenses.

245.     Later that day, Merrill's finance team circulated to Mr. Cotty and Mr. Belk, who was updating the Merger models, an email discussing the changes that would be made to the fourth quarter forecast and 2009 Plan as discussed during the meeting between CEO Lewis and Mr. Thain.  Ex. 125; Ex. 129.

246.     According to the email, the fourth quarter forecast would now reflect a $14 billion fourth quarter loss, and 2009 Plan expenses would be adjusted downward by $2.2 billion.  The email instructed "use these changes in your models."  Ex. 125.  Ex. 130.

**The December 4, 2008 Merrill Forecast And 2009 Plan Update**

247.     The day before the BofA Stockholder Vote, on December 4, 2008, an updated fourth quarter forecast and 2009 Plan, entitled "December 3, 2008 (Revised 6 pm)" were circulated.  Ex 130.

248.     The revised 2008 fourth quarter forecast increased Merrill's fourth quarter loss to **$14.043 billion** pre-tax ($8.988 billion after-tax) to reflect Mr. Cotty's position that an additional $3 billion in losses should be booked.  Thus, from November 12 to December 3, 2008, Merrill's fourth quarter losses had trended **from $8.9 billion to $14.043 billion**.  Ex 130.

249.     The December 3, 2008, 6 pm 2009 Plan reflected 2009 net income of $2.021 billion in accordance with Mr. Lewis's instruction to reflect a "bigger number."  Ex 130.  The revised 2009 Plan, however, was still over $2 billion less than the 2009 revenue forecast that formed the basis, not only for pricing the Merger, but for the September 15, 2008 analyst call and Merger Proxy disclosures of the accretive nature of the Merger.

250.     In a December 4, 2008, email, Mr. Cotty repeated CEO Lewis and CEO Thain's view of Merrill's 2009 Plan when he stated, "In light of the **dismal out look** [sic] for next year, Ken [Lewis] and John [Thain] have concluded we need to move faster on reductions and

accelerate some actions that may have been postponed to later periods." Ex. 131 (emph. added).

251.    On December 4, 2008, at 12:00 pm, CFO Price met with Mr. Cotty and other members of the BofA management team to discuss Merrill's updated P&L and trading losses. Ex. 89 at UR-BAC-ML-NYAG00006656; Ex. 132; Ex. 133.

252.    CFO Price, having days earlier received an update of the most recent analyst expectations for Merrill's 2009 earnings of $3.515 billion, was well aware that the market (and BofA shareholders) had **no indication** that Merrill's financial condition had so rapidly deteriorated, nor that the accretion/dilution figures included in the Merger Proxy were no longer attainable.

253.    Moreover, an email sent by BofA Treasurer Brown confirmed that BofA stockholders were unaware of Merrill's deteriorating financial condition during the fourth quarter 2008.  Ex. 134 at BAC-502-WLRK 00003467-71 (December 18, 2008, email from Treasurer Brown to CEO Lewis and other BofA executives regarding S&P, "**they clearly think the worst of Merrill Lynch is behind** and that purchase accounting adjustments we have outlined should cover most meaningful risks"); Ex. 135 (December 19, 2009, email from Peter Hein of Wachtell stating, "fundamental issue of lack of credibility with rating agencies to whom [Merrill] may not have disclosed the ever increasing losses for the fourth quarter"); Ex. 136; Ex. 113 at 814.

254.    Based on his knowledge of Merrill's drastically deteriorated financial condition, Chairman Lewis knew prior to the December 5, 2008 Stockholder Vote that BofA's prior statements concerning the accretive nature of the Merger were no longer true.

**BofA Update Of The Accretion/Dilution Model
Prior To The Stockholder Vote**

255.    David Belk, the "man in charge of the merger" (Ex. 137, Brown 4, at 97:19-21),

was directed to update the "Bankers models" to determine the effect of Merrill's further deteriorating financial condition on BofA.  Ex. 15, Brown DE Tr. at 220:7-16; Ex. 138; Ex. 139, Ex. 140 at BAC-ML-NYAG00029174-6; Ex. 141 at UR-BAC-ML-NYAG00760339-50; Ex. 142 at UR-BAC-ML-NYAG00760272-82; Ex. 143.

256.    In addition, Treasurer Brown testified that when he received Merrill's updated forecast he updated BofA's capital models to reflect the new information.  Ex. 15, Brown DE Tr. 211.  BofA knew, but did not disclose that Merrill's losses "would have a dent on Bank of America's capital ratios and capital position. "  *Id.* at 212:4-14.

257.    In order to update his Merger model, on the evening of December 3, 2008, Mr. Belk requested that Mr. Felsman of JCF, provide him with a "refresh" on analyst consensus earnings estimates for Merrill 2009.  Ex. 144.

258.    On December 4, 2008, at 8:11 pm, BofA treasurer Mr. Brown received Mr. Belk's updated accretion/dilution analysis.  Ex. 145, in relevant part.

259.    Mr. Belk's updated analysis of the dilutive nature of the Merger, which included Merrill's most recent 2009 Plan projection, was shocking.  Ex. 145.

260.    According to Mr. Belk's updated analysis, the Merger would be **16% dilutive in 2009, 6.3% dilutive in 2010, 1.3% dilutive in 2011**.  Mr. Belk's revised December 4, 2008, accretion/dilution projections stood in stark contrast to the materially false and misleading accretion/dilution information provided to BofA's stockholders in the Merger Proxy which stated in relevant part:

> each of FPK and J.C. Flowers determined that the merger would be **2.5%** dilutive to Bank of America's consensus analyst estimated EPS in 2009**, 0.3% accretive** to Bank of America's consensus analyst estimated EPS in 2010**, and increasingly accretive** to Bank of America's consensus analyst estimated EPS in subsequent years.

Id./Ex. 39. (Emphasis added).

**Belk's Updated Merger Model Was Immediately Incorporated
Into A Presentation To The Board**

261.     On December 5, 2008, at 12:23 am, four hours after Mr. Belk updated his

accretion/dilution analysis and 10 hours prior to the Stockholder Vote, Mr. Price was provided

with a draft of the financial presentation he was slated to provide to the BofA Board of Directors.

Ex. 146, in relevant part.   The draft presentation included Merrill's revised 2009 earnings

projection of $882 million after-tax as well as the updated accretion/dilution figures which

reflected the drastically lower Merrill 2009 Plan.  Id.

262.     According to this draft Board presentation, hours prior to the Stockholder Vote,

BofA was projecting that the Merger would be **20.9% dilutive in 2009, 6.7% dilutive in 2010

and 1.2% accretive in 2011**.  Id. at BAC-ML-NYAG70312505.  BofA stockholders were

unaware of this material information.

**Despite Serious Concerns By BofA's Three Top Financial Officers
That Merrill's Financial Condition Should Be Disclosed,
No Disclosures Are Made Prior To Stockholder Vote**

263.     Treasurer Brown was so concerned over the failure to disclose Merrill's

deteriorating financial condition that he feared going to prison.  This fear motivated him to

approach CFO Price and argue in favor of disclosing Merrill's losses.  According to Treasurer

Brown, he told CFO Price that "**[I] don't want to be talking to you through a glass wall over a

telephone**."  Ex. 15, Brown DE Tr. at 210.

264.     Moreover, Treasurer Brown explained that his belief that BofA stockholders

should be informed of Merrill's financial condition in advance of the Stockholder Vote was

based on the fact that it was widely known within BofA that Merrill's financial condition would

have a material adverse impact on BofA.  Treasurer Brown recalled discussions by BofA

employees as follows:

> [W]e were all shareholders, associates or shareholders as well.  We had paid a lot for Merrill Lynch and we were also watching before our eyes their financial condition deteriorate.  **You knew that there was likely to be adverse impacts to [BofA's stock] price and that wasn't necessarily a good thing as a shareholder.**

Ex. 15, Brown DE Tr. at 192-193.

### CFO Cotty Urged Disclosure Of Merrill's Financial Condition

265.     In addition, prior to the Stockholder Vote, Mr. Cotty confronted CFO Price as to why no disclosure was being made concerning Merrill's deteriorating financial condition.  Mr. Cotty testified that he approached CFO Price on the issue of disclosure when Merrill's pre-tax loss had deteriorated from $10 billion to $14 billion over a matter of days.  Ex. 87, Cotty DE Tr. at 157:4-6.

266.     Mr. Cotty testified that he raised the disclosure issue with CFO Price because Merrill's undisclosed losses continued to increase drastically ahead of the upcoming Stockholder Vote:

> Q. Did you have any concern around this point in time, around December 1, with Merrill's escalating fourth quarter loss projections?
>
> A. I would say I'm not sure it is the escalation but **it is a loss and there is a proxy statement out there** and what is our obligation on a very complicated area and is he consulting counsel.

Ex. 87, Cotty DE Tr. at 158:13-20.

267.     CFO Price assured Mr. Cotty that he was consulting with counsel.  Id. at 158:22-23.

### Price Consulted In-House Counsel About Disclosure

268.     On or about December 3, 2008, CFO Price "informally" raised the issue of disclosing Merrill's deteriorating financial condition with BofA's general counsel, Mr.

Mayopoulos.  According to Mr. Price, he raised the disclosure issue with Mr. Mayopoulos "more of in the hallway or a quick, you know, when we just happened to run into each other."  Ex. 66, Price DE Tr. at 205:12-16.  According to Mr. Price, Mr. Mayopoulos counseled that disclosure was not necessary.  There is, however, a material disagreement between Mr. Price and Mr. Mayopoulos concerning what information Mr. Price provided to Mr. Mayopoulos during this "informal" meeting.

269.    According to Mr. Mayopoulos, Mr. Price informed him that Merrill's fourth quarter loss had escalated from $5 billion to $7 billion, as reflected in the early version of the December 3, 2008, forecast.  Mr. Price, however, insists that he provided Mr. Mayopoulos with the revised 6 pm version of the December 3, 2008, fourth quarter forecast of a loss of $8.988 billion.  Ex. 102, Mayopoulos DE Tr. at 245-246; Ex. 66, Price DE Tr. at 213-214; Ex. 117 at BAC-ML-NYAG-502-00064560.

270.    In addition, Mr. Price did not inform Mr. Mayopoulos of the change in Merrill's 2009 Plan or the effect that the change had on accretion/dilution assumptions publicly disclosed. Id./Ex. 66, Price DE Tr. at 231.

**December 5 Stockholder Vote**

271.    The BofA Stockholder Vote to vote to approve the Merger occurred on December 5, 2008, at 11:00 am.

272.    The morning of the Stockholder Vote, Mr. Price met with Mr. Cotty, Treasurer Brown and Mr. Belk, at 8:30 am.  Ex 89 at UR-BAC-ML-NYAG00006656.  The evening before, CFO Price had been provided with the results of Mr. Belk's updated Merger model, which included the updated accretion/dilution analysis.  Thus, CFO Price was fully aware that the accretion/dilution analysis publicly disclosed during the September 15, 2008, analyst call and in

the Merger Proxy, were no longer valid, and in fact, were materially false and misleading.

273.    CEO Lewis was also aware that the publicly disclosed accretion/dilution analysis was materially false and misleading.  In preparation for the Stockholder Vote, BofA's management team provided CEO Lewis and CFO Price with a question and answer memorandum, updated as of December 1, 2008, which included a potential question from stockholders concerning the dilutive impact of the Merger.  Ex. 147.

274.    The proposed response was intended to update the September 15, 2008, analyst call and Merger Proxy disclosures to reflect a deterioration of Merrill's financial condition. However, the December 1, 2008, Q&A failed to reflect BofA's most current analysis provided to CFO Price the day before.  The Q&A stated as follows:

Q. How do you justify the dilution caused by the Merrill acquisition?

A. **We estimate the transaction to be approximately 4% dilutive in the first year and 3% dilutive in the second year before restructuring charges…**

Ex. 147 at 2 (emph. added).

275.    These numbers, while not the most current, were materially different from the accretion/dilution analysis in the Merger Proxy and reflected the impact Merrill's losses were expected to have on BofA.  Thus, while different than the accretion/dilution analysis in the Board update provided to CFO Price earlier that day, the proposed answer was intended to disclose to the stockholders that the Merger was projected to be materially more dilutive than as disclosed in the Merger Proxy.

276.    The Stockholder Vote was very contentious.  Ex. 148, in relevant part.  In the beginning, one stockholder demanded to speak with an independent director, only to be told that the only director in attendance was CEO Lewis.  Id. at 16 -17 ("Unidentified Audience: Thank you, sir. Well, will there be an opportunity to hear  from an independent director?  Chairman

Lewis: No, there will not…Unidentified Audience: I have a need to have independent information that's independent of management.  Chairman Lewis: That's why you have independent auditors").

277.    Following numerous contentious questions concerning the dilutive effect of the Merger, the following exchange occurred wherein CEO Lewis was not truthful:

> JOHN BURKE: You didn't respond to the lady's comment.  This will dilute our shares, will it not, yes or no, not -- not in the future some day, but this afternoon?

> CHAIRMAN LEWIS: We have said that the -- as I recall in the presentation, that we will have **dilution in the first year, break even in -- break even in the second and then accretion in the third.**

Id. at 29-30.

278.    CFO Price then went on to clarify that Mr. Lewis was referring to the Merger Proxy when he said "presentation."  *Id.* at 32-33 ("[t]he dilution of the transaction and the shares associated with the transaction reflected in the proxy and Mr. Lewis has referred to as shown in the financials there").

279.    Even though Chairman Lewis knew that the revenue forecast underpinning the accretion/dilution analysis was no longer attainable, he nevertheless deliberately repeated this materially false and misleading information contained in the Merger Proxy because, according to CEO Lewis, it was "the only thing that we had said publicly" on the issue.  Ex. 34, Lewis DE Tr. at 252:2-5.

280.    Not only did Chairman Lewis provide stockholders materially misleading information concerning the dilutive nature of the Merger, he also materially misrepresented BofA's role in the payment of bonuses to Merrill employees in fiscal 2008.  When stockholders questioned Chairman Lewis about Merrill payments of 2008 bonuses, he was not truthful:

> AL H. GRAVES: Also, I'd like to know about if Merrill Lynch is going to pay

their  bonuses.

CHAIRMAN LEWIS: I have nothing to do with what Merrill Lynch does with
their bonuses.

Ex. 148  at 21.

281.    CEO Lewis admitted this statement was false when he acknowledged that BofA
was clearly involved in the setting of Merrill bonuses.  Ex. 34, Lewis DE Tr. at 244-245; Ex.32,
Thain DE Tr. at 56-59 (BofA was actively involved in the role of awarding Merrill bonuses); Ex.
28, Fleming DE Tr. at 154-155 (BofA selected a bonus cap during the Merger negotiations with
"lots of room going forward to figure it out").

### 10.    December 5, 2008 Board Telephone Conference

282.    On December 5, 2008 at 2 pm, the Director Defendants convened for a voluntary
Board Call.

283.    As with prior Board meetings and voluntary calls, CFO Price updated the Director
Defendants as to Merrill's financial condition.  Ex.149 ("Mr. Lewis commenced the call by
noting that overall conditions have worsened and then asked Mr. Price to elaborate");  Ex. 150,
(December 4, 2008, email from Mr. Cotty to Merrill's finance personnel, "Similar to last month,
Joe [Price] has a board meeting [December 5] and would like to update them on both BAC and
ML trading results.").

### 11.    December 9, 2008 Board Meeting

284.    During a December 8, 2008, meeting between Mr. Cotty and CFO Price to
prepare for the following day's Board meeting, Mr. Cotty provided CFO Price with an updated
Merrill fourth quarter forecast which showed a $16.474 billion pre-tax loss.  Ex. 151; Ex. 152;.
Ex. 153 (December 7, 2008, email from Merrill finance personnel to Mr. Cotty annexing Merrill
P&L reports with the exclamation "What a disaster!"); Ex. 154 (December 8, 2008 email from

Mr. Cotty to Merrill personnel regarding the daily net revenue report for December 8 with the exclamation, "Another ugly day" which brought the response "[t]otally awful").

285.    In an email earlier that day to Mr. Thain, discussing the Merrill fourth quarter forecast and the next day's Board meeting, Mr. Cotty stated that he "cautioned Joe [Price] there is a downside in December…He mentioned that he would hedge accordingly."  Ex. 152.

286.    On December 9, 2012, the Director Defendants held a regularly scheduled meeting of the Board of Directors.

287.    During the Board meeting, CFO Price formally presented the "2009 Plan Board of Directors Review."  Ex. 155, in relevant part.  Included within this presentation were the updated Merrill 2009 Plan and its impact on the accretion/dilution analysis, as well as an update on Merrill's fourth quarter 2008 losses.  Id.; Ex. 156 in relevant part, at 4-5 ("Mr. Lewis called on Mr. Price to review the estimated fourth quarter results of…Merrill Lynch…as well as the 2009 Plan….").

288.    According to CFO Price's presentation, BofA was forecasting Merrill 2009 earnings of $882 million and an impact on BofA as follows: **13.1% dilution in 2009, 2.8% dilution in 2010 and 2% accretion in 2011.**  Ex. 155 at 57.

289.    In addition, CFO Price's presentation included a slide on Merrill's fourth quarter 2008 loss which was pegged at $8.98 billion.  Id. at 47.  This figure was sourced to the December 3, 2008, 6 pm forecast.  Ex. 130.

290.    CFO Price also provided the Board with the updated December 8, 2008, Merrill fourth quarter forecast.  Ex. 151; Ex. 51, Barnet DE Tr. at 194:5-16 (Director Defendant Barnet understood that CFO Price's plan, as presented at the December 9 Board Meeting was overly "optimistic").

291.    The significance of Merrill's deteriorating financial condition to BofA's financial

health was not lost on the Director Defendants.  Defendant Tommy Franks testified that:

> [T]he view with respect to dilution, neutrality, and – and accretion of the Merrill
> acquisition over time…that would get my attention.  **It did get my attention, and
> the same I suspect with the board**, because you'll recall I said earlier that -- that
> the presentation and what the board knew throughout this period had
> an…**expectation of…an '09 that was…dilutive, a 2010 that was a neutral**, and
> a 2011 that was accretive, making money for the bank.

Ex. 23, Franks DE Tr. at 178:3-13.

292.    After the conclusion of the Board meeting, Director Defendant Gifford sent an

email to BofA executive Brian Moynihan, recognizing the impact Merrill's losses were having

on BofA, "**Tough day for shareholders**."  Ex. 157

293.    During their depositions, the Director Defendants sought to downplay the

materiality of Merrill's fourth quarter 2008 losses and 2009 Plan by repeatedly and uniformly

testifying that they were focused on the long term benefit that would result from the Merger.  Ex.

23, Franks DE Tr. at 219:2-10; Ex. 158, Tom May DE Tr. at 97-99; Ex. 159, Walter Massey DE

Tr. at 89:20-90:3; Ex. 160, Thomas Ryan DE Tr. at 72; Ex. 51, Barnet DE Tr. at 57:7-18.

294.    The flaw in this strategy, however, is made evident by the simple fact that the

only "long-term" analysis provided to the Board through the Stockholder Vote was the three-

year accretion/dilution analysis contained in the September 14, 2008 Board Package, the

September 15, 2008, analyst call, the Merger Proxy, and the updates to the accretion/dilution

analysis.

295.    Therefore, the only facts available to the Director Defendants which they

uniformly testified that they relied on clearly demonstrate that: (i) no benefit would flow to BofA

from the Merger during the three-year period reflected in the accretion/dilution analysis; and (ii)

the Merger was, therefore, not in BofA's best interest.  Ex. 14, Curl Jan. 23, 2012 DE Tr. at

16:12-22 (BofA's "general guideline" was that a merger "would turn accretive…12 or 18 months following closing and recover the dilution incurred in approximately three years…").

### BofA Fired General Counsel Mayopoulos When He Sought To Confront Price Concerning Merrill's Losses

296.    During the December 9, 2008, Board meeting, Mr. Mayopoulos learned that CFO Price had not fully informed him of the extent of Merrill's fourth quarter losses and its impact on Merrill's 2009 Plan.  Ex. 102, Mayopoulos DE Tr. at 251-252.

297.    Immediately following the Board meeting, Mr. Mayopoulos sought out CFO Price but was told he was unavailable.  Ex.102, Mayopoulos DE Tr. at 254-255.

298.    Hours later, Mr. Mayopoulos was fired and escorted from the building by security.  Ex. 102, Mayopoulos DE Tr. at 259-260.  In order to appease a number of the Director Defendants with close ties to Mr. Moynihan, whom CEO Lewis had just fired, CEO Lewis announced that Mr. Moynihan would replace Mr. Mayopoulos as General Counsel.  Ex. 161.

299.    Mr. Moynihan, BofA's current CEO, had a long-standing, close personal relationship with Director Defendants May and Gifford, as each were former executives and directors of Fleet Boston, who transitioned to BofA following the merger of the two companies.

300.    Director Defendant Gifford was Chairman and CEO of Fleet Boston when BofA acquired Fleet Boston in 2004.  Following the acquisition of Fleet Boston, Director Defendant Gifford was Co-Chairman of BofA along with CEO Lewis for several months, for which Lewis paid him a bonus amount up to $8,000,000.  (¶ 86.)  Director Defendant Gifford also was provided with other substantial benefits including an office and secretarial staff at BofA expense, which he maintains.

301.    Certain of the Director Defendants were distraught by the fact that CEO Lewis fired their friend Mr. Moynihan.  Ex 26, Gifford DE Tr. at 138-140.  Upon learning that CEO

Lewis had "saved" Mr. Moynihan at Mr. Mayopoulos's expense, the Director Defendants expressed their relief.  Ex. 27.

302.    Director Defendants Gifford and May are two of the four remaining Director Defendants who currently sit on BofA's Board of Directors, with Mr. Moynihan as BofA's CEO.

**Beginning On December 12, 2008 BofA Evaluated Invoking The MAC**

303.    Days after the Stockholder Vote, on December 12, 2008, Mr. Cotty received Merrill's updated fourth quarter forecast dated as of December 10, 2008.  This forecast reflected a pre-tax loss of $18.1 billion ($12.493 billion after-tax).  Ex. 162; Ex. 117 at BAC-ML-NYAG-502-00064625.

304.    Receipt of this forecast prompted Mr. Cotty and CFO Price to question whether BofA should invoke the Material Adverse Event clause in the Merger agreement ("MAC") in order to terminate the Merger.   According to Mr. Cotty, CFO Price remarked, "That weekend Joe [Price] certainly had second givings in questioning [the Merger]…We didn't sign up for an $8 billion loss."  Ex. 87, Cotty DE Tr. at 245-246.

305.    On December 12, 2008, CFO Price discussed Merrill's updated 2008 forecast with Mr. Curl and Mr. Herlihy.  Ex. 163.  Mr. Curl agreed that invoking the MAC was warranted.  Ex. 38, Curl Jan. 22, 2012 DE Tr. at 188-189.  Ex. 164 (email from BofA in-house counsel Brenner stating that Wachtell "made a very strong case as to why there is a MAC");  Ex. 165, Teresa Brenner DE Tr. at 215:5-223:3,  237:3-238:7.

306.    On December 14, 2008 CFO Price discussed with CEO Lewis invoking the MAC.

**On December 17, 2008  BofA Informed The Regulators**
**That BofA Intended To Invoke The MAC**

307.    Beginning December 15, 2008, BofA's management team and Wachtell had numerous discussions concerning Wachtell's analysis of the MAC issue.  It was BofA's view

that Merrill's "**Q4 = a disaster**."  (Ex. 113 at 822.)

308.    On the morning of December 15, CFO Price had a discussion with Wachtell during which Wachtell outlined three possible paths for the deal (1) consummate the Merger on the originally negotiated terms; (2) renegotiate the deal and present it to stockholders; or (3) declare a MAC.  Ex 46, Roth DE Tr. at 93:22-94:21.

309.    During meetings with Wachtell on December 15, and 16, 2008, it was agreed that CEO Lewis would renegotiate the Merger consideration with Mr. Thain, and Wachtell prepared a script for CEO Lewis to use for the renegotiations.  Ex 46, Roth DE Tr. at 113:5-115:15; 131:16-132:5.  This renegotiation never happened.  Ex. 32, Thain DE Tr. 166:3-22.

310.    On December 16, Mr. Cotty met with Mr. Thain to review the December 10, 2008, fourth quarter forecast.  Thereafter, Mr. Cotty informed CFO Price that Mr. Thain believed the forecast to be accurate.  Ex. 166.

311.    According to CFO Price, on December 17, 2008, a decision was made to invoke the MAC and to meet with federal regulators in Washington, D.C. to inform them of this decision.

312.    During the meeting with the federal regulators, CFO Price announced that BofA had a basis to invoke the MAC.  Ex. 66, Price DE Tr. at 298:4-300:4.

313.    On December 17, 2008, the Director Defendants received notice of a special Board meeting to be held on December 19, but were told nothing concerning the subject (which in fact was the monumental decision to call a MAC).  Defendants Gifford and May sarcastically joked about the lack of transparency concerning the purpose of the meeting and that perhaps it was another huge acquisition.  Defendant May wrote: "Here we go again. Maybe its Citi."  Ex. 167.  Gifford replied: "Better not be… a bit more than curious."  Id.

314.     On the morning of December 18, 2008, Mr. Cotty informed Mr. Thain that CFO Price would be providing the Director Defendants with a financial update the following day and sought Mr. Thain's views on Merrill's updated December 16, 2008, forecast.  As of December 16, 2008, Merrill's fourth quarter forecast had increased to a pre-tax loss of $21.407 billion ($14.771 after-tax losses), which included for the first time, a $2.3 billion charge for goodwill impairment.  Ex. 168, in relevant part.

### December 19, 2008 BofA Telephone Conference of the Board

315.     During the Board's December 19, 2008, telephone conference, CFO Price informed the Director Defendants that "Merrill continues deterioration" (Ex. 169).  In addition, there was discussion of invoking the MAC and Wachtell's position that there was a good faith basis to invoke the MAC.  (Ex. 170.)

316.     Based on Mr. Lewis's recommendation, the Board authorized Mr. Lewis to approach Secretary Paulson and Mr. Bernanke to discuss BofA invoking the MAC and terminating the Merger.  Ex. 23, Franks DE Tr. at 187:13-15

317.     Apparently CEO Lewis did not inform the other Director Defendants that he had already informed Secretary Paulson, over Mr. Herlihy's objection that BofA was going to invoke the MAC.  Ex. 171 at 95:15-96:10.

318.     Despite the gravity of the decisions being made by the Director Defendants considering invoking the MAC, Wachtell was notably absent from the December 19, 2008, Board Meeting.  Moreover, none of the Director Defendants requested that Wachtell attend the Board meeting or address the Board on the issue of the MAC.  . Ex. 172 at 78:7-16.  The decision not to seek the counsel of Wachtell in connection with the monumental decision to call a MAC was inexplicable.  Ex. 24, Sloan DE Tr. at 162:8-10 ("You got to remember Herlihy was

… looked upon as a legal god").

### Secretary Paulson Threatened To Fire Defendant Lewis and Remove The Director Defendants

319.    In preparation for a telephonic meeting between CEO Lewis and Secretary Paulson, Wachtell prepared "talking points" which reiterated BofA's position that there was a good faith basis to invoke a MAC as well as the damage that would be done to BofA by closing the Merger pursuant to the terms of the Merger agreement.  Ex. 173, "We are still of the view that there has been a MAC at Merrill … **there is no way to make up for the dramatic across-the-board decline at Merrill**;" "[A] **very substantial purchase price reduction to the Merrill stockholders would be highly appropriate**") (emph. added).

320.    During the call on Sunday, December 21, 2008, Secretary Paulson threatened that if BofA went ahead with its decision to invoke a MAC, Secretary Paulson would remove the Board and management.  As testified to by CEO Lewis:

> There was -- there was a call that I had with Hank Paulson, and again, I don't know the exact date, but it was on a Sunday, as I recall, and I told him that we still were strongly considering a MAC, and he said, again, I can't be precise on his wording, but, in essence, that **"If you -- if you call a MAC, we will remove the board and the management."**

Ex. 34, Lewis DE Tr. at 298:20-299:1.

321.    Secretary Paulson's threat had the intended effect.

### 13.  December 22, 2008 Special Meeting Of The Board

322.    Within hours of receiving Secretary Paulson's threat, Chairman and CEO Lewis called a special meeting of the Board of Directors for 4 pm on December 22, 2008.  (Ex. 174.)

323.    At the outset of the special meeting, CEO Lewis informed the Board of Secretary Paulson's threat, and that CEO Lewis decided not to invoke the MAC and instead to close the Merger in accordance with the terms of the Merger agreement.

> Mr. Lewis stated the purpose of the special meeting is to insure that the Board is **in accord with management's recommendation to complete the acquisition of Merrill Lynch & Co Inc.** ("Merrill Lynch"), as scheduled on January 1, 2009, pursuant to the terms of that certain Agreement and Plan of Merger ("Merger Agreement"), dated September 15, 2008, after due consideration of the undertakings and admonitions of the federal regulators.

Ex. 175, p.1; Id. at 2 ("[T]he Treasury and Fed stated strongly that were the Corporation to invoke the material adverse change ("MAC") clause in the merger agreement with Merrill Lynch and fail to close the transaction, the Treasury and Fed would remove the Board and management of the Corporation").

324.    The Director Defendants were very concerned, however, that closing the Merger on the existing terms would cause a large "hole" in BofA's capital structure.  According to Director Defendant Countryman, the deterioration of Merrill's financial condition had created a "capital hole" in BofA and he feared "**the capital hole would be so large that it would be very difficult for [BofA]**."  Ex. 58, Countryman DE Tr. at 196:18-20.

325.    As a result of the Merrill losses, in late December BofA was required to raise additional capital, which was projected to cost BofA $1.5 billion over three years.  Ex. 113.

326.    CEO Lewis reported that the federal regulators stated that they would provide assistance to protect against Merrill losses, but that the terms of any such assistance to be provided to BofA by the federal government would not be provided prior to the close of the Merger.  Ex.175, p.2.

327.    As made clear by CEO Lewis in a December 22, 2008, email to the other Director Defendants, **it was the Director Defendants continued desire to prevent BofA stockholders from learning of Merrill's losses prior to the December 31, 2008, close of the Merger**:

> I just talked with Hank Paulson.  He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure **which, of course, we do not want**.

Ex. 176 (emphasis added).

328.     At the time the Merger closed on December 31, 2008, Chairman of the Federal

Reserve Bernanke and Secretary Paulson still had not provided BofA with any guarantee that

government assistance would be forthcoming, or if it was forthcoming, what the terms of any

such assistance would be.  As recognized by Director Defendant Sloan, the Director Defendants

were "**betting the bank**" on the government's undocumented, vague representations as to

financial assistance.

> At this point in time we're still **betting the bank**, and as you can tell from this we
> ended up betting the bank on their word, which is a -- was very nervous…because
> they didn't live up to everything they told us.

Ex. 24, Sloan DE Tr. at 172:5-10; Ex. 177, p.2, Minutes of Special Meeting of the Board,

December 30, 2008 ("[BofA] did not have a written agreement with the federal regulators and

[BofA] could only rely on the oral commitments of …senior representatives at the Treasury and

Fed….").

329.     BofA recognized the potential damage to both BofA and its stockholders in not

knowing the terms the regulators would exact from BofA in exchange for the government

assistance necessary to "fill the hole" created by Merrill's losses.  For example, Mr. Moynihan

viewed the risk as follow:

> I am quite concerned that we need to step back and rethink how [the Fed] fill[s]
> the whole [sic].  If it is filled with common, we **are paying twice (so to speak)
> for Merrill** once to ml shareholders and once to the govt by delivering them
> common.

Ex. 178 at BAC-502-WLRK (CSI) 0007934 (emph. added); Ex. 179 (email from Moynihan to

CFO Price, "The issue with issuing too much equity at these low prices is that we are **penalizing**

**our shareholders too much**") (emphasis added).

330.    On January 1, 2009, the Merger closed.

331.    On January 14, 2009, the fears of damaging BofA stockholders became a reality when the onerous terms of the government financial assistance were disclosed.  On that date it was disclosed that BofA required $20 billion in TARP funds from the government in order to assist the BofA acquisition of Merrill.  The terms of the TARP funds required that BofA issue to the U.S. Treasury 800,000 shares of 8% Series R Preferred Stock, as well as 150.4 million shares of BofA common stock.

332.    The 8% preferred stock dividend rate on the TARP funds was excessively high. According to Professor Saunders, the total cost to BofA for the $20 billion in TARP funds was $1.4 billion.  Ex. 18 at 47.

333.    In addition the federal regulators provided BofA a guarantee of up to $118 billion (later reduced to $104 billion) for potential losses on troubled assets.  In exchange for this assistance, BofA paid $276 million to the U.S. Treasury, $57 million to the Federal Reserve and $92 million to the FDIC.  Id. at 48.

334.    All told, the cost to BofA of the government assistance required to close the Merger was $1.8 billion.  Id. at 48.

**14.  The Director Defendants' Reactions To The Government Assistance**

335.    During a January 15, 2009, Special Board meeting to discuss Merrill and BofA's 2008 full-year results as well as the government assistance, Director Defendant Gifford and Director Defendant May exchanged a series of emails.  These emails made clear the Director Defendants' view of the reckless damage being done to BofA stockholders as a result of the Merger:

---

From:     Gifford, Chad
Sent:     Thursday, January 15, 2009 6:03 PM
To:       May, Thomas
Subject: RE: Are you available.

Amaaaazing...

---

**From:** May, Thomas [_____Redacted_____]
**Sent:** Thursday, January 15, 2009 6:02 PM
**To:** Gifford, Chad
**Subject:** RE: Are you available.

good comeback.  Holy shit on the people

> **From:** Gifford, Chad [mailto:chad.gifford@bankofamerica.com]
> **Sent:** Thursday, January 15, 2009 6:00 PM
> **To:** May, Thomas
> **Subject:** RE: Are you available.
>
> Only stated in the context of a horrible economy!!! Will effect
> everyone...
>
> ---
>
> **From:** May, Thomas [_____Redacted_____]
> **Sent:** Thursday, January 15, 2009 5:59 PM
> **To:** Gifford, Chad
> **Subject:** RE: Are you available.
>
> No trail
>
> > **From:** Gifford, Chad [mailto:chad.gifford@bankofamerica.com]
> > **Sent:** Thursday, January 15, 2009 5:57 PM
> > **To:** May, Thomas
> > **Subject:** RE: Are you available.
> >
> > Unfortunately it's screw the shareholders !!

---

Ex. 180.

336.    In addition, in a January 21, 2009, email to his family, Director Defendant Gifford

admitted that the Merger was "a bad mistake":

> [Merrill's] assets became much worse than expected when presented in
> September.  When the deal was announced we were $31-32/share and then boom.
> **This was a bad decision and when we realized same the US Government
> pressured us to stick with it**. That's when they agreed to give us more capital
> and guarantee some of their bad assets ... But the street worries that there is more
> crap and wonders why we got ourselves into this quagmire.

Ex. 181 (emph. added).

337.    On January 26, 2009, Director Defendant Barnet emailed Director Defendant Gifford that, "some feel Ken ego and ambition cause of all this…."   Ex. 182.

G.    **The Federal Regulators Removed**
**The Director Defendants From BofA's Board**

338.    Following the close of the Merger, it was widely reported that the federal regulators entered into a memorandum of understanding with BofA pursuant to which the regulators demanded the resignation of 11 of the 16 Director Defendants who oversaw the Merger.   Ex. 199.

339.    During the Director Defendants' depositions in the Delaware Derivative Action, BofA instructed the Director Defendants not to testify on the subject of the Memorandum of Understanding ("MOU") and their resignations from the Board.

340.    According to a July 16, 2009 *Wall Street Journal* article, "The MOU surprised some [BofA] executives who hadn't expecte4d federal regulators to issue such a formal rebuke. [BofA] responded swiftly, with six directors resigning since May 26.  The departures include O. Temple Sloan Jr., [BofA]'s lead independent director, and Jackie Ward, chairman of the board's asset quality committee."   Id. 199.

IV.    **THE COLLUSIVE SETTLEMENT DISCUSSIONS**

341.    In April 2011, Mr. Portnoy, counsel for the Director Defendants, contacted Robert Kriner, Co-Lead counsel for the Delaware Plaintiff concerning the possibility of settlement.   Dkt # 559, ¶ 3; Ex. 184, ¶ 2.

342.    When Mr. Portnoy proposed to Mr. Kriner that BofA's multi-billion dollar derivative claims against the Director Defendants be settled by having BofA institute a series of "new corporate governance measures," he was promptly rebuffed by Mr. Kriner.  Dkt # 559, ¶ 3-

4; Ex. 184, ¶ 2.

343.    Mr. Kriner informed Mr. Portnoy that any settlement of the Delaware Derivative Action would require significant monetary benefit to BofA.  Id.

344.    Armed with the knowledge that the Delaware Plaintiff would not agree to settle BofA's multi-billion dollar derivative claims in exchange for corporate governance changes, and that the Delaware Plaintiff was vigorously preparing for trial, Mr. Portnoy then approached the Consolidated Derivative Plaintiffs to entice them to enter into a quick and easy settlement that was based on corporate governance changes.

345.    As Mr. Portnoy has admitted, "in the fall of 2011 . . .  I suggested [to the Consolidated Derivative Plaintiffs] that it might be possible to reach a settlement based on corporate governance measures.  Counsel for the New York derivative Plaintiffs informed me that they were willing to consider such measures as part of a settlement . . . ."  Dkt # 559, ¶ 5.

346.    Confident that they had now secretly isolated attorneys willing to sell out BofA's derivative claims and obtain a release of the derivative claims that were being vigorously litigated by the Delaware Plaintiff, the Director Defendants worked rapidly to ensure the success of their "reverse auction" scheme.  Remarkably, Mr. Portnoy boasts in his Affidavit of his success in getting the Consolidated Derivative Plaintiffs to make a demand to settle the claims for "governance reforms," before a deposition was taken in the Consolidated Actions, stating in relevant part:

> [O]n October 24, 2011, counsel for the Consolidated Derivative Plaintiffs made a formal settlement demand to Defendants' counsel.  **The demand included a number of corporate governance reforms** and described the contours of the proposed new board-level committee that counsel had previously discussed.

Dkt # 559, ¶ 7 (emph. added).

347.    While the Portnoy Affidavit alludes to a suggestion that counsel for the

Consolidated Derivative Plaintiffs believed that a settlement "would also have to include a monetary component," a careful reading of the Portnoy Affidavit makes clear that the October 24, 2011, demand considered a monetary payment an afterthought and did not contain any demand involving the payment of any specific sum to BofA in connection with the proposed Settlement.    In this vein, the Portnoy Affidavit states, "the demand also reiterated the Consolidated Derivative Plaintiffs' position regarding a monetary payment from Defendants or their insurance carriers to the Bank."  Dkt # 559, ¶ 7.

348.    The Director Defendants admit they and BofA acted quickly to ensure that the Director Defendants would be able to reap the benefits of the collusive proposed Settlement.  On December 16, 2011, the Director Defendants responded to the Consolidated Derivative Plaintiffs' settlement demand by stating they "were willing to explore a settlement based on certain of the Consolidated Derivative Plaintiffs' proposed corporate governance reforms, subject to certain modifications," and "reiterated their position that, given the factual and legal infirmities in Plaintiffs' case, a monetary payment by Defendants or their insurance carrier was unwarranted." Id. Dkt # 559, ¶ 9.  In addition, Mr. Portnoy has represented that, "Defendants' counsel maintained that a monetary contribution was inappropriate given the weakness of the derivative claims" (Id. Dkt # 559, ¶ 6), "my belief that neither of the plaintiffs' groups in the two pending derivative actions had developed evidence to support any bad faith claim, and thus I did not see any settlement value in the Delaware law claims, much less value that would justify an out-of-pocket contribution by Defendants" (Id. Dkt # 559¶ 16).

349.    The collusive scheme was very effective and by mid-February 2012 the Director Defendants were able to secure the non-monetary relief that they have consistently demanded. Id. Dkt # 559, ¶ 13.  The Consolidated Derivative Plaintiffs and their counsel were eager and

willing participants in a collusive "reverse auction" scheme initiated by the Director Defendants to assure that the Director Defendants would be able to: (i) settle all of the claims asserted in both the Delaware and Consolidated Derivative Actions for corporate governance reforms and a mere $20 million; and (ii) avoid having to personally contribute to any settlement involving a resolution of BofA's derivative claims against them and to assure counsel for the Consolidated Derivative Plaintiffs that they would be paid a fee for "selling out" BofA's multi-billion dollar derivative claims.

350.   Any suggestion that the Director Defendants sought to engage the Delaware Plaintiff in good-faith settlement negotiations in February 2012 is patently false because at that point in time the Director Defendants had already achieved the non-monetary settlement they sought once the Consolidated Derivative Plaintiffs' agreed to "sell out" BofA's multi-billion dollar derivative claims in a collusive, "reverse auction."

351.   On Friday, February 10, 2012, at 2:30 PM, counsel for the Delaware Plaintiff, Mr. Kriner, Efrat Pellet, and myself participated in a telephonic conversation with counsel for the Director Defendants, Mr. Portnoy.   During the call, Mr. Kriner inquired as to whether Mr. Portnoy was involved in settlement discussions with the Consolidated Derivative Plaintiffs.   Mr. Portnoy responded, there "is nothing to share on settlement," and that there "was no agreement at this point," but he refused to discuss the substance of his discussions with the Consolidated Derivative Plaintiffs.

352.   In response to Mr. Kriner's suggestion that the parties consider mediating their claims, Mr. Portnoy responded, "there is no mediation process ongoing," and that he did not believe mediation would be helpful and that he did not want his client to incur the expense of mediation.   Mr. Kriner further stated that if there were discussions regarding the resolution of

claims in the Consolidated Derivative Plaintiffs, the Delaware Plaintiff should be included and that he would not be involved in a reverse-auction.  Mr. Portnoy rejected mediation as being both too costly and premature.

353.    Only two weeks later, the Director Defendants and Consolidated Derivative Plaintiffs engaged in mediation, however, the Delaware Derivative Plaintiff did not have any knowledge that this mediation was occurring.   Dkt # 559, ¶ 18.

354.    On February 14, 2012, Delaware Plaintiff's counsel attended a meeting with counsel for the Director Defendants wherein Delaware Plaintiff's counsel stated that with the completion of merits discovery approaching, they were prepared to commence settlement discussions.  Delaware Plaintiff's counsel commented that, although their damages expert had not yet concluded his analysis, preliminary information suggested that BofA had incurred billions of dollars in damages as a result of the Director Defendants having breached the fiduciary duties that each of them owed to BofA in connection with the Merger.

355.    In response, counsel for the Director Defendants stated that any settlement would have to be within the policy limits.  Delaware Plaintiff's counsel responded that, in light of the extremely large damages, Delaware Plaintiff's opening settlement demand would be in excess of the applicable insurance limits, however, Delaware Plaintiff's counsel remained willing to engage in good faith settlement negotiations with the Director Defendants in order to explore whether any discounts to the initial demand might be appropriate to compromise the claims.

356.    The February 14, 2012 meeting concluded with counsel agreeing they would meet to discuss settlement after the conclusion of merits discovery on March 6, 2012.  Delaware Plaintiff's counsel repeated their readiness and willingness to discuss the claims and explore settlement during a March 16, 2012, meet and confer with counsel for the Director Defendants

concerning summary judgment.

357.    The Director Defendants' lack of good faith was unknown to the Delaware Plaintiff and her counsel until nearly a month later when they learned for the first time that the Director Defendants and the Consolidated Derivative Plaintiffs had already agreed to the substantive terms of a non-monetary settlement.

358.    Specifically, by February 17, 2012, the Consolidated Derivative Plaintiffs and Defendants informed this Court in chambers that there was an agreement on core aspects of the settlement, excluding the monetary component.  Dkt # 558, ¶ 20; Dkt # 559, ¶ 17.

359.    On March 19, 2012, counsel for the Delaware Plaintiff met with BofA's counsel, Mitchell Lowenthal of Cleary Gottlieb, at Mr. Lowenthal's invitation.  Mr. Lowenthal began the March 19, 2012, meeting by informing counsel for the Delaware Plaintiff that Mr. Portnoy was actively engaged in settlement discussions with counsel for the Consolidated Derivative Plaintiffs.

360.    Mr. Lowenthal further stated that, once concluded, the settlement agreed to by the Director Defendants and the Consolidated Derivative Plaintiffs would extinguish and release all of the breach of fiduciary duty claims currently pending against the Director Defendants.  Once it became clear that BofA's counsel had not called the meeting for the purpose of allowing Delaware Plaintiff's counsel to explain the evidence that the Delaware Plaintiff had developed which greatly bolstered the strength of BofA's derivative claims against the Director Defendants, the meeting was promptly concluded.

361.    In an attempt to stop the reverse auction process, the Delaware Plaintiff wrote to counsel for the Consolidated Derivative Plaintiffs on March 22, 2012 and informed them that the Delaware Plaintiff believes "it is now appropriate for the Plaintiffs in both the Delaware and

New York Derivative Actions to jointly make a demand to settle all of the derivative claims asserted in both the Delaware and the New York Derivative Actions." Ex. 185.

362.   The Delaware Derivative Plaintiffs' March 22nd letter also stated in relevant part:

> [W]e believe that a joint demand and joint settlement discussions are the best way to maximize the value of the derivative claims for the company, and to avoid the risk of potential reverse auctioning or disagreements among the Delaware and New York derivative actions concerning the value of the claims which could otherwise result from separate settlement demands being made, or separate settlement discussions being held.

Id.

363.   On March 23, 2012, the Delaware Plaintiff wrote to Messrs. Lowenthal and Portnoy.  The March 23rd letter stated in relevant part:

> We are in agreement with Larry that such discussions should be simultaneously conducted jointly with Plaintiffs' counsel in both the Delaware and New York Derivative Actions.   We believe that joint settlement negotiations are the appropriate manner to fully and finally resolve all of the claims asserted in both the Delaware and New York Derivative Actions without protracted objections and appeals.  Finally, Plaintiffs are also willing to engage in a joint mediation of the claims asserted in the Delaware and New York Derivative Actions . . . .

Ex. 186.

364.   On March 28, 2012, Mr. Portnoy responded by letter in which he openly admitted that the Director Defendants were engaged in a "reverse-auction" with the Consolidated Derivative Plaintiffs and their counsel.  Mr. Portnoy's letter admits that, because the Delaware Derivative Plaintiffs' refusal to make a settlement demand within the policy limits was "unacceptable" to the Individual Defendants, the Individual Defendants had "commenced settlement discussions with the New York plaintiffs" and "those settlement discussions have proceeded and will continue to proceed, and I will advise the Delaware plaintiffs if and when we reach agreement."  Ex. 187.

365.   On March 29, 2012, Donald Wolfe, Jr., who is Delaware counsel for BofA, also

responded to the Delaware Plaintiff's March 23d letter to Messrs. Lowenthal and Portnoy.  Mr. Wolfe's letter similarly confirmed that BofA and its counsel had actual knowledge that the Director Defendants were engaged in a "reverse-auction" to resolve BofA's claims in both the Delaware and Consolidated Derivative Actions and that, despite such knowledge and their knowledge of the fact that BofA's financial interests would be greatly harmed if the "reverse-auction" process was successful, neither BofA nor its counsel were taking any action whatsoever to halt this process.  Ex. 188.

366.    Mr. Wolfe's letter did not invite the Delaware Plaintiff to work with BofA to halt the "reverse-auction" being conducted by the Director Defendants and the Consolidated Derivative Plaintiffs.  Neither did Mr. Wolfe indicate that BofA would independently act to protect its interests.  Instead, BofA's counsel simply stated, "while it is our current understanding that no proposed settlement . . . has been reached . . . as we told you at the meeting we believe that such an agreement may be imminent."  Ex. 188.

367.    BofA's apparent lack of interest in protecting its multi-billion dollar derivative claims from being "sold-out" in a "reverse auction" process are all the more inexplicable in light of BofA's representations to this Court that "[n]either the Bank, nor any component of its Board, is seeking to displace the judgment of the stockholders' court-appointed representatives. The Bank merely supports the proposed settlement."  Ex. 189 (July 10, 2012 Letter from Mitchell A. Lowenthal).  However, BofA's outside counsel made a contrary representation to Chancellor Strine that BofA signed the proposed Settlement because it was in the best interests of the BofA and its stockholders.  Ex. 190, ¶ 4.

368.    By March 29, 2012, the Delaware Plaintiff had not received any response to the March 22, 2012, letter to the Consolidated Derivative Plaintiffs.  Accordingly, counsel for the

Delaware Plaintiff attempted to contact counsel for the Consolidated Derivative Plaintiffs by telephone on March 29th and again on March 30th.

369.    Counsel for the Consolidated Derivative Plaintiffs refused to take either telephone call, and never responded to messages requesting that they return such calls.

370.    On March 30, 2012, Paul O. Paradis, Co-Lead counsel for the Delaware Plaintiff, telephoned Mr. Portnoy to request an in-person meeting to request that Mr. Portnoy put an immediate halt to the "reverse-auction" process and commence simultaneous joint settlement discussions with both the Delaware Plaintiff and Consolidated Derivative Plaintiffs.

371.    Mr. Portnoy agreed to meet with Mr. Paradis for lunch on April 6, 2012.  On the morning of April 6th, however, Mr. Portnoy emailed Mr. Paradis and requested that the lunch be rescheduled to April 11th because a "client issue" had come up.

372.    On April 11, 2012, Mr. Portnoy met with Mr. Paradis, however, at the outset of the meeting, both agreed that the entirety of that meeting was subject to F.R.E. 408, accordingly, the discussions had during that meeting are not able to be further disclosed.

## V.    THE DELAWARE PLAINTIFF LEARNS OF THE SETTLEMENT OF THE CONSOLIDATED DERIVATIVE ACTION

373.    Late in the afternoon of April 12, 2012, Mr. Portnoy telephoned Mr. Paradis and informed him that the Director Defendants had, earlier that day, executed a memorandum of understanding with the Consolidated Derivative Plaintiffs pursuant to which the Consolidated Derivative Plaintiffs had agreed to settle all of BofA's derivative claims asserted in both Delaware and Consolidated Derivative Actions for a mere $20 million and certain corporate governance reforms.

374.    During the April 12, 2012 conversation with Mr. Paradis, Mr. Portnoy attempted to entice the Delaware Planitiff and her counsel by informing Mr. Paradis that the Director

Defendants would agree to allow the Delaware Plaintiff and her counsel to make a fee application in exchange for Delaware Plaintiff and her counsel agreeing to support the proposed Settlement.  Mr. Paradis immediately refused Mr. Portnoy's offer and responded that neither the Delaware Plaintiff, nor her counsel, could be bought.  Ex. 191.

375.    By letter dated April 12, 2012, Mr. Portnoy informed the Court that the parties to the Consolidated Derivative Action had entered into the Memorandum of Understanding.

376.    Upon learning the terms of the proposed Settlement reached by the Consolidated Derivative Plaintiffs, and in light of the fact that: (i) there was $500 million in insurance coverage available to be paid in settlement of BofA's derivative claims; and (ii) the $20 million payment to be made in connection with the proposed Settlement had not even consumed the entire $25 million balance of the first layer of insurance coverage available to satisfy BofA's derivative claims, the Delaware Plaintiff literally worked around the clock to ensure that the Bank's multi-billion dollar derivative claims would not be released for a paltry $20 million by the New York Derivative Plaintiffs and their attorneys.

A.  **The Delaware Plaintiff Files Motion for Injunctive Relief**

377.    On April 13, 2012, the Delaware Plaintiff moved the Delaware Chancery Court for an Order, *inter alia*, (1) enjoining Defendants from entering into or approving any agreement to settle the Delaware Plaintiff's claims without the Delaware Plaintiff's approval or an order from the Delaware Chancery Court; and (2) granting the Delaware Plaintiff's expedited discovery concerning any discussions and negotiations concerning potential settlement between the Defendants and the Consolidated Derivative Plaintiffs.

378.    In response, on April 18, 2012, Defendants moved to stay the Delaware Derivative Action.

379.    On May 4, 2012, Chancellor Strine granted the Stay pending this Court's ruling on the proposed Settlement, reiterating his view that the Delaware Derivative Action raised important issues of Delaware law:

> [I] have obviously expressed my view in the past, and I continue to adhere to this view, that **with respect to the application of principles of law to the question of whether the directors of Bank of America breached any duties to their stockholders, is one that's an important one under Delaware law.**

Ex. 192, May 4, 2012 Transcript of Teleconference, 5-6.

380.    Furthermore, Chancellor Strine recognized the efforts of the Delaware Plaintiff's counsel in pursuing the claims on behalf of BofA.

> I have every expectation that the **Delaware plaintiffs' arguments about the settlement will be taken seriously by my federal colleague. I also have every expectation that they will be treated fairly in terms of their contribution to bringing about the settlement because of their vigor in pushing forward to a trial here.**

Id. at 8.

381.    Finally the Delaware Chancery Court ordered that if this Court does not approve the proposed Settlement, the Defendants will forego the right to have their summary judgment motion heard and the Delaware Plaintiff "should have the right to go to trial on the schedule that the defendants agreed upon." Id. at 10-12.

### B.  Delaware Plaintiff Files a Petition for an Order to Show Cause Seeking to Protect BofA From the Collusive Settlement

382.    In addition, on April 13, 2012, the Delaware Plaintiff petitioned this Court for an Order to Show Cause seeking the following relief: (i) ordering the Director Defendants and the Consolidated Derivative Plaintiffs to show cause why they should not be enjoined from consummating a proposed $20 million derivative settlement, that is the product of collusion and a reverse-auction, and that is otherwise grossly inadequate because it is well below the range of recovery in which a settlement of Bank of America's derivative claims may be considered fair;

(ii) ordering Consolidated Derivative Plaintiffs' Counsel to show cause why these two firms should not be removed as Interim Co-Lead Counsel in this action because they have demonstrated that they are inadequate Co-Lead Counsel; (iii) ordering the Consolidated Derivative Plaintiffs to show cause why they should not be removed as Co-Lead Plaintiffs in this action because they have demonstrated that they are inadequate Co-Lead Plaintiffs; and (iv) the Director Defendants and the Consolidated Derivative Plaintiffs to show cause why the Delaware plaintiffs should not be permitted to intervene and to seek appointment as Lead Plaintiffs, and their counsel not be permitted to seek appointment as Co-Lead Counsel in this action in order to protect BofA's  interests in this litigation.

383.    In denying the Delaware Plaintiff's Petition, this Court held that the Delaware Plaintiff's arguments directed to the proposed Settlement's fairness and adequacy are best weighed as objectors to the proposed settlement.  Dkt # 564,  Memorandum and Order dated May 14, 2012 at 4.

## VI. CONSOLIDATED DERIVATIVE PLAINTIFFS ACTIVELY TRADED BOFA COMMON STOCK DURING THE PENDENCY OF THIS ACTION WHILE IN POSSESSION OF CONFIDENTIAL DISCOVERY MATERIAL

384.    One of the issues the Delaware Plaintiff raised in her Petition was that the Consolidated Derivative Plaintiff demonstrated their inadequacy to represent the interests of BofA as a result of their trading in BofA common stock during the pendency of this Action and while in possession of confidential discovery material.

385.    The Consolidated Derivative Plaintiffs' own filings evidenced that they purchased at least 132,641 shares of the BofA's common stock after April 6, 2009, despite being plaintiff-fiduciaries in possession of material, non-public information concerning BofA. Dkt # 62 at 11, fn 7,; Dkt # 558, ¶ 2.

386.    The Court, in its Order denying the Petition, however, directed the Consolidated Derivative Plaintiffs to file "an affidavit addressing whether each derivative plaintiff satisfies the 'continuous ownership' requirement of DE law and otherwise has standing to bring the claims." Dkt # 566, May 14, 2012 Memorandum and Order at 2, fn 1.

387.    In response, the Consolidated Derivative Plaintiffs filed identical declarations which failed to attach any evidence of continuous ownership and failed to address the question of whether the Consolidated Derivative Plaintiffs have traded in BofA stock during the pendency of the Action while in possession of confidential discovery material.  Dkt # 571, Exs. A and B (Declaration of Dave Strauss dated May 24, 2012, and Declaration of Kathy Bourque dated May 24, 2012, respectively).  Also glaringly absent were are any attestations from the Consolidated Derivative Plaintiffs' counsel attesting to the fact that they had reviewed their clients' trading records and confirmed continuous ownership and that their clients had not traded in BofA common stock in violation of Delaware law.

388.    Based on the Consolidated Derivative Plaintiffs' failure to provide a far less than adequate response to this Court's May 14 Order, on July 6, 2012, the Delaware Plaintiff filed an Application for Discovery seeking, among other things, documents concerning the nature and extent of the Consolidated Derivative Plaintiffs' ownership, including all purchases or sales, of the Bank's common stock.

389.    By Order dated July 20, 2012, this Court ordered that each of the Consolidated Derivative Plaintiffs "shall provide documents showing their holdings of BofA common stock and purchases or sales of BofA common stock from September 1, 2008 to the date of the application to this Court for preliminary approval of the settlement." Dkt # 707 at 2-3.

390.    On August 10, 2012, the Consolidated Derivative Plaintiffs produced trading

records that clearly demonstrate that the Consolidated Derivative Plaintiffs collectively traded over 1 million shares of BAC common stock during the pendency of the Consolidated Derivative Action and while in possession of Confidential Discovery Material as follows:

A.      Louisiana Municipal Police Employees Retirement System traded **769,022** shares of BAC common stock between September 15, 2008 and May 18, 2012; and

B.      Hollywood Police Officers' Retirement System traded **241,395** shares of BAC common stock between September 15, 2008 and July 2, 2012.

Ex.4.

391.    Counsel for the Director Defendants, Mr. Portnoy, has admitted that he reviewed the Consolidated Derivative Plaintiffs' records of their trading during the pendency of the action. Dkt # 559 *(*Portnoy Aff), ¶ 32.  This may answer the question as to why Defendants did not seek to create a discovery record of the Consolidated Derivative Plaintiffs adequacy to represent BofA's interests in this action.

## VII.    PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

392.    By Order dated June 20, 2012, in response to Mr. Portnoy's letter informing the Court that the parties to the Consolidated Derivative Action had entered into a definitive settlement agreement, the Court Ordered that:

> [I]f the Court grants preliminary approval, it is contemplating conducting the final settlement hearing after the conclusion of the trial of the Consolidated Securities Class Action, which will commence on October 22, 2012 [because] there is a serious issue presented in the pending summary judgment motions in the Consolidated Securities Class Action whether certain types of damages are properly recoverable in the derivative action or in the securities action and deferring the issue will prevent any Whipsawing on this issue; **second, the issue of available Directors & Officers liability coverage will be clarified, given that both the derivative and securities actions are likely drawing on the same pool of coverage; and third, the Court will have a better understanding of the**

**underlying facts after having presided at the securities trial.**

Dkt # 620 at 1 (emph. added).

393.    In addition, the Court addressed the fact that the Consolidated Derivative Plaintiffs had negotiated for the payment of interest on their attorneys' fees, but failed to provide for the payment of interest on the $20 million payment to BofA.  The Court therefore Ordered that "[t]he parties should address…why the settlement proceeds ought not be placed in an interest bearing escrow account pending final approval."  Id. at 2.

394.    On July 3, 2012, the parties to the Consolidated Derivative Action filed their Memorandum of Law in Support of Joint Motion for Preliminary Approval of Settlement and informed the Court that Consolidated Derivative Plaintiffs' counsel would be seeking the payment of attorneys' fees in the amount of $13 million, plus interest, representing an unprecedented 68% of the cash component of the proposed Settlement.

395.    In addition, the parties addressed the issue the Court raised with respect to the fact that the proposed $20 million payment to BofA would not earn interest pending final approval by informing the Court that, while "the net benefit to BofA of placing the settlement funds in an interest-bearing escrow account pending final approval of the Settlement is likely to be immaterial," the $20 million would be placed in and interest-bearing escrow account.  Dkt # 662 at 13.

396.    Unaddressed was why the Consolidated Derivative Plaintiffs' counsel viewed the interest they would earn on their fee as material but did not view not the interest the $20 million would earn for BofA as material.  These actions demonstrate both the glaring inadequacy of the Consolidated Derivative Plaintiffs and their counsel, as well their utter failure to represent the financial interests of BofA, rather than their own interests.

A. **Court Grants Preliminary Approval**

397.    On July 13, 2012, the Court, *inter alia,* preliminarily approved the proposed Settlement and the proposed Notice Program.  Dkt # 690.

B. **Delaware Plaintiff's Objection to Preliminary Approval**

398.    On July 17, 2012, the Delaware Plaintiff timely filed her Objection to Joint Motion for Preliminary Approval of Settlement and thereby requested that the Court deny the Joint Motion for Preliminary Approval of Settlement.

399.    The Delaware Plaintiff cited the following grounds upon which the Court should deny the Joint Motion.

A.      The proposed Settlement is the product of a collusive reverse auction. Defendants colluded with the Consolidated Derivative Plaintiffs who are less informed than the Delaware Plaintiff and who therefore eagerly accepted the Defendants' invitation to settle BofA's multi-billion dollar derivative claims for nominal, at best, corporate governance reforms (which had previously been rejected out of hand by the Delaware Plaintiff), and the expectation of a $13.6 million payoff in attorneys' fees to be paid by BofA.

B.      The Consolidated Derivative Plaintiffs' counsel (and their mediator) lacked critical information necessary to assess the value of BofA's derivative claims when they agreed to the terms of the proposed Settlement.

C.      The $20 million proposed Settlement (even before deduction of $13.6 million in attorneys' fees) represents a mere pittance of the value of BofA's multi-billion dollar derivative claims and of the $500 million in insurance coverage available here, and does not include a contribution by any of the Director

95

> Defendants – all of whom have significant assets from which a judgment in favor of BofA could be satisfied.  Moreover, the non-monetary "governance reform" component is window dressing that adds little, if any, value.
>
> D.    The settling parties have demonstrated a continuing and dire fear of transparency that would reveal the grossly inadequate record and nature of the proposed Settlement for both the Court and BofA's stockholders.  They have repeatedly ignored legitimate inquires about the nature of the proposed Settlement by the Delaware Plaintiff, and have even attempted to block her from being heard by this Court in connection with the Joint Motion.

Dkt # 705.

400.    In addition, the Delaware Plaintiff objected to the proposed Notice Program because, among other things, the settling parties sought to hide the Consolidated Derivative Plaintiffs extraordinary fee request by asking the Court to approve only summary notice which **excluded the fee request and the right to object thereto**, and to defer ruling on the fee request until after the Settlement has been approved.

401.    Because the Court granted the Joint Motion before it had the benefit of the Delaware Plaintiff's timely filed objection, on July 27, 2012, the Delaware Plaintiff filed her Motion for Reconsideration of Order Setting Schedule and Preliminarily Approving Proposed Settlement.  Dkt # 717.

402.    By Order dated August 3, 2012, this Court denied the Delaware Plaintiff's Motion to Reconsider and held that:

> The matter may look differently when the Court has had a full opportunity to consider which elements of damages are recoverable against the individual defendants in a derivative suit on behalf of the corporation, as distinguished from a suit by shareholders against the individual defendants.  By the time of the

settlement hearing, the Court will also have a better sense of the strength of the derivative claims through the trial of the securities claims in the class action.  It will have the benefit of hearing from all shareholders in the final approval process.

Dkt # 721, August 3 Order at 1.

## VIII.   THE MEDIATOR'S LACK OF SUPPORT
## FOR THE PROPOSED SETTLEMENT

403.    In support of the Joint Motion, the settling parties submitted the Declaration of Layne R.  Phillips dated April 27, 2012, the mediator retained by the settling parties.  Ex. 193, ¶ 6.

404.    According to Mediator Phillips, his view that "counsel were well-versed on the relative merits of their claims and defenses," is based on the settling parties "respective mediation statements."  Ex. 193, ¶ 7.  It appears that during the sole February 29, 2012, mediation session there was no presentation by the settling parties as to the merits of the derivative claims.  Id.

405.    As discussed above, however, due to the Consolidated Derivative Plaintiffs' failure to conduct the appropriate discovery in order to inform themselves of the strength of their claims, as well as the failure to retain an expert to provide them with an opinion as to damages incurred by BofA, the Consolidated Derivative Plaintiffs' mediation statement could not have properly and adequately informed Mediator Phillips as to the merits of the derivative claims.  In fact, Defendants Lewis and Price were not deposed in the Consolidated Actions until months later after the mediation had been conducted and the transcripts of the 40 depositions taken by the Delaware Plaintiff were only delivered by Defendants to the Consolidated Derivative Plaintiffs two days before the mediation.

406.    Mediator Phillips represents that the $20 million monetary component of the

settlement was the result of a "mediator's proposal" which was a compromise of the "parties respective positions."  Ex. 193, ¶ 9.

407.    Absent from Mediator Phillips' Declaration is any representation that the $20 million monetary component of the settlement is fair, reasonable and adequate to BofA.

408.    The only representation contained in Mediator Phillips' Declaration concerning the settlement is a statement that the settlement negotiations "were conducted at arm's length, in good faith, free of collusion…."  Ex. 193, ¶ 10.

409.    A review of 35 declarations submitted by Mediator Phillips in connection with the settlement of other actions previously mediated by Mediator Phillips indicates that when Mediator Phillips believes a settlement to be fair, adequate and reasonable and adequate, he makes that very specific representation in his declarations.  For example, in each of the 30 declarations annexed hereto as Ex. 194, Mediator Phillips makes one of the following representations concerning the fairness of a settlement:

**7 Derivative Action Settlements**

- "an excellent result for the Company"

- "I firmly believe that the settlement is fair, reasonable, and adequate and should be approved by this Court"

- "the mediation process involved extensive analysis of the parties' positions including the merits of plaintiffs' stock options back dating claims…I firmly believe that the settlement is fair, reasonable and adequate and should be approved by this Court."

- "I firmly believe that the settlement is fair, adequate and reasonable and should be approved by this Court"

**A Global Settlement of Securities and Derivative Actions:**

- "the parties accepted my recommendation of a settlement structure…I believe the agreed settlement is, in light of all of the circumstances, fair, reasonable and adequate.  Given the excellent results achieved…"

### Securities and Derivative Action Settlements:

- "an excellent recovery…and equitable settlement"

### Other Settlements:

- "the proposed settlement is fair, adequate and reasonable"

- "is a fair settlement to the parties"

- "the settlement obtained is particularly fair, adequate and reasonable"

- "I believe this is a fair and adequate settlement"

- "the proposed settlement is not only fair and reasonable, but an excellent result"

- "excellent recovery for the class"

- "I strongly believe that the settlements…represent a very favorable resolution…from a mediator's perspective, I unreservedly recommend [the settlements]"

- "I unreservedly recommend the Settlement as…an accurate reflection of the risks and potential rewards of the settled claims"

- "I believe that the terms of the settlement are fair, adequate and reasonable and in the best interest of the Settlement Sub-classes"

- "I believe the Settlement represents a recovery and outcome that is reasonable and fair"

- In a settlement achieved as a result of the mediator's recommendation, which resulted in a "fair and equitable settlement"

410.    However, when Mediator Phillips is not prepared to endorse a settlement as fair, reasonable and adequate, his declarations in support of final approval are, not surprisingly, devoid of such affirmative language.  For example, the declarations annexed hereto as Ex. 195, which Mediator Phillips submitted in other actions, mirror the language in the Phillips' Declaration filed in the Consolidated Derivative Action (Ex. 193), and only contain representations concerning settlement negotiations, but are silent as to the fairness of the proposed settlements:

99

## 2 Derivative Action Settlements

- "I believe that the settlement was negotiated by the parties at arm's-length, carefully, and in good faith."

- "I believe that the settlement was negotiated by the parties at arm's-length, carefully and in good faith"

## Other Settlements:

- "I believe that the settlement was reached by the parties acting at arm's-length, carefully and in good faith"

- "The parties ultimately reached agreement on a settlement amount that was only slightly below my Mediator's Recommendation…the settlement process was arms-length."

411.    The foregoing makes clear Mediator Phillips' lack of endorsement of the proposed Settlement as fair, reasonable and adequate here.

412.    Finally, Mediator Phillips' statement that he "saw no evidence of a 'reverse auction,'" ignores certain critical facts.  Ex. 193, ¶ 10

413.    First, counsel for the Delaware Plaintiff contacted Mediator Phillips on July 12, 2011, and informed him that the Delaware Derivative Action was "well advanced…with a discovery cutoff date of December 31, 2011 and a trial scheduled for 2012. Thus, it is well advanced beyond the [Consolidated Derivative Action], which has conducted no depositions, has no cutoff date and no trial date."  Ex. 196.

414.    Counsel for the Delaware Plaintiff contacted Mediator Phillips again on March 23, 2012, and requested that in the event there would be a mediation in the Consolidated Derivative Action, that the Delaware Plaintiff "be given the opportunity to participate in them so that [BofA's] interests and claims are fully protected and aired."  Ex. 197.

415.    Mediator Phillips responded via email the next day and stated, "I am not in charge of invitations or notice nor am I at liberty to make disclosures about the same."  Ex. 197_.

416.    Therefore, Mediator Phillips was made aware that the all of the factors for a "reverse-auction" was present, *i.e.*, where a defendant seeks to settle with the weakest plaintiff who is most distant from trial because that plaintiff would recognize that they cannot possibly avoid preclusion by other plaintiffs whose actions would be earlier resolved.

## IX.    DELAWARE PLAINTIFF RENEWED REQUEST FOR CONSOLIDATED DERIVATIVE PLAINTIFFS' MEDIATION STATEMENT

417.    Following the Consolidated Derivative Plaintiffs' admission that they do not possess an expert report, by letter dated September 12, 2012, the Delaware Plaintiff renewed her request for the discovery of the Consolidated Derivative Plaintiffs' Mediation statement.

418.    The Delaware Plaintiff informed the Court that without an expert report, the mediation statement prepared by the Consolidated Derivative Plaintiffs is the only evidence of the Consolidated Derivative Plaintiffs' view as to proving liability and the maximum potential recovery in the event liability is established (Dkt # 677, Discovery Application, pp., 11-13).

419.    By Memo Endorsed dated September 18, 2012, this Court denied the DE Plaintiff's request.

## X.    THE SETTLEMENT OF THE CONSOLIDATED SECURITIES ACTION

420.    By press release dated September 28, 2012, BofA announced the settlement of the Consolidated Securities Action.  According to the press release, the $2.43 billion payment in settlement of these claims is to be funded solely by BofA, "[t]he amount to be paid under the proposed settlement will be covered by a combination of Bank of America's existing litigation reserves and incremental litigation expense to be recorded in the third quarter of 2012." BofA further announced that the settlement was "expected to negatively impact reported third quarter EPS by approximately $0.28."  Ex. 198.

421.    The stock market did not react kindly to the news that BofA would be funding the

$2.43 billion settlement, "Charles Elson, a finance professor at the University of Delaware and director of the John L. Weinberg Center for Corporate Governance commented "that settlements of cases like the one announced Friday hit shareholders twice, first when the actions at the heart of the case occur and then when the bank has to pay out the settlement on behalf of the executives."  BofA's stock price dropped on the news.

422.    The settlement in the Consolidated Securities Action also contained several corporate governance provisions.  While the parties in the Consolidated Securities Action have not publicly filed the settlement agreement, according to the press release announcing the settlement, the settlement contemplated, in addition to the $2.43 billion settlement fund, several corporate governance items.    The corporate governance settlement terms included the requirement that a majority of stockholders vote in director elections, annual disclosure of noncompliance with stock ownership guidelines, policies for a board committee regarding future acquisitions, the independence of the board's compensation committee and its compensation consultants, and an annual "say-on-pay" vote by stockholders.

## XI.    THE SETTLEMENT IN *SEC v. BANK OF AMERICA CORP.*

423.    Pursuant to an Opinion and Order dated February 22, 2010, Judge Rakoff in *Securities and Exchange Commission v. Bank of America Corp.,* 09 civ. 6829, 10 civ. 0215, (S.D.N.Y.), approved a settlement of an action by the SEC against BofA concerning nondisclosures by BofA in connection with the Merger. As part of the Consent Judgment approved by the court, BAC agreed to pay a "$150 million fine." Order, p. 11. As Judge Rakoff recognized, the "fine assessed against [BofA], taken by itself, penalizes the shareholders for what was, in effect, if not in intent, a fraud by management on the shareholders." Order, p. 1.

424.    As part of the SEC settlement, BofA was required to implement and maintain

seven corporate governance changes for a period of three years.  Those corporate governance reforms included:

A.         Retain an independent auditor to perform an audit of the BofA's internal disclosure controls and procedures and to issue an attestation report, in a form acceptable to the SEC;

B.         Have its Chief Executive and Chief Financial Officers certify that they have reviewed all annual and merger proxy statements;

C.         Retain disclosure counsel who will report to, and advise, the Board's Audit Committee on the Bank's disclosures, including current and periodic filings and proxy statements.

D.         Adopt a "super-independence" standard for all members of the Board's Compensation Committee that prohibits them from accepting any consulting, advisory or other compensatory fees from BofA other than in the member's capacity as a member of BofA's Board;.

E.         Maintain a consultant to the Compensation Committee that would also meet super-independence criteria and report solely to the Compensation Committee;

F.         Implement and maintain incentive compensation principles and procedures and publish such principles and processes in a prominent location on BofA's Web site; and

G.         At any annual meeting of security holders, provide shareholders with an advisory vote with respect to executive compensation.

*Securities and Exchange Commission v. Bank of America Corporation*, Civil Action Nos. 09-

6829, 10-0215 (S.D.N.Y), Dkt. #13.

Sworn to under penalty of perjury under the laws of the United States this 27th day of November 2012.

_____
Michael A. Schwartz