UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
                        :

IN RE BANK OF AMERICA CORP.        :      Master File No.
SECURITIES, DERIVATIVE, AND      :    09 MD 2058 (PKC)
EMPLOYEE RETIREMENT INCOME   :        ECF Case
SECURITY ACT (ERISA) LITIGATION  :
-------------------------------------------------------- x
                        :

This document relates to:           :
                        :
Consolidated Derivative Action    :
-------------------------------------------------------- x

## DECLARATION OF PROFESSOR GEOFFREY MILLER
## IN SUPPORT OF OBJECTION OF THE LABORERS NATIONAL PENSION FUND
## AND NANCY ROTHBAUM TO FINAL APPROVAL OF
## PROPOSED SETTLEMENT OF THE CONSOLIDATED DERIVATIVE ACTION

I, GEOFFREY MILLER, being duly sworn, depose and say:

1.      I have been engaged by Co-Lead Counsel[1] in the Delaware Action (defined

below) to provide expert analysis and opinions concerning the negotiations and terms of

the proposed settlement in the above-captioned Consolidated Derivative Action

("Proposed Settlement").  Under the terms of the Proposed Settlement, the "Released

Claims" specifically include any and all claims relating to the allegations in the derivative

action pending in the Delaware Court of Chancery, *In re Bank of America Corp.*

*Stockholder Derivative Litigation*, C.A. No. 4307-CS ("Delaware Action").  (Stipulation

¶9).  The Proposed Settlement provides a broad release to current and former BOA[2]

officers, directors, advisors and affiliates in exchange for a $20 million payment to BOA

by insurance carriers and four non-monetary "governance reforms."  BOA has agreed,

---

[1] "Co-Lead Counsel" means Horwitz, Horwitz & Paradis, Attorneys at Law; Chimicles & Tikellis LP and Wolf
Haldenstein Adler Freeman & Herz LLP
[2] "BOA" means nominal Defendant Bank of America Corporation.

among other things, to implement the reforms and to pay the fees and expenses of the Settling Plaintiffs' Counsel.[3]

2.      I have reviewed the Declaration of Michael A. Schwartz ("Schwartz Dec.") and the other documents cited herein.

3.      I am being compensated at my hourly rate of seven hundred fifty ($750) per hour for the work that I am performing in this litigation.

## I.   Qualifications and Background

### Qualifications

4.      A copy of my resume is attached as Appendix A.  I am the Stuyvesant P. Comfort Professor of Law at the New York University Law School.  I am a a *magna cum laude* graduate of Princeton University and a 1978 graduate of the Columbia Law School where I was Editor-in-Chief of the Law Review.  I served as a law clerk to the Honorable Carl McGowan of the United States Court of Appeals for the District of Columbia Circuit and to the Honorable Byron R. White, Associate Justice of the United States Supreme Court. I was an attorney-adviser at the Office of Legal Counsel in the United States Department of Justice from 1980-1982.  After practicing civil litigation with a Washington D.C. law firm, I joined the faculty of the University of Chicago Law School in 1983, where I served as Kirkland & Ellis Professor and Associate Dean.  I moved to New York University in 1995.

5.      I am a founder, board member and former co-president of the Society for Empirical Legal Studies, an organization of professors in the fields of law, economics, sociology, psychology, business, and political science whose work examines the

---

[3] "Settling Plaintiffs' Counsel" means Saxena White P.A. and Kahn Swick & Foti, LLC

statistical and empirical bases of legal rules. I am a 2011 inductee into the American Academy of Arts and Sciences and one of HeinOnline Law Journal Library's top-100 most cited authors all time.[4] A recent empirical study of scholarly influence lists me as one of the top 50 most relevant law professors in the United States.[5]

6.      I have written extensively over the years on issues relating to attorneys' fees, particularly in class and derivative action cases. My articles with Professor Macey on class action litigation have been cited as authority by courts across the United States.[6] My empirical studies on class action cases, co-authored with Professor Theodore

---

[4] See http://www.heinonline.org/HOL/MostCitedAuthors?collection=journals.

[5] John Yoo & James Cleith Phillips, The Cite Stuff: Inventing a Better Law Faculty Relevance Measure, UC Berkeley Public Law Research Paper No. 2140944 (September 3, 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2140944.

[6] *In re Processed Egg Products Antitrust Litigation*, 2012 WL 2885924 (E.D.Pa. 2012); *Louisiana Municipal Police Employees' Retirement System v. Pyott*,--- A.3d ----, 2012 WL 2087205 (Del.Ch. 2012); *Forsythe v. ESC Fund Management Co.*, 2012 WL 1655538 ( Del.Ch. 2012); *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, (7th Cir. 2011); *In re Sauer-Danfoss Inc. Shareholders Litigation*, 2011 WL 2519210 (Del.Ch. 2011); *Thorogood v. Sears, Roebuck and Co.*, 627 F.3d 289 (7th Cir. 2010); *Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3rd Cir. 2010); *In re Revlon, Inc. Shareholders Litigation*, 990 A.2d 940 (Del.Ch. 2010); *Lubin v. Farmers Group, Inc*., 2009 WL 3682602 (Tex.App. 2009); *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 2007 WL 2269471 (Ohio App. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D.Cal. 2007); *Amalgamated Bank v. Yost*, 2005 WL 226117 (E.D.Pa. 2005); *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3rd Cir. 2003); *Fruchter v. Florida Progress Corp.*, 2002 WL 1558220, (Fl. App. 2002); *In re Microstrategy, Inc.*, 172 F.Supp.2d 778 (E.D.Va. 2001); *In re Cendant Corp. Litigation*, 264 F.3d 201 (3rd Cir. 2001); *Scardelletti v. Debarr*, 265 F.3d 195 (4th Cir. 2001); *In re Auction Houses Antitrust Litigation*, 197 F.R.D. 71 (S.D.N.Y. 2000); *Lealao v. Beneficial California, Inc*., 82 Cal.App.4th 19, 97 Cal.Rptr.2d 797 (2000); *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202 (2nd Cir. 2000); *Davis v. Carl Cannon Chevrolet-Olds, Inc.*, 182 F.3d 792 (11th Cir. 1999); *In re Baan Co. Securities Litigation*, 186 F.R.D. 214 D.D.C. 1999); *In re Quantum Health Resources, Inc.*, 962 F.Supp. 1254 (C.D. Cal. 1999); *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D.La. 1997); *Howard v. Globe Life Ins. Co.*, 973 F.Supp. 1412 (N.D.Fla. 1996); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996); *In re Asbestos Litigation*, 90 F.3d 963 (5th Cir. 1996); *General Motors Corp. v. Bloyed*, 916 S.W.2d 949 (Tex. 1996); *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill.2d 235, 659 N.E.2d 909, 213 Ill.Dec. 563 (1995); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3rd Cir. 1995); *BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463 (1st. Cir. 1995); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3rd Cir. 1993); *In re Oracle Securities Litigation*, 829 F.Supp. 1176 (N.D. Ca. 1993); *Gottlieb v. Wiles*, 150 F.R.D. 174 (D.Colo. 1993); *Durr v. Intercounty Title Co. of Illinois*, 826 F.Supp. 259 (N.D.Ill. 1993); *qad. inc. v. ALN Associates, Inc.*, 807 F.Supp. 465 (N.D.Ill. 1992); *Wesley v. General Motors Acceptance Corp.*, 1992 WL 57948 (N.D.Ill. 1992); *In re Verifone Securities Litigation*, 784 F.Supp. 1471 (N.D.Cal. 1992); *Davis v. Coopers & Lybrand*, 1991 WL 154460 (N.D.Ill. 1991).

Eisenberg of Cornell University, have been cited by courts around the country and are a leading authority on that topic.[7]

7.        I have participated extensively in derivative and class action litigation, both as an attorney and more recently as an expert consultant and expert witness on issues such as

---

[7] *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011); *Allapattah Servs., Inc. v. Exxon Corp.*, 362 F.3d 739, 760 (11th Cir. 2004) (Judges Tjoflat and Birch, dissenting from denial of en banc review); *In re Amaranth Natural Gas Commodities Litig.*, No. 07-6377, 2012 U.S. Dist. LEXIS 82599, at *7 n.12 (S.D.N.Y. June 11, 2012); *Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-686, 2012 U.S. Dist. LEXIS 79418, at *5 n.12 (S.D.N.Y. June 7, 2012); *Lane v. Page*, No. 06-1071, 2012 U.S. Dist. LEXIS 74273, at *161 (D.N.M. May 22, 2012); *Silverman v. Motorola, Inc.*, No. 07-4507, 2012 U.S. Dist. LEXIS 63477, at *15 (N.D. Ill. May 7, 2012); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 09-2046, 2012 U.S. Dist. LEXIS 37326, at *94, *116 (S.D. Tex. Mar. 20, 2012) ("The tables included in the [Eisenberg and Miller] study are good indicators of what the market would pay for class counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."); *Walsh v. Popular, Inc.*, No. 09-1552, 2012 U.S. Dist. LEXIS 32991, at *24 (D.P.R. Mar. 12, 2012); *Am. Int'l Group, Inc. v. Ace Ina Holdings, Inc.*, No. 07-2898, 2012 U.S. Dist. LEXIS 25265, at *59 (N.D. Ill. Feb. 28, 2012); *Ebbert v. Nassau County*, 05-5445, 2011 U.S. Dist. LEXIS 150080, at *41 (E.D.N.Y. Dec. 22, 2011); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1336 n.4 (S.D. Fla. 2011); *Latorraca v. Centennial Techs., Inc.*, No. 97-10304, 2011 U.S. Dist. LEXIS 135435, at *11 (D. Mass. Nov. 22, 2011); *In re Ky. Grilled Chicken Coupon Mktg. & Sales Litig.*, 2011 WL 5599129 (N.D. Ill. Nov. 16, 2011); *Pavlik v. FDIC*, No. 10-816, 2011 U.S. Dist. LEXIS 126016, at *11 (N.D. Ill. Nov. 1, 2011); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010); *Velez v. Novartis Pharms Corp.*, 04-09194, 2010 U.S. Dist. LEXIS 125945, at *60-61 (S.D.N.Y. Nov. 30, 2010); *Braud v. Transport Serv. Co. of Illinois*, No. 05-1898, 2010 U.S. Dist. LEXIS 93433, at *27-30 (E.D. La. Aug. 17, 2010); *In re Lawnmower Engine Horsepower Mktg. & Sales Prac. Litig.*, 733 F. Supp. 2d 997, 1013 (E.D. Wis. 2010); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010); *Fiala v. Metro. Life Ins. Co.*, 899 N.Y.S.2d 531, 541 (N.Y. Sup. Ct. 2010); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010); *In re Marsh Erisa Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010); *Strawn v. Farmers Ins. Co.*, 226 P.3d 86, 99 (Or. Ct. App. 2010); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 403 n.35 (S.D.N.Y. 2009); *In re Trans Union Corp. Privacy Litig.*, No. 00-4729, 2009 U.S. Dist. LEXIS 116934, at *22-25, *39 (N.D. Ill. Dec. 9, 2009); *Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 724 (S.D. W.Va. 2009) ("Because the Eisenberg and Miller study was a far more comprehensive analysis of similar cases than this Court could hope to achieve in a reasonable time, the Court accepts their results as a benchmark on which to judge a reasonable fee in this case."); *Rodriguez v. West Publ'g Co.*, 563 F.3d 948, 958 (9th Cir. 2009); *In re OCA, Inc. Sec. and Deriv. Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *63-66 (E.D. La. Mar. 2, 2009); *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 800 (S.D. Tex. 2008); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 755 n.2 (S.D. Ohio 2007); *In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 269 (D.N.H. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853, 862-64, 866, 870 (E.D. La. 2007) ("[T]he Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude"); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 n.6 (S.D.N.Y. 2007); *Fireside Bank v. Superior Court*, 155 P.3d 268, 281 n.7 (Cal. 2007); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38, 42 (D.N.H. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1209, 1211 (S.D. Fla. 2006); *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 629-32 (E.D. La. 2006); *Hicks v. Morgan Stanley*, No. 01-10071, 2005 U.S. Dist. LEXIS 24890, at *25 (S.D.N.Y. Oct. 24, 2005); *In re Lupron Mktg. and Sales Prac. Litig.*, 01-10861, 2005 U.S. Dist. LEXIS 17456, at *18 (D. Mass. Aug. 17, 2005); *In re HPL Techs., Inc. Sec. Litig.*, 366 F.Supp.2d 912, 914 (N.D. Cal. 2005); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-81 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 286 (D. Mass. 2004).

class counsel fees and the value of settlements.   I recently served as expert legal consultant to British Petroleum in connection with the settlement of claims arising out of the Deepwater Horizon oil spill incident.

8.        I am an expert in the field of banking law and regulation.  My casebook, *The Law of Banking and Financial Institutions* (co-authored with Richard Scott Carnell and Jonathan R. Macey), now in its fourth edition, is widely recognized as a leading authority in the field.  I am the author of several other books and many research articles on the topic of financial institution regulation, including a book on the financial crisis, *Risk, Trust, and Moral Hazard in Financial Markets*.  I have been a visiting scholar at the Bank of Japan and the Federal Reserve Bank of Chicago, and am a member of the board of directors and the audit, ALCO, compensation and risk committees of State Farm Bank, a federally-chartered thrift institution with nearly $15 billion in assets.

9.        I have also taught and written extensively on the topic of legal ethics and the legal profession.  In addition to regularly teaching the class in Professional Responsibility at NYU Law School, I have lectured on the topic at law firms and Practising Law Institute events.  My publications on legal ethics topics are also listed in Appendix A to this declaration.

## II.    Summary of Opinions

10.        In my opinion, the Proposed Settlement provides no appreciable value to BOA or its current stockholders.  The "governance reforms" do not add appreciably to the existing fundamental duties or accountability standards of directors of a Delaware corporation in mergers and acquisitions.  The $20 million cash payment from insurance

was apparently intended by Settling Plaintiffs' Counsel to cover attorneys' fees and expenses, not to provide any substantial value to BOA.

11.     Further, in my opinion, the Proposed Settlement presents "red flags" of an improperly collusive "reverse auction." Settling Plaintiffs' Counsel and Defendants agreed to negotiate a non-monetary settlement in the face of vigorous litigation in the Delaware Action and a refusal by Co-Lead Counsel in the Delaware Action to consider such nominal value to settle. Settling Plaintiffs' Counsel lacked important information to evaluate the value of the claims and the Proposed Settlement, including expert reports and key witness discovery. The Defendants maintained from the outset of the negotiations that the derivative claims had no substantial value, and the "reforms" were apparently agreed with relative ease. No monetary component whatsoever was added to the Proposed Settlement until the end of the process, and the $20 million amount was apparently intended, at least by Settling Plaintiffs' counsel, to cover their expected attorneys' fees. Co-Lead Counsel in the Delaware Action were excluded from the negotiations. Further, the participation by BOA's outside counsel in the exclusive negotiations, as the hotly contested litigation in the Delaware Action proceeded, implicates the concern for the potential of improper collusion to terminate properly initiated derivative actions which precipitated the rules established in *Zapata v. Maldonado*, 430 A.2d 779 (Del. 1981).

12.     The Settling Plaintiffs' Counsel assert, based on the Expert Report of Professor Elizabeth A. Nowicki ("Nowicki Report"), that the "governance reforms" have value "likely in excess of hundreds of millions of dollars" to BOA. In my opinion, the Nowicki Report provides no reliable support for the Proposed Settlement.

## III.   Opinions

### A. The Reforms Provide No Appreciable Value to the Company or Stockholders

13.      In my opinion, the "governance reforms" in the Proposed Settlement provide no appreciable value to BOA or its stockholders, because the "reforms" do not appreciably enhance existing director duties or heighten the standard of director accountability under Delaware law.

14.      The derivative claims at issue (and the proposed reforms) arise in the context of fundamental board responsibility in mergers and acquisitions. In the merger context, Directors of Delaware corporations each already have fundamental authority and fiduciary responsibility. *Smith v VanGorkom* 488 A.2d 858, 873 (Del. 1985); *Sealy Mattress Co. of NJ* 532 A.2d 324, 1337 (Del. Ch. 1987). The fiduciary duties of directors in mergers and acquisitions are unremitting and require directors affirmatively (not passively) to react and discharge their duties as circumstances develop after the merger agreement is announced. *Omnicare, Inc. v. NCH Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003). This authority and responsibility includes providing complete disclosure to voting stockholders. *Malone v Brincat* 1722 A.2d 5, 10 (Del. 1988).

15.      The centerpiece "reform" is a new board committee ("Corporate Development Committee") *to assist* the board in mergers and acquisitions greater than $2 billion for a four-year period. This appears to contemplate a subset of directors to liaison with management and report to the board concerning large mergers and acquisitions. There are no special expertise requirements or new director duties or accountability standards.

16.      As I observe above, each BOA director already has fundamental authority and duties in mergers and acquisitions under Delaware law. The contrast between the

description of the CDC set forth in the "Corporate Governance Term Sheet" and the actual terms provided in the "[Draft] Corporate Development Committee Charter" illuminates the fact that the duties of each director already exist. The "Term Sheet" states that BOA will create a new committee "with responsibility for overseeing certain acquisition related activities of the Company for transactions valued at $2 billion of more." Corporate Governance Term Sheet, Exhibit A to the Stipulation of Settlement at pg. 1. The "[Draft] Charter" states that the CDC "is responsible *for assisting the Board of Directors ... in exercising oversight...*" Bank of America Corporation [Draft] Corporate Development Committee Charter, Corporate Governance Term Sheet, Exhibit A to the Stipulation of Settlement at pg. 3. (Emphasis added). The "[Draft] Charter" correctly recognizes that the authority and duties belong to the entire Board already.[8]

17.     A new board committee was addressed in a settlement of derivative claims in *In re Caremark*, 698 A.2d 973 (Del Ch. 1997), the case which addressed director fiduciary duties of oversight concerning the day to day business operations of the Company. By contrast, the derivative claims here relate to matters of fundamental board authority and responsibility in mergers and acquisitions. The derivative claims against the Caremark directors related to the violations by company employees of federal and state laws applicable to health care providers which led to a government investigation and indictment of the company. The terms of the settlement of the derivative claims in *Caremark* included a new board committee to enact and monitor new compliance policies which were also part of the settlement. In reviewing the settlement consideration, the Court found the new policies and committee to be "positive consequences" of the

---

[8] I note that Professor Nowicki's opinion concerning the CDC appears to be based on the CDC description in the "Term Sheet" without reference to the actual terms in the "[Draft] Charter."

litigation, but "very modest benefits." 698 2d. at 972. The Court approved the settlement as adequate "given the weakness of the plaintiffs' claims." *Id.*

18.    I also note that the Chairman, Chief Executive Officer at the heart of the derivative claims, Ken Lewis, as well as 11 other Director Defendants[9], are no longer in the governance structure of BOA, following the Memorandum of Understanding with federal regulators in 2009. (Schwartz Dec. ¶338-340). Further, to the extent the CDC is envisioned to be a committee on which the full board will rely in decision-making in mergers and acquisitions, such a committee could in fact undermine full engagement and accountability of the full board. BOA does not have a controlling stockholder or majority of inside directors, circumstances in which a Board committee, in my opinion, could add protection against self-dealing insiders. *Compare Weinberger v. UOP Inc.*, 457 A.2d 701, 709 n. 7 (Del. 1983).

19.    The "Disclosure Committee" Charter amendment reform, similarly, imposes no new duty or heightened accountability. The reform purportedly will require the existing "Disclosure Committee," to review and consider the disclosures required in connection with the mergers and acquisitions covered by the CDC reform and to conduct semi-annual best practices reviews. This reform adds nothing to director duties or accountability. Under Delaware law, as observed above, all BOA directors already have fiduciary duties which include the requirement to disclose all material information within their control in connection with such transactions. Thus, to the extent such disclosures in connection with mergers and acquisitions are drafted by others, in my opinion, review of

---

[9] "Director Defendants" means Kenneth D. Lewis, Charles K. Gifford, William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward

required disclosures for accuracy, completeness and timeliness logically inheres in the existing duties of each director under Delaware law.   Moreover, the "Disclosure Committee" is not a Board committee, it is a committee of company employees and its function appears already to include review of BofA proxy statements and public presentations. (Schwartz Dec. ¶208).  Thus, the reform adds no duty or accountability for disclosures.

20.      The remaining two reforms are related to continuing director education concerning best practices and fiduciary duties and a requirement that the Chief Risk Officer or an equivalent attend each meeting of the Enterprise Risk Committee and that the Chief Compliance Officer attend such meetings at least twice per year.   These "reforms", in my opinion, fall into the "minimum requirement" category.  They are, at best, very modestly additive to the governance of BOA.

21.      A marked contrast exists between the reforms in the Proposed Settlement and the reform provisions in the SEC settlement.  The SEC settlement included seven reforms. Each reform in the SEC settlement raises the bar above the requirements of existing law. (Schwartz Dec. ¶423-424.)

22.      The cases cited by the Settling Parties[10] in support of the reforms in the Proposed Settlement which address claims concerning the directors' responsibility of oversight of the company's business operations and to ensure proper systems of control are in place, are inapposite here. (Dkt #746 at 35-39; Dkt #747 at 16-17.)  Such claims are known as classic "*Caremark*" claims under Delaware law.  In such a case, providing an added mechanism to assist the Board in monitoring the business operations of the Company can

---

[10] "Settling Parties" means the Director Defendants, Hollywood Police Officers' Retirement System and Louisiana Municipal Police Employees Retirement System

be additive.  However, the present context involves fundamental existing authority and duty of directors in mergers and acquisitions, as explained above.  Also, as noted above, even in *Caremark*, the Court found the reforms which included a new board committee to be "very modest" benefits.

### B. The Settlement Presents "Red Flags" Of An Improperly Collusive "Reverse Auction"

23.     In my opinion, the proposed Settlement presents "red flags" of an improperly collusive "reverse auction" in which Defendants pit the respective groups of Plaintiffs' counsel against one another for the opportunity to secure a settlement at an optimal cost to Defendants.   *See* John C. Coffee Jr., *Forum Selection Clauses and the Market for Settlements*, NYLJ, May 17, 2012,[11] (discussing the effect of parallel actions pending in the Delaware Court of Chancery and district courts that cause competition to see which plaintiffs firm can settle first, which ultimately requires the first "plaintiffs firm to offer to settle cheaply and the preconditions are thereby satisfied for the commencement of a 'reverse auction' under which the winner is generally the low bidder").  *See also* John C. Coffee, Jr. Class Wars:  The Dilemma of Mass Tort Class Actions, 95 Colum. L. Rev 1343, 1370-72 (1995); Brief of Special Counsel at pp 4-17, *Scully v Nighthawk Radiology Holdings, Inc.* C.A. No. 5890-VCL.

24.     In this case, Counsel for the Director Defendants offered each of the two groups of Plaintiffs' counsel to negotiate a non-monetary settlement of all of the derivative claims, before deposition discovery had begun. (Schwartz Dec. ¶341-344). Defendants knew that the two groups had chasmal differences in vigor and value requirements for a settlement. (Schwartz Dec. ¶343, 345). The Co-Lead Counsel in the Delaware Action,

---

[11] Available at: http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202554035470&thepage=1

who had made known their willingness to vigorously litigate the derivative fiduciary duty claims to trial, if necessary, rejected the proposition and maintained that the claims had substantial value and refused to limit a settlement demand to an amount within the $500 million of available insurance coverage and refused not to pursue out-of-pocket contributions from the Director Defendants.   (Schwartz Dec. ¶355).   The Settling Plaintiffs' Counsel agreed to a subordinate role in discovery vis à vis Lead Counsel in the federal securities class action. (Schwartz Dec. ¶10).   Trial in the Delaware Action was scheduled to commence in October 2012; and trial in the New York litigation was scheduled by this Court to follow the Delaware trial. (Schwartz Dec. ¶37, 85).   With deposition discovery having not yet begun in the New York litigation, the Settling Plaintiffs' Counsel accepted Defendants' offer to negotiate a non-monetary settlement of the derivative claims and proceeded to negotiate. (Schwartz Dec. ¶345, 346).   Although it appears that the Settling Plaintiffs' Counsel maintained that some monetary component would be necessary, the negotiation history evidences that the negotiators never contemplated a substantial amount and Settling Plaintiffs' Counsel were seeking an amount sufficient to cover attorneys' fees and expenses. (Schwartz Dec. ¶347, 399).

25.    Defendants maintained from the outset and throughout the settlement discussions with Settling Plaintiffs' Counsel that the derivative claims had no substantial value. (Schwartz Dec. ¶348).

26.    No monetary component whatsoever was added to the settlement discussions until the end of the process. (Schwartz Dec. ¶358).   Given that Settling Plaintiffs' Counsel expressed their intent to seek $13.6 million of the $20 million cash component as fees and expenses for themselves, the cash component negotiation was apparently focused, at

least from the perspective of Settling Plaintiffs' Counsel, on an amount to cover the amount of fees and expenses they expected.

27.        It is well-recognized that once adversaries in representative litigation reach a settlement agreement, their interests become aligned in supporting the settlement. *In re Bank of Am. Corp. Sec., Derivative, Emple. Ret. Income Sec. Act (ERISA) Litig.*, 2012 U.S. Dist. LEXIS 67730, 21-22 (S.D.N.Y. May 14, 2012) ("Shareholders and the Court should closely scrutinize a proposed derivative settlement, because 'in seeking court approval of their settlement proposal, plaintiffs' attorneys and defendants' interests coalesce and mutual interest may result in mutual indulgence.'") *citing Kaplan v. Rand*, 192 F.3d 60, 67 (2d Cir. N.Y. 1999).  In this case, the interests of Defendants and Settling Plaintiffs' Counsel become aligned in October 2011 when they agreed to proceed with a non-monetary settlement of the claims, in face of the substantial value position vigorously advanced by Co-Lead Counsel in the Delaware Action.

28.        It appears that the Settling Parties agreed on the non-monetary reform terms with relative ease after a few discussions and exchanges of drafts.  (Schwartz Dec. ¶345, 348, 349).   A mediation with a private mediator was thereafter suggested by Settling Plaintiffs' Counsel to resolve the lack of agreement concerning the amount of the monetary component, which apparently was envisioned, at least by Settling Plaintiffs' Counsel, primarily to pay the fees and expenses of Settling Plaintiffs' Counsel. (Schwartz Dec. ¶353).  Also, Defendants did not depose either of the Settling Plaintiffs, although they deposed the Plaintiffs in the Delaware Action.  (Schwartz Dec. ¶16, 54). Further, the Settling Parties apparently agreed not to serve expert reports by the Court-ordered March 16, 2012 deadline.  (Schwartz Dec. ¶22).

29.     Co-Lead Counsel in the Delaware Action were excluded from the settlement negotiations.    (Schwartz Dec. ¶351-358).    By excluding Co-Lead Counsel in the Delaware Action from the settlement negotiations, the interests of the supposedly adverse negotiators were aligned and the negotiation was focused on a non-monetary settlement with a fund to pay attorneys' fees for Settling Plaintiffs' Counsel.  At that point, there was no zealous advocate left on behalf of the substantial value of the derivative claims asserted by Co-Lead Counsel in the Delaware Action.

30.     The Settling Plaintiffs' Counsel lacked important information to assess liability, damages and the value of the derivative claims, or whether the Director Defendants could withstand a judgment.   When the Settling Plaintiffs' Counsel agreed to proceed with negotiations on the basis of a non-monetary settlement, deposition discovery had just begun.   (Schwartz Dec. ¶346).   When they agreed to the reform terms, key witnesses including Ken Lewis, had not yet been deposed.   (Schwartz Dec. ¶10).   The Settling Plaintiffs' Counsel apparently had no expert opinions to assess the value of the claims and reasonableness and adequacy of the Proposed Settlement, and apparently did not receive the 40 deposition transcripts from the Delaware Action until Defendants provided them until two days before the mediation.  (Schwartz Dec. ¶ 405).

31.     In my opinion, the settlement process in this case also implicates the governance concerns which were the underpinning of the Delaware Supreme Court ruling in *Zapata v Maldonado*, 430 A.2d 779 (Del. 1981). *Zapata* set the standard for judicial review where, as here, director defendants and the Company seek to terminate derivative claims brought by stockholders which have survived a Rule 23.1 motion.  *Zapata* was motivated by the concern for the potential collusion by the Company and defendant directors to terminate

properly initiated derivative claims for reasons unrelated to the best interests of the Company and its stockholders, such as to avoid potential liability to fellow directors. *See Zapata*, 430 A.2d at 787 ("Situations could develop where such motions [to dismiss] could be filed after nearly three years of vigorous litigation for reasons unconnected with the merits of the lawsuit."). In this case, after years of vigorous litigation of the derivative claims in the Delaware Action, outside counsel for BOA and Counsel to the Director Defendants co-operated to obtain termination of the derivative claims in exchange for no substantial consideration. (Schwartz Dec. ¶359-367). If the BOA Board believed in good faith that a negotiation of a non-monetary settlement was in the best interests of BOA and its current stockholders, *Zapata* provided a specific mechanism for the Board to seek a stay or dismissal of the Delaware Action. *See Carlton v. TLC Beatrice.* BOA did not follow this mechanism and did not seek a stay until the Proposed Settlement was signed and revealed. (Schwartz Dec. ¶378). In support of the stay, BOA's outside counsel asserted that BOA signed the Proposed Settlement because it was in the best interests of the Company and its stockholders. (Schwartz Dec. ¶367). However, in a letter to this Court later, BOA's outside counsel asserted, without explanation, that the Board had no involvement in approving the Proposed Settlement. (Schwartz Dec. ¶ 367). Further, BOA's outside Counsel did not convey information concerning the ongoing negotiations to Plaintiffs or the Court in the Delaware Action until March 2012. (Schwartz Dec. ¶359).

32.  In my opinion, a further "red flag" is the fact that after the Proposed Settlement terms were agreed in principle, BOA asserted, based in part on prior rulings by this Court, that the "vast majority" of the billions of dollars in damages sought by the federal

securities class were in fact damages suffered by BOA which could be recovered only through derivative claims.  (Objection of Laborers National Pension Fund and Nancy Rothbaum To Final Approval of Proposed Settlement. pp. 39-44.)  BOA thereafter agreed to pay $2.43 billion to settle the class claims.  (Schwartz Dec. ¶420).  BOA has failed to explain how it is in the best interest of the company to fund the $2.43 billion class settlement while leaving the D&O insurance policies essentially untouched or unclaimed against.  *Id.*

### C.  The Nowicki Report Provides No Reliable Support For the Settlement

33.      I have reviewed the Nowicki Report.  In my opinion, the Nowicki Report provides no reliable support for Professor Nowicki's opinions that the settlement consideration "is well within the range of appropriate settlements," that the "governance reforms" "are of significant value" or that the "governance reforms" "provides [sic] significant value to BAC and its shareholders likely in excess of hundreds of millions of dollars."  Professor Nowicki provides no analysis of how the "governance reforms" add accountability to the existing governance of BOA under Delaware law or the federal securities laws.

34.      The central basis of the opinions in the Nowicki Report is the general assertion that that "studies" show that greater accountability promotes better governance behavior. Even accepting this general proposition as correct, however, the Nowicki Report fails to identify any appreciable increase in "accountability" effected by the reforms.  As I note above, in my opinion the reforms in the Proposed Settlement provide no appreciable increase in duties or accountability at BOA beyond the well-established duties and accountability already existing under Delaware law.  Similarly, the Nowicki Report

includes no reliable evidence to support a valuation of the reforms in the amount of "many millions" or "likely in excess of hundreds of millions," as concluded by the Nowicki Report. The writings cited by Professor Nowicki to support that proposition that a "premium" on stock value is attributable to companies with "good governance," provide no helpful guidance to value the particular "governance reforms" at issue here. I was able to obtain some of the writings cited in but not filed with the Nowicki Report, including Deutsche Bank, *Beyond the Numbers, Materiality of Corporate Governance*, November 5, 2005; Felton, Hudnut, and van Heeckeren, *Putting a Value on Board Governance*, The McKinsey Quarterly, 1996 Number 4, at 170-175; *Global Investor Opinion Survey on Corporate Governance*, McKinsey & Company, June 2000; Gompers, Ishii and Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics 118(1), February 2003; Brown and Caylor, *Corporate Governance and Firm Performance*, December 2004; Cheng & Wu, *Evolving Corporate Governance and Equity Prices* (2006); Hoyt & Liebenberg, *The Value of Enterprise Risk Management* (2009); and Standard & Poor's, Global Credit Portal RatingsDirect, *North American and Bermudan Insurers Continue to Step Up Their Enterprise Risk Management Efforts* (May 2011). These writings involve statistical analyses to explore the relationship between certain financial metrics and certain aspects of corporate governance and stockholder rights in existing corporations, such as classified boards, director independence, poison pills and director term limits. None of the studies I reviewed addressed any of the reforms in the Proposed Settlement, with the possible exception of "director education" generally in the Brown/Caylor paper. In any event I discern no basis for utilizing these writings to value any particular governance term generally, much less the "governance

reforms" in the Proposed Settlement.  Moreover, any such analysis ignores the damage to value of BOA caused by the Defendants' wrongdoing in connection with the Merger.  If Professor Nowicki's general premise were correct that companies could add "hundreds of millions of dollars" to stockholder value with "governance reforms" such as those here, one would expect to see rampant adoption of such measures.  I observe no discernible market uptick on the announcement of these "governance reforms."

Sworn to under penalty of perjury under the laws of the United States this 27th day of November 2012.

GEOFFREY MILLER

Appendix A: Resume

# GEOFFREY P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

## Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Visiting Lecturer, University of Frankfurt, 2013 (invited)
Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012
Visiting Lecturer, University of Genoa Department of Law, 2011
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009
Faculty Member, NYU-NUS in Singapore, 2009, 2011, 2013 (invited)
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
        Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008

Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
    Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
    Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
    2004, 2005, 2007, 2008, 2009, 2010, 2011, 2012, 2013 (invited)
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
    Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

## Corporate Service

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional thrift institution with $15 billion in assets.

## Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

Publications

Books

The Governance of International Banking (co-authored with Fabrizio Cafaggi, with Tiago Andreotti, Maciej Borowicz, Agnieszka Janczuk, Eugenia Macchiavello and Paolo Saguato) (Edward Elgar, forthcoming)

Ways of a King: Legal and Political Ideas in the Bible (Vandenhoeck & Ruprecht 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino 2011)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Civil Procedure

An Information-Forcing Approach to the Motion to Dismiss (manuscript) (with Samuel Issacharoff)

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after Tellabs, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator 323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

Legal Ethics/Legal Profession

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

Corporate, Contract and Securities Law

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, 167 Journal of Theoretical and Institutional Economics 80-93 (2011)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

## Constitutional Law

Confederacy, in The Encyclopedia of Political Thought (Wiley-Blackwell) (forthcoming)

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

## Financial Institutions

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund, Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin

America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

<u>Legal History</u>

The Corporate Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

Ancient Law

Taxation, in Oxford Encyclopedia of the Bible and Law (Oxford University Press) (forthcoming)

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age: How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East 113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

<u>Law and Society</u>

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

## Book Reviews

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save?  How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

## Major Lectures

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

<u>Journal Referee Reports</u>

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

<u>Conferences Organized</u>

Fifth Annual NYU Global Economic Policy Forum (New York, New York, November 12, 2012) (co-organizer)

Tackling Systemic Risk: 2nd Annual Law & Banking/Finance Conference (Zurich, Switzerland, April 20-21 2012) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Banking and Finance: 1st Annual Law and Banking/Finance Conference (Florence, Italy, April 15-16, 2011) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis  (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:  Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

·NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard.  Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise..

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996).  This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions.  Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996).  This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin

American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995). This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994). This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen, Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law Schools (1995)
Member of the Board of Directors, American Law and Economics Association (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law, Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute of International Financial Law (2001-present)

Member of the Advisory Board, LSN Comparative Law Abstracts

Courses

Legal Profession (1985-93; 1996-98; 2003-2007; 2013 (scheduled))
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008; 2012)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005; 2011)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010; 2012)
Law and Business of Banking (2012; with Gerald Rosenfeld)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008; 2009; 2010; 2011; 2012)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009, 2010; 2011; 2012
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)
Banking: Law and Economics Issues after the Financial Crisis (Study Center Gerzensee, 2012)

Litigation and Alternative Dispute Resolution

Brief and Reply Brief for Plaintiff-Appellant, Glancy v. Taubman Centers, Inc. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., In Re: Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued Moran v. Household Finance Corp. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts. Conducted depositions and other pretrial discovery. (1982-1983)

Briefed and argued Hodges v. Metts, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of American Psychological Association v. Birch Tree Press, et al. (U.S. District Court, Washington, D.C. 1983).

Deposit Insurance for Thailand.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard.  Neutral arbitrator in a commercial arbitration (2000)

<u>Expert Witness Testimony (past five years)</u>

Lasker v. Kanas (North Fork Bancorporation Litigation), Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

John Hancock Life Insurance Co. v. Goldman, Sachs & Co., No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

Comes v. Microsoft Corp., No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

Figueroa v. Sharper Image Co., Case No.: 05-21251, United States District Court, Southern District of Florida (2007) (declaration and testimony on coupon relief).

Love v. Blue Cross & Blue Shield Association, et al., No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

Feuerabend v. UST, Inc., Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070, United States District Court for the Central District of California (2007) (declaration on fairness of settlement and fee award)

In re Trans Union Corp. Privacy Litigation, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

Hoffman v. American Express, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

In re Pet Foods Products Liability Litigation, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (2008) (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

Chivers v. State Farm Fire & Casualty Co., NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

In re Vioxx Products Liability Litigation, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

State of Missouri v. SBC Communications, Inc., No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

Alexander v. Nationwide Mutual Insurance Co., No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

Iorio v. Asset Marketing Systems, Inc., Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Villaflor v. Equifax Information Services, LLC, Case No.: 3:09-cv-00329-MMC, Northern District of California (2011) (declaration on fees)

Feely v. Allstate Insurance Company, Case No. CV-2004-294-3A, Circuit Court of Miller County, Arkansas (2011) (affidavit on settlement and fees)

Keegan v. American Honda Motor Co., Inc., Case Number: 2:10-cv-09508-MMM-AJW, United States District Court for the Central District of California (2011) (declaration on certification)

Compusource Oklahoma v. BNY Mellon, N.A., Case No: CIV 08-469-KEW, United States District Court for the Eastern District of Oklahoma (2011) (declaration on certification)

ABN Amro Bank v. Dinallo, Index No.: 601846/09 (New York State Supreme Court) (declaration and deposition on corporate restructuring/administrative law issue)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of America case; declaration and supplemental declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of Oklahoma case; declaration on fairness of settlement and fees)

In re Cell Therapeutics Inc. Securities Litigation, Master Docket No. C10-414 MJP, United States District Court for the Western District of Washington (2012) (declaration on fees)

In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179, Eastern District of Louisiana (2012) (declarations on economic and medical benefits class settlements)

Freudenberg v. eTrade Financial Corporation, Case No.: 07-CV-8538, United States District Court for the Southern District of New York (2012) (declaration on fees)

LaCour v. Whitney Bank, Case No. 8:11-cv-1896-VMC-MAP (United States District Court for the Middle District of Florida (2012) (declaration on settlement and fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Union Bank case; declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of the West case; declaration on fairness of settlement and fees)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

## Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

## Languages

Reading knowledge of Spanish, French, and Italian.

## Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

## Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson: Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson: Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors: Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case: Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case: Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case: What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen: Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)