UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

IN RE BANK OF AMERICA CORP.        :
SECURITIES, DERIVATIVE, AND       :
EMPLOYEE RETIREMENT INCOME      :
SECURITY ACT (ERISA) LITIGATION    :

Master File
No. 09 MD 2058 (PKC)
ECF Case

------------------------------------------------------------ x
                                                :

This document relates to:                 :
                                                :

Consolidated Derivative Action        :

------------------------------------------------------------ x

**DECLARATION OF MICHAEL A. SCHWARTZ**
**IN SUPPORT OF DELAWARE SHAREHOLDER'S APPLICATION FOR**
**<u>ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES</u>**

## TABLE OF CONTENTS

THE WORK PERFORMED BY DELAWARE COUNSEL BEFORE
THIS COURT AND THE DELAWARE CHANCERY COURT
DIRECTLY CONTRIBUTED TO THE $62.5 SETTLEMENT
APPROVED BY THE COURT ........................................................................5

I.    DELAWARE COUNSEL SPENT NINE MONTHS IN THIS COURT
      VIGORUSLY OPPOSING THE PROPOSED $20 MILLION SETTLEMENT .................7

      A.   The Delaware Plaintiff Learns Of The Proposed
           $20 Million Settlement Of The Consolidated Derivative Action .......................7

      B.   The Delaware Plaintiff Files A Motion for Injunctive Relief............................7

      C.   Delaware Plaintiff Files a Peititon for an Order to Show Cause
           Seeking to Protect BofA From the Unfair and Inadequate Settlement................9

      D.   The Court's June 20, 2012 Order ........................................................10

      E.   Preliminary Approval Of The Proposed Settlement................................11

      F.   Delaware Plaintiff's Application for Discovery
           Concerning the Proposed Settlement................................................13

      G.   Delaware Plaintiff's Renewed Request For Discovery ..........................14

      H.   Delaware Shareholder Objects To Final Approval Of Proposed Settlement ...................15

II.   DELAWARE COUNSEL  NEGOTIATED A $42.5 MILLION
      INCREASE IN THE CASH VALUE OF THE PROPOSED SETTLEMENT ...................16

III.  DELAWARE COUNSELS' EFFORTS IN THE DELAWARE
      DERIVATIVE ACTION FORMED THE BASIS FOR THE
      OBJECTION TO THE PROPOSED $20 MILLION SETTLEMENT
      AND ENABLED DELAWARE COUNSEL TO NEGOTIATE THE
      $42.5 MILLION BENEFIT OBTAINED FOR BOFA .......................................21

      A.   History Of The Delaware Derivative Action................................................21

      B.   Fact Discovery In The Delaware Derivative Action ......................................24

           1.   Discovery of the Parties.................................................................24

           2.   Discovery Motions.........................................................................29

i

Delaware Plaintiff's Supplemental Motion to Compel
Seeking leave To Take Discovery Concerning The
Destruction Of Merger-Related Documents ............................................................33

3.   Discovery of Non-Parties ........................................................................36

4.   Depositions .............................................................................................36

    a.   Present and Former BofA and Merrill Employees ...................................38

    b.   Financial And Legal Advisors ...............................................................38

5.   Discovery Conducted by Defendants of the Delaware Plaintiffs ....................39

C.   Expert Discovery .............................................................................................39

D.   Summary Judgment ..........................................................................................44

I, MICHAEL A. SCHWARTZ, being duly sworn, deposes and says:

1.      I am a partner of the law firm of Horwitz, Horwitz & Paradis, counsel for Nancy Rothbaum, lead plaintiff in *In re Bank of America Corporation Stockholder Derivative Litigation*, C.A. No. 4307-CS (Del. Ch.) (the "Delaware Plaintiff" or "Delaware Shareholder" and "Delaware Derivative Action"), and court-appointed Co-Lead Counsel in the Delaware Derivative Action, along with Chimicles & Tikellis, LLP, and Wolf Haldenstein Adler Freeman & Herz LLP (collectively, "Delaware Counsel").

2.      In addition, Horwitz, Horwitz & Paradis is counsel for former Delaware objectors, the Delaware Plaintiff and Laborers National Pension Fund.

3.      I am admitted to practice law in the State of New York and before this Court and have personal knowledge of the facts set forth herein, which are known to me to be true and correct. I could and would testify competently about the matters set forth herein if called upon to do so.

4.      I respectfully submit this Declaration in support of the Delaware Shareholder's Application for Attorneys' Fees and Reimbursement of Expenses.

5.      Throughout the course of the Delaware Derivative Action and the course of this Court's consideration of the initially proposed $20 million Settlement and revised $62.5 million Settlement of this Action, Delaware Counsel vigorously sought to prosecute Bank of America Corp.'s ("BofA") derivative claims in connection with the merger between BofA and Merrill Lynch & Co ("Merrill") (the "Merrill Merger").

6.      Set forth below is a detailed description of the work performed by Delaware

1

Counsel[1] in connection with the pursuit of BofA's derivative claims.

7.      From April 1, 2012 through January 11, 2013, Delaware Counsel had a total lodestar of $4,298,766. *See* Exh. 5, ¶ 4; Exh. 6, ¶ 4; Exh. 7, ¶ 4. From inception through January 11, 2013, Delaware Counsel had a total lodestar of $23,230,354 and incurred total expenses of $1,851,754. Attached hereto as Exh. 1 is a summary chart of Delaware Counsel's lodestar and expenses.

8.      Attached hereto as Exh. 2 is a summary chart reflecting each of the Delaware Counsel's hours billed and lodestar.

9.      Attached hereto as Exh. 3 is a summary chart reflecting Delaware Counsel's total expenses by category.

10.     In support of the application for the reimbursement of the $722,975 in costs related to the retention of experts and consultants as reflected in Exh. 3, attached hereto as Exh. 4 is the Affidavit of Michael A. Schwartz in Support of Delaware Shareholder's Counsel's Application for Reimbursement of Expert Witness Fee Expenses which identifies the experts and consultants retained, the work performed and the invoices paid.

11.     In addition, attached hereto are the individual affidavits of Delaware Counsel in support of this Application, as follows:

        a.      Attached hereto as Exh. 5 is the Affidavit of Michael A. Schwartz submitted on behalf of Horwitz, Horwitz & Paradis Attorneys at Law, which reflects the time expended and expenses incurred by Horwitz, Horwitz & Paradis, Attorneys at Law, in connection with the prosecution of this action as Co-Lead Counsel.

---

[1]     In addition to Delaware Counsel, the following firms expended billable hours in connection with the prosecution of the Delaware Derivative Action, Law Offices of James V. Bashian, Evangelista & Associates, LLC and James A. Dunlap Jr. & Associates, LLC, and are therefore part of this Application.

b.      Attached hereto as Exh. 6 is the Affidavit of Robert J. Kriner submitted on behalf of Chimicles & Tikellis, LLP, which reflects the time expended and expenses incurred by Chimicles & Tikellis, LLP, in connection with the prosecution of this action as Co-Lead Counsel.

c.      Attached hereto as Exh. 7 is the Affidavit of Peter C. Harrar submitted on behalf of Wolf Haldenstein Adler Freeman & Herz LLP, which reflects the time expended and expenses incurred by Wolf Haldenstein Adler Freeman & Herz, LLP, in connection with the prosecution of this action as Co-Lead Counsel.

d.      Attached hereto as Exh. 8 is the Affidavit of James V. Bashian submitted on behalf of the Law Offices of James V. Bashian, which reflects the time expended and expenses incurred by the Law Offices of James V. Bashian, in connection with the prosecution of the Delaware Derivative Action.

e.      Attached hereto as Exh. 9 is the Affidavit of James Evangelista submitted on behalf of Evangelista & Associates, LLC, which reflects the time expended and expenses incurred by Evangelista & Associates, LLC, in connection with the prosecution of the Delaware Derivative Action.

f.      Attached hereto as Exh. 10 is the Affidavit of James A. Dunlap submitted on behalf of James A. Dunlap Jr. & Associates, LLC, which reflects the time expended and expenses incurred by James A. Dunlap Jr. & Associates, LLC, in connection with the prosecution of the Delaware Derivative Action.

12.     As detailed below, Delaware Counsel devoted substantial human and financial resources to developing the facts relating to the Director Defendants' breaches of fiduciary duty. The revised $62.5 million Settlement of this litigation was achieved only through the substantial

3

efforts of the Delaware Counsel, who vigorously litigated BofA's breach of fiduciary duty claims and were able to achieve a significant benefit for BofA through hard-fought litigation and negotiations with Defendants' counsel.  Based on Delaware Counsel's extensive investment of time and resources, as well as their belief that the Delaware State law breach of fiduciary duty claims asserted against the Director Defendants had substantial value, the Delaware Shareholder and Delaware Counsel waged a relentless fight before this Court to protect BofA's claims from being released in exchange for the woefully inadequate consideration of the proposed $20 million Settlement.

13.     In light of the risks the Delaware Shareholder faced, the compromise embodied in the revised $62.5 million Settlement represents a substantial achievement in terms of a successful resolution to a complicated derivative litigation.

14.     Delaware Counsel have not received any payment for their services in prosecuting this litigation for over four years, nor have they received reimbursements for their expenses incurred in the prosecution of BofA's derivative claims.

15.     The Notice published on January 31, 2013 pursuant to this Court's Order Setting Schedule for Application for Attorneys' Fees and Reimbursement of Expenses dated January 24, 2013, Dkt # 799, provides that Delaware Counsel would seek up to $10.625 million in fees and up to $1.75 million in reimbursement of expenses.  As set forth in the Memorandum of Law in Support of this Application ("Fee Brief"), the requested fee award of $7.5 million, representing 17.7% of the $42.5 million benefit created as a result of the Delaware Counsel's efforts, is within the range of fees awarded by courts in cases like this one, which have been vigorously litigated and where counsel's efforts have bestowed a significant benefit on the company.

16.     In addition, Delaware Counsel incurred $1,851,754 in litigation expenses, but, as

4

set forth in the Notice, are seeking reimbursement of expenses in the amount of $1.75 million.

17.     As discussed at length in the Fee Brief, Delaware Counsel's request for an award of fees and reimbursement of expenses compares favorably as a cross check to their lodestar and actual expenses.

18.     In addition, Delaware Counsel are restricting their application exclusively to the significant $42.5 million increase in the cash value of the revised $62.5 million Settlement which resulted from Delaware Counsel's litigation efforts, both in Delaware Chancery Court and before this Court.

19.     Delaware Counsel achieved this favorable result for BofA at great risk and substantial expense to themselves.  As set forth in detail below, Delaware Counsel consulted with financial experts, traveled across the country to take 48 depositions, pursued motions to compel, issued and negotiated 45 subpoena *duces tecum* and housed and reviewed over 4 million of pages of documents.  Delaware Counsel were unwavering in their dedication to the interests of BofA, and in their investment of the time and resources necessary to bring this litigation to a successful conclusion.  The requested fee is reasonable based on the effort and quality of Delaware Counsel's work and benefit obtained by BofA.

**THE WORK PERFORMED BY DELAWARE COUNSEL BEFORE THIS COURT
AND THE DELAWARE CHANCERY COURT DIRECTLY CONTRIBUTED
TO THE $62.5 SETTLEMENT APPROVED BY THE COURT**

20.     The following is a description of the nature of the claims asserted, the principal proceedings to date, the legal services provided by Delaware Counsel, all of which contributed to the Settlement of this Action, as well as the Delaware objectors' efforts before this Court which resulted in the $42.5 million increase to the cash component of the revised $62.5 million Settlement, as set forth in Amendment No. 1 to Stipulation and Agreement of Compromise,

Settlement, and Release dated January 11, 2013 as approved by the Court on January 11, 2013.

21.     BofA's derivative claims in connection with the Merrill Merger were carefully investigated and vigorously litigated since its commencement four years ago. Delaware Counsel reviewed and analyzed 4.7 million pages of documents, including financial reports and analyses, board presentations and drafts of publicly filed documents, and transcripts from related government actions, hearings, and investigations. Additionally, Delaware Counsel deposed 48 witnesses, defended depositions, and consulted with well-respected financial experts in fields concerning issues of the litigation. Delaware Counsel successfully opposed Defendants' Motions to Dismiss and filed two motions to compel that led to the production of thousands of never-before produced documents.

22.     When the Delaware Plaintiff became aware of a pending and inadequate proposed $20 million Settlement in the Consolidated Derivative Action, the Delaware Plaintiff relentlessly litigated for nine months before this Court to enhance the value of the proposed Settlement.

23.     Finally, pursuant to this Court's January 4, 2013 Order, Delaware Counsel alone engaged in rigorous settlement negotiations with Defendants which resulted in a substantially enhanced and revised proposed $62.5 million Settlement equaling three times the originally submitted proposed $20 million Settlement in this Action.

24.     As set forth below in ¶¶ 26-79, the $42.5 million increase in the cash value of the Settlement is directly and solely attributable to the efforts of Delaware Counsel.

25.     On January 11, 2013, this Court held a fairness hearing and found the revised $62.5 million Settlement to "represent a fair and reasonable recovery for Bank of America." *See* Exh. 13, Transcript of January 11, 2013 Final Settlement Hearing at 42-43.

I.  **DELAWARE COUNSEL SPENT NINE MONTHS IN THIS COURT VIGORUSLY OPPOSING THE PROPOSED $20 MILLION SETTLEMENT**

A.  **The Delaware Plaintiff Learns Of The Proposed $20 Million Settlement Of The Consolidated Derivative Action**

26.     Late in the afternoon of April 12, 2012, counsel for the Director Defendants, Mr. Portnoy, telephoned one of Delaware Counsel, Mr. Paradis, and informed him that the Director Defendants had, earlier that day, executed a Memorandum of Understanding with the Plaintiffs in the Consolidated Derivative Action ("Plaintiffs") pursuant to which Plaintiffs had agreed to settle all of BofA's derivative claims asserted in both Delaware and Consolidated Derivative Actions for $20 million and certain corporate governance reforms.

27.     By letter dated April 12, 2012, Mr. Portnoy informed the Court that the parties to the Consolidated Derivative Action had entered into the Memorandum of Understanding.

28.     Upon learning the terms of the proposed $20 million Settlement reached by Plaintiffs, and in light of the fact that: (i) Delaware Plaintiff's expert had estimated damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty to be in the range of $6 billion; (ii) there was $500 million in insurance coverage available to be paid in settlement of BofA's derivative claims; and (iii) the $20 million payment to be made in connection with the proposed Settlement had not even consumed the entire $25 million of the first layer of insurance coverage available to satisfy BofA's derivative claims, Delaware Counsel literally worked around the clock to ensure that BofA's multi-billion dollar derivative claims would not be released for what was believed to be a wholly unfair and inadequate proposed $20 million Settlement.

B.  **The Delaware Plaintiff Files A Motion for Injunctive Relief**

29.     On April 13, 2012, the Delaware Plaintiff moved the Delaware Chancery Court

for an Order, *inter alia*, (1) enjoining Defendants from entering into or approving any agreement to settle the Delaware Plaintiff's claims without the Delaware Plaintiff's approval or an order from the Delaware Chancery Court; and (2) granting the Delaware Plaintiff's expedited discovery concerning any discussions and negotiations concerning potential settlement between the Defendants and the Plaintiffs.

30.   In response, on April 18, 2012, Defendants moved to stay the Delaware Derivative Action.

31.   On May 4, 2012, Chancellor Strine granted the Stay pending this Court's ruling on the proposed Settlement, reiterating his view that the Delaware Derivative Action raised important issues of Delaware law:

> [I] have obviously expressed my view in the past, and I continue to adhere to this view, that **with respect to the application of principles of law to the question of whether the directors of Bank of America breached any duties to their stockholders, is one that's an important one under Delaware law.**

Dkt # 766-192, May 4, 2012 Transcript of Teleconference, 5-6.

32.   Recognizing that the relentless litigation efforts of the Delaware Plaintiff to be a contributing factor to the proposed Settlement, Chancellor Strine held that "anyone who can order lunch from McDonald's can understand that the fact that there was a trial date here would be on the mind of the defendants in reaching a settlement." Id.

33.   Chancellor Strine further recognized the efforts of the Delaware Plaintiff's counsel in pursuing the claims on behalf of the BofA.

> I have every expectation that the **Delaware plaintiffs' arguments about the settlement will be taken seriously by my federal colleague. I also have every expectation that they will be treated fairly in terms of their contribution to bringing about the settlement because of their vigor in pushing forward to a trial here.**

Id. at 8.

34.   Finally the Delaware Chancery Court ordered that if this Court did not approve

the proposed $20 million Settlement, Defendants would forego the right to have their summary

judgment motion heard and Chancellor Strine would proceed to trial swiftly:

> [F]rankly, the Delaware plaintiffs have expended an awful lot of resources
> preparing for trial, have now had to fight it out in New York, and have successfully
> convinced a federal judge not to uphold the settlement, then I think they should be
> prepared to go -- they should have the right to go to trial on the schedule that the
> defendants agreed upon.  And the defendants, having, by their own efforts, altered
> the course of events, are going to have to suffer the consequences.  So my final
> view, so it's clear up in New York, is if this settlement goes away, the trial date
> stands.

Id.

### C.    Delaware Plaintiff Files a Petition for an Order to Show Cause Seeking to Protect BofA From the Unfair and Inadequate Settlement

35.    Simultaneously, on April 13, 2012, the Delaware Plaintiff petitioned this Court

for an Order to Show Cause (Dkt # 541), seeking the following relief: (i) ordering the Director

Defendants and Plaintiffs to show cause why they should not be enjoined from consummating a

proposed $20 million Settlement, that was the product of collusion and a reverse-auction, and

that was otherwise grossly inadequate because it was well below the range of recovery in which

a settlement of BofA's derivative claims could be considered fair; (ii) ordering Plaintiffs'

Counsel to show cause why these two firms should not be removed as Interim Co-Lead Counsel

in this action because they had demonstrated that they were inadequate Co-Lead Counsel; (iii)

ordering the Plaintiffs to show cause why they should not be removed as Co-Lead Plaintiffs in

this action because they had demonstrated that they were inadequate Co-Lead Plaintiffs; and (iv)

the Director Defendants and the Plaintiffs to show cause why the Delaware plaintiffs should not

be permitted to intervene and to seek appointment as Lead Plaintiffs, and their counsel not be

permitted to seek appointment as Co-Lead Counsel in this action in order to protect BofA's

interests in this litigation.

36.    The particularized grounds for the allegations in the Delaware Plaintiff's Petition,

especially concerning the inadequacy of the proposed $20 million Settlement, were developed from the three years of contentious litigation of the Delaware Derivative Action, as discussed below in ¶¶ 80-185, below.

37.     In opposition to the Delaware Plaintiff's Order to Show Cause, Plaintiffs extolled the benefits of the proposed Settlement, asserting that "the extensive corporate governance reforms and the $20 million payment to BAC represent[ed] an **outstanding settlement**." Dkt # 557 at 15 (emph. added).

38.     In denying the Delaware Plaintiff's Petition, this Court held that the Delaware Plaintiff's arguments directed to the proposed Settlement's fairness and adequacy were best weighed as objectors to the proposed Settlement.  Dkt # 564, Memorandum and Order dated May 14, 2012 at 4.

> ## **D.     The Court's June 20, 2012 Order**

39.     By Order dated June 20, 2012, in response to Mr. Portnoy's letter informing the Court that the parties to the Consolidated Derivative Action had entered into a definitive settlement agreement, the Court put the parties on notice of issues the Court intended to have addressed before considering final approval of the proposed Settlement,  The Court Ordered that:

> [I]f the Court grants preliminary approval, it is contemplating conducting the final settlement hearing after the conclusion of the trial of the Consolidated Securities Class Action, which will commence on October 22, 2012 [because] there is a serious issue presented in the pending summary judgment motions in the Consolidated Securities Class Action whether certain types of damages are properly recoverable in the derivative action or in the securities action and deferring the issue will prevent any Whipsawing on this issue; **second, the issue of available Directors & Officers liability coverage will be clarified, given that both the derivative and securities actions are likely drawing on the same pool of coverage; and third, the Court will have a better understanding of the underlying facts after having presided at the securities trial.**

Dkt # 620 at 1 (emph. added).

40.     In addition, the Court addressed the fact that the Plaintiffs had negotiated for the payment of interest on their attorneys' fees, but failed to provide for the payment of interest on the $20 million payment to BofA.   The Court therefore Ordered that "[t]he parties should address…why the settlement proceeds ought not be placed in an interest bearing escrow account pending final approval." Id. at 2.

**E.     Preliminary Approval Of The Proposed Settlement**

41.     On July 3, 2012, the parties to this Action filed their Memorandum of Law in Support of Joint Motion for Preliminary Approval of Settlement and informed the Court that Plaintiffs' counsel would be seeking the payment of attorneys' fees in the amount of $13 million, plus interest, representing 68% of the cash component of the proposed $20 million Settlement. Dkt # 662.

42.     In addition, the parties addressed the issue the Court raised with respect to the fact that the proposed $20 million payment to BofA would not earn interest pending final approval by informing the Court that, while "the net benefit to the Bank of placing the settlement funds in an interest-bearing escrow account pending final approval of the Settlement is likely to be immaterial," the $20 million would be placed in an interest-bearing escrow account.  Dkt # 662 at 13.

43.     On July 13, 2012, the Court, *inter alia,* preliminarily approved the proposed $20 million Settlement and the proposed Notice Program.  Dkt # 690.

44.     On July 17, 2012, the Delaware Plaintiff timely filed her Objection to Joint Motion for Preliminary Approval of Settlement (Dkt # 705), and thereby requested that the Court deny the Joint Motion for Preliminary Approval of Settlement.

45.     The Delaware Plaintiff cited the following grounds, *inter alia,* upon which the

Court should deny the Joint Motion:

      a.     The $20 million proposed Settlement (even before deduction of $13.6 million in attorneys' fees) represented a mere pittance of the value of BofA's multi-billion dollar derivative claims and of the $500 million in insurance coverage available here, and did not include a contribution by any of the Director Defendants – all of whom have significant assets from which a judgment in favor of BofA could be satisfied. Moreover, the non-monetary "governance reform" component was window dressing that added little, if any, value.

      b.     The settling parties demonstrated a continuing and dire fear of transparency that would reveal the grossly inadequate record and nature of the proposed Settlement for both the Court and BofA's stockholders. The parties repeatedly ignored legitimate inquires about the nature of the proposed Settlement by the Delaware Plaintiff, and even attempted to block her from being heard by this Court in connection with the Joint Motion.

      c.     The proposed Settlement was the product of a collusive reverse auction. Defendants colluded with the Plaintiffs who were less informed than the Delaware Plaintiff and who therefore eagerly accepted the Defendants' invitation to settle BofA's multi-billion dollar derivative claims for nominal, at best, corporate governance reforms (which had previously been rejected out of hand by the Delaware Plaintiff), and the expectation of a $13.6 million payoff in attorneys' fees to be paid by BofA.

      d.     The Plaintiffs' counsel (and their mediator) lacked critical information necessary to assess the value of BofA's derivative claims when they agreed to the terms of the proposed Settlement.

Dkt # 705.

46.      The Delaware Plaintiff provided the Court with certain of the information specified in its June 20 Order, the results of Delaware Counsel's three year litigation efforts in Delaware, including the Delaware Plaintiff's position on damages and liability, and provided the Court with Professor Saunders' Expert Report.  *Id.*

47.      Because the Court granted the Joint Motion before it had the benefit of the Delaware Plaintiff's timely filed objection, on July 27, 2012, the Delaware Plaintiff filed her Motion for Reconsideration of Order Setting Schedule and Preliminarily Approving Proposed Settlement.  Dkt # 717.

48.      By Order dated August 3, 2012, this Court denied the Delaware Plaintiff's Motion to Reconsider and held that:

> The matter may look differently when the Court has had a full opportunity to consider which elements of damages are recoverable against the individual defendants in a derivative suit on behalf of the corporation, as distinguished from a suit by shareholders against the individual defendants. By the time of the settlement hearing, the Court will also have a better sense of the strength of the derivative claims through the trial of the securities claims in the class action.  It will have the benefit of hearing from all shareholders in the final approval process.

Dkt # 721, August 3 Order at 1.

**F.      Delaware Plaintiff's Application for Discovery
Concerning the Proposed Settlement**

49.      Unable to fathom a basis for Plaintiffs to agree to release BofA's $6 billion derivative claims against the Director Defendants for $20 million, on July 6, 2012, the Delaware Plaintiff filed an Application for Discovery Concerning Proposed Settlement (Docket # 677) ("Discovery Application"), seeking, among other things, expert reports prepared for the Plaintiffs as well as any mediation statement provided to the mediator in the Action in order to assist the

Court in obtaining sufficient facts to determine whether the proposed $20 million Settlement is fair, reasonable and adequate.

50.     On July 20, 2012, the Court granted the Discovery Application, in part, recognizing the contribution the Delaware Plaintiff could make to assist the Court in evaluating the fairness of the proposed $20 million Settlement:

> Ms. Rothbaum and her counsel, by reason of their familiarity with the parallel derivative action in Delaware, **have important and useful information that bears upon the fairness, reasonableness and adequacy of the proposed settlement** For example, her counsel aided by experts may have **analyzed liability and damage issues** that could shed light on the relative difficulty of proving liability and the maximum potential recovery in the event that liability is established, factors bearing on the settlement's reasonableness. **Ms. Rothbaum and her counsel may be in the position to demonstrate why the proponents of the settlement are in error in certain of their assessments.**

Dkt # 707 (Emph. added).

51.     The Court went on to Order the Plaintiffs to produce, *inter alia,* "(1) any expert report served pursuant to Rule 26(a)(2), Fed. R. Civ. P., or (2) any expert report not served but actually shared with the mediator or with counsel for the defendants in the course of negotiations or mediation." Docket # 707, Order dated July 20, 2012 at 2.

**G.      Delaware Plaintiff's Renewed Request For Discovery**

52.     Following Plaintiffs' admission that they agreed to settle the Action without the benefit of an expert report on damages, the Delaware Plaintiff renewed her request for the discovery of the Plaintiffs' mediation statement.  Dkt # 677.

53.     The Delaware Plaintiff informed the Court that without an expert report, the mediation statement prepared by the Plaintiffs is the only evidence of the Plaintiffs' view as to proving liability and the maximum potential recovery in the event liability is established.  Dkt # 677 at 11-13.  Moreover, based on the failure of the proponents of the proposed Settlement to

provide the Court with any information as to their view on damages or liability, this discovery would be critical to the Court's evaluation of the proposed Settlement's fairness. *Id.*

54.     By Memo Endorsed dated September 18, 2012, (Dkt # 726), this Court denied the Delaware Plaintiff's renewed request.

### H.     Delaware Shareholder Objects To Final Approval Of Proposed Settlement

55.     On November 6, 2012, the parties to the Action filed their briefs in support of final approval of the proposed $20 million Settlement.  In their moving papers, neither Defendants nor the Plaintiffs addressed the issues the Court identified in its June 20 Order, including the available D&O insurance, the underlying facts of the case, and which elements of damages are recoverable against the Director Defendants in a derivative suit on behalf of the corporation, as distinguished from a suit by shareholders.  Dkt # 746-747.

56. .   On November 27, 2012, the Delaware Shareholder[2] filed her Objection to Final Approval of Proposed Settlement of the Consolidated Derivative Action.  Dkt # 764.  The Delaware Shareholder also filed the Declaration of Michael A. Schwartz in Support of the Objection (Dkt # 766), as well as 199 exhibits, comprising an extensive detailed record of the underlying facts uncovered during the Delaware Derivative Action, which demonstrated the risk of establishing liability and the damages incurred by BofA.  Finally, the Delaware Shareholder submitted the Declaration of Professor Geoffrey Miller to rebut the Plaintiffs' unsubstantiated position that the proposed Settlement's governance reforms provided a benefit to BofA "likely in excess of hundreds of millions" of dollars.  Dkt # 765 at ¶ 12.

57.     The Delaware Shareholder's objection to final approval was premised upon the following grounds, all supported by the detailed record developed in the Delaware Derivative

---

[2]     In addition to Delaware Plaintiff Rothbaum, the undersigned were retained by Laborers National Pension Fund to object to final approval of the proposed Settlement.

Action:

a.     The proposed $20 million Settlement did not satisfy the *Grinnell* factors in light of the risk of establishing liability, as well as the risk of maintaining BofA's Delaware State law claims through trial;

b.     The proposed Settlement consideration was grossly inadequate in the face of the $6 billion in damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty in connection with the Merrill Merger, as set forth in the Expert Report of Professor Anthony Saunders; and

c.     The proposed Settlement was the result of a procedurally unfair process.

58.     Plaintiffs' position in response to the Delaware Shareholder's objection was the again repeated assertion that the proposed $20 million Settlement was "fair, reasonable and adequate, and represent[ed] *an outstanding result* for BAC." Dkt # 782 at 3 (emph. added).

## II.     DELAWARE COUNSEL  NEGOTIATED A $42.5 MILLION INCREASE IN THE CASH VALUE OF THE PROPOSED SETTLEMENT

59.     On January 4, 2013, this Court issued an Order holding that while "in the process of reviewing all submissions by proponents and objectors of the settlement…the Court has not yet been persuaded of the fairness, reasonableness and adequacy of a settlement of the derivative claims against defendant Lewis in exchange for corporate governance reforms of unquantifiable value and $20 million in cash…." Dkt # 791.

60.     Further, the Court directed counsel for the parties to the Consolidated Derivative Action and the Delaware objectors to meet at 2 p.m. on Monday, January 7, 2013, to discuss revisions to the proposed Settlement. *Id.*

61.     That same day, counsel for the Delaware objectors, *i.e.,* Delaware Counsel, Paul Paradis and the undersigned, called counsel for Plaintiffs, Joe White, to discuss a strategy to

16

maximize the benefit to BofA through the parties' combined efforts.  Delaware Counsel noted that it would be imperative for Plaintiffs' Counsel and Delaware Counsel to meet prior to the Court-Ordered meeting at 2 p.m. on January 7, 2013, to discuss revisions to the proposed Settlement.  *See also* Declaration of Paul O. Paradis in Support of Delaware Shareholder's Application for Attorneys' Fees and Reimbursement of Expenses ("Paradis Decl., ¶ __"), ¶ 7, annexed hereto as Exh. 11.

62.     During the call, Mr. White stated that Delaware Counsel's proposal made sense, but that Plaintiffs' Counsel had concerns that as a result of the signed Stipulation and Agreement of Compromise, Settlement and Release, dated June 19, 2012 (Dkt # 662-1, the "June 19 Settlement Stipulation"), Plaintiffs were contractually bound to support the proposed $20 million Settlement in its present form.  *See also* Paradis Decl., ¶8.

63.     . On the morning of January 7, 2013, Counsel for Plaintiffs and Delaware Counsel participated in a conference call to discuss the Court's January 4 Order.  The substance of the call is covered by FRE 408.

64.     On January 7, 2013 at 2 p.m., counsel for all of the Defendants, Plaintiffs and the Delaware objectors convened at the offices of the Director Defendants' counsel.

65.     During the meeting, counsel for the Director Defendants and the Delaware objectors engaged in a dialogue concerning the need to significantly increase the cash component of the proposed $20 million Settlement in order to achieve a resolution of BofA's derivative claims that could be supported by the Delaware objectors. *See also* Paradis Decl., ¶ 11.

66.     Director Defendants' Counsel, however, stated that the Parties were bound by the June 19 Settlement Stipulation, and further stated that it was the D&O carriers' view that as a result of the fact that the proposed $ 20 million Settlement had been preliminarily approved, the

17

"Delaware claims were about to vanish." *See also* Paradis Decl., ¶ 12.

67.     During the meeting, counsel for the Delaware objectors made a demand on counsel for the Director Defendants that the cash component of the proposed Settlement be increased by millions of dollars. *See also* Paradis Decl., ¶ 13.

68.     At approximately 4:30 p.m., following further discussion of the Delaware objectors' settlement demand which consisted solely of an increase in the cash value of the proposed $20 million Settlement, the meeting concluded with the Director Defendants agreeing to take the Delaware objectors' settlement demand to the D&O carriers. *See also* Paradis Decl., ¶ 14.   By agreement of counsel for the Director Defendants and Delaware objectors, these settlement discussions were not covered by FRE 408

69.     On Tuesday, January 8, 2013, counsel for the Director Defendants, Mr. Portnoy, called counsel for the Delaware objectors, Mr. Paradis and the undersigned, and provided the D&O carriers' response to the Delaware objectors' settlement demand. *See also* Paradis Decl., ¶ 15.

70.     During this conversation, I inquired of Mr. Portnoy whether counsel for the Director Defendants was also simultaneously negotiating with counsel for the Plaintiffs. *See also* Paradis Decl., ¶ 16.

71.     Mr. Portnoy responded that counsel for the Director Defendants was only negotiating with counsel for the Delaware objectors and emphatically stated that he was not negotiating with counsel for Plaintiffs because the Director Defendants had a settlement stipulation that had been signed by the Plaintiffs which embodied the $20 million proposed Settlement, *i.e.,* the June 19 Settlement Stipulation. *See also* Paradis Decl., ¶ 17.

72.     Mr. Portnoy stated that, while he had informed Plaintiffs' counsel of the D&O

carrier's response to the Delaware objectors' demand, he had done so only as a courtesy – and not as part of any negotiations, because as Mr. Portnoy reiterated, it was the position of the Parties that Plaintiffs were bound by the June 19 Settlement Stipulation. *See also* Paradis Decl., ¶ 18.

73.     Over the following days, counsel for BofA, the Director Defendants, and the Delaware objectors engaged in numerous, difficult negotiations with a view to achieving a revised settlement that the Delaware objectors could support. *See also* Paradis Decl., ¶ 19.

74.     Counsel for Plaintiffs did not participate in any of these negotiations. *See also* Paradis Decl., ¶ 20.

75.     During a January 10, 2013, 5:35 p.m. telephone call between Mr. Portnoy and Mr. Paradis and the undersigned, it was agreed that Mr. Portnoy would convey Delaware Counsel's $62.5 million demand to the D&O carriers, in exchange for which, if accepted, all Delaware objectors would agree to support the revised settlement. *See also* Paradis Decl., ¶ 21. Moreover, when asked whether he had had discussions with the counsel for Plaintiffs concerning the Delaware objectors' latest demand, Mr. Portnoy reiterated, "I am not negotiating with [Plaintiffs], I am only negotiating with you . . . I have a $20 million settlement with [Plaintiffs]." *Id.*

76.     The settlement discussions continued among Defendants' counsel and counsel for the Delaware objectors until past midnight on January 10, 2013. *See also* Paradis Decl., ¶ 22.

77.     It was not until 12:02 a.m. on January 11, 2013, that counsel for the Director Defendants informed counsel for the Delaware objectors, *via* email, that a revised $62.5 million settlement between the Delaware objectors and Defendants had been reached:

> The carriers have agreed to meet **your demand of $62.5 million**. Accordingly, our understanding is that we now have an agreement and that the **Delaware**

**Objectors will withdraw their objection and support the settlement**. Please confirm.

*See* Exh. 12 hereto.  *See also* Paradis Decl., ¶ 23.

78.     Shortly thereafter, counsel for the Delaware objectors confirmed that a revised $62.5 million Settlement had indeed been reached, and that the Delaware objectors would support a revised $62.5 million settlement as fair, reasonable and adequate.  *See also* Paradis Decl., ¶ 24.

79.     As a result of the Delaware Shareholder's nine months of litigation before this Court and three years of litigation in Delaware Chancery Court -  in the face of Parties' steadfast defense of the proposed $20 million Settlement - the Delaware Shareholder's single-handed efforts resulted in a $42.5 million increase in the proposed Settlement and the execution of Amendment No. 1 to Stipulation and Agreement of Compromise, Settlement, and Release dated January 11, 2013, pursuant to which the initially proposed $20 million Settlement was amended to increase the cash component of the Settlement to $62.5 million.

80.     On January 11, 2013, the revised $62.5 million Settlement was presented to the Court and was approved.

81.     During this hearing, the fact that counsel for the Delaware objectors was solely responsible for the resulting $42.5 million increase in the proposed Settlement was recognized by counsel for both BofA and the Director Defendants.  In particular, counsel for BofA represented to the Court that:

> [W]e commend . . . in particular, counsel for the Delaware objectors who, in our view, in many respects, are **principally responsible** for the increase in the cash component of the settlement.

Exh. 13 at 25. *See also Id.* at 23-24 ("MR. PORTNOY: . . .   And during the course of this week we have been engaged in negotiations in particular with the Delaware then objectors, no longer objectors. . . .").

**III.   DELAWARE COUNSELS' EFFORTS IN THE DELAWARE DERIVATIVE ACTION FORMED THE BASIS FOR THE OBJECTION TO THE PROPOSED $20 MILLION SETTLEMENT AND ENABLED DELAWARE COUNSEL TO NEGOTIATE THE $42.5 MILLION BENEFIT OBTAINED FOR BOFA**

**A.   <u>History Of The Delaware Derivative Action</u>**

82.     On January 22, 2009, the Delaware Plaintiff filed a stockholder derivative action in Delaware Chancery Court against Chairman and CEO Kenneth D. Lewis, the Director Defendants William Barnet, III, Frank P. Bramble, Sr., John T. Collins, Gary L. Countryman, Tommy R. Franks, Charles K. Gifford, Monica C. Lozano, Walter E. Massey, Thomas J. May, Patricia E. Mitchell, Thomas M. Ryan, O. Temple Sloan, Jr., Meredith R. Spangler, Robert L. Tillman and Jackie M. Ward (collectively, the "Director Defendants" or the "Board"), who were directors serving on BofA's Board between September 2008 and January 2009, for breaches of fiduciary duty, and nominal defendant BofA, in connection with BofA's disclosures relating to the Merrill Merger.

83.     This action was later consolidated with other similar actions filed in the Delaware Chancery Court and re-styled, *In re Bank of America Corporation Stockholder Derivative Litigation*, and Delaware Counsel were appointed Co-lead Counsel by Chancellor Strine.

84.     The Delaware Plaintiff filed the Verified Consolidated Amended Derivative Complaint on May 8, 2009 (the "Delaware Derivative Complaint").  Dkt # 766-7.  The Delaware Derivative Complaint alleged that with Merrill teetering on failure in the midst of extreme market turmoil, BofA management hastily arranged and recommended an acquisition of Merrill over the course of a weekend after limited due diligence, and, on Sunday, September 14, 2008,

the Director Defendants hastily approved the acquisition of Merrill, for $50 billion in BofA stock, at a 70% premium to Merrill's previous closing price. (Id., ¶¶ 68-73.)

85.     The Delaware Plaintiff further alleged that following the Director Defendants' approval of the Merger, Merrill's financial condition continued to dramatically deteriorate up to and through the December 5, 2008, meeting of BofA stockholders to vote on the Merger ("Stockholder Vote"). The Delaware Plaintiff claims, among other things, that against this backdrop, the Director Defendants breached the fiduciary duties owed to BofA and its shareholders by failing to disclose material information concerning Merrill's financial condition and the Merger prior to the Stockholder Vote, and thereafter bowed to government pressure to close the Merger on the original terms without disclosure, in breach of their fiduciary duty of loyalty. (Id., ¶¶ 13-26, 89-165.)

86.     On June 19, 2009, Defendants filed their Motion to Dismiss the Delaware Derivative Action under Chancery Court Rules 23.1 and 12(b)(6), alleging that demand on the BofA Board was not excused, and that the facts did not state claims for breaches of the duty of loyalty or for waste.

87.     On October 12, 2009, the Delaware Chancery Court denied Defendants' Motion to Dismiss, finding that demand was excused. Dkt # 766-8, October 12, 2009, Transcript of Argument and Ruling on Motion to Dismiss, in relevant part, at 112-127.

88.     During a later hearing before Chancellor Strine, counsel for the Director Defendants, Mr. Portnoy, recognized the importance of the Delaware State law issues being litigated, and noted that Defendants attempted to stay the Consolidated Derivative Action.[3]

---

[3]     As a result of the Delaware Plaintiff defeating Defendants' motion to dismiss the Delaware State law breach of fiduciary duty claims for failure to make a demand, Defendants did

89.     The Delaware Chancery Court recognized the importance of the Delaware State law issues being litigated in the Delaware Derivative Action. For example, Chancellor Strine stated to counsel for BofA during a conference:

> THE COURT: [T]his is a case about a deal, right, and whether it was good for the stockholders of the company...As I understand it, this is the idea that the Bank of America fiduciaries breached their fiduciary duties and did a deal which was bad for their stockholders; right?
>
> MR. PORTNOY: That's the core of it.
>
> MR. KRINER: Right.
>
> THE COURT: That is a core Delaware law issue...frankly, if you mislead your stockholders in connection with the stockholder vote, that's a breach of fiduciary duty. I believe that sort of thing would be a breach of fiduciary duty going back before there were federal securities laws. The idea that when you ask your -- the object of your fiduciary duties, you know, ward or something like that, to give a consent, the idea that you have to give all the material facts and do so truthfully is not something that was simply invented in the 1930s as a matter of federal statutory law. .

Ex. 766-3 at 3-4.

90.     The Delaware Chancery Court went on to observe:

> I also really don't understand when the allegation is this is a catastrophically injurious merger to Bank of America and its stockholders, how that doesn't **raise pretty core concerns of state, you know, corporate law. . .**
>
> * * *
>
> **And as I said, we got a derivative case involving very important issues Delaware law that's waiting to move forward.** And it's going to move forward.

Id. at 17-18; 27-28 (emph. added).

91.     In response, counsel for the Director Defendants, Larry Portnoy, agreed with Chancellor Strine and responded in relevant part:

---

not move to dismiss the Consolidated Derivative Action's breach of fiduciary duty claims pending before this Court, one of the only surviving claims from Plaintiffs' initial complaint.

> And **I don't disagree about the primacy of Delaware and the Delaware interests here**. And we moved to stay in New York, and we were – that motion was denied.

Id. at 14 (emph. added).

92.     Defendants knew well the implications under Delaware law and chose to spend millions of dollars actively litigating the derivative claims in Delaware Chancery Court for years thereafter.

### B.    Fact Discovery In The Delaware Derivative Action

#### 1.    Discovery of the Parties

93.     Following Chancellor Strine's denial of Defendants' Motion to Dismiss, the Delaware Plaintiff immediately began the discovery process, serving discovery requests upon all Defendants, subpoenas *duces tecum* on non-party witnesses, and pursuing FOIA requests served on government entities..

94.     From the inception of discovery, Defendants took the position that the 2 million pages of documents previously produced to various government agencies investigating the Merrill Merger satisfied Defendants' burden to produce documents to the Delaware Plaintiff. The Delaware Plaintiff believed the government productions were incomplete as a result of the narrow scope of the government investigations, and vigorously sought additional discovery from Defendants.

95.     Against this backdrop, over the course of the next two and a half years, the Delaware Plaintiff relentlessly and successfully pursued the production of an additional two million pages of documents (some, as discussed below, became highly relevant to the claims asserted).  Moreover, these litigation efforts by Delaware Counsel resulted in Defendants producing these documents in the Consolidated Derivative Action as well, thereby benefitting

Plaintiffs in the Consolidated Derivative Action.

96.     In an effort to move discovery forward and obtain access to certain documents BofA and their regulators had claimed as privileged, the Delaware Plaintiff negotiated and executed several protective orders: (i) Stipulation and Order Governing the Production and Exchange of Confidential Material, entered December 21, 2009; (ii) Supplemented Stipulation and Order, entered February 25, 2010; (iii) Order governing Discovery of Certain Documents, entered March 24, 2010; and (iv) Amendment to the Stipulation and Order Governing the Disclosure of Certain Documents, entered February 10, 2012.

97.     Delaware Plaintiff served her First, Second and Third Requests for Production of Documents on all Defendants in the first three months following the denial of Defendants' Motion to Dismiss.  After Defendants expressed their intention to restrict document production to those documents already produced to the government entities investigating the Merrill Merger, Delaware Counsel immediately sought the production of all of the subpoenas and document requests served on Defendants in connection with the government investigations.

98.     Delaware Counsel then began the time consuming and painstaking analysis of Defendants' document productions, comparing the responsiveness of the productions to the government discovery requests and their responsiveness to the discovery served by Delaware Counsel.

99.     In February 2010, Defendants produced transcripts of testimony taken in various government actions and investigations related to the Merrill Merger.

100.     In addition, in response to the 45 subpoena *duces tecum* the Delaware Plaintiff served on non-parties, Delaware Counsel received thousands of pages of documents produced by non-parties including, among others, BofA's Financial Advisors and Outside Counsel.

101.    Delaware Counsel immediately began analyzing the transcripts, including, among other things, comparing testimony elicited prior to BofA's waiver of attorney-client privilege, re-creating, synthesizing and reviewing all exhibits introduced during the government depositions, and comparing the documents produced to documents requested by the Delaware Plaintiff's counsel.

102.    After months of negotiations, Delaware Counsel successfully petitioned for, and received, documents designated as "Confidential Supervisory Information" by the Federal Reserve Board related to the Merrill Merger.

103.    In February 2010, when Delaware Counsel determined that Defendants had redacted hundreds of thousands of pages of documents, Delaware Counsel demanded that Defendants produce a privilege log.  Defendants answered that they would produce a privilege log at the conclusion of document discovery.

104.    On May 17, 2010, Defendants represented to the Delaware Plaintiff that document production was complete with over 2 million pages of documents produced.

105.    After BofA had proclaimed that it had fulfilled its obligation to produce documents to the Delaware Plaintiff, and Delaware Counsel had carefully reviewed and analyzed the 2 million pages of documents, Delaware Counsel was convinced that BofA had withheld relevant information from its productions.

106.    The parties met and conferred in June 2010 to discuss certain pervasive shortcomings with BofA's document productions.  In preparation for the meet and confer, Delaware Counsel prepared a letter brief outlining the following issues with BofA's document productions: (i) Defendants could not limit their production in the Delaware Derivative Action to documents produced to the government entities; (ii) the relevant time period could not be limited

to documents created during the Merrill Merger period, but rather it must include documents created thereafter that referred to the Merrill Merger; (iii) Defendants could not withhold relevant D&O Insurance policies; (iv): Defendants could not withhold documents based on the attorney-client privilege; and (v) certain documents contained improper redactions or claims of privilege.

107.    During the meet and confer, Delaware Counsel also repeated their demand for the production of privilege logs.  In response, BofA stated that it would produce the privilege logs previously provided to the government agencies.

108.    Further, Defendants again stated their position that the production of the documents produced to the government entities satisfied any obligation BofA had to produce responsive documents to the Delaware Plaintiff, and further that it was the Delaware Plaintiff's burden to identify categories of documents missing from the productions and not covered by any of the entered protective orders and stipulations.

109.    Defendants also informed Delaware Counsel that the demand for production of privileged documents under the so-called *Garner Doctrine* would not be met.

110.    After reviewing the government privilege logs, Delaware Counsel determined that these logs were wholly inadequate and again demanded the production of logs that satisfied the Delaware Chancery Court rules. As discussed below, it was not until February and March 2012, after the Delaware Plaintiff filed a motion to compel that BofA complied and produced a 600 page redaction log.

111.    In an effort to move the litigation process forward, Delaware Counsel again met and conferred with Defendants in September of 2010, concerning BofA's document productions. As a result of the meet and confer, Defendants produced to Delaware Counsel the multitude of

subpoenae, document requests and letter requests served on BofA by the various state and federal agencies investigating the Merrill Merger. In addition, BofA produced documents related to BofA's settlement of the SEC actions and the D&O insurance policies.

112.    After comparing the universe of government document requests to both, (a) the document productions; and (b) the Delaware Derivative Complaint's allegations and Delaware Plaintiff's document requests, Delaware Counsel, in early 2011, served additional document requests on all Defendants.

113.    In response, Defendants produced an additional 300,000 pages of documents produced to government entities but not previously produced to Delaware Plaintiff.

114.    During a meet and confer that followed, Defendants conveyed that they expected to produce additional documents, some that were previously identified by Defendants as "non-responsive," but upon additional review were deemed responsive, or previously produced in redacted form.

115.    In the spring of 2011, following these productions, Delaware Counsel were vigorously preparing for depositions while analyzing the new document productions. At the same time, Delaware Counsel was actively pursuing the resolution of myriad outstanding discovery issues relating to the scope of BofA's productions, inconsistent and improper redactions, claims of privilege and *Garner*-related documents.

116.    As a result of the Delaware Counsel's efforts, in May 2011 Defendants produced in unredacted form previously redacted BofA Board meeting minutes, as well as previously withheld notes from BofA's outside counsel at Wachtell Lipton concerning the Merrill Merger.

117.    In total, the Delaware Plaintiff served a total of six separate Requests for the Production of Document upon Defendants as it became clear with each subsequent production

that material, relevant information had not been produced in the document production to the government entities investigating the Merrill Merger.

### 2.    Discovery Motions

118.    Delaware Counsel's careful and painstaking analysis of the document productions continued to reveal that entire categories of responsive documents had not been produced by BofA.  Moreover, BofA remained steadfast in its refusal to provide Delaware Plaintiff with privilege and redaction logs, even though Delaware Plaintiff had identified over 500,000 pages of documents that had been redacted for no apparent lawful reason.

119.    This dogged persistence led to the filing of motions to compel, as discussed below, which ultimately led to the production of millions of pages of previously withheld relevant documents concerning BofA's breach of fiduciary duty claims.

120.    In preparation for the depositions of BofA's Financial Advisors, Fox-Pitt Kelton Cochran Caronia Waller LLC and J.C. Flowers (the "the Financial Advisors"), Delaware Counsel discovered inconsistencies between documents produced by BofA and documents produced by the Financial Advisors.  Based on further analysis of these discrepancies, the Delaware Plaintiff concluded that BofA failed to produce or improperly redacted, certain documents relating to the fairness opinion, the Merger Proxy disclosures and diligence performed by the Financial Advisors.

121.    BofA, however, continued to assert that the 2 million pages of documents originally produced to the various government agencies and the Delaware Plaintiff (and plaintiffs in the Consolidated Actions), was an over-inclusive, "comprehensive," exhaustive universe of all documents relating to the Merger gathered from all custodians believed potentially to possess relevant information.

122.    Delaware Counsel's efforts, however, demonstrated that these repeated representations were simply not correct.  An exhaustive review of the productions by BofA and Wachtell, as compared to the productions by the Financial Advisors, led the Delaware Plaintiff to conclude that BofA had omitted from production documents relevant to the Financial Advisor's fairness opinions and disclosures in the Merger Proxy concerning same.

123.    The Delaware Plaintiff ultimately concluded that BofA withheld from its productions to the government entities, as well as the private plaintiffs in all the related actions, the FPK fairness opinion letters that contained the cautionary language, as well as the correspondence concerning BofA's desire to remove language from FPK's fairness opinion which would have informed BofA's stockholders of FPK's concerns with respect to the limitations of its fairness opinion.

124.    Based on these findings, on December 19, 2011, the Delaware Plaintiff sought an order to compel BofA and Wachtell, on whose behalf BofA had collected, produced and redacted documents, to produce in unredacted form all documents and communications previously withheld or redacted concerning the Merger Proxy and the Financial Advisors' fairness opinions therein.

125.    In response to BofA's argument that the documents at issue were redacted and withheld on the basis of "relevance," Chancellor Strine found the sanitized documents to be highly relevant to the Delaware Plaintiff's claims:

> Quite frankly, we're not talking about documents today that are not related to the merger, that have nothing to do with the plaintiffs' claims.  **What the stockholders were told at the time they approved the deal is pretty front and center in this.**  In the total mix of information, the reliability of the fairness opinions on which the deal was originally premised might still be important. What the board knew about those, whether there were people at Bank of America who, frankly, wished to portray to the stockholders a more solid basis to rely upon the banker's opinion than the banker wished to convey, or, frankly, a more solid one

than the board was given, I mean, I don't know. **I haven't seen the evidence; but the idea that it's irrelevant, it's certainly relevant to the merger.**

January 23, 2012, Transcript of Oral Argument on Plaintiffs' Motion to Compel and Ruling of the Court, in relevant part, at 36-37 (emph. added).

126.    The Delaware Court of Chancery granted the Delaware Plaintiff's motion and ordered BofA to produce all non-privileged documents relating to BofA's Financial Advisors and the Merger Proxy, stating, "[i]t's certainly core -- relevant to the Merger what the proxy statement says about the fairness opinion." Id. at 68:21-22.

127.    As a direct result of the Delaware Plaintiff's efforts, Defendants agreed to produce thousands of documents from the files of BofA's outside counsel and BofA employees not previously produced in any action. In addition, the parties entered into a *Garner* stipulation pursuant to which BofA produced documents previously withheld on a claim of privilege.

128.    Additionally, as a result of the Delaware Plaintiff's motion, Defendants were directed by Chancellor Strine to re-review all previously redacted documents, and either produce the documents in unredacted form or provide Delaware Plaintiff with appropriate privilege logs.

129.    Delaware Plaintiff's motion resulted in the production of a treasure trove of relevant documents, which in turn, resulted in the Delaware Plaintiff uncovering the fact that BofA directed Wachtell to threaten FPK to induce it to materially alter its fairness opinion included in the Merger Proxy.

130.    This "final" FPK fairness opinion letter, which was provided to BofA, included the following cautionary language which Mr. Roddy conveyed to the Director Defendants during the September 14, 2008, Board meeting:

> The market and industry circumstances surrounding the Merger have been
> extraordinary.  In the context of the current credit market crisis in the United
> States and its dramatic impact on the value, volatility and viability of many

financial institutions and investment banking firms, on Saturday, September 13, 2008, the Company commenced preliminary negotiations to potentially acquire Merrill Lynch.  In connection with, and shortly after, the commencement of such preliminary negotiations on such date, we were engaged by the Company to provide certain financial advisory services in connection with the Company's potential acquisition of Merrill Lynch and to prepare this opinion with a view toward the Company's being in a position to consider entering into the Merger Agreement by Sunday evening, September 14, 2008.  **As a result of these extraordinary circumstances and the exigencies of the brief time period involved, our review of the information described below was necessarily extremely limited and was performed without the benefit of independent verification.  Accordingly, we did not perform many of the due diligence inquiries and analysis that we would customary conduct under normal circumstances in connection with rendering a fairness opinion in connection with a transaction such as the Merger.**  Moreover, the unprecedented nature of the current market conditions and their uncertain future potential impact on the value, volatility and viability of financial institutions and investment banking firms, including Merrill Lynch, may **render many customary and accepted valuation criteria and metrics less reliable** as traditional measures of assessing the fairness, from a financial point of view, of a transaction such as a Merger.

131.    FPK's general counsel testified that the foregoing cautionary language was "important" to the fairness opinion letter.

132.    Upon review of the FPK fairness opinion letter, Wachtell (on behalf of BofA) returned a redlined version striking the above-quoted cautionary text intended to be disclosed to BofA stockholders.

133.    In response, FPK relented and removed certain of the cautionary language but refused to remove the following:

> In addition, we note that the company retained our firm over the weekend of September 13, 2008, and consequently, we did not perform many of the due diligence inquiries and analysis that we would customarily conduct under normal circumstances in connection with rendering a fairness opinion in connection with a transaction such as the Merger.

134.    Faced with FPK's refusal to comply with BofA's demand to remove the above cautionary language from the fairness opinion letter, Mr. Belk communicated with his boss, Mr. Curl (who reported directly to Ken Lewis), that Mr. Flowers would "deal with FPK." Ex. 65 ("I

talked to Flowers, he will deal with FPK").

135.     Mr. Belk, the BofA executive responsible for the Financial Advisors (Ex. 73),
thereupon instructed Wachtell to convey the threat to FPK that BofA was going to remove all
references to FPK and FPK's fairness opinion from the Merger Proxy unless FPK removed the
offending cautionary language.  Ex. 65.  Wachtell relayed BofA's threat to FPK as follows:

> **I've spoken with Bank of America.  They would rather not have the opinion
> than have the opinion with that language included.**  I honestly believe you
> should be ok from a legal perspective - there have been many big bank deals
> where the bankers come in at the last minute, and the Bank certainly appreciates
> the impact of the rushed timing.  But obviously it's your decision.  **If you'd prefer
> this approach, please let us know and we'll go ahead and take references to
> FPK and the copy of your opinion out of the S-4 draft.**

136.     The implication of BofA's threat, as delivered by Wachtell, was not lost on FPK
as they understood that without a signed engagement letter from BofA, the removal of the FPK
fairness opinion letter from the Merger Proxy would result in FPK forfeiting its $1 million fee
for the engagement.

137.     FPK quickly succumbed to the BofA threat, which resulted in a sanitized version
of the FPK fairness opinion letter being submitted to the SEC, and ultimately disclosed to the
stockholders.  Had the Director Defendants reviewed the Merger Proxy or final fairness opinion
letter before filing with the SEC, they would have known that the cautionary language contained
in the oral fairness opinion presentation given to them during the September 14, 2008, Board
meeting was not contained in the written presentation ultimately disclosed to stockholders.

### Delaware Plaintiff's Supplemental Motion to Compel
### Seeking leave To Take Discovery Concerning The
### Destruction Of Merger-Related Documents

138.     In connection with  BofA's compliance with the January 23 Order, BofA revealed
information which indicated that, despite a September 19, 2008, litigation hold relating to the

Merger, important documents of at least one key BofA senior officer and custodian, David Belk, appear to have been destroyed and possibly irretrievably lost during the Merger Transition Period.

139.    As early as September 13, 2010, however, BofA represented to the Delaware Plaintiff that BofA provided notice of the September 19, 2008, litigation hold to 66 specifically named BofA employees, including Mr. Belk, "all of whom it was believed could potentially possess relevant information, to preserve all documents related to the merger." September 13, 2010 Letter from Matthew Fischer to Robert Kriner at 2. Based on the documents which BofA produced following the January 23 Order, however, the Delaware Plaintiff believed gaps remained in BofA's document production, particularly relating to Mr. Belk's emails and Merger financial models.

140.    During his deposition by the Delaware Derivative Plaintiff, Mr. Belk admitted that he would, "routinely delete documents on my computer, you know, in the normal course of business."

141.    In light of this testimony, BofA finally revealed that, contrary to its repeated, prior representations, Mr. Belk deleted documents until a January 26, 2009, litigation hold was put in place, nearly *four months after* the Director Defendants approved the Merger. During these four months, Mr. Belk updated the BofA Merger models to reflect the disastrous financial impact Merrill's losses were having on BofA's Merger projections.

142.    The fact that Mr. Belk was identified by BofA as a key custodian of documents relating to the Merger is hardly surprising. Mr. Belk was Senior Vice President in BofA's Corporate Development department, which functioned as BofA's mergers and acquisitions team. Mr. Belk reported to the department's Vice Chairman, Greg Curl, who was one of Defendant

Chairman and CEO Ken Lewis' direct reports. BofA's executive officers testified to Mr. Belk's integral role in the Merger, including running acquisition financial models. Additionally, Mr. Belk worked closely with the Financial Advisors to create pro forma financial models during the Merger weekend.

143.    Specifically, absent from BofA's productions were versions of the Merger financial models referred to by witnesses during their deposition testimony. Indeed, even though BofA had a template model it utilized to evaluate the Merger, no version of this document was found in BofA's productions. Moreover, transmittal emails containing or concerning the Merger financial models were not produced, aside from a single email sent the day before the Stockholder Vote which attached a sobering update of the Merger model.

144.    This discovery led the Delaware Plaintiff to file a Supplemental Motion to Compel on March 26, 2012, seeking leave to take discovery concerning the destruction of Merger-related documents. Further, the Delaware Plaintiff sought to reserve the right to request evidentiary rulings based on the spoliation of evidence. This motion remains *sub judice* and could have dire consequences for the Director Defendants in the form of an adverse inference should Chancellor Strine find that material evidence was spoliated.

145.    These foregoing facts were developed exclusively by the Delaware Plaintiff and the additional 350,000 pages of documents produced subsequent to the Delaware Plaintiff's motions to compel were never reviewed by the government agencies but were subsequently produced to the Consolidated Actions, thereby benefitting both the Delaware and Consolidated Actions.[4]

---

[4]    *See, e.g.*, Dkt. # 783, Supplemental Declaration of Lawrence Portnoy in Support of Final Approval of Settlement and In Response to Objections, at 2 ("[i]t is my understanding that, by the time the MOU was executed, all discovery in the Delaware action had been produced to Lead

### 3. Discovery of Non-Parties

146.    Additionally, the Delaware Plaintiff conducted an extensive discovery program directed to non-parties, serving over 45 subpoenae *duces tecum*, on, among others, BofA's Merger Financial Advisors, BofA's auditors at Ernst & Young LLP, and BofA's legal advisors in connection with the Merger, Wachtell, Lipton, Rosen & Katz ("Wachtell").

147.    In response, non-parties produced tens of thousands of documents, some highly relevant to Delaware Plaintiff's claims.

148.    In all, in response to the Delaware Plaintiff's document requests, subpoenae *duces tecum*, and motions to compel, as discussed below, Defendants and non-parties produced to the Delaware Plaintiff over 4.7 million pages of documents, which included millions of pages not produced in connection with the government investigations.

149.    Delaware Counsel's litigation efforts resulted in the production of these documents to the Plaintiffs, thereby benefitting both Actions.

### 4. Depositions

150.    The Delaware Plaintiff began a comprehensive deposition program in May 2011 and completed the last deposition on March 6, 2012.  In total, the Delaware Plaintiff deposed 48 witnesses, including all 16 Director Defendants, BofA's Financial Advisors and outside counsel.

---

Counsel, as follows: On February 2, 2012, transcripts of 36 of the depositions taken in the Delaware action, including each of the Outside Directors, were produced to Lead Plaintiffs. The remaining deposition transcripts were produced on a rolling basis, with all but two, including that of Mr. Lewis, produced by March 19, 2012, and the rest on April 10, 2012. Documents produced to Ms. Rothbaum in response to a motion to compel in the Delaware litigation (described in paragraph 48 of the Declaration of Michael Schwartz (Dkt. No. 761)) were generally produced simultaneously to Lead Counsel, except for certain documents produced pursuant to the *Garner* doctrine that were produced to Lead Counsel on a rolling basis on March 19, March 27 and April 6, 2012.). *See also*, Dkt # 782, Lead Plaintiffs' Reply Memorandum of Law In Further Support of Motion for Final Approval of Derivative Action Settlement, at 39, n. 54 (Plaintiffs recognizing receipt of *Garner* documents, which occurred only as a result of the Delaware Plaintiff's litigation efforts).

151.    Beginning in February 2012, Defendants produced to the Plaintiffs transcripts of the 48 depositions taken by the Delaware Counsel.

152.    Within the first three months of deposition discovery, the Delaware Counsel deposed seven Director Defendants, while negotiations continued over Defendants document productions.

153.    On August 4, 2011, following this Court's July 29, 2011, ruling on Defendants' Motion to dismiss in the Consolidated Actions, Delaware Counsel sent a letter to lead counsel in the Consolidated Actions in order to discuss coordination of deposition discovery.

154.    Concurrently, Defendants began unilaterally cancelling previously agreed to deposition dates in the Delaware Derivative Action in anticipation of a meet and confer concerning deposition discovery coordination in the Consolidated Actions.

155.    Delaware Counsel immediately notified Defendants that such unilateral action was inappropriate and a thinly-veiled attempt to evade the Scheduling Order entered by Chancellor Strine on November 24, 2010.

156.    On August 26, 2011, Defendants filed a Motion for Revised Scheduling Order. In their motion, Defendants sought to alter the Delaware Scheduling Order by extending the deadline for the completion of deposition discovery from December 2011 to March 2012, to coincide with the discovery schedule in the Consolidated Actions pending before this Court.

157.    On September 6, 2011, Chancellor Strine encouraged the parties to coordinate depositions to the extent reasonable, but refused to extend his Scheduling Order to parallel the Consolidated Actions pending before this Court:

> I am not going to be driven by Congressional-mandated discovery periods that go on forever in a case involving Delaware law . . . So I want coordination. I don't want a melee. **I don't understand why proceedings about this subject would, you know, be held up in Delaware.** I want coordination, to the extent

possible; but, frankly, **the predominant interest here is the protection -- the application of Delaware law** . . . [T]he fact is that the motion to dismiss was denied in this case awhile back. The plaintiffs here have been patient. We've been trying to be coordinated. And now -- I understand the frustration. . . . This Court already took steps to protect the defendants from duplicative proceedings . . . nobody has been trying to make duplicative proceedings; but there has to be kind of some sense of equity about how it's gone about. And as I said, **we got a derivative case involving very important issues of Delaware law that's waiting to move forward. And it's going to move forward.**

See Scheduling Office Conference Transcript dated September 6, 2011.

158.   Delaware Counsel thereafter met and conferred with counsel in the Consolidated Actions, as well as counsel for Defendants, and mutually agreed to coordinate certain depositions.

### a.   Present and Former BofA and Merrill Employees

159.   Delaware Counsel deposed numerous present and former BofA employees who were integral in analyzing the pro forma effects of the Merger on BofA, as well as keeping the Director Defendants informed of material information concerning the effects of Merrill's deteriorating financial condition on BofA's financials during the period following the Director Defendants' approval of the Merger up until the close of the Merger on December 31, 2008 (the "Merger Transition Period").

160.   In addition, Delaware Counsel deposed former Merrill employees, including former CEO John Thain and former CFO Nelson Chai, who testified that BofA had full access to Merrill's financial information during the Merger Transition Period and that BofA's Chief Accounting Officer, Neil Cotty, effectively became acting CFO of Merrill during this Merger Transition Period.

### b.   Financial And Legal Advisors

161.   Delaware Counsel subpoenaed seven principles and employees of Fox-Pitt Kelton

Cochran Caronia Waller LLC and J.C. Flowers, the Financial Advisors hired by BofA to perform due diligence in advance of the Merrill Merger and to prepare a fairness opinion to be included in the Merger Proxy.

162.    These depositions focused on, among other things, the non-disclosures in the Merger Proxy of the Financial Advisor's concerns with respect to the Merger Proxy, as well as the Director Defendants' knowledge of same.

163.    Delaware Counsel also deposed three Wachtell attorneys who acted as BofA's Merger legal advisors and further developed facts concerning both the BofA Threat and the fact that BofA concluded in November 2008 that disclosure concerning Merrill's losses was warranted prior to the Stockholder Vote.  In addition, the Delaware Plaintiff uncovered that, Wachtell believed BofA had good cause to declare a MAC and that CEO Lewis notified federal regulators of BofA's intent to declare a MAC over Wachtell's objection.

### 5.    Discovery Conducted by Defendants of the Delaware Plaintiffs

164.    Defendants sought extensive discovery of the Delaware plaintiffs, including voluminous interrogatories and document requests.

165.    Moreover, Defendants deposed each of the Delaware plaintiffs in order to inquire into their fitness to represent BofA's interest in the Delaware Derivative Action.

166.    The Delaware Plaintiff similarly responded to contention interrogatories propounded by Defendants.

### C.    Expert Discovery

167.    Delaware Counsel retained one testifying expert and three consultants to advise Delaware Counsel on the issue of damages incurred by BofA as a result of the Merrill Merger.

168.    Delaware Counsel retained Professor Anthony Saunders as their testifying expert.

Professor Saunders is the John M. Schiff Professor of Finance, and former Chair of the Department of Finance, at the Stern School of Business at New York University. Professor Saunders received his Ph.D. from the London School of Economics and has taught both undergraduate and graduate level courses at New York University since 1978. He has more than 30 years of experience in assessing the financial health of companies, with a specialized focus on banking practices and the behavior of financial institutions and markets.

169.     In addition, to assist with Professor Saunders' damage analysis, Delaware Counsel retained the services of the following consultants: Professor Linda Allen, Ph.D., a professor at the Zicklin School of Business, Baruch College, to consult on the issue of damages incurred by Bank of America as a result of the Merger; Professor Menachem Brenner, Ph.D., Research Professor of Finance at the Leonard N. Stern School of Business at New York University, to consult on the issue of damages incurred by Bank of America Corp as a result of the Merger; and Professor Geoffrey P. Miller, Esq., the Stuyvesant P. Comfort Professor of Law at the New York University Law School, to consult on the issues of damages and breaches of fiduciary duty.

170.     Delaware Counsel spent months consulting with these experts on the difficult issues concerning the damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty under Delaware law.

171.     On April 6, 2012, the Delaware Plaintiff served the Corrected Expert Report of Professor Anthony Saunders. Dkt # 766-18. Professor Saunders utilized two approaches to estimate damages incurred by BofA as a result of the Merger. First, he performed an event study analysis, utilizing BofA's stock price reaction to the newly disclosed material information concerning Merrill on January 16, 2009, to estimate damages. In addition, he utilized standard

40

valuation techniques employed in mergers and acquisition to value Merrill, which include a: (i) discounted cash flow analysis; (ii) comparable companies anaylsis; and (iii) comparable transactions anaylsis. Professor Saunders then utilized the Merrill valuation obtained using these three methodologies in order to calculate damages resulting from the Director Defendants' breaches of fiduciary duty in connection with the Merger.

172.   Additional measure of damages incurred by BofA were determined by Professor Saunders by calculating the cost of the government assistance provided to BofA by the United States Treasury in connection with the Merger as first disclosed on January 14, 2009 (the "Government Assistance").

173.   Professor Saunders opined that the damages incurred by BofA as a result of the Merger, obtained using the event study, are $3.884 billion. *Id.* at 3.

174.   Professor Saunders further opined that:

a.   the damages incurred by BofA as a result of the Merger, as estimated using the valuation approach described above, are $4.554 billion as of December 31, 2008; and

b.   BofA incurred additional damages of $1.861 billion, representing the cost to BofA of the government financial assistance necessary to close the Merger.

175.   Professor Saunders opined that total damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty in connection with ther Merger ranged from $5.895 to $6.565 billion. *Id.* at 5.

176.   Professor Saunders further opined that BofA's officers and Director Defendants were fully aware of the impact of Merrill's losses on BofA's capital prior to the close of the Merger. For example, Professor Saunders relied on the fact that Director Defendant May

testified as follows:

> Q. Right.  And I'm trying to understand from your perception whether there was any threat of concern expressed by management concerning the mounting losses at 9 billion for the fourth quarter at the December 9 meeting?
>
> A. Nobody likes losses, period.  So when you say concern, yeah.  Everybody was concerned.  But it didn't change our view on the merger.  At this stage, the escalation of the losses, the rapidity with which they had grown in a week's time or 10 days or whatever, was of an alarming nature, and so there was a pause in discussion about what this was doing and what kind of a hole it would create in our balance sheet.

*Id.* at 20.

177.   In addition, Professor Saunders relied on BofA CFO Joe Price's testimony in response to a question about declines in Merrill's valuation:  "[T]he capital hole or the capital diminution that had occurred because of the losses needed to support the business." *Id.* at 20.

178.   Professor Saunders found that BofA Director Defendant Countryman understood that "the capital hole created by deterioration of Merrill Lynch" necessitated $25 billion of additional TARP assistance from the government.  *Id.* at 20-21.

179.   Professor Saunders concluded that because of the large "capital hole" resulting from Merrill's fourth quarter 2008 losses, BofA was forced to obtain regulatory help to "cure the capital problem." *Id.*  This regulatory assistance took the form of an additional $20 billion in TARP infusions, as well as credit guarantees.  Thus, BofA Director Defendant Sloan stated:

> Then we talked about the injection of funds and then how -- if the bank was going to be forced to buy Merrill at that point in time…just how big is this hole because there's, you know, 150 billion dollars worth of this paper sitting out there, and we asked the Fed to give us a wraparound protection because the bank couldn't absorb that kind of hit.

*Id.* at 22.

180.   Professor Saunders also concluded that Merrill's undisclosed fourth quarter 2008 losses were material, as confirmed by internal BofA communications which reflected concerns

about Merrill's poor fourth quarter 2008 performance.  For example, Professor Saunders relied

upon an email authored by Peter Hein of Wachtell which stated that:

> Fundamental issue of lack of credibility with rating agencies to whom Target
> [MER] may not have disclosed the ever increasing losses for the fourth quarter; if
> Target now belatedly makes that disclosure, likely to have adverse impact on
> perception of rating agencies (**who do not have an inkling this is coming**); such
> a rating agency reaction would, if such reaction occurred after deal fell apart,
> presumably confirm materiality of the fourth quarter losses; also poses significant
> risk of acquirer [BAC] since acquirer faces prospect if it goes ahead that because
> of Target's lack of credibility there will be extreme negative reaction by rating
> agencies if acquisition occurs and then the information Target has not provided to
> rating agencies become known to them belatedly.

*Id.* at 25-26.

181.    Thus, Professor Saunders concluded that his conservative estimate of total

damages incurred by BofA as a result of the Director Defendants' breaches of fiduciary duty,

utilizing the event study estimate of damages, plus Government Assistance and SEC Settlement

damages, to be $5.895 billion.

182.    In addition, the Director Defendants served the expert report of  Professor Anil

Shivdasani

183.    Professor Saunders and the consulting experts conferred with Delaware Counsel

on the substance of Professor Anil Shivdasani's report and thereafter Professor Saunders drafted

his rebuttal report.   Moreover, Delaware Counsel consulted with the foregoing experts in

connection with the preparation of the depositions of various fact witnesses where the

Professors' financial expertise were invaluable.

184.    The work of Delaware Counsel's experts was indispensable to the prosecution of

the Delaware Shareholder's objection to the proposed $20 million Settlement.  For example, the

Expert Report of Professor Anthony Saunders was the *only* expert report that explained and

quantified for Defendants (and the D&O insurance carriers) and the Court the damages incurred

by BofA as a result of the Director Defendants' breaches of fiduciary duty under Delaware law – or otherwise - in connection with the Merger.

**D.**    **Summary Judgment**

185.    As the April 20, 2012 deadline for filing motions for summary approached, Delaware Counsel had already been spending months marshalling all of the facts necessary to defeat the expected motion for summary judgment from the Director Defendants.

186.    On April 20, 2012, the Director Defendants filed their Motion for Summary Judgment in the Delaware Derivative Action seeking to dismiss all claims in the Verified Consolidated Amended Derivative Complaint.

187.    Had Chancellor Strine not stayed the Delaware Derivative Action, as discussed below, the Delaware Plaintiff was prepared to submit the strong factual record developed to defeat the Director Defendants' Motion for Summary Judgment, and prevail at trial which was scheduled to commence on October 22, 2012, and conclude on November 7, 2012.

Sworn to under penalty of perjury under the laws of the United States this 7th day of February 2013.

_____
Michael A. Schwartz