**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION | Master File No. 09 MDL 2058 (PKC) ECF CASE |
| THIS DOCUMENT RELATES TO: Consolidated Securities Action | |

**JOINT DECLARATION OF STEVEN B. SINGER, FREDERIC S. FOX, AND DAVID KESSLER IN SUPPORT OF (A) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (B) CO-LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

STEVEN B. SINGER, FREDERIC S. FOX, AND DAVID KESSLER, declare as follows:

1.     We, Steven B. Singer, Frederic S. Fox, and David Kessler are partners of the law firms of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), Kaplan Fox & Kilsheimer, LLP ("Kaplan Fox"), and Kessler Topaz Meltzer & Check, LLP ("KTMC"), respectively.[1] BLB&G, Kaplan Fox, and KTMC (together, "Co-Lead Counsel") represent the Court-appointed Lead Plaintiffs, the State Teachers Retirement System of Ohio; the Ohio Public Employees Retirement System; the Teacher Retirement System of Texas; Stichting Pensioenfonds Zorg en Welzijn, represented by PGGM Vermogensbeheer B.V.; and Fjärde AP-Fonden, and additional Court-certified class representative, Grant Mitchell (together with Lead Plaintiffs, the "Class Representatives" or "Plaintiffs"), in this consolidated securities class action lawsuit (the "Action"). We have personal knowledge of the matters set forth herein based on our active

---

[1] Unless otherwise noted, capitalized terms shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated as of November 30, 2012 which was entered into by and among Lead Plaintiffs and the Defendants (the "Stipulation").

supervision of and participation in the prosecution and settlement of the claims asserted on behalf of the Court-certified Class (defined below) in the Action.

2.     We respectfully submit this Joint Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement (the "Settlement") that the Court preliminarily approved by its Order Preliminarily Approving Proposed Settlement and Providing for Notice dated December 4, 2012 (the "Preliminary Approval Order"). The results achieved in this case, we believe, are exceptional and were the product of arduous and protracted litigation, spanning over three-and-a-half years, which ended just weeks before trial was set to begin. This Joint Declaration sets forth in detail how Co-Lead Counsel and the Lead Plaintiffs were able to achieve this outstanding result on behalf of the Class.[2]

---

[2] The final approval of the Settlement will resolve all claims in this litigation against all Defendants and the other Defendants' Releasees on behalf of the following Class of persons and entities that was certified by the Court pursuant to a Memorandum and Order issued on February 6, 2012:

> (i) As to claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who held Bank of America Corporation ("BoA") common stock as of October 10, 2008, and were entitled to vote on the merger between BoA and Merrill Lynch & Co., Inc. ("Merrill"), and were damaged thereby; and (ii) as to claims under Sections 10(b) and 20(a) of the Exchange Act, all persons and entities who purchased or otherwise acquired BoA common stock during the period from September 18, 2008 through January 21, 2009, inclusive (the "Class Period"), excluding shares of BoA common stock acquired by exchanging stock of Merrill for BoA stock through the merger between the two companies consummated on January 1, 2009, and were damaged thereby; and (iii) as to claims under Sections 10(b) and 20(a) of the Exchange Act, all persons and entities who purchased or otherwise acquired January 2011 call options of BoA from September 18, 2008 through January 21, 2009, inclusive, and were damaged thereby; and (iv) as to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), all persons and entities who purchased BoA common stock issued under the Registration Statement and Prospectus for the BoA common stock offering that occurred on or about October 7, 2008, and were damaged thereby (the "Class").

3.     We also respectfully submit this Joint Declaration in support of (i) Lead Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Settlement to eligible Class Members (the "Plan of Allocation"), and (ii) Co-Lead Counsel's motion for an award of attorneys' fees in the amount of 6.56% of the Settlement Fund net of Plaintiffs' Counsel's expenses (*i.e.*, $158,549,766.46 plus interest on such amount at the same rate as earned by the Settlement Fund), reimbursement of Plaintiffs' Counsel's expenses in the amount of $8,028,828.32, and awards pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") in the total amount of $453,003.04 for costs and expenses incurred by Lead Plaintiffs in connection with their representation of the Class) (the "Fee and Expense Application").

4.     For the reasons set forth below and in the accompanying memoranda,[3] Lead Plaintiffs and Co-Lead Counsel respectfully submit that (i) the terms of the Settlement are fair, reasonable and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair and reasonable and should be approved by the Court; and (iii) the Fee and Expense Application is supported by the facts and the law and should be granted in all respects.

---

Excluded from the Class by definition are: Defendants, present or former executive officers of BoA and Merrill present or former members of Merrill's and BoA's Board of Directors and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions, *i.e.*, children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law). Also excluded from the Class are any Persons who submitted a request for exclusion in connection with the previously mailed Notice of Pendency of Class Action (the "Class Notice") as set forth on Appendix 1 to the Stipulation who do not opt-back into the Class (*see* ¶175, fn. 17 below).

[3] In conjunction with the Joint Declaration, Lead Plaintiffs and Co-Lead Counsel are also submitting (i) the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and (ii) the Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum").

## I.   THE OUTSTANDING RECOVERY ACHIEVED

5.      Lead Plaintiffs have agreed to settle all claims against all Defendants for a cash payment of $2,425,000,000 (the "Settlement Amount").[4]  In addition to the cash consideration, Defendant BoA has agreed to implement or continue certain corporate governance changes that are significant, including amendments to its Corporate Governance Guidelines with respect to majority voting for directors and minimum stock ownership by executive officers and directors, and amendments to its charter for the Corporate Development Committee in order to provide for additional oversight of senior management (the "Corporate Governance Enhancements") (*see* ¶¶ 164-165 below).

6.      The Settlement is an outstanding result for the Class.  If approved, the Settlement would represent the single largest securities class action settlement ever resolving a Section 14(a) claim – the federal securities law provision designed to protect investors against misstatements in connection with a proxy solicitation – and would represent the sixth largest settlement in the history of securities litigation.[5]  The Settlement also represents one of the four largest ever funded by a single corporate defendant for violations of the federal securities laws, and the largest settlement of a securities class action in which there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct.  Lastly, the Settlement dwarfs all prior securities class action settlements related to the subprime financial crisis.  Moreover, as explained below, the Settlement provides an immediate and extraordinary cash benefit to the Class together with the significant Corporate Governance Enhancements to be

---

[4] Pursuant to the Stipulation, the Settlement Amount has been deposited into interest-bearing escrow accounts for the benefit of the Class.

[5] *See, e.g.*, Securities Class Action Services, "Top 100 Settlements Semi-Annual Report" at 3 (reporting settlements as of December 2012), excerpt attached hereto as Exhibit 1.

implemented or continued by BoA, while avoiding the substantial risks and expense of taking this Action to trial, including the risk of recovering less than the Settlement Amount, or no recovery at all, after substantial delay.

7.     Lead Plaintiffs and Co-Lead Counsel have vigorously litigated the Action from the moment they sought appointment to represent the Class on March 20, 2009 through the achievement on September 27, 2012 of the agreement in principle to settle.

8.     The Parties were in their final pre-trial preparations when we reached this Settlement.  In the three-and-a-half years of litigation that had brought us to that point, we had engaged in comprehensive and vigorous litigation which included (i) conducting an extensive investigation into the Class's claims; (ii) drafting two detailed amended complaints; (iii) successfully moving for a partial modification of the PSLRA's mandatory discovery stay in order to obtain documents from Defendants that had been produced to government regulators and investigators; (iv) successfully opposing Defendants' multiple motions to dismiss in two separate rounds of briefing; (v) successfully opposing Defendants' efforts to seek certification of the question of whether Lead Plaintiffs could bring their Section 14(a) claim as a direct action to the Delaware Supreme Court; (vi) successfully opposing Defendants' efforts to seek interlocutory appeal of certain issues decided by the Court in connection with Defendants' motions to dismiss the First Amended Complaint; (vii) successfully briefing Lead Plaintiffs' motion for class certification and opposing Defendants' efforts to seek appellate interlocutory review of the Court's order granting class certification; (viii) engaging in a fast-moving discovery program, including participating in 61 depositions and reviewing more than 4.75 million pages of documents; (ix) opposing Defendants' multiple motions for summary judgment; (x) preparing Lead Plaintiffs' own motion for partial summary judgment;

(xi) consulting extensively with experts and consultants in the areas of damages, corporate disclosure requirements, valuation, solvency, and accounting for goodwill; and (xii) preparing for trial, including exchanging with Defendants *Daubert* motions, motions *in limine*, jury verdict forms, jury instructions, *voir dire* and draft pre-trial orders.

9.     The Settlement was accomplished through arms'-length settlement discussions facilitated by Judge Layn Phillips, a former federal district judge in the United States District Court for the Western District of Oklahoma and an experienced and highly respected mediator. The discussions included numerous in-person mediation sessions with high-level presentations by attorneys and experts representing each side, focusing first on liability and subsequently on damages, telephonic follow-up and in-person sessions and ultimately, face-to-face meetings between representatives of each side over the course of several months.  The Parties reached an agreement in principle just weeks before trial, which was scheduled to begin on October 22, 2012.  Even after reaching the agreement in principle, we engaged in two more months of negotiations over the specific terms of the Stipulation.

10.     As evidenced by the enormous effort and advocacy summarized above and described in greater detail herein, Lead Plaintiffs and Co-Lead Counsel had a thorough understanding of the relative strengths and weaknesses of the claims asserted at the time the Settlement was reached.  We unequivocally believe, based on our knowledge and understanding of the claims and defenses asserted in this Action, that the Settlement is an outstanding result for the Class, particularly when considered against the very substantial risk of a much smaller recovery – or, even no recovery – after a trial of the Action, and the inevitable and lengthy appeals that would follow assuming success at trial.

11.     As detailed below, in Section II, we discuss Lead Plaintiffs' and Co-Lead Counsel's prosecution of this Action; in Section III, we discuss the risks that Lead Plaintiffs faced in continuing to prosecute this Action; in Section IV, we discuss the negotiation process that led to achievement of the Settlement and the consideration obtained; in Section V, we discuss the Plan of Allocation and its fairness to the Class as a whole; in Section VI, we discuss Lead Plaintiffs' compliance with the Court's Order requiring the issuance of notice of the Settlement to Class Members; in Section VII, we discuss the merits of Co-Lead Counsel's fee application; and in Section VIII, we discuss the merits of Co-Lead Counsel and Lead Plaintiffs' request for reimbursement of Litigation Expenses.

## II.    LEAD PLAINTIFFS' AND CO-LEAD COUNSEL'S PROSECUTION OF THE ACTION

### A.    Factual Background of the Action as Set Forth in Lead Plaintiffs' Complaint, Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment

12.     This case arose out of the largest merger in BoA's history during one of the most tumultuous periods in the world's financial markets.  On Saturday, September 13, 2008, with the impending bankruptcy of Lehman Brothers Holdings Inc., one of Merrill's chief competitors, all but certain, Defendant John A. Thain ("Thain"), Merrill's Chief Executive Officer, called Defendant Kenneth D. Lewis ("Lewis"), BoA's Chief Executive Officer, to propose a strategic arrangement between the two companies.

13.     Lewis immediately travelled to New York City to meet with Thain.  While Thain proposed that BoA purchase a 10% stake in Merrill, Lewis insisted that BoA wanted to acquire the entirety of Merrill outright.  By the following afternoon − Sunday, September 14, 2008 − BoA had agreed to acquire Merrill in one of the largest mergers in Wall Street history.

14.     In a span of less than 48 hours, BoA and Merrill had negotiated and memorialized the terms of the Merger in an Agreement and Plan of Merger which was executed in the early morning hours of Monday, September 15, 2008 (the "Merger Agreement").   The Merger Agreement called for BoA to acquire Merrill for $29 per share, which placed a value on the transaction at $50 billion.   This was a 70% premium over Merrill's closing price the previous Friday.

15.     One of the three main topics of the weekend negotiations between BoA and Merrill was the timing and payment of Merrill's 2008 bonus compensation.   The result of these negotiations was that BoA agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses to its executives and employees prior to the close of the Merger.   This bonus agreement, which was memorialized in a separate document called a Disclosure Schedule, modified the terms of the Merger Agreement, which stated that Merrill would not pay bonuses prior to the Merger closing without explicit consent from BoA.

16.     On September 15, 2008, Defendants publicly announced the Merger.   In a presentation to analysts, press release, and conference call, Defendants represented that the Merger was expected to be "3% dilutive in 2009" and "breakeven in 2010."

17.     On September 18, 2008, BoA publicly filed the Merger Agreement, but not the Disclosure Schedule.

18.     Shortly after the Merger was announced, BoA transferred 200 employees, including a large financial team, to Merrill's offices in order to monitor Merrill's financial condition.

19.     Almost immediately after the Merger was announced, the internal projections for Merrill's 2008 fourth quarter were dire and Merrill's actual losses for October, the first month of the fourth quarter of 2008, were $7.5 billion, the second largest monthly loss in Merrill's history.

20.     As alleged in this Action, Merrill's growing fourth-quarter 2008 losses were communicated directly to BoA's senior officers in November 2008 through the high-level BoA personnel installed at Merrill following the announcement of the Merger.   For example, on November 5, 2008, one week before Merrill finalized its October results, Defendant Neil A. Cotty ("Cotty"), BoA's Chief Accounting Officer and Merrill's acting Chief Financial Officer, provided Defendant Joe L. Price ("Price") with a preliminary report on Merrill's October results that reflected an estimated $6.1 billion pre-tax loss.   Lewis was also informed of Merrill's October losses, and acknowledged during a November 7, 2008 BoA Board of Director's meeting that "October may have been the worst month in history."

21.     On November 3, 2008, BoA and Merrill filed with the U.S. Securities and Exchange Commission ("SEC") a Joint Definitive Proxy Statement (the "Proxy") soliciting approval of the Merger from both BoA and Merrill shareholders.   The Proxy did not disclose Merrill's October losses or the Disclosure Schedule related to the bonus agreement.   In addition, the Proxy attached a copy of the Merger Agreement, and repeated Defendants' September 15, 2008 representation that the Merger was expected to be "3% dilutive in 2009" and "breakeven in 2010."   The Proxy did not make any representation or forecast about Merrill's fourth-quarter results.

22.     As alleged in this Action, in light of Merrill's October losses, BoA executives sought the advice of BoA's in-house and outside counsel as to whether Merrill's 2008 fourth-quarter losses should be disclosed to shareholders in advance of the December 5, 2008

shareholder vote.  BoA's attorneys initially agreed that some disclosure of the losses was required, but reversed course and concluded on November 20, 2008, that no disclosure was warranted.  Among other things, BoA's attorneys reasoned that, because Merrill's anticipated fourth-quarter losses were within the range of losses that Merrill had suffered over the previous five quarters, they did not need to be disclosed.

23.     At a December 3, 2008 meeting, as alleged in this Action, Defendants Lewis, Cotty, Price and Thain determined that Merrill's then-current $11.043 billion fourth-quarter loss forecast had to be adjusted upward by $3 billion, bringing Merrill's total expected fourth-quarter loss to $14.043 billion before taxes.  Although Merrill's updated loss figures, which did not yet include an expected $2 billion goodwill impairment charge, now exceeded the range of losses suffered by Merrill over the previous five quarters, BoA's attorneys were not informed of Merrill's updated loss forecast prior to the December 5, 2008 shareholder vote.

24.     Just prior to the shareholder vote, as alleged in this Action, in an effort to offset the impact that Merrill's losses were having on its capital position, BoA executives demanded that Merrill reduce its balance sheet by billions of dollars.  In addition, because Merrill's losses were also affecting its liquidity, BoA raised approximately $20 billion in December 2008, including a $9 billion debt offering on December 1, 2008, just days before the shareholder vote.  Neither of these actions was disclosed to the shareholders voting on the Merger.

25.     Merrill's balance sheet reduction, and the costs associated with BoA's Merger-related debt offerings, reduced the combined company's future earnings ability.  As a result, BoA executives revised the accretion/dilution figures that were first provided to BoA shareholders on September 15, 2008 and in the Proxy, and now expected the deal to be more than 13% dilutive in 2009 (not 3% dilutive) and 2.8% dilutive in 2010 (not breakeven).

26.     At the December 5, 2008 shareholder meeting, during which BoA shareholders voted to approve the Merger, Lewis did not disclose the updated accretion/dilution figures, but instead reaffirmed the accuracy of the accretion/dilution figures that had been previously provided to shareholders when asked a question related to the accretive/dilutive nature of the deal.  In addition, Merrill's 2008 fourth-quarter losses were not disclosed to BoA shareholders during the December 5, 2008 shareholder meeting.   On the same date, BoA shareholders approved the Merger.  The closing date for the Merger was set for January 1, 2009.

27.     At a December 9, 2008 BoA Board of Director's meeting, BoA's general counsel, Timothy Mayopoulos ("Mayopoulos"), who had previously provided advice to BoA that disclosure of the interim fourth-quarter results was not required, learned that Merrill's pre-tax loss forecast had now ballooned to $14 billion for the quarter.  Mayopoulos sought to confront Defendant Price about the updated loss figures, but was terminated before he could speak with Price.

28.     Approximately two weeks after the shareholder vote on the Merger, BoA's executives determined that BoA could not proceed with the Merger due to Merrill's losses and informed senior officials from the U.S. Department of the Treasury (the "Treasury") and the U.S. Federal Reserve System (the "Federal Reserve") of their intent to invoke the "material adverse effect" clause in the Merger Agreement (the "MAC") and terminate the deal.

29.     BoA decided not to invoke the MAC and to proceed with the Merger only after securing a $20 billion taxpayer bailout from the federal government, along with a $118 billion asset-guarantee to cover future losses on Merrill's high-risk assets.

30.     In mid-January 2009, after the Merger closed, it was revealed to the market that Merrill's fourth-quarter 2008 losses had actually exceeded $21 billion pre-tax and BoA had

agreed to allow Merrill to award $3.6 billion in bonuses to its employees for 2008 on an accelerated basis before the Merger closed.  Specifically, on January 11, 2009, Citigroup issued an analyst report estimating that Merrill would record a net loss for the fourth quarter of $6 billion, or $3.75 per share.  By January 13, 2009, news that BoA would require a taxpayer bailout in order to absorb Merrill's losses leaked to the market through various sources.  *The Wall Street Journal* confirmed this news on January 15, 2009, reporting that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co."  On the following day, January 16, 2009, BoA accelerated its earnings announcement when it publicly disclosed the taxpayer bailout, and further announced that Merrill had suffered $21.5 billion in pre-tax losses during the 2008 fourth quarter.  Finally, on January 21, 2009, the *Financial Times* reported that Merrill had taken the "unusual step" of accelerating $3 to $4 billion in bonus payments to its employees before the Merger closed.

31.     The price of BoA common stock fell by more than 50% when Merrill's fourth-quarter losses and bonus payments were belatedly revealed to the market.

**B.     The Prosecution of the Action**

32.     Beginning in January 2009, twenty-eight separate actions were filed against BoA, Merrill, and certain officers and directors of both companies related to the Merger in the United States District Court for the Southern District of New York.[6]

33.     The actions filed in the Southern District of New York included securities class actions, federal derivative actions and actions brought under the Employee Retirement Income

---

[6] Cases were also filed in other courts around the United States but were later transferred to the Southern District of New York by order of the Judicial Panel on Multi-District Litigation.  ECF No. 1.

Security Act ("ERISA").  In addition, the New York Attorney General ("NYAG") and the SEC each had independently commenced investigations into the facts and circumstances surrounding BoA's disclosure of Merrill's bonus payments.  Derivative litigation had also been commenced on behalf of BoA in the Delaware Court of Chancery.

34.    By Order dated February 25, 2009, the Honorable Denny Chin accepted the civil cases filed in the Southern District of New York as related cases and ordered that by March 23, 2009, any motions to consolidate these related cases and appoint lead plaintiffs were to be filed in his Court.

35.    On March 23, 2009, Lead Plaintiffs moved to consolidate all of the related securities class actions before Judge Chin, to be appointed lead plaintiffs in those actions and to have the Court approve their selection of BLB&G, Kaplan Fox and KTMC (f/k/a Barroway Topaz Kessler Meltzer & Check, LLP) as Co-Lead Counsel for the Class.

36.    By Memorandum Opinion and Order dated June 30, 2009 (the "Consolidation Order"), Judge Chin consolidated the federal securities actions pending before him, appointed the Lead Plaintiffs pursuant to the PSLRA, and approved our firms as Co-Lead Counsel.  ECF No. 2.  In the same opinion, Judge Chin also consolidated the related federal derivative cases and ERISA cases and directed that the lead counsel for each of these groups of cases prepare a joint case management plan for all the cases.

37.    Following our appointment, our firms coordinated the efforts of all plaintiffs in the securities, ERISA and federal derivative cases to finalize an initial case management plan that would streamline briefing and reduce the administrative burden on the Court.  On July 29, 2009, the Court approved this initial case management plan, which required Lead Plaintiffs to

file an amended consolidated class action complaint in the consolidated securities class action by September 25, 2009.  ECF No. 18.

> **1.     Co-Lead Counsel's Pre-Filing Investigation and Preparation of the Consolidated Amended Class Action Complaint**

38.     Even before our firms' appointment as Co-Lead Counsel, we had developed a plan to coordinate a thorough investigation of Lead Plaintiffs' claims against BoA, preserve relevant discovery and access all relevant information from public and non-public sources.  By July 2009, BoA's merger with Merrill was the subject of Congressional, New York State and SEC review.  Investigators at each of our firms were assigned to gather all responsive public information concerning the Merger.  Marshaling these sources of information, Co-Lead Counsel developed leads for potential additional witnesses.  Co-Lead Counsel also ensured that no efforts were duplicated but that all sources of information to support the claims in this case were thoroughly reviewed.

39.     Our firms' coordinated pre-filing investigation included, among other things, a detailed review and analysis of (i) public filings with the SEC by BoA and Merrill; (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by BoA and Merrill; (v) press releases and media reports; (vi) economic analyses of securities price movements and pricing data; (vii) publicly available legal actions involving both companies; and (viii) public material obtained in connection with continuing investigations by the United States Congress, the New York Attorney General, and the SEC.

40.     In addition, very early in the case, prior to the consolidated amended complaint being filed, our firms retained experts and consultants, in the areas of damages, due diligence and accounting to assist in developing the claims that would ultimately be asserted against the

Defendants in the consolidated amended complaint.  The work performed by these experts and consultants is described in more detail below at ¶¶ 108-116.

41.     On September 25, 2009, Lead Plaintiffs filed the 130-page Consolidated Amended Class Action Complaint (the "First Amended Complaint"), which asserted that Defendants had violated federal securities laws and alleged claims on behalf of all persons who (i) purchased or acquired BoA shares between September 15, 2008 and January 21, 2009, inclusive; (ii) held BoA stock as of October 10, 2008 and were entitled to vote on the Merger; or (iii) purchased BoA common stock in the Secondary Offering,[7] and were damaged thereby.  The First Amended Complaint also included claims on behalf of investors in certain of BoA's other traded securities during the Class Period.  ECF No. 29.

42.     Generally, Lead Plaintiffs alleged in the First Amended Complaint that:

- Defendants violated the federal securities laws by failing to disclose or update prior to the shareholder vote on the Merger, and/or making materially false and misleading statements concerning (i) Merrill's billions of dollars of losses during the fourth quarter of 2008 (including, but not limited to, Merrill's goodwill impairment); (ii) BoA's agreement to allow Merrill to pay up to $5.8 billion in bonuses to its employees before the Merger closed, notwithstanding those substantial losses; (iii) the circumstances surrounding the negotiation of the Merger (including the inadequacy of due diligence and pressure from federal regulators); (iv) the purported benefits of the Merger; and (v) BoA's own deteriorating financial condition;

---

[7] The Secondary Offering refers to BoA's sale, on October 7, 2008, of 455,000,000 shares of its common stock at $22 per share for net proceeds of $9.9 billion pursuant to the Registration Statement and Prospectus.

- these false statements and omissions, artificially inflated the price of BoA stock, and caused putative Class Members to purchase BoA stock at artificially inflated prices;

- following the shareholder vote, but before the Merger closed on January 1, 2009, (i) BoA decided that it had grounds to terminate the Merger because of the magnitude of Merrill's losses and BoA's own deteriorating financial condition; and (ii) in order to consummate the Merger and absorb Merrill's fourth-quarter losses, BoA obtained a $138 billion bailout from the Federal Government to prevent BoA's own collapse;

- the truth about Merrill's financial condition was not revealed until mid-January 2009, when several alleged corrective disclosures revealed that Merrill had suffered a pre-tax loss of more than $21 billion during the fourth quarter of 2008 and, as a result, BoA had sought and obtained government assistance;

- on January 21, 2009, it was further reported that, despite Merrill's losses, BoA had allowed Merrill to pay $3 to $4 billion in bonuses before the Merger closed, and that, as these facts became known, the price of BoA common stock declined, causing damage to putative Class Members; and

- Lead Plaintiffs and the Class were entitled to recover damages for all of their claims based solely on the amount that the price of BoA's securities allegedly dropped as a result of alleged corrective disclosures during January 2009.

43.     Based on these facts, the First Amended Complaint alleged that Defendants violated Sections 14(a), 10(b), and 20(a) of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act.  In addition to BoA and Merrill, the First Amended Complaint named as

defendants Kenneth D. Lewis, John A. Thain, Joe L. Price, Neil A. Cotty, Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and the members of BoA's Board of Directors at the time of the Merger (the "BoA Board"). ECF No. 29.

   **2.    Lead Plaintiffs' Motion for Partial Modification of the PSLRA's Discovery Stay**

44.    While Co-Lead Counsel were investigating the claims asserted by Lead Plaintiffs on behalf of the Class, because of the automatic stay of discovery imposed by the PSLRA, we were doing so without the benefit of discovery. Parallel cases brought by the SEC, the New York Attorney General and by counsel in derivative litigation in the Delaware Chancery Court, meanwhile, were moving ahead with discovery.

45.    Indeed, based on the SEC's investigation, on August 3, 2009, the SEC brought Section 14(a) claims against BoA based solely on BoA's failure to disclose the Bonus Agreement in the Proxy. Shortly thereafter, those parties agreed to a $33 million settlement of the SEC's claims related to the bonus allegations. After the proposed $33 million settlement was initially rejected by Judge Rakoff on September 14, 2009, the SEC and BoA entered into a revised settlement of $150 million, which Judge Rakoff approved, but which settlement now also included and resolved claims regarding BoA's failure to disclose the fourth-quarter losses. Moreover, on October 12, 2009, in connection with a derivative action filed in the Delaware Court of Chancery, Vice Chancellor Leo Strine denied motions to dismiss filed by BoA, Lewis and the BoA Board, thus paving the way for discovery to commence in that action as well. A host of other governmental entities, including Congress, the North Carolina Attorney General and the New York Attorney General, had also received extensive documentary discovery and sworn testimony concerning the Merger.

46.     Accordingly, on October 6, 2009, Lead Plaintiffs sought a partial modification of the PSLRA discovery stay in order to obtain (i) documents that Defendants had produced to various government agencies (including, but not limited to, the SEC, Congress and the New York Attorney General) in connection with those agencies' investigations into the Merger; and (ii) transcripts of any testimony given in connection with those investigations.   Defendants opposed the motion.   On November 16, 2009, after oral argument, Judge Chin ordered Defendants to produce to Lead Plaintiffs all of the documents previously produced to government regulators and Congress.

### 3.     Defendants' Motions to Dismiss the First Amended Complaint, Motion to Certify a Question to the Delaware Supreme Court and Motion for Reconsideration

47.     On November 24, 2009, Defendants filed multiple motions to dismiss the First Amended Complaint.   ECF Nos. 59-68.   These motions raised numerous novel issues.   In particular, the Defendants argued, with respect to Lead Plaintiffs' Section 14(a) claims, that there was not a direct cause of action available to the Lead Plaintiffs and, instead, these were derivative claims belonging solely to BoA for which the Lead Plaintiffs lacked standing.   The Defendants also argued that there was no transaction causation for the Section 14(a) claims because the Class had not purchased, exchanged or otherwise transacted in BoA stock in connection with the Merger.   Rather, BoA had merely issued new BoA shares to Merrill shareholders.

48.     In addition to the causation and derivative/direct claim arguments referenced above with respect to Lead Plaintiffs' Section 14(a) claims, Defendants also argued that the Lead Plaintiffs had failed to plead scienter or negligence in connection with their claims, as applicable; that the Defendants had no duty to disclose Merrill's interim fourth-quarter losses, the bonus agreement, or the MAC/bailout negotiations either under Section 10(b) or Section 14(a); and the

alleged misstatements and omissions were immaterial as a matter of law.   In addition, Defendants Merrill and Thain both filed motions to dismiss arguing, among other things, that they owed no disclosure duties whatsoever to BoA shareholders.

49.     On December 18, 2009, just three weeks after Defendants moved to dismiss the First Amended Complaint, Lead Plaintiffs filed their Omnibus Opposition to Defendants' Motions to Dismiss, contending, among other things, that Lead Plaintiffs were permitted to bring their Section 14(a) claims directly and that they had adequately alleged transaction causation in connection with their Section 14(a) claims.   ECF No. 135.   Lead Plaintiffs also offered supporting law and facts in their omnibus brief demonstrating that each of the Defendants issued materially false and misleading statements in connection with the Merger, that Defendants violated their duty to update and correct the representations contained in the Proxy, and that each of the Defendants acted with the requisite scienter or negligence.

50.     The briefing on Defendants' motions to dismiss the First Amended Complaint, which was completed on January 26, 2010, totaled over 245 pages.   While briefing the motions to dismiss, Co-Lead Counsel continued to press Defendants for production of discovery pursuant to Judge Chin's order modifying the discovery stay, discussed more fully below at ¶¶ 80-85.

51.     On March 8, 2010, while Defendants' motions to dismiss the First Amended Complaint were *sub judice*, Defendants requested permission to file a motion to certify to the Delaware Supreme Court the question of whether Lead Plaintiffs' Section 14(a) claims could be maintained directly.   Judge Chin granted Defendants' request to file a motion to certify on March 11, 2010, and a briefing schedule was issued.   ECF No. 199.

52.     On March 25, 2010, the Bank Defendants[8] filed a motion to certify a question of

law to the Delaware Supreme Court concerning the circumstances under which a plaintiff may

bring, in federal court, a direct (as opposed to a derivative) action to enforce Section 14(a) of the

Exchange Act.  ECF Nos. 210-212.  The Bank Defendants argued that the Court must look to

Delaware law to determine if Lead Plaintiffs' claims under Section 14(a) of the Exchange Act

are direct, and that to the extent Delaware law is unsettled, the Delaware Supreme Court should

decide the issue.

53.     On April 8, 2010, we opposed the Bank Defendants' motion on the grounds, *inter*

*alia*, that the question of whether Lead Plaintiffs' Section 14(a) claim was direct is a question of

federal law which cannot be certified to a state court; that Lead Plaintiffs' ability to bring their

Section 14(a) claim directly was well-settled as a matter of federal law; and, that, even if state

law were relevant, Delaware courts uniformly have held that where, as here, a plaintiff alleges

that its right to cast a fully informed vote has been infringed, its claim is direct.  ECF No. 237.

On April 15, 2010, the Bank Defendants submitted a reply memorandum in further support of

their motion to certify a question to the Delaware Supreme Court.

54.     On April 28, 2010, upon Judge Chin's appointment to the United States Court of

Appeals for the Second Circuit, this matter was reassigned to the Honorable P. Kevin Castel.

ECF No. 250.

55.     Judge Castel convened a conference with counsel for all parties on May 19, 2010.

During the conference, the Parties discussed with the Court, among other things, the appropriate

measure of damages under Section 14(a) of the Exchange Act, and whether such damages

potentially overlapped with the remedies sought in the derivative actions pending in the

---

[8] "Bank Defendants" refers to the BoA Board, Lewis, Price, Cotty, BoA and Banc of America
Securities LLC.

Delaware Court of Chancery and in this Court.  To our knowledge, this was an issue that had never before been raised in the context of a federal securities class action.

56.     At the Court's request, on June 4, 2010, the Parties submitted supplemental letter briefs to the Court concerning the measure of recoverable damages for Lead Plaintiffs' Section 14(a) claims, and whether such damages potentially overlapped with any derivative remedies.

> **4.     The Court's Ruling on Defendants' Motions to Dismiss the First Amended Complaint and Defendants' Motion for Certification for Interlocutory Appeal**

57.     On August 27, 2010, the Court issued a Memorandum and Order that granted in part, and denied in part, Defendants' motions to dismiss the First Amended Complaint.  ECF No. 303.  Specifically, the Court sustained (i) Lead Plaintiffs' Section l4(a) claim regarding (a) Merrill's ability to pay, prior to the close of the Merger, bonuses to its employees for fiscal-year 2008, and (b) Merrill's fourth-quarter 2008 losses; (ii) Lead Plaintiffs' Section 10(b) claims regarding Merrill's ability to pay bonuses to its employees for fiscal-year 2008 prior to the Merger closing; (iii) Lead Plaintiffs' Section 20(a) claims for control person liability; and (iv) Lead Plaintiffs' Securities Act claims.  The Court dismissed Lead Plaintiffs' remaining claims, including (most significantly) Lead Plaintiffs' Section 10(b) claims regarding Defendants' failure to disclose Merrill's fourth-quarter 2008 losses, and further held that allegations relating to events post-dating the December 5, 2008 shareholder vote could not form the basis of a Section 14(a) claim.  In addition, the Court rejected Defendants' argument that Lead Plaintiffs had failed to allege causation and damages in connection with their Section 14(a) claim.  Moreover, in connection with the Court's August 27, 2010 Memorandum and Order regarding Defendants' motions to dismiss, Judge Castel denied Defendants' motion to certify a question to the Delaware Supreme Court.  *Id*.

58.     On September 10, 2010, Defendants filed motions seeking certification for interlocutory appeal or, in the alternative, for reconsideration, of multiple issues decided by this Court in its August 27, 2010 Memorandum and Order, including (i) whether Defendants had a duty under Section 14(a) to disclose Merrill's fourth-quarter financial results; (ii) whether Plaintiffs here met the transaction causation element of Section 14(a); and (iii) whether covenants in a private merger agreement are actionable under the federal securities laws.  ECF Nos. 308-313.  Lead Plaintiffs opposed Defendants' motions on September 24, 2010, arguing that Defendants had failed to establish a substantial ground for disagreement with the Court's motion to dismiss opinion or any other exceptional circumstance that would warrant interlocutory appeal.  ECF Nos. 333-335.  On October 8, 2010, the Court denied all of Defendants' motions.  ECF No. 345.

### 5.     Co-Lead Counsel's Continuing Investigation and Preparation of the Consolidated Second Amended Class Action Complaint

59.     Co-Lead Counsel's investigative efforts continued while Defendants' motions to dismiss the First Amended Complaint were pending.  These efforts during this time period included, among other things, reviewing (i) additional public material obtained in connection with the investigations conducted by Congress, the SEC, and the New York Attorney General; (ii) the documents produced to Lead Plaintiffs by Defendants pursuant to the lifting of the PSLRA discovery stay; and (iii) sworn testimony taken in connection with the legal actions brought against BoA by the SEC and New York Attorney General.

60.     Following the Court's denial of Defendants' motions for reconsideration of the Court's August 27, 2010 Memorandum and Order (ECF No. 303), Lead Plaintiffs sought permission from the Court to amend the pleadings to replead Lead Plaintiffs' Section 10(b) claims based on Merrill's undisclosed losses prior to and following the shareholder vote on the

Merger and BoA's bailout to accomplish the Merger.  The Court had dismissed these claims based on a finding that Lead Plaintiffs had failed to adequately plead scienter for any of the Defendants in support of these claims.  We believed that, based on the additional facts that Co-Lead Counsel had uncovered during the course of their investigation, we could successfully convince the Court to allow these claims to proceed.  The decision to proceed with these claims was risky, as reflected in the Court's Order of September 9, 2010, which warned counsel of the risks involved in such a decision and the potential for delay that could ensue as a result of amending the complaint to pursue such claims.  ECF No. 307.  Nonetheless, we firmly believed that pursuing these claims was in the best interest of the Class and without them, numerous Class Members could be deprived of any remedy for the substantial losses that flowed from the ultimate disclosure of Merrill's losses.  Accordingly, committed to maintaining an aggressive trial schedule for the Action, we requested to file a second amended complaint in short order.

61.     On October 22, 2010, based upon the additional facts obtained through Co-Lead Counsel's investigation and our firms' efforts in achieving a partial lifting of the PSLRA discovery stay, Lead Plaintiffs filed their Consolidated Second Amended Class Action Complaint (the "Second Amended Complaint"), which contained additional allegations in support of Lead Plaintiffs' Section 10(b) claims against Defendants Lewis, Price and BoA related to these Defendants' alleged failure to disclose Merrill's fourth-quarter losses and BoA's receipt of the taxpayer bailout.  ECF No. 363.  The Second Amended Complaint also contained additional allegations bearing on the scienter of BoA, Lewis and Price, including, *inter alia*, allegations that BoA's former General Counsel was not advised of the full extent of Merrill's losses prior to the December 5, 2008 shareholder vote.  In addition, the Second Amended

Complaint added Grant Mitchell as a named plaintiff, an individual who had purchased call options on BoA common stock during the Class Period.

### 6. Defendants' Motions to Dismiss the Second Amended Complaint

62. Defendants moved to dismiss the Second Amended Complaint on November 29, 2010. ECF Nos. 369-373. In their motions, Defendants argued that (i) the Second Amended Complaint failed to allege an actionable misstatement or omission, and failed to plead a strong inference of scienter in connection with the failure to disclose Merrill's fourth-quarter losses; (ii) Defendants did not violate Section 10(b) by failing to disclose the bailout prior to January 16, 2009; (iii) Lead Plaintiffs lacked standing to assert claims on behalf of purchasers of 22 series of BoA preferred shares and 21 series of BoA bonds; and (iv) named plaintiff Grant Mitchell only possessed standing to assert claims on behalf of purchasers of BoA January 2011 call options.

63. On December 21, 2010, Lead Plaintiffs filed their brief in opposition to Defendants' motions to dismiss the Second Amended Complaint. ECF Nos. 384-385. In their opposition brief, Lead Plaintiffs argued, among other things, that Defendants Lewis and Price acted with scienter in failing to disclose Merrill's fourth-quarter losses and the taxpayer bailout to shareholders; that Defendants' failure to disclose Merrill's fourth-quarter losses constituted an actionable omission under Section 10(b); and that Lead Plaintiffs possessed standing to assert claims on behalf of purchasers of certain preferred shares, debt securities and stock options. Lead Plaintiffs also argued that Defendants' contention that there was no duty to disclose Merrill's losses under Section 10(b) ignored Second Circuit authority and the Court's exhaustive August 27, 2010 Memorandum and Order finding that Defendants did have such a duty. *Id.*; *see also* ECF No. 303. Defendants filed their reply briefs on January 28, 2011. ECF Nos. 390-391.

### 7.    The Court's Ruling on Defendants' Motions to Dismiss the Second Amended Complaint

64.    By Memorandum and Order dated July 29, 2011, the Court sustained Lead Plaintiffs' Section 10(b) claims regarding Defendants' failure to disclose Merrill's fourth-quarter losses, but granted Defendants' motions to dismiss Lead Plaintiffs' claims related to Defendants' failure to disclose the taxpayer bailout.   ECF No. 405.   The Court further held that Lead Plaintiffs and Grant Mitchell lacked standing to bring claims on behalf of purchasers or sellers of BoA securities that they did not themselves purchase or sell during the Class Period, but sustained claims on behalf of purchasers of BoA January 2011 call options.

65.    On August 31, 2011, Defendants answered the Second Amended Complaint. ECF Nos. 426-429.   Defendants denied Lead Plaintiffs' claims in their entirety and asserted a number of alleged defenses to liability, including, *inter alia*, that Defendants had no duty to disclose Merrill's interim financial results, that Class Members knew or should have known the allegedly misstated or omitted information, that Defendants acted in good faith at all times, that Lead Plaintiffs had failed to allege a harm to BoA shareholders that was independent from a harm suffered by BoA, and that any damages suffered by BoA shareholders had to be offset by gains on their holdings of Merrill securities.

66.    On September 7, 2011, the Court held a Status Conference, setting the pre-trial schedule and October 22, 2012 as the trial date.

### 8.    Lead Plaintiffs' Motion to Certify the Class

67.    On July 29, 2011, the Court issued an order setting the schedule for class certification discovery and class certification briefing, among other things.   ECF No. 406.

68.    The motion for class certification was vigorously contested and entailed extensive discovery, much of which occurred before the filing of the motion.   Co-Lead Counsel's

experience and expertise enabled them to complete what turned out to be an enormous undertaking in less than three months in accordance with the Court's July 29, 2011 Order (ECF No. 406).   Thus, for example, while Defendants' motion to dismiss the Second Amended Complaint was pending, Co-Lead Counsel streamlined discovery by exchanging and responding to discovery requests (which included requests that pertained to class certification), and met and conferred with Defendants regarding any objections to discovery.   This greatly assisted Lead Plaintiffs in meeting the Court's class certification schedule.   With the assistance of Co-Lead Counsel, the proposed Class Representatives, including the Lead Plaintiffs, collected, reviewed and produced hundreds of thousands of pages of documents in response to the forty-four requests contained in Defendants' First Request for Documents, which included, among other things, Plaintiffs' trading histories in BoA and Merrill securities and the securities of certain other investment banking institutions, documents in their possession concerning BoA, Merrill or the Merger, and all of the documents cited in the Second Amended Complaint.

69.   Defendants also served subpoenas on dozens of outside investment managers for Lead Plaintiffs, and Co-Lead Counsel coordinated and conferred with each of these outside investment managers regarding the permissible scope of discovery.

70.   In addition to document discovery, Defendants deposed representatives from each of the five institutional Lead Plaintiffs pursuant to 30(b)(6) deposition notices, and named plaintiff Grant Mitchell.   Defendants also deposed each of Lead Plaintiffs' investment managers.

71.   There was also considerable expert discovery taken in connection with the motion for class certification.   The Parties submitted expert reports in support of their respective positions and Defendants deposed Lead Plaintiffs' experts, Chad W. Coffman and Professor Steven J. Choi, and Lead Plaintiffs deposed Defendants' expert, Allen Ferrell.   In addition,

Defendants subpoenaed industry analysts in an effort to challenge the fraud-on-the-market theory of reliance, and Co-Lead Counsel also prepared for and attended these depositions.

72.     Co-Lead Counsel defended and/or participated in the depositions of 16 individuals in connection with class certification discovery.

73.     On October 17, 2011, Lead Plaintiffs and named plaintiff Grant Mitchell filed their Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Class Certification Motion").  ECF Nos. 478-480.

74.     On October 31, 2011, Defendants filed their opposition to Lead Plaintiffs' motion, arguing that (i) Plaintiffs failed to show that their Section 14(a) damages theory was economically cognizable; (ii) individualized issues of reliance predominated because Plaintiffs had failed to establish materiality; and (iii) Plaintiffs' Section 10(b) and Section 14(a) classes were overbroad.  ECF Nos. 487-488.  Defendants also argued that no Securities Act class could be certified because (i) Plaintiffs failed to demonstrate numerosity; (ii) individualized stock tracing issues predominated; and (iii) there were no material misrepresentations or omissions in the offering documents.  *Id*.

75.     On November 11, 2011, Lead Plaintiffs filed a reply brief in further support of their motion.  ECF Nos. 494-495.

76.     On February 6, 2012, the Court issued a Memorandum and Order granting Plaintiffs' Class Certification Motion in its entirety.[9]  ECF No. 527.

77.     On February 21, 2012, Defendants sought permission to appeal the Court's Order granting class certification to the Second Circuit under Fed. R. Civ. P. 23(f).   Defendants

---

[9] With respect to the "tracing" issue Defendants raised relating Plaintiffs' Section 11 claims, the court clarified that the definition of the Class as proposed by Plaintiffs was limited to investors who purchased in the Secondary Offering, and did not encompass investors who later bought in the secondary market.

requested that the Second Circuit review the District Court's ruling on the grounds that (i) the Section 14(a) class lacked a cognizable damages theory; (ii) Defendants had no duty to disclose Merrill's fourth-quarter losses prior to quarter-end; and (iii) the alleged omissions regarding Merrill's fourth-quarter losses and the bonus agreement were immaterial.  After full briefing, on July 23, 2012, the Court of Appeals issued an Order denying Defendants' Rule 23(f) petition.

79.     In connection with the Court's certification of the Class, on February 24, 2012 Lead Plaintiffs filed a motion to approve the Notice and Summary Notice of Pendency of Class Action.  ECF No. 530.  On March 1, 2012, the Court approved the Class Notice prepared by Co-Lead Counsel.  ECF No. 531.  The Class Notice was mailed to millions of potential Class Members beginning on March 21, 2012.  The Class Notice notified potential Class Members of, among other things:  (i) the Action pending against the Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Court-certified Class; and (iii) their right to request to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion.  At the Court's request, the trial date of October 22, 2012 was set forth prominently in the Notice.  As set forth on Appendix 1 to the Stipulation, 864 requests for exclusion from the Class were received in connection with the Class Notice.

### 9.     Lead Plaintiffs' Extensive Discovery Efforts

79.     Through the course of extensive and highly contested discovery, Lead Plaintiffs, through the efforts of Co-Lead Counsel, were able to develop strong evidentiary support for the claims asserted in the First and Second Amended Complaints.  The results achieved for the Class would not have been possible in the absence of these discovery efforts.

80.     As discussed above, at the very inception of this case, we knew that it was critical to the success of the litigation that Lead Plaintiffs and the Class be placed on the same footing as

other interested parties, such as the SEC and NYAG who were pursuing parallel proceedings relating to the facts at issue in this Action, as well as the derivative litigation pending in the Delaware Court of Chancery.  For this reason, in October 2009, when it was evident to us that the Defendants in this Action were exchanging information with parties in other proceedings, we sought relief from the PSLRA's discovery stay.  At the time, we had just commenced briefing on Defendants' motions to dismiss the First Amended Complaint.

81.    Judge Chin ordered oral argument on Lead Plaintiffs' motion and following this argument, on November 16, 2009, granted Lead Plaintiffs' motion.  ECF No 43.  Accordingly, Defendants were ordered to produce to Lead Plaintiffs all documents produced to the SEC, NYAG and Congress in connection with these entities' investigations of the Merger, BoA's receipt of federal bailout funds to complete the Merger, and the payment of bonuses to Merrill's employees in the context of this bailout.  Although Judge Chin ordered this relief in November 2009, there were extensive negotiations with Defendants before Lead Plaintiffs finally began to receive documents, as Defendants contended that they had to "re-review" the documents for relevancy prior to complying with the Court's order and the Court, once again, had to intervene.

82.    In this respect, on December 17, 2009, Judge Chin issued an order holding that, in modifying the PSLRA discovery stay, he did not contemplate that Defendants would re-review for relevancy the documents produced to regulators and other civil parties.  ECF No. 134. However, production of crucial documents was still delayed on the basis of Defendants' claim that many documents BoA produced to the SEC and other governmental agencies, which were critical to this litigation, involved communications with the Federal Reserve and were "Confidential Supervisory Information" that Defendants were barred from disclosing absent agreement from the Federal Reserve.

83.     Accordingly, on December 23, 2009, BoA moved for clarification of Judge Chin's December 17, 2009 Order on the issue of whether and to what extent BoA was required to produce "Confidential Supervisory Information" to Lead Plaintiffs.  ECF Nos. 144-145.  In opposing Defendants' motion, Lead Plaintiffs noted that the privilege Defendants were relying upon was the Federal Reserve's, not BoA's.  ECF Nos. 154-155.

84.     At a hearing held on January 5, 2010, the Parties agreed to submit a proposed protective order within two weeks, and addressed the issue of whether Defendants would be permitted to re-review their prior productions to redact "Confidential Supervisory Information" contained in BoA's communications with the Federal Reserve.  Lead Plaintiffs agreed to seek the Federal Reserve's consent for the release of the information before seeking a ruling from the Court as to whether BoA could properly withhold such information.  Subsequently, Lead Plaintiffs contacted and negotiated with senior officers at the Federal Reserve and ultimately obtained the consent of the Federal Reserve to have the information produced to Plaintiffs.  The Parties submitted a proposed protective order, which the Court entered on January 20, 2010 (ECF No. 160), and a proposed rider to the protective order concerning documents produced pursuant to authorization by the Federal Reserve Board, which the Court entered on January 29, 2010 (ECF No.  173).  Following entry of the protective order, Defendants produced to Lead Plaintiffs the documents and transcripts of testimony that they had previously produced to government entities.

85.     Over the course of the next several months, between January 2010 and August 2010, Defendants produced to Lead Plaintiffs approximately half a million pages of documents that had been previously produced to the SEC, the NYAG and Congress, including documents prepared by BoA's internal and external counsel.  Whether and to what extent Defendants would

produce the latter documents was again vigorously contested, as Defendants attempted to "cabin" their waiver of the attorney-client privilege under the then-new Federal Rule of Evidence 502, with respect to documents produced to the SEC.  We had extensive negotiations with Defendants over a confidentiality order that, among other things, preserved Lead Plaintiffs' arguments regarding the propriety of Defendants' cabined waiver under Rule 502.

86.     On April 21, 2010, during the PSLRA's discovery stay, Judge Chin issued an Order granting Lead Plaintiffs permission to serve document preservation subpoenas on non-parties.  ECF No. 245.  Subsequently, Lead Plaintiffs served preservation subpoenas on eight non-parties, requesting that documents related to this litigation be preserved.

87.     Immediately following the Court's July 29, 2011 decision on Defendants' motions to dismiss the Second Amended Complaint, full merits and class certification discovery commenced.  The Parties were able to commence discovery so promptly because at Lead Plaintiffs' insistence, the Parties had earlier exchanged document requests and had already begun meeting and conferring on any document requests as to which Defendants had stated objections. Additionally, by that date, Lead Plaintiffs had fully reviewed all the discovery that they had obtained through the Court's granting of their motion to lift the PSLRA's automatic discovery stay.

88.     Lead Plaintiffs also served document production subpoenas on a total of 43 non-parties, including the eight non-parties on which document preservation subpoenas had earlier been served.  *See* ¶ 86 above.  In response to those subpoenas, the non-parties produced approximately 775,000 pages of documents.

89.     We were also very cognizant of working efficiently to ensure that the discovery we received would be quickly and accurately reviewed but without duplication.  Our firms

devised a document management plan to govern the production of documents from Defendants and non-parties, providing to each of our firms' lawyers remote access to all the documents that Defendants were producing.  We then organized teams of lawyers to review these documents in a non-duplicative and coordinated way, sharing issue memos among the firms on the key topics involved in the Action.

90.    Our early efforts to secure discovery through lifting the PSLRA stay, and to exchange formal discovery requests and objections with Defendants prior to the Court's July 29, 2011 opinion, placed Lead Plaintiffs in a superior strategic position at the time when fact and expert discovery formally commenced.  We were able to work efficiently within the narrow deadlines that this Court set for formal discovery, which was September 2011 through April 2012.  During this period, Lead Plaintiffs and Co-Lead Counsel also responded to multiple sets of document requests, interrogatories and requests for admission issued by Defendants, including providing detailed responses to Defendants' contention interrogatories on May 14, 2012.

91.    At the same time, Lead Plaintiffs also issued their own requests for admission, along with two sets of interrogatories and three sets of document requests (130 individual requests), to Defendants.  Ultimately, in response to these document requests, Defendants produced approximately 3,803,000 pages of documents.

92.    Lead Plaintiffs coordinated with plaintiffs in the derivative litigation in the Delaware Court of Chancery to depose certain of Defendants' fact witnesses.  While these discussions were protracted, difficult, and sometimes contentious, we viewed them as necessary to streamline discovery, promote efficiencies and keep the case on an accelerated pace.

93.    Additionally, in a forty-five day period between March 16, 2012 and April 30, 2012, the Parties exchanged 17 opening and rebuttal reports from 11 experts, accompanied by

thousands of pages of exhibits. Lead Plaintiffs submitted expert reports on the issues of loss causation and damages, Merrill's financial condition and the impact of Merrill's financial condition on BoA, and the materiality of Merrill's goodwill impairment under Generally Accepted Accounting Principles. Lead Plaintiffs also retained two additional experts in order to rebut expert reports submitted by Defendants on whether the Merger was beneficial to BoA, and on the ways that institutional investors analyze and interpret publicly available information. During this same period, we prepared Lead Plaintiffs' experts for depositions and defended their depositions while simultaneously preparing for and taking Defendants' experts' depositions. Many of these depositions were scheduled back-to-back, or in parallel, and it was a significant challenge to complete expert discovery during that forty-five day period.

94.    In addition to reviewing millions of pages of documents produced by the Defendants and multiple non-parties during discovery, Co-Lead Counsel also reviewed, translated and produced an extensive amount of Plaintiffs' documents. As discussed above, at the class certification stage, Plaintiffs produced documents concerning, among other things: (i) their trading history in BoA, Merrill and certain other investment banking companies, (ii) documents concerning BoA, Merrill and the Merger, and (iii) the documents referenced in the Second Amended Complaint. In addition, on April 9, 2012, as fact discovery was set to conclude, the Court issued an order directing Lead Plaintiffs to produce all documents concerning the pricing, valuation, valuation impairment, or the impact of widening credit spreads on the pricing or valuation, of more than ten broad categories of assets, including, among others, mortgage-backed securities, leveraged loans and commercial real estate. ECF No. 537. Given the amount of assets being managed by Lead Plaintiffs, who represent some of the largest public and private pension funds in the world, responding to a broad document request such as this one

is no small feat.  Nevertheless, by May 18, 2012, Co-Lead Counsel and Lead Plaintiffs collected, reviewed, and produced hundreds of thousands of additional pages of documents responsive to Defendants' request.  Lead Plaintiffs ultimately produced more than 500,000 pages of documents on behalf of the Lead Plaintiffs.

95.     Discovery concluded on May 18, 2012.   During the course of fact, class and expert discovery, the Parties conducted 61 depositions (35 fact depositions, 10 expert merits depositions, and 16 depositions (including both fact and expert witnesses) with respect to class certification) and Co-Lead Counsel reviewed and analyzed more than 4.75 million pages of documents.

### 10.     The Parties' Cross-Motions for Summary Judgment

96.     On June 3, 2012, Lead Plaintiffs and Defendants filed cross-motions for summary judgment, each of which included briefing, statements of undisputed facts pursuant to Local Civil Rule 56.1, supporting exhibits and expert reports.   ECF Nos. 584-587, 589-590, 593, 595, 597-617.   On June 29, 2012, the Parties filed opposition briefs, counterstatements of facts, responses to statements of undisputed facts and accompanying exhibits.   ECF Nos.  645-659. Briefing on the Parties' summary judgment motions was completed on July 17, 2012, when reply briefs were filed, along with accompanying exhibits.   ECF Nos. 692-704.   In connection with summary judgment, the Parties prepared and submitted well over 700 pages of briefing, statements of undisputed facts, and counterstatements of facts, in addition to approximately 500 exhibits.   These summary judgment motions were pending at the time the agreement in principle to resolve the Action was reached.

97.     As set forth in Lead Plaintiffs' summary judgment papers, Lead Plaintiffs uncovered significant facts concerning the impact of Merrill's losses on its financial condition that were not alleged by any regulator.   In particular, Lead Plaintiffs obtained evidence that,

before the vote, Merrill's losses (i) triggered a liquidity crisis at Merrill, requiring BoA to issue billions of dollars in debt; (ii) severely eroded Merrill's capital, requiring BoA to order Merrill to reduce its balance sheet by hundreds of billions of dollars; and (iii) significantly reduced Merrill's earnings ability in future years. Based on this evidence, Lead Plaintiffs were able to advance compelling arguments that, before the vote, Merrill's losses had a highly material, negative impact on Merrill and the combined company.

98.     Lead Plaintiffs also developed unique evidence concerning BoA's statements regarding the accretive/dilutive impact of the Merger.  Specifically, during Defendant Lewis's deposition, Lead Plaintiffs obtained testimony that, as of the time of the vote, the Proxy's representations concerning the accretive/dilutive impact of the Merger were no longer true.  As Lewis testified, while the Proxy represented that the Merger would be 3% dilutive in 2009 and breakeven in 2010, BoA had determined, as of the vote, that the deal would be more than 13% dilutive in 2009 and 2.8% dilutive in 2010.

99.     Based on this evidence, Lead Plaintiffs sought partial summary judgment as to the alleged falsity and materiality of statements related to the projected accretive/dilutive impact of the Merger.  The motion focused on statements that Lewis made at BoA's December 5, 2008 shareholder meeting relating to BoA's accretion/dilution forecast, as well as on statements that Defendants made about this forecast on September 15, 2008 and in the November 3, 2008 Proxy.

100.     In responding to Lead Plaintiffs' motion, Defendants argued that the statements at issue were not false, that there was no duty to update them, that they were immaterial as a matter of law, that the individuals who made the alleged statements lacked scienter, that Lead Plaintiffs failed to meet the burden necessary to obtain summary judgment on these claims, and that Lead Plaintiffs could not obtain summary judgment on purported misstatements that had not

previously been pleaded in the Second Amended Complaint.  Lead Plaintiffs addressed each of these arguments in a July 17, 2012 reply brief in further support of their motion.  ECF No. 693.

101.    In turn, Defendants sought summary judgment as to Lead Plaintiffs' Section 14(a) claims on the ground that Lead Plaintiffs failed to adduce evidence that members of the Section 14(a) class sustained any compensable injury or actual damages that was separate and apart from a harm inflicted upon BoA.  In addition, Defendants sought summary judgment as to Lead Plaintiffs' claims under the Exchange Act related to Merrill's bonus payments, as well as to Lead Plaintiffs' claims related to the alleged January 12, 2009 and January 13, 2009 corrective disclosures related to Merrill's fourth-quarter losses, on the ground that Lead Plaintiffs failed to establish loss causation for these claims.  Defendants also sought summary judgment as to Lead Plaintiffs' bonus-related claims under the Securities Act on the ground that Defendants had met their burden of establishing negative causation with respect to these claims.   In addition, Defendants Lewis, Price, Thain, Cotty, and the BoA Board each sought summary judgment on the Securities Act and/or the Exchange Act claims for reasons specific to their individual circumstances.

102.    On June 29, 2012, Lead Plaintiffs filed an omnibus brief in opposition to Defendants' motions for summary judgment.  ECF Nos. 653-654.  In their opposition brief, Lead Plaintiffs again argued that their Section 14(a) claim sought compensation for a direct harm suffered by the Class as opposed to any harm suffered by BoA, and that the Class's damages are properly measured based on the decline in BoA's stock price following the corrective disclosures.  Lead Plaintiffs also argued that Defendants had not established the absence of loss causation as a matter of law.  In addition, Lead Plaintiffs refuted each of the individualized arguments raised by Defendants Lewis, Price, Thain, Cotty, and the BoA Board.

### 11.    Lead Plaintiffs' Extensive Pre-Trial Efforts

103.    In preparation for trial, Co-Lead Counsel drafted and, on August 17, 2012, served Lead Plaintiffs' preliminary witness list, exhibit list, preliminary statements of claims and defenses, deposition designations for those witnesses that would be unavailable at trial, a joint pretrial report, jury verdict form, stipulated statement of facts, jury instructions, *voir dire* questions and initial jury remarks.  Two weeks later, on August 31, 2012, Co-Lead Counsel served three *Daubert* motions and began preparing responses to the *Daubert* motions Defendants served with respect to all five of Lead Plaintiffs' experts.  On the same date, Co-Lead Counsel also served 18 motions *in limine* and began preparing responses to 14 *in limine* motions received from Defendants.

104.    On September 7, 2012, the Parties exchanged objections and counter-designations to each other's exhibit lists and deposition designations.

105.    Between September 11, 2012 and September 18, 2012, the Parties conducted multiple in-person and telephonic meetings in an effort to reach agreement regarding their proposed pretrial submissions to the Court.

106.    The trial in this Action was scheduled by the Court to begin at 10:00 a.m. on October 22, 2012.

107.    With the Parties essentially trial ready, on September 27, 2012, as discussed in Section IV below, the Parties reached an agreement in principle to settle the Action.

### 12.    Lead Plaintiffs' Work with Experts and Consultants

108.    Lead Plaintiffs consulted with several experts and consultants while investigating and prosecuting the Action, including a damages expert and various experts and consultants in the fields of financial economics, due diligence and accounting, among others.

109.    Lead Plaintiffs retained Chad W. Coffman, the founder and President of Global Economics Group and an expert in the fields of market efficiency, loss causation, and damages. Mr. Coffman issued an expert report on market efficiency and materiality in support of Plaintiffs' motion for class certification.  In connection with Plaintiffs' class certification reply brief, Mr. Coffman prepared a rebuttal report addressing arguments made by Defendants' expert Allen Ferrell.  Mr. Coffman also issued three expert reports on the issues of damages and loss causation:  an opening report addressing Plaintiffs' Section 10(b) and 14(a) claims; a rebuttal report addressing Defendants' expert's criticisms of Plaintiffs' Section 11 claims; and a responsive report addressing arguments raised by Defendants' expert Allen Ferrell related to Plaintiffs' Section 10(b) and 14(a) claims.  Mr. Coffman was deposed on October 14, 2011 and May 24, 2012.

110.    Lead Plaintiffs retained Professor Stephen Choi, J.D., Ph.D., the Murray and Kathleen Bring Professor of Law at the New York University Law School, as an expert at the class certification stage.  On September 26, 2011, Professor Choi issued a report rebutting certain opinions offered by Defendants' expert Allen Ferrell related to the measurement of damages in connection with Lead Plaintiffs' Section 14(a) claims.  Professor Choi was deposed on October 13, 2011.

111.    Lead Plaintiffs retained Bernard A. Katz, senior partner at J.H. Cohn LLP and an expert in the field of financial economics.  Mr. Katz issued an expert report addressing the impact of Merrill's fourth-quarter losses on its financial condition and on the financial condition of BoA.  Significantly, Mr. Katz determined that Merrill's fourth-quarter losses severely impacted its capital and liquidity position, and reduced the future earnings capacity of the

combined company.  Mr. Katz also responded to the expert reports issued by Defendants' experts Charles Porten and Dr. Anil Shivdasani.  Mr. Katz was deposed on June 27, 2012.

112.    Lead Plaintiffs retained Harris L. Devor, CPA, an accountant with nearly 40 years of experience and a named shareholder at Shechtman Marks Devor PC.  Mr. Devor submitted an expert report opining that Merrill's $2.2 billion goodwill impairment charge for the fourth-quarter of 2008, which was identified prior to the December 5, 2008 shareholder vote, was quantitatively and qualitatively material under Generally Accepted Accounting Principles.  In addition, Mr. Devor issued a follow-up report responding to numerous arguments raised by Defendants' accounting expert, J. Duross O'Bryan.  Mr. Devor was deposed on May 22, 2012.

113.    Lead Plaintiffs retained Harvey Pitt, a former Chairman of the SEC and the Chief Executive Officer of Kalorama Partners, LLC, to respond to the reports of Defendants' experts Charles Porten and Douglas Taylor.  Chairman Pitt issued a report highlighting the deficiencies in Mr. Porten's and Mr. Taylor's reports, and opining that, among other things, a company's own disclosures – not those of news media or analysts – are of paramount importance in the context of a shareholder vote on significant corporate actions.  Chairman Pitt was deposed on May 16, 2012.

114.    Lead Plaintiffs retained J.T. Atkins, an investment banker with over 27 years of experience in mergers and acquisitions and the head of Cypress Associates LLC, to respond to certain opinions offered by Defendants' expert Dr. Anil Shivdasani.  Mr. Atkins issued an expert report highlighting the errors committed by Dr. Shivdasani in his analysis of whether the Merger was value enhancing to BoA.  Mr. Atkins was deposed on June 5, 2012.

115.    Lastly, Lead Plaintiffs retained Professor Jesse Fried, a professor of law at the Harvard Law School and noted expert on issues of corporate governance, to advise Lead Plaintiffs and Co-Lead Counsel on measures to enhance BoA's corporate governance.

116.    Each of these experts and consultants was necessary to assist in the litigation or resolution thereof by clarifying complex issues for the Court and properly framing the evidence for the jury in simple terms and to assure that the corporate governance component of the Settlement consideration was appropriate.

### 13.    Other Significant Actions Taken By Co-Lead Counsel

#### a.    Ensuring Efficient Prosecution of Related Actions

117.    In addition to actively litigating this matter on behalf of the Class, Co-Lead Counsel also took significant steps to ensure that this Action was managed and prosecuted in an orderly and efficient manner.  In paragraph 7 of the Court's Consolidation Order (ECF No. 15), the Court requested "the assistance of counsel in calling to the attention of the Clerk of this Court the filing or transfer of any case that might properly be consolidated as part of the Securities Actions."  Pursuant to this request, Co-Lead Counsel, on numerous occasions, brought such matters to the Court's attention.

118.    For instance, on December 28, 2009, Co-Lead Counsel informed the Court of a class action complaint titled *Iron Workers of Western Pennsylvania Pension Plan v. Bank of America Corp., et al.*, No. 09-cv-10394 ("*Iron Workers*"), which asserted Section 10(b) and Section 20(a) claims on behalf of purchasers of 529 different BoA debt securities against many of the same Defendants in this Action and arising out of the same underlying facts and alleged false and misleading statements and omissions at issue in this Action.  Similarly, on January 19, 2010, Co-Lead Counsel alerted the Court to a class action complaint titled *Dornfest v. Bank of America Corp., et al.*, No. 10-cv-275 ("*Dornfest*"), which asserted Section 10(b) and

Section 20(a) claims on behalf of purchasers of BoA stock options against many of the same Defendants in this Action and arising out of the same underlying facts and alleged false and misleading statements and omissions at issue in this Action.  Co-Lead Counsel requested that the Court consolidate both *Iron Workers* and *Dornfest* with this Action.

119.    Counsel for the plaintiffs in both *Iron Workers* and *Dornfest* disputed Co-Lead Counsel's request for consolidation, and submitted numerous letters to the Court setting forth their positions.  On April 9, 2010, after Co-Lead Counsel submitted multiple letters to the Court opposing the arguments raised by *Iron Workers* and *Dornfest*, the Court issued an Order consolidating both matters into this Action, reaffirming Co-Lead Counsel's authority to manage the contours of this Action.  Counsel in *Dornfest* continued to pursue the matter seeking certification under Rule 23(f) of the Court's ruling, that was ultimately denied.  Co-Lead Counsel's efforts assured that Court-appointed Lead Plaintiffs would retain control of the litigation to the benefit of the Class, and also avoided fragmentation of the litigation, which would have resulted in inefficiencies going forward and a much more complex trial.

### b.    Coordinating Efforts Among Co-Lead Counsel

120.    Co-Lead Counsel maintained close control and monitored the work performed by the lawyers and professional support staff working on this case in order to avoid duplication of effort and to ensure efficient prosecution.  While declarants personally devoted substantial time to this novel, wide-ranging case, other experienced attorneys at our firms undertook particular tasks appropriate to their levels of expertise, skill and experience, and paralegals were assigned to work on matters as appropriate.

### c.    Establishing a Case-Dedicated Litigation Website

121.    Co-Lead Counsel established a comprehensive website for the Action to provide an accessible place for potential Class Members, the Parties to the case, and other interested non-

parties to view Court rulings, Court-approved notices, Lead Plaintiffs' pleadings, and other documents filed and submitted in this Action.

122.    Co-Lead Counsel created the website, found at www.boasecuritieslitigation.com, in November 2009 (the "BoA Website") and have consistently monitored and updated it by posting relevant pleadings and announcements of major developments in the Action.  Visitors to the BoA Website were directed to send any requests for additional information to an email address associated with the BoA Website (*i.e.,<info@boasecuritieslitigation.com>*) and   Co-Lead Counsel responded to these emails in a timely fashion.

123.    In connection with the Settlement, Co-Lead Counsel transferred their management of the BoA Website to the claims administrator for the Settlement, The Garden City Group, Inc. ("GCG"), who will be able to devote the necessary resources to responding to the voluminous amount of emails regarding the Settlement and the submission and processing of Proof of Claim Forms that is anticipated in a settlement of this size.  The BoA Website has also recently been updated to address the Settlement, posting all relevant settlement materials and listing important dates in connection with the Settlement (including the March 5, 2013 objection deadline, the April 25, 2013 Proof of Claim Form submission deadline, as well as the April 5, 2013, 2:00 p.m. Settlement Fairness Hearing).  Downloadable copies of the Settlement Notice and Proof of Claim Form are also available on the BoA Website.

## III.    RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION

124.    At the time the Settlement was reached, Lead Plaintiffs and Co-Lead Counsel had a thorough understanding of the strengths and weaknesses of the Action.  While Lead Plaintiffs and Co-Lead Counsel believe that the claims asserted against the Defendants have merit, they also recognize that there were considerable risks involved in pursuing the Action against the Defendants through trial and beyond.

A.     **Risks Regarding Liability Against the Defendants**

125.    Even though Plaintiffs had prevailed at the motion to dismiss stage on certain of their fraud claims under Section 10(b) and all of their negligence claims under Section 14(a), Plaintiffs faced a substantial risk that the Court would find that they had failed to establish liability as a matter of law against any of the Defendants or, if the Court were to permit claims to proceed to trial, the jury would find against Plaintiffs.

126.    First, with respect to Lead Plaintiffs' claims regarding the failure to disclose Merrill's losses, there was a risk that the Court, at summary judgment, or a jury at trial, would conclude that Defendants Lewis, Price, and BoA (who were the only Defendants against whom Plaintiffs were pursuing a fraud claim based on Merrill's undisclosed losses) did not act recklessly in failing to disclose Merrill's losses.  There was a similar risk that either the Court or a jury would find that Defendants Lewis, Price, BoA, or the BoA Board did not act negligently.

127.    Specifically, Defendants relied on evidence to argue that they were neither reckless nor negligent because in-house and outside counsel were closely involved in the decision not to disclose the losses.  Defendants argued that they repeatedly consulted with in-house and outside counsel about whether the losses should be disclosed, and were told that no disclosure was required on multiple occasions before the vote.  For example, Mayopoulos, BoA's former General Counsel, testified that Defendant Price contacted him regarding disclosure on two occasions before the vote; he considered whether the losses should be disclosed; he based his decision that no disclosure was required on several factors; and communicated his decision to Price.  Wachtell attorneys also testified that they were involved in the decision not to disclose Merrill's losses prior to the vote, and agreed with Mayopoulos's analysis.  Lewis testified that he asked Price whether Price had vetted the disclosure issue with counsel, and was told by Price that counsel had concluded that no disclosure was necessary.  While Lead Plaintiffs would have

argued in response that neither outside nor in-house counsel knew the full extent of Merrill's losses and their impact on the company, the involvement of BoA's inside and outside counsel in the determination not to disclose the losses created a significant risk that either the Court or a jury could find that the decision not to disclose was made in good faith and had a reasonable basis.

128.    Moreover, Defendants argued that they did not personally benefit from their non-disclosure of the losses.  Indeed, there was no evidence that any Defendant engaged in insider trading during the Class Period or otherwise reaped a concrete, personal financial benefit from the failure to disclose Merrill's losses and the consummation of the Merger.  The lack of such evidence heightened the risk that a jury would not find them liable.

129.    Defendants also raised a number of additional arguments that either the Court or a jury could have accepted, including that Merrill's estimated fourth-quarter loss forecasts frequently changed, were only interim in nature, and therefore were too uncertain to be disclosed.  The strength of Defendants' defenses rested in part on the testimony of many notable experts who, while Plaintiffs sought to exclude them through *Daubert* motions, could have been found by a jury to be highly credible witnesses for Defendants at trial.  These arguments, if accepted, could also have defeated a finding of recklessness or negligence.

130.    Defendants also contended that they had no legal duty to disclose the losses.  As Defendants argued, they did not make any false statements about Merrill's fourth-quarter performance, the Proxy did not discuss Merrill's fourth quarter performance, and the law typically does not impose a duty to disclose intra-quarter results.  While Lead Plaintiffs believed that these arguments were incorrect based on the facts of this case, there was a risk that either the

Court or a jury could come to a different conclusion, which would have defeated Lead Plaintiffs' loss-related claims under both Sections 10(b) and 14(a).

131.    In addition, Defendants argued at summary judgment that Merrill's losses in the fourth quarter of 2008 were immaterial as a matter of law.  These arguments were based on expert testimony and evidentiary support concerning what the markets purportedly knew concerning Merrill's historical and 2008 fourth-quarter losses.  Indeed, Defendants argued that, in the five quarters preceding the Merger, Merrill lost almost $40 billion pre-tax, and the market knew that Merrill was continuing to suffer massive losses during the fourth quarter of 2008.  At the motion to dismiss stage, this Court noted that Defendants "minced no words" about the impact of the fourth quarter on Merrill, and at the class certification stage, the Court left open the possibility that Defendants could show, with sufficient evidence, that the market expected much, if not all, of the losses that Merrill ultimately reported.

132.    Lead Plaintiffs' bonus disclosure claims were fraught with similar risks. Foremost, Defendants argued throughout the litigation that the non-disclosure of the bonus agreement in the Proxy was immaterial.  At the motion to dismiss stage, at class certification and at summary judgment, Defendants offered newspaper articles and analysis which they contended showed that the market knew that Merrill would be paying bonuses prior to the close of the Merger, and that certain publications went so far as to speculate as to the amount of such bonuses.  Even if the Court did not accept such arguments at summary judgment, there was a considerable risk that these arguments would have been accepted by a jury.

133.    In addition, Defendants argued that any non-disclosure of the bonus agreement was neither intentional nor reckless and, therefore, was not sufficient to find liability under Section 10(b), nor did it meet the threshold of negligence for a finding of liability under

Section 14(a).  Indeed, Defendants argued that at all times, their counsel was aware of the existence of the bonus agreement, and that the decision not to disclose the Disclosure Schedule was left entirely up to BoA's and Merrill's lawyers, thereby mitigating against a finding that Defendants had an intent to deceive shareholders, or even acted negligently.  There existed a substantial risk that a jury would have accepted this argument, especially given that none of the Defendants in the Action were the recipients of any bonuses that were the subject of the Disclosure Schedule and thus, there existed a lack of provable motive for fraud.  Indeed, this lack of financial motive had been persuasive for the Court in dismissing certain of Lead Plaintiffs' fraud claims at the motion to dismiss stage.

134.    Additionally, Defendants argued that they represented to investors that they were entering into the Merger because they believed it would have long-term benefits to BoA, and that, in fact, the Merger was beneficial to BoA shareholders.  Indeed, Defendants argued that Merrill contributed significantly to BoA's earnings since the Merger, and was a principal driver of the profits that BoA reported after the Merger closed.  While Lead Plaintiffs would have disputed this and, in any event, would have argued that this "hindsight benefit" was irrelevant under the federal securities laws, there certainly was a risk that Defendants' arguments could have impact on a jury.

### B.    Risks Regarding Loss Causation and Establishing Damages

135.    From the outset of this case, Co-Lead Counsel recognized that the paucity of case law establishing the remedies available to Class Members under Section 14(a) would present serious risks.   In no previous case had plaintiffs established that they were entitled to monetary damages under Section 14(a) from the stock price drop resulting from the disclosure of information alleged to have been improperly withheld from voters approving a merger.

136.    Indeed, the Court itself, *sua sponte*, had raised the question at a status conference in June 2010 as to whether any portion of the Section 14(a) remedy sought in this case was duplicative, or overlapping, with the remedy being sought in the derivative litigation pending in the Delaware Chancery Court and in the consolidated federal derivative proceedings in this litigation.  The Parties briefed these issues separately in connection with Defendants' motions to dismiss the First Amended Complaint and, when the Court sustained the claim, Defendants moved to certify the question of whether the Section 14(a) claim was direct or derivative to the Delaware Supreme Court.

137.    In its opinion dated August 27, 2010 (ECF No. 303), the Court made an initial determination that there was "at least a potential" that Lead Plaintiffs could show "a diminution in the value of the shares that [members of the Section 14(a) class] held which was not due to an injury inflicted upon BofA."  *In re Bank of Am. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 292 (S.D.N.Y. 2010).  This allowed Lead Plaintiffs' Section 14(a) claims to proceed to discovery, but the question of what Lead Plaintiffs ultimately would have to prove remained a significant and ongoing trial risk.

138.    Based on this uncertainty, Defendants repeatedly challenged the availability and measure of Lead Plaintiffs' Section 14(a) damages.  At class certification, Defendants raised again the argument that Lead Plaintiffs' Section 14(a) remedy was not provided for by law and therefore, a class pursuing such a remedy could not be certified.  Once again, in response to Lead Plaintiffs' arguments, the Court allowed Lead Plaintiffs to proceed on the basis that "there plausibly may be distinct, non-overlapping grounds for both direct and derivative recovery."  *In re Bank of Am. Sec., Deriv. & ERISA Litig.*, 281 F.R.D. 134, 141 (S.D.N.Y. 2012).  This

decision, once again, left open the question of whether and what remedy Plaintiffs could ultimately establish under Section 14(a).

139.    At summary judgment, Defendants again raised the question of whether and to what extent Plaintiffs could establish a remedy under Section 14(a).  In their briefing, Defendants argued that Plaintiffs had failed to meet their pre-trial burden that the damages sought under Section 14(a) were not overlapping with damages available derivatively.  Briefing on this issue was pending before the Court at the time of settlement, but assuming that Plaintiffs successfully defeated Defendants' arguments at summary judgment, there still remained the risk that the ultimate questions of what the measure of Section 14(a) damages was and whether or not they were overlapping with some theoretical derivative remedy would have to be proven to a jury. Even if Lead Plaintiffs had prevailed at trial on the question of damages, the Class faced an inevitable appeal on this and numerous other issues.  Given that the vast majority of Lead Plaintiffs' claimed damages in this case arose under Section 14(a), this issue had particularly significant risk for Lead Plaintiffs.

140.    The risks relating to causation and damages were not limited to simply whether a Section 14(a) direct claim existed or the proper measure of damages it provided − there were also enormous risks with respect to the theory of loss causation that Plaintiffs set out to prove.  Lead Plaintiffs' theory of loss causation for all claims asserted in the Action was that material information concerning the bonus agreement between BoA and Merrill and information concerning Merrill's increasing fourth-quarter losses was concealed from BoA's shareholders and investors until such information was disclosed through a series of corrective disclosures on January 12, 13, 15, 16 and 21, 2009 (the "Corrective Disclosures").  Plaintiffs alleged that information concerning Merrill's losses was revealed through corrective disclosures on

January 12, 15 and 16 and through "leakage" of information on January 13, and that information concerning Merrill's payment of bonuses to its employees was revealed through a *Financial Times* article on January 21, 2009.

141.   Whether and to what extent these Corrective Disclosures revealed the information that Plaintiffs alleged was previously withheld was hotly contested in this case.  Defendants proffered expert testimony from Dr.  Allen Ferrell who opined that the price movements that Plaintiffs' expert had identified on the corrective disclosure dates were substantially smaller or immaterial when viewed against market or industry factors, and that the price drops on those dates could be explained as being more closely related to what was happening to the economy in general and, in particular, to the financial sector itself, rather than being related to anything announced in connection with Merrill.

142.   In addition, Defendants made a number of arguments with respect to specific disclosure dates.  For example, Lead Plaintiffs alleged that January 12, 2009 was a corrective disclosure date based on a Citigroup analyst report which disclosed to the market that Merrill was estimated to report a net loss of $6 billion for the fourth quarter.  However, Defendants asserted that, at the time the Citigroup report was issued, the market was already expecting Merrill to suffer losses of at least $6 billion because on December 7, 2008, more than one month before the alleged corrective information was published in the Citigroup report, Morgan Stanley issued a report estimating that Merrill would take $8.9 billion of marks on its assets.  Based on this argument, there was a material risk that a jury could find that the Citigroup report did not reveal new information, and thus, that January 12, 2009 was not a corrective disclosure date.

143.   Lead Plaintiffs also asserted that January 13, 2009 was a corrective disclosure date because news leaked to the market concerning BoA's need for a bailout.  In particular, Lead

Plaintiffs asserted that the market understood a speech by Federal Reserve Chairman Ben Bernanke, in which he referenced banks' need for additional capital, to concern BoA's need for a bailout.   However, Defendants argued that Chairman Bernanke's speech could not constitute leakage because it did not reference BoA or Merrill, and no analyst or member of the financial press connected Chairman Bernanke's speech to either BoA or Merrill.

144.   As to the bonus claim, Lead Plaintiffs contended that January 21, 2009 was a corrective disclosure date because the *Financial Times* disclosed, for the first time, that BoA had permitted Merrill to pay billions of dollars in bonuses before the Merger closed, notwithstanding Merrill's large fourth-quarter losses and BoA's need for a bailout.   Defendants, however, pointed to numerous articles published before January 21, 2009 that they contended revealed that Merrill was going to pay, and in fact had paid, billions of dollars in bonuses before the Merger closed, notwithstanding the fact that Merrill was performing poorly.   While Lead Plaintiffs believed that these articles did not disclose the relevant facts, there was a risk that, after trial, a jury could conclude that these articles revealed the information that Lead Plaintiffs contended was first disclosed by the *Financial Times* article on January 21, 2009, thereby eliminating it as a corrective disclosure date.

145.   Moreover, as to the remaining corrective disclosure dates on January 15 and 16, 2009, Defendants' expert argued that price movements observed on these dates were confounded by other adverse information disclosed by BoA's own results for the 2008 fourth quarter, which was unrelated to the allegations in the case.   Indeed, BoA reported its first quarterly loss in its entire history for the fourth quarter of 2008 on these days, and thus, Defendants' expert contended that it was more likely than not that such information was a substantial, if not the primary, driver behind any stock price reaction on these days.

C.      **Risks Attendant to Trial**

146.    In addition to the usual uncertainties attendant to placing complex issues before a jury, a trial of this case presented many specific risks.  All of the key fact witnesses in this Action who Plaintiffs would have used to present evidence at trial were adverse witnesses, including Defendants Lewis, Price, Cotty, Thain, the BoA Board, current and former BoA and Merrill officers, and Defendants' counsel, such as partners at Wachtell Lipton, who still represented the Defendants.  Even Mayopoulos, BoA's former general counsel who was allegedly terminated for asking too many questions about the increasing size of Merrill's losses following a board meeting after the shareholder vote, testified at deposition as to what he viewed as logical, non-fraudulent reasons for providing the non-disclosure advice he gave to BoA.

147.    Moreover, key witnesses for the Plaintiffs were Plaintiffs' experts, including former SEC Chairman, Harvey Pitt, accounting expert, Harris Devor, financial experts, Bernard Katz and J.T. Atkins, and Chad Coffman, Plaintiffs' damages expert.  At the time the Settlement was reached, the Parties had exchanged *Daubert* motions in which Defendants were seeking to exclude all or most of the testimony that Plaintiffs intended to offer through these experts.  Should Defendants have prevailed in excluding any of this testimony, the presentation of many aspects of Plaintiffs' case would have been extremely difficult, thereby increasing the risks at trial.

148.    In addition, at the time the Settlement was reached, the Parties had also briefed *in limine* motions in which Defendants were seeking, through 14 *in limine* motions, to exclude key evidence relating to bonus payments received by Merrill's employees, and the termination of Mayopoulos, among others.  If Defendants succeeded on these motions, it would have presented enormous obstacles to Plaintiffs' presentation of their claims.

### D.     Risk of Summary Judgment

149.    At the time of settlement, Defendants had sought to dismiss all or part of Plaintiffs' Sections 10(b) and 14(a) claims on the basis of immateriality of the non-disclosure of the losses and bonuses, lack of damages, and lack of scienter and negligence.  At the time the Settlement was reached, the Court had not rendered its decision with respect to these motions. Success by Defendants, even partially, on their summary judgment motions, would have dramatically eroded the value of the claims left to try to a jury.

### E.     Risk of Prolonged Appeal

150.    Even if Lead Plaintiffs were successful in obtaining a jury verdict on all or part of their claims, it was a foregone certainty that a jury verdict would have been just the beginning of a long appellate process.  Given the novelty of the issues concerning materiality, damages, and the duties attendant under Sections 10(b) and 14(a), a long and arduous appellate process, likely proceeding to the highest review, with the possibility of reversal, presented extreme risk to the Class of actual recovery.

## IV.    <u>THE SETTLEMENT</u>

151.    The Settlement currently pending before this Court provides for $2,425,000,000 in cash (which has been deposited and is earning interest) and certain significant corporate governance measures to be implemented or continued by BoA.  As set forth above and more fully below, the Settlement achieved in this Action was the result of protracted arms'-length negotiations by fully informed Lead Plaintiffs and Co-Lead Counsel, overseen by the Honorable Layn Phillips.

152.    The Settlement provides the members of the Court-certified Class with an immediate cash benefit as well as additional benefits flowing from the Corporate Governance Enhancements (*see* ¶¶ 164-165 below) and eliminates the significant risks of taking this Action

to trial.  Co-Lead Counsel believe that the Settlement is a fair, reasonable and excellent result for the Class considering the risk of recovering less, or nothing at all, from Defendants after the delay of a trial and likely appeals.

### A.    The Parties' Settlement Negotiations

153.    The process of achieving the Settlement was long and arduous.  The Parties first began discussing a potential resolution of the Action in August 2010.  Specifically, at the May 29, 2010 status conference for this case, the Court encouraged the Parties to explore mediation through a private mediator.  At the Court's suggestion, the Parties, shortly thereafter, agreed on the retention of the Honorable Layn Phillips to mediate the matter.

154.    The first mediation with Judge Phillips was held on October 1, 2010 in New York, New York.  In advance of this mediation, the Parties prepared and exchanged detailed mediation statements and each side prepared extensive oral and Power Point presentations for joint sessions.  Representatives for each of the Lead Plaintiffs traveled to and attended the mediation, as did representatives of the Defendants.  At the mediation, the Parties made presentations to Judge Phillips and to each other which supplemented the mediation statements exchanged in advance.  After the mediation, the Parties remained far apart in their respective positions.  Following the mediation, Co-Lead Counsel continued to prosecute the case, while both sides continued their dialogue through Judge Phillips.

155.    In connection with the October 1, 2010 mediation, each side agreed to respond to detailed questions prepared by the opposing side relating to the information presented at the mediation.  These questions and answers were exchanged over the subsequent months following the October 1, 2010 mediation, and set the stage for the Parties' second mediation with Judge Phillips, which was held on March 1, 2011.

156.    In advance of the March 1, 2011 mediation, each side once again prepared detailed presentations principally relating to issues concerning damages, including presentations by each side's respective damages consultants.  However, once again, although these sessions were productive in communicating the Parties' respective positions and views on damages, the Parties remained too far apart in their respective positions to bridge the gap between them.

157.    Following the March 1, 2011 mediation, the Parties continued their discussions through Judge Phillips; however, further discussions were unsuccessful given the very different views that Lead Plaintiffs and Defendants had of the merits of the case.  Meanwhile, the Parties vigorously litigated the case on an accelerated schedule, briefing class certification in the fall of 2011, and taking and defending 61 depositions through June of 2012, as described more fully above.

158.    With the October 22, 2012 trial date set, settlement discussions resumed. Ultimately, both sides agreed to accept a "mediator's recommendation" that the Action settle for $2.425 billion, plus corporate governance measures to be negotiated.

159.    With the assistance of Judge Phillips, on September 20, 2012, counsel for BoA and Co-Lead Counsel, on behalf of Lead Plaintiffs, agreed to enter into a term sheet setting forth, *inter alia*, the monetary terms of the Settlement.

160.    On September 27, 2012, BoA and Lead Plaintiffs completed their negotiations on the Corporate Governance Enhancements to be implemented or continued by BoA and executed a supplemental term sheet containing those terms.

161.    On September 28, 2012, in light of their agreement in principle, the Parties orally requested the Court's adjournment of the trial date, all pre-trial submissions, the final pre-trial

conference and the rendering of the Court's decision on summary judgment, which adjournments were granted by the Court.

162.    Over the next two months, we, on behalf of Lead Plaintiffs, and Defendants, through their respective counsel, engaged in further negotiations over the specific terms of the Settlement and memorialized the Parties' final agreement in the Stipulation dated as of November 30, 2012 and related exhibits (*i.e.*, proposed orders, Settlement Notice, Summary Notice and Proof of Claim Form).  At the end of this process, Lead Plaintiffs filed their motion for preliminary approval of the Settlement.  ECF Nos. 767-769.  On December 4, 2012, the Court issued orders preliminarily approving the Settlement and terminating the Parties' cross-motions for summary judgment.  ECF Nos. 771-772.

### B.    The Settlement Consideration

163.    Pursuant to the terms of the Stipulation, in consideration of the full and complete settlement of the Released Lead Plaintiffs' Claims against the Defendants and other Defendants' Releasees,[10] BoA, on behalf of all Defendants and other Defendants' Releasees, has paid the cash Settlement Amount (*i.e.*, $2.425 billion) into the Escrow Accounts.  In addition to its payment of the Settlement Amount, BoA also agreed to implement or continue certain significant corporate governance measures.

164.    If the Settlement is approved, BoA will, within forty-five (45) days following the Court's entry of the Judgment, or Alternative Judgment if applicable, implement the following Corporate Governance Enhancements,  and   will   maintain   such   Corporate   Governance

---

[10] As defined in ¶1(v) of the Stipulation, "Defendants' Releasees" means the Defendants and their respective present and former parents, subsidiaries, divisions and affiliates and the respective present and former employees, members, partners, principals, officers, directors, attorneys, advisors, accountants, auditors, and insurers of each of them; and the predecessors, successors, estates, heirs, executors, trusts, trustees, administrators, agents, representatives and assigns of each of them, in their capacity as such.

Enhancements through the later of January 1, 2015 or eighteen (18) months following the Court's entry of the Judgment, or Alternative Judgment if applicable:

> (i)    BoA will amend Section 3 of its Corporate Governance Guidelines to

read, in relevant part, as follows:

> "***Majority Voting for Directors.***  In an uncontested election, a director who fails to receive the required number of votes for re-election in accordance with the Bylaws shall offer to resign. In addition, a director whose resignation is under consideration shall abstain from participating in any recommendation or decision regarding that resignation.  The Corporate Governance Committee shall make a recommendation to the Board as to whether to accept or reject the tendered resignation, or whether other action should be taken.  The Corporate Governance Committee and the Board, in making their decisions, may consider any factor or other information that they deem relevant.  The Board shall act on the tendered resignation, taking into account the Corporate Governance Committee's recommendation, and shall publicly disclose its decision regarding the resignation and the basis for the decision within ninety (90) days after the results of the election are certified.  If the resignation is not accepted, the director will continue to serve until the next annual meeting of stockholders and until the director's successor is elected and qualified.  The Board shall not permit the director to stand for election at the next annual meeting."

> (ii)    BoA will amend Section 8 of its Corporate Governance Guidelines to

read, in relevant part, as follows:

> "***Minimum Stock Ownership by Executive Officers and Directors.***  In order to align the interests of the Company's executive officers and directors with those of the Company's stockholders, the Board has adopted the following minimum stock ownership requirements:   (a) the Chief Executive Officer shall hold at least 500,000 shares of the Company's common stock and retain at least 50% of the net after-tax shares from future equity awards until retirement; (b) other executive officers shall hold at least 300,000 shares of the Company's common stock and retain at least 50% of the net after-tax shares from future equity awards until the ownership guideline is achieved; and (c) non-management directors are required to hold and cannot sell the restricted stock they receive as compensation (except as necessary to pay taxes upon vesting) until termination of their service.  The Company shall disclose in its annual proxy statement any failure of any director to comply with the stock ownership guidelines.  All full value shares and units beneficially owned by executive officers and directors are included in the calculation; performance contingent shares and units are included in the calculation when earned; and stock options are not included.  Newly appointed executive officers will have up to five years to achieve compliance."

(iii)   In connection with the establishment of the Corporate Development Committee BoA will amend the charter for the Corporate Development Committee to read, in relevant part, as follows:

"***Committee Authority and Responsibilities.***   In carrying out its oversight responsibilities as set forth above, the Committee shall oversee senior management's establishment of policies and guidelines, to be adopted by the Board, establishing appropriate systems (including policies, procedures and/or management committees) to ensure that Applicable Transactions are vetted carefully and that adequate due diligence is performed prior to Board approval of any Applicable Transaction.  Among other things, the Committee shall ensure that the Chief Executive Officer and the Board are informed with respect to any bonus or incentive compensation agreements with an actual or estimated aggregate value exceeding 5% of the acquisition price at the time the Applicable Transaction is announced, which agreements have been negotiated in connection with an Applicable Transaction and are based on or otherwise related to such Applicable Transaction.  In connection with any Applicable Transaction to be submitted to the Board for approval, the Committee shall meet at least once, telephonically or in person, with members of senior management to review management's compliance with applicable policies and procedures related to the Company's consideration of the Applicable Transaction, prior to its presentation to the Board for approval."

165.   BoA will also maintain the following corporate governance reforms (agreed to previously with the SEC) through January 1, 2015:

(i)   that all compensation committee members be super-independent;

(ii)   that BoA publish on its website the incentive compensation principles and the requirement that it adhere to them;

(iii)   that BoA have its Chief Executive and Chief Financial Officers certify that they have reviewed all annual and merger proxy statements;

(iv)   that BoA maintain a consultant to the Compensation Committee who would report solely to the Compensation Committee and would be "independent" under all applicable NYSE rules and guidelines concerning compensation consultants; and

(v)    that BoA provide shareholders with an annual non-binding "say on pay" with respect to executive compensation.

166.    The five institutional Lead Plaintiffs fully endorse and support the Settlement. *See* declarations submitted on their behalf attached hereto as Exhibits 2 through 6.  Based on their collective experience in the prosecution of complex securities litigation and close knowledge of the facts and applicable law, as well as their understanding of the risks involved in taking an action such as this Action to trial and overcoming the various defenses Defendants would likely assert which, if accepted by a jury, would substantially reduce or eliminate altogether the amount of damages for which Lead Plaintiffs allege Defendants are liable (*see* Section III, above), Co-Lead Counsel recommended and the Lead Plaintiffs determined that the Settlement was in the best interest of the Class.

## V.    PLAN OF ALLOCATION

167.    Pursuant to the Preliminary Approval Order, and as set forth in the Settlement Notice, all Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (i) any Taxes, (ii) any Notice and Administrative Costs, (iii) any Litigation Expenses awarded by the Court, and (iv) any attorneys' fees awarded by the Court) must submit a valid Proof of Claim Form and all required information to the Court-approved Claims Administrator, GCG, postmarked no later than April 25, 2013.  As provided in the Settlement Notice, the Net Settlement Fund will be distributed according to a plan of allocation approved by the Court.

168.    If approved, the proposed plan of allocation set forth in the Settlement Notice (the "Plan of Allocation") will govern how the Net Settlement Fund will be distributed among

Authorized Claimants.[11]   The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund to those Class Members who suffered losses as a result of the alleged violations of the securities laws.

169.   Co-Lead Counsel developed the Plan of Allocation in consultation with Lead Plaintiffs' damages expert.   Co-Lead Counsel worked closely with Lead Plaintiffs' damages expert in developing the Plan of Allocation, and believe that the proposed plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

170.   The Plan of Allocation provides for separate calculations under Section 10(b) (for both BoA common stock and January 2011 call options) and Section 14(a).[12]   In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the amount of estimated alleged artificial inflation in the per share closing prices of BoA common stock as well as January 2011 call options throughout the Class Period that purportedly was proximately caused by Defendants' alleged misrepresentations and material omissions.   Lead Plaintiffs' damages expert's analysis entailed studying the price declines in BoA common stock and January 2011 call options in

---

[11] As defined at ¶1(c) of the Stipulation, an "Authorized Claimant" is a Class Member who submits a timely and valid Proof of Claim Form to the Claims Administrator, in accordance with the requirements established by the Court, that is approved for payment from the Net Settlement Fund.

[12] As set forth above, in this Action claims were asserted under both Sections 10(b) and 14(a) of the Exchange Act.   Under the federal securities laws, an investor is not entitled to multiple recoveries and thus, because there is overlap between the shares of BoA common stock that were damaged pursuant to Sections 10(b) and 14(a), Lead Plaintiffs' damages expert eliminated the overlap in his calculations.   With respect to Class Members who purchased or otherwise acquired shares of BoA common stock on or after September 18, 2008 through and including October 10, 2008 as to which a claim can be stated with respect to both Sections 10(b) and 14(a), the Recognized Loss Amount calculated pursuant to the Section 14(a) calculations as set forth in the Plan of Allocation will be used for purposes of determining a claimant's overall Recognized Claim as that amount will always be greater than the Recognized Loss Amount calculated pursuant to the Section 10(b) calculations as set forth in the Plan of Allocation.

reaction to certain public announcements regarding BoA in which such misrepresentations and material omissions were alleged to have been finally revealed to the market (*i.e.*, "corrective disclosures"),[13] adjusted to eliminate the effects attributable to general market and/or industry conditions. In this respect, the artificial inflation tables that were created for trial were presented as part of the Settlement Notice for every trading day during the Class Period for both BoA common stock and January 2011 call options. These tables will be utilized in calculating each claimant's Recognized Loss and/or Gain Amounts, and ultimately a claimant's overall Recognized Claim.[14]

171.    GCG, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated in accordance with the Plan of Allocation. Calculation of Recognized Claims will depend upon several factors, including when the Authorized Claimant's shares of BoA common stock or January 2011 call options were purchased or otherwise acquired during the Class Period and whether these securities were sold, and if so, when.[15]

---

[13] The alleged corrective disclosures that removed artificial inflation from the prices of BoA common stock and January 2011 call options occurred on the following dates:  (i) Sunday January 11, 2009, thereby impacting the market on January 12, 2009; (ii) January 13, 2009; (iii) after the close of trading on January 14, 2009, thereby impacting the market on January 15, 2009; (iv) January 16, 2009; and (v) after the close of trading on January 21, 2009, thereby impacting the market on January 22, 2009.

[14] BoA common stock that was acquired from the exchange of Merrill shares in connection with the Merger are not covered by the definition of the Class and, thus, those shares are not included in the calculation of a Claimant's Recognized Loss and/or Gain Amounts pursuant to the Plan of Allocation.

[15] With respect to the Section 10(b) calculation for BoA common stock, Recognized Loss Amounts are reduced to an appropriate extent by taking into account the closing prices of BoA common stock during the 90-day-look-back period as set forth pursuant to Section 21D(e)(1) of the PSLRA.

172.    In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiffs' damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants based on the amount of alleged artificial inflation present in BoA's common stock and January 2011 call options that was purportedly caused by the Defendants' misstatements and omissions relating to the Merger throughout the Class Period.  Accordingly, Co-Lead Counsel respectfully submit that the proposed Plan of Allocation is fair and reasonable and should be approved.

## VI.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S ORDER REQUIRING ISSUANCE OF  NOTICE OF THE SETTLEMENT TO CLASS MEMBERS

173.    The Preliminary Approval Order directed that the Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Settlement Notice") be disseminated to the Class, set the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application as March 5, 2013 and set a final approval hearing date of April 5, 2013.  ECF No. 771.

174.    The Preliminary Approval Order, authorized Co-Lead Counsel to retain GCG as the Claims Administrator in the Action[16] and ordered the mailing of the Court-approved Settlement Notice and Proof of Claim Form (together, the "Notice Packet") to potential Class Members within 21 calendar days after the entry of the Preliminary Approval Order, posting of the Settlement Notice and Proof of Claim Form on the website designated for this Action, www.boasecuritieslitigation.com, contemporaneously with the mailing of the Notice Packet, and publishing of the Summary Notice once in the national editions of *The Wall Street Journal* and

---

[16] GCG was previously approved by the Court to be the Notice Administrator and disseminated the Class Notice to potential Class Members.  ECF. No. 531.

*The New York Times* and once in the *Financial Times*, and transmission once over the *PR Newswire*, not later than 10 calendar days after the mailing of the Notice Packet.

175.   A description of the terms of the Settlement and the proposed Plan of Allocation are set forth in the Settlement Notice, which also provides potential Class Members with, among other things, a description of their right to object to any aspect of the Settlement, the Plan of Allocation, and/or Co-Lead Counsel's request for an award of attorneys' fees and reimbursement of Litigation Expenses and the manner for submitting a Proof of Claim Form in order to be eligible to receive a payment from the Settlement.   The Settlement Notice informs Class Members of Co-Lead Counsel's intention to apply for an award of attorneys' fees in the amount of 6.56% of the Settlement Fund (which amount includes interest), and for reimbursement of litigation expenses paid or incurred in connection with the prosecution and resolution of the Action, as well as PSLRA awards, in an amount not to exceed $17.5 million.   The Settlement Notice also informs recipients that if they previously submitted a request for exclusion in connection with the Class Notice that they may elect to "opt-back" into the Class and be eligible to receive a payment from the Settlement, and sets forth the manner for doing so.[17]

---

[17] In connection with the Court's Order dated February 29, 2012, the Class Notice was previously mailed to potential members of the Class to notify them of, among other things: (i) the Action pending against the Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Court-certified Class; and (iii) their right to request to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion.   As set forth on Appendix 1 to the Stipulation, 864 requests for exclusion were received pursuant to the Class Notice.   Pursuant to the Preliminary Approval Order, "[i]n light of the extensive notice program undertaken in connection with class certification and the ample opportunity provided to Class Members to request exclusion from the Class at that time, the Court is exercising its discretion in accordance with Second Circuit precedent (*see, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) and *Wal-Mart Stores, Inc.* v. *Visa U.S.A., Inc.*, 396 F.3d 96, 114-15 (2d Cir. 2005)) to preclude Class Members from having a second opportunity to exclude themselves from the Class in connection with the Settlement proceedings."   *See* ECF. No. 771, at ¶12.

176.    As set forth in the Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Settlement Notice and Proof of Claim Form and (B) Publication of the Summary Notice; and (C) Report on Opt-Ins Received to Date ("Cirami Aff.") attached as Exhibit 7 hereto, on or before December 26, 2012, GCG disseminated 3,186,107 copies of the Notice Packet to potential Class Members and nominees by first-class mail.  *Id.* ¶ 4.  As of February 14, 2013, over 3,298,000 Notice Packets have been mailed to potential Class Members and nominees.  *Id.* ¶ 6.

177.    On January 3, 2013, in accordance with the Preliminary Approval Order, GCG caused the Summary Notice to be published in *The Wall Street Journal*, *The New York Times* and the *Financial Times*, and to be transmitted over *PRNewswire*.  *See* Cirami Aff. at ¶ 7.

178.    The Court-ordered deadline for Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request to opt back into the Class is March 5, 2013.  To date, one objection to the Settlement and one objection to the Fee and Expense Application have been received; there have been no objections to the proposed Plan of Allocation.[18]    Additionally, as of February 14, 2013, GCG has received 6 requests to opt-back into the Class.  *Id.* at ¶ 10.[19]

_____

[18] As the deadline for submitting objections has not passed, Co-Lead Counsel will address all objections, including the two objections received to date, in their reply papers to be filed with the Court on March 29, 2013.  Copies of the two objections received to date, submitted by Dennis Breuel and Scott Boatwright, are attached hereto as Exhibits 8 and 9, respectively.  Mr. Breuel's objection, which is based on "the shareholders [having] had to approve a sale of Merrill Lynch without material information being presented and could affect the results of the merger," essentially asks the Court to order another vote, and "[i]f the vote decouples the merger, the management should reverse the integration."  *See* Exhibit 8 hereto.  Mr. Boatwright's primary objection is that the fee request is not "reasonable compensation for the work of Co-Lead Counsel in this case."  Mr. Boatwright, however, acknowledges that his knowledge of the litigation is "limited to press reports and the Notice of Proposed Settlement and Plan of Allocation" and that he does not have the necessary information to fully assess the amount of fees sought by Co-Lead Counsel.  Co-Lead Counsel will post this Joint Declaration, which details the extensive time and effort expended by Co-Lead Counsel during the pendency of this Action, along with the memoranda in support of the Settlement and Fee and Expense

## VII.   THE FEE APPLICATION

### A.   General Statement

179.   In addition to seeking final approval of the Settlement and Plan of Allocation, Co-Lead Counsel are making an application to the Court for a collective award of attorneys' fees, reimbursement of litigation expenses incurred during the course of the Action, and PSLRA awards for the Lead Plaintiffs for the costs and expenses they incurred in connection with their representation of the Class in the Action.

180.   As discussed below, we are submitting the fee application with the prior approval of the Lead Plaintiffs and it is, in all respects, in accordance with the retainer agreements entered into by the Lead Plaintiffs and our respective firms at the outset of the Action.   Under the retainer agreements, Co-Lead Counsel agreed to undertake the litigation on an entirely contingent basis, meaning that Co-Lead Counsel would not be compensated at all, or reimbursed for any expenses they incurred on behalf of the Class, unless they obtained a recovery for the Class.   Generally, the retainer agreements provided that attorneys' fees would be based on a "fee grid" which scaled attorneys' fees based upon the amount recovered and the stage of the

---

Application, on the website, www.boasecuritieslitigation.com, for review by Class Members. Co-Lead Counsel are also aware of another potential objection which was served upon defense counsel by Mr. Robert Shattuck in a separate matter and which states that it will also be filed in the ***Bank of America*** matter at the appropriate time.   As of this date, however, the objection has yet to be filed in this Action or served upon Co-Lead Counsel in accordance with the Preliminary Approval Order.   If filed and served in a timely fashion, Co-Lead Counsel will address the objection in our reply papers.

[19] To the extent that any individuals or entities who previously excluded themselves from the Class in connection with the Class Notice (as set forth on Appendix 1 to the Stipulation) submit a Proof of Claim Form by the March 5, 2013 deadline for opting back into the Class, Co-Lead Counsel believe that such claims should be interpreted as an "opt-in" request and these claims, to the extent they are valid, should be eligible to participate in the Settlement.

proceedings, with the permissible fee percentage decreasing with the size of settlement amount and increasing as the case got closer to trial.

181.    For purposes of determining an appropriate fee, at the outset of the Action, Lead Plaintiffs insisted and agreed that the lowest fee grid among the retainer agreements that each had negotiated with our respective firms would be utilized to calculate the percentage of attorneys' fees that Co-Lead Counsel would be permitted to apply for in connection with a settlement of the Action.  Based upon the provisions of the retainer agreement containing the lowest fee grid, Co-Lead Counsel are applying for a fee award of 6.56% of the Settlement Amount net of Plaintiffs' Counsel's expenses (*i.e.*, $158,549,766.46 plus interest accrued thereon) (the "Fee Application").

182.    Co-Lead Counsel also request reimbursement in the amount of $8,082,828.32 from the Settlement Fund for the expenses paid or incurred in connection with the prosecution and resolution of the Action.  Co-Lead Counsel further request reimbursement of $453,003.04 in costs and expenses incurred by the Lead Plaintiffs directly related to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The total amount of out-of-pocket expenses requested for reimbursement together with the costs and expenses of the Lead Plaintiffs (*i.e.*, $8,535,831.36) is well below the maximum expense amount of $17.5 million set forth in the Settlement Notice.

183.     The legal authorities supporting the requested fees and expenses are set forth in the accompanying Fee Memorandum.  The primary factual bases for the requested fees and expenses are summarized below.

### B.    The Requested Fee is Fair and Reasonable

184.    Based on the extensive efforts expended on behalf of the Class, the extraordinary result achieved, the risks of the litigation and the contingent nature of their representation, Co-

Lead Counsel submit that their request for an award of attorneys' fees in the amount of 6.56% of the Settlement Fund (net of Plaintiffs' Counsel's expenses) is justified and should be approved. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.  The percentage method is also supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, is the authorized method under the PSLRA and represents the overwhelmingly current trend in the Second Circuit and most other Circuits.

185.   Moreover, as discussed in the accompanying Fee Memorandum, Co-Lead Counsel's request for a fee award of 6.56% of the Settlement Fund net of Plaintiffs' Counsel's expenses is on the lower end of fee percentages customarily sought and awarded in federal securities law class actions, and well within the range of fees awarded in similar settlements that are in the billion dollar or greater range.

1.     **The Significant Time and Labor Devoted to the Action by Co-Lead Counsel**

186.   The work undertaken by Co-Lead Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  As more fully set forth above, the Action settled only after Co-Lead Counsel overcame multiple legal and factual challenges and the Parties had litigated the case to the eve of trial.  Among other efforts, Co-Lead Counsel conducted an extensive investigation into the Class's claims; researched and prepared two detailed amended complaints; successfully moved for partial modification of the PSLRA's discovery stay; successfully opposed Defendants' multiple motions to dismiss and Defendants' efforts to seek interlocutory appeal of

certain issues decided by the Court in connection with Defendants' motions to dismiss the First Amended Complaint; successfully moved for Class certification; consulted extensively with experts and consultants; obtained, organized and reviewed more than 4.75 million pages of documents obtained from Defendants and non-parties, and took or defended 61 depositions; moved for partial summary judgment and opposed Defendants' multiple motions for summary judgment; prepared for a trial scheduled to begin on October 22, 2012; and engaged in a hard-fought and protracted settlement process with experienced defense counsel.

187.   At all times throughout the pendency of the Action, Co-Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Class, whether through settlement or trial.  The substantial time and expense incurred by Co-Lead Counsel have achieved precisely such an outcome, and accordingly, this factor weighs strongly in favor of Co-Lead Counsel's Fee Application.

### 2.   A Lodestar Cross-Check Confirms the Reasonableness of Co-Lead Counsel's Fee Application

188.   As described in the Fee Memorandum, the requested fee percentage is not only fair and reasonable under the percentage method but a lodestar cross-check confirms the reasonableness of the fee.

189.   Attached hereto as Exhibit 10 are declarations from Plaintiffs' Counsel[20] in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Included with each firm's declaration is a schedule that summarizes the lodestar of the firm, as well as the expenses incurred by category (the "Fee and Expense Schedules").[21]  In particular,

---

[20]  Plaintiffs' Counsel includes Co-Lead Counsel and the law firm of Flanagan, Lieberman, Hoffman and Swaim which served as additional counsel for Lead Plaintiffs the State Teachers Retirement System of Ohio and the Ohio Public Employees Retirement System.

the attached declarations and the Fee and Expense Schedules contained within each indicate the amount of time spent on this case by each attorney and professional support staff employed by Plaintiffs' Counsel, and the lodestar calculations based on their current billing rates.  As set forth in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.  The hourly rates for attorneys and professional support staff included in these schedules are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation.  For attorneys or professional support staff who are no longer employed by Plaintiffs' Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

190.    As summarized in Exhibit 10 hereto, Plaintiffs' Counsel have expended 193,547 hours in the investigation, prosecution and resolution of the Action against Defendants, for a collective lodestar value of $88,307,135 through January 31, 2013.[22]    Under the lodestar approach, the requested fee yields a multiplier of approximately 1.8 on the lodestar.  This multiplier is within the range of multipliers awarded in actions where similar settlements have been achieved.  *See* Fee Memorandum at § III.B.

---

[21] Attached as the first page to Exhibit 10 is a summary chart of the hours expended and lodestar amounts for each firm comprising Plaintiffs' Counsel, as well as a summary of each firm's total litigation expenses.

[22] Co-Lead Counsel will continue to perform legal work on behalf of the Class should the Court approve the proposed Settlement.  Additional resources will be expended assisting Class Members with their Proof of Claim Forms and related inquiries and working with the Claims Administrator, GCG, to ensure the smooth progression of claims processing.

C.      **Lead Plaintiffs Support the Fee Application**

191.    Each of the five Lead Plaintiffs – sophisticated institutional investors of the type favored by Congress when passing the PSLRA – fully supports Co-Lead Counsel's Fee Application.

192.    The State Teachers Retirement System of Ohio ("STRS Ohio") is a public pension fund organized for the benefit of current and retired educators in Ohio and serves nearly 475,200 active, inactive and retired Ohio public educators.   With investment assets of $64.3 billion (including short-term investments) as of June 30, 2012, STRS Ohio is one of the larger public pension funds in the country.

193.    The Ohio Public Employees Retirement System ("Ohio PERS") is a public pension fund organized for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement system and serves more than one million members.  With assets of approximately $80.3 billion as of December 31, 2011, Ohio PERS is the largest state pension fund in Ohio, as well as the 11th largest public retirement system and 15th largest retirement system in the country.

194.    The Teacher Retirement System of Texas ("Texas Teachers") is a public pension fund organized for the benefit of current and retired public education employees of the State of Texas.  Texas Teachers' defined benefit plans served a total of 1,335,402 participants and had approximately $111 billion in assets under management as of August 31, 2012.

195.    Stichting    Pensioenfonds    Zorg    en    Welzijn,    represented    by    PGGM Vermogensbeheer B.V. ("PGGM"), is the public pension fund for the healthcare and welfare sector in the Netherlands, and the second largest pension fund in Europe.  The pension fund serves approximately 2.5 million members.  PGGM currently manages approximately €129 billion in assets for Stichting Pensioenfonds Zorg en Welzijn.

196.    Fjärde AP-Fonden ("AP-4") is a public pension fund in Sweden and is a part of the Swedish National Pension Fund System.  With approximately $32 billion in assets under management, AP-4 is one of the largest pension funds in Scandinavia.

197.    Lead Plaintiffs have evaluated Co-Lead Counsel's Fee Application, as well as the Expense Application discussed in Section VIII below, and believe it to be fair and reasonable and warranting consideration and approval by the Court.  As a result, Lead Plaintiffs collectively endorse Co-Lead Counsel's application for an award of attorneys' fees constituting 6.56% of the Settlement Fund net of Plaintiffs' Counsel's expenses, an amount consistent with or below the amount set forth in each of Lead Plaintiffs' respective retainer agreements.  In addition to their responsibilities as Court-appointed lead plaintiffs and certified class representatives, as public pension funds, each of the Lead Plaintiffs has independent duties and obligations to their respective constituents to ensure that they are acting in their best interests and that they are appropriately reviewing Co-Lead Counsel's Fee and Expense Application.  Accordingly, Lead Plaintiffs' endorsement of Co-Lead Counsel's Fee and Expense Application is significant.

### D.    The Quality of Co-Lead Counsel's Representation

198.    A number of considerations may be relevant to assessing the quality of class counsel's representation of a plaintiff class, including the Court's own observations, class counsel's experience and standing at the bar, and the quality of opposing counsel.  Ultimately, however, the acid test for evaluating "quality of the representation" is the quality of the results achieved for the class members whom they were appointed to represent.

### 1.    The Excellent Results Obtained from Co-Lead Counsel's Efforts

199.    Here, for the reasons previously detailed above, Co-Lead Counsel respectfully submit that the Settlement, consisting of $2.425 billion in cash − the fourth largest securities class action settlement ever paid by a single corporate defendant − combined with the Corporate

Governance Enhancements to be implemented or maintained by BoA, is an extraordinary result for the Class. Indeed, the result achieved for the Class reflects the superior quality of Co-Lead Counsel's representation.

200. Reached just weeks before trial, the Settlement is the result of Co-Lead Counsel's hard work, persistence and skill in a case that presented significant litigation risks. If approved, the Settlement would represent the single largest securities class action settlement ever resolving a Section 14(a) claim and the sixth largest settlement in securities class action history. It also bears repeating that Co-Lead Counsel obtained this exceptional result where there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct, and the Settlement dwarfs all prior recoveries in class actions stemming from the subprime crisis.

### 2. The Court's Observations as to the Quality of Co-Lead Counsel's Work

201. The Court may, of course, also take into account its own observations of the quality of Co-Lead Counsel's representation during the course of this litigation. Since the inception of the Action in January 2009, Co-Lead Counsel have appeared on multiple occasions before the Court, and the Court has reviewed myriad motions and briefing submitted by Co-Lead Counsel, including, *inter alia*, two detailed amended complaints, briefing in opposition to Defendants' multiple motions to dismiss, a motion and briefing in support of class certification, a motion for partial summary judgment, briefing in opposition to Defendants' motions for summary judgment, and the numerous papers in connection with both preliminary and final approval of the Settlement. Although this work represents only a fraction of the total work performed by Co-Lead Counsel throughout the pendency of the Action, Co-Lead Counsel respectfully submit that the quality of that work is reflective of the quality, thoroughness and

professionalism of the effort that Co-Lead Counsel have devoted to all aspects of this Action on behalf of the Class.

### 3.     The Standing and Expertise of Co-Lead Counsel

202.    Co-Lead Counsel are highly experienced in prosecuting complex litigation, particularly securities class actions, and worked diligently and efficiently in prosecuting this Action.  As demonstrated by the firm resumes attached to their respective declarations (*see* Exhibits 10A, 10B and 10C hereto), Co-Lead Counsel – the law firms of BLB&G, Kaplan Fox and KTMC – are among the most experienced and skilled firms in the securities litigation field, and each firm has a long and successful track record in securities cases throughout the country.

### 4.     Standing and Caliber of Defense Counsel

203.    The quality of the work performed by Co-Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by no less than eleven law firms, which included many of the nation's most elite firms.  Defense counsel included Paul, Weiss, Rifkind, Wharton & Garrison LLP; Cleary Gottlieb Steen & Hamilton LLP; Wachtell, Lipton, Rosen & Katz; Shearman & Sterling LLP; Davis Polk & Wardwell LLP; Debevoise & Plimpton LLP; Baker Botts L.L.P.; Dechert LLP; Cohen & Gresser LLP; and Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP.  These firms vigorously represented the interests of their respective clients.   In the face of this experienced, formidable, and well-financed opposition who aggressively litigated the Action on behalf of their clients until the "eve" of trial, Co-Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms highly favorable to the Class – a fact which makes Co-Lead Counsel's success here all the more impressive.

### E.   The Risks and Unique Complexities of the Litigation

#### 1.   The Risks Undertaken By Co-Lead Counsel in Pursuing this Action

204.   This Action presented exceedingly novel procedural and substantive legal challenges from the outset.  As discussed in Section III above, Co-Lead Counsel were required to contend with, among others, unusual class certification issues and complex issues of loss causation and damages, many of which were lacking precedent.  In particular, there were substantial risks to establishing damages under Section 14(a) – the federal securities law provision designed to protect investors against misstatements in connection with a proxy solicitation, as Defendants argued that Class Members seeking recovery under Section 14(a), who did not purchase or otherwise exchange any shares of their BoA common stock in connection with the Merger, failed to adduce evidence of a direct, compensable injury under Section 14(a).

205.   These novel risks are in addition to the more typical risks accompanying litigation, such as the fact that this prosecution was undertaken by Co-Lead Counsel entirely on a contingent-fee basis as discussed below.

#### 2.   The Risks of Contingent Litigation

206.   As a general matter, it should be observed that there are numerous cases where plaintiffs' counsel in contingent-fee cases such as this have expended thousands of hours, only to receive no compensation whatsoever.  This prosecution was undertaken by Co-Lead Counsel on a contingent-fee basis, and the risks assumed by Co-Lead Counsel (as described above), and the time and expenses incurred without any payment (as described above), were substantial.

207.   From the outset, Co-Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that

responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average lag time of several years for cases of this type to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel have received no compensation during the course of the Action and have advanced or incurred $8,082,828.32 in expenses in prosecuting the Action for the benefit of the Class.

208.    Co-Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

209.    Moreover, for decades the United States Supreme Court (and countless lower courts) have repeatedly and consistently recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Indeed, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

210.    The risks assumed by Co-Lead Counsel in connection with the Action, and the time and expenses incurred without any payment, were extensive. Co-Lead Counsel's persistent efforts in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class. In circumstances such as these, and in

consideration of Co-Lead Counsel's hard work and the extraordinary result achieved, the requested fee of 6.56% of the Settlement Fund net of Plaintiffs' Counsel's expenses and reimbursement of $8,082,828.32 in expenses, as detailed below, is reasonable and should be approved.

### F. Awards in Similar Cases

211.   Awards of attorneys' fees that have been approved in other large securities class action cases have been compiled and are discussed in the accompanying Fee Memorandum.  *See* Fee Memorandum at § III.A.  For the reasons set forth therein, Co-Lead Counsel's 6.56% fee award request is well within the range of fee awards that have been approved in other large litigations.

### G. The Reaction of the Class to the Fee Application

212.   In accordance with the Preliminary Approval Order, more than 3.2 million Notice Packets have been mailed to potential Class Members and nominees advising them that Co-Lead Counsel would seek an award of attorneys' fees in the amount of 6.56% of the Settlement Fund and reimbursement of expenses paid or incurred in connection with the prosecution and resolution of the Action in an amount not to exceed $17.5 million.  *See* Cirami Aff. ¶ 6. Additionally, on January 3, 2013, the Court-approved Summary Notice was published in *The Wall Street Journal*, *The New York Times* and the *Financial Times*, and was transmitted over the Internet via *PRNewswire*.  *Id.* at ¶ 7.  All important documents related to the Action and the Settlement, including the Stipulation, have also been posted on the website for this Action, www.boasecuritieslitigation.com, for review.  *Id.* at ¶ 9.  As noted above, the deadline set by the Court for Class Members to object to the amount of attorneys' fees and expenses set forth in the Settlement Notice has not yet passed.  To date, Co-Lead Counsel are aware of only one objection by any Class Member to the amount of fees set forth in the Settlement Notice.  *See* ¶ 175, fn. 18

above.  Co-Lead Counsel will address all objections received in their reply papers to be filed

with the Court on March 29, 2013.

## VIII.   REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

213.   Co-Lead Counsel also seek reimbursement from the Settlement Fund in the total

aggregate amount of $8,082,828.32 for litigation expenses that were reasonably incurred by

Plaintiffs' Counsel in connection with commencing, prosecuting and resolving the claims

asserted in the Action against Defendants, as well as $453,003.04 for the costs and expenses

incurred by Lead Plaintiffs directly related to their representation of the Class (the "Expense

Application").

214.   From the beginning of the case, Co-Lead Counsel were aware that they might not

recover any of their expenses, and, at the very least, would not recover any of their out-of-pocket

expenses until the Action was successfully resolved.  Thus, Co-Lead Counsel were motivated to,

and did, take significant steps to minimize expenses whenever practicable without jeopardizing

the vigorous and efficient prosecution of the case.

215.   As set forth in the Fee and Expense Schedules (attached to Exhibit 10 hereto),

Plaintiffs' Counsel have incurred a total of $8,082,828.32 in unreimbursed litigation expenses in

connection with the prosecution of the Action for which they are seeking reimbursement.[23]  As

attested to, these expenses are reflected on the books and records maintained by respective

---

[23] Indeed, in order to further control expenses, Co-Lead Counsel have agreed to only seek reimbursement for certain expenditures as "capped" in accordance with certain retainer agreements entered into at the outset of the litigation and to not request reimbursement for certain other categories of expenses that are routinely approved by courts because the retainer agreements categorized them as unreimbursable.  For example, in-house copying was capped at $0.15 per page, working meals in town are not being charged to the Class and no secretarial overtime is being billed to the case.  Furthermore, hotel stays and meals while traveling were capped consistent with the retainer agreements.  In addition, in accordance with our customary practice, reimbursement for flights is sought only at a coach fare.

Plaintiffs' Counsel.  These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  Plaintiffs' Counsel's expenses are set forth in detail in their firm's respective declaration, each of which identifies the specific category of expense, *e.g.*, online legal and factual research, experts' fees, out-of-town travel costs, the costs of document management and litigation support, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Co-Lead Counsel seek reimbursement.  These expense items are billed separately and such charges are not duplicated in the respective firms' billing rates, thus, no amount for general overhead is included in the expense amounts.  Additionally, with respect to reimbursement for expenses incurred to outside vendors, the amounts requested reflect the actual amounts billed by the providers.  A summary chart of Plaintiffs' Counsel's expenses is attached hereto as Exhibit 11.

216.    Co-Lead Counsel maintained strict control over the litigation expenses.  Indeed, many of the litigation expenses were paid out of a litigation fund created by Co-Lead Counsel and maintained by KTMC (the "Litigation Fund").  Co-Lead Counsel collectively contributed $6,303,000 to the Litigation Fund.  A description of the payments from the Litigation Fund by category is set forth in the individual firm declaration submitted on behalf of KTMC (the "Kessler Declaration").  Currently, a balance of $20,332,81 remains in the Litigation Fund.  This amount has been credited to KTMC and removed from its expense request so as to avoid any double counting of expenditures.  *See* Kessler Declaration at ¶ 10.

217.    Of the total amount of expenses, $4,462,782.80, or approximately 55%, was expended on experts and consultants.  As noted above in ¶¶ 109; 169-170, Co-Lead Counsel retained a damages expert to assist in the prosecution of the Action as well as to assist in

developing a fair and reasonable plan for allocating the net settlement proceeds to eligible Class Members.  Co-Lead Counsel also retained an accounting expert, various industry experts, and an expert on remedies available under Section 14(a) of the Exchange Act.  Co-Lead Counsel also retained a trial consulting firm to prepare exhibits for trial, conduct jury focus groups and mock trials and analyze the results of the deliberations of mock jurors.  These experts and consultants were essential to the overall prosecution of the Action.  In total, Co-Lead Counsel retained seven experts and consultants to analyze complex matters involved in this Action. In addition to consulting with Co-Lead Counsel in developing the case, Lead Plaintiffs' experts produced a total of 12 expert reports and six of Lead Plaintiffs' experts were deposed by Defendants.

218.    Another large component of the expenses, $1,115,997.76 or approximately 13.9% of the total expense amount related to the document production.  Co-Lead Counsel had to retain the services of vendors to, among other things, (i) maintain the electronic database through which the millions of pages of documents produced were reviewed; (ii) have documents processed so that they would be in searchable format; and (iii) convert and upload hard documents so that they would be electronically searchable.

219.    Additionally, Co-Lead Counsel paid $302,553.76 for mediation fees assessed by the mediator in this matter, Judge Phillips.

220.    The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, costs of out-of-town travel, copying costs, long distance telephone and facsimile charges and postage and delivery expenses.

221.    All of the Litigation Expenses incurred by Plaintiffs' Counsel, which total $8,082,828.32, were necessary to the successful investigation, prosecution and resolution of the

claims asserted in the Action against Defendants.  Co-Lead Counsel's Expense Application has been approved by Lead Plaintiffs.  *See* Exhibits 2 through 6 attached hereto.

222.    Additionally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Plaintiffs, STRS Ohio, Ohio PERS, Texas Teachers, PGGM and AP-4 seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class in the amounts of $34,375.00, $19,263.66, $14,065.00, $259,610.98, and $125,688.40, respectively.   The amount of time and effort devoted to this Action by the Lead Plaintiffs is detailed in the accompanying declarations of their respective representatives, annexed hereto as Exhibits 2 through 6.  *See* Declaration of William J. Neville, General Counsel of STRS Ohio at ¶ 15; Declaration of Julie E. Becker, Esq., General Counsel of Ohio PERS at ¶ 15; Declaration of Timothy P. Wei, Assistant General Counsel of Texas Teachers at ¶ 14; Declaration of Femke Van't Groenewout-Hendriks, Senior Advisor, Responsible Investment & Attorney at Law at PGGM at ¶ 12; and Declaration of Agneta Wilhelmson Kåremar, Chief Operating Officer of AP-4 at ¶ 12.[24]  Co-Lead Counsel respectfully submit that these requested amounts are fully consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.

223.    As set forth in the Fee Memorandum and in the supporting declarations submitted on behalf of the Lead Plaintiffs attached hereto, Lead Plaintiffs have been fully committed to pursuing the Class's claims against the Defendants for more than three years.   These large

---

[24]  The requested PSLRA awards for PGGM and AP-4 were determined by converting their respective currencies, the euro and the Swedish krona, to US dollars. The United States Dollar-Euro exchange rate reported by the European Central Bank for the close of trading at 5 p.m. eastern standard time on February 15, 2013 was $1.3325 per euro, while the United States Dollar-Swedish Krona exchange rate reported by the Sveriges Riksbank (Swedish Central Bank) was $0.1579 per krona.

institutions have actively and effectively fulfilled their obligations as representatives of the Class, complying with all of the many demands placed upon them during the litigation and settlement of this Action, and providing valuable assistance to Co-Lead Counsel.  The efforts expended by the representatives for the Lead Plaintiffs during the course of this Action are precisely the types of activities Courts have found to support reimbursement to class representatives, and fully support Lead Plaintiffs' requests for reimbursement of costs and expenses.  *See* Fee Memorandum at §VI.

224.    The Settlement Notice informed potential Class Members that Co-Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $17.5 million and that the costs and expenses of the Class Representatives could be sought as part of the request for reimbursement of Litigation Expenses.  The total amount sought by the Lead Plaintiffs (*i.e.*, $453,003.04), when added to the request of Plaintiffs' Counsel (*i.e.*, $8,082,828.32), is still significantly below the $17.5 million that Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of Litigation Expenses set forth in the Notice, including the amount sought to be reimbursed to the Lead Plaintiffs.

225.    In view of the complex nature of the Action, as well as the fact that this Action was vigorously prosecuted until the "eve" of trial, the expenses incurred by Plaintiffs' Counsel were reasonable and necessary to pursue the interests of the Class and achieve the present Settlement.  Accordingly, Co-Lead Counsel respectfully submit that the expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs are fair and reasonable and should be reimbursed in full from the Settlement Fund.

## IX.    CONCLUSION

226.    In view of the significant recovery to the Class and the very substantial risks of this litigation, as described above and in the accompanying Settlement Memorandum, Co-Lead

Counsel respectfully submit that the Settlement should be approved as fair, reasonable and adequate and that the proposed Plan of Allocation should be approved as fair and reasonable. In addition, based on the significant recovery in the face of substantial risks; the efforts of Co-Lead Counsel; the novel issues faced; the quality of work performed; the contingent nature of the fee; the complexity of the case; and, the standing and experience of Co-Lead Counsel, as described above and in the accompanying Fee Memorandum, Co-Lead Counsel respectfully submit that a fee in the amount of $158,549,766.46 (plus interest) be awarded to Co-Lead Counsel; that Plaintiffs' Counsel's expenses in the amount of $8,082,828.32 be reimbursed in full; and the Lead Plaintiffs' costs and expenses in the amount of $453,003.04 be reimbursed in full as PSLRA awards.

227.    We each declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on February 19, 2013.


_____          _____          _____
   Steven B. Singer                      Frederic S. Fox                     David Kessler