UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYMENT RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION<br><br>-----------------------------------------------------------<br><br>**THIS DOCUMENT RELATES TO**:<br><br>Consolidated Derivative Action | Master File No. 09 MDL 2058 (PKC)<br>ECF CASE |

# NOMINAL DEFENDANT BANK OF AMERICA'S
# MEMORANDUM OF LAW IN RESPONSE TO THE
# <u>MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND EXPENSES</u>

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

CLEARY, GOTTLIEB,
   STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY  10006
(212) 225-2000

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Nominal Defendant*
*Bank of America Corporation*

## **TABLE OF CONTENTS**

**Page**

Table of Authorities ................................................................................................................... ii
Preliminary Statement ................................................................................................................1
Relevant Facts ............................................................................................................................4
        A.      The Settlement of the New York Action ..................................................................4
        B.      The Pinsly Objection ................................................................................................8
Argument ..................................................................................................................................10
        A.      Lead Counsel's Fee Request Is Unreasonably High and Should Be
                Reduced by the Court ............................................................................................11
        B.      The Weiser Firm's Request for Fees and Expenses Should Be Rejected
                in its Entirety .........................................................................................................13
Conclusion ...............................................................................................................................17

**Table of Authorities**

                 **Page**

**CASES**

*Goldberger* v. *Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000) ............................................................................. 10, 11, 12, 13

*In re Interpublic Sec. Litig.*,
    No. 02 Civ. 6527(DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ........................... 12

*In re Nigeria Charter Flights Litig.*,
    No. MDL 2004–1613 (RJD)(MDG), 2011 WL 7945548
    (E.D.N.Y. Aug. 25, 2011) ................................................................................................ 10

*In re Pfizer Inc. Shareholder Deriv. Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011) ............................................................................. 14

*In re Wachovia Preferred Sec. and Bond/Notes Litig.*,
    No. 09 Civ. 6351(RJS), 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) ............................... 11

**STATUTES**

Delaware General Corporation Law § 220 ................................................................................. 15

Nominal defendant Bank of America Corporation ("BofA") submits this memorandum of law in response to the three motions for awards of attorneys' fees and expenses filed with the Court on February 8, 2013, namely: (i) the motion by shareholder Nancy Rothbaum (the "Delaware Shareholders") for an award of $7.5 million in attorneys' fees to her counsel (the "Delaware Counsel") and reimbursement of $1.75 million in expenses; (ii) the motion by lead plaintiffs in the above-captioned action ("Lead Plaintiffs") for an award of $13 million in attorneys' fees to their counsel ("Lead Counsel") and reimbursement of $419,800.54 in expenses; and (iii) the motion by objector Matthew Pinsly ("Pinsly") for an award of $2 million in attorneys' fees to his counsel, the Weiser Law Firm, P.C. (the "Weiser firm"), and reimbursement of $4,746.28 in expenses.

For the reasons set forth below, BofA respectfully submits that $22.5 million in fees is too high an award in a settlement that yielded $62.5 million as the cash component of the recovery. Specifically, the $13 million fee request by Lead Counsel is unreasonably high, and should be reduced to no more than $7.5 million. BofA further respectfully submits that the Weiser firm's motion for an award of fees and expenses should be denied in its entirety because Mr. Pinsly did not contribute any value to either the prosecution of this action or its resolution. BofA does not object to Delaware Counsel's $7.5 million fee request, which is $3.15 million less than the fee amount they originally sought in this action.

**Preliminary Statement**

Beginning in 2009, derivative claims on behalf of Bank of America Corporation ("BofA") relating to its merger with Merrill Lynch & Co., Inc. (the "Merger") were pursued by Lead Plaintiffs in the consolidated derivative litigation filed in this Court (the "New York action") and by the Delaware Shareholders in a derivative litigation filed in the Delaware Court of Chancery (the "Delaware action"). In April 2012, the parties to the New York action

announced that they had agreed in principle to a proposed settlement under which, in exchange for a release of the claims in both actions, the insurance carriers for the individual director defendants (the "Individual Defendants") would pay $20 million and BofA would implement certain corporate governance enhancements. The Delaware Shareholders objected to this settlement, principally arguing that the monetary component of the settlement was too low. After considering this objection, as well as other information in the record available to the Court, this Court issued an Order on January 4, 2013 stating that the Court had not yet been persuaded of the fairness, reasonableness and adequacy of a settlement of the derivative claims against one of the Individual Defendants "in exchange for corporate governance reforms of unquantifiable value and $20 million in cash, some, most or all of which will be consumed by plaintiffs' attorneys' fees." By that Order, this Court directed counsel for the Lead Plaintiffs, the Individual Defendants and the Delaware Shareholders to meet and discuss revisions to the proposed settlement. Ultimately, with the assistance and approval of the Court, the monetary component of the settlement was increased from $20 million to $62.5 million, and the Delaware Shareholders withdrew their objection.

    Counsel for both Lead Plaintiffs and the Delaware Shareholders now seek attorneys' fees as remuneration for their efforts in obtaining this result on behalf of the Company. BofA does not dispute that both of these sets of counsel have devoted significant efforts to the prosecution of the derivative claims, and recognizes that these counsel pursued the derivative claims notwithstanding very significant risks that, on the facts and legal claims presented, plaintiffs would not be able to establish liability and/or recover any monetary damages in these actions. BofA thus does not dispute that both Lead Counsel and Delaware Counsel should be awarded reasonable attorneys' fees in exchange for their efforts.

As discussed below, BofA believes, however, that the $13 million fee request by Lead Counsel is unreasonably high, particularly in light of the fact that Lead Counsel was not the driving force behind the $42.5 million increase above the initial settlement amount. The $13 million fee sought by Lead Counsel represents 65 percent of the monetary component of the original $20 million settlement secured by Lead Counsel, to which Lead Plaintiffs were bound by a written settlement agreement. And while Lead Counsel also contributed to the settlement by securing what this Court has described as "corporate governance reforms of unquantifiable value," it does not follow from that proposition that Lead Counsel should be awarded fees in the amount of 65 percent of the monetary component of the settlement to which Lead Counsel agreed. Moreover, Lead Counsel's fee request should not be considered in a vacuum; the fee award to Lead Counsel should be considered alongside the fee request by Delaware Counsel, who are principally responsible for the increase in the cash component of the settlement and who also seek and are entitled to reasonable fees.

BofA therefore respectfully requests that the Court exercise its discretion to reduce Lead Counsel's fee request and award no more than $7.5 million in attorneys' fees to each of Lead Counsel and Delaware Counsel. Such a reduction would result in a total payment of attorneys' fees of $15 million in this action to shareholders' counsel, representing 24 percent of the monetary component of the settlement, and would fairly compensate both Lead Counsel and Delaware Counsel for their efforts in securing a successful resolution of the Merger-related derivative claims.

Finally, BofA respectfully requests that this Court deny Mr. Pinsly's request for an award to the Weiser firm of attorneys' fees in the amount of $2 million and expenses of $4,746.28. Neither Mr. Pinsly nor the Weiser firm was involved in the litigation of the New

York or Delaware actions. To the contrary, Mr. Pinsly elected to file his own Merger-related derivative claims nearly 3 years after the New York and Delaware actions had commenced, and months after a proposed settlement of the New York action had been agreed to in principle. Mr. Pinsly thus sought, for no apparent purpose, to duplicate efforts by Lead Plaintiffs and the Delaware Shareholders that had begun long beforehand — with the counter-productive result of wasting the time and resources of the Court, BofA, and the Individual Defendants. Moreover, Mr. Pinsly and his counsel did not add any value to the settlement in this case, instead advocating for an amendment to the settlement agreement that this Court characterized as a "redundancy" at the settlement fairness hearing. And the $2 million fee request is more than eight times the Weiser firm's lodestar in this action, which includes hours spent by the Weiser firm on litigation in Delaware that the Delaware Chancery Court characterized as an attempt to "circumvent" prior rulings of this Court.

For these reasons, as set forth more fully below, BofA respectfully requests that this Court limit the attorneys' fees awarded to each of Lead Counsel and Delaware Counsel to $7.5 million and deny the Weiser firm's request for fees and expenses in its entirety.

## Relevant Facts

**A.     The Settlement of the New York Action**

On April 13, 2012, Lead Counsel and counsel for the Individual Defendants and nominal defendant BofA filed with this Court a Memorandum of Understanding ("MOU") agreeing in principle to a proposed settlement that would resolve the New York action and release all other derivative claims arising out of the Merger. (Dkt. No. 540.) That agreement was expressed in a Stipulation and Agreement of Compromise, Settlement and Release (the "Settlement Agreement") executed on June 19, 2012.

Pursuant to the Settlement Agreement, the Individual Defendants' insurance carriers agreed to pay $20 million, and BofA agreed to implement certain corporate governance reforms. (Dkt. No. 662-1 at ¶ 15.) In exchange for this consideration, it was agreed that plaintiffs would release all claims that related to the subject matter of the New York action. (*Id.* at ¶¶ 9, 16.) The Settlement Agreement could be terminated only upon the occurrence of specified conditions (*id.* ¶ 25), and was otherwise binding on the parties (*id.* ¶ 35). The Settlement Agreement was filed with the Court on July 3, 2012. (Dkt. No. 662.)

Shortly after reaching agreement on the terms of the proposed settlement, Lead Counsel conferred with counsel for the Individual Defendants to determine whether an agreement could be reached on an amount of fees and expenses to be paid to Lead Counsel in the event that the Court approved the proposed settlement. (Declaration of Lawrence Portnoy, dated March 1, 2013 (hereinafter "Portnoy Decl.") at ¶ 3.) Lead Counsel informed the Individual Defendants' counsel that, following approval of the settlement, Lead Counsel intended to seek an award of attorneys' fees of $13 million, plus expenses. (*See id.*) The Individual Defendants' counsel informed Lead Counsel that, although the Individual Defendants and BofA agreed that Lead Counsel is entitled to an award of reasonable attorneys' fees and expenses, the Individual Defendants and BofA believed that a fee request of $13 million was unreasonably high and would object to any such request. (*See id.*) This position was reflected in the notice of the settlement that was distributed to shareholders on or about October 12, 2012, which advised shareholders that Lead Counsel would seek up to $13 million in fees and that BofA and the Individual Defendants had "advised Lead Counsel that they plan to object to an application seeking fees in the range of $13 million." (Dkt. No. 783-29 at 11.)

5

In anticipation of a hearing on the fairness of the proposed settlement, this Court issued an Order on January 4, 2013 (the "January 4 Order") stating that this Court was still "in the process of reviewing all submissions by proponents and objectors of the settlement," but that the Court had not yet been persuaded of the fairness, reasonableness and adequacy of a settlement of the derivative claims as to one of the Individual Defendants "in exchange for corporate governance reforms of unquantifiable value and $20 million in cash, some, most or all of which will be consumed by plaintiffs' attorneys' fees." (Dkt. No. 791.) The January 4 Order directed counsel for the Lead Plaintiffs, the Individual Defendants and the Delaware Shareholders to meet and discuss revisions to the proposed settlement. (*See id.*)

In the week following the issuance of the January 4 Order, counsel for BofA, the Individual Defendants, the Individual Defendants' insurance carriers, Lead Plaintiffs and the Delaware Shareholders met and had numerous calls to discuss increasing the monetary component of the settlement. (Portnoy Decl. at ¶ 4.) By January 10, the Individual Defendants' insurance carriers had agreed to increase the cash component of the settlement from $20 million to $62.5 million. (*Id.*) Early the next day, the Delaware Shareholders agreed to withdraw their objection in light of the increased cash contribution from the Individual Defendants' carriers. (*Id.*) At the settlement fairness hearing on January 11, the Court approved the revised terms of the settlement, which was memorialized by written agreement of the parties in an amendment to the Settlement Agreement. (*See* Declaration of Daniel J. Kramer, dated February 28, 2013 (hereinafter "Kramer Decl.") Ex. C.) The Court issued an Order on January 24, 2013 granting final approval of the settlement. (Dkt. No. 805.)

While Lead Counsel were helpful in achieving a global resolution of the claims in this action, as described in the accompanying Portnoy Declaration, they were not a principal

6

driver in securing the additional $42.5 million in settlement consideration reflected in the final settlement. (*See* Portnoy Decl. at ¶ 5.) Lead Plaintiffs had previously agreed to the original $20 million settlement and were bound by its terms, and thus they were not in a strong position to bargain for additional consideration. (*See id.*) The lead attorney for the Individual Defendants thus did not consider himself to be engaged in a negotiation with Lead Counsel in the multi-party discussions that took place between January 7 and January 11 and culminated in the final settlement. (*Id.*)

Following the settlement fairness hearing on January 11, counsel for BofA had separate discussions with Lead Counsel and Delaware Counsel concerning their anticipated fee applications. (*See* Kramer Decl. at ¶ 2.) At the outset of these discussions, Lead Counsel and Delaware Counsel originally intended to apply for a total of $23.65 million in fees ($13 million by Lead Counsel and $10.65 million by Delaware Counsel). (*See id.* at ¶ 3.) (This was separate and apart from any fees sought by the Weiser firm, which later made a separate application for $2 million in fees. (*See id.*).) Collectively, Lead Counsel and Delaware Counsel thus planned to seek fees that would consume about 38 percent of the $62.5 million cash component of the revised settlement approved by this Court. (*See id.*)

BofA's counsel, Mr. Kramer, told both Lead Counsel and Delaware Counsel that BofA could not support fee applications that exceeded $15 million in total. (*See id.* at ¶ 4.) Mr. Kramer indicated that BofA could support fee applications from Lead Counsel and from Delaware Counsel that did not exceed $15 million — $7.5 million for each counsel. (*See id.*) Following these discussions, Delaware Counsel advised BofA that it would agree to reduce its fee request from $10.65 million to $7.5 million. (*See id.* at ¶ 5.) Lead Counsel declined to

reduce its request and instead moved the Court for an award of $13 million in fees.  (*See id.* at ¶ 6.)

**B.     The Pinsly Objection**

More than 3 years after the New York and Delaware actions had been commenced, and months after an April 13, 2012 filing indicating that an agreement in principle on a proposed settlement of the New York action had been reached (Dkt. No. 540), Mr. Pinsly filed a lawsuit on June 19, 2012, in which he purported to assert derivative claims on behalf of BofA in connection with alleged misconduct by BofA's officers and directors concerning the Merger, as well as BofA's subprime exposure and its merger with Countrywide Financial Corporation ("Countrywide").  (*See* 12 Civ. 4778 Dkt. No. 1.)  The Merger-related claims unquestionably overlap with, and are duplicative of, the claims alleged in the New York action that were subject to a proposed settlement before Mr. Pinsly had even asserted them.  Indeed, Mr. Pinsly has acknowledged that the settlement of this action moots his Merger-related claims.  (*See* 12 Civ. 4778 Dkt. No. 28 at 3 n.6.)

On May 30, 2012, Mr. Pinsly sent a letter to the Individual Defendants complaining that the scope of the release in the April 12, 2012 MOU agreeing in principle to the original proposed settlement of this action was overbroad, and asking that the Individual Defendants confirm that they do not intend to release his claims to the extent that they are premised on events unrelated to the Merger.  (*See* Kramer Decl. Ex. A.)  Mr. Pinsly further demanded that the MOU be amended to clarify the scope of the release.  (*Id.*)

By letter dated June 7, 2012, the Individual Defendants assured Mr. Pinsly that the settlement releases would not cover Mr. Pinsly's claims relating to BofA's subprime exposure or the Countrywide merger.  (*See* Kramer Decl. Ex. B.)  In particular, the Individual Defendants provided Mr. Pinsly with the precise language of the release that would be presented

8

to the Court in the Settlement Agreement, which expressly provided that released claims would include only claims that "relate to, directly or indirectly, the subject matter of the [New York action]." (*Id.*) The Individual Defendants further represented in writing that "[t]his definition of 'Released Claims' is not intended to release, and in fact will not release, the claims that Mr. Pinsly purports to assert insofar as those claims do not relate to the [Merger] but instead relate solely to [BofA's] subprime exposure or the acquisition of [Countrywide]." (*Id.*)

Notwithstanding these written assurances, on November 27, 2012, Mr. Pinsly filed an objection to the settlement that included an objection to the breadth of the release. (Dkt. No. 770.) In particular, Mr. Pinsly objected both to the definition of "Released Claims," as well as the definition of "Unknown Claims" incorporated therein. Citing his subprime- and Countrywide-related claims, Mr. Pinsly argued that the proposed settlement was "not fair, reasonable, and adequate because it purport[ed] to release valuable claims that were neither brought nor diligenced in the [New York action], but were asserted in [Pinsly's own derivative action]." (*Id.* at 16.)

At the settlement fairness hearing on January 11, Mr. Pinsly presented this objection to the Court. Counsel for the Individual Defendants reiterated the Individual Defendants' assurance, previously provided to Mr. Pinsly in writing in the June 7 letter, that the release does not cover derivative litigation arising out of topics other than the Merger. (*See* Jan. 11, 2013 Hr'g Tr. at 26 (Kramer Decl. Ex. C).) Specifically, the Individual Defendants' counsel stated on the record that the release "is intended to release all . . . legal claims arising out of the Merrill Lynch transaction," and that "[t]o the extent there are derivative litigations arising out of other topics, such as the litigation that's being referred to [by Mr. Pinsly's counsel], *that is not released by this settlement*." (*Id.* (emphasis added).) Addressing Mr. Pinsly's objection, the

9

Court stated, "[i]t does sometimes come to pass that welcomed redundancy in an agreement can eliminate an issue. So you may wish to, in drafting your papers, make doubly clear that which you've confirmed was the intent of the parties in the first place." (*Id.* at 27.)

Following the hearing, a "belt and suspenders" approach was adopted to address Mr. Pinsly's objection. Specifically, the Individual Defendants and BofA agreed to an amendment to the proposed order and final judgment effectuating the Court's approval of the Settlement that added an unnecessary but express carve out of the non-Merger-related claims in the Pinsly action from the settlement release. This was done by amending the definition of "Released Claims" to provide "[f]or the avoidance of doubt" that "Released Claims do not include "derivative claims related to BAC's subprime exposure or its acquisition of Countrywide" and by adding to the definition of "Unknown Claims" the language already contained in the definition of "Released Claims" limiting the release to claims "which relate to . . . the subject matter" of the New York action. (*See* Dkt. No. 795-3.)

## **Argument**

Under Second Circuit case law, only attorneys who have contributed to the benefit to be received by a party are entitled to an award of attorneys' fees. *See Goldberger* v. *Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). For those who have added value and are entitled to an award, it is within the District Court's discretion to determine the appropriate amount of attorneys' fees to be awarded out of a settlement fund as a whole. *Id.*

To assess the reasonableness of a requested fee, "[c]ourts in the Second Circuit have favored the percentage method . . . [by which] the court calculates the fee award as some percentage of the settlement fund." *In re Nigeria Charter Flights Litig.*, No. MDL 2004–1613 (RJD)(MDG), 2011 WL 7945548, at *4 (E.D.N.Y. Aug. 25, 2011) (citing *Wal-Mart Stores, Inc.* v. *Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)). An analysis of the reasonableness of a

common fund fee award involves the consideration of the following factors from *Goldberger*: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50.

A.  **Lead Counsel's Fee Request Is Unreasonably High and Should Be Reduced by the Court**

In light of these principles, BofA respectfully submits that Lead Counsel's requested fee award of $13 million is unreasonably high. (*See* Kramer Decl. at ¶ 4.) While Lead Counsel contend that their request should be viewed as 20.8 percent of the total $62.5 million cash payment to BofA (Lead Pls.' Br. (Dkt. No. 815) at 23), Lead Counsel cannot properly be considered the driving force behind the $42.5 million increase from the original settlement to the final settlement. (*See supra* pp. 3, 6-7.) Viewed fairly, Lead Counsel's $13 million fee request comprises 65 percent of the monetary component of the $20 million settlement that Lead Counsel negotiated and to which Lead Plaintiffs were bound under the Settlement Agreement. This vastly exceeds the average range of attorneys' fees generally awarded to plaintiffs' counsel in this circuit. As the Second Circuit noted in *Goldberger*, which Lead Counsel cite throughout their brief, "empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally . . . award[ed] fees in the lower range of about 11% to 19%." 209 F.3d at 52.

Even assuming, *arguendo*, that Lead Counsel's fees are properly measured as a percentage of the final settlement amount, Lead Counsel's $13 million fee request is still too high. An award of $13 million is approximately 21 percent of the total monetary component of the final settlement, which would place the award at the high end of the range recognized in *Goldberger*. And that is before any other fee request is considered. While Lead Counsel cherry-

11

pick a handful of cases with fee awards of 20 percent and above (Lead Pls.' Br. (Dkt. No. 815) at 24), there also are numerous cases applying *Goldberger* in this judicial district in which the award made was below this range. *See, e.g., In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 09 Civ. 6351(RJS), 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012) (reducing requested fee application of 17.5 percent to 12 percent and citing cases where courts awarded fees below eight percent of the settlement fund); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2004 WL 2397190, at *12-*13 (S.D.N.Y. Oct. 26, 2004) (reducing requested fee award of 17 percent to 12 percent of settlement). In fact, in the *Goldberger* decision itself, which involved a total settlement amount in the same range as the $62.5 million figure here, the Second Circuit held that the district court did *not* abuse its discretion in awarding reduced attorneys' fees amounting to only 4 percent of the total settlement. *See Goldberger*, 209 F.3d at 53 (sustaining an award of attorneys' fees of $2.1 million, or 4 percent of total $54 million settlement, instead of requested $13.5 million, or 25 percent, and noting that "this Court has never found that a district court abused its discretion by awarding in a common fund case a fee that counsel assailed as too stingy").

        Equally important, Lead Counsel's analysis ignores the reality that another set of counsel, the Delaware Counsel, played a prominent role in the litigation of the derivative claims, including developing those claims in Delaware, and in the successful resolution of the New York action. Lead Counsel's fee request cannot be seen in a vacuum, separate and apart from the fee request of Delaware Counsel. Delaware Counsel and Lead Counsel chose to litigate parallel actions in two separate courts, with considerable duplication of efforts and resources, and at considerable additional expense to BofA in whose interests they purported to act. (In fact, Delaware Counsel represent that they devoted over 46,000 hours to the prosecution of the

Delaware action, and Lead Counsel represent that they devoted over 26,000 hours to the prosecution of the New York action.) BofA respectfully submits that a fee award of $15 million, or 24 percent of the total monetary component of the settlement — shared between Delaware Counsel and Lead Counsel — strikes the right balance.

Finally, Lead Counsel also argue that their fee request should recognize the value of the corporate governance enhancements that they negotiated and obtained as part of the settlement. To that end, Lead Counsel cite a number of therapeutics-only settlements in which the awarded fees ranged from $8.75 to $14.5 million. (Lead Pls.' Mot. (Dkt. 815) at 21-22.) Most of these awards, however, fell at the low end of that range (all but one were below $10 million), and the corporate therapeutics agreed to in these actions varied tremendously in scope and import. BofA does not dispute that the corporate governance enhancements negotiated as part of the settlement are valuable (although their value is difficult to quantify, as this Court noted in the January 4 Order). But it does not follow from that proposition that Lead Counsel are entitled to fees in the amount of 65 percent of the monetary component of the settlement to which Lead Counsel agreed.

**B.     The Weiser Firm's Request for Fees and Expenses Should
        Be Rejected in its Entirety**

Under applicable law, attorneys are only entitled to receive a portion of a settlement fund as an attorneys' fees award if their efforts contributed to the creation of that fund. *See Goldberger* v. *Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citing *Boeing Co.* v. *Van Gemert*, 444 U.S. 472, 478 (1980)). The Weiser firm did not contribute to the creation of the settlement fund, and thus is not entitled to fees from that fund.

Mr. Pinsly and his counsel at the Weiser firm — unlike Lead Counsel and Delaware Counsel — did not add any value to the settlement. The Weiser firm did not prosecute

13

the New York action or the Delaware action. The Weiser firm also did not play any role in negotiating the additional monetary consideration in the revised, final settlement. (*See* Portnoy Decl. at ¶ 6.) While Mr. Pinsly filed an objection to the adequacy of the monetary component of the original settlement, this objection was largely premised on an *ad hominem* attack on the adequacy of the two institutional plaintiffs appointed as Lead Plaintiffs in the New York action. (*See, e.g.*, Dkt. No. 770, at 1-4.) Mr. Pinsly did not substantiate that attack with any concrete evidence, and this Court did not cite the adequacy of Lead Plaintiffs as a concern at any time during its consideration of the original settlement.

In its fee motion, the Weiser firm also makes much of a minor edit to the general release contained in the settlement that it alleges came about solely through its efforts and which it claims radically improved the terms of the final settlement for all plaintiffs. (*See* Pinsly Br. (Dkt. No. 810) at 2, 18.) The alterations demanded by the Weiser firm, discussed *supra* pp. 8-10, were unnecessary and certainly did not add value to the settlement. As this Court noted at the settlement hearing, the changes to the language of the release demanded by the Weiser firm constituted a "redundancy," and the Court simply suggested that the parties "make *doubly* clear [in the final settlement papers] that which you've confirmed was the intent of the parties in the first place." (*See* Jan. 11, 2013 Hr'g Tr. at 27: 1-5 (Kramer Decl. Ex. C) (emphasis added); *see also* Kramer Decl. Ex. B.)

In fact, settlements containing language substantially identical to the original "Unknown Claims" release — without the addition sought by the Weiser firm here — have been approved in this district on other occasions. By way of example, in *In re Pfizer Inc. Shareholder Deriv. Litig.*, 780 F. Supp. 2d 336 (S.D.N.Y. 2011), Judge Rakoff approved a derivative settlement — to which the Weiser firm was a signatory — with a broadly worded release of

certain known and unknown claims that did not expressly limit its definition of "Unknown Claims" in the manner that the Weiser firm insisted was necessary here. (*See* 09 Civ. 7822, Dkt. Nos. 88 and 127.) BofA therefore respectfully submits that the "redundancy" contributed by the Weiser firm does not merit any award, much less the $2 million award it seeks.

In addition, the $2 million award sought by the Weiser firm is unhinged from any efforts the Weiser firm actually expended in this action. In the Nelson Declaration that accompanies the Weiser firm's motion, the Weiser firm claims to have spent 507 hours on the litigation of the New York action, with a lodestar of $240,475. (Nelson Decl. (Dkt. No. 811) at ¶ 14.) The Weiser firm seeks to recover *more than 8 times its lodestar* through its $2 million fee request. This is an exorbitant demand and should be denied on that basis as well.

Moreover, the 507 hours that the Weiser firm purportedly expended includes time worked on a books and records inspection demand filed in Delaware Chancery Court under Delaware General Corporation Law § 220 (the "220 Action"), in an effort to obtain discovery relating to the proposed settlement of the New York action before this Court. (*See* Nelson Decl. (Dkt. No. 811) at ¶ 14 & n.1.) Among the reasons Mr. Pinsly gave for bringing this 220 Action was that it would be a "futile act" to request such settlement related discovery from this Court, which had previously denied a request for such discovery by other objectors to the proposed settlement (namely the Delaware Shareholders), based upon the lack of relevance of the materials. (*See* 12 Civ. 4778 Dkt. No. 22-2 at 45.) In a bench ruling on December 20, 2012, the Delaware court denied Mr. Pinsly's motion for judgment on the pleadings in the 220 Action, noting (among other things) that it was improper for Mr. Pinsly to attempt to use a Section 220 action to collaterally attack this Court's discovery ruling in the New York action. (*See* 12 Civ. 4778 Dkt. No. 22-2 at 63-66 (denying Mr. Pinsly's motion for judgment on the pleadings in the

220 Action because, in seeking "to circumvent orders by other courts denying discovery into the same documents" and "try[ing] to make an end run around stays of discovery," the 220 Action lacked the "proper purpose" that a shareholder demanding corporate books and records must show under Delaware law).)  BofA respectfully submits that there is no basis to compensate the Weiser firm for any time spent on the 220 Action, which merely served the purpose of wasting the time and resources of both BofA and the Delaware Chancery Court.

**Conclusion**

For all of the foregoing reasons, BofA respectfully requests that the Court reduce Lead Counsel's request for fees to no more than $7.5 million, and deny the Weiser firm's motion for an award of attorneys' fees and expenses in its entirety.

Dated: New York, New York
March 1, 2013

Respectfully submitted,

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

By: _/s Daniel J. Kramer_
Brad S. Karp
Daniel J. Kramer
Audra J. Soloway
1285 Avenue of the Americas
New York, NY  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
dkramer@paulweiss.com

**CLEARY, GOTTLIEB, STEEN &
HAMILTON LLP**

Mitchell A. Lowenthal
Lewis J. Liman
Jennifer Kennedy Park
One Liberty Plaza
New York, NY  10006
Tel:  (212) 225-2000
Fax:  (212) 225-3999

**WACHTELL, LIPTON, ROSEN & KATZ**

Peter C. Hein
Eric M. Roth
51 West 52nd Street
New York, NY  10019
Tel:  (212) 403-1000
Fax:  (212) 403-2000

*Attorneys for Nominal Defendant Bank of America Corporation*

17