**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                             :

IN RE BANK OF AMERICA CORP.     :
SECURITIES, DERIVATIVE, AND     :
EMPLOYEE RETIREMENT INCOME   :     Master File No. 09 MDL 2058 (PKC)
SECURITY ACT (ERISA) LITIGATION  :
                             :     ECF CASE
------------------------------------------------------------x
                             :

THIS DOCUMENT RELATES TO     :
                             :

All Derivative Actions             :
                             :
------------------------------------------------------------x

 

**LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................1

     I.     Plaintiffs' Fee Request is Reasonable and Should Be Granted ..............................1

          A.     The Shareholders' Reaction Provides Powerful Evidence that the
Requested Fee is Fair and Reasonable .......................................................1

          B.     BAC's Response Disregards Both the Facts and the Law ...........................2

               1.     The "Great Value" of the Governance Reforms Must Be
Considered .....................................................................................3

               2.     Lead Counsel Played an Integral Role in Achieving the
Settlement, Including Increasing the Monetary Component ..........5

                    a.     BAC cannot credit litigation in Delaware for
advancing the settlement of this action .............................5

                    b.     BAC's proposal to split fees equally among Lead
Counsel and the Delaware Objectors' counsel is
unsupported........................................................................7

                    c.     Alternatively, the increase in monetary component
should be shared proportionately amongst Lead
Counsel and Delaware Objectors' counsel. ......................9

     II.     There Are No Objections to Plaintiffs' Request for Reimbursment of Expenses ...9

CONCLUSION......................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Cohorst v. BRE Props., Inc.*,
    No. 10cv2666 JM (BGS), 2012 WL 2001754 (S.D. Cal. June 5, 2012) ....................................9

*Goldberger v. Integrated Resources, Inc.*,,
    209 F.3d 45 (2d Cir. 2000) ...............................................................................................3

*In re AMF Bowling Sec. Litig.*,
    334 F. Supp. 2d 462 (S.D.N.Y. 2004)................................................................................2

*In re AOL Time Warner S'holder Derivative Litigation*,
    No. 02-cv-6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)..............................................3

*In re Apple Computer, Inc. Deriv. Litig.*,
    No. 06-cv-4128, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008)...........................................4, 9

*In re Bank of Am. Sec., Deriv. & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)................................................................................8

*In re Cendant Corp., Deriv. Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2002) ...................................................................................2

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009)......................................................................................7

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................................7

*In re Interpublic Securities Litigation*,
    No. 02-cv-6527, 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) .............................................3

*In re MDC Holdings Sec. Litig.*,
    No. 89-cv-90, 1990 WL 454747 (S.D. Cal. Aug. 30, 1990) ..............................................4, 9

*In re NVidia Corp. Derivative Litigation*
    No. C-06-06110, 2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009)........................4, 9

*In re Pfizer Inc. Derivative Litigation*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011)................................................................................9

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) .............................................................................................2

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)..............................................................................2, 5

*In re Wachovia Preferred Securities and Bond/Notes Litigation.*,
   No. 09-cv-6351, 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012) ....................................................3

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) .........................................................................................4

*Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*,
   No. 10-cv-7821, 2012 WL 603996 (S.D.N.Y. Feb. 23, 2012) ...................................................2

*Maley v. Del Global Tech. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................................2, 3

*Metro. Life Deriv. Litig.*,
   935 F. Supp. 286 (S.D.N.Y. 1996) ..............................................................................................3

*Milstein v. Werner*,
   58 F.R.D. 544 (S.D.N.Y. 1973)...................................................................................................5

*Sines v. Serv. Corp. Int'l*,
   No. 03 CIV. 5465 (PKC), 2006 WL 1148725 (S.D.N.Y. May 1, 2006) ....................................4

*White v. Auerbach*,
   500 F.2d 822 (2d Cir. 1974) ........................................................................................................7

## INTRODUCTION

After giving notice to the owners of Bank of America's 10.7 billion shares of common stock, not a single shareholder has objected to Plaintiffs' application for attorneys' fees and expenses.  BAC agrees that Lead Counsel deserve a substantial fee for their services; however, it now urges that Lead Counsel and counsel for the Delaware Objectors be paid $7.5 million each. In the process, BAC trivializes the Corporate Governance reforms achieved by the Settlement, which the Court recognized conferred "great value" on BAC and which the BAC Defendants themselves once loudly championed as providing "extensive," "forward-looking," "real," "substantial," "valuable," "meaningful," "immediate," "concrete" and "certain" benefits.  Dkt. No. 747 at 1-2, 16, 30.  And the Bank marginalizes Lead Counsel, who not only brought the most valuable claims that served as the basis for the Settlement, but also litigated most efficiently on behalf of BAC.  In sum, nothing in BAC's response to Plaintiffs' fee request calls into question its reasonableness in light of the outstanding results achieved.  Accordingly, Plaintiffs respectfully reaffirm their request for $13 million in attorneys' fees and $419,800.54 in expenses.

## ARGUMENT

Plaintiffs have demonstrated that Lead Counsel earned their requested fee of $13 million by virtue of a final Settlement that not only ranks among the top ten federally-approved derivative settlements, but also mandates tailored, wide-reaching reforms that place BAC at the cutting edge of corporate governance practices in the country.  Moreover, Plaintiffs have demonstrated that their fee request is reasonable both as a percentage of the total Settlement fund of $62.5 million, and as a modest 1.14 multiplier to Lead Counsel's $11.3 million lodestar.  *See* Dkt. No. 815 ("Br.").

**I.     PLAINTIFFS' FEE REQUEST IS REASONABLE AND SHOULD BE GRANTED**

**A.     The Shareholders' Reaction Provides Powerful Evidence that the Requested Fee is Fair and Reasonable**

Pursuant to the Court's Order (Dkt. No. 799), on January 31, 2013, Lead Counsel published the Notice of Fee Hearing that informed BAC shareholders, for the second time, that

1

Lead Counsel would be applying for fees not to exceed $13 million and expenses. *See* JAFD

Exh. N (Dkt. No. 817-14).[1]  Having been informed twice of Plaintiffs' fee request and their right

to object, not a single shareholder objected.  Notably, 58% of BAC's shares are held by

institutional investors, including major banks and financial institutions, mutual funds, sovereign

funds, and some of the world's largest retirement funds.  *See* Reply JAD Exh. 2 (Dkt. No. 780-

2).  These "sophisticated institutional investors" had "considerable financial incentive to object

[if] they believed the requested fees were excessive."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d

294, 305 (3d Cir. 2005).  The fact that none did "is powerful evidence that the requested fee is

fair and reasonable."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 594 (S.D.N.Y. 2008).  *See*

*also Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) ("[T]his

overwhelmingly positive response by the Class attests to the approval of the Class with respect to

. . . the fee and expense application.").

### B.   BAC's Response Disregards Both the Facts and the Law

By any measure, Plaintiffs' fee request is fair.  It comprises 20.8% of the $62.5 million

cash component, which is reasonable in light of the Court's previous fee awards and of similar

derivative recoveries.[2]  And it is a modest 1.14 multiplier to Lead Counsel's lodestar.  *See* Br. at 4.

BAC concedes that 24% of the cash component is reasonable.  However, it opposes

Plaintiffs' fee request and proposes to allocate $7.5 million to both Lead Counsel and Delaware

Objectors' counsel.  *See* Dkt. No. 833 ("Bank Br.") at 3, 11-13.  But, as demonstrated below,

BAC substantially ignores the value of the Corporate Governance reforms and substantially

understates the role Lead Counsel played in both achieving the Settlement and in increasing the

---

[1]   Lead Counsel first noticed the anticipated fee request on October 12, 2012.  *See* Stipulation (Dkt. No. 750-1),
Exh. C at 11.
[2]   *See, e.g.*, *In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 469 (S.D.N.Y. 2004) (Castel, J.) (awarding 25%
of class action settlement fund); *Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*, No. 10-cv-7821, 2012 WL 603996,
at *2-3 (S.D.N.Y. Feb. 23, 2012) (Castel, J.) (awarding 20% of class action settlement fund in a case where issues
"were relatively straightforward" and no depositions were taken).  *See also In re Pfizer Inc. S'holder Deriv. Litig.*,
780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) (awarding fees of $22 million for settlement including $75 million cash
and extensive governance reforms, or 29.3% of cash component); *In re Cendant Corp., Deriv. Action Litig.*, 232 F.
Supp. 2d 327, 340 (D.N.J. 2002) (awarding $12 million in attorneys' fees over objections, comprising 22% of the
$54 million cash recovery received by the corporation).

cash component.

Moreover, BAC does not explain how Plaintiffs' citations to this Court's previous orders awarding fees, and fee awards in derivative cases of similar size and scope, amount to "cherry-pick[ing]" (Bank Br. at 12), merely citing three cases involving dissimilar facts.  *See id.*[3]

### 1.  The "Great Value" of the Governance Reforms Must Be Considered

Through Lead Counsel's efforts alone, BAC agreed to implement four fundamental corporate governance reforms.[4]  These reforms were formulated with the assistance of, and endorsed by, Professor Dan R. Dalton, whose opinions have not been challenged in this action. Dalton Decl. ¶¶ 2-3 (Dkt. No. 750-2).  Professor Elizabeth A. Nowicki has conservatively estimated their value to be worth "hundreds of millions" of dollars, Nowicki Decl. ¶ 45 (Dkt. No. 756-1); Nowicki Supp. Decl. ¶ 13 (Dkt. No. 780-7); Dkt. No. 782, at 17-19, a point which BAC does not dispute.  As reflected in their respective Declarations, both Professors Dalton and Nowicki are nationally-recognized corporate governance experts.  The Court itself noted that these reforms "have great value" and, critically, "are tailored directly to the alleged deficiencies asserted in this action."  Fairness Hr'g Tr. at 36:12-13; 43:8-15.  Courts uniformly praise such targeted reforms as providing powerful and substantial benefits to companies, justifying fee awards in and of themselves.[5]  Yet BAC, which previously extolled their value, now attempts to undermine them.

BAC contends that the fee awards in most of Plaintiffs' cases fall "at the low end" of the $8.75–$14 million range for therapeutics-only settlements.  But BAC makes no attempt to

---

[3]   In *In re Wachovia Preferred Securities and Bond/Notes Litigation.*, No. 09-cv-6351, 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012), the total settlement fund was $627 million and the original fee request was $75.24 million and would have constituted a multiplier of approximately 3.3.  In *In re Interpublic Securities Litigation*, No. 02-cv-6527, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004), the originally requested fee would have resulted in a 5.62 multiplier, and the court reduced fees such that the final multiplier was 3.96.  In *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 45, 46-56 (2d Cir. 2000), the Second Circuit affirmed a fee award based purely on lodestar and declining to award a multiplier in light of: (i) counsel's rates "clearly at the higher end" of prevailing rates," (ii) the "dramatically" increased chance of success arising from guilty pleas by Drexel Burnham and Michael Millken, and (iii) the absence of any "groundbreaking" legal issues.  *Cf.* Fairness Hr'g Tr. (Dkt. No. 795-4) at 40:13-41:18.

[4]   *See* Br. at 16-18.  The Delaware Objectors never sought to improve the governance reforms achieved by Plaintiffs.  Rather, they denigrated the reforms as effectively worthless.  *See* Dkt. No. 763, at 26-35.

[5]   *See, e.g.*, *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02-cv-6302, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006); *In re Metro. Life Deriv. Litig.*, 935 F. Supp. 286, 292 (S.D.N.Y. 1996).  *See also* Br. at 21-22.

distinguish the reforms in any of those cases from the reforms here, and it admits that the settlements in those cases featured therapeutics that "varied tremendously in scope and import." Bank Br. at 13. Without belaboring the already voluminous record on this issue, the reforms here:

> [A]re *decidedly warranted and confer substantial benefits on Bank of America.* When fully implemented, these rectifications will *markedly improve* the corporate governance, mergers, acquisitions, and other corporate restructurings, and derivatively the overall risk management processes of Bank of America.

Dalton Decl. ¶ 4 (Dkt. No. 750-2) (emphases added). That $8.75–$14 million in fees have been awarded for therapeutics of lesser scope highlights the reasonableness of Plaintiffs' request.

BAC's focus on the $13 million fee request as a percentage of the initial cash component is myopic. *See* Bank Br. at 11. Courts have long awarded fees constituting a large percentage of the cash amount when accompanied by substantial governance reforms. *See, e.g., In re Apple Computer, Inc. Deriv. Litig.*, No. 06-cv-4128, 2008 WL 4820784, at *3-4 (N.D. Cal. Nov. 5, 2008) (awarding fees comprising 63% of cash payment to company where accompanied by extensive corporate governance reforms); *In re NVidia Corp. Deriv. Litig.*, No. C-06-06110, 2009 U.S. Dist. LEXIS 24973, at *14-16 (N.D. Cal. Mar. 18, 2009) (same, 91% of cash and 46% of total economic value); *In re MDC Holdings Sec. Litig.*, No. 89-cv-90, 1990 WL 454747, at *3-4 (S.D. Cal. Aug. 30, 1990) (same, 60% of cash). Even assuming that the governance reforms entitle Lead Counsel only to a fee of $9 million, which is "at the low end" of the $8.75–$14.5 million range, the remaining $4 million requested would constitute only 20% of the *original* monetary component achieved prior to the Delaware Objectors' appearance in this action. This by itself demonstrates the reasonableness of Plaintiff's request. It is below the 24% that BAC believes to be reasonable. And when measured against the entire $62.5 million cash component, as it should be, Plaintiffs' fee request is eminently fair. Analyzing the fee award solely on the monetary recovery would provide perverse incentives to future derivative plaintiffs *not* to seek cash in addition to governance reforms, for fear of artificially capping their fees.[6]

---

[6]   *See* Br. at 23. *See also Sines v. Serv. Corp. Int'l*, No. 03 CIV. 5465 (PKC), 2006 WL 1148725, at *1 (S.D.N.Y. May 1, 2006) (Castel, J.) ("It is important that counsel receive full and fair compensation for their work lest an inadequate award serve as a disincentive to filing meritorious suits in the future."); *In re WorldCom, Inc. Sec. Litig.*,

### 2. Lead Counsel Played an Integral Role in Achieving the Settlement, Including Increasing the Monetary Component

#### a. BAC cannot credit litigation in Delaware for advancing the Settlement of this action

BAC urges that Plaintiffs' fee application "ignores the reality that [Delaware Objectors' counsel] played a prominent role in the litigation of the derivative claims, including developing those claims in Delaware . . . ."  Bank Br. at 12.  This is wrong.  BAC ignores that, with respect to this action, Delaware counsel represented objectors, not litigants.  Any development of the state-law claims in that litigation neither formed the basis for the negotiation of, nor were reflected in, the Settlement approved in this litigation.  Rather, the Section 14(a) claims drove the Settlement, for reasons the Court noted:

> The reality is that the New York action is the action in which the 14(a) claim was pending.  And, in addition to the state law breach of fiduciary duty claims, it was the 14(a) claim which was governed by a negligence standard and, arguably, was the easier claim to prove.

Fairness Hr'g Tr. at 44:11-17; *see also id.* at 40:5-19.  In short, the Delaware Objectors' choice to pursue far more difficult claims in Delaware did not make a difference to this Settlement; if anything, it simply produced duplicative and uncoordinated discovery that unnecessarily added to the financial burdens of the nominal defendant.

Similarly misguided is BAC's attempt to credit the Delaware Objectors with creating the conditions leading to the increased cash component after the January 11 Fairness Hearing, given the Court's explanation for issuing the January 4 Order.  *See* Fairness Hr'g Tr. at 35:3-9 (referring to "work-in-progress" on an order for summary judgment in the Securities Action).  As the Court noted, it had "lived with" this action for nearly four years and took great efforts to "familiarize itself in . . . great detail" with it.  Fairness Hr'g Tr. at 35:10-14.  While Plaintiffs recognize that the Delaware Objectors were invited to participate in the revisions, unlike

---

388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are willing to do so, it is necessary to provide appropriate financial incentives"); *In re Telik*, 576 F. Supp. 2d at 585 ("in addition to providing just compensation, awards of attorneys' fees . . . serve to encourage skilled counsel"); *Milstein v. Werner*, 58 F.R.D. 544, 549 (S.D.N.Y. 1973) (fee allowances in derivative actions "should be viewed as an incentive, as much as a just reward for services performed").

Plaintiffs, their assent was not necessary to an approved Settlement, and it was the resources invested by the Court, Lead Counsel, Defendants' Counsel, and the D&O Insurers' counsel that facilitated the conditions giving rise to the increased cash component.  Indeed, the amended Stipulation, which BAC, Defendants, Lead Counsel, and Delaware Objectors' counsel all signed, squarely contradicts any claim that the Delaware Objectors were principally responsible for the increase in the cash component.  *See* Dkt. No. 795-3 ¶¶ I–J.  In that regard, the Stipulation merely accorded with what was true both before and after the January 4 Order.

Immediately after the January 4 status conference with the Court, Lead Counsel told Defendants' Counsel that a larger cash component would be a necessary part of the Settlement. JAFD ¶ 70 (Dkt. No. 817).  Throughout the next week, Lead Counsel engaged in telephonic conferences with Defendants' Counsel, often several times per day.  *Id.* ¶¶ 71-72.  These discussions were aimed at securing a monetary component that Lead Counsel and Defendants' Counsel believed the Court would find acceptable in light of the January 4 Order.  As part of these efforts, Lead Counsel and Defendants' Counsel participated in a series of status conferences between January 8 and 11 to advise the Court of the efforts, the Parties' and the D&O Insurers' positions, and the progress being made.  *Id.* ¶¶ 72-73.  The Court expressed appreciation and encouraged the Parties to continue to negotiate.  Lead Counsel also spoke occasionally with Delaware Objectors' counsel.  Lead Counsel and Defendants' Counsel worked well into the early morning hours of January 11 to secure the final cash component, *id.* ¶¶ 73-74, but it was only a few hours earlier that Delaware (having made an implausible demand on January 7 that was far afield of the feasible range that Lead Counsel, Defendants' Counsel, and D&O Insurers' counsel worked off the entire week) had even re-entered the discussions.

BAC did not participate in any of the final week's discussions with Lead Counsel.  *See* Fairness Hr'g Tr. at 25:11-13 (statement of Bank counsel) ("Our role in the past week has been that of encouraging all of the parties to reach a settlement . . . .").  Its contention that the Delaware Objectors were "principally" responsible for the increased cash component relies only on Defendants' Counsel's assertion that Lead Counsel "were not in a position to bargain for

additional consideration, and I did not consider myself to be in negotiation with them . . . ." Portnoy Decl. ¶ 5. But the notion that Lead Counsel were duty-bound to adhere to the original Settlement is belied by the January 4 status conference and the January 4 Order itself, in which the Court instructed *all* counsel, including Lead Counsel, to discuss "revisions." Dkt. No. 791. *See also* Fairness Hr'g Tr. at 35:24-36:4 ("The Court meant every word of the order that was issued last Friday."). Throughout the litigation, Lead Counsel "acted in the utmost of good faith and in a sincere effort to represent the best interest of their clients." *Id*. at 44:20-22. *See also id*. at 43:21-24 ("[T]he settlement negotiations appeared to have been conducted in good faith.").

### b.  BAC's proposal to split fees equally among Lead Counsel and Delaware Objectors' counsel is unsupported

BAC seeks to pay the Delaware Objectors $7.5 million, which is 12% of the cash component and a 1.75 multiplier to their counsel's $4.298 million in lodestar. But BAC provides no authority or justification for its contention that $7.5 million for each Lead Counsel and Delaware Objectors' counsel "strikes the right balance." Bank Br. at 13. BAC neglects the well-settled law that objectors are entitled to a fee award only "where a proper showing has been made that the settlement was improved as a result of their efforts." *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 132 (S.D.N.Y. 2009) (quoting *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974)). In unilaterally proclaiming what is reasonable, BAC essentially usurps the Court's "broad discretion" to determine a fee award. *White*, 500 F.2d at 828.[7]

BAC does not set forth any grounds justifying its position that an objector is entitled to share fees on similar footing—much less exactly equally—with the counsel who bore the risk of,

---

[7]    Similarly unavailing is the Bank's argument that fees for cash settlements in the $50-75 million range "empirically" constitute only 11%-19% of the fund. Bank Br. at 12. As noted *supra*, note 3, *Goldberger* involved dissimilar facts. Moreover, it pointedly rejects any implication that there is a mandatory benchmark percentage for fees. *See id.* at 53 ("A fee award should be assessed based on scrutiny of the unique circumstances of each case."). As one court noted, the principle of awarding lower percentage fees on large-sized settlements "cannot be considered in isolation *without also reviewing the amount of work and time spent by counsel in this litigation*." *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 514-15 (S.D.N.Y. 2009) (emphasis added). Where, as here, a case settles only after substantial discovery and motion practice, and the requested fee is nearly equal to lodestar, *Goldberger*'s "empirical" range does not dictate a reduction. *See, e.g., id. See also In re Pfizer*, 780 F. Supp. 2d at 343 ("Moreover, the Court notes that the requested fee award compares favorably with plaintiffs' counsel's lodestar, given the 38,720 hours they report having spent prosecuting this action.") Notably, in *Pfizer*, plaintiffs' counsel's lodestar amount was $16 million; fees represented a 1.375 multiplier, less than the 1.14 multiplier sought here. *See* Dkt. No. 750-16 ¶ 97.

litigated, and settled the action, and irrespective the extent to which the objector's activities actually contributed to settlement approval.[8]  Nor does BAC's contention find support in the Portnoy Declaration, which does not credit the Delaware Objectors with principal responsibility for the increase.  *See* Portnoy Decl. ¶¶ 4-5 (Dkt. No. 835).  For that matter, the Portnoy Declaration does not indicate that *Defendants* believed they were negotiating with the Delaware Objectors.  *See id.* ¶¶ 3-5.  In fact, Lead Counsel specifically recall Mr. Portnoy informing this Court during the January 10 status conference that the parties' significant progress to that point was not in response to the Delaware Objectors' January 7 demand but rather was geared to the concerns raised by the Court in the status conferences of January 4 and January 9.

In addition, BAC's claim that Lead Counsel's efforts were "duplicative" of Delaware counsel's is exactly backwards.  The Court itself has recognized that Lead Counsel carefully avoided duplicative work that "cut[] down on fees and expenses" and thereby "facilitate[d] the conduct of discovery . . . ."  Fairness Hr'g Tr. at 39:3-6.  BAC's suggestion that Lead Counsel should be punished because the Delaware Objectors chose to file actions with far higher evidentiary standards than the federal Section 14(a) claims asserted in this action is contrary to what BAC should have wanted on its behalf.  As this Court noted in its denial of Defendants' motion to abstain in favor of the Delaware Action, the Section 14(a) claims represented "a significant consideration because important federal policies are implicated."  *In re Bank of Am. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 345-46 (S.D.N.Y. 2010).

In sum, BAC simply ignores the very substantial time, effort, and financial resources that Lead Counsel committed to the prosecution of this case on the Bank's behalf; instead, it seeks to marginalize Lead Counsel's efforts, without which no Settlement could have been achieved.  As demonstrated above, if the Delaware Objectors or Pinsly were never to have appeared in this action, the result would have been the same.  And the now-finally-approved Settlement would

---

[8]     *See In re Visa Check/Mastermoney Antitrust Litig.*, No. CV-96-5238, 2004 U.S. Dist. LEXIS 8737, at *20-36 (E.D.N.Y. Apr. 2, 2004) ((limited objector to lodestar reasonably related to objection), *adopted*, 2004 U.S. Dist. LEXIS 8729 (E.D.N.Y. Apr. 27, 2004).

not have been possible without Lead Counsel's and Defendants' Counsel's commitment to take the Court's concerns to heart, negotiate in good faith, communicate with the Court, and, when necessary, invoke the Court's guidance and oversight.

                         **c.**      **Alternatively, the increase in monetary component should be shared proportionately amongst Lead Counsel and Delaware Objectors' Counsel**

Even assuming, *arguendo*, that the Delaware Objectors contributed substantively to the increase in cash consideration, and should be paid based on a percentage of it, it would be patently unfair, and contrary to Lead Counsel's integral role, not to apportion the increase among both Lead Counsel and the Delaware Objectors' counsel. Even if, for example, the Court gave equal credit to Lead Counsel and Delaware Objectors' counsel for this amount, Lead Counsel would be responsible for a total of $41.25 million plus the value of the governance reforms.[9] Under these assumptions (and even ascribing *no* value to the governance reforms), the requested fee would amount to 31.5% of the cash, in line with or less than fees awarded in other situations where substantial governance reforms were achieved. *Cf. In re Pfizer Inc.*, 780 F. Supp. 2d at 343 (fees equal to 29.3% of cash); *In re Apple Computer*, 2008 WL 4820784, at *4 (63% of cash); *In re MDC Holdings*, 1990 WL 454747, at *4 (60% of cash); *In re Nvidia Corp.*, 2009 U.S. Dist. LEXIS 24973, at *14-16 (91% of cash and 46% of total economic value).

## II.    THERE ARE NO OBJECTIONS TO PLAINTIFFS' REQUEST FOR REIMBURSEMENT OF EXPENSES

Plaintiffs seek $419,800.54 in unreimbursed costs, an amount significantly less than the $700,000 ceiling referred to in the Fee Notice. *See* Dkt. No. 799. No one has objected.

---

[9]    *See, e.g., Cohorst v. BRE Props., Inc.*, No. 10cv2666 JM (BGS), 2012 WL 2001754, at *3 (S.D. Cal. June 5, 2012) (proportionately sharing fee based on increase in settlement for which objectors played a role) Even if Lead Counsel's and Delaware counsel's fee requests were granted in their entirety, for a total of $20.5 million, they would constitute 32.8% of the cash component of the Settlement, an amount supported by precedent for settled litigation of similar scope and complexity. *See, e.g., In re Pfizer*, 780 F. Supp. 2d at 343; *In re Apple Computer*, 2008 WL 4820784, at *4. When the Corporate Governance reforms are accounted for, of course, the true percentage allocated to attorneys' fees is substantially less.

## CONCLUSION

For these reasons, and for reasons set forth in their moving brief, Plaintiffs respectfully request that attorneys' fees and expenses be awarded to Lead Counsel in the amounts requested.

Dated:  March 15, 2013

Respectfully submitted,

SAXENA WHITE P.A.

*/s/ Joseph E. White III*
Joseph E. White, III
Lester R. Hooker
Brandon T. Grzandziel
*jwhite@saxenawhite.com*
*lhooker@saxenawhite.com*
*bgrzandziel@saxenawhite.com*
2424 North Federal Hwy. Suite 257
Boca Raton, Florida 33431
Tel: (561) 394-3399
Fax: (561) 394-3082

KAHN SWICK & FOTI, LLC

Lewis S. Kahn
Michael A. Swick
Albert M. Myers
Melinda Nicholson
*lewis.kahn@ksfcounsel.com*
*michael.swick@ksfcounsel.com*
*albert.myers@ksfcounsel.com*
*melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, Louisiana 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498

*Lead Counsel for Lead Plaintiffs*

LAW OFFICES OF CURTIS V. TRINKO, LLP

Curtis V. Trinko
Jennifer Traystman
C. William Margrabe
*ctrinko@trinko.com*
*jtraystman@trinko.com*
*wmargrabe@trinko.com*
16 West 46th Street, 7th Floor
New York, NY 10036
Tel.: (212) 490-9550
Fax: (212) 986-0158

*Liaison Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 15, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

/s/ Joseph E. White, III
Joseph E. White, III

11