USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-25-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE: BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME               Master File No. 09 MD 2058 (PKC)
SECURITY ACT (ERISA) LITIGATION
------------------------------------------------------------x               MEMORANDUM AND ORDER
THIS DOCUMENT RELATES TO:

MICHAEL WABER, derivatively on behalf of
BANK OF AMERICA CORPORATION,

                         Plaintiff,                          12 Civ. 4568 (PKC)

             -against-

KENETH D. LEWIS, et al,

                         Defendants,
------------------------------------------------------------x
MATTHEW PINSLY, derivatively on behalf of
BANK OF AMERICA CORPORATION,

                         Plaintiff,                          12 Civ. 4778 (PKC)

             -against-

CHARLES O. HOLLIDAY, JR., et al,

                         Defendants,
------------------------------------------------------------x
P. KEVIN CASTEL, District Judge:

    Plaintiffs Matthew Pinsly and Michael Waber bring separate derivative actions

on behalf of nominal defendant Bank of America Corporation ("BofA") alleging that BofA's

directors and officers breached their fiduciary duties and were unjustly enriched when BofA

acquired Countrywide Financial Corporation ("Countrywide") and Merrill, Lynch & Co.

("Merrill"). Pinsly separately alleges that defendants breached their fiduciary duties to BofA

when they invested in volatile subprime assets despite knowing of their attendant risks, while

-2-

Waber separately asserts that defendants are liable to BofA for investigations and claims concerning their lending practices. Both Pinsly and Waber submitted litigation demands to BofA's board of directors, which declined to pursue the claims. Pinsly and Waber both contend that the board's refusals to pursue legal action were motivated by bad faith and self-interest.

All defendants have moved to dismiss the <u>Pinsly</u> and <u>Waber</u> complaints pursuant to Rule 12(b)(6), Fed. R. Civ. P. In each case, separate motions have been filed by the individual defendants and by nominal defendant BofA. Because the two complaints set forth similar allegations against overlapping parties, this Memorandum and Order reviews all four motions to dismiss in the <u>Pinsly</u> and <u>Waber</u> cases.

Because the complaints do not plausibly allege that BofA's board refused plaintiffs' litigation demands in violation of the Delaware business judgment rule, they are dismissed. The plaintiffs' claims also are dismissed on separate and independent grounds. For the reasons explained, the Order and Judgment in the consolidated derivative action, which asserted claims arising from BofA's acquisition of Merrill, precludes plaintiffs from pursuing these derivative actions concerning the Merrill acquisition. <u>See</u> 09 MD 2058, Docket # 805. Additionally, the <u>Pinsly</u> and <u>Waber</u> complaints name as defendants certain individuals who had no affiliation with BofA at the time of the alleged wrongdoings, and also fail to state claims for breach of fiduciary duty or unjust enrichment under Delaware law.

The <u>Pinsly</u> and <u>Waber</u> actions are therefore dismissed.

BACKGROUND

For the purposes of defendants' motions, all non-conclusory factual allegations set forth in the two complaints are accepted as true, <u>see</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662

(2009), and all reasonable inferences are drawn in favor of Pinsly and Waber.  See In re

Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

    A.  BofA's Acquisition of Countrywide.

        1.  Countrywide-Based Allegations in the *Pinsly* Action.

        BofA purchased Countrywide in 2008 for $4 billion.  (Pinsly Compl't ¶¶ 9-10.)

Defendants publicly stated that BofA conducted "extensive due diligence" of Countrywide,

even though, plaintiff asserts, there were significant liabilities and then-unknown problems

concerning Countrywide's underwriting and lending practices.  (Pinsly Compl't ¶¶ 10-11,

108-09, 113-18.)  According to Pinsly, the Countrywide acquisition "dramatically increased"

BofA's subprime exposure, leaving BofA with a portfolio of extensive liabilities and

deteriorating assets.  (Pinsly Compl't ¶¶ 106-07, 119-25.)  Pinsly asserts that defendants

withheld information about the true condition of Countrywide, which proved to be "one of the

most destructive acquisitions" in U.S. history, with "disastrous effects" that continue to harm

BofA and shareholders.  (Pinsly Compl't ¶¶ 12-15.)  The Complaint alleges that BofA has

suffered more than $20 billion of loss through litigation and the lost value of Countrywide-

related assets.  (Pinsly Compl't ¶¶ 16-19.)

        2.  Countrywide-Based Allegations in the *Waber* Action.

        Waber's complaint notes that in a press release, Lewis described Countrywide

as "the best domestic mortgage platform at an attractive price," and stated that its acquisition

would "affirm our position as the nation's premier lender to consumers.  (Waber Compl't ¶

64.)  Kenneth Lewis, BofA's then-CEO, stated that the acquisition provided "an opportunity

to better serve our customers and to enhance future profitability."  (Waber Compl't ¶ 64.)

The press release "went on to tout" Countrywide's subprime expertise. (Waber Compl't ¶ 65.)

Waber also recites defendants' representations that BofA conducted extensive due diligence of Countrywide, asserts that defendants withheld information about Countrywide's likely litigation and regulatory exposure, and contends that BofA diligence failed to uncover problems with Countrywide's lending practices that ultimately led to significant losses for BofA. (Waber Compl't ¶¶ 66-72, 80-84.) Waber contends that defendants caused BofA to issue materially misleading statements that praised Countrywide's strengths and concealed its regulatory exposure. (Waber Compl't ¶¶ 228-36.) His complaint summarizes legal and regulatory actions taken against Countrywide following the acquisition. (Waber Compl't ¶¶ 75, 78-79, 263-82.) Waber also alleges that the legal fees for former Countrywide executives, including its CEO Angelo Mozillo, were paid by BofA as part of an indemnification clause contained in "the corporate bylaws." (Waber Compl't ¶¶ 85-88.) As a result of past practices, Countrywide has caused BofA to lose billions in litigation and asset write downs, Waber asserts. (Waber Compl't ¶¶ 89-91.)

B. BofA's Acquisition of Merrill.

1. Merrill-Based Allegations in the *Pinsly* Action.

Pinsly asserts that defendants also made "another risky bet" in acquiring Merrill for $29 per share. (Pinsly Compl't ¶¶ 20, 132.) He asserts that defendants overpaid for the acquisition, that Merrill over-invested in "toxic assets," and that the acquisition had a dilutive effect on BofA shares. (Pinsly Compl't ¶¶ 20-22.) The transaction was hastily negotiated and approved by the BofA directors without adequate diligence into Merrill's condition, plaintiff claims. (Pinsly Compl't ¶¶ 23-24, 126-32.) Pinsly alleges that the

transaction included an arrangement for large, undisclosed, discretionary bonuses to Merrill employees. (Pinsly Compl't ¶¶ 133-43, 196-97.) Defendants did not disclose to shareholders that Merrill's ongoing losses exceeded prior forecasts, and they internally debated whether to invoke a "material adverse effect" clause and terminate the transaction. (Pinsly Compl't ¶¶ 25-27, 144-95, 207-24, 238-40.) In soliciting shareholder approval for the transaction, defendants never updated BofA's proxy statement to reflect Merrill's deteriorating condition, and did not disclose acts of government financial assistance that helped to consummate the transaction. (Pinsly Compl't ¶¶ 28-30, 198-202, 225-37.) Pinsly notes that government officials, courts and the SEC have identified actual and potential liability arising out of the Merrill acquisition. (Pinsly Compl't ¶¶ 31-35, 271-81, 283-86.) Pinsly alleges that BofA has reserved $20 billion for litigation exposure arising out of the Merrill acquisition and other potential liabilities. (Pinsly Compl't ¶ 36.)

### 2. Merrill-Based Allegations in the *Waber* Action.

Like Pinsly, Waber alleges that, under Lewis's guidance, BofA hastily agreed to acquire Merrill Lynch without conducting adequate diligence, while also agreeing to a secret, accelerated bonus arrangement wherein Merrill employees would be paid up to $5.8 billion in discretionary compensation. (Waber Compl't ¶¶ 92-110, 160-61, 237-39.) Waber alleges that various defendants, and particularly Lewis, publicly misrepresented Merrill's risk profile, the Merrill bonus arrangement and Merrill's overall financial health. (Waber Compl't ¶¶ 111-17.) Waber also claims that after the announcement of the transaction but prior to shareholder approval, defendants consciously chose not to disclose significant ongoing losses at Merrill, which totaled $15.5 billion during October and November 2008. (Waber Compl't ¶¶ 118-59, 169-72, 243-55.) His complaint asserts that the shareholder proxy issued prior to

the transaction misstated and omitted information related to the bonuses and the ongoing losses. (Waber Compl't ¶¶ 162-68.) Even after the transaction was approved, defendants concealed Merrill's true condition. (Waber Compl't ¶¶ 196-205.)

   Waber alleges that despite reservations about the transaction, Lewis agreed to consummate the transaction under pressure from federal officials, and that BofA required significant federal financial assistance in order to absorb the Merrill losses. (Waber Compl't ¶¶ 173-195.) In January 2009, when the market learned Merrill's true financial condition, the federal financial assistance and the existence of the Merrill bonus arrangement, BofA share prices dropped sharply. (Waber Compl't ¶¶ 206-227.) Waber notes that BofA has since had to pay severance packages to Thain and Lewis. (Waber Compl't ¶¶ 292-94.)

   C. Pinsly's Allegations Concerning BofA's Subprime Holdings.

   Pinsly also sets forth allegations concerning BofA's history with originating and investing in subprime real-estate loans. After previous public statements that conveyed misgivings about the risks associated with subprime lending, beginning in 2005, BofA expanded its holdings in subprime debt. (Pinsly Compl't ¶¶ 4-8, 77-79.) BofA periodically purchased subprime mortgages from third parties and then pooled them with mid-level and prime residential mortgages, which it then securitized and sold to investors as Collateralized Debt Obligations ("CDOs"). (Pinsly Compl't ¶¶ 5, 78.) BofA made nine such CDO offerings in 2005 and ten in 2006, after which it retained "super senior" interests in the CDOs. (Pinsly Compl't ¶¶ 5-6.) Plaintiff asserts that although they were known to be risky and volatile investments, by the end of 2007, BofA held $11.63 billion in CDOs. (Pinsly Compl't ¶¶ 7, 82.) In 2007, a rising number of BofA-originated loans began to default, including high-rated consumer residential loans, which, plaintiff contends, reflected inadequate underwriting

practices at BofA.  (Pinsly Compl't ¶¶ 96.)  Plaintiff contends that defendants orchestrated

BofA's participation in the subprime market without adequate investigation, controls or

public disclosures.  (Pinsly Compl't ¶¶ 8, 94-103.)

        D.  Plaintiffs' Litigation Demands to the BofA Board.

        1.  Pinsly's Demand.

On August 4, 2011, Pinsly submitted a demand to the BofA Board pursuant to

Delaware Court of Chancery Rule 23.1, requesting the board to commence an action against

BofA's current and/or former directors and officers.  (Pinsly Compl't ¶¶ 37, 295.)  On January

19, 2012, the board sent a letter to Pinsly's counsel stating that it had referred the demand to

its audit committee for review, and that the audit committee recommended against pursuing

the claims.  (Pinsly Compl't ¶¶ 38-39, 296.)  BofA's full board voted against commencing the

action demanded by Pinsly.  (Pinsly Compl't ¶¶ 39-40, 297-98.)  Pinsly asserts that the board

did not act with diligence and good faith, and did not adequately explain the basis for refusal.

(Pinsly Compl't ¶¶ 41-42, 299-301.)

        2.  Waber's Demand.

Waber asserts that on July 18, 2011, he served BofA with a written demand

that the board establish a committee "to fully investigate and recover damages in connection

with, inter alia, the due diligence regarding the Countrywide merger, the indemnification of

Countrywide officers, Merrill Lynch bonuses, municipal derivatives, mortgage foreclose

problems and recent settlements . . . ."  (Waber Compl't ¶ 300; see also Burnovsky Dec. Ex. 3

(Docket # 37).)  On October 19, 2011, BofA's general counsel wrote Waber stating that the

board had authorized its audit committee to review the demand.  (Waber Compl't ¶ 301.)  On

January 19, 2012, an associate general counsel wrote to Waber's counsel stating that the audit

committee and the board had reviewed the demand and concluded that it was not in BofA's best interest to pursue the claims. (Waber Compl't ¶ 302; see also Burnovsky Dec. Ex. 4 (Docket # 37).)  Waber asserts that none of the directors was disinterested or independent with respect to his demand. (Waber Compl't ¶ 304.)

### E. Parties to the *Pinsly* Complaint.

Pinsly is a BofA shareholder who has continually held BofA shares "since at least 2005." (Pinsly Compl't ¶¶ 46, 294.) BofA, the nominal defendant, is a Delaware corporation with its principal place of business in Charlotte, North Carolina. (Pinsly Compl't ¶ 47.) Defendant Joseph L. Price was an officer at BofA from June 2003 through September 2011, including from 2007 to 2010, when he was BofA's chief financial officer. (Pinsly Compl't ¶ 52.) Defendant Amy Woods Brinkley had the title of Global Risk Executive from 2001 to 2009. (Pinsly Compl't ¶ 53.) Defendant Kenneth D. Lewis was BofA's CEO from 2001 to 2009. (Pinsly Compl't ¶ 54.) Defendant Brian Moynihan has been BofA's CEO since 2009. (Pinsly Compl't ¶ 60.) Defendant Alvaro G. de Molina was CFO from 2005 to 2006. (Pinsly Compl't ¶ 64.) Defendant Barbara J. Desoer served as president of BofA Home Loans from 2008 through February 2012. (Pinsly Compl't ¶ 65.) All other defendants are named in their capacities as BofA's directors. (Pinsly Compl't ¶¶ 48-51, 55-59, 61-63.)

Pinsly alleges that defendants failed to meet the fiduciary obligations that they owed to BofA. (Pinsly Compl't ¶¶ 68-71.) His complaint asserts nine separate breach of fiduciary duty claims, all of which allege that, in essence, defendants disseminated false information, failed to properly manage BofA and failed to maintain adequate internal controls. (Pinsly Compl't ¶¶ 302-15, 333-50.) Pinsly alleges that through lucrative bonuses and salaries, defendants unjustly enriched themselves at the expense of BofA. (Pinsly

Compl't ¶¶ 316-18.)  He also brings a claim captioned as "gross mismanagement," asserting that defendants breached duties to manage and oversee BofA.  (Pinsly Compl't ¶¶ 319-22.)

### F.  Parties to the *Waber* Complaint.

Waber asserts claims against 14 of the defendants named in the Pinsly action,[1] along with nine additional defendants.  Defendant Neil Cotty was BofA's chief accounting officer during the Merrill acquisition.  (Waber Compl't ¶ 33.)  John A. Thain was Merrill's CEO prior to its acquisition, and thereafter retained a senior position at Merrill until January 22, 2009.  (Waber Compl't ¶ 32.)  William Barnet, III, William P. Boardman, John T. Collins, Gary L. Countryman, Charles O. Holliday, Walter E. Massey and Thomas M. Ryan are current or former members of the BofA board.  (Waber Compl't ¶¶ 35, 37, 40, 41, 43, 46, 51.)

Waber asserts five causes of action against all defendants.  He alleges that defendants breached their fiduciary duties by disseminating false and misleading statements and by failing to maintain adequate internal controls against "obvious and pervasive" problems within BofA.  (Waber Compl't ¶¶ 305-12.)  He also asserts claims of unjust enrichment, "abuse of control" and "gross mismanagement."  (Compl't ¶¶ 313-24.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The "factual content" offered must "allow[ ] the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged."  Id. Accordingly, "the plausibility standard . . . asks for more than a sheer possibility that a

---

[1] Specifically, Waber and Pinsly both name as defendants Lewis, Price, Ambani, Bies, Bramble, Colbert, Gifford, Jones, Lozano, Moynihan, May, Powell, Rossotti and Scully.

defendant has acted unlawfully." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.; see also Twombly, 550 U.S. at 555.

A "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). "However, 'even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'" Id. (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).

DISCUSSION

I.      Plaintiffs Do Not Set Forth Facts that Plausibly Allege the Board Denied Their Litigation Demands in Bad Faith.

A.      Pinsly's Complaint Does Not Set Forth Allegations Sufficient to Overcome Delaware's Business Judgment Rule.

BofA is a Delaware corporation with its headquarters in Charlotte, North Carolina. (Pinsly Compl't ¶ 2.) The demand requirements in a derivative action are governed by the law of the state of incorporation. See, e.g., Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991).

"A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation." Levine v. Smith, 591 A.2d 194, 200 (Del. 1991), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).[2] "Derivative suits have been used most frequently as a means of redressing harm to a corporation allegedly resulting from misconduct by its directors." Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993).

"Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 Del. C. § 141(a), the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so . . . ." Id. at 932 (citing Levine, 591 A.2d at 200). "The purpose of pre-suit demand is to assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur." Spiegel v. Buntrock, 571 A.2d 767, 772 (Del. 1990). "Consistent with the purpose of requiring a demand, a board decision to cause a derivative suit to be dismissed as detrimental to the company, after demand has been made and refused, will be respected unless it was wrongful." Zapata Corp. v. Maldonado, 430 A.2d 779, 784 (Del. 1981).

Pinsly submitted his litigation demand on August 4, 2011, contending that the BofA board should "take action to remedy breaches of fiduciary duty and other violations of law by certain current and former directors and executive officers of the Company . . . ." (Pinsly Compl't Ex. A, at 1.) The demand letter asserted breaches of fiduciary duty consistent

---

[2] Brehm, which overruled in part several rulings cited in this Memorandum and Order on points not relevant here, held that a Chancery Court's conclusions as to demand excusal are reviewed de novo and not pursuant to an abuse of discretion standard. 746 A.2d at 253.

with the Complaint's above-summarized allegations. (Pinsly Compl't Ex. A.) In a letter dated October 19, 2011, Jennifer E. Bennett, an associate general counsel and assistant corporate secretary at BofA, confirmed receipt of Pinsly's demand and stated that BofA's board authorized its audit committee to review the demand and make recommendations to the board as to any additional action. (Parmar Dec. Ex. A (Docket # 22).)

At the time that Pinsly submitted his demand, a majority of the board – eight of thirteen directors – had begun their affiliations with BofA only after the Countrywide and Merrill acquisitions. (Parmar Dec. Ex. B. at 2-6 (Docket # 22).) These eight directors, including all five members of the board's audit committee, were not affiliated with BofA until after January 1, 2009. (Id.) Only four of the thirteen directors had been board members during the acquisitions of Countrywide and Merrill. (Id.) Another director, current CEO Brian Moynihan, was a BofA officer at the time of the acquisition. (Id.)

In a meeting of January 11, 2012, based on the audit committee's recommendation, the board concluded that "it is not in the best interests of the Corporation to take this action or pursue the claims that your letter appears to propose." (Id.) Pursuing the claims could have a "potential adverse effects" on BofA in other pending litigations, and "would likely impair the Corporation's defenses in these various proceedings and investigations." (Id.) The letter stated that parties in those other actions would construe BofA's pursuit of plaintiff's proposed claims as an admission of liability. (Id.) It noted the presence of "practical barriers to recovery" on the claims, and said that any recovery was likely outweighed by the risks of weakening BofA's defenses in those other pending actions. (Id.) In her letter to Pinsly's attorney dated January 19, 2012, Bennett stated that the board would not take action or pursue plaintiff's proposed claims. (Pinsly Compl't Ex. B.)

Pinsly asserts that the letter of January 19 inadequately explained the board's refusal to take further action on his demand letter. (Pinsly Compl't ¶¶ 299-300.) According to his complaint, the January 19 letter "contains <u>no information</u> whatsoever concerning what kind of investigation the Audit Committee engaged in, or what its substantive findings were regarding the merits of any of Plaintiff's claims as set forth in the Demand, despite the blanket statement that there are 'legal and practical barriers to recovery.'" (Pinsly Compl't ¶ 299; emphasis in original.) He alleges that the board's response reflected "complete disregard" of his claims. (Pinsly Compl't ¶ 300.)

A board's refusal to pursue a shareholder's litigation demand is reviewed under Delaware's business judgment rule. <u>Levine</u>, 591 A.2d at 209; <u>Spiegel</u>, 571 A.2d at 775-76; <u>Aronson v. Lewis</u>, 473 A.2d 805, 813 (Del. 1984). "The business judgment rule is a presumption that in making a business decision, not involving self-interest, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Spiegel</u>, 571 A.2d at 774. "[W]hen a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation." <u>Id.</u> at 777. If a board's refusal satisfies the business judgment rule, courts will not disturb its decision. <u>Id.</u> In considering the board's course of action, "[c]ourts do not measure, weigh or quantify directors' judgments." <u>Brehm</u>, 746 A.2d at 264. There is "no prescribed procedure that a board must follow" for investigating a shareholder demand. <u>Levine</u>, 591 A.2d at 214.[3]

---

[3] In opposition, Pinsly heavily relies on <u>In re PSE&G Shareholder Litigation</u>, 801 A.2d 295 (N.J. 2002), a case that applies New Jersey law to a New Jersey corporation. That decision adopts a "modified business judgment rule" for reviewing demand refusals, one that places the initial burden on directors to demonstrate that they acted reasonably and in good faith when rejecting a shareholder demand. <u>Id.</u> at 301. <u>PSE&G</u> is contrary to the Delaware standard and does not apply here. Pinsly also relies on a New York trial court decision, <u>Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.</u>, 273 N.Y.S.2d 16 (N.Y. Sup. Ct. Onondaga Cty. 1966), which

Pinsly's complaint does not plausibly allege that BofA's board violated the business judgment rule when it declined to pursue plaintiff's litigation demand.  Its demand allegations consist principally of two paragraphs.  Paragraph 299 asserts that the board's letter of January 19, 2012 did not adequately explain the substance and process of the audit committee's inquiry.  Paragraph 300 consists solely of legal conclusions that are not afforded the presumption of truth under Iqbal, and states: "Clearly, the Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith."

Drawing every reasonable inference in favor of the plaintiff, these assertions fall far short of plausibly alleging facts defeating the presumption that the board did not act with honest, good-faith belief that its refusal was in the best interest of the company.  Spiegel, 571 A.2d at 774.  They instead reflect plaintiff's subjective disagreement with the ultimate merits of the board's refusal of his demand letter.  But Delaware does not permit a court second-guess the substantive merits of a demand's refusal or to prescribe a board's deliberation process, so long as the board conducts itself in good faith.  Brehm, 746 A.2d at 264; Levine, 591 A.2d at 214.  As alleged in Pinsly's complaint, and in the January 19 letter that it annexes as an exhibit, the board received plaintiff's demand, referred it to the audit committee for consideration, and concluded that the risks posed by other, parallel litigations outweighed any possible recovery.  The complaint contains no assertions plausibly alleging that the board's refusal of his demand violated the business judgment rule or was procedurally deficient.

applied New York law to allegations that upon receipt of a litigation demand, a board of directors failed to commence any investigation.  New York law does not apply, and the Complaint here does not allege that the board made no investigation, but that the board failed to explain to the shareholder's counsel the scope of its investigation.

Plaintiff makes no factual allegations as to why or how the eight directors who joined the board after the events at issue, including the entire membership of the audit committee, acted in bad faith or in their own self-interest in refusing a litigation demand directed toward conduct that occurred prior to their roles on the board.  See, e.g., Scattered Corp. v. Chicago Stock Exch., Inc., 701 A.2d 70, 75 (Del. 1997) (plaintiff must make "particularized allegations" that the board "was biased [or] lacked independence" in order to "create[ ] a reasonable doubt that demand was properly refused.").

Five of the thirteen directors were affiliated with BofA at the time of the alleged wrongdoing, but Pinsly does not assert that their participation in the board's response to the demand is evidence of bad faith.  Under Delaware law, if a board's majority consists of disinterested directors, the business judgment rule applies to its review of the litigation demand, absent allegations of "specific facts pointing to bias."  Aronson, 473 A.2d at 815 & n.8.  As Pinsly himself observes, Mount Moriah Cemetery on Behalf of Dun & Bradstreet Corp v. Moritz, 1991 WL 50149, at *3 (Del. Ch. 1991), noted that "[b]y making demand, a plaintiff tacitly admits that demand was not futile and, therefore, concedes that a majority of the board is independent."  Accord Spiegel, 571 A.2d at 777 (a litigation demand "tacitly concedes the independence of a majority of the board to respond," and when a shareholder challenges its refusal, "the only issues to be examined are the good faith and reasonableness of its investigation.").  The fact that five of the thirteen directors, none of whom were appointed to the audit committee, apparently voted with the eight disinterested directors in approving the audit committee's recommendation does not raise an inference that the board's refusal was biased or anything other than independent.

Because the Complaint does not plausibly allege that the board's refusal of plaintiff's litigation demand falls outside the protection of the business judgment rule, BofA's motion is granted, and Pinsly's action is dismissed in its entirety.

> B.  For Substantially the Same Reasons, Waber's Complaint Does Not Overcome Delaware's Business Judgment Rule.

As noted, on July 18, 2011, Waber's counsel wrote BofA asking its board to establish an independent committee to investigate purported the purported breaches of duty set forth in the Complaint. (Burnovsky Dec. Ex. 3 (Docket # 37).)  On October 19, 2011, Bennett responded to Waber's counsel, stating that the board had authorized the audit committee to review the demand, undertake any steps it deemed advisable, and make recommendations to the full board. (Waber Opp. Mem. Ex. B (Docket # 43).)

In a response to the demand dated January 19, 2012, Bennett stated that following the audit committee's review and recommendation, the full board concluded that it was "not in the best interests of the Corporation to take this action or pursue the claims that your letter appears to propose." (Burnovsky Dec. Ex. 4 (Docket # 37.)  As with the response to Pinsly, Bennett noted that pursuing the demand could have an adverse effect on BofA's defenses in pending litigations, proceedings and investigations. (Id.)  "Plaintiffs in these cases would likely argue that assertion of such claims constitutes an admission of liability by the Corporation as to the full scope of claims currently being asserted against the Corporation, or otherwise seek to use any litigation papers filed by the Corporation against the Corporation itself." (Id.)  When weighing the likelihood of recovery from plaintiff's demand against the likely impairments it would cause to BofA's defenses in other proceedings, the board elected not to pursue the claims. (Id.)

Waber, like Pinsly, does not plausibly allege that the BofA board wrongfully refused his demand in violation of Delaware law. Waber's sole allegation in support of the purported unlawfulness of rejecting his demand is a conclusory assertion that the board was not "disinterested and independent with respect to considering the Plaintiff's demand letters." (Waber Compl't ¶ 304.) This legal conclusion is not afforded the presumption of truth. Iqbal, 556 U.S. at 678; see also Scattered Corp., 701 A.2d at 75 ("conclusory statements" do not allege "reasonable doubt upon the disinterestedness, good faith or reasonableness of the Executive Committee in acting on the demand.").

A plaintiff may raise "reasonable doubt" as to director independence if "(1) a majority of the board has a material financial or familial interest; [or] (2) a majority of the board is incapable of acting independently for some other reason such as domination or control . . . ." Grimes v. Donald, 673 A.2d 1207, 1216 (Del. 1996). Delaware courts have rejected as inadequate significantly more detailed allegations of director self-interest. See, e.g., Levine, 591 A.2d at 207 ("Plaintiffs' conclusory allegations that the outside directors' independence was compromised by the inside directors' misleading, manipulative and deceptive conduct are unsupported by particularized facts."); Grobow v. Perot, 539 A.2d 180, 188-89 (Del. 1988) (allegations that directors received compensation for joining board and that they faced potential "embarrassment" if they acted on plaintiff's demand did not raise doubts as to disinterest or independence). Waber's bare, conclusory allegation that the board was not "disinterested and independent with respect to considering the Plaintiff's demand letters" does not plausibly allege that the directors lacked independence or had a personal interest in rejected the demand. See also Mount Moriah, 1991 WL 50149, at *3; Spiegel, 571 A.2d at 777.

In addition, as noted in discussing Pinsly's demand, it is a matter of public record that at the time Waber submitted his demand, eight of BofA's thirteen board members had no affiliation with BofA during the Merrill and Countrywide transactions, including all members of the audit committee. Defendants Bramble, Gifford, Lozano and May were directors during the transactions, and Moynihan, BofA's current CEO, was general counsel during the transactions. (Waber Compl't ¶¶ 38, 42, 45, 47-48.) The lack of historical connection between the eight new directors and the misconduct alleged in the Complaint further reflects the conclusory nature of plaintiff's assertion that the directors were not disinterested or independent.

In opposition, Waber cites to Delaware cases concerning a board's use of a special litigation committee to weigh a demand, arguing that the board's bad faith is illustrated by its failure to form such a committee. (Waber Opp. Mem. at 12-17 (Docket # 43).) But Delaware does not require a board to delegate review of a litigation demand to a special litigation committee, which is most often employed "to isolate the interested directors from material information during either the investigative or decisional process." Spiegel, 571 A.2d at 776 n.18. Waber has not articulated why a special litigation committee was required to investigate the claims in his demand letter. (Waber Opp. Mem. at 12-15.) He also has not explained why he is entitled to additional discovery into the good faith and reasonableness of the board's decisionmaking process. (Waber Opp. Mem. at 15-17.) "The law in Delaware is settled that plaintiffs in a derivative suit are not entitled to discovery to assist their compliance with the particularized pleading requirement of Rule 23.1 in a case of demand refusal." Scattered Corp., 701 A.2d at 77.

Because Waber has not plausibly alleged that the BofA board wrongfully refused his litigation demand, his complaint is dismissed in its entirety.

## II.   Plaintiffs May Not Pursue Claims Directed to the Merrill Acquisition.

The two plaintiffs' respective failure to plausibly allege, in non-conclusory terms, that the Board's denial of their litigation demands were not protected by Delaware's business judgment rule are, standing alone, a sufficient basis to dismiss the complaints. Their complaints suffer from several additional infirmities, however, each of which provides separate and independent grounds for dismissal.

### A.   Pinsly Now Characterizes His Merrill Claims as "Moot."

On January 11, 2013, this Court approved, pursuant to Rule 23.1, Fed. R. Civ. P., the settlement of a consolidated derivative action alleging that BofA's directors and officers breached their fiduciary duties to BofA.  (09 MD 2058, Docket # 796 (transcript of proceedings), # 805 (order and final judgment).)  The Order and Judgment in the parallel derivative case states that BofA released all claims that "relate to, directly or indirectly, the subject matter of the Derivative Action in any court, tribunal, forum or proceeding . . . ."  (09 MD 2058, Docket # 805, at 4.)  The Order and Judgment expressly stated that it did not release Pinsly's "derivative claims related to [BofA's] subprime exposures or its acquisition of Countrywide . . . ."  (Id. at 5-6.)  In a letter dated January 25, 2013, Pinsly acknowledged that his Merrill-related claims are foreclosed by the final judgment in that case: "As a result of the release of the Merrill acquisition related claims through the Settled Derivative Action, a good portion of the Complaint is now moot . . . ."  (Jan. 25 ltr. at 4; see also 12 Civ. 4778, Docket # 27, 33 (denying plaintiff's applications for a stay).)

Pinsly's claims in this action that relate to Merrill are dismissed, on the alternative basis that the Order and Final Judgment in the Consolidated Derivative Action released and foreclosed BofA's claims related to the Merrill acquisition.

### B. For the Same Reasons, Waber's Claims Directed to the Merrill Transaction are Dismissed.

As with Pinsly's claims, the Order and Final Judgment in the Consolidated Derivative Action precludes Waber from maintaining his claims directed to the Merrill acquisition.  (09 MD 2058, Docket # 805.)  In a joint letter to this Court dated October 8, 2012, the parties expressly acknowledged this, stating that plaintiff's Merrill "allegations will be rendered moot by the proposed $20 million settlement dated July 3, 2012 in the Consolidated Derivative Action, Case No. 09 MD 2058." (Burnovsky Dec. Ex. 1 at n.1 (Docket # 37).)  In his opposition memo, plaintiff does not address his claims against Merrill. (Reply Mem. at 1 n.1 (Docket # 47).)

Waber's claims relating to the Merrill acquisition are dismissed on the alternative basis that they are released and foreclosed by the judgment in the Consolidated Derivative Action.

### III. Both Complaints Assert Claims against Defendants Who Had No Affiliation to BofA at the Time of Alleged Wrongdoing.

#### A. The Pinsly Complaint Fails to State a Claim as to Eight Defendants.

According to the Pinsly complaint, defendants Bies, Colbert, Holliday, Jones, Powell, Rossotti and Scully did not join the BofA board until 2009.  (Pinsly Compl't ¶¶ 55, 57-59, 61-63.)  The complaint defines the "relevant period" of this action as running "from 2005 to the present." (Pinsly Compl't ¶ 1.)  As to the purported misconduct, it asserts that BofA acquired Countrywide in 2008, and that the Merrill acquisition was announced in

September 2008, approved by shareholders the following December and consummated on January 1, 2009. (Pinsly Compl't ¶¶ 10, 20-30.) Plaintiff's allegations concerning BofA's subprime exposure cite investment and underwriting practices from 2001 through 2008. (Pinsly Compl't ¶¶ 4-7.) Thus, all alleged acts of wrongdoing set forth in the Pinsly complaint occurred before these seven director-defendants joined the board in 2009.

To the extent that the complaint cites to events in 2009 and thereafter, they describe the ongoing consequences of prior actions, including corrective disclosures, BofA's litigation exposure, government regulatory actions and press reports concerning BofA's ongoing losses. (See, e.g., Pinsly Compl't ¶¶ 13-14, 16-17, 31-36, 102, 119, 121-25, 133-34, 140-41, 157, 163, 165, 184, 186, 219, 240-91.)

Pinsly alleges no facts that connect defendants Bies, Colbert, Holliday, Jones, Powell, Rossotti or Scully to the alleged breaches of fiduciary duty relating to the Countrywide or Merrill acquisitions, or to the BofA subprime portfolio. They appear to be named as defendants based on their status as BofA directors, and not any purported misconduct that occurred since they joined the board. While the Complaint defines the "relevant period" as extending "to the present" (Pinsly Compl't ¶ 1) it identifies no misconduct that could be attributed to these defendants since they became members of the BofA board. Plaintiff's claims against Bies, Colbert, Holliday, Jr., Jones, Powell, Rossotti and Scully are therefore dismissed on this alternative ground.

In addition, defendants move to dismiss plaintiff's claims against former BofA CFO Alvaro G. de Molina. The Complaint asserts that de Molina was CFO in 2005 and 2006. (Pinsly Compl't ¶ 64.) de Molina's tenure at BofA pre-dated the acquisitions of Merrill and

Countrywide. All claims against him that are directed to the Merrill and Countrywide acquisitions are therefore dismissed on this alternative ground.

### B. The Waber Complaint Fails to State a Claim as to Nine Defendants.

Like Pinsly, Waber asserts claims against director-defendants who were not affiliated with BofA at the time of the alleged underlying wrongdoing. Defendants Ambani, Bies, Boardman, Colbert, Holliday, Jones, Powell, Rossotti and Scully joined the BofA board between 2009 and 2011, prior to which, they were unaffiliated with the company. The Complaint expressly alleges that Bies, Boardman, Holliday, Jones and Powell joined the board in 2009. (Waber Compl't ¶¶ 36-37, 43-44, 49.) The Complaint appears to contain no specific allegations as to Scully's tenure or purported misconduct, aside from asserting that he was a member of the board and its audit committee as of July 18, 2011. (Waber Compl't ¶ 304.)

The Complaint inaccurately asserts that Ambani joined the board in March 2001 and that Colbert and Rossotti had joined the board by January 11, 2008. (Waber Compl't ¶¶ 34, 39, 50.) However, as reflected in BofA's public filings, Ambani joined the board in March 2011, Colbert and Rossotti in January 2009 and Scully in August 2009. (Burnovsky Dec. Ex. 5 at 2, 3, 6 (March 28, 2012 Schedule 14A soliciting shareholder votes for BofA directors) (Docket # 37).)[4]

Waber's claims against defendants Ambani, Bies, Boardman, Colbert, Holliday, Jones, Powell, Rossotti and Scully are dismissed on the alternative ground that they

---

[4] Because the Complaint purports to allege the dates of tenure of the BofA directors, the Court considers this Section 14A filing to be integral to the Complaint and appropriately considered as part of a Rule 12(b)(6) motion. See generally DiFolco, 622 F.3d at 111. Waber does not dispute the relevance or authenticity of the document. In addition, on a motion to dismiss, a court may take judicial notice of an SEC filing that is not referenced in a complaint without converting a motion to dismiss into one for summary judgment. Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

did not join the BofA board until after the purported misconduct alleged in Waber's

complaint.

IV.   <u>Pinsly Fails to Allege Breach of Fiduciary Duty or Unjust Enrichment.</u>

   A.   Pinsly Fails to Allege Breach of Fiduciary Duty Against the
        Director-Defendants for Failing to Monitor BofA Subprime
        <u>Holdings.</u>

   Delaware law permits a corporation to limit a director's personal liability to the

corporation or its shareholders "for monetary damages for breach of fiduciary duty as a

director," provided that it does not limit liability for a director's breach of loyalty or for a

director's acts taken in bad faith or in knowing violation of the law.  8 Del. C. §102(b)(7).

BofA's certificate of incorporation exculpates its directors from personal liability to the

corporation, except in cases of disloyalty and other exceptions not relevant here, "[t]o the

fullest extent permitted" under Delaware law.  (Burnovsky Dec. Ex. 14, Art. 6 (Docket # 26).)

Thus, to state a claim for breach of fiduciary duty against the director defendants, Pinsly must

plausibly allege that they breached their duties of loyalty or acted in bad faith.

   "[D]irector liability based on the duty of oversight 'is possibly the most

difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  <u>In</u>

<u>re Citigroup S'holder Derivative Litig.</u>, 964 A.2d 106, 125 (Del. Ch. 2009) (quoting <u>In re</u>

<u>Caremark Int'l Inc. Derivative Litig.</u>, 698 A.2d 959, 967 (Del. Ch. 1996)).  To state a claim

that directors have not satisfied their oversight duties, a complaint must plausibly allege that

directors "utterly failed to implement any reporting or information system or controls," or

that, "having implemented such a system or controls, consciously failed to monitor or oversee

its operations thus disabling themselves from being informed of risks or problems requiring

their attention."  <u>Stone v. Ritter</u>, 911 A.2d 362, 370 (Del. 2006).  "[O]nly a sustained or

systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." Caremark, 698 A.2d at 971.

Bad faith is a "necessary condition to director oversight liability." In re Citigroup S'holder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009) (emphasis in original). It "encompasses not only an intent to harm but also intentional dereliction of duty." Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 240 (Del. 2009). A plaintiff must allege that the directors knew that they were violating their fiduciary obligations, intended to cause harm or that they acted with a conscious disregard for their responsibilities. Id.; accord Canadian Commercial Workers Indus. Pension Plan v. Alden, 2006 WL 456786, at *7 (Del. Ch. Feb. 22, 2006) (complaint must "allege specific facts showing that the accused directors had knowledge of the alleged wrongdoing or ignored a 'red flag' regarding it or that the board exhibited a sustained or systematic failure to exercise oversight."). Conclusory allegations that defendants failed to act on "warning signs" in the broader economy do not suffice to state a claim. In re Citigroup, 964 A.2d at 126-27.

Pinsly fails to allege that the director-defendants consciously failed to monitor BofA's subprime holdings or the terms of the Countrywide acquisition, or that they acted with conscious disregard for their responsibilities. His complaint expressly alleges that the BofA board delegated oversight duties to the audit committee, including supervision of risk-management policies and BofA's legal compliance. (Pinsly Compl't ¶ 71.) Pinsly alleges that BofA should have implemented additional internal controls to monitor subprime exposure, but does not allege what those controls should have entailed. (Pinsly Compl't ¶ 80.) In addition, his complaint makes no allegations that identify where a breakdown in

oversight mechanisms allegedly occurred.  He therefore fails to allege facts amounting to "a sustained or systematic failure of the board to exercise oversight . . . ."  Caremark, 699 A.2d at 971.  His claims against the director-defendants arising out of BofA's subprime holdings are dismissed.

> B.  Pinsly's Complaint Fails to Allege Breach of Fiduciary Duty Against the Officer-Defendants for Failing to Monitor BofA Subprime Holdings.

Pinsly does not allege facts that plausibly support his claims that officer-defendants failed to satisfy their duties concerning BofA's subprime portfolio.  As noted, Lewis stated in 2001 that the "volatile earnings streams" of subprime holdings were "unattractive from a risk reward standpoint," leading BofA to liquidate a $26.3 billion subprime portfolio.  (Pinsly Compl't ¶ 77.)  Pinsly alleges that beginning in 2005, and contrary to prior company policy, BofA expanded its holdings in subprime debt and CDOs.  (Pinsly Compl't ¶¶ 79-82.)

In its November 2007 Form 10-Q filing, BofA reported "significant dislocations in the CDO market," described itself as "an active participant in the CDO market," and stated that "current dislocations in the markets . . . may have broader impacts on the Corporation," likely to "adversely impact our results during the fourth quarter."  (Pinsly Compl't ¶ 84.)  In an annual report filed with the SEC on February 28, 2008, BofA stated that a rise in mortgage defaults and concerns about "faltering" subprime and mortgage markets "triggered financial market turbulence" the previous summer.  (Pinsly Compl't ¶ 93.)

Pinsly cites "lax" and inadequate internal controls (Pinsly Compl't ¶¶ 93, 99, 101.)  He also states that in 2010, defendants "admitted" that they incorrectly classified

certain transactions as "'sales' when they were really a 'secured borrowing'" and that the error was a result of "an internal 'control deficiency' . . . ." (Pinsly Compl't ¶ 102.)

In opposition to the motion, Pinsly argues that defendants reversed, without announcement, the established BofA policy of not investing in subprime assets. (Pinsly Opp. Mem. at 19.) But the complaint also alleges that by 2007, BofA's quarterly filing characterized the company as "active" in the subprime market. (Pinsly Compl't ¶ 84.) Pinsly has not alleged facts to support his contention that the officer-defendants misled shareholders about the extent of BofA's subprime holdings. See, e.g., In re INFOUSA, Inc. S'holders Litig., 953 A.2d 963, 990 (Del. Ch. 2007) (derivative liability for breach of fiduciary duty may arise when a corporation misleads shareholders, "particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete . . . ."). Aside from citing to the 2001 remarks of Lewis, the Pinsly complaint makes no individualized allegations as to the officer defendants. See id. at 990-95 (reviewing allegations as to each individual defendant's potential liability). As to Lewis, the complaint does not allege that Lewis deliberately misled shareholders, or that BofA did not sell its 2001 holdings before later re-entering the subprime market.

Pinsly therefore fails to state a claim for breach of fiduciary duty as to the officer-defendants' role in BofA's subprime holdings.

### C. Pinsly's Complaint Fails to State a Claim against Any Defendant as to the Countrywide Acquisition.

Pinsly's complaint alleges that defendants failed "to conduct a proper and thorough due diligence investigation of Countrywide's core business operations," and that they should have discovered "improper mortgage origination practices, lax underwriting standards, and toxic debt securitization practices." (Pinsly Compl't ¶¶ 108, 117, 329.) The

complaint notes BofA's representations that diligence was conducted over 30 days and

involved more than 60 professionals, and does not allege that those representations were false.

(Pinsly Compl't ¶¶ 108, 114.)

"[T]here is a vast difference between an inadequate or flawed effort to carry

out fiduciary duties and a conscious disregard for those duties." Lyondell Chem. Co. v. Ryan,

970 A.2d 235, 243 (Del. 2009).  Pinsly does not identify particular defects in the due

diligence process or which facts he contends should have been uncovered during diligence.

His complaint does not set forth facts to plausibly allege that diligence was conducted in bad

faith.  See, e.g., In re Lear Corp. S'holder Litig., 967 A.2d 640, 652 (Del. Ch. 2008) (plaintiff

does not allege bad faith by merely asserting "that the directors made an unreasonable or even

grossly unreasonable judgment.").  The complaint does not assert that any officers were

members of the diligence team or they were grossly negligent in supervising diligence.

These allegations are insufficient to state a claim that defendants breached their fiduciary

duties in conducting or supervising diligence of Countrywide.

In addition, Pinsly does not plausibly allege that defendants breached their

fiduciary duty to BofA by making misleading statements about the Countrywide acquisition.

His complaint recites representations that the acquisition was "an important advancement" in

customer service, "a rare opportunity" and "a unique opportunity" for BofA, and that the

acquisition was beneficial to BofA from a tax perspective.  (Pinsly Compl't ¶¶ 110-11.)

Delaware courts have observed that a breach of fiduciary duty may arise when directors "are

deliberately misinforming shareholders about the business of the corporation, either directly

or by a public statement . . . ." Malone v. Brincat, 722 A.2d 5, 14 (Del. Sup. Ct. 1998).  The

statements concerning the potential benefits of the Countrywide acquisition, however, are

generalizations stated by officers that do not constitute misrepresentations of fact. For that same reason, assuming that officers can be liable for breach of fiduciary duty based on misstatements that are unrelated to a solicitation of shareholder approval, such claims are also dismissed against the officer defendants.

Because Pinsly does not plausibly allege that defendants breached a fiduciary duty as to the Countrywide due diligence or representations made about the benefits of acquiring Countrywide, plaintiff's claims are dismissed.

### D. Pinsly Fails to Allege Unjust Enrichment.

Because Pinsly's unjust enrichment claim is premised on defendants' violation of their fiduciary duties, and the breach of fiduciary duty claim is dismissed, Pinsly's unjust enrichment claim is dismissed as well. See, e.g., Monroe Cnty. Employees' Ret. Sys. v. Carlson, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) ("Count III must be dismissed because the unjust enrichment claim asserted therein depends on the success of the breach of fiduciary duty claim alleged in Count II.").

### V. Waber's Complaint Fails to State a Claim As to the Countrywide Acquisition and Other Purported Misconduct.

For the same reasons, Waber's complaint fails to plausibly allege that the defendants in his action violated their fiduciary duties to BofA.

Waber asserts that the defendants failed to ensure that BofA "conduct[ed] adequate due diligence" of Countrywide, stating that BofA should have uncovered "fraudulent loan practices and "extremely lax underwriting guidelines," and then "backed out of the deal, or purchased Countrywide at a much lower price." (Waber Compl't ¶¶ 72, 80, 269.) He acknowledges that BofA stated that diligence took place over 30 days and involved more than 60 professionals, and does not assert that this representation was false. (Waber

Compl't ¶¶ 67, 232.)  Waber also alleges that BofA "uncovered major problems and potential liabilities" at Countrywide, but failed to disclose them.  (Waber Compl't ¶ 70.)  Like Pinsly, Waber fails to allege bad faith, which is a "necessary condition to director oversight liability," In re Citigroup, 964 A.2d at 123, and "encompasses not only an intent to harm but also a dereliction of duty."  Lyondell, 970 A.2d at 240.  Similarly, as to BofA's officers, the complaint fails to allege that defendants were "grossly negligent" in carrying out their duties during the Countrywide transaction, such that they displayed "gross negligence" amounting to "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."  Tomczak v. Morton Thiokol, Inc., 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) (quotation marks omitted); see also In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Income Sec. Act ("ERISA") Litig., 757 F. Supp. 2d 260, 338-39 (S.D.N.Y. 2010) (because derivative complaint failed to allege officers' participation in diligence or responsibility beyond their job titles, plaintiffs failed to plausibly allege gross negligence or bad faith).

Waber also fails to plausible allege that defendants made any misrepresentation concerning the Countrywide acquisition.  As previously discussed, statements that Countrywide offered "the best domestic mortgage platform at an attractive price" and represented a "one time opportunity" are optimistic generalizations and not actionable misstatements, and do not support an inference that defendants were "deliberately misinforming shareholders about the business of the corporation, either directly or by public statement."  Malone, 722 A.2d at 14.

In addition to Waber's allegations concerning the Countrywide acquisition, he briefly describes a variety of other incidents in which the defendants purportedly breached

their duties to BofA.  He alleges that defendants are liable to BofA for "numerous whistleblower lawsuits" involving BofA and Countrywide.  (Waber Compl't ¶¶ 263-69.)  He notes that on June 3, 2009, the SEC filed complaints against BofA and others, alleging that they misled investors about the liquidity risks of auction-rate securities, and that BofA "and the other firms entered into a $6.7 billion settlement with the SEC for these complaints." (Waber Compl't ¶ 275.)  The complaint mentions an October 19, 2012 news report that the FBI was investigating whether BofA engaged in criminal misconduct as to its mortgage documentation practices, particularly its employees' practice of "robo-signing" applications without scrutiny.  (Waber Compl't ¶ 276.)  Lastly, Waber states that in July 2010, Bloomberg Markets "accused" BofA "of engaging in a conspiracy" in which municipalities' financial advisers colluded with BofA "to rig bids on auctions for guaranteed investment contracts." (Waber Compl't ¶¶ 283-84.)

In describing these lawsuits, investigations and accusations, Waber's complaint fails to connect the purported misconduct to the individual defendants.  All claims directed to these incidents are dismissed, on the alternative ground that Waber has failed to allege bad faith or gross negligence, let alone articulate a theory as to how defendants are liable in these assorted matters.  See, e.g., Lyondell, 970 A.2d at 240; Tomczak, 1990 WL 42607, at *12.  In addition, most of these actions, reports or investigations are unresolved accusations, from which it is unclear whether BofA suffered any economic harm.

Lastly, because Waber has failed to plausibly allege that defendants breached their fiduciary duties, his unjust enrichment claim is dismissed.  Monroe Cty. Emps. Ret. Sys., 2010 WL 2376890, at *2.

VI.   Waber and Pinsly Have Not Set Forth a Valid Basis to Grant Leave to Amend.

A. Pinsly.

Pinsly argues that in the event that this action is dismissed, he should be granted "leave to amend to include, inter alia, new allegations based on books and records obtained through the 220 Action." (Pinsly Opp. Mem. at 25 n.20.) Pinsly had previously moved to stay this action based on a proceeding that he commenced in Delaware Chancery Court, through which he sought to compel disclosure of records related to the refusal of his litigation demand. The Court denied that application in an Order dated March 5, 2013. (Docket # 33.) As noted in that Order, the Delaware Code provides a qualified right for shareholders to inspect corporate books and records. 8 Del. C. § 220; Amalgamated Bank v. NetApp, Inc., 2012 WL 379908, at *3 (Del. Ch. Feb. 6, 2012). As that Order observed, Pinsly commenced his Section 220 proceeding on October 2, 2012, several months after he brought this action. With exceptions not applicable here, Delaware tribunals have required plaintiffs to bring a Section 220 action prior to pursuing derivative relief. See Central Laborers Pension Fund v. News Corp., 2011 WL 6224538, at *2 (Del. Ch. Nov. 30, 2011) (derivative plaintiff not permitted "to use the tools of Section 220 while actively pursuing a simultaneously-filed plenary derivative action at its early stages.'); Amalgamated Bank, 2012 WL 379908, at *3-4 (reviewing general disfavor of commencing Section 220 proceeding after filing derivative complaint, but noting exceptions when "plenary court either advised or suggested that the stockholder-plaintiffs make use of Section 220 in order to successfully plead demand futility . . . ."); cf. South v. Baker, 62 A.3d 1, 22 (Del. Ch. 2012) ("Recent Court of Chancery decisions have suggested an evidentiary presumption that a plaintiff who files a Caremark claim hastily and without using Section 220 or otherwise conducting a meaningful

investigation has acted disloyally to the corporation and served instead the interests of the law firm who filed suit.").

       Pinsly's application is based on conjecture.  At this point, he has not asserted that he possesses additional information that affects the outcome of any ground raised in defendants' motions to dismiss.  His request to amend is, in effect, a second application to stay this action until he sees whether he can obtain material in the Section 220 action.

       Pinsly's request for leave to replead is therefore denied.

       B.  <u>Waber.</u>

       Waber has not articulated any basis to grant his request for leave to replead.  (Waber Opp. Mem. at 23 n.4.)  He merely asserts that leave is freely given under Rule 15(a)(2), Fed. R. Civ. P., and requests leave to amend in the event that defendants' motions are granted.  Armed with defendants' motions to dismiss, Waber has not articulated what he would allege to cure any claimed deficiency.  It is simply a blank-check request to amend, which is denied.

CONCLUSION

       The defendants' motions in <u>Pinsly v. Holliday, et al.</u>, are granted.  (12 Civ. 4778, Docket # 21, 24.)

       The defendants' motions in <u>Waber v. Lewis, et al.</u>, are granted.  (12 Civ. 4568, Docket # 32, 35; 09 MD 2058, Docket # 784, 787.)

       The Clerk is directed to terminate the motions and enter judgment in favor of the defendants in both actions.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       April 25, 2013