UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IN RE: BANK OF AMERICA CORP.
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION
-----------------------------------------------------------
THIS DOCUMENT RELATES TO:

DR. SALOMEN MELGEN, FLOR MELGEN
and SFM HOLDINGS LIMITED
PARTNERSHIP,

                    Plaintiffs,

     -against-

BANK OF AMERICA CORPORATION and
KENNETH D. LEWIS,
                   Defendants.
-----------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12 - 11 - 13_

Master File No. 09 MD 2058 (PKC)

MEMORANDUM AND ORDER

12 Civ. 5210 (PKC)

P. KEVIN CASTEL, District Judge:

        Plaintiffs bring claims of fraud, breach of fiduciary duty and negligent

misrepresentation, asserting injury in both their capacities as purchasers and holders of common

stock in Bank of America Corporation ("BofA").  They allege that BofA and its then-CEO,

Kenneth D. Lewis, are liable for fraud, breach of fiduciary duty and negligent misrepresentation

due to allegedly material misstatements and omissions related to the 2008 financial crisis.

        Defendants now move to dismiss plaintiffs' Complaint pursuant to Rules 12(b)(6)

and 9(b), Fed. R. Civ. P.  (12 Civ. 5210, Docket # 56.)  For the reasons more fully explained, the

motion is granted.  The Court concludes that the Securities Litigation Uniform Standards Act

("SLUSA"), 15 U.S.C. § 78bb(f), precludes plaintiffs' state-law claims directed to the Merrill

acquisition, and that even if it did not, plaintiffs' claims would be dismissed based on plaintiffs'

failure to timely opt out of the related class action.  To the extent that plaintiffs assert Florida state-law claims as "holders" of BofA shares, and assuming that Florida law would recognize such claims, plaintiffs have failed to plead the requisite reliance.  Lastly, the Complaint fails to plausibly allege claims of fraud, negligent misrepresentation and breach of fiduciary duty.

BACKGROUND

Plaintiffs commenced this action on May 3, 2012 in the Fifteenth Judicial Circuit Court of Palm Beach County, Florida.  (Docket # 1.)  On June 1, 2012 BofA removed the action to the United States District Court for the Southern District of Florida on the basis of diversity jurisdiction.  (Docket # 1.)  Plaintiffs Flor Melgen and Dr. Salomon Melgen are Florida citizens. (Docket # 68, SFM Dec. ¶ 5.)  The membership of plaintiff SFM Holdings Limited Partnership consists of Flor Melgen, Dr. Salomon Melgen and SFM Investments, Inc., which is a Nevada corporation with its principal place of business in Florida.  (SFM Dec. ¶ 3.)  Defendant BofA is incorporated in Delaware and maintains its principal place of business in North Carolina, and defendant Lewis is a North Carolina citizen.  (Notice of Removal ¶¶ 7-8.)

The Complaint brings claims directed toward defendants' conduct as it relates to BofA's mortgage practices and corporate acquisitions.  (Compl't ¶¶ 68-111.)  Counts I, II and III assert claims of fraud, breach of fiduciary duty and negligent misrepresentation directed toward plaintiffs' decisions to retain and hold their shares of BofA common stock.  (Compl't ¶¶ 68-89.) Counts IV, V and VI assert those same claims, but are directed toward plaintiffs' status as purchasers of BofA's common stock.  (Compl't ¶¶ 90-111.)

As discussed below, the Complaint asserts unlawful conduct in four areas of BofA's business.

A. <u>BofA's Portfolio of Securitized Mortgages.</u>

According to the Complaint, beginning sometime prior to 2007, BofA "aggressively" participated in the market for residential mortgage-backed securities ("RMBS"). (Compl't ¶¶ 15-16.)  Plaintiffs assert that BofA originated and acquired numerous high-risk subprime mortgages, and that by the end of 2007, held approximately $11.63 billion of subprime mortgage assets.  (Compl't ¶¶ 15-17.)

BofA publicly disclosed its internal underwriting guidelines.  (Compl't ¶ 19.) According to the Complaint, when BofA acted as originator or acquirer of residential mortgage loans, it had access to the applicants' occupation, income and creditworthiness, but BofA failed to follow its own internal underwriting standards, exposing the company to "extraordinary" risk on RMBS assets and to broad litigation exposure.  (Compl't ¶¶ 19-21.)  Plaintiffs assert that BofA falsely stated to the public that its mortgage practices complied with company standards, while knowing that they did not, and instructed its outside due-diligence teams "to ignore red flags" in the loans.  (Compl't ¶ 22.)

The Complaint also asserts that BofA's filings with the SEC did not properly account for the value of its RMBS holdings and that BofA failed to meet GAAP requirements to set aside reserves for possible losses on those holdings.  (Compl't ¶ 24.)  Plaintiffs contend that BofA's failure to reserve against future losses and account for the value of RMBS holdings resulted in false and misleading statements and omissions that persisted through the first half of 2008.  (Compl't ¶ 25.)  They assert that BofA's RMBS holdings dropped in value beginning in 2007, and that BofA materially misstated their value in SEC filings through the first half of 2008. (Compl't ¶¶ 26-27.)  Plaintiffs state that these holdings caused BofA "to suffer massive losses"

3

when housing prices declined and mortgage defaults rates rose, resulting in "huge" writedowns beginning in January 2009.  (Compl't ¶¶ 28-29.)

### B.  BofA's Receipt of Federal Funding.

Plaintiffs allege that, beginning in March 2008, BofA received "massive" emergency financing from the federal government.  (Compl't ¶ 30.)  This included government financing to facilitate the purchase and borrowing of asset-backed commercial paper; access to funding that provided liquidity to large brokerage firms; collateralized loans; and financial assistance directed to mortgage bonds.  (Compl't ¶ 31.)  Plaintiffs assert that this emergency funding was not disclosed, even though by 2009, it totaled more than BofA's market capitalization.  (Compl't ¶ 32.)  Plaintiffs allege that the receipt of government funding contradicted defendants' upbeat public statements about BofA's financial health and its ability to weather the 2008 financial crisis.  (Compl't ¶¶ 33-37.)

### C.  BofA's Acquisition of Countrywide.

On or about July 2, 2008, BofA acquired Countrywide Financial Corporation ("Countrywide").  (Compl't ¶ 38.)  Plaintiffs assert that the acquisition exposed BofA to approximately $30 billion in loan loss and $8.7 billion in litigation loss due to Countrywide's mortgage-related practices.  (Compl't ¶ 40.)  They state that the losses incurred through the Countrywide acquisition hindered BofA's ability to withstand the deterioration of the broader subprime market.  (Compl't ¶ 42.)  According to plaintiffs, BofA intentionally and negligently misrepresented the risks of the Countrywide acquisition, thereby depriving investors of necessary information.  (Compl't ¶¶ 41, 43.)

### D. BofA's Acquisition of Merrill.

Lastly, plaintiffs assert claims directed to BofA's acquisition of Merrill Lynch & Co., Inc. ("Merrill"). (Compl't ¶¶ 44-60.) Beginning on or about September 13, 2008, Lewis and Merrill CEO John Thain began to discuss the possibility of BofA acquiring Merrill. (Compl't ¶ 44.) During early negotiations, BofA agreed that Merrill could pay $5.8 billion in employee bonuses prior to the close of the proposed transaction. (Compl't ¶¶ 45-47.) This figure totaled approximately 12% of the transaction's overall value. (Compl't ¶ 45.) The bonus arrangement was memorialized in a non-public disclosure schedule. (Compl't ¶ 49.)

According to the Complaint, while shareholder approval for the transaction was pending, Merrill incurred significant losses that were not disclosed to shareholders. (Compl't ¶¶ 50-52.) In October and November 2008, its losses allegedly exceeded $15 billion. (Compl't ¶¶ 50-51.) Plaintiffs allege that BofA was aware of Merrill's losses but did not disclose them to shareholders. (Compl't ¶ 51.) Plaintiffs assert that the losses exceeded BofA's earnings for the first nine months of 2008, which totaled $5.8 billion. (Compl't ¶ 52.)

Plaintiffs also assert that the defendants are responsible for material misstatements and omissions contained in the joint proxy that solicited shareholder approval for BofA's acquisition of Merrill. (Compl't ¶¶ 53-60.) They note that the joint proxy did not disclose the Merrill bonuses or the scope of Merrill's fourth-quarter losses, despite an obligation to do so. (Compl't ¶¶ 57-58.) According to the Complaint, the joint proxy misleadingly stated that Merrill employees would not receive additional compensation that was "not required" by an existing plan or agreement, when, at the same time, defendants had agreed to the accelerated Merrill bonuses. (Compl't ¶ 57.) As further alleged: "BofA's intention was to convince its

shareholders to hold their stock by providing them with false and misleading information and by omitting and failing to disclose material accurate information." (Compl't ¶ 60.)

The procedural context for plaintiffs' Merrill claims is critical to defendants' motion. It is undisputed that the plaintiffs did not follow the court-ordered opt-out procedure for those seeking exclusion from the certified class in the related Consolidated Securities Class Action. At the time that plaintiffs filed this action, this Court had certified a class of shareholder plaintiffs in the related Consolidated Securities Class Action asserting claims directed to BofA's acquisition of Merrill Lynch. In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., 281 F.R.D. 134 (S.D.N.Y. 2012). On March 21, 2012, a Notice of Pendency of Class Action was distributed via first-class mail to 538,696 potential class members. (09 MD 2058, Docket # 539 ¶ 4.) The Notice directed any class member who wished to opt out to request exclusion from the class by May 7, 2012. (09 MD 2058, Docket # 539, Ex. A ¶ 20.) Plaintiffs commenced this action on May 3, 2012. (12 Civ. 5210, Docket # 1.) As discussed in greater detail below, defendants contend that plaintiffs' failure to submit a request to opt out of the class bars them from pursuing claims directed to the Merrill Lynch acquisition. Defendants also assert that the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f), precludes plaintiffs from pursuing their Merrill-based claims because the action was transferred to this Court for coordinated and consolidated pretrial proceedings under the multidistrict litigation statute.

RULE 12(b)(6) AND RULE 9(b) STANDARDS.

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).  Legal conclusions, however, are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

Rule 9(b) governs state-law fraud claims when a federal court exercises diversity jurisdiction.  See, e.g., Stern v. Gen. Elec. Corp., 924 F.2d 472, 476 n.6 (2d Cir. 1991).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b), Fed. R. Civ. P.  To plead a fraudulent misstatement, "the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks and citation omitted).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Rule 9(b), but a plaintiff alleging fraud also must plead facts giving rise to "a strong inference of fraudulent intent."  Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995).  This may be accomplished "by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996).

DISCUSSION.

    I.    <u>Plaintiffs' Claims Directed to the Merrill Acquisition Are Dismissed.</u>

        A.  <u>SLUSA Precludes Plaintiffs' Claims.</u>

Defendants contend that the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f), precludes plaintiffs from pursuing their state-law claims directed to BofA's acquisition of Merrill. As noted, this action was originally filed in state court, was removed to federal court on grounds of complete diversity of citizenship and asserts claims solely on behalf of two natural persons and one limited partnership. The Judicial Panel on Multidistrict Litigation transferred the action to the undersigned "for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." (12 Civ. 5210, Docket # 14.)

Congress adopted SLUSA in 1998 with the goal of precluding plaintiffs from bringing state-law claims that circumvent the heightened pleading standard of the Private Securities Litigation Reform Act (the "PSLRA"). <u>See</u>, <u>e.g.</u>, <u>In re Herald</u>, 730 F.3d 112, 118 (2d Cir. 2013) (reviewing history of SLUSA's adoption). SLUSA "mak[es] federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities" and "mandat[es] that such class actions be governed exclusively by federal law." <u>Lander v. Hartford Life & Annuity Ins. Co.</u>, 251 F.3d 101, 108 (2d Cir. 2001); <u>see also</u> <u>Ring v. AXA Financial, Inc.</u>, 483 F.3d 95, 101 (2d Cir. 2007) ("[T]he purpose of SLUSA is to preclude class action suits based on state law grounds but alleging fraud in the sale of 'covered securities' . . . .").

    SLUSA states in relevant part:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging --
>
> > (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security.

8

15 U.S.C. § 78bb(f)(1).  The statute defines a "covered class action" as including:

> any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which --
>
> > (I) damages are sought on behalf of more than 50 persons; and
> >
> > (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B)(ii).  SLUSA preclusion is evaluated on a claim-by-claim basis.  Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 43-44 (2d Cir. 2005), vacated on other grounds, 547 U.S. 71 (2006).

 Here, the Complaint's Merrill-related allegations are directed toward material misstatements and omissions concerning its acquisition by BofA, and the resulting damage that plaintiffs allegedly suffered as shareholders.  (See, e.g., Compl't ¶¶ 49, 57-67.)  Plaintiffs assert that they purchased more than one million BofA shares between January and November 2008 in reliance on defendants' alleged misstatements and omissions.  (Compl't ¶ 62.)  Plaintiffs' allegations closely parallel those asserted in the Consolidated Securities Class Action Complaint filed in this same MDL.  See, e.g., In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., 757 F. Supp. 2d 260 (S.D.N.Y. 2010).  The related class action consisted of approximately 538,696 members (09 MD 2058, Docket # 539 ¶¶ 3-4), far exceeding the SLUSA threshold of 50.  This action asserts claims based on misrepresentations or omissions in connection with the purchase of a covered security, 15 U.S.C. § 78bb(f)(1)(A).

 Plaintiffs assert that SLUSA should not apply because this case does not fall within the statute's definition of a "covered class action."  15 U.S.C. § 78bb(f)(5)(B)(ii).  While plaintiffs commenced this action on their own behalves, and not as a purported class action,

numerous tribunals have concluded that SLUSA's definition of a "covered class action"

encompasses actions brought solely on a plaintiff's own behalf when, as here, the proceeding is

coordinated for pretrial purposes under the multidistrict litigation statute, 28 U.S.C. § 1407.  For

instance, Judge Kaplan recently concluded that SLUSA precluded a state-law claim that

paralleled related federal securities-law claims, all of which were before him in a pending MDL.

In re Lehman Bros. Sec. & ERISA Litig., 2012 WL 6603321 (S.D.N.Y. Dec. 17, 2012).  In that

action, plaintiff filed claims on its own behalf in the Northern District of California, including

one claim under California state law.  Id. at *1.  Pursuant to 28 U.S.C. § 1407, the Panel on

Multidistrict Litigation transferred the California action to Judge Kaplan for coordinated pretrial

proceedings, which involved "a large number of other[ ]" cases that alleged material

misstatements and omissions relating to defendant's securities offerings.  Id.  Judge Kaplan

concluded that although the action was brought solely on behalf of one plaintiff, it qualified as a

"covered class action" under SLUSA.  Id.  He explained:

> This case is pending in the same court as a large number of others,
> all of which relate to Lehman Brothers and all of which involve
> common questions of law or fact. . . .  These cases collectively
> meet any definition of the word "group."  Although this case is
> brought only on behalf of this plaintiff, damages are sought in
> these cases on behalf of thousands, tens of thousands, or even more
> persons.  The actions are consolidated here for pretrial purposes by
> Pretrial Order No. 1 and the orders of the Judicial Panel on
> Multidistrict Litigation.  Hence, there is no serious question that
> this is a "covered class action" within the plain terms of the
> statutory definition.

Id.  He concluded that "the language of SLUSA is crystal clear," and "clearly" applied to "an

individual case seeking damages on behalf of a single person that is transferred for coordinated

or consolidated pretrial purposes with a class action or multiple individual actions where

damages are sought on behalf of more than 50 persons."  Id.  at *2.  He also noted that SLUSA

was enacted "decades after" Congress adopted the MDL statute, 28 U.S.C. § 1407, and expressly applies to actions that are "joined, consolidated, or otherwise proceed as a single action for any purpose." Id. at *2 (quoting 15 U.S.C. § 77bb(f)(5)(B)(ii)(II)).

Although the Second Circuit has not spoken to whether SLUSA's definition of "covered class action" applies to such claims, Judge Kaplan cited to numerous cases that have so held. Id. at *1 n.6 (collecting cases); see, e.g., Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1347 (11th Cir. 2008) ("bona fide individual action[ ]" bringing a state-law claim directed to securities purchase was a "covered class action" under SLUSA); In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 479 (S.D.N.Y. 2012) (Crotty, J.) ("SLUSA is triggered where a group of actions are formally consolidated for any purpose (discovery, pre-trial, trial, etc.)."); Krys v. Sugrue (In re Refco Inc. Sec. Litig.), 859 F. Supp. 2d 644, 648-49 (S.D.N.Y. 2012) (Rakoff, J.) (coordinated MDL proceedings qualify as "proceeding as a single action" under SLUSA); Amorosa v. Ernst & Young LLP, 682 F. Supp. 2d 351, 374 (S.D.N.Y. 2010) (McMahon, J.) ("courts in this District have not been shy to apply SLUSA to [preclude] state law claims" when individual actions proceed in tandem with actions brought on behalf of 50 or more people); In re WorldCom, Inc. Sec. Litig., 308 F. Supp. 2d 236, 244-47 (S.D.N.Y. 2004) (Cote, J.) (ten individual actions removed from state court and consolidated for pretrial MDL proceedings constituted covered class actions under SLUSA).

This Court is persuaded by the reasoning of Judge Kaplan and the line of authority on which he relies. SLUSA's definition of a "covered class action" is not limited solely to class actions as conceived under Rule 23, Fed. R. Civ. P.  Under SLUSA, a "covered class action" may consist of "any group of lawsuits filed or . . . pending in the same court and involving common questions of law or fact," which seek damages for more than 50 persons and

"proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii) (emphasis added).

As the Second Circuit observed, "SLUSA is broadly worded." In re Herald, 730 F.3d at 118.

Under the text of SLUSA, an action directed to the purchase or sale of a security, filed solely on

behalf of three individual plaintiffs, which is then transferred by the Judicial Panel on

Multidistrict Litigation "for coordinated or consolidated pretrial proceedings pursuant to 28

U.S.C. § 1407" (Docket # 14) falls within "any group of lawsuits" that "proceed[s] as a single

action for any purpose," and therefore constitutes a "covered class action" under SLUSA.

Plaintiffs cite authorities that they claim are to the contrary. They amount to

nothing more than dicta in opinions that, themselves, precluded plaintiffs from pursuing state-

law claims.[1] Plaintiffs also argue that applying the plain meaning of the words of SLUSA

"would lead 'to absurd or futile results.'" (Opp. Mem. at 12 (quoting United States v. Am.

Trucking Ass'ns, 310 U.S. 534, 543 (1940)).) They assert that it is contrary to SLUSA's intent

to preclude claims filed in state court on behalf of individuals, which are then grouped with other

actions only by virtue of an MDL transfer. (Opp. Mem. at 11-12.) However, as discussed by

Judge Kaplan, SLUSA was enacted "decades after Section 1407 was passed and multidistrict

litigation had become a common feature of our legal landscape." In re Lehman Bros. Sec. &

ERISA Litig., 2012 WL 6603321, at *2. Congress could have included a carve-out for actions

commenced in state court or actions that joined a "group of lawsuits" by virtue of MDL transfer,

but it chose not to do so. Id. It remains Congress's prerogative to amend the statute's plain

---

[1] See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 87 (2006) (SLUSA's bar against state securities claims is preclusive rather than preemptive); In re Enron Corp. Sec. Litig., 535 F.3d 325, 339-42 (5th Cir. 2008) (SLUSA precluded plaintiffs' state law securities claims); In re Lehman Bros. Sec. & ERISA Litig., 2012 WL 6603321, at *2 (same); Stichting Pensioenfonds ABP v. Merck & Co., 2012 WL 3235783, at *13-17 (D.N.J. Aug. 1, 2012) (same). In Ventura v. AT&T Corp., 2006 WL 2627979 (S.D.N.Y. Sept. 13, 2006), Judge Stanton declined to preclude certain claims under SLUSA. But there, the apparently related class action had already been dismissed for failure to state a claim. Id. at *1. The court dismissed plaintiff's federal securities law claims and declined to exercise supplemental jurisdiction over the remaining state law claims. Id. at *2. As Judge McMahon noted in Amorosa, 682 F. Supp. 2d at 375, the procedural posture of Ventura's plaintiff and claims was otherwise unclear.

language if it so wishes.  Id. at *3.  The Court declines plaintiffs' invitation to create an MDL-based carve-out for SLUSA.[2]

Because SLUSA precludes plaintiffs' claims directed to BofA's acquisition of Merrill, those claims are dismissed.

### B.  Plaintiffs Did Not Timely Opt Out of the Related Class Action.

Plaintiffs' Merrill-related claims are dismissed for the separate and additional reason that plaintiffs failed to comply with the opt-out procedures required of class members who wished to be excluded from the class action.

On February 6, 2012, this Court certified a class of BofA securities purchasers pursuant to Rule 23, Fed. R. Civ. P., with a class definition that included all persons and entities who purchased shares of BofA common stock between September 18, 2008 and January 21, 2009.  In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., 281 F.R.D. 134 (S.D.N.Y. 2012).  According to plaintiffs, they purchased more than 1 million BofA shares between January and November 2008, including shares purchased in reliance on allegedly misleading statements about Merrill.  (Compl't ¶ 62.)  Thereafter, on March 21, 2012, a Notice of Pendency of Class Action was sent to all 538,696 potential class members, providing a deadline of May 7, 2012 to opt out of the class.  (09 MD 2058, Docket # 539 ¶ 4 & Ex. A ¶ 20.)  The class notice included express and unambiguous instructions for filing an opt-out notice.  (09 MD 2058, Docket # 539 Ex. 1 ¶ 20.)

---

[2] Plaintiffs separately request that, in the event that SLUSA precludes their claims, the Court should stay this action to allow plaintiffs to move for remand pursuant to Rule 10.3 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation.  (Opp. Mem. at 12 n.5.)  In essence, plaintiffs contend that they were sandbagged by defendants' reliance on SLUSA, and that the MDL Panel would not have transferred this action if it had known plaintiffs' claims risked SLUSA preclusion.  (Id.)  Nothing in this Memorandum and Order bars plaintiffs from filing such a motion.  Plaintiffs, however, have not persuasively articulated why such a stay should issue at this point.

On April 8, 2013, this Court entered a Final Order and Judgment in the Consolidated Securities Class Action, which stated that each class member is "deemed to have, and by operation of law . . . fully, finally and forever compromised, settled, released, resolved, relinquished, waived, discharged and dismissed each and every Released Lead Plaintiffs' Claim against the Defendants . . . ." (09 MD 2058, Docket # 871 ¶ 7(a).) "Released Lead Plaintiffs' Claims" included "any and all claims and causes of action of every nature and description," including those based on state law, that were directed toward the purchase of BofA stock during the class period and asserted claims based on the Merrill acquisition. (09 MD 2058, Docket # 767-1, at 22-23.) The class notice expressly stated that failure to submit an opt-out request would bind a class member to "all past, present and future orders and judgments" in the class action. (09 MD 2058, Docket # 539 Ex. A ¶ 18(a).)

As discussed, plaintiffs' Merrill-based claims assert that they purchased BofA shares in reliance on alleged misstatements and omissions concerning Merrill's financial strength, including its fourth-quarter losses and the non-disclosure of employee bonuses. (Compl't ¶¶ 44-60.) These claims directly overlap with those in the Consolidated Securities Class Action.

There is no dispute that plaintiffs failed to seek exclusion from the class using the procedures directed in the class notice. They are not named in the list of excluded class members that was filed with the Court. (09 MD 2058, Docket # 871 Ex. 1.) However, plaintiffs commenced this action on May 3, 2012, four days before the opt-out deadline expired. (Docket # 1.) Plaintiffs contend that the commencement of the present action was sufficient to provide notice of their desire to opt out of the class. (Opp. Mem. at 8.)

"Absent a violation of due process or excusable neglect for failure to timely opt out, a class-action settlement agreement binds all class members who did not do so." In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 129 (2d Cir. 2011). "It is well-established that 'pendency of an individual action does not excuse a class member from filing a valid request for exclusion.'" In re Prudential Secs. Inc. Ltd. P'ships Litig., 164 F.R.D. 362, 370 (S.D.N.Y. 1996) (Pollack, J.) (collecting cases) (quoting Berman v. L.A. Gear, Inc., 1993 WL 437733 at 5 n.1 (S.D.N.Y. Oct. 26, 1993) (Sand, J.)); accord In re Auction Houses, 2004 WL 2624896, at *6 (S.D.N.Y. Nov. 18, 2004 (Ellis, M.J.); 5 Newberg on Class Actions § 16:15 (4th ed. 2013) (quoting In re Prudential).

In a prior Memorandum and Order, this Court concluded that a group of plaintiffs was barred from pursuing their individual action when they failed to timely file a notice of intent to opt out of the class. See KERS & Co. v. Bank of Am. Corp. (In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.), 2013 WL 2443748 (S.D.N.Y. June 5, 2013). Those plaintiffs had commenced an action bringing claims directed to the Merrill acquisition. Id. at *1. They failed to submit a timely opt-out request, as the class notice expressly required. Id. As the Court noted, "'without a firm opt-out date, litigants could wait to see if the class action resulted in a more favorable than anticipated resolution before choosing whether to continue with their own litigation.'" Id. at *7 (quoting In re WorldCom, Inc. Sec. Litig., 2005 WL 1048073, at *3 (S.D.N.Y. May 5, 2005) (Cote, J.)).

Plaintiffs do not dispute that they received the class notice or assert that the class notice did not include explicit instructions as to its opt-out procedure. The class notice stated in part: "If you wish to be excluded from the Class, you must specifically request exclusion in accordance with the following procedures." (09 MD 2058, Docket # 539 Ex. A ¶ 20.) It

required opt-out plaintiffs to mail identifying information to the claims administrator.  (Id.)  It stated that class members could not request exclusion by alternative communications, such as telephone or e-mail.  (Id.)

Plaintiffs offer no explanation as to why they did not submit an opt-out request consistent with the procedures set forth in the class notice, while also electing to pursue claims that are expressly barred by the Judgment in this case.  (09 MD 2058, Docket # 767-1, at 22-23 (defining "Released Lead Plaintiffs' Claims").)  Permitting plaintiffs' claims to carve out an alternative opt-out procedure would encourage wait-and-see gamesmanship and introduce uncertainty in the class settlement process.

Therefore, in addition to SLUSA's preclusion of plaintiffs' Merrill-based claims, those same claims are separately dismissed due to plaintiffs' failure to comply with the express and unambiguous opt-out procedures set forth in the class notice.

II.     Counts I and III, Which Assert Claims as Holders, Are Dismissed.

Plaintiffs move to dismiss Counts I and III of the Complaint, which "assert common law claims relating to plaintiffs' decision to hold [BofA] stock" against all defendants. (Compl't at 18; emphasis omitted.)  Count I asserts that defendants fraudulently misrepresented BofA's true condition, thereby inducing plaintiffs to retain their BofA shares.  (Compl't ¶¶ 69, 71-72.)  Plaintiffs assert that they would have sold all shares had they known BofA's "true financial condition."  (Compl't ¶ 72.)  They allege that they "suffered significant damages" from their "failure to sell their BofA stock before the collapse of prices . . . ."  (Compl't ¶ 74.)  Count III asserts negligent representation, and alleges that defendants made representations that they knew or should have known to be false.  (Compl't ¶¶ 82-83.)  Plaintiffs state that they relied on

defendants' misstatements, which induced them to retain their shares rather than sell them all "before the price of BofA's stock collapsed." (Compl't ¶¶ 85-87.)

    A. <u>Florida Law Governs Plaintiffs' Claims</u>.

    As an initial matter, the parties dispute whether plaintiffs' claims are governed by the law of North Carolina or the law of Florida. Because this action was commenced in Florida, Florida's choice-of-law rules govern. <u>See</u>, <u>e.g.</u>, <u>Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.</u>, 87 F.3d 604, 607 (2d Cir. 1996) ("'a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed.'") (quoting <u>Menowitz v. Brown</u>, 991 F.2d 36, 40 (2d Cir. 1993)).

    When making choice-of-law determinations for tort claims, Florida has "abandoned the rule that the applicable substantive law is the law of the state where the injury occurred – <u>i.e.</u>, lex loci delecti – in favor of a flexible test to determine which state has the most significant relationships to the cause of action." <u>State Farm Mut. Auto Ins. Co. v. Roach</u>, 945 So.2d 1160, 1163 (Fla. 2006) (collecting cases); <u>see also</u> <u>Bishop v. Florida Specialty Paint Co.</u>, 389 So.2d 999, 1001 (Fla. 1980) (adopting "substantial relationships test" for tort claims). In making such an analysis, the Florida Supreme Court relies on the factors outlined in the Restatement (Second) of Conflict of Laws § 145 (1971). <u>See</u>, <u>e.g.</u>, <u>Bishop</u>, 389 So.2d at 1001; <u>Celotex Corp. v. Meehan</u>, 523 So.2d 141, 144 (Fla. 1988). The Restatement states that the contacts "taken into account" include: "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" <u>Celotex</u>, 523 So.2d at 144 (quoting Restatement (Second) of Conflict of Laws § 145(2)). Even under this approach, "[t]he state where the injury occurred

would, under most circumstances, be the decisive consideration in determining the applicable choice of law," but courts are to use "a less mechanical, and more rational, process," and apply the law of the state with the most "actual significance for the cause of action." Bishop, 389 So.2d at 1001.

In addition to Section 145, federal courts undertaking a Florida choice-of-law analysis have also relied on Section 148 of the Restatement (Second) of Conflict of Laws, which governs claims of fraud and misrepresentation. See Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115-16, 1118 (11th Cir. 1996) (relying on sections 145 and 148 of the Restatement for Florida choice-of-law analysis); Walewski v. ZeniMax Media, Inc., 2012 WL 834125, at *7 (M.D. Fla. Jan. 30, 2012) ("Section 148 of the Restatement provides the choice of law principles for fraud and misrepresentation, and Florida would apply this section."). Under Section 148, a choice-of-law analysis for a fraud claim weighs "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." Restatement (Second) of Conflict of Laws § 148(2). Although the Florida state courts have not themselves cited to Section 148, both sides urge that it applies. Section 148 of the Restatement is consistent with and complements the text of Section 145. As a federal court sitting in diversity, this Court predicts that the Florida Supreme Court would look to Section 148 for guidance in a choice of law analysis for a fraud claim. See, e.g., Travelers Ins. Co. v. Carpenter,

411 F.3d 323, 329 (2d Cir. 2005) (federal court sitting in diversity should predict ruling of relevant state's highest court).

In considering the factors listed in Section 145, Florida is "the place where the injury occurred." Restatement (Second) of Conflict of Laws § 145(2)(a). This consideration weighs strongly in favor of applying Florida law. Bishop, 389 So.2d at 1001. Plaintiffs also are Florida citizens who purchased their BofA shares through a Florida brokerage and received the alleged misrepresentations in Florida. (Compl't ¶ 4-5; Gunnell Dec. Ex. D.) These considerations weigh in favor of applying Florida law under subsections (a) and (b) of Section 148(2). Defendants assert that "all" of the alleged misstatements were made in North Carolina. (Def. Mem. at 11, citing Compl't ¶¶ 7-8, 33-34, 35.) However, these statements were disseminated nationally through SEC filings and other public statements; they were not limited to an intrastate transaction or a communication that occurred solely within North Carolina. As North Carolina was the originating state of the communications, Section 148(2)(c) weighs somewhat in favor of applying North Carolina law. Section 148(2)(d) does not favor either state: BofA is incorporated in Delaware with its principal place of business in North Carolina; it maintains branches throughout Florida; and plaintiffs are citizens of Florida. Subsections (e) and (f) are not, on their face, applicable to plaintiffs' claims.

Weighing the factors outlined in Sections 145 and 148, and mindful that Florida applies "the law of the state having the most significant relationship to the occurrence and the parties," Bates v. Cook, Inc., 509 So.2d 1112, 1114 (Fla. 1987), the Court concludes that Florida law governs plaintiffs' claims. Plaintiffs incurred their alleged injuries in Florida, the underlying stock purchases were made in Florida, plaintiffs are Florida citizens, defendants have a significant business presence in Florida and the action was originally filed in Florida state courts.

North Carolina's interests include its role as the location of BofA's principal place of business, Lewis's state of citizenship and the originating locus of the alleged misleading statements and omissions. While North Carolina's interests have some weight, Florida has a substantially more significant relationship to the causes of action. Its law therefore governs.

Applying Florida law is consistent with the conclusions of other courts that have made choice-of-law determinations on similar claims. See, e.g., Walewski, 2012 WL 834125, at *8 (applying Florida law when misrepresentations from national corporation were made nationwide, plaintiff was a Florida citizen, purchased product in Florida and was injured in Florida); Valentino v. Bond, 2008 WL 3889603, at *9 (N.D. Fla. Aug. 19, 2008) (applying Florida law when Florida plaintiff acted in Florida based on representations made in the UK); Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1365-66 (S.D. Fla. 2007) (applying Florida law when misrepresentations were received in Florida, transactions occurred in Florida and alleged misrepresentations issued from defendant's New Jersey headquarters).

Because Florida has a greater interest in this action than North Carolina, Florida law governs plaintiffs' claims.

### B.  Assuming that Florida Law Would Recognize Common-Law Claims Brought by a Holder, Plaintiffs Have Not Adequately Alleged Reliance.

Plaintiffs contend that Florida law recognizes so-called "holder" claims, in which a plaintiff asserts that it was induced to retain shares through material misstatements and omissions. While one federal district court observed that such claims are viable under Florida law, it did so without citing Florida authority, and ultimately dismissed plaintiffs' claims for failing to allege reliance. See Rogers v. Cisco Systems, Inc., 268 F. Supp. 2d 1305, 1312 n.13 (N.D. Fla. 2003) (in contrast to state and federal securities statutes, Florida's common law permits plaintiffs to bring claims of fraud and negligent misrepresentation based on

"representations intended to induce a stockholder to retain their securities."). Another federal court more recently observed that "Florida law is unclear as to whether a plaintiff can sustain such a claim." Pafumi v. Davidson, 2007 WL 1729969, at *3 (S.D. Fla. June 14, 2007); accord Bruhl v. Controy, 2007 WL 983228, at *9 (S.D. Fla. Mar. 27, 2007) ("There is no definitive determination regarding the viability of a holding claim under Florida common law."). This Court is unable to find any Florida authorities that rely on Rogers. Cf. Hunt v. Enzo Biochem, 471 F. Supp. 2d 390, 411 n.133 (S.D.N.Y. 2006) (Scheindlin, J.) ("Rogers has not been cited in any other Florida case.").

Plaintiffs argue that this Court should adopt the conclusion of Rogers. They contend that Florida law would recognize holder claims as an extension of precedent that permits fraud claims based on a defendant's inducement of a plaintiff to refrain from taking certain action. See, e.g., Ward v. Atlantic Sec. Bank, 777 So.2d 1144, 1145-46 (Fla. Dist. Ct. App. 2001) (plaintiff had viable fraud claim when defendant knowingly induced him to retain investments in failing fund); Hollywood Lakes Country Club v. Community Ass'n Servs., Inc., 770 So.2d 716, 718 (Fla. Dist. Ct. App. 2000) (misstatements that prompted plaintiff "to refrain from independently acting to collect assessments" were sufficient to state a claim of fraud); Chino Elec., Inc. v. U.S. Fidelity & Guar. Co., 578 So.2d 320 (Fla. Dist. Ct. App. 1991) (plaintiff adequately alleged fraud when it failed to take legal action based on defendant's alleged misrepresentations about terms of a bond); see also AHW Inv. P'ship v. Citigroup Inc., __ F. Supp. 2d __, 2013 WL 5827643, at *5-6 (S.D.N.Y. Oct. 30, 2013) (Stein, J.) (predicting that Florida would recognize holder claims).

Assuming arguendo that Florida common law would recognize a fraud claim based on a plaintiff's decision to hold shares – a proposition that is far from clear – the

Complaint nevertheless fails to allege fraud or negligent representation with the particularity required of Rule 9(b).[3]  In dismissing plaintiffs' holder-based claims under Florida law, Pafumi observed that "Rule 9(b) is particularly significant where a plaintiff claims that a defendant's fraudulent misrepresentation or omission induced the plaintiff not to act."  2007 WL 1729969, at *3.  A plaintiff bringing such a claim "must specifically identify what she would have done had the misrepresentation or omission not occurred."  Id.  Reviewing authorities that have recognized holder claims, Pafumi stated that a plaintiff "must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status, the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place."  Id. (quotation marks omitted) (citing Rogers, 268 F. Supp. 2d at 1312-13; Small v. Fritz Co., 65 P.3d 1255, 1265 (Cal. 2003)).

Pafumi's reasoning is consistent with other courts that have required plaintiffs to plead heightened detail for holder claims.  See In re WorldCom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 320 (S.D.N.Y. 2004) (Cote, J.) ("The few courts that have recognized common law 'holder' class action claims impose heightened pleading standards on plaintiffs and require them to allege specific reliance on the alleged misrepresentations by defendants."); Bruhl, 2007 WL 983228, at *9 (Rule 9(b) requires a plaintiff pursuing a holder claim to allege "that, if the material information had been disclosed, he would have sold the shares, the amount of shares he would have sold, and when he would have sold them in relation to the time the material information should have been disclosed.").  Rogers ultimately concluded that plaintiffs failed to allege fraud because the allegation that they would have sold their shares if they had known the company's

---

[3] "Negligent misrepresentation is a type of fraud and, as such, is subject to Rule 9(b)'s heightened pleading standard." Koch v. Pechota, 2013 WL 4834131, at *2 (S.D.N.Y. Sept. 9, 2013) (Sweet, J.) (quotation marks omitted); accord BNP Paribas Mortg. Corp. v Bank of America, N.A., __ F. Supp. 2d __, 2013 WL 2452169, at *14 (S.D.N.Y. June 6, 2013) (Sweet, J.) (collecting cases).

true condition was "too vague to satisfy reliance requirement for a holding claim," and that a plaintiff "must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied upon the misrepresentations." 268 F. Supp. 2d at 1313-14.

Assuming arguendo that Florida would recognize plaintiffs' holder claims, the plaintiffs nevertheless fail to allege reliance on the purported misstatements or omissions.  The Complaint asserts that plaintiffs "relied on" defendants' statements when they decided to hold their BofA shares.  (Compl't ¶¶ 62-64.)  The Complaint states:  "Had the BofA Defendants informed Plaintiffs of the whole truth as it [sic] was required to do, Plaintiffs . . . would have sold all of their BofA shares after reading or becoming aware of the true and accurate condition of the Company's financial condition."  (Compl't ¶ 65.)  "As a result of their failure to sell their BofA stock before the collapse of prices caused by the compounding of false reports, Plaintiffs suffered over ten million dollars in damages."  (Compl't ¶ 66.)

These assertions do not allege reliance on any purported misstatements or omissions, and are instead the broad allegations that other courts have rejected as insufficient to support holder claims.  They contain no details as to when plaintiffs would have sold their shares, how many shares they would have sold and any "actions, as distinguished from unspoken and unrecorded thoughts and decisions" that reflected an intent to sell their shares.  Pafumi, 2007 WL 1729969, at *3; Rogers, 268 F. Supp. 2d at 1314.

This failure to allege reliance is particularly notable here, where plaintiffs allege misstatements and omissions covering four separate areas of alleged wrongdoing, which extended from sometime in 2007 through the receipt of federal financial support in 2009. Plaintiffs allegedly purchased approximately 1,000,000 BofA shares between January and

November 2008.  (Compl't ¶ 62.)  Their allegations concerning BofA's RMBS practices, the

Countrywide acquisition, the Merrill acquisition and the receipt of federal financial support all

involve separate and discrete time periods and areas of purported misconduct, some of which

predate their share purchases.  The Complaint makes no attempt to allege at what point plaintiffs

would have sold their BofA shares.  There is no coherent or detailed allegation of reliance, but

only a generalized averment that plaintiffs would have sold all BofA shares at an unspecified

point in time if defendants had not misstated or omitted material information about the company.

(Compl't ¶¶ 63-66.)  This is insufficient to allege reliance.

       Because the Complaint fails to allege reliance as to plaintiffs' holder claims,

Counts I and III are dismissed.

      III.    The Complaint Does Not Adequately Allege Fraud or Negligent
              <u>Misrepresentation as to Plaintiffs' Purchaser Claims.</u>

       Counts IV and VI of the Complaint assert that plaintiffs purchased BofA shares in

reliance on defendants' alleged material misstatements and omissions concerning BofA.

(Compl't ¶¶ 90-98, 104-11.)  Count IV asserts fraud and Count VI asserts negligent

misrepresentation.  (<u>Id.</u>)  For the reasons explained, the Complaint fails to allege fraud or

negligent misrepresentation consistent Rule 9(b) and Florida law.[4]

       Under Florida law, "[t]he elements of fraud are: (1) a false statement concerning a

specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention

that the representation induces another's reliance; and (4) consequent injury by the other party

acting in reliance on the representation." <u>Rhodes v. O. Turner & Co., LLC</u>, 117 So.3d 872, 876

(Fla. Dist. Ct. App. 2013).  A plaintiff's reliance on the misrepresentation must be justifiable.

---

[4] For the reasons previously discussed, plaintiffs' claims related to the Merrill acquisition are dismissed due to
SLUSA preclusion and plaintiffs' failure to submit a request for exclusion from the class.  Defendants therefore do
not move to dismiss plaintiffs' Merrill-related claims for failure to plead fraud consistent with Rule 9(b) and Florida
law.  (Def. Mem. at 16.)

Specialty Marine & Indus. Supplies, Inc. v. Venus, 66 So.3d 306, 310 (Fla Dist. Ct. App. 2011). The elements of a negligent misrepresentation claim are identical, except that a plaintiff need not allege or prove justifiable reliance. Id. Thus, in a negligent misrepresentation claim, "'a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had [the recipient] made an investigation, unless [the recipient] knows the representation to be false or its falsity is obvious.'" Id. (alterations in original) (quoting Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334, 336 (Fla. 1997)).

As noted, Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Anschutz, 690 F.3d at 108.

Excepting plaintiffs' Merrill allegations, which are not subject to this aspect of defendants' motion, the Complaint does not allege fraudulent statements with particularity. Each of plaintiffs' allegations are addressed below.

BofA's RMBS Practices. In asserting that defendants failed to disclose the nature or extent of BofA's RMBS practices, plaintiffs contend that BofA "promulgated and publicly disclosed internal underwriting guidelines," but cites no language from those guidelines and offers no examples where it "failed to adhere to its own underwriting standards . . . ." (Compl't ¶¶ 19-20.) They assert that defendants knew that their RMBS practices deviated from internal standards and that BofA directed outside firms to ignore red flags, but make no allegations of defendants' states of mind or offer examples of such instructions. (Compl't ¶ 22.) Plaintiffs assert that BofA misrepresented the value of its RMBS holdings, but do not identify the misrepresentations or the SEC filings alluded to in the Complaint. (Compl't ¶ 24.) It also does

not identify which statements were rendered allegedly misleading by BofA's purported failure to reserve against future losses.  (Compl't ¶¶ 25-27.)

By failing to identify allegedly fraudulent statements, identify their speakers, state when or where the statements were made or plausibly alleging why the statements were fraudulent, plaintiffs' fraud and negligent representation claims directed to BofA's RMBS practices do not satisfy Rule 9(b).  See Anschutz, 690 F.3d at 108.

Counts IV and VI are dismissed to the extent that they implicate defendants' RMBS practices.

Federal Financial Support.  The Complaint alleges that defendants concealed tens of billions of dollars in emergency financing from the United States government.  (Compl't ¶ 30.)  It identifies several programs that allegedly benefited BofA: the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility, the Commercial Paper Funding Facility, the Primary Dealer Credit Facility, the Fed's Single-Tranche Open Market Operations, the Term Securities Lending Facility and the Term Auction Facility.  (Compl't ¶ 31.)

Plaintiffs assert that BofA's participation in these federal financial programs contradicted Lewis's representations about BofA's financial strength.  (Compl't ¶¶ 33-34, 36.) Plaintiffs identify an April 21, 2008 statement in which Lewis said that BofA was "in a strong position to withstand jolts to the system and emerge even stronger when conditions improve," a September 15, 2008 statement in which he said that "[m]any strong companies have fallen victim to this environment, while others have capitalized on opportunities as they have presented themselves," and a statement in which Lewis described federal financial support for the Merrill acquisition as "funds that [BofA] did not need and did not seek."  (Compl't ¶¶ 33-34, 36.)

In an attempt to identify misleading statements, the plaintiffs have cited broad generalities that reflect Lewis's subjective opinions, and not representations of fact that could be construed to allege fraud with particularity.  Lewis offered subjective, generalized, opinion-based assessments when he stated that BofA was "in a strong position" and was seeking out "opportunities" in the midst of an economic crisis.  (Compl't ¶¶ 33-34.)  In addition, Lewis's statement about BofA's receipt of funds did not implicate the programs cited in the Complaint.  (Compl't ¶ 36.)  It was instead directed to "a capital injection" that BofA received from the federal government "in connection with its acquisition of Merrill," and not BofA's participation in the various credit facilities cited in the Complaint.  (Compl't ¶ 36.)  Plaintiff's contention that the Court is obligated to impute this assertion to the array of credit facilities recited in the Complaint (see Opp. Mem. at 23 n.17) is inconsistent with Rule 8 and Rule 9(b).

Under Florida law, a statement of opinion "cannot support a cause of action for fraud."  Thompson v. Bank of New York, 862 So.2d 768, 770 (Fla. Dist. Ct. App. 2003) (collecting cases).  A "'false statement of fact, to be a ground for fraud, must be of a past or existing fact,'" and "statements of opinions or promises of future action" are generally inactionable.  Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc., 79 So.3d 855, 862 (Fla Dist. Ct. App. 2012) (quoting Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla Dist. Ct. App. 2005)).  Similarly, a negligent misrepresentation claim may not be premised on the purported falsehood of an opinion.  See, e.g., H & S Corp. v. U.S. Fidelity & Guar. Co., 667 So.2d 393, 396-97 (Fla. Dist. Ct. App. 1995).  In certain circumstances, however, Florida recognizes a fraud claim if an opinion or a prediction is so definitive, or the position of the parties is so unequal, that the statement amounts to a misrepresentation of existing fact.  See,

e.g., Tres-AAA-Exxon v. City First Mortg., Inc., 870 So.2d 905, 907-08 (Fla. Dist. Ct. App. 2004).

Because the allegedly misleading statements cited by plaintiffs consist of non-actionable opinions and a remark that is unrelated to the programs cited by plaintiffs, Counts IV and VI are dismissed to the extent that they implicate BofA's access to federal credit facilities.

BofA's Acquisition of Countrywide.  Plaintiffs allege that on a July 21, 2008 conference call, "Defendant Price" announced better-than-expected quarterly earnings, and stated, "We think the worst is behind us on value declines, as evidence in our results for the quarter."[5]  (Compl't ¶ 39.)  According to the Complaint, BofA "repeatedly assured" shareholders that the company had reduced its exposure to subprime mortgages.  (Compl't ¶ 40.)  Plaintiffs assert that, in reality, the Countrywide acquisition exposed BofA to $30 billion in loan losses, with BofA incapable of withstanding the subsequent deterioration of the subprime loan market. (Compl't ¶¶ 40-43.)

Aside from the single remark by Price, the Complaint cites no statements that they contend support a claim for fraud or negligent misrepresentation.  Price's statement was qualified to the extent that he said that BofA executives "think the worst is behind us."  (Compl't ¶ 39.) This remark was an opinion as to the company's future performance in light of the just-released earnings statements.  In addition, it was phrased in a broad manner, with no apparent reference to the portfolio of assets acquired through the Countrywide transaction.  The remark is not sufficient to allege fraud or negligent misrepresentation under Florida law, see Eagletech, 79 So.3d at 862, and H&S Corp., 667 So.2d at 396-97, or to plead fraud with the particularity required by Rule 9(b).

---

[5] Although a defendant in other actions that were consolidated as part of this MDL, Joe L. Price, who was BofA's chief financial officer, is not named as a defendant in plaintiffs' Complaint.  The Complaint's single reference to him as a defendant is apparently in error.

Counts IV and VI are dismissed to the extent that they bring claims directed to the Countrywide acquisition.

IV.     The Complaint Does Not Plausibly Allege a Breach of Fiduciary Duty.

Counts II and V assert breach of fiduciary duty claims, asserting that defendants owed BofA shareholders a fiduciary duty, which they breached by omitting and misrepresenting material information related to BofA.  (Compl't ¶¶ 76-80, 99-103.)  Because plaintiffs' Merrill-related claims are dismissed for the previously discussed reasons, this motion addresses the breach of fiduciary duty claims solely as they are directed toward BofA's RMBS practices, the Countrywide acquisition and its involvement with certain federal financing programs.

When a claim is directed toward the "organization or internal affairs" of a corporation, including a claim for breach of fiduciary duty, Florida courts apply the law of the state of incorporation.  See Fla. Stat. § 607.1505(3) (Florida may not regulate internal affairs of a foreign corporation doing business in Florida); Banco Industrial De Venezuela C.A., Miami Agency v. De Saad, 68 So.3d 895, 898 (Fla. 2011); Mukamai v. Bakes, 378 Fed. Appx. 890, 897 (11th Cir. 2010) (unpublished opinion) (Florida applies Delaware law to breach of fiduciary duty claim against Delaware corporation).

Under Delaware law, a corporation does not owe a fiduciary duty to its shareholders.  See, e.g., Alessi v. Beracha, 849 A.2d 939, 950 (Del. Ch. 2004) (corporation does not owe a fiduciary duty to its shareholders); In re Dataproducts Corp. S'holders Litig., 1991 WL 165301, at *6 (Del. Ch. Aug. 22, 1991) ("a corporation qua corporate entity is not a fiduciary of, and thus cannot owe a fiduciary duty to, its shareholders.").  Plaintiffs' breach of fiduciary duty claims against BofA are therefore dismissed.

As to plaintiff's breach of fiduciary duty claim against Lewis, under Delaware law, to plead such a claim directly, as opposed to derivatively, a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. Ch. 2004). "To state a direct claim, the shareholder must allege . . . an injury that is different from what is suffered by other shareholders . . . ." Manzo v. Rite Aid Corp., 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002). Manzo concluded that a plaintiff could not pursue a direct claim that he was "deprived of accurate information upon which to base investment decisions," because any resulting injury was "suffered by all . . . shareholders in proportion to their pro rata share ownership. This would state a derivative claim." Id. Here, plaintiffs have identified no injury that would permit them to pursue a direct claim under Delaware law. Plaintiffs' holder claim asserts that they retained their shares based on defendants' purported breaches of fiduciary duty, and their purchaser claim asserts that they bought stock at a price that did not reflect BofA's true condition. (Compl't ¶¶ 79, 102.) These claims assert injuries that would have affected all BofA shareholders on a pro rata basis, and not the plaintiffs specifically. The plaintiffs therefore fail to allege that Lewis breached a fiduciary duty to shareholders. Manzo, 2002 WL 31926606, at *5.

Even if the Complaint asserted a direct injury, these claims would be dismissed as to Lewis due to plaintiffs' failure to allege bad faith. As this Court has discussed elsewhere, BofA's certificate of incorporation "exculpates its directors from personal liability to the corporation, except in cases of disloyalty and other exceptions not relevant here, '[t]o the fullest extent permitted' under Delaware law." Waber v. Lewis (In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.), 2013 WL 1777766, at *12 (S.D.N.Y. Apr. 25, 2013); see also 8 Del.

C. § 102(b)(7); Musoff Dec. Ex. C (BofA certificate of incorporation).  To plausibly allege that Lewis violated his duty of loyalty, plaintiffs therefore must plead facts that "support the inference that the disclosure violation was made in bad faith, knowingly or intentionally."  In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 132 (Del. Ch. 2009) (quotation marks omitted).

For many of the reasons previously discussed, the Complaint fails to allege bad faith as to Lewis.  Its allegations concerning RMBS practices and the Countrywide acquisition do not even mention Lewis by name.  (Compl't ¶¶ 15-29, 38-43.)  Lewis's statements concerning the strength of BofA's position were broad, opinion-based and non-actionable.  (Compl't ¶¶ 33-34, 36.)  Plaintiffs' other allegations concerning Lewis's intentions are conclusory.  (Compl't ¶¶ 10 (asserting unspecified "false and misleading statements" and "schemes to defraud"), 12-14 (asserting unspecified intentional misrepresentations).)  These allegations do not plausibly allege a bad faith, knowing or intentional disclosure violation.  In re Citigroup, 964 A.2d at 132.

Plaintiffs' breach of fiduciary duty claims are therefore dismissed.

LEAVE TO AMEND IS DENIED

In a footnote to their opposition brief, plaintiffs request that, "[i]n the event the Court concludes Plaintiffs have not pleaded their holder claims sufficiently under Florida law, the Court should provide plaintiffs with an opportunity to amend the Complaint."  (Opp. Mem. at 18 n.12.)  In the face of defendants' motion, plaintiffs have not identified what additional facts they would allege to cure the deficiencies asserted by defendants.  On the present record, the request is denied.

CONCLUSION

        For the reasons explained, the defendants' motion to dismiss is GRANTED.  (12

Civ. 5210, Docket # 56.)  Plaintiffs' alternative request for a stay pending a motion to remand is

DENIED.  The Clerk is directed to terminate the motion.

        SO ORDERED.

                                                           P. Kevin Castel
                                      United States District Judge

Dated:      New York, New York
             December 11, 2013